## PARTICIPATION AGREEMENT

<div style="border:1px solid black; display:inline-block;">**EXHIBIT A**</div>

### Castleberry Prospect
### Conecuh County, Alabama

**THIS PARTICIPATION AGREEMENT** (the "**Agreement**"), dated effective as of the 7th day of November, 2012 (the "**Effective Date**"), is entered into by and between the following (sometimes herein referred to singularly as a "**Party**" or collectively as the "**Parties**"):

**SKLAR EXPLORATION COMPANY L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President & Chief Operating Officer, David A. Barlow ("SEC" or "**Operator**");

**SKLARCO L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President & Chief Operating Officer, David A. Barlow ("Sklarco");

**MCCOMBS ENERGY, LTD.**, a Texas limited partnership, whose address is 5599 San Felipe, Suite 1200, Houston, Texas 77056-2794, represented herein by its Vice President, Ricky Haikin ("McCombs");

**THE RUDMAN PARTNERSHIP**, a Texas general partnership, whose address is 1700 Pacific Avenue, Suite 4700, Dallas, TX 75201, represented herein by W.R. (Trey) Sibley, III, as the duly authorized Attorney-In-Fact of said partnership ("Rudman");

**TARA RUDMAN**, Individually, whose address is 1700 Pacific Avenue, Suite 4700, Dallas, TX 75201 ("Tara Rudman");

**JJS WORKING INTERESTS LLC**, a Texas limited liability company, whose address is 4295 San Felipe, Suite 207, Houston, Texas 77027, represented herein by Houston Bulldog Capital Management, LLC, its duly authorized Manager, represented herein by Justin Simons, in his capacity as the duly authorized Manager of Houston Bulldog Capital Management, LLC ("JJS");

**FANT ENERGY LIMITED**, a Texas limited partnership, whose address is 5800 Westview Drive, Houston, Texas 77055, represented herein by its General Partner, Richard E. Fant L.L.C., which itself is represented herein by its Manager, Phil O. Kelley ("Fant");

**PICKENS FINANCIAL GROUP, L.L.C.**, a Texas limited liability company, whose address is 8499 Greenville Avenue, Suite 105, Dallas, TX 75231-2417, represented herein by Michael K. Pickens, as the duly authorized Vice President of said company ("Pickens");

**FLEET HOWELL**, 416 Travis Street, Suite 715, Shreveport, Louisiana 71101 ("Howell");

**TAUBER EXPLORATION & PRODUCTION CO.**, a Texas corporation, whose address is 55 Waugh Drive, Suite 600, Houston TX 77007, represented herein by Richard E. Tauber, as the duly authorized President of said company ("Tauber");

**TIEMBO, LTD.**, a Texas limited partnership, whose address is P. O. Box 270415, Houston, Texas 77277-0415, represented herein by its Registered Agent, Mark Rauch ("Tiembo");

**KUDZU OIL PROPERTIES, LLC**, a Mississippi limited liability company, whose address is 300 Concourse Blvd., Suite 101, Ridgeland, Mississippi 39157, represented herein by its Executive Vice President, R. Nash Neyland ("Kudzu");

**MARKSCO, L.L.C.,** a Louisiana limited liability company, whose address
is 333 Texas Street, Suite 1050, Shreveport, Louisiana 71101,
represented herein by its Member, Mark P. Sealy ("Marksco");

**LANDMARK EXPLORATION, LLC,** a Mississippi limited liability
company, whose address is Post Office Box 12004, Jackson, MS
39236, represented herein by Larry Johnson, as the duly authorized
Manager/Member of said company ("Landmark");

**CRAFT EXPLORATION COMPANY, LLC,** a Mississippi limited
liability company, whose address is 325 Lakeshire Parkway,
Canton, MS 39046, represented herein by Steven H. Craft, as the
duly authorized Manager/Member of said company ("Craft")

**DICKSON OIL & GAS, LLC,** a Louisiana limited liability company,
whose address is Post Office Box 52479, Shreveport, Louisiana
71135, represented herein by its Manager, C. Bickham Dickson III
("Dickson");

**BUNDERO INVESTMENT COMPANY, L.L.C.,** a Louisiana limited
liability company, whose address is 333 Texas Street, Suite 300,
Shreveport, Louisiana 71101, represented herein by its Manager,
Robert P. Bowman ("Bundero"); and

**RESOURCE VENTURES, LLC,** an Indiana limited liability company,
whose address is 8369 South Park Lane, Suite B, Littleton, CO
80120, represented herein by Mark A. Arnold, as the duly
authorized General Manager of said company ("Resource");

(hereinafter Sklarco, McCombs, Rudman, Tara Rudman, JJS, Fant,
Pickens, Howell, Tauber, Tiembo, Kudzu, Marksco, Landmark,
Craft, Dickson, Bundero and Resource are sometimes referred to
collectively as the "**Sklar Participants**" or individually as a "Sklar
Participant");

a n d

**ASPEN ENERGY, INC.,** a Kentucky corporation, whose address is 161
St. Matthews Ave., Suite 16, Louisville, Kentucky 40207,
represented herein by its President, Michael S. Reed ("Aspen");
and

**SEPULGA RIVER FUELS, LLC,** an Alabama limited liability
company, whose address is 15 Ridgers Lane, Brewton, Alabama
36426, represented herein by its Sole Member, Cosby H. Martin,
Jr. ("Sepulga");

(hereinafter Aspen and Sepulga are sometimes referred to
collectively as the "**Aspen Participants**" or individually as an
"Aspen Participant");

(hereinafter the Sklar Participants and the Aspen Participants are sometimes
referred to collectively as the "**Participants**" or individually as a
"Participant");

## W I T N E S S E T H:

**WHEREAS,** Aspen owns the oil, gas and other mineral leases (hereinafter sometimes
referred singularly as a "Lease" or collectively as the "**Leases**") described on Exhibit "A-1," attached hereto
and made a part hereof, covering approximately 1,572.6843 net mineral acres located in Conecuh County,
Alabama, lying within a contract area (the "**Contract Area**") outlined in black on the plat attached hereto as
Exhibit "A," which itself lies within an area of mutual interest (the "**AMI**") outlined in red on said plat,
generally known (and hereinafter referred to) as the "**Castleberry Prospect**", said Contract Area and AMI
covering lands located in Section 36, Township 4 North, Range 10 East, and in Sections 31 and 32, Township
4 North, Range 11 East, all in Conecuh County, Alabama; and

WHEREAS, Aspen was not qualified to do business in Alabama at the time the Leases were obtained but is now and, accordingly, is in the process of obtaining documents executed by the lessors under the Leases to remove any questions concerning that point and also to correct an error in Aspen's name in some of the Leases: and

WHEREAS, subject to a reservation of overriding royalty interest and the reversionary working interest described hereinbelow, Aspen desires to retain a portion and sell the remainder to the other Participants, of its right, title and interest in and to the Leases and the minerals covered by the Leases; and

WHEREAS, the Sklar Participants desire to acquire, process and interpret seismic data over the Castleberry Prospect and other property; and

WHEREAS, all of the Participants desire to have an exploratory well drilled by SEC, as Operator, (the "Initial Well," which term, as used in this Agreement, shall include any sidetrack or substitute well for said well if problems are encountered in drilling the well) to be located either in the Castleberry Prospect or in the L Pond Prospect (which is created by a separate Participation Agreement by and between some of the Parties and executed concurrently herewith and which covers Sections 28, 33, & 34 T4N, R11E), said well to be drilled to the depth hereinafter provided in this Agreement; and

WHEREAS, the Parties desire to enter this Agreement to set forth the terms and conditions under which they sell, retain or acquire, as the case may be, those working interests, acquire, process and interpret the seismic data and potentially drill the Initial Well.

NOW, THEREFORE, the Parties agree as follows:

## Article I. Purchase And Sale And Development Commitments

### Section 1.1. Leases and Assignment

Aspen represents and warrants that it owns the Leases (and all rights and interests granted to the lessees thereunder), that the Leases are paid up leases with no delay rentals or option bonuses due or to be paid to maintain them, that all of the Leases are in full force and effect and have not been amended or modified, that there has been no breach of any of the obligations of the lessee under the Leases, that none of the lessors has notified Aspen of any alleged breach of any such obligation, that (with the exception of that certain Oil Gas & Other Mineral Lease dated June 12, 2012, executed by Cedar Creek Land & Timber, Inc., as Lessor, in favor of Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5359 of the records of the Probate Judge of Conecuh County, Alabama, and that certain Oil, Gas and Mineral Lease dated June 12, 2012, by and between McMillan, Ltd., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5362 of the Probate Judge Records of Conecuh County, Alabama (hereinafter collectively referred to as the "CCL&T/McMillan Leases") there are no restrictions upon assignment or transfer on any of the Leases, and that it has full and complete power and authority to enter into this agreement, to execute the Assignment attached as Exhibit B, and to otherwise perform all of its obligations hereunder. Additionally, other than the interest of Sepulga as reflected below, Aspen warrants that no one has a right or claim to any portion or share of the working interest (lessee's interest) under the Leases, and Aspen and Sepulga agree to indemnify and hold harmless each of the Sklar Participants from and against any loss, cost, expense or damages (including reasonable attorneys fees) arising out of or resulting from any claim (by suit or otherwise) by anyone (other than Sepulga) based on or alleging that such person or entity is entitled to a portion or share of said working interest. With respect to the CCL&T/McMillan Leases, Aspen agrees to use its best efforts to obtain a consent to assign from each of the lessors. SEC may, in its discretion, withhold the recording of the assignment described below in this Section 1.1 until receiving the fully executed consents to assign from Aspen.

By prior agreement (the "Aspen Prior Agreement"), and subject to the terms, provisions, reservations and limitations hereinafter set forth, Aspen has agreed to convey an undivided thirty-five percent gross working interest (35% GWI) in the Leases to the Aspen Participants in the following percentages:

| Aspen Participants | | Percentages |
|---|---|---|
| Aspen | | 50% of 35% or 17.50% |
| Sepulga | | 50% of 35% or 17.50% |
| | Total | 100% of 35% or 35% |

The Sklar Participants agree to pay Aspen the amount of Four Hundred Seventy Five Thousand Two Hundred Sixty Five and 15/100 Dollars ($475,265.15), representing sixty-five percent (65%) of Seven Hundred Thirty One Thousand One Hundred Seventy Seven and 15/100 Dollars ($731,177.15), being the sum of (i) Four Hundred NinetySix Thousand Four Hundred Eighty Five and No/100 Dollars ($496,485.00),

which is the product of 1,103.3 net mineral acres multiplied by $450 per net mineral acre, and (ii) Two Hundred Thirty Four Thousand Six Hundred Ninety Two and 15/100 Dollars ($234,693.15), which is the product of 469.3843 net mineral acres multiplied by $500 per net mineral acre (collectively, the "**Prospect Fee**"), said Prospect Fee payable to Aspen by the Sklar Participants in the following percentages and amounts:

| Sklar Participants | Percentages | Amount |
|---|---|---|
| Sklarco | 11.293750%/65% or 17.375% | $82,577.32 |
| McCombs | 17.225000%/65% or 26.5% | $125,945.26 |
| Rudman | 1.300000%/65% or 2% | $9,505.30 |
| Tara Rudman | 6.825000%/65% or 10.5% | $49,902.84 |
| JJS | 6.500000%/65% or 10% | $47,526.51 |
| Fant | 6.500000%/65% or 10% | $47,526.51 |
| Pickens | 3.250000%/65% or 5% | $23,763.26 |
| Howell | 3.250000%/65% or 5% | $22,763.26 |
| Tauber | 1.625000%/65% or 2.5% | $11,881.63 |
| Tiembo | 1.300000%/65% or 2% | $9,505.30 |
| Kudzu | 1.300000%/65% or 2% | $9,505.30 |
| Marksco | 1.300000%/65% or 2% | $9,505.30 |
| Landmark | 1.300000%/65% or 2% | $9,505.30 |
| Craft | 0.650000%/65% or 1% | $4,752.65 |
| Dickson | 0.650000%/65% or 1% | $4,752.65 |
| Bundero | 0.650000%/65% or 1% | $4,752.65 |
| Resource | 0.081250%/65% or 0.125% | $594.08 |
| Total | 65%/65% or 100% | $475,265.15 |

For convenience, SEC will invoice each of the Sklar Participants their share of the Prospect Fee which they agree to tender unto SEC, and SEC shall pay Aspen the entire Prospect Fee on behalf of all of the Sklar Participants, concurrent with SEC's execution of this Agreement.

For and in consideration of the Prior Aspen Agreements and the Prospect Fee, and the other terms and conditions of this Agreement, the receipt and sufficiency of which are hereby acknowledged, Aspen hereby agrees to execute and deliver to SEC for recording, concurrent with its execution of this Agreement, by means of the form of assignment attached hereto as Exhibit "B," an assignment of the gross working interests in the Leases to the Participants, such that the Participants shall own the following before payout gross working interest ("**BPO WI**") percentages in and under the Leases, to-wit:

| Participants | Percentages |
|---|---|
| Sklarco | 11.293750% |
| McCombs | 17.225000% |
| Rudman | 1.300000% |
| Tara Rudman | 6.825000% |
| JJS | 6.500000% |
| Fant | 6.500000% |
| Pickens | 3.250000% |
| Howell | 3.250000% |
| Tauber | 1.625000% |
| Tiembo | 1.300000% |
| Kudzu | 1.300000% |
| Marksco | 1.300000% |
| Landmark | 1.300000% |
| Craft | 0.650000% |
| Dickson | 0.650000% |
| Bundero | 0.650000% |
| Resource | 0.081250% |
| Aspen | 17.50% |
| Sepulga | 17.50% |
| Total | 100.00000% |

This assignment of this interest shall be (i) made without warranty of title, express or implied, not even for return of the Prospect Fee, except that Aspen will warrant (a) the matters stated in the first paragraph of this Section 1.1 and (b) its authority to make the assignment and title to the interests assigned against all defects arising out of claims by Aspen or of persons claiming by, through or under Aspen, all as more particularly provided in the limited warranty contained in Exhibit B hereto, (ii) subject to the terms of the Leases, (iii) subject to this Agreement and the JOA described in Section 2.1 of this Agreement, including, without limitation, the overriding royalty interest described in this Section 1.1 and the reversionary working interest

described in Section 1.5 of this Agreement. Anything herein to the contrary notwithstanding, the Parties agree that, if as of the date this Agreement is executed, Aspen has not obtained corrective instruments satisfactory to SEC covering all of the Leases and relating to any questions that might arise from the fact that Aspen was not qualified to do business in Alabama as of the dates the Leases were executed, then (a) the Leases as to which Aspen has not obtained such instruments (the "**Remaining Leases**") shall not be included in said assignment (Exhibit B hereto), and (b) Aspen agrees that within sixty (60) days after execution of this Agreement, it will obtain such instruments as to the Remaining Leases and will assign to the Participants the undivided interests specified above in the Remaining Leases using the form of assignment attached hereto as Exhibit B (the "**Additional Assignment**"), provided that, if at the end of said sixty (60) day period Aspen shall not have obtained such instrument as to any of the Remaining Leases, then, at SEC's option, those Leases shall be excluded from the Additional Assignment and Aspen will refund to SEC (on behalf of the Sklar Participants) a portion of the Prospect Fee, said portion to be in the proportion that the net mineral acres estimated on Exhibit A to be covered by such Lease(s) bears to the total net mineral acres estimated on Exhibit A to be covered by all the Leases. Thereafter, should Aspen obtain a corrective instrument with respect to any Remaining Lease not covered by the Additional Assignment, such Lease shall be treated as a new lease obtained as of the date the corrective instrument is executed and shall be subject to the AMI provisions of Section 3.1, below.

The Participants shall own their share of each of the Leases subject to a proportionate part of, and Aspen shall reserve under the assignment (including any Additional Assignment), an overriding royalty interest (the "**ORRI**") in favor of Aspen equal to the positive difference, if any, between the lessor's royalty under each Lease and twenty-five percent (25%). The CCL&T/McMillan Leases contain a twenty-five percent (25%) lessor's royalty escalating to thirty percent (30%) after production of 50,000 barrels of oil on a unit basis as more particularly described therein; said CCL&T/McMillan Leases shall not bear any ORRI. The ORRI shall be calculated and shall be delivered and paid to Aspen in the manner provided in Exhibit B and shall be subject to proportionate reduction as provided in that Exhibit.

Three of the Leases, namely, Lease No. 24, Lease No. 26 and Lease No. 27 on Exhibit A-1, cover lands located both inside of the AMI and outside. The assignment attached as Exhibit B shall convey unto the Assignees thereunder their proportionate share of interest under those two Leases insofar and only insofar as they cover lands located within the AMI and shall reserve unto the Assignor thereunder all rights under those two Leases insofar and only insofar as they cover lands located outside the AMI.

### Section 1.2.  Three-Dimensional Seismic Data Acquisition

#### Subsection 1.2(a).  Costs

SEC and the Sklar Participants are also parties to that certain Shipps Creek Participation Agreement covering lands located in Escambia and Conecuh Counties, Alabama (the "**Shipps Creek PA**"), including an Operating Agreement attached thereto as an exhibit (the "**Shipps Creek JOA**"). SEC and the Sklar Participants plan to shoot (or cause to be shot) 3D seismic across the lands covered by the Shipps Creek PA and Shipps Creek JOA. Aspen agrees to execute and deliver to SEC concurrent with the Parties execution of this Agreement (and with the execution of any Additional Assignment) the Geophysical Permit Agreement attached hereto as Exhibit "C" and by reference made a part hereof (the "**GPA**"). In consideration of the GPA, and the other terms and provisions of this Agreement, SEC and the Sklar Participants agree to expand the scope of the 3D shoot to include Contract Area and AMI of this Castleberry Prospect and sufficient offset acreage around it that, in SEC's opinion, is necessary or desirable to image the Contract Area and AMI itself.

If within six months from the Effective Date of this Agreement, Aspen sells an additional undivided ten percent (10%) before payout gross working interest in the Leases to the Sklar Participants on the same terms and in the same proportions as the undivided sixty-five percent (65%) acquired under Section 1.1 of this Agreement, then, in that event, Aspen shall not bear any costs associated with the permitting, acquisition and processing of the 3D seismic data. If, on the other hand, that sale does not occur within that time period, or within a mutually agreeable extended time period, then, in that event, Aspen agrees to pay SEC (and SEC to reimburse the Sklar Participants) ten percent (10%) of a fraction of the actual costs incurred by SEC and the Sklar Participants to permit, acquire and process the 3D seismic data, the numerator of such fraction being 5,120 acres (or 8 square miles), which is the number of surface acres added to the 3D seismic shoot in order to image the Contract Area and AMI of this Castleberry Prospect (including offset acreage described above), and the denominator being the total surface acres covered by the 3D seismic shoot.

#### Subsection 1.2(b).  Owners' Access To Data And Right To License

Both during the term of this Agreement, and after its termination, SEC shall have the exclusive rights to sell or license the 3D seismic data. The rights of the Sklar Participants to access or

obtain a license to the data shall be governed by the Shipps Creek PA. Aspen's rights to access and/or obtain a license to the 3D seismic data shall be governed by the GPA.

### Subsection 1.2(c). Restrictions Upon Transfer Of Seismic Data And License

The restrictions upon transfer set forth in the Shipps Creek PA and Shipps Creek JOA shall govern the rights and obligations of SEC and the Sklar Participants with respect to transfer of the 3D seismic data. The restrictions upon transfer set forth in the GPA shall govern the rights and obligations of Aspen with respect to transfer of the 3D seismic data.

### Subsection 1.2(d). Proceeds from Sale or License

Aspen is not entitled to any proceeds that SEC and the Sklar Participants may earn from the sale or licensing of the 3D seismic data other than through participation as a Sklar Participant in the Shipps Creek Prospect. The rights and obligations of SEC and the Sklar Participants with respect to proceeds from the sale or licensing of the 3D seismic data shall be governed by the Shipps Creek PA.

### Section 1.3. Geochemistry

Aspen may acquire, or may cause to be acquired, surface samples and conduct a surface geochemical survey in the Contract Area at its own cost. Aspen further agrees to make the results of such survey available to all of the Participants upon receipt of same by Aspen.

### Section 1.4. Initial Well

### Subsection 1.4(a). Drilling of Initial Well

Within one hundred and twenty (120) days from receipt of the final processed data from the 3D seismic shoot described in Section 1.2, and in any event no later than 18 months from the Effective Date of this Agreement, and subject to rig availability, SEC shall commence or cause to be commenced operations for the drilling of the Initial Well at a location of Operator's choice within the Castleberry Prospect or within the L Pond Prospect, and thereafter continue the drilling of the Initial Well with due diligence to a true vertical depth of 13,000' or to such lesser depth as may be sufficient in SEC's opinion to test the Upper Smackover and Norphlet Formations (the "**Objective Depth**"). If the initial well is located on the Castleberry Prospect, the Participants agree to participate in the drilling of the Initial Well to the Objective Depth in the following percentages:

| Participants | Percentages |
|---|---|
| Sklarco | 11.293750% |
| McCombs | 17.225000% |
| Rudman | 1.300000% |
| Tara Rudman | 6.825000% |
| JJS | 6.500000% |
| Fant | 6.500000% |
| Pickens | 3.250000% |
| Howell | 3.250000% |
| Tauber | 1.625000% |
| Tiembo | 1.300000% |
| Kudzu | 1.300000% |
| Marksco | 1.300000% |
| Landmark | 1.300000% |
| Craft | 0.650000% |
| Dickson | 0.650000% |
| Bundero | 0.650000% |
| Resource | 0.081250% |
| Aspen | 17.50000% |
| Sepulga | 17.50000% |
| Total | 100.00000% |

Operator may adjust (prospectively and retroactively) the percentages under which the Participants participate in the Initial Well (and any subsequent wells) on the Contract Area if a title opinion by an Alabama licensed attorney reveals that the ownership percentages set forth above are incorrect as to the unit on which the well is drilled. If such adjustment is required, the share of costs due from each Participant for the Initial Well shall be retroactively adjusted.

**Subsection 1.4(b).   Initial Well Payment Obligations if Well Located on Castleberry Prospect**

Concurrent with their execution of this Agreement, the Participants agree to execute an Authority For Expenditure ("AFE") attached hereto as Exhibit "D," which shall apply to the Initial Well if it is located on the Castleberry Prospect. Notwithstanding the estimates contained in the AFE, the Participants are responsible for and must pay SEC their share of all actual costs to drill the Initial Well (if it is on the Castleberry Prospect) to the Objective Depth in the following manner: (i) SEC will furnish the Participants with a Cash Call Invoice approximately thirty (30) days before the anticipated spud date of the Initial Well covering their share of the amount estimated in the AFE to drill the Initial Well to the Objective Depth, excluding estimated completion costs, but including the amount estimated to plug and abandon the Initial Well in the event it is not completed as a producing well, and the Participants must tender to SEC as an advance, within fifteen (15) days of receipt and, in any event, prior to spudding the Initial Well, full payment of the Cash Call Invoice; and (ii) the Participants must tender to SEC, within 15 days of receipt of (an) invoice(s) from SEC, the difference, if any, between said advance and their share of the actual costs to drill the Initial Well to the Objective Depth.

If any Participant fails to pay its share of the actual costs to drill the Initial Well to the Objective Depth in the manner and within the time deadlines set forth in the immediately preceding paragraph, then, in that event, and only in that event, at Operator's election, either (a) that Participant shall be deemed to have elected to withdraw from this Agreement and to have relinquished all of its right, title and interest in the Castleberry Prospect and the Leases (excluding, however, any overriding royalty interest under Section 1.1 of this Agreement or any reversionary back-in working interest under Section 1.5 of this Agreement) and shall execute those instruments provided by SEC necessary to convey said interest to the Participants who paid their share of the actual costs to drill the Initial Well to the Objective Depth, for no consideration, not even for return of the Prospect Fee or any other payment(s) made hereunder; or (b) the Operator may proceed to collect the amounts due from the defaulting Participant by suit or otherwise and in that event the defaulting Participant shall also be liable for (and shall pay to Operator) interest on the amount due at the rate of 1.5% per month and for all costs of collection, including a reasonable attorneys fee. Regardless of whether the Operator selects option "(a)" or "(b)", the Operator shall bill each of the remaining Participants for their proportionate share of the amount due from the Participant who fails to pay and each such Participant agrees to pay the bill within three (3) business days.  Upon receipt of the assignment(s) if option (a) is selected, the Operator will record the same and furnish a copy to each of the Participants; and upon receipt of the amounts due from the defaulting Participant if option (b) is selected, the Operator shall credit each of the Participants who paid the amounts owed by the defaulting party with each such Participants proportionate share of the principle and interest paid by the defaulting Participant. If any Participant transfers or assigns some or all of its rights and obligations hereunder and the transfer or assignment becomes effective pursuant to the provisions of Section 3.13 of this Agreement before SEC furnishes the Participants with the first Cash Call Invoice for the Initial Well described above, then, in that event, any failure to timely pay by such Participant shall make its interest subject to relinquishment at the election of the Operator as described above, but shall not result in relinquishment or otherwise prejudice the rights of that Participant's transferee or assignee (provided such transferee or assignee itself has timely paid its share of the actual costs to drill the Initial Well to the Objective Depth as described above).

**Subsection 1.4(c).  Operations After Reaching The Objective Depth**

After the Initial Well has been drilled to the Objective Depth, and regardless of whether it is located on the Castleberry Prospect or L Pond Prospect, the Operator shall make a copy of any logs, core analysis, drill-stem test analysis or results of any other tests available to a representative of the Participants at the wellsite, or if none is present, by email, facsimile or overnight delivery.  If the Initial Well is located on the Castleberry Prospect, then: Operator shall also furnish such Participants in a like manner with its recommendation regarding the disposition of the wellbore, in accordance with the JOA; failure to respond within the time specified shall be deemed an election to participate in Operator's recommended operation; and the casing point election and all subsequent operations and elections shall be governed by the JOA.

