PARTICIPATION AGREEMENT

$\boxed{\textbf{EXHIBIT B}}$

## Shipps Creek Prospect
## Conecuh and Escambia Counties, Alabama

**THIS PARTICIPATION AGREEMENT** (the "Agreement"), dated effective as of the 1st day of June, 2012 (the "Effective Date"), is entered into by and between the following (sometimes herein referred to singularly as a "Party" or collectively as the "Parties"):

**SKLAR EXPLORATION COMPANY L.L.C.,** a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President & Chief Operating Officer, David A. Barlow ("SEC" or "Operator");

**SKLARCO L.L.C.,** a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President & Chief Operating Officer, David A. Barlow ("Sklarco");

**MCCOMBS ENERGY, LTD.,** a Texas limited partnership, whose address is 5599 San Felipe, Suite 1200, Houston, Texas 77056-2794, represented herein by its Vice President, Ricky Haikin ("McCombs");

**THE RUDMAN PARTNERSHIP,** a Texas general partnership, whose address is 1700 Pacific Avenue, Suite 4700, Dallas, TX 75204, represented herein by W.R. (Trey) Sibley, III, as the duly authorized Attorney-In-Fact of said partnership ("Rudman");

**TARA RUDMAN,** Individually, whose address is 1700 Pacific Avenue, Suite 4700, Dallas, TX 75204 ("Tara Rudman");

**JJS WORKING INTERESTS LLC,** a Texas limited liability company, whose address is 4295 San Felipe, Suite 207, Houston, Texas 77027, represented herein by Houston Bulldog Capital Management, LLC, its duly authorized Manager, represented herein by Justin Simons, in his capacity as the duly authorized Manager of Houston Bulldog Capital Management, LLC ("JJS");

**FANT ENERGY LIMITED,** a Texas limited partnership, whose address is 5800 Westview Drive, Houston, Texas 77055, represented herein by its General Partner, Richard E. Fant L.L.C., which itself is represented herein by its Manager, Phil O. Kelley ("Fant");

**PICKENS FINANCIAL GROUP, L.L.C.,** a Texas limited liability company, whose address is 8499 Greenville Avenue, Suite 105, Dallas, TX 75231-2417, represented herein by Michael K. Pickens, as the duly authorized Vice President of said company ("Pickens");

**FLEET HOWELL,** 416 Travis Street, Suite 715, Shreveport, Louisiana 71101 ("Howell");

**TAUBER EXPLORATION & PRODUCTION CO.,** a Texas corporation, whose address is 55 Waugh Drive, Suite 600, Houston TX 77007, represented herein by Richard E. Tauber, as the duly authorized President of said company ("Tauber");

**TIEMBO, LTD.,** a Texas limited partnership, whose address is P. O. Box 270415, Houston, Texas 77277-0415, represented herein by its Registered Agent, Mark Rauch ("Tiembo");

**KUDZU OIL PROPERTIES, LLC,** a Mississippi limited liability company, whose address is 300 Concourse Blvd., Suite 101, Ridgeland, Mississippi 39157, represented herein by its Executive Vice President, R. Nash Neyland ("Kudzu");

**MARKSCO, L.L.C.,** a Louisiana limited liability company, whose address is 333 Texas Street, Suite 1050, Shreveport, Louisiana 71101, represented herein by its Member, Mark P. Sealy ("Marksco");

**LANDMARK EXPLORATION, LLC,** a Mississippi limited liability company, whose address is Post Office Box 12004, Jackson, MS 39236, represented herein by Larry Johnson, as the duly authorized Manager/Member of said company ("Landmark");

**CRAFT EXPLORATION COMPANY, LLC,** a Mississippi limited liability company, whose address is 325 Lakeshire Parkway, Canton, MS 39046, represented herein by Steven H. Craft, as the duly authorized Manager/Member of said company ("Craft")

**DICKSON OIL & GAS, LLC,** a Louisiana limited liability company, whose address is Post Office Box 52479, Shreveport, Louisiana 71135, represented herein by its Manager, C. Bickham Dickson III ("Dickson");

**BUNDERO INVESTMENT COMPANY, L.L.C.,** a Louisiana limited liability company, whose address is 333 Texas Street, Suite 300, Shreveport, Louisiana 71101, represented herein by its Manager, Robert P. Bowman ("Bundero"); and

**RESOURCE VENTURES, LLC,** an Indiana limited liability company, whose address is 8369 South Park Lane, Suite B, Littleton, CO 80120, represented herein by Mark A. Arnold, as the duly authorized General Manager of said company ("Resource");

(hereinafter Sklarco, McCombs, Rudman, Tara Rudman, JJS, Fant, Pickens, Howell, Tauber, Tiembo, Kudzu, Marksco, Landmark, Craft, Dickson, Bundero and Resource are sometimes referred to collectively as the "Owners" or individually as an "Owner");

## W I T N E S S E T H:

**WHEREAS,** SEC has acquired two oil, gas and mineral leases ( hereinafter referred to as the "Leases") from Cedar Creek Land & Timber Company ("CCL&T"), a copy of which is attached hereto as Exhibit "B-1" and "B-2" and by reference made a part hereof (a memorandum of which is recorded in Book 2012, Page 3443 of the records of the probate judge of Conecuh County, Alabama, and  in Book 536, Page 166 of the records of the probate judge of Escambia County, Alabama), covering approximately 25,252.9 gross and 25,235.7 net acres of lands located in Conecuh and Escambia Counties, Alabama more particularly described in Exhibit "A-1" attached hereto and by reference made a part hereof (referred to below as the "Exhibit A lands") lying within a contract area (the "Contract Area") outlined in black on the plat attached hereto as Exhibit "A-2," which itself is lying within an area of mutual interest (the "AMI") outlined in red on said plat, generally known as the Shipps Creeks Prospect (the "Prospect"); and

**WHEREAS,** subject to terms, conditions and provisions of this Agreement, including the reversionary back-in working interest described hereinbelow, SEC desires to sell all of its right, title and interest in and to the Leases to the Owners; and

**WHEREAS,** the Owners desire to acquire, process and interpret seismic data over the Exhibit A lands in order to determine whether to participate in the drilling of an exploratory well on lands covered by the Leases or pooled therewith to be operated by SEC (the "Initial Well"); and

**WHEREAS,** the Parties desire to enter this Agreement to set forth the terms and conditions under which they sell, retain or acquire, as the case may be, those working interests, acquire, process and interpret the seismic data and potentially drill the Initial Well.

**NOW, THEREFORE,** the Parties agree as follows:

## Article I.  Purchase And Sale And Development Commitments

### Section 1.1.  Leases

SEC represents but does not warrant that it owns the Leases, and agrees to use its best efforts to obtain a consent to assign for each of the Leases from the lessor in the form attached hereto as Exhibit "B-3".  The Owners agree to pay SEC the amount of Five Million Forty Seven Thousand One Hundred Forty and No/100 Dollars ($5,047,140.00) (collectively, the "Prospect Fee"), being the bonus for the Leases which is the product of Two Hundred and No/100 Dollars ($200.00) per net mineral acre multiplied by 25,235.7 net mineral acres covered by the Leases in the following percentages (hereinafter the collectively referred to as the "Owners' Share" or individually as an "Owner's Share"):

| Owners | Owners' Share | Amount |
|---|---|---|
| Sklarco | 17.375% | $876,940.57 |
| McCombs | 26.5% | $1,337,492.10 |
| Rudman | 2% | $100,942.80 |
| Tara Rudman | 10.5% | $529,949.70 |
| Fant | 10% | $504,714.00 |
| JJS | 10% | $504,714.00 |
| Pickens | 5% | $252,357.00 |
| Howell | 5% | $252,357.00 |
| Tauber | 2.5% | $126,178.50 |
| Tiembo | 2% | $100,942.80 |
| Kudzu | 2% | $100,942.80 |
| Marksco | 2% | $100,942.80 |
| Landmark | 2% | $100,942.80 |
| Craft | 1% (but see below) | $50,471.40 |
| Dickson | 1% | $50,471.40 |
| Bundero | 1% | $50,471.40 |
| Resource | 0.125% | $6,308.93 |
| Total | 100% | $5,047,140.00 |

SEC's invoices covering each Owner's Share of the Prospect Fee are attached hereto as Exhibit "C" and by reference made a part hereof, and each Owner agrees to pay its invoice in full concurrent with its execution of this Agreement.    For and in consideration of the Prospect Fee, and the other terms and conditions of this Agreement, the receipt and sufficiency of which are hereby acknowledged, SEC hereby agrees to execute by means of the form of assignment attached hereto as Exhibit "D," an assignment of all of its right, title and interest in and to the Leases to the Owners in the same percentages as their Owners' Share set forth above (with adjustments provided for below).  This assignment of this interest shall be (i) made without warranty of title, express or implied, not even for return of the Prospect Fee, except that SEC warrants its authority to make the assignment and title to the interests assigned against all defects arising out of claims of persons claiming by, through or under SEC, all as more particularly provided in the limited warranty contained in Exhibit "D" hereto, (ii) subject to the terms of the Leases and (iii) subject to this Agreement and the JOA described in Section 2.1 of this Agreement, including, without limitation, the reversionary back-in working interest described in Section 1.4 of this Agreement.  SEC may, in its discretion, withhold the execution and recording of the assignment described in this Section 1.1 until receiving the fully executed consents to assign from the lessor and payment of the Prospect Fee by all the Owners.

Anything herein to the contrary notwithstanding the Parties agree that:  Craft is a party to another Area of Mutual Interest covering the following sections in Conecuh County, Alabama (hereinafter, the "Dan Hughes 3D Shoot AMI"): Sections 1, 2, 11, 12, 13 and 14, Township 4 North, Range 10 East, Sections 1-12 and 14-18, Township 4 North, Range 11 East; and Sections 5-8, Township 4 North, Range 12 East.  Craft shall not be entitled to receive an assignment of any interest in the Leases insofar as the Leases cover property located in the Dan Hughes 3D Shoot AMI but, rather, that interest shall be assigned to the other Owners with such Owners to take in proportion to which their interest bears to one another, excluding the interest of Craft; and the Assignment of the Leases shall specifically limit the interest in the Leases assigned to Craft  to an interest in those Leases insofar and only insofar as the Leases cover lands other than the lands included within the limits of the Dan Hughes 3D Shoot AMI and shall assign to the other Owners the interest that otherwise would be assigned to Craft in the Leases insofar as the Leases cover property in the Dan Hughes 3D Shoot AMI with said Owners to take in proportion to which their interest bears to one another, excluding the interest of Craft.  Additionally, Craft has advised that the instrument creating the Dan Hughes 3D Shoot AMI provides that that AMI can, under certain circumstances, be expanded to include additional property, and Craft hereby agrees that, upon request by SEC, it will advise SEC of the acreage then covered by the Dan Hughes 3D Shoot AMI and that, if an interest in the Leases is assigned to Craft in the Assignment that covers property that is within the boundaries of the Dan Hughes 3D

Shoot AMI at the time the Assignment is executed, the Assignment shall to that extent (and only to that extent) be void and of no force and effect, and Craft agrees to execute an instrument assigning record title to any such interest to the other Owners with those Owners to take in proportion to which their interest bears to one another, excluding the interest of Craft. The fact that Craft will not receive or be assigned an interest in the Leases insofar as the Leases cover property in the Dan Hughes 3D Shoot AMI shall not, however, reduce or otherwise affect the amounts to be paid by Craft that are based on its 1% Owner's Share as set forth above – for example, Craft's share of the Prospect Fee pursuant to this Section 1.1 and Craft's share of the actual cost incurred in connection with seismic operations pursuant to Section 1.2 below shall be calculated as if it owned a full 1% interest in the Leases as to all property covered by the Leases.

### Section 1.2. Three-Dimensional Seismic Data Acquisition

#### Subsection 1.2(a). Costs

Within one year after the date of the Leases, SEC plans to shoot (or cause to be shot) 3D seismic across the Exhibit A lands and other lands in the general area. Each Owner assumes and agrees to pay its Owner's Share of the actual cost incurred in connection with such seismic operations. At this time it is estimated that the costs for the 3D seismic, including permitting, acquisition and processing, will be approximately $74,000.00 per square mile and that the area included in the seismic shoot will comprise about 85 square miles. Accordingly, the total amount owed by all of the Owners under this Agreement is estimated to be approximately $6,290,000.00. Each Owner agrees to pay its Owner's Share of $6,290,000.00, which amount is subject to adjustment if the actual cost of the 3D seismic is more or less than the amount set forth above, said payment to be made within fifteen (15) days of receipt of an invoice from SEC for said amount.

If an Owner fails to pay its Owner's Share of an invoice for actual costs of the 3D seismic within said fifteen (15) day time period, SEC may send that Owner a notice of default. If the Owner fails to pay its Owner's Share of said invoice within fifteen (15) days from receipt of the notice of default, then, at SEC's discretion, SEC may either seek collection of the amount due from said Owner, together with interest at the rate of 7% per annum and any attorney's fees incurred in collecting the same (all of which said Owner agrees to pay), or may send said Owner a notice of non-participation, in which case that Owner shall forever relinquish, release and abandon all of its right, title and working interest (but not reversionary back-in working interest under Section 1.4 of this Agreement) in and to the Leases, any wells and the Prospect and agrees to execute a recordable assignment of its interest to the remaining Owners who agree to assume their proportionate share of said interest.

#### Subsection 1.2(b). Owners' Access To Data And Right To License

Both during the term of this Agreement, and after its termination, SEC shall have the exclusive rights to sell or license the 3D seismic data. Any Owner who has paid its Owner's Share of the Prospect Fee and of the actual costs of the 3D seismic operation shall, upon reasonable request, be entitled to have access to the data on SEC's workstation at its office during normal business hours. Upon written request, SEC shall also furnish any such Owner a copy of the final processed 3D seismic data subject, however, to the terms of the seismic license attached hereto as Exhibit "E" and by reference made a part hereof, which any such Owner must execute prior to obtaining a copy of the data.

#### Subsection 1.2(c). Restrictions Upon Transfer Of Seismic Data And License

Any Owner which sells or transfers all of its right, title and interest in and to the Shipps Creek Prospect to a single third party, including all of its interests in oil and gas leases covering lands located within the AMI and all of its interests in any wells located within the AMI, may also transfer all of its rights to the 3D seismic data under Subsection 1.2(b) and under any license granted pursuant thereto such third party without the consent of the other Owners, provided such third party agrees to be bound by the terms of any applicable license agreement, this Agreement and the JOA. If an Owner sells or transfers some, but not all, of its right, title and interest in and to Shipps Creek Prospect to one or more third parties, or if an Owner sells or transfers all of its right, title and interest in and to the Shipps Creek Prospect to several third parties, then, in either event, the Owner may transfer all of its seismic rights hereunder and under any license granted pursuant hereto to a single third party without the consent of the other Owners, provided that single third party agrees to be bound by the terms of any applicable license agreement, this Agreement and the JOA; provided further that such rights may not be transferred to multiple third parties, but only a single third party and such transfer must include all of such Owner's rights and interests in the seismic data under this Agreement and under any license granted pursuant to this Agreement, and, accordingly such Owner will no longer own any seismic rights under this Agreement or under any license granted pursuant to this Agreement even if that Owner retains some interest in the Shipps Creek Prospect. Except as provided for herein, an Owner's seismic rights under

Subsection 1.2(b) and under any license granted pursuant thereto shall be non-transferrable, and SEC shall not sell or license the 3D seismic data to any third parties during the term of this Agreement, without the express written consent of SEC and at least 66.7% in interest of the Owners. In no event shall any transfer of seismic rights as aforesaid be binding on SEC until 30 days after it has been provided with written documentation satisfactory to it evidencing such transfer. Nothing herein shall restrict the right of SEC, as Operator, to sell or transfer rights to the 3D seismic data to third parties for the purpose of obtaining a seismic permit or other rights needed to acquire the data in the first place. Without limitation upon the foregoing, the Owners acknowledge that the lessor under the Leases has also executed two Geophysical Permit Agreements in favor of SEC whereby that lessor is entitled to the 3D seismic data under the terms of said Geophysical Permit Agreements. After termination of this Agreement, SEC alone may freely sell or license the 3D seismic data to third parties, without the requirement of obtaining the Owners' consent, subject, however, to the requirements of Subsection 1.2(d) below.

### Subsection 1.2(d). Proceeds from Sale or License

SEC shall distribute any proceeds from a permitted sale or license of the 3D seismic data, net of applicable costs, among all of the Owners in proportion to their Owner's Share. If an Owner transfers all of its rights and interests in and to the 3D seismic data under Subsection 1.2(b) and under any license granted pursuant thereto to a single third party, as provided for under the terms of Subsection 1.2(c) above, and provided such third party agrees to be bound by the terms of the license agreement (if there is one), this Agreement and the JOA, then, in that event and only in that event, such Owner's portion of the proceeds from a permitted sale or license of the 3D seismic data thereafter shall be owned by, and SEC shall distribute those proceeds to, that third party; provided, however, that no such transfer by an Owner to a third party shall be binding on SEC until 30 days after SEC has been provided with written documentation satisfactory to it evidencing such transfer.

### Section 1.3.    Initial Well

### Subsection 1.3(a). Proposal Of The Initial Well/In Or Out Election

Operator may, at any time, propose the drilling of an Initial Well (the "Operator's Proposal") to be drilled at a location described in the proposal and to a depth sufficient to test the Upper Smackover and Norphlet Formations (the "Objective Depth"). If Operator does not propose an Initial Well within one hundred and twenty (120) days from receipt of the final processed data from the 3D seismic shoot described in Section 1.2, and in any event no later than 18 months from the Effective Date of this Agreement, then, in that event, any Owner may propose to drill the Initial Well. If Operator proposes to drill an Initial Well, then the Operator's Proposal shall contain an AFE, and each of the Owners shall have thirty (30) days from delivery of the Operator's Proposal within which to respond whether that Owner elects to participate or not to participate in the drilling of the Initial Well. Failure to respond within said time period shall be deemed an election to participate in Operator's Proposal. Each of the Owners may participate in the drilling of the Initial Well to the Objective Depth in the same percentages in which they own working interest in the unit for the well that are subject to this Agreement (hereinafter referred to as an Owner's "Well Unit Interest"). So long as the Initial Well identified in the Operator's Proposal is in fact drilled, then, in that event and only in that event, any Participant that elects not to participate in Operator's Proposal (a "Non-Consenting Party") shall forever relinquish, release and abandon all of its right, title and working interest (but not reversionary back-in working interest under Section 1.4 of this Agreement) in and to the Initial Well, the Leases and the Prospect and agrees to execute a recordable assignment of its interest to each Consenting Party who elects to bear (and assume) its proportionate share of the Non-Consenting Parties' (or Party's) interest in the proportions which the share of the Non-Consenting Parties' (or Party's) interest each such Consenting Owner agrees to bear (and assume) bears to the total of the Non-Consenting Parties' (or Party's) interest borne (and assumed) by all Consenting Parties.

If one or more of the Owners elects not to participate in Operator's Proposal, then Operator immediately after expiration of the notice period shall advise the Owners who elected to participate in Operator's Proposal (the "Consenting Parties") of the total interest of the Owners approving such operation and its recommendation as to whether those Consenting Parties should proceed with the operation as proposed. Each of the Consenting Parties within twenty-four (24) hours after delivery of such notice shall advise Operator of its desire to (a) limit participation to such party's Owner's Well Unit Interest or (b) bear (and assume) all of its proportionate part of the Non-Consenting Parties' interests. Failure to advise Operator shall be deemed an election under (a). Operator, at its election, may withdraw such proposal if, in Operator's opinion, there is insufficient participation and shall promptly notify all parties of such decision. Those Consenting Parties who make an election under (b) agree to bear not only their share of the costs to drill the Initial Well to the Objective Depth, but they also agree to bear, in the proportion that their interest bears to the interest of all parties electing under (b), the costs to drill the Initial Well to the Objective Depth attributable to the interests of each Non-Consenting Party.

If an Owner proposes the drilling of an Initial Well (the "Alternate Proposal"), then the Alternate Proposal shall describe the location and Objective Depth of the Initial Well and shall include an AFE. Each of the Owners shall have thirty (30) days from delivery of the Alternate Proposal within which to respond whether that Owner elects to participate or not to participate. So long as the Initial Well identified in the Alternate Proposal is in fact drilled, then, in that event, and only in that event, any Owner that elects not to participate in the Alternate Proposal (also a "Non-Consenting Party") shall forever relinquish, release and abandon all of its right, title and working interest (but not reversionary back-in working interest under Section 1.4 of this Agreement) in and to the Initial Well, the Leases and the Prospect and agrees to execute a recordable assignment of its interest to each Consenting Party who elects to bear (and assume) its proportionate share of the Non-Consenting Parties' (or Party's) interest in the proportions which the share of the Non-Consenting Parties' (or Party's) interest each such Consenting Party agrees to bear (and assume) bears to the total of the Non-Consenting Parties' (or Party's) interest born (and assumed) by all Consenting Parties.

If one or more of the Owners elects not to participate in the Alternate Proposal, then the Operator immediately after expiration of the notice period shall advise the Owners who elected to participate in the Alternate Proposal (also the "Consenting Parties") of the total interest of the Owners approving such operation and its recommendation as to whether those Consenting Parties should proceed with the operation as proposed. Each of the Consenting Parties within twenty-four (24) hours after delivery of such notice shall advise the successor Operator of its desire to (a) limit participation to such party's Owner's Well Unit Interest or (b) bear (and assume) all of its proportionate part of the Non-Consenting Parties' interests. Failure to advise the Operator shall be deemed an election under (a). The Owner proposing the Alternate Proposal, at its election, may withdraw such proposal if there is, in its opinion, insufficient participation and shall promptly notify all parties of such decision. Likewise, the Operator is not required to drill the Initial Well under the Alternate Proposal unless and until all of the cost to drill said well is assumed by the Consenting Parties. Those Consenting Parties who make an election under (b) agree to bear not only their share of the costs to drill the Initial Well to the Objective Depth, but they also agree to bear, in the proportion that their Well Unit Interest bears to the Well Unit Interest of all parties electing under (b), the costs to drill the Initial well to the Objective Depth attributable to the interests of each Non-Consenting Party.

The Operator may pre-bill each Owner that has elected to participate in the applicable proposal their share of the estimated dry hole costs as per the AFE for the Initial Well. Each such Owner must pay the pre-bill in full within fifteen (15) days; provided, however, such pre-bill shall not be sent earlier than thirty (30) days from the anticipated mobilization of the drilling rig to the location of the Initial Well. Failure timely to pay shall be deemed an election not to participate and shall result in the Owner being a Non-Consenting Party and forever relinquishing, releasing and abandoning all of its right, title and working interest (but not reversionary back-in working interest under Section 1.4 of this Agreement) in and to the Initial Well, the Leases and the Prospect, such Owner agreeing to execute a recordable assignment of its interest in the same manner as any other Non-Consenting Party.

At the time the Operator's Proposal or the Alternate Proposal is sent out, the Party sending out the Proposal shall, based on information then available, make a good faith effort to determine the Well Unit Interest owned by each Owner and shall, in a document accompanying the proposal, list the Well Unit Interest of each Owner in the unit for the Initial Well. The Well Unit Interests of the Owner's shall, however, be subject to adjustment if a title opinion by an Alabama licensed attorney should thereafter reveal that the initial determination is incorrect, and if such adjustment is required, the share of costs due from each Consenting Owner for the Initial Well shall be retroactively adjusted.

### Subsection 1.3(b). Operations After Reaching The Objective Depth

After the Initial Well has been drilled to the Objective Depth, the Operator shall make a copy of any logs, core analysis, drill-stem test analysis or results of any other tests available to a representative of the Consenting Parties at the wellsite, or if none is present, by email, facsimile or overnight delivery. Operator shall also furnish such Consenting Parties in a like manner with its recommendation regarding the disposition of the wellbore, in accordance with the JOA. Failure to respond within the time specified shall be deemed an election to participate in Operator's recommended operation. The casing point election and all subsequent operations and elections shall be governed by the JOA.

### Section 1.4. Reversionary (After Payout) Back-In Working Interest

As further consideration for the assignment described in Section 1.1 above, upon reaching Prospect Payout (as defined below), an undivided fifteen percent (15%) of the interest of each of the Owners, except Sklarco and JJS, in the Leases and all wells, rights of way, personal property, equipment, facilities and pipelines attributable to said working interest shall automatically and permanently transfer to and vest in

Sklarco and JJS (in the relative percentages indicated below) such that the before payout ("BPO") and after payout ("APO") gross working interests of the Owners in the Leases are as follows:

| Sklar Owners | BPO GWI | APO GWI |
|---|---|---|
| Sklarco | 17.375% | 27.125281% |
| McCombs | 26.5% | 22.525% |
| Rudman | 2% | 1.7% |
| Tara Rudman | 10.5% | 8.925% |
| Fant | 10% | 8.5% |
| JJS | 10% | 11.143469% |
| Pickens | 5% | 4.25% |
| Howell | 5% | 4.25% |
| Tauber | 2.5% | 2.125% |
| Tiembo | 2% | 1.7% |
| Kudzu | 2% | 1.7% |
| Marksco | 2% | 1.7% |
| Landmark | 2% | 1.7% |
| Craft | 1% | 0.85% |
| Dickson | 1% | 0.85% |
| Bundero | 1% | 0.85% |
| Resource | 0.125% | 0.10625% |
| Total | 100% | 100% |

At the request of Sklarco or JJS, each of the Owners will convey and assign said interest unto Sklarco and JJS after Prospect Payout, including, without limitation, a like interest in the Leases (and the lessee's interest under the Leases), in the proceeds from the sale of oil, gas, and all other products produced or derived from any and all wells drilled within the Shipps Creek Prospect, and in any easements, rights of way, personal property, equipment, facilities and pipelines associated with such wells; and such conveyance and assignment shall contain a warranty of title and possession against the claims of anyone claiming by, through or under the assignor. The above percentage interests of individual Owners are subject to adjustment to account for changes in the interests of the Owners that result from other provisions of this Agreement and/or provisions contained in the JOA (defined below), and should any Owner's interest or any portion thereof be transferred to another party (as a result of a transfer or assignment, an election not to participate by such party, or any other means), such interest shall continue to be subject to and burdened by the above described after prospect payout back-in working interest (which is sometimes referred to herein as the "reversionary back-in working interest") of Sklarco and JJS. Additionally, the Parties specifically agree that the interest in the Leases which, pursuant to Section 1.1, above, is to be excepted from the conveyance to Craft and is, instead, to be conveyed to all Owners other than Craft shall be subject to the reversionary back-in working interest in favor of Sklarco and JJS.

As provided in more detail in other provisions of this Agreement and/or the JOA (defined below), the reversionary back-in working interest in favor of Sklarco and JJS provided for in this paragraph (being an after Prospect Payout undivided fifteen percent (15%) of the interest of each of the Owners, except Sklarco and JJS) shall also apply to and burden (a) other leases (and all wells, rights of way, personal property, equipment, facilities and pipelines attributable to thereto) acquired by the Owners (or any of them) within the AMI and made subject to the JOA and (b) any lease extensions or renewals acquired under Article VIII.B of the JOA.

**Prospect Payout** is defined on a Prospect (not well-by-well) basis as the first day of the calendar month following the month in which the portion of total and cumulative revenue derived from the Shipps Creek Prospect allocable to an Owner's Share equals the portion of total and cumulative cost incurred within the Shipps Creek Prospect allocable to that Owner's Share (and paid by that Owner). For purposes of Prospect Payout, (i) the total and cumulative revenue shall consist of all proceeds from the sale of all oil, gas and other hydrocarbons and minerals saved from wells subject to the JOA (defined below) for the Shipps Creek Prospect and any other income or revenue derived by the Owners from the Shipps Creek Prospect, and (ii) the total and cumulative cost incurred shall include all royalty and overriding royalty payments, severance, ad valorem, production and other taxes applicable to production and not measured by the Owner's other income, all lease acquisition and maintenance costs (including the costs of acquiring leases in the AMI if such party elects to participate in the acquisition of such lease), all seismic survey and data costs, geological and geophysical evaluation costs, all costs for site preparation, drilling, completing, reworking, deepening, sidetracking, logging, stimulation, testing, equipping, operating, plugging and abandoning the Initial Well and all other wells drilled by Owners within the Shipps Creek Prospect prior to Prospect Payout, and the cost of all surface damages, pipelines, gathering and other production handling facilities related thereto.

**Article II.  Operations**

    **Section 2.1.  JOA**

        SEC is hereby designated Operator.  Except as otherwise provided in this Agreement, operations of the Initial Well, and all other operations within the Contract Area (as defined in the JOA), shall be governed by the Operating Agreement (the "JOA") dated effective as of June 1, 2012, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco and Sklarco et al., as Non-Operator, attached hereto as Exhibit "F."  The Parties agree to execute the JOA concurrent with their execution of this Agreement.  In the event of a conflict between this Agreement and the JOA, this Agreement shall govern and control.  Each of the Owners agrees to execute the JOA concurrent with its execution of this Agreement.  The Owners authorize Sklar Exploration Company L.L.C., as Operator, to amend Exhibit "A" to the JOA to conform the final interests of the Owners consistent with their elections under this Agreement or the JOA.

**Article III.  Miscellaneous**

    **Section 3.1.  AMI**

        The Parties have formed an Area of Mutual Interest or AMI under the terms contained in Article XV.K of the JOA covering the lands within the red outline on the plat attached hereto as Exhibit "A-2."  The AMI does not govern the acquisition of the Leases, but shall govern the acquisition and sharing of all other oil and gas leases covering lands located within the AMI.

        Sklarco has acquired an Oil, Gas And Mineral Lease dated May 2, 2012, executed by Joseph R. Pate, Jr. et ux., as Lessor, covering 220.00 gross and 90.00 net acres located within the AMI.  Sklarco has also acquired Oil, Gas And Mineral Leases dated May 24, 2012, executed by various members of the Monk family, as Lessor, covering 497.40 gross and 365.45 net acres located within the AMI.  Even though these leases are dated prior to the Effective Date of this Agreement, the Parties agree to treat all of these leases as if they were acquired after the Effective Date and for them to be offered by Sklarco to the Owners under the terms of the AMI as soon as this Agreement is fully executed by all the Parties.

        The reversionary back-in working interest described in Section 1.4 shall burden leases acquired under the AMI.  Any renewals or extensions acquired under Article VIII.B of the JOA shall also be burdened by the reversionary back-in working interest described in Section 1.4 of this Agreement.  Except as expressly provided to the contrary in this Section 3.1, by agreeing to the terms of this Agreement, each of the Owners agrees to acquire and share all oil and gas leases covering lands located in the AMI under the terms provided in said Article XV.K.

        As set forth hereinabove, Craft is a party to another Area of Mutual Interest covering lands located in the Dan Hughes 3D Shoot AMI.  Notwithstanding any provisions contained in this Section 3.1 or in said Article XV.K of the JOA, Craft has no obligation to offer to the other Owners any new oil and gas lease covering lands located within the AMI under this Agreement to the extent that (but only to the extent that) such lease is subject to the Dan Hughes 3D Shoot AMI, and neither SEC nor the other Owners have any obligation to offer Craft any new oil and gas lease to the extent that such lease covers lands located within both the AMI under this Agreement and the Dan Hughes 3D Shoot AMI.  To the extent (and only to the extent) that any new lease acquired by Craft covers property located within the AMI under this Agreement and is not subject to the Dan Hughes 3D Shoot AMI, Craft shall offer the same to the other Owners pursuant to the terms of the AMI in Article XV.K of the JOA, and to the extent (and only to the extent) that any new lease acquired by any other Owners or by SEC covers property that is located within the AMI under this Agreement but not within the Dan Hughes 3D Shoot AMI, the same shall be offered to Craft under the terms of the AMI in Article XV.K of the JOA.  The Owners other than Craft shall have the right to share in any new oil and gas leases covering lands located within both the AMI under this Agreement and the Dan Hughes 3D Shoot AMI in proportion to which their interest bears to one another, excluding the interest of Craft.

        Resource is a party to another Area of Mutual Interest covering lands located in the following sections, all located in Conecuh County, Alabama (hereinafter, the "Aspen Energy Prospect"):  Sections 28, 31, 32 and 33, Township 4 North, Range 11 East; and Section 36, Township 4 North, Range 10 East.  Notwithstanding any provisions contained in this Section 3.1 or in said Article XV.K of the JOA, Resource has no obligation to offer any new oil and gas lease to the other Owners to the extent that it covers lands located within both the AMI under this Agreement and the Aspen Energy Prospect, and neither SEC nor the other Owners have any obligation to offer Resource any new oil and gas lease to the extent that such lease covers lands located within both the AMI under this Agreement and the Aspen Energy Prospect.  The Owners other than Resource shall have the right to share in any new oil and gas lease acquired by an Owner other than Resources covering lands located within both the AMI under this

Agreement and the Aspen Energy Prospect in proportion to which their interest bears to one another, excluding the interest of Resource.

On information and belief, Aspen Energy, Inc. has acquired an oil and gas lease from Cedar Creek Land & Timber Company covering lands located within the Aspen Energy Prospect. SEC has had preliminary, non-binding discussions with Aspen Energy, Inc. concerning whether SEC and the Owners under this Agreement, on one hand (referred to in this Section 3.1 as the "Sklar Parties"), and Aspen Energy, Inc. and all of its owners, on the other hand (referred to in this Section 3.1 as the "Aspen Parties"), could work together jointly to develop their acreage. Without obligation on any parties, the parties have discussed the possibility of cross assigning leasehold interest on a net acreage basis within a certain area. For instance, if the Sklar Parties' Leases covered 18,000 acres within that area, and the Aspen Parties' lease covered 2,000 acres within that area, then the Sklar Parties would assign unto the Aspen Parties an undivided 2,000/20,000 or 10% interest in the Sklar Parties' Leases (insofar as it covered that area), whereas the Aspen Parties would assign unto the Sklar Parties an undivided 18,000/20,000 or 90% interest in the Aspen Parties' lease. The Aspen Parties would further subscribe to and agree to be bound to the terms of the JOA as Non-Operators. The reversionary back-in working interest described in Section 1.4 of this Agreement would not burden the interest of the Aspen Parties in either the Aspen Parties' lease or in the Sklar Parties' Leases, but it would burden the interest of the Sklar Parties in both the Aspen Parties' lease and in the Sklar Parties' Leases. Although their participation may cause the size of the shoot to expand, the Aspen Parties would further agree to participate in and pay a share of the costs of the 3D seismic shoot described in Section 1.2 of this Agreement. Any terms such as those discussed by SEC and Aspen Energy, Inc. and recited in this paragraph are not binding on any of the Parties to this Agreement unless and until they are reduced to a formal, written agreement executed by all of the Parties to this Agreement and by all of the Aspen Parties. However, the Owners grant SEC authority to negotiate with Aspen Energy, Inc. toward that end.

Rudman may own unleased oil and gas interests covering lands located within the AMI. Other Owners may own unleased oil and gas interests covering lands located within the AMI. The Parties agree that any Owner who owns as of the Effective Date of this Agreement unleased oil and gas interests covering lands located within the AMI (referred to in this Section 3.1 as a "Mineral Owner") does not have an obligation to offer the same to the other Owners under the terms of the AMI provisions contained in Article XV.K of the JOA, provided, however, that the Mineral Owner must, within fifteen (15) days (24 hours if a drilling rig is on location) of receiving a proposal under this Agreement or the JOA to drill a well on lands covered by their unleased oil and gas interests or pooled therewith, elect either to participate or not to participate for such interest in the proposed well. If the Mineral Owner elects to participate, then it shall participate as a Non-Operator under the JOA for its unleased oil and gas interest, which shall be treated for all purposes as provided in Article III.A of the JOA as if it were covered by the form of oil and gas lease attached as Exhibit "B" to the JOA and shall otherwise be subject to the JOA, and the Mineral Owner shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder (with the interests of the Parties in the unit for the well to be adjusted accordingly). If the Mineral Owner elects not to participate in the well proposal or fails to respond thereto within fifteen (15) days (24 hours if a drilling rig is on location), then that interest shall also be treated for all purposes as provided in Article III.A of the JOA as if it were covered by the form of oil and gas lease attached as Exhibit "B" to the JOA, and while the Mineral Owner shall be deemed to own both the royalty interest and the lessee's interest under such lease, the lessee's thereunder (insofar as it covers lands in the unit for the well) shall be treated as an interest owned by a Non-Consenting Party under Article VI.B.2 of the JOA and the royalty interest shall be treated as a jointly owned lease burden. In such event, the interest of the lessee in the unit for the well shall be subject to the relinquishment provisions of Article VI.B.2 of the JOA and shall otherwise be subject to the JOA. Regardless of whether the Mineral Owner elects to participate or not participate as set forth above, the Mineral Owner's interest as lessee under the lease shall not be subject to the reversionary back-in working interest described in Section 1.4 of this Agreement, and any title loss shall be an individual and not a joint title loss. Any unleased oil and gas interests covering lands located within the AMI acquired after the Effective Date of this Agreement shall be governed by the AMI set forth in Article XV.K of the JOA.

**Section 3.2. Information**

Upon execution of this Agreement by all of the Parties, any Owner may request and shall be entitled to a copy of all of the Leases and of any other title information such as any abstracts of title or drill-site title opinions for the drill-site tract of and drilling unit for the Initial Well, along with drilling and completion and log reports for the Initial Well and any subsequent wells.

**Section 3.3. Confidentiality**

The Parties agree to keep confidential and not disclose any information about this Prospect, not already disclosed or of public record, to third parties except as required by statutes, regulations or court

order for so long as this Agreement is in effect, except that any Owner may disclose information about this Agreement to bona fide third party prospective purchasers of that Owner's working interest under this Agreement and the JOA. The Parties may also disclose information about this Prospect to attorneys, accountants and other consultants provided that the Party disclosing such information bears the responsibility that their attorney, accountant or other consultant himself keep the information confidential.

### Section 3.4.  Closing

Closing shall occur by mail or by such other means and at such time and place to which the Parties mutually agree.

### Section 3.5.  Binding On Successors And Assigns

This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and assigns, subject, however, to the provisions of Section 3.13, below.

### Section 3.6.  Entire Agreement

This Agreement and its attachments constitute the entire agreement of the Parties with respect to the subject matter hereof, and any other promises, inducements, representations, warranties or agreements with respect to the subject matter hereof have been superseded hereby and are not intended to survive this Agreement. Except as otherwise expressly provided herein, no amendment or modification of this Agreement shall be effective unless set forth in writing and duly executed by all of the Parties.

### Section 3.7.  Severability

The invalidity of any one or more of the provisions of this Agreement does not affect the remaining portions of this Agreement, and in case of any such invalidity, this Agreement should be construed as if the invalid provision(s) had not been inserted.

