# PARTICIPATION AGREEMENT

EXHIBIT C

### Escambia Prospect
### Escambia and Conecuh Counties, Alabama

**THIS PARTICIPATION AGREEMENT** (the "Agreement"), dated effective as of the 1st day of November, 2006 (the "Effective Date"), is entered into by and between the following (sometimes herein referred to singularly as a "Party" or collectively as the "Parties"):

> **SKLAR EXPLORATION COMPANY L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its Chief Operating Officer, David A. Barlow ("SEC" or "Operator");

> **SKLARCO L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its Chief Operating Officer, David A. Barlow ("Sklarco");

> **McCOMBS ENERGY, LTD.**, a Texas limited partnership, whose address is 5599 San Felipe, Suite 1200, Houston, Texas 77056-2794, represented herein by its Vice President, Ricky Haikin ("McCombs");

> **WAC INVESTMENT COMPANY, LLC**, a Louisiana limited liability company, whose address is 333 Texas Street, Suite 2121, Shreveport, Louisiana 71101, represented herein by its Executive Vice President, Michael E. Riddick ("WAC");

> **THE RUDMAN PARTNERSHIP**, a Texas general partnership, whose address is 1700 Pacific Avenue, Ste. 4700, Dallas, TX 75201-4670, represented herein by W. R. (Trey) Sibley, III, its duly authorized Attorney in Fact ("Rudman");

> **PICKENS FINANCIAL GROUP, LLC**, a Texas limited liability company, whose address is 8499 Greenville Avenue, Suite 105, Dallas, Texas 75231-2417, represented herein by its Vice President, Michael K. Pickens ("Pickens");

> (hereinafter Sklarco, McCombs, WAC, Rudman and Pickens are sometimes referred to collectively as the "Participants" or individually as a "Participant");

### W I T N E S S E T H:

**WHEREAS**, Sklarco holds record title for and on behalf of SEC to the oil, gas and other mineral leases (hereinafter sometimes referred singularly as a "Lease" or collectively as the "Leases") described on Exhibit "A-1," attached hereto and made a part hereof, covering lands located in Escambia and Conecuh Counties, Alabama, lying within a contract area (the "Contract Area") outlined in black on the plat attached hereto as Exhibit "A," which itself is lying within an area of mutual interest (the "AMI") outlined in red on said plat, generally known as the Escambia Prospect (the "Prospect"); and

**WHEREAS**, SEC desires to sell, and the Participants desire to acquire, all of SEC's right, title and interest in and to the Leases, and the Participants desire to participate in the drilling of an exploratory well to test the Prospect operated by SEC (the "Initial Well"); and

**WHEREAS**, the Parties desire to enter this Agreement to set forth the terms and conditions under which they sell, acquire or retain those working interests and drill the Initial Well.

**NOW, THEREFORE**, the Parties agree as follows:

## Article I.  Purchase And Sale And Development Commitments

### Section 1.1.  Leases

SEC represents and warrants that it owns the Leases and that all of those Leases are in full force and effect.  The Participants have either tendered to SEC, or shall tender to SEC concurrent with their execution of this Agreement, in the following proportions, the amount Seven Hundred Fifty Thousand and No/100 Dollars $750,000 (collectively, the "Prospect Fee"), representing the total lease bonus, brokerage, geological, geophysical and other costs associated with the prospect through the Effective Date:

| Participant | Proportion | Amount |
|---|---|---|
| Sklarco | 0.37500000 | $281,250 |
| McCombs | 0.25000000 | $187,500 |
| WAC | 0.20000000 | $150,000 |
| Rudman | 0.12500000 | $ 93,750 |
| Pickens | 0.05000000 | $ 37,500 |
| *Total* | 1.00000000 | $750,000 |

For and in consideration of the Prospect Fee and the reservation of reversionary back-in working interest described below, SEC hereby sells and agrees to cause Sklarco or such other record title owner formally to assign to the Participants in the same proportions, upon full payment and receipt of the Prospect Fee if the Participant so desires or otherwise within thirty (30) days from receipt of written notice to SEC, by means of the form of assignment attached hereto as Exhibit "B," all of its right, title and interest in and to the Leases.  This assignment of this interest shall be (i) proportionately reduced to the interest owned by SEC, (ii) made without warranty of title, express or implied, not even for return of the Prospect Fee, except SEC agrees to warrant title against all defects arising out of claims by SEC, Sklarco or of persons claiming by, through or under SEC or Sklarco, (iii) subject to all burdens of record, (iv) subject to the terms of the Leases and (v) subject to this Agreement and the JOA described in Section 2.1 of this Agreement. SEC represents, but does not warrant, that it is delivering a cumulative net revenue interest in the Leases to the Participants of approximately 77.5%.  Notwithstanding anything herein to the contrary, the assignment as to Rudman (and only as to Rudman) shall exclude any of the Leases insofar and only insofar as they cover lands located within the blue outline on the plat attached as Exhibit "A" (and being further identified as Sections 27, 28, 29, 32, 33 and 34, Township 4 North, Range 13 East, Conecuh County, Alabama).

### Section 1.2.  Initial Well

#### Subsection 1.2(a).  Drilling Of The Initial Well

On or before June 1, 2007, and subject to rig availability, SEC shall commence or cause to be commenced operations for the drilling of the Initial Well at a location of Operator's choice within Section 5, Township 3 North, Range 13 East, Escambia County, Alabama, or as near thereto as practicable, and thereafter continue the drilling of the Initial Well with due diligence to a measured depth of 12,000' in a vertical bore hole, or a depth sufficient in SEC's discretion, to test the Upper Smackover and Norphlet Formations, whichever is more shallow (the "Objective Depth"). The Participants agree to participate in the drilling of the Initial Well to the Objective Depth in the following proportions:

| Participant | Proportion |
|---|---|
| Sklarco | 0.37500000 |
| McCombs | 0.25000000 |
| WAC | 0.20000000 |
| Rudman | 0.12500000 |
| Pickens | 0.05000000 |
| *Total* | 1.00000000 |

Concurrent with their execution of this Agreement, the Participants agree to execute an Authority For Expenditure ("AFE") attached hereto as Exhibit "D." Notwithstanding the estimates contained in the AFE, subject to Article XV.AA of the JOA, the Participants are responsible for and must pay SEC their share of all actual costs to drill the Initial Well to the Objective Depth in the following manner: (i) SEC will furnish the Participants with a Cash Call Invoice approximately thirty (30) days before its anticipated spud date of the Initial Well covering their share of the amount estimated in the AFE to drill the Initial Well to the Objective Depth, excluding estimated completion costs, but including the amount estimated to plug and abandon the Initial Well in the event it is not completed as a producing well, and the Participants must tender to SEC as an advance, within fifteen (15) days of receipt and, in any event, prior to spudding the Initial Well, full payment of the Cash Call Invoice; and (ii) the Participants must tender to SEC, within 15 days of receipt of (an) invoice(s) from SEC, the difference, if any, between said advance and their share of the actual costs to drill the Initial Well to the Objective Depth.

If any Participant fails to pay its share of the actual costs to drill the Initial Well to the Objective Depth in the manner and within the time deadlines set forth above, then, in that event, and only in that event, that Party hereby agrees to relinquish all of its right, title and interest in the Prospect and the Leases and to execute those instruments provided by SEC necessary to convey said interest to the Participants who paid their share of the actual costs to drill the Initial Well to the Objective Depth and who elect to accept such an additional interest or portion thereof, for no consideration, not even for return of the Prospect Fee or drilling advance. This forfeiture of interest shall be without prejudice and in addition to the rights of the Operator and Non-Operators who paid their shares of the actual costs to drill the Initial Well to the Objective Depth to offset and recover all sums owed by a Party that fails to pay its share of actual costs to drill the Initial Well to the Objective Depth.

### Subsection 1.2(b).  Operations After Reaching The Objective Depth

After the Initial Well has been drilled to the Objective Depth, SEC shall make a copy of any logs, core analysis, drill-stem test analysis or results of any other tests or evaluations available to a representative of the Participants at the wellsite, or if none is present, by email, mail, facsimile or overnight delivery.  SEC shall also furnish the Participants in a like manner with its recommendation regarding the disposition of the wellbore, in accordance with the JOA.  Failure to respond within the time specified shall be deemed an election to participate in SEC's recommended operation.  An election not to participate in an election to set production casing and complete the Initial Well shall result in the forfeiture of interest not only in the Initial Well, but also in the entire Contract Area and AMI pursuant to Article XV.C of the JOA.  Said forfeiture shall only apply if two (2) or more of the cost bearing Parties owning a minimum of sixty percent (60%) elect and participate in setting production pipe and completion of said well.  All subsequent operations and elections shall be governed by the following provisions of the JOA.

### Section 1.3.  Reversionary Back-In Working Interest

As further consideration for the sale described in Section 1.1 above, upon reaching Prospect Payout (as defined below), an undivided twenty-five percent (25%) of the other Participants' interests in the Leases, wells, Contract Area and AMI shall automatically and permanently revert to and vest in Sklarco.  At Sklarco's request, those other Participants will assign said interest unto Sklarco after Project Payout, including, without limitation, a like interest in the Leases, the proceeds from the sale of oil, gas, and all other products produced or derived from any and all wells drilled within the Prospect, and in any easements, rights of way, personal property, equipment, facilities and pipelines associated with such wells.

Prospect Payout is defined on a Prospect (not well-by-well) basis as the first day of the calendar month following the month in which a Participant's share of the total and cumulative revenue resulting from or relating to the Prospect, equals that Participant's share of the total and cumulative cost incurred within that Prospect. For purposes of Prospect Payout, (i) the total and cumulative revenue shall consist of the Participant's share of all proceeds from the sale of all oil, gas and other hydrocarbons and minerals saved and sold from the applicable Prospect and any other income, bonus payment or other revenue attributable to the Participant's interest therein, and (ii) the total and cumulative cost incurred shall include the Participant's share of all royalty and overriding royalty payments, severance, ad valorem, production and other taxes applicable to production and

not measured by the Participant's other income, all lease acquisition and maintenance costs, all seismic survey and data costs, geological and geophysical evaluation costs, including the Prospect Fee, all costs for site preparation, drilling, completing, reworking, deepening, sidetracking, logging, stimulation, testing, equipping, operating, plugging and abandoning the Initial Well and all other wells within the Prospect, and the cost of all surface damages, pipelines, gathering and other production handling facilities related thereto.

## Article II.  Operations

### Section 2.1.  JOA

SEC is hereby designated initial Operator.  Except as otherwise provided in this Agreement, all operations within the Contract Area shall be governed by the joint operating agreement (the "JOA"), covering the Contract Area attached hereto as Exhibit "D."  Insofar and only insofar as it applies to Rudman, the Contract Area shall exclude lands located within the blue outline on the plat attached hereto as Exhibit "A" (and being further identified as Sections 27, 28, 29, 32, 33 and 34, Township 4 North, Range 13 East, Conecuh County, Alabama).  The Parties agree to execute the JOA concurrent with their execution of this Agreement.  In the event of a conflict between this Agreement and the JOA, this Agreement shall govern and control.

## Article III.  Miscellaneous

### Section 3.1.  AMI

The Parties have formed an AMI under the terms contained in Article XV.M of the JOA covering the lands within the red outline on the plat attached hereto as Exhibit "A" which shall govern all other acquisitions within the Contract Area.  Notwithstanding any provisions contained in said Article XV.M, or otherwise in this Agreement, Rudman has no obligation to offer any oil and gas leases and/or oil and gas interests covering lands located within the blue outline on said Exhibit "A" (and being further identified as Sections 27, 28, 29, 32, 33 and 34, Township 4 North, Range 13 East, Conecuh County, Alabama) to the other Participants, and neither SEC nor the other Participants have any obligation to offer Rudman any oil and gas leases and/or oil and gas interests covering lands located within that blue outline.  The Participants other than Rudman shall have the right to share in any oil and gas leases and/or oil and gas interests covering lands located within that blue outline in proportion to which their interest bears to one another, excluding the interest of Rudman.

### Section 3.2.  Information

Upon execution of this Agreement by all of the Parties, any Participate may request and shall be entitled to a copy of all of the Leases and of the drill-site title opinion for the drill-site tract of the Initial Well.

### Section 3.3.  Confidentiality

The Parties agree to keep confidential and not disclose any information about this Prospect, not already disclosed or of public record, to third parties for so long as this Agreement is in effect, except that any Party may disclose information about the Prospect to bona fide third party prospective purchasers of that Party's working interest in the Prospect.

### Section 3.4.  Closing

Closing shall occur by mail or by such other means and at such time and place to which the Parties mutually agree.

### Section 3.5.  Binding On Successors And Assigns

This Agreement shall enure to the benefit of and be binding upon the Parties hereto and their respective successors and assigns.

### Section 3.6.  Entire Agreement

This Agreement and its attachments constitute the entire agreement of the Parties with respect to the subject matter hereof, and any other promises, inducements, representations, warranties or agreements with respect to the subject matter hereof have been superseded hereby and are not intended to survive this Agreement.  Except as otherwise expressly provided herein, no amendment or modification of this Agreement shall be effective unless set forth in writing and signed by a duly authorized officer of each of the Parties.

### Section 3.7.  Severability

The invalidity of any one or more of the provisions of this Agreement does not affect the remaining portions of this Agreement, and in case of any such invalidity, this Agreement should be construed as if the invalid provision(s) had not been inserted.

### Section 3.8.  Notices

All notices between the Parties authorized or required by any of the provisions of this Agreement, unless otherwise expressly provided, shall be given in writing by email or facsimile or regular mail, addressed to those of the Parties to whom the notice is given at the email addresses or fax telephone numbers and addresses set forth in Exhibit "A" to the JOA.  Any of the Parties may change its designated email address, fax telephone number and address at any time, and from time to time, by giving written notice thereof to the other Parties.

### Section 3.9.  Headings for Convenience

The article, section and subsection headings used in this Agreement are inserted for convenience only and shall not be regarded in construing this Agreement.

### Section 3.10.  Governing Law

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Alabama.

### Section 3.11.  Relationship Of The Parties

Liability of the Parties hereto shall be several and not joint or collective.  Each Party shall make its own elections under this Agreement and shall be responsible only for its obligations as herein set out.  It is not the intention of the Parties to create, nor shall this Agreement be construed as creating, a mining or other partnership, joint venture or association between the Parties.

### Section 3.12.  Assignability

The Parties to this Agreement may assign all or part of their rights and obligations hereunder, provided, however, that any such assignment must be made subject to the terms and conditions of this Agreement and the JOA.

### Section 3.13.  Term

This Agreement shall remain in full force and effect as between the Parties until expiration of the last lease jointly owned by them, or any combination of the Parties, covering any part of the AMI.

### Section 3.14.  Sophisticated Investors

By execution of this Agreement, the Participants confirm that they have a working knowledge of the oil and gas industry and that they each has thoroughly investigated its participation in the Prospect.  Each Participant acknowledges that it is a sophisticated investor and it (or its owner) has a financial net worth in excess of one million dollars.  Each Participant represents it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of not just its share of the Prospect Fee and drilling advance, but also its

share of all other costs incurred in operations on the Prospect.    EACH PARTICIPANT ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES. Each Participant further confirms and accepts that the offering of the interest herein purchased has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the States of Louisiana or Alabama, or any other state.  Each Participant has hereby agreed to participate in the Prospect for investment purposes only, and not with a view to or for sale in connection with any distribution of interests in the Prospect within the meaning of said laws.

### Section 3.15.  Counterparts

This Participation Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

THUS DONE AND SIGNED This *14* day of *DECEMBER*, 2006, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By _____
    David A. Barlow
    Chief Operating Officer

SKLARCO L.L.C.

By _____
    David A. Barlow
    Chief Operating Officer

McCOMBS ENERGY, LTD.

By_____
    Ricky Haikin
    Vice President

WAC INVESTMENT COMPANY, LLC

By_____
    Michael E. Riddick
    Executive Vice President

PICKENS FINANCIAL GROUP, LLC

By:_____
    Michael K. Pickens
    Vice President

THE RUDMAN PARTNERSHIP

By:_____
    W. R. (Trey) Sibley, III
    Attorney in Fact

share of all other costs incurred in operations on the Prospect. EACH PARTICIPANT ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES. Each Participant further confirms and accepts that the offering of the interest herein purchased has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the States of Louisiana or Alabama, or any other state. Each Participant has hereby agreed to participate in the Prospect for investment purposes only, and not with a view to or for sale in connection with any distribution of interests in the Prospect within the meaning of said laws.

### Section 3.15. Counterparts

This Participation Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

THUS DONE AND SIGNED This _____ day of _____, 2006, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By _____
    David A. Barlow
    Chief Operating Officer

SKLARCO L.L.C.

By _____
    David A. Barlow
    Chief Operating Officer

McCOMBS ENERGY, LTD.

By_____
    Ricky Halkin
    Vice President

WAC INVESTMENT COMPANY, LLC

By_____
        Michael E. Riddick
        Executive Vice President

PICKENS FINANCIAL GROUP, LLC

By:_____
        Michael K. Pickens
        Vice President

THE RUDMAN PARTNERSHIP

By:_____
        W. R. (Trey) Sibley, III
        Attorney in Fact

share of all other costs incurred in operations on the Prospect.  EACH PARTICIPANT ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES. Each Participant further confirms and accepts that the offering of the interest herein purchased has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the States of Louisiana or Alabama, or any other state.  Each Participant has hereby agreed to participate in the Prospect for investment purposes only, and not with a view to or for sale in connection with any distribution of interests in the Prospect within the meaning of said laws.

### Section 3.15.  Counterparts

This Participation Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

THUS DONE AND SIGNED This ____ day of _____, 2006, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By_____
David A. Barlow
Chief Operating Officer

SKLARCO L.L.C.

By_____
David A. Barlow
Chief Operating Officer

McCOMBS ENERGY, LTD.

By_____
Ricky Haikin
Vice President

WAC INVESTMENT COMPANY, LLC

By_____
Michael E. Riddick
Executive Vice President

PICKENS FINANCIAL GROUP, LLC

By:_____
Michael K. Pickens
Vice President

THE RUDMAN PARTNERSHIP

By:_____
W. R. (Trey) Sibley, III
Attorney in Fact

share of all other costs incurred in operations on the Prospect.   EACH PARTICIPANT ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES. Each Participant further confirms and accepts that the offering of the interest herein purchased has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the States of Louisiana or Alabama, or any other state. Each Participant has hereby agreed to participate in the Prospect for investment purposes only, and not with a view to or for sale in connection with any distribution of interests in the Prospect within the meaning of said laws.

### Section 3.15. Counterparts

This Participation Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

THUS DONE AND SIGNED This 27 day of December, 2006, but effective as of the Effective Date.

Pickens Financial Group's acceptance of the attached JOA is conditioned upon the inclusion of the following clause in the JOA:

Until receipt by Operator of notice from Non-Operator to discontinue such sales, Operator will market and sell the gas and associated hydrocarbons attributable to the interest of Non-Operator in the Contract Area, will receive the proceeds of such a sale, and will disburse such proceeds (less applicable production and severance taxes) to Non-Operator and the royalty and overriding royalty owners entitled to receive the same, in proportion to their respective interests. To effect such a sale, Operator may enter into contracts for the sale of such gas, provided that no such contract shall extend for a period in excess of one (1) year. Operator will notify Non-Operator promptly of the execution of any contract for the sale of Non-Operator's gas which is to continue for a period in excess of ninety (90) days.

Such gas and associated hydrocarbons shall be sold for a price which is not less than the price Operator receives for its own gas and associated hydrocarbons produced from the Contract Area.

Such authority and responsibility of Operator to market and sell the gas and associated hydrocarbons of Non-Operator may be revoked by Non-Operator by notice to Operator delivered not less than 15 days prior to the date on which such revocation is to become effective. Such a revocation shall not affect the validity of a contract in respect of which Non-Operator has received notice as hereinabove provided.

SKLAR EXPLORATION COMPANY L.L.C.

By _____
  David A. Barlow
  Chief Operating Officer

SKLARCO L.L.C.

By _____
  David A. Barlow
  Chief Operating Officer

McCOMBS ENERGY, LTD.

