

# FRANKS
EXPLORATION COMPANY, L.L.C.

November 19, 2018

Sklar Exploration Company, L.L.C.
Attn: Mr. J. Marshall Jones, III, VP Land & Business Development
5395 Pearl Parkway, Ste. 200
Boulder, CO 80301

**Re:    Ratification of Unit Agreement or Unit Operating Agreement, or Both**
**Southeast Brooklyn Oil Unit**
**Brooklyn Field**
**Conecuh & Escambia Counties, AL**

Dear Mr. Jones,

Enclosed is the subject ratification instrument executed by Bobby E. Jelks, Manager of Franks Exploration Company, L.L.C.

Sincerely,

*Edward Yarbrough*

Edward Yarbrough
Exploration Manager

Enclosure (1)

EY/
lettmr

EXECUTE AND RETURN
TO SKLAR

[Individual]

WITNESS

_____
WITNESS                                    SIGNATURE*

_____                    _____
                                           DATE

WITNESS                                    SIGNATURE*

_____                    _____
                                           DATE

[Trustee]

WITNESS                                    SIGNATURE*

_____                    _____
                                           DATE

                                           As Trustee of the following trust:

WITNESS                                    SIGNATURE*

_____                    _____
                                           DATE

                                           As Trustee of the following trust:

[Legal entity]

                                           ENTITY NAME:

                                           Franks Exploration Company, L.L.C.

WITNESS/ATTEST                             By _____
                                           Its Bobby E. Jelks, Manager

_____
D. Marlowe                                 DATE
                                           November 12, 2018

*PLEASE TYPE OR PRINT YOUR NAME HERE:

_____

Re: Ratification of Unit Agreement or
    Unit Operating Agreement, or Both
    Southeast Brooklyn Oil Unit
    Brooklyn Field
    Conecuh & Escambia Counties, AL

This Instrument Prepared by:

Conrad P. Armbrecht
ARMBRECHT JACKSON LLP
Post Office Box 290
Mobile, Alabama 36601

2

## RATIFICATION OF UNIT AGREEMENT OR UNIT OPERATING AGREEMENT, OR BOTH

### SOUTHEAST BROOKLYN OIL UNIT
### BROOKLYN FIELD,
### CONECUH AND ESCAMBIA COUNTIES, ALABAMA

KNOW ALL MEN BY THESE PRESENTS,

**WHEREAS,** an agreement entitled "Unit Agreement, Southeast Brooklyn Oil Unit, Brooklyn Field, Conecuh and Escambia Counties, Alabama," dated as of November 1, 2018, provides that any owner of a Royalty Interest or Working Interest, or both, in and to any Tract identified therein may become a party to such agreement by signing an instrument ratifying the same; and

**WHEREAS,** a companion agreement entitled "Unit Operating Agreement, Southeast Brooklyn Oil Unit, Brooklyn Field, Conecuh and Escambia Counties, Alabama," dated as of November 1, 2018, likewise provides that any owner of a Working Interest in and to any Tract identified therein may become a party to such agreement by signing an instrument ratifying the same; and

**WHEREAS,** each of the undersigned represents that he/she/it is the owner of a Royalty Interest, Working Interest, or both, in and to one or more of the Tracts identified in said agreements; and

**WHEREAS,** Exhibit "A," attached to said Unit Agreement is a plat showing the boundary lines of the Unit Area and the boundary lines and designations of each Tract within the Unit Area; and Exhibit "B," attached to said Unit Agreement identifies each Tract in the Unit Area shown on Exhibit "A," describes the same and reflects for each such Tract its Tract Participation;

**NOW, THEREFORE,** the undersigned owners of Royalty Interest hereby ratify and adopt the Unit Agreement, and the undersigned owners of Working Interest, or owners of both Working Interest and Royalty Interest, hereby ratify and adopt both the Unit Agreement and the Unit Operating Agreement.

The undersigned owners of the Royalty Interest hereby acknowledge receipt of a full and true copy of the Unit Agreement and the undersigned owners of Working Interest hereby acknowledge receipt of full and true copies of both the Unit Agreement and the Unit Operating Agreement.

**IN WITNESS WHEREOF,** each of the undersigned has executed this instrument on the date set forth opposite his signature in the presence of the undersigned witness(es).

EXECUTE AND RETURN
TO SKLAR

*[Individual]*

WITNESS _____   SIGNATURE* _____   DATE _____

WITNESS _____   SIGNATURE* _____   DATE _____

*[Trustee]*

WITNESS _____   SIGNATURE* _____   DATE _____

As Trustee of the following trust: _____

WITNESS _____   SIGNATURE* _____   DATE _____

As Trustee of the following trust: _____

*[Legal entity]*

ENTITY NAME: _____

WITNESS / ATTEST _____

By _____
Its _____   DATE _____

**\*PLEASE TYPE OR PRINT YOUR NAME HERE:** _____

This Instrument Prepared by:

Conrad P. Armbrecht
ARMBRECHT JACKSON LLP
Post Office Box 290
Mobile, Alabama 36601

2

September 28, 2018

**STATE OF ALABAMA**

**TUSCALOOSA COUNTY**

## CERTIFICATION OF ORDER

I, Berry H. (Nick) Tew, Jr., hereby certify that the petitions by Sklar Exploration Company L.L.C. bearing Docket Nos. 04-4-18-01, 4-4-18-02, 4-4-18-03, 4-4-18-04 and Pruet Production Co., bearing Docket Nos. 4-4-18-05, 4-4-18-06, 4-4-18-07, and 4-4-18-08 are GRANTED, subject to the STIPULATIONS set forth hereinbelow by the State Oil and Gas Board of Alabama on September 28, 2018, said Order having been voted on by Board members James H. Griggs and Charles E. (Ward) Pearson.

(1) That the allocation formula for the four units shall be fifty percent hydrocarbon pore volume as proposed by Petitioners Sklar Exploration Company L.L.C. and Pruet Production Co. and fifty percent productivity, productivity being based equally on (a) each Tract's maximum production during any consecutive six-month period and (b) each Tract's production during the six-month period of production from January 2018 through June 2018.

(2) That Petitioners divided the original 160-acre production unit for the CCLT 33-6 Well, Permit No. 16685, and the CCLT 33-4 Well, Permit No. 17264-B, into two 80-acre tracts. Tract 11, an 80-acre tract in the Northwest Unit, and Tract 1, an 80-acre tract in the Southwest Unit, shall utilize the actual well on each tract to calculate the productivity factor; i.e; Tract 11 in the Northwest Unit shall utilize the CCLT 33-4 Well to calculate

its productivity factor, and Tract 1 in the Southwest Unit shall utilize the CCLT 33-6 #1

Well to calculate its productivity factor. In order to protect the correlative rights of

mineral owners in other 160-acre tracts, the productivity factor for the two 80-acre tracts

shall be divided by two in calculating the productivity factor for the two 80-acre tracts.

Further, each of these wells was shut in partly during the months of January through

June, 2018 in compliance with the Board's regulations, and, therefore, in determining the

productivity factor, production shall be prorated over six months based on the average

daily production for each well during that time period.*

(3)  That Sklar Exploration Company L.L.C. and Pruet Production Co. shall recalculate the

Tract Participations in accordance with this order and submit revised unit agreements,

revised Tract Participations incorporating the allocation formula in accordance with this

order, and ratifications in accordance with Section 9-17-80 et seq. of the *Code of*

*Alabama* (1975).

Berry H. (Nick) Tew, Jr.
State Oil and Gas Supervisor

\* In determining the productivity factor for the two 80-acre tracts, production should be used
as follows:

| | | |
|---|---|---|
| Maximum 6 month: | CCLT 33-6 | 36,826 BOE (73,652 divided by 2) |
| | CCLT 33-4 | 10,866 BOE (21,771 divided by 2) |
| | | |
| January 2018 through | CCLT 33-6 | 19,370 BOE (38,741 divided by 2) |
| June 2018: | CCLT 33-4 | 10,886 BOE (21,771 divided by 2) |

UNIT AGREEMENT

SOUTHEAST BROOKLYN OIL UNIT

BROOKLYN FIELD

CONECUH AND ESCAMBIA COUNTIES, ALABAMA

THIS AGREEMENT, entered into as of the 1st day of November, 2018, by the parties who have signed the original of this instrument, a counterpart thereof, or other instrument ratifying and agreeing to be bound by the provisions hereof;

WITNESSETH:

WHEREAS, in the interest of private and public welfare, to promote, foster and encourage conservation, to increase the ultimate recovery of oil, gas and associated minerals from the Brooklyn Field, Conecuh and Escambia Counties, Alabama (hereinafter referred to as "said field") to avoid waste, to prevent the drilling of unnecessary wells and to protect the correlative rights of all owners of the interests in said field, it is deemed necessary and desirable to enter into this agreement creating and establishing a unit comprising the Unit Area, under the applicable provisions of the laws of the State of Alabama, and to unitize the Oil and Gas Rights in and to the Unitized Interval in order to conduct Unit Operations as herein provided.

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained, it is agreed as follows:

ARTICLE 1

DEFINITIONS

As used in this agreement, the terms herein contained shall have the following meaning:

1.1    UNIT AREA (sometimes referred to as the "Southeast Brooklyn Oil Unit ") means the lands shown outlined on Exhibit "A" and described as a Unit and by Tracts on Exhibit "B" insofar as said lands relate to the Unitized Interval.

1.2    UNITIZED INTERVAL (sometimes referred to as the "Unitized Formation") means the subsurface portion of the Unit Area (which is within the Smackover Formation) in the interval between the depths of 12,016 feet measured depth (MD) and 12,235 feet measured depth (MD) in the CCL&T 4-1 #1 Well, Permit No. 17061-B, with a surface location 117 feet FSL and 839 feet

FEL of Section 4, Township 3 North, Range 13 East, Conecuh County, Alabama, as defined by the Array Induction – SP-GR-Lithodensity- Compensated Neutron-Borehole Compensated Sonic log for said well and including those strata underlying the Unit Area which can be correlated therewith, which are in communication therewith, or which are productive extensions thereof.

1.3    UNITIZED SUBSTANCES means all oil, gas, gaseous substances, sulfur contained therein, condensate, distillate, and all associated and constituent liquid or liquefiable substances, other than water and Outside Substances, within or produced from the Unitized Interval.

1.4    WORKING INTEREST means an interest in Unitized Substances by virtue of a lease, operating agreement, fee title or otherwise, including a carried interest, which interest is chargeable with and obligated to pay or bear, either in cash or out of production or otherwise, all or a portion of the cost of drilling, developing, producing and operating the Unitized Interval.

1.5    ROYALTY INTEREST means a right to or interest in any portion of the Unitized Substances or proceeds thereof other than a Working Interest, including but not limited to royalty interests, overriding royalty interests and production payment rights.

1.6    ROYALTY OWNER means a party hereto who owns a Royalty Interest in the Unit Area.

1.7    WORKING INTEREST OWNER means a party hereto who owns a Working Interest in the Unit Area. The owner of Oil and Gas Rights that are free of lease or other instrument conveying the Working Interest to another shall be regarded as a Working Interest Owner to the extent of seven-eighths (7/8ths) of his interest in Unitized Substances, and as Royalty Owner with respect to his remaining one-eighth (1/8th) interest therein.

1.8    TRACT means each parcel of land described as such and given a tract number in Exhibit "B".

1.9    UNIT OPERATING AGREEMENT means the agreement entitled "Unit Operating Agreement, Southeast Brooklyn Oil Unit, Conecuh and Escambia Counties, Alabama," of the same effective date as the Effective Date of this agreement, and which is entered into by Working Interest Owners who are parties hereto, and any amendment thereof.

1.10    UNIT OPERATOR means the Working Interest Owner or other party designated by Working Interest Owners under the Unit Operating Agreement to conduct all Unit Operations, pursuant to this Agreement and the Unit Operating Agreement.

2

1.11   TRACT PARTICIPATION means the percentage shown on Exhibit "B" for allocating Unitized Substances to a Tract under this agreement. Tract Participations were determined as set forth in Article 5.

1.12   UNIT PARTICIPATION of each Working Interest Owner shall mean the sum of the percentages obtained by multiplying such Working Interest Owner's fractional working interest (either cost bearing or net revenue) in each Tract by the Tract Participation of such Tract. When the term Unit Participation is used in reference to the interest of a Working Interest Owner or Owners, it shall be deemed to refer to the cost bearing interest of the owner(s) unless the context clearly indicates that it is intended to refer to the net revenue interest of the owner(s). Unit Participation of a Royalty Interest Owner is the sum of the percentages obtained by multiplying the Royalty Interest of such Royalty Interest Owner in each Tract by the Tract Participation of such Tract.

1.13   OUTSIDE SUBSTANCES means all substances obtained from any source other than the Unitized Interval and which are injected into the Unitized Interval.

1.14   OIL AND GAS RIGHTS means the right to explore, develop and operate lands within the Unit Area for the production of Unitized Substances, or to share in the production so obtained or the proceeds thereof.

1.15   UNIT OPERATIONS means all operations conducted by Working Interest Owners or Unit Operator pursuant to this agreement and the Unit Operating Agreement for or on account of the development and operation of the Unitized Interval for the production of Unitized Substances.

1.16   UNIT EQUIPMENT means all personal property, lease and well equipment, and other facilities and equipment taken over or otherwise acquired for use in Unit Operations pursuant to the Unit Operating Agreement.

1.17   UNIT OIL means all liquid Unitized Substances that are produced by a well and that are saved and sold or delivered for sale upstream of the Well Gas Meter for the well as oil, condensate distillate, and the constituent liquids associated therewith

1.18   UNIT RICH GAS means all Unitized Substances and Outside Substances produced in the form of gaseous substances, including the liquefiable hydrocarbons entrained therein that are separated from free liquids prior to the Well Gas Meter to which the well is connected.

1.19   UNIT EXPENDITURE or UNIT EXPENSE means a cost, expense or indebtedness

3

incurred by Unit Operator on behalf of Working Interest Owners pursuant to and authorized by this Agreement and the Unit Operating Agreement for or on account of Unit Operations.

1.20   EFFECTIVE DATE means the date that this agreement becomes effective as determined by Article 16 hereof.

1.21   Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural include the singular, and the neuter gender includes the masculine and the feminine.

## ARTICLE 2

## EXHIBITS

2.1   EXHIBITS.   Attached hereto are the following exhibits which are incorporated herein by reference:

2.1.1   EXHIBIT "A" which is a map that shows the boundary lines of the Unit Area and the Tracts therein.

2.1.2   EXHIBIT "B" which is a schedule that describes the Unit Area, each Tract in the Unit Area and the Tract Participation of each Tract.

2.1.3   EXHIBITS "C-1", "C-2," and "C-3" which are isopach maps showing net porosity feet based on hydrocarbon pore volume.

2.1.4   EXHIBIT "D" which is a schedule showing the computed Tract Participation of each tract based upon the parameters shown thereon.

2.1.5   EXHIBIT "E" which is a schedule showing, as of the date it was prepared, the total Unit Participation of each Working Interest Owner (both cost bearing and net revenue) and Royalty Owner.   Exhibit "E" or a revision thereof, shall not be conclusive as to the information therein, except it may be used as showing the Unit Participations of the Working Interest Owners for purposes of this Agreement until shown to be in error (as the result of a conveyance or otherwise) or revised as herein authorized.

2.2   REFERENCE TO EXHIBITS.   When reference herein is made to an exhibit, the reference is to the Exhibit as originally attached hereto or, if revised, to the latest revision.

2.3   EXHIBITS CONSIDERED CORRECT.   Except as otherwise provided in this Agreement, an exhibit shall be considered to be correct until revised as herein provided.

2.4   ALTERATION OF TRACT PARTICIPATION.   If it subsequently appears that any

4

mechanical miscalculation or clerical error has been made or that the Tract Participation of any tract within the Unit Area is incorrect because of subsequently discovered data, the Unit Operator shall correct the mistake by revising the Exhibits to conform to the facts. The revision shall not include any re-evaluation of engineering or geological interpretations used in determining Tract Participation. Each such revision of an Exhibit made prior to thirty (30) days after the Effective Date shall be effective as of the Effective Date. Each such revision thereafter made shall be effective at 7:00 a.m. on the first day of the calendar month next following the filing for record of the revised Exhibit or on such other date as may be determined by the Working Interest Owners and set forth in the revised Exhibit.

2.5 FILING REVISED EXHIBIT. If an exhibit is revised pursuant to this agreement, Unit Operator shall certify and promptly file the revised exhibit for record in the office of the Probate Judge of Conecuh and Escambia Counties, Alabama, and with the State Oil and Gas Board of Alabama.

## ARTICLE 3

## CREATION AND EFFECT OF UNIT

3.1 OIL AND GAS RIGHTS UNITIZED. Subject to the provisions of this agreement, all Oil and Gas Rights of Royalty Owners in and to the lands described in Exhibit "B" and all Oil and Gas Rights of Working Interest Owners in and to said lands, are hereby unitized, subject to the approval of the State Oil and Gas Board of Alabama, insofar as the respective Oil and Gas Rights pertain to the Unitized Interval, so that operations may be conducted as if the Unitized Interval had been included in a single lease executed by all Royalty Owners, as Lessors, in favor of all Working Interest Owners, as Lessees, and as if the lease had been subject to all of the provisions of this agreement.

3.2 PERSONAL PROPERTY EXCEPTED. All lease and well equipment, materials, and other facilities heretofore or hereafter placed by any of the Working Interest Owners on the lands covered hereby shall be deemed to be and shall remain personal property belonging to and may be removed by Working Interest Owners. The rights and interests therein, as among Working Interest Owners, are set forth in the Unit Operating Agreement.

3.3 COSTS AND EXPENSES OF UNIT OPERATIONS. The costs and expenses of Unit Operations, including prospective investment costs, shall be allocated and charged to each Tract in

the proportion that each Tract shares in Unitized Substances, and shall be paid by the respective Working Interest Owners owning an interest in each such Tract, said allocation and charge being more fully set forth in the Unit Operating Agreement. Without limitation to the rights and remedies afforded Unit Operator and Working Interest Owners as provided by the Unit Operating Agreement, if the full amount of any charge made against a Tract is not paid by the Working Interest Owner or Owners owning the same, then seven-eighths (7/8ths) of the Unitized Substances allocated to such Tract, proportionately reduced to the interest of such Working Interest Owner which has not paid such charges, may be appropriated by the Unit Operator and marketed and sold for the payment of such charge, together with interest thereon at the prime rate designated by Paragraph 1.3.B of Exhibit "F" of the Unit Operating Agreement or the maximum rate allowed by law, whichever is less. A one-eighth (1/8th) part of the Unitized Substances allocated to each Tract shall in all events be regarded as royalty to be distributed to and among or the proceeds thereof paid to the respective owners of royalty, other than overriding royalty or production payments, free and clear of Unit Expenditures and free and clear of any lien therefor. The owner of any overriding royalty, production payment interest, royalty in excess of one-eighth (1/8th) of production, or other interest not primarily responsible for the payment of costs and expenses of Unit Operations shall, to the extent of such payment or deduction from its share, be subrogated to all the rights of the Unit Operator with respect to the interest or interests primarily responsible for such payment. Once the Unit Operator has recovered the full amount of any such charge, the Unit Operator will continue to appropriate, market and sell the Unitized Substances attributable to the interest of such delinquent Working Interest Owner or Owners and will distribute the proceeds therefrom to the Owner or Owners of overriding royalty, production payment interest, royalty in excess of one-eighth (1/8th) of production or other interests not primarily responsible for the payment of costs and expenses of Unit Operations, until each of such Owner has received its respective allocation of proceeds together with interest thereon at the prime rate designated by Paragraph 1.3.B of Exhibit "F" of the Unit Operating Agreement (or the maximum rate allowed by law, whichever is less) from the sale of Unitized Substances.

3.4  PRIOR UNITS PRESERVED AS TRACTS. Except as otherwise noted below in this paragraph, production units of approximately 160 acres, included within the Unit Area, established in accordance with the Special Field Rules for the Brooklyn Field by the State Oil and Gas Board of

6

Alabama constitute Tracts hereunder and are delineated and numbered as such on Exhibit "A," provided, however, that if the producing well on a production unit is not producing from the Unitized Interval or if all wells on the unit capable of producing from the Unitized Interval have been plugged and abandoned, then the Tract includes only the portion of the unit underlain by the Unitized Interval (as reflected on Exhibit C) together with such additional, commonly owned area as is shown on Exhibits A and C. The production allocated to each portion of each Tract hereunder shall be considered as produced from each portion of such Tract by a well drilled thereon and shall have the same legal force and effect.

3.5     CONTINUATION OF LEASES AND TERM INTERESTS. Production from any part of the Unitized Formation and Unit Operations on any Tract shall be considered, except for the purpose of determining payments to Royalty Owners, as production from or operations upon each Tract, and such production and/or operations shall continue in effect each lease or term mineral or royalty interest as to all lands and formations covered thereby just as if such operations were conducted on and as if a well were producing from each Tract. It is agreed that each lease shall remain in full force and effect from the date of execution hereof until the Effective Date, and thereafter in accordance with its terms and this Agreement.

