## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | Case No. 20-12377-EEB |
| SKLAR EXPLORATION COMPANY, LLC<br>EIN: 72-1417930 | Chapter 11 |
| Debtor. | |
| SKLARCO, LLC<br>EIN: 72-1425432 | Case No. 20-12380-EEB |
| Debtor. | Chapter 11 |

## FPCC USA, INC.'S OBJECTION TO DEBTORS' MOTION
## FOR AUTHORITY TO USE CASH COLLATERAL

FPCC USA, Inc. ("**FPCC USA**") hereby files this objection (**"Objection"**) to the *Motion for Authority to Use Cash Collateral* [Dkt. No. 34] (the "**Cash Collateral Motion**") filed by Sklar Exploration Company, LLC ("**SEC**") and Sklarco, LLC ("**Sklarco**" and collectively with SEC, the "**Debtors**").  In support thereof, FPCC USA states as follows:

### I.    PRELIMINARY STATEMENT[1]

1.     Since the Petition Date, the Debtors' bankruptcy cases have been plagued by a lack of disclosure, a lack of funding, and a lack of a realistic business plan.  Indeed, it seems that the Debtors intend to hide behind the protections of the Bankruptcy Code, hoping that the price of oil will recover in time for the Debtors to refinance the East West Bank loan.  In essence, the Debtors are seeking to force all of the major stakeholders to finance this "bet" by the Debtors on the price of oil.  This course of action completely ignores the Debtors' fiduciary obligations. *See, e.g., In re Hous. Reg'l Sports Network, L.P.*, 505 B.R. 468, 480-81 (Bankr. S.D. Tex. 2014) (recognizing that,

---

[1] Capitalized terms used in this preliminary statement are used elsewhere in this Objection.

upon the bankruptcy filing, a debtor's management becomes "duty-bound to meet fiduciary responsibilities" and to "act in the best interest" of the debtors' estate.); *In re InnKeepers USA Tr.,* 442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010) ("In a bankruptcy case, it is 'Bankruptcy 101' that a debtor and its board of directors owe fiduciary duties to the debtor's creditors to maximize the value of the estate, and each of the estates in a multi-debtor case.").

2.      As it relates to the instant motion, it appears that the Debtors' "proposal" for use of cash collateral completely ignores the rights of working interest holders—rights that are governed by the oil and gas law of a number of states where the Debtors have done business.  First, the Debtors represented that the February Revenue Distribution is not an asset of the estate at the First Day Hearing.[2]   Yet, the Debtors have communicated that they intend to continue to hold this property, thereby subjecting the estate to potential administrative claims for tortious conversion. The Court should order the Debtors to immediately remit the entire February Revenue Distribution. Likewise, the Cash Call Advances are not the property of the estate and must be remitted.  Finally, the Debtors cannot demonstrate that FPCC USA's interests in the cash collateral have been adequately protected and the relief requested in the Cash Collateral Motion must be denied.

3.      At the First Day Hearing, the Court set the final cash collateral hearing for Monday, April 27th, 2018.  To the extent that the Debtors (or other parties in interest) seek further interim approval of the use of cash collateral at the April 27th hearing, the Court should add the following requirement to any Order authorizing use of cash collateral:

> Notwithstanding anything herein or in the Motion to the contrary, the Debtors shall only be entitled to use cash collateral to the extent that:

---

[2] *See* paragraph 14, *infra.*

> (i)  the Debtors shall immediately remit the entire February Revenue Distribution (as such term is defined in FPCC USA, Inc.'s Objection to Debtors' Motion for Authority to Use Cash Collateral) [Dkt. No.___] to the parties owed such monies under applicable non-bankruptcy law;

> (ii)  SEC shall immediately open a segregated account ("Designated Account") into which all non-Sklarco working interest revenues (and only non-Sklarco working interest revenues) are deposited and there must be no use of such funds except to pay working interest owners their proceeds;

> (iii)  no lien or other security interest by East West Bank (or any other purported secured party) shall attach or be deemed to attach to the Designated Account;

> (iv)  the Debtors shall immediately prepare and maintain separate budgets for SEC and Sklarco that shall be accessible to, among other parties, the working interest holders; and

> (v)  the Debtors shall immediately provide the working interest holders (including FPCC USA, Inc.) an accounting of any prepaid amounts advanced by the working interest holders within the last six months.

