# Exhibit 5

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

```
IN RE:                          ) Case No. 1:20-bk-12377
                                ) (Jointly Administered)
SKLAR EXPLORATION COMPANY,      ) Chapter 11
LLC AND SKLARCO, LLC,           )
                                ) Courtroom F
                                ) U.S. Custom House
                                ) 721 19th Street
          Debtors.             ) Denver, Colorado 80202-2508
                                )
                                ) April 9, 2020
                                ) 2:32 p.m.
```

### TRANSCRIPT TELEPHONIC HEARING:  FIRST DAY MOTIONS
### BEFORE HONORABLE ELIZABETH E. BROWN
### UNITED STATES BANKRUPTCY JUDGE

```
TELEPHONIC APPEARANCES:

For the Debtor:                 Kutner Law
                                By:  LEE M. KUTNER, ESQ.
                                     KERI L. RILEY, ESQ.
                                1660 Lincoln Street
                                Suite 1850
                                Denver, CO 80264


Transcript requested by:        JOSEPH E. BAIN, ESQ. (Jones
                                Walker) and DUANE J. BRESCIA, ESQ.
                                (Clark Hill Strasburger)
Requested on:                   April 14, 2020
Provided on:                    April 15, 2020
Cost of Transcript:             $453.75 (Daily @ $6.05/page)
```

**TRANSCRIPTION SERVICE:**          **TRANSCRIPTS PLUS, INC.**
                                    **435 Riverview Circle**
                                    **New Hope, Pennsylvania 18938**
                                    **Telephone:  215-862-1115**
                                    **Facsimile: 215-862-6639**
                                    **e-mail CourtTranscripts@aol.com**

```
  Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.
```

```
TELEPHONIC APPEARANCES:
(Continued)

For the Debtor:              Berg Hill Greenleaf Ruscitti, LLP
                             By:  GIOVANNI M. RUSCITTI, ESQ.
                             1525 17th Street
                             Denver, CO 80202


Special Counsel for the      Armbrecht Jackson LLP
Debtor:                      By:  CONRAD ARMBRECHT, ESQ.
                                  BENJAMIN FORD, ESQ.
                             RSA Tower, 27th Floor
                             11 North Water Street
                             Mobile, Alabama 36602


For the U.S. Trustee:        Department of Justice
                             Office of the U.S. Trustee
                             By:  PAUL MOSS, ESQ.
                             Byron G. Rogers Federal Building
                             1961 Stout St.
                             Suite 12-200
                             Denver, CO 80294


For East-West Bank:          Bryan Cave Leighton Paisner LLP
                             By:  CRAIG K. SCHUENEMANN, ESQ.
                             1700 Lincoln Street
                             Suite 4100
                             Denver, CO 80203


                             Bryan Cave Leighton Paisner LLP
                             By:  BRYCE SUZUKI, ESQ.
                             Suite 2200
                             Two North Central Avenue
                             Phoenix, AZ 85004-4406


For Stoneham Drilling        Bradley
Corporation:                 By:  JAMES B. BAILEY, ESQ.
                             1819 5th Ave. North
                             Birmingham, AL 35203


For Lucas Petroleum:         Clark Hill Strasburger
                             By:  DUANE BRESCIA, ESQ.
                             720 Brazos
                             Suite 700
                             Austin, TX 78701
```

```
TELEPHONIC APPEARANCES:
(Continued)


For Tauber, et al.:          Maynes, Bradford, Shipps
                             & Sheftel, LLP
                             By:  THOMAS H. SHIPPS, ESQ.
                                  SHAY L. DENNING, ESQ.
                             835 E. Second Avenue
                             P.O. Box 2717
                             Suite 123
                             Durango, CO 81301

                             Barnet B. Skelton, Jr., P.C.
                             By:  BARNET B. SKELTON, JR., ESQ.
                             815 Walker
                             Suite 1502
                             Houston, TX 77002


For AEEC II, LLC, et al.:    Kean Miller
                             By:  ERIC LOCKRIDGE, ESQ.
                             400 Convention Street
                             Suite 700
                             Baton Rouge, LA 70802


For Baker Hughes:            Foley & Lardner LLP
                             By:  TIMOTHY C. MOHAN, ESQ.
                             600 17th Street
                             Suite 2020S
                             Denver, CO 80202


For Pruet Oil Company,       Holland & Hart
LLC, et al.:                 By:  MATTHEW J. OCHS, ESQ.
                             555 17th Street
                             Suite 3200
                             Denver, CO 80202

                             Balch & Bingham
                             By:  JEREMY L. RETHERFORD, ESQ.
                             1901 Sixth Ave N
                             Suite 1500
                             Birmingham, AL 35203
```

4

```
TELEPHONIC APPEARANCES:
(Continued)


For Meritage Energy            Buck Keenan
et al.:                        By:  ROBERT L PADDOCK, ESQ.
                               2229 San Felipe
                               Suite 1000
                               Houston, TX 77019


For Hopping Green & Sams:      Hopping Green & Sams
                               By:  TIMOTHY MICHAEL RILEY, ESQ.
                               119 S. Monroe St.
                               Suite 300
                               Tallahassee, FL 32301


For the Colorado               Office of the Colorado
Department of Revenue:         Attorney General
                               By:  DEANNA L. WESTFALL, ESQ.
                               1300 Broadway, 8th Floor
                               Denver, CO 80026


For Kudzo Oil Properties,      Moye White
LLC, et al:                    By:  TIMOTHY M. SWANSON, ESQ.
                               1400 16th St.
                               6th Floor
                               Denver, CO 80202

                               Law Offices of Craig Geno
                               By:  CRAIG GENO, ESQ.
                               587 Highland Colony Parkway
                               Ridgeland, MS 39157


For FPCC USA, Inc.:            Jones Walker LLP
                               By:  JOSEPH ERIC BAIN, ESQ.
                               811 Main Street
                               Suite 2900
                               Houston, TX 77002


For Frank's Exploration:       Cook, Yancey, King & Galloway PLC
                               By:  JOHN KALMBACH, ESQ.
                               333 Texas Street, Suite 1700
                               Shreveport, LA 71101
```

5

```
TELEPHONIC APPEARANCES:
(Continued)


LISTEN ONLY:

STEVEN HATCHER, ESQ.

Berger Singerman LLP
By:  MICHAEL NILES, ESQ.
313 North Monroe Street
Suite 301
Tallahassee, FL 32301

KYLE McINNIS, ESQ.
HATTIE V. GUIDRY, ESQ.

JEFFREY SIMONS, ESQ.

Jackson Walker
By:  VICTORIA ARGEROPLOS
1401 McKinney Street
Suite 1900
Houston, Texas 77010

Copeland Cook Taylor & Bush
By:  Christopher Meredith, ESQ.
GLENN TAYLOR, ESQ.
1076 Highland Colony Parkway
Ridgeland, Mississippi 39157
```

1      **(Due to multiple parties speaking simultaneously or a**

2 **participant not being heard clearly, an indiscernible resulted)**

3      THE COURT:  Good afternoon, all.  This is Judge

4 Brown, please let me know if I'm coming in too softly or too

5 loudly, and I'll be happy to adjust.

6      And let me pull up the case number, one second.

7               (Pause)

8      THE COURT:  All right, we are here in the case of

9 Sklar Exploration Company, LLC and Sklar Co., LLC, which are

10 jointly administered under Case Number 20-12377.

11      We're here on several first day motions.  Let's go

12 ahead and take appearances, and we'll start with the debtor,

13 and I'm going to ask you all to go slowly so that I can find

14 you on this list and check you off, okay?  Let's start with the

15 debtor.

16      MR. KUTNER:  Thank you, Your Honor.  This is Lee

17 Kutner, and I'm appearing along with Keri Riley on behalf of

18 the debtor.  And Keri Riley will be taking the lead on

19 addressing most of the issues today.

20      THE COURT:  Very good; thank you.

21      MR. SCHUENEMANN:  Craig -- Craig Schuenemann on

22 behalf of secured creditor, East-West Bank.  And with me is my

23 colleague, Bryce Suzuki.  I also believe we may have a client

24 rep on the phone, Ms. Mary Lou Allen.

25      THE COURT:  Ms. Allen, are you on the line?

 1              MS. ALLEN:  Good morning, Your Honor.

 2              THE COURT:  Oh, very good.

 3         All right, and were there any client reps on the line

 4    for the debtors?

 5              MR. SKLAR:  Yes, this is Howard Sklar, the manager of

 6    Sklar Exploration Company, LLC and also Sklarco, LLC.

 7              MR. JONES:  And you've got Marshall Jones, Vice

 8    President, COO of Sklar Exploration and Sklarco, LLC.

 9              THE COURT:  Okay, thank you.

10              MS. RILEY:  And, Your Honor, there's also John

11    Strausser, he is the controller and CFO of the debtor, he is

12    also on the line, as are special counsel, Giovanni Ruscitti and

13    Conrad Armbrecht.

14              MR. RUSCITTI:  Good afternoon, Your Honor.  This is

15    Giovanni Ruscitti.

16              THE COURT:  Thank you.

17              MULTIPLE SPEAKERS:  (Indiscernible).

18              THE COURT:  So we don't all talk over each other,

19    what I'm going to do is go through this list of entities, and

20    then have you enter your appearance for that particular entity.

21         So the first one on my list is Stoneham Drilling.

22              MR. BAILEY:  Your Honor, James Bailey on behalf of

23    Stoneham Drilling Corporation.

24              THE COURT:  Thank you.

25              Lucas Petroleum?

1      (No audible response heard)

2    THE COURT:  If you put us on mute, you should unmute

3 us to make your appearance for this purpose.

4    MR. BRESCIA:  Thank you, Your Honor.  Yes, Your

5 Honor, I apologize.  Duane Brescia for Lucas Petroleum.

6    I have submitted the request to be admitted to the

7 District, and have been approved.  And although I'm not sure if

8 I file anything with the Bankruptcy Court, I do have filing

9 privileges, and I request permission to appear today at this

10 hearing.

11    THE COURT:  Okay.  As you know, we're not holding

12 court in person because of Coronavirus, so everybody's request

13 to appear telephonically is, of course, granted.  But thank you

14 for letting me know that you are in process for getting

15 admitted to the District Court here.

16    All right.  How about for CTM 2005 Limited?

17    MR. SHIPPS:  Your Honor, this is Thomas Shipps from

18 Maynes, Bradford, Shipps & Sheftel.  I'm here today with

19 myself, and also my partner, Shay Denning.

20    We may also have been joined by Barnet B. Skelton,

21 Jr., in Houston, Texas, and there may also be representatives

22 of the clients, Tauber Exploration and Production, CTM 2005,

23 Pickens Financial Group, LLC, and I&L Missouri I or Miss I, LP

24 may also be present.

25    THE COURT:  Is it okay if I shorten your client rep

9

1  name to Tauber for this hearing?

2         MR. SHIPPS:  That would be appreciated, Your Honor.

3         THE COURT:  Okay.  And who will be speaking for your

4  clients, yourself or Mr. Denning?

5         MR. SHIPPS:  I will be speaking for the client; Mr.

6  Shipps.

7         THE COURT:  Okay.

8         MR. SHIPPS:  And it is possible, Your Honor,

9  depending upon how things proceed, if Mr. Barnet is also

10  permitted potentially to participate.

