# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

|  |  |  |
|---|---|---|
| | ) | |
| | ) | Case No. 20-12377-EEB |
| SKLAR EXPLORATION COMPANY, LLC | ) | |
| EIN: 72-1417930 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | |
| SKLARCO, LLC | ) | Case No. 20-12380-EEB |
| EIN:  72-1425432 | ) | Chapter 11 |
| Debtor. | ) | |

## MOTION TO ASSUME CRUDE OIL SUPPLY CONTRACTS WITH PLAINS MARKETING, L.P., AND ASSET TRANSFER AGREEMENT WITH PLAINS GAS SOLUTION, LLC

The Debtors, Sklar Exploration Company, LLC and Sklarco, LLC ("Debtors"), by and through their attorneys, Kutner Brinen, P.C., move the Court for entry of an order authorizing: (a) the assumption and cure of an Asset Transfer Agreement dated March 1, 2020 by and between Sklar Exploration Company, LLC and Plains Gas Solutions, LLC; and (b) assumption of certain crude oil purchase contracts with Plains Marketing, L.P., and as grounds therefor states as follows:

### BACKGROUND

1.      Sklar Exploration Company, L.L.C. ("SEC") and Plains Gas Solutions, LLC (f/k/a CDM Max, LLC) ("PGS") were parties to a Service Agreement dated June 22, 2009, as amended, and a Service Agreement dated September 14, 2011, as amended (collectively, the "Service Agreements"). The Service Agreements provided for the construction and operation of a plant in Conecuh County, Alabama to condition gas and extract liquefiable hydrocarbons.

2.      The Service Agreements provided that on March 1, 2020, all assets at the plant would be transferred to Debtor (the "Asset Transfer") provided that SEC was not in default under the Service Agreements, including payment of all amounts owed by SEC to PGS.

3.     To effectuate the Asset Transfer, PGS and SEC entered into an Asset Transfer Agreement dated March 1, 2020 (the "Asset Transfer Agreement") and, in connection therewith, terminated the Service Agreements effective March 1, 2020.

4.     Pursuant to Section 8.07 of the Asset Transfer Agreement, SEC covenanted to pay PGS all unpaid amounts SEC owed PGS under the Service Agreements.

5.     On March 1, 2020, SEC owed PGS $268,229.58 under the Service Agreements which, amount is due and required to be paid under the Asset Transfer Agreement.

6.     The Service Agreements conditioned the Asset Transfer on Debtor not being in default, which would require Debtor to have paid PGS all past due amounts. PGS claims that absent payment, the Asset Transfer fails for lack of consideration and the transfer is voidable.  The Debtor believes that it has defenses to such claims.

7.     SEC, as seller, and Plains Marketing, L.P. ("PMLP"), as purchaser, are parties to three Crude Oil Supply Contracts for the purchase of crude oil. The Crude Oil Supply Contracts are attached hereto as Exhibit A, and result in approximately $300,000 in revenues per month for the Debtor.

8.     PMLP contends that the purchase contracts are forward contracts as defined in the Bankruptcy Code and can be terminated pursuant to 11 U.S.C. § 556 based upon the filing of SEC's bankruptcy.

9.     Maintaining the Crude Oil Supply Contracts is necessary for SEC's continued operations, and provides a substantial benefit to the estate.

**RELIEF REQUESTED**

10.     As set forth more fully herein, SEC requests entry of an Order authorizing the assumption of its Crude Oil Supply Contracts with PMLP and the Asset Transfer Agreement with PGS, and payment of the amounts owed to PGS as a condition of the assumption of the Asset Transfer Agreement.

11.     Assumption or rejection of executory contracts or unexpired leases by a debtor is subject to Court review under the business judgment standard.  See *NLRB v. Bildisco & Bildisco*,

465 U.S. 513, 523 (1984); *In re Mile High Medal Systems, Inc.*, 899 F.2d 887, 896 (10th Cir. 1990); *In re Grayhall Resources, Inc.*, 63 B.R. 382, 384 (Bankr. D. Colo. 1986).

12.     Pursuant to the business judgment test, the debtor's decision to assume or reject an executory contract should be approved when the debtor decides, in good faith, that assumption or rejection is beneficial to the estate. *In re Chipwich, Inc.*, 54 B.R. 427, 430-431 (Bankr. S.D.N.Y. 1985) ("it is enough, if, as a matter of business judgment, rejection of the burdensome contract may benefit the estate").  Under Section 365(a), "the debtor's business judgment should not be interfered with, absent a showing of bad faith or abuse of business discretion." *Chipwich, Inc.,* 54 B.R. 430-31.  As stated by one Court, "Court approval under Section 365(a), if required, except in extraordinary situations, should be granted as a matter of course." *Summit Land Co. v. Allen (In re Summit Land Co.),* 13 B.R. 310, 315 (Bankr. D. Utah 1981).

13.     SEC's assumption of the purchase contracts and the ability to continue to sell crude oil to PMLP is important and provides substantial revenue to the Debtor.  Ongoing use of PMLP's services is critical given the location of the plant and the type of product that is being shipped and requires specialized transportation.

14.     SEC requires the services of PMLP to ship product from the plant for SEC's product purchaser.  PMLP agrees to continue to negotiate a contract to provide for the shipment of the product, provided the purchaser and PMLP can agree to reasonable terms.

15.     PMLP is the sole member of PGS. PMLP has agreed to continue to purchase crude oil from Debtor and not terminate the purchase contracts as part of the assumption and cure of the Asset Transfer.

16.     Assumption of the Crude Oil Supply Contracts is in SEC's best interest, as it provides a substantial benefit to the estate, and is necessary to SEC's continued operations.

17.     Assumption of the Asset Transfer Agreement is further in the best interest of SEC, as it will allow SEC to operate the plant and generate revenue from the sale of the liquified hydrocarbons generated by the plant.

18.     If the Asset Transfer Agreement is not assumed, and cured through the payment to PGS the unpaid amount of $268,229.58, it will lead to a protracted legal dispute regarding the Asset Transfer, and would likely impair SEC's ability to operate and generate revenue from the Plan.

19.    PGS has agreed that the $268,229.58 may be paid at the rate of one third upon Court approval and one third each month thereafter until paid.

WHEREFORE, the Debtors pray that the Court make and enter an Order authorizing the Debtors, to pay the prepetition amount due to PGS on the terms set forth herein, authorizing the Debtors to assume its Crude Oil Supply Contracts with PMLP, and for such further and additional relief to the Court may appear proper.

Dated: May 4, 2020.                        Respectfully submitted,

By:/s/ Keri L. Riley
  Lee M. Kutner, #10966
  Keri L. Riley, #47605
  **KUTNER BRINEN P.C.**
  1660 Lincoln St., Suite 1850
  Denver, CO  80264
  Telephone:  (303) 832-2400
  Telecopy: (303) 832-1510
  E-Mail: klr@kutnerlaw.com

Exhibit A



November 19, 2003

Ms. Marie Baker
Contract Administration
Plains Marketing, L.P.
12700 Hillcrest Road, Suite 158
Dallas, Texas 75230

RE:    PMLP Contract: 3796-1003
Sklar Exploration Company L.L.C. - Cameron #1
Well, Laney Road Field, Three Creeks Prospect,
Union County, Arkansas

Dear Ms. Baker:

Enclosed is a duplicate executed original of the referenced purchase contract which I have executed on behalf of Sklar Exploration Company L.L.C.   We kept one duplicate original for our file.  Please note that we changed the address and phone number of our company on both original contracts.

Thank you for your assistance in this matter.

Yours very truly,

David A. Barlow
Chief Operating Officer

DAB:lme
Enclosure
cc:    Kevin Walker

U:\David\Gas and Oil Marketing\ltr to Plains Marketing re PMLP Contract for Cameron #1 (111903).wpd

*tel:* 318.227.8668 • *fax:* 318.227.9012 • 401 Edwards Street,  Ste 1601 • Shreveport, Louisiana 71101



# Crude Oil Purchase Contract

CONTRACT NO.3796-1003                                        November 05, 2003

This contract by and between **Sklar Exploration Company LLC ("SKLAR")**, with an address of ~~P O Box 1753~~, Shreveport, LA ~~71166~~ and **Plains Marketing, L.P., ("PMLP")**, covering the sale and delivery by Sklar and the purchase and receipt by PMLP of the hereinafter specified oil is entered into in accordance with the following terms and conditions:

*(handwritten: 71101  401 Edwards St., Suite 1601,)*

1. **TERM:**          The primary term shall be a period of 3 months from November 01, 2003 to February 01, 2004.

     The term shall be automatically extended for a Secondary Term month to month thereafter unless notice of non-renewal is given by either party hereto upon not less than thirty (30) days advance written notice to the other party.

2. **QUALITY AND CRUDE TYPE:**          Arkansas Sweet crude oil.

3. **QUANTITY:**          An amount equal to actual lease receipts from lease(s) indicated on Exhibit "A" attached hereto and made a part hereof. (Approximately 200 barrels per day).

4. **DELIVERY:**          Shall be made at the well tankage into PMLP's designated transportation facilities.

5. **PRICE:**          For the crude oil sold and delivered hereunder, PMLP agrees to pay a price per barrel equal to PMLP North Louisiana Crude Oil Posting, deemed 40.0° API gravity, plus an additional $3.0500 premium as indicated on Exhibit "A" attached hereto and made a part hereof. For pricing purposes, deliveries will be calculated on equal daily quantities.

6. **PAYMENT:**          Payment shall be made by check on or about the twentieth (20th) day of the month following the month of delivery.

PMLP's General Provisions dated February 01, 2001 are incorporated herein by reference and made a part hereof. To the extent of any conflict between the provisions herein and the General Provisions, the provisions herein shall govern.

If Division Orders have been issued to SKLAR by PMLP and executed by SKLAR covering the wells on Exhibit A, the Division Orders are incorporated herein and made a part hereof. The provisions of this Agreement, including but not limited to those relating to term, rights of termination, price and otherwise, shall be applicable and govern, notwithstanding any provision in the Division Orders to the contrary.

All invoices and notices given pursuant to this agreement shall be in writing, telex or faxed and shall be deemed delivered when received by the other party at the address specified below:

Notices and all other correspondence to PMLP shall be mailed or faxed as follows:

> Plains Marketing, L.P.
> 12700 Hillcrest Road, Suite 158
> Dallas, Texas 75230
> Phone: (972) 991-7544
> Fax: (972) 991-7547

Invoices shall be mailed or faxed to PMLP as follows:

> Plains Marketing, L.P.
> 333 Clay Street Suite 1600
> Houston, Texas 77002
> Phone: (713) 646-4100
> Fax: (713) 646-4114

Notices and all other correspondence to SKLAR shall be mailed or faxed as follows:

> Sklar Exploration Company LLC
> ~~P O Box 1753~~ 401 Edwards Street, Suite 1601
> Shreveport, LA ~~71166~~ 71101
> Phone:(318) ~~222-3119~~ 227-8668
> Fax:(318) 227-9012

Plains Marketing, L.P.
By Plains Marketing GP Inc.
Its General Partner                    Sklar Exploration Company LLC

Agreed to and accepted this ____5____ day   Agreed to and accepted this _19th_ day of
of _____NOV_____ , 03 .               NOVEMBER, 2003.

By: _____            By: _____

Name: Keith D. Halloran                 Name: __David A. Barlow__

Title: Director, East Texas and North   Title: __Chief Operating Officer__
       Louisiana Region
       and Attorney in Fact

mlb
Log No.: 9182
File No.: 0

# Exhibit "A"

**Plains Marketing L.P.**

Plains contract: 3796-1003

Effective: 11-01-2003

Partner contract:

| PM Lease | Lease | Operator | County/Parish | State | Price Code* | Price Method** | Applicable Deduct Premium | Percent | Gravity | State Lease |
|---|---|---|---|---|---|---|---|---|---|---|
| 116653 | CAMERON #1 | SKLAR EXPLORATION COMPANY LLUNION | | AR | S2037 | EDQ | $3.0500 | 100.000000% | Deemed 40.0° API | |

(*)S2037 PLAINS MARKETING LP-NORTH LOUISIANA

(**)EQUAL DAILY QUANTITIES

PLAINS MARKETING, L. P.
By Plains Marketing GP Inc.
Its General Partner
GENERAL PROVISIONS/OIL PURCHASE CONTRACT

I    **PAYMENT:** As soon as possible after the close of each calendar month during which deliveries are made, Seller shall invoice Buyer for the crude oil delivered. Unless otherwise provided herein, payment for the oil purchased hereunder shall be made by the twentieth (20th) of the month following the month of delivery, subject to timely receipt by Buyer of invoice and written confirmation of invoiced quantity from the receiving facility. If the payment date falls on a Saturday or Non-Friday bank holiday, payment will be due on the next succeeding work day. All deliveries hereunder shall be deemed a single on-going transaction.

II    **SET-OFFS:** In the event either party shall fail to make timely delivery of any crude oil and/or condensate or other applicable products due and owing to the other party, or in the event that either party shall fail to make timely payment of any monies due and owing to the party, the other party may set off any deliveries or payments due under this or any other agreement between the parties. "Party" for the purposes of this paragraph shall include for each party its affiliates (including, but not limited to, both parent and subsidiary companies). It is the intent of the parties to this contract to treat each party hereto and its respective affiliates (including, but not limited to, both parent and subsidiary corporate entities) as a single legal entity for the purposes of set-off regarding debts and claims.

III    **RIGHT TO AUDIT:** In the event the price of the crude oil or condensate sold hereunder is based on an average acquisition cost, Seller agrees to maintain and retain all pertinent books, records and documents relating to the transactions hereunder for a period of not less than two (2) years following termination of this agreement, and Buyer or its duly authorized representatives shall have access to such records, and the right to audit the same, at all reasonable times during the existence of this Contract, and for such two (2) year period following its termination.

IV    **MEASUREMENTS AND TEST:** Quantities of oil delivered hereunder shall be determined from tank gauges on 100% tank table basis or by the use of mutually acceptable automatic measuring equipment. Volume and gravity of said quantities shall be corrected for temperature to 60&deg; Fahrenheit in accordance with the latest A.S.T.M.-I.P. Petroleum Measurement Tables. The oil delivered hereunder shall be merchantable and acceptable to the carriers involved but not to exceed one percent (1%) S&W. Full deduction shall be made for all S&W content as determined by tests conducted according to the latest A.S.T.M. standard method in effect. Tests for quality shall be made at regular intervals by Seller in accordance with recognized procedures. Each party shall have the right to have a representative or independent inspector (which cost shall be shared equally between the parties hereto) present to witness all gauges, tests and measurements.

V    **WARRANTY:** Seller warrants title, free and clear of all taxes, liens and encumbrances which are customarily paid by Seller prior to delivery, to the oil sold and delivered hereunder and warrants that said oil has been produced, handled and transported to the delivery point hereunder in accordance with the laws, rules and regulations of all local, state or federal authorities having jurisdiction thereof. In this regard, Seller agrees to provide Buyer with any transaction documentation requested.

VI    **FORCE MAJEURE:** Continued performance by either party of any obligation except as to payment due hereunder, may be suspended immediately to the extent caused or contributed to by acts of God, fire, labor or trade disturbance, war, civil commotion or act of the public enemy, unavailability of transportation, storage, manufacturing, refining or distributing facilities, compliance in good faith with any applicable foreign or domestic regulation or order, whether or not it later proves to be invalid, or any cause beyond the reasonable control of either Buyer or Seller whether similar or dissimilar to the enumeration contained herein, except inability to discharge financial obligations when due. The party suspending performance under this clause shall give prompt notice and shall use its best efforts to cure promptly the cause for such suspension. Upon cessation of the cause for suspension, performance shall resume (or commence) immediately. However, if any given Force Majeure condition continues beyond ninety (90) days, the party not claiming said condition shall have the option of terminating this contract upon the giving of written notice thereof to the other party.

VII    **TITLE AND RISK OF LOSS:** Title and risk of loss to crude oil delivered into storage, tankers, barges, tank trucks, and/or pipeline facilities shall pass to Buyer as the crude oil enters the intake pipes of such equipment of the receiving facility, or is in-line transferred.

VIII    **ENTIRETY OF AGREEMENT, MODIFICATION, WAIVER, AND ASSIGNMENT:** This Contract and amendments constitute the entire understanding of the parties relating to the sale of the crude oil specified herein. There shall be no modification or amendment of this Contract except by writing, signed by both parties hereto. Waiver of performance of any obligations by either party of default by the other hereunder shall not operate as a waiver of performance of any other obligation or a future waiver of the same obligation or a waiver of any future default. Neither party shall assign this Contract to a person or firm except upon written consent of the other party, such consent, however, shall not be unreasonably withheld. This Contract shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.

IX    **EQUAL DAILY DELIVERIES:** Except for delivery by truck tanker, for the purpose of invoicing, any crude oil delivered hereunder shall be deemed to have been delivered in equal daily quantities during the calendar month in which deliveries occur.

X    **CHOICE OF LAW:** This Contract shall be constructed in accordance with, and governed by, the law of, and Buyer and Seller consent to the jurisdiction of the courts of, the State of Texas.

XI    **DEFAULT:** In the event Seller shall fail to make timely deliveries due Buyer under this Contract, or if Seller is otherwise in default hereunder, Buyer may, on written notice to Seller terminate this contract or suspend performance of all obligations hereunder during default.

XII    **NOTICE:** Any notice required or permitted hereunder shall be deemed given when deposited in the U.S. Mail as registered or certified mail, return receipt requested, postage prepaid, and addressed to the party to whom the notice is being given at the address set forth on the first page hereof (or such other address as is provided by written notice in accordance with this provision). During the term of this Contract Seller herein agrees to notify Buyer immediately in writing upon Seller's corporate reorganization, merger, or acquisition by another, or any other similar corporate structural change.

Revised: 2/1/01
n:\ljd\ general provisions 3\ls

# Plains

**Marketing, L.P.**

17304 Preston Road, Suite 280 | Dallas, Texas 75252 | Phone: (972) 991-7544 | Fax/Email: (972) 991-7547

March 25, 2020

Sklar Exploration Company LLC
401 Edwards St., Ste 1601
Shreveport, LA 71101
Fax/email: Shatcher@sklarexploration.com

RE:  PMLP Amendment: February 01, 2020-1
      PMLP Contract: 3796-1003

Attention:  Steven Hatcher

Please refer to the above referenced contract dated November 05, 2003.

Effective on and after February 01, 2020, please amend the subject contract by deleting the "Price" clause for X1584 and inserting the "Price" clause as follows for the leases in Clarke and Smith County, MS only:

**PRICE:**    X1456 For the crude oil sold and delivered hereunder, { Buyer } agrees to pay a price per barrel which shall be calculated as follows:

a. Phillips' 66 West Texas Intermediate crude oil posting deemed at 40.0° API gravity based on equal daily quantities during the calendar month in which deliveries occur.

b. To the number determined in the foregoing subparagraph {a.}, add the average of the daily quotes for Argus Weighted Daily Average Posting Plus for the month of delivery in Petroleum Argus "Americas Crude Assessments" based on pricing assessed for the days the U.S. Crude Oil Market is open (weekends and U.S. holidays excluded) during the period beginning with the 26th day of the month that is two months prior to the month of delivery through and including the 25th day of the month that is immediately prior to the month of delivery, provided, however, that if the first day of the period falls on a day on which the U.S. Crude Oil Market is closed, the period shall begin on the first trading day thereafter, and if the last day of the period falls on a day on which the U.S. Crude Oil Market is closed, the period shall end on the last trading day prior thereto. The number determined pursuant to this subparagraph shall be the base price per barrel of crude oil.

c. To the number determined in the foregoing subparagraph (b.) add the weighted average differential for LLS for the month of delivery in ARGUS (Petroleum) "America's Crude Oil Assessments" based on pricing assessed for the days the U. S. crude oil market is open (weekends and U. S. holidays excluded) during the period beginning with the 26th day of the month that is two (2) months prior to the month of delivery through and including the 25th day of the month that is immediately prior to the month of delivery, provided, however, that if the first day of the period falls on a day on which the U. S. crude oil market is closed, the period shall begin on the first trading day thereafter, and if the last day of the period falls on a day on which the U. S. crude oil market is closed, the period shall end on the last trading day prior thereto. The number determined pursuant to subparagraphs (a.), (b.), and (c.) shall be the base price per barrel of crude oil.

d. To the base price determined in (c.) above, less the applicable deduct, if applicable, as indicated on attached Exhibit "A"; and with applicable gravity adjustments as indicated on attached Exhibit "A"..

Please acknowledge by return fax/email your agreement to the Amendment stated herein. Unless we receive written notice of objection within five (5) business days from receipt of this amendment, this Amendment shall be binding on both parties. Except as modified herein, the terms and provisions of the Original Contract and any previous amendments thereto, shall remain in full force and effect and are ratified hereby.

The parties agree that faxed/emailed documents shall be deemed to be admissible as primary evidence in a court of law as original or as counterparts of the original documents, either of which is to be retained and available for inspection.

Very truly yours,

PLAINS MARKETING, L.P.
By: Plains GP LLC,
Its General Partner

Kevin E. Walker
Senior Crude Oil Representative

jah
Log no.: 40522

**SKLAR EXPLORATION COMPANY LLC**

Plains contract:   3796-1003   Effective:02-01-2020

Partner contract:

**Exhibit "A"**

Plains Marketing L.P.

