IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT COLORADO

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| **SKLAR EXPLORATION COMPANY, LLC** | ) | Case No. 20-12377-EEB |
| **and SKLARCO, LLC** | ) | |
| | ) | Chapter 11 |
| Debtors. | ) | |
| | ) | |
| **SKLARCO, LLC** | ) | Case No. 20-12380-EEB |
| | ) | |
| | ) | Chapter 11 |
| | ) | |

**SUPPLEMENTAL RESPONSE OF TAUBER EXPLORATION & PRODUCTION COMPANY; CTM 2005, LTD; PICKENS FINANCIAL GROUP, LLC; I & L MISS I, LP; MER ENERGY, LTD; MR OIL & GAS, LLC; TARA RUDMAN REVOCABLE TRUST; FEATHER RIVER 75, LLC; RUDMAN FAMILY TRUST; AND THE RUDMAN PARTNERSHIP TO DEBTOR'S
MOTION FOR AUTHORITY TO USE CASH COLLATERAL**
[Docket No. 34]

Tauber Exploration & Production Company, CTM 2005, Ltd., Pickens Financial Group, LLC, I & L Miss I, LP, MER Energy, Ltd, MR Oil & Gas, LLC, Tara Rudman Revocable Trust, Feather River 75, LLC, Rudman Family Trust, and The Rudman Partnership, (collectively the "Tauber Group Non-Operators"), hereby file their Supplemental Response to Debtor's Motion for a final order granting Authority to Use Cash Collateral [Docket No. 34] and respectfully represent as follows:

1

# I.
# Overview

1. The Tauber Group Non-Operators filed their original Response to the Motion on April 9, 2020 [Docket No. 68], to which reference should be made for background information about the parties and the key arguments advanced therein, which are incorporated by reference as if set out verbatim.

2. This Supplemental Response is intended to address additional issues that have come to light since the filing of the original Response, which may be summarized as follows:

- The cash collateral budget must demonstrate that the sources of funds being used by Sklar Exploration Company, LLC ("Sklar Exploration") to pay its obligations do not include non-Sklarco, LLC working interest owner revenue. Sklar Exploration must not use any revenue of non-Sklarco working interest owners other than to pay current taxes and lessor's royalties attributable to such working interest owners. The balance must then be paid each month to the non-Sklarco, LLC working interest owners.

- Sklar Exploration must establish a segregated revenue account into which all post-petition revenue attributable to working interest owners other than Sklarco, LLC ("Sklarco") are deposited.

- The Debtors must submit separate budgets for each Debtor entity. Despite representations of their counsel that they would do so by April 23, 2020, Debtors now claim that separate budgets are not necessary. However, since the Debtors' Estates have not been substantively consolidated, and because Sklar Exploration is an operating company with no oil and gas assets, while Sklarco does, it is imperative that creditors are presented with separate budgets and financial projections for each entity.

3. At the outset of this case, the Tauber Group Non-Operators and other working interest owners were primarily concerned with what the Debtors did with over $7 million dollars in cash call advances and how to protect those funds. Debtors now admit that they used all of the money before the Petition Date, but not for the purposes for which the cash call advances were intended.

4.     As more information about the Debtors use of cash has come to light, the primary concern of working interest owners is how to protect and obtain payment of their production revenues which are received each month by Sklar Exploration.  It has become increasingly evident that the Debtors have unlawfully, and without consent, been using working interest owner revenue to pay for Debtors' operations and obligations.  The Tauber Group Non-Operators insist that this practice must cease and that the only cash collateral the Debtors may use is cash collateral Debtors can prove is derived from their own income and not the income of working interest owners.

## II.
## Sklar Exploration's Duty to Account for and to Pay Revenue from Production to Working Interest Owners

7.     The Joint Operating Agreements ("JOAs") governing the rights and obligations of Sklar Exploration, as Operator, and the Tauber Group Non-Operators and other working interest owners, "Non-Operators", as defined in the JOAs,[1] require the Operator to "keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received."  JOA Article VII.C.

