# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | Case No. 20-12377-EEB |
| SKLAR EXPLORATION COMPANY, LLC, | |
| Debtor. | Chapter 11 |
| In re: | Case No. 20-12380-EEB |
| SKLARCO, LLC | |
| Debtor. | Chapter 11 |
| | **Jointly Administered Under Case No. 20-12377-EEB** |

## OBJECTION TO MOTION TO BIFURCATE CASH COLLATERAL ISSUES

Come now, Pruet Production Co. ("PPC") both in its individual capacity and as agent for certain owners of working interests (the "Owners")[1] and Pruet Oil Company, LLC ("POC" and together with PPC, "Pruet"), creditors and parties in interest, and file this objection (the "Objection") to the Motion to Bifurcate [Docket No. 223] (the "Motion to Bifurcate") filed by Debtor Sklar Exploration Company, LLC ("SEC") and Debtor Sklarco, LLC ("Sklarco" and together with SEC, the "Debtors"). Pruet states the following in support of this Objection:

### I.    SUMMARY OF OBJECTION

The Debtors have readily admitted their total and utter disregard to the interests of Pruet and the Owners. Cash call advances paid by POC to WEC pre-petition have been spent. Revenues collected by SEC pre-petition on behalf of PPC and the Owners have not been paid to them as they should have been. PPC and the Owners are owed $651,055.86 for production from

---

[1] A list of the Owners is included in the Verified Rule 2019 Statement of Multiple Representation filed at Docket No. 162 as amended by Docket No. 211.

1381517.2

January and February 2020. Rather than pay these revenues to their rightful owners now, the Debtors seek to use these funds under the guise of "cash collateral." In so doing, the Debtors seek to avoid answering a fundamental question: Do the Debtors' even own these funds? Despite previously taking the position that the revenues were not part of the bankruptcy estates, the Debtors would now have the Court believe that the answer to this question is separate and apart from the question of whether the Debtor can use the funds. As inconvenient for the Debtors as it may be, the second question cannot be answered without the first one being addressed. In short, the Debtors simply cannot use money it is holding on behalf of Pruet without Pruet's prior consent (which Pruet does not give).

In the Motion to Bifurcate, the Debtors ask the Court to set aside the question as to ownership of the funds held by the Debtors so that the Debtors can have a final cash collateral order entered. According to the Debtors, Pruet and the multiple other similarly-situated working interest owners should each file separate adversary proceedings to address the question of ownership. There is a fundamental flaw in the Debtors' proposal though. In the months it will take to resolve these adversary proceedings, the Debtors' will be spending the very cash that Pruet contends is not the Debtors' to spend. Pruet's concerns could perhaps be addressed if it knew the funds owned by Pruet (at least to the extent held by the Debtors as of the Petition Date) would be handed over to Pruet once the Court finds in favor of Pruet. However, the Debtors have not provided this assurance. Unless so done, the question of who owns the funds held by the Debtors must be adjudicated before the Debtors are allowed to spend the funds.

## II. BACKGROUND

### A. *The SE Brooklyn Operating Agreement.*

1. SEC is operator under the Unit Operating Agreement dated November 1, 2018 for the Southeast Brooklyn Oil Unit (the "<u>SE Brooklyn Operating Agreement</u>") in which

PPC and the Owners are identified as working interest owners. A true and correct copy of the SE Brooklyn Operating Agreement is attached hereto as **Exhibit A**.[2]

2. The Unit Agreement for the Southeast Brooklyn Oil Unit (included in Exhibit A) states in Section 3.6 that nothing in the agreement is to be construed as a transfer of title to "Oil and Gas Rights" by the working interest owners to SEC. The term "Oil and Gas Rights" is defined as the "right to explore, develop and operate lands within the Unit Area for the production of Unitized Substances, **or to share in the production so obtained or the proceeds thereof**." (emphasis added).

