# EXHIBIT E

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT
## Northwest Quarter (NW/4) of Section 17
## Township 4 North, Range 13 East
## Conecuh County, Alabama

OPERATING AGREEMENT

DATED

_____ **July 1** _____ , __**2008**__ ,
<br>*Year*

OPERATOR   **Sklar Exploration Company L.L.C.** _____

CONTRACT AREA   **As shown on Exhibit "A" to this Agreement.** _____

_____

_____

COUNTY OR PARISH OF   **Conecuh** _____   STATE OF   __**Alabama**__

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM. A.A.P.L. NO. 610 – 1982 REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___Sklar Exploration Company L.L.C._____

_____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

ARTICLE I.
DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

ARTICLE II.
EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑ A. Exhibit "A", shall include the following information:

    (1) Identification of lands subject to this agreement,

    (2) Restrictions, if any, as to depths, formations, or substances,

    (3) Percentages or fractional interests of parties to this agreement,

    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,

    (5) Addresses of parties for notice purposes.

☑ B. Exhibit "B", Form of Lease.

☑ C. Exhibit "C", Accounting Procedure.

☑ D. Exhibit "D", Insurance.

☑ E. Exhibit "E", Gas Balancing Agreement.

☐ ~~F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.~~

☐ ~~G. Exhibit "G", Tax Partnership.~~

If any provision of any exhibit, except Exhibits "E" ~~and "G"~~, is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE III.**
**INTERESTS OF PARTIES**

**A.   Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

**B.   Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____all jointly owned lease burdens_____ which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, / the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

*royalties and other burdens*

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C.   Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production / in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

*which is not a joint obligation of the parties*

**D.   Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.   If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.   If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

**ARTICLE IV.**
**TITLES**

**A.   Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be includ-ed, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐   Option No. 1:   Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE IV**
**continued**

1 ☑ Underline Option No. 2:   Costs incurred by Operator in procuring abstracts /   and fees paid outside attorneys / for title examination

2 (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) / shall be borne by the Drilling Parties

3 in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-

4 hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above

5 functions.

6

7 / Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection

8 with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling

9 designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.

10 This shall not prevent any party from appearing on its own behalf at any such hearing.

11

12    No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above

13 provided, and (2) the title has been approved by the examining attorney or title has been accepted by ~~all of the parties who are to par-~~

14 ~~ticipate in the drilling of the well.~~ Operator.

15

16 ~~B.   Loss of Title:~~

17

18    ~~1. Failure of Title:   Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a~~

19 ~~reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days~~

20 ~~from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-~~

21 ~~tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil~~

22 ~~and gas leases and interests; and,~~

23    ~~(a)   The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be~~

24 ~~entitled to recover from Operator or any development or operating costs which it may have theretofore paid or incurred,~~

25 ~~but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

26    ~~(b)   There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has~~

27 ~~been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-~~

28 ~~curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract~~

29 ~~Area by the amount of the interest lost;~~

30    ~~(c)   If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is~~

31 ~~increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-~~

32 ~~terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such~~

33 ~~well;~~

34    ~~(d)   Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has~~

35 ~~failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties~~

36 ~~who bore the costs which are so refunded;~~

37    ~~(e)   Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be~~

38 ~~borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,~~

39    ~~(f)   No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest~~

40 ~~claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in~~

41 ~~connection therewith.~~

42 This space intentionally left blank.

43

44    ~~2. Loss by Non-Payment or Erroneous Payment of Amount Due:   If, through mistake or oversight, any rental, shut-in well~~

45 ~~payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,~~

46 ~~there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required~~

47 ~~payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,~~

48 ~~which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the~~

49 ~~date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in~~

50 ~~the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the~~

51 ~~required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to~~

52 ~~the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it~~

53 ~~shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled~~

54 ~~or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~

55    ~~(a)   Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,~~

56 ~~up to the amount of unrecovered costs;~~

57    ~~(b)   Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of~~

58 ~~oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease~~

59 ~~termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said~~

60 ~~portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,~~

61    ~~(c)   Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest~~

62 ~~lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

63

64    3. Other Losses:   All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses

65 and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of

66 the Contract Area.

67 *   Curative matters and materials
68 **  Landmen and consultants
***and for applications and hearings

69

70

- 3 -

**ARTICLE V.**

**OPERATOR**

**A.   Designation and Responsibilities of Operator:**

<u>Sklar Exploration Company L.L.C.</u> _____ shall be the
Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and
required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall
have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross
negligence or willful misconduct.

**B.   Resignation or Removal of Operator and Selection of Successor:**

     1. <u>Resignation or Removal of Operator:</u>   Operator may resign at any time by giving written notice thereof to Non-Operators.
If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as
Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator
may be removed ~~if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership,~~ by the
affirmative vote of ~~two (2)~~ or more / Non-Operators owning a / ~~majority~~ interest based on ownership as shown on Exhibit "A" remaining
after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the
first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action
by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier
date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of cor-
porate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not
be the basis for removal of Operator.

*(interlineation above line 18: "three (3)    parties    total of 51% or greater voting")*
*(interlineation above line 18: "voting")*

     2. <u>Selection of Successor Operator:</u>   Upon the resignation or removal of Operator, a successor Operator shall be selected by
the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor
Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority / interest
based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to
succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based
on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

**C.   Employees:**

     The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the
compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

**D.   Drilling Contracts:**

     All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so
desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing
rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and
such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of in-
dependent contractors who are doing work of a similar nature.

**ARTICLE VI.**

**DRILLING AND DEVELOPMENT**

**A.   Initial Well:**

     On or before the ____1st____ day of _____September_____ , (year) ___2008___ , / Operator shall commence the drilling of a well for
oil and gas at the following location: **1124' FNL and 845' FWL of Section 17, T4N, R13E, Conecuh County, Alabama.**

*(interlineation above line 54: "and subject to rig availability,")*

and shall thereafter continue the drilling of the well with due diligence to **11,600 feet subsurface or a depth sufficient to test the
stratigraphic equivalent of the Smackover Formation.**

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is en-
countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

     Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and
gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which
event Operator shall be required to test only the formation or formations to which this agreement may apply.

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

~~If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.~~

**B.   Subsequent Operations:**

   1. Proposed Operations:   Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A., or to rework, reenter, recomplete, sidetrack / deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing or capable of producing / in paying quantities, the party desiring to drill, rework, reenter, recomplete, sidetrack / deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma- tion and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill- ing rig is on location within the contract area / , notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to  forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays. Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

   If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on loca- tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par- ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex- amination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor- dance with the provisions hereof as if no prior proposal had been made.

   2. Operations by Less than All Parties:   If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera- tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Con- senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con- ditions of this agreement.

   If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par- ticipation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

   The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense. If any well drilled, / reworked, recompleted, sidetracked deepened or plugged back under the provisions of this Article results in a pro- ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1     and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-

2     ties. Upon commencement of operations for the drilling, / reworking, deepening or plugging back of any such well by Consenting Parties

3     in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,

4     and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting

5     Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or

6     market value thereof if such share is not sold, (after deducting production taxes, ~~severance taxes, windfall profit taxes, similar taxes,~~ excise taxes, / royalty, overriding royalty and other in-

7     terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest

8     until it reverts) shall equal the total of the following:

9

10

11

12     (a) ~~100%~~ **200%** of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead

13     connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus / **200%** ~~100%~~ of each such

14     Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-

15     Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-

16     Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting

17     Party had it participated in the well from the beginning of the operations; and

18

19

20

21     (b)   **200** % of that portion of the costs and expenses of drilling, reworking, / deepening, plugging back, testing and completing,

22     after deducting any cash contributions received under Article VIII.C., and   **200** % of that portion of the cost of newly acquired equip-

23     ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had

24     participated therein.

25

26

27

28     An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-

29     working / or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consenting election applied that is

30     conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such

31     reworking / or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well

32     and there shall be added to the sums to be recouped by the Consenting Parties ~~one hundred percent (100%)~~ **two hundred percent (200%)** of that portion of the costs of

33     the reworking / or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If

34     such a reworking / or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-

35     plicable as between said Consenting Parties in said well.

36

37

38

39     During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the

40     proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other

41     taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-

42     ticle III.D.

43

44

45

46     In the case of any reworking, / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free

47     of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon

48     abandonment of a well after such reworking, / plugging back or deeper drilling, the Consenting Parties shall account for all such equip-

49     ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

50

51

52

53     Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the

54     Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an

55     itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its

56     option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-

57     ings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the

58     operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-

59     curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds

60     realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas

61     produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic

62     well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation

63     which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs

64     of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as

65     above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

66

67     *recompleting, sidetracking

68

69

70

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1       If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2  the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3  Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production
4  therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, recompleting, sidetracking / reworking, deepening or plugging
5  back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6  the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

10       Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall
11  be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
12  well conforms to the then-existing well spacing pattern for such source of supply. ; provided that an exceptional well location that is
13  approved by the State Oil and Gas Board of Alabama shall be deemed to conform to the then-existing spacing pattern.

