IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT COLORADO

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| **SKLAR EXPLORATION COMPANY, LLC and SKLARCO, LLC** | ) | Case No. 20-12377-EEB |
| | ) | |
| | ) | Chapter 11 |
| Debtors. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **SKLARCO, LLC** | ) | Case No. 20-12380-EEB |
| | ) | |
| | ) | Chapter 11 |
| | ) | |

---

**MOTION TO APPOINT CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104, OR IN THE ALTERNATIVE, CONVERT TO CHAPTER 7 PURSUANT TO 11 U.S.C. § 1112(b) BY TAUBER EXPLORATION & PRODUCTION COMPANY; CTM 2005, LTD; PICKENS FINANCIAL GROUP, LLC; I & L MISS I, LP; MER ENERGY, LTD; MR OIL & GAS, LLC; TARA RUDMAN REVOCABLE TRUST; FEATHER RIVER 75, LLC; RUDMAN FAMILY TRUST; AND THE RUDMAN PARTNERSHIP**

---

Tauber Exploration & Production Company, CTM 2005, Ltd., Pickens Financial Group, LLC, I & L Miss I, LP, MER Energy, Ltd, MR Oil & Gas, LLC, Tara Rudman Revocable Trust, Feather River 75, LLC, Rudman Family Trust, and The Rudman Partnership, (collectively the "Tauber Group Non-Operators"), through undersigned counsel, hereby respectfully move this Court to Appoint a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104, or in the Alternative, Convert the above-captioned bankruptcy cases to liquidation proceedings under Chapter 7 pursuant to 11 U.S.C. § 1112(b) ("Motion"), and in support thereof, state as follows:

# I.  INTRODUCTION

As George Orwell warns, "[h]e who control the past controls the future. He who controls the present controls the past." George Orwell, *1984*  (London: Secker and Warburg, 1949). Such a cautionary observation resonates here as, until this Motion, the Debtors have crafted a subjective narrative of the past, present, and future, attempting to assuage creditor concerns about misuse of their funds and to illustrate how and why their vision for reorganization is in the best interest of creditors and the bankruptcy estate.

A review of their pre-petition and post-petition conduct, however, reveals that the Debtors and their management have systematically mismanaged the funds of working interest owners placed in their custody for specific uses while prioritizing the interests of the Debtors' insiders and beneficial owners. The Bankruptcy Court should find the Debtors' misleading and dishonest pre-petition conduct to be similarly reflected in a post-petition context, including the continued unauthorized use of working interest owner revenues, the commingling of funds between the two Debtors, and the filing of misleading Schedules and Statements of Financial Affairs.   Debtors have proven themselves unworthy of the protections and powers afforded to Debtors in Possession under the Bankruptcy Code, thus warranting either the appointment of a Chapter 11 trustee or conversion of the cases to proceedings under Chapter 7 of the Bankruptcy Code.

# II.   JURISDICTION

1.  This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 1334 and 157(b)(2).

2.  Venue of a proceeding arising from this Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory basis for the relief requested herein is 11 U.S.C. §§ 105, 1104, and 1112(b), as implemented through Rules 2007.1 and 9014 of the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rule 9013.

### III. BACKGROUND AND STATEMENT OF FACTS

4. Debtors Sklar Exploration, LLC ("SEC") and Sklarco, LLC ("Sklarco and together the "Debtors") filed for protection under Chapter 11 of the Bankruptcy Code on April 1, 2020. To date, the Debtors remain Debtors-in-Possession.

5. The cases are being jointly administered but have not been substantively consolidated. As has been shown, however, the Debtors have transferred funds between the estates, have commingled funds of Sklarco with those of SEC and have used each other's funds at will and without proper authorization or accounting.

6. For purposes of this Motion, the Tauber Group Non-Operators seek appointment of a trustee or conversion of both cases because, as set forth below, the two Debtors' operations are so interrelated that one cannot be managed without the other.

7. The Tauber Group Non-Operators comprise non-operating working interest owners of oil and gas leases who participated with the Debtors in oil and gas exploration operations in the southeastern United States, primarily in Alabama, Mississippi, Florida, Louisiana, and Texas. Not all of the Tauber Group Non-Operators participated in the same projects; however, there is substantial overlap in many of the projects. The Debtors are also involved in an exploratory helium prospect in Montana, but the Tauber Group Non-Operators are not participants in that prospect.

