UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 20-12377-EEB |
| SKLAR EXPLORATION COMPANY, LLC | ) | |
| EIN: 72-1417930 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | Case No. 20-12380-EEB |
| SKLARCO, LLC | ) | |
| EIN:  72-1425432 | ) | Chapter 11 |
| Debtor. | ) | |

**OBJECTION TO MOTION TO APPOINT CHAPTER 11 TRUSTEE OR, IN THE
ALTERNATIVE, CONVERT TO CHAPTER 7**

The Debtors, Sklar Exploration Company, LLC ("SEC") and Sklarco, LLC ("Sklarco" and together, "Debtors"), state their Objection to the Motion to Appoint Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104, or in the Alternative, Convert to Chapter 7 Pursuant to 11 U.S.C. § 1112(b) filed by the Tauber Group[1] ("Trustee Motion"), and joined by the Kudzu Group[2], the Landmark Entities[3], and the Pruet Parties[4] on a limited basis (together with the Tauber Group, Kudzu Group, and Landmark Entities, the "Opposing Creditors"), as follows:

### INTRODUCTION

1.      The Trustee Motion is nothing more than a bald-faced attempt by the Tauber Group to force the Debtors into a liquidation so that the Tauber Group can acquire Sklarco's assets for pennies on the dollar. The Tauber Group makes no secret of their desired outcome in this case.  The Trustee Motion, at Paragraph 49 proudly states that they intend to "maximize recovery under an orderly liquidation."  But while the Tauber Group is **only** a creditor of SEC, it is not SEC's assets that they are after.  Instead, they are after the valuable assets held by Sklarco; assets that the Tauber Group

---

[1] The "Tauber Group" is comprised of Tauber Exploration & Production Company, CTM 2005, LTD., Pickens Financial Group, LLC, I & L Miss. I, LP, MER Energy, LTD, MR Oil & Gas, LLC, Tara Rudman Revocable Trust, Feather River 75, LLC, the Rudman Family Trust, and the Rudman Family Partnership.
[2] The "Kudzu Group" is comprised of Kudzu Oil Properties, LLC, Alabama Oil Company, and Apple River Investments, LLC.
[3] The "Landmark Entities" is comprised of Landmark Oil and Gas, LLC, Landmark Exploration, LLC, Lexington Investments, LLC and Stone Development, LLC.
[4] The "Pruet Parties" are comprised of Pruet Production Co. and Pruet Oil Company, LLC

can only reach if they can force both Debtors into a liquidation.

2.      The other creditors joining in the Trustee Motion are similarly conflicted, and have other goals that are not in the best interests of the Debtors, their estates, or the majority of their creditors.

3.      As set forth more fully herein, the Trustee Motion must be denied because the Opposing Creditors have no standing to appoint a trustee or seek conversion in Sklarco's case, and because the Trustee Motion does not establish cause for appointment of a Chapter 11 trustee or conversion in SEC's case.

## FACTUAL BACKGROUND

### _Background of Operations_

4.      SEC is engaged in business as an independent exploration and production company in the oil and gas industry.  SEC is an operating company and does not own oil or gas properties. SEC has its principal business office in Boulder, Colorado and has additional offices in Shreveport, Louisiana and Brewton, Alabama.  SEC's exploration and production activities are primarily located in East Texas, North Louisiana, South Mississippi, South Alabama and the Florida Panhandle.  SEC is also developing properties and opportunities in the western United States, though no oil or gas is currently being produced from the wells in the western United States.

5.      Sklarco is a Louisiana limited liability company engaged in business as the owner of certain oil and gas leases and property interests in East Texas, North Louisiana, South Mississippi, South Alabama, the Florida Panhandle, and the western United States.

6.      While Sklarco is the owner of the oil and gas properties and SEC owns no properties, it is important to note that SEC is the operator of many of the wells and properties owned by Sklarco.  The Sklarco wells and properties are either operated by SEC in large part or by third party unrelated operators.  In each case, Sklarco must pay the operator for ongoing management and production.

7.      As of the Petition Date, SEC was the operator of approximately 60 wells, and was in the process of developing several new prospects, including oil wells in Mississippi and Alabama, a helium well in Montana, and a pipeline in Florida to bring on a new discovery oil well.

8.      Each of the wells operated by SEC is subject to a number of different property interests, including royalty interests ("RIs"), overriding royalty interests ("ORRIs"), and working interests ("WIs").  RIs and ORRIs are not required to contribute to the ongoing expenses and

development of the operation of the wells, while WIs are required to contribute a proportionate share for ongoing operation of the operated property in which they hold a WI.  The WI owners' rights among each other are generally governed through an Operating Agreement ("JOA") in which the holders of WIs agree to share the costs of drilling and operating wells.  The WI interests and the rights afforded to the WI interest holders are grounded in the JOAs between the parties.

9.      As the operator of the wells, in the ordinary course of business, SEC collects revenue from the sales of hydrocarbons, and distributes revenue, first to its RIs to ensure maintenance of applicable mineral leases, and then to ORRIs and WIs.  The holders of WIs are also issued invoices for their proportionate share of expenses through joint interest billings ("JIBs").

10.     Sklarco, as an owner of WIs and ORRIs in properties operated by SEC, is also entitled to payments of revenue derived from the sale of hydrocarbons.  Sklarco's funds are generally pooled at SEC and used in the ordinary course of SEC's operations, including paying employees of SEC.  This practice has continued on a post-petition basis by request from the Official Committee of Unsecured Creditors ("Committee") and East West Bank ("Bank").

11.     The Debtors filed for relief under Chapter 11 of the Bankruptcy Code on April 1, 2020.   The Debtors remain Debtors-in-Possession.   While the Debtors' cases are jointly administered, they are not substantively consolidated, and remain entirely separate estates.

12.     The Office of the United States Trustee appointed an Official Committee of Unsecured Creditors in SEC's case on April 16, 2020.  No Committee has been appointed in the Sklarco bankruptcy case.

### *Events Leading to Bankruptcy Filing*

13.     The Debtors' assets are subject to a duly perfected secured claim in favor of the Debtors' prime lender East West Bank as Agent and Lead Arranger ("Bank").  The Bank filed Proof of Claim No. 29-1 in SEC's case asserting a secured claim in the amount of $22,989,650.74. The same claim is evidenced by Proof of Claim No. 1-1 filed in Sklarco's case.

14.     In early December, the Debtors were notified for the first time by email about a default with respect to the Debtors' Current Ratio.

15.     At the time of learning about the default in the Current Ratio, the Debtors were advised that the default could be addressed with a payment in the amount of $12,500.

16.     In February 2020, the Debtors received the first letter asserting a default under the

3

Debtors' lending agreement with the Bank. At that time, the Debtors engaged in discussions with the Bank regarding a forbearance agreement that would resolve issues related to the default.

17.      The Debtors' discussions were ongoing, and likely would have been successful, but for the impact of the ongoing dispute between Russia and the Organization of Petroleum Exporting Countries ("OPEC") causing a substantial decrease in oil prices, which were then compounded by the COVID-19 crisis.

18.      The substantial drop in the price of oil, from an average price of $61.06 per barrel on January 1, 2020 to $20.48 per barrel on March 31, 2020, caused a substantial loss of revenue to the Debtors.[5]  As a result of the loss of revenue, the Debtors became heavily dependent on the revenue from the Debtors' hedging agreements and the Debtors' ongoing discussions with the Bank were placed in jeopardy.

19.      With the breakdown in the discussions with the Bank, the Debtors' hedging agreements were placed in jeopardy, and the Debtors filed their voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code on April 1, 2020 to preserve the hedging agreements and reorganize while preserving the going concern value of the Debtors.

### *Cash Call Advances and Payments to Howard Sklar/Howard Sklar Trust*

20.      One of the primary issues raised by the Tauber Group, among others, in the numerous pleadings filed in this case is the issue of cash call advances.

21.      Cash call advances are funds requested from the holders of working interests in various wells in advance of large projects, such as drilling a new well, workovers of existing wells, and building pipelines.

22.      In each instance, the cash call advance is requested to ensure that the operator is not left shouldering the burden of the full expense, particularly where the proposed exploration operation is risky and could result in a "dry hole."

23.      The JOAs, while each varies slightly, generally provide that the operator can issue cash call advances to all or some of the working interest holders.

24.      In its ordinary course of operations, SEC would generally issue requests for cash call advances to other, non-insider, working interest holders, but would not issue a cash call advance to Sklarco. The reason for this is simple: there was no risk of Sklarco not paying its portion of the expense when actually incurred by SEC as its revenue allowed for such payments. After all, generally

---

[5] Prices based on West Texas Intermediate Crude.

speaking, SEC already had access to Sklarco's funds.

25.     Pre-petition, SEC had embarked on a number of exploratory projects for which it issued cash call advances, including construction of the Florida pipeline, construction of the Mississippi well, and the Myrtice Ellis Well.  SEC also issued cash call advances for a number of other large-scale projects, including workovers of several existing wells.

