UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

IN RE:                        .   Case No. 20-12377 EEB
                              .               Chapter 11
SKLAR EXPLORATION COMPANY,    .
LLC,
      Debtor.                 .
                              .
SKLARCO, LLC,                 .   Case No. 20-12380 EEB
      Debtor.                 .               Chapter 11
                              .
                              .   Jointly Administered Under
. . . . . . . . . . . . . . . .   20-12377 EEB


**TRANSCRIPT OF ORAL RULING ON (1) DEBTORS' MOTION
FOR AUTHORITY TO USE CASH COLLATERAL ON AN INTERIM BASIS
(DKT. NO. 34)**


BEFORE THE HONORABLE ELIZABETH E. BROWN
UNITED STATES BANKRUPTCY JUDGE

MONDAY, MAY 18, 2020
DENVER, COLORADO


TRANSCRIPT REQUESTED BY:     KUTNER BRINEN, P.C.
TRANSCRIPT ORDERED ON:       JUNE 3, 2020
TRANSCRIPT DELIVERED ON:     JUNE 4, 2020
TRANSCRIPT PRICE:            $6.05 PER PAGE; $205.70

```
 1   APPEARANCES:

 2   For the Debtor:              Lee M. Kutner
                                  Keri Riley
 3                               Howard Sklar
                                  Conrad Ambrecht
 4                               Marshall Jones

 5   United States Trustee:       Paul Moss

 6   Creditors' Committee:        John Cornwell
                                  Grant Beiner
 7
     East West Bank               Bryce Suzuki
 8                               Craig Schuenemann

 9   Anderson Exploration Energy  Eric Lockridge
     Co., TCP Cottonwood, L.P.,
10   AEEC II, LLC, and Sugar Oil
     Properties:
11
     Baker Hughes:               Timothy Mohan
12
     Bri-Chem Supply Co.:         David Miller
13
     Fant Energy Ltd., JJS        Jennifer Hardy
14   Interests Escambia, LLC,
     JJS Interests Steele Kings,
15   LLC, JJS Working Interests,
     LLC:
16
     Fletcher Petroleum Co.,      Michael Niles
17   Fletcher Exploration, LLC,
     Fletcher Petroleum Group:
18
     FPCC USA:                    Joseph Bain
19                               Amy Vazquez

20   Franks Exploration Co.,      Jordan Bird
     AEH Investments, J & A
21   Harris Bundero Investment
     Co., Kingston, Hughes Oil
22   South, KMR Investments,
     Tommy Youngblood:
23

24

25
```

```
 1   Appearances continued:

 2   J.F. Howell Interests:          David R. Taggart
                                     David Morgan
 3
     Kudzu Oil Properties,           Timothy Swanson
 4   Alabama Oil Co. & Apple         Craig Geno
     River Investments, Alabama
 5   Oil & Gas, LLC:

 6   Landmark Oil and Gas,           Jim Spencer
     Landmark Exploration,
 7   Lexington Investments,
     Stone Development:
 8
     Lucas Petroleum Oil:            Duane Brescia
 9
     Barbara Page Lawrence,          Michael Guyerson
10   Estate of Pamela Page:

11   PAR Minerals, Eastern           Christopher Meredith
     Fishing & Tool Rental           Glen Taylor
12   Company, and Coastal
     Exploration:
13
     Pruet Oil Company, LLC,         Jeremy Retherford
14   Pruet Production Co.            Matt Ochs
     (Individually and as agent):   Stan Kynerd
15
     Stoneham Drilling:              James Bailey
16                                   Heather Stickle

17   Strago Petroleum Corporation,  Robert Paddock
     Meritage Energy Ltd.,          Louis Goza
18   Gateway Exploration, Harvest   John Aubrey
     Gas Management, G Crew         George Jochetz
19   Properties:

20   Tauber Exploration &            Thomas Shipps
     Production Co., CTM 2005,       Barnet Skelton, Jr.
21   Ltd., I & L Miss I, LP,
     Pickens Financial Group,
22   LLC, MER Energy, Ltd., The
     MR Trust, Tara Rudman
23   Revocable Trust, Rudman
     Family Trust, The Rudman
24   Partnership, Feather River
     75, LLC:
25
```

1  Appearances continued:

2  Court Recorder:                    Clerk's Office
                                      U.S. Bankruptcy Court
3                                     721 19th Street
                                      Denver, CO  80202
4
   Transcription Service:             AB Litigation Services
5                                     216 16th Street, Suite 600
                                      Denver, CO  80202
6                                     (303) 296-0017

7  Proceedings recorded by electronic sound recording;
   transcript produced by transcription service.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Time Noted:  9:01 a.m.)

 2              THE COURT CLERK:  The United States Bankruptcy

 3    Court for the District of Colorado is now in session.  The

 4    Honorable Elizabeth E. Brown, presiding.

 5              THE COURT:  Good morning, all.  We are here in the

 6    case of -- oops, I don't have the case number.

