UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: <br><br> SKLAR EXPLORATION COMPANY, LLC <br><br> Debtor. <br><br> _____ | Case No. 20-12377-EEB <br><br> Chapter 11 |
| In re: <br><br> SKLARCO, LLC <br><br> Debtor. <br><br> _____ | Case No. 20-12380-EEB <br><br> Chapter 11 |

**OBJECTION OF BAKER HUGHES OILFIELD OPERATIONS LLC TO THE DEBTORS' MOTION FOR APPROVAL OF LENDING AGREEMENT AND FOR AUTHORITY TO INCUR DEBT ON AN ADMINISTRATIVE, UNSECURED BASIS**

Baker Hughes Oilfield Operations LLC ("Baker Hughes") hereby submits this objection (the "Objection") to the *Debtors' Motion for Approval of Lending Agreement and for Authority to Incur Debt on an Administrative, Unsecured Basis* [Docket No. 346] (the "DIP Motion").[1] In support of the Objection, Baker Hughes respectfully states as follows:

**BACKGROUND**

1. On April 1, 2020 (the "Petition Date"), Sklar Exploration Company, LLC ("SEC") and Sklarco, LLC ("Sklarco," and together with SEC, the "Debtors") commenced Chapter 11 cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the DIP Motion.

4811-2814-0990

2. On April 16, 2020, the United States Trustee appointed an Official Committee of Unsecured Creditors.

**The DIP Facility**

3. Pursuant to the DIP Motion, the Debtors are seeking authority to obtain post-petition financing in the amount of $1,233,000 (the "DIP Facility") on an administrative, unsecured basis from Howard Sklar ("H. Sklar"), the Howard Sklar Trust (the "Howard Trust"), the Jacob Sklar Trust (the "Jacob Trust"), and the Alan Sklar Trust (the "Alan Trust," and with the Howard Trust, and the Jacob Trust, the "Trusts," and, together, Sklar and the Trusts, the "Sklar Parties"). The terms of the DIP Facility are set forth in the Lending Agreement (the "Lending Agreement") attached as Exhibit B to the DIP Motion.

4. The DIP Facility and Lending Agreement provide, among other things:

(A) the DIP Facility accrues interest at a rate of 5% per annum prior to confirmation of a plan;[2]

(B) the DIP Facility matures in one year or earlier in the event of confirmation of a plan;

(C) the DIP Facility will hold an administrative expense claim pursuant to section 346(b) of the Bankruptcy Code;

(D) the repayment of the DIP Facility shall be waived by the Sklar Parties and subordinated to the claims of unsecured creditors, subject to the Sklar Parties' right to the Proposed Offset (as defined below); and

(E) "[i]f any judgment is entered against the [Sklar Parties] for any action arising under Section 544, 547, 548, or 550, the amount of such judgment shall be offset first against the balance of the [DIP Facility]" (the "Proposed Offset").

*See* DIP Motion, ¶ 21; Loan Agreement.

---

[2] The interest rate increases to 10% per annum following an event of default. *See* Loan Agreement, ¶ 6.

5. The Loan Agreement also provides for an "Event of Default", at which point the interest rate accrues at a rate of 10% per annum, if, among other things:

(A) the Borrowers fail to pay within ten days of the due date;

(B) these cases are dismissed, converted, or a trustee is appointed; a Disclosure Statement (as defined in the Lending Agreement) is approved for a Plan of Reorganization (as defined in the Lending Agreement) proposed by a third party that does not provide for payment in full in cash of the Note (as defined in the Lending Agreement) on the Maturity Date or upon confirmation of the Plan; or

(C) a change of control of the Borrowers occurs absent the consent of the Sklar Parties.

*See* Lending Agreement, ¶ 15. If an Event of Default occurs, the Sklar Parties can declare the Note, together with all interest, fees, and expenses immediately due and payable. *Id.* Further, upon an Event of Default, the Sklar Parties are entitled to reimbursement for out-of-pocket expenses, including attorney fees and disbursements of the Sklar Parties' counsel in connection with such Event of Default. *Id.* at ¶ 24. The Lending Agreement also contains an affirmative covenant that the Debtors pay all agreed obligations arising under the Lending Agreement. *Id.* at ¶ 13.f.

