UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 20-12377-EEB |
| SKLAR EXPLORATION COMPANY, LLC | ) | |
| EIN: 72-1417930 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | Case No. 20-12380-EEB |
| SKLARCO, LLC | ) | |
| EIN:  72-1425432 | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

**DEBTORS' APPLICATION FOR ORDER APPOINTING
EPIQ CORPORATE RESTRUCTURING, LLC AS CLAIMS, NOTICING,
<u>SOLICITATION, AND ADMINISTRATIVE AGENT</u>**

The Debtors, Sklar Exploration Company, LLC ("<u>SEC</u>") and Sklarco, LLC ("<u>Sklarco</u>" collectively, the "<u>Debtors</u>"), file this application (the "<u>Application</u>") for the entry of an Order appointing Epiq Corporate Restructuring, LLC ("<u>Epiq</u>") as the claims, noticing, and solicitation agent ("<u>Claims and Administrative Agent</u>") in these chapter 11 cases. Specifically, the Debtors request entry of an order appointing Epiq as the Claims and Administrative Agent to, among other things, (a) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and other parties in interest, (b) provide computerized claims, objection, and solicitation and balloting-related services, and (c) assist the Debtors in claim and ballot processing and other administrative services with respect to these chapter 11 cases, in each case, pursuant to the terms of the Engagement Agreement, dated July 2, 2020 (the "<u>Engagement Agreement</u>"), between the Debtors and Epiq, a copy of which agreement is attached hereto as **Exhibit A**. In support of this Application, the Debtors submit the *Declaration of Jaymi Helen Cook in Support of Debtors' Application for Order Appointing Epiq Corporate Restructuring, LLC as Claims, Noticing, Solicitation, and Administrative Agent* (the "<u>Cook Declaration</u>"), attached hereto as **Exhibit B**.

**<u>BACKGROUND</u>**

**A.     The Chapter 11 Cases**

1.      The Debtors filed their voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code on April 1, 2020 (the "Petition Date"). The Debtors have requested that the Chapter 11 Cases be jointly administered for procedural purposes only.

2.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee or examiner has been appointed in the Chapter 11 Cases.

3.      On April 16, 2020, the Office of the United States Trustee for Region 19 (the "U.S. Trustee") organized and appointed the Official Committee of Unsecured Creditors ("Committee"), consisting of seven members: Stoneham Drilling Corporation; Mesa Fluids, LLC; TPC Cottonwood, L.P.; RAPAD Well Service Company, Inc.; Kelley Brothers Contractors, Inc.; Baker Hughes Company; and FPCC USA, Inc. (Docket No. 99).

4.      SEC is engaged in business as an independent exploration and production company in the oil and gas industry.  SEC is an operating company and does not own oil or gas properties. SEC has its principal business office in Boulder, Colorado and has additional offices in Shreveport, Louisiana and Brewton, Alabama.  SEC's exploration and production activities are primarily located in East Texas, North Louisiana, South Mississippi, South Alabama and the Florida Panhandle.  SEC is also developing properties and opportunities in the western United States, though no oil or gas production has been produced from the wells in the western United States.

5.      Sklarco is a Louisiana limited liability company engaged in business as the owner of certain oil and gas leases and property interests in East Texas, North Louisiana, South Mississippi, South Alabama, the Florida Panhandle, and the western United States.

6.      As of the Petition Date, SEC was the operator of approximately 60 wells and was in the process of developing several new prospects, including a helium well in Montana, a well and pipeline in Florida, and several new wells in Alabama.

## RELIEF REQUESTED

7.      The Debtors request entry of an order appointing Epiq as the Claims and Noticing Agent for the Debtors and their Chapter 11 Cases, to, among other tasks, (i) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and parties in interest; (ii) provide computerized claims, objection, solicitation, and balloting database services; and

(iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to the Debtors' bankruptcy cases, pursuant to the provisions of the Engagement Agreement.

## **BASIS FOR RELIEF**

8.     The Debtors' selection of Epiq to act as the Claims and Noticing Agent is appropriate under the circumstances and is in the best interest of the estates. Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise. The terms of Epiq's retention are set forth in the Engagement Agreement attached hereto as **Exhibit A**.

9.     The Debtors filed their schedules of assets and liabilities and statements of financial affairs (the "Schedules") on April 17, 2020 (Case No. 20-12377, Docket Nos. 103-107; Case No. 20-12380, Docket Nos. 28-32).  Given the number of counterparties to unexpired executory contracts and leases, namely the mineral leases, as well as the holders of interests in the wells operated by SEC, the Debtors anticipate that there will be several thousand persons and entities to be noticed and that many of these parties will file claims.  By way of example, notice of the Debtors' *Motion to Extend Time to Assume or Reject Nonresidential Real Property Leases Pursuant to 11 U.S.C. § 365(d)(4)* was served on approximately 2,900 parties, most of whom were counterparties to an oil and gas lease held by Sklarco.

10.     In view of the number of anticipated notice parties and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's Office of the administrative burden of, noticing, administering claims, and soliciting and tabulating votes and is in the best interests of both the Debtors' estates and their creditors.

## **Epiq's Qualifications**

11.     Epiq is one of the country's leading chapter 11 administrators, with significant experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases. Epiq has substantial experience providing services, including claims and noticing services, in matters comparable in size and complexity to this matter. *See, e.g.*, *In re PetroQuest Energy, Inc.*, No. 18-36322 (DRJ) (Bankr. S.D. Tex. November 7, 2018); *In re EXCO Resources, Inc.,* No. 18-30155 (MI) (Bankr. S.D. Tex. Jan. 15, 2018); *In re*

*Stone Energy Corp.*, No. 16-36390 (MI) (Bankr. S.D. Tex. Dec. 14, 2016); *In re Illinois Power Generation Co.*, No. 16-36326 (MI) (Bankr. S.D. Tex. Dec. 9, 2016); *In re Warren Res., Inc.*, No. 16-32760 (MI) (Bankr. S.D. Tex. Jun. 2, 2016); *In re Ultra Petrol. Corp.,* No. 16-32202 (MI) (Bankr. S.D. Tex. Apr. 29, 2016); *In re Energy XXI Ltd.*, No. 16-31928 (DRJ) (Bankr. S.D. Tex. Apr. 13, 2016); *In re ERG Intermediate Holdings, LLC*, No. 15-31858 (HDH) (Bankr. N.D. Tex. Apr. 30, 2015); and *In re Life Partners Holdings, Inc.*, No. 15-40289 (RFN) (Bankr. N.D. Tex. Jan. 20, 2015).

