## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SKLAR EXPLORATION COMPANY, LLC | ) | Case No. 20-12377-EEB |
| EIN: 72-1417930 | ) | |
| | ) | Chapter 11 |
| Debtor-in-Possession. | ) | |
| | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| SKLARCO, LLC | ) | Case No. 20-12380-EEB |
| EIN: 72-1425432 | ) | |
| | ) | Chapter 11 |
| | ) | |
| | ) | |
| Debtor-in-Possession. | ) | |
| | ) | |

## *AD HOC* COMMITTEE OF WORKING INTEREST OWNERS' MOTION TO MODIFY THE AUTOMATIC STAY TO: (A) HOLD A MEETING OF THE WORKING INTEREST OWNERS IN THE BROOKLYN OIL UNITS; (B) TAKE A CONTRACTUALLY AUTHORIZED VOTE TO REMOVE DEBTOR SKLAR EXPLORATION COMPANY, LLC, AS OPERATOR OF THE BROOKLYN OIL UNITS; (C) UPON AN AFFIRMATIVE VOTE TO REMOVE SEC AS OPERATOR IN ORDER TO TAKE ALL STEPS NECESSARY TO EFFECTUATE THE REMOVAL

**COMES NOW**, the *Ad Hoc* Committee of Working Interest Owners of Debtors Sklar Exploration Company, LLC, and Sklarco, LLC (the "*Ad Hoc* **Committee**"), by and through their undersigned counsel, for their Motion to Modify the Automatic Stay to: (A) Hold a Meeting of the Working Interest Owners in the Brooklyn Oil Units; (B) Take a Contractually Authorized Vote to Remove Debtor Sklar Exploration Company, LLC ("**SEC**"), as Operator of the Brooklyn Oil Units; and (C) Upon an Affirmative Vote to Remove SEC as Operator, to Take All Steps Necessary to Effectuate the Removal (the "**Motion**").  In support of the Motion, the *Ad Hoc* Committee states as follows:

**Jurisdiction and Venue**

1.      This Court has jurisdiction over these Chapter 11 cases pursuant to 28 U.S.C. §§ 157(a) and (b), and 1334(a) and (b). This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (G) as this matter concerns the administration of the Debtors' estates and a request to modify the automatic stay.  The statutory and rule-based predicates for the relief requested in the Motion are Section 362(d)(1) of the Bankruptcy Code, Rule 4001 of the Bankruptcy Rules and L.B.R. 4001-1.  Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

**Background**

**A.      The Relationship Between Working Interest Owners and the Operator Explained.**

2.      Through a written agreement—commonly in the form of an oil, gas, and mineral lease—owners of mineral interests convey to a third party an interest in minerals that entitles the third party the right to capture minerals from the relevant parcel of land for a specified period of time "and so long thereafter" as minerals are produced in paying quantities in exchange for either a share of production or the proceeds thereof.  This interest, together with any mineral interest not subject to an oil, gas and mineral lease, is known as a "**Working Interest**.", with the owner of a Working Interest being known as a "**Working Interest Owner**". The cost of drilling, developing, producing and operating oil and gas wells are charged to the Working Interest and are the responsibility of the Working Interest Owner. The rights and responsibilities of the Working Interest Owners associated with the capture of minerals on a designated area of land (the "**Contract Area**") are generally governed by an industry form of agreement commonly known as a Joint Operating Agreement ("**OA**"). The Working Interest Owners will designate one party to serve as the operator under the OA, who is charged with carrying out operations for the exploration and development of minerals on the Contract Area, as provided by the OA and as directed and

approved by the Working Interest Owners. In the State of Alabama, drilling and production units are established for each oil and gas well in accordance with the rules and regulations of the Alabama Oil and Gas Board ("**AOGB**"). Commonly, the rules and regulations permit only one well to be drilled on each drilling and production unit, with each well operated independently of other wells in the field, subject to the rules and regulations of the AOGB.

3.       As oil and gas is produced from a well governed by an OA, the pressure in the reservoir begins to decline, and in the absence of secondary or enhanced recovery methods, a significant portion of the oil and gas originally in place in the reservoir will not be recovered and will be lost. Secondary recovery programs have been developed, whereby a medium such as gas or water is injected into the reservoir for purposes of re-pressuring the reservoir, thus permitting the production of additional reserves not otherwise recoverable. Because the process involves the injection of a medium that will cross the boundary lines of the drilling and production units for the individual wells, producing states, including Alabama, have enacted laws permitting the operation and development of a pool in a field, which commonly consists of a group of wells, as one operation so as to permit the development of the field in such manner as will promote the conservation of oil and gas resources, prevent waste, and protect the correlative rights of the parties in the field, in order to increase the ultimate recovery of oil or gas by enhanced recovery methods. *See* Code of Alabama § 9-17-80 *et seq*. In Alabama, orders issued by the AOGB approving secondary recovery operations contain provisions allocating among the separately owned tracts within the unit the oil and gas produced, based upon the relative contribution which each tract is expected to make during the course of unit operations to the total production of oil and gas, and set forth the mechanism for the sharing of costs and expenses for unit operations. *See* Code of Alabama § 9-17-83. Also in Alabama, the order includes the designation of the unit operator (the

3

"**Unit Operator**"), or a provision for the selection of a unit operator, with the conduct of all unit operations by the unit operator and the selection of a successor to the unit operator governed by the terms and provisions of the unit agreement and unit operating agreement. *See* Code of Alabama §9-17-83(6). The Brooklyn Oil Units (hereafter described) were established and approved by the AOGB by order effective January 1, 2019 (Order Nos. 2018-48  and 2018-49), with SEC being designated as the initial Unit Operator under the Brooklyn Agreements (hereafter defined). Insofar as is relevant to this matter, all of the members of the *Ad Hoc* Committee are Working Interest Owners in the Brooklyn Oil Units and as such, are responsible for their share of the costs of operations conducted by the Unit Operator in accordance with the Brooklyn Agreements. The members of the *Ad Hoc* committee own and or represent approximately 38.17% of the Southwest Brooklyn Oil Unit, and approximately 40.68% of the Southeast Brooklyn Oil Unit.

4.      Paragraph 3.1 for each of the Southeast Brooklyn Unit Operating Agreement and the Southwest Brooklyn Unit Operating Agreement (as defined below) provides that Working Interest Owners "…shall exercise overall supervision and control of all matters pertaining to Unit Operations…,", with paragraph 7.1 providing that "Subject to the provisions of …[the Brooklyn Agreements] and to instructions from Working Interest Owners, Unit Operator shall have the exclusive right and be obligated to conduct Unit Operations."

5.      The success of a secondary recovery operation relies upon the competence, integrity and abilities of the Unit Operator to successfully navigate geological, engineering and regulatory issues, and other variables appurtenant to operations. The Unit Operator further pays the costs of the approved expenditures incurred in operations, bills the Working Interest Owners their *pro rata* share of expenses (known as joint interest billings, or "**JIBs**"), maintains accountings of all costs and revenues and distributes the proceeds from the sale of production to the royalty

owner(s) and Working Interest Owners in accordance with the contractual requirements of the governing Unit Operating Agreements. For this reason, the Working Interest Owners' selection of the Unit Operator in whom they have confidence is paramount. In virtually all Unit Operating Agreements, the Working Interest Owners are granted the right to remove the Unit Operator and to select a successor Unit Operator. As set forth below, the Brooklyn Agreements pertaining to the Brooklyn Oil Units contain such provisions.

**B.      Background Regarding the *Ad Hoc* Committee's Interests.**

5.      The members of the *Ad Hoc* Committee are: (i) Pruet Production Co.; (ii) JF Howell Interests, LP; (iii) McCombs Energy, Ltd.; and (iv) FPCC USA, Inc.  (*See* Docket No. 670).

6.      Each of the members of the *Ad Hoc* Committee own Working Interests in both the Southwest Brooklyn Oil Unit and the Southeast Brooklyn Oil Unit located in Conecuh and Escambia Counties, Alabama (collectively, the "**Brooklyn Oil Units**").

7.      The members of the *Ad Hoc* Committee, Debtor Sklarco, LLC ("**Sklarco**"), and SEC are parties, among others, to the following agreements:

    a.  Southwest Brooklyn Unit Agreement dated November 1, 2018 (the "**Southwest Brooklyn Unit Agreement**").  A true and correct copy of the Southwest Brooklyn Unit Agreement is attached hereto as Exhibit 1;

    b.  Southwest Brooklyn Unit Operating Agreement dated November 1, 2018 (the "**Southwest Brooklyn Unit Operating Agreement**").  A true and correct copy of the Southwest Brooklyn Unit Operating Agreement is attached hereto as Exhibit 2;

    c.  Southeast Brooklyn Unit Agreement dated November 1, 2018 (the "**Southeast Brooklyn Unit Agreement**").  A true and correct copy of the Southeast Brooklyn Unit Agreement is attached hereto as Exhibit 3; and

    d.   Southeast Brooklyn Unit Operating Agreement dated November 1, 2018 (the "**Southeast Brooklyn Unit Operating Agreement**" and together with the Southeast Brooklyn Unit Operating Agreement, the "**Operating Agreements**").  A true and correct copy of the Southeast Brooklyn Unit Agreement is attached hereto as Exhibit 4.

5

(collectively the "**Brooklyn Agreements**").

8.      SEC is the "Unit Operator" for the assets located within the Brooklyn Oil Units. (*See* Ex. 2 at § 6.1; Ex. 4 at § 6.1).   The Unit Operator is the party designated by the Working Interest Owners to conduct all unit operations in the Brooklyn Oil Units pursuant to the Unit Operating Agreements.  (*Id*. at § 1.10; *id*. at § 1.10).

9.      Section 3.1 of each of the Operating Agreements provides that "Working Interest Owners shall exercise ***overall supervision and control of all matters*** pertaining to the Unit Operations pursuant to [Article IV of] this Agreement and the Unit Agreement."  (*See* Ex. 2 at § 3.1; Ex. 4 at § 3.1) (emphasis added).

   **C.      Background on Meeting and Voting Mechanisms in the Brooklyn Agreements.**

10.      As set forth in the Unit Operating Agreements, any meetings of the Working Interest Owners in the Brooklyn Oil Units must either be called by SEC, as Unit Operator, or upon the motion of Working Interest Owners whose participation in the particular Brooklyn Oil Unit total not less than twenty-five percent (25%).  (*Id*. at § 4.2; *id*. at § 4.2).  If SEC, as Unit Operator, fails to call a meeting of the Working Interest Owners within ten (10) days after having been requested to do so by any Working Interest Owner then such Working Interest Owner may call a meeting.  (*Id*.).[1]

11.      At a called meeting, each Working Interest Owner has a voting interest equal to its participation in the particular oil unit at the time of the vote.  (*Id*. at § 4.3.1; *id*. at § 4.3.1).  Unless otherwise excepted, all matters presented at any meeting must pass by an affirmative vote of three

---

[1] To the extent required under the Unit Operating Requests, this Motion shall serve as the *Ad Hoc* Committee members' request upon SEC to call the meeting set forth in § 4.2.

(3) or more Working Interest Owners having a combined voting interest, based upon participation percentage, of at least a majority of the Working Interest.  (*Id*. at § 4.3.2; *id*. at § 4.3.2).

12.     The Working Interest Owners may remove SEC, or any other Unit Operator, at any time by the affirmative vote of more than sixty-six and two thirds percent (66 2/3%) of the voting interest, based upon participation percentage, in the manner previously described, *i.e.*, at a duly called meeting with at least three (3) or more Working Interest Owners voting in favor of the removal.  (*Id*. at § 6.2; *id*. at § 6.2).  Upon the removal of SEC as Unit Operator, the Working Interest Owners may select a successor Unit Operator.  (*Id*. at § 6.3; *id*. at § 6.3).

**D.     Removal of SEC as Operator Is Subject to Applicable Non-Bankruptcy Law.**

13.     Because the Brooklyn Oil Units are located in Alabama, the operations thereof are governed by Alabama law and are regulated by the State Oil and Gas Board of Alabama (the "**AOGB**").

14.     Under Alabama law, a change in the Operator of a well must be approved by the AOGB.  *See* Ala. Admin. Code R. 400-1-2-.05(2) ("Within sixty (60) days of the effective date of any agreement or other transaction causing a change of operator, any person or persons desiring to become the new operator of a well or wells must submit for approval to the Supervisor Form OGB-1E, Application for Change of Operator.").

15.     Accordingly, to the extent the Working Interest Owners in the Brooklyn Oil Units affirmatively vote to remove SEC as the Unit Operator, the AOGB must approve any change of SEC as such operator.

**E.     Background Regarding these Bankruptcy Cases.**

16.     On April 1, 2020 (the "**Petition Date**"), the Debtors commenced these Chapter 11 cases when they filed their voluntary petitions.  (Docket No. 1).

4810-4555-3617.5

17.     On May 11 and 12, 2020, the Court held a two-day evidentiary hearing where the Debtors' executives, including the Debtors' CEO and primary equity stakeholder Howard Sklar, testified regarding their purported interests in the commingled cash on hand as of the Petition Date. The Debtors' executive team testified that certain cash call advances received from, *inter alia*, members of the *Ad Hoc* Committee as well as unpaid revenues from production owed to certain Working Interest Owners (including members of the *Ad Hoc* Committee) have been commingled in the Debtors' operating account and spent—on purposes other than those permissible under the Brooklyn Agreements.  Furthermore, the Debtors' executive team acknowledged that the Debtors would not be relying on future third party working interest revenue in order to sustain their operations on a go forward basis.  Lastly, the Debtors' executives testified that SEC, contrary to its obligations as an operator under various agreements, including the Brooklyn Agreements, has not required Sklarco to pay its share of any cash call advances.

18.     On June 15, 2020, the Court authorized: (i) the employment of CR3 Partners as CRO of the Debtors; and (ii) the Debtor to incur post-petition financing from Mr. Howard Sklar on an unsecured basis in order to sustain post-petition operations including for the payment of wages, operating expenses, ongoing administrative expenses and expenses associated with the CRO.  (Docket Nos. 341, 346, 429 and 431).  Also, on June 15, 2020, the Court entered its Final Cash Collateral Order.  (*See* Docket No. 433).

19.     On July 27, 2020, the Court entered its Order extending the Debtors' exclusive period to file a Chapter 11 plan to November 25, 2020, and the time frame to obtain acceptance of any such Chapter 11 plan was extended an additional 117 days.  (Docket No. 500).

20.     On September 4, 2020, the Debtors filed their Motion for Clarification and to Authorize Immediate Offset of Joint Interest Billing Obligations (the "**Motion to Clarify**"),

believing that the Final Cash Collateral Order and the Oil and Gas Order were ambiguous and that the Debtors, despite the plain language of the orders, intended to permit the offset of a working interest holders' post-petition revenue payment against its unpaid post-petition JIBs (Docket No. 551) (the "**Motion to Clarify**").  Various Working Interest Owners, including some members of the *Ad Hoc* Committee, objected to the Motion to Clarify.  The Court has held the Motion to Clarify in abeyance pending a further order of the Court.  (Docket No. 630).

21.     As of the date of this Motion, the Debtors have neither filed their proposed Chapter 11 plan nor indicated—despite the Court's prompting—which executory contracts, such as the Brooklyn Agreements, they intend to assume.  Indications from the hearing on the Motion to Clarify, and from the Debtors' late delivery of the reserve report (dated November 4, 2020), are that further delay, to the detriment of all concerned, is possible (if not likely).

## Relief Requested

22.     The *Ad Hoc* Committee requests that the automatic stay be modified so that the Working Interest Owners in the Brooklyn Oil Units be authorized to: (a) call a meeting among the Working Interest Owners as authorized under § 4.2 of the Unit Operating Agreements; (b) to take a vote, in accordance with the applicable mechanisms of the Unit Operating Agreements including §§ 4.3 and 6.2 of the Unit Operating Agreements, to remove SEC as the Unit Operator of the Brooklyn Oil Units; and (c) to take all steps necessary to effectuate the removal of SEC as the Unit Operator of the Brooklyn Oil Units, in accordance with the terms of the Brooklyn Agreements, including, but not limited to, the obtaining of approval of such removal from the AOGB and that SEC cooperate in good faith with the Working Interest Owners with the removal.

## Argument

23.     The automatic stay prohibits "any act to obtain possession of property of the estate or of property from estate or to exercise control over property of the estate."   11 U.S.C. 362(a)(3)(emphasis added); *Columbia Cas. Co. v. Markus*, 2006 U.S. Dist. LEXIS 64181 (D. Utah Sept. 7, 2006) ("The automatic stay applies only to property of the estate . . .").   Property of the estate includes a debtor's interest in executory contracts.  *See* 11 U.S.C. 541(a)(1).  With respect to property of the estate, Section 362(d)(1) of the Bankruptcy Code provides how a creditor may seek relief from the automatic stay for "cause":

> (d)     On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
>    (1)     for cause, including the lack of adequate protection of an interest in property of such party in interest;

24.     "Because 'cause' is not further defined in the Bankruptcy Code, relief from stay for cause is a discretion determination made on a case by case basis."  *In re JE Livestock, Inc.*, 375 B.R. 892, 897 (B.A.P. 10th Cir. 2007); *In re Auld*, 2014 Bankr. LEXIS 2568, at *35 (Bankr. D. Kan. June 11, 2014 (stating that "there is no clear definition" of "cause" under Section 362(d)(1) of the Bankruptcy Code); *In re S. Farmland Props., Inc.*, 2010 Bankr. LEXIS 6552, at *12 (Bankr. W.D. Tenn. May 18, 2010) ("Because the inquiry is so fact-specific, there is no set formula courts can use in determining if cause exists under § 362(d)(1).").

25.     In this case, "cause" exists in order for the Working Interest Owners in the Brooklyn Oil Units to call a meeting and take a vote to remove SEC as Unit Operator under the Brooklyn Agreements.  As stated above, overall supervision and control of operations of these units lies with the Working Interest Owners in these units.  Such supervision and control includes choosing the Unit Operator.  The Working Interest Owners in the Brooklyn Oil Unit are contractually authorized

10

4810-4555-3617.5

to select, and remove, the Unit Operator at their discretion as such right was specifically bargained for in the Brooklyn Agreements.

26.     In similar circumstances to those here, the automatic stay has been held to not apply to parties exercising contractual rights in matters of corporate governance.  *See Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*, 801 F.2d 60, 66-67 (2d Cir. 1986) (holding that the rights of shareholders to compel a shareholders' meeting for the purpose of electing a new board of directors subsists during reorganization proceedings); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 302 (Bankr. D. Del. 2013) ("It is axiomatic that the commencement of a Chapter 11 case does not suspend or displace non-bankruptcy law and contractual rights regarding corporate governance.").

27.     As set forth above, it is critical to the nature of the Working Interest that the Working Interest Owners be able to select, and proceed with, an operator in whom the Working Interest Owners have confidence and is capable of maximizing the value of the Unit Area for the benefit of the Working Interest Owners.  Here, the members of the *Ad Hoc* Committee are not asking the Court to remove SEC as the Unit Operator.  Instead, the *Ad Hoc* Committee is requesting—as they are contractually permitted under the Brooklyn Agreements—that they be authorized to call a meeting and take a vote among all of the Working Interest owners in the Brooklyn Oil Unit to determine whether SEC should be removed as Unit Operator.[2]

28.     This bankruptcy case has languished in Chapter 11 for more than seven (7) months with minimal progress towards maximizing the value of the Working Interests in the Brooklyn Oil

---

[2] Moreover, by calling a meeting and exercising the contractually authorized vote, the Working Interest Owners are not improving their position as creditors in these Chapter 11 cases vis-à-vis other creditors.  *See In re Gencanna Glob. USA, Inc.*, 2020 Bankr. LEXIS 1742, at *11-14 (Bankr. E.D. Ky. July 2, 2020) ("A shareholder that uses its equity voting rights to improve its position as a creditor is acting to exercise control over property of the estate and attempting to collect on its claim in violation of the stay.").  Instead, the Working Interest Owners here are interested in preserving and maximizing the value of their Working Interests in the Brooklyn Oil Units.

Units.  The Working Interest Owners in the Brooklyn Oil Units are entitled to have the value of their Working Interests maximized by removing and/or changing the Unit Operator.  The right of SEC or any other person to be the Unit Operator under the Brooklyn Agreements is, and has always been, subject to being removed by vote by the Working Interest Owners with or without cause. Accordingly, "cause" exists under Section 362(d)(1) of the Bankruptcy Code to authorize the Working Interest Owners to call a meeting and take a vote, in accordance with the Brooklyn Agreements, to determine whether to remove SEC as Unit Operator.  To the extent the Working Interest Owners vote to remove SEC as Unit Operator, SEC should cooperate in good faith with the Working Interest Owners in effectuating the removal.

29.     Furthermore, to the extent SEC opposes its removal as Unit Operator, it will have not one, but two opportunities to challenge this removal.  First, SEC is not prohibited from making its case to the Working Interest Owners as to why it should not be removed.  Second, should those efforts fall flat, SEC may challenge its removal when the affirmative vote to remove SEC as operator is brought before the AOGB for regulatory approval.  Accordingly, SEC's rights as Unit Operator, if any, are protected as any vote to remove must be approved by the AOGB.

### Reservation of Rights

30.     The *Ad Hoc* Committee makes no admission of fact or law and reserves any rights, claims, objections, and defenses, that may be available to them before this Court and any other court with competent jurisdiction over the parties and the matters at issue and any other matters involving the administration of this case, the estate, and the merits of the Working Interest Owners. Nothing in this Motion constitutes a waiver or release of any rights, claims, or defenses of the *Ad Hoc* Committee in this case or any other case or proceeding.  The *Ad Hoc* Committee reserves the right to seek relief from the automatic stay on the same or other grounds if cause exists.

## **Waiver of Stay Under Federal Rule of Bankruptcy Procedure 4001(a)(3)**

31.     In connection with any order granting this Motion, the *Ad Hoc* Committee requests that the Court waive the fourteen (14) days stay provided for in Rule 4001(a)(3) of the Bankruptcy Rules.

WHEREFORE, the *Ad Hoc* Committee requests that this Court enter an order which modifies the automatic stay and authorizes the Working Interest Owners in the Brooklyn Oil Units to: (i) hold a meeting in accordance with the Brooklyn Agreements; (ii) take a vote, in accordance with the Brooklyn Agreements, to remove SEC as Unit Operator of the Brooklyn Oil Units; (iii) subject to the results of such votes, immediately execute upon and enforce the rights conferred upon the Working Interest Owners under the Operating Agreements; and (iv) for all such other and further relief this Court deems fair and equitable under the circumstances.

### **[INTENTIONAL PAGE BREAK – SIGNATURE PAGE FOLLOWS]**

4810-4555-3617.5

Dated: November 18, 2020.                          Respectfully submitted,

**AD HOC COMMITTEE OF WORKING INTEREST HOLDERS OF SKLAR EXPLORATION COMPANY, LLC, AND SKLARCO, LLC**

By:   */s/Timothy M. Swanson*
Timothy M. Swanson (Colorado No. 47267)
MOYE WHITE LLP
1400 16th Street
6th Floor
Denver, Colorado 80202-1486
Tel: (303) 292-2900
Fax: (303) 292 4510
Tim.Swanson@moyewhite.com
*Counsel to the Ad Hoc Committee of Working Interest Holders of Sklar Exploration Company, LLC, and Sklarco, LLC*

--and--

Craig M. Geno
Law Offices of Craig M. Geno, PLLC
587 Highland Colony Parkway
Ridgeland, Mississippi 39157
Tel: (601) 427-0048
Fax: (601) 427-0050
cmgeno@cmgenolaw.com
*Counsel to the Ad Hoc Committee of Working Interest Holders of Sklar Exploration Company, LLC, and Sklarco, LLC*