**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

In Re.                                    )
                                          )
SKLAR EXPLORATION COMPANY, LLC, and       )    **20-12377-EEB**
                                          )     **Chapter 11**
SKLARCO, LLC                              )
                                          )
              Debtors.                    )
                                          )
Hearing on: (1) Ad Hoc Committee of       )
Working Interest Holders' Motion for      )
Relief from Stay On (A) Hold a Meeting    )
of the Working Interest Owners in the     )
Brooklyn Oil Units; (B) Take a            )
Contractually Authorized Vote to Remove   )
Debtor Sklar Exploration Company, LLC,    )
as Operator of the Brooklyn Oil Units;    )
and (C) Upon an Affirmative Vote to       )
Remove Sklar Exploration Company, LLC,    )
as Operator in Order to Take All Steps    )
Necessary to Effectuate the Removal and   )
Debtors' Response Thereto; and (2)        )
Discovery Dispute.                        )
_____)

**December 17, 2020**

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE ELIZABETH E. BROWN**
**THURSDAY, DECEMBER 17, 2020; 1:33 P.M.**
**DENVER, COLORADO**

**FOR THE DEBTORS:**
     Keri L. Riley, Esq.
     1660 Lincoln Street, Suite 1850
     Denver, Colorado 80202

     Benjamin Y. Ford, Esq.
     RSA Tower, 27th Floor
     11 North Water Street
     Mobile, Alabama 36602

     Duane A. Graham, Esq.
     RSA Tower, 27th Floor
     11 North Water Street
     Mobile, Alabama  36602

**FOR THE AD HOC COMMITTEE:**

    Timothy M. Swanson, Esq.
    1400 16 Street, 6th Floor
    Denver, Colorado  80202

    Craig M. Geno, Esq.
    587 Highland Colony Parkway
    Ridgeland, Mississippi  39157

**FOR THE CREDITORS' COMMITTEE:**

    Christopher D. Johnson, Esq.
    700 Milam Street, Suite 2700
    Houston, Texas  77002

    Grant Matthew Beiner, Esq.
    700 Milam Street, Suite 2700
    Houston, Texas  77002

**FOR CREDITORS TAUBER EXPLORATION & PRODUCTION, PICKENS
FINANCIAL GROUP, AND THE RUDMAN PARTNERSHIP:**

    Barnet Skelton, Jr., Esq.
    815 Walker, Suite 1502
    Houston, Texas 77002

    Thomas H. Shipps, Esq.
    835 East Second Avenue
    P.O. Box 2717
    Durango, Suite 123
    Durango, Colorado  81301

**FOR CREDITORS PRUET OIL COMPANY, LLC, and PRUET PRODUCTION CO.:**

    Jeremy L. Retherford, Esq.
    1901 Sixth Avenue North, Suite 1500
    Birmingham, Alabama  35203

    Matthew J. Ochs, Esq.
    555 17th Street
    Denver, Colorado  80202

**FOR CREDITOR FANT ENERGY LTD:**

    Brent R. Cohen, Esq.
    1200 17th Street, Suite 3000
    Denver, Colorado  80202

**FOR CREDITOR FLETCHER PETROLEUM CO.:**

>    Brian Rich, Esq.
>    313 North Monroe Street, Suite 301
>    Tallahassee, Florida  33301

**FOR CREDITORS MCCOMBS ENERGY AND MCCOMBS EXPLORATION:**

>    Stephen K. Lecholop, II, Esq.
>    755 East Mulberry Avenue, Suite 200
>    San Antonio, Texas  78212

**FOR CREDITOR FPCC USA:**

>    Joseph Eric Bain, Esq.
>    811 Main Street, Suite 2900
>    Houston, Texas  77002

**FOR CREDITOR J.F. HOWELL INTERESTS:**

>    David R. Taggart, Esq.
>    401 Edwards Street, Suite 1000
>    Shreveport, Louisiana  71101

**FOR CREDITOR LUCAS PETROLEUM OIL:**

>    Duane Breschia, Esq.
>    720 Brazos, Suite 700
>    Austin, Texas  78701

Proceedings electronically recorded and produced by Federal
Reporting Service, Inc.

_____

Requested By: Bryan Cave          FEDERAL REPORTING SERVICE, INC.
Leighton Paisner LLP              17454 EAST ASBURY PLACE
Date: December 31, 2020           AURORA, CO 80013
Delivered: January 7, 2020        (303) 751-2777
Time: 7 day
$4.50 per page: $297.00

1                  P R O C E E D I N G S

2          THE COURT:  Good afternoon.  We are here in the case

3  of Sklar Exploration Company, LLC, and Sklarco, LLC, under Case

4  No. 20-12377.  We are here on a motion for relief from stay as

5  well as a discovery dispute.

6              Let's go ahead and take appearances, and I'm going to

7  start with our movant, the ad hoc committee.

8          MR. SWANSON:  Good afternoon, Your Honor.  This is

9  Tim Swanson on behalf of the ad hoc committee of working

10  interest owners.  Also on the telephone is Mr. Craig Geno of

11  the Craig M. Geno Law Firm in Ridgeland, Mississippi.

12          THE COURT:  Thank you.

13          Okay.  How about for our debtor?

14          MS. RILEY:  Good afternoon, Your Honor.  This is Keri

15  Riley appearing on behalf of the debtors.  Also on the line we

16  have Duane Graham and Ben Ford.  Both of them will be taking a

17  lead on arguing today's motion.  And we also have Client

18  Representatives Marshall Jones, John Strausser, and James

19  Katchadurian.

20          THE COURT:  Okay.  Then I better have you--if they're

21  going to argue, I better have those names again on the

22  attorneys.

23          MS. RILEY:  Certainly.  It's Duane Graham.

24          THE COURT:  G-R-A-H-A-M-?

25          MS. RILEY:  Yes.

1          THE COURT:  Okay.  And?

2          MS. RILEY:  Ben Ford.

3          THE COURT:  Ford.  Okay, great.  Thank you.

4          Okay.  So let's try to take turns somehow.  I don't

5     have a list of who all is listening in, so let's go ahead and

6     start with creditors.

7          MR. JOHNSON:  Good afternoon, Your Honor.  This is

8     Chris Johnson on behalf of the official committee of unsecured

9     creditors, and also on the line is my associate, Mr. Grant

10    Beiner.

11         THE COURT:  Thank you.

12         MR. SUZUKI:  Afternoon, Your Honor.  Bryce Suzuki

13    from Bryan Cave Leighton Paisner on behalf of East West Bank.

14    Two representatives of East West Bank are also on the line,

15    Stuart Bonomo and Mary Lou Allen.

16         THE COURT:  Very good.  Thank you.

17         MR. SKELTON:  This is Barnet Skelton on behalf of

18    Tauber Exploration and Production, Pickens Financial Group, and

19    the Rudman Partnership.  I am joined up by Tom Shipps, Thomas

20    S. Shipps, and we may have Mr. Trey Sibley, a client rep, and

21    Mr. Mike Pickens on.  I'm not sure whether they signed in or

22    not.  And we did file a joinder to the motion for relief from

23    stay.

24         THE COURT:  Okay, thank you.

25         MR. RETHERFORD:  Good afternoon, Your Honor.  This is

1   Jeremy Retherford appearing on behalf of Pruet Production and

2   Pruet Oil Company, along with Co-Counsel Matt Ochs.  And also

3   on the line is Client Representative Stan Kynerd.

4            THE COURT:  Okay, thank you.

5            MR. COHEN:  Hello, Your Honor.  This is Brent Cohen

6   appearing on behalf of Fant Energy, and I believe my client

7   representative, Steven Swan, is on the line today.

8            THE COURT:  Very good.  Thank you.

9            MR. RICH:  Good afternoon, Your Honor.  This is Brian

10   Rich representing Fletcher Petroleum.

11            THE COURT:  Okay, thank you.

12            MR. LECHOLOP:  Good afternoon, Your Honor.  This is

13   Steve Lecholop representing McCombs Energy and McCombs

14   Exploration, and we are a member of the movant ad hoc group of

15   working interest owners.

16            THE COURT:  Okay, thank you.

17            MR. BAIN:  Good afternoon, Your Honor.  Joseph Bain

18   on behalf of FPCC USA, and, likewise, we are a member of the ad

19   hoc group (inaudible).

20            THE COURT:  Okay.

21            MR. TAGGART:  Good afternoon, Judge.  This is David

22   Taggart with Bradley Murchison Kelly & Shea.  I represent J. F.

23   Howell Interests, LP.  Today I'm appearing as a member of the

24   ad hoc committee of working interest owners, and my client

25   representative, David Morgan, will be joining and listening in

1    the call as well.

2              THE COURT:  Okay, thank you.

3              MR. BRESCIA:  Good afternoon, Your Honor.  This is

4    Duane Brescia for Lucas Petroleum Group.  My client is not one

5    of the movants, but it's a working interest owner that is

6    interested, and I'll just be listening.

7              THE COURT:  Okay, thank you.

8              MR. MCKINNIS:  Your Honor, this is Kyle McInnis

9    (phonetic).  I'm a member of the unsecured creditors committee

10   in the bankruptcy, and I'm a client representative for AEEC2

11   (phonetic) and PCP Cottonwood (phonetic).

12             THE COURT:  Okay, thank you.

13             Anybody else?  Okay.  I'm going to assume, unless you

14   tell me somewhere else along the line during this hearing, that

15   the members of the ad hoc committee and the members of the

16   official committee are going to be represented by the

17   committees' counsel in both cases.  So I won't be calling on

18   you unless you speak up at some point; okay?

19             All right.  So we've got a lot of feedback noise from

20   somebody.  If you're not speaking, I think you probably should

21   mute us, because I don't know who's making all that noise.

22             That really helped.  Great.

23             Okay, but unmute us, Mr. Swanson so you could begin

24   with your motion.

25             MR. SWANSON:  Yes.  Good afternoon, Your Honor.  Tim

1  Swanson again on behalf of the ad hoc committee.

2         To set the stage, Mr. Geno is going to be handling

3  the stay relief motion, and I will be handling the discovery

4  dispute.

5         THE COURT:  Okay, let's start with the relief from

6  stay motion, so Mr. Geno?

7         MR. GENO:  Thank you, Your Honor.  Good afternoon.

8  May it please the Court, Craig Geno for the movant ad hoc

9  committee working interest owners.

10        I really had three issues and for the proffer, Your

11 Honor, to bring to the Court's attention today.  First is the

12 contractual agreements that form the backbone or the background

13 for the motion for relief of the automatic stay, along with a

14 proffer of testimony from Stan Kynerd; second, a little bit

15 about the legal issues as we see them; and then, third, we have

16 ready a proffer of testimony from two petroleum engineers with

17 respect to why we believe the automatic stay should be lifted

18 as to the competency of Sklar Exploration as operator of the

19 Southwest/Southeast Brooklyn Oil Units.

20        That testimony and that proffer is highly technical

21 in nature, as I'm sure the Court can appreciate.  And I'm not

22 sure that the Court wants to hear that this afternoon.  In the

23 event the Court decides this should be pushed over to an

24 evidentiary hearing, that may be a better day for that.  But

25 we're prepared to go forward with that, but it's technical in

1  nature, and I do not know if the Court wants to entertain that

2  proffer this afternoon on this (inaudible) or not.

3          THE COURT:  Well, I'm glad you're asking that

4  question, and my reaction to that is that it wouldn't be proper

5  at either this prelim hearing or even at a final hearing if we

6  need a final hearing, because the issue is not so much whether

7  the debtor is competent.  That would be a big issue for if I

8  allowed you to go ahead and hold your working interest owners

9  meeting and voting on who should continue to be the operator.

10  It's very relevant to that.

11          But I'm more concerned about a higher level of

12  whether or not there's cause for relief from stay here.

13          So--and, you know, I could see how you could view

14  competency as cause, but unless there is a motion to appoint a

15  trustee or something of that nature, I think we're more talking

16  about assets of the estate and whether they're necessary for

17  reorganization and whether there's any emergency issues going

18  on, things of that nature.

19          MR. GENO:  Thank you, Your Honor.  I appreciate that,

20  and I'm really glad now I did bring that up.

21          THE COURT:  Uh-huh, okay.  Thank you.

22          MR. GENO:  One point about the documents, Your Honor,

23  that have been submitted by the debtor and by the ad hoc

24  committee:  The Southwest Brooklyn Oil Unit, the unit agreement

25  or unit operating agreement was listed in the initial

1   submissions of exhibits by both the movant ad hoc committee and

2   by the debtor.

3            Unfortunately, throughout most of this case, for

4   whatever reason, pages 7 through 9 of that agreement have been

5   missing.  So I pointed that out to Mr. Swanson last night and

6   this morning, and I don't know if the Court has seen this or

7   not.  A revised Exhibit 40 was submitted on behalf of the ad

8   hoc committee.  It contains most of the operative documents

9   with respect to the Southwest Brooklyn Oil Unit, including now

10  a complete unit operating agreement for the Southwest Brooklyn

11  Oil Unit that contains pages 7 through 9.

12           And because those pages, as you might expect, are

13  very pertinent to today's hearing, I just wanted to point that

14  out to the Court, because I'll be using that exhibit as part of

15  my presentation.  I don't know if the Court saw that or not,

16  but those pages are missing from Exhibit 2, I believe, of our

17  original submissions, and the entire Southwest Brooklyn Oil

18  Unit series of documents are now contained within Exhibit 40.

19           THE COURT:  Okay, thank you.

20           MR. GENO:  The ad hoc committee, Your Honor, is

21  composed, as you know, of some of the working interest owners

22  in an oil and gas development or field in the State of Alabama

23  known as the Brooklyn Oil Field or Brooklyn Field.

24           The field or unit has been unitized so that the

25  development has been and will be operated and developed as part

1  of a pool in a field where there is a group of wells operated

2  so as to permit development of the field in a way to maximize

3  the hydrocarbon recovery, also prevent waste and to protect the

4  rights of all stakeholders in the project, as well as the

5  interests of the State of Alabama through the Alabama Oil and

6  Gas Board.

7         The members of the ad hoc committee are a production

8  company, J.F. Howell Interests LP, McCombs Energy Ltd., FPCC

9  USA.  A recent addition is Fant Energy.  As Mr. Skelton

10 mentioned, his clients, the Tauber Group, have joined in the

11 motion; and the Landmark interest represented by Jim Spencer

12 have also informally joined in and will join in the vote

13 consistent with the votes of the members of the ad hoc

14 committee.

15        As such, Your Honor, the members of the ad hoc

16 committee and the latecomers control the interest in the

17 Southwest Brooklyn Oil Unit to the tune of 56.4 percent of the

18 interest and the Southeast Unit 50.99 percent.

19        Under the terms of the agreements, Your Honor, that

20 are part of Exhibit 40, the unit agreement, which is page 7 of

21 92, based on the Court's file stamp, the creation and effect of

22 the unit is described in paragraph 3.1--

23        THE COURT:  Let me get there.  Just a minute.  Can

24 you give me a minute to just navigate to there?  Our computers

25 at the Court today have had a lot of issues, so they're very

1   slow.

2            MR. GENO:  It's page 7 of 92 on the Court's numbering

3   system, Your Honor, in the upper right-hand corner and page--

4            THE COURT:  I'm just pulling the--I'm pulling the

5   document up now, but it's circling quite a bit, so just give me

6   a minute.

7            MR. GENO:  Yes, ma'am.

8       (Pause.)

9            THE COURT:  Okay, I'm just going to look for page 7.

10      (Pause.)

11           I'm seeing Bates stamp numbers at the top.  Which

12   Bates stamp number?

13           MR. GENO:  This is actually page 5, Your Honor, of

14   the Southwest Brooklyn Oil Unit unit agreement.

15           THE COURT:  Well, I'm in Exhibit 40.  Is that where

16   you want me?

17           MR. GENO:  Yes, ma'am.

18           THE COURT:  Okay.  And it doesn't have page numbers.

19   At the bottom it has AHC Bates stamp numbers at the top.  So if

20   you can give me the Bates stamp number, that will help me

21   navigate.

22           MR. GENO:  Actually, Your Honor, I don't have the

23   Bates stamp number.  I have a blank agreement that came from a

24   different spot.

25           THE COURT:  Well, that's not going to help me.  Can

1  anybody else help?

2           UNIDENTIFIED SPEAKER:  Yes, I can forward that to Mr.

3  Geno right now, Your Honor.

4           THE COURT:  Thank you.

5           MR. GENO:  Your Honor, if you look at the upper

6  right-hand corner of that document, I think it will say, "From

7  the Clerk's Office."  It has a stamp of page 7.

8           THE COURT:  Mine doesn't have that.  These exhibits

9  don't have that.

10          MR. GENO:  Oh, got you.

11          THE COURT:  They just have the AHC Bates stamp.

12          MS. RILEY:  Your Honor, I believe it's AHC000885.

13          THE COURT:  885.  Thank you.

14      (Pause.)

15          I'm at 883.

16      (Pause.)

17          Okay, this one did not have a Bates stamp number at

18  the top.  That might be 885.  It follows 884.  Okay.  You want

19  885.  Okay.  Well, that's paragraphs 1.3, 1.4, etc., so I

20  should scroll down to what paragraph number?

21          MR. GENO:  3.1, Your Honor.

22          THE COURT:  Thank you.

23      (Pause.)

24          I so prefer document sharing with Sim.  Okay, 3.1.

25  I've got it now.  Thank you.

1          MR. GENO:  Thank you, Your Honor.  That's where the

2     oil and gas rights are unitized so that in the fifth line of

3     3.1, it provides that, "Operations may be conducted as if a

4     unitized interval had been included in a single lease executed

5     by our royalty owners as lessors and payors (phonetic) while

6     working interest owners as lessees and as if the lease had been

7     subject to all the provisions of this agreement."

8          That is the unitized provision--unitization

9     provision.

10          Two paragraphs down, Your Honor, Section 3.3, is

11     titled "Cost and Expenses of Unit Operations," and it

12     provides that, "The cost and expenses of unit operations,

13     including prospective investment costs, shall be allocated and

14     charged to each tract in the proportion that each tract shares

15     in unitized substances and shall be paid by the respective

16     working interest owners, owning an interest in each such tract

17     said allocation charge being more fully set forth in the unit

18     operating agreement."

19          And I'll get to the unit operating agreement, Your

20     Honor, in just a moment.

21          The operating methods under the unit agreement, Your

22     Honor, are discussed in paragraph Section 4.2 of this same

23     document.

24          THE COURT:  Okay, I have it.

25          MR. GENO:  That provides that, "The working interest

1    owners shall, with diligence and in accordance with good

2    engineering and production practices, engage in repressuring

3    and/or water injection operations and maintain a rate of

4    production to the end (phonetic) if the quantity of unitized

5    substances ultimately recovered shall be maximized and waste

6    prevented."

7              4.3 provides that, "Nothing herein shall prevent

8    working interest owners to discontinue, no changing in whole or

9    in part, any methods of operations which, in their opinion, is

10   no longer in accord with good engineering or production

11   practices.  Other methods of operation may be conducted or

12   changes may be made by working interest owners from time to

13   time (inaudible) them to be feasible and necessary or desirable

14   to increase the recovery of unitized substances (inaudible) of

15   regulatory authorities."

16             So that, Your Honor, is the highlights I wanted to

17   bring to the Court's attention in the unit agreement.

18             Next I would like to briefly go through the unit

19   operating agreement, which is the--should be the next exhibit

20   in your stack.

21             THE COURT:  Not 41.  We're going back to--

22             MR. GENO:  It's within Exhibit 40, Your Honor.  You

23   would follow--

24             THE COURT:  Oh, it is?  Okay.

25             MR. GENO:  It's (inaudible) pages over, but it

1  follows the unit agreement.

2        THE COURT:  Okay, I'm scrolling slowly.  The

3  ratification, page 882?

4        MR. GENO:  No, ma'am, it's about 60 or 70 pages in.

5        THE COURT:  And can somebody give me a Bates stamp

6  number?

7        UNIDENTIFIED SPEAKER:  930, Your Honor.

8        THE COURT:  Thank you.

9     (Pause.)

10        A lot of the pages aren't Bates stamped, which does

11  not help.  Okay, I'm at 905.

12     (Pause.)

13        I'm getting closer.

14     (Pause.)

15        MR. SWANSON:  Your Honor, this is Tim Swanson.  Would

16  it help if I e-mailed chambers a PDF copy of--so that way the

17  Court's not having to look at it on the ECF docket?

18        THE COURT:  I don't know if that would help or not.

19  I'd still be scrolling through.  Some pages are numbered, some

20  are not.

21        MS. RILEY:  Your Honor, they're all numbered.  I

22  think perhaps it's the slow conduction (phonetic).  If you--it

23  might help it if you saved that PDF document to your local hard

24  drive instead of pulling it from the--

25        THE COURT:  I will be happy to try that.

1       (Pause.)

2           It's saving it extremely slowly.

3       (Pause.)

4           I'm about halfway to saving it.

5       (Pause.)

6           I don't know, it says it's saved now, but it's still

7   scrolling in the same ridiculous fashion with a lot of pages

8   not marked.  They say AHC on them but not a number, so it

9   hasn't improved anything.

10          MS. RILEY:  Maybe try closing Adobe altogether and

11  reopening it and then opening a version that you just saved on

12  your hard drive.

13          THE COURT:  Okay.

14      (Pause.)

15          Oh, it's going through the whole downloading thing

16  again.  I'm going to try to open it.  This is awful.

17      (Pause.)

18          Okay, it opens, and now it looks like I'm scrolling

19  fast.  In the future, if we're going to have these big

20  documents, I'm going to need parties to provide hard copies or

21  at least thumb drives.

22          Okay, 911 (inaudible).

23      (Pause.)

24          This looks no better.  929.  Hold on.  Okay, Unit

25  Operating Agreement.  Doesn't say 930, but it's got to be.

1  Okay.

2          MR. GENO:  Thank you, Your Honor.  This is a Unit

3  Operating Agreement for the Southwest Brooklyn Oil Unit,

4  Brooklyn Field, for the counties in Alabama.  Page 2 of the

5  document, Your Honor, Section 3.1, is entitled "Supervision of

6  Operations By Working Interest Owners and Overall Supervision."

7          THE COURT:  Okay, got it.

8          MR. GENO:  It provides, "Working interest owners

9  shall exercise overall supervision and control of all matters

10 pertaining to unit operations pursuant to this agreement and

11 the unit agreement.  In the exercise of such authority, each

12 working interest owner shall act solely in its own behalf in

13 the capacity of an individual owner and not on behalf of the

14 owners as an entity provided, however, that nothing herein

15 shall prevent one or more working interest owners from

16 appointing someone or some entity, which may be another working

17 interest owner or a third party, to act on behalf of such

18 working interest owner in any or all matters relating to this

19 agreement."

20          And 3.2 specifies, "Certain designated authorities

21 and duties, including in 3.2.1, the method of operation, which

22 includes any type of pressured maintenance, secondary recovery,

23 or other recovery (inaudible) to be employed."

24          3.2.2, "The Drilling of Wells," 3.2.3, "Well

25 Completions, Recompletions, and Change of Status," and a number

1    of other specific duties and responsibilities over on page 3 of

2    the agreement from 3.2.4 through 3.2.9.

3            And then 3.2.10 relates to assignment to committees.

4    "The working interest owners can appoint to committees to study

5    any problems in connection with unit operations."

6            Then 3.2.11, "Removal of the Unit Operator," and it

7    provides, "The removal of the unit operator and the selection

8    of a successor as provided in Section 6.2."

9            THE COURT:  Counsel, you know what might help things

10   along here is, instead of you reading all these different

11   paragraphs, why don't you just tell me in your own words what

12   you understand the provisions--and if you want to tell me what

13   provisions you're talking about so that I can look at and study

14   it later, that would be fine.  But let's not just have you read

15   the document.

16           MR. GENO:  Certainly, Your Honor.  Thank you.

17           Those sections, Your Honor, we just read, the

18   highlights are that (inaudible) consistent provision from the

19   unit agreement provides that the working interest owners make

20   all the decisions with respect to the operations of the wells.

21           That's in a nutshell what they say.

22           Article 4, "Manner of Exercising Supervision,"

23   discusses how supervision is exercised.  And it goes over in

24   4.2, 4.3, 4.3.1, 4.3.2 the calling of meetings of the working

25   interest owners and the unit operator, which is Sklar

1    Exploration.  The voting requirements that are in those

2    meetings (inaudible) when and where the votes may take place.

3            Article 6, a page over, designates Sklar Exploration

4    as the initial unit operator.  6.2 discusses how the initial

5    operator can be removed.  6.3 discusses the selection of a new

6    operator.

7            Article 7, the next page over, again, this reiterates

8    that the unit operator has the right to obligate and conduct

9    unit operations subject to instructions from the working

10   interest owners.  7.2 requires the unit operator to engage in

11   workman-like conduct.  7.3 requires the unit operator to

12   endeavor to keep the land and the leases free and clear of

13   liens.

14           Article 11, Your Honor, some four pages over, five

15   pages over, discusses unit expenditures, how obligations of the

16   unit are incurred initially and paid, how they are reimbursed,

17   how the unit operator can require working interest owners to

18   advance funds.  And 11.3 discusses the commingling of funds

19   held by the unit operator.

20           Those are, Your Honor, the highlighted provisions in

21   flip notes nutshell forms of the contractual obligations that

22   give rise to the motion that is before the Court today.  While

23   that relates to the Southwest Brooklyn Unit, the unit agreement

24   and the unit operating agreement, the Southeast Brooklyn unit

25   agreement and unit operating agreement is essentially the same

1    set of documents with Sklar Exploration as the unit operator,

2    the working interest owners as working interest owners and

3    owners of the project, and the decision makers with respect to

4    carrying out the operations in the field with respect to the

5    operation of the wells.

6         With respect to testimony, Your Honor, from a non-

7    technical standpoint, the ad hoc committee would call Stan

8    Kynerd, and if he were to testify, he would testify that he is

9    the general counsel, corporate in-house counsel, for Pruet

10   Production, one of the working interest owners.  But he also

11   participates extensively in business meetings, operational

12   meetings, management meetings on behalf of Pruet and especially

13   with respect to the operations at Southwest Brooklyn Oil Unit/

14   Southeast Brooklyn Oil Unit that are pertinent to the motion.

15        He had been intimately involved with these operating

16   agreements and with the operations at the Southeast and

17   Southwest Brooklyn Units, and he is familiar with those

18   operations.

19        If called to testify, he will testify that the terms

20   and provisions of the operating agreements, just like we just

21   read, require a mandate that it is the working interest owners

22   who make decisions with respect to the actual oil field

23   operations at the wells and that the working interest owners

24   direct Sklar Exploration to carry out those decisions on behalf

25   of the working interest owners and their ownership interests.

1          He would testify that the working interest owners

2     have not been given the opportunity to have as much input as

3     they desire with respect to oil field operations and that from

4     time to time communications have been either non-existent or

5     poor or have failed and that Sklar Exploration has not always

6     carried out the directives and the wishes and the desires of

7     the working interest owners.

8          If called to testify, he would note that there has

9     been a number of liens that have been filed against the

10    project, contrary to the terms of the unit operating agreement;

11    and those liens and claims liens are liens against the project

12    itself owned by the working interest owners.

13         He will testify that the working interest owners have

14    lost trust in Sklar Exploration, in part because the Court will

15    recall the number of issues and testimony and witnesses and

16    documents we heard about the cash calls that had been received

17    by Sklar prior to the filing of the bankruptcy cases and how

18    those funds were not used for the purposes for which they were

19    intended.

20         But just as importantly, the working interest owners

21    have lost confidence in the competency of Sklar to actually

22    operate and conduct the operations in the Southwest and

23    Southeast Units in a competent, professional, engineering

24    proficient manager so as to maximize recovery of the

25    hydrocarbons that are there and when engaging in secondary

1    recovery.  And there are numbers of specific examples he will

2    give in that regard.

3            The operating agreements, he will testify, as we just

4    noted, Your Honor, provide for the removal of the operator from

5    the boat (phonetic) of the working interest owners, the ad hoc

6    committee, along with recent folks who have joined it, have

7    significant interest in these projects.  They are, in large

8    part, sophisticated investors, sophisticated oil and gas

9    investors, and in some instances operators themselves.  And he

10   would testify that the committee did not come to this decision

11   lightly or without due consideration.

12           The ad hoc committee is willing to consider Pruet as

13   the operator, as a matter of disclosure to the Court.  In the

14   event the Court sees fit to lift the stay, its effect to have

15   the vote, remove Sklar as the operator subject to the votes of

16   the working interest owners, of course.

17           His testimony will be that Pruet is not interested in

18   becoming the operator or profit or as a matter of a significant

19   stream of revenue, because the operations do not produce a

20   significant stream of revenue for the operator.

21           He will further testify that this motion (inaudible)

22   is only for the operations in the field, that is, the Southwest

23   Brooklyn Oil Unit, the Southeast Brooklyn Oil Unit, and they do

24   not touch upon operations of gas plants or anything else, only

25   with respect to operations of the actual oil wells and oil well

1    operations in the field.

2          Further, he will testify, Your Honor, that Pruet is

3    not a member of the ad hoc committee, nor are the other members

4    pursuing their own self-interest, but they are pursuing this

5    motion and this matter to preserve and protect the hydrocarbons

6    that remain in the reservoirs in the Southwest Brooklyn Units

7    and the Southeast Brooklyn Units by improving the secondary

8    recovery; that this is not a matter of a difference of opinion.

9    It's a matter of preservation of assets of the estate for the

10   benefit, not just for the ad hoc committee members, not just

11   for the working interest owners, but of all creditors, because

12   preservation of the value of these assets for the ad hoc

13   committee, the working interest owners will also (inaudible)

14   benefit of all the creditors in the case.

15         And at the end of the day, Your Honor, if there is a

16   difference of opinion, without being blunt, the only difference

17   of opinion that really matters insofar as the contractual

18   agreements that gave rise to this dispute and the motion to

19   relieve the automatic stay is the opinion and all the opinions

20   of the working interest owners.

21         While the opinions of Sklar Exploration may have some

22   bearing or some suggestion as a suggestion or recommendation,

23   it is the decision of working interest owners who own the

24   project and under the contracts at issue to make this final

25   determination as to how secondary recovery should be executed,

1   how water injection of the wells and other technical issues

2   should be determined, it is not up to Sklar Exploration.  And

3   the communication between Sklar Exploration and the working

4   interest owners has either been non-existent, limited, or Sklar

5   simply has performed as if it owns the unit in certain

6   instances and not that it is working for the working interest

7   owners.

8          One point I would like to make, Your Honor, that is a

9   little bit outside Mr. Kynerd's testimony is that the debtors

10  agree in their response to the relief of stay motion, and they

11  do not dispute that but for the bankruptcy filing, the working

12  interest owners would, as they say, indeed have the right under

13  the governing agreements to hold a vote.

14         And, Your Honor, as Mr. Skelton has so astutely

15  pointed out to me, you have actually entered an order in this

16  case, which we believe gives the ad hoc committee, the working

17  interest owners, the right to move forward without moving to

18  lift the stay and enforcing what they believe are their rights.

19  The order is Docket Number--designated as Docket Number 649.

20  It was filed October 30th of this year, and it's an order

21  granting a motion to assume non-residential real property

22  leases.

23         And among other things, it provides that (inaudible)

24  without prejudice, the rights of the working interest owners

25  under unit operating agreements and joint operating

1    agreements--and we have a unit operating agreement here--of
2    various properties to take such action as any working interest
3    owner deems appropriate under the joint operating agreements or
4    other contractual rights in accordance with applicable
5    bankruptcy and non-bankruptcy law.  And that includes but not
6    limited to seeking to compel Sklar Exploration to assume or
7    reject one or more joint operating agreements, exercising their
8    rights under the joint operating agreements, seeking to enforce
9    any rights under the joint operating agreements against any
10   other working interest owner, including Sklarco or SEC as
11   operator.

12            That order, Your Honor, we believe, allows and
13   authorizes the working interest owners, the ad hoc committee,
14   to be given relief of the automatic stay so as to deduct the
15   vote of the working interest owners and to enforce their rights
16   under the (inaudible) agreements that we've already gone
17   through against Sklarco or against SEC as operator.

18            And that's what this motion seeks to do.  We don't
19   know how the vote will come out.  Maybe Sklarco Exploration
20   will prevail, and the working interest owners will vote to
21   retain it as operator, but maybe not.  And it's the working
22   interest owners who own the projects, Your Honor, who pay the
23   bills, who take the risk, who have the exposure, and who have
24   contracted in these solemn agreements for the right to remove
25   the unit operator for whatever reason, sort of like an at-will

1   employment agreement.  But in this instance they believe they

2   have cause to do it for the reasons that Mr. Kynerd will

3   testify to and for the technical reasons in the event the Court

4   sees fit to go that far.

5         Thank you, Your Honor.

6         THE COURT:  Now, so I'm looking at this order, you

7   know, and this is a case where it is a proposed order submitted

8   by the debtor, and nobody opposed it, and so we stamped the

9   order.  So it's not an order that the Court drafted.

10        And it looks to me, though, that it's styled--the

11  paragraph you read from is a reservation of rights.  It's not a

12  termination of rights and whether there is relief from stay.

13  It's just a--it's just a reservation of rights for working

14  interest owners to assert whatever rights they have under those

15  contracts; right?

16        MR. GENO:  Yes, ma'am.  It says, "Seeking to enforce

17  any rights that they have against any other working interest

18  owner including Sklarco with SEC as operator."  That's--

19        THE COURT:  But I'm not saying they get to seek that.

20  It's just without prejudice to their rights to take such action

21  as they deem appropriate.

22        MR. GENO:  Yes, ma'am, under applicable bankruptcy or

23  non-bankruptcy law.

24        THE COURT:  Okay, thank you.

25        Do you have--do you want to offer Exhibit 40 into

1  evidence?

2          MR. GENO:  Yes, Your Honor, and Exhibits 3 and 4 as

3  well (inaudible)--

4          THE COURT:  Okay, any--somebody's breathing really

5  heavily into the microphone, if you could refrain from doing

6  that.

7          So any objection to Exhibits 40, 3, and 4?

8          UNIDENTIFIED SPEAKER:  No, Your Honor.

9          THE COURT:  Ms. Riley?

10          MS. RILEY:  No, Your Honor.

11          THE COURT:  Okay, they are received.

12      (Creditors' Exhibits 40, 3, and 4 were received in

13  evidence.)

14          Okay, does that conclude your proffer?

15          MR. GENO:  Yes, Your Honor.  The other documents that

16  we listed are--relate more to technical issues, so I understand

17  the Court is not going to consider those at this point, so we

18  will not offer those.

19          THE COURT:  Okay, very good.

20          And do I want to hear from the joint movants, which

21  would be Tauber Group?

22          MR. SKELTON:  Yes, Your Honor, this is Barnet

23  Skelton.  I won't add to--I will add a couple of points, one

24  concerning the order entered at Docket 646.  There is another

25  reason--or 649--excuse me.  There is another reason why I

1    believe that order could be dispositive, and that is that it is

2    an order granting a motion to assume all the oil and gas leases

3    of the debtor.  And those oil and gas leases include the oil

4    and gas leases that were unitized by the unit agreement--unit

5    operating agreement on the Southeast and Southwest Brooklyn Oil

6    Units.

7         But it goes further than that.  Among the exhibits

8    submitted by the ad hoc committee were three orders signed by

9    the Alabama Oil and Gas Board.  Those orders are required in

10   order to implement the secondary recovery or enhanced recovery

11   program and, as Mr. Graham should well know, because he's the

12   one that argued in favor of it in front of the Oil and Gas

13   Board.

14        The bottom line is, Judge, those leases were assumed,

15   and those leases bring with it the unit agreements and the unit

16   operating agreements, because they have been unitized.  Those

17   leases no longer just cover the individual tract that was

18   originally described that Ma Kettle owned and Pa Kettle owned.

19   They all have a part ownership in the production.

20        And, therefore, you can't really say there hasn't

21   been an assumption of the operating agreements and the unit

22   agreements, because those leases now must be operated in

23   accordance with those agreements and in accordance with the

24   order of the Alabama Oil and Gas Board.

25        So I think it's a lot stickier than just a matter of

1   what those clauses are or reservation rights, because what unit

2   agreements do is they modify existing oil and gas leases.  They

3   entitle the lessor to its royalty based on a share of

4   production attributable to the unit, not just the tract.  And

5   the production-permuted operations perpetuates the lease even

6   after its primary term expires and even if the production isn't

7   from the lease in question.

8        And so the production from the unit operations hold

9   and maintains these leases even if the production comes from a

10   well a mile away.

11        So I think by having sought and obtained an order,

12   assuming the oil and gas leases, those leases come with all of

13   the burdens and benefits of the unit operating agreements and

14   unit agreements.  And so it would appear to us that it is

15   appropriate that under those circumstances that the working

16   interest owners be entitled to enforce those agreements.

17        Now, one last thing.  Why is that so important?  It's

18   important because these are dynamic assets.  They're not static

19   assets.  Time does matter.  Time does kill.  Delay can actually

20   end up harming these reservoirs.

21        So if the Court doesn't grant a relief from the

22   automatic stay and there is no vote, there is another

23   consequence, and I'll close with this:  The fact is that as

24   soon as that plan is confirmed and there's no stay involved,

25   these contracts can be enforced and will be enforced.

1          So if the Court and the creditors want to know

2   whether there is a feasible plan and it's if, indeed, as Mr.

3   Katchadurian has said, that the operations from the Brooklyn

4   fields or units are critical, then might as well go ahead and

5   take the vote, because if there is no vote, then the plan--it's

6   hard to know whether it could be feasible until a vote takes

7   place.

8          So there really isn't any harm to the debtor's plan

9   of reorganization.  In fact, it will give the debtor the

10  opportunity to show it's either got the votes or it doesn't.

11         So I again urge the Court to consider that allowing

12  this vote to take place is not the taking of any property.

13  It's simply the exercise of the working interest owners' voting

14  rights.  And, as Mr. Geno aptly pointed out, SEC doesn't really

15  have any asset involved.  Sklarco does.  It's a working

16  interest owner, and he can vote.

17         So for those reasons, I'd urge the Court to grant the

18  motion.

19         THE COURT:  Who is your witness, and what would they

20  say for your statement that delay harms the reservoirs?

21         MR. SKELTON:  I would rely on Mr.--the witness's--Mr.

22  Kynerd.

23         THE COURT:  And what would they say is how delay

24  harms the reservoirs?

25         MR. SKELTON:  Okay.  The delay harms the reservoir

1    for this reason:  Because the whole purpose of an enhanced

2    recovery operation is to properly inject water into injection

3    wells at specified locations, to move the hydrocarbons to

4    production wells.

5            In other words, there comes a point in time where,

6    without the effect of basically goosing the formation with the

7    injection of water, the water flood operation doesn't work

8    optimally.  And damage to the formation, I believe Mr. Kynerd

9    would testify and the engineers would testify, can occur.  It's

10   not like you can just turn it off and say, oh, well, I guess

11   we'll wait a few months and see what happens with the plan of

12   reorganization.  No.  It needs to be done right.

13           And the position of the working interest owners that

14   are proponents of having the vote is that, to put it in

15   colloquial term, that SEC is poor-boying it, and they're not

16   doing it right.  They're trying to do quick fixes by injecting

17   acid into certain wells, and they also didn't even follow the

18   plan that they themselves proposed and that was approved by the

19   Alabama Gas Board, Oil and Gas Board.

20           That's why delay makes a difference.

21           MR. GENO:  This is Craig Geno.  If I may add--I

22   apologize for interrupting--that is the testimony of our

23   technical expert, so David Hillson and John Maxey will testify

24   that delay in infusing and flooding the reservoir as oil is

25   removed and the pressure--the natural pressure is decreased

1   (inaudible) needs to be injected in it to increase the pressure

2   and to recover as many--as much of the hydrocarbon, preferably

3   oil and not gas, as possible.

4         The delay in flooding or injecting water into the

5   reservoir or injecting insufficient water into the reservoir,

6   which is what they have observed, will result in hydrocarbons

7   that otherwise would be recoverable, would not be recoverable.

8   And that's the technical aspect of their testimony.

9         So I appreciate your letting me add that in.

10        THE COURT:  Okay, all right.  Ms. Riley.

11        MS. RILEY:  And, Your Honor, Duane Graham will

12   actually be arguing on behalf of the debtors.

13        THE COURT:  Okay, very good.

14        MR. GRAHAM:  Good afternoon, Your Honor.  This is

15   Duane Graham with the Armbrecht Jackson firm in Mobile,

16   Alabama, on behalf of the debtors.

17        I first want to apologize for the fact that I'm

18   addressing the Court without ever having formally met you.

19   That seems awkward to some extent, and I apologize for that.  I

20   have some edge over you, because I've listened in on some of

21   the Zoom hearings, so I've at least seen you and heard you

22   speak even though you don't know me from Adam.

23        But as some of the people mentioned, I was integrally

24   involved in obtaining the unitization orders, I wrote these

25   agreements that you have been directed to look at, and so I

1    think it was considered that I might be in a good position to

2    be able to address some of this issue.

3           First of all, I would like to note that from Sklar

4    Exploration's perspective, being the operator of these two

5    units is a valuable asset.  It provides a revenue stream.

6    Basically, the motion represents an attempt to take this asset

7    away from Sklar Exploration prior to consideration of the plan.

8           The fact that Sklar Exploration is currently the

9    operator of these properties is a vital element of the plan,

10   which will be submitted tomorrow.  The purpose of the stay, as

11   I appreciate it--I'm not a bankruptcy lawyer, but I've been

12   informed about some of it.  The purpose of the stay is to give

13   the debtors a breather from the various circling sharks that

14   are trying to attack it so that it has an opportunity to try to

15   put together a plan and see if it can reorganize itself and

16   continue in business.

17          What this motion effectively says is, let's stop the

18   bankruptcy process right now, and let's allow the ad hoc

19   committee to pursue in complete isolation from the plan this

20   effort to take a vote for removal rather than seeing whether

21   the plan, as will be proposed tomorrow, can be approved.

22          There's been complaints in this case about delay.

23   And yes, we've been several months, but we are now on the eve

24   of presenting the plan, and they want to stop everything to let

25   this vote process occur.

1           Now, I want the Court to understand what exactly

2    would be involved in trying to pursue this removal effort.

3           This isn't just like you take a vote tomorrow, and

4    it's all over.  First of all, there has to be a formal request

5    from 25 percent of the ownership interest to Sklar Exploration

6    requesting that a working interest owner meeting be called.  If

7    that percentage is done, then Sklar Exploration is required to

8    schedule the meeting.  Notice has to be provided for that

9    meeting, and the minimum notice is ten days.

10          You then have a meeting.  We will have to figure out

11   some way to do that during a COVID pandemic when the agreement

12   doesn't contemplate anything but an in-person meeting.  Let's

13   assume we can get over that hurdle.  I'm sure there will be

14   some other legal issues given the adversarial nature of all of

15   this that will come up that will have to be resolved.

16          Assuming we can have this meeting, the ad hoc

17   committee has got to obtain a two-thirds vote by interest to

18   remove Sklar.  We don't think they can do that, but I guess no

19   one at this point knows that for sure.

20          They also would have to get a separate two-thirds

21   vote to appoint a successor operator.  It certainly is possible

22   that they could have a vote to remove Sklar Exploration but not

23   have the two-thirds vote to appoint Pruet as the successor.

24          Now, let's assume for further discussion purposes

25   that they are able to muster the two-thirds vote to remove

1  Sklar Exploration and a two-thirds vote to replace them with

2  Pruet.  As the ad hoc committee's motion notes, that action

3  doesn't end the inquiry.  We're not through yet.  We have to go

4  to the State Oil and Gas Board of Alabama, which has to approve

5  both items.

6       The State Oil and Gas Board has discretion as to

7  whether to conduct an evidentiary hearing about that.  The

8  motion that is before the Court notes that Sklar would have the

9  opportunity to object before the Oil and Gas Board for that

10  purpose, and so it would likely be that the Board would

11  schedule a hearing.

12       I have--I did a change of operator about a year ago

13  on a unitized property, and the Board scheduled a hearing, and

14  we had an evidentiary hearing to make that determination.  I

15  have looked, and there have been several examples in the past

16  few years of larger unitized fields like Brooklyn where there's

17  been a change of operator.  And I'm not talking a contested

18  change of operator, an uncontested one where the Board has

19  conducted an evidentiary hearing and then made its ruling.

20       Let's assume that this vote, if allowed, could occur

21  sometime in January or maybe by early February.  Let's assume

22  that they were successful in their efforts.  The Oil and Gas

23  Board holds hearings generally every six to eight weeks.  The

24  first hearing can be continued as a matter of practice.  They

25  grant any motion to continue the first hearing date.  So a

1  hearing at the earliest would occur sometime in March or April,

2  but it may be a month or two after that.

3         The Board then would hear the evidence and would

4  enter a ruling.  It has thirty days to enter that ruling; and,

5  frankly, here in the past couple of years it takes about two

6  months before you get an actual signed order from the Board

7  with their determination.

8         After that order is entered, whichever party or

9  parties are dissatisfied with the result of that Board order

10  have the right to appeal to the Circuit Court.  And, of course,

11  resolution of that appeal could take months and months to

12  occur.

13         So my point is, if the vote is allowed and if they

14  are successful, we could conceivably be twelve months from now

15  without that issue having been resolved.  It would still be

16  pending and open.  Debtors--

17         THE COURT:  Well, that--Counsel, I'm sorry to

18  interrupt you, but I'm going to.

19         MR. GRAHAM:  Yes, ma'am.

20         THE COURT:  Doesn't that bode for the Court granting

21  relief from stay because you're likely to beat them to the

22  punch through a plan?

23         MR. GRAHAM:  I think not.  Here's what we think is a

24  more reasonable way to do this.  The plan that will be

25  submitted tomorrow presupposes that Sklar Exploration remains

1    the operator of these two units.

2            The opportunity is now presented for Sklar to vet and

3    try to sell its plan.  And if the plan can be confirmed, then

4    so be it.  If the plan cannot be--if a plan is not confirmed,

5    then, frankly, we think this motion will be moot at that point,

6    because our best estimation at this point is that without this

7    plan or something substantially similar to it, Sklar

8    Exploration has no future and would be forced into liquidation,

9    in which case de facto we would resign, I suppose you would

10   say, as operator.  There wouldn't have to be this removal

11   process.

12           On the other hand, if the plan can be confirmed,

13   then, as one of the gentlemen said, there would come a point in

14   time at which the working interest owners could try this

15   removal effort again.  But at that point in time, the working

16   interest owners would know exactly what it would be costing

17   them monetarily under the plan to remove Sklar Exploration,

18   because they will receive more money under the plan with Sklar

19   Exploration as operator than they would without Sklar

20   Exploration.

21           At the present point, to try to have the working

22   interest owners vote, they don't know what they would get under

23   the plan.  They don't know what the alternative is now.  If we

24   go through the plan approval process, either this will become

25   moot or we will--the working interest owners will know exactly

1    what they have under the plan if Sklar Exploration remains as

2    the operator.

3         Now, some of the upset with Sklar Exploration has to

4    do with actions that occurred pre-petition.  And one thing that

5    this plan is going to do is provide for an independent manager

6    to manage the operations of the company.  Howard Sklar will not

7    be involved in the management decision-making of this company

8    for several years under this plan.

9         And so my point of all of that is that if the plan

10   can be confirmed, if the working interest owners know what

11   money they are projected to receive if Sklar Exploration

12   remains operator, if they know that management changes have

13   occurred with respect to Sklar Exploration, they are in a much

14   more informed position to be able to decide whether they still

15   want to remove Sklar Exploration as operator.

16        There could be some people even on this call who

17   apparently want to remove Sklar Exploration as operator now,

18   who might change their mind if they learn exactly what that's

19   going to cost them and if they understand how Sklar will be

20   operated in the future.

21        I think that--my understanding, Your Honor, is that

22   to lift the stay, there has to be cause shown.  And in

23   evaluating that cause, my understanding is that you are to

24   engage in a balancing act to evaluate the harm that lifting the

25   stay might produce to the debtor versus the harm of not lifting

1  the stay to the movants.

2          And in that respect, I guess what we're saying, Your

3  Honor, is that lifting the stay, at least to the extent that

4  the vote was to remove Sklar Exploration, the effect of that on

5  Sklar Exploration, basically it's a death knell.  So the

6  downside risk to Sklar Exploration is severe.  Whereas, the--

7          THE COURT:  Excuse me.  Tell me then what your

8  response is when the Tauber Group tells me that there is

9  irreparable harm that will occur to the economic interests of

10  the working interest holders if nothing is done, that these

11  reservoirs are subject to diminution just with the passage of

12  time.  What's your response to that?

13          MR. GRAHAM:  Well, that presupposes that there would

14  be some material change if a new operator came in.

15          THE COURT:  No, they're saying--

16          MR. GRAHAM:  What we--

17          THE COURT:  No, they're saying if SEC continues as

18  the operator and isn't doing things the way we want them done

19  right away, then these reservoirs will be damaged.

20          MR. GRAHAM:  We just think that's factually off base.

21  That is simply not the case.  We have been engaging on a

22  voluntary basis with what we've called a technical committee

23  that was established in either June or July, in which Pruet and

24  FPCC, two of the ad hoc committee members, have actively

25  participated in.   And the issue--the main issue that was

1  discussed is, is there's something that Sklar can do or quit

2  doing in order to increase the level of water injection?  And

3  basically that committee hasn't come up with anything.  The

4  only thing that they have suggested is that we could create a

5  second injection well in the Southeast Unit, which probably

6  would increase the quantum of water injected, and that's

7  something that the working interest owners can consider.  But

8  the plans submitted to the Oil and Gas Board call for there to

9  only be one injection well.

10       So if after that many months Pruet and FPCC and Sklar

11  acting together have not come up with some way that the water

12  injection would be increased, there is no reason to think that

13  changing the operator is going to change that at all.

14       We are injecting water.  Our water injection rates

15  have increased in the past six months, and water is being

16  injected.  Our gas:oil ratio--that's a measure of what you do,

17  as I understand it--is either stabilized or even going down.

18  And so the reservoir is not being harmed.  We are maintaining

19  the pressure, and we are doing the things that the secondary

20  recovery operation calls for.

21       I might note--they would argue it's irrelevant--I

22  might note that Pruet in the two northern units is injecting

23  far less than a hundred percent of the water that it projected

24  to be produced, and nobody's claiming that there's some

25  emergency there.  The emergency is--or the problem is alleged

1    only to exist in the southern units, which have had a very

2    similar experience in terms of the percentage of projected

3    water injection.

4            So we just--our position would be that that argument

5    just holds no water whatsoever.

6            THE COURT:  No pun intended.

7            MR. GRAHAM:  No pun intended, yes, ma'am.

8            THE COURT:  Okay, all right.  Anything else?  You

9    were saying before I interrupted that it's a balancing act, and

10   the debtor is facing a death knell if the--

11           MR. GRAHAM:  Exactly.  It's a potential death knell

12   to the debtor, at least Sklar Exploration.  We're really not

13   talking Sklarco.  We're talking Sklar Exploration.

14           But it's potentially a death knell to Sklar

15   Exploration; whereas, I mean--yes, Sklar Exploration--whereas,

16   there's no tangible evidence that any immediate harm would

17   occur to these movants if, instead of taking their vote in

18   January, they had the ability to take their vote in April after

19   they know whether or not there's a plan and what they would get

20   under the plan.

21           THE COURT:  So you're thinking we're only a month

22   away.

23           MR. GRAHAM:  Well, Your Honor, I shouldn't be

24   speculating about that.  I think Keri told me dates of, like,

25   March or April to finalize the process, but I am not a

1   bankruptcy lawyer.  You would know far better than I what the

2   timing is on that.

3           THE COURT:  Yeah.  I just don't know how--you know,

4   usually in Chapter 11 a plan is proposed, and then people

5   negotiate further, and an amended plan is filed and so on and

6   so forth.  So it's not typical that the first plan proposed is

7   confirmed.

8           Okay, all right, well, thank you.

9           Mr. Geno, you want to respond?

10           MR. GENO:  I do, Your Honor, a couple of points.

11           The circling sharks that were referred happen to be

12   the owners of this project.  The circling sharks contracted for

13   and received under their documents the right to replace the

14   operator if, for whatever reason, because it's an at-will kind

15   of contract of employment, but in this instance it's not just

16   at-will.  It's loss of confidence, loss of trust, and loss of

17   competency.  That--

18           THE COURT:  Okay, let me--let me interrupt and ask a

19   bunch of questions as you go.

20           MR. GENO:  Yes, ma'am.

21           THE COURT:  He's telling me that back in June or July

22   there was a technical committee formed, and your client was a

23   part of that, and that that group has not come up with any

24   recommendations, and even if they did, it would have to go to

25   the Board as to this water injection issue.  Do you agree with

```
 1   that?

 2           MR. GENO:  We do not.  That is a factual dispute,

 3   Your Honor.

 4           THE COURT:  But--

 5           MR. GENO:  As to--sorry, Your Honor, I didn't mean to

 6   interrupt you.  As to whether or not suggestions were made or

 7   recommendations were made that were not followed, that is a

 8   fact that is in dispute.

 9           THE COURT:  Do you have any exhibits to offer to show

10   a demand for a change was made?  Because he's saying it was

11   discussed, but then no recommendation came out of it, except

12   the possibility of a second injection in the southeast, which

13   would require Board approval.

14           MR. GENO:  Sorry, Your Honor.  Some of those exhibits

15   that are of a technical nature, Your Honor, do discuss those

16   technical meetings, and they do touch upon suggestions.  I am

17   not sure I would call them recommendations, but they do talk

18   about suggestions that were made by Pruet and some of the other

19   members of the ad hoc committee.  But those are technical in

20   nature, and at first we decided not to go there.

21           THE COURT:  Okay.  Do you disagree with the timetable

22   he set out for even if you want to remove SEC and replace SEC

23   with Pruet or whoever else, that it would have to go through

24   this lengthy process with the Board?

25           MR. GENO:  I don't believe that process would be as
```

1    lengthy as suggested, Your Honor, based on the information I

2    have received from the Alabama Oil and Gas Board, the lawyers,

3    or people who practice there routinely.  They would be better

4    able to speak to that than me.

5           But I do have a couple points about that time frame.

6    We have already made the request for the meeting to be set up.

7    It's Footnote 1, page 6, of our motion for relief of the

8    automatic stay, which says, "To the extent required under the

9    unit operating request, the motion shall serve as the ad hoc

10   committee members' request for SEC to call the meeting in

11   Section 4.2 for removal."

12          That request has already been made as of the filing

13   of the motion, and it's been pending for some considerable

14   period of time.

15          In addition, Your Honor, Section 4.3.3 of the unit

16   operating agreement says, when he was talking about being

17   physically present at a meeting, that, "Any working interest

18   owner who is not represented at a meeting may vote by letter,

19   facsimile, or e-mail addressed to the representative of the

20   unit operator."

21          So that meeting can be called quickly.  It should

22   have already been called, because the requisite number of

23   working interest owners have already made requests for the

24   meeting in Footnote 1, page 6.  There is no requirement of

25   physical presence as long as the vote is made by fax, e-mail,

```
 1    or letter before the deadline.  So that cuts down that time

 2    frame significantly.

 3            And my information is, the Alabama Oil and Gas Board

 4    could move much faster, especially considering the allegations,

 5    if proven, that waste is occurring and that the hydrocarbons

 6    that could be recovered are not being recovered in time.

 7            THE COURT:  Okay.  Anything else?

 8            MR. GENO:  Do you have more questions, Your Honor?

 9            THE COURT:  No, go ahead.

10            MR. GENO:  Just a couple of things.

11            If it's true that continuing as operator is the

12    cornerstone of the Sklar Exploration plan, it seems to me that

13    plan is ultimately going to fail because of lack of

14    feasibility.  As Mr. Skelton said, whether the vote is done now

15    just for the Court to see what the working interest owners

16    prefer without going further past the vote, or if the plan does

17    get confirmed and the working interest owners continue with

18    this problem that they have with Sklar as operator, then even

19    the debtor agrees that after the bankruptcy Sklar would be

20    removed based upon the vote.

21            All of the procedures that were outlined by counsel

22    for the debtor fully protect, it seems to us, the contractual

23    agreement and the contractual rights and the statutory rights

24    of Sklar to protest the vote, to lobby the working interest

25    owners, to leave them in--to leave Sklar in place, and to have
```

1    their due process rights before the Alabama Oil and Gas Board

2    and may convince them that they should remain as operator or

3    that, as was argued, Pruet is not the appropriate operator.

4    And we don't know until the vote's taken how the working

5    interest owners are going to come out on either of those

6    issues, removal of Sklar and/or replacement of Sklar by Pruet.

7              The cost of litigating a plan that does not seem to

8    have feasibility chances either at confirmation, Your Honor, or

9    shortly after that, the cost of litigating that in a crammed-

10   down situation and the interest in the votes of the working

11   interest owners could be considered beforehand, in our view,

12   mitigates in favor of lifting the automatic stay if, for

13   nothing else, to see how those votes come out.

14             Sklar or the ad hoc committee will have their chance

15   to lobby the working interest owners to the extent they want to

16   and try to convince them that we should wait.  Maybe the

17   independent manager will make a difference, but maybe, since

18   there is such a change in management, maybe the working

19   interest owners won't approve even that independent manager.

20   That's just another issue or another can to kick down the road

21   that we would prefer not to kick down the road until we see

22   what the working interest owners want to do with respect to the

23   situation we have now, and that's whether they want to vote for

24   a new Sklar.

25             Thank you, Your Honor.  Nothing further.

```
1              THE COURT:  Okay.  And for Tauber.

2              MR. SKELTON:  Judge, I would say that Mr. Graham as

3    actuary (inaudible) pointed out made our case.

4              It looks like you've got due process and

5    opportunities galore in the State of Alabama if they really

6    want to fight it.  I think it makes pragmatic sense to lift the

7    stay and let the votes be taken and let the chips fall where

8    they may.  So, basically, it's going to happen now, or it will

9    happen later, it seems to us.  Thank you, Your Honor.

10             THE COURT:  Thank you.

11             All right.  As you all know, relief from stay and

12   whether it should be granted or conditioned, etc., is a matter

13   left to the Court's discretion.  And it's intended to be a

14   summary process, not a final determination of anybody's rights

15   under any agreements or anything of that nature.

16             So as I look at this--sorry, I keep having to sneeze.

17   Achoo.  Oh, I hate that.

18             UNIDENTIFIED SPEAKER:  Bless you.

19             THE COURT:  Okay, thank you.

20             As I look at this, my reaction to it is that, of

21   course, at some point in time, the working interest owners are

22   going to be entitled to all their rights, to assert all their

23   rights, to have a meeting and have a vote if that's what they

24   want to do.

25             But the question is whether now is the right time for
```

1  that.  We are on the precipice of a plan being filed tomorrow,

2  and nobody's seen the terms of that plan.  And the debtor is

3  telling me that with a little bit of time, the working interest

4  owners beyond those that are on this ad hoc committee and

5  including those on the committee are going to have a lot more

6  information to make meaningful decisions on whether they would

7  want to replace SEC as the operator or who they might want to

8  replace them with, given the costs that would be involved.

9         That seems like a compelling argument to the Court.

10  It's not that these rights are going to be unduly delayed

11  forever, but we need to see a little more of the Chapter 11

12  process play out.  These are critical assets to the debtor's

13  operation, their ability to reorganize.  Both sides are telling

14  me that.

15         And while I appreciate very much that it is going to

16  impact feasibility of any plan if the working interest owners

17  aren't happy with the plan that's proposed, we can hold a

18  relief from stay proceeding on these issues as well as the

19  feasibility of this plan in due course.

20         So what I could either do is deny the motion today or

21  say I'm going to kick the can down the road.  And normally

22  Section 362(e)(1) would require that I hold the final hearing

23  and conclude it no later than thirty days from today.  But then

24  it says, "Or for a specific time which the Court finds is

25  required by compelling circumstances."

1        And I want to say that I think those exist here, and

2    here's why:  This will be an extensive fight, and to fight it

3    all first before we even see a plan and the disclosure

4    statement's information that goes with the plan, you know,

5    there may or may not be something to fight about.  And if we've

6    got to have that fight in connection with feasibility of the

7    plan, then maybe we set the final hearing on this motion in

8    connection with confirmation of the plan.

9        So I'm going to ask our movant, co-movants, if

10   they're amenable to kicking this down and setting it with the

11   confirmation hearing or if you want me to just deny it outright

12   today.

13       MR. GENO:  Craig Geno for the ad hoc committee, Your

14   Honor.  Given those parameters, I think we pick door number one

15   and ask the Court to move it to confirmation.

16       I would ask for a little bit different alternative,

17   because who knows when confirmation is going to be?  If

18   confirmation is not by mid-April, we would ask the Court reset

19   it for that point in time, because that means there is some

20   problem with the plan, and we're going through different

21   iterations rather than being in August or September of next

22   year for confirmation.

23       THE COURT:  I completely understand that.

24       Mr. Skelton, your input?

25       MR. SKELTON:  I'm in favor of the kick-the-can plan.

```
 1              THE COURT:  Okay, thank you.
 2              You know, it's part of a Judge's job in Chapter 11
 3    and all bankruptcy cases to look at the economical approach so
 4    that we don't have endless attorneys' fees being incurred and
 5    fights that may not need to be fought.  So that's a lot of what
 6    factors into this to me as well.
 7              But at some point, if the debtor's plan process is
 8    seriously derailed, I don't want to hold you to this forever.
 9    So I will set a final hearing on this motion in connection with
10    confirmation, but parties by April can ask to reset it separate
11    from confirmation; okay?
12              Thank you for your good presentations.  Anything
13    else?
14              MS. RILEY:  Oh, with the discovery dispute--
15              THE COURT:  Go ahead.  (Inaudible), go ahead.
16              MS. RILEY:  Was there a specific date in April?  By
17    April 1st if it's not--
18              THE COURT:  By April Fool's Day they can file
19    something if they want to.
20              MS. RILEY:  Thank you.
21              THE COURT:  And then let's talk about the discovery
22    dispute, because you still probably will have need for more
23    discovery.  So, Mr. Swanson, do you want to begin on that?
24              MR. SWANSON:  Yes, good afternoon, Your Honor.  Tim
25    Swanson from Moye White on behalf of the ad hoc committee
```

1    working interest owners.

2            We requested this discovery hearing back on the--I

3    think it was the 4th of--or, I'm sorry, the 8th of this month.

4    I think it probably makes a little bit of sense just to kind of

5    give the Court an overlay of what's been going on behind the

6    scenes and how we got here today.

7            THE COURT:  Okay.

8            MR. SWANSON:  As the Court is aware, a 2004 exam was

9    granted back in November, November 9, 2020, at Docket No. 661.

10   Promptly the ad hoc committee followed up with the debtors to

11   begin the process to move forward and engaged in, as I thought,

12   I believe, a productive telephone call on the 18th of November,

13   and we discussed potential objections, general objections,

14   specific objections, things that perhaps the ad hoc committee

15   can get a little bit more narrow on.

16           And the hope was is that those things that weren't

17   objected to we can start moving those documents, kind of called

18   the easy documents, things we're not fighting about or don't

19   need to have clarity.  And we were asked to prioritize our

20   request, and we did so.

21           After about--having not heard anything for the better

22   part of eleven, twelve days, we responded in writing and said,

23   "Where are we at on this?"  And we even agreed to narrow the

24   general objections and, again, please start producing the easy

25   documents.

1           There was a status conference before Your Honor on

2    December 4th, and this hearing or this portion of the hearing

3    was previewed before Your Honor, and I think you encouraged us

4    to reach out to the Court for facilitation of these issues.

5    And that's on December 8th.  We did reach out to Your Honor.

6           After the Court had set the hearing, the ad hoc

7    committee voluntarily reached out to the debtors again to try

8    and narrow the issues before Your Honor and see if we can find

9    common agreement.

10          We engaged in a telephone call on the 14th of

11   December with the Armbrecht Jackson firm, whose scope of

12   employment was extended by Your Honor back in November for

13   these specific issues.  Mr. Graham and I engaged, I think, in a

14   meaningful discussion, sharing the frustrations that the ad hoc

15   committee had had with the debtors and the lack of producing

16   documents in response to e-mails that we'd want to see things

17   moving.  And so Mr. Graham and I chatted on Monday.  He did

18   represent that we'd start receiving documents this week.

19          And then on Tuesday, 35 days after our subpoena was

20   served or agreed to be accepted, we received our first document

21   (inaudible) request by the debtors to further narrow the scope

22   of a couple of document requests.  We are taking the time and

23   the effort to accommodate that, because we do want to receive

24   very meaningful documents and not a data dump.

25          So while we are encouraged, Your Honor, at this

1   juncture we have received documents.  It's taken much longer

2   than we would have liked.  We were all operating under the

3   assumption that things are going to really move forward with a

4   full head of steam here in the month of December with this

5   hearing and also with the debtor's exclusivity period ending

6   tomorrow, and I guess the plan will be filed tomorrow.

7          So we are encouraged.  I notice in their discovery

8   report they say that they have substantial documents to produce

9   to us prior to Christmas, and we are looking forward to

10  receiving those.

11         We are also looking forward to understanding when the

12  document production will be complete.  Now that it appears the

13  stay release hearing, final hearings, have been continued, I

14  don't want to say indefinitely, but till April 1st or

15  (inaudible) in July, we still want to keep our momentum,

16  because the other part of this, Your Honor, is we have been

17  unable to schedule a deposition of the debtor's 30(b)(6)

18  representative.  And as Your Honor can imagine, we need our

19  documents to be able to have a meaningful examination.

20         So we are encouraged, but we'd also like to see an

21  end date to that.  And so we're going to continue to work with

22  Mr. Graham.  We know--and, again, I think, as I said, I was

23  encouraged that we received documents albeit when we received

24  them.

25         So we will continue to work with them.  We may be

1   back before Your Honor if we do not start receiving documents

2   that we believe are responsive.  So on the timing of receiving

3   documents, we have been receiving them as of this week.  We

4   even received some yesterday.

5          So we may be back before Your Honor, but I think

6   Issue One in our status report is likely best held in abeyance,

7   so that way Mr. Graham and myself can continue to talk through

8   the issues.  We can address the narrow--the narrowing request

9   that he had in greater detail, again, so that they can make a

10   better meaningful production to us.  So I believe that Issue

11   One should be held in abeyance.

12          THE COURT:  Okay.  Mr. Graham?

13          MR. GRAHAM:  That's fine with us.  We have--as of, I

14   think, this morning, we have now produced over 11,000 pages of

15   documents.  We have a good bit more, I think, lined up to be

16   uploaded shortly.  I am supposed to be receiving the e-mails

17   tomorrow, and Ben and I and whatever other lawyers around here

18   we need to commission on this are going to give the review of

19   those e-mails our top priority.

20          We are being told that the at least gigabyte quantum

21   of these e-mails is enormous.  We don't know the actual number

22   of e-mails yet until we see them.  These requests are extremely

23   broad.  We are trying to respond to them, and so that has

24   generated, predictably enough, just a huge quantum of e-mails.

25   But we are going to start hopefully in the morning reviewing

1  those.  We would plan to get those to Mr. Swanson as and--sort

2  of in a rolling production as and when they're ready.

3       I would like to think that we can finish that e-mail

4  review before Christmas for a whole variety of reasons.  Until

5  I actually see the e-mails, presumably tomorrow, Ben and I

6  cannot report that that is, in fact, doable.  But what we will

7  try to do is to get as much of it done before Christmas as we

8  can, and we will roll it out to Mr. Swanson as we have them

9  ready.

10      THE COURT:  Okay.  So partial productions as you've

11 gone through however many thousands of e-mails.  You know

12 they're not privileged, you ship them on to him, then you look

13 at the next thousand, do that in sort of a rolling--

14      MR. GRAHAM:  That's right.  I mean, we are reviewing

15 them primarily for privilege issues.  If we see a completely

16 non-responsive one, we can pull it out, too, but primarily--

17 I've done this several times recently.  And with this type of

18 bulk of e-mails and the short time fuse you have, you basically

19 just review for privilege, and that's it.

20      THE COURT:  Yeah, okay.  Okay, well, I'm going to

21 leave you--

22      MR. SWANSON:  Your Honor--

23      THE COURT:  Oh, who's speaking?

24      MR. SWANSON:  This is Mr. Swanson.  My apologies.

25 One just point I think--you know, I think we've maybe--I heard

1  from Mr. Graham there is, you know, if they're not privileged

2  to produce them, the whole point--and, again, we believe our

3  requests are rather narrow to begin with, and we've even agreed

4  to undertake further narrowing them to make things meaningful

5  and to not have a data dump.

6          So I think what I heard in there--and I hope he's

7  saying--is that you're not just going to--if it's non-

8  privileged, we're going to produce it.  Well, we want it to be

9  non-privileged and then further respond to them.

10         Our preference, strong preference, when we hear the

11 word "thousands upon thousands" is to not receive non-

12 responsive, non-privileged e-mails.  Obviously that would be

13 (inaudible)--

14         THE COURT:  Well, when you--when you have exceedingly

15 broad requests, you should expect a data dump.  So you either

16 have to tailor your requests narrowly to get what you really

17 want, or you are going to get a data dump.  When I saw the

18 original requests, which your statement--your position

19 statements, you know, it's like all communications with working

20 interest owners.  I mean, that would be enormous I bet.  So--

21         MR. SWANSON:  And, Your Honor, we are going, like I

22 said, to efforts to try and narrow those to make the, again,

23 more meaningful production rather than to dump it.  And we have

24 been in discussions or communication, Mr. Graham and I.

25         So that would be the only thing I want to just say on

1  the record is that quality is just as important, so--but I
2  agree that Issue One should probably be held in abeyance at
3  this juncture.
4          THE COURT:  Well, we'll hold it in abeyance until you
5  all tell us otherwise.  But if you do need the Court to say
6  whether something is too broad of a request or not, we're happy
7  to hold a hearing.
8          Now, there may be--I think these holidays coming up
9  are on Thursdays, right, or maybe Fridays?  But the Court is
10  closed on both Thursday and Friday, so that could be a little
11  tricky.  But we'll fit you in as best as we can.
12          MR. SWANSON:  And we appreciate the Court's
13  accommodating us.  Thank you, Your Honor.
14          Issue Number Two--Issue Number Two deals with
15  Document Request Number 17.  Document Request Number 17 is all
16  drafts of the NASI (phonetic) reports, and that is (inaudible).
17          Your Honor may recall October 22nd of this year there
18  was a hearing on the debtor's motion to clarify, and one of the
19  themes--besides the Court holding that motion in abeyance, one
20  of the themes from the debtor's side was (inaudible) necessary
21  for value concerning the debtor's value or asset value to also
22  determine the potential assumption of JOAs and other documents.
23  And it's going to be potentially necessary for Chapter 11 plan
24  valuation.
25          I believe at that hearing Mr. Katchadurian stated

1    that he shared drafts of the reserve report (inaudible) believe

2    that Mr. Suzuki mentioned that the drafts had been shared with

3    their East West Bank's internal engineers.

4            THE COURT:  Well, that--

5            MR. SWANSON:  As Your Honor recalls--

6            THE COURT:  Excuse, I'm going to interrupt again.

7    That makes them not privileged, but why are they relevant,

8    these prior drafts?

9            MR. SWANSON:  Sure.  The prior drafts--

10           THE COURT:  You have the bank--go ahead.

11           MR. SWANSON:  Sorry.  To answer the relevancy, in

12   this final reserve report, Your Honor, there is--on the face of

13   the report it says that Netherland Sewell says that SEC

14   directed certain assumptions to Netherland Sewell regarding

15   pricing, those assumptions that obviously affect the ultimate

16   value and conclusions contained in the report.

17           For instance on pages 1, 3, and 4 of the reserve

18   report, Netherland Sewell says they're relying on the

19   assumptions provided or the information provided, costs

20   provided by SEC to prepare the report.

21           Why it's relevant, it's relevant from our perspective

22   for a few reasons, Your Honor:  the reliability, the assumption

23   that the debtors required Netherland Sewell to use may skew the

24   value of the assets that Netherland Sewell had been asked to

25   opine on, but it also--yeah, so apparently the reliability of

1   the report.

2          Second, Your Honor, it requires Netherland Sewell to

3   make the decision using only the debtor's information and

4   showed bias, which, again, skewed the value.

5          We already talked about whether--from the privileged

6   perspective, the waiver issue.  The relevance comes in in a few

7   spots, especially if we kind of look down the road, Your Honor,

8   with this plan that is going to be filed tomorrow.  There could

9   be objection based upon good faith, whether there has been any

10  sort of undue influence of manipulating the value or

11  influencing the value.  (Inaudible) interest in creditors, Your

12  Honor, what is truly the value of these assets would be

13  relevant.

14         And, finally, feasibility.  Could a plan that's

15  premised on the values from this final report's value be

16  workable?

17         And so, really, the only way to determine the

18  reliability or bias or lack thereof is to (inaudible) the

19  assumptions in the prior drafts.  And so that's why it's

20  relevant to receive the drafts.

21         THE COURT:  Okay.  Mr. Graham, your response?

22         MR. GRAHAM:  Well, keep in mind that they do have the

23  final report.  I understand there aren't necessarily separate

24  drafts.  There is one document that was continually revised.

25  And so in that regard, I'm not sure exactly what it is they

1    want us to send.  I think that providing--if there's some way

2    to come up with each iteration of the report, I think there's

3    potential for confusion.  And if all they're looking for is

4    assumptions that went into the report, isn't there an easier

5    way to get that data than to have to dig all the e-mail drafts

6    and things or whatever there is and just give them the

7    assumptions?

8              THE COURT:  Well, what would that be documentary-

9    wise?

10             MR. GRAHAM:  Your Honor, I'll have to tell you that I

11   don't know.  I'm just wondering if there's not some easier way

12   to do that.

13             THE COURT:  Mr. Suzuki, you're on the call.  You've

14   seen the various versions of the reserve report.  Do you have

15   any input?

16             MR. SUZUKI:  I haven't seen various versions of the

17   reserve report.  And just to clarify, I think what I said is

18   that the hearing was to make clear that the bank was not

19   providing input into drafts of the report.  Some of the

20   underlying data was shared with the bank and specifically the

21   bank's in-house engineering folks.

22             And I think that what happened is that whatever

23   database they were using on the engineering information was

24   shared, some of that data was.  But in terms of a draft report

25   from the reserve engineer, we did not receive draft reports

1   like that.  So we had access to some of the underlying data,

2   but no drafts of the report.

3            THE COURT:  Okay, thank you.

4            How about the official committee?  Mr. Johnson?

5            MR. JOHNSON:  Thank you, Your Honor.  Chris Johnson

6   on behalf of the committee.  We did not see drafts.  If you

7   will recall, at the hearing I specifically inquired about

8   drafts of the report, because we were interested in it as well.

9            Mr. Katchadurian stated in response to your

10  questioning and mine that he had not seen a draft until the

11  week prior.

12           So this should not be a difficult exercise.  And the

13  fact that the debtor doesn't want to produce this gives us some

14  concern.  It should be very easy to say, Show me all the draft

15  reports or iterations or versions of reports sent by NSAI to

16  the debtors.  It's not a tough exercise.  We've heard that many

17  times today about how difficult everything will be to get done,

18  but we've got some smart people here, and technology is really

19  great.  Just send us the drafts.  Every time NSAI sent a

20  version of the report to the debtor, let's take a look at it,

21  and let's look at the responses from the debtor.

22           THE COURT:  So you want e-mails then, too?

23           MR. JOHNSON:  Well, I'm not sure if there's an e-mail

24  or probably a redline, Judge.  The way most things are done in

25  this is a redline.  But I would bet you that if there was a

1  redline, there was a cover e-mail that may explain what the

2  changes were.  But, again, what's to hide?

3          THE COURT:  Okay.  Mr. Graham?

4          MR. GRAHAM:  Well, I have nothing further at all.

5          THE COURT:  Okay, all right, then I'm going to rule

6  that the debtor needs to produce the redlines and any versions

7  that the debtor has retained of the reserve report that

8  preceded the final report.

9          MR. GRAHAM:  Yes, Your Honor.

10          THE COURT:  If it's--

11          MR. JOHNSON:  Your Honor--

12          THE COURT:  --hard to do that, you see that it's very

13  voluminous, or some other problem occurs, then we can have

14  another further hearing on this.

15          MR. GRAHAM:  Thank you, Your Honor.

16          MR. JOHNSON:  Your Honor, if I may, this is Chris

17  Johnson.  Can the committee get those documents as well?

18          THE COURT:  I don't see why not.  Mr. Graham?

19          MR. GRAHAM:  That's fine with--Keri, was that you?

20          MS. RILEY:  Sorry, this is Keri Riley, Your Honor,

21  for the debtor.  The committee has access to all of the

22  documents that we are currently producing for the ad hoc

23  committee's request.

24          So we have created a folder within the data room with

25  sort of restricted access to the parties who are requesting it.

1  The Committee and the bank and the ad hoc committee are all on

2  that folder.

3           MR. JOHNSON:  Thank you.

4           Yeah, that's true, Your Honor.  I'm just talking

5  about these new additional documents that the debtor has agreed

6  to produce.

7           THE COURT:  Okay, well, they're going to go into that

8  data room subfolder, so that should be good for everybody, at

9  least the official committee, the ad hoc committee, and the

10 bank and the debtor at least.

11          Okay, very good.

12          All right.  Is there any other business before the

13 Court before we recess?

14          MR. SWANSON:  Not from the ad hoc committee, Your

15 Honor.

16          THE COURT:  Okay.

17          MR. GRAHAM:  Not from debtors.

18          THE COURT:  Okay.  Not hearing any then, we will go

19 ahead and recess.  And happy holidays to everybody, and we

20 will, I'm sure, hear from you all in the coming months.  Thank

21 you.  This Court is now in recess.

22      (Proceedings concluded at 3:18 p.m.)

23

24

25

65

1                          TRANSCRIBER'S CERTIFICATE

2              "I, court approved transcriber, certify that the

3      foregoing is a correct transcript from the official electronic

4      sound recording of the proceedings in the above-entitled

5      matter."

6

7                          Dated this 2nd day of January, 2021.

8                          /S/ SYLVIA BESEL

9                          SYLVIA BESEL

10                         FEDERAL REPORTING SERVICE, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

E X H I B I T S

| NUMBER | OFFERED | RECEIVED |
|--------|---------|----------|
| Creditors' | | |
| 40, 3, and 4 | 28 | 28 |