## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE: | **CHAPTER 11** |
| **SKLAR EXPLORATION COMPANY, LLC** | **Case No. 20-12377-EEB** |
| | |
| **SKLARCO, LLC** | **Case No. 20-12380-EEB** |
| *Debtors* | **(Jointly Administered)** |

---

### OBJECTION TO THE DEBTORS' DISCLOSURE STATEMENT

---

Eastern Energy Services, Inc., formerly known as Eastern Fishing & Rental Tool Company, Inc. ("Eastern"), a creditor and party-in-interest in the above-captioned jointly administered Chapter 11 bankruptcy cases (the "Bankruptcy Cases") of Sklar Exporation Company, LLC ("SEC") and Sklarco, LLC ("Sklarco") (together, the "Debtors"), objects to the *Disclosure Statement to Accompany Joint Plan of Reorganization Dated December 18, 2020* (SEC Dkt. # 740, the "Disclosure Statement") filed by the Debtors in connection with the proposed *Joint Plan of Reorganization Dated December 18, 2020* (SEC Dkt. # 739, the "Plan"), as follows:

### Introduction

Eastern filed its Proof of Claim (Claim # 36, the "Proof of Claim") in the SEC case on May 7, 2020. As set forth in the Proof of Claim, Eastern is the holder of a prepetition claim against Debtor SEC in the amount of $260,865.69 for goods sold and work performed by Eastern.

The Debtors filed their Plan and Disclosure Statement on December 18, 2020. Eastern appears to be a "Class 6" creditor under the Plan, but it is impossible for Eastern to determine from the Disclosure Statement how much the Debtor proposes to pay Eastern on account of its allowed Class 6 claim. The Disclosure Statement and Plan further fail to provide adequate information about key aspects of the Plan, including the future management of the Debtors, the mechanisms for evaluating and pursuing Avoidance Actions, the Plan's blatant violation of

the absolute priority rule, and the confirmability of the Plan. Accordingly, Eastern objects to the approval of the Debtors' Disclosure Statement.

## OBJECTION

I.  ***The Disclosure Statement should not be approved because it fails to provide adequate information as required by 11 U.S.C. § 1125***

Section 1125(b) of the Bankruptcy Code makes clear that before a debtor may solicit acceptance of a plan, the court must approve the written disclosure statement as containing "adequate information,"[1] which is defined as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would **enable such a hypothetical investor of the relevant class to make an informed judgment about the plan** . . . .[2]

Section 1125 further provides that, "[i]n determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information . . . ."[3]

"Numerous courts have prescribed a list of disclosures which typically should be included in a disclosure statement."[4] The factors that Courts have identified that may be necessary to meet the statutory requirement of adequate information include:

---

[1] 11 U.S.C. § 1125(b).

[2] 11 U.S.C. § 1125(a)(1) (emphasis added).

[3] 11 U.S.C. § 1125(a)(1).

[4] *In re Puff*, No. 10-01877, 2011 Bankr. LEXIS 2445 at *9–10 (Bankr. N.D. Iowa June 30, 2011) (citing *In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990); *In re Scioto Valley Mortgage Co.*, 88 B.R. 168 (Bankr. S.D. Ohio 1988); *In re S.E.T. Income Props, III,* 83 B.R. 791 (Bankr. N.D. Okla. 1988); *In re Jeppson*, 66 B.R. 269 (Bankr. D. Utah 1986); *In re Metrocraft Publishing Servs., Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984); *In re Malek*, 35 B.R. 443 (Bankr. E.D. Mich. 1983)). *See also* 7 Collier on Bankruptcy ¶ 1125.02 (16th ed. rev. 2020) (same, and citing cases).

(1)     the events which led to the filing of a bankruptcy petition;

(2)     a description of the available assets and their value;

(3)     the anticipated future of the company;

(4)     the source of information stated in the disclosure statement;

(5)     a disclaimer;

(6)     the present condition of the debtor while in Chapter 11;

(7)     the scheduled claims;

(8)     the estimated return to creditors under a Chapter 7 liquidation;

(9)     the accounting method utilized to produce financial information and the name of the accountants responsible for such information;

(10)    the future management of the debtor;

(11)    the Chapter 11 plan or a summary thereof;

(12)    the estimated administrative expenses, including attorneys' and accountants' fees;

(13)    the collectability of accounts receivable;

(14)    financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;

(15)    information relevant to the risks posed to creditors under the plan;

(16)    the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

(17)    litigation likely to arise in a nonbankruptcy context;

(18)    tax attributes of the debtor; and

(19)    the relationship of the debtor with affiliates.[5]

---

[5] *In re Puff*, 2011 Bankr. LEXIS 2445 at *9–10 (citing *Cardinal Congregate I*, 121 B.R. at 765-66; *In re U.S. Brass Corp.*, 194 B.R. 420, 424-25 (Bankr. E.D. Tex. 1996)). *See also* 7 Collier on Bankruptcy ¶ 1125.02 (16th ed. rev. 2020).

The Debtors' Disclosure Statement fails in numerous respects to provide clear, adequate information that would enable a hypothetical investor to make an informed judgment about the Plan, including, but not necessarily limited to, the following:

**A.   The Disclosure Statement does not contain adequate information about the amount of Class 5 claims or the amount(s) to be paid to Class 5 creditors**

The Disclosure Statement suggests that Class 6 claims will not be paid unless and until Class 5 claims are paid in full.[6] Thus, a Class 6 claimant such as Eastern must first determine when Class 5 claims are likely to be paid in full before it can determine whether, when, or how much its Class 6 claim might be paid. Unfortunately, the Disclosure Statement does not provide adequate information to perform that task.

Under the Disclosure Statement and Plan, Class 5 claims are "JOA Cure Claims," which the Plan defines as

> the Allowed Claim[s] held by Revenue Parties for an unpaid monetary default under the applicable JOA, comprised of the unpaid revenue owed to such Revenue Party or such other amount as set by the Bankruptcy Court, for those JOAs assumed by SEC prior to or at confirmation of the Plan.[7]

In this regard, the term "Revenue Parties" is defined as "working interest holders, overriding royalty interest holders, and royalty interest holders holding an interest in the wells operated by SEC on the Effective Date of the Plan."[8]

Neither the Disclosure Statement nor the Plan states the total "gross" amount of Class 5 claims. Exhibit "E" to the Disclosure Statement appears to be a list of leases and contracts that SEC proposes to assume, and a small percentage of these leases and contracts are accompanied

---

[6] Disclosure Statement at 26 ("Commencing the first quarter following the date on which the Class 5 Claims are paid in full, and continuing on a quarterly basis thereafter, the accrued funds shall be distributed to Class 6 Creditors on a pro rata basis.")
[7] Plan at 7.
[8] Plan at 8.

by a "Cure Amount." It *may* be possible to determine the gross amount of Class 5 claims by adding together all of the Cure Amounts in Exhibit "E," but it is not clear, for at least the following reasons:

- The sum of all the "Cure Amounts" listed in Exhibit "E" is $1,153,104.00, but the Disclosure Statement says that "[a]pproximately $3 million [of the $4.1 million in unpaid revenue SEC owes to working interest holders from revenue received in January and February 2020] is attributed to those contracts which SEC intends to assume, which amount must be paid by SEC to cure the monetary defaults under the JOAs."[9] This appears to be a significant and unresolved discrepancy.

- Every page of Exhibit "E" contains a conspicuous red watermark warning that it is "SUBJECT TO CHANGE." The Disclosure Statement likewise warns that "Exhibit E is subject to further revision based on SEC's business judgment," and that "SEC may elect to assume or reject additional JOAs at any time prior to confirmation."[10] So even if the cure amounts listed in Exhibit "E" *are* intended to be the amounts of Class 5 claims, the Debtors appear to be reserving the right to change these amounts and/or claimants unilaterally at any time prior to confirmation.

- The Disclosure Statement further says that "the amount required [to] cure any contracts that SEC elects to assume is subject to agreement between the parties or determination by the Bankruptcy Court."[11] There is no apparent indication in the Disclosure Statement or Plan whether or to what extent any agreements have been reached or Bankruptcy Court determinations requested as to any such cure amounts.

In light of the foregoing, the gross amount of Class 5 claims *could* be anywhere from approximately $1.1 million to approximately $3 million, but in any case subject to change at the Debtor's discretion with no apparent mechanism for providing notice.

The Debtors' proposed *treatment* of Class 5 only compounds this lack of specificity. According to the Disclosure Statement, on the Effective Date, SEC will first "offset and/or recoup *up to* [$1 million] of the unpaid JIB Obligations owed by Class 5 Claimants against the Class 5 Claims."[12] The $1 million figure is placed in square brackets in the Disclosure

---

[9] Disclosure Statement at 20–21.
[10] Disclosure Statement at 21.
[11] Disclosure Statement at 21.
[12] Disclosure Statement at 26 (emphasis added) (square brackets in original).

Statement, suggesting a lack of finality to this number. Moreover, it is not clear from the Disclosure Statement how much "up to" this figure would be offset or recouped, or how that determination would be made. Even if the full $1 million is offset/recouped, depending on how the gross amount of Class 5 is determined, this would reduce the total amount of Class 5 claims to *either* approximately $100,000.00 *or* approximately $2 million—a significant variance.

Next, after this non-specific initial setoff/recoupment, the Debtors propose to "reduce the balance of the Revenue Account to an amount necessary to pay the upcoming revenue cycle," and then distribute "[a]ll funds excess of the amount necessary to pay the upcoming revenue cycle . . . on a pro rata basis to all Class 5 Claims."[13] Exhibit "H" to the Disclosure Statement indicates that there is $496,293.00 in the SEC Revenue Account (which is curiously listed under "Sklarco Assets" even though the Plan defines it as an "account established by SEC"[14]), but there is no apparent indication of what amount would be "necessary to pay the upcoming revenue cycle." It is therefore impossible to determine from the Disclosure Statement whether or how much this step would reduce the net amount of Class 5 claims.

Finally, the Disclosure Statement provides that the remaining amount of Class 5 claims will be paid by "quarterly distributions of [100%] of SEC Net Operating Income as set forth on the Projections attached as Exhibit B until paid in full."[15] Again, the square brackets in the Disclosure Statement suggest a degree of malleability to this rather significant 100% figure. Exhibit "B" to the Disclosure Statement does appear to contain projections for "SEC Net Operating Income," which Exhibit "B" confusingly refers to as "SEC Adjusted Operating

---

[13] Disclosure Statement at 26.
[14] Plan at 8.
[15] Disclosure Statement at 26 (square brackets in original).

Income." Nevertheless, Exhibit "B" does not appear to set forth any quarterly distributions to any creditors.

The "Total Projected SEC Net Operating Income" over the Plan term is $1,824,000.00.[16] Thus, depending on the other variables discussed above, Class 5 claims *could* be paid in full on the Effective Date on the one hand, or left only partially paid at the end of the five-year Plan term on the other hand. For example, if the net amount of Class 5 claims is only approximately $100,000.00, and if the Revenue Account contains that amount or more after paying "the upcoming revenue cycle,"[17] then the net Class 5 claims *could* be satisfied in full on the Effective Date. On the other hand, if the net amount of Class 5 claims is approximately *$2 million*, and if there are no funds remaining in the Revenue Account after paying the upcoming revenue cycle, then even 100% of the projected $1,824,000.00 of SEC Net Operating Income would be insufficient to pay off the remaining $2 million in Class 5 claims over the Plan term.

In short, the Disclosure Statement does not contain enough information for creditors to determine how much or when the Debtors actually propose to pay Class 5 claimants. The projections attached to the Disclosure Statement do not reflect any unsecured creditor payments, so creditors are forced to guess. Thus, the Disclosure Statement fails in this respect to provide critical information such as "the scheduled claims," "financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan," and "information relevant to the risks posed to creditors under the plan."[18] Therefore, the Disclosure Statement fails to provide adequate information and should not be approved.

---

[16] Disclosure Statement at 26.
[17] Disclosure Statement at 26.
[18] *In re Puff*, 2011 Bankr. LEXIS 2445 at *9–10; 7 Collier on Bankruptcy ¶ 1125.02 (16th ed. rev. 2020).

**B.**     **The Disclosure Statement does not contain adequate information about the amount of Class 6 claims or the amount(s) to be paid to Class 6 creditors**

As noted above, the Disclosure Statement indicates that Class 6 creditors will not begin to be paid unless and until Class 5 claims have been paid in full.[19] And as discussed above, that could be on the Effective Date, never, or somewhere in between. But even if it were possible to determine the start date of Class 6 payments with any reasonable degree of certainty, the Disclosure Statement still does not contain adequate information to determine the amount of Class 6 claims or how much the Debtors actually propose to pay to Class 6.

Regarding the total amount of Class 6 claims, the Disclosure Statement says that "the total amount of unsecured claims asserted against SEC [is] approximately $36,617,000," but that "SEC anticipates that the total amount of Class 6 claims will be reduced by at least $18 million."[20] Nowhere in the Disclosure Statement does there appear to be an explanation or analysis of how or why the Debtors anticipate being able to reduce the amount of Class 6 claims by *at least* $18 million, which is roughly *half* of the total Class 6 claims.

To further complicate the problem, the Disclosure Statement then suggests that "general unsecured claims arising from cash call liabilities may also be *reduced* prior to and after confirmation"[21] with no indication of when or how much, *and* that "[t]he amount of Class 6 claims may *increase* based on claims arising from SEC's rejection of certain JOAs,"[22] again with no indication of the timing or amount of these potential increases. As a result, creditors

---

[19] Disclosure Statement at 26 (payments to Class 6 creditors to commence "the first quarter following the date on which the Class 5 Claims are paid in full").
[20] Disclosure Statement at 20.
[21] Disclosure Statement at 20 (emphasis added).
[22] Disclosure Statement at 20 (emphasis added).

simply have no way to determine the amount of claims the Debtors propose to include within Class 6.

Even if the total amount of Class 6 claims were known, it is still unclear from the Disclosure Statement when or how much the Debtors actually propose to pay to Class 6 creditors. According to the Disclosure Statement, the principal source of funds for the payment of Class 6 claims would be the same "SEC Net Operating Income" fund discussed above in connection with Class 5 claims.[23] And as discussed above, there is no way to determine from the Disclosure Statement how much of the "SEC Net Operating Income" fund the Debtors actually propose to make available to Class 6 creditors.

In addition to any distributions Class 6 creditors may or may not receive from the "SEC Net Operating Income" fund, the Disclosure Statement also proposes that "Class 6 creditors shall receive [5%] of the SKC Available Cash after Class C creditors are paid in full," and that these payments would begin in the second year of the Plan term "[a]ssuming that Class C Claims are $500,000 or less . . . ."[24] This raises two *further* problems.

First, neither the Disclosure Statement nor the Plan indicates how much "SKC Available Cash" might be available for such payments to Class 6 creditors, and the term "SKC Available Cash" does not appear on any of the projections attached to the Disclosure Statement. Based on the Plan's definition of the term,[25] it is possible that "SKC Available Cash" may correlate in some way to the "SKC Adjusted Operating Income" line item on Exhibit "B" to the Disclosure Statement, but if so, the relationship is not at all clear.

---

[23] Disclosure Statement at 26.
[24] Disclosure Statement at 27.
[25] *See* Plan at 9 (defining "SKC Available Cash" to mean "net revenue owned by Sklarco, whether maintained in accounts owned by Sklarco or SEC, after payment of expenses including payment of joint interest billing obligations to third party operators and contribution to the Reserve Fund in accordance with the budgets prepared by the Debtors").

Second, the Disclosure Statement provides no explanation or analysis that would enable creditors to gauge the validity of the assumption that Class C claims will be $500,000 or less.

Beyond any potential "SKC Available Cash" distributions, the Disclosure Statement further indicates that "Class 6 creditors shall also receive a pro rata distribution of all of the net proceeds of any Avoidance Action . . . ."[26] In this regard, the Disclosure Statement explains that "SEC has identified approximately $10 million" in potentially recoverable preference payments, but "is still evaluating the pre-petition payments to determine if valid preference actions exist, the likelihood of recovery, and the existence of likelihood of success of any defenses to Avoidance Actions."[27] The Disclosure Statement adds that "[a]dditional claims may exist against pre-petition officers or directors of SEC," but that any such claims "will likely be limited to the potential recovery under applicable Directors and Officers Insurance Policies."[28]

The Disclosure Statement offers no projections or estimates of (a) how much of the "approximately $10 million" in preference payments the Debtors believe to be recoverable, or (b) the amount, nature, or recovery potential of any claims that "may exist against pre-petition officers or directors of SEC." Thus, in short, the Disclosure Statement fails in this respect to provide critical information such as "a description of the available assets and their value," "the scheduled claims," "financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan," and "information relevant to the risks posed to creditors under the plan."[29] Therefore, the Disclosure Statement fails to provide adequate information and should not be approved.

---

[26] Disclosure Statement at 27.
[27] Disclosure Statement at 27.
[28] Disclosure Statement at 27.
[29] *In re Puff*, 2011 Bankr. LEXIS 2445 at *9–10; 7 Collier on Bankruptcy ¶ 1125.02 (16th ed. rev. 2020).

C.    **The Disclosure Statement does not contain adequate information about the actual or projected realizable value from recovery of preferential or otherwise voidable transfers**

As noted above in the preceding section, the Disclosure Statement discloses that "SEC has identified approximately $10 million" in potentially recoverable preference payments, and that "[a]dditional claims may exist against pre-petition officers or directors of SEC,"[30] but the Disclosure Statement does not even *attempt* to project the realizable value from recovery of such Avoidance Actions. Perhaps more troubling though, the Disclosure Statement suggests that the Avoidance Actions would be pursued—*if at all*—in a manner likely to *reduce* the potential for recovery.

In this regard, the Debtors explain in the Disclosure Statement that "all Avoidance Actions will be reserved to Class 6 general unsecured creditors of SEC," but would only be pursued "at the discretion of the *Debtors* after evaluation by the Independent Manager."[31] But "[i]n certain [unspecified] instances, the Independent Manager may decline to pursue an Avoidance Action based on a number of factors," and if such factors "weigh against pursing an Avoidance Action, the Debtors will likely elect not to pursue Avoidance Actions."[32] These factors include:

1) any valid defenses that may be raised;

2) the strength of the claims in light of the anticipated defenses;

3) the anticipated cost of litigation versus the amount to be recovered;

4) the likelihood of recovery if successful;

5) the cost to the estate and the Debtors' ability to maintain its business relationship, versus the cost of possibly losing that business relationship and the impact on future revenues; and

---

[30] Disclosure Statement at 27.
[31] Disclosure Statement at 15 (emphasis added).
[32] Disclosure Statement at 15.

6) any insurance coverage that may exist for such claims, including Directors and Officers Insurance.[33]

In other words, although the Class 6 creditors are to be the *sole beneficiaries* of any Avoidance Actions, the *Debtors* propose to reserve for themselves the sole discretion as to whether and in what manner to actually *pursue* any Avoidance Actions, in consultation with an Independent Manager that would be appointed by the Debtors and East West Bank with no input from unsecured creditors.[34] Indeed, under the Disclosure Statement and Plan, the Debtors would not have any apparent interest in pursuing Avoidance Actions at all, and the parties that would have such an interest—the Class 6 creditors—would be excluded from the process entirely.

Moreover, the Debtors propose that the cost-benefit analysis for any Avoidance Actions should be conducted by the *Debtors*, not by the Class 6 creditors that would stand to benefit and that will (presumably) bear the cost. And astonishingly, the Debtors suggest that they might choose not to pursue an otherwise viable Avoidance Action simply to preserve a "business relationship" with the potential defendant. In other words, the Debtors reserve the right to *prefer* potential *preference* defendants, to the detriment of all other unsecured creditors, which is the very reason the Bankruptcy Code makes preferences avoidable in the first place.[35]

Section 1123(b)(3)(B) of the Bankruptcy Code permits a Plan to provide for claims such as the Avoidance Actions to be retained and enforced by "a representative of the estate appointed for such purpose."[36] The Disclosure Statement provides no information, much less

---

[33] Disclosure Statement at 15.
[34] Plan at 16.
[35] *See, e.g.,* 5 Collier on Bankruptcy ¶ 547.01 (16th ed. rev. 2020) ("[T]he preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of its class may be required to disgorge the payment so that all may share equally.").
[36] 11 U.S.C. § 1123(b)(3)(B).

adequate information, regarding why the Debtors propose to retain and enforce such Avoidance Actions themselves under the circumstances, rather than appointing a representative with whom the Class 6 creditors have a voice. The Disclosure Statement further fails to provide any information regarding what would become of the Avoidance Actions in the event the Independent Manager decides to "effectuate the wind down and dissolution of SEC."[37]

In light of the foregoing, the Disclosure Statement fails in this respect to provide critical information such as "a description of the available assets and their value" and "the actual or projected realizable value from recovery of preferential or otherwise voidable transfers."[38] Therefore, the Disclosure Statement fails to provide adequate information and should not be approved.

### D.   The Disclosure Statement does not contain adequate information regarding the Plan's blatant violation of the absolute priority rule

"[T]he absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under a reorganization plan."[39] It is codified in Section 1129(b)(2) of the Bankruptcy Code, subsection (B) of which requires that, with respect to unsecured creditors, the Plan provide that "each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim,"[40] *or* that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . ."[41]

---

[37] Disclosure Statement at 28.
[38] *In re Puff*, 2011 Bankr. LEXIS 2445 at *9–10; 7 Collier on Bankruptcy ¶ 1125.02 (16th ed. rev. 2020).
[39] *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202, 108 S. Ct. 963, 966 (1988) (quotation marks and square brackets omitted).
[40] 11 U.S.C. § 1120(b)(2)(B)(i).
[41] 11 U.S.C. § 1120(b)(2)(B)(ii).

As discussed above, the Plan does *not* provide that the holders of Class 6 unsecured claims will receive value equal to the allowed amounts of Class 6 claims. Nevertheless, the Plan appears to propose that the Class 7 equity interests in the SEC Debtor will retain their interests regardless of whether unsecured creditors are paid in full, or at all.

Specifically, the Plan proposes that Class 7 equity interests in SEC "be placed in escrow and subject to an escrow agreement until all payments to Class 2 and 6 Creditors are completed in accordance with the Plan."[42] As discussed in detail above, the Plan does not actually provide for any concrete payments to Class 6 creditors, but merely *allows* for the *possibility* of distributions within the five-year "Repayment Term" *if* there are funds available from certain designated sources. Thus, under the Plan, it is entirely possible that "all payments to Class 2 and 6 Creditors" could be "completed in accordance with the Plan" even if the Class 6 creditors have not actually been paid *at all*, let alone in full. In any event, the Plan appears to propose that at that point, the Class 7 equity interests would be released from escrow, regardless of whether the unsecured claims have been satisfied.

Consistent with this, the Plan further provides that the Independent Manager(s) appointed under the Plan shall resign and "the management of the Debtors may be turned back to the Debtors, the Howard Trust, and Howard Sklar" upon the occurrence of three events, which include the payment of the *secured* creditor in full and the completion of "all distributions required during the Repayment Term,"[43] but there is *no* requirement for the payment in full of all *unsecured* claims. Again, the Plan appears to contemplate that "the Debtors, the Howard Trust, and Howard Sklar" will retain their Class 7 prepetition equity interests regardless of whether Class 6 unsecured claims are paid.

---

[42] Plan at 15; Disclosure Statement at 28.
[43] Plan at 17.

Moreover, the Disclosure Statement and Plan imply that Class 7 equity interest holders will fully retain their prepetition *economic* interests in the Debtors. In this regard, the Disclosure Statement asserts that Class 7 is impaired due to temporary "loss of control" and "loss of voting rights," with no mention of loss of economic interest.[44] As if to confirm this point, the Disclosure Statement says that "[n]o distributions or dividends will be paid to Howard Sklar *during the Plan term*,"[45] implying that distributions and dividends *will* be paid to Howard Sklar *after* the Plan term.

Notwithstanding this alleged temporary "loss of control"[46] on the part of Class 7 during the Plan term, the Plan still contemplates that "[t]he existing Interest Holders may have input in [the] continued operation of the Debtors" as conducted by the as-yet-unidentified "Independent Manager(s)."[47] The capitalized term "Interest Holders" is never defined in the Disclosure Statement or Plan, but it is only ever used to refer to the holders of prepetition equity interests in the Debtors.[48]

In short, the Plan proposes that the Class 7 holders of prepetition equity interests in the Debtors fully retain their interests subject only to a temporary five-year partial "time out" from formal governing authority, regardless of whether the Debtors' unsecured creditors are paid in full or at all. This clearly violates the absolute priority rule, which requires that the holders of Class 7 claims retain or receive **nothing** on account of their claims unless the holders of Class 5 and 6 claims are paid *in full.*[49] The Disclosure Statement fails to provide adequate information

---

[44] Disclosure Statement at 27–28.
[45] Disclosure Statement at 29 (emphasis added).
[46] Disclosure Statement at 27–28.
[47] Disclosure Statement at 28; Plan at 17.
[48] *See, e.g.,* Plan at 15 and Disclosure Statement at 27 ("Class 7 is impaired by the Plan, in that there is a loss of control for the Interest Holders"); Plan at 17 (in the event of liquidation, after all debt claims paid, "any residual funds will be distributed to Interest Holders").
[49] 11 U.S.C. § 1120(b)(2)(B).

regarding this blatant violation of the absolute priority rule and therefore should not be approved.

### E.   The Disclosure Statement does not contain adequate information regarding the failure to pay unsecured claims with interest

As discussed above, Section 1129(b)(2)(B)(i) of the Bankruptcy Code requires that holders of unsecured claims receive "property of a value, *as of the effective date of the plan*, equal to the allowed amount of such claim."[50] As the Supreme Court explained in *Till v. SCS Credit Corporation*:

> A debtor's promise of future payments is worth less than an immediate payment of the same total amount because the creditor cannot use the money right away, inflation may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment. The challenge for bankruptcy courts reviewing such repayment schemes, therefore, is to choose an interest rate sufficient to compensate the creditor for these concerns.[51]

Although *Till* was a Chapter 13 case, the Supreme Court specifically cited Section 1129(b)(2)(B)(i) for the proposition that the Bankruptcy Code requires "a court to discount a stream of deferred payments back to their present dollar value to ensure that a creditor receives at least the value of its claim."[52] Thus, "if the interest rate provided for in the plan is below a market rate of interest, a stream of principal payments equal to the allowed amount of the unsecured claim will not be 'fair and equitable.'"[53]

The Debtors' Plan does not propose to pay *any* interest, let alone a market rate of interest, on allowed Class 6 unsecured claims. Because the Disclosure Statement fails to provide adequate information regarding the Debtors' failure to pay Class 6 claims with interest, the Disclosure Statement should not be approved.

---

[50] 11 U.S.C. § 1120(b)(2)(B)(i) (emphasis added).
[51] *Till v. SCS Credit Corp.*, 541 U.S. 465, 474, 124 S. Ct. 1951, 1958 (2004).
[52] *Id.* n.10 (citing *Rake v. Wade*, 508 U.S. 464, 472 n.8, 113 S. Ct. 2187, 2191 (1993)) (internal citations, quotation marks, square brackets, and ellipses omitted).
[53] 7 Collier on Bankruptcy ¶ 1129.04[3][a] (16th ed. rev. 2020)

16

## II. *The Disclosure Statement should not be approved because it discusses a Plan that is facially unconfirmable as a matter of law*

A bankruptcy court may address confirmation issues at a hearing on the disclosure statement when the plan is so fatally and obviously flawed that it cannot be confirmed.[54] Further, if a plan of reorganization described in a disclosure statement is unconfirmable as a matter of law, the court is authorized to deny approval of the disclosure statement.[55] "Allowing a facially nonconfirmable plan to accompany a disclosure statement is both inadequate disclosure and a misrepresentation."[56]

Addressing these issues in conjunction with the Disclosure Statement hearing has the added benefit of conserving the valuable resources and time of this Court, the creditors and other parties in interest, and the Estate.

In order for a plan to be confirmable, (i) the proponent of the plan is required to have "disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor," (ii) the appointment of such individual to such office must be "consistent with the interests of creditors and equity security holders and with public policy," *and* (iii) the proponent of the plan is required to have "disclosed the identity of any insider that will be employed or retained by the reorganized debtor and the nature of any compensation for such insider."[57]

---

[54] *See, e.g., In re Bjolmes Realty Trust*, 134 B.R. 1000, 1002 (Bankr. D. Mass. 1991) ("It is permissible, moreover, for the court to pass upon confirmation issues where, as here, it is contended that the plan is so fatally and obviously flawed that confirmation is impossible.").

[55] *See, e.g., In re Monroe Well Serv., Inc.*, 80 B.R. 324, 332 (Bankr. E.D. Pa. 1987) (disapproval of disclosure statement appropriate where court is convinced that the plan could not possibly be confirmed). *See also In re Ginger Ella*, 148 B.R. 157 (Bankr. D.R.I. 1992); *In re Dakota Rail*, 104 B.R. 138, 143 (Bankr. D. Minn. 1989); *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986); *In re Kehn Ranches, Inc.*, 41 B.R. 832 (Bankr. D.S.D. 1984).

[56] *In re Dakota Rail*, 104 B.R. at 143.

[57] 11 U.S.C. §§ 1129(a)(5); 11 U.S.C. § 1129(b)(1).

The Disclosure Statement and Plan provide for the appointment of an Independent Manager for each Debtor, who will "manage the day-to-day affairs of the Debtors,"[58] maintain "control over all bank accounts and funds held and maintained by the Debtors,"[59] "[d]irect[] business decisions by the Debtors,"[60] and other functions typical of a director, officer, or voting trustee. Yet the Plan fails to disclose the identity or affiliations of any Independent Manager as required by Section 1129(a)(5)(A)(i) of the Bankruptcy Code. The Plan further fails to demonstrate that the appointment of such Independent Manager(s) is "consistent with the interests of creditors and equity security holders and with public policy" as required by Section 1129(a)(5)(A)(ii) of the Bankruptcy Code.

The Disclosure Statement further indicates that "[c]ertain insiders employed by the Debtors on a pre-petition basis may remain in place as part of SEC's management team" and would be "compensated in accordance with applicable market rates," but neither the Plan nor the Disclosure Statement discloses the *identity* of any such insiders or the actual compensation they would receive, as required by Section 1129(a)(5)(B) of the Bankruptcy Code.

The Plan violates Section 1129(a)(5) of the Bankruptcy Code and therefore cannot be confirmed as a matter of law. And for the same reason, the Disclosure Statement fails to provide adequate information about "the future management of the debtor,"[61] and therefore should not be approved.

Additionally, the lack of information discussed above, together with the proposed treatment of Class 7 equity claims at the expense of Class 6 unsecured creditors, raises serious

[58] Plan at 16; Disclosure Statement at 28.
[59] Plan at 16.
[60] Plan at 16.
[61] *In re Puff*, 2011 Bankr. LEXIS 2445 at *9–10; 7 Collier on Bankruptcy ¶ 1125.02 (16th ed. rev. 2020).

questions about whether the Plan has been proposed in good faith as required by Section 1129(1)(3) of the Bankruptcy Code.[62] If not, the Plan is also unconfirmable for that reason.

Eastern reserves the right to raise additional possible grounds at the hearing on this matter.

## Conclusion

In sum, the Disclosure Statement fails in numerous respects to provide clear, adequate information that would enable a hypothetical investor to make an informed judgment about the Plan, and therefore should not be approved. Moreover, the Plan as described in the Disclosure Statement does not comply with all provisions of the Bankruptcy Code and therefore is facially unconfirmable. In the event this Court does approve the Disclosure Statement, Eastern reserves all rights to object to confirmation of the Plan, including on grounds not raised in this Objection.

**WHEREFORE,** Eastern respectfully requests that this Court not approve this Disclosure Statement. Eastern further prays for general relief.

**THIS** the 27th day of January, 2021.

Respectfully submitted,

**EASTERN ENERGY SERVICES, INC.**

By: /s/ Christopher H. Meredith
   Christopher H. Meredith, MSB No. 103656
   Copeland, Cook, Taylor & Bush, P.A.
   600 Concourse, Suite 200
   1076 Highland Colony Parkway [Zip—39157]
   P.O. Box 6020
   Ridgeland, MS  39158-6020
   Phone: 601-856-7200
   Facsimile: 601-856-7626
   cmeredith@cctb.com
   *One of Its Attorneys*

---

[62] 11 U.S.C. § 1129(a)(3).

## CERTIFICATE OF SERVICE

The undersigned hereby certifies the following parties have this day received a true and correct copy of the above and foregoing via a Notice of Electronic Filing transmitted by CM/ECF in accordance with Local Bankruptcy Rule 5005-4(a):

| | |
|---|---|
| James B. Bailey | jbailey@bradley.com, ashaver@bradley.com,jbailey@ecf.courtdrive.com |
| Joseph Eric Bain | jbain@joneswalker.com, kvrana@joneswalker.com; joseph-bain-8368@ecf.pacerpro.com |
| Grant Matthew Beiner | gbeiner@munsch.com |
| Jordan B. Bird | jordan.bird@cookyancey.com |
| Daniel L. Bray | daniel.bray@huschblackwell.com, ann.stolfa@huschblackwell.com; LegalSupportTeam-Litigation-DEN@huschblackwell.com; daniel-bray-5348@ecf.pacerpro.com |
| Casey Carlton Breese | cbreese@wsmtlaw.com, lhayter@wsmtlaw.com |
| Duane Brescia | dbrescia@clarkhill.com, kalexander@clarkhill.com;djaenike@clarkhill.com |
| Jeffrey S. Brinen | jsb@kutnerlaw.com, vlm@kutnerlaw.com |
| Jeffery Dayne Carruth | jcarruth@wkpz.com |
| Brent R. Cohen | bcohen@lrrc.com, brent-cohen-8759@ecf.pacerpro.com,jeastin@lrrc.com; jennifer-eastin-5017@ecf.pacerpro.com |
| John Cornwell | jcornwell@munsch.com, hvalentine@munsch.com |
| Christopher M. Crowley | ccrowley@fncmlaw.com |
| Joseph D. DeGiorgio | josephde@bdfgroup.com |
| Shay L. Denning | sdenning@mbssllp.com |
| Jonathan Dickey | jonathan@kjblawoffice.com, sharon@kjblawoffice.com;Teresa@kjblawoffice.com |

| | |
|---|---|
| Katherine Guidry Douthitt | kdouthitt@bwor.com |
| Jenny M.F. Fujii | jmf@kutnerlaw.com, vlm@kutnerlaw.com |
| Craig M. Geno | cmgeno@cmgenolaw.com, kcarter@cmgenolaw.com; spurvis@cmgenolaw.com; cmgeno@ecf.courtdrive.com |
| Michael J. Guyerson | mike@kjblawoffice.com, celina@kjblawoffice.com;teresa@kjblawoffice.com |
| Jennifer Hardy | jhardy2@willkie.com, mao@willkie.com |
| Belinda Harrison | belindapittsharrison@gmail.com, belindapittsharrison@gmail.com |
| Theodore J. Hartl | hartlt@ballardspahr.com, blessingb@ballardspahr.com |
| Adam L. Hirsch | adam.hirsch@dgslaw.com, robin.anderson@dgslaw.com |
| Christopher D. Johnson | cjohnson@munsch.com, scurry@munsch.com |
| Lee M. Kutner | lmk@kutnerlaw.com, vlm@kutnerlaw.com |
| Stephen K. Lecholop, II | slecholop@rpsalaw.com, amartinez@rpsalaw.com |
| Eric Lockridge | eric.lockridge@keanmiller.com, Stephanie.gray@keanmiller.com |
| Armistead Mason Long | along@gamb.law |
| Ryan Lorenz | RLorenz@ClarkHill.com |
| David M. Miller | dmiller@spencerfane.com, nschacht@spencerfane.com |
| Timothy C. Mohan | tmohan@foley.com, tim.mohan4@gmail.com |
| Paul Moss | Paul.Moss@usdoj.gov |
| Kevin S. Neiman | kevin@ksnpc.com |
| Michael Niles | mniles@bergersingerman.com, efile@bergersingerman.com;efile@ecf.inforuptcy.com |

| | |
|---|---|
| Jennifer Norris Soto | jennifersoto@arklatexlaw.com, curtisshelton@arklatexlaw.com, |
| Matthew J. Ochs | mjochs@hollandhart.com, tldevlin@hollandhart.com |
| Matthew Okin | mokin@okinadams.com |
| John Thomas Oldham | joldham@okinadams.com, bmoore@okinadams.com |
| Robert L Paddock | rpaddock@buckkeenan.com, myers@buckkeenan.com |
| Robert Padjen | Robert.padjen@coag.gov |
| Jeremy L Retherford | jretherford@balch.com, kskelton@balch.com,skynerd@pruet.com |
| Brian Rich | brich@bergersingerman.com, efile@bergersingerman.com; efile@ecf.inforuptcy.com |
| Keri L. Riley | klr@kutnerlaw.com, vlm@kutnerlaw.com |
| Timothy Michael Riley | timothyr@hgslaw.com |
| Katherine A Ross | katherine.ross@usdoj.gov, USACO.ECFCivil@usdoj.gov; caseview.ecf@usdoj.gov; megan.ingebrigtsen@usdoj.gov |
| Michael D Rubenstein | mdrubenstein@liskow.com |
| Ryco Exploration, LLC. | rsmith.ryco@att.net |
| Craig K. Schuenemann | craig.schuenemann@bryancave.com, alicia.berry@bryancave.com 44Team_DEN@bryancave.com |
| Ryan Seidemann | seidemannr@ag.louisiana.gov |
| Andrew James Shaver | ashaver@bradley.com |
| Thomas H Shipps | tshipps@mbssllp.com |
| Barnet B Skelton, Jr | barnetbjr@msn.com |
| Jim F Spencer, Jr | jspencer@watkinseager.com, mryan@watkinseager.com |

| | |
|---|---|
| Bryce Suzuki | bryce.suzuki@bclplaw.com, tina.daniels@bclplaw.com |
| Timothy M. Swanson | tim.swanson@moyewhite.com, audra.albright@moyewhite.com; hope.stone@moyewhite.com |
| David R Taggart | dtaggart@bradleyfirm.com, kburnley@bradleyfirm.com, nmobley@bradleyfirm.com |
| Glenn Taylor | gtaylor@cctb.com |
| Madison M. Tucker | mtucker@joneswalker.com, madison-tucker-7703@ecf.pacerpro.com |
| US Trustee | USTPRegion19.DV.ECF@usdoj.gov |
| Amy Vazquez | avazquez@joneswalker.com |
| Tyler Lee Weidlich | tweidlich@bwenergylaw.com, efile@bwenergylaw.com |
| Deanna L. Westfall | deanna.westfall@coag.gov, bncmail@w-legal.com |

**THIS** the 27th day of January, 2021.

/s/ Christopher H. Meredith
Of Counsel