# MARTIN PROSPECT

## MARTIN FIELD

## RED RIVER PARISH, LOUISIANA

Operator:     Sklar Exploration Company L.L.C.

Non-Operators:     Sklarco L.L.C.
Mike Rogers Drilling Co., Inc.
Hilliard Acquisition II L.L.C.
Flournoy Family Properties Ltd.
HughesOil, Inc.

Documents:

Participation Agreement

Assignment of Contract Rights

Exhibit A - Plat ("Contract Area")

Exhibit A-1 - Description of Leases

Exhibit B - Prospect Purchase Agreement

Exhibit C - Authority for Expenditure ("AFE ")

Exhibit D - Joint Operating Agreement ("JOA") with attached exhibits:

    Exhibit A - Interests of the Parties

    Exhibit A - 1 - Description of Leases

    Exhibit A-2   - Plat ("Contract Area")

    Exhibit B - Oil, Gas and Mineral Lease

    Exhibit C - Accounting Procedure Joint Operations

    Exhibit D - Insurance

    Exhibit E - Gas Balancing Statement

Exhibit E - Model Turnkey Drilling Contract

# PARTICIPATION AGREEMENT

**Martin Prospect**
**Sections 1, 2, 10 and 11, Township 13 North, Range 9 West**
**Red River Parish, Louisiana**

**THIS PARTICIPATION AGREEMENT** (the "Agreement"), dated effective as of the 1st day of April, 2002, is entered into by and between the following (sometimes herein referred to singularly as a "Party" or collectively as the "Parties"):

**SKLAR EXPLORATION COMPANY L.L.C.,** a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its Chief Operating Officer, David A. Barlow ("SEC"); and

**SKLARCO L.L.C.,** a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its Chief Operating Officer, David A. Barlow ("Sklarco");

**MIKE ROGERS DRILLING CO., INC.,** an Arkansas corporation, whose address is 100 North Street, Suite 18, Magnolia, Arkansas 71753, represented herein by its President, Mike Rogers ("Rogers");

**HILLIARD ACQUISITIONS II L.L.C.,** a Louisiana limited liability company, whose address is Louisiana Tower, Suite 2000, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its Member/Manager, E. L. Hilliard, III ("Hilliard");

**FLOURNOY FAMILY PROPERTIES LTD.,** a Texas limited partnership, whose address is Post Office Box 1578, Alice, Texas 78333-0491, represented herein by its General Partner, Lucien Flournoy ("Flournoy");

(hereinafter Sklarco, Rogers, Hilliard and Flournoy are sometimes referred to collectively as the "Participants" or individually as a "Participant");

## WITNESSETH:

**WHEREAS,** SEC has obtained rights to an oil and gas prospect covering Sections 1, 2, 10 and 11, Township 13 North, Range 9 West, Red River Parish, Louisiana (the "Contract Area"), which area is outlined in red on the plat attached hereto as Exhibit "A," known as the Martin Prospect (the "Prospect"); and

**WHEREAS,** Participants desire to acquire an undivided working interest in SEC's leases covering the Prospect, and participate in the drilling of an exploratory well to test the Prospect known as the Sklar Exploration Company L.L.C. - HOSS RA SUO; International Paper Co. #1 Well (the "Initial Well"); and

**WHEREAS**, the Parties desire to enter this Agreement to set forth the terms and conditions under which they sell or acquire, as the case may be, those undivided working interests and drill the Initial Well.

**NOW, THEREFORE**, the Parties agree as follows:

## Article I.  Purchase And Sale And Development Commitments

### Section 1.1.  Leases

Participants agree to tender unto SEC, concurrent with their execution of this Agreement, in the following proportions, their share of $235,000.00, being the sum of the costs to acquire the oil, gas and mineral leases (the "Leases") described on Exhibit "A-1," and geological and geophysical costs (collectively, the "Prospect Fee"):

| Participant | Proportion | Amount |
|---|---|---|
| Sklarco | 70.0% | $164,500 |
| Rogers | 10.0% | $ 23,500 |
| Hilliard | 10.0% | $ 23,500 |
| Flournoy | 10.0% | $ 23,500 |
| Total | 100% | $235,000 |

For and in consideration of the Prospect Fee, the receipt of which is hereby acknowledged, and in further consideration of Participants' obligation to participate in the Initial Well pursuant to Section 1.2 of this Agreement, and in further consideration of, and subject to, the reversionary back-in working interest described in Section 1.3, SEC hereby sells and agrees to assign to Participants all of its right, title and interest in and to the Leases in the following proportions:

| Participant | Proportion |
|---|---|
| Sklarco | 70.0% |
| Rogers | 10.0% |
| Hilliard | 10.0% |
| Flournoy | 10.0% |
| Total | 100% |

This assignment of interest shall be (i) proportionately reduced to the interest owned by SEC, (ii) made without warranty of title, express or implied, not even for return of the Prospect Fee, except SEC agrees to warrant title against all defects arising out of claims by SEC or of persons claiming by, through and under SEC, (iii) subject to all burdens of record and (iv) subject to the following unrecorded agreements, namely, the JOA described in Section 2.1 below, that certain Prospect Purchase Agreement dated effective as of July 1, 2000, by and between Integrated Exploration Corporation ("Integrated") and SEC, a copy of which is attached hereto as Exhibit "B," and that certain Assignment of Overriding Royalty Interest dated effective as of April 1, 2002, executed by SEC in favor of Integrated Exploration Corporation pursuant to that Prospect Purchase Agreement.

**Section 1.2.  Initial Well**

**Subsection 1.2(a).  Drilling Of The Initial Well**

On or before May 10, 2002, SEC shall commence or cause to be commenced operations for the drilling of the Initial Well at a legal location in the Southeast Quarter of the Southeast Quarter (SE 1/4 of SE 1/4) of Section 2, Township 13 North, Range 9 West, Red River Parish, Louisiana, or as near thereto as practicable, and thereafter continue the drilling of the Initial Well with due diligence to a measured depth of 7,500' in a vertical bore hole, or a depth sufficient, in SEC's sole discretion, to test the Upper Hosston Sands, whichever is deeper (the "Objective Depth").  As further consideration for the sale described in Section 1.1 above, Participants, simultaneously with their execution of this Agreement, must execute the Authority For Expenditure ("AFE") attached hereto as Exhibit "C."  Concurrent with their execution of this Agreement, all Participants except for Rogers must tender to SEC the following sums as advances, representing their share of the amount estimated in the AFE to drill the Initial Well to the Objective Depth, excluding estimated completion costs, but including the amount estimated to plug and abandon the Initial Well in the event it is not completed as a producing well, to-wit:

| Participant | Share | Amount |
|---|---|---|
| Sklarco | 70.0% | $273,980 |
| Rogers | 10.0% | n/a |
| Hilliard | 10.0% | $ 39,140 |
| Flournoy | 10.0% | $ 39,140 |
| *Total* | 100% | $391,400 |

Notwithstanding the estimates contained in the AFE, the Participants are responsible for and must pay SEC their share of all actual costs to drill the Initial Well to the Objective Depth in the following manner: (i) All Participants, except for Rogers, must tender to SEC within 15 days of receipt of (an) invoice(s) from SEC, the difference, if any, between the aforesaid advance and their share of the actual costs to drill the Initial Well to the Objective Depth; and (ii) Rogers must tender SEC, concurrent with SEC's payment to Rogers of the Turnkey Amount under Exhibit "E," Roger's share of the actual costs to drill the Initial Well to the Objective Depth, excluding estimated completion costs, but including the amount estimated to plug and abandon the Initial Well in the event it is not completed as a producing well.  Rogers further agrees to pay, within 15 days of receipt of an invoice from SEC, its share of any actual costs to drill the Initial Well to the Objective Depth that are not known, billed or otherwise processed at the time the Turnkey Amount is paid to Rogers.  Nothing herein shall limit the authority of the Operator under the JOA to require the Non-Operators thereunder to advance costs pursuant to Article XV.E of the JOA.  Anything contained in this Agreement or the JOA to the contrary notwithstanding, if any Participant fails to pay its share of the actual costs to drill the Initial Well to the Objective Depth in the manner and within the time deadlines set forth above, then, in that event, and only in that event, that Party hereby agrees to relinquish all of its right, title and interest in the Prospect and to execute those instruments provided by SEC necessary to convey said interest to SEC for no consideration, not even for return of the Prospect Fee or drilling advance.  This forfeiture of interest shall be without prejudice and in addition to the rights of the Operator to offset and recover all sums owed by a Party that fails to pay its share of actual costs to drill the Initial Well to the Objective Depth.

**Subsection 1.2(b).  Operations After Reaching The Objective Depth**

After the Initial Well has been drilled to the Objective Depth, SEC shall make a copy of any logs, core analysis, drill-stem test analysis or results of any other tests available to a representative of the Participants at the wellsite, or if none is present, by facsimile or overnight delivery.  SEC shall also furnish Participants in a like manner with its recommendation whether to attempt to set production casing and complete the well, conduct further tests or operations or plug and abandon the well.  If the recommendation is to plug and abandon the Initial Well, then the Participants must either elect to participate and pay their share of the costs of plugging and abandoning the well, or elect to take the well over at their sole cost, risk and expense.  If SEC's recommendation is to attempt to set production casing and complete the well, Participants must elect either to participate in the recommendation or not to participate.  In any event, a Participant must return its fully executed election ballot to SEC within 24 hours of the Participant's receipt of SEC's recommendation.  Failure to respond within this time period shall be deemed an election to participate in SEC's recommended operation.  An election not to participate in an attempt to set production casing and complete the Initial Well shall result in a forfeiture of interest pursuant to Article XV.C of the JOA.

**Section 1.3.  Reversionary Back-In Working Interest**

As further consideration for the sale described in Section 1.1 above, upon reaching Prospect Payout (as defined below), an undivided twenty-five percent (25%) of each Participant's undivided working interest (except for Sklarco), shall automatically and permanently revert to and vest in Sklarco.  At Sklarco's request, each Participant will assign said interest unto Sklarco after Project Payout, including, without limitation, a like interest in the Leases, the proceeds from the sale of oil, gas, and all other products produced or derived from any and all wells drilled within the Prospect, and in any easements, rights of way, personal property, equipment, facilities and pipelines associated with such wells.

Prospect Payout is defined on a Prospect (not well-by-well) basis as the first day of the calendar month following the month in which a Participant's share of the total and cumulative revenue resulting from or relating to the Prospect, equals that Participant's share of the total and cumulative cost incurred within that Prospect. For purposes of Prospect Payout, (i) the total and cumulative revenue shall consist of a Participant's share of all sales proceeds for all oil, gas and other hydrocarbons and minerals saved and sold from the applicable Prospect and any other income, bonus payment or other revenue attributable to that Participant's interest therein, and (ii) the total and cumulative cost incurred shall include the Participant's share of all royalty and overriding royalty payments, severance, ad valorem, production and other taxes applicable to production and not measured by the Participant's other income, all lease acquisition and maintenance costs, all seismic survey and data costs, geological and geophysical evaluation costs, all costs for site preparation, drilling, reworking, deepening, sidetracking, logging, stimulation, testing, equipping, operating, plugging and abandoning the Initial Well and all other wells within the Prospect, and the cost of all surface damages, pipelines, gathering and other production handling facilities related thereto.

**Article II.  Operations**

**Section 2.1.  JOA**

SEC is hereby designated Operator.  Except as otherwise provided in this Agreement, all operations within the Contract Area shall be governed by the joint operating agreement (the "JOA"), dated April 1, 2002, by and between SEC, as Operator, and the Participants, as Non-Operators, covering the Contract Area,

attached hereto as Exhibit "D." The Parties agree to execute the JOA concurrent with their execution of this Agreement. In the event of a conflict between this Agreement and the JOA, this Agreement shall govern and control.

### Section 2.2.  Drilling Contract

SEC and Rogers agree to execute, concurrent with the Parties' execution of this Agreement, the IADC Model Turnkey Contract attached hereto as Exhibit "E" under which Rogers, as an independent contractor, shall drill the Initial Well to the Objective Depth on a "turnkey basis," as set forth in more detail therein.

## Article III.  Miscellaneous

### Section 3.1.  AMI

The Parties agree to form an area of mutual interest (the "AMI") pursuant to Article XV.M of the JOA.

### Section 3.2.  Information

Upon execution of this Agreement by all of the Parties, any Participate may request and shall be entitled to a copy of all of the Leases and of the drill-site title opinion for the drill-site tract of the Initial Well.

### Section 3.3.  Recordable Assignment

If the Initial Well is drilled to the Objective Depth and completed, then any Participant that elected to participate in that completion and paid SEC its share of all actual expenses to drill and complete the well, may request and shall be entitled to a recordable assignment of its interest in the Leases, subject to the provisions of Section 1.1 above.

### Section 3.4.  Confidentiality

The Parties agree to keep confidential and not disclose any information about this Prospect, not already disclosed or of public record, to third parties for so long as this Agreement is in effect.

### Section 3.5.  Closing

Closing shall occur on April 15, 2002, at the offices of SEC, Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, or, for those parties that cannot attend, by overnight delivery.

### Section 3.6.  Binding On Successors And Assigns

Subject to the conditions set forth above, this Agreement shall enure to the benefit of and be binding upon the Parties hereto and their respective successors and assigns.

-5-

### Section 3.7.  Entire Agreement

This Agreement and its attachments constitute the entire agreement of the Parties with respect to the subject matter hereof, and any other promises, inducements, representations, warranties or agreements with respect to the subject matter hereof have been superseded hereby and are not intended to survive this Agreement.  Except as otherwise expressly provided herein, no amendment or modification of this Agreement shall be effective unless set forth in writing and signed by a duly authorized officer of each of the Parties.

### Section 3.8.  Severability

The invalidity of any one or more of the provisions of this Agreement does not affect the remaining portions of this Agreement, and in case of any such invalidity, this Agreement should be construed as if the invalid provision(s) had not been inserted.

### Section 3.9.  Notices

All notices between the Parties authorized or required by any of the provisions of this Agreement, unless otherwise expressly provided, shall be given in writing by facsimile followed by regular mail, addressed to those of the Parties to whom the notice is given at the fax telephone numbers and addresses set forth in Exhibit "A" to the JOA.  Any of the Parties may change its designated fax telephone number and address at any time, and from time to time, by giving written notice thereof to the other Parties.

### Section 3.10.  Headings for Convenience

The article, section and subsection headings used in this Agreement are inserted for convenience only and shall not be regarded in construing this Agreement.

### Section 3.11.  Time

Time is of the essence hereunder.

### Section 3.12.  Governing Law

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Louisiana.

### Section 3.13.  Relationship Of The Parties

Liability of the Parties hereto shall be several and not joint or collective.  Each Party shall be responsible only for its obligations as herein set out.  It is not the intention of the Parties to create, nor shall this Agreement be construed as creating, a mining or other partnership, joint venture or association between the Parties.

### Section 3.14.  Assignability

SEC shall not bear any obligation to perform its obligations under this Agreement or as Operator under the JOA to a multiplicity of parties succeeding to the interest of a Participant.  Therefore, should

a Participant assign or otherwise transfer all or part of its interest in the Prospect, SEC may require that each such assignor or transferor designate a single individual or party to receive all notices and make all elections for the full interest originally held by the Participant. Further, SEC may hold the Participant responsible for all costs and liabilities associated with the interest that is assigned, should the assignee fail or refuse to pay such costs and liabilities. Subject to the foregoing, the Parties to this Agreement may assign all or part of their rights and obligations hereunder.

THUS DONE AND SIGNED This __ day of April, 2002, but effective as of the date first above written.

SKLAR EXPLORATION COMPANY L.L.C.

By _____
David A. Barlow
Chief Operating Officer

SKLARCO L.L.C.

By _____
David A. Barlow
Chief Operating Officer

MIKE ROGERS DRILLING CO., INC.

By _____
Mike Rogers
President

HILLIARD ACQUISITIONS II L.L.C.

By _____
E. L. Hilliard, III
Member/Manager

FLOURNOY FAMILY PROPERTIES LTD.

By:_____
Lucien Flournoy
General Manager

-7-

a Participant assign or otherwise transfer all or part of its interest in the Prospect, SEC may require that each such assignor or transferor designate a single individual or party to receive all notices and make all elections for the full interest originally held by the Participant.  Further, SEC may hold the Participant responsible for all costs and liabilities associated with the interest that is assigned, should the assignee fail or refuse to pay such costs and liabilities.  Subject to the foregoing, the Parties to this Agreement may assign all or part of their rights and obligations hereunder.

THUS DONE AND SIGNED This __ day of April, 2002, but effective as of the date first above written.

SKLAR EXPLORATION COMPANY L.L.C.


By_____
       David A. Barlow
       Chief Operating Officer

SKLARCO L.L.C.


By_____
       David A. Barlow
       Chief Operating Officer

MIKE ROGERS DRILLING CO., INC.


By_____
       Mike Rogers
       President

HILLIARD ACQUISITIONS II L.L.C.


By_____
       E. L. Hilliard, III
       Member/Manager

FLOURNOY FAMILY PROPERTIES LTD.


By:_____
       Lucien Flournoy
       General Manager

a Participant assign or otherwise transfer all or part of its interest in the Prospect, SEC may require that each such assignor or transferor designate a single individual or party to receive all notices and make all elections for the full interest originally held by the Participant.  Further, SEC may hold the Participant responsible for all costs and liabilities associated with the interest that is assigned, should the assignee fail or refuse to pay such costs and liabilities.  Subject to the foregoing, the Parties to this Agreement may assign all or part of their rights and obligations hereunder.

THUS DONE AND SIGNED This __ day of April, 2002, but effective as of the date first above written.

SKLAR EXPLORATION COMPANY L.L.C.

By_____
     David A. Barlow
     Chief Operating Officer

SKLARCO L.L.C.

By_____
     David A. Barlow
     Chief Operating Officer

MIKE ROGERS DRILLING CO., INC.

By_____
     Mike Rogers
     President

HILLIARD ACQUISITIONS II L.L.C.

By_____
     E. L. Hilliard, III
     Member/Manager

FLOURNOY FAMILY PROPERTIES LTD.

By:_____
     Lucien Flournoy
     General Manager

Attachments

| | |
|---|---|
| Exhibit "A": | Plat |
| Exhibit "A-1": | Description of Leases |
| Exhibit "B": | Integrated Prospect Purchase Agreement |
| Exhibit "C": | AFE |
| Exhibit "D": | JOA |
| Exhibit "E": | Drilling Contract |

## ASSIGNMENT OF CONTRACT RIGHTS

STATE OF LOUISIANA,

PARISH OF RED RIVER.

KNOW ALL MEN BY THESE PRESENTS That:

SKLARCO L.L.C., a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101 (hereinafter, "Assignor");

does hereby grant, bargain, sell, transfer, assign, convey and deliver unto:

HughesOil, Inc.
~~HUGHES SOUTH CORPORATION,~~ a Mississippi Corporation, whose address is 2829 Lakeland Drive, Suite 1101, Jackson, Mississippi 39232 (hereinafter, "Participant");

an undivided 5% interest in, to and under that certain unrecorded Participation Agreement dated effective as of April 1, 2002, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., Mike Rogers Drilling Co., Inc., Hilliard Acquisitions II, L.L.C., and Flournoy Family Properties Ltd., including without limitation, that certain Joint Operating Agreement attached thereto as Exhibit "D," dated April 1, 2002, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., Mike Rogers Drilling Co., Inc., Hilliard Acquisitions II, L.L.C., and Flournoy Family Properties Ltd., as Non-Operators, covering a Contract Area defined as Sections 1, 2, 10 and 11, Township 13 North, Range 9 West, Red River Parish, Louisiana, and all other exhibits to that Participation Agreement and Joint Operating Agreement.

This Assignment is made for and in consideration of Participant's agreement to participate for his 5% share in drilling the Initial Well (Sklar Exploration Company L.L.C. - HOSS RA SUO; International Paper Co. #1 Well) to the Objective Depth as set forth in the Participation Agreement and payment by Participant of the sum of Thirty-One Thousand Three Hundred Twenty and No/100 Dollars ($31,320.00), representing (i) Participant's 5% share of the Prospect Fee described in Section 1.1 of the Participation Agreement; and (ii) Participant's 5% share of the costs estimated in the AFE attached as Exhibit "C" to the Participation Agreement to drill the Initial Well to the Objective Depth. The Prospect Fee is a non-refundable cost, while the share of estimated costs is an advance pursuant to Section 1.2(a) of the Participation Agreement.

As further consideration, upon reaching Prospect Payout, as defined in Section 1.3 of the Participation Agreement, an undivided twenty-five percent (25%) of Participant's undivided 5% working interest, or an undivided 1.25%, shall automatically and permanently revert to and vest in Assignor. At Assignor's request, Participant will assign said interest unto Sklarco after Project Payout, including, without limitation, a like interest in all leases, the proceeds from the sale of oil, gas, and all other products produced or derived from any and all wells drilled within the Contract Area, and in any easements, rights of way, personal property, equipment, facilities and pipelines associated with such wells.

This Assignment is made subject to the terms of the Participation Agreement and Joint Operating Agreement, to which, by his signature below, the Participant subscribes. Participant also agrees to execute, concurrent herewith, the AFE for the Initial Well. It is the intent of this Assignment to convey unto the Participant a non-operating undivided 5% working interest under the aforesaid agreements and the leases covered thereby and the Initial Well described therein, together with all of the rights and obligations attributable to such an interest under those agreements.

This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, this Assignment of Contract Rights is executed and delivered on the dates set forth in the acknowledgments below, but is effective as of April 1, 2002.

ASSIGNOR:

SKLARCO L.L.C.

By: _David A. Barlow_
David A. Barlow
Chief Operating Officer

PARTICIPANT:

HughesOil, Inc.
~~HUGHES SOUTH CORPORATION~~

By: _Dudley J. Hughes_
Dudley J. Hughes
President

## ACKNOWLEDGEMENTS

STATE OF LOUISIANA     §

PARISH OF CADDO     §

On this ___ day of May, 2002, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer of Sklarco L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

             Notary Public in and for the State
             of Louisiana

             Comm. Expires: _LIFE_____

STATE OF MISSISSIPPI     §
COUNTY OF ~~HINDS~~ Rankin     §

         WILLIAM T. GATES, NOTARY PUBLIC
         STATE OF LOUISIANA
         MY COMMISSION IS FOR LIFE

On this 7th day of May, 2002, before me appeared Dudley J. Hughes, to me known, who being by me duly sworn, did say that he is the President of ~~Hughes South Corporation~~ Mississippi, Inc., a Mississippi corporation, and that the foregoing instrument was signed by him on behalf of said corporation, and said Appearer acknowledged said instrument to be the free act and deed of said corporation.

             Notary Public in and for the State
             of Mississippi

             Comm. Expires: _July 28, 2005_

Exhibit "A"

This Exhibit "A" is attached to and made a part of that certain Participation Agreement dated effective April 1, 2002, by and between Sklar Exploration Company, L.L.C. and Sklarco, L.L.C., et al.



**Martin Prospect**
**Red River Parish, Louisiana**

EXHIBIT "A-1" TO PARTICIPATION AGREEMENT
MARTIN PROSPECT
RED RIVER PARISH, LA

| LESSOR | LESSEE | LEASE DATE | EXP. DATE | GR. AC. | NET ACRES | ROY. | ORRI | DESCRIPTION | REG. # | VOL. | PAGE | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ivy Clayton Dupree, ux | Sklar Expl. Co., LLC | 4/24/00 | 4/24/03 | 120.00 | 40.00 | 3/16 | 3% | Sec. 2: NE NW, SW, NE; W/2 SE NE; W/2 NW NE | 196280 | 284 | 215 | |
| Helen Deltoache Living Trust | Sklar Expl. Co., LLC | 4/24/00 | 4/24/03 | 120.00 | 40.00 | 3/16 | 3% | Sec. 2: NE NW, SW, NE; W/2 SE NE; W/2 NW NE | 196279 | 284 | 213 | |
| Hubert Lane Joyner, etal | Sklar Expl. Co., LLC | 4/24/00 | 4/24/03 | 120.00 | 40.00 | 3/16 | 3% | Sec. 2: NE NW, SW, NE; W/2 SE NE; W/2 NW NE | 196278 | 284 | 211 | |
| International Paper Co., etal | Sklar Expl. Co., LLC | 4/28/00 | 4/28/02 | 560.00 | 560.00 | 1/4 | 3% | Sec. 2: NW NW; S/2 NW; S/2 | 196277 | 284 | 208 | |
| Creswod Land Mng't, L.P. | Sklar Expl. Co., LLC | 5/23/01 | 5/23/04 | 120.00 | 120.00 | 3/16 | 3% | Sec. 2: SW NE, SE SW, NW SE; Sec. 11: NE NE, E/2 NW NE; E/2 SE NE | 195820 | 283 | 491 | |
| Edgar Cason, ux | Sklar Expl. Co., LLC | 5/29/01 | 5/29/04 | 10.00 | 10.00 | 3/16 | 3% | Sec. 11: 40 ac. in W/2 NW/4 | 195818 | 283 | 485 | |
| Catherine Stephens Harrell | Sklar Expl. Co., LLC | 6/1/01 | 6/1/04 | 10.00 | 10.00 | 1/6 | 3% | Sec. 11: SE/4 SE/4 SE/4 | 195819 | 283 | 488 | |
| Jo C. Lawson | Sklar Expl. Co., LLC | 10/24/01 | 10/24/04 | 160.00 | 160.00 | 3/16 | 3% | Sec. 11: W/2 SW & Sec. 10: E/2 SE | 196400 | 284 | 381 | |
| William J. Colbert, Jr. | Sklar Expl. Co., LLC | 11/1/01 | 11/1/03 | 120.00 | 22.50 | 1/4 | 3% | Sec. 11: N/2 NE4 & SE/4 NE/4 | 196643 | 284 | 834 | |
| Elizabeth C. Flournoy | Sklar Expl. Co., LLC | 11/1/01 | 11/1/03 | 120.00 | 22.50 | 1/4 | 3% | Sec. 11: N/2 NE4 & SE/4 NE/4 | 196646 | 284 | 846 | |
| Reagor Family LLC | Sklar Expl. Co., LLC | 11/1/01 | 11/1/03 | 120.00 | 22.50 | 1/4 | 3% | Sec. 11: N/2 NE4 & SE/4 NE/4 | 196645 | 284 | 842 | |
| Joanna Hunter Beaird Carson | Sklar Expl. Co., LLC | 11/1/01 | 11/1/03 | 120.00 | 30.00 | 1/4 | 3% | Sec. 11: N2 NE4 & SE/4 NE/4 | 196644 | 284 | 838 | |
| Harley R. Colbert, Sr., | Sklar Expl. Co., LLC | 11/1/01 | 11/1/03 | 120.00 | 22.50 | 1/4 | 3% | Sec. 11: N2 NE4 & SE/4 NE/4 | 196538 | 284 | 648 | |
| James M. Moore | Sklar Expl. Co., LLC | 11/1/01 | 11/1/03 | 120.00 | 42.00 | 3/16 | 3% | Sec. 11: N/2 NE4 & SE/4 NE/4 | 195536 | 284 | 642 | |
| Marshall Moore, ux | Sklar Expl. Co., LLC | 11/16/01 | 11/16/04 | 104.00 | 10.00 | 3/16 | 3% | Sec. 11: E/2 NE less North 15 ac.; Sec. 10: 39.0 ac. in W/2 NW/4 | 195537 | 284 | 645 | |
| Sidney Moore, ux | Sklar Expl. Co., LLC | 11/16/01 | 11/16/04 | 105.00 | 53.00 | 3/16 | 3% | Sec. 11: E/2 NE less North 15 ac.; Sec. 10: 39.0 ac. in W/2 NW/4; Sec. 10 & 11: 1.0 ac. tract in NW/4 of Sec. 10 & NE/4 of Sec. 11 | 195535 | 284 | 639 | |
| The Connell Living Trust | Sklar Expl. Co., LLC | 2/28/01 | 2/28/03 | 40.00 | 13.33 | 3/16 | 3% | Sec. 11: NE/4 of SE/4 | | | | |
| Barbara Koetter | Sklar Expl. Co., LLC | 2/28/01 | 2/28/03 | 40.00 | 4.44 | 3/16 | 3% | Sec. 11: NE/4 of SE/4 | | | | |
| Harriet K. Bridges | Sklar Expl. Co., LLC | 2/28/01 | 2/28/03 | 40.00 | 4.44 | 3/16 | 3% | Sec. 11: NE/4 of SE/4 | | | | |
| Elizabeth K. Allison | Sklar Expl. Co., LLC | 2/28/01 | 2/28/03 | 40.00 | 4.44 | 3/16 | 3% | Sec. 11: NE/4 of SE/4 | | | | |
| Theodore G. Mullens | Sklar Expl. Co., LLC | 2/28/01 | 2/28/03 | 40.00 | 4.44 | 3/16 | 3% | Sec. 11: NE/4 of SE/4 | | | | |
| Gamette Sue Long | Sklar Expl. Co., LLC | 2/28/01 | 2/28/03 | 40.00 | 0.00 | 3/16 | 3% | Sec. 11: NE/4 of SE/4 | | | | |
| Sheila Mullens Riffe | Sklar Expl. Co., LLC | 2/28/01 | 2/28/03 | 40.00 | 6.67 | 3/16 | 3% | Sec. 11: NE/4 of SE/4 | | | | |
| Marathon Oil Company (Farmor) | Sklar Expl. Co., LLC (Farmee) | 2/11/02 | 2/11/04 | 180.00 | 6.67 | 3/16 | 3% | Unrecorded Farmout Letter Agreement dated 2/11/02 and agreed to and accepted 2/21/02 covering: Sec. 11: E/2 NW/4, NE/4 SW/4, SW/4 SE/4, W/2 SE/4 SE/4 | | | | |
| **TOTALS** | | | | | 1245.00 | | | | | | | |

# PROSPECT PURCHASE AGREEMENT
## MARTIN PROSPECT

This Agreement, including the exhibits attached hereto, (collectively, the "Agreement") is made and entered into by and between SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company (hereinafter called "SEC"), with offices at 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101, and INTEGRATED EXPLORATION CORPORATION, a Louisiana corporation (hereinafter called "IEC"), with offices at 407 Beck Building, 400 Travis Street, Shreveport, Louisiana 71101 (SEC and IEC are sometimes collectively referred to herein as the "Parties" or individually as a "Party").

WITNESSETH:

WHEREAS, IEC has developed a prospect believed to be productive of oil, gas, or both, commonly referred to as the Martin Prospect defined as all lands located within the boundaries outlined in red on the plat attached hereto as Exhibit "A" and by reference made a part hereof (the "Prospect Area"); and

WHEREAS, IEC has developed the prospect by means of acquiring, evaluating and developing geological, geochemical, geophysical, and seismic data and related intellectual property, knowledge and information, (said information, including any analyses, compilations, maps, studies, records and other documentation, generated or acquired by IEC, its agents, employees or representatives, are hereinafter collectively referred to as the "Data"); and

WHEREAS, IEC desires to provide such Data, and SEC desires to purchase the same, along with any other rights IEC may have or claim in regard to said Data, and any mineral and/or leasehold rights within the Prospect Area previously acquired by IEC, its agents, employees, or representatives (such Data and rights collectively referred to hereinafter as the "Prospect");

NOW, THEREFORE, in consideration of the purchase price, the receipt and sufficiency of which IEC does hereby acknowledge, and the other terms set forth herein, the Parties agree as follows:

1. IEC hereby sells to SEC, and SEC hereby purchases from IEC, all of IEC's right, title and interest in the Prospect.

2. Upon execution hereof, or within a reasonable time thereafter, IEC shall deliver to SEC complete copies of the Data insofar as legally permissible. Any Data which IEC cannot transfer ownership or deliver possession of to SEC due to a licensing agreement or other restriction on transfer is hereinafter referred to as the "Restricted Data". SEC understands that IEC makes no representation or warranty as to the accuracy and completeness of the Data or its sufficiency or fitness for a particular purpose.

3. In the event title to any mineral or leasehold rights covering any of the Prospect Area is presently held by IEC, its agents, employees, or representatives, assignments of same shall be promptly made in recordable form to SEC.

4. The purchase price paid to IEC by SEC for the Prospect is Fifty Thousand and No/100 Dollars ($50,000.00). IEC acknowledges that SEC has prepaid a portion of the purchase price and that it is in receipt of the same, being Eleven Thousand Six Hundred Sixty-Six and 67/100 Dollars ($11,666.67). Concurrent with the Parties' execution of this Agreement, SEC has tendered unto IEC, and IEC acknowledges receipt of, the balance, being Thirty-Eight Thousand Three Hundred Thirty-Three and 33/100 Dollars ($38,333.33).

5. As additional consideration, SEC has reimbursed IEC, and IEC acknowledges receipt of all of IEC's out of pocket geophysical data and other expenses associated with the Prospect through the date hereof.

6.    SEC agrees to convey unto IEC, as further consideration, the following interests:

(a)    a three percent (3%) overriding royalty interest on all leases and/or farm-ins, either acquired or entered into by SEC, its agents, employees, or representatives within the Prospect Area, proportionately reduced to the applicable leasehold interest acquired by SEC; and

(b)    one-half (½) of any carried interest, back-in interest, net profits interest or other promoted interest or monies acquired by SEC in selling an undivided working interest in the Prospect Area to a third party, on the same terms enjoyed by SEC and proportionately reduced to the working interest on which such promote is paid.

Any Area of Mutual Interest subsequently formed affecting the Prospect Area shall reflect the burden of IEC's overriding royalty interest within and only within the Prospect Area as defined herein.

7.    SEC shall have no obligation to drill or cause to be drilled any well(s) or to market or sell any undivided working interest in the Prospect(on a promoted, unpromoted or other basis) to third parties. Should SEC, in its sole discretion, drill or caused to be drilled a well(s), all decisions relating to such well(s) as between the Parties hereto, shall be in SEC's sole discretion, including the choice of operator and well locations, provided, however, that IEC shall confer with SEC regarding its ideas, opinions and interpretations relating to such decisions. Likewise, should SEC, in its sole discretion, market or sell undivided working interest in the Prospect Area to third parties, all trade terms (including promoted costs, if any) shall be determined soley by SEC. IEC shall assist SEC in marketing the Prospect at no additional cost. Such assistance shall include, among other things, participation in showing the Restricted Data to third parties in such a manner as to comply with the terms of any applicable licensing agreements.

8.    IEC must maintain its knowledge of the Data and location of the Prospect Area in the strictest of confidence and will not disclose this information to others, except as expressly permitted and authorized by SEC in writing. The conditions of confidentiality imposed on IEC do not apply to any part of the Data which was or becomes public knowledge through no breach of the conditions contemplated by this Agreement.

9.    IEC expressly agrees it will not, either directly or indirectly, alone or through others, acquire any mineral or leasehold rights in the Prospect Area for so long as SEC, either directly or indirectly, owns any mineral and/or leasehold rights therein.

10.    The Parties hereto recognize that an agreement not to compete must be reasonable in its geographic area, geologic extent, and duration. IEC agrees that the area encompassing the Prospect Area is reasonable in its size and geologic extent and that the term imposed in paragraph 9 is reasonable in its length. This obligation not to compete shall apply to the current and future directors, officers, employees, clients, advisors, associates, consultants, or investors of IEC, and IEC agrees to be responsible for any breach of this obligation by such parties.

11.    The Parties hereto agree that no failure or delay by SEC in exercising any right, power, or privilege provided for in this Agreement shall operate as a waiver, nor shall any single or partial exercise preclude the exercise of any other right, power, or privilege under the terms of this Agreement.

12.    SEC shall have no obligation to IEC or any third party for payment of any agent's commissions, finder's fees, expenses, broker's fees, consulting services fees, or any other type of remuneration unless expressly provided for herein. The purchase price and additional consideration set forth herein represent full and complete consideration for all obligations of SEC hereunder.

13.    This Agreement constitutes the entire agreement between the Parties relative to the purchase and sale of the Prospect and supersedes any prior agreements, whether oral or in writing, including, but not limited to, that certain letter dated June 13, 2000, from SEC to IEC and that certain letter dated June 16, 2000, from IEC to SEC. All modification of and amendments to this Agreement must be in writing signed by both Parties.

14.    Notwithstanding anything to the contrary herein, in the event the Data and Prospect Area, including any oil and gas assets resulting therefrom, are deemed subject to the agreement set forth in 14.(a) below, and there is a conflict between such agreement and the terms of this Agreement, it is agreed that the terms of the agreement set forth below shall govern and prevail:

       (a)    Integrated Exploration Program Termination Agreement dated September 23, 1999, by and between Assignor and Sklar & Phillips, Inc., et al.

15.    The Parties hereto agree that it is not their intent to create any form of partnership, joint venture, or mining partnership, nor to make either Party the agent of or for the other.

16.    Each of the Parties shall from time to time and at all times perform all acts, deliver and execute all instruments and documents as may be reasonably required, in order to fully perform and carry out the terms and provisions of this Agreement. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and assigns.

              This Agreement is signed by the Parties on the date of the acknowledgments of their signatures below, but is effective for all purposes as of July 1, 2000.

WITNESSES:

INTEGRATED EXPLORATION CORPORATION

By _____
Name: John Takach
Title: Vice - President

SKLAR EXPLORATION COMPANY, L.L.C.

By _____
Name: Jim Cantwell
Title: Chief Operating Officer

– STATE OF LOUISIANA

PARISH OF CADDO

On this 21' day of July , 2000, before me appeared John Garach , to me known, who, being by me duly sworn, did say:

That he is the Vice President of INTEGRATED EXPLORATION CORPORATION, a Louisiana corporation, and that the foregoing instrument was signed in behalf of said corporation by authority of its Board of Directors, and said Appearer acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

NOTARY PUBLIC in and for
Caddo Parish, Louisiana

ROBERT U. GOODMAN, Notary Public
Caddo Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

On this 20th day of July , 2000, before me appeared Jim Cantwell, to me known, who, being by me duly sworn, did say:

That he is the Chief Operating Officer of SKLAR EXPLORATION COMPANY, L.L.C., a Louisiana limited liability company, and he acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

NOTARY PUBLIC in and for
Caddo Parish, Louisiana

BETTYE M. LaCOUR
NOTARY PUBLIC CADDO PARISH, LA.
MY COMMISSION EXPIRES WITH LIFE

e:\linda edwards\garrett\Sklar-IntegratedProspectPurchaseAgreement

### Exhibit "A"

This Exhibit "A" is attached to and made a part of that certain Prospect Purchase Agreement dated effective July 1, 2000, by and between Sklar Exploration Company LLC and Integrated Exploration Corporation.



**Martin Prospect**
**Red River Parish, Louisiana**



**Martin Prospect**
Red River Parish, Louisiana

# SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| DATE: | December 18, 2001 | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Louisiana |
| WELL: | International Paper #1 | HORIZON: | Hosston |
| LOCATION: | 1145' FSL & 1,500' FEL of S2, T13N, R9W in Red River Parish | PROJ. T.D.: | 7,500 |

| PROPOSAL: | Drill and complete a Hosston sand test. Revised to reflect current market contions. | | |
|---|---|---|---|
| | Date last revised: | 2-Apr-02 | |

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| **9100** | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 5,000 | | 5,000 |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $5,000 | $0 | $5,000 |

| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
|---|---|---|---|---|
| 01 | SURVEY, DOC HEARINGS, PERMITS | | | |
| 02 | LOCATION PREPARATION/DIRT WORK | 5,000 | | 5,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 25,000 | 10,000 | 35,000 |
| 04 | SURFACE DAMAGES & ROW | 14,000 | 2,000 | 16,000 |
| 05 | SETTING CONDUCTOR CASING | 15,000 | 15,000 | 30,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | | | |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE (3 days @ $7,500/D) | 240,000 | | 240,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | 22,500 | 15,000 | 37,500 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | | | |
| 14 | RIG INSTRUMENTATION & MONITORING | 4,400 | 8,000 | 12,400 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | | | |
| 17 | MUD & CHEMICALS | | | |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | | | |
| 24 | CEMENTING & EQUIPMENT | 4,000 | | 4,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 20,000 | 20,000 |
| 26 | PIPE TESTING | 3,500 | 3,500 | 7,000 |
| 27 | EQUIPMENT RENTALS | | | |
| 28 | FISHING TOOLS & SVCS | | 2,500 | 2,500 |
| 29 | TELEPHONE & COMMUNICATIONS | 2,000 | 500 | 2,500 |
| 30 | WATER | 2,500 | | 2,500 |
| 31 | FUEL | | | |
| 32 | BITS | | | |
| 33 | TRANSPORTATION & TRUCKING | | 1,000 | 1,000 |
| 34 | CONTRACT LABOR | 1,000 | 4,500 | 5,500 |
| 35 | SAFETY & H2S TRAINING | | 15,000 | 15,000 |
| 36 | LOGGING & WIRELINE | | | |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | 10,000 | 10,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | | |
| 47 | PERFORATION SERVICES | | 15,000 | 15,000 |
| 48 | COMPLETION FLUIDS | | 12,000 | 12,000 |
| 49 | STIMULATION SERVICES | | 9,000 | 9,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | | |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | | |
| 65 | PLUG & ABANDON COSTS | 10,000 | -10,000 | |
| 78 | INSURANCE | 10,000 | | 10,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 6,000 | 8,000 | 14,000 |
| 82 | MISCELLANEOUS:  includes a 5% contingency | 20,000 | 15,000 | 35,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $384,900 | $156,000 | $540,900 |

| **9500** | **TANGIBLE EQUIPMENT - DRILLING** | | | |
|---|---|---|---|---|
| 01 | CONDUCTOR CASING | | | |
| 02 | SURFACE CASING | | | |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 1,500 | | 1,500 |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $1,500 | $0 | $1,500 |

| **9520** | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
|---|---|---|---|---|
| 21 | PRODUCTION CASING & LINERS | | | |
| 22 | TUBING | | 40,000 | 40,000 |
| 23 | PACKERS | | 23,000 | 23,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 11,000 | 11,000 |
| 25 | WELLHEAD EQUIPMENT | | 1,500 | 1,500 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 15,000 | 15,000 |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $90,500 | $90,500 |

| **9540** | **SURFACE PRODUCTION EQUIPMENT** | | | |
|---|---|---|---|---|
| 41 | SURFACE PRODUCTION EQUIPMENT | | 43,000 | 43,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | | |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 7,500 | 7,500 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 10,000 | 10,000 |
| 46 | SALES METERING EQUIPMENT | | 52,000 | 52,000 |
| | | | 5,000 | 5,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $117,500 | $117,500 |

| | **TOTAL EQUIPMENT** | $1,500 | $208,000 | $209,500 |
|---|---|---|---|---|

| | **TOTAL WELL COST** | $391,400 | $364,000 | $755,400 |
|---|---|---|---|---|

APPROVED: _April 25_ , 2002

BY: _Dan A Barber, COO of SklarCo L.L.C._

## SKLAR Exploration Company L.L.C.
401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-6668

### AUTHORITY FOR EXPENDITURE

| DATE: | December 18, 2001 | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Louisiana |
| WELL: | International Paper #1 | HORIZON: | Hosston |
| LOCATION: | 1145' FSL & 1,500' FEL of S2, T13N, R9W in Red River Parish | PROJ. T.D.: | 7,500 |

PROPOSAL: Drill and complete a Hosston sand test.
Revised to reflect current market conitions.

Date last revised: 2-Apr-02

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 5,000 | | 5,000 |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $5,000 | $0 | $5,000 |

| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
|---|---|---|---|---|
| 01 | SURVEY, DOC HEARINGS, PERMITS | 5,000 | | 5,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 25,000 | 10,000 | 35,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 14,000 | 2,000 | 16,000 |
| 04 | SURFACE DAMAGES & ROW | 15,000 | 15,000 | 30,000 |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE | | | |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | 240,000 | | 240,000 |
| 10 | DAYWORK WITH DRILL PIPE (3 days @ $7,500/D) | 22,500 | 15,000 | 37,500 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION: | | | |
| 14 | RIG INSTRUMENTATION  & MONITORING | 4,400 | 8,000 | 12,400 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | | | |
| 17 | MUD & CHEMICALS | | | |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 4,000 | | 4,000 |
| 24 | CEMENTING & EQUIPMENT | | 20,000 | 20,000 |
| 25 | CASING CREW & LAYDOWN MACHINE: | 3,500 | 3,500 | 7,000 |
| 26 | PIPE TESTING | | | |
| 27 | EQUIPMENT RENTALS | | 2,500 | 2,500 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS: | 2,000 | 500 | 2,500 |
| 30 | WATER | 2,500 | | 2,500 |
| 31 | FUEL | | | |
| 32 | BITS | | | |
| 33 | TRANSPORTATION & TRUCKING | 1,000 | 4,500 | 5,500 |
| 34 | CONTRACT LABOR | | 1,000 | 1,000 |
| 35 | SAFETY & H2S TRAINING | | 15,000 | 15,000 |
| 36 | LOGGING & WIRELINE | | | |
| 37 | DRILL STEM & PRODUCTION TESTING | | 10,000 | 10,000 |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 15,000 | 15,000 |
| 47 | PERFORATION SERVICES | | 12,000 | 12,000 |
| 48 | COMPLETION FLUIDS | | 9,000 | 9,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | | |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | | |
| 65 | PLUG & ABANDON COSTS | 10,000 | -10,000 | |
| 78 | INSURANCE | 10,000 | | 10,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 6,000 | 8,000 | 14,000 |
| 82 | MISCELLANEOUS:  Includes a 5% contingency | 20,000 | 15,000 | 35,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $384,900 | $156,000 | $540,900 |

| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
|---|---|---|---|---|
| 01 | CONDUCTOR CASING | | | |
| 02 | SUFACE CASING | | | |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 1,500 | | 1,500 |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $1,500 | $0 | $1,500 |

| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
|---|---|---|---|---|
| 21 | PRODUCTION CASING & LINERS | | 40,000 | 40,000 |
| 22 | TUBING | | 23,000 | 23,000 |
| 23 | PACKERS | | 11,000 | 11,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 1,500 | 1,500 |
| 25 | WELLHEAD EQUIPMENT | | 15,000 | 15,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $90,500 | $90,500 |

| 9540 | **SURFACE PRODUCTION EQUIPMENT** | | | |
|---|---|---|---|---|
| 41 | SURFACE PRODUCTION EQUIPMENT | | 43,000 | 43,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 7,500 | 7,500 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 10,000 | 10,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 52,000 | 52,000 |
| 46 | SALES METERING EQUIPMENT | | 5,000 | 5,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $117,500 | $117,500 |

| | **TOTAL EQUIPMENT** | $1,500 | $208,000 | $209,500 |

| | **TOTAL WELL COST** | $391,400 | $364,000 | $755,400 |

.10
BPO

APPROVED: 2001 Hilliard Acquisitions LLC
BY: E L Hilliard
E. L. Hilliard

# SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| DATE: | December 18, 2001 | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Louisiana |
| WELL: | International Paper #1 | HORIZON: | Hosston |
| LOCATION: | 1,000' FEL & 1,000' FSL of S2, T13N, R9W in Red River Parish | PROJ. T.D.: | 7,500 |

PROPOSAL: Drill and complete a Hosston sand test.
Revised to reflect current market conitions.

Date last revised: 2-Apr-02

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | LEASEHOLD COSTS | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 5,000 | | 5,000 |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 86 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | TOTAL LEASEHOLD COSTS | $5,000 | $0 | $5,000 |
| | | | | |
| 9200/9300 | INTANGIBLE DRILLING & COMPLETION | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | | | |
| 02 | LOCATION PREPARATION/DIRT WORK | 5,000 | | 5,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 25,000 | 10,000 | 35,000 |
| 04 | SURFACE DAMAGES & ROW | 14,000 | 2,000 | 16,000 |
| 05 | SETTING CONDUCTOR CASING | 15,000 | 15,000 | 30,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | | | |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | 240,000 | | 240,000 |
| 10 | DAYWORK WITH DRILL PIPE (3 days @ $7,500/D) | 22,500 | 15,000 | 37,500 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | | | |
| 14 | RIG INSTRUMENTATION & MONITORING | 4,400 | 8,000 | 12,400 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | | | |
| 17 | MUD & CHEMICALS | | | |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 4,000 | | 4,000 |
| 24 | CEMENTING & EQUIPMENT | | 20,000 | 20,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 3,500 | 3,500 | 7,000 |
| 26 | PIPE TESTING | | | |
| 27 | EQUIPMENT RENTALS | | | |
| 28 | FISHING TOOLS & SVCS | | 2,500 | 2,500 |
| 29 | TELEPHONE & COMMUNICATIONS | 2,000 | 500 | 2,500 |
| 30 | WATER | 2,500 | | 2,500 |
| 31 | FUEL | | | |
| 32 | BITS | | | |
| 33 | TRANSPORTATION & TRUCKING | | 1,000 | 1,000 |
| 34 | CONTRACT LABOR | 1,000 | 4,500 | 5,500 |
| 35 | SAFETY & H2S TRAINING | | 15,000 | 15,000 |
| 36 | LOGGING & WIRELINE | | | |
| 37 | DRILL STEM & PRODUCTION TESTING | | 10,000 | 10,000 |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | | |
| 47 | PERFORATION SERVICES | | 15,000 | 15,000 |
| 48 | COMPLETION FLUIDS | | 12,000 | 12,000 |
| 49 | STIMULATION SERVICES | | 9,000 | 9,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | | |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | | |
| 65 | PLUG & ABANDON COSTS | 10,000 | -10,000 | |
| 78 | INSURANCE | 10,000 | | 10,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 6,000 | 8,000 | 14,000 |
| 82 | MISCELLANEOUS: Includes a 5% contingency | 20,000 | 15,000 | 35,000 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $384,900 | $156,000 | $540,900 |
| | | | | |
| 9500 | TANGIBLE EQUIPMENT - DRILLING | | | |
| 01 | CONDUCTOR CASING | | | |
| 02 | SURFACE CASING | | | |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 1,500 | | 1,500 |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $1,500 | $0 | $1,500 |
| | | | | |
| 9520 | TANGIBLE EQUIPMENT - COMPLETION | | | |
| 21 | PRODUCTION CASING & LINERS | | | |
| 22 | TUBING | | 40,000 | 40,000 |
| 23 | PACKERS | | 23,000 | 23,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 11,000 | 11,000 |
| 25 | WELLHEAD EQUIPMENT | | 1,500 | 1,500 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 15,000 | 15,000 |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $90,500 | $90,500 |
| | | | | |
| 9540 | SURFACE PRODUCTION EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 43,000 | 43,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 7,500 | 7,500 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 10,000 | 10,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 52,000 | 52,000 |
| 46 | SALES METERING EQUIPMENT | | 5,000 | 5,000 |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $117,500 | $117,500 |
| | | | | |
| | TOTAL EQUIPMENT | $1,500 | $208,000 | $209,500 |
| | | | | |
| | TOTAL WELL COST | $391,400 | $364,000 | $755,400 |

APPROVED: _____ , 2001

BY: _____

International Paper #1 (Wolfpack),5/6/02,5:48 PM

# Sklar Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8688

## AUTHORITY FOR EXPENDITURE

| DATE: | December 18, 2001 | FIELD: | Wildcat |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Louisiana |
| WELL: | International Paper #1 | HORIZON: | Hosston |
| LOCATION: | 145' FSL & 1,500' FEL of S2, T13N, R9W in Red River Paris | PROJ. T.D.: | 7,500 |

PROPOSAL:   Drill and complete a Hosston sand test.
Revised to reflect current market contitions.

Date last revised:   2-Apr-02

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 5,000 | | 5,000 |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $5,000 | $0 | $5,000 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 5,000 | | 5,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 25,000 | 10,000 | 35,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 14,000 | 2,000 | 16,000 |
| 04 | SURFACE DAMAGES & ROW | 15,000 | 15,000 | 30,000 |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE | | | |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | 240,000 | | 240,000 |
| 10 | DAYWORK WITH DRILL PIPE (3 days @ $7,500/D) | 22,500 | 15,000 | 37,500 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 4,400 | 8,000 | 12,400 |
| 14 | RIG INSTRUMENTATION  & MONITORING | | | |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | | | |
| 17 | MUD & CHEMICALS | | | |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 4,000 | | 4,000 |
| 24 | CEMENTING & EQUIPMENT | | 20,000 | 20,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 3,500 | 3,500 | 7,000 |
| 26 | PIPE TESTING | | | |
| 27 | EQUIPMENT RENTALS | | 2,500 | 2,500 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 2,000 | 500 | 2,500 |
| 30 | WATER | 2,500 | | 2,500 |
| 31 | FUEL | | | |
| 32 | BITS | | 1,000 | 1,000 |
| 33 | TRANSPORTATION & TRUCKING | 1,000 | 4,500 | 5,500 |
| 34 | CONTRACT LABOR | | 15,000 | 15,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | | | |
| 37 | DRILL STEM & PRODUCTION TESTING | | 10,000 | 10,000 |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 15,000 | 15,000 |
| 47 | PERFORATION SERVICES | | 12,000 | 12,000 |
| 48 | COMPLETION FLUIDS | | 9,000 | 9,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | | |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | | |
| 65 | PLUG & ABANDON COSTS | 10,000 | -10,000 | |
| 78 | INSURANCE | 10,000 | | 10,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 6,000 | 8,000 | 14,000 |
| 82 | MISCELLANEOUS:  Includes a 5% contingency | 20,000 | 15,000 | 35,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $384,900 | $156,000 | $540,900 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 01 | CONDUCTOR CASING | | | |
| 02 | SURFACE CASING | | | |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 1,500 | | 1,500 |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $1,500 | $0 | $1,500 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS | | 40,000 | 40,000 |
| 22 | TUBING | | 23,000 | 23,000 |
| 23 | PACKERS | | 11,000 | 11,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 1,500 | 1,500 |
| 25 | WELLHEAD EQUIPMENT | | 15,000 | 15,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $90,500 | $90,500 |
| | | | | |
| 9540 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 43,000 | 43,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 7,500 | 7,500 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 10,000 | 10,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 52,000 | 52,000 |
| 46 | SALES METERING EQUIPMENT | | 5,000 | 5,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $117,500 | $117,500 |
| | | | | |
| | **TOTAL EQUIPMENT** | $1,500 | $208,000 | $209,500 |
| | | | | |
| | **TOTAL WELL COST** | $391,400 | $364,000 | $755,400 |

APPROVED: _May 7, 2002._

BY: _(signature)_

HughesOil, Inc.
Dudley J. Hughes, President

**EXHIBIT "D"**

This Exhibit "D" is attached to and made a part of that Participation Agreement dated April 1, 2002, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., Mike Rogers Drilling Co., Inc., Hilliard Acquisitions II L.L.C., and Flournoy Family Properties LTD., covering lands located in Red River Parish, Louisiana.

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

## MARTIN FIELD PROSPECT

OPERATING AGREEMENT

DATED

__April 1__ , __2002__ ,
<sub>Year</sub>

OPERATOR   **SKLAR EXPLORATION COMPANY, L.LC.**

**401 Edwards Street, Suite 1601**

**Shreveport, LA 71101**

CONTRACT AREA   __As shown on Exhibit "A" to this Agreement.__

~~COUNTY OR~~ PARISH OF   __Red River__          STATE OF   __Louisiana__

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM.  A.A.P.L. NO. 610 – 1982 REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
|  | A. OIL AND GAS INTERESTS | 2 |
|  | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
|  | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
|  | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
|  | A. TITLE EXAMINATION | 2-3 |
|  | B. LOSS OF TITLE | 3 |
|  | 1. Failure of Title | 3 |
|  | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
|  | 3. All Other Losses | 3 |
| V. | OPERATOR | 4 |
|  | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
|  | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
|  | 1. Resignation or Removal of Operator | 4 |
|  | 2. Selection of Successor Operator | 4 |
|  | C. EMPLOYEES | 4 |
|  | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
|  | A. INITIAL WELL | 4-5 |
|  | B. SUBSEQUENT OPERATIONS | 5 |
|  | 1. Proposed Operations | 5 |
|  | 2. Operations by Less than All Parties | 5-6-7 |
|  | 3. Stand-By Time | 7 |
|  | 4. Sidetracking | 7 |
|  | C. TAKING PRODUCTION IN KIND | 7 |
|  | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
|  | E. ABANDONMENT OF WELLS | 8 |
|  | 1. Abandonment of Dry Holes | 8 |
|  | 2. Abandonment of Wells that have Produced | 8-9 |
|  | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
|  | A. LIABILITY OF PARTIES | 9 |
|  | B. LIENS AND PAYMENT DEFAULTS | 9 |
|  | C. PAYMENTS AND ACCOUNTING | 9 |
|  | D. LIMITATION OF EXPENDITURES | 9-10 |
|  | 1. Drill or Deepen | 9-10 |
|  | 2. Rework or Plug Back | 10 |
|  | 3. Other Operations | 10 |
|  | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
|  | F. TAXES | 10 |
|  | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
|  | A. SURRENDER OF LEASES | 11 |
|  | B. RENEWAL OR EXTENSION OF LEASES | 11 |
|  | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
|  | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
|  | E. WAIVER OF RIGHTS TO PARTITION | 12 |
|  | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
|  | A. LAWS, REGULATIONS AND ORDERS | 14 |
|  | B. GOVERNING LAW | 14 |
|  | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982



## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___**SKLAR EXPLORATION COMPANY, L.L.C.**___

___**401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101**___, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay ~~its~~ **for 100% of** / its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate **for 100% of its share of** ~~in~~ / a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑ A. Exhibit "A", shall include the following information:

    (1) Identification of lands subject to this agreement,

    (2) Restrictions, if any, as to depths, formations, or substances,

    (3) Percentages or fractional interests of parties to this agreement,

    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,

    (5) Addresses of parties for notice purposes.

☑ B. Exhibit "B", Form of Lease.

☑ C. Exhibit "C", Accounting Procedure.

☑ D. Exhibit "D", Insurance.

☑ E. Exhibit "E", Gas Balancing Agreement.

☐ ~~F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.~~

☐ ~~G. Exhibit "G", Tax Partnership.~~

If any provision of any exhibit, except Exhibits "E" ~~and "G"~~, is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982



**ARTICLE III.**
**INTERESTS OF PARTIES**

**A.   Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

**B.   Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred  in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A".  In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____all jointly owned lease burdens_____ which shall be borne as hereinafter set forth.

Each of the Parties hereto shall pay or deliver or cause to be paid or delivered its proportionate part of the royalties and overriding ~~royalties~~ ~~(regardless~~ ~~of~~ ~~which~~ ~~party~~ ~~has~~ ~~contributed~~ ~~the~~ ~~leases),~~ ~~and~~ ~~all~~ ~~interests)~~ ~~hereto~~ ~~of~~ ~~which~~ ~~royalty~~ ~~is~~ ~~not,~~ ~~and~~ royalties and other leasehold burdens as described in the attached Exhibit "A" and ~~and~~ ~~interest(s)~~ ~~hereto~~ ~~of~~ ~~which~~ ~~royalty~~ ~~is~~ ~~not,~~ ~~and~~ ~~hereby,~~ ~~each~~ ~~party~~ ~~entitled~~ ~~to~~ ~~receive~~ ~~a~~ ~~share~~ ~~of~~ ~~production~~ ~~of~~ ~~oil~~ ~~and~~ ~~gas~~ ~~from~~ ~~the~~ ~~Contract~~ ~~Area~~ and shall hold the other Parties free from any liability ~~thereof.~~ ~~shall~~ ~~bear~~ ~~and~~ ~~deliver,~~ ~~or~~ ~~If~~ ~~the~~ ~~interest~~ ~~of~~ ~~any~~ ~~Party~~ ~~in~~ ~~any~~ ~~oil~~ ~~and~~ ~~gas~~ ~~lease~~ ~~covered~~ ~~by~~ this agreement is subject to any additional royalty, overriding royalty, production payment or other charges over and above those as shown on Exhibit "A", such Party shall assume and alone bear all such obligations and they shall account for or cause to be accounted for such interests to the owners thereof, ~~cause~~ ~~to~~ ~~be~~ ~~paid~~ ~~or~~ ~~delivered,~~ ~~to~~ ~~the~~ ~~extent~~ ~~of~~ ~~its~~ ~~interest~~ ~~in~~ ~~such~~ ~~production,~~ ~~the~~ ~~royalty~~ ~~amounts~~ ~~stipulated~~ ~~hereinabove~~ ~~and~~ ~~shall~~ ~~hold~~ ~~the~~ ~~other~~ ~~parties~~ ~~free~~ ~~from~~ ~~any~~ ~~liability~~ ~~therefor.~~  No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C.   Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production ~~in~~ ~~excess~~ ~~of~~ ~~the~~ ~~amount~~ ~~stipulated~~ ~~in~~ ~~Article~~ ~~III.B.~~, which is not a joint obligation of the parties such party shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D.   Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.   If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.   If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

**ARTICLE IV.**
**TITLES**

**A.   Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be includ- ed, in the drilling unit around such well.  The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases.  At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge.  All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator.  Operator shall cause title to be examined by attorneys on its staff or by outside attorneys.  Copies of all title opinions shall be furnished to each party hereto.  The cost incurred by Operator in this title program shall be borne as follows:

~~□~~   ~~Option~~ ~~No.~~ ~~1:~~   ~~Costs~~ ~~incurred~~ ~~by~~ ~~Operator~~ ~~in~~ ~~procuring~~ ~~abstracts~~ ~~and~~ ~~title~~ ~~examination~~ ~~(including~~ ~~preliminary,~~ ~~supplemental,~~ ~~shut-in~~ ~~gas~~ ~~royalty~~ ~~opinions~~ ~~and~~ ~~division~~ ~~order~~ ~~title~~ ~~opinions)~~ ~~shall~~ ~~be~~ ~~a~~ ~~part~~ ~~of~~ ~~the~~ ~~administrative~~ ~~overhead~~ ~~as~~ ~~provided~~ ~~in~~ ~~Exhibit~~ ~~"C",~~ ~~and~~ ~~shall~~ ~~not~~ ~~be~~ ~~a~~ ~~direct~~ ~~charge,~~ ~~whether~~ ~~performed~~ ~~by~~ ~~Operator's~~ ~~staff~~ ~~attorneys~~ ~~or~~ ~~by~~ ~~outside~~ ~~attorneys.~~

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE IV**
**continued**

1 ☑ **Option No. 2:** Costs incurred by Operator in procuring abstracts / and fees paid outside attorneys / * for title examination
2 (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) / shall be borne by the Drilling Parties *** 
3 in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4 hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5 functions.
6
7 ~~Each party shall be responsible for securing~~ Operator shall use its best efforts to secure / curative matter and pooling amendments or agreements required in connection
8 with leases of oil and gas interests ~~contributed by such party~~ subject to this agreement and charge these fees to the joint account. Operator shall be responsible for the preparation and recording of pooling
9 designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10 This shall not prevent any party from appearing on its own behalf at any such hearing.
11
12 No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
13 provided, and (2) the title has been approved by the examining attorney or title has been accepted by / Operator. ~~all of the parties who are to par-~~
14 ~~ticipate in the drilling of the well.~~
15
16 ~~B. Loss of Title:~~
17
18 ~~1. Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a~~
19 ~~reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days~~
20 ~~from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-~~
21 ~~tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil~~
22 ~~and gas leases and interests; and,~~
23 ~~(a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be~~
24 ~~entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,~~
25 ~~but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~
26 ~~(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has~~
27 ~~been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-~~
28 ~~curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract~~
29 ~~Area by the amount of the interest lost;~~
30 ~~(c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is~~
31 ~~increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-~~
32 ~~terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such~~
33 ~~well;~~
34 ~~(d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has~~
35 ~~failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties~~
36 ~~who bore the costs which are so refunded;~~
37 ~~(e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be~~
38 ~~borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,~~
39 ~~(f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest~~
40 ~~claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in~~
41 ~~connection therewith.~~
42
43 ~~2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well~~
44 ~~payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,~~
45 ~~there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required~~
46 ~~payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,~~
47 ~~which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the~~
48 ~~date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in~~
49 ~~the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the~~
50 ~~required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to~~
51 ~~the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it~~
52 ~~shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled~~
53 ~~or wells thereafter abandoned) from so much of the following as is necessary to effect reimbursement:~~
54 ~~(a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,~~
55 ~~up to the amount of unrecovered costs;~~
56 ~~(b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of~~
57 ~~oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease~~
58 ~~termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said~~
59 ~~portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and,~~
60 ~~(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest~~
61 ~~lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~
62
63 3. **Other Losses:** All losses incurred, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses
64 and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
65 the Contract Area.
66 *curative matters and material
   **landmen and consultants       ***and for applications and hearings
67
68
69
70

- 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982



ARTICLE V.

OPERATOR

A.   Designation and Responsibilities of Operator:

_____SKLAR EXPLORATION COMPANY, L.L.C. of Shreveport, Louisiana_____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and authorized by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

B.   Resignation or Removal of Operator and Selection of Successor:

1.   Resignation or Removal of Operator:   Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator. * this condition shall not apply to Sklar Exploration Company, L.L.C. or any other designated **operator who owns no interest in the Contract Area by virtue of the fact that it is solely an operating company.**

2.   Selection of Successor Operator:   Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

C.   Employees:

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D.   Drilling Contracts:

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. / **\*\*** If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. **\*\*except that in Operator's sole discretion all factors, such as rig availability, equipment condition, contractor employee reliability and knowledge, and drilling contractor reputation shall be taken into consideration in determining the real competitive price such that the lowest price bid may not provide the overall best value in the Drilling Parties to accomplish the drilling operations.**

ARTICLE VI.

DRILLING AND DEVELOPMENT

A.   Initial Well:

**The Initial Well is the Initial Well referred to in Subsection 1.2 (a) of the Participation Agreement to which this instrument is attached as Exhibit "D."**

On or before the _____10th_____ day of _____May_____ , (year) _____2002_____ , Operator shall commence the drilling of a well for oil and gas at the following location: **Surface Location:   approximately 1145' FSL and 1500' FEL of Section 2, T13N-R9W, Red River Parish, Louisiana.**

and shall thereafter continue the drilling of the well with due diligence to

**a measured depth of 7500' in a vertical bore hole, or a depth sufficient in Operator's sole discretion to test the Upper Hosston Sands.**

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

**B.  Subsequent Operations:**

1. Proposed Operations: Should any party hereto desire to drill any well / on the Contract Area other than the well provided _any well includes water source or injection wells_ _center, recomplete, sidetrack_ for in Article VI.A., or to rework, / deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in / paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation.  The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation.  If a drilling rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to/ ~~forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays.~~ _twenty-four (24) hours_  Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.  Any notice or response given by telephone shall be promptly confirmed in writing.
*Notwithstanding this Article VI.B.1. and subject to the right of any party to non-consent the proposed operation, a proposal to rework, recomplete, sidetrack, deepen or plugback a well producing in paying quantities, which is consented to by two (2) or more of the Parties owning two-thirds (2/3rds) or more of the working interest under the well may proceed and be executed on behalf of the Consenting Parties without the unanimous consent of all parties.

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of / ~~thirty (30)~~ _fifteen (15)_ days (or as promptly as possible after the expiration of the / ~~forty-eight (48)~~ _twenty-four (24)_ hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all parties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance.  Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance with the provisions hereof as if no prior proposal had been made.

2. Operations by Less than All Parties:  If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as elect to participate in the operation shall, within ninety (90) days after the expiration of the notice period of / ~~thirty (30)~~ days (or as promptly as possible after the expiration of the / ~~forty-eight (48)~~ _twenty-four (24)_ hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence.  Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work.  Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties  approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed.  Each Consenting Party, within / ~~forty-eight (48) hours~~ _twenty-four (24)_ ~~(exclusive of Saturday, Sunday and legal holidays)~~ after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry / its proportionate part of Non-Consenting Parties' interests, and _all of_ failure to advise the proposing party shall be deemed an election under (a).  In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of/ ~~forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays).~~ _twenty-four (24)_  The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph.  Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.  If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense.  If any well drilled, reworked, / deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued



1 and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2 ties. Upon commencement of operations for the drilling, reworking, / deepening or plugging back of any such well by Consenting Parties [recompleting,]
3 in accordance with the provisions of this Article, each Consenting Party shall be deemed to have relinquished to Consenting Parties,
4 and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5 Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6 market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7 terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8 until it reverts) shall equal the total of the following:

9
10
11
12   (a) / 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead [500%]
13 connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
14 Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15 Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16 Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17 Party had it participated in the well from the beginning of the operations; and

18
19
20  r
21   (b) __500__ % of that portion of the costs and expenses of drilling, reworking, / deepening, plugging back, testing and completing, [recompleting, sidetracking,]
22 after deducting any cash contributions received under Article VIII.C, and __500__ % of that portion of the cost of newly acquired equip-
23 ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24 participated therein.

25
26
27
28   An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-
29 working / or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is [recompleting, sidetracking,]
30 conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31 reworking / or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well [recompleting, sidetracking,]
32 and there shall be added to the sums to be recouped by the Consenting Parties  one-hundred percent (100%) of that portion of the cost of [five] [(500%)]
33 the reworking / or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If [recompleting, sidetracking,]
34 such a reworking / or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap- [recompleting, sidetracking,]
35 plicable as between said Consenting Parties in said well.

36
37
38
39   During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40 proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41 taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42 ticle III.D.

43
44
45
46   In the case of any reworking, / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free [recompleting, sidetracking,]
47 of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48 abandonment of a well after such reworking, / plugging back or deeper drilling, the Consenting Parties shall account for all such equip- [recompleting, sidetracking,]
49 ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

50
51
52
53   Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54 Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55 itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56 option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57 ings. Each / month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the [quarter]
58 operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59 curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
60 realized from the sale of the well's working interest production during the preceding / month. In determining the quantity of oil and gas [quarter]
61 produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62 well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63 which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64 of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65 above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
continued

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production recompleting, sidetracking therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, / deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

Notwithstanding the provisions of this Article VI.B.2., / it is agreed that without the mutual consent / of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply; provided that an exceptional well location that is approved by the Louisiana Office of Conservation shall be deemed to conform to the then-existing spacing pattern.
*   and subject to the right of any party to non-consent the proposed operation
**  two or more Parties owning two-thirds (2/3rds) or more of the working interest

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. recompleting, sidetracking except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, / deepening and plugging back of such initial well after if has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for production, ceases to produce in paying quantities.

3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

(a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

(b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period twenty-four (24) shall be limited to / forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and twenty-four (24) receive up to eight (8) additional days after expiration of the / forty-eight (48) hours within which to respond by paying for all stand-by time incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in- fifteen (15) stances the response period to a proposal for sidetracking shall be limited to / thirty (30) days.

**C.   TAKING PRODUCTION IN KIND:**

have the right to
Each party shall / take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5  its share of all production.

6

7      In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8  the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it,
9  but not the obligation, to purchase such oil and gas or sell it to others / at any time and from time to time, for the account of the non-
10  taking party~~at the best price obtainable in the area for such production~~. Any such purchase or sale by Operator shall be subject always to
11  the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas
12  not previously delivered to a purchaser.  Any purchase or sale by Operator of any other party's share of oil and gas shall be only for such
13  reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event
14  for a period in excess of one (1) year.  Notwithstanding the foregoing, Operator shall not make a sale, including one into interstate com-
15  merce, of any other party's share of gas production without first giving such other party thirty (30) days notice of such intended sale.
16  * on the same terms and basis as Operator is marketing Operator's and other Non-Operators' share of production

17  D.  **Access to Contract Area and Information:**

18

19      Each / party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
       consenting
20  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
21  and records relating thereto.  Operator, upon request, shall furnish each of the other / parties with copies of all forms or reports filed with
        consenting
22  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
23  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area.  The cost of
24  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
25  quests the information.

26

27  E.  **Abandonment of Wells:**

28

29      1.  <u>Abandonment of Dry Holes:</u>  Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
30  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
31  without the consent of all parties.  Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
       twenty-four (24) hours
32  within / ~~forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays)~~ after receipt of notice of the proposal to plug and abandon
33  such well, such party shall be deemed to have consented to the proposed abandonment.  All such wells shall be plugged and abandoned in
34  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
35  such well.  Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
36  operations in search of oil and/or gas subject to the provisions of Article VI.B.

37

38      2.  <u>Abandonment of Wells that have Produced:</u>  Except for any well in which a Non-Consent operation has been conducted
39  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
40  producer shall not be plugged and abandoned without the consent of all parties.  If all parties consent to such abandonment, the well shall
41  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto.  If, within
42  thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
43  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
44  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
45  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.  Each abandoning party shall assign
46  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
47  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
48  terval or intervals of the formation or formations then open to production.  If the interest of the abandoning party is or includes an oil and
49  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
50  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
51  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1  "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2  assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3  Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4  interests in the remaining portion of the Contract Area.
5
6      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7  the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8  quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9  templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10  well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11  repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12  visions hereof.
13
14      3.  Abandonment of Non-Consent Operations:  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15  Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16  permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17  of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18  VI.E.
19
20                              ARTICLE VII.
21                  EXPENDITURES AND LIABILITY OF PARTIES
22
23  A.  Liability of Parties:
24
25      The liability of the parties shall be several, not joint or collective.  Each party shall be responsible only for its obligations, and
26  shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27  among the parties in Article VII.B. are given to secure only the debts of each severally.  It is not the intention of the parties to create, nor
28  shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.
29
30  B.  Liens and Payment Defaults:
31
32      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33  of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34  at the rate provided in Exhibit "C".  To the extent that Operator has a security interest under the Uniform Commercial Code of the
35  state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code.  The bringing of a suit and the ob-
36  taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37  rights or security interest as security for the payment thereof.  In addition, upon default by any Non-Operator in the payment of its share
38  of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39  the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid.  Each
40  purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default.  Operator grants a like lien
41  and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.
42
43      If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
44  Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
45  the interest of each such party bears to the interest of all such parties.  Each party so paying its share of the unpaid amount shall, to obtain
46  recover the amount it paid plus five hundred percent (500%) of the amount out of the proceeds from the sale of the defaulting
47  party's share of oil and/or gas, and , to secure payment thereof, be subrogated to the security rights described in the foregoing
48  agreement.
49  C.  Payments and Accounting:
50
51      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
52  and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
53  tionate shares upon the expense basis provided in Exhibit "C".  Operator shall keep an accurate record of the joint account hereunder,
54  showing expenses incurred and charges and credits made and received.
55
56      Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
57  of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
58  month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
59  with an invoice for its share thereof.  Each such statement and invoice for the payment in advance of estimated expense shall be submitted
60  on or before the 20th day of the next preceding month.  Each party shall pay to Operator its proportionate share of such estimate within
61  fifteen (15) days after such estimate and invoice is received.  If any party fails to pay its share of said estimate within said time, the amount
62  due shall bear interest as provided in Exhibit "C" until paid.  Proper adjustment shall be made monthly between advances and actual ex-
63  pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
64
65  D.  Limitation of Expenditures:
66
67      1.  Drill or Deepen:  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
68  pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the drilling or deepening shall include:
69
70

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

1 ☑  *Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2 necessary tankage and/or surface facilities. *This Option No. 1 shall apply only to water source and/or water injection wells.
3
4 ☑  **Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5 authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6 to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have / forty-eight  <sup>twenty-four (24)</sup>
7 (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8 tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9 cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,  <sup>recompleting, sidetracking</sup>
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, / deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties. **This Option No. 2 shall cover all wells except those expressly covered by Option No. 1 above.
14
15     2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.
19
20     3. Other Operations:  <sup>*one or more Parties owning a majority interest</sup> Without the consent of / all parties, Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of _____Fifty Thousand and No/100_____ Dollars ($_____50,000.00_____ )
22 except in connection with a well, the drilling, deepening, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of _____Fifty Thousand and No/100_____
28 Dollars ($_____50,000.00_____ ) but less than the amount first set forth above in this paragraph.
29
30 **E.  Rentals, Shut-in Well Payments and Minimum Royalties:**
31
32     Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35 behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B. a.
39
40     Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46 **F.  Taxes:**
47
48     Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".
59
60     If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".
66
67     Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
68 to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.
69
70

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
continued

1  G.  **Insurance:**
2
3          At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4  the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5  pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
6  also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7  hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8  law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.
9
10         In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11  parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.
12
13                                  **ARTICLE VIII.**
14                  **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**
15
16  A.  **Surrender of Leases:**
17
18         The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19  or in part unless all parties consent thereto.
20
21         However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22  agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23  such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24  thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas in-
25  terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26  such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27  lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all
28  obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29  attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30  duction other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the
31  party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32  ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33  salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest
34  shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.
35
36         Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39  agreement.
40
41  B.  **Renewal or Extension of Leases:**
42
43         If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44  shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the
45  renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46  portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47  interests held at that time by the parties in the Contract Area.
48
49         If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50  who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51  to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52  Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.
53
54         Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55  by the acquiring party.
56
57         The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58  or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or
59  contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
60  tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61  the provisions of this agreement.
62
63         The provisions in this Article shall also be applicable to extensions of oil and gas leases.
64
65  C.  **Acreage or Cash Contributions:**
66
67         While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69  applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the con-
70  tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VIII
### continued

said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D.   Maintenance of Uniform Interests:**

~~For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells, equipment and production unless such disposition covers either:~~

~~1.   the entire interest of the party in all leases and equipment and production; or~~

~~2.   an equal undivided interest in all leases and equipment and production in the Contract Area.~~

Every ~~such~~ sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties. **Any added expenditures required as a result of a partial disposition, including marketing or metering of production, shall be borne solely by the party transferee.**

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E.   Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

**F.   ~~Preferential Right to Purchase:~~**

~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~

## ARTICLE IX.
### INTERNAL REVENUE CODE ELECTION

This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1986, as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1986, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982



ARTICLE X.

CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____ Ten Thousand and No/100 _____ Dollars ($ _____ 10,000.00 _____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder. **All claims or suits involving title to any interest subject to this Agreement shall be treated as a claim or suit against all parties hereto.**

ARTICLE XI.

FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

ARTICLE XII.

NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

ARTICLE XIII.

TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☑ Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☐ Option No. 2: ~~In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.~~

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

- 13 -

### ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

**A.  Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B.  Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ **Louisiana** _____ shall govern.

**C.  Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of ~~the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and~~ any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to <sup>any</sup> said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

### ARTICLE XV.
### OTHER PROVISIONS

(See attached pages 14-1 through 14-7)

- 14 -

**ARTICLE XV.**

**OTHER PROVISIONS**

### A. PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1) an election to perform additional logging, coring or testing;

(2) an election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;

(3) an election to plug back and attempt to complete the well in a shallower depth or formation;

(4) an election to deepen the well;

(5) an election to sidetrack the well;

(6) an election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;

(7) an election to temporarily abandon the well;

(8) an election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of a majority of the consenting parties in possessory, cost-bearing interest (and not in number), a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth. In such event, the operation, which, in the opinion of a majority of the consenting parties in possessory, cost bearing interest (and not in number) is less likely to jeopardize the well, will be given priority. Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail. It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests. For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

### B. HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

### C. INITIAL WELL

The parties hereto understand and agree that the Initial Well described in Article VI A herein refers to the same well described in Section 1.2 of that certain Participation Agreement dated April 1, 2002, to which this agreement is attached as Exhibit "D". Notwithstanding anything to the contrary contained herein as it pertains to the Initial Well, if a party elects or is deemed to have elected not to participate in the completion of the Initial Well, or fails to pay all of its share of the actual costs to complete that well, then such party shall be deemed a "Non-Participating Party or Non-Participant" in said Initial Well and shall automatically be deemed to have relinquished and forfeited all of its interest, including but not limited to its leasehold, oil and gas interests and contractual rights in and to the Contract Area. In the event an assignment of oil and gas interests, leasehold or contractual rights have been made to such Party electing not to participate in the Initial Well, the Non-Participating Party agrees hereby to promptly assign to Operator as agent on behalf of the Consenting Parties, all of its right, title and interest in all oil and gas interests, leasehold and contractual rights within the Contract Area, and such Non-Participating Party agrees and shall perform all necessary acts to evidence such relinquishment and forfeiture. Any such Non-Participating Party's Assignment shall be without warranty, except by, through and under Assignor, and shall be delivered to the Operator within thirty (30) days of the request for such Assignment. Operator shall assign such Non-Participating Party's oil and gas interests, leasehold and contractual rights to the Consenting Party or Parties, or their designee, who shall have the right to receive their proportionate share of such forfeited Non-Participating Party's interest in the entire Contract and AMI area. This forfeiture shall be without prejudice and in addition to the rights of the Operator under Articles VII and XV.E of this agreement.

### D. DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties. If the parties are equally divided, the opinion of the Operator will prevail.

### E. ADVANCEMENT OF COSTS

Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s) in advance of its respective share of (i) the dry hole cost for the initial well to be drilled under Article VI A, (ii) the dry hole cost for any other well to be drilled hereunder to which such Non-Operator has consented, and (iii) the cost of any completion, reworking, recompletion, sidetracking, deepening or plugging back operation to which such Non-Operator has consented (any such operation under clause (i), (ii), or (iii) being herein called a "Drilling Operation"). Such request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Drilling Operation. The amount of each Non-Operator's advance payment shall be based upon the latest AFE for such operation. Such advanced payments shall be held by Operator for the account of the Non-Operators and applied, with interest, against the actual costs incurred in the applicable operation.

A Non-Operator receiving a request for advance payment shall, within two (2) days of the receipt of such request if and when a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to operator in cash the full amount of such request. Operator shall credit the amount to the Non-Operator's account for the payment of such Non-Operator's share of costs of such Drilling operation, and following the end of each month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement. Advance payment by a Non-Operator of his share of completed well costs shall in no event prevent such completion of a well pursuant to Option No. 2 of Article VII.D.1. and, in the event such a Non-Operator elects not to participate in completion, the sums that such Non-Operator has advanced shall not be charged with any share of the costs of any completion attempted.

In the event a Non-Operator from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by depositing cash as aforesaid, then Operator, at his option, shall make a second written or telephonic request for such advance. Non-Operator shall pay for said advance as aforesaid within two (2) days from receipt of such second request.

If a Non-Operator fails to pay within two (2) days of the receipt of such second request, then:

(1) If the advance payment was requested for the drilling of the initial well under Article VI A Non-Operator may, at the sole discretion and timing election of the Operator, be deemed to have relinquished all of its leasehold and contractual rights in the Contract Area retroactive to the date of default in payment, and if assignment has been made to such Non-Operator, Non-Operator shall assign all of its rights in and to the Contract area, within thirty (30) days of a request for such assignment, to those parties who have participated in such Drilling Operation, in the proportion that such parties elected to share the relinquished interest.

(2) If the advance payment was requested for any other Drilling Operation (including completion of the initial well), Non-Operator may, at the sole discretion and timing election of the Operator, be deemed non-consent in said operation retroactive to the beginning of such operation and thereafter subject to the penalty provisions of Article VI.B.2 hereof.

If the Non-Operator fails to make such payment or furnish such security within two (2) days of the receipt of such second request, Operator shall promptly notify all other parties still participating in such Drilling Operation of the default in payment and if and when applicable, of the relinquishment of an interest under this provision. The parties who wish to participate in the Drilling Operation shall have five (5) days from receipt of the applicable notice to elect to assume the costs chargeable to such relinquished interest and shall share such relinquished interest in proportion to their assumption of such relinquished interest. If the parties who wish to participate in the Drilling Operation are unwilling to assume the costs chargeable to such relinquished interest, the Drilling Operation shall be cancelled, and if the cancelled Drilling Operation involves the drilling of a test well under Article VI A no assignment shall be due as a consequence of the failure to pay.

Notwithstanding anything to the contrary herein, if the applicable drill well or operation is unsuccessful or results in a dry hole, Operator shall have the right to sue a Non-Operator who failed to pay for its proportionate share of expenses in lieu of Operator's right to an assignment of all Non-Operator's leasehold and contractual rights within the Contract Area, or in lieu of deeming the Non-Operator Non-Consent.

#### F. NECESSARY EXPENDITURES EXCLUDE SIDETRACKING

The phrase "necessary expenditures" in Article VII.D.1. (Option No. 2) on page 10 shall not be deemed to include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

#### G. ADDITIONAL CHARGES

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Unit Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same:

Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and expenses in connection with preparation and presentation of evidence and exhibits of Department of Conservation hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

#### H. INDEMNITY

Each Non-Operator shall defend, indemnify and hold Operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operator's officers, employees and/or agents, resulting from or in any way relating to such officers, employees, and/or agents presence on a drilling rig on the Contract Area or from such person traveling by air or water between any point and such drilling rig.  Such indemnity to Operator shall also apply to any other person whose presence on the rig or transportation to or from such rig is at the request of the indemnifying Non-Operator

#### I. RECOUPMENT

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

#### J. SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

#### K. NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

#### L. PIPELINE AND/OR GATHERING LINE CONSTRUCTION

If any party to this Agreement elects either to construct, operate or purchase or to join in the construction, operation or purchase of a pipeline, and/or gathering line to transport production from the Contract Area, then such party shall notify the other parties hereto furnishing all pertinent cost and information. Each party receiving such notice shall have thirty (30) days to exercise their right in writing to participate in the construction, operation and ownership of such pipeline and/or gathering line, including the right of transporting production from the Contract Area, by agreeing to bear their proportionate share of the cost of such operation and thereafter entering into a mutually acceptable operating agreement for the operation thereof.  Otherwise, the parties consenting to participate in such operation shall be entitled to establish the terms and conditions (including any costs and fees for use or reservation of the applicable facilities) under which the non-consenting parties may use or have access to the applicable facilities.  Absent a mutually agreeable agreement for the use of said facilities by and between the consenting and non-consenting parties, the non-consenting parties shall be obligated to separately dispose of their share of all production.

#### M. AREA OF MUTUAL INTEREST

The parties hereby create an Area of Mutual Interest ("AMI") consisting of the lands outlined by a bold black line on the plat attached hereto as Exhibit "A-2".  This AMI shall remain in force and effect as long as this Agreement remains in effect, unless sooner terminated in writing by the parties.

During the term of this AMI, if any party hereto ("Acquiring Party") acquires, renews or extends any oil and gas lease or any interest therein, any unleased mineral interest or any farmout or other contract with respect thereto which affect lands and minerals lying within the AMI ("Oil and Gas Interest"), the Acquiring Party shall promptly advise the other parties ("Offerees") of such acquisition. In such event, each Offeree shall have the right to acquire its proportionate interest in such Oil and Gas Interest in accordance with the other provisions of this AMI.

Promptly upon acquiring such Oil and Gas Interest, the Acquiring Party shall, in writing, advise the Offerees of such acquisition. The notice shall include a copy of all instruments of acquisition including, by way of example but not of limitation, copies of the leases, assignments, subleases, farmouts or other contracts affecting the Oil and Gas Interest.

The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by the Acquiring Party in acquiring such Oil and Gas Interest, excluding, however, costs and expenses of its own personnel ("Acquisition costs"). The Offeree shall have a period of thirty (30) days after receipt of the notice within which to furnish the Acquiring Party written notice of its election to acquire its proportionate interest in the offered Oil and Gas Interest. If, however, a well in search of oil or gas is being drilled within the AMI or at a location outside the AMI of which the result could be expected to materially affect the value of the offered Oil and Gas Interest, each Offeree shall have a period of forty-eight (48) hours (excluding Saturdays, Sundays and legal holidays) after receipt of the notice within which to elect to acquire its proportionate interest in the Oil and Gas Interest so offered. It is provided, however, that the forty-eight (48) hour election period shall not apply unless the Acquiring Party shall give the notice to the Offerees within two (2) days after the date on which the Acquiring Party acquired the Oil and Gas Interest so offered. In addition thereto, the Acquiring Party shall also:

    (a)    furnish the Offerees with the approximate location of the well then being drilled and the name of the operator or drilling contractor drilling the well, and

    (b)    specifically advise the Offerees that the Offerees shall have a period of forty-eight (48) hours within which to elect to acquire an interest in the offered Oil and Gas Interest.

The above information shall be in addition to the information and copies of instruments provided for above in connection with the usual notices of acquisition of an Oil and Gas Interest. If the Acquiring Party does not receive actual written notice of election of an Offeree to acquire its proportionate interest within the thirty (30) day or forty-eight (48) hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire its interest in the Oil and Gas Interest. An Offeree accepting the offered Oil and Gas Interest shall be entitled to participate in such Oil and Gas Interest in the proportion to which its interest bears to the total interest of all parties (including the acquiring party) electing to participate. Promptly after the time for election expires, the Acquiring Party shall invoice the Offeree electing to acquire an interest for its proportionate part of the Acquisition Cost, as reflected by the invoice. Upon receipt of such reimbursement, the Acquiring Party shall execute and deliver an appropriate assignment to such Offeree. If the Acquiring Party does not receive the amount due from the Offeree within thirty (30) days after receipt by the Offeree of the invoice for its cost, the Acquiring Party may, at its election, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within five (5) days after receipt of such written notice by the delinquent Offeree shall constitute a withdrawal by the delinquent Offeree of its former election to acquire the interest, and such Offeree shall no longer have the right to acquire an interest in the offered Oil and Gas Interest.

Any assignment made by the Acquiring Party shall be made free and clear of any liens, encumbrances, overriding royalty interests and other burdens created by or arising under the Acquiring Party but otherwise without warranty of title, either express or implied. The assignment shall be made and accepted subject to, and each assignee shall expressly assume its portion of, all of the obligations of the Acquiring Party.

If the Oil and Gas Interest covers lands lying partially inside and partially outside the boundaries of the AMI, or outside the Contract Area but inside the AMI, the Acquiring Party shall offer the entirety of such Oil and Gas Interest to the Offerees. If an Offeree acquires its proportionate interest of such Oil and Gas Interest, the lands lying outsides the AMI or Contract Area, as the case may be, shall become a part of the Contract Area subject to the Operating Agreement and the Contract Area or AMI, as the case may be, shall be enlarged thereby.

If two (2) or more separate Oil and Gas Interests are included in the same notice, the Offeree shall have the separate right of election as to each separate Oil and Gas Interest.

The provisions of this AMI shall not apply to acquisitions as a result of merger, consolidation, reorganization or an acquisition from a parent, subsidiary, or affiliated corporation, or as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries. Neither shall it apply to sales and acquisitions between partners in a partnership or venturers in a joint venture, or to any acquisition by any party of an interest which interest prior to and at the time of such acquisition was subject to this Agreement, unless such acquisition was the renewal or extension of a lease which at the date of expiration was subject to this Agreement. As used herein a renewal or extension of any lease means any renewal lease, extension, top lease or new lease covering all or any portion of or any interest in the area covered by an expiring lease taken before, or taken or contracted for within one year, after the expiration of the predecessor lease.

Integrated Exploration Corporation or its assigns shall be entitled to receive the following interests out of any leases or farm-ins acquired or entered into covering the "Prospect Area" as defined in Exhibit "B" to the Participation Agreement to which this agreement is attached as Exhibit "D": an overriding royalty interest equal to three percent (3%) of 8/8ths out of any lease proportionately reduced.

N. **DISBURSEMENT OF ROYALTIES**

If Operator prepares and administers a division order for and receives and distributes the proceeds of production attributable to the interest of a Non-Operator, then Operator shall be entitled to charge that party for an appropriate monthly overhead charge for disbursing such royalty payments, in addition to the combined fixed rates specified in Exhibit "C" hereto. If through error or inadvertence Operator shall fail to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, he shall not be liable in damages to the other Parties hereto for such failure.

O. **INFORMATION**

Anything to the contrary hereinabove notwithstanding, it is stipulated that any non-consenting party to an operation conducted hereunder shall have no right to observe such operation or have access to information pertaining to such operation, until such time as the non-consenting party's share of the cost of such operation and the penalty therefor has been recovered by the consenting parties as provided herein. It is understood that this Section O of Art. XV does not apply when the in the situation where the non-consenting party is a Farmor under this Agreement.

P. **OPERATOR'S LIEN – SECURITY INTEREST**

Subject to the provision of Article VII. B. of this Agreement, each non-Operator grants to Operator a lien upon all of the rights, titles, and interests of each "Non-Operator, whether now existing or hereafter acquired, in and to the (1) the oil, gas, or other minerals in, on, and under the Contract Area and (2) any oil, gas, and mineral leases covering the Contract Area or any portion thereof. In addition, each Non-Operator grants to Operator a security interest in and to all of such Non-Operator's rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (1) all oil, gas and other minerals produced from the Contract Area when produced; (2) all accounts receivable accruing or arising as a result of the sale of such oil, gas and other minerals; (3) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (4) all oil and gas wells and other surface and sub-surface equipment and facilities of any kind or character located on the Contract Area and the cash or other proceeds received from the sale thereof (collectively, the "Personal Property Collateral"). Some of the Personal Property Collateral is or will become fixtures on the Contract Area, and the interest of Non-Operator in and to the oil, gas and other minerals when extracted from the Contract Area and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area. This Agreement (including a carbon, photographic, or other reproduction hereof) shall constitute a non-standard form financing statement under the terms of the Uniform Commercial Code of the State in which the Contract Area is located, and as such, may be filed for record in the real estate records of the county in which the Contract Area is located. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense, if any.

Q. **MARKETING OF PRODUCTION**

Operator agrees to market all Non-Operator's share of any production from the Contract Area under the same terms that Operator is marketing its share of said production; provided, however, that contracts entered into by Operator in marketing Non-Operator's share of production shall be subject to the limitations set forth in Article VI. C. hereof. Further, Non-Operator shall be given the continuing right to participate as a signatory to any contract entered into by Operator to market production hereunder. Notwithstanding the above, any Non-Operator may choose to separately market its proportionate share of said production by giving written notice to Operator by the 15th day of the month prior to the month in which said Non-Operator intends to separately market its production. Conversely, if said Non-Operator again requests that Operator market its production, Non-Operator must provide written request of same by the 15th day of the month prior to the month in which Operator is again to market said Non-Operator's production.

R. **METERING OF PRODUCTION**

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

S. **PLUGGING AND LEASEHOLD RESTORATION FUND**

At any time any well subject to this agreement is, in Operator's sole opinion, approaching the end of its economic life and/or its useful purpose, Operator may pre-bill the joint account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location. Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and abandonment and restoration of the leasehold premises. In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any accrued interest on such difference, based upon the then working interest percentage of such owner. In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

T. **SEPARATE AGREEMENT FOR NON-UNIFORM INTEREST**

Any leases or interests therein (and the land covered thereby) that, pursuant to the terms of this Agreement or otherwise, become owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such leases become so owned. Any leases or interests therein (and the lands covered thereby) that, pursuant to the terms of this Agreement or otherwise, become owned by more than one but less than all of the parties hereto or in which a party assigns, transfers or otherwise disposes of all or part of its interests shall remain subject to this Agreement as to the surviving parties; however, for all purposes, the terms of this Agreement shall apply separately to each such lease (or group of such leases in which the parties' ownership is uniform) as if it were a separate agreement covering such lease(s), with an Exhibit "A" modified to reflect the parties' interests therein, based upon the parties' ownership in such lease(s).

U. **OBLIGATORY WELL**

Notwithstanding the provisions of this agreement and particularly Article VI, if any proposed operations are necessary to maintain a Lease covered by this agreement in force or an agreement to earn a lease(s) which would otherwise expire unless such operations are conducted, then in lieu of being penalized under Article VI.B.2., each Non-Consenting Party shall assign to Consenting Parties all of such Non-Consenting Party's right, title and interest in and to the Lease(s) or portion thereof or such agreement which would be lost or not earned if such operations were not conducted.

Such assignment shall be promptly due upon commencement of said proposed operations by Consenting Parties and shall be free and clear of all overriding royalties, production payments, mortgages, liens and other burdens and encumbrances placed thereon by the assigning party or resulting from its ownership or operation of such Lease or interest which is not a joint obligation of the parties, but otherwise without warranty of title either expressed or implied.

If the assignment is in favor of more than one party, the assigned interest shall be shared by the Consenting Parties in the proportions that the interest of each bears to the interest of all Consenting Parties unless otherwise agreed to in writing. Thereafter, such acreage covered by said assignment shall not be subject to the terms of this agreement, but shall be deemed to be subject to an agreement identical to this changed only in Exhibit "A" to indicate the Consenting Parties and their percentages of interest. Operations that are necessary to either maintain a Lease covered by this agreement in force or to earn a lease or part thereof under an agreement which would otherwise expire unless operations are conducted, shall be defined as operations that are proposed within six (6) months of the date the Lease or agreement would otherwise expire.

V. **PREVAILING AGREEMENT**

If there is a conflict between provisions of the Participation Agreement dated April 1, 2002, to which this Operating Agreement is attached as Exhibit "D", and this Operating Agreement, the provisions of the Participation Agreement shall prevail, and shall be binding upon all parties to this Operating Agreement.

W. **DEFAULT PENALTY/AUTOMATIC NON-CONSENT**

If written notice has been given that the lien rights conferred in Article VII. B. have been implemented or enforced against any party hereto, for so long as the affected party remains in default, it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and shall not be entitled to vote its interest in any matter hereunder. As to any proposed operation in which it otherwise would have the right to participate, such party shall not have the right to elect to participate or be a Consenting Party unless and until it pays in full the amount it is in default plus all other outstanding amounts due hereunder. If an operation proposed during such default period commences before such payment in full, the party in default shall automatically be deemed a Non-Consenting Party to the operation.

X. **PRIOR OPERATING AGREEMENT(S)**

This operating agreement, as to the parties executing same and as to the Contract Area and Depth Restrictions, shall supersede and replace any prior operating agreement(s) covering all or any portion of the Contract Area of this operating agreement.

Y. **NON-PARTICIPATING INTERESTS**

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto as same may be revised from time to time to reflect record title and/or reformation of the Contract Area.

Z. **EXECUTION**

This agreement shall be binding upon each Non-Operator that executes this agreement without regard to whether this same instrument, or any copy or counterpart hereof shall be executed by any other Non-Operator.

AA. **MISCELLANEOUS**

Anything to the contrary herein notwithstanding, this Operating Agreement is expressly made subject to the terms and provisions of the leases and farmout agreements described in Exhibit "A" hereof.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 1st _____ day of _____ April _____ , (year) __2002__ .

~~_____ who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____, have been made to the form.~~

### OPERATOR

Witness

Witness — Deborah C Walker

**SKLAR EXPLORATION COMPANY, L.L.C.**

By: David A. Barlow, Chief Operating Officer

### NON-OPERATORS

Witness

Witness — Deborah C Walker

**SKLARCO L.L.C.**

By: David A. Barlow, Chief Operating Officer

**MIKE ROGERS DRILLING CO., INC.**

Witness

Witness

By: Mike Rogers, President

**HILLIARD ACQUISITION II L.L.C.**

Witness — Martin M. Rousset

Witness — Wendy Simcoe

By: E. L. Hilliard, Jr., Member/Manager

**FLOURNOY FAMILY PROPERTIES LTD.**

Witness

Witness

By: Lucien Flournoy, General Partner

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____April_____ , (year) __2002__ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____, have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY, L.L.C.

Witness _____

By: David A. Barlow, Chief Operating Officer

Witness _____

NON-OPERATORS

SKLARCO L.L.C.

Witness _____

By: David A. Barlow, Chief Operating Officer

Witness _____

MIKE ROGERS DRILLING CO., INC.

_Craig Rogers_
Witness _____

_Mike Rogers_
By: Mike Rogers, President

_Melissa Dickson_
Witness _____

HILLIARD ACQUISITION II L.L.C.

Witness _____

By: E. L. Hilliard, III, Member/Manager

Witness _____

FLOURNOY FAMILY PROPERTIES LTD.

Witness _____

By: Lucien Flournoy, General Partner

Witness _____

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE XVI.**
**MISCELLANEOUS**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____April_____ , (year) __2002__ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____, have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY, L.L.C.

By: David A. Barlow, Chief Operating Officer

_____
Witness

_____
Witness

NON-OPERATORS

SKLARCO L.L.C.

By: David A. Barlow, Chief Operating Officer

_____
Witness

_____
Witness

MIKE ROGERS DRILLING CO., INC.

By: Mike Rogers, President

_____
Witness

_____
Witness

HILLIARD ACQUISITION II L.L.C.

By: E. L. Hilliard, III, Member/Manager

_____
Witness

_____
Witness

FLOURNOY FAMILY PROPERTIES LTD.

By: Lucien Flournoy, General Partner

_____
Witness

_____
Witness

- 15 -

**ACKNOWLEDGMENT**

STATE OF LOUISIANA

PARISH OF CADDO

On this 25th day of April _____, 2002, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for Sklar Exploration Company, L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_Kim S. Elias_
Notary Public in and for the Parish of Caddo
State of Louisiana   KIM S. ELIAS, Notary Public
Caddo Parish, Louisiana
My Commission is for Life

**ACKNOWLEDGMENT**

STATE OF LOUISIANA

PARISH OF CADDO

On this 25th day of April _____, 2002, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for Sklarco L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_Kim S. Elias_
Notary Public in and for the Parish of Caddo
State of Louisiana   KIM S. ELIAS, Notary Public
Caddo Parish, Louisiana
My Commission is for Life

**ACKNOWLEDGMENT**

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2002, before me appeared Mike Rogers, to me known, who being by me duly sworn, did say that he is the President of Mike Rogers Drilling Co., Inc., an Arkansas corporation, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

**ACKNOWLEDGMENT**

STATE OF LOUISIANA

PARISH OF CADDO

On this 25th day of April _____, 2002, before me appeared E. L. Hilliard,      to me known, who being by me duly sworn, did say that he is the Member/Manager of Hilliard Acquisitions II L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_Virginia V. Brown_
Notary Public in and for the Parish of Caddo
State of Louisiana   VIRGINIA V. BROWN
NOTARY PUBLIC in and for
Bossier-Caddo Parish, Louisiana
My commission is for Life.

**ACKNOWLEDGMENT**

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2002, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for Sklar Exploration Company, L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

**ACKNOWLEDGMENT**

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2002, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for Sklarco L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

**ACKNOWLEDGMENT**

STATE OF ARKANSAS

COUNTY OF COLUMBIA

On this _25th_ day of ____April_____, 2002, before me appeared Mike Rogers, to me known, who being by me duly sworn, did say that he is the President of Mike Rogers Drilling Co., Inc., an Arkansas corporation, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the State of Arkansas
County of Columbia

**ACKNOWLEDGMENT**

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2002, before me appeared E. L. Hilliard, III, to me known, who being by me duly sworn, did say that he is the Member/Manager of Hilliard Acquisitions II L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

## ACKNOWLEDGMENT

STATE OF TEXAS

COUNTY OF *Jim Wells*

On this *15th* day of _____ *May* _____, 2002, before me appeared Lucien Flournoy, to me known, who being by me duly sworn, did say that he is a General Partner of Flournoy Family Properties LTD, a Texas limited partnership, and that the foregoing instrument was signed by him on behalf of said partnership, and said Appearer acknowledged said instrument to be the free act and deed of said partnership.

IN WITNESS WHEREOF, I hereunto set my hand and official seal *Sue Murdock*

_____
Notary Public in and for the State of Texas

SUE MURDOCH
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 01-25-2005

EXHIBIT "A"

ATTACHED TO AND MADE A PART OF THAT CERTAIN OPERATING AGREEMENT DATED THE 1ST DAY OF APRIL, 2002, BY AND BETWEEN SKLAR EXPLORATION COMPANY, L.L.C., AS OPERATOR AND SKLARCO., ET AL, AS NON-OPERATOR(S).

(1) Identification of Lands Subject to this Agreement:

**Contract Area**

Township 13 North, Range 9 West
Red River Parish, Louisiana
All of Sections 1, 2, 10, and 11

**Area of Mutual Interest**

Township 13 North, Range 9 West
Red River Parish, Louisiana
All of Section 1, 2, 3, 10, 11, and 12
And the North Half of Section 13, 14, and 15

Township 13 North, Range 8 West
Red River Parish, Louisiana
West Half of Section 6, 7, and 18

Township 14 North, Range 8 West
Red River Parish, Louisiana
West Half of Section 31

Township 14 North, Range 9 West
Red River Parish, Louisiana
All of Section 34, 35 and 36

(2) Restrictions, if any, as to Depths, Formations, or Substances:

There are no restrictions except as may be provided for in any lease or contract subject to this Operating Agreement.

(3) Decimal interest and names and addresses of Parties to this Agreement:

| OWNERS | BEFORE PAYOUT* | AFTER PAYOUT* |
|---|---|---|
| Sklarco, L.L.C. | .700 | .775 |
| Mike Rogers Drilling Co., Inc. | .100 | .075 |
| Hilliard Acquisition II L.L.C. | .100 | .075 |
| Flournoy Family Properties, LTD. | .100 | .075 |
| Total | 1.00 | 1.000 |

*"Payout" is defined in Section 1.3 of the Participation Agreement to which this Operating Agreement is attached as Exhibit "D."

(4) Oil and Gas Leases and/or oil and gas interests subject to this Agreement:

(a) See Exhibit "A-1" Description of Leases. All leases and interests are subject to that certain Prospect Purchase Agreement for the Martin Prospect dated effective as of July 1, 2000, by and between Sklar Exploration Company, L.L.C. and Integrated Exploration Corporation.

(b) Unrecorded Farmout Letter Agreement dated February 11, 2002, agreed to and accepted February 21, 2002, by and between Marathon Oil Company, as Farmor, and Sklar Exploration Company, L.L.C., as Farmee.

(5)     Addresses of parties for notice purposes:

Sklar Exploration Company, L.L.C.
Attention:  David A. Barlow
401 Edwards Street, Ste. 1601
Shreveport, LA  71101
Phone:  (318) 227-8668
Fax:  (318) 227-9012

Sklarco, L.L.C.
Attention:  David A. Barlow
401 Edwards Street, Ste. 1601
Shreveport, LA  71101
Phone:  (318) 227-8668
Fax:  (318) 227-9012

Mike Rogers Drilling Co., Inc.
100 North Street, Ste. 18
Magnolia, AR  71753
Phone:  (870) 234-2356
Fax:  (870) 234-7487

Hilliard Acquisitions II L.L.C.
401 Edwards Street, Ste. 2000
Shreveport, LA  71101-3160
Phone:  (318) 424-5345
Fax:  (318) 429-4911

Flournoy Family Properties, LTD.
Attention:  Lucien Flournoy
P.O. Box 1578
Alice, TX  78333-0491
Street Address:  1909 E. Main, Alice TX  78332
Phone:  (361) 664-8989
Fax:  (361) 668-0121

EXHIBIT "A" - 1" TO OPERATING AGREEMENT
MARTIN PROSPECT
RED RIVER PARISH, LA

| LESSOR | LESSEE | LEASE DATE | EXP. DATE | GR. AC. | NET ACRES | ROY. | ORRI | DESCRIPTION | REG. # | VOL | PAGE | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ivy Clayton Dupree, ux | Sklar Expl. Co., LLC | 4/24/00 | 4/24/03 | 120.00 | 40.00 | 3/16 | 3% | Sec. 2: NE NW; SW NE, W/2 SE NE, W/2 NW NE | 196280 | 284 | 215 | |
| Helen Delcache Living Trust | Sklar Expl. Co., LLC | 4/24/00 | 4/24/03 | 40.00 | 40.00 | 3/16 | 3% | Sec. 2: NE NW; SW NE, W/2 SE NE, W/2 NW NE | 196279 | 284 | 213 | |
| Hubert Lane Joyner, etal | Sklar Expl. Co., LLC | 4/24/00 | 4/24/03 | 120.00 | | 3/16 | 3% | Sec. 2: NE NW, SW NE, W/2 SE NE, W/2 NW NE | 196278 | 284 | 211 | |
| International Paper Co., etal | Sklar Expl. Co., LLC | 4/28/00 | 4/28/02 | 560.00 | 560.00 | 1/4 | 3% | Sec. 2: NW NW, SW NE; W/2 SE NE, W/2 NW NE | 196277 | 284 | 208 | • |
| Creswood Land Mng't, L.P. | Sklar Expl. Co., LLC | 5/23/01 | 5/23/04 | 120.00 | 120.00 | 3/16 | 3% | Sec. 2: SW NE, SE SW; NW SE / Sec. 2: NE NE; E/2 NW NW; E/2 SE NE | 195820 | 283 | 491 | |
| Edgar Cason, ux | Sklar Expl. Co., LLC | 5/29/00 | 5/29/04 | 10.00 | 10.00 | 3/16 | 3% | Sec. 2: 40 ac. in W/2 NW/4 / SE/4 SE/4 SE/4 | 195818 | 283 | 495 | |
| Catherine Stephens Harrell | Sklar Expl. Co., LLC | 6/1/01 | 6/1/04 | 10.00 | 10.00 | 1/6 | 3% | Sec. 11: NE/4 SE/4 SE/4 | 195819 | 283 | 488 | |
| Jo. C. Lawson | Sklar Expl. Co., LLC | 10/24/00 | 10/24/04 | 160.00 | 160.00 | 3/16 | 3% | Sec. 11: W/2 SW & Sec. 10: E/2 SE | 196400 | 284 | 381 | |
| William J. Colbert, Jr. | Sklar Expl. Co., LLC | 11/1/01 | 11/1/03 | 120.00 | 22.50 | 1/4 | 3% | Sec. 11: N2 NE4 & SE/4 NE4 | 196643 | 284 | 834 | |
| Elizabeth C. Flournoy | Sklar Expl. Co., LLC | 11/1/01 | 11/1/03 | 120.00 | 22.50 | 1/4 | 3% | Sec. 11: N2 NE4 & SE/4 NE4 | 196646 | 284 | 846 | |
| Reagor Family LLC | Sklar Expl. Co., LLC | 11/1/01 | 11/1/03 | 120.00 | 22.50 | 1/4 | 3% | Sec. 11: N2 NE4 & SE/4 NE4 | 196645 | 284 | 842 | |
| Joanna Hunter Beaird Carson | Sklar Expl. Co., LLC | 11/1/01 | 11/1/03 | 120.00 | 30.00 | 1/4 | 3% | Sec. 11: N2 NE4 & SE/4 NE4 | 196644 | 284 | 838 | |
| Harley R. Colbert, Sr. | Sklar Expl. Co., LLC | 11/1/01 | 11/1/03 | 120.00 | 22.50 | 1/4 | 3% | Sec. 11: N2 NE4 & SE/4 NE4 | 196538 | 284 | 648 | |
| James M. Moore | Sklar Expl. Co., LLC | 11/16/01 | 11/16/04 | 120.00 | 42.00 | 3/16 | 3% | Sec. 11: 39.0 ac in W/2 NW/4 | 196536 | 284 | 642 | |
| Marshall Moore, ux | Sklar Expl. Co., LLC | 11/16/01 | 11/16/04 | 104.00 | 10.00 | 3/16 | 3% | Sec. 10: E/2 NE less North 15 ac. / Sec. 10: 39.0 ac. less North 15 ac. / Sec. 11: 39.0 ac in W/2 NW/4 / Sec. 10: E/2 NE less North 15 ac. | 196537 | 284 | 645 | |
| Sidney Moore, ux | Sklar Expl. Co., LLC | 11/16/01 | 11/16/04 | 105.00 | 53.00 | 3/16 | 3% | Sec. 10 & 11: 1.0 ac. tract in NW/4 of Sec. 10 & / NE/4 of Sec. 11 | 196535 | 284 | 639 | |
| The Connell Living Trust | Sklar Expl. Co., LLC | 2/28/01 | 2/28/03 | 40.00 | 13.33 | 3/16 | 3% | Sec. 11: NE/4 of SE/4 | | | | |
| Barbara Koetter | Sklar Expl. Co., LLC | 2/28/01 | 2/28/03 | 40.00 | 4.44 | 3/16 | 3% | Sec. 11: NE/4 of SE/4 | | | | |
| Harriet K. Bridges | Sklar Expl. Co., LLC | 2/28/01 | 2/28/03 | 40.00 | 4.44 | 3/16 | 3% | Sec. 11: NE/4 of SE/4 | | | | |
| Elizabeth K. Allison | Sklar Expl. Co., LLC | 2/28/01 | 2/28/03 | 40.00 | 4.44 | 3/16 | 3% | Sec. 11: NE/4 of SE/4 | | | | |
| Theodore G. Mullens | Sklar Expl. Co., LLC | 2/28/01 | 2/28/03 | 40.00 | 0.00 | 3/16 | 3% | Sec. 11: NE/4 of SE/4 | | | | |
| Gamette Sue Long | Sklar Expl. Co., LLC | 2/28/01 | 2/28/03 | 40.00 | 6.67 | 3/16 | 3% | Sec. 11: NE/4 of SE/4 | | | | |
| Sheila Mullens Riffe | Sklar Expl. Co., LLC | 2/28/01 | 2/28/03 | 40.00 | 6.67 | 3/16 | 3% | Sec. 11: NE/4 of SE/4 | | | | |
| TOTALS | | | | | 1245.00 | | | | | | | |

EXHIBIT "A-2" TO OPERATING AGREEMENT
DATED APRIL 1, 2002
MARTIN PROSPECT



Bath Form Louisiana Spec. 14-BR1-2A-NL  Paid up R2/99

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of _____, _____ between

Lessor (whether one or more) whose address is: _____

and _____ Lessee,

whose address is _____

WITNESSETH:

1   Lessor in consideration of  One Hundred Dollars and Other Valuable Considerations ($100.00 & OVC), in hand paid, of the royalties herein provided, and of the agreement of Lessee herein contained, hereby grants, leases and lets unto Lessee, the exclusive right to enter upon and use the land hereinafter described for the exploration for and production of oil, gas, sulphur and all other minerals, together with the use of the surface of the land for all purposes incident to the exploration for and production, ownership, possession and transportation of said minerals (either from said land or acreage pooled therewith), and the  right to dispose of salt water, with the right of ingress and egress to and from said lands at all times for such purposes, including for operations hereunder or in connection with similar operations on adjoining land; the land to which this lease applies and which is affected hereby

being situated in _____ Parish, Louisiana, and described as follows, to-wit:

This lease shall  also extend and apply to any interest therein which Lessor may hereafter acquire, including, but not limited to, outstanding mineral rights acquired by reversion, prescription or otherwise, and includes batteries, accretions, roads, highways, easements, right-of-ways and all land, if any, contiguous or adjacent to, or adjoining the land particularly described above.  Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land.  For the purposes of determining the amount of bonus and the shut-in royalty payment  hereunder, said land shall be deemed to contain _____ acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof.

2.   Subject to the other provisions herein contained, this lease shall be for a period of _____ years from the date hereof (called "primary term") and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith, or (2) it is maintained in force in any other manner herein provided.

3.   For the consideration hereinabove recited, this lease shall remain in full force and effect during the primary term, without any additional payment and without Lessee being required to conduct any operations on the land (either before or after the discovery of minerals), except to drill such wells as might be necessary to protect the land from drainage, as hereinafter provided.

4.   The royalties to be paid by Lessee are:   (a) on oil, and other hydrocarbons which are produced at the well in liquid form by ordinary production methods, one-eighth of that produced and saved from said land, same to be delivered at the wells or to the credit of Lessor in the pipe line to which the wells may be connected; Lessor's interest in either case to bear its proportion of any expenses for treating the oil to make it marketable as crude; Lessee may from time to time purchase any royalty oil or other liquid hydrocarbons in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas, or other gaseous substance produced from said land and sold or used off the premises or for the extraction of gasoline or other products therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; such gas, casinghead gas, residue gas, or gas of any other nature or description whatsoever, as may be disposed of for no consideration to Lessee, either through unavoidable waste or leakage, or in order to recover oil or other liquid hydrocarbons, or returned to the ground, shall not be deemed to have been sold or used either on or off the premises within the meaning of this paragraph 4 hereof; (c) on all other  minerals mined and marketed, one-eighth, either in kind or value at the well or mine, at Lessee's election, except that on sulphur the royalty shall be one dollar ($1.00) per long ton.

5.   If Lessee during or after the primary term should drill a well capable of producing gas or gaseous substances in paying quantities, (or which although previously produced Lessee is unable to continue to produce) and should Lessee be unable to operate said well because of lack of market or marketing facilities or governmental restrictions, then Lessee's rights may be maintained beyond or after the primary term without production of minerals or further drilling operations by paying Lessor as royalty a sum equal to one dollar (1.00) per acre of land covered hereby per year, the first payment being due, if said well should be completed or shut-in after the primary term, within ninety (90) days after the completion of such well or the cessation of production and such payment will extend Lessee's rights from the date of such completion or cessation.  If such a well should be completed during the primary term, the first payment, if made by Lessee, shall be due within 90 days after such well is shut-in, or before the expiration date of the primary term herein fixed, whichever is the later date. Thereafter Lessee's rights may be continued from year to year by making annual payments in the amount stated on or before the anniversary date beginning with the date of completion of said well (if completed after the primary term) or the end of the primary term (if completed prior thereto) as the case may be;  each of such payments to extend Lessee's rights for one year.  The annual payments herein provided for may be deposited to Lessor's credit in the _____

_____ Bank of _____ which bank shall be and remain Lessor's agent for such purpose regardless of any change or changes in the ownership of the land or mineral rights therein.  The owners of the royalty as of the date of such payments shall be entitled thereto in proportion to their ownership of said royalty.  The provisions of this paragraph shall be recurring at all times during the life of this lease. Should any well producing gas or gaseous substances be completed on a drilling unit which includes any part of the land herein leased, the provisions of this paragraph shall be subject to all other agreements herein contained allowing the pooling of the above described lands with other lands.

6.   If within ninety (90) days prior to the end of the primary term, Lessee should complete or abandon a well on the lands described above or on land pooled therewith, or if production previously secured should cease from any cause, this lease shall continue in force and effect for ninety (90) days from such completion or abandonment or cessation of production.  If at the expiration of the primary term or at the expiration of the ninety (90) day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith, but Lessee is then engaged in operations for drilling, completion or reworking, completion or reworking thereon, or operations to achieve or restore production, or operations to achieve or restore production, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations for drilling, completion or reworking, or operations to achieve or restore production, with no cessation between operations or between such cessation of production and additional operations of more than ninety (90) consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith.  If sulphur be encountered on said premises or on land pooled therewith, this lease shall continue in force and effect so long as Lessee is engaged with due diligence in explorations for and/or erecting a plant for the production of sulphur and thereafter subject to the foregoing provisions hereof so long as oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith.

7.   Lessee is hereby granted the right as to all or any part of the land described herein, without Lessor's joinder, to combine, pool or unitize the acreage royalty or mineral interest covered by this lease, or any portion thereof,  at any time during the life of this lease, with any other land, lease or leases, royalty or mineral interests in or under any other tract or tracts of land in the vicinity thereof, whether owned by Lessee or others, when owned by Lessee or some other Person, or corporation so as to create, by the combination of such lands and leases, one or more operating units, as to any and all mineral horizons, provided that no one operating unit shall, in the case of gas, including condensate, embrace more than six hundred forty (640) acres, and in the case of oil, including casinghead gas, embrace more than eighty (80) acres; and provided further, however, that if any spacing or other rules and regulations of the State or Federal Commission, Agency, or regulatory body having or claiming jurisdiction shall hereafter or shall at any time hereafter permit or prescribe a drilling or operating unit or spacing rule in the case of gas, including condensate, greater than six hundred forty (640) acres, or in the case of oil or casinghead gas greater than eighty (80) acres, then the unit or units herein contemplated may have, or may be redesigned so as to have, as the case may be, the same surface content as, but not more than, the unit or the acreage in the spacing rule so prescribed or permitted. However, it is further specifically understood and agreed, anything herein to the contrary notwithstanding, that the Lessee shall have the right to, and the benefit of an acreage tolerance of ten per cent in excess of any drilling or operating unit authorized herein.  The commencement of operations for the drilling of a well, or the completion of a well to production of either oil, gas, casinghead gas, condensate or other minerals on any portion of an operating unit in which all or any part of the land described herein is embraced, or production of oil, gas, casinghead gas, condensate, or other minerals therefrom shall have the same effect under the terms of this lease as if a well were commenced, completed or producing oil, gas, casinghead gas, condensate, or other minerals in paying quantities on the land embraced by this lease.  Lessee shall execute in writing and file for record in the records of the Parish in which the lands herein leased are located, an instrument identifying or describing the pooled acreage, or an instrument supplemental thereto redesignating same, as the case may be.  Either prior to the securing of production from any unit created under the authority hereinabove granted, or after cessation of production if after cessation Lessee shall have the right to dissolve the unit so created, without Lessor's joinder or further consent, by executing in writing and placing of record in the Parish or Parishes in which the lands making up such unit may be located, an instrument identifying and dissolving such unit.  The provisions hereof shall be construed as a covenant running with the land and shall inure to the benefit of and be binding upon the parties hereto, their heirs, representatives, successors and assigns.  In the event such operating unit or units is/are so created by Lessee, Lessor shall receive out of production or the proceeds from production from such operating unit or units or out of the shut-in royalty provided for above, such portion of the royalty or of the shut-in royalty specified herein as the number of acres (mineral acres) out of the lease placed in any such operating unit or units bears to the total number of acres included in such operating unit or units.

8.   If Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the payments provided herein shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

9.   Lessee shall have the exclusive right to explore the land herein described by geological, geophysical or other methods, whether similar to those herein specified or not and whether now known or not, including the drilling of holes, use of torsion balance, seismograph explosions, magnetometer, or other geophysical or  geological instruments, test or procedures, for

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

# EXHIBIT "C"

Attached to and made a part of  the Operating Agreement dated April 1, 2002 between Sklar Exploration Company L.L.C. as Operator, and Sklarco, L.L.C. et al as Non-Operators, covering the Martin Prospect located in Red River Parish, Louisiana.

# ACCOUNTING PROCEDURE

# JOINT OPERATIONS

## I. GENERAL PROVISIONS

### 1.    Definitions

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

### 2.    Statement and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

### 3.    Advances and Payments by Non-Operators

A.    Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B.    Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at Bank One, Shreveport, Louisiana on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

### 4.    Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

## COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.

- 1 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

5.   **Audits**

A.   A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B.   The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6.   **Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.   **Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2.   **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

3.   **Labor**

A.   (1)   Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2)   Salaries of First level Supervisors in the field.

(3)   Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4)   Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation or the Joint Property if such charges are excluded from the overhead rates.

B.   Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D.   Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4.   **Employee Benefits**

Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.



COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

5. **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6. **Transportation**

Transportation of employees and Material necessary for the Joint Operations ~~shall be charged at actual cost incurred by Operator.~~ ~~but subject to the following limitations:~~

~~A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.~~

~~B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.~~

~~C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.~~

7. **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8. **Equipment and Facilities Furnished By Operator**

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed __fifteen__ percent ( __15__ %) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9. **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10. **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, ~~except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.~~   and the costs and expenses incurred in connection with hearings and other matters before governmental bodies and agencies and costs and expenses incurred in examining and curing title.

11. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

COPAS   1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

**12.**   **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**13.**   **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

**14.**   **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property.   In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

**15.**   **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

### III. OVERHEAD

**1.**   **Overhead - Drilling and Producing Operations**

i.   As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph lA, or
(     ) Percentage Basis, Paragraph lB

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II.   The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii.   The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

(     ) shall be covered by the overhead rates, or
( X ) shall not be covered by the overhead rates.

iii.   The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

(     ) shall be covered by the overhead rates, or
( X ) shall not be covered by the overhead rates.

A.   Overhead - Fixed Rate Basis   See ADDITIONAL REVISIONS page 9.

(1)   Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $___8,500.00_____
(Prorated for less than a full month)

Producing Well Rate $___850.00_____

(2)   Application of Overhead - Fixed Rate Basis shall be as follows:

(a)   Drilling Well Rate

(1)   Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b) Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B.   Overhead - Percentage Basis

(1)   Operator shall charge the Joint Account at the following rates:

(a)   Development

_____ Percent (_____%) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b)   Operating

_____ Percent (_____%) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2)   Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 3 of this Section III. All other costs shall be considered as operating.

2.   Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

Account for overhead based on the following rates for any Major Construction project in excess of $ __25,000.00__ :

A. ___5___ % of first $100,000 or total cost if less, plus

B. ___4___ % of costs in excess of $100,000 but less than $1,000,000, plus

C. ___3___ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3. **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. ___5___ % of total costs through $100,000; plus

B. ___4___ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. ___3___ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4. **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV.   PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A. New Material (Condition A)

(1) Tubular Goods Other than Line Pipe

(a) Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at ~~/ Eastern mill~~ cost, ~~published carload base prices effective as of date of movement plus transportation cost using the 30,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 30,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.~~

(b) For grades which are special to one mill only, prices shall be computed at ~~/ the mill base of that mill plus~~ cost, ~~transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000~~

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS



pound Oil Field Haulers Association interstate truck rate shall be used.

   (c)   Special end finish tubular goods shall be priced at / cost. the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

   (d)   Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at / cost. the lowest published out-of-stock price f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2)   Line Pipe

   (a)   Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced / at cost. under provisions of tubular goods pricing in Paragraph A.(l)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

   (b)   Line Pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at / cost. Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(l)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

   (c)   Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced / at cost. f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

   (d)   Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at / cost. quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3)   Other Material shall be priced at / cost. the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4)   Unused new Material, except tubular goods, moved from the Joint Property shall be priced at / cost. the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(l) and (2).

B.   Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1)   Material moved to the Joint Property

   At seventy-five percent (75%) of current / market value. new price, as determined by Paragraph A.

(2)   Material used on and moved from the Joint Property

   (a)   At seventy-five percent (75%) of current / market value. new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

   (b)   At sixty-five percent (65%) of current / market value. new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material

(3)   Material not used on and moved from the Joint Property

   At seventy-five percent (75%) of current / market value. new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C.   Other Used Material

(1)   Condition C

   Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at / current market value. fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2) Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a) Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight.  Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b) Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3) Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading or unloading costs may be charged to the Joint Account at / ~~the rate of twenty-five cents (25¢) per hundred weight~~ **actual costs incurred by Operator** on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph I.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material.  Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator, provided however, if a Non-Operator elects to furnish material in kind, such material must (a) meet the quality specifications set by Operator, and (b) be inspected by Operator with inspection costs to be billed to the Joint Account.

4. **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished.  In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of  a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

COPAS   1984   ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.   **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.   In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.   **Expense of Conducting Inventories**

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

**ADDITIIONAL REVISIONS**
(1)   In the event the subject well is expected to be above the State threshold for H2S sour gas operations, the Drilling Well rate set forth in Art. III.1.A(1) will be increased by $2000.00 per month and the associated Producing Well Overhead Rate will be increased an additional $100.00 per month.

## EXHIBIT "D"

This Exhibit "D" is attached to and made a part of that Operating Agreement dated the 1st day of April, 2002, by and between Sklar Exploration Company L.L.C, as Operator, and Sklarco, L.L.C., et al, as Non-Operators.

## INSURANCE

Operator shall carry the following insurance with the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of insurance will be provided upon request.

I.   WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

    A.   Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

    B.   Extension of Coverage B of policy to provide for not less than $500,000 for death or injury to one person in any one accident.

II   COMPREHENSIVE GENERAL LIABILITY

Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $2,000,000 for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III   AUTOMOBILE LIABILITY

Coverage shall include owned, non-owned and hired vehicles. Limit $500,000 combined single limit each occurrence for bodily injury and property damage.

IV   EXCESS LIABILITY

Operator shall carry excess liability insurance in an amount necessary to provide a total of $10,000,000 coverage for both Automobile Liability and Comprehensive General Liability.

Any party, at its own expense, may carry its own coverage for Excess Liability Insurance with limits as set forth in this Section IV. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

V.   EXTRA EXPENSE LIABILITY

Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $25,000 per occurrence.

Liability Limit: $5,000,000

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder.

**EXHIBIT "E"**

This Exhibit "E" is attached to and made a part of that Operating Agreement dated the 1st day of April, 2002 by and between Sklar Exploration Company L.L.C. as Operator, and Sklarco, L.L.C. et al, as Non-Operators.

GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement, the parties hereto own and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area described in the Operating Agreement (the "JOA").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the gas produced from said JOA. However, one or more of the parties may be unable to take or market its interest in the gas production from time to time; therefore, to permit any party to produce and dispose of its interest in the gas production from the JOA with as much flexibility as possible, the parties hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser. Any party whose share of gas is not marketed shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operations, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto monthly statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ration of its participation percentage under this Operating Agreement to the participating percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, it any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Operator will, in turn, make settlement for all royalties and overriding royalties which are payable on gas produced from the Contract Area. In the event that the total royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Contract Area, then any such deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Contract Area shall furnish the Operator with division order title opinions on which Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser shall pay, or

1

cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the volume of gas actually taken for its account.

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold or took but did not sell, less applicable production taxes and royalties theretofore paid, less any reasonable compression treating, gathering or transportation costs actually incurred and paid to third party, unaffected entitles and otherwise directly in connection with the sale of the overproduction, at the price received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party. Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.

2

NOTE: This model contract is a suggested guide only and use of this form or any variation thereof shall be at the sole discretion and risk of the user parties. Users of the model contract or any portion thereof are encouraged to seek the advice of counsel to ensure that their contract reflects the complete agreement of the parties and applicable law. The International Association of Drilling Contractors disclaims any liability whatsoever for loss or damages which may result from use of the form contract or portions or variations thereof.

*Revised July, 1998*



**INTERNATIONAL ASSOCIATION OF DRILLING CONTRACTORS**

## MODEL TURNKEY CONTRACT

## THIS AGREEMENT CONTAINS PROVISIONS RELATING TO INDEMNITY, RELEASE OF LIABILITY, AND ALLOCATION OF RISK

THIS AGREEMENT (The "Contract") is made and entered into on the date hereinafter set forth by and between the parties herein designated as "Operator" and "Contractor."

| | |
|---|---|
| OPERATOR: | SKLAR EXPLORATION, LLC         ATTN:  MR. MIKE WEISS |
| Address: | 401 EDWARDS STREET, STE 1601 |
| | SHREVEPORT, LA  71101 |
| CONTRACTOR: | MIKE ROGERS DRILLING COMPANY, INC. |
| Address: | P. O. BOX 126 |
| | MAGNOLIA, AR. 71754-0126 |

IN CONSIDERATION of the mutual promises, conditions and agreements herein contained and the specifications and special provisions set forth in Exhibit "A" and Exhibit "B" attached hereto and made a part hereof, Operator engages Contractor as an independent Contractor to drill the hereinafter designated well in search of oil or gas on a turnkey basis.

For purposes hereof the term "turnkey basis" means Contractor shall furnish the equipment, labor, and perform services as herein provided to drill a well, as specified by Operator, to the turnkey depth. Subject to terms and conditions hereof, payment to Contractor at a stipulated price is earned upon attaining such turnkey depth and completion of the other obligations of Contractor hereunder. While drilling on a turnkey basis Contractor shall direct, supervise and control drilling operations and assumes certain liabilities to the extent specifically provided for herein. Notwithstanding that this is a turnkey contract, Contractor and Operator recognize that certain portions of the operations as hereinafter designated, may be performed on a daywork basis. For purposes hereof the term "daywork basis" means Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of Operator (inclusive of any employee, agent, consultant, or subcontractor engaged by Operator to direct drilling operations). When operating on a daywork basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein as being applicable during daywork operations. Except for such obligations and liabilities specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a daywork basis, including results and all other risks or liabilities incurred in or incident to such operations.

1. **LOCATION OF WELL:**
   Well name
   and number: _____IPCO #1_____
   Parish/
   County: RED RIVER____ State: LOUISIANA____ Field Name: MARTIN____
   Well location and
   land description: ____SECTION 2-T13N-R9W____

   The above is for well and contract identification only and Contractor assumes no liability whatsoever for a proper survey or location stake on Operator's lease.

2. **COMMENCEMENT DATE:**

   2.1 Contractor agrees to use reasonable efforts to commence operations for the drilling of the well by the __10th__ day of __May__, ~~19~~ 2002____, or _when location is complete and rig is available_____

   2.2 Notwithstanding any provision in this Contract to the contrary, in the event Operator fails, for any reason (including, but not limited to, Force Majeure), to permit Contractor to commence operations for the drilling of the well by _30 days from contract date_ Contractor may, at its option, elect to terminate this Contract, and Contractor's right to compensation shall be as set forth in Subparagraph 6.3(a) hereof.

3. **DEPTH:**

   Subject to the right of the Operator to direct the stoppage of work at any time (as provided in Paragraph 6), the well shall be drilled to the depth from the ~~surface as provided~~ as specified below:

   3.1 Turnkey Depth: The well shall be drilled to __7500__ feet or __N/A_____ of the ____N/A____ formation, or the depth at which the 4½ or 5½ inch casing or liner is set, whichever is the lesser depth, which will herein be referred to as the turnkey depth.

   3.2 Daywork Basis Drilling: All drilling below turnkey depth and all work performed which is not specified herein to be performed by Contractor on a turnkey basis shall be performed on a daywork basis as defined herein and Contractor shall be paid for such drilling and work at the applicable daywork rate specified below.

   3.3 (a) Contract Depth: The well shall be drilled to a total depth of __7500__ feet, or __N/A__ formation, whichever depth is first reached, which depth is hereunder referred to as the Contract depth.
       (b) Maximum Depth: Contractor shall not be required to drill said well under the terms of this Contract below a maximum depth of __8000__ feet.

4. **TURNKEY AMOUNT, DAYWORK RATES, BASIS OF DETERMINING AMOUNTS PAYABLE TO CONTRACTOR:**
   Contractor shall be paid as follows for the work performed hereunder.

   4.1 Turnkey Amount: For work performed on a turnkey basis herein provided the amount will be $__202,000.00__. The turnkey amount will be $__N/A__ if the turnkey depth is reached and the well is plugged and abandoned.

   4.2 Operating Day Rate: For work performed on a daywork basis the daywork rate per twenty-four hour day with __4__ man crew will be:

| DEPTH INTERVALS | | WITHOUT DRILL PIPE | WITH DRILL PIPE | |
|---|---|---|---|---|
| From | To | | Straight Hole | Directional or Uncontrolled Deviated Hole |
| 0 | 7500 | $ 7,900.00 per day | $ 7,900.00 per day | $ N/A per day |
| | | $ per day | $ per day | $ per day |
| | | $ per day | $ per day | $ per day |
| Using Operator's drill pipe | | $ N/A per day | | |

Revised July, 1938

Directional or uncontrolled deviated hole will be deemed to exist when deviation exceeds _____7_____ degrees or when the change of angle exceeds _____2_____ degrees per one hundred feet.

Drill pipe shall be considered in use not only when in actual use, but also while it is being picked up or laid down. When drill pipe is standing in the derrick, it shall not be considered in use, provided, however, that if Contractor furnishes special strings of drill pipe, drill collars, and handling tools as provided in Exhibit "A", the same shall be considered in use at all times when on location or until released by Operator. In no event shall fractions of an hour be considered in computing the amount of time drill pipe is in use but such time shall be computed to the nearest hour, with thirty minutes or more being considered a full hour and less than thirty minutes not to be counted.

4.3 Repair Time: In the event it is necessary to shut down Contractor's rig for repairs, excluding routine rig servicing, while Contractor is on a daywork basis hereunder, Contractor shall be allowed compensation at the applicable daywork rate for such shut down time up to a maximum of _____2_____ hours for any one rig repair job or _____6_____ hours for any ~~serial~~ ~~number~~ week. Routine rig servicing shall include, but not be limited to, cutting and slipping drilling line, changing pump or swivel expendables, lubricating rig, ~~xxx~~ etc.

4.4 Standby Time: Rate with Crews $ ___7,900.00___ per twenty-four (24) hour day. Rate without crews $ ___7,500.00___ per twenty-four (24) hour day. Standby time shall be defined to include time when the rig is shut down although in readiness to begin or resume operations but Contractor is waiting on orders of Operator or on materials, services or other items to be furnished by Operator.

4.5 Work Stoppage Rate: $ ___7,500.00___ Per day, $ ___312.50___ Per Hour. The above rate shall apply under the following circumstances:

(a) During any continuous period that normal operations are suspended or cannot be carried on due to conditions of Force Majeure as defined in Paragraph 20 hereof. It is understood, however, that Operator shall have the right to release the rig in accordance with Operator's right to direct stoppage of work (see Paragraph 6), effective when conditions will permit the rig to be moved from the location.

(b) During any period when Contractor has notified Operator that the rig is available for movement to the drilling site and movement cannot be accomplished because of Operator's failure or inability to furnish and/or maintain adequate roadway or location.

(c) During any period after operations other than this Contract have been completed and Operator has released the rig and the same cannot be dismantled and/or transported from the location due to inadequate roadway or location.

4.6 Reimbursable Costs: Operator shall reimburse Contractor for the costs of material, equipment, work or services which are to be furnished by Operator as provided for herein but which for convenience are actually furnished by Contractor at Operator's request, plus _____5_____ percent for such cost of handling.

4.7 Daywork Operations: In addition to other work specified herein the following work performed by Contractor shall be on a daywork basis:

(a) All drilling after completion of turnkey drilling including the setting of any string of casing below the turnkey depth.

(b) All work performed by Contractor, whether or not prior to reaching the turnkey depth, in an effort to restore the hole to such condition that further drilling or other operations may be conducted, in the event of loss or damage to the hole as a result of any delay by Operator or the failure, at any time, of materials, equipment, goods or services furnished by Operator.

(c) All other work performed by Contractor at the request of Operator, regardless of depth, which is not specified herein to be performed on a turnkey basis.

(d) All time when Contractor, in accordance with the terms hereof, has suspended turnkey operations to prepare for daywork operations, including all time required to restore the hole to the same drilling condition which existed when turnkey operations were suspended.

## 5. TIME OF PAYMENT:

Subject to Operator's right to require Contractor to furnish it with reasonable evidence that Contractor has paid all labor and material claims chargeable to Contractor, payment becomes due by Operator to Contractor as follows:

5.1 Turnkey Basis: Payment becomes due for all turnkey services when Contractor completes the drilling to turnkey depth and performs the services as specified under this Contract. Payment for such work shall be due and payable upon presentation of invoice to Operator and Operator's acceptance of work performed as specified in Paragraph 10.

5.2 Daywork Basis: Payment for drilling and other work performed at daywork rates shall become due upon acceptance by Operator of the work performed in accordance with this Contract upon presentation of invoice therefor upon completion of demobilization, rig release or at the end of the month in which such daywork was performed, whichever shall first occur.

5.3 Late Payment: Any sum or sums not paid within ___thirty (30)___ days after the date hereinabove specified shall bear interest at the rate of _____15_____ percent per annum or the maximum legal rate, whichever is less, from such date until paid.

## 6. STOPPAGE OF WORK BY OPERATOR OR CONTRACTOR:

6.1 By Operator: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, Operator shall have the right to direct the stoppage of work to be performed by the Contractor hereunder at any time prior to reaching the turnkey depth, and even though Contractor has made no default hereunder, in such event Operator shall be under no obligation to Contractor except as set forth in Subparagraph 6.3 hereof.

6.2 By Contractor: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, should Contractor fail to make any payment when due in accordance with this Contract or should the drilling unit be lost or destroyed or in the event Operator shall become insolvent, or be adjudicated bankrupt, or file, by way of petition or answer, a debtor's petition or other pleading seeking adjustment of Operator's debts, under any bankruptcy or debtor's relief laws now or hereafter prevailing, or if any such be filed against Operator, or in case a receiver be appointed of the Operator or Operator's property, or any part thereof, or Operator's affairs be placed in the hands of a Creditor's Committee, Contractor may, at its option, elect to terminate further performance of any work under this Contract and Contractor's right to compensation shall be as set forth in Subparagraph 6.3 hereof. In addition to Contractor's right to terminate performance hereunder, Operator hereby expressly agrees to protect, indemnify and save Contractor harmless from any claims, demands and causes of action, including all costs of defense in favor of Operator, Operator's co-ventures, or other parties arising out of any drilling commitments or obligations contained in any lease, farmout agreement or other agreement, which may be affected by such termination of performance hereunder.

6.3 Early Termination Compensation:

(a) Prior to Commencement: In the event Operator terminates this Contract prior to commencement of operations hereunder, Operator shall pay Contractor as liquidated damages, and not as a penalty, ___100___ % of all expenses reasonably and necessarily incurred and to be incurred by the Contractor by reason of this Contract and by reason of the premature stoppage of work, plus the sum of $___10%___.

(b) After Commencement: If such work stoppage occurs after commencement of operations, but before the turnkey depth is reached, the Operator shall pay Contractor as liquidated damages and not as a penalty:

(1) an amount equal to the number of days the rig was moving (including time spent rigging up and dismantling the rig) or in operation at the applicable day rate shown in Subparagraph 4.2; plus

(2) ___100___ % of the cost of all items furnished by the Contractor that would have been furnished by the Operator if the Contract had been on a daywork basis; plus

(3) ___100___ % of the cost of all other expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of this Contract and by reason of the premature stoppage of work excluding, however, the expense of normal drilling crew and supervision; plus

(4) the sum of $___5,000.00___.

## 7. CASING PROGRAM:

7.1 The casing program to be followed in the drilling of said well is set forth in Exhibit "A", Paragraph 2 and Contractor shall drill a hole of size specified in Exhibit "A", Paragraph 2, to set at the approximate depth therein indicated the size of casing so specified.

7.2 The setting of any string of casing within the turnkey depth shall be performed as specified in Exhibit "A", Paragraph 10.

7.3 The setting of any string of casing below the turnkey depth shall be performed on a daywork basis.

7.4 Operator or Contractor may modify said casing program provided any modifications thereof which materially increase Contractor's hazards or costs of performing its obligations hereunder can only be made by mutual written consent of Contractor and Operator. In such event Contractor agrees to run casing, cement and test cement on such liners and strings of casing and to perform cement squeezing jobs as required by Operator. Operator shall furnish all necessary materials and services and all such work shall be on a daywork basis.

Revised July, 1998

**8.   LABOR, EQUIPMENT, MATERIALS, SUPPLIES, AND SERVICES:**

The furnishing of labor, equipment, appliances, materials, supplies, and services of whatever character necessary or proper in the drilling and completion of said well and not otherwise specifically provided for herein shall be furnished by Contractor or Operator as specified in Exhibit "A".

**9.   DRILLING METHODS AND PRACTICES:**

9.1 Contractor shall maintain well control equipment in good condition at all times and shall use all reasonable means to prevent and control fires and blowouts and to protect the hole.

9.2 The drilling mud shall be provided by the party designated in Exhibit "A", Subparagraph 10.36. The Contractor shall have the right to control the mud program and determine the type and character of drilling fluid during the time that Contractor is performing work on a turnkey basis under the terms of this Contract as specified in Exhibit "A", Paragraph 5.

9.3 Subject  to  the terms hereof, at all times during the drilling of the well on a daywork basis  Operator  shall have the right to control the mud program, and the drilling fluid must be of a type and have characteristics acceptable to Operator and be maintained by Contractor in accordance with specifications shown in Paragraph 5 of Exhibit "A".  The cost of maintaining the drilling fluid while on daywork will be borne by the party designated in Exhibit "A", Subparagraph 10.36.  No change or modification of said specifications which increases Contractor's hazards or costs of performing its obligations hereunder shall be made by Operator without consultation with and consent of Contractor.  Operator shall have the right to make any tests of the drilling fluid which may be necessary at Operator's expense.

9.4 Contractor  shall  measure the total length of drill pipe in service with a steel tape at  the  point  where the  turnkey  depth has been reached; and when requested by Operator, on a daywork basis, before setting casing or liner and after reaching final depth.

9.5 Contractor  agrees  to  furnish  equipment, workmen and instruments acceptable to Operator  and  to make slope tests as provided in Exhibit "A", Paragraph 4.  All such slope tests shall be made at Contractor's sole risk, cost and expense until turnkey depth is reached while working on a turnkey basis.  If, in the opinion of Operator, it becomes advisable to obtain the use of an additional slope test instrument and accessory equipment for the purpose either of checking previous readings or of determining the direction of the drift, the rental charges therefor shall be paid by Operator, and the running of same shall be on a daywork basis.  Should the hole, at any depth during the time Contractor is performing work on a turnkey basis, have either a deviation from vertical or a change in overall angle in excess of the limits prescribed in Exhibit "A", Paragraph 4, Contractor/agrees to restore the hole to a condition suitable within deviation, by conventional methods and procedures while drilling ahead or by cementing off and redrilling.  While operations are being performed on a daywork basis, or after turnkey depth is reached, Contractor agrees to exercise due diligence and shall maintain the straight hole specifications, if any, set forth in Paragraph 4 of Exhibit "A" but all risk and expense of maintaining such specifications or restoring the hole to a condition suitable for completion shall be assumed by Operator.

**10.   TURNKEY COMMITMENTS AND LIABILITY:**

10.1 Upon completion by  Contractor  of all operations to be performed by it under the turnkey basis as specified in  Exhibit "A", Paragraph 10, Contractor shall notify Operator of such completion by noting the date and hour of such completion upon the daily drilling report form required by Subparagraph 12.1 hereof.  No later than twenty-four (24) hours after Operator's receipt of such notification, Operator shall advise Contractor in writing of any objections it may have with respect to Contractor's performance hereunder.  Operator's failure to so object to Contractor's performance within the specified period shall be conclusive proof of Operator's acceptance of the well and Contractor's performance hereunder.

10.2 Upon acceptance of the work by Operator pursuant to Subparagraph 10.1 hereinabove, all risk of loss with respect to the well drilled hereunder and goods and services provided by Contractor shall pass to Operator.  Contractor shall have no liability for any defects in such completed operations.  Notwithstanding anything else contained herein to the contrary, Operator accepts all material, supplies, equipment and services furnished or performed by Contractor as is and where is.  CONTRACTOR MAKES NO WARRANTY, EXPRESSED OR IMPLIED, AS TO THE MERCHANTABILITY, OR FITNESS OF ANY MATERIALS, SUPPLIES OR EQUIPMENT FOR ANY PURPOSE.  NO WARRANTY OF GOOD AND WORKMANLIKE PERFORMANCE IS GIVEN BY THE CONTRACTOR BY VIRTUE OF THIS CONTRACT FOR ANY PERFORMANCE ACCEPTED BY OPERATOR.

**11.   CORING, DRILL STEM TEST, AND WIRELINE LOGGING:**

11.1 In the event additional rig time should be required for services or purposes other than that which Contractor agrees to furnish, as specified in Exhibit "A", Contractor shall perform such operations on a daywork basis.

11.2 As directed by  Operator  and utilizing the type of coring equipment specified in  Exhibit "A",  Paragraph 9, and furnished as shown in Exhibit "A", Subparagraph 10.88 and performed on a turnkey or daywork basis as shown in Exhibit "A", Subparagraph 10.89, Contractor agrees at any time to attempt either rat-hole or full hole conventional or wire line cores in the manner requested by Operator.

11.3 When requested by Operator, Contractor shall save and identify the cuttings and cores, free from contamination, and place them in separate containers which shall be furnished by Operator; cumulative time for circulating for samples for such cuttings and cores shall be limited to a total of ____0____ hours while on a turnkey basis.  All additional time consumed in circulating for samples shall be on a daywork basis.

11.4 Operator shall have a period of time, not to exceed See  11.6 hours from the time at which the last wireline log run specified in Exhibit "A", Paragraph 7 is out of the hole to determine whether a string of casing or liner is to be run or the well is to be plugged and abandoned.  All additional time which Operator may require to decide and to so advise Contractor to either commence the running of such string of casing or liner or to plug and abandon the well shall be on a daywork basis.  If Operator decides not to run a production string of casing the party so designated in Exhibit "A" Subparagraph 10.87 shall plug and abandon said well.  If Operator decides to run a production string of casing the party so designated in Exhibit "A" Subparagraph 10.79 shall furnish the materials and services required to run such string of casing.

11.5 If at any time  Operator  desires to conduct a drill stem test or wireline logging operation, it shall be Contractor's obligation to perform such operation subject to the provisions as specified in Exhibit "A".  Provided, however, if the Contractor considers the hole unsafe to perform such operation, Contractor shall so notify the Operator and provide an explanation.  Any such objection will be so noted on the daily drilling report.  Operator shall nevertheless have the right to have Contractor attempt to conduct such operation but the same shall be performed on a daywork basis.

**12.   REPORTS TO BE FURNISHED BY CONTRACTOR:**

12.1 Contractor  shall  keep  and  furnish  to  Operator  an  accurate  report  of  the  work performed and formations drilled on the IADC-API Daily Drilling Report Form or  other  form  acceptable to Operator.  A  legible copy of  said form  shall be  furnished by Contractor to Operator at ___Operator's address___.

12.2 Delivery tickets, if requested by Operator, covering any material or supplies furnished by Operator shall be turned in each day with the daily drilling report.  The quantity and description of materials and supplies so furnished shall be checked by Contractor.

**13.   INGRESS AND EGRESS TO LOCATION:**

Operator hereby assigns to Contractor Operator's rights of ingress and egress with respect to the tract of land where the well is to be located for the performance by Contractor of all work contemplated by this Contract.  Should Contractor be denied free access to the location for any reason not reasonably within Contractor's control, any time lost by Contractor as a result of such denial shall be paid for at the applicable rate in keeping with the stage of operations at that time.  In the event there are any restrictions, conditions, or limitations in Operator's lease which would affect the free right of ingress and egress to be exercised by Contractor, its employees or subcontractors hereunder, Operator agrees to timely advise Contractor in writing with respect to such restrictions, conditions, or limitations, and Contractor agrees to observe same.

**14.   RESPONSIBILITY FOR ROAD AND SOUND LOCATION:**

14.1 The party designated in Exhibit "A", Subparagraph 10.3 to provide the road agrees at all times to maintain the road in such a condition that will allow free access and movement to and from the drilling site in an ordinarily equipped highway type vehicle.  If it is necessary to use bulldozers, tractors, or any other specialized transportation equipment for the movement of necessary personnel, machinery, or equipment over access roads or on the drilling location, the party so designated shall furnish the same at its expense.

*Revised July, 1994*

14.2 The party designated in Exhibit "A", Subparagraph 10.4 shall prepare and maintain a sound location adequate in size and capable of properly supporting the drilling rig. It is recognized that Operator has superior knowledge of the location and access route to the location and must advise Contractor of any subsurface conditions or obstructions including, but not limited to, mines, caverns, sink holes, streams, pipelines, power lines, and telephone lines) which Contractor might encounter while en route to the location or during operations hereunder. In the event subsurface conditions cause a cratering or shifting of the location's surface and loss or damage to the rig or its associated equipment results therefrom, Operator shall without regard to the other provisions of this Contract reimburse Contractor to the extent not covered by Contractor's insurance for all such loss or damage. If the location is furnished by Operator, Operator shall reimburse Contractor for any costs incurred in leveling and releveling the derrick because of location settling. The location shall be constructed in such a manner so as to allow for adequate drainage and shall conform to all laws, rules and regulations of all federal, state or regulatory agencies having jurisdiction over same.

## 15. INSURANCE:

During the term of this Contract, Contractor shall at Contractor's expense maintain with an insurance company or companies authorized to do business in the state where the work is to be performed or through a self-insurance program, insurance coverage of the kind and in the amounts set forth in Exhibit "A", Paragraph 1, insuring the liabilities specifically assumed by Contractor in Paragraph 17 of this Contract. Contractor shall, if requested to do so by Operator, procure from the company or companies writing said insurance a certificate or certificates satisfactory to Operator that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Operator. For liabilities assumed hereunder by Contractor, its insurance shall be endorsed to provide that the underwriters waive their right of subrogation against Operator. Operator will, as well, cause its insurer to waive subrogation against Contractor for liability it assumes and shall maintain, at Operator's expense, or shall self insure, insurance coverage of the same kind and in the same amount as is required of Contractor, insuring the liabilities specifically assumed by Operator in Paragraph 17 of this Contract.

## 16. CLAIMS AND LIENS:

Contractor agrees to pay all valid claims for labor, material, services, and supplies to be furnished by Contractor hereunder, and agrees to allow no lien by such third parties to be fixed upon the lease, the well, or other property of the Operator or the land upon which said well is located.

## 17. RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK:

17.1 Contractor's Surface Equipment: Contractor shall assume liability at all times, regardless of whether the work is being performed on a turnkey basis or a daywork basis, for damage to or destruction of Contractor's surface equipment, regardless of when or how such damage or destruction occurs, and Contractor shall release Operator of any liability for any such loss except for such loss or damage provided in Paragraph 14 and Subparagraph 17.5 herein.

17.2 Contractor's In-Hole Equipment - Turnkey Basis: Contractor shall assume liability at all times while work is being performed on a turnkey basis for damage to or destruction of Contractor's in-hole equipment including, but not limited to, drill pipe, drill collars, and tool joints, and Contractor shall release Operator of any liability for any such loss except as provided for in Paragraph 14.

17.3 Contractor's In-Hole Equipment - Daywork Basis: Operator shall assume liability at all times while work is being performed on a daywork basis for damage to or destruction of Contractor's in-hole equipment including, but not limited to, drill pipe, drill collars, and tool joints, and Operator shall reimburse Contractor for the value of any such loss or damage; the value to be determined by agreement between Contractor and Operator as current repair cost or ____100____ percent of current new replacement cost of such equipment delivered to the well site.

17.4 Contractor's Equipment - Environmental Loss or Damage - Turnkey Basis: Contractor shall assume liability at all times for damage to or destruction of Contractor's equipment caused by exposure to highly corrosive or otherwise destructive elements, including those introduced into the drilling fluid while drilling on a turnkey basis.

17.5 Contractor's Equipment - Environmental Loss or Damage - Daywork Basis: Notwithstanding the provisions of Subparagraph 17.1 above, Operator shall assume liability at all times while work is being performed on a daywork basis for damage to or destruction of Contractor's equipment caused by exposure to highly corrosive or otherwise destructive elements, including those introduced into the drilling fluid while drilling on a daywork basis.

17.6 Operator's Equipment: Operator shall assume liability at all times for damage to or destruction of Operator's equipment, including, but not limited to, drilling tools, casing, tubing and well head equipment, regardless of when or how such damage or destruction occurs, and Operator shall release Contractor of any liability for any such loss or damage.

17.7 The Hole - Turnkey Basis: Subject to the provisions hereof, should a fire or blowout occur or should the hole be lost or damaged while Contractor is engaged in the performance of work hereunder on a turnkey basis, all such loss or of damage to the hole shall be borne by Contractor; and if the hole is not in condition to be carried to the turnkey depth as herein provided, Contractor shall, at Contractor's option, either:

(a) commence a new hole without delay at Contractor's cost; the right to drill a substitute well shall be recurring, and the drilling of the new hole shall be conducted under the terms and conditions of this Contract as though it were the first hole, or

(b) abandon the hole, giving Operator notice of Contractor's intent and, in such case, Contractor shall not be entitled to any portion of the turnkey price.

If Contractor elects to abandon the hole, the cost to plug and abandon will be at Contractor's expense. In either case, Contractor shall not be entitled to any payment or compensation for expenditures made or incurred by Contractor on or in connection with the abandoned hole(s), except for daywork earned for which Contractor would have been compensated had such hole not been junked and abandoned.

Notwithstanding the foregoing provisions, if the hole is lost or damaged as a result of any delay by Operator or the failure, at any time, of materials, casing or equipment furnished by Operator, including the failure of Operator's casing or equipment either during or after the running and setting of such casing, or as a result of subsequent failure of Operator provided services resulting in parted casing, such loss shall be borne by Operator and Contractor shall nevertheless be paid:

(1) ____100____ % of all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the Contract and by reason of the premature stoppage of the work, excluding however, the expense of normal drilling crew and supervision; plus

(2) a sum calculated at the appropriate daywork or standby rate for all time from the date upon which Contractor commenced any operations hereunder to such date subsequent to the date of work stoppage as will afford Contractor reasonable time to dismantle its rig and equipment; plus

(3) the cost of dismantling the rig, moving to and rigging up Contractor's equipment prior to starting the drilling of a replacement hole at an offset location designated by Operator, if so requested.

The work of drilling the replacement hole shall be performed by Contractor under the terms and conditions of this Contract.

17.8 The Hole - Daywork Basis: In the event the hole should be lost or damaged while Contractor is working on a daywork or standby basis, Operator shall be solely responsible for such damage to or loss of the hole, including the casing therein, as well as for cost of control of any wild well. Operator shall release Contractor of any liability for, and shall protect, defend and indemnify Contractor from and against any and all claims, liability, and expenses relating to such damage to or loss of the hole and for the cost of control of any wild well. Contractor shall nevertheless be paid as set forth in Subparagraph 17.7.

17.9 Sidetracking/Substitute Well Obligations: If, before the turnkey depth is reached, Contractor encounters any condition which in Contractor's judgement makes drilling abnormally difficult or hazardous including, but not limited to, loss of circulation, partial loss of circulation, water flow, domal formation, abnormal pressures, heaving shale or other similar condition, which precludes further drilling using normal procedures, then Contractor, at its sole option, may elect to discontinue operations or to sidetrack or commence operations for the drilling of a substitute well at a location agreeable to both parties. The right, but not the obligation, to sidetrack or drill a substitute well(s) shall be recurring. Any substitute well shall be drilled under the terms and conditions of this Contract. It is understood that Contractor reserves the right to redesign and revise the well program in keeping with good engineering and drilling practices if Contractor at its sole option elects to drill a substitute hole, and also that if Contractor does not obligate itself to drill this hole or a substitute hole the only penalty for failure to do so shall be the loss of compensation to be paid hereunder, and the Contractor shall be under no further obligation of any kind to Operator. In addition to Contractor's right to terminate performance hereunder, Operator shall release Contractor of any liability for, and shall protect, defend and indemnify Contractor from and against any and all claims, demands and causes of action, including all costs of defense, in favor of Operator, Operator's joint interest owners or other parties arising out of any drilling commitments or obligations contained in any lease, farmout agreement or other agreement which may be affected by such termination of performance hereunder.

Revised July, 1998

**17.10 Underground Damage:** Operator shall release Contractor of any liability for, and shall protect, defend and indemnify Contractor from and against any and all claims, liability, and expense resulting from operations under this Contract on account of injury to, destruction of, loss or impairment of any property right in or to oil, gas, or other mineral substance or water, and for any loss or damage to any formation, strata, or reservoir beneath the surface of the earth.

**17.11 Inspection of Material Furnished by Operator:** Contractor agrees to visually inspect all materials furnished by Operator before using same and to notify Operator of any apparent defects therein. Contractor shall not be liable for any loss or damage resulting from the use of materials furnished by Operator. Contractor will preassemble, disassemble, or assemble materials to be furnished by Operator only when directed by Operator and when such work can be accomplished by normal rig personnel. All such services shall be performed on a daywork basis. Operator shall release Contractor of any liability for, and shall protect, defend and indemnify Contractor from and against any liability for such service.

**17.12 Contractor's Indemnification of Operator:** Contractor shall release Operator from any liability for, and shall protect, defend and indemnify Operator, its officers, directors, employees and joint owners from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Contractor's employees or Contractor's subcontractors or their employees, or Contractor's invitees, on account of bodily injury, death or damage to property. Contractor's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Operator pursuant to Paragraph 15. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 17.12 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnitees, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

**17.13 Operator's Indemnification of Contractor:** Operator shall release Contractor from any liability for, and shall protect, defend and indemnify Contractor, its officers, directors, employees and joint owners from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Operator's employees or Operator's contractors or their employees, or Operator's invitees other than those parties identified in Subparagraph 17.12 on account of bodily injury, death or damage to property. Operator's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Contractor pursuant to Paragraph 15. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 17.13 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnitees, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

**17.14 (a) Pollution, Contamination and Blowout Control - Turnkey Basis:** Except as hereinafter provided, while operations are being conducted on a turnkey basis, Contractor shall assume all responsibility for, and shall protect, defend and indemnify Operator from and against any loss, expense, claim, demand or liability for pollution or contamination (including control and removal thereof) originating from:

(i) spills, leaks or discharges of fuel, lubricants, motor oils, pipe dope, paint solvents, garbage, seepage or any other liquid or solid whatsoever in the possession and control of Contractor, except such pollution or contamination that may be caused by Operator or Operator's agents, employees or representatives;

(ii) blowout, loss of well control or seepage of underground fluids. In the event of a blowout or well out of control, Contractor assumes liability for control of such well and/or the drilling of a relief well or wells. Contractor's maximum liability under this Subparagraph 17.14 shall not, however exceed $100,000.00 _____ per occurrence, including lost rig time. For the purposes of this Contract, where a series of and/or several losses occur which are attributable directly or indirectly to one accident, event, or cause, all such losses shall be added together and the total amount of such losses shall be treated as one occurrence irrespective of the period or area over which the losses occur. Operator shall assume full responsibility for all costs and expenses arising under this Subparagraph 17.14 in excess of said $100,000.00 _____ and shall release Contractor from any liability for, and shall protect, defend and indemnify Contractor from said excess, regardless of the sole or concurrent negligence or fault of any party, either active or passive, and from any liability imposed under any theory of strict or products liability.

(b) Pollution, Contamination and Blowout Control - Daywork Basis: Notwithstanding anything to the contrary contained herein, except the provisions of Paragraph 10 and Subparagraph 17.13, it is understood and agreed by and between Contractor and Operator that the responsibility for pollution and contamination which occurs while operations are being conducted on a daywork basis shall be as follows:

(i) Unless otherwise provided herein, Contractor shall assume all responsibility for, including control and removal of, and protect, defend and indemnify Operator from and against all claims, demands and causes of action of every kind and character arising from pollution or contamination, which originates above the surface of the land from spills, leaks of fuel, lubricants, motor oils, pipe dope, paints, solvents, and garbage, except unavoidable pollution from reserve pits, wholly in Contractor's possession and control and directly associated with Contractor's equipment and facilities.

(ii) Operator shall assume all responsibility for, including control and removal of, protect, defend and indemnify Contractor from and against all claims, demands, and causes of action of every kind and character arising directly or indirectly from all other pollution or contamination which may occur during the conduct of operations hereunder, including, but not limited to, that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance, as well as the use or disposition of all drilling fluids, including, but not limited to, oil emulsion, oil base or chemically treated drilling fluids, contaminated cuttings or cavings, lost circulation and fish recovery materials and fluids. Operator's liability and indemnification of Contractor hereunder shall include the cost of controlling a blowout or well out of control, and the drilling of any relief well or wells, if necessary.

(iii) In the event a third party commits an act or omission which results in pollution or contamination for which either Contractor or Operator, for whom such party is performing work, is held to be legally liable, the responsibility therefor shall be considered, as between Contractor and Operator, to be the same as if the party for whom the work was performed had performed the same and all the obligations respecting protection, defense, indemnity, and limitation of responsibility, as set forth in (i) and (ii) above, shall be specifically applied.

**17.15 Termination of Location Liability:** When Contractor has complied with all obligations of the Contract regarding restoration of Operator's location, Operator shall thereafter be liable for damage to property, personal injury or death of any person which occurs as a result of the condition of the location and Contractor shall be relieved of such liability; provided, however, if Contractor shall subsequently reenter upon the location for any reason, including removal of the rig, and terms of the Contract relating to such reentry activity shall become applicable during such period.

**17.16 Consequential Damages:** Neither party shall be liable to the other for special, indirect or consequential damages resulting from or arising out of this Contract, including, without limitation, loss of profit or business interruptions including loss or delay of production, however same may be caused.

**17.17 Indemnity Obligation:** Except as otherwise expressly limited herein, it is the intent of parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including without limitation, Subparagraphs 17.1 through 17.16 hereof, be without limit and without regard to the cause or causes thereof (including preexisting conditions), strict liability, regulatory or statutory liability, breach of warranty (express or implied), any theory of tort, breach of contract or the negligence of any party or parties (including the negligence of the indemnified party or parties), whether such negligence be sole, joint or concurrent, active or passive. The indemnities, and releases and assumptions of liability extended by the parties hereto under the provisions of Paragraph 17 shall extend to the parties, their parent, holding and affiliated companies and their respective officers, directors, employees, agents and servants. Such indemnification and assumptions of liability shall not be deemed to create any rights to indemnification in any person or entity not a party to this Contract (including the contractors of the respective parties), either as a third party beneficiary or by reason of any agreement of indemnity between one of the parties hereto and another person or entity not a party to this Contract.

**17.18 Governing Law - Severability:** (a) The terms and provisions of this Contract and associated exhibits shall be construed, governed, interpreted, enforced and litigated, and the relations between the parties determined in accordance with the laws of ___Arkansas___.

(b) In the event any provision herein contained or contained in an associated Exhibit should be deemed inconsistent with or contrary to any Federal, State or Municipal law, rule or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule or regulation and as so modified said provision and this Contract shall continue in full force and effect without affecting the enforceability of the remaining provisions duties, and liabilities set forth herein and in the associated Exhibit.

(c) Contractor and Operator agree to comply with all laws, rules, and regulations of any Federal, State, and Local government authority which are now, or may in the future become applicable to the operations covered by this Contract or accruing out of the performance of such operations; provided, however, as between Operator and Contractor specific provisions herein contained respecting the risk and responsibility for such compliance shall be controlling. When required by law, the terms of Exhibit "B", attached hereto, shall apply to this Contract.

*Revised July, 1996*

**18.  INDEPENDENT CONTRACTOR RELATIONSHIP AND OPERATOR'S REPRESENTATIVE:**

18.1 In the performance of the work herein contemplated, Contractor is an Independent Contractor, with the authority to control and direct the performance of the details of the work, Operator being only interested in the final results obtained. The work shall meet the approval of Operator and be subject to the right of inspection and supervision herein provided. Operator shall not unreasonably withhold approval of all such work, when performed by Contractor in accordance with the generally accepted practices and methods customary in the industry.

18.2 Operator shall be privileged to designate a representative or representatives who shall at all times have access to the premises for the purpose of observing tests or inspecting the work of Contractor. Such representative or representatives shall be empowered to act for Operator in all matters relating to the work herein undertaken and Contractor shall be entitled to rely on the orders and directions issued by such representative or representatives as being those of Operator.

**19.  NO WAIVER EXCEPT IN WRITING:**

It is fully understood and agreed that none of the requirements of this Contract shall be considered as waived by either party unless the same is done in writing.

**20.  FORCE MAJEURE:**

Except for the duty to make payments hereunder when due, and the indemnification provisions under this Contract, neither Operator nor Contractor shall be responsible to the other for any delay, damage or failure caused by or occasioned by a Force Majeure Event. As used in this Contract, "Force Majeure Event" includes: acts of God, action of the elements, warlike action, insurrection, revolution or civil strife, piracy, civil war or hostile action, strikes, differences with workmen, acts of public enemies, federal or state laws, rules and regulations of any governmental authorities having jurisdiction in the premises or of any other group, organization or informal association (whether or not formally recognized as a government), inability to procure material, equipment or necessary labor in the open market, acute and unusual labor or material or equipment shortages, or any other cause (except financial) beyond the control of either party. Neither Operator nor Contractor shall be required against its will to adjust any labor or similar disputes except in accordance with applicable law. In the event that either party hereto is rendered unable, wholly or in part, by any of these causes to carry out its obligation under this Contract, it is agreed that such party shall give notice and details of Force Majeure in writing to the other party as promptly as possible after its occurrence. After such period of delay which continues for more than ____2____ consecutive days and prior to the expiration or termination of this Contract, Operator shall pay Contractor the work stoppage rate specified in Subparagraph 4.5. Each party shall exercise reasonable diligence to remove any such cause of delay to the work. Notwithstanding the foregoing, the work stoppage rate as set forth in Subparagraph 4.5 shall be applicable for all delays caused solely by weather when the Drilling Unit is not otherwise prevented from operating. After such Force Majeure delay has continued for a period of ____2____ days, either party may elect to terminate this Contract.

**21.  INFORMATION CONFIDENTIAL:**

Upon written request by Operator, information obtained by Contractor in the conduct of drilling operations on this well, including, but not limited to, depth, formations penetrated, the results of coring, testing, and surveying, shall be considered confidential and shall not be divulged by either party or its employees, to any other person, firm or corporation.

**22.  ATTORNEY'S FEES:**

If this Agreement is placed in the hands of an attorney for collection of any sums due hereunder, or · suit is brought on same, or sums due hereunder are collected through bankruptcy or probate proceedings, then Operator agrees that there shall be added to the amount due reasonable attorney's fees and costs.

**23.  ASSIGNMENT:**

Neither party may assign this Contract without the prior written consent of the other and prompt notice of any such intent to assign shall be given to the other party. In the event of such assignment, the assigning party shall remain liable to the other party as a guarantor of the performance by the assignee of the terms of this Contract. If any assignment is made that materially alters Contractor's financial burden, Contractor's compensation shall be adjusted to give effect to any increase or decrease in Contractor's operating costs.

**24.  NOTICES AND PLACE OF PAYMENT:**

Notice is not required for any change from turnkey basis to daywork basis, or vice versa, pursuant to the terms of this Contract. Notices, reports, and other communications required or permitted by this Contract to be given or sent by one party to the other shall be delivered by hand, mailed or telecopied to the address hereinabove shown. All sums payable hereunder to Contractor shall be payable at its address hereinabove shown unless otherwise specified herein.

**25.  CONFLICTS:**

In the event of any conflict between the provisions of this Contract and Exhibit "A" or "B" attached hereto and made a part hereof, the latter shall be controlling.

**26.  AUDIT:**

If any payment provided for hereunder is made on the basis of Contractor's costs, Operator shall have the right to audit Contractor's books and records relating to such costs. Contractor agrees to maintain such books and records for a period of two (2) years from the date such costs were incurred and to make such books and records available to Operator at any reasonable time or times within the period.

**27.  ACCEPTANCE OF CONTRACT:**

The foregoing Contract is agreed to and accepted by Operator this **25ᵗʰ** day of **APRIL** , 19 **2002**.

OPERATOR:   SKLAR EXPLORATION, LLC   *YOUR COPY*

By: _David A Harlan_

Title: _CHIEF OPERATING OFFICER_

The foregoing Contract is accepted by undersigned as Contractor this **20th** day of **March** , 19 **2002** which is the effective date of this Contract, subject to rig availability, and subject to all of its terms and provisions, with the understanding that it will not be binding upon Operator until Operator has noted its acceptance, and with the further understanding that unless said Contract is thus executed by Operator within ____10____ days of the above date Contractor shall be in no manner bound by its signature thereto. This contract will remain in effect for sixty (60) days from the date of execution and may be extended by both parties if mutually agreeable.

CONTRACTOR:   MIKE ROGERS DRILLING COMPANY, INC.

By: _Craig Rogers_

Title: _Craig Rogers, Vice-President_

Revised July, 1998

## EXHIBIT "A"

To Turnkey Drilling Contract dated __March 20_____, 19 2002 .
Operator: __Sklar Exploration, LLC_____ Contractor: __Mike Rogers Drilling Co., Inc.__
Well Name & Number __IPCO #1__

### 1. INSURANCE (See Paragraph 15) (See attached certificate)
1.1 Adequate Workers' Compensation Insurance complying with State Laws applicable or Employers' Liability Insurance with limits of $_____ covering all of Contractor's employees working under this Contract.
1.2 Commercial (or Comprehensive) General Liability Insurance, including contractual obligations as respects this Contract and proper coverage for all other obligations assumed in this Contract. The limit shall be $_____ combined single limit per occurrence for Bodily Injury and Property Damage.
1.3 Automobile Public Liability Insurance with limits of $_____ for the death or injury of each person and $_____ for each accident; and Automobile Public Liability Property Damage Insurance with limits of $_____ for each accident.
1.4 "Operator's Extra Expense" Insurance which includes well control, redrilling, pollution and contamination with a limit of $ __N/A__ in the aggregate for one well, such coverage to be endorsed to include coverage for the subject well and to provide coverage for the benefit of both Operator and Contractor as their interest may appear. The premium for such coverage shall be paid by __N/A__ .
1.5 Other Insurance_____

### 2. CASING PROGRAM (See Paragraph 7)

| | Hole Size | Casing Size | Weight | Grade | Approximate Setting Depth | Wait on Cement Time |
|---|---|---|---|---|---|---|
| Conductor | (See Exh in.A, Page 4in. #75) | | lbs/ft. | | ft. | Per state hrs. requirements |
| Surface | 12-1/4 in. | 9-5/8 in. | 36 lbs/ft. | J-55 | 1000 | ft. Per state hrs. requirements |
| Protection | ___ in. | ___ in. | ___ lbs/ft. | | ___ ft. | ___ hrs. |
| | ___ in. | ___ in. | ___ lbs/ft. | | ___ ft. | ___ hrs. |
| Production | ___ in. | ___ in. | ___ lbs/ft. | | ___ ft. | ___ hrs. |
| Liner | ___ in. | ___ in. | ___ lbs/ft. | | ___ ft. | ___ hrs. |
| | ___ in. | ___ in. | ___ lbs/ft. | | ___ ft. | ___ hrs. |

### 3. CEMENTING SPECIFICATIONS

| | Type Cement | Volume |
|---|---|---|
| Conductor | | ___ sacks |
| Surface | As per state requirements | ___ sacks |
| | | ___ sacks |
| Protection | N/A | ___ sacks |
| | | ___ sacks |
| Production | As required by Operator | ___ sacks |
| | | ___ sacks |
| Liner | | ___ sacks |

### 4. STRAIGHT HOLE SPECIFICATIONS (See Subparagraph 9.5)

| From | To | Maximum Distance Between Surveys, Feet | Maximum Deviation From Vertical, Degrees | Maximum Change of Inclination per 100' (a) |
|---|---|---|---|---|
| 0 | 1000' | 500' or bit trip | 3° | 1-1/2° |
| 1000' | 7500' TD | 1000' or bit trip | 5° | 2½° |
| | | | | |
| | | | | |

Location of well bore at __N/A__ feet shall be __N/A__

(a) If these limits are exceeded and the distance between surveys is more than 100 feet, Contractor shall take intermediate surveys no more than 100 feet apart. If such intermediate surveys show that the above limits for any interval have been exceeded, Contractor shall correct hole deviation to within the limits of the above specifications.

### 5. MUD CONTROL PROGRAM (See Paragraph 9)

| | Depth Interval (ft.) | | | | | |
|---|---|---|---|---|---|---|
| From | | To | Type Mud | Weight (lbs/gal.) | Viscosity (secs.) | Water Loss (cc) |
| | | | Potassium based | | | |
| **SEE ATTACHED MUD RECOMMENDATION FROM BAROID DRILLING FLUIDS | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

It is understood that in the event it becomes necessary to suddenly raise the mud weight __2__ lbs. per gallon above the weight currently being used or to raise the mud weight at any time above the maximum weights specified above, operations will go forward on a daywork basis until such condition has been overcome and the mud system stabilized at the applicable weight specified above.
Other mud specifications: __Contractor may raise viscosity if hole conditions dictate.__



## *Baroid Drilling Fluids*

**Attention: Craig Rogers**

### ROGERS/SKLAR
### INTERNATIONAL PAPER #1
### SECTION 2-13N-9W
### RED RIVER PARISH, LOUISIANA

## HOLE SIZE AND CASING CONFIGURATION

| Depth | Hole Size | Casing Size |
|---|---|---|
| 0' - 90' | 12 1/4" | 9 5/8" |
| 90' - 7,500' | 8 3/4" | |

## SUGGESTED DRILLING FLUIDS PROPERTIES

| Depth | Weight | Vis | YP | pH | Loss | Fluid K ion |
|---|---|---|---|---|---|---|
| 0' - 90' | 8.8 –9.2 | 30-40 | 2-10 | 8.5 | N/C | |
| 90' - 3,400' | 9.2 –10.0 | 30-36 | 2-10 | 9.0 | 30-20 | |
| 3,400' - 5,200' | 10.0 –10.8 | 40-46 | 4-10 | 9.5 | 20-15 | 1000 |
| 5,200' - 6,500' | 10.8 –11.0 | 40-46 | 4-10 | 9.5 | 15-10 | 1500 |
| 6,500' - 7,500' | 10.8 –11.2 | 40-46 | 6-10 | 9.5 | 10 | 2000 |

## RECOMMENDATIONS:

1. Sweep hole as needed with AQUAGEL/ EZ-MUD sweeps to keep hole clean especially when drilling with a PDC bit.
2. Increase mud weight to +/- 10.0 ppg. by 3,400' for the Glen Rose.
3. Start adding caustic potash and/or potassium acetate for potassium ion.
4. Increase mud weight to 10.8 ppg. by +/- 5,200' for the Rodessa. Monitor actual well conditions and adjust mud weight as needed.
5. Reduce fluid loss to 10 cc from 6,500' to TD.
6. Possible lost returns as mud weight is increased.

**Estimated Days: 14-16**        **Estimated Cost: $28,000.00**

**PREPARED BY: Steve Permenter**
**Operations Engineer**
**Phone: (318) 742-3120**
**Date: February 8, 2002**

*Mike*
*We drilled Sklar & Phillips*
*IPCo #1 in 1991. We took*
*a kick @ 5368' with a 10.2#*
*mud weight. We weighted up to*
*11.3# to kill the kick & T.D.ed*
*with a the 11.3# mud weight.*

*Craig*

Revised July, 1998

**6. DRILLING RIG** ☐ Specified Below ☒ Rig Inventory Attached

| | | | |
|---|---|---|---|
| **Rig No.** ___1___ | Depth Rating_____ft. | Date Available_____ | |
| **Drawworks:** | Make_____ | Model_____ | Rated HP_____ |
| **Compound:** | Make_____ | Model_____ | Rated HP_____ |
| **Engines: No.** _____ | Make_____ | Model_____ | Rated HP_____ |
| **Rotary:** | Make_____ | Model_____ | Rating_____ |
| **Auxiliary Brake:** | Make_____ | Model_____ | |
| **A.C. Generators:** | Engine_____ | HP_____ | |
| | Generator_____ | KW_____ | |
| **Main Pump:** | Make_____ | Model_____ | Rated HP_____ • |
| **Main Pump Power:** | Make_____ | Model_____ | Rated HP_____ |
| **Auxiliary Pump:** | Make_____ | Model_____ | Rated HP_____ • |
| **Aux. Pump Power:** | Make_____ | Model_____ | Rated HP_____ |
| **Mast:** | Make_____ | Hookload_____lbs. | With_____lines |
| **Substructure:** | Height_____ft. | Csg. Cap._____lbs. | Setback Cap:_____lbs. |
| **Active Mud Tanks:** | No._____ | Size_____ | Capacity_____bbls. |

**Drill Pipe:**

| Amount | Size | Weight | Grade |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

**Drill Collars: Number & Size**_____

**Blowout Preventers:**

| Size | Working Pressure | Make & Model | Single or Double | Number |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

**Choke Manifold:**  Valve & Choke Description

| | | |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

**B.O.P. Closing Unit:** _____   _____   _____ Stations

**B.O.P. Accumulator:** _____   _____   _____ Gallons

*During daywork operations, Contractor agrees to operate equipment at _____% of manufacturer's maximum rated capacity and pressure.

**7. WIRELINE LOGGING SERVICES**

| Type Log | Company | Depth to be Run |
|---|---|---|
| ___See 11.5___ | _____ | _____ft. to _____ft. |
| _____ | _____ | _____ft. to _____ft. |
| _____ | _____ | _____ft. to _____ft. |
| _____ | _____ | _____ft. to _____ft. |

**8. DRILL STEM TEST PROGRAM**

| Depth | Type DST Service | DST Company | Remarks |
|---|---|---|---|
| ___See 11.3___ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

**9. CORING PROGRAM**

| Depth | Description of Equipment and Services |
|---|---|
| ___See 11.4___ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

Revised July, 1998

**10.  EQUIPMENT, MATERIALS, AND SERVICES TO BE PROVIDED AS DESIGNATED:**

| | | To be Provided By and at the Expense of: | | | |
|---|---|---|---|---|---|
| | | **TURNKEY** | | **DAYWORK** | |
| | | Oper. | Contr. | Oper. | Contr. |
| 1. | Drilling permit .................................................... | X | | X | |
| 2. | Stake location, obtain all necessary rights-of-way, and settle surface damages ... | X | | X | |
| 3. | Furnish and maintain road to location ................................. | X | | X | |
| 4. | Construct and maintain location .................................... | X | | X | |
| 5. | Special foundation for rig ......................................... | X | | X | |
| 6. | Bonds for public roads ............................................ | X | PERMITS | X | PERMITS |
| 7. | Construct and maintain reserve pit .................................. | X | | X | |
| 8. | Reserve pit liner ...................................If required. | X | | X | |
| 9. | Dispose of drilling fluid, refill and level reserve pit .................... | X | | X | |
| 10. | Cellar ........................................................... | X | | X | |
| 11. | Rat and mouse holes ............................................. | | X | X | |
| 12. | Fill and plug rat and mouse holes .................................. | X | | X | |
| 13. | Earthen mud pits ................................................ | X | | X | |
| 14. | Remove debris from location ....................................... | X | | X | |
| 15. | Restore road and location ......................................... | X | | X | |
| 16. | Water source including required permits .................See. 11.2. | X | | X | |
| 17. | Water lines including required permits ..................See. 11.2. | X | | X | |
| 18. | Water pump:As per attached inventory only See 11.2 | | X | X | |
| 19. | Fuel for water pump ..............................See. 11.2. | | X | | X |
| 20. | Maintenance of water well, if required ...............Inc.. See. 11.2. | X | | X | |
| 21. | Labor to operate water well or water pump Inc.. fuel.. See. 11.2. | X | | X | |
| 22. | Water storage tanks 210 bbl capacity .See. rig. inventory......... | | X | | X |
| 23. | Potable water for crews ........................................... | N/A | N/A | N/A | N/A |
| 24. | Salt water and storage ............................................ | X | | X | |
| **25. | Rig fuel, type diesel ............................................ | | X | | X |
| 26. | Highline electric power for rig, installation and removal .................... | N/A | N/A | N/A | N/A |
| 27. | Electric power for Operator's equipment ..Limited to rig capacity. | | X | | X |
| 28. | Transportation of Contractor equipment, move-in, rig-up, rig-down, move-out .... | | X | | X |
| 29. | Bulldozers or winching service if required in lieu of all weather road .......... | X | | X | |
| 30. | Forklift, during drilling operations .......Operator equipment only. | X | | X | |
| 31. | Transportation of Operator's equipment ............................. | X | | X | |
| 32. | Installation and removal of Operator's equipment, unless otherwise specified herein | X | | X | |
| 33. | Boiler or hot air heater ........................................... | N/A | N/A | N/A | N/A |
| 34. | Fuel for boiler or hot air heater, type _____ ...................... | N/A | N/A | N/A | N/A |
| 35. | Telephone or radio ..................If required by Operator.. | X | | X | |
| 36. | Drilling mud and additives ......................................... | | X | X | |
| 37. | Diesel/oil for drilling mud ......................................... | N/A | N/A | X | |
| 38. | Mud engineering service ........................................... | | X | X | |
| 39. | PVT equipment: | X | | X | |
| 40. | Corrosion inhibitor for protecting drill string ........................... | N/A | | X | |
| 41. | Shale shaker: | | X | | X |
| 42. | Shale shaker screens: | | X | | X |
| 43. | Desander: | | X | | X |
| 44. | Desilter: | | X | | X |
| 45. | Centrifuge:_____ If required by Operator | X | | X | |
| 46. | Mud Cleaner:_____ If required by Operator | X | | X | |
| 47. | Degasser:_____ If required by Operator | X | | X | |
| 48. | Hydraulic choke ...................If required by Operator.. | X | | X | |
| 49. | Gas separator with plumbing .........If required by Operator.. | X | | X | |
| 50. | Trip tank ........................................................ | N/A | | X | |
| 51. | Rotating head ................................................... | N/A | | X | |
| 52. | Rotating head rubbers ............................................ | N/A | | X | |
| 53. | Storage for mud and chemicals, mud house ........................... | | X | | X |
| 54. | Special or added storage for mud and chemicals ...................... | X | | X | |
| 55. | Mud pit covers ................................................... | X | | X | |
| 56. | Chemical treatment of mud if $H_2S$ or $CO_2$ is encountered .................. | X | | X | |
| 57. | Drilling bits, stabilizers, reamers and other drilling tools .................... | | X | X | |
| 58. | Drilling time recorder, 2 pens ................................... | | X | | X |
| 59. | Conventional drift indicator, 7 degress ......................... | | X | | X |

**Operator will pay fuel cost over $0.75¢ per gallon.

*Model Turnkey Contract - Exhibit "A" - Page 3)*

Revised July, 1998

| | To be Provided By and at the Expense of: | | | |
| | TURNKEY | | DAYWORK | |
| | Oper. | Contr. | Oper. | Contr. |
|---|---|---|---|---|
| 60. Fishing (for Contractor provided equipment): | | | | |
| a. Tools and services | | X | X | |
| b. Rig time | | X | X | |
| 61. Fishing (for Operator provided equipment): | | | | |
| a. Tools and services | X | | X | |
| b. Rig time | X | | X | |
| 62. D.P. protectors for use on normal strings of D.P. inside casing | | X | X | |
| 63. Inspection of drill collars and subs | N/A | N/A | X | |
| 64. Special strings of D.P., D.C., handling tools and D.P. protectors as follows: | | | | |
| _____ | N/A | N/A | N/A | N/A |
| & surface casing | | | | |
| 65. BOP testing service and pack off ......... If required by Operator | X | | X | |
| 66. Mud Logging: _____ | X | | X | |
| 67. H₂S equipment, if necessary, for Contractor, Operator and normal service personnel & equipment or services required by State & including rig time to hook up same | X | | X | |
| 68. Upper kelly cock | N/A | | N/A | |
| 69. Lower kelly cock | N/A | | N/A | |
| 70. Floor safety valve | | X | | X |
| 71. Extra crew labor, if required by Operator | N/A | | X | |
| 72. Camp facilities | N/A | | X | |
| 73. Catering | N/A | | X | |
| 74. Circulating time for samples, breaks or DST's (subject to Subparagraph 11.3) | X | | X | |
| 75. Conductor: This rig does not require conductor casing under normal conditions. Should this well site require conductor to avoid excessive washout under the rig, Operator will pay this. | | | | |
| a. Hole | X | | X | |
| b. Casing and thread protectors | X | | X | |
| c. Scratchers, centralizers & float equipment | X | | X | |
| d. Casing crew and tools and casing lubricant | X | | X | |
| e. Pick-up and laydown machine | X | | X | |
| f. Rig time to run casing | X | | X | |
| g. Cement and cementing service | X | | X | |
| h. Rig time to cement | X | | X | |
| i. WOC time | X | | X | |
| j. Welding service in connection with the above | X | | X | |
| 76. Protection string: | | | | |
| a. Casing and thread protectors | | N/A | | N/A |
| b. Scratchers, centralizers and float equipment | | N/A | | N/A |
| c. Casing crew and tools and casing lubricant | | N/A | | N/A |
| d. Pick-up and laydown machine | | N/A | | N/A |
| e. Rig time to run casing | | N/A | | N/A |
| f. Cement and cementing service | | N/A | | N/A |
| g. Rig time to cement | | N/A | | N/A |
| h. WOC time | | N/A | | N/A |
| i. Welding service in connection with the above | | N/A | | N/A |
| j. Casing rams | | N/A | | N/A |
| 77. Surface string: Contractor will provide API casing and prudent drilling methods to drill this well, but does not warrant the integrity of the surface casing upon completion of the Turnkey Contract. | | | | |
| a. Casing and thread protectors | | X | X | |
| b. Scratchers, centralizers and float equipment | | X | X | |
| c. Casing crew and tools and casing lubricant | | X | X | |
| d. Pick-up and laydown machine | N/A | | X | |
| e. Rig time to run casing | | X | X | |
| f. Cement and cementing service | | X | X | |
| g. Rig time to cement | | X | X | |
| h. WOC time | | X | X | |
| i. Welding service in connection with the above | | X | X | |
| j. Casing rams | N/A | | X | |
| 78. Protection string: | | | | |
| a. Casing and thread protectors | | N/A | | N/A |
| b. Scratchers, centralizers and float equipment | | N/A | | N/A |
| c. Casing crew and tools and casing lubricant | | N/A | | N/A |
| d. Pick-up and laydown machine | | N/A | | N/A |
| e. Rig time to run casing | | N/A | | N/A |
| f. Cement and cementing service | | N/A | | N/A |
| g. Rig time to cement | | N/A | | N/A |

Revised July, 1998

| | To be Provided By and at the Expense of: | | | |
| | TURNKEY | | DAYWORK | |
| | Oper. | Contr. | Oper. | Contr. |
|---|---|---|---|---|
| h. WOC time ............................................ | N/A | | N/A | |
| i. Welding service in connection with the above ..................... | N/A | | N/A | |
| j. Casing rams .......................................... | N/A | | N/A | |
| k. Rig time to lay down drill string ................................ | N/A | | N/A | |
| **79.** Production string: | | | | |
| a. Casing and thread protectors ................................ | X | | X | |
| b. Scratchers, centralizers and float equipment ......................... | X | | X | |
| c. Casing crew and tools and casing lubricant ..................... | X | | X | |
| d. Pick-up and laydown machine ............................... | X | | X | |
| e. Rig time to run casing ................................... | X | | X | |
| f. Cement and cementing service ............................. | X | | X | |
| g. Rig time to cement ..................................... | X | | X | |
| h. WOC time ......................................... | X | | X | |
| i. Welding service in connection with the above ..................... | X | | X | |
| j. Casing rams ........................................ | X | | X | |
| k. Rig time to lay down drill string .................... See 11.6 ..... | X | | X | |
| **80.** Liner: | | | | |
| a. Casing and thread protectors ................................ | N/A | | N/A | |
| b. Scratchers, centralizers and float equipment ......................... | N/A | | N/A | |
| c. Casing crew and tools and casing lubricant ..................... | N/A | | N/A | |
| d. Pick-up and laydown machine ............................... | N/A | | N/A | |
| e. Rig time to run casing ................................... | N/A | | N/A | |
| f. Cement and cementing service ............................. | N/A | | N/A | |
| g. Rig time to cement ..................................... | N/A | | N/A | |
| h. WOC time ......................................... | N/A | | N/A | |
| i. Welding service in connection with the above ..................... | N/A | | N/A | |
| j. Casing rams ........................................ | N/A | | N/A | |
| k. Liner hanger and tools ................................. | N/A | | N/A | |
| l. Rig time to lay down drill string ............................. | N/A | | N/A | |
| **81.** Clean out and test liner ................................. | N/A | | N/A | |
| **82.** Cement, cementing service and tools for remedial cementing operations ....... for surface casing only | | X | X | |
| **83.** Temperature survey ......................................... | X | | X | |
| **84.** Bond log ............................................. | X | | X | |
| **85.** Coring service, as specified in Exhibit "A", Paragraph 9 .... See 11.4 .... | X | | X | |
| **86.** DST service, as specified in Exhibit "A", Paragraph 8 ..... See 11.3 ..... | X | | X | |
| **87.** Wireline logging service, as specified in Exhibit "A", Paragraph 7 See 11.5 ... | X | | X | |
| **88.** Rig time required to get logs to bottom ................ See 11.5 ... | | X | X | |
| **89.** Rig time: | | | | |
| a. DST ............................................ See 11.3 ... | X | | X | |
| b. Coring & reaming core hole ...................... See 11.4 ... | X | | X | |
| c. Logging ................................... See 11.5 ... | X | | X | |
| d. Plug & abandon ...................................... | X | | X | |
| **90.** Directional services ..................................... | X | | X | |
| **91.** Caliper services ........................................ | X | | X | |
| **92.** Completion tools and services .............................. | X | | X | |
| **93.** Wellhead equipment: | | | | |
| All other wellhead equipment | X | | X | |
| Weld on casing head | X | | X | |
| **94.** Spacers, spools, or adapters to match BOP equipment to casing head ......... | X | | X | |
| **95.** Wellhead wear bushing and running tool ........ If required by Operator | X | | X | |
| **96.** Cleaning materials and steamer services when oil base mud is used .......... | X | | X | |
| **97.** Plug and abandon: Set cement plugs, perforate, squeeze, and cut-off in accordance with regulatory requirements ................ | X | | X | |
| **98.** Trash trailer - if required by Operator | X | | X | |
| **99.** Port-a-toilet  - if required by Operator | X | | X | |
| **100.** | | | | |

**II.  SPECIAL PROVISIONS**

**1.  Maximum limits to be paid by Contractor:**

11.1(B).  Contractor will furnish an 11" x 3000# OCT Profile C-22 type bradenhead to drill this well.  In the event this equipment is used in an attempt at production, Operator agrees to pay Contractor $1,600.00 for said equipment.

All costs above these limits shall be paid by the Operator upon presentation of invoice therefore upon completion of the well.

11.2  Contractor will supply water pump (see rig inventory) and first $1,000.00 for water to be used in drilling this well.  Any cost over $1,000.00 will be billed at actual cost.

11.3  N/A

11.4  N/A

11.5  When the "Turnkey" depth is reached, Contractor will provide rig time to condition hole, make a short trip if necessary in the judgment of Contractor, remove the drill string from the hole, and get the initial log run to bottom and out of the hole.  Contractor shall exert every reasonable effort to get the logging tool to bottom on the first attempt, but does not guarantee that the first attempt will be successful.  Contractor will go back in the hole with the drill string and condition mud and hole as many times as necessary until one logging run is made to bottom.  Contractor shall not be responsible for any standby time of the logging company, delays caused by waiting on the logging company, failure of the logging tool to properly function, and getting the logging tool to bottom shall have the same meaning as getting the first log to bottom.  Operator shall pay for logs and carry Tool Protection Insurance for logging tool lost in hole or damage to logging tool.  Contractor will not be responsible for fishing logging tool due to failure of logging company equipment or negligence of logging company.

11.6  Daywork rates on the rig will be $7,900.00 per day with or without drill pipe.  The "Turnkey" contract shall be fulfilled, the "Turnkey" amount shall be earned and Daywork Basis Operations shall commence when logs listed above are on the bank, notwithstanding the fact that some daywork may have been previously performed at the request of the Operator

Signed by the
Parties as correct:

Contractor: _Craig Rogers_

Operator: _Dan W Harlow_ YOUR COPY
          CPO, SKLAR EXPLORATION CO. LLC

(Model Turnkey Contract - Exhibit "A" - Page 6)

Revised July, 1996

**EXHIBIT "B"**
(See Subparagraph 17.18)

The following clauses, when required by law, are incorporated in the Contract by reference as if fully set out:

(1) The Equal Opportunity Clause prescribed in 41 CFR 60-1.4.

(2) The Affirmative Action Clause prescribed in 41 CFR 60-250.4 regarding veterans and veterans of the Vietnam era.

(3) The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60-741.4.

(4) The Certification of Compliance With Environmental Laws prescribed in 40 CFR 15.20.

# ACORD™ CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YY)**
12/27/2001

| PRODUCER (870)836-5724          FAX (870)837-2188 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. | |
|---|---|---|
| Campbell & Company (The Harold Campbell Company) P.O. Box D Camden, AR 71711 | | |
| INSURED Mike Rogers Drilling Co., Inc. PO Box 126 Magnolia, AR 71754-0126 | INSURERS AFFORDING COVERAGE | |
| | INSURER A: Bituminous | |
| | INSURER B: National Union Fire Ins Co | |
| | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY** X COMMERCIAL GENERAL LIABILITY CLAIMS MADE X OCCUR | CLP 3 127163B | 10/31/2001 | 10/31/2002 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | FIRE DAMAGE (Any one fire) | $ 100,000 |
| | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY PRO-JECT LOC | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| A | **AUTOMOBILE LIABILITY** X ANY AUTO ALL OWNED AUTOS SCHEDULED AUTOS HIRED AUTOS NON-OWNED AUTOS | CAP 3 127142B | 10/31/2001 | 10/31/2002 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | BODILY INJURY (Per person) | $ |
| | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | **GARAGE LIABILITY** ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | OTHER THAN EA ACC AUTO ONLY: AGG | $ $ |
| B | **EXCESS LIABILITY** X OCCUR CLAIMS MADE DEDUCTIBLE X RETENTION $ 10,000 | BE8718430 | 10/31/2001 | 10/31/2002 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | AGGREGATE | $ 1,000,000 |
| | | | | | | $ |
| | | | | | | $ |
| | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** | | | | WC STATU-TORY LIMITS OTH-ER | |
| | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | **OTHER** | | | | E.L. DISEASE - POLICY LIMIT | $ |

**DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS**
Blanket Additional Insured endorsement applicable in favor of certificate holder as required by written contract in regards to GL & Auto Liability coverage only. Blanket Waiver of Subrogation Endorsement Applicable in favor of certificate holder as requested by written contract in regards to GL & Auto.

| CERTIFICATE HOLDER | ADDITIONAL INSURED; INSURER LETTER: | CANCELLATION |
|---|---|---|
| | | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL __10__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES. AUTHORIZED REPRESENTATIVE *Lisa Davidson* |

ACORD 25-S (7/97)                                                                                      ©ACORD CORPORATION 1988

# ACORD™ CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YY) 07/09/2001 |

| PRODUCER (501)223-2400        FAX (501)223-0611 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|
| Insurance Center, Inc.<br>2207 Hidden Valley Drive,<br>Suite 203<br>Little Rock, AR 72212-4163 | |
| | **INSURERS AFFORDING COVERAGE** |
| INSURED Mike Rogers Drilling Company, Inc.<br>    P. O. Box 126<br>    Magnolia, AR 71753 | INSURER A:  American Interstate |
| | INSURER B: |
| | INSURER C: |
| | INSURER D: |
| | INSURER E: |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| | **GENERAL LIABILITY** | | | | EACH OCCURRENCE | $ |
| | ☐ COMMERCIAL GENERAL LIABILITY | | | | FIRE DAMAGE (Any one fire) | $ |
| | ☐ CLAIMS MADE ☐ OCCUR | | | | MED EXP (Any one person) | $ |
| | | | | | PERSONAL & ADV INJURY | $ |
| | | | | | GENERAL AGGREGATE | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>☐ POLICY ☐ PRO-JECT ☐ LOC | | | | PRODUCTS - COMP/OP AGG | $ |
| | **AUTOMOBILE LIABILITY**<br>☐ ANY AUTO | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ALL OWNED AUTOS<br>☐ SCHEDULED AUTOS | | | | BODILY INJURY (Per person) | $ |
| | ☐ HIRED AUTOS<br>☐ NON-OWNED AUTOS | | | | BODILY INJURY (Per accident) | $ |
| | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | **GARAGE LIABILITY**<br>☐ ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | OTHER THAN    EA ACC<br>AUTO ONLY:    AGG | $<br>$ |
| | **EXCESS LIABILITY**<br>☐ OCCUR ☐ CLAIMS MADE | | | | EACH OCCURRENCE | $ |
| | | | | | AGGREGATE | $ |
| | | | | | | $ |
| | ☐ DEDUCTIBLE | | | | | $ |
| | ☐ RETENTION    $ | | | | | $ |
| A | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** | AVWCAR1023072001 | 07/07/2001 | 07/07/2002 | ☐ WC STATU-TORY LIMITS ☐ OTH-ER | |
| | | | | | E.L. EACH ACCIDENT | $    1,000,000 |
| | | | | | E.L. DISEASE - EA EMPLOYEE | $    1,000,000 |
| | | | | | E.L. DISEASE - POLICY LIMIT | $    1,000,000 |
| | **OTHER** | | | | | |

**DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS**

| CERTIFICATE HOLDER | ADDITIONAL INSURED; INSURER LETTER | CANCELLATION |
|---|---|---|
| | | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL __10__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES. |
| **File Copy** | | AUTHORIZED REPRESENTATIVE<br>Clay Murphy/RHONDA    *Clay Murphy* |

ACORD 25-S (7/97)                                          ©ACORD CORPORATION 1988

## MIKE ROGERS
## DRILLING COMPANY, INC.

P. O. BOX 126 ~ MAGNOLIA,ARKANSAS ~ 71754-0126
PHONE (870) 234-2356
FAX (870) 234-7487

# ~  DRILLING  ~

# EXPLORATION  ~  PRODUCTION

TURNKEY DRILLING
AND/OR INTEREST PARTICIPATION

DRILLING IN THE ARK-LA-TEX FROM 3,000' TO 9,800'

# MIKE ROGERS
# DRILLING COMPANY, INC.

### RIG NUMBER 1
### EFFICIENT DRILLING 3,000 TO 9,800 FT.

**DRAWWORKS**
Spencer-Harris 7000 rated 650 H.P.
Parkersburg 18" triple hydromatic brake

**DERRICK & SUBSTRUCTURE**
Spencer-Harris 97' 8" mast with 250,000# hook load capacity
Spencer-Harris 10" substructure

**COMPOUND**
Spencer-Harris 2 engine rated 650 H.P.

**ENGINES**
2 - Cat 3406 rated 325 H.P. each

**MUD PUMPS**
2 - Continental-Emsco DB-550 duplex rated 550 H.P. driven by
    Cat D-379 rated 600 H.P.

**MUD SYSTEM**
1 - Mud Tank with 550 bbl. capacity
1 - 5x6 mud mixing pump powered by 271 G.M. engine
Desander 400 GPM - 4x3 Cent. Pump with 20 H.P. Electric Motor
Desilter 400 GPM - 4x3 Cent. Pump with 20 H.P. Electric Motor
Shale Shaker
Mud Jets and Stirring Guns
Mud Storage House
2 - 10 H.P. Mud Agitators

**BOP SYSTEM**
1 - 10" double rams 3000#
1 - 10" annular 3000#
1 - 2" 3000# choke and kill manifold
1 - 4 station 80 gallon Koomey closing unit

# MIKE ROGERS
## DRILLING COMPANY, INC.

## RIG NUMBER 1

**GENERATORS**
2 - 100 KW Generators powered by Cat 3304

**DRILL STRING**
Drill Pipe - 4" O.D. 14# grade S-135
Drill Collars - 20  6"  O.D.
Additional drill pipe and collars are in inventory subject to
    availability and operator

**TRAVELING & ROTARY**
Continental-Emsco 17-1/2 rotary table
McKissick 160 ton block with Web Wilson hook
Continental-Emsco 300 ton swivel

**INSTRUMENTATION**
Martin Decker 3 pin drilling recorder
Martin Decker weight indicator
Martin Decker tong torque
Martin Decker rotary torque

**AUXILIARY EQUIPMENT**
Mobile phones in pusher's vehicle
I.R. air hoist
Wireline unit and 7 degree survey instrument
Toolpusher's quarters
Rig is fully equipped with tools, subs, and other auxiliary
    equipment necessary for efficient drilling