UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

IN RE:                          .   Case No. 20-12377-EEB
                                .            Chapter 11
SKLAR EXPLORATION COMPANY,   .
LLC, and SKLARCO, LLC,       .   Case No. 20-12380-EEB
                                .            Chapter 11
        Debtors.            .
                                .   Jointly Administered Under
. . . . . . . . . . . . . . .        20-12377-EEB

**TRANSCRIPT OF ZOOM HEARING ON: (1) ADEQUACY OF DISCLOSURE STATEMENT AND ANY OBJECTIONS THERETO; AND (2) DEBTOR'S MOTION FOR CLARIFICATION OF ORDERS AND TO AUTHORIZE IMMEDIATE OFFSET OF JOINT INTEREST BILLING OBLIGATIONS AND ANY OBJECTIONS THERETO**

BEFORE THE HONORABLE ELIZABETH E. BROWN
UNITED STATES BANKRUPTCY JUDGE

THURSDAY FEBRUARY 11, 2021
DENVER, COLORADO

TRANSCRIPT REQUESTED BY:     KUTNER BRINEN, P.C.
TRANSCRIPT ORDERED ON:       FEBRUARY 17, 2021
TRANSCRIPT DELIVERED ON:     FEBRUARY 23, 2021
TRANSCRIPT PRICE:            $4.85 PER PAGE; $276.45

```
 1   APPEARANCES:

 2   For the Debtor:              Keri Riley
                                  James Katchadurian
 3                                Duane Graham

 4   United States Trustee:       Paul Moss

 5   Creditors' Committee:        Chris Johnson
                                  Grant Beiner
 6
     East West Bank               Bryce Suzuki
 7
     Anderson Exploration Energy  Eric Lockridge
 8   Co., TCP Cottonwood, L.P.,
     AEEC II, LLC, and Sugar Oil
 9   Properties:

10   Fant Energy Ltd., JJS        Jennifer Hardy
     Interests Escambia, LLC,
11   JJS Interests Steele Kings,
     LLC, JJS Working Interests,
12   LLC:

13   FPCC USA:                    Joseph Bain

14   Franks Exploration Co.,      Jordan Bird
     AEH Investments, J & A
15   Harris Bundero Investment
     Co., Kingston, Hughes Oil
16   South, KMR Investments,
     Tommy Youngblood:
17
     Kudzu Oil Properties,        Timothy Swanson
18   Alabama Oil Co. & Apple      Craig Geno
     River Investments, Alabama
19   Oil & Gas, LLC:

20   Ad Hoc Committee of Working  Timothy Swanson
     Interest Owners:             David Morgan
21
     Landmark Oil and Gas,        Jim Spencer
22   Landmark Exploration,
     Lexington Investments,
23   Stone Development:

24   Lucas Petroleum Oil:         Duane Brescia

25
```

```
 1  Appearances continued:

 2  Pruet Oil Company, LLC,       Jeremy Retherford
    Pruet Production Co.          Matt Ochs
 3  (Individually and as agent):  Stan Kynerd
                                  David Hilton
 4
    Eastern Energy Services:      Christopher Meredith
 5
    Fant Energy, Ltd:             Brent Cohen
 6
    Liquid Gold Well Service,     Chris Crowley
 7  Inc.:

 8  McCombs Energy, McCombs       Steve Lecholop
    Exploration:
 9

10  Howard Sklar, Howard Sklar    Adam Hirsch
    Trust:
11
    Strago Petroleum Corporation, Robert Paddock
12  Meritage Energy Ltd.,         Louis Goza
    Gateway Exploration, Harvest  John Aubrey
13  Gas Management, G Crew
    Properties:
14
    Tauber Exploration &          Thomas Shipps
15  Production Co., CTM 2005,      Barnet Skelton, Jr.
    Ltd., I & L Miss I, LP,       Shay Denning
16  Pickens Financial Group,      Trey Sibley
    LLC, MER Energy, Ltd., The    Mike Pickens
17  MR Trust, Tara Rudman
    Revocable Trust, Rudman
18  Family Trust, The Rudman
    Partnership, Feather River
19  75, LLC:

20

21

22

23

24

25
```

1  Appearances continued:

2  Court Recorder:                Clerk's Office
                                  U.S. Bankruptcy Court
3                                 721 19th Street
                                  Denver, CO  80202
4
   Transcription Service:         AB Litigation Services
5                                 216 16th Street, Suite 600
                                  Denver, CO  80202
6                                 (303) 296-0017

7  Proceedings recorded by electronic sound recording;
   transcript produced by transcription service.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Time Noted:  9:31 a.m.)

2          THE COURT CLERK:  United States Bankruptcy Court

3    for the District of Colorado is now in session.  The

4    Honorable Elizabeth E. Brown, presiding.

5          THE COURT:  Good morning to all.  We are here in

6    the case of *Sklarco, LLC, and Sklar Exploration Company, LLC*,

7    and it's Case Number 20-12377.

8          We're here on Debtor's motion, and we've got a lot

9    of things to talk about today, so I'm going to go ahead and

10   just jump right in to taking appearances.  So who do we have

11   today for the Debtor, please?

12         MS. RILEY:  Good morning, Your Honor.  This is

13   Keri Riley appearing on behalf of the Debtors Sklar

14   Exploration Company, LLC, and Sklarco, LLC, and I believe the

15   CRO, James Katchadurian, is also on, as well.

16         THE COURT:  Very good.  Thank you.

17         How about for our U.S. Trustee?

18         MR. MOSS:  Good morning, Your Honor.  Paul Moss on

19   behalf of the U.S. Trustee.

20         THE COURT:  Thank you.

21         For East West Bank?

22         MR. SUZUKI:  Good morning, Your Honor.  Bryce

23   Suzuki of the law firm Snell & Wilmer on behalf of East West

24   Bank.

25         THE COURT:  Thank you.

```
 1                    For the Committee?

 2                    MR. JOHNSON:  Good morning, Your Honor.  Chris

 3      Johnson on behalf of the Committee.  Also with me is my

 4      associate, Mr. Grant Beiner.

 5                    THE COURT:  Thank you.

 6                    Do we have anybody for the Anderson parties?

 7           (No audible response.)

 8                    THE COURT:  No?

 9                    MR. LOCKRIDGE:  Yes, Your Honor.  Eric Lockridge

10      here today for the Anderson parties who are AEEC II, LLC,

11      Anderson Exploration Energy Company, LC, TCP Cottonwood,

12      L.P., also here today for Sugar Oil Properties, L.P.

13                    THE COURT:  Thank you.

14                    For Baker Hughes Oilfield?  Anybody?

15           (No audible response.)

16                    THE COURT:  I'm just going by old appearance

17      lists.

18                    Font [sic] Energy?

19                    MR. COHEN:  Good morning, Your Honor.  Brent Cohen

20      appearing on behalf of Fant Energy.

21                    THE COURT:  Fant, okay.  I always mispronounce it.

22      Thank you.

23                    MR. COHEN:  Thanks.

24                    THE COURT:  FPCC?

25                    MR. BAIN:  Good morning, Your Honor.  Joseph Bain
```

1  on behalf of FPCC.

2          THE COURT:  Thank you.

3          For Franks Exploration, et al?

4          MR. BIRD:  Good morning, Judge.  Jordan Bird on

5  behalf of Franks Exploration group.

6          THE COURT:  Thank you.

7          All right.  How about Hall Management, et al.?

8      (No audible response.)

9          THE COURT:  Anybody?  No?

10          Okay.  J.F. Howell?

11      (No audible response.)

12          THE COURT:  Got to take us off mute.

13          MR. MORGAN:  This is David Morgan, but I'll be

14  represented by be represented by Tim Swanson.

15          THE COURT:  Okay.  Mr. Swanson, are you there?

16          MR. SWANSON:  Good morning, Your Honor.  Tim

17  Swanson, counsel to the Ad Hock Committee of Working Interest

18  Owners, of which J.F. Howell interests are indeed a member.

19          THE COURT:  Okay.

20          JJS Working Interests, et cetera?

21          MS. HARDY:  Good morning, Your Honor.  Jennifer

22  Hardy on behalf of the JJS entities.

23          THE COURT:  Thank you.

24          The Kudzu parties?  Mr. Geno?

25      (No audible response.)

```
 1              THE COURT:  Mr. -- okay, so they filed an
 2   objection, I thought they'd -- if you've got us on mute,
 3   please unmute.
 4              MR. SWANSON:  Judge, I believe Mr. Geno's --
 5              MR. GENO:  I'm here, Your Honor.  Craig Geno and
 6   Tim Swanson for the Kudzu parties.
 7              THE COURT:  Okay.  Thank you.
 8              Lucas Petroleum?
 9              MR. BRESCIA:  Good morning, Your Honor.  This is
10   Duane Brescia for Lucas Petroleum Group, Inc.
11              THE COURT:  Thank you.
12              McCombs Energy?
13              MR. LECHOLOP:  Good morning, Your Honor.  Steve
14   Lecholop for McCombs Energy and McCombs Exploration.
15              THE COURT:  Thank you.
16              Pruet?
17              MR. RETHERFORD:  Good morning, Your Honor.  Jeremy
18   Retherford, along with Matt Ochs, for all the Pruet
19   Properties.  And also on the line are (unintelligible)
20   representatives, Stan Kynerd and David Hilton.
21              THE COURT:  Thank you.
22              The Strago Group?
23              MR. PADDOCK:  Good morning, Your Honor.  Robert
24   Paddock on behalf of the Strago Group.  And also on the line
25   today are client representatives, Louis Goza and John Aubrey.
```

1          THE COURT:  Okay.  Thank you.

2          Tauber Group?

3       (No audible response.)

4          THE COURT:  Mr. Skelton?  Mr. --

5          MR. SHIPPS:  Good morning, Your Honor.  This is

6   Tom Shipps on behalf of the Tauber Group.  Also here as

7   counsel, Barnet Skelton, and client representatives Trey

8   Sibley and Mike Pickens.

9          THE COURT:  Okay.  Thank you.

10          All right.  And how about MAR Energy, MR Oil and

11   Gas, et cetera?

12       (No audible response.)

13          THE COURT:  Anybody?  No?

14          Is there anybody I haven't called that wishes to

15   enter their appearance?

16          MR. HIRSCH:  Good morning, Your Honor.  Adam

17   Hirsch on behalf of Howard Sklar and Howard Sklar Trust.

18          THE COURT:  Thank you.

19          MR. GRAHAM:  Your Honor, this is Duane Graham,

20   special Alabama counsel (unintelligible).

21          THE COURT:  I couldn't catch what you said at the

22   end about who you represent.

23          MR. GRAHAM:  I'm special Alabama counsel for the

24   Debtors.

25          THE COURT:  Oh, for the Debtors.  Okay.

1          MR. SPENCER:  Your Honor, Jim Spencer for the

2    Landmark parties.

3          THE COURT:  Okay.  Thank you.

4          MR. MEREDITH:  Good morning, Judge.  Christopher

5    Meredith for Eastern Energy Services.

6          THE COURT:  Okay.  Hold on.

7       (Brief pause)

8          THE COURT:  All right.  Anybody else?

9          MR. CROWLEY:  Good morning, Your Honor.  Chris

10   Crowley for Liquid Gold Well Services, Inc.

11         THE COURT:  Okay.

12         Anyone else?

13         MR. SHIPPS:  Your Honor, this is Tom Shipps again.

14   You asked a question about MER Energy, and they are also

15   working interest owners, non-operating working interest

16   owners --

17         THE COURT:  Ah.

18         MR. SHIPPS:  -- that we represent.

19         THE COURT:  Got it.  Thank you.  I had to turn the

20   page, so that connection was not obvious.

21         Okay.  Anybody else?

22       (No audible response.)

23         THE COURT:  All right.  I got to ask a question

24   here.  We've been using Zoom in this case a lot, and I'm

25   guessing that you all like that since you don't have to

1  travel, it's a lot cheaper for your clients.  Show me your

2  hands if this has been a benefit.

3       (Brief pause)

4            THE COURT:  Okay.

5            Because I have been thinking about, I mean, we all

6  want to go back to in-person things, but allowing some

7  combinations for out-of-town folks to participate by Zoom

8  makes sense.  I get a lot more input into the case, which is

9  helpful to everyone.  So thank you for being willing to

10 participate this way.

11           All right.  So, Ms. Riley, do you want to begin?

12           MS. RILEY:  Certainly, Your Honor.

13           And the first question that we have for the Court

14 at this point is, where would you like us to start?  We're

15 happy to address either the disclosure statement and the

16 motion to continue the hearing on the disclosure statement,

17 or we can sort of apprise the Court as to where we're at with

18 respect to the offset motion and those issues.

19           THE COURT:  Okay.  I don't care.  So whatever you

20 want to start with.

21           MS. RILEY:  Your Honor, I think maybe the first

22 place to start is with a general status report as to where

23 we're at in this case, and that does tie in pretty

24 significantly to, frankly, both of these motions -- or both

25 of the issues on the table.

1          THE COURT:  Okay.

2          MS. RILEY:  And then we have the disclosure

3    statement, as well.

4          So at this point, the Debtors did file their joint

5    plan of reorganization and a company disclosure statement on

6    December 18th.  Since that time, we also participated in a

7    two-day mediation early in January.  That mediation was

8    attended by not only the Debtors, but also the Unsecured

9    Creditors' Committee, East West Bank, the Ad Hoc Committee

10   of Working Interest Holders, I believe the Tauber group was

11   in attendance for at least the first day, JJS was in

12   attendance, and I believe that Mr. Sklar was in attendance

13   the first day, although I don't know how much the mediator

14   actually interacted with him.

15         That mediation did result in at least, sort of,

16   the preliminary terms of an agreement with respect to the

17   Plan between East West Bank and the Committee and the

18   Debtors, which we have been working to formalize and fill in,

19   really, over the past few weeks.

20         We have reached an agreed term sheet with the

21   Committee and East West Bank that does still need some

22   additional negotiation and modification to incorporate into

23   the terms of an amended plan of reorganization, but that term

24   sheet was circulated to, frankly, I think the entire entry

25   list, yesterday, by email.  So parties have had an

1  opportunity to, maybe not a very long opportunity, but

2  certainly an opportunity to review that term sheet.  And we,

3  of course, are certainly open to any comments and we are

4  willing to discuss those issues going forward, as well.

5          But at this point, because we do have this sort of

6  agreed form of what an amended plan is going to look like, we

7  do believe that it is pertinent to continue the hearing on

8  the adequacy of the disclosure statement given that we will

9  need to incorporate the terms of that agreement into an

10  amended plan and amended disclosure statement in order to

11  ensure that the parties do have adequate information about

12  what that agreement is going to look like and what the

13  amended plan is going to look like going forward.

14          I would note that a number of the objections that

15  have been filed to the motion to continue the disclosure

16  statement hearing were really substantive objections to the

17  disclosure statement themselves.  A number of those issues

18  have been resolved, or we believe will be resolved, by virtue

19  of the agreements that were reached between the bank, the

20  Committee, and the Debtors, and it will subsequently be

21  incorporated into an amended plan.

22          We recognize that there are likely still a number

23  of issues that will need to be resolved ahead of

24  confirmation, but giving us this additional time to

25  incorporate those terms and file an amended plan will, at the

1   very least, narrow the issues that are going to eventually be

2   before the Court, and should result in a more efficient

3   confirmation process going forward.

4            THE COURT:  Okay.

5            MS. RILEY:  One of the other issues that the

6   Debtor is facing, as well, and this does tie into our,

7   really, the motion to clarify the cash collateral order, is

8   that FCC is continuing to experience a cash crunch that is

9   really related in large part, not just due to the ongoing

10  expenditures in this case, but really related to the

11  nonpayment of joint interest billing obligations by a number

12  of working interest holders.  And that is what prompted us to

13  file our motion to expedite the hearing for an expedited

14  motion to reset a hearing on that particular motion.  Because

15  it's the language of the cash collateral order that is

16  limiting our ability to exercise FCC's rights as an operator

17  under the respective JOAs.

18            Since the filing of the expedited motion to reset

19  the hearing, we have been in contact with a number of parties

20  and have reached agreement, either in writing or sort of in

21  their principal terms, with a number of the working interest

22  holders who have either been withholding JIBs or not paying

23  JIBs at some point during this case.

24            By way of example, with Fant Energy we have agreed

25  that they will continue to remain current on all post-

1  petition JIBs and reserve their rights to set-off as to any

2  prepetition unpaid JIBs against their prepetition unpaid

3  revenue.

4        We did reach a stipulation with JJS that was filed

5  yesterday that does preserve JJS's rights of recoupment, but

6  does provide for them, the JJS entities, to remain current on

7  their joint interest billing obligations going forward.

8        We've been in discussions with a number of the

9  other parties, namely McCombs and Kudzu, regarding agreements

10  along the similar -- along similar lines that would result in

11  payment of JIBs going forward, payment of any, I would say

12  over withheld JIBs, which means that are JIBs that haven't

13  been paid in excess of the amount of any prepetition revenue

14  obligations, and again would ensure that the JIBs payments

15  remain current going forward.

16        THE COURT:  So is Kudzu in the same position as

17  McCombs where they owe more than they are owed?

18        MS. RILEY:  Yes, Your Honor, they are.

19        THE COURT:  Okay.

20        MS. RILEY:  And we have briefly had some

21  discussions with FPCC, as well.  However, we do recognize Mr.

22  Bain reached out to us this morning to discuss a potential

23  continuance on issues with respect to FPCC as a result of

24  some of his recent health issues, and we are amenable to that

25  (unintelligible) if the summary agreement along those lines

1    can be reached.

2            The issue that we still face, even if we reach

3    agreements with these respective parties, is that FCC is

4    still limited in its ability to act as an effective operator

5    on these properties if we are limited in our ability to

6    offset JIBs against revenue for any future defaults.  Because

7    it's not just these four parties, there are hundreds of

8    working interest holders here, and if one of them defaults

9    currently on their JIB payments, we have no ability to offset

10   our net -- their joint interest billing obligations against

11   their revenue unless we either get something in writing from

12   them that authorizes it, or we come back to bankruptcy court

13   and we ask that relief.

14           So that is limiting our ability in the event that

15   somebody does default, if they refuse to pay, if they ignore

16   demand letters, it limits our ability to put them in default

17   and really efficiently act as an operator going forward.

18   We're still paying them their revenue, but they're not paying

19   their proportionate share of the expenses, resulting in,

20   really, scarco (phonetic) by virtue of contributing through

21   any sort of intercompany loan, if additional revenue to cover

22   that nonpayment of the JIBs, putting us in this situation

23   where there are serious cash shortfalls and cash flow issues

24   that really jeopardize the reorganization efforts going

25   forward.

1          So with respect to the motion to continue the

2     disclosure statement hearing, we would ask at this point that

3     the Court set dates by which the Debtors are required to file

4     their amended plan of reorganization and an amended

5     disclosure statement, I would say no later than February

6     26th.  That should give the parties plenty of time to

7     incorporate the terms of an agreement into an amended plan

8     and circulate that.

9          Ideally we, of course, would want to be able to do

10    that sooner, but we recognize that there are, of course, a

11    lot of parties involved, and so we would propose setting that

12    deadline no later than February 26th.

13         And then with respect to the motion for

14    clarification.  We would suggest that with respect to those

15    parties with whom we have reached, sort of, the principal

16    terms of an agreement, we have a stipulation and that would

17    be -- sorry, McCombs and FPCC, we have a stipulation filed no

18    later than February 19th, and that we move forward with the

19    issues regarding the clarification and modification of the

20    language in the cash collateral order today.

21         THE COURT:  Mr. Suzuki, on behalf of the bank are

22    you willing to push this out that far, to the February 26th

23    date?

24         MR. SUZUKI:  With respect to the parties with whom

25    the Debtor's negotiating stipulations, Your Honor?

1          THE COURT:  Well, for the Debtor to file a new

2     amended plan and disclosure statement.

3          MR. SUZUKI:  Oh, I'm sorry.  We're talking about

4     two things there.

5          THE COURT:  Sure.

6          MR. SUZUKI:  We are amenable to that, Your Honor.

7     We think that deadlines make cases, and in this instance we

8     have a term sheet that's been circulated.  The basic

9     structure of the deal, I think, has been really vetted among

10    the three parties that Ms. Riley noted, the Debtors, the

11    bank, and the Committee, over two days of mediation, and then

12    subsequently in numerous iterations.  And so the basic

13    structure, we have hashed out.  Clearly, how that gets

14    translated into a Plan and disclosure statement takes some

15    doing, and we understand that that process takes some time,

16    but expediting that timeline as much as possible, while still

17    being reasonable, we are supportive of.

18         So the short answer is, yes.

19         THE COURT:  Thank you.

20         And the official committee feels the same?

21         MR. JOHNSON:  Good morning, Your Honor.  Chris

22    Johnson on behalf of the Committee.

23         Yes, we did file a joinder supporting the Debtor's

24    motion.  I think that the February 26th deadline is

25    appropriate to push the parties that weren't participants to

1  the initial term sheet, to allow us to get their input and

2  incorporate, you know, those discussions.

3       Judge, I recognize you're working in somewhat of a

4  vacuum.  You saw the Plan was filed on the 18th.  I don't

5  know -- you know, I can tell you from a Committee standpoint

6  that was an objectionable plan.

7       What you haven't seen is the term sheet, and so I

8  think it would be helpful for you if I just gave you a basic

9  understanding of the structure.

10      The structure still provides for both debtors to

11  reorganize.  There would be a joint plan, with the creation

12  of a post-confirmation trust.  The post-confirmation trust is

13  for the benefit of creditors of both FCC and Sklarco, so they

14  are treated pari passu under a single post-confirmation

15  trust.  That trust has the responsibility to investigate and

16  pursue all claims of the estate, including claims against

17  insiders.  You know, those are all major, modifications from

18  the current plan that's on file.

19      The significant part of the negotiation with East

20  West Bank provides that, while the bank is claims allowed,

21  the bank will fund a war chest for the Committee.  The bank

22  will allow a portion of its collateral, what we're calling

23  the available cash, to be used to pay cured claims.  And

24  that's going to be a point of discussion, a point of dispute,

25  and a point of negotiation that I think we're going to have

1    to work through how much of that, you know, will be allocated

2    to pay cure claims and when can we satisfy cure claims.

3    That's all to be negotiated.

4          But the other significant portion of this deal is

5    the recognition by the bank that some assets are unencumbered

6    and the proceeds from the operation or the sale of those

7    assets are certain (unintelligible) interests, and third-

8    party investments will flow to the trust.

9          And with respect to what we're calling the "bank

10   collateral," they're agreeing that approximately $1 million

11   that was paid post-petition is adequate protection payments

12   and applied to post-petition interest, will instead be

13   applied to reduce the amount of their claim.

14         And that, you know, we still have this

15   monetization event, Judge, where we give the Debtor two

16   years, and the bank's consented to give the Debtor two years

17   to allow time for prices to recover, for the market to

18   stabilize, to rebuild its business, to try to take out the

19   bank and replace them with a new lender to refinance the

20   debt.

21         If they are unable to refinance the debt, the

22   Debtor will go forward with the sale process.  And under the

23   refinancing process the Committee and the unsecured

24   creditors, both FCC and Sklarco, will receive $3 million from

25   that refinancing out of the bank's claim.

1           Additionally, if there is a sale event the

2    unsecured creditors, and here's another problematic issue,

3    the trust would receive the equity from the sale above the

4    amount of the bank's claim until a certain amount, either the

5    unsecured creditors are paid in full, or there's a note

6    component that would be satisfied.

7           I recognize based on Mr. -- or, our discussions

8    with Mr. Hirsch, Mr. Sklar doesn't agree that the Committee

9    is entitled to that, that unsecured creditors are entitled to

10   any portion of Sklarco assets or revenue over and above the

11   amount of the bank claims.  So that's going to be something

12   that, you know, we're going to probably coming to you, Judge,

13   to take a look at and to address.

14          I think those are the major parts.  I'll open it

15   up to Mr. Suzuki or Ms. Riley to correct me or to provide

16   additional comment.  But I just thought it would be useful

17   for you to see what we're talking about.

18          THE COURT:  That's very helpful.

19          Anything anybody wants to add to that to describe

20   the term sheet?

21          MR. HIRSCH:  Your Honor, this is Adam Hirsch on

22   behalf of Howard Sklar and the Howard Sklar Trust.

23          Your Honor, I appreciate Mr. Johnson's comment.  I

24   think just to preview it.  Mr. --

25          THE COURT:  Hold on.  I can't find you.  You must

1  be buried way below.

2          MR. HIRSCH:  I'm going to be at the bottom, Your

3  Honor.

4          THE COURT:  Trish, how do I get him to show up?

5      (Brief pause)

6          THE COURT:  Speaker view.  Got it.  Thank you.

7          Okay.

8          MR. HIRSCH:  Are we good, Your Honor?

9          THE COURT:  She saved the day, yes.

10          MR. HIRSCH:  Okay.

11          Mr. Sklar and the Howard Sklar Trust do view

12  Sklarco as a solvent entity.  And as Mr. Johnson previewed

13  for the Court, we do take issue with the notion that assets,

14  beyond that necessary to pay the bank, would be in any way

15  contributed to pay the Sklar Exploration creditors without

16  Mr. Sklar's or the Howard Trust's consent.  We oppose that.

17  And so simply to preview that for the Court, that will be an

18  issue I would hope that would not need to be litigated.

19  We've been available, and remain available, to negotiate

20  terms where something could be contributed, but that has not

21  gone very far to date.

22          THE COURT:  Well, let me hear again from Mr.

23  Johnson about -- well, somebody needs to remind me, is it

24  just our CRO, Mr. Katchadurian, or is it the Committee, as

25  well, that were to investigate the transactions or the

 1  transfers by the Debtors to Mr. Sklar and his family trust?

 2          MS. RILEY:  Your Honor?  Sorry, if I may?  This is

 3  Keri Riley.

 4          The CRO was tasked with, really, sort of tracing

 5  the disposition of the cash call advances and other funds

 6  that came into the Debtor on a prepetition basis.  The

 7  Unsecured Creditors' Committee did undertake a 2004

 8  examination to look into any number of issues, including, but

 9  not limited to, I believe, transfers.  And that 2004

10  examination was both of the Debtors and of Mr. Sklar

11  individually.  I would just note that we are still in some

12  discussions regarding the assets that will be assigned to the

13  trust, so --

14          THE COURT:  To his trust?

15          MS. RILEY:  Oh.

16          THE COURT:  Or to this, it's not a liquidating

17  trust, but it's a creditor trust.

18          MS. RILEY:  Right.  The assets will be assigned to

19  the post-confirmation trust.

20          THE COURT:  Got it.

21          MS. RILEY:  So we are still in discussions with

22  the Committee regarding those.

23          THE COURT:  Okay.  I would --

24          Well, Mr. Johnson, tell me a little bit, have you

25  done much investigating yet on possible avoidance actions

1  against Mr. Sklar?

2  MR. JOHNSON:  So, Your Honor, we have focused both

3  on those transactions of potential claims the estates may

4  have against Mr. Sklar and those trusts, as well as the

5  Debtor's prepetition conduct and operations and whether or

6  not there is grounds to treat these as a single business

7  enterprise.

8  As the Court heard many times, all of the assets

9  are at Sklar and all of the debt is at FCC.  FCC never could

10  have operated without continuous capital infusions from

11  Sklarco.  There's very -- and again, I don't want to get into

12  argument, but to answer your question, we investigated the

13  basis for forcing Sklarco to contribute its assets to fund

14  FCC operations, and we believe that we've done a significant

15  investigation, or a sufficient investigation, to allege

16  claims against Mr. Sklar, his trust, and the other family

17  trusts, to preserve those claims in the disclosure statement

18  and pursue those post-confirmation.

19  THE COURT:  Well, I'm going to ask you to file a

20  status report on that investigative effort, and I'd like to -

21  - is two weeks sufficient time?

22  MR. JOHNSON:  It is, Your Honor.

23  THE COURT:  Okay.

24  UNIDENTIFIED MALE:  Your Honor, can we make it the

25  26th, as well?

1        THE COURT:  Certainly.  That sounds great.

2        And Mr. Katchadurian should file his portion of

3   that, as well.

4        MS. RILEY:  Certainly, Your Honor.

5        MR. HIRSCH:  Your Honor, if I may very briefly?

6   Just for clarity of the record --

7        THE COURT:  Mr. Hirsch.

8        MR. HIRSCH:  Yes.  I'm sorry, this

9   (unintelligible).

10        THE COURT:  I see you now, but we always have to

11   remember that the audio has to know who's speaking, because

12   if there's a transcript made, they've got to know.

13        MR. HIRSCH:  Very good.

14        I just wanted to say, just for clarity of the

15   record, just, you know, based on what I just heard I want to

16   make sure that there's no confusion here.

17        One issue may be the claims that would be assigned

18   to the trust and potential Chapter V causes of action that

19   may exist against either Mr. Sklar, or the trust, or either

20   of the various family trusts.  That is a separate issue from

21   when encumbered (unintelligible) assets or outside

22   investments, and may also be contributed to FCC unsecured

23   creditor or clients.  And just to let you -- and we may have

24   a different view on those two, on the two issues.

25        Mr. Sklar acknowledges that people may believe

 1   they have claims, obviously we dispute them.  But the notion

 2   of assigning those claims to the trust may not be as

 3   offensive to Mr. Sklar in deciding assets that properly

 4   belong to Sklarco.

 5            THE COURT:  Okay.  But somehow I need to know what

 6   you all have learned so far about the status of what went out

 7   the door to cause the problems that the Debtor is in, to

 8   cause the $7 million that was advanced by working interest

 9   owners to disappear.

10            MR. HIRSCH:  Understood, Your Honor.  I just

11   wanted to make sure the (unintelligible) the case.

12            THE COURT:  Got it.  Thank you.

13            Okay.  Anybody want to fill the Court in further

14   on pertinent terms on the term sheet?

15            MR. SUZUKI:  Your Honor, Bryce Suzuki on behalf of

16   East West Bank.

17            I think Mr. Johnson did a nice job summarizing the

18   Plan terms.  A couple of other just minor pieces of

19   information to keep in your head, Judge, as we move forward

20   on this with respect to post-petition management.  It was

21   important to the bank, and I think the other creditors, that

22   a level of independence be maintained throughout the post-

23   confirmation era, so to speak, and so there is a provision

24   for an independent manager.

25            Some of what we have to do between now and the

1  26th is actually identify who that is.  So that's one of our

2  task lists, but that is something that I think is important

3  and Your Honor should know about.

4        Mr. Johnson is correct overall about the structure

5  of the bank's claim, an over seared claim, but we're going to

6  sort of split off a portion of that for the benefit of

7  unsecured creditors, and we're going to apply the adequate

8  protection payments received post-petition pre-confirmation,

9  with the exception of bank's attorney's fees, to principal to

10  reduce the overall claim amount of the amortization of that

11  reduced claim amount as it relates to the bank, two-year

12  term, and then a refinance or a sale type of exit event.

13        So we think that this is a structure where the

14  bank is actually giving quite a lot, the creditors are

15  getting quite a lot.  And if we can't get there under this

16  plan structure, Judge, given the cash issues, the cash flow

17  issues on the FCC side, and some real potential adequate

18  protection issues because of the shortfalls from JIBs,

19  effectively Sklarco is using the bank's cash collateral to

20  fund these operations, then this case, I think, decomposes

21  very, very quickly.

22        So to the point that I made earlier, I think it's

23  important to move very quickly, as fast as we reasonably can,

24  to push this through and to get through confirmation.  If

25  this Plan is not going to work, Judge, I think, you know,

1  sort of the parties have spoken and we've got to look at

2  other avenues, likely liquidation scenarios.

3           THE COURT:  All right.  So is the amount the bank

4  is willing to pony up to help the unsecureds out that you

5  mentioned, is that sufficient to pay the cure amounts to

6  working interest owners that -- because to me, I'm not going

7  to approve assumption of agreements that are not promptly

8  cured.  So the original Plan's proposal of paying that off

9  over several years, I would not approve unless the creditor

10  consented.

11          MR. SUZUKI:  Yeah, and that's something that we

12  have to look at.  I mean, as the Plan currently -- or as the

13  term sheet currently contemplates, there would be a term out

14  of some of those.  What's required is assurances of prompt

15  cure.  What "prompt" means is subject to your discretion,

16  Judge, on a case-by-case basis, we understand that.

17          THE COURT:  But that's not going to be years.

18          MR. SUZUKI:  We understand.  And so that's

19  something that we're going to have to, you know, take a hard

20  look at.

21          There's only so much cash that these operations

22  are going to spit off.  And if you service the bank debt and

23  you deal with the excess cash flows, we understand that, you

24  know, those cure payments are going to have to be made.

25  Exactly how much when, we've got to look at the reality of

 1  the cash flows and understand how that operates.

 2        But Your Honor's comments are well taken.  We

 3  understand.  We will work through that.  That's going to be a

 4  point of negotiation, I think, between the various parties,

 5  including the working interest holders.  But we understand

 6  the reality and we're going to address that.

 7        THE COURT:  Very good.

 8        That kind of takes us back, Ms. Riley, to your

 9  comments about you really -- the Debtor really needs this

10  money from the post-petition JIB obligations of the working

11  interest owners now because it's running out of cash, and I

12  understand that.  But to resolve that issue it's going to

13  take an adversary.

14        The cash collateral order and the oil and gas

15  order were heavily negotiated form of orders.  The parties

16  picked the language that appears there, so there's nothing

17  for the Court to clarify.  That language, we all knew, did

18  not go far enough.  It only was a stopgap measure, and it

19  didn't talk about the post-petition offsetting issues

20  directly.  The agreements cover that, of course, but we have

21  the complication of all this prepetition obligation that

22  hasn't been fulfilled by the Debtors.

23        So I am not inclined to do some hurry up adversary

24  proceedings to figure out, you know, this offsetting or

25  recoupment issue when it will all likely be moot.  If the

1  Debtor can't cure these contracts on a very -- on a prompt

2  basis, not over years, then we're wasting our time here, as

3  everybody has said.  And so you've got to get to that cure

4  issue, that's the only way we're going to get there safely.

5          But what I also saw as I read through the

6  objections, and now I know that it involves not just McCombs

7  but also Kudzu, when there is a working interest owner who

8  owes more than the Debtor owes it, when you put pre and post

9  both together, and they just want to hold back and not make

10  payments because they want to see where the debtor goes,

11  whether the debtor ultimately reorganizes or not, that is not

12  how 365 of the Code works.  And parties are supposed to, even

13  if the debtor gets until confirmation to assume executory

14  contracts, and in the meantime the non-debtor party has to

15  keep performing.

16          If there's some real risk to the nonperforming

17  party, then they can ask for a quick deadline to assume or

18  reject, or some other way to push the matter forward.  But

19  when they're not at risk because they owe more than is owed

20  to them, to me I'm going to hold those creditors in contempt

21  if within two weeks' time they don't pay up their post-

22  petition obligations to the extent that it is offset.

23          I'm probably not stating this clearly enough.  But

24  to the extent that the Debtor is owed more money by McCombs

25  and Kudzu, and anybody else in that same situation, they've

1  got to pay that excess post-petition amount, so.  And I will,

2  you know, it will -- I will enter contempt orders with

3  monetary sanctions if that doesn't happen.

4        So let me hear from the McCombs' counsel and Kudzu

5  counsel.

6        MR. LECHOLOP:  Your Honor, Steve Lecholop,

7  representing McCombs Energy and McCombs Exploration.  Good

8  morning.

9        Your Honor, we have been in negotiations over the

10  last day with Ms. Riley to do exactly what the Court

11  suggested.  There will be no need for a contempt.  We have

12  been willing to do exactly what the Court has suggested.  The

13  issue for us has been the lack of engagement in doing -- in

14  resolving this, despite the pleadings that were on -- despite

15  the language in the pleadings, Your Honor.

16        Before I unilaterally reached out to Ms. Riley at

17  4 o'clock yesterday, I hadn't heard from the Debtors a single

18  time.  Now --

19        THE COURT:  But you're experienced bankruptcy

20  counsel, right?

21        MR. LECHOLOP:  Yes, Your Honor.

22        THE COURT:  And so you know that you have an --

23  your clients have an obligation to continue to perform until

24  the point at which it's rejected or assumed, right?

25        MR. LECHOLOP:  That's right, Your Honor.  And as

1    counsel I have advised my client --

2         THE COURT:  Good.

3         MR. LECHOLOP:  -- in the way that I am obligated

4    to advise them.

5         THE COURT:  Then I'm going to help you with the

6    hammer.  They've got two weeks to pony up, or they'll get hit

7    with sanctions.

8         MR. LECHOLOP:  Yes, Your Honor.  Heard loud and

9    clear.

10         THE COURT:  Okay.

11         MR. LECHOLOP:  We will absolutely ensure that that

12    happens.

13         Your Honor, a part of that, there are two parts to

14    that, I just want to make sure Your Honor is clear here.

15         So certainly there is a delta that Your Honor

16    spoke of between what's owed on both sides.  But there are

17    two buckets of money that that's coming from, and so for

18    purposes of awarding contempt I want Your Honor to be very --

19    just to be very clear about where these buckets of money are

20    coming from.

21         THE COURT:  Okay.

22         MR. LECHOLOP:  So on January 25th, Your Honor set

23    the hearing on the motion to clarify for today.  The next set

24    of revenue obligations -- revenue distributions to working

25    interest owners were supposed to be distributed January 31st.

1          THE COURT:  Uh-huh.

2          MR. LECHOLOP:  McCombs, and I believe others, I'm

3   not certain, but I believe others, were not paid those

4   January 31st revenue obligations.  Effectively, the Debtors

5   took the judge's pen and unilaterally rewrote the cash

6   collateral order and oil and gas order, without waiting for

7   Your Honor to rule in any way.

8          I believe under Section 1112 that that, frankly,

9   that disobedience, (unintelligible) violation of a court

10  order is cause for conversion.  However, we, as McCombs, are

11  willing to overlook that.  We are willing to agree that those

12  proceeds can be applied to this delta.  The proceeds I

13  believe are still being held by Sklar, I think Ms. Riley

14  said, in a revenue account.  And then McCombs separately will

15  be -- whatever is remaining between what is being withheld by

16  the Debtors and the delta, we will be cutting a check, so to

17  speak, to the Debtor's bankruptcy estate for purposes of use

18  in the operating account of the Debtors.

19          And so because those numbers may not match up on

20  the ledger as far as a check coming from McCombs to the

21  debtors, I want you to understand there was that separate

22  bucket that's being withheld by the Debtors.

23          THE COURT:  Well, I understand the statement you

24  just made.  I don't know, the Debtor may have a different

25  view of it.  We'll save that for now.  But two weeks is the

1   time frame for resolving this.

2            Let me hear also from Kudzu.

3            MS. RILEY:  Your Honor, if I may just address that

4   point?  Because those were some fairly serious accusations

5   that were thrown at the Debtors here.

6            THE COURT:  You don't need to respond to that, Ms.

7   Riley.

8            MS. RILEY:  Thank you.

9            THE COURT:  I have a lot of skepticism about what

10  was said, so.

11           MS. RILEY:  Thank you, Your Honor.

12           THE COURT:  All right.  Let me hear from Kudzu.

13           MR. GENO:  Please the Court, Craig Geno for Kudzu.

14           It's not the, all the Kudzu parties, Your Honor,

15  because we kind of revert to our three classes, the Kudzu

16  parties that are subject to some of the pointed claims of the

17  Debtor's motion.  It's actually only Kudzu oil properties.

18  Alabama Oil Company and Apple River are current with respect

19  to, or close to current depending on the time of the month,

20  with respect to the agreements that they have with the

21  Debtors.

22           As I understand the Court's statement, but please

23  correct me if I misunderstood you.  When you say that if the

24  Debtors are owed more money than the Debtors owe to the

25  working interest owners, I assume you're talking about only

1   post-petition and we're not including cash call advances in

2   that debtor-creditor calculation.

3          THE COURT:  No.  I think for now let's treat the

4   pre and the post together and look at who's got the -- who

5   still owes after an imaginary set-off were to occur.  And if

6   Kudzu owes more, they need to pay that within two weeks, or

7   they'll be in contempt.

8          MR. GENO:  If they are -- if you -- again, Your

9   Honor, I don't mean to negotiate with the Court, but I want

10  to be clear because contempt is certainly not something we

11  want to be afoul of.  If we combine the cash call advances

12  that Kudzu is owed, plus any post-petition revenue, that

13  debtor-creditor relationship changes significantly.

14         THE COURT:  Okay.  And so maybe you're not in this

15  category.  Because for right now, I'm including the pre and

16  the post, because there is this issue of recoupment that's

17  out there.  That is an interesting legal issue and we could

18  delve into it, but we're not going to because it's going to

19  be moot very quickly in this case.  But I'm saying if there's

20  somebody that when you put pre and post together owes the

21  Debtor at the end of the day, that's not acceptable

22  (unintelligible).

23         MR. GENO:  I -- I'm sorry, Your Honor.

24         THE COURT:  Okay.

25         MR. GENO:  I apologize.  I didn't mean to

 1   interrupt you.  I understand that completely.

 2          I think that may be the case, but that does not

 3   affect the agreement that we tentatively have reached with

 4   Ms. Riley with respect to Kudzu, and then respectably,

 5   assuming we can get that properly documented, we intend to

 6   live by the settlement discussions that we have had with her

 7   last night and this morning, as well.

 8          THE COURT:  Okay.  If she agrees to it on behalf

 9   of the Debtor, Debtors, then the Court will accept that so,

10   if it's some other offsetting arrangement.  Okay.

11          MR. GENO:  Thank you, Judge.

12          THE COURT:  All right.

13          MR. BAIN:  Your Honor, if I may?  This is Joseph

14   Bain on behalf of FPCC.

15          THE COURT:  Okay.

16          MR. BAIN:  We're also in this -- in this -- in

17   this --

18          THE COURT:  Category.

19          MR. BAIN:  Yes, Your Honor.  And of course we

20   fully intend to comply with Your Honor's order.

21          THE COURT:  The bad children sitting in the

22   corner?

23          MR. BAIN:  Well, and, Your Honor, I think I

24   completely understand your position with regards to the

25   recruitment issue.  And honestly, I think we're actually owed

1   more than we currently owe.  But if by some chance there's a

2   disagreement between us and the Debtors, could we ask for a

3   hearing, you know, just to resolve that?  Because obviously

4   we don't want to be in the position where, you know --

5          THE COURT:  You can always interplead money, just

6   the disputed portion of it.

7          MR. BAIN:  Understood.

8          THE COURT:  But I want everybody to --

9          MR. BAIN:  Right.

10         THE COURT:  -- follow 365.

11         MR. BAIN:  Sounds good.

12         THE COURT:  Yeah.  Okay.

13         MR. BAIN:  And then, Your Honor, if I may?

14  There's one additional issue related to that.  And I'm not

15  trying to mudslinging, but just in response to this kind of

16  back and forth.  The Debtors put all of our (unintelligible)

17  and sent us a letter saying that they're going to put all of

18  our revenue in suspense, which makes (unintelligible) just

19  hold it in an account.  We would ask obviously, if we're

20  trying to chew everything up, that they not do that.  Because

21  we would argue that it violates the oil and gas order, and

22  that they take it out of (unintelligible) --

23         THE COURT:  Well, I don't think that oil and gas

24  order really attempted to address this big, looming issue

25  with recoupment and set off.  And it was -- anyways, it was a

1    stopgap measure, it wasn't an attempt to resolve all of this.

2              And as I said, we're going to put our focus on the

3    Plan and the assumption of these agreements, which will

4    require a prompt cure.  Because any other money is just going

5    to be wasted and it's going to be moot.

6              So if Mr. Sklar has to kick in some of the money

7    he took out to front some of the operations going forward,

8    you know, whatever the Debtor needs to do, go to the bank, go

9    to Mr. Sklar, whoever, that should occur if you are in dire

10   need of money.  But we're not going to hold things up and try

11   to -- and try an adversary on this now.

12             MR. BAIN:  I see.

13             THE COURT:  So.

14             MR. BAIN:  Thank you, Your Honor.

15             THE COURT:  Okay.

16             Well, I'm going to grant the Debtor's request to

17   continue, or to set a deadline for the filing of the amended

18   plan and disclosure statement by February 26th.  We know that

19   we've got the status reports coming on transfer analysis

20   investigation by the Committee and the CRO by the 26th.

21             What else can we do today?

22             UNIDENTIFIED MALE:  Judge?

23             MR. SKELTON:  Your Honor?

24             THE COURT:  Mr. Skelton.

25             MR. SKELTON:  Yes.  One of the things I raised in

```
 1   our response, and of course I'd like it to be at least a week
 2   earlier that this deadline is set, but so be it.  But one of
 3   the things you made clear at our December 4th status
 4   conference is that when the Plan is filed, and the Plan
 5   provides for the assumption of executory contract, there
 6   shall be a separate motion filed for each such contract.
 7             THE COURT:  Correct.
 8             MR. SKELTON:  That did not happen, and that must
 9   happen.  Because the absolutely crucial -- one of the
10   absolutely crucial issues for the working interest owners is
11   cure.
12             THE COURT:  Right.
13             MR. SKELTON:  And this is a check's in the mail
14   proposition that was in the original plan, which is not
15   acceptable.  And our position, well, which I think is what
16   you were stating, is that "prompt means prompt," as Professor
17   Norton said in his treatise.  And so we think that's
18   absolutely essential.
19             We'd also hope, if there is any ability to
20   compress some of the time periods from, you know, disclosure
21   statement hearing and confirmation hearing, we would urge
22   that there be as much compression as possible.  Because among
23   the points that several other parties have made, is the burn
24   rate in this case is very serious and we just cannot afford
25   to, you know, lollygag around.
```

```
 1              I'm not going to point any fingers about why are
 2    we here now, because yesterday, yesterday, is the first time
 3    there has been any reach out from the Debtor, with a term
 4    sheet or anything, for any of the working interest owners.
 5    And so, but here we are.  But I think, frankly, the Debtor's
 6    got to be on a short leash.
 7              THE COURT:  Okay.
 8              MR. SKELTON:  And --
 9              THE COURT:  Okay.  I hear that point.  And what
10    I'll do is set the February 26th deadline to include filing
11    the motions to assume contracts.
12              MR. SKELTON:  Thank you.
13              THE COURT:  And rejection, as well.  We might as
14    well get those out.  And I can approve those without a plan
15    confirmation.
16              I won't approve the motions to assume unless we
17    also confirm the Plan.  But we ought to tease out there and
18    find out what the cure amounts are and where we're apart on
19    that amount, et cetera.  So that groundwork needs to happen
20    in tandem with the Plan process.
21              MS. RILEY:  So, my apologies, Your Honor.  This is
22    Keri Riley for the Debtors.  I just want to be clear.
23              So February 26th would also be the deadline to
24    file any motions to assume --
25              THE COURT:  Or reject.
```

1          MS. RILEY:  -- or reject.

2          And, Your Honor, if we may, to the extent that

3 there are operating agreements that FCC intends to reject,

4 would Your Honor be amenable to us filing, perhaps, an

5 omnibus motion to reject those?

6          THE COURT:  Yes.  Omnibus on the rejection is

7 fine.  But I think in your title, I think there were only 13

8 that you were indicating you were going to reject?

9          MS. RILEY:  I believe so, Your Honor.

10          THE COURT:  So why don't you put that in

11 parentheses and make it a long title, so it just draws

12 peoples' eyes to it more, who is being rejected.  Because

13 there may be a lot of those contracts that haven't been

14 heavily involved in these proceedings, and they get a piece

15 of paper and they tend to throw it away, so.

16          MS. RILEY:  Certainly, Your Honor.

17          THE COURT:  Okay.

18          And then the motion to assume, obviously by

19 separate motion for each contract.  I know it's 156 of them,

20 if you need to hire some contract help to help you, you know,

21 I will act on that employment application quickly.

22          MS. RILEY:  Thank you, Your Honor.

23          THE COURT:  Okay.

24          And let's talk about the response time.  Frankly,

25 I don't remember what it is under the rules.  It's at least

1   two weeks, I'm sure.

2           MS. RILEY:  (Unintelligible) --

3           THE COURT:  Is any -- go ahead.

4           MS. RILEY:  My apologies, Your Honor.

5           It's generally 14 days for a response on a motion

6   to assume or reject under the local rules.  But given that

7   some of these will need to be mailed to a large number of

8   people in Alabama, or Louisiana, or, I mean, really, a lot of

9   places outside of Colorado, it may make sense to extend that

10  in this case, particularly given that it will sort of be dual

11  tracked with a plan and disclosure statement.

12          THE COURT:  Well, I want them to speak up about

13  what they think they're owed, the netting of all these

14  things, so that you can react to that and we can tie that in

15  with confirmation and keep both moving forward.  So let's

16  keep it with the 14 days.  I was going to suggest shortening

17  it, but you've convinced me not to.

18          Okay.

19          MR. SUZUKI:  Your Honor, Bryce Suzuki on behalf of

20  East West Bank.  May I be just heard on a --

21          THE COURT:  Certainly.

22          MR. SUZUKI:  -- couple of issues?

23          THE COURT:  Okay.

24          MR. SUZUKI:  I'm not going to -- you're not going

25  to believe this, but I actually agree with Mr. Skelton on a

1   point.  Which is, we do need to keep this moving forward, and

2   I actually appreciate the comments.  If we can compressed the

3   time frame, the bank is certainly amenable to that.  We are

4   committed to working however hard we need to work to make

5   that happen.  So to the extent some of these time frames can

6   be truncated, for example between the time of disclosure

7   statement approval and confirmation hearing, we would

8   certainly appreciate that.  We think that's important given

9   the cash issues.

10          And to that point, Your Honor, I do have one

11  question of clarification which is, someone asked about

12  whether the set-off, or recoupment, or whatever we're going

13  to call it, or the preservation of that right, would include

14  both prepetition revenue amounts owed versus the JIBs, or

15  also amounts owed for cash call advances.  And I don't know

16  that I understood exactly the response to that.

17          And that's important, Judge, because the cash call

18  advances, they're not owed in the same way that -- there's a

19  claim there, there's certainly liability --

20          THE COURT:  Well, it might --

21          MR. SUZUKI:  -- and the Debtor meeting

22  (unintelligible) --

23          THE COURT:  It might be set-off, but it's not

24  recoupment, you're suggesting?

25          MR. SUZUKI:  Well, you know, so those -- you know,

1   cash call advances are provided, and then they are, you know,

2   you're supposed to go do your project.  Well, the Debtor may

3   still go do that project.  It's not that they owe a

4   repayment, an immediate payment obligation on the cash call

5   advances.  And so adding those two together creates, in my

6   view, a more inflated prepetition claim.

7           And the bank's ox really is kind of gored by this,

8   because the less that the JIBs come in, the more the bank's

9   cash collateral is the sole source of funding for the case.

10  And that pool of cash collateral has shrunk dramatically over

11  the term of the case, and so I view that as shifting a lot of

12  the risk to the bank, and the bank has borne a lot of that

13  risk to this point.

14          So I guess my request would be if we're going to

15  determine what amount the excess that must be paid within the

16  two weeks, then it really should be based on what is owed for

17  prepetition oil and gas revenue payments versus post-petition

18  JIBs and not put every, you know, bid of prepetition claim

19  together.  Because that just seems inappropriate given the

20  distinction between cash call advances and a revenue claim,

21  which is a claim for a right to payment.

22          THE COURT:  And yet, with the cure of those

23  contracts, both would be taken into account, would they not?

24          MR. SUZUKI:  Well, the cash call advances, from

25  our perspective, Your Honor, is those are funds that were

1  advanced for a project.  So adequate assurance of future

2  performance that those projects would be going forward

3  without funding --

4           THE COURT:  Okay.

5           MR. SUZUKI:  -- could accomplish that result.

6           Cure payments really are, they're a monetary

7  breach, and those payment rights need to be, you know, trued

8  up promptly.

9           THE COURT:  I understand your point, and I'm sure

10  that the working interest owners do not agree.

11           MR. SUZUKI:  I'm (unintelligible).  I'm sure they

12  don't.

13           THE COURT:  Oh, I don't --

14           MR. SUZUKI:  But this is --

15           THE COURT:  They don't --

16           MR. SUZUKI:  -- (unintelligible).

17           THE COURT:  We don't need to hear from all the

18  working interest owners to know that they don't agree with

19  that.

20           MR. SWANSON:  Your Honor?  Your Honor, this is Tim

21  Swanson, counsel for the Ad Hock Committee of Working

22  Interest Owners.  I'm wondering if we may be heard on several

23  of these points.

24           THE COURT:  You may, briefly.  As I said, I don't

25  doubt that you dispute that.

1          MR. SWANSON:  Right.  We obviously would dispute

2   that.

3          And, you know, we don't share as much optimism as

4   the next two weeks may bring.  We think there are, again,

5   some really substantial flaws with the previous plan, but we

6   don't see that this most recent term sheet has addressed many

7   of those.

8          And Your Honor has identified, perhaps, a

9   threshold issue.  And so when there are, you know, statements

10  of oxes being gored, let's not forget how the Debtor got to

11  where it is, and the working interest owners have seen some

12  cash dissipate.

13         And then, you know, with the prospect of, well,

14  your cure payment you may have to take over a period of time,

15  I understand that doesn't jive with what Your Honor views

16  365(b)(1)(a) to say, we have some skepticism.  And, you know,

17  this purported term sheet, or the term sheet, you know, it

18  was reached between three parties, and the working interest

19  owners, as the Debtors have admitted, you know, they're

20  critical.

21         The Ad Hoc Committee was formed for the purpose

22  of not being heard, and the trust had been burned, and the

23  FCC as an operator operates wells to the benefit of the

24  working interest owner.

25         And so, you know, we think there's a lot of

1   challenges with the term sheet, and we are in favor of

2   expediting what Mr. Skelton had mentioned.  And we think it's

3   critically important that, as the Court is doing, to

4   scrutinize the further cash burn.  Because if they can't cure

5   these defaults in accordance with 365, then what are we

6   doing?  Let's move forward.

7            And so we would echo those comments, and --

8            THE COURT:  Okay.  But I do hear Mr. Suzuki's

9   point that the cash advances that weren't used for the

10  purpose they were supposed to be used for may be an issue of

11  adequate assurances of future performance rather than a cure

12  obligation.  So as you all discuss and trade numbers, you

13  should separate those out.

14           And, you know, if I have to resolve that issue as

15  part of confirmation and assumption, then I will do that.

16  But I think you should, to further your discussions, you

17  should put those -- you should separate those in your mind,

18  as far as calculating numbers.

19           Does everybody, I hope, understand that point?

20           UNIDENTIFIED MALE:  (Unintelligible).

21           THE COURT:  If you're unclear, go ahead.

22           MS. RILEY:  Your Honor, this is Keri Riley for the

23  Debtors.

24           The agreements that we have been discussing,

25  specifically with respect to the payment of the JIBs issue,

1  and those agreements that we've been discussing, have focused

2  on the prepetition revenue and not on any cash call advances.

3  It was never our intention to reach any agreement with a

4  party that any sort of recoupment or set-off would be allowed

5  as to the cash call advance balance, because they are really

6  a performance liability that relates to adequate assurance

7  and future performance.

8           So I did just --

9           THE COURT:  So you agree with the bank?

10          MS. RILEY:  -- want to put that on the -- that's

11  correct.

12          THE COURT:  Okay.

13          And now I think everybody, I hope, if you're not

14  clear and you need the Court to state something further,

15  please let me know, on this point, that whether ultimately I

16  agree with the bank and the debtor's position that the cash

17  call advances aren't a cure amount or not, we need to set out

18  those numbers separately so that we can look at them

19  separately.  So is everybody clear on that?

20          UNIDENTIFIED MALE:  Just one question I have,

21  Judge.  Am I correct that you are not entering an order

22  granting the Debtor's motion today?

23          THE COURT:  That's correct.

24          UNIDENTIFIED MALE:  Okay.  Because --

25          THE COURT:  And, in fact, I'm not going to rule on

1    it.

2            UNIDENTIFIED MALE:  Okay.

3            THE COURT:  I mean, I guess I'm denying it on the

4    basis of mootness, because it will be moot by the time we

5    would get to resolving it.

6            UNIDENTIFIED MALE:  There was another issue, the

7    Exhibit A that showed all the alleged amounts unpaid,

8    included -- my clients have paid their JIBs currently.  But

9    there's always a current amount owed.  I mean, there's always

10   --

11           THE COURT:  Of course.

12           UNIDENTIFIED MALE:  And so --

13           THE COURT:  Of course.

14           UNIDENTIFIED MALE:  -- you know, we were going to

15   need clarification on that, because they just listed

16   everybody.  So, in any event, I think this resolves it, from

17   our point of view.

18           THE COURT:  Well, and for that, in the gap

19   amounts, you know, it should probably say -- I don't know,

20   there should be a column for what's due as of when so that we

21   can sort that out.

22           MR. BAIN:  Your Honor?

23           THE COURT:  Yes?

24           MR. BAIN:  Joseph Bain on behalf of FPCC.

25           We are in the position where we did not reach a

1   deal prior to the hearing, so it's more of a question.  I

2   just want to know what direction to give my client in terms

3   of terming up the JIB amount, and then whether or not we

4   should include the cash call advance amount as part of the

5   hypothetical set-off, if you will, or whether or not they

6   need to include that in the amount or not.

7           THE COURT:  Yeah, we didn't focus on that with the

8   earlier discussion and the contempt possibilities.  I think -

9   - I think for now the cash call advances should not be

10   included.  That money is paid and it, you know, so -- but

11   it's supposed to be used for a project that be Debtor may

12   actually go through with.  So you can still fight about it in

13   the adequate assurance of future performance category.

14           MR. BAIN:  Okay.  And if you don't mind, just to

15   make sure I'm absolutely clear, given the --

16           THE COURT:  Sure.

17           MR. BAIN:  So we will not include that as a

18   deduction in terms of what is owed.  It's not going to be the

19   delta, it's just going to be the revenue amount is all that

20   we are going to --

21           THE COURT:  So if you're looking at recoupment,

22   and under that basis we're putting pre and post together --

23           MR. BAIN:  Right.

24           THE COURT:  -- and netting out who owes who at the

25   end of the day.  The cash call advances should probably not

1   be included in that.

2              MR. BAIN:  Understood.  Thank you, Your Honor.

3              THE COURT:  Sure.

4              And anybody else need any further clarification?

5         (No audible response.)

6              THE COURT:  Okay.  All right.  Anything else we

7   should take care of today?

8              MS. RILEY:  Your Honor, just one point of

9   clarification.  To the extent that there are subsequent

10  parties who fail to pay their JIBs in the amount above any

11  revenue obligations that are owed, obviously, you know, we've

12  discussed it with the parties today, but would the debtors be

13  able to bring subsequent motions for contempt if this issue

14  arises further down the road?

15             THE COURT:  Yes.

16             MS. RILEY:  Thank you, Your Honor.

17             THE COURT:  Okay.

18             MR. PADDOCK:  Your Honor?

19             THE COURT:  But recognizing there are a lot of

20  parties here who weren't forewarned, so it will probably be a

21  motion for an order to show cause.  It won't be, boom,

22  there's contempt right away, because --

23             MS. RILEY:  Certainly, Your Honor.

24             THE COURT:  Okay.

25             MR. PADDOCK:  Your Honor, Robert Paddock on behalf

1    of Strago group.  I just had one procedural comment or

2    question to make.

3            With respect to the motion to assume or reject, I

4    know Ms. Riley suggested she needed additional time

5    (unintelligible) the original 14 days because of the issues

6    related to assumption.  But with respect to those JOA's,

7    which are (unintelligible) my client's JOAs, that the Debtor

8    intends on rejecting.  And maybe this is a question of Ms.

9    Riley here in front of the Court.  Is there any reason that

10   that time period couldn't be shortened to seven days?

11   Because it's a little different animal and a little simpler

12   than the motion to assume, which I understand is slightly

13   more complicated.  So all I'm -- I guess all I'm asking the

14   Court is, could we have a shortening of time for the response

15   time on this on this omnibus motion to reject?

16           THE COURT:  Because you might have another payment

17   coming due?

18           MR. PADDOCK:  Maybe.  Maybe.

19           THE COURT:  I understand that.

20           Ms. Riley?

21           MS. RILEY:  Your Honor, overall I don't know that

22   I am opposed to shortening the time frame on a motion to

23   reject.  My concern is, just again, that there are a lot of

24   parties that this does need to go out to.  But if the Court

25   is amenable to shortening the notice period after the motion

 1  is filed, then I think we would be open to that.

 2            As far as shortening the time frame before it's

 3  filed, frankly, we're going to need 14 days at a minimum.

 4            THE COURT:  How about with Counsel's request to

 5  shorten just on his contract?  And this is not your time to

 6  send the motion in, but his time to respond.

 7            MS. RILEY:  Certainly.

 8            THE COURT:  So is that -- it'll either be an issue

 9  or it will be uncontested and an order can enter and he can

10  avoid another payment.

11            MS. RILEY:  Thank you, Your Honor.

12            THE COURT:  Okay.

13            All right.  Anything else for today?

14            THE COURT CLERK:  Your Honor, do you want to set

15  the objection period for any amended disclosure statement?

16            THE COURT:  Oh.

17            THE COURT CLERK:  And a further hearing.

18            THE COURT:  Thank you.  Thank you.  I had a

19  thought and I lost it about exactly that, so thank you.

20            You know, I want to ask all of you to focus on the

21  real issue here, and disclosure often becomes the

22  battleground if it's a layer to fight about, and, you know,

23  I'd like in some ways for people to forecast what their

24  confirmation issues will be, because it gives everybody time

25  to look at that and think about that.  But I don't want to

1  have a lot of extensive disclosure fights.

2          You all represent sophisticated clients, you all

3  seem to be very experienced bankruptcy attorneys, and, you

4  know, I just, I don't think our money is well spent on

5  disclosure fights.  Confirmation fights, absolutely.  But I

6  hope that you will be extremely judicious in what you put

7  into a disclosure statement objection.  I will look very

8  unfavorably towards, you know, just having more arrows shot

9  at the Debtor that aren't really going to amount to much.

10          So it will delay the process, and you've all told

11  me that that's not in anybody's best interest.  So you all

12  have a common enemy, which is time, and we need to try to

13  manage this better.

14          So I will shorten the disclosure statement

15  objections to two weeks, so that'll get us teed up for the

16  confirmation fights much faster.  But even with the two

17  weeks, you know, choose your battles wisely, okay?

18          All right.  What else?

19          THE COURT CLERK:  Do you want to set a further

20  hearing date on the amended disclosure statement?

21          THE COURT:  Yeah, I guess while everybody is here

22  we could talk about that.

23          Anybody want to throw out some time period, and

24  then we'll check our calendar as the Court?  If we're having

25  these things all filed by the 26th, then two weeks from that

1  for the disclosure objections would be -- I'm trying to get

2  up my calendar.

3          MS. RILEY:  Your Honor, this is Keri Riley for the

4  Debtors.

5          If objections to the disclosure statement would be

6  due by the 11th, perhaps one week after, for the --

7          THE COURT:  Hearing.

8          MS. RILEY:  Yes.  So that would put us March 18th

9  or March 19th, both of which are free on the Debtor's

10  calendars.

11          THE COURT:  Okay.

12          Anybody have a problem with the 18th, that you

13  know of?

14      (No audible response.)

15          THE COURT:  And, Kerstin, can you check for us to

16  see if we have a problem?

17      (Brief pause)

18          THE COURT CLERK:  Other than our regular relief

19  from stay docket, there shouldn't be a problem with the 18th.

20          THE COURT:  Okay.  We could start at 9:30 that

21  day.  Does anybody know, right now, that they are going to

22  participate in that hearing likely and they have a conflict?

23          MR. PADDOCK:  Your Honor, Robert Paddock for the

24  Strago group.  I don't know what our participation is going

25  to be at that hearing.  At least in Texas, that's our spring

1  break, and I'll be traveling that day.  So that's not a

2  reason to not set it for everyone else, I just don't know

3  whether we're going to have significant participation or not.

4          THE COURT:  Especially since your contract may be

5  rejected.  And so maybe an associate of your firm could fill

6  in for you, if needed.  Okay.

7          MR. PADDOCK:  Sure.

8          MR. GENO:  Your Honor, this is -- this is Craig

9  Geno.  I have some hearings that morning.  If we could set

10  this in the afternoon, that would allow me to participate on

11  the 18th.

12          THE COURT:  We could probably set it for 2:15.  I

13  always have a 1:30 preliminary relief from stay docket on

14  Thursdays, but we could do that.

15          MR. GENO:  That will work.  Thank you very much.

16          THE COURT:  Okay.  So the 18th at 2:15 Colorado

17  time.  Does anybody -- speak now or forever hold your peace.

18       (No audible response.)

19          THE COURT:  Okay.  That's our hearing time, and

20  we'll go from there.

21          Anything else before we recess?

22       (No audible response.)

23          MS. RILEY:  Nothing from the Debtors, Your Honor.

24  Thank you.

25          THE COURT:  Thank you.

1            Okay.  All right.  Then thank you, all.

2            And I'm wishing you all the best luck to find a

3    solution that everybody can live with here.  If it's less

4    than what the Code requires but you consent, I will not stand

5    in your way.  So, anyway.

6            Okay, we'll stand in recess.  Thank you.

7            UNIDENTIFIED MALE:  Thank you, Your Honor.

8            UNIDENTIFIED MALE:  Thank you, Your Honor.

9            THE COURT CLERK:  This Court is now in recess.

10           (Time Noted:  10:39 a.m.)

11                      * * * * *

12                      CERTIFICATE

13       I, RANDEL RAISON, certify that the foregoing is a

14   correct transcript from the official electronic sound

15   recording of the proceedings in the above-entitled matter, to

16   the best of my ability.

17

18

19   _____        February 23, 2021

20   Randel Raison

21

22

23

24

25