January 29, 1968

## AMENDMENT TO OPERATING AGREEMENT

Reference is made to Operating Agreement dated November 3, 1957, effective October 15, 1956, entered into by and between Sam Sklar, Operator, and Union Producing Company, et al, Non-Operators, applying to certain leases described on Exhibit "A" of said Operating Agreement covering certain lands in Cass County, Texas, and Miller County, Arkansas. Reference is particularly made to Article 16 of said Operating Agreement pertaining to extensions, renewals, and new leases, which in effect establishes an "Area of Mutual Interest".

Because of the expiration of almost all of the leases described on said Exhibit "A" of the Operating Agreement, and further because of numerous transfers of interests and/or farmouts between the parties, it appears desirable and to the mutual benefit of all parties to amend said Operating Agreement in the following respects:

Exhibit "A" of said Operating Agreement is hereby deleted in its entirety, and the following Exhibit is hereby substituted in its place:

## EXHIBIT "A"

ATTACHED TO AND MADE A PART OF OPERATING AGREEMENT EFFECTIVE AS OF OCTOBER 15, 1956, BY AND BETWEEN SAM SKLAR, AS OPERATOR, AND UNION PRODUCING COMPANY, ET AL, AS NON-OPERATORS, COVERING RODESSA BLOCK #2, CASS COUNTY, TEXAS.

The following oil, gas and mineral leases cover lands located in Cass County, Texas. The lease number indicated with reference to each lease refers to Sam Sklar's file number, and the volume and page indicated with reference to each lease refers to the Deed Records of Cass County, Texas.

1. Lease #879 dated February 3, 1955, from G. C. Williams et ux to M. E. Weber, recorded in Vol. 311, Page 438, describing 233 acres, more or less, of the Mark M. Miller Survey, A-741, but determined by title examination that the interest covered by this lease applies only to two tracts of land in said Miller Survey, being the G. C. Williams 121 acre tract, and the G. C. Williams 70 acre tract. LESS, SAVE & EXCEPT oil and oil rights under 13.90 acres out of the Mark M. Miller Survey, A-741, from the surface of the ground down to a depth of 6,233 ft., as described in that certain Assignment dated February 14, 1967, executed by Union Producing Company in favor of Sklar Producing Co., Inc., recorded in Vol. 489, Page 506.

2. Lease #921 dated February 7, 1955, from F. A. Williams et ux to M. E. Weber, recorded in Vol. 311, Page 450, describing 233 acres, more or less, of the Mark M. Miller Survey, A-741, but determined by title examination that the interest covered by this lease applies only to 121 acres, more or less, in said Miller Survey, being the G. C. Williams 121 acre tract. LESS, SAVE & EXCEPT: Same exception as set out in #879, above.

3. Lease #960 dated March 14, 1955, from F. M. Williams et ux to M. E. Weber, recorded in Vol. 311, Page 307, covering: Same description and exception as set out in #921, above.

4. Lease #1425 dated June 20, 1956, from H. K. Carr to Sam Sklar, recorded in Vol. 332, Page 247, covering 70 acres, more or less, of the M. M. Miller HR Survey.

5. Lease #3499 dated December 7, 1960, from Mrs. Amena Nestor to Geo. E. Jinkins, recorded in Vol. 407, Page 61, covering 141 acres, more or less, of the Bryant Holmes Survey, A-447, INSOFAR as said lease covers and affects all formations below a depth of 6,269 ft. below the surface of the ground.

6. Lease #3500 dated December 7, 1960, from Mrs. Audros Finley to Geo. E. Jinkins, recorded in Vol. 407, Page 64, covering:  Same as set out in the foregoing Lease #3499.

7. Lease #3501 dated December 7, 1960, from Barbara Sue Brooks Goodwin et vir to Geo. E. Jinkins, recorded in Vol. 407, Page 67, covering:  Same as set out in the foregoing Lease #3499.

8. Lease #3502 dated December 7, 1960, from Mrs. Gladys Brooks to Geo. E. Jinkins, recorded in Vol. 407, Page 70, covering: Same as set out in the foregoing Lease #3499.

9. Lease #3503 dated December 19, 1960, from Mrs. Gladys Brooks, Guardian of the Estate of Carolyn Ann Brooks, a minor, to Geo. E. Jinkins, recorded in Vol. 407, Page 73, covering:  Same as set out in the foregoing Lease #3499.

10. Lease #3504 dated December 7, 1960, from Mrs. Louise L. Brooks to Geo. E. Jinkins, recorded in Vol. 407, Page 76, covering: Same as set out in the foregoing Lease #3499.

11. Lease #3505 dated December 19, 1960, from Mrs. Louise Lockwood Brooks Baker, Guardian of the Estates of Mary Anna Brooks and Cynthia Elizabeth Brooks, minors, to Geo. E. Jinkins, recorded in Vol. 407, Page 79, covering:  Same as set out in the foregoing Lease #3499.

12. Lease #1015 dated April 8, 1955, from A. H. Long et ux to George E. Jinkins, recorded in Vol. 310, Page 440, covering 50 acres, more or less, of the Bryant Holmes Survey, INSOFAR as said lease covers and affects all formations below a depth of 6,169 ft. below the surface of the ground.

13. Lease #1018 dated April 5, 1955, from Charles Hooper to George E. Jinkins, recorded in Vol. 448, Page 370, covering 100.5 acres, more or less, of the Bryant Holmes H.R. Survey, LESS, SAVE & EXCEPT 23.34 acres from the surface of the ground down to and including the depth of 6,169 ft., as described in that certain Assignment dated October 8, 1964, executed by Union Producing Company et al in favor of Sam Sklar et al, recorded in Vol. 461, Page 484.

14. Lease #1074 dated June 1, 1955, from Henry A. King to Lamar Neill, recorded in Vol. 314, Page 428, covering:  Same description and exception as set out in #1018, above.

15. Lease #1113 dated June 17, 1955, from J. E. Davis et al to Lamar Neill, recorded in Vol. 317, Page 300, covering 79.8 acres, more or less, of the Howard Reams Survey, A-874.

16. Lease #1114 dated July 2, 1955, from Tom N. Cope et al to Lamar Neill, recorded in Vol. 317, Page 298, covering same land described in #1113, above.

17. Lease #1115 dated July 5, 1955, from Edwards Mineral Corporation to Lamar Neill, recorded in Vol. 317, Page 308, covering same land described in #1113, above.

18. Lease #1116 dated June 24, 1955, from Mrs. Ruth Davis to Lamar Neill, recorded in Vol. 316, Page 75, covering same land described in #1113, above.

19. Lease #1117 dated June 23, 1955, from R. C. Hardy to Lamar Neill, recorded in Vol. 316, Page 77, covering same land described in #1113, above.

20. Lease #1118 dated June 24, 1955, from G. H. Heard to Lamar Neill, recorded in Vol. 316, Page 73, covering same land described in #1113, above.

21. Lease #1119 dated June 15, 1955, from William H. Cook et ux to Lamar Neill, recorded in Vol. 316, Page 61, covering same land described in the foregoing #1113.

22. Lease #1120 dated June 7, 1955, from Homer B. Steger et al to Lamar Neill, recorded in Vol. 316, Page 59, covering same land described in the foregoing #1113.

23. Lease #1275 dated January 20, 1956, from Mrs. Willie Carney to H. H. Harris, recorded in Vol. 328, Page 340, covering same land described in the foregoing #1113.

24. Lease #1277 dated January 9, 1956, from Mrs. Lucille Shope et al to H. H. Harris, recorded in Vol. 328, Page 342, covering same land described in the foregoing #1113.

25. Lease #1290 dated January 20, 1956, from Mrs. Ruth McWilliams et al to H. H. Harris, recorded in Vol. 328, Page 345, covering same land described in the foregoing #1113.

26. Lease #1358 dated April 18, 1956, from B. F. Whitworth to H. H. Harris, recorded in Vol. 330, Page 404, covering same land described in the foregoing #1113.

27. Lease #1821 dated August 20, 1956, from Katie Thurmon Bond to A. H. Richardson, Jr., recorded in Vol. 334, Page 413, covering same land described in the foregoing #1113.

28. Lease #1921 dated March 14, 1958, from C. R. Newland to H. H. Harris, recorded in Vol. 353, Page 541, covering same land described in the foregoing #1113.

29. Lease #1122 dated June 7, 1955, from Lillie Johnson Price et al to Lamar Neill, recorded in Vol. 316, Page 56, covering: First Tract: Same land described in the foregoing #1113; Second Tract: 50 acres, more or less, of the Howard Reams Survey, A-874.

30. Lease #1123 dated June 14, 1955, from Henry A. King et ux to Lamar Neill, recorded in Vol. 316, Page 65, covering: First Tract: 51.8 acres, more or less, of the John M. Watson Survey, A-1075; Second Tract: Same land described in the foregoing #1113.

31. Lease #1124 dated June 7, 1955, from A. J. Nelson to Lamar Neill, recorded in Vol. 316, Page 71, covering: First Tract: 50 acres, more or less, of the Howard Reams Survey, A-873; Second Tract: Same land described in the foregoing #1113.

32. Lease #1112 dated July 5, 1955, from Edna M. Wilson to Lamar Neill, recorded in Vol. 317, Page 296, covering 50 acres, more or less, of the Howard Reams Survey, A-874.

33. Lease #1121 dated June 15, 1955, from T. C. Bloxom to Lamar Neill, recorded in Vol. 316, Page 63, covering same land described in #1112, above.

34. Lease #1199 dated August 9, 1955, from Charles Willard Asberry et al to S. C. McKinney, recorded in Vol. 321, Page 356, covering 50 acres, more or less, of the Albert Emanuel Survey, A-326.

It is hereby agreed that, as to the terms of said Operating Agreement, and particularly Article 16 thereof, the Operating Agreement shall be applicable only to the lands and leases hereinabove set forth and substituted for the original Exhibit "A" attached to said Operating Agreement.

If you approve this amendment, please so indicate by signing in the space provided below.

AGREED TO AND ACCEPTED:

_____     Date: ___1-30-68___
Sam Sklar

_____     Date: ___1-30-68___
Albert Sklar, Individually & as Executor
of the Estate of Ida Siegel Sklar, deceased.

_____     Date: ___1-30-68___
Leonard W. Phillips

_August Erickson_ (signature)                    Date: _1-29-68_
August Erickson

_Morris B. White_ (signature)                    Date: _1-30-68_
Morris B. White

_Sam Y. Dorfman, Jr._ (signature)                Date: _2/9/68_
Sam Y. Dorfman, Jr.

_Louis Dorfman_ (signature)                      Date: _2/9/68_
Louis Dorfman

ELIZABETH F. DORFMAN TRUST

By _S. L. Florsheim Jr._ (signature)             Date: _2/9/68_
   S. L. Florsheim, Jr., Trustee

_S. L. Florsheim Jr._ (signature)                Date: _2/9/68_
S. L. Florsheim, Jr.

_Mary Sneed Walker_ (signature)                  Date: _8/5/68_
Mary Speed Walker, widow & sole devisee
of the Estate of Paul R. Walker, deceased.

UNION PRODUCING COMPANY

By _N. G. _____ (signature)                      Date: _8-1-68_
   AGENT AND ATTORNEY-IN-FACT                    AGENT AND ATTORNEY-IN-FACT
_Annie Norton_ (signature)

By _Leonard Hargrove_ (signature)               Date: 6/4/68
Mrs. Annie Norton   By:
F. Leonard Hargrove,
Agent and Attorney in Fact
_Richard W. Norton, Jr. by Leonard Hargrove_ (signature)   Date: 6/4/68
Richard W. Norton, Jr. by:
F. Leonard Hargrove, Agent & Attorney in Fact

NORTON OIL COMPANY, INC.

By _Allen E. McGary_ (signature)                 Date: 6/4/68
   Allen E. McGary, Vice President

_John S. Ivy_ (signature)                        Date: _8-24-68_
John S. Ivy

BUTLER-JOHNSON, INC.

By _H. Blume Johnson_ (signature)                Date: _5/20/68_
   H. Blume Johnson, President

TRIANGLE REFINERIES, INC.

By _J. H. Barksdale_ (signature)                 Date: _8/10/68_
   J. H. BARKSDALE, PRESIDENT

Page 4

SKELLY OIL COMPANY

By _____                    Date: __September 23, 1968__
A. J. O'Rourke, Attorney in Fact

_____                        Date: __2-29-68__
David Crow

RUTH WHITAKER ESTATE PROPERTIES

By _____                     Date: __2-29-68__
Douglas Whitaker


Skelly Oil Company's interest in the leases covered and affected
hereby applies only to those leases subject to this amendment
which were conveyed by J. R. Butler & Company to Skelly Oil Company
by instrument dated October 10, 1967, recorded in Volume 498, Page
471, Deed Records of Cass County, Texas.

OPERATING AGREEMENT

THIS AGREEMENT, made and entered into as of the _3ʳᵈ_ day of _November_ , 1957, by and between Sam Sklar, as "Operator", and the undersigned corporation and individuals as "Non-Operators";

W I T N E S S E T H :

WHEREAS, the parties hereto are the owners, in indivision, of those certain oil, gas and mineral leases covering certain lands in Cass County, Texas and Miller County, Arkansas, described on the Descriptive List of Leases attached hereto, marked Exhibit "A" for identification herewith, and made a part hereof for all purposes.

WHEREAS, said parties have agreed between themselves concern-ing their respective rights, privileges and duties concerning the development and operation of said leases for the production, saving and handling of oil, gas and other minerals thereunder, and desire to set said Agreement out in writing and to designate and appoint one party as the Operator to conduct all drilling and other opera-tions on said leases for the production, saving and handling of oil, gas and other minerals thereunder, except as may be herein otherwise specifically provided;

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements herein contained to be kept and performed by the parties hereto respectively, it is agreed by and between said parties as follows:

ARTICLE 1.

For the purposes hereof, the words and terms defined in this Article 1 shall have and are hereby given the following meanings when used in this Agreement:

(a) The word "OPERATOR" shall mean the party hereto designated hereinbelow as Operator.

(b) The term "NON-OPERATOR" shall mean any one of the parties hereto other than the one of them designated as Operator, as provided in paragraph (a) above, and the term Non-Operators shall mean all of such par-ties other than such Operator.

(c) The term "ROYALTIES" shall mean the royalties set out

and provided for in any oil, gas and mineral leases subject hereto, and shall also include any overriding royalty, payment out of production or other charge against the production applicable to any such lease.

(d) The term "JOINT ACCOUNT" shall mean the combined interests of parties hereto as hereinafter set out in Article 2 hereof.

(e) The term "LEASES" shall mean the leases described in Exhibit "A" hereof.

### ARTICLE 2.

Operator shall develop and operate the leases subject to this Agreement for the joint benefit of all of the parties hereto, and, except as hereinafter provided, each of such parties severally shall be liable for and pay its proportionate part of all costs, expenses and liabilities incurred under the provisions of this Agreement in drilling, producing, saving and handling oil, gas and other minerals from said leases; the proportionate part of the costs, expenses and liabilities, for which each of said respective parties shall pay and be liable, is that proportion thereof set out opposite the name of said respective parties as follows:

| Party | Per cent |
|---|---|
| Union Producing Company | 25.000 per cent |
| Mrs. Annie Norton | 12.125 per cent |
| Richard W. Norton, Jr. | 12.125 per cent |
| John S. Ivy | .750 per cent |
| J. R. Butler | 18.750 per cent |
| David Crow | 6.250 per cent |
| Douglas Whitaker | 6.250 per cent |
| Sam Sklar | 4.541 per cent |
| Estate of Sam Y. Dorfman | 4.541 per cent |
| Albert Sklar | 4.541 per cent |
| Leonard W. Phillips | 4.541 per cent |
| Paul R. Walker | .147 per cent |
| Morris B. White | .147 per cent |
| S. L. Florsheim, Jr. | .146 per cent |
| August Erickson | .146 per cent |

Said parties shall own in the respective proportions above set out

-2-

all of the oil, gas and other minerals that may be produced and saved from said leases; subject, however, to the terms and provisions of said leases, and less the oil and gas required for the development and operation thereof; provided, however, that each of the respective parties hereto shall be liable for and shall pay, or cause to be paid, out of its proportion of such production, any and all royalties applicable to such proportion of the production, payable under the terms of the leases subject hereto and any and all overriding royalties and payments out of production assumed or agreed to be paid by such party, or to which such party's interest may be subject.

ARTICLE 3.

Sam Sklar is hereby designated as the Operator of said leases. Operator shall, subject to the limitations of this Agreement, manage, develop and operate said leases at the joint expense and for the joint account of the parties hereto, in accordance with the terms and provisions of this Agreement, and shall, subject to the limitations of this Agreement, have full control and management of the operations on and under said leases for the production and saving of oil, gas and other minerals therefrom; and, in connection therewith, shall undertake and perform, subject to the terms and provisions of this Agreement, all of the obligations of said oil, gas and mineral leases.  Operator shall conduct all such operations in a careful, diligent, prudent and businesslike manner.

Operator shall not be liable to Non-Operators for errors of judgment or for the loss of or damage to any property belonging to the joint account in the absence of gross negligence or willful misconduct on the part of Operator or its employees.

Operator may be discharged and its powers, rights and duties as Operator of said leases terminated by Non-Operators, or any one of Non-Operators willing and able to take over operations, if it shall fail or refuse to operate said leases in accordance with the

-3-

provisions of this agreement.  Operator shall be discharged and its powers, rights and duties as Operator of said leases terminated by Non-Operators if it shall (a) tender its resignation as Operator, or (b) become insolvent.  Neither Operator nor any successor Operator hereunder shall be released from the duties and obligations of Operator for a period of ninety (90) days after its discharge or resignation, unless a successor Operator shall have been designated by Non-Operators and shall have agreed in writing to take over and assume the duties of Operator hereunder prior to the expiration of said period.

## ARTICLE 4.

Except as may be hereinafter otherwise provided, Operator shall, in the first instance, advance and pay all costs and expenses incurred in the development and operation of said leases for the joint account.  All charges to the joint account and all matters of accounting procedure between the parties hereto shall be governed by the provisions hereof and the provisions of the accounting procedure attached hereto, marked Exhibit "B" for identification herewith, and made a part hereof.  In case of conflict between Agreement and Exhibit "B", the provisions of Agreement shall control.

Operator shall mail to each Non-Operator at the address hereinafter provided for, on or before the end of each calendar month during the term hereof, a statement itemized in reasonable detail for the month next preceding, showing all charges or credits applicable to the joint account.

If the above mentioned statement reflects any amount to be due to any Non-Operator, Operator shall accompany such statement with its check or draft therefor, payable to such Non-Operator, as payment of the amount due Non-Operator as hereinabove provided. If payment of such amount does not accompany such statement, the unpaid balance shall bear interest at the rate of six (6%) per cent per annum from the date such payment was due until paid.

If the above mentioned statement reflects an amount to be due

-4-

by any Non-Operator to Operator, then, and in that event, such Non-Operator agrees to pay said amount within thirty (30) days after receipt of said statement, and if payment is not made within such time, the unpaid balance shall bear interest at the rate of six (6%) per cent per annum from the date such payment was due until paid.

Neither receipt by any Non-Operator of such statement nor the payment or receipt by any Non-Operator of any amount shown to be due by or to it by such statement shall prejudice the right of Non-Operator to protest the correctness thereof; provided, however, that unless the same is protested in writing within two (2) years after the receipt thereof, such statement shall, for all purposes, be considered as correct.

## ARTICLE 5.

No well shall be drilled by Operator for the joint account without the written consent of Non-Operators, and no expenditures shall be made by Operator for the joint account, in connection with any single project or item, in excess of the sum of Five Thousand ($5,000.00) Dollars, without the written consent of Non-Operators; provided, however, that when the parties hereto have agreed upon the drilling of any well, Operator is authorized to make any expenditures necessary in the drilling, completing and equipping of such well for the production of oil or gas and, further provided, that in the event of an emergency, such as a fire, blow-out or other happening, whether similar or dissimilar, Operator is authorized to expend such sums as he deems reasonably necessary to combat such emergency in the protection of human life, property of Non-Operators and the property of third parties. In the event of such emergency expenditures, Operator shall promptly notify Non-Operators in writing of the nature and extent of such emergency, and the sums expended for the joint account in combatting such emergency.

## ARTICLE 6.

Except as herein otherwise provided, each and all wells which may be drilled pursuant to this Agreement, and the material and

equipment therein and thereon and included therewith, shall be owned by the parties hereto in the proportions hereinabove set out.

Surplus equipment and materials belonging to the joint account, when, in the judgment of Operator, the same are not necessary for the operations to be conducted by Operator hereunder, may, with the consent of all parties hereto, be divided in kind, or sold to any party or parties hereto, or to third parties, for the benefit of the joint account. Small materials may be transferred from the joint account of Operator to its warehouse, or to other leases, without obtaining the formal consent of Non-Operators, but proper credits shall be made by Operator, as provided in the attached accounting procedure, for all such materials.

### ARTICLE 7.

Operator may, if it elects, require each Non-Operator to pay in cash to the joint account its proportionate part of the estimated cost of drilling and equipping any wells, or of any other project or item which may have been authorized under the provisions hereof, before making any expenditures in connection therewith. Each Non-Operator agrees to pay to Operator its proportionate part of said sums at least five (5) days before any such expenditure is to be made, after having received statement from Operator showing the estimated amount required and the date such expenditure is to be made; and, if payment is not made within such delay, the unpaid balance shall bear interest at the rate of six (6%) per cent per annum until paid. Adjustments between estimates and actual costs shall be made by Operator with Non-Operators after the actual costs have been determined.

### ARTICLE 8.

In the event any well drilled by Operator for the benefit of the joint account has reached the depth agreed upon and cannot, in Operator's opinion, be completed as a commercial oil or gas well at such depth, or at any lesser depth, Operator shall promptly notify, by telegram or telephone, each Non-Operator of such fact

-6-

and shall within forty-eight (48) hours thereafter submit to each Non-Operator simultaneously a written proposal to either conduct additional operations or to plug and abandon such well, after removing such casing and other materials as may be salvable.

Each Non-Operator shall have forty-eight (48) hours, such forty-eight (48) hour period to begin at 12:00 o'clock midnight on the date of the mailing of said written proposal, within which to advise Operator in writing of its approval or disapproval of Operator's proposal, and if all of the Non-Operators approve such proposal, Operator shall proceed at the expense and for the benefit of the joint account with the additional operations or plugging and abandoning agreed upon.

In the event Operator shall have proposed additional operations on such well and one, or more, of the Non-Operators does not consent in writing to such additional operations within said forty-eight (48) hours, as provided above, the Operator and those Non-Operators, if any, who do consent may, at its or their sole risk, cost and expense, independent of the joint account, proceed with such additional operations, and shall be liable for and pay all costs and expenses accruing or thereafter incurred by them in connection with such additional operations after the termination of the forty-eight (48) hours within which Non-Operators are obligated to notify Operator, as above provided.  Failure on the part of any Non-Operator to notify Operator within the time specified shall be construed as an election on the part of such Non-Operator not to participate in the proposed additional operations.

In the event Operator shall have proposed to plug and abandon such well, and one, or more, of the Non-Operators desires to conduct additional operations, then such Non-Operator, or Non-Operators, shall have the right, if exercised within forty-eight (48) hours (as such forty-eight (48) hours is hereinabove designated) to take over such well for the purpose of conducting such additional operations at its, or their, sole risk, cost and expense independent

-7-

of the joint account, and shall be liable for and pay all costs and expenses accruing or thereafter incurred by them in connection with such additional operations after the termination of said forty-eight (48) hour period.  Failure on the part of any Non-Operator to notify Operator within the forty-eight (48) hours shall be construed as consent on the part of such Non-Operator to the plugging and abandonment.

It is agreed that the forty-eight (48) hour delay periods above provided for, and notices in writing above provided for, shall be used only if it is impossible in the practical course of business to contact one or more of Non-Operators by telephone or telegram, and for one or more of Non-Operators to answer by telephone or telegram, it being the intention of all parties that notice and answer be given as soon as any of the problems contemplated above occur, and that answer be given immediately, if practical, to the end that no unnecessary shut-down time expenses be incurred.

In the event one or more, but less than all, of the parties hereto elect to conduct any additional operations on any well, independent of the joint account as hereinabove provided in this Article 8, and completes such well as a producer of oil, gas or other minerals, such party, or parties, shall own the equipment placed therein or thereon subsequent to the taking over of said well and shall be entitled to all of the proceeds attributable to the sale of production therefrom until such party, or parties, shall have thus received, or there shall have thus accrued to the credit of such party, or parties, (after deducting the lessor's royalty payable on all of such production; that part of any overriding royalties, production payments and like or similar payments to which the interest of the non-participating party, or parties, may be subject and payable out of such production; any severance, production and like taxes paid or payable on such production which are not paid by or deductible from the interests of third parties; and any expenses incurred in operating such well) an amount equal

-8-

to triple the sum expended by such party, or parties, in connection with such additional operations independent of the joint account; provided, however, that during such period said party, or parties, shall pay, or cause to be paid, all royalties, overriding royalties, production payments, production or severance taxes, and all like or similar payments as may be payable on the production from such well.

When said party, or parties, shall have received, or there shall have accrued to the credit of said party, or parties, triple the amount expended in connection with any such independent operations, as hereinabove provided, then such well, the equipment therein and thereon and the production therefrom shall be owned by all the parties hereto in the proportions set out in Article 2 hereof, and the well shall be taken over and operated by Operator under and pursuant to the terms of this Operating Agreement for the joint account of all parties.

ARTICLE 9.

No well owned by all of the parties hereto which is capable of producing, or has ceased to produce, shall be plugged and abandoned unless and until agreed upon in writing by all of said parties.

Operator shall notify all Non-Operators simultaneously in writing of its recommendation to plug and abandon any such well, or of any drilling, reworking or other operations it deems advisable in an effort to restore such well to commercial production. Each Non-Operator shall advise Operator within thirty (30) days from the date of such notice of its approval or disapproval of the proposed operation and, if all of the parties approve, then Operator shall proceed therewith for the benefit and at the expense of the joint account.

In the event Operator recommends plugging and abandoning any well, and any Non-Operator, or more than one, does not approve such proposal, then such Non-Operator, or Non-Operators, shall have the right, if exercised within sixty (60) days from the date of notice from Operator, to take over such well for the purpose of conducting

-9-

additional operations, at their sole cost, risk and expense, as pro-
vided in Article 8 hereof.

In the event Operator proposes, at the request of any one or
more of Non-Operators, additional drilling, reworking or other oper-
ations in an effort to restore any such well to commercial produc-
tion, and should any Non-Operator, or Non-Operators, disapprove such
proposed operations, then, and in that event, Operator, for those
parties who do approve, shall have the right to take over said well
and conduct such proposed operations at the sole cost, risk and
expense of such approving parties, independent of the joint account,
as provided in Article 8 hereof.

## ARTICLE 10.

If, while this Agreement is in force, any party hereto, other
than Operator, desires to drill a well in search of oil or gas under
one or more of said leases, such party shall so notify the remain-
ing parties simultaneously, stating in such notice the proposed
location, the depth to which such well is to be drilled, naming
the main objective horizon and stating the estimated cost of the
well properly itemized; but any such notice shall not include more
than one well.

Each of the parties so notified shall have a period of thirty
(30) days from the date of such notice within which to notify such
party who so gave notice of its desire to drill, as to whether or
not it desires to participate in the drilling of such well, and if
any party shall fail to give such notice within such thirty (30)
day period, then such party shall be deemed to have elected not to
participate in the drilling of such well. If all parties hereto
elect to participate in the drilling of such well, then Operator
shall cause such well to be drilled for the joint account.

If one, or more, of the parties hereto does not elect to parti-
cipate in the drilling of said well, then, in such event, the party
who gave notice of its desire to drill such well, and any remaining
party, or parties, desiring to drill same, shall have the right to

-10-

drill such well at its or their sole cost, risk and expense,

provided that:

(a) Operations for the drilling of such well are com-
menced within sixty (60) days after such notice of
the desire to drill same was given and such opera-
tions and the actual drilling of said well at the
location stated in such notice, are in good faith
prosecuted with reasonable diligence in conformance
with such notice of the desire to drill same;

(b) Such well is drilled in conformance with the appli-
cable laws, and the rules and regulations and orders
(if any) of any regulatory body having jurisdiction,
either Federal or State, and if no spacing rules or
patterns have then been fixed or prescribed therefor
by any regulatory body having jurisdiction, the loca-
tion of such well shall conform to the spacing pat-
tern adopted or generally used in the field;

but, such party, or parties, so drilling such well shall fully in-

demnify the remaining party, or parties, against any and all loss,

costs and expenses resulting from such separate and independent

operations.  In the event such well is completed as a commercial

oil or gas well, the party, or parties, so drilling such well shall

own the equipment therein and thereon and shall be entitled to all

of the proceeds attributable to the sale of production therefrom

until such party, or parties, shall have thus received, or there

shall have thus accrued to the credit of such party, or parties,

(after deducting the lessor's royalty payable on all of such produc-

tion; that part of any overriding royalties, production payments and

like or similar payments to which the interest of the non-participat-

ing party, or parties, may be subject and payable out of such produc-

tion; any severance, production and like taxes paid or payable on

such production which are not paid by or deductible from the inter-

ests of third parties; and any expenses incurred in operating such

well) an amount equal to double the sum  spent by such party, or

parties, in drilling, completing and equipping such well independent

of the joint account; provided, however, that during such period

said party, or parties, shall pay, or cause to be paid, all royalties,

overriding royalties, production payments, production or severance

taxes, and all like or similar payments as may be payable on the

production from said well.

After the party, or parties, drilling such well has received, or there has accrued to the credit of such party, or parties, out of production, the aforesaid amount, the well, equipment therein and thereon, and the production therefrom, shall be owned by all the parties in the same proportions and under the same conditions as provided in Article 2 hereof, the same as if said well had been drilled for the joint account, and further operations in connection therewith shall be conducted by Operator under and pursuant to the terms hereof for the joint account. If such well is not completed as a commercial oil or gas well, but is completed as a dry hole, or fails to produce sufficient oil or gas for the drilling party, or parties, to receive out of such production the aforesaid sum, the party, or parties, drilling such well shall not be entitled to any credits or reimbursements from the other party, or parties, or from the joint account, in connection with such well; and the party, or parties, drilling said well shall plug and abandon same at its, or their sole cost and expense.

ARTICLE 11.

It is contemplated that Operator will be able to secure the payment by the pipe line purchaser of production from the lands covered hereby of royalties, overriding royalties, production payments and other such payments due and payable by virtue of Non-Operators leases covered hereby, and Operator is hereby authorized to allow such payments. In the event it is impossible or impractical in the ordinary course of business to secure payments as above outlined, Operator shall, for and on behalf of the parties to this Agreement, pay or cause to be paid, monthly, to the owners as their respective interests may appear, all royalties, overriding royalties, payments out of production, or other amounts and charges, which may be or become payable by reason of the discovery or production of oil, gas or other minerals from the leases subject hereto, and except as may be otherwise herein provided, Operator shall charge to each of the respective parties hereto the amount thereof applicable to such party's interest, and Operator may charge Non-Operators a

-12-

fair and equitable charge to cover expenses incurred by Operator in handling such payments. When any Non-Operator is receiving in kind its proportionate share of production, as hereinafter provided for, then such Non-Operator shall advise Operator in writing, on or before the 10th day of the month following that in which the same is sold or used off the premises, the amount so sold or used and the price received therefor. Operator, by reason of its obligation to make the aforesaid payments for and on behalf of Non-Operators, shall not incur any responsibility, obligation or liability to any of the owners of the royalties, overriding royalties, payments out of production or other amount or charges which may be, or become payable by reason of the discovery or production of oil, gas or other minerals from said leased premises (except as to any royalties payable on Operator's interest therein or any other payment, or payments due thereon, due by Operator, which Operator has assumed under any lease or any instrument or instruments affecting said lease) but said responsibility, obligation or liability shall be and remain the responsibility, obligation or liability of each Non-Operator.

The foregoing provisions of this Article 11 shall apply only to production for the Joint Account and not to production from any well while operated independent of the joint account for the account of less than all of the parties to this Agreement.

ARTICLE 12.

Operator, for and on behalf of the parties to this Agreement, shall pay any delay rentals which may become due under the terms of the leases subject to this Agreement, which, in its discretion, are necessary to be paid in order to maintain such leases in force and effect in the absence of drilling or production thereon, at least twenty (20) days prior to the due date thereof, in accordance with the terms and provisions of the respective leases, and each Non-Operator shall reimburse Operator for its proportionate part of any and all delay rental so paid within ten (10) days after receipt of statement showing the amount so paid. Should any party hereto desire to discontinue payment of delay rentals under any lease subject

-13-

hereto, such party shall have that right upon giving to the other parties hereto thirty (30) days written notice to that effect, and such party shall also, upon request of the parties so notified, assign to such parties all its interest in such lease; provided, however, that Operator shall pay such rental unless all Non-Operators give notice.

Operator shall not, by reason of the provisions of this Article, incur any liability toward the remaining party to this Agreement for failure, through oversight, to make any such rental payments or for erroneously making any such payments, so long as Operator follows its usual and customary method and practices of making delay rental payments, and so long as it acts in good faith in connection there-with.

## ARTICLE 13.

Operator agrees to advance and pay all severance, production and other like or similar taxes, either State or Federal, which may be legally assessed against and due and payable on the production from the leases subject hereto as to the interest of each party hereto. Operator will not render said leases for ad valorem tax until such time as any such lease shall become productive of oil or gas in paying quantities, and Non-Operators shall render such properties for ad valorem taxation, if they so desire. At such time as any lease becomes productive, Operator shall render the same for ad valorem taxation and shall pay all taxes which may be legally assessed against such lease and leasehold equipment necess-ary and used in connection therewith. All taxes so paid shall be included in the charges to the joint account of the parties hereto.

The foregoing provisions of this Article 13 concerning sever-ance, production and other like or similar taxes shall apply only to production for the joint account and not to production for any well operated independent of the joint account for the account of less than all of the parties to this Agreement.

-14-

ARTICLE 14.

In the operation by Operator of all lands subject to this Agreement, Operator shall carry Workmans Compensation and Employers Liability Insurance as required by the laws of the states in which the property is located. Operator shall also carry Public Liability Insurance in at least the amounts of $100,000.00 each person and $300,000.00 each occurrence, and Property Damage Insurance in at least the amounts of $100,000.00 each accident and $300,000.00 aggregate. Operator shall also carry Automobile Public Liability and Property Damage Insurance in at least the amounts of $100,000.00 each person, $300,000.00 each accident, and Property Damage Liability in at least the amount of $25,000.00 each accident. Operator shall also carry fire and extended coverage insurance on Non-Operators' above ground property to the extent of ninety (90%) per cent of the value thereof. The premiums for all such insurance so carried shall be paid by Operator and charged to the joint account. Operator shall, at any time requested, furnish any Non-Operator with full information concerning the kind, character and amounts of insurance carried.

Operator shall promptly notify Non-Operators of any loss, damage or claim not covered by insurance carried by Operator for the joint account.

Operator shall require all contractors and subcontractors to carry insurance of the same character and in at least the minimum amounts as above set out.

ARTICLE 15.

Each of the parties hereto shall own and, at its own expense, shall take in kind or separately dispose of its proportionate part of all the oil, gas, casinghead gas and other hydrocarbon substances produced and saved from the lease acreage covered hereby, exclusive of the production which may be used by the Operator in developing and producing operations and in preparing and treating oil for market purposes and of production unavoidably lost; provided, that, each of

-15-

the parties hereto shall pay, or secure the payment of, the royalty interest in its proportionate part of said production. At such time or times as Non-Operator shall fail or refuse to take in kind or separately dispose of its proportionate part of said production from said lease acreage, the Operator, except to the extent otherwise expressly provided in the next succeeding paragraph hereof, shall have the authority, revocable by the Non-Operator at will, to sell (a) in the case of oil and condensate, all or part of said oil and condensate to others at the same price which the Operator receives for its own portion of said oil and condensate and (b) in the case of casinghead gas and natural gas, all or part of said gas to others at the best price obtainable therefor. All such sales by the Operator of a Non-Operator's production shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but in no event shall any such sale be for a period in excess of one (1) year.

Each of the parties hereto shall have the right and option to withhold the production and sale of such party's proportionate part of the natural gas and casinghead gas production from said lease acreage by giving written notice thereof to the other parties hereto. In such event, the party or parties not electing to exercise said right and option (hereinafter referred to as the "selling party", whether one or more) may produce and sell all or any part of the natural gas and casinghead gas production from said lease acreage for which the selling party shall have a market, but all royalty, overriding royalties and other encumbrances upon such production shall be paid as elsewhere provided herein in the same manner and to the same parties as though there had been no withholding. All of such production, except that attributable to royalty, overriding royalties and other encumbrances on such production, shall be the sole and exclusive property of the selling party. The selling party shall keep an accurate record of all of such production from said

-16-

lease acreage during the withholding period and shall furnish each
month the party or parties electing to exercise said right and op-
tion (hereinafter referred to as the "withholding party", whether
one or more) with a copy of said record. At such time as the with-
holding party may elect to take in kind or separately dispose of
its proportionate part of said production, the withholding party
shall give written notice thereof to the selling party. Thereafter,
and until such time as the withholding party shall have recovered
all of its proportionate part of said production, all natural gas
and casinghead gas production from said lease acreage, except that
attributable to royalty, overriding royalties and other encumbrances
upon production, shall, to the extent feasible under this agreement,
be the sole and exclusive property of the withholding party, but all
royalty, overriding royalties and other encumbrances upon such pro-
duction shall be paid as elsewhere provided herein in the same manner
and to the same parties as though there had been no withholding. At
such time as the withholding party shall have recovered its propor-
tionate part of said production, all parties thereafter shall parti-
cipate in the production from said lease acreage as elsewhere herein
expressly provided. The parties hereto at all times shall pay their
respective shares of the cost, expense and risk incurred in the
operation and development of the lease acreage, without regard to
whether one or more of said parties then may be withholding production
or recovering previously withheld production. If the natural gas and
casinghead gas production from said lease acreage shall be depleted
before the withholding party recovers its proportionate share thereof,
the selling party shall not incur or suffer any liability or obliga-
tion to the withholding party because of such depletion. In the
event one or more of the parties hereto should elect to withhold
production, as hereinabove provided, the parties hereto may adopt
detailed procedures for carrying the provisions of this paragraph
into effect.

-17-

## ARTICLE 16.

It is agreed that should the term of any lease or leases subject hereto be extended, or should any such lease be renewed by any party hereto, or should any new lease be acquired by any party hereto covering any of the lands covered by the leases presently subject to this agreement, then each of the remaining parties shall have the right, at its election, to acquire from the party so extending, renewing or acquiring such lease, an undivided interest therein to the end that such party will own an interest therein in the same proportion that the parties hereto participating in the ownership thereof now own in the leases presently subject hereto, in the following manner, to-wit:

(a) The party so acquiring such extension, renewal or new lease shall, within ten (10) days after the date of such acquisition, give each of the remaining parties written notice that it has acquired such extension, renewal, or new lease, and shall simultaneously therewith furnish to each such party to whom such notice is so given, the following:

1. A true copy of such extension agreement, renewal agreement or new lease;

2. All title information relating to such lease and the land affected which may be possessed by the party giving such notice;

3. A statement setting out the cost incurred by such party in acquiring such extension, renewal or new lease;

and each party to whom such notice is given shall have a period of fifteen (15) days after receipt of such notice, the copy of such extension agreement, renewal agreement or new lease, title information and statement, within which to notify the party that originally acquired such extension, renewal or new lease as to whether or not it elects to acquire the aforesaid undivided interest therein.

(b) If any party hereto who is entitled to acquire said undivided interest in any such extension, renewal or new lease, so notifies the party which originally acquired same that it desires to acquire such interest therein, then the party which originally acquired same shall promptly, upon receipt of such notice, assign to such party the undivided interest in such extension, renewal or new lease to which such party is entitled; such assignment to be made subject to the proportionate part of the obligation of such lease or other agreements so acquired and subject to all of the terms and provisions of this Operating Agreement. The party receiving such assignment shall

-18-

promptly after receipt thereof pay to the assigning party its proportionate part, determined as set forth in Article 2 hereof, of the cost and expense to such assigning party of acquiring the extension, renewal or new lease in which such undivided interest was assigned. If, however, the party entitled to acquire said undivided interest in such extension, renewal or new lease, shall notify the party which acquired same that it does not desire to acquire such undivided interest therein, or fails to notify the party which originally acquired same, within the option period hereinabove provided, that it does desire to acquire such undivided interest therein, then, in either such event, such party shall no longer have the right to acquire an interest therein and such extension, renewal or new lease shall thereafter be owned by the party who originally acquired same and any remaining party or parties hereto who may elect to acquire an interest therein, free and clear of all claims of such party not electing to exercise its option to acquire an interest, and such party shall have no duties and obligations under this Agreement with respect thereto.

The party originally acquiring such extension, renewal or new lease shall not be required to warrant title to any other party hereto which may elect to participate in the ownership of such extension, renewal or new lease, nor shall there be any warranty by implication.

### ARTICLE 17.

No sale or assignment shall be binding upon Operator until Operator shall have been furnished with a certified copy of recorded instrument evidencing same, and no sale or assignment shall be effective until all monies due and accounts payable, accruing or arising out of the development and operation of the leases subject hereto shall have been paid in full by the party assigning its interest hereunder.

### ARTICLE 18.

Each party shall have, and is hereby given, a first and prior lien on the interest of each of the other parties in the oil, gas and mineral leases subject hereto, all production therefrom, and all proceeds thereof, and in all personal property and equipment thereon or used in connection therewith, as security for the payment of any amount due by such party to the other. Each party agrees and obligates itself, at any time when it shall be in arrears

-19-

in payment to the other party, as Operator or Non-Operator, but only in such event, to execute from time to time, as requested by such other party, such instrument or instruments as may be necessary, required or desirable to give and grant to such other party, Operator or Non-Operator, to whom it may be indebted, preference and priority over third parties for the payment of any and all amounts due and owing hereunder.

### ARTICLE 19.

Each party to this Agreement, without limitation of any other rights and privileges elsewhere herein granted, shall have the following specific rights and privileges:

(a) Access to the leased premises at all reasonable times to inspect the work or development and operations thereon.

(b) The right to inspect logs, samples and cuttings from any and all wells drilled hereunder; and, in this connection, Operator agrees to keep accurate logs of all wells drilled by Operator and, upon request, each Non-Operator shall be furnished with copies of all such logs and any other information pertaining to the drilling of any well by Operator; and, when oil, gas or other mineral bearing sand is encountered, each Non-Operator shall be given the opportunity to have a representative present to witness any test made thereof. Each Non-Operator shall be furnished daily drilling reports, and also, upon request, be furnished with a reasonable amount of samples and cuttings out of the samples and cuttings that Operator may have in its possession at the time such request is made.

(c) The right to inspect and audit, at all reasonable times, the books of Operator and its records and invoices pertaining to the matter of accounting arising hereunder; provided, however, such right of inspection and auditing is hereby limited to a period of two (2) years next preceding the date Non-Operator elects to make such inspection and audit.

Any and all rights, powers and privileges granted to Non-Operators in this paragraph shall (but not by way of limitation) be available to any party hereto, insofar as said rights, powers and privileges are applicable, in connection with all transactions, carried on under this agreement by any other party independent of the joint account.

## ARTICLE 20.

It is not the intention of this Agreement to create the relationship of partnership between the parties hereto, and no act done by any party hereto, pursuant to the provisions hereof, shall operate to create such relationship, nor shall the provisions of this Agreement be construed as creating such relationship. The liability of the parties hereto shall be several and not joint or collective, and each party hereto shall be responsible only for its obligation as herein set forth, and shall be liable only for its part of the costs, expenses and liabilities incurred in the developing, operating, saving and handling of the oil, gas and other minerals from the leases subject to this Agreement.

Each party hereto does hereby elect, as authorized by Section 761 of the Internal Revenue Code of 1954, to be excluded from the application of Subchapter K of Chapter I of Subtitle A of the Internal Revenue Code of 1954 with respect to the operations covered by this Agreement. Should regulations issued by the Internal Revenue Service under said Subchapter K require further evidence of such election, each party agrees to execute such evidence, or join in the execution thereof.

## ARTICLE 21.

All of the terms and provisions of this Agreement are hereby expressly made subject to all Federal and State laws, and to all valid orders, rules and regulations of any duly constituted authority having jurisdiction in the premises; and they are also subject to Acts of God, inability to obtain material and equipment, inability to obtain, at reasonable rates, an adequate drilling rig or contractor acceptable to Operator, strikes, riots and other matters beyond the control of the parties hereto, whether similar or dissimilar, and Operator shall not be liable to the remaining parties to this Agreement for failure to perform, or for delay in performance of, any of the terms and provisions hereof, if such failure or delay is the result of any such cause. Operator shall prepare and

-21-

furnish to any duly constituted authority, through its proper agency or department, any and all reports, statements and information that may be requested, when such reports are required to be furnished.

ARTICLE 22.

All notices required to be given hereunder shall be given in writing, and shall be deemed to have been duly given if either sent by United States Mail, postage prepaid, or by prepaid Western Union telegram, properly addressed to the party to whom such notice is to be given, as stated below, or to such other address as they shall respectively hereinafter designate in writing, or if personally delivered to the party to be notified at such address, to-wit:

Union Producing Company
P. O. Box 1407
Shreveport, Louisiana

Mrs. Annie Norton and Richard W. Norton, Jr.
P. O. Box 1183
Shreveport, Louisiana

John S. Ivy
Neils Esperson Building
Houston, Texas

J. R. Butler
2138 Bank of the Southwest Building
Houston, Texas

David Crow
2000 Beck Building
Shreveport, Louisiana

Douglas Whitaker
300 Sklar Building
Shreveport, Louisiana

Sam Sklar, Albert Sklar, Leonard W. Phillips,
Paul R. Walker, Morris B. White and August
Erickson
P. O. Box 3068
Shreveport, Louisiana

Estate of Sam Y. Dorfman and
S. L. Florsheim, Jr.
P. O. Box 966
Longview, Texas

ARTICLE 23.

This Agreement shall remain in full force and effect as long

-22-

as any one or more of the leases now subject hereto remains in force and effect and during the term of any extension or renewal thereof and of any new lease or leases, if the same become subject to the terms hereof, as hereinabove provided, whether by production or otherwise, and thereafter until all materials, equipment, supplies and property covered hereby, owned by the joint account, have been salvaged and disposed of and final settlement has been made between the parties hereto; and may be terminated prior thereto only with the mutual consent of all parties hereto; provided, however, if any party so desires, it may be relieved from all obligations and liabilities not previously incurred or accrued hereunder in connection with any one or more of the leases now, or hereafter, made subject hereto by tendering to the remaining parties an assignment conveying and transferring to such parties, without cost or charge and without warranty of title, all of its right, title and interest in and to such lease or leases. Thereupon the right of such assignor to any benefits thereafter accruing as to such lease or leases so assigned shall cease.

### ARTICLE 24.

All of the terms, conditions and provisions of this Agreement shall extend to and be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto, and this Agreement shall constitute a covenant running with the leases and lands subject hereto. It is agreed, however, except as to the successors and assigns of the parties hereto, as aforesaid, and except as otherwise specifically provided in this Agreement, the parties hereto mutually agree that this contract is not made, or intended to be, for the benefit of any third parties, and they shall receive no rights herein or benefits hereunder.

IN WITNESS WHEREOF this instrument has been executed as of the day and date first hereinabove written between and by the parties hereto in multiple originals, and the same is hereby made

effective as of October 15, 1956.

ATTEST:

By _____
                   Secretary
       B. M. BYRD

UNION PRODUCING COMPANY

By _____
    Executive Vice-President

_____
Mrs. Annie Norton by
F. Leonard Hargrove,
Agent and Attorney in fact

_____
Richard W. Norton, Jr. by
F. Leonard Hargrove,
Agent and Attorney in fact

_____
John S. Ivy

_____
J. R. Butler

_____
David Crow

_____
Douglas Whitaker

_____
Sam Sklar

_____
Albert Sklar

_____
Leonard W. Phillips

_____
Paul R. Walker

_____
Morris B. White

_____
August Erickson

_____
Sam Y. Dorfman, Jr.,Individually
& as Independent Executor of
Estate of Sam Y. Dorfman,Deceased

_____
S. L. Florsheim, Jr.

-24-

EXHIBIT "A"

ATTACHED TO AND MADE A PART OF OPERATING AGREEMENT EFFECTIVE AS
OF OCTOBER 15, 1956, BY AND BETWEEN SAM SKLAR, AS OPERATOR, AND
UNION PRODUCING COMPANY, ET AL, AS NON-OPERATORS, COVERING
RODESSA BLOCK #2, CASS COUNTY, TEXAS AND MILLER COUNTY, ARKANSAS

The following oil, gas and mineral leases cover lands
located in Cass County, Texas.  The lease number indi-
cated with reference to each lease refers to Sam Sklar's
file number, and the volume and page indicated with re-
ference to each lease refers to the Deed Records of said
County.

1. Lease #879 dated February 3, 1955 from G. C. Williams
et ux to M. E. Weber, recorded in Vol. 311, page 438.

2. Lease #921 dated February 7, 1955 from F. A. Williams
et ux to M. E. Weber, recorded in Vol. 311, page 450.

3. Lease #924 dated February 17, 1955 from J. H. Williams
et ux to M. E. Weber, recorded in Vol. 311, page 454.

4. Lease #925 dated February 18, 1955 from Ed Rabb et ux
to M. E. Weber, recorded in Vol. 311, page 457.

5. Lease #929 dated February 18, 1955 from Lillie Price
et al to M. E. Weber, recorded in Vol. 311, page 461.

6. Lease #930 dated February 21, 1955 from O. L. Hunt to
M. E. Weber, recorded in Vol. 311, page 464.

7. Lease #931 dated February 18, 1955 from Alice M. Alex-
ander to M. E. Weber, recorded in Vol. 311, page 468.

8. Lease #932 dated February 21, 1955 from C. B. Anderson
et ux to M. E. Weber, recorded in Vol. 311, page 471.

9. Lease #933 dated February 10, 1955 from C. C. Williams
et ux to M. E. Weber, recorded in Vol. 311, page 417.

10. Lease #944 dated March 4, 1955 from Mary L. Cook et al
to M. E. Weber, recorded in Vol. 311, page 409.

11. Lease #945 dated February 28, 1955 from C. V. Brooks
et al to M. E. Weber, recorded in Vol. 311, page 405.

12. Lease #947 dated February 21, 1955 from J. W. May to
M. E. Weber, recorded in Vol. 311, page 428.

13. Lease #948 dated February 24, 1955 from Willie Spear-
man et al to M. E. Weber, recorded in Vol. 311,page 424.

14. Lease #949 dated March 4, 1955 from Ophelia Weaver et
al to M. E. Weber, recorded in Vol. 311, page 431.

15. Lease #950 dated March 10, 1955 from D. M. Hardin et ux
to M. E. Weber, recorded in Vol. 311, page 420.

16. Lease #952 dated March 15, 1955 from J. H. Williams
et al to M. E. Weber, recorded in Vol. 314, page 119.

17. Lease #953 dated March 15, 1955 from J. H. Williams
et al to M. E. Weber, recorded in Vol. 314, page 114.

Page 1 of Exhibit "A"

*Exp*    18. Lease #954 dated February 25, 1955 from Mrs. Marie Newkirk Winfrey et al to M. E. Weber, Recorded in Vol. 311, page 297.

*Exp- New Lease secured by Lses 3499 thru 3505 (Brooks #1 + #2)* →19. Lease #956 dated March 22, 1955 from C. V. Brooks et al to M. E. Weber, recorded in Vol. 311, page 401.

*Exp*    20. Lease #957 dated March 22, 1955 from M. H. Glass et al to M. E. Weber, recorded in Vol. 311, page 301.

*Exp*    21. Lease #958 dated March 14, 1955 from Elmer Endsley et ux to M. E. Weber, recorded in Vol. 311, page 305.

*GC Williams #1 + #3 Elkins #1* →22. Lease #960 dated March 14, 1955 from F. M. Williams et ux to M. E. Weber, recorded in Vol. 311, page 307.

*AH Long #1*    23. Lease #1015 dated April 8, 1955 from A. H. Long et ux to George E. Jinkins, recorded in Vol. 310, page 440.

*New ls acqurd ls #4156 AH Long #1* *Exp* →24. Lease #1017 dated April 11, 1955 from Ford E. Bridges to George E. Jinkins, recorded in Vol. 311, page 275.

*AH Long #1*    25. Lease #1018 dated April 5, 1955 from Charles Hooper to George E. Jinkins, recorded in Vol. 311, page 271.

*New, Lease Exp. Acq = #4157 Nearce #1, Elkins #1, Hardin #2* ⎰26. Lease #1019 dated April 11, 1955 from Lillie Almer Dauphin et vir to George E. Jinkins, recorded in Vol. 311, page 268.

*Exp - New lease Acquired - Ls 4469 (Hardin #2, Elkin #1)* ⎱27. Lease #1020 dated April 13, 1955 from Cleavie Dees Parker et al to George E. Jinkins, recorded in Vol. 311, page 263.

*Exp- New lease = Ls 4482 (Hardin #2, Elkin #1)* →28. Lease #1021 dated April 13, 1955 from Helen Parker Nattier et vir to George E. Jinkins, recorded in Vol. 314, page 86.

*Exp- New Lse 4536 Long #1* →29. Lease #1022 dated April 14, 1955 from J. E. Drury et ux to George E. Jinkins, recorded in Vol. 314, page 93.

*Exp- New Ls 4482 - Hardin #2, Elkin #1* → 30. Lease #1044 dated April 13, 1955 from Era Mae Parker Boren et vir to George E. Jinkins, recorded in Vol. 314, page 90.

*Exp*    31. Lease #1046 dated March 14, 1955 from Mrs. Marie New-kirk Winfrey et al to M. E. Weber, recorded in Vol. 314, page 128.

*Exp- New Lse on part (Lse 4866 - Brooks Water flood)* 32. Lease #1072 dated May 27, 1955 from Chester Williams et ux to George E. Jinkins, recorded in Vol. 314, page 415.

   33. Lease #1073 dated May 27, 1955 from Chester Williams et ux to George E. Jinkins, recorded in Vol. 314, page 419.

*AH Long #1*    34. Lease #1074 dated June 1, 1955 from Henry A. King to Lamar Neill, recorded in Vol. 314, page 428.

*Exp* 35. Lease #1075 dated May 30, 1955 from T. A. Howe et al to Lamar Neill, recorded in Vol. 314, page 422.

*Exp* 36. Lease #1076 dated May 30, 1955 from Charles Thomas Howe et al to Lamar Neill, recorded in Vol. 314, page 425.

Page 2 of Exhibit "A"

*Exp* 37. Lease #1077 dated May 31, 1955 from Clara Hopkins et vir to Lamar Neill, recorded in Vol. 314, page 430.

*Exp* 38. Lease #1078 dated May 31, 1955 from Aurelia Davis et al to Lamar Neill, recorded in Vol. 314, page 432.

*Exp* 39. Lease #1079 dated May 31, 1955 from T. A. Howe et ux to Lamar Neill, recorded in Vol. 314, page 434.

*Exp* 40. Lease #1080 dated June 2, 1955 from O. J. Stephens et ux to Lamar Neill, recorded in Vol. 314, page 436.

*Exp* 41. Lease #1081 dated June 2, 1955 from H. C. Sheppard to Lamar Neill, recorded in Vol. 314, page 438.

*Exp* 42. Lease #1082 dated June 2, 1955 from Dessie M. Long to Lamar Neill, recorded in Vol. 314, page 440.

*Exp* 43. Lease #1100 dated May 2, 1955 from Mollie A. Bain et al to George E. Jinkins, recorded in Vol.315,page 469.

*Exp* 44. Lease #1111 dated June 17, 1955 from Mrs. Azelle Robertson et al to Lamar Neill, recorded in Vol. 317, page 304.

Ava Hall Kelly #1  45. Lease #1112 dated July 5, 1955 from Edna M. Wilson to Lamar Neill, recorded in Vol. 317, page 296.

Oscar Grigsby # 1  46. Lease #1113 dated June 17, 1955 from J. E. Davis et al to Lamar Neill, recorded in Vol. 317, page 300.

'' 47. Lease #1114 dated July 2, 1955 from Tom N. Cope et al to Lamar Neill, recorded in Vol. 317, page 298.

'' 48. Lease #1115 dated July 5, 1955 from Edwards Mineral Corporation to Lamar Neill, recorded in Vol. 317, page 308.

'' 49. Lease #1116 dated June 24, 1955 from Mrs. Ruth Davis to Lamar Neill, recorded in Vol. 316, page 75.

'' 50. Lease #1117 dated June 23, 1955 from R. C. Hardy to Lamar Neill, recorded in Vol. 316, page 77.

'' 51. Lease #1118 dated June 24, 1955 from G. H. Heard to Lamar Neill, recorded in Vol. 316, page 73.

'' 52. Lease #1119 dated June 15, 1955 from William H. Cook et ux to Lamar Neill, recorded in Vol. 316, page 61.

'' 53. Lease #1120 dated June 7, 1955 from Homer B. Steger et al to Lamar Neill, recorded in Vol. 316, page 59.

Ava Hall Kelly  54. Lease #1121 dated June 15, 1955 from T. C. Bloxom to Lamar Neill, recorded in Vol. 316, page 63.

Oscar Grigsby # 1  55. Lease #1122 dated June 7, 1955 from Lillie Johnson Price et al to Lamar Neill, recorded in Vol. 316, page 56.

Oscar Grigsby #1  56. Lease #1123 dated June 14, 1955 from Henry A. King et ux to Lamar Neill, recorded in Vol. 316, page 65.

Page 3 of Exhibit "A"

*Osc ar Grigsby #1 + Ava Hall Kelly*

57. Lease #1124 dated June 7, 1955 from A. J. Nelson to Lamar Neill, recorded in Vol. 316, page 71.

*Exp*

58. Lease #1125 dated June 10, 1955 from Abe M. Mays et ux to Lamar Neill, recorded in Vol. 316, page 69.

*J. Exp*

59. Lease #1126 dated June 10, 1955 from Ed Rabb to Lamar Neill, recorded in Vol. 316, page 67.

*Exp - New lease on part (L> 4866 - Brooks W.F.)*

60. Lease #1140 dated May 27, 1955 from Selma Pittman Williams et al to George E. Jinkins, recorded in Vol. 319, page 14.

*"*

61. Lease #1141 dated May 27, 1955 from Selma Pittman Williams to George E. Jinkins, recorded in Vol. 319, page 18.

*"*

62. Lease #1142 dated May 27, 1955 from S. L. Williams et al to George E. Jinkins, recorded in Vol. 319, page 30.

*"*

63. Lease #1143 dated May 27, 1955 from S. L. Williams et al to George E. Jinkins, recorded in Vol. 319, page 23.

*"*

64. Lease #1144 dated May 27, 1955 from Ada McDuff Williams et al to George E. Jinkins, recorded in Vol. 320, page 12, and Ratification of said lease dated August 18, 1955, executed by Carnie Williams Godwin et al, recorded in Vol. 323, page 83.

*"*

65. Lease #1145 dated May 27, 1955 from Ada McDuff Williams et al to George E. Jinkins, recorded in Vol. 320, page 17, and Ratification of said lease dated August 18, 1955, executed by Carnie Williams Godwin et al, recorded in Vol. 323, page 81.

*Potea Force Unit*

66. Lease #1199 dated August 9, 1955 from Charles Willard Asberry et al to S. C. McKinney, recorded in Vol. 321, page 356.

*Exp*

67. Lease #1325 dated October 10, 1955 from Mrs. Maud Webb Westbrook et al to L. E. Damon, recorded in Vol. 324, page 8.

*Oscar Grigsby #1*

68. Lease #1358 dated April 18, 1956 from B. F. Whitworth to H. H. Harris, recorded in Vol. 330, page 404.

*G C Williams #3*

69. Lease #1425 dated June 20, 1956 from H. K. Carr to Sam Sklar, recorded in Vol. 332, page 247.

— — — — — — — — —

The following oil, gas and mineral leases cover lands located in Miller County, Arkansas. The lease number indicated with reference to each lease refers to Sam Sklar's file number, and the volume and page indicated with reference to each lease refers to the Records of said County.

*Exp*

70. Lease #961 dated March 23, 1955 from Mrs. J. W. Hanner et al to M. E. Weber, recorded in Book M-173, page 18.

Page 4 of Exhibit "A"

71. Lease #1014 dated March 23, 1955 from Mrs. D. V. Davis et al to M. E. Weber, recorded in Book M-173, page 34.

72. Lease #1042 dated March 25, 1955 from Mrs. J. W. Glass et al to M. E. Weber, recorded in Book M-172, page 425.

73. Lease #1061 dated May 6, 1955 from James M. Embree, Jr. et al to Douglas Whitaker, recorded in Book M-172, page 450.

74. Lease #1066 dated June 3, 1955 from James M. Embree, Jr. et al to George E. Jinkins, recorded in Book M-163, page 329.

75. Lease #1067 dated June 3, 1955 from Mrs. Belle Embree Oder et al to George E. Jinkins, recorded in Book M-163, page 333.

76. Lease #1083 dated June 4, 1955 from Thomas V. Richeson et al to Lamar Neill, recorded in Book M-163, page 335, and Ratification of said lease dated July 30, 1955, executed by Thomas V. Richeson et al, recorded in Book M-178, page 176.

77. Lease #1084 dated June 3, 1955 from 4 (Four) States Grocer Company to Lamar Neill, recorded in Book M-163, page 334.

78. Lease #1085 dated June 4, 1955 from Orville Richeson et al to Lamar Neill, recorded in Book M-163, page 336.

79. Lease #1151 dated July 29, 1955 from Ina Louise Richeson et al to Lamar Neill, recorded in Book M-176, page 19.

80. Lease #1152 dated July 29, 1955 from Edith Richeson Smith et al to Lamar Neill, recorded in Book M-176, page 20.

81. Lease #1624 dated April 9, 1957 from Mrs. Harry Wann et al to Douglas Whitaker, recorded in Book M-176, page 285.

82. Lease #1625 dated April 10, 1957 from Mrs. N. P. Hanner et al to Douglas Whitaker, recorded in Book M-176, page 284.

83. Lease #1731 dated June 14, 1957 from J. D. Lauck et al to Douglas Whitaker, recorded in Book M-188, page 188.

Reference is here made to the instruments hereinabove described and the respective records thereof for all purposes, and particularly, but not by way of limitation, for an accurate description of the lands covered and affected thereby.

Page 5 of Exhibit "A"

601 ROSS·MARTIN CO.
TULSA 1, OKLAHOMA

EXHIBIT   " B "

*PASO-T-1955-2*

Attached to and made a part of ..Operating..Agreement..between..Sam
Sklar,..as..Operator,..and..Union..Producing..Company..et
al,..as..Non-Operators,..covering..Rodessa..Block..No...2
Cass..County,..Texas..and..Miller..County,..Arkansas...........

# ACCOUNTING PROCEDURE

### (UNIT AND JOINT LEASE OPERATIONS)

## I. GENERAL PROVISIONS

### 1. Definitions

"Joint property" as herein used shall be construed to mean the subject area covered by the agreement to which this "Accounting Procedure" is attached.

"Operator" as herein used shall be construed to mean the party designated to conduct the development and operation of the subject area for the joint account of the parties hereto.

"Non-Operator" as herein used shall be construed to mean any one or more of the non-operating parties.

### 2. Statements and Billings

Operator shall bill Non-Operator on or before the last day of each month for its proportionate share of costs and expenditures during the preceding month. Such bills will be accompanied by statements, reflecting the total costs and charges as set forth under Subparagraph ....B......... below:

A. Statement in detail of all charges and credits to the joint account.

B. Statement of all charges and credits to the joint account, summarized by appropriate classifications indicative of the nature thereof.

C. Statements as follows:
   (1) Detailed statement of material ordinarily considered controllable by operators of oil and gas properties;
   (2) Statement of ordinary charges and credits to the joint account summarized by appropriate classifications indicative of the nature thereof; and
   (3) Detailed statement of any other charges and credits.

### 3. Payments by Non-Operator

Each party shall pay its proportion of all such bills within fifteen (15) days after receipt thereof. If payment is not made within such time, the unpaid balance shall bear interest at the rate of six per cent (6%) per annum until paid.

### 4. Adjustments

Payment of any such bills shall not prejudice the right of Non-Operator to protest or question the correctness thereof. Subject to the exception noted in Paragraph 5 of this section I, all statements rendered to Non-Operator by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period Non-Operator takes written exception thereto and makes claim on Operator for adjustment. Failure on the part of Non-Operator to make claim on Operator for adjustment within such period shall establish the correctness thereof and preclude the filing of exceptions thereto or making of claims for adjustment thereon. The provisions of this paragraph shall not prevent adjustments resulting from physical inventory of property as provided for in Section VI, Inventories, hereof.

### 5. Audits

A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the accounting hereunder for any calendar year within the twenty-four (24) month period following the end of such calendar year, provided, however, that Non-Operator must take written exception to and make claim upon the Operator for all discrepancies disclosed by said audit within said twenty-four (24) month period. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator.

## II. DEVELOPMENT AND OPERATING CHARGES

*Subject to limitations hereinafter prescribed, Operator shall charge the joint account with the following items:*

### 1. Rentals and Royalties

Delay or other rentals, when such rentals are paid by Operator for the joint account; royalties, when not paid directly to royalty owners by the purchaser of the oil, gas, casinghead gas, or other products.

### 2. Labor

A. Salaries and wages of Operator's employees directly engaged on the joint property in the development, maintenance, and operation thereof, including salaries or wages paid to geologists and other employees who are temporarily assigned to and directly employed on a drilling well.

B. Operator's cost of holiday, vacation, sickness and disability benefits, and other customary allowances applicable to the salaries and wages chargeable under Subparagraph 2 A and Paragraph 11 of this Section II. Costs under this Subparagraph 2 B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable under Subparagraph 2 A and Paragraph 11 of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Costs of expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's labor cost of salaries and wages as provided under Subparagraphs 2 A, 2 B, and Paragraph 11 of this Section II.

### 3. Employee Benefits

Operator's current cost of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost, provided that the total of such charges shall not exceed ten per cent (10%) of Operator's labor costs as provided in Subparagraphs A and B of Paragraph 2 of this Section II and in Paragraph 11 of this Section II.

### 4. Material

Material, equipment, and supplies purchased or furnished by Operator for use of the joint property. So far as it is reasonably practical and consistent with efficient and economical operation, only such material shall be purchased for or transferred to the joint property as may be required for immediate use; and the accumulation of surplus stocks shall be avoided.

### 5. Transportation

Transportation of employees, equipment, material, and supplies necessary for the development, maintenance, and operation of the joint property subject to the following limitations:

A. If material is moved to the joint property from vendor's or from the Operator's warehouse or other properties, no charge shall be made to the joint account for a distance greater than the distance from the nearest reliable supply store or railway receiving point where such material is available, except by special agreement with Non-Operator.

—1—

B. If surplus material is moved to Operator's warehouse or other storage point, no charge shall be made to the joint account for a distance greater than the distance from the nearest reliable supply store or railway receiving point, except by special agreement with Non-Operator. No charge shall be made to the joint account for moving material to other properties belonging to Operator, except by special agreement with Non-Operator.

**6. Service**

A. Outside Services:
The cost of contract services and utilities procured from outside sources.

B. Use of Operator's Equipment and Facilities:
Use of and service by Operator's exclusively owned equipment and facilities as provided in Paragraph 5 of Section III entitled "Operator's Exclusively Owned Facilities."

**7. Damages and Losses to Joint Property and Equipment**

All costs or expenses necessary to replace or repair damages or losses incurred by fire, flood, storm, theft, accident, or any other cause not controllable by Operator through the exercise of reasonable diligence. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after report of the same has been received by Operator.

**8. Litigation Expense**

All costs and expenses of litigation, or legal services otherwise necessary or expedient for the protection of the joint interests, including attorneys' fees and expenses as hereinafter provided, together with all judgments obtained against the parties or any of them on account of the joint operations under this agreement, and actual expenses incurred by any party or parties hereto in securing evidence for the purpose of defending against any action or claim prosecuted or urged against the joint account or the subject matter of this agreement.

A. If a majority of the interests hereunder shall so agree, actions or claims affecting the joint interests hereunder may be handled by the legal staff of one or more of the parties hereto; and a charge commensurate with cost of providing and furnishing such services rendered may be made against the joint account; but no such charge shall be made until approved by the legal departments of or attorneys for the respective parties hereto.

B. Fees and expenses of outside attorneys shall not be charged to the joint account unless authorized by the majority of the interests hereunder.

**9. Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the properties which are the subject of this agreement, the production therefrom or the operation thereof, and which taxes have been paid by the Operator for the benefit of the parties hereto.

**10. Insurance and Claims**

A. Premiums paid for insurance required to be carried for the benefit of the joint account, together with all expenditures incurred and paid in settlement of any and all losses, claims, damages, judgments, and other expenses, including legal services, not recovered from insurance carrier.

B. If no insurance is required to be carried, all actual expenditures incurred and paid by Operator in settlement of any and all losses, claims, damages, judgments, and any other expenses, including legal services, shall be charged to the joint account.

**11. District and Camp Expense (Field Supervision and Camp Expense)**

A pro rata portion of the salaries and expenses of Operator's production superintendent and other employees serving the joint property and other properties of the Operator in the same operating area, whose time is not allocated directly to the properties, and a pro rata portion of the cost of maintaining and operating ~~XXXXXXXXXXXXXXXXXXXXXXX~~ the production staff & facilities in the general office located at or near ............ Shreveport, Louisiana ............ (or a comparable office if location changed), and necessary suboffices (if any), maintained for the convenience of the above-described office, and all necessary camps, including housing facilities for employees if required, used in the conduct of the operations on the joint property and other properties operated in the same locality. The expense of, less any revenue from, these facilities should be inclusive of depreciation or a fair monthly rental in lieu of depreciation on the investment. Such charges shall be apportioned to all properties served on some equitable basis consistent with Operator's accounting practice.

**12. Administrative Overhead**

Operator shall have the right to assess against the joint property covered hereby the following management and administrative overhead charges, which shall be in lieu of all expenses of all offices of the Operator not covered by Section II, Paragraph 11, above, including salaries and expenses of personnel assigned to such offices, except that salaries of geologists and other employees of Operator who are temporarily assigned to and directly serving on the joint property will be charged as provided in Section II, Paragraph 2, above. Salaries and expenses of other technical employees assigned to such offices will be considered as covered by overhead charges in this paragraph unless charges for such salaries and expenses are agreed upon between Operator and Non-Operator as a direct charge to the joint property.

### WELL BASIS (Rate Per Well Per Month)

| Well Depth | DRILLING WELL RATE Each Well | PRODUCING WELL RATE (Use Completion Depth) First Five | Next Five | All Wells Over Ten |
|---|---|---|---|---|
| 5500' – 6500' | $250.00 | $60.00 | $50.00 | $35.00 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

On individual lease basis; not area basis

A. Overhead charges for drilling wells shall begin on the date each well is spudded and terminate when it is on production or is plugged, as the case may be, except that no charge shall be made during the suspension of drilling operations for fifteen (15) or more consecutive days.

B. In connection with overhead charges, the status of wells shall be as follows:
  (1) Injection wells for recovery operations, such as for repressure or water flood, shall be included in the overhead schedule the same as producing oil wells.
  (2) Water supply wells utilized for water flooding operations shall be included in the overhead schedule the same as producing oil wells.
  (3) Producing gas wells shall be included in the overhead schedule the same as producing oil wells.

— 2 —

(4) Wells permanently shut down but on which plugging operations are deferred shall be dropped from the overhead schedule at the time the shutdown is effected. When such wells are plugged, overhead shall be charged at the producing well rate during the time required for the plugging operation.

(5) Wells being plugged back, drilled deeper, or converted to a source or input well shall be included in the overhead schedule the same as drilling wells.

(6) Temporarily shut-down wells (other than by governmental regulatory body) which are not produced or worked upon for a period of a full calendar month shall not be included in the overhead schedule; however, wells shut in by governmental regulatory body shall be included in the overhead schedule only in the event the allowable production is transferred to other wells on the same property. In the event of a unit allowable, all wells capable of producing will be counted in determining the overhead charge.

(7) Wells completed in dual or multiple horizons shall be considered as two wells in the producing overhead schedule.

(8) Lease salt water disposal wells shall not be included in the overhead schedule unless such wells are used in a secondary recovery program on the joint property.

C. The above overhead schedule for producing wells shall be applied to the total number of wells operated under the Operating Agreement to which this accounting procedure is attached, irrespective of individual leases.

D. It is specifically understood that the above overhead rates apply only to drilling and producing operations and are not intended to cover the construction or operation of additional facilities such as, but not limited to, gasoline plants, compressor plants, repressuring projects, salt water disposal facilities, and similar installations. If at any time any or all of these become necessary to the operation, a separate agreement will be reached relative to an overhead charge and allocation of district expense.

E. The above specific overhead rates may be amended from time to time by agreement between Operator and Non-Operator if, in practice, they are found to be insufficient or excessive.

### 13. Operator's Fully Owned Warehouse Operating and Maintenance Expense
(Describe fully the agreed procedure to be followed by the Operator.)

Operator shall be entitled to assess warehouse handling charges on material held in inventory for more than ninety (90) days prior to the transfer of joint property; 2½% on tubular goods (2" and over) and 5% on major items of equipment or machinery such as separators, heaters, etc.

### 14. Other Expenditures
Any expenditure, other than expenditures which are covered and dealt with by the foregoing provisions of this Section II, incurred by the Operator for the necessary and proper development, maintenance, and operation of the joint property.

## III. BASIS OF CHARGES TO JOINT ACCOUNT

### 1. Purchases
Material and equipment purchased and service procured shall be charged at price paid by Operator after deduction of all discounts actually received.

### 2. Material Furnished by Operator
Material required for operations shall be purchased for direct charge to joint account whenever practicable, except that Operator may furnish such material from Operator's stocks under the following conditions:

A. New Material (Condition "A")

(1) New material transferred from Operator's warehouse or other properties shall be priced f.o.b. the nearest reputable supply store or railway receiving point, where such material is available, at current replacement cost of the same kind of material. This will include material such as tanks, pumping units, sucker rods, engines, and other major equipment. Tubular goods, two-inch (2") and over, shall be priced on carload basis effective at date of transfer and f.o.b. railway receiving point nearest the joint account operation, regardless of quantity transferred.

(2) Other material shall be priced on basis of a reputable supply company's preferential price list effective at date of transfer and f.o.b. the store or railway receiving point nearest the joint account operation where such material is available.

(3) Cash discount shall not be allowed.

B. Used Material (Condition "B" and "C")

(1) Material which is in sound and serviceable condition and is suitable for reuse without reconditioning shall be classed as Condition "B" and priced at seventy-five per cent (75%) of new price.

(2) Material which cannot be classified as Condition "B" but which,
(a) After reconditioning will be further serviceable for original function as good secondhand material (Condition "B"), or
(b) Is serviceable for original function but substantially not suitable for reconditioning,
shall be classed as Condition "C" and priced at fifty per cent (50%) of new price.

(3) Material which cannot be classified as Condition "B" or Condition "C" shall be priced at a value commensurate with its use.

(4) Tanks, buildings, and other equipment involving erection costs shall be charged at applicable percentage of knocked-down new price.

### 3. Premium Prices
Whenever materials and equipment are not readily obtainable at the customary supply point and at prices specified in Paragraphs 1 and 2 of this Section III because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the joint account for the required materials on the basis of the Operator's direct cost and expense incurred in procuring such materials, in making it suitable for use, and in moving it to the location, provided, however, that notice in writing is furnished to Non-Operator of the proposed charge prior to billing the Non-Operator for the material and/or equipment acquired pursuant to this provision, whereupon Non-Operator shall have the right, by so electing and notifying Operator within 10 days after receiving notice from the Operator, to furnish in kind, or in tonnage as the parties may agree, at the location, nearest railway receiving point, or Operator's storage point within a comparable distance, all or part of his share of material and/or equipment suitable for use and acceptable to the Operator. Transportation costs on any such material furnished by Non-Operator, at any point other than at the location, shall be borne by such Non-Operator. If, pursuant to the provisions of this paragraph, any Non-Operator furnishes material and/or equipment in kind, the Operator shall make appropriate credits therefor to the account of said Non-Operator.

### 4. Warranty of Material Furnished by Operator
Operator does not warrant the material furnished beyond or back of the dealer's or manufacturer's guaranty; and in case of defective material, credit shall not be passed until adjustment has been received by Operator from the manufacturers or their agents.

### 5. Operator's Exclusively Owned Facilities
The following rates shall apply to service rendered to the joint account by facilities owned exclusively by Operator:

A. Water, fuel, power, compressor and other auxiliary services at rates commensurate with cost of providing and furnishing such service to the joint account but not exceeding rates currently prevailing in the field where the joint property is located.

— 3 —

B. Automotive equipment at rates commensurate with cost of ownership and operation. Such rates should generally be in line with the schedule of rates adopted by the Petroleum Motor Transport Association, or some other recognized organization, as recommended uniform charges against joint account operations and revised from time to time. Automotive rates shall include cost of oil, gas, repairs, insurance, and other operating expense and depreciation; and charges shall be based on use in actual service on, or in connection with, the joint account operations. Truck and tractor rates may include wages and expenses of driver.

C. A fair rate shall be charged for the use of drilling and cleaning-out tools and any other items of Operator's fully owned machinery or equipment which shall be ample to cover maintenance, repairs, depreciation, and the service furnished the joint property; provided that such charges shall not exceed those currently prevailing in the field where the joint property is located. Pulling units shall be charged at hourly rates commensurate with the cost of ownership and operation, which shall include repairs and maintenance, operating supplies, insurance, depreciation, and taxes. Pulling unit rates may include wages and expenses of the operator.

D. A fair rate shall be charged for laboratory services performed by Operator for the benefit of the joint account, such as gas, water, core, and any other analyses and tests; provided such charges shall not exceed those currently prevailing if performed by outside service laboratories.

E. Whenever requested, Operator shall inform Non-Operator in advance of the rates it proposes to charge.

F. Rates shall be revised and adjusted from time to time when found to be either excessive or insufficient.

## IV. DISPOSAL OF LEASE EQUIPMENT AND MATERIAL

The Operator shall be under no obligation to purchase interest of Non-Operator in surplus new or secondhand material. The disposition of major items of surplus material, such as derricks, tanks, engines, pumping units, and tubular goods, shall be subject to mutual determination by the parties hereto; provided Operator shall have the right to dispose of normal accumulations of junk and scrap material either by transfer or sale from the joint property.

### 1. Material Purchased by the Operator or Non-Operator

Material purchased by either the Operator or Non-Operator shall be credited by the Operator to the joint account for the month in which the material is removed by the purchaser.

### 2. Division in Kind

Division of material in kind, if made between Operator and Non-Operator, shall be in proportion to their respective interests in such material. Each party will thereupon be charged individually with the value of the material received or receivable by each party, and corresponding credits will be made by the Operator to the joint account. Such credits shall appear in the monthly statement of operations.

### 3. Sales to Outsiders

Sales to outsiders of material from the joint property shall be credited by Operator to the joint account at the net amount collected by Operator from vendee. Any claims by vendee for defective material or otherwise shall be charged back to the joint account if and when paid by Operator.

## V. BASIS OF PRICING MATERIAL TRANSFERRED FROM JOINT ACCOUNT

Material purchased by either Operator or Non-Operator or divided in kind, unless otherwise agreed, shall be valued on the following basis:

### 1. New Price Defined

New price as used in the following paragraphs shall have the same meaning and application as that used above in Section III, "Basis of Charges to Joint Account."

### 2. New Material

New material (Condition "A"), being new material procured for the joint account but never used thereon, at one hundred per cent (100%) of current new price (plus sales tax if any).

### 3. Good Used Material

Good used material (Condition "B"), being used material in sound and serviceable condition, suitable for reuse without reconditioning:

A. At seventy-five per cent (75%) of current new price if material was charged to joint account as new, or

B. At sixty-five per cent (65%) of current new price if material was originally charged to the joint property as secondhand at seventy-five per cent (75%) of new price.

### 4. Other Used Material

Used material (Condition "C"), at fifty per cent (50%) of current new price, being used material which:

A. After reconditioning will be further serviceable for original function as good secondhand material (Condition "B"), or

B. Is serviceable for original function but substantially not suitable for reconditioning.

### 5. Bad-Order Material

Material and equipment (Condition "D"), which is no longer usable for its original purpose without excessive repair cost but is further usable for some other purpose, shall be priced on a basis comparable with that of items normally used for that purpose.

### 6. Junk

Junk (Condition "E"), being obsolete and scrap material, at prevailing prices.

### 7. Temporarily Used Material

When the use of material is temporary and its service to the joint account does not justify the reduction in price as provided in Paragraph 3 B, above, such material shall be priced on a basis that will leave a net charge to the joint account consistent with the value of the service rendered.

## VI. INVENTORIES

### 1. Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the joint account material, which shall include all such material as is ordinarily considered controllable by operators of oil and gas properties.

Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operator may be represented when any inventory is taken.

Failure of Non-Operator to be represented at an inventory shall bind Non-Operator to accept the inventory taken by Operator, who shall in that event furnish Non-Operator with a copy thereof.

### 2. Reconciliation and Adjustment of Inventories

Reconciliation of inventory with charges to the joint account shall be made by each party at interest, and a list of overages and shortages shall be jointly determined by Operator and Non-Operator.

Inventory adjustments shall be made by Operator with the joint account for overages and shortages, but Operator shall be held accountable to Non-Operator only for shortages due to lack of reasonable diligence.

### 3. Special Inventories

Special inventories may be taken, at the expense of the purchaser, whenever there is any sale or change of interest in the joint property; and it shall be the duty of the party selling to notify all other parties hereto as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be represented and shall be governed by the inventory so taken.

— 4 —