**Section 1.5.  Reversionary Back-In Working Interest**

As further consideration for the assignment described in Section 1.1 above, upon reaching Prospect Payout (as defined below), an undivided twenty percent (20%) of the interest of each of the Sklar Participants in the Leases except for the CCL&T/McMillan Leases, and an undivided fifteen percent (15%) of the interest of each of the Sklar Participants in the CCL&T/McMillan Leases, shall automatically and permanently vest in the Aspen Participants (in the relative percentages indicated below) such that the before payout ("BPO") and after payout ("APO1") interests of the Participants in the CCL&T/McMillan Leases and the after payout ("APO2") interests of the Participants in all of the other Leases are as follows:

| Participants | BPO | APO1 | APO2 |
|---|---|---|---|
| Sklarco | 11.293750% | 9.5996875% | 9.03500% |
| McCombs | 17.225000% | 14.641250% | 13.7800% |
| Rudman | 1.300000% | 1.1050000% | 1.04000% |
| Tara Rudman | 6.825000% | 5.8012500% | 5.460000% |
| JJS | 6.500000% | 5.5250000% | 5.20000% |
| Fant | 6.500000% | 5.5250000% | 5.20000% |
| Pickens | 3.250000% | 2.7625000% | 2.60000% |
| Howell | 3.250000% | 2.7625000% | 2.60000% |
| Tauber | 1.625000% | 1.3812500% | 1.30000% |
| Tiembo | 1.300000% | 1.1050000% | 1.04000% |
| Kudzu | 1.300000% | 1.1050000% | 1.04000% |
| Marksco | 1.300000% | 1.1050000% | 1.04000% |
| Landmark | 1.300000% | 1.1050000% | 1.04000% |
| Craft | 0.650000% | 0.5525000% | 0.52000% |
| Dickson | 0.650000% | 0.5525000% | 0.52000% |
| Bundero | 0.650000% | 0.5525000% | 0.52000% |
| Resource | 0.081250% | 0.0690625% | 0.06500% |
| Aspen | 17.50000% | 22.375000% | 24.0000% |
| Sepulga | 17.50000% | 22.375000% | 24.0000% |
| Total | 100.00000% | 100.0000000% | 100.00000% |

The Sklar Participants will assign said interest unto the Aspen Participants after Prospect Payout. Should any Sklar Participant's interest or any portion thereof be transferred to another party (as a result of a transfer or assignment or an election not to participate by such party), such interest shall continue to be subject to and burdened by the above described Reversionary Back-in Working Interest. Any assignment and/or transfer, as contemplated herein above, shall so describe Aspen's right to receive an assignment of the Reversionary Back-in Working Interest.

**Prospect Payout** is defined on a Prospect (not well-by-well) basis as the first day of the calendar month following the month in which a Sklar Participant's share of the total and cumulative revenue received from the sale of oil, gas and other hydrocarbons and minerals produced, saved and sold from the Contract Area (including any net proceeds actually received from any insurance or legal settlements related thereto), and allocable to that Sklar Participant's interest as set forth above, equals that Sklar Participant's share of the total and cumulative costs and expenses allocable to said interest. For purposes of Prospect Payout, (i) the total and cumulative revenue shall consist of the Sklar Participant's above-described share of all sales proceeds received for all oil, gas and other hydrocarbons and minerals produced, saved and sold from the Contract Area (including any net proceeds actually received from any insurance or legal settlements related thereto), and (ii) the total and cumulative cost incurred shall include the Sklar Participant's above described share of all royalty and overriding royalty payments, severance, ad valorem, production and other taxes applicable to production and not measured by such party's other income, the Prospect Fee, all lease acquisition and maintenance costs (including the costs of acquiring leases in the AMI if such party elects to participate in the acquisition of such lease), all seismic survey and data costs, geological and geophysical evaluation costs, all costs related to site preparation, drilling, reworking, deepening, sidetracking, logging, stimulation, testing, equipping, operating, plugging and (if abandoned before Prospect Payout) abandoning the Initial Well and all other wells within the Contract Area, the cost of all surface damages, pipelines, gathering and other production handling facilities related thereto, the costs of administrative or court proceedings incurred in connection with the development of the Contract Area, all costs incurred in connection with the sale of production (including costs incurred with respect to any insurance or legal settlements related thereto), and all other costs billed to such party by the Operator for activities related to the development of the Contract Area, including all costs and charges which are allocable to the Joint Account received or incurred in the conduct of Joint Operations under the Operating Agreement attached hereto as Exhibit "E". The reversionary working interest described in this Section 1.5 shall bear its share of the ORRI described in Section 1.1 above.

### Section 1.6.    Conflicts with Prior Agreements

As between the Parties hereto, this Agreement sets forth all of the terms and provisions of their contract respecting the Contract Area and the AMI, and accordingly supersedes all such prior agreements, including the Aspen Prior Agreement and the Shipps Creek PA. And no one who is not a party to any such prior agreement prior to the execution of this Agreement shall, as a result of his/her/its execution of or joinder in this Agreement, be bound by or have any rights under, any such prior Agreement. As between the parties to any such prior agreement, however, the same shall remain in effect as to those Parties to the extent not subsumed in or replaced by this Agreement; provided that as between the SEC and the Sklar Participants, this Agreement shall, as elsewhere herein provided, replace the Shipps Creek PA.

## Article II.  Operations

### Section 2.1.  JOA

SEC is hereby designated Operator.  Except as otherwise provided in this Agreement, all operations within the Contract Area shall be governed by the Operating Agreement (the "**JOA**"), covering the Contract Area attached hereto as Exhibit "E."  The Parties agree to execute the JOA concurrent with their execution of this Agreement.  In the event of a conflict between this Agreement and the JOA, this Agreement shall govern and control.

## Article III.  Miscellaneous

### Section 3.1.  AMI

The Parties have formed an AMI under the terms contained in Article XV.K of the JOA covering the lands within the red outline on the plat attached hereto as Exhibit "A" which shall govern the acquisition by any of the Parties of any oil and gas lease covering lands located within the Contract Area and AMI created under this Agreement.  The ORRI described in Section 1.1 above shall burden new leases acquired under this AMI, and the Party acquiring such new leases shall, upon assigning the working interest under the applicable lease to the Participants who elect to participate in that acquisition, assign unto Aspen the ORRI due, if any (depending on the lessor's royalty under the applicable lease), in the same manner the ORRI is reserved in the assignment under Section 1.1 of this Agreement.  The reversionary working interest described in Section 1.5 shall burden new leases acquired under the AMI.  Any renewals or extensions acquired under Article VIII.B of the JOA shall also be burdened by the ORRI reserved in the assignment under Section 1.1 of this Agreement and the reversionary working interest described in Section 1.5 of this Agreement.

The AMI shall not govern oil and gas interests (as defined in the JOA).  Without limitation upon the foregoing, the Sole Member of Sepulga, Cosby H. Martin, Jr. also owns and manages MAFLA Land & Minerals, LLC, which owns minerals in and under, and/or royalty interests in minerals that may be produced from, lands located within the AMI, and such interest(s) shall be free and clear of this Agreement and the JOA and shall not be bound under the terms of this AMI.  Nor shall any such interests be burdened by the ORRI described in Section 1.1 or the reversionary working interest described in Section 1.5 of this Agreement.

SEC and the Sklar Participants hereby amend the Shipps Creek PA and the Shipps Creek JOA to exclude therefrom oil and gas leases covering the following described lands, to-wit: Section 36, Township 4 North, Range 10 East, and in Sections 31 and 32, Township 4 North, Range 11 East, all in Conecuh County, Alabama.  SEC and the Sklar Participants further agree that this Agreement, and not the Shipps Creek PA and the Shipps Creek JOA, shall govern their relationship as to the Contract Area and AMI of this Agreement.  Without limitation upon the foregoing, the AMI set forth in Section 3.1 of the Shipps Creek PA and Article XV.K of the Shipps Creek JOA is hereby terminated insofar and only insofar as it governs oil and gas leases covering lands located within Section 36, Township 4 North, Range 10 West, and in Sections 31 and 32, Township 4 North, Range 11 East, all in Conecuh County, Alabama.  SEC and the Sklar Participants hereby agree to maintain, as among themselves, the AMI established under Section 3.1 of the Shipps Creek PA and Article XV.K of the Shipps Creek JOA insofar as it governs oil and gas interests covering lands located within said Section 36, Township 4 North, Range 10 West, and said Sections 31 and 32, Township 4 North, Range 11 East, Conecuh County, Alabama.  Further without limitation upon the foregoing, Sklarco's reversionary back-in working interest described in Section 1.5 of the Shipps Creek PA shall not burden any of the Leases or any other oil and gas leases or oil and gas interests covering lands located within the Contract Area and AMI of this Agreement.  Except as expressly amended by the foregoing paragraph, the Shipps Creek PA and Shipps Creek JOA shall remain in full force and effect, binding upon and enforceable against SEC and the Sklar Participants.  The Sklar Participants further acknowledge that Aspen may be subject to the terms of the original AMI for the Shipps Creek Prospect by virtue of a transaction whereby it acquired interest therein from Tara Rudman, and that Aspen may have purchased some of the Leases covering lands located within the original AMI for the Shipps Creek Prospect after the effective date of that AMI, but before the Effective Date of this Agreement and the AMI under this Agreement. The Sklar Participants agree that all of the Leases, regardless of the date that they were acquired and the effective date of the Shipps Creek PA and the Effective Date of this Agreement, shall be governed by this Agreement and not the Shipps Creek PA.

### Section 3.2.  Information

Upon execution of this Agreement by all of the Parties, any Participant may request and shall be entitled to a copy of all of the Leases and of any other title information such as any abstracts of title

or drill-site title opinions for the drill-site tract of and drilling unit for the Initial Well, along with drilling and completion and log reports for the Initial Well and any subsequent wells.

### Section 3.3.  Confidentiality

The Parties agree to keep confidential and not disclose any information about the Castleberry Prospect, not already disclosed or of public record, to third parties except as required by statutes, regulations or court order for so long as this Agreement is in effect, but not to exceed three (3) years from the date of this Agreement.

### Section 3.4.  Closing

Closing shall occur by mail or by such other means and at such time and place to which the Parties mutually agree.

### Section 3.5.  Binding On Successors And Assigns

This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and assigns, subject, however, to the provisions of Section 3.13, below.

### Section 3.6.  Entire Agreement

This Agreement and its attachments constitute the entire agreement of the Parties with respect to the subject matter hereof, and any other promises, inducements, representations, warranties or agreements with respect to the subject matter hereof have been superseded hereby and are not intended to survive this Agreement.  Except as otherwise expressly provided herein, no amendment or modification of this Agreement shall be effective unless set forth in writing and signed by a duly authorized officer of each and all of the Parties.

### Section 3.7.  Severability

The invalidity of any one or more of the provisions of this Agreement does not affect the remaining portions of this Agreement, and in case of any such invalidity, this Agreement should be construed as if the invalid provision(s) had not been inserted.

### Section 3.8.  Notices

All notices between the Parties authorized or required by any of the provisions of this Agreement, unless otherwise expressly provided, shall be given in writing by email or facsimile or regular or express mail, addressed to those of the Parties to whom the notice is given at the email addresses or fax telephone numbers and addresses set forth in Exhibit "A" to the JOA.  Any of the Parties may change its designated email address, fax telephone number and address at any time, and from time to time, by giving written notice thereof to the other Parties.

### Section 3.9.  Headings for Convenience

The article, section and subsection headings used in this Agreement are inserted for convenience only and shall not be regarded in construing this Agreement.

### Section 3.10.  Time

Time is of the essence hereunder.

### Section 3.11.  Governing Law

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Alabama.

### Section 3.12.  Relationship Of The Parties

Liability of the Parties hereto shall be several and not joint or collective.  Each Party shall make its own elections under this Agreement and shall be responsible only for its obligations as herein set out.  It is not the intention of the Parties to create, nor shall this Agreement be construed as creating, a mining or other partnership, joint venture or association between the Parties.

**Section 3.13.  Assignability**

Except as otherwise provided herein, the Parties to this Agreement may assign all or part of their rights and obligations hereunder, provided, however, that any such assignment must be made subject to the terms and conditions of this Agreement and the JOA, and provided further that no such assignment shall be effective as to the Operator until 30 days after the Operator shall have been provided with a certified copy of a recorded instrument evidencing the assignment and with such other documents and information as the Operator may reasonably request.

**Section 3.14.  Term**

This Agreement shall remain in full force and effect as between the Parties until expiration of the last lease jointly owned by them, or any combination of the Parties, covering any part of the AMI and shall not be merged into or terminated by any assignment or conveyance made pursuant to this Agreement.

**Section 3.15.  Counterparts**

This Participation Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

**Section 3.16. Pronouns.**

Where used to refer to the Participants, the pronoun "it" shall be deemed to include the pronouns he and she, and the same shall apply to the possessive case of those pronouns.

**Section 3.17    Waiver of Right to Trial by Jury**

Each of the Parties hereby waives the right to trial by jury in any litigation between any of the Parties relating to this Agreement.

**Section 3.18    Pooling**

Many of the Leases grant to the lessee thereunder the right to pool or unitize the Lease and the lands covered thereby (or portions thereof) with other lands or leases (or portions thereof) to establish units for wells, and it is expected that leases heretofore or hereafter obtained that are, or become, subject to the AMI provisions set forth in this Agreement and in the JOA will contain similar provisions regarding pooling and unitization.  The Participants for themselves and for their successors and assigns hereby grant to Operator and its successors the right to exercise any such pooling or unitization rights so granted to them, or any of them, with full authority to execute (for them and on their behalf) any documents deemed necessary or appropriate to effectuate said pooling or unitization and hereby agree and stipulate that any instrument or declaration executed by the Operator (or its successor) with respect to any such pooling or unitization shall have the same force and effect as one executed by all of the Participants (and their successors and assigns).  Nothing in this paragraph shall limit or alter a Participant's right to consent or not consent to any operation in accordance with and subject to the terms of this Agreement and/or the JOA, and the power and authority granted to the Operator in this Section shall remain in effect so long as either this Agreement or the JOA remains in effect and shall not be affected by the death or incompetency of any Participant who is a natural person.

**Section 3.19    Entity Status**

Each of the Parties that is not a natural person hereby represents and warrants that it is validly formed and currently existing in good standing under the laws of the state where it is formed and that it has the power and authority to enter into this Agreement and to perform its obligations hereunder.

THUS DONE AND SIGNED This *9th* day of *November*, 2012, but effective as of
the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By _____
     David A. Barlow
     President & Chief Operating Officer

SKLARCO L.L.C.

By _____
     David A. Barlow
     President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

By _____
     Ricky Haikin
     Vice President

THE RUDMAN PARTNERSHIP

By _____
     W. R. (Trey) Sibley, III
     Attorney-In-Fact

_____
     TARA RUDMAN

JJS WORKING INTERESTS LLC
By:    Houston Bulldog Capital Management, LLC

By _____
     Justin Simons
     Manager

FANT ENERGY LIMITED
By:    Richard E. Fant, L.L.C., its General Partner

By _____
     Phil O. Kelley
     Manager

PICKENS FINANCIAL GROUP, L.L.C.

By _____
     Michael K. Pickens
     Vice President

_____
     FLEET HOWELL

THUS DONE AND SIGNED This 9TH day of *November*, 2012, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By _____
     David A. Barlow
     President & Chief Operating Officer

SKLARCO L.L.C.

By _____
     David A. Barlow
     President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

By _____
     Ricky Haikin
     Vice President

THE RUDMAN PARTNERSHIP

By _____
     W. R. (Trey) Sibley, III
     Attorney-In-Fact

_____
     TARA RUDMAN

JJS WORKING INTERESTS LLC
By:    Houston Bulldog Capital Management, LLC

By _____
     Justin Simons
     Manager

FANT ENERGY LIMITED
By:    Richard E. Fant, L.L.C., its General Partner

By _____
     Phil O. Kelley
     Manager

PICKENS FINANCIAL GROUP, L.L.C.

By _____
     Michael K. Pickens
     Vice President

_____
     FLEET HOWELL

Page **12** of **53**

Signature Page -- Castleberry Prospect
Conecuc County, Alabama
"Participation Agreement"

THUS DONE AND SIGNED This 9ᵗʰ day of November, 2012, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By _____
David A. Barlow
President & Chief Operating Officer

SKLARCO L.L.C.

By _____
David A. Barlow
President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

By _____
Ricky Haikin
Vice President

THE RUDMAN PARTNERSHIP

By _____
W. R. (Trey) Sibley, III
Attorney-In-Fact

_____
TARA RUDMAN

JJS WORKING INTERESTS LLC
By:     Houston Bulldog Capital Management, LLC

By _____
Justin Simons
Manager

FANT ENERGY LIMITED
By:     Richard E. Fant, L.L.C., its General Partner

By _____
Phil O. Kelley
Manager

PICKENS FINANCIAL GROUP, L.L.C.

By _____
Michael K. Pickens
Vice President

_____
FLEET HOWELL

Page **12** of **53**

THUS DONE AND SIGNED This 9ᵀᴴ day of *NOVEMBER*, 2012, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By _____
  David A. Barlow
  President & Chief Operating Officer

SKLARCO L.L.C.

By _____
  David A. Barlow
  President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

By _____
  Ricky Haikin
  Vice President

THE RUDMAN PARTNERSHIP

By _____
  W. R. (Trey) Sibley, III
  Attorney-In-Fact

_____
  TARA RUDMAN

JJS WORKING INTERESTS LLC
By:    Houston Bulldog Capital Management, LLC

By _____
  Justin Simons
  Manager

FANT ENERGY LIMITED
By:    Richard E. Fant, L.L.C., its General Partner

By _____
  Phil O. Kelley
  Manager

PICKENS FINANCIAL GROUP, L.L.C.

By _____
  Michael K. Pickens
  Vice President

_____
  FLEET HOWELL

Page **12** of **53**

THUS DONE AND SIGNED This 9TH day of *November*, 2012, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By_____
  David A. Barlow
  President & Chief Operating Officer

SKLARCO L.L.C.

By_____
  David A. Barlow
  President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

By_____
  Ricky Haikin
  Vice President

THE RUDMAN PARTNERSHIP

By_____
  W. R. (Trey) Sibley, III
  Attorney-In-Fact


_____
  TARA RUDMAN

JJS WORKING INTERESTS LLC
By: Houston Bulldog Capital Management, LLC

By_____
  Justin Simons
  Manager

FANT ENERGY LIMITED
By: Richard E. Fant, L.L.C., its General Partner

By_____
  Phil O. Kelley
  Manager


PICKENS FINANCIAL GROUP, L.L.C.

By_____
  Michael K. Pickens
  Vice President


_____
  FLEET HOWELL

Page **12** of **53**

THUS DONE AND SIGNED This 9ᵀᴴ day of *November*, 2012, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By _____
   David A. Barlow
   President & Chief Operating Officer

SKLARCO L.L.C.

By _____
   David A. Barlow
   President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

By _____
   Ricky Haikin
   Vice President

THE RUDMAN PARTNERSHIP

By _____
   W. R. (Trey) Sibley, III
   Attorney-In-Fact

_____
   TARA RUDMAN

JJS WORKING INTERESTS LLC
By:    Houston Bulldog Capital Management, LLC

By _____
   Justin Simons
   Manager

FANT ENERGY LIMITED
By:    Richard E. Fant, L.L.C., its General Partner

By _____
   Phil O. Kelley
   Manager

PICKENS FINANCIAL GROUP, L.L.C.

By _____
   Michael K. Pickens
   Vice President

_____
   FLEET HOWELL

Page **12** of **53**

THUS DONE AND SIGNED This 9 ͭ ͪ day of *November*, 2012, but effective as of
the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By_____
     David A. Barlow
     President & Chief Operating Officer

SKLARCO L.L.C.

By_____
     David A. Barlow
     President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

By_____
     Ricky Haikin
     Vice President

THE RUDMAN PARTNERSHIP

By_____
     W. R. (Trey) Sibley, III
     Attorney-In-Fact



_____
     TARA RUDMAN

JJS WORKING INTERESTS LLC
By:    Houston Bulldog Capital Management, LLC

By_____
     Justin Simons
     Manager

FANT ENERGY LIMITED
By:    Richard E. Fant, L.L.C., its General Partner

By_____
     Phil O. Kelley
     Manager


PICKENS FINANCIAL GROUP, L.L.C.

By_____
     Michael K. Pickens
     Vice President



_____
     FLEET HOWELL

THUS DONE AND SIGNED This *9TH* day of *November*, 2012, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By _____
    David A. Barlow
    President & Chief Operating Officer

SKLARCO L.L.C.

By _____
    David A. Barlow
    President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

By _____
    Ricky Haikin
    Vice President

THE RUDMAN PARTNERSHIP

By _____
    W. R. (Trey) Sibley, III
    Attorney-In-Fact


_____
    TARA RUDMAN

JJS WORKING INTERESTS LLC
By:    Houston Bulldog Capital Management, LLC

By _____
    Justin Simons
    Manager

FANT ENERGY LIMITED
By:    Richard E. Fant, L.L.C., its General Partner

By _____
    Phil O. Kelley
    Manager


PICKENS FINANCIAL GROUP, L.L.C.

By _____
    Michael K. Pickens
    Vice President


_____
    FLEET HOWELL

Page 12 of 53

CASTLEBERRY PA

Partic.pation Agreement
Castleberry Prospect
Conecuh County, Alabama

TAUBER EXPLORATION & PRODUCTION CO.

By_____
        Richard E. Tauber
        President

TIEMBO, LTD.

By_____
        Mark Rauch
        Registered Agent

KUDZU OIL PROPERTIES, L.L.C.

By_____
        R. Nash Neyland
        Executive Vice President

MARKSCO, L.L.C.

By_____
        Mark P. Sealy
        Member

LANDMARK EXPLORATION, LLC

By_____
        Larry Johnson
        Manager/Member

CRAFT EXPLORATION COMPANY, LLC

By_____
        Stephen H. Craft
        Manager/Member

DICKSON OIL & GAS, L.L.C.

By_____
        C. Bickham Dickson, III
        Manager

BUNDERO INVESTMENT COMPANY, L.L.C.

By_____
        Robert P. Bowman
        Manager

RESOURCE VENTURES, LLC

By_____
        Mark A. Arnold
        General Manager

TAUBER EXPLORATION & PRODUCTION CO.


By_____
        Richard E. Tauber
        President

TIEMBO, LTD.


By_____
        Mark Rauch
        Registered Agent

KUDZU OIL PROPERTIES, L.L.C.


By_____
        R. Nash Neyland
        Executive Vice President

MARKSCO, L.L.C.


By_____
        Mark P. Sealy
        Member

LANDMARK EXPLORATION, LLC


By_____
        Larry Johnson
        Manager/Member

CRAFT EXPLORATION COMPANY, LLC


By_____
        Stephen H. Craft
        Manager/Member


DICKSON OIL & GAS, L.L.C.


By_____
        C. Bickham Dickson, III
        Manager


BUNDERO INVESTMENT COMPANY, L.L.C.


By_____
        Robert P. Bowman
        Manager

RESOURCE VENTURES, LLC


By_____
        Mark A. Arnold
        General Manager

TAUBER EXPLORATION & PRODUCTION CO.


By_____
      Richard E. Tauber
      President

TIEMBO, LTD.


By_____
      Mark Rauch
      Registered Agent

KUDZU OIL PROPERTIES, L.L.C.


By _R. Nash Neyland (signature)_
      R. Nash Neyland
      Executive Vice President

MARKSCO, L.L.C.


By_____
      Mark P. Sealy
      Member

LANDMARK EXPLORATION, LLC


By_____
      Larry Johnson
      Manager/Member

CRAFT EXPLORATION COMPANY, LLC


By_____
      Stephen H. Craft
      Manager/Member


DICKSON OIL & GAS, L.L.C.


By_____
      C. Bickham Dickson, III
      Manager


BUNDERO INVESTMENT COMPANY, L.L.C.


By_____
      Robert P. Bowman
      Manager

RESOURCE VENTURES, LLC


By_____
      Mark A. Arnold
      General Manager

TAUBER EXPLORATION & PRODUCTION CO.


By_____
      Richard E. Tauber
      President

TIEMBO, LTD.


By_____
      Mark Rauch
      Registered Agent

KUDZU OIL PROPERTIES, L.L.C.


By_____
      R. Nash Neyland
      Executive Vice President

MARKSCO, L.L.C.


By_____
      Mark P. Sealy
      Member

LANDMARK EXPLORATION, LLC


By_____
      Larry Johnson
      Manager/Member

CRAFT EXPLORATION COMPANY, LLC


By_____
      Stephen H. Craft
      Manager/Member


DICKSON OIL & GAS, L.L.C.


By_____
      C. Bickham Dickson, III
      Manager


BUNDERO INVESTMENT COMPANY, L.L.C.


By_____
      Robert P. Bowman
      Manager

RESOURCE VENTURES, LLC


By_____
      Mark A. Arnold
      General Manager

TAUBER EXPLORATION & PRODUCTION CO.


By_____
      Richard E. Tauber
      President

TIEMBO, LTD.


By_____
      Mark Rauch
      Registered Agent

KUDZU OIL PROPERTIES, L.L.C.


By_____
      R. Nash Neyland
      Executive Vice President

MARKSCO, L.L.C.


By_____
      Mark P. Sealy
      Member

LANDMARK EXPLORATION, LLC


By_____
      Larry Johnson
      Manager/Member

CRAFT EXPLORATION COMPANY, LLC


By_____
      Stephen H. Craft
      Manager/Member


DICKSON OIL & GAS, L.L.C.


By_____
      C. Bickham Dickson, III
      Manager


BUNDERO INVESTMENT COMPANY, L.L.C.


By_____
      Robert P. Bowman
      Manager

RESOURCE VENTURES, LLC


By_____
      Mark A. Arnold
      General Manager

TAUBER EXPLORATION & PRODUCTION CO.


By_____
     Richard E. Tauber
     President

TIEMBO, LTD.


By_____
     Mark Rauch
     Registered Agent

KUDZU OIL PROPERTIES, L.L.C.


By_____
     R. Nash Neyland
     Executive Vice President

MARKSCO, L.L.C.


By_____
     Mark P. Sealy
     Member

LANDMARK EXPLORATION, LLC


By_____
     Larry Johnson
     Manager/Member

CRAFT EXPLORATION COMPANY, LLC


By_____
     Stephen H. Craft
     Manager/Member

DICKSON OIL & GAS, L.L.C.


By_____
     C. Bickham Dickson, III
     Manager

BUNDERO INVESTMENT COMPANY, L.L.C.


By_____
     Robert P. Bowman
     Manager

RESOURCE VENTURES, LLC


By_____
     Mark A. Arnold
     General Manager



TAUBER EXPLORATION & PRODUCTION CO.


By_____
      Richard E. Tauber
      President

TIEMBO, LTD.


By_____
      Mark Rauch
      Registered Agent

KUDZU OIL PROPERTIES, L.L.C.


By_____
      R. Nash Neyland
      Executive Vice President

MARKSCO, L.L.C.


By_____
      Mark P. Sealy
      Member

LANDMARK EXPLORATION, LLC


By_____
      Larry Johnson
      Manager/Member

CRAFT EXPLORATION COMPANY, LLC


By_____
      Stephen H. Craft
      Manager/Member

DICKSON OIL & GAS, L.L.C.


By_____
      C. Bickham Dickson, III
      Manager


BUNDERO INVESTMENT COMPANY, L.L.C.


By_____
      Robert P. Bowman
      Manager

RESOURCE VENTURES, LLC


By_____
      Mark A. Arnold
      General Manager

TAUBER EXPLORATION & PRODUCTION CO.


By_____
      Richard E. Tauber
      President

TIEMBO, LTD.


By_____
      Mark Rauch
      Registered Agent

KUDZU OIL PROPERTIES, L.L.C.


By_____
      R. Nash Neyland
      Executive Vice President

MARKSCO, L.L.C.


By_____
      Mark P. Sealy
      Member

LANDMARK EXPLORATION, LLC


By_____
      Larry Johnson
      Manager/Member

CRAFT EXPLORATION COMPANY, LLC


By_____
      Stephen H. Craft
      Manager/Member


DICKSON OIL & GAS, L.L.C.


By_____
      C. Bickham Dickson, III
      Manager


BUNDERO INVESTMENT COMPANY, L.L.C.


By_____
      Robert P. Bowman
      Manager

RESOURCE VENTURES, LLC


By_____
      Mark A. Arnold
      General Manager

TAUBER EXPLORATION & PRODUCTION CO.

By_____
      Richard E. Tauber
      President

TIEMBO, LTD.

By_____
      Mark Rauch
      Registered Agent

KUDZU OIL PROPERTIES, L.L.C.

By_____
      R. Nash Neyland
      Executive Vice President

MARKSCO, L.L.C.

By_____
      Mark P. Sealy
      Member

LANDMARK EXPLORATION, LLC

By_____
      Larry Johnson
      Manager/Member

CRAFT EXPLORATION COMPANY, LLC

By_____
      Stephen H. Craft
      Manager/Member

DICKSON OIL & GAS, L.L.C.

By_____
      C. Bickham Dickson, III
      Manager

BUNDERO INVESTMENT COMPANY, L.L.C.

By_____
      Robert P. Bowman
      Manager

RESOURCE VENTURES, LLC

By_____
      Mark A. Arnold
      General Manager

Page **13** of **53**

ASPEN ENERGY, INC.

By _Michael S Reed_

Michael S. Reed
President

SEPULGA RIVER FUELS, LLC

By _____

Cosby H. Martin, Jr.
Sole Member

Attachments

| | |
|---|---|
| Exhibit "A": | Plat |
| Exhibit "A-1": | Description of Leases |
| Exhibit "B": | Form of Assignment |
| Exhibit "C": | Geophysical Permit Agreement |
| Exhibit "D": | AFE |
| Exhibit "E": | JOA |

ASPEN ENERGY, INC.

By_____
      Michael S. Reed
      President

SEPULGA RIVER FUELS, LLC

By_____
      Cosby H. Martin, Jr.
      Sole Member

Attachments

| | | |
|---|---|---|
| Exhibit "A": | Plat | |
| Exhibit "A-1": | Description of Leases | |
| Exhibit "B": | Form of Assignment | |
| Exhibit "C": | Geophysical Permit Agreement | |
| Exhibit "D": | AFE | |
| Exhibit "E": | JOA | |

## ACKNOWLEDGMENTS TO PARTICIPATION AGREEMENT

STATE OF LOUISIANA

PARISH OF CADDO

    I, _Kim S. Elias_____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklar Exploration Company L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the ___9th___ day of __November__, 2012.

<div align="right">

_Kim S. Elias_

NOTARY PUBLIC

</div>

[AFFIX NOTARIAL SEAL]

My Commission Expires: _at death_

<div align="right">

Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commission is for Life

</div>

STATE OF LOUISIANA

PARISH OF CADDO

    I, _Kim S. Elias_____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklarco L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the ___9th___ day of __November__, 2012.

<div align="right">

_Kim S. Elias_

NOTARY PUBLIC

Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commission is for Life

</div>

[AFFIX NOTARIAL SEAL]

My Commission Expires: _at death_

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

<div align="right">

_____

NOTARY PUBLIC

</div>

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

<div align="center">

Page **15** of **52**

</div>

STATE OF LOUISIANA

PARISH OF CADDO

    I, Kim S. Elias _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklar Exploration Company L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the ___9th___ day of ___November___, 2012.

                                  Kim S. Elias
                                  NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
                           Kim S. Elias, Notary Public # 52698
                               Caddo Parish, Louisiana
My Commission Expires: at death             My Commission is for Life


STATE OF LOUISIANA

PARISH OF CADDO

    I, Kim S. Elias _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklarco L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the ___9th___ day of ___November___, 2012.

                                    Kim S. Elias
                                  NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
                           Kim S. Elias, Notary Public # 52698
                               Caddo Parish, Louisiana
My Commission Expires: at death             My Commission is for Life


STATE OF TEXAS

COUNTY OF Harris

    I, Sharon M. McDonald _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the ___13___ day of ___November___, 2012.

        [SEAL: SHARON METCALF McDONALD, Notary Public, State of Texas, Commission Expires 12-29-2013]
                                  Sharon M. McDonald
                                  NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: 12/29/2013

**ACKNOWLEDGMENTS TO PARTICIPATION AGREEMENT**

STATE OF LOUISIANA

PARISH OF CADDO

    I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklarco L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                                       _____
                                       NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                                         _____
                                       NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF Dallas

    I, Robert Hiram Lucius, a notary public in and for said County and State, hereby certify that W. R. (Trey) Sibley, III, whose name as Attorney-in-Fact of THE RUDMAN PARTNERSHIP, a Texas general partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said partnership.

    Given under my hand and notarial seal this the 17th day of December, 2012.

ROBERT HIRAM LUCIUS
Notary Public, State of Texas
My Commission Expires
04/15/2016

                                       Robert Hiram Lucius
                                       NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: April 15, 2016

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that W. R. (Trey) Sibley, III, whose name as Attorney-in-Fact of THE RUDMAN PARTNERSHIP, a Texas general partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said partnership.

Given under my hand and notarial seal this the ___ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF *TEKAS*

COUNTY OF *DALLAS*

I, *LINDA SANDERS*_____, a notary public in and for said County and State, hereby certify that TARA RUDMAN, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she executed the same as her free act and deed.

Given under my hand and notarial seal this the *5th* day of *December*, 2012.

*Linda Sanders*
_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: *5.14.2016*

LINDA SANDERS
Notary Public, State of Texas
My Commission Expires
05/14/2016

STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

Page 16 of 52

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that W. R. (Trey) Sibley, III, whose name as Attorney-in-Fact of THE RUDMAN PARTNERSHIP, a Texas general partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said partnership.

Given under my hand and notarial seal this the ___ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that TARA RUDMAN, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she executed the same as her free act and deed.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the 21st day of November 2012.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: 8-11-15

MARCIA A. DE LUNA
Notary Public, State of Texas
My Commission Expires
August 11, 2015

Page **16** of **52**

STATE OF TEXAS

COUNTY OF _Harris_

I, _Brenda Witt White_, a notary public in and for said County and State, hereby certify that Phil O. Kelley, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

Given under my hand and notarial seal this the _14th_ day of _November_, 2012.

_Brenda Witt White_
Notary Public

BRENDA WITT WHITE
Notary Public, State of Texas
My Commission Expires
March 23, 2015

My commission expires: _3-23-15_


STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as duly authorized Vice President of PICKENS FINANCIAL GROUP, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

Page **17** of **52**

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Phil O. Kelley, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
                           Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF Dallas

    I, Marilyn L. Fulton, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as duly authorized Vice President of PICKENS FINANCIAL GROUP, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the 15th day of November, 2012.

Marilyn L. Fulton
My Commission Expires
06/23/2016

Marilyn L. Fulton
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: 6-23-16

STATE OF LOUISIANA

PARISH OF CADDO

    I, _____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
                           Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Phil O. Kelley, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as duly authorized Vice President of PICKENS FINANCIAL GROUP, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

      I, _Melissa R. Ebarb_____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

      Given under my hand and notarial seal this the _14th_ day of _Nov_, 2012.

_____
Notary Public
# 68325

(AFFIX NOTARIAL SEAL)

My commission expires: is for Life

*CASTLEBERRY PROSPECT PA*

STATE OF TEXAS

COUNTY OF *HARRIS*

I, *MYLA WUNDERLICH*, a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as duly authorized President of TAUBER EXPLORATION & PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the *12th* day of *DECEMBER*, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

MYLA WUNDERLICH
Notary Public, State of Texas
Commission Expires 02-11-2016


STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Page 18 of 52

STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as duly authorized President of TAUBER EXPLORATION & PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF *HARRIS*

     I, *PATTI L HANSON*, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the *16* day of *November*, 2012.

_____
NOTARY PUBLIC

```
┌─────────────────────────────────┐
│   ★   PATTI L HANSON            │
│       MY COMMISSION EXPIRES     │
│       January 18, 2015          │
└─────────────────────────────────┘
```

[AFFIX NOTARIAL SEAL]

My Commission Expires: *1/18/15*


STATE OF MISSISSIPPI

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as duly authorized President of TAUBER EXPLORATION & PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF MISSISSIPPI

COUNTY OF _Madison_

I, _Pamela F. Sebren_, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _13_ day of _November_, 2012.

_Pamela F. Sebren_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 63506
PAMELA F. SEBREN
Commission Expires
July 18, 2013
RANKIN COUNTY

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, Aungel Pattison , a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the 15 day of NOV , 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

AUNGEL PATTISON
Embossed Hereon Is My
DeSoto, Caddo, Bossier Parishes
Louisiana Notary Public Seal
Notary ID No. 063733
My Commission Expires Upon My Death

STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Larry Johnson, whose name as duly authorized Manager/Member of LANDMARK EXPLORATION, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Steven H. Craft, whose name as duly authorized Manager/Member of CRAFT EXPLORATION COMPANY, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF MISSISSIPPI

COUNTY OF _Rankin_

I, _Lena M. Mayfield_, a notary public in and for said County and State, hereby certify that Larry Johnson, whose name as duly authorized Manager/Member of LANDMARK EXPLORATION, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _16_ day of _November_, 2012.

_Lena M. Mayfield_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _2-17-2013_

STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Steven H. Craft, whose name as duly authorized Manager/Member of CRAFT EXPLORATION COMPANY, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

                                    _____

                                      Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Larry Johnson, whose name as duly authorized Manager/Member of LANDMARK EXPLORATION, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

                                      _____

                                    NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF _MADISON_

      I, _JOZIE DenHerder_____, a notary public in and for said County and State, hereby certify that Steven H. Craft, whose name as duly authorized Manager/Member of CRAFT EXPLORATION COMPANY, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _20th_ day of _NOVEMBER_, 2012.

                                    _____

                                    NOTARY PUBLIC

STATE OF MISS
ID No 103723
Comm Expires
October 15, 2016
NOTARY PUBLIC
MADISON COUNTY

[AFFIX NOTARIAL SEAL]

My Commission Expires: _10·15·16_

STATE OF LOUISIANA

PARISH OF CADDO

    I, *George* *Portocarrero*, a notary public in and for said Parish and State, hereby certify that C. Bickham Dickson, III, whose name as Member of the DICKSON OIL & GAS, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _4TH_ day of _December_, 2012.

                                 _____
                                        Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _For Life_

> GEORGE PORTOCARRERO
> NOTARY PUBLIC - LOUISIANA
> CADDO - BOSSIER PARISH
> NOTARY ID NUMBER 056297
> My Commission Is For Life

STATE OF LOUISIANA

PARISH OF CADDO

    I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                               _____
                               NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF COLORADO

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Mark A. Arnold, whose name as duly authorized General Manager of RESOURCE VENTURES, LLC, an Indiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                               _____
                               NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Page **20** of **52**

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that C. Bickham Dickson, III, whose name as Member of the DICKSON OIL & GAS, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, Deborah W. Cox_____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 15th day of November, 2012.

_____
NOTARY PUBLIC

DEBORAH W. COX  26623
Notary Public
Parish of Caddo
State of Louisiana

[AFFIX NOTARIAL SEAL]

My Commission Expires: for life

STATE OF COLORADO

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Mark A. Arnold, whose name as duly authorized General Manager of RESOURCE VENTURES, LLC, an Indiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that C. Bickham Dickson, III, whose name as Member of the DICKSON OIL & GAS, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

                                        _____
                                            Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

                                          _____
                                      NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF COLORADO

COUNTY OF Douglas

      I, JoAnne Scherfel, a notary public in and for said County and State, hereby certify that Mark A. Arnold, whose name as duly authorized General Manager of RESOURCE VENTURES, LLC, an Indiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the 20 Th day of November, 2012.

                                        JoAnne Scherfel
                                      NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: 3/5/2013

STATE OF KENTUCKY

COUNTY OF _Jefferson_

    I, ____Terri P Jones____, a notary public in and for said County and State, hereby certify that Michael S. Reed, whose name as duly authorized President of ASPEN ENERGY, INC., a Kentucky corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the __15th__ day of __November__, 2012.

                                    _____
                                  NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _Sept 12, 2016_

STATE OF ALABAMA

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Cosby H. Martin, Jr., whose name as the Sole Member of SEPULGA RIVER FUELS, LLC, an Alabama limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                                    _____
                                  NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF KENTUCKY

COUNTY OF _____

       I, _____, a notary public in and for said County and State, hereby certify that Michael S. Reed, whose name as duly authorized President of ASPEN ENERGY, INC., a Kentucky corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

       Given under my hand and notarial seal this the _____ day of _____, 2012.


                                 _____
                                   NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF ALABAMA

COUNTY OF *Escambia*

       I, *Kathy Helton*, a notary public in and for said County and State, hereby certify that Cosby H. Martin, Jr., whose name as the Sole Member of SEPULGA RIVER FUELS, LLC, an Alabama limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

       Given under my hand and notarial seal this the *19th* day of *November*, 2012.


                                 *Kathy Helton*
                                   NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: ___My Commission Expires June 19, 2013___

# EXHIBIT A

Attached to and made a part of that certain Castleberry Prospect Participation Agreement
dated effective as of November 7, 2012, by and between Sklar Exploration Company
L.L.C., as Operator and Sklarco L.L.C, McCombs Energy, Ltd., The Rudman Partnership,
Tara Rudman, JJS Working interests LLC, Fant Energy Limited, Pickens Financial Group,
LLC, Fleet Howell, Tauber Exploration & Production Co., Tiembo, Ltd., Kudzu Oil
Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC, Craft Exploration
Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C.,
Resource Ventures, LLC, Aspen Energy, Inc., and Sepulga River Fuels, LLC, as Non-
Operators.



## EXHIBIT "A-1"

Attached to and made a part of that certain
Castleberry Prospect Participation Agreement dated effective as of November 7, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C, McCombs Energy, Ltd.,
The Rudman Partnership, Tara Rudman, JJS Working Interests LLC,
Fant Energy Limited, Pickens Financial Group, LLC, Fleet Howell,
Tauber Exploration & Production Co., Tiembo, Ltd., Kudzu Oil Properties, L.L.C.,
Marksco, L.L.C., Landmark Exploration, LLC, Craft Exploration Company, LLC,
Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C., Resource Ventures, LLC,
Aspen Energy, Inc., and Sepulga River Fuels, LLC

## DESCRIPTION OF LEASES

1.  Oil, Gas and Mineral Lease dated June 12, 2012, by and between Cedar Creek Land and Timber, Inc., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5359 of the Probate Judge Records of Conecuh County, Alabama (Estimated 1070.80 Net Mineral Acres).

2.  Oil, Gas and Mineral Lease dated June 12, 2012, by and between McMillan, Ltd., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5362 of the Probate Judge Records of Conecuh County, Alabama (Estimated 32.50 Net Mineral Acres).

3.  Oil, Gas and Mineral Lease May 9, 2012, by and between Chester Hix, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5367 of the Probate Judge Records of Conecuh County, Alabama (Estimated 10.8381 Net Mineral Acres).

4.  Oil, Gas and Mineral Lease May 8, 2012, by and between Escon, Inc., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5365 of the Probate Judge Records of Conecuh County, Alabama (Estimated 2.50 Net Mineral Acres).

5.  Oil, Gas and Mineral Lease May 9, 2012, by and between George W. Pritchett et ux., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5369 of the Probate Judge Records of Conecuh County, Alabama (Estimated 2.50 Net Mineral Acres).

6.  Oil, Gas and Mineral Lease May 15, 2012, by and between Broox G. Garrett, Jr., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5370 of the Probate Judge Records of Conecuh County, Alabama (Estimated 1.666666 Net Mineral Acres).

7.  Oil, Gas and Mineral Lease June 12, 2012, by and between Sally Jane Spencer, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5383 of the Probate Judge Records of Conecuh County, Alabama (Estimated 1.666666 Net Mineral Acres).

8.  Oil, Gas and Mineral Lease May 8, 2012, by and between Kathryn Ann Till, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5372 of the Probate Judge Records of Conecuh County, Alabama (Estimated 0.833333 Net Mineral Acres).

9.  Oil, Gas and Mineral Lease May 21, 2012, by and between Robert R. Smith Family Trust, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5374 of the Probate Judge Records of Conecuh County, Alabama (0.833333 Net Mineral Acres).

10. Oil, Gas and Mineral Lease June 21, 2012, by and between William Bertrand Spencer, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5381 of the Probate Judge Records of Conecuh County, Alabama (Estimated 1.666666 Net Mineral Acres).

11. Oil, Gas and Mineral Lease May 23, 2012, by and between Patricia V. Saloom Assemany, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book

2012, Page 5385 of the Probate Judge Records of Conecuh County, Alabama (Estimated 0.833333 Net Mineral Acres).

12.   Oil, Gas and Mineral Lease July 17, 2012, by and between David Coker, Individually and as Trustee, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5379 of the Probate Judge Records of Conecuh County, Alabama (Estimated 1.666666 Net Mineral Acres).

13.   Oil, Gas and Mineral Lease June 15, 2012, by and between Guy F. Stovall III et al., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5376 of the Probate Judge Records of Conecuh County, Alabama (Estimated 2.500000 Net Mineral Acres).

14.   Oil, Gas and Mineral Lease April 10, 2012, by and between Richard A. Baggett, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5334 of the Probate Judge Records of Conecuh County, Alabama (Estimated 53.333333 Net Mineral Acres).

15.   Oil, Gas and Mineral Lease April 10, 2012, by and between Craig A. Baggett, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5332 of the Probate Judge Records of Conecuh County, Alabama (Estimated 53.333333 Net Mineral Acres).

16.   Oil, Gas and Mineral Lease April 10, 2012, by and between James A. Baggett, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5330 of the Probate Judge Records of Conecuh County, Alabama (Estimated 53.333333 Net Mineral Acres).

17.   Oil, Gas and Mineral Lease June 12, 2012, by and between Myrtice W. Ellis et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5336 of the Probate Judge Records of Conecuh County, Alabama (Estimated 20.892850 Net Mineral Acres).

18.   Oil, Gas and Mineral Lease July 26, 2012, by and between Irvine Peter Brennecke, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5339 of the Probate Judge Records of Conecuh County, Alabama (Estimated 3.333333 Net Mineral Acres).

19.   Oil, Gas and Mineral Lease April 12, 2012, by and between Daniel Bryan Reed et ux., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5353 of the Probate Judge Records of Conecuh County, Alabama (Estimated 148.00 Net Mineral Acres).

20.   Oil, Gas and Mineral Lease April 12, 2012, by and between Daniel Bryan Reed et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5356 of the Probate Judge Records of Conecuh County, Alabama (Estimated 80.00 Net Mineral Acres).

21.   Oil, Gas and Mineral Lease June 14, 2012, by and between Elsie Jane Dyess et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5347 of the Probate Judge Records of Conecuh County, Alabama (Estimated 4.00 Net Mineral Acres).

22.   Oil, Gas and Mineral Lease June 14, 2012, by and between Elsie Jane Dyess et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5349 of the Probate Judge Records of Conecuh County, Alabama (Estimated 4.125 Net Mineral Acres).

23.   Oil, Gas and Mineral Lease June 14, 2012, by and between Elsie Jane Dyess et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5351 of the Probate Judge Records of Conecuh County, Alabama (Estimated 5.15 Net Mineral Acres).

24.   Oil, Gas and Mineral Lease June 14, 2012, by and between Elsie Jane Dyess et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5344 of the Probate Judge Records of Conecuh County, Alabama (Estimated 1.520000 Net Mineral Acres).

25.   Oil, Gas and Mineral Lease June 14, 2012, by and between Michael Thomas Dyess et ux., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5341 of the Probate Judge Records of Conecuh County, Alabama (Estimated 0.935000 Net Mineral Acres).

26.   Oil, Gas and Mineral Lease August 8, 2012, by and between Dee Ann Bray Matheson, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5575 of the Probate Judge Records of Conecuh County, Alabama (Estimated 6.916666 Net Mineral Acres).

27.     Oil, Gas and Mineral Lease August 8, 2012, by and between George Michael Bray, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5834 of the Probate Judge Records of Conecuh County, Alabama (Estimated 6.196666 Net Mineral Acres).

EXHIBIT "B"

Attached to and made a part of that certain
Castleberry Prospect Participation Agreement dated effective as of November 7, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd.,
The Rudman Partnership, Tara Rudman, JJS Working Interests LLC,
Fant Energy Limited, Pickens Financial Group, LLC, Fleet Howell,
Tauber Exploration & Production Co., Tiembo, Ltd., Kudzu Oil Properties, L.L.C.,
Marksco, L.L.C., Landmark Exploration, LLC, Craft Exploration Company, LLC,
Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C., Resource Ventures, LLC,
Aspen Energy, Inc., and Sepulga River Fuels, LLC

**FORM OF ASSIGNMENT OF OIL, GAS AND OTHER MINERAL LEASES**

STATE OF ALABAMA,

COUNTY OF CONECUH.

KNOW ALL MEN BY THESE PRESENTS That:

**ASPEN ENERGY, INC.**, a Kentucky corporation, whose address is 161 St. Matthews Ave., Suite 16, Louisville, Kentucky 40207, represented herein by its President, Michael S. Reed (hereinafter referred to as "Aspen" or "Assignor");

for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the assignment of overriding royalty interest and reversionary back-in working interest described hereinbelow, does hereby grant, bargain, sell, convey, assign, set over and transfer unto the following (hereinafter sometimes referred to collectively as the "Assignees" or individually as an "Assignee"):

**SKLARCO L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President & Chief Operating Officer, David A. Barlow ("Sklarco");

**MCCOMBS ENERGY, LTD.**, a Texas limited partnership, whose address is 5599 San Felipe, Suite 1200, Houston, Texas 77056-2794, represented herein by its Vice President, Ricky Haikin ("McCombs");

**THE RUDMAN PARTNERSHIP**, a Texas general partnership, whose address is 1700 Pacific Avenue, Suite 4700, Dallas, TX 75201, represented herein by W.R. (Trey) Sibley, III, as the duly authorized Attorney-In-Fact of said partnership ("Rudman");

**TARA RUDMAN**, Individually, whose address is 1700 Pacific Avenue, Suite 4700, Dallas, TX 75201 ("Tara Rudman");

**JJS WORKING INTERESTS LLC**, a Texas limited liability company, whose address is 4295 San Felipe, Suite 207, Houston, Texas 77027, represented herein by Houston Bulldog Capital Management, LLC, its duly authorized Manager, represented herein by Justin Simons, in his capacity as the duly authorized Manager of Houston Bulldog Capital Management, LLC ("JJS");

Page **26** of **52**

**FANT ENERGY LIMITED**, a Texas limited partnership, whose address is 5800 Westview Drive, Houston, Texas 77055, represented herein by its General Partner, Richard E. Fant L.L.C., which itself is represented herein by its Manager, Phil O. Kelley ("Fant");

**PICKENS FINANCIAL GROUP, L.L.C.**, a Texas limited liability company, whose address is 8499 Greenville Avenue, Suite 105, Dallas, TX 75231-2417, represented herein by Michael K. Pickens, as the duly authorized Vice President of said company ("Pickens");

**FLEET HOWELL** 416 Travis Street, Suite 715, Shreveport, Louisiana 71101 ("Howell");

**TAUBER EXPLORATION & PRODUCTION CO.**, a Texas corporation, whose address is 55 Waugh Drive, Suite 600, Houston TX 77007, represented herein by Richard E. Tauber, as the duly authorized President of said company ("Tauber");

**TIEMBO, LTD.**, a Texas limited partnership, whose address is P. O. Box 270415, Houston, Texas 77277-0415, represented herein by its Registered Agent, Mark Rauch ("Tiembo");

**KUDZU OIL PROPERTIES, LLC**, a Mississippi limited liability company, whose address is 300 Concourse Blvd., Suite 101, Ridgeland, Mississippi 39157, represented herein by its Executive Vice President, R. Nash Neyland ("Kudzu");

**MARKSCO, L.L.C.**, a Louisiana limited liability company, whose address is 333 Texas Street, Suite 1050, Shreveport, Louisiana 71101, represented herein by its Member, Mark P. Sealy ("Marksco");

**LANDMARK EXPLORATION, LLC**, a Mississippi limited liability company, whose address is Post Office Box 12004, Jackson, MS 39236, represented herein by Larry Johnson, as the duly authorized Manager/Member of said company ("Landmark");

**CRAFT EXPLORATION COMPANY, LLC**, a Mississippi limited liability company, whose address is 325 Lakeshire Parkway, Canton, MS 39046, represented herein by Steven H. Craft, as the duly authorized Manager/Member of said company ("Craft")

**DICKSON OIL & GAS, LLC**, a Louisiana limited liability company, whose address is Post Office Box 52479, Shreveport, Louisiana 71135, represented herein by its Manager, C. Bickham Dickson III ("Dickson");

**BUNDERO INVESTMENT COMPANY, L.L.C.**, a Louisiana limited liability company, whose address is 333 Texas Street, Suite 300, Shreveport, Louisiana 71101, represented herein by its Manager, Robert P. Bowman ("Bundero");

**RESOURCE VENTURES, LLC**, an Indiana limited liability company, whose address is 8369 South Park Lane, Suite B, Littleton, CO 80120, represented herein by Mark A. Arnold, as the duly authorized General Manager of said company ("Resource"); and

**SEPULGA RIVER FUELS, LLC**, an Alabama limited liability company, whose address is 15 Ridgers Lane, Brewton, Alabama 36426, represented herein by its Sole Member, Cosby H. Martin, Jr. ("Sepulga");

an undivided 82.500000% before payout interest (BPO) in and to the oil, gas and other mineral leases

(together with any corrective instruments relating thereto) described in Exhibit "A" (the "Leases") attached

hereto and by reference made a part hereof, an undivided 77.625000% after payout interest in and to Lease No. 1 described on Exhibit "A" (APO1), and an undivided 76.00000% after payout interest in the other Leases (APO2), and a like interest in and to the rights, estates and interests of the lessee under all of the Leases, in the proportions set forth below as to each such Assignee's name:

| Assignees | BPO | APO1 | APO2 |
|---|---|---|---|
| Sklarco | 11.293750% | 9.5996875% | 9.035000% |
| McCombs | 17.225000% | 14.6412500% | 13.78000% |
| Rudman | 1.300000% | 1.1050000% | 1.040000% |
| Tara Rudman | 6.825000% | 5.8012500% | 5.460000% |
| JJS | 6.500000% | 5.5250000% | 5.200000% |
| Fant | 6.500000% | 5.5250000% | 5.200000% |
| Pickens | 3.250000% | 2.7625000% | 2.600000% |
| Howell | 3.250000% | 2.7625000% | 2.600000% |
| Tauber | 1.625000% | 1.3812500% | 1.300000% |
| Tiembo | 1.300000% | 1.1050000% | 1.040000% |
| Kudzu | 1.300000% | 1.1050000% | 1.040000% |
| Marksco | 1.300000% | 1.1050000% | 1.040000% |
| Landmark | 1.300000% | 1.1050000% | 1.040000% |
| Craft | 0.650000% | 0.5525000% | 0.520000% |
| Dickson | 0.650000% | 0.5525000% | 0.520000% |
| Bundero | 0.650000% | 0.5525000% | 0.520000% |
| Resource | 0.081250% | 0.0690625% | 0.065000% |
| Sepulga | 17.50000% | 22.3750000% | 24.00000% |
| *Total* | 82.50000% | 77.625000% | 76.00000% |

Aspen hereby excepts from this Assignment and reserves unto itself the following before payout interest in and to the Leases (BPO), after payout interest in and to Lease No. 1 described on Exhibit "A" (APO1), and after payout interest in the other Leases (APO2), and a like interest in and to the rights, estates and interests of the lessee under all of the Leases, to-wit:

| Assignor | BPO | APO1 | APO2 |
|---|---|---|---|
| Aspen | 17.50000% | 22.375000% | 24.00000% |

Aspen further hereby excepts from this Assignment and reserves unto itself an overriding royalty interest (the "ORRI") equal to the positive difference, if any, between the lessor's royalty under each Lease and twenty-five percent (25%). With respect to any Lease as to which there is a positive difference (an "ORRI Lease"), each Assignee, separately and in proportion, and only in proportion, to the interest owned by such Assignee in the ORRI Lease, agrees: (a) to deliver to the credit of Aspen, or designee(s), in the pipeline to which the Assignees' well(s) may be connected, the applicable ORRI percentage of the oil produced and saved by Assignee pursuant to and allocable to the ORRI Lease, or from time to time, to pay Aspen, or designee(s), the average posted price of the applicable ORRI percentage of such oil at the well as of the day it is run to the pipeline or storage tanks, Aspen's, or designee(s), interest, in either case, to bear its proportionate share of the cost of treating oil to render it marketable pipeline oil; and (b) to pay Aspen, or designee(s), on gas and casinghead gas produced pursuant to and allocable to the ORRI Lease (1) when sold by Assignee, the applicable ORRI percentage of the amount realized by Assignee, computed at the mouth of

Page **28** of **52**

the well, or (2) when used by Assignee off the ORRI Lease or in the manufacture of gasoline or other products, the market value at the well of the applicable ORRI percentage of such gas or casinghead gas, Aspen's, or designee(s), interest, in either case, to bear its proportionate share of the cost of treating, extracting and/or manufacturing such gas or other products to render it/them marketable pipeline quality. In the event that any ORRI Lease covers less than all mineral rights in and under any tract of land subject to said Lease, or in the event that Aspen, or designee(s), owns less than 100% of the lessee's interest (working interest) under any ORRI Lease, then the ORRI (if any) with respect to such Lease shall be proportionately reduced.

Aspen further excepts and reserves unto itself all right, title and interest in and under three of the Leases, namely, Lease No. 24, Lease No. 26 and Lease No. 27 on Exhibit A, insofar and only insofar as they cover lands located outside of: Section 36, Township 4 North, Range 10 East, and Sections 31 and 32, Township 4 North, Range 11 East, all in Conecuh County, Alabama.

TO HAVE AND TO HOLD unto the Assignees and Aspen, their successors and assigns, forever, subject to, and in accordance with, the following terms and provisions:

1. This Assignment is made effective as of November 7, 2012 (the "Effective Date").

2. The Assignment of interests in the Leases (and in the rights, estates and interests of the lessees thereunder) made herein and of the ORRI made herein are both made without warranty of title, express or implied, not even return of the purchase price, except that: (a) Assignor warrants and agrees to defend title against all defects or encumbrances arising out of claims by Assignor or of persons claiming by, through or under Assignor; (b) Assignor further warrants and covenants that each of the Leases is fully enforceable by Assignor, and will be enforceable by Assignees, in accordance with, and subject to, its terms and provisions (but Assignor does not warrant the title of the lessor) and that none of them are subject to being declared void or otherwise terminated by the lessors thereunder; and (c) Assignor specifically represents and warrants that it has full and complete authority to assign the above described interests in the Leases to Assignees, that it has not alienated or encumbered (in any manner whatsoever) the rights and interests conveyed or transferred in or under the Leases and that such rights and interests are free and clear of, and Assignor will defend title thereto and possession thereof against, any claims, interests, or liens by anyone claiming by, through or under Assignor. Additionally, this Assignment is made with transfer and subrogation to Assignees of all rights that Assignor may have under warranties in the Leases and/or under warranties by any prior owners of the lands covered by the Leases.

3. This Assignment, and the interest assigned hereunder, is made subject to the terms and conditions of the Leases.

4. This Assignment is also made in accordance with and subject to that certain Castleberry Prospect Participation Agreement (the "PA") dated effective as of November 7, 2012, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., The Rudman Partnership, Tara Rudman, JJS Working interests LLC, Fant Energy Limited, Pickens Financial Group, LLC, Fleet Howell, Tauber Exploration & Production Co., Tiembo, Ltd., Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC, Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C., Resource Ventures, LLC, Aspen Energy, Inc., and Sepulga River Fuels, LLC , and all attachments thereto, including that certain Operating Agreement dated November 7, 2012, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C. et al., as Non-Operators, and all of the terms and provisions of that Participation Agreement and its attachments, all of which are incorporated herein by reference. Without limitation upon the foregoing, this Assignment is made subject to the

reversionary working interest described in Section 1.5 of the PA. The terms "before payout" and "after payout" shall have the meanings ascribed to them in the PA.

5.      This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. Also, all signature pages to copies of this Assignment may be attached to one copy thereof, and only that copy need be recorded.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

**ASSIGNORS:**

ASPEN ENERGY, INC.

By_____
            Michael S. Reed
            President

**ASSIGNEES:**

SKLARCO L.L.C.

By_____
            David A. Barlow
            President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

By_____
            Ricky Haikin
            Vice President

THE RUDMAN PARTNERSHIP

By_____
            W. R. (Trey) Sibley, III
            Attorney-In-Fact


_____
            TARA RUDMAN

JJS WORKING INTERESTS LLC
By:      Houston Bulldog Capital Management, LLC

By_____
            Justin Simons
            Manager

FANT ENERGY LIMITED
By:      Richard E. Fant, L.L.C., its General Partner

By_____
            Phil O. Kelley
            Manager

Page **30** of **52**

PICKENS FINANCIAL GROUP, L.L.C.


By_____
        Michael K. Pickens
        Vice President



_____
      FLEET HOWELL

TAUBER EXPLORATION & PRODUCTION CO.


By_____
        Richard E. Tauber
        President

TIEMBO, LTD.


By_____
        Mark Rauch
        Registered Agent

KUDZU OIL PROPERTIES, L.L.C.


By_____
        R. Nash Neyland
        Executive Vice President

MARKSCO, L.L.C.


By_____
        Mark P. Sealy
        Member

LANDMARK EXPLORATION, LLC


By_____
        Larry Johnson
        Manager/Member

CRAFT EXPLORATION COMPANY, LLC


By_____
        Stephen H. Craft
        Manager/Member

DICKSON OIL & GAS, L.L.C.


By_____
        C. Bickham Dickson, III
        Manager

BUNDERO INVESTMENT COMPANY, L.L.C.


By_____
　　　　Robert P. Bowman
　　　　Manager

RESOURCE VENTURES, LLC


By_____
　　　　Mark A. Arnold
　　　　General Manager

ASPEN ENERGY, INC.


By_____
　　　　Michael S. Reed
　　　　President

SEPULGA RIVER FUELS, LLC


By_____
　　　　Cosby H. Martin, Jr.
　　　　Sole Member

## EXHIBIT "A"

Attached to and made a part of that certain Assignment Of Oil, Gas And Other Mineral Leases dated effective as November 7, 2012, executed by Aspen Energy, Inc., as Assignor, in favor of Sklarco L.L.C, McCombs Energy, Ltd., The Rudman Partnership, Tara Rudman, JJS Working Interests LLC, Fant Energy Limited, Pickens Financial Group, LLC, Fleet Howell, Tauber Exploration & Production Co., Tiembo, Ltd., Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC, Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C., Resource Ventures, LLC, and Sepulga River Fuels, LLC, as Assignees

### DESCRIPTION OF LEASES

1. Oil, Gas and Mineral Lease dated June 12, 2012, by and between Cedar Creek Land and Timber, Inc., as Lessor, and Aspen Energy, as Lessee, a memorandum of which is recorded in Book 2012, Page 5359 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 23, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

2. Oil, Gas and Mineral Lease dated June 12, 2012, by and between McMillan, Ltd., as Lessor, and Aspen Energy, as Lessee, a memorandum of which is recorded in Book 2012, Page 5362 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 22, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

3. Oil, Gas and Mineral Lease May 9, 2012, by and between Chester Hix, as Lessor, and Aspen Energy, as Lessee, a memorandum of which is recorded in Book 2012, Page 5367 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 31, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

4. Oil, Gas and Mineral Lease May 8, 2012, by and between Escon, Inc., as Lessor, and Aspen Energy, as Lessee, a memorandum of which is recorded in Book 2012, Page 5365 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 30, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

5. Oil, Gas and Mineral Lease May 15, 2012, by and between Broox G. Garrett, Jr., as Lessor, and Aspen Energy, as Lessee, a memorandum of which is recorded in Book 2012, Page 5370 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 22, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

6. Oil, Gas and Mineral Lease June 12, 2012, by and between Sally Jane Spencer, as Lessor, and Aspen Energy, as Lessee, a memorandum of which is recorded in Book 2012, Page 5383 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 30, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

7. Oil, Gas and Mineral Lease May 8, 2012, by and between Kathryn Ann Till, as Lessor, and Aspen Energy, as Lessee, a memorandum of which is recorded in Book 2012, Page 5372 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 31, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

8. Oil, Gas and Mineral Lease May 21, 2012, by and between Robert R. Smith Family Trust, as Lessor, and Aspen Energy, as Lessee, a memorandum of which is recorded in Book 2012, Page 5374 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 22 and October 29, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

9. Oil, Gas and Mineral Lease June 21, 2012, by and between William Bertrand Spencer, as Lessor, and Aspen Energy, as Lessee, a memorandum of which is recorded in Book 2012, Page 5381 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 29, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

10.  Oil, Gas and Mineral Lease July 17, 2012, by and between David Coker, Individually and as Trustee, as Lessor, and Aspen Energy, as Lessee, a memorandum of which is recorded in Book 2012, Page 5379 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 31, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

11.  Oil, Gas and Mineral Lease April 10, 2012, by and between Richard A. Baggett, as Lessor, and Aspen Energy, as Lessee, recorded in Book 2012, Page 5334 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on November 1, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

12.  Oil, Gas and Mineral Lease April 10, 2012, by and between Craig A. Baggett, as Lessor, and Aspen Energy, as Lessee, recorded in Book 2012, Page 5332 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 29, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

13.  Oil, Gas and Mineral Lease April 12, 2012, by and between Daniel Bryan Reed et ux., as Lessor, and Aspen Energy, as Lessee, recorded in Book 2012, Page 5353 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 22, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

14.  Oil, Gas and Mineral Lease April 12, 2012, by and between Daniel Bryan Reed et al., as Lessor, and Aspen Energy, as Lessee, recorded in Book 2012, Page 5356 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 22, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

15.  Oil, Gas and Mineral Lease June 14, 2012, by and between Elsie Jane Dyess et al., as Lessor, and Aspen Energy, as Lessee, recorded in Book 2012, Page 5347 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 25, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

16.  Oil, Gas and Mineral Lease June 14, 2012, by and between Elsie Jane Dyess et al., as Lessor, and Aspen Energy, as Lessee, recorded in Book 2012, Page 5349 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 25, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

17.  Oil, Gas and Mineral Lease June 14, 2012, by and between Elsie Jane Dyess et al., as Lessor, and Aspen Energy, as Lessee, recorded in Book 2012, Page 5344 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 25, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

18.  Oil, Gas and Mineral Lease August 8, 2012, by and between Dee Ann Bray Matheson, as Lessor, and Aspen Energy, as Lessee, recorded in Book 2012, Page 5575 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 26, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

19.  Oil, Gas and Mineral Lease August 8, 2012, by and between George Michael Bray, as Lessor, and Aspen Energy, as Lessee, recorded in Book 2012, Page 5834 of the Probate Judge Records of Conecuh County, Alabama, as corrected by an instrument signed by Lessor on October 26, 2012, the original of which is, or will shortly be, recorded in said Probate Court records.

**ACKNOWLEDGMENTS TO ASSIGNMENT OF OIL, GAS AND OTHER MINERAL LEASES**

STATE OF KENTUCKY

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Michael S. Reed, whose name as duly authorized President of ASPEN ENERGY, INC., a Kentucky corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.


                                      _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklarco L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.


                                        _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.


                                        _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

       I, _____, a notary public in and for said County and State, hereby certify that W. R. (Trey) Sibley, III, whose name as Attorney-in-Fact of THE RUDMAN PARTNERSHIP, a Texas general partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said partnership.

       Given under my hand and notarial seal this the __ day of _____, 2012.


                                    _____
                                      NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF _____

COUNTY OF _____

       I, _____, a notary public in and for said County and State, hereby certify that TARA RUDMAN, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she executed the same as her free act and deed.

       Given under my hand and notarial seal this the _____ day of _____, 2012.


                                      _____
                                      Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF TEXAS

COUNTY OF HARRIS

       I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

       Given under my hand and notarial seal this the _____ day of _____, 2012.


                                      _____
(AFFIX NOTARIAL SEAL)                           NOTARY PUBLIC

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Phil O. Kelley, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

     Given under my hand and notarial seal this the _____ day of _____, 2012.

                                     _____

                                         Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as duly authorized Vice President of PICKENS FINANCIAL GROUP, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2012.

                                     _____

                                       NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

     I, _____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

     Given under my hand and notarial seal this the _____ day of _____, 2012.

                                     _____

                                       Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as duly authorized President of TAUBER EXPLORATION & PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                                    _____
                                      NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                                      _____
                                      NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                                      _____
                                      NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

     I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2012.

                                  _____
                                          Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Larry Johnson, whose name as duly authorized Manager/Member of LANDMARK EXPLORATION, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2012.

                                    _____
                                    NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Steven H. Craft, whose name as duly authorized Manager/Member of CRAFT EXPLORATION COMPANY, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2012.

                                    _____
                                    NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that C. Bickham Dickson, III, whose name as Member of the DICKSON OIL & GAS, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.


                                       _____
                                            Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.


                                       _____
                                      NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF COLORADO

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Mark A. Arnold, whose name as duly authorized General Manager of RESOURCE VENTURES, LLC, an Indiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.


                                       _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF ALABAMA

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Cosby H. Martin Jr., whose name as the Sole Member of SEPULGA RIVER FUELS, LLC, an Alabama limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.


                                                _____
                                              NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

EXHIBIT "C"

Attached to and made a part of that certain
Castleberry Prospect Participation Agreement dated effective as of November 7, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C, McCombs Energy, Ltd.,
The Rudman Partnership, Tara Rudman, JJS Working Interests LLC,
Fant Energy Limited, Pickens Financial Group, LLC, Fleet Howell,
Tauber Exploration & Production Co., Tiembo, Ltd., Kudzu Oil Properties, L.L.C.,
Marksco, L.L.C., Landmark Exploration, LLC, Craft Exploration Company, LLC,
Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C., Resource Ventures, LLC,
Aspen Energy, Inc., and Sepulga River Fuels, LLC

## GEOPHYSICAL PERMIT AGREEMENT

STATE OF ALABAMA

COUNTY OF CONECUH

THIS AGREEMENT made and entered into as of the 7th day of November, 2012, by and between Aspen Energy, Inc., a Kentucky corporation, whose address is 161 St. Matthews Ave., Suite 16, Louisville, Kentucky 40207, represented herein by its President, Michael S. Reed, hereinafter referred to as "Grantor" and Sklar Exploration Company L.L.C., a Louisiana limited liability company, whose mailing is 401 Edwards St., Ste. 1601, Shreveport, LA 71101, represented herein by its President & Chief Operating Officer, David A. Barlow, hereinafter referred to as "Grantee."

A. CONSIDERATION AND OPTION

For and in of the sum of Ten Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and of the agreements herein contained and subject to the terms and conditions hereinafter set forth, Grantor hereby grants unto Grantee the exclusive right during the Permit Period (as defined below) covering all of Grantor's interest under the Oil, Gas and Mineral Leases (the "Leases") described in Exhibit "C" attached hereto and by reference made a part hereof, and the lands covered by those Leases, to conduct or cause to be conducted geophysical and other exploration surveys on said property for the purpose of exploring same for the possible existence of oil, gas and other hydrocarbons (all such permitted methods of exploration being collectively referred to as "Seismic Operations"). It is the intention of the Grantor to grant to the Grantee a Geophysical Permit. The "Permit Period" shall commence beginning on the date of this agreement and run concurrent with the term of the Leases.

B. MINERAL OWNERS

Grantor hereby declares that it does not own the oil and gas in and under the lands covered by the Leases but instead owns the leasehold rights thereunder, including any rights to conduct geophysical or other exploration surveys on the lands covered by the Leases. If and to the extent that Grantee must also obtain permission from the lessor of the Leases or other owners of oil and gas in and under the lands covered by the Leases, Grantee shall be solely responsible for identifying the same and obtaining all, if any, necessary consents or permits prior to commencing operations on or under lands subject to the Leases.

C. OPERATIONS

Grantee shall be responsible for paying any amounts due to the surface owners of the lands covered by the Leases for any damages caused by Grantee's geophysical operations.

Grantee shall conduct said seismic operations and surveys or cause same to be conducted in a workmanlike manner, according to accepted industry practice, and all applicable federal, state, county, and local rules, regulations, and statutes.

D. GEOPHYSICAL DATA TO BE FURNISHED

Within ninety days after the completion of final processing, Grantee agrees to license to Grantor the geophysical data as provided on Exhibit "A" hereto, and within the data area as outlined in Exhibit "B" pursuant to terms and requirements and provisions of the seismic license attached hereto as Exhibit "D" and by reference made a part hereof, which Grantor must execute prior to obtaining a copy of the data.

If Grantor sells or transfers all of its right, title and interest in and to the Castleberry Prospect (as defined in the Castleberry Prospect Participation Agreement to which this Geophysical Permit Agreement is attached as Exhibit "C") to a single third party, including all of its interests in oil and gas leases covering lands located within the AMI and all of its interests in any wells located within the AMI, then, in that event, Grantor may also transfer all of its rights to the 3D seismic data under the license granted pursuant hereto to such third party without the consent of Grantee, provided such third party agrees to be bound by the terms of the applicable license agreement, the Castleberry Prospect Participation Agreement and the JOA attached thereto as Exhibit "E". If Grantor sells or transfers some, but not all, of its right, title and interest in and to the Castleberry Prospect to one or more third parties, or if Grantor sells or transfers all of its right, title and interest in and to the Castleberry Prospect to several third parties, then, in either event, Grantor may transfer all of its rights under the license granted pursuant hereto to a single third party without the consent of Grantee, provided that single third party agrees to be bound by the terms of the applicable license agreement, the Castleberry Prospect Participation Agreement and the JOA attached thereto as Exhibit "E"; provided further that such rights may not be transferred to multiple third parties, but only a single third party and such transfer must include all of Grantor's rights and interests in the seismic data, and, accordingly Grantor will no longer own any seismic rights under the license granted pursuant to this agreement or otherwise even if Grantor retains some interest in the Castleberry Prospect. Except as provided for herein, Grantor's seismic rights under this Agreement and under the license granted pursuant hereto shall be non-transferrable.

E. NOTICE

Any notice, communication or payment to a party hereunder may be given, sent, paid or tendered by postage prepaid mail addressed to said party at the address shown below or such other address as is hereafter designated in writing:

For: ASPEN ENERGY, INC.:
161 St. Matthews Ave., Suite 16
Louisville, Kentucky 40207

For: SKLAR EXPLORATION COMPANY L.L.C.:
401 Edwards St., Suite 1601
Shreveport, Louisiana 71101

F. SEVERABILITY

Any provision of this Agreement which is prohibited or unenforceable, in whole or in part, shall be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. If the scope of any provision set forth in this Agreement is too broad to permit enforcement of such provision to its full extent, then such provision shall be enforced to the maximum extent permitted by applicable law and, if necessary, the scope of any such provision may be judicially modified to the minimum extent necessary in any proceeding brought to enforce such provision and thereafter such provision, as so modified, may be fully enforced.

IN WITNESS WHEREOF, the parties hereto have executed this instrument in duplicate original counterparts, as of the date hereinabove written.

ASPEN ENERGY, INC.


By:_____
      Michael S. Reed, President



SKLAR EXPLORATION COMPANY L.L.C.


By:_____
      David A. Barlow, President and Chief
      Operating Officer

STATE OF _____
COUNTY OF _____

       I, _____ , a notary public in and for said county in said state, hereby certify that Michael S. Reed, whose name as President of Aspen Energy, Inc., a Kentucky corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument, he, as such officers and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and seal of office this ____ day of _____, 2012.

                                        _____
                                        Notary Public
                                        My Commission Expires:

                                        _____

STATE OF LOUISIANA
PARISH OF CADDO

I, _____ , a notary public, in and for the aforesaid jurisdiction, hereby certify that David A. Barlow, as President & Chief Operating Officer of Sklar Exploration Company L.L.C., a Louisiana limited liability company, who is known to me, personally appeared and acknowledged before me on this day, that being informed of the contents of the foregoing instrument he signed, executed and delivered the foregoing instrument voluntarily for and on behalf of said company on the day the same bears, he being duly authorized to do so.

Given under my hand and seal of office this the ____ day of _____, 2012.

Notary Public

                                      _____
                                        My Commission Expires:
                                        _____

## EXHIBIT "A"

Attached to and made a part of that certain Geophysical Permit Agreement dated effective as of November 7, 2012 by and between Aspen Energy, Inc. and Sklar Exploration Company L.L.C.

Seismic Data Requirements and Format

_____                    2-D Data Requirements:

1. Shotpoint map or plat on 1" = 2000' or larger
2. Seismic data loading SEG P1 file to include X-Y coordinates or shotpoints
3. Copy of acquisition and processing parameters
4. Field tapes and support documents, either DLT tape format or DVD
5. Copy of decon gathers-digital media format, either DLT tape or DVD
6. DVD of processed stacks and final migrated data in X-Y bin form, SEG-Y format
7. Copies of observer notes, survey notes and any other information and support data necessary for the complete reprocessing of the data

As used herein, the term "final" shall be defined as migrated stack.

_____        3-D Data Requirements:

1. Bin fold plat
2. Seismic data loading information to include X-Y coordinates of subsurface bin locations, bin spacing, and byte location of inlines and traces (xlines)
3. Copy of acquisition and processing parameters and all field, survey or observer notes necessary for complete reprocessing of all data
4. Field tapes and support documents, either on DLT tape format, DVD, or external hard drive
5. Copy of decon gathers-digital media format:  DLT tape, DVD, or external hard drive
6. DVD of processed stacks and final migrated data in X-Y bin form, SEG-Y format

As used herein, the term "final" shall be defined as the migrated stack.

**EXHIBIT "B"**

Attached to and made a part of that certain Geophysical Permit Agreement dated effective as of November 7, 2012 by and between Aspen Energy, Inc. and Sklar Exploration Company L.L.C.

**Data Area**

Insofar and only insofar as the data covers the Contract Area and AMI for the Castleberry Prospect and a one-half mile halo around such area (as such terms are defined in the Castleberry Prospect Participation Agreement to which this Geophysical Permit Agreement is attached as Exhibit "C").

## EXHIBIT "C"

Attached to and made a part of that certain Geophysical Permit Agreement dated effective as of November 7, 2012 by and between Aspen Energy, Inc. and Sklar Exploration Company L.L.C.

## DESCRIPTION OF OIL, GAS AND MINERAL LEASES

1.  Oil, Gas and Mineral Lease dated June 12, 2012, by and between Cedar Creek Land and Timber, Inc., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5359 of the Probate Judge Records of Conecuh County, Alabama.

2.  Oil, Gas and Mineral Lease dated June 12, 2012, by and between McMillan, Ltd., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5362 of the Probate Judge Records of Conecuh County, Alabama.

3.  Oil, Gas and Mineral Lease May 9, 2012, by and between Chester Hix, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5367 of the Probate Judge Records of Conecuh County, Alabama.

4.  Oil, Gas and Mineral Lease May 8, 2012, by and between Escon, Inc., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5365 of the Probate Judge Records of Conecuh County, Alabama.

5.  Oil, Gas and Mineral Lease May 9, 2012, by and between George W. Pritchett et ux., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5369 of the Probate Judge Records of Conecuh County, Alabama.

6.  Oil, Gas and Mineral Lease May 15, 2012, by and between Broox G. Garrett, Jr., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5370 of the Probate Judge Records of Conecuh County, Alabama.

7.  Oil, Gas and Mineral Lease June 12, 2012, by and between Sally Jane Spencer, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5383 of the Probate Judge Records of Conecuh County, Alabama.

8.  Oil, Gas and Mineral Lease May 8, 2012, by and between Kathryn Ann Till, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5372 of the Probate Judge Records of Conecuh County, Alabama.

9.  Oil, Gas and Mineral Lease May 21, 2012, by and between Robert R. Smith Family Trust, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5374 of the Probate Judge Records of Conecuh County, Alabama.

10. Oil, Gas and Mineral Lease June 21, 2012, by and between William Bertrand Spencer, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5381 of the Probate Judge Records of Conecuh County, Alabama.

11. Oil, Gas and Mineral Lease May 23, 2012, by and between Patricia V. Saloom Assemany, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5385 of the Probate Judge Records of Conecuh County, Alabama.

12. Oil, Gas and Mineral Lease July 17, 2012, by and between David Coker, Individually and as Trustee, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5379 of the Probate Judge Records of Conecuh County, Alabama.

13. Oil, Gas and Mineral Lease June 15, 2012, by and between Guy F. Stovall III et al., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5376 of the Probate Judge Records of Conecuh County, Alabama.

14. Oil, Gas and Mineral Lease April 10, 2012, by and between Richard A. Baggett, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5334 of the Probate Judge Records of Conecuh County, Alabama.

15.     Oil, Gas and Mineral Lease April 10, 2012, by and between Craig A. Baggett, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5332 of the Probate Judge Records of Conecuh County, Alabama.

16.     Oil, Gas and Mineral Lease April 10, 2012, by and between James A. Baggett, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5330 of the Probate Judge Records of Conecuh County, Alabama.

17.     Oil, Gas and Mineral Lease June 12, 2012, by and between Myrtice W. Ellis et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5336 of the Probate Judge Records of Conecuh County, Alabama.

18.     Oil, Gas and Mineral Lease July 26, 2012, by and between Irvine Peter Brennecke, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5339 of the Probate Judge Records of Conecuh County, Alabama.

19.     Oil, Gas and Mineral Lease April 12, 2012, by and between Daniel Bryan Reed et ux., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5353 of the Probate Judge Records of Conecuh County, Alabama.

20.     Oil, Gas and Mineral Lease April 12, 2012, by and between Daniel Bryan Reed et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5356 of the Probate Judge Records of Conecuh County, Alabama.

21.     Oil, Gas and Mineral Lease June 14, 2012, by and between Elsie Jane Dyess et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5347 of the Probate Judge Records of Conecuh County, Alabama.

22.     Oil, Gas and Mineral Lease June 14, 2012, by and between Elsie Jane Dyess et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5349 of the Probate Judge Records of Conecuh County, Alabama.

23.     Oil, Gas and Mineral Lease June 14, 2012, by and between Elsie Jane Dyess et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5351 of the Probate Judge Records of Conecuh County, Alabama.

24.     Oil, Gas and Mineral Lease June 14, 2012, by and between Elsie Jane Dyess et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5344 of the Probate Judge Records of Conecuh County, Alabama.

25.     Oil, Gas and Mineral Lease June 14, 2012, by and between Michael Thomas Dyess et ux., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5341 of the Probate Judge Records of Conecuh County, Alabama.

26.     Oil, Gas and Mineral Lease August 8, 2012, by and between Dee Ann Bray Matheson, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5575 of the Probate Judge Records of Conecuh County, Alabama.

27.     Oil, Gas and Mineral Lease August 8, 2012, by and between George Michael Bray, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5834 of the Probate Judge Records of Conecuh County, Alabama.

## EXHIBIT "D"

Attached to and made a part of that certain Geophysical Permit Agreement dated effective as of November 7, 2012 by and between Aspen Energy, Inc. and Sklar Exploration Company L.L.C.

## SEISMIC DATA LICENSE AGREEMENT

Date: _____ ___, _____

| | |
|---|---|
| | LICENSOR: Sklar Exploration Company L.L.C. |
| | Attention: Don Eustes |
| | 401 Edwards Street, Suite 1601 |
| | Shreveport, Louisiana 71101 |

LICENSOR represents that it has the right and authority to make available such seismic data to LICENSEE and that such seismic data are transferred subject to the following conditions:

LICENSOR represents that it has the right to license to LICENSEE certain confidential seismic data ("Data") described in the Geophysical Permit Agreement to which this Seismic Data License Agreement is attached as Exhibit "D". LICENSOR hereby grants to LICENSEE a non-exclusive right to use the Data, and LICENSEE agrees to receive the Data and use it in accordance with the terms and conditions hereof. LICENSEE acknowledges that this license is non-exclusive and that the Data is the property of the LICENSOR.

LICENSOR retains title and full ownership rights to Data including, but not limited to, the exclusive right to license, trade, loan, transfer and reproduce the same. LICENSEE agrees that the Data, and any copies thereof, shall be for its own internal use only and that the same shall not be given, sold, traded, disposed of or otherwise divulged to any other party, except as follows:

    a.    Data may be provided to a consultant to prepare an analysis and interpretation for LICENSEE.

    b.    If LICENSEE is entering into this Agreement as the operator or other representative of one or more parties disclosed to LICENSOR, then such other parties may be shown the Data by LICENSEE or its bona fide consultant, but only if each such party agrees in writing not to divulge the data to any other party.

    c.    LICENSEE can make a prospect presentation of the Data and the results of any analysis and interpretations to a third party with a bona fide interest in joining LICENSEE to explore, develop, produce, or finance any appropriate property for the purpose of identifying subsurface oil and gas deposits, provided that such third party agrees to treat all such data as confidential. Should such third party wish to make his own evaluation of the data, he/she/it may do so in LICENSEE's office only, provided that such third party agrees in writing not to remove any such licensed data from LICENSEE's office, and to treat all such data as confidential.

    d.    If LICENSEE is a legal entity other than an individual, it may disclose, by providing copies thereof, the Data to a company owing 50% or more of the LICENSEE or to a company which is owned 50% or more by LICENSEE or to a surviving company in the event of a complete merger by LICENSEE, provided each such company is disclosed in advance to LICENSOR and that company agrees in writing to assume the terms and obligations of this agreement.

    e.    LICENSEE may show, and provide copies of, the Data to agencies of federal and state governments having jurisdiction to the extent required or allowed by applicable law or regulation if necessary in the ordinary course of the LICENSEE's business.

    f.    LICENSEE shall have the right to make copies of adaptations from the Data (including reprocessed seismic traces) for his/her/its own internal use. LICENSEE may also transfer the Data to a third party for the sole purpose of further processing and data analysis provided the third party agrees to hold the Data confidential and to return all manifestations of the Data to the LICENSEE when the reprocessing of analysis has been completed.

LICENSEE may transfer, for no additional fee or other consideration, all of its right, title and interest under this license to a buyer of all of its undivided working interest in the Castleberry Prospect, Conecuh County,

Alabama, provided such buyer agrees to be bound by this License Agreement and the applicable Participation Agreement and Operating Agreement governing said prospect.

LICENSEE agrees that he/she/it accepts the Data tendered to it "As Is, Where Is". LICENSOR does not make any warranty or representation regarding the quality or reliability of any or all of the Data delivered hereunder. Any action taken by LICENSEE or any opinions formed or conclusions drawn on the basis of any or all Data shall be at the sole risk and expense of the party taking such action, forming such opinion or drawing such conclusion. LICENSOR warrants that any Data it furnished hereunder is free of liens, encumbrances, and limitations on use or disposition other than those expressly set out above. THESE WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE REGARDING ANY DATA GIVEN THE LICENSEE HEREUNDER.

LICENSEE shall not have nor ever assert any claim or cause of action against LICENSOR arising out of any defect or inaccuracy in the Data, whether such defect or inaccuracy arose by negligence or any other cause.

In the event that any governmental unit should levy a sales or use tax of similar nature related to the licensing or transfer of the data covered under this agreement, then LICENSEE shall reimburse LICENSOR the amount of such levies or taxes.

The use license granted in this agreement shall continue for a term of forty-nine (49) years and shall be automatically renewed for an additional forty-nine (49) years, for no additional consideration, unless otherwise terminated by the mutual consent of both parties.

All section time and prints including all reprocessed or reformatted sections shall show the data owner as being LICENSOR and shall contain a notice reading substantially as follows:

| NOTICE |
| --- |
| "This document is licensed for use only to: _____, Licensee, by SKLAR EXPLORATION COMPANY L.L.C., LICENSOR.<br><br>Its use is governed by the terms specified in the license agreement signed by LICENSEE." |

By their execution of this document, LICENSOR and LICENSEE do each hereby approve and agree to be bound by the terms and conditions stated above.

LICENSOR:                                          LICENSEE:
**Sklar Exploration Company L.L.C.**


By: _____                    By: _____
    David A. Barlow

Title:  President - Chief Operating Officer         Title:

Date:  _____                 Date: _____

## EXHIBIT "D"

Attached to and made a part of that certain
Castleberry Prospect Participation Agreement dated effective as of November 7, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd.,
The Rudman Partnership, Tara Rudman, JJS Working Interests LLC,
Fant Energy Limited, Pickens Financial Group, LLC, Fleet Howell,
Tauber Exploration & Production Co., Tiembo, Ltd., Kudzu Oil Properties, L.L.C.,
Marksco, L.L.C., Landmark Exploration, LLC, Craft Exploration Company, LLC,
Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C., Resource Ventures, LLC,
Aspen Energy, Inc., and Sepulga River Fuels, LLC

## AFE

Castleberry Prospect D&C AFE 002112.xls,11/9/2012,1:51 PM

### SKLAR Exploration Company L.L.C.

401 Edwards St., Suite 1601
Shreveport, LA 71101
(318) 227-8658

**AUTHORITY FOR EXPENDITURE**

| DATE: | September 21,2012 | FIELD: | Wildcat |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | AL |
| WELL: | Castleberry Prospect, Initial Well | HORIZON: | Smackover |
| LOCATION: | S.36, T4N - R10E or S.31 or 32, T4N, R11E, Conecuh County | PROJ. T.D.: | 13,000' MD = 13,000' TVD |

PROPOSAL: Drill straight hole 13,000' TD.
Set 9-5/8" at 3100'.
Set 5-1/2" at 13,000'.

Latest Revision:

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 83 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 86 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $0 | $0 | $0 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 2,000 | 2,000 | 4,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 140,000 | 5,000 | 145,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 25,000 | | 25,000 |
| 04 | SURFACE DAMAGES & ROW | | | |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 165,000 | | 165,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 415,000 | 35,000 | 450,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 52,000 | 15,000 | 67,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 8,000 | | 8,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 20,000 | | 20,000 |
| 17 | MUD & CHEMICALS | 100,000 | | 100,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 24,000 | | 24,000 |
| 24 | CEMENTING & EQUIPMENT | 51,000 | 35,000 | 86,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 25,000 | 22,000 | 47,000 |
| 26 | PIPE TESTING | 5,000 | 4,000 | 9,000 |
| 27 | EQUIPMENT RENTALS | 40,000 | 14,000 | 54,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 8,000 | | 8,000 |
| 31 | FUEL | 55,000 | | 55,000 |
| 32 | BITS | 60,000 | | 60,000 |
| 33 | TRANSPORTATION & TRUCKING | 26,000 | 16,000 | 42,000 |
| 34 | CONTRACT LABOR | 16,000 | 13,000 | 29,000 |
| 35 | SAFETY & H2S TRAINING | 8,000 | | 8,000 |
| 36 | LOGGING & WIRELINE | 60,000 | 12,000 | 72,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | 3,000 | 3,000 |
| 38 | CORING & ANALYSIS | 90,000 | | 90,000 |
| 39 | GEOLOGICAL | 4,000 | | 4,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 31,000 | 31,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 5,000 | 5,000 |
| 49 | STIMULATION SERVICES | | 25,000 | 25,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | | |
| 62 | HOT OIL SERVICE | | 3,000 | 3,000 |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 40,000 | -40,000 | |
| 78 | INSURANCE | 12,000 | | 12,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 15,000 | 2,000 | 17,000 |
| 82 | MISCELLANEOUS - 10% contingency | 76,000 | 12,000 | 88,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $1,595,000 | $250,000 | $1,845,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING (9-5/8") | 89,000 | | 89,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 4,000 | | 4,000 |
| 05 | WELLHEAD EQUIPMENT | 5,000 | | 5,000 |
| 06 | CONDUCTOR CASING | 11,000 | | 11,000 |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $109,000 | $0 | $109,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS (5-1/2") | | 261,000 | 261,000 |
| 22 | TUBING (2-7/8") | | 84,000 | 84,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 26 | WELLHEAD EQUIPMENT | | 24,000 | 24,000 |
| 26 | ROD/DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | 23,000 | 23,000 |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $412,000 | $412,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 39 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 120,000 | 120,000 |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 260,000 | 260,000 |
| 42 | COMPRESSION (VRU) | | 60,000 | 60,000 |
| 43 | TANK BATTERY COSTS | | 105,000 | 105,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 110,000 | 110,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 15,000 | 15,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $720,000 | $720,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $109,000 | $1,132,000 | $1,241,000 |
| | | | | |
| | **TOTAL WELL COST** | $1,707,000 | $1,382,000 | $3,089,000 |

APPROVED:_____, 2012.

BY:_____

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than_____
☐ Coverage under Operator's policy

NOTE: If no election is checked or owner
has not supplied proof of coverage
prior to spud, owner will be included
under and charged for SEC's OEE
coverage.

Page 51 of 52

**EXHIBIT "E"**

Attached to and made a part of that certain
Castleberry Prospect Participation Agreement dated effective as of November 7, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C, McCombs Energy, Ltd.,
The Rudman Partnership, Tara Rudman, JJS Working Interests LLC,
Fant Energy Limited, Pickens Financial Group, LLC, Fleet Howell,
Tauber Exploration & Production Co., Tiembo, Ltd., Kudzu Oil Properties, L.L.C.,
Marksco, L.L.C., Landmark Exploration, LLC, Craft Exploration Company, LLC,
Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C., Resource Ventures, LLC,
Aspen Energy, Inc., and Sepulga River Fuels, LLC

**JOA**

EXHIBIT "E"

Attached to and made a part of that certain Castleberry Prospect Joint Operating Agreement dated effective as of November 7, 2012, by and between Sklar Exploration Company L.L.C., as Operator and Sklarco L.L.C., McCombs Energy, Ltd., The Rudman Partnership, Tara Rudman, JJS Working interests LLC, Fant Energy Limited, Pickens Financial Group, LLC, Fleet Howell, Tauber Exploration & Production Co., Tiembo, Ltd., Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC, Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C., Resource Ventures, LLC, Aspen Energy, Inc., and Sepulga River Fuels, LLC, as Non-Operators.

A.A.P.L. FORM 610-1982

MODEL FORM OPERATING AGREEMENT

CASTLEBERRY PROSPECT
Conecuh County, Alabama

OPERATING AGREEMENT

DATED

__November 7__ , __2012__ ,
<small>year</small>

OPERATOR   __Sklar Exploration Company L.L.C.__

CONTRACT AREA   __As shown on Exhibit "A" to this Agreement.__

COUNTY OR ~~PARISH~~ OF   __Conecuh__          STATE OF   __Alabama__

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM. A.A.P.L. NO. 610 – 1982 REVISED

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2-3 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4-5 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

**Table of Contents**

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___Sklar Exploration Company L.L.C., a Louisiana limited liability___ ___Company, 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101___, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement, **including royalty and overriding royalty interests.**

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay **100% of** its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.
*

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine. **Words defined herein shall have the same meaning whether or not they are capitalized.**

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑  A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases ~~and/or oil and gas interests~~ subject to this agreement,
    (5) Addresses of parties for notice purposes.
☑  ~~/ B. Exhibit "B", Form of Lease.~~
☑  C. Exhibit "C", Accounting Procedure.
☑  D. Exhibit "D", Insurance.
☑  E. Exhibit "E", Gas Balancing Agreement.
☐  ~~F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.~~
☐  ~~G. Exhibit "G", Tax Partnership.~~

If any provision of any exhibit, except Exhibits "A" and "E", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail. If any provisions of Exhibits "A" or "E" is inconsistent with any provision contained in the body of this Agreement, the provision of the exhibit shall prevail.

I. The term "Deepen" shall mean a single operation whereby a well drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the deepest Zone proposed in the associated AFE, whichever is the lesser.

J. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

K. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned or temporarily isolated in order to attempt a Completion in or commingling with a different Zone within the existing wellbore.

L. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore or improve production in a Zone which is currently open to production in the wellbore. Such operations include, without limitation, well stimulation operations, but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting or Plugging Back of a well.

M. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

N. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

~~If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.~~
•

- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE III.**
**INTERESTS OF PARTIES**

A.    Oil and Gas Interests:

If any party owns an oil and gas interest in the Contract Area, that interest shall be ~~treated for all purposes of~~ excluded from this agreement. ~~and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.~~

B.    Interests of Parties in Costs and Production:

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____all jointly owned lease burdens_____ which shall be borne as hereinafter set forth.

**Each of the Parties hereto shall pay or deliver or cause to be paid or delivered its proportionate part of the royalties and over-** ~~Regardless of which party has contributed the leases and/or oil and gas interests) hereto on which royalty is due and~~ **riding royalties and other leasehold burdens as described in the attached Exhibit "A" and shall hold the other Party/ies free from any** ~~payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or~~ **liability therefore. If the interest of any Party/ies in any oil and gas lease covered by this Agreement is subject to any additional** ~~cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the~~ **royalty, overriding royalty, production payment or other charge over and above those shown on Exhibit "A", such Party/ies shall** ~~other parties free from any liability therefor, assume and alone bear all such obligations and shall account for or cause to be accounted for~~ **such interests to the owners thereof.** No party shall ever be responsible, on- a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

C.    Excess Royalties, Overriding Royalties and Other Payments:

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, **which is not a joint obligation of the parties** overriding royalty, production payment or other burden on production / ~~in excess of the amount stipulated in Article III.B.~~, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

D.    Subsequently Created Interests:

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", ~~or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties,~~ or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.   If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.   If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

**ARTICLE IV.**
**TITLES**

A.    Title Examination:

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be includ- ed, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto **provided such party has paid 100% of its share of all costs of all operations conducted under the provisions of this Agreement.** The cost incurred by Operator in this title program shall be borne as follows:

☐   ~~Option No. 1:   Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division-order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.~~

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1  ☑   Option No. 2:   Costs incurred by Operator in procuring abstracts / and fees paid outside attorneys / for title examination
2  (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) / shall be borne by the Drilling Parties
3  in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4  hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5  functions.
6  *      Curative matters and materials
   **    Landmen and consultants
7  ***    and for applications and hearings

8  Operator shall use its best efforts to secure
9  / Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection
                        subject to this agreement and charge these fees to the joint account.
10  with leases or oil and gas interests / contributed by such party. Operator shall be responsible for the preparation and recording of pooling
11  designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
12  This shall not prevent any party from appearing on its own behalf at any such hearing.

13
14      No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
                                                                                    Operator.
15  provided, and (2) the title has been approved by the examining attorney or title has been accepted by / all of the parties who are to par-
16  ticipate in the drilling of the well.

17
18  B.   Loss of Title:

19
20      1. Failure of Title:  Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a
21  reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days
22  from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-
23  tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil
24  and gas leases and interests: and,
25      (a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be
26  entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,
27  but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;
28      (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has
29  been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-
30  curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
31  Area by the amount of the interest lost;
32      (c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is
33  increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-
34  terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such
35  well;
36      (d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has
37  failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties
38  who bore the costs which are so refunded;
39      (e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be
40  borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,
41      (f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest
42  claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in
43  connection therewith.

44
45      2. Loss by Non-Payment or Erroneous Payment of Amount Due:  If, through mistake or oversight, any rental, shut-in well
46  payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,
47  there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required
48  payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,
49  which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the
50  date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in
51  the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the
52  required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to
53  the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it
54  shall be reimbursed for unrecovered actual costs paid by it (but not for its share of the cost of any dry hole previously drilled
55  or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:
56      (a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,
57  up to the amount of unrecovered costs;
58      (b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of
59  oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease
60  termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
61  portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,
62      (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest
63  lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

64
65      3. Other Losses:  All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses
66  and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
67  the Contract Area.
68
69
70

- 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE V.
## OPERATOR

**A.   Designation and Responsibilities of Operator:**

_____Sklar Exploration Company L.L.C. , of Shreveport, Louisiana_____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

**B.   Resignation or Removal of Operator and Selection of Successor:**

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, ~~no longer owns an interest hereunder in the Contract Area,~~ or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. **Such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within 30 days from its receipt.** Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator ~~which~~ has been removed ~~fails to vote or votes only to succeed itself,~~ the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

**C.   Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

**D.   Drilling Contracts:**

**except that in Operator's sole discretion all factors such as rig availability, equipment condition, contractor employee reliability and knowledge and drilling contractor reputation shall be taken into consideration in determining the real competitive price.** All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. / If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefore shall not exceed the prevailing rates in the area ~~and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced,~~ and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.
**E. Custody of Funds: Operator shall hold for the account of Non-Operators any funds of Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advance or paid until used for their intended purpose or otherwise delivered to Non-Operators or applied toward the payment of debts, regardless of whether the debts arise out of the same well or operation for which the funds were advanced or from which the sales proceeds were derived. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators.**
**F. Statutory Employer: Operator shall be considered the statutory employer of all employees of all Contractors, their sub-contractors or agents, whose goods furnished or services rendered for Operator are an integral part of or essential to Operator's ability to perform its operations as an oil and gas operator.**

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

**A.   Initial Well:**

The initial well is the Initial Well referred to in Subsection 1.4(a)of the Participation Agreement to which this instrument is attached as Exhibit "E".

~~On or before the_____day of_____, (year)_____, Operator shall commence the drilling of a well for oil and gas at the following location:~~

~~and shall thereafter continue the drilling of the well with due diligence to~~

~~unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.~~

-4-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

**B.   Subsequent Operations:**

1. Proposed Operations:  Should any party hereto desire to drill any / well on the Contract Area other than the well provided *any well includes water source or injection wells* for in Article VI.A., or to rework, / deepen or plug back a dry hole *drilled at the joint expense of all parties or* a well jointly owned by all *reenter, recomplete, sidetrack* *reenter, recomplete, sidetrack* the parties and not then producing in / paying quantities, the party desiring to drill, rework, / deepen or plug back such a well shall give the *that have not forfeited their interest in the well* other parties / written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma- tion and the estimated cost of the operation. The parties -/ receiving such a notice / shall have / thirty (30) days after receipt / of the notice *to whom* *is delivered* *Fifteen (15)* *delivery* within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill- ing rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to / forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays. Failure of a party / receiving such notice / -to reply *Twenty-four (24) hours* *to whom* *is delivered* *within* the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing. *Not withstanding this Article VI.B.1, and subject to the right of any party to non-consent the proposed operation, a proposal to re-* *work, recomplete, sidetrack, deepen or plugback a well producing in paying quantities, which is consented to by two (2) or more of* *the Parties owning two-thirds (2/3rds) or more of the working interest under the well may proceed and be executed on behalf of the* *Consenting Parties without the unanimous consent of all parties.*

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of / thirty (30) days (or as promptly as possible after the expiration of the / forty-eight (48) hour period when a drilling rig is on loca- *twenty-four (24)* tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par- ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex- amination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor- dance with the provisions hereof as if no prior proposal had been made. *Operator may, at its discretion, perform preparatory work in connection with, or even actually commence, an operation for which* *notice has been provided under this Article VI.B prior to our during the notice period, and if such operation ultimately is one con-* *ducted by less than all parties, the Consenting Parties shall, nevertheless, be entitled to recover the risk compensation provided for* *hereunder.*

2. Operations by Less than All Parties:  If any party / receiving such notice / as provided in Article VI.B.1. or VII.D.1. (Option *to whom* *is delivered* No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties *subject to availability of equipment and personnel,* giving the notice and such other parties as shall elect to participate in the operation shall, / within ninety (90) days after the expiration of *fifteen (15)* the notice period of / thirty (30) days (or as promptly as possible after the expiration of the / forty-eight (48) hour period when a drilling rig is *twenty-four (24)* on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera- tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Con- senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con- ditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within / forty-eight (48) hours *twenty-four (24)* (exclusive of Saturday, Sunday and legal holidays) after receipt *delivery* of such notice, shall advise the proposing party of its desire to (a) limit par- *all of* ticipation to such party's interest as shown on Exhibit "A" or (b) carry / its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of / forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party, *twenty-four (24) hours* at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. *either* If such an operation results in a dry hole, the Consenting Parties shall / plug and abandon the well and restore the surface location at their *recompleted, sidetracked* sole cost, risk and expense /. If any well drilled, reworked, / , deepened or plugged back under the provisions of this Article results in a pro- ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, *or one of them shall make a proposal to the other Consenting Parties to conduct further operations under Article VI.B*

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

1   and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2   ties. Upon commencement of operations for the drilling, / reworking, deepening or plugging back of any such well by Consenting Parties
3   in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4   and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5   Party's interest in the **entire** well and not just a particular Zone therein and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6   market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7   terests not excepted by Article III.D. payable out of or measured by the production from any and all Zones within / such well accruing with respect to such interest
8   until it reverts) shall equal the total of the following:

12   (a)   ~~100%~~ / **500%** of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13   connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
14   Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15   Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16   Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17   Party had it participated in the well from the beginning of the operations; and

21   (b) ____**500**____ % of that portion of the costs and expenses of drilling, reworking, / deepening, plugging back, testing and completing,
22   after deducting any cash contributions received under Article VIII.C., and ____**500**____ % of that portion of the cost of newly acquired equip-
23   ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24   participated therein.

28   An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-
29   working / or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30   conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31   reworking / or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
32   and there shall be added to the sums to be recouped by the Consenting Parties ~~one~~-hundred **live**/**500%** percent (~~100%~~) of that portion of the costs of
33   the reworking / or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
34   such a reworking / or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35   plicable as between said Consenting Parties in said well.

39   During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40   proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41   taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42   ticle III.D.

46   In the case of any reworking, / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47   of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48   abandonment of a well after such reworking, / plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49   ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

53   Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54   Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55   itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56   option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57   ings. Each / **quarter** ~~month~~-thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
58   operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59   curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
60   realized from the sale of the well's working interest production during the preceding **quarter** / ~~month~~. In determining the quantity of oil and gas
61   produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62   well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63   which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64   of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65   above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

66
67   **\*recompleting, sidetracking**

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, recompleting, sidetracking reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

Notwithstanding the provisions of this Article VI.B.2., / it is agreed that without the mutual consent of /- all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply; ; provided that an exceptional well location that is approved by the Alabama Oil and Gas Board shall be deemed to conform to the then-existing spacing pattern.
*and subject to the right of any party to non-consent the proposed operation
**two (2) or more Parties owning 75% or more of the working interest

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. recompleting, sidetracking except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, / deepening and plugging back of such initial well after if has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for production, ceases to produce in paying quantities.

3. Stand-By Time:  When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

4. Sidetracking:  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

(a)  If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

(b)  If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period twenty-four (24) hours shall be limited to-/ forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and twenty-four (24) hours receive up to eight (8) additional days after expiration of the / forty-eight (48) hours within which to respond by paying for all stand-by time incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other instances the response period to a proposal for sidetracking shall be limited to-/ thirty (30) days.  fifteen (15)

C.   TAKING PRODUCTION IN KIND:

have the right to
Each party shall / take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3  Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from

4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for ~~on the same terms as Operator is marketing Operator's and/or other Non-Operators' share of production~~

5  its share of all production.

6

7  In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of

8  the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not

9  the obligation, to purchase such oil or sell it to others at any time and from time to time, for the account of the non-taking party~/ at the~

10  ~best price obtainable in the area for such production~. Any such purchase or sale by Operator shall be subject always to the right of the

11  owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously

12  delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of

13  time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess

14  of one (1) year.

15

16  In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or

17  deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to

18  be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing

19  agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

20

21

22  **D.   Access to Contract Area and Information:**

23
                                                                consenting
24  Except as otherwise provided herein Each / party who has paid 100% of its share of all costs of all operations conducted under

      this Agreement shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,

25  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
                                                                                                 consenting
26  and records relating thereto. Operator, upon request, shall furnish each of the other / parties with copies of all forms or reports filed with

27  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of

28  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of

29  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-

30  quests the Information.

31

32  **E.   Abandonment of Wells:**

33

34  1. Abandonment of Dry Holes:  Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been

35  drilled or deepened pursuant to the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned

36  without the consent of / ~all parties~ / Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
                            twenty-four (24) hours (inclusive
37  within / ~forty-eight (48) hours (exclusive~ of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon

38  such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
                                                      ***
39  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
                                                      or parties owning greater than ten percent (10%) interest in the well
40  such well. / Any party / who objects to such plugging and abandoning such well shall have the right to take over the well and conduct further

41  operations in search of oil and/or gas subject to the provisions of Article VI.B.
        *ninety percent (90%) or more of the parties thereof
42  ** If the well has been drilled pursuant to Article VI.B.2, only the consent of the consenting parties therein shall be required.
        ***Any cement plugs used for plugging and abandoning such well shall be in excess of that required by the regulatory body
43  recommended to be a volume of one and one-half times of that required.

44

45

46  2. Abandonment of Wells that have Produced:  Except for any well in which a Non-Consent operation has been conducted

47  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
                                                                          such parties
48  producer shall not be plugged and abandoned without the consent of ~all parties~ / . If / ~all parties~ consent to such abandonment, the well shall

49  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
                                              fifteen (15)
50  ~thirty (30)~ / days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,

51  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other

52  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
                                       Should any party fail to reply to such notice, such party shall be deemed to have consented to the proposed abandonment.
53  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. / Each abandoning party shall assign

54  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and

55  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-

56  terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and

57  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-

58  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-

59  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

60
      ****two-thirds percent (2/3rds%) or more of the owners thereof. If the well has been drilled or reworked pursuant to Article VI.B.2
61  and the consenting parties therein have not been fully reimbursed as therein provided, only the approval of such consenting parties
      shall be required
62

63

64

65

66

67

68

69

70

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

1   "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2   assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3   Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4   interests in the remaining portion of the Contract Area.
5
6      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7   the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8   quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9   templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10  well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11  repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12  visions hereof.
13
14      3. <u>Abandonment of Non-Consent Operations:</u>  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15  Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16  permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17  of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18  VI.E.
19
20                      **ARTICLE VII.**
21        **EXPENDITURES AND LIABILITY OF PARTIES**
22
23
24  **A.    Liability of Parties:**
25
26      The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
27  shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
28  among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
29  shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.
     In their relations with each other under this Agreement, the parties shall not be considered fiduciaries or to have
30  established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own self-
     interest.
31
32  **B.    Liens and Payment Defaults:**
33
34      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
35  of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
36  at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the
37  state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
38  taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
39  rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
40  of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
41  the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
42  purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
43  and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.
44
45      If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefore by
46  Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
47  the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain
48  reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph, be entitled to recover the amount it paid
49  plus five hundred percent (500%) of that amount out of the proceeds from the sale of the defaulting party's share of oil and for gas.
     and, to obtain payment thereof, be subrogated to the security rights described in the foregoing paragraph.  Notwithstanding
50  anything contained to the contrary in this paragraph, all parties agree that this provision shall not apply to any operation requiring
     an AFE unless Operator has advance billed all parties for their proportionate share of said costs in accordance with other
     provisions of this agreement.
51  **C.    Payments and Accounting:**
52
53      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
54  and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
55  tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
56  showing expenses incurred and charges and credits made and received.
57
58      Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
59  of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
60  month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
61  with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
62  on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
63  fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
64  due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
65  pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
66
67  **D.    Limitation of Expenditures:**
68
69      1. <u>Drill or Deepen:</u>  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
70  pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VII**
**continued**

1  ☑   Option No. 1:  All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2  necessary tankage and/or surface facilities. **\*This Option No. 1 shall apply only to water source and/or water injection wells.**
3
4
5  ☑   Option No. 2:  All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
6  authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
7  to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight
8  (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
9  tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
10  cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
11  constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
12  elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging
13  back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
14  than all parties.**\*\*This Option No. 2 shall cover all wells except those expressly covered by Option No. 1 above.**
15
16      2. Rework or Plug Back:  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
17  plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
18  include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
19  and/or surface facilities.
20
                                     Two or more Parties owning a majority interest
21      3. Other Operations:  Without the consent of / all parties, Operator shall not undertake any single project reasonably estimated
22  to require an expenditure in excess of _____ **Fifty Thousand and No/100--------** Dollars ($ _____ **50,000.00** _____ )
23  except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
24  previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
25  emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
26  to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
27  parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
28  an information copy thereof for any single project costing in excess of _____ **Fifty Thousand and No/100--------** _____
29  Dollars ($ _____ **50,000.00** _____ ) but less than the amount first set forth above in this paragraph.
30
31  E.    **Rentals, Shut-in Well Payments and Minimum Royalties:**
32
33      Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
34  party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
35  tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
36  behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
37  failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
38  ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
39  visions of Article IV.B.~~2~~3.
40
41      Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
42  of a producing gas well, ~~at least five (5) days (excluding Saturday, Sunday and legal holidays),~~ or at the earliest opportunity permitted by
43  circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
44  Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
45  shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
46
47  F.    **Taxes:**
48
49      Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
50  subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
51  become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
52  be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
53  Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
54  riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
55  owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
56  tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
57  anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
58  value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
59  the manner provided in Exhibit "C".
60
61      If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
62  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
63  mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
64  interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
65  count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
66  provided in Exhibit "C".
67
68      Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
69  to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.
70

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

1  G.  **Insurance:**
2
3       At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4  the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5  pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
6  also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7  hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8  law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.
9
10      In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11  parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.
12
13                              **ARTICLE VIII.**
14              **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**
15
16  A.  **Surrender of Leases:**
17
18      The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19  or in part unless all parties consent thereto.
20
21      However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22  agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23  such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24  thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas in-
25  terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26  such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27  lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all
28  obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29  attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30  duction other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the
31  party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32  ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33  salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest
34  shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.
35
36      Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39  agreement.
40
41  B.  **Renewal or Extension of Leases:**
42
43      If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44  shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the
45  renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46  portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47  interests held at that time by the parties in the Contract Area.
48
49      If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50  who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51  to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52  Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.
53
54      Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55  by the acquiring party.
56
57      The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58  or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or
59  contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
60  tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61  the provisions of this agreement.
62
63      The provisions in this Article shall also be applicable to extensions of oil and gas leases.
64
65  C.  **Acreage or Cash Contributions:**
66
67      While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69  applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the con-
70  tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VIII**
**continued**

1    said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2 governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3 it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4 tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

6      If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7 consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

9 **D.   Maintenance of Uniform Interests:**

11      ~~For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no~~
12 ~~party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,~~
13 ~~equipment and production unless such disposition covers either:~~

15      ~~1.   the entire interest of the party in all leases and equipment and production; or~~

17      ~~2.   an equal undivided interest in all leases and equipment and production in the Contract Area.~~

19      Every ~~such~~ sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20 and shall be made without prejudice to the right of the other parties. **Any added expenditure required as a result of disposition,**
21 **including but not limited to additional marketing or metering expense, shall be borne solely by the party transferee.**

23      If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
24 require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
25 and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
26 party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
27 into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
28 Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

30 **E.   Waiver of Rights to Partition:**

32      If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
33 undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
34 interest therein.

36 **F.   ~~Preferential Right to Purchase:~~**

38      ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
39 ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
40 ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
41 ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
42 ~~on the same terms and conditions which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
43 ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
44 ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
45 ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
46 ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~

48 **ARTICLE IX.**
49 **INTERNAL REVENUE CODE ELECTION**

51      This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
52 for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
53 and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
54 purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
55 from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as per-
56 mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
57 ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
58 United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
59 and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
60 evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
61 Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
62 action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
63 Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
64 Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is per-
65 mitted, each such party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
66 tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
67 computation of partnership taxable income.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE X.
## CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed __Ten Thousand and No/100__ ———————————————————————————— Dollars ($__10,000.00__ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder. **All claims or suits involving title to any interest subject to this Agreement shall be treated as a claim or suit against all parties hereto.**

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☑   Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☐   ~~Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.~~

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE XIV.**
**COMPLIANCE WITH LAWS AND REGULATIONS**

**A.   Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, or-dinances, rules, regulations, and orders.

**B.   Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____Alabama_____ shall govern.

**C.   Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offset-ting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or ap-plication was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of ~~the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and~~ any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said / Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

**ARTICLE XV.**
**OTHER PROVISIONS**

**(see attached pages 14-1 through 14-6)**

- 14 -

## ARTICLE XV.

## OTHER PROVISIONS

### A.  PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1) an election to perform additional logging, coring or testing;
(2) an election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;
(3) an election to plug back and attempt to complete the well in a shallower depth or formation;
(4) an election to deepen the well;
(5) an election to sidetrack the well;
(6) an election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;
(7) an election to temporarily abandon the well;
(8) an election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of a majority of the consenting parties in possessory, cost-bearing interest (and not in number), a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth.   In such event, the operation, which, in the opinion of a majority of the consenting parties in possessory, cost bearing interest (and not in number) is less likely to jeopardize the well, will be given priority.   Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail.   It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests.   For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

### B.  HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

### C.  DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties.   If the parties are equally divided, the opinion of the Operator will prevail.

### D.  ADVANCEMENT OF COSTS

The provisions of section 1.4(a) of the Participation Agreement to which this agreement is attached as Exhibit "E" shall govern advancement of costs relative to the initial well. Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s) in advance of its respective share of (i) the dry hole cost for any other well to be drilled hereunder to which such Non-Operator has consented, and (ii) the cost of any completion, reworking, recompletion, sidetracking, deepening or plugging back operation to which such Non-Operator has consented (any such operation under clause (i) or (ii), being herein called a "Drilling Operation").   Such request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Drilling Operation. The amount of each Non-Operator's advance payment shall be based upon the latest AFE for such operation.   Such advanced payments shall be held by Operator for the account of the Non-Operators and applied, with interest, against the actual costs incurred in the applicable operation.

A Non-Operator receiving a request for advance payment shall, within seven (7) days of the receipt of such request if and when a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to operator in cash the full amount of such request.  Operator shall credit the amount to the Non-Operator's account for the payment of such Non-Operator's share of costs of such Drilling operation, and following the end of each month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation previously approved, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement.  Advance payment by a Non-Operator of his share of completed well costs shall in no event prevent such completion of a well pursuant to Option No. 2 of Article VII.D.1. and, in the event such a Non-Operator elects not to participate in completion, the sums that such Non-Operator has advanced shall not be charged with any share of the costs of any completion attempted.

In the event a Non-Operator from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by depositing cash as aforesaid, then Operator, at his option, shall make a second written request by certified mail, return receipt requested for such advance.   Non-Operator shall pay for said advance as aforesaid within five (5) business days from receipt of such second request.

If a Non-Operator fails to pay within five (5) business days of the receipt of such second request, then Non-Operator may, at the sole discretion and timing election of the Operator, be deemed non-consent in said operation retroactive to the beginning of such operation and thereafter subject to the penalty provisions of Article VI.B.2 hereof.

If the Non-Operator fails to make such payment or furnish such security within five (5) business days of the receipt of such second request, Operator shall promptly notify all other parties still participating in such Drilling Operation of the default in payment and if and when applicable, of the relinquishment of an interest under this provision.   The parties who wish to participate in the Drilling Operation shall have five (5) days from receipt of the applicable notice to elect to assume the costs chargeable to such relinquished interest and shall share such relinquished interest in proportion to their assumption of such relinquished interest.   If the parties who wish to participate in the Drilling Operation are unwilling to assume the costs chargeable to such relinquished interest, the Drilling Operation shall be cancelled.

Notwithstanding anything to the contrary herein, if the applicable drill well or operation is unsuccessful or results in a dry hole, Operator shall have the right to sue a Non-Operator who failed to pay for its proportionate share of expenses in lieu of Operator's right to deem the Non-Operator Non-Consent.

E.   **NECESSARY EXPENDITURES EXCLUDE SIDETRACKING**

The phrase "necessary expenditures" in Article VII.D.1. (Option No. 2) on page 10 shall not be deemed to Include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

F.   **ADDITIONAL CHARGES**

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Unit Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same:

Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and expenses in connection with preparation and presentation of evidence and exhibits of State Oil and Gas Board of Alabama hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

G.   **INDEMNITY**

Except for liabilities resulting from the gross negligence or willful misconduct of the Operator, each Non-Operator shall defend, indemnify and hold Operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operator's officers, employees and/or agents, resulting from or in any way relating to such officers, employees, and/or agents presence on a drilling rig on the Contract Area or from such person traveling by air or water between any point and such drilling rig.   Such indemnity to Operator shall also apply to any other person whose presence on the rig or transportation to or from such rig is at the request of the indemnifying Non-Operator (except for liabilities resulting from the gross negligence or willful misconduct of the Operator).

## H.  GAS BALANCING

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

## I.  SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

## J.  NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

## K.  AREA OF MUTUAL INTEREST

The parties hereby create an Area of Mutual Interest ("AMI") consisting of the lands outlined by a bold red line on the plat attached hereto as Exhibit "A-2".  This AMI shall remain in force and effect for a term of five (5) years from the date of this Agreement and, insofar and only insofar as the AMI includes lands covered by oil and gas leases and/or oil and gas interests subject to this Agreement, as long thereafter as said oil and gas leases and/or oil and gas interests remain in force and effect.  This AMI shall terminate after five (5) years as to all such lands not covered by oil and gas leases and/or oil and gas interests subject to this Agreement.

During the term of this AMI, if any party hereto, including related persons or entities, ("Acquiring Party") directly or indirectly acquires any oil and gas lease or any oil and gas interest covering lands lying within the AMI, the Acquiring Party shall promptly advise the other parties ("Offerees") of such acquisition.  In such event, each Offeree shall have the right to acquire its proportionate interest in such oil and gas lease and/or oil and gas interest in accordance with the other provisions of this AMI.

Promptly upon acquiring such oil and gas lease and/or oil and gas interest, the Acquiring Party shall, in writing, advise the Offerees of such acquisition.  The notice shall include a copy of all instruments of acquisition including, by way of example but not of limitation, copies of the leases, assignments, subleases, farmouts or other contracts affecting the oil and gas lease and/or oil and gas interest.

The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by the Acquiring Party in acquiring such oil and gas lease and/or oil and gas interest ("Acquisition costs").  The Offeree shall have a period of fifteen (15) days after receipt of the notice within which to furnish the Acquiring Party written notice of its election to acquire its proportionate interest in the offered oil and gas lease and/or oil and gas interest.  If, however, a well in search of oil or gas is being drilled within the AMI, each Offeree shall have a period of twenty-four (24) hours (excluding Saturdays, Sundays and legal holidays) after delivery of the notice within which to elect to acquire its proportionate interest in the oil and gas lease and/or oil and gas interest so offered.  It is provided, however, that the twenty-four (24) hour election period shall not apply unless the Acquiring Party shall give the notice to the Offerees within two (2) days after the date on which the Acquiring Party acquired the oil and gas lease and/or oil and gas interest so offered.  In addition thereto, the Acquiring Party shall also:

   (a)   furnish the Offerees with the approximate location of the well then being drilled and the name of the operator or drilling contractor drilling the well, and

   (b)   specifically advise the Offerees that the Offerees shall have a period of twenty-four (24) hours within which to elect to acquire an interest in the offered Oil and Gas Interest.

The above information shall be in addition to the information and copies of instruments provided for above in connection with the usual notices of acquisition of an oil and gas lease and/or oil and gas interest.  If the Acquiring Party does not receive actual written notice of election of an Offeree to acquire its proportionate interest within the fifteen (15) day or twenty-four (24) hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire its interest therein.  An Offeree accepting the offered interest shall be entitled to participate in such oil and gas lease and/or oil and gas interest in the proportion

to which its interest bears to the total interest of all parties (including the acquiring party) electing to participate. Promptly after the time for election expires, the Acquiring Party, or the Operator on its behalf, shall invoice the Offeree electing to acquire an interest for its proportionate part of the Acquisition Cost, as reflected by the invoice. Upon receipt of such reimbursement, the Acquiring Party shall execute and deliver an appropriate assignment to such Offeree. If the Acquiring Party does not receive the amount due from the Offeree within thirty (30) days after receipt by the Offeree of the invoice for its cost, the Acquiring Party may, at its election, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within five (5) days after receipt of such written notice by the delinquent Offeree shall constitute a withdrawal by the delinquent Offeree of its former election to acquire the interest, and such Offeree shall no longer have the right to acquire an interest in the offered oil and gas lease and/or oil and gas interest.

Any assignment made by the Acquiring Party shall be made free and clear of any liens, encumbrances, overriding royalty interests and other burdens created by or arising under the Acquiring Party but otherwise without warranty of title, either express or implied not even for the return of the purchase price. The assignment shall be made and accepted subject to, and each assignee shall expressly assume its portion of all of the obligations of the Acquiring Party. The assignment shall also be made and accepted subject to this Agreement and the Participation Agreement to which this Agreement is attached as Exhibit "E". Without limitation upon the foregoing, oil and gas lease or oil and gas interest covered by the assignment shall bear its share of the ORRI described in section 1.1, the carried working interest described in subsection 1.4(c), and the reverserary working interest described in section 1.5 of said Participation Agreement.

If two (2) or more separate oil and gas leases and/or oil and gas interests are included in the same notice, the Offeree shall have the separate right of election as to each separate oil and gas lease and/or oil and gas interest.

The provisions of this AMI shall not apply to acquisitions as a result of merger, consolidation, reorganization or an acquisition from a parent, subsidiary, or affiliated corporation, or as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries. Neither shall it apply to sales and acquisitions between partners in a partnership or venturers in a joint venture, or to any acquisition by any party of an interest which interest prior to and at the time of such acquisition was subject to this Agreement, unless such acquisition was the renewal or extension of a lease which at the date of expiration was subject to this Agreement.

Renewals and extensions of oil and gas lease(s) and/or oil and gas interest(s) shall be subject to Article VIII.B of this Agreement.

## L.  DISBURSEMENT OF ROYALTIES

If Operator prepares and administers a division order for and receives and distributes the proceeds of production attributable to the interest of a Non-Operator, then Operator shall be entitled to charge that party for an appropriate monthly overhead charge for disbursing such royalty payments, in addition to the combined fixed rates specified in Exhibit "C" hereto. If through error or inadvertence Operator shall fail to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, he shall not be liable in damages to the other Parties hereto for such failure, unless arising out of the gross negligence or willful misconduct of the Operator.

## M.  INFORMATION

Anything to the contrary hereinabove notwithstanding, it is stipulated that any non-consenting party to an operation conducted hereunder shall have no right to observe such operation or have access to information pertaining to such operation, until such time as the non-consenting party's share of the cost of such operation and the penalty therefor has been recovered by the consenting parties as provided herein.

## N.  OPERATOR'S LIEN – SECURITY INTEREST

Subject to the provision of Article VII. B. of this Agreement, each non-Operator grants to Operator a lien upon all of the rights, titles, and interests of each Non-Operator, whether now existing or hereafter acquired, in and to the (1) the oil, gas, or other minerals in, on, and under the Contract Area and (2) any oil, gas, and mineral leases covering the Contract Area or any portion thereof. In addition, each Non-Operator grants to Operator a security interest in and to all of such Non-Operator's rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (1) all oil, gas and other minerals produced from the Contract Area when produced; (2) all accounts receivable accruing or arising as a result of the sale of such oil, gas and other minerals; (3) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (4) all oil and gas wells and other surface and sub-surface equipment and facilities of any kind or character located on the

Contract Area and the cash or other proceeds received from the sale thereof (collectively, the "Personal Property Collateral"). Some of the Personal Property Collateral is or will become fixtures on the Contract Area, and the interest of Non-Operator in and to the oil, gas and other minerals when extracted from the Contract Area and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area. This Agreement (including a carbon, photographic, or other reproduction hereof) shall constitute a non-standard form financing statement under the terms of the Uniform Commercial Code of the State in which the Contract Area is located, and as such, may be filed for record in the real estate records of the county in which the Contract Area is located. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense, if any.

## O.  SEPARATE AGREEMENT FOR NON-UNIFORM INTEREST

Any oil and gas lease and/or oil and gas interest that is both acquired after the effective date of this Agreement and covered by Article VIII.B, VIII.C or XV.K of this Agreement, that thereafter becomes owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such lease and/or interest becomes so owned. Any oil and gas lease and/or oil and gas interest acquired after the effective date of this Agreement and covered by Article VII.B, VIII.C or XV.K of this Agreement, that becomes owned by more than one but less than all of the parties hereto shall remain subject to this Agreement as to the parties who own an interest therein, but Operator is authorized to modify Exhibit "A" to this Agreement to reflect the parties' interests in each such oil and gas lease and/or oil and gas interest. Operator is further authorized to modify said Exhibit "A" to this Agreement to reflect the parties' interests in each well subject to this Agreement.

## P.  METERING OF PRODUCTION

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

## Q.  PLUGGING AND LEASEHOLD RESTORATION FUND

At any time any well subject to this agreement is, in Operator's sole opinion, approaching the end of its economic life and/or its useful purpose, Operator may pre-bill the joint account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location. Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and abandonment and restoration of the leasehold premises. In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any accrued interest on such difference, based upon the then working interest percentage of such owner. In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

## R.  PREVAILING AGREEMENT

If there is a conflict between provisions of that Participation Agreement dated effective as of November 7, 2012 to which this form of Operating Agreement is attached as Exhibit "E" and this Operating Agreement, the provisions of the Participation Agreement shall prevail, and shall be binding upon all parties to this Operating Agreement.

## S.  DEFAULT PENALTY/AUTOMATIC NON-CONSENT

If written notice has been given that the lien rights conferred in Article VII. B. have been implemented or enforced against any party hereto, for so long as the affected party remains in default, it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and shall not be entitled to vote its interest in any matter hereunder. As to any proposed operation in which it otherwise would have the right to participate, such party shall not have the right to elect to participate or be a Consenting Party unless and until it pays in full the amount it is in default plus all other outstanding amounts due hereunder. If an operation proposed during such default period commences before such payment in full, the party in default shall automatically be deemed a Non-Consenting Party to the operation.

## T.  NON-PARTICIPATING INTERESTS

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto as same may be revised from time to time to reflect record title and/or reformation of the Contract Area.

Page 14-5

## U.  MISCELLANEOUS

Anything to the contrary herein notwithstanding, this Operating Agreement is expressly made subject to the terms and provisions of the leases and any farmout agreements described in Exhibit "A" hereof.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereto shall be deemed to run with the oil and gas leases and/or oil and gas interests subject to this Agreement.  The headings used in this Agreement are for convenience only and shall not be considered in the interpretation or construction of the Agreement.

## V. NON-CONSENT

Any party that forfeits its interest in a well pursuant to Article VI.B.2 of this Agreement forfeits their interest in the entire well and revenue therefrom, not just a particular Zone therein, for the duration of the recoupment period or, if the risk compensation is never recovered, forever.  The parties recognize, however, that applicable rules of the State   Oil and Gas Board of Alabama may allow for the drilling and completion of additional wells within the unit for an existing well, and, subject to the other provisions of this Agreement, the forfeiture by one party of its interest in the existing well does not affect that party's right to elect to participate or not to participate in a proposal to drill, or any other operation with respect to, another well, even if the other well is located in the same unit, and even if the new well is completed in the same Zone from which the existing well is producing.

Anything to the contrary hereinabove notwithstanding, any Non-Consenting Party to an operation conducted hereunder shall have no right to observe such operation or subsequent operations within the same well or have access to information pertaining to such operation or subsequent operations, until such time as the Non-Consenting Party's share of the cost of such operation, and any applicable subsequent operations, and the risk compensation therefor has been recovered by the Consenting Parties as provided herein.

## W. SOPHISTICATED INVESTORS

By execution of this Agreement, each Non-Operator represents to each other and to Operator: (i) that it has a working knowledge of the oil and gas industry; (ii) that it is a sophisticated investor and has a financial net worth in excess of one million dollars; (iii) that it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of leasehold costs, drilling costs, completion costs, and all other costs incurred in operations under this Agreement; (iv) that it ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES; (v) that its interest hereunder has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the State of Alabama, or any other state ("Securities Law"), and that it owns said interest for investment purposes only, and not with a view to or for sale in connection with any distribution thereof within the meaning of Securities Law.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ **7th** _____ day of _____ **November** _____ , (year) _____ **2012** _____ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____, have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

_____
David A. Barlow
President & Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

_____
David A. Barlow
President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

_____
Ricky Haikin
Vice President

THE RUDMAN PARTNERSHIP

_____
W. R. (Trey) Sibley
Manager and Attorney-in-Fact

_____
Tara Rudman

JJS WORKING INTERESTS LLC
Houston Bulldog Capital Management, LLC

_____
Justin Simons
Manager

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____7th_____ day of _____November_____ , (year) __2012__.

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles_____ _____, have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

_____
Ericka Levine

_____
Mary L. Esker

David A. Barlow
President & Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

_____
Ericka Levine

_____
Mary L. Esker

David A. Barlow
President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

_____
John M. Forney

_____
Billy Forney III

Ricky Haikin
Vice President

THE RUDMAN PARTNERSHIP

_____

_____

W. R. (Trey) Sibley
Manager and Attorney-in-Fact

_____

_____

Tara Rudman

JJS WORKING INTERESTS LLC
Houston Bulldog Capital Management, LLC

_____

Justin Simons
Manager

_____

- 15 -
Castleberry Prospect

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 7th _____ day of _____ November _____ , (year) _____ 2012 _____ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____, have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

_____
David A. Barlow
President & Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

_____
David A. Barlow
President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

_____
Ricky Haikin
Vice President

THE RUDMAN PARTNERSHIP

_____
W. R. (Trey) Sibley
Manager and Attorney-in-Fact

_____
Tara Rudman

JJS WORKING INTERESTS LLC
Houston Bulldog Capital Management, LLC

_____
Justin Simons
Manager

- 15 -
Castleberry Prospect

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XVI.
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ **7th** _____ day of _____ **November** _____ , (year) ____ **2012** ____ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the A.A.P.L. Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____, have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

Ericka Levine

Mary L. OEsken

David A. Barlow
President & Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

Ericka Levine

Mary L. OEsken

David A. Barlow
President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

Ricky Haikin
Vice President

THE RUDMAN PARTNERSHIP

W. R. (Trey) Sibley
Manager and Attorney-in-Fact

Tara Rudman

JJS WORKING INTERESTS LLC
Houston Bulldog Capital Management, LLC

Justin Simons
Manager

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____7th_____ day of _____November_____ , (year) __2012__ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____, have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

David A. Barlow
President & Chief Operating Officer

Ericka Levine

Mary L. Esken

NON-OPERATORS

SKLARCO L.L.C.

David A. Barlow
President & Chief Operating Officer

Ericka Levine

Mary L. Esken

MCCOMBS ENERGY, LTD.

Ricky Haikin
Vice President

THE RUDMAN PARTNERSHIP

W. R. (Trey) Sibley
Manager and Attorney-in-Fact

Tara Rudman

JJS WORKING INTERESTS LLC
Houston Bulldog Capital Management, LLC

Justin Simons
Manager

- 15 -
Castleberry Prospect

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

FANT ENERGY LIMITED
Richard B. Fant, L.L.C., its General Partner

Phil O. Kelley
Manager

PICKENS FINANCIAL GROUP, L.L.C.

Michael K. Pickens
Vice President

FLEET HOWELL

TAUBER EXPLORATION & PRODUCTION CO.

Richard E. Tauber
President

TIEMBO, LTD.

Mark Rauch
Registered Agent

KUDZU OIL PROPERTIES, L.L.C.

R. Nash Neyland
Executive Vice President

MARKSCO, L.L.C.

Mark P. Sealy
Member

LANDMARK EXPLORATION, LLC

Larry Johnson
Manager/Member

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

| | |
|---|---|
| 1 | **FANT ENERGY LIMITED** |
| 2 | Richard E. Fant, L.L.C., its General Partner |
| 3 | |
| 4 | |
| 5 | Phil O. Kelley |
| 6 | Manager |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | **PICKENS FINANCIAL GROUP, L.L.C.** |
| 12 | |
| 13 | Michael K. Pickens |
| 14 | Vice President |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | **FLEET HOWELL** |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | **TAUBER EXPLORATION & PRODUCTION CO.** |
| 27 | |
| 28 | |
| 29 | |
| 30 | Richard E. Tauber |
| 31 | President |
| 32 | |
| 33 | |
| 34 | |
| 35 | |
| 36 | **TIEMBO, LTD.** |
| 37 | |
| 38 | |
| 39 | |
| 40 | Mark Rauch |
| 41 | Registered Agent |
| 42 | |
| 43 | |
| 44 | |
| 45 | **KUDZU OIL PROPERTIES, L.L.C.** |
| 46 | |
| 47 | |
| 48 | |
| 49 | R. Nash Neyland |
| 50 | Executive Vice President |
| 51 | |
| 52 | |
| 53 | |
| 54 | **MARKSCO, L.L.C.** |
| 55 | |
| 56 | |
| 57 | |
| 58 | Mark P. Sealy |
| 59 | Member |
| 60 | |
| 61 | |
| 62 | |
| 63 | |
| 64 | |
| 65 | **LANDMARK EXPLORATION, LLC** |
| 66 | |
| 67 | |
| 68 | |
| 69 | Larry Johnson |
| 70 | Manager/Member |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

FANT ENERGY LIMITED
Richard E. Fant, L.L.C., its General Partner

_____
Phil O. Kelley
Manager


PICKENS FINANCIAL GROUP, L.L.C.

_____
Michael K. Pickens
Vice President


_____
FLEET HOWELL


TAUBER EXPLORATION & PRODUCTION CO.

_____
Richard E. Tauber
President


TIEMBO, LTD.

_____
Mark Rauch
Registered Agent


KUDZU OIL PROPERTIES, L.L.C.

_____
R. Nash Neyland
Executive Vice President


MARKSCO, L.L.C.

_____
Mark P. Sealy
Member


LANDMARK EXPLORATION, LLC

_____
Larry Johnson
Manager/Member

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

FANT ENERGY LIMITED
Richard E. Fant, L.L.C., its General Partner

Phil O. Kelley
Manager

PICKENS FINANCIAL GROUP, L.L.C.

Michael K. Pickens
Vice President

FLEET HOWELL

CASTLEBERRY PROSPECT OA

TAUBER EXPLORATION & PRODUCTION CO.

Rebekah McLeod

Richard E. Tauber
President

John Robinson

TIEMBO, LTD.

Mark Rauch
Registered Agent

KUDZU OIL PROPERTIES, L.L.C.

R. Nash Neyland
Executive Vice President

MARKSCO, L.L.C.

Mark P. Sealy
Member

LANDMARK EXPLORATION, LLC

Larry Johnson
Manager/Member

- 15 -
Castleberry Prospect

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

FANT ENERGY LIMITED
Richard E. Fant, L.L.C., its General Partner

_____
Phil O. Kelley
Manager


PICKENS FINANCIAL GROUP, L.L.C.

_____
Michael K. Pickens
Vice President


_____
FLEET HOWELL


TAUBER EXPLORATION & PRODUCTION CO.

_____
Richard E. Tauber
President


TIEMBO, LTD.

_____
Mark Rauch
Registered Agent


KUDZU OIL PROPERTIES, L.L.C.

_____
R. Nash Neyland
Executive Vice President


MARKSCO, L.L.C.

_____
Mark P. Sealy
Member


LANDMARK EXPLORATION, LLC

_____
Larry Johnson
Manager/Member

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

FANT ENERGY LIMITED
Richard E. Fant, L.L.C., its General Partner

_____
Phil O. Kelley
Manager


PICKENS FINANCIAL GROUP, L.L.C.

_____
Michael K. Pickens
Vice President


FLEET HOWELL


TAUBER EXPLORATION & PRODUCTION CO.

_____
Richard E. Tauber
President


TIEMBO, LTD.

_____
Mark Rauch
Registered Agent


KUDZU OIL PROPERTIES, L.L.C.

_____
R. Nash Neyland
Executive Vice President


MARKSCO, L.L.C.

_____
Mark P. Sealy
Member


LANDMARK EXPLORATION, LLC

_____
Larry Johnson
Manager/Member

- 15 -
Castleberry Prospect

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

FANT ENERGY LIMITED
Richard E. Fant, L.L.C., its General Partner

_____
Phil O. Kelley
Manager


PICKENS FINANCIAL GROUP, L.L.C.

_____
Michael K. Pickens
Vice President


_____
FLEET HOWELL


TAUBER EXPLORATION & PRODUCTION CO.

_____
Richard E. Tauber
President


TIEMBO, LTD.

_____
Mark Rauch
Registered Agent


KUDZU OIL PROPERTIES, L.L.C.

_____
R. Nash Neyland
Executive Vice President


MARKSCO, L.L.C.

_____
Mark P. Sealy
Member


LANDMARK EXPLORATION, LLC

_____
Larry Johnson
Manager/Member

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

FANT ENERGY LIMITED
Richard E. Fant, L.L.C., its General Partner

_____
Phil O. Kelley
Manager


PICKENS FINANCIAL GROUP, L.L.C.

_____
Michael K. Pickens
Vice President


_____
FLEET HOWELL


TAUBER EXPLORATION & PRODUCTION CO.

_____
Richard E. Tauber
President


TIEMBO, LTD.

_____
Mark Rauch
Registered Agent


KUDZU OIL PROPERTIES, L.L.C.

_____
R. Nash Neyland
Executive Vice President


MARKSCO, L.L.C.

_____
Mark P. Sealy
Member


LANDMARK EXPLORATION, LLC

_____
Larry Johnson
Manager/Member

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

CRAFT EXPLORATION COMPANY, LLC

_Steven_

Stephen H. Craft
Manager/Member

DICKSON OIL & GAS, L.L.C.

C. Bickham Dickson, III
Manager

BUNDERO INVESTMENT COMPANY, L.L.C.

Robert P. Bowman
Manager

RESOURCE VENTURES, LLC

Mark A. Arnold
General Manager

ASPEN ENERGY, INC.

Michael S. Reed
President

SEPULGA RIVER FUELS, LLC

Cosby H. Martin, Jr.
Sole Member

- 15 -
Castleberry Prospect

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

CRAFT EXPLORATION COMPANY, LLC

_____
Stephen H. Craft
Manager/Member

DICKSON OIL & GAS, L.L.C.

_____
C. Bickham Dickson, III
Manager

BUNDERO INVESTMENT COMPANY, L.L.C.

_____
Robert P. Bowman
Manager

RESOURCE VENTURES, LLC

_____
Mark A. Arnold
General Manager

ASPEN ENERGY, INC.

_____
Michael S. Reed
President

SEPULGA RIVER FUELS, LLC

_____
Cosby H. Martin, Jr.
Sole Member

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

CRAFT EXPLORATION COMPANY, LLC

_____
Stephen H. Craft
Manager/Member

DICKSON OIL & GAS, L.L.C.

_____
C. Bickham Dickson, III
Manager

BUNDERO INVESTMENT COMPANY, L.L.C.

_____
Robert P. Bowman
Manager

RESOURCE VENTURES, LLC

_____
Mark A. Arnold
General Manager

ASPEN ENERGY, INC.

_____
Michael S. Reed
President

SEPULGA RIVER FUELS, LLC

_____
Cosby H. Martin, Jr.
Sole Member

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

CRAFT EXPLORATION COMPANY, LLC

_____
Stephen H. Craft
Manager/Member

DICKSON OIL & GAS, L.L.C.

_____
C. Bickham Dickson, III
Manager

BUNDERO INVESTMENT COMPANY, L.L.C.

_____
Robert P. Bowman
Manager

RESOURCE VENTURES, LLC

_____
Mark A. Arnold
General Manager

ASPEN ENERGY, INC.

_____
Michael S. Reed
President

SEPULGA RIVER FUELS, LLC

_____
Cosby H. Martin, Jr.
Sole Member

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

CRAFT EXPLORATION COMPANY, LLC

_____

Stephen H. Craft
Manager/Member

DICKSON OIL & GAS, L.L.C.

_____

C. Bickham Dickson, III
Manager

BUNDERO INVESTMENT COMPANY, L.L.C.

_____

Robert P. Bowman
Manager

RESOURCE VENTURES, LLC

_____

Mark A. Arnold
General Manager

ASPEN ENERGY, INC.

_____

Michael S. Reed
President

SEPULGA RIVER FUELS, LLC

_____

Cosby H. Martin, Jr.
Sole Member

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

CRAFT EXPLORATION COMPANY, LLC

Stephen H. Craft
Manager/Member

DICKSON OIL & GAS, L.L.C.

C. Bickham Dickson, III
Manager

BUNDERO INVESTMENT COMPANY, L.L.C.

Robert P. Bowman
Manager

RESOURCE VENTURES, LLC

Mark A. Arnold
General Manager

ASPEN ENERGY, INC.

Michael S. Reed
President

SEPULGA RIVER FUELS, LLC

Cosby H. Martin, Jr.
Sole Member

- 15 -
Castleberry Prospect

**ACKNOWLEDGMENTS TO JOINT OPERATING AGREEMENT**

STATE OF LOUISIANA

PARISH OF CADDO

I, Kim S. Elias_____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklar Exploration Company L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___9th___ day of _November_, 2012.

_Kim S. Elias_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commission is for Life

My Commission Expires: at death


STATE OF LOUISIANA

PARISH OF CADDO

I, Kim S. Elias_____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklarco L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___9th___ day of _November_, 2012.

_Kim S. Elias_
NOTARY PUBLIC

Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commission is for Life

[AFFIX NOTARIAL SEAL]

My Commission Expires: at death


STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

## ACKNOWLEDGMENTS TO JOINT OPERATING AGREEMENT

STATE OF LOUISIANA

PARISH OF CADDO

    I, Kim S. Elias _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklar Exploration Company L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the ___9th___ day of __November__, 2012.

                                _Kim S. Elias_____
                                  NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
                           Kim S. Elias, Notary Public # 52698
                             Caddo Parish, Louisiana
My Commission Expires: at death         My Commssion is for Life

STATE OF LOUISIANA

PARISH OF CADDO

    I, Kim S. Elias _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklarco L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the ___9th___ day of __November__, 2012.

                                  _Kim S. Elias_____
                                  NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
                           Kim S. Elias, Notary Public # 52698
                             Caddo Parish, Louisiana
My Commission Expires: at death         My Commssion is for Life

STATE OF TEXAS

COUNTY OF _Harris_

    I, _Sharon M McDonald_____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the ___13___ day of __November__, 2012.

                    SHARON METCALF McDONALD
                    Notary Public, State of Texas
                    Commission Expires 12-29-2013

                                  _Sharon M McDonald_____
                                  NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: 12/9/2013

STATE OF TEXAS

COUNTY OF Dallas

I, Robert Hiram Lucius_____, a notary public in and for said County and State, hereby certify that W. R. (Trey) Sibley, III, whose name as Attorney-in-Fact of THE RUDMAN PARTNERSHIP, a Texas general partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said partnership.

Given under my hand and notarial seal this the 17th day of December, 2012.

ROBERT HIRAM LUCIUS
Notary Public, State of Texas
My Commission Expires
04/15/2016

_Robert Hiram Lucius_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: April 15, 2016

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that TARA RUDMAN, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she executed the same as her free act and deed.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that W. R. (Trey) Sibley, III, whose name as Attorney-in-Fact of THE RUDMAN PARTNERSHIP, a Texas general partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said partnership.

     Given under my hand and notarial seal this the ___ day of _____, 2012.


                                 _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF _TEXAS_

COUNTY OF _DALLAS_

     I, _LINDA SANDERS_____, a notary public in and for said County and State, hereby certify that TARA RUDMAN, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she executed the same as her free act and deed.

     Given under my hand and notarial seal this the _5th_ day of _December_, 2012.


                                 _Linda Sanders_
                                        Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _5.14.2016_

                                LINDA SANDERS
                             Notary Public, State of Texas
                             My Commission Expires
                             05/14/2016


STATE OF TEXAS

COUNTY OF HARRIS

     I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2012.


                                   _____
                                          NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that W. R. (Trey) Sibley, III, whose name as Attorney-in-Fact of THE RUDMAN PARTNERSHIP, a Texas general partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said partnership.

      Given under my hand and notarial seal this the ___ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF _____

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that TARA RUDMAN, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she executed the same as her free act and deed.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF TEXAS

COUNTY OF HARRIS

      I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the 21st day of November 2012.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: 8-11-15

MARCIA A. DE LUNA
Notary Public, State of Texas
My Commission Expires
August 11, 2015

STATE OF TEXAS

COUNTY OF _Harris_

    I, _Brenda Witt White_, a notary public in and for said County and State, hereby certify that Phill O. Kelley, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, represented herein by its General Partner, Richard E. Fant, L.L.C., which itself is represented herein by its Manager, Phil O. Kelley, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

    Given under my hand and notarial seal this the _14th_ day of _November_, 2012.

_Brenda Witt White_
Notary Public

> BRENDA WITT WHITE
> Notary Public, State of Texas
> My Commission Expires
> March 23, 2015
> (AFFIX NOTARIAL SEAL)

My commission expires: _3-23-15_


STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as duly authorized Vice President of PICKENS FINANCIAL GROUP, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

    I, _____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Phill O. Kelley, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, represented herein by its General Partner, Richard E. Fant, L.L.C., which itself is represented herein by its Manager, Phil O. Kelley, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF TEXAS

COUNTY OF Dallas

I, Marilyn L. Fulton, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as duly authorized Vice President of PICKENS FINANCIAL GROUP, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 13th day of November, 2012.

*Marilyn L Fulton*
*My Commission Expires*
*06/23/2016*

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: 6-23-16


STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Phill O. Kelley, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, represented herein by its General Partner, Richard E. Fant, L.L.C., which itself is represented herein by its Manager, Phil O. Kelley, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as duly authorized Vice President of PICKENS FINANCIAL GROUP, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

      I, _Melissa R. Ebarb_____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

      Given under my hand and notarial seal this the _14th_ day of _Nov._, 2012.

_____
Notary Public
#68375

(AFFIX NOTARIAL SEAL)

My commission ~~expires:~~ _is for life_

STATE OF TEXAS                    *Castleberry Prospect OA* (handwritten)

COUNTY OF *Harris* (handwritten)

    I, *Myla Wunderlich* (handwritten), a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as duly authorized President of TAUBER EXPLORATION & PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the *12th* (handwritten) day of *December* (handwritten), 2012.

                           _____
                           NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

                    MYLA WUNDERLICH
               Notary Public, State of Texas
            Commission Expires 02-11-2016


STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                           _____
                           NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF MISSISSIPPI

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                           _____
                           NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as duly authorized President of TAUBER EXPLORATION & PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

        Given under my hand and notarial seal this the _____ day of _____, 2012.

                                      _____
                                      NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _HARRIS_

    I, _PATTI L HANSON_, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

        Given under my hand and notarial seal this the _16_ day of _November_, 2012.

                PATTI L. HANSON
                MY COMMISSION EXPIRES
                January 18, 2015

                                    _Patti L Hanson_
                                      NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _1/18/15_


STATE OF MISSISSIPPI

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

        Given under my hand and notarial seal this the _____ day of _____, 2012.

                                        _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as duly authorized President of TAUBER EXPLORATION & PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                                       _____
                                       NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                                       _____
                                       NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF MISSISSIPPI

COUNTY OF _Madison_

    I, _Pamela F. Sebren_, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _13th_ day of _November_, 2012.

                                       _Pamela F. Sebren_
                                       NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Castleberry JOA - Page 4 of 7

STATE OF LOUISIANA

PARISH OF CADDO

     I, *Aungel Pattison*, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

     Given under my hand and notarial seal this the ___15___ day of ___Nov___, 2012.

                                          _____
                                            Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

AUNGEL PATTISON
Embossed Hereon Is My
DeSoto, Caddo, Bossier Parishes
Louisiana Notary Public Seal
Notary ID No. 063733
My Commission Expires Upon My Death

STATE OF MISSISSIPPI

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Larry Johnson, whose name as duly authorized Manager/Member of LANDMARK EXPLORATION, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2012.

                                           _____
                                          NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Steven H. Craft, whose name as duly authorized Manager/Member of CRAFT EXPLORATION COMPANY, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2012.

                                           _____
                                          NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
                           Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

 

STATE OF MISSISSIPPI

COUNTY OF _Rankin_

      I, _Lena M. Mayfield_, a notary public in and for said County and State, hereby certify that Larry Johnson, whose name as duly authorized Manager/Member of LANDMARK EXPLORATION, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _16_ day of _November_, 2012.

_Lena M. Mayfield_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _2-17-13_

 

STATE OF MISSISSIPPI

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Steven H. Craft, whose name as duly authorized Manager/Member of CRAFT EXPLORATION COMPANY, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

                                             _____
                                                   Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Larry Johnson, whose name as duly authorized Manager/Member of LANDMARK EXPLORATION, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

                                         _____
                                     NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF __MADISON__

      I, __Sue DenHerder__, a notary public in and for said County and State, hereby certify that Steven H. Craft, whose name as duly authorized Manager/Member of CRAFT EXPLORATION COMPANY, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the __20th__ day of __NOVEMBER__, 2012.

                                         _____
                                     NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: __10·15·16__

                                Castleberry JOA - Page 5 of 7

STATE OF LOUISIANA

PARISH OF CADDO

    I, _George Portocarrero_, a notary public in and for said Parish and State, hereby certify that C. Bickham Dickson, III, whose name as Member of the DICKSON OIL & GAS, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _4TH_ day of _December_, 2012.

                           _____
                              Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _For Life_

                                   GEORGE PORTOCARRERO
                                   NOTARY PUBLIC - LOUISIANA
                                   CADDO - BOSSIER PARISH
                                   NOTARY ID NUMBER 056297
                                   My Commission is For Life

STATE OF LOUISIANA

PARISH OF CADDO

    I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                             _____
                              NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF COLORADO

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Mark A. Arnold, whose name as duly authorized General Manager of RESOURCE VENTURES, LLC, an Indiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                             _____
                              NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

    I, _____, a notary public in and for said Parish and State, hereby certify that C. Bickham Dickson, III, whose name as Member of the DICKSON OIL & GAS, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.


_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

    I, Deborah W. Cox, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the 15th day of November, 2012.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: per life

DEBORAH W. COX  26623
Notary Public
Parish of Caddo
State of Louisiana


STATE OF COLORADO

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Mark A. Arnold, whose name as duly authorized General Manager of RESOURCE VENTURES, LLC, an Indiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

    I, _____, a notary public in and for said Parish and State, hereby certify that C. Bickham Dickson, III, whose name as Member of the DICKSON OIL & GAS, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.


_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

    I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF COLORADO

COUNTY OF _Douglas_

    I, _JoAnne Scherfel_, a notary public in and for said County and State, hereby certify that Mark A. Arnold, whose name as duly authorized General Manager of RESOURCE VENTURES, LLC, an Indiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _20Th_ day of _November_, 2012.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _3/5/2013_

Castleberry JOA - Page **6** of **7**

STATE OF KENTUCKY

COUNTY OF ~~Kentucky~~ Jefferson

I, _Terri P Jones_, a notary public in and for said County and State, hereby certify that Michael S. Reed, whose name as duly authorized President of ASPEN ENERGY, INC., a Kentucky corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the __15th__ day of __November__, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _Sept 12, 2016_


STATE OF ALABAMA

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Cosby H. Martin, Jr., whose name as the Sole Member of SEPULGA RIVER FUELS, LLC, an Alabama limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF KENTUCKY

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Michael S. Reed, whose name as duly authorized President of ASPEN ENERGY, INC., a Kentucky corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2012.


                               _____
                               NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF ALABAMA

COUNTY OF *Escambia*

     I, *Kathy Helton*_____, a notary public in and for said County and State, hereby certify that Cosby H. Martin, Jr., whose name as the Sole Member of SEPULGA RIVER FUELS, LLC, an Alabama limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the *19th* day of *November*_____, 2012.


                                 *Kathy Helton*
                               NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

My Commission Expires June 19, 2013

**EXHIBIT "A"**
**CASTLEBERRY PROSPECT**
**CONECUH COUNTY, ALABAMA**

Attached to and made a part of that certain Castleberry Prospect Joint Operating Agreement dated effective as of November 7, 2012, by and between Sklar Exploration Company L.L.C., as Operator and Sklarco L.L.C, McCombs Energy, Ltd., The Rudman Partnership, Tara Rudman, JJS Working interests LLC, Fant Energy Limited, Pickens Financial Group, LLC, Fleet Howell, Tauber Exploration & Production Co., Tiembo, Ltd., Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC, Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C., Resource Ventures, LLC, Aspen Energy, Inc., and Sepulga River Fuels, LLC, as Non-Operators.

(1)    **Identification of lands subject to this agreement:**

**Contract Area***

**All lands, oil and gas leasehold interest and**
**oil and gas interest lying within the following sections as depicted on the black**
**boundary as shown on the plat designated at Exhibit "A-2":**

**Section 36, Township 4 North, Range 10 East**
**Sections 31 & 32, Township 4 North, Range 11 East**
**Conecuh County, Alabama**

**Area of Mutual Interest****

**All lands, oil and gas leasehold interest and**
**oil and gas interest lying within the following sections as depicted on the red**
**boundary as shown on the plat designated at Exhibit "A-2":**

**Section 36, Township 4 North, Range 10 East**
**Sections 31 & 32, Township 4 North, Range 11 East**
**Conecuh County, Alabama**

(2)    **Restrictions, if any, as to depths, formations, or substances:**

There are no restrictions except as may be provided for in any lease or contract subject to this Operating Agreement.

(3)    **Percentages or Fractional Interests of Parties to this Agreement:**

| Participants | BPO | APO1 | APO2 |
|---|---|---|---|
| Sklarco | 11.293750% | 9.599688% | 9.035000% |
| McCombs | 17.225000% | 14.641250% | 13.78000% |
| Rudman | 1.300000% | 1.1050000% | 1.040000% |
| Tara Rudman | 6.825000% | 5.8012500% | 5.460000% |
| JJS | 6.500000% | 5.5250000% | 5.200000% |
| Fant | 6.500000% | 5.5250000% | 5.200000% |
| Pickens | 3.250000% | 2.7625000% | 2.600000% |
| Howell | 3.250000% | 2.7625000% | 2.600000% |
| Tauber | 1.625000% | 1.3812500% | 1.300000% |
| Tiembo | 1.300000% | 1.1050000% | 1.040000% |
| Kudzu | 1.300000% | 1.1050000% | 1.040000% |
| Marksco | 1.300000% | 1.1050000% | 1.040000% |
| Landmark | 1.300000% | 1.1050000% | 1.040000% |
| Craft | 0.650000% | 0.5525000% | 0.520000% |
| Dickson | 0.650000% | 0.5525000% | 0.520000% |
| Bundero | 0.650000% | 0.5525000% | 0.520000% |
| Resource | 0.081250% | 0.0690630% | 0.065000% |
| Aspen | 17.50000% | 22.375000% | 24.00000% |
| Sepulga | 17.50000% | 22.375000% | 24.00000% |
| Total | 100.00000% | 100.00000% | 100.0000% |

BPO, APO1, and APO2 shall have the same meaning as set forth in the Participation Agreement to which this Operating Agreement is attached as Exhibit "E".

(4)   **Oil and gas leases and/or oil and gas interests subject to this agreement:**

See Exhibit "A-1" Description of Oil and Gas Leases.  This Agreement covers not only the oil and gas leases described in Exhibit "A-1," but also any oil and gas leases acquired after the effective date of this Agreement and covered by the Participation Agreement to which this Agreement is attached as Exhibit "E" or Article VIII.B, VIII.C or XV.K of this Agreement.  The only jointly owned lease burdens are the lessor's royalty under each of the oil and gas leases described in Exhibit "A-1", including any escalation thereof under any of these oil and gas leases, the overriding royalty interest described in Section 1.1, and the reversionary working interest described in Section 1.5, of the Participation Agreement to which this Agreement is attached as Exhibit "E". There are no other joint burdens whatsoever.

(5)   **Addresses of parties for notice purposes:**

**Sklar Exploration Company, LLC**
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Telephone: (318) 227-8668
Telecopier: (318) 227-9012

**Sklarco, LLC**
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Telephone: (318) 227-8668
Telecopier: (318) 227-9012

**MCCOMBS ENERGY, LTD**
McCombs Energy, Ltd.
5599 San Felipe Street, Suite 1200
Houston, Texas  77056-2721

**The Rudman Partnership**
W. R. (Trey) Sibley, III
1700 Pacific Avenue, Suite 4700
Dallas, Texas 75204

**Tara Rudman**
1700 Pacific Avenue, Suite 4700
Dallas, Texas 75204

**JJS Working Interests LLC**
4295 San Felipe, Suite 207
Houston, Texas  77027

**Fant Energy Limited**
5800 Westview Drive
Houston, Texas  77055

**Fleet Howell**
416 Travis Street, Suite 715
Shreveport, Louisiana  71101

**Pickens Financial Group, LLC**
8499 Greenville Avenue, Suite 105
Dallas, Texas 75231-2417

**Tauber Exploration & Production Company**
55 Waugh Drive, Suite 601
Houston, TX 77007

**Tiembo Ltd.**
P. O. Box 270415
Houston, Texas  77277-0415

**Kudzu Oil Properties, LLC**
300 Concourse Blvd., Suite 101
Ridgeland, Mississippi 39157

**Marksco, L.L.C.**
333 Texas Street, Suite 1050
Shreveport, Louisiana 71101

**Landmark Exploration, LLC**
P. O. Box 12004
Jackson, MS 39236

**Craft Exploration Company L.L.C.**
325 Lakeshire Parkway
Canton, MS 39046

**Dickson Oil & Gas, LLC**
P. O. Box 52479
Shreveport, Louisiana 71135

**Bundero Investment Company, L.L.C.**
333 Texas Street, Suite 300
Shreveport, Louisiana 71101

**Resource Ventures, LLC**
8369 SouthPark Lane, Ste B
Littleton, CO 80120

**Sepulga River Fuels, LLC**
Attn: Cosby H. Martin, Jr.
15 Ridgers Lane
Brewton, AL 36426
(251) 867-5457

**Aspen Energy, Inc.**
Attn: Mike Reed
161 St. Matthews Ave, Ste 16
Louisville, Kentucky 40207
Phone: (502) 897-1757

## EXHIBIT "A-1"

Attached to and made a part of that certain Castleberry Prospect Joint Operating Agreement dated effective as of November 7, 2012, by and between Sklar Exploration Company L.L.C., as Operator and Sklarco L.L.C, McCombs Energy, Ltd., The Rudman Partnership, Tara Rudman, JJS Working interests LLC, Fant Energy Limited, Pickens Financial Group, LLC, Fleet Howell, Tauber Exploration & Production Co., Tiembo, Ltd., Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC, Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C., Resource Ventures, LLC, Aspen Energy, Inc., and Sepulga River Fuels, LLC, as Non-Operators.

## DESCRIPTION OF LEASES

1. Oil, Gas and Mineral Lease dated June 12, 2012, by and between Cedar Creek Land and Timber, Inc., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5359 of the Probate Judge Records of Conecuh County, Alabama.

2. Oil, Gas and Mineral Lease dated June 12, 2012, by and between McMillan, Ltd., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5362 of the Probate Judge Records of Conecuh County, Alabama.

3. Oil, Gas and Mineral Lease May 9, 2012, by and between Chester Hix, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5367 of the Probate Judge Records of Conecuh County, Alabama.

4. Oil, Gas and Mineral Lease May 8, 2012, by and between Escon, Inc., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5365 of the Probate Judge Records of Conecuh County, Alabama.

5. Oil, Gas and Mineral Lease May 9, 2012, by and between George W. Pritchett et ux., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5369 of the Probate Judge Records of Conecuh County, Alabama.

6. Oil, Gas and Mineral Lease May 15, 2012, by and between Broox G. Garrett, Jr., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5370 of the Probate Judge Records of Conecuh County, Alabama.

7. Oil, Gas and Mineral Lease June 12, 2012, by and between Sally Jane Spencer, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5383 of the Probate Judge Records of Conecuh County, Alabama.

8. Oil, Gas and Mineral Lease May 8, 2012, by and between Kathryn Ann Till, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5372 of the Probate Judge Records of Conecuh County, Alabama.

9. Oil, Gas and Mineral Lease May 21, 2012, by and between Robert R. Smith Family Trust, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5374 of the Probate Judge Records of Conecuh County, Alabama.

10. Oil, Gas and Mineral Lease June 21, 2012, by and between William Bertrand Spencer, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5381 of the Probate Judge Records of Conecuh County, Alabama.

11. Oil, Gas and Mineral Lease May 23, 2012, by and between Patricia V. Saloom Assemany, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5385 of the Probate Judge Records of Conecuh County, Alabama.

12. Oil, Gas and Mineral Lease July 17, 2012, by and between David Coker, Individually and as Trustee, as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5379 of the Probate Judge Records of Conecuh County, Alabama.

13. Oil, Gas and Mineral Lease June 15, 2012, by and between Guy F. Stovall III et al., as Lessor, and Aspen Energy, Inc., as Lessee, a memorandum of which is recorded in Book 2012, Page 5376 of the Probate Judge Records of Conecuh County, Alabama.

Page 2
Exhibit "A-1"

14.    Oil, Gas and Mineral Lease April 10, 2012, by and between Richard A. Baggett, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5334 of the Probate Judge Records of Conecuh County, Alabama.

15.    Oil, Gas and Mineral Lease April 10, 2012, by and between Craig A. Baggett, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5332 of the Probate Judge Records of Conecuh County, Alabama.

16.    Oil, Gas and Mineral Lease April 10, 2012, by and between James A. Baggett, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5330 of the Probate Judge Records of Conecuh County, Alabama.

17.    Oil, Gas and Mineral Lease June 12, 2012, by and between Myrtice W. Ellis et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5336 of the Probate Judge Records of Conecuh County, Alabama.

18.    Oil, Gas and Mineral Lease July 26, 2012, by and between Irvine Peter Brennecke, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5339 of the Probate Judge Records of Conecuh County, Alabama.

19.    Oil, Gas and Mineral Lease April 12, 2012, by and between Daniel Bryan Reed et ux., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5353 of the Probate Judge Records of Conecuh County, Alabama.

20.    Oil, Gas and Mineral Lease April 12, 2012, by and between Daniel Bryan Reed et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5356 of the Probate Judge Records of Conecuh County, Alabama.

21.    Oil, Gas and Mineral Lease June 14, 2012, by and between Elsie Jane Dyess et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5347 of the Probate Judge Records of Conecuh County, Alabama.

22.    Oil, Gas and Mineral Lease June 14, 2012, by and between Elsie Jane Dyess et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5349 of the Probate Judge Records of Conecuh County, Alabama.

23.    Oil, Gas and Mineral Lease June 14, 2012, by and between Elsie Jane Dyess et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5351 of the Probate Judge Records of Conecuh County, Alabama.

24.    Oil, Gas and Mineral Lease June 14, 2012, by and between Elsie Jane Dyess et al., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5344 of the Probate Judge Records of Conecuh County, Alabama.

25.    Oil, Gas and Mineral Lease June 14, 2012, by and between Michael Thomas Dyess et ux., as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5341 of the Probate Judge Records of Conecuh County, Alabama.

26.    Oil, Gas and Mineral Lease August 8, 2012, by and between Dee Ann Bray Matheson, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5575 of the Probate Judge Records of Conecuh County, Alabama.

27.    Oil, Gas and Mineral Lease August 8, 2012, by and between George Michael Bray, as Lessor, and Aspen Energy, Inc., as Lessee, recorded in Book 2012, Page 5834 of the Probate Judge Records of Conecuh County, Alabama.

## EXHIBIT "A-2"

Attached to and made a part of that certain Castleberry Prospect Joint Operating Agreement dated effective as of November 7, 2012, by and between Sklar Exploration Company L.L.C., as Operator and Sklarco L.L.C, McCombs Energy, Ltd., The Rudman Partnership, Tara Rudman, JJS Working interests LLC, Fant Energy Limited, Pickens Financial Group, LLC, Fleet Howell, Tauber Exploration & Production Co., Tiembo, Ltd., Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC, Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C., Resource Ventures, LLC, Aspen Energy, Inc., and Sepulga River Fuels, LLC, as Non-Operators.



EXHIBIT "B"

Producers 88 (9/70)—Paid Up (SP 4-75)
With Pooling Provision
Mississippi-Alabama-Florida                                                                 HEDERMAN BROS., ROSELAND, MS

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of _____ 20 ____ between

_____

_____

_____

_____

lessor (whether one or more), whose address is: _____

and _____ lessee, WITNESSETH:

1. Lessor, in consideration of _____ Dollars, receipt of which is hereby acknowledged, and of the covenants and agreements of lessee hereinafter contained, does hereby grant, lease and let unto lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas (including casing-head gas, hydrogen sulphide and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, power lines, telephone lines, employee houses and other structures on said land, necessary or useful in lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any other land adjacent thereto. The land covered hereby, herein called "said land", is located in the County of _____, State of _____, and is described as follows:

[blank space for legal description]

This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain _____ acres, whether or not it actually contains more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights, and options hereunder.

2. Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of ten (10) years from the date hereof, hereinafter called "primary term", and so long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3. As royalty, lease covenants and agrees: (a) To deliver to the credit of lessor, in the pipe line to which lessee may connect its wells, the equal one-eighth part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such one-eighth part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear one-eighth of the cost of treating oil to render it marketable pipe line oil; (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, one-eighth of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of one-eighth of such gas and casinghead gas; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one-tenth either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing gas or any other mineral covered hereby, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this sub-paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, or may be deposited to such parties credit in the _____ Bank

at _____ or its successor, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that lessee pays or renders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein provided, pay or tender such royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownership thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4. Lessee is hereby granted the right, at its option, to pool or unitize all or any part of said land and of this lease as to any or all minerals or horizons thereunder, with other lands, lease or leases, or portion or portions thereof, or mineral or horizons thereunder, so as to establish units containing not more than 80 surface acres plus 10% acreage tolerance; provided, however, a unit may be established or an existing unit may be enlarged to contain not more than 640 acres plus 10% acreage tolerance, if unitized only as to gas or as to gas and liquid hydrocarbons (condensate) which are not a liquid in the subsurface reservoir. If larger units are required, under any governmental rule or order, for the drilling or operation of a well at a regular location, or for obtaining maximum allowable, from any well to be drilled, drilling or already drilled, any such unit may be established or enlarged to conform to the size required by such governmental order or rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of said options may be exercised by lessee from time to time, and whether before or after production has been established either on said land or on the portion of said land included in the unit or on other land unitized therewith and such unit may include any well to be drilled, being drilled or already completed. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be no land or mineral, royalty or leasehold interest in land within the unit which are not pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted under this lease. There shall be allocated to the land covered by this lease included in any such unit that proportion of the total production of unitized minerals from wells in the unit, after deducting any used in lease or unit operations, which the number of surface acres in the land covered by this lease included in the unit bears to the total number of surface acres in the unit. The production so allocated shall be considered for all purposes, including the payment of delivery of royalty, overriding royalty and any other payments out of production, to be the entire production of unitized minerals from the portion of said land covered hereby and included in such unit, in the same manner as though produced from said land under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of such unit shall have the effect of changing the ownership of any change in such production royalty which may become payable under this lease. Neither shall it impair the right of lessee to release as provided in paragraph 5 hereof but, as to any portion of said land, lessor's rights and interests thereunder shall remain otherwise unaffected. In lieu of the royalties elsewhere herein specified, including shut-in gas royalties, lessor shall receive on production from a unit so pooled only such portion of the royalty stipulated herein as the amount of his acreage placed in the unit or his royalty interest therein on an acreage basis bears to the total acreage so pooled in the particular unit involved.

5. Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations as to the released acreage or interest.

6. This is a PAID-UP LEASE. In consideration of the down cash payment, Lessor agrees that Lessee shall not be obligated, except as otherwise provided herein, to commence or continue any operations during the primary term. Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

7. Lessee shall have the use, free from royalty, of water, other than from lessor's water wells, and of oil and gas produced from said land in all operations hereunder. Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing. No well shall be drilled nearer than 200 feet to the house or barn now on said land without the consent of the lessor. Lessee shall pay for damages caused by its operations to growing crops and timber on said land.

EXHIBIT "B", continued

8. The rights and estate of any party hereto may be assigned from time to time in whole or in part and as to any mineral or horizon. All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns. No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of lessee, including, but not limited to, the location and drilling of wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof of or to lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by lessee or lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of the death of the owner, lessee may, nevertheless, pay or tender such royalties, or other moneys, or part thereof, to the credit of the decedent in a depository bank provided for above.

9. In the event lessor considers that lessee has not complied with all its obligations hereunder, both express and implied, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor. The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee. Neither the service of said notice nor the doing of any acts by lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that lessee has failed to perform all its obligations hereunder. Should it be asserted in any notice given to the lessor under the provisions of this paragraph that lessee has failed to comply with any implied obligation or covenant hereof, this lease shall not be subject to cancellation for any such cause except after final judicial ascertainment that such failure exists and lessee has then been afforded a reasonable time to prevent cancellation by complying with and discharging its obligations as to which lessee has been judicially determined to be in default. If this lease is cancelled for any cause, it shall nevertheless remain in force and effect as to (1) sufficient acreage around each well as to which there are operations to constitute a drilling or maximum allowable unit under applicable governmental regulations, (but in no event less than forty acres), such acreage to be designated by lessee as nearly as practicable in the form of a square centered at the well, or in such shape as then existing spacing rules require; and (2) any part of said land included in a pooled unit on which there are operations. Lessee shall also have such easements on said land as are necessary to operations on the acreage so retained.

10. Lessee hereby warrants and agrees to defend title to said land against the claims of all persons whomsoever. Lessor's rights and interests hereunder shall be charged primarily with any mortgage, taxes or other lien, or interest and other charge on said land, but lessee agrees that lessee shall have the right at any time to pay or reduce same for lessor, either before or after maturity, and be subrogated to the rights of the holder thereof and to deduct amounts so paid from royalties or other payments payable or which may become payable to lessor and/or assigns under this lease. Lessee is hereby given the right to acquire for its own benefit, deeds, leases, or assignments covering any interest or claim in said land which lessee or any other party contends is outstanding and not covered hereby and even though such outstanding interest or claim be invalid or adverse to lessor. If this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether lessor's interest is herein specified or not), or no interest therein, then the royalties, and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by lessor) shall be paid out of the royalty herein provided. This lease shall be binding upon each party who executes it without regard to whether it is executed by all those named herein as lessor.

11. If, while this lease is in force, at or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and lessee is not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delay had not occurred.

12. Within thirty (30) days prior to the expiration of the primary term of this lease, or if operations are being conducted on said lease or land pooled therewith at the expiration of the primary term in such manner as to maintain this lease in force, within thirty (30) days after the completion of a dry hole resulting from such operations, lessee may extend the primary term of this lease as to all or any part of acreage then covered hereby, for an additional five (5) years beyond the initial primary term, by written notification of action taken and by making payment to lessor or lessee's successor in interest as reflected by notice to lessee pursuant to Paragraph 8 hereof, or to the credit of lessor at such depository bank named herein in any amendatory instrument in the sum of $_____ for each net acre as to which the lease is so extended. If this option is exercised by lessee, the lease as extended will thereafter be treated as if the original primary term had been five (5) years longer.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

_____      _____ (SEAL)

_____      _____ (SEAL)

_____      _____ (SEAL)

JOINT OR SINGLE ACKNOWLEDGMENT
(MISSISSIPPI-ALABAMA-FLORIDA)

STATE OF _____

COUNTY OF _____

I hereby certify, that on this day, before me, a _____

duly authorized in the state and county aforesaid to take acknowledgments, personally appeared _____

to me known to be the person _____ described in and who executed the foregoing instrument and _____ he _____
acknowledged before me that, being informed of the contents of the same, _____ he _____ voluntarily signed and delivered
the within and foregoing instrument on the day and year therein mentioned.

Given under my hand and official seal, this _____ day of _____ A.D., 20 _____

(Affix Seal)

_____
(Title of Official)

My commission expires _____      in and for _____ County, _____

WITNESS ACKNOWLEDGMENT
(MISSISSIPPI-ALABAMA-FLORIDA)

STATE OF _____

COUNTY OF _____

I, a _____ in and for the aforesaid jurisdiction, hereby certify that _____

a subscribing witness to the foregoing instrument, known to me, appeared before me on this day, and being sworn, stated that _____

the grantor(s), having been informed of the contents thereof, voluntarily executed and delivered the same in his presence, and in the presence of the other subscribing witness, on the day the same bears date; that he attested the same in the presence of the grantor(s), and of the other witness, and that such other witness subscribed his name as a witness in his presence.

_____
(Subscribing Witness)

Given under my hand and official seal, this _____ day of _____ 20 _____

(Affix Seal)

_____
(Title of Official)

My commission expires _____      in and for _____ County, _____



COPAS 2005 Accounting Procedure
Recommended by COPAS

## Exhibit "-C "
## ACCOUNTING PROCEDURE
## JOINT OPERATIONS

Attached to and made part of  that certain Operating Agreement dated  November 7,  2012by and between Sklar Exploration Company
L.L.C., as Operator, and SKLARCO L.L.C., et al, as Non-Operators.

### I. GENERAL PROVISIONS

IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE
COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE
BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.

IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE
PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT
FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT
OF THE PARTIES IN SUCH EVENT.

1.    **DEFINITIONS**

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

"**Affiliate**" means for a person, another person that controls, is controlled by, or is under common control with that person. In this
definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities
of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an
individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

"**Agreement**" means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting
Procedure is attached.

"**Controllable Material**" means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified
in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

"**Equalized Freight**" means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest
Railway Receiving Point to the property.

"**Excluded Amount**" means a specified excluded trucking amount most recently recommended by COPAS.

"**Field Office**" means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is
to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable
field personnel.

"**First Level Supervision**" means those employees whose primary function in Joint Operations is the direct oversight of the Operator's
field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may
include, but are not limited to:

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance,
  construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental
  part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices
- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group
  or team leaders.

"**Joint Account**" means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be
shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

"**Joint Operations**" means all operations necessary or proper for the exploration, appraisal, development, production, protection,
maintenance, repair, abandonment, and restoration of the Joint Property.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



"**Joint Property**" means the real and personal property subject to the Agreement.

"**Laws**" means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

"**Material**" means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

"**Non-Operators**" means the Parties to the Agreement other than the Operator.

"**Offshore Facilities**" means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

"**Off-site**" means any location that is not considered On-site as defined in this Accounting Procedure.

"**On-site**" means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

"**Operator**" means the Party designated pursuant to the Agreement to conduct the Joint Operations.

"**Parties**" means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

"**Participating Interest**" means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

"**Participating Party**" means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

"**Personal Expenses**" means reimbursed costs for travel and temporary living expenses.

"**Railway Receiving Point**" means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

"**Shore Base Facilities**" means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.

"**Supply Store**" means a recognized source or common stock point for a given Material item.

"**Technical Services**" means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

2.   **STATEMENTS AND BILLINGS**

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section 1.2 and/or Section 1.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



**c o p a s**

3.  **ADVANCES AND PAYMENTS BY THE PARTIES**

    A.  Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

    B.  Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

        (1)  being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

        (2)  being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

        (3)  being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

        (4)  charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

4.  **ADJUSTMENTS**

    A.  Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

    B.  All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

        (1)  a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

        (2)  an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

        (3)  a government/regulatory audit, or

        (4)  a working interest ownership or Participating Interest adjustment.

5.  **EXPENDITURE AUDITS**

    A.  A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

    Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

1  those Non-Operators approving such audit.

3  The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after
4  completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month
5  requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be
6  supported with sufficient documentation.

8  A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to
9  the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator
10  hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to
11  comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with
12  the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against
13  the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations,
14  provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or
15  I.5.C.

17 B.  The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator
18  receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive
19  response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion
20  thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section
21  I.3.B (*Advances and Payments by the Parties*).

23 C.  The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator
24  shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator
25  shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not
26  adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response
27  to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately
28  granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and
29  Payments by the Parties*).

31 D.  If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after
32  Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution
33  meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable.
34  The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting
35  shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with
36  authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution
37  reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the
38  Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself.
39  Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information
40  supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may
41  be discussed at subsequent meetings until each such issue is resolved.

43  If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall
44  be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute
45  shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present
46  at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to
47  ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any
48  Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60)
49  days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other
50  provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or
51  to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

53 E.  ☐ *(Optional Provision – Forfeiture Penalties)*
54  *If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-*
55  *Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been*
56  *withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that*
57  *were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response*
58  *of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made,*
59  *without interest, to the Joint Account.*

61 **6.   APPROVAL BY PARTIES**

63 A.  GENERAL MATTERS

65  Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting
66  Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B.   AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____ (_____) or more Parties, one of which is the Operator, having a combined working interest of at least _____ percent (_____%), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C.   AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

1.   **RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

2.   **LABOR**

A.   Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

   (1)   Operator's field employees directly employed On-site in the conduct of Joint Operations,

   (2)   Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

   (3)   Operator's employees providing First Level Supervision,

   (4)   Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

   (5)   Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B.   Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

D. Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E. Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F. Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G. Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H. Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3. **MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4. **TRANSPORTATION**

A. Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B. Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

   (1) If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property . The Operator shall consistently apply the selected alternative.

   (2) If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5. **SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6. **EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A. The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____ percent (_____%) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

## 7.   AFFILIATES

A.   Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $_____ If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B.   For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $_____ in a given calendar year.

C.   The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

## 8.   DAMAGES AND LOSSES TO JOINT PROPERTY

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

## 9.   LEGAL EXPENSE

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or  necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

## 10.   TAXES AND PERMITS

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

**11. INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12. COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

**14. ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15. OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

### III. OVERHEAD

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

**I.   OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

☑   (**Alternative 1**) Fixed Rate Basis, Section III.1.B.
☐   (**Alternative 2**) Percentage Basis, Section III.1.C.

**A.   TECHNICAL SERVICES**

(i)   Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

☑   (**Alternative 1 – Direct**) shall be charged <u>**direct**</u> to the Joint Account.

☐   (**Alternative 2 – Overhead**) shall be covered by the <u>**overhead**</u> rates.

(ii)   Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

☐   (**Alternative 1 – All Overhead**) shall be covered by the <u>**overhead**</u> rates.

☑   (**Alternative 2 – All Direct**) shall be charged <u>**direct**</u> to the Joint Account.

☐   (**Alternative 3 – Drilling Direct**) shall be charged <u>**direct**</u> to the Joint Account, <u>**only**</u> to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

**B.   OVERHEAD—FIXED RATE BASIS**

(1)   The Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate per month $ **9,400.00**            (prorated for less than a full month)

Producing Well Rate per month $ **965.00**

(2)   Application of Overhead—Drilling Well Rate shall be as follows:

(a)   Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



(b)   Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3)   Application of Overhead—Producing Well Rate shall be as follows:

(a)   An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b)   Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c)   A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d)   An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e)   Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4)   The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

C.   OVERHEAD—PERCENTAGE BASIS

(1)   Operator shall charge the Joint Account at the following rates:

(a)   Development Rate _____ percent (_____) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (*Legal Expense*) and all Material salvage credits.

(b)   Operating Rate _____ percent (_____%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.

(2)   Application of Overhead—Percentage Basis shall be as follows:

(a)   The Development Rate shall be applied to all costs in connection with:

[i]   drilling, redrilling, sidetracking, or deepening of a well
[ii]   a well undergoing plugback or workover operations for a period of five (5) or more consecutive work–days
[iii]   preliminary expenditures necessary in preparation for drilling
[iv]   expenditures incurred in abandoning when the well is not completed as a producer
[v]   construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead-Major Construction and Catastrophe*).

(b)   The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead-Major Construction and Catastrophe*).

2.   **OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE**

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.   If the Operator absorbs the engineering, design and drafting costs related to the project:

    (1)   ____5____% of total costs if such costs are less than $100,000; plus

    (2)   ____2____% of total costs in excess of $100,000 but less than $1,000,000; plus

    (3)   ____1____% of total costs in excess of $1,000,000.

B.   If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

    (1)   ____5____% of total costs if such costs are less than $100,000; plus

    (2)   ____2____% of total costs in excess of $100,000 but less than $1,000,000; plus

    (3)   ____1____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

3.   **AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

<div align="center">

**IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS**

</div>

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

1.   **DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

\* **To be negotiated if the need arises.**

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.



## 2.  TRANSFERS

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

### A.  PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1)  Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

    (a)  For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

    (b)  For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2)  Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3)  Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4)  As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

### B.  FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1)  Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2)  Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3)  Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4)  Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

### C.  TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.



c o p a s

D. CONDITION

(1) Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2) Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3) Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4) Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section I.6.A (*General Matters*).

(5) Condition "E" – Junk shall be priced at prevailing scrap value prices.

E. OTHER PRICING PROVISIONS

(1) Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2) Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

## 3. DISPOSITION OF SURPLUS

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

## 4. SPECIAL PRICING PROVISIONS

### A. PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

### B. SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

### C. MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.



1. **DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A.   A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B.   Actual transportation costs and Personal Expenses for the inventory team.

C.   Reasonable charges for report preparation and distribution to the Non-Operators.

2. **NON-DIRECTED INVENTORIES**

A.   OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B.   NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C.   SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

# EXHIBIT "D"

Attached to and made a part of that certain Castleberry Prospect Joint Operating Agreement dated effective as of November 7, 2012, by and between Sklar Exploration Company L.L.C., as Operator and Sklarco L.L.C, McCombs Energy, Ltd., The Rudman Partnership, Tara Rudman, JJS Working interests LLC, Fant Energy Limited, Pickens Financial Group, LLC, Fleet Howell, Tauber Exploration & Production Co., Tiembo, Ltd., Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC, Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C., Resource Ventures, LLC, Aspen Energy, Inc., and Sepulga River Fuels, LLC, as Non-Operators.

Operator shall carry the following insurance with the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit.  Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement.  Non-operating working interest owners shall be named as additional insured on the liability policies.  This insurance shall be primary. Certificates of insurance will be provided upon request.

I.     WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

A.  Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

B.  Extension of Coverage B of policy to provide for not less than $500,000 for death or injury to one person in any one accident.

II.     COMPREHENSIVE GENERAL LIABILITY

Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $2,000,000 for bodily injury and property damage.  Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III.     AUTOMOBILE LIABILITY

Coverage shall include owned, non-owned and hired vehicles.  Limit $500,000 combined single limit each occurrence for bodily injury and property damage.

IV.     EXCESS LIABILITY

Operator shall carry excess liability insurance in an amount necessary to provide a total of $5,000,000 coverage for both Automobile Liability and Comprehensive General Liability.

Any party, at its own expense, may carry its own coverage for Excess Liability Insurance with limits as set forth in this Section IV.  Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability.  Upon timely notification such party will not be charged by Operator for the coverage.

V.     EXTRA EXPENSE LIABILITY

Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $25,000 per occurrence.

Liability Limit: $5,000,000

Any party, at its own expense, may carry its own coverage for Extra Expense Liability Insurance with limits as set forth in this Section V.  Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability.  Upon timely notification such party will not be charged by Operator for the coverage.

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder.

**EXHIBIT "E"**

Attached to and made a part of that certain Castleberry Prospect Joint Operating Agreement dated effective as of November 7, 2012, by and between Sklar Exploration Company L.L.C., as Operator and Sklarco L.L.C, McCombs Energy, Ltd., The Rudman Partnership, Tara Rudman, JJS Working interests LLC, Fant Energy Limited, Pickens Financial Group, LLC, Fleet Howell, Tauber Exploration & Production Co., Tiembo, Ltd., Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC, Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C., Resource Ventures, LLC, Aspen Energy, Inc., and Sepulga River Fuels, LLC, as Non-Operators.

## GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement, the parties hereto own and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area described in the Operating Agreement (the "JOA").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the gas produced from said JOA. However, one or more of the parties may be unable to take or market its interest in the gas production from time to time; therefore, to permit any party to produce and dispose of its interest in the gas production from the JOA with as much flexibility as possible, the parties hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser. Any party whose share of gas is not marketed shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto monthly statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ration of its participation percentage under this Operating Agreement to the participating percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, it any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Operator will, in turn, make settlement for all royalties and overriding royalties which are payable on gas produced from the Contract Area. In the event that the total royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Contract Area, then any such deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Contract Area shall furnish the Operator with division order title opinions on which Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser shall pay, or cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the volume of gas actually taken for its account.

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold or took but did not sell, less applicable production taxes and royalties theretofore paid, less any reasonable compression, treating, gathering, or transportation costs actually incurred and paid to third party, unaffected entitles and otherwise directly in connection with the sale of the overproduction, at the price received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party. Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.