### Section 3.8.  Notices

All notices between the Parties authorized or required by any of the provisions of this Agreement, unless otherwise expressly provided, shall be given in writing by email or facsimile or regular or express mail or national express delivery service, addressed to those of the Parties to whom the notice is given at the email addresses or fax telephone numbers and addresses set forth in Exhibit "A" to the JOA. Any of the Parties may change its designated email address, fax telephone number and address at any time, and from time to time, by giving written notice thereof to the other Parties.

### Section 3.9.  Headings for Convenience

The article, section and subsection headings used in this Agreement are inserted for convenience only and shall not be regarded in construing this Agreement.

### Section 3.10.  Time

Time is of the essence hereunder.

### Section 3.11.  Governing Law

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Alabama.

### Section 3.12.  Relationship Of The Parties

Liability of the Parties hereto shall be several and not joint or collective. Each Party shall make its own elections under this Agreement and shall be responsible only for its obligations as herein set out. It is not the intention of the Parties to create, nor shall this Agreement be construed as creating, a mining or other partnership, joint venture or association between the Parties.

### Section 3.13.  Assignability

Subject to the terms of Section 1.2 of this Agreement, the Parties to this Agreement may assign all or part of their rights and obligations hereunder, provided, however, that any such assignment must be made subject to the terms and conditions of this Agreement and the JOA, and provided further that no

such assignment shall be effective as to the Operator until 30 days after the Operator shall have been provided with a certified copy of a recorded instrument evidencing the assignment and with such other documents and information as the Operator may reasonably request. Also, any Party making such an assignment must obtain lessor approval as required under the terms of the Leases and any other approval as may be required under the terms of any other applicable lease or agreement.

### Section 3.14.  Term

This Agreement shall remain in full force and effect as between the Parties until expiration of the last lease jointly owned by them, or any combination of the Parties, covering any part of the AMI.

### Section 3.15.  Counterparts

This Participation Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

### Section 3.16.  Sophisticated Investors

By execution of this Agreement, the Owners confirm that they have a working knowledge of the oil and gas industry and that they have each thoroughly investigated his/her/its participation in the Prospect and have been furnished with sufficient information which he/she/it has deemed appropriate in his/her/its independent judgment to evaluate the merits and risks of participation in the Prospect. Each Owner represents and acknowledges that he/she/it is a sophisticated investor and has (or, in the case of a business entity, it or its owner has) a financial net worth in excess of one million dollars. Each Owner represents he/she/it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of not just its share of the payments called for under this Agreement, but also his/her/its share of all other costs incurred in operations on the Shipps Creek Prospect. EACH OWNER ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES. Each Owner further confirms and accepts that the offering of the interest herein purchased has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the States of Louisiana or Alabama, or any other state. Each Owner has hereby agreed to participate in the Prospect for investment purposes only, and not with a view to or for sale in connection with any distribution of interests in the Prospect within the meaning of said laws.

THUS DONE AND SIGNED by each of the Parties on the date of its acknowledgment, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By _____
David A. Barlow
President & Chief Operating Officer

SKLARCO L.L.C.

By _____
David A. Barlow
President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

By _____
Ricky Haikin
Vice President

Page **11** of 47

such assignment shall be effective as to the Operator until 30 days after the Operator shall have been provided with a certified copy of a recorded instrument evidencing the assignment and with such other documents and information as the Operator may reasonably request. Also, any Party making such an assignment must obtain lessor approval as required under the terms of the Leases and any other approval as may be required under the terms of any other applicable lease or agreement.

### Section 3.14.  Term

This Agreement shall remain in full force and effect as between the Parties until expiration of the last lease jointly owned by them, or any combination of the Parties, covering any part of the AMI.

### Section 3.15.  Counterparts

This Participation Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

### Section 3.16.  Sophisticated Investors

By execution of this Agreement, the Owners confirm that they have a working knowledge of the oil and gas industry and that they have each thoroughly investigated his/her/its participation in the Prospect and have been furnished with sufficient information which he/she/it has deemed appropriate in his/her/its independent judgment to evaluate the merits and risks of participation in the Prospect. Each Owner represents and acknowledges that he/she/it is a sophisticated investor and has (or, in the case of a business entity, it or its owner has) a financial net worth in excess of one million dollars. Each Owner represents he/she/it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of not just its share of the payments called for under this Agreement, but also his/her/its share of all other costs incurred in operations on the Shipps Creek Prospect. EACH OWNER ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES. Each Owner further confirms and accepts that the offering of the interest herein purchased has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the States of Louisiana or Alabama, or any other state. Each Owner has hereby agreed to participate in the Prospect for investment purposes only, and not with a view to or for sale in connection with any distribution of interests in the Prospect within the meaning of said laws.

THUS DONE AND SIGNED by each of the Parties on the date of its acknowledgment, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By _____
David A. Barlow
President & Chief Operating Officer

SKLARCO L.L.C.

By _____
David A. Barlow
President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

By _____
Ricky Haikin
Vice President

Shipps Creek Prospect
Dated Effective: June 1, 2012

THE RUDMAN PARTNERSHIP

By_____
            W. R. (Trey) Sibley, III
            Attorney-In-Fact


_____
        TARA RUDMAN


JJS WORKING INTERESTS LLC
By:     Houston Bulldog Capital Management, LLC


By_____
            Justin Simons
            Manager

FANT ENERGY LIMITED
By:     Richard E. Fant, L.L.C., its General Partner


By_____
            Phil O. Kelley
            Manager

PICKENS FINANCIAL GROUP, L.L.C.


By_____
            Michael K. Pickens
            Vice President


_____
        FLEET HOWELL


TAUBER EXPLORATION & PRODUCTION CO.


By_____
            Richard E. Tauber
            President


TIEMBO, LTD.


By_____
            Mark Rauch
            Registered Agent


KUDZU OIL PROPERTIES, L.L.C.


By_____
            R. Nash Neyland
            Executive Vice President


Page 12 of 47

THE RUDMAN PARTNERSHIP


By_____
       W. R. (Trey) Sibley, III
       Attorney-In-Fact


_____
    TARA RUDMAN


JJS WORKING INTERESTS LLC
By:    Houston Bulldog Capital Management, LLC


By_____
       Justin Simons
       Manager

FANT ENERGY LIMITED
By:    Richard E. Fant, L.L.C., its General Partner


By_____
       Phil O. Kelley
       Manager
PICKENS FINANCIAL GROUP, L.L.C.


By_____
       Michael K. Pickens
       Vice President



_____
    FLEET HOWELL

TAUBER EXPLORATION & PRODUCTION CO.


By_____
       Richard E. Tauber
       President

TIEMBO, LTD.


By_____
       Mark Rauch
       Registered Agent

KUDZU OIL PROPERTIES, L.L.C.


By_____
       R. Nash Neyland
       Executive Vice President

THE RUDMAN PARTNERSHIP

By_____
       W. R. (Trey) Sibley, III
       Attorney-In-Fact

_____
       TARA RUDMAN

JJS WORKING INTERESTS LLC
By:    Houston Bulldog Capital Management, LLC

By_____
       Justin Simons
       Manager

FANT ENERGY LIMITED
By:    Richard E. Fant, L.L.C., its General Partner

By_____
       Phil O. Kelley
       Manager
PICKENS FINANCIAL GROUP, L.L.C.

By_____
       Michael K. Pickens
       Vice President

_____
       FLEET HOWELL

TAUBER EXPLORATION & PRODUCTION CO.

By_____
       Richard E. Tauber
       President

TIEMBO, LTD.

By_____
       Mark Rauch
       Registered Agent

KUDZU OIL PROPERTIES, L.L.C.

By_____
       R. Nash Neyland
       Executive Vice President

THE RUDMAN PARTNERSHIP

By_____
   W. R. (Trey) Sibley, III
   Attorney-In-Fact


_____
   TARA RUDMAN


JJS WORKING INTERESTS LLC
By:  Houston Bulldog Capital Management, LLC


By_____
   Justin Simons
   Manager

FANT ENERGY LIMITED
By:  Richard E. Fant, L.L.C., its General Partner

By  _Phil O. Kelley_____
   Phil O. Kelley
   Manager
PICKENS FINANCIAL GROUP, L.L.C.


By_____
   Michael K. Pickens
   Vice President


_____
   FLEET HOWELL

TAUBER EXPLORATION & PRODUCTION CO.


By_____
   Richard E. Tauber
   President

TIEMBO, LTD.


By_____
   Mark Rauch
   Registered Agent

KUDZU OIL PROPERTIES, L.L.C.


By_____
   R. Nash Neyland
   Executive Vice President


Page 12 of 47

THE RUDMAN PARTNERSHIP

By_____
       W. R. (Trey) Sibley, III
       Attorney-In-Fact


_____
    TARA RUDMAN

JJS WORKING INTERESTS LLC
By:    Houston Bulldog Capital Management, LLC

By_____
       Justin Simons
       Manager

FANT ENERGY LIMITED
By:    Richard E. Fant, L.L.C., its General Partner

By_____
       Phil O. Kelley
       Manager

PICKENS FINANCIAL GROUP, L.L.C.

By_____
       Michael K. Pickens
       Vice President


_____
    FLEET HOWELL

TAUBER EXPLORATION & PRODUCTION CO.

By_____
       Richard E. Tauber
       President

TIEMBO, LTD.

By_____
       Mark Rauch
       Registered Agent

KUDZU OIL PROPERTIES, L.L.C.

By_____
       R. Nash Neyland
       Executive Vice President

THE RUDMAN PARTNERSHIP

By_____
   W. R. (Trey) Sibley, III
   Attorney-In-Fact


_____
  TARA RUDMAN

JJS WORKING INTERESTS LLC
By: Houston Bulldog Capital Management, LLC

By_____
   Justin Simons
   Manager

FANT ENERGY LIMITED
By: Richard E. Fant, L.L.C., its General Partner

By_____
   Phil O. Kelley
   Manager
PICKENS FINANCIAL GROUP, L.L.C.

By_____
   Michael K. Pickens
   Vice President

_____
  FLEET HOWELL

TAUBER EXPLORATION & PRODUCTION CO.

By_____
   Richard E. Tauber
   President

TIEMBO, LTD.

By_____
   Mark Rauch
   Registered Agent

KUDZU OIL PROPERTIES, L.L.C.

By_____
   R. Nash Neyland
   Executive Vice President

THE RUDMAN PARTNERSHIP

By_____
       W. R. (Trey) Sibley, III
       Attorney-In-Fact


_____
     TARA RUDMAN

JJS WORKING INTERESTS LLC
By:    Houston Bulldog Capital Management, LLC

By_____
       Justin Simons
       Manager

FANT ENERGY LIMITED
By:    Richard E. Fant, L.L.C., its General Partner

By_____
       Phil O. Kelley
       Manager
PICKENS FINANCIAL GROUP, L.L.C.

By_____
       Michael K. Pickens
       Vice President

*SIGNATURE PAGE TO:*
*PARTICIPATION AGREEMENT,*
*SHIPPS CREEK PROSPECT,*
*CONECUH/ESCAMBIA*
*COUNTIES, ALABAMA*

_____
     FLEET HOWELL

TAUBER EXPLORATION & PRODUCTION CO.

By_____
       Richard E. Tauber
       President

TIEMBO, LTD.

By_____
       Mark Rauch
       Registered Agent

KUDZU OIL PROPERTIES, L.L.C.

By_____
       R. Nash Neyland
       Executive Vice President

Page **12** of **47**

THE RUDMAN PARTNERSHIP

By_____
        W. R. (Trey) Sibley, III
        Attorney-In-Fact


_____
     TARA RUDMAN

JJS WORKING INTERESTS LLC
By:    Houston Bulldog Capital Management, LLC


By_____
        Justin Simons
        Manager

FANT ENERGY LIMITED
By:    Richard E. Fant, L.L.C., its General Partner


By_____
        Phil O. Kelley
        Manager
PICKENS FINANCIAL GROUP, L.L.C.


By_____
        Michael K. Pickens
        Vice President


_____
     FLEET HOWELL

TAUBER EXPLORATION & PRODUCTION CO.


By_____
        Richard E. Tauber
        President

TIEMBO, LTD.


By_____
        Mark Rauch
        Registered Agent

KUDZU OIL PROPERTIES, L.L.C.


By_____
        R. Nash Neyland
        Executive Vice President

THE RUDMAN PARTNERSHIP

By_____
          W. R. (Trey) Sibley, III
          Attorney-In-Fact


_____
          TARA RUDMAN

JJS WORKING INTERESTS LLC
By:      Houston Bulldog Capital Management, LLC

By_____
          Justin Simons
          Manager

FANT ENERGY LIMITED
By:      Richard E. Fant, L.L.C., its General Partner

By_____
          Phil O. Kelley
          Manager
PICKENS FINANCIAL GROUP, L.L.C.

By_____
          Michael K. Pickens
          Vice President


_____
          FLEET HOWELL

TAUBER EXPLORATION & PRODUCTION CO.

By_____
          Richard E. Tauber
          President

TIEMBO, LTD.

By_____
          Mark Rauch
          Registered Agent

KUDZU OIL PROPERTIES, L.L.C.

By_____
          R. Nash Neyland
          Executive Vice President

MARKSCO, L.L.C.

By _____
      Mark P. Sealy
      Member

LANDMARK EXPLORATION, LLC


By _____
      Larry Johnson
      Manager/Member

CRAFT EXPLORATION COMPANY, LLC


By _____
      Stephen H. Craft
      Manager/Member

DICKSON OIL & GAS, L.L.C.


By _____
      C. Bickham Dickson, III
      Manager

BUNDERO INVESTMENT COMPANY, L.L.C.


By _____
      Robert P. Bowman
      Manager


RESOURCE VENTURES, LLC


By _____
      Mark A. Arnold
      General Manager


Attachments

| | |
|---|---|
| Exhibit "A-1": | Description of Lands Covered by Leases |
| Exhibit "A-2": | Plat |
| Exhibit "B-1": | Lease |
| Exhibit "B-2": | Lease |
| Exhibit "B-3": | Form of Consent to Assign |
| Exhibit "C": | Invoices |
| Exhibit "D": | Form of Assignment Of Oil, Gas And Other Mineral Leases |
| Exhibit "E": | Form of Seismic Data License Agreement |
| Exhibit "F": | JOA |

MARKSCO, L.L.C.


By_____
     Mark P. Sealy
     Member

LANDMARK EXPLORATION, LLC


By_____
     Larry Johnson
     Manager/Member

CRAFT EXPLORATION COMPANY, LLC


By_____
     Stephen H. Craft
     Manager/Member

DICKSON OIL & GAS, L.L.C.


By_____
     C. Bickham Dickson, III
     Manager

BUNDERO INVESTMENT COMPANY, L.L.C.


By_____
     Robert P. Bowman
     Manager


RESOURCE VENTURES, LLC


By_____
     Mark A. Arnold
     General Manager


Attachments

| | |
|---|---|
| Exhibit "A-1": | Description of Lands Covered by Leases |
| Exhibit "A-2": | Plat |
| Exhibit "B-1": | Lease |
| Exhibit "B-2": | Lease |
| Exhibit "B-3": | Form of Consent to Assign |
| Exhibit "C": | Invoices |
| Exhibit "D": | Form of Assignment Of Oil, Gas And Other Mineral Leases |
| Exhibit "E": | Form of Seismic Data License Agreement |
| Exhibit "F": | JOA |

MARKSCO, L.L.C.

By_____
      Mark P. Sealy
      Member

LANDMARK EXPLORATION, LLC

By_____
      Larry Johnson
      Manager/Member

CRAFT EXPLORATION COMPANY, LLC

By_____
      Stephen H. Craft
      Manager/Member

DICKSON OIL & GAS, L.L.C.

By_____
      C. Bickham Dickson, III
      Manager

BUNDERO INVESTMENT COMPANY, L.L.C.

By_____
      Robert P. Bowman
      Manager

RESOURCE VENTURES, LLC

By_____
      Mark A. Arnold
      General Manager

Attachments

| | |
|---|---|
| Exhibit "A-1": | Description of Lands Covered by Leases |
| Exhibit "A-2": | Plat |
| Exhibit "B-1": | Lease |
| Exhibit "B-2": | Lease |
| Exhibit "B-3": | Form of Consent to Assign |
| Exhibit "C": | Invoices |
| Exhibit "D": | Form of Assignment Of Oil, Gas And Other Mineral Leases |
| Exhibit "E": | Form of Seismic Data License Agreement |
| Exhibit "F": | JOA |

MARKSCO, L.L.C.

By_____
           Mark P. Sealy
           Member

LANDMARK EXPLORATION, LLC

By_____
           Larry Johnson
           Manager/Member

CRAFT EXPLORATION COMPANY, LLC

By_____
           Stephen H. Craft
           Manager/Member

DICKSON OIL & GAS, L.L.C.

By_____
           C. Bickham Dickson, III
           Manager

BUNDERO INVESTMENT COMPANY, L.L.C.

By_____
           Robert P. Bowman
           Manager

RESOURCE VENTURES, LLC

By_____
           Mark A. Arnold
           General Manager

Attachments

| | |
|---|---|
| Exhibit "A-1": | Description of Lands Covered by Leases |
| Exhibit "A-2": | Plat |
| Exhibit "B-1": | Lease |
| Exhibit "B-2": | Lease |
| Exhibit "B-3": | Form of Consent to Assign |
| Exhibit "C": | Invoices |
| Exhibit "D": | Form of Assignment Of Oil, Gas And Other Mineral Leases |
| Exhibit "E": | Form of Seismic Data License Agreement |
| Exhibit "F": | JOA |

RECEIVED
JUL 11
BY:_____

MARKSCO, L.L.C.

By_____
     Mark P. Sealy
     Member

LANDMARK EXPLORATION, LLC

By_____
     Larry Johnson
     Manager/Member

CRAFT EXPLORATION COMPANY, LLC

By_____
     Stephen H. Craft
     Manager/Member

DICKSON OIL & GAS, L.L.C.

By_____
     C. Bickham Dickson, III
     Manager

BUNDERO INVESTMENT COMPANY, L.L.C.

By_____
     Robert P. Bowman
     Manager

RESOURCE VENTURES, LLC

By_____
     Mark A. Arnold
     General Manager

Attachments

| | | |
|---|---|---|
| Exhibit "A-1": | Description of Lands Covered by Leases |
| Exhibit "A-2": | Plat |
| Exhibit "B-1": | Lease |
| Exhibit "B-2": | Lease |
| Exhibit "B-3": | Form of Consent to Assign |
| Exhibit "C": | Invoices |
| Exhibit "D": | Form of Assignment Of Oil, Gas And Other Mineral Leases |
| Exhibit "E": | Form of Seismic Data License Agreement |
| Exhibit "F": | JOA |

MARKSCO, L.L.C.

By_____
        Mark P. Sealy
        Member

LANDMARK EXPLORATION, LLC

By_____
        Larry Johnson
        Manager/Member

CRAFT EXPLORATION COMPANY, LLC

By_____
        Stephen H. Craft
        Manager/Member

DICKSON OIL & GAS, L.L.C.

By_____
        C. Bickham Dickson, III
        Manager

BUNDERO INVESTMENT COMPANY, L.L.C.

By_____
        Robert P. Bowman
        Manager

RESOURCE VENTURES, LLC

By_____
        Mark A. Arnold
        General Manager

Attachments

| | |
|---|---|
| Exhibit "A-1": | Description of Lands Covered by Leases |
| Exhibit "A-2": | Plat |
| Exhibit "B-1": | Lease |
| Exhibit "B-2": | Lease |
| Exhibit "B-3": | Form of Consent to Assign |
| Exhibit "C": | Invoices |
| Exhibit "D": | Form of Assignment Of Oil, Gas And Other Mineral Leases |
| Exhibit "E": | Form of Seismic Data License Agreement |
| Exhibit "F": | JOA |

**ACKNOWLEDGMENTS**

STATE OF LOUISIANA

PARISH OF CADDO

    I, *Bettye M. LaCour*, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklar Exploration Company L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the *19th* day of ____*June*____, 2012.

                                                    NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

        Bettye M. LaCour, Notary Public # 3620
            Caddo Parish, Louisiana
          My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

    I, *Bettye M. LaCour*, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklarco L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the *19th* day of ____*June*____, 2012.

                                                    NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: ____Bettye M. LaCour, Notary Public # 3620____
                          Caddo Parish, Louisiana
                   My Commission is for Life

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                          _____
                              NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Page **14** of 47

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

    I, *Bettye M. LaCour*, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklar Exploration Company L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the ___19th___ day of ___June___, 2012.

<div align="right">

*Bettye M. LaCour*
NOTARY PUBLIC
</div>

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

<div align="center">

Bettye M. LaCour, Notary Public # 3620
Caddo Parish, Louisiana
My Commission is for Life
</div>

STATE OF LOUISIANA

PARISH OF CADDO

    I, *Bettye M. LaCour*, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklarco L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the ___19th___ day of ___June___, 2012.

<div align="right">

*Bettye M. LaCour*
NOTARY PUBLIC
</div>

[AFFIX NOTARIAL SEAL]

My Commission Expires: _Bettye M. LaCour, Notary Public # 3620_
Caddo Parish, Louisiana
My Commission is for Life

STATE OF TEXAS

COUNTY OF *Harris*

    I, *Olivia Bailey*, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    ~~Given under my hand and notarial~~ seal this the ___21st___ day of ___June___, 2012.

<div align="center">

OLIVIA BAILEY
Notary Public, State of Texas
Commission Expires 11-16-2014
</div>

<div align="right">

*Olivia Bailey*
NOTARY PUBLIC
</div>

[AFFIX NOTARIAL SEAL]

My Commission Expires: _11-16-2014_

<div align="center">

Page **14** of 47
</div>

STATE OF TEXAS

COUNTY OF _Dallas_

    I, _Robert Hiram Lucius_____, a notary public in and for said County and State, hereby certify that W. R. (Trey) Sibley, III, whose name as Attorney-in-Fact of THE RUDMAN PARTNERSHIP, a Texas general partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said partnership.

Given under my hand and notarial seal this the 25th day of __June__, 2012.

_Robert Hiram Lucius_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

ROBERT HIRAM LUCIUS
Notary Public, State of Texas
My Commission Expires
04/15/2016


STATE OF _____

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that TARA RUDMAN, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she executed the same as her free act and deed.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF TEXAS

COUNTY OF HARRIS

    I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that W. R. (Trey) Sibley, III, whose name as Attorney-in-Fact of THE RUDMAN PARTNERSHIP, a Texas general partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said partnership.

    Given under my hand and notarial seal this the ___ day of _____, 2012.

_____
                   NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _TEXAS_____

COUNTY OF _DALLAS____

    I, _LINDA SANDERS___, a notary public in and for said County and State, hereby certify that TARA RUDMAN, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she executed the same as her free act and deed.

    Given under my hand and notarial seal this the _26th_ day of _June_, 2012.

LINDA SANDERS
Notary Public, State of Texas
My Commission Expires
05/14/2016

_____
                   Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _5.14.16_____

STATE OF TEXAS

COUNTY OF HARRIS

    I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
                   NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that W. R. (Trey) Sibley, III, whose name as Attorney-in-Fact of THE RUDMAN PARTNERSHIP, a Texas general partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said partnership.

Given under my hand and notarial seal this the ___ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that TARA RUDMAN, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she executed the same as her free act and deed.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the 2nd day of July, 2012.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____8-11-15_____

MARCIA A. DE LUNA
Notary Public, State of Texas
My Commission Expires
August 11, 2015

Page **15** of **47**

STATE OF TEXAS

COUNTY OF _Harris_

    I, _Brenda Witt White_, a notary public in and for said County and State, hereby certify that Richard E. Fant, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, represented herein by its General Partner, Richard E. Fant, L.L.C., which itself is represented herein by its Manager, Phil O. Kelley, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

    Given under my hand and notarial seal this the _21st_ day of _June_, 2012.

                                 _Brenda Witt White_
                                       Notary Public

> BRENDA WITT WHITE
> Notary Public, State of Texas
> My Commission Expires
> MARCH 23, 2015

My commission expires: _3.23.15_

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as duly authorized Vice President of PICKENS FINANCIAL GROUP, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                                  _____
                                  NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

    I, _____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                                  _____
                                  Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

Page **16** of 47

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Richard E. Fant, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, represented herein by its General Partner, Richard E. Fant, L.L.C., which itself is represented herein by its Manager, Phil O. Kelley, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                          _____
                                  Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF TEXAS

COUNTY OF __Dallas__

    I, __Marilyn L. Fulton__, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as duly authorized Vice President of PICKENS FINANCIAL GROUP, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the __25th__ day of ___June___, 2012.

                          _Marilyn L. Fulton_

        Marilyn L Fulton
        My Commission Expires
        06/23/2016          NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: 6/23/16


STATE OF LOUISIANA

PARISH OF CADDO

    I, _____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                          _____
                                  Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Richard E. Fant, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, represented herein by its General Partner, Richard E. Fant, L.L.C., which itself is represented herein by its Manager, Phil O. Kelley, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

     Given under my hand and notarial seal this the _____ day of _____, 2012.

                                            _____
                                                  Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as duly authorized Vice President of PICKENS FINANCIAL GROUP, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2012.

                                            _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

     I, _Melissa R. Ebarb_____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

     Given under my hand and notarial seal this the 29th day of June, 2012.

                                          _Melissa R. Ebarb_____
                                        Notary Public

(AFFIX NOTARIAL SEAL)

My commission ~~expires~~: is for life

*Ack. Page - Shipps Creek Prospect Participation Agreement*

STATE OF TEXAS

COUNTY OF *HARRIS*

I, *Myla Wunderlich*, a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as duly authorized President of TAUBER EXPLORATION & PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the *27th* day of *JUNE*, 2012.

MYLA WUNDERLICH
Notary Public, State of Texas
Commission Expires 02-11-2016

NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as duly authorized President of TAUBER EXPLORATION & PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _HARRIS__

I, _PATTI L HANSON___, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _25_ day of _June_, 2012.

PATTI L HANSON
MY COMMISSION EXPIRES
January 18, 2015

_Patti L Hanson_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _1/18/15_


STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Page 17 of 47

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as duly authorized President of TAUBER EXPLORATION & PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

        Given under my hand and notarial seal this the _____ day of _____, 2012.

                                _____
                                  NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

        Given under my hand and notarial seal this the _____ day of _____, 2012.

                                  _____
                                  NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF _Madison_

    I, _Pamela F. Sebren_, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

        Given under my hand and notarial seal this the _25_ day of _June_____, 2012.

                              _Pamela F. Sebren_
                                  NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 63506
PAMELA F. SEBREN
Commission Expires
July 18, 2013
RANKIN COUNTY

STATE OF LOUISIANA

PARISH OF CADDO

    I, _Peggy Day Gill #24725_, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _27_ day of _June_, 2012.

                                      _____
                                             (Notary Public)

(AFFIX NOTARIAL SEAL)

My commission expires: _at my death_


STATE OF MISSISSIPPI

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Larry Johnson, whose name as duly authorized Manager/Member of LANDMARK EXPLORATION, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                                        _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF MISSISSIPPI

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Steven H. Craft, whose name as duly authorized Manager/Member of CRAFT EXPLORATION COMPANY, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                                        _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires:

Page **18** of 47

STATE OF LOUISIANA

PARISH OF CADDO

        I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

        Given under my hand and notarial seal this the _____ day of _____, 2012.

                                          _____
                                              Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF MISSISSIPPI

COUNTY OF Rankin

        I, Lena M. Mayfield _____, a notary public in and for said County and State, hereby certify that Larry Johnson, whose name as duly authorized Manager/Member of LANDMARK EXPLORATION, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

        Given under my hand and notarial seal this the 22 day of June _____, 2012.

                                     Lena M. Mayfield
                                     NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: 2-17-13

*(Notary seal: STATE OF MISSISSIPPI, NOTARY PUBLIC, ID # 92353, LENA M. MAYFIELD, Commission Expires Feb. 17, 2013, RANKIN COUNTY)*

STATE OF MISSISSIPPI

COUNTY OF _____

        I, _____, a notary public in and for said County and State, hereby certify that Steven H. Craft, whose name as duly authorized Manager/Member of CRAFT EXPLORATION COMPANY, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

        Given under my hand and notarial seal this the _____ day of _____, 2012.

                                         _____
                                           NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires:

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Larry Johnson, whose name as duly authorized Manager/Member of LANDMARK EXPLORATION, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF _Madison_

I, _The Gordon Densford_, a notary public in and for said County and State, hereby certify that Steven H. Craft, whose name as duly authorized Manager/Member of CRAFT EXPLORATION COMPANY, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _23_ day of _June_, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires:

Page 18 of 47

STATE OF LOUISIANA

PARISH OF CADDO

I, *George Portocarrero*, a notary public in and for said Parish and State, hereby certify that C. Bickham Dickson, III, whose name as Member of the DICKSON OIL & GAS, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the *10th* day of *July*, 2012.

*George Por*
_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: *For Life*

GEORGE PORTOCARRERO
NOTARY PUBLIC - LOUISIANA
CADDO - BOSSIER PARISH
NOTARY ID NUMBER 056297
My Commission Is For Life

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF COLORADO

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Mark A. Arnold, whose name as duly authorized General Manager of RESOURCE VENTURES, LLC, an Indiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that C. Bickham Dickson, III, whose name as Member of the DICKSON OIL & GAS, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.


_____
Notary Public


(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

I, Deborah W. Cox, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 28th day of June, 2012.


_____
NOTARY PUBLIC


[AFFIX NOTARIAL SEAL]

My Commission Expires: for life

> DEBORAH W. COX  26623
> Notary Public
> Parish of Caddo
> State of Louisiana


STATE OF COLORADO

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Mark A. Arnold, whose name as duly authorized General Manager of RESOURCE VENTURES, LLC, an Indiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.


_____
NOTARY PUBLIC


[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that C. Bickham Dickson, III, whose name as Member of the DICKSON OIL & GAS, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

                                  _____
                                      Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

                                    _____
                                    NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF COLORADO

COUNTY OF _Douglas_

      I, _JoAnne Scherfel_, a notary public in and for said County and State, hereby certify that Mark A. Arnold, whose name as duly authorized General Manager of RESOURCE VENTURES, LLC, an Indiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _25Th_ day of _June_, 2012.

                                      _JoAnne Scherfel_
                                  NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _3/5/2013_

EXHIBIT "A-1"

Attached to and made a part of that certain
Shipps Creek Prospect Participation Agreement dated effective as of June 1, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd.,
The Rudman Partnership, Tara Rudman, JJS Working interests LLC, Fant Energy Limited,
Pickens Financial Group, LLC, Fleet Howell, Tauber Exploration & Production Co.,
Tiembo, Ltd., Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC,
Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C.
and Resource Ventures, LLC,


## DESCRIPTION OF LANDS COVERED BY LEASES


### DESCRIPTION OF PROPERTY IN CONECUH COUNTY, ALABAMA:


### TOWNSHIP 4 NORTH, RANGE 10 EAST

Section 24:     E/2 of SE/4, **LESS and EXCEPT** seven (7) acres in W/2 of NE/4 of SE/4
        73 acres, more or less

Section 25:     N/2 of NE/4 of NE/4
        21 acres, more or less


### TOWNSHIP 4 NORTH, RANGE 11 EAST

Section 13:     All
        640 acres, more or less

Section 19:     S/2; SW/4 of NE/4; NE/4 of NW/4
        397 acres, more or less


Section 20:     NW/4 of SW/4
        40 acres, more or less

Section 21:     N/2 of N/2; SE/4 of NW/4; SW/4 of NE/4; S/2 of NE/4 of SE/4; S/2 of SW/4 of SW/4
        276 acres, more or less

Section 22:     N/2 of NW/4; eight (8) acres in portion of NW/4 of NW/4 of NE/4; NE/4 of SW/4
        125 acres, more or less

Section 23:     All, **LESS and EXCEPT** the SW/4 of SW/4 and **LESS and EXCEPT** a portion in NW/4
of N/W/4, also **LESS and EXCEPT** a parcel in the SE corner of the SE/4 of the SE/4, and **LESS and
EXCEPT** a parcel lying on the South line of the section in the SW/4 of SE/4.
        590 acres, more or less

Section 24:     N/2
        320 acres, more or less

Section 25:     S/2, **LESS and EXCEPT** a parcel situated on the Eastern line of the Section in the NE/4 of
SE/4, lying just North of County Rd. 6
        315 acres, more or less

Section 29:     N/2 of NW/4, **LESS and EXCEPT** 5 acs. in the NE/4 of NE/4 of NW/4; NW/4 of NE/4
NW/4 of SE/4 of NW/4; SW/4, **LESS and EXCEPT** N/2 of NE/4 of SE/4.  W/2 of SE/4; E/2 of NE/4; NE/4
of SE/4; E/2 of SW/4 of NE1/4
        481 acres, more or less

Section 30:     NW/4 of NE/4; NE/4 of NW/4; S/2 of SE/4 of SE/4
        100 acres,  more or less

Page **20** of 47

## TOWNSHIP 4 NORTH, RANGE 12 EAST

Section 7:         All, **LESS and EXCEPT** W/2 of NW/4
            560 acres, more or less

Section 8:         E/2; N/2 of NW/4; SE/4 of NW/4; SE/4 of SW/4
            484 acres, more or less

Section 16:        N/2
            306.5 acres, more or less

Section 17:        All, **LESS and EXCEPT** N/2 of SE/4, and **LESS and EXCEPT** portion in S/2 of NE/4 of
NE/4
            540 acres, more or less

Section 18:        All, **LESS and EXCEPT** SE/4 of NE/4; **LESS and EXCEPT** SW/4 of SE/4
            563 acres, more or less

Section 19:        NW/4; NE/4; SW/4
            480 acres, more or less


## DESCRIPTION OF PROPERTY IN ESCAMBIA COUNTY, ALABAMA:


## TOWNSHIP 3 NORTH, RANGE 10 EAST

Section 1:         All, **LESS and EXCEPT** the NW1/4 of NW1/4
            601.2 acres, more or less

Section 2:         SE/4 of SE/4; S/2 of NE/4 of SE/4; N/2 of NE/4 of SE/4 all lying East of Railroad; SE/4
            of NE/4 all lying East of Railroad
            86.5 acres, more or less

Section 11:        All E/2, lying East of Railroad; SW/4 of SE/4, lying West of Railroad; E/2 of SE/4 of
            SW/4; NE/4 of NE/4, lying West of Railroad.
            235 acres, more or less

Section 12:        All
            634.4 acres, more or less

Section 13:        All
            642.1 acres, more or less

Section 14:        E/2; E/2 of SE/4 of SW/4; NW/4 of NW/4 of SW1/4; SW/4 of SW/4 of NW/4; NE/4 of
            NE/4 of NW/4
            366.3 acres, more or less

Section 23:        E/2; W/2, **LESS and EXCEPT** SW/4 of SW/4 of SW/4;
            639.6 acres, more or less

Section 24:        N/2; NW/4 of SW/4; N/2 of SE/4
            454.8 acres, more or less

Section 25:        All
            636.7 acres, more or less

Section 26:        NE/4 of NE/4; SE/4 of SE/4
            78.8 acres, more or less

Section 35:        NW/4; NE/4; SE/4, all lying East of Railroad
            404.9 acres, more or less

Page **21** of **47**

Section 36:    S/2 of SW/4; NW/4 of SW/4; 10.2 acres in the S/2 of NE/4 of SW/4; SW/4 of SE/4,
               **LESS and EXCEPT**
               Portion of N/2 of SW/4 of SE/4; E/2 of NE/4 of NE/4; SE/4 of NE/4
               216.4 acres, more or less


**TOWNSHIP 3 NORTH, RANGE 11 EAST**

Section 2:     E/2 of E/2, **LESS and EXCEPT** the N/2 of NE/4 of NE/4; W/2 of W/2, **LESS and
               EXCEPT** the N/2 of NW/4 of NW/4
               282.1 acres, more or less

Section 3:     All, **LESS and EXCEPT** the NE/4 of NE/4
               588.1 acres, more or less

Section 4:     SW/4; NE/4 of NE/4
               202.1 acres, more or less

Section 5:     All
               633.1 acres, more or less

Section 6:     All
               639.1 acres, more or less

Section 7:     All
               633.2 acres, more or less

Section 8:     All
               630.1 acres, more or less

Section 9:     All
               643.4 acres, more or less

Section 10:    All
               622.9 acres, more or less

Section 11:    All
               634.2 acres, more or less

Section 12:    All
               635.4 acres, more or less

Section 13:    NW/4
               160 acres, more or less

Section 18:    All
               639.4 acres, more or less

Section 19:    All
               631.9 acres, more or less

Section 25:    S/2
               319.25 acres, more or less

Section 26:    S/2
               319.25 acres, more or less

Section 27:    S/2
               319.8 acres, more or less

Section 28:    S/2
               322.1 acres, more or less

Page **22** of 47

Section 29:     All
                652.6 acres, more or less

Section 30:     All, less and except W/2 of SW/4
                568 acres, more or less

Section 31:     All
                644.5 acres, more or less

Section 32:     All
                655.1 acres, more or less

Section 33:     All
                644.7 acres, more or less

Section 34:     All
                639.9 acres, more or less

Section 35:     All
                639.7 acres, more or less

Section 36:     All
                644.8 acres, more or less

**EXHIBIT "A-2"**
Attached to and made a part of that certain
Shipps Creek Prospect Participation Agreement dated effective as of June 1, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C.,
McCombs Energy, Ltd., The Rudman Partnership, Tera Rudman,
JJS Working Interests LLC, Fant Energy Limited, Pickens Financial Group, LLC,
Fleet Howell, Tauber Exploration & Production Co., Tiembo, Ltd.,
Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC,
Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C.,
Bundero Investment Company, L.L.C., Resource Ventures, LLC

**EXHIBIT "B-1"**

Attached to and made a part of that certain
Shipps Creek Prospect Participation Agreement dated effective as of June 1, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd.,
The Rudman Partnership, Tara Rudman, JJS Working interests LLC, Fant Energy Limited,
Pickens Financial Group, LLC, Fleet Howell, Tauber Exploration & Production Co.,
Tiembo, Ltd., Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC,
Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C.
and Resource Ventures, LLC,


**COPY OF CCL&T LEASE COVERING LANDS LOCATED IN ESCAMBIA COUNTY, AL
(Attached)**

## OIL, GAS AND MINERAL LEASE

STATE OF ALABAMA

COUNTY OF CONECUH

THIS AGREEMENT, to be effective this 14ᵗʰ day of June , 2012, between **CEDAR CREEK LAND & TIMBER, INC.** (hereinafter referred to as "LESSOR") of Post Office Box 1769, Brewton, Alabama 36427, and **SKLAR EXPLORATION COMPANY, L.L.C.** (hereinafter referred to as "LESSEE") of 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101.

### W I T N E SSE T H:

1.   LEASE CONSIDERATION

LESSOR, in consideration of Ten and No/100 Dollars ($10.00), in hand paid, of the royalties and other benefits herein provided, and of the agreements of LESSEE herein contained, but subject to the further terms hereof, hereby GRANTS, LEASES AND LETS exclusively unto LESSEE for the purpose of investigating, exploring, prospecting and drilling for and producing oil and gas, the lands (hereinafter referred to as the "Leased Premises"), described in and on Exhibit "A", attached hereto and identified as such, which said Exhibit as so attached and identified, is incorporated herein by reference and made a part hereof for a more particular description of said land. For the purpose of calculating and determining the amount of any money payment hereunder, and for all other pertinent purposes of this Lease the land therein described is hereby estimated, and shall be regarded and treated as actually comprising and containing **6,311.5** net acres, whether it be more or less, and in the event of a partial assignment or surrender hereof or hereunder, the assigned or surrendered portion or portions shall be deemed to contain the number of acres estimated realistically in such instrument or assignment or surrender. The term "oil and gas" as used in this Lease shall mean oil, gas, casinghead gas, distillate, gas condensate and the by-products thereof, and such other hydrocarbon substances and sulphur as are necessarily produced with and incidental to the production of oil and gas. LESSOR hereby reserves and excepts from this Lease and the rights granted hereunder any and all coal, lignite, uranium and other fissionable materials, geothermal energy, base and precious metals, rock, stone, limestone, sand, gravel and other similar aggregates, and clay, and retains unto itself and other subsequent or concurrent lessees of interests therein the right to explore for and produce such reserved minerals.

2.   TERM

Subject to the preservation provisions of subsection 3.4.1 and Section 5 hereof, this lease shall be for a term of **three (3) years** from this date (called "primary term") and for so long thereafter as oil or gas is produced in paying quantities from the Leased Premises or, this Lease is otherwise maintained in force and effect under the terms hereof.

3.   RESERVATION OF ROYALTIES

3.1     LESSOR hereby reserves, and LESSEE hereby agrees to pay or deliver to LESSOR, the following royalties on account of the oil and gas produced  from the Leased Premises in accordance with, but subject to, all subsequent subsections hereof:

3.1.1   AS TO OIL:

**25%** of all oil, condensate and/or other liquid hydrocarbons, produced and saved from the Leased Premises, or from a unit embracing all or a portion thereof, the same to be delivered, free of cost, at the mouth of the well, or, at LESSOR's option, to the credit of Lessor into the pipe line or lines to which LESSEE may connect its wells; provided, however, that LESSEE may purchase LESSOR's oil, condensate and/or other liquid hydrocarbons by paying to LESSOR the average posted market price of such royalty share then in effect for such oil, condensate and/or other liquid hydrocarbons at the wells as of the day  such substances are run to the pipe line or storage tank.

3.1.2   AS TO GAS:

**25%** of the market value, hereinafter  defined, of all gas and casinghead gas produced and saved from the Leased Premises, or from a unit embracing all or a portion thereof.

3.1.3   ROYALTY PERCENTAGE ESCALATION:

The "25%" royalty percentage specified in subsections 3.1.1 and 3.1.2 above shall be increased to "30%" on a unit by unit basis as follows:  As to production allocated to the portion of the Leased Premises included within a production unit established by the State Oil and Gas Board of Alabama, the royalty fraction stated above shall be increased to 30% for oil and gas produced from the well (or wells) on said unit commencing in the month during which the total cumulative production of oil from said well (or wells) on said production unit equals 50,000 barrels. Percentage escalation applies only to production after the threshold is reached.

3.2     LESSOR specifically reserves hereby the right to take in kind or separately dispose of its proportionate royalty share of all oil and/or gas produced from the Leased Premises, or from a unit embracing all or a portion thereof, and, in the event such an election is made, shall be required to pay only for the proportionate share of such part of LESSEE's surface facilities which it uses.

3.3     PAYMENT AND DELIVERY OF LESSOR'S ROYALTIES:

3.3.1     Any and all royalties due and owing to LESSOR in accordance herewith shall be payable or deliverable to LESSOR no later than 60 days after the end of the calendar month within which oil and/or gas production is sold; provided however, that the acceptance of any such royalty by LESSOR  shall never be taken or construed as a waiver of any of LESSOR's rights or remedies for breach by LESSEE, its successors or assigns, of any express or implied covenant of this Lease.

1

3.3.2     Any payment of any royalty after the date specified in subparagraph 3.3.1 above shall bear interest from and after its respective due date until payment in full is received by LESSOR, said interest factor to be equivalent to the prime rate, as the same shall be set from time to time by the BankTrust of Mobile, Alabama (or any successor to said bank).  Furthermore, if LESSEE should fail to pay any royalty or royalties payable hereunder when the same shall become due, LESSOR shall have the specific right and option to terminate this Lease forthwith for such non-payment if such royalties due and payable to LESSOR are not delivered to the said LESSOR on or before the expiration of sixty (60) days after LESSEE receives written notice from LESSOR of LESSEE's failure to pay all royalties when due.

3.3.3     All royalties payable to LESSOR under the terms and provisions of subparagraph 3.1 hereof are payable and shall be paid in cash or by check delivered or mailed to LESSOR at its principal place of business in Brewton, Escambia County, Alabama, or at such other address as LESSOR may designate.

3.3.4     In the event LESSOR should elect to take in kind its royalty on any one or more substances covered by this Lease, LESSOR may exercise such option at any time and from time to time upon 60 days written notice to LESSEE, in which event LESSEE shall deliver same, free of cost other than as provided in 3.2 to LESSOR, to and into LESSOR's pipe lines, tanks or other storage or transportation facilities until 60 days after receipt of written notice that LESSOR has revoked such option and has elected to receive any such royalty interest or share in cash or by check payable at its designated address as hereinabove provided.  Except to the extent to which LESSOR may have exercised its option to take one or more of its royalty interest or share in kind, as herein provided, LESSEE may, subject to all pertinent provisions of this Section 3 of this Lease, barter, contribute, dispose of, exchange, sell swap or use any one or more of said substances covered by this Lease, but shall account to LESSOR therefore to the extent and in the manner hereinabove provided.

3.4     MONETARY SUBSTITUTES FOR ACTUAL PRODUCTION

3.4.1.     Shut-In Royalty on Suspended Production

(a)     While there is a well on the Leased Premises capable of producing gas in paying quantities, as said phrase is hereinafter defined, but the production there from is shut-in, shut down, or suspended for any reason, then and in any such event, LESSEE shall pay royalty on or before ninety (90) days after the date on which (1) production from any such well is shut-in, shut down or suspended, or (2) this Lease is no longer maintained by compliance with one of the other preservation provisions, hereof, (whichever is the later date, and thereafter at annual intervals during the primary term, a sum and amount equal to One Dollar ($1.00) multiplied by the number of acres then covered by this Lease), and after the expiration of the primary term, a sum and amount equal to Twenty Five Dollars ($25.00) multiplied by the number of acres then covered by this Lease, and, if such payments are made, this Lease shall not terminate, but, on the contrary, will continue in full force and it will be considered that a substance covered by this Lease is being produced from the Leased Premises in paying quantities within the meaning of each pertinent provision of this Lease, it being understood and agreed that such payments shall only apply to the geologic strata capable of producing gas in paying quantities.

(b)     The provisions of subparagraph 3.4.1(a) shall not apply to oil wells, as the same may be classified by the State Oil and Gas Board of Alabama, by the Florida Department of Natural Resources or by its Bureau of Geology, and this Lease shall not be kept in force solely by the payment of any shut-in royalty payment on any such well.

(c)     After the primary term hereof, this Lease may not be kept in force solely by the payment of shut-in royalties hereunder for more than a period of two (2) consecutive years after the date of the first payment of any shut-in royalty hereunder.

3.4.2     Take or Pay Product Purchase Contracts

(a)     No "take or pay" products purchase contract shall be finally consummated or valid as to any substance covered hereby and produced from the Leased Premises without LESSOR's written consent.

(b)     All royalties hereunder applicable to gas, casinghead gas, or any other gaseous hydrocarbon covered by this Lease shall be due and payable to LESSOR for any such gas paid for but not taken pursuant to any "take or pay" provision of any pertinent gas purchase contract covering the Leased Premises, any part thereof, and/or any well or wells thereon, but LESSOR agrees to be responsible and liable for its proportionate share of any payments that may be recoverable by the gas purchaser by later takes of gas or refunds of money.  In the event gas is taken in kind as recoupment of take or pay payments, that gas shall be exempt from any royalties.

3.5     LESSEE shall not conduct underground storage operations without the written consent of LESSOR.

3.6     LESSEE shall not use nuclear or other blasts to create artificial conduits, chimneys or reservoirs without the written consent of LESSOR, and if such consent is given, LESSEE shall not use such artificial conduits, chimneys or reservoirs without the additional written consent of LESSOR.

3.7     All pertinent subparagraphs of this Paragraph 3 of this Lease shall apply to and govern the delivery in kind as royalty, or the payment of royalties on all such elements, natural products, by-products, residues or residuals produced from, or allocable to the Leased Premises, under the terms of, or as a result of, revised,

2

permanent or temporary pooling, spacing or unitizing orders or rules issued by the State Oil and Gas Board of Alabama.

3.8     FREE FUEL AND WATER

    3.8.1     Free Water

    LESSEE shall have free use of any and all subsurface water during any primary operations conducted hereunder.

    3.8.2     Free Fuel

    LESSEE shall have free use, during any primary operations conducted hereunder, of any and all fuel or other substances covered by this Lease and produced from the Leased Premises, and the royalties thereon due and payable to LESSOR shall be computed after deducting any amount of any such substance so used.

    3.8.3     For the purposes of this subparagraph 3.8, primary operations shall include the production of oil and gas and all operations associated therewith during such time as oil and gas, or either of them, are produced from a unit embracing all or a portion of the Leased Premises with the sole use of natural reservoir energy. Primary operations shall not include secondary recovery, pressure maintenance, or other operations related thereto.

3.9     Any and all royalties due and payable to LESSOR pursuant to this Paragraph shall be so paid to LESSOR, or to the credit of LESSOR, free of any and all exploration, development, production, treatment, gathering, marketing, or other related costs, excepting any taxes which may be applicable to such royalties.

4.     DELAY RENTALS          THIS IS A PAID-UP LEASE. NO DELAY RENTAL IS DUE.

4.1     The cash down payment or bonus given for the execution of this Lease constitutes a part of the consideration hereof according to its terms and shall not be allocated as mere rental for a period.

5.     CONTINUOUS OPERATIONS

5.1     If, prior to the discovery and production of any substance covered by this Lease on or from the Leased Premises or from a unit embracing any portion thereof, LESSEE should drill a dry hole or holes thereon, or, if after discovery and production of any such substances covered by this Lease, the production thereof should cease for any reason, this Lease shall not terminate if LESSEE commences operations for drilling or reworking within ninety (90) days thereafter or pays shut-in royalty as provided by 3.4.1.

5.2     If upon or after the expiration of the primary term of this Lease, no substance covered hereby is being produced from the Leased Premises or lands pooled therewith in paying quantities, as said phrase is hereafter defined, but LESSEE is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within ninety (90) days prior to the end of the primary term, this Lease may be continued in force if, within ninety (90) days from and after the completion of the preceding well, or the cessation of operations thereon if it is dry and unproductive, LESSEE commences or causes to be commenced 1) drilling operations on an additional well on some part or portion of the Leased Premises lying outside of any previously established drilling or production allowable unit or 2) reworking operations on any well previously drilled and completed on the Leased Premises or on a unit containing all or any portion thereof. After having so commenced the drilling or reworking operations described above, LESSEE may perpetuate the term of this Lease through drilling or reworking operations or the completion or abandonment of additional wells, with no more than ninety (90) consecutive days elapsing between the completion or abandonment of one such additional well and the commencement of drilling or reworking operations for another well on another unit or tract until the entire Leased Premises has been developed to the density, degree and extent permitted by any applicable statewide or field rules, or until at least one oil or gas well has been drilled and completed or abandoned under each such unit or units that may be established within the Leased Premises; provided additionally, that if any of the foregoing drilling or reworking operations result in paying production of any substance covered by this Lease, then this Lease shall remain in force as to the productive unit or units, subject to the further provisions hereof, for so long thereafter as any such substance is produced from the Leased Premises or from land pooled therewith in paying quantities, as that phrase is defined hereinafter.

6.     FORCE MAJEURE

6.1     Should LESSEE be prevented from complying with any express or implied covenant of this Lease, from conducting drilling, reworking or marketing operations, or from producing or marketing the substances covered by this Lease, by operation of force majeure, war, rebellion, devastating fires or floods, orders, rules or regulations of State or Federal governmental authority, or by other such other acts or events beyond the control or LESSEE, then while so prevented, LESSEE's obligation to comply with such covenant shall be suspended, LESSEE shall not be liable in damages for failure to comply therewith, and this Lease shall be extended while and so long as LESSEE is prevented by any such cause from conducting drilling, reworking, or marketing operations on or from producing oil and/or gas from the Leased Premises; provided, however, that neither force majeure nor any other cause similar or dissimilar to those described hereinabove shall confer upon LESSEE the right to extend this Lease for more than a period of twelve (12) months.

6.2     Notwithstanding anything to the contrary contained in subparagraph 6.1 above, LESSEE shall not be excused, through the operation of the foregoing force majeure provisions, from making of all proper and timely payments of delay rentals, royalties, shut-in royalties or all other payments required pursuant to the terms of this Lease.

3

7.      USE, DAMAGES TO, AND RESTORATION OF THE LEASED PREMISES

    7.1     USE OF THE SURFACE OF THE LEASED PREMISES

      Subject to the further terms and provisions hereof, LESSEE shall have and is hereby given access to and use of so much of the surface of the Leased Premises as is reasonably necessary to conduct all activities and operations authorized, permitted and required by the terms of this Lease which do not unduly or unreasonably hamper, interfere with or restrict LESSOR's communicating, cultivating, farming, fishing, grazing, harvesting, hunting, logging, lumbering, milling, planting, seeding, transporting, trapping or other related or non-related activities and operations therein and thereon, it being the intention of the parties hereto to create and recognize between them reciprocal rights and complimentary estates.  To this end, it is expressly AGREED, UNDERSTOOD, and hereby STIPULATED that:

      7.1.1     LESSEE COVENANTS AND AGREES:

      (a)     Not to use any more of the surface of the Leased Premises as is reasonably necessary to conduct all operations authorized, permitted and required by this Lease and specifically not to locate any well, treatment plant, flow line, gathering line, pipe line or other such facility closer than 330 feet from any house, cabin, shed, barn, silo, storage bin, feeding trough, or other structure located on the Leased Premises;

      (b)     Not to grant to any third party or parties any easement for any pipeline unassociated with the transportation of oil and gas produced from the Leased Premises or from a unit embracing all or a portion thereof, any water line, transmission line, or other burden on the Leased Premises;

      (c)     Not to fish, hunt or carry or use fishing gear or firearms onto the Leased Premises and to make every reasonable effort, by specific instructions, warnings, warning signs, or otherwise, to prevent its agents, executives, employees and personnel, or those furnishing material, supplies, physical equipment or third party services from fishing, hunting or carrying or using fishing gear or firearms on the Leased Premises; and

      (d)     Not to cultivate, farm, graze livestock, harvest, log, lumber, mill, plant, seed, or conduct or engage in such other activities and operations similar or dissimilar in nature to those mentioned herein and not contemplated by the terms of this Lease.

      7.1.2     LESSOR COVENANTS AND AGREES:

      (a)     To maintain all fences and gates in good state of repair, and when and where it becomes absolutely necessary to cut or otherwise remove LESSOR's fences, to install adequate gates and cattleguards; and

      (b)     To exercise all of its rights, privileges, powers and immunities, and to conduct its usual and customary activities and operations on the Leased Premises in a manner such that it will not unduly or unreasonably hamper, interfere with or restrict any operation or activity authorized, permitted or required by this Lease; and

      (c)     To insure that any of its licensees, guests, invitees or subsequent lessees conduct their activities and operations so as not to hamper, interfere with or restrict unduly or unreasonably any operation or activity authorized, permitted or required by this Lease.

    7.2     DAMAGES TO THE SURFACE OF THE LEASED PREMISES:

    LESSEE COVENANTS AND AGREES:

      (a)     To consult with and obtain the written release and consent of LESSOR before selecting or clearing sites for wells, pits, drainage ditches, receptacles, shafts, or locating, constructing or installing tank batteries, field-type separation devices, treating or processing mills or plants, laying pipe lines, gathering lines or flow lines, surveying and drilling shot holes for seismic surveys, or building roads, bridges or culverts on the Leased Premises; and, when requested by LESSOR, to bury all pipe lines, gathering lines and flow lines below plow depth or the depth to and at which LESSOR's timber or other seedlings are normally planted, whichever is deeper;

      (b)     To conduct all seismic and other surveys in a manner so as not to damage LESSOR's water wells, tanks or reservoirs, and to conduct all operations so as not to permit any deleterious substance to collect, escape, pollute, run, seep, spread, stand or come in contact with or damage LESSOR'S blinds, boat docks, cattle, crops, fish, or other aquatic life, hunting or fishing camps or lodges, lakes, land, livestock, logs, lumber, logging and lumbering camps, mills, roads or tramways, ponds, reservoirs, seedlings, springs, streams, tanks, timber, trees, vegetation, water wells, wildlife or any other things of value on, in, over or under the Leased Premises; and

      (c)     To respond to and pay damages, based on replacement cost, cost of repairs, or such other assessment to which LESSOR may agree, for the damage to, loss of, or diminution or depreciation of the beneficial use or value of any house, cabin, shed, barn, silo, storage bin, fence, crop, timber, lumber, vehicles, feeding trough or other thing of value lost, damaged or destroyed as a result of or through the conduct of any activity or operation authorized, permitted or required by this Lease or by any activity of LESSEE, its agents, employees or representatives, which amounts to a breach of any covenant hereof.  This paragraph shall not apply where Lessor is negligent or involved in willful misconduct notwithstanding anything to the contrary, it is not intended that **Sklar Exploration Company, L.L.C.** indemnify LESSOR for the negligent acts of LESSOR's servants or employees or for willful misconduct.

4

7.3     RESTORATION OF THE SURFACE OF THE LEASED PREMISES

LESSEE hereby covenants and agrees to maintain and/or restore the surface of the Leased Premises, immediately after the particular surface area of the said Leased Premises has served its purpose, in and to as near as practicable its natural state before operations and activities began hereunder. To this end, it is expressly AGREED, UNDERSTOOD, and hereby STIPULATED that LESSEE covenants and agrees:

(a)     To dispose of all drilling mud, chemicals, tailings, waste, debris, and all other deleterious substances and/or materials in a lawful manner as approved by the State of Alabama or any other governing body;

(b)     To properly and promptly fill, roll, tamp and cover all pits and sumps after each pit and sump has served its particular purpose;

(c)     To close, securely seal and properly plug any and all wells drilled and abandoned hereunder;

(d)     To clean up and generally repair the site used for any well, pit, receptacle, shaft, tank, plant, or other physical facility;

(e)     To dispose of all saline solutions, saltwater, waste oil, and all other obnoxious and/or deleterious substances by removing them from the Leased Premises or through the use of authorized injection wells for disposal purposes; and

(f)     To take all other reasonable steps to maintain and preserve the Leased Premises in a clean and orderly manner.

8.     REMOVAL OF FIXTURES FROM AND TITLE TO ABANDONED WELLS

8.1     REMOVAL OF AND TITLE TO FIXTURES:

Subject to the further terms and provisions hereof, LESSEE shall have and is hereby given and granted the right to remove all property, physical equipment, facilities and fixtures placed on, in and under the Leased Premises by LESSEE within one hundred eighty (180) days after the expiration of this Lease, or, if the termination of this Lease or any portion thereof is in controversy, within one hundred eighty (180) days after final determination of such controversy, but not thereafter, it being understood and agreed that all wells, receptacles, shafts, tanks, well holes or bores, and any and all such property, physical equipment, facilities and fixtures remaining in, on or under the Leased Premises, including casing and other downhole equipment left in any such wells, upon and after the expiration of said 180 day period, shall then and thereupon become the property of LESSOR.

8.2     WATER WELLS:

LESSOR shall have and is hereby given and granted the option, at its election, of taking over and thereafter owning and operating any well initially drilled as or later converted to a water well and equipped as such by LESSEE, including all physical facilities and equipment placed by LESSEE therein, thereon, or used by LESSEE in connection therewith, which said well or wells LESSEE may at any time or from time to time elect to abandon by paying to LESSEE the reasonable salvage value of all such salvable physical facilities and equipment as of the date of abandonment by LESSEE; provided however, that as is provided in subparagraph 8.1 above, LESSOR shall nevertheless become the owner of all such water wells located on the Leased Premises and of the equipment therein, thereon or used in connection therewith upon the expiration of the said 180 day period.

8.3     TITLE MATTERS:

Insofar as it may be necessary to fully effectuate all provisions of this Paragraph 8, all apt words of grant, bargain, sale, conveyance, transfer and delivery are incorporated herein by reference and made a part of this said Paragraph 8 for all pertinent purposes.

9.     ADDITIONAL EXPRESS COVENANTS

By the acceptance of this Lease, and as a substantial part of the consideration therefore, LESSEE hereby expressly COVENANTS and AGREES:

9.1     After the discovery of oil or gas in paying quantities on said premises, LESSEE shall develop the acreage hereunder as a reasonably prudent operator. In the event a well or wells producing oil or gas in paying quantities should be brought in on other land in the vicinity of and draining the Leased Premises or acreage pooled therewith, LESSEE agrees to drill such offset well as a reasonably prudent operator would drill under the same or similar circumstances. Such offset well or wells shall be commenced within ninety (90) days after commencement of production in paying quantities from the well being offset:

9.2     To produce, gather, process, preserve, save, store, take care of, treat, transport and market said production, products, by-products, residues, residuals and tailing, and to conduct all such producing, gathering, processing, preserving, saving, storing, caring of, treating, transporting and marketing activities and operations at the time, with the rapidity, at the rate, and in the manner and to the extent that a reasonably prudent operator, acting under the same or similar circumstances, and with the best interests of both the LESSOR and LESSEE in mind and at heart, should or would so conduct such activities and operations;

9.3     To conduct pressure maintenance, or secondary recovery operations, or both, if the characteristics of the particular reservoir are such that, from sound engineering and economical standpoints, and with the best interests of both LESSOR and LESSEE in mind and at heart a reasonably prudent operator would or should conduct one or both such operations;

5

9.4     To market with due diligence and in good faith all oil and gas produced from a well or wells completed on the Leased Premises, or on a unit or units embracing any part thereof, which is not utilized by LESSEE pursuant to subparagraph 3.8 hereof;

9.5     To build, construct or install and to maintain and operate a mill or mills, or plant or plants, or with LESSOR's written consent, to enter contracts, in good faith and at arm's length, with independent processors, for the purpose of absorbing, assimilating, blending, compounding, concentrating, cycling, deriving, extracting, milling, processing, recovering, refining, saving, treating or upgrading all oil and gas initially produced from the Leased Premises, or from lands pooled therewith if such oil and gas, or either of them, are of such quality and in such quantity as to justify the building, constructing, installing, maintaining and operating of such a mill or plant by a reasonably prudent operator or processor, or to justify such a reasonably prudent operator entering into such contracts with independent processors;

9.6     To install, maintain and operate one or more field-type device or devices such as but not limited to Bradenheads and separators, for the purpose of extracting, recovering or saving one or more elements of the oil and gas produced from the Leased Premises, or from lands pooled therewith, such as and including casinghead gas, distillate, gas condensate and natural gasoline if such oil and gas, or either of them initially produced from the said Leased Premises, or from land pooled therewith, are not of such quality or are not in such quantity as to justify plant processing;

9.7     To enter into contracts, in good faith and at arm's length, for the sale, at or near the wells, or elsewhere, of such products and substances, covered hereby and produced from the Leased Premises, or from lands pooled therewith, which are not of such quality or are not in such quantity as to justify the installation and operation of field-type devices described in subparagraph 9.6 above;

9.8     To furnish promptly to LESSOR, upon written request at its principal office and place of business in Brewton, Escambia County, Alabama, or at such other address as LESSOR may designate in writing:

(a)     Copies, duplicates or reproductions of all location plats, applications for and permits to drill, daily drilling reports on and in connection with all wells drilled on the Leased Premises or lands pooled therewith; copies of all pipe perforation and well completion records; and copies of all reports and forms required by or filed with the State Oil and Gas Board of Alabama, and all other such regulatory bodies, state and federal, having jurisdiction;

(b)     Copies and duplicates or reproductions of all logs or surveys, drillers, electrical or otherwise, of all wells drilled on the Leased Premises or lands pooled therewith; all surveys and similar data, all coring data and core analysis reports, core analyses, core records, reports or results of drill stem or other tests, and all other data and information obtained in connection with or as a result of the exploration, development, operation and protection of the Leased Premises;

Each and all of the foregoing covenants to be construed as those running with and touching and concerning this Lease and with the acreage constituting the Leased Premises.

10.    RIGHTS OF LESSOR

LESSOR, acting by and through its corporate officers, executives, agents or duly authorized representatives, shall have and is hereby given and granted immediate access to and the absolute right, at its own risk, cost and expense, at any time and from time to time, to:

10.1     Observe, from the well site, derrick floor, drilling platform, or from any other vantage point, all drilling, completing, logging, surveying, producing, reworking, plugging and all other such or similar activities or operations conducted on the Leased Premises by LESSEE, its agents, employees, independent contractors, or by those furnishing third party services. Access to drilling rig and location may be denied in the event a life-threatening situation exists;

10.2     Make annual audits or LESSEE's accounts, contracts, books and records, at its own expense and at any reasonable time, for the purpose of ascertaining the amount of the production, sales and cost of manufacturing and extracting of any and all substances covered by this agreement. Each such audit shall cover the period intervening since the last audit, and LESSOR shall have one (1) year next following the close of the calendar year in which said audit is made within which to present to and assert against LESSEE any and all claims or demands against LESSEE that may be disclosed by or result from said audit.

11.    ASSIGNMENT OF RIGHTS HEREUNDER

11.1     RIGHTS OF LESSOR;

The rights of Lessor hereunder may be assigned, either in whole or in part, and the provisions hereof shall extend to and be binding upon the parties hereto and their respective successors, assigns and legal representatives; provided however, that no change or division in the ownership of the lands covered hereby, delay rentals, royalties or other payments to accrue or become payable to LESSOR hereunder, however accomplished, shall operate to enlarge the obligations or diminish the rights of LESSEE, and no change or division of such ownership shall be binding on LESSEE until thirty (30) days after LESSEE shall have been furnished with a duly certified copy of the recorded instrument or instruments evidencing same.

11.2     RIGHTS OF LESSEE:

Notwithstanding anything to the contrary indicated herein, the rights of LESSEE hereunder may not be assigned in whole or in part, except by transfer or exchange of stock, merger, consolidation or reorganization without LESSOR's written consent, it being understood that for purposes of this subparagraph, LESSOR's written

6

consent may be given by any officer of said corporation and that such consent will not be unreasonably withheld. In the event such consent is requested and given, it shall not be construed as a waiver of LESSOR's right to approve any and all subsequent assignments thereafter.

12.   NOTICE OF NONCOMPLIANCE

In the event LESSOR considers that operations are not at any time being conducted in compliance with this Lease, LESSOR shall notify LESSEE in writing of the facts relied upon as constituting a breach of any obligation arising hereunder, and LESSEE, if in default, shall have sixty (60) days after receipt of such notice within which to comply with and satisfy any such obligation.

13.   CONSENT TO POOL

LESSEE shall have the right as to all or any part of the Leased Premises, without LESSOR's joinder, to combine the leasehold estate and LESSOR's royalty estate created by this Lease with any other lease or leases or lands, whether owned by LESSEE or some other person, partnership, firm, corporation or joint venture group, so as to create, by the combination of such leases, one or more operating or production units, provided that no single operating unit may embrace more than one hundred sixty (160) acres per oil well (plus 10% tolerance to allow for irregular sections) or six hundred forty (640) acres per gas well (plus 10% tolerance to allow for irregular sections), or such other amount authorized and required by the appropriate state agency having jurisdiction thereof, whichever said amount is the lesser. In the event any such unit is created hereunder by LESSEE, LESSOR agrees to accept and shall receive out of the production from any such unit the royalties described in Paragraph 3 hereof, said royalties to be proportionately reduced and to be paid only on the percentage of production that the number of acres pooled from the Leased Premises bears to the total number of acres included within the respective unit. The commencement or reworking of a well or the completion of a well to production (and production from such well) on any portion of a unit on which all or any part of the land described herein is embraced shall have the same effect under the terms of this Lease as if a well were commenced, reworked, completed, or producing on the herein Leased Premises.

14.   SEVERANCE OF LEASEHOLD ACREAGE

14.1     Notwithstanding anything to the contrary herein contained (except for the provision of Section 5 above), drilling or reworking operations on a pooled unit or units established as provided herein or by governmental authority shall maintain this Lease in force only as to the portion of the Leased Premises included in such unit or units, subject to further limitations set forth below. The Lease may be maintained as to the remainder of the Leased Premises in any manner specified herein, including Section 5, above, and this paragraph shall not limit the ability of the Lessee to maintain this lease as to all property covered hereby by conducting continuous operations in accordance with Section 5, above.

14.2     It is hereby understood by and agreed between the LESSOR and LESSEE that in the event this Lease should lapse and terminate either through the operation of 1) this Paragraph 14,  2) Paragraph 3 hereof dealing with the payment and delivery of royalties and shut-in royalties on production of oil and gas established hereunder, 3) Paragraph 4 hereof concerning the payment and delivery of delay rentals, 4)  Paragraph 5 hereof dealing with the perpetuation of this Lease through continuous operations, or 5) any other applicable provisions herein, LESSEE shall nevertheless be entitled to retain, subject to all of the express and implied covenants of this Lease, sufficient acreage around each well producing oil or gas in paying quantities, as defined herein, from the Leased Premises, or from any part thereof included in a pooled unit, so as to constitute a maximum producing unit pursuant to the applicable field rule or rules of statewide coverage, such acreage to be designated by Lessee as nearly as practicable in the form of a square, or in such shape as then existing spacing rules require.

14.2.1     Once this Lease has expired except as to any retained producing units, the Lease shall remain in force and effect as to each such retained producing unit only as to all depths equal to or above one hundred (100) feet below the deepest depth of any well completed on the Leased Premises or lands pooled therewith and productive of oil and/or gas, and only for so long as there is production therefrom in paying quantities, or for so long as drilling or reworking operations are conducted on each such unit.

14.2.2     LESSEE shall be obligated to survey any and all retained producing units established pursuant to this subparagraph 14.2, and to file for record in the county and state wherein the Leased Premises are located a release or releases of all nonproductive acreage or depths not retained hereunder or thereafter terminating due to cessation of production. Upon written request from LESSOR, LESSEE shall furnish to LESSOR copies of all surveys and releases made and executed hereunder.

14.2.3     Should LESSOR own or otherwise control or hereafter acquire the ownership or control of the surface of the Leased Premises, LESSEE shall be entitled to receive from LESSOR such easements on, over and across said lands as shall be necessary to conduct operations on the acreage retained hereby.

15.   WARRANTY OF TITLE

15.1     This lease is given without warranty of any kind, either expressed or implied, but with full substitution and subrogation in and to all of the rights and actions that LESSOR now has or may hereafter acquire.

15.2   PROPORTIONATE REDUCTION:

If LESSOR owns less than the full fee simple title to the substances which this Lease purports to cover, then the royalties and payments provided for in Paragraph 3 hereof, the delay rentals provided for in Paragraph 4 hereof, and any and all other payments and benefits to accrue, become payable or inure to the benefit of LESSOR under the terms and provisions of this Lease shall be reduced in proportion that LESSOR's interest bears to the whole and undivided fee simple estate therein.

7

16.    GENERAL PROVISIONS

      16.1    LESSOR hereby expressly covenants and agrees not to withhold, fail, or refuse unreasonably to give or grant its written consent whenever such consent shall be called for or required pursuant to any term or provision of this Lease.  Financial responsibility and operational staffing are deemed reasonable inquires as to proposed assignees.

      16.2    LESSEE further agrees that it will indemnify and hold LESSOR harmless against any and all loss, damage, liability, cost or expense, including any claims, fines, penalties and reasonable attorneys' fees, on account of injuries to or death of persons or damage to property of any kind, arising out of or resulting from any operation hereunder; and in the event of any suit or other proceeding against LESSOR on account thereof, LESSEE shall, at LESSOR's request, appear and defend same and LESSEE shall  pay  any assessment, judgment or settlement which may be rendered or given against LESSOR therein.  This paragraph shall not apply where LESSOR is negligent or involved in willful misconduct notwithstanding anything to the contrary, it is not intended that **SKLAR EXPLORATION COMPANY, L.L.C.** indemnify LESSOR's for the negligent acts of LESSOR's servants or employees or for willful misconduct.

17.    ADDRESSES

      Any and all notices and/or requests required pursuant to the terms of this Lease, whether such notices and/or requests be of a general or specific nature, shall be mailed or otherwise delivered to the parties hereto at their respective business addresses listed below:

|  | With copy to: |  |
|---|---|---|
| CEDAR CREEK LAND & TIMBER, INC, | PAUL D. OWENS, JR. | SKLAR EXPLORATION CO., LLC |
| (214 Deer Street - zip 36426) | (315 Belleville Ave.) | 401 Edwards St., Ste 1601 |
| P. O. BOX 1769 | P. O. Box 1229 | Shreveport, LA  71101 |
| Brewton, AL  36427 | Brewton, AL  36427 |  |

18.    GENERAL DEFINITIONS

      A.    PAYING QUANTITIES:  The phrase "paying quantities"  as, when and wherever it appears in this Lease, is hereby defined as that quantum of production which will return a profit, regardless of how small, above, over or beyond producing, transporting, treating and marketing costs and expenses such as and including all direct and reasonable administrative, supervisory and overhead charges, all at the field, but not the district level, actually and fairly attributable, allocable or apportionable to such production; all labor, and all minor  repairs to and maintenance of, physical facilities and equipment actually  used and actually and fairly attributable, allocable or apportionable to such production, including actual, but not book, depreciation on all salvable equipment;  all costs and expenses incurred and actually paid in connection with or resulting from all reworking and other operations designed to increase or restore production; all milling, treating, transporting and marketing costs and expenses incurred and actually paid; all ad valorem and other taxes assessed and actually paid; and all other such costs and expenses directly ,fairly and actually attributable, allocable or apportionable to such production but not to the drilling and completion of wells as such.

      B.    DEVELOPMENT and/or PROTECTION WELLS:  Insofar as the express and implied covenants of this Lease are concerned, "development" and "protection" wells are hereby defined as wells which a reasonably prudent operator, acting under the same or similar circumstances as LESSEE may face hereunder, 1) would drill with reasonable expectations or prospects of completing as producers which would be likely to return a reasonable profit above, over and beyond drilling, completing,  producing, marketing, treating and transporting costs, or 2) should drill pursuant to the express covenants set forth in Paragraph 9 hereof.

      C.    EXPLORATORY WELLS:  Insofar as the express and implied covenants of this Lease are concerned, "exploratory" wells are hereby defined as wells which a reasonably prudent operator, acting under the same or similar circumstances as LESSEE may face hereunder, would drill for the purpose of fully exploring the Leased Premises, and every prospectively productive formation therein and thereunder, but not necessarily with expectations or prospects of completing as producers which would be likely to return a reasonable profit above,  over and beyond drilling, completing, producing, marketing, treating and transporting costs.

      D.    BARTER, CONTRIBUTE, DISPOSE,EXCHANGE, SELL, SEVER, SWAP, OR USE:    The words or terms "barter", "contribute", "dispose", "exchange", "sell", "sever", "swap" or "use", as, when and wherever they appear in this Lease, are hereby defined as a barter, contribution, disposition, exchange, sale, severance, swap or use, with LESSOR's written consent as the same shall be required herein, made in good faith, at arm's length, and with the best interests of both  the LESSOR and LESSEE in mind and at heart .

      E.    JUSTIFY:    The word or term "justify" as, when and wherever it appears in any Paragraph or subparagraph of this Lease, is hereby defined as that which is just, right, reasonable and warranted from an economic point of view.

      F.    DRILLING OR REWORKING OPERATIONS:   Insofar as Paragraphs 5 and 14 of this Lease are concerned, the phrase "drilling or reworking operations" is hereby defined as the spudding in and actual drilling of an oil or gas well reasonably and with due diligence, and all work as operations designed to secure, restore or improve production through some use of a hole previously drilled, including, but not limited to, mechanical or chemical treatment of any horizon, deepening to test deeper strata, and plugging back to test shallower strata.

      G.    COMMENCEMENT:  The word "commencement", as it is used and referred to specifically in Paragraph 5 hereof and generally in any other provision of this Lease, shall be defined as the actual spudding in of a well.

H.     COMPLETION:   The word "completion" as it is used and referred to specifically in Paragraph 5 hereof and  generally in any other provision of this Lease, shall be defined as the actual operation of installing on the well in question valves, meters, gauges and other controls collectively referred to as the "christmas tree".

I.     MARKET VALUE:   Insofar as Paragraph 3 of this Lease is concerned, the term "market value" shall be defined  as the applicable price determined under one of the following standards applicable to the sale of any gas produced hereunder:

(1)     Where such gas is sold on the Lease or in the field where produced by LESSEE at an arms-length transaction, the price received by LESSEE under the terms of any gas purchase contract for gas produced and sold from the Leased Premises by LESSEE.

(2)     Where such gas is not sold on the lease or from the field where produced by LESSEE in an arms-length transaction the average of the three highest prices paid under contracts entered into not more than one year previous to the date of first production of gas of the same or similar quality and content produced and sold from wells within the county and state wherein the Leased Premises are situated when gas is sold from a well or wells on the Leased Premises.  Said average to be determined on a semi-annual basis by LESSOR who shall submit the contractual information relied upon to LESSEE.  Failure to determine said average and submit said contractual information to LESSEE semi-annually shall be an acceptance of the price received by LESSEE as a market value price for the succeeding six-month period.

IN WITNESS WHEREOF,  the parties hereto have executed and accepted this instrument on the day and date hereinabove first written, in the presence of the undersigned, competent witnesses.

LESSOR

CEDAR CREEK LAND & TIMBER, INC.

ATTEST:

_____
RUSSELL SMITH

By:    PAUL D. OWENS, JR.

LESSEE

SKLAR EXPLORATION COMPANY, L.L.C.

By:
DAVID A. BARLOW

CORPORATE  ACKNOWLEDGEMENT

STATE OF ALABAMA                    )

COUNTY OF ESCAMBIA                    )

I,  ___Deborah Arrington___ , a Notary Public in and for the State and County aforesaid, hereby certify that Paul D. Owens, Jr. and Russell Smith, whose names as President and Assistant Secretary, respectively of CEDAR CREEK LAND & TIMBER, INC., an Alabama Corporation, are signed to the foregoing instrument and who are known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument, they, as such officers and with full authority, executed the same voluntarily for and as the act of the said Corporation.

Given under my hand and official seal on this the  11th  day of June 2012.

_____
NOTARY PUBLIC
My commission expires:

03-11-2014

9

ACKNOWLEDGEMENT

STATE OF *Alabama*                )

COUNTY OF *Escambia*            )

I, *W. Cameron Dorsey*, a Notary Public in and for the State and County aforesaid, hereby certify that *David Barlow*, whose name as *President*, of SKLAR EXPLORATION COMPANY, L.L.C., a Louisiana Limited Liability Company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument and with full authority executed the same voluntarily for and as the act of the said Company.

Given under my hand and official seal on this the *13th* day of *June*, 2012.

NOTARY PUBLIC

My commission expires:

*June 14th, 2014*

## EXHIBIT "A"

Attached to and made a part of that certain **OIL, GAS AND MINERAL LEASE** between CEDAR CREEK LAND & TIMBER, INC. and SKLAR EXPLORATION COMPANY, LLC, with an effective date of _June 14_, 2012.

All mineral interest owned by Lessor in Conecuh County, Alabama, described as follows:

**TOWNSHIP 4 NORTH, RANGE 10 EAST**
Section 24:     E/2 of SE/4, **LESS and EXCEPT** seven (7) acres in W/2 of NE/4 of SE/4
73 acres, more or less

Section 25:     N/2 of NE/4 of NE/4
21 acres, more or less

**TOWNSHIP 4 NORTH, RANGE 11 EAST**
Section 13:     All
640 acres, more or less

Section 19:     S/2; SW/4 of NE/4; NE/4 of NW/4
397 acres, more or less

Section 20:     NW/4 of SW/4
40 acres, more or less

Section 21:     N/2 of N/2; SE/4 of NW/4; SW/4 of NE/4; S/2 of NE/4 of SE/4; S/2 of SW/4 of SW/4
276 acres, more or less

Section 22:     N/2 of NW/4; eight (8) acres in portion of NW/4 of NW/4 of NE/4; NE/4 of SW/4
125 acres, more or less

Section 23:     All, **LESS and EXCEPT** the SW/4 of SW/4 and **LESS and EXCEPT** a portion in NW/4 of N/W/4, also **LESS and EXCEPT** a parcel in the SE corner of the SE/4 of the SE/4, and **LESS and EXCEPT** a parcel lying on the South line of the section in the SW/4 of SE/4.
590 acres, more or less

Section 24:     N/2
320 acres, more or less

Section 25:     S/2, **LESS and EXCEPT** a parcel situated on the Eastern line of the Section in the NE/4 of SE/4, lying just North of County Rd. 6
315 acres, more or less

Section 29:     N/2 of NW/4, **LESS and EXCEPT** 5 acs. in the NE/4 of NE/4 of NW/4; NW/4 of NE/4 NW/4 of SE/4 of NW/4; SW/4, **LESS and EXCEPT** N/2 of NE/4 of SE/4. W/2 of SE/4; E/2 of NE/4; NE/4 of SE/4; E/2 of SW/4 of NE1/4
481 acres, more or less

Section 30:     NW/4 of NE/4; NE/4 of NW/4; S/2 of SE/4 of SE/4
100 acres, more or less

**TOWNSHIP 4 NORTH, RANGE 12 EAST**
Section 7:     All, **LESS and EXCEPT** W/2 of NW/4
560 acres, more or less

Section 8:     E/2; N/2 of NW/4; SE/4 of NW/4; SE/4 of SW/4
484 acres, more or less

Section 16:     N/2
306.5 acres, more or less

Section 17:     All, **LESS and EXCEPT** N/2 of SE/4, and **LESS and EXCEPT** portion in S/2 of NE/4 of NE/4
540 acres, more or less

Section 18:     All, **LESS and EXCEPT** SE/4 of NE/4; **LESS and EXCEPT** SW/4 of SE/4
563 acres, more or less

Section 19     NW/4; NE/4; SW/4
480 acres, more or less

Containing **6,311.50** net mineral acres more or less.

**It is the intent to include all net mineral acreage as described within the respective quarter sections herein.**

SIGNED FOR IDENTIFICATION BY LESSOR:              SIGNED FOR IDENTIFICATION BY LESSEE:

**CEDAR CREEK LAND & TIMBER, INC.**              **SKLAR EXPLORATION COMPANY, LLC**

By: _____              By: _____

11

**EXHIBIT "B-2"**

Attached to and made a part of that certain
Shipps Creek Prospect Participation Agreement dated effective as of June 1, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd.,
The Rudman Partnership, Tara Rudman, JJS Working interests LLC, Fant Energy Limited,
Pickens Financial Group, LLC, Fleet Howell, Tauber Exploration & Production Co.,
Tiembo, Ltd., Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC,
Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C.
and Resource Ventures, LLC,

**COPY OF CCL&T LEASE COVERING LANDS LOCATED IN CONECUH COUNTY, AL**
**(Attached)**

## OIL, GAS AND MINERAL LEASE

STATE OF ALABAMA

COUNTY OF ESCAMBIA

THIS AGREEMENT, to be effective this 14 day of June, 2012, between **CEDAR CREEK LAND & TIMBER, INC.** (hereinafter referred to as "LESSOR") of Post Office Box 1769, Brewton, Alabama 36427, and **SKLAR EXPLORATION COMPANY, L.L.C.** (hereinafter referred to as "LESSEE") of 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101.

### W I T N E S S E T H:

1. **LEASE CONSIDERATION**

LESSOR, in consideration of Ten and No/100 Dollars ($10.00), in hand paid, of the royalties and other benefits herein provided, and of the agreements of LESSEE herein contained, but subject to the further terms hereof, hereby GRANTS, LEASES AND LETS exclusively unto LESSEE for the purpose of investigating, exploring, prospecting and drilling for and producing oil and gas, the lands (hereinafter referred to as the "Leased Premises"), described in and on Exhibit "A", attached hereto and identified as such, which said Exhibit as so attached and identified, is incorporated herein by reference and made a part hereof for a more particular description of said land. For the purpose of calculating and determining the amount of any money payment hereunder, and for all other pertinent purposes of this Lease the land therein described is hereby estimated, and shall be regarded and treated as actually comprising and containing **18,941.4** net acres, whether it be more or less, and in the event of a partial assignment or surrender hereof or hereunder, the assigned or surrendered portion or portions shall be deemed to contain the number of acres estimated realistically in such instrument or assignment or surrender. The term "oil and gas" as used in this Lease shall mean oil, gas, casinghead gas, distillate, gas condensate and the by-products thereof, and such other hydrocarbon substances and sulphur as are necessarily produced with and incidental to the production of oil and gas. LESSOR hereby reserves and excepts from this Lease and the rights granted hereunder any and all coal, lignite, uranium and other fissionable materials, geothermal energy, base and precious metals, rock, stone, limestone, sand, gravel and other similar aggregates, and clay, and retains unto itself and other subsequent or concurrent lessees of interests therein the right to explore for and produce such reserved minerals.

2. **TERM**

Subject to the preservation provisions of subsection 3.4.1 and Section 5 hereof, this lease shall be for a term of **three (3) years** from this date (called "primary term") and for so long thereafter as oil or gas is produced in paying quantities from the Leased Premises or, this Lease is otherwise maintained in force and effect under the terms hereof, provided, however, that, if during the primary term hereof, Lessee conducts 3-D seismic operations on or with respect to all or a portion of the Leased Premises, then as to any portion of the Leased Premises covered by or included in such seismic operations, the primary term of this lease shall be **four (4) years** rather than 3 years as stated above. Any such seismic operations shall be deemed to cover and include all of that portion of the Leased Premises that is included in any Quarter Section of land that has a seismic shot point or receiver located in it. Upon completion of its 3-D seismic operations, Lessee shall provide Lessor with a map showing the location of all shot points and receivers and with a description of the portion of the Leased Premises as to which the primary term has been extended to four (4) years, and Lessee may record an instrument identifying the portion of the Leased Premises as to which the primary term has been extended to four (4) years if so desires.

3. **RESERVATION OF ROYALTIES**

3.1     LESSOR hereby reserves, and LESSEE hereby agrees to pay or deliver to LESSOR, the following royalties on account of the oil and gas produced from the Leased Premises in accordance with, but subject to, all subsequent subsections hereof:

3.1.1     **AS TO OIL:**

**25%** of all oil, condensate and/or other liquid hydrocarbons, produced and saved from the Leased Premises, or from a unit embracing all or a portion thereof, the same to be delivered, free of cost, at the mouth of the well, or, at LESSOR's option, to the credit of Lessor into the pipe line or lines to which LESSEE may connect its wells; provided, however, that LESSEE may purchase LESSOR's oil, condensate and/or other liquid hydrocarbons by paying to LESSOR the average posted market price of such royalty share then in effect for such oil, condensate and/or other liquid hydrocarbons at the wells as of the day such substances are run to the pipe line or storage tank.

3.1.2     **AS TO GAS:**

**25%** of the market value, hereinafter defined, of all gas and casinghead gas produced and saved from the Leased Premises, or from a unit embracing all or a portion thereof.

3.1.3     ROYALTY PERCENTAGE ESCALATION:

The "25%" royalty percentage specified in subsections 3.1.1 and 3.1.2 above shall be increased to "30%" on a unit by unit basis as follows: As to production allocated to the portion of the Leased Premises included within a production unit established by the State Oil and Gas Board of Alabama, the royalty fraction stated above shall be increased to 30% for oil and gas produced from the well (or wells) on said unit commencing in the month during which the total cumulative production of oil from said well (or wells) on said production unit equals 50,000 barrels. Percentage escalation applies only to production after the threshold is reached.

3.2     LESSOR specifically reserves hereby the right to take in kind or separately dispose of its proportionate royalty share of all oil and/or gas produced from the Leased Premises, or from a unit embracing all or a

1

portion thereof, and, in the event such an election is made, shall be required to pay only for the proportionate share of such part of LESSEE's surface facilities which it uses.

3.3     PAYMENT AND DELIVERY OF LESSOR'S ROYALTIES:

3.3.1     Any and all royalties due and owing to LESSOR in accordance herewith shall be payable or deliverable to LESSOR no later than 60 days after the end of the calendar month within which oil and/or gas production is sold; provided however, that the acceptance of any such royalty by LESSOR shall never be taken or construed as a waiver of any of LESSOR's rights or remedies for breach by LESSEE, its successors or assigns, of any express or implied covenant of this Lease.

3.3.2     Any payment of any royalty after the date specified in subparagraph 3.3.1 above shall bear interest from and after its respective due date until payment in full is received by LESSOR, said interest factor to be equivalent to the prime rate, as the same shall be set from time to time by the BankTrust of Mobile, Alabama (or any successor to said bank).  Furthermore, if LESSEE should fail to pay any royalty or royalties payable hereunder when the same shall become due, LESSOR shall have the specific right and option to terminate this Lease forthwith for such non-payment if such royalties due and payable to LESSOR are not delivered to the said LESSOR on or before the expiration of sixty (60) days after LESSEE receives written notice from LESSOR of LESSEE's failure to pay all royalties when due.

3.3.3     All royalties payable to LESSOR under the terms and provisions of subparagraph 3.1 hereof are payable and shall be paid in cash or by check delivered or mailed to LESSOR at its principal place of business in Brewton, Escambia County, Alabama, or at such other address as LESSOR may designate.

3.3.4     In the event LESSOR should elect to take in kind its royalty on any one or more substances covered by this Lease, LESSOR may exercise such option at any time and from time to time upon 60 days written notice to LESSEE, in which event LESSEE shall deliver same, free of cost other than as provided in 3.2 to LESSOR, to and into LESSOR's pipe lines, tanks or other storage or transportation facilities until 60 days after receipt of written notice that LESSOR has revoked such option and has elected to receive any such royalty interest or share in cash or by check payable at its designated address as hereinabove provided.  Except to the extent to which LESSOR may have exercised its option to take one or more of its royalty interest or share in kind, as herein provided, LESSEE may, subject to all pertinent provisions of this Section 3 of this Lease, barter, contribute, dispose of, exchange, sell swap or use any one or more of said substances covered by this Lease, but shall account to LESSOR therefore to the extent and in the manner hereinabove provided.

3.4     MONETARY SUBSTITUTES FOR ACTUAL PRODUCTION

3.4.1.     Shut-In Royalty on Suspended Production

(a)     While there is a well on the Leased Premises capable of producing gas in paying quantities, as said phrase is hereinafter defined, but the production there from is shut-in, shut down, or suspended for any reason, then and in any such event, LESSEE shall pay royalty on or before ninety (90) days after the date on which (1) production from any such well is shut-in, shut down or suspended, or (2) this Lease is no longer maintained by compliance with one of the other preservation provisions, hereof, (whichever is the later date, and thereafter at annual intervals during the primary term, a sum and amount equal to One Dollar ($1.00) multiplied by the number of acres then covered by this Lease), and after the expiration of the primary term, a sum and amount equal to Twenty Five Dollars ($25.00) multiplied by the number of acres then covered by this Lease, and, if such payments are made, this Lease shall not terminate, but, on the contrary, will continue in full force and it will be considered that a substance covered by this Lease is being produced from the Leased Premises in paying quantities within the meaning of each pertinent provision of this Lease, it being understood and agreed that such payments shall only apply to the geologic strata capable of producing gas in paying quantities.

(b)     The provisions of subparagraph 3.4.1(a) shall not apply to oil wells, as the same may be classified by the State Oil and Gas Board of Alabama, by the Florida Department of Natural Resources or by its Bureau of Geology, and this Lease shall not be kept in force solely by the payment of any shut-in royalty payment on any such well.

(c)     After the primary term hereof, this Lease may not be kept in force solely by the payment of shut-in royalties hereunder for more than a period of two (2) consecutive years after the date of the first payment of any shut-in royalty hereunder.

3.4.2     Take or Pay Product Purchase Contracts

(a)     No "take or pay" products purchase contract shall be finally consummated or valid as to any substance covered hereby and produced from the Leased Premises without LESSOR's written consent.

(b)     All royalties hereunder applicable to gas, casinghead gas, or any other gaseous hydrocarbon covered by this Lease shall be due and payable to LESSOR for any such gas paid for but not taken pursuant to any "take or pay" provision of any pertinent gas purchase contract covering the Leased Premises, any part thereof, and/or any well or wells thereon, but LESSOR agrees to be responsible and liable for its proportionate share of any payments that may be recoverable by the gas purchaser by later takes of gas or refunds of money.  In the event gas is taken in kind as recoupment of take or pay payments, that gas shall be exempt from any royalties.

2

3.5     LESSEE shall not conduct underground storage operations without the written consent of LESSOR.

3.6     LESSEE shall not use nuclear or other blasts to create artificial conduits, chimneys or reservoirs without the written consent of LESSOR, and if such consent is given, LESSEE shall not use such artificial conduits, chimneys or reservoirs without the additional written consent of LESSOR.

3.7     All pertinent subparagraphs of this Paragraph 3 of this Lease shall apply to and govern the delivery in kind as royalty, or the payment of royalties on all such elements, natural products, by-products, residues or residuals produced from, or allocable to the Leased Premises, under the terms of, or as a result of, revised, permanent or temporary pooling, spacing or unitizing orders or rules issued by the State Oil and Gas Board of Alabama.

3.8     FREE FUEL AND WATER

    3.8.1     Free Water

LESSEE shall have free use of any and all subsurface water during any primary operations conducted hereunder.

    3.8.2     Free Fuel

LESSEE shall have free use, during any primary operations conducted hereunder, of any and all fuel or other substances covered by this Lease and produced from the Leased Premises, and the royalties thereon due and payable to LESSOR shall be computed after deducting any amount of any such substance so used.

    3.8.3     For the purposes of this subparagraph 3.8, primary operations shall include the production of oil and gas and all operations associated therewith during such time as oil and gas, or either of them, are produced from a unit embracing all or a portion of the Leased Premises with the sole use of natural reservoir energy.  Primary operations shall not include secondary recovery, pressure maintenance, or other operations related thereto.

3.9     Any and all royalties due and payable to LESSOR pursuant to this Paragraph shall be so paid to LESSOR, or to the credit of LESSOR, free of any and all exploration, development, production, treatment, gathering, marketing, or other related costs, excepting any taxes which may be applicable to such royalties.

4.     DELAY RENTALS          THIS IS A PAID-UP LEASE. NO DELAY RENTAL IS DUE.

4.1     The cash down payment or bonus given for the execution of this Lease constitutes a part of the consideration hereof according to its terms and shall not be allocated as mere rental for a period.

5.     CONTINUOUS OPERATIONS

5.1     If, prior to the discovery and production of any substance covered by this Lease on or from the Leased Premises or from a unit embracing any portion thereof, LESSEE should drill a dry hole or holes thereon, or, if after discovery and production of any such substances covered by this Lease, the production thereof should cease for any reason, this Lease shall not terminate if LESSEE commences operations for drilling or reworking within ninety (90) days thereafter or pays shut-in royalty as provided by 3.4.1.

5.2     If upon or after the expiration of the primary term of this Lease, no substance covered hereby is being produced from the Leased Premises or lands pooled therewith in paying  quantities, as said phrase is hereafter defined, but LESSEE is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within ninety (90) days prior to the end of the primary term, this Lease may be continued in force if, within ninety (90) days from and after the completion of the preceding well, or the cessation of operations therein if it is dry and unproductive, LESSEE commences or causes to be commenced 1) drilling operations on an additional well on some part or portion of  the Leased Premises lying outside of any previously established  drilling or production allowable unit or 2) reworking operations on any  well previously drilled and completed on the Leased  Premises or on a unit containing all or any portion thereof.  After having so commenced the drilling or reworking  operations described above, LESSEE  may perpetuate the term of this Lease through drilling or reworking operations or the completion or abandonment of additional wells, with no more than ninety (90) consecutive days elapsing between the completion or abandonment of one such additional well and the commencement of drilling or reworking operations for another well on another unit or tract until the entire Leased Premises has been developed to the density, degree and extent permitted by any applicable statewide or field rules, or until at least one oil or gas well has been drilled and completed or abandoned under each such unit or units that may be established within the Leased Premises; provided additionally, that if any of the foregoing drilling or reworking operations result in paying production of any substance covered by this Lease, then this Lease shall remain in force as to the productive unit or units, subject to the further provisions hereof, for so long thereafter as any such substance is produced from the Leased Premises or from land pooled therewith in paying quantities, as that phrase is defined hereinafter.

6.     FORCE MAJEURE

6.1     Should LESSEE be prevented from complying with any express or implied covenant of this Lease, from conducting drilling, reworking or marketing operations, or from producing or marketing the substances covered by this Lease, by operation of force majeure, war, rebellion, devastating fires or floods, orders, rules or regulations of State or Federal governmental authority, or by other such other acts or events beyond the control or LESSEE, then while so prevented,  LESSEE's obligation to comply with such covenant shall be suspended, LESSEE  shall not be liable in damages for failure to comply therewith, and this Lease shall be extended while and so long as LESSEE is prevented by any such cause from conducting drilling, reworking, or marketing operations on or from producing oil and/or gas from the Leased Premises; provided, however, that neither force majeure nor any other cause similar or

3

dissimilar to those described hereinabove shall confer upon LESSEE the right to extend this Lease for more than a period of twelve (12) months.

      6.2      Notwithstanding anything to the contrary contained in subparagraph 6.1 above, LESSEE shall not be excused, through the operation of the foregoing force majeure provisions, from making of all proper and timely payments of delay rentals, royalties, shut-in royalties or all other payments required pursuant to the terms of this Lease.

7.      <u>USE, DAMAGES TO, AND RESTORATION OF THE LEASED PREMISES</u>

    7.1      <u>USE OF THE SURFACE OF THE LEASED PREMISES</u>

      Subject to the further terms and provisions hereof, LESSEE shall have and is hereby given access to and use of so much of the surface of the Leased Premises as is reasonably necessary to conduct all activities and operations authorized, permitted and required by the terms of this Lease which do not unduly or unreasonably hamper, interfere with or restrict LESSOR's communicating, cultivating, farming, fishing, grazing, harvesting, hunting, logging, lumbering, milling, planting, seeding, transporting, trapping or other related or non-related activities and operations therein and thereon, it being the intention of the parties hereto to create and recognize between them reciprocal rights and complimentary estates. To this end, it is expressly AGREED, UNDERSTOOD, and hereby STIPULATED that:

      7.1.1      <u>LESSEE COVENANTS AND AGREES:</u>

      (a)      Not to use any more of the surface of the Leased Premises as is reasonably necessary to conduct all operations authorized, permitted and required by this Lease and specifically not to locate any well, treatment plant, flow line, gathering line, pipe line or other such facility closer than 330 feet from any house, cabin, shed, barn, silo, storage bin, feeding trough, or other structure located on the Leased Premises;

      (b)      Not to grant to any third party or parties any easement for any pipeline unassociated with the transportation of oil and gas produced from the Leased Premises or from a unit embracing all or a portion thereof, any water line, transmission line, or other burden on the Leased Premises;

      (c)      Not to fish, hunt or carry or use fishing gear or firearms onto the Leased Premises and to make every reasonable effort, by specific instructions, warnings, warning signs, or otherwise, to prevent its agents, executives, employees and personnel, or those furnishing material, supplies, physical equipment or third party services from fishing, hunting or carrying or using fishing gear or firearms on the Leased Premises; and

      (d)      Not to cultivate, farm, graze livestock, harvest, log, lumber, mill, plant, seed, or conduct or engage in such other activities and operations similar or dissimilar in nature to those mentioned herein and not contemplated by the terms of this Lease.

      7.1.2      <u>LESSOR COVENANTS AND AGREES:</u>

      (a)      To maintain all fences and gates in good state of repair, and when and where it becomes absolutely necessary to cut or otherwise remove LESSOR's fences, to install adequate gates and cattleguards; and

      (b)      To exercise all of its rights, privileges, powers and immunities, and to conduct its usual and customary activities and operations on the Leased Premises in a manner such that it will not unduly or unreasonably hamper, interfere with or restrict any operation or activity authorized, permitted or required by this Lease; and

      (c)      To insure that any of its licensees, guests, invitees or subsequent lessees conduct their activities and operations so as not to hamper, interfere with or restrict unduly or unreasonably any operation or activity authorized, permitted or required by this Lease.

    7.2      <u>DAMAGES TO THE SURFACE OF THE LEASED PREMISES:</u>

<u>LESSEE COVENANTS AND AGREES:</u>

      (a)      To consult with and obtain the written release and consent of LESSOR before selecting or clearing sites for wells, pits, drainage ditches, receptacles, shafts, or locating, constructing or installing tank batteries, field-type separation devices, treating or processing mills or plants, laying pipe lines, gathering lines or flow lines, surveying and drilling shot holes for seismic surveys, or building roads, bridges or culverts on the Leased Premises; and, when requested by LESSOR, to bury all pipe lines, gathering lines and flow lines below plow depth or the depth to and at which LESSOR's timber or other seedlings are normally planted, whichever is deeper;

      (b)      To conduct all seismic and other surveys in a manner so as not to damage LESSOR's water wells, tanks or reservoirs, and to conduct all operations so as not to permit any deleterious substance to collect, escape, pollute, run, seep, spread, stand or come in contact with or damage LESSOR'S blinds, boat docks, cattle, crops, fish, or other aquatic life, hunting or fishing camps or lodges, lakes, land, livestock, logs, lumber, logging and lumbering camps, mills, roads or tramways, ponds, reservoirs, seedlings, springs, streams, tanks, timber, trees, vegetation, water wells, wildlife or any other things of value on, in, over or under the Leased Premises; and

      (c)      To respond to and pay damages, based on replacement cost, cost of repairs, or such other assessment to which LESSOR may agree, for the damage to, loss of, or diminution or depreciation

<div align="center">4</div>

of the beneficial use or value of any house, cabin, shed, barn, silo, storage bin, fence, crop, timber, lumber, vehicles, feeding trough or other thing of value lost, damaged or destroyed as a result of or through the conduct of any activity or operation authorized, permitted or required by this Lease or by any activity of LESSEE, its agents, employees or representatives, which amounts to a breach of any covenant hereof. This paragraph shall not apply where Lessor is negligent or involved in willful misconduct notwithstanding anything to the contrary, it is not intended that **Sklar Exploration Company, L.L.C.** indemnify LESSOR for the negligent acts of LESSOR's servants or employees or for willful misconduct.

### 7.3    RESTORATION OF THE SURFACE OF THE LEASED PREMISES

LESSEE hereby covenants and agrees to maintain and/or restore the surface of the Leased Premises, immediately after the particular surface area of the said Leased Premises has served its purpose, in and to as near as practicable its natural state before operations and activities began hereunder. To this end, it is expressly AGREED, UNDERSTOOD, and hereby STIPULATED that LESSEE covenants and agrees:

(a)      To dispose of all drilling mud, chemicals, tailings, waste, debris, and all other deleterious substances and/or materials in a lawful manner as approved by the State of Alabama or any other governing body;

(b)      To properly and promptly fill, roll, tamp and cover all pits and sumps after each pit and sump has served its particular purpose;

(c)      To close, securely seal and properly plug any and all wells drilled and abandoned hereunder;

(d)      To clean up and generally repair the site used for any well, pit, receptacle, shaft, tank, plant, or other physical facility;

(e)      To dispose of all saline solutions, saltwater, waste oil, and all other obnoxious and/or deleterious substances by removing them from the Leased Premises or through the use of authorized injection wells for disposal purposes; and

(f)      To take all other reasonable steps to maintain and preserve the Leased Premises in a clean and orderly manner.

### 8.    REMOVAL OF FIXTURES FROM AND TITLE TO ABANDONED WELLS

### 8.1    REMOVAL OF AND TITLE TO FIXTURES:

Subject to the further terms and provisions hereof, LESSEE shall have and is hereby given and granted the right to remove all property, physical equipment, facilities and fixtures placed on, in and under the Leased Premises by LESSEE within one hundred eighty (180) days after the expiration of this Lease, or, if the termination of this Lease or any portion thereof is in controversy, within one hundred eighty (180) days after final determination of such controversy, but not thereafter, it being understood and agreed that all wells, receptacles, shafts, tanks, well holes or bores, and any and all such property, physical equipment, facilities and fixtures remaining in, on or under the Leased Premises, including casing and other downhole equipment left in any such wells, upon and after the expiration of said 180 day period, shall then and thereupon become the property of LESSOR.

### 8.2    WATER WELLS:

LESSOR shall have and is hereby given and granted the option, at its election, of taking over and thereafter owning and operating any well initially drilled as or later converted to a water well and equipped as such by LESSEE, including all physical facilities and equipment placed by LESSEE therein, thereon, or used by LESSEE in connection therewith, which said well or wells LESSEE may at any time or from time to time elect to abandon by paying to LESSEE the reasonable salvage value of all such salvable physical facilities and equipment as of the date of abandonment by LESSEE; provided however, that as is provided in subparagraph 8.1 above, LESSOR shall nevertheless become the owner of all such water wells located on the Leased Premises and of the equipment therein, thereon or used in connection therewith upon the expiration of the said 180 day period.

### 8.3    TITLE MATTERS:

Insofar as it may be necessary to fully effectuate all provisions of this Paragraph 8, all apt words of grant, bargain, sale, conveyance, transfer and delivery are incorporated herein by reference and made a part of this said Paragraph 8 for all pertinent purposes.

### 9.    ADDITIONAL EXPRESS COVENANTS

By the acceptance of this Lease, and as a substantial part of the consideration therefore, LESSEE hereby expressly COVENANTS and AGREES:

9.1      After the discovery of oil or gas in paying quantities on said premises, LESSEE shall develop the acreage hereunder as a reasonably prudent operator. In the event a well or wells producing oil or gas in paying quantities should be brought in on other land in the vicinity of and draining the Leased Premises or acreage pooled therewith, LESSEE agrees to drill such offset well as a reasonably prudent operator would drill under the same or similar circumstances. Such offset well or wells shall be commenced within ninety (90) days after commencement of production in paying quantities from the well being offset:

9.2      To produce, gather, process, preserve, save, store, take care of, treat, transport and market said production, products, by-products, residues, residuals and tailing, and to conduct all such producing, gathering,

5

processing, preserving, saving, storing, caring of, treating, transporting and marketing activities and operations at the time, with the rapidity, at the rate, and in the manner and to the extent that a reasonably prudent operator, acting under the same or similar circumstances, and with the best interests of both the LESSOR and LESSEE in mind and at heart, should or would so conduct such activities and operations;

9.3     To conduct pressure maintenance, or secondary recovery operations, or both, if the characteristics of the particular reservoir are such that, from sound engineering and economical standpoints, and with the best interests of both LESSOR and LESSEE in mind and at heart a reasonably prudent operator would or should conduct one or both such operations;

9.4     To market with due diligence and in good faith all oil and gas produced from a well or wells completed on the Leased Premises, or on a unit or units embracing any part thereof, which is not utilized by LESSEE pursuant to subparagraph 3.8 hereof;

9.5     To build, construct or install and to maintain and operate a mill or mills, or plant or plants, or with LESSOR's written consent, to enter contracts, in good faith and at arm's length, with independent processors, for the purpose of absorbing, assimilating, blending, compounding, concentrating, cycling, deriving, extracting, milling, processing, recovering, refining, saving, treating or upgrading all oil and gas initially produced from the Leased Premises, or from lands pooled therewith if such oil and gas, or either of them, are of such quality and in such quantity as to justify the building, constructing, installing, maintaining and operating of such a mill or plant by a reasonably prudent operator or processor, or to justify such a reasonably prudent operator entering into such contracts with independent processors;

9.6     To install, maintain and operate one or more field-type device or devices such as but not limited to Bradenheads and separators, for the purpose of extracting, recovering or saving one or more elements of the oil and gas produced from the Leased Premises, or from lands pooled therewith, such as and including casinghead gas, distillate, gas condensate and natural gasoline if such oil and gas, or either of them initially produced from the said Leased Premises, or from land pooled therewith, are not of such quality or are not in such quantity as to justify plant processing;

9.7     To enter into contracts, in good faith and at arm's length, for the sale, at or near the wells, or elsewhere, of such products and substances, covered hereby and produced from the Leased Premises, or from lands pooled therewith, which are not of such quality or are not in such quantity as to justify the installation and operation of field-type devices described in subparagraph 9.6 above;

9.8     To furnish promptly to LESSOR, upon written request at its principal office and place of business in Brewton, Escambia County, Alabama, or at such other address as LESSOR may designate in writing:

(a)     Copies, duplicates or reproductions of all location plats, applications for and permits to drill, daily drilling reports on and in connection with all wells drilled on the Leased Premises or lands pooled therewith; copies of all pipe perforation and well completion records; and copies of all reports and forms required by or filed with the State Oil and Gas Board of Alabama, and all other such regulatory bodies, state and federal, having jurisdiction;

(b)     Copies and duplicates or reproductions of all logs or surveys, drillers, electrical or otherwise, of all wells drilled on the Leased Premises or lands pooled therewith; all surveys and similar data, all coring data and core analysis reports, core analyses, core records, reports or results of drill stem or other tests, and all other data and information obtained in connection with or as a result of the exploration, development, operation and protection of the Leased Premises;

Each and all of the foregoing covenants to be construed as those running with and touching and concerning this Lease and with the acreage constituting the Leased Premises.

10.     RIGHTS OF LESSOR

LESSOR, acting by and through its corporate officers, executives, agents or duly authorized representatives, shall have and is hereby given and granted immediate access to and the absolute right, at its own risk, cost and expense, at any time and from time to time, to:

10.1     Observe, from the well site, derrick floor, drilling platform, or from any other vantage point, all drilling, completing, logging, surveying, producing, reworking, plugging and all other such or similar activities or operations conducted on the Leased Premises by LESSEE, its agents, employees, independent contractors, or by those furnishing third party services. Access to drilling rig and location may be denied in the event a life-threatening situation exists;

10.2     Make annual audits or LESSEE's accounts, contracts, books and records, at its own expense and at any reasonable time, for the purpose of ascertaining the amount of the production, sales and cost of manufacturing and extracting of any and all substances covered by this agreement. Each such audit shall cover the period intervening since the last audit, and LESSOR shall have one (1) year next following the close of the calendar year in which said audit is made within which to present to and assert against LESSEE any and all claims or demands against LESSEE that may be disclosed by or result from said audit.

11.     ASSIGNMENT OF RIGHTS HEREUNDER

11.1     RIGHTS OF LESSOR:

The rights of Lessor hereunder may be assigned, either in whole or in part, and the provisions hereof shall extend to and be binding upon the parties hereto and their respective successors, assigns and legal representatives; provided however, that no change or division in the ownership of the lands covered hereby, delay rentals, royalties or other payments to accrue or become payable to LESSOR hereunder, however accomplished, shall operate to enlarge the obligations or diminish the rights of LESSEE, and no change or division of such ownership

6

shall be binding on LESSEE until thirty (30) days after LESSEE shall have been furnished with a duly certified copy of the recorded instrument or instruments evidencing same.

### 11.2   RIGHTS OF LESSEE:

Notwithstanding anything to the contrary indicated herein, the rights of LESSEE hereunder may not be assigned in whole or in part, except by transfer or exchange of stock, merger, consolidation or reorganization without LESSOR's written consent, it being understood that for purposes of this subparagraph, LESSOR's written consent may be given by any officer of said corporation and that such consent will not be unreasonably withheld.  In the event such consent is requested and given, it shall not be construed as a waiver of LESSOR's right to approve any and all subsequent assignments thereafter.

### 12.   NOTICE OF NONCOMPLIANCE

In the event LESSOR considers that operations are not at any time being conducted in compliance with this Lease, LESSOR shall notify LESSEE in writing of the facts relied upon as constituting a breach of any obligation arising hereunder, and LESSEE, if in default, shall have sixty (60) days after receipt of such notice within which to comply with and satisfy any such obligation.

### 13.   CONSENT TO POOL

LESSEE shall have the right as to all or any part of the Leased Premises, without LESSOR's joinder, to combine the leasehold estate and LESSOR's royalty estate created by this Lease with any other lease or leases or lands, whether owned by LESSEE or some other person, partnership, firm, corporation or joint venture group, so as to create, by the combination of such leases, one or more operating or production units, provided that no single operating unit may embrace more than one hundred sixty (160) acres per oil well (plus 10% tolerance to allow for irregular sections) or six hundred forty (640) acres per gas well (plus 10% tolerance to allow for irregular sections), or such other amount authorized and required by the appropriate state agency having jurisdiction thereof, whichever said amount is the lesser.  In the event any such unit is created hereunder by LESSEE, LESSOR agrees to accept and shall receive out of the production from any such unit the royalties described in Paragraph 3 hereof, said royalties to be proportionately reduced and to be paid only on the percentage of production that the number of acres pooled from the Leased Premises bears to the total number of acres included within the respective unit.  The commencement or reworking of a well or the completion of a well to production (and production from such well) on any portion of a unit on which all or any part of the land described herein is embraced shall have the same effect under the terms of this Lease as if a well were commenced, reworked, completed, or producing on the herein Leased Premises.

### 14.   SEVERANCE OF LEASEHOLD ACREAGE

14.1   Notwithstanding anything to the contrary herein contained (except for the provision of Section 5 above), drilling or reworking operations on a pooled unit or units established as provided herein or by governmental authority shall maintain this Lease in force only as to the portion of the Leased Premises included in such unit or units, subject to further limitations set forth below.  The Lease may be maintained as to the remainder of the Leased Premises in any manner specified herein, including Section 5, above, and this paragraph shall not limit the ability of the Lessee to maintain this lease as to all property covered hereby by conducting continuous operations in accordance with Section 5, above.

14.2   It is hereby understood by and agreed between the LESSOR and LESSEE that in the event this Lease should lapse and terminate either through the operation of 1) this Paragraph 14, 2) Paragraph 3 hereof dealing with the payment and delivery of royalties and shut-in royalties on production of oil and gas established hereunder, 3) Paragraph 4 hereof concerning the payment and delivery of delay rentals, 4)  Paragraph 5 hereof dealing with the perpetuation of this Lease through continuous operations, or 5) any other applicable provisions herein, LESSEE shall nevertheless be entitled to retain, subject to all of the express and implied covenants of this Lease, sufficient acreage around each well producing oil or gas in paying quantities, as defined herein, from the Leased Premises, or from any part thereof included in a pooled unit, so as to constitute a maximum producing unit pursuant to the applicable field rule or rules of statewide coverage, such acreage to be designated by Lessee as nearly as practicable in the form of a square, or in such shape as then existing spacing rules require.

14.2.1   Once this Lease has expired except as to any retained producing units, the Lease shall remain in force and effect as to each such retained producing unit only as to all depths equal to or above one hundred (100) feet below the deepest depth of any well completed on the Leased Premises or lands pooled therewith and productive of oil and/or gas, and only for so long as there is production therefrom in paying quantities, or for so long as drilling or reworking operations are conducted on each such unit.

14.2.2   LESSEE shall be obligated to survey any and all retained producing units established pursuant to this subparagraph 14.2, and to file for record in the county and state wherein the Leased Premises are located a release or releases of all nonproductive acreage or depths not retained hereunder or thereafter terminating due to cessation of production.  Upon written request from LESSOR, LESSEE shall furnish to LESSOR copies of all surveys and releases made and executed hereunder.

14.2.3   Should LESSOR own or otherwise control or hereafter acquire the ownership or control of the surface of the Leased Premises, LESSEE shall be entitled to receive from LESSOR such easements on, over and across said lands as shall be necessary to conduct operations on the acreage retained hereby.

### 15.   WARRANTY OF TITLE

15.1   This lease is given without warranty of any kind, either expressed or implied, but with full substitution and subrogation in and to all of the rights and actions that LESSOR now has or may hereafter acquire.

7

15.2   PROPORTIONATE REDUCTION:

If LESSOR owns less than the full fee simple title to the substances which this Lease purports to cover, then the royalties and payments provided for in Paragraph 3 hereof, the delay rentals provided for in Paragraph 4 hereof, and any and all other payments and benefits to accrue, become payable or inure to the benefit of LESSOR under the terms and provisions of this Lease shall be reduced in proportion that LESSOR's interest bears to the whole and undivided fee simple estate therein.

16.   GENERAL PROVISIONS

16.1   LESSOR hereby expressly covenants and agrees not to withhold, fail, or refuse unreasonably to give or grant its written consent whenever such consent shall be called for or required pursuant to any term or provision of this Lease. Financial responsibility and operational staffing are deemed reasonable inquires as to proposed assignees.

16.2   LESSEE further agrees that it will indemnify and hold LESSOR harmless against any and all loss, damage, liability, cost or expense, including any claims, fines, penalties and reasonable attorneys' fees, on account of injuries to or death of persons or damage to property of any kind, arising out of or resulting from any operation hereunder; and in the event of any suit or other proceeding against LESSOR on account thereof, LESSEE shall, at LESSOR's request, appear and defend same and LESSEE shall pay any assessment, judgment or settlement which may be rendered or given against LESSOR therein. This paragraph shall not apply where LESSOR is negligent or involved in willful misconduct notwithstanding anything to the contrary, it is not intended that **SKLAR EXPLORATION COMPANY, L.L.C.** indemnify LESSOR's for the negligent acts of LESSOR's servants or employees or for willful misconduct.

17.   ADDRESSES

Any and all notices and/or requests required pursuant to the terms of this Lease, whether such notices and/or requests be of a general or specific nature, shall be mailed or otherwise delivered to the parties hereto at their respective business addresses listed below:

|  | With copy to: |  |
|---|---|---|
| CEDAR CREEK LAND & TIMBER, INC, | PAUL D. OWENS, JR. | SKLAR EXPLORATION CO., LLC |
| (214 Deer Street - zip 36426) | (315 Belleville Ave.) | 401 Edwards St., Ste 1601 |
| P. O. BOX 1769 | P. O. Box 1229 | Shreveport, LA  71101 |
| Brewton, AL  36427 | Brewton, AL  36427 |  |

18.   GENERAL DEFINITIONS

A.   PAYING QUANTITIES: The phrase "paying quantities" as, when and wherever it appears in this Lease, is hereby defined as that quantum of production which will return a profit, regardless of how small, above, over or beyond producing, transporting, treating and marketing costs and expenses such as and including all direct and reasonable administrative, supervisory and overhead charges, all at the field, but not the district level, actually and fairly attributable, allocable or apportionable to such production; all labor, and all minor repairs to and maintenance of, physical facilities and equipment actually used and actually and fairly attributable, allocable or apportionable to such production, including actual, but not book, depreciation on all salvable equipment; all costs and expenses incurred and actually paid in connection with or resulting from all reworking and other operations designed to increase or restore production; all milling, treating, transporting and marketing costs and expenses incurred and actually paid; all ad valorem and other taxes assessed and actually paid; and all other such costs and expenses directly ,fairly and actually attributable, allocable or apportionable to such production but not to the drilling and completion of wells as such.

B.   DEVELOPMENT and/or PROTECTION WELLS: Insofar as the express and implied covenants of this Lease are concerned, "development" and "protection" wells are hereby defined as wells which a reasonably prudent operator, acting under the same or similar circumstances as LESSEE may face hereunder, 1) would drill with reasonable expectations or prospects of completing as producers which would be likely to return a reasonable profit above, over and beyond drilling, completing, producing, marketing, treating and transporting costs, or 2) should drill pursuant to the express covenants set forth in Paragraph 9 hereof.

C.   EXPLORATORY WELLS: Insofar as the express and implied covenants of this Lease are concerned, "exploratory" wells are hereby defined as wells which a reasonably prudent operator, acting under the same or similar circumstances as LESSEE may face hereunder, would drill for the purpose of fully exploring the Leased Premises, and every prospectively productive formation therein and thereunder, but not necessarily with expectations or prospects of completing as producers which would be likely to return a reasonable profit above, over and beyond drilling, completing, producing, marketing, treating and transporting costs.

D.   BARTER, CONTRIBUTE, DISPOSE,EXCHANGE, SELL, SEVER, SWAP, OR USE: The words or terms "barter", "contribute", "dispose", "exchange", "sell", "sever", "swap" or "use", as, when and wherever they appear in this Lease, are hereby defined as a barter, contribution, disposition, exchange, sale, severance, swap or use, with LESSOR's written consent as the same shall be required herein, made in good faith, at arm's length, and with the best interests of both  the LESSOR and LESSEE in mind and at heart .

E.   JUSTIFY: The word or term "justify" as, when and wherever it appears in any Paragraph or subparagraph of this Lease, is hereby defined as that which is just, right, reasonable and warranted from an economic point of view.

F.   DRILLING OR REWORKING OPERATIONS: Insofar as Paragraphs 5 and 14 of this Lease are concerned, the phrase "drilling or reworking operations" is hereby defined as the spudding in and actual drilling of an oil or gas well reasonably and with due diligence, and all work as operations designed to secure, restore or improve

8

production through some use of a hole previously drilled, including, but not limited to, mechanical or chemical treatment of any horizon, deepening to test deeper strata, and plugging back to test shallower strata.

G.  COMMENCEMENT:  The word "commencement", as it is used and referred to specifically in Paragraph 5 hereof and generally in any other provision of this Lease, shall be defined as the actual spudding in of a well.

H.  COMPLETION:  The word "completion" as it is used and referred to specifically in Paragraph 5 hereof and generally in any other provision of this Lease, shall be defined as the actual operation of installing on the well in question valves, meters, gauges and other controls collectively referred to as the "christmas tree".

I.  MARKET VALUE:  Insofar as Paragraph 3 of this Lease is concerned, the term "market value" shall be defined as the applicable price determined under one of the following standards applicable to the sale of any gas produced hereunder:

(1)  Where such gas is sold on the Lease or in the field where produced by LESSEE at an arms-length transaction, the price received by LESSEE under the terms of any gas purchase contract for gas produced and sold from the Leased Premises by LESSEE.

(2)  Where such gas is not sold on the lease or from the field where produced by LESSEE in an arms-length transaction the average of the three highest prices paid under contracts entered into not more than one year previous to the date of first production of gas of the same or similar quality and content produced and sold from wells within the county and state wherein the Leased Premises are situated when gas is sold from a well or wells on the Leased Premises.  Said average to be determined on a semi-annual basis by LESSOR who shall submit the contractual information relied upon to LESSEE.  Failure to determine said average and submit said contractual information to LESSEE semi-annually shall be an acceptance of the price received by LESSEE as a market value price for the succeeding six-month period.

IN WITNESS WHEREOF, the parties hereto have executed and accepted this instrument on the day and date hereinabove first written, in the presence of the undersigned, competent witnesses.

LESSOR

**CEDAR CREEK LAND & TIMBER, INC.**

ATTEST:

_Russell Smith_
RUSSELL SMITH

By:  PAUL D. OWENS, JR.

LESSEE

**SKLAR EXPLORATION COMPANY, L.L.C.**

By: DAVID A. BARLOW

CORPORATE ACKNOWLEDGEMENT

STATE OF ALABAMA  )

COUNTY OF ESCAMBIA  )

I, _Deborah Harrington_, a Notary Public in and for the State and County aforesaid, hereby certify that Paul D. Owens, Jr. and Russell Smith, whose names as President and Assistant Secretary, respectively of CEDAR CREEK LAND & TIMBER, INC., an Alabama Corporation, are signed to the foregoing instrument and who are known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument, they, as such officers and with full authority, executed the same voluntarily for and as the act of the said Corporation.

Given under my hand and official seal on this the _11th_ day of _June_, 2012.

NOTARY PUBLIC
My commission expires:
_03-11-2014_

9

ACKNOWLEDGEMENT

STATE OF *ALABAMA*          )

COUNTY OF *ESCAMBIA*          )

I, *W. CAMERON DORSEY*, a Notary Public in and for the State and County aforesaid, hereby certify that *DAVID BARLOW*, whose name as *PRESIDENT*, of SKLAR EXPLORATION COMPANY, L.L.C., a Louisiana Limited Liability Company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument and with full authority executed the same voluntarily for and as the act of the said Company.

Given under my hand and official seal on this the *13th* day of *June*, 2012.

NOTARY PUBLIC

My commission expires:

*June 14, 2014*

10

<u>EXHIBIT "A"</u>

Attached to and made a part of that certain <u>OIL, GAS AND MINERAL LEASE</u> between **CEDAR CREEK LAND & TIMBER, INC.** and **SKLAR EXPLORATION COMPANY, LLC**, with an effective date of _June 14_ , 2012.

All mineral interest owned by Lessor in Escambia County, Alabama, described as follows:

**TOWNSHIP 3 NORTH, RANGE 10 EAST**

| | |
|---|---|
| Section 1: | All, **LESS and EXCEPT** the NW1/4 of NW1/4<br>601.2 acres, more or less |
| Section 2: | SE/4 of SE/4; S/2 of NE/4 of SE/4; N/2 of NE/4 of SE/4 all lying East of Railroad; SE/4 of NE/4 all lying East of Railroad<br>86.5 acres, more or less |
| Section 11: | All E/2, lying East of Railroad; SW/4 of SE/4, lying West of Railroad; E/2 of SE/4 of SW/4; NE/4 of NE/4, lying West of Railroad.<br>235 acres, more or less |
| Section 12: | All<br>634.4 acres, more or less |
| Section 13: | All<br>642.1 acres, more or less |
| Section 14: | E/2; E/2 of SE/4 of SW/4; NW/4 of NW/4 of SW1/4; SW/4 of SW/4 of NW/4; NE/4 of NE/4 of NW/4<br>366.3 acres, more or less |
| Section 23: | E/2; W/2, **LESS and EXCEPT** SW/4 of SW/4 of SW/4;<br>639.6 acres, more or less |
| Section 24: | N/2; NW/4 of SW/4; N/2 of SE/4<br>454.8 acres, more or less |
| Section 25: | All<br>636.7 acres, more or less |
| Section 26: | NE/4 of NE/4; SE/4 of SE/4<br>78.8 acres, more or less |
| Section 35: | NW/4; NE/4; SE/4, all lying East of Railroad<br>404.9 acres, more or less |
| Section 36: | S/2 of SW/4; NW/4 of SW/4; 10.2 acres in the S/2 of NE/4 of SW/4; SW/4 of SE/4, **LESS and EXCEPT** Portion of N/2 of SW/4 of SE/4; E/2 of NE/4 of NE/4; SE/4 of NE/4<br>216.4 acres, more or less |

**TOWNSHIP 3 NORTH, RANGE 11 EAST**

| | |
|---|---|
| Section 2: | E/2 of E/2, **LESS and EXCEPT** the N/2 of NE/4 of NE/4; W/2 of W/2, **LESS and EXCEPT** the N/2 of NW/4 of NW/4<br>282.1 acres, more or less |
| Section 3: | All, **LESS and EXCEPT** the NE/4 of NE/4<br>588.1 acres, more or less |
| Section 4: | SW/4; NE/4 of NE/4<br>202.1 acres, more or less |
| Section 5: | All<br>633.1 acres, more or less |
| Section 6: | All<br>639.1 acres, more or less |
| Section 7: | All<br>633.2 acres, more or less |
| Section 8: | All<br>630.1 acres, more or less |
| Section 9: | All<br>643.4 acres, more or less |
| Section 10: | All<br>622.9 acres, more or less |
| Section 11: | All<br>634.2 acres, more or less |

11

Section 12:       All
                  635.4 acres, more or less

Section 13:       NW/4
                  160 acres, more or less

Section 18:       All
                  639.4 acres, more or less

Section 19:       All
                  631.9 acres, more or less

Section 25:       S/2
                  319.25 acres, more or less

Section 26:       S/2
                  319.25 acres, more or less

Section 27:       S/2
                  319.8 acres, more or less

Section 28:       S/2
                  322.1 acres, more or less

Section 29:       All
                  652.6 acres, more or less

Section 30:       All, less and except W/2 of SW/4
                  568 acres, more or less

Section 31:       All
                  644.5 acres, more or less

Section 32:       All
                  655.1 acres, more or less

Section 33:       All
                  644.7 acres, more or less

Section 34:       All
                  639.9 acres, more or less

Section 35:       All
                  639.7 acres, more or less

Section 36:       All
                  644.8 acres, more or less

Containing **18,941.4** net mineral acres more or less.

**It is the intent to include all net mineral acreage as described within the respective quarter sections herein.**

SIGNED FOR IDENTIFICATION BY LESSOR:          SIGNED FOR IDENTIFICATION BY LESSEE:

**CEDAR CREEK LAND & TIMBER, INC.**          **SKLAR EXPLORATION COMPANY, LLC**

By: _____                By: _____

12

## EXHIBIT "B-3"

Attached to and made a part of that certain
Shipps Creek Prospect Participation Agreement dated effective as of June 1, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd.,
The Rudman Partnership, Tara Rudman, JJS Working interests LLC, Fant Energy Limited,
Pickens Financial Group, LLC, Fleet Howell, Tauber Exploration & Production Co.,
Tiembo, Ltd., Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC,
Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C.
and Resource Ventures, LLC,


## FORM OF CONSENT TO ASSIGN FOR ESCAMBIA COUNTY LEASE


COUNTY OF ESCAMBIA

STATE OF ALABAMA

Whereas, Cedar Creek Land & Timber, Inc., ("Lessor), granted unto Sklar Exploration Company L.L.C., ("Lessee") an Oil, Gas and Mineral Lease (the "Lease"), dated June 14, 2012, covering lands in Section 1-12, 18, 19, 25-36, Township 3 North, Range 11 East and Sections 1, 2, 11, 12, 13, 14, 23 and 24, Township 3 North, Range 10 East, Escambia County, Alabama.

Whereas, a memorandum of said lease has been or will shortly be  recorded in the real property records in the Probate Court of Escambia County, Alabama; and

Whereas, pursuant to the language contained in Paragraph 11.2 of said lease, Lessee may not assign said lease without the express written approval of Lessor.

Now, therefore, Lessee hereby requests that Lessor consent to and approve Lessee's assignment of the Lease to the following:

Sklarco L.L.C.
401 Edwards Street, Suite 1601
Shreveport, Louisiana 71101

Bundero Investment Company, L.L.C.
333 Texas Street, Ste. 300
Shreveport, LA 71101

Craft Exploration Company, L.L.C.
325 Lakeshire Parkway
Canton, MS 39046

Dickson Oil & Gas, LLC
P. O. Box 52479
Shreveport, LA  71135

Fant Energy Limited
5800 Westview Drive
Houston, Texas 77055

Fleet Howell
416 Travis Street, Suite 715
Shreveport, LA  71101

JJS Working Interests LLC
4295 San Felipe, Suite 207
Houston, Texas 77027

Kudzu Oil Properties, LLC
300 Concourse Blvd, Suite 101
Ridgeland, Mississippi 39157

Landmark Exploration, LLC
P.O. Box 12004
Jackson, MS 39236

Marksco, LLC
333 Texas Street, Ste. 1050
Shreveport, LA 71101

McCombs Energy, Ltd.
5599 San Felipe, Suite 1200
Houston, Texas 77056-2794

Pickens Financial Group, LLC
8499 Greenville Avenue, Suite 105
Dallas, Texas 75231-2417

Resource Ventures, LLC
8369 SouthPark Lane, Ste B
Littleton, CO 80120

The Rudman Partnership
1700 Pacific Avenue, Suite 4700
Dallas, Texas 75201-4670

Tara Rudman
1700 Pacific Avenue, Suite 4700
Dallas, Texas 75201-4670

Lessee acknowledges that by making such assignment, Lessee shall not be relieved of Lessee's obligations or liabilities under the Lease.

By its execution of this document, Lessor hereby consents to and approves the assignment by Lessee of the Lease or interests therein to the above named parties.

Sklar Exploration Company L.L.C.


_____

By:     David A. Barlow
        President and C.O.O

APPROVED this _____ day of _____, 2012


CEDAR CREEK LAND & TIMBER COMPANY, INC.


By_____
   As its _____

## FORM OF CONSENT TO ASSIGN FOR CONECUH COUNTY LEASE

COUNTY OF CONECUH

STATE OF ALABAMA

Whereas, Cedar Creek Land & Timber, Inc., ("Lessor), granted unto Sklar Exploration Company L.L.C., ("Lessee") an Oil, Gas and Mineral Lease (the "Lease"), dated June 14, 2012, covering lands in Sections 24 & 25, Township 4 North, Range 10 East, Sections 13, 19, 20, 23, 24, 29 & 30, Township 4 North, Range 11 East and Sections 7, 8 & 16-19 Conecuh County, Alabama;

Whereas, a memorandum of said lease has been or will shortly be recorded in the real property records in the Probate Court of Conecuh County, Alabama; and

Whereas, pursuant to the language contained in Paragraph 11.2 of said lease, Lessee may not assign said lease without the express written approval of Lessor.

Now, therefore, Lessee hereby requests that Lessor consent to and approve Lessee's assignment of the Lease to the following:

Sklarco L.L.C.
401 Edwards Street, Suite 1601
Shreveport, Louisiana 71101

Bundero Investment Company, L.L.C.
333 Texas Street, Ste. 300
Shreveport, LA 71101

Craft Exploration Company, L.L.C.
325 Lakeshire Parkway
Canton, MS 39046

Dickson Oil & Gas, LLC
P. O. Box 52479
Shreveport, LA 71135

Fant Energy Limited
5800 Westview Drive
Houston, Texas 77055

Fleet Howell
416 Travis Street, Suite 715
Shreveport, LA 71101

JJS Working Interests LLC
4295 San Felipe, Suite 207
Houston, Texas 77027

Kudzu Oil Properties, LLC
300 Concourse Blvd, Suite 101
Ridgeland, Mississippi 39157

Landmark Exploration, LLC
P.O. Box 12004
Jackson, MS 39236

Marksco, LLC
333 Texas Street, Ste. 1050
Shreveport, LA 71101

McCombs Energy, Ltd.
5599 San Felipe, Suite 1200
Houston, Texas 77056-2794

## EXHIBIT "C"

Attached to and made a part of that certain
Shipps Creek Prospect Participation Agreement dated effective as of June 1, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd.,
The Rudman Partnership, Tara Rudman, JJS Working interests LLC, Fant Energy Limited,
Pickens Financial Group, LLC, Fleet Howell, Tauber Exploration & Production Co.,
Tiembo, Ltd., Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC,
Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C.
and Resource Ventures, LLC,

## INVOICES

**Sklar Exploration Co., L.L.C.**
401 Edwards Street, Suite 1601
Shreveport, LA  71101
(318)227-8668

# Settlement Statement

Bundero Investment Company, L.L.C.
Robert P. Bowman, Manager
333 Texas Street
Suite 300
Shreveport, LA  71101

Account:  BUNI01

Date:  06/13/2012

**Account: BUNI01 - Statement of Account:**

| Date | Reference | Description | Charges | Credits |
|------|-----------|-------------|---------|---------|
| 05/31/2012 | | Balance Forward | 13,084.29 | |
| 06/13/2012 | | Previous Billing | 16,415.92 | |
| | | New Balance Forward | 29,500.21 | |

**Summary by LEASE:**

| Property# | Description | Expenses | You Owe |
|-----------|-------------|----------|---------|
| | Unpaid Previous Balance | | 29,500.21 |
| 1SHI01 | Shipps Creek Prospect | 50,471.40 | 50,471.40 |
| | **Totals:** | **50,471.40** | **79,971.61** |

PLEASE PAY THIS AMOUNT ----------------------^

From:   Sklar Exploration Co., L.L.C.
To:   Bundero Investment Company, L.L.C.

For Billing Dated 06/13/2012
Account: BUNI01   Page   2

**LEASE: (1SHI01)  Shipps Creek Prospect   County: ESCAMBIA, AL**

Expenses:

| Reference | Description | Deck/AFE | Invoice Amt | Total | Your Share |
|---|---|---|---|---|---|
| LHC | | | | | |
| *Lease Bonus* | | | | | |
| 1SHI01060412 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 1,262,300.00 | | |
| 1SHI01060412-1 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 3,784,840.00 | 5,047,140.00 | 50,471.40 |
| | Total LHC | | | 5,047,140.00 | 50,471.40 |

| LEASE Summary: | Wrk Int | | Expenses | You Owe |
|---|---|---|---|---|
| 1SHI01 | 0.01000000 | | 50,471.40 | 50,471.40 |

2

**Sklar Exploration Co., L.L.C.**
401 Edwards Street, Suite 1601
Shreveport, LA 71101
(318)227-8668

# *Settlement Statement*

Craft Exploration Company L.L.C.
325 Lakeshire Parkway
Canton, MS 39046

Account: CRAE01

Date: 06/13/2012

**Account: CRAE01 - Statement of Account:**

| Date | Reference | Description | Charges | Credits |
|------|-----------|-------------|---------|---------|
| 05/31/2012 | | Balance Forward | 68,704.96 | |
| 06/13/2012 | | Previous Billing | 16,415.92 | |
| | | New Balance Forward | 85,120.88 | |

**Summary by LEASE:**

| Property# | Description | Expenses | You Owe |
|-----------|-------------|----------|---------|
| | Unpaid Previous Balance | | 85,120.88 |
| 1SHI01 | Shipps Creek Prospect | 50,471.40 | 50,471.40 |
| | **Totals:** | **50,471.40** | **135,592.28** |

PLEASE PAY THIS AMOUNT ----------------------^

2

From:   Sklar Exploration Co., L.L.C.
To:   Craft Exploration Company L.L.C.

For Billing Dated 06/13/2012
Account: CRAE01   Page   2

**LEASE: (1SHI01) Shipps Creek Prospect   County: ESCAMBIA, AL**

**Expenses:**

| Reference | Description | Deck/AFE | Invoice Amt | Total | Your Share |
|---|---|---|---|---|---|
| LHC | | | | | |
| *Lease Bonus* | | | | | |
| 1SHI01060412 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 1,262,300.00 | | |
| 1SHI01060412-1 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 3,784,840.00 | 5,047,140.00 | 50,471.40 |
| | **Total LHC** | | | **5,047,140.00** | **50,471.40** |

| LEASE Summary: | Wrk Int | Expenses | You Owe |
|---|---|---|---|
| 1SHI01 | 0.01000000 | 50,471.40 | 50,471.40 |

2

**Sklar Exploration Co., L.L.C.**
401 Edwards Street, Suite 1601
Shreveport, LA  71101
(318)227-8668

# *Settlement Statement*

Dickson Oil & Gas, LLC
c/o C. Bickham Dickson, III, Manager
P.O. Box 52479
Shreveport, LA  71135

Account:  DICO01

Date:  06/13/2012

**Account: DICO01 - Statement of Account:**

| Date | Reference | Description | Charges | Credits |
|------|-----------|-------------|---------|---------|
| 05/31/2012 | | Balance Forward | 97,272.34 | |
| 06/13/2012 | | Previous Billing | 16,415.92 | |
| | | New Balance Forward | 113,688.26 | |

**Summary by LEASE:**

| Property# | Description | Expenses | You Owe |
|-----------|-------------|----------|---------|
| | Unpaid Previous Balance | | 113,688.26 |
| 1SHI01 | Shipps Creek Prospect | 50,471.40 | 50,471.40 |
| | **Totals:** | **50,471.40** | **164,159.66** |

**PLEASE PAY THIS AMOUNT ---------------------^**

2

From:   Sklar Exploration Co., L.L.C.
To:   Dickson Oil & Gas, LLC

For Billing Dated 06/13/2012
Account: DICO01   Page   2

## LEASE: (1SHI01)  Shipps Creek Prospect   County: ESCAMBIA, AL

**Expenses:**

| | Reference | Description | Deck/AFE | Invoice Amt | Total | Your Share |
|---|---|---|---|---|---|---|
| **LHC** | | | | | | |
| *Lease Bonus* | | | | | | |
| | 1SHI01060412 | Sklarco LLC– Cedar Creek L&T, Inc. | PC01 | 1,262,300.00 | | |
| | 1SHI01060412-1 | Sklarco LLC– Cedar Creek L&T, Inc. | PC01 | 3,784,840.00 | 5,047,140.00 | 50,471.40 |
| | **Total LHC** | | | | **5,047,140.00** | **50,471.40** |

| LEASE Summary: | Wrk Int | Expenses | You Owe |
|---|---|---|---|
| 1SHI01 | 0.01000000 | 50,471.40 | 50,471.40 |

2

**Sklar Exploration Co., L.L.C.**
401 Edwards Street, Suite 1601
Shreveport, LA  71101
(318)227-8668

# *Settlement Statement*

Fant Energy Limited
5800 Westview Drive
Houston, TX  77055

Account:  FANE01

Date:  06/13/2012

**Account: FANE01 - Statement of Account:**

| Date | Reference | Description | Charges | Credits |
|------|-----------|-------------|---------|---------|
| 05/31/2012 | | Balance Forward | 1,412,887.50 | |
| 06/13/2012 | | Previous Billing | 164,159.20 | |
| | | New Balance Forward | 1,577,046.70 | |

**Summary by LEASE:**

| Property# | Description | Expenses | You Owe |
|-----------|-------------|----------|---------|
| | Unpaid Previous Balance | | 1,577,046.70 |
| 1SHI01 | Shipps Creek Prospect | 504,714.00 | 504,714.00 |
| | **Totals:** | **504,714.00** | **2,081,760.70** |

**PLEASE PAY THIS AMOUNT ----------------------^**

2

From:   Sklar Exploration Co., L.L.C.
To:   Fant Energy Limited

For Billing Dated 06/13/2012
Account: FANE01   Page   2

### LEASE: (1SHI01) Shipps Creek Prospect   County: ESCAMBIA, AL

**Expenses:**

| Reference | Description | Deck/AFE | Invoice Amt | Total | Your Share |
|---|---|---|---|---|---|
| **LHC** | | | | | |
| *Lease Bonus* | | | | | |
| 1SHI01060412 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 1,262,300.00 | | |
| 1SHI01060412-1 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 3,784,840.00 | 5,047,140.00 | 504,714.00 |
| | **Total LHC** | | | **5,047,140.00** | **504,714.00** |

| LEASE Summary: | Wrk Int | Expenses | You Owe |
|---|---|---|---|
| 1SHI01 | 0.10000000 | 504,714.00 | 504,714.00 |

2

**Sklar Exploration Co., L.L.C.**
401 Edwards Street, Suite 1601
Shreveport, LA  71101
(318)227-8668

# *Settlement Statement*

Fleet Howell
416 Travis Street
Suite 715
Shreveport, LA  71101

Account:  HOWF01

Date:  06/13/2012

**Account: HOWF01 - Statement of Account:**

| Date | Reference | Description | Charges | Credits |
|------|-----------|-------------|---------|---------|
| 05/31/2012 | | Balance Forward | 404,803.69 | |
| 06/04/2012 | 4931 | Payment-Thank You! Ck# 34686 | | (77,350.00) |
| 06/04/2012 | 4931 | Partial Payment Ck# 34684 | | (351.87) |
| 06/04/2012 | 4931 | Partial Payment Ck# 34684 | | (61.50) |
| 06/04/2012 | 4931 | Payment-Thank You! Ck# 34681 | | (72,117.40) |
| 06/04/2012 | 4931 | Partial Payment Ck# 34684 | | (37.79) |
| 06/04/2012 | 4931 | Payment-Thank You! Ck# 34684 | | (52,516.40) |
| 06/04/2012 | 4931 | Payment-Thank You! Ck# 34688 | | (74,850.00) |
| 06/04/2012 | 4931 | Payment-Thank You! Ck# 34680 | | (63,354.88) |
| 06/13/2012 | | Previous Billing | 82,079.60 | |
| | | New Balance Forward | 146,243.45 | |

**Summary by LEASE:**

| Property# | Description | Expenses | You Owe |
|-----------|-------------|----------|---------|
| | Unpaid Previous Balance | | 146,243.45 |
| 1SHI01 | Shipps Creek Prospect | 252,357.00 | 252,357.00 |
| | Totals: | 252,357.00 | 398,600.45 |

PLEASE PAY THIS AMOUNT ----------------------^

2

From:   Sklar Exploration Co., L.L.C.
To:   Fleet Howell

For Billing Dated 06/13/2012
Account: HOWF01   Page   2

**LEASE: (1SHI01)  Shipps Creek Prospect   County: ESCAMBIA, AL**

Expenses:

| | Reference | Description | Deck/AFE | Invoice Amt | Total | Your Share |
|---|---|---|---|---|---|---|
| LHC | | | | | | |
| *Lease Bonus* | | | | | | |
| | 1SHI01060412 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 1,262,300.00 | | |
| | 1SHI01060412-1 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 3,784,840.00 | 5,047,140.00 | 252,357.00 |
| | **Total LHC** | | | | **5,047,140.00** | **252,357.00** |

| LEASE Summary: | Wrk Int | Expenses | You Owe |
|---|---|---|---|
| 1SHI01 | 0.05000000 | 252,357.00 | 252,357.00 |

2

**Sklar Exploration Co., L.L.C.**
401 Edwards Street, Suite 1601
Shreveport, LA  71101
(318)227-8668

# *Settlement Statement*

JJS Working Interests LLC
4295 San Felipe
Suite 207
Houston, TX  77027

Account:  JJSW01

Date:  06/13/2012

**Account: JJSW01 - Statement of Account:**

| Date | Reference | Description | Charges | Credits |
|------|-----------|-------------|---------|---------|
| 05/31/2012 | | Balance Forward | 774,248.38 | |
| 06/08/2012 | 4937 | Payment-Thank You! Ck# 3027 | | (686,098.33) |
| 06/13/2012 | | Previous Billing | 195,759.85 | |
| | | New Balance Forward | 283,909.90 | |

**Summary by LEASE:**

| Property# | Description | Expenses | You Owe |
|-----------|-------------|----------|---------|
| | Unpaid Previous Balance | | 283,909.90 |
| 1SHI01 | Shipps Creek Prospect | 504,714.00 | 504,714.00 |
| | **Totals:** | **504,714.00** | **788,623.90** |

PLEASE PAY THIS AMOUNT ----------------------^

2

From:   Sklar Exploration Co., L.L.C.
To:     JJS Working Interests LLC

For Billing Dated 06/13/2012
Account: JJSW01   Page   2

**LEASE: (1SHI01)  Shipps Creek Prospect   County: ESCAMBIA, AL**

Expenses:

| | Reference | Description | Deck/AFE | Invoice Amt | Total | Your Share |
|---|---|---|---|---|---|---|
| LHC | | | | | | |
| *Lease Bonus* | | | | | | |
| | 1SHI01060412 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 1,262,300.00 | | |
| | 1SHI01060412-1 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 3,784,840.00 | 5,047,140.00 | 504,714.00 |
| | **Total LHC** | | | | **5,047,140.00** | **504,714.00** |

| LEASE Summary: | Wrk Int | Expenses | You Owe |
|---|---|---|---|
| 1SHI01 | 0.10000000 | 504,714.00 | 504,714.00 |

2

**Sklar Exploration Co., L.L.C.**
401 Edwards Street, Suite 1601
Shreveport, LA  71101
(318)227-8668

# *Settlement Statement*

Kudzu Oil Properties, LLC
300 Concourse Blvd, Suite 101
Ridgeland, MS  39157

Account:  KUDO01

Date:  06/13/2012

**Account: KUDO01 - Statement of Account:**

| Date | Reference | Description | Charges | Credits |
|------|-----------|-------------|---------|---------|
| 05/31/2012 | | Balance Forward | 156,527.77 | |
| 06/13/2012 | | Previous Billing | 32,831.84 | |
| | | New Balance Forward | 189,359.61 | |

**Summary by LEASE:**

| Property# | Description | Expenses | You Owe |
|-----------|-------------|----------|---------|
| | Unpaid Previous Balance | | 189,359.61 |
| 1SHI01 | Shipps Creek Prospect | 100,942.80 | 100,942.80 |
| | **Totals:** | **100,942.80** | **290,302.41** |

**PLEASE PAY THIS AMOUNT ----------------------^**

2

**LEASE: (1SHI01)  Shipps Creek Prospect   County: ESCAMBIA, AL**

Expenses:

| Reference | Description | Deck/AFE | Invoice Amt | Total | Your Share |
|---|---|---|---|---|---|
| **LHC** | | | | | |
| *Lease Bonus* | | | | | |
| 1SHI01060412 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 1,262,300.00 | | |
| 1SHI01060412-1 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 3,784,840.00 | 5,047,140.00 | 100,942.80 |
| | **Total LHC** | | | **5,047,140.00** | **100,942.80** |

| LEASE Summary: | Wrk Int | Expenses | You Owe |
|---|---|---|---|
| 1SHI01 | 0.02000000 | 100,942.80 | 100,942.80 |

2

**Sklar Exploration Co., L.L.C.**
401 Edwards Street, Suite 1601
Shreveport, LA  71101
(318)227-8668

# *Settlement Statement*

Landmark Exploration, LLC
P.O. Box 12004
Jackson, MS  39236

Account:  LANE02

Date:  06/13/2012

**Account: LANE02 - Statement of Account:**

| Date | Reference | Description | Charges | Credits |
|------|-----------|-------------|---------|---------|
| 05/31/2012 | | Balance Forward | 126,137.38 | |
| 06/04/2012 | 4931 | Payment-Thank You! Ck# 1544 | | (115,068.90) |
| 06/13/2012 | | Previous Billing | 32,831.84 | |
| | | New Balance Forward | 43,900.32 | |

**Summary by LEASE:**

| Property# | Description | Expenses | You Owe |
|-----------|-------------|----------|---------|
| | Unpaid Previous Balance | | 43,900.32 |
| 1SHI01 | Shipps Creek Prospect | 100,942.80 | 100,942.80 |
| | **Totals:** | **100,942.80** | **144,843.12** |

**PLEASE PAY THIS AMOUNT -----------------------^**

2

From:   Sklar Exploration Co., L.L.C.
To:     Landmark Exploration, LLC

For Billing Dated 06/13/2012
Account: LANE02   Page   2

### LEASE: (1SHI01)  Shipps Creek Prospect   County: ESCAMBIA, AL

**Expenses:**

| | Reference | Description | Deck/AFE | Invoice Amt | Total | Your Share |
|---|---|---|---|---|---|---|
| **LHC** | | | | | | |
| *Lease Bonus* | | | | | | |
| | 1SHI01060412 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 1,262,300.00 | | |
| | 1SHI01060412-1 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 3,784,840.00 | 5,047,140.00 | 100,942.80 |
| | | **Total LHC** | | | **5,047,140.00** | **100,942.80** |

| LEASE Summary: | Wrk Int | Expenses | You Owe |
|---|---|---|---|
| 1SHI01 | 0.02000000 | 100,942.80 | 100,942.80 |

2

**Sklar Exploration Co., L.L.C.**
401 Edwards Street, Suite 1601
Shreveport, LA 71101
(318)227-8668

# *Settlement Statement*

Marksco, L.L.C.
Attn: Mark Sealy
333 Texas Street, Suite 1050
Shreveport, LA 71101

Account: MARK01

Date: 06/13/2012

**Account: MARK01 - Statement of Account:**

| Date | Reference | Description | Charges | Credits |
|------|-----------|-------------|---------|---------|
| 05/31/2012 | | Balance Forward | 251,544.97 | |
| 06/04/2012 | 4931 | Partial Payment Ck# 50436 | | (140.75) |
| 06/04/2012 | 4931 | Partial Payment Ck# 50436 | | (24.60) |
| 06/04/2012 | 4931 | Payment-Thank You! Ck# 50436 | | (29,745.43) |
| 06/04/2012 | 4931 | Partial Payment Ck# 50436 | | (15.12) |
| 06/11/2012 | 4941 | Payment-Thank You! Ck# 50048 | | (89,726.95) |
| 06/11/2012 | 4941 | Partial Payment Ck# 50048 | | (54,282.07) |
| 06/11/2012 | 4941 | Payment-Thank You! Ck# 50049 | | (25,712.50) |
| 06/11/2012 | 4941 | Partial Payment Ck# 50049 | | (26,280.00) |
| 06/13/2012 | | Previous Billing | 32,831.84 | |
| | | New Balance Forward | 58,449.39 | |

**Summary by LEASE:**

| Property# | Description | Expenses | You Owe |
|-----------|-------------|----------|---------|
| | Unpaid Previous Balance | | 58,449.39 |
| 1SHI01 | Shipps Creek Prospect | 100,942.80 | 100,942.80 |
| | Totals: | **100,942.80** | **159,392.19** |

**PLEASE PAY THIS AMOUNT ----------------------^**

2

From:   Sklar Exploration Co., L.L.C.
To:     Marksco, L.L.C.

For Billing Dated 06/13/2012
Account: MARK01    Page    2

**LEASE: (1SHI01) Shipps Creek Prospect    County: ESCAMBIA, AL**

Expenses:

| | Reference | Description | Deck/AFE | Invoice Amt | Total | Your Share |
|---|---|---|---|---|---|---|
| LHC | | | | | | |
| *Lease Bonus* | | | | | | |
| | 1SHI01060412 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 1,262,300.00 | | |
| | 1SHI01060412-1 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 3,784,840.00 | 5,047,140.00 | 100,942.80 |
| | **Total LHC** | | | | **5,047,140.00** | **100,942.80** |

| LEASE Summary: | Wrk Int | Expenses | You Owe |
|---|---|---|---|
| 1SHI01 | 0.02000000 | 100,942.80 | 100,942.80 |

2

**Sklar Exploration Co., L.L.C.**
401 Edwards Street, Suite 1601
Shreveport, LA  71101
(318)227-8668

# *Settlement Statement*

McCombs Energy, Ltd.
5599 San Felipe, Ste. 1200
Houston, TX  77056

Account:  MCCE01

Date:  06/13/2012

**Account: MCCE01 - Statement of Account:**

| Date | Reference | Description | Charges | Credits |
|------|-----------|-------------|---------|---------|
| 05/31/2012 | | Balance Forward | 2,738,546.46 | |
| 06/04/2012 | 4931 | Payment-Thank You! Ck# 29380 | | (892,522.85) |
| 06/13/2012 | | Previous Billing | 435,021.88 | |
| | | New Balance Forward | 2,281,045.49 | |

**Summary by LEASE:**

| Property# | Description | Expenses | You Owe |
|-----------|-------------|----------|---------|
| | Unpaid Previous Balance | | 2,281,045.49 |
| 1SHI01 | Shipps Creek Prospect | 1,337,492.10 | 1,337,492.10 |
| | **Totals:** | **1,337,492.10** | **3,618,537.59** |

**PLEASE PAY THIS AMOUNT -----------------------^**

2

From:   Sklar Exploration Co., L.L.C.
To:   McCombs Energy, Ltd.

For Billing Dated 06/13/2012
Account: MCCE01   Page   2

**LEASE: (1SHI01)  Shipps Creek Prospect   County: ESCAMBIA, AL**

Expenses:

| | Reference | Description | Deck/AFE | Invoice Amt | Total | Your Share |
|---|---|---|---|---|---|---|
| LHC | | | | | | |
| *Lease Bonus* | | | | | | |
| | 1SHI01060412 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 1,262,300.00 | | |
| | 1SHI01060412-1 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 3,784,840.00 | 5,047,140.00 | 1,337,492.10 |
| | **Total LHC** | | | | **5,047,140.00** | **1,337,492.10** |

| LEASE Summary: | Wrk Int | Expenses | You Owe |
|---|---|---|---|
| 1SHI01 | 0.26500000 | 1,337,492.10 | 1,337,492.10 |

2

**Sklar Exploration Co., L.L.C.**
401 Edwards Street, Suite 1601
Shreveport, LA  71101
(318)227-8668

# *Settlement Statement*

Pickens Financial Group, LLC
8499 Greenville Avenue, Suite 105
Dallas, TX  75231-2411

Account:  PICF01

Date:  06/13/2012

**Account: PICF01 - Statement of Account:**

| Date | Reference | Description | Charges | Credits |
|------|-----------|-------------|---------|---------|
| 05/31/2012 | | Balance Forward | 315,224.98 | |
| 06/01/2012 | 4930 | Partial Payment Ck# 32900 | | (71,665.54) |
| 06/01/2012 | 4930 | Partial Payment Ck# 32900 | | (76,850.00) |
| 06/01/2012 | 4930 | Partial Payment Ck# 32900 | | (74,350.00) |
| 06/01/2012 | 4930 | Payment-Thank You! Ck# 32900 | | (63,354.88) |
| 06/13/2012 | | Previous Billing | 82,079.60 | |
| | | New Balance Forward | 111,084.16 | |

**Summary by LEASE:**

| Property# | Description | Expenses | You Owe |
|-----------|-------------|----------|---------|
| | Unpaid Previous Balance | | 111,084.16 |
| 1SHI01 | Shipps Creek Prospect | 252,357.00 | 252,357.00 |
| | Totals: | 252,357.00 | 363,441.16 |

**PLEASE PAY THIS AMOUNT ----------------------^**

2

From:   Sklar Exploration Co., L.L.C.
To:   Pickens Financial Group, LLC

For Billing Dated 06/13/2012
Account: PICF01   Page   2

**LEASE: (1SHI01)  Shipps Creek Prospect   County: ESCAMBIA, AL**

Expenses:

| | Reference | Description | Deck/AFE | Invoice Amt | Total | Your Share |
|---|---|---|---|---|---|---|
| **LHC** | | | | | | |
| *Lease Bonus* | | | | | | |
| | 1SHI01060412 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 1,262,300.00 | | |
| | 1SHI01060412-1 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 3,784,840.00 | 5,047,140.00 | 252,357.00 |
| | | **Total LHC** | | | **5,047,140.00** | **252,357.00** |

| LEASE Summary: | Wrk Int | Expenses | You Owe |
|---|---|---|---|
| 1SHI01 | 0.05000000 | 252,357.00 | 252,357.00 |

2

**Sklar Exploration Co., L.L.C.**
401 Edwards Street, Suite 1601
Shreveport, LA  71101
(318)227-8668

# *Settlement Statement*

Resource Ventures, LLC
Attn: Mark A. Arnold
8369 SouthPark Lane
Suite B
Littleton, CO  80120

Account:  RESV01

Date:  06/13/2012

**Account: RESV01 - Statement of Account:**

| Date | Reference | Description | Charges | Credits |
|------|-----------|-------------|---------|---------|
| 05/31/2012 | | Balance Forward | 21,826.11 | |
| 06/13/2012 | | Previous Billing | 2,051.99 | |
| | | New Balance Forward | 23,878.10 | |

**Summary by LEASE:**

| Property# | Description | Expenses | You Owe |
|-----------|-------------|----------|---------|
| | Unpaid Previous Balance | | 23,878.10 |
| 1SHI01 | Shipps Creek Prospect | 6,308.93 | 6,308.93 |
| | Totals: | 6,308.93 | 30,187.03 |

PLEASE PAY THIS AMOUNT ----------------------^

2

From:  Sklar Exploration Co., L.L.C.
To:    Resource Ventures, LLC

For Billing Dated 06/13/2012
Account: RESV01   Page   2

### LEASE: (1SHI01) Shipps Creek Prospect   County: ESCAMBIA, AL

Expenses:

| Reference | Description | Deck/AFE | Invoice Amt | Total | Your Share |
|---|---|---|---|---|---|
| **LHC** | | | | | |
| *Lease Bonus* | | | | | |
| 1SHI01060412 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 1,262,300.00 | | |
| 1SHI01060412-1 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 3,784,840.00 | 5,047,140.00 | 6,308.93 |
| | **Total LHC** | | | **5,047,140.00** | **6,308.93** |

| LEASE Summary: | Wrk Int | Expenses | You Owe |
|---|---|---|---|
| 1SHI01 | 0.00125000 | 6,308.93 | 6,308.93 |

2

**Sklar Exploration Co., L.L.C.**
401 Edwards Street, Suite 1601
Shreveport, LA 71101
(318)227-8668

# *Settlement Statement*

The Rudman Partnership
1700 Pacific Ave., Ste 4700
Dallas, TX 75201-4670

Account: RUDP01

Date: 06/13/2012

**Account: RUDP01 - Statement of Account:**

| Date | Reference | Description | Charges | Credits |
|------|-----------|-------------|---------|---------|
| 05/31/2012 | | Balance Forward | 762,698.05 | |
| 06/04/2012 | 4931 | Payment-Thank You! Ck# 30662 | | (719,180.67) |
| 06/13/2012 | | Previous Billing | 205,199.00 | |
| | | New Balance Forward | 248,716.38 | |

**Summary by LEASE:**

| Property# | Description | Expenses | You Owe |
|-----------|-------------|----------|---------|
| | Unpaid Previous Balance | | 248,716.38 |
| 1SHI01 | Shipps Creek Prospect | 100,942.80 | 100,942.80 |
| | **Totals:** | **100,942.80** | **349,659.18** |

**PLEASE PAY THIS AMOUNT ----------------------^**

2

From: Sklar Exploration Co., L.L.C.
To: The Rudman Partnership

For Billing Dated 06/13/2012
Account: RUDP01   Page   2

### LEASE: (1SHI01)  Shipps Creek Prospect   County: ESCAMBIA, AL

**Expenses:**

| Reference | Description | Deck/AFE | Invoice Amt | Total | Your Share |
|---|---|---|---|---|---|
| **LHC** | | | | | |
| *Lease Bonus* | | | | | |
| 1SHI01060412 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 1,262,300.00 | | |
| 1SHI01060412-1 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 3,784,840.00 | 5,047,140.00 | 100,942.80 |
| | **Total LHC** | | | **5,047,140.00** | **100,942.80** |

| LEASE Summary: | Wrk Int | | Expenses | You Owe |
|---|---|---|---|---|
| 1SHI01 | 0.02000000 | | 100,942.80 | 100,942.80 |

2

**Sklar Exploration Co., L.L.C.**
401 Edwards Street, Suite 1601
Shreveport, LA  71101
(318)227-8668

# Settlement Statement

Tara Rudman
1700 Pacific Ave., Ste 4700
Dallas, TX  75201-4670

Account:  RUDT01

Date:  06/13/2012

**Summary by LEASE:**

| Property# | Description | Expenses | You Owe |
|-----------|-------------|----------|---------|
| 1SHI01 | Shipps Creek Prospect | 529,949.70 | 529,949.70 |
| | **Totals:** | **529,949.70** | **529,949.70** |

**PLEASE PAY THIS AMOUNT ----------------------^**

2

From:   Sklar Exploration Co., L.L.C.
To:   Tara Rudman

For Billing Dated 06/13/2012
Account: RUDT01    Page   2

### LEASE: (1SHI01)  Shipps Creek Prospect   County: ESCAMBIA, AL

Expenses:

| Reference | Description | Deck/AFE | Invoice Amt | Total | Your Share |
|---|---|---|---|---|---|
| **LHC** | | | | | |
| *Lease Bonus* | | | | | |
| 1SHI01060412 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 1,262,300.00 | | |
| 1SHI01060412-1 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 3,784,840.00 | 5,047,140.00 | 529,949.70 |
| | **Total LHC** | | | **5,047,140.00** | **529,949.70** |

| LEASE Summary: | Wrk Int | | Expenses | You Owe |
|---|---|---|---|---|
| 1SHI01 | 0.10500000 | | 529,949.70 | 529,949.70 |

2

**Sklar Exploration Co., L.L.C.**
401 Edwards Street, Suite 1601
Shreveport, LA  71101
(318)227-8668

# *Settlement Statement*

Sklarco, LLC                                                    Account:  SKLA01
401 Edwards Street
Suite 1601                                                     Date:  06/13/2012
Shreveport, LA  71101

**Account: SKLA01 - Statement of Account:**

| Date | Reference | Description | Charges | Credits |
|------|-----------|-------------|---------|---------|
| 06/13/2012 |  | Previous Billing | 253,625.96 |  |
|  |  | New Balance Forward | 253,625.96 |  |

**Summary by LEASE:**

| Property# | Description | Expenses | You Owe |
|-----------|-------------|----------|---------|
|  | Unpaid Previous Balance |  | 253,625.96 |
| 1SHI01 | Shipps Creek Prospect | 876,940.57 | 876,940.57 |
|  | **Totals:** | **876,940.57** | **1,130,566.53** |

**PLEASE PAY THIS AMOUNT ----------------------^**

2

From:  Sklar Exploration Co., L.L.C.
To:    Sklarco, LLC

For Billing Dated 06/13/2012
Account: SKLA01   Page   2

**LEASE: (1SHI01)  Shipps Creek Prospect   County: ESCAMBIA, AL**

Expenses:

| Reference | Description | Deck/AFE | Invoice Amt | Total | Your Share |
|---|---|---|---|---|---|
| **LHC** | | | | | |
| *Lease Bonus* | | | | | |
| 1SHI01060412 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 1,262,300.00 | | |
| 1SHI01060412-1 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 3,784,840.00 | 5,047,140.00 | 876,940.57 |
| | **Total LHC** | | | **5,047,140.00** | **876,940.57** |

| LEASE Summary: | Wrk Int | Expenses | You Owe |
|---|---|---|---|
| 1SHI01 | 0.17375000 | 876,940.57 | 876,940.57 |

2

**Sklar Exploration Co., L.L.C.**
401 Edwards Street, Suite 1601
Shreveport, LA  71101
(318)227-8668

# *Settlement Statement*

Tauber Exploration & Production Co          Account:  TAUE01
55 Waugh Drive, Suite 600
Houston, TX  77007                          Date:  06/13/2012

**Account: TAUE01 - Statement of Account:**

| Date | Reference | Description | Charges | Credits |
|------|-----------|-------------|---------|---------|
| 05/31/2012 | | Balance Forward | 157,344.35 | |
| 06/04/2012 | 4931 | Payment-Thank You! Ck# 276963 | | (36,058.70) |
| 06/04/2012 | 4931 | Payment-Thank You! Ck# 276964 | | (38,675.00) |
| 06/04/2012 | 4931 | Payment-Thank You! Ck# 276962 | | (37,425.00) |
| 06/04/2012 | 4931 | Payment-Thank You! Ck# 276960 | | (31,677.44) |
| 06/13/2012 | | Previous Billing | 41,039.80 | |
| | | New Balance Forward | 54,548.01 | |

**Summary by LEASE:**

| Property# | Description | Expenses | You Owe |
|-----------|-------------|----------|---------|
| | Unpaid Previous Balance | | 54,548.01 |
| 1SHI01 | Shipps Creek Prospect | 126,178.50 | 126,178.50 |
| | **Totals:** | **126,178.50** | **180,726.51** |

**PLEASE PAY THIS AMOUNT ----------------------^**

2

From:   Sklar Exploration Co., L.L.C.
To:   Tauber Exploration & Production Co

For Billing Dated 06/13/2012
Account: TAUE01   Page   2

**LEASE: (1SHI01)  Shipps Creek Prospect   County: ESCAMBIA, AL**

Expenses:

| | Reference | Description | Deck/AFE | Invoice Amt | Total | Your Share |
|---|---|---|---|---|---|---|
| **LHC** | | | | | | |
| *Lease Bonus* | | | | | | |
| | 1SHI01060412 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 1,262,300.00 | | |
| | 1SHI01060412-1 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 3,784,840.00 | 5,047,140.00 | 126,178.50 |
| | **Total LHC** | | | | **5,047,140.00** | **126,178.50** |

| LEASE Summary: | Wrk Int | Expenses | You Owe |
|---|---|---|---|
| 1SHI01 | 0.02500000 | 126,178.50 | 126,178.50 |

2

**Sklar Exploration Co., L.L.C.**
401 Edwards Street, Suite 1601
Shreveport, LA  71101
(318)227-8668

# *Settlement Statement*

Tiembo Ltd.
Attn: Mark Rauch
P.O. Box 270415
Houston, TX  77277-0415

Account:  TIEM01

Date:  06/13/2012

**Account: TIEM01 - Statement of Account:**

| Date | Reference | Description | Charges | Credits |
|------|-----------|-------------|---------|---------|
| 05/31/2012 | | Balance Forward | 167,244.23 | |
| 06/07/2012 | 4936 | Payment-Thank You! Ck# 1211 | | (140,781.40) |
| 06/13/2012 | | Previous Billing | 32,831.84 | |
| | | New Balance Forward | 59,294.67 | |

**Summary by LEASE:**

| Property# | Description | Expenses | You Owe |
|-----------|-------------|----------|---------|
| | Unpaid Previous Balance | | 59,294.67 |
| 1SHI01 | Shipps Creek Prospect | 100,942.80 | 100,942.80 |
| | Totals: | 100,942.80 | 160,237.47 |

**PLEASE PAY THIS AMOUNT ----------------------^**

2

From:   Sklar Exploration Co., L.L.C.
To:   Tiembo Ltd.

For Billing Dated 06/13/2012
Account: TIEM01    Page   2

**LEASE: (1SHI01)  Shipps Creek Prospect   County: ESCAMBIA, AL**

Expenses:

| Reference | Description | Deck/AFE | Invoice Amt | Total | Your Share |
|---|---|---|---|---|---|
| **LHC** | | | | | |
| *Lease Bonus* | | | | | |
| 1SHI01060412 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 1,262,300.00 | | |
| 1SHI01060412-1 | Sklarco LLC- Cedar Creek L&T, Inc. | PC01 | 3,784,840.00 | 5,047,140.00 | 100,942.80 |
| | **Total LHC** | | | **5,047,140.00** | **100,942.80** |

| LEASE Summary: | Wrk Int | Expenses | You Owe |
|---|---|---|---|
| 1SHI01 | 0.02000000 | 100,942.80 | 100,942.80 |

2

### EXHIBIT "D"

Attached to and made a part of that certain
Shipps Creek Prospect Participation Agreement dated effective as of June 1, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd.,
The Rudman Partnership, Tara Rudman, JJS Working interests LLC, Fant Energy Limited,
Pickens Financial Group, LLC, Fleet Howell, Tauber Exploration & Production Co.,
Tiembo, Ltd., Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC,
Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C.
and Resource Ventures, LLC,

### FORM OF ASSIGNMENT

STATE OF ALABAMA,

COUNTIES OF CONECUH AND ESCAMBIA.

KNOW ALL MEN BY THESE PRESENTS That:

**SKLAR EXPLORATION COMPANY L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President & Chief Operating Officer, David A. Barlow (hereinafter referred to as "Assignor");

for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable

consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the exceptions,

limitations, reversionary back-in working interest and other matters set forth below, does hereby grant,

bargain, sell, convey, assign, set over and transfer unto the following (hereinafter sometimes referred to

collectively as the "Assignees" or individually as an "Assignee"):

**SKLARCO L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President & Chief Operating Officer, David A. Barlow ("Sklarco");

**MCCOMBS ENERGY, LTD.**, a Texas limited partnership, whose address is 5599 San Felipe, Suite 1200, Houston, Texas 77056-2794, represented herein by its Vice President, Ricky Haikin ("McCombs");

**THE RUDMAN PARTNERSHIP**, a Texas general partnership, whose address is 1700 Pacific Avenue, Suite 4700, Dallas, TX 75204, represented herein by W.R. (Trey) Sibley, III, as the duly authorized Attorney-In-Fact of said partnership ("Rudman");

**TARA RUDMAN**, Individually, whose address is 1700 Pacific Avenue, Suite 4700, Dallas, TX 75204 ("Tara Rudman");

**JJS WORKING INTERESTS LLC**, a Texas limited liability company, whose address is 4295 San Felipe, Suite 207, Houston, Texas 77027, represented herein by Houston Bulldog Capital Management, LLC, its duly authorized Manager, represented herein by Justin Simons, in his capacity as the duly authorized Manager of Houston Bulldog Capital Management, LLC ("JJS");

**FANT ENERGY LIMITED**, a Texas limited partnership, whose address is 5800 Westview Drive, Houston, Texas 77055, represented

herein by its General Partner, Richard E. Fant L.L.C., which itself is represented herein by its Manager, Phil O. Kelley ("Fant");

**PICKENS FINANCIAL GROUP, L.L.C.,** a Texas limited liability company, whose address is 8499 Greenville Avenue, Suite 105, Dallas, TX 75231-2417, represented herein by Michael K. Pickens, as the duly authorized Vice President of said company ("Pickens");

**FLEET HOWELL** 416 Travis Street, Suite 715, Shreveport, Louisiana 71101 ("Howell");

**TAUBER EXPLORATION & PRODUCTION CO.,** a Texas corporation, whose address is 55 Waugh Drive, Suite 600, Houston TX 77007, represented herein by Richard E. Tauber, as the duly authorized President of said company ("Tauber");

**TIEMBO, LTD.,** a Texas limited partnership, whose address is P. O. Box 270415, Houston, Texas 77277-0415, represented herein by its Registered Agent, Mark Rauch ("Tiembo");

**KUDZU OIL PROPERTIES, LLC,** a Mississippi limited liability company, whose address is 300 Concourse Blvd., Suite 101, Ridgeland, Mississippi 39157, represented herein by its Executive Vice President, R. Nash Neyland ("Kudzu");

**MARKSCO, L.L.C.,** a Louisiana limited liability company, whose address is 333 Texas Street, Suite 1050, Shreveport, Louisiana 71101, represented herein by its Member, Mark P. Sealy ("Marksco");

**LANDMARK EXPLORATION, LLC,** a Mississippi limited liability company, whose address is Post Office Box 12004, Jackson, MS 39236, represented herein by Larry Johnson, as the duly authorized Manager/Member of said company ("Landmark");

**CRAFT EXPLORATION COMPANY, LLC,** a Mississippi limited liability company, whose address is 325 Lakeshire Parkway, Canton, MS 39046, represented herein by Steven H. Craft, as the duly authorized Manager/Member of said company ("Craft")

**DICKSON OIL & GAS, LLC,** a Louisiana limited liability company, whose address is Post Office Box 52479, Shreveport, Louisiana 71135, represented herein by its Manager, C. Bickham Dickson III ("Dickson");

**BUNDERO INVESTMENT COMPANY, L.L.C.,** a Louisiana limited liability company, whose address is 333 Texas Street, Suite 300, Shreveport, Louisiana 71101, represented herein by its Manager, Robert P. Bowman ("Bundero");

all of its right, title and interest in and to the oil, gas and other mineral leases (the "Leases") described in Exhibit "A" attached hereto and by reference made a part hereof and the rights, estates and interests of the lessee thereunder, in the proportions set forth below as to each such Assignee's name:

| Assignees | Before Payout | After Payout |
|---|---|---|
| Sklarco | 17.375% | 27.125281% |
| McCombs | 26.5% | 22.525% |
| Rudman | 2% | 1.7% |
| Tara Rudman | 10.5% | 8.925% |
| Fant | 10% | 8.5% |
| JJS | 10% | 11.143469% |
| Pickens | 5% | 4.25% |
| Howell | 5% | 4.25% |
| Tauber | 2.5% | 2.125% |

Page **33** of **47**

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

**ASSIGNOR:**

SKLAR EXPLORATION COMPANY L.L.C.

By_____
       David A. Barlow
       President & Chief Operating Officer

**ASSIGNEES:**

SKLARCO L.L.C.

By_____
       David A. Barlow
       President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

By_____
       Ricky Haikin
       Vice President

THE RUDMAN PARTNERSHIP

By_____
       W. R. (Trey) Sibley, III
       Attorney-In-Fact

_____
       TARA RUDMAN

JJS WORKING INTERESTS LLC
By:    Houston Bulldog Capital Management, LLC

By_____
       Justin Simons
       Manager

FANT ENERGY LIMITED
By:    Richard E. Fant, L.L.C., its General Partner

By_____
       Phil O. Kelley
       Manager

PICKENS FINANCIAL GROUP, L.L.C.


By_____
      Michael K. Pickens
      Vice President



_____
      FLEET HOWELL


TAUBER EXPLORATION & PRODUCTION CO.


By_____
      Richard E. Tauber
      President


TIEMBO, LTD.


By_____
      Mark Rauch
      Registered Agent


KUDZU OIL PROPERTIES, L.L.C.


By_____
      R. Nash Neyland
      Executive Vice President


MARKSCO, L.L.C.


By_____
      Mark P. Sealy
      Member


LANDMARK EXPLORATION, LLC


By_____
      Larry Johnson
      Manager/Member


CRAFT EXPLORATION COMPANY, LLC


By_____
      Stephen H. Craft
      Manager/Member


DICKSON OIL & GAS, L.L.C.


By_____
      C. Bickham Dickson, III
      Manager

BUNDERO INVESTMENT COMPANY, L.L.C.


By_____
      Robert P. Bowman
      Manager

RESOURCE VENTURES, LLC


By_____
      Mark A. Arnold
      General Manager

## EXHIBIT "A"

Attached to and made a part of that certain Assignment Of Oil, Gas And Other Mineral Leases dated
effective as of June 1, 2012, executed by Sklar Exploration Company L.L.C., as Assignor,
in favor of Sklarco L.L.C., McCombs Energy, Ltd., The Rudman Partnership, Tara Rudman,
JJS Working interests LLC, Fant Energy Limited, Pickens Financial Group, LLC,
Fleet Howell, Tauber Exploration & Production Co., Tiembo, Ltd., Kudzu Oil Properties, L.L.C.,
Marksco, L.L.C., Landmark Exploration, LLC, Craft Exploration Company, LLC,
Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C. and Resource Ventures, LLC, as
Assignees

### DESCRIPTION OF LEASES

Oil, Gas and Mineral Lease dated June 14, 2012, by and between Cedar Creek Land and Timber, Inc., as
Lessor, and Sklar Exploration Company LLC, as Lessee, a memorandum of which is recorded in Book 2012,
Page 3443 of the Probate Judge Records of Conecuh County, Alabama.

Oil, Gas and Mineral Lease dated June 14, 2012, by and between Cedar Creek Land and Timber, Inc., as
Lessor, and Sklar Exploration Company LLC, as Lessee, a memorandum of which is recorded in Book 536, ,
Page 166 of the Probate Judge Records of Escambia County, Alabama.

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

  I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklar Exploration Company L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

  Given under my hand and notarial seal this the _____ day of _____, 2012.

            _____
            NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

  I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklarco L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

  Given under my hand and notarial seal this the _____ day of _____, 2012.

            _____
            NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

  I, _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

  Given under my hand and notarial seal this the _____ day of _____, 2012.

            _____
            NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that W. R. (Trey) Sibley, III, whose name as Attorney-in-Fact of THE RUDMAN PARTNERSHIP, a Texas general partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said partnership.

    Given under my hand and notarial seal this the ___ day of _____, 2012.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF _____

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that TARA RUDMAN, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she executed the same as her free act and deed.

    Given under my hand and notarial seal this the _____ day of _____, 2012.


_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF TEXAS

COUNTY OF HARRIS

    I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.


_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

Page **40** of **47**

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Richard E. Fant, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, represented herein by its General Partner, Richard E. Fant, L.L.C., which itself is represented herein by its Manager, Phil O. Kelley, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as duly authorized Vice President of PICKENS FINANCIAL GROUP, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

Page **41** of **47**

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as duly authorized President of TAUBER EXPLORATION & PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

        I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

        Given under my hand and notarial seal this the _____ day of _____, 2012.


                                        _____
                                                Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF MISSISSIPPI

COUNTY OF _____

        I, _____, a notary public in and for said County and State, hereby certify that Larry Johnson, whose name as duly authorized Manager/Member of LANDMARK EXPLORATION, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

        Given under my hand and notarial seal this the _____ day of _____, 2012.


                                          _____
                                           NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF MISSISSIPPI

COUNTY OF _____

        I, _____, a notary public in and for said County and State, hereby certify that Steven H. Craft, whose name as duly authorized Manager/Member of CRAFT EXPLORATION COMPANY, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

        Given under my hand and notarial seal this the _____ day of _____, 2012.


                                          _____
                                           NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

        I, _____, a notary public in and for said Parish and State, hereby certify that C. Bickham Dickson, III, whose name as Member of the DICKSON OIL & GAS, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

        Given under my hand and notarial seal this the _____ day of _____, 2012.


                                  _____
                                           Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

        I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

        Given under my hand and notarial seal this the _____ day of _____, 2012.


                                  _____
                            NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF COLORADO

COUNTY OF _____

        I, _____, a notary public in and for said County and State, hereby certify that Mark A. Arnold, whose name as duly authorized General Manager of RESOURCE VENTURES, LLC, an Indiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

        Given under my hand and notarial seal this the _____ day of _____, 2012.


                                  _____
                            NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

**EXHIBIT "E"**

Attached to and made a part of that certain
Shipps Creek Prospect Participation Agreement dated effective as of June 1, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd.,
The Rudman Partnership, Tara Rudman, JJS Working interests LLC, Fant Energy Limited,
Pickens Financial Group, LLC, Fleet Howell, Tauber Exploration & Production Co.,
Tiembo, Ltd., Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC,
Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C.
and Resource Ventures, LLC,

**SEISMIC DATA LICENSE AGREEMENT**

Date: _____ ___, _____

| | |
|---|---|
| | LICENSOR: Sklar Exploration Company L.L.C. |
| | Attention: Don Eustes |
| | 401 Edwards Street, Suite 1601 |
| | Shreveport, Louisiana 71101 |

LICENSOR represents that it has the right and authority to make available such seismic data to LICENSEE and that such seismic data are transferred subject to the following conditions:

LICENSOR represents that it has the right to license to LICENSEE certain confidential seismic data ("Data") as set forth below in "Description of Seismic Data". LICENSOR hereby grants to LICENSEE a non-exclusive right to use the Data, and LICENSEE agrees to receive the Data and use it in accordance with the terms and conditions hereof. LICENSEE acknowledges that this license is non-exclusive and that the Data is the property of the LICENSOR.

LICENSOR retains title and full ownership rights to Data including, but not limited to, the exclusive right to license, trade, loan, transfer and reproduce the same. LICENSEE agrees that the Data, and any copies thereof, shall be for its own internal use only and that the same shall not be given, sold, traded, disposed of or otherwise divulged to any other party, except as follows:

a. Data may be provided to a consultant to prepare an analysis and interpretation for LICENSEE.

b. If LICENSEE is entering into this Agreement as the operator or other representative of one or more parties disclosed to LICENSOR, then such other parties may be shown the Data by LICENSEE or its bona fide consultant, but only if each such party agrees in writing not to divulge the data to any other party.

c. LICENSEE can make a prospect presentation of the Data and the results of any analysis and interpretations to a third party with a bona fide interest in joining LICENSEE to explore, develop, produce, or finance any appropriate property for the purpose of identifying subsurface oil and gas deposits, provided that such third party agrees to treat all such data as confidential. Should such third party wish to make his own evaluation of the data, he/she/it may do so in LICENSEE's office only, provided that such third party agrees in writing not to remove any such licensed data from LICENSEE's office, and to treat all such data as confidential.

d. If LICENSEE is a legal entity other than an individual, it may disclose, by providing copies thereof, the Data to a company owing 50% or more of the LICENSEE or to a company which is owned 50% or more by LICENSEE or to a surviving company in the event of a complete merger by LICENSEE, provided each such company is disclosed in advance to LICENSOR and that company agrees in writing to assume the terms and obligations of this agreement.

e. LICENSEE may show, and provide copies of, the Data to agencies of federal and state governments having jurisdiction to the extent required or allowed by applicable law or regulation if necessary in the ordinary course of the LICENSEE's business.

Page 45 of 47

     f.      LICENSEE shall have the right to make copies of adaptations from the Data (including reprocessed seismic traces) for his/her/its own internal use. LICENSEE may also transfer the Data to a third party for the sole purpose of further processing and data analysis provided the third party agrees to hold the Data confidential and to return all manifestations of the Data to the LICENSEE when the reprocessing of analysis has been completed.

LICENSEE may transfer, for no additional fee or other consideration, all of its right, title and interest under this license to a buyer of all of its undivided working interest in the Shipps Creek Prospect, Conecuh and Escambia Counties, Alabama, provided such buyer agrees to be bound by this License Agreement and the applicable Participation Agreement and Operating Agreement governing said prospect.

LICENSEE agrees that he/she/it accepts the Data tendered to it "As Is, Where Is". LICENSOR does not make any warranty or representation regarding the quality or reliability of any or all of the Data delivered hereunder. Any action taken by LICENSEE or any opinions formed or conclusions drawn on the basis of any or all Data shall be at the sole risk and expense of the party taking such action, forming such opinion or drawing such conclusion. LICENSOR warrants that any Data it furnished hereunder is free of liens, encumbrances, and limitations on use or disposition other than those expressly set out above. THESE WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE REGARDING ANY DATA GIVEN THE LICENSEE HEREUNDER.

LICENSEE shall not have nor ever assert any claim or cause of action against LICENSOR arising out of any defect or inaccuracy in the Data, whether such defect or inaccuracy arose by negligence or any other cause.

In the event that any governmental unit should levy a sales or use tax of similar nature related to the licensing or transfer of the data covered under this agreement, then LICENSEE shall reimburse LICENSOR the amount of such levies or taxes.

The use license granted in this agreement shall continue for a term of forty-nine (49) years and shall be automatically renewed for an additional forty-nine (49) years, for no additional consideration, unless otherwise terminated by the mutual consent of both parties.

All section time and prints including all reprocessed or reformatted sections shall show the data owner as being LICENSOR and shall contain a notice reading substantially as follows:

| NOTICE |
| --- |
| "This document is licensed for use only to: _____, Licensee, by SKLAR EXPLORATION COMPANY L.L.C., LICENSOR.<br><br>Its use is governed by the terms specified in the license agreement signed by LICENSEE." |

      By their execution of this document, LICENSOR and LICENSEE do each hereby approve and agree to be bound by the terms and conditions stated above.

LICENSOR:                               LICENSEE:
**Sklar Exploration Company L.L.C.**

By: _____         By: _____
      David A. Barlow

Title:  President - Chief Operating Officer     Title:

Date: _____        Date: _____

**EXHIBIT "F"**

Attached to and made a part of that certain
Shipps Creek Prospect Participation Agreement dated effective as of June 1, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd.,
The Rudman Partnership, Tara Rudman, JJS Working interests LLC, Fant Energy Limited,
Pickens Financial Group, LLC, Fleet Howell, Tauber Exploration & Production Co.,
Tiembo, Ltd., Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC,
Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment Company, L.L.C.
and Resource Ventures, LLC,

**OPERATING AGREEMENT**
**(Attached)**

**EXHIBIT "F"**
**Attached to and made a part of that certain**
**Shipps Creek Prospect Participation Agreement dated effective as of June 1, 2012,**
**by and between Sklar Exploration Company L.L.C., Sklarco L.L.C.,**
**McCombs Energy, Ltd., The Rudman Partnership, Tara Rudman,**
**JJS Working Interests LLC, Fant Energy Limited, Pickens Financial Group, LLC,**
**Fleet Howell, Tauber Exploration & Production Co., Tiembo, Ltd.,**
**Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC,**
**Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C.,**
**Bundero Investment Company, L.L.C., Resource Ventures, LLC**

A.A.P.L. FORM 610-1982

MODEL FORM OPERATING AGREEMENT

SHIPPS CREEK PROSPECT
CONECUH and ESCAMBIA COUNTY, ALABAMA

OPERATING AGREEMENT

DATED

_____ **June 1** _____ , ___ **2012** ___ ,
                                        _year_

OPERATOR   **Sklar Exploration Company L.L.C.** _____

CONTRACT AREA   **As shown on Exhibit "A" to this Agreement.** _____

_____

_____

COUNTY OR ~~PARISH~~ OF   **Conecuh and Escambia** _____ STATE OF ____ **Alabama** ____

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM. A.A.P.L. NO. 610 – 1982 REVISED

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2-3 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4-5 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___Sklar Exploration Company L.L.C., a Louisiana limited liability___ ___Company, 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101_____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided.

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A.  The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B.  The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C.  The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement, including royalty and overriding royalty interests.

D.  The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E.  The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F.  The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G.  The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay **100% of** its share of the cost of any operation conducted under the provisions of this agreement.

H.  The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.
*

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine. **Words defined herein shall have the same meaning whether or not they are capitalized.**

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑  A.  Exhibit "A", shall include the following information:
   (1) Identification of lands subject to this agreement,
   (2) Restrictions, if any, as to depths, formations, or substances,
   (3) Percentages or fractional interests of parties to this agreement,
   (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
   (5) Addresses of parties for notice purposes.
☑  / B.  Exhibit "B", Form of Lease.
☑  C.  Exhibit "C", Accounting Procedure.
☑  D.  Exhibit "D", Insurance.
☑  E.  Exhibit "E", Gas Balancing Agreement.
☐  ~~F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.~~
☐  ~~G. Exhibit "G", Tax Partnership.~~

If any provision of any exhibit, except Exhibits "A" and "E", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail. If any provisions of Exhibits "A" or "E" is inconsistent with any provision contained in the body of this Agreement, the provision of the exhibit shall prevail.

I.  The term "Deepen" shall mean a single operation whereby a well drilled to an objective Zone below the deepest Zone    in which the well was previously drilled, or below the deepest Zone proposed in the associated AFE, whichever is the lesser.

J.  The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

K.  The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned or temporarily isolated in order to attempt a Completion in or commingling with a different Zone within the existing wellbore.

L.  The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore or improve production in a Zone which is currently open to production in the wellbore. Such operations include, without limitation, well stimulation operations, but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting or Plugging Back of a well.

M.  The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

N.  The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

I.
~~If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.~~
•

- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE III.
## INTERESTS OF PARTIES

**A. Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee there under; **provided, however, the provisions of this Article III.A. shall be subject to the provisions of Section 3.1 of the Participation Agreement to which this agreement is attached as Exhibit "F".**

**B. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____ **all jointly owned lease burdens** _____ which shall be borne as hereinafter set forth.

**Each of the Parties hereto shall pay or deliver or cause to be paid or delivered its proportionate part of the royalties and over-** ~~Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and~~ **riding royalties and other leasehold burdens as described in the attached Exhibit "A" and shall hold the other Party/ies free from any** ~~payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or~~ **liability therefore. If the interest of any Party/ies in any oil and gas lease covered by this Agreement is subject to any additional** ~~cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the~~ **royalty, overriding royalty, production payment or other charge over and above those shown on Exhibit "A," such Party/ies shall** ~~other parties free from any liability therefor; assume and alone bear all such obligations and shall account or cause to be accounted for~~ **such interests to the owners thereof.** No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C. Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production **which is not a joint obligation of the parties** / in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D. Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", ~~or~~ ~~was not disclosed in writing to all other parties prior to the execution of this agreement by all parties,~~ or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1. If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2. If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

## ARTICLE IV.
## TITLES

**A. Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party **hereto provided such party has paid 100% of its share of all costs of all operations conducted under the provisions of this Agreement.** The cost incurred by Operator in this title program shall be borne as follows:

~~☐ Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.~~

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1  ☑  Option No. 2:  Costs incurred by Operator in procuring abstracts / and fees paid outside attorneys / for title examination
2  (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) / shall be borne by the Drilling Parties
3  in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4  hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5  functions.
   *     Curative matters and materials
6  **    Landmen and consultants
7  ***   and for applications and hearings
8
   Operator shall use its best efforts to secure
9  / Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection
            subject to this agreement and charge these fees to the joint account.
10  with leases or oil and gas interests / contributed by such party. Operator shall be responsible for the preparation and recording of pooling
11  designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
12  This shall not prevent any party from appearing on its own behalf at any such hearing.
13
14      No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
                                                                           Operator.
15  provided, and (2) the title has been approved by the examining attorney or title has been accepted by / all of the parties who are to par-
16  ticipate in the drilling of the well.
17
18  B.  Loss of Title:
19
20      1. Failure of Title:  Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a
21  reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days
22  from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-
23  tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil
24  and gas leases and interests: and,
25      (a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be
26  entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,
27  but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;
28      (b)  There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has
29  been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-
30  curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
31  Area by the amount of the interest lost;
32      (c)  If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is
33  increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-
34  terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such
35  well;
36      (d)  Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has
37  failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties
38  who bore the costs which are so refunded;
39      (e)  Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be
40  borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,
41      (f)  No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest
42  claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in
43  connection therewith.
44
45      2. Loss by Non-Payment or Erroneous Payment of Amount Due:  If, through mistake or oversight, any rental, shut-in well
46  payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,
47  there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required
48  payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,
49  which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the
50  date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in
51  the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the
52  required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to
53  the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it
54  shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled
55  or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:
56      (a)  Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,
57  up to the amount of unrecovered costs;
58      (b)  Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of
59  oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease
60  termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
61  portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,
62      (c)  Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest
63  lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.
64
65      3. Other Losses:  All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses
66  and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
67  the Contract Area.
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE V.
OPERATOR

A. **Designation and Responsibilities of Operator:**

_____ **Sklar Exploration Company L.L.C. , of Shreveport, Louisiana** _____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

B. **Resignation or Removal of Operator and Selection of Successor:**

1. _Resignation or Removal of Operator:_  Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, / or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. **Such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within 30 days from its receipt.** Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. _Selection of Successor Operator:_  Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

C. **Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D. **Drilling Contracts:**

**except that in Operator's sole discretion all factors such as rig availability, equipment condition, contractor employee reliability and knowledge and drilling contractor reputation shall be taken into consideration in determining the real competitive price.** All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area, / If so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefore shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

E. Custody of Funds: Operator shall hold for the account of Non-Operators any funds of Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to Non-Operators or applied toward the payment of debts, regardless of whether the debts arise out of the same well or operation for which the funds were advanced or from which the sales proceeds were derived. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators.

F. Statutory Employer: Operator shall be considered the statutory employer of all employees of all Contractors, their sub-contractors or agents, whose goods furnished or services rendered for Operator are an integral part of or essential to Operator's ability to perform its operations as an oil and gas operator.

ARTICLE VI.
DRILLING AND DEVELOPMENT

A. **Initial Well:**

The initial well is the Initial Well referred to in Subsection I.3 (a) of the Participation Agreement to which this instrument is attached as Exhibit "F".

On or before the _____ day of _____ , (year) _____ , Operator shall commence the drilling of a well for oil and gas at the following location:

and shall thereafter continue the drilling of the well with due diligence to

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

-4-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

**B. Subsequent Operations:**

1. Proposed Operations:  Should any party hereto desire to drill any / well on the Contract Area other than the well provided for in Article VI.A., or to rework, / deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in / paying quantities, the party desiring to drill, rework, / deepen or plug back such a well shall give the other parties / written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties / receiving such a notice / shall have / thirty (30) days after receipt / of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to / forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays. Failure of a party / receiving such notice / -to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

*Not withstanding this Article VI.B.1, and subject to the right of any party to non-consent the proposed operation, a proposal to re-work, recomplete, sidetrack, deepen or plugback a well producing in paying quantities, which is consented to by two (2) or more of the Parties owning two-thirds (2/3rds) or more of the working interest under the well may proceed and be executed on behalf of the Consenting Parties without the unanimous consent of all parties.

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of / thirty (30) days (or as promptly as possible after the expiration of the / forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all parties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance with the provisions hereof as if no prior proposal had been made.  Operator may, at its discretion, perform preparatory work in connection with, or even actually commence, an operation for which notice has been provided under this Article VI.B prior to our during the notice period, and if such operation ultimately is one consented by less than all parties, the Consenting Parties shall, nevertheless, be entitled to recover the risk compensation provided for hereunder.

2. Operations by Less than All Parties:  If any party / receiving such notice / as provided in Article VI.B.1. or VI.D.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall / within ninety (90) days after the expiration of the notice period of / twenty (30) days (or as promptly as possible after the expiration of the / forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within / forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt delivery of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry / its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of / forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall / plug and abandon the well and restore the surface location at their sole cost, risk and expense /. If any well drilled, reworked, / deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

*or one of them shall make a proposal to the other Consenting Parties to conduct further operations under Article VI.B

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1982

### ARTICLE VI
### continued

1    and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-

2    ties. Upon commencement of operations for the drilling, / reworking, deepening or plugging back of any such well by Consenting Parties

3    in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,

4    and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting

5    Party's interest in the **entire** well *and not just a particular Zone therein* / and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or

6    market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-

7    terests not excepted by Article III.D. payable out of or measured by the production from / such well **any and all Zones within** accruing with respect to such interest

8    until it reverts) shall equal the total of the following:

9

10

11

12    (a) **500%** 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead

13    connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such

14    Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-

15    Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-

16    Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting

17    Party had it participated in the well from the beginning of the operations; and

18

19

20

21    (b) **500** % of that portion of the costs and expenses of drilling, reworking, / deepening, plugging back, testing and completing,

22    after deducting any cash contributions received under Article VIII.C., and **500** % of that portion of the cost of newly acquired equip-

23    ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had

24    participated therein.

25

26

27

28    An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-

29    working / or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is

30    conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such

31    reworking / or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well

32    and **except that** there shall be added to the sums to be recouped by the Consenting Parties **five,** one-hundred percent (100%) **500%** of that portion of the costs

33    the reworking / or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If

34    such a reworking / or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-

35

36    plicable as between said Consenting Parties in said well.

37

38

39

40    During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the

41    proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other

42    taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-

43    ticle III.D.

44

45

46

47    In the case of any reworking, / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free

48    of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon

49    abandonment of a well after such reworking, / plugging back or deeper drilling, the Consenting Parties shall account for all such equip-

50    ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

51

52

53

54    Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the

55    Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an

56    itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its

57    option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-

58    ings. Each / **quarter** month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the

59    operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-

60    curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds

61    realized from the sale of the well's working interest production during the preceding / **quarter** month. In determining the quantity of oil and gas

62    produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic

63    well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation

64    which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs

65    of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as

66    above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

67    **\*recompleting, sidetracking**

68

69

70

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1   If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2   the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3   Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production
                                                                                          recompleting, sidetracking
4   therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, / reworking, deepening or plugging
5   back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6   the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

7

8                                                                    *                                          **
9       Notwithstanding the provisions of this Article VI.B.2., / it is agreed that without the mutual consent of /- all parties, no wells shall
10  be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
11  well conforms to the then-existing well spacing pattern for such source of supply; provided that an exceptional well location that is
        approved by the Alabama Oil and Gas Board shall be deemed to conform to the then-existing spacing pattern.
12  *and subject to the right of any party to non-consent the proposed operation
      **two (2) or more Parties owning 75% or more of the working interest
13

14
                                                                                                  recompleting, sidetracking
15      The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.
16  except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, / deepening and plugging back of such initial well
17  after if has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-
18  duction, ceases to produce in paying quantities.

19

20

21      3. Stand-By Time:  When a well which has been drilled or deepened has reached its authorized depth and all tests have been
22  completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
23  reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
24  ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
25  first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
26  matical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently
27  withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
28  each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
29  ties.

30

31

32

33      4. Sidetracking:  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
34  also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
35  location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
36  mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
37  affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
38  to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

39

40

41

42      (a)  If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
43  the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

44

45

46

47      (b)  If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
48  salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
49  provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

50

51

52
                                                                               twenty-four (24) hours
53      In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
54  shall be limited to/ forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and
                                                                              twenty-four (24) hours
55  receive up to eight (8) additional days after expiration of the / forty-eight (48) hours within which to respond by paying for all stand-by time
56  incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand
57  by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
58  ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in-
                                                                                fifteen (15)
59  stances the response period to a proposal for sidetracking shall be limited to/ thirty (30) days.

60

61

62

63

64  **C.   TAKING PRODUCTION IN KIND:**

65
                                                             have the right to
66      Each party shall / take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
67  exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for
68  marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any
69  party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

70

- 7 -

**ARTICLE VI**
continued

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.
2
3      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5  its share of all production.
6
7      In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8  the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
    <ins>on the same terms as Operator is marketing Operator's and/or other Non-Operators' share of production</ins>
9  the obligation, to purchase such oil or sell it to others at any time and from time to time, for the account of the non-taking party~/ at the
10 best-price-obtainable-in-the-area-for-such-production. Any such purchase or sale by Operator shall be subject always to the right of the
11 owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously
12 delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of
13 time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14 of one (1) year.
15
16     In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or
17 deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18 be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19 agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.
20
21
22 D.   **Access to Contract Area and Information:**
23
    <ins>consenting</ins>
24     Except as otherwise provided herein Each / party who has paid 100% of its share of all costs of all operations conducted under
    this Agreement shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
25 and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
    <ins>consenting</ins>
26 and records relating thereto. Operator, upon request, shall furnish each of the other / parties with copies of all forms or reports filed with
27 governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
28 each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
29 gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
30 quests the Information.
31
32 E.   **Abandonment of Wells:**
33
34     1.  Abandonment of Dry Holes:  Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
35 drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
             *
36 without the consent of / all parties. / Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
      **   <ins>twenty-four (24) hours (inclusive</ins>
37 within / forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
38 such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
         ***     <ins>or parties owning greater than ten percent (10%) interest in the well</ins>
39 accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
40 such well. / day party / who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
41 operations in search of oil and/or gas subject to the provisions of Article VI.B.
    *ninety percent (90%) or more of the parties thereof
42     ** If the well has been drilled pursuant to Article VI.B.2, only the consent of the consenting parties therein shall be required.
43     ***Any cement plugs used for plugging and abandoning such well shall be in excess of that required by the regulatory body
    recommended to be a volume of one and one-half times of that required.
44
45
46     2.  Abandonment of Wells that have Produced:  Except for any well in which a Non-Consent operation has been conducted
47 hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
                                             ****  <ins>such parties</ins>
48 producer shall not be plugged and abandoned without the consent of all parties / . / If / all parties consent to such abandonment, the well shall
                      <ins>fifteen (15)</ins>
49 be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
50 thirty (30) / days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
51 those wishing to continue its operation from the interval(s) then open to production shall tender to each of the other
52 parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
              <ins>Should any party fail to reply to such notice, such party shall be deemed to have consented to the proposed abandonment.</ins>
53 Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. / Each abandoning party shall assign
54 the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
55 material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
56 terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
57 gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
58 tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
59 duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit
60
61     ****two-thirds (66.67%) or more of the owners thereof. If the well has been drilled or reworked pursuant to Article VI.B.2 and the
    consenting parties therein have not been fully reimbursed as therein provided, only the approval of two-thirds of such consenting
62     parties shall be required
63
64
65
66
67
68
69
70

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

"B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portion of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-visions hereof.

3. Abandonment of Non-Consent Operations:  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.

## ARTICLE VII.
### EXPENDITURES AND LIABILITY OF PARTIES

A.   **Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners. **In their relations with each other under this Agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own self-interest.**

B.   **Liens and Payment Defaults:**

Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefore by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph, be entitled  to recover the amount it paid **plus five hundred percent (500%)** of that amount out of the proceeds from the sale of the defaulting party's share of oil and for gas, and, to secure payment thereof, be subrogated to the security rights described in the foregoing paragraph. Notwithstanding anything contained to the contrary in this paragraph, all parties agree that this provision shall not apply to any operation requiring an AFE unless Operator has advance billed all parties for their proportionate share of said costs in accordance with other provisions of this agreement. Notwithstanding anything herein to the contrary, the provisions set forth in lines 45-51 on this page 9 shall not apply to any oil and gas interest contributed or made subject to this agreement.

C.   **Payments and Accounting:**

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

D.   **Limitation of Expenditures:**

1. Drill or Deepen:  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
### continued

1  ☑   Option No. 1:  All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2  necessary tankage and/or surface facilities. **This Option No. 1 shall apply only to water source and/or water injection wells.**

4  ☑   Option No. 2:  All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5  authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6  to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight
7  (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8  tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9  cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10  constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11  elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging
12  back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13  than all parties.**This Option No. 2 shall cover all wells except those expressly covered by Option No. 1 above.**

16    2. Rework or Plug Back:  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
17  plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
18  include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
19  and/or surface facilities.

                                 Two or more Parties owning a majority interest
21    3. Other Operations:  Without the consent of / ~~all parties~~, Operator shall not undertake any single project reasonably estimated
22  to require an expenditure in excess of _____Fifty Thousand and No/100--------- Dollars ($_____50,000.00_____)
23  except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
24  previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
25  emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
26  to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
27  parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
28  an information copy thereof for any single project costing in excess of _____Twenty Five Thousand and No/100--------
29  Dollars ($_____25,000.00_____ ) but less than the amount first set forth above in this paragraph.

31  E.  **Rentals, Shut-in Well Payments and Minimum Royalties:**

33      Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
34  party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
35  tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
36  behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
37  failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
38  ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
39  visions of Article IV.B.23.

41      Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
42  of a producing gas well, ~~at least five (5) days (excluding Saturday, Sunday and legal holidays),~~ or at the earliest opportunity permitted by
43  circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
44  Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
45  shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

47  F.  **Taxes:**

49      Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
50  subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
51  become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
52  be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
53  Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
54  riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
55  owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
56  tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
57  anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
58  value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
59  the manner provided in Exhibit "C".

61      If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
62  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
63  mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
64  interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
65  count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
66  provided in Exhibit "C".

68      Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
69  to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VII**
**continued**

1  **G.    Insurance:**
2
3        At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4  the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5  pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
6  also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7  hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8  law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.
9
10       In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11  parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.
12
13                                          **ARTICLE VIII.**
14                        **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**
15
16  **A.    Surrender of Leases:**
17
18       The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19  or in part unless all parties consent thereto.
20
21       However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22  agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23  such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24  thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas in-
25  terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26  such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27  lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all
28  obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29  attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30  duction other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the
31  party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32  ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33  salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest
34  shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.
35
36       Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39  agreement.
40
41  **B.    Renewal or Extension of Leases:**
42
43       If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44  shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the
45  renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46  portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47  interests held at that time by the parties in the Contract Area.
48
49       If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50  who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51  to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52  Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.
53
54       Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55  by the acquiring party.
56
57       The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58  or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or
59  contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
60  tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61  the provisions of this agreement.
62
63       The provisions in this Article shall also be applicable to extensions of oil and gas leases.
64
65  **C.    Acreage or Cash Contributions:**
66
67       While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69  applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the con-
70  tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VIII
### continued

1 said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2 governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3 it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4 tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.
5
6    If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7 consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8
9 **D.  Maintenance of Uniform Interests:**
10
11    For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no
12 party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,
13 equipment and production unless such disposition covers either:
14
15    1.  the entire interest of the party in all leases and equipment and production; or
16
17    2.  an equal undivided interest in all leases and equipment and production in the Contract Area.
18
19    Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20 and shall be made without prejudice to the right of the other parties. Any added expenditure required as a result of disposition,
21 including but not limited to additional marketing or metering expense, shall be borne solely by the party transferee.
22
23    If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
24 require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
25 and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
26 party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
27 into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
28 Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.
29
30 **E.  Waiver of Rights to Partition:**
31
32    If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
33 undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
34 interest therein.
35
36 F.    Preferential Right to Purchase:
37
38    Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract
39 Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the
40 name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms
41 of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase
42 on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-
43 ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-
44 ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to
45 dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all its assets to a subsidiary or parent com-
46 pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.
47
48                                    **ARTICLE IX.**
49                          **INTERNAL REVENUE CODE ELECTION**
50
51    This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
52 for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
53 and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
54 purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
55 from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as per-
56 mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
57 ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
58 United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
59 and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
60 evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
61 Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
62 action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
63 Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
64 Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is per-
65 mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
66 tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
67 computation of partnership taxable income.
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

<div style="text-align:center">

**ARTICLE X.**
**CLAIMS AND LAWSUITS**

</div>

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed __Ten Thousand and No/100__ ——————————————————————————————————————— Dollars (**$10,000.00**——————————————————— ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder. **All claims or suits involving title to any oil and gas lease subject to this Agreement shall be treated as a claim or suit against all parties hereto.**

<div style="text-align:center">

**ARTICLE XI.**
**FORCE MAJEURE**

</div>

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

<div style="text-align:center">

**ARTICLE XII.**
**NOTICES**

</div>

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier, **or email and** addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier, **or email.** Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

<div style="text-align:center">

**ARTICLE XIII.**
**TERM OF AGREEMENT**

</div>

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☑  Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☐  ~~Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.~~

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

<div style="text-align:center">- 13 -</div>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

**A.   Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B.   Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____**Alabama**_____ shall govern.

**C.   Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of ~~the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and~~ any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said **any** / Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

### ARTICLE XV.
### OTHER PROVISIONS

**(see attached pages 14-1 through 14-6)**

- 14 -

## ARTICLE XV

## OTHER PROVISIONS

### A. PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1) an election to perform additional logging, coring or testing;
(2) an election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;
(3) an election to plug back and attempt to complete the well in a shallower depth or formation;
(4) an election to deepen the well;
(5) an election to sidetrack the well;
(6) an election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;
(7) an election to temporarily abandon the well;
(8) an election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of a majority of the consenting parties in possessory, cost-bearing interest (and not in number), a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth. In such event, the operation, which, in the opinion of a majority of the consenting parties in possessory, cost bearing interest (and not in number) is less likely to jeopardize the well, will be given priority. Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail. It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests. For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

### B. HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

### C. DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties. If the parties are equally divided, the opinion of the Operator will prevail.

### D. ADVANCEMENT OF COSTS

The provisions of section 1.3(a) of the Participation Agreement to which this agreement is attached as Exhibit "F" shall govern advancement of costs relative to the initial well. Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s) in advance of its respective share of (i) the dry hole cost for any other well to be drilled hereunder to which such Non-Operator has consented, and (ii) the cost of any completion, reworking, recompletion, sidetracking, deepening or plugging back operation to which such Non-Operator has consented (any such operation under clause (i) or (ii), being herein called a "Drilling Operation"). Such request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Drilling Operation. The amount of each Non-Operator's advance payment shall be based upon the latest AFE for such operation. Such advanced payments shall be held by Operator for the account of the Non-Operators and applied, with interest, against the actual costs incurred in the applicable operation.

A Non-Operator receiving a request for advance payment shall, within seven (7) days of the receipt of such request if and when a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to operator in cash the full amount of such request.   Operator shall credit the amount to the Non-Operator's account for the payment of such Non-Operator's share of costs of such Drilling operation, and following the end of each month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation previously approved, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement.   Advance payment by a Non-Operator of his share of completed well costs shall in no event prevent such completion of a well pursuant to Option No. 2 of Article VII.D.1. and, in the event such a Non-Operator elects not to participate in completion, the sums that such Non-Operator has advanced shall not be charged with any share of the costs of any completion attempted.

In the event a Non-Operator from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by depositing cash as aforesaid, then Operator, at his option, shall make a second written request by certified mail, return receipt requested for such advance.   Non-Operator shall pay for said advance as aforesaid within five (5) business days from receipt of such second request.

If a Non-Operator fails to pay within five (5) business days of the receipt of such second request, then Non-Operator may, at the sole discretion and timing election of the Operator, be deemed non-consent in said operation retroactive to the beginning of such operation and thereafter subject to the penalty provisions of Article VI.B.2 hereof.

If the Non-Operator fails to make such payment or furnish such security within five (5) business days of the receipt of such second request, Operator shall promptly notify all other parties still participating in such Drilling Operation of the default in payment and if and when applicable, of the relinquishment of an interest under this provision.   The parties who wish to participate in the Drilling Operation shall have five (5) days from receipt of the applicable notice to elect to assume the costs chargeable to such relinquished interest and shall share such relinquished interest in proportion to their assumption of such relinquished interest.   If the parties who wish to participate in the Drilling Operation are unwilling to assume the costs chargeable to such relinquished interest, the Drilling Operation shall be cancelled.

Notwithstanding anything to the contrary herein, if the applicable drilled well or operation is unsuccessful or results in a dry hole, Operator shall have the right to sue a Non-Operator who failed to pay for its proportionate share of expenses in lieu of Operator's right to deem the Non-Operator Non-Consent.

## E.   NECESSARY EXPENDITURES EXCLUDE SIDETRACKING

The phrase "necessary expenditures" in Article VII.D.1., (Option No. 2) on page 10 shall not be deemed to Include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

## F.   ADDITIONAL CHARGES

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Contract Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same:

Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and expenses in connection with preparation and presentation of evidence and exhibits of State Oil and Gas Board of Alabama hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

## G.   INDEMNITY

Except for liabilities resulting from the gross negligence or willful misconduct of the Operator, each Non-Operator shall defend, indemnify and hold Operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operator's officers, employees and/or agents, resulting from or in any way relating to such officers, employees, and/or agents presence on a drilling rig on the Contract Area or from such person traveling by air or water between any point and such drilling rig.   Such indemnity to Operator shall also apply to any other person whose presence on the rig or

transportation to or from such rig is at the request of the indemnifying Non-Operator (except for liabilities resulting from the gross negligence or willful misconduct of the Operator).

## H.  GAS BALANCING

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

## I.  SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.   Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

## J.  NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege.   The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

## K.  AREA OF MUTUAL INTEREST

The parties hereby create an Area of Mutual Interest ("AMI") consisting of the lands outlined by a bold red line on the plat attached hereto as Exhibit "A-2".   This AMI shall remain in force and effect for a term of five (5) years from the date of this Agreement and, insofar and only insofar as the AMI includes lands covered by oil and gas leases and/or oil and gas interests subject to this Agreement, as long thereafter as said oil and gas leases and/or oil and gas interests remain in force and effect.   This AMI shall terminate after five (5) years as to all such lands not covered by oil and gas leases and/or oil and gas interests subject to this Agreement.

During the term of this AMI, if any party hereto, including related persons or entities, ("Acquiring Party") directly or indirectly acquires any oil and gas lease or any oil and gas interest covering lands lying within the AMI, the Acquiring Party shall promptly advise the other parties ("Offerees") of such acquisition.   In such event, each Offeree shall have the right to acquire its proportionate interest in such oil and gas lease and/or oil and gas interest in accordance with the other provisions of this AMI.

Promptly upon acquiring such oil and gas lease and/or oil and gas interest, the Acquiring Party shall, in writing, advise the Offerees of such acquisition.   The notice shall include a copy of all instruments of acquisition including, by way of example but not of limitation, copies of the leases, assignments, subleases, farmouts or other contracts affecting the oil and gas lease and/or oil and gas interest.

The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by the Acquiring Party in acquiring such oil and gas lease and/or oil and gas interest ("Acquisition costs"). The Offeree shall have a period of fifteen (15) days after receipt of the notice within which to furnish the Acquiring Party written notice of its election to acquire its proportionate interest in the offered oil and gas lease and/or oil and gas interest.   If, however, a well in search of oil or gas is being drilled within the AMI, each Offeree shall have a period of twenty-four (24) hours (excluding Saturdays, Sundays and legal holidays) after delivery of the notice within which to elect to acquire its proportionate interest in the oil and gas lease and/or oil and gas interest so offered.   It is provided, however, that the twenty-four (24) hour election period shall not apply unless the Acquiring Party shall give the notice to the Offerees within two (2) days after the date on which the Acquiring Party acquired the oil and gas lease and/or oil and gas interest so offered.   In addition thereto, the Acquiring Party shall also:

(a)     furnish the Offerees with the approximate location of the well then being drilled and the name of the operator or drilling contractor drilling the well, and

(b)     specifically advise the Offerees that the Offerees shall have a period of twenty-four (24) hours within which to elect to acquire an interest in the offered oil and gas lease and/or oil and gas interest.

The above information shall be in addition to the information and copies of instruments provided for above in connection with the usual notices of acquisition of an oil and gas lease and/or oil and gas interest. If the Acquiring Party does not receive actual written notice of election of an Offeree to acquire its proportionate interest within the fifteen (15) day or twenty-four (24) hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire its interest therein. An Offeree accepting the offered interest shall be entitled to participate in such oil and gas lease and/or oil and gas interest in the proportion to which its interest bears to the total interest of all parties (including the acquiring party) electing to participate. Promptly after the time for election expires, the Acquiring Party, or the Operator on its behalf, shall invoice each Offeree electing to acquire an interest for its proportionate part of the Acquisition Cost, as reflected by the invoice. Upon receipt of such reimbursement, the Acquiring Party shall execute and deliver an appropriate assignment to such Offeree. If the Acquiring Party does not receive the amount due from the Offeree within thirty (30) days after receipt by the Offeree of the invoice for its cost, the Acquiring Party may, at its election, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within five (5) days after receipt of such written notice by the delinquent Offeree shall constitute a withdrawal by the delinquent Offeree of its former election to acquire the interest, and such Offeree shall no longer have the right to acquire an interest in the offered oil and gas lease and/or oil and gas interest.

Any assignment made by the Acquiring Party shall be made free and clear of any liens, encumbrances, overriding royalty interests and other burdens created by or arising under the Acquiring Party but otherwise without warranty of title, either express or implied not even for the return of the purchase price. The assignment shall be made and accepted subject to, and each assignee shall expressly assume its portion of all of the obligations of the Acquiring Party. The assignment shall also be made and accepted subject to this Agreement and the Participation Agreement to which this Agreement is attached as Exhibit "F". Without limitation upon the foregoing, oil and gas lease or oil and gas interest covered by the assignment shall bear its share of the reversionary working interest described in section 1.4 of said Participation Agreement.

If two (2) or more separate oil and gas leases and/or oil and gas interests are included in the same notice, the Offeree shall have the separate right of election as to each separate oil and gas lease and/or oil and gas interest.

The provisions of this AMI shall not apply to acquisitions as a result of merger, consolidation, reorganization or an acquisition from a parent, subsidiary, or affiliated corporation, or as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries. Neither shall it apply to sales and acquisitions between partners in a partnership or venturers in a joint venture, or to any acquisition by any party of an interest which interest prior to and at the time of such acquisition was subject to this Agreement, unless such acquisition was the renewal or extension of a lease which at the date of expiration was subject to this Agreement.

Renewals and extensions of oil and gas lease(s) and/or oil and gas interest(s) shall be subject to Article VIII.B of this Agreement.

In the event of a conflict between this Article XV.K and Section 3.1 of the Participation Agreement to which this Agreement is attached as Exhibit "F", then the provisions of Section 3.1 of the Participation Agreement shall govern and control.

## L.  DISBURSEMENT OF ROYALTIES

If Operator prepares and administers a division order for and receives and distributes the proceeds of production attributable to the interest of a Non-Operator, then Operator shall be entitled to charge that party for an appropriate monthly overhead charge for disbursing such royalty payments, in addition to the combined fixed rates provided in Exhibit "C" hereto. If through error or inadvertence Operator shall fail to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, it shall not be liable in damages to the other Parties hereto for such failure, unless arising out of the gross negligence or willful misconduct of the Operator.

## M.  INFORMATION

Anything to the contrary hereinabove notwithstanding, it is stipulated that any non-consenting party to an operation conducted hereunder shall have no right to observe such operation or have access to information pertaining to such operation, until such time as the non-consenting party's share of the cost of such operation and the penalty therefor has been recovered by the consenting parties as provided herein.

## N.  OPERATOR'S LIEN – SECURITY INTEREST

Subject to the provision of Article VII. B. of this Agreement, each non-Operator grants to Operator a lien upon all of the rights, titles, and interests of each Non-Operator, whether now existing or hereafter acquired, in and to the (1) the oil, gas, or other minerals in, on, and under the Contract Area and (2) any oil,

gas, and mineral leases covering the Contract Area or any portion thereof. In addition, each Non-Operator grants to Operator a security interest in and to all of such Non-Operator's rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (1) all oil, gas and other minerals produced from the Contract Area when produced; (2) all accounts receivable accruing or arising as a result of the sale of such oil, gas and other minerals; (3) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (4) all oil and gas wells and other surface and sub-surface equipment and facilities of any kind or character located on the Contract Area and the cash or other proceeds received from the sale thereof (collectively, the "Personal Property Collateral"). Some of the Personal Property Collateral is or will become fixtures on the Contract Area, and the interest of Non-Operator in and to the oil, gas and other minerals when extracted from the Contract Area and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area. This Agreement (including a carbon, photographic, or other reproduction hereof) shall constitute a non-standard form financing statement under the terms of the Uniform Commercial Code of the State in which the Contract Area is located, and as such, may be filed for record in the real estate records of the county in which the Contract Area is located. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense, if any.

## O.  SEPARATE AGREEMENT FOR NON-UNIFORM INTEREST

Any oil and gas lease and/or oil and gas interest that is both acquired after the effective date of this Agreement and covered by Article VIII.B, VIII.C or XV.K of this Agreement, that thereafter becomes owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such lease and/or interest becomes so owned. Any oil and gas lease and/or oil and gas interest acquired after the effective date of this Agreement and covered by Article VIII.B, VIII.C or XV.K of this Agreement, that becomes owned by more than one but less than all of the parties hereto shall remain subject to this Agreement as to the parties who own an interest therein, but Operator is authorized to modify Exhibit "A" to this Agreement to reflect the parties' interests in each such oil and gas lease and/or oil and gas interest. Operator is further authorized to modify said Exhibit "A" to this Agreement to reflect the parties' interests in each well subject to this Agreement.

## P.  METERING OF PRODUCTION

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

## Q.  PLUGGING AND LEASEHOLD RESTORATION FUND

At any time any well subject to this agreement is, in Operator's sole opinion, approaching the end of its economic life and/or its useful purpose, Operator may pre-bill the joint account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location. Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and abandonment and restoration of the leasehold premises. In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any accrued interest on such difference, based upon the then working interest percentage of such owner. In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

## R.  PREVAILING AGREEMENT

If there is a conflict between provisions of that Participation Agreement dated effective as of June 1, 2012 to which this form of Operating Agreement is attached as Exhibit "F" and this Operating Agreement, the provisions of the Participation Agreement shall prevail, and shall be binding upon all parties to this Operating Agreement.

## S.  DEFAULT PENALTY/AUTOMATIC NON-CONSENT

If written notice has been given that the lien rights conferred in Article VII. B. have been implemented or enforced against any party hereto, for so long as the affected party remains in default, it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and shall not be entitled to vote its interest in any matter hereunder. As to any proposed operation in which it otherwise would have the right to participate, such party shall not have the right to elect to participate or be a Consenting Party unless and until it pays in full the amount it is in default plus all other outstanding amounts due hereunder. If an operation proposed during such default period commences before such payment in full, the party in default shall automatically be deemed a Non-Consenting Party to the operation.

**T.  NON-PARTICIPATING INTERESTS**

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto as same may be revised from time to time to reflect record title and/or reformation of the Contract Area.

**U.  MISCELLANEOUS**

Anything to the contrary herein notwithstanding, this Operating Agreement is expressly made subject to the terms and provisions of the leases and any farmout agreements described in Exhibit "A" hereof.   This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereto shall be deemed to run with the oil and gas leases and/or oil and gas interests subject to this Agreement.   The headings used in this Agreement are for convenience only and shall not be considered in the interpretation or construction of the Agreement.

**V. NON-CONSENT**

Any party that relinquishes its interest in a well pursuant to Article VI.B.2 of this Agreement relinquishes their interest in the entire well and revenue therefrom, not just a particular Zone therein, for the duration of the recoupment period or, if the risk compensation is never recovered, forever.   The parties recognize, however, that applicable rules of the State   Oil and Gas Board of Alabama may allow for the drilling and completion of additional wells within the unit for an existing well, and, subject to the other provisions of this Agreement, the forfeiture by one party of its interest in the existing well does not affect that party's right to elect to participate or not to participate in a proposal to drill, or any other operation with respect to, another well, even if the other well is located in the same unit, and even if the new well is completed in the same Zone from which the existing well is producing.

Anything to the contrary hereinabove notwithstanding, any Non-Consenting Party to an operation conducted hereunder shall have no right to observe such operation or subsequent operations within the same well or have access to information pertaining to such operation or subsequent operations, until such time as the Non-Consenting Party's share of the cost of such operation, and any applicable subsequent operations, and the risk compensation therefor has been recovered by the Consenting Parties as provided herein.

**W. SOPHISTICATED INVESTORS**

By execution of this Agreement, each Non-Operator represents to each other and to Operator: (i) that it has a working knowledge of the oil and gas industry; (ii) that it is a sophisticated investor and has a financial net worth in excess of one million dollars; (iii) that it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of leasehold costs, drilling costs, completion costs, and all other costs incurred in operations under this Agreement; (iv) that it ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES; (v) that its interest hereunder has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the State of Alabama, or any other state ("Securities Law"), and that it owns said interest for investment purposes only, and not with a view to or for sale in connection with any distribution thereof within the meaning of Securities Law.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XVI.
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____June_____ , (year) __2012__ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alteraTarations, or modifications, other than those in Articles _____ _____, have been made to the form.~~

OPERATOR

_(signatures)_

SKLAR EXPLORATION COMPANY L.L.C.

_(signature)_

David A. Barlow
President & Chief Operating Officer

NON-OPERATORS

_(signatures)_

SKLARCO L.L.C.

_(signature)_

David A. Barlow
President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

_____
Ricky Haikin
Vice President

THE RUDMAN PARTNERSHIP

_____
W. R. (Trey) Sibley
Manager and Attorney-in-Fact

_____
TARA RUDMAN

JJS WORKING INTERESTS LLC
Houston Bulldog Capital Management, LLC

_____
Justin Simons
Manager

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____June_____ , (year) __2012__ .

~~, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms-On-A-Disk, Inc. No changes, alteraTarations, or modifications, other than those in Articles , have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

_____
David A. Barlow
President & Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

_____
David A. Barlow
President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

_____
Ricky Hatfin
Vice President

THE RUDMAN PARTNERSHIP

_____
W. R. (Trey) Sibley
Manager and Attorney-in-Fact

_____
TARA RUDMAN

JJS WORKING INTERESTS LLC
Houston Bulldog Capital Management, LLC

_____
Justin Simons
Manager

- 15 -

Shipps Creek Prospect
A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT Dated Effective: 06-01-12

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____June_____ , (year) __2012__ .

~~, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms-On-A-Disk, Inc. No changes, alteraTarations, or modifications, other than those in Articles have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

_David A. Barlow_
President & Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

_David A. Barlow_
President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

_____
Ricky Haikin
Vice President

THE RUDMAN PARTNERSHIP

_W. R. (Trey) Sibley, III_
Manager and Attorney-in-Fact

_____
TARA RUDMAN

JJS WORKING INTERESTS LLC
Houston Bulldog Capital Management, LLC

_____
Justin Simons
Manager

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____**1st**_____ day of _____**June**_____ , (year) __**2012**__ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alteraTarations, or modifications, other than those in Articles _____ _____, have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

_____

_____
David A. Barlow
President & Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

_____

_____
David A. Barlow
President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

_____
Ricky Haikin
Vice President

_____

THE RUDMAN PARTNERSHIP

_____
W. R. (Trey) Sibley
Manager and Attorney-in-Fact

_____

_____
TARA RUDMAN

JJS WORKING INTERESTS LLC
Houston Bulldog Capital Management, LLC

_____
Justin Simons
Manager

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 1st _____ day of _____ June _____ , (year) _2012_ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alteraTarations, or modifications, other than those in Articles _____ _____, have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

_____
David A. Barlow
President & Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

_____
David A. Barlow
President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

_____
Ricky Haikin
Vice President

THE RUDMAN PARTNERSHIP

_____
W. R. (Trey) Sibley
Manager and Attorney-in-Fact

_____
TARA RUDMAN

JJS WORKING INTERESTS LLC
Houston Bulldog Capital Management, LLC

_____
Justin Simons
Manager

- 15 -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1982

FANT ENERGY LIMITED
Richard E. Fant, L.L.C., its General Partner

_____
Phil O. Kelley
Manager

PICKENS FINANCIAL GROUP, L.L.C.

_____
Michael K. Pickens
Vice President

_____
FLEET HOWELL

TAUBER EXPLORATION & PRODUCTION CO.

_____
Richard E. Tauber
President

TIEMBO, LTD.

_____
Mark Rauch
Registered Agent

KUDZU OIL PROPERTIES, L.L.C.

_____
R. Nash Neyland
Executive Vice President

MARKSCO, L.L.C.

_____
Mark P. Sealy
Member

LANDMARK EXPLORATION, LLC

_____
Larry Johnson
Manager/Member

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

FANT ENERGY LIMITED
Richard E. Fant, L.L.C., its General Partner

_____
Phil O. Kelley
Manager

PICKENS FINANCIAL GROUP, L.L.C.

_____
Michael K. Pickens
Vice President

_____
FLEET HOWELL

TAUBER EXPLORATION & PRODUCTION CO.

_____
Richard E. Tauber
President

TIEMBO, LTD.

_____
Mark Rauch
Registered Agent

KUDZU OIL PROPERTIES, L.L.C.

_____
R. Nash Neyland
Executive Vice President

MARKSCO, L.L.C.

_____
Mark P. Sealy
Member

LANDMARK EXPLORATION, LLC

_____
Larry Johnson
Manager/Member

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

FANT ENERGY LIMITED
Richard E. Fant, L.L.C., its General Partner

Phil O. Kelley
Manager

PICKENS FINANCIAL GROUP, L.L.C.

Michael K. Pickens
Vice President

*Courtney Craig*
Courtney Craig

*Candy Crabtree*
Candy Crabtree

*[signature]*
FLEET HOWELL

TAUBER EXPLORATION & PRODUCTION CO.

Richard E. Tauber
President

TIEMBO, LTD.

Mark Rauch
Registered Agent

KUDZU OIL PROPERTIES, L.L.C.

R. Nash Neyland
Executive Vice President

MARKSCO, L.L.C.

Mark P. Sealy
Member

LANDMARK EXPLORATION, LLC

Larry Johnson
Manager/Member

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

FANT ENERGY LIMITED
Richard E. Fant, L.L.C., its General Partner

_____
Phil O. Kelley
Manager

PICKENS FINANCIAL GROUP, L.L.C.

_____
Michael K. Pickens
Vice President

_____   FLEET HOWELL

TAUBER EXPLORATION & PRODUCTION CO.

_____
Richard E. Tauber
President

*ANDREW HAMLETT*

*JOHN ROBINSON*

*OPERATING AGREEMENT*
*SHIPPS CREEK PROSPECT*
*ESCAMBIA/CONECUH COUNTIES, ALABAMA*

TIEMBO, LTD.

_____
Mark Rauch
Registered Agent

KUDZU OIL PROPERTIES, L.L.C.

_____
R. Nash Neyland
Executive Vice President

MARKSCO, L.L.C.

_____
Mark P. Sealy
Member

LANDMARK EXPLORATION, LLC

_____
Larry Johnson
Manager/Member

- 15 -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1982

FANT ENERGY LIMITED
Richard E. Fant, L.L.C., its General Partner

_____    _____
                                    Phil O. Kelley
_____    Manager


PICKENS FINANCIAL GROUP, L.L.C.

_____    _____
                                    Michael K. Pickens
_____    Vice President


_____    _____
                                    FLEET HOWELL
_____


TAUBER EXPLORATION & PRODUCTION CO.

_____    _____
                                    Richard E. Tauber
_____    President


TIEMBO, LTD.

_____    _Mark Rauch (signature)_____
                                    Mark Rauch
_____    Registered Agent


KUDZU OIL PROPERTIES, L.L.C.

_____    _____
                                    R. Nash Neyland
_____    Executive Vice President

MARKSCO, L.L.C.

_____    _____
                                    Mark P. Sealy
_____    Member


LANDMARK EXPLORATION, LLC

_____    _____
                                    Larry Johnson
_____    Manager/Member

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

FANT ENERGY LIMITED
Richard E. Fant, L.L.C., its General Partner

_____
Phil O. Kelley
Manager

_____


PICKENS FINANCIAL GROUP, L.L.C.

_____
Michael K. Pickens
Vice President

_____


_____   FLEET HOWELL

_____


TAUBER EXPLORATION & PRODUCTION CO.

_____
Richard E. Tauber
President

_____


TIEMBO, LTD.

_____
Mark Rauch
Registered Agent

_____


KUDZU OIL PROPERTIES, L.L.C.

_____
R. Nash Neyland
Executive Vice President

_____


MARKSCO, L.L.C.

_____
Mark P. Sealy
Member

_____


LANDMARK EXPLORATION, LLC

_____
Larry Johnson
Manager/Member

_____

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

FANT ENERGY LIMITED
Richard E. Fant, L.L.C., its General Partner

_____        _____
                                        Phil O. Kelley
                                        Manager
_____


PICKENS FINANCIAL GROUP, L.L.C.

_____        _____
                                        Michael K. Pickens
_____        Vice President


_____          FLEET HOWELL

_____


TAUBER EXPLORATION & PRODUCTION CO.

_____        _____
                                        Richard E. Tauber
_____        President


TIEMBO, LTD.

_____        _____
                                        Mark Rauch
_____        Registered Agent


KUDZU OIL PROPERTIES, L.L.C.

_____        _____
                                        R. Nash Neyland
_____        Executive Vice President

MARKSCO, L.L.C.

_____        _____
                                        Mark P. Sealy
_____        Member


LANDMARK EXPLORATION, LLC

_____        _____
                                        Larry Johnson
_____        Manager/Member

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

FANT ENERGY LIMITED
Richard E. Fant, L.L.C., its General Partner

_____    _____
                                    Phil O. Kelley
                                    Manager


PICKENS FINANCIAL GROUP, L.L.C.

_____    _____
                                    Michael K. Pickens
                                    Vice President


_____    FLEET HOWELL


TAUBER EXPLORATION & PRODUCTION CO.

_____    _____
                                    Richard E. Tauber
                                    President


TIEMBO, LTD.

_____    _____
                                    Mark Rauch
                                    Registered Agent


KUDZU OIL PROPERTIES, L.L.C.

_____    _____
                                    R. Nash Neyland
                                    Executive Vice President


MARKSCO, L.L.C.

_____    _____
                                    Mark P. Sealy
                                    Member


LANDMARK EXPLORATION, LLC

_____    _____
                                    Larry Johnson
                                    Manager/Member

- 15 -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1982

CRAFT EXPLORATION COMPANY, LLC

Stephen H. Craft
Manager/Member

DICKSON OIL & GAS, L.L.C.

_____
C. Bickham Dickson, III
Manager

BUNDERO INVESTMENT COMPANY, L.L.C.

_____
Robert P. Bowman
Manager

RESOURCE VENTURES, LLC

_____
Mark A. Arnold
General Manager

- 15 -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1982

CRAFT EXPLORATION COMPANY, LLC

_____
Stephen H. Craft
Manager/Member


DICKSON OIL & GAS, L.L.C.

_____
C. Bickham Dickson, III
Manager


BUNDERO INVESTMENT COMPANY, L.L.C.

_____
Robert P. Bowman
Manager


RESOURCE VENTURES, LLC

_____
Mark A. Arnold
General Manager

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1982

CRAFT EXPLORATION COMPANY, LLC

_____
Stephen H. Craft
Manager/Member

DICKSON OIL & GAS, L.L.C.

_____
C. Bickham Dickson, III
Manager

BUNDERO INVESTMENT COMPANY, L.L.C.

_____
Robert P. Bowman
Manager

RESOURCE VENTURES, LLC

_____
Mark A. Arnold
General Manager

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

CRAFT EXPLORATION COMPANY, LLC

_____
Stephen H. Craft
Manager/Member


DICKSON OIL & GAS, L.L.C.

_____
C. Bickham Dickson, III
Manager


BUNDERO INVESTMENT COMPANY, L.L.C.

_____
Robert P. Bowman
Manager


RESOURCE VENTURES, LLC

_____
Mark A. Arnold
General Manager

**EXHIBIT "A"**
**SHIPPS CREEK PROSPECT**
**CONECUH AND ESCAMBIA COUNTIES, ALABAMA**

Attached to and made a part of that certain
Shipps Creek Prospect Operating Agreement dated effective as of June 1, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy,
Ltd., The Rudman Partnership, Tara Rudman, JJS Working Interests LLC, Fant Energy
Limited, Pickens Financial Group, LLC, Fleet Howell, Tauber Exploration & Production
Co., Tiembo, Ltd., Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration,
LLC, Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C., Bundero Investment
Company, L.L.C. and Resource Ventures, LLC

(1)   **Identification of lands subject to this agreement:**

**Contract Area**

**And being further described as all lands, oil and gas leasehold interest and
oil and gas interests lying within the red boundary as shown on the plat
designated as Exhibit "A-2".**

Sections  24 & 25, Township 4 North, Range 10 East
Sections 13, 19, 20-25, 29, & 30, Township 4 North, Range 11 East
Sections 7, 8, & 16-19, Township 4 North, Range 12 East
Sections 1, 2, 11-14, 23-26, 35, & 36, Township 3 North, Range 10 East
Sections 2-13, 18, 19, & 25-36, Township 3 North, Range 11 East
Conecuh and Escambia Counties, Alabama

**Area of Mutual Interest**

**And being further described as all lands, oil and gas leasehold interest and
oil and gas interests lying within the red boundary as shown on the plat
designated as Exhibit "A-2".**

Sections  24 & 25, Township 4 North, Range 10 East
Sections 13, 19, 20-25, 29, & 30, Township 4 North, Range 11 East
Sections 7, 8, & 16-19, Township 4 North, Range 12 East
Sections 1, 2, 11-14, 23-26, 35, & 36, Township 3 North, Range 10 East
Sections 2-13, 18, 19, & 25-36, Township 3 North, Range 11 East
Conecuh and Escambia Counties, Alabama

(2)   **Restrictions, if any, as to depths, formations, or substances:**

There are no restrictions except as may be provided for in any lease or contract
subject to this Operating Agreement.

(3)   **Percentages or fractional interests of Parties to this Agreement**

| Owners | Interest |
|---|---|
| Sklarco, LLC | 17.37500000% |
| McCombs Energy, Ltd. | 26.50000000% |
| JJS Working Interests LLC | 10.00000000% |
| Fant Energy Limited | 10.00000000% |
| Fleet Howell | 5.00000000% |
| Pickens Financial Group, LLC | 5.00000000% |
| Tauber Exploration & Production Company | 2.50000000% |
| Tiembo Ltd. | 2.00000000% |
| Kudzu Oil Properties, LLC | 2.00000000% |
| Marksco, L.L.C. | 2.00000000% |
| Landmark Exploration, LLC | 2.00000000% |
| Craft Exploration Company L.L.C. | 1.00000000% |
| Dickson Oil & Gas, LLC | 1.00000000% |
| Bundero Investment Company, L.L.C. | 1.00000000% |
| Resource Ventures, LLC | 0.12500000% |
| The Rudman Partnership | 2.00000000% |
| Tara Rudman | 10.50000000% |
| **TOTAL** | **100.00000000%** |

The above percentages of the Parties to this Agreement are subject to any adjustments called for under the Participation Agreement to which this Agreement is attached as Exhibit "F".

(4)     **Oil and gas leases and/or oil and gas interests subject to this agreement:**

Oil, Gas and Mineral Lease dated June 14, 2012, by and between Cedar Creek Land and Timber, Inc., as Lessor, and Sklar Exploration Company LLC, as Lessee, a memorandum of which is recorded in Book 2012, Page 3443 of the Probate Judge Records of Conecuh County, Alabama.

Oil, Gas and Mineral Lease dated June 14, 2012, by and between Cedar Creek Land and Timber, Inc., as Lessor, and Sklar Exploration Company LLC, as Lessee, a memorandum of which is recorded in Book 536, , Page 166 of the Probate Judge Records of Escambia County, Alabama.

This Agreement covers not only the aforesaid oil and gas lease and/or oil and gas interests, but also any oil and gas leases and/or oil and gas interests acquired after the effective date of this Agreement and covered by the Participation Agreement to which this Agreement is attached as Exhibit "F" or Article VIII.B, VIII.C or XV.K of this Agreement. The only jointly owned lease burdens are the lessor's royalty under each of the oil and gas leases, including the royalty escalation burden thereunder, and the reversionary back-in working interest described in Section 1.4 of the Participation Agreement to which this Agreement is attached as Exhibit "F". There are no other joint burdens whatsoever.

(5)     **Addresses of parties for notice purposes:**

**Sklar Exploration Company, LLC**
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Telephone: (318) 227-8668
Fax: (318) 227-9012
Email: dbarlow@sklarexploration.com

**Sklarco, LLC**
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Telephone: (318) 227-8668
Fax: (318) 227-9012
Email: dbarlow@sklarexploration.com

**MCCOMBS ENERGY, LTD**
McCombs Energy, Ltd.
5599 San Felipe Street, Suite 1200
Houston, Texas  77056-2721
Phone: (713) 621-0033
Fax:  (713) 621-1670
Email:  rhaikin@mccombsenergy.com  and  lwyont@mccombsenergy.com  and
smcdonald@mccombsenergy.com

**JJS Working Interests LLC**
4295 San Felipe, Suite 207
Houston, Texas  77027
Phone: (713) 888-0875
Fax:  (866) 406-9550
Email: justin@hbcapllc.com & suzanne@hbcapllc.com

**Fant Energy Limited**
5800 Westview Drive
Houston, Texas  77055
Phone: (713) 316-1216
Fax: (713) 316-1473
Email: pkelley@nps.cc

**Fleet Howell**
416 Travis Street, Suite 715
Shreveport, Louisiana 71101
Phone: (318) 221-6382
Weekend Phone: (318) 868-1185
Fax: (318) 425-0839
Email: fleet@jfhowell.com

**Pickens Financial Group, LLC**
8499 Greenville Avenue, Suite 105
Dallas, Texas 75231-2417
Telephone: (214) 503-1271
Fax: (214) 503-7247
Email: mike@pickensenergy.com and pjackson33@msn.com

**Tauber Exploration & Production Company**
55 Waugh Drive, Suite 601
Houston, TX 77007
Tel: (713) 869-5656
Fax: (713) 869-1997
Email:   john.robinson@tauberoil.com   and   billh@tauberoil.com   and
terrys@tauberoil.com

**Tiembo Ltd.**
P. O. Box 270415
Houston, Texas 77277-0415
Phone: (713) 627-1700 ext. 109
Weekend Hm Phone: (713) 263-0651
Cell Phone: (713) 818-1374
Mark Rauch Cell Phone: (713) 829-0065
Fax: (713) 621-9292
Email: mrauch@standardsouthern.com and
phanson@standardsouthern.com and rauchm@aol.com

**Kudzu Oil Properties, LLC**
300 Concourse Blvd., Suite 101
Ridgeland, Mississippi 39157
Phone: (601) 987-6576
Fax: (601) 366-1922
Email: kudzu@cavaliergrp.com and pam@cavaliergrp.com

**Marksco, L.L.C.**
333 Texas Street, Suite 1050
Shreveport, Louisiana 71101
Phone: (318) 222-8700 Ext. 7325
Fax: (318) 222-4124
Mobile: (318) 458-0437
Other: (318) 208-3340
Email: marks@sealynet.com

**Landmark Exploration, LLC**
P. O. Box 12004
Jackson, MS 39236
Tel: (601) 932-2121
Cell: (601) 278-8516
Fax: (601) 932-1949
Email: llj@lmhomes.net

**Craft Exploration Company L.L.C.**
325 Lakeshire Parkway
Canton, MS 39046
Cell: (601) 594-4400
Fax: (601) 914-6732
Email: stevecraft@att.net

**Dickson Oil & Gas, LLC**
P. O. Box 52479
Shreveport, Louisiana 71135
Phone: (318) 841-1122
Cell: (318) 458-7277
Fax: (318) 841-1124
Email: bickham@bdicksonproperties.com

**Bundero Investment Company, L.L.C.**
333 Texas Street, Suite 300
Shreveport, Louisiana 71101
Phone: (318) 213-8780
Cell:    (318) 840-6226
Fax: (318) 213-8784
**Email: rbowman@bowmansystems.com**

**Resource Ventures, LLC**
8369 SouthPark Lane, Ste B
Littleton, CO 80120
Phone: (303) 217-5151
Email: Arnold@royaltyexploration.com

**The Rudman Partnership**
W. R. (Trey) Sibley, III
1700 Pacific Avenue, Suite 4700
Dallas, Texas 75204
Phone: (214) 220-3900
Fax: (214) 220-3901
Email: lsanders@rudmangroup.com and tsibley@rudmangroup.com and
wellinfo@rudmangroup.com

**Tara Rudman**
1700 Pacific Avenue
Suite 4700
Dallas, TX 75204
Phone: (214) 220-3900
Fax: (214) 220-3901
Email: lsanders@rudmangroup.com and tsibley@rudmangroup.com and
wellinfo@rudmangroup.com

EXHIBIT "A-2"

Attached to and made a part of that certain
Shipps Creek Joint Operating Agreement dated effective as of June 1, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C.,
McCombs Energy, Ltd., The Rudman Partnership, Tara Rudman,
JJS Working Interests LLC, Fant Energy Limited, Pickens Financial Group, LLC,
Fleet Howell, Tauber Exploration & Production Co., Tiembo, Ltd.,
Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC,
Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C.,
Bundero Investment Company, L.L.C., Resource Ventures, LLC

# EXHIBIT "B"

Producers 88 (7-69) - Paid Up
With 640 Acres Pooling Provision

TRP Form 5-04

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of _____, between

_____

_____

lessor (whether one or more), whose address is:_____

and_____, lessee. WITNESSETH:

1. Lessor, in consideration of ___Ten Dollars and other good and valuable consideration the___ ~~Dollars,~~ receipt of which is hereby acknowledged, and of the covenants and agreements of lessee hereinafter contained, does hereby grant, lease and let unto lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating, for producing and owning oil, gas, ~~sulphur~~ and all other related minerals ~~(whether or not similar to those mentioned)~~, together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, telephone lines, employee houses and other structures on said land, necessary or useful in lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any other land adjacent thereto. The land covered hereby, herein called "said land", is located in the County of ____Conecuh or Escambia____, State of ___Alabama___, and is described as follows:

Said land is described in the Exhibit "A" attached hereto, which exhibit is incorporated herein by reference for all purposes.

~~This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which lessor has a preference right of acquisition.~~ Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain _____000.0_____ acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights and options hereunder.

2. Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of ~~ten (10) years~~ __six (6) months__ from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3. As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipe line to which lessee may connect its wells, the equal ~~one-eighth~~ one-fourth (1/4th) part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such ~~one-eighth~~ one-fourth (1/4th) part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear ~~one-eighth~~ one-fourth (1/4th) of the cost of treating oil to render it marketable pipe line oil; (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, ~~one-eighth~~ one-fourth (1/4th) of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of ~~one-eighth~~ one-fourth (1/4th) of such gas and casinghead gas; (c) To pay lessor on all other minerals ~~mined and~~ marketed or utilized by lessee from said land, ~~one-tenth~~ one-fourth (1/4th) either in kind or value at the well ~~or mine~~ at lessee's election, ~~except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton.~~ If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands within which said land or any portion thereof has been pooled, capable of producing oil or gas, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, ~~and may be deposited in the~~ ~~Bank at _____ or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty.~~ If at any time lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, ~~in the manner above specified,~~ either jointly to such parties or separately to each in accordance with their respective ownership thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment ~~or to a depository bank provided above~~ on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4. Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease with any other land covered by this lease, and/or with any other land, lease, or leases, as to any or all minerals or horizons, so as to establish units containing not more than 80 surface acres, plus 10% acreage tolerance; provided, however, units may be established as to any one or more horizons, or existing units may be enlarged as to any one or more horizons, so as to contain not more than 640 surface acres plus 10% acreage tolerance, if limited to one or more of the following: (1) gas, other than casinghead gas, (2) liquid hydrocarbons (condensate) which are not liquids in the subsurface reservoir, (3) minerals produced from wells classified as gas wells by the conservation agency having jurisdiction. If larger units than any of those herein permitted, either at the time established, or after enlargement, are required under any governmental rule or order, for the drilling or operation of a well at a regular location, or for obtaining maximum allowable from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged to conform to the size required by such governmental order or rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of said options may be exercised by lessee at any time and from time to time while this lease is in force, and whether before or after production has been established either on said land, or on the portion of said land included in the unit, or on other land unitized therewith. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be mineral, royalty, or leasehold interests in lands within the unit which are not effectively pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted upon said land under this lease. There shall be allocated to the land covered by this lease within each such unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) that proportion of the total production of unitized minerals from the unit, after deducting any used in lease or unit operations, which the number of surface acres in such land (or in each such separate tract) covered by this lease within the unit bears to the total number of surface acres in the unit, and the production so allocated shall be considered for all purposes, including payment or delivery of royalty, overriding royalty and any other payments out of production, to be the entire production of unitized minerals from the land to which allocated in the same manner as though produced therefrom under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of any unit hereunder which includes land not covered by this lease shall not have the effect of exchanging or transferring any interest under this lease (including, without limitation, any shut-in royalty which may become payable under this lease) between parties owning interests in land covered by this lease and parties owning interests in land not covered by this lease. Neither shall it impair the right of lessee to release as provided in paragraph 5 hereof, except that lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are released as to lands within the unit. At any time while this lease is in force lessee may dissolve any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. If this lease now or hereafter covers separate tracts, no pooling or unitization of royalty interests as between any such separate tracts is intended or shall be implied or result merely from the inclusion of such separate tracts within this lease but lessee shall nevertheless have the right to pool or unitize as provided in this paragraph 4 with consequent allocation of production as herein provided. As used in this paragraph 4, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the leased premises.

# EXHIBIT "B"

5.  Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations as to the released acreage or interest.

6.  Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

7.  Lessee shall have the use, free from royalty, of water, other than from lessor's water wells, and of oil and gas produced from said land in all operations hereunder. Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing. No well shall be drilled nearer than 200 600 feet to the house or barn now on said land without the consent of the lessor. Lessee shall pay for damages caused by its operations to growing crops and timber on said land.

8.  The rights and estate of any party hereto may be assigned from time to time in whole or in part and as to any mineral or horizon. All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns and successive assigns. No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of lessee including, but not limited to, the location and drilling of wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof of or to lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by lessor or lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of .the death of the owner, lessee may, nevertheless pay or tender such royalties, or other moneys, or part thereof, to the credit estate of the decedent in a depository bank provided for above until final resolution of the estate.

9.  In the event lessor considers that lessee has not complied with all its obligations hereunder, both express and implied, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor. The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee. Neither the service of said notice nor the doing of any acts by lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that lessee has failed to perform all its obligations hereunder. If this lease is cancelled for any cause, it shall nevertheless remain in force and effect as to (1) sufficient acreage around each well as to which there are operations to constitute a drilling or maximum allowable unit under applicable governmental regulations, (but in no event less than forty acres), such acreage to be designated by lessee as nearly as practicable in the form of a square centered at the well, or in such shape as then existing spacing rules require; and (2) any part of said land included in a pooled unit on which there are operations. Lessee shall also have such easements on said land as are necessary to operations on the acreage so retained.

10.  Lessor hereby warrants and agrees to defend title to said land against the claims of all persons whomsoever. Lessor's rights and interests hereunder shall be charged primarily with any mortgages, taxes or other liens, or interest and other charges on lessor's interest in said land, but lessor agrees that lessee shall have the right at any time to pay or reduce same for lessor, either before or after maturity, and be subrogated to the rights of the holder thereof and to deduct amounts so paid from royalties or other payments payable or which may become payable to lessor and/or assigns under this lease. If this lease covers a less interest in the oil, gas, sulphur or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether lessor's interest is herein specified or not), or no interest therein, then the royalties and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by lessor) shall be paid out of the royalty herein provided. This lease shall be binding upon each party who executes it without regard to whether it is executed by all those named herein as lessor.

11.  If, while this lease is in force, at, or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and lessee is not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delay had not occurred.

IN WITNESS WHEREOF, this instrument is executed as of the date first written above.

LESSOR:  _____

LESSOR'S ACKNOWLEDGEMENT:

STATE OF _____

COUNTY OF _____

This instrument was acknowledged before me this _____ day of _____, by _____.

_____
Notary Public, State of _____

TRP Form 5-04 – Page 2 of 2



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

# Exhibit " C "
## ACCOUNTING PROCEDURE
## JOINT OPERATIONS

Attached to and made part of  that certain Operating Agreement dated  June 1 ,  2012by and between Sklar Exploration Company L.L.C., as Operator, and SKLARCO L.L.C., et al, as Non-Operators.

_____

### I. GENERAL PROVISIONS

IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.

1.   **DEFINITIONS**

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

"Affiliate" means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

"Agreement" means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

"Controllable Material" means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

"Equalized Freight" means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

"Excluded Amount" means a specified excluded trucking amount most recently recommended by COPAS.

"Field Office" means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

"First Level Supervision" means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices
- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

"Joint Account" means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

"Joint Operations" means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

"Joint Property" means the real and personal property subject to the Agreement.

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

"Laws" means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

"Material" means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

"Non-Operators" means the Parties to the Agreement other than the Operator.

"Offshore Facilities" means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

"Off-site" means any location that is not considered On-site as defined in this Accounting Procedure.

"On-site" means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

"Operator" means the Party designated pursuant to the Agreement to conduct the Joint Operations.

"Parties" means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

"Participating Interest" means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

"Participating Party" means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

"Personal Expenses" means reimbursed costs for travel and temporary living expenses.

"Railway Receiving Point" means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

"Shore Base Facilities" means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.

"Supply Store" means a recognized source or common stock point for a given Material item.

"Technical Services" means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

2.   STATEMENTS AND BILLINGS

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

c o p a s

3.   **ADVANCES AND PAYMENTS BY THE PARTIES**

A.   Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B.   Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

   (1)   being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

   (2)   being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

   (3)   being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

   (4)   charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

4.   **ADJUSTMENTS**

A.   Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B.   All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

   (1)   a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

   (2)   an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

   (3)   a government/regulatory audit, or

   (4)   a working interest ownership or Participating Interest adjustment.

5.   **EXPENDITURE AUDITS**

A.   A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

**COPAS**

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B. The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C. The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D. If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E. ☐ *(Optional Provision – Forfeiture Penalties)*
*If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*

6. **APPROVAL BY PARTIES**

A. GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B.  AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____ (_____) or more Parties, one of which is the Operator, having a combined working interest of at least _____ percent (_____%), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C.  AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

1.  **RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

2.  **LABOR**

A.  Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1)  Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2)  Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3)  Operator's employees providing First Level Supervision,

(4)  Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5)  Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B.  Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.  Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

C O P A S

D. Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E. Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F. Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G. Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H. Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3. MATERIAL

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4. TRANSPORTATION

A. Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B. Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

   (1) If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property. The Operator shall consistently apply the selected alternative.

   (2) If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5. SERVICES

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6. EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A. The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____ percent (_____%) per annum; provided, however, depreciation shall not be charged when the



equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B.  In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

7. **AFFILIATES**

A.  Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $_____ If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B.  For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $_____ in a given calendar year.

C.  The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

8. **DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

9. **LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

10. **TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

**11. INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12. COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

**14. ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15. OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

## III. OVERHEAD

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**c o p a s**

- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

1.   **OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

☒   **(Alternative 1)** Fixed Rate Basis, Section III.1.B.
☐   **(Alternative 2)** Percentage Basis, Section III.1.C.

A.   TECHNICAL SERVICES

(i)   Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

☒   **(Alternative 1 – Direct)** shall be charged **direct** to the Joint Account.

☐   **(Alternative 2 – Overhead)** shall be covered by the **overhead** rates.

(ii)   Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

☐   **(Alternative 1 – All Overhead)** shall be covered by the **overhead** rates.

☒   **(Alternative 2 – All Direct)** shall be charged **direct** to the Joint Account.

☐   **(Alternative 3 – Drilling Direct)** shall be charged **direct** to the Joint Account, **only** to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

B.   OVERHEAD—FIXED RATE BASIS

(1)   The Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate per month $_10,000.00_____ (prorated for less than a full month)

Producing Well Rate per month $_1,000.00_____

(2)   Application of Overhead—Drilling Well Rate shall be as follows:

(a)   Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead—Producing Well Rate shall be as follows:

(a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e) Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4) The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

C. OVERHEAD—PERCENTAGE BASIS

(1) Operator shall charge the Joint Account at the following rates:

(a) Development Rate _____ percent (_____) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (*Legal Expense*) and all Material salvage credits.

(b) Operating Rate _____ percent (_____%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead—Percentage Basis shall be as follows:

(a) The Development Rate shall be applied to all costs in connection with:

[i] drilling, redrilling, sidetracking, or deepening of a well
[ii] a well undergoing plugback or workover operations for a period of five (5) or more consecutive work–days
[iii] preliminary expenditures necessary in preparation for drilling
[iv] expenditures incurred in abandoning when the well is not completed as a producer
[v] construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead-Major Construction and Catastrophe*).

(b) The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead-Major Construction and Catastrophe*).

2. OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.  If the Operator absorbs the engineering, design and drafting costs related to the project:

(1)  _____5_____% of total costs if such costs are less than $100,000; plus

(2)  _____2_____% of total costs in excess of $100,000 but less than $1,000,000; plus

(3)  _____1_____% of total costs in excess of $1,000,000.

B.  If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1)  _____5_____% of total costs if such costs are less than $100,000; plus

(2)  _____2_____% of total costs in excess of $100,000 but less than $1,000,000; plus

(3)  _____1_____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

3.  **AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

## IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

1.  **DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

*  To be negotiated if the need arises.

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

2.   **TRANSFERS**

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

A.   PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1)   Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

   (a)   For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

   (b)   For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2)   Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3)   Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4)   As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

B.   FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1)   Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2)   Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3)   Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4)   Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

C.   TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

D.   CONDITION

(1)   Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section 1.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2)   Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)   Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)   Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section 1.6.A (*General Matters*).

(5)   Condition "E" – Junk shall be priced at prevailing scrap value prices.

E.   OTHER PRICING PROVISIONS

(1)   Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2)   Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

**c o p a s**

3. **DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

4. **SPECIAL PRICING PROVISIONS**

A. PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

B. SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C. MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**c o p a s**

1. **DIRECTED INVENTORIES**

   Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

   Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

   A. A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

   B. Actual transportation costs and Personal Expenses for the inventory team.

   C. Reasonable charges for report preparation and distribution to the Non-Operators.

2. **NON-DIRECTED INVENTORIES**

   A. OPERATOR INVENTORIES

      Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

   B. NON-OPERATOR INVENTORIES

      Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

   C. SPECIAL INVENTORIES

      The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

## EXHIBIT "D"
Attached to and made a part of that certain
Shipps Creek Prospect Participation Agreement dated effective as of June 1, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C.,
McCombs Energy, Ltd., The Rudman Partnership, Tara Rudman,
JJS Working Interests LLC, Fant Energy Limited, Pickens Financial Group, LLC,
Fleet Howell, Tauber Exploration & Production Co., Tiembo, Ltd.,
Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC,
Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C.,
Bundero Investment Company, L.L.C., Resource Ventures, LLC

Operator shall carry the following insurance with the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of insurance will be provided upon request.

I.   WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

A.  Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

B.  Extension of Coverage B of policy to provide for not less than $500,000 for death or injury to one person in any one accident.

II.   COMPREHENSIVE GENERAL LIABILITY

Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $2,000,000 for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III.   AUTOMOBILE LIABILITY

Coverage shall include owned, non-owned and hired vehicles. Limit $500,000 combined single limit each occurrence for bodily injury and property damage.

IV.   EXCESS LIABILITY

Operator shall carry excess liability insurance in an amount necessary to provide a total of $5,000,000 coverage for both Automobile Liability and Comprehensive General Liability.

Any party, at its own expense, may carry its own coverage for Excess Liability Insurance with limits as set forth in this Section IV. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

V.   EXTRA EXPENSE LIABILITY

Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $25,000 per occurrence.

Liability Limit: $5,000,000

Any party, at its own expense, may carry its own coverage for Extra Expense Liability Insurance with limits as set forth in this Section V. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder.

EXHIBIT "E"

Attached to and made a part of that certain
Shipps Creek Prospect Participation Agreement dated effective as of June 1, 2012,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C.,
McCombs Energy, Ltd., The Rudman Partnership, Tara Rudman,
JJS Working Interests LLC, Fant Energy Limited, Pickens Financial Group, LLC,
Fleet Howell, Tauber Exploration & Production Co., Tiembo, Ltd.,
Kudzu Oil Properties, L.L.C., Marksco, L.L.C., Landmark Exploration, LLC,
Craft Exploration Company, LLC, Dickson Oil & Gas, L.L.C.,
Bundero Investment Company, L.L.C., Resource Ventures, LLC

## GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement, the parties hereto own and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area described in the Operating Agreement (the "JOA").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the gas produced from said JOA. However, one or more of the parties may be unable to take or market its interest in the gas production from time to time; therefore, to permit any party to produce and dispose of its interest in the gas production from the JOA with as much flexibility as possible, the parties hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser. Any party whose share of gas is not marketed shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto monthly statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ration of its participation percentage under this Operating Agreement to the participating percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, it any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Operator will, in turn, make settlement for all royalties and overriding royalties which are payable on gas produced from the Contract Area. In the event that the total royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Contract Area, then any such deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Contract Area shall furnish the Operator with division order title opinions on which Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser shall pay, or cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the volume of gas actually taken for its account.

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold or took but did not sell, less applicable production taxes and royalties theretofore paid, less any reasonable compression, treating, gathering, or transportation costs actually incurred and paid to third party, unaffected entitles and otherwise directly in connection with the sale of the overproduction, at the price received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party. Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

I, _[signature]_____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklar Exploration Company L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _19th_ day of _June_____, 2012.

_[signature]_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Bettye M. LaCour, Notary Public # 3620
Caddo Parish, Louisiana
My Commission is for Life


STATE OF LOUISIANA

PARISH OF CADDO

I, _[signature]_____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklarco L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _19th_ day of _June_____, 2012.

_[signature]_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____
Bettye M. LaCour, Notary Public # 3620
Caddo Parish, Louisiana
My Commission is for Life

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

I, _Bettye M. LaCour_, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklar Exploration Company L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _19th_ day of _June_, 2012.

_Bettye M. LaCour_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Bettye M. LaCour, Notary Public # 3620
Caddo Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

I, _Bettye M. LaCour_, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of Sklarco L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _19th_ day of _June_, 2012.

_Bettye M. LaCour_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____ Bettye M. LaCour, Notary Public # 3620
Caddo Parish, Louisiana
My Commission is for Life

STATE OF TEXAS

COUNTY OF _Harris_

I, _Olivia Bailey_, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _21st_ day of _June_, 2012.

_Olivia Bailey_
NOTARY PUBLIC

OLIVIA BAILEY
Notary Public, State of Texas
Commission Expires 11-16-2014

[AFFIX NOTARIAL SEAL]

My Commission Expires: _11-16-2014_

STATE OF TEXAS

COUNTY OF _Dallas_

    I, _Robert Hiram Lucius_, a notary public in and for said County and State, hereby certify that W. R. (Trey) Sibley, III, whose name as Attorney-in-Fact of THE RUDMAN PARTNERSHIP, a Texas general partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said partnership.

    Given under my hand and notarial seal this the 25 day of _June_, 2012.

ROBERT HIRAM LUCIUS
Notary Public, State of Texas
My Commission Expires
04/15/2016

_Robert Hiram Lucius_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF _____

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that TARA RUDMAN, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she executed the same as her free act and deed.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF TEXAS

COUNTY OF HARRIS

    I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that W. R. (Trey) Sibley, III, whose name as Attorney-in-Fact of THE RUDMAN PARTNERSHIP, a Texas general partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said partnership.

Given under my hand and notarial seal this the ___ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF _TEXAS_

COUNTY OF _DALLAS_

I, _LINDA SANDERS_, a notary public in and for said County and State, hereby certify that TARA RUDMAN, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she executed the same as her free act and deed.

Given under my hand and notarial seal this the _26th_ day of _June_, 2012.

[seal: LINDA SANDERS
Notary Public, State of Texas
My Commission Expires
05/14/2016]

_Linda Sanders_
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _5.14.16_


STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that W. R. (Trey) Sibley, III, whose name as Attorney-in-Fact of THE RUDMAN PARTNERSHIP, a Texas general partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said partnership.

     Given under my hand and notarial seal this the ___ day of _____, 2012.

                               _____
                                     NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that TARA RUDMAN, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she executed the same as her free act and deed.

     Given under my hand and notarial seal this the _____ day of _____, 2012.

                                 _____
                                     Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF HARRIS

     I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

     Given under my hand and notarial seal this the ___2nd___ day of ___July___, 2012.

                                 _____
                                       NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: ___8-11-15___

MARCIA A. DE LUNA
Notary Public, State of Texas
My Commission Expires
August 11, 2015

STATE OF TEXAS

COUNTY OF _Harris_

    I, _Brenda Witt White_, a notary public in and for said County and State, hereby certify that Richard E. Fant, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, represented herein by its General Partner, Richard E. Fant, L.L.C., which itself is represented herein by its Manager, Phil O. Kelley, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

    Given under my hand and notarial seal this the __2/st__ day of __June__, 2012.

<div style="text-align:right">_Brenda Witt White_</div>

<div style="text-align:right">Notary Public</div>

> BRENDA WITT WHITE
> Notary Public, State of Texas
> My Commission Expires
> March 23, 2015
> NOTARIAL SEAL

My commission expires: _3·23·15_


STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as duly authorized Vice President of PICKENS FINANCIAL GROUP, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

<div style="text-align:right">_____</div>

<div style="text-align:right">NOTARY PUBLIC</div>

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

    I, _____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

<div style="text-align:right">_____</div>

<div style="text-align:right">Notary Public</div>

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Richard E. Fant, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, represented herein by its General Partner, Richard E. Fant, L.L.C., which itself is represented herein by its Manager, Phil O. Kelley, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF TEXAS

COUNTY OF _Dallas_

I, _Marilyn L. Fulton_, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as duly authorized Vice President of PICKENS FINANCIAL GROUP, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _25th_ day of __June__, 2012.

Marilyn L Fulton
My Commission Expires
06/23/2016

_Marilyn L. Fulton_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _6-23-16_


STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Richard E. Fant, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, represented herein by its General Partner, Richard E. Fant, L.L.C., which itself is represented herein by its Manager, Phil O. Kelley, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as duly authorized Vice President of PICKENS FINANCIAL GROUP, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

      I, _Melissa R. Ebarb_, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

      Given under my hand and notarial seal this the _29th_ day of _June_, 2012.

_Melissa R. Ebarb_
Notary Public

#68325

(AFFIX NOTARIAL SEAL)

My commission ~~expires~~ _is for life_

*Acr. Page – Operating Agreement – Shipps Creek Prospect* [handwritten]

STATE OF TEXAS

COUNTY OF ~~Harris~~ [handwritten]

I, ~~Myla Wunderlich~~ [handwritten], a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as duly authorized President of ==TAUBER EXPLORATION & PRODUCTION CO.==, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ~~27th~~ [handwritten] day of ~~June~~ [handwritten], 2012.

NOTARY PUBLIC  *[signature]*

[AFFIX NOTARIAL SEAL]

> MYLA WUNDERLICH
> Notary Public, State of Texas
> Commission Expires 02-11-2016

My Commission Expires:

> MYLA WUNDERLICH
> Notary Public, State of Texas
> Commission Expires 02-11-2016

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as duly authorized President of TAUBER EXPLORATION & PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                                  _____
                                    NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF *HARRIS*

    I, *PATTI L HANSON*, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the *25* day of *June*, 2012.

PATTI L. HANSON
MY COMMISSION EXPIRES
January 18, 2015

                                *Patti L Hanson*
                                  NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: *1/18/15*


STATE OF MISSISSIPPI

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                                    _____
                                    NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as duly authorized President of TAUBER EXPLORATION & PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                                         _____
                                         NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2012.

                                         _____
                                         NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF Madison

    I, Pamela F. Sebren _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the 25 day of June _____, 2012.

                                         Pamela F. Sebren
                                         NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires:

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 63506
PAMELA F. SEBREN
Commission Expires
July 18, 2013
RANKIN COUNTY

STATE OF LOUISIANA

PARISH OF CADDO

~~PEGGY DAY GILL, NOTARY PUBLIC~~
~~CADDO PARISH, LOUISIANA~~
~~MY COMMISSION IS FOR LIFE~~
~~NOTARY NO. 2425~~

I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _27_ day of _June_, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Larry Johnson, whose name as duly authorized Manager/Member of LANDMARK EXPLORATION, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Steven H. Craft, whose name as duly authorized Manager/Member of CRAFT EXPLORATION COMPANY, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

                                        _____
                                             Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF MISSISSIPPI

COUNTY OF _Rankin_

      I, _Lena M. Mayfield_, a notary public in and for said County and State, hereby certify that Larry Johnson, whose name as duly authorized Manager/Member of LANDMARK EXPLORATION, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _22_ day of _June_, 2012.

                                       _Lena M. Mayfield_
                                           NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _2-17-13_

*(Notary seal: STATE OF MISSISSIPPI, NOTARY PUBLIC, ID # 92353, LENA M. MAYFIELD, Commission Expires Feb. 17, 2013, RANKIN COUNTY)*

STATE OF MISSISSIPPI

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Steven H. Craft, whose name as duly authorized Manager/Member of CRAFT EXPLORATION COMPANY, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

                                        _____
                                          NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires:

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Larry Johnson, whose name as duly authorized Manager/Member of LANDMARK EXPLORATION, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF _Madison_

I, _The Gordon Dawson_, a notary public in and for said County and State, hereby certify that Steven H. Craft, whose name as duly authorized Manager/Member of CRAFT EXPLORATION COMPANY, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _23_ day of _June_, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires:

STATE OF LOUISIANA

PARISH OF CADDO

I, *George Portocarrero*, a notary public in and for said Parish and State, hereby certify that C. Bickham Dickson, III, whose name as Member of the DICKSON OIL & GAS, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the *10th* day of *July*, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: *For Life*

GEORGE PORTOCARRERO
NOTARY PUBLIC - LOUISIANA
CADDO - BOSSIER PARISH
NOTARY ID NUMBER 056297
My Commission Is For Life

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF COLORADO

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Mark A. Arnold, whose name as duly authorized General Manager of RESOURCE VENTURES, LLC, an Indiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that C. Bickham Dickson, III, whose name as Member of the DICKSON OIL & GAS, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
                              Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _Deborah W. Cox_____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _28th_ day of _June_____, 2012.

_Deborah W. Cox_____
                      NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _for life___

> DEBORAH W. COX 26623
> Notary Public
> Parish of Caddo
> State of Louisiana

STATE OF COLORADO

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Mark A. Arnold, whose name as duly authorized General Manager of RESOURCE VENTURES, LLC, an Indiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that C. Bickham Dickson, III, whose name as Member of the DICKSON OIL & GAS, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2012.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF COLORADO

COUNTY OF _Douglas_

I, _JoAnne Scherfel_, a notary public in and for said County and State, hereby certify that Mark A. Arnold, whose name as duly authorized General Manager of RESOURCE VENTURES, LLC, an Indiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _25Th_ day of _June_, 2012.

_JoAnne Scherfel_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _3/5/2013_