By_____
  Ricky Haikin
  Vice President

WAC INVESTMENT COMPANY, LLC

By_____
  Michael E. Riddick
  Executive Vice President

PICKENS FINANCIAL GROUP, LLC

By: _____
  Michael K. Pickens
  Vice President

THE RUDMAN PARTNERSHIP

By: _____
  W. R. (Trey) Sibley, III
  Attorney in Fact

share of all other costs incurred in operations on the Prospect. EACH PARTICIPANT ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES. Each Participant further confirms and accepts that the offering of the interest herein purchased has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the States of Louisiana or Alabama, or any other state. Each Participant has hereby agreed to participate in the Prospect for investment purposes only, and not with a view to or for sale in connection with any distribution of interests in the Prospect within the meaning of said laws.

### Section 3.15. Counterparts

This Participation Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

THUS DONE AND SIGNED This ____ day of _____, 2006, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By _____
     David A. Barlow
     Chief Operating Officer

SKLARCO L.L.C.

By _____
     David A. Barlow
     Chief Operating Officer

McCOMBS ENERGY, LTD.

By_____
     Ricky Haikin
     Vice President

WAC INVESTMENT COMPANY, LLC

By_____
     Michael E. Riddick
     Executive Vice President

PICKENS FINANCIAL GROUP, LLC

By:_____
     Michael K. Pickens
     Vice President

THE RUDMAN PARTNERSHIP

By:_____
     W. R. (Trey) Sibley, III
     Attorney in Fact

Attachments
  Exhibit "A":   Plat
  Exhibit "A-1":  Description of Leases
  Exhibit "B":   Form of Assignment
  Exhibit "C":   AFE
  Exhibit "D":   JOA

## EXHIBIT "A"

Attached to and made a part of that certain Participation Agreement dated November 1, 2006, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., WAC Investment Company, L.L.C., Pickens Financial Group, LLC, and The Rudman Partnership, as Non-Operators.



# EXHIBIT "A-1"

Attached to and made a part of that certain Participation Agreement
dated effective as of November 1, 2006, by and between
Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd.,
WAC Investment Company, LLC, The Rudman Partnership and Pickens Financial Group, LLC

## DESCRIPTION OF OIL, GAS AND OTHER MINERAL LEASES

1.  Oil, Gas and Mineral Lease dated December 28, 2005, by and between Cary Page, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2022 of the Probate Judge Records of Conecuh County, Alabama.

2.  Oil, Gas and Mineral Lease dated December 28, 2005, by and between Dorothy Faye Jones, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2024 of the Probate Judge Records of Conecuh County, Alabama.

3.  Oil, Gas and Mineral Lease dated December 28, 2005, by and between Dwight Taylor, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2026 of the Probate Judge Records of Conecuh County, Alabama.

4.  Oil, Gas and Mineral Lease dated January 9, 2006, by and between Tully L. Logan, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 779 of the Probate Judge Records of Escambia County, Alabama.

5.  Oil, Gas and Mineral Lease dated January 9, 2006, by and between Jack D. Logan, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 777 of the Probate Judge Records of Escambia County, Alabama.

6.  Oil, Gas and Mineral Lease dated January 9, 2006, by and between Kenneth Allen Baker, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2028 of the Probate Judge Records of Conecuh County, Alabama.

7.  Oil, Gas and Mineral Lease dated February 16, 2006, by and between Cedar Creek Land & Timber, as Lessor, and John C. Albury, as Lessee, the existence of which is set forth by that Declaration of Lease dated February 24, 2006 and recorded in Book 2006, Page 2091 of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 771 of the Probate Judge Records of Escambia County, Alabama.

8.  Oil, Gas and Mineral Lease dated January 9, 2006, by and between Raymond B. Logan, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 775 of the Probate Judge Records of Escambia County, Alabama.

9.  Oil, Gas and Mineral Lease dated January 24, 2006, by and between Loree R. Hamiter, James E. Hamiter and Harold W. Hamiter, as Trustees under the Last Will and Testament of Harold E. Hamiter, deceased, dated February 14, 1991, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2030 of the Probate Judge Records of Conecuh County, Alabama.

10. Oil, Gas and Mineral Lease dated January 9, 2006, by and between James W. Logan, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 781 of the Probate Judge Records of Escambia County, Alabama.

11. Oil, Gas and Mineral Lease dated January 9, 2006, by and between Bertie T. Hassell, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 783 of the Probate Judge Records of Escambia County, Alabama.

12. Oil, Gas and Mineral Lease dated March 8, 2006, by and between Ralls Properties, L.L.C., as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 785 of the Probate Judge Records of Escambia County, Alabama.

13. Oil, Gas and Mineral Lease dated February 13, 2006, by and between R. Wyatt Feagin, as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 787 of the Probate Judge Records of Escambia County, Alabama.

14. Oil, Gas and Mineral Lease dated February 13, 2006, by and between Nanette Feagin Beck, as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 790 of the Probate Judge Records of Escambia County, Alabama.

15. Oil, Gas and Mineral Lease dated March 10, 2006, by and between Noel E. Lindholm, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2032 of the Probate Judge Records of Conecuh County, Alabama.

16. Oil, Gas and Mineral Lease dated January 30, 2006, by and between J. C. Snowden, as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 793 of the Probate Judge Records of Escambia County, Alabama.

17. Oil, Gas and Mineral Lease dated February 9, 2006, by and between Charles D. Searcy, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2034 of the Probate Judge Records of Conecuh County, Alabama.

18. Oil, Gas and Mineral Lease dated January 31, 2006, by and between Barbara Ann Stone Robinson, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 795 of the Probate Judge Records of Escambia County, Alabama.

19. Oil, Gas and Mineral Lease dated March 1, 2006, by and between Jon McMurray, as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 797 of the Probate Judge Records of Escambia County, Alabama.

20. Oil, Gas and Mineral Lease dated March 3, 2006, by and between William E. Older, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2036 of the Probate Judge Records of Conecuh County, Alabama.

21. Oil, Gas and Mineral Lease dated March 3, 2006, by and between Earline B. Older, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2038 of the Probate Judge Records of Conecuh County, Alabama.

22. Oil, Gas and Mineral Lease dated March 9, 2006, by and between Juanita C. Waters, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2040 of the Probate Judge Records of Conecuh County, Alabama.

23. Oil, Gas and Mineral Lease dated March 9, 2006, by and between Alva Nann Taylor, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2042 of the Probate Judge Records of Conecuh County, Alabama.

24. Oil, Gas and Mineral Lease dated February 20, 2006, by and between Howard Sylvester Stewart, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2044 of the Probate Judge Records of Conecuh County, Alabama.

25. Oil, Gas and Mineral Lease dated February 28, 2006, by and between Dale B. Blair, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 799 of the Probate Judge Records of Escambia County, Alabama.

26. Oil, Gas and Mineral Lease dated March 9, 2006, by and between Jo Ann Langham, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2046 of the Probate Judge Records of Conecuh County, Alabama.

27. Oil, Gas and Mineral Lease dated February 20, 2006, by and between Charles A. Frazier, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2048 of the Probate Judge Records of Conecuh County, Alabama.

28. Oil, Gas and Mineral Lease dated February 20, 2006, by and between Charles A. Frazier, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2050 of the Probate Judge Records of Conecuh County, Alabama.

29. Oil, Gas and Mineral Lease dated February 20, 2006, by and between Charles A. Frazier, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2054 of the Probate Judge Records of Conecuh County, Alabama.

30. Oil, Gas and Mineral Lease dated March 9, 2006, by and between Robert Cary, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2056 of the Probate Judge Records of Conecuh County, Alabama.

31. Oil, Gas and Mineral Lease dated March 20, 2006, by and between Stephen Jeter, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2083 of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 801 of the Probate Judge Records of Escambia County, Alabama.

32. Oil, Gas and Mineral Lease dated March 20, 2006, by and between John J. Jeter, III, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2087 of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 805 of the Probate Judge Records of Escambia County, Alabama.

33. Oil, Gas and Mineral Lease dated March 20, 2006, by and between Sally Jeter Hammond, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2079 of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 809 of the Probate Judge Records of Escambia County, Alabama.

34. Oil, Gas and Mineral Lease dated March 28, 2006, by and between Allene B. Ward, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2058 of the Probate Judge Records of Conecuh County, Alabama.

35. Oil, Gas and Mineral Lease dated March 28, 2006, by and between Allene B. Ward, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2068 of the Probate Judge Records of Conecuh County, Alabama.

36. Oil, Gas and Mineral Lease dated April 10, 2006, by and between Dorothy Nowling Womack, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2060 of the Probate Judge Records of Conecuh County, Alabama.

37. Oil, Gas and Mineral Lease dated April 10, 2006, by and between Douglas Gene Rabren, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2062 of the Probate Judge Records of Conecuh County, Alabama.

38. Oil, Gas and Mineral Lease dated April 10, 2006, by and between Henry George Foster, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2064 of the Probate Judge Records of Conecuh County, Alabama.

39. Oil, Gas and Mineral Lease dated April 11, 2006, by and between Julia Blair, as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 813 of the Probate Judge Records of Escambia County, Alabama.

40. Oil, Gas and Mineral Lease dated April 2, 2006, by and between David Edwin Logan, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book _____, Page _____ of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 815 of the Probate Judge Records of Escambia County, Alabama.

41. Oil, Gas and Mineral Lease dated January 9, 2006, by and between Sarah M. Lanier, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2066 of the Probate Judge Records of Conecuh County, Alabama.

42. Oil, Gas and Mineral Lease dated February 28, 2006, by and between Wayne M. Blair, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 409, Page 814 of the Probate Judge Records of Escambia County, Alabama.

43. Oil, Gas and Mineral Lease dated May 12, 2006, by and between William E. Older, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2532 of the Probate Judge Records of Conecuh County, Alabama.

44. Oil, Gas and Mineral Lease dated April 11, 2006, by and between Juanita Ralls, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2530 of the Probate Judge Records of Conecuh County, Alabama.

45. Oil, Gas and Mineral Lease dated May 10, 2006, by and between Dorothy Faye Jones, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2528 of the Probate Judge Records of Conecuh County, Alabama.

46. Oil, Gas and Mineral Lease dated February 28, 2006, by and between Martha B. Robinson, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 816 of the Probate Judge Records of Escambia County, Alabama.

47. Oil, Gas and Mineral Lease dated May 12, 2006, by and between Earline B. Older, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2526 of the Probate Judge Records of Conecuh County, Alabama.

48. Oil, Gas and Mineral Lease dated April 28, 2006, by and between Helen Pate, as Trustee for Josh Pate and Jill Pate, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2522 of the Probate Judge Records of Conecuh County, Alabama.

49. Oil, Gas and Mineral Lease dated May 10, 2006, by and between Dwight Taylor, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2524 of the Probate Judge Records of Conecuh County, Alabama.

50. Oil, Gas and Mineral Lease dated February 28, 2006, by and between Mary B. Andrews, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 409, Page 818 of the Probate Judge Records of Escambia County, Alabama.

51. Oil, Gas and Mineral Lease dated March 29, 2006, by and between Oscar DePriest Tucker, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2514 of the Probate Judge Records of Conecuh County, Alabama.

52. Oil, Gas and Mineral Lease dated May 30, 2006, by and between John N. Feagin, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2520 of the Probate Judge Records of Conecuh County, Alabama.

53. Oil, Gas and Mineral Lease dated June 5, 2006, by and between Joel R. Pate, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2509 of the Probate Judge Records of Conecuh County, Alabama.

54. Oil, Gas and Mineral Lease dated May 24, 2006, by and between William G. Dawkins, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 409, Page 827 of the Probate Judge Records of Escambia County, Alabama.

55. Oil, Gas and Mineral Lease dated May 24, 2006, by and between Carolyn C. Kennedy, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 820 of the Probate Judge Records of Escambia County, Alabama.

56. Oil, Gas and Mineral Lease dated June 5, 2006, by and between Frank Steadman, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2534 of the Probate Judge Records of Conecuh County, Alabama.

57. Oil, Gas and Mineral Lease dated May 18, 2006, by and between Sarah Ann Leyden, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 832 of the Probate Judge Records of Escambia County, Alabama.

58. Oil, Gas and Mineral Lease dated May 18, 2006, by and between Michael P. Leyden, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 829 of the Probate Judge Records of Escambia County, Alabama.

59. Oil, Gas and Mineral Lease dated June 23, 2006, by and between Frank M. Stamps, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 822 of the Probate Judge Records of Escambia County, Alabama.

60. Oil, Gas and Mineral Lease dated February 28, 2006, by and between Nell Blair, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 825 of the Probate Judge Records of Escambia County, Alabama.

61. Oil, Gas and Mineral Lease dated May 22, 2006, by and between Jean Ray and Glen Ray, Successor Co-Trustees of the Edna B. Gunter Revocable Trust dated June 2, 1992, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2503 of the Probate Judge Records of Conecuh County, Alabama.

62. Oil, Gas and Mineral Lease dated July 14, 2006, by and between Cedar Creek Land & Timber, Inc., as Lessor, and John C. Albury, as Lessee, the existence of which is set forth by that Memorandum of Oil and Gas Lease recorded in Book 2006, Page 2511 of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 835 of the Probate Judge Records of Escambia County, Alabama.

63. Oil, Gas and Mineral Lease dated July 28, 2006, by and between J. Randle Feagin, a/k/a, John Randle Feagin, as Lessor, and John C. Albury, as Lessee, recorded in Book _____, Page _____ of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book _____, Page _____ of the Probate Judge Records of Escambia County, Alabama.

64. Oil, Gas and Mineral Lease dated July 28, 2006, by and between Nancy Feagin, as Lessor, and John C. Albury, as Lessee, recorded in Book _____, Page _____ of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book _____, Page _____ of the Probate Judge Records of Escambia County, Alabama.

## EXHIBIT "B"

Attached to and made a part of that certain Participation Agreement
dated effective as of November 1, 2006, by and between
Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd.,
WAC Investment Company, LLC, The Rudman Partnership and Pickens Financial Group, LLC

## FORM OF ASSIGNMENT OF OIL, GAS AND OTHER MINERAL LEASES

STATE OF ALABAMA,

COUNTIES OF ESCAMBIA AND CONECUH.

KNOW ALL MEN BY THESE PRESENTS That:

> **SKLARCO L.L.C.**, a Louisiana limited liability company, whose
> address is Louisiana Tower, Suite 1601, 401 Edwards Street,
> Shreveport, Louisiana 71101, represented herein by its Chief
> Operating Officer, David A. Barlow ("Assignor") ;

for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable

consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the

back-in after project payout reversionary working interest described hereinbelow, does hereby grant,

bargain, sell, convey, assign, set over and transfer unto:

> **SKLARCO L.L.C.**, a Louisiana limited liability company, whose
> address is Louisiana Tower, Suite 1601, 401 Edwards Street,
> Shreveport, Louisiana 71101, represented herein by its Chief
> Operating Officer, David A. Barlow ("Sklarco") ;

> **McCOMBS ENERGY, LTD.**, a Texas limited partnership, whose
> address is 5599 San Felipe, Suite 1200, Houston, Texas
> 77056-2794, represented herein by its Vice President, Ricky
> Haikin ("McCombs");

> **WAC INVESTMENT COMPANY, LLC**, a Louisiana limited
> liability company, whose address is 333 Texas Street, Suite
> 2121, Shreveport, Louisiana 71101, represented herein by its
> Executive Vice President, Michael E. Riddick ("WAC");

> **PICKENS FINANCIAL GROUP, LLC**, a Texas limited liability
> company, whose address is 8499 Greenville Avenue, Suite
> 105, Dallas, Texas 75231-2417, represented herein by its Vice
> President, Michael K. Pickens ("Pickens");

> **THE RUDMAN PARTNERSHIP**, a Texas general partnership,
> whose address is 1700 Pacific Avenue, Ste. 4700, Dallas, TX
> 75201-4670, represented herein by W. R. (Trey) Sibley, III, its
> duly authorized Attorney in Fact ("Rudman");

> (hereinafter Sklarco, McCombs, WAC, Rudman and Pickens are
> sometimes referred to collectively as the "Assignees" or individually
> as an "Assignor");

all of Assignor's right, title and interest in and to the oil, gas and mineral leases (the "Leases")

described on Exhibit "A," attached hereto and by reference made a part hereof, to be shared by the

Assignees in the proportions set forth below as to each such Assignee's name:

| ASSIGNEES | | INTEREST |
|---|---|---|
| Sklarco | | 0.32500000 of 8/8ths |
| McCombs | | 0.25000000 of 8/8ths |
| WAC | | 0.20000000 of 8/8ths |
| Rudman | | 0.12500000 of 8/8ths |
| Pickens | | 0.10000000 of 8/8ths |
| | Total | 1.00000000 of 8/8ths |

TO HAVE AND TO HOLD unto Assignees, their successors and assigns, forever, subject to, and in accordance with, the following terms and provisions:

1. This Assignment is made effective as of November 1, 2006 (the "Effective Date").

2. This Assignment is made without warranty of title, express or implied, not even return for the purchase price, except that Assignor agree to warrant title against all defects arising out of claims by Assignor or Sklar Exploration Company L.L.C. or of persons claiming by, through or under Assignor or Sklar Exploration Company L.L.C.

3. This Assignment, and the interest assigned hereunder, is made subject to the terms and conditions of the Leases and all other instruments of record affecting those Leases as of the Effective Date, including, without limitation, [INSERT DESCRIPTION OF ANY INSTRUMENTS OF RECORD HERE].

4. This Assignment is also made in accordance with and subject to that certain Participation Agreement dated effective as of November 1, 2006, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C, McCombs Energy, Ltd. and WAC Investment Company, LLC, and all attachments thereto, including that certain Joint Operating Agreement dated November 1, 2006, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C. et al., as Non-Operators, and all of the terms and provisions of that Participation Agreement and its attachments, including, without limitation, the back-in after prospect payout reversionary working interest described therein.

5. As to Rudman, and only as to Rudman, this Assignment shall exclude any of the Leases insofar and only insofar as they cover lands located within Sections 27, 28, 29, 32, 33 and 34, Township 4 North, Range 13 East, Conecuh County, Alabama. The Assignees other than Rudman are hereby assigned an interest in the Leases insofar and only insofar as they cover lands located within those sections in proportion to which their interest bears to one another, excluding the interest of Rudman.

6. This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

**SKLARCO L.L.C.**

By_____
      David A. Barlow
      Chief Operating Officer

                                            - - ASSIGNOR

**SKLARCO L.L.C.**

By_____
      David A. Barlow
      Chief Operating Officer

**McCOMBS ENERGY, LTD.**

By_____
      Ricky Haikin
      Vice President

**WAC INVESTMENT COMPANY, LLC**

By_____
      Michael E. Riddick
      Executive Vice President

**THE RUDMAN PARTNERSHIP**

By:_____
      W. R. (Trey) Sibley, III
      Attorney in Fact

**PICKENS FINANCIAL GROUP, LLC**

By:_____
      Michael K. Pickens
      Vice President

                                            - - ASSIGNEES

# EXHIBIT "A"

Attached to and made a part of that certain Assignment Of Oil, Gas And Mineral Leases
dated effective as of November 1, 2006, by and between Sklarco L.L.C.,
as Assignor, and Sklarco L.L.C., McCombs Energy, Ltd., WAC Investment Company, LLC,
The Rudman Partnership and Pickens Financial Group, LLC, as Assignees

## DESCRIPTION OF OIL, GAS AND OTHER MINERAL LEASES

1. Oil, Gas and Mineral Lease dated December 28, 2005, by and between Cary Page, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2022 of the Probate Judge Records of Conecuh County, Alabama.

2. Oil, Gas and Mineral Lease dated December 28, 2005, by and between Dorothy Faye Jones, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2024 of the Probate Judge Records of Conecuh County, Alabama.

3. Oil, Gas and Mineral Lease dated December 28, 2005, by and between Dwight Taylor, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2026 of the Probate Judge Records of Conecuh County, Alabama.

4. Oil, Gas and Mineral Lease dated January 9, 2006, by and between Tully L. Logan, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 779 of the Probate Judge Records of Escambia County, Alabama.

5. Oil, Gas and Mineral Lease dated January 9, 2006, by and between Jack D. Logan, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 777 of the Probate Judge Records of Escambia County, Alabama.

6. Oil, Gas and Mineral Lease dated January 9, 2006, by and between Kenneth Allen Baker, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2028 of the Probate Judge Records of Conecuh County, Alabama.

7. Oil, Gas and Mineral Lease dated February 16, 2006, by and between Cedar Creek Land & Timber, as Lessor, and John C. Albury, as Lessee, the existence of which is set forth by that Declaration of Lease dated February 24, 2006 and recorded in Book 2006, Page 2091 of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 771 of the Probate Judge Records of Escambia County, Alabama.

8. Oil, Gas and Mineral Lease dated January 9, 2006, by and between Raymond B. Logan, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 775 of the Probate Judge Records of Escambia County, Alabama.

9. Oil, Gas and Mineral Lease dated January 24, 2006, by and between Loree R. Hamiter, James E. Hamiter and Harold W. Hamiter, as Trustees under the Last Will and Testament of Harold E. Hamiter, deceased, dated February 14, 1991, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2030 of the Probate Judge Records of Conecuh County, Alabama.

10. Oil, Gas and Mineral Lease dated January 9, 2006, by and between James W. Logan, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 781 of the Probate Judge Records of Escambia County, Alabama.

11. Oil, Gas and Mineral Lease dated January 9, 2006, by and between Bertie T. Hassell, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 783 of the Probate Judge Records of Escambia County, Alabama.

12. Oil, Gas and Mineral Lease dated March 8, 2006, by and between Ralls Properties, L.L.C., as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 785 of the Probate Judge Records of Escambia County, Alabama.

13. Oil, Gas and Mineral Lease dated February 13, 2006, by and between R. Wyatt Feagin, as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 787 of the Probate Judge Records of Escambia County, Alabama.

14. Oil, Gas and Mineral Lease dated February 13, 2006, by and between Nanette Feagin Beck, as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 790 of the Probate Judge Records of Escambia County, Alabama.

15. Oil, Gas and Mineral Lease dated March 10, 2006, by and between Noel E. Lindholm, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2032 of the Probate Judge Records of Conecuh County, Alabama.

16. Oil, Gas and Mineral Lease dated January 30, 2006, by and between J. C. Snowden, as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 793 of the Probate Judge Records of Escambia County, Alabama.

17. Oil, Gas and Mineral Lease dated February 9, 2006, by and between Charles D. Searcy, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2034 of the Probate Judge Records of Conecuh County, Alabama.

18. Oil, Gas and Mineral Lease dated January 31, 2006, by and between Barbara Ann Stone Robinson, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 795 of the Probate Judge Records of Escambia County, Alabama.

19. Oil, Gas and Mineral Lease dated March 1, 2006, by and between Jon McMurray, as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 797 of the Probate Judge Records of Escambia County, Alabama.

20. Oil, Gas and Mineral Lease dated March 3, 2006, by and between William E. Older, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2036 of the Probate Judge Records of Conecuh County, Alabama.

21. Oil, Gas and Mineral Lease dated March 3, 2006, by and between Earline B. Older, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2038 of the Probate Judge Records of Conecuh County, Alabama.

22. Oil, Gas and Mineral Lease dated March 9, 2006, by and between Juanita C. Waters, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2040 of the Probate Judge Records of Conecuh County, Alabama.

23. Oil, Gas and Mineral Lease dated March 9, 2006, by and between Alva Nann Taylor, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2042 of the Probate Judge Records of Conecuh County, Alabama.

24. Oil, Gas and Mineral Lease dated February 20, 2006, by and between Howard Sylvester Stewart, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2044 of the Probate Judge Records of Conecuh County, Alabama.

25. Oil, Gas and Mineral Lease dated February 28, 2006, by and between Dale B. Blair, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 799 of the Probate Judge Records of Escambia County, Alabama.

26. Oil, Gas and Mineral Lease dated March 9, 2006, by and between Jo Ann Langham, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2046 of the Probate Judge Records of Conecuh County, Alabama.

27. Oil, Gas and Mineral Lease dated February 20, 2006, by and between Charles A. Frazier, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2048 of the Probate Judge Records of Conecuh County, Alabama.

28. Oil, Gas and Mineral Lease dated February 20, 2006, by and between Charles A. Frazier, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2050 of the Probate Judge Records of Conecuh County, Alabama.

29. Oil, Gas and Mineral Lease dated February 20, 2006, by and between Charles A. Frazier, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2054 of the Probate Judge Records of Conecuh County, Alabama.

30. Oil, Gas and Mineral Lease dated March 9, 2006, by and between Robert Cary, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2056 of the Probate Judge Records of Conecuh County, Alabama.

31. Oil, Gas and Mineral Lease dated March 20, 2006, by and between Stephen Jeter, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2083 of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 801 of the Probate Judge Records of Escambia County, Alabama.

32. Oil, Gas and Mineral Lease dated March 20, 2006, by and between John J. Jeter, III, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2087 of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 805 of the Probate Judge Records of Escambia County, Alabama.

33. Oil, Gas and Mineral Lease dated March 20, 2006, by and between Sally Jeter Hammond, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2079 of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 809 of the Probate Judge Records of Escambia County, Alabama.

34. Oil, Gas and Mineral Lease dated March 28, 2006, by and between Allene B. Ward, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2058 of the Probate Judge Records of Conecuh County, Alabama.

35. Oil, Gas and Mineral Lease dated March 28, 2006, by and between Allene B. Ward, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2068 of the Probate Judge Records of Conecuh County, Alabama.

36. Oil, Gas and Mineral Lease dated April 10, 2006, by and between Dorothy Nowling Womack, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2060 of the Probate Judge Records of Conecuh County, Alabama.

37. Oil, Gas and Mineral Lease dated April 10, 2006, by and between Douglas Gene Rabren, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2062 of the Probate Judge Records of Conecuh County, Alabama.

38. Oil, Gas and Mineral Lease dated April 10, 2006, by and between Henry George Foster, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2064 of the Probate Judge Records of Conecuh County, Alabama.

39. Oil, Gas and Mineral Lease dated April 11, 2006, by and between Julia Blair, as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 813 of the Probate Judge Records of Escambia County, Alabama.

40. Oil, Gas and Mineral Lease dated April 2, 2006, by and between David Edwin Logan, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book _____, Page _____ of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 815 of the Probate Judge Records of Escambia County, Alabama.

41. Oil, Gas and Mineral Lease dated January 9, 2006, by and between Sarah M. Lanier, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2066 of the Probate Judge Records of Conecuh County, Alabama.

42. Oil, Gas and Mineral Lease dated February 28, 2006, by and between Wayne M. Blair, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 409, Page 814 of the Probate Judge Records of Escambia County, Alabama.

43. Oil, Gas and Mineral Lease dated May 12, 2006, by and between William E. Older, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2532 of the Probate Judge Records of Conecuh County, Alabama.

44. Oil, Gas and Mineral Lease dated April 11, 2006, by and between Juanita Ralls, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2530 of the Probate Judge Records of Conecuh County, Alabama.

45. Oil, Gas and Mineral Lease dated May 10, 2006, by and between Dorothy Faye Jones, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2528 of the Probate Judge Records of Conecuh County, Alabama.

46. Oil, Gas and Mineral Lease dated February 28, 2006, by and between Martha B. Robinson, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 816 of the Probate Judge Records of Escambia County, Alabama.

47. Oil, Gas and Mineral Lease dated May 12, 2006, by and between Earline B. Older, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2526 of the Probate Judge Records of Conecuh County, Alabama.

48. Oil, Gas and Mineral Lease dated April 28, 2006, by and between Helen Pate, as Trustee for Josh Pate and Jill Pate, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2522 of the Probate Judge Records of Conecuh County, Alabama.

49. Oil, Gas and Mineral Lease dated May 10, 2006, by and between Dwight Taylor, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2524 of the Probate Judge Records of Conecuh County, Alabama.

50. Oil, Gas and Mineral Lease dated February 28, 2006, by and between Mary B. Andrews, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 409, Page 818 of the Probate Judge Records of Escambia County, Alabama.

51. Oil, Gas and Mineral Lease dated March 29, 2006, by and between Oscar DePriest Tucker, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2514 of the Probate Judge Records of Conecuh County, Alabama.

52. Oil, Gas and Mineral Lease dated May 30, 2006, by and between John N. Feagin, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2520 of the Probate Judge Records of Conecuh County, Alabama.

53. Oil, Gas and Mineral Lease dated June 5, 2006, by and between Joel R. Pate, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2509 of the Probate Judge Records of Conecuh County, Alabama.

54. Oil, Gas and Mineral Lease dated May 24, 2006, by and between William G. Dawkins, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 409, Page 827 of the Probate Judge Records of Escambia County, Alabama.

55. Oil, Gas and Mineral Lease dated May 24, 2006, by and between Carolyn C. Kennedy, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 820 of the Probate Judge Records of Escambia County, Alabama.

56. Oil, Gas and Mineral Lease dated June 5, 2006, by and between Frank Steadman, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2534 of the Probate Judge Records of Conecuh County, Alabama.

57. Oil, Gas and Mineral Lease dated May 18, 2006, by and between Sarah Ann Leyden, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 832 of the Probate Judge Records of Escambia County, Alabama.

58. Oil, Gas and Mineral Lease dated May 18, 2006, by and between Michael P. Leyden, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 829 of the Probate Judge Records of Escambia County, Alabama.

59. Oil, Gas and Mineral Lease dated June 23, 2006, by and between Frank M. Stamps, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 822 of the Probate Judge Records of Escambia County, Alabama.

60. Oil, Gas and Mineral Lease dated February 28, 2006, by and between Nell Blair, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 825 of the Probate Judge Records of Escambia County, Alabama.

61. Oil, Gas and Mineral Lease dated May 22, 2006, by and between Jean Ray and Glen Ray, Successor Co-Trustees of the Edna B. Gunter Revocable Trust dated June 2, 1992, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2503 of the Probate Judge Records of Conecuh County, Alabama.

62. Oil, Gas and Mineral Lease dated July 14, 2006, by and between Cedar Creek Land & Timber, Inc., as Lessor, and John C. Albury, as Lessee, the existence of which is set forth by that Memorandum of Oil and Gas Lease recorded in Book 2006, Page 2511 of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 835 of the Probate Judge Records of Escambia County, Alabama.

63. Oil, Gas and Mineral Lease dated July 28, 2006, by and between J. Randle Feagin, a/k/a, John Randle Feagin, as Lessor, and John C. Albury, as Lessee, recorded in Book _____, Page _____ of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book _____, Page _____ of the Probate Judge Records of Escambia County, Alabama.

64. Oil, Gas and Mineral Lease dated July 28, 2006, by and between Nancy Feagin, as Lessor, and John C. Albury, as Lessee, recorded in Book _____, Page _____ of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book _____, Page _____ of the Probate Judge Records of Escambia County, Alabama.

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2006, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for SKLARCO L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

STATE OF TEXAS

COUNTY OF _____

On this _____ day of _____, 2006, before me appeared Ricky Haikin, to me known, who being by me duly sworn, did say that he is the Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, and that the foregoing instrument was signed by him on behalf of said limited partnership, and said Appearer acknowledged said instrument to be the free act and deed of said limited partnership.

IN WITNESS WHEREOF, I hereunto set my hand and official seal

_____
Notary Public in and for the State of Texas

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2006, before me appeared Michael E. Riddick, to me known, who being by me duly sworn, did say that he is the Executive Vice President of WAC INVESTMENT COMPANY, LLC, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

STATE OF TEXAS

COUNTY OF _____

On this ____ day of _____, 2006, before me appeared W. R. (Trey) Sibley, III, to me known, who being by me duly sworn, did say that he is the Attorney in Fact of THE RUDMAN PARTNERSHIP, a Texas general partnership, and that the foregoing instrument was signed by him on behalf of said partnership, and said Appearer acknowledged said instrument to be the free act and deed of said partnership.

IN WITNESS WHEREOF, I hereunto set my hand and official seal

_____
Notary Public in and for the State of Texas

STATE OF TEXAS

COUNTY OF _____

On this ____ day of _____, 2006, before me appeared Michael K. Pickens, to me known, who being by me duly sworn, did say that he is the Vice President of PICKENS FINANCIAL GROUP, LLC, a Texas limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal

_____
Notary Public in and for the State of Texas

## EXHIBIT "C"

Attached to and made a part of that certain Participation Agreement
dated effective as of November 1, 2006, by and between
Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd.,
WAC Investment Company, LLC, The Rudman Partnership and Pickens Financial Group, LLC

### AFE

AFE,12/13/2006,4:04 PM

### SKLAR Exploration Company L.L.C.
401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8868

**AUTHORITY FOR EXPENDITURE**

| DATE: | July 21, 2006 | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Alabama |
| WELL: | SE/4 of Section 5, T3N, R13E | HORIZON: | Smackover |
| LOCATION: | Escambia County | PROD. T.D.: | 12000' |

PROPOSAL:  AFE to drill & complete Smackover well in Escambia County Alabama.  Assumes flowing oil well.  No
money for artificial lift or natural gas sales.
Rig dayrate is estimated to be $21,000/D          Date last revised:

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | LEASEHOLD COSTS | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 7,500 | | 7,500 |
| 88 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | 2,500 | | 2,500 |
| 91 | RECORDING FEES | | | |
| | TOTAL LEASEHOLD COSTS | $10,000 | $0 | $10,000 |
| | | | | |
| 9200/9300 | INTANGIBLE DRILLING & COMPLETION | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 125,000 | 15,000 | 140,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 25,000 | | 25,000 |
| 04 | SURFACE DAMAGES & ROW | 5,000 | | 5,000 |
| 05 | DRIVING DRIVE PIPE | 10,000 | | 10,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE (19 days @ $21,000/D) | 399,000 | 42,000 | 441,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 5,000 | | 5,000 |
| 13 | ENGINEERING & SUPERVISION | 40,000 | 12,000 | 52,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 10,000 | | 10,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 0 | | |
| 17 | MUD & CHEMICALS | 35,000 | | 35,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 12,000 | | 12,000 |
| 24 | CEMENTING & EQUIPMENT | 27,000 | 25,000 | 52,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 7,500 | 12,000 | 19,500 |
| 26 | PIPE TESTING | | 2,000 | 2,000 |
| 27 | EQUIPMENT RENTALS | 35,000 | 2,865 | 37,865 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 1,000 | 500 | 1,500 |
| 30 | WATER | 5,000 | | 5,000 |
| 31 | FUEL | 90,000 | 6,000 | 96,000 |
| 32 | BITS | 25,000 | 1,000 | 26,000 |
| 33 | TRANSPORTATION & TRUCKING | 10,000 | 15,000 | 25,000 |
| 34 | CONTRACT LABOR | 10,000 | 25,000 | 35,000 |
| 35 | SAFETY & H2S TRAINING | 10,000 | | 10,000 |
| 36 | LOGGING & WIRELINE | 75,000 | 20,000 | 95,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 20,000 | | 20,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 20,000 | 20,000 |
| 47 | PERFORATION SERVICES | | 15,000 | 15,000 |
| 48 | COMPLETION FLUIDS | | 5,000 | 5,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 56 | AUTO EXPENSE | 1,000 | 500 | 1,500 |
| 61 | SALT WATER DISPOSAL | | 1,000 | 1,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 2,000 | 2,000 |
| 65 | PLUG & ABANDON COSTS | 15,000 | -15,000 | |
| 78 | INSURANCE | 40,000 | | 40,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 9,500 | | 9,500 |
| 82 | MISCELLANEOUS: 5% contingency | 60,000 | 10,000 | 70,000 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $1,262,000 | $217,000 | $1,480,000 |
| | | | | |
| 9500 | TANGIBLE EQUIPMENT - DRILLING | | | |
| 02 | SURFACE CASING (2,400' of 9-5/8") | 70,000 | | 70,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 5,000 | | 5,000 |
| 05 | WELLHEAD EQUIPMENT | 1,500 | | 1,500 |
| 06 | DRIVE PIPE | 5,000 | | 5,000 |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $82,000 | $0 | $82,000 |
| | | | | |
| 9520 | TANGIBLE EQUIPMENT - COMPLETION | | | |
| 21 | PRODUCTION CASING & LINERS (5-1/2" 17# & 20# L-80) | | 205,000 | 205,000 |
| 22 | TUBING (2-7/8" 6.50# L-80) | | 78,000 | 78,000 |
| 23 | PACKERS | | 10,000 | 10,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 21,000 | 21,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $319,000 | $319,000 |
| | | | | |
| 9535 | SURFACE PRODUCTION EQUIPMENT | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 25,000 | 25,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 10,000 | 10,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | | |
| 46 | SALES METERING EQUIPMENT | | 20,000 | 20,000 |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $95,000 | $95,000 |
| | | | | |
| | TOTAL EQUIPMENT | $82,000 | $414,000 | $496,000 |
| | | | | |
| | TOTAL WELL COST | $1,355,000 | $631,000 | $1,986,000 |

APPROVED _____ Dec. 14, _____ 2006
BY David E. Sklar, VP-COO of SKLARCO LLC

# EXHIBIT "C"

Attached to and made a part of that certain Participation Agreement
dated effective as of November 1, 2006, by and between
Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd.,
WAC Investment Company, LLC, The Rudman Partnership and Pickens Financial Group, LLC

## AFE

AFE,12/13/2006,4:04 PM

## SKLAR Exploration Company L.L.C.
401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8868

### AUTHORITY FOR EXPENDITURE

| DATE: | July 21, 2006 | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Alabama |
| WELL: | SE/4 of Section 5, T5N, R13E | HORIZON: | Smackover |
| LOCATION: | Escambia County | PROJ. T.D.: | 12000' |

**PROPOSAL:** AFE to drill & complete Smackover well in Escambia County Alabama. Assumes flowing oil well. No
money for artificial lift or natural gas sales.
Rig dayrate is estimated to be $21,000/D.     Date last revised:

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| **9100** | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 7,500 | | 7,500 |
| 85 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | 2,500 | | 2,500 |
| 91 | RECORDING FEES | | | |
| | TOTAL LEASEHOLD COSTS | $10,000 | $0 | $10,000 |
| | | | | |
| **9200/9300** | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 125,000 | 15,000 | 140,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 25,000 | | 25,000 |
| 04 | SURFACE DAMAGES & ROW | 5,000 | | 5,000 |
| 05 | DRIVING DRIVE PIPE | 10,000 | | 10,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE (19 days @ $21,000/D) | 399,000 | 42,000 | 441,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 5,000 | | 5,000 |
| 13 | ENGINEERING & SUPERVISION | 40,000 | 12,000 | 52,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 10,000 | | 10,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 0 | | |
| 17 | MUD & CHEMICALS | 35,000 | | 35,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 12,000 | | 12,000 |
| 24 | CEMENTING & EQUIPMENT | 27,000 | 25,000 | 52,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 7,500 | 12,000 | 19,500 |
| 26 | PIPE TESTING | | 2,000 | 2,000 |
| 27 | EQUIPMENT RENTALS | 35,000 | 2,665 | 37,665 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 1,000 | 500 | 1,500 |
| 30 | WATER | 5,000 | | 5,000 |
| 31 | FUEL | 90,000 | 8,000 | 98,000 |
| 32 | BITS | 25,000 | 1,000 | 26,000 |
| 33 | TRANSPORTATION & TRUCKING | 10,000 | 15,000 | 25,000 |
| 34 | CONTRACT LABOR | 10,000 | 25,000 | 35,000 |
| 35 | SAFETY & H2S TRAINING | 10,000 | | 10,000 |
| 36 | LOGGING & WIRELINE | 75,000 | 20,000 | 95,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 20,000 | | 20,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 20,000 | 20,000 |
| 47 | PERFORATION SERVICES | | 15,000 | 15,000 |
| 48 | COMPLETION FLUIDS | | 5,000 | 5,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | 1,000 | 500 | 1,500 |
| 61 | SALT WATER DISPOSAL | | 1,000 | 1,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 2,000 | 2,000 |
| 65 | PLUG & ABANDON COSTS | 15,000 | -15,000 | |
| 78 | INSURANCE | 40,000 | | 40,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 9,800 | | 9,800 |
| 82 | MISCELLANEOUS: x% contingency | 60,000 | 10,000 | 70,000 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $1,263,000 | $217,000 | $1,480,000 |
| | | | | |
| **9500** | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING (2,400' of 9-5/8") | 70,000 | | 70,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 5,000 | | 5,000 |
| 05 | WELLHEAD EQUIPMENT | 1,500 | | 1,500 |
| 06 | DRIVE PIPE | 5,000 | | 5,000 |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $82,000 | $0 | $82,000 |
| | | | | |
| **9520** | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS (5-1/2" 17# & 20# L-80) | | 205,000 | 205,000 |
| 22 | TUBING (2-7/8" 6.50# L-80) | | 78,000 | 78,000 |
| 23 | PACKERS | | 10,000 | 10,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 21,000 | 21,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $319,000 | $319,000 |
| | | | | |
| **9535** | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 38 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 25,000 | 25,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 10,000 | 10,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | | |
| 46 | SALES METERING EQUIPMENT | | 20,000 | 20,000 |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $95,000 | $95,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $82,000 | $414,000 | $496,000 |
| | | | | |
| | **TOTAL WELL COST** | $1,355,000 | $631,000 | $1,986,000 |

APPROVED: 12/19/06 _____ 2006

BY _____

# EXHIBIT "C"

Attached to and made a part of that certain Participation Agreement
dated effective as of November 1, 2006, by and between
Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd.,
WAC Investment Company, LLC, The Rudman Partnership and Pickens Financial Group, LLC

## AFE

AFE,12/13/2006,4.04 PM

## SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1001
Shreveport, LA 71101
(318) 227-6968

| AUTHORITY FOR EXPENDITURE | | | |
|---|---|---|---|
| DATE: | July 21, 2006 | FIELD: | Wildcat |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Alabama |
| WELL: | SE¼ of Section 5, T3N, R13E | HORIZON: | Smackover |
| LOCATION: | Escambia County | PROJ. T.D.: | 12000' |
| PROPOSAL: | AFE to drk & complete Smackover well in Escambia County Alabama. Assumes flowng oil wel. No money for artificial lift or natural gas sales. Rig dayrate is estimated to be $21,000/D | Date last revised: | |

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | LEASEHOLD COSTS | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 7,500 | | 7,500 |
| 88 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | 2,500 | | 2,500 |
| 91 | RECORDING FEES | | | |
| | TOTAL LEASEHOLD COSTS | $10,000 | $0 | $10,000 |

| 9200/9300 | INTANGIBLE DRILLING & COMPLETION | | | |
|---|---|---|---|---|
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 125,000 | 15,000 | 140,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 25,000 | | 25,000 |
| 04 | SURFACE DAMAGES & ROW | 5,000 | | 5,000 |
| 05 | DRIVING DRIVE PIPE | 10,000 | | 10,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE (19 days @ $21,000/D) | 399,000 | 42,000 | 441,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 5,000 | | 5,000 |
| 13 | ENGINEERING & SUPERVISION | 40,000 | 12,000 | 52,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 10,000 | | 10,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL, DRILLING TOOLS & SVCS | 0 | | |
| 17 | MUD & CHEMICALS | 35,000 | | 35,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 12,000 | | 12,000 |
| 24 | CEMENTING & EQUIPMENT | 27,000 | 25,000 | 52,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 7,500 | 12,000 | 19,500 |
| 26 | PIPE TESTING | | 2,000 | 2,000 |
| 27 | EQUIPMENT RENTALS | 35,000 | 2,865 | 37,865 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 1,000 | 500 | 1,500 |
| 30 | WATER | 5,000 | | 5,000 |
| 31 | FUEL | 90,000 | 6,000 | 96,000 |
| 32 | BITS | 25,000 | 1,000 | 26,000 |
| 33 | TRANSPORTATION & TRUCKING | 10,000 | 15,000 | 25,000 |
| 34 | CONTRACT LABOR | 10,000 | 25,000 | 35,000 |
| 35 | SAFETY & H2S TRAINING | 10,000 | | 10,000 |
| 36 | LOGGING & WIRELINE | 75,000 | 20,000 | 95,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 20,000 | | 20,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 20,000 | 20,000 |
| 47 | PERFORATION SERVICES | | 15,000 | 15,000 |
| 48 | COMPLETION FLUIDS | | 5,000 | 5,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | 1,000 | 500 | 1,500 |
| 61 | SALT WATER DISPOSAL | | 1,000 | 1,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 2,000 | 2,000 |
| 65 | PLUG & ABANDON COSTS | 15,000 | -15,000 | |
| 78 | INSURANCE | 40,000 | | 40,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 9,800 | | 9,800 |
| 82 | MISCELLANEOUS: 5% contingency | 60,000 | 10,000 | 70,000 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $1,263,000 | $217,000 | $1,480,000 |

| 9500 | TANGIBLE EQUIPMENT - DRILLING | | | |
|---|---|---|---|---|
| 02 | SURFACE CASING (2,400' of 9-5/8") | 70,000 | | 70,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 5,000 | | 5,000 |
| 05 | WELLHEAD EQUIPMENT | 1,500 | | 1,500 |
| 06 | DRIVE PIPE | 5,000 | | 5,000 |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $82,000 | $0 | $82,000 |

| 9520 | TANGIBLE EQUIPMENT - COMPLETION | | | |
|---|---|---|---|---|
| 21 | PRODUCTION CASING & LINERS (5-1/2" 17# & 20# L-50) | | 205,000 | 205,000 |
| 22 | TUBING (2-7/8" 6.50# L-80) | | 78,000 | 78,000 |
| 23 | PACKERS | | 10,000 | 10,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 21,000 | 21,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $319,000 | $319,000 |

| 9535 | SURFACE PRODUCTION EQUIPMENT | | | |
|---|---|---|---|---|
| 39 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 25,000 | 25,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 10,000 | 10,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | | |
| 46 | SALES METERING EQUIPMENT | | 20,000 | 20,000 |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $95,000 | $95,000 |

| | TOTAL EQUIPMENT | $82,000 | $414,000 | $496,000 |
|---|---|---|---|---|

| | TOTAL WELL COST | $1,355,000 | $631,000 | $1,986,000 |
|---|---|---|---|---|

APPROVED: December 15, 2006

BY: *[signature]*

# EXHIBIT "C"

Attached to and made a part of that certain Participation Agreement
dated effective as of November 1, 2006, by and between
Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd.,
WAC Investment Company, LLC, The Rudman Partnership and Pickens Financial Group, LLC

## AFE

AFE 12/13/2006 4:04 PM

## SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8556

### AUTHORITY FOR EXPENDITURE

| | | | |
|---|---|---|---|
| DATE: | July 21, 2006 | FIELD: | Wildcat |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Alabama |
| WELL: | SE¼ of Section 5, T3N, R13E | HORIZON: | Smackover |
| LOCATION: | Escambia County | PROJ. T.D.: | 12000' |

PROPOSAL: AFE to drill & complete Smackover well in Escambia County Alabama. Assumes flowing oil well. No money for artificial lift or natural gas sales.
Rig dayrate is estimated to be $21,000/D          Date last revised:

| CODE of SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| **9100** | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 7,500 | | 7,500 |
| 88 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | 2,500 | | 2,500 |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $10,000 | $0 | $10,000 |
| | | | | |
| **9200/9300** | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 125,000 | 15,000 | 140,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 25,000 | | 25,000 |
| 04 | SURFACE DAMAGES & ROW | 5,000 | | 5,000 |
| 05 | DRIVING DRIVE PIPE | 10,000 | | 10,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE (19 days @ $21,000/D) | 399,000 | 42,000 | 441,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 5,000 | | 5,000 |
| 13 | ENGINEERING & SUPERVISION | 40,000 | 12,000 | 52,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 10,000 | | 10,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS. | 0 | | |
| 17 | MUD & CHEMICALS | 35,000 | | 35,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 12,000 | | 12,000 |
| 24 | CEMENTING & EQUIPMENT | 27,000 | 25,000 | 52,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 7,500 | 12,000 | 19,500 |
| 26 | PIPE TESTING | | 2,000 | 2,000 |
| 27 | EQUIPMENT RENTALS | 35,000 | 2,865 | 37,865 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 1,000 | 500 | 1,500 |
| 30 | WATER | 5,000 | | 5,000 |
| 31 | FUEL | 90,000 | 6,000 | 96,000 |
| 32 | BITS | 25,000 | 1,000 | 26,000 |
| 33 | TRANSPORTATION & TRUCKING | 10,000 | 15,000 | 25,000 |
| 34 | CONTRACT LABOR | 10,000 | 25,000 | 35,000 |
| 35 | SAFETY & H2S TRAINING | 10,000 | | 10,000 |
| 36 | LOGGING & WIRELINE | 75,000 | 20,000 | 95,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 20,000 | | 20,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 20,000 | 20,000 |
| 47 | PERFORATION SERVICES | | 15,000 | 15,000 |
| 48 | COMPLETION FLUIDS | | 5,000 | 5,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | 1,000 | 500 | 1,500 |
| 61 | SALT WATER DISPOSAL | | 1,000 | 1,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 2,000 | 2,000 |
| 65 | PLUG & ABANDON COSTS | 15,000 | -15,000 | |
| 78 | INSURANCE | 40,000 | | 40,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 9,800 | | 9,800 |
| 82 | MISCELLANEOUS: 5% contingency | 60,000 | 10,000 | 70,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $1,263,000 | $217,000 | $1,480,000 |
| | | | | |
| **9500** | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING (2.400' of 9-5/8") | 70,000 | | 70,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 5,000 | | 5,000 |
| 05 | WELLHEAD EQUIPMENT | 1,500 | | 1,500 |
| 06 | DRIVE PIPE | 5,000 | | 5,000 |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $82,000 | $0 | $82,000 |
| | | | | |
| **9520** | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS (5-1/2" 17# & 20# L-80) | | 205,000 | 205,000 |
| 22 | TUBING (2-7/8" 6.50# L-80) | | 78,000 | 78,000 |
| 23 | PACKERS | | 10,000 | 10,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 21,000 | 21,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $319,000 | $319,000 |
| | | | | |
| **9535** | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 25,000 | 25,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 10,000 | 10,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | | |
| 46 | SALES METERING EQUIPMENT | | 20,000 | 20,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $95,000 | $95,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $82,000 | $414,000 | $496,000 |
| | | | | |
| | **TOTAL WELL COST** | $1,355,000 | $631,000 | $1,986,000 |

APPROVED: _12/13/__ 2006

BY _Michel H. _____

# SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

| AUTHORITY FOR EXPENDITURE | | | |
|---|---|---|---|
| DATE: July 21, 2006 | | FIELD: Wildcat | |
| OPERATOR: Sklar Exploration Company LLC | | STATE: Alabama | |
| WELL: SE/4 of Section 5, T3N, R13E | | HORIZON: Smackover | |
| LOCATION: Escambia County | | PROJ. T.D.: 12000' | |

PROPOSAL: AFE to drill & complete Smackover well in Escambia County Alabama. Assumes flowing oil well. No money for artificial lift or natural gas sales.
Rig dayrate is estimated to be $21,000/D          Date last revised:

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| **9100** | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 7,500 | | 7,500 |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | 2,500 | | 2,500 |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $10,000 | $0 | $10,000 |

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| **9200/9300** | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 125,000 | 15,000 | 140,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 25,000 | | 25,000 |
| 04 | SURFACE DAMAGES & ROW | 5,000 | | 5,000 |
| 05 | DRIVING DRIVE PIPE | 10,000 | | 10,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE (19 days @ $21,000/D) | 399,000 | 42,000 | 441,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 5,000 | | 5,000 |
| 13 | ENGINEERING & SUPERVISION: | 40,000 | 12,000 | 52,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 10,000 | | 10,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 0 | | |
| 17 | MUD & CHEMICALS | 35,000 | | 35,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 12,000 | | 12,000 |
| 24 | CEMENTING & EQUIPMENT | 27,000 | 25,000 | 52,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 7,500 | 12,000 | 19,500 |
| 26 | PIPE TESTING | | 2,000 | 2,000 |
| 27 | EQUIPMENT RENTALS | 35,000 | 2,865 | 37,865 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 1,000 | 500 | 1,500 |
| 30 | WATER | 5,000 | | 5,000 |
| 31 | FUEL | 90,000 | 6,000 | 96,000 |
| 32 | BITS | 25,000 | 1,000 | 26,000 |
| 33 | TRANSPORTATION & TRUCKING | 10,000 | 15,000 | 25,000 |
| 34 | CONTRACT LABOR | 10,000 | 25,000 | 35,000 |
| 35 | SAFETY & H2S TRAINING | 10,000 | | 10,000 |
| 36 | LOGGING & WIRELINE | 75,000 | 20,000 | 95,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 20,000 | | 20,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 20,000 | 20,000 |
| 47 | PERFORATION SERVICES | | 15,000 | 15,000 |
| 48 | COMPLETION FLUIDS | | 5,000 | 5,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | 1,000 | 500 | 1,500 |
| 61 | SALT WATER DISPOSAL | | 1,000 | 1,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 2,000 | 2,000 |
| 65 | PLUG & ABANDON COSTS | 15,000 | -15,000 | |
| 78 | INSURANCE | 40,000 | | 40,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 9,800 | | 9,800 |
| 82 | MISCELLANEOUS: ±5% contingency | 60,000 | 10,000 | 70,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $1,263,000 | $217,000 | $1,480,000 |

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| **9500** | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING (2,400' of 9-5/8") | 70,000 | | 70,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 5,000 | | 5,000 |
| 05 | WELLHEAD EQUIPMENT | 1,500 | | 1,500 |
| 06 | DRIVE PIPE | 5,000 | | 5,000 |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $82,000 | $0 | $82,000 |

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| **9520** | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS (5-1/2" 17# & 20# L-80) | | 205,000 | 205,000 |
| 22 | TUBING (2-7/8" 6.50# L-80) | | 78,000 | 78,000 |
| 23 | PACKERS | | 10,000 | 10,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 21,000 | 21,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $319,000 | $319,000 |

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| **9535** | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 25,000 | 25,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 10,000 | 10,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | | |
| 46 | SALES METERING EQUIPMENT | | 20,000 | 20,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $95,000 | $95,000 |

| | **TOTAL EQUIPMENT** | $82,000 | $414,000 | $496,000 |

| | **TOTAL WELL COST** | $1,355,000 | $631,000 | $1,986,000 |

THE RUDMAN PARTNERSHIP  12.5% WI
APPROVED _____ 12th _____ 2006

BY: _James C. Trimble_____
James C. Trimble, Manger - Exploration & Production

**EXHIBIT "D"**

**This Exhibit "D" is attached to and made a part of that Participation Agreement dated effective as of November 1, 2006 by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., WAC Investment Company, L.L.C., Pickens Financial Group, LLC, The Rudman Partnership, covering lands located in Conecuh and Escambia Counties, Alabama.**

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

## ESCAMBIA PROSPECT

OPERATING AGREEMENT

DATED

November 1 , 2006 ,
*year*

OPERATOR   Sklar Exploration Company L.L.C.

CONTRACT AREA   As shown on Exhibit "A" to this Agreement.

COUNTY OR ~~PARISH~~ OF   Conecuh and Escambia          STATE OF   Alabama

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM. A.A.P.L. NO. 610 – 1982 REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. All Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___Sklar Exploration Company L.L.C., a Louisiana limited liability Company, 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101_____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

**WITNESSETH:**

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

**ARTICLE I.**
**DEFINITIONS**

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement, including royalty and overriding royalty interests.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay 100% of its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine. Words defined herein shall have the same meaning whether or not they are capitalized.

**ARTICLE II.**
**EXHIBITS**

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑ A. Exhibit "A", shall include the following information:
   (1) Identification of lands subject to this agreement,
   (2) Restrictions, if any, as to depths, formations, or substances,
   (3) Percentages or fractional interests of parties to this agreement,
   (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
   (5) Addresses of parties for notice purposes.
☑ B. Exhibit "B", Form of Lease.
☑ C. Exhibit "C", Accounting Procedure.
☑ D. Exhibit "D", Insurance.
☑ E. Exhibit "E", Gas Balancing Agreement.
☐ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit "G", Tax Partnership.

If any provision of any exhibit, except Exhibits "A" and "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail. If any provisions of Exhibits "A" or "E" is inconsistent with any provision contained in the body of this Agreement, the provision of the exhibit shall prevail.

J. The term "Deepen" shall mean a single operation whereby a well drilled to an objective Zone below the deepest Zone in which the well was previously drilled or below the deepest Zone proposed in the associated AFE, whichever is the lesser.

K. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

K. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned or temporarily isolated in order to attempt a Completion in or continuing with a different Zone within the existing wellbore.

L. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore or improve production in a Zone which is currently open to production in the wellbore. Such operations include, without limitation, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting or Plugging Back of a well.

M. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

N. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE III.
### INTERESTS OF PARTIES

**A.    Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

**B.    Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____ all jointly owned lease burdens _____ which shall be borne as hereinafter set forth.

~~Each of the Parties hereto shall pay or deliver or cause to be paid or delivered its proportionate part of the royalties and over-~~ ~~Regardless of which party has contributed the leases' and/or oil and gas interest(s) hereto on which royalty is~~ due and riding royalties and other leasehold burdens as described in the attached Exhibit "A" and shall hold the other Party/ies free from any ~~payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or~~ liability therefore. If the interest of any Party/ies in any oil and gas lease covered by this Agreement is subject to any additional ~~cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the~~ royalty, overriding royalty, production payment or other charge over and above those shown on Exhibit "A", such Party/ies shall ~~other parties free from any liability therefore, assume and abide bear all such obligations and shall account or cause to be accounted for such~~ interests to the owners thereof. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C.    Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production ~~in excess of the amount stipulated in Article III.B.,~~ which is not a joint obligation of the parties such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D.    Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", ~~or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties,~~ or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.    If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.    If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

### ARTICLE IV.
### TITLES

**A.    Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto provided such party has paid 100% of its share of all costs of all operations conducted under the provisions of this Agreement. The cost incurred by Operator in this title program shall be borne as follows:

~~☒~~   ~~Option No. 1:   Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.~~

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE IV
### continued

☑ Option No. 2: Costs incurred by Operator in procuring abstracts */ and fees paid outside attorneys **/ for title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) [/ shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Operator shall use its best efforts to secure
~~Each party shall be responsible for securing~~ curative matter and pooling amendments or agreements required in connection
subject to this agreement and charge these fees to the joint account
with leases or oil and gas interests [/ contributed by such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders. This shall not prevent any party from appearing on its own behalf at any such hearing.

No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
                                                                                                          Operator
provided, and (2) the title has been approved by the examining attorney or title has been accepted by [/ ~~all of the parties who are to participate in the drilling of the well.~~

**B. Loss of Title:**

~~1. Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interests; and,~~

~~(a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

~~(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the interest lost;~~

~~(c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well;~~

~~(d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;~~

~~(e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,~~

~~(f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in connection therewith.~~
This space intentionally left blank.

~~2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~

~~(a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis, up to the amount of unrecovered costs;~~

~~(b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,~~

~~(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

3. Other Losses: All losses incurred, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of the Contract Area.

*     Curative matters and materials
**    Landmen and consultants
***   and for applications and hearings

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE V.
## OPERATOR

**A.   Designation and Responsibilities of Operator:**

_____Sklar Exploration Company L.L.C., of Shreveport, Louisiana_____ shall be the
Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and
required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall
have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross
negligence or willful misconduct.

**B.   Resignation or Removal of Operator and Selection of Successor:**

1. _Resignation or Removal of Operator:_   Operator may resign at any time by giving written notice thereof to Non-Operators.
If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, ~~or~~ is no longer capable of serving as
Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator
may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the
affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining
after excluding the voting interest of Operator. Such vote shall not be deemed effective until a written notice has been delivered to the
Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within 30 days from its receipt. Such
resignation        or        removal        shall        not        become        effective        until        7:00        o'clock        A.M.        on        the
first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action
by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier
date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a cor-
porate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not
be the basis for removal of Operator. *This condition shall not apply to a designated operator, such as Sklar Exploration Company
L.L.C., who owns no interest in the Contract Area by virtue of the fact that it is solely an operating company.
If Sklarco L.L.C. sells, transfers or relinquishes all of its interest, or otherwise fails to maintain an interest in the Contract Area,
Sklar Exploration Company L.L.C. may be removed as Operator without cause by a vote of two or more parties owning in excess of fifty
percent (50%) of the cost bearing interest in the Contract Area.

2. _Selection of Successor Operator:_   Upon the resignation or removal of Operator, a successor Operator shall be selected by
the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor
Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest
based on ownership as shown on Exhibit "A"; provided, however, if an Operator ~~which~~ has been removed ~~fails to vote or votes only to~~
~~succeed itself,~~ the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based
on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

**C.   Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the
compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

**D.   Drilling Contracts:**

except that in Operator's sole discretion all factors such as rig availability, equipment condition, contractor employee reliability
and knowledge and drilling contractor reputation shall be taken into consideration in determining the real competitive price.
All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area, ~~[~~If it so
desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing
rates in the area ~~and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced,~~ and
such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of in-
dependent contractors who are doing work of a similar nature.
E. Custody of Funds:  Operator shall hold for the account of Non-Operators any funds of Non-Operators advanced or paid to the Operator,
either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the
funds of the Non-Operators on whose account they are advance or paid until used for their intended purpose or otherwise delivered to Non-
Operators or applied toward the payment of debts regardless of whether the debts arise out of the same well or operation for which the funds
were advanced or from which the sales proceeds were derived.  Nothing in this paragraph shall be construed to establish a fiduciary
relationship between Operator and Non-Operators.  Nothing in this paragraph shall require the maintenance by Operator of separate accounts
for the funds of Non-Operators.
F. Statutory Employer:  Operator shall be considered the statutory employer of all employees of all Contractors, their sub-contractors or
agents whose goods furnished or services rendered for Operator are an integral part of or essential to Operator's ability to perform its
operations as an oil and gas operator.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

**A.   Initial Well:**

The initial well is the Initial Well referred to in Subsection 1.2 (a) of the Participation Agreement to which this instrument is attached as
Exhibit ___.                                                                And subject to rig availability.
On or before the ____1st____ day of _____June_____, (year) ___2007__, Operator shall commence the drilling of a well for
oil and gas at the following location: of Operator's choice within Section 5, T3N, R13E, Escambia County, Alabama, or as near there to as
practicable

and shall thereafter continue the drilling of the well with due diligence to a measured depth of 12,000' in a vertical bore hole, or a depth
sufficient in SEC's discretion, to test the Upper Smackover and Norphlet Formations, whichever is more shallow

- 4 -

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is en-
countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and
gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which
event Operator shall be required to test only the formation or formations to which this agreement may apply.

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the
well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

## B.   Subsequent Operations:

any well includes water source or injection wells

1. Proposed Operations:  Should any party hereto desire to drill any *well* on the Contract Area other than the well provided
Reenter, recomplete, sidetrack
for in Article VI.A., or to rework, ~~deepen or plug back a dry~~ hole ~~drilled at the joint expense of all parties or a well jointly owned by all~~
reenter recomplete sidetrack
~~the parties and not then producing in paying quantities,~~ the party desiring to drill, rework, / deepen or plug back such a well shall give the
that have not forfeited their interest in the well
other parties / written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
to whom                        is delivered            fifteen (15)                delivery
tion and the estimated cost of the operation. The parties, / receiving such a notice / shall have / ~~thirty (30)~~ days after receipt / of the notice
within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill-
twenty-four (24) hours
ing rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be
to whom                is delivered
limited to ~~forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays.~~ Failure of a party / receiving such notice / to reply
within
the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or
response given by telephone shall be promptly confirmed in writing.
*Not withstanding this Article VI.B.1, and subject to the right of any party to non-consent the proposed operation, a proposal to re-
work, recomplete, sidetrack, deepen or plugback a well producing in paying quantities, which is consented to by two (2) or more of
the parties owning two-thirds (2/3rds) or more of the working interest under the well may proceed and be executed on behalf of the
Consenting Parties without the unanimous consent of all parties.

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice
fifteen (15)                                                twenty-four (24)
period of / ~~thirty (30)~~ days (or as promptly as possible after the expiration of the / ~~forty-eight (48)~~ hour period when a drilling rig is on loca-
tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
amination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the
actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
dance with the provisions hereof as if no prior proposal had been made.
Operator may, at its discretion, perform preparatory work in connection with, or even actually commence, an operation for which
notice has been provided under this Article VI.B. prior to our during the notice period, and if such operation ultimately is one non-con-
ducted by less than all parties, the Consenting Parties shall, nevertheless, be entitled to recover the risk compensation provided for
hereunder.

to whom                is delivered
2. Operations by Less than All Parties:  If any party / receiving such notice / as provided in Article VI.B.1. or VII.D.1. (Option
subject to availability of equipment and personnel
No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
giving the notice and such other parties as shall elect to participate in the operation shall, / within ninety (90) days after the expiration of
fifteen (15)                                                twenty-four (24)
the notice period of / ~~thirty (30)~~ days (or as promptly as possible after the expiration of the / ~~forty-eight (48)~~ hour period when a drilling rig is
on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all
work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Con-
senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
ditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as
twenty-four (24)
to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within / ~~forty-eight (48)~~ hours
(exclusive of Saturday, Sunday and legal holidays) after ~~receipt~~ delivery of such notice, shall advise the proposing party of its desire to (a) limit par-
either
ticipation to such party's interest as shown on Exhibit "A" or (b) carry / is proportionate part of Non-Consenting Parties' interests, and
failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for
twenty-four (24) hours
such a response shall not exceed a total of / ~~forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays)~~. The proposing party,
at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such
operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
recompleted, sidetracked,
If such an operation results in a dry hole, the Consenting Parties shall / plug and abandon the well and restore the surface location at their
sole cost, risk and expense / . If any well drilled, reworked, / deepened or plugged back under the provisions of this Article results in a pro-
either
ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,
*or one of them shall make a proposal to the other Consenting Parties to conduct further operations under Article VI.B

-5-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
ties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties
in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
Party's interest in the entire well _and not just a particular Zone therein_ and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
terests not excepted by Article III.D. payable out of or measured by the production from _any and all Zones within_ such well accruing with respect to such interest
until it reverts) shall equal the total of the following:

  (a)  100%  ~~500%~~ of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
Party had it participated in the well from the beginning of the operations; and

  (b)   500   % of that portion of the costs and expenses of drilling, reworking, * deepening, plugging back, testing and completing,
after deducting any cash contributions received under Article VIII.C., and    500    % of that portion of the cost of newly acquired equip-
ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
participated therein.

   An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-
working * or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
reworking * or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent _five_ (100%) of that portion of the costs of
the reworking * or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
such a reworking * or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
plicable as between said Consenting Parties in said well.

   During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
ticle III.D.

   In the case of any reworking, * plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
abandonment of a well after such reworking, * plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

   Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
ings. Each _quarter_ month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
realized from the sale of the well's working interest production during the preceding _quarter_ month. In determining the quantity of oil and gas
produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

*recompleting, sidetracking

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, recompleting, sidetracking deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

Notwithstanding the provisions of this Article VI.B.2., *it is agreed that without the mutual consent of *, all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply ; provided that an exceptional well location that is approved by the Louisiana Office of Conservation shall be deemed to conform to the then-existing spacing pattern.

*and subject to the right of any party to non-consent the proposed operation
**two (2) or more Parties owning 75% or more of the working interest

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, recompleting, Sidetracking deepening and plugging back of such initial well after if has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for production, ceases to produce in paying quantities.

3. Stand-By Time:   When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

4. Sidetracking:   Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

(a)  If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

(b)  If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period twenty-four (24) hours shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and twenty-four (24) hours receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other infifteen (15) stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

### C.   TAKING PRODUCTION IN KIND:

have the right to
Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1    required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4   the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5   its share of all production.

6

7      In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8   the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9   the obligation, to purchase such oil or sell it to others at any time and from time to time, ~~on the same terms as Operator is marketing Operator's and/or other Non-Operators' share of production~~ ~~for the account of the non-taking party / at the~~
10   ~~best price obtainable in the area for such production.~~ Any such purchase or sale by Operator shall be subject always to the right of the
11   owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously
12   delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of
13   time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14   of one (1) year.

15

16      In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or
17   deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18   be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19   agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

20

21   **D.   Access to Contract Area and Information:**

22

23      Except as otherwise provided herein Each / party ^consenting^ who has paid 100% of its share of all costs of all operations conducted under this
24   Agreement shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
25   and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
26   and records relating thereto. Operator, upon request, shall furnish each of the other / ^consenting^ parties with copies of all forms or reports filed with
27   governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
28   each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
29   gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
30   quests the information.

31

32   **E.   Abandonment of Wells:**

33

34      1. Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
35   drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
36   without the consent of / ~~all parties.~~ ^**^ Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
37   within / ~~forty-eight (48) hours (exclusive~~ ^twenty-four (24) hours (inclusive^ of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
38   such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
39   accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
40   such well. / Any party / ^**^ who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
41   operations in search of oil and/or gas subject to the provisions of Article VI.B.
42   ~~ninety percent (90%) or more of the parties thereof.~~
     ^**If the well has been drilled pursuant to Article VI.B.2, only the consent of the consenting parties therein shall be required.^
43   ^***Any cement plugs used for plugging and abandoning such well shall be in excess of that required by the regulatory body^
     ^recommended to be a volume of one and one-half times of that required.^

44

45      2. Abandonment of Wells that have Produced: Except for any well in which a Non-Consent operation has been conducted
46   hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
47   producer shall not be plugged and abandoned without the consent of all parties / ~~.~~ ^***^ ^such parties^ consent to such abandonment, the well shall
48   be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
49   ~~thirty (30) /~~ ^fifteen (15)^ days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
50   those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
51   parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
52   ^Should any party fail to reply to such notice, such party shall be deemed to have consented to the proposed abandonment.^ Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. / Each abandoning party shall assign
53   the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
54   material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
55   terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
56   gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
57   tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
58   duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit
59   ^****two-thirds percent (2/3rds%) or more of the owners thereof. If the well has been drilled or reworked pursuant to Article VI.B.2 and the^
60   ^consenting parties therein have not been fully reimbursed as therein provided, only the approval of such consenting parties shall be required^

61

62

63

64

65

66

67

68

69

70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1  "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2  assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3  Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4  interests in the remaining portion of the Contract Area.
5
6         Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7  the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8  quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9  templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10  well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11  repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12  visions hereof.
13
14         3. Abandonment of Non-Consent Operations:  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15  Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16  permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17  of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18  VI.E.
19
20                                         **ARTICLE VII.**
21                         **EXPENDITURES AND LIABILITY OF PARTIES**
22
23  **A.    Liability of Parties:**
24
25         The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26  shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27  among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28  shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners. In their
29  relations with each other under this Agreement, the parties shall not be considered fiduciaries or to have established a confidential
   relationship but rather shall be free to act on an arm's-length basis in accordance with their own self-interest.
30
31  **B.    Liens and Payment Defaults:**
32
33         Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
34  of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
35  at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the
36  state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
37  taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
38  rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
39  of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
40  the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
41  purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
42  and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.
43
44         If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
45  Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
46  the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain
47  reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph, be entitled to recover the amount it paid
   plus five hundred percent (500%) of that amount out of the proceeds from the sale of the defaulting party's share of oil and for gas; and, to
48  secure payment thereof, be subrogated to the security rights described in the foregoing paragraph. Notwithstanding anything contained to the
   contrary in this paragraph, all parties agree that this provision shall not apply to any operation requiring an AFE unless Operator has advance
49  billed all parties for their proportionate share of said costs in accordance with other provisions of this agreement.
50
51  **C.    Payments and Accounting:**
52
53         Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
54  and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
55  tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
56  showing expenses incurred and charges and credits made and received.
57
58         Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
59  of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
60  month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
61  with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
62  on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
63  fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
64  due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
65  pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
66
67  **D.    Limitation of Expenditures:**
68
69         1. Drill or Deepen:  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
70  pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:

- 9 -

A.A.P.L. FORM 610 - MOL__ FORM OPERATING AGREEMENT - 1902

### ARTICLE VII
### continued

1  ☑  *Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2  necessary tankage and/or surface facilities. *This Option No. I shall apply only to water source and/or water injection wells.
3
4  ☑  **Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5  authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6  to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have ~~forty-eight~~  twenty-four (24) hours
7  ~~(48) hours (exclusive of Saturday, Sunday and legal holidays)~~ in which to elect to participate in the setting of casing and the completion at-
8  tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9  cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10  constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11  elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking,  recompleting, sidetracking  deepening or plugging
12  back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13  than all parties. **This Option No. 2 shall cover all wells except those expressly covered by Option No. 1 above.
14
15  2. Rework or Plug Back:  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16  plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17  include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18  and/or surface facilities.
19
20  ~~3. Other Operations:~~  Two or more Parties owning a majority interest  Without the consent of ~~all parties,~~  Operator shall not undertake any single project reasonably estimated
21  to require an expenditure in excess of _____ Fifty Thousand and No/100------- _____ Dollars ($_____ 50,000.00 _____ )
22  except in connection with ~~the drilling, reworking,~~  sidetracking  ~~deepening, completing, recompleting, or plugging back of which has been~~
23  previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24  emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25  to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26  parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27  an information copy thereof for any single project costing in excess of _____ Fifty Thousand and No/100------- _____
28  Dollars ($_____ 50,000.00 _____ ) but less than the amount first set forth above in this paragraph.
29
30  E.   Rentals, Shut-in Well Payments and Minimum Royalties:
31
32      Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33  party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34  tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35  behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36  failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37  ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38  visions of Article IV.B.3.3.
39
40      Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41  of a producing gas well, ~~at least five (5) days (excluding Saturday, Sunday and legal holidays)~~, or at the earliest opportunity permitted by
42  circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43  Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44  shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46  F.   Taxes:
47
48      Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49  subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50  become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51  be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52  Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53  riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54  owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55  tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56  anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57  value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58  the manner provided in Exhibit "C".
59
60      If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62  mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63  interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64  count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65  provided in Exhibit "C".
66
67      Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
68  to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.
69
70

- 10 -

A.A.P.L. FORM 610 - MODᴇʟ FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
### continued

**G. Insurance:**

At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

### ARTICLE VIII.
### ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

**A. Surrender of Leases:**

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leased interest. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

**B. Renewal or Extension of Leases:**

If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of oil and gas leases.

**C. Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VIII
### continued

said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D.  Maintenance of Uniform Interests:**

~~For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells, equipment and production unless such disposition covers either:~~

~~1.   the entire interest of the party in all leases and equipment and production; or~~

~~2.   an equal undivided interest in all leases and equipment and production in the Contract Area.~~

Every ~~such~~ sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties.  Any added expenditure required as a result of partial disposition, including but not limited to additional marketing or metering expense, shall be borne solely by the party transferee.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E.  Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

~~F.  Preferential Right to Purchase:~~

~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~

### ARTICLE IX.
### INTERNAL REVENUE CODE ELECTION

This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE X.
### CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed ____ Ten Thousand and No/100 -------------------------------------------------------------------------------------------------------------- Dollars ($ _____10,000.00_____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.  All claims or suits involving title to any interest subject to this Agreement shall be treated as a claim or suit against all parties hereto.

### ARTICLE XI.
### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

### ARTICLE XII.
### NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

### ARTICLE XIII.
### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☑   Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☐   Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

- 13 -

A.A.P.L. FORM 610 - MODᴇᴌ FORM OPERATING AGREEMENT - 1982

**ARTICLE XIV.**
**COMPLIANCE WITH LAWS AND REGULATIONS**

**A.   Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B.   Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____Alabama_____ shall govern.

**C.   Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the ~~"Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time~~ ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said [any] Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

**ARTICLE XV.**
**OTHER PROVISIONS**

<u>(See attached page 14-1 through 14-8)</u>

ARTICLE XV.

OTHER PROVISIONS

A. PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1) an election to perform additional logging, coring or testing;
(2) an election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;
(3) an election to plug back and attempt to complete the well in a shallower depth or formation;
(4) an election to deepen the well;
(5) an election to sidetrack the well;
(6) an election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;
(7) an election to temporarily abandon the well;
(8) an election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of two or more Parties with a majority of the consenting parties in possessory, cost-bearing interest (and not in number), a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth. In such event, the operation, which, in the opinion of two or more Parties with a majority of the consenting parties in possessory, cost bearing interest (and not in number) is less likely to jeopardize the well, will be given priority. Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail. It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests. For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation. Notwithstanding anything to the contrary contained in this Article XV.A, an election supported by two or more consenting parties owning at least two-thirds (2/3rds) of the cost bearing interest in the well shall control regardless of where that election falls in the preference of operations set forth above.

B. HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

C. INITIAL WELL

The parties hereto understand and agree that the Initial Well described in Article VI A herein refers to the same well described in Section 1.2 of that certain Participation Agreement dated November 1, 2006, to which this agreement is attached as Exhibit "D". If a party elects or is deemed to have elected not to participate in the completion of the Initial Well, or fails to pay all of its share of the actual costs to complete that well, then such party shall be deemed a "Non-Participating Party" or "Non-Participant" in said Initial Well and shall automatically be deemed to have relinquished and forfeited all of its interest, including but not limited to its leasehold, oil and gas interests and contractual rights in and to the Initial Well, the Contract Area and the AMI. In the event an assignment of oil and gas interests, leasehold or contractual rights have been made to such Party electing not to participate in the Initial Well, the Non-Participating Party agrees hereby to promptly assign to Operator as agent on behalf of the Consenting Parties, all of its right, title and interest in all oil and gas leases and oil and gas interests covering lands located within the Contract Area and AMI, and such Non-Participating Party agrees and shall perform all necessary acts to evidence such relinquishment and forfeiture. Any such Non-Participating Party's Assignment shall be without warranty, except by, through and under Assignor, and shall be delivered to the Operator within thirty (30) days of the request for such Assignment. Operator shall assign such Non-Participating Party's interests in oil and gas leases and/or oil and gas interests to the Consenting Party or

Parties, or their designee, their proportionate share of such forfeited Non-Participating Party's interest in the entire Contract Area and AMI. This forfeiture shall be without prejudice and in addition to the rights of the Parties under Articles VII and XV.E of this agreement. Notwithstanding the aforesaid, if a party elects not to participate in the completion of the Initial Well, forfeiture of its interest as herein provided shall only apply in the event two (2) or more of the cost bearing parties owning a minimum of sixty percent (60%) elect and participate in setting production pipe and completion of said well.

D. <u>DISPUTES AS TO PROPOSED DEPTHS</u>

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of two or more Parties with a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties. If the parties are equally divided, the opinion of the Operator will prevail.

E. <u>ADVANCEMENT OF COSTS</u>

Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s) in advance of its respective share of (i) the dry hole cost for the initial well to be drilled under Article VI A, (ii) the dry hole cost for any other well to be drilled hereunder to which such Non-Operator has consented, and (iii) the cost of any completion, reworking, recompletion, sidetracking, deepening or plugging back operation to which such Non-Operator has consented (any such operation under clause (i), (ii), or (iii) being herein called a "Drilling Operation"). Such request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Drilling Operation. The amount of each Non-Operator's advance payment shall be based upon the latest AFE for such operation. Such advanced payments shall be held by Operator for the account of the Non-Operators and applied, with interest, against the actual costs incurred in the applicable operation.

A Non-Operator receiving a request for advance payment shall, within two (2) days of the receipt of such request if and when a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to Operator by wire transfer, check or other ready funds the full amount of such request. Operator shall credit the amount to the Non-Operator's account for the payment of such Non-Operator's share of costs of such Drilling operation, and following the end of each month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement.

In the event a Non-Operator to which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by tendering ready funds as aforesaid, then Operator, at its option, shall make a second written or telephonic request for such advance. Non-Operator shall pay for said advance as aforesaid within two (2) days from delivery of such second request.

If a Non-Operator fails to pay within two (2) days of the delivery of such second request, then:

(1) If the advance payment was requested for the drilling of the Initial Well under Article VI.A, Non-Operator may, at the sole discretion and timing election of the Operator, be deemed to have relinquished all of its interests in the oil and gas leases and/or oil and gas interests covering lands located in the Contract Area and AMI retroactive to the date of default in payment, and if assignment has been made to such Non-Operator, Non-Operator shall assign all of such rights, within thirty (30) days of a request for such assignment, to those parties who have participated in such Drilling Operation, in the proportion that such parties share the relinquished interest.

(2) If the advance payment was requested for any other Drilling Operation (including completion of the initial well), Non-Operator may, at the sole discretion and timing election of the Operator, be deemed non-consent in said operation retroactive to the beginning of such operation and thereafter subject to the risk compensation provisions of Article VI.B.2 hereof.

If the Non-Operator fails to make such payment within two (2) business days of the receipt of such second request, Operator shall promptly notify all other Consenting Parties to such Drilling Operation of the default in payment and if and when applicable, of the relinquishment of an interest under this provision. The Consenting Parties who wish to participate in the Drilling Operation shall have five (5) days from receipt of the applicable notice to elect to assume the costs chargeable to such relinquished interest and shall share such relinquished interest in proportion to their assumption of such relinquished interest. If the Consenting Parties who wish to participate in the Drilling Operation are unwilling to assume the costs chargeable to such relinquished interest, the Drilling Operation shall be cancelled and the forfeiture described above shall not take effect.

Notwithstanding anything to the contrary herein, if the applicable drill well or operation is unsuccessful or results in a dry hole, Operator and Non-Operator(s) shall have the right to sue a Party who failed to pay for its proportionate share of expenses in lieu of a Party's right to an assignment of all Non-Operator's leasehold and contractual rights within the Contract Area, or in lieu of deeming the Party Non-Consent.

## F.  NECESSARY EXPENDITURES EXCLUDE SIDETRACKING

The phrase "necessary expenditures" in Article VII.D.1. (Option No. 2) on page 10 shall not be deemed to include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

## G.  ADDITIONAL CHARGES

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Unit Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same: Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and expenses in connection with preparation and presentation of evidence and exhibits of State Oil and Gas Board of Alabama hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

## H.  INDEMNITY

Except for liabilities resulting from the gross negligence or willful misconduct of the Operator, each Non-Operator shall defend, indemnify and hold Operator harmless against any and all claims, causes of action, debts, liabilities and other responsibilities whatsoever arising out of Operator's performance of its obligations hereunder for and on behalf of the Non-Operators.

## I.  RECOUPMENT

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

## J.  SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

## K.  NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

L. GAS MARKETING

Upon request by Non-Operators, Operator agrees to make a good faith effort to market Non-Operator's share of all production of oil, gas and related hydrocarbons produced from the Contract Area under the same terms and conditions as Operator markets its own. Nothing herein shall be construed as establishing a fiduciary relationship between Operator and Non-Operators.

M. AREA OF MUTUAL INTEREST

The parties hereby create an Area of Mutual Interest ("AMI") consisting of the lands outlined by a bold red line on the plat attached hereto as Exhibit "A-2". This AMI shall remain in force and effect for a term of five (5) years from the date of this Agreement and, insofar and only insofar as the AMI includes lands covered by oil and gas leases and/or oil and gas interests subject to this Agreement, as long thereafter as said oil and gas leases and/or oil and gas interests remain in force and effect. This AMI shall terminate after five (5) years as to all such lands not covered by oil and gas leases and/or oil and gas interests subject to this Agreement.

During the term of this AMI, if any party hereto, including related persons or entities, ("Acquiring Party") directly or indirectly acquires any oil and gas lease or any oil and gas interest covering lands lying within the AMI, the Acquiring Party shall promptly advise the other parties ("Offerees") of such acquisition. In such event, each Offeree shall have the right to acquire its proportionate interest in such oil and gas lease and/or oil and gas interest in accordance with the other provisions of this AMI.

Promptly upon acquiring such oil and gas lease and/or oil and gas interest, the Acquiring Party shall, in writing, advise the Offerees of such acquisition. The notice shall include a copy of all instruments of acquisition including, by way of example but not of limitation, copies of the leases, assignments, subleases, farmouts or other contracts affecting the oil and gas lease and/or oil and gas interest.

The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by the Acquiring Party in acquiring such oil and gas lease and/or oil and gas interest ("Acquisition costs"). The Offeree shall have a period of fifteen (15) days after receipt of the notice within which to furnish the Acquiring Party written notice of its election to acquire its proportionate interest in the offered oil and gas lease and/or oil and gas interest. If, however, a well in search of oil or gas is being drilled within the AMI, each Offeree shall have a period of twenty-four (24) hours (excluding Saturdays, Sundays and legal holidays) after delivery of the notice within which to elect to acquire its proportionate interest in the oil and gas lease and/or oil and gas interest so offered. It is provided, however, that the twenty-four (24) hour election period shall not apply unless the Acquiring Party shall give the notice to the Offerees within two (2) days after the date on which the Acquiring Party acquired the oil and gas lease and/or oil and gas interest so offered. In addition thereto, the Acquiring Party shall also:

    (a)    furnish the Offerees with the approximate location of the well then being drilled and the name of the operator or drilling contractor drilling the well, and

    (b)    specifically advise the Offerees that the Offerees shall have a period of twenty-four (24) hours within which to elect to acquire an interest in the offered Oil and Gas Interest.

The above information shall be in addition to the information and copies of instruments provided for above in connection with the usual notices of acquisition of an oil and gas lease and/or oil and gas interest. If the Acquiring Party does not receive actual written notice of election of an Offeree to acquire its proportionate interest within the fifteen (15) day or twenty-four (24) hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire its interest therein. An Offeree accepting the offered interest shall be entitled to participate in such oil and gas lease and/or oil and gas interest in the proportion to which its interest bears to the total interest of all parties (including the acquiring party) electing to participate. Promptly after the time for election expires, the Acquiring Party shall invoice the Offeree electing to acquire an interest for its proportionate part of the Acquisition Cost, as reflected by the invoice. Upon receipt of such reimbursement, the Acquiring Party shall execute and deliver an appropriate assignment to such Offeree. If the Acquiring Party does not receive the amount due from the Offeree within thirty (30) days after receipt by the Offeree of the invoice for its cost, the Acquiring Party may, at its election, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within five (5) days after receipt of such written notice by the delinquent Offeree shall constitute a withdrawal by the delinquent Offeree of its former election to acquire the interest, and such Offeree shall no longer have the right to acquire an interest in the offered oil and gas lease and/or oil and gas interest.

Page 14-4

Any assignment made by the Acquiring Party shall be made free and clear of any liens, encumbrances, overriding royalty interests and other burdens created by or arising under the Acquiring Party but otherwise without warranty of title, either express or implied. The assignment shall be made and accepted subject to, and each assignee shall expressly assume its portion of all of the obligations of the Acquiring Party. The assignment shall also be made and accepted subject to this Agreement.

If two (2) or more separate oil and gas leases and/or oil and gas interests are included in the same notice, the Offeree shall have the separate right of election as to each separate oil and gas lease and/or oil and gas interest.

The provisions of this AMI shall not apply to acquisitions as a result of merger, consolidation, reorganization or an acquisition from a parent, subsidiary, or affiliated corporation, or as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries. Neither shall it apply to sales and acquisitions between partners in a partnership or venturers in a joint venture, or to any acquisition by any party of an interest which interest prior to and at the time of such acquisition was subject to this Agreement, unless such acquisition was the renewal or extension of a lease which at the date of expiration was subject to this Agreement.

Renewals and extensions of oil and gas lease(s) and/or oil and gas interest(s) shall be subject to Article VIII.B of this Agreement.

Notwithstanding any provisions contained in this Article XV.M, or otherwise in this agreement, The Rudman Partnership has no obligation to offer any oil and gas leases and/or oil and gas interests covering lands located within the blue outline on said Exhibit "A-2" (and being further identified as Sections 27, 28, 29, 32, 33 and 34, Township 4 North, Range 13 East, Conecuh County, Alabama) to the other Non-Operators, and neither Operator nor the other Non-Operators have any obligation to offer The Rudman Partnership any oil and gas leases and/or oil and gas interests covering lands located within that blue outline. The Non-Operators other than The Rudman Partnership shall have the right to share in any oil and gas leases and/or oil and gas interests covering lands located within that blue outline in proportion to which their interest bears to one another, excluding the interest of The Rudman Partnership.

N. OPERATOR'S and NON OPERATORS' LIEN – SECURITY INTEREST

At the request of Operator, each Non-Operator agrees to execute and furnish Operator for filing in the records of Cherokee County, Texas a Memorandum of Operating Agreement in a form suitable to Operator for the purpose of perfecting and giving effect to the lien described in Article VII.B of this Agreement.

If written notice has been given that the lien rights conferred in Article VII.B have been implemented or enforced against any party hereto, for so long as the affected party remains in default, it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and shall not be entitled to vote its interest in any matter hereunder. As to any proposed operation in which it otherwise would have the right to participate, such party shall not have the right to elect to participate or be a Consenting Party unless and until it pays in full the amount it is in default plus all other outstanding amounts due hereunder. If an operation proposed during such default period commences before such payment in full, the party in default shall automatically be deemed a Non-Consenting Party to the operation.

O. METERING OF PRODUCTION

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

P. PLUGGING AND LEASEHOLD RESTORATION FUND

At any time any well subject to this agreement is approaching the end of its economic life and/or its useful purpose, upon the approval of two or more Parties with a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A", Operator may pre-bill the joint account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location. Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and abandonment and restoration of the leasehold premises. In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any

accrued interest on such difference, based upon the then working interest percentage of such owner. In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

Q. SEPARATE AGREEMENT FOR NON-UNIFORM INTEREST

Any oil and gas lease and/or oil and gas interest that is either (i) described in Exhibit "A-1" to this Agreement or (ii) that is both acquired after the effective date of this Agreement and covered by Article VIII.B, VIII.C or XV.M of this Agreement, that thereafter becomes owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such lease and/or interest becomes so owned. Any oil and gas lease and/or oil and gas interest acquired after the effective date of this Agreement and covered by Article VII.B, VIII.C or XV.M of this Agreement, that becomes owned by more than one but less than all of the parties hereto shall remain subject to this Agreement as to the parties who own an interest therein, but Operator is authorized to modify Exhibit "A" to this Agreement to reflect the parties' interests in each such oil and gas lease and/or oil and gas interest. Operator is further authorized to modify said Exhibit "A" to this Agreement to reflect the parties' interests in each well subject to this Agreement.

R. OBLIGATORY WELL

Notwithstanding the provisions of this agreement and particularly Article VI.B, if any proposed operations are necessary to maintain a an oil and gas lease and/or oil and gas interest covered by this Agreement in force or an agreement to earn an oil and gas lease and/or oil and gas interest which would otherwise expire unless such operations are conducted, then in lieu of being penalized under Article VI.B.2., each Non-Consenting Party shall assign to Consenting Parties all of such Non-Consenting Party's right, title and interest in and to the oil and gas lease(s) and/or oil and gas interest(s) or portion thereof or such agreement which would be lost or not earned if such operations were not conducted. Such assignment shall be promptly due upon commencement of said proposed operations by Consenting Parties and shall be free and clear of all overriding royalties, production payments, mortgages, liens and other burdens and encumbrances placed thereon by the assigning party or resulting from its ownership or operation thereof which is not a joint obligation of the parties, but otherwise without warranty of title either expressed or implied.

If the assignment is in favor of more than one party, the assigned interest shall be shared by the Consenting Parties in the proportions that the interest of each bears to the interest of all Consenting Parties unless otherwise agreed to in writing. Thereafter, Operator may modify Exhibit "A" to reflect the distinct ownership of such acreage covered by said assignment. Operations that are necessary to either maintain an oil and gas lease and/or oil and gas interest covered by this Agreement in force or to earn an interest in the same or part thereof under an agreement which would otherwise expire unless operations are conducted, shall be defined as operations that are proposed within six (6) months of the date the oil and gas lease and/or oil and gas interest or agreement would otherwise expire.

S. PREVAILING AGREEMENT

If there is a conflict between provisions of the Participation Agreement dated November 1, 2006, to which this Operating Agreement is attached as Exhibit "D", and this Operating Agreement, the provisions of the Participation Agreement shall prevail, and shall be binding upon all parties to this Operating Agreement. In the event of a conflict between any of the additional provisions in Article XV of this Agreement, or any added text in this Agreement, on one hand, and any form text contained in this Agreement, the additional provisions or added text, as the case may be, shall govern and control.

T. NON-PARTICIPATING INTERESTS

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto as same may be revised from time to time to reflect record title and/or reformation of the Contract Area.

U. EXECUTION

This agreement shall be binding upon each Non-Operator that executes this agreement without regard to whether this same instrument, or any copy or counterpart hereof shall be executed by any other Non-Operator. This Agreement shall be effective as between the Operator and each Non-Operator who executes this Agreement, regardless of whether all of the Non-Operators execute the same.

Page 14-6

V. MISCELLANEOUS

Anything to the contrary herein notwithstanding, this Operating Agreement is expressly made subject to the terms and provisions of the oil and gas leases and any farmout agreements described in Exhibit "A" hereof. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereto shall be deemed to run with the oil and gas leases and/or oil and gas interests subject to this Agreement. The headings used in this Agreement are for convenience only and shall not be considered in the interpretation or construction of the Agreement.

W. NON-CONSENT

Any party that forfeits its interest in a well pursuant to Article VI.B.2 of this Agreement forfeits their interest in the entire well and revenue therefrom, not just a particular Zone therein, for the duration of the recoupment period or, if the risk compensation is never recovered, forever. The parties recognize, however, that applicable rules of the State Oil and Gas Board of Alabama may allow for the drilling and completion of additional wells within the unit for an existing well, and, subject to the other provisions of this Agreement, the forfeiture by one party of its interest in the existing well does not affect that party's right to elect to participate or not to participate in a proposal to drill, or any other operation with respect to, another well, even if the other well is located in the same unit, and even if the new well is completed in the same Zone from which the existing well is producing.

Anything to the contrary hereinabove notwithstanding, any Non-Consenting Party to an operation conducted hereunder shall have no right to observe such operation or subsequent operations within the same well or have access to information pertaining to such operation or subsequent operations, until such time as the Non-Consenting Party's share of the cost of such operation, and any applicable subsequent operations, and the risk compensation therefor has been recovered by the Consenting Parties as provided herein.

X. SOPHISTICATED INVESTORS

By execution of this Agreement, each Non-Operator represents to each other and to Operator: (i) that it has a working knowledge of the oil and gas industry; (ii) that it is a sophisticated investor and has a financial net worth in excess of one million dollars; (iii) that it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of leasehold costs, drilling costs, completion costs, and all other costs incurred in operations under this Agreement; (iv) that it ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES; (v) that its interest hereunder has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the State of Louisiana or Alabama, or any other state ("Securities Law"), and that it owns said interest for investment purposes only, and not with a view to or for sale in connection with any distribution thereof within the meaning of Securities Law.

Y. PAYMENT OF ROYALTIES

Notwithstanding anything to the contrary in this agreement, Operator shall use its best efforts to deliver or cause to be delivered all royalties, overriding royalties, production payments and similar charges to the persons entitled thereto and such charges shall be borne proportionately by the Parties hereto on the basis of their respective ownership of the leases or well. It is provided, however, if the interest of any Party is subject to and burdened with royalties, overriding royalties, production payments, or similar burdens ("additional burdens") which are not borne proportionately by all other Parties hereto, such Party shall account to the owners of the additional burdens for the amount due them or arrange for Operator to handle such payments. Operator shall have no liability for the failure to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, except such as may result from gross negligence or willful misconduct.

Z. NOTICE FOR RENEWALS OR EXTENSION OF LEASES

With regard to Articles VIII.B. and/or VIII.C., hereof, in the event that a drilling rig is on location, notice may be given by telephone, and the time permitted for participation election shall not exceed forty-eight (48) hours, exclusive of weekends and holidays."

Page 14-7

AA.  WHEN AN AFE IS EXCEEDED BY TWENTY-FIVE PERCENT (25%)

If in drilling any well under the terms of the agreement of the Operator's estimated cumulative costs of operations prior to reaching the proposed depth exceeds 25% of the Authority for Expenditure (AFE) for such well, exclusive of the estimated cost of completion, and for reasons which could not be avoided by abandoning the well (as for example well control costs, fishing costs, etc.), it is agreed that Operator shall promptly advise Non-Operator(s).  If after having received such information all parties agree the operator may plug and abandon the well or take such other acts as the parties may desire.  If the parties cannot agree as to further operations, the following provisions will control:

(1)  If two or more parties with a majority in possessory, cost-bearing interest (and not in number) desire to attempt to complete the well at or above the depth reached, further operation shall be conducted as if the well had been drilled to the proposed depth.  Those not participating in the completion shall be non-consent and subject to the terms of Article VI.B.2 and XV.A above.

(2)  If two or more parties with a majority in possessory, cost-bearing interest (and not in number) elects to continue operations in an attempt to drill the well to the proposed total depth, those not desiring to participate in such further operations may become non-consenting parties subject to the term of Article VI.B.2 and XV.A above.

(3)  If two or more parties with a majority in possessory, cost-bearing interest (and not in number) desire to cease further operations and plug and abandon the well without a completion attempt, any one or more of the parties hereto shall have the right to continue drilling in an effort to reach the depth initially proposed in connection with such well.  All costs, risk and expense incurred after such takeover by the parties shall be at the sole cost, risk and expense of the parties continuing such further operations.  Such parties shall have the right to drill the well to any depth at which they may desire, even beyond the proposed depth.  They shall both plug and abandon and restore the surface or complete and equip the well for production of oil or gas in a formation below that reached after taking over the operation.  If the well is completed for production of oil or gas in a formation below that reached after taking over the operation, the non-consenting parties.  If the parties taking over the operation desire to attempt to complete the well in a formation and at a depth that reached before the well was taken over by them, they shall notify the non-consenting parties who shall have the right either to participate or not to participate.

BB.  PIPELINES AND OR GATHERING LINE COSNTRUCTION:

Should any party subject to this agreement construct, operate or purchase, or join in the construction, operation or purchase of a pipeline and/or gathering line to transport production from lands covered by the Contract Area; then in that event, such party shall notify the remaining parties furnishing all pertinent cost and information.  The remaining parties shall have the right to participate in the construction, operation and ownership of such pipeline and/or gathering line by assuming its proportionate share of the obligations and paying the cost attributable thereto.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ day of _____ , (year) __2006__ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____, have been made to the form.~~

O P E R A T O R

SKLAR EXPLORATION COMPANY L.L.C.

_David A. Barlow_ (signature)
David A. Barlow, Chief Operating Officer

_Kim E Ramsey_ (signature)

_James Marshall Jones Sr._ (signature)

N O N - O P E R A T O R S

SKLARCO L.L.C.

_David A. Barlow_ (signature)
David A. Barlow, Chief Operating Officer

_Kim E. Ramsey_ (signature)

_James Marshall Jones Sr._ (signature)

McCOMBS ENERGY, LTD.

_____
Ricky Haikin, Vice President

WAC INVESTMENT COMPANY, L.L.C.

_____
Michael E. Riddick, Executive Vice President

PICKENS FINANCIAL GROUP, LLC

_____
Michael K. Pickens, Vice President

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ day of _____ , (year) __2006__

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____. have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

_____
David A. Barlow, Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

_____
David A. Barlow, Chief Operating Officer

McCOMBS ENERGY, LTD.

_____
Ricky Haikin, Vice President

WAC INVESTMENT COMPANY, L.L.C.

_____
Michael E. Riddick, Executive Vice President

PICKENS FINANCIAL GROUP, LLC

_____
Michael K. Pickens, Vice President

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.

MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ day of _____ , (year) __2006__

~~who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ , have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

_David A. Barlow_

David A. Barlow, Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

_David A. Barlow_

David A. Barlow, Chief Operating Officer

McCOMBS ENERGY, LTD.

_____
Ricky Halkin, Vice President

John R. Gardner

Gregory L. Rembert

WAC INVESTMENT COMPANY, L.L.C.

_Michael E. Riddick_

Michael E. Riddick, Executive Vice President

PICKENS FINANCIAL GROUP, LLC

_____
Michael K. Pickens, Vice President

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ day of _____ , (year) __2006__

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

_____

_____
David A. Barlow, Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

_____

_____
David A. Barlow, Chief Operating Officer

Pickens Financial Group's acceptance of this JOA is conditioned upon the inclusion of the following clause in the JOA:

Until receipt by Operator of notice from Non-Operator to discontinue such sales, Operator will market and sell the gas and associated hydrocarbons attributable to the interest of Non-Operator in the Contract Area, will receive the proceeds of such a sale, and will disburse such proceeds (less applicable production and severance taxes) to Non-Operator and the royalty and overriding royalty owners entitled to receive the same, in proportion to their respective interests. To effect such a sale, Operator may enter into contracts for the sale of such gas, provided that no such contract shall extend for a period in excess of one (1) year. Operator will notify Non-Operator promptly of the execution of any contract for the sale of Non-Operator's gas which is to continue for a period in excess of ninety (90) days.

Such gas and associated hydrocarbons shall be ~~sold for a price which is not less than the price~~ Operator receives for its own gas and associated hydrocarbons produced from the Contract Area.

Such authority and responsibility of Operator to market and sell the gas and associated hydrocarbons of Non-Operator may be revoked by Non-Operator by notice to Operator delivered not less than 15 days prior to the date on which such revocation is to ~~become effective. Such a revocation shall not affect~~ the validity of a contract in respect of which Non-Operator has received notice as hereinabove provided.

McCOMBS ENERGY, LTD.

_____
Ricky Haikin, Vice President

WAC INVESTMENT COMPANY, L.L.C.

_____
Michael E. Riddick, Executive Vice President

PICKENS FINANCIAL GROUP, LLC

_____   10/27/06
Michael K. Pickens, Vice President

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

Signature Page to that
certain Operating Agreement
for the Escambia Prospect,
Escambia County, Alabama.

THE RUDMAN PARTNERSHIP

_____
W.R. (Rey) Sibley, Jr., Attorney in Fact

- 15 -

EXHIBIT "A"
ESCAMBIA PROSPECT
CONECUH AND ESCAMBIA COUNTIES, ALABAMA

Attached to and made a part of that certain Operating Agreement dated November 1, 2006, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., WAC Investment Company, LLC, Pickens Financial Group, LLC, and The Rudman Partnership, as Non-Operators.

(1)     Identification of lands subject to this agreement:

Contract Area*

All lands, oil and gas leasehold interest and
oil and gas interest lying within the following sections as depicted on the black
boundary as shown on the plat designated at Exhibit "A-2":

Sections 1-3, 10-15, 22-27, 34-36, Township 3 North, Range 12 East
Sections 3-10, 15-22, 27-34, Township 3 North, Range 13 East
Sections 25-27, 34-36, Township 4 North, Range 12 East
Sections 27-34, Township 4 North, Range 13 East
Conecuh and Escambia Counties, Alabama

*Insofar and only insofar as it applies to The Rudman Partnership, the Contract Area shall exclude lands located within the blue outline on the plat attached hereto as Exhibit "A-2" (and being further identified as Sections 27, 28, 29, 32, 33 and 34, Township 4 North, Range 13 East, Conecuh County, Alabama).

Area of Mutual Interest**

All lands, oil and gas leasehold interest and
oil and gas interest lying within the following sections as depicated on the red
boundary as shown on the plat designated at Exhibit "A-2":

Sections 1-3, 10-15, 22-27, 34-36, Township 3 North, Range 12 East
Sections 3-10, 15-22, 27-34, Township 3 North, Range 13 East
Sections 25-27, 34-36, Township 4 North, Range 12 East
Sections 27-34, Township 4 North, Range 13 East
Conecuh and Escambia Counties, Alabama

**Insofar and only insofar as it applies to The Rudman Partnership, the AMI shall exclude lands located within the blue outline on the plat attached hereto as Exhibit "A-2" (and being further identified as Sections 27, 28, 29, 32, 33 and 34, Township 4 North, Range 13 East, Conecuh County, Alabama).

(2)     Restrictions, if any, as to depths, formations, or substances:

There are no restrictions except as may be provided for in any lease or contract subject to this Operating Agreement.

(3)     Decimal interest and names and addresses of Parties to this Agreement:

| Owners | | BPPO | APPO |
|---|---|---|---|
| Sklarco L.L.C. | | 0.37500000 | 0.53125000 |
| McCombs Energy, Ltd. | | 0.25000000 | 0.18750000 |
| WAC Investment Company, L.L.C. | | 0.20000000 | 0.15000000 |
| Pickens Financial Group, LLC | | 0.05000000 | 0.03750000 |
| The Rudman Partnership | | 0.12500000 | 0.09375000 |
| | Total | 1.00000000 | 1.00000000 |

(4)     Oil and gas leases and/or oil and gas interests subject to this agreement:

See Exhibit "A-1" Description of Leases. This Agreement covers not only the oil and gas leases and/or oil and gas interests described in Exhibit "A-1," but also any oil and gas leases and/or oil and gas interests acquired after the effective date of this Agreement and covered by the Participation Agreement to which this Agreement is attached as

Exhibit "E" or Article VIII.B, VIII.C or XV.M of this Agreement.  The only jointly owned lease burdens are the lessor's royalty under each of the oil and gas leases described in Exhibit "A-1" and the overriding royalty interest described in Section 1.1 of the Participation Agreement to which this Agreement is attached as Exhibit "D".  There are no other joint burdens whatsoever.

(5)   **Addresses of parties for notice purposes:**

Sklar Exploration Company, LLC
Attn: David A. Barlow
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Telephone: (318) 227-8668
Telecopier: (318) 227-9012

Sklarco, LLC
Attn: David A. Barlow
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Telephone: (318) 227-8668
Telecopier: (318) 227-9012

McCombs Energy, Ltd.
Attn: Ricky Haikin, Vice President
5599 San Felipe Street, Suite 1200
Houston, Texas 77056-2721
Telephone: (713) 621-0033
Telecopier: (713) 621-1670

WAC Investment Company, LLC
Attn: Michael E. Riddick, Executive Vice President
333 Texas Street, Suite 2121
Shreveport, Louisiana 71101
Telephone: (318) 222-0026
Telecopier: (318) 429-1600

Pickens Financial Group, LLC
Attn: Michael K. Pickens, Vice President
8499 Greenville Avenue, Suite 105
Dallas, Texas 75231-2417
Telephone: (214) 503-1271
Telecopier: (214) 503-7247

The Rudman Partnership
Attn: W. R. (Trey) Sibley, III, Attorney in Fact
1700 Pacific Avenue, Suite 4700
Dallas, Texas 75201-4670
Telephone: (214) 220-3900
Telecopier: (214) 220-3901

## EXHIBIT "A-1"

Attached to and made a part of that certain Operating Agreement dated November 1, 2006, by and between Sklar Exploration Company, L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., WAC Investment Company, L.L.C., Pickens Financial Group, LLC, and The Rudman Partnership, as Non-Operators.

## OIL, GAS AND MINERAL LEASES

1. Oil, Gas and Mineral Lease dated December 28, 2005, by and between Cary Page, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2022 of the Probate Judge Records of Conecuh County, Alabama.

2. Oil, Gas and Mineral Lease dated December 28, 2005, by and between Dorothy Faye Jones, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2024 of the Probate Judge Records of Conecuh County, Alabama.

3. Oil, Gas and Mineral Lease dated December 28, 2005, by and between Dwight Taylor, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2026 of the Probate Judge Records of Conecuh County, Alabama.

4. Oil, Gas and Mineral Lease dated January 9, 2006, by and between Tully L. Logan, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 779 of the Probate Judge Records of Escambia County, Alabama.

5. Oil, Gas and Mineral Lease dated January 9, 2006, by and between Jack D. Logan, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 777 of the Probate Judge Records of Escambia County, Alabama.

6. Oil, Gas and Mineral Lease dated January 9, 2006, by and between Kenneth Allen Baker, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2028 of the Probate Judge Records of Conecuh County, Alabama.

7. Oil, Gas and Mineral Lease dated February 16, 2006, by and between Cedar Creek Land & Timber, as Lessor, and John C. Albury, as Lessee, the existence of which is set forth by that Declaration of Lease dated February 24, 2006 and recorded in Book 2006, Page 2091 of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 771 of the Probate Judge Records of Escambia County, Alabama.

8. Oil, Gas and Mineral Lease dated January 9, 2006, by and between Raymond B. Logan, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 775 of the Probate Judge Records of Escambia County, Alabama.

9. Oil, Gas and Mineral Lease dated January 24, 2006, by and between Loree R. Hamiter, James E. Hamiter and Harold W. Hamiter, as Trustees under the Last Will and Testament of Harold E. Hamiter, deceased, dated February 14, 1991, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2030 of the Probate Judge Records of Conecuh County, Alabama.

10. Oil, Gas and Mineral Lease dated January 9, 2006, by and between James W. Logan, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 781 of the Probate Judge Records of Escambia County, Alabama.

Page 2
Exhibit "A-1"

11. Oil, Gas and Mineral Lease dated January 9, 2006, by and between Bertie T. Hassell, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 783 of the Probate Judge Records of Escambia County, Alabama.

12. Oil, Gas and Mineral Lease dated March 8, 2006, by and between Ralls Properties, L.L.C., as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 785 of the Probate Judge Records of Escambia County, Alabama.

13. Oil, Gas and Mineral Lease dated February 13, 2006, by and between R. Wyatt Feagin, as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 787 of the Probate Judge Records of Escambia County, Alabama.

14. Oil, Gas and Mineral Lease dated February 13, 2006, by and between Nanette Feagin Beck, as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 790 of the Probate Judge Records of Escambia County, Alabama.

15. Oil, Gas and Mineral Lease dated March 10, 2006, by and between Noel E. Lindholm, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2032 of the Probate Judge Records of Conecuh County, Alabama.

16. Oil, Gas and Mineral Lease dated January 30, 2006, by and between J. C. Snowden, as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 793 of the Probate Judge Records of Escambia County, Alabama.

17. Oil, Gas and Mineral Lease dated February 9, 2006, by and between Charles D. Searcy, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2034 of the Probate Judge Records of Conecuh County, Alabama.

18. Oil, Gas and Mineral Lease dated January 31, 2006, by and between Barbara Ann Stone Robinson, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 795 of the Probate Judge Records of Escambia County, Alabama.

19. Oil, Gas and Mineral Lease dated March 1, 2006, by and between Jon McMurray, as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 797 of the Probate Judge Records of Escambia County, Alabama.

20. Oil, Gas and Mineral Lease dated March 3, 2006, by and between William E. Older, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2036 of the Probate Judge Records of Conecuh County, Alabama.

21. Oil, Gas and Mineral Lease dated March 3, 2006, by and between Earline B. Older, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2038 of the Probate Judge Records of Conecuh County, Alabama.

22. Oil, Gas and Mineral Lease dated March 9, 2006, by and between Juanita C. Waters, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2040 of the Probate Judge Records of Conecuh County, Alabama.

23. Oil, Gas and Mineral Lease dated March 9, 2006, by and between Alva Nann Taylor, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2042 of the Probate Judge Records of Conecuh County, Alabama.

24. Oil, Gas and Mineral Lease dated February 20, 2006, by and between Howard Sylvester Stewart, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2044 of the Probate Judge Records of Conecuh County, Alabama.

25. Oil, Gas and Mineral Lease dated February 28, 2006, by and between Dale B. Blair, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 405, Page 799 of the Probate Judge Records of Escambia County, Alabama.

26. Oil, Gas and Mineral Lease dated March 9, 2006, by and between Jo Ann Langham, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2046 of the Probate Judge Records of Conecuh County, Alabama.

27. Oil, Gas and Mineral Lease dated February 20, 2006, by and between Charles A. Frazier, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2048 of the Probate Judge Records of Conecuh County, Alabama.

28. Oil, Gas and Mineral Lease dated February 20, 2006, by and between Charles A. Frazier, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2050 of the Probate Judge Records of Conecuh County, Alabama.

29. Oil, Gas and Mineral Lease dated February 20, 2006, by and between Charles A. Frazier, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2054 of the Probate Judge Records of Conecuh County, Alabama.

30. Oil, Gas and Mineral Lease dated March 9, 2006, by and between Robert Cary, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2056 of the Probate Judge Records of Conecuh County, Alabama.

31. Oil, Gas and Mineral Lease dated March 20, 2006, by and between Stephen Jeter, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2083 of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 801 of the Probate Judge Records of Escambia County, Alabama.

32. Oil, Gas and Mineral Lease dated March 20, 2006, by and between John J. Jeter, III, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2087 of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 805 of the Probate Judge Records of Escambia County, Alabama.

33. Oil, Gas and Mineral Lease dated March 20, 2006, by and between Sally Jeter Hammond, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2079 of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 809 of the Probate Judge Records of Escambia County, Alabama.

34. Oil, Gas and Mineral Lease dated March 28, 2006, by and between Allene B. Ward, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2058 of the Probate Judge Records of Conecuh County, Alabama.

35. Oil, Gas and Mineral Lease dated March 28, 2006, by and between Allene B. Ward, et al, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2068 of the Probate Judge Records of Conecuh County, Alabama.

36. Oil, Gas and Mineral Lease dated April 10, 2006, by and between Dorothy Nowling Womack, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2060 of the Probate Judge Records of Conecuh County, Alabama.

37. Oil, Gas and Mineral Lease dated April 10, 2006, by and between Douglas Gene Rabren, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2062 of the Probate Judge Records of Conecuh County, Alabama.

38. Oil, Gas and Mineral Lease dated April 10, 2006, by and between Henry George Foster, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2064 of the Probate Judge Records of Conecuh County, Alabama.

Page 4
Exhibit "A-1"

39. Oil, Gas and Mineral Lease dated April 11, 2006, by and between Julia Blair, as Lessor, and John C. Albury, as Lessee, recorded in Book 405, Page 813 of the Probate Judge Records of Escambia County, Alabama.

40. Oil, Gas and Mineral Lease dated April 2, 2006, by and between David Edwin Logan, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book ____, Page ____ of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 815 of the Probate Judge Records of Escambia County, Alabama.

41. Oil, Gas and Mineral Lease dated January 9, 2006, by and between Sarah M. Lanier, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2066 of the Probate Judge Records of Conecuh County, Alabama.

42. Oil, Gas and Mineral Lease dated February 28, 2006, by and between Wayne M. Blair, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 409, Page 814 of the Probate Judge Records of Escambia County, Alabama.

43. Oil, Gas and Mineral Lease dated May 12, 2006, by and between William E. Older, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2532 of the Probate Judge Records of Conecuh County, Alabama.

44. Oil, Gas and Mineral Lease dated April 11, 2006, by and between Juanita Ralls, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2530 of the Probate Judge Records of Conecuh County, Alabama.

45. Oil, Gas and Mineral Lease dated May 10, 2006, by and between Dorothy Faye Jones, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2528 of the Probate Judge Records of Conecuh County, Alabama.

46. Oil, Gas and Mineral Lease dated February 28, 2006, by and between Martha B. Robinson, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 816 of the Probate Judge Records of Escambia County, Alabama.

47. Oil, Gas and Mineral Lease dated May 12, 2006, by and between Earline B. Older, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2526 of the Probate Judge Records of Conecuh County, Alabama.

48. Oil, Gas and Mineral Lease dated April 28, 2006, by and between Helen Pate, as Trustee for Josh Pate and Jill Pate, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2522 of the Probate Judge Records of Conecuh County, Alabama.

49. Oil, Gas and Mineral Lease dated May 10, 2006, by and between Dwight Taylor, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2524 of the Probate Judge Records of Conecuh County, Alabama.

50. Oil, Gas and Mineral Lease dated February 28, 2006, by and between Mary B. Andrews, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 409, Page 818 of the Probate Judge Records of Escambia County, Alabama.

51. Oil, Gas and Mineral Lease dated March 29, 2006, by and between Oscar DePriest Tucker, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2514 of the Probate Judge Records of Conecuh County, Alabama.

52. Oil, Gas and Mineral Lease dated May 30, 2006, by and between John N. Feagin, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2520 of the Probate Judge Records of Conecuh County, Alabama.

53. Oil, Gas and Mineral Lease dated June 5, 2006, by and between Joel R. Pate, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2509 of the Probate Judge Records of Conecuh County, Alabama.

Page 5
Exhibit "A-1"

54.     Oil, Gas and Mineral Lease dated May 24, 2006, by and between William G. Dawkins, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 409, Page 827 of the Probate Judge Records of Escambia County, Alabama.

55.     Oil, Gas and Mineral Lease dated May 24, 2006, by and between Carolyn C. Kennedy, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 820 of the Probate Judge Records of Escambia County, Alabama.

56.     Oil, Gas and Mineral Lease dated June 5, 2006, by and between Frank Steadman, et ux, as Lessors, and John C. Albury, as Lessee, recorded in Book 2006, Page 2534 of the Probate Judge Records of Conecuh County, Alabama.

57.     Oil, Gas and Mineral Lease dated May 18, 2006, by and between Sarah Ann Leyden, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 832 of the Probate Judge Records of Escambia County, Alabama.

58.     Oil, Gas and Mineral Lease dated May 18, 2006, by and between Michael P. Leyden, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 829 of the Probate Judge Records of Escambia County, Alabama.

59.     Oil, Gas and Mineral Lease dated June 23, 2006, by and between Frank M. Stamps, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 822 of the Probate Judge Records of Escambia County, Alabama.

60.     Oil, Gas and Mineral Lease dated February 28, 2006, by and between Nell Blair, as Lessor, and John C. Albury, as Lessee, recorded in Book 409, Page 825 of the Probate Judge Records of Escambia County, Alabama.

61.     Oil, Gas and Mineral Lease dated May 22, 2006, by and between Jean Ray and Glen Ray, Successor Co-Trustees of the Edna B. Gunter Revocable Trust dated June 2, 1992, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page 2503 of the Probate Judge Records of Conecuh County, Alabama.

62.     Oil, Gas and Mineral Lease dated July 14, 2006, by and between Cedar Creek Land & Timber, Inc., as Lessor, and John C. Albury, as Lessee, the existence of which is set forth by that Memorandum of Oil and Gas Lease recorded in Book 2006, Page 2511 of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book 405, Page 835 of the Probate Judge Records of Escambia County, Alabama.

63.     Oil, Gas and Mineral Lease dated July 28, 2006, by and between J. Randle Feagin, a/k/a, John Randle Feagin, as Lessor, and John C. Albury, as Lessee, recorded in Book _____, Page _____ of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book _____, Page _____ of the Probate Judge Records of Escambia County, Alabama.

64.     Oil, Gas and Mineral Lease dated July 28, 2006, by and between Nancy Feagin, as Lessor, and John C. Albury, as Lessee, recorded in Book _____, Page _____ of the Probate Judge Records of Conecuh County, Alabama and also recorded in Book _____, Page _____ of the Probate Judge Records of Escambia County, Alabama.

## EXHIBIT "A-2"

Attached to and made a part of that certain Operating Agreement dated November 1, 2006, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., WAC Investment Company, L.L.C., Pickens Financial Group, LLC, and The Rudman Partnership, as Non-Operators.



Producers 88 (9770)—Paid Up
With Pooling Provision
Mississippi-Alabama-Florida

Hederman Brothers – Ridgeland, Mississippi
(3-89)

EXHIBIT "B"

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of _____ 20 _____, between

_____

_____

_____

_____

lessor (whether one or more), whose address is: _____

and _____, lessee, WITNESSETH:

1. Lessor, in consideration of _____ Dollars, receipt of which is hereby acknowledged, and of the covenants and agreements of lessee hereinafter contained, does hereby grant, lease and let unto lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas, sulphur and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, power lines, telephone lines, employee houses and other structures on said land, necessary or useful in lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any other land adjacent thereto. The land covered hereby, herein called "said land", is located in the

County of _____, State of _____, and is described as follows:

This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain _____ acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights, and options hereunder.

2. Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of ten (10) years from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3. As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipe line to which lessee may connect its wells, the equal one-eighth part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such one-eighth part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear one-eighth of the cost of treating oil to render it marketable pipe line oil; (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, one-eighth of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of one-eighth of such gas and casinghead gas; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one-tenth either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing gas or any other mineral covered hereby, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this sub-paragraph. Each payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, and may be deposited to such parties credit in the _____ _____ Bank at _____, or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time this lease pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownerships thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4. Lessee is hereby granted the right, at its option, to pool or unitize all or any part of said land and of this lease as to any or all minerals or horizons thereunder, with other lands, lease or leases, or portion or portions thereof, or mineral or horizon thereunder, so as to establish units containing not more than 80 surface acres plus 10% acreage tolerance; provided, however, a unit may be established or an existing unit may be enlarged to contain not more than 640 acres plus 10% acreage tolerance, if unitized only as to gas or only as to gas and liquid hydrocarbons (condensate) which are not a liquid in the subsurface reservoir. If larger units are required, under any governmental rule or order, for the drilling or operation of a well at a regular location, or for obtaining maximum allowable, from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged, to conform to the size required by such governmental order or rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of said options may be exercised by lessee from time to time, and whether before or after production has been established either on said land or on the portion of said land included in the unit or on other land unitized therewith and any such unit may include any well to be drilled, being drilled or already completed. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be land or mineral, royalty or leasehold interests in land within the unit which are not pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted under this lease. There shall be allocated to the land covered by this lease included in any such unit that proportion of the total production of unitized minerals from wells in the unit, after deducting any used in lease or unit operations, which the number of surface acres in the land covered by this lease included in the unit bears to the total number of surface acres in the unit. The production so allocated shall be considered for all purposes, including the payment or delivery of royalty, over-riding royalty, and any other payments out of production, to be the entire production of unitized minerals from the portion of said land covered hereby and included in such unit in the same manner as though produced from said land under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of such unit shall not have the effect of changing the ownership of any shut-in production royalty which may become payable under this lease. Neither shall it impair the right of lessee to release from this lease all or any portion of said land, except that lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are released as to lands within the unit. Lessee may dissolve any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. A unit may be so established, modified or dissolved during the life of this lease.

5. Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations as to the released acreage or interest.

6. This is a PAID-UP LEASE. In consideration of the down cash payment, Lessor agrees that Lessee shall not be obligated except as otherwise provided herein, to commence or continue any operations during the primary term. Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

7. Lessee shall have the use, free from royalty, of water, other than from lessor's water wells, and of oil and gas produced from said land in all operations hereunder. Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing. No well shall be drilled nearer than 200 feet to the house or barn now on said land without the consent of the lessor. Lessee shall pay for damages caused by its operations to growing crops and timber on said land.

8. The rights and estate of any party hereto may be assigned from time to time in whole or in part and as to any mineral or horizon. All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns. No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of lessee, including, but not limited to, the location and drilling of wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof of or to lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by lessor or lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of the death of the owner, lessee may, nevertheless, pay or tender such royalties, or other moneys, or part thereof, to the credit of the decedent in a depository bank provided for above.

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

# EXHIBIT " C "

Attached to and made a part of the Operating Agreement dated November 1, 2006, between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., WAC Investment Company, L.L.C., Pickens Financial Group, LLC, and The Rudman Partnership, as Non-Operators, covering Escambia Prospect, located in Conecuh and Escambia Counties, Texas.

# ACCOUNTING PROCEDURE

# JOINT OPERATIONS

## I. GENERAL PROVISIONS

1.  **Definitions**

    "Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

    "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

    "Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

    "Operator" shall mean the party designated to conduct the Joint Operations.

    "Non-Operators" shall mean the Parties to this agreement other than the Operator.

    "Parties" shall mean Operator and Non-Operators.

    "First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

    "Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Operations.

    "Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

    "Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

    "Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

2.  **Statement and Billings**

    Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3.  **Advances and Payments by Non-Operators**

    A.  Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

    B.  Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at Hibernia National Bank, Shreveport, Louisiana on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4.  **Adjustments**

    Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof, provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.

- I -

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

**5.   Audits**

A.   A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B.   The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

**6.   Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II.  DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

**1.   Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

**2.   Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

**3.   Labor**

A.   (1)   Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2)   Salaries of First level Supervisors in the field.

(3)   Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4)   Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B.   Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D.   Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

**4.   Employee Benefits**

Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

5. **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6. **Transportation**

Transportation of employees and Material necessary for the Joint Operations, shall be charged at actual cost incurred by Operator but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7. **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8. **Equipment and Facilities Furnished By Operator**

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed = _____fifteen_____ percent (_____15_____%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9. **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10. **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3. and the costs and expenses incurred in connection with hearings and other matters before governmental bodies and agencies and costs and expenses incurred in examining and curing title.

11. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

12.    **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13.    **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14.    **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property.    In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15.    **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

I.    **Overhead - Drilling and Producing Operations**

i.    As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph IA, or
(    ) Percentage Basis, Paragraph IB

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II.    The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii.    The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

(    ) shall be covered by the overhead rates, or
( X ) shall not be covered by the overhead rates.

iii.    The ~~salaries, wages and Personal Expenses of Technical Employees and/or~~ costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

(    ) shall be covered by the overhead rates, or
( X ) shall not be covered by the overhead rates.

A.    Overhead - Fixed Rate Basis_____ See ADDITIONAL REVISIONS, page 9.

(1)    Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $____7,000.00_____
    (Prorated for less than a full month)

Producing Well Rate $____700.00_____

(2)    Application of Overhead - Fixed Rate Basis shall be as follows:

(a)    Drilling Well Rate

(1)    Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

- 4 -

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b) Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

~~B.   Overhead - Percentage Basis~~

~~(1)   Operator shall charge the Joint Account at the following rates:~~

~~(a)   Development~~

~~_____ Percent (_____ %) of the cost of development of the Joint Property, exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.~~

~~(b)   Operating~~

~~_____ Percent (_____ %) of the cost of operating the Joint Property, exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.~~

~~(2)   Application of Overhead - Percentage Basis shall be as follows:~~

~~For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.~~

2.    Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

Account for overhead based on the following rates for any Major Construction project in excess of $ 25,000.00                           :

A.        5        % of first $100,000 or total cost if less, plus

B.        4        % of costs in excess of $100,000 but less than $1,000,000, plus

C.        3        % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3.      Catastrophe Overhead

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A.        5        % of total costs through $100,000; plus

B.        4        % of total costs in excess of $100,000 but less than $1,000,000; plus

C.        3        % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4.      Amendment of Rates

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

IV.      PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1.      Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2.      Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.      New Material (Condition A)

    (1)   Tubular Goods Other than Line Pipe

        (a)   Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at ~~cost~~ Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

        (b)   For grades which are special to one mill only, prices shall be computed at ~~cost~~ the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property, as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000

...f Petroleum Accountants
Societies

COPAS

pound Oil Field Haulers Association interstate truck rate shall be used.

    (c) Special end finish tubular goods shall be priced at _cost_ ~~the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.~~

    (d) Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at _cost_ ~~the lowest published out-of-stock price, f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.~~

(2) Line Pipe

    (a) Line pipe movements (except size 24 inch OD and larger with walls 3/4 inch and over) 30,000 pounds or more shall be priced at _at cost_ /~~under provisions of tubular goods pricing in Paragraph A (1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.~~

    (b) Line Pipe movements (except size 24 inch OD and larger with walls 3/4 inch and over) less than 30,000 pounds shall be priced at _cost_ /~~Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A (1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.~~

    (c) ~~Line pipe 24 inch OD and over and 3/4 inch wall and larger shall be priced at _at cost_ /f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.~~

    (d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at _cost_ /~~quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.~~

    (3) ~~Other Material shall be priced at _cost_ /the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.~~

    (4) ~~Unused new Material, except tubular goods, moved from the Joint Property shall be priced at _cost_ /the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars shall be priced as provided above in Paragraph 2.A.(1) and (2).~~

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

    ~~At seventy-five percent (75%) of current _market value_ new price, as determined by Paragraph A.~~

(2) Material used on and moved from the Joint Property

    (a) ~~At seventy-five percent (75%) of current _market value_ new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or~~

    (b) ~~At sixty-five percent (65%) of current _market value_ new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material~~

(3) Material not used on and moved from the Joint Property

    ~~At seventy-five percent (75%) of current _market value_ new price as determined by Paragraph A.~~

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material

(1) Condition C

    Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at _current market value_ ~~fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.~~

Recommended by the Council
of Petroleum Accountants
Societies



    (2)  Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

    (a)  Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

    (b)  Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

    (3)  Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.  Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.  Pricing Conditions

    (1)  ~~Loading or unloading costs may be charged to the Joint Account at~~ actual costs incurred by operator ~~the rate of twenty-five cents (25¢) per hundred weight~~ on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

    (2)  Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.  **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator; provided, however, if a Non-Operator elects to furnish material in kind, such material must (a) meet the quality specifications set by Operator, and (b) be inspected by Operator with inspection costs to be billed to the Joint Account.

4.  **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.  **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.  **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

Recommended by the Council
of Petroleum Accountants
Societies



overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4. **Expense of Conducting Inventories**

A. The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B. The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

ADDITIONAL REVISIONS

(1)    In the event the subject well is expected to be above the State threshold for H2S sour gas operations, the Drilling Well rate set forth in Art. III.1.A(1) will be increased by $2000.00 per month and the associated Producing Well Overhead Rate will be increased an additional $100.00 per month.

## EXHIBIT "D"

Attached to and made a part of that certain Operating Agreement dated January 25, 2006, by and between Sklar Exploration Company L.L.C., as Operator, and Williams Petroleum, LLC, Yates Drilling Company L.L.C., Sklarco L.L.C., McCombs Energy, LTD, Anderson-Drake Partners, Inc., Dudley Hughes, LLC, and David New Drilling Company, Inc., as Non-Operators.

Operator shall carry the following insurance wit h the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of insurance will be provided upon request.

I.     WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

    A.  Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

    B.  Extension of Coverage B of policy to provide for not less than $500,000 for death or injury to one person in any one accident.

II.    COMPREHENSIVE GENERAL LIABILITY

    Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $2,000,000 for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III.   AUTOMOBILE LIABILITY

    Coverage shall include owned, non-owned and hired vehicles. Limit $500,000 combined single limit each occurrence for bodily injury and property damage.

IV.   EXCESS LIABILITY

    Operator shall carry excess liability insurance in an amount necessary to provide a total of $5,000,000 coverage for both Automobile Liability and Comprehensive General Liability.

    Any party, at its own expense, may carry its own coverage for Excess Liability Insurance with limits as set forth in this Section IV. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

V.    EXTRA EXPENSE LIABILITY

    Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $25,000 per occurrence.

Liability Limit: $5,000,000

Any party, at its own expense, may carry its own coverage for Extra Expense Liability Insurance with limits as set forth in this Section V. Any party so electing must notify

Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder.

EXHIBIT "E"

Attached to and made a part of that certain Operating Agreement dated January 25, 2006, by and
between Sklar Exploration Company L.L.C., as Operator, and Williams Petroleum, LLC, Yates
Drilling Company L.L.C., Sklarco L.L.C., McCombs Energy, LTD, Anderson-Drake Partners,
Inc., Dudley Hughes, LLC, and David New Drilling Company, Inc., as Non-Operators.

GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement, the parties hereto
own and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating
Area described in the Operating Agreement (the "JOA").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its
share of the gas produced from said JOA. However, one or more of the parties may be unable to take or
market its interest in the gas production from time to time; therefore, to permit any party to produce and
dispose of its interest in the gas production from the JOA with as much flexibility as possible, the parties
hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the
period or periods when any party hereto has no market for, or its purchaser is unable to take or if any
party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and
take said share, and each of such taking parties shall have the right to take all or any part of its pro rata
share thereof, said pro rata share being based on the ratio of its participation percentage under this
Operating Agreement to the participation percentages of all taking parties.  All parties hereto shall share
in and own the condensate recovered at the surface in accordance with their respective interest, but each
party taking such gas shall own all of the gas delivered to its purchaser.  Any party whose share of gas is
not marketed shall be credited with gas in storage equal to its share of the gas produced, less its share of
the gas used in lease operation, vented or lost.  Operator shall maintain a current account of the gas
balance between the parties and shall furnish all parties hereto monthly statements showing the total
quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate
recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced.
In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account,
shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced
party's share of gas produced.  If more than one party is entitled to the stated volume of the overproduced
parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro
rata share being based on the ration of its participation percentage under this Operating Agreement to the
participating percentages of all entitled parties.  Each party shall at all times use its best efforts to regulate
its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the
allowable, it any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall
furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the
preceding month and to the revenue attributable thereto; and any such party shall pay to the Operator a
percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and
overriding royalties which are payable on gas produced by any such party, and Operator will, in turn,
make settlement for all royalties and overriding royalties which are payable on gas produced from the
Contract Area.  In the event that the total royalties and overriding royalties so paid to the Operator be
insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from
the Contract Area, then any such deficiency will be borne by the party whose interest is burdened by the
royalty or overriding royalty as to which the deficiency was asserted.  Any party or parties contributing
separate leases to the Contract Area shall furnish the Operator with division order title opinions on which
Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of
production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all
production taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser

shall pay, or cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the volume of gas actually taken for its account.

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold or took but did not sell, less applicable production taxes and royalties theretofore paid, less any reasonable compression, treating, gathering, or transportation costs actually incurred and paid to third party, unaffected entitles and otherwise directly in connection with the sale of the overproduction, at the price received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party. Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.

# EXHIBIT "D"

Attached to and made a part of that certain Operating Agreement dated November 1, 2006, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., WAC Investment Company, L.L.C., The Rudman Partnership and Pickens Financial Group, LLC, as Non-Operators.

Operator shall carry the following insurance with the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of insurance will be provided upon request.

I.      WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

A.  Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

B.  Extension of Coverage B of policy to provide for not less than $500,000 for death or injury to one person in any one accident.

II.     COMPREHENSIVE GENERAL LIABILITY

Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $2,000,000 for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III.    AUTOMOBILE LIABILITY

Coverage shall include owned, non-owned and hired vehicles. Limit $500,000 combined single limit each occurrence for bodily injury and property damage.

IV.     EXCESS LIABILITY

Operator shall carry excess liability insurance in an amount necessary to provide a total of $5,000,000 coverage for both Automobile Liability and Comprehensive General Liability.

Any party, at its own expense, may carry its own coverage for Excess Liability Insurance with limits as set forth in this Section IV. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

V.      EXTRA EXPENSE LIABILITY

Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $25,000 per occurrence.

Liability Limit: $5,000,000

Any party, at its own expense, may carry its own coverage for Extra Expense Liability Insurance with limits as set forth in this Section V. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder.

**EXHIBIT "E"**

Attached to and made a part of that certain Operating Agreement dated January 25, 2006, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, LTD, WAC Investment Company, L.L.C., The Rudman Partnership and Pickens Financial Group, LLC, as Non-Operators.

## GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement, the parties hereto own and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area described in the Operating Agreement (the "JOA").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the gas produced from said JOA. However, one or more of the parties may be unable to take or market its interest in the gas production from time to time; therefore, to permit any party to produce and dispose of its interest in the gas production from the JOA with as much flexibility as possible, the parties hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser. Any party whose share of gas is not marketed shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto monthly statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ration of its participation percentage under this Operating Agreement to the participating percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, it any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Operator will, in turn, make settlement for all royalties and overriding royalties which are payable on gas produced from the Contract Area. In the event that the total royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Contract Area, then any such deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Contract Area shall furnish the Operator with division order title opinions on which Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser

shall pay, or cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the volume of gas actually taken for its account.

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold or took but did not sell, less applicable production taxes and royalties theretofore paid, less any reasonable compression, treating, gathering, or transportation costs actually incurred and paid to third party, unaffected entitles and otherwise directly in connection with the sale of the overproduction, at the price received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party. Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

On this 14th day of December, 2006, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for Sklar Exploration Company L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana
Tyler E. Adams. Jr. Notary Public # 50412
Caddo Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

On this 14th day of December, 2006, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for Sklarco L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company. and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana
Tyler E. Adams. Jr. Notary Public # 50412
Caddo Parish, Louisiana
My Commission is for Life

STATE OF TEXAS

COUNTY OF _____

On this _____ day of _____, 2006, before me appeared Ricky Haikin, to me known, who being by me duly sworn, did say that he is the Vice President of McCombs Energy, L.L.C., a Texas limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal

_____
Notary Public in and for the State of Texas

STATE OF LOUISIANA

COUNTY OF CADDO

On this _____ day of _____, 2006, before me appeared Micahel E. Riddick, to me known, who being by me duly sworn, did say that he is the Executive Vice Presidentt for WAC Investment Company, LLC, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the State of Louisiana

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

On this 14th day of December, 2006, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for Sklar Exploration Company L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public in and for the Parish of Caddo
State of Louisiana

Tyler E, Adams, Jr. Notary Public # 50412
Caddo Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

On this 14th day of December, 2006, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for Sklarco L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public in and for the Parish of Caddo
State of Louisiana

Tyler E, Adams, Jr. Notary Public # 50412
Caddo Parish, Louisiana
My Commission is for Life

STATE OF TEXAS

COUNTY OF Harris

On this 19 day of Dec, 2006, before me appeared Ricky Haikin, to me known, who being by me duly sworn, did say that he is the Vice President of McCombs Energy, L.L.C., a Texas limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal

SHARON METCALF McDONALD
Notary Public, State of Texas
Commission Expires 12-29-2009

Notary Public in and for the State of Texas

STATE OF LOUISIANA

COUNTY OF CADDO

On this _____ day of _____, 2006, before me appeared Micahel E. Riddick, to me known, who being by me duly sworn, did say that he is the Executive Vice Presidentt for WAC Investment Company, LLC, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the State of Louisiana

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

On this 14th day of December, 2006, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for Sklar Exploration Company L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public in and for the Parish of Caddo
State of Louisiana
Tyler E. Adams. Jr. Notary Public # 50412
Caddo Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

On this 14th day of December, 2006, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for Sklarco L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public in and for the Parish of Caddo
State of Louisiana
Tyler E. Adams. Jr. Notary Public # 50412
Caddo Parish, Louisiana
My Commission is for Life

STATE OF TEXAS

COUNTY OF _____

On this _____ day of _____, 2006, before me appeared Ricky Haikin, to me known, who being by me duly sworn, did say that he is the Vice President of McCombs Energy, L.L.C., a Texas limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal

Notary Public in and for the State of Texas

STATE OF LOUISIANA

COUNTY OF CADDO

On this 20th day of December, 2006, before me appeared Micahel E. Riddick, to me known, who being by me duly sworn, did say that he is the Executive Vice Presidentt for WAC Investment Company, LLC, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

KAREN L. CODDINGTON, Notary Public
ID # 2088
Caddo Parish, Louisiana
My Commission is for Life

Notary Public in and for the State of Louisiana

STATE OF TEXAS

COUNTY OF D̲a̲l̲l̲a̲s̲

On this 2̲5̲ day of D̲e̲c̲e̲m̲b̲e̲r̲, 2006, before me appeared Michael K. Pickens, to me known, who being by me duly sworn, did say that he is the Vice President for Pickens Financial Group, LLC, a Texas limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

LINDA M HOWARD
Notary Public, State of Texas
My Commission Expires
November 03, 2009

_Linda M. Howard_
Notary Public in and for the State of Texas

STATE OF TEXAS

COUNTY OF _____

On this _____ day of _____, 2006, before me appeared W. R. (Trey) Sibley, III, to me known, who being by me duly sworn, did say that he is the Attorney in Fact for The Rudman Partnership, **a Texas general partnership**, and that the foregoing instrument was signed by him on behalf of said partnership, and Appearer acknowledged said instrument to be the free act and deed of said partnership.

IN WITNESS WHEREOF, I hereunto set my hand and official seal

_____
Notary Public in and for the State of Texas

STATE OF TEXAS

COUNTY OF _____

     On this _____ day of _____, 2006, before me appeared Michael K. Pickens, to me known, who being by me duly sworn, did say that he is the Vice President for Pickens Financial Group, LLC, a Texas limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the State of Texas

STATE OF TEXAS

COUNTY OF Dallas _____

     On this 20th day of December, 2006, before me appeared W. R. (Trey) Sibley, III, to me known, who being by me duly sworn, did say that he is the Attorney in Fact for The Rudman Partnership, a Texas general partnership, and that the foregoing instrument was signed by him on behalf of said partnership, and Appearer acknowledged said instrument to be the free act and deed of said partnership.

IN WITNESS WHEREOF, I hereunto set my hand and official seal

_____
Notary Public in and for the State of Texas