3.6     TITLES UNAFFECTED BY UNITIZATION. Nothing herein shall be construed to result in the transfer of title to Oil and Gas Rights by any party hereto to any other party or to Unit Operator.

3.7     INJECTION RIGHTS. Royalty Owners hereby grant Working Interest Owners the right to inject into the Unitized Formation any substances, including Unitized Substances and Outside Substances, in whatever amounts Working Interest Owners deem expedient for Unit Operations, together with the right to drill, use and maintain injection wells on the Unit Area, and to use for injection purposes any non-producing or abandoned wells or dry holes and any producing wells completed in the Unitized Interval.

ARTICLE 4

PLAN OF OPERATIONS

4.1     UNIT OPERATOR. Working Interest Owners are, as of the Effective Date of this agreement, entering into the Unit Operating Agreement designating Sklar Exploration Company L.L.C., a Louisiana limited liability company, as initial Unit Operator. Unit Operator shall have the

7

exclusive right to conduct Unit Operations. The operations shall conform to the provisions of the Unit Agreement and the Unit Operating Agreement. If there is any conflict between such agreements, this Agreement shall govern.

4.2    OPERATING METHODS.    Working Interest Owners shall, with diligence and in accordance with good engineering and production practices, engage in re-pressuring and/or water injection operations and maintain a rate of production to the end that the quantity of Unitized Substances ultimately recovered shall be maximized and waste prevented.

4.3    CHANGE OF OPERATING METHODS.    Nothing herein shall prevent Working Interest Owners from discontinuing or changing in whole or in part any method of operations which, in their opinion, is no longer in accord with good engineering or production practices. Other methods of operation may be conducted or changes may be made by Working Interest Owners from time to time if determined by them to be feasible, necessary or desirable to increase the ultimate recovery of Unitized Substances, subject to any necessary approval of regulatory authorities.

ARTICLE 5

TRACT PARTICIPATION

5.1    TRACT PARTICIPATION. Each Tract shall participate in the Unitized Substances produced from the Unit Area in accordance with the Tract Participation allocated thereto as set forth in Exhibit "B." The Tract Participation of each Tract in the Unit Area has been calculated as shown on Exhibit "D" by taking into consideration pertinent geological and engineering factors and utilizing a two part formula consisting of 50% hydrocarbon pore volume and 50% productivity, both determined as follows:

The aerial distribution of hydrocarbon pore volume ("HCPV") was established by mapping the net HCPV porosity feet ("HCFT") for the Smackover Zones in each well. For purposes of the Southeast Brooklyn Oil Unit, HCFT means the vertical feet of hydrocarbon saturated pore space based on core porosity data, except for intervals of the Smackover Formation where core samples are not available. Where core samples are not available, petrophysical log porosity data was used to determine HCFT for each well. The Southeast Brooklyn Oil Unit HCFT determinations were made based on porosity cutoff factors for netting porosity-feet, which is porosity equal to, or greater than 10% for Smackover Zone 1 and 6% for Smackover Zones 2 and 5, and determinations of hydrocarbon-saturated porosity-feet, in measured depth (HCFT- MD) were made where each

8

qualifying porosity-foot must have an oil saturation (So) of at least 55% (Maximum Sw = 45, So=1-Sw) as determined by the Archie equation using the resistivity (Rt ) as measured from the petrophysical logs for each foot, using a water resistivity (Rw) of 0.017. The HCFT- MD value for each Smackover Zone in each well was corrected for true vertical depth (TVD) using a TVD factor based on each well's borehole survey, and the HCFT-MD value was converted for each Smackover Zone of each well as HCFT. The acreage attributable to each HCFT contour within each Unit Tract was determined, and the HCPV was calculated for each Smackover Zone for each Tract. The Tract's HCPV for each Smackover Zone was posted and summed as the HCPV totals in acre-feet for each Tract. The HCPV totals for each Tract, were summed to determine the total HCPV for the Unit such that each Tract's percentage of the total HCPV equals the Tract's HCPV Tract Factor, which is 50% of the allocation formula.

The other 50% of the allocation formula is a productivity factor, with productivity based equally on (a) each Tract's maximum oil production during any consecutive six-month period and the gas production occurring within that same consecutive six-month period (the "Best Six Months") and (b) each Tract's oil and gas production during the six-month period from January 2018 through June 2018 (the "Recent Six Months"), such that the Best Six Months factor shall be 25% of the allocation formula and the Recent Six Months factor shall be 25% of the allocation formula. Production data of both oil and gas was tabulated, and this data was evaluated to determine, for each Tract, the Best Six Months production and the Recent Six Months production; provided, however, that if more than one well located on a Tract had produced from the Unitized Formation, only the well having the highest historical production data for a consecutive six-month period was utilized in calculating the Tract's Best Six Months half of the total productivity factor.

The total gas production during each relevant period, for each Tract, was converted to barrels of oil equivalent (BOE) using a 13.6 Mcf/bbl BOE factor, and added to the total oil production during that period, providing either the Best Six Months production or the Recent Six Months production for each Tract, as the case may be. The Best Six Months production from each Tract determined in this manner was then divided by the total of all Tracts' Best Six Months production to determine each Tract's Best Six Months half of the total productivity factor, while the Recent Six Months production from each Tract was then divided by the total of all Tracts' Recent Six Months production to determine each Tract's Recent Six Months half of the total productivity factor.

9

The above allocation formula is the formula specifically approved by the State Oil and Gas Board in its Certification of Order dated September 28, 2018, entered in Docket Nos. 4-4-18-01, 4-4-18-02, 4-4-18-03, 4-4-18-04, 4-4-18-05, 4-4-18-06, 4-4-18-07 and 4-4-18-08.

## ARTICLE 6

## ALLOCATION OF UNITIZED SUBSTANCES AND OUTSIDE SUBSTANCES

6.1   ALLOCATION TO TRACTS AND WORKING INTEREST OWNERS.   All Unitized Substances produced and saved shall be allocated to the several Tracts in accordance with the respective Tract Participation effective during the period that the Unitized Substances were produced, subject, however, to the other provisions of this Article 6.   The amount of Unitized Substances allocated to each Tract, regardless of whether it is more or less than the actual production of Unitized Substances from the well or wells, if any, on such Tract shall be deemed for all purposes to have been produced from such Tract.   All Outside Substances produced and saved shall be allocated to the several Working Interest Owners in accordance with their Unit Participation effective during the period that the Outside Substances were produced subject, however, to the other provisions of this Article 6.

6.2   DISTRIBUTION WITHIN TRACTS.   If any Oil and Gas Rights in a Tract are now or hereafter become divided and owned in severalty as to different parts of the Tract, the owners of the divided interests, in the absence of an agreement providing for a different division, shall share in the Unitized Substances allocated to the Tract, or in the proceeds thereof, in proportion to the surface acreage of their respective parts of the Tract.   Except as otherwise provided elsewhere in this Agreement, the Unitized Substances allocated to each Tract or portion thereof shall be distributed among, or accounted for to, the parties entitled to share in the production from such Tract or portion thereof in the same manner, in the same proportions and upon the same conditions as they would have participated and shared in production from such Tract or such portion thereof, or in the proceeds thereof, had this Agreement not been entered into, and with the same legal effect.

6.3   TAKING   OF   PRODUCED   UNITIZED   SUBSTANCES   AND   OUTSIDE SUBSTANCES IN KIND.   The Unitized Substances allocated to each Tract shall be delivered to the respective parties entitled thereto by virtue of the ownership of Oil and Gas Rights therein or to the buyers of such Unitized Substances for the account of such parties; and the Outside Substances allocated to each Working Interest Owner shall be delivered to such owner or the buyer (if any) of

10

Outside Substances for the account of such owner (subject, however, to the provisions of the Unit Operating Agreement). Each Working Interest Owner at any time and from time to time may appoint a designee to physically receive its share of Unitized Substances, Outside Substances or revenue derived therefrom and delivery of such Unitized Substances, Outside Substance or revenue to such designee shall have the same effect as if the same had been delivered to the Working Interest Owner that made the designation. If a Royalty Owner has the right to take in kind a share of Unitized Substances and fails to do so, the Working Interest Owner whose Working Interest is subject to such Royalty Interest shall be entitled to take in kind such share of the Unitized Substances.

If there is any difference in the quality of Unitized Substances or Outside Substances produced from different wells in the Unit Area and if that difference affects the value of such substances, Unit Operator shall cooperate with the parties (if any) taking such substances in kind to assure that the Unitized Substances or Outside Substances delivered to those parties are balanced both as to volume and as to quality. Parties taking Unitized Substances or Outside Substances in kind shall have the right to construct, maintain, and operate within the Unit Area all necessary facilities for that purpose, provided that they are constructed, maintained and operated so as not to interfere with Unit Operations. Any extra expenditures incurred by Unit Operator by reason of the delivery in kind of any portion of the Unitized Substances and/or Outside Substances shall be borne by the party taking such substances in kind.

6.4  FAILURE TO TAKE IN KIND.  If any party having a right to take in kind fails to take in kind or separately dispose of its share of Unitized Substances or Outside Substances currently as and when produced, the Unit Operator shall have the right but not the obligation to dispose of such production in any reasonable manner (i) for such reasonable period of time as is consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one year, and (ii) at not less than the best price offered to Unit Operator for such production (subject to any transportation charges for transporting the same after it leaves Unit Equipment and any charges for treating, processing, marketing or the like), and the account of such party shall be charged therewith as having received the same.  The net proceeds, if any, of the Unitized Substances or Outside Substances so disposed of by the Unit Operator shall be paid to the party for whose account the same is so disposed under the provisions of applicable division orders.

11

6.5    RESPONSIBILITY FOR ROYALTY SETTLEMENTS.  Any party receiving in kind or separately disposing of all or part of the Unitized Substances allocated to any Tract or receiving the proceeds therefrom shall be responsible for the payment thereof to the persons entitled thereto, and shall indemnify all parties hereto, including Unit Operator, against any liability for all royalties, overriding royalties, production payments, severance tax and all other payments chargeable against or payable out of such Unitized Substances or the proceeds therefrom. In the event a party fails to take and dispose of its part of Unitized Substances in kind, and subject to the provisions of Article 6.4, Unit Operator or the purchaser of unitized substances will make settlement for the proceeds of such production under its Division Order.

6.6    ROYALTY ON OUTSIDE SUBSTANCES.  There shall be no royalty payable on Outside Substances.  If any Outside Substances injected into the Unitized Interval consist of liquefied petroleum hydrocarbons or natural gases, and if the Unitized Substances subsequently produced contain such gases or hydrocarbons as determined by fractional analysis or other appropriate tests, the Working Interest Owners shall have the right to recover such contained gases or hydrocarbons, or their equivalent value from such Unitized Substance, without payment of royalty thereon.  If any Outside Substances of value are injected into the Unitized Interval, and such Outside Substances cannot be distinguished from Unitized Substances, then seventy-five percent (75%) of any like substances contained in Unitized Substances subsequently produced and sold, or used for other than Unit Operations, shall be deemed to be Outside Substances until the aggregate of said seventy-five percent (75%) equals the accumulated volume of such Outside Substances injected into the Unitized Interval, and no payments shall be due or payable to Royalty Owners on such Outside Substances.

6.7    PRODUCED OUTSIDE SUBSTANCES WITH NO VALUE.        Anything herein to the contrary notwithstanding, if any Outside Substance produced in conjunction with Unitized Substances has no value and if that substance can be separated from the Unitized Substances by the Unit Operator, then with the approval of the Working Interest Owners, the Unit Operator shall at Unit Expense separate and re-inject or dispose of such Outside Substance.

ARTICLE 7

PRODUCTION AS OF THE EFFECTIVE DATE

7.1    OIL IN LEASE TANKS. Unit Operator shall gauge all lease and other tanks within the

12

Unit Area to ascertain the amount of merchantable oil or other liquid hydrocarbons produced from the Unitized Interval in such tanks, above the pipe line connections, as of 7:00 a.m. on the Effective Date hereof. All such oil shall remain the property of the parties entitled thereto the same as if the unit had not been formed. Any such oil not promptly removed may be sold by the Unit Operator for the account of the parties entitled thereto, subject to the payment of all royalties, overriding royalties, production payments, severance tax and all other payments under the provisions of the applicable lease or other contracts.

## ARTICLE 8

## USE OF UNITIZED SUBSTANCES AND ROYALTY SETTLEMENTS

8.1   USE OF UNITIZED SUBSTANCES. Working Interest Owners may use or consume as much of the Unitized Substances as they deem appropriate for the operation and development of the Unitized Interval including, but not limited to, the injection thereof into the Unitized Interval. No royalty, overriding royalty, production or severance tax or other payments shall be payable on account of Unitized Substances used, unavoidably lost or consumed in Unit Operations.

8.2   ROYALTY SETTLEMENT. Unit Operator is hereby authorized to deliver in kind to Royalty Owners the amount of Unitized Substances to which they are entitled under the provisions of their lease or other contract and to deduct such amounts from the share of each Working Interest Owner responsible therefor. Settlement for Royalty Interest not taken in kind shall be made by the Working Interest Owners in each Tract responsible therefor under existing contracts, laws and regulations, in accordance with the provisions of Article 6 hereof.

## ARTICLE 9

## TITLES

9.1   WORKING INTEREST TITLES. If title to a Working Interest fails, the rights and obligations of Working Interest Owners by reason of the failure of title shall be governed by the Unit Operating Agreement.

9.2   ROYALTY OWNER TITLES. If title to a Royalty Interest fails, the party whose title failed shall not be entitled to share hereunder with respect to such interest.

9.3   PRODUCTION WHERE TITLE IS IN DISPUTE. If the title or right of any party claiming the right to receive in kind all or any portion of the Unitized Substances allocated to a Tract is in dispute, Unit Operator shall either:

13

(a)   require that the party to whom such Unitized Substances are delivered or to whom the proceeds thereof are paid, furnish security for the proper accounting therefor to the rightful owner if the title or right of such party fails in whole or in part; or

(b)   withhold and market the portion of Unitized Substances with respect to which title or rights is in dispute, and withhold the proceeds thereof with such interest thereon as may be required under applicable laws of the State of Alabama until such time as the title or right thereto is established by a final judgment of a court of competent jurisdiction or otherwise to the satisfaction of the Working Interest Owners, whereupon the proceeds so withheld shall be paid to the party rightfully entitled thereto.

9.4   PAYMENT OF TAXES TO PROTECT TITLE.   If any taxes are not paid when due by or for any owner of surface rights to lands within the Unit Area, or severed mineral interests or Royalty Interests in such lands, or lands outside the Unit Area on which Unit Equipment is located, Unit Operator may, at any time prior to tax sale, or expiration of period of redemption after tax sale, pay the tax and redeem or purchase such rights, interests or property.   Any such payment shall be a Unit Expenditure.   Unit Operator shall, if possible, withhold from any proceeds derived from the sale of Unitized Substances otherwise due any delinquent taxpayer an amount sufficient to defray the costs of such payment, such withholding to be credited to Working Interest Owners.   Such withholding shall be without prejudice to any other remedy available to Unit Operator or Working Interest Owners.

9.5   UNDERLYING AGREEMENTS.   Nothing contained herein shall be construed as altering or impairing the provisions of any leases or other agreements with reference to the proportionate reduction of royalties, overriding royalties, payments out of production, and other obligations, and irrespective of the provisions of any such leases and other agreements, it being understood and agreed that in the event any Royalty Owner or Working Interest Owner owns less than the entirety of the interest or interests claimed by or certified to him in a division order, transfer order, or other agreement, with reference to any Tract, all payments to such party shall be reduced to the proportionate interest actually owned by him in such Tract.

14

ARTICLE 10

EASEMENTS OR USE OF SURFACE

10.   GRANT OF EASEMENTS.   The parties hereto, to the extent of their rights and interests, hereby grant to Working Interest Owners the right to use as much of the surface of the land within the Unit Area as may reasonably be necessary for Unit Operations and for transportation of Unitized and Outside Substances.

10.2   USE OF WATER.   Working Interest Owners shall have free use of water from the Unit Area for Unit Operations except water from any domestic water well, commercial lake, pond, or irrigation ditch of a Surface Owner.

10.3   SURFACE DAMAGES.   Working Interest Owners shall pay the rightful owner for damages to growing crops, timber, fences, improvements, and structures on the Unit Area that result from Unit Operations.

ARTICLE 11

ENLARGEMENT OF UNIT AREA

11.1   ENLARGEMENT OF UNIT AREA.   The Unit Area may, with the approval of the State Oil and Gas Board in accordance with Section 9-17-85 of the Code of Alabama (1975), be enlarged from time to time to include additional acreage reasonably proved to be productive from the Unitized Interval upon the written agreement to the enlargement and ratification of this Agreement and the Unit Operating Agreement by the Working Interest Owners owning sixty-six and two-thirds percent (66 2/3%) in interest, as costs are shared, in the area to be added, and the written agreement to the enlargement and ratification of this Agreement by the Royalty Owners owning sixty-six and two-thirds percent (66 2/3%) in interest in the area to be added, all subject to the following:

11.1.1   As provided in Section 9-17-85 of the Code of Alabama (1975), the portion of Unitized Substances from the Unit Area as enlarged to be allocated to the added area shall be based on the relative contribution which such added area is expected to make, during the remaining course of Unit Operations, and the Unitized Substances so allocated to the added area shall be allocated to the Tracts therein on the basis of the relative contribution of each such Tract and, as to the area added, the Effective Date shall be the effective date of such enlargement.

11.1.2   The remaining portion of the Unitized Substances from the Unit Area as enlarged

15

shall be allocated among the Tracts within the previously established Unit Area in the same proportions as elsewhere herein provided.

11.1.3   The effective date of any enlargement of the Unit Area shall be 7:00 a.m. on the first day of the calendar month following the date on which the order of the State Oil and Gas Board of Alabama, after notice and hearing, approves the enlargement and finds that the enlargement has been agreed to in compliance with the requirements of Section 9-17-85(b)(2) of the Code of Alabama (1975), as amended.

11.2   NO RETROACTIVE ALLOCATION OF EXPENSES OR PRODUCTION.   There shall be no retroactive allocation or adjustment of Unit Expenditures or of interests in the Unitized Substances produced, or the proceeds thereof, by reason of an enlargement of the Unit Area; provided, however, this limitation shall not prevent an adjustment of investment among the Working Interest Owners pursuant to the Unit Operating Agreement.

11.3   DETERMINATION OF TRACT PARTICIPATION AND REVISION OF EXHIBITS.   The Unit Operator shall determine the Tract Participation of each Tract within the Unit Area as enlarged and upon approval by Working Interest Owners, revise Exhibits "A", "B", "C-1," "C-2," "C-3," "D" and "E" accordingly and file for record the revised Exhibits with the State Oil and Gas Board of Alabama and in the office of the Probate Judge of Conecuh and Escambia Counties, Alabama.

ARTICLE 12

CHANGE OF TITLE

12.1   COVENANT RUNNING WITH THE LAND.   This agreement shall extend to, be binding upon and inure to the benefit of the respective heirs, devisees, legal representatives, successors and assigns of the parties hereto, and shall constitute a covenant running with the lands, leases and interests covered hereby.

12.2   NOTICE OF TRANSFER.   Any conveyance of all or any part of any interest owned by any party hereto with respect to any Tract shall be made expressly subject to this Agreement.  No change of title shall be binding upon the Unit Operator, or upon any party hereto other than the party so transferring, until the first day of the calendar month next succeeding the date of receipt by Unit Operator of a photocopy or a certified copy of the recorded instrument evidencing such change in ownership.

16

12.3   WAIVER OF RIGHTS TO PARTITION.   Each party hereto covenants that, during the existence of this Agreement, it will not resort to any action to partition the Unitized Interval within the Unit Area or the Unit Equipment, and to that extent waives the benefits of all laws authorizing such partition.

## ARTICLE 13

## RELATIONSHIP OF PARTIES

13.1   NO PARTNERSHIP.   The duties, obligations and liabilities of the parties hereto are intended to be several and not joint or collective.   This Agreement is not intended to create, and shall not be construed to create, an association or trust, or to impose a partnership duty, obligation or liability with regard to any one or more of the parties hereto.   Each party hereto shall be individually responsible for its own obligations as herein provided.

13.2   NO SHARING OF MARKET.   This Agreement is not intended to provide, and shall not be construed to provide, directly or indirectly, for any cooperative or joint sale or marketing of Unitized Substances.

13.3   ROYALTY OWNERS FREE OF COSTS.   Subject to the provisions of Article 3.3 hereof, this Agreement is not intended to impose, and shall not be construed to impose, upon any Royalty Owner any obligation to pay for Unit Expenditures unless such Royalty Owner is otherwise so obligated.

13.4   INFORMATION TO ROYALTY OWNERS.   Each Royalty Owner shall be entitled to all information in possession of Unit Operator to which such Royalty Owner is entitled by an existing agreement with any Working Interest Owner.

## ARTICLE 14

## LAWS AND REGULATIONS

14.1   LAWS AND REGULATIONS.   This agreement shall be subject to the valid rules, regulations and orders of the State Oil and Gas Board of Alabama, and to all other applicable Federal, State and municipal laws, rules, regulations and orders.

## ARTICLE 15

## FORCE MAJEURE

15.1   FORCE MAJEURE.   All obligations imposed by this Agreement on each party, except for the payment of money, shall be suspended while compliance is prevented, in whole or in

17

part, by a strike, fire, war, civil disturbance, explosion, act of God, by Federal, State or municipal laws; by any rules, regulations, or order of a governmental agency; by inability to secure materials; or by any other cause or causes beyond reasonable control of the party. No party shall be required against its will to adjust or settle any labor dispute. Neither this Agreement nor any lease or other instrument subject thereto shall be terminated by reason of suspension of Unit Operations due to any one or more of the causes set forth in this Article.

## ARTICLE 16

### EFFECTIVE DATE

16.1    EFFECTIVE DATE.   This Agreement shall become binding upon all parties who execute or ratify it as of the date of execution or ratification by such party and shall become effective notwithstanding the fact that one or more of the Working Interest Owners or one or more of the Royalty Owners shall fail or refuse to execute or ratify this Agreement when the conditions for effectiveness have been met as follows:    (1) when the same has been executed or ratified by parties who own of record legal title to at least an undivided sixty-six and two-thirds percent (66 2/3%) in interest (calculated using the cost bearing Unit Participations of the Working Interest Owners) of the Working Interest in the total Unit Area and by parties who own of record legal title to at least sixty-six and two-thirds percent (66 2/3%) in interest (calculated using the allocation formula) of the Royalty Interest in the total Unit Area (for the purpose of this provision, with respect to an interest which is encumbered of record with a mortgage or deed of trust, both the grantor and grantee therein shall be considered as the record owner of legal title thereto, except that when the instrument gives the grantor in such mortgage or deed of trust the right to execute a Unit Agreement, the grantor shall be deemed the record owner); and (2) when an order has been issued by the State Oil and Gas Board of Alabama approving Unit Operation of the Unit Area in accordance with the terms of this Agreement and the Unit Operating Agreement.   The Effective Date of the Unit shall be as specified in the order of the State Oil and Gas Board of Alabama. If, however, this Agreement does not become effective on or before March 24, 2019, then this Agreement shall _ipso facto_ terminate and thereafter be of no further force and effect unless prior thereto at least two Working Interest Owners owning a combined Unit Participation of at least fifty percent (50%) (calculated using the allocation formula) who have become parties to this Agreement have decided to extend said termination date for a period not to exceed one (1) year.   If said

18

termination date is extended and this Agreement does not become effective on or before said extended termination date, this Agreement shall ipso facto terminate on said extended termination date, and thereafter be of no further force or effect. For the purpose of this article, and except as hereinabove specifically provided in Section 16.1, ownership shall be computed on the basis of the Tract Participations set forth in Exhibit "B."

16.2   CERTIFICATE OF EFFECTIVENESS.  Unit Operator shall file for record in Conecuh and Escambia Counties, Alabama, a Certificate to the effect that this Agreement has become effective according to its terms and stating further the Effective Date.

ARTICLE 17

TERM

17.1   TERM. The term of this Agreement shall be for the time that Unitized Substances are produced or Unit Operations are conducted without a cessation of more than ninety (90) consecutive days, unless sooner terminated by Working Interest Owners in the manner herein provided.

17.2   TERMINATION BY WORKING INTEREST OWNERS.  Subject to approval by the State Oil and Gas Board after notice and a hearing, this Agreement may be terminated by Working Interest Owners having a combined Unit Participation (cost bearing) of at least sixty-six and two-thirds percent (66 2/3%) whenever such Working Interest Owners determine that Unit Operations are no longer profitable or feasible.

17.3   EFFECT OF TERMINATION.  Upon termination of this Agreement, the further development and operation of the Unitized Interval as a Unit shall be abandoned; Unit Operations shall cease; the parties' rights in and to the Unitized Substances and Outside Substances resulting from or created by this Agreement or any order of the State Oil and Gas Board approving this Agreement shall cease, with the rights to own and/or capture oil, gas and other minerals in the Unitized Interval thereafter belonging to the persons or entities who would have had those rights if this Unit had never been formed (subject, however, to the provisions of the last sentence or this paragraph); and the Tracts comprising the Unit Area shall continue to exist as separate tracts subject to the laws, rules and regulations of the State of Alabama.  Each oil and gas lease and other agreement covering lands within the Unit Area shall remain in force for sixty (60) days after the date on which this Agreement terminates, and for such further period as is provided by the lease or

19

other agreement.

17.4  CERTIFICATE OF TERMINATION.  Unit Operator, upon decision being reached to terminate this Agreement, shall immediately file for record in the office or offices where a counterpart of this Agreement is recorded, a certificate to the effect that this Agreement has been terminated according to its terms and stating further the termination date.

17.5  SALVAGING EQUIPMENT UPON TERMINATION.  If not otherwise granted by the leases or other instruments affecting each Tract unitized under this Agreement, Royalty Owners hereby grant Working Interest Owners a period of one (1) year after the date of termination of this Agreement within which to salvage and remove Unit Equipment.

ARTICLE 18

EXECUTION

18.1  ORIGINAL, COUNTERPART, OR OTHER INSTRUMENT.  An owner of Oil and Gas Rights may become a party to this Agreement by signing the original of this instrument, a counterpart thereof, or other instrument ratifying and agreeing to be bound by the provisions hereof. The signing of any such instrument shall have the same effect as if all the parties had signed the same instrument.  All signature pages to this Agreement or counterparts hereof that are executed by Owners of Oil and Gas Rights may be attached to one copy of this Agreement.

18.2  JOINDER IN DUAL CAPACITY.  Execution as herein provided by any party as either a Working Interest Owner or a Royalty Owner shall commit all interests that may be owned or controlled by such party.

18.3  APPROVAL OF UNIT OPERATING AGREEMENT.  Joinder herein shall constitute approval of the Unit Operating Agreement.

ARTICLE 19

DETERMINATIONS BY WORKING INTEREST OWNERS

19.1  DETERMINATIONS BY WORKING INTEREST OWNERS.  All decisions, determinations, or approvals by Working Interest Owners hereunder shall be made pursuant to the voting procedure of the Unit Operating Agreement, unless otherwise provided herein.

ARTICLE 20

GENERAL

20.1  AMENDMENTS AFFECTING WORKING INTEREST OWNERS.  Unless

20

otherwise provided to the contrary elsewhere herein or in the Unit Operating Agreement, amendments hereto or to the Unit Operating Agreement relating wholly to Working Interest Owners may be made if signed or ratified by Working Interest Owners having a combined Unit Participation (cost bearing) of at least sixty-six and two thirds percent (66 2/3%) and approved by the State Oil and Gas Board.

20.2   ACTION BY WORKING INTEREST OWNERS. Except as otherwise provided in this Agreement, any action or approval required by Working Interest Owners hereunder shall be in accordance with the provisions of the Unit Operating Agreement.

20.3   SEVERABILITY OF PROVISIONS. The provisions of this Agreement are severable and if any section, sentence, clause or part thereof is held to be invalid for any reason, such invalidity shall not be construed to affect the validity of the remaining provisions of this Agreement.

## ARTICLE 21

## SUCCESSORS AND ASSIGNS

21.1   SUCCESSORS AND ASSIGNS. This Agreement shall extend to, be binding upon, and inure to the benefit of the Parties hereto and their respective heirs, devisees, legal representatives, successors, and assigns, and shall constitute a covenant running with the lands, leases, and interests covered

ENTERED INTO as of the day and year first above written.

[SIGNATURE PAGES FOLLOW]

21

UNIT AGREEMENT
SOUTHEAST BROOKLYN OIL UNIT
BROOKLYN FIELD
CONECUH AND ESCAMBIA COUNTIES, ALABAMA

UNIT OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

ATTEST:

By: _____
Its: _____

WORKING INTEREST OWNERS

[Individual]

ATTEST

_____          _____
SIGNATURE                          DATE

[Trustee]

ATTEST

_____          _____
SIGNATURE                          DATE

As Trustee of the following trust:

_____

[Legal entity]

ENTITY NAME:

Sklaro LLC

ATTEST

By: _____
Its: _____          11-6-18
                                         DATE

23

ROYALTY AND OVERRIDING ROYALTY OWNERS

*[Individual]*

ATTEST

_____    _____
SIGNATURE                               DATE

*[Trustee]*

ATTEST

_____    _____
SIGNATURE                               DATE

As Trustee of the following trust:

_____

*[Legal entity]*

ATTEST

ENTITY NAME: _____

By _____    _____
Its _____            DATE

24



UNIT PLAT
EXHIBIT A
TO UNIT AGREEMENT FOR
SOUTHEAST BROOKLYN OIL UNIT
Sklar Exploration Company LLC
PROPOSED SOUTHEAST BROOKLYN OIL UNIT
PROPOSED NORTHWEST BROOKLYN OIL UNIT
PROPOSED NORTHEAST BROOKLYN OIL UNIT
BROOKLYN FIELD
T4N R13E
T3N R13E
Active Oil Well
Dry Hole
Gas-Input Well
Oil Well
Plugged & Abandoned Oil Well
Shut-in Oil Well
Salt Water Disposal Well
Temporarily Abandoned Oil Well
15 Proposed Southeast Brooklyn Oil Unit Tract Numbers
0'
3,000'
SCALE IN FEET
N
Mary Mack 30-14 Pruet 16398
Mary Mack 30-15 Pruet 16445
Salter 29-13 Pruet 16487
Thomasson 29-10 #1 Sklar 16512
CCL&T 28-13 #1 Pruet 16597
CCL&T 28-15 #1 Pruet 16682
CCL&T 27-13 #1 Pruet 16723
CCL&T 27-10, 4-13 #1 Pruet 16682-B
CCL&T 27-15 #1 Pruet 16682-B-1
CCL&T 26-15 #1 Pruet 16984-B
Godwin 31-3 Pruet 16453
Rhodes 31-1 #1 Sklar 17262-B
Mary Mack 31-2 #1 Sklar 16498
Hamiter 32-3 #1 Sklar 16415
CCL&T 32-2 Pruet 16486
CCL&T 33-4 #1 Pruet 16656-B
CCL&T 33-2, 4-13 Pruet 16788
CCL&T 34-4 #1 Pruet 16896
CCL&T 34-2 #1 Pruet 17043-B
CCL&T 31-12 #1 Sklar 16532
Bull 32-10 #1 Sklar 16776
CCL&T 32-9 #1 Sklar 16776-B-1
Thomasson 33-12 #1 Sklar 16983-B
CCL&T 33-10 #1 Pruet 17022-B
CCL&T 34-12 #1 Pruet 17085-B
CCL&T 34-15 #1 Pruet 17130-B
CCL&T 35-13 #1 Pruet 17205-B
Johnston-Stewart 32-12 #1 Sklar 15934
Logan 5-7 #1 Sklar 15363
CCL&T 4-1 #1 Sklar 17061-B
CCL&T 3-4 #1 (R13E) Sklar 17071-B
CCL&T 3-7 #1 Sklar 17204-B
Findley 2-5 #1 Fletcher 17193
CCL&T 4-9 #1 ST Sklar 17138-B-1
CCL&T 4-9 #1 Sklar 17138-B
Pate 3-11 #1 Sklar 17128
Pate 3-9 #1 Fletcher 17207-B
Pate 2-12 #1 Fletcher 17239
CCL&T 2-15 #1 Sklar 17257-B
CCL&T 7-4 #1 Sklar 15825
Anderson Johnson 12-4 #1 Malatex 11119
Pate 11-2 #1 Fletcher 17258-B
TR-41
TR-45
TR-49
TR-4
TR-9
TR-14
TR-19
TR-24
TR-25
TR-42
TR-46

**TRACT PARTICIPATION SCHEDULE**

**EXHIBIT B**
**TO UNIT AGREEMENT FOR**
**SOUTHEAST BROOKLYN OIL UNIT**

Sheet 1 of 2

Southeast Brooklyn Oil Unit, Tract Participation Schedule

(50% HCPY + 25% Best Six Months Productivity + 25% January – June 2018 Productivity)

Page 1 of 2

| Tract | Well or Tract Name | Location | Description | Tract Factor |
|---|---|---|---|---|
| 1 | CCBLT 32-9 #1 | | SE/4 of Sec. 32-4N-13E, Coneuch County | 0.0371745320 |
| 2 | Thomasson 33-12 #1 | | NW/4 of Sec. 33-4N-13E, Coneuch County | 0.0602272768 |
| 3 | CCBLT 34-10 #1 | | SE/4 of Sec. 34-4N-13E, Coneuch County | 0.0888888896 |
| 4 | CCBLT 34-12 #1 | | SW/4 of Sec. 34-4N-13E, Coneuch County | 0.1647095735 |
| 5 | CCBLT 34-15 #1 | | SE/4 of Sec. 34-4N-13E, Coneuch County | 0.1545669600 |
| 6 | CCBLT 35-13 #1 | | SW/4 of Sec. 35-4N-13E, Coneuch County | 0.0420170744 |
| 7 | Logan 5-7 #1 | | NE/4 of Sec. 5-3N-13E, Escambia County | 0.0567682680 |
| 8 | CCBLT 4-1 #1 | | NE/4 of Sec. 4-3N-13E, Coneuch County | 0.0869190490 |
| 9 | CCBLT 3-4 #1 (R13E) | | NW/4 of Sec. 3-3N-13E, Coneuch County | 0.2319792610 |
| 10 | CCBLT 3-7 #1 | | NE/4 of Sec. 3-3N-13E, Coneuch County | 0.1456322670 |
| 11 | Pate 3-11 #1 | | SW/4 of Sec. 3-3N-13E, Coneuch County | 0.0163267082 |
| 12 | 4-13-31-6 | SE 31-4N-13E | NE/4 of NE/4 of SE/4 of Sec. 31-4N-13E, Coneuch County | 0.0000454530 |
| 13 | 4-13-32-12-1 | SW 32-4N-13E | All of the W/2 of NW/4 of SW/4 of Sec. 32-4N-13E, Coneuch County, lying South of County Highway #6 | 0.0005568490 |
| 14 | 4-13-32-12-2 | SW 32-4N-13E | All of the E/2 of NW/4 of SW/4 of Sec. 32-4N-13E, Coneuch County, lying South of County Highway #6, less the following described tract: Commencing at a point 85 feet North of the NE corner of the SW/4 of Sec. 32-4N-13E, then running south to said corner 85 feet; thence West 502 feet; thence North 460 feet; thence Southeast 630 feet to the place of commencement. | 0.0006598581 |
| 15 | 4-13-32-3-1 | SW 32-4N-13E | Commence at the NW corner of the E/4 of SW/4 of Sec. 32-4N-13E, Coneuch County to form or make a starting point; thence run East along the North line of said forty 686.4 feet; thence run South 1,023 feet, more or less, to North ROW of said road 889 feet, more or less, to the West line of said forty; thence run North along the West line of forty 528 feet, more or less, to starting point. | 0.0025257044 |
| 16 | 4-13-32-3-2 | SW 32-4N-13E | Commence at a point 686.4 feet East of the NW corner of the NE/4 of SW/4 of Sec. 32-4N-13E, Coneuch County to form or make a starting point; thence run East along forty line 237.6 feet; thence run South 1,194.6 feet, more or less, to North ROW of Castleberry-Brooklyn Road; thence run North 54 degrees West and along North line of said road 293.7 feet, more or less, to SE corner of parcel of land conveyed to Eleanor T. Cary; thence run North and along East line of Eleanor T. Cary parcel 1,023 feet to starting point. | 0.0010000007 |
| 17 | 4-13-32-3-3 | SW 32-4N-13E | Commence at a point 924 feet East of the NW corner of the NE/4 of SW/4 of Sec. 32-4N-R13E, Coneuch County to form or make a starting point; thence run East along forty line 211.1 feet; thence run South 1,366.4 feet, more or less, to North ROW of Castleberry-Brooklyn Road; thence run North 54 degrees West and along North line of said road 250.8 feet, more or less, to SE corner of parcel of land conveyed to Dorothy T. Nowling and husband, Roy Nowling. Thence run North and along East line of Dorothy T. Nowling of husband, Roy Nowling parcel 1,194.6 feet to starting point. | 0.0000084008 |



**EXHIBIT B**
**TO UNIT AGREEMENT FOR**
**SOUTHEAST BROOKLYN OIL UNIT**

**TRACT PARTICIPATION SCHEDULE**

Sheet 2 of 2

Southeast Brooklyn Oil Unit, Tract Participation Schedule (50% HCPV + 50% Productivity)

Page 2 of 2

| Tract | Tract ID | Location | Description | Participation Factor |
|---|---|---|---|---|
| 18 | 4-13-32-3-4 | SW 4N-13E | Commence at a point 1135.2 feet East of the NW corner of the NE/4 of SW/4 of Sec. 32-4N-13E, Conecuh County to form or make a starting point. Thence run East along the North line of said forty 184.8 feet to NE corner of said forty; thence run South along East line of the E/2 of SW/4 1,485 feet, more or less, to North ROW of Castleberry Road. Thence run North 54 degrees West and along North ROW of said road 217.8 feet, more or less, to the SE corner of parcel of land owned by Henry G. Foster and wife, Velma B. Foster.  Thence run North 1,346.6 feet, more or less, to starting point. LESS AND EXCEPT the following described parcel Commence at a point 1135.2 feet East of the NW corner of the NE/4 of SW/4 of Sec. 32-4N-13E, Conecuh County; the Point of Beginning; thence run South 54 degrees East 150 feet; thence run South 380 feet; thence run North 54 degrees West 150 feet along County Road Six; thence run North 380 feet to the Point of Beginning. | 0.00071477 |
| 19 | 4-13-32-3-4 | SW 32-4N-13E | All that portion of the NE/4 of SW/4 of Sec. 32-4N-13E, Conecuh County, lying South of Conecuh County Road #6, less and except the following described parcel  Commencing at the NE corner of the SE/4 of SW/4 of Sec. 32-4N-13E, then run South 350 feet, more or less, to a point on the North line of an old railroad; thence run North 65 degrees West along said old railroad 1031.00 feet; thence run South 25 degrees West 50 feet to make or form a Starting Point; thence run South 25 degrees West 208.71 feet; thence run North 65 degrees West 208.71 feet; thence run North 25 degrees East 208.71 feet; thence run South 65 degrees East 208.71 feet back to the starting Point. | 0.00027104 |
| 20 | 3-13-3-3 | NW-4N-13E | E/2 of E/2 of NW/4 of Sec. 4-3N-13E, Conecuh County | 0.00038136 |
| 21 | 3-13-4-9-1 | SE 4-3N-13E | All that part of the NE/4 of SE/4 of Sec. 4-3N-13E, Conecuh County lying West of Road | 0.00027096 |
| 22 | 3-13-4-9-2 | SE 4-3N-13E | All that part of the NE/4 of SE/4 of Sec. 4-3N-13E, Conecuh County lying East of Road | 0.00008577 |
| 23 | 4-13-35-15 | SE 35-4N-13E | SW/4 of SE/4 of Sec. 35-4N-13E, Conecuh County | 0.00024107 |
| 24 | 4-13-32-12-2 | SW 32-4N-13E | All the W/2 of NW/4 of SW/4 of Sec. 32-4N-R13E, Conecuh County, lying North of County Highway #6. | 0.00003030 |
| 25 | 4-13-32-12-4 | SW 32-4N-13E | All of the E/2 of NW/4 of SW/4 of Sec. 32-4N-R13E, Conecuh County, lying North of County Highway #6. | 0.00059564 |
| 26 | 4-13-32-12-5 | SW 32-4N-13E | Commencing at a point 85 feet North of the NE corner of the SW/4 of Sec. 32-4N-13E, Conecuh County, then running south to said corner 85 feet, thence West 502 feet, thence North 460 feet, thence Southeast 630 feet to the place of commencement. | 0.00056693 |
| | | | | 1.00000000 |







## Southeast Brooklyn Oil Unit, Tract Allocation Schedule

### (50% HCPV + 25% Best Six Months Productivity + 25% January - June 2018 Productivity)

| Tract | Well or Tract Name | Permit No. | Location | Tract Total Pore Volume (Acre-Ft) | Pore Volume Tract Factor | Best Six Months Tract Productivity (Bbls) | Best Six Months Productivity Tract Factor | January - June 2018 Productivity (Bbls) | January - June 2018 Productivity Tract Factor | Tract Factor |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CCL&T 32-9 #1 | 16776-B-1 | SE 32-4N-13E | 67.91 | 0.02744702 | 20,228 | 0.06143267 | 4,551 | 0.03225410 | 0.03714520 |
| 2 | Thomasson 33-12 #1 | 16983-B | SW 33-4N-13E | 76.09 | 0.03075311 | 18,932 | 0.05749505 | 5,914 | 0.04190946 | 0.04022768 |
| 3 | CCL&T 33-10 #1 | 17022-B | SE 33-4N-13E | 228.19 | 0.09222700 | 40,342 | 0.12251784 | 6,819 | 0.04832160 | 0.08882336 |
| 4 | CCL&T 34-12 #1 | 17085-B | SW 34-4N-13E | 471.91 | 0.19073072 | 35,117 | 0.10665060 | 24,090 | 0.17071734 | 0.16470735 |
| 5 | CCL&T 34-15 #1 | 17130-B | SE 34-4N-13E | 323.60 | 0.13078863 | 50,078 | 0.15208553 | 28,702 | 0.20340321 | 0.15426650 |
| 6 | CCL&T 35-13 #1 | 17205-B | SW 35-4N-13E | 124.22 | 0.05020570 | 10,370 | 0.03149407 | 5,103 | 0.03616431 | 0.04201744 |
| 7 | Logan 5-7 #1 | 15363 | NE 5-3N-13E | 13.96 | 0.00564218 | 2,181 | 0.00662281 | 675 | 0.00478354 | 0.00567268 |
| 8 | CCL&T 4-1 #1 | 17061-B | NE 4-3N-13E | 192.90 | 0.07796393 | 35,398 | 0.10750336 | 11,476 | 0.08133075 | 0.08619049 |
| 9 | CCL&T 3-4 #1 (R13E) | 17071-B | NW 3-3N-13E | 478.08 | 0.19322444 | 69,190 | 0.21013009 | 35,465 | 0.25132868 | 0.21197691 |
| 10 | CCL&T 3-7 #1 | 17204-B | NE 3-3N-13E | 396.16 | 0.16011503 | 43,023 | 0.13066128 | 17,385 | 0.12319936 | 0.14352267 |
| 11 | Pate 3-11 #1 | 17128 | SW 3-3N-13E | 55.78 | 0.02254447 | 4,414 | 0.01340671 | 930 | 0.00658764 | 0.01627082 |
| 12 | 4-13-31-9 | | SE 31-4N-13E | 0.22 | 0.00009085 | | | | | 0.00004543 |
| 13 | 4-13-32-12-1 | | SW 32-4N-13E | 2.81 | 0.00113698 | | | | | 0.00056849 |
| 14 | 4-13-32-12-2 | | SW 32-4N-13E | 4.28 | 0.00173163 | | | | | 0.00086581 |
| 15 | 4-13-32-3-1 | | SW 32-4N-13E | 12.72 | 0.00514088 | | | | | 0.00257044 |
| 16 | 4-13-32-3-2 | | SW 32-4N-13E | 4.95 | 0.00200015 | | | | | 0.00100007 |
| 17 | 4-13-32-3-3 | | SW 32-4N-13E | 4.16 | 0.00168016 | | | | | 0.00084008 |
| 18 | 4-13-32-3-4 | | SW 32-4N-13E | 3.54 | 0.00142953 | | | | | 0.00071477 |
| 19 | 4-13-32-3-4 | | SW 32-4N-13E | 1.34 | 0.00054209 | | | | | 0.00027104 |
| 20 | 3-13-4-3 | | NW 4-3N-13E | 1.89 | 0.00076272 | | | | | 0.00038136 |
| 21 | 3-13-4-9-1 | | SE 4-3N-13E | 1.34 | 0.00054193 | | | | | 0.00027096 |
| 22 | 3-13-4-9-2 | | SE 4-3N-13E | 1.81 | 0.00073154 | | | | | 0.00036577 |
| 23 | 4-13-35-15 | | SE 35-4N-13E | 1.19 | 0.00048214 | | | | | 0.00024107 |
| 24 | 4-13-32-12-3 | | SW 32-4N-13E | 0.15 | 0.00006060 | | | | | 0.00003030 |
| 25 | 4-13-32-12-4 | | SW 32-4N-13E | 4.73 | 0.00191329 | | | | | 0.00095664 |
| 26 | 4-13-32-12-5 | | SW 32-4N-13E | 0.28 | 0.00011329 | | | | | 0.00005665 |
| | | | Total | 2,474.22 | 1.00000000 | 329,274 | 1.00000000 | 141,109 | 1.00000000 | 1.00000000 |

Sklar Exploration Company LLC

**SOUTHEAST BROOKLYN OIL UNIT - TRACT FACTOR**
**SCHEDULE OF TRACT PARAMETERS**

**EXHIBIT D**
**TO UNIT AGREEMENT FOR SOUTHEAST BROOKLYN OIL UNIT**

# EXHIBIT E TO UNIT AGREEMENT FOR
## SOUTHEAST BROOKLYN OIL UNIT

## SUMMARY OF UNIT NET REVENUE INTERESTS

| Royalty and Overriding Royalty Ownership | Total Unit Interest |
|---|---|
| Adrian C. Allen, as Trustee of the ADRIAN C ALLEN REVOCABLE TRUST | 0.00188674 |
| Adrienne P. Watkins | 0.00005478 |
| Adrienne P. Watkins, as Trustee of the Adrienne P. Watkins Trust U/A 3/17/2005 | 0.00140567 |
| Albert Clark Tate III | 0.00016080 |
| Albert W. Key | 0.00011915 |
| Allen C. Phillips | 0.00739974 |
| Allene Ward, for life, then to James Earl Beverly | 0.00035725 |
| Allene Ward, for life, then to Sandra Beverly, Brandon K. Beverly, and Hollie Marie Nelson | 0.00012980 |
| Alva Nann Cary Taylor | 0.00012852 |
| ANN BLAIR EDWARDS | 0.00000509 |
| Anna L Downing | 0.00025129 |
| Anna Lillian D. Nelson | 0.00000028 |
| Aspen Energy Inc. | 0.00019212 |
| Atwood M. Kimbrough | 0.00008936 |
| Auburn University | 0.00418386 |
| BABE DEVELOPMENT COMPANY LLC | 0.00034902 |
| Bama Land and Timber Company, Inc. | 0.00448508 |
| Benjamin O. Barlow | 0.00004467 |
| Berry Hill Farms, Inc. | 0.00358807 |
| Brandon K. Beverly | 0.00008650 |
| Brenda Gail Wise | 0.00003213 |
| Brooklyn Baptist Church | 0.00057026 |
| Brooklyn Volunteer Fire Department | 0.00002183 |
| Camilla Huxford | 0.00140815 |
| Cark Rabren | 0.00004467 |
| CAROLYN BLAIR | 0.00000254 |
| Cathryn Abbott Jones | 0.00045450 |
| Cedar Creek Land & Timber, Inc. | 0.10911060 |
| Central Petroleum, Inc. | 0.00014576 |
| Charles A. Frazier, for life; Howard S. Stewart and Diana L. Wiggs, remainder for their lives, with survivorship; then Heather L. Stewart and Damon Dean Salter, in fee | 0.00003388 |
| CHARLES D SEARCY | 0.00025849 |
| Charles James Shaffer and Katrina Jeanne Shaffer, as Trustees of the CK Shaffer Family Trust | 0.00031447 |
| Charles R. Tait, III | 0.00000333 |
| Charles R. Tait, Jr. | 0.00000266 |
| Christ the King Catholic Church | 0.00178979 |
| Christopher A. Farrell | 0.00059997 |
| Claude E. Hamilton, III | 0.00100931 |
| Cynthia S. Rilling | 0.00062892 |
| Daboil Resources, L.C. | 0.00156266 |
| DALE B BLAIR | 0.00002034 |
| Dan M. Downing | 0.00025155 |
| Daniel W. McMillan | 0.00083383 |
| Darrell Preston Brannon | 0.00000332 |
| David Bissmeyer | 0.00000346 |
| David Earl Miller | 0.00047109 |
| David Edwin Logan | 0.00034798 |
| Deborah Jean Shaffer | 0.00031446 |

| Name | Amount |
|---|---|
| Diana Adele Tait Crabtree | 0.00000311 |
| Disputed ownership between Betty Spurlock and Ray Weeks, Jr., on the one hand, and Al Smith and Sheila Smith, on the other hand | 0.00000002 |
| Disputed ownership between either (a) Betty Spurlock and Ray Weeks, Jr., (b) Alfred Smith; (c) John W. Tisdale, Jr.; (d) John Randle Feagin, Nancy Denman Feagin, Robert Terrell Feagin, Stephen Jeter, John R. Jeter, III, and Sally Jeter Hammond; or (e) Susan Blair, Wayne M. Blair, Mary Blair Andrews, Martha Blair Robinson, Ann Edwards, John Blair, Elizabeth Blair, Betty Johansen, Howard Blair, Jr., Dale Blair, Maria/Marita Blair, Julia Blair and Margaret Long | 0.00000320 |
| Disputed ownership between Janice Matthews, on the one hand, and Frances M. Fine, Jean F. Watson, and Virginia F. Sewell, on the other hand | 0.00000031 |
| Disputed ownership between Janie Johnston, Joi Defee, John Wade Johnston, and Connie Johnston | 0.00001777 |
| Disputed ownership between Kathy Ann Feagin, on the one hand, and Ronnie Fouts and M. Timothy Michael, on the other hand | 0.00000189 |
| Uncertain ownership but taxes paid by John M. Fendley, as Trustee of the John M. Fendley Living Trust | 0.00005139 |
| Disputed ownership between Valhalla Royalty, LLC, Christopher Ashley Farrell, Eustes Energy, Inc., Ezelle Energy, LLC, and Daboil Resources LC, on the one hand, and Frances M. Fine and Virginia F. Sewell, on the other hand | 0.00000000 |
| Disputed ownership between William R. Rollo and Gloria R. Rollo, as Co-Trustees of the William R. and Gloria R. Rollo Revocable Trust, Elba Exploration LLC, Mary Lou Vela-Clark, and Ruby M. Clark, on the one hand, and Ronnie Fouts and M. Timothy Michael, on the other hand | 0.00000063 |
| Disputed ownerships between Kathy Ann Feagin, on the one hand, and Kathy Ann Feagin, Zachary T. Feagin, Jacob A. Feagin, Joshua W. Feagin, and Avaida B. Gladney, on the other | 0.00002787 |
| Dorothy Gates, As Trustee of the Dorothy Jones Gates Revocable Trust | 0.00002990 |
| Douglas Gene Rabren | 0.00012501 |
| DOUGLAS LADSON MCBRIDE III | 0.00034902 |
| Downing Family Properties, LLC | 0.00877653 |
| Downing McDowell Minerals, LLC | 0.00025155 |
| Ed Leigh McMillan, III | 0.00083383 |
| Edward McMillan Tate | 0.00016079 |
| ELBA Exploration LLC | 0.00044916 |
| ELIZABETH BLAIR JOHANSEN | 0.00000509 |
| Elizabeth R. Epstein | 0.00012208 |
| ELVIRA MCMILLAN TATE | 0.00102554 |
| Elvira Tate Hoskins | 0.00016079 |
| Estate of E.D. Scruggs, Jr. c/o J. Carroll Chastain, as Executor | 0.00041064 |
| Estate of Ed Leigh McMillan II c/o Paul D. Owens, Jr., Executor | 0.00000106 |
| Estate of Stirling H. Hamilton, Jr. c/o Cecelia C. Hamilton and Stirling H. Hamilton, III, as Co-Executors | 0.00100930 |
| Eustes Energy, Inc. | 0.00260443 |
| Ezelle Energy LLC | 0.00260443 |
| Flowing Well, LLC | 0.00387938 |
| Frances M. Fine | 0.00000103 |

| Name | Amount |
|---|---|
| Francis L. Pope and Robert R. Crittenden, as Trustees of the Family Trust U/W Robert Downing Pope, Jr. | 0.00005477 |
| GEL, Inc. | 0.00006104 |
| George R. Logan | 0.00004107 |
| Gerald Edwin Hill | 0.00003213 |
| Gerald Stephen Herman, as Trustee of the Adrienne P. Watkins Irrevocable Mineral Rights Trust f/b/o Adrienne W. Snively Family dated September 29, 2011 | 0.00140566 |
| Ginger McWaters | 0.00001071 |
| Gulf Coast Mineral, LLC | 0.00006994 |
| Hamilton Pleus Properties, LLC | 0.00100930 |
| Harvest Gas Management, LLC | 0.00015434 |
| Haywood Hanna, III | 0.00020532 |
| Helen Pate, For Life | 0.00013951 |
| Henry G. Foster and Velma B. Foster, with right of survivorship | 0.00010501 |
| Hermine M. Downing | 0.00083475 |
| Herschel Lee Abbott, III | 0.00045449 |
| Hollie Marie (Beverly) Nelson | 0.00008650 |
| HOWARD BLAIR JR | 0.00000509 |
| Hubert E Kidd | 0.00001014 |
| Jack M. Watkins, Sr., as Trustee of the Jack M. Watkins, Sr. Family Trust dated 3/17/2005 | 0.00421246 |
| Jack M. Watkins, Sr., as Trustee of the Jack M. Watkins, Jr. Family dated September 29, 2011 | 0.00000452 |
| Jacob Benjamin Logan, for life | 0.00019712 |
| James A. Bull | 0.00085388 |
| James Adrian Allen | 0.00062891 |
| James Boyd Bel | 0.00090896 |
| James C. Findley | 0.00058306 |
| James C. Kimbrough | 0.00002978 |
| James H. Barrow, Jr. and Jamie Barrow, as Trustees of The Barrow Family Revocable Trust | 0.00090896 |
| JAMES K COOK AND SUSAN M COOK | 0.00034465 |
| James R. Simpson, Richard A. Simpson, and Wendell P. Simpson, III, as Trustees of the Pamela L. Stimpson Irrevocable Trust dated June 16, 2016 | 0.00041064 |
| James Walls | 0.00001071 |
| Janan Goodner Cohen and Reliance Trust Company, as Co-Trustees of the Randall Montgomery Goodner Trust Share of Trust A under The Evelyn M. Britton Declaration of Trust | 0.00172210 |
| Jane Downing Dunaway | 0.00022360 |
| Janice Matthews Lee | 0.00000409 |
| Janie M. Johnston | 0.00011205 |
| Jean F. Watson | 0.00000110 |
| Jean Kirby Jones | 0.00070408 |
| Jean Miller Stimpson | 0.00047109 |
| Jeanne Ann Giles | 0.00003213 |
| Jeanne Bel Ingraham | 0.00090896 |
| Jeffreys & Powell, LLC | 0.00053772 |
| Jenny H. McGowin | 0.00050465 |
| Jessica D. Harris | 0.00029153 |
| Jo Ann Langham | 0.00012852 |
| Joan L. Lindsey | 0.00002396 |
| Joan P. Bel Whitt, as Trustee of the Ernest F. Bel Family Trust | 0.00090896 |
| JOHN BLAIR | 0.00000509 |
| John E. Downing | 0.00022360 |
| John F. McCreary, as Trustee of the John Fendley McCreary Living Trust | 0.00045256 |

| Name | Value |
|---|---|
| John H. Gray, Jr., as Trustee of the Adrienne P. Watkins Irrevocable Mineral Rights Trust for the benefit of the Jack M. Watkins, Jr. Family dated September 29, 2011 | 0.00140566 |
| John R. Jeter, III | 0.00019917 |
| John Richard Miller, III | 0.00065329 |
| John Randle Feagin | 0.00019917 |
| John Robert Downing | 0.00005770 |
| JOYCO INVESTMENTS LLC | 0.00034902 |
| Juanita Cary | 0.00020901 |
| Juanita Ralls | 0.00026991 |
| Julia Blair | 0.00002785 |
| JULIE SCOTT MCBRIDE | 0.00034902 |
| Katherine E. McMillan Owens | 0.00166873 |
| Kathy Ann Feagin | 0.00037819 |
| Kay Mitchell | 0.00020532 |
| Kersh Group, LLC | 0.00160794 |
| Knight Petroleum, LP | 0.00000507 |
| L. Adrian Dunn | 0.00021379 |
| Larry J. Findley | 0.00044112 |
| Laura W. Grier | 0.00070408 |
| Lawrence R. Baria | 0.00007116 |
| Lewis S. Hamilton | 0.00100930 |
| Linda H. Chavers | 0.00181013 |
| LISA D HEATON | 0.00022360 |
| Lisa D. Nordmeyer | 0.00012577 |
| LIVING TR FRANCES W SANDERS | 0.00021428 |
| M. Travis Holzbom | 0.00041737 |
| M. Timothy Michael | 0.00029153 |
| Mae Adele Tait Sharp | 0.00000265 |
| MARCUS W BLAIR | 0.00000127 |
| MARGARET LONG | 0.00000509 |
| MARITA BLAIR SNYDER | 0.00002034 |
| Marjorie Rabun Woodell | 0.00018219 |
| MARTHA BLAIR ROBINSON | 0.00000509 |
| MARY BLAIR ANDREWS | 0.00000509 |
| Mary J. Kennedy | 0.00002396 |
| Mary Katherine Brundage | 0.00002990 |
| Mary Lou Vela-Clark | 0.00006153 |
| Max C. Johnson | 0.00000071 |
| McCreary Family Minerals, LLC | 0.00072342 |
| Michael Adrian Shaffer and Clarissa Shaffer, as Trustees of the Shaffer Family Living Trust | 0.00031446 |
| Michael Brian Crookshank | 0.00000332 |
| Michael Management, Inc. | 0.00006478 |
| Minnie Tate Dubilier | 0.00016079 |
| MONICA BLAIR HANKS | 0.00000127 |
| Nancy Feagin | 0.00019917 |
| Nancy M. Melton | 0.00047109 |
| Nanette Feagin Beck | 0.00003490 |
| Nathan James Bull | 0.00085388 |
| Newport Five, LLC | 0.00064317 |
| Opal L. Kidd Family Partnership, Ltd | 0.00000569 |
| Ownership disputed between Sarah Lenn Lanier and U.S. Bank National Association, as Trustee for the Certificate Holders Citigroup Mortgage Loan Trust Inc. Asset-Backed Pass-Through Certificates Series 2007-AHL3 (both unleased) | 0.00010823 |

| Name | Value |
|---|---|
| Ownership disputed among Sarah M. Lanier, individually and as Trustee of the Sarah M. Lanier Irrevocable Trusts FBO Glenn E. Lanier II, Sarah Lenn Lanier, and Marie Ann Lanier (leased to Sklarco); Janie M. Johnston (unleased); Sharon T. Cooke and Jennifer Leigh Taylor, as Trustees of the Larry Dwight Taylor 2012 Irrevocable Trust (unleased); Dorothy Gates, As Trustee of the Dorothy Jones Gates Revocable Trust U/A 5/1/2012 (unleased); Mary Katherine Brundage (unleased); Kenneth Allen Baker (leased to Sklarco); and Randle Bruce Baker (leased to Sklarco) | 0.00000379 |
| Patricia A. McGowin | 0.00001494 |
| Patricia Downing McFarland | 0.00007819 |
| Patrick Garrett | 0.00003213 |
| Patrick J. McBride | 0.00001067 |
| Peter B. Hamilton, Jr. | 0.00090896 |
| Peyton H. Carmichael | 0.00100930 |
| Pflanzer Partners, Ltd | 0.00000213 |
| Philippa Peyton M. Bethea | 0.00050465 |
| Phillips Operations, LLC | 0.00321087 |
| R. J. Cole | 0.00006104 |
| R. Wyatt Feagin | 0.00003490 |
| Ralls Properties, LLC | 0.00000499 |
| Raymond B. Logan | 0.00011636 |
| Rhodna F. Fouts | 0.00035632 |
| Richard Allen Cobb | 0.00051698 |
| Richard Watters, As Executor of the Estate of George M. Findley | 0.00000332 |
| River Bottom Acreage–dispute between State of Alabama and Cedar Creek Land & Timber | 0.00583688 |
| River Falls Machinery Sales, Inc. | 0.00178979 |
| Roabie Downing Johnson | 0.00067079 |
| Robert Cary | 0.00008033 |
| Robert H. Kirby | 0.00070408 |
| Robert T. Feagin | 0.00026556 |
| Robert Terrell McLendon | 0.00026148 |
| Rock Springs Energy, LLC | 0.00000719 |
| Rock Springs Minerals I, LLC | 0.00063638 |
| Rock Springs Oil Co. | 0.00006665 |
| Roderick Wade Goodner , Jr. and Reliance Trust Company, as Co-Trustees of the Roderick Wade Goodner Trust Share of Trust A under the Evelyn M. Britton Declaration of Trust | 0.00172210 |
| Ronice Cook Thames, Individually and as Trustee of the Lanoy Thames and Ronice Cook Thames Family Trust and as Trustee of the Non-Marital Trust established in Article XXI of the Lanoy Thames and Ronice Cook Thames Family Trust | 0.00001994 |
| Ronice Cook Thames and Rebecca T. Savage, as Trustees of the Ronice Cook Thames Living Trust, a Revocable Trust (unleased) | 0.00000708 |
| Ruby M. Clark | 0.00004102 |
| Sally Jeter Hammond | 0.00019917 |
| Sandra Beverly | 0.00008650 |
| Sara Beall Neal Marital Trust U/W W.T. Neal, Jr. c/o Regions Bank, Trustee | 0.00102473 |
| Sarah Allen Wilson | 0.00003213 |
| Sarah M. Lanier | 0.00003637 |
| Sarah M. Lanier, Trustee of the Sarah M. Lanier Irrevocable Trust f/b/o Glenn E. Lanier II | 0.00001535 |

| | |
|---|---|
| Sarah M. Lanier, Trustee of the Sarah M. Lanier Irrevocable Trust f/b/o Sarah Lenn Lanier | 0.00001535 |
| Sarah M. Lanier, Trustee of the Sarah M. Lanier Irrevocable Trust f/b/o Marie Ann Lanier | 0.00001535 |
| Scott B. Hassell | 0.00007209 |
| Sellars Family, LLC | 0.00000427 |
| Sharon T. Cook and Jennifer Leigh Taylor, as Trustees of the Larry Dwight Taylor 2012 Irrevocable Trust | 0.00005979 |
| Source Rock Minerals II, LLC | 0.00025913 |
| Source Rock Minerals, LLC | 0.00000026 |
| Spanish Fort Royalty, LLC | 0.00021055 |
| SSC Minerals, LLC | 0.00120595 |
| Stella Livingston Hawkins | 0.00067079 |
| Stephen Jeter | 0.00019917 |
| SUE HANSON MCBRIDE | 0.00034902 |
| Susan Blair | 0.00002785 |
| SUSAN WINCHESTER | 0.00062892 |
| Suzanne C. Allen, as Trustee of the Suzanne C. Allen Revocable Trust | 0.00188675 |
| Suzanne W. Zimmer | 0.00070409 |
| Terry Lefler Walls | 0.00001071 |
| Thomas E. McMillan, Jr. | 0.00097486 |
| Thomas E. McMillan, Jr., as Trustee U/W Iva Lee McMillan | 0.00644959 |
| Thomas E. McMillan, Jr., Ed Leigh McMillan, III, and Daniel W. McMillan, As Trustees U/W Ed Leigh McMillan | 0.00010247 |
| Timothy P. McGowin | 0.00001494 |
| Tom Malloy | 0.00178007 |
| Trant L. Kidd Family Partnership, Ltd. | 0.00000071 |
| Trant L. Kidd, as Trustee of The Trant L. Kidd Special Trust | 0.00007912 |
| Trustmark National Bank and Candy McMillan, as Co-Trustees of the Robert C. McMillan 2011 Trust under agreement dated November 29, 2011 | 0.00161803 |
| Tully Logan for life | 0.00008214 |
| Valhalla Royalty, LLC | 0.00033795 |
| Vera Frances Tait | 0.00000266 |
| Virginia F. Sewell | 0.00000103 |
| W. GRAY SANDERS | 0.00021428 |
| W.T. Neal Family Stock, LLC | 0.00986585 |
| Wanda Sue Wallace | 0.00003995 |
| Wendy Lucas West and Eric Coale, as Trustees of the Reo Kirkland, III Trust | 0.00001867 |
| Wiley W. Downing, IV | 0.00012578 |
| William Hamilton, Jr. | 0.00100931 |
| William R. Rollo and Gloria R. Rollo, as Trustee of the William R. & Gloria R. Rollo Revocable Trust | 0.00007882 |
| WSK Properties, LLC | 0.00000071 |
| **TOTAL ROYALTY AND OVERRIDING ROYALTY INTERESTS:** | 0.25555191 |

| Working Interest Ownership | Total Unit Interest |
|---|---|
| AEH INVESTMENTS LLC | 0.00434324 |
| Anderson Exploration Energy Co. | 0.00130418 |
| Aspen Energy Inc. | 0.00085049 |
| B. Coleman and B. Coleman, as trustees of THE COLEMAN REVOC LIVING TRUST | 0.00347460 |
| Bantam Creek LLC | 0.00072381 |

| Name | Value |
|---|---|
| BARBARA M SUGAR | 0.00506544 |
| Barnes Creek Drilling LLC | 0.00012463 |
| Bellis Investments LP | 0.00010759 |
| Benjamin O. Barlow | 0.00031271 |
| Bundero Investment Company, LLC | 0.00698857 |
| C. H. Oil and Gas, LLC | 0.00015650 |
| C. Sugar and T. Youngblood, as Co-Trustees of the SUGAR PROPERTIES TRUST | 0.00014646 |
| Cark Rabren | 0.00031271 |
| Central Exploration Co, Inc. | 0.00044402 |
| Central Petroleum, Inc. | 0.00053173 |
| CFBR Partners | 0.00150699 |
| Charles A. Frazier, for life; Howard S. Stewart and Diana L. Wiggs, remainder for their lives, with survivorship; then Heather L. Stewart and Damon Dean Salter, in fee | 0.00023716 |
| Chateau Blanche, L.L.C. | 0.00002608 |
| Craft Exploration Company L.L.C. | 0.00245529 |
| Crow Partners, Ltd. | 0.00003913 |
| DARLENE K HALL | 0.00347460 |
| DBC RESOURCES LP | 0.02535412 |
| DCOD LLC | 0.02215054 |
| Dickson Oil & Gas, LLC | 0.00295606 |
| Disputed ownerships between Janie Johnston, Joi Defee, John Wade Johnston, and Connie Johnston | 0.00012436 |
| Disputed ownership between Sklarco L.L.C., et al., on the one hand, and Frances M. Fine | 0.00000001 |
| Dolkas Investments LP | 0.00016138 |
| Don B. Saunders, as Trustee of the DON B SAUNDERS TRUST | 0.00277968 |
| Dorothy Gates, As Trustee of the Dorothy Jones Gates Revocable Trust | 0.00020927 |
| DoublePine Investments, Ltd. | 0.00144763 |
| Douglas Gene Rabren | 0.00087506 |
| Ed L. Dunn | 0.00155813 |
| EDWARD L YARBROUGH JR | 0.00069492 |
| Efraim Brody | 0.00014042 |
| El Dorado Gulf Coast Production, LLC | 0.00009703 |
| ELBA Exploration LLC | 0.00139355 |
| Emerald Oil & Mining Co. | 0.00029415 |
| Estate of Wolfe E. Rudman c/o Tara Rudman and Ira Silverman, Executors | 0.00002608 |
| Fant Energy Limited | 0.02957822 |
| FIDDLER INVESTMENTS | 0.00738351 |
| Fletcher Exploration, LLC | 0.00942518 |
| FOUR D LLC | 0.00277968 |
| FPCC USA, Inc. | 0.03462329 |
| FRANKS EXPLORATION CO LLC | 0.03405103 |
| GASTON OIL COMPANY INC | 0.00781784 |
| GJR INVESTMENTS INC | 0.00277968 |
| Gulf Coast Mineral, LLC | 0.00081712 |
| HALL AND HALL LLC | 0.00127691 |
| HALL MANAGEMENT LLC | 0.00347460 |
| HANSON OPERATING CO INC | 0.02605168 |
| Harvest Gas Management, LLC | 0.00049002 |
| Henry G. Foster and Velma B. Foster, with right of survivorship | 0.00073507 |
| HUGHES 2000 CT LLC | 0.01276913 |
| HUGHESOIL INC | 0.08351014 |
| J & A HARRIS LP | 0.02813379 |
| J.F. Howell Interests, LP | 0.01361025 |
| Janet Faulkner Dunn | 0.00033302 |

| Name | Value |
|---|---|
| Janie M. Johnston | 0.00012436 |
| JCE GALBRAITH OIL & GAS LLC | 0.00347460 |
| Jeffreys Drilling, LLC | 0.00108140 |
| JJS Interests Escambia, LLC | 0.02937261 |
| JMS OIL & GAS HOLDINGS LLC | 0.00138984 |
| John C. Nix, Jr., for life, then to Elba Exploration, LLC | 0.00062038 |
| John Kubala | 0.00053821 |
| John W. Tisdale, Jr. | 0.00003461 |
| Jura-Search, Inc. | 0.00045256 |
| Kidd Production, Ltd. | 0.00430568 |
| King Oil, LLC | 0.00001304 |
| KKS Oil & Gas, LP | 0.00009703 |
| KMR INVESTMENTS LLC | 0.01021531 |
| Kwazar Resources, LLC | 0.00143523 |
| Lamancha Investments II, LLC | 0.00002608 |
| Landmark Exploration, LLC | 0.00518263 |
| LEANNE D FORD | 0.00076615 |
| LEONARD E WILLIAMS | 0.00277968 |
| M JOHNSON INVESTMENT PTN I | 0.00277968 |
| Marcy Beach, as Trustee of The Marcy Beach 2011 Irrevocable Trust | 0.00005808 |
| Marksco, L.L.C. | 0.00591564 |
| Marlin Exploration, LLC | 0.00013042 |
| Mary Katherine Brundage | 0.00020927 |
| Max C. Johnson | 0.00000194 |
| McCombs Energy Ltd., | 0.05425997 |
| Michael Management, Inc. | 0.00099973 |
| Northstar Producing I, Ltd. | 0.00003913 |
| Opal L. Kidd Family Partnership. Lt | 0.00001725 |
| Ownership disputed among Sarah M. Lanier, individually and as Trustee of the Sarah M. Lanier Irrevocable Trusts FBO Glenn E. Lanier II, Sarah Lenn Lanier, and Marie Ann Lanier (leased to Sklarco); Janie M. Johnston (unleased); Sharon T. Cooke and Jennifer Leigh Taylor, as Trustees of the Larry Dwight Taylor 2012 Irrevocable Trust (unleased); Dorothy Gates, As Trustee of the Dorothy Jones Gates Revocable Trust U/A 5/1/2012 (unleased); Mary Katherine Brundage (unleased); Kenneth Allen Baker (leased to Sklarco); and Randle Bruce Baker (leased to Sklarco) | 0.00002651 |
| Ownership disputed between Sarah Lenn Lanier and U.S. Bank National Association, as Trustee for the Certificate Holders Citigroup Mortgage Loan Trust Inc. Asset-Backed Pass-Through Certificates Series 2007-AHL3 (both unleased) | 0.00075759 |
| PAM LIN CORPORATION | 0.00521189 |
| Parous Energy, L.L.C. | 0.00036205 |
| Party Hat Enterprises, LLC | 0.00003093 |
| Patrick J. McBride | 0.00007140 |
| PAULA W DENLEY LLC | 0.00127691 |
| PetroDrill, LLC | 0.00002608 |
| PETROLEUM INVESTMENTS INC | 0.00347460 |
| Pflanzer Partners, Ltd | 0.00005862 |
| Pickens Financial Group, LLC | 0.01243041 |
| Porter Estate Company Oakley Ran | 0.00161463 |
| PRUET PRODUCTION CO | 0.00347459 |
| RAB OIL & GAS HOLDINGS LLC | 0.00138984 |
| Resource Ventures, LLC | 0.00030272 |
| Rhoda F. Fouts | 0.00133915 |
| Ridgway Management, Inc. | 0.00005217 |

| | |
|---|---|
| RIVER BOTTOM ACREAGE-dispute between Pruet Production Co. and Fletcher Exploration, LLC | 0.01147090 |
| RIVER BOTTOM ACREAGE-dispute between Sklarco L.L.C. and Fletcher Exploration, LLC | 0.00603974 |
| Robert Cary | 0.00056228 |
| Ronice Cook Thames and Rebecca T. Savage, as Trustees of the Ronice Cook Thames Living Trust, a Revocable Trust (unleased) | 0.00004957 |
| Roosth 806, Ltd, a Texas Ltd Partnership | 0.00717613 |
| Royalty Exploration, LLC | 0.00012911 |
| RYCO EXPLORATION LLC | 0.00405138 |
| SAWYER DRILLING & SERVICE INC | 0.00694919 |
| Sellars Family, LLC | 0.00006508 |
| Sesnon Oil Company | 0.00010759 |
| Sharon T. Cook and Jennifer Leigh Taylor, as Trustees of the Larry Dwight Taylor 2012 Irrevocable Trust | 0.00041853 |
| Shelley M. Chavanne | 0.00001304 |
| Sklarco L.L.C. | 0.09054603 |
| Spanish Fort Royalty, LLC | 0.00066059 |
| Spindletop Oil & Gas Co. | 0.00032604 |
| Steven E. Calhoun | 0.00143523 |
| Strago Petroleum Corporation | 0.00161463 |
| Stroud Family LLC | 0.00014346 |
| SUGAR OIL PROPERTIES LP | 0.00521189 |
| SUMMIT LLC | 0.00127691 |
| Tara Rudman and Ira W. Silverman, as Co-Trustees of The Rudman Family Trust | 0.00072381 |
| Tauber Exploration & Production Co. | 0.00638432 |
| Teresa Rudman, as Trustee of the Tara Rudman Revocable Trust | 0.00072381 |
| The Marcy Beach 2011 Irrevocable Trust | 0.00000352 |
| The Rudman Partnership, Ltd. | 0.02388586 |
| Tiembo Ltd. | 0.00510746 |
| TOM YOUNGBLOOD | 0.00694919 |
| Trant K. Kidd Family Partnership, Ltd. | 0.00000216 |
| Trimble Energy, LLC | 0.00144763 |
| Tyler Oil And Gas, LLC | 0.00005217 |
| W D MOUNGER | 0.00347460 |
| WALLACE & WALLACE LLC | 0.00127691 |
| Wells Fargo Bank, as Trustee of the HARKNESS A DUNCAN FAMILY TRUST | 0.00277968 |
| William R. Rollo and Gloria R. Rollo, as Trustees of the William R. & Gloria R. Rollo Revocable Trust | 0.00156199 |
| William S. Schreier | 0.00107642 |
| WSK Properties, LLC | 0.00000216 |
| TOTAL WORKING INTEREST REVENUE: | 0.74444809 |
| TOTAL UNIT REVENUE INTERESTS: | 1.00000000 |

## SUMMARY OF UNIT OWNERSHIPS AS COSTS ARE SHARED
### (Gross Working Interests)

| Gross Working Interest Ownership | Total Unit Interest |
|---|---|
| AEH INVESTMENTS LLC | 0.578672% |
| Anderson Exploration Energy Co. | 0.173784% |
| Aspen Energy Inc. | 0.113328% |
| B. Coleman and B. Coleman, as trustees of THE COLEMAN REVOC LIVING TRUST | 0.462937% |
| Bantam Creek LLC | 0.096109% |
| BARBARA M SUGAR | 0.674893% |
| Barnes Creek Drilling LLC | 0.016617% |
| Bellis Investments LP | 0.014336% |
| Benjamin O. Barlow | 0.035738% |
| Bundero Investment Company, LLC | 0.928511% |
| C. H. Oil and Gas, LLC | 0.020854% |
| C. Sugar and T. Youngblood, as Co-Trustees of the SUGAR PROPERTIES TRUST | 0.019513% |
| Cark Rabren | 0.035738% |
| Central Exploration Co, Inc. | 0.059203% |
| Central Petroleum, Inc. | 0.070894% |
| CFBR Partners | 0.200932% |
| Charles A. Frazier, for life; Howard S. Stewart and Diana L. Wiggs, remainder for their lives, with survivorship; then Heather L. Stewart and Damon Dean Salter, in fee | 0.027104% |
| Chateau Blanche, L.L.C. | 0.003476% |
| Craft Exploration Company L.L.C. | 0.325239% |
| Crow Partners, Ltd. | 0.005214% |
| DARLENE K HALL | 0.462937% |
| DBC RESOURCES LP | 3.378053% |
| DCOD LLC | 2.951225% |
| Dickson Oil & Gas, LLC | 0.391446% |
| Disputed ownerships between Janie Johnston, Joi Defee, John Wade Johnston, and Connie Johnston | 0.014212% |
| Disputed ownership between Sklarco L.L.C., et al., on the one hand, and Frances M. Fine | 0% |
| Dolkas Investments LP | 0.021505% |
| Don B. Saunders, as Trustee of the DON B SAUNDERS TRUST | 0.370350% |
| Dorothy Gates, As Trustee of the Dorothy Jones Gates Revocable Trust | 0.023916% |
| DoublePine Investments, Ltd. | 0.192219% |
| Douglas Gene Rabren | 0.100007% |
| Ed L. Dunn | 0.207700% |
| EDWARD L YARBROUGH JR | 0.092587% |
| Efraim Brody | 0.018711% |
| El Dorado Gulf Coast Production, LLC | 0.012929% |
| ELBA Exploration LLC | 0.185807% |
| Emerald Oil & Mining Co. | 0.039220% |
| Estate of Wolfe E. Rudman c/o Tara Rudman and Ira Silverman, Executors | 0.003476% |
| Fant Energy Limited | 3.913840% |
| FIDDLER INVESTMENTS | 0.983742% |
| Fletcher Exploration, LLC | 1.256691% |
| FOUR D LLC | 0.370350% |
| FPCC USA, Inc. | 4.772487% |
| FRANKS EXPLORATION CO LLC | 4.536785% |
| GASTON OIL COMPANY INC | 1.041609% |
| GJR INVESTMENTS INC | 0.370350% |
| Gulf Coast Mineral, LLC | 0.100569% |

| Name | Percentage |
| --- | --- |
| HALL AND HALL LLC | 0.170129% |
| HALL MANAGEMENT LLC | 0.462937% |
| HANSON OPERATING CO INC | 3.703498% |
| Harvest Gas Management, LLC | 0.065200% |
| Henry G. Foster and Velma B. Foster, with right of survivorship | 0.084008% |
| HUGHES 2000 CT LLC | 1.701294% |
| HUGHESOIL INC | 11.126464% |
| J & A HARRIS LP | 3.748402% |
| J.F. Howell Interests, LP | 1.801503% |
| Janet Faulkner Dunn | 0.044402% |
| Janie M. Johnston | 0.014212% |
| JCE GALBRAITH OIL & GAS LLC | 0.462937% |
| Jeffreys Drilling, LLC | 0.143971% |
| JIS Interests Escambia, LLC | 4.077522% |
| JMS OIL & GAS HOLDINGS LLC | 0.185175% |
| John C. Nix, Jr., for life, then to Elba Exploration, LLC | 0.082666% |
| John Kubala | 0.071761% |
| John W. Tisdale, Jr. | 0.003466% |
| Jura-Search, Inc. | 0.060342% |
| Kidd Production, Ltd. | 0.538210% |
| King Oil, LLC | 0.001738% |
| KKS Oil & Gas, LP | 0.012929% |
| KMR INVESTMENTS LLC | 1.361035% |
| Kwazar Resources, LLC | 0.179403% |
| Lamancha Investments II, LLC | 0.003476% |
| Landmark Exploration, LLC | 0.685842% |
| LEANNE D FORD | 0.102078% |
| LEONARD E WILLIAMS | 0.370350% |
| M JOHNSON INVESTMENT PTN I | 0.370350% |
| Marcy Beach, as Trustee of The Marcy Beach 2011 Irrevocable Trust | 0.008214% |
| Marksco, L.L.C. | 0.782768% |
| Marlin Exploration, LLC | 0.017378% |
| Mary Katherine Brundage | 0.023916% |
| Max C. Johnson | 0.000258% |
| McCombs Energy Ltd., | 7.166913% |
| Michael Management, Inc. | 0.133297% |
| Northstar Producing I, Ltd. | 0.005214% |
| Opal L. Kidd Family Partnership, Lt | 0.002299% |
| Ownership disputed among Sarah M. Lanier, individually and as Trustee of the Sarah M. Lanier Irrevocable Trusts FBO Glenn E. Lanier II, Sarah Lenn Lanier, and Marie Ann Lanier (leased to Sklarco); Janie M. Johnston (unleased); Sharon T. Cooke and Jennifer Leigh Taylor, as Trustees of the Larry Dwight Taylor 2012 Irrevocable Trust (unleased); Dorothy Gates, As Trustee of the Dorothy Jones Gates Revocable Trust U/A 5/1/2012 (unleased); Mary Katherine Brundage (unleased); Kenneth Allen Baker (leased to Sklarco); and Randle Bruce Baker (leased to Sklarco) | 0.003030% |
| Ownership disputed between Sarah Lenn Lanier and U.S. Bank National Association, as Trustee for the Certificate Holders Cirigroup Mortgage Loan Trust Inc. Asset-Backed Pass-Through Certificates Series 2007-AHL3 (both unleased) | 0.086581% |
| PAM LIN CORPORATION | 0.694406% |
| Parous Energy, L.L.C. | 0.048273% |
| Party Hat Enterprises, LLC | 0.004125% |
| Patrick J. McBride | 0.009515% |

| | |
|---|---|
| PAULA W DENLEY LLC | 0.170129% |
| PetroDrill, LLC | 0.003476% |
| PETROLEUM INVESTMENTS INC | 0.462937% |
| Pflanzer Partners, Ltd | 0.007812% |
| Pickens Financial Group, LLC | 1.690072% |
| Porter Estate Company Oakley Ran | 0.215284% |
| PRUET PRODUCTION CO | 0.462937% |
| RAB OIL & GAS HOLDINGS LLC | 0.185175% |
| Resource Ventures, LLC | 0.041996% |
| Rhodna F. Fouts | 0.178553% |
| Ridgway Management, Inc. | 0.006951% |
| RIVER BOTTOM ACREAGE-dispute between Pruet Production Co. and Fletcher Exploration, LLC | 1.529454% |
| RIVER BOTTOM ACREAGE-dispute between Sklarco L.L.C. and Fletcher Exploration, LLC | 0.857168% |
| Robert Cary | 0.064261% |
| Ronice Cook Thames and Rebecca T. Savage, as Trustees of the Ronice Cook Thames Living Trust, a Revocable Trust (unleased) | 0.005665% |
| Roosth 806, Ltd, a Texas Ltd Partnership | 0.897017% |
| Royalty Exploration, LLC | 0.017205% |
| RYCO EXPLORATION LLC | 0.539785% |
| SAWYER DRILLING & SERVICE INC | 0.925874% |
| Sellars Family, LLC | 0.008672% |
| Sesnon Oil Company | 0.014336% |
| Sharon T. Cook and Jennifer Leigh Taylor, as Trustees of the Larry Dwight Taylor 2012 Irrevocable Trust | 0.047832% |
| Shelley M. Chavanne | 0.001738% |
| Sklarco L.L.C. | 12.592820% |
| Spanish Fort Royalty, LLC | 0.088079% |
| Spindletop Oil & Gas Co. | 0.043446% |
| Steven E. Calhoun | 0.179403% |
| Strago Petroleum Corporation | 0.215284% |
| Stroud Family LLC | 0.019116% |
| SUGAR OIL PROPERTIES LP | 0.694406% |
| SUMMIT LLC | 0.170129% |
| Tara Rudman and Ira W. Silverman, as Co-Trustees of The Rudman Family Trust | 0.096109% |
| Tauber Exploration & Production Co. | 0.845035% |
| Teresa Rudman, as Trustee of the Tara Rudman Revocable Trust | 0.096109% |
| The Rudman Partnership, Ltd. | 3.171608% |
| Tiembo Ltd. | 0.676028% |
| TOM YOUNGBLOOD | 0.925874% |
| Trant K. Kidd Family Partnership, Ltd. | 0.000287% |
| Trimble Energy, LLC | 0.192219% |
| Tyler Oil And Gas, LLC | 0.006951% |
| W D MOUNGER | 0.462937% |
| WALLACE & WALLACE LLC | 0.170129% |
| Wells Fargo Bank, as Trustee of the HARKNESS A DUNCAN FAMILY TRUST | 0.370350% |
| William R. Rollo and Gloria R. Rollo, as Trustees of the William R. & Gloria R. Rollo Revocable Trust | 0.208240% |
| William S. Schreier | 0.143523% |
| WSK Properties, LLC | 0.000287% |
| TOTAL WORKING INTEREST COSTS: | 100.000000% |

# UNIT OPERATING AGREEMENT

## SOUTHEAST BROOKLYN OIL UNIT

### BROOKLYN FIELD

### CONECUH AND ESCAMBIA COUNTIES, ALABAMA

**THIS AGREEMENT**, entered into as of the 1st day of November, 2018, by the parties who have signed the original of this instrument, a counterpart thereof, or other instrument ratifying and agreeing to be bound by the provisions hereof (hereinafter referred to as the "parties hereto");

#### WITNESSETH:

**WHEREAS**, the parties hereto as Working Interest Owners have executed, as of the date hereof, an agreement entitled "Unit Agreement, Southeast Brooklyn Oil Unit, Brooklyn Field, Conecuh and Escambia Counties, Alabama," herein referred to as "Unit Agreement," which, among other things, provides for a separate agreement to be entered into by Working Interest Owners to provide for the development and operation of the Unit Area as therein defined;

**NOW, THEREFORE**, in consideration of the mutual agreements herein set forth, it is agreed as follows:

### ARTICLE 1

### CONFIRMATION OF UNIT AGREEMENT

1.1    CONFIRMATION OF UNIT AGREEMENT.    The Unit Agreement is hereby confirmed and by reference made a part of this Agreement. The definitions in the Unit Agreement are adopted for all purposes of this Agreement. If there is some conflict between the Unit Agreement and this Agreement, the Unit Agreement shall govern.

### ARTICLE 2

### EXHIBITS

2.1 EXHIBITS. The following exhibits are incorporated herein by reference:

2.1.1 EXHIBITS "A," "B," "C-1," "C-2," "C-3," "D," and "E" of the Unit Agreement.

2.1.2 EXHIBIT "F," attached hereto, which is the Accounting Procedure applicable to Unit Operations. If there is any conflict between this Agreement and Exhibit "F," this Agreement shall govern.

2.1.3 EXHIBIT "G," attached hereto, which contains insurance provisions applicable to Unit Operations.

# UNIT OPERATING AGREEMENT

## SOUTHEAST BROOKLYN OIL UNIT

### BROOKLYN FIELD

### CONECUH AND ESCAMBIA COUNTIES, ALABAMA

**THIS AGREEMENT**, entered into as of the 1st day of November, 2018, by the parties who have signed the original of this instrument, a counterpart thereof, or other instrument ratifying and agreeing to be bound by the provisions hereof (hereinafter referred to as the "parties hereto");

### WITNESSETH:

**WHEREAS,** the parties hereto as Working Interest Owners have executed, as of the date hereof, an agreement entitled "Unit Agreement, Southeast Brooklyn Oil Unit, Brooklyn Field, Conecuh and Escambia Counties, Alabama," herein referred to as "Unit Agreement," which, among other things, provides for a separate agreement to be entered into by Working Interest Owners to provide for the development and operation of the Unit Area as therein defined;

**NOW, THEREFORE,** in consideration of the mutual agreements herein set forth, it is agreed as follows:

### ARTICLE 1

### CONFIRMATION OF UNIT AGREEMENT

1.1    CONFIRMATION OF UNIT AGREEMENT.    The Unit Agreement is hereby confirmed and by reference made a part of this Agreement.    The definitions in the Unit Agreement are adopted for all purposes of this Agreement.    If there is some conflict between the Unit Agreement and this Agreement, the Unit Agreement shall govern.

### ARTICLE 2

### EXHIBITS

2.1 EXHIBITS.  The following exhibits are incorporated herein by reference:

2.1.1 EXHIBITS "A," "B," "C-1," "C-2," "C-3," "D," and "E" of the Unit Agreement.

2.1.2 EXHIBIT "F," attached hereto, which is the Accounting Procedure applicable to Unit Operations.  If there is any conflict between this Agreement and Exhibit "F," this Agreement shall govern.

2.1.3   EXHIBIT "G," attached hereto, which contains insurance provisions applicable to Unit Operations.

2.1.4  EXHIBIT "H," attached hereto, which is a Gas Balancing Agreement applicable to Unit Operations.

2.2  REVISION OF EXHIBITS.  If Exhibits "A," "B," "C-1", "C-2," "C-3," and "D" are revised, Exhibit "E" shall be revised accordingly and be effective as of the same date.

2.2.1  CORRECTION OF EXHIBITS.  If it subsequently appears that any mechanical miscalculation or clerical error has been made or if subsequently discovered data renders any Exhibit incorrect, the Working Interest Owners shall correct the mistake by revising the Exhibits to conform to the facts.

## ARTICLE 3

## SUPERVISION OF OPERATIONS
## BY WORKING INTEREST OWNERS

3.1  OVERALL  SUPERVISION.  Working  Interest  Owners  shall  exercise  overall supervision and control of all matters pertaining to Unit Operations pursuant to this Agreement and the Unit Agreement.  In the exercise of such authority, each Working Interest Owner shall act solely in its own behalf in the capacity of an individual owner and not on behalf of the owners as an entirety; provided, however, that nothing herein shall prevent one or more Working Interest Owners from appointing someone or some entity (which may be another Working Interest Owner or a third party) to act on behalf of such Working Interest Owner(s) in any or all matters relating to this Agreement.

3.2  SPECIFIC AUTHORITIES AND DUTIES.  The matters with respect to which the Working Interest Owners shall decide and take action shall include, but not be limited to, the following:

3.2.1  METHOD OF OPERATION.  The method of operation, including any type of pressure maintenance, secondary recovery, or other recovery program to be employed.

3.2.2  DRILLING OF WELLS.  The drilling of any well whether for production of Unitized Substances, for use as an injection well, or for other purposes.

3.2.3  WELL COMPLETIONS, RECOMPLETIONS AND CHANGE OF STATUS.  The completion of any well drilled under the terms of Article 3.2.2 above, recompletion, abandonment, plugging or change of status of any well, or the use of any well for injection or other purposes.

2

3.2.4 EXPENDITURES. The making of any single expenditure in excess of Fifty Thousand Dollars ($50,000.00) except in connection with a well, the drilling, re-working, deepening completing, re-completing or plugging back of which has been previously authorized by or pursuant to this Agreement.

3.2.5 DISPOSITION OF UNIT EQUIPMENT. The selling or otherwise disposing of any major item of surplus or obsolete Unit Equipment, if the current list price of new equipment similar thereto is Thirty Thousand Dollars ($30,000.00) or more.

3.2.6 APPEARANCE BEFORE A COURT OR REGULATORY AGENCY. The designating a representative to appear before any court or regulatory agency, in matters pertaining to Unit Operations; provided that such designation shall not prevent any Working Interest Owner from appearing in person or from designating another representative in its own behalf.

3.2.7 AUDITS. The auditing of the accounts of Unit Operator pertaining to Unit Operations hereunder, however, the audits shall

(a)     not be conducted more than once each year except upon the resignation or removal of Unit Operator, and

(b)     be made upon the approval of the owner or owners of a majority of Working Interest other than that of Unit Operator, at the expense of all Working Interest Owners, or

(c)     be made at the expense of those Working Interest Owners requesting such audit, if owners of less than a majority of Working Interest, other than that of Unit Operator, request such an audit, and

(d)     be made upon not less than thirty (30) days' written notice to Unit Operator and all Working Interest Owners, and

(e)     be otherwise governed by the provisions of Article 1, paragraph 5 of Exhibit "F."

3.2.8 INVENTORIES. The taking of periodic inventories under the terms of Exhibit "F."

3.2.9 TECHNICAL SERVICES. The authorizing of charges to the joint account for services by consultants or Unit Operator's technical personnel not otherwise provided for or covered by the overhead charges provided by Exhibit "F" when such charges are reasonably expected to

3

exceed Thirty thousand dollars ($30,000) for a single project.

3.2.10 ASSIGNMENT TO COMMITTEES. The appointment of committees to study any problems in connection with Unit Operations.

3.2.11 REMOVAL OF UNIT OPERATOR. The removal of Unit Operator and the selection of a successor as provided in Section 6.2.

3.2.12 ENLARGEMENT OF UNIT AREA. The enlargement of the Unit Area.

3.2.13 INVESTMENT ADJUSTMENT. The adjustment and re-adjustment of investments.

3.2.14 INJECTION OF ANY SUBSTANCE. The injection of any substance into the Unitized Interval (including, but not limited to, water and/or gas either produced from the Unitized Interval or purchased from a party hereto or any third party).

3.2.15 TERMINATION OF UNIT AGREEMENT. The termination of the Unit Agreement.

## ARTICLE 4

## MANNER OF EXERCISING SUPERVISION

4.1 DESIGNATION OF REPRESENTATIVES. Each Working Interest Owner shall, in writing, inform Unit Operator of the name and address of its representative who is authorized to represent and bind such Working Interest Owner with respect to Unit Operations. Each Working Interest Owner may also designate, in writing, alternate(s) who is/are authorized to bind each Working Interest Owner with respect to Unit Operations. The representative or alternate(s) may be changed from time to time by written notice to Unit Operator.

4.2 MEETINGS. All meetings of Working Interest Owners shall be called by Unit Operator upon its own motion or at the request of one or more Working Interest Owners having a combined Unit Participation totaling not less than Twenty-Five Percent (25%). If Unit Operator fails to call a meeting of the Working Interest Owners for a period of ten (10) days after having been requested to do so by one or more of the Working Interest Owners, any one of such Working Interest Owners who requested a meeting may call the same. Unless otherwise agreed upon by the Working Interest Owners, no meeting shall be called on less than ten (10) days' advance written notice, with agenda attached. Working Interest Owners attending the meeting and having a combined voting interest sufficient to determine a matter may amend items included in the agenda

4

and may upon an amended item or other items presented at the meeting. The representative of Unit Operator shall be chairman of each meeting, except any meeting called by a Working Interest Owner following Unit Operator's failure to call a requested meeting as hereinabove provided, and at such meeting the representative of the Working Interest Owner calling the meeting shall be chairman. Meetings shall be held at the time and place stipulated in the notice calling the meeting.

4.3  VOTING PROCEDURES. Working Interest Owners shall decide all matters coming before them as follows:

4.3.1  VOTING INTEREST. Each Working Interest Owner shall have a voting interest equal to its Unit Participation (cost bearing) at the time of the vote.

4.3.2  VOTE REQUIRED - GENERALLY. Unless otherwise provided herein or in the Unit Agreement, Working Interest Owners shall determine all matters by the affirmative vote of three (3) or more Working Interest Owners having a combined voting interest, based on Unit Participation, of at least a majority of the Working Interest.

4.3.3  VOTE AT MEETING BY NON-ATTENDING WORKING INTEREST OWNER.

Any Working Interest Owner who is not represented at a meeting may vote by letter, facsimile, or email addressed to the representative of the Unit Operator if its vote is received prior to the vote on the item.

4.3.4  POLL VOTES. Working Interest Owners may vote on and decide, by letter, facsimile, or email, any matter submitted in writing to Working Interest Owners, if no meeting is requested, as provided in Article 4.2, within fifteen (15) days after the proposal is received by Working Interest Owners. Any notice given by facsimile shall be deemed received once same is properly transmitted. If a drilling rig is on location, notice of any proposal concerning the further use of said rig on location may be given by facsimile, email or telephone, and the response period shall be limited to twenty-four (24) hours, inclusive of Saturday, Sunday and legal holidays. Any notice given by telephone shall be promptly confirmed in writing (by letter, email, or facsimile). The failure of any Working Interest Owner to timely reply within said period to any such submittal shall be conclusively construed as a negative vote by such Working Interest Owner. Unit Operator will give prompt notice of the results of the voting to all Working Interest Owners.

4.3.5  BINDING EFFECT OF VOTE. All Working Interest Owners shall be bound for their proportionate share of all costs and expenses of Unit Operations which have been approved by

5

the vote of Working Interest Owners required by Article 4.3.2 herein.

## ARTICLE 5

## INDIVIDUAL RIGHTS OF WORKING INTEREST OWNERS

5.1     RESERVATION OF RIGHTS.     Working Interest Owners severally reserve to themselves all their rights, except as otherwise provided in this Agreement and the Unit Agreement.

5.2     SPECIFIC RIGHTS.     Each Working Interest Owner shall have, among others, the following specific rights.

5.2.1     ACCESS TO UNIT AREA.     Access to the Unit Area at all reasonable times at its sole risk, to inspect Unit Operations, all wells, equipment and facilities and the records and data pertaining thereto.

5.2.2     REPORTS.     The right to receive from Unit Operator, upon written request, copies of all reports to any governmental agency, monthly reports of crude oil runs and stocks, inventory reports, and all other information pertaining to the Unit Operations.     The cost of gathering and furnishing information not ordinarily furnished by Unit Operator to all Working Interest Owners shall be charged to the Working Interest Owner who requests the information.

## ARTICLE 6

## UNIT OPERATOR

6.1     INITIAL UNIT OPERATOR.     Sklar Exploration Company L.L.C. is hereby designated as initial Unit Operator.

6.2     RESIGNATION OR REMOVAL.     Unit Operator may resign at any time.     Working Interest Owners may remove Unit Operator at any time by the affirmative vote of more than Sixty-six and two-thirds Percent (66 2/3%) of the voting interest, based on Unit Participation, in the manner specified in Paragraph 4.3, above (excluding Paragraph 4.3.2).     A Unit Operator who resigns or is removed shall not be released from its obligations hereunder for a period of three (3) months after the resignation or discharge, unless a successor Unit Operator has taken over Unit Operations prior to the expiration of such period.

6.3     SELECTION OF SUCCESSOR.     Upon the resignation or removal of a Unit Operator, a successor Unit Operator shall be selected by Working Interest Owners.     The successor Unit Operator shall be selected by the affirmative vote of at least Sixty-Six and Two-Thirds Percent (66 2/3%) of the voting interest, based on Unit Participation.

6

6.4    DELIVERY OF PROPERTY. On the effective date of resignation or removal, Unit Operator shall deliver to the successor Unit Operator the possession of everything jointly owned by the Working Interest owners pursuant to this Agreement.

**ARTICLE 7**

**AUTHORITIES AND DUTIES OF UNIT OPERATOR**

7.1    EXCLUSIVE RIGHT TO OPERATE UNIT.    Subject to the provisions of this Agreement, the Unit Agreement and to instructions from Working Interest Owners, Unit Operator shall have the exclusive right and be obligated to conduct Unit Operations.

7.2    WORKMANLIKE CONDUCT. Unit Operator shall conduct Unit Operations in a good and workmanlike manner and, in the absence of specific instructions from Working Interest Owners, shall have the right and duty to conduct such operations in the same manner as would a prudent operator under the same or similar circumstances. Unit Operator shall freely consult with Working Interest Owners and keep them informed of all matters which Unit Operator, in the exercise of its best judgment, considers important. Unit Operator shall not be liable to Working Interest Owners for damages, unless such damages result from its gross negligence or willful misconduct.

7.3 LIENS AND ENCUMBRANCES. Unit Operator shall endeavor to keep the lands and leases and Unit Equipment in the Unit Area free from all liens and encumbrances occasioned by Unit Operations, except the lien of Unit Operator granted hereunder.

7.4    EMPLOYEES.   The number of employees used by Unit Operator in conducting Unit Operations, their selection, hours of labor, and compensation shall be determined by Unit Operator, with the employees to be the employees of the Unit Operator and not of the other Working Interest Owners.

7.5    RECORDS.   Unit Operator shall keep full, true and correct books, accounts, and records of the Unit Operations, which shall be made available for inspection by any Working Interest Owner at Unit Operator's principal place of business during normal business hours.

7.6    REPORTS TO WORKING INTEREST OWNERS. Unit Operator shall furnish to Working Interest Owners monthly reports and shall keep the Working Interest Owners fully informed of Unit Operations.

7.7    REPORTS TO GOVERNMENTAL AUTHORITIES. Except as otherwise provided in

7

Section 8.2, below, Unit Operator shall make all reports to governmental authorities that are required for Unit Operations.

7.8  ENGINEERING AND GEOLOGICAL INFORMATION.  Unit Operator shall furnish to a Working Interest Owner, upon written request, a copy of all logs and other engineering and geological data pertaining to wells drilled for Unit Operations.

7.9  EXPENDITURES.  Unit Operator shall neither make any single expenditure nor undertake any project costing in excess of Fifty Thousand Dollars ($50,000.00) without prior approval of Working Interest Owners.  In cases of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Unit Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property, but Unit Operator shall report to Working Interest Owners, as promptly as possible, the nature of the emergency and the action taken.

7.10  WELLS DRILLED BY UNIT OPERATOR.  All wells drilled by Unit Operator shall be at the usual rates prevailing in the area.  Unit Operator may, with approval of Working Interest Owners being first obtained, employ its own tools and equipment, or that of an affiliate, but the rates for the services shall not exceed the then current rates charged by Unit Operator or the affiliate to third parties for like kind services.

7.11  DISPOSITION OF UNIT EQUIPMENT.  Unit Operator may dispose of any major item of surplus or obsolete Unit Equipment, subject to the terms and conditions of Article IV of Exhibit "F" of this Agreement, if the current price of new equipment similar thereto is less than Thirty Thousand Dollars ($30,000.00).

7.12  RETURN LINES.  Working Interest Owners reserve the right to use unutilized capacity in any Return Lines constructed by Working Interest Owners at Unit Expense after the Effective Date for the transportation of natural gas to wells outside the Unit Area, subject to and conditioned upon (1) the overall and superseding right of the Return Lines to be used for Unit Operations, (ii) the quality and specifications of the natural gas which is transported for Unit Operations, and (iii) the approval of Unit Operator, which approval will not be unreasonably withheld.

**ARTICLE 8**

8

## TAXES

8.1   AD VALOREM TAXES.   Unit Operator shall make and file all necessary ad valorem tax renditions and returns with the proper taxing authorities covering Unit Equipment.   Unit Operator shall settle assessments arising therefrom.   Any such ad valorem taxes due and payable shall be paid by the Unit Operator and charged to the joint account in the same manner as other operating expenses.

8.2   OTHER TAXES.   Unit Operator shall pay or cause to be paid all production, severance, gathering, and other taxes imposed upon or in respect to the production of Unitized Substances sold by the Unit Operator.   Any party hereto that takes Unitized Substances in kind shall be responsible for payment of all production, severance, gathering, and other taxes imposed upon or with respect to the production of such Unitized Substances, and for all reports to governmental agencies relating thereto.

## ARTICLE 9

## INSURANCE

9.1   INSURANCE.   Unit Operator, with respect to Unit Operations, shall provide insurance for the benefit of the Joint Account as specified in Exhibit "G."

## ARTICLE 10

## PERSONAL PROPERTY AND ADJUSTMENT OF INVESTMENTS

10.1   PERSONAL PROPERTY TAKEN OVER.   Upon the effective date hereof, Working Interest Owners shall deliver to Unit Operator the following items of Unit Equipment:

10.1.1   WELLS AND CASING.   All wells completed in the Unit Area together with the casing therein.

10.1.2   WELL AND LEASE EQUIPMENT.   The tubing in each such well, the wellhead connections thereon, and all other lease and operating equipment that is used in the operations of such wells which Working Interest Owners determine is necessary or desirable for conducting Unit Operations provided, however, that the meters located near the wells which are utilized to measure Unit Rich Gas produced from each well, together with all of the gathering lines located downstream of those meters which are used to transport Unit Rich Gas for processing and treatment, shall not become Unit Equipment but the Working Interest Owners hereby grant to Unit Operator the nonexclusive rights to use the above-described meters for measurement of Unit Rich Gas, to

9

perform tests on and calibrate the meters, and to repair or replace the meters when necessary with the reasonable expense therefor to be chargeable to the Working Interest Owners (as a Unit Expense) and/or to the then owners of the meters as the Unit Operator shall deem appropriate.

10.1.3   RECORDS.   A copy of all production and well records that pertain to each such well.

10.2   INVENTORY AND EVALUATION OF PERSONAL PROPERTY AND WELLBORES.   Unit Operator shall, on behalf of the Working Interest Owners and at unit expense within a reasonable time after the effective date hereof, inventory and evaluate the personal property taken over by the Unit Operator under this Article.   Such inventory shall include and be limited to those items of equipment considered controllable under Exhibit "F" except upon determination of Working Interest Owners, items considered non-controllable may be included in the inventory in order to insure a more equitable adjustment of investment.   Casing shall be included in the inventory for record purposes, but shall be excluded from evaluation and investment adjustment.

10.3   INVESTMENT ADJUSTMENT.   Upon approval by the Working Interest Owners of the inventory and evaluation, each Working Interest Owner shall be credited with the value, as determined in accordance with Article 10.2, of its interest (prior to unitization) in all personal property taken over under this Article 10, and shall be charged with an amount equal to that obtained by multiplying the total value of all personal property taken over under Article 10.1 by such Working Interest Owner's Unit Participation.   If the charge against the Working Interest Owner is greater than the amount credited to such Working Interest Owner, the resulting net charge shall be an item of Unit Expenditure chargeable against such Working Interest Owner.   If the credit to the Working Interest Owner is greater than the amount charged against the Working Interest Owner, the resulting net credit shall be paid to the Working Interest Owner out of funds received by Unit Operator in settlement of the net charges described above.

10.4   OWNERSHIP OF PERSONAL PROPERTY AND FACILITIES.   Each Working Interest Owner, individually, shall by virtue hereof, own an undivided interest, equal to its Unit Participation, in all wells, equipment and facilities taken over or otherwise acquired by Unit Operator pursuant to this Agreement.

**ARTICLE 11**

**UNIT EXPENDITURES**

10

11.1  BASIS OF CHARGE TO WORKING INTEREST OWNERS.  Unit Operator initially shall pay all Unit Expenditures.  Each Working Interest Owner shall reimburse Unit Operator for its share of Unit Expenditure.  Each Working Interest Owner's share shall be the same as its Unit Participation in effect at the time the expense was incurred and paid.  All charges, credits and accounting for Unit Expenditures shall be in accordance with Exhibit "F."  Charges for outside attorneys, landmen and/or technical experts used in conjunction with Unit Operations, title examination, and/or hearings before Governmental Agencies will be direct charges to the Unit Joint Account.  Unit Operator shall charge a reasonable fee for services rendered by its in-house personnel in the foregoing functions.

11.2  ADVANCE BILLINGS.  Unit Operator shall have the right to require Working Interest Owners to advance their respective shares of estimated Unit Expenditures by submitting to Working Interest Owners, on or before the 15th day of any month, an itemized estimate thereof for the succeeding month, with a request for payment in advance.  Within fifteen (15) days after receipt thereof, each Working Interest Owner shall pay to Unit Operator its share of such estimate.  Adjustments between estimated and actual Unit Expenditures shall be made by Unit Operator at the close of each calendar month, and the accounts of Working Interest Owners shall be adjusted accordingly.

11.3  COMMINGLING OF FUNDS.  Unit Operator shall hold for the account of the Working Interest Owners any funds of the Working Interest Owners advanced or paid to the Unit Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Unit Area, and such funds shall remain the funds of the Working Interest Owners on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Working Interest Owners or applied toward the payment of debts as provided in Section 11.5.  Nothing in this paragraph shall be construed to establish a fiduciary relationship between Unit Operator and Working Interest Owners for any purpose other than to account for Working Interest Owners' funds as herein specifically provided, and no funds received by Unit Operator under this agreement need be segregated or maintained by it as a separate fund, but may be commingled with its own funds.

11.4  LIEN OF UNIT OPERATOR.  Each Working Interest Owner grants to Unit Operator a first and preferred lien upon its Oil and Gas Rights in each Tract, its share of Unitized Substances

11

and Outside Substances when produced, and its interest in all Unit Equipment, as security for payment of its share of Unit Expenditures, together with interest thereon at the prime rate designated by Paragraph 1.3.B of Exhibit "F", provided, however, if this interest rate exceeds the maximum allowed by Alabama law, then the interest rate will be limited to the maximum permitted under Alabama law. Each Working Interest Owner also grants to Unit Operator a security interest in its share of oil and/or gas when extracted and a security interest in all equipment as security for payment for its share of Unit Expenditures together with interest thereon. To the extent that Unit Operator has a security interest under the Uniform Commercial Code of Alabama, Unit Operator shall be entitled to exercise the rights and remedies of a Secured Party under the Code. The bringing of a suit and the obtaining of judgment by Unit Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In the event any Working Interest Owner takes over as Unit Operator in the manner described elsewhere in this Agreement, Unit Operator shall thereupon grant a like lien to other Working Interest Owners. Unit Operator shall have the right to bring suit to enforce collection of such indebtedness with or without seeking foreclosure of the lien. In addition, upon default by any Working Interest Owner in the payment of its share of Unit Expenditures, Unit Operator shall have the right without prejudice to other existing remedies, to collect from the purchaser the proceeds from the sale of such Working Interest Owner's share of Unitized Substances not to exceed seven-eighths (7/8ths) of the proceeds allocated to the Tract or Tracts in which said Working Interest Owner owns a Working Interest, until the amount owed by such Working Interest Owner, plus interest as aforesaid, has been paid. However, Unit Operator shall continue to collect such proceeds and distribute same to the Owner or Owners of overriding royalty, production payment interest, royalty in excess of one-eighth (1/8th) of production or other interests not primarily responsible for the payment of Unit Expenditures in the event that any of the proceeds so appropriated by Unit Operator were attributable to the interest of said Owner or Owners. Each purchaser shall be entitled to rely upon Unit Operator's written statement concerning the amount of any default.

In such event, each Working Interest Owner hereby authorizes and directs the purchaser to pay Unit Operator pursuant to the terms hereof upon receipt of written notice given by Unit Operator to the purchaser and to such Working Interest Owner. If any Working Interest Owner

12

shall create any overriding royalty, production payment or other burden against its share of Unitized Substances, and if Unit Operator shall become entitled to receive the proceeds from the sale of such Working Interest Owner's share of Unitized Substances as provided herein, Unit Operator shall receive such production free and clear of such burdens against such production which may have been created subsequent to this Agreement, and the Working Interest Owner creating such subsequent burden shall save harmless Unit Operator with respect to said burden or burdens and shall bear same at its own expense.

11.5   SUBSEQUENTLY CREATED INTEREST.   If any Working Interest Owner shall, after executing this Agreement, create an overriding royalty, production payment, net proceeds interest, carried interest, or any other interest out of its Working Interest, such subsequently created interest shall be subject to the terms and provisions of this Agreement, specifically including, but without limitation, Section 11.4 hereof entitled "Lien of Unit Operator." If the Working Interest Owner creating such subsequently created interest (a) fails to pay any Unit Expenditure chargeable to such Working Interest Owner under this Agreement, and the production of Unitized Substances accruing to the credit of such Working Interest Owner is insufficient for that purpose, or (b) withdraws from this Agreement under the terms and provisions of Article 17 hereof, the subsequently created interest shall be chargeable with a pro-rata portion of all Unit Expenditure incurred hereunder, the same as though such subsequently created interest were a Working Interest, and Unit Operator shall have the right to enforce against such subsequently created interest the lien for the purpose of collecting the Unit Expenditure chargeable to the subsequently created interest.

## ARTICLE 12

## NON-UNITIZED FORMATIONS

12.1   RIGHT TO OPERATE.   Any Working Interest Owner that now has or hereafter acquires the right to drill for and produce oil, gas or other minerals from other than the Unitized Interval shall have the right to do so notwithstanding this Agreement or the Unit Agreement. In exercising this right, however, the Working Interest Owner shall exercise reasonable precaution to prevent unreasonable interference with Unit Operations. No Working Interest Owner shall produce Unitized Substances through any well drilled or operated by it. If any Working Interest Owner drills any well into or through the Unitized Interval, the Unitized Interval shall be protected in a manner satisfactory to Working Interest Owners so that the production of Unitized Substances will

13

not adversely be affected.

## ARTICLE 13

### TITLES

13.1   REPRESENTATIONS AND INDEMNITY.   Each Working Interest Owner represents to the best of its knowledge and belief that it is the owner of the respective working interests set forth opposite its name in Exhibit "E," and hereby agrees to indemnify and hold harmless the other Working Interest Owners from any loss due to failure, in whole or in part, of its title to any such interest, except failure of title arising out of Unit Operations; provided that such indemnity shall be limited to an amount equal to the net value that has been received from the sale or receipt of Unitized Substances attributed to the interest as to which title failed and there will be no retroactive adjustments of Unit Expenditures or allocation of proceeds.

13.2   FAILURE OF TITLE.   Should any interest or lease, or interest therein, be lost through failure of title, this Agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interest.   The party whose lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Unit Operator or the other Working Interest Owners any Unit Expenditure which it may have theretofore paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure. There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interests of the parties shall be revised, as of the time it is determined finally that title failure has occurred so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Unit Area by the amount of the interest lost.   If the proportionate interest of the other parties hereto in the Unit Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it.   Should any person not a party to this Agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the Working Interest Owners who bore the costs which are so refunded.   Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the party or parties whose title failed in the same proportions in which they shared in such prior

14

production. No charge shall be borne by the Working Interest Owners or Unit Operator for legal expenses, fees or salaries, in connection with the defense of the interest claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses incurred thereby, unless such title failure be due to Unit Operations, then the loss shall be borne jointly by Working Interest Owners in proportion to their Unit Participation.

## ARTICLE 14

## LIABILITY, CLAIMS AND SUITS

14.1    INDIVIDUAL LIABILITY.    The duties, obligations, and liabilities of Working Interest Owners shall be individual and not joint or collective; and nothing herein contained shall ever be construed as creating a partnership of any kind, joint venture, association, or trust among Working Interest Owners.

14.2    SETTLEMENTS. Unit Operator may settle any single damage claim or suit involving Unit Operations but not involving an expenditure in excess of Twenty-Five Thousand Dollars ($25,000.00) provided the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above specified amount, Working Interest Owners shall assume and take over the further handling of the claim or suit unless such authority is expressly delegated to Unit Operator. All costs and expense of handling, settling, or otherwise discharging such claim or suit shall be an item of Unit Expenditure. If a claim is made against any Working Interest Owner or if any Working Interest Owner is sued on account of any matter arising from Unit Operations and over which such Working Interest Owner individually has no control because of the rights given Working Interest Owners and Unit Operator by this Agreement and the Unit Agreement, the claim or suit shall be treated as any other claim or suit involving Unit Operations.

14.3    INDEMNIFICATION.

14.3.1   Working Interest Owners agree to indemnify and hold Unit Operator harmless from any and all losses, damages, injuries, claims and causes of action arising out of, incident to, or resulting directly or indirectly from Unit Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy, Federal Energy Regulatory Commission, State Oil and Gas Board of Alabama or Alabama Department of Environmental Management or predecessor or successor agencies to the extent Unit Operator's interpretation or application of such rules, rulings, regulations or orders was made in good faith. Working Interest Owners further agree

15

to reimburse Unit Operator for their proportionate share of any amounts Unit Operator may be required to refund, rebate or pay as a result of an such incorrect interpretation or application of the above-noted rules, rulings, regulations or orders together with the Working Interest Owner's proportionate part of interest and penalties owing by Unit Operator as a result of such incorrect interpretation or application of such rules, rulings, regulations, or orders.

14.3.2   Notwithstanding anything to the contrary contained in this Unit Operating Agreement, in the Accounting Procedure made a part thereof, or in any other attachment hereto or thereto or in any other instrument covering or affecting the terms, conditions, and provisions of this Unit Operating Agreement, it is specifically agreed that all costs, liabilities, obligations, and expenses, including, but not limited to, court costs, litigation expenses, expenses incurred in administrative proceedings, attorney's fees, fines, penalties, judgments, and orders incurred by or levied, granted, or issued to or against Unit Operator by any Federal or State court, administrative body, or other agency with respect to violations or alleged violations of, or actions or inactions contrary to any Federal or State laws, rules and regulations, or any one or more of them, pertaining directly, indirectly, or in whole or in part to pollution, environmental protection, Fair Labor Standards, safety and occupational injuries, allocation of crude oil and other petroleum products, any and all other Federal and State Laws, rules and regulations, or any one or more of them, of a like or similar nature, shall be considered a Unit Expenditure to be paid, respectively, by the parties to this Unit Operating Agreement in the same manner as other Unit Expenditures are allocated and paid, save and except only in those cases where Unit Operator has been proven guilty of gross negligence or willful misconduct directly causing the costs and expenses involved.  In case of any conflict between the provisions of the sentence immediately preceding and any other terms, conditions, and provisions of this Unit Operating Agreement or any ambiguity as between them, or any of them, then the provisions of said sentence next preceding shall govern and prevail with respect to the matter involved.

## ARTICLE 15

## INTERNAL REVENUE PROVISION

15.1   INTERNAL REVENUE PROVISION.   Notwithstanding any provisions herein that the rights and liabilities of the parties hereunder are several and not joint or collective, or that this Agreement and the operations hereunder shall not constitute a partnership, if for Federal income tax

16

purposes this Agreement and the operations hereunder are regarded as a partnership, then each of the parties hereto hereby elects to be excluded from the applications of all of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986 as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder. Unit Operator is hereby authorized and directed to execute on behalf of each of the parties hereto such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Federal Regulations 1.761-1(a). Should there by any requirement that each party hereto further evidence this election, each party hereto agrees to execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. Each party hereto further agrees not to give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the State of Alabama, or any future income tax law of the United States contain, or shall hereafter contain, provisions similar to those contained in Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, under which an election similar to that provided by Section 761 of said Subchapter K is permitted, each of the parties hereto hereby makes such election or agrees to make such election as may be permitted by such laws. In making this election, each of the parties hereto hereby states that the income derived by it from the operations under this Agreement can be adequately determined without the computation of partnership taxable income.

## ARTICLE 16

## NOTICES

16.1   GIVING AND RECEIVING NOTICES.   All notices shall be in writing and delivered in person or by mail, email, overnight delivery service or facsimile; however, if a drilling rig is on location and standby charges are accumulating, such notices shall be given by (i) facsimile or email or (ii) by telephone, and immediately confirmed in writing. Notice shall be deemed given only when received by the Party to whom such notice is directed, except that any notice by overnight delivery service, properly addressed (pursuant to Section 4.1) and marked for next day delivery, with all charges prepaid shall be deemed given twenty-four (24) hours after such notice is delivered to a national overnight delivery service.

17

16.2 CONTENT OF NOTICE. Any notice that requires a response shall indicate the maximum time allowed for responding as specified in elsewhere in this Agreement or the Unit Agreement. If a proposal involves a well operation, the notice shall include the proposed depth, the objective zone or zones to be tested, the surface and bottom-hole locations, the equipment to be used, and the estimated costs of the operation including all necessary expenditures through installation of the wellhead.

16.3 RESPONSE TO NOTICES. Each Party's response to a proposal shall be in writing to the Unit Operator. The maximum response time shall be thirty (30) days; however, if a drilling rig is on location and standby charges are accumulating, the maximum response time to a notice pertaining to such drilling rig shall be twenty-four (24) hours, including holidays and weekends.

16.4 FAILURE TO RESPOND. Failure of any Party to respond to a notice within the required period shall be deemed to be a negative vote.

## ARTICLE 17

## WITHDRAWAL OF WORKING INTEREST OWNER

17.1 WITHDRAWAL. A Working Interest Owner may withdraw from this Agreement by transferring, without warranty of title, either express or implied, to the other Working Interest Owners who do not desire to withdraw and are willing to accept such transfer, all of its Oil and Gas Rights, exclusive of Royalty interests, together with its interest in all Unit Equipment and in all wells used in Unit Operations. Such transfer shall not relieve said Working Interest Owner from any obligation or liability incurred or resulting from an event which occurred prior to the first day of the month following receipt by Unit Operator of such transfer. The interest transferred shall be owned by the transferees in proportion that the Unit Participation of each transferee bears to the Unit Participation of all transferees who are willing to accept such transfer, or as may be agreed among the transferees. The transferees, in proportion to the respective interests so acquired, shall pay transferor, for its interest in Unit Equipment, the fair salvage value thereof as estimated and agreed upon by Working Interest Owners less such transferor's share of the estimated cost of salvaging same, of plugging and abandoning all wells then being used or held for Unit Operations and of terminating of the Unit. In the event such withdrawing owner's interest in the aforesaid salvage value is less than such owner's share of such estimated costs, the withdrawing owner, as a condition precedent to withdrawal, shall pay the Unit Operator, for the benefit of Working Interest

18

Owners succeeding to its interest, a sum equal to the deficiency. Within sixty (60) days after receiving delivery of the transfer, Unit Operator shall render a final statement to the withdrawing owner for its share of Unit Expenditure, including any deficiency in salvage value, as determined by Working Interest Owners, incurred as of the first day of the month following the date of receipt of the transfer. Provided all Unit Expenditures, including any deficiency hereunder, due from the withdrawing owner has been paid in full within thirty (30) days after the rendering of such final statement by the Unit Operator, the transfer shall be effective the first day of the month following receipt of said transfer by Unit Operator and, as of such effective date, the withdrawing Working Interest Owner shall be relieved from all further obligations and liability hereunder and under the Unit Agreement, and the rights of such Working Interest Owner hereunder and under the Unit Agreement shall cease insofar as they existed by virtue of the interest transferred.

17.2  LIMITATION ON WITHDRAWAL. Notwithstanding anything set forth in Section 17.1, Working Interest Owners may refuse to permit the withdrawal of a Working Interest Owner if its Working Interest is burdened by any royalties, overriding royalties, production payments, net proceeds interest, carried interest or any other interest created out of the Working Interest in excess of twenty-five percent (25%), unless the other Working Interest Owners willing to accept the assignment agree to accept the Working Interest subject to such burdens.

17.3  ASSIGNMENT OF INTEREST. Notwithstanding any Provision in this Article 17 to the contrary, nothing herein shall preclude one or more Working Interest Owners from transferring or assigning to another Working Interest Owner or Owners or a third party all or part of its or their interest in the Unit provided any such assignment is made subject to the Unit Agreement and this Unit Operating Agreement.

**ARTICLE 18**

**ABANDONMENT OF WELLS**

18.1  RIGHTS OF FORMER OWNERS. If Working Interest Owners decide to abandon permanently any well within the Unit Area prior to termination of the Unit Agreement, Unit Operator shall give written notice thereof to the Working Interest Owners of the Tract on which the well is located, and they shall have the option for a period of fifteen (15) days after the sending of such notice, or twenty-four (24) hours, inclusive of Saturday, Sunday, or legal holidays if a rig is on location, to notify Unit Operator in writing of their election to take over and own the well and to

19

deepen or plug-back the well to a formation other than the Unitized Interval. The absence of a reply from one or more Working Interest Owners during such fifteen (15) day or 24 hour (as applicable) period shall be conclusively presumed to be an election NOT to take over such well. Within ten (10) days after the Working Interest Owners of the Tract have notified Unit Operator of their election to take over the well, they shall pay Unit Operator, for credit to the Working Interest Owners, the amount estimated by Working Interest Owners to be the net salvage value of the casing and equipment in and on the well to be transferred. The Working Interest Owners of the Tract, by taking over the well, agree to seal off effectively and protect the Unitized Interval, and upon abandonment to plug the well at their sole cost, risk and expense in compliance with applicable laws and regulations.

18.2 PLUGGING. If the Working Interest Owners of a Tract do not elect to take over a well located thereon which is proposed for abandonment, Unit Operator shall plug and abandon the well at the expense of the Working Interest Owners in compliance with applicable laws and regulations.

## ARTICLE 19

## EFFECTIVE DATE AND TERM

19.1 EFFECTIVE DATE. This Agreement shall become effective on the date and at the time that the Unit Agreement becomes effective, and on such date, this Unit Operating Agreement shall supersede, replace and be used in lieu of any Operating Agreements currently in force and effect governing and controlling operations on the Tracts, or any one or more thereof, insofar and only insofar as (i) any such existing Operating Agreements cover the Unitized Interval and (ii) are in conflict with or otherwise inconsistent with the terms of this Agreement and/or the Unit Agreement. Except as provided in the preceding sentence any currently effective Operating Agreements that cover all or any portion of any of the Tracts shall remain in effect.

19.2 TERM. This Agreement shall continue in effect so long as the Unit Agreement remains in effect, and thereafter until (a) all unit wells have been abandoned and plugged or turned over to Working Interest Owners in accordance with Article 20, (b) all Unit Equipment and real property acquired for Unit Operations have been disposed of by Unit Operator in accordance with instructions of Working Interest Owners, and (c) there has been a final accounting.

## ARTICLE 20

20

## ABANDONMENT OF OPERATIONS

20.1  TERMINATION.  Upon termination of the Unit Agreement, the following will occur:

20.1.1  OIL AND GAS RIGHTS.  Oil and Gas Rights in and to each separate Tract shall no longer be affected by this Agreement, and thereafter the parties shall be governed by the terms and provisions of the leases, contracts and other instruments affecting the separate Tracts.  Ownership and possession of all Oil and Gas in and under and all Oil and Gas Rights in and to the several separate tracts shall revert to the Working Interest Owners thereof.

20.1.2  RIGHT TO OPERATE.  Working Interest Owners of any Tract that desire to take over and continue to operate wells located thereon may do so by paying Unit Operator, for credit to the Working Interest Owners, the net salvage value of the casing and equipment in and on the wells taken over, as estimated by Working Interest Owners, and by agreeing to plug each well in compliance with applicable laws and regulations at such time as it is abandoned.

20.1.3  SALVAGING WELLS.  Unit Operator shall salvage as much of the casing and equipment in or on wells not taken over by Working Interest Owners of separate Tracts as can economically and reasonably be salvaged, and shall cause the wells to be plugged and abandoned in compliance with applicable laws and regulations.

20.1.4  COST OF SALVAGE.  Working Interest Owners shall share the cost of salvaging, liquidation or other distribution of assets and properties used in Unit Operation in proportion to the respective Unit Participation.

20.1.5  DISTRIBUTION OF ASSETS.  Working Interest Owners shall share in the distribution of Unit Equipment, or the proceeds thereof, in proportion to their Unit Participations.

20.1.6  COST OF ABANDONMENT AND SURFACE RESTORATION.  The cost of abandonment of Unit Operations and surface restoration of the Unit Area shall be a Unit Expenditure.

## ARTICLE 21

## EXECUTION

21.1  ORIGINAL, COUNTERPART OR OTHER INSTRUMENT.  A Working Interest Owner may become a party to this Agreement by signing the original of this instrument, a counterpart thereof, or other instrument ratifying and agreeing to be bound by the provisions hereof.  The signing of any such instrument shall have the same effect as if all the parties had signed the

21

same instrument. All signature pages to this Agreement or counterparts hereof that are executed by Working Interest Owners may be attached to one copy of this Agreement.

## ARTICLE 22

## SUCCESSORS AND ASSIGNS.

22.1 SUCCESSORS AND ASSIGNS. The provisions hereof shall be covenants running with the lands, leases and interests covered hereby, and shall be binding upon and inure to the benefit of the respective heirs, devisees, legal representatives, successors and assigns of the parties hereto.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the dates opposite their respective signatures.

[SIGNATURE PAGES FOLLOW]

22

UNIT OPERATING AGREEMENT

SOUTHEAST BROOKLYN OIL UNIT

BROOKLYN FIELD

CONECUH AND ESCAMBIA COUNTIES, ALABAMA

UNIT OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

By: _____
Its: _____

ATTEST:

Its: _____

NON-OPERATORS
WORKING INTEREST OWNERS

*[Individual]*

SIGNATURE _____   DATE _____

ATTEST _____

*[Trustee]*

SIGNATURE _____   DATE _____

ATTEST _____

As Trustee of the following trust:

_____

*[Legal entity]*

ENTITY NAME: _____

By: _____
Its: _____   DATE   11-6-18

ATTEST _____

23

COPAS 2005 Accounting Procedure
Recommended by COPAS

# Exhibit "F-___"
# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

Attached to and made part of _Unit Operating Agreement for the Southeast Brooklyn Oil Unit_

## I. GENERAL PROVISIONS

IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.

IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.

1. **DEFINITIONS**

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

"**Affiliate**" means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

"**Agreement**" means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

"**Controllable Material**" means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

"**Equalized Freight**" means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

"**Excluded Amount**" means a specified excluded trucking amount most recently recommended by COPAS.

"**Field Office**" means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

"**First Level Supervision**" means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices
- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

"**Joint Account**" means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

"**Joint Operations**" means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

1

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

1  "**Joint Property**" means the real and personal property subject to the Agreement.

3  "**Laws**" means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other
4  governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions
5  contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted,
6  promulgated or issued.

8  "**Material**" means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

10  "**Non-Operators**" means the Parties to the Agreement other than the Operator.

12  "**Offshore Facilities**" means platforms, surface and subsea development and production systems, and other support systems such as oil and
13  gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping,
14  heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of
15  offshore operations, all of which are located offshore.

17  "**Off-site**" means any location that is not considered On-site as defined in this Accounting Procedure.

19  "**On-site**" means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of
20  Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other
21  facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

23  "**Operator**" means the Party designated pursuant to the Agreement to conduct the Joint Operations.

25  "**Parties**" means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as
26  "**Party**."

28  "**Participating Interest**" means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees,
29  or is otherwise obligated, to pay and bear.

31  "**Participating Party**" means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of
32  the costs and risks of conducting an operation under the Agreement.

34  "**Personal Expenses**" means reimbursed costs for travel and temporary living expenses.

36  "**Railway Receiving Point**" means the railhead nearest the Joint Property for which freight rates are published, even though an actual
37  railhead may not exist.

39  "**Shore Base Facilities**" means onshore support facilities that during Joint Operations provide such services to the Joint Property as a
40  receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication,
41  scheduling and dispatching center; and other associated functions serving the Joint Property.

43  "**Supply Store**" means a recognized source or common stock point for a given Material item.

45  "**Technical Services**" means services providing specific engineering, geoscience, or other professional skills, such as those performed by
46  engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint
47  Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second
48  paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-
49  Operator, Non-Operator Affiliate, and/or third parties.

51  2.    **STATEMENTS AND BILLINGS**

53  The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the
54  preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all
55  charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified
56  and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications.
57  Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

59  The Operator may make available to Non-Operators any statements and bills required under Section 1.2 and/or Section 1.3.A (*Advances
60  and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper
61  copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and
62  bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of
63  weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via
64  email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings
65  electronically, if available from the Operator, or request paper copies. Such decision may be changed upon thirty (30) days prior written
66  notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

2

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

(C) O P a S

## 3. ADVANCES AND PAYMENTS BY THE PARTIES

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator ends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1) being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

(2) being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

(3) being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

(4) charges outside the adjustment period, as provided in Section 1.4 (*Adjustments*).

## 4. ADJUSTMENTS

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section 1.5 (*Expenditure Audits*).

B. All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section 1.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1) a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

(2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

(3) a government/regulatory audit, or

(4) a working interest ownership or Participating Interest adjustment.

## 5. EXPENDITURE AUDITS

A. A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section 1.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Under no circumstances shall an audit, provided for in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

3

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A. (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B.   The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C.   The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D.   If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office, or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the cost of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E.   ☐ (*Optional Provision – Forfeiture Penalties*)
If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustment shall be made, without interest, to the Joint Account.

6.   APPROVAL BY PARTIES

A.   GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

4

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

## B. AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____ two _____ ( _2_ ) or more Parties, one of which is the Operator, having a combined working interest of at least _____ sixty-seven _____ percent ( _67_ %), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

## C. AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

~~For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.~~

# II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

## 1. RENTALS AND ROYALTIES

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

## 2. LABOR

A. Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1) Operator's field employees directly employed On-site in the conduct of Joint Operations.

(2) Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section I.6.A (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*).

(3) Operator's employees providing First Level Supervision.

(4) Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

(5) Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B. Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

5

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

D.  Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E.  Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (General Matters).

F.  Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G.  Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H.  Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3.  MATERIAL

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material Purchases, Transfers, and Dispositions). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4.  TRANSPORTATION

A.  Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B.  Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1)  If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property. The Operator shall consistently apply the selected alternative.

(2)  If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5.  SERVICES

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (Overhead), or Section II.7 (Affiliates), or excluded under Section II.9 (Legal Expense). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (Overhead).

6.  EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A.  The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (Labor). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____ percent (_____ %) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

6

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Formatted: Tab stops: 5", Centered

equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

7. **AFFILIATES**

A. Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate's goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $ _____. If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (General Matters).

B. For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (General Matters), if the charges exceed $ _____ in a given calendar year.

C. The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate, and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of an Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (Communications).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

8. **DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

9. **LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (General Matters) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

10. **TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct

If ad valorem taxes paid by the Operator are based, in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

7

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

## 11. INSURANCE

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

## 12. COMMUNICATIONS

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

## 13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

## 14. ABANDONMENT AND RECLAMATION

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

## 15. OTHER EXPENDITURES

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

## III. OVERHEAD

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and ~~gas chart integration~~

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

8

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than Onsite inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

## I. OVERHEAD—DRILLING AND PRODUCING OPERATIONS

As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

☑ (Alternative 1) Fixed Rate Basis, Section III.1.B.
☐ (Alternative 2) Percentage Basis, Section III.1.C.

### A. TECHNICAL SERVICES

(i) Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for On-site Technical Services, including third party Technical Services:

☑ (**Alternative 1 – Direct**) shall be charged **direct** to the Joint Account.

☐ (**Alternative 2 – Overhead**) shall be covered by the **overhead** rates.

(ii) Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for Off-site Technical Services, including third party Technical Services:

☐ (**Alternative 1 – All Overhead**) shall be covered by the **overhead** rates.

☑ (**Alternative 2 – All Direct**) shall be charged **direct** to the Joint Account.

☐ (**Alternative 3 – Drilling Direct**) shall be charged **direct** to the Joint Account, **only** to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead – Major Construction and Catastrophe*) shall be covered by the overhead rates.

Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

### B. OVERHEAD—FIXED RATE BASIS

(1) The Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate per month $ 15,030.16 _____ (prorated for less than a full month)

Producing Well Rate per month $ 1,545.00 _____

(2) Application of Overhead—Drilling Well Rate shall be as follows:

(a) Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

9

c o p a s

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work-days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead—Producing Well Rate shall be as follows:

(a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B (2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e) Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4) The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement, provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

C.   OVERHEAD—PERCENTAGE BASIS

(1) Operator shall charge the Joint Account at the following rates:

Development Rate _____ percent (___ %) of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (Legal Expense) and all Material salvage credits.

Operating Rate _____ percent (___ %) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (Rentals and Royalties) and II.9 (Legal Expense); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead—Percentage Basis shall be as follows:

(a) The Development Rate shall be applied to all costs in connection with:

[i] drilling, redrilling, sidetracking, or deepening of a well
[ii] a well undergoing plugback or workover operations for a period of five (5) or more consecutive work-days
[iii] preliminary expenditures necessary in preparation for drilling
[iv] expenditures incurred in abandoning when the well is not completed as a producer
[v] construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (Overhead-Major Construction and Catastrophe).

(b) The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (Overhead-Major Construction and Catastrophe).

2.   OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

10

c o p a s

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.  If the Operator absorbs the engineering, design and drafting costs related to the project:

    (1) ___5___ % of total costs if such costs are less than $100,000; plus

    (2) ___2___ % of total costs in excess of $100,000 but less than $1,000,000; plus

    (3) ___1___ % of total costs in excess of $1,000,000.

B.  If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

    (1) ___5___ % of total costs if such costs are less than $100,000; plus

    (2) ___2___ % of total costs in excess of $100,000 but less than $1,000,000; plus

    (3) ___1___ % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophe, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section II.2 and the provisions of Sections II.2 (Labor), II.5 (Services), or II.7 (Affiliates), the provisions of this Section II.2 shall govern.

3.  AMENDMENT OF OVERHEAD RATES

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (Amendments).

IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

1.  DIRECT PURCHASES

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

11

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**2. TRANSFERS**

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safekeeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

**A. PRICING**

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than appreciable grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1) Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

(a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

(b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2) Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3) Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4) As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

**B. FREIGHT**

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MPF-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2) Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3) Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4) Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

**C. TAXES**

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

12

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

**D.  CONDITION**

(1)  Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the diverting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material transferred to the Joint Property if these services were not repeated for such Material for the receiving property.

(2)  Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the diverting property.

If the Material was originally charged to the Joint Account at used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)  Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)  Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section I.6.A (*General Matters*).

(5)  Condition "E" – Junk shall be priced at prevailing scrap value prices.

**E.  OTHER PRICING PROVISIONS**

(1)  Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of services. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2)  Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

13

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**C O P A S**

## 3. DISPOSITION OF SURPLUS

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

## 4. SPECIAL PRICING PROVISIONS

### A. PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

### B. SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

### C. MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced at K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

14

c o p a s

**1.  DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgement in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A.  A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (General Matters). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B.  Actual transportation costs and Personal Expenses for the inventory team.

C.  Reasonable charges for report preparation and distribution to the Non-Operators.

**2.  NON-DIRECTED INVENTORIES**

A.  OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B.  NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C.  SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (Directed Inventories), V.2.A (Operator Inventories), or V.2.B (Non-Operator Inventories), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (Directed Inventories).

# EXHIBIT "G"
## UNIT OPERATING AGREEMENT
## SOUTHEAST BROOKLYN OIL UNIT
## INSURANCE

Unit Operator shall maintain for the benefit of all Working Interest Owners, insurance of the types and with limits as designated below. Such insurance may carry reasonable deductibles or self-insured retention limits, not to exceed $200,000, as determined by Unit Operator. Deductibles and self-insured retention limits shall be borne by the Working Interest Owners in the proportion in which they own in the Unit Area. Actual net premiums for such insurance shall be charged to the Joint Account, and the Unit Operator shall credit the Working Interest Owners with any refunds, bonuses or other credits.

Working Interest Owners acknowledge that Unit Operator and/or other Working Interest Owners may carry insurance with limits and insured risks greater than that as herein provided, and that any such additional limits and additional protections are for the benefit only of the party carrying and maintaining such additional limits or kinds of insurance. Other Working Interest Owners shall not bear any part of the premium for any such additional limits or kinds of insurance that may be maintained by Unit Operator or other Working Interest Owners for the benefit only of the Unit Operator or other Working Interest Owner.

Working Interest Owners shall be named as Additional Insureds on the liability insurance policies provided below, but only with respect to the performance of the work under the Unit Operating Agreement and to the limits shown in this agreement. This insurance shall be primary to any insurance carried by Working Interest Owners.

All such insurance shall be carried by an insurer or insurers acceptable to Unit Operator and shall be maintained in full force and effect during the term of this Agreement. If so requested, Unit Operator agrees to furnish or cause to be furnished to each of the Working Interest Owners certificates of insurance evidencing such insurance coverage.

Working Interest Owners agree that the limits and coverage set forth herein are adequate as of the effective date hereof. In the event that Unit Operator is unable to procure and maintain any of the insurance as herein provided, Unit Operator shall give prompt written notice to Working Interest Owners, and such notice, which shall be effective 30 days after receipt, shall constitute a waiver of the requirement that Unit Operator procure and maintain the insurance which is the subject of the notice. Any liabilities resulting from accidents or occurrences not covered by the following insurance, or for which insurance is not available, or in excess of the limits of insurance as herein provided, shall be borne by the Working Interest Owners in the proportion in which they own in the Unit Area unless arising out of the gross negligence or willful misconduct of the Unit Operator.

Unit Operator and Working Interest Owners agree to mutually waive Subrogation in favor of each other on all insurance carried by each party and/or to obtain such waiver from the insurance carrier if so required by the insurance contract. If such a waiver is not obtained, the party failing to do so shall indemnify the other party against any claim by an insurance carrier arising out of Subrogation.

## UNIT OPERATOR'S INSURANCE REQUIREMENTS:

a.   Workers' Compensation insurance in full compliance with all applicable state and federal laws and regulations.

b.   Employer's Liability insurance in the limits of $1,000,000 per accident covering injury or death to any employee who may be outside the scope of the Workers' Compensation statute of the state in which the work is performed.

c.   Commercial (or Comprehensive) General Liability insurance with combined single limits per occurrence (and any general aggregate if applicable) of $1,000,000 for Bodily Injury and Property Damage, including Property Damage due to Blowout and Cratering, Completed Operations, and Broad Form Contractual Liability as respects any written contract into which the Unit Operator may enter under the terms of this agreement.

d.   Automobile Liability insurance covering owned, non-owned and hired automotive equipment with limits for Bodily Injury and Property Damage of $1,000,000.

e.   Unit Operator shall carry Control of Well Insurance covering the costs of controlling a Blowout, the expenses involved in redrilling or restoring the well, and certain other related costs. (These are descriptive terms only and exact coverage can be found only in the policy.) The limit for this insurance is $7,500,000.00 for drilling and $1,000,000.00 for producing and shut-in per occurrence with a deductible/self-retention limit as determined reasonable by Unit Operator not to exceed $200,000. Working Interest Owners not wishing to be covered under this policy must notify Unit Operator prior to spud date and provide evidence of satisfactory insurance with minimum limits in the amounts hereinabove provided; and by such refusal of coverage each such Working Interest Owner agrees to be responsible for his proportionate share of such loss, and the Unit Operator agrees not to charge each such Working Interest Owner for any of the premiums associated with Control of Well Insurance.

f.   Excess Liability Insurance, umbrella form, with limits of Five Million dollars ($5,000,000) for each occurrence and Ten Million dollars ($10,000,000) aggregate.

EXHIBIT "H"

To Unit Operating Agreement, Southeast Brooklyn Oil Unit, Conecuh and Escambia Counties, Alabama

## GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Unit Operating Agreement (hereinafter "Operating Agreement"), the parties hereto own and are entitled to share in the Unitized Substances and Outside Substances produced from the wells in the Unit Area. Capitalized terms used herein shall have the meaning ascribed to them in the Operating Agreement.

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the Unit Rich Gas ("gas") produced from the Unitized Interval. However, one or more of the parties may be unable to take or market its interest in the gas production from time to time; therefore, to permit any party to produce and dispose of its interest in the gas production from the Unitized Interval with as much flexibility as possible, the parties hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate and other liquids recovered by lease equipment at the well in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser. Any party whose share of gas is not marketed (either by the party or by the Unit Operator for the party) shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or lost. Unit Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Unit Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participating percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, it any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Unitized Interval, any party taking or marketing gas shall furnish to the Unit Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto; and any such party shall pay to the Unit Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Unit Operator will, in turn, make settlement for all royalties and overriding royalties which are payable on gas produced from the Unitized Interval. In the event that the total royalties and overriding royalties so paid to the Unit Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Unitized Interval, then any such deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Unit Area shall furnish the Unit Operator with division order title opinions on which Unit Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser shall pay, or cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the

-1-

volume of gas actually taken for its account.

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from the Unitized Interval be permanently discontinued before the parties account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Unit Operator along with sufficient accounting documentation as hereinafter described and Unit Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold, less applicable production taxes and royalties theretofore paid, less any reasonable dehydration, compression, treating, processing, gathering or transportation costs actually incurred, including amortized capital costs associated with the design, construction or operation of any plants to dehydrate, compress, treat or process gas, in connection with the sale of the overproduction, at the price and based on the proceeds actually received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party). Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party if parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Unit Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in Unit operations as its share thereof is set forth in the above described Operating Agreement nor shall it change or affect any rights or obligations of any party under the Unit Agreement referenced in the Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.

-2-