Similar relief has been granted by this Court in recognition of the rights of working interest holders under applicable oil and gas law. *See In re Kings Peak Energy, LLC*, Case No. 17-16046-EEB, Dkt. No. 41, at 2 ¶ 8 (Bankr. D. Colo.) (Interim Order Authorizing Debtors' Use of Cash Collateral; " … Proven and/or Debtor shall open, establish and maintain a second separate segregated account ('Escrow Account') to which funds for taxes and any suspended outside owner payments (which include non-woring interest owner, overriding royalty interests, royalty payment to landowner and royalty payments) shall be deposited, and (a) shall provide the name of the bank and account number for each Escrow Account to [Macquarie Bank Limited ('MBL')] and (b) describe in writing the sources of funds in the Escrow Account."); *c.f., In re Whiting Petroleum Corp.*, Case No. 20-32021 (DRJ), Dkt. No. 47, at 2 ¶ 2 (Bankr. S.D. Tex.) (Final Order (I) Authorizing Payment of Mineral Obligations and (II) Granting Related Relief; "The Debtors are authorized: (a) to pay

prepetition amounts owed on account of Mineral Obligations in the ordinary course of business on a postpetition bases and (b) to continue making payments on account of the Mineral Obligations in the ordinary course of business on a postpetition basis").

## II.     BACKGROUND

### A.     FPCC USA's Rights Under Applicable Nonbankruptcy Law

4.     FPCC USA is an affiliate of Formosa Petrochemical Corporation ("FPCC"), a Taiwan-based company principally engaged in the refining and distribution of oil products. FPCC's stock trades on the Taiwan Stock Exchange.

5.     Debtor SEC and FPCC USA are parties to several Joint Operating Agreements, pursuant to which SEC serves as operator of certain oil and gas properties; FPCC USA holds a working interest ownership ("**Working Interests**") in those properties.  As an owner of Working Interests, FPCC USA receives revenues on oil and gas production and shares in operational expenses in proportion to its ownership interest.

6.     As an operator, SEC has control of all oil and gas operations on the lands covered under an agreement.  Pursuant to certain Joint Operating Agreements, SEC has the right to demand advance payments for upcoming operations.  Particular to the Cash Collateral Motion and this Objection, two Joint Operating Agreements (collectively, the "**JOA**")[3] contain the following provision:

> Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be

---

[3] The pertinent portions of these two Joint Operating Agreements are attached hereto as Exhibits 1 and 2.  As noted herein, SEC and FPCC USA are parties to several such agreements whereby FPCC USA contributes funds for expenses and receives revenue from production.  In order to streamline this Objection and not burden the Court, FPCC USA only provides the referenced Joint Operating Agreements.  However, FPCC USA will provide additional agreements upon request, subject to entry of an appropriate protective order.

> incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof.

*See* Exhibits 1&2, Article VII.C.

7.     SEC exercised its right under that provision several times over the course of the last year, seeking advance payment from FPCC USA for various operations to be conducted under the JOA.  FPCC USA complied with its obligation under the advance payment provision and paid all requested amounts.  As of March 31, 2020, SEC had $353,331.44 of funds in its possession that FPCC USA pre-paid, but has not been used for the intended operational purposes (the **"Cash Call Advances"**).  *See* Exhibit 3.

8.     With respect to funds of non-operating working interest owners (such as FPCC USA), the JOA explicitly provides that those funds remain the property of the non-operating working interest owners:

> Custody of Funds:  Operator shall hold *for the account of Non-Operators* any funds of Non-Operators advanced or paid to Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and *such funds shall remain the funds of Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to Non-Operators or applied toward the payment of debts*, regardless of whether the debts arise out of the same well or operation for which the funds were advanced or from which the sales proceeds were derived.

*See* Exhibits 1 & 2, Article V.E. (emphasis added). Thus, in addition to any unpaid revenues, the Cash Call Advances remain FPCC USA's property.

9.     In addition to the JOA, the operation of the Southeast and Southwest Brooklyn Oil Units, which contain wells at issue herein, are subject to the jurisdiction of the State Oil and Gas Board of Alabama (the **"Board"**).  In orders dated December 17, 2018, the Board established the

Southeast and Southwest Brooklyn Oil Unit, designating SEC as "Unit Operator," and approving a Unit Operating Agreement. *See, e.g.,* Exhibit 4 (Southeast Brooklyn Unit Order excerpts). Similar to the JOA, the Unit Operating Agreement permits the Unit Operator to request advance payment of expenses. *Id.* at Unit Operating Agreement, ¶ 11.2. Also like the JOA, those funds remain the funds of the working interest owner that advanced those funds until used for their intended purpose or delivered to the working interest owners. *Id.* at ¶ 11.3.

**B.  Procedural History.**

10.  On April 1, 2020 (the "**Petition Date**"), the Debtors filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**" or simply "**Code**"). The Debtors are currently acting as a debtors-in-possession pursuant to sections 1106 and 1107 of the Bankruptcy Code.

11.  On April 16, 2020, Patrick S. Layng, the United States Trustee (in such capacity, the "**US Trustee**") appointed the Official Committee of Unsecured Creditors for Sklar Exploration Company, LLC (the "**Committee**"). Dkt. No. 99. Notably, the US Trustee appointed the Committee to represent only the unsecured creditors of SEC but not Sklarco.[4]

12.  On April 6, 2020, the Debtors filed the Cash Collateral Motion requesting immediate use of cash collateral purportedly subject to a security interest of East West Bank as Agent and Lead Arranger (in such capacity, "**East West Bank**").

---

[4] While FPCC USA was appointed to the Committee, FPCC USA files this objection on its own behalf and not on behalf of the Committee. Notably, FPCC USA has claims against Sklarco based on that certain Partial Assignment of Contract Rights, dated effective as of March 1, 2017 (the "**Assignment**"), wherein Sklarco as "Assignor" agreed to "warrant title against all defects arising out of claims by Assignor or persons claiming by, through or under Assignor." Assignment at 2 ¶ 5. In other words, to the extent that the Debtors (or any third party "by, through or under" the Debtors) seek to interfere with FPCC USA's rights to its Working Interest, FPCC USA has a claim for breach of this warranty against Sklarco.

13.     At a hearing held on April 9, 2020 (the **"First Day Hearing"**), the Debtors requested interim approval of the Cash Collateral Motion.  At the First Day Hearing, the Debtors described how the Debtors' proposed interim budget proposed a slight delay in the payment of more than $4 million in production proceeds (attributable to oil and gas produced in February) owed to third party working interest holders, including FPCC USA (such production proceeds being the **"February Revenue Distribution"**).

14.     As represented to the Bankruptcy Court at the First Day Hearing, the Debtors admitted that the February Revenue Distribution belongs to third-party interest holders and not to the Debtors but that the Debtors were proposing to delay payment as consideration to East West Bank:

> Ms. Riley (as Debtors' Counsel):     … And I would like to address briefly one change that we have proposed to make to the budget, specifically to some of the concerns raised by East-West Bank.
>
> Previously in the week ending April 24th, … there is a $4 million revenue payable to others expense that we have proposed to pay. This is payments that are due to working interest holders, royalty interest holders, overriding royalty interest holders for the time period of February …
>
> We have proposed moving that back.  ***We do not believe that revenue is really an asset of the estate.***  But to address those issues further, give parties additional time to review information that the debtor is in the process of providing, we have proposed moving that back to May 1st and scheduling a hearing on the debtors' continued use of cash collateral prior to making those payments.

4.9.2020 Hr'g Tr. (hereinafter, the **"First Day Hearing Tr."**) at 27:3-27:21 (emphasis added).[5]

15.     At the First Day Hearing, counsel for East West Bank generally represented that a delay until May 1st, 2020 to make the February Revenue Distribution was sufficient:

---

[5] A copy of the First Day Hearing Tr. is attached hereto as Exhibit 5.

> Mr. Suzuki (as counsel to East West Bank): …  I'm trying to understand what that $4 million is comprised of, and whether the rights that the payees would have would be superior to the bank in any way, and we appreciate them pushing that out ***to give us time to investigate.***

First Day Hearing Tr. at 29:19-23 (emphasis added).

16.     On April 15, 2020, this Court entered the Interim Order Authorizing Use of Cash Collateral [Dkt. No. 94] (the "**First Interim Order**").  Under the First Interim Order, FPCC USA's rights to property owned by FPCC USA but held by the Debtor was preserved:

> The funds in an account of either Debtor shall retain their ownership as to the individual Debtor who provided such funds into the account and/or any applicable third party that may claim ownership to such funds under applicable non-bankruptcy law.

First Interim Order at 3 ¶ 3.

17.     Since entry of the First Interim Order, FPCC USA (along with other working interest holders) have communicated with counsel for East West Bank in an effort to alleviate any concerns regarding amounts owed to FPCC USA on account of its Working Interests and the JOA. Indeed, counsel for the Debtors circulated the email attached hereto as Exhibit 6 (the "**April 21st Email**") on the evening of April 21, 2020 that, at first blush, appeared to indicate that the issues concerning, at minimum, payment of the February Revenue Distribution had been resolved.

18.     Nonetheless, counsel for the Debtors later communicated to counsel for FPCC USA that East West Bank has, in fact, not agreed to the payment of the February Revenue Distribution according to the schedule described at the First Day Hearing.  Thus, the filing of this Objection has become necessary, and Court intervention is required.

### III.    ARGUMENT AND AUTHORITIES

**A.    THE DEBTORS SHOULD BE COMPELLED TO IMMEDIATELY PAY THE FEBRUARY REVENUE DISTRIBUTION AND ALL ON-GOING PRODUCTION PROCEEDS OWED TO THIRD PARTIES.**

19.    At the First Day Hearing, the Debtors unambiguously stated their position that February Revenue Distribution is <u>not</u> property of the Debtors' estate. First Day Hearing Tr. at 27:15-16 ("We do not believe that the revenue is really an asset of the estate.").

20.    Moreover, at such hearing, East West Bank simply requested a postponement of such payment until May 1st (as proposed by the Debtors) and at no time indicated that further extension would be necessary.  *See* First Day Hearing Tr. at 29:19-23.  The working interest holders have relied on the Debtors' representation that any delay of payment of the February Revenue Distribution would be minor—and in East West Bank's acquiescence to the same—in agreeing to the relief requested by the Debtors.  *See, e.g.,* First Day Hearing Tr. at 42:6-9.  As such, the Debtors should be estopped from continuing to withhold the February Revenue Distribution. *See Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1069 (10th Cir. 2005) (quoting *Davis v. Wackelee*, 156 U.S. 680, 689 (1895)) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that legal position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.").

21.    By the same token, East West Bank has had ample opportunity to "investigate" the need for the Debtors to make the February Revenue Distribution and—to the extent that it seeks to attack the validity of the interests attributable to the February Revenue Distribution—file an adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7001.  *See* Fed. R. Bankr. P. 7001(2); *see also In re Colrud*, 45 B.R. 169, 172 n.2 (Bankr. D. Alaska 1984).  East West Bank

has not done so and, indeed, cannot continue to use whatever influence it has over the debtor to prevent the Debtors from remitting the February Revenue Distribution.

22.     More to the point, a failure of the Debtors to remit February Revenue Distribution constituted a misappropriation of property that the Debtors have admitted is not property of the estate. *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935) ("The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment."). The liability accruing from the Debtors' failure to remit such non-estate property would likewise constitute an administrative claim. *See Reading Co. v. Brown*, 391 U.S. 471, 486 (1968); *In re Hildebrand*, 205 B.R. 278, 286 (Bankr. D. Colo. 1997) (relying on *Reading* in awarding an administrative claim); *see also Al Copeland Enters., Inc. v. State of Texas (In re Al Copeland Enters., Inc.)*, 991 F.2d 233, 239-40 (5th Cir. 1993) (citing *Reading* and concluding that because the debtor's "post-petition decision [not to carry out its obligations under applicable non-bankruptcy law] to pay sales tax revenues] resulted in monetary harm to the State," an award of interest to the State "constitute[d] an administrative expense under 11 U.S.C. § 503(b).").

23.     Given the issues concerning potential administrative insolvency, the Debtors should be compelled to immediately remit the February Revenue Distribution to avoid the burden of additional administrative claims from the withholding of these production proceeds. The Debtors should further be required to remit production proceeds owed to third party royalty holders on a going-forward basis. *See In re MCZ, Inc.*, 82 B.R. 40, 42-43 (Bankr. S.D. Tex. 1987) (requiring debtors to remit production proceeds held by debtors "as bailee" when estate had nothing more than a "bare possessory interest").

**B.** **THE CASH CALL ADVANCES ARE ALSO NOT PROPERTY OF THE ESTATE AND MUST BE REMITTED.**

24.     Likewise, FPCC USA's objects to the use of the Cash Call Advances for any purpose not stated in the written demand for a particular cash call.  The Cash Call Advances are held in trust by Debtor SEC, not owned by SEC.

25.     The Cash Call Advances are not property of the estate under 11 U.S.C. § 541 – each Cash Call Advance is owned by the working interest owner who advanced the funds.

26.     A bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  "Under 11 U.S.C. § 541(d), 'property of the estate' includes property in which a debtor holds, as of the commencement of the debtor's bankruptcy case, only legal title and not an equitable interest, but only to the extent of the debtor's legal title to such property and not to the extent of any equitable interest that the debtor does not hold.  On its face, § 541(d) thus excludes from a debtor's bankruptcy estate property that the debtor holds in constructive trust for another." *Ocker v. Quarles (In re Quarles)*, Nos. 11-36436 HRT, 1201093 HRT, 2014 Bankr. LEXIS 22, at *25 (Bankr. D. Colo. Jan. 3, 2014) (*quoting In re Ebel*, 144 B.R. 510, 515 (D. Colo. 1992); *see also MCZ, Inc.*, 82 B.R. at 42-43 (requiring debtors to remit production proceeds held by debtors "as bailee" when estate had nothing more than a "bare possessory interest").   In sum, "[p]roperty subject to a trust is not property of the bankruptcy estate."  *Hill v. Kinzler (In re Foster)*, 275 F.3d 924, 926, (10th Cir. 2001) (citations omitted).

27.     "The party seeking imposition of a constructive trust bears the burden of establishing the trust requirements."  *Id.*  Moreover, "a creditor cannot simply claim entitlement to a constructive trust."  *Cousatte v. Lucas (In re Lucas)*, 300 B.R. 526, 533 (B.A.P. 10th Cir. 2003).  Instead, bankruptcy courts must look to state law to determine whether to impose a constructive

trust. *Hernandez v. Musgrave (In re Musgrave)*, 2011 Bankr. LEXIS 282, *52, 2011 WL 312883 (B.A.P. 10th Cir. 2011) (citing *Hill v. Kinzler*).

28.     As the applicable situs of the Working Interests generally fall within Alabama and Florida, the decisions from such courts should control the imposition of a construction trust over production proceeds from the Working Interests. *See* Exhibits 1 & 2 at 1 (coversheet).  Moreover, the JOAs are generally governed by Alabama law. *See* Exhibits 1 & 2 at 14 § B (governing law).

29.     Alabama and Florida courts employ an expansive view of the constructive trust and its appropriate application as an equitable remedy. "A constructive trust will be found when property has either been acquired by fraud, or where in the absence of fraud it would not be equitable to allow it to be retained by him who holds it.  In essence, a constructive trust is imposed to prevent unjust enrichment."  *Brothers v. Fuller*, 607 So. 2d 135, 137 (Ala. 1992) (internal citations and quotations omitted).  Relying on equitable principles, the Alabama Supreme Court explained in another decision:

> Equity may also impress a constructive trust on property in favor of one beneficially entitled thereto against a person, who, against the rules of equity and against good conscience, in any way either has obtained or holds and enjoys legal title to property that in justice that person ought not to hold and enjoy.  A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.

*Brown v. Brown*, 604 So. 2d 365, 370 (Ala. 1992) (internal citations and quotations omitted). Further, and significant here, the principle that funds held in trust are not part of the bankruptcy estate "applies with equal force to funds impressed with a 'constructive trust' by operation of law." *In re Poffenbarger*, 281 B.R. 379, 392 (Bankr. S.D. Ala 2002) (applying Alabama law); *accord. Saporta v. Saporta*, 766 So. 2d 379, 382 (Fla. Dist. Ct. App. 2000) ("Even when a property has

not been acquired by fraud, a constructive trust will be imposed if equity would be offended should the property be retained by the person holding it. This is so because a constructive trust is a remedial device with the dual objectives of restoring property to its rightful owner and preventing unjust enrichment.") (internal citations omitted).

30.     Here, the imposition of a constructive is appropriate.  SEC solicited advance payments from FPCC USA to be applied to operations pursuant to the JOA.  In accordance with its contractual obligations, FPCC USA paid as requested.  Both the JOA and the Unit Operating Agreement specifically provide that those funds remain FPCC USA's property unless appropriated to the operations for which they were requested.

31.     Rather than maintaining those funds for the purposes for which they were requested, the Debtors now seek the Court's permission to utilize FPCC USA's money to keep the Debtors afloat during the pendency of their bankruptcy cases. Clearly, the Debtors will be unjustly enriched if they are permitted to use FPCC USA's money for this purpose.  Pursuant to operation of applicable law, equity imposes a constructive trust in this situation, and FPCC USA is deemed rightful owner of these funds.

32.     A prior decision from the Tenth Circuit Court of Appeals presents a similar factual scenario and is instructive here.  In *In re Mahan & Rowsey, Inc.*, 817 F.2d 682 (10th Cir. 1987), the court reviewed a judgment of a district court sitting as an appellate Court in bankruptcy.  There, pursuant to an "oil well operating agreement," a working interest owner paid the operator his proportionate share of expenses for drilling and completion of a well.  *Id.* at 683.  However, the operator over-billed its working interest owner, but rather than returning the approximately $42,000 overpayment, the operator deposited the funds into its own accounts and utilized the

money for its own purposes. *Id.* When the operator later filed for bankruptcy, approximately $11,000 of the working interest owner's money remained. *Id.*

33.    At the lower level, the district court agreed with the bankruptcy court's determination that a constructive trust was imposed upon the overpayment. *Id.* The Tenth Circuit also agreed with that determination, explaining that a "constructive trust was imposed involuntarily upon the Debtor by operation of equity." *Id.* at 684. The Court elaborated:

> The sums subject to the constructive trust never became a part of the bankruptcy estate. Because the money was held by the Debtor [operator] prior to bankruptcy only for the benefit of [the working interest owner] under a trust arising from nonbankruptcy law,[6] that money was not property of the estate by definition.

*Id.* (citing *inter alia* 11 U.S.C. § 541(a)(1) and (c)(2)). Likewise, a constructive trust arises by operation of law here, as SEC requested advance payment of FPCC USA's share of expenses and is required to utilize that money only for the purpose requested.

34.    Further, while fraud is not required to impose a constructive trust, the timing and amounts of SEC's cash call requests are troubling, especially given its representations to the Court. The majority of the Cash Call Advances (approximately $413,000) were solicited by SEC and promptly paid by FPCC USA in the two months before Debtors' commenced this bankruptcy action. Now, Debtors seek to use the recent infusion of money for its own purposes, rather than maintaining the funds for the provided purposes, as required by contract, order, and equity.

35.    Debtors' lack of respect for the purpose of the Cash Call Advances is amplified by their representations to the Court. In the Cash Collateral Motion, Debtors represented that they only had approximately $2.4 million in their bank accounts. During the First Day Hearing,

---

[6] In *Mahan*, the Tenth Circuit based its decision on a fiduciary relationship arising from the duty of fair dealing in contractual relationships. In contrast, the nonbankruptcy law relied upon here are Alabama's guidelines for the imposition of a constructive trust.

Debtors' counsel explained that working interest owners had pre-paid expenses and how those funds were to be applied. However, while FPCC USA recently provided a large sum, of which only a portion has been applied for its intended purpose, counsel represented that none of Debtors' remaining money included working interest owners' advance payments:

> The Court:    Okay. So the two million in the debtors' - - the DIP's bank account on the date of filing is attributable then to what?
>
> Ms. Riley:    Primarily to ongoing operations. It is attributable, in some part, to income generated by Sklarco, additional - - and additional joint interest billings paid to the debtor for, in those instances, where Sklar Exploration does not have a cash call advance on hand, and there are working interest holders participating in the property.
>
> But primarily those funds are from the ongoing revenue generated from the sale of oil and gas - - oil and gas products.
>
> The Court:    So none of it is attributable to these prepayment of cash call advances?
>
> Ms. Riley:    We don't believe so, Your Honor.

*See* First Day Hearing Tr. at 25:8-22. After issues were raised concerning this representation, Debtors' counsel noted that operator was not required to maintain advance payments in a separate account.

36.    While it is true that Debtors were not required to maintain a separate account, that does not permit the unrestrained spending of funds earmarked for a specific purpose, and which did not belong to them. Debtors' actions eviscerate the provisions in both the JOA and the Unit Operating Agreement that specifically state that the funds remain the property of the working interest owner. However, it is clearly possible that Debtors have ignored that provision and have misappropriated FPCC USA's Cash Call Advances. *See Knapp v. Seligson (In re Ira Haupt)*, 361 F.2d 164, 168 (2d Cir. 1966) (Friendly, J.) ("The conduct of bankruptcy [cases] not only should be right but must seem right.").

37.     Given these circumstances and the applicable law, the Cash Call Advances are not part of Debtors' bankruptcy estate, and Debtors should not be permitted to use those funds to sustain themselves.  Further, those funds should be segregated in a separate account to be preserved for their intended purpose or returned to FPCC USA.

C.     **THE USE OF CASH COLLATERAL MUST BE DENIED ABSENT ADEQUATE PROTECTION TO FPCC USA**

38.     It cannot be denied that, at bottom, FPCC USA has an interest in certain of the Debtors' cash pursuant to its Working Interest and the JOA.  Indeed, as mentioned above, the Debtors have represented as much to the Court in seeking interim approval of the Cash Collateral Motion. First Day Hearing Tr. at 27:15-16 ("We do not believe that the revenue is really an asset of the estate.").

39.     As such, the Court is required to prohibit and/or condition the use of the Debtors' cash "as is necessary to provide adequate protection of such interest."  Bankruptcy Code § 363(e); *see also In re Heatron, Inc.*, 6 B.R. 493 (Bankr. W.D. Mo. 1980) ("Providing adequate protection is mandatory[.]"); *cf. Lyons v. Federal Sav. Bank (In re Lyons)*, 193 B.R. 637, 644 (Bankr. D. Mass. 1996) (holding that "[a]dequate protection is a condition precedent to obtaining turnover.").

40.     The Debtors have the burden of demonstrating that FPCC USA's interest in the cash at issue has been adequately protected in order to be granted use of such cash.  Bankruptcy Code § 363(p)(1) (providing that a debtor in possession "has the burden of proof on the issue of adequate protection").  And, to the extent that the Debtors have failed to meet such burden, the Debtors use of such cash must be prohibited.  *See, e.g., In re Magness*, 972 F.2d 689, 697 (6th Cir. 1992); *In re Martin*, 761 F.2d 472, 475 (8th Cir. 1985).

41.     Here, the Debtors have readily admitted that FPCC USA and others have, at minimum, an interest in certain of the cash, including the February Revenue Distribution.

However, the Debtors have offered no showing of adequate protection. For this reason alone, the Cash Collateral Motion must be denied.

WHEREFORE, FPCC USA requests that the Cash Collateral Motion be denied and that the Court grant such relief to FPCC USA that would be equitable and just.

*[Continues on Next Page]*

Dated:  April 23, 2020                    Respectfully submitted,

**JONES WALKER LLP**

By: */s/ Joseph E. Bain*
Joseph E. Bain  *(Admitted Pro Hac Vice)*
Amy L. Vazquez  *(Admitted Pro Hac Vice)*
811 Main Street, Ste. 2900
Houston, Texas 77002
Tel: 713-437-1800
Fax: 713-437-1801
Email: jbain@joneswalker.com;
            avazquez@joneswalker.com

-and-

Madison M. Tucker *(Admitted Pro Hac Vice)*
201 St. Charles Avenue
New Orleans, Louisiana 70170-5100
Tel: 504-582-8000
Fax: 504-589-8261
Email: mtucker@joneswalker.com

*Counsel for FPCC USA, Inc.*

## CERTIFICATE OF SERVICE

I certify that on April 23, 2020, I caused a copy of the foregoing document to be served by electronic transmission to all registered ECF users appearing in this case.

*/s/ Joseph E. Bain*
Joseph E. Bain