11         THE COURT:  Is he a member of your firm or --

12         MR. SHIPPS:  Mr. Barnet is a practitioner in Houston,

13  he was admitted to the Colorado District Court here either a

14  day -- a couple of days ago, and I --

15         THE COURT:  Okay.

16         MR. SHIPPS:  I believe he's been trying to enter his

17  appearance for the last couple of days.

18         THE COURT:  Okay, all right.  So just to keep this

19  moving, anybody who's on the line, other than Mr. Denning and

20  Mr. Shipps for the Tauber clients, plural, just so we can keep

21  a good record of who's on the line, just state your name

22  quickly, please.

23         MR. GOOLSBY:  Jim Goolsby with Tauber Exploration &

24  Production Company.

25         THE COURT:  Okay.

10

1              MR. SKELTON:  This is Barnet B. Skelton, Jr.,

2  Houston, Texas on behalf of the Tauber Group.

3              THE COURT:  Okay.  Anybody else?

4                  (No audible response heard)

5              THE COURT:  All right, okay.  So let's go down to

6  AEEC II LLC.

7              MR. LOCKRIDGE:  Your Honor, Eric Lockridge with Kean

8  Miller on behalf of -- on behalf of multiple clients, including

9  AEEC.

10             THE COURT:  Can I call them all Anderson?

11             MR. LOCKRIDGE:  That would be correct, Your Honor.

12             THE COURT:  Okay, excellent; thank you.

13             All right, Baker Hughes?

14                  (No audible response heard)

15             THE COURT:  Anybody?  Is Mr. Mohan --

16             MR. MOHAN:  I'm sorry, Your Honor.  I'm sorry, Your

17 Honor.  Timothy Mohan with Foley & Lardner on behalf of Baker

18 Hughes, I'm here, and I'll be the only representative of Baker

19 Hughes.

20             THE COURT:  Okay.

21             MR. MOHAN:  Thank you.

22             THE COURT:  How about, everybody, until we get

23 through the appearances, take us off of mute, and you can put

24 us back on once we get going.

25             Okay.  For the U.S. Trustee's Office?

11

1            MR. MOSS:  Good afternoon, Your Honor.  Paul Moss on

2  behalf of the U.S. Trustee.

3            THE COURT:  Thank you.

4            For Plains Gas Solution and Plains Marketing?  Mr.

5  Neiman, are you there?  Kevin Neiman, are you there?

6                 (No audible response heard)

7            THE COURT:  Okay, I guess not.

8            All right, Pruet Oil and Pruet Production?

9            MR. OCHS:  Good afternoon, Your Honor.  Matt Ochs

10  with Holland & Hart, and with me on the phone is my co-counsel,

11  Jeremy Retherford of Balch & Bingham, and we appear on behalf

12  of Pruet Production and Pruet Oil, we'll just refer to them as

13  Pruet.

14            THE COURT:  Okay.  And who would be speaking on

15  behalf of these clients?

16            MR. OCHS:  Matt Ochs, I will, Your Honor.

17            THE COURT:  Okay, all right; thank you.

18            Next is Meritage Energy and Strago Petroleum.

19            MR. PADDOCK:  Yes, Your Honor.  This is Robert

20  Paddock here on behalf of Strago Petroleum and Meritage Energy.

21            THE COURT:  And if I call them Strago clients, that

22  will be okay?

23            MR. PADDOCK:  That's fine.

24            THE COURT:  Thank you.

25            All right, then let's see, Hopping Green & Sams?

1          MR. RILEY:  Good afternoon, Your Honor.  This is

2   Timothy Riley on behalf of Hopping Green & Sams.

3          THE COURT:  Thank you.

4          BP American -- America Production Company?  Michael

5   Rubenstein, are you on the line?

6               (No audible response heard)

7          THE COURT:  Well, I guess he dropped off; okay.

8          East-West Bank, we've gotten already.

9          We already got those folks.

10         Colorado Department of Revenue?

11         MS. WESTFALL:  Yes, good afternoon, Your Honor.

12   Deanna Westfall on behalf of Colorado Attorney General's Office

13   who have more than one agency.

14         THE COURT:  Okay.

15         MS. WESTFALL:  So the Department of Revenue or

16   Attorney General is fine.

17         THE COURT:  Okay, thank you.  Did I already call --

18   yes, I did that one.

19         How about for Fletcher Petroleum, is there anybody?

20         MR. NILES:  Good afternoon, Your Honor.  This is Mike

21   Niles from Berger Singerman for Fletcher Petroleum.

22         I just did want to let you know that I'm not

23   currently admitted in Colorado.  A longstanding client had just

24   informed us of this hearing.  We don't intend to participate or

25   take a position in any of the motions filed, but just listen if

13

1 that's okay.

2          THE COURT:  That's fine.  And, you know, these first

3 day orders, we understand that.  But if you're going to

4 participate in the future, we'll need you to fill out the form

5 and pay the boxtop amount for the District Court, and you'll be

6 all set.

7          MR. NILES:  Understood; thank you, Your Honor.

8          THE COURT:  Okay.  How about -- let's see if I've got

9 anybody else.  Mr. Swanson, who do you represent?

10          MR. SWANSON:  Oh, good afternoon, Your Honor.  Tim

11 Swanson, I represent Kudzo Oil Properties, Alabama Oil and Gas,

12 LLC --

13          THE COURT:  I'm hearing a little muffled, can you

14 just spell the first name of all of that?

15          MR. SWANSON:  Sure.  K U D Z U [sic] --

16          THE COURT:  Kudzu.

17          MR. SWANSON:  And you can refer Kudzu entities.

18          THE COURT:  Thank you.

19          MR. SWANSON:  Also on the line, Your Honor, is Mr.

20 Craig Geno from the Law Offices of Craig Geno in Jackson,

21 Mississippi.  He is in the process of getting admitted to the

22 District Court; we were just retained within a few hours ago.

23 We expect him to be admitted fairly quickly, but he is on the

24 line.  If we participate, it would be Mr. Geno speaking.

25          THE COURT:  Mr. Geno.  Can you spell that last name?

14

1          MR. SWANSON:  Yes, Your Honor, G E --

2          MR. GENO:  G E N O.

3          MR. SWANSON:  G E N O.

4          THE COURT:  Geno, oh, that's way too easy, okay.

5          All right, and then, let's see, is Conrad -- Conrad

6  Armbrecht on the line?

7          MR. ARMBRECHT:  Yes, Your Honor.  I am Alabama

8  counsel for Sklar, and I will not be speaking today.

9          THE COURT:  Got it, okay, sorry.

10         All right.  Is there anybody then that has not

11 entered their appearance who is on the line listening in?

12         MULTIPLE SPEAKERS:  (Indiscernible).

13         THE COURT:  Let's do one at a time.  Go ahead.

14         MR. HATCHER:  Your Honor, this is Steven Hatcher, in-

15 house counsel for Sklar.  I'm not going to be participating in

16 the call.

17         THE COURT:  Okay.

18         MR. FORD:  And, Your Honor, this is Ben Ford, also

19 special counsel from Alabama, along with Conrad Armbrecht.  I'm

20 not planning on speaking, as well.

21         THE COURT:  Okay; thank you.

22         Anybody else?

23         MR. BAIN:  Yes, Your Honor.  This is Joseph Bain with

24 the law firm of Jones Walker on of FPCC USA and my client

25 (indiscernible) will also be listening in.

1          THE COURT:  Okay.  So I need you to repeat, again,

2  your name.

3          MR. BAIN:  Sure.  Joseph Bain, the last name is

4  spelled B --

5          THE COURT:  Can you spell that?

6          MR. BAIN: -- as in boy, A I N.  Yes, ma'am, B, as in

7  boy, A I N.

8          THE COURT:  Bain.  Okay.  And your client, again, is

9  FP USA?

10          MR. BAIN:  FPCC USA.

11          THE COURT:  Got it now; thank you.

12          MR. BAIN:  Thank you.

13          THE COURT:  Anybody else?

14          MULTIPLE SPEAKERS:  (Indiscernible).

15          MR. SIMONS:  Your Honor, Jeffrey Simons for JJS

16  Working Interest.

17          THE COURT:  Simons for JJ --

18          MR. SIMONS:  JJS Working Interest, Your Honor.

19          THE COURT:  Okay, thank you.

20          MR. SIMONS:  Thank you.

21          THE COURT:  Anybody else?

22          MR. KALMBACH:  Your Honor, John Kalmbach, it's K A L

23  M B A C H, and I'm here for Frank's Exploration Company, LLC.

24          THE COURT:  Got it; thank you.

25          Anybody else?

16

1              MULTIPLE SPEAKERS:  (Indiscernible).

2              MS. ARGEROPLOS:  Victoria Argeroplos.

3              THE COURT:  Victoria what?

4              MS. ARGEROPLOS:  Argeroplos, A R G E R O P L O S, I'm

5   with the law firm of Jackson Walker down in Houston, and I'm

6   not going to be participating in the hearing, but I'm here on

7   behalf of Zant Energy (phonetic).

8              THE COURT:  Okay, thank you.

9              MS. ARGEROPLOS:  Thank you.

10             THE COURT:  Anybody else.

11             MR. McINNIS:  Your Honor, Kyle McInnis and Hattie

12  Guidry on behalf of Anderson listening in.

13             THE COURT:  Okay; thank you.

14             Anybody else listening in?

15             MR. TAYLOR:  Your Honor, it's Glenn Taylor and

16  Christopher Meredith listening in for Eastern Fishing and

17  Rental Tool Company and Paul Minerals.

18             THE COURT:  So if I say Eastern Fishing, that's

19  enough?

20             MR. TAYLOR:  That's enough.

21             THE COURT:  Okay; thank you.

22             Anybody else?

23                  (No audible response heard)

24             THE COURT:  Okay.  Now our entries of appearances

25  will probably exceed the time we spend on the actual motions,

1  so let's jump in.  Ms. Riley, if you'd like to take us through

2  your motions that you want to cover today.

3          MS. RILEY:  Certainly, Your Honor.

4          THE COURT:  I guess what we'll do is take one a time,

5  and see if anybody wants to be heard on those particular

6  motions.

7          MS. RILEY:  All right.

8          THE COURT:  And then we'll go to the next motion,

9  okay.

10          MS. RILEY:  Thank you, Your Honor.

11          Just for the purposes of providing some background

12  with respect to what these debtors are and what they do, Sklar

13  Exploration is the operating company that provides -- it

14  operates several oil and gas properties located throughout

15  primarily the southeastern -- southeastern United States,

16  including Texas, Louisiana, Mississippi, and Alabama, as well

17  as Florida.

18          There are also some properties located in Montana and

19  Wyoming.

20          Sklar Exploration does not operate any properties

21  within the State of Colorado, however, it is headquartered in

22  Boulder.

23          Sklarco is a holding company that holds primarily oil

24  and gas leases, as well as working interests and several other

25  interests.

1          A majority of the properties in which Sklarco holds

2    an interest are operated by Sklar Exploration.  However, there

3    are several properties that it holds an interest in that are

4    operated by third -- non-related third parties.

5          Sklar Exploration itself is managed by -- it's owned

6    primarily by the Howard S. Sklar Trust and managed by Howard

7    Sklar.  It is a third generation Sklar-managed company, and has

8    been in operation for over 80 years.  Mr. Sklar himself has

9    significant experience in operating this business, and has been

10   in charge of it for a number of years.

11         With respect to the debtors' operations, again, they

12   do operate almost exclusively in the southeastern United

13   States.  And the reason for this filing was really due to the

14   extreme decline in the price per barrel of oil.  Earlier this

15   year in approximately March, when Russia began to get into its

16   dispute with OPEC, the price of oil dropped significantly.  It

17   went from averaging approximately $57 per barrel, or more, to

18   an average price of approximately $20 per barrel.

19         As a result, this caused the debtor to lose

20   significant revenue from its ongoing oil sales.  And as a

21   result, it filed this case in order to reorganize and continue

22   in operation.

23         The debtor can operate profitably because it is

24   located primarily in the southeastern United States, they can

25   operate profitably at a significantly lower price per barrel of

1   oil as companies that may be, for instance, located in

2   Colorado.  It does have lower operating expenses but, again,

3   with prices falling that dramatically and that quickly, it did

4   cause significant issues in terms of the debtors' cash flow.

5           The debtors' operations have changed somewhat leading

6   up to the bankruptcy filing.  In March of 2020, it did acquire

7   a gas plant that was previously located on some of its oil

8   fields.  That gas plant will bring additional revenue into the

9   debtor that was not previously available to it.

10          Additionally, it is in the process of developing a

11  pipeline for a new discovery located in Florida.  And once that

12  pipeline is completed, it would be brought online and would

13  provide additional revenue to the debtor there, as well.

14          So with respect to the present motions, there are a

15  number of motions that were set for the first day -- for the

16  interim procedures and on an expedited basis.

17          So just to briefly address the service of those

18  motions, the debtor did file its motion seeking expedited entry

19  of orders, and did serve that motion primarily by email on the

20  20 largest -- the interested parties, including East-West Bank.

21  And we have been in communication with a number of the parties

22  who are on the line by email in advance of this hearing to

23  discuss the issues raised in the series of objections that were

24  filed.

25          The full 20 largest -- list of 20 largest creditors

1 in each company were served with copies of the motions

2 primarily by email; some were served by mail, as well.

3        THE COURT: Well, I --

4        MS. RILEY: So --

5        THE COURT: I have some thoughts on your motion to

6 limit notice, and one has to do with the fact that there are no

7 schedules on file for the debtor yet, unless that happened this

8 morning. Do you have schedules filed yet?

9        MS. RILEY: Not yet, Your Honor.

10        THE COURT: Okay. And I really can't determine

11 whether or not I'm going to allow you to limit notice until I

12 see those. And at a minimum, I would want all the parties who

13 have executory contracts or leases to receive notice, as well.

14 As you can see, there's a great deal of interest from a lot of

15 those parties.

16        So we're going to have to expand quite a bit who

17 you're giving notice to. You are always free to hire, you

18 know, an agent to do the noticing process for you. So it

19 sounds like this estate's largest enough, it could bear that

20 expense.

21        But -- so when do you think you'll have the schedules

22 on file?

23        MS. RILEY: Well, Your Honor, we were planning to

24 have them on file approximately the -- it would be April 15th,

25 which is, of course, two weeks following the petition date

21

1  itself.

2          There will be a significant list of executory

3  contracts and leasing parties that would be -- parties in

4  interest.  And, you know, we don't deny that they should, of

5  course, receive notice of the bankruptcy filing, there's no

6  question about that.

7          However, we do believe that the motion to limit

8  notice will ultimately be necessary even if a noticing agent is

9  engaged here, just because there are so many parties involved

10 that the mailing expense to mail out every single motion to

11 each of those parties could be very significant.

12          THE COURT:  Well, how many creditors would it be if

13 you expand it to include executory contracts and leases?  Just

14 give me a ballpark.  Is that all of the 457 creditors or 200,

15 would you say?

16          MS. RILEY:  Well, Your Honor, I think it would very

17 likely -- to could include executory contracts and leases, I

18 think that it could easily be two to 300, if not more.

19          THE COURT:  Okay.  Let me hear from some of the

20 creditors.  And, again, be sure to state your shortened client

21 name and your name as you speak.  But if anybody has any --

22 anybody who wants to weigh in on this motion to limit notice,

23 please do so now.

24          (No audible response heard)

25          THE COURT:  Nobody cares or you're trying to find the

1  mute button?

2                              (Laughter)

3          THE COURT:  I know a couple of people objected to it

4  formally, so -- do creditors not care if they have an executory

5  contract or lease if they get notice of things that are

6  happening in the case?

7                  (No audible response heard)

8          THE COURT:  Okay.  Well, then I'll just wait --

9          MS. RILEY:  And, Your Honor --

10         THE COURT:  I'll just wait until I see the schedules

11 before I rule on this.

12         MS. RILEY:  Certainly, Your Honor.

13         And, of course, to the extent that there is an

14 interested party with respect to that particular motion, of

15 course that motion would be served on them, as well, regardless

16 of the limited notice procedures.

17         THE COURT:  Okay.  All right, next?

18         MS. RILEY:  So turning in the first instance to the

19 motion to use cash collateral, the debtor does request

20 authorization to use cash collateral on an interim basis in

21 accordance with the budget attached to the motion, as least as

22 to the fee, on an interim basis for -- we had previously

23 requested approximately 30 days.  However, based on discussions

24 with the parties, we are proposing through approximately the

25 week of May 1st.  And, Your Honor, I'll address that a little

23

1    bit further.

2            The interim use of cash collateral is necessary in

3    this case.  Without the ability to use cash collateral in which

4    East-West Bank and others may have an interest, the debtor

5    won't be able to function, it won't be able to maintain its

6    operations, and it won't be able to continue paying its ongoing

7    operating expenses necessary to continue to generate revenue

8    for the benefit of the estate.

9            This includes the operating expenses associated with

10   operating the properties, paying its obligations to its -- in

11   certain instances, to the revenue holders, paying its

12   utilities, and paying its employees, as well.

13           With respect to the interest in the debtors' cash in

14   accounts, East-West Bank is the primary secured creditor here.

15   They do have a secured lien of approximately $22,350,000

16   secured by substantially all of the debtors' assets, including

17   several hedge agreements that the debtor had in place on a

18   prepetition basis that, given the decline in the price of oil,

19   do have significant value, and they are holding their value, if

20   not increasing in value.

21           The -- there are additional parties who have, based

22   on the objections, asserted that they may have an interest in

23   cash collateral, as well.  Some of these include the working

24   interest holders who have provided cash call advances to the

25   debtor on a prepetition basis.

1          With those cash call advances, generally the debtor

2     would -- Sklar Exploration specifically would request funds for

3     drilling a new well, building a pipeline, things along those

4     lines.  In certain instances, it may request a cash call

5     advance just for the continued operation of a property that is

6     ongoing.

7          Those cash call advances would be paid to the debtor

8     by the working interest holders who are participating in that

9     property and are generally accounted for by the debtor as a

10    credit on the debtors' books.

11         The cash itself is kept in the general operating

12    account and used by the debtor.  And then as joint interest

13    billings were issued against those particular wells, for

14    instance for trucking expenses, for building expenses, or other

15    expenses associated with that property, that joint interest

16    bill would then be billed against that credit from the working

17    cash advance, reducing the amount of the cash call advance on

18    the debtors' books, and not requiring any additional cash

19    funding from that working interest holder.

20         In addition, certain of the working interest

21    holder --

22         THE COURT:  So it's your position they don't have

23    liens on the cash?

24         MS. RILEY:  Well, Your Honor, I think that's an issue

25    that we would have to review further as time goes on.  But at

1   this time, the debtor does not believe that it has any funds

2   from cash call advances on hand in its operating account, for

3   instance.

4          However, again, it is accounting for all of these

5   cash call advances and the expenses billed against those cash

6   call advances on an ongoing basis as it continues in operations

7   and develops the property.

8          THE COURT:  Okay.  So the two million in the debtors'

9   -- the DIP's bank account on the date of filing is attributable

10  then to what?

11         MS. RILEY:  Primarily to ongoing operations.  It is

12  attributable, in some part, to income generated by Sklarco,

13  additional -- and additional joint interest billings paid to

14  the debtor for, in those instances, where Sklar Exploration

15  does not have a cash call advance on hand, and there are

16  working interest holders participating in the property.

17         But primarily those funds are from the ongoing

18  revenue generated from the sale of oil and gas -- oil and gas

19  products.

20         THE COURT:  So none of it is attributable to these

21  prepayment of cash call advances?

22         MS. RILEY:  We don't believe so, Your Honor.

23         THE COURT:  And if creditors wanted to look to any

24  records to verify that, how -- what would you have available?

25         MS. RILEY:  Well, Your Honor, we would certainly be

26

1  willing to provide accounting records, ledgers, and even to a

2  certain extent, bank accounts, in order to provide additional

3  information to creditors going forward.

4        THE COURT:  Okay.  And those documents are available

5  -- readily available now?

6        MS. RILEY:  Yes, Your Honor.

7        THE COURT:  Okay; thank you.

8        All right, so it's your contention that everything in

9  this budget is absolutely necessary for the next three weeks on

10  an interim basis.  There's nothing that could wait to be paid

11  until a final hearing.

12        MS. RILEY:  Your Honor, we do believe that all of

13  these expenses are necessary.

14        We have proposed one change --

15        THE COURT:  That wasn't my question.  What we should

16  be only granting on an interim basis is things that would cause

17  -- otherwise cause irreparable damage to this business.  So,

18  you know, anybody who's under a contract, they can't walk away

19  from the contract.  They have to play it out for a little while

20  longer under the bankruptcy system, so they don't have to get

21  paid up-front.

22        Now I'm sure you're going to tell me that the

23  employees do or they'll walk.  But somehow we need to get

24  through this list since we do have objections and pare it down

25  to what absolutely has to be paid before we get to a final

1 hearing.

2          MS. RILEY:  Certainly, Your Honor.

3          And I would just like to address briefly one change

4 that we have proposed to make to the budget, specifically in

5 response to some of the concerns raised by East-West Bank.

6          Previously in the week ending April 24th, the third

7 week of the budgeted time frame, there is a $4 million revenue

8 payable to others expense that we have proposed to pay.  This

9 is payments that are due to working interest holders, royalty

10 interest holders, overriding royalty interest holders for the

11 time period of February, all of the revenue payments are

12 generally paid two months in arrears.  We do have a motion

13 pending on regular notice that accounts for some of the January

14 payments.

15          We have proposed moving that back.  We do not believe

16 that that revenue is really an asset of the estate.  But to

17 address those issues further, give parties additional time to

18 review information that the debtor is in the process of

19 providing, we have proposed moving that back to May 1st and

20 scheduling a hearing on the debtors' continued use of cash

21 collateral prior to making those payments.

22          THE COURT:  Okay.

23          MS. RILEY:  Turning to --

24          THE COURT:  That's a big chunk.

25          MS. RILEY:  And turning to the other expenses that

28

1  are in the budget, these are necessary to ensure that there is

2  no irreparable harm to the debtors' ongoing operations.  For

3  instance, the severance tax, that's necessary to ensure that

4  the debtor does not have post petition tax payables that remain

5  unpaid, the fees associated with continuing to maintain the

6  debtors' operation, contract pumpers, compression rentals, all

7  of these are necessary to ensure that the debtors' operations

8  can remain ongoing.

9       For instance, there is a $185,000 expense to Escambia

10  River Electric, that is a very necessary expense.  If that's

11  not paid, the debtors' use of electricity will be terminated

12  for that particular well.  And without the use of the

13  electricity services, they won't be able to continue to run the

14  well, bring the oil out of the ground, and sell that to

15  generate the revenue necessary.

16       The employee expenses, those, as well, are necessary

17  to ensure that there's no irreparable harm.  Obviously if the

18  employees aren't paid, they will not continue working for the

19  debtor.

20       The -- even the officer's salary here, that is an

21  amount that would be paid to Mr. Sklar.  It is a significant

22  decrease from his prepetition salary -- salary and

23  distributions, I should say.  But, again, he is providing

24  services to this company daily, and he does need to maintain

25  his income, as well, so that he can continue to pay his living

1  expenses.

2          So with the exception of the change identified in

3  moving the $4 million payment back one week, and scheduling the

4  hearing prior, we do believe that all other expenses are

5  necessary to ensure that there's no irreparable harm to the

6  debtors' estate.

7          THE COURT:  Okay.  Let's hear, first, from East-West

8  Bank.

9          MR. SUZUKI:  Thank you, Your Honor.  This is Bryce

10 Suzuki on behalf of East-West Bank.

11         I should note, Your Honor, that I have applied to be

12 admitted through the District Court, and that was granted, I

13 believe, two days ago.

14         THE COURT:  Okay.

15         MR. SUZUKI:  I just wanted to make you aware of

16 that.

17         Your Honor, we do have ongoing concerns with cash

18 collateral budgets.  We -- the largest single issue by dollar

19 amount, at least, has been deferred.  I'm trying to understand

20 what that $4 million is comprised of, and whether the rights

21 that the payees would have would be superior to the bank in any

22 way, and we appreciate them pushing that out to give us time to

23 investigate.

24         Some of the other line items, though, we need

25 additional clarification on in a similar vein.  The severance

1  tax obligation, we had received a little bit of information

2  about that; we want to be sure that that is for post petition

3  severance taxes, and to understand whether that is to be

4  immediately payable or whether that can be pushed out.

5        The payment of LOE from the WI owners is a line item.

6  I think it's probably something we can probably support but,

7  again, we'd want to know those funds are post petition in

8  nature or, in fact, are not property of the bankruptcy estate.

9        The other big issues relate to -- some of it is what

10 is not in this budget.  In examining the other first day

11 papers, Your Honor, we noticed that Mr. Sklar's declaration

12 recognizes a total cash balance of almost $2.4 million as of

13 the petition date.  So we have a beginning cash balance in the

14 budget of roughly $2 million, and based on Paragraph 9 of the

15 declaration, there appears about $230,000, or a little bit more

16 than that, would just be paid to Mr. Sklar's trust.

17       We don't see that reflected in the budget.  We have

18 serious concerns about a large transfer to an insider with no

19 real disclosure about what that is for, and clearly the need to

20 vet the assertions that the transfer to an insider of the

21 debtor is proper under the circumstances.  So that's not

22 necessarily in the budget, but it's something that the budget

23 probably reflects, and something that needs to be vetted.

24       We also have concerns about the CEO's salary line

25 item which seems exorbitant given the cash status of the

1  estate.

2          Now having said all that, I think we can get to a

3  resolution on most of those issues, especially with that $4

4  million number being pushed out and keeping us adequately

5  protected pending resolution.  But we do have a little bit more

6  work to do, I'm confident we can work through some of those

7  issues.

8          But when it comes to things like the transfer of the

9  trust -- or the transfer to the trust, the CEO's salary line

10 item, Your Honor, we may need some determinations from you

11 about whether those are proper and essential at this stage of

12 the case.

13         THE COURT:  Okay.  Is it just Mr. Sklar, or are there

14 other insider payments?  You mentioned the Sklar trust; anybody

15 else on the insider category in your view?

16         MR. SUZUKI:  No.  The Sklar trust, and then the CEO

17 line item payment of $41,000 roughly.

18         THE COURT:  Right.

19         MR. SUZUKI:  Those were the two that caught our eye.

20         THE COURT:  Uh-huh.

21         MR. SUZUKI:  And I will say that the employee

22 payments, that pencils out to about $2,000 per week per

23 employee; they only have 40 employees.  That's something that

24 may need to be examined at the appropriate time.  But we

25 understand that that's what it is right now, and we're

1  comfortable at this stage of the case paying those.

2           So to answer your question directly, the only two

3  issues are the CEO's salary line item and the -- what appears

4  to be a proposed transfer of the trust.

5           THE COURT:  And you mentioned that the severance tax,

6  you want to be assured that what's being paid is only a post

7  petition amount.  Do you feel that way as to the other

8  operating expenses?  Do you have concerns that they're paying

9  any prepetition amounts owed to, for example, the contract

10 pumpers?

11          MR. SUZUKI:  Those were items -- from what our client

12 has taken a look at, they feel comfortable in paying.  Those

13 seem to be consistent with prior operations, and we're taking

14 the debtors' word that those are for post petition expenses

15 only.

16          THE COURT:  Okay, all right.

17          All right.  Who wants to speak next on cash

18 collateral?  I guess let me first look at our list of actual

19 objectors.  How about for Strago?

20          MR. PADDOCK:  Yes, Your Honor.  Robert Paddock on

21 behalf of Strago Petroleum and Meritage Energy.

22           We have -- as our objection reflects, we had some

23 real concerns, kind of because of the lack of information here.

24 What I just heard from debtors' counsel was that none of the

25 2.3 or however much in their cash account now, is attributable

1  to the cash call advances.  I'm not sure how anybody could make

2  that claim if all the monies paid for cash call advances went

3  to the same operating account.

4          And for example, my clients have advanced around --

5  my two -- just two clients advanced around $700,000 for the

6  drilling of a well which has not been drilled yet.  So somehow,

7  that money was spent somewhere else.

8          THE COURT:  And that may very well be, but you're

9  raising a really good point about the commingling of these

10  funds.  So to the extent, you know, one working interest member

11  feels that it's their money that the debtor is holding, it's

12  going to be very difficult, if not impossible, to trace at this

13  point.

14          MR. PADDOCK:  Yes.

15          THE COURT:  So I don't --

16          MR. PADDOCK:  Yeah, I -- yeah, I certainly appreciate

17  that fact.  I was just sort of struck by the comment that the

18  debtors' counsel made that we know -- or what I thought I heard

19  was we know that none of the money currently in the account --

20  in the account would (indiscernible) cash call advances, like

21  that's just one of the -- I think she said one operating

22  account, I'm not sure how you could make that statement.

23          But in terms of what else is in the budget, we --

24  well, excuse me, let me back up.

25          There's been an order circulated by debtors' counsel

34

1   just in the last hour or so which --

2           THE COURT:  Okay, I've not seen it, so --

3           MR. PADDOCK:  -- would satisfy, I think, some of our

4   immediate concerns, at least up until May 1st.  You know, we

5   also have concerns as counsel for East-West Bank mentioned,

6   about the payment to the trust, that we don't know enough

7   about.

8           But we think that some language in the order -- the

9   proposed order that we've seen which expands the lien

10  protection to not only East-West Bank, but any other working

11  interest owners who have secured claims.  We think that, at

12  least on an interim basis, would satisfy us, although reserving

13  our rights to raise issues at a final hearing.

14          THE COURT:  Okay.  So -- and none of the line items,

15  other than the trust payment, are troubling to you?

16          MR. PADDOCK:  Not on first glance.  I'll be honest, I

17  haven't had a chance to really scrub through them, but that's

18  the one that jumps out, and that was in the affidavit itself.

19          THE COURT:  Okay, all right; thank you.

20          All right.  Next up, Stoneham Drilling, Mr. Bailey?

21          MR. BAILEY:  Yes, Your Honor; thank you.

22          I don't want to -- I agree with the bank and other

23  creditors and other creditors regarding the particular line

24  items.  And, Your Honor, I don't believe I have anything else

25  at this time.

1          Your Honor, I will note that my client is in a little

2     different situation from what I believe are most of the other

3     objectors.  My client actually provided drilling services for

4     wells in Montana, and has a significant investment into those

5     operations on behalf of the debtors.  But because of that, I

6     believe we will have a mineral lien interest in the proceeds

7     from those wells or, you know, other interests in those wells.

8          So, Your Honor, in the language in the proposed order

9     that's been circulated, I'd ask to include protection of those

10    rights for similarly situated materialmen mechanic lienholders,

11    mineral lienholders.  I felt that was not, as well, represented

12    on this call.  But, Your Honor, I'd -- I'd put that language to

13    be included and preserve rights for those parties --

14          THE COURT:  Yeah, I get why you want that, and

15    that's, you know, good for your client but, you know, we're

16    just talking about interest in cash collateral, and you're

17    telling me about a real estate interest that your client has.

18    I don't want to mucky up the cash collateral order to go

19    further than people who have interest in the cash collateral.

20          MR. BAILEY:  Your Honor, I understand that, and what

21    I'm saying is that we could potentially have an interest in the

22    proceeds from that well, but I can't -- I can't tell you with

23    relative priorities or anything like that based on the

24    information we have.

25          So all I'm asking is to preserve those rights, to the

36

1 extent we have any. And I think the language in the order does
2 that.

3          THE COURT:  Okay.

4          MR. BAILEY:  Um, so --

5          THE COURT:  All right.  How about for Anderson, Mr. -
6 - did you have something else, Mr. Bailey?

7          MR. BAILEY:  No, Your Honor, I believe that's all;
8 thank you very much.

9          THE COURT:  Okay; thank you.

10          All right, Mr. Lockridge, on behalf of the Anderson
11 clients.

12          MR. LOCKRIDGE:  Thank you, Your Honor.  Eric
13 Lockridge on behalf of the Anderson parties.

14          Your Honor, with regard to the line items in the
15 budget, we also identified the two major concerns that have
16 also -- that have already been discussed.  We're concerned
17 about the big line item for the Boulder office rent that's
18 coming due the first week of May.  We understand that, you
19 know, if the interim order is revised, and that's pushed out,
20 then that's not something to talk about today.  But it will be
21 something definitely to talk about at the next hearing.  It's a
22 whole lot of money to go out the door while we're still trying
23 to figure out where did the money come from that the money has.

24          The cash call advances are a significant concern.  My
25 client's been working through their records to figure out, you

37

1  know, how much their -- to reconcile everything with the cash

2  call advances with the debtor.  Their records show that the

3  debtor should have $765,000 in cash call advances from the

4  Anderson parties on two particular projects through -- and

5  that's through receipts received through April 3rd.  And one of

6  those projects has been stalled since at least March, nothing's

7  been happening.

8       So we're going to be very, very concerned about, you

9  know, where are those funds, how are they accounted for, and we

10 appreciate the debtors' willingness to provide documents, and

11 we'll -- you know, we would like to see that the cash order

12 require the debtor to actually provide an accounting to the

13 working interest owners that requested about how their -- what

14 happened to their cash calls.  It seems like everybody's

15 wondering.

16      THE COURT:  And I -- and I understand that, and you

17 certainly have an entitlement under Rule 2004 or otherwise to

18 get that information, but I'm not wanting the cash collateral

19 order to try to deal with all questions and all issues in this

20 case, so we're going to keep it streamlined.

21      So I'm glad you brought it up, and I'm sure Ms. Riley

22 will put together some kind of a data room electronically where

23 people can see the necessary bank statements, and other

24 documents that she detailed that are readily available for you

25 all to start looking at.

38

1          Okay, how about on behalf of Tauber, Mr. Denning?

2          MR. SHIPPS:  It's Mr. Shipps, Your Honor.

3          THE COURT:  Oh, that's right; I'm sorry.

4          MR. SHIPPS:  Okay.

5          THE COURT:  Thank you.

6          MR. SHIPPS:  And -- and just so you know, it's Ms.

7  Denning, but --

8          THE COURT:  Shay is a female name; got it.

9          MR. SHIPPS:  That's correct.

10          THE COURT:  I did not know.

11          MR. SHIPPS:  But on behalf of the Tauber Group, we

12  share the same concerns, and we have filed an objection, which

13  I think tracks in many respects with comments made on behalf of

14  Anderson, and Strago, and, again, it's the issue of cash

15  advances, which were called for for specific projects on

16  specific wells.  Our clients collectively have paid cash

17  advances for those specific items in amount of approximately

18  $300,000.

19          And some of those -- at least one in particular in

20  Mississippi was specifically for an initial well, that's

21  required to hold the lease, that's important for an overall

22  prospect and project.

23          And to the extent those funds have not been expended

24  for those purposes, it is of great concern to our client what's

25  happened to the money, and what's going to happen to the

39

1   specific activities that were required to be undertaken with

2   regard to those funds.

3          So we share the same concerns that have been raised

4   by some of the previous speakers.

5          THE COURT:  Okay.  In terms of line items on the

6   budget, are there any others that you're concerned about that

7   you want to point out to the Court?

8          MR. SHIPPS:  We also had similar concern with respect

9   to payments for the rent, for example, in the Boulder office.

10  We had concern about the salary.

11         THE COURT:  No need to repeat.

12         MR. SHIPPS:  Yeah.

13         THE COURT:  Just if you have any additional ones.

14         MR. SHIPPS:  Uh, no, Your Honor.

15         THE COURT:  Okay; thank you.

16         MR. SKELTON:  Your Honor, this is Barnet Skelton, I'm

17  also representing Tauber.

18         There's just one thing that I don't think you have

19  quite addressed yet, and that is that what is referred to as

20  SEC, Sklar Exploration, is an operator, and it doesn't own,

21  other than minor exceptions, any assets in the sense of oil and

22  gas assets.

23         So any money it has comes from revenues attributable

24  to all of these working interest owners, or revenues that have

25  been or cash call advances.  This is not the same thing as an

1    E&P company that has its own working interest.  Now Sklarco

2    does, Sklarco does have working interest.

3            But it is extremely confusing to me -- and I've been

4    doing this since the early 80's -- how the debtor could say in

5    a motion that it is holding trust funds or any funds that would

6    be excluded from the estate under Section 541(b) in the amount

7    of seven million twenty-three thousand nineteen forty-four.

8            Now what it really has, I think, baldly admitted is

9    that it has spent every penny of it.  And it -- it -- and it

10   must have spent it on -- for purposes other than the advances,

11   and this is a serious matter in the oil business.  I mean this

12   is not a garden variety misstep.

13           And our concern is that, okay, here we are in the

14   twilight zone.  We are all parties to an operating agreement

15   that are executory contracts that have not been assumed.  The

16   debtor doesn't have to perform, but we do.

17           And we are extremely concerned about being under a

18   continuing obligation to advance funds under the JOAs while the

19   debtor has apparently absconded with $10 million.  Or there

20   must be some explanation for it, but we certainly haven't heard

21   it.

22           THE COURT:  Okay.  So --

23           MR. SKELTON:  And that's --

24           THE COURT:  I know you all are experienced bankruptcy

25   attorneys, and you know how to request a Chapter 11 trustee, or

41

1  an examiner, or whatever you need at any point in time.

2         But I also want to encourage any and all of you to

3  consider being on the Unsecured Creditors' Committee and get,

4  you know, a collective voice heard on many of these issues, how

5  we're going to operate going forward so we don't have these

6  concerns added in the future.  So --

7         MR. SKELTON:  Yes, Your Honor.

8         THE COURT:  Okay.

9         MR. SKELTON:  If the Court --

10        THE COURT:  So any -- any additional line items, Mr.

11 Skelton, that you can identify that you're concerned about?

12 Because what I'm trying to get to here is an interim cash

13 collateral budget that is fairly consensual.  And -- and then

14 we'll hash out what isn't at the final hearing.

15        And I know that none of you really want the debtor to

16 close shop today, so there has to be some amount of money

17 that's going out for operating expenses post petition.  So I'm

18 trying to identify where the sticking points are in this

19 budget.

20        So any -- let me open it up to anybody else who

21 hasn't spoken yet, if they have concerns about line items in

22 the budget.  And please don't repeat the ones that have already

23 been mentioned, just tell me if there are any additional line

24 items.

25        MR. BRESCIA:  Your Honor, Duane Brescia for Lucas

42

1  Petroleum.

2          THE COURT:  Okay.

3          MR. BRESCIA:  I don't have a new line item, so I

4  apologize, but it's more of a treatment of some of the line

5  items.

6          As Mr. Skelton mentioned, that we believe most of

7  this revenue is not revenue of Sklar Exploration.  We are okay,

8  my client, with a set aside of the $4 million not to be paid

9  during this interim period.

10         Our concern is the protections afforded to East-West

11 Bank on those funds.  We'd like to see that, and to the extent

12 it's collections, placed into a segregated account, and any

13 adequate protection or replacement liens not directly attached

14 to those funds until this Court can sort out who is owed that

15 money, because we do not believe it's property of the estate.

16         THE COURT:  Okay. (Indiscernible - multiple

17 speakers).

18         MR. BRESCIA:  Yes, Your Honor.  We believe that those

19 funds collected are not property of the estate.  But to the

20 extent that it is being held and not paid to working interest

21 owners and royalty owners, that that money should be segregated

22 in a separate account when it's collected at least to the tune

23 of $4 million.  And that the replacement liens granted to East-

24 West Bank not attach to those funds until this Court can rule

25 on who actually owns them because we don't believe that they

1 would be cash collateral.

2          THE COURT:  So you're talking about four million in

3 funds the debtor is holding?

4          MR. BRESCIA:  Yes.

5          THE COURT:  But I thought they only had --

6          MR. BRESCIA:  And if you look at --

7          THE COURT:  -- two million in their account.

8          MR. BRESCIA:  Correct.  And if you look at the

9 expected revenue coming in, 173,000 this week, it looks like

10 2.7 million from oil sales --

11          THE COURT:  Oh.

12          MR. BRESCIA:  -- and perhaps another $680,000 of gas

13 sales.

14          THE COURT:  So you're --

15          MR. BRESCIA:  (Indiscernible - multiple speakers).

16          THE COURT:  -- talking about new revenues -- new

17 revenues coming in.

18          MR. BRESCIA:  Correct.

19          THE COURT:  Okay.  I thought you meant the existing

20 revenues in the account, okay.

21          MR. BRESCIA:  I believe that's part of it, as well,

22 what they're holding.

23          THE COURT:  Okay.  So what we really need is some

24 sort of wiggle room language that says "to the extent anybody

25 has a lien, those liens are preserved, and replacement liens

44

1  are given in the same priority, etc., that they have outside of

2  bankruptcy" without any determination of who has those at this

3  point.

4          Now I would imagine that is troubling to the bank, so

5  I'm going to circle back to the bank and hear from --

6          MR. SUZUKI:  Mr. Suzuki, Your Honor.

7          THE COURT:  Thank you.

8          MR. SUZUKI:  No problem.

9          THE COURT:  Please go forward.

10                         (Laughter)

11         MR. SUZUKI:  You're correct that the bank would have,

12 for lack of a better term, serious heartburn about putting that

13 amount of money in a segregated account with a determination

14 that the bank's liens do not attach thereto.  That would be

15 insufficient to provide any degree of adequate protection, and

16 it is wholly uncertain that that amount is not subject to the

17 bank's liens.

18         And so what we would propose -- and I think it's what

19 Your Honor is alluding to, and we don't have a problem with

20 that, to the extent in priority of these -- of the prepetition

21 liens of these parties or property rights, if it's not property

22 of the estate, the same rights, lien rights, ownership rights

23 would attach to the post petition revenues on the same

24 character of assets that -- to which the parties had rights

25 prepetition, and in the same priority.  And I think that

45

1  protects everyone without undermining the bank's lien rights.

2       We would only hold what we held prepetition, and the

3  relative rights of the parties would be fully preserved with

4  respect to those funds until we can sort this out.

5       THE COURT:  Okay; thank you.

6       All right, let's circle back to the debtor.  Ms.

7  Riley, you've heard about the line items that are particularly

8  troubling, and tell me why I shouldn't hold those over until

9  the final hearing.  That would be the trust -- the transfer to

10  the Sklar trust for roughly $400,000, and the salary of forty-

11  one or 42,000 a month to Mr. Sklar.

12       MS. RILEY:  Yes, Your Honor.

13       THE COURT:  And severance tax being post petition

14  only -- um, what else?  I think that was it.  Oh, the Boulder

15  office rent.

16       MS. RILEY:  So, Your Honor --

17       THE COURT:  Go ahead.

18       MS. RILEY:  -- with respect to the transfer of the

19  funds to the trust, just to clarify, that amount would be

20  approximately 233,000 that is not actually accounted for in the

21  budget, but was deducted from the amounts prior to formation of

22  the budget.

23       THE COURT:  Okay.  So it's just as in his affidavit?

24       MS. RILEY:  That's correct, Your Honor, and that's

25  the kind of hanging paragraph at the bottom of Paragraph 9.

46

1          THE COURT:  Okay.  So you're fine about that waiting

2  until the final hearing, okay.

3          How about the Boulder rent?

4          MS. RILEY:  So, Your Honor, the Boulder rent is not

5  currently scheduled to be paid until May 1st.  And as we've

6  indicated, the debtor does believe that it would be appropriate

7  to have a hearing on the debtors' continued use of cash

8  collateral prior to May 1st.  Ideally the beginning of that

9  week, so that at that point, we will have had time to provide

10  additional documents to the various parties who are requesting

11  information, start to, you know, set up kind of a general data

12  room for everyone to access, and hopefully address some of

13  these issues by providing additional information voluntarily so

14  that people can start to feel more comfortable with the

15  debtors' continued operation, use of funds, and things along

16  those lines.

17          So I think, depending on the Court's schedule, that

18  may be a non-issue if we can set a hearing on continued use of

19  cash collateral prior to that date.

20          THE COURT:  I'm sure we can, okay.

21          And how about Mr. Sklar's salary?

22          MS. RILEY:  So with respect to Mr. Sklar's salary,

23  again, he does have living expenses he does need to pay, as

24  well.  He --

25          THE COURT:  Forty-two thousand a month?

1    MS. RILEY:  And, Your Honor, this is a fairly

2 significant decrease.  On a prepetition basis, prior to the

3 debtors' bankruptcy case, he was earning significantly more.

4 But he does have a mortgage, he does have an ongoing domestic

5 support obligation himself, he does have expenses that he has

6 to pay if he wants to continue his living expenses and remain

7 current on his own bills.

8    THE COURT:  Well, we'll take that up at the final

9 hearing.  So no payment on an interim basis; I'm sure he has

10 other resources.

11    Okay, so --

12    MS. RILEY:  And, Your Honor, if I may --

13    THE COURT:  I'm -- go ahead.

14    MS. RILEY:  -- briefly address the form of order.

15    THE COURT:  Okay.

16    MS. RILEY:  We have been circulating a form of order.

17 We've incorporated requested changes from a number of parties,

18 a majority of which really it just clarifies that, you know, to

19 the extent that somebody does have a secured interest or an

20 interest in this cash account, that that is preserved, and that

21 they would be afforded a replacement lien to the same extent,

22 priority, etc., as they had on a prepetition basis.

23    We did try to provide a copy to chambers because

24 shortly prior to the hearing -- again, I say "shortly," just

25 approximately five minutes prior to the hearing --

48

1          THE COURT:  I know, and I haven't read it, so

2   summarize to me a little bit, and then I'll look at it more

3   closely.

4          MS. RILEY:  Specifically, with respect to the

5   language of the order itself, it does expand it to be more

6   broadly inclusive than our original proposed order had been.

7   You know, initially we had proposed only to provide replacement

8   liens to East-West Bank, and now it is expanded to include

9   other parties who may assert an interest, as well.

10          The variance has been modified such that it can be up

11   to 20 percent for each line item in -- during the budgeted time

12   period, but no more than a ten percent overall variance.

13          THE COURT:  Okay.

14          MS. RILEY:  And additionally, it does clarify that to

15   the extent that the debtor is holding any funds attributable to

16   these cash call advances, that those will be separately

17   retained and accounted for, but that we do not believe that we

18   are holding any at this time.

19          THE COURT:  Fine.

20          MS. RILEY:  Several of the parties are correct.  You

21   know, it is difficult for us to say no, we definitely don't

22   have any of these funds attributable to cash call advances

23   right now because the funds haven't commingled in the past.

24   And, you know, there was nothing in the various joint operating

25   agreements that required them to be separately retained, but

1  that's a separate issue for another day.

2          So we do believe that with the broader language, it

3  does cover all of the various interests that may be asserted in

4  funds that could be characterized as cash collateral or may not

5  be cash collateral, depending on, you know, to the extent that

6  it's revenue attributed to, for instances, a working interest

7  holder, that may not be cash collateral but somebody would

8  certainly have an interest in it.

9          THE COURT:  Okay.

10         MS. RILEY:  It does also allow for parties, including

11 East-West Bank, to request access to the debtors' books and

12 records, and provide that financial information.  So that would

13 also make it very clear to all of these parties who are

14 requesting additional information that we will provide it, and

15 we will continue to provide it on an ongoing basis.  Again, we

16 would ask that there's some reasonable time frames given,

17 especially the anticipated volume of requests.  But we can

18 certainly provide those as quickly as possible once those

19 requests are saved.

20         Also requires the debtor to provide to specifically

21 East-West Bank, and really any other parties who are requesting

22 it, the budget to actual report on a weekly basis.  So that

23 way, people can keep track of the debtors' expenditures, and

24 look at those variances on a weekly basis, but really provides

25 for accounting for that per line item and overall variance on a

50

1  per month basis.

2          THE COURT:  Okay.  And you know my predilections for

3  orders, that there not be a lot of factual findings, especially

4  at this early stage in the case.  And, at most, you say so-and-

5  so represented XYZ, and not have me make findings about things.

6          MS. RILEY:  Correct, Your Honor.

7          THE COURT:  The form --

8          MS. RILEY:  Five -- or I think less than that -- four

9  paragraphs of the factual findings, none of which are

10 conclusive, and just it -- you know, East-West Bank --

11         THE COURT:  Okay.

12         MS. RILEY:  -- asserts a secured claim, and so on and

13 so forth.

14         THE COURT:  Perfect, okay.  So that shouldn't be a

15 problem.

16         All right, so do you need -- I would assume you need

17 to revise it in accordance with this hearing so that you take

18 out some of the budget items that are mentioned and --

19         MS. RILEY:  Yes, Your Honor, and then we can

20 certainly provide a revised copy.  I think it would be

21 appropriate in this instance to maybe circulate it one more

22 time to the parties --

23         THE COURT:  Okay.

24         MS. RILEY:  -- prior to submitting it to chambers

25 again --

51

1          THE COURT:  Okay.

2          MS. RILEY:  -- and allow everyone to have an

3 opportunity to be comfortable with the language.

4          THE COURT:  And that's a great idea.  How about you

5 get it to them as soon -- the earliest you can on -- tomorrow

6 and Friday, and then let's say by the end of close of business

7 on Tuesday, you file it or upload it for the Court?

8          MS. RILEY:  Certainly, Your Honor.

9          And just given that things are operating a little bit

10 differently in terms of telephonic hearings, and things along

11 those lines, would the Court like us to file, for instance, a

12 notice of filing revised interim order just so it's on the

13 docket for everyone?

14          THE COURT:  Yeah, that sure is a good idea.  I --

15 let's do that, with a revised budget attached.

16          And then have the order not attach the budget, but

17 refer to it as docket -- the one that's attached to docket

18 number whatever.

19          MS. RILEY:  Certainly.

20          THE COURT:  Okay.

21          MR. SUZUKI:  Your Honor?

22          THE COURT:  Yes; who's speaking?

23          MR. SUZUKI:  This is Bryce Suzuki, I'm sorry to

24 interrupt Your Honor.

25          There is, I think, one line item that we asked Ms.

52

1  Riley about, and it may have just slipped through the cracks.

2  But the severance tax obligation --

3          THE COURT:  Post petition only?

4          MR. SUZUKI:  Yeah, that's all post petition only, if

5  that could make its way into the order, that would be

6  appreciated.  And any prepetition amounts would need to be left

7  back for determination at a later date.

8          THE COURT:  And I think that should be true of all

9  line items, Ms. Riley, that we're not paying, other than the

10 employees -- that we're not paying any prepetition amounts.  So

11 the debtor ought to make that representation -- the debtors,

12 okay?

13         MS. RILEY:  Certainly.

14         THE COURT:  Okay, all right.  So as far as a hearing

15 on final cash collateral, let's see.  So you want sometime

16 early in the week of April 27th?

17         MS. RILEY:  Yes, Your Honor, if possible.

18         THE COURT:  All right.  I would imagine we're pretty

19 side open, but Ms. Cass, can you take a look and give us a

20 proposed time and date?

21         MS. CASS:  We're open -- pretty side open on Monday,

22 the 27th.

23         THE COURT:  Okay.

24         MS. CASS:  We could do the afternoon of the 28th.

25         THE COURT:  Okay.  What about 1:30 on April 27th?

1  Anybody that feels the need to participate in that hearing that

2  knows they have a conflict?

3                  (No audible response heard)

4          THE COURT:  No?  Okay, then that's our hearing date.

5          But I don't know how to predict whether you all are

6  going to need to put some evidence in front of the Court.  We

7  can certainly set this up for a Zoom hearing to where we can

8  swear in a witness, and all that.  What gets really tricky is

9  the exhibits, and so we'd have to have a much earlier date for

10  the transmission of the exhibits and hard copy to the Court.

11  And I say "hard copy" if there are lengthy exhibits.  If it's

12  just another budget, that's not a problem, we can print that

13  off.  But -- so with that in mind, Ms. Riley, do you want to

14  weigh in on this?

15          MS. RILEY:  On --

16          THE COURT:  Because I'm looking for -- do you see a

17  need for evidence to be received?  And if so, what do you

18  propose for a deadline for the submission of the exhibits, and

19  a witness and exhibit list?

20          MS. RILEY:  Your Honor, at this point, I don't

21  anticipate a need for evidence.  I believe we should be able to

22  work with the various parties to resolve the pending

23  objections.

24          But to the extent that an evidentiary hearing -- it

25  does become an evidentiary hearing, I think I would propose

1  witness and exhibit lists maybe no later than the 20th.

2          THE COURT:  Okay.  So a week before for the witness

3  and exhibit list.

4          And the actual exhibits to be tendered to the Court -

5  - I don't know how you'd get them to all the parties.  And, you

6  know, I'm not just directing this to the debtor, this is an

7  issue for any of the objectors, as well.

8          MS. RILEY:  And, Your Honor, if I may, I know that in

9  the context of, for instance, relief from stay hearings, one

10 method that's been used somewhat effectively is to actually

11 file the exhibits with the Court.  So to the extent that there

12 is no, you know, confidential exhibits, or anything along those

13 lines, I think that --

14         THE COURT:  Okay.

15         MS. RILEY:  -- may be an option that would provide

16 access to everyone.

17         And certainly we would be emailing copies to all of

18 the parties in interest -- or -- well, the parties who have

19 filed an objection, as well.

20         THE COURT:  Okay.  So that sounds good to me, but I

21 still want a hard copy if it's anything, you know, substantial

22 in terms of the documents.  I don't normally need that, but

23 when I'm working at home, I'm not going to start printing off

24 reams of paper.

25         MS. RILEY:  Certainly, Your Honor.

55

1          THE COURT:  Okay.

2          MS. RILEY:  And to that end, I believe the Clerk's

3 Office is still accepting --

4          THE COURT:  They are.

5          MS. RILEY:  So we need --

6          THE COURT:  So you --

7          MS. RILEY:  -- to just drop a copy to the Clerk's

8 Office.

9          THE COURT:  And they'll get it up to our chambers, so

10 -- because nobody will be there to receive it if you went

11 directly up to chambers.  So -- okay.

12          Any of the other objectors and potential objectors

13 that haven't yet objected that are on this phone call have any

14 -- want to weigh in any -- this is the April 20th deadline for

15 witness and exhibit list, and exchange of exhibits, is that a

16 problem for anybody?

17          MR. MOSS:  Your Honor, this is Paul Moss with the

18 U.S. Trustee's Office.

19          I wanted to advise the Court and the parties on the

20 line that there is a committee formation meeting Wednesday,

21 April 15th at 2 o'clock p.m., and those of us -- or those who

22 haven't contacted me yet can contact me, I'll forward them the

23 call-in information.  But I do expect a committee in the case,

24 Your Honor.  The 15th is about five days out from the 20th, and

25 so there may be a request for an extension down the road, but I

56

1  just wanted to advise the parties that that is in the works,

2  Your Honor.

3          THE COURT:  So in case there's a new committee

4  counsel who is just hired right before this deadline, I

5  understand that, and we'll try to accommodate that.

6          MR. MOSS:  Okay; thank you, Your Honor.

7          THE COURT:  Okay; thank you for that.

8          Anybody else?  Speak now or forever hold your peace.

9              (No audible response heard)

10          THE COURT:  Okay.  So April 27th at 1:30; April 20th

11  for the exchange of exhibits by filing them with the Court.

12  And if there are any lengthy exhibits, they definitely have to

13  have a hard copy delivered to the courthouse.

14          Okay, and we won't set a deadline for objections to

15  exhibits, we'll just take that at the hearing because there's

16  not enough time between the two --

17          MR. SUZUKI:  Your Honor?

18          THE COURT:  Yes?

19          MR. SUZUKI:  I hate -- this is Bryce Suzuki on behalf

20  of East-West Bank again, and I hate to keep interrupting.  You

21  know, as much as the bank likes certainty, and would like to

22  get to a final order by the 27th, and we're comfortable for our

23  part that the parties can work through the issues that can be

24  worked through, and if there are final issues that need

25  determination by Your Honor, I think we can present those

1 efficiently through an evidentiary hearing.

2        But what I'm hearing about the appointment of a

3 committee five days before the exhibits are due, that would

4 give me some pause, and it's really more of a question for Your

5 Honor, your comfort level, with the procedural -- which is in

6 many cases, which is if we get to that point, and we need to go

7 for another short second interim order for a period of time to

8 allow the committee to get up to speed, and make sure that all

9 parties who have an interest in the outcome of this have

10 adequate time, is that something Your Honor would entertain?

11 Or should we just gear up and committee counsel's going to need

12 to giddy up pretty quickly to get prepared, if they need to,

13 for the evidentiary hearing?

14        THE COURT:  I would definitely be amenable to having

15 the committee work out some arrangement on a short basis that

16 gives them a chance to get up to speed.  So to answer your

17 question, that would be perfectly acceptable, if it is with all

18 the parties.  And I would encourage the parties to work

19 together cooperatively to allow that to happen at the last

20 minute because it's going to be last minute.

21        So, you know, nobody wants to shut this company down

22 today, or even on the 20th so -- or the 27th.  So you all

23 should keep working hard to reach an agreement.

24        And if there are no outstanding issues, we can

25 obviously do away with the April 27th hearing, and -- I don't

58

1    know what you'd put together to show that everybody's

2    objections have been resolved, but I'm sure you'll come up with

3    something, and we'll be happy to take it off the calendar if

4    there's no remaining issues.

5          But you're right, if something makes you want to kick

6    the can down just a week, especially given the lack of

7    hearings, you know, the -- there are much less hearings going

8    on these days because of Coronavirus, we will have no trouble

9    fitting you in somewhere on a short basis, so -- okay?

10         MR. SUZUKI:  Understood, Your Honor; thank you.

11         THE COURT:  All right.  So we've got everybody's

12   input on cash collateral.  We're ready to move on to another

13   motion?

14              (No audible response heard)

15         THE COURT:  All right.  Ms. Riley, take it away.

16         MS. RILEY:  So, Your Honor, I'm going to turn to the

17   next instance to the debtors' motion for continued use of its

18   prepetition bank accounts.  Debtor was previously maintaining

19   its accounts at East-West Bank, and they would request

20   authorization to continue using those accounts to the same

21   extent and manner that they did on a prepetition basis.

22         We did have an objection that did raise a concern

23   just that, you know, to the extent that there are any

24   prepetition, we don't want the order to be interpreted such

25   that it would be authorizing prepetition payments.  We have

1  agreed to a revised form of order that was, again, submitted

2  just very shortly prior to the hearing that --

3           THE COURT:  Okay.

4           MS. RILEY:  -- does clarify that any payment for

5  prepetition expenses could only be made based on prior

6  authorization of the Court.

7           THE COURT:  And no setoff rights being expended or

8  being done by the bank absent Court order?

9           MS. RILEY:  That is not incorporated into the order,

10 Your Honor, but we would certainly be amenable to including

11 that, as well.

12          THE COURT:  Okay.  And the bank's okay with that?

13          MR. SUZUKI:  The bank -- the bank is fine with that.

14 In fact, the bank prefers maintaining the bank accounts.

15          THE COURT:  Okay; all right.

16          MR. MOSS:  Your Honor, this is Paul Moss with the

17 U.S. Trustee.

18          THE COURT:  Yes?

19          MR. MOSS:  I had a comment with the use of bank

20 accounts.  East-West Bank is an authorized depository, so we

21 don't have an objection regarding continued use of the

22 accounts.

23          However, I spoke to Ms. Riley yesterday and that we

24 would like the checks to reflect debtor in possession and the

25 case numbers of each debtor on the checks going forward.  And

1  so I believe that was acceptable with the debtor, but I had

2  wanted to let the Court know and the debtor know that we wanted

3  that as part of the order.

4       THE COURT:  Absolutely.  So, Ms. Riley, the form of

5  proposed order you're going to hand to me will include that,

6  right?

7       MS. RILEY:  Yes, Your Honor.

8       THE COURT:  Okay, that's fine.

9       All right, and before we leave this motion on use of

10 the existing bank account, is there anybody else who hasn't

11 spoken who's opposed to that?

12      MR. LOCKRIDGE:  Your Honor, this is Eric Lockridge

13 for the Anderson parties.

14      We included a concern about that motion in our

15 combined objection.  I think adding the language always

16 prevents any setoff rights, absent Court order.  We'll address

17 our concern in the -- you know, we'll be digging into which

18 funds are debtor funds, and which funds are not debtor funds,

19 and we can deal with that later.  But I think that prevention

20 of setoff rights will address our concern for now.

21      THE COURT:  Okay; very good.  Thank you.

22      Anybody else?

23          (No audible response heard)

24      THE COURT:  Going.  Going.  Gone.

25      Okay.  Which one do you want to do next, Ms. Riley?

1              MS. CASS:  Judge, I'm sorry to interrupt, this is

2   Kerstin.  Do you want to set a deadline for her to submit a

3   revised proposed order on bank account?

4              THE COURT:  Tuesday at 5 o'clock.

5              MS. CASS:  Thank you.

6              THE COURT:  You can do it sooner, but not later.

7                        (Laughter)

8              MS. RILEY:  Yes, Your Honor.

9              THE COURT:  Okay, what's next?

10             MS. RILEY:  So next, Your Honor, I think we'll turn

11  to the employee benefits and the continuation of the employee

12  benefit motion.

13             THE COURT:  Okay.

14             MS. RILEY:  So --

15             THE COURT:  I'm scrolling down to find it; there it

16  is, okay.

17             MS. RILEY:  So, Your Honor, through this motion, the

18  debtor does request authorization to pay any amounts that would

19  be attributed to prepetition benefits, and to continue its

20  employee benefit programs.

21             There's really two primary categories of benefits

22  that are provided to employees:

23             One of those is insurance benefits.  The debtor does

24  provide comprehensive health insurance to its employees, and

25  that includes vision and dental insurance.  We do believe that

1 that is incredibly necessary for employees' well-being,

2 especially considering the current state of the world;

3          The other is a retirement benefit.  The debtor does

4 maintain a 401k program.  The debtor is not currently matching

5 any 401k contribution.  However, it does allow for employees to

6 have amounts withheld from their pay to be contributed to the

7 401k plan that it maintains.

8          So we are requesting authorization to maintain those

9 programs to ensure that the debtor can continue to provide

10 insurance benefits to its employees, and to continue to make

11 those contributions to the 401k plan that the employees have

12 elected to have withheld.  Again, these aren't debtor funds,

13 these are just employee funds that have been withheld from

14 their pay to be contributed.

15          THE COURT:  Okay.  And they --

16          MS. RILEY:  We have --

17          THE COURT:  Oh, go ahead.

18          MS. RILEY:  We have requested authorization to pay

19 any prepetition amounts.  To -- just for the purposes of the

20 record, we don't believe that there are currently any amounts

21 due on a prepetition basis.  The debtor is current on all of

22 its health insurance premiums, it is current on all of its

23 elected 401k contributions.

24          However, to the extent that, for instance, maybe

25 United Health may construe some portion of an insurance premium

63

1 as prorated to be on a prepetition basis, we do want to ensure

2 that the debtor can just continue to maintain its full

3 insurance benefits and pay that amount.

4         But, again, we don't believe that any amount should

5 actually be owed.

6         THE COURT:  Okay.  And the parties will correct me if

7 I'm wrong, but it looked to me as though nobody was objecting

8 other than to have the debtor be limited to the cap on the

9 priority amount for employees.

10         So the motion states that the debtors state to the

11 best of their knowledge that nobody's above that cap.  But this

12 would require the language in the order to say "up to, but not

13 beyond the cap."  So --

14         MS. RILEY:  And, Your Honor --

15         THE COURT:  Is there any other objection besides that

16 to this payment of employee benefits?

17              (No audible response heard)

18         THE COURT:  Okay.  So can you clarify that in the

19 order, Ms. Riley?

20         MS. RILEY:  Certainly, Your Honor.

21         THE COURT:  Okay.  What do you want to do next?

22         MS. RILEY:  So I think the next one we'll turn to

23 would be the motion to pay the prepetition joint interest

24 billing obligations of Sklarco.  And this one really relates to

25 payment of those joint interest billing obligations that

64

1  Sklarco has received through bills from the non-Sklar

2  Exploration operators.

3         So, again, the debtor does hold a number of working

4  interests in wells that are not operated by Sklar Exploration;

5  they're operated by third parties.  Those third parties have

6  expenses they are required to maintain, as well.  In order to

7  maintain the operations on those wells in which Sklarco holds a

8  working interest, it issues these joint interest billings, the

9  same way that Sklar Exploration does to its working interest

10 holders.

11        We do believe that payment of these -- I should say

12 that a number of these joint interest billings are offset

13 against Sklarco's revenue, and Sklarco can elect to have those

14 offset from its revenue prior to payment of that revenue to

15 Sklarco.

16        We do believe that continued payment of these joint

17 interest billings is going to be necessary in order to allow

18 the debtor, Sklarco, to maintain its working interest going

19 forward.

20        To the extent that these joint operating agreements

21 that give rise to the working interest are subject to

22 assumption, it would have to be carried at the time of

23 assumption.  But more importantly, right now, those working --

24 those payments to the joint interest obligations is necessary

25 to allow the operators to maintain their expenses to ensure

65

1  that the working -- other working interest holders don't have

2  claims against the estate for payment of those expenses, and to

3  ensure that the debtor is not assessed any penalties for

4  nonpayment of its ongoing joint interest billing obligations.

5  In some instances, those penalties could be as much as 200 to

6  300 percent, which is fairly significant.

7          And so Sklarco has identified a number of joint

8  interest billing obligations that do need to be paid at this

9  time, I think it amounts to approximately $300,000.  And,

10 again, to the extent that those joint interest billing

11 obligations are not paid on an ongoing basis, it's likely that

12 the other working interest holders would attempt to offset

13 against its future revenue regardless of whether or not Sklarco

14 does elect to do that, and could potentially be entitled to

15 withhold that revenue from Sklarco, as well.

16         THE COURT:  Okay.  Let's start with Mr. Suzuki for

17 the bank.

18         MR. SCHUENEMANN:  Your Honor, this is --

19         MR. SUZUKI:  Go ahead, Craig.

20         MR. SCHUENEMANN:  Your Honor, this is Craig

21 Schuenemann, I'm going to take this one on behalf of East-West

22 Bank.

23         THE COURT:  Okay.

24         MR. SCHUENEMANN:  And the bank has two issues with

25 what I will refer to as the JIB motion:

1          The first issue, Your Honor already seized on, and

2     that is that these are contracts, and contracts with the debtor

3     in possession, and they are not simply something that the

4     contract counterparties that the debtor has with these

5     contracts can simply walk away from.

6          Secondly, there just hasn't been a showing of

7     necessity of the level that needs to be made for a critical

8     vendor motion in this instance.  We do not have a showing from

9     the debtor that these are essential to the debtors' operations,

10    and that these particular counterparties meet the definition of

11    a critical vendor.

12         Secondly, the issue that we have here is an issue of

13    information.  We do not know exactly what the substance of

14    these contracts are, and if they even constitute assumable

15    executory contracts under the Code.

16         Additionally, the numbers just don't line up.  The

17    numbers in the debtors' budget for the lease operating expenses

18    non-operated properties, which is what the debtor says that

19    these payments are going to come out of, do not match the

20    $324,000 that they're looking for in the motion.

21         And so it's unclear what the -- what exactly is being

22    paid out, and what is going to be offset with respect to these

23    JIBs.

24         We just haven't had the time or the information that

25    we need to get comfortable with paying these JIBs, and we don't

67

1   think it's proper that this be addressed on an interim basis.

2              THE COURT:  Okay, all right.  We've been going about

3   an hour and a half, and I'd like to have us take a five-minute

4   break.  So just put your phone on mute, and we'll resume in

5   five minutes, okay?  And I'll hear from other parties at that

6   time; thank you.

7              (Recess 3:55 p.m./Reconvene 4:01 p.m.)

8              THE COURT:  Okay.  By my count, it's been seven

9   minutes for a break, so hopefully people have come back, and

10  you'll take us off of mute.

11             We're back on the critical vendor motion, and we've

12  heard from the bank.  Let's hear from any of our other

13  objectors on this motion.  Anybody?

14             (No audible response heard)

15             THE COURT:  And no need to repeat if you just have

16  the same objection as the bank, just say "same."

17             (No audible response heard)

18             THE COURT:  Anybody?

19             MR. BAILEY:  Your Honor?

20             THE COURT:  Yes?

21             MR. BAILEY:  Your Honor, James Bailey.

22             I raised this similar issues in my objection, so same

23  objection as the bank.

24             Thank you.

25             THE COURT:  Very good; thank you.

68

1          Anybody else?

2          MR. SCHUENEMANN:  Your Honor, this is Craig

3 Schuenemann on behalf of the bank again.

4          May I add one point?

5          THE COURT:  Yes.

6          MR. SCHUENEMANN:  I'd also note that Ms. Riley

7 mentioned penalties that may incur on these JIBs if they're not

8 made part of a critical vendor payment.  I'd note that those

9 would become part of the claims; these are prepetition

10 expenses, and they would be added to the prepetition claims in

11 the case, and do not necessarily need to be dealt with at this

12 point.

13          THE COURT:  Yeah, she's just trying to avoid the

14 occurrence of penalties.  But, you know, in the scheme of

15 things, they'd be subordinated, so maybe it won't matter so

16 much.

17          All right, any other objectors want to be heard on

18 the critical vendor motion?

19               (No audible response heard)

20          THE COURT:  Okay.  Well, it sounds like we need an

21 evidentiary hearing on this.  Should we do this on April 27th

22 with --

23          MS. RILEY:  So, Your Honor --

24          THE COURT:  -- cash collateral?

25          MS. RILEY:  If I could just briefly respond to the

1  points?

2          THE COURT:  Sure.

3          MS. RILEY:  I would just like to point out that

4  really this revenue that's coming in from these third party

5  operators, it is critical to both of the debtors' survival

6  here.  It's -- you know, if the money comes into Sklarco, it is

7  used -- or provided to Sklar Exploration for continued

8  operating expenses, as well.

9          And, you know, the -- the revenue could potentially

10 be not just -- I mean it does not just become a prepetition

11 claim, but the revenue could actually be withheld or offset --

12 really withheld by the other third party operators.

13         THE COURT:  Wouldn't that violate the automatic stay?

14         MS. RILEY:  Well, Your Honor, in some instance, they

15 may request relief from stay in order to perform these offsets.

16 In others, it may be that, you know, these continued -- that

17 the joint operating agreements would allow for the withholding

18 of payment as belonging to that operator until that amount is

19 paid.

20         So that is part of the reason why we do believe that

21 it is necessary.

22         THE COURT:  Well, I'll tell you what, I think as part

23 of your electronic data room, you should have all of these

24 contracts available to creditors to see.  And I think we ought

25 to be setting this one over for a further hearing.  And at that

1  point, you know, they may agree with you on some of that once

2  they've seen the agreements themselves.  But partly, they're

3  operating in a vacuum at this point, so --

4          MS. RILEY:  Certainly, Your Honor.

5          THE COURT:  How -- I don't know how many contracts

6  we're talking about since I don't have schedules.  Are we

7  talking time that it's going to take you a long time to get

8  that set up?

9          MS. RILEY:  I -- well, Your Honor, a lot of this

10 information has been compiled, so I don't know that it will

11 take us that long.  We may not be able to provide all of the

12 contracts that are subject to the third party operators, but we

13 could certainly provide some of those in advance of the April

14 27th hearing.  And candidly, Your Honor, I just don't recall

15 how many there are off the top of my head.

16         THE COURT:  Okay.  But it sounds doable to you to get

17 that up and running within, say, a week's time or ten days?

18         MS. RILEY:  Yes, Your Honor.

19         THE COURT:  Okay; very good.

20         All right, so if we're going to have a further

21 hearing, if we need it, you all could come to terms before

22 that, I realize.  But if we need a hearing on it, then should

23 we put it on April 27th?  Is that too soon?  What are people's

24 opinions on that?

25         MS. RILEY:  I think April 27th should be sufficient

1  from the debtors' perspective, Your Honor.

2           THE COURT:  Okay.

3           UNIDENTIFIED ATTORNEY:  From the bank's perspective,

4  Your Honor, if the debtor can produce the material that Ms.

5  Riley mentioned, and we can get a look at it, you know, well

6  ahead of the 20th when we would have to provide exhibits, I

7  think we can make it happen from the bank's perspective.

8           THE COURT:  Okay.  How about Mr. Bailey?

9           MR. BAILEY:  Your Honor, I would like to review, as

10  well, whatever is provided to the bank, so that's fine.

11           THE COURT:  Okay.  So to make this time frame work, I

12  probably need it to be uploaded by April 15th, and then give

13  people the April 20th deadline for witness and exhibit lists

14  for an April 27th hearing, we'll put it on track with the

15  other.

16           Is that still doable, Ms. Riley?

17           MS. RILEY:  I believe so, Your Honor.

18           THE COURT:  Okay, excellent.

19           Okay, next motion?

20           MS. RILEY:  So, Your Honor, we've already -- Your

21  Honor briefly already addressed the limited notice.  So I think

22  the only other things remaining are the retention of counsel

23  for the debtor, specifically we still do have our application

24  to employ pending to be primary 327(a) counsel for the debtor;

25  there are also two applications to employ special counsel, we

1  have Mr. Ruscitti's firm who will be acting as corporate

2  counsel in this case, as well as Mr. Armbrecht's firm that will

3  be acting as oil and gas counsel specifically in the State of

4  Alabama where a majority of these oil and gas interests are

5  located.

6          THE COURT:  Okay.  As you know, the Federal Rule of

7  Bankruptcy Procedure 6003 says that we should not approve these

8  any time sooner than 21 days from the petition date, and you

9  put them out on notice with an objection deadline of April

10 20th.  So I think we're premature taking them up at this point

11 in time.

12         MS. RILEY:  So with respect to our application to be

13 employed as primary counsel for the debtor, I don't believe

14 that one did go out on notice.  And I think the order also

15 provides that we can be employed on an interim basis, at least

16 for the first --

17         MULTIPLE SPEAKERS:  (Indiscernible).

18         MS. RILEY:  And our only concern, of course, is that

19 the debtors being limited liability companies, obviously cannot

20 appear without counsel.  And I think everyone would -- I think

21 maybe should feel a little bit more comfortable if there was an

22 order approving our employment for the debtors here.

23         THE COURT:  Well, I can't give that to you until

24 April 22nd.  So you're just going to have to take that risk and

25 appear for your client between now and then.  So -- unless you

1  can show me irreparable harm, but it doesn't look like you're

2  going to have trouble getting paid in this case, so that's what

3  I'm going to insist on.

4      You're right, it was just the motions for retainers

5  that went out on objection, so -- but even the applications,

6  they're subject to that rule so we're going to have to wait.

7      MS. RILEY:  Certainly, Your Honor.

8      THE COURT:  And we shouldn't be approving the interim

9  payment procedures until the objection deadline has run, and

10  employment apps have been grant.  So -- and when -- if and

11  when, if we don't have objections, and we do ultimately grant

12  the interim payment procedures, we'll do it on our courtroom

13  standard order, which requires interim fee apps every 120 days.

14  And if you delay doing that, then we stop the interim payment

15  procedures, and we don't allow the 20 percent holdback until

16  the final fee app.  So I know that's different than the Local

17  Rule, but the Local Rule provides that each division can rule

18  otherwise, and I will be.

19      Okay, all right.  Your 366 motion for the utilities?

20      MS. RILEY:  Yes, Your Honor.  So we do believe that

21  the utility motion -- the utility motion is necessary to ensure

22  that there is no discontinuation of services.  A copy of this

23  was also mailed directly to the various utilities that are

24  affected, as well, and it does allow them to require an

25  additional deposit for continuation of services.

74

1        But this one is, again, necessary to prevent
2   irreparable harm here.  If they don't have electricity, they
3   can't continue to operate if they don't have ongoing utility
4   services, water services.  Again, they just can't continue to
5   operate, and it would result in irreparable harm to the estate.
6        THE COURT:  I see -- have the debtors been past due
7   on utilities prepetition?
8        MS. RILEY:  No, Your Honor.
9        THE COURT:  Okay.  All right, so I think it's highly
10  unlikely that they're going to shut you off.  And if you give
11  them the one-month deposit that your motion refers to, then,
12  you know, they're going to have to raise an objection to that
13  as not being sufficient.  And if they do, I will put you in a
14  court hearing on an emergency basis.  But as I read Section
15  366, it doesn't provide for the sort of preemption of them
16  being able to come in and say that's not enough of a deposit.
17       So I'm not going to grant the motion, but as I said,
18  you should not have any risk here.  And if there should be a
19  risk, I will give you an emergency hearing on it.
20       MS. RILEY:  Certainly, Your Honor.
21       THE COURT:  Okay.  All right, is that everything?
22            (Pause/No audible response heard)
23       THE COURT:  I think so.
24                 (Pause)
25       THE COURT:  Okay, all right.  Everybody heard Mr.

75

1   Moss's offer to join on the committee formation meeting on

2   April 15th at 2 p.m., and I hope a lot of you will participate

3   in that.

4           Is there anything else for the good of the order

5   that anybody wants the Court to know while we're all gathered

6   here?

7           MS. RILEY:  Nothing further from the debtors, Your

8   Honor.

9           THE COURT:  Okay, all right.

10          Okay, then, everybody, thank you.  And we will wish

11  you good luck in working the consensual arrangements out before

12  April 27th.

13          MS. RILEY:  Yes, Your Honor.

14          THE COURT:  But if not, we'll be here.  All right,

15  we'll stand in recess.

16          MULTIPLE SPEAKERS:  Thank you.

17       (Whereupon, at 4:13 p.m., the hearing was adjourned.)

18

19

20

21

22

23

24

25

76

CERTIFICATE OF TRANSCRIBER

     I, KAREN HARTMANN, a certified Electronic Court
Transcriber, certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings in the
above-entitled matter.


*Karen Hartmann*


Karen Hartmann, AAERT CET 475   Date: April 15, 2020
TRANSCRIPTS PLUS, INC.

TRANSCRIPTS PLUS, INC.
PHONE 215-862-1115 ● E-MAIL CourtTranscripts@aol.com