Mar 25, 2020
Page 1 of 2

| PM Lease # ‡=Inact | Lease | Operator | County/Parish | St | Price St Code* | Price Method** | Applicable Premium or (Deduct) | Applicable PLA | Fuel Adj | Percent | Gravity | State Lease |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 040736 | TAYLOR #1 | SKLAR EXPLORATION COMPANY | CASS | TX | X1447 | EDQ | ($1.4000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 012994 |
| 120404 | G C WILLIAMS | SKLAR EXPLORATION COMPANY | CASS | TX | X1447 | EDQ | ($1.7500) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 013096 |
| 120405 | STARCKE | SKLAR EXPLORATION COMPANY | CASS | TX | X1447 | EDQ | ($1.7500) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 012808 |
| 120465 ‡ | BURCHFIELD #1 | SKLAR EXPLORATION COMPANY | BIENVILLE | LA | X1447 | EDQ | ($2.2500) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 614958 |
| 124138 ‡ | V K HILL #1 | SKLAR EXPLORATION COMPANY | LEON | TX | X1447 | EDQ | ($2.7500) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 206071 |
| 132021 ‡ | CLOYD CINDY LOU #1 | SKLAR EXPLORATION COMPANY | BIENVILLE | LA | X1447 | EDQ | ($2.7500) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 601290 |
| 139233 | B & K EXPLORATION INV LLC #1 | SKLAR EXPLORATION COMPANY | CADDO | LA | X1447 | EDQ | ($1.5000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 305903 |
| 154750 ‡ | MERRITT J C ETAL #1 | SKLAR EXPLORATION COMPANY | BIENVILLE | LA | X1447 | EDQ | ($2.0000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 615529 |
| 154974 ‡ | HENLEY ROYCE TRUST #1 | SKLAR EXPLORATION COMPANY | BIENVILLE | LA | X1447 | EDQ | ($2.0000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 615314 |
| 166565 ‡ | MOAK R D #1 | SKLAR EXPLORATION COMPANY | CLAIBORNE | LA | X1447 | EDQ | ($2.0000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 615357 |
| 166580 | BICKHAM DICKSON 37 #1 | SKLAR EXPLORATION COMPANY | CADDO | LA | X1447 | EDQ | ($1.5000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 615364 |
| 166656 ‡ | PATE SARAH 26 #1 | SKLAR EXPLORATION COMPANY | CLAIBORNE | LA | X1447 | EDQ | ($2.0000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 615485 |
| 166689 ‡ | WEYERHAEUSER CO #1 | SKLAR EXPLORATION COMPANY | BIENVILLE | LA | X1447 | EDQ | ($2.0000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 615233 |
| 166924 | LAY KIMBERLY 33 #1 | SKLAR EXPLORATION COMPANY | CLAIBORNE | LA | X1447 | EDQ | ($2.0000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 615940 |
| 182294 ‡ | HASTY JAMES #1-ALT /SER 244234 | SKLAR EXPLORATION COMPANY | BIENVILLE | LA | X1670 | EDQ | ($2.7000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 051460 |
| 182333 | ALBERT KEY #1 | SKLAR EXPLORATION COMPANY | MARION | TX | X1447 | EDQ | ($1.5000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 015243 |
| **182482** | **JEANETTE S COLE 21-11-1** | **SKLAR EXPLORATION COMPANY** | **SMITH** | **MS** | **X1456** | **EDQ** | **($6.8500)** | **0.00%** | **$0.0000** | **100.00000%** | **Flat-G00A** | **003759** |
| 186107 | VICKERS | SKLAR EXPLORATION COMPANY | FREESTONE | TX | X1447 | EDQ | ($1.5000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 607712 |
| 199009 | BRYANT JOHN D JR | SKLAR EXPLORATION COMPANY | BIENVILLE | LA | X1447 | EDQ | ($2.0000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 015412 |
| 199097 | JOHN T FAVELL ET AL #1 | SKLAR EXPLORATION COMPANY | HARRISON | TX | X1447 | EDQ | ($2.0400) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 015404 |
| 199098 ‡ | ALBERT S AGNOR ET AL | SKLAR EXPLORATION COMPANY | HARRISON | TX | X1447 | EDQ | ($2.0400) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 015406 |
| 199099 ‡ | SUSAN A TOYE ET AL | SKLAR EXPLORATION COMPANY | HARRISON | TX | X1447 | EDQ | ($2.0400) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| **199105** | **SANDRA BATEMAN 21-9 #1** | **SKLAR EXPLORATION COMPANY** | **SMITH** | **MS** | **X1456** | **EDQ** | **($6.7700)** | **0.00%** | **$0.0000** | **100.00000%** | **Flat-G00A** | **612978** |
| 199168 ‡ | WILLAMETTE 21 #1 | SKLAR EXPLORATION COMPANY | BIENVILLE | LA | X1447 | EDQ | ($2.0000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 617931 |
| 199215 | ECHO PAPA 10-10 #1 | SKLAR EXPLORATION COMPANY | BIENVILLE | LA | X1447 | EDQ | ($2.7000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 617923 |
| 199216 | RUSHING ETAL #2 | SKLAR EXPLORATION COMPANY | NATCHITOCHES | LA | X1447 | EDQ | ($2.9000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199287 ‡ | RED RIVER 15-3 NO 1 | SKLAR EXPLORATION COMPANY | BIENVILLE | LA | X1447 | EDQ | ($2.7000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 000000 |
| 199379 | EVANS J B 11-4 #1 | SKLAR EXPLORATION COMPANY | BIENVILLE | LA | X1447 | EDQ | ($2.7000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 617963 |
| **199459** | **MCLEOD ET AL 30-11 #1** | **SKLAR EXPLORATION COMPANY** | **CLARKE** | **MS** | **X1456** | **EDQ** | **($7.6500)** | **0.00%** | **$0.0000** | **100.00000%** | **Flat-G00A** | |
| **224041** | **FLEMING ET AL 30-15 #1** | **SKLAR EXPLORATION COMPANY** | **CLARKE** | **MS** | **X1456** | **EDQ** | **($7.6500)** | **0.00%** | **$0.0000** | **100.00000%** | **Flat-G00A** | |
| 504304 | FAIR OIL CO #1 | SKLAR EXPLORATION COMPANY | SMITH | TX | X1447 | EDQ | ($0.8000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 010430 |
| 505461 | TELEDYNE | SKLAR EXPLORATION COMPANY | SMITH | TX | X1447 | EDQ | ($0.8000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 0833 |
| 506158 | SUN 1-R | SKLAR EXPLORATION COMPANY | SMITH | TX | X1447 | EDQ | ($0.8000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 010681 |

## Exhibit "A"

**SKLAR EXPLORATION COMPANY LLC**

Mar 25, 2020

Page 2 of 2

Plains contract: 3796-1003    Effective:02-01-2020

Plains Marketing L.P.

Partner contract:

| PM Lease ‡=Inact | Lease | Operator | County/Parish | St | Price Code* | Price Method ** | Applicable Premium or (Deduct) | Applicable PLA | Fuel Adj | Percent | Gravity | State Lease |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 508433 | HILLIARD WARREN ES | SKLAR EXPLORATION COMPANY | SMITH | TX | X1447 | EDQ | ($0.8000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 011235 |
| 540497 | HAYNESVILLE MERCANTILE #1 | SKLAR EXPLORATION COMPANY | WEBSTER | LA | X1447 | EDQ | ($1.6500) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 026313 |
| 547108 ‡ | WIGGINS #1 | SKLAR EXPLORATION COMPANY | RED RIVER | LA | X1447 | EDQ | ($1.8500) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | 610796 |

(*)X1447   SPECIAL POSTINGS-PMWTI +ARGUS POST PLUS WTD AVG

(*)X1456   SPECIAL POSTINGS-CPWTI+ARGPPLUS+ARGLLS/WTI DIFF

(*)X1670   SPECIAL POSTINGS-PM SO ARK NLOUISIANA SOUR + P+

(**)EQUAL DAILY QUANTITIES



**PLAINS**
MARKETING, L.P.

## Crude Oil Purchase Contract

**PMLP Contract No. 3796-1005**                                      **Date: September 20, 2011**

**THIS CRUDE OIL PURCHASE CONTRACT CANCELS AND SUPERSEDES THAT CERTAIN CRUDE OIL PURCHASE CONTRACT DATED JULY 18, 2011. THIS AGREEMENT SHALL BE THE ONLY GOVERNING CONTRACT IN REGARD TO THE PURCHASE AND SALE OF THE CRUDE OIL STATED HEREIN.**

This Crude Oil Purchase Contract ("Agreement") by and between Sklar Exploration Company LLC ("Sklar" or "Seller"), with an address of 401 Edwards St, Suite 1601 Shreveport, Louisiana 71101 and Plains Marketing L.P. ("PMLP" or "Buyer"), covering the sale and delivery by Sklar and the purchase and receipt by PMLP of the hereinafter specified oil is entered into this 20th day of September, 2011 to be effective as of July 1, 2011 in accordance with the following terms and conditions:

**1. Term.** The primary term shall be a period of six (6) months from July 1, 2011 to December 31, 2011 (the "Primary Term"). At the end of the Primary Term, this Agreement shall be automatically extended month to month thereafter unless notice of non-renewal is given by either party hereto upon not less than thirty (30) days advance written notice to the other party.

**2. Quality and Crude Type.** Alabama Light Sweet and Mississippi Sweet crude oil.

**3. Quantity.** An amount equal to all of the actual lease receipts from the lease(s) indicated on Exhibit "A" attached hereto and made a part hereof (approximately 1,000 Barrels per day).

**4. Delivery.** Seller shall cause the oil to be delivered from lease facilities into the gathering facilities of Buyer or its designated carrier as per Buyer's nominations.

**5. Price.**
5.1 For the crude oil sold and delivered hereunder, PMLP agrees to pay a per Barrel price which shall be calculated as follows:

(a) The weighted average of PMLP's West Texas Intermediate (All Other Areas) crude oil posting for the month of delivery (weekends and U.S. holidays excluded) deemed at 40.0° API gravity based on equal daily quantities.

(b) To the number determined in the foregoing subparagraph (a), add the Argus P-Plus weighted average differential for the month of delivery in Argus (Petroleum) "Americas Crude Oil Assessments" based on pricing assessed for the days the U.S. crude oil market is open (weekends and U.S. holidays excluded) during the period beginning with the 26th day of the month that is two months prior to the month of delivery through and including the 25th day of the month that is immediately prior to the month of delivery, provided, however, that if the first day of the period falls on a day on which the U.S. crude oil market is closed, the period shall begin on the first trading day thereafter, and if the last day of the period falls on a day on which the U.S. crude oil market is closed, the period shall end on the last trading day prior thereto.

(c) To the number determined in subparagraphs (a) and (b) above, add the Argus LLS weighted average differential for the month of delivery in Argus (Petroleum) "Americas Crude oil Assessments" based on pricing assessed for the days the U.S. crude oil market is open (weekends and U.S. holidays excluded) during the period beginning with the 26th day of the month that is two months prior to the month of delivery through and including the 25th day of the month that is immediately prior to the month of delivery, provided, however, that if the first day of the period falls on a day on which the U.S. crude oil market is closed, the period shall begin on the first trading day thereafter, and if the last day of the period falls on a day on which the U.S. crude oil market is closed, the period shall end on the

PAA_LAW_COM: 509580v5

**Plains Marketing GP Inc., General Partner**
12700 Hillcrest Road, Suite 158  ■  Dallas, Texas 75230  ■  972-991-7544  ■  Fax 972-991-7547

last trading day prior thereto. The number determined pursuant to this subparagraph (c) and subparagraphs (a) and (b) above shall be the base price per Barrel of crude oil.

(d) To the base price determined in (c) above, add or subtract the amount indicated as "Applicable Premium or (Deduct)" on Exhibit "A" attached hereto, as the same may be amended from time to time and make the applicable gravity adjustments also indicated on Exhibit "A".

5.2 Notwithstanding the foregoing, the parties agree that during the Primary Term of this Agreement only for the first 1,000 Barrels delivered each day to Buyer, the price determined in Section 5.1 (d) shall be adjusted by an amount, positive or negative based on the calculation set forth below:

  (a) If the Reference Price (as defined hereinafter) is less than $16.10 per Barrel the ("Fixed Price"), then the price determined in Section 5. 1 (d) shall be adjusted upward by the amount by which the Fixed Price exceeds the Reference Price; and

  (b) If the Reference Price (as defined hereinafter) is greater than the Fixed Price, then the price determined in Section 5.1 (d) shall be adjusted downwards by the amount by which the Reference Price exceeds the Fixed Price.

"Reference Price" means a price equal to the Argus LLS weighted average differential for the month of delivery in Argus (Petroleum) "Americas Crude oil Assessments" based on pricing assessed for the days the U.S. crude oil market is open (weekends and U.S. holidays excluded) during the period beginning with the 26th day of the month that is two months prior to the month of delivery through and including the 25th day of the month that is immediately prior to the month of delivery, provided, however, that if the first day of the period falls on a day on which the U.S. crude oil market is closed, the period shall begin on the first trading day thereafter, and if the last day of the period falls on a day on which the U.S. crude oil market is closed, the period shall end on the last trading day prior thereto.

5.3 Buyer will make the calculations for the monthly settlement price due from Buyer to Seller.

6. **Payment**. Payment shall be made by wire transfer on or about the twentieth (20th) day of the month following the month of delivery. In the event payment due date falls on a Saturday or a bank holiday other than a Monday, payment shall be due on the last preceding business day, Should the payment due date fall on a Sunday or a Monday bank holiday, payment shall be due on the following business day.

7. **Special Terms.**
7.1 Seller agrees to pay all underlying royalty and other interest owners in accordance with the applicable oil and gas leases or other agreements under which payment of proceeds are due including obligations for valuation, timing of settlements, the fractional and/or decimal interest or title in production, oil production and/or severance taxes and compliance with applicable laws pertaining to payment of oil sale proceeds.
7.2 Seller may not assign this Agreement.

8. **Events of Default and Termination.**
8.1 An event of default ("Event of Default") with respect to a party hereto (the "Defaulting Party") shall mean any one of the following: (i) the failure of the Defaulting Party to make, when due, any payment or delivery under this Agreement, required to be made; (ii)  the failure of the Defaulting Party to comply with its other respective obligations under this Agreement, and such failure continues uncured for five (5) days after written notice thereof; or (iii) the Defaulting Party shall be subject to a bankruptcy proceeding.
8.2 Upon the occurrence of an Event of Default, as to the Defaulting Party, the other party (the "Non-Defaulting Party") may in its sole discretion, (i) terminate this Agreement immediately; (ii) suspend performance of its obligations under this Agreement until such Event of Default is cured; or (iii) withhold any payments due to the Defaulting Party until such Event of Default is cured.
8.3 The Defaulting Party will pay to the Non-defaulting Party, the Non-defaulting Party's Loss in respect of this Agreement. "Loss" means, with respect to this Agreement, and a party, the amount that party reasonably determines in good faith to be its total losses and costs in connection with this Agreement including any loss of bargain, cost of cover or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position.

9. **Other Terms and Conditions.** Conoco Company's General Provisions for Domestic Crude Oil Agreements dated January 01, 1993 ("General Provisions") attached hereto as Exhibit "B" are incorporated herein by

reference and made a part hereof. To the extent of any conflict between the provisions herein and the General Provisions, the provisions herein shall govern.

**10.Contacts and Notices.** All invoices and notices given pursuant to this Agreement shall be in writing and mailed, emailed or faxed as provided below and shall be deemed delivered when received by the other party at the address specified below:
Notices and all other correspondence to PMLP shall be mailed, emailed or faxed as follows:

> Plains Marketing, L.P.
> 12700 Hillcrest Road Suite 158
> Dallas, Texas 75230
> Phone: (972) 991-7544
> Fax: (972) 991-7547
> Email: kdhalloran@paalp.com

Invoices to PMLP shall be mailed or faxed as follows:

> Plains Marketing L.P.
> 333 Clay Street, Suite 1600
> Houston, Texas 77002
> Phone: (713) 646-4100
> Fax: (713) 646-4680
> Attn: Accounting Department

Notices and all other correspondence to Sklar shall be mailed, emailed or faxed as follows:

> Sklar Exploration Company LLC
> 401 Edwards St., Suite 1601
> Shreveport, Louisiana 71101
> Phone: (318) 227-8668
> Fax:  (318) 227-9012
> Attn: David Barlow
> Email: dbarlow@sklarexploration.com

**11.  Counterparts.** This Agreement may be executed in one or more counterparts each of which shall be deemed an original, but all of which together shall constitute the same instrument. The parties agree that faxed documents shall be deemed to be admissible as primary evidence in a  court of law as original counterparts or as counterparts of the original documents, either of which is to be retained and available for inspection.

This contract evidences our understanding of the entire agreement and shall constitute the formal contract.

Please acknowledge your acceptance of and agreement to the terms stated herein by signing a copy of this Agreement and returning it to us. Unless we receive notice of your objections within five (5) business days, we will consider this Agreement as final and binding on both parties.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the day first written above.

**PLAINS MARKETING, L.P.**
**By Plains Marketing GP Inc. Its General Partner**

Name: Keith D. Halloran
Title: Director, East Texas and North Louisiana
            Region and Attorney in Fact

**SKLAR EXPLORATION COMPANY LLC**

Name:       David A. Barlow
Title:       President & Chief Operating Officer
              Sklar Exploration Company L.L.C.

# Exhibit "A"

**SKLAR EXPLORATION COMPANY LLC**
Plains contract:   3796-1005   Effective:07-01-2011

Plains Marketing L.P.

Partner contract:

Sep 20, 2011
Page 1 of 2

| PM Lease #-Inact | Lease | Operator | County/Parish | State | Price Code* | Price Method** | Applicable Premium or (Deduct) | Fuel Adj | Percent | Gravity | State Lease |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 124336 | ANDERSON-TULLY 8-4 #1 | SKLAR EXPLORATION COMPA | WARREN | MS | X1465 | EDQ | ($3.0500) | $0.0000 | 100.00000% | Flat G00A | |
| 125670 | CRAFT-MACK 7-2 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 125960 | HOEFFNER-BROUGHTON | SPOONER PETROLEUM COMP | MONROE | AL | X1465 | EDQ | ($4.4000) | $0.0000 | 100.00000% | Flat G00A | |
| 132382 | CRAFT-CEDAR CREEK LA | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 139200 | CRAFT-BRYE 8-4 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Deemed 40.0º API | |
| 139333 | CRAFT-RALLS 5-14 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 139447 | CRAFT-RALLS 8-12 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 139448 | LOGAN 5-7 #1 | SKLAR EXPLORATION COMPA | ESCAMBIA | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 139496 | CRAFT-RALLS 5-10 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 151928 | CRAFT-RALLS 5-8 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 151958 | CRAFT-RALLS 4-5 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 154510 | CRAFT-MACK 8-2 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 154766 | FELD HEIRS #3 | SKLAR EXPLORATION COMPA | WARREN | MS | X1465 | EDQ | ($3.0500) | $0.0000 | 100.00000% | Flat G00A | |
| 154825 | CRAFT-RALLS 33-14 #2 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 154826 ‡ | CRAFT-RALLS 33-16 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 154915 | CRAFT-RALLS 4-12 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 154946 | FELD MOMO #4 | SKLAR EXPLORATION COMPA | WARREN | MS | X1465 | EDQ | ($3.0500) | $0.0000 | 100.00000% | Flat G00A | |
| 166508 | CRAFT-MACK 17-4 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 166513 | CRAFT-RALLS 33-15 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 166521 | CRAFT-RALLS 4-2 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 166569 ‡ | CRAFT-RALLS 33-8 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 166923 | CRAFT-RALLS 33-7 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 166926 | CRAFT-SOTERRA LLC 27- | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 175250 | CRAFT-SOTERRA LLC 27- | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 175262 | CRAFT-SMURFIT-STONE : | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 175263 | CRAFT-RALLS 28-16 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 175432 | HAMITER 32-3 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 175476 | MARY MACK 31-2 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 175485 | THOMASSON 29-10 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 182025 | CEDAR CREEK LAND & TI | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDQ | ($3.4500) | $0.0000 | 100.00000% | Flat G00A | |
| 706373 | FELD HEIRS #1 | SKLAR EXPLORATION COMPA | WARREN | MS | X1465 | EDQ | ($3.0500) | $0.0000 | 100.00000% | Flat G00A | |

# Exhibit "A"

Plains Marketing L.P.

SKLAR EXPLORATION COMPANY LLC

Plains contract:   3796-1005      Effective:07-01-2011

Partner contract:

Sep 20, 2011
Page 2 of 2

| PM Lease ‡ =Inact | Lease | Operator | County/Parish | State | Price Code* | Price Method** | Applicable Premium or (Deduct) | Fuel Adj | Percent | Gravity | State Lease |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 706497 ‡ | PHELPS-BOVINA UNIT 5-1 | SKLAR EXPLORATION COMPA | WARREN | MS | X1465 | EDQ | ($3.0500) | $0.0000 | 100.00000% | Flat G00A | |

(*)X1465   SPECIAL POSTINGS-PM WTH+LLS+ARGUSPP

(**)EQUAL DAILY QUANTITIES



**GENERAL PROVISIONS**
**DOMESTIC CRUDE OIL AGREEMENTS**

**A.    Measurement and Tests:**  All measurements hereunder shall be made from static tank gauges on 100 percent tank table basis or by positive displacement meters.  All measurements and tests shall be made in accordance with the latest ASTM or ASME-API (Petroleum PD Meter Code) published methods then in effect, whichever apply.  Volume and gravity shall be adjusted to 60 degrees Fahrenheit by the use of Table 6A and 5A of the Petroleum Measurement Tables ASTM Designation D1250 in their latest revision.  The crude oil delivered hereunder shall be marketable and acceptable in the applicable common or segregated stream of the carriers involved but not to exceed 1% S&W.  Full deduction for all free water and S&W content shall be made according to the API/ASTM Standard Method then in effect.  Either party shall have the right to have a representative witness all gauges, tests and measurements.  In the absence of the other party's representative, such gauges, tests and measurements shall be deemed to be correct.

**B.    Warranty:**  The Seller warrants good title to all crude oil delivered hereunder and warrants that such crude oil shall be free from all royalties, liens, encumbrances and all applicable foreign, federal, state and local taxes.

Seller further warrants that the crude oil delivered shall not be contaminated by chemicals foreign to virgin crude oil including, but not limited to chlorinated and/or oxygenated hydrocarbons and lead.  Buyer shall have the right, without prejudice to any other remedy available to Buyer, to reject and return to Seller any quantities of crude oil which are found to be so contaminated, even after delivery to Buyer.

**C.    Rules and Regulations:**  The terms, provisions and activities undertaken pursuant to this Agreement shall be subject to all applicable laws, orders and regulations of all governmental authorities.  If at any time a provision hereof violates any such applicable laws, orders or regulations, such provision shall be voided and the remainder of the Agreement shall continue in full force and effect unless terminated by either party upon giving written notice to the other party hereto.  If applicable, the parties hereto agree to comply with all provisions (as amended) of the Equal Opportunity Clause prescribed in 41 C.F.R. 60-1.4; the Affirmative Action Clause for disabled veterans and veterans of the Vietnam Era prescribed in 41 C.F.R. 60-250.4; the Affirmative Action Clause for Handicapped Workers prescribed in 41 C.F.R. 60-741.4; 48 C.F.R. Chapter 1 Subpart 19.7 regarding Small Business and Small Disadvantaged Business Concerns; 48 C.F.R. Chapter 1 Subpart 20.3 regarding Utilization of Labor Surplus Area Concerns; Executive Order 12138 and regulations thereunder regarding subcontracts to women-owned business concerns; Affirmative Action Compliance Program (41 C.F.R. 60-1.40); annually file SF-100 Employer Information Report (41 C.F.R. 60-1.7); 41 C.F.R. 60-1.8 prohibiting segregated facilities; and the Fair Labor Standards Act of 1938 as amended, all of which are incorporated in this Agreement by reference.

**D.    Hazard Communication:**  Seller shall provide its Material Safety Data Sheet ("MSDS") to Buyer.  Buyer acknowledges the hazards and risks in handling and using crude oil.  Buyer shall read the MSDS and advise its employees, its affiliates, and third parties, who may purchase or come into contact with such crude oil, about the hazards of crude oil, as well as the precautionary procedures for handling said crude oil, which are set forth in such MSDS and any supplementary MSDS or written warning(s) which Seller may provide to Buyer from time to time.

**E.    Force Majeure:**  Except for payment due hereunder, either party hereto shall be relieved from liability for failure to perform hereunder for the duration and to the extent such failure is occasioned by war, riots, insurrections, fire, explosions, sabotage, strikes, and other labor or industrial disturbances, acts of God or the elements, governmental laws, regulations, or requests, acts in furtherance of the International Energy Program, disruption or breakdown of production or transportation facilities, delays of pipeline carrier in receiving and delivering crude oil tendered, or by any other cause, whether similar or not, reasonably beyond the control of such party.  Any such failures to perform shall be remedied with all reasonable dispatch, but neither party shall be required to supply substitute quantities from other sources of supply.  Failure to perform due to events of Force Majeure shall not extend the terms of this Agreement.

Notwithstanding the above, and in the event that the Agreement is an associated purchase/sale, or exchange of crude oil, the parties shall have the rights and obligations described below in the circumstances described below:

(1)        If, because of Force Majeure, the party declaring Force Majeure (the "Declaring Party") is unable to deliver part or all of the quantity of crude oil which the Declaring Party is obligated to deliver under the Agreement or associated contract, the other party (the "Exchange Partner") shall have the right but not the obligation to reduce its deliveries of crude oil under the same Agreement or associated contract by an amount not to exceed the number of barrels of crude oil that the Declaring Party fails to deliver.

(2)        If, because of Force Majeure, the Declaring Party is unable to take delivery of part or all of the quantity of crude oil to be delivered by the Exchange Partner under the Agreement or associated contract, the Exchange Partner shall have the right but not the obligation to reduce its receipts of crude oil under the same Agreement or associated contract by an amount not to exceed the number of barrels of crude oil that the Declaring Party fails to take delivery of.

**F.    Payment:**  Unless otherwise specified in the Special Provisions of this Agreement, Buyer agrees to make payment against Seller's invoice for the crude oil purchased hereunder to a bank designated by Seller in U.S. dollars by telegraphic transfer in immediately available funds.  Unless otherwise specified in the Special Provisions of this Agreement, payment will be due on or before the 20th of the month following the month of delivery.  If payment due date is on a Saturday or New York bank holiday other than Monday, payment shall be due on the preceding New York banking day.  If payment due date is on a Sunday or a Monday New York bank holiday, payment shall be due on the succeeding New York banking day.

Payment shall be deemed to be made on the date good funds are credited to Seller's account at Seller's designated bank.

In the event that Buyer fails to make any payment when due, Seller shall have the right to charge interest on the amount of the overdue payment at a per annum rate which shall be two percentage points higher than the published prime lending rate of Morgan Guaranty Trust Company of New York on the date payment was due, but not to exceed the maximum rate permitted by law.

**Effective January 1, 1993**
**Supersedes November 1983 General Provisions**

G.     **Financial Responsibility:**  Notwithstanding anything to the contrary in this Agreement, should Seller reasonably believe it necessary to assure payment, Seller may at any time require, by written notice to Buyer, advance cash payment or satisfactory security in the form of a Letter or Letters of Credit at Buyer's expense in a form and from a bank acceptable to Seller to cover any or all deliveries of crude oil.  If Buyer does not provide the Letter of Credit on or before the date specified in Seller's notice under this section, Seller or Buyer may terminate this Agreement forthwith.  However, if a Letter of Credit is required under the Special Provisions of this Agreement and Buyer does not provide same, then Seller only may terminate this Agreement forthwith.  In no event shall Seller be obligated to schedule or complete delivery of the crude oil until said Letter of Credit is found acceptable to Seller.     Each   party   may offset any payments or deliveries due to the other party under this or any other agreement between the parties.

       If a party to this Agreement (the "Defaulting Party") should (1) become the subject of bankruptcy or other insolvency proceedings, or proceedings for the appointment of a receiver, trustee, or similar official, (2) become generally unable to pay its debts as they become due, or (3) make a general assignment for the benefit of creditors, the other party to this Agreement may withhold shipments without notice.

H.     **Liquidation:**

       (1)        Right to Liquidate.  At any time after the occurrence of one or more of the events described in the third paragraph of Section G, Financial Responsibility, the other party to the Agreement (the "Liquidating Party") shall have the right, at its sole discretion, to liquidate this Agreement by terminating this Agreement.  Upon termination, the parties shall have no further rights or obligations with respect to this Agreement, except for the payment of the amount(s) (the "Settlement Amount" or "Settlement Amounts") determined as provided in Paragraph (3) of this section.

       (2)        Multiple Deliveries.  If this Agreement provides for multiple deliveries of one or more types of crude oil in the same or different delivery months, or for the purchase or exchange of crude oil by the parties, all deliveries under this Agreement to the same party at the same delivery location during a particular delivery month shall be considered a single commodity transaction ("Commodity Transaction") for the purpose of determining the Settlement Amount(s).  If the Liquidating Party elects to liquidate this Agreement, the Liquidating Party must terminate all Commodity Transactions under this Agreement.

       (3)        Settlement Amount.  With respect to each terminated Commodity Transaction, the Settlement Amount shall be equal to the contract quantity of crude oil, multiplied by the difference between the contract price per barrel specified in this Agreement (the "Contract Price") and the market price per barrel of crude oil on the date the Liquidating Party terminates this Agreement (the "Market Price").  If the Market Price exceeds the Contract Price in a Commodity Transaction, the selling party shall pay the Settlement Amount to the buying party.  If the Market Price is less than the Contract Price in a Commodity Transaction, the buying party shall pay the Settlement Amount to the selling party.  If the Market Price is equal to the Contract Price in a Commodity Transaction, no Settlement Amount shall be due.

       (4)        Termination Date.  For the purpose of determining the Settlement Amount, the date on which the Liquidating Party terminates this Agreement shall be deemed to be (a) the date on which the Liquidating Party sends written notice of termination to the Defaulting Party, if such notice of termination is sent by telex or facsimile transaction; or (b) the date on which the Defaulting Party receives written notice of termination from the Liquidating Party, if such notice of termination is given by United States mail or a private mail delivery service.

       (5)        Market Price.  Unless otherwise provided in this Agreement, the Market Price of crude oil sold or exchanged under this Agreement shall be the price for crude oil for the delivery month specified in this Agreement and at the delivery location that corresponds to the delivery location specified in this Agreement, as reported in Platt's Oilgram Price Report ("Platt's") for the date on which the Liquidating Party terminates this Agreement.  If Platt's reports a range of prices for crude oil on that date, the Market Price shall be the arithmetic average of the high and low prices reported by Platt's.  If Platt's does not report prices for the crude oil being sold under this Agreement, the Liquidating Party shall determine the Market Price of such crude oil in a commercially reasonable manner, unless otherwise provided in this Agreement.

       (6)        Payment of Settlement Amount.  Any Settlement Amount due upon termination of this Agreement shall be paid in immediately available funds within two business days after the Liquidating Party terminates this Agreement.  However, if this Agreement provides for more than one Commodity Transaction, or if Settlement Amounts are due under other agreements terminated by the Liquidating Party, the Settlement Amounts due to each party for such Commodity Transactions and/or agreements shall be aggregated.  The party owing the net amount after such aggregation shall pay such net amount to the other party in immediately available funds within two business days after the date on which the Liquidating Party terminates this Agreement.

       (7)        Miscellaneous.  This section shall not limit the rights and remedies available to the Liquidating Party by law or under other provisions of this Agreement.  The parties hereby acknowledge that this Agreement constitutes a forward contract for purposes of Section 556 of the U.S. Bankruptcy Code.

I.     **Equal Daily Deliveries:**  For pricing purposes only, unless otherwise specified in the Special Provisions, all crude oil delivered hereunder during any calendar month shall be considered to have been delivered in equal daily quantities during such month.

J.     **Exchange Balancing:**  If volumes are exchanged, each party shall be responsible for maintaining the exchange in balance on a month-to-month basis, as near as pipeline or other transportation conditions will permit.  In all events upon termination of this Agreement and after all monetary obligations under this Agreement have been satisfied, any volume imbalance existing at the conclusion of this Agreement of less than 1,000 barrels will be declared in balance.  Any volume imbalance of 1,000 barrels or more, limited to the total contract volume, will be settled by the underdelivering party making delivery of the total volume imbalance in accordance with the delivery provisions of this Agreement applicable to the underdelivering party, unless mutually agreed to the contrary.  The request to schedule all volume imbalances must be confirmed in writing by one party or both parties.  Volume imbalances confirmed by the 20th of the month shall be delivered during the calendar month after the volume imbalance is confirmed.  Volume imbalances confirmed after the 20th of the month shall be delivered during the second calendar month after the volume imbalance is confirmed.

K.      **Delivery, Title, and Risk of Loss:**  Delivery, title, and risk of loss of the crude oil delivered hereunder shall pass from Seller to Buyer as follows:

For lease delivery locations, delivery of the crude oil to the Buyer shall be effected as the crude oil passes the last permanent delivery flange and/or meter connecting the Seller's lease/unit storage tanks or processing facilities to the Buyer's carrier.  Title to and risk of loss of the crude oil shall pass from Seller to Buyer at the point of delivery.

For delivery locations other than lease/unit delivery locations, delivery of the crude oil to the Buyer shall be effected as the crude oil passes the last permanent delivery flange and/or meter connecting the delivery facility designated by the Seller to the Buyer's carrier.  If delivery is by in-line transfer, delivery of the crude oil to the Buyer shall be effected at the particular pipeline facility designated in this Agreement.  Title to and risk of loss of the crude oil shall pass from the Seller to the Buyer upon delivery.

L.      **Term:**  Unless otherwise specified in the Special Provisions, delivery months begin at 7:00 a.m. on the first day of the calendar month and end at 7:00 a.m. on the first day of the following calendar month.

M.      **Governing Law:**      This Agreement and any disputes arising hereunder shall be governed by the laws of the State of Texas.

N.      **Necessary Documents:**  Upon request, each party agrees to furnish all substantiating documents incident to the transaction, including a Delivery Ticket for each volume delivered and an invoice for any month in which the sums are due.

O.      **Waiver:**  No waiver by either party regarding the performance of the other party under any of the provisions of this Agreement shall be construed as a waiver of any subsequent performance under the same or any other provisions.

P.      **Assignment:**  Neither party shall assign this Agreement or any rights hereunder without the written consent of the other party unless such assignment is made to a person controlling, controlled by or under common control of assignor, in which event assignor shall remain responsible for nonperformance.

Q.      **Entirety of Agreement:**  The Special Provisions and these General Provisions contain the entire Agreement of the parties; there are no other promises, representations or warranties.  Any modification of this Agreement shall be by written instrument.  Any conflict between the Special Provisions and these General Provisions shall be resolved in favor of the Special Provisions.  The section headings are for convenience only and shall not limit or change the subject matter of this Agreement.

R.      **Definitions:**  When used in this Agreement, the terms listed below have the following meanings:

"API" means the American Petroleum Institute.

"ASME" means the American Society of Mechanical Engineers.

"ASTM" means the American Society for Testing Materials.

"Barrel" means 42 U.S. gallons of 231 cubic inches per gallon corrected to 60 degrees Fahrenheit.

"Carrier" means a pipeline, barge, truck, or other suitable transporter of crude oil.

"Crude Oil" means crude oil or condensate, as appropriate.

"Day," "month," and "year" mean, respectively, calendar day, calendar month, and calendar year, unless otherwise specified.

"Delivery Ticket" means a shipping/loading document or documents stating the type and quality of crude oil delivered, the volume delivered and method of measurement, the corrected specific gravity, temperature, and S&W content.

"Invoice" means a statement setting forth at least the following information:  The date(s) of delivery under the transaction; the location(s) of delivery; the volume(s); price(s); the specific gravity and gravity adjustments to the price(s) (where applicable); and the term(s) of payment.

"S&W" means sediment and water.

**Effective January 1, 1993**
**Supersedes November 1983 General Provisions**

# Plains

**Marketing, L.P.**

17304 Preston Road, Suite 140 | Dallas, Texas 75252 | Phone: (972) 991-7544 | Fax/email:(972) 991-7547

November 13, 2019

Sklar Exploration Company LLC
401 Edwards St, Ste 1601
Shreveport, LA 71101
Fax/email: SHatcher@sklarexploration.com

RE:   PMLP Amendment: October 01, 2019-2
        PMLP Contract: 3796-1005

Attention:  Stephen Hatcher

Please refer to the above referenced contract dated September 20, 2011.

Effective on and after October 01, 2019, please amend the subject contract by changing the applicable deduct on PMLP #224096 Pitnic Limited 16-3 #1 ST only as indicated on Exhibit "A" attached hereto and made a part hereof.

Please acknowledge by return fax/email your agreement to the Amendment stated herein. Unless we receive written notice of objection within five (5) business days from receipt of this amendment, this Amendment shall be binding on both parties. Except as modified herein, the terms and provisions of the Original Contract and any previous amendments thereto, shall remain in full force and effect and are ratified hereby.

The parties agree that faxed/emailed documents shall be deemed to be admissible as primary evidence in a court of law as original or as counterparts of the original documents, either of which is to be retained and available for inspection.

Very truly yours,

PLAINS MARKETING, L.P.
By: Plains GP LLC,
Its General Partner

Kevin E. Walker
Senior Crude Oil Representative

jah
Log no.: 40258

Nov 13, 2019
Page 1 of 3

# Exhibit "A"

Plains Marketing L.P.

**SKLAR EXPLORATION COMPANY LLC**

Plains contract: 3796-1005   Effective:10-01-2019   Partner contract:

| PM Lease ‡ #Inact | Lease | Operator | County/Parish | St | Price Code* | Price Method ** | Applicable Premium or (Deduct) | Applicable PLA | Fuel Adj | Percent | Gravity | State Lease |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 199382 | CEDAR CREEK LND & TMB 2-15 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 154825 | CRAFT-RALLS 33-14 #2 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182217 | GRADDY 34-10 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199439 | CEDAR CREEK LND & TMB 35-15 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182202 | CEDAR CREEK LND & TMB 34-14 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199207 | CEDAR CREEK LND & TMB 3-7 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 166513 ‡ | CRAFT-RALLS 33-15 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 166508 | CRAFT-MACK 17-4 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182216 | CEDAR CREEK LND & TMB 35-5 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199463 | CRAFT-MACK 7-8 NO 1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199378 ‡ | MARY MACK 31-2 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182203 | CEDAR CREEK LND & TMB 33-10 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224024 | CEDAR CREEK LAND & TMB 34-15 1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 132382 ‡ | CRAFT-CEDAR CRK LND TMB 5-1 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224025 | CEDAR CREEK LAND & TMB 35-13 1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182454 | CEDAR CREEK LAND & TMB 35-11 1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182435 | THOMASSON 33-12 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224017 | CEDAR CREEK LND & TMB 32-11 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 154510 | CRAFT-MACK 8-2 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 139200 | CRAFT-BRYE 8-4 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 139333 | CRAFT-RALLS 5-14 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 175263 ‡ | CRAFT-RALLS 28-16 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 139447 | CRAFT-RALLS 8-12 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224023 | CEDAR CREEK LAND & TMB 34-12 1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182204 | CEDAR CREEK LND & TMB 33-12 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 154826 ‡ | CRAFT-RALLS 33-16 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182205 | CEDAR CREEK LND & TMB 33-6 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 154915 | CRAFT-RALLS 4-12 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 139496 ‡ | CRAFT-RALLS 5-10 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182424 | CRAFT-HAMITER 20-11 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 151958 | CRAFT-RALLS 4-5 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 166521 ‡ | CRAFT-RALLS 4-2 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 151928 ‡ | CRAFT-RALLS 5-8 #1 | SKLAR EXPLORATION COMPANY CONECUH | CONECUH | AL | XI522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |

# Exhibit "A"

Plains Marketing L.P.

Nov 13, 2019
Page 2 of 3

SKLAR EXPLORATION COMPANY LLC
Plains contract: 3796-1005  Effective:10-01-2019

Partner contract:

| PM Lease ‡=Inact | Lease | Operator | County/Parish | St | Price Code* | Price Method** | Applicable Premium or (Deduct) | Applicable PLA | Fuel Adj | Percent | Gravity | State Lease |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 224022 | CEDAR CREEK LAND & TMB 33-10 1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 125670 | CRAFT-MACK 7-2 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 166569 ‡ | CRAFT-RALLS 33-8 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 166923 ‡ | CRAFT-RALLS 33-7 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224018 | CEDAR CREEK LAND & TMB 32-9 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182495 | CEDAR CREEK LND & TMB 32-9 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 166926 | CRAFT-SOTERRA LLC 27-6 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 175250 | CRAFT-SOTERRA LLC 27-2 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199041 | CEDAR CREEK LND & TMB 4-1 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199042 | CEDAR CREEK LND & TMB 4-1 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 175262 ‡ | CRAFT-SMURFIT-STONE 27-12 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199063 | PATE 3-11 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199065 ‡ | CEDAR CREEK LND & TMB 13-16 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182154 | GRADDY 34-8 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 200637 | CEDAR CREEK LND & TMB 24-1 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199377 ‡ | GARRETT ET AL 4-7 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199299 | EDWARDS FAMILY TRUSTS 26-6 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199281 | CEDAR CREEK LND & TMB 18-13 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199246 | CEDAR CREEK LND&TMB 13-15 #1ST | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199096 | CEDAR CREEK LND & TMB 13-1 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199090 | CEDAR CREEK LND & TMB 2-9 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199061 ‡ | CEDAR CREEK LND & TMB 5-3 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182500 | CEDAR CREEK LND & TMB 3-2 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182497 | CEDAR CREEK LND & TMB 4-2 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182494 | CEDAR CREEK LND & TMB 3-4 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182474 | CEDAR CREEK LAND & TMB 2-11 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182472 ‡ | CEDAR CRK LAND & TIMBER 9-3 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182461 ‡ | CEDAR CRK LAND & TIMBER 10-5 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182460 | CEDAR CRK LAND & TMB 9-8 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182458 ‡ | CEDAR CRK LAND & TIMBER 14-9 1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224021 | HOLLEY 1-4 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224020 | CEDAR CREEK LND & TMB 2-2 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224019 | CEDAR CREEK LAND & TMB 2-4 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1522 | EDQ | ($4.6000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |

**SKLAR EXPLORATION COMPANY LLC**

Plains contract: 3796-1005   Effective:10-01-2019

# Exhibit "A"

Plains Marketing L.P.

Partner contract:

Nov 13, 2019
Page 3 of 3

| PM Lease ‡=Inact | Lease | Operator | County/Parish | St | Price Code* | Price Method** | Applicable Premium or (Deduct) | Applicable PLA | Fuel Adj | Percent | Gravity | State Lease |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 224009 | POLK ESTATE ET AL 13-10 #1 | SKLAR EXPLORATION COMPANY | SANTA ROSA | FL | X1522 | EDQ | ($3.5000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224008 | POLK ESTATE ET AL 13-5 #1 | SKLAR EXPLORATION COMPANY | SANTA ROSA | FL | X1522 | EDQ | ($3.5000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224096 | PITNIC LIMITED 16-3 #1 ST | SKLAR EXPLORATION COMPANY | SANTA ROSA | FL | X1522 | EDQ | ($7.0500) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224049 | BATES 2-2 #1 | SKLAR EXPLORATION COMPANY | SANTA ROSA | FL | X1522 | EDQ | ($3.5000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 154766 | FELD HEIRS #3 | SKLAR EXPLORATION COMPANY | WARREN | MS | X1465 | EDQ | ($3.5000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 706497 ‡ | PHELPS-BOVINA UNIT 5-13 #1 | SKLAR EXPLORATION COMPANY | WARREN | MS | X1447 | EDQ | ($3.5000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 706373 | FELD HEIRS #1 | SKLAR EXPLORATION COMPANY | WARREN | MS | X1465 | EDQ | ($3.5000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 124336 ‡ | ANDERSON-TULLY 8-4 #1 | SKLAR EXPLORATION COMPANY | WARREN | MS | X1447 | EDQ | ($3.5000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |

(*)X1447   SPECIAL POSTINGS-PMWTI +ARGUS POST PLUS WTD AVG
(*)X1465   SPECIAL POSTINGS-PM WTI+LLS+ARGUSPP
(*)X1522   SPECIAL POSTINGS-SHELL WTI+ARGUSPP+ARGUS LLS
(**)EQUAL DAILY QUANTITIES



## PLAINS
### MARKETING, L.P.

## Crude Oil Exchange Contract

CONTRACT NO.3796-1007                                                    August 20, 2012

This contract by and between Plains Marketing, L.P. ("PMLP") and Sklar Exploration Company LLC, ("Sklar"), with an address of 401 Edwards St, Ste 1601, Shreveport, LA 71101, covering the exchange of crude oil is entered into in accordance with the terms and conditions as herein specified:

### SECTION "A" - Delivery by PMLP

**1. QUALITY AND CRUDE TYPE:** Alabama Light Sweet crude oil.

**2. QUANTITY:** Approximately 2,500 barrels per day.

**3. DELIVERY:** Shall be made as crude enters at Goodway Refinery.

**4. PRICE:** For the crude oil sold and delivered hereunder, Sklar agrees to pay price per barrel which shall be calculated as follows:

    a. PMLP's West Texas Intermediate (all other areas) crude oil posting deemed at 40.0° API gravity based on equal daily quantities.

    b. To the number determined in the foregoing, add the Argus Posting Plus weighted average for the month of delivery in Argus (Petroleum) "Americas Crude Oil Assessments" based on pricing assessed for the days the U.S. crude oil market is open (weekends and U.S. holidays excluded)during the period beginning with the 26th day of the month that is two months prior to the month of delivery through and including the 25th day of the month that is immediately prior to the month of delivery, provided, however, that if the first day of the period falls on a day on which the U.S. crude oil market is closed, the period shall begin on the first trading day thereafter, and if the last day of the period falls on a day on which the U.S. crude oil market is closed, the period shall end on the last trading day prior thereto.

    c. To the number determined above (a + b), add the LLS weighted average differential for the month of delivery in Argus (Petroleum) "Americas Crude oil Assessments" based on pricing assessed for the days the U.S. crude oil market is open (weekends and U.S. holidays excluded) during the period beginning with the 26th day of the month that is two months prior to the month of delivery through and including the 25th day of the month that is immediately prior to the month of delivery, provided, however, that if the first day of the period falls on a day on which the U.S. crude oil market is closed, the period shall begin on the first trading day thereafter, and if the last day of the period falls on a day on which the U.S. crude oil market is closed, the period shall end on the last trading day prior thereto. The number determined pursuant to this subparagraph and subparagraphs (a) and (b) above shall be the base price per barrel of crude oil.

**5. PAYMENT:** Upon receipt of invoice, payment shall be made by wire transfer on the 20th day of the month following the month of delivery. In the event the payment due date falls on a Saturday or a bank holiday other than a Monday, payment shall be due on the last preceding business day. Should the payment due date fall on a Sunday or a Monday bank holiday, payment shall be due on the following business day. Wire transfer funds to: Plains Marketing, L.P., Bank of America, 100 West 33rd Street, New York, NY 10001. Account # 000056096260 ABA # 026009593.

## SECTION "B" - Delivery to PMLP

| | | |
|---|---|---|
| 6. | **QUALITY AND CRUDE TYPE:** | Alabama Light Sweet crude oil. |
| 7. | **QUANTITY:** | An amount equal to actual lease receipts from lease(s) indicated on Exhibit "A" attached hereto and made a part hereof. (Approximately 2,500 barrels per day). |
| 8. | **DELIVERY:** | Shall be made as crude enters PMLP's trucks. |
| 9. | **PRICE:** | For the crude oil sold and delivered hereunder, PMLP agrees to pay price per barrel which shall be calculated as follows: |

a. PMLP's West Texas Intermediate (all other areas) crude oil posting deemed at 40.0° API gravity based on equal daily quantities.

b. To the number determined in the foregoing, add the Argus Posting Plus weighted average for the month of delivery in Argus (Petroleum) "Americas Crude Oil Assessments" based on pricing assessed for the days the U.S. crude oil market is open (weekends and U.S. holidays excluded)during the period beginning with the 26th day of the month that is two months prior to the month of delivery through and including the 25th day of the month that is immediately prior to the month of delivery, provided, however, that if the first day of the period falls on a day on which the U.S. crude oil market is closed, the period shall begin on the first trading day thereafter, and if the last day of the period falls on a day on which the U.S. crude oil market is closed, the period shall end on the last trading day prior thereto.

c. To the number determined above (a + b), add the LLS weighted average differential for the month of delivery in Argus (Petroleum) "Americas Crude oil Assessments" based on pricing assessed for the days the U.S. crude oil market is open (weekends and U.S. holidays excluded) during the period beginning with the 26th day of the month that is two months prior to the month of delivery through and including the 25th day of the month that is immediately prior to the month of delivery, provided, however, that if the first day of the period falls on a day on which the U.S. crude oil market is closed, the period shall begin on the first trading day thereafter, and if the last day of the period falls on a day on which the U.S. crude oil market is closed, the period shall end on the last trading day prior thereto. The number determined pursuant to this subparagraph and subparagraphs (a) and (b) above shall be the base price per barrel of crude oil.

d. To the base price determined above, subtract $ 2.5000 per barrel.

| | | |
|---|---|---|
| 10. | **PAYMENT:** | Payment shall be made by wire transfer on or about the twentieth (20th) day of the month following the month of delivery. In the event the payment due date falls on a Saturday or a bank holiday other than a Monday, payment shall be due on the last preceding business day. Should the payment due date fall on a Sunday or a Monday bank holiday, payment shall be due on the following business day. |
| 11. | **REJECTED TRUCK LOAD FEE:** | PMLP will assess Seller a fee in an amount of $150.00 per rejected truck load, which amount shall be deducted from the payment due by PMLP to Seller. |

## SECTION "C" - Applicable to Both Sections "A" & "B"

| | | |
|---|---|---|
| 12. | **TERM:** | The Primary Term shall be a period of six months from July 01, 2012 to January 01, 2013. The Term shall be automatically extended for a Secondary Term month to month thereafter unless notice of non-renewal is given by either party hereto upon not less than thirty (30) days advance written notice to the other party. |

**EXCHANGE BALANCING:** Neither party will be obligated to maintain Exchange Volume Balancing throughout

term of contract. Each party shall timely perform their respective delivery obligations to the other party under this agreement with all monetary obligations under this contract to be paid and satisfied, as herein provided, during the month following the month of delivery. Monthly delivery obligations of both parties shall be determined on a trailing three month calendar month average basis using actual deliveries. In the event that either party shall have failed to make timely deliveries of any volumes due the other party during the contract term, then the under delivered party shall have the right within three calendar months of the underdelivery month, to request in writing a delivery in kind of such underdelivered quantity. In the absence of any written request to make delivery of the under delivered quantity as provided in the preceding sentence, then the volume for such calendar delivery month(s) shall be deemed to be in balance.

PMLP's General Provisions dated February 01, 2001 are incorporated herein by reference and made a part hereof. To the extent of any conflict between the provisions herein and the General Provisions, the provisions herein shall govern.

All invoices and notices given pursuant to this agreement shall be in writing, telex or faxed/emailed and shall be deemed delivered when received by the other party at the address specified below:

Notices and all other correspondence to PMLP shall be mailed or faxed/emailed as follows:
        Plains Marketing, L.P.
        12700 Hillcrest Road, Suite 158
        Dallas, Texas 75230
        Phone: (972) 991-7544
        Fax/email: (972) 991-7547

Invoices shall be mailed or faxed/emailed to PMLP as follows:
        Plains Marketing, L.P.
        333 Clay Street Suite 1600
        Houston, TX 77002
        Phone: (713) 646-4100
        Fax/email: (713) 646-4114

Notices and all other correspondence to Sklar shall be mailed or faxed/emailed as follows:
        Sklar Exploration Company LLC
        401 Edwards St, Ste 1601
        Shreveport, LA 71101
        Phone: (318) 227-8668
        Fax/email: (318) 227-9012

**BUYER**

Plains Marketing, L.P.
By Plains Marketing GP Inc.
Its General Partner
Agreed to and accepted this __20__ day of
__AUG__, __17__.

By: _K C Halloran_
Name: Keith D. Halloran
Title:   Director, East Texas and North Louisiana
       Region and Attorney in Fact

jah
Log No. 29513

**SELLER**

Sklar Exploration Company LLC
Agreed to and accepted this __7th__ day of
__SEPTEMBER__, __2012__.

By: _David A. Barlow_
Name:
Title:   David A. Barlow
       President & Chief Operating Officer
       Sklar Exploration Company L.L.C.

**PLAINS MARKETING, L. P.**
By Plains Marketing GP Inc.
Its General Partner

**GENERAL PROVISIONS/OIL PURCHASE CONTRACT**

I   **PAYMENT:** As soon as possible after the close of each calendar month during which deliveries are made, Seller shall invoice Buyer for the crude oil delivered. Unless otherwise provided herein, payment for the oil purchased hereunder shall be made by the twentieth (20th) of the month following the month of delivery, subject to timely receipt by Buyer of invoice and written confirmation of invoiced quantity from the receiving facility. If the payment date falls on a Saturday or Non-Friday bank holiday, payment will be due on the next succeeding work day. All deliveries hereunder shall be deemed a single on-going transaction.

II   **SET-OFFS:** In the event either party shall fail to make timely delivery of any crude oil and/or condensate or other applicable products due and owing to the other party, or in the event that either party shall fail to make timely payment of any monies due and owing to the party, the other party may set off any deliveries or payments due under this or any other agreement between the parties. "Party" for the purposes of this paragraph shall include for each party its affiliates (including, but not limited to, both parent and subsidiary companies). It is the intent of the parties to this contract to treat each party hereto and its respective affiliates (including, but not limited to, both parent and subsidiary corporate entities) as a single legal entity for the purposes of set-off regarding debts and claims.

III   **RIGHT TO AUDIT:** In the event the price of the crude oil or condensate sold hereunder is based on an average acquisition cost, Seller agrees to maintain and retain all pertinent books, records and documents relating to the transactions hereunder for a period of not less than two (2) years following termination of this agreement, and Buyer or its duly authorized representatives shall have access to such records, and the right to audit the same, at all reasonable times during the existence of this Contract, and for such two (2) year period following its termination.

IV   **MEASUREMENTS AND TEST:** Quantities of oil delivered hereunder shall be determined from tank gauges on 100% tank table basis or by the use of mutually acceptable automatic measuring equipment. Volume and gravity of said quantities shall be corrected for temperature to 60 deg; Fahrenheit in accordance with the latest A.S.T.M.-I.P. Petroleum Measurement Tables. The oil delivered hereunder shall be merchantable and acceptable to the carriers involved but not to exceed one percent (1%) S&W. Full deduction shall be made for all S&W content as determined by tests conducted according to the latest A.S.T.M. standard method in effect. Tests for quality shall be made at regular intervals by Seller in accordance with recognized procedures. Each party shall have the right to have a representative or independent inspector (which cost shall be shared equally between the parties hereto) present to witness all gauges, tests and measurements.

V   **WARRANTY:** Seller warrants title, free and clear of all taxes, liens and encumbrances which are customarily paid by Seller prior to delivery, to the oil sold and delivered hereunder and warrants that said oil has been produced, handled and transported to the delivery point hereunder in accordance with the laws, rules and regulations of all local, state or federal authorities having jurisdiction thereof. In this regard, Seller agrees to provide Buyer with any transaction documentation requested.

VI   **FORCE MAJEUR:** Continued performance by either party of any obligation except as to payment due hereunder, may be suspended immediately to the extent caused or contributed to by acts of God, fire, labor or trade disturbance, war, civil commotion or act of the public enemy, unavailability of transportation, storage, manufacturing, refining or distributing facilities, compliance in good faith with any applicable foreign or domestic regulation or order, whether or not it later proves to be invalid, or any cause beyond the reasonable control of either Buyer or Seller whether similar or dissimilar to the enumeration contained herein, except inability to discharge financial obligations when due. The party suspending performance under this clause shall give prompt notice and shall use all commercially reasonable efforts to cure promptly the cause for such suspension. Upon cessation of the cause for suspension, performance shall resume (or commence) immediately. However, if any given Force Majeure condition continues beyond ninety (90) days, the party not claiming said condition shall have the option of terminating this contract upon the giving of written notice thereof to the other party.

VII   **TITLE AND RISK OF LOSS:** Title and risk of loss to crude oil delivered into storage, tankers, barges, tank trucks, and/or pipeline facilities shall pass to Buyer as the crude oil enters the intake pipes of such equipment of the receiving facility, or is in-line transferred.

VIII   **ENTIRETY OF AGREEMENT, MODIFICATION, WAIVER, AND ASSIGNMENT:** This Contract and amendments constitute the entire understanding of the parties relating to the sale of the crude oil specified herein. There shall be no modification or amendment of this Contract except by writing, signed by both parties hereto. Waiver of performance of any obligations by either party of default by the other hereunder shall not operate as a waiver of performance of any other obligation or a future waiver of the same obligation or a waiver of any future default. Neither party shall assign this Contract to a person or firm except upon written consent of the other party, such consent, however, shall not be unreasonably withheld. This Contract shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.

IX   **EQUAL DAILY DELIVERIES:** Except for delivery by truck tanker, for the purpose of invoicing, any crude oil delivered hereunder shall be deemed to have been delivered in equal daily quantities during the calendar month in which deliveries occur.

X   **CHOICE OF LAW:** This Contract shall be construed in accordance with, and governed by, the law of, and Buyer and Seller consent to the jurisdiction of the courts of, the State of Texas.

XI   **DEFAULT:** In the event Seller shall fail to make timely deliveries due Buyer under this Contract, or if Seller is otherwise in default hereunder, Buyer may, on written notice to Seller terminate this contract or suspend performance of all obligations hereunder during default.

XII   **NOTICE:** Any notice required or permitted hereunder shall be deemed given when deposited in the U.S. Mail as registered or certified mail, return receipt requested, postage prepaid, and addressed to the party to whom the notice is being given at the address set forth on the first page hereof (or such other address as is provided by written notice in accordance with this provision). During the term of this Contract Seller herein agrees to notify Buyer immediately in writing upon Seller's corporate reorganization, merger, or acquisition by another, or any other similar corporate structural change.

Revised: 2/1/01
n:\jd general provisions 3Vs

{ PAGE }

SKLAR EXPLORATION COMPANY LLC
Plains contract:   3796-1007     Effective 07-01-2012

**Exhibit "A"**
Plains Marketing L.P.

Partner contract:

Aug 20, 2012
Page 1 of 1

| PM Lease | Lease | Operator | County/Parish | St | Price Code* | Price Method** | Applicable Premium or (Deduct) | Applicable PLA | Fuel Adj | Percent | Gravity | State Lease |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 182158 | CEDAR CREEK LND & TIM | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDO | ($2.5000) | 0.00% | $0.0000 | 100.00000% | Flat G90A | |
| 182159 | CEDAR CREEK LND & TIM | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDO | ($2.5000) | 0.00% | $0.0000 | 100.00000% | Flat G90A | |
| 182160 | JONES 34-4 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDO | ($2.5000) | 0.00% | $0.0000 | 100.00000% | Flat G90A | |
| 182178 | GRADDY 34-8 #1 | SKLAR EXPLORATION COMPA | CONECUH | AL | X1465 | EDO | ($2.5000) | 0.00% | $0.0000 | 100.00000% | Flat G90A | |

(*)X1465   SPECIAL POSTINGS-PM WTH-LLS-ARGUSPP
(**)EQUAL DAILY QUANTITIES

# Plains

**Marketing, L.P.**

17304 Preston Road, Suite 140 | Dallas, Texas 75252 | Phone: (972) 991-7544 | Fax/email: (972) 991-7547


October 22, 2019

Sklar Exploration Company LLC
401 Edwards St, Ste 1601
Shreveport, LA 71101
Fax/email: Shatcher@sklarexploration.com

RE:  PMLP Amendment: October 01, 2019-1
      PMLP Contract: 3796-1007

Attention:  Steven Hatcher

Please amend the subject contract by adding and/or deleting the following well(s) effective as shown.

| Add Delete | PMLP Number | Well Name | Operator | County/State | Effective |
|---|---|---|---|---|---|
| Add | 224095 | PITNIC LIMITED 16-3 #1 ST | SKLAR EXPLORATION COMPANY LLC | SANTA ROSA , FL | Oct 01 2019 |

Please see Exhibit "A" attached for pricing purposes.

Please acknowledge by return fax/email your agreement to the Amendment stated herein. Unless we receive written notice of objection within five (5) business days from receipt of this amendment, this Amendment shall be binding on both parties. Except as modified herein, the terms and provisions of the Original Contract and any previous amendments thereto, shall remain in full force and effect and are ratified hereby.

The parties agree that faxed/emailed documents shall be deemed to be admissible as primary evidence in a court of law as original or as counterparts of the original documents, either of which is to be retained and available for inspection.


Very truly yours,

PLAINS MARKETING, L.P.
By: Plains GP LLC,
Its General Partner


Kevin E. Walker
Senior Crude Oil Representative


jah
Log no.: 40221

**SKLAR EXPLORATION COMPANY LLC**

Plains contract: 3796-1007    Effective:10-01-2019

Partner contract:

# Exhibit "A"

Plains Marketing L.P.

Oct 22, 2019

Page 1 of 2

| PM Lease # ‡=Inact | Lease | Operator | County/Parish | St | Price Code* | Price Method** | Applicable Premium or (Deduct) | Applicable PLA | Fuel Adj | Percent | Gravity | State Lease |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 139448 | LOGAN 5-7 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 166898 | CRAFT-SOTERRA LLC 27-6 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 175476 ‡ | MARY MACK 31-2 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182148 | CEDAR CREEK LAND & TMB 35-11 1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182158 | CEDAR CREEK LND & TMB 33-12 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182159 | CEDAR CREEK LND & TMB 33-6 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182179 | GRADDY 34-8 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182181 | CEDAR CREEK LND & TMB 34-14 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182182 | CEDAR CREEK LND & TMB 33-10 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182187 | GRADDY 34-10 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182207 | CEDAR CREEK LND & TMB 35-5 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182231 | CEDAR CREEK LND & TMB 4-2 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182233 | CEDAR CREEK LND & TMB 3-4 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182243 ‡ | CEDAR CREEK LND & TMB 4-3 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182253 | CEDAR CREEK LND & TMB 3-2 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182311 | CEDAR CREEK LND & TMB 32-9 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182436 | THOMASSON 33-12 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182459 ‡ | CEDAR CREEK LND & TMB 14-9 1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182462 | CEDAR CREEK LND & TMB 9-8 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182463 ‡ | CEDAR CREEK LND & TMB 10-5 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182471 ‡ | CEDAR CREEK LND & TMB 9-3 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 182473 | CEDAR CREEK LND & TMB 2-11 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199034 ‡ | CEDAR CREEK LND & TMB 2-9 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199038 | CEDAR CREEK LND & TMB 3-4 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199039 | CEDAR CREEK LND & TMB 4-1 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199050 ‡ | CEDAR CREEK LND & TMB 5-3 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199062 ‡ | PATE 3-11 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199064 ‡ | CEDAR CREEK LND & TMB 13-16 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199092 | CRAFT-SOTERRA LLC 27-2 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199095 | CEDAR CREEK LND & TMB 13-11 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199158 | CRAFT-HAMITER 20-11 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199159 | CRAFT-RALLS 4-12 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199160 | CRAFT-RALLS 8-12 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |

Oct 22, 2019
Page 2 of 2

**SKLAR EXPLORATION COMPANY LLC**

Plains contract: 3796-1007    Effective:10-01-2019     Partner contract:

## Exhibit "A"

**Plains Marketing L.P.**

| PM Lease ‡=Inact | Lease | Operator | County/Parish | St | Price Code* | Price Method** | Applicable Premium or (Deduct) | Applicable PLA | Fuel Adj | Percent | Gravity | State Lease |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 199161 | CRAFT-RALLS 5-14 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199162 | CRAFT-MACK 17-4 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199163 | CRAFT-MACK 8-2 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199164 ‡ | CRAFT-RALLS 28-16 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199165 | CRAFT-SMURFIT-STONE 27-12 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199208 | CEDAR CREEK LND & TMB 3-7 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199242 | CRAFT-MACK 7-2 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199245 | CEDAR CREEK LND&TMB 13-15#1 ST | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199280 | CEDAR CREEK LND & TMB 18-13 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199300 | EDWARDS FAMILY TRUSTS 26-6 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199376 ‡ | GARRETT ET AL 4-7 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199383 | CEDAR CREEK LND & TMB 2-15 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199440 | CEDAR CREEK LND & TMB 35-15#1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199441 | CRAFT-RALLS 4-5 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 199464 | CRAFT-MACK 7-8 NO 1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 200643 | CEDAR CREEK LND & TMB 24-1 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224026 | CEDAR CREEK LND & TMB 32-11 1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224027 | CEDAR CREEK LND & TMB 32-9 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224028 | CEDAR CREEK LND & TMB 34-15 1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224029 | CEDAR CREEK LAND & TMB 2-2 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224030 | HOLLEY 1-4 #1 | SKLAR EXPLORATION COMPANY | ESCAMBIA | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224031 | CEDAR CREEK LND & TMB 33-10 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224032 | CEDAR CREEK LND & TMB 34-12 #1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224033 | CEDAR CREEK LND & TMB 34-15 1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224034 | CEDAR CREEK LND & TMB 35-13 1 | SKLAR EXPLORATION COMPANY | CONECUH | AL | X1465 | EDQ | ($2.3000) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224036 | POLK ESTATE ET AL 13-5 #1 | SKLAR EXPLORATION COMPANY | SANTA ROSA | FL | X1465 | EDQ | ($1.9500) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224037 | POLK ESTATE ET AL 13-10 #1 | SKLAR EXPLORATION COMPANY | SANTA ROSA | FL | X1465 | EDQ | ($1.9500) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| 224050 | BATES 2-2 #1 | SKLAR EXPLORATION COMPANY | SANTA ROSA | FL | X1465 | EDQ | ($1.9500) | 0.00% | $0.0000 | 100.00000% | Flat-G00A | |
| **224095** | **PITNIC LIMITED 16-3 #1 ST** | **SKLAR EXPLORATION COMPANY** | **SANTA ROSA** | **FL** | **X1465** | **EDQ** | **($1.9500)** | **0.00%** | **$0.0000** | **100.00000%** | **Flat-G00A** | |

(*)X1465   SPECIAL POSTINGS-PM WTI+LLS+ARGUSPP
(**)EQUAL DAILY QUANTITIES

Exhibit B

## ASSET TRANSFER AGREEMENT

This ASSET TRANSFER AGREEMENT ("**Agreement**") is entered into on the 1st day of March, 2020 (the "**Closing Date**"), between Plains Gas Solutions, LLC, a Texas limited liability company ("**Transferor**") and Sklar Exploration Company, L.L.C., a Louisiana limited liability company ("**Transferee**"). Each of Transferor and Transferee may be referred to herein as a "**Party**" or jointly as "**Parties**".

## RECITALS:

WHEREAS, Transferor was formerly known as CDM Max, LLC;

WHEREAS, Transferor, Transferee and certain working interest owners are party to that certain Service Agreement North Beach Plant Conecuh County, Alabama, dated June 22, 2009 (as amended, the "**North Beach Service Agreement**");

WHEREAS, Transferor, Transferee and certain working interest owners are party to that certain Service Agreement Abbyville Plant Conecuh County, Alabama dated September 14, 2011 (as amended, the "**Abbyville Service Agreement**", and together with the North Beach Service Agreement, the "**Service Agreements**");

WHEREAS, Transferor owns the Assets (as defined below);

WHEREAS, in accordance with the Service Agreements, Transferor desires to assign and transfer to Transferee, and Transferee desires to acquire from Transferor, the Assets and to assume from Transferor certain liabilities related thereto on the terms and conditions set forth herein; and

WHEREAS, Transferee will receive title to the Plants under each respective Service Agreement for and on behalf of the Customers as identified in those Agreements (the "**Customers**").

NOW, THEREFORE, in consideration of the premises, mutual covenants, representations, warranties, conditions, and agreements set forth herein and the Services Agreements, and the benefits to be derived by each Party under this Agreement, including Transferee's assumption of the Assumed Liabilities (as defined below) and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. **Defined Terms**. Each capitalized term used in this Agreement shall have the meaning given such term in <u>Section 12</u> unless defined elsewhere in this Agreement.

2. **Transfer**.

2.01 <u>Assets</u>. On the Closing Date, upon the terms and conditions contained in this Agreement, Transferor agrees to convey, assign and deliver to Transferee, for and on behalf of the Customers, and Transferee, for and on behalf of the Customers, agrees to acquire and accept

PAA: LAW_COR: 135773v16

from Transferor all of Transferor's right, title and interest in and to the following personal property interests, other than the Excluded Assets (collectively, the "**Assets**"):

      (a)     The agreements, contracts, permits and licenses including all amendments, modifications and supplements thereto, as described on <u>Exhibit A</u> attached hereto the ("**Assigned Contracts**"); and

      (b)     The North Beach Plant and the Abbyville Plant, together with all facilities, machinery, piping, fixtures, appurtenances and equipment owned by Transferor directly related to the ownership and operation of the Plants, as more particularly set forth on <u>Exhibit B</u> attached hereto (the "**Personal Property**").

2.02   <u>Inventory</u>. The Inventory will be measured, calculated and analyzed at 7:01 A.M. Central Standard Time on the Closing Date pursuant to Transferor's customary procedures. Upon conclusion of the Closing, custody of the Inventory will be transferred to Transferee pursuant to a custody transfer certificate substantially in the form attached hereto as <u>Exhibit C</u> (the "**Custody Transfer Receipt**"), whereby Transferor conveys and transfers to Transferee all of Transferor's rights and obligations with respect to the Inventory.

3.    <u>**Closing**</u>.

3.01   <u>Closing</u>.  Subject to the terms and conditions set forth herein, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall occur on the Closing Date and be effective at 12:01 a.m. Central Time on the Closing Date. The Closing shall take place at the offices of Transferor or such other place as the Parties otherwise agree to in writing.

3.02   <u>Deliveries at Closing</u>.  At the Closing, the following documents shall be delivered and the following events shall occur, the execution of each document and the occurrence of each event being a condition precedent to the others and each being deemed to have occurred simultaneously with the others:

      (a)     Transferor and Transferee shall execute and deliver to each other the Bill of Sale, substantially in the form attached hereto as <u>Exhibit D</u> (the "**Bill of Sale**");

      (b)     Transferor and Transferee shall execute and deliver to each other an Assignment and Assumption Agreement, substantially in the form attached hereto as <u>Exhibit E</u> (the "**Assignment and Assumption Agreement**"), which sets forth the term and conditions upon which Transferor shall assign and Transferee shall assume and accept the Assumed Liabilities and the Assigned Contracts;

      (c)     Transferor and Transferee shall execute and deliver to each other the Termination of the Service Agreements, substantially in the form attached hereto as <u>Exhibit F</u> (the "**Service Agreement Termination Agreement**");

      (d)     Transferor and Transferee shall execute and deliver to each other the Termination of the Lease, substantially in the form attached hereto as <u>Exhibit G</u> (the "**Lease Termination Agreement**");

     (e)    Transferor and Transferee shall execute and deliver to each other the Termination of Condensate Processing Agreement, substantially in the form attached hereto as <u>Exhibit H</u> (the "**Condensate Processing Termination Agreement**");

     (f)    the Custody Transfer Receipt; and

     (g)    Transferor and Transferee shall execute and deliver any other documents, instruments, or agreements contemplated hereby or reasonably necessary or appropriate to consummate the transactions contemplated by this Agreement and in a form reasonably acceptable to Transferor and Transferee (it being understood that such instruments shall not require Transferor, Transferee, or any other Person to make any additional representations, warranties, or covenants, express or implied, not contained in or as contemplated by this Agreement or any other agreement executed in connection with the transactions contemplated by this Agreement).

4.    **Transferor's Representations**.  Subject to the limitations, exceptions, disclaimers and other matters set forth in this Agreement, Transferor represents and warrants to Transferee that:

    4.01    <u>Organization and Good Standing</u>.  Transferor is a limited liability company duly organized, validly existing and in good standing under the laws of the state of its formation, and is duly qualified or licensed to do business in the state in which the Assets are located.  The execution, delivery and performance of this Agreement and the transactions contemplated hereby have been duly and validly authorized by all necessary action on the part of Transferor.

    4.02    <u>Execution and Effect</u>.  This Agreement has been duly executed and delivered on behalf of Transferor, and at the Closing, all documents and instruments required hereunder will be duly executed and delivered by Transferor.  This Agreement does, and such documents and instruments will, constitute legal, valid and binding obligations of Transferor in accordance with its terms.

    4.03    <u>No Violation</u>.  Transferor has all requisite power and authority to enter into this Agreement, to convey the Assets on the terms described in this Agreement and to perform its other obligations under this Agreement.  The consummation of the transactions contemplated by this Agreement will not violate, nor be in conflict with, any provisions of Transferor's limited liability company agreement, or any material agreement or instrument to which Transferor is a party or is bound, or to Transferor's knowledge any judgment, decree, order, statute, rule or regulations applicable to Transferor.

    4.04    <u>No Broker's Fees</u>.  Transferor has incurred no liability, contingent or otherwise, for brokers or finder's fees in respect of this transaction for which Transferee shall have any responsibility whatsoever.

    4.05    <u>Disclaimer - Profits</u>.  Transferor makes no representations concerning the present or future value or the possible income, costs or profits, if any, to be derived from the Assets.

5.    **Transferee's Representations**.  Transferee represents and warrants to Transferor that:

5.01    <u>Organization and Good Standing</u>.  Transferee is a limited liability company duly organized, validly existing and in good standing under the laws of the state of its formation, is duly qualified or licensed to do business in the state in which the Assets are located, and has requisite permits, licenses and bonds to perform all of its duties and obligations under this Agreement. The execution, delivery and performance of this Agreement and the transactions contemplated hereby have been duly and validly authorized by all necessary action on the part of Transferee.

5.02    <u>Execution and Effect</u>.  This Agreement has been duly executed and delivered on behalf of Transferee, and at the Closing all documents and instruments required hereunder will be duly executed and delivered by Transferee.  This Agreement does, and such documents and instruments will, constitute legal, valid and binding obligations of Transferee in accordance with its terms.

5.03    <u>No Violation</u>.  Transferee has all requisite power and authority to enter into this Agreement, to acquire the Assets on the terms described in this Agreement, to own and operate the Assets and to perform its other obligations under this Agreement, in each case on behalf of itself and on behalf of the Customers.  The consummation of the transactions contemplated by this Agreement will not violate, nor be in conflict with, any provisions of Transferee's by-laws, charter or governing documents, or any agreement or instrument to which Transferee is a party or is bound, or any judgment, decree, order, statute, rule or regulation applicable to Transferee.

5.04    <u>No Broker's Fees</u>.  Transferee has incurred no liability, contingent or otherwise, for brokers or finder's fees in respect of this transaction for which Transferor shall have any responsibility whatsoever.

5.05    <u>Financial Ability</u>.  Transferee has the financial capability to fully perform its obligations under this Agreement including the assumption of the Assumed Liabilities.

5.06    <u>Transferee's Evaluation</u>.  Transferee (a) is an experienced and knowledgeable owner and operator in the oil and gas business, (b) as a party to the Service Agreements and the Lease, has extensive knowledge of, and is familiar with, the Assets and the operations of the Assets and (c) is capable of independently evaluating the merits and risks of the conveyance of the Assets contemplated by this Agreement. Prior to entering into this Agreement, Transferee has had the opportunity to inspect the Assets and to review such information as it deems necessary, and it has engaged or employed the services of consultants and/or professionals to advise it as it deems necessary to make an informed decision as a prudent and knowledgeable entity to acquire the Assets.  With respect to proceeding with the transactions contemplated by this Agreement, Transferee has evaluated the merits and risks of acquiring the Assets and has formed an opinion based solely upon its knowledge, experience and, other than the express representations and warranties contained in this Agreement, not in reliance on any statements or actions by Transferor or any information, data or materials furnished to Transferee in connection with the Assets, and any reliance or use of the same has been at Transferee's sole risk.  Transferee is acquiring the Assets in the ordinary course of its business for purposes of operating the same and not for purposes of resale.

6.      **Disclaimer of Condition of the Assets**

6.01    Acknowledgment by Transferee.

(a)    NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, TRANSFEREE ACKNOWLEDGES AND AGREES THAT, THE ASSETS ARE BEING ASSIGNED AND ACCEPTED BY TRANSFEREE IN THEIR "AS IS, WHERE IS" CONDITION, WITH ALL FAULTS, LIMITATIONS AND DEFECTS (HIDDEN AND APPARENT) WITHOUT ANY GUARANTEES OR WARRANTIES WHATSOEVER, EXPRESS, IMPLIED OR STATUTORY, AS TO THEIR TITLE, CONDITION, QUALITY, MERCHANTABILITY OR THEIR FITNESS FOR TRANSFEREE'S INTENDED USE OR PURPOSE; PROVIDED, HOWEVER THAT TRANSFEROR WARRANTS AS OF THE DATE HEREOF THAT THE ASSETS ARE FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES CREATED BY TRANSFEROR, EXCEPT FOR PERMITTED LIENS. TRANSFEREE ACKNOWLEDGES AND AFFIRMS THAT PRIOR TO THE CLOSING DATE IT HAS MADE AN OPERATIONAL AND ENVIRONMENTAL ASSESSMENT AND INVESTIGATION OF THE ASSETS WHICH ARE NECESSARY TO DETERMINE THE ENVIRONMENTAL AND PHYSICAL CONDITION OF THE ASSETS, INCLUDING WITHOUT LIMITATION AN ON-SITE INSPECTION OF THE ASSETS. TRANSFEREE FURTHER ACKNOWLEDGES AND UNDERSTANDS THAT THERE MAY HAVE BEEN SPILLS OF WASTES, CRUDE OIL, PETROLEUM PRODUCTS, CHEMICALS, PRODUCED WATER, NATURAL GAS CONDENSATE, NATURAL GAS LIQUIDS, OR OTHER MATERIALS IN THE PAST AT OR ON THE ASSETS OR IN CONNECTION WITH THEIR OPERATION. IN ADDITION, THE ASSETS MAY CONTAIN ASBESTOS, UNDISPLACED CRUDE OIL, NATURAL GAS LIQUIDS OR PETROLEUM PRODUCTS, COATS OF LEAD-BASED PAINTS, PCB'S IN TRANSFORMERS, MERCURY IN ELECTRICAL SWITCHES, CHEMICALS, METALS, NATURALLY OCCURRING RADIOACTIVE MATERIAL, AND OTHER MATERIALS, SUBSTANCES AND CONTAMINANTS.  THE PARTIES AGREE THAT TO THE EXTENT REQUIRED TO BE OPERATIVE, THE DISCLAIMERS OF CERTAIN WARRANTIES CONTAINED IN THIS SECTION 6.01 AND SECTION 6.02 ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSES OF ANY APPLICABLE LAW, RULE OR ORDER.

(b)    TRANSFEREE UNDERSTANDS THAT ALL OR SOME PORTION OF THE ASSETS MAY BE INACTIVE, MAY HAVE LATENT OR PATENT DEFECTS, AND THAT THE EQUIPMENT AT THE PLANTS MAY NOT BE SUITABLE FOR OPERATION IN ACCORDANCE WITH INDUSTRY STANDARDS OR LAWS (INCLUDING ENVIRONMENTAL LAWS).  BY EXECUTION HEREOF, TRANSFEREE ACKNOWLEDGES THAT TRANSFEROR MAKES NO REPRESENTATION OR WARRANTY ABOUT THE CURRENT CONDITION OF ANY OF THE ASSETS, OTHER THAN THAT AS OF THE DATE HEREOF THE ASSETS ARE FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES CREATED BY TRANSFEROR, EXCEPT FOR PERMITTED LIENS.

(c)    Without limiting the foregoing, Transferee is familiar with the Assets, and acknowledges that there may be potential damage to the Assets caused by vibration,

electrolysis, corrosion, metallurgical failure or stress and other similar physical or chemical processes or events that may have occurred and the damage from those or other causes may allow the undetected escape of petroleum products and vapors which, even if not ignited, may cause pollution of water, contamination of land and other damages. Transferee acknowledges that the plants and associated equipment may contain crude oil, natural gas or other hydrocarbons of an unknown quantity owned by Transferee and/or third parties.  WITH FULL AWARENESS OF THE AFORESAID HAZARDS AND OTHER POTENTIAL HAZARDS NOT LIMITED TO THOSE SET FORTH ABOVE, TRANSFEREE AT ITS SOLE RISK AND EXPENSE ASSUMES ALL RESPONSIBILITY WITH RESPECT TO THE SAFE AND LAWFUL DISPOSAL OF THE CONTENTS, IF ANY, OF THE NATURAL GAS, CRUDE OIL AND OTHER HYDROCARBONS LOCATED IN, ON OR ADJACENT TO THE ASSETS.

6.02    Disclaimer - Representations and Warranty.  EXCEPT AS SET FORTH IN SECTION 4 AND EXCEPT AS TO TRANSFEROR'S WARRANTY AS OF THE DATE HEREOF THAT THE ASSETS ARE FREE AND CLEAR OF LIENS CREATED BY TRANSFEROR, EXCEPT PERMITTED LIENS, (a) TRANSFEROR IS TRANSFERRING THE ASSETS ON AN "AS IS, WHERE IS" BASIS, IN THEIR PRESENT CONDITION AND STATE OF REPAIR, WITH ALL FAULTS, LIMITATIONS AND DEFECTS (HIDDEN AND APPARENT) WITHOUT ANY GUARANTIES AND DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES (WHETHER EXPRESS OR IMPLIED) CONCERNING THE ASSETS; (b) TRANSFEROR MAKES NO REPRESENTATION OR WARRANTY OF TITLE, OR FITNESS WITH REGARD TO THE ASSETS AND TRANSFEROR EXPRESSLY DISCLAIMS ANY WARRANTIES (EXPRESS, IMPLIED OR STATUTORY), WHETHER OF TITLE, QUALITY, CONDITION, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE, COVERING THE ASSETS; (c) TRANSFEROR DOES NOT WARRANT TITLE, DESCRIPTION, VALUE, QUALITY, CONDITION, MERCHANTABILITY, OR FITNESS OF PURPOSE OF THE PLANTS, APPURTENANCES OR ASSOCIATED EQUIPMENT OR OTHER REAL OR PERSONAL PROPERTY LOCATED ON OR INCLUDED IN THE ASSETS; AND (d) TRANSFEROR MAKES NO REPRESENTATION OR WARRANTY WITH RESPECT TO THE EXISTENCE OF OR KNOWLEDGE OF ANY ENCROACHMENTS ON THE ASSETS. EXCEPT AS SET FORTH SECTION 4 AND EXCEPT AS TO TRANSFEROR'S WARRANTY AS OF THE DATE HEREOF THAT THE ASSETS ARE FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES CREATED BY TRANSFEROR, EXCEPT PERMITTED LIENS, ALL REPRESENTATIONS AND WARRANTIES OF TRANSFEROR (WHETHER EXPRESS OR IMPLIED) ARE EXCLUDED.

7.    **Employee Matters**.

7.01    Transferred Employees.  All Transferred Employees shall become employees of Transferee (or an Affiliate of Transferee) effective as of 12:01A.M. Central Time on March 1, 2020.  Transferee covenants that at such time, Transferee (or an Affiliate of Transferee) shall assume and be responsible for payment of all salaries and benefits and all other costs and liabilities relating to services provided by the Transferred Employees on and after the Closing Date. Transferee covenants that no Transferred Employee's initial Compensation as an employee

of Transferee or its Affiliate shall be reduced during the initial 12-month period after the Closing Date.

7.02    Service Credit.  From and after the Closing Date, Transferee covenants that the Transferred Employees shall be given credit for their service recognized by Transferor or Transferor's Affiliates on the day immediately prior to the Closing Date for all purposes, including eligibility, vesting and benefit determination and accrual under all applicable plans and programs of Transferee or its Affiliates as well as for purposes of determining any  severance or other related benefits to be provided pursuant to the manner described above, but excluding vacation benefits.  Notwithstanding the foregoing, Transferee shall not be liable for any obligations of Transferor or Transferor's Affiliates arising out of participation by Transferred Employees in the Employee Benefit Plans of Transferor or Transferor's Affiliates.

7.03    Benefits.

(a)    Transferee covenants that Transferee, or Transferee's Affiliates, shall provide to all Transferred Employees employee benefits in accordance with those employee benefit plans, programs, policies and pay practices, which shall be the same as or better than the benefits provided to similar employees of Transferee, or Transferee's Affiliates.  Transferee covenants that effective as of the Closing Date, Transferee shall recognize years of service with Transferor and/or a Transferor Affiliate (together with any predecessors thereof that previously employed such Transferred Employee and as to which Transferor and/or a Transferor Affiliate recognize such years of service) for purposes of determining such Transferred Employee's eligibility to participate in and vesting under any and all applicable plans or policies of Transferee, excluding vacation benefits.  Transferor and/or Transferor Affiliates agree to fully vest each Transferred Employee in Transferor's or any Transferor Affiliate's Employee Benefit Plans covering such Transferred Employee as of the Closing Date pursuant to the terms of such Employee Benefit Plans.    Transferee covenants that Transferee, or Transferee's Affiliates, shall provide to all Transferred Employees, the ability to transfer any 401k plan and any outstanding loans thereunder to the 401k provider of Transferee.

(b)    For each Transferred Employee who participates in any welfare benefit plan, or is subject to any policy or pay practice of Transferee or its Affiliates, Transferee covenants that Transferee, its Affiliates and the applicable welfare benefit plan, policy and pay practice: (i) shall not require a physical examination or other proof of insurability, and shall waive all coverage exclusions and limitations relating to waiting periods or pre-existing conditions, with respect to any Transferred Employees or any dependent covered by Transferor and Transferor's Affiliates welfare benefit plans, policies or pay practices in effect as of the Closing Date; and (ii) shall credit the expenses of the Transferred Employees which were credited toward deductibles and co-insurance for the plan year in which the Closing Date occurs under the applicable welfare benefit plan of Transferor or Transferor's Affiliates against satisfaction of any deductibles and co-insurance for the plan year in which the Closing Date occurs under Transferee's medical welfare benefit plan for the Transferred Employees, subject to either Transferor or such Transferred Employee providing an explanation of benefits and other required documents to receive credit for such expenses.

(c)     Transferor shall be responsible for paying each Transferred Employee for any vacation due as of the Closing Date under the applicable vacation policy of Transferor of Transferor's Affiliates.   From and after the Closing Date, Transferee covenants that Transferee, or Transferee's Affiliates, shall provide each Transferred Employee with vacation in accordance with Transferee Employer's vacation policy and in accordance with the employment offers made to each Transferred Employee pursuant to the Employee Matters Letter.

(d)     In the event that the employment of any Transferred Employee is terminated within one (1) year following the Closing Date (other than for violation of generally applicable policies of Transferee or Transferee's Affiliates or other reasonable circumstances constituting cause), then Transferee or Transferee's Affiliates shall provide such Transferred Employee with severance pay and benefits available under the severance program of Transferee or Transferee's Affiliates available to similarly situated employees of Transferee or Transferee's Affiliates.

(e)     WARN ACT.  Transferee shall take no employment action, including any plant closing, mass layoff, change of conditions of employment or employment loss within the meaning of the Worker Adjustment Retraining Notification Act, 29 U.S.C. Sec. 2101 et. seq. ("**WARN Act**"), for a period of at least ninety (90) days after the Closing Date, which causes Losses to Transferor under the WARN Act.  Transferee and Transferor shall cooperate with each other in causing the appropriate Party to send notices, if any are required in connection with the WARN Act, or any similar state or local Law, to employees in order to limit any liability and/or commence any notice period arising under the WARN Act, or any similar state or local Law.

7.04   No Third Party Beneficiaries.  No provision of this Section 7 shall create any third-party beneficiary rights in any Person, including any Transferred Employee, employee or former employee (and any beneficiaries, dependents or representatives thereof) of Transferor or Transferee or any of their respective Affiliates, and no provisions of this Section 7 shall create such third-party beneficiary rights in any Person in respect of any benefits that may be provided, directly or indirectly, under any Employee Benefit Plan or arrangement of Transferee or its Affiliates.

8.    **Post Closing**.

8.01   Taxes.

(a)     Transferee shall pay all transfer fees and taxes related to the acquisition of the Assets.  All taxes, including but not limited to ad valorem, property, and similar taxes and assessments (hereinafter collectively called "**Assessments**") in this Section 8.01(a) attributable to the Assets acquired by Transferee at Closing shall be prorated between Transferor and Transferee as of the Closing Date, with Transferor responsible for the prorated portion of such Assessments prior to the Closing Date and Transferee responsible for the prorated portion of such Assessments on and after the Closing Date. To the extent such Assessments are paid in arrears on a date subsequent to the Closing, such Assessments shall be paid by Transferee (or its Affiliate) on or before the delinquent

date thereof, but Transferor shall pay to Transferee at the Closing the estimated prorated amount of such Assessments due by Transferor (the "**Estimated Assessment**").  If the Estimated Assessment is greater than the actual prorated portion of Assessment due by Transferor, then Transferor shall send an invoice to Transferee for the amount of such overpayment and Transferee shall pay such amount within 10 days of receipt of such invoice.  If the Estimated Assessment is smaller than the actual prorated portion of Assessment due by Transferor, then Transferee shall send an invoice to Transferor for the amount of such overpayment and Transferor shall pay such amount within 10 days of receipt of such invoice.

(b)     Transferee is responsible for ascertaining whether any sales, transfer or use tax is due. Transferor agrees to reasonably cooperate with Transferee in demonstrating the requirements for an isolated or occasional sale or that other sales tax exemptions have been met.

(c)     Subject to this Section 8.01, to the extent applicable exemption requirements have not been met, Transferee shall be solely liable for any and all sales, transfer or use taxes and fees as well as all other taxes, fees, and costs of every type and description associated with this Agreement including any interest and penalties associated therewith; provided, however, that each Party is responsible for its own income tax liability, if any, association with the transaction contemplated by this Agreement.

8.02   Recording Fees.  Transferor shall have no obligations to expend any amounts or incur any liabilities in connection with the transfer of Assets to Transferee.   Transferee shall pay all documentary, filing and recording fees required in connection with the transaction contemplated by this Agreement.

8.03   Records.  Within ninety (90) days after the Closing Date, Transferor shall provide to Transferee, after first making any copies Transferor deems necessary, all Records attributable to the Assets in Transferor's possession.  Transferor does not represent that the Records are in compliance with any applicable regulations or laws but simply reflect the Records kept by Transferor in its ordinary course of business.

8.04   Utilities and Billing Transfers.  As soon as reasonably practicable following the Closing (but in any event within ninety (90) days after the Closing Date), Transferee shall transfer to itself all utility accounts related to any utility services provided to and utilized by the Assets.  These utility services include electricity, heat, sewer, and water and may include services for ongoing telephone and internet service and a deposit from Transferee required by the utility provider.  If Transferee fails to pay any utility bill and payment is demanded from Transferor, and Transferor pays the utility bill, then Transferee shall promptly reimburse Transferor for payment of any such utility bill.  If Transferee fails to effect the transfer to itself of utility services within ninety (90) days following Closing, Transferor then has the option to inform the utility provider to discontinue the utility service without any liability for such discontinuance to Transferor.  Prior to the Closing, Transferor shall pay all outstanding invoices for utility services provided to and utilized by the Assets.  After the Closing, Transferor and Transferee will prorate any invoices for such utility services as of the Closing Date based on the assumption that each day of the service period covered by the invoice used utility services in the

amount equal to 1 divided by the number of days in the service period times the total amount of the invoice, with Transferor responsible for all utility charges prior to the Closing Date, and Transferee responsible for all utility charges on and after the Closing Date.

8.05    Removal of Signs/Transferor Marks.   This Agreement does not license or authorize Transferee to use or display the "Plains" name or any trademarks or other intellectual property, including manuals and procedures proprietary to Transferor or its Affiliates, owned by Transferor or any of its Affiliates.  After the Closing, Transferee shall promptly (but in no event later than thirty (30) days after the Closing Date) remove all evidence such as printed names, markings, insignia or other signs (including pipeline markers) identifying the Assets as the property of Transferor or its Affiliates or indicating that the Assets were ever owned and/or operated by Transferor or its Affiliates.

8.06    Expenses.  Except as expressly otherwise provided herein, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby and thereby shall be paid by the Party incurring such cost or expense.

8.07    Allocation of Revenue, Costs and Expenses.  All income, proceeds and receipts attributable to the Assets (including, without limitation, the NGL Net Proceeds (as defined in the Service Agreements)) with respect to periods of time prior to the Closing Date shall be distributed to Transferee and Transferor in accordance with the Service Agreements. Transferor's share of the income, proceeds or receipts attributable to the Assets with respect to periods of time prior to the Closing Date shall be the property of Transferor for purposes of this Agreement and shall be allocated and credited to Transferor; and, to the extent received by Transferee or its Affiliates, Transferee shall promptly and fully disclose, account for and transmit same to Transferor. Transferee's share of the income, proceeds or receipts attributable to the Assets with respect to periods of time prior to the Closing Date shall be the property of Transferee for purposes of this Agreement and shall be allocated and credited to Transferee; and, to the extent received by Transferor or its Affiliates, Transferor shall promptly and fully disclose, account for and transmit same to Transferee. All income, proceeds and receipts attributable to the Assets with respect to periods of time on and after the Closing Date shall be the property of Transferee for purposes of this Agreement and shall be allocated and credited to Transferee; and, to the extent received by Transferor or its Affiliates, Transferor shall promptly and fully disclose, account for and transmit same to Transferee.  All invoices, costs, expenses, disbursements and payables attributable to the Assets with respect to periods of time prior to the Closing Date shall be the sole obligation of Transferor and allocated to Transferor, and Transferor shall promptly pay, or, if paid by Transferee, Transferor shall promptly reimburse Transferee for same.   All invoices, costs, expenses, disbursements and payables attributable to the Assets with respect to periods of time on and after the Closing Date shall be the sole obligation of Transferee and allocated to Transferee, and Transferee shall promptly pay, and, to the extent paid by Transferor, Transferee shall promptly reimburse Transferor for same.

8.08    Further Assurances.

(a)    Each of the Parties shall, from time to time and at all times, do all such other and further acts and deliver and execute such other and further instruments and documents and records as may reasonably be required in order to fully perform and carry

PAA: LAW_COR: 135773v16

out the terms and the provisions of this Agreement, including correcting legal descriptions of certain of the Assets that may in the future be determined to be incorrectly described or mistakenly omitted, and both Transferor and Transferee covenant and agree that, in the event that any such legal description of any portion of the Assets is/are determined, within one (1) year from the Closing Date, to be incorrectly described or mistakenly omitted, Transferor or Transferee, as the case may be, will execute whatever supplemental documentation may be necessary to correctly describe any such portion of the Assets relative to which the legal description may be inadequate.

(b)     Transferor and Transferee further intend that Transferor shall transfer and Transferee shall acquire only the Assets as herein described.  If through inadvertent error or omission, any of the Assets transferred and delivered or to be transferred and delivered by Transferor to Transferee are incorrectly described or mistakenly omitted, within one (1) year from the Closing Date, Transferor and Transferee shall promptly execute such further instruments and documents to correct the error or omission without monetary or other consideration being paid by Transferee to Transferor.  Likewise, if through scrivener's error or any other cause, Transferor inadvertently transfers and delivers to Transferee other Transferor-owned pipelines, rights-of-way, fee lands, files or other Transferor property not constituting part of the Assets as herein defined (collectively referred to in this Section 8.08(b) as "**Property**"), Transferee shall transfer said Property back to Transferor without monetary or other consideration being paid by Transferor to Transferee.  Transferor and Transferee shall promptly execute such further instruments and documents to return title to Transferor of the Property transferred to Transferee in error.

8.09     Consents; Non-Assignable Rights. If the terms of any Assigned Contract referenced in this Agreement (including the Exhibits attached hereto) require that consent, or approval be obtained from any Third Party prior to any assignment, conveyance or other transfer contemplated by this Agreement, and such consent, conveyance or transfer has not been obtained as of the Closing Date hereof, Transferor and Transferee shall reasonably cooperate and work together to seek and obtain such consent or approval (at no out-of-pocket cost to Transferor). Nothing in this Agreement including any Exhibit referenced herein or subsequently executed by Transferor shall be construed as an attempt by Transferor to assign or transfer to Transferee any Assigned Contract that by its terms or by operation of law is not assignable unless the requisite consent or approval shall have been given.

8.10     Public Announcements. Neither Party (nor any of their respective Affiliates) shall issue any press release or similar public announcement pertaining to this Agreement or the transactions contemplated hereby without the prior consent of the other Party (which consent shall not be unreasonably withheld, delayed or conditioned); provided, however, that a Party may, without the prior consent of the other Party, issue any press release or similar public announcement to the extent required to be made or issued by applicable Law or by obligations pursuant to any listing agreement with any national securities exchange, as reasonably determined by the Party issuing such press release or making such public announcement, in which case, such issuing or announcing Party shall provide, to the extent reasonably practicable, at least twenty-four (24) hours prior notice of such press release or public announcement to the other Party for review and comment.

PAA: LAW_COR: 135773v16

8.11   <u>Governmental Filings</u>. Within thirty (30) days after the Closing Date, (x) Transferee shall file or cause to be filed any and all filings, notifications and other documents required by any Governmental Authority to evidence that Transferee is the owner of the Assets and the operator of record with respect to the Assets, including but not limited to Form ADEM 103 with the Alabama Department of Environmental Management, indicating a change of ownership, and (y) shall provide written evidence of such filings to Transferor.  To the extent any such filings require execution by Transferor, Transferor shall execute such filings promptly upon request by Transferee.  Within eight (8) days after the Closing Date, (z) Transferee shall prepare and forward to Transferor an appropriate change of operator form for each of the plants to be filed with the State Oil and Gas Board of Alabama, and (a) Transferor shall execute the form and return the original to Transferee for filing.

8.12   <u>Release of Security Agreement Liens</u>.  Transferor shall use commercially reasonable efforts to cause the release of any lien related to any security agreement between Transferor and Sklar or Transferor and any other Customer, that remains outstanding as of the Closing (each such lien, a "**Security Agreement Lien**") as soon as reasonably practicable following the Closing.

9.   **Insurance**.

9.01   Transferee acknowledges that, at or promptly following the Closing, the insurance policies maintained by Transferor and Transferor Affiliates for the benefit of Transferor and Transferor Affiliates shall be terminated or modified to exclude coverage for Transferor and Transferor Affiliates and, as a result, Transferee shall be responsible for obtaining at its sole cost and expense replacement insurance and including insurance required by any Third Party to be maintained by or for the benefit of Transferee.  If required by Law or contract, Transferee shall provide to Governmental Entities and Third Parties evidence of such replacement or substitute insurance coverage for the continued operations of the Plants following the Closing.

10.   **Indemnity and Release**.

10.01   <u>Transferee's Indemnity Obligations</u>.  Subject to the provisions of this Section 10 (including <u>Section 10.03</u>), from and after the Closing and except as to the Retained Liabilities, Transferee, its successors and assigns agree to fully defend, protect, indemnify, hold harmless, and render whole Transferor, its subsidiaries and Affiliates, and the respective managers, members, directors, officers, agents and employees of Transferor and its subsidiaries and Affiliates (collectively, the "**Transferor Group**") from and against all Losses incurred by Transferor Group resulting from, related to, or arising out of:

(a)   any breach by Transferee of any representation or warranty of Transferee contained in this Agreement;

(b)   any breach by Transferee of any covenant or agreement contained in this Agreement; and

(c)   the Assumed Liabilities.

PAA: LAW_COR: 135773v16

10.02   <u>Transferor's Indemnity Obligations</u>. From and after Closing, and except as to the Assumed Liabilities, Transferor, its successors and assigns, agree to fully defend, protect, indemnify, hold harmless, and render whole Transferee, its subsidiaries and Affiliates, and the respective managers, members, directors, officers, agents and employees of Transferee and its subsidiaries and Affiliates (collectively, the "**Transferee Group**") from and against all Losses incurred by Transferee Group resulting from, related to, or arising out of:

(a)      any breach by Transferor of any representation or warranty of Transferor contained in this Agreement;

(b)      any breach by Transferor of any covenant or agreement contained in this Agreement; and

(c)      any Retained Liabilities of Transferor.

10.03   <u>Limitations on Indemnification</u>.   Notwithstanding any provision in this Agreement to the contrary:

(a)      EXCEPT WITH RESPECT TO A THIRD PARTY CLAIM FOR WHICH A PARTY IS SEEKING INDEMNIFICATION HEREUNDER, NEITHER PARTY SHALL HAVE ANY LIABILITY UNDER THIS AGREEMENT FOR EXEMPLARY, PUNITIVE, SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, REMOTE OR SPECULATIVE DAMAGES (INCLUDING LOSS OF, DAMAGE TO OR DELAY IN PROFIT, REVENUE OR PRODUCTION OR DIMUNITION IN VALUE), WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, OTHER LAW OR OTHERWISE AND WHETHER OR NOT ARISING FROM A PARTY'S OR ANY OF ITS AFFILIATES' SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY, WILLFUL MISCONDUCT OR OTHER FAULT; AND

(b)      Transferor shall have no liability pursuant to or in connection with this Agreement (and Transferee hereby releases Transferor therefrom) with respect to any Environmental Condition and/or compliance with Environmental Laws, whether occurring prior to, on, or subsequent to, the Closing Date of this Agreement.

10.04   <u>Survival of Representations and Warranties</u>.  All representations and warranties herein, the covenants of the Parties and the indemnification obligations of the Parties set forth in this Agreement shall survive the Closing as follows:

(a)      The representations and warranties of Transferor set forth in <u>Section 4</u> and the indemnification obligations set forth in <u>Section 10.02(a)</u> and <u>Section 10.02(c)</u> shall expire on September 1, 2020, unless Transferee gives written notice prior to such date that a claim exists with respect thereto, and to the extent set forth in such written notice, such indemnification obligations shall survive until such claim has been fully resolved. The disclaimers and acknowledgements set forth in <u>Section 6</u> shall survive the termination of this Agreement indefinitely.

(b)      The representations and warranties of Transferee set forth in Section 5 hereto and the indemnification obligations set forth in Section 10.01(a) shall survive until the lapse of the applicable statute of limitations and expire thereafter.

(c)      All covenants and agreements of Transferee set forth herein and the indemnification obligations set forth in Section 10.01(b) shall survive until performed and expire thereafter.

(d)      All covenants and agreements of Transferor set forth herein and the indemnification obligations set forth in Section 10.02(b) shall survive termination until performed and expire immediately thereafter.

(e)      The indemnification obligations set forth in Sections 10.01(c) shall survive the Closing indefinitely.

10.05   Matters Involving Third Parties.

(a)      If any Third Party shall notify either Party (the "**Indemnified Party**") with respect to any matter (a "**Third Party Claim**") that may give rise to a right to a claim for indemnification against any Party (the "**Indemnifying Party**") under Section 10.01 or Section 10.02 hereof, then the Indemnified Party shall promptly (and in any event within five (5) business days after receiving notice of the Third Party Claim) notify the Indemnifying Party thereof in writing; *provided, however*, that failure to give timely notice shall not affect the right to indemnification to the extent such failure to give timely notice is not prejudicial to the Indemnifying Party.

(b)      The Indemnifying Party will have the right to assume and thereafter conduct the defense of the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party; *provided, however*, that the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party, not to be unreasonably withheld, unless the judgment or proposed settlement involves only the payment of money damages not in excess of the Transferor Cap (taking into account all prior claims) and does not impose an injunction or other equitable relief upon the Indemnified Party.

(c)      Unless and until the Indemnifying Party assumes the defense of the Third Party Claim as provided in Section 10.05(b) above, the Indemnified Party may defend against the Third Party Claim in any manner it reasonably may deem appropriate for the account of the Indemnifying Party.

(d)      In no event will the Indemnified Party consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, unless the Indemnified Party desires to waive its right to indemnification from the Indemnifying Party with respect to such Third Party Claim.

10.06   Exclusive Remedy.  From and after the Closing, the provisions of this Agreement shall be the exclusive basis for assertion of claims against, or the imposition of liability on, any Party by another Party with respect to any breach of, or other failure to meet any obligation under, this Agreement, the events giving rise to this Agreement, and the transactions contemplated hereby.  Neither Party nor any of its respective successors or assigns shall have any rights against the other Party or its Affiliates other than as expressly provided in this Agreement.

10.07   Notice of Claims.  The Party believing a dispute or claim to exist will give the other Party prompt written notice thereof within the applicable time period set forth in Section 10.04 (at the notice address set forth in Section 11.01), setting forth in reasonable detail the facts alleged to give rise to such dispute or claim, any relevant contractual provisions, the nature of any claimed default or breach and a statement of the manner in which such Party believes the dispute or claim should be resolved.

11.   **Miscellaneous**.

11.01   Notices.  All notices hereunder shall be sufficient upon receipt for all purposes hereunder if in writing and delivered personally, sent by documented overnight delivery service or, to the extent receipt is confirmed, other electronic transmission service to the appropriate address or number as set forth below.  Either Party may, by written notice so delivered to the other Party, change the address or contact person to which delivery shall thereafter be made. Notices shall be directed to:

Transferor:

Plains Gas Solutions, LLC
333 Clay Street, Suite 1600
Houston, Texas 77002
Attn: Dean Liollio, President
Phone: 713-652-3672
Email: csliollio@pnglp.com

With a copy to:

Plains Gas Solutions, LLC
333 Clay Street, Suite 1600
Houston, Texas 77002
Attn:  Richard McGee, Executive Vice President and General Counsel
Phone: 713-652-3655
Email: rkmcgee@paalp.com

Transferee:

Sklar Exploration Company, L.L.C.
5395 Pearl Parkway, Suite 200
Boulder, CO 80301
Attn: Howard Sklar
Phone: 720-306-8310

PAA: LAW_COR: 135773v16

Email: hsklar@sklarexploration.com

With a copy to:

Sklar Exploration, L.L.C.
5395 Pearl Parkway, Suite 200
Boulder, CO 80301
Attn: Steven R. Hatcher, Jr.
Vice President – Land & Legal
Phone: 720-306-8310
Email: shatcher@sklarexploration.com

11.02   Headings.  The headings shown for each section in this Agreement are general descriptions and are for guidance only, are not for limitation or alteration of the contents of this Agreement in any way and shall have no significance in the interpretation of this Agreement.

11.03   Assignment.  This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assigns.  Neither Party shall assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the other Party. To the extent such assignment is permitted under this Section 11.03, this Agreement shall be binding on the successors and assigns of each Party.

11.04   Construction; Exclusion of Prior Drafts.

(a)   The Parties stipulate and agree that this Agreement and the language used herein is the product of both Parties' efforts and each Party hereby irrevocably waives the benefit of the rule of construction which disfavors the drafter of an agreement.  Drafts of this Agreement and prior correspondence regarding this Agreement shall not be used by either Party as evidence of the intent of the Parties and shall not be admissible in evidence in interpreting this Agreement.

(b)   In construing this Agreement, the following principles will be followed, in each case unless expressly provided otherwise in a particular instance: (i)  the singular includes the plural and vice versa; (ii) references to any Exhibit, Section, subsection and other subdivision refer to the corresponding Exhibits, Sections, subsections and other subdivisions of this Agreement, unless expressly provided otherwise; (iii) references in any Section, or definition to any clause means such clause of such Section, or definition; (iv) "hereunder", "hereof", "hereto" and words of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement; (v) the word "or" is not exclusive, and the word "including" (in its various forms) means "including without limitation"; (vi) references to "days" are to calendar days; and (vii) all references to money refer to the lawful currency of the United States.

11.05   Entire Agreement; Amendment.  This Agreement (including the Exhibits attached hereto) constitutes the entire agreement between the Parties with respect to the transaction contemplated hereby and supersedes all other agreements, either written or oral, between Transferor and Transferee concerning the acquisition of the Assets.   Any waiver of any

PAA:LAW_COR: 135773v16

requirements and/or provisions of this Agreement (including the Exhibits attached hereto) must be in writing and signed by an officer or authorized representative of the waiving Party in order to be effective and enforceable; no purported oral waiver of any requirements and/or provisions of this Agreement shall be effective or enforceable; and no waiver of any requirements and/or provisions of this Agreement based on course of conduct, course of dealing, or course of performance shall be effective or enforceable.  In the event of a conflict between the provisions of this Agreement and any provision in any document delivered at Closing, the provisions of this Agreement shall control.  This Agreement may only be supplemented, altered, amended, modified or revoked in writing, signed by both of the Parties.

11.06   <u>Governing Law; Venue</u>.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Alabama without giving effect to any choice or conflict of Law provision or rule (whether of the State of Alabama or any other jurisdiction) that would call for the application of the Laws of any jurisdiction other than the State of Alabama.  THE PARTIES FURTHER HEREBY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING THAT MAY ARISE OUT OF OR RELATING TO THIS AGREEMENT.

11.07   <u>No Third Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns.

11.08   <u>Time is of the Essence</u>.  Time is of the essence in performance of each Party's obligations under this Agreement.

11.09   <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts (including by means of portable document format (*.pdf)), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.10   <u>No Relationship</u>. Nothing in this Agreement creates or is intended to create an association, trust, partnership, joint venture or any other legal relationship between the Parties, or impose a trust, partnership or fiduciary duty, or similar obligation or liability on or with respect to either Party.  Neither Party is, nor shall either Party act as or be the agent or representative of the other Party for any purposes whatsoever and neither Party hereto shall have the authority to make any commitments or incur any legal obligations to any Third Party on behalf of the other Party unless specifically authorized by the terms of this Agreement.

12.   **Definitions**.

"**Abbyville Plant**" means those certain gas processing plant facilities and certain condensate assets owned by Transferor in Conecuh County, Alabama between the Abbyville Plant Delivery Meter (as defined in the Abbyville Service Agreement) and the Abbyville Plant Redelivery Meter (as defined in the Abbyville Service Agreement) and on the lands subject to the Lease, as further depicted on <u>Exhibit I</u> attached hereto.

"**Abbyville Service Agreement**" has the meaning set forth in the Recitals.

PAA: LAW_COR: 135773v16

"**Affiliate**" shall mean, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For the purposes of this definition, "control" means, when used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract, or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"**Agreement**" shall have the meaning set forth in the Preamble hereto.

"**Assessments**" shall have the meaning set forth in Section 8.01(a).

"**Assets**" shall have the meaning set forth in Section 2.01.

"**Assigned Contracts**" shall have the meaning set forth in Section 2.01(a).

"**Assignment and Assumption Agreement**" shall have the meaning set forth in Section 3.02(b).

"**Assumed Liabilities**" shall mean, other than the Retained Liabilities, all liabilities, obligations, responsibilities, costs and expenses of whatever kind and nature, primary or secondary, direct or indirect, absolute or contingent, whether based in common law or statute or arising under written contract or otherwise (including under Environmental Laws), known or unknown, liquidated or unliquidated, real or potential, tangible or intangible, whether or not accrued, now existing or arising at any time prior to, on or after the Closing Date, whether caused by, arising out of, incurred in connection with or relating in any way to the ownership, use, construction, operation, maintenance, repair, expansion, removal, replacement or management of the Assets; provided, however, that "Assumed Liabilities" will not include amounts due by Transferor as set forth in Section 8.07 for periods of time prior to the Closing Date.

"**Bill of Sale**" shall have the meaning set forth in Section 3.02(a).

"**Closing**" shall have the meaning set forth in Section 3.01.

"**Closing Date**" shall have the meaning set forth in the Preamble.

"**Compensation**" shall have the meaning set forth in the Employee Matters Letter.

"**Condensate Processing Termination Agreement**" shall have the meaning set forth in Section 3.02(e).

"**Custody Transfer Receipt**" shall have the meaning set forth in Section 2.02.

"**Employee Benefit Plan**" shall mean any bonus, vacation, deferred compensation, pension, retirement, profit-sharing, thrift, savings, employee unit ownership, unit bonus, unit purchase, restricted unit and unit option plan, any employment, retention or severance contract, any medical, dental, disability, health and life insurance plan, any other employee benefit and

fringe benefit plan contract or arrangement and any applicable "change of control" or similar provision in any plan, contract or arrangement maintained or contributed to for the benefit of officers, former officers, employees, former employees, directors, former directors, or the beneficiaries of any of the foregoing, including any "employee benefit plan" as defined in ERISA Section 3(3).

"**Employee Matters Letter**" shall mean that certain Employee Matters Letter dated January 30, 2020 by and between Transferor and Transferee.

"**Employees**" shall have the meaning set forth in the Employee Matters Letter.

"**Environmental Condition**" shall mean surface soil, subsurface soil, surface water, and/or groundwater contamination, or other types of Releases of Hazardous Materials or environmental damage or contamination in, on, around or under the Assets or arising, originating or migrating offsite from the Assets, including offsite disposal thereof and which requires containment, remediation, clean-up, restoration, removal or monitoring under Environmental Laws.

"**Environmental Laws**" shall mean any and all Laws, policies, directives, or standards of any Governmental Authority, or any principle of common law or governmental interpretation thereof relating to Hazardous Materials, the abatement of pollution, protection or restoration of the environment, or ensuring public health and safety from environmental hazards, specifically including, but not limited to, those relating to the exposure to, or the use, Release, emission, presence, storage, treatment, generation, transportation, processing or handling, management or control of, Hazardous Materials, including, but not limited to, the Safe Drinking Water Act, 42 U.S.C. § 300f et seq.; Federal Water Pollution Control Act, 33 U.S.C. § 1251, et. seq.; the Federal Insecticide, Fungicide & Rodenticide Act, 7 U.S.C. § 136 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Clean Water Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9601 et seq.;   the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.; and the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 11001 et seq., and all similar statutes or Laws, as each has been amended from time to time.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended, and all regulations corresponding to or promulgated under authority of any of the foregoing statutes.

"**Estimated Assessment**" has the meaning set forth in Section 8.01(a).

"**Excluded Assets**" shall mean those assets set forth on Exhibit J attached hereto and any other asset that is not an Asset under the terms of this Agreement.

"**Governmental Authority**" shall mean any entity of or pertaining to government, including federal, state, local, municipal, foreign, or other governmental or administrative agency, department, official, court, tribunal arbitrator, commission or board having jurisdiction.

"**Hazardous Materials**" shall mean (a) any chemicals, materials or substances defined as "hazardous waste", "hazardous substance", "extremely hazardous substance", "toxic chemical", "hazardous chemical", "toxic pollutants", "contaminants", "chemical", "chemical substance", or "asbestos", as such terms are defined in any of the Environmental Laws in such quantities or concentrations as are regulated by such Environmental Laws; and (b) any petroleum or petroleum products, natural or synthetic gas, radioactive materials, asbestos, urea formaldehyde foam insulation in such quantities, condition or concentrations as are regulated by Environmental Laws.

"**Indemnified Party**" shall have the meaning set forth in <u>Section 10.05(a)</u>.

"**Indemnifying Party**" shall have the set forth in <u>Section 10.05(a)</u>.

"**Inventory**" shall mean the natural gas liquids, condensate and other inventories as of the Closing Date located at the Plants or in the possession or control of Transferor or any other Person, in each case attributable to the Assets.

"**Law**" shall mean any and all federal, state, local, or other law, statute, treaty, ordinance, rule, regulation, order, decree, penalty, permit, or requirement, whether heretofore existing or hereafter enacted, promulgated, signed, ordered, or otherwise arising or becoming effective, as they exist now or in the future, and all amendments thereto, including but not limited to all Environmental Laws.

"**Lease**" shall mean that certain Amended and Restated Lease by and between Transferee and CDM, predecessor to Transferor, dated September 14, 2011, as amended.

"**Lease Termination Agreement**" shall have the meaning set forth in <u>Section 3.02(d)</u>.

"**Losses**" shall mean all claims, causes of action, demands, lawsuits, losses, damages, liabilities, fines, penalties, judgments, liens, diminution in the value or marketability, loss of use, loss of profits, loss of rentals or other income, loss of business opportunity, increased development costs, and any other cost and expense of every type (including, but not limited to, court costs, reasonable attorneys' fees and expenses, consultant or expert fees, investigatory or monitoring costs, litigation preparation costs, cleanup or other costs).

"**North Beach Plant**" means those certain gas processing plant facilities and certain condensate assets owned by Transferor in Conecuh County, Alabama between the Plant Delivery Meter (as defined in the North Beach Service Agreement) and the Plant Redelivery Meter (as defined in the North Beach Service Agreement) and on the lands subject to the Lease, as further depicted on <u>Exhibit I</u> attached hereto.

"**North Beach Service Agreement**" has the meaning set forth in the Recitals.

"**Party**" and/or "**Parties**" shall have the set forth in the Preamble.

PAA: LAW_COR: 135773v16

"**Permitted Lien**" means (a) liens, claims and encumbrances that are not yet due and payable or are being contested in good faith by Transferor for taxes (including ad valorem taxes for the current fiscal year), (b) statutory liens (including materialman's, warehousemen's, mechanic's, landlord's, and similar liens) that are not yet due and payable or are being contested in good faith by Transferor arising in the ordinary course of business incidental to the operation of the Assets, (c) the Assumed Liabilities, (d) any lien, claim or encumbrance created by Transferee, (e) the terms and conditions of any permit and (f) any Security Agreement Lien.

"**Person**" shall mean any Governmental Authority, natural person, corporation, limited liability company, partnership, association, or other legal entity.

"**Personal Property**" has the meaning set forth in Section 2.01(b).

"**Plants**" shall mean the North Beach Plant and the Abbyville Plant.

"**Property**" shall have the meaning set forth in Section 8.08(b).

"**Records**" means the files, records and data of Transferor directly related to and exclusively associated with the Assets in Transferor's or any of its Affiliates' possession, including land and title records and micro-fiche data files whose transfer will not violate any Third Party restriction or are not prohibited by Law and that are not protected by Transferor's attorney-client privilege; provided, however, that "Records" shall not include any files, records or data related to any Retained Liability or Excluded Asset or any manuals or procedures that are proprietary to the Transferor or its Affiliates.

"**Regulated Substance**" shall mean any substance or material defined or designated as a hazardous or toxic substance, waste, or material, a solid waste, a non-hazardous oilfield waste, a pollutant, a contaminant, an infectious material, or other similar term, or otherwise regulated by or under any Environmental Laws, including, but not limited to, polychlorinated biphenols (PCBs), petroleum hydrocarbons (including gasoline or diesel), asbestos, and naturally occurring radioactive materials.

"**Release**" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, placing, spilling, percolating, draining, seeping, or migrating (including, but not limited to, the abandoning or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) of a substance (including any Regulated Substance) into the environment.  To the extent any Environmental Laws establish a meaning for the term "Release" which is broader than provided in the preceding sentence, such broader definition shall apply in this Agreement.

"**Retained Liabilities**" shall mean (x) liabilities relating to the Excluded Assets, (y) any liabilities or obligations arising out of the employment by Transferor (or its Affiliates) of any Transferred Employee prior to the Closing Date and (z) actual and direct obligations, liabilities costs and expenses arising out of or relating to administrative/accounting/payment activities that (i) were undertaken by Transferor prior to the Closing Date in violation of either Service Agreement or contrary to proper operation of the Plants or (ii) were not undertaken by Transferor, but should have been undertaken in accordance with the Service Agreements or in accordance with the proper operation of the Plants; provided, however, that no other obligations

or liabilities associated with any of the proceeds, permits, contracts or agreements associated with the Service Agreement shall be deemed a "Retained Liability".

"**Security Agreement Lien**" shall have the meaning set forth in <u>Section 8.12</u>.

"**Service Agreement Termination Agreement**" shall have the meaning set forth in <u>Section 3.02(c)</u>.

"**Service Agreements**" shall have the meaning set forth in the Recitals.

"**Third Party**" shall mean any Person that is not a Party to this Agreement.

"**Third Party Claim**" shall have the meaning set forth in <u>Section 10.05(a)</u>.

"**Transferee**" shall have the meaning set forth in the Preamble.

"**Transferee Group**" shall have the meaning set forth in <u>Section 10.02</u>.

"**Transferor**" shall have the meaning set forth in the Preamble.

"**Transferor Group**" shall have the meaning set forth in <u>Section 10.01</u>.

"**Transferred Employees**" shall mean those Employees who have accepted employment with Transferee, or Transferee's Affiliates, pursuant to the Employee Matters Letter.

"**WARN Act**" shall have the meaning set forth in <u>Section 7.03(e)</u>.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Closing Date.

**TRANSFEROR:**

**PLAINS GAS SOLUTIONS, LLC**

By: _____ mcc

Name: Dean Liollio

Title:   President

*(Signature Page to Asset Transfer Agreement)*

**TRANSFEREE:**

**SKLAR EXPLORATION COMPANY, L.L.C**

By: _____

Name: Howard F. Sklar

Title: CEO & President

*(Signature Page to Asset Transfer Agreement)*

## **List of Exhibits**

Exhibit A:      Assigned Contracts
Exhibit B:      Personal Property
Exhibit C:      Custody Transfer Receipt
Exhibit D:      Bill of Sale
Exhibit E:      Assignment and Assumption Agreement
Exhibit F:      Service Agreement Termination Agreement
Exhibit G:      Lease Termination Agreement
Exhibit H:      Condensate Processing Termination Agreement
Exhibit I:      Abbyville Plant and North Beach Plant
Exhibit J:      Excluded Assets

## EXHIBIT A

## ASSIGNED CONTRACTS

1. Amended and Restated Interruptible Gas Gathering and Processing Service Agreement North Beach Plant Conecuh County, Alabama between Plains Gas Solutions, LLC and Fletcher Petroleum Corp., dated July 1, 2014
2. Gas Contract Compression Agreement dated as of April 25, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC, as amended (Unit 005)
3. Gas Contract Compression Agreement dated as of May 1, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC, as amended (Unit 009)
4. Gas Contract Compression Agreement dated as of January 5, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC, as amended (Unit 0011)
5. Gas Contract Compression Agreement dated as of January 30, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC, as amended (Unit 0012)
6. Gas Contract Compression Agreement dated as of January 30, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC, as amended (Unit 0013)
7. Compression Operations Agreement, dated March 2, 2018, between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC and/or affiliates (Unit #5011)
8. Gas Contract Compression Agreement dated as of January 5, 2012, between Kodiak Gas Services, LLC and CDM Max, LLC (Unit #11011)
9. Gas Contract Compression Agreement dated as of January 30, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC (Unit #12012)
10. Gas Contract Compression Agreement dated as of January 30, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC (Unit #12013)
11. Gas Contract Compression Agreement dated as of May 1, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC, as amended (Unit 0006)
12. Gas Contract Compression Agreement dated as of May 1, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC, as amended (Unit 0007)
13. Gas Contract Compression Agreement dated as of May 1, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC, as amended (Unit 0008)
14. Gas Contract Compression Agreement dated as of May 1, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC (Unit #12-0006)
15. Gas Contract Compression Agreement dated as of May 1, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC (Unit #12-0007)
16. Gas Contract Compression Agreement dated as of May 1, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC (Unit #12-0008)
17. Gas Contract Compression Agreement dated as of May 1, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC (Unit #12-0009)
18. Major Source Operating (Air) Permit 103-0029, dated as of April 15, 2019[1]

---

[1] The Alabama Department of Environmental Management requires Transferee to submit a Form ADEM 103 indicating a change of ownership.

## EXHIBIT B

## Personal Property

1) North Beach and Abbyville Plants Major Equipment List:

| TRAIN I | | | | | | |
|---|---|---|---|---|---|---|
| | | MAWP | | | | 4.4.16 |
| TAG ID | NB # | PSIG | | TEMP | DESCRIPTION | DWG # |
| V-1B | 19163 | 1100 | @ | 100 | INLET FILTER SEPARATOR | 1003 |
| V-1 | 12978 | 500 | @ | 250 | INLET SCRUBBER | 1003A |
| V-3 | 13000 | 1200 | @ | 250 | COLD SEPARATOR | 1008 |
| V-2 | 12998 | 1200 | @ | 250 | 3 PHASE SEPARATOR | 1005 |
| V-6 | 13004 | 350 | @ | 250 | REFRIGERANT SCRUBBER | 1007 |
| T-1 | 13016 | 500 | @ | 250 | STABILIZER TOWER | 1009 |
| V-7 | 13002 | 350 | @ | 250 | PROPANE RECEIVER | 1014 |
| V-X2 | 12972 | 720 | @ | 120 | SCRUBBER | 1004 |
| V-X1 | 13007 | 720 | @ | 120 | SULFA TREAT VESSEL | 1004 |
| V-5 | 12971 | 150 | @ | 250 | FUEL GAS SCRUBBER | 1016 |
| E-4 | 260 | 500 | @ | 350 | STABILIZER REBOILER | 1009 |
| E-3 | 261 | 350 | @ | 150 | GAS CHILLER | 1007 |
| E-1 | 262 | 720 | @ | 150 | GAS/GAS EXCHANGER | 1005 |
| E-2 | 263 | 720 | @ | 150 | GAS LIQUID EXCHANGER | 1006 |
| AC-2A | 67356 | 500 | @ | 300 | PROPANE CONDENSER FANS | 1010 |
| AC-2B | 67357 | 500 | @ | 300 | PROPANE CONDENSER FANS | 1010 |
| C-VRU-1 | 348 | 150 | @ | 200 | VRU COALESCING FILTER | 1021A |
| C-VRU-2 | 486673 | 225 | @ | 300 | VRU OIL/GAS SEPARATOR | 1021A |
| V-1A | *UTT* | 1440 | @ | 100 | INLET SCRUBBER | 1003 |
| V-601 | *UTT* | 75 | @ | | FLARE KNOCK OUT DRUM | 1020 |
| NOT IN SERVICE | | | | | | |
| F-103A | 49919 | 1480 | @ | 100 | TEG COALESCING FILTER | 1004B |
| F-103B | 50029 | 1480 | @ | 100 | TEG COALESCING FILTER | 1004B |
| H-2A | 781 | 1200 | @ | 120 | GLYCOL CONTACT TOWER | 1004A |
| V-8 | 13001 | 125 | @ | 350 | GLYCOL FLASH TANK | OLD 1012 |
| V-4 | 12975 | 335 | @ | 250 | FLASH TANK | OLD 1016 |
| E-5 | 259 | 150 | @ | 150 | LEAN RICH GLYCOL EXCHANGER | OLD 1008 |
| F-1 | 49594 | 275 | @ | 100 | SOCK FILTER | OLD 1012 |

| | | | | | | |
|---|---|---|---|---|---|---|
| F-2 | 49595 | 150 | @ | 220 | CARBON FILTER | OLD 1012 |
| **COMPRESSORS TRAIN I** | | | | | | |
| **C-1** | UTT / 9739 | 270 | @ | 150 | FUEL GAS        (MAJ-1501) | 23821-115A |
| | 89 | 200 | @ | 300 | 1ST STAGE SCRUBBER | |
| INLET COMP | 10878 | 200 | @ | 300 | 1ST STAGE SUCTION BOTTLE | 111-01 A |
| | 10879 | 200 | @ | 350 | 1ST STAGE DISCHARGE | |
| | 9280 | 645 | @ | 350 | 1ST STAGE COOLER | |
| | 90 | 500 | @ | 300 | 2ND STAGE SCRUBBER | |
| | 91 | 500 | @ | 300 | 2ND STAGE SUCTION | 111-02 A |
| | 92 | 635 | @ | 350 | 2ND STAGE DISCHARGE | |
| | 9281 | 645 | @ | 350 | 2ND STAGE COOLER | |
| | 93 | 635 | @ | 300 | 3RD STAGE SCRUBBER | |
| | 94 | 635 | @ | 300 | 3RD STAGE SUCTION | 111-03 A |
| | 95 | 1650 | @ | 350 | 3RD STAGE DISCHARGE | |
| | 9282 | 1440 | @ | 350 | 3RD STAGE COOLER | |
| **C-2** | 48124 | 350 | @ | 400 | V-100 OIL SEPARATOR | |
| PROPANE COMP | 48125 | 600 | @ | 400 | F-104 DUAL ELEMENT OIL FILTER TANK | 09P110-40 |
| | 48126 | 600 | @ | 400 | F-105 DUEL ELEMENT OIL FILTER TANK | |
| | 48130 | 350 | @ | 400 | V-200 ECONOMIZER | |
| | 6149 | 270 | @ | 150 | F-1014 FUEL GAS FILTER | |
| | 67384 | 450 | @ | 350 | Discharge OIL COOLER | |
| **C-3 O.H. COMP** | 9730 | 625 | @ | 150 | SCRUBBER | 1011 |
| **C-4** | 2386 | 1292 | @ | 350 | DISCHARGE COOLER | |
| RESIDUE COMP | 2564 | 1292 | @ | 350 | DISCHARGE COOLER | 1005A |
| | 1638 | 1200 | @ | 150 | SCRUBBER | |
| **TRAIN II   MOLESIEVE** | | | | | | |
| AC-101 | n/a | 1100 | @ | 550 | REGEN GAS COOLER | 107 |
| F-101 | 92 | 1100 | @ | 200 | INLET FILTER COALESCER | 104 |
| F-102A | 93 | 1100 | @ | 200 | DUST FILTER | 105 |
| F-102B | 94 | 1100 | @ | 200 | DUST FILTER | 105 |
| V-101 | 88 | 1100 | @ | 200 | INLET SEPARATOR | 104 |
| V-102A | 89 | 1100 | @ | 550 | MOLECULAR SIEVE BED | 105 |

2

| | | | | | | |
|---|---|---|---|---|---|---|
| V-102B | 90 | 1100 | @ | 550 | MOLECULAR SIEVE BED | 105 |
| F-103 | 95 | 1100 | @ | 200 | REGEN GAS COALESCER | 106 |
| V-103 | 91 | 1100 | @ | 200 | REGEN GAS SCRUBBER | 107 |
| F-K101 | 15377 | 1440 | @ | 125 | REGEN COMPRESSOR FILTER | 107 |
| | | | | | | |
| F-1000 | 3427 | 125 | @ | 100 | COALESCING FILTER SCRUBBER | 1003C |
| V-3101 | 16530 | 1200 | @ | 120 | SULFA TREAT | 101-04 |
| E-6101 | 21176 | 950 | @ | 150 | GAS/GAS EXCHANGER | 101-05 |
| E-6102 | 21180 | 950 | @ | 150 | GAS/LIQUID EXCHANGER | |
| E-6103 | 21179 | 315 | @ | 150 | GAS CHILLER | |
| V-6105 | 16542 | 1200 | @ | 120 | COLD SEPARATOR | |
| T-6106 | 16529 | 450/950 | @ | 250 | STABILIZER | 101-06 |
| E-6107 | 21181 | 400 | @ | 250 | STABILIZER REBOILER | |
| E-6109 | 21172 | 450 | @ | 150 | OH GAS/PRODUCT EXCHANGER | 101-07 |
| V-2101 | 51346 | 1480 | @ | 100 | HORIZONTAL GAS COALESCER | 101-03 |
| V-419 | 16424 | 150 | @ | 100 | CLOSED DRAIN DRUM | 101-09 |
| V-1000 | *UTT* | 125 | @ | 600 | INLET SLUG CATCHER | 1003C |
| **CONDENSATE STABILIZER** | | | | | | |
| CS-V-130 | 247 | 150 | @ | 350 | CONDENSATE STABILIZER | 500 |
| CS-V-120 | 1422945 | 250 | @ | 120 | FUEL GAS SCRUBBER | 500 |
| CS-V-110 | 36 | 150 | @ | 350 | SEPARATOR | 500 |
| CS-V-115 | 146 | 1440 | @ | 350 | BLOW CASE | 500 |
| **COMPRESSORS TRAIN II** | | | | | | |
| **C-5101** | 10455 | 270 | @ | 150 | FUEL GAS       (MAJ-2501) | 23821-115 |
| INLET | 13912 | 200 | @ | 300 | 1ST STAGE SUCTION BOTTLE | 111-01 |
| COMP | 13913 | 300 | @ | 350 | 1ST STAGE DISCHARGE BOTTLE | |
| | 9285 | 645 | @ | 350 | 1ST STAGE COOLER | |
| | 96 | 200 | @ | 300 | 1ST STAGE SCRUBBER | |
| | 9286 | 645 | @ | 350 | 2ND STAGE COOLER | 111-02 |
| | 97 | 500 | @ | 300 | 2ND STAGE SCRUBBER | |
| | 98 | 500 | @ | 300 | 2ND STAGE SUCTION | |
| | 99 | 635 | @ | 350 | 2ND STAGE DISCHARGE | |

3

| | | | | | | |
|---|---|---|---|---|---|---|
| | 9287 | 1440 | @ | 350 | 3RD STAGE COOLER | 111-03 |
| | 100 | 635 | @ | 300 | 3RD STAGE SCRUBBER | |
| | 101 | 635 | @ | 300 | 3RD STAGE SUCTION | |
| | 102 | 1650 | @ | 350 | 3RD STAGE DISCHARGE | |
| **C-105** O.H. COMP | 72962 | 1270 | @ | 350 | DISCHARGE COOLER | *100-01   & 3284-100-01* |
| | 1213 | 645 | @ | 150 | SCRUBBER A | |
| | 1214 | 645 | @ | 150 | SCRUBBER B | |
| **C-106** | 72963 | 1270 | @ | 350 | DISCHARGE COOLER | *100-01   & 3285-100-01* |
| RESIDUE | 1215 | 645 | @ | 150 | SCRUBBER C | |
| COMP | 1216 | 645 | @ | 150 | SCRUBBER D | |
| **C-107** | 1217 | 645 | @ | 150 | SCRUBBER E | *100-01   & 3286-100-01* |
| RES. COMP | 72964 | 1270 | @ | 350 | DISCHARGE COOLER | |
| **C-103** | 3528 | 300 | @ | 450 | 704-V-100 SUCTION ACCUMULATOR | 12P003-3 |
| PROPANE | 48730 | 400 | @ | 400 | 603-V-100 OIL SEPARATOR | 12P003-4 |
| COMP | 48731 | 400 | @ | 400 | 613-V-100 OIL SEPARATOR | 12P003-5 |
| | **3527** | 350 | @ | 450 | 704-V-200 THERMOSYPHON RECEIVER | 12P003-7 |
| | **3531** | 350 | @ | 450 | 704-V-300 HIGH PRESSURE RECEIVER | 12P003-7 |
| | 815&816 | 522 | @ | 302 | 603/613-E-100 PLATE FRAME OIL COOLERS | 12P003-4/5 |
| | 24326 | 350/425 | @ | 300 | 704-E-200 ECONOMIZER | 12P003-7 |
| | 9807 | 350 | @ | 350 | 704-E-100 CONDENSER | 12P003-6 |
| I & II | **TANKS** | | | | | |
| S-1 | 52943 | 325 | @ | 150 | NGL STORAGE TANK (BULLET) | 1010 |
| TK-425 | no # on u1a UTT | 407 | @ | 650 | NGL STORAGE TANK (BULLET) | 101-11 |
| V-11 | 241365 | 200 | @ | 450 | INSTRUMENT AIR TANK | 1024 |
| V-12 | 241582 | 200 | @ | 400 | UTILITY AIR TANK | |
| V-13 | 289119 | 200 | @ | 400 | UTILITY AIR TANK | |
| V-1007 | UT READINGS | 250 | @ | 100 | PROPANE TANK (5k GALLON TANK) | 1007 A |
| 1200 | API 653 | | | | CONDENSATE STORAGE TANK | 1021 |

4

| | | | | | | |
|---|---|---|---|---|---|---|
| 1201 | | | | | CONDENSATE STORAGE TANK | |
| 1202 | | | | | SLOP STORAGE TANK | |
| 1203 | | | | | WATER STORAGE TANK | |
| B-TEX | 1079057 | 200 | @ | 650 | B-TEX TANK (NIS) | 1017 |
| I & II | **HEATERS** | | | | | |
| H-1 | 2009 | 0 | @ | 450 | (EG) GLYCOL REBOILER | 1013 |
| H-2 | 00S | N/A | | N/A | GLYCOL REBOILER | 1004A |
| H-101 | 2012 | 1050 | @ | 650 | REGEN GAS HEATER | 106 |
| H-100 | 2015 | N/A | | N/A | CS - INDIRECT HEATER | 500 |

2)   All interconnecting piping, valves and meters associated with the above listed equipment.

PAA: LAW_COR: 140096v2

## EXHIBIT C

## FORM OF CUSTODY TRANSFER CERTIFICATE

This CUSTODY TRANSFER CERTIFICATE (this "*Agreement*"), dated as of March 1, 2020 ("*Closing Date*"), is by and between Plains Gas Solutions, LLC a Texas limited liability company ("*Transferor*") and Sklar Exploration Company, L.L.C., a Louisiana limited liability company ("*Transferee*"). Each of Transferor and Transferee are referred to herein individually as a "*Party*" and collectively as the "*Parties*".

**WHEREAS**, pursuant to that certain Asset Transfer Agreement dated March 1, 2020 by and between Transferor and Transferee (the "*Agreement*"), Transferor will convey to Transferee the Assets. Terms used herein but not defined shall have the meanings ascribed to such terms in the Agreement; and

**WHEREAS**, contemporaneously with the transfer of the Assets, Transferee shall take custody, but not title, to the Inventory as measured on the Closing Date.

**NOW, THEREFORE**, for and in consideration of the agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. As of the Closing Date, Transferor has transferred custody to Transferee and Transferee acknowledges custody (but not title) and receipt of the Inventory presently located at the Plants for the account of the owners of such Inventory.

2. The Parties agree that the amount of such Inventory as of 7 a.m. Central Standard Time on March 1, 2020, is as follows:

| **Type**[1] | **Total Volume (in bbl)** |
|---|---|
| Natural Gas Liquids[2] | |
| Condensate | |

3. This Agreement may be executed in one or more counterparts (including by means of facsimile or a portable document format (*.pdf)), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[SIGNATURE PAGE FOLLOWS]

---

[1] Any deductions, including any market and transportation deductions, and commodity pricing will be the average deductions and the average monthly pricing for the individual commodity as seen in the prior month (*i.e.*, February 2020).

[2] The Natural Gas Liquid breakdown will be the average of all liquids generated in the prior month (*i.e.*, February 2020).

PAA: LAW_COR: 138892v3

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

PLAINS GAS SOLUTIONS, LLC


By: _____
Name: Dean Liollio
Title:  President

SKLAR EXPLORATION COMPANY, L.L.C.

By: _____
Name: _____
Title: _____

*(Signature Page to Custody Transfer Certificate)*

## EXHIBIT D

## FORM OF BILL OF SALE

THIS BILL OF SALE (this "***Bill of Sale***"), dated as of March 1, 2020 (the "***Effective Date***"), is given by Plains Gas Solutions, LLC, a Texas limited liability company ("***Transferor***") to Sklar Exploration Company, L.L.C., a Louisiana limited liability company ("***Transferee***"). Each of Transferor and Transferee are hereinafter sometimes referred to herein individually as a "***Party***" and collectively as the "***Parties***". All capitalized terms used, but not defined herein, shall have the meanings set forth in that certain Asset Transfer Agreement dated March 1, 2020 by and among the Parties (the "***Transfer Agreement***").

WHEREAS, the Transfer Agreement provides for the transfer of the Assets from Transferor to Transferee (on behalf of the Customers); and

WHEREAS, the Parties desire to effect the transfer of the Assets (other than the Assigned Contracts).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which the Transferor and Transferee hereby acknowledge, Transferor hereby grants, assigns, conveys and transfers to Transferee, its successors and assigns, for and on behalf of the Customers, subject to, and upon the terms and conditions of, the Transfer Agreement, including all disclaimers as to the condition of the Assets set forth in Section 6.01 of the Transfer Agreement, all of Transferor's right, title and interest in and to the Assets (other than the Assigned Contracts) (such property being described herein as the "***Transferred Property***"), without any representations or warranties, express or implied, except as set forth in the Transfer Agreement, to have and to hold the same forever.

This Bill of Sale is an instrument of transfer and conveyance contemplated by, and is executed and delivered under and is subject to in all respects, the Transfer Agreement, and nothing contained in this Bill of Sale shall be deemed to amend, modify or expand any of the provisions of the Transfer Agreement or any rights or obligations of the Parties under the Transfer Agreement.  In the event of any conflict or inconsistency between the terms of the Transfer Agreement and the terms hereof, the terms of the Transfer Agreement will govern.

This Bill of Sale shall be governed by and construed in accordance with the laws of the State of Alabama, excluding any choice of law rules that would call for the application of the substantive laws of another jurisdiction.

This Bill of Sale may be executed in one or more counterparts (including by means of facsimile or a portable document format (*.pdf)), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have executed this Bill of Sale to be effective as of the Effective Date.

**TRANSFEROR:**

**PLAINS GAS SOLUTIONS, LLC**


By: _____
Name:
Title:


**TRANSFEREE:**

**SKLAR EXPLORATION COMPANY, L.L.C.**


By:  _____
Name:
Title:

## EXHIBIT E

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "*Agreement*"), dated March 1, 2020 ("*Effective Date*"), is made by and between Plains Gas Solutions LLC, a Texas limited liability company ("*Assignor*") and Sklar Exploration Company, L.L.C., a Louisiana limited liability company ("*Assignee*"). Each of Assignor and Assignee is hereinafter sometimes referred to herein individually as a "*Party*" and collectively as the "*Parties*". All capitalized terms used, but not otherwise defined herein, shall have the meanings set forth in that certain Asset Transfer Agreement dated March 1, 2020 by and between the Parties (the "*Transfer Agreement*").

**WHEREAS**, in accordance with the Transfer Agreement, Assignor desires to assign and convey to Assignee, for and behalf of the Customers, all of Assignor's right, title and interest in and to the Assigned Contracts;

**WHEREAS**, Assignor and Assignee also desire to effectuate the assumption by Assignee of the Assumed Liabilities under the Transfer Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants set forth in the Transfer Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignee and Assignor hereby agree as follows:

1.    In accordance with the terms and provisions of the Transfer Agreement, Assignor hereby transfers, conveys and assigns to Assignee, its successors and assigns, Assignor's right, title and interest to the Assigned Contracts set forth on Exhibit A attached hereto, to have and to hold the same forever. In accordance with the terms and provisions of the Transfer Agreement, Assignee hereby accepts such assignment and agrees to assume all of Assignor's rights and obligations under the Assigned Contracts.

2.    Assignee hereby assumes and agrees to pay, perform and discharge in full when due all amounts and obligations arising under any of the Assumed Liabilities, including any and all of Assignor's obligations under the Assigned Contracts, as provided in the Transfer Agreement.

3.    Notwithstanding Section 1 hereof, this Agreement shall not constitute an agreement to assign or transfer any Assigned Contracts, if an attempted assignment or transfer thereof, without the required consents thereto, would (a) constitute a breach or violate any right of any third party thereof, (b) violate or otherwise not be permitted by Law, or (c) in any way, materially and adversely affect the rights of Assignor thereunder.

4.    From time to time, as and when requested by Assignor or Assignee (in such case, a "*Requesting Party*"), the other Party shall execute and deliver, or cause to be executed and delivered, at Requesting Party's sole cost and expense all such documents and instruments and shall take, or cause to be taken, all such further or other actions, as the Requesting Party or its successors and permitted assigns may reasonably deem necessary or desirable in order for Assignee to effectively assume, pay, perform and discharge in full the Transfer Contracts.

PAA: LAW_COR: 135777v6

5.     This Agreement is an instrument of transfer contemplated by, and is executed and delivered under and subject to, the Transfer Agreement, and nothing contained in this Agreement shall be deemed to amend, modify or expand any of the provisions of the Transfer Agreement or any rights or obligations of Assignor or Assignee under the Transfer Agreement.  In the event of any conflict or inconsistency between the terms of the Transfer Agreement and the terms hereof, the terms of the Transfer Agreement will govern.

6.     This Agreement may be executed in one or more counterparts (including by means of facsimile or a portable document format (*.pdf)), each of which, when delivered, shall be deemed an original but all of which together shall constitute one and the same instrument.

7.     This Agreement shall be governed by and construed in accordance with the laws of the State of Alabama, excluding any choice of law rules that would call for the application of the substantive laws of another jurisdiction.

[SIGNATURE PAGE FOLLOWS]

PAA: LAW_COR: 135777v6

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the Effective Date.


ASSIGNOR:

**PLAINS GAS SOLUTIONS, LLC**



By: _____
Name:
Title:



ASSIGNEE:

**SKLAR EXPLORATION COMPANY, L.L.C.**



By: _____
Name:
Title:

*(Signature Page to Assignment and Assumption Agreement)*

## Exhibit A

## ASSIGNED CONTRACTS

1. Amended and Restated Interruptible Gas Gathering and Processing Service Agreement North Beach Plant Conecuh County, Alabama between Plains Gas Solutions, LLC and Fletcher Petroleum Corp., dated July 1, 2014
2. Gas Contract Compression Agreement dated as of April 25, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC, as amended (Unit 005)
3. Gas Contract Compression Agreement dated as of May 1, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC, as amended (Unit 009)
4. Gas Contract Compression Agreement dated as of January 5, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC, as amended (Unit 0011)
5. Gas Contract Compression Agreement dated as of January 30, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC, as amended (Unit 0012)
6. Gas Contract Compression Agreement dated as of January 30, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC, as amended (Unit 0013)
7. Compression Operations Agreement, dated March 2, 2018, between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC and/or affiliates (Unit #5011)
8. Gas Contract Compression Agreement dated as of January 5, 2012, between Kodiak Gas Services, LLC and CDM Max, LLC (Unit #11011)
9. Gas Contract Compression Agreement dated as of January 30, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC (Unit #12012)
10. Gas Contract Compression Agreement dated as of January 30, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC (Unit #12013)
11. Gas Contract Compression Agreement dated as of May 1, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC, as amended (Unit 0006)
12. Gas Contract Compression Agreement dated as of May 1, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC, as amended (Unit 0007)
13. Gas Contract Compression Agreement dated as of May 1, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC, as amended (Unit 0008)
14. Gas Contract Compression Agreement dated as of May 1, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC (Unit #12-0006)
15. Gas Contract Compression Agreement dated as of May 1, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC (Unit #12-0007)
16. Gas Contract Compression Agreement dated as of May 1, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC (Unit #12-0008)
17. Gas Contract Compression Agreement dated as of May 1, 2012 between Kodiak Gas Services, LLC and Plains Gas Solutions, LLC (Unit #12-0009)

## EXHIBIT F

### FORM OF TERMINATION AGREEMENT

This TERMINATION AGREEMENT (this "Agreement"), dated as of March 1, 2020, is entered into by and between Plains Gas Solutions LLC, a Texas limited liability company ("**PGS**"), Sklar Exploration Company, L.L.C., a Louisiana limited liability company ("**Sklar**") and those working interest owners set forth on Exhibit A attached hereto (the "**Customers**"). Each of PGS, Sklar and the Customers are sometimes referred to collectively as the "**Parties**" and individually as a "**Party**." All capitalized terms used, but not otherwise defined herein, shall have the meanings set forth in that certain Asset Transfer Agreement dated March 1, 2020 by and between the Parties (the "**Transfer Agreement**").

**WHEREAS**, PGS was formerly known as CDM Max, LLC;

**WHEREAS**, the PGS, Sklar and the Customers are parties to (i) that certain Service Agreement North Beach Plant Conecuh County, Alabama, dated June 22, 2009 (as amended, the "**North Beach Service Agreement**") and (ii) that certain Service Agreement Abbyville Plant Conecuh County, Alabama, dated September 14, 2011 (as amended, the "**Abbyville Service Agreement**" and, together with the North Beach Service Agreement, the "**Service Agreements**"); and

**WHEREAS**, in accordance with the Transfer Agreement, the Parties desire to terminate the Service Agreements on the terms set forth herein.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      <u>Termination of the Service Agreements</u>.  In accordance with the terms and provisions of the Transfer Agreement, effective as of the date hereof, the Parties agree that each of the North Beach Service Agreement and the Abbyville Service Agreement is terminated pursuant to the terms thereof, with no liability (of any nature) arising for any Party in connection therewith.

2.      <u>Effect of Termination</u>.  In accordance with the terms and provisions of the Transfer Agreement, upon termination, the Service Agreements shall become void and there shall be no further liability or obligation under the Service Agreements on the part of any Party.

3.      <u>Miscellaneous</u>.

(a)      <u>Governing Law</u>.  This Agreement and the obligations of the Parties hereunder shall be governed by and construed and enforced in accordance with the substantive and procedural laws of the State of Alabama, without regard to the laws of the State of Alabama that would call for the application of the laws of any other jurisdiction.

(b)      <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement and understanding of the Parties in respect to the subject matter hereof and supersedes all prior

agreements, arrangements and undertakings, whether written or oral, relating to the subject matter hereof.

(c)     <u>Successors and Assigns</u>.    This Agreement and all covenants and agreements contained herein and rights, interests or obligations hereunder, by or on behalf of any Party, shall bind and inure to the benefit of the respective successors and permitted assigns of the Parties.

(d)     <u>Conflicts</u>. This Agreement is executed and delivered under and subject to, the Transfer Agreement, and nothing contained in this Agreement shall be deemed to amend, modify or expand any of the provisions of the Transfer Agreement or any rights or obligations of Assignor or Assignee under the Transfer Agreement.    In the event of any conflict or inconsistency between the terms of the Transfer Agreement and the terms hereof, the terms of the Transfer Agreement will govern.

(e)     <u>Headings</u>.    The Section headings contained in this Agreement are for reference purposes only, and shall not in any way affect the meaning or interpretation of this Agreement.

(f)     <u>Counterparts</u>.    This Agreement may be executed simultaneously in one or more counterparts (including by means of facsimile or .pdf signature pages), all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the Parties and delivered to the other Party.

*[Signature page follows]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**PLAINS GAS SOLUTIONS, LLC**


By: _____
Name: Dean Liollio
Title: President

**SKLAR EXPLORATION COMPANY, L.L.C.**,
on behalf of itself and on behalf of each and every Customer


By: _____
Name:
Title:

**Exhibit A**

**Customers**

**North Beach**

Ansaben Trust
Beazley Petroleum, LLC
Bobmary L.C.
Brock Resources, LLC
Bundero Investment Company, L.L.C.
Carl Herrin Oil & Gas, LLC
Cayman Resources, Inc.
Coastal Exploration, Inc.
[Conecoh] Oil Company, LLC
Craft Exploration Company, LLC
Dickson Oil & Gas, LLC
Embayment Production, LLC
Fant Energy Limited
Fleet Howell
J.C. Ogden
Joseph Pflanzer, M.D.
Kudzu Oil Properties, LLC
Longleaf Energy Group, Inc.
Lucas Petroleum
Marksco, LLC
McCombs Energy, Ltd.
Parous Energy, LLC
Quail Creek Production Company
R. Hiram Lucius
Sellars Family Trust
Sepulga River Fuels, LLC
Sklarco, L.L.C.
Tenexco, Inc.
Tiembo, Ltd.
Trek Exploration, LLC
Tyler Oil & Gas, LLC
Vickery Exploration, LLC
Wolfe Rudman
Yates Resources, LP

## **Abbyville**

Bundero Investment Company, L.L.C.
Craft Exploration Company, LLC
Dickson Oil & Gas, LLC
Fant Energy Limited
Fleet Howell
JJS Working Interests LLC
JSS Interests LLC
Kudzu Oil Properties, LLC
Landmark Exploration, LLC
Marksco, LLC
McCombs Energy, Ltd.
Pickens Financial Group, LLC
Sklarco, L.L.C.
Tauber Exploration & Production Co.
The Rudman Partnership
Tiembo, Ltd.
Wolfe Rudman

## EXHIBIT G

### FORM OF TERMINATION AGREEMENT

This TERMINATION AGREEMENT (this "*Agreement*"), dated as of March 1, 2020, is entered into by and between Plains Gas Solutions LLC, a Texas limited liability company ("*PGS*") and Sklar Exploration Company, L.L.C., a Louisiana limited liability company ("*Sklar*"). Each of PGS and Sklar are sometimes referred to collectively as the "*Parties*" and individually as a "*Party*." All capitalized terms used, but not otherwise defined herein, shall have the meanings set forth in that certain Asset Transfer Agreement dated March 1, 2020 by and between the Parties (the "*Transfer Agreement*").

**WHEREAS**, PGS was formerly known as CDM Max, LLC;

**WHEREAS**, PGS and Sklar are parties to that certain Amended and Restated Lease dated September 14, 2011 (as amended, the "*Lease*"); and

**WHEREAS**, in accordance with the Transfer Agreement, the Parties desire to terminate the Lease on the terms set forth herein.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. <u>Termination of the Lease</u>.  In accordance with the terms and provisions of the Transfer Agreement, effective as of the date hereof, the Parties agree that the Lease is terminated pursuant to the terms thereof, with no liability (of any nature) arising for any Party or any of their respective affiliates, directors, officers, managers, employees, members or stockholders in connection therewith.

2. <u>Effect of Termination</u>.  In accordance with the terms and provisions of the Transfer Agreement, upon termination, the Lease shall become void and there shall be no further liability or obligation under the Lease on the part of any Party or their respective affiliates, directors, officers, managers, employees, members or stockholders.

3. <u>Miscellaneous</u>.

(a) <u>Governing Law</u>.  This Agreement and the obligations of the Parties hereunder shall be governed by and construed and enforced in accordance with the substantive and procedural laws of the State of Alabama, without regard to the laws of the State of Alabama that would call for the application of the laws of any other jurisdiction.

(b) <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement and understanding of the Parties in respect to the subject matter hereof and supersedes all prior agreements, arrangements and undertakings, whether written or oral, relating to the subject matter hereof.

(c)     <u>Successors and Assigns</u>.    This Agreement and all covenants and agreements contained herein and rights, interests or obligations hereunder, by or on behalf of any Party, shall bind and inure to the benefit of the respective successors and permitted assigns of the Parties.

(d)     <u>Conflicts</u>. This Agreement is executed and delivered under and subject to, the Transfer Agreement, and nothing contained in this Agreement shall be deemed to amend, modify or expand any of the provisions of the Transfer Agreement or any rights or obligations of Assignor or Assignee under the Transfer Agreement.    In the event of any conflict or inconsistency between the terms of the Transfer Agreement and the terms hereof, the terms of the Transfer Agreement will govern.

(e)     <u>Headings</u>.    The Section headings contained in this Agreement are for reference purposes only, and shall not in any way affect the meaning or interpretation of this Agreement.

(f)     <u>Counterparts</u>.    This Agreement may be executed simultaneously in one or more counterparts (including by means of facsimile or .pdf signature pages), all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the Parties and delivered to the other Party.

[<i>Signature page follows</i>]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**PLAINS GAS SOLUTIONS LLC**

By: _____
Name:
Title:

**SKLAR EXPLORATION COMPANY, L.L.C.,**

By: _____
Name:
Title:

*(Signature Page to Lease Termination Agreement)*

## EXHIBIT H

### FORM OF TERMINATION AGREEMENT

This TERMINATION AGREEMENT (this "Agreement"), dated as of March 1, 2020, is entered into by and between Plains Gas Solutions LLC, a Texas limited liability company ("**PGS**"), Sklar Exploration Company, L.L.C., a Louisiana limited liability company ("**Sklar**") and those working interest owners set forth on Exhibit A attached hereto (the "**Customers**"). Each of PGS, Sklar and the Customers are sometimes referred to collectively as the "**Parties**" and individually as a "**Party**." All capitalized terms used, but not otherwise defined herein, shall have the meanings set forth in that certain Asset Transfer Agreement dated March 1, 2020 by and between the Parties (the "**Transfer Agreement**").

**WHEREAS**, the PGS, Sklar and the Customers are parties to that certain Condensate Processing Agreement, dated August 18, 2014 (as amended, the "**Condensate Processing Agreement**"); and

**WHEREAS**, in accordance with the Transfer Agreement, the Parties desire to terminate the Condensate Processing Agreement on the terms set forth herein.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      Termination of the Condensate Processing Agreement.  In accordance with the terms and provisions of the Transfer Agreement, effective as of the date hereof, the Parties agree that the Condensate Processing Agreement is terminated pursuant to the terms thereof, with no liability (of any nature) arising for any Party in connection therewith.

2.      Effect of Termination.  In accordance with the terms and provisions of the Transfer Agreement, upon termination, the Condensate Processing Agreement shall become void and there shall be no further liability or obligation under the Condensate Processing Agreement on the part of any Party.

3.      Miscellaneous.

(a)      Governing Law.  This Agreement and the obligations of the Parties hereunder shall be governed by and construed and enforced in accordance with the substantive and procedural laws of the State of Alabama, without regard to the laws of the State of Alabama that would call for the application of the laws of any other jurisdiction.

(b)      Entire Agreement.  This Agreement sets forth the entire agreement and understanding of the Parties in respect to the subject matter hereof and supersedes all prior agreements, arrangements and undertakings, whether written or oral, relating to the subject matter hereof.

(c)      Successors and Assigns.   This Agreement and all covenants and agreements contained herein and rights, interests or obligations hereunder, by or on behalf of any

Party, shall bind and inure to the benefit of the respective successors and permitted assigns of the Parties.

(d)     Conflicts. This Agreement is executed and delivered under and subject to, the Transfer Agreement, and nothing contained in this Agreement shall be deemed to amend, modify or expand any of the provisions of the Transfer Agreement or any rights or obligations of Assignor or Assignee under the Transfer Agreement.   In the event of any conflict or inconsistency between the terms of the Transfer Agreement and the terms hereof, the terms of the Transfer Agreement will govern.

(e)     Headings.  The Section headings contained in this Agreement are for reference purposes only, and shall not in any way affect the meaning or interpretation of this Agreement.

(f)     Counterparts.  This Agreement may be executed simultaneously in one or more counterparts (including by means of facsimile or .pdf signature pages), all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the Parties and delivered to the other Party.

*[Signature page follows]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**PLAINS GAS SOLUTIONS, LLC**


By: _____
Name:
Title:


**SKLAR EXPLORATION COMPANY, L.L.C.,**
on behalf of itself and on behalf of each and every Customer



By: _____
Name:
Title:

*(Signature Page to Condensate Processing Termination Agreement)*

**Exhibit A**

**Customers**

**North Beach**

Ansaben Trust
Beazley Petroleum, LLC
Bobmary L.C.
Brock Resources, LLC
Bundero Investment Company, L.L.C.
Carl Herrin Oil & Gas, LLC
Cayman Resources, Inc.
Coastal Exploration, Inc.
[Conecoh] Oil Company, LLC
Craft Exploration Company, LLC
Dickson Oil & Gas, LLC
Embayment Production, LLC
Fant Energy Limited
Fleet Howell
J.C. Ogden
Joseph Pflanzer, M.D.
Kudzu Oil Properties, LLC
Longleaf Energy Group, Inc.
Lucas Petroleum
Marksco, LLC
McCombs Energy, Ltd.
Parous Energy, LLC
Quail Creek Production Company
R. Hiram Lucius
Sellars Family Trust
Sepulga River Fuels, LLC
Sklarco, L.L.C.
Tenexco, Inc.
Tiembo, Ltd.
Trek Exploration, LLC
Tyler Oil & Gas, LLC
Vickery Exploration, LLC
Wolfe Rudman
Yates Resources, LP

## **Abbyville**

Bundero Investment Company, L.L.C.
Craft Exploration Company, LLC
Dickson Oil & Gas, LLC
Fant Energy Limited
Fleet Howell
JJS Working Interests LLC
JSS Interests LLC
Kudzu Oil Properties, LLC
Landmark Exploration, LLC
Marksco, LLC
McCombs Energy, Ltd.
Pickens Financial Group, LLC
Sklarco, L.L.C.
Tauber Exploration & Production Co.
The Rudman Partnership
Tiembo, Ltd.
Wolfe Rudman

# EXHIBIT I

## North Beach and Abbyville Plant Description



## EXHIBIT J

### EXCLUDED ASSETS

The following shall constitute Excluded Assets:

1.  All of Transferor's cash and cash equivalents (including marketable securities and short-term investments).

2.  All accounts and notes receivable as of 11:59 p.m., Central Time, on the Closing Date.

3.  Assets, property and other rights held or owned by Transferor not used exclusively by Transferor in the operation of the Assets as operated by Transferor in the ordinary course of business, including records necessary to file tax returns, assets related to certain support services provided by Transferor's Affiliates to the Assets as described in clause 3(a) below and certain other specified assets not located at the Plants as described in clause 3(b) below:

    a.  Legal services, accounting services, health-safety-security and environmental services, human resource services, engineering services and operational services; and

    b.  All assets at Transferor's Control Center in Midland, Texas.

4.  Tax refunds arising out of all Taxes relating to the Assets accruing to or for any period, or portion thereof, ending prior to or on the Closing Date.

5.  All forecasts, financial information or financial statements and proprietary manuals.

6.  All copies of and subscriptions to Third Party reports.

7.  All information technology equipment and hardware, computers, PCs and servers not listed on the Exhibit B, including, but not limited to, the following:

| Hardware | | | |
|---|---|---|---|
| | Router | ISR4321/K9 | FLM2041W0VJ |
| | Switch | WS-C3560CX-8PC-S | FOC2107Z02C |
| | Riverbed Appliance | CX570 (CX570H) | EC6RS000F55F5 |
| | Firewall | Cisco ASA 5505 | JMX172741EM |
| | | | |
| **Circuits** | | | |
| | 10MB AVPN MPLS Circuit ID | MLEC.597227.ATI | |
| **Workstations and Services** | | | |
| | Latitude 7480 | 6LNVNN2 | User PC |
| | Latitude 5490 | 7MVSHR2 | User PC |

|  | OptiPlex 3020 | 9WFXF32 | User PC |
|---|---|---|---|
|  | Latitude E6440 | 8NMJL32 | User PC |
|  | Latitude 5490 | CW6THR2 | User PC |
| **Phones** |  |  |  |
|  | FFNV1HTQHFLR | IPHONE 6S SPACE GRAY 32GB VZN-USA | Verizon |
|  | DNPPTCP9G5MC | IPHONE 6 SPACE GRAY 16GB AT&T-USA | AT&T |
|  | FK1VP1DBHFLR | IPHONE 6S SPACE GRAY 32GB VZN-USA | Verizon |
|  | FFMPV1C3G5MC | IPHONE 6 SPACE GRAY 16GB AT&T-USA | AT&T |
|  | FK1WFCU3HFLM | IPHONE 6S SPACE GRAY 32GB AT&T-USA | AT&T |

- Business workstation installed software, including Microsoft products
- Maximo/Datasplice
- Cognos/TM1
- PI Software (OSIsoft)
- Any and all leased Xerox print devices

8.  Any remediation equipment used primarily for investigation, cleanup or treatment of contamination in the soil or groundwater located at the Assets.

9.  Defenses and claims (i) that Transferor could assert against Third Parties other than claims that Transferor could assert on account of matters or acts as to which Transferee has agreed to assume liability, or (ii) as to matters to the extent Transferee is entitled to be indemnified by Transferor pursuant to this Agreement.

10. Any assets, improvements, appurtenances, fixtures, plant, property, equipment or goods located on the parcels covered by the Lease that are not owned by Transferor, including without limitation spare parts on consignment, certain chemicals on consignment, leased and rented mobile equipment, leased office equipment, copiers, telephones and other leased items.

11. The following Intellectual Property:

a.  All Intellectual Property and technology owned by Transferor;

b.  All internet domain names;

c.  All Intellectual Property licenses, and all rights granted under such licenses, from Third Parties which are used or useful in connection with the Assets as operated by Transferor or its Affiliates;

d.  All software owned by Third Parties which is used or useful in connection with the Assets as operated by Transferor or its Affiliates;

PAA: LAW_COR: 135810v4

2

     e.   All software owned by Transferor which is used or useful in connection with the Assets as currently operated by Transferor or its Affiliates; and

     f.   All Third Party software covered by Intellectual Property licenses.

     g.   Transferee will need to obtain its own licenses for any Third Party software at Transferee's expense.

*"***Intellectual Property***"* shall mean trademarks, service names, trade names, logos, patents, utility models, supplementary protection certificates, inventions, trade secrets, know-how, designs, design rights, copyrights, database rights, domain names and URLs, all technical information, software to the extent any of the foregoing are represented, embedded or embodied within such software, and all other proprietary rights (whether or not the same are registered or capable of registration) anywhere in the world and all applications for, or for the protection of, any of the foregoing and all rights (including licenses) under or in the above.

12.    All service marks, trademarks, trade names, trade dress, slogans, logos, designs and all other sources or business identifiers of Transferor,  together with goodwill associated with the foregoing, and all applications, registrations, renewals and extensions for the same including the words "Plains", the Plains pipeline valve design and any items that include the word "Plains".

13.    All books, documents, records and files prepared in connection with or relating in any way to the transactions contemplated by this Agreement, including analyses relating in any way to the Assets and the Assumed Liabilities.

14.    All rights of Transferor under or pursuant to this Agreement and the other agreements and transactions contemplated hereby.

15.    All assets, property and property improvements, appurtenances, fixtures, equipment, goods and rights owned by any Third Party.

16.    The rights and obligations of Transferor under any agreements, contracts, leases, licenses and similar instruments that do not relate exclusively to the Assets.

17.    Any rights under or amounts payable from present or former insurance policies applicable to the Assets.

18.    All arrangements, contracts, agreements, understandings or commitments, whether written or oral, by and among Transferor and its Affiliates, it being understood that all such arrangements, contracts, agreements, understandings or commitments (other than agreements exclusively related to the Assets) will be terminated on or prior to the Closing Date.

19.    All leased office equipment or other equipment used by Transferor in the operation of the Assets.

PAA: LAW_COR: 135810v4

3

20.    All vehicles and trailers.

21.    All FCC licenses and authorizations.