8.     Each month, as agent for the Non-Operators, Sklar Exploration markets and receives payments for the sale of oil and gas of all Non-Operators, which are (or should be) deposited in an account at East West Bank called the "Revenue Account."  Because revenues are

---

[1] The Accounting Procedures attached to each JOA utilized by Sklar Exploration contain the following definitions:
"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.
"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.
"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.
"Operator" shall mean the party designated to conduct the Joint Operations.
"Non-Operators" shall mean the Parties to this agreement other than the Operator.

3

typically received approximately 60 days after the month in which the oil and gas was sold, the February 2020 production revenues were received by Sklar Exploration in April 2020.

9. As part of its duties in maintaining the Revenue Account, Sklar Exploration keeps records that allow it to know the amount of production of oil and gas attributable to each Non-Operator and to calculate to the penny the amount of revenue payable to each Non-Operator, as is evidenced by the spreadsheet attached hereto as Exhibit 1, which was downloaded from the Sklar Exploration Data Room. Thus far, significant portions of January 2020 production revenues and all of the February 2020 production revenues have not been paid to the Non-Operators. But it is not because there is any mystery as to the source of the revenue or the amounts each Non-Operator is entitled to receive.

10. Indeed, like most states, Alabama requires the operator or purchaser of production not only to keep such records but to state in detail on a check stub or statement all of the following information accompanying each payment to an "Interest Owner"[2]:

> **(b)** Whenever payment is made for oil or gas production to an interest owner, whether pursuant to a division order, lease, servitude, or other agreement, all of the following information shall be included on or ascertainable from the check stub or on an attachment to the form of payment, unless the information is otherwise provided on a regular basis:
>
> **(1)** Lease, property or well identification number, if any, or reference to appropriate agreement with identification of the well or unit from which production is attributed.
>
> **(2)** Month and year of sales or purchases included in the payment.
>
> **(3)** Total barrels of crude oil or MCF of gas purchased or sold.
>
> **(4)** Owner's final realizable price per barrel MCF, long ton, or other appropriate measurement.

---

[2] Defined as "A person owning a royalty interest or a working interest in an oil or gas well or unit." Code of Ala. § 9-17-33(a)(3).

**(5)** Total amount of severance and other production taxes, with the exception of windfall profit tax.

**(6)** Net value of total sales from the property after taxes are deducted.

**(7)** Interest owner's interest, expressed as a decimal fraction, in production from subparagraph (1) above.

**(8)** Interest owner's share of the total value of sales prior to any tax deductions.

**(9)** Interest owner's share of the sales value less the share of the production and severance taxes, as applicable.

Code of Ala. § 9-17-33(b).

11. It follows that unless Sklar Exploration has failed to maintain the Joint Account (as defined in the JOA (*see* note 1, *infra*) and the records pertaining thereto in accordance with the applicable JOA's, and/or has failed to comply with Alabama law, it must necessarily know precisely to whom and how much the remaining January and the February revenues are payable, should be able to segregate and pay those funds, and all future revenues to the rightful parties and can prepare a budget that ensures that there will be no unlawful expenditure of working interest owner revenue in connection with the Final Cash Collateral Order.

### III.
### Sklar Exploration has no Authority to Charge the "Alabama Gas Plant Management Fee"

12. Certain of the Tauber Group Non-Operators (or their predecessors), including Pickens Financial Group, LLC and The Rudman Partnership, have held non-operating working interests in the Escambia Prospect, a prospect area comprising approximately 60 square miles located in Conecuh and Escambia Counties, Alabama, since the initial formation of a participating group in 2006. Collectively, the interests of the participants in the Escambia Prospect from the Tauber Group Non-Operators represent approximately 14% of the working interest ownership of the original Escambia Prospect.

13. To meet the need for pipeline and gathering systems, Sklar Exploration and the Escambia Prospect working interest owners, entered into a Service Agreement dated September 14, 2011 ("Service Agreement") with CDM Max, LLC (now Plains Gas Solutions, LLC), pursuant to which CDM/Plains agreed to construct, own and operate a gas processing and treating plant. Additionally, the non-operating interest owners paid for the construction of a pipeline gathering system to connect wells within the Escambia Prospect area to the Abbyville Plant, the plant that was constructed and operated by CDM/Plains under the Service Agreement.

14. The Service Agreement contained a mechanism for CDM/Plains to recover its costs of constructing and operating the plant and retention of a percentage of proceeds ("POP"), specifically 25% of the proceeds, obtained from the sale of treated residue gas and natural gas liquid products ("NGLs") obtained through gas processing at the Abbyville Plant. Under that arrangement CDM/Plains retained 25% of the sales proceeds of residue and NGLs after deduction of the costs of operating the plant.

15. By letter dated February 13, 2020 ("February 13th Letter"), Sklar Exploration informed the working interest owners that, in accordance with the terms of the Service Agreement, ownership of the plant was scheduled to vest in Sklar Exploration on behalf of the non-operating working interest owners on March 1, 2020, exactly one month before Debtors commenced this reorganization effort.

16. The February 13th Letter also contained a proposed amendment, which, if adopted by the working interest owners, would be added as a new "Exhibit F" to the Escambia Prospect Operating Agreement (itself Exhibit D to the Participation Agreement for the Escambia Prospect dated effective November 1, 2006). The new Exhibit F addressed ongoing operation of the Abbyville Plant, the Escambia Gathering System, as well as an additional gathering system that

6

had been funded by the working interest owners that connected wells from the nearby Shipps Creek Prospect area to the Escambia Gathering System.

17. Under the new arrangement proposed by Sklar Exploration, any commodity risk previously borne by CDM/Plains under its 25% POP arrangement was to be replaced by a new plant management fee ("Management Fee") to be paid to Sklar Exploration of $0.65 per thousand cubic feet ("MCF") received at the inlet of the plant ("Management Fee"). Additionally, the working interest owners would continue to pay for all the costs of operating the plant, and associated taxes, royalties, and other charges.

18. The Management Fee proposed by Sklar Exploration was to be a new source of operating revenue for Sklar Exploration in addition to the $1,543 per well per month charge being collected by Sklar Exploration under the COPAS provisions of the Unit Operating Agreement, in addition to the Direct Charges that could be charged to cover actual direct labor costs for running the plant under COPAS provisions, and in addition to the labor charges and plant operating expenses that would be payable by the working interest owners as Monthly Operating Costs under the proposed Amendment to Operating Agreement.

19. Although the February 13th Letter did not indicate the threshold of participant approval needed to approve the amendment, it did contain signature lines and corresponding interest percentages for each of the owners. Several of the Tauber Group Non-Operators, including Pickens Financial Group, LLC, Rudman Family Trust, Tara Rudman Revocable Trust, and The Rudman Partnership declined to approve the amendment. However, none of the Tauber Group Non-Operators received word from Sklar Exploration as to whether the proposed amendment had been approved. Nor did the Tauber Group Non-operators receive copies of the ownership transfer of the Abbyville Plant as had been promised by Sklar Exploration in the February 13th Letter.

20. Section 3.6 of the Escambia Prospect Participation Agreement provides as follows:

> This Agreement and its attachments [including Exhibit D – Operating Agreement] constitute the entire agreement of the Parties . . . . Except as otherwise expressly provided herein, no amendment or modification of this Agreement shall be effective unless set forth in writing and signed by a duly authorized officer of each of the Parties.

Based on that provision, the imposition of the Management Fee proposed by Sklar Exploration in its February 13th Letter, called for in an Amendment to the Operating Agreement for the Escambia Prospect, cannot be effectuated in the absence of unanimous consent of the Escambia Prospect participants.

21. On April 19, 2020, Debtors made available a proposed 150-day budget showing monthly revenue from "Alabama gas plant management fees" in the amount $118,625 commencing in mid-May, which, though unexplained, appears to consist largely of the proposed Management Fee. Regardless of the fairness or unreasonableness of the Management Fee, there is a serious question whether the Management Fee has been properly authorized and whether those assessments can be billed to the Escambia Prospect participants or projected as a reliable source of revenue. Certain of the Tauber Group Non-Operators will oppose payment of any joint interest billings for the disputed Management Fee.

### IV.
### Argument and Authorities

22. The Debtors admit they have cash and accounts on hand as of the Petition Date and will generate certain postpetition revenue, which could constitute "Cash Collateral," as that term is defined by section 363(a) of the Bankruptcy Code (as so defined, "Cash Collateral"). Pursuant to the Bankruptcy Code, the Debtor may not use Cash Collateral unless "each entity that has an interest in such cash collateral consents," or unless "the court, after notice and a hearing, authorizes

such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2)(A)-(B) (2013).

23. The Debtors acknowledge that, in order to use Cash Collateral, they must provide adequate protection to all parties with interests in Cash Collateral and who do not consent to its use. *See* 11 U.S.C. § 363(e). The party requesting court approval to use cash collateral over the secured creditor's objection must prove that there is adequate protection for that creditor. *Mendoza v. Temple-Inland Mortgage Corp. (Matter of Mendoza)*, 111 F.3d 1264, 1272 (5th Cir. 1997).

24. As previously discussed, the Tauber Group Non-Operators have interests in Debtors' Cash Collateral arising from the liens and security interests created under its JOA's to secure Debtors' financial obligations under the JOA's. The relative priority of these liens and security interests vis a vis other creditors, including East West Bank, is not known at this time. Creditors such as the Tauber Group Non-Operators must be specifically included among those creditors with interests in Cash Collateral who are entitled to adequate protection of their interests.

25. The Tauber Group Non-Operators also have superior equitable title to funds constituting working interest revenues from production, as to which Debtors hold, at best, legal title. *See Reserve Oil, Inc. v. Dixon*, 711 F.2d 951, 953 (10th Cir. 1983) (holding that funds advanced to further a joint operating contract are held in trust for the benefit of the party that advanced the funds); *see also Dime Box Petroleum Corp*, 717 F.Supp. 717, 721-22 (D. Colo. 1989) (citing *Reserve Oil, Inc.*, 711 F.2d 953). As such, the production revenue funds are not property of the estate under 11 U.S.C. § 541(d), which provides in pertinent part, as follows:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest …but as to which the debtor retains legal title… becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

The production revenue funds are likewise not subject to the liens of any creditor or the Debtors, since such liens may not encumber property that is not property of Debtors. *See Hoxworth v. Blinder*, 74 F.3d 205, 211 (10th Cir. 1996) (recognizing that funds held in trust are not property of the bankruptcy estate).

26. The budget submitted as Exhibit B to the Motion for Authority to Use Cash Collateral is not sufficiently detailed to allow Non-Operators to know whether their money is being used. Debtors must provide a detailed accounting of the funds it has received, and apparently has not yet used, from Non-Operators' proceeds of production, including the Tauber Group Non-Operators.

27. Debtors must be prohibited from using the Cash Collateral of the Tauber Group Non-Operators or the proceeds of production attributable to the Tauber Group Non-Operators unless the objections raised in this Supplement and their original Response are fully addressed.

Dated this 4th day of May, 2020

Respectfully submitted,

**Maynes, Bradford, Shipps & Sheftel, LLP**
*/s/ Thomas H. Shipps*
Thomas H. Shipps
*/s/ Shay L. Denning*
Shay L. Denning
Maynes, Bradford, Shipps & Sheftel, LLP
835 E. Second Ave., Suite 123
Durango, CO 81301
Telephone: (970) 247-1755
Facsimile: (970) 247-8827
Email: tshipps@mbssllp.com;
sdenning@mbssllp.com

*/s/ Barnet B. Skelton, Jr.*
Barnet B. Skelton, Jr.
815 Walker, Suite 1502
Houston, TX 77002
Telephone: (713) 659-8761
Cell: (713) 516-7450
Facsimile: (713)659-8764
Email: barnetbjr@msn.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on May 4, 2020, the foregoing instrument was electronically filed and served via CM/ECF pursuant to L.B.R. 9036-1. All attorneys and parties identified with the Court for electronic service on the record in this case were served by electronic service in accordance with the CM/ECF system on the date of filing

/s/ *Kate Potemkin*
Kate Potemkin