3. The SE Brooklyn Operating Agreement recognizes that SEC as operator will market and sale oil and gas produced from the well on behalf of the working interest owners and will collect revenues on those owners' behalf. As such, section 11.3 of the agreements provides as follows:

> Unit Operator shall hold for the account of the Working Interest Owners any funds of the Working Interest Owners advances or paid to the Unit Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Unit Area, **and such funds shall remain the funds of the Working Interest Owners on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Working Interest Owners** or applied toward the payment of debts as provided in Section 11.5. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Unit Operator and Working Interest Owners for any purpose other than to account for Working Interest Owners' funds as herein specifically provided, and no funds received by Unit Operator under this agreement need be segregated or maintained by it as a separate fund, but may be commingled with its own funds.

(emphasis added).

---

[2] All exhibits attached hereto are incorporated herein by reference.

### B. *The Southwest Brooklyn Operating Agreement.*

1. SEC is operator under the Unit Operating Agreement dated November 1, 2018 for the Southwest Brooklyn Oil Unit (the "SW Brooklyn Operating Agreement") in which PPC and the Owners are identified as working interest owners. A true and correct copy of the SW Brooklyn Operating Agreement is attached hereto as **Exhibit B**.

2. The Unit Agreement for the Southwest Brooklyn Oil Unit (included in Exhibit B) states in Section 3.6 that nothing in the agreement is to be construed as a transfer of title to "Oil and Gas Rights" by the working interest owners to SEC. The term "Oil and Gas Rights" is defined as the "right to explore, develop and operate lands within the Unit Area for the production of Unitized Substances, **or to share in the production so obtained or the proceeds thereof**." (emphasis added).

3. The SW Brooklyn Operating Agreement recognizes that SEC as operator will market and sale oil and gas produced from the well on behalf of the working interest owners and will collect revenues on those owners' behalf. As such, section 11.3 of the agreements provides as follows:

> Unit Operator shall hold for the account of the Working Interest Owners any funds of the Working Interest Owners advances or paid to the Unit Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Unit Area, **and such funds shall remain the funds of the Working Interest Owners on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Working Interest Owners** or applied toward the payment of debts as provided in Section 11.5. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Unit Operator and Working Interest Owners for any purpose other than to account for Working Interest Owners' funds as herein specifically provided, and no funds received by Unit Operator under this agreement need be segregated or maintained by it as a separate fund, but may be commingled with its own funds.
>
> (emphasis added).

### C. The Little Cedar Creek Operating Agreement.

1. SEC is operator under the Unit Operating Agreement dated March 20, 2014 for the Little Cedar Creek Oil Unit II (the "LCC Operating Agreement") in which PPC and the Owners are identified as working interest owners. A true and correct copy of the LCC Operating Agreement is attached hereto as **Exhibit C**.

2. The Unit Agreement for the Little Cedar Creek Oil Unit II (including in Exhibit C) states in Section 3.6 that nothing in the agreement is to be construed as a transfer of title to "Oil and Gas Rights" by the working interest owners to SEC. The term "Oil and Gas Rights" is defined as the "right to explore, develop and operate lands within the Unit Area for the production of Unitized Substances, **or to share in the production so obtained or the proceeds thereof**." (emphasis added).

3. The LCC Operating Agreement recognizes that SEC as operator will market and sale oil and gas produced from the well on behalf of the working interest owners and will collect revenues on those owners' behalf. As such, section 11. 3 of the agreements provides as follows:

> Unit Operator shall hold for the account of the Working Interest Owners any funds of the Working Interest Owners advances or paid to the Unit Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Unit Area, **and such funds shall remain the funds of the Working Interest Owners on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Working Interest Owners** or applied toward the payment of debts as provided in Section 11.5. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Unit Operator and Working Interest Owners for any purpose other than to account for Working Interest Owners' funds as herein specifically provided, and no funds received bv Unit Operator under this agreement need be segregated or maintained by it as a separate fund, but may be commingled with its own funds.
>
> (emphasis added).

### D. The Hamiter 20-11 Operating Agreement & the Craft Mack 17-4 Operating Agreement.

1. SEC is operator under the Operating Agreement dated January 1, 2014 for what commonly is referred to as the Hamiter 20-11 Well (the "Hamiter Operating Agreement") in which PPC and the Owners are identified as working interest owners. A true and correct copy of the Hamiter Operating Agreement is attached hereto as **Exhibit D**.

2. SEC is operator under the Operating Agreement dated July 1, 2008 for what commonly is referred to as the Craft Mack 17-4 Well (the "Craft Mack Operating Agreement") in which PPC and the Owners are identifies as working interest owners. A true and correct copy of the Craft Mack Operating Agreement is attached hereto as **Exhibit E**.

3. Article III.B of both the Hamiter 20-11 Operating Agreement and the Craft Mack Operating Agreement states the working interest owners own the production of oil and gas from the contract area.

### E. The Myrtice Ellis Operating Agreement.

1. SEC is operator under the Operating Agreement dated December 15, 2019 for what commonly is referred to as the Myrtice Ellis well (the "ME Operating Agreement") in which POC is a working interest owner. A true and correct copy of the ME Operating Agreement is attached hereto as **Exhibit F**.

2. Pursuant to the ME Operating Agreement, SEC as operator may require the working interest owners to pay in advance their respective share of costs associated with drilling and operating the well. *See* Section VII.C of the ME Operating Agreement and Section 3.A of Exhibit "C" of the ME Operating Agreement. Pursuant to the ME Operating Agreement, cash advanced by the working interest owners is to be used solely for the drilling and operation of the well.

  3. Prior to the Petition Date, POC had advanced to SEC cash in an amount no less than $293,055.00.

  4. SEC has indicated it spent all of the cash advances under the ME Operating Agreement prior to the Petition Date.

 **F.** ***The Cash Collateral Motion & the Motion to Bifurcate.***

  1. On April 6, 2020, the Debtors filed their Motion for Authority to Use Cash Collateral [Doc. 34] (the "<u>Cash Collateral Motion</u>"). Pruet filed a limited objection to the Cash Collateral Motion on April 8, 2020 [Doc. 57]. In that limited objection, Pruet stated that it did not object to the Debtors' use of its own cash, but objected to the Debtors' use of cash owned by Pruet that was held by the Debtors.

  2. The Court entered an interim order on the Cash Collateral Motion on April 15, 2020 [Doc. 94] as well as a second interim order on April 27, 2020 [Doc. 189].

  3. A final hearing on the Cash Collateral Motion is set for May 11, 2020.

  4. On May 5, 2020, the Debtors filed the Motion to Bifurcate. In this Motion the Debtors say that Pruet and the other working interest owners have not established an interest in the Debtors' cash cannot assert an interest in that cash (para. 12). The Debtors also state that the working interest owners cannot make a claim to the cash until each of them file an adversary proceeding and have the Court make a determination as the interest in the cash.[3]

  5. The Debtors thus ask that the Court bifurcate the question of who owns the money held by the Debtor from the question of whether the Debtor can use the money it holds. While the Debtor cites case law standing for the blackletter law as to when a court may bifurcate

---

[3] Based upon the number of working interest owner groups that have filed objections to the Cash Collateral Motion, no less than 13 different adversary proceedings would be filed under the Debtors' approach.

issues, no cases are cited by the Debtor to support bifurcation of the question of ownership of funds in the context of use of cash collateral in a bankruptcy context.

6. In essence, the Debtors' position appears to be that while they agree that the revenues received by the Debtors for the working interest owners are in fact owned by those working interest owners, the Debtors did not properly account for these funds as industry standards and the most basic duty of loyalty would require. As a result, Pruet's funds have been commingled with the Debtors' own funds and until Pruet spends the time and money necessary to trace its owns funds and until this Court enters an order ruling these funds are in fact owned by Pruet, Pruet's money has become the Debtors' money for the Debtors to spend long before this determination ever occurs.

### III. DISCUSSION

It is well established that the movant bears the burden regarding a motion to bifurcate—a burden, in many cases, being difficult to surmount. *See The Marianist Province of the United States, Inc. v. Ace USA*, 2010 WL 2681760, (D. Colo. July 2, 2010) (citing Fed. R. Civ. P 42(b) advis. comm. notes (noting that bifurcation should not "routinely be ordered")). The Tenth Circuit Court of Appeals has stated that bifurcation is proper when the "issues are clearly separable" and "such interests favor separation." *Palace Exploration Co. v. Petroleum Dev. Co.*, 316 F.3d 1110, 1119 (10th Cir. 2003). Upon clear separation, bifurcation will then be warranted "if the court finds that it will: (1) avoid prejudice; (2) be more convenient; or (3) be conducive to expedition and economy." *Leone v. Owsley*, No. 12-CV-02961-PAB-KMT, 2016 WL 9735826, at *1 (D. Colo. June 23, 2016) (Brimmer J.); *Baros v. Sentry Ins.*, No. 11-cv- 02487-LTB-KLM, 2012 WL 84706 at *2 (D. Colo. Mar. 12, 2012) (Babcock, J.). "Regardless of efficiency and separability, however, bifurcation is an abuse of discretion if it is unfair or prejudicial to a party."

*Angelo v. Armstrong World Indus.*, 11 F.3d 957, 964 (10th Cir. 1993). Moreover, bifurcation is to be decided "on a case-by-case basis" and should not be regarded as "routine." *Marshall v. Overhead Door Corp.*, 131 F.R.D. 94, 97–98 (E.D. Pa. 1990). Bifurcation under Rule 42(b) is inappropriate when it will "not appreciably shorten the trial or [a]ffect the evidence offered by the parties" because claims are inextricably linked. *F.D.I.C. v. Refco Group, Ltd.*, 184 F.R.D. 623, 629 (D. Colo. 1999). The Debtors have not satisfied their burden of showing the two issues they seek to bifurcate are clearly separable. That is because the Debtors cannot make this showing.

It is true that Section 541 of the Bankruptcy Code has an expansive view of what constitutes property of a bankruptcy estate. 11 U.S.C. 541(a); *In re Blinder, Robinson & Co., Inc.*, 140 B.R. 790, 793 (D. Colo. 1992). Though expansive, it is not all encompassing. As the United States Bankruptcy Court for the Eastern District of Tennessee has stated:

> Property cannot be cash collateral unless it is also property of the estate because, under § 363(c)(2), cash collateral includes only property "in which *the estate* and an entity other than the estate have an interest...." *Id.* (emphasis added). Thus, property that is not property of the estate as defined in 11 U.S.C.A. § 541(a) (West 1993) is "not available as cash collateral nor as a funding source for the debtor's reorganization plan." *First Fidelity Bank, N.A. v. Jason Realty, L.P. (In re Jason Realty, L.P.),* 59 F.3d 423, 425–26 (3rd Cir.1995)(determining whether rents are property of the estate under § 541(a) when considering debtor's motion to use the rents as cash collateral); *see also In re Suter,* 181 B.R. 116, 119 (Bankr.N.D.Ala.1994).

*In re Kingsport Ventures, L.P.* 251 B.R. 841, 845-46 (Bankr. E.D. Tenn. 2000). Because only property of a debtor's estate can constitute cash collateral, it is axiomatic that a debtor cannot be allowed to use cash as cash collateral until and unless it is determined that the said cash in fact constitutes property of the estate. To say otherwise is to trample upon the rights of other claimants to the cash.

In the case at hand, the governing operating agreements clearly articulate that the revenues generated from the wells operated by SEC are owned by Pruet and that this fact does not change

simply because SEC may commingle those funds with funds of its own. If the written agreement is not sufficient enough to establish ownership in the revenue funds by Pruet, one can look to industry standards as well to see that revenues held by operators for working interest owners are universally deemed to be owned by the working interest owners and not the operator. In fact, the Debtors have acknowledged that the revenues are owned by the working interest owners and not the Debtors. At the April 9, 2020 hearing on the Cash Collateral Motion, the Debtors stated that they "do not believe that that revenue is really an asset of the estate." April 9, 2020 Hearing Transcript 27:15-16.[4] The fact the Debtors now are in dire need of cash cannot undo this.

But the Debtors would have the Court disregard all of this for the moment. Instead, the Debtors ask that the Court allow the Debtors to use the cash in its accounts regardless of its source and instead send Pruet and the other working interest owners off to file adversary proceedings apparently against the Debtors, the bank, and even against their co-working interest owners to determine whether the cash in the Debtors' accounts as of the Petition Date is in fact owned by the respective working interest owners. The Debtors would also have the Court believe that ascertaining which funds in its accounts belong to which working interest owners is an insurmountable task. However, up until now the Debtors have had no problem making revenue payments to the rightful owners and the Debtors' bank records made available for review in this case would seem to suggest that remains true.

All of this can be summed in a different way: The Debtors are telling us that while they created the problem, it is no longer their problem and someone else should sort it out. Though there are many, the primary flaw to the Debtors' position is that while litigation ensues on the

---

[4] A copy of the April 9, 2020 transcript is attached hereto as **Exhibit G**.

ownership issue, the Debtors will be spending the very money in dispute. It is for this reason that the Debtors request to bifurcate the issue of ownership from the issue of use cannot be granted.

### IV. RESERVATION OF RIGHTS

Pruet makes no admission of fact or law and reserves any and all rights, claims, objections, and defenses that may be available to them before this Court and any other court with competent jurisdiction over the parties and the matters at issue, including in connection with the Motion to Bifurcate or any other related motions, pleadings, or orders, asserted liens and interests, and any other matters involving the administration of this case, the estate, and Pruet's interests, any and all rights available to them under the Bankruptcy Code and applicable non-bankruptcy law. Pruet reserves any and all rights to supplement or amend this Objection and at any hearing.

### V. JOINDER

Pruet joins the objections of all other parties to the Motion to Bifurcate to the extent such objections are not inconsistent with this Objection.

### VI. CONCLUSION

Pruet requests that the Court deny the Motion to Bifurcate. In the event the Motion to Bifurcate is granted, Pruet requests the Court grant it only on the condition that Pruet's interest in the funds held by the Debtors as of the Petition Date be adequately protected to ensure those funds will remain in place and be paid to Pruet upon the Court's determination that the funds are in fact owned by Pruet. Pruet seeks such other and different relief as the Court deems proper and just.

Dated:  May 7, 2020

/s/ *Matthew J. Ochs*
Matthew J. Ochs
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
P.O. Box 8749
Denver, CO  80201-8749
Telephone: (303) 295-8299
Facsimile: (303) 416-8951
Email: mjochs@hollandhart.com

-and-

/s/ *Jeremy L. Retherford*
Jeremy L. Retherford
Balch & Bingham LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama  35203-4642
Telephone: (205) 226-3479
Facsimile: (205) 488-5693
Email: jretherford@balch.com

*Attorneys for Pruet Oil Company, LLC and Pruet Production Co. in its individual capacity and as agent of the Owners.*

1381517.2

**CERTIFICATE OF SERVICE**

    I certify that on May 7, 2020, the foregoing was electronically filed with the Court via the CM/ECF system. All attorneys and parties identified with the Court for electronic service on the record in this case were served by electronic service in accordance with the CM/ECF system on the date of filing.

                                                        */s/ Matthew J. Ochs*
                                                          Matthew J. Ochs