17       The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.
18  except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, recompleting, sidetracking / deepening and plugging back of such initial well
19  after if has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-
20  duction, ceases to produce in paying quantities.

24       3. Stand-By Time:  When a well which has been drilled or deepened has reached its authorized depth and all tests have been
25  completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
26  reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
27  ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
28  first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
29  matical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently
30  withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
31  each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
32  ties.

36       4. Sidetracking:  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
37  also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
38  location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
39  mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
40  affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
41  to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

45       (a)  If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
46  the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

50       (b)  If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
51  salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
52  provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

56       In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
57  shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and
58  receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time
59  incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand
60  by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
61  ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in-
62  stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

66  C.   TAKING PRODUCTION IN KIND:

68       Each party shall have the right to / take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
69  exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for
70  marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any
    party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
continued

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3  Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5  its share of all production.

6

7  In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8  the oil / produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9  the obligation, to purchase such oil / or sell it to others at any time and from time to time, for the account of the non-taking party at the
10  best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the
11  owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil / not previously
12  delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil / shall be only for such reasonable periods of
13  time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14  of one (1) year.

*(interlineations: "and/or gas" above lines 8, 9, 11, 12)*

15

16  In the event one or more parties' separate disposition of its share of the gas causes split-stream / deliveries to separate pipelines and/or
17  deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18  be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19  agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

*(interlineation: "sales or" above line 16)*

20

21  D.  **Access to Contract Area and Information:**

22

23  Each / party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
25  and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with
26  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29  quests the Information.

*(interlineation: "consenting" above line 23)*

30

31  E.  **Abandonment of Wells:**

32

33  1. Abandonment of Dry Holes:  Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35  without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
36  within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37  such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39  such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40  operations in search of oil and/or gas subject to the provisions of Article VI.B.

41

42  2. Abandonment of Wells that have Produced:  Except for any well in which a Non-Consent operation has been conducted
43  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44  producer shall not be plugged and abandoned without the consent of all parties / . If all parties consent to such abandonment, the well shall
45  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
46  thirty (30) days after receipt of notice of the proposed abandonment of any well / , all parties do not agree to the abandonment of such well,
47  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. / Each abandoning party shall assign
50  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52  terval or intervals of the formation or formations then open to production. ~~If the interest of the abandoning party is or includes an oil and~~
53  ~~gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil-and-gas lease, limited to the interval or in-~~
54  ~~tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-~~
55  ~~duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit~~

*(interlineations: line 44 "who have a present working interest in such well"; line 46 "or within forty-eight (48) hours if a drilling rig is on location"; line 49 "Failure to respond to said notice shall constitute an election to plug and abandon said well.")*

56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

- 8 -

## ARTICLE VI
### continued

1  "B".—The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2  assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3  Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4  interests in the remaining portion of the Contract Area.
5
6      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7  the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8  quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9  templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10 well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11 repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12 visions hereof.
13
14      3. Abandonment of Non-Consent Operations:   The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15 Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16 permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17 of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18 VI.E.
19
20                          **ARTICLE VII.**
21                **EXPENDITURES AND LIABILITY OF PARTIES**
22
23 **A.   Liability of Parties:**
24
25      The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26 shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27 among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28 shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.
29
30 **B.   Liens and Payment Defaults:**
31
32      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33 of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34 at the rate provided in Exhibit "C". To the extent that Operator  has a security interest under the Uniform Commercial Code of the
35 state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
36 taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37 rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
38 of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39 the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
40 purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
41 and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.
42
43      ~~If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by~~
44 ~~Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that~~
45 ~~the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain~~
46 ~~reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.~~
47
48 **C.   Payments and Accounting:**
49
50      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
51 and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
52 tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
53 showing expenses incurred and charges and credits made and received.
54
55      Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
56 of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
57 month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
58 with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
59 on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
60 fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
61 due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
62 pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
63
64 **D.   Limitation of Expenditures:**
65
66      1. Drill or Deepen:  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
67 pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
### continued

1  □  *Option No. 1:  All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2  necessary tankage and/or surface facilities.

3

4  ☑  **Option No. 2:  All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5  authorized depth, and all tests have been completed, and the results thereof (including all logs) / furnished to the parties, Operator shall give immediate notice
6  to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have / forty-eight twenty-four (24) hours
7  (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8  tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9  cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10  constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11  elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase / reworking, recompleting, sidetracking / deepening or plugging
12  back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13  than all parties.

14

15  2. Rework or Plug Back:  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16  plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17  include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18  and/or surface facilities.

19

20  3. Other Operations:  Without the consent of all parties, Operator shall not undertake any single project reasonably estimated
21  to require an expenditure in excess of _____ Fifty Thousand and No/100——— Dollars ($ 50,000.00 )
22  except in connection with a well, the drilling, reworking, sidetracking / deepening, completing, recompleting, or plugging back of which has been
23  previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24  emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25  to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26  parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27  an information copy thereof for any single project costing in excess of _____ Ten Thousand and No/100———
28  Dollars ($ 10,000.00 ) but less than the amount first set forth above in this paragraph.

29

30  E.   Rentals, Shut-in Well Payments and Minimum Royalties:

31

32  Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33  party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34  tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35  behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36  failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37  ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38  visions of Article IV.B.2 3.

39

40  Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41  of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42  circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43  Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44  shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

45

46  F.   Taxes:

47

48  Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49  subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50  become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51  be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52  Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53  riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54  owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55  tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56  anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57  value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58  the manner provided in Exhibit "C".

59

60  or Non-Operator
60  If Operator / considers any tax assessment improper, and, in the case of a Non-Operator, if any such Non-Operator timely notifies
61  Operator  in  writing,     Operator  may,     shall  at  its  discretion,  protest  within  the  time  and  manner
62  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
63  mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
64  interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
65  count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
66  provided in Exhibit "C".

67  Operator         on behalf of all parties
67  / Each party shall pay or cause to be paid / all production, severance, excise, gathering and other taxes imposed upon or with respect
68  to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

69

70

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
continued

1  **G.  Insurance:**

3     At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4  the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5  pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
6  also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7  hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8  law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

10     In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11  parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

13                                    **ARTICLE VIII.**
14                    **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

16  A.   Surrender of Leases:

18     The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19  or in part unless all parties consent thereto.

21     However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22  agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23  such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24  thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas in-
25  terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26  such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27  lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all
28  obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29  attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30  duction other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the
31  party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32  ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33  salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest
34  shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

36     Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39  agreement.

41  B.   Renewal or Extension of Leases:

43     If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44  shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the
45  renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46  portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47  interests held at that time by the parties in the Contract Area.

49     If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50  who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51  to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52  Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

54     Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55  by the acquiring party.

57     The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58  or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or
59  contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
60  tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61  the provisions of this agreement.

63     The provisions in this Article shall also be applicable to extensions of oil and gas leases.

65  C.   Acreage or Cash Contributions:

67     While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69  applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the con-
70  tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VIII**
**continued**

1  ~~said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be~~
2  ~~governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions~~
3  ~~it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-~~
4  ~~tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.~~

6  ~~If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such~~
7  ~~consideration shall not be deemed a contribution as contemplated in this Article VIII.C.~~

9  **D.    Maintenance of Uniform Interests:**

11  For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no
12  party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,
13  equipment and production unless such disposition ~~covers either:~~

15  ~~1.    the entire interest of the party in all leases and equipment and production; or~~

17  ~~2.    an equal undivided interest in all leases and equipment and production in the Contract Area.~~

19  ~~Every such sale, encumbrance, transfer or other disposition made by any party~~ shall be made expressly subject to this agreement
20  and shall be made without prejudice to the right of the other parties.  Any extra expenditures incurred as a result or a partial disposition,
21  including any additional marketing or metering expense shall be borne to the party to which such interest in is transferred.

22  ~~If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may~~
23  ~~require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for~~
24  ~~and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such~~
25  ~~party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter~~
26  ~~into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract~~
27  ~~Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.~~  In the event a disposition is made to a third
28  party who, at the time of disposition is in receivership or has filed for or has been petitioned into bankruptcy, the disposing party
29  shall also be liable to the other parties for all amounts accrued for operations in which the disposing party chose to participate under
30  this Agreement, attributable to the disposed interest prior to the effective date of the disposition.

31  **E.    Waiver of Rights to Partition:**

33  If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
34  undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
35  interest therein.

37  ~~F.    Preferential Right to Purchase:~~

39  ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
40  ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
41  ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
42  ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
43  ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
44  ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
45  ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
46  ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
47  ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~

49  **ARTICLE IX.**
50  **INTERNAL REVENUE CODE ELECTION**

52  This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
53  for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
54  and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
55  purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
56  from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as per-
57  mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
58  ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
59  United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
60  and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
61  evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
62  Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
63  action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
64  Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
65  Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is per-
66  mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
67  tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
68  computation of partnership taxable income.

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE X.**

**CLAIMS AND LAWSUITS**

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed   Ten Thousand and No/100 -------------------------------------------------------------------------------------------------   Dollars ($_____10,000.00_____) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

**ARTICLE XI.**

**FORCE MAJEURE**

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

**ARTICLE XII.**

**NOTICES**

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex / or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex / or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

**ARTICLE XIII.**

**TERM OF AGREEMENT**

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☐   Option No. 1: ~~So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.~~

☑   Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____180_____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____180_____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE XIV.**

**COMPLIANCE WITH LAWS AND REGULATIONS**

**A.    Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B.    Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ **Alabama** _____ shall govern.

**C.    Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

**ARTICLE XV.**

**OTHER PROVISIONS**

**(See attached page 14-1 through 14-3)**

**ARTICLE XVI.**
**MISCELLANEOUS**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____July_____ , (year) __2008__.

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____, have been made to the form.~~

O P E R A T O R

**SKLAR EXPLORATION COMPANY, L.L.C.**

_____     David A. Barlow, Chief Operating Officer

_____

N O N - O P E R A T O R S

**SKLARCO L.L.C.**

_____     David A. Barlow, Chief Operating Officer

_____

**COASTAL EXPLORATION, INC.**

_____     Julius M. Ridgway, President

_____

**LUCAS PETROLEUM GROUP, INC.**

_____     Fain Brock, President

_____

**TYLER OIL & GAS, LLC**

_____     HENRY B. TYLER, M.D.

_____

**SELLARS FAMILY TRUST**

_____     William A. Sellars, Trustee

_____

JOSEPH PFLANZER, MD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

CONECUH OIL COMPANY LLC

Scott Hines, Manager

CARL HERRIN OIL AND GAS LLC

Carl Herrin, Member

PAROUS ENERGY, LLC

George S. Dennis, General Partner

VICKERY EXPLORATION, LLC

Jimmy D. Vickery, Manager

EMBAYMENT PRODUCTION, LLC

William B. Ridgway, Jr., Manager

KUDZU OIL PROPERTIES, LLC

Wirt A. Yerger, III

ANSABEN TRUST

David A. Barlow, Trustee

BOBMARY L.C.

Robert Lafargue, Registered Agent / Member

BUNDERO INVESTMENT COMPANY, L.L.C.

Robert P. Bowman, Manager

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

C. Bickham Dickson, III


FANT ENERGY LIMITED


Richard E. Fant, Member


TIEMBO, LTD.


Gary S. Glesby, Registered Agent


MARKSCO, L.L.C.


Mark P. Sealy, Manager


JAMES FLEET HOWELL


TENEXCO, INC.


Richard S. Incandela, President


ROBERT BOURNE


DBC RESOURCES, LP

Print Name:
Title:


DCOD II, LLC

Print Name:
Title:


BOBBY COLEMAN

- 15 -

FOUR D LLC

Print Name: _____
Title:

HARKNESS A. DUNCAN FAMILY TRUST

Print Name: _____
Title:

FIDDLER INVESTMENTS

Print Name: _____
Title:

FRANKS EXPLORATION CO., LLC

Print Name: _____
Title:

GJR INVESTMENTS, INC.

Print Name: _____
Title:

JCE GALBRAITH OIL & GAS, LLC

Print Name: _____
Title:

GASTON OIL COMPANY

Print Name: _____
Title:

DONALD HALL, M.D.

HANSON OPERATING COMPANY, INC.

Print Name: _____
Title:

J & A HARRIS, LP

_____    _____
                                       Print Name:
                                       Title:
_____

_____

HARRIS OIL AND LAND CORPORATION

_____    _____
                                       Print Name:
                                       Title:
_____

HUGHES 2000 LLC

_____    _____
                                       Print Name:
                                       Title:
_____

HUGHES OIL, INC.

_____    _____
                                       Print Name:
                                       Title:
_____

MELVIN J. JOHNSON, M.D.

_____    _____

_____

MARSHA JOHNSON

_____    _____

_____

KMR INVESTMENTS, LLC

_____    _____
                                       Print Name:
                                       Title:
_____

W. D. MOUNGER

_____    _____

_____

PAM-LIN CORPORATION

_____    _____
                                       Print Name:
                                       Title:
_____

PETROLEUM INVESTMENTS, INC.

_____
Print Name:
Title:

_____
DON B. SAUNDERS

SAWYER DRILLING & SERVICE, INC.

_____
Print Name:
Title:

_____
JAMES M. SENEFF, JR.

RYCO EXPLORATION, LLC

_____
Print Name:
Title:

SUGAR OIL PROPERTIES, LP

_____
Print Name:
Title:

_____
LEONARD E. WILLIAMS

_____
EDWARD L. YARBROUGH, JR.

_____
TOM YOUNGBLOOD

AGENT AND NOMINEE FOR THE MIDROC PARTIES

MIDROC OPERATING COMPANY

_____
Donald Clark, President

# ARTICLE XV.

## OTHER PROVISIONS

### A. PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1) an election to perform additional logging, coring or testing;

(2) an election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;

(3) an election to plug back and attempt to complete the well in a shallower depth or formation;

(4) an election to deepen the well to a new objective formation;

(5) an election to sidetrack the well;

(6) an election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;

(7) an election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of a majority in interest (not in number) of the consenting parties, a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth. In such event, the operation, which, in the opinion of said majority in interest is less likely to jeopardize the well, will be given priority. Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail. It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests. For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

### B. HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

### C. DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties. If the parties are equally divided, the opinion of the Operator will prevail.

### D. INDEMNITY

Each Non-Operator shall defend, indemnify and hold Operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operator=s officers, employees and/or agents, resulting from or in any way relating to such officers, employees, and/or agents presence on a drilling rig on the Contract Area or from such person traveling by air or water between any point and such drilling rig, including, without limitation, claims arising out of THE FAULT, LIABILITY, NEGLIGENCE OR GROSS NEGLIGENCE OF OPERATOR. Such indemnity to Operator shall also apply to any other person whose presence on the rig or transportation to or from such rig is at the request of the indemnifying Non-Operator.

### E. SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon any binding determination that any term or other provision is

invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

## F.  NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

## G.  INTERESTS OF THE PARTIES & TITLES

Subject to the provisions of Article XV.H below, the provisions of Article III.B, C and D and Article IV shall apply as between each of the Sklar Parties, or as between each of the Midroc Parties, but as between the Sklar Parties, on one hand, and the Midroc Parties, on the other hand, the provisions set forth in this Article XV.G shall apply.  The Sklar Parties own Oil, Gas And Mineral Lease Nos. 1-4 (hereinafter the "Sklar Lease") described in Exhibit "A-1" to this Operating Agreement.  The Sklar Parties alone shall bear, in proportion to their interest in the Sklar Lease set forth in Exhibit "A" to this Operating Agreement, all burdens, losses and costs attributable to that lease, including, without limitation, the following: (i) all royalties, overriding royalties, production payments or other burdens on production to which the Sklar Lease is subject; (ii) all losses associated with the Sklar Lease, through failure of title or otherwise; and (iii) such costs attributable to the working interest in the Sklar Lease as that lease's share of the costs to drill the Initial Well.  The Midroc Parties own Oil, Gas And Mineral Lease Nos. 5-6 (hereinafter the "Midroc Lease") described in Exhibit "A-1" to this Operating Agreement.  The Midroc Parties alone shall bear, in proportion to their interest in the Midroc Lease set forth in Exhibit "A" to this Operating Agreement, all burdens, losses and costs attributable to that  lease, including, without limitation, the following: (i) all royalties, overriding royalties, production payments or other burdens on production to which the Midroc Lease is  subject; (ii) all losses associated with the Midroc Lease, through failure of title or otherwise; and (iii) such costs attributable to the working interest in the Midroc Lease as that leases' share of the costs to drill the Initial Well.

The Sklar Parties and the Midroc Parties agree to share costs within the Contract Area in the proportion that the interest of each group bears to the total interest of both groups as determined by title examination to the drilling unit for the Initial Well more particularly described as the Northwest Quarter of Section 17, Township 4 North, Range 13 East, Conecuh County, Alabama.  Operator may rely upon said title examination for the purpose of invoicing costs between the Sklar Parties, on one hand, and the Midroc Parties, on the other hand.  Costs attributable to any non-participating oil and gas interest or oil and gas lease shall be carried by the Sklar Parties, on one hand, and the Midroc Parties, on the other hand, in the same proportion.  The voting interest or interest to make other decisions required or permitted by the Non-Operators hereunder shall be allocated between the Sklar Parties, on one hand, and the Midroc Parties, on the other hand, in the same manner.

Nothwithstanding anything herein to the contrary, the Sklar Parties or Operator on their behalf may perform curative work or otherwise protect the Sklar Lease against title loss, and bear no obligation to offer extensions, amendments, renewals, ratifications or other curative instruments relating to the Sklar Lease or lands covered by that lease to the Midroc Parties.  Similarly, the Midroc Parties or Midroc Operating Company on their behalf may perform curative work or otherwise protecting the Midroc Lease against title loss, and bear no obligation to offer extensions, amendments, renewals, ratifications or other curative instruments relating to the Midroc Lease or lands covered by that  lease to the Sklar Parties.

The Sklar Parties shall be entitled, in proportion to their interest in the Sklar Lease set forth in Exhibit "A" and subject to all burdens, the share of the proceeds from the sale of oil and gas produced from the Initial Well or Subsequent Wells drilled and completed hereunder attributable to the Sklar Lease, whereas the Midroc Parties shall be entitled, in proportion to their interest in the Midroc Lease set forth in Exhibit "A" and subject to all burdens, the share of the proceeds from the sale of oil and gas produced from the Initial Well or Subsequent Wells drilled and completed hereunder attributable to the Midroc Lease.  The Sklar Parties and the Midroc Parties agree to share the proceeds from the sale of oil and gas produced from the Initial Well or Subsequent Wells drilled and completed hereunder in the proportion that the interest of each group bears to the total interest of both groups as determined by title examination to the producing unit for such well.  Operator may rely upon said title examination for the purpose of disbursing proceeds between the Sklar Parties, on one hand, and the Midroc Parties, on the other hand.

Midroc Operating Company subscribes to and is a party to this Operating Agreement as agent and nominee for and on behalf of the Midroc Parties.  Operator may invoice Midroc Operating Company, as agent and nominee for the Midroc Parties, all costs attributable to the Midroc Lease and owed by the Midroc Parties.  Operator may also disburse to Midroc Operating Company, as agent and nominee for the Midroc Parties, all proceeds from the sale of oil and gas produced from wells located within the Contract Area attributable to the Midroc Lease, including proceeds attributable to royalties, overriding royalties and working interest under such lease.  Any notice delivered to Midroc Operating Company under this Operating Agreement shall be deemed to be delivered to the Midroc Parties as well.  Midroc Operating Company also agrees to act as agent and nominee with respect to non-consent interest as set forth in Article XV.I of this Operating Agreement.

**H.  PRIOR AGREEMENTS**

The Sklar Parties are also parties to another operating agreement (the "Sklar JOA") by and between Sklar Exploration Company L.L.C., as Operator, and the Sklar Parties, as Non-Operators, covering lands that include, among other lands, the Contract Area of this Operating Agreement.  Likewise, the Midroc Parties are also parties to another operating agreement (the "Midroc JOA") by and between Midroc Operating Company, as Operator, and the Midroc Parties, as Non-Operators covering lands that include, among other lands, the Contract Area of this Operating Agreement.  The Sklar Parties bear no obligations under the Midroc JOA, and the Midroc Parties bear no obligations under the Sklar JOA.  If there is a conflict between this Operating Agreement and a prior operating agreement, then, as between the parties to the prior operating agreement, the prior operating agreement shall govern and prevail.  However, if there is such a conflict, then, in that event, and insofar and only insofar as the Contract Area under this Operating Agreement is concerned, this Operating Agreement, as between the Sklar Parties, on one hand, and the Midroc Parties, on the other hand, shall govern and prevail.

**I.  NON-CONSENT**

All of the Sklar Parties and all of the Midroc Parties have consented to participate in the drilling of the Initial Well pursuant to Article VI.A of this Operating Agreement.  Elections to participate in any subsequent operations under Article VI.B of this Operating Agreement shall be made by Operator on behalf of all of the interest of the Sklar Parties, and by Midroc Operating Company on behalf of all of the interest of the Midroc Parties.  If one or more of the Sklar Parties elects not to participate in a subsequent operation, the non-consent interest shall be assumed by the remaining Sklar Parties pursuant to the terms of the Sklar JOA, whereas if one or more of the Midroc Parties elects not to participate in a subsequent operation, the non-consent interest shall be assumed by the remaining Midroc Parties pursuant to the terms of the Midroc JOA.  The provisions of Article VI.B.2 of this Operating Agreement shall only apply to elections to which either Operator non-consents on behalf of all of the Sklar Parties, or Midroc non-consents on behalf of all of the Midroc Parties.

**J. EXECUTION**

This agreement shall be binding upon each party that executes this agreement without regard to whether this same instrument, or any copy or counterpart hereof shall be executed by any other parties.

**K.  HEADINGS FOR CONVENIENCE**

The headings used in this agreement are inserted for convenience only and shall not be regarded in construing or interpreting this Agreement.

**L.  RELATIONSHIP OF THE PARTIES**

In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's length basis in accordance with their own self interest.

# EXHIBIT "A"

Attached to and made of that certain Operating Agreement dated July 1, 2008, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., et al, as Non-Operators.

(1)  **Identification of lands subject to this agreement:**

## Contract Area

TOWNSHIP 4 NORTH, RANGE 13 EAST
CONECUH COUNTY, ALABAMA

Section 17: Northwest Quarter (NW/4)

And being further described as all lands, oil and gas leasehold interest and oil and gas interests lying within the black boundary as shown on the plat designated as Exhibit "A-2".

(2)  **Restrictions, if any, as to depths, formations, or substances:**

There are no restrictions except as may be provided for in any lease or contract subject to this Operating Agreement.

(3)  **Decimal Interest and names of Parties to this Agreement:**

a.  The following parties (who are sometimes referred to in this Exhibit "A", in the Operating Agreement to which this exhibit is attached and other exhibits thereto as the "Sklar Parties") own Oil, Gas and Mineral Lease Nos. 1-4 in Exhibit "A-1" in the following fractional interests:

| Owners | Interest |
|---|---|
| Sklarco, L.L.C. | 0.50583333 |
| Ansaben Trust | 0.00250000 |
| BobMary L.C. | 0.00500000 |
| Bundero Investment Company, L.L.C. | 0.01000000 |
| C. Bickham Dickson, III | 0.01000000 |
| Fant Energy Limited | 0.10000000 |
| James Fleet Howell | 0.04000000 |
| Marksco, L.L.C. | 0.02000000 |
| Tenexco, Inc. | 0.04000000 |
| Tiembo Ltd. | 0.02000000 |
| Coastal Exploration, Inc. | 0.01000000 |
| Lucas Petroleum Group, Inc. | 0.06666667 |
| Kudzu Oil Properties, LLC | 0.02000000 |
| Tyler Oil and Gas, L.L.C. | 0.00500000 |
| Sellars Family Trust | 0.01000000 |
| Joseph Pflanzer, MD | 0.01000000 |
| Conecuh Oil Company LLC | 0.03125000 |
| Carl Herrin Oil and Gas LLC | 0.04687500 |
| Parous Energy, LLC. | 0.02187500 |
| Vickery Exploration, LLC | 0.01000000 |
| Embayment Production, LLC | 0.01500000 |
| TOTAL FOR LEASES NOS. 1-4 | 1.00000000 |

b.  The following parties (who are sometimes referred to in this Exhibit "A", in the Operating Agreement to which this exhibit is attached and other exhibits thereto as the "Midroc Parties") own Oil, Gas and Mineral Lease Nos. 5-6 in Exhibit "A-1" in the following fractional interests:

| Owners | Interest |
|---|---|
| Robert Bourne | 0.0040000 |
| DBC Resources, LP | 0.0779700 |
| DCOD II, L.L.C. | 0.0637500 |
| Bobby Coleman | 0.0100000 |
| Four D LLC | 0.0080000 |
| Harkness A. Duncan Family Trust | 0.0080000 |
| Fiddler Investments | 0.0212500 |
| Franks Exploration Company, LLC | 0.0980000 |
| GJR Investments, Inc. | 0.0080000 |
| JCE Glabraith Oil & Gas, LLC | 0.0100000 |
| Gaston Oil Company, Inc. | 0.0225000 |
| Dr. Donald Hall | 0.0200000 |
| Hanson Operating Company, Inc. | 0.0800000 |
| J & A Harris LP | 0.0859700 |
| Harris Oil and Land Corporation | 0.0125000 |
| Hughes 2000 LLC | 0.1470000 |
| HughesOil, Inc. | 0.1470000 |
| Dr. Melvin J. and Marsha Johnson | 0.0080000 |
| KMR Investments, LLC | 0.0294000 |
| W. D. Mounger | 0.0100000 |
| Pam-Lin Corporation | 0.0150000 |
| Petroleum Investments, Inc. | 0.0100000 |
| Don B. Saunders | 0.0080000 |
| Sawyer Drilling & Service Inc. | 0.0200000 |
| James M. Seneff, Jr. | 0.0040000 |
| RYCO Exploration, LLC | 0.0116600 |
| Sugar Oil Properties, LP | 0.0300000 |
| Leonard E. Williams | 0.0080000 |
| Edward L. Yarborough, Jr. | 0.0020000 |
| Tom Youngblood | 0.0200000 |
| TOTAL FOR LEASE NOS. 5-6 | 1.0000000 |

(4)  Oil and gas lease and/or oil and gas interests subject to this agreement:

See Exhibit "A-1" Description of Leases.

(5)  Addresses of parties for notice purposes:

Sklar Exploration Company L.L.C.
401 Edwards St., Suite 1601
Shreveport, LA 71101

Sklarco L.L.C.
401 Edwards St., Suite 1601
Shreveport, LA 71101

Coastal Exploration, Inc.
P.O. Box 16667
Jackson, MS 39236

Lucas Petroleum Group, Inc.
2303 Rio Grande Street
Austin, TX 78705-5147

Kudzu Oil Properties, LLC
P.O. Box 16910
Jackson, MS 39236

Tyler Oil and Gas, L.L.C.
137 Bridgewater Crossing
Ridgeland, MS 39157

Ansaben Trust
David A. Barlow, Trustee
627 Oneonta Street
Shreveport, LA 71106

Sellars Family Trust
William A. Sellars, Trustee
2801 Bolton Boone, Suite 101
DeSoto, TX 75115

Joseph Pflanzer, MD
2801 Bolton Boone, Suite 101
DeSoto, TX 75115

Carl Herrin Oil and Gas LLC
P.O. Box 329
Jackson, MS 39205

BobMary L.C.
5928 East Ridge Drive
Shreveport, LA 71106

Vickery Exploration, LLC
106 Oak Wood Drive
Raymond, MS 39154

C. Bickham Dickson, III
333 Texas Street, Suite 1050
Shreveport, LA 71101

James Fleet Howell
416 Travis Street, Suite 715
Shreveport, LA 71101

Tenexco, Inc.
414 N. Clinton, Suite 106
River Forest, IL 60305

Robert Bourne
450 S. Orange Ave., 10th Floor
Orlando, Florida 32801

DCOD II, L.L.C.
16250 Dallas North Parkway
Dallas, Texas 75248

Four D LLC
P. O. Box 2444
Durango, CO 81302

Fiddler Investments
4601 Langland Rd., Suite 107
Dallas, Texas 75244

GJR Investments, Inc.
100 S. Eola Dr., PH115
Orlando, FL 32801

Gaston Oil Company
9306 Milbank Drive
Shreveport, Louisiana 71115

Hanson Operating Co., Inc.
P. O. Box 1515
Roswell, NM 88202-1515

Conecuh Oil Company LLC
P.O. Box 3216
Ridgeland, MS 39158

Parous Energy, LLC
P.O. Box 1823
Jackson, MS 39215

Bundero Investment Company, L.L.C.
333 Texas Street, Suite 300
Shreveport, LA 71101

Embayment Production LLC
P.O. Box 187
Jackson, MS 39205-0187

Fant Energy Limited
5800 Westview Drive
Houston, TX 77055

Marksco, LLC
333 Texas Street, Suite 1050
Shreveport, LA 71101

Tiembo, Ltd.
P.O. Box 270415
Houston, TX 77277-0415

DBC Resources, LP
P. O. Box 191407
Dallas, TX 75219-1407

Bobby Coleman
4600 Greenville Ave., Suite 300
Dallas, TX 75206

Harkness A. Duncan Family Trust
706 Turnbull Ave., Suite 104
Altamonte Springs, FL 32701

Franks Exploration Co., LLC
P. O. Box 7665
Shreveport, LA 71137-7665

JCE Galbraith Oil & Gas, LLC
2032 Alameda Avenue
Orlando, FL 32804

Dr. Donald Hall
4913 Oak Point Drive
Shreveport, LA 71107

J & A Harris, LP
333 Texas St. Suite 1414
Shreveport, LA 71101-3679

Harris Oil and Land Corporation
333 Texas Street, Suite 1414
Shreveport, Louisiana 71101-3679

Hughes Oil, Inc.
2829 Lakeland Dr., Suite 1670
Flowood, MS 39232

KMR Investments, LLC
P.O. Box 417
Homer, LA 71040

Pam-Lin Corporation
P.O. Box 191407
Dallas, TX 75219-1407

Don B. Saunders
1721 Spring Lake Drive
Orlando, FL 32804

James M. Seneff, Jr.
450 S. Orange Ave., 10th Floor
Orlando, FL 32801

Sugar Oil Properties, LP
625 Market St., Suite 100
Shreveport, LA 71101

Edward L. Yarbrough, Jr.
P.O. Box 11
Belcher, LA 71004

Midroc Operating Company
P.O. Box 191407
Dallas, TX 75219-1407

Hughes 2000 LLC
2829 Lakeland Dr., Suite 1670
Flowood, MS 39232

Dr. Melvin J. and Marsha Johnson
1558 Waterwitch Drive
Orlando, FL 32806

W. D. Mounger
200 E. Capitol St., Suite 1601
Jackson, MS 39201

Petroleum Investments, Inc.
416 Travis St., Suite 612
Shreveport, LA 71101-5584

Sawyer Drilling & Service, Inc.
P.O. Box 5275
Bossier City, LA 71171-5275

RYCO Exploration, LLC
333 Texas St., Suite 1414
Shreveport, LA 71101-3679

Leonard E. Williams
2518 Norfolk Road
Orlando, FL 32803

Tom Youngblood
P.O. Box 5926
Shreveport, LA 71135-5926

**EXHIBIT "A-1"**

Attached to and made a part of that certain Operating Agreement dated July 1, 2008, between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., et al, as Non-Operators.

## DESCRIPTION OF OIL AND GAS LEASES

1. Oil, Gas and Mineral Lease dated April 28, 2004, by and between Mary Horton Mack, represented herein by, Mary Ann Mack, her Attorney in Fact, as Lessor, and Craft Exploration Company, LLC, as Lessee, recorded in Book 2004, Page 2217 of the Probate Judge Records of Conecuh County, Alabama, extended in accordance to the terms of said oil, gas and mineral lease, the Notice of Exercise of Option to Extend Primary Term of Oil, Gas and Mineral Lease dated May 8, 2006, recorded in Book 2006, Page 1365 of the Probate Judge Records of Conecuh County, Alabama.

2. Oil, Gas and Mineral Lease dated May 24, 2004, by and between Ruby Nell Taylor, as Lessor, and Craft Exploration Company, LLC, as Lessee, recorded in Book 2004, Page 2294 of the Probate Judge Records of Conecuh County, Alabama.

3. Oil, Gas and Mineral Lease dated May 20, 2004, by and between Edgar C. McCreary and Annie Ruth McCreary, as Lessor, and Craft Exploration Company, LLC, as Lessee, recorded in Book 2004, Page 2231 of the Probate Judge Records of Conecuh County, Alabama.

4. Oil, Gas and Mineral Lease dated May 21, 2004, by and between Scott Ellis Matthews and Charlotte S. Matthews, as Lessor, and Craft Exploration Company, LLC, as Lessee, recorded in Book 2004, Page 2225 of the Probate Judge Records of Conecuh County, Alabama.

5. Oil, Gas and Mineral Lease dated December 27, 2006, by and between Ed Leigh McMillan, et al, as Lessor, and Midroc Operating Company, as Lessee, the existence of which is set forth by that Memorandum of Oil and Gas Lease recorded in Book 2007, Page 174 of the Probate Judge Records of Conecuh County, Alabama.

6. Oil, Gas and Mineral Lease dated December 27, 2006, by and between Elvira M. Tate, as Lessor, and Midroc Operating Company, as Lessee, the existence of which is set forth by that Memorandum of Oil and Gas Lease recorded in Book 2007, Page 177 of the Probate Judge Records of Conecuh County, Alabama.

**INSOFAR AND ONLY INSOFAR AS SAID OIL, GAS AND MINERAL LEASES COVER ACREAGE LYING WITHIN THE NORTHWEST QUARTER (NW/4) OF SECTION 17, TOWNSHIP 4 NORTH, RANGE 13 EAST, CONECUH COUNTY, ALABAMA.**

EXHIBIT A-2

Attached to and made a part of that Operating Agreement dated July 1, 2008,
by and between SKLAR EXPLORATION COMPANY L.L.C., as Operator,
and SKLARCO L.L.C., et al as Non-Operators.

## NORTHWEST QUARTER (NW/4)
### SECTION 17, TOWNSHIP 4 NORTH, RANGE 13 EAST
### CONECUH COUNTY, ALABAMA



With Pooling Provision
Mississippi - Alabama Form
(3-14)

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of _____ 20 _____, between

_____

_____

_____

_____

lessor (whether one or more), whose address is: _____

and _____, lessee, WITNESSETH:

1. Lessor, in consideration of _____ Dollars, receipt of which is hereby acknowledged, and of the covenants and agreements of lessee hereinafter contained, does hereby grant, lease and let unto lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas, sulphur and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, telephone lines, employee houses and other structures on said land, necessary or useful in lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any other land adjacent thereto. The land covered hereby, herein called "said land," is located in the

County of _____, State of _____, and is described as follows:

This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain _____ acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights, and options hereunder.

2. Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of ten (10) years from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3. As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipe line to which lessee may connect its wells, the equal one-eighth part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such one-eighth part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear one-eighth of the cost of treating oil to render it marketable pipe line oil; (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, one-eighth of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of one-eighth of such gas and casinghead gas; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one-tenth either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing gas or any other mineral covered hereby, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this sub-paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, or may be deposited to such parties credit in the _____

_____ Bank

at _____, or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownerships thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4. Lessee is hereby granted the right, at its option, to pool or unitize all or any part of said land and of this lease as to any or all minerals or horizons thereunder, with other lands, lease or leases, or portion or portions thereof, or mineral or horizon thereunder, so as to establish units containing not more than 80 surface acres plus 10% acreage tolerance; provided, however, a unit may be established or an existing unit may be enlarged to contain not more than 640 acres plus 10% acreage tolerance, if unitized only as to gas or only as to gas and liquid hydrocarbons (condensate) which are not a liquid in the subsurface reservoir. If larger units are required, under any governmental rule or order, for the drilling or operation of a well at a regular location, or for obtaining maximum allowable, from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged, to conform to the size required by such governmental order or rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of said options may be exercised by lessee from time to time, and whether before or after production has been established either on said land or on the portion of said land included in the unit or on other land unitized therewith and any such unit may include any well to be drilled, being drilled or already completed. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be land or mineral, royalty or leasehold interests in land within the unit which are not pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted upon this lease. There shall be allocated to the land covered by this lease included in any such unit that proportion of the total production of unitized minerals from wells in the unit, after deducting any used in lease or unit operations, which the number of surface acres in the land covered by this lease included in the unit bears to the total number of surface acres in the unit. The production so allocated shall be considered for all purposes, including the payment or delivery of royalty, over-riding royalty, and any other payments out of production, to be the entire production of unitized minerals from the portion of said land covered hereby and included in such unit in the same manner as though produced from said land under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of such unit shall not have the effect of changing the ownership of any shut-in production royalty which may become payable under this lease. Neither shall it impair the right of lessee to release from this lease all or any portion of said land, except that lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are released and to lands within the unit. Lessee may dissolve any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. A unit may be so established, modified or dissolved during the life of this lease.

5. Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations as to the released acreage or interest.

6. This is a PAID-UP LEASE. In consideration of the down cash payment, Lessor agrees that Lessee shall not be obligated except as otherwise provided herein, to commence or continue any operations during the primary term. Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

7. Lessee shall have the use, free from royalty, of water, other than from lessor's water wells, and of oil and gas produced from said land in all operations hereunder. Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing. No well shall be drilled nearer than 200 feet to the house or barn now on said land without the consent of the lessor. Lessee shall pay for damages caused by its operations to growing crops and timber on said land.

8. The rights and estate of any party hereto may be assigned from time to time in whole or in part and as to any mineral or horizon. All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns. No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of lessee, including, but not limited to, the location and drilling of wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof of or to lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by lessor or lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of the death of the owner, lessee may, nevertheless, pay or tender such royalties, or other moneys, or part thereof, to the credit of the decedent in a depository bank provided for above.

9. In the event lessor considers that lessee has not complied with all its obligations hereunder, both express and implied, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor. The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee. Neither the service of said notice nor the doing of any act by lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that lessee has failed to perform all its obligations hereunder. Should it be asserted in any notice given to the lessee under the provisions of this paragraph that lessee has failed to comply with any implied obligation or covenant hereof, this lease shall not be subject to cancellation for any such cause except after final judicial ascertainment that such failure exists and lessee has then been afforded a reasonable time to prevent cancellation by complying with and 'discharging its obligations as to which lessee has been judicially determined to be in default. If this lease is cancelled for any cause, it shall nevertheless remain in force and effect as to (1) sufficient acreage around each well as to which there are operations to constitute a drilling or maximum allowable unit under applicable governmental regulations, (but in no event less than forty acres), such acreage to be designated by lessee as nearly as practicable in the form of a square centered at the well, or in such shape as then existing spacing rules require; and (2) any part of said land included in a pooled unit on which there are operations. Lessee shall also have such easements on said land as are necessary to operations on the acreage so retained.

10. Lessor hereby warrants and agrees to defend title to said land against the claims of all persons whomsoever. Lessor's rights and interests hereunder shall be charged primarily with any mortgages, taxes or other liens, or interest and other charges on said land, but lessor agrees that lessee shall have the right at any time to pay or reduce same for lessor, either before or after maturity, and be subrogated to the rights of the holder thereof and to deduct amounts so paid from royalties or other payments payable or which may become payable to lessor and/or assigns under this lease. Lessee is hereby given the right to acquire for its own benefit, deeds, leases, or assignments covering any interest or claim in said land which lessee or any other party contends is outstanding and not covered hereby and even though such outstanding interest or claim be invalid or adverse to lessor. If this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether lessor's interest is herein specified or not), or no interest therein, then the royalties, and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by lessor) shall be paid out of the royalty herein provided. This lease shall be binding upon each party who executes it without regard to whether it is executed by all those named herein as lessor.

11. If, while this lease is in force, at, or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and lessee is not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delay had not occurred.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

_____     (SEAL)

_____     (SEAL)

_____     (SEAL)

_____     (SEAL)

**JOINT OR SINGLE ACKNOWLEDGMENT**
**(MISSISSIPPI-ALABAMA-FLORIDA)**

STATE OF _____

COUNTY OF _____

I hereby certify, that on this day, before me, a _____

duly authorized in the state and county aforesaid to take acknowledgments, personally appeared _____

to me known to be the person _____ described in and who executed the foregoing instrument and _____ he _____

acknowledged before me that, being informed of the contents of the same, _____ he _____ voluntarily signed and delivered the within and foregoing instrument on the day and year therein mentioned.

Given under my hand and official seal, this _____ day of _____ 20 _____

(Affix Seal)

_____
(Title of Official)

My commission expires _____     in and for _____ County, _____

**WITNESS ACKNOWLEDGMENT**
**(MISSISSIPPI-ALABAMA-FLORIDA)**

STATE OF _____

COUNTY OF _____

I, _____ in and for the aforesaid jurisdiction, hereby certify that _____

a subscribing witness to the foregoing instrument, known to me, appeared before me on this day, and being sworn, stated that _____

the grantor(s), having been informed of the contents thereof, voluntarily executed and delivered the same in his presence, and in the presence of the other subscribing witness, on the day the same bears date; that he attested the same in the presence of the grantor(s), and of the other witness, and that such other witness subscribed his name as a witness in his presence.

_____
(Subscribing Witness)

Given under my hand and official seal, this _____ day of _____, A.D., 20 _____

(Affix Seal)

_____
(Title of Official)

My commission expires _____     in and for _____ County, _____

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

# EXHIBIT  "C"

**Attached to and made a part of that certain Operating Agreement dated July 1, 2008, by
and between SKLAR EXPLORATION COMPANY L.L.C. as Operator, and SKLARCO L.L.C., et al, as
Non-Operators.**

## ACCOUNTING PROCEDURE

## JOINT OPERATIONS

### I. GENERAL PROVISIONS

1.     **Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure
is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and
maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint
Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct
supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating
capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other
professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and
problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as
most recently recommended by the Council or Petroleum Accountants Societies.

2.     **Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint
Account for the preceding month. Such bills will be accompanied by statements which identify the authority for
expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and
expense except that items of Controllable Material and unusual charges and credits shall be separately identified and
fully described in detail.

3.     **Advances and Payments by Non-Operators**

A.     Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their
share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the
billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust
each monthly billing to reflect advances received from the Non-Operators.

B.     Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made
within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at   CHASE BANK NA, or successors
on the first day of the month in which delinquency occurs plus 1% or the
maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located,
whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid
amounts.

4.     **Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof;
provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall
conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar
year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes
claim on Operator for adjustment.  No adjustment favorable to Operator shall be made unless it is made within the same
prescribed period.  The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of
Controllable Material as provided for in Section V.

**COPYRIGHT  ©  1985  by  the  Council  of  Petroleum  Accountants  Societies.**

Case:20-12377-MER   Doc#:248-5   Filed:05/07/20   Entered:05/07/20 21:11:17   Page36 of 46

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

5.  **Audits**

   A.  A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

   B.  ~~The Operator shall reply in writing to an audit report within 180 days after receipt of such report.~~

6.  **Approval By Non-Operators**

   Where an approval or agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II.  DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.  **Ecological and Environmental**

   Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2.  **Rentals and Royalties**

   Lease rentals and royalties paid by Operator for the Joint Operations.

3.  **Labor**

   A.  (1)  Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

      (2)  Salaries of First level Supervisors in the field.

      (3)  Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

      (4)  Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation on the Joint Property if such charges are excluded from the overhead rates.

   B.  Operator's cost of ~~holiday, vacation, sickness and disability benefits and other customary allowances paid~~ to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

   C.  Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

   D.  Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4.  **Employee Benefits**

   ~~Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.~~

5.  **Material**

   Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV.  Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6.  **Transportation**

   Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

   A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material

COPAS

is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

    B.   If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

    C.   In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

**7.    Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III.   The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

**8.    Equipment and Facilities Furnished By Operator**

    A.   Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed ____eight____ percent ( ___8.0%___ ) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

    B.   In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%.   For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

**9.    Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

**10.    Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

**11.    Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

**12.    Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**13.    Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

**14.    Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property.   In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

**15.    Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

**1.    Overhead - Drilling and Producing Operations**

i.    As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( x ) Fixed Rate Basis, Paragraph 1A, or
(    ) Percentage Basis, Paragraph 1B

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II.   The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii.   The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property

(    ) shall be covered by the overhead rates, or
( x ) shall not be covered by the overhead rates.

iii.  The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

(    ) shall be covered by the overhead rates, or
( X ) shall not be covered by the overhead rates.

A.    Overhead - Fixed Rate Basis

(1)    Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $_____7,411.61_____
(Prorated for less than a full month)

Producing Well Rate $_____741.16_____

(2)    Application of Overhead - Fixed Rate Basis shall be as follows:

(a)    Drilling Well Rate

(1)    Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever is later, except that no charge shall be made during suspension of drilling or completion   operations   for fifteen (15) or more consecutive calendar days

(2)    Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b)    Producing Well Rates

(1)    An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2)    Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3)    An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4)    A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5)    All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3)    The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached.    The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

- 4 -

B.  (1) Overhead - Percentage Basis :

Operator shall charge the Joint Account at the following rates:

(a) Development

_____ Percent (_____%) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b) Operating

_____ Percent (_____%) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

**2.  Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of $_____:

A.  ____5____ % of first $100,000 or total cost if less, plus

B.  ____2____ % of costs in excess of $100,000 but less than $1,000,000, plus

C.  ____1____ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

**3.  Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophe as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A.  ____5____ % of total costs through $100,000; plus

B.  ____2____ % of total costs in excess of $100,000 but less than $1,000,000; plus

C.  ____1____ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

**4.  Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

**IV.  PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS**

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

**1.  Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

- 5 -

COPAS 1984 ONSHORE
Adopted by the Council
of Petroleum Accountants
Societies

COPAS

2.    **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.    New Material (Condition A)

    (1)    Tubular Goods Other than Line Pipe

        (a)    Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

        (b)    For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

        (c)    Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

        (d)    Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

    (2)    Line Pipe

        (a)    Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(l)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

        (b)    Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

        (c)    Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

        (d)    Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

    (3)    Other Material shall be priced at the current market price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

    (4)    Unused new Material, except used tubular goods, moved from the Joint Property shall be priced at the current market price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(l) and (2).

B.    Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

    (1)    Material moved to the Joint Property

    At seventy-five percent (75%) of current market price, as determined by Paragraph A.

    (2)    Material used on and moved from the Joint Property

        (a)    At seventy-five percent (75%) of current martket price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

        (b)    At sixty-five percent (65%) of current market price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material

    (3)    Material not used on and moved from the Joint Property

    At seventy-five percent (75%) of current market price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

- 6 -

COPAS

C. Other Used Material

    (1) Condition C

        Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current / new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

    (2) Condition D

        Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

        (a) Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

        (b) Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

    (3) Condition E

        Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D. Obsolete Material

    Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

    (1) Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

    (2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. **Premium Price**

    Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. **Warranty of Material Furnished By Operator**

    Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**

    At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**

    Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

- 7 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

3.   **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.   **Expense of Conducting Inventories**

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

EXHIBIT "D"

**Attached to and made a part of that certain Operating Agreement dated effective July 1, 2008 by and between Sklar Exploration Company, LLC, as Operator, and Sklarco L.L.C., et al., as Non-Operators.**

## INSURANCE PROVISIONS

### SCHEDULE OF INSURANCE TO BE CARRIED

| Type of coverage: | | Limits: |
|---|---|---|
| (a) | Workman's Compensation | Statutory |
| | | |
| (b) | Employer's Liability | |
| | Bodily Injury (each accident) | $  500,000.00 |
| | Occupational Disease (policy limit) | $  500,000.00 |
| | Occupational Disease (each employee) | $  500,000.00 |
| | | |
| (c) | Commercial General Liability | |
| | General Aggregate | $1,000,000.00 |
| | Products-Completed Operations Aggregate | $1,000,000.00 |
| | Personal & Advertising Injury | $1,000,000.00 |
| | Each Occurrence | $1,000,000.00 |
| | Medical Expense (any one person) | $      5,000.00 |
| | | |
| (d) | Excess Liability | |
| | Each Occurrence | $5,000,000.00 |
| | Aggregate | $5,000,000.00 |
| | | |
| (e) | Comprehensive Automobile Liability | $1,000,000.00 |
| | | |
| (f) | Operator's Extra Expense | |
| | Aggregate | $5,000,000.00 |
| | Retention | $  500,000.00 |

Operator, at his election, may carry, for the benefit of the Joint Account, umbrella coverage which shall be in excess of the primary amounts listed above. In no event, however, shall operator carry umbrella coverage in excess of $10,000,000. All premiums paid on the insurance listed above may, at Operator's disrection, be charged to the Joint Account.

In lieu of the Operator's insurance provided for herein, Non-Operators may elect to provide their own Umbrella Liability Coverage and Cost of Well Control Insurance. Non-Operators shall evidence such an election by providing Operator with Certificates of Insurance at Operator's request.

All losses not covered by standard form policies of insurance for hazards as set out above, shall be borne by the parties hereto as their interest may appear at the same time of loss.

Operator shall not be liable to Non-Operators for loss suffered on account of the insufficiency of insurance carried, or of the Insurer with whom carried.

## EXHIBIT "E"

Attached to and made a part of that certain Operating Agreement dated July 1, 2008 by and between Sklar Exploration Company L.L.C., and Sklarco L.L.C., et al., as Non-Operators.

## GAS BALANCING AGREEMENT

The parties hereto recognize that the taking or marketing of gas by the respective parties may occur at different times or may result in imbalances in accordance with each party's ownership interest therein, and the following terms and provisions shall be applicable and effective at any time and at all times that any of the parties hereto is not taking or marketing one hundred percent (100%) of its share of the gas produced, or a purchaser of gas from any party is not taking such party's full share of the gas produced (hereinafter referred to as an "underproducing party"), or so long as any of the parties is in an underproduced position..

I.

During any period when there are one or more underproducing parties, the other parties shall be entitled to produce one hundred percent (100%) of the allowable gas production assigned by a governmental regulatory body having jurisdiction or produce such gas at the maximum efficient rate in the absence of regulation, and to any sales proceeds therefrom. Such other parties shall be entitled to take or market all of the gas produced during such period. Parties who take or market more than their working interest share of the gas during any month are hereinafter referred to as "overproducing parties". All underproducing and overproducing parties shall share in and own the proceeds attributable to the liquid hydrocarbons recovered by lease equipment from such gas in accordance with their respective interest and subject to the Operating Agreement to which this Agreement is attached. However, the overproducing parties shall own and have title to such residual gas and any and all liquid hydrocarbons recovered downstream of such lease equipment.

In order for the Operator to develop and maintain current the MMBTU volume and value imbalance account contemplated by this Agreement, each month in which an MMBTU imbalance is created, each and every overproducing party taking or marketing its share of the gas in-kind hereby agrees to and shall provide Operator with a statement itemizing for its account (i) the total MMBTU volume of gas taken and not marketed, and taken and marketed, (ii) an estimate of the value (if any) of all such gas taken but not marketed, and (iii) the Net Amount Realized (as hereinafter defined) for all such gas taken and marketed, for the applicable production month. Such statements shall be provided to Operator in writing no later than sixty (60) days following the end of the applicable production month. Such statements shall not be required from overproducing parties for any month(s) in which such parties' gas is being taken or marketed by Operator.

For the purposes of maintaining the value of each underproduced party's imbalance account, Operator shall determine and proportionately apply to each MMBTU of underproduced gas each month, a weighted average net price per MMBTU for each MMBTU of gas taken or marketed by each overproducing party during the applicable month. Such weighted average net price shall be equal to the sum of the estimated value and the Net Amount Realized by such overproducing party, divided by the total MMBTU volume of gas allocated to such overproducing party's account for such month. The Net Amount Realized by an overproducing party during any given month shall be equal to the total proceeds actually received by such party for gas (and when applicable, liquid hydrocarbons) sold for its account during such month, less any and all costs paid by such party in marketing or selling its gas (and liquid hydrocarbons when applicable) which reduces the amount actually realized by such party for such sales, including but not limited to capital amortization, operating, treating, processing, gathering, compression, dehydration, transportation and other such costs. Operator shall be entitled to rely on all of the information provided to it by each and every overproducing party and all purchasers of gas, and shall not be held accountable or liable for maintaining the imbalance value of any underproduced MMBTU volumes for any month(s) for which it does not have or is not provided, the information necessary to determine such value. Nevertheless, Operator shall endeavor to maintain the MMBTU volume (but not value) imbalance account for all parties for such month(s), based on information it has received or had access to, such as pipeline volume allocation statements.

II.

On a cumulative basis, each underproducing party shall be credited each calendar month with an MMBTU volume of gas in storage equal to its full share of the MMBTU of gas actually produced from the applicable unit during such month, less its share of MMBTU of gas used in lease operations, vented or lost, and less that MMBTU portion such party took and/or marketed during such month. The Operator under said Operating Agreement will establish and maintain current, an MMBTU gas volume account to show the MMBTU gas imbalance which exists between all the parties and will furnish each of these parties a monthly statement showing the total MMBTU quantity of gas produced, the amount used in lease operations, vented or lost, the total quantity of gas taken or delivered to market for the account of each party (including any in-kind make-up volumes), and the monthly and cumulative over and under account of each party, all on an MMBTU basis. Subject to the other provisions hereof, the Operator shall be responsible for determining the final MMBTU volume accounting of the underproduction and overproduction on a unit by unit basis. To the extent the Operator has been timely and properly informed of the estimated value and Net Amounts Realized by each and every overproduced party taking and/or marketing its share of the gas as described above, and of the volumes taken and amounts paid by the applicable purchasers of gas, Operator shall also be responsible for determining and maintaining current the value of each underproduced account and the amounts due to be paid to, or by, each party upon final settlement.

III.

Each party agrees to indemnify and hold each and every other party harmless from any and all claims for royalty payments asserted by royalty owners to whom each indemnifying party is accountable. The term "royalty owner" shall include owners of royalty, overriding royalties, productions payments, reversionary interests and similar interests.

IV.

If an underproduced party desires to take make-up gas in-kind, at least fifteen (15) days prior to the beginning of a calendar month, said party shall give written notice to the Operator and all other parties and such party may begin the next month taking or marketing its full share of the gas produced, less such party's share of gas used in operations, vented or lost. In addition to such share, each underproduced party, until it has recovered it's MMBTU of gas in storage and balanced the gas account as to its interest shall also be entitled to take or market all or part of the following amounts of make-up gas:

(a)  If any other party is not then taking or marketing its full share of the gas, the amount of gas not being taken or marketed by such underproducing party; plus

(b)  Up to fifty percent (50%) of the interest in the then current gas production of each and every overproduced party until the gas account of each such overproduced party is balanced.

(c)  Notwithstanding anything to the contrary herein no party shall be allowed to make up any of its underproduced gas in-kind during the calendar months of November, December, January or February, regardless of which calendar month(s) the underproduction occurred.

All such make-up gas taken or marketed in-kind by an underproduced party at any time and from time to time shall first be deemed taken or marketed from any amount available under Subsection IV.(a) above; and, provided further, that if more than one underproduced party desires to take or market make-up gas in-kind, each such party shall be entitled to take or market that portion of available make-up gas represented by the total of Subsection (a) and (b) above, determined by multiplying such available make-up amount by a fraction, the numerator of which is the then current working interest of such party in the applicable unit and the denominator of which is the sum of the then current working interests of all underproduced parties desiring to so take or market such available make-up gas in-kind in the applicable unit.

V.

Each party producing and taking or marketing gas shall pay any and all production taxes and royalty due on such gas.

VI.

Nothing herein contained shall be construed as denying any party the right, from time to time, to produce and take or deliver to its purchaser its working interest share of gas production to meet the deliverability tests required by its purchaser.

VII.

In the event production of gas is permanently discontinued or ceases for 12 consecutive months before the MMBTU gas imbalance account for all parties is balanced, Operator will provide all parties with written notice thereof together with the then current MMBTU volume and value imbalance account statement. A financial settlement will then be made between the under produced and overproduced parties as to the then existing imbalance within sixty (60) days of such notice. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties based on the value and proceeds received by the overproduced party or parties from overproduction, which proceeds are not

subject to refund in whole or in part.  Such sum shall be less applicable royalty, taxes, reversionary interests and similar lease burdens and other costs actually incurred and theretofore paid by the applicable overproduced party or parties and shall be based on the weighted average net price actually received by the overproduced party at the time the overproduced party took or marketed that portion of production that was attributable to the share of the underproduced party as described in Section I. and reflected in Operator's imbalance statements.

Notwithstanding the foregoing, should the underproduced party elect to receive any sums of money which are subject to refund, it shall be entitled to the payment thereof from the overproduced party or parties upon the underproduced party executing and delivering to said overproduced party or parties a letter, in which the underproduced party agrees to timely repay to the overproduced party or parties that amount so said that is ultimately required to be refunded.  For the purposes of this Agreement, the in-kind make-up of gas by any underproduced party at any time and from time to time, shall be considered and reflected by Operator in its imbalance statements as make-up of the gas first chronologically stored for the account of such underproduced party.

Upon providing notice to all parties that the production of gas from a given unit has permanently discontinued or ceased for 12 consecutive months together with the then current MMBTU volume and value imbalance account provided for herein, Operator shall have completed and satisfied all of its obligations and liabilities hereunder.  Operator shall not be responsible for initiating, negotiating, or concluding a financial settlement between any under and over produced parties hereto and each party shall indemnify and hold harmless Operator from any and all claims, suits and other causes of action for damages or other losses arising from or related to the accuracy or completeness of said MMBTU volume and value imbalance account, and the timing, amount, accuracy or other provisions of any financial settlements arising from or related to such imbalance account, except as may result from Operator's gross negligence or willful misconduct.

VIII.

Nothing herein contained shall change or affect the obligations of each party to bear or pay its proportionate share of all costs, expenses, and liabilities as provided in the Operating Agreement.

IX.

This Agreement shall become effective in accordance with its terms and shall remain in force and effect for the longer of the effective term of the Operating Agreement to which it is attached is in effect, or so long as there remains an unbalanced or unsettled  imbalance account hereunder.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, their heirs, successors, legal representatives and assigns.

X.

If any party sells or assigns an interest in the working interest in the land owned by it when such party is an underproduced party, the sale or assignment shall include all interest of the selling or assigning party in the underproduced gas, all right to take make-up gas in-kind and all right to any money payment which may ultimately be due hereunder, in the absence of specific provision in the assignment instrument otherwise.

XI.

If any situation arises in which there exists an imbalance of gas in a given unit, Operator shall make a reasonable effort to determine the point in time when an overproduced party has taken one hundred percent (100%) of its working interest share of the estimated gas reserves attributable to such unit.  Operator shall be entitled to rely on its own or third party estimates of gas reserves for such purposes.  Upon notice by Operator to such party that it believes that such point in time has been reached, Operator shall be entitled to and shall suspend the delivery and allocation of  gas to such overproduced party and each underproduced party shall be entitled to take its proportionate share of such overproduced party's production in such unit until recovery of its cumulative underproduction, and from the time of such notice until the  recovery of all underproduced volumes by all underproduced parties in such unit, the overproduced party shall have no rights to the gas produced from such unit.