8. The typical modus operandi of the Debtors was first to identify a potential prospect, acquire the required oil and gas leases from the owners of the minerals and then to offer undivided interests in the leases to outside oil and gas investors. The leases would be initially vested in Sklarco and

3

then undivided interests would be conveyed to the investors. Sklarco typically retained or received an undivided working interest in the leases ranging from 10% to 30%, with an across-the-board blended average of approximately 16%.

9. To participate in these prospects, individual parties within the Tauber Group Non-Operators entered into, or succeeded to interests in, Participation Agreements, which included Operating Agreements ("JOAs"), that spelled out the various rights and duties of the participating parties with respect to exploration activities in a particular oil and gas field or prospect area. Such participation also required the payment by each non-operating participant of its percentage share of the designated costs of acquiring oil and gas leases in the prospect area and the participant's percentage of the costs of drilling the initial well in the prospect area, which, if successful, would be operated by SEC as the Operator. A representative example of these Participation Agreements is the Participation Agreement for the Escambia Prospect, a copy of which was admitted into evidence as TAU-A at the hearing held on May 11 and 12, 2020 on Debtors' Motion to Use Cash Collateral (the "Hearing"), through the testimony of W.R. (Trey) Sibley, III.

10. Generally, the Participation Agreements and the JOAs designated SEC as the Operator for the various prospects. Among its duties as Operator, SEC was responsible for drilling the initial well and developing the prospect, paying all bills as they came due, and distributing revenues received by the Operator on behalf of the participants from the sale of oil, gas, or associated products extracted from the prospect wells, after first paying severance taxes, royalties, and overriding royalties.

11. The costs incurred in operating and developing a prospect generally fall within two major categories: ongoing lease operating costs and expenses ("LOE"), and more capital-intensive costs associated with drilling or re-working wells ("Drilling Costs").

12.  To be reimbursed for the Operator's payment of LOE, the normal process was for SEC, as Operator, to send each non-operator a monthly joint interest billing ("JIB") or "Settlement Statement," an example of which was admitted into evidence at the Hearing, as TAU-B, through the testimony of Mike Pickens.

13.  All non-operators must participate in the Drilling Costs of the initial well.  As to Drilling Costs after the initial well, the JOA includes a process by which the Operator may propose a capital-intensive project, seek the consent or non-consent of each participant for that project, and call for the advance payment of each consenting participant's share of cash ("Cash Call Advances") based on the anticipated cost for the specific purpose identified in a participant-approved authorization for expenditure ("AFE").

14.  Non-operators participating in SEC-operated projects, including parties within the Tauber Group Non-Operators, paid Cash Call Advances to SEC for conducting the specific activities identified in each participant's approved AFE, as well as remitting funds for payment of LOE's through JIBs.

15.  Prior to filing the above cases, Debtors appeared to be operating two healthy companies. The Tauber Group Non-Operators were receiving payments for their interests in the various prospects and making payments to SEC in accordance with the AFEs and monthly JIBs. However, commencing in the fall of 2019 and continuing into 2020, an unusual flurry of Cash Call Advances was received by the Tauber Group Non-Operators and other non-operators. In retrospect, these Cash Call Advances do not appear to have been issued for the stated purposes, but instead were a guise to solicit credit from the unwitting non-operators.

16.  Prior to the bankruptcy filing, members of the Tauber Group Non-Operators did not know that the Debtors' companies were struggling to meet regular operating expenses or that they were in

default with the Debtors' commercial lender, East West Bank.  Based upon statements on the record by counsel for East West Bank at the Hearing, it appears that Debtors had defaulted on their principal credit facility in late 2019.  This fact appears to be admitted in a recent filing of the Debtors.  *See* Debtors' Report on Issues Raised by Court on Cash Collateral Issues (May 14, 2020), Exhibit 1 (Email from Andrew Long to John Strausser dated Dec. 6, 2019) (confirming coverage ratio violation) [Docket No. 299-1].

17.  At the Hearing, Debtors claimed that the need for filing this Chapter 11 action arose from the precipitous drop in oil prices following the COVID-19 pandemic and the decline in oil prices resulting from oil price/production wars between Russia and OPEC.

18.  Examination of Howard Sklar, the Debtors' chief executive officer, Marshall Jones, III, Debtors' vice president and chief operating officer, and John Strausser, Debtors' controller, revealed that the real reasons underlying Debtors' financial woes resulted from undisclosed transfers of substantial amounts of funds attributable to non-operating working interest revenues or Cash Call Advances through the Debtors to insiders, including family trusts, the expenditure of over $500,000 for private jet travel, and the failure of Sklarco to pay its share of Cash Call Advances and JIBs, and a myriad of actions constituting fraud and gross mismanagement.

19.  What is now evident is that Howard Sklar spent at least the past year raiding Debtors to fund his extravagant lifestyle and pay for, among a myriad of other things, his divorce obligations to his ex-wife of over $30,000 per month and other expenses wholly unrelated to the Debtors' business operations.

20.  The Statement of Financial Affairs of SEC falsely stated that significant transfers of funds to Sklarco were used to pay JIBs, but in fact both Howard Sklar and John Strausser testified that certain of those funds were actually transferred by Sklarco to Sklar family trusts rather than used to

pay JIBs. The false characterization of these transfers is a potential criminal offense under 18 U.S.C. § 157.

21.   The Statements of Financial Affairs of the Debtors reveal that a significant amount of the funds transferred from SEC to Sklarco were, under false pretenses, made for the actual purpose of lining the pockets of Howard Sklar and other beneficiaries  of Sklar family trusts rather than to pay for legitimate JIB expenses.

22.   These transfers continued despite Debtors being in default on their loan covenants to East West Bank, and otherwise failing to meet other financial obligations of the companies.  *See* Debtors' Report on Issues Raised by Court on Cash Collateral Issues (May 14, 2020) [Docket No. 299].

23.   Howard Sklar, as CEO of SEC and Manager of Sklarco, breached his duty of good faith to the Debtors, caused Debtors to breach their contracts with East West Bank and the non-operators, and defrauded the creditors who relied on the Debtors to develop the prospects pursuant to the various Participation Agreements.  Each AFE for which the non-operators made Cash Call Advances between November 2019 and March of 2020, constituted a false representation and an intentional omission by Debtors to state material facts, since Debtors appear to have had no intention to use the funds for the purposes stated in the AFEs.

24.   In addition to the fraudulent activity set forth above, the Debtors were grossly mismanaged, and the incompetency of upper management was hidden from the world until the Hearing, when the curtains opened.

25.   At the Hearing, COO Marshall Jones and CEO Howard Sklar admitted that  Debtors had operated the business on the float, taking money from Cash Call Advances paid by non-operators and using it to pay general operating invoices.

26.  This practice is incredibly disturbing and contrary to both the usual practices in the industry and the expectations of the Tauber Group Non-Operators, who reasonably anticipated that their funds advanced to pay for specifically designated projects would be used for the projects authorized in AFEs circulated to them for approval by SEC.  However, at the Hearing the Debtors' management baldly admitted that the Debtors used those funds as they saw fit.[1]

27.  Debtors admit that SEC collected over $7 million in Cash Call Advances from the non-operators and did not use substantial portions of those funds for their intended purposes.  These funds were comingled with other monies received by Debtors and used by Debtors for whatever purpose Howard Sklar directed, including enrichment of Sklar family trusts and extravagant private jet travel.

28.  At the time Debtors filed for bankruptcy protection, every penny of this money was gone, with little, if any of it, having been directed for its intended uses.[2]  Debtors further admit that they failed to pay working interest owners their pre-bankruptcy revenues in an amount totaling $4,499,300.[3]

---

[1] This practice was also a breach of Article V.E of the JOA which requires that both funds advanced by non-operators and revenues of non-operators shall remain the property of non-operators and are to be used for the purposes intended, returned to non-operators or used to pay other debts of non-operators.  *See* Model Form Operating Agreement incorporated as Exhibit D to Escambia Participation Agreement, Hearing TAU-A at 36.

[2] "SEC owes approximately $7,023,910.44 in cash call advance liabilities from working interest holders." Debtor's Motion to: 1) Honor and Pay Overriding Royalty, Royalty, and Working Interest Obligations; and 2) Offset Joint Interest Billing Obligations, ¶ 11. [Docket No. 37] ("JIB Motion"). "In accordance with the Debtors' statements during the April 9, 2020 hearing on the Cash Collateral Motion, the Debtors do not believe that SEC is currently holding any funds from Cash Call Advances. Debtors' Status Report  ¶ 16. [Docket No. 173].

[3] Debtors' Status Report  ¶ 17. [Docket No. 173].  Yet at the same time they showed their intent to continue playing the float during the pendency of the case by using working interest owner funds:  "Given that payment of these amounts would significantly reduce SEC's available cash for operations, a detailed review of these payments by EWB, the Committee, and SEC is warranted to determine if those amounts must be paid at this time."  *Id.*

29.  The incompetence of Debtors' management insiders and other management officials in spending the non-operators' funds in this manner boggles the mind.  As pointed out by Walker Sturdivant, the Kudzu Parties' witness during the Hearing, if the Debtors are to be believed, they collected $7 million from the non-operators and lost $5 million of those funds in less than a month.

30.  It does not take Howard Sklar's advanced degrees in nuclear science or geophysics to know what constitutes theft, defalcation, or fraud.  He knew exactly what he was doing and that it was wrong.  An individual with such a high intellect should not be permitted to avoid responsibility for his conduct by belated assertions of mistake.

## IV.  ARGUMENT

### A.  *The Bankruptcy Code Requires That a Debtor Seeking its Reorganization Protections Exercise Honesty and Conduct Itself as a Fiduciary.*

31.  The Bankruptcy Code protects and "relieve[s] the honest debtor from the weight of oppressive indebtedness and permit[s] . . . a fresh start free from the obligations and responsibilities consequent upon business misfortunes." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (quoting *Williams v. U.S. Fidelity & G. Co.*, 236 U.S. 549, 554-55 (1915)).  In exchange for taking advantage of such rights and opportunities, the Bankruptcy Code demands complete transparency and truthfulness from the outset of the Bankruptcy Case. *In re Kestell*, 99 F.3d 146, 149 (4th Cir.1996) ("fresh start depends upon the honest and forthright invocation of the Code's protections"); *see also Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998) (citing *Grogan v. Garner*, 498 U.S. 279, 287 (1991)) ("Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud. . . ."); *In re Phouminh*, 339 B.R. 231 (Bankr.D.Colo.2006).  When the debtor fails to uphold these requirements, the Court must step in and protect the Bankruptcy Estate and its creditors.

32.  Normally, the debtor is allowed to remain in control of its company by acting as the debtor-in-possession.   This makes sense because the debtor is in the best position to manage the day-to-day affairs of the business and take the actions necessary to reorganize the debtor's business.

33.  However, the Bankruptcy Code protects creditors from fraudulent, dishonest, or incompetent debtors who are incapable of taking the steps necessary to bring the debtor out of bankruptcy.  *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) (debtor-in-possession control "is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.") (quoting *Wolf v. Weinstein*, 372 U.S. 633, 649-52 (1963)); *see also In re Ionosphere Clubs, Inc*., 113 B.R. 164, 169 (Bankr.S.D.N.Y.1990) (citing *In re Sharon Steel Corp*. 86 B.R. 455, 457 (Bankr. W.D.Pa. 1988), aff'd, 871 F.2d 1217 (3d Cir. 1989)); *In re Ford*, 36 B.R. 501, 504 (Bankr.W.D.ky.1983) ("does not permit a debtor to continue business free of creditors' legal rights in the assets, nor can the debtor unilaterally ignore responsibilities imposed on him by the Code").

34.  The Court may remove the debtor-in-possession and appoint a Chapter 11 trustee "[a]t any time after the commencement of the case but before confirmation of a plan, on request of a party in interest . . . for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case . . . if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor." 11 U.S.C. §§ 1104(a)(1)-(2).

35.  Should the Bankruptcy Court find that cause exists for the appointment of a Chapter 11 trustee, an order for the appointment of a trustee is mandatory.  *In re Colorado-Ute Elec. Ass'n,*

*Inc.*, 120 B.R. 164, 174 (Bankr.D.Colo.1990) (citing *In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir.1988)); *see also In re W.R. Grace & Co.*, 285 B.R. 148, 158 (Bankr.D.Del.2002).

36.  Alternatively, the Court may convert a case from a Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code should liquidation by and through a Chapter 7 trustee offer the best outcome for creditors and the estate. 11 U.S.C. § 1112(b) ("for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate").

37.  "A debtor, by and through its officers and managing members, has an obligation to treat all parties, not merely the shareholders, fairly." *In re The AdBrite Corporation*, 290 B.R. 209, 217 (Bankr. S.D.N.Y. 2003) (citing *Weintraub*, 471 U.S. at 355-56); *see also In re Northwest Airlines Corp. v. Ass'n of Flight Attendants-CWA*, 483 F.3d 160, 181 (2d Cir. 2007). The fiduciary duties of a debtor-in-possession include, but are not limited to, carrying out the primary goals of the bankruptcy process, conducting business to benefit the estate as a whole, "a duty of care to protect the assets, a duty of loyalty and a duty of impartiality." *In re Bowman*, 181 B.R. 836, 843 (Bankr.D.Md.1995) (loyalty requires "avoid[ing] self-dealing, conflicts of interest and the appearance of impropriety"); *In re Pied Piper Casuals, Inc.*, 40 B.R. 723, 727 (Bankr.S.D.N.Y.1984) ("to get the creditors paid").

**B.     The Court Should Appoint a Chapter 11 Trustee Because it is in the Best Interest of the Bankruptcy Estates and All Other Interested Parties.**

38.  Pursuant to 11 U.S.C. 1104(a)(2), the Bankruptcy Court may appoint a Chapter 11 trustee when no "cause" exists. *See In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 474 (3d. Cir.1998); *Sharon Steel Corp.*, 871 F.2d at 1228. In determining whether to appoint a trustee, the Bankruptcy Court may "eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests." *In re Hotel Assocs., Inc.*, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980).

39.   Accordingly, the Bankruptcy Court should consider the following four factors when reviewing this matter under the flexible standard embodied in section 1104(a)(2): (i) the trustworthiness of the debtor; (ii) the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence - or lack thereof - of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment.  *Colorado-Ute Elec. Ass'n.*, *Inc.*, 120 B.R. at 176 (quoting *Ionosphere Clubs*, 113 B.R. at 168); *see also In re V. Savino Oil & Heating Co.,* *Inc*., 99 B.R. 518, 527 n.11 (Bankr.E.D.N.Y.1989) ("factors . . . are amorphous, diverse, and necessarily involve a great deal of judicial discretion . . . . § 1104(a)(2)  reflects 'the practical reality that a trustee is needed.'" (citation omitted)).

### C.    Consideration of the Colorado Ute Factors Mandates the Appointment of a Chapter 11 Trustee.

40.   When considering the standards set forth in *Colorado Ute*, it becomes painfully apparent that removing the Debtors as Debtors-in-Possession and appointing a Chapter 11 Trustee is in the best interest of all parties involved in these cases.

41.   Mr. Sklar has engaged in outright fraud by looting the Debtors for his own personal gain. He transferred  $2,643,445.10 from Sklarco to himself, his trust, and his children's trusts in less than a year before filing,[4] using $2,654,260 transferred from SEC to Sklarco under the guise of JIB payments,[5] while Debtors were insolvent or rendering them unable to pay their debts as they became due.

---

[4]  *See* Sklarco Statement of Financial Affairs at Docket No. 27, pp. 14-17, a copy of which is attached hereto as Exhibit TAU-1.

[5]  *See* SEC Statement of Financial Affairs at Docket No. 102, pp. 28-29, a copy of which is attached hereto as Exhibit TAU-2.

42.   Furthermore, the Debtors have operated "on the float," using working interest owner revenues and Cash Call Advances without their knowledge or authority – a practice that is contrary to industry standards, the expectations of the parties who sent millions of dollars to the Debtors to develop oil and gas prospects, and is in breach of the applicable JOAs.

43.   As a result of the Debtors' gross mismanagement, the Debtors spent more than $7 million of the non-operator's money on items that appear unrelated to the projects for which the money was intended.  At the same time, Sklarco did not pay its share of a single Cash Call Advance under the AFEs, resulting in an indebtedness to the working interest owners of $2,816,846.47,[6] and other outstanding JIBs of at least $324,632.29.[7]

44.   The Debtors, and the upper management of Debtors, cannot be trusted to run the company for the benefit of the creditors in this case.

45.   The creditors, and the business community at large, have lost complete trust in the Debtors. As was apparent during the Hearing, many of the non-operators are against paying JIBs while the Debtors have failed to return Cash Call Advances.  Furthermore, East West Bank is unwilling to extend additional funding to the Debtors and Debtors have not presented any other bank that is willing to take this risk.

46.   As Mr. Sklar noted during the Hearing, in the oil and gas business reputation is everything, and Mr. Sklar's reputation and the reputation of Debtors has been completely destroyed.

47.   Debtors claim that they are now seeking to appoint a Chief Restructuring Officer ("CRO") to oversee the management of the Debtors during the bankruptcy.  However, Mr. Sklar would

---

[6] *See* Exhibit TAU-3 attached hereto, which was prepared from Tauber Exhibit L-1, admitted at the Hearing.

[7] *See* Debtor's Motion for Entry of an Order Authorizing the Payment of Pre-petition Joint Interest Billing Obligations as Critical Vendors, ¶ 6.  [Docket No. 41]

continue as the CEO and continue to have oversight of the management of Debtors. The appointment of a CRO is a woefully inadequate gesture to attempt to restore trust in the Debtors.

48. The Tauber Group Non-Operators recognize that there is a cost associated with turning these cases over to a Chapter 11 Trustee. However, the costs associated with the Trustee are far less than the additional loss of funds from keeping the business in the hands of the Debtors.

49. It may be that these cases are destined for conversion to Chapter 7 one way or the other, but in the near term, the Tauber Group Non-Operators believe a Chapter 11 Trustee could keep the companies operating for long enough to maintain any of Debtors' going concern value and maximize recovery under an orderly liquidation.

**D.     Howard Sklar Cannot Continue to Run Debtors' Business Due to Fraudulent Activity Prior to Filing.**

50. An independent trustee should be appointed under section 1104(a)(2) of the Bankruptcy Code where, as here, a debtor and its management and insiders suffer from material conflicts of interest and cannot be trusted to conduct independent investigations of questionable transactions in which they were involved. *See, e.g., In re PRS Ins. Group, Inc.*, 274 B.R. 381, 389 (Bankr.D.Del.2001) (appointment of trustee appropriate under section 1104(a)(2) where causes of action against insiders are a significant asset of the estate); *In re Microwave Prods. Of Am., Inc.*, 102 B.R. 666, 676 (Bankr.W.D.Tenn.1989) (chapter 11 trustee appointed where debtor was "not in a strong-posture to pursue possible claims" due to conflicts of interest and fraudulent transfers, and "a trustee would likely be able to investigate claims that could result in additional sums of money coming into the estate"); *In re L.S. Good & Co.*, 8 B.R. 312 (Bankr. N.D.W.Va.1980) (appointing trustee under section 1104(a)(2) where "[t]he magnitude of the number of inter-company transactions places current management of [the debtor] in a position of having grave potential conflicts of interest and the presumption arises that the current management of [the debtor] will be

14

unable to make the impartial investigations and decisions demanded in evaluating and pursuing inter-company claims on behalf of [the debtor]").

51.   The facts here are analogous to those found in the bankruptcy case of *Ondova Limited Company*, where a Chapter 11 trustee was appointed. *In re Ondova Ltd. Co.*, Case No. 0934784 (SGJ), Dkt. No. 56 (Bankr. N.D.Tex. Sept. 2, 2009).   The *Ondova* court was troubled by its perception "that the goal of Ondova in this Chapter 11 case (while under the direction of [the debtor's principal] and the current management team) may not be centered around reorganizing a viable company (or providing a soft landing to a financially-stressed company), for the benefit of creditors and other parties-in-interest, but more geared toward protecting the personal interests of [the principal] and his affiliates ." *Id*. at 4-5. The court also had concerns "about complex, prepetition transactions among various companies in which [the principal] has some interest or control, which transactions may affect the Debtor (and the value available/reachable for creditors), that need investigating by an independent fiduciary." *Id*.

52.   Howard Sklar, in particular, has irreconcilable conflicts of interest that preclude his continued involvement in management.   First, he and his family trusts have received substantial fraudulent transfers and Mr. Sklar is the last person to expect to investigate and prosecute avoidance actions against himself and his family members and their trusts.   Second, Mr. Sklar is a trustee of one or more trusts that appear to have some indirect ownership interests in Sklarco and SEC.   His obligations as a fiduciary to the bankruptcy estates cannot be reconciled with his fiduciary duties as a trustee of the trusts.   Third, there appears to be an agency relationship between Sklarco and SEC, and various family members, trusts and a Louisiana "succession" (presumably a decedent's estate) pursuant to that certain Agency Services Agreement dated May 1, 2010, as amended by the First Amendment to Agency Services Agreement dated August 31, 2015, copies of which are attached

15

hereto as Exhibits TAU-4 and TAU-5.[8]  Sklarco is authorized as Agent for the Principals to "acquire, hold, develop, maintain and manage various properties on behalf of each such Principal, including, but not limited to, the development, maintenance and management of various oil and gas properties . . . ."

53.  Mr. Sklar cannot serve so many masters, nor can he be trusted to act in accordance with his fiduciary duties to creditors and the bankruptcy estates.  This reason alone necessitates the appointment of a Chapter 11 trustee under 11 U.S.C. § 1104(a)(2).

### E.   Alternatively, the Court Should Convert These Cases Because Reorganization is not Feasible, and Conversion is in the Best Interest of Creditors.

54.  It has become increasingly apparent that the past fraud and gross mismanagement of Debtors makes it unlikely that reorganization attempts will be successful and it could also be in the best interest of creditors to convert these cases to Chapter 7 pursuant to 11 U.S.C. § 1112(b).

55.  To date, Debtors have failed to submit an operating budget that extends more than a several of weeks into the future.  However, in those short-term projections, the Debtors are continuing to lose money, even without paying Mr. Sklar his "usual" salary and while halting pending development operations that would bring in necessary funds to the Debtors' operations.

56.  Furthermore, Debtors have presented no real plan to continue exploration operations within existing prospects.  This is because they do not have the funds necessary to drill the wells and develop the prospects as set forth in the Participation Agreements.  These funds have already been spent and the Debtors cannot now go back to the non-operators and ask for additional monies.

---

[8] The "Principals" named in the Agency Agreement are Howard Sklar (a) as Manager of Miriam Sklar, L.C.; (b) as Trustee of the Howard Trust; (c) as Trustee of the Alan Trust; (c) as Trustee of the Alan Trust; (d) as Trustee of the Sam Trust; (e) as Independent Executor of the Succession of Miriam Mandel Sklar; and (f) as Trustee of the Jacob Grantor Trust.

57.  The *Colorado-Ute* Court, upon finding that the debtor therein suffered net losses within the two (2) year preceding bankruptcy and projected to realize net losses post-petition, reasoned that "[u]less [the debtor] is placed in the hands of an experienced, capable party who can make informed and directed decisions to reorganize . . . it is not likely that the substantial losses will slow down soon enough to enable successful rehabilitation . . . ." *Colorado-Ute Elec. Ass'n., Inc.*, 120 B.R. at 177.

58.  Debtors claim that they were profitable prior to the downturn in the economy preceding the COVID-19 crisis.  However, we know that Debtors were failing to meet their financial covenants and in default of their loan with East West Bank in the fall of 2019, months before the COVID-19 crisis hit the oil and gas economy.

59.  These issues do not go away with a reorganization.  Debtors have been unable to present any likelihood of take-out financing or ability to generate operating capital to continue with operations that would bring them out of bankruptcy.

60.  In response to this Court's admonition at the Hearing, Mr. Sklar appears to believe he has acted magnanimously in offering to extend $1,233,000 in financing to the Debtors.  This insulting offer does not replace the $2,643,445.10 in advances to Mr. Sklar and the family trusts, the $7 million raided from the Debtors prior to filing, the $2,816,846.47 in Cash Call Advances, the $324,632.29 in unpaid JIBs owed by Sklarco, and the $4,499,300 in unpaid working interest owner revenue,  and will do little to meet the Debtors' obligations under the Participation Agreements.

61.  Debtors hid the unprofitable financial condition of their companies prior to filing.  Debtors will continue to be unprofitable in the future.  The only hope for the creditors is to get these prospects into the hands of a party that can properly develop them and realize a return on investment for the non-operators.

17

62.  Therefore, if the Bankruptcy Court chooses not to replace the current management with a Chapter 11 trustee, conversion to Chapter 7 is appropriate to protect the best interests of the bankruptcy estate and prevent the Debtor from further squandering funds in violation of the Trust Fund Statute and the Bankruptcy Code.

### F.    Abundant "Cause Exists to Warrant Appointment of a Chapter 11 Trustee or Conversion to a Case Under Chapter 7.

63.  Although sections 1104 and 1112 of the Bankruptcy Code expressly identify bases upon which "cause" may exist, such enumerated grounds are not exhaustive. *Pacific Rim Investments, LLP v. Oriam, LLC*, 243 B.R. 768, 771 (D. Colo. 2000); *see also Ford*, 36 B.R. at 504 ("judicial considerations in determining the issue of whether to appoint a trustee are not limited to such cause as enumerated specifically in § 1104(a)(1)")); *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D.Ill.1994) ("particularly wide discretion").

64.  Additional grounds that may establish cause under section 1104(a)(1) include, without limitation, as follows: (1) materiality of the debtor's pre- and/or post-petition misconduct, (2) acrimony between the debtor and creditors, (3) existence of pre-petition voidable preferences or fraudulent transfers, (4) unwillingness or inability to pursue estate causes of action, (5) conflicts of interest interfering with the ability to fulfill fiduciary duties, (6) waste or squandering of corporate assets, (7) failure to satisfy duties of disclosure and transparency, and (8) "questionable business transactions with related companies. . . ." *Tradex Corp. v. Morse*, 339 B.R. 823, 835 (D.Mass.2006) (citing *Oklahoma Refining*, 838 F.2d at 1136); *see also Marvel Entm't Grp., Inc.*, 140 F.3d at 472-73; *Sharon Steel Corp.* 86 B.R. at 457; *In re Intercat, Inc.*, 247 B.R. 911, 920-21 (Bankr.S.D.Ga.2000); *In re Celeritas Technologies*, LLC, 446 B.R. 514 (Bankr. D. Kan. 2011); *Colorado-Ute Elec. Ass'n., Inc.*, 120 B.R. at 175-77.

65.   In this case, the Debtors have demonstrated (both pre-petition and post-petition) that a Chapter 11 trustee or conversion to Chapter 7 is necessary to protect the interests of the creditors. As set forth above, the Debtors' misconduct, including substantial pre-petition voidable transfers to Howard Sklar and his family trusts, warrants either appointment of a Chapter 11 trustee or conversion to Chapter 7 liquidations.  *Intercat, Inc.*, 247 B.R. at 920 ("appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served*"); see also V. Savino Oil & Heating Co.*, 99 B.R. at 525 ("Section 1104(a) represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession").

WHEREFORE, the Tauber Group Non-Operators respectfully request that this Court enter an Order: (a) authorizing appointment of a Chapter 11 trustee in the above-captioned cases pursuant to 11 U.S.C. § 1104(a), or alternatively converting the cases to Chapter 7 liquidation cases pursuant to 11 U.S.C. § 1112(b); (b) ordering the United States Trustee to seek approval of such appointment from this Court, pursuant to 11 U.S.C. § 1104(d) and FED. R. BANKR. P. 2007; (c) ordering the Debtors, and any other individual or entity in possession of the Debtors' documents, records, electronically stored information, and property, to immediately turn over any and all such assets and information of the estate in their possession or control as directed by the Chapter 11 trustee or Chapter 7 trustee; and (c) grant such other and further relief as this  Court deems just and proper.

Dated this 17th day of May, 2020

Respectfully submitted,

**Maynes, Bradford, Shipps & Sheftel, LLP**

*/s/ Thomas H. Shipps*
*/s/ Shay L. Denning*
Thomas H. Shipps
Shay L. Denning
Maynes, Bradford, Shipps & Sheftel, LLP
835 E. Second Ave., Suite 123
Durango, CO  81301
Telephone: (970) 247-1755
Cell: (970) 749-1479; (970) 946-0846
Facsimile: (970) 247-8827
Email: tshipps@mbssllp.com; sdenning@mbssllp.com

and

*/s/ Barnet B. Skelton, Jr.*
Barnet B. Skelton, Jr.
815 Walker, Suite 1502
Houston, TX  77002
Telephone: (713) 659-8761
Cell: (713) 516-7450
Facsimile: (713)659-8764
Email: barnetbjr@msn.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on May 17, 2020, the foregoing instrument was electronically filed and served via CM/ECF pursuant to L.B.R. 9036-1.  All attorneys and parties identified with the Court for electronic service on the record in this case were served by electronic service in accordance with the CM/ECF system on the date of filing.

*/s/ Kate Potemkin*
Kate Potemkin