26.     In each instance, while a cash call advance was not issued to Sklarco, Sklarco's allocated portion of the expense was still accounted for to ensure that Sklarco's portion of the expenses was tracked, and not inadvertently billed to other working interest holders.  In addition, Sklarco was also entitled to receive the revenue that was allocable to the Howard Trust, Jacob Sklar Trust and Alan Sklar Trust with respect to the actual WIs that such entities own, and such funds were frequently allowed to be held by SEC for operations.  In essence, SEC had access to funds owned by Sklarco, the Howard Trust, the Jacob Trust and the Alan Trust to pay its expenses which included the expenses for which cash call advances were requested.

27.     Between November 2019 and February 2020, SEC requested and received approximately $7 million in cash call advances.  In each instance, the amount paid was tracked by SEC, resulting in a "credit" on the account of the working interest holder who paid the cash call advance.  As expenses were incurred, the amounts were billed against the credit, resulting in a reduction in the credit amount.

28.     During this time, SEC was also commencing the operations for which it had issued cash call advances.  Work had started, and in fact was almost complete, on the Montana helium well when a stay-at-home order issued by the Montana governor forced the operations to grind to a halt.

29.     Work had similarly commenced on the various other projects for which a cash call advance was issued, although in many instances, was not completed due to the catastrophic drop in oil prices and ultimately, the suspension of ongoing operations.

30.     SEC does not deny, and has never denied, that the cash call advances were deposited into the general operating account, and used for ongoing expenses.  However, SEC has always maintained a careful accounting of the cash call advances to ensure that credits are issued to working interest holders for those projects on which they have paid a cash call advance.

31.     The Tauber Group asserts that none of the cash call advances were used for their intended purpose, asserting that the funds were somehow used for the "enrichment of Sklar family trusts and extravagant private jet travel."

32.     This argument is false, and unsupported by the Debtors' bank records to which the Tauber Group has had access for months.

33.     In fact, the funds were used primarily to pay the ongoing expenses for the various wells, payment of which ensure that operations would continue for the benefit of all of the working interest holders, including the Tauber Group.

34.     Furthermore, there is no evidence that cash call advances were paid to Sklarco or Howard Sklar.  While there were transfers to Sklarco and/or the Howard Sklar Trust during this time, it is likely that these funds came from other sources, including Sklarco's own revenue, or other income received by SEC.

### *Relationship Between Opposing Creditors and SEC*

35.     Certain members of the Tauber Group have been investing in SEC operated properties since as early as 2005.  SEC's operation of the wells has resulted in the collective members of the Tauber Group receiving well in excess of $20 million in **_net_** profit.

36.     The other Opposing Creditors have similarly received substantial net profits from their investments in SEC operated properties.

37.     On the Petition Date, the Opposing Creditors' combined claims from cash call advances amounted to approximately 8.8% of the general unsecured claims against SEC.

38.     None of the Opposing Creditors have a claim against Sklarco.

39.     After the Debtors' respective bankruptcy filings, the Opposing Creditors have turned into a vocal minority, and a source of opposition at every turn despite the substantial returns they have made by investing in properties operated by SEC, even going so far as to oppose the Debtors' use of cash collateral on an interim basis.

### *The Pruet Parties' Conflict*

40.     One of the large and profitable fields operated by SEC is the Brooklyn Field in Alabama.  In late 2018, but effective as of January 1, 2019, SEC and Pruet Production ("Pruet") agreed to the unitization of the Brooklyn Field, pursuant to which Pruet operates the Northeast and Northwest units of the Brooklyn Field and SEC operates the Southeast and Southwest Units of the Brooklyn Field.

41.     Based upon the conduct and pleadings filed by Pruet in this case it is apparent that they clearly have an interest in gaining control over Sklarco's interest in the Brooklyn Field by joining in the Trustee Motion and in gaining operational control over the 2 Units operated by SEC.  Pruet

requests appointment of a Trustee (even in the case of Sklarco in which it is no longer a creditor) but not conversion to Chapter 7, as the immediate cessation in operations at units operated by SEC following the conversion to a Chapter 7 would cause irreparable harm to the reservoir, and would be a death knell to the operations Pruet seeks to own and/or control.

42.     On May 17, 2020, the Tauber Group filed their Trustee Motion, seeking to appoint a Chapter 11 trustee or, in the alternative, convert the Debtors' cases to Chapter 7.[6] As set forth herein, the Trustee Motion is nothing more than an attempt by the Tauber Group and others to reach the assets of the Sklarco estate to which they have no claim.   The Trustee Motion must be denied as the Opposing Creditors have no standing in Sklarco's bankruptcy case, and the Trustee Motion fails to establish cause for appointing a trustee, and fails to establish cause for conversion of SEC's case to Chapter 7.

## LEGAL ARGUMENT

### A.  The Tauber Group and the Joining Creditors Lack Standing to Appoint a Trustee or Seek Conversion for Sklarco

43.     "Standing is a threshold issue in every federal case."  *In re Morreale*, 2015 Bankr. LEXIS 2195, at \*21 (Bankr. D. Colo. May 28, 2015)(quoting *Thomas v. Fed. Nat'l Mortg. Assoc. (In re Thomas)*, 469 B.R. 915, 921 (10th Cir. BAP 2012)).  The burden to establish standing is on the party asserting such standing.  *Ebel v. King (In re Ebel)*, 338 B.R. 862, 869 (Bankr. D. Colo. 2005).

44.     Pursuant to 11 U.S.C. § 1109(b), "A party in interest, including the debtor . . . a creditor, [or] an equity security holder . . . may raise and may appear and be heard on any issue in a case under this chapter."

45.     "Although 11 U.S.C. § 1109(b) broadly defines 'party in interest,' the phrase invites interpretation, and 'is generally understood to include all persons whose pecuniary interests are, directly affected by the bankruptcy proceedings.'"  *Nintendo Co. v. Patten (In re Alpex Computer Corp.)*, 71 F.3d 353, 356 (10th Cir. 1995).  Bankruptcy courts must decide on a case by case basis if prospective party has a "sufficient stake in the proceeding so as to require representation."  *Vermejo Park Co. v. Kaiser Coal Corp.*, 998 F.2d 783, 788 (10th Cir. 1993)(quoting *In re Amatex Corp.*, 755

---

[6]  The Tauber Group is attempting to use the expedited procedures set forth in L.B.R. 2081-3 for the Trustee Motion by including a request for conversion.  The Debtors object to the use of summary procedures for the Trustee Motion and assert that an evidentiary hearing is required for the Trustee Motion.

F.2d 1034, 1042 (3d. Cir. 1985)).

46.     The Tauber Group does not provide any basis for any standing in Sklarco's case, nor can they.  No member of the Tauber Group is listed as a creditor of Sklarco, nor have any members of the Tauber Group filed a claim in Sklarco's case.  While Sklarco may have an interest in some of the same operated properties in which the members of the Tauber Group assert an interest, the mere fact of ownership in similar projects is insufficient to establish that the members of the Tauber Group have a "sufficient stake in the bankruptcy proceeding so as to require representation."  *See id.*

47.     The Tauber Group's only apparent mention of any possible claim against Sklarco is related to alleged unpaid cash call advances.  While the Debtors deny that Sklarco had a specific obligation to pay cash call advances versus paying expenses as they were incurred and billed to Sklarco, even *if* Sklarco was required to pay cash call advances, this still would not give the Tauber Group standing in Sklarco's case.  At most, it would be a debt owed to SEC as operator of the properties by Sklarco, not to other working interest holders.

48.     Nor can any of the other Opposing Creditors establish standing in Sklarco's bankruptcy case.  The only party who may have been able to establish standing in Sklarco's case was Pruet, who held a claim against Sklarco on the Petition Date in the amount of $112,436.80.  On or about May 5, 2020, Pruet elected to offset its pre-petition claim against Sklarco's post-petition revenue.  *See* Letter from Matt Ochs dated May 5, 2020, attached hereto as Exhibit A.  As a result, Pruet's claim has been paid in full, and Pruet no longer has standing in Sklarco's bankruptcy case.

49.     Nor can the Opposing Creditors assert that the Debtors' cases are so inextricably linked as to be wholly inseparable.  This argument lacks any factual or legal basis.

50.     The Debtors' cases have been jointly administered, but not substantively consolidated.  SEC and Sklarco each filed separate Schedules and Statements of Financial Affairs, identifying the distinct assets owned by each debtor.  There has been uncontroverted testimony at multiple hearings that while SEC operates the various oil and gas wells, it does not have any ownership interest in the wells.  The ownership interests and mineral leases are maintained entirely with Sklarco.

51.     The only "intertwining" that has occurred is the continued maintenance of Sklarco's funds with SEC for use in SEC's continued operations, an act that occurred by agreement between the Debtors, the Bank, and the Committee in negotiating the continued use of cash collateral.  But for this agreement, post-petition Sklarco's funds would have been transferred to Sklarco's bank accounts.

52.     The two estates could easily be separated and maintained entirely separately on a post-

petition basis. Accordingly, the Tauber Group's argument that the estates are inextricably linked fails.

53.     The Kudzu Parties, like the Tauber Group, are not creditors of Sklarco. They were not listed as creditors, have not filed proofs of claim, and similarly provide no basis in their joinder as to their basis for standing.

54.     There is no question as to why the Opposing Creditors are attempting to link Sklarco's assets to SEC: Sklarco's assets hold substantial value, while the value of SEC's assets is minimal in comparison. But the mere desire to link the assets of the two companies, and liquidate both does not create a factual or legal basis to do so, nor does it create standing for parties with no pecuniary interest in Sklarco's bankruptcy case.

55.     The Opposing Creditors do not have standing in Sklarco's bankruptcy case. As such, the Trustee Motion as to Sklarco can go no further, and must be denied.

**_B. Cause Does Not Exist to Appoint a Trustee in SEC's Bankruptcy Case._**

56.     Pursuant to 11 U.S.C. § 1104(a)(1), the court may order the appointment of trustee for "cause, including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management[.]"

57.     The appointment of a trustee is an extraordinary remedy. *In re Colorado-UTE Elec. Ass'n*, 120 B.R. 164, 173 (Bankr. D. Colo. 1990). "There is a strong presumption that the debtor should be permitted to remain in possession absent a showing of need for the appointment of a trustee." *Id.* (internal quotations omitted) (citing *In re Ionosphere Clubs, Inc. (Eastern Airlines)*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990)).

58.     Generally, the appointment of a trustee "should be the exception, rather than the rule . . . ." *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 655-56 (Bankr. S.D.N.Y. 2006). The burden is on the moving party to establish by clear and convincing evidence that cause exists to appoint a trustee. *Id.*

59.     When considering whether "cause" exists for appointment of a trustee, the focus is on the post-petition activities of the debtor-in-possession, not past misconduct. *In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001). "Speculation that a debtor may do something in the future does not overcome the strong presumption that the debtor should be permitted to remain in possession in a chapter 11 case or justify the additional cost of a trustee." *Id.*

60.     Focusing on the post-petition actions by SEC, acting as debtor-in-possession, it is evident that cause does not exist for appointment of a Chapter 11 Trustee.

61.     Post-petition, SEC has undertaken substantial efforts to reorganize, even in the short time this case has been active including:

    a.  Furloughing or terminating employees where appropriate to reduce fixed costs;

    b.  Changing cash management processes to ensure all post-petition revenue received from the sale of oil and gas products remains segregated from funds in SEC's operating account;

    c.  Negotiating with vendors to reduce overhead costs;

    d.  Ensuring that post-petition revenues will be timely paid to the holders of working interests, royalty interests, and overriding royalty interests; and

    e.  Appointment of a Chief Restructuring Officer ("CRO").

62.     On May 21, 2020, the Debtors filed their *Motion for Entry of Order Authorizing Debtors' Employment of CR3 Partners as Chief Restructuring Officer Effective as of May 21, 2020* ("CRO Motion").  As set forth in the CRO Motion, the proposed scope of the CRO's engagement is extensive, and includes, but is not limited to:

    a.  Acting with authority with respect to all aspects of the Debtors' day to day business activities and operations, including budgeting, cash management and financial management;

    b.  Evaluating and pursuing any litigation and claims held by the Debtors' respective estates;

    c.  Acting as the party with **ultimate** authority over corporate decisions; and

    d.  Evaluating liquidity options and developing a plan for the reorganization, refinancing, restructuring, or sale of the Debtors' assets.

63.     Furthermore, the manager of the Debtors, Howard Sklar, together with the Howard Sklar Trust, the Alan Sklar Trust, and the Jacob Sklar Trust, have agreed to provide a post-petition loan in the amount of $1,233,000 to the Debtors, repayment of which will be waived and subordinated to interests unsecured creditors, subject to certain conditions.

64.     The post-petition conduct of the Debtors evidences that the Debtors are complying with their fiduciary duties as debtors-in-possession to maximize the value of the respective estates for the benefit of creditors, and proceeding with their reorganization in an orderly fashion.

65.     Additionally, the appointment of a CRO will reduce the possibility of any conflicts of interest, and will ensure additional oversight to the Debtors' ongoing operations.

66.     Accordingly, cause does not exist for the appointment of a Trustee pursuant to 11 U.S.C. § 1104(a)(1).

### C.  Cause Does Not Exist for Appoint of a Trustee Pursuant to 11 U.S.C. § 1104(a)(2)

67.     Pursuant to 11 U.S.C. § 1104(a)(2), the court may order the appointment of a trustee "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate[.]"

68.     "There are no hard and fast rules governing the application of this provision . . . . In assessing the merits of a motion under (a)(2), courts 'eschew rigid absolutes and look[] to the practical realities and necessities' of the case." *In re China Fishery Grp. Ltd.*, 2016 Bankr. LEXIS 3852, at *59 (Bankr. S.D.N.Y. Oct. 28, 2016)(quoting *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989)).

69.     In evaluating whether appointment of a trustee is in the best interests of creditors and equity security holders, courts generally consider four factors: 1) the trustworthiness of the debtor; 2) the debtor's past and present performance and prospects for the debtor's rehabilitation; 3) the confidence, or lack thereof, of the business community and creditors in present management; and 4) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment. *Colorado-Ute*, 120 B.R. at 176; *China Fishery*, 2016 Bankr. LEXIS 3852, at *59. However, the decision whether to appoint a trustee ultimately rests with court's discretion, requiring the court to engage in a "fact driven analysis, principally balancing the advantages and disadvantages of [appointing a trustee.]" *China Fishery*, 2016 Bankr. LEXIS 3852 at *59-60 (quoting *In re Adelphia Communications Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006)).

### I. Trustworthiness of SEC and Confidence in Present Management

70.     The Tauber Group broadly asserts that the SEC has lost the trust of its creditors and the business community at large.

71.     While it is true that testimony at the hearing on the Debtors' continued use of cash collateral did establish that a number of working interest holders no longer trust SEC, it cannot be said that the same holds universally true for the entire business community.  Indeed, there are a lot of working interest holders who still trust SEC to operate the properties on their behalf, and a lot of vendors that are still working with SEC, and want to continue working with SEC during the pendency of the bankruptcy case.  Letters supporting the Debtors' reorganization efforts from Sklarco's largest lessor, Cedar Creek Land & Timber, Inc., and from SEC's largest purchaser,

Goodway Refining, are attached hereto as Exhibit B and C respectively, and further evidence that SEC has strong support from vendors and the business community as a whole.

72.     Additionally, by agreeing to the appointment of a CRO, it is intended that the CRO will inject the presence of a neutral third party into SEC's ongoing business dealings with creditors, including the working interest holders who have entered an appearance in this case.

73.     Contrary to the Tauber Group's assertions, Howard Sklar would not continue to have ultimate control over the management of SEC.  Rather it is contemplated that the appointed CRO would have ultimate decision-making authority over SEC's business decisions.  While this would likely require consultation with Howard Sklar – the only person at SEC familiar with the 20-plus year history of the company and its assets – control will still rest with the CRO.

### *II.  SEC's Performance and Prospects for Rehabilitation*

74.     Notably absent from the Trustee Motion is an analysis of SEC's past and present performance, and the prospects for rehabilitation.  That is because on this point, there is no question that SEC has performed well as an operator in years prior, earning its working interest holders millions in net revenue over the years of their investments.  There is also no question that the Debtors' projections anticipate sufficient cash flow during the pendency of this bankruptcy case to meet its ongoing expenses.

75.     SEC has operated successfully for over 20 years.  During that time, they have made substantial efforts to operate the oil and gas properties in an efficient and profitable manner, and have developed new properties for the benefit of all parties holding an interest.

76.     As the operator of the properties, SEC has been able to maintain relatively stable production from its wells, resulting in a steady stream of income to the revenue interest holders.

77.     SEC was also in the process of developing several new prospects, including a Florida well and pipeline and the helium well in Montana, that would likely result in substantial revenue, not just to Sklarco, but to the other interest holders as well.

78.     Prior to the bankruptcy filing, parties with interests in the wells could have exercised their rights under the respective JOAs to remove SEC as operator. They did not do so. They could have also exercised their rights to take their production "in kind."  They did not do so. Had SEC demonstrated a history of poor performance, these rights would have been exercised, and not doing so further evidences SEC's successful performance prior to the bankruptcy filing.

79.     The Debtors also have a strong likelihood of rehabilitation.  As evidenced by the Debtors' 13-week budget, attached hereto as Exhibit D, the Debtors anticipate meeting their expenses, and having positive cash flow during the pendency of the bankruptcy case.  Their liquidity is further bolstered by the post-petition loan that will be provided by Howard Sklar, the Howard Sklar Trust, the Jacob Sklar Trust, and the Alan Sklar Trust.

80.     The Debtors intend to refinance their debt and exit bankruptcy by early 2021.  With the time afforded by the bankruptcy filing, and the continuing increase in the price of oil, it is highly likely that the Debtors will be able to successfully refinance their debt and successfully exit bankruptcy as a reorganized Debtor.

81.     Accordingly, SEC's prior and present performance and likelihood of rehabilitation evidences that appointment of a trustee is not warranted.

### III.  Cost of a Trustee Versus the Benefit to be Derived

82.     Appointment of a Chapter 11 Trustee will be an expensive endeavor, providing little to no benefit to creditors beyond those working interest holders who are looking to force a liquidation and acquire assets at below market prices.

83.     There is no question that appointment of a Chapter 11 trustee will result in significant additional administrative expenses to the estate – costs that can and will be mitigated through the appointment of a CRO.

84.     A Chapter 11 trustee, who will undoubtedly bill at an hourly rate, will be coming into the business with no prior knowledge of the assets and operations, and will have to spend substantial additional time getting familiar with SEC's assets and liabilities.  The trustee will also retain their own counsel, retain an accountant, and hire any number of other professionals in the course of administering SEC's estate, all with no cap the on overall expenses incurred.

85.     The administrative expenses of the trustee and their professionals would be in addition to the administrative expenses incurred by SEC's professionals, including counsel, and Committee counsel.

86.     The end result of a trustee would undoubtedly be a liquidation of SEC's assets.  Given that the value of SEC's assets is less than that the amount of East West Bank's secured claim, there would be no recovery for any unsecured creditors in the event of an appointment of a Chapter 11 Trustee.

87.     The real goal for the Tauber Group in appointing a trustee would be to attempt to reach Sklarco's assets and attempt to force a sale of Sklarco's leasehold interests.  However, even if Sklarco's assets are liquidated, those funds would not go to pay SEC's creditors. The funds would go first to pay East West Bank, then to pay its unsecured claims of approximately $300,000 with a bulk of the funds flowing back to the equity holders.  The *only* party to benefit from this scenario would undoubtedly be those parties hoping to buy Sklarco's mineral interests for below market value.

88.     In contrast, by allowing SEC to remain a debtor-in-possession and appointing a CRO, there are safeguards in place to ensure that there is a recovery for unsecured creditors.

89.     CR3 has agreed to a cap on their fees, ensuring that the administrative expense associated with bringing in "new management" will not become excessive or result in administrative insolvency.  An additional but not insignificant benefit would be the realization of the financing being provided by the Sklar Trust entities of approximately $1,233,000 which would be unavailable without a CRO.

90.     Sklarco has agreed to continue contributing its revenues to SEC, ensuring the SEC has additional funds for its continued operations.

91.     Furthermore, the Debtors intend to propose a Plan of Reorganization that will result in a refinance of the Debtors, and result in SEC's creditors receiving some payment on account of their claims.

92.     Accordingly, the cost of appointing a trustee for SEC far outweighs the benefit to any creditors, and further evidences that appointment of a trustee is not warranted pursuant to 11 U.S.C. § 1104(a)(2).

### D.  Cause Does Not Exist to Convert SEC's Case to a Case Under Chapter 7

93.     As set forth above, the Opposing Creditors do not have standing in Sklarco's bankruptcy case.  As such, the Opposing Creditors do not have standing to seek conversion of Sklarco's bankruptcy case, and therefore the request for conversion of Sklarco's bankruptcy case must be denied.

94.     The Tauber Group further asserts that cause pursuant to 11 U.S.C. § 1112(b) exists for conversion of SEC's case because it is "unlikely that reorganization attempts would be successful[.]"

95.     While not citing to any specific provisions of section 1112(b)(4), Tauber appears

14

to assert that there are continuing losses or diminution to the estate, and the absence of reasonable likelihood of rehabilitation.

96.     Cause under section 1112(b)(4)(A) has two elements: 1) whether the debtor has suffered or continued to experience negative cash flow; and 2) whether there is any reasonable likelihood that the debtor will be able "to stem its losses and place the debtor's business enterprise back on a solid financial footing within a reasonable amount of time." *In re Western Pac. Airlines*, 218 B.R. 590, 594 (Bankr. D. Colo. 1998); COLLIER ON BANKRUPTCY ¶ 1112.04 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

97.     As set forth in the projections on Exhibit D, while the Debtors are projecting some losses over the budgeted period, the losses are not substantial, and are not increasing over the budgeted time.  Additionally, the Debtors are still projected to have a positive cash balance well in excess of $2 million during the budgeted time frame.

98.     The Tauber Group therefore cannot establish that there are substantial losses to the estate.

99.     Nor can the Tauber Group establish that SEC lacks the ability to reorganize in a reasonable period of time.

100.    The Tauber Group's primary complaints are that SEC has presented "no real plan to continue exploration operations" or "any likelihood of take-out financing." This argument wholly ignores the fact that this case is still less than 60 days old, and that the Debtors have faced opposition, primarily from the Tauber Group, at every turn.  It is impossible to fathom how **any** company could expect to have a refinancing package in place to refinance over $22 million in secured debt less than 60 days after a bankruptcy filing when a two-day trial is required to obtain the use of cash collateral for just over two weeks.

101.    In reality, SEC has a proven track record of successfully operating wells in years past, and Sklarco has a strong portfolio of assets.  As oil prices continue to rise, more lenders will be attracted to the Debtors to provide refinancing options, and the Debtors will likely be able to reorganize in a reasonable period of time.

102.    Moreover, conversion of SEC's case to Chapter 7 is not in the best interests of the estate, or its creditors.  In a Chapter 7, not only will there be additional administrative expenses from the Chapter 7 Trustee and professionals hired by a Chapter 7 trustee, but the estate will lose all going concern value, assets will be auctioned off, and the estate will receive pennies on the

dollar, all of which will be paid to the secured creditor.  It is only by maintaining SEC as a going concern that SEC's creditors will receive any recovery on account of their claims.

## CONCLUSION

103.    The Trustee Motion is a bald-faced attempt to force the Debtors into a liquidation so that the Tauber Group and others can acquire Sklarco's assets for pennies on the dollar.  The Opposing Creditors have no pecuniary interest in Sklarco's bankruptcy case, and therefore no standing to request the appointment of a Chapter 11 Trustee, or conversion of its case to a case under Chapter 7.  Furthermore, the Tauber Group has failed to establish cause for appointment of a Chapter 11 trustee for SEC or conversion of SEC's case to a case under Chapter 7, as the Debtors are appointing a CRO to take over management of the day-to-day affairs of the companies, removing the possibility of conflicts of interest and ensuring additional oversight in the Debtors management.  Furthermore, appointment of a Chapter 11 Trustee or conversation of SEC's case to a case under Chapter 7 is not in the best interests of the estate or its creditors, as it will do nothing more than incur additional expense with no benefit. Accordingly, the Trustee Motion must be denied in its entirety.


DATED: June 1, 2020                             Respectfully submitted,

                                                By:    /s/  Keri L. Riley
                                                       Lee M. Kutner #10966
                                                       Keri L. Riley, #47605
                                                       **KUTNER BRINEN, P.C.**
                                                       1660 Lincoln St., Suite 1850
                                                       Denver, CO 80264
                                                       Telephone: (303) 832-2400
                                                       E-Mail: lmk@kutnerlaw.com
                                                       E-Mail: klr@kutnerlaw.com

Exhibit A



**Matthew J. Ochs**
**Partner**
**Phone** 303.295.8299
mjochs@hollandhart.com

May 5, 2020

<u>EMAIL</u>

Ms. Keri L. Riley
Kutner Brinen, P.C.
1660 Lincoln Street, Suite 1850
Denver, Colorado 80264
klr@kutnerlaw.com

Re:     *In re Sklar Exploration Company, LLC, et al.* **(Bankr. Case No. 20-12377)**
         **NW Brooklyn Oil Unit Inventory Adjustment and JIB Recoupment**

Dear Keri:

    As you know, this law firm represents Pruet Production Co. ("<u>Pruet</u>") in the above-referenced bankruptcy case of Sklar Exploration Company, LLC ("<u>SEC</u>") and Sklarco, LLC ("<u>Sklarco</u>"). Sklarco is a non-operator under that certain Unit Operating Agreement effective January 1, 2019 (the "<u>NW UOA</u>") governing operations for the NW Brooklyn Oil Unit in which Pruet is the operator.  In accordance with Paragraph 10.2 of the NW UOA, an inventory was conducted and by letter dated November 14, 2019, the proposed adjustment was submitted to the working interest owners for approval. By email dated December 20, 2019, Pruet advised the working interest owners in the NW Brooklyn Oil Unit that the inventory adjustment had been approved, and thereafter, Pruet included the adjustment in its monthly JIB accounts to the working interest owners. A copy of the November 14, 2019 letter and the December 20, 2019 email is attached. The inventory adjustment reflects a net sum due Sklarco in the amount of $249,416.88. By the terms of the NW UOA, Pruet is to pay the net credit to the entitled parties out of the funds received by Pruet in settlement of the inventory adjustment. At this time, Pruet believes that it has received substantially all of the net credit due Sklarco, but will confirm over the next two business days.  Upon such confirmation, Pruet will submit to Sklarco a check in the amount of the funds received by Pruet in settlement of the sums owed to Sklarco, together with an accounting of the outstanding sums, if any.

    Separately, Sklarco and SEC, as agent, are non-operators in various oil and gas wells and units operated by Pruet, including the properties identified by the attached Exhibit "A". The applicable operating and unit operating agreements are noted by Exhibit "A". As of April 30, 2020, the amount of $112,436.80 is owed by Sklarco and SEC, as agent, in joint-interest billings under the operating and unit operating agreements. Also as of April 30, 2020, the amount of $129,710.98 in revenue for production as reflected in the attached "Exhibit A" is owing to Sklarco and SEC, as agent, under the operating and unit operating agreements. By the attached "Exhibit A", the

T 303.295.8000   F 303.295.8261
555 17th Street, Suite 3200, Denver, CO 80202-3921
Mail to: P.O. Box 8749, Denver, CO 80201-8749
www.hollandhart.com

Alaska        Montana       Utah
Colorado      Nevada        Washington, D.C.
Idaho         New Mexico    Wyoming

 HOLLAND&HART.

Ms. Keri L. Riley
May 5, 2020
Page 2

outstanding JIB is matched with the applicable revenue, both as to party and property, under each operating and unit operating agreement. Because both amounts arise out of the same agreement, the doctrine of recoupment is applicable. As such, Pruet intends to exercise its right of recoupment against the revenues to collect the sum of $101,858.13 in outstanding unpaid JIB, allocating the available revenue by property and by owner. Doing so will result in net revenues payable to Sklarco in the amount of $27,852.85. The amount of $10,578.67 in unpaid JIB will remain owing from SEC. Pruet intends to exercise its right of recoupment against future revenues on a going forward basis to recoup this unpaid JIB balance as well as future JIB that may remain unpaid. A check payable to Sklarco in the net amount of $27,852.85 will be sent at the same time the inventory check referenced in the above paragraph is sent.

Pruet's reconciliation of the inventory adjustment and application of recoupment is not intended to waive, nor shall be deemed in any way, to waive the rights of Pruet and the working interest owners under any of the operating and unit operating agreements, nor waive any of their rights and remedies with respect to amounts owed to them any operating and unit operating agreement, or any other agreement.

Very truly yours,

/s/ Matt Ochs

Matt Ochs
Partner
of Holland & Hart LLP

MJO:mgc

cc:  Stan Kynerd
     Jeremy Retherford

PRUET PRODUCTION CO.
217 WEST CAPITOL STREET, SUITE 201
JACKSON, MS 39201-2004

141841

5/07/2020

| INVOICE NUMBER | INVOICE DATE | | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|
| MP14841 | 05/07/2020 | INVENTORY ADJUSTMENT PER NW BROOKLYN OIL UNIT OPERATING AGREEMENT | | $249,416.88 |

THE FACE OF THIS DOCUMENT HAS A VOID FEATURE, MICRO PRINTING AND A WATERMARK.

**PRUET PRODUCTION CO.**
217 WEST CAPITOL STREET, SUITE 201
JACKSON, MS 39201-2004

**REGIONS**
85-543
653

**141841**

| CHECK NO. |
|---|
| 141841 |

Pay ****************SUM OF 249,416 DOLLARS AND 88 CENTS*******************

| DATE | AMOUNT |
|---|---|
| 05/07/2020 | ****$249,416.88**** |

TO THE ORDER OF:
SKLARCO LLC
401 EDWARDS ST, STE 1601
SHREVEPORT LA 71101-5507

AUTHORIZED SIGNATURE

5/07/2020

MP589332     05/07/2020     NET REVENUE DUE SKLARCO                                    $27,852.85
                            FOR FEBRUARY PRODUCTION
                            AFTER RECOUPMENT OF OUTSTANDING JIB
                            THRU MARCH 31, 2020

**PRUET PRODUCTION CO.**
217 WEST CAPITOL STREET, SUITE 201
JACKSON, MS 39201-2004

THE FACE OF THIS DOCUMENT HAS A VOID FEATURE, MICRO PRINTING AND A WATERMARK - VERIFY FOR AUTHENTICITY.

**PRUET PRODUCTION CO.**                           **Regions** Bank                    589332
217 WEST CAPITOL STREET, SUITE 201
JACKSON, MS 39201-2004                             85-543
**OIL & GAS REVENUE**                              653
                                                                        CHECK NO.

                                                                        589332

                                                   VOID AFTER 90 DAYS

**P**ay    ****************SUM OF 27,852 DOLLARS AND 85 CENTS*****************     | DATE | AMOUNT |

                                                   05/07/2020          ****$27,852.85****

TO THE        SKLARCO LLC
ORDER OF:     401 EDWARDS ST, STE 1601
              SHREVEPORT LA 71101-5507

**Exhibit B**



**Cedar Creek**
Land & Timber, Inc.
**BREWTON, ALABAMA 36427**

DEER STREET
P. O. BOX 1769

(205) 867-6165

Re:   In re Sklar Exploration Company L.L.C.
In re Sklarco L.L.C.
Case Nos. 20-12377 and 20-12380
U.S. Bankruptcy Court for the
District of Colorado

Dear Judge Brown:

Cedar Creek Land & Timber, Inc. is a large land and mineral owner in southwest Alabama. Over the past 10 to 15 years, we have granted a number of oil and gas leases to the Sklar companies. Many of these leases are currently in production, are owned by Sklarco and other non-operating working interest owners, and are operated by Sklar Exploration Company. It is my understanding that we are the largest royalty owner under Sklar operated leases in Alabama. We also own minerals and royalty interests under thousands of acres covered by oil and gas leases owned and operated by other lessees and operators in south Alabama.

We have had a very good relationship with the Sklar companies for many years. Sklar has been a dependable and honorable operator during all those years. They have been a good steward in developing and producing oil and gas from our properties for many years. We have been very satisfied with our relationship with the Sklar companies and hope that it will continue.

We understand that some parties are trying to interfere with the Sklar companies' efforts to reorganize. We strongly oppose those efforts. We think Sklar Exploration Company should continue to operate the many wells in which we have an interest and believe our interest might be negatively impacted if a new operator came into place. We do not want a court trustee appointed to take over control of the Sklar companies, and we do not want to see the Sklar companies forced into liquidation. We do support the motion filed by the Sklar companies to appoint a CRO.

Sincerely,

Paul D. Owens
Chairman of the Board

**Exhibit C**

Goodway Refining, LLC
The Leigh Place
PO Box 649
Brewton, Alabama, 36427

Re:    In re Sklar Exploration Company L.L.C.
       In re Sklarco L.L.C.
       Case Nos. 20-12377 and 20-12380
       U.S. Bankruptcy Court for the
       District of Colorado

Dear Judge Brown:

Goodway Refining, LLC is an oil purchaser and transporter in southwest Alabama. Over the past number of years, we have been the largest purchaser of oil produced by Sklar in Alabama. We have had a very good relationship with the Sklar companies for many years. We can always count on Sklar to do what it is supposed to do. We have been very satisfied with our relationship with the Sklar companies and hope that it will continue.

We understand that some parties are trying to interfere with the Sklar companies' efforts to reorganize. We strongly oppose those efforts. We think Sklar Exploration Company should continue to operate its wells. We do not want a court trustee appointed to take over control of the Sklar companies, and we do not want to see the Sklar companies forced into liquidation. We do support the motion filed by the Sklar companies to appoint a CRO.

Sincerely,

Paul D. Owens Jr
Its Manager

**Exhibit D**

**SKLAR EXPLORATION COMPANY LLC and SKLARCO LLC**
**13 WEEK CASH FLOWS**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| | 22-May | 29-May | 5-Jun | 12-Jun | 19-Jun | 26-Jun | 3-Jul | 10-Jul |
| **CASH RECEIPTS** | | | | | | | | |
| | *April production* | | | | | *May production* | | |
| *Sklar operated oil production volume estimate (8/8ths BBL)* | 85,500 | | | | | 80,010 | | |
| *Oil price estimate (realized)* | $ 13.40 | | | | | $ 18.00 | | |
| *Oil price estimate (NYMEX WTI)* | | | | | | $ 26.00 | | |
| | | | | | | | | |
| *Sklar operated gas production volume estimate (8/8ths MCF)* | 315,120 | | | | | 315,120 | | |
| *Gas price estimate (realized)* | $ 1.42 | | | | | $ 1.55 | | |
| *Gas price estimate (NYMEX HH)* | | | | | | $ 1.68 | | |
| | | | | | | | | |
| **Operated properties [1]** | | | | | | | | |
| Oil | 1,145,700 | | | | | 1,440,180 | | |
| Gas | 447,470 | | | | | 488,436 | | |
| **Non-operated properties - Sklarco Revenue** | 45,000 | 45,000 | 30,000 | 32,000 | 30,000 | 22,000 | 27,000 | 32,000 |
| **Alabama gas plant management fees** | | 59,300 | 59,300 | | | | 59,300 | 59,300 |
| **Oil hedge settlements** | | | | 213,500 | | | | 168,500 |
| **Gas hedge settlements** | | | | 20,300 | | | | 20,300 |
| **Howard Sklar DIP loan [2]** | | | 1,000,000 | | | | | |
| **CASH RECEIPTS** | **1,638,170** | **104,300** | **1,089,300** | **265,800** | **30,000** | **1,950,616** | **86,300** | **280,100** |
| | | | | | | | | |
| **CASH DISBURSEMENTS** | | | | | | | | |
| | | *March Production* | | | | *April Production* | | |
| Revenue payable to others [3] | | 2,763,502 | | | | 1,338,263 | | |
| Severance tax | 193,005 | | | | 95,590 | | | |
| **Lease operating expenses (gross) for operated properties** | | | | | | | | |
| Contract pumpers | 10,350 | 5,250 | 3,450 | 3,000 | 7,350 | 5,250 | 3,450 | 3,000 |
| Compression rentals and maintenance | 26,906 | 9,050 | | 12,096 | 14,810 | 9,050 | | 12,096 |
| Saltwater disposal | 33,175 | 18,550 | 14,625 | 18,550 | 14,625 | 18,550 | 14,625 | 18,550 |
| Electrical service and supply | 2,600 | 1,900 | 700 | 1,900 | 700 | 1,900 | 700 | 1,900 |
| Oilfield supply | 1,205 | 605 | 600 | 175 | 1,030 | 605 | 600 | 175 |
| Artificial lift | 950 | 400 | 14,800 | 475 | 475 | 400 | 400 | 475 |
| RTU - remote monitoring | 3,060 | 1,400 | 8,500 | 130 | 2,930 | 1,400 | 8,500 | 130 |
| Gas measurement - meter calibration and lab | 1,500 | 750 | 750 | 750 | 750 | 750 | 750 | 750 |
| Safety systems - testing and repairs | 2,850 | 525 | | 1,150 | 1,700 | 525 | | 1,150 |
| Fuel and power - | | | | | | | | |
| Southern Propane Supplies | 3,676 | 1,838 | 1,838 | 1,838 | 1,838 | 1,838 | 1,470 | 1,470 |
| McAdams Propane | 76 | | | 76 | | | | 76 |
| Cherokee Co Electric Co-op | | | 250 | | | | 250 | |
| Thompson Gas | | 1,900 | 76 | | | 1,900 | 76 | |

**SKLAR EXPLORATION COMPANY LLC and SKLARCO LLC**
**13 WEEK CASH FLOWS**

| | 1 22-May | 2 29-May | 3 5-Jun | 4 12-Jun | 5 19-Jun | 6 26-Jun | 7 3-Jul | 8 10-Jul |
|---|---|---|---|---|---|---|---|---|
| Mc Pherson Lubes | 2,050 | | | | 2,050 | | | |
| Herring Gas Company, Inc | 700 | | | | 700 | | | |
| Southern Pine Electric | 147,050 | | | 147,050 | | | | 147,050 |
| Escambia River Electric, Inc. | | 7,700 | | | | 7,700 | | |
| Yazoo Valley Electric | 10,729 | | 160 | | 10,729 | | 160 | |
| Upshur Rural Electric Co-op | 270 | | 385 | 270 | | | 385 | 270 |
| Navasota Valley Electric Co-op | | | 23 | | | | 23 | |
| Swepco | | 150 | 225 | | | 150 | 225 | |
| Mississippi Power | 10,655 | | | 10,655 | | | | 10,655 |
| Chemicals | 6,400 | | 4,500 | 1,900 | 4,500 | | 4,500 | 1,900 |
| Construction | 1,000 | 1,000 | 500 | 500 | 500 | 500 | 400 | 400 |
| Environmental services | 1,249 | 30,400 | | 14,737 | | | | 1,249 |
| Slickline services / jet pump support | 525 | | 525 | | 525 | | | 525 |
| Engineering services | | 1,500 | | | | 1,500 | | |
| Tubulars and inspections | 473 | | | 473 | | | | 473 |
| Insurance | | 47,851 | | | | 47,851 | | |
| Regulatory/Maintenance fees | | 44,642 | 2,600 | | | 142 | 22,000 | |
| Gas plant payroll | 29,561 | 29,561 | | | 29,561 | | 29,561 | |
| Gas plant operating costs | 71,950 | 3,800 | 7,000 | 69,450 | 40,000 | 28,800 | 7,000 | 69,450 |
| **Reimbursement of operated property LOE from other WI owners [4]** | (342,157) | (214,006) | (96,194) | (275,129) | (154,807) | (150,037) | (123,049) | (264,384) |
| **Lease operating expenses for non-operated properties - Sklarco Current JIBS** | 35,880 | 17,940 | 17,940 | 17,940 | 17,940 | 17,940 | 17,940 | 17,940 |
| **Transportation (truck pmts to Ford)** | 5,985 | 5,259 | 560 | 3,644 | 2,341 | 5,259 | 560 | 3,644 |
| **General and administrative** | | | | | | | | |
| Outsourced IT support and general computer exp (eg, Wolfepak) | 9,869 | | | 2,349 | 7,520 | | | 2,349 |
| Employee salaries and payroll taxes, excl. gas plant (see above) | 123,012 | 110,742 | | | 110,742 | | 110,742 | |
| Employee portion of 401k | 9,000 | | 9,000 | | 9,000 | | | 9,000 |
| CEO salary [5] | | 25,000 | | | | | 25,000 | |
| Employee benefits (health, dental, vision, life ins, ST/LT disability) | | 74,367 | | | | 74,367 | | |
| Payroll processing fees | | | 800 | | | | 800 | |
| Misc. insurance | | 3,974 | | | | 3,974 | | |
| Sales and use tax | 700 | | | 700 | | | | 700 |
| Outsourced preparation of sales and use tax | | 8,200 | | | | 3,200 | | |
| Geology and production system license fees | | 5,432 | | | | | | |
| Web mapping license fees (Tobin) | | | 70,920 | | | | | |
| Office rent - | | | | | | | | |
| Boulder [6] | 34,765 | 34,765 | | | | 34,765 | | |
| Shreveport | | 7,240 | | | | 7,240 | | |
| Bretwon, AL | | 1,800 | | | | 1,800 | | |
| Parking expense (Shreveport) | | 800 | | | | 800 | | |

**SKLAR EXPLORATION COMPANY LLC and SKLARCO LLC**
**13 WEEK CASH FLOWS**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| | 22-May | 29-May | 5-Jun | 12-Jun | 19-Jun | 26-Jun | 3-Jul | 10-Jul |
| Deposit for electricity for Alabama gas plant | | 70,536 | | | | | | |
| Corwin well - BOP rental @ $200/day (Weatherford) | | 23,117 | 6,510 | | | | 6,300 | |
| Outsourced gas plant settlement accounting fees | 18,844 | | 17,200 | | | | 2,200 | |
| Fuel and mileage | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 |
| Copier and postage rental and usage | 2,250 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 |
| Cell phones | 3,475 | | | | 3,475 | | | |
| Office utilities and maintenance | 6,000 | | | | | 3,000 | | |
| Bank - letter of credit fees | 500 | | | 500 | | | | 500 |
| Bank - misc charges | 985 | | | | 985 | | | |
| Bank interest | | | 92,000 | | | | 92,000 | |
| CRO / financial advisor fees | | 175,000 | | | | | 75,000 | |
| Legal fees - Sklar's counsel | | 63,469 | 50,000 | | | | 50,000 | |
| Legal fees - EWB | | | 100,000 | | | | 75,000 | |
| Legal fees - creditor committee | | 75,000 | | | | | 75,000 | |
| Critical vendors (pre-petition debts) [7] | | | 335,273 | | | | | |
| Trustee disbursement fees | | | | | | | | |
| Cash collateralize letters of credit for P&A bonds | 100,000 | | | | | | | 85,000 |
| Property tax | | | | | | | | |
| Escheat to various states | 100 | | | 110 | | | 26,927 | |
| General and misc office expenses | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| Controller - CO apt, travel and moving exp reimbursement | 4,701 | 4,660 | 470 | | | | 470 | |
| | | | | | | | | |
| **CASH DISBURSEMENTS** | **580,774** | **3,471,593** | **672,010** | **41,314** | **233,584** | **1,475,406** | **535,990** | **132,518** |
| | | | | | | | | |
| **NET CASH FLOW** | **1,057,396** | **(3,367,293)** | **417,290** | **224,486** | **(203,584)** | **475,210** | **(449,690)** | **147,582** |
| | | | | | | | | |
| **ALL ACCOUNTS BEGINNING CASH BALANCE *** | **5,505,045** | **6,562,441** | **3,195,148** | **3,612,438** | **3,836,924** | **3,633,340** | **4,108,550** | **3,658,860** |
| **ALL ACCOUNTS ENDING CASH BALANCE** | **6,562,441** | **3,195,148** | **3,612,438** | **3,836,924** | **3,633,340** | **4,108,550** | **3,658,860** | **3,806,442** |
| | | | | | | | | |
| **REVENUE ACCOUNT BEGINNING CASH BALANCE** | **2,746,813** | **4,146,978** | **868,795** | **868,795** | **868,795** | **773,205** | **1,108,651** | **1,108,651** |
| *inflows* | 1,593,170 | - | - | - | - | 1,928,616 | - | - |
| *severance taxes* | (193,005) | - | - | - | (95,590) | - | - | - |
| *reveine payable to WI, RI and ORRI* | - | (2,763,502) | - | - | - | (1,338,263) | - | - |
| *outflows to Sklar* | - | (514,681) | - | - | - | (254,907) | - | - |
| **REVENUE ACCOUNT ENDING CASH BALANCE** | **4,146,978** | **868,795** | **868,795** | **868,795** | **773,205** | **1,108,651** | **1,108,651** | **1,108,651** |
| | | | | | | | | |
| **ALL OTHER ACCOUNTS BEGINNING CASH BALANCE** | **2,758,232** | **2,415,463** | **2,326,353** | **2,743,642** | **2,968,128** | **2,860,135** | **2,999,899** | **2,550,209** |
| *inflows for Sklar revenue* | - | 514,681 | - | - | - | 254,907 | - | - |

**SKLAR EXPLORATION COMPANY LLC and SKLARCO LLC**
**13 WEEK CASH FLOWS**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| | 22-May | 29-May | 5-Jun | 12-Jun | 19-Jun | 26-Jun | 3-Jul | 10-Jul |
| *Howard Sklar DIP loan (stock liquidation)* | - | - | 1,000,000 | - | - | - | - | - |
| *all other inflows & outflows, net* | (342,769) | (603,791) | (582,710) | 224,486 | (107,994) | (115,143) | (449,690) | 147,582 |
| **ALL OTHER ACCOUNTS ENDING CASH BALANCE** | **2,415,463** | **2,326,353** | **2,743,642** | **2,968,128** | **2,860,135** | **2,999,899** | **2,550,209** | **2,697,791** |
| | - | - | - | - | - | - | - | - |

<mark>*\* Includes Kutner Brinen trust balance of 89,819 as of May 21, 2020*</mark>

[1] Includes revenue attributed to Sklarco for the operated properties, which accounts for approximately 16% of the revenue from the operated properties, and 100% of the revenue from non-operated properties
[2] $500,000 will be maintained in a segregated account in accordance with the Final Cash Collateral Order
[3] Revenue Payable to Others includes distributions to WI, RI and ORRI
[4] Includes reimbursement of LOE related to third party costs and COPAS reimbursements, which is an overhead cost recovery mechanism for well operators
[5] Subject to ongoing discussions by EWB
[6] Includes sublease income of $8,372
[7] Payment of Plains bills (in week 3)

**SKLAR STAND-ALONE / NET CASH FLOWS**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sklarco's share of operated property revenue (incl. severance tax) | - | 514,681 | - | - | - | 254,907 | - | - |
| Sklarco non-op property revenue | 45,000 | 45,000 | 30,000 | 32,000 | 30,000 | 22,000 | 27,000 | 32,000 |
| AL gas plant management fee | | 59,300 | 59,300 | | | | 59,300 | 59,300 |
| Hedge settlements | - | - | - | 233,800 | - | - | - | 188,800 |
| Sklarco's share of LOE from operated properties | (26,803) | 5,235 | 34,688 | (10,046) | 20,035 | 21,227 | 27,974 | (7,360) |
| Sklarco's LOE for non-operated properties | (35,880) | (17,940) | (17,940) | (17,940) | (17,940) | (17,940) | (17,940) | (17,940) |
| Truck pmts | (5,985) | (5,259) | (560) | (3,644) | (2,341) | (5,259) | (560) | (3,644) |
| G&A, net of COPAS reimbursement | (217,616) | (376,658) | (110,925) | (9,184) | (136,762) | (135,171) | (178,464) | (18,074) |
| Interest and other bank charges | (1,485) | - | (92,000) | (500) | (985) | - | (92,000) | (500) |
| Cash collateralize letters of credit | (100,000) | | | | | | | (85,000) |
| Legal fees - bankruptcy specific | - | (138,469) | (150,000) | - | - | - | (200,000) | - |
| CRO / financial advisor | - | (175,000) | - | - | - | - | (75,000) | - |
| Howard Sklar DIP loan | - | - | 1,000,000 | - | - | - | - | - |
| Critical vendor pre-petition debts | - | - | (335,273) | - | - | - | - | - |
| Trustee disbursement fees | - | - | - | - | - | - | - | - |
| **PERIOD CASH FLOWS** | **(342,769)** | **(89,110)** | **417,290** | **224,486** | **(107,994)** | **139,764** | **(449,690)** | **147,582** |
| **CUMULATIVE CASH FLOWS** | **(342,769)** | **(431,879)** | **(14,590)** | **209,896** | **101,903** | **241,667** | **(208,023)** | **(60,441)** |
| | - | - | - | - | - | - | - | - |

**SKLAR EXPLORATION COMPANY LLC and SKLARCO LLC**
**13 WEEK CASH FLOWS**

| | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|
| | 17-Jul | 24-Jul | 31-Jul | 7-Aug | 14-Aug |
| **CASH RECEIPTS** | | | | | |
| | | *June production* | | | |
| *Sklar operated oil production volume estimate (8/8ths BBL)* | | 80,010 | | | |
| *Oil price estimate (realized)* | | $ 32.50 | | | |
| *Oil price estimate (NYMEX WTI)* | | $ 31.00 | | | |
| | | | | | |
| *Sklar operated gas production volume estimate (8/8ths MCF)* | | 315,120 | | | |
| *Gas price estimate (realized)* | | $ 1.75 | | | |
| *Gas price estimate (NYMEX HH)* | | $ 1.68 | | | |
| | | | | | |
| **Operated properties [1]** | | | | | |
| Oil | | 2,600,325 | | | |
| Gas | | 551,460 | | | |
| **Non-operated properties - Sklarco Revenue** | 33,500 | 35,000 | 34,500 | 43,500 | 45,000 |
| **Alabama gas plant management fees** | | | 59,300 | 59,300 | |
| **Oil hedge settlements** | | | | 186,500 | |
| **Gas hedge settlements** | | | | 13,500 | |
| **Howard Sklar DIP loan [2]** | | | | | |
| **CASH RECEIPTS** | **33,500** | **3,186,785** | **93,800** | **302,800** | **45,000** |
| | | | | | |
| **CASH DISBURSEMENTS** | | | | | |
| | | | *May Production* | | |
| **Revenue payable to others [3]** | | | 1,620,037 | | |
| **Severance tax** | 115,717 | | | | 189,107 |
| **Lease operating expenses (gross) for operated properties** | | | | | |
| Contract pumpers | 7,350 | 3,000 | 2,250 | 3,450 | 3,000 |
| Compression rentals and maintenance | 14,810 | 6,000 | 3,050 | | 12,096 |
| Saltwater disposal | 14,625 | 12,000 | 6,550 | 14,625 | 18,550 |
| Electrical service and supply | 700 | 1,200 | 700 | 700 | 1,900 |
| Oilfield supply | 1,030 | 430 | 175 | 600 | 175 |
| Artificial lift | 475 | 200 | 200 | 400 | 475 |
| RTU - remote monitoring | 2,930 | 900 | 500 | 8,500 | 130 |
| Gas measurement - meter calibration and lab | 750 | 750 | | 750 | 750 |
| Safety systems - testing and repairs | 1,700 | 525 | | | 1,150 |
| Fuel and power - | | | | | |
| Southern Propane Supplies | 1,470 | 1,470 | 1,470 | 1,838 | 1,838 |
| McAdams Propane | | | | | 76 |
| Cherokee Co Electric Co-op | | | 250 | | |
| Thompson Gas | | 1,900 | | 76 | |

**SKLAR EXPLORATION COMPANY LLC and SKLARCO LLC**
**13 WEEK CASH FLOWS**

| | 9 17-Jul | 10 24-Jul | 11 31-Jul | 12 7-Aug | 13 14-Aug |
|---|---|---|---|---|---|
| Mc Pherson Lubes | 2,050 | | | | |
| Herring Gas Company, Inc | 700 | | | | |
| Southern Pine Electric | | | | | 147,050 |
| Escambia River Electric, Inc. | | 7,700 | | | |
| Yazoo Valley Electric | 10,729 | | | 160 | |
| Upshur Rural Electric Co-op | | | | 385 | 270 |
| Navasota Valley Electric Co-op | | | | 23 | |
| Swepco | | 150 | | 225 | |
| Mississippi Power | | | | | 10,655 |
| Chemicals | 3,000 | | 1,500 | 4,500 | 1,900 |
| Construction | 400 | 400 | 400 | 500 | 500 |
| Environmental services | | | | | 5,600 |
| Slickline services / jet pump support | | | 525 | 525 | |
| Engineering services | | 1,500 | | | |
| Tubulars and inspections | | | | 473 | |
| Insurance | | 47,851 | 65,168 | | |
| Regulatory/Maintenance fees | | 142 | 22,000 | | |
| Gas plant payroll | 29,561 | | 29,561 | | 29,561 |
| Gas plant operating costs | 40,000 | 3,800 | 2,000 | 7,000 | 69,450 |
| **Reimbursement of operated property LOE from other WI owners [4]** | (152,813) | (118,923) | (156,028) | (82,773) | (291,089) |
| **Lease operating expenses for non-operated properties - Sklarco Current JIBS** | 17,940 | 8,970 | 8,970 | 17,940 | 17,940 |
| **Transportation (truck pmts to Ford)** | 2,341 | 5,259 | | 560 | 3,644 |
| **General and administrative** | | | | | |
| Outsourced IT support and general computer exp (eg, Wolfepak) | 7,520 | | | | 2,349 |
| Employee salaries and payroll  taxes, excl. gas plant (see above) | 110,742 | | 110,742 | | 106,732 |
| Employee portion of 401k | 9,000 | | | 9,000 | |
| CEO salary [5] | | | 25,000 | | |
| Employee benefits (health, dental, vision, life ins, ST/LT disability) | | 74,367 | | | |
| Payroll processing fees | | | | 800 | |
| Misc. insurance | | 3,974 | | | |
| Sales and use tax | | | | | 700 |
| Outsourced preparation of sales and use tax | | 3,200 | | | |
| Geology and production system license fees | | 5,432 | | | |
| Web mapping license fees (Tobin) | | | | | |
| Office rent - | | | | | |
| Boulder [6] | | | 34,765 | | |
| Shreveport | | 7,240 | | | |
| Bretwon, AL | | 1,800 | | | |
| Parking expense (Shreveport) | | 800 | | | |

**SKLAR EXPLORATION COMPANY LLC and SKLARCO LLC**
**13 WEEK CASH FLOWS**

| | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|
| | 17-Jul | 24-Jul | 31-Jul | 7-Aug | 14-Aug |
| Deposit for electricity for Alabama gas plant | | | | | |
| Corwin well - BOP rental @ $200/day (Weatherford) | | | | 6,510 | |
| Outsourced gas plant settlement accounting fees | | | | 2,200 | |
| Fuel and mileage | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 |
| Copier and postage rental and usage | 1,125 | 564 | 564 | 1,125 | 1,125 |
| Cell phones | 3,475 | | | | |
| Office utilities and maintenance | | | 3000 | | |
| Bank - letter of credit fees | | | | | 500 |
| Bank - misc charges | 985 | | | | |
| Bank interest | | | 92,000 | | |
| CRO / financial advisor fees | | | 75,000 | | |
| Legal fees - Sklar's counsel | | | 50,000 | | |
| Legal fees - EWB | | | 75,000 | | |
| Legal fees - creditor committee | | | 50,000 | | |
| Critical vendors (pre-petition debts) [7] | | | | | |
| Trustee disbursement fees | | | 110,000 | | |
| Cash collateralize letters of credit for P&A bonds | | | | | |
| Property tax | | | 570 | | |
| Escheat to various states | | | | | |
| General and misc office expenses | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| Controller - CO apt, travel and moving exp reimbursement | | | | 470 | |
| | | | | | |
| **CASH DISBURSEMENTS** | **253,212** | **87,501** | **2,240,819** | **5,462** | **341,033** |
| | | | | | |
| **NET CASH FLOW** | **(219,712)** | **3,099,284** | **(2,147,019)** | **297,338** | **(296,033)** |
| | | | | | |
| **ALL ACCOUNTS BEGINNING CASH BALANCE *** | **3,806,442** | **3,586,730** | **6,686,015** | **4,538,995** | **4,836,333** |
| **ALL ACCOUNTS ENDING CASH BALANCE** | **3,586,730** | **6,686,015** | **4,538,995** | **4,836,333** | **4,540,300** |
| | | | | | |
| **REVENUE ACCOUNT BEGINNING CASH BALANCE** | **1,108,651** | **992,934** | **4,144,719** | **2,216,103** | **2,216,103** |
| *inflows* | - | 3,151,785 | - | - | - |
| *severance taxes* | (115,717) | - | - | - | (189,107) |
| *reveine payable to WI, RI and ORRI* | - | - | (1,620,037) | - | - |
| *outflows to Sklar* | | | (308,579) | | |
| **REVENUE ACCOUNT ENDING CASH BALANCE** | **992,934** | **4,144,719** | **2,216,103** | **2,216,103** | **2,026,996** |
| | | | | | |
| **ALL OTHER ACCOUNTS BEGINNING CASH BALANCE** | **2,697,791** | **2,593,796** | **2,541,296** | **2,322,892** | **2,620,231** |
| *inflows for Sklar revenue* | - | - | 308,579 | - | - |

**SKLAR EXPLORATION COMPANY LLC and SKLARCO LLC**
**13 WEEK CASH FLOWS**

| | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|
| | 17-Jul | 24-Jul | 31-Jul | 7-Aug | 14-Aug |
| *Howard Sklar DIP loan (stock liquidation)* | - | | | | |
| *all other inflows & outflows, net* | (103,995) | (52,501) | (526,982) | 297,338 | (106,926) |
| **ALL OTHER ACCOUNTS ENDING CASH BALANCE** | **2,593,796** | **2,541,296** | **2,322,892** | **2,620,231** | **2,513,304** |
| | - | - | - | - | - |

**\* Includes Kutner Brinen trust balance of 89,819 as of M**

[1] Includes revenue attributed to Sklarco for the operated properties, which accou
[2] $500,000 will be maintained in a segregated account in accordance with the Fin
[3] Revenue Payable to Others includes distributions to WI, RI and ORRI
[4] Includes reimbursement of LOE related to third party costs and COPAS reimburs
[5] Subject to ongoing discussions by EWB
[6] Includes sublease income of $8,372
[7] Payment of Plains bills (in week 3)

**SKLAR STAND-ALONE / NET CASH FLOWS**

| | | | | | |
|---|---|---|---|---|---|
| Sklarco's share of operated property revenue (incl. severance tax) | - | - | 308,579 | - | - |
| Sklarco non-op property revenue | 33,500 | 35,000 | 34,500 | 43,500 | 45,000 |
| AL gas plant management fee | - | - | 59,300 | 59,300 | - |
| Hedge settlements | - | - | - | 200,000 | - |
| Sklarco's share of LOE from operated properties | 20,533 | 29,005 | 19,729 | 38,043 | (14,036) |
| Sklarco's LOE for non-operated properties | (17,940) | (8,970) | (8,970) | (17,940) | (17,940) |
| Truck pmts | (2,341) | (5,259) | - | (560) | (3,644) |
| G&A, net of COPAS reimbursement | (136,762) | (102,277) | (179,541) | (25,005) | (115,806) |
| Interest and other bank charges | (985) | - | (92,000) | - | (500) |
| Cash collateralize letters of credit | - | - | - | - | - |
| Legal fees - bankruptcy specific | - | - | (175,000) | - | - |
| CRO / financial advisor | - | - | (75,000) | - | - |
| Howard Sklar DIP loan | - | - | - | - | - |
| Critical vendor pre-petition debts | - | - | - | - | - |
| Trustee disbursement fees | - | - | (110,000) | - | - |
| **PERIOD CASH FLOWS** | **(103,995)** | **(52,501)** | **(218,403)** | **297,338** | **(106,926)** |
| **CUMULATIVE CASH FLOWS** | **(164,436)** | **(216,936)** | **(435,340)** | **(138,001)** | **(244,928)** |
| | - | - | - | - | - |