 7              THE COURT CLERK:  Just one moment, please.

 8         (Pause)

 9              THE COURT:  Thank you.  Okay, here we go.  We're

10    here in the case of Sklar Exploration Company, LLC, and

11    Sklarco, LLC, case number 20-12377.

12              We're here for the Court's oral ruling on cash

13    collateral and an oil and gas motion.

14              Let's go through now and do entries of appearance.

15    And I'll call first for the Debtors.

16              MR. KUTNER:  Good morning, Your Honor.  Lee Kutner

17    appearing on behalf of the Debtors.

18              THE COURT:  Okay.

19              MR. KUTNER:  And also Keri Riley should be on the

20    phone, and will enter appearance separately.

21              THE COURT:  Very good.  Ms. Riley, are you there?

22              MS. RILEY:  Good morning, Your Honor.  Keri Riley

23    appearing on behalf of the Debtors.  Also on the line we have

24    Marshall Jones, Howard Sklar, John Strausser, as well as

25    special counsel, I believe, Conrad Armbrecht and Duane
```

```
 1   Graham, and possibly Ben Ford.
 2             THE COURT:  Okay, very good.  Thank you.  Nobody
 3   from the U.S. Trustee, I'm assuming?
 4             MR. MOSS:  Your Honor, Paul Moss on the phone.
 5             THE COURT:  Oh, excellent.  Thank you, Mr. Moss.
 6             All right.  So East West Bank?
 7             MR. SUZUKI:  Good morning, Your Honor.  Bryce
 8   Suzuki and Craig Schuenemann on behalf of East West Bank.
 9             THE COURT:  Thank you.  The Creditors' Committee?
10             MR. CORNWELL:  Good morning, Your Honor.  This is
11   John Cornwell on behalf of the Creditors' Committee.  Also on
12   the line is Grand Beiner.
13             THE COURT:  Okay, thank you.  The Anderson
14   parties?
15             MR. LOCKRIDGE:  Good morning, Your Honor.  Eric
16   Lockridge from Kean Miller on behalf of AEEC II, LLC,
17   Anderson Exploration Energy Company, L.P., TCP Cottonwood,
18   L.P., and Sugar Oil Properties, L.P.
19             THE COURT:  Thank you.  Baker Hughes?
20        (No response)
21             THE COURT:  Mr. Mohan?
22        (No response)
23             THE COURT:  Okay.  They are not required to be
24   here.
25             MR. MOHAN:  Sorry, sorry.  Sorry, Your Honor, I
```

1  was on mute.  I'm sorry.  Timothy Mohan of Foley & Lardner on

2  behalf of Baker Hughes.

3         THE COURT:  Okay, thank you.  To make this go

4  quickly, let's have everybody un-mute for just a moment until

5  we get the entries of appearances in.

6         Okay, Bri-Chem?

7         MR. MILLER:  Good morning, Your Honor.  David

8  Miller appearing on behalf of Bri-Chem Chemical Corp., LLC.

9         THE COURT:  Thank you.  Fant Energy?

10        MS. HARDY:  Good morning, Your Honor.  Jennifer

11 Hardy of Willkie Farr, on behalf of Fant Energy and the JJS

12 entities.

13        THE COURT:  Thank you.  Fletcher Petroleum?

14        MR. NILES:  Good morning, Your Honor.  Michael

15 Niles for Fletcher Petroleum Company, LLC, Fletcher

16 Exploration, LLC, and Fletcher Petroleum Group.

17        THE COURT:  Thank you.  Franks?

18        MR. BIRD:  Good morning, Judge.  Jordan Bird on

19 behalf of Franks Exploration Company, LLC, Bundero Investment

20 Company, LLC, Kingston, LLC, AEH Investments, LLC, J & A

21 Harris, LLC, Hughes Oil South, LLC, KMR Investments, LLC, and

22 Tommy Youngblood.

23        THE COURT:  Thank you.  FPCC?

24        MR. BAIN:  Good morning, Your Honor.  Joseph Bain

25 and Amy Cazquez on behalf of FPCC USA, Inc.

1          THE COURT:  Thank you.  J.F. Howell?

2          MR. TAGGART:  Good morning, Your Honor.  David

3    Taggart on behalf of J.F. Howell Interests, L.P.  And my

4    client representative, Mr. Morgan, is also joining us.

5          THE COURT:  Thank you.  Hopping Green and Sam's?

6       (No response)

7          THE COURT:  No.  Okay.  Kudzu parties?

8          MR. SWANSON:  Good morning, Your Honor.  Tim

9    Swanson on behalf of Kudzu Oil Properties, LLC, Alabama Oil

10   Company, and Apple River Investments, LLC.  I believe Mr.

11   Craig Geno is on the line, and there may be several company

12   representatives on the line, as well.

13         THE COURT:  Very good.  Thank you.  Landmark

14   entities?

15         MR. SPENCER:  Good morning, Your Honor.  Jim

16   Spencer with Watkins & Eager Law Firm in Jackson,

17   Mississippi, on behalf of Landmark Oil and Gas, LLC, Landmark

18   Exploration, LLC, Stone Development, LLC, and Lexington

19   Investments, LLC.

20         THE COURT:  Thank you.  Barbara Page Lawrence, and

21   the Estate of Pamela Page?

22         MR. GUYERSON:  Good morning, Your Honor.  It's

23   Michael Guyerson appearing on behalf of Barbara Page

24   Lawrence, and the Estate of Pamela Page.  And I believe Ms.

25   Lawrence is listening in this morning, as well.

1           THE COURT:  Thank you.  Lucas Petroleum?

2           MR. BRESCIA:  Good morning, Your Honor.  This is

3  Duane Brescia on behalf of Lucas Petroleum Group.  I'm on the

4  telephone, but for some reason I'm not able to get my audio-

5  video to work.  I apologize for that.  I would like to listen

6  in.

7           THE COURT:  Okay.  We're not doing video for the

8  9:00 o'clock.  At the 10:00 o'clock, anybody who is going to

9  participate at 10:00, that's a Zoom call.  But this is just

10  straight old telephone conference call.

11          MR. BRESCIA:  Okay, great.  Thank you, Your Honor.

12          THE COURT:  Sure.  PAR Minerals, et al.?

13          MR. TAYLOR:  Good morning, Your Honor.  Glen

14  Taylor and Christopher Meredith for PAR Minerals, Eastern

15  Fishing, and Coastal Exploration.

16          THE COURT:  Thank you.  Pruet Production?

17          MR. RETHERFORD:  Your Honor, Jeremy Retherford and

18  Matt Ochs on behalf of Pruet Oil Company and Pruet

19  Production, both in its individual capacity and as agent and

20  attorney-in-fact for the working interest owners listed in

21  our 2019 notice.

22          And also on the line is client rep, Mr. Stan

23  Kynerd.

24          THE COURT:  Thank you.  Strago Group?

25          MR. PADDOCK:  Good morning, Your Honor.  Robert

1   Paddock on behalf of Strago Petroleum Corporation, Meritage

2   Energy Ltd., and Gateway Exploration, LLC, G Crew Properties,

3   LLC, Harvest Gas Management, LLC.

4          And I believe also on the line are client

5   representatives Louis Goza, John Aubrey, and George Jochetz,

6   which is J-o-c-h-e-t-z.

7          THE COURT:  Thank you.  Stoneham Drilling?

8          MR. BAILEY:  Your Honor, James Bailey with Bradley

9   Arant Boult Cummings, on behalf of Stoneham Drilling.  On the

10  line, as well, is Heather Stickle.

11         THE COURT:  Thank you.  All right, and the Tauber

12  Group?

13         MR. SHIPPS:  Good morning, Your Honor.  This is

14  Tom Shipps here on behalf of Tauber Exploration and

15  Production Company, CTM 2005 Ltd., Pickens Financial Group,

16  LLC, I & L Miss I, L.P., MER Energy Ltd., MR Oil and Gas,

17  LLC, Tara Rudman Revocable Trust, Feather River 75, LLC,

18  Rudman Family Trust, and the Rudman Partnership.

19         Also on the line may be Mr. Skelton or Shay

20  Denning.  Ms. Denning from our office.  And I don't know, but

21  we may also have some representatives of the clients also in

22  attendance.

23         THE COURT:  Okay.  Thank you.  All right, any

24  housekeeping matters?  I'll turn to you first, Ms. Riley,

25  before the Court reads its oral ruling.

1          MS. RILEY:  Your Honor, I don't believe we have

2     any housekeeping matters ahead of this particular hearing.

3          THE COURT:  Okay.  Very good.  All right.

4          So this is about a 6-page single spaced ruling, so

5     settle in and drink some coffee and stay awake.

6          Today the Court is prepared to issue its bench

7     ruling on two motions offered by the Debtors:  The third

8     interim cash collateral motion, which would allow SEC to use

9     cash through the end of May --

10         I'm going to ask the parties to all put us on mute

11    now since you're just listening to the oral ruling.  I'm

12    getting a lot of feedback in the courtroom.

13         Thank you.

14         All right.  So it's on the third interim cash

15    collateral motion, which would allow SEC to use cash through

16    the end of May, and what we have all referred to as the oil

17    and gas motion.

18         We've conducted two and a half days of hearings on

19    these motions, beginning on May 8th, and completing on May

20    12th.

21         The motions, as they've been modified over time,

22    are supported by the Debtors, East West Bank, and the

23    Official Unsecured Creditors' Committee.

24         Originally, we had 16 objectors, most of whom are

25    working interest holders, but also a few mechanic's lien

1   holders.

2          Over the course of these proceedings, many of the

3   objectors negotiated for language to protect their interests

4   in the short term, and then consented to the present form of

5   the proposed third interim cash collateral order.

6          But we have a few remaining objectors, and I'm

7   going to refer to them by the shorthand references that we

8   derived during the course of the hearings.

9          In reality, the attorneys represented multiple

10   parties with similar interests, and they may have even been

11   related companies, but we just didn't get into all of that.

12          The shorthand references for these groups were The

13   Tauber Group, FPCC, and Kudzu.  I will mostly refer to them

14   collectively as the objectors.

15          As we all know, Section 363(c) governs the

16   Debtors' ability to use cash collateral.  Cash is so easily

17   dissipated that the Bankruptcy Code has built in special

18   protections for persons having an interest in it.  It

19   requires either the consent of each entity that has an

20   interest in the cash, or a court order allowing its use after

21   notice and a hearing.

22          In stating who must consent, the Code doesn't just

23   refer to entities with lien rights against the cash.  It's

24   anyone claiming an interest in it.

25          Our objectors have taken the position that the

1  funds in question do not belong to this Estate, and that they

2  have ownership rights to the cash, and they do not consent to

3  its use.

4         Explaining the nature of the objectors' interests

5  requires a bit of background.

6         We have two Debtors here:  Sklarco and SEC.  SEC

7  is an operator of oil and gas wells.  It does not have an

8  ownership interest in any wells.  It operates wells for the

9  benefit of others.

10        Sklarco owns various forms of interests in wells,

11 including wells operated by SEC.  Both SEC and Sklarco are

12 related, as they have the same owner:  The Howard F. Sklar

13 Trust.

14        In the past and present, Sklarco has contributed

15 its share of revenues earned on its well interests operated

16 by SEC to fund the operations of SEC.

17        SEC has and had four different bank accounts for

18 the cash it holds.  Two are not really relevant to this

19 dispute, as they are the employee payroll and benefits

20 accounts.  The two that are important here are SEC's general

21 operating account, and its revenue account.

22        To understand the use of these two accounts, I'll

23 take a short detour to describe the business of SEC.

24        Simply put, SEC operates wells in a number of

25 states, bringing oil and gas above ground.  It sells the oil

1   and gas product and transports it to others, including

2   refineries.  A month later, it gets paid.

3          The revenue is deposited into the revenue account,

4   just as its name would indicate.

5          These revenues, however, belong to a number of

6   different kinds of interest holders.  There are royalty

7   interests and over-riding royalty interests who receive

8   payment without having to contribute anything toward the

9   costs of production.

10          There are working interest holders who are

11   entitled to receive the revenues net of the cost of

12   production.

13          Severance taxes are also owed on the revenue, and

14   the funds to pay these taxes are also kept in the revenue

15   account.

16          The operator is entitled to compensation from the

17   services it provides, from these funds.

18          SEC receives bills from sub-contractors, so to

19   speak, who provide various services in the production

20   process.  It then issues joint billing statements to the

21   working interest owners.  Each working interest owner is

22   liable to contribute its share of these costs, depending on

23   the size of the interest each holds.

24          There are two ways the working interest owners can

25   pay their share:  They can send in a check to SEC, or they

1 | can allow SEC to take the money from their share of the
2 | revenues, setting off expenses against income.
3 |          Once expenses are paid, then SEC sends each
4 | working interest owner a check for its share of the revenue.
5 |          In simplistic terms, this is how the money flows
6 | from production.
7 |          Then we have the cash call advances.  When SEC
8 | proposes to drill a new well, or build a pipeline, some kind
9 | of new project, it will estimate the costs of the special
10 | project and send out AFEs to prospective investors.  If they
11 | agree to participate and sign a participation agreement, then
12 | they will have whatever interest they purchased in the new
13 | venture, and they will have agreed to pay their proportionate
14 | shares of the costs of the project.
15 |          They are required to pay costs based on the
16 | estimates in advance.  The parties refer to these payments as
17 | the cash call advances.  They are due in advance, as Mr.
18 | Sklar testified, because each new project is considered
19 | risky.
20 |          The well that SEC drills might turn out to be a
21 | dry hole.  If working interest owners didn't pay in advance
22 | on these risky ventures, then it would be much harder to
23 | collect from them after a negative outcome.
24 |          When working interest owners pay in advance, the
25 | funds are deposited into SEC's operating account.  They are

1   commingled with funds from lots of different sources in that

2   account.

3            In the months leading up to their bankruptcy

4   filings, the Debtors received about $7 million dollars in

5   cash call advances.  How much of these funds were actually

6   used to pay expenses on the projects for which they were

7   advanced is unknown at this time.

8            The Debtors contend that at least some of the

9   money went for its intended purpose.  The objectors are more

10  than skeptical about this.

11           What everyone acknowledges is that the lion's

12  share of this money is now gone, and that the funds remaining

13  in the Debtors' bank accounts on the Petition date were

14  insufficient to pay the Debtors' obligations, including the

15  payment of the January and February revenues owed to the

16  working interest owners.

17           What caused the cash shortfall, and thus these

18  bankruptcy filings, has not been established with sufficient

19  evidence.

20           I heard the testimony of Mr. Sklar and other

21  representatives of SEC that it was due to two causes:  The

22  suspense of certain operations due to COVID; and the price

23  war on oil due to Saudi Arabia and Russia, resulting in a

24  dramatic drop in oil prices.

25           Then in the closing arguments, the Court asked

1   counsel for the bank about when the bank declared a default

2   on the Debtors' line of credit and why.  Counsel indicated

3   that the defaults occurred around the fall of 2019, well

4   before COVID and the drop in oil prices, and that the

5   defaults were triggered, at least in part, to large

6   withdrawals from the Debtors' accounts by Mr. Sklar.

7           Now, these statements of counsel are not evidence,

8   and so the Court makes no findings on the causes of

9   bankruptcy filings at this time, nor is it necessary for the

10  Court to do so in order to rule on the present motions.

11          What was clear from the evidence was that at some

12  point between the fall of 2019 and the April 1 bankruptcy

13  filings, SEC had received about the $7 million in cash call

14  advances, but that even with this large influx of cash, it

15  was not enough to keep the ship afloat.

16          SEC did not have the money to pay the interest

17  holders their share of the January and February revenues.

18          At the time of the bankruptcy filings, SEC had

19  only $1.8 million in its revenue account, and only about

20  $770,000.00 in its operating account.

21          I don't believe I was ever told during the

22  hearings what amount should have been in these accounts to

23  cover all of the revenue payments and bills due.  But clearly

24  these amounts were insufficient.

25          This brings us to the objectors' claims.

1          The Debtor has proposed to use cash collateral

2   that existed on the Petition date, and going forward through

3   the end of May.  The objectors say that the Debtors should

4   not be permitted to do so because that cash belongs to them;

5   at least the amount held in the revenue account.

6          It is not the Debtors' money, and they have not

7   agreed to loan their money to SEC for its working capital.

8          In response, the Debtors assert that the objectors

9   must be able to trace their ownership interests in the funds

10  because both accounts --

11         I'm going to ask whoever just joined to put your

12  phone on mute, as it is creating a lot of background noise.

13         In response, the Debtors assert that the objectors

14  must be able to trace their ownership interests in these

15  funds because both accounts are commingled with the funds of

16  many others.  They claim that tracing and proving ownership

17  will require an adversary proceeding under Rule 7001.

18         A final determination of ownership interests would

19  require a separate bankruptcy lawsuit.  But Section 363(p)

20  tells us about who has the burden to prove what at a hearing

21  under Section 363.

22         If a debtor is proposing to use property in which

23  another has an interest, the debtor carries the burden of

24  proving that interest will be adequately protected, despite

25  the debtor's use.

1       If an entity asserts that it has an interest in

2  the property that needs to be adequately protected, that

3  entity has the burden of proof to establish the validity,

4  priority, and extend, of its interest.

5       If those interests could only be asserted by means

6  of an adversary proceeding, then Section 363(p)(2) would be

7  rendered superfluous.

8       So that tells me that what happens in the context

9  of the cash collateral hearing is not a full blown trial on

10 the interests held in property.  And if it's not a full blown

11 trial, then the Court's determination of those interests in

12 connection with a 363 motion is not a final determination as

13 to those interests that would be afforded collateral estoppel

14 in any subsequent proceedings.

15      But it is some determination.  It is enough to say

16 whether or not a debtor can use the property, and to what

17 extent the purported property interest needs to be protected.

18      So that is the context in which I will make the

19 remainder of my findings.

20      Even for these limited purposes, and in this

21 limited context, the Debtors claim that the objectors must

22 still trace their interests to particular funds, or at least

23 in a particular amount.

24      Clearly, they did not do that during this trial.

25      Nevertheless, the Tauber Group asserts that it

1  only needed to show the extent of the Debtors' interest in

2  the funds in the revenue account.  It very deftly elicited

3  testimony that only about $71,000.00 of funds in the revenue

4  account on the Petition date belonged to Sklarco, and that

5  everything else belonged to someone else.

6      Remember, on the Petition date the revenue account

7  had $1.8 million dollars in it.  Debtors' exhibits 8 and 9

8  contain bank statements for both the operating and revenue

9  accounts.  On March 30, the revenue account had a balance of

10  $2.6 million, but on the April 1 Petition date, SEC

11  transferred $800,000.00 from this account to the operating

12  account.

13      SEC asserts that Sklarco's share of the revenues

14  was about $871,000.00.  The $800,000.00 transfer represented

15  the bulk of its revenue share.

16      But was that really Sklarco's share?  That might

17  have been true if the account still held all of the revenues

18  owed to all interest holders.  But we know it didn't.

19      Why Sklarco would get a full share when others

20  went unpaid is beyond my understanding.

21      And we know that Sklarco is obligated to pay its

22  share of the cash call advances totaling on Tauber exhibit

23  L-1 $2,688,045.93.  It did not pay these funds, which was a

24  serious breach of its contractual duties to the other working

25  interest owners.

1          Mr. Sklar testified that there was no need for

2    Sklarco to pre-pay its share of expenses, because even if

3    there was a dry hole, Sklarco would always contribute the

4    amount it owed.

5          But that's not true today, is it?  Sklarco doesn't

6    have the money to pay.

7          So in my mind, its failure to honor its cash call

8    obligations, and the fact that the revenue account was

9    seriously deficient to pay all of the claims on those funds,

10   means that Sklarco was not entitled to the $800,000.00 that

11   got transferred to SEC.

12         But for the purpose of ruling on this cash

13   collateral motion, that's really water under the bridge.  The

14   money was not Sklarco's or SEC's money to spend.  Some

15   portion of it may have belonged to the objectors and to the

16   other unpaid working interest owners.

17         But that $800,000.00 has been commingled in SEC's

18   operating account, and it has been spent.

19         The money retained in the revenue account on the

20   Petition date of $1.8 million has also been spent.  Under the

21   second interim cash collateral order and the interim order

22   authorizing payment of over-riding royalty and royalty

23   interest obligations entered on April 27, 2020, that money

24   went to satisfy the royalty interest holders to preserve the

25   Estate's rights in its leasehold interests.

1     So the objectors are right that the Debtors did

2 not own all of the funds in the revenue account.  Some

3 portion of it likely belonged to them, but it is now gone.

4     The funds the Debtor seeks to use in the proposed

5 third interim order are new funds received post-Petition.

6 Those funds do not belong solely to the Debtor, either.

7     But the Debtors have assured this Court that all

8 post-Petition funds from production, and the pre-Petition

9 March revenues are and will be and will remain segregated.

10     What this means, from what has been described to

11 the Court, is that the money will go into the revenue

12 account, strict records will be kept as to who is owed what

13 share of the funds, and that all interest holders, royalty

14 interests, over-riding royalty interests, and working

15 interests, will be paid their contractual amounts due from

16 the March revenue onward.

17     Now, I heard nothing from the Committee nor any

18 objectors that would suggest that this means of "segregation"

19 was insufficient.

20     Now, it doesn't sound much different to me from

21 the way SEC has operated in the past.  Maybe everyone is

22 counting on the CRO who will be hired to implement sufficient

23 safeguards to ensure that the interest holders' funds are not

24 spent inappropriately.

25     For now, I have no disputes raised as to the

1  mechanics of the segregation.

2        Nor did the objectors raise any objections to the

3  budgeted line items on Debtors' exhibit D-4.  Earlier in

4  these proceedings, there were objections to some expenses

5  such as paying the Boulder lease and Mr. Sklar's salary, but

6  those seem to have fallen by the wayside once the terms of

7  the proposed third interim cash collateral order were

8  negotiated.

9        The Debtors have pointed out that it is far from

10  clear that SEC is entitled to the management fee it claims it

11  will receive from the operation of the Alabama Gas plant.

12  That is not a matter before this Court.

13        It would have been necessary for the objectors to

14  show that absent receipt of that fee, SEC cannot operate

15  profitably between now and the end of May.  They did not do

16  so.

17        So the objectors did not prove to the Court that

18  the funds presently held, and which the Debtor proposes to

19  use, belong to them.  The pre-Petition funds are gone.  The

20  post-Petition funds received will not be used in SEC's

21  operations to the extent they belong to the objectors.

22        The budget does not purport to use the funds owed

23  to the working interest owners.  At least that is the

24  Debtors' representation, and I heard no evidence to

25  contradict it.

1            SEC will segregate the funds owed to the objectors

2  from March onward, and will not spend them.

3            I encourage the objectors to insert themselves

4  into the negotiations on the duties of the CRO and his or her

5  selection so they will have as much confidence as possible

6  that appropriate safeguards will exist to prevent what has

7  happened from happening again.

8            Moreover, the terms of the negotiated proposed

9  third interim cash collateral order contain provisions that

10 should give our objectors additional comfort.  The Debtors,

11 the bank, and the Committee, are willing to stipulate that to

12 the extent anyone's funds that existed on the Petition date

13 have already been spent, those entities that had an interest

14 in the now gone funds will have a "replacement lien" in

15 future revenues to compensate for that loss to the same

16 extent, and in the same priority as whatever legal rights

17 they had pre-Petition.

18           That may seem like cold comfort now, but it might

19 be worth something later.

20           Speaking of the proposed third interim cash

21 collateral order, I have made some edits where I thought

22 additional clarity was needed.

23           Primarily, I changed the references to the

24 objecting parties being those who were still objectors by the

25 time of the evidentiary hearing, and then renamed everyone

 1   who has asserted an interest in cash collateral during these

 2   proceedings, other than the bank and any additional secured

 3   creditors.

 4            I have renamed them all as "the interest holders,"

 5   and tried to make the protections extend to all of the

 6   interest holders and not just the remaining objectors.

 7            But if my changes will upset any hard fought

 8   alliances, I want to give you an opportunity to review a

 9   redlined version and to be heard before that order enters.

10            But first I have a question.  The order has a

11   provision for a final hearing on cash collateral.  What are

12   the parties' intentions in that regard?  So I want you to be

13   thinking about that, and then as I finish up this ruling,

14   that's where we'll go next.

15            Okay.  Then I will make a redline version

16   available to all by emailing it to Ms. Riley's office, who I

17   trust will send it out to you all by email shortly

18   thereafter.  Her office has the master email list.

19            Now, I know she will be in a hearing before the

20   Court starting at 10:00 o'clock on another Sklar matter, and

21   so her ability to do so may be hampered.  So watch your

22   emails from either her or some other person at her firm.

23            Then I would propose that any of you who have

24   concerns over language changes will call in to an audio

25   hearing.  And I'm stressing it's an audio hearing, just as

1  this 9:00 o'clock hearing is, so you're going to call the

2  same numbers that you called in to this morning, and let me

3  know your concerns.

4          So what I'll do is I'll break from my 10:00

5  o'clock hearing at noon, and I will not resume until 2:00

6  o'clock.  That should give Ms. Riley the long lunch hour to

7  review it, and then everyone can be heard briefly between

8  1:30 and 2:00 if you have concerns with the form of the

9  proposed cash collateral order.

10          If there are no concerns, it will be a very short

11  call.

12          Now on to the oil and gas motion.  The form of

13  proposed order tendered to the Court on this motion is very

14  careful to say essentially four things:

15          1.  That the revenues will be paid on a post-

16  Petition basis to all working interest owners;

17          2.  Sklarco's share of the revenues will be

18  contributed to fund SEC's operations;

19          3.  Offsets for expenses owed by the working

20  interest owners against revenues will only occur when the

21  working interest owner has so authorized in writing; and

22          4.  Everyone's right to assert an interest in pre-

23  and post-Petition revenues is preserved.

24          These provisions leave open, and the Court has not

25  been asked to rule yet on such matters as whether the working

1  interest owner will be required to pay JIBs, joint interest

2  billings, for which they already advanced funds now that

3  those funds are gone.

4        It also does not speak to the issue of the working

5  interest owners who did not fulfill all of their capital call

6  obligations, of which there are a few.  Sklarco was not the

7  only one.

8        The proposed order on the oil and gas motion is

9  limited in scope and works in tandem with the budget that the

10  Court just approved.

11        So I am granting it, and had no changes to the

12  form of its proposed order, which will enter later today.

13        And since I consider this one to be a final order,

14  a separate judgment will enter, as well.

15        So now let's go to the question of:  What are we

16  going to do as far as use of cash beyond May 31 and final

17  cash collateral hearing?

18        Ms. Riley, would you begin first?

19        MS. RILEY:  At this point, the Debtors have been

20  very carefully negotiating a final form of cash collateral

21  order with both the bank and the Committee that I think

22  provides protection to certainly the bank and some of the

23  other parties, as well, that would need to be circulated to

24  the various interest holders.

25        There is a possibility that that final order may

1   need to be sent out on notice, just given some of the

2   protections that are afforded, and the fact that obviously we

3   want parties to be aware of the entry of the final order, as

4   well.

5          So to that end, I think that it may be necessary

6   to at various times extend the third interim order, which we

7   have discussed with both the bank and the Committee, and that

8   should allow for sufficient time to send out any sort of

9   final order on notice to all of the parties.

10         THE COURT:  Well, everybody would have to see the

11  new budget, because the budgets we have only goes through the

12  end of May.

13         MS. RILEY:  That's correct, Your Honor.  And we do

14  have a budget that is prepared in connection with the final

15  form of order, as well.

16         THE COURT:  Okay.

17         MR. KUTNER:  Your Honor, this is Lee Kutner.  We

18  have had a lot of extensive conversations with the bank and

19  the Creditors' Committee, and I believe -- and the bank can

20  speak to correct me if I'm wrong here, but I believe that the

21  bank has found the budget acceptable for an extension of time

22  on this third interim order so that we don't have to continue

23  to come back to Court on very short and incremental advances.

24         The point being that during the next few days we

25  will have a CRO motion, as well as a debtor-in-possession

 1   financing motion, and by the time the two weeks have run on

 2   those two motions, there will be an opportunity for people to

 3   file any objection that they might have to the final cash

 4   collateral order.

 5          And so Mr. Suzuki can speak to the extension, but

 6   I believe that is what we have been contemplating with the

 7   bank and the Creditors' Committee.

 8          THE COURT:  Okay.  So then I would take out of the

 9   third interim order any reference to a final hearing?

10          MR. KUTNER:  I believe so.  And it would be set in

11   connection with the notice that we sent out with respect to

12   the final cash collateral order, which I think you would find

13   would need to be noticed.

14          THE COURT:  Okay.

15          MR. KUTNER:  And then the CRO motion can go at the

16   same time.  We're hopeful of that.  They are checking the

17   conflicts we have jointly.  The three of us at least have

18   agreed on a CRO, and the others we just haven't had time to

19   discuss it with the other numerous objecting parties.

20          But it is a completely independent company with

21   substantial experience.  And so we can notice that out, as

22   well as Mr. Sklar's DIP financing motion, and get all of that

23   running this week.

24          THE COURT:  Okay, that sounds good.  Okay, so we

25   will get out this redline and a clean version of the order on

1   cash collateral that we intend to enter today.  If anybody

2   has any problems or concerns with it, call in at 1:30 at the

3   same numbers from this morning's hearing.

4          And --

5          MR. SKELTON:  Your Honor?

6          THE COURT:  Yes?  Who is speaking?

7          MR. SKELTON:  Barnet Skelton on behalf of the

8   Tauber Group.

9          THE COURT:  Okay.

10          MR. SKELTON:  The problem with everything that

11  I've just heard proposed is that the bank has no skin in the

12  game post-Petition.  They are not putting in any new funds.

13          The Court is aware that we filed yesterday a

14  motion to appoint a Chapter 11 Trustee, or convert.

15          The parties who actually will be responsible for

16  continuing to make advances for this company to operate are

17  the working interest owners.  And look who the Debtor has not

18  been talking to.  Debtor has not been talking to the parties

19  who are essential to the continued operation of this company,

20  which, as the Court is well aware, we do not think has the

21  right or -- you know, moral authority or any authority to

22  continue.

23          THE COURT:  Okay.

24          MR. SKELTON:  So the notion that all of these

25  discussions should continue without our involvement is

1  ridiculous.

2         THE COURT:   That's not what I just heard.   They

3  indicated that they are now going to open it up to the

4  working interest holders -- owners, and so that should not be

5  the case.

6         And to say that the bank has no skin in the game

7  when these contractual rights that the Debtors have are --

8  their other collateral, it isn't necessary that they be a DIP

9  lender to have skin in the game.

10        So that's an over statement.

11        So I understand that you want to be heard, you

12 want a seat at the table, you should have that.   I'm sure

13 that is going to happen.   Mr. Kutner is giving me assurances

14 that that is the next step.

15        It would be foolish for them not to bring your

16 clients and similar clients into the fold.   But I would also

17 hope that the Committee is looking out for the interests of

18 the working interest owners.   That is also some protection.

19 And they have had a seat at the table all along.

20        Okay, I'm not going to debate --

21        MR. CORNWELL:   I'm very sorry to interrupt, Your

22 Honor.   This is John Cornwell on behalf of the Committee.

23 May I have just a moment?

24        THE COURT:   Yes, you may.

25        MR. CORNWELL:   Thank you very much.   Again, my

1   apologies for the interruption.

2           With respect to Mr. Skelton's comments, the

3   Committee has been very involved in the selection of the CRO

4   and negotiation of the final cash collateral order.

5           And among the representatives on the Committee are

6   both general trade creditors and working interest owners, and

7   the Committee absolutely supports, particularly after the

8   negotiations of last Friday afternoon, that the Debtor did

9   exactly what Mr. Kutner and Ms. Riley just said, and that is

10  to begin to verbalize and discuss the selection of the

11  Committee, the bank, and the Debtors, with the working

12  interest owners.

13          This process needs to be open, honest, and to the

14  extent humanly possible, agreeable.

15          So I would just like to echo those comments.  And

16  the reason that I spoke up principally was I heard the

17  comments about the extension of the budget.  Those were all

18  things discussed last Friday, which the Committee supports in

19  principle.

20          But unless I just missed it over the weekend, and

21  apologies if I did, I have not seen the extended budget.  And

22  I would like an opportunity to review that.

23          So if before the 1:30 call the Debtors could not

24  only -- I'm sorry, everyone can not only get a chance to

25  review the redline from Your Honor, but also the renewed

1   budget, that would be very helpful.

2            THE COURT:  All right, well, Ms. Riley, is that

3   possible?  Is it in writing yet?

4            MS. RILEY:  If Your Honor is referring to the

5   budget, yes, it is in writing.  And we can certainly

6   circulate that prior to the 1:30 call.

7            THE COURT:  Okay.  Who should we send our draft

8   third interim order to at your office that can get it out on

9   the email right away?

10           MS. RILEY:  Your Honor, you can actually send it

11  to me.  Mr. Kutner is going to be taking the lead at the

12  10:00 o'clock hearing.

13           THE COURT:  Okay, very good.  So if you could get

14  that plus the budget out right away, then people can be

15  looking at it with plenty of time before 1:30, that would be

16  great.

17           Okay.  All right.  So thank you all.  For the sake

18  of the record, the minutes will reflect that both motions are

19  granted, and the form of order to enter later today.

20           All right, thank you.  We will now recess until we

21  begin a Zoom hearing on Strago's motion to assume or reject

22  at 10:00 o'clock.

23           Court is in recess.

24                    (Time Noted:  9:39 a.m.)

25                        * * * * *

1                               CERTIFICATE

2          I, RANDEL RAISON, certify that the foregoing is a

3    correct transcript from the official electronic sound

4    recording of the proceedings in the above-entitled matter, to

5    the best of my ability.

6

7

8    _____          June 4, 2020

9    Randel Raison

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25