6. The Budget (as defined in the DIP Motion), attached as Exhibit A to the DIP Motion, states that the Debtors will initially receive $1,000,000 from the DIP Facility. *See* Budget. Of that $1,000,000, "$500,000 will be maintained in a segregated account in accordance with the Final Cash Collateral Order." *Id*, FN 2 (these segregated funds appear to be earmarked for use at the discretion of the CRO).

## **OBJECTION**

7. Baker Hughes appreciates, but is wary, that the Sklar Parties—who seem to have misappropriated funds from the Debtors; withheld the payment of working interest obligations, JIBs (as defined below), and other payments from third parties; and ran SEC into the ground—

are now willing to provide a DIP Facility to fund and prolong these cases. The proposed lending arrangement is far from a typical debtor-in-possession financing. It is promoted as something of a grant which is subordinated to all general unsecured claims. However, it is structured as an administrative claim upon which interest and fees may be owed and paid during its short term. The Lending Agreement could have simply subordinate the Loan (as defined in the Lending Agreement) without more, if that is what was really intended. Rather, it provides that "Repayment of the Loan <u>shall be</u> waived by the Sklar Parties and subordinated to the repayment of claims held by general unsecured creditors." It is unclear what "shall be" means and when the waiver and subordination are effective.

8. It is suspicious that Sklar did not just provide a simple subordinated note. Also, it is suspicious that the Sklar Parties would insist on having the right to offset the Loan against preference recoveries and other liabilities against them—as if knowing that there are an abundance of such. Moreover, insofar as preference recoveries are often pursued at the end of a case and available to unsecured creditors, rather than (as proposed here) being eaten up to pay for operations, the unsecured creditors' ultimate recovery would likely be undercut.

9. We can only conjecture what is motivating the Sklar Parties to provide the Loan. Indeed, the following conjecture and questions arise, among others:

 (A) Perhaps Sklar is just returning some of the funds misappropriated pre-petition.

 (B) Perhaps Sklar thinks that by making a partial down payment on his exposure he is less likely to be pursued on other claims.

 (C) Perhaps Sklar thinks that such funds will first pay down working interest obligations, JIBs, and other amounts which he is arguably obligated on.

 (D) Perhaps Sklar thinks that the funds will hold off appointment of a trustee or the conversion of these cases, insofar as such would fund the retention of a CRO might work with Sklar and leave him in relative control of the Debtors.

In sum, there are serious questions that should be investigated in relation to the Debtors pursing this atypical "loan" and before the Sklar Parties fund the extension of these cases, perhaps for their own benefit and/or just to buy time.

10. The proposed DIP Facility needs to be understood and the Sklar Parties questioned before the Court goes through contortions to approve such a highly unusual and suspect transaction which might turn out to solely provide benefits to the Sklar Parties at the expense of general unsecured creditors—parties already harmed by Sklar.

11. A proposed financing arrangement "will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate." In re Ames Dep't Stores, Inc., 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990); see also In re Tenney Vill, Co., Inc., 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (denying approval of a financing agreement that "would pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of" a secured creditor). "A principal goal of the reorganization provisions of the Bankruptcy Code is to benefit the creditors of the Chapter 11 debtor by preserving going-concern values and thereby enhancing the amounts recovered by all creditors." In re Timbers of Inwood Forest Assocs., Ltd., 808 F.2d 363, 374 (5th Cir. 1987), aff'd sub nom. United Sav. Ass'n of Texas v. Timers of Inwood Forest Assocs., Ltd., 484 U.S. 365 (1988) (emphasis added); see also In re Gulf Coast Oil Corp., 404 B.R. 407, 426 (Bankr. S.D. Tex. 2009) (stating that "bankruptcy is, at its essence, a collective remedy intended to benefit all creditors, not just the secured lender").

12. To that end, the DIP Facility benefits the Sklar Parties without a commensurate benefit to the Debtors' estates, and, in fact, the DIP Facility could actually harms recoveries for general unsecured creditors. Therefore, the DIP Motion should not be approved.

### I.     Sklar Should Pay—Not Loan—Amounts Owed to the Debtors

13.    The proposed $1,233,000 DIP Facility is a related-party transaction between the Debtors and their insiders.  If the Sklar Parties see benefit in funding the Debtors' expenses, any such funding should be treated as a capital contribution or "catch up" payment on amounts the Sklar Parties owe to the Debtors.  At the very least, it should be structured as a simple subordinated loan, specifically subordinated to general unsecured claims and not be used to reduce preference and other liabilities of the Sklar Parties.

14.    It seems the Sklar Parties took out substantial money from the Debtors' estates prior to the Petition Date without paying their contractual obligations under various joint operating agreements, participation agreements, and other controlling agreements governing Sklarco's working ownership interests, which were operated by SEC as the operator.  Pursuant to these agreements, Sklar, through Sklarco, failed to make necessary cash call advances based on authorization for expenditures, joint interest billings ("JIBs"), and other capital contribution requirements to SEC.  As such, there should be amounts owed from Sklarco to SEC under the operative agreements for unpaid JIBs and cash call advances.[3]  Sklar could true-up certain of these amounts owed as a working interest owner through the $1,233,000 proposed under the DIP Facility.

15.     Sklar is essentially requesting to receive up to $1,233,000 in credit against his Chapter 5 and other liabilities rather than simply returning funds that he, through Sklarco, owes to SEC.  Making a capital contribution or catch up payment on the JIBs will provide essentially the same result as the proposed DIP Facility—funds for the Debtors' estates that are unconditionally subordinated in recovery to general unsecured creditors.  The questionable other

---

[3] Of note, the Debtors' Schedules of Assets and Liabilities do not contain reference to what the intercompany receivables/payables are between SEC and Sklarco.

provisions of the DIP Facility and Lending Agreement that grant the Sklar Parties inequitable protections are unnecessary and undercut the stated goal of the DIP Facility.

16.     Therefore, the Court should not approve the DIP Motion in its current form and require that any funding be considered a capital contribution or a catch up payment on Sklaco's JIBs, cash call advances, and other working interest obligations.

## II. The Debtors Should Show that Sklar and the Sklar Parties Have the Authority to Loan the Monies Under the DIP Facility

17.     Three of the Sklar Parties are Trusts. No evidence has been presented to show that Sklar is, in fact, the trustee for each of the Trusts and that Sklar has the authority to make a loan from each of the Trusts under the DIP Facility. Given the insider nature of the Sklar Parties and the fact that the DIP Facility proposes to provide the Proposed Offset for the benefit of the Sklar Parties, the Debtors' estates must have comfort that the Trusts' actually have authority to make the Loan.

18.     In cases where unsecured creditors are not anticipated to receive much, if any, recovery, there must be certainty that the Debtors' estates will not be burdened with a claim for repayment of the DIP Facility due to the lack of authority. On May 28, 2020, counsel to Baker Hughes requested copies of the relevant trust documents from the Howard Trust, Jacob Trust, and Alan Trust from Debtors' counsel. As of the date hereof, Baker Hughes has neither received a copy of the relevant trust documents nor an answer from Debtors' counsel whether they will provide copies of the trust documents.

19.     The Court should require that the Sklar Parties and the Debtors provide parties copies of the trust documents and other relevant information so that these parties can make an independent determination of where the cash used to fund the DIP Facility comes from, that Sklar

has the necessary authority to commit the Trusts to fund the DIP Facility, and that the trust documents permit the Trusts to advance funds under the DIP Facility.

### III. The Sklar Entities Are Not Entitled to the Proposed Offset

20. Granting the Proposed Offset is unjustified and certainly premature at this time. The parties in interest have not had sufficient time to investigate and evaluate causes of action against the Sklar Parties. According to the Debtors' Statements of Financial Affairs, the Debtors distributed over $2.7 million to the Sklar Parties in the year prior to the Petition Date. *See* SEC Amended Statement of Financial Affairs [Case No. 20-12377, Docket No. 324]; Sklarco Statement of Financial Affairs [Case No. 20-12380, Docket No. 41]. The Proposed Offset is intended to shield the Sklar Parties from Chapter 5 causes of action (collectively "Avoidance Actions")—potential recoveries for general unsecured creditors in these cases. These Avoidance Actions may be worth millions to the Debtors' estates and the Proposed Offset proposes to limit potential recoveries to unsecured creditors.

21. Avoidance Actions are distinct creatures of bankruptcy law designed to benefit, and ensure equality of distribution among unsecured creditors. *See In re Qualitech Steel Corp.*, 276 F.3d 245, 248 (7th Cir. 2001) (noting courts do not favor granting pre-petition lenders security interests in the proceeds of avoidance actions); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 244 (3d Cir. 2000), rev'd en banc, 330 F.3d 548 (3d Cir. 2003) (identifying underlying intent of avoidance powers to recover valuable assets for estate's benefit); *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("The purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully part of the bankruptcy estate, even if they have been transferred away. When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all

unsecured creditors, including those who individually had no right to avoid the transfer.") (internal citations omitted); *In re Tribune Co.*, 464 B.R. 126, 171 (Bankr. D. Del. 2011) (noting "that case law permits all unsecured creditors to benefit from avoidance action recoveries"); *Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.)*, 390 B.R. 784, 786-87 (Bankr. S.D.N.Y. 2008) ("Avoidance actions . . . never belonged to the Debtor, but rather were creditor claims that could only be brought by a trustee or debtor in possession . . . ."); *In re Sweetwater*, 55 B.R. 724, 731 (D. Utah 1985) ("The avoiding powers are not 'property' but a statutorily created power to recover property."), rev'd on other grounds, 884 F.2d 1323 (10th Cir. 1989); *In re Sapolin Paints, Inc.*, 11 B.R. 930, 937 (Bankr. E.D.N.Y. 1981) (reciting "the well-settled principle that neither a trustee . . . nor a debtor-in-possession, can assign, sell or otherwise transfer the right to maintain a suit to avoid a preference") (emphasis added).

22. There have been various allegations against Sklar and other insiders regarding his use of the Debtors' estates for personal benefit, at times when the Debtors did not appear to be able to—and did not—pay debts as they came due. This Court should not permit a permanent offset against Avoidance Actions before parties have had a time to sufficiently investigate claims and causes of actions that the Debtors' estates may have against the Sklar Parties—particularly when the retention of the CRO has not yet been approved by this Court. It would be premature to grant the Proposed Offset in these cases prior to the completion of any investigation by parties in interest. As such, Baker Hughes requests that the Court not approve the Proposed Offset.

23. In the event the Court decides to approve the Proposed Offset, then the Court should limit the Proposed Offset to actual money provided by each respective Sklar Party and utilized by the Debtors.

## IV. Questions Regarding the DIP Facility Must Be Answered

24. In the event the Court believes it prudent to approve the DIP Motion, the DIP Motion should not be approved in its current form. The Debtors must clarify several provisions regarding the DIP Facility and Lending Agreement before parties in interest can further consider the requested relief.

### A. Payment of Interest, Fees, and Upon an Event of Default

25. The Lending Agreement states that repayment of the DIP Facility "shall be waived" by the Sklar Parties and subordinated to unsecured creditor claims. *See* Lending Agreement, ¶ 8. However, there are various provisions in the Lending Agreement regarding the payment of interest and fees and the repayment of the DIP Facility during its term and upon an Event of Default. It is unclear what, if any, of these items are intended to be paid by the Debtors and if any amounts for these items are subordinated to the repayment of general unsecured creditor claims.

26. The Lending Agreement states that the DIP Facility will accrue interest at 5% per annum, 10% per annum upon an Event of Default. Lending Agreement, ¶ 5. In addition, the Lending Agreement states that the Sklar Parties are entitled to reimbursement for out-of-pocket expenses, including attorney fees and disbursements of the Sklar Parties' counsel in connection with such Event of Default. *Id.* at ¶ 24. If an Event of Default occurs, the Sklar Parties can declare the DIP Facility, together with all interest, fees, and expenses immediately due and payable. *Id* at ¶ 15. This language is inconsistent with the proposed subordination of the DIP Facility and appears to allow the Sklar Parties to, upon an Event of Default, jump in front of general unsecured creditors.

27. If the DIP Facility is truly subordinated to unsecured creditor recoveries, then the proposed order must contain clear language that all payments of the DIP Facility, interest, and

fees are subordinated to the full recovery of general unsecured creditors, regardless of whether an Event of Default occurs. The Court should not permit the Sklar Parties from using vague language in the Lending Agreement to work around the intent that the Sklar Parties' recovery from the DIP Facility, including all interest and fees thereto, is subordinate to the full recovery of general unsecured creditors.

### B. Each Sklar Parties' Commitment Under the DIP Facility

28. It is unclear which amounts of the DIP Facility each Sklar Party is funding and, therefore, what the Debtors obligations are to each Sklar Party. Moreover, the Proposed Offset would permit the Sklar Parties to offset the amount of the DIP Facility from any Avoidance Actions, parties in interest must have a definite understanding of what the scope of that potential offset is. Without this information, parties in interest cannot make an informed decision regarding the Proposed Offset.

### C. The Use of the DIP Facility

29. The Budget attached as Exhibit B to the DIP Motion provides that $500,000 of the proceeds from the DIP Facility "will be maintained in a segregated account in accordance with the Final Cash Collateral Order." Budget, FN 2. The proposed "Final Cash Collateral Order" states that the $500,000 (the "Segregated Unsecured Loan Funds") will be "segregated from the Cash Collateral, the revenue of non-insider working interest holders, and any other cash, and may be used in the Bankruptcy Cases for any lawful purpose as determined by the [CRO]." *See* Final Cash Collateral Order, ¶ 2 [Docket No. 350-1]. It is unclear what the Segregated Unsecured Loan Funds will be used for or whether they are even necessary to fund these cases. If the Court approves the DIP Motion, it must only approve it to the amount of the DIP Facility necessary to fund these cases, not to fund an uncontrolled reserve account for unknown purposes.

30. In the event the Court approves the DIP Motion, the Court must require the Debtors to provide the missing information identified above.

## **RESERVATION OF RIGHTS**

31. As of the date of the filing of this Objection, Baker Hughes is still performing diligence relevant to the proposed DIP Facility. Accordingly, this Objection is submitted without prejudice to, and with a full reservation of, Baker Hughes's rights, claims, defenses, and remedies, including the right to amend, modify, or supplement this Objection, to raise additional objections and to introduce evidence at any hearing relating to this Objection, and without in any way limiting any other rights of Baker Hughes to further object to the DIP Motion, on any grounds, as may be appropriate.

*[Remainder of page intentionally left blank.]*

Dated: June 5, 2020

Respectfully submitted,

**FOLEY & LARDNER LLP**

*/s/ Timothy C. Mohan*
Timothy C. Mohan, Atty No. 50559
600 17th Street, Suite 2020S
Denver, CO 80202
Tel: (720) 437-2000
Fax: (720) 437-2200
tmohan@foley.com

*Counsel for Baker Hughes Oilfield Operations LLC*

**CERTIFICATE OF SERVICE**

    The undersigned hereby certifies that, on June 5, 2020, the foregoing instrument was electronically filed and served via CM/ECF pursuant to L.B.R. 9036-1. All attorneys and parties identified with the Court for electronic service on the record in this case were served by electronic service in accordance with the CM/ECF system on the date of filing.

                                               */s/ Timothy C. Mohan*
                                               Timothy C. Mohan