12.    Prior to selecting Epiq as the proposed Claims and Administrative Agent, the Debtors requested and received quotes from a number of prospective parties. The Debtors selected Epiq based on their qualifications, and the bid submitted in relation to the Debtors' cases.

13.    The appointment of Epiq as Claims and Administrative Agent in these Chapter 11 Cases will expedite the distribution of notices and the processing of claims, and the office of the Clerk of the Bankruptcy Court for the District of Colorado (the "Clerk") will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

<u>**Services to Be Provided**</u>

14.    This application pertains to the work to be performed by Epiq under section 105(a) of the Bankruptcy Code and under the Clerk's delegation of duties permitted by 28 U.S.C. § 156(c). Specifically, Epiq will perform, to the extent the Debtors request, the following services in its role as the Claims and Administrative Agent (the "Claims and Administrative Services"), as well as all quality control relating thereto:[1]

    a.    preparing and serving required notices and documents in these Chapter 11 Cases in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules in the form and manner directed by the Debtors and/or the Court, including, if applicable, (i) notice of any claims bar date, (ii) notices of transfers of claims, notices of objections to claims, and objections to transfers of claims, (iii) notices of any hearings on a disclosure statement and confirmation of the Debtors' chapter 11 plan, including under Bankruptcy Rule 3017(d), (iv) notice of the effective date of any chapter 11 plan, and (v) all other notices, orders, pleadings, publications, and other documents as the Debtors and/or the Court

---

[1]    The list of Claims and Administrative Services to be performed by Epiq is intended to be broad and certain services may not be necessary in these Chapter 11 Cases. Only those services that are requested by the Debtors will be performed by Epiq.

may deem necessary or appropriate for an orderly administration of these Chapter 11 Cases;

b. preparing and filing or causing to be filed with the Clerk an affidavit or certificate of service for all notices, motions, orders, other pleadings, or documents served within seven business days of service that includes either a copy of the notice served or the docket number(s) and title(s) of the pleading(s) served, (ii) a list of persons to whom it was mailed (in alphabetical order) with their addresses, (iii) the manner of service, and (iv) the date served;

c. assisting the Debtors with administrative tasks in the preparation of any Amended Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("Statements"), if needed, and including (as necessary): (i) coordinating with the Debtors and their advisors regarding the Schedules and Statements process, requirements, timelines, and deliverables; (ii) creating and maintaining databases for maintenance and formatting of Schedules and Statements data; (iii) coordinating collection of data from the Debtors and their advisors; and (iv) providing data entry and quality assurance assistance regarding Schedules and Statements;

d. assisting the Debtors in managing the claims reconciliation and objection process;

e. maintaining (i) a list of all potential creditors, equity holders, and other parties in interest, (ii) a "core" mailing list consisting of all parties described in Bankruptcy Rule 2002 and those parties that have filed a notice of appearance pursuant to Bankruptcy Rule 9010, and (iii) a limited notice list consisting of those parties required pursuant to the *Order Granting Ex Parte Motion for Entry of Order Limiting Notice* (Docket No. 263);

f. after a claims bar date is established, furnishing a notice to all potential creditors of the last date for filing proofs of claim and a form for filing a proof of claim, after such notice and form are approved by the Court, and notifying potential creditors of the existence, amount, and classification of their respective claims as set forth in the Schedules (if applicable), which may be effected by inclusion of such information (or the lack thereof, in cases where the Schedules indicate no debt due to the subject party) on a customized proof of claim form provided to potential creditors;

g. maintaining a post office box or address for the purpose of receiving claims and returned mail, and processing all mail received;

5

h.      processing all proofs of claim received, including those received by the Clerk's office, and checking said processing for accuracy, and maintaining the original proofs of claim in a secure area;

i.      maintaining the official claims registers for the Debtors (the "Claims Registers") on behalf of the Clerk and upon the Clerk's request, providing the Clerk with certified, duplicate unofficial Claims Registers; and specifying in each of the Claims Registers the following information for each claim docketed: (i) the claim number assigned; (ii) the date received; (iii) the name and address of the claimant and agent, if applicable, who filed the claim; (iv) the amount asserted; (v) the asserted classification(s) of the claim (*e.g.*, secured, unsecured, priority, *etc.*); and (vi) any disposition of the claim;

j.      periodically filing with the Court a notice of the list of claims that have been filed with Epiq;

k.      implementing necessary security measures to ensure the completeness and integrity of the Claims Registers and the safekeeping of the original claims;

l.      recording all transfers of claims and providing any notices of such transfers as required by Bankruptcy Rule 3001(e);

m.      relocating, by messenger or overnight delivery, all of the court-filed proofs of claim to the offices of Epiq, not less than weekly;

n.      upon completion of the docketing process for all claims received to date for each case, turning over to the Clerk copies of the Claims Registers for the Clerk's review (upon the Clerk's request);

o.      monitoring the Court's docket for all notices of appearance, address changes, and claims-related pleadings and orders filed, and making necessary notations on and/or changes to the Claims Registers;

p.      assisting in the dissemination of information to the public and responding to requests for administrative information regarding the cases, as directed by the Debtors and/or the Court, including through the use of a case website and/or call center;

q.      30 days prior to the close of these Chapter 11 Cases, to the extent practicable, requesting that the Debtors submit to the Court a proposed order dismissing Epiq and terminating Epiq's services upon completion of its duties and responsibilities and upon the closing of these Chapter 11 Cases;

r.      at least seven days before entry of an order closing these Chapter 11 Cases, Epiq shall reconcile all proofs of claim with the Court, to ensure that all claims received by Epiq are accounted for on the Claims Register.

s.      at the close of these Chapter 11 Cases, boxing and transporting all original documents, in proper format, as provided by the Clerk's office, to (i) the Federal Archives Record Administration, located at Central Plains Region, 200 Space Center Drive, Lee's Summit, Missouri 64064 or (ii) any other location requested by the Clerk's Office.

t.      coordinating publication of certain notices in periodicals and other media to the extent necessary;

u.      to the extent necessary, distributing claim acknowledgement cards to creditors having filed a proof of claim or interest, as applicable;

v.      providing balloting, solicitation, and tabulation services, including preparing ballots, producing personalized ballots, assisting in the production of solicitation materials, tabulating creditor ballots on a daily basis, preparing a certification of voting results, and providing court testimony with respect to balloting, solicitation, and tabulation matters;

w.      providing state-of-the-art call center facility and services, including (as needed): (i) creating of frequently asked questions, call scripts, escalation procedures and call log formats; (ii) recording automated messaging; (iii) training call center staff; and (iv) maintaining and transmitting call log to the Debtors and their advisors;

x.      creating and maintaining a public access website setting forth pertinent case information and allowing access to electronic copies of proofs of claim or proofs of interest;

y.      providing the Debtors with consulting and computer software support regarding the reporting and information management requirements of the bankruptcy administration process;

z.      educating and training the Debtors in the use of support software, as necessary;

aa.     generating, assisting with, and providing strategic communications advice, strategy, and expertise, as needed;

bb.     if requested by the Debtors, acting as disbursing agent (to the extent such services are not performed by another agent) in connection

7

with the distributions required under a confirmed chapter 11 plan;
and

cc.   providing such other claims processing, noticing, and related
administrative services as may be requested from time to time by the
Debtors.

15.   The Claims Registers shall be open to the public for examination without charge
during regular business hours and on a case-specific website maintained by Epiq. Epiq shall not
employ any past or present employee of the Debtors for work that involves these Chapter 11 Cases.

16.   Epiq will follow the notice and claims procedures that conform to the guidelines
promulgated by the Clerk's Office or as otherwise directed by the Court.

## Compensation

17.   The Debtors propose to compensate Epiq on substantially the terms and conditions
set forth in the Engagement Agreement, upon receipt of reasonably detailed invoices setting forth
the services provided by Epiq during the prior month and the rates charged for such services
performed.  A summary of the primary applicable rates is as follows:

| Clerical/Administrative Support | $25.00 – $55.00/hr |
|---|---|
| Case Managers | $70.00 – $165.00/hr |
| Consultants/Directors/Vice Presidents | $160.00 – $195.00/hr |
| Solicitation Consultant | $195.00 |
| Printing | $0.10 per image |
| Postage / Overnight Delivery | At Cost at Preferred Rates |
| Website Hosting Fee | No Charge |
| On-Line Claim Filing | No Charge |

18.   The Debtors respectfully request that the undisputed fees and expenses incurred by
Epiq in the performance of the Claims and Administrative Services, in accordance with the fee
schedule appended thereto, be treated as administrative expenses of the Debtors' estates pursuant
to 28 U.S.C. § 156(c) and 11 U.S.C. § 503(b)(1)(A) of the Bankruptcy Code and be paid in the
ordinary course of business without further application to or order of the Court. Epiq agrees to
maintain records of all services performed, showing dates, categories of services, fees charged,
and expenses incurred, and to serve monthly invoices on the Debtors, the U.S. Trustee, counsel for
the Debtors, counsel for any official committee monitoring the expenses of the Debtors, and any
party in interest that specifically requests service of the monthly invoices. If any dispute arises

relating to the Engagement Agreement or monthly invoices, the parties shall meet and confer in an attempt to resolve the dispute. If resolution is not achieved, the parties may seek resolution of the matter from the Court.

19.    The Debtors have provided Epiq a retainer in the amount of $10,000.  The Debtors are filing a separate motion seeking approval of the retainer concurrently herewith.  Epiq seeks to hold the retainer under the Engagement Agreement during the Chapter 11 Cases as security for the payment of fees and expenses incurred in rendering the Epiq Services hereunder, with any remainder to be held as security for the payment of other approved fees and expenses incurred in rendering other services under the Engagement Agreement.  After applying the retainer to any outstanding fees and costs, the balance of the retainer will be returned to the Debtors.

20.    As part of the overall compensation procedures for Epiq, the Debtor has agreed to certain limitations of liability and indemnification provisions as set forth in paragraphs 7 and 8 of the Engagement Agreement.

21.    Notwithstanding anything to the contrary in the Engagement Agreement, the Debtors shall have no obligation to indemnify Epiq, or provide contribution or reimbursement to Epiq, for any claim or expense that is either: (a) judicially determined to have arisen from Epiq's gross negligence, willful misconduct, fraud, bad faith, self-dealing, or breach of fiduciary duty (if any); (b) for a contractual dispute in which the Debtors allege the breach of Epiq's contractual obligations if the Court determines that indemnification, contribution, or reimbursement would not be permissible under applicable law; (c) of any type for which the Court determines that indemnification, contribution, or reimbursement would not be permissible pursuant to applicable law; or (d) settled prior to a judicial determination, but determined by this Court, after notice and a hearing, to be a claim or expense for which Epiq should not receive indemnity, contribution, or reimbursement under the terms of the Engagement Agreement as modified by this Order.

22.    The Debtors and Epiq believe that the indemnification provisions contained in the Engagement Agreement are customary and reasonable for Epiq and comparable firms providing claims, noticing, solicitation, and related administrative services.

## **Disinterestedness**

23.    Epiq has reviewed its electronic database to determine whether it has any relationships with the creditors and parties in interest provided by the Debtors, and, to the best of

the Debtors' knowledge, information, and belief, and except as disclosed in the Cook Declaration, Epiq has represented that it neither holds nor represents any interest materially adverse to the Debtors' estates in connection with any matter on which it would be employed.

24.     In connection with its retention as Claims and Administrative Agent, Epiq represents in the Cook Declaration, among other things, that:

      a.    Epiq is not a creditor of the Debtors;

      b.    Epiq will not consider itself employed by the United States government and will not seek any compensation from the United States government in its capacity as the Claims and Administrative Agent in these Chapter 11 Cases;

      c.    by accepting employment in these Chapter 11 Cases, Epiq waives any rights to receive compensation from the United States government in connection with the Debtors' Chapter 11 Cases;

      d.    in its capacity as the Claims and Administrative Agent in these Chapter 11 Cases, Epiq will not be an agent of the United States and will not act on behalf of the United States; and

      e.    Epiq is a "disinterested person" as that term is defined in Bankruptcy Code Section 101(14) with respect to the matters upon which it is to be engaged.

25.     To the extent that there is any inconsistency between this application, the Order, or the Engagement Agreement, the Order will govern.

## WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

26.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

27.     Notice of this Motion shall be electronically served on all parties who have entered an appearance in the case pursuant to L.B.R. 5005-4. Due to the nature of the relief requested herein, the Debtors submit that no other or further notice need be provided.  A separate motion to approve the proposed retainer is being filed concurrently herewith, with notice provided to all parties required by *Order Granting Ex Parte Motion for Order Limiting Notice* (Docket No. 263).

## <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

DATED: July 10, 2020                                        Respectfully submitted,

By:   */s/  Keri L. Riley*
    Lee M. Kutner, # 10966
    Keri L. Riley, #47605
    **KUTNER BRINEN, P.C.**
    1660 Lincoln Street, Suite 1850
    Denver, CO 80264
    Telephone:  (303) 832-2400
    E-mail: klr@kutnerlaw.com

## Exhibit A

**Engagement Agreement**



# EPIQ CORPORATE RESTRUCTURING

## STANDARD SERVICES AGREEMENT

This Standard Services Agreement is being entered into by and between the undersigned parties, referred to herein as "Epiq" and "Client" as of the Effective Date, as defined below. In consideration of the premises herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## General Terms and Conditions

**1. Services.**

In accordance with the charges, terms and conditions contained in this agreement and in the schedule(s) attached hereto (collectively, the "Agreement"), Epiq agrees to furnish Client with the services set forth on the Services Schedule hereto (the "Services") in connection with a corporate restructuring. Services will be provided on an as needed basis and upon request or agreement of Client. Charges for the Services will be based on the pricing schedule provided to Client hereto (the "Pricing Schedule"). The Pricing Schedule sets forth individual unit pricing for each of the Services provided by Epiq and represents a bona fide proposal for that Service. Client may request separate Services or all of the Services reflected in the Pricing Schedule.

**2. Term.**

This Agreement shall become effective on the date of its acceptance by both Epiq and Client; provided, however, Epiq acknowledges that Bankruptcy Court approval of its engagement may be required in order for Epiq to be engaged in a chapter 11 proceeding. The Agreement shall remain in effect until terminated: (a) by Client, on thirty (30) days' prior written notice to Epiq and, to the extent Epiq has been retained by Bankruptcy Court order, entry of an order of the Bankruptcy Court discharging Epiq; or (b) by Epiq, on ninety (90) days' prior written notice to Client and, to the extent Epiq has been retained by Bankruptcy Court order, entry of an order of the Bankruptcy Court discharging Epiq.

**3. Charges.**

3.1 For the Services and materials furnished by Epiq under this Agreement, Client shall pay the fees, charges and costs set forth in the Pricing Schedule subject to any previously agreed upon discount if applicable. Epiq will bill Client monthly. All invoices shall be due and payable upon receipt.

3.2 Epiq reserves the right to make reasonable increases to the unit prices, charges and professional service rates reflected in the Pricing Schedule on an annual basis effective January 2, 2021. If such annual increases exceed 10% from the prior year's level, Epiq shall provide sixty (60) days' prior written notice to Client of such proposed increases.



3.3    Client agrees to pay Epiq for all materials necessary for performance of the Services under this Agreement (other than computer hardware and software) and any reasonable out of pocket expenses including, without limitation, transportation, long distance communications, printing, photocopying, fax, postage and related items.

3.4    Client shall pay or reimburse all taxes applicable to services performed under this Agreement and, specifically, taxes based on disbursements made on behalf of Client, notwithstanding how such taxes may be designated, levied or based. This provision is intended to include sales, use and excise taxes, among other taxes, but is not intended to include personal property taxes or taxes based on net income of Epiq.

3.5    Client shall pay to Epiq any actual charges (including fees, costs and expenses as set forth in the Pricing Schedule) related to, arising out of or resulting from any Client error or omission. Such charges may include, without limitation, print or copy re-runs, supplies, long distance phone calls, travel expenses and overtime expenses for work chargeable at the rates set forth on the Pricing Schedule.

3.6    In the event of termination pursuant to Section 2 hereof, Client shall be liable for all amounts then accrued and/or due and owing to Epiq under the Agreement.

3.7    To the extent permitted by applicable law, Epiq shall receive a retainer in the amount of $10,000 (the "Retainer") that may be held by Epiq as security for Client's payment obligations under the Agreement. The Retainer is due upon execution of this Agreement. Epiq shall be entitled to hold the Retainer until the termination of the Agreement. Following termination of the Agreement, Epiq shall return to Client any amount of the Retainer that remains following application of the Retainer to the payment of unpaid invoices.

**4.  <u>Confidentiality.</u>**

Client data provided to Epiq during the term of this Agreement in connection with the Services ("<u>Client Data</u>") shall be maintained confidentially by Epiq in the same manner and to the same level as Epiq safeguards data relating to its own business; <u>provided</u>, <u>however</u>, that if Client Data is publicly available, was already in Epiq's possession or known to it, was required to be disclosed by law, was independently developed by Epiq without use or reference to any Client Data, or was rightfully obtained by Epiq from a third party, Epiq shall bear no responsibility for public disclosure of such data. Client agrees that Epiq shall not be liable for damages or losses of any nature whatsoever arising out of the unauthorized acquisition or use of any Client Data or other Client materials provided to Epiq in the performance of this Agreement.



## 5.  Title to Property.

Epiq reserves all property rights in and to all materials, concepts, creations, inventions, works of authorship, improvements, designs, innovations, ideas, discoveries, know-how, techniques, programs, systems and other information, including, without limitation, data processing programs, specifications, applications, processes, routines, sub-routines, procedural manuals and documentation furnished or developed by Epiq for itself or for use by Client (collectively, the "Property").  Charges paid by Client do not vest in Client any rights to the Property, it being expressly understood that the Property is made available to Client under this Agreement solely for Client's use during and in connection with each use of the Epiq equipment and services.  Client agrees not to copy or permit others to copy any of the Property.

## 6.  Disposition of Data.

6.1   Client is responsible for the accuracy of the programs and Client Data it provides or gives access to Epiq and for the output resulting from such data.  Client shall initiate and maintain backup files that would allow Client to regenerate or duplicate all programs and Client Data which Client provides or gives access to Epiq.  Client agrees, represents and warrants to Epiq that, prior to delivery of any Client Data to Epiq, it has full authority to deliver Client Data to Epiq.  Client agrees, represents and warrants to Epiq that it has obtained binding consents, permits, licenses and approvals from all necessary persons, authorities or individuals, and has complied with all applicable policies, regulations and laws, required by Client, in order to allow Epiq to use all Client Data delivered to it in connection with its Services.  Epiq shall not be liable for, and Client accepts full responsibility for, any liability or obligation with respect to Client Data prior to Epiq's receipt, including without limitation, any liability arising during the delivery of Client Data to Epiq.

6.2   Any Client Data, programs, storage media or other materials furnished by Client to Epiq in connection with this Agreement (collectively, the "Client Materials") may be retained by Epiq until the services provided pursuant to this Agreement are paid for in full, or until this Agreement is terminated with the services provided herein having been paid for in full.  Client shall remain liable for all out of pocket charges incurred by Epiq under this Agreement as a result of any Client Materials maintained by Epiq.  Epiq shall dispose of Client Materials in the manner requested by Client (except to the extent disposal may be prohibited by law).  Client agrees to pay Epiq for reasonable expenses incurred as a result of the disposition of Client Materials.  Epiq reserves the right to dispose of any Client Materials if this Agreement is terminated without Client's direction as to the return or disposal of Client Materials or Client has not paid all charges due to Epiq for a period of at least ninety (90) days; provided, however, Epiq shall provide Client with thirty (30) days' prior written notice of its intent to dispose of such data and media.

## 7.  Indemnification.

Client shall indemnify, defend and hold Epiq, its affiliates, parent, and each such entity's officers, members, directors, agents, representatives, managers, consultants and employees (each an "Indemnified Person") harmless from and against any and all losses, claims, damages, liabilities, costs



(including, without limitation, costs of preparation and attorneys' fees) and expenses as incurred (collectively, "Losses"), to which any Indemnified Person may become subject or involved in any capacity arising out of or relating to this Agreement or Epiq's rendering of services pursuant hereto, regardless of whether any of such Indemnified Persons is a party thereto, other than Losses resulting solely from Epiq's gross negligence or willful misconduct.  Without limiting the generality of the foregoing, "Losses" includes any liabilities resulting from claims by third persons against any Indemnified Person.  Client and Epiq shall notify the other party in writing promptly of the commencement, institution, threat, or assertion of any claim, action or proceeding of which Client is aware with respect to the services provided by Epiq under this Agreement.  Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of Client, and shall survive the termination of this Agreement until the expiration of all applicable statutes of limitation with respect to Epiq's liabilities.

**8. <u>Limitation of Liability</u>**

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, THIS SECTION SHALL CONTROL.

(a) EACH PARTY AND ITS RESPECTIVE AGENTS SHALL NOT HAVE ANY OBLIGATION OR LIABILITY TO THE OTHER PARTY OR TO ANY THIRD PARTY (WHETHER IN TORT, EQUITY, CONTRACT, WARRANTY OR OTHERWISE AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE, PRODUCT LIABILITY, OR STRICT LIABILITY IN ACCORDANCE WITH APPLICABLE LAW, RULE OR REGULATION) FOR ANY INDIRECT, GENERAL, PUNITIVE, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO BUSINESS INTERRUPTION, LOST WAGES, BUSINESS OR PROFITS, OR LOSS OF DATA INCURRED BY CLIENT OR ANY OTHER PERSON, ARISING OUT OF RELATING TO THIS AGREEMENT, OR ANY USE, INABILITY TO USE OR RESULTS OF USE OF THE SERVICES OR SOFTWARE OR OTHERWISE, EVEN IF SUCH PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b) EPIQ SHALL NOT BE LIABLE TO CLIENT FOR ANY LOSSES REGARDLESS OF THEIR NATURE THAT ARE CAUSED BY OR RELATED TO A FORCE MAJEURE EVENT.

(c) THE TOTAL LIABILITY OF EACH PARTY AND ITS AGENTS TO THE OTHER PARTY OR TO ANY THIRD PARTY FOR ALL LOSSES ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE SERVICES SHALL NOT EXCEED THE TOTAL AMOUNT PAID BY THE CLIENT TO EPIQ FOR THE PARTICULAR SERVICES WHICH GAVE RISE TO THE LOSSES IN THE IMMEDIATE SIX (6) MONTHS PRIOR TO THE DATE OF THE ACTION GIVING RISE TO THE ALLEGED LOSS.



**9.  Representations / Warranties.**

Epiq makes no representations or warranties, express or implied, including, without limitation, any implied or express warranty of merchantability, suitability, fitness or adequacy for a particular purpose or use, quality, productiveness or capacity.

**10. Confidential On-Line Workspace**

Upon request of Client, Epiq shall be authorized to: (a) establish a confidential on-line workspace with an outside vendor in connection with the provision of its services to Client pursuant to this Agreement; and (b) with the consent of Client and/or its designees, publish documents and other information to such confidential workspace.  By publishing documents and other information to this confidential workspace in accordance with the foregoing, Epiq shall not be considered in violation of any of the provisions of this Agreement, including, but not limited to, Section 4 (Confidentiality).

**11.  General**

11.1  No waiver, alteration, amendment or modification of any of the provisions of this Agreement shall be binding upon either party unless signed in writing by a duly authorized representative of both parties.

11.2  This Agreement may not be assigned by Client without the express written consent of Epiq, which consent shall not be unreasonably withheld.  The services provided under this Agreement are for the sole benefit and use of Client, and shall not be made available to any other persons.

11.3  This Agreement shall be governed by the laws of the State of New York, without regard to that state's provisions for choice of law.  Client and Epiq agree that any controversy or claim arising out of or relating to this Agreement or the alleged breach thereof shall be settled by mandatory, final and binding arbitration before the American Arbitration Association in New York, New York and such arbitration shall comply with and be governed by the rules of the American Arbitration Association, provided that each party may seek interim relief in court as it deems necessary to protect its confidential information and intellectual property rights.  Any arbitration award rendered pursuant to this provision shall be enforceable worldwide.

11.4  The parties hereto agree that this Agreement is the complete and exclusive statement of the agreement between the parties which supersedes all proposals or prior agreements, oral or written, and all other communications between the parties relating to the subject matter of this Agreement.

11.5  Client will use its best efforts to cooperate with Epiq at Client's facilities if any portion of the Services requires its physical presence thereon.

11.6  In no event shall Epiq's Services constitute or contain legal advice or opinion, and neither Epiq nor its personnel shall be deemed to practice law hereunder.



11.7 Except for Client's obligation to pay fees, expenses and charges hereunder when due, neither party shall be in default or otherwise liable for any delay in or failure of its performance under this Agreement to the extent such delay or failure arises by reason of any act of God, any governmental requirement, act of terrorism, riots, epidemics, flood, strike, lock-out, industrial or transportational disturbance, fire, lack of materials, war, event of force majeure, or other acts beyond the reasonable control of a performing party.

11.8 This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

11.9 All clauses and covenants in this Agreement are severable; in the event any or part of them are held invalid or unenforceable by any court, such clauses or covenants shall be valid and enforced to the fullest extent available, and this Agreement will be interpreted as if such invalid or unenforceable clauses or covenants were not contained herein.  The parties are independent contractors and, except as expressly stated herein, neither party shall have any rights, power or authority to act or create an obligation on behalf of the other party.



11.10   Notices to be given or submitted by either party to the other, pursuant to this Agreement, shall be sufficiently given or made if given or made in writing and sent by hand delivery, overnight or certified mail, postage prepaid, and addressed as follows:

        If to Epiq:

                Epiq Corporate Restructuring, LLC
                777 Third Avenue, 12th Floor
                New York, New York 10017
                Attn:  Robert A. Hopen

        If to Client:

                Sklar Exploration Company, LLC and Sklarco, LLC
                5395 Pearl Parkway, Ste. 200
                Boulder, CO 80301
                Attn – James Katchadurian, CRO

        With a copy to:
                Keri L. Riley, Esq.
                Kutner Brinen, P.C.
                1660 Lincoln St., Suite 1850
                Denver, CO  80264
                303-832-2910 Direct
                KLR@kutnerlaw.com

11.11 Invoices sent to Client should be delivered to the following address:

                Sklar Exploration Company, LLC and Sklarco, LLC
                5395 Pearl Parkway, Ste. 200
                Boulder, CO 80301
                Attn – James Katchadurian, CRO

        Email:        james.katchadurian@cr3partners.com

11.12   The "Effective Date" of this Agreement is July 2, 2020.



IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**EPIQ CORPORATE RESTRUCTURING, LLC**

_____
Name:  Robert A. Hopen
Title:    President

**SKLAR EXPLORATION COMPANY, LLC**

By:_____
Name:  James Katchadurian
Title:    Chief Restructuring Officer

8



# SERVICES SCHEDULE

## SCHEDULES/STATEMENT PREPARATION

➢ Assist the Debtors with administrative tasks in the preparation of their bankruptcy Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("Statements"), including (as needed):

- Coordinate with the Client and its advisors regarding the Schedules and Statements process, requirements, timelines and deliverables.
- Create and maintain databases for maintenance and formatting of Schedules and Statements data.
- Coordinate collection of data from Client and advisors.
- Provide data entry and quality assurance assistance regarding Schedules and Statements, including, specifically, the creation of Schedule G.

## CLAIMS MANAGEMENT

➢ Maintain copies of all proofs of claim and proofs of interest filed (in hard copy and electronic form).

➢ Provide a secure on-line tool through which creditors can file proofs of claim and related documentation, eliminating costly manual intake, processing and data entry of paper claims and ensuring maximum efficiency in the claim-filing process.

➢ Create and maintain electronic databases for creditor/party in interest information provided by the debtor (e.g., creditor matrix and Schedules of Statements of Assets and Liabilities) and creditors/parties in interest (e.g., proof of claim/interests).

➢ Process all proof of claim/interest submitted.

➢ Provide access to the public for examination of copies of the proofs of claim or interest without charge during regular business hours.

➢ Maintain official claims registers, including, among other things, the following information for each proof of claim or proof of interest:

- Name and address of the claimant and any agent thereof, if the proof of claim or proof of interest was filed by an agent;
- Date received;
- Claim number assigned; and
- Asserted amount and classification of the claim.



➢ Create and maintain a website with general case information, key documents, claim search function, and mirror of ECF case docket.

➢ Transmit to the Clerk's office a copy of the claims registers on a monthly basis, unless requested by the Clerk's office on a more or less frequent basis or, in the alternative, make available the claims register on-line.

➢ Implement necessary security measures to ensure the completeness and integrity of the claims registers.

➢ Record all transfers of claims pursuant to Bankruptcy Rule 3001(e) and provide notice of such transfers as required by Bankruptcy Rule 3001(e).

➢ Maintain an up-to-date mailing list for all entities that have filed a proof of claim, proof of interest or notice of appearance, which list shall be available upon request of a party in interest or the Clerk's office.

## NOTICING

➢ Prepare and serve required notices in these Chapter 11 cases, including:

- Notice of the commencement of these Chapter 11 cases and the initial meeting of creditors under section 341(a) of the Bankruptcy Code;

- Notice of any auction sale hearing;

- Notice of the claims bar date;

- Notice of objection to claims;

- Notice of any hearings on a disclosure statement and confirmation of the plan of reorganization; and

- Other miscellaneous notices to any entities, as the debtor or the Court may deem necessary or appropriate for an orderly administration of these Chapter 11 cases.

➢ After service of a particular notice - whether by regular mail, overnight or hand delivery, email or facsimile service - file with the Clerk's office an affidavit of service that includes a copy of the notice involved, a list of persons to whom the notice was mailed and the date and manner of mailing.

➢ Update claim database to reflect undeliverable or changed addresses.



➢ Coordinate publication of certain notices in periodicals and other media.

➢ Distribute Claim Acknowledgement Cards to creditor having filed a proof of claim/interest.

## BALLOTING/TABULATION

➢ Provide balloting services in connection with the solicitation process for any chapter 11 plan for which a disclosure statement has been approved by the court, including (as needed):

- Consult with Client and its counsel regarding timing issues, voting and tabulation procedures, and documents needed for the vote.

- Review of voting-related sections of the voting procedures motion, disclosure statement and ballots for procedural and timing issues.

- Assist in obtaining information regarding members of voting classes, including lists of holders of bonds from DTC and other entities (and, if needed, assist Client in requesting these listings).

- Coordinate distribution of solicitation documents.

- Respond to requests for documents from parties in interest, including brokerage firm and bank back-offices and institutional holders.

- Respond to telephone inquiries from lenders, bondholders and nominees regarding the disclosure statement and the voting procedures.

- Receive and examine all ballots and master ballots cast by voting parties.  Date- stamp the originals of all such ballots and master ballots upon receipt.

- Tabulate all ballots and master ballots received prior to the voting deadline in accordance with established procedures, and prepare a certification for filing with the court.

Undertake such other duties as may be requested by the Client.

## CALL CENTER

➢ Provide state-of-the-art Call Center facility and services, including (as needed):

- Create frequently asked questions, call scripts, escalation procedures and call log formats.
- Record automated messaging.
- Train Call Center staff.
- Maintain and transmit call log to Client and advisors.



## **MISCELLANEOUS**

➢ Provide such other claims processing, noticing and related administrative services as may be requested from time to time by the Client.

➢ Promptly comply with such further conditions and requirements as the Court may at any time prescribe.

➢ Comply with applicable federal, state, municipal, and local statutes, ordinances, rules, regulations, orders and other requirements.

➢ Provide temporary employees to the Clerk's Office to process claims, as necessary.



# **PRICING SCHEDULE**

## **CLAIM ADMINISTRATION HOURLY RATES**

| Title | Rates |
|---|---|
| Clerical/Administrative Support | $25.00 – $55.00 |
| IT / Programming | $65.00 – $85.00 |
| Case Managers | $70.00 – $165.00 |
| Consultants/ Directors/Vice Presidents | $160.00 – $195.00 |
| Solicitation Consultant | $195.00 |
| Executive Vice President, Solicitation | $215.00 |
| Executives | No Charge |

## **CLAIMS AND NOTICING RATES[1]**

| | |
|---|---|
| Printing | $0.10 per image |
| Personalization / Labels | WAIVED |
| Envelopes | VARIES BY SIZE |
| Postage / Overnight Delivery | AT COST AT PREFERRED RATES |
| E-Mail Noticing | WAIVED |
| Fax Noticing | $0.05 per page |
| Claim Acknowledgement Letter | $0.05 per letter |
| Publication Noticing | Quoted at time of request |

## **DATA MANAGEMENT RATES**

| | |
|---|---|
| Data Storage, Maintenance and Security | $0.10 per record/month |
| Electronic Imaging | $0.10 per image; no monthly storage charge |
| Website Hosting Fee | NO CHARGE |
| CD- ROM (Mass Document Storage) | Quoted at time of request |

## **ON-LINE CLAIM FILING SERVICES**

| | |
|---|---|
| On-Line Claim Filing | NO CHARGE |

---

[1]   Noticing via overnight delivery after traditional overnight drop-off times (e.g., 9:00 p.m. in NYC) may result in additional print charges.



## CALL CENTER RATES

Standard Call Center Setup                     NO CHARGE

Call Center Operator                           $55 per hour

Voice Recorded Message                         $0.34 per minute

## OTHER SERVICES RATES

Custom Software, Workflow
and Review Resources                           Quoted at time of request

Depositions/Court Reporting                    Quoted at time of request, bundled pricing available

eDiscovery                                     Quoted at time of request, bundled pricing available

Virtual Data Room --
Confidential On-Line Workspace                 Quoted at time of request

Disbursements -- Check and/or Form 1099        Quoted at time of request

Disbursements -- Record to Transfer Agent      Quoted at time of request

14

## Exhibit B

**Cook Declaration**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 20-12377-EEB |
| SKLAR EXPLORATION COMPANY, LLC | ) | |
| EIN: 72-1417930 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | Case No. 20-12380-EEB |
| SKLARCO, LLC | ) | |
| EIN:  72-1425432 | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

**DECLARATION OF JAYMI HELEN COOK IN SUPPORT OF DEBTORS'
APPLICATION FOR ORDER APPOINTING EPIQ CORPORATE RESTRUCTURING,
LLC AS CLAIMS, NOTICING, SOLICITATION, AND ADMINISTRATIVE AGENT**

I, Jaymi Helen Cook, declare as follows:

1.      I am a Director at Epiq Corporate Restructuring, LLC ("Epiq"), which maintains an office at 777 Third Avenue, Twelfth Floor, New York, New York, 10017. I am duly authorized to make this declaration on behalf of Epiq, and I submit this declaration on behalf of Epiq (the "Cook Declaration") in support of the application (the "Application")[1] of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), for an order under Judicial Code Section 156(c), Bankruptcy Code Sections 105(a), 327(a), 328(a), and 503(b), Bankruptcy Rules 2014 and 6004, and Bankruptcy Local Rules 2014-1 and 9013-1 appointing Epiq as claims, noticing, solicitation, and administrative agent pursuant to the terms of the Engagement Agreement. The facts set forth herein are personally known to me and, if called as a witness, I could and would testify thereto.

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

2.      As the Claims and Administrative Agent, Epiq will perform at the request of the Clerk the services specified in the Application and the Engagement Agreement. In addition, at the Debtors' request, Epiq will perform such other Claims and Administrative Services specified in the Application.

3.      Epiq represents that:

a.      it is not a creditor of the Debtors;

b.      it will not consider itself employed by the United States government and shall not seek any compensation from the United States government in its capacity as the Claims and Administrative Agent in these Chapter 11 Cases;

c.      by accepting employment in these Chapter 11 Cases, Epiq waives any rights to receive compensation from the United States government in connection with these Chapter 11 Cases;

d.      in its capacity as the Claims and Administrative Agent in these Chapter 11 Cases, Epiq will not be an agent of the United States and will not act on behalf of the United States; and

e.      it is a "disinterested person" as that term is defined in Bankruptcy Code Section 101(14) with respect to the matters upon which it is to be engaged.

4.      Epiq is a data processing firm that specializes in chapter 11 administration, consulting and analysis, including noticing, claims processing, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases. Epiq has assisted and advised numerous chapter 11 debtors in connection with noticing and claims administration and reconciliation. Epiq has provided identical or substantially similar services in other chapter 11 cases nationwide, including before this Court.[2]

---

[2]   Nationally, Epiq has provided identical or substantially similar services in chapter 11 cases. *See, e.g.*, *PetroQuest Energy, Inc.*, No. 18-36322 (DRJ) (Bankr. S.D. Tex. November 7, 2018); *In re EXCO Resources, Inc.,* No. 18-30155 (MI) (Bankr. S.D. Tex. Jan. 15, 2018); *In re Stone Energy Corp.*, No. 16-36390 (MI) (Bankr. S.D. Tex. Dec. 14, 2016); *In re Illinois Power Generating Co.,* No. 16-36326 (MI) (Bankr. S.D. Tex Dec 9, 2016); *In re Warren Res. Inc.*, No. 16-32760 (MI) (Bankr. S.D. Tex. Jun. 2, 2016); *In re Ultra Petrol. Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. Apr. 29, 2016); *In re Energy XXI Ltd.*, No. 16-31928 (DRJ) (Bankr. S.D. Tex. Apr. 13, 2016); *In re ERG Intermediate Holdings, LLC*, No. 15-31858 (HDH) (Bankr. N.D. Tex. Apr. 30, 2015); and  *In re Life Partners Holdings, Inc.*, No. 15-40289 (RFN) (Bankr. N.D. Tex. Jan. 20, 2015);.

5.      In connection with the preparation of this declaration, I caused to be submitted for review by our conflicts system the names of interested parties and significant creditors (the "Potential Parties in Interest") in these Chapter 11 Cases. The list of Potential Parties in Interest was provided by the Debtors and included the Debtors, the Debtors' current and former directors and officers, significant stockholders, secured creditors, top unsecured creditors, and other parties. The results of the conflicts check were compiled and reviewed by employees of Epiq, under my supervision. At this time, Epiq is not aware of any relationship that would present a disqualifying conflict of interest. Epiq currently serves, or in the past may have served, in a neutral capacity as claims, noticing, balloting, and/or solicitation agent for these parties or related parties. However, given Epiq's neutral position as Claims and Administrative Agent or administrative advisor in the listed-party's cases, or any other cases, Epiq does not view such relationships as real or potential conflicts. Further, to the best of my knowledge, any such relationship is completely unrelated to these Chapter 11 Cases. Accordingly, to the best of my knowledge, Epiq and each of its employees are "disinterested persons," as that term is defined in Section 101(14) of the Bankruptcy Code, and neither Epiq nor any of its employees hold or represent an interest adverse to the Debtors' estates related to any matter for which Epiq will be employed.

6.      To the best of my knowledge, and based upon information provided to me by the Debtors, and except as provided herein, neither Epiq nor any employee thereof, has any materially adverse connection to the Debtors, their creditors, or other relevant parties. Epiq may have relationships with certain of the Debtors' creditors as vendors or in connection with cases in which Epiq serves or has served in a neutral capacity as noticing, claims, balloting, or administrative advisor for another chapter 11 debtor. In addition, Epiq personnel may have relationships with some of the Debtors' creditors or other parties in interest. However, to the best of my knowledge,

3

such relationships, to the extent they exist, are of a personal nature and completely unrelated to these Chapter 11 Cases.

7.      Epiq has and will continue to represent clients in matters unrelated to the Chapter 11 Cases. In addition, Epiq has had and will continue to have relationships in the ordinary course of its business with certain vendors, professionals, and other parties in interest that may be involved in these Chapter 11 Cases in matters unrelated to these Chapter 11 Cases. Epiq may also provide professional services to entities or persons that may be creditors or parties in interest in these Chapter 11 Cases, which services do not directly relate to, or have any direct connection with, these Chapter 11 Cases or the Debtors.

8.      Epiq is a wholly owned subsidiary of Epiq Systems, Inc., which is corporate parent to certain companies that provide integrated technology products and services to the legal profession for electronic discovery, class action settlements, financial transactions, chapter 7 and 13 bankruptcy, litigation, and regulatory compliance. Given the legal and operational separateness of Epiq from its affiliates and the administrative nature of the services performed by such companies, Epiq does not believe that a conflict would arise solely from any relationship or claim of an Epiq affiliate or its corporate parent.

9.      Epiq Systems, Inc., is a wholly owned subsidiary of Document Technologies, LLC ("DTI"), a global legal process outsourcing company, which, in turn, is wholly owned by DTI Topco, Inc. ("DTI Topco").  DTI Topco is a privately-held entity with majority ownership held by OMERS Administration Corporation ("OAC"), the administrator of the OMERS pension funds, and managed by OMERS Private Equity Inc. ("OPE", which together with OAC are referred to as "OMERS"), and funds managed by Harvest Partners, LP, ("Harvest") a leading private equity investment firm.

10.     Neither OMERS nor Harvest are currently identified on the Potential Parties in Interest list. However, the following disclosure is made out of an abundance of caution and in an effort to comply with the Bankruptcy Code and Bankruptcy Rules.

11.     Designees of OMERS and Harvest are members of the Board of Directors of DTI Topco ("Parent Board Designees").  No designees of OMERS or Harvest are members of the Board of Directors of DTI or Epiq, or any other subsidiaries of DTI.  Further, Epiq has the following restrictions in place (collectively, the "Barrier"):  (i)  prior to the Debtors commencing these cases, Epiq did not share the names or any other   information identifying the Debtors with OMERS, Harvest, or the Parent Board Designees; (ii) Epiq has not   and will not furnish any material nonpublic information about the Debtors to OMERS, Harvest, or the Parent Board Designees; (iii) no OMERS or Harvest personnel, including the Parent Board Designees,   work on Epiq client matters or have access to Epiq client information, client files,  or client personnel; (iv) no  OMERS or Harvest personnel, including the Parent Board Designees, work in Epiq's  offices; (v) other than the Parent Board Designees, Epiq operates independently from   OMERS and Harvest, including that it does not share any employees, officers or other management with  OMERS or Harvest, has separate offices in separate buildings, and has separate IT systems; and (vi) no Epiq executive or employee is a director, officer or employee of OMERS or Harvest (or vice versa other than the Parent Board Designees).

12.     Epiq has searched the names of OMERS and Harvest against the Debtors and the Potential Parties in Interest list provided by the Debtors. Based solely on the foregoing search, Epiq has determined, to the best of its knowledge, that there are no connections. Because of any applicable securities laws and the fact that Epiq operates independently from OMERS and Harvest, prior to the Petition Date, Epiq was unable to further investigate with either OMERS or Harvest,

to the extent necessary, any potential or actual connection between either OMERS or Harvest and the Debtors and the potential parties in interest.

13.     Should Epiq discover any new relevant facts or relationships bearing on the matters described herein during the period of its retention, Epiq will use reasonable efforts to promptly supplement its disclosure to the Court.

14.     In performing the Claims and Administrative Services as described in the Application, Epiq will charge the rates set forth in the Engagement Agreement. These rates are at least as favorable as the prices Epiq charges in other cases in which the firm has been retained to perform similar services.

15.     In addition, the indemnification provisions set forth in the Engagement Agreement reflect standard and customary terms of engagement contained in Epiq's engagement letters both in and outside of bankruptcy. Based on my experience, these indemnification provisions are similar to provisions in the engagement letters of other similarly situated companies in engagements both in and outside of bankruptcy.

16.     The Debtors have paid to Epiq a retainer in the amount of $10,000.00 (the "Retainer"). Epiq seeks to hold such retainer under the Engagement Agreement during these Chapter 11 Cases as security for the payment of fees and expenses incurred under the Engagement Agreement.

17.     If appointed as Claims and Administrative Agent, Epiq will not (a) cease providing Claims and Administrative Services during these Chapter 11 Cases for any reason, including nonpayment, without an order of the Court or (b) undertake any legal representation of the Debtors, nor provide any advice of a legal nature, outside the scope of the duties outlined in the Application, without prior order from the Court authorizing Epiq to do so.

6

18.    Epiq will comply with all requests of the Clerk.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true
and correct to the best of my knowledge, information, and belief.

Dated: July 10, 2020

EPIQ CORPORATE RESTRUCTURING, LLC

By:    Jaymi/Helen Cook