Name of Well: **CCL&T 2-9 #1**
Prospect, County & State: **Escambia Prsp. Escambia Co., AL**
Proposal: **JOA**
Date of Election: **September 30, 2014**
Transmittal Method: **Email**
Landman: **Marshall**

| Working Interest Owners | Date of Election | Election Deadline | Election Received | Response | Follow Up |
|---|---|---|---|---|---|
| Sklarco, LLC | September 30, 2014 | | September 30, 2014 | Yes | |
| JJS Working Interests | September 30, 2014 | | October 13, 2014 | Yes | |
| Bundero Investment Company | September 30, 2014 | | September 30, 2014 | Yes | |
| Bickham Dickson | September 30, 2014 | | January 6, 2015 | Yes | |
| Central Petroleum | September 30, 2014 | | October 9, 2014 | Yes | |
| Carl Herrin O&G | September 30, 2014 | | January 13, 2015 | Yes | |
| Craft Exploration | September 30, 2014 | | September 30, 2014 | Yes | |
| Fant Energy Limited | September 30, 2014 | | September 30, 2014 | Yes | |
| Fleet Howell | September 30, 2014 | | February 2, 2015 | Yes | |
| Horace LLC | September 30, 2014 | | October 10, 2014 | Yes | |
| Kudzu Oil Properties, LLC | September 30, 2014 | | September 30, 2014 | Yes | |
| Landmark Exploration, LLC | September 30, 2014 | | January 6, 2015 | Yes | |
| Marksco, LLC | September 30, 2014 | | September 30, 2014 | Yes | |
| Marco Land & Petroleum | September 30, 2014 | | October 3, 2014 | Yes | |
| McCombs Energy, Ltd. | September 30, 2014 | | September 30, 2014 | Yes | |
| Pickens Financial Group | September 30, 2014 | | September 30, 2014 | Yes | |
| Resource Ventures, LLC | September 30, 2014 | | September 30, 2014 | Yes | |
| Spanish Fort Royalty | September 30, 2014 | | October 10, 2014 | Yes | |
| The Rudman Partnership | September 30, 2014 | | October 16, 2014 | Yes | |
| Tauber Exploration | September 30, 2014 | | November 13, 2014 | Yes | |
| Tiembo, Ltd. | September 30, 2014 | | February 9, 2015 | Yes | |

**SCANNED**

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

**CCLT 2-9 #1 Well**
**Section 2**
**Township 3 North, Range 12 East**
**Escambia County, Alabama**

OPERATING AGREEMENT

DATED

_____ August 1 _____ , _ 2014 _ ,
<span style="font-size:smaller">year</span>

OPERATOR   Sklar Exploration Company, L.L.C. _____

CONTRACT AREA   As shown on Exhibit "A" to this Agreement _____

_____

_____

COUNTY OR PARISH OF   Escambia _____   STATE OF   Alabama _____

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM. A.A.P.L. NO. 610 – 1982 REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1982

### OPERATING AGREEMENT

1
2
3  THIS AGREEMENT, entered into by and between    Sklar Exploration Company, L.L.C.
4  _____, hereinafter designated and
5  referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein
6  as "Non-Operator", and collectively as "Non-Operators".
7
8                                              WITNESSETH:
9
10     WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in
11  Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the
12  production of oil and gas to the extent and as hereinafter provided,
13
14     NOW, THEREFORE, it is agreed as follows:
15
16                                              ARTICLE I.
17                                             DEFINITIONS
18
19     As used in this agreement, the following words and terms shall have the meanings here ascribed to them:
20     A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons
21  and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.
22     B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land
23  lying within the Contract Area which are owned by the parties to this agreement.
24     C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the
25  Contract Area which are owned by parties to this agreement.
26     D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be
27  developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests
28  are described in Exhibit "A".
29     E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or
30  federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-
31  ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.
32     F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.
33     G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of
34  any operation conducted under the provisions of this agreement.
35     H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate
36  in a proposed operation.
37
38     Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the
39  singular, and the neuter gender includes the masculine and the feminine.
40
41                                              ARTICLE II.
42                                              EXHIBITS
43
44     The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:
45  ☑  A. Exhibit "A", shall include the following information:
46         (1) Identification of lands subject to this agreement,
47         (2) Restrictions, if any, as to depths, formations, or substances,
48         (3) Percentages or fractional interests of parties to this agreement,
49         (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
50         (5) Addresses of parties for notice purposes.
51  ☑  B. Exhibit "B", Form of Lease.
52  ☑  C. Exhibit "C", Accounting Procedure.
53  ☑  D. Exhibit "D", Insurance.
54  ☑  E. Exhibit "E", Gas Balancing Agreement.
55  ☐  ~~F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.~~
56  ☐  ~~G. Exhibit "G", Tax Partnership.~~
57     If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body
58  of this agreement, the provisions in the body of this agreement shall prevail.
59
60
61
62
63
64
65
66
67
68
69
70

- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE III.
### INTERESTS OF PARTIES

A.   Oil and Gas Interests:

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

B.   Interests of Parties in Costs and Production:

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____ all jointly owned lease burdens _____ which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, ~~royalties and other burdens encumbering its interest.~~ the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

C.   Excess Royalties, Overriding Royalties and Other Payments:

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production ~~in excess of the amount stipulated in Article III.B.,~~ which is not a joint obligation of the parties such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

D.   Subsequently Created Interests:

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.   If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.   If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

## ARTICLE IV.
### TITLES

A.   Title Examination:

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto, the cost incurred by Operator in this title program shall be borne as follows:

~~☐   Option No. 1:   Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in-gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.~~

-2-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE IV**
continued

1  ☒ Option No. 2:  Costs incurred by Operator in procuring abstracts / and fees paid outside attorneys / for title examination
2  (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) / shall be borne by the Drilling Parties
3  in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4  hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5  functions.

6
7  Operator, ~~if itself party,~~ shall be responsible for securing curative matter and pooling amendments or agreements required in connection
8  with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling
9  designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10  This shall not prevent any party from appearing on its own behalf at any such hearing.

11
12  No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
13  provided, and (2) the title has been approved by the examining attorney or title has been accepted by / all of the parties who are to par-  Operator
14  ticipate in the drilling of the well.

15
16  **B.  Loss of Title:**

17
18  ~~1.  Failure of Title.  Should any oil and gas interest or lease, or interest therein, be lost through failure of title, this loss shall not result in a~~
19  ~~reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days~~
20  ~~from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-~~
21  ~~tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil~~
22  ~~and gas leases and interests; and~~
23  ~~(a)  The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be~~
24  ~~entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,~~
25  ~~but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~
26  ~~(b)  There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has~~
27  ~~been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-~~
28  ~~curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract~~
29  ~~Area by the amount of the interest lost;~~
30  ~~(c)  If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is~~
31  ~~increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-~~
32  ~~terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such~~
33  ~~well;~~
34  ~~(d)  Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has~~
35  ~~failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties~~
36  ~~who bore the costs which are so refunded;~~
37  ~~(e)  Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be~~
38  ~~borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,~~
39  ~~(f)  No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest~~
40  ~~claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in~~
41  ~~connection therewith.~~

42
43  ~~2.  Loss by Non-Payment or Erroneous Payment of Amount Due.  If, through mistake or oversight, any rental, shut-in well~~
44  ~~payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,~~
45  ~~there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required~~
46  ~~payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,~~
47  ~~which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the~~
48  ~~date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in~~
49  ~~the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the~~
50  ~~required payment shall have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to~~
51  ~~the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it~~
52  ~~shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled~~
53  ~~or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~
54  ~~(a)  Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,~~
55  ~~up to the amount of unrecovered costs;~~
56  ~~(b)  Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of~~
57  ~~oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease~~
58  ~~termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said~~
59  ~~portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,~~
60  ~~(c)  Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest~~
61  ~~lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

62
63  3.  Other Losses:  All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses
64  and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
65  the Contract Area.

66
67  * curative matters and materials
68  ** landmen and consultants
69  *** and for applications and hearings
70

-3-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE V.
OPERATOR

A.    Designation and Responsibilities of Operator:

Sklar Exploration Company, L.L.C. _____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

B.    Resignation or Removal of Operator and Selection of Successor:

1. Resignation or Removal of Operator:  Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of / two (2) or more / Non-Operators owning a majority-interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator:  Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

C.    Employees:

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D.    Drilling Contracts:

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

ARTICLE VI.
DRILLING AND DEVELOPMENT

A.    Initial Well:

On or before the ____1st____ day of____August____ and subject to rig availability , (day) ___2014___ , / Operator shall commence the drilling of a well for oil and gas at the following location: A bottom hole location of 700' FEL and 1,970' FSL of the SE/4 of Section 2, Township 3 North, Range 12 East, Escambia County, Alabama. The surface location will be at a location of 1,297' FEL and 1,377' FSL of Section 2, Township 4 North, Range 12 East, Escambia County, Alabama.

and shall thereafter continue the drilling of the well with due diligence to 12,472 feet or a depth sufficient to test the stratigraphic equivalent of the Haynesville, Smackover and Norphlet Formations of the Upper Jurassic System.

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon this well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
continued

1   ~~If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the~~
2   ~~well as a dry hole, the provisions of Article VII.B.1. shall thereafter apply.~~
3
4
5
6   B.   Subsequent Operations:
7
8      1. Proposed Operations:  Should any party hereto desire to drill any well on the Contract Area other than the well provided
9   for in Article VI.A., or to rework, / deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all
10  the parties and not then producing / in paying quantities, the party desiring to drill, rework, / deepen or plug back such a well shall give the
11  other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
12  tion and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice
13  within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill-
14  ing rig is on location /, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be
15  limited to forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays. Failure of a party receiving such notice to reply within
16  the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or
17  response given by telephone shall be promptly confirmed in writing.
18
19
20
21      If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice
22  period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on loca-
23  tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
24  ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
25  for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
26  permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
27  amination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the
28  actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
29  if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
30  dance with the provisions hereof as if no prior proposal had been made.
31
32
33
34
35      2. Operations by Less than All Parties:  If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option
36  No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
37  giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of
38  the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is
39  on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all
40  work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
41  a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
42  tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Con-
43  senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
44  ditions of this agreement.
45
46
47      If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
48  notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as
49  to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours
50  (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-
51  ticipation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and
52  failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for
53  such a response shall not exceed a total of forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party,
54  at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.
55
56
57
58      The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
59  elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such
60  operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If
61  such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their
62  sole cost, risk and expense. If any well drilled, / reworked, deepened or plugged back under the provisions of this Article results in a pro-
63  ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,
64
65
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
#### continued

1 and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2 ties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties
3 in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4 and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5 Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6 market value thereof if such share is not sold, (after deducting production taxes, excise taxes, / royalty, overriding royalty and other in-
7 terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8 until it reverts) shall equal the total of the following:

9
10
11
12 (a)  200% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13 connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus / 400% of each such
14 Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15 Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16 Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17 Party had it participated in the well from the beginning of the operations; and

18
19
20
21 (b) ___500___ % of that portion of the costs and expenses of drilling, reworking, / deepening, plugging back, testing and completing,
22 after deducting any cash contributions received under Article VIII.C., and ___500___ % of that portion of the cost of newly acquired equip-
23 ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24 participated therein.

25
26
27
28 An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-
29 working / or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30 conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31 reworking / or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
32 and there shall be added to the sums to be recouped by the Consenting Parties / two hundred percent (200%) (110%) of that portion of the costs of
33 the reworking / or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
34 such a reworking / or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35 plicable as between said Consenting Parties in said well.

36
37
38
39 During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40 proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41 taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42 ticle III.D.

43
44
45
46 In the case of any reworking, / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47 of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48 abandonment of a well after such reworking, / plugging back or deeper drilling; the Consenting Parties shall account for all such equip-
49 ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

50
51
52
53 Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54 Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55 itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56 option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57 ings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
58 operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59 curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
60 realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas
61 produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62 well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63 which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64 of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65 above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

66
67 * recompleting, sidetracking,
68
69
70

-6-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, recompleting, sidetracking, / deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply provided that an exceptional well location that is approved by the State Oil and Gas Board of Alabama shall be deemed to conform to the then-existing spacing pattern.

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, recompleting, sidetracking, / deepening and plugging back of such initial well after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for production, ceases to produce in paying quantities.

3. Stand-By Time:  When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

4. Sidetracking:  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

(a)  If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

(b)  If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

In the event that notice for a sidetracking operation is given while the drilling rig is to be utilized is on location, the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand-by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other instances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

### C.  TAKING PRODUCTION IN KIND:

Each party shall / take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
continued

1 required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3     Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4 the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5 its share of all production.

6

7     In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8 the oil / produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9 the obligation, to purchase such oil / or sell it to others at any time and from time to time, for the account of the non-taking party in the
10 best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the
11 owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil / not previously
12 delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil / shall be only for such reasonable periods of
13 time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14 of one (1) year.

15

16     In the event one or more parties' separate disposition of its share of the gas causes split-stream / deliveries to separate pipelines and/or
17 deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18 be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19 agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

20

21 D.   Access to Contract Area and Information:

22

23     Each / party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24 and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
25 and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with
26 governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27 each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28 gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29 quests the information.

30

31 E.   Abandonment of Wells:

32

33     1. Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34 drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35 without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
36 within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37 such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38 accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39 such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40 operations in search of oil and/or gas subject to the provisions of Article VI.B.

41

42     2. Abandonment of Wells that have Produced: Except for any well in which a Non-Consent operation has been conducted
43 hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44 producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
45 be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
46 thirty (30) days after receipt of notice of the proposed abandonment of any well / , all parties do not agree to the abandonment of such well,
47 those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48 parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49 Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. / Each abandoning party shall assign
50 the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51 material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52 terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
53 gas interest, such party shall execute and deliver to the non abandoning party or parties an oil and gas lease, limited to the interval or in-
54 tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55 duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

56

57

58

59

60

61

62

63

64

65

66

67

68

69

70

-8-

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

1 ~~"D".~~ The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2 assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3 Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4 interests in the remaining portion of the Contract Area.
5
6       Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7 the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8 quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9 templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10 well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11 repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12 visions hereof.
13
14      3. Abandonment of Non-Consent Operations:  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15 Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16 permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17 of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18 VI.E.
19
20                          ARTICLE VII.
21              EXPENDITURES AND LIABILITY OF PARTIES
22
23 A.   Liability of Parties:
24
25      The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26 shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27 among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28 shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.
29
30 B.   Liens and Payment Defaults:
31
32      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33 of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34 at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the
35 state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
36 taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37 rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
38 of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39 the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
40 purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
41 and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.
42
43 ~~If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by~~
44 ~~Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that~~
45 ~~the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain~~
46 ~~reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.~~
47
48 C.   Payments and Accounting:
49
50      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
51 and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
52 tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
53 showing expenses incurred and charges and credits made and received.
54
55      Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
56 of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
57 month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
58 with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
59 on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
60 fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
61 due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
62 pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
63
64 D.   Limitation of Expenditures:
65
66      1. Drill or Deepen:  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
67 pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:
68
69
70

-9-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
#### continued

1 ☐ Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2 necessary tankage and/or surface facilities.
3
4 ☒ Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5 authorized depth, and all tests have been completed, and the results thereof including all logs furnished to the parties, Operator shall give immediate notice
6 to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have / forty-eight
7 (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8 tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9 cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, / deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties.
14
15 2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.
19
20 3. Other Operations: Without the consent of all parties, Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of   Fifty Thousand and NO/100————————— Dollars ($ 50,000.00   )
22 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of   Ten Thousand and NO/100—————————————
28 Dollars ($ 10,000.00   ) but less than the amount first set forth above in this paragraph.
29
30 E.   Rentals, Shut-in Well Payments and Minimum Royalties:
31
32 Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35 behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B.2.
39
40 Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46 F.   Taxes:
47
48 Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".
59
60 If Non-Operator   and in the case of a Non-Operator, if any such Non-Operator timely notifies Operator in writing,
      If Operator / considers any tax assessment improper, / Operator may   shall at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".
66
67 Operator   on behalf of all parties
      Each party shall pay or cause to be paid / all production, severance, excise, gathering and other taxes imposed upon or with respect
68 to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.
69
70

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
continued

1 G.  Insurance:
2
3      At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4 the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5 pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
6 also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7 hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8 law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.
9
10     In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11 parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.
12
13                                   ARTICLE VIII.
14              ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST
15
16 A.   Surrender of Leases:
17
18     The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19 or in part unless all parties consent thereto.
20
21     However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22 agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23 such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24 thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas in-
25 terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26 such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27 lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all
28 obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29 attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30 duction other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the
31 party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32 ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33 salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest
34 shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.
35
36     Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessee's or surrendering
37 party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38 assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39 agreement.
40
41 B.   Renewal or Extension of Leases:
42
43     If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44 shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the
45 renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46 portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47 interests held at that time by the parties in the Contract Area.
48
49     If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50 who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51 to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52 Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.
53
54     Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55 by the acquiring party.
56
57     The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58 or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or
59 contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
60 tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61 the provisions of this agreement.
62
63     The provisions in this Article shall also be applicable to extensions of oil and gas leases.
64
65 C.   Acreage or Cash Contributions:
66
67     While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68 operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69 applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the con-
70 tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VIII
#### continued

1  ~~said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be~~
2  ~~governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions~~
3  ~~it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-~~
4  ~~tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.~~
5
6  ~~If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such~~
7  ~~consideration shall not be deemed a contribution as contemplated in this Article VIII.C.~~
8
9  D.   Maintenance of Uniform Interests:
10
11     For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no
12  party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,
13  equipment and production unless such disposition covers either:
14
15  ~~1.   the entire interest of the party in all leases and equipment and production; or~~
16
17  ~~2.   an equal undivided interest in all leases and equipment and production in the Contract Area.~~
18
19     ~~Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement~~
20  ~~and shall be made without prejudice to the right of the other parties. Any extra expenditures incurred as a result of a partial disposition,~~
21  ~~including any additional marketing or metering expense, shall be borne by the party to which such interest is transferred.~~
22     ~~If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may~~
23  ~~require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for~~
24  ~~and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such~~
25  ~~party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter~~
26  ~~into and execute such contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract~~
27  ~~Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.~~ In the event a disposition is made to a third
   party who, at the time of disposition is in receivership or has filed or has been petitioned into bankruptcy, the disposing party shall
28  also be liable to the other parties for all amounts accrued for operations in which the disposing party chose to participate under this
   agreement attributable to the disputed interest prior to the effective date of the disposition.
29  E.   Waiver of Rights to Partition:
30
31     If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32  undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33  interest therein.
34
35  ~~F.   Preferential Right to Purchase:~~
36
37  ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38  ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39  ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40  ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41  ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42  ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43  ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44  ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45  ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~
46
47  ### ARTICLE IX.
48  #### INTERNAL REVENUE CODE ELECTION
49
50     This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51  for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52  and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53  purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54  from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as per-
55  mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56  ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57  United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58  and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59  evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60  Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61  action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62  Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63  Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is per-
64  mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65  tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66  computation of partnership taxable income.
67
68
69
70

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

<div style="text-align:center">

**ARTICLE X.**

**CLAIMS AND LAWSUITS**

</div>

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed __Ten Thousand and NO/100_____ Dollars ($ __10,000.00_____) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

<div style="text-align:center">

**ARTICLE XI.**

**FORCE MAJEURE**

</div>

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

<div style="text-align:center">

**ARTICLE XII.**

**NOTICES**

</div>

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex / or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex / or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

<div style="text-align:center">

**ARTICLE XIII.**

**TERM OF AGREEMENT**

</div>

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☐   ~~Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.~~

☑   Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____180_____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____180_____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

<div style="text-align:center">

- 13 -

</div>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XIV.
COMPLIANCE WITH LAWS AND REGULATIONS

A.   Laws, Regulations and Orders:

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

B.   Governing Law:

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ Alabama _____ shall govern.

C.   Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

ARTICLE XV.
OTHER PROVISIONS

A. PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1)   An election to perform additional logging, coring or testing;
(2)   An election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;
(3)   An election to plug back and attempt to complete the well in a shallower depth or formation;
(4)   An election to deepen the well to a new objective formation;
(5)   An election to sidetrack the well;
(6)   An election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;
(7)   An election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of a majority in interest (not in number) of the consenting parties, a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well to the objective depth or objective formation, such election shall not be given the priority herein above set forth. In such event, the operation, which, in the opinion of said majority in interest is less likely to jeopardize the well, will be given priority. Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail. It is further understood that if same, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests.  For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

B. HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

C. DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties. If the parties are equally divided, the opinion of the Operator will prevail.

- 14a -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**D. INDEMNITY**

Each Non-Operator shall defend, indemnify and hold Operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operator's officers, employees and/or agents, resulting from or in any way relating to such officers, employees, and/or agents presence on a drilling rig on the Contract Area or from such person traveling by air or water between any point and such drilling rig, including, without limitation, claims arising out of THE FAULT, LIABILITY, NEGLIGENCE OR GROSS NEGLIGENCE OF OPERATOR. Such indemnity to Operator shall also apply to any other person whose presence on the rig or transportation to or from such rig is at the request of the indemnifying Non-Operator.

**E. SEVERABILITY**

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

**F. NO WAIVERS**

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

**G. PRIOR AGREEMENTS**

The Sklar Parties are also parties to another operating agreement (the "Sklar JOA") by and between Sklar Exploration Company L.L.C., as Operator, and the Sklar Parties, as Non-Operators, covering lands that include, among other lands, the Contract Area of this Agreement. The Sklar JOA is referred to herein as the Prior Agreement. None of the parties to this Agreement shall have any rights or obligations under the Prior Agreement unless hereinafter it is now, or later becomes by separate instrument, a Party to such Prior Agreement. If there is a conflict between this Agreement and the Prior Agreement, then, as between the parties to the Prior Agreement, the Prior Agreement shall govern and prevail. Except as provided in the preceding sentence, this Agreement shall control as among the parties herewith with respect to the matters covered hereby.

If there is a conflict between the provisions of Article XV and the Joint Operating Agreement to which Article XV is attached, the provisions of Article XV shall prevail and shall be binding upon all parties to the Operating Agreement.

**II. INTERESTS OF THE PARTIES & TITLES**

Subject to the provisions of Article XV.G above, the provisions set forth in this Article XV.II shall apply and govern in lieu of the provisions of Article III.B, C and D and Article IV, to the extent the provisions of this Article XV.II are inconsistent with those provisions.

The Sklar Parties own Oil, Gas and Mineral Lease Nos. 1 through 28 (hereinafter the "Sklar Leases") described in Exhibit "A-1" to this Operating Agreement. The Sklar Parties alone shall bear, in proportion to their interests in the Sklar Leases set forth in Exhibit "A" to this Operating Agreement, all burdens, losses and costs attributable to their proportional interests in those leases, including, without limitation, the following: (i) all of their proportionate share of royalties, overriding royalties, production payments or other burdens on production to which the Sklar Leases are subject; (ii) all of their proportionate share of losses associated with the Sklar Leases, through failure of title or otherwise; and (iii) all of their proportionate share of such costs attributable to the working interest in the Sklar Leases as those leases' share of the costs to drill the Initial Well. Central Petroleum, Inc. owns Oil, Gas and Mineral Lease No. 29 (hereinafter the "Central Petroleum Lease") described in Exhibit "A-1" to this Operating Agreement. Central Petroleum, Inc. alone shall bear, in proportion to its interest in the Central Petroleum Lease set forth in Exhibit "A" to this Operating Agreement, all burdens, losses and costs attributable to that lease, including, without limitation, the following: (i) all royalties, overriding royalties, production payments or other burdens on production to which the Central Petroleum Lease is subject; (ii) all losses associated with the Central Petroleum Lease, through failure of title or otherwise; and (iii) such costs attributable to the working interest in the Central Petroleum Lease as that lease's share of the costs to drill the Initial Well. Marco Land & Petroleum, Inc. owns Oil, Gas and Mineral Lease Nos. 30 through 32 (hereinafter the "Marco Leases") described in Exhibit "A-1" to this Operating Agreement. Marco Land & Petroleum, LLC alone shall bear, in proportion to its interest in the Marco Leases set forth in Exhibit "A" to this Operating Agreement, all burdens, losses and costs attributable to those leases, including, without limitation, the following: (i) all royalties, overriding royalties, production payments or other burdens on production to which the Marco Leases are subject; (ii) all losses associated with the Marco Leases, through failure of title or otherwise; and (iii) such costs attributable to the working interest in the Marco Leases as those leases' share of the costs to drill the Initial Well.

The Sklar Parties, Central Petroleum, Inc. and Marco Land & Petroleum, Inc. agree to share costs within the Contract Area in the proportion that the interest of each bears to the total interest of all of them as determined by title examination to the drilling unit for the Initial Well more particularly described as the Southeast Quarter of Section 2, Township 3 North, Range 12 East, Escambia County, Alabama. Operator may rely upon said title examination for the purpose of invoicing costs between each of the Sklar Parties, Central Petroleum, Inc. and Marco Land & Petroleum, Inc. Costs attributable to any non-participating oil and gas interest or oil and gas lease shall be carried by each of the Sklar Parties, Central Petroleum, Inc. and Marco Land & Petroleum, Inc., in the same proportion. The voting interest or interest to make other decisions required or permitted by the Non-Operators hereunder shall be allocated between each of the Sklar Parties, Central Petroleum, Inc. and Marco Land & Petroleum, Inc., in the same manner. Notwithstanding any provisions of this paragraph or any other provisions of this Operating Agreement to the contrary, if Operator invoices the Sklar Parties, Central Petroleum, Inc. and Marco Land & Petroleum, Inc. for costs associated with the Initial Well based upon title examination of the drilling unit for that well as of a date prior to the commencement of operations for the drilling of that well, and if any of the oil and gas leases described in Exhibit "A-1" terminate prior to the commencement of operations for the drilling of the Initial Well, then, in that event, Operator shall cause its title examination to the drilling unit to be updated and shall invoice the Sklar Parties, Central Petroleum, Inc. and Marco Land & Petroleum, Inc. all costs associated with the Initial Well based upon the updated title examination and shall credit any amounts previously invoiced and refund any amounts previously over paid by any Non-Operator based upon the prior title examination. Nothing herein shall prevent any Non-Operator from contesting the accuracy or validity of any title opinion if it believes in good faith that the title opinion is inaccurate or invalid.

Notwithstanding anything herein to the contrary, the Sklar Parties or Operator on their behalf may perform curative work or otherwise protect the Sklar Leases against title loss, and bear no obligation to offer extensions, amendments, renewals, ratifications or other curative instruments relating to the Sklar Leases or lands covered by those leases to Central Petroleum, Inc. or Marco Land & Petroleum, Inc. Central Petroleum, Inc. may perform curative work or otherwise protect the Central Petroleum Lease against title loss, and bears no obligation to offer extensions, amendments, renewals, ratifications or other curative instruments relating to the Central Petroleum Lease or lands covered by that lease to the Sklar Parties or Marco Land & Petroleum, Inc. Marco Land & Petroleum, Inc. may perform curative work or otherwise protect the Marco Leases against title loss, and bears no obligation to offer extensions, amendments, renewals, ratifications or other curative instruments relating to the Marco Leases or lands covered by those leases to the Sklar Parties or Central Petroleum, Inc.

The Sklar Parties shall be entitled to, in proportion to their interest in the Sklar Leases set forth in Exhibit "A" and subject to all burdens, the share of the proceeds from the sale of oil and gas produced from the Initial Well or Subsequent Wells drilled and completed hereunder attributable to the Sklar Leases. Central Petroleum, Inc. shall be entitled to, in proportion to its interest in the

- 14b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1   Central Petroleum Lease set forth in Exhibit "A" and subject to all burdens, the share of the proceeds, from the sale of oil and gas
2   produced from the Initial Well or Subsequent Wells drilled and completed hereunder attributable to the Central Petroleum Lease.
3   Marco Land & Petroleum, Inc. shall be entitled to, in proportion to its interest in the Marco Lease set forth in Exhibit "A" and
    subject to all burdens, the share of the proceeds, from the sale of oil and gas produced from the Initial Well or Subsequent Wells
4   drilled and completed hereunder attributable to the Marco Lease. The Sklar Parties, Central Petroleum, Inc. and Marco Land &
5   Petroleum, Inc. agree to share the proceeds from the sale of oil and gas produced from the Initial Well or Subsequent Wells drilled
    and completed hereunder in the proportion that the interest of each bears to the total interest of all as determined by title
6   examination in the producing unit for such well.  Operator may rely upon said title examination for the purpose of disbursing
    proceeds between each of the Sklar Parties, Central Petroleum, Inc. and Marco Land & Petroleum, Inc.

7   I.  NON-CONSENT
8
9   All of the Sklar Parties, Sklar Parties, Central Petroleum, Inc. and Marco Land & Petroleum, Inc. have consented to participate in
10  the drilling of the Initial Well pursuant to Article VI.A of this Agreement.  Elections to participate in any subsequent operations
11  under Article VI.B of this Agreement shall be made by Operator on behalf of all of the interest of the Sklar Parties.  If one or more of
    the Sklar Parties elects not to participate in a subsequent operation, the non-consent interest shall be assumed by the remaining Sklar
12  Parties pursuant to the terms of the Sklar JOA.  Accordingly, insofar as the Sklar Parties are concerned, the provisions of Article
13  VI.B.2 of this Agreement shall only apply to elections to which Operator non-consents on behalf of all of the Sklar Parties.

14  J.  EXECUTION
15
16  This Agreement shall be binding upon each party that executes this Agreement without regard to whether this same instrument, or
17  any copy or counterpart hereof shall be executed by any other parties.

18  K.  HEADINGS FOR CONVENIENCE
19
20  The headings used in this Agreement are inserted for convenience only and shall not be regarded in construing or interpreting this
21  Agreement.

22  L.  RELATIONSHIP OF THE PARTIES
23
24  In their relations with each other under this Agreement, the parties shall not be considered fiduciaries or to have established a
25  confidential relationship but rather shall be free to act on an arm's length basis in accordance with their own self interests.

26  M.  PAYMENT OF LEASE ROYALTIES AND OTHER BURDENS
27
28  If requested, Operator may, but is not obligated to, pay any royalty, overriding royalty, production payment, or other burden on
    production (regardless of whether or not it exceeds the amount stipulated in Article III.B.) on behalf of the party obligated to make
29  such payment.  And if operator makes such payment, it shall not be liable for any mistake made in making the payment, and the
30  party who is obligated to make such payment agrees to reimburse Operator for any additional cost or expense that may be incurred
31  in connection with making such payment and to save Operator harmless from, and indemnify Operator against, any loss, cost,
    damage or expense of any nature whatsoever (including reasonable attorneys' fees and regardless of whether or not caused by
32  negligence of Operator) arising out of any claim or suit relating to payments made or not made by Operator on behalf of such party.
33  If Operator commences making such payments on behalf of any party hereto, it may thereafter cease making such payments provided
34  that, thirty (30) days prior to such cessation, it notifies the party in question that it intends to cease making such payments.

35  N.  POOLING
36
37  Many of the Leases described on Exhibit A-1 grant to the lessee thereunder the right to pool or unitize the Lease and the lands
38  covered thereby (or portions thereof) with other lands or leases (or portions thereof) to establish units for wells.  The parties for
    themselves and for their successors and assigns hereby grant to Operator and its successors the non-exclusive right, as limited to the
39  Contract Area of this Agreement, to exercise any such pooling or unitization rights so granted to them, or any of them, with full
40  authority to execute (for them and on their behalf) any documents deemed necessary or appropriate to effectuate said pooling or
41  unitization and hereby agree and stipulate that any instrument or declaration executed by the Operator (or its successor) with respect
    to any such pooling or unitization shall have the same force and effect as one executed by all of the parties to this Agreement (and
42  their successors and assigns).  Nothing in this paragraph shall limit or alter a party's right to consent or not consent to any operation
43  in accordance with and subject to the terms of this Agreement, and the power and authority granted to the Operator in this Section
44  shall remain in effect so long as this Agreement remains in effect and shall not be affected by the death or incompetency of any party
    who is a natural person.

46  O.  WAIVER OF RIGHT TO TRIAL BY JURY
47
48  Each of the parties to this Agreement hereby waives the right to trial by jury in any litigation between any of the parties relating to
    this Agreement.

50  P.  CONFLICTS WITH OTHER PROVISIONS
51
52  Should any provision of this Article XV conflict or be inconsistent with any other provision of this Agreement, then the provision of
    this Article XV shall govern and control.

53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

- 14c -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 1st _____ day of _____ August _____ , (year) _____ 2014 _____ .

~~, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in computerized form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY, L.L.C.

_____

DAVID A. BARLOW,
President-Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

_____

DAVID A. BARLOW, President-Chief Operating Officer

RUNDERO INVESTMENT COMPANY, L.L.C.

_____

ROBERT P. BOWBLIS, Manager

CRAFT EXPLORATION COMPANY, L.L.C.

_____

STEVEN H. CRAFT, Managing Member

DICKSON OIL & GAS, LLC

_____

C. BICKHAM DICKSON, III, Member

FANT ENERGY LIMITED
Richard E. Fant, LLC, General Partner of Fant Energy
Limited

_____

RICHARD E. FANT, Manager of Richard E. Fant, LLC, the
General Partner of Fant Energy Limited

_____

FLEET HOWELL

- 15a -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 1st _____ day of _____ August _____ , (year) ___2014___ .

_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the A.A.P.L. Form 610 1982 Model Form Operating Agreement, as published in computerized form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____; have been made to the form.

OPERATOR

SKLAR EXPLORATION COMPANY, L.L.C.

DAVID A. BARLOW,
President-Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

DAVID A. BARLOW, President-Chief Operating Officer

BUNDERO INVESTMENT COMPANY, L.L.C.

10/2/14

ROBERT F. BOWMAN, Manager

CRAFT EXPLORATION COMPANY, L.L.C.

STEVEN H. CRAFT, Managing Member

DICKSON OIL & GAS, LLC

C. BICKHAM DICKSON, III, Member

FANT ENERGY LIMITED
Richard E. Fant, LLC, General Partner of Fant Energy
Limited

RICHARD E. FANT, Manager of Richard E. Fant, LLC, the
General Partner of Fant Energy Limited

FLEET HOWELL

- 15a -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

```
 1
 2                                          CENTRAL PETROLEUM, INC.
 3  _____
 4                                          GEORGE S. DENNIS, President
 5  _____
 6
 7                                          MARCO LAND & PETROLEUM, INC.
 8
 9  _____
10                                          COSBY MARTIN, President
11  _____
12  _____
13
14  _____
15  STATE OF  Colorado       )
16  COUNTY/PARISH OF  Boulder  )
17     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A.
18  BARLOW, whose name as President and Chief Operating Officer of SKLAR EXPLORATION COMPANY, L.L.C., is signed to the
    foregoing instrument and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as
    such President and Chief Operating Officer and with full authority executed the same voluntarily on the 30 day of September
19  2014.
20     Given under my hand and seal on this the 30 day of September, 2014.
21
22
23  [affix notarial seal]                      Monica Goncalves
24  My commission expires: 06|17|2018           NOTARY PUBLIC
25
26  STATE OF  Colorado       )
27  COUNTY/PARISH OF  Boulder  )
28     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A.
29  BARLOW, whose name as President and Chief Operating Officer of SKLARCO, L.L.C., is signed to the foregoing instrument and who
    is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such President and Chief
30  Operating Officer and with full authority executed the same voluntarily on the 30 day of September, 2014.
31     Given under my hand and seal on this the 30 day of September, 2014.
32
33
34  [affix notarial seal]                      Monica Goncalves
35  My commission expires: 06|17|2014           NOTARY PUBLIC
36
37  STATE OF  Louisiana      )
38  COUNTY/PARISH OF  Caddo   )
39     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that ROBERT P.
40  BOWMAN, whose name as Manager of BUNDERO INVESTMENT COMPANY, L.L.C., is signed to the foregoing instrument and who
    is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as Manager and with full
41  authority executed the same voluntarily on the 2 day of October, 2014.
42     Given under my hand and seal on this the 2nd day of October, 2014.
43
44                                             Deborah W. Cox
45  [affix notarial seal]                      NOTARY PUBLIC
46  My commission expires: _____          DEBORAH W. COX 26623
47                                              Notary Public
48  STATE OF _____        )               Parish of Caddo
49  COUNTY/PARISH OF _____  )               State of Louisiana
50     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that STEVEN H.
51  CRAFT, whose name as Managing Member of CRAFT EXPLORATION COMPANY, L.L.C., is signed to the foregoing instrument and
    who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Managing
52  Member and with full authority executed the same voluntarily on the ___ day of ___, 2014.
53     Given under my hand and official seal on this the ___ day of ___, 2014.
54
55  _____
56  [affix notarial seal]                      NOTARY PUBLIC
57  My commission expires: _____
58
59  STATE OF _____        )
60  COUNTY/PARISH OF _____  )
61     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that C. BICKHAM
    DICKSON, III, whose name as Member of DICKSON OIL & GAS, LLC, is signed to the foregoing instrument and who is known to me,
62  acknowledged before me on this day that, being informed of the contents of said instrument, he as such Member and with full authority
    executed the same voluntarily on the ___ day of ___, 2014.
63     Given under my hand and official seal on this the ___ day of ___, 2014.
64
65  _____
66  [affix notarial seal]                      NOTARY PUBLIC
67  My commission expires: _____
68
69
70
```

MONICA GONCALVES
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20144024167
COMMISSION EXPIRES JUNE 17, 2018

MONICA GONCALVES
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20144024167
COMMISSION EXPIRES JUNE 17, 2018

- 15e -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____August_____ , (year) __2014__ .

~~who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in computerized form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ , have been made to the form.~~

OPERATOR

_J. Marshall Jones___                    SKLAR EXPLORATION COMPANY, L.L.C.

                                         _David H. Jones_
                                         DAVID A. BARLOW,
                                         President-Chief Operating Officer

NON-OPERATORS

_J. Marshall Jones___                    SKLARCO L.L.C.

                                         _David H. Jones_
                                         DAVID A. BARLOW, President-Chief Operating Officer

                                         BUNDERO INVESTMENT COMPANY, L.L.C.

                                         ROBERT T. BOWMAN, Manager

                                         CRAFT EXPLORATION COMPANY, L.L.C.

                                         _Steven Craft_  MANAGER
                                         STEVEN H. CRAFT, Managing Member

                                         DICKSON OIL & GAS, LLC

                                         C. BICKHAM DICKSON, III, Member

                                         FANT ENERGY LIMITED
                                         Richard E. Fant, LLC, General Partner of Fant Energy
                                         Limited

                                         RICHARD E. FANT, Member of Richard E. Fant, LLC, the
                                         General Partner of Fant Energy Limited

                                         FLEET HOWELL

- 15a -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1
2
3
4 _____          CENTRAL PETROLEUM, INC.
5
6 _____          GEORGE S. DENNIS, President
7
8 _____          MARCO LAND & PETROLEUM, INC.
9
10 _____         COSBY MARTIN, President
11
12 _____
13
14
15 STATE OF Colorado )
16 COUNTY/PARISH OF Boulder )
17   I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A.
18 BARLOW, whose name as President and Chief Operating Officer of SKLAR EXPLORATION COMPANY, L.L.C., is signed to the
foregoing instrument and who is known to me, acknowledged before me that, being informed of the contents of said instrument, as
19 said President and Chief Operating Officer and with full authority executes the same voluntarily on the 3O day of September
20 2014.
21   Given under my hand and seal on this the 3O day of September, 2014.
22
23 [affix notarial seal]                      Mimia Goncalves
24 My commission expires: 06/17/2018          NOTARY PUBLIC
25
26 STATE OF Colorado )
27 COUNTY/PARISH OF Boulder )
28   I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A.
29 BARLOW, whose name as President and Chief Operating Officer of SKLARCO, L.L.C. is signed to the foregoing instrument and who
is known to me, acknowledged before me that, being informed of the contents of said instrument, as their President and Chief
30 Operating Officer and with full authority executed the same voluntarily on the 3O day of September, 2014.
31   Given under my hand and seal on this the 3O day of September, 2014.
32
33
34 [affix notarial seal]                      Mimia Goncalves
35 My commission expires: 06/17/2014          NOTARY PUBLIC
36
37 STATE OF _____ )
38 COUNTY/PARISH OF _____ )
39   I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that ROBERT P.
40 BOYALAN, whose name as Manager of RUNNING INVESTMENTS, L.L.C. is signed to the foregoing instrument and who
is known to me, acknowledged before me that, being informed of the contents of said instrument, as such Manager and with full
41 authority executed the same voluntarily on the ___ day of _____, 2014.
42   Given under my hand and seal on this the ___ day of _____, 2014.
43
44
45 [affix notarial seal]                      _____
46 My commission expires: _____        NOTARY PUBLIC
47
48 STATE OF Mississippi )
49 COUNTY/PARISH OF Madison )
50   I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that STEVEN H.
51 CRAFT, whose name as Managing Member of CRAFT EXPLORATION COMPANY, L.L.C. is signed to the foregoing instrument who
is known to me, acknowledged before me that, being informed of the contents of said instrument, as such Member and with full
52 Member and with full authority executed the same voluntarily on the ___ day of October, 2014.
53   Given under my hand and official seal on this the 1 day of Octob, 2014.
54
55
56 [affix notarial seal]                      _____
57 My commission expires: 10.15.16            NOTARY PUBLIC
58
59 STATE OF _____ )
60 COUNTY/PARISH OF _____ )
61   I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that C. BICKHAM
62 DICKSON III, whose name as Member of DICKSON OIL & GAS L.L.C. is signed to the foregoing instrument and who is known to me,
acknowledged before me on this day that, being informed of the contents of said instrument, as such Member and with full authority
63 executed the same voluntarily on the ___ day of _____, 2014.
64   Given under my hand and official seal on this the ___ day of _____, 2014.
65
66 [affix notarial seal]                      _____
67 My commission expires: _____        NOTARY PUBLIC
68
69
70

- 150 -

MONICA GONCALVES
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20144024167
COMMISSION EXPIRES JUNE 17, 2014

MONICA GONCALVES
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20144024167
COMMISSION EXPIRES JUNE 17, 2015

OF MISSISSIPPI
Julie Den Hartog
ID No 103723
Comm Expires
October 15, 2016
NOTARY PUBLIC
MADISON COUNTY

CCL+T 2-9

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 15th _____ day of _____ August _____ , (year) _____ 2014 _____ .

~~who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement as published in computerized form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____ have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY, L.L.C.

DAVID A. BARLOW,
President-Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

DAVID A. BARLOW, President-Chief Operating Officer

BUNDERO INVESTMENT COMPANY, L.L.C.

ROBERT P. BOWMAN, Manager

CRAFT EXPLORATION COMPANY, L.L.C.

STEVEN H. CRAFT, Managing Member

DICKSON OIL & GAS, LLC

C. BURNAM DICKSON, III, Member

FANT ENERGY LIMITED
Richard E. Fant, LLC, General Partner of Fant Energy
Limited

RICHARD E. FANT, Manager of Richard E. Fant, LLC, the
General Partner of Fant Energy Limited

FLEET HOWELL

- 15a -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1
2
3                                            CENTRAL PETROLEUM, INC.
4  _____           _____
                                             GEORGE S. DENNIS, President
5
6  _____
7
8                                            MARCO LAND & PETROLEUM, INC.
9
10 _____           _____
11                                           COSBY MARTIN, President
12 _____
13
14 STATE OF _Colorado_____ )
15 COUNTY/PARISH OF _Boulder_ )
16
17     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A.
   BARLOW, whose name as President and Chief Operating Officer of SKLAR EXPLORATION COMPANY, L.L.C., is signed to the
18 foregoing instrument and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as
   such President and Chief Operating Officer and with full authority executed the same voluntarily on the 30 day of September
19 2014.
20     Given under my hand and seal on this the 30 day of September, 2014.
21
22                                            _Monica Goncalves_____
23 [affix notarial seal]                           NOTARY PUBLIC
24 My commission expires: _06/17/2018_
25
26 STATE OF _Colorado_____ )
27 COUNTY/PARISH OF _Boulder_ )
28
29     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A.
   BARLOW, whose name as President and Chief Operating Officer of SKLARCO, L.L.C., is signed to the foregoing instrument and who
   is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such President and Chief
30 Operating Officer and with full authority executed the same voluntarily on the 30 day of September, 2014.
31     Given under my hand and seal on this the 30 day of September, 2014.
32
33                                            _Monica Goncalves_____
34 [affix notarial seal]                           NOTARY PUBLIC
35 My commission expires: _06/17/2014_
36
37 STATE OF _____ )
38 COUNTY/PARISH OF _____ )
39
40     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that ROBERT P.
   BOWMAN, whose name as Manager of BANDERO INVESTMENT COMPANY, L.L.C., is signed to the foregoing instrument and who
41 is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such Manager and with full
   authority executed the same voluntarily on the ____ day of _____, 2014.
42     Given under my hand and seal on this the ____ day of _____, 2014.
43
44                                            _____
45 [affix notarial seal]                           NOTARY PUBLIC
46 My commission expires: _____
47
48 STATE OF _____ )
49 COUNTY/PARISH OF _____ )
50     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that STEVEN H.
   CRAFT, whose name as Managing Member of CRAFT EXPLORATION COMPANY, L.L.C., is signed to the foregoing instrument and
51 who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Managing
   Member and with full authority executed the same voluntarily on the ____ day of _____, 2014.
52
53     Given under my hand and official seal on this the ____ day of _____, 2014.
54
55                                            _____
56 [affix notarial seal]                           NOTARY PUBLIC
57 My commission expires: _____
58
59 STATE OF _LOUISIANA_ )
60 COUNTY/PARISH OF _CADDO_ )
61     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that C. BICKHAM
   DICKSON, III, whose name as Member of DICKSON OIL & GAS of L.C. is signed to the foregoing instrument and who is known to me,
62 acknowledged before me on this day that, being informed of the contents of said instrument, he as such Member and with full authority
   executed the same voluntarily on the 13 day of JAN, 2014.
63     Given under my hand and official seal on this the 13 day of JAN, 2014, 2015.
64
65                                            _Sherri H. Imbrdeaux_____
66 [affix notarial seal]                           NOTARY PUBLIC
67 My commission expires: _____
68                              _____, Notary Public # 060494
69                              Bossier Parish, Louisiana
70                              My Commission is for Life

- 15c -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 1st _____ day of _____ August _____ , (year) __2014__ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in computerized form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____, have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY, L.L.C.

_J. Marshall Jones_

_David A. Barlow_
DAVID A. BARLOW,
President-Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

_J. Marshall Jones_

DAVID A. BARLOW, President-Chief Operating Officer

BUNDERO INVESTMENT COMPANY, L.L.C.

_____
ROBERT P. BOWMAN, Manager

CRAFT EXPLORATION COMPANY, L.L.C.

_____
STEVEN H. CRAFT, Managing Member

DICKSON OIL & GAS, LLC

_____
C. BICKHAM DICKSON, III, Member

FANT ENERGY LIMITED
Richard E. Fant, LLC, General Partner of Fant Energy Limited

_____
RICHARD E. FANT, Manager of Richard E. Fant, LLC, the General Partner of Fant Energy Limited

_____
FLEET HOWELL

- 15a -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1  STATE OF _TEXAS_____ )
2  COUNTY/PARISH OF _____ )
3      I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that RICHARD E.
4  FANT, whose name as Manager of Richard E. Fant, LLC, as General Partner of FANT ENERGY PARTNERS, is signed to the foregoing
   instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as
   such Manager and with full authority executed the same voluntarily on the ____ day of _____, 2014.
5      Given under my hand and official seal on this the _1_ day of _OCT_____, 2014.
6
7
8  [affix notarial seal]
9  My commission expires: _2/25/17_
10
11 STATE OF _____ ) .
12 COUNTY/PARISH OF _____ )
13     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that _____,
14 whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of
   the contents of said instrument, he executed the same voluntarily on the ____ day of _____, 2014.
15     Given under my hand and official seal on this the ____ day of _____, 2014.
16
17
18 [affix notarial seal]                                        NOTARY PUBLIC _____
19 My commission expires: _____
20
21 STATE OF _____ )
22 COUNTY/PARISH OF _____ )
23     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that JUSTIN SIMONS,
24 whose name as President of JIS VENTURES EXCHANGE, LLC, is signed to the foregoing instrument and who is known to me, acknowl-
   edged before me on this day that, being informed of the contents of said instrument, he as such President and with full authority
25 executed the same voluntarily on the ____ day of _____, 2014.
26     Given under my hand and official seal on this the ____ day of _____, 2014.
27
28                                                             NOTARY PUBLIC _____
29 [affix notarial seal]
30 My commission expires: _____
31
32 STATE OF _____ )
33 COUNTY/PARISH OF _____ )
34     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that WRIT A.
   YERGER, III, whose name as Manager of KODZO OIL PROPERTIES, LLC, is signed to the foregoing instrument and who is known to
35 me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Manager and with full
   authority executed the same voluntarily on the ____ day of _____, 2014.
36     Given under my hand and official seal on this the ____ day of _____, 2014.
37
38
39 [affix notarial seal]                                        NOTARY PUBLIC _____
40 My commission expires: _____
41
42 STATE OF _____ )
43 COUNTY/PARISH OF _____ )
44     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that LARRY
45 JOHNSON, whose name as Managing Member of LANDMARK EXPLORATION, LLC, is signed to the foregoing instrument and who
   is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Managing
46 Member and with full authority executed the same voluntarily on the ____ day of _____, 2014.
47     Given under my hand and official seal on this the ____ day of _____, 2014.
48
49
50 [affix notarial seal]                                        NOTARY PUBLIC _____
51 My commission expires: _____
52
53 STATE OF _____ )
54 COUNTY/PARISH OF _____ )
      I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MARK P. SEALY,
55 whose name as Member of JMARKCO, L.L.C., is signed to the foregoing instrument and who is known to me, acknowledged before me
   on this day that, being informed of the contents of said instrument, he as such Member and with full authority executed the same
56 voluntarily on the ____ day of _____, 2014.
57     Given under my hand and official seal on this the ____ day of _____, 2014.
58
59
60 [affix notarial seal]                                        NOTARY PUBLIC _____
61 My commission expires: _____
62
63
64
65
66
67
68
69
70

- 15d -

JANET LEGENDRE
MY COMMISSION EXPIRES
February 25, 2017

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 1st _____ day of _____ August _____ , (year) _2014_ .

~~_____ who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in computerized from by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____, have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY, L.L.C.

DAVID A. BARLOW,
President-Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

DAVID A. BARLOW, President-Chief Operating Officer

BUNDERO INVESTMENT COMPANY, L.L.C.

ROBERT F. BOWMAN, Manager

CRAFT EXPLORATION COMPANY, L.L.C.

STEVEN H. CRAFT, Managing Member

DICKSON OIL & GAS, LLC

C. BICKHAM DICKSON, III, Member

FANT ENERGY LIMITED
Richard E. Fant, LLC, General Partner of Fant Energy Limited

RICHARD E. FANT, Manager of Richard E. Fant, LLC, the General Partner of Fant Energy Limited

David
Morgan — J P Howell Interests LP
David Morgan

- 15a -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1  STATE OF _____ )
2  COUNTY/PARISH OF _____ )
3        I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that RICHARD E.
   FANT, whose name is Manager of Richard E. Fant, LLC, as General Partner of FANT ENERGY LIMITED, is signed to the foregoing
4  instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as
   such Manager and with full authority executed the same voluntarily on the ____ day of _____, 2014.
5        Given under my hand and official seal on this the ____ day of _____, 2014.
6
7                                                                  _____
8  [affix notarial seal]                                          NOTARY PUBLIC
9  My commission expires: _____
10
11 STATE OF __Louisiana_____ )
12 COUNTY/PARISH OF __Caddo__ )                                          David Morgan
13       I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that _____ MORGAN,
   whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of
14 the contents of said instrument, he executed the same voluntarily on the __2__ day of __Feb.___ 2015. 2014.
15       Given under my hand and official seal on this the __2__ day of __Feb.___ 2015. 2014.
16
17                                                                  _Melissa R. Ebarb_____
18 [affix notarial seal]                                           NOTARY PUBLIC
19 My commission expires: __is for Life__                          #68325
20                                                                 Melissa R. Ebarb
21 STATE OF _____ )
22 COUNTY/PARISH OF _____ )
23       I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that JUSTIN SIMONS,
   whose name is President of J&S INTERESTS ESCANDIA, LLC, is signed to the foregoing instrument and who is known to me, acknow-
24 ledged before me on this day that, being informed of the contents of said instrument, he as such President and with full authority
   executed the same voluntarily on the ____ day of _____, 2014.
25
26       Given under my hand and official seal on this the ____ day of _____, 2014.
27
28                                                                  _____
29 [affix notarial seal]                                           NOTARY PUBLIC
30 My commission expires: _____
31
32 STATE OF _____ )
33 COUNTY/PARISH OF _____ )
34       I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that WIRT A.
   VERGER, III, whose name is Manager of KOIV21 OIL PROPERTIES, LLC, is signed to the foregoing instrument and who is known to
35 me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Manager and with full
   authority executed the same voluntarily on the ____ day of _____, 2014.
36       Given under my hand and official seal on this the ____ day of _____, 2014.
37
38                                                                  _____
39 [affix notarial seal]                                           NOTARY PUBLIC
40 My commission expires: _____
41
42 STATE OF _____ )
43 COUNTY/PARISH OF _____ )
44       I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that LARRY
   JOHNSON, whose name is Managing Member of LANIMAIDA EXPLORATION, LLC, is signed to the foregoing instrument and who
45 is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Managing
   Member and with full authority executed the same voluntarily on the ____ day of _____, 2014.
46
47       Given under my hand and official seal on this the ____ day of _____, 2014.
48
49                                                                  _____
50 [affix notarial seal]                                           NOTARY PUBLIC
51 My commission expires: _____
52 STATE OF _____ )
53 COUNTY/PARISH OF _____ )
54       I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MARK P. SEALY,
   whose name is Member of MARKSCO, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me
55 on this day that, being informed of the contents of said instrument, he as such Member and with full authority executed the same
   voluntarily on the ____ day of _____, 2014.
56
57       Given under my hand and official seal on this the ____ day of _____, 2014.
58
59                                                                  _____
60 [affix notarial seal]                                           NOTARY PUBLIC
61 My commission expires: _____
62
63
64
65
66
67
68
69
70

- 15d -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JJS INTERESTS ESCAMBIA LLC

_Ashley Kinnard_

JUSTIN SIMONS, President

KUDZU OIL PROPERTIES, LLC

WIRT A. YERGER, III, Manager

LANDMARK EXPLORATION, LLC

LARRY JOHNSON, Managing Member

MARKSCO, LLC

MARK P. SEALY, Member

McCOMBS ENERGY, LTD.

LARRY WYONT, Vice President, Operations

PICKENS FINANCIAL GROUP, LLC

MICHAEL K. PICKENS, Vice President

RESOURCE VENTURES, LLC

MARK A. ARNOLD, General Manager

THE RUDMAN PARTNERSHIP

W.R. (TREY) SIBLEY, III, AIF

TAUBER EXPLORATION & PRODUCTION CO.

JOHN ROBINSON, Vice President-Land

TIEMBO, LTD.
Simba Investors, L.L.C., Its General Partner

MARK RAUCH, Member of Simba Investors, L.L.C., the
General Partner of Tiembo, Ltd.

- 15b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1 STATE OF _____ )
2 COUNTY/PARISH OF _____ )

3     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that RICHARD E.
4 FANT, whose name as Manager of Richard E. Fant, L.L.C. as General Partner of FANT ENERGY LIMITED, is signed to the foregoing
    instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as
5 such Manager and with full authority executed the same voluntarily on the ____ day of _____, 2014.
6
7     Given under my hand and official seal on this the ____ day of _____, 2014.
8 [affix notarial seal]
                                     NOTARY PUBLIC
9 My commission expires: _____
10

11 STATE OF _____ )
12 COUNTY/PARISH OF _____ )

13     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that FLEET HOWELL,
14 whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of
    the contents of said instrument, he executed the same voluntarily on the ____ day of _____, 2014.
15     Given under my hand and official seal on this the ____ day of _____, 2014.
16
17
18 [affix notarial seal]
                                       NOTARY PUBLIC
19 My commission expires: _____
20

21 STATE OF **TEXAS** )
22 COUNTY/PARISH OF **HARRIS** )

23     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that JUSTIN SIMONS,
24 whose name as President of JAS RESOURCES, L.L.C. is signed to the foregoing instrument and who is known to me, acknowl-
25 edged before me on this day that, being informed of the contents of said instrument, he as such President and with full authority
    executed the same voluntarily on the 13 day of OCTOBER, 2014.

26     Given under my hand and official seal on this the 13 day of OCTOBER, 2014.
27                                 *Daphne R. Norwood*
28                                 NOTARY PUBLIC
29 [affix notarial seal]
30 My commission expires: **MAY 13, 2018**

                                        DAPHENE R. NORWOOD
                                        Notary Public, State of Texas
                                        My Commission Expires
                                        May 13, 2018

31
32 STATE OF _____ )
33 COUNTY/PARISH OF _____ )

34     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that WILEY A.
    VERGER, III, whose name as Manager of RUDOLF OIL PROPERTIES, L.L.C. is signed to the foregoing instrument and who is known to
35 me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Manager and with full
    authority executed the same voluntarily on the ____ day of _____, 2014.
36     Given under my hand and official seal on this the ____ day of _____, 2014.
37
38
39 [affix notarial seal]
                                         NOTARY PUBLIC
40 My commission expires: _____
41

42 STATE OF _____ )
43 COUNTY/PARISH OF _____ )

44     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that LARRY
45 JOHNSON, whose name as Managing Member of LANDMARK EXPLORATION, LLC, is signed to the foregoing instrument and who
46 is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Managing
    Member and with full authority executed the same voluntarily on the ____ day of _____, 2014.
47     Given under my hand and official seal on this the ____ day of _____, 2014.
48
49
50 [affix notarial seal]
                                         NOTARY PUBLIC
51 My commission expires: _____

52 STATE OF _____ )
53 COUNTY/PARISH OF _____ )

54     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MARK P. SEALY,
55 whose name as Member of MARESCO, L.L.C. is signed to the foregoing instrument and who is known to me, acknowledged before me
    on this day that, being informed of the contents of said instrument, he as such Member and with full authority executed the same
56 voluntarily on the ____ day of _____, 2014.
57     Given under my hand and official seal on this the ____ day of _____, 2014.
58
59                                          NOTARY PUBLIC
60 [affix notarial seal]
61 My commission expires: _____
62
63
64
65
66
67
68
69
70

- 15d -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JJS INTERESTS ESCAMBIA LLC

_____
JUSTIN SIMONS, President

KUDZU OIL PROPERTIES, LLC

_____
WIRT A. YERGER, Its Manager

LANDMARK EXPLORATION, LLC

_____
LARRY JOHNSON, Managing Member

MARKSCO, LLC

_____
MARK P. SEALY, Member

McCOMBS ENERGY, LTD.

_____
LARRY WYONT, Vice President, Operations

PICKENS FINANCIAL GROUP, LLC

_____
MICHAEL K. PICKENS, Vice President

RESOURCE VENTURES, LLC

_____
MARK A. ARNOLD, General Manager

THE RUDMAN PARTNERSHIP

_____
W.R. (TREY) SIBLEY, III, AIF

TAUBER EXPLORATION & PRODUCTION CO.

_____
JOHN ROBINSON, Vice President-Land

TIEMBO, LTD.
Simba Investors, L.L.C., Its General Partner

_____
MARK RAUCH, Member of Simba Investors, L.L.C., the
General Partner of Tiembo, Ltd.

- 15b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

STATE OF _____)
COUNTY/PARISH OF _____)

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that RICHARD E. FANT, whose name as Manager of Richard E. Fant, LLC, as General Partner of FANT ENERGY LIMITED, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Manager and with full authority executed the same voluntarily on the ____ day of _____, 2014.

Given under my hand and official seal on this the ____ day of _____, 2014.

                                        _____
                                        NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

STATE OF _____)
COUNTY/PARISH OF _____)

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that FLEET HOWELL, whose name is signed to the foregoing instrument and who is known to me, acknowledged before me of this day that, being informed of the contents of said instrument, he executed the same voluntarily on the ____ day of _____, 2014.

Given under my hand and official seal on this the ____ day of _____, 2014.

                                        _____
                                        NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

STATE OF _____)
COUNTY/PARISH OF _____)

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that JUSTIN SIMONS, whose name as President of JJS INVESTMENTS CANDO, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such President and with full authority executed the same voluntarily on the ____ day of _____, 2014.

Given under my hand and official seal on this the ____ day of _____, 2014.

                                        _____
                                        NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

STATE OF Mississippi )
COUNTY/PARISH OF Madison )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that WIRT A. YERGER, III, whose name as Manager of KUDZU OIL PROPERTIES, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Manager and with full authority executed the same voluntarily on the 30 day of Sept, 2014.

Given under my hand and official seal on this the 30 day of Sept, 2014.

                                        Pamela F Sebren
                                        NOTARY PUBLIC

[affix notarial seal]

My commission expires: July 18, 2017

STATE OF _____)
COUNTY/PARISH OF _____)

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that LARRY JOHNSON, whose name as Managing Member of LANDMARK EXPLORATION, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Managing Member and with full authority executed the same voluntarily on the ____ day of _____, 2014.

Given under my hand and official seal on this the ____ day of _____, 2014.

                                        _____
                                        NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

STATE OF _____)
COUNTY/PARISH OF _____)

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MARK P. SEALY, whose name as Member of MARESCO, L.L.C., is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Member and with full authority executed the same voluntarily on the ____ day of _____, 2014.

Given under my hand and official seal on this the ____ day of _____, 2014.

                                        _____
                                        NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

[Notary seal: STATE OF MISSISSIPPI NOTARY PUBLIC PAMELA F. SEBREN ID # 63506 Commission Expires July 18, 2017 RANKIN COUNTY]

- 15d -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JJS INTERESTS ESCAMBIA LLC

_____
JUSTIN SIGMAN, President

KUDZU OIL PROPERTIES, LLC

_____
WIRT A. YERGER, III, Manager

LANDMARK EXPLORATION, LLC

_____
LARRY JOHNSON, Managing Member
Michael Johnson, Manager

MARESCO, LLC

_____
MARK P. SEALY, Member

McCOMBS ENERGY, LTD.

_____
LARRY WYONT, Vice President, Operations

PICKENS FINANCIAL GROUP, LLC

_____
MICHAEL N. PICKENS, Vice President

RESOURCE VENTURES, LLC

_____
MARK A. ARNOLD, General Manager

THE RUDMAN PARTNERSHIP

_____
W.JC (TREY) SIBLEY, III, AIF

TAUBER EXPLORATION & PRODUCTION CO.

_____
JOHN ROBINSON, Vice President-Land

TINABO, LTD.
Sinbo Investors, L.L.C., its General Partner

_____
JOHN MARCH, Member of Sinbo Investors, L.L.C., the
General Partner of Tinabo, Ltd.

- 15b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1 STATE OF _____)
2 COUNTY/PARISH OF _____)
3   I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that RICHARD E.
4 FANT, whose name as Manager of Richard E. Fant, LLC, as General Partner of FANT ENERGY LIMITED, is signed to the foregoing
  Instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as
  such Manager and with full authority executed the same voluntarily on the _____ day of _____, 2014.
5       Given under my hand and official seal on this the _____ day of _____, 2014.

6
7
                                              _____
8 [affix notarial seal]                        NOTARY PUBLIC
9 My commission expires _____
10

11 STATE OF _____)
12 COUNTY/PARISH OF _____)
13   I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that FLEET HOWELL,
14 whose name is signed to the foregoing instrument and who is known to me, acknowledged before me this day that, being informed of
  the contents of said instrument, he executed the same voluntarily on the _____ day of _____, 2014.
15      Given under my hand and official seal on this the _____ day of _____, 2014.

16
17
                                              _____
18 [affix notarial seal]                        NOTARY PUBLIC
19 My commission expires _____
20

21 STATE OF _____)
22 COUNTY/PARISH OF _____)
23   I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that JUSTIN SIMONS,
24 whose name as President of SJS INVESTMENTS EXPLORATION, LLC, is signed to the foregoing instrument and who is known to me, acknowl-
  edged before me on this day that, being informed of the contents of said instrument, he as such President and with full authority
25 executed the same voluntarily on the _____ day of _____, 2014.
26      Given under my hand and official seal on this the _____ day of _____, 2014.

27
28
                                              _____
29 [affix notarial seal]                        NOTARY PUBLIC
30 My commission expires _____
31

32 STATE OF _____)
33 COUNTY/PARISH OF _____)
34   I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that WIRT A.
  YERGER, III, whose name as Manager of KOTSAI OIL PROPERTIES, LLC, is signed to the foregoing instrument and who is known to
35 me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Manager and with full
  authority executed the same voluntarily on the _____ day of _____, 2014.
36      Given under my hand and official seal on this the _____ day of _____, 2014.

37
38
                                              _____
39 [affix notarial seal]                        NOTARY PUBLIC
40 My commission expires _____
41

42 STATE OF Mississippi)
43 COUNTY/PARISH OF Rankin)          *Michael Johnson*
44   I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that LARRY
45 JOHNSON, whose name as Managing Member of LANDMARK EXPLORATION, LLC, is signed to the foregoing instrument and who
  is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Managing
46 Member and with full authority executed the same voluntarily on the 5 day of May, 2014.
47      Given under my hand and official seal on this the 5 day of May, 2014.

48                                            *Lena M. Mayfield*
49
50 [affix notarial seal]  *4-29-17*            NOTARY PUBLIC
51 My commission expires _____

52 STATE OF _____)
53 COUNTY/PARISH OF _____)
54   I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MARK P. SEALY,
  whose name as Member of ALARKCO, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me
55 on this day that, being informed of the contents of said instrument, he as such Member and with full authority executed the same
  voluntarily on the _____ day of _____, 2014.
56
57      Given under my hand and official seal on this the _____ day of _____, 2014.

58
59
                                              _____
60 [affix notarial seal]                        NOTARY PUBLIC
61 My commission expires _____
62
63
64
65
66
67
68
69
70

(Notary seal: STATE OF MISSISSIPPI, NOTARY PUBLIC, ID # 92353, LENA M. MAYFIELD, Commission Expires April 29, 2017, RANKIN COUNTY)

- 15d -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JJS INTERESTS ESCAMBIA LLC

_____
JUSTIN SIMONS, President

KUDZU OIL PROPERTIES, LLC

_____
WIRT A. YERGER, III, Manager

LANDMARK EXPLORATION, LLC

_____
LARRY JOHNSON, Managing Member

MARKSCO, LLC

Christine M Fortson
Christine M. Fortson
MARK F. SEALY, Member

McCOMBS ENERGY, LTD.

_____
LARRY WYONT, Vice President, Operations

PICKENS FINANCIAL GROUP, LLC

_____
MICHAEL B. PICKENS, Vice President

RESOURCE VENTURES, LLC

_____
MARK A. ARNOLD, General Manager

THE RUDMAN PARTNERSHIP

_____
W.R. (TREY) SIBLEY, III, AIF

TAUBER EXPLORATION & PRODUCTION CO.

_____
JOHN ROBINSON, Vice President-Land

TIEMBO, LTD.
Simba Investors, L.L.C., its General Partner

_____
MARK RAUCH, Member of Simba Investors, L.L.C., the
General Partner of Tiembo, Ltd.

- 15b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

```
1
2                                          CENTRAL PETROLEUM, INC.
3
4  _____
5                                          GEORGE S. DENNIS, President
6  _____
7                                          MARCO LAND & PETROLEUM, INC.
8
9
10 _____
11                                         COSBY BLARTEN, President
12 _____
13
14
15 STATE OF  Colorado        )
16 COUNTY/PARISH OF  Boulder )
17   I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A.
18 BARLOW, whose name as President and Chief Operating Officer of SKLAR EXPLORATION COMPANY, L.L.C. is signed to the
   foregoing instrument and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as
   said President and Chief Operating Officer and with full authority executed the same voluntarily on the 30 day of September
19 2014.
20     Given under my hand and seal on this the 30 day of September, 2014.
21
22                                           Monica Gencalves
23 [affix notarial seal]                       NOTARY PUBLIC
24 My commission expires:  06/17/2018
25
26 STATE OF  Colorado        )
27 COUNTY/PARISH OF  Boulder )
28   I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A.
29 BARLOW, whose name as President and Chief Operating Officer of SKLARCO, L.L.C. is signed to the foregoing instrument and who
   is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as said President and Chief
30 Operating Officer and with full authority executed the same voluntarily on the 30 day of December, 2014.
31     Given under my hand and seal on this the 30 day of December, 2014.
32
33                                           Monica Gencalves
34 [affix notarial seal]                       NOTARY PUBLIC
35 My commission expires:  06/17/2014
36
37 STATE OF _____ )
38 COUNTY/PARISH OF _____ )
39   I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that ROBERT P.
40 BOWMAN, whose name as Manager of BANDERO OIL & GAS COMPANY, L.L.C. is signed to the foregoing instrument and who
   is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such Manager and with full
41 authority executed the same voluntarily on the ____ day of _____, 2014.
42     Given under my hand and seal on this the ____ day of _____, 2014.
43
44
45 [affix notarial seal]                       NOTARY PUBLIC
46 My commission expires: _____
47
48 STATE OF _____ )
49 COUNTY/PARISH OF _____ )
50   I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that STEVEN H.
51 CRAFT, whose name as Managing Member of CRAFT EXPLORATION COMPANY, L.L.C. is signed to the foregoing instrument and
   who is known to me, acknowledged before me that, being informed of the contents of said instrument, he as such Managing
52 Member and with full authority executed the same voluntarily on the ____ day of _____, 2014.
53     Given under my hand and official seal on this the ____ day of _____, 2014.
54
55
56 [affix notarial seal]                       NOTARY PUBLIC
57 My commission expires _____
58
59 STATE OF _____ )
60 COUNTY/PARISH OF _____ )
61   I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that C. BICKHAM
   DICKSON, III, whose name as Member of DICKSON OIL & GAS L.L.C. is signed to the foregoing instrument and who is known to me,
62 acknowledged before me on this day that, being informed of the contents of said instrument, he as such Member and with full authority
   executed the same voluntarily on the ____ day of _____, 2014.
63     Given under my hand and official seal on this the ____ day of _____, 2014.
64
65
66 [affix notarial seal]                       NOTARY PUBLIC
67 My commission expires: _____
68
69
70
```

MONICA GONCALVES
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20144024167
COMMISSION EXPIRES JUNE 17, 2018

MONICA GONCALVES
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20144024167
COMMISSION EXPIRES JUNE 17, 2018

- 15c -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JJS INTERESTS ESCAMBIA LLC

_____
JUSTIN SIMONS, President

KUDZU OIL PROPERTIES, LLC

_____
WIRT A. YERGER, III, Manager

LANDMARK EXPLORATION, LLC

_____
LARRY JOHNSON, Managing Member

MARKSCO, LLC

_____
MARK P. SEALY, Member

McCOMBS ENERGY, LTD.,

_____
LARRY DUPONT, Vice President, Operations

RICKY HAIKIN
VICE PRESIDENT

PICKENS FINANCIAL GROUP, LLC

_____
MICHAEL R. PICKENS, Vice President

RESOURCE VENTURES, LLC

_____
MARK A. ARNOLD, General Manager

THE RUDMAN PARTNERSHIP

_____
WJG (TREY) SIBLEY, III, AIF

TAUBER EXPLORATION & PRODUCTION CO.

_____
JOHN ROBINSON, Vice President-Land

TIEMBO, LTD.
Simba Investors, L.L.C., its General Partner

_____
MARK RAUCH, Attorney of Simba Investors, L.L.C., the
General Partner of Tiembo, Ltd.

- 15b -

OCLAT 2-9 #1

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1  STATE OF _Texas_____ )
2  COUNTY/PARISH OF _Harris___ )
3     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that _____ COUNTY,
4  whose name as Vice President, Operations of RECANDS ENERGY, LTD., is signed to the foregoing instrument and who is known to
5  me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Vice President, Operations
6  and with full authority executed the same voluntarily on the ___ day of _____, 2014.

       Given under my hand and official seal on this the 30 day of _Sept_, 2014.

                                                              _____
                                                              NOTARY PUBLIC

8  [affix notarial seal]
9  My commission expires:

                    SHARON M. McDONALD
                    Notary Public, State of Texas
                    Commission Expires  12-29-2017

11 STATE OF _____ )
12 COUNTY/PARISH OF _____ )
13     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MICHAEL K.
14 PICKENS whose name as Vice President of PICKENS FINANCIAL GROUP, L.L.C., is signed to the foregoing instrument and who is
    known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Vice President and
15 with full authority executed the same voluntarily on the day the same bears date.
16     Given under my hand and official seal on this the ___ day of _____, 2014.

                                                              _____
                                                              NOTARY PUBLIC

19 [affix notarial seal]
20 My commission expires: _____

22 STATE OF _____ )
23 COUNTY/PARISH OF _____ )
24     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MARK A.
    ARNOLD, whose name as General Manager of RESOURCE VENTURES, L.L.C., is signed to the foregoing instrument and who is known
25 to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such General Manager and with
    full authority executed the same voluntarily on the ___ day of _____, 2014.
26     Given under my hand and official seal on this the ___ day of _____, 2014.

                                                              _____
                                                              NOTARY PUBLIC

29 [affix notarial seal]
30 My commission expires: _____

32 STATE OF _____ )
33 COUNTY/PARISH OF _____ )
34     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that W.R. (THEY)
    SIBLEY, III, whose name as attorney-in-fact for THE RUDMAN PARTNERSHIP, is signed to the foregoing instrument and who is
35 known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such attorney-in-fact
36 and with full authority executed the same voluntarily on the ___ day of _____, 2014.
37     Given under my hand and official seal on this the ___ day of _____, 2014.

                                                              _____
                                                              NOTARY PUBLIC

40 [affix notarial seal]
41 My commission expires: _____

43 STATE OF _____ )
44 COUNTY/PARISH OF _____ )
45     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that JOHN ROBINSON,
    whose name as Vice President-Land of TAUBER EXPLORATION & PRODUCTION COMPANY, is signed to the foregoing instrument
46 and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Vice
47 President-Land and with full authority executed the same voluntarily on the ___ day of _____, 2014.
48     Given under my hand and official seal on this the ___ day of _____, 2014.

                                                              _____
                                                              NOTARY PUBLIC

50 [affix notarial seal]
51 My commission expires: _____

53 STATE OF _____ )
54 COUNTY/PARISH OF _____ )
55     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MARK RAUCH,
    whose name as Member of Simba Investors, L.L.C. as General Partner of TEMPLO, LTD., is signed to the foregoing instrument and
56 who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Member
57 and with full authority executed the same voluntarily on the ___ day of _____, 2014.
58     Given under my hand and official seal on this the ___ day of _____, 2014.

                                                              _____
                                                              NOTARY PUBLIC

60 [affix notarial seal]
61 My commission expires: _____

- 15e -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JJS INTERESTS ESCAMBIA LLC

JUSTIN SIMONS, President

KIIIZU OIL PROPERTIES, LLC

WIRT A. YERGER, III, Manager

LANDMARK EXPLORATION, LLC

LARRY JOHNSON, Managing Member

MARKSCO, LLC

MARK P. SEALY, Member

McCOMBS ENERGY, LTD.

LARRY WYONT, Vice President, Operations

PICKENS FINANCIAL GROUP, LLC

MICHAEL R. PICKENS, Vice President

RESOURCE VENTURES, LLC

MARK A. ARNOLD, General Manager

THE RUDMAN PARTNERSHIP

W.IC (TREY) SIBLEY, III, AIF

TAUBER EXPLORATION & PRODUCTION CO.

JOHN ROBINSON, Vice President-Land

TIEMBO, LTD.
Simba Investors, L.L.C., Its General Partner

MARK KAUCH, attorney of Simba Investors, L.L.C., the
General Partner of Tiembo, Ltd.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that LARRY WYONT, whose name as Vice President, Operations of McCOMBS ENERGY, LTD., is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Vice President, Operations and with full authority executed the same voluntarily on the _____ day of _____, 2014.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]
My commission expires: _____

STATE OF Texas )
COUNTY/PARISH OF Dallas )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MICHAEL H. PICKENS, whose name as Vice President of PICKENS FINANCIAL GROUP, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Vice President and with full authority executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on the the 1st day of Oct , 2014.

Marilyn S. Fulton
NOTARY PUBLIC

[affix notarial seal]                    Marilyn L Fulton
My Commission Expires                    My Commission Expires
                                         06/23/2016

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MARK A. ARNOLD, whose name as General Manager of RESOURCE VENTURES, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such General Manager and with full authority executed the same voluntarily on the _____ day of _____, 2014.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]
My commission expires: _____

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that W.R. (TREY) SIBLEY, III, whose name as attorney-in-fact for THE RUDMAN PARTNERSHIP, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such attorney-in-fact and with full authority executed the same voluntarily on the _____ day of _____, 2014.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]
My commission expires: _____

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that JOHN ROBINSON, whose name as Vice President-Land of TAUBER EXPLORATION & PRODUCTION COMPANY, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Vice President-Land and with full authority executed the same voluntarily on the _____ day of _____, 2014.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]
My commission expires: _____

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MARK RAUCH, whose name as Member of Simon Investors, L.L.C., as General Partner of TIERMB, LTD., is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Member and with full authority executed the same voluntarily on the _____ day of _____, 2014.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]
My commission expires: _____

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JJS INTERESTS ESCAMBIA LLC

_____
JUSTIN SIMKINS, President

KUDZU OIL PROPERTIES, LLC

_____
WILLY A. YERGER, III, Manager

LANDMARK EXPLORATION, LLC

_____
LARRY JOHNSON, Managing Member

MARISCO, LLC

_____
MARK V. SEALY, Member

McCOMBS ENERGY, LTD.

_____
LARRY WYONT, Vice President, Operations

PICKENS FINANCIAL GROUP, LLC

_____
MICHAEL E. PICKENS, Vice President

RESOURCE VENTURES, LLC

Sandra J. John _____
MARK A. ARNOLD, General Manager

THE RUDMAN PARTNERSHIP

_____
W.JC (TREY) SHELLY, III, AIF

TAUBER EXPLORATION & PRODUCTION CO.

_____
JOHN ROBINSON, Vice President-Land

TIEMBO, LTD.
Simba Investors, L.L.C., Its General Partner

_____
MARK HAUCH, Member of Simba Investors, L.L.C., the
General Partner of Tiembo, Ltd.

- 15b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

STATE OF_____)
COUNTY/PARISH OF_____)

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that LARRY WYONT, whose name as Vice President, Operations of MCCOMBS ENERGY, LTD., is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Vice President, Operations and with full authority executed the same voluntarily on the _____ day of _____, 2014.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

STATE OF_____)
COUNTY/PARISH OF_____)

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MICHAEL E. PICKENS, whose name as Vice President of PICKENS FINANCIAL GROUP, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Vice President and with full authority executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

STATE OF    Colorado    )
COUNTY/PARISH OF    Douglas    )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MARK A. ARNOLD, whose name as General Manager of RANGELAND ENERGY II, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such General Manager and with full authority executed the same voluntarily on the 30th day of Sept, 2014.

Given under my hand and official seal on this the 30 day of Sept, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]

My commission expires: 3/5/17

JOANNE SCHERFEL
Notary Public
State of Colorado
Notary ID 20014001784
My Commission Expires Mar 5, 2017

STATE OF_____)
COUNTY/PARISH OF_____)

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that _____ SIBLEY, III, whose name as attorney-in-fact for _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such attorney-in-fact and with full authority executed the same voluntarily on the _____ day of _____, 2014.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

STATE OF_____)
COUNTY/PARISH OF_____)

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that JOHN ROBINSON, whose name as Vice President of TAUBER EXPLORATION & PRODUCTION COMPANY, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Vice President and with full authority executed the same voluntarily on the _____ day of _____, 2014.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

STATE OF_____)
COUNTY/PARISH OF_____)

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MARK RAUCH, whose name as Member of Simba Investors, LLC, as General Partner of TREBRO, LTD., is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Member and with full authority executed the same voluntarily on the _____ day of _____, 2014.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

- 15e -

Signature Page to that Operating Agreement
for the CCL&T 2-9 #1 Well in
Escambia County, Alabama.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JJS INTERESTS ESCAMBIA LLC

JUSTIN SIMONS, President

KUDZU OIL PROPERTIES, LLC

WIRT A. YERGER, III, Manager

LANDMARK EXPLORATION, LLC

LARRY JOHNSON, Managing Member

MARKSCO, LLC

MARK P. SEALY, Member

McCOMBS ENERGY, LTD.

LARRY WYONT, Vice President, Operations

PICKENS FINANCIAL GROUP, LLC

MICHAEL K. PICKENS, Vice President

RESOURCE VENTURES, LLC

MARK A. ARNOLD, General Manager

THE RUDMAN PARTNERSHIP

W.R. (REX) SIMMONS, JR.

TAUBER EXPLORATION & PRODUCTION CO.

JOHN ROBINSON, Vice President-Land

TIEMBO, LTD.
Simba Investors, L.L.C., its General Partner

MARK RAUCH, Member of Simba Investors, L.L.C., the
General Partner of Tiembo, Ltd.

- 15b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1  STATE OF _____ )
2  COUNTY/PARISH OF _____ )
3      I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that LARRY WYONT,
4  whose name as Vice President, Operations of the COMBS ENERGY, LLC, is signed to the foregoing instrument and who is known to
5  me, acknowledged before me on this day that, being informed of the contents of said instrument, he is such Vice President, Operations
   and with full authority executed the same voluntarily on the ____ day of _____, 2014.
       Given under my hand and official seal on this the ____ day of _____, 2014.
6
7
8  [affix notarial seal]                                               NOTARY PUBLIC
9  My commission expires: _____
10
11 STATE OF _____ )
12 COUNTY/PARISH OF _____ )
13     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MICHAEL K.
14 PICKENS, whose name as Vice President of PICKENS FINANCIAL GROUP, LLC, is signed to the foregoing instrument and who is
15 known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he is such Vice President and
   with full authority executed the same voluntarily on the day the same bears date.
16     Given under my hand and official seal on this the ____ day of _____, 2014.
17
18                                                                     NOTARY PUBLIC
19 [affix notarial seal]
20 My commission expires: _____
21
22 STATE OF _____ )
23 COUNTY/PARISH OF _____ )
24     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MARK A.
   ARNOLD, whose name as General Manager of RESOURCE VENTURES, LLC, is signed to the foregoing instrument and who is known
25 to me, acknowledged before me on this day that, being informed of the contents of said instrument, he is such General Manager and with
   full authority executed the same voluntarily on the ____ day of _____, 2014.
26     Given under my hand and official seal on this the ____ day of _____, 2014.
27
28
29 [affix notarial seal]                                               NOTARY PUBLIC
30 My commission expires: _____
31
32 STATE OF  TEXAS  )
33 COUNTY/PARISH OF  DALLAS  )
34     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that W.R. (TREY)
35 SIBLEY, III, whose name as attorney-in-fact of WIE RUBMAN PARTNERSHIP, is signed to the foregoing instrument and who is
   known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he is such attorney-in-fact
   and with full authority executed the same voluntarily on the ____ day of  October , 2014.
36     Given under my hand and official seal on this the  3rd  day of  October , 2014.
37
38 [affix notarial seal]                                               NOTARY PUBLIC
39 My commission expires:  April 15, 2016
40
41
42
43 STATE OF _____ )
44 COUNTY/PARISH OF _____ )
45     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that JOHN ROBINSON,
46 whose name as Vice President-Land of TAUBER EXPLORATION & PRODUCTION COMPANY, is signed to the foregoing instrument
   and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he is such Vice
   President-Land and with full authority executed the same voluntarily on the ____ day of _____, 2014.
47     Given under my hand and official seal on this the ____ day of _____, 2014.
48
49
50 [affix notarial seal]                                               NOTARY PUBLIC
51 My commission expires: _____
52
53 STATE OF _____ )
54 COUNTY/PARISH OF _____ )
55     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MARK RAUCH,
56 whose name as Member of Simba Investors, LLC, as General Partner of TIEAIRD, LTD., is signed to the foregoing instrument and
   who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he is such Member
57 and with full authority executed the same voluntarily on the ____ day of _____, 2014.
58     Given under my hand and official seal on this the ____ day of _____, 2014.
59
60                                                                     NOTARY PUBLIC
61 [affix notarial seal]
62 My commission expires: _____
63
64
65
66
67
68
69
70

- 15e -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JJS INTERESTS ESCAMBIA LLC

JUSTIN SIMONS, President

KUDZU OIL PROPERTIES, LLC

WIRT A. YERGER, III, Manager

LANDMARK EXPLORATION, LLC

LARRY JOHNSON, Managing Member

MARKSCO, LLC

MARK P. SEALY, Member

McCOMBS ENERGY, LTD.

LARRY WYONT, Vice President, Operations

PICKENS FINANCIAL GROUP, LLC

MICHAEL K. PICKENS, Vice President

RESOURCE VENTURES, LLC

MARK A. ARNOLD, General Manager

THE RUDMAN PARTNERSHIP

==Signature / Acknowledgement Pages to that certain Operating Agreement, dated August 1, 2014, Sklar Exploration Company, LLC, as Operator; Cedar Creek Land & Timber 2-9 # 1 Well, Section 2, T3N, R12E, Escambia County, Alabama.==

W.R. (TREY) SIBLEY, III, AIF

==TAUBER EXPLORATION & PRODUCTION CO.==

Richard E. Tauber, President

TIEMBO, LTD.
Simba Investors, L.L.C., its General Partner

MARK RAUCH, Member of Simba Investors, L.L.C., the
General Partner of Tiembo, Ltd.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1  STATE OF _____ )
2  COUNTY/PARISH OF _____ )
3        I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that LARRY WYONT, whose
   name as Vice President, Operations of McCOMBS ENERGY, LTD., is signed to the foregoing instrument and who is known to me, acknow-
4  ledged before me on this day that, being informed of the contents of said instrument, he as such Vice President, Operations and with full authority
   executed the same voluntarily on the ____ day of _____, 2014.
5
6        Given under my hand and official seal on this the ____ day of _____, 2014.
7
8  [affix notarial seal]                                          NOTARY PUBLIC
9  My commission expires: _____
10

11 STATE OF _____ )
12 COUNTY/PARISH OF _____ )
13       I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MICHAEL K. PICKENS,
14 whose name as Vice President of PICKENS FINANCIAL GROUP, LLC, is signed to the foregoing instrument and who is known to me,
   acknowledged before me on this day that, being informed of the contents of said instrument, he as such Vice President and with full authority
15 executed the same voluntarily on the day the same bears date.
16       Given under my hand and official seal on this the ____ day of _____, 2014.
17
18
19 [affix notarial seal]                                          NOTARY PUBLIC
20 My commission expires: _____
21

22 STATE OF _____ )
23 COUNTY/PARISH OF _____ )
24       I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MARK A. ARNOLD, whose
   name as General Manager of RESOURCE VENTURES, LLC, is signed to the foregoing instrument and who is known to me, acknowledged
25 before me on this day that, being informed of the contents of said instrument, he as such General Manager and with full authority executed the
   same voluntarily on the ____ day of _____, 2014.
26       Given under my hand and official seal on this the ____ day of _____, 2014.
27
28
29 [affix notarial seal]                                          NOTARY PUBLIC
30 My commission expires: _____
31

32 STATE OF _____ )
33 COUNTY/PARISH OF _____ )
34       I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that W.R. (TREY) SIBLEY, III,
35 whose name as attorney-in-fact for THE RUDMAN PARTNERSHIP, is signed to the foregoing instrument and who is known to me, acknow-
36 ledged before me on this day that, being informed of the contents of said instrument, he as such attorney-in-fact and with full authority executed
   the same voluntarily on the ____ day of _____, 2014.
37       Given under my hand and official seal on this the ____ day of _____, 2014.
38
39                                          **Signature / Acknowledgement Pages to that certain**
40 [affix notarial seal]                    **Operating Agreement, dated August 1, 2014, Sklar**
41 My commission expires: _____ **Exploration Company, LLC, as Operator; Cedar Creek**
                                            **Land & Timber 2-9 # 1 Well, Section 2, T3N, R12E,**
42                                          **Escambia County, Alabama.**
43 STATE OF _TEXAS_____ )
44 COUNTY/PARISH OF _HARRIS___ )
45       I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that Richard E. Tauber, whose
   name as President of TAUBER EXPLORATION & PRODUCTION CO., is signed to the foregoing instrument and who is known to me,
46 acknowledged before me on this day that, being informed of the contents of said instrument, he as such President and with full authority executed
   the same voluntarily on the 6th day of November, 2014.
47       Given under my hand and official seal on this the 6th day of November, 2014.    _Myla Wunderlich_
48
49                                          MYLA WUNDERLICH
50 [affix notarial seal]         NOTARY PUBLIC   Notary Public, State of Texas
51 My commission expires: _____   Commission Expires 02-11-2016
52

53 STATE OF _____ )
54 COUNTY/PARISH OF _____ )
55       I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MARK RAUCH, whose
56 name as Member of Simba Investors, L.L.C., as General Partner of TIEMBO, LTD., is signed to the foregoing instrument and who is known to
   me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Member and with full authority
57 executed the same voluntarily on the ____ day of _____, 2014.
58       Given under my hand and official seal on this the ____ day of _____, 2014.
59
60
61 [affix notarial seal]                                          NOTARY PUBLIC
62 My commission expires: _____
63
64
65
66
67
68
69
70

- 15e -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JJS INTERESTS ESCAMBIA LLC

JUSTIN SIMONS, President

KUDZU OIL PROPERTIES, LLC

WIRT A. YERGER, III, Manager

LANDMARK EXPLORATION, LLC

LARRY JOHNSON, Managing Member

MARKSCO, LLC

MARK F. SEALY, Member

McCOMBS ENERGY, LTD.

LARRY WYONT, Vice President, Operations

PICKENS FINANCIAL GROUP, LLC

MICHAEL R. PICKENS, Vice President

RESOURCE VENTURES, LLC

MARK A. ARNOLD, General Manager

THE RUDMAN PARTNERSHIP

W.R. (TREY) SIBLEY, III, AIF

TAUBER EXPLORATION & PRODUCTION CO.

JOHN ROBINSON, Vice President-Land

TIEMBO, LTD.
Simba Investors, L.L.C., its General Partner

_M.b A____ (signature)

MARK RAUCH, Member of Simba Investors, L.L.C., the
General Partner of Tiembo, Ltd.

- 15b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1  STATE OF _____ )
2  COUNTY/PARISH OF _____ )
3      I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that LARRY WYONT,
   whose name as Vice President, Operations of McCOMBS ENERGY, LTD., is signed to the foregoing instrument and who is known to
4  me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Vice President, Operations
   and with full authority executed the same voluntarily on the ____ day of _____, 2014.
5
6      Given under my hand and official seal on this the ____ day of _____, 2014.
7
8  [affix notarial seal]                                      NOTARY PUBLIC _____
9  My commission expires: _____
10
11 STATE OF _____ )
12 COUNTY/PARISH OF _____ )
13      I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MICHAEL G.
14 PICKENS, whose name as Vice President of PICKENS FINANCIAL GROUP, LLC, is signed to the foregoing instrument and who is
   known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Vice President and
15 with full authority executed the same voluntarily on the day the same bears date.
16      Given under my hand and official seal on this the ____ day of _____, 2014.
17
18
19 [affix notarial seal]                                      NOTARY PUBLIC _____
20 My commission expires: _____
21
22 STATE OF _____ )
23 COUNTY/PARISH OF _____ )
24      I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MARK A.
   ARNOLD, whose name as General Manager of RESOURCE VENTURES, LLC, is signed to the foregoing instrument and who is known
25 to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such General Manager and with
   full authority executed the same voluntarily on the ____ day of _____, 2014.
26      Given under my hand and official seal on this the ____ day of _____, 2014.
27
28
29 [affix notarial seal]                                      NOTARY PUBLIC _____
30 My commission expires: _____
31
32 STATE OF _____ )
33 COUNTY/PARISH OF _____ )
34      I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that W.R. (TREY)
35 SIBLEY, III, whose name as attorney-in-fact for THE RIDMAN PARTNERSHIP, is signed to the foregoing instrument and who is
   known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such attorney-in-fact
36 and with full authority executed the same voluntarily on the ____ day of _____, 2014.
37      Given under my hand and official seal on this the ____ day of _____, 2014.
38
39
40 [affix notarial seal]                                      NOTARY PUBLIC _____
41 My commission expires: _____
42
43 STATE OF _____ )
44 COUNTY/PARISH OF _____ )
45      I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that JOHN ROBINSON,
   whose name as Vice President-Land of TAUBER EXPLORATION & PRODUCTION COMPANY, is signed to the foregoing instrument
46 and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Vice
   President-Land and with full authority executed the same voluntarily on the ____ day of _____, 2014.
47      Given under my hand and official seal on this the ____ day of _____, 2014.
48
49
50 [affix notarial seal]                                      NOTARY PUBLIC _____
51 My commission expires: _____
52
53 STATE OF TEXAS )
54 COUNTY/PARISH OF HARRIS )
55      I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that MARK RAUCH,
56 whose name as Member of Simpa Investors, L.L.C., as General Partner of PIEARO, LTD., is signed to the foregoing instrument and
   who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Member
57 and with full authority executed the same voluntarily on the ____ day of _____, 2014.
58      Given under my hand and official seal on this the ____ day of Feb , 2014.
59
60                                                          NOTARY PUBLIC  Patti L. Hanson
61 [affix notarial seal]
62 My commission expires: 1/18/2019
63
64                        PATTI L. HANSON
65                        NOTARY PUBLIC
66                        STATE OF TEXAS
67                        EXPIRES
68                        01-18-2019
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

CENTRAL PETROLEUM, INC.

GEORGE S. DENNIS, President

MARCO LAND & PETROLEUM, INC.

COSBY MARTIN, President

CARL HERRIN OIL AND GAS, LLC

CARL HERRIN, Manager

HORACE, LLC

SCOTT NOBLITT, Managing Member

SPANISH FORT ROYALTY, LLC

CARL D. WILLIAMS, Manager

STATE OF _____ )
COUNTY/PARISH OF _____ )
     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A. BARLOW, whose name as President and Chief Operating Officer of SKLAR EXPLORATION COMPANY, L.L.C., is signed to the foregoing instrument and who is known to me, and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such President and Chief Operating Officer and with full authority executed the same voluntarily on the _____ day of _____, 2014.
     Given under my hand and seal on this the _____ day of _____, 2014.

_____
                                                  NOTARY PUBLIC
[affix notarial seal]
My commission expires: _____

STATE OF _____ )
COUNTY/PARISH OF _____ )
     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A. BARLOW, whose name as President and Chief Operating Officer of SKLARCO, L.L.C., is signed to the foregoing instrument and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such President and Chief Operating Officer and with full authority executed the same voluntarily on the _____ day of _____, 2014.
     Given under my hand and seal on this the _____ day of _____, 2014.

_____
                                                  NOTARY PUBLIC
[affix notarial seal]
My commission expires: _____

STATE OF _____ )
COUNTY/PARISH OF _____ )
     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that ROBERT P. BOWMAN, whose name as Manager of BUNDERO INVESTMENT COMPANY, L.L.C., is signed to the foregoing instrument and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such Manager and with full authority executed the same voluntarily on the _____ day of _____, 2014.
     Given under my hand and seal on this the _____ day of _____, 2014.

_____
                                                  NOTARY PUBLIC
[affix notarial seal]
My commission expires: _____

- 15c -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

STATE OF _____ MS _____ )

COUNTY/PARISH OF _____ Madison _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that GEORGE S. DENNIS, whose name as President of CENTRAL PETROLEUM, INC., is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such President and with full authority executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the 10th day of Oct. , 2014.

_____
NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

on the _____ day of _____, 2014.

STATE OF _____ )

COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that COSBY MARTIN, whose name as President of MARCO LAND & PETROLEUM, INC., is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such President and with full authority executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

STATE OF _____ )

COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that CARL HERRIN, whose name as Manager of CARL HERRIN OIL AND GAS, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Manager and with full authority executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

on the _____ day of _____, 2014.

STATE OF _____ )

COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that SCOTT NOBLITT, whose name as Managing Member of HORACE, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Managing Member and with full authority executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

on the _____ day of _____, 2014.

STATE OF _____ )

COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that CARL D. WILLIAMS, whose name as Manager of SPANISHPORT ROYALTY, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Manager and with full authority executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

on the _____ day of _____, 2014.

- 15f -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

CENTRAL PETROLEUM, INC.

_____

GEORGE S. DENNIS, President

MARCO LAND & PETROLEUM, INC.

_____

COSBY MARTIN, President

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A. BARLOW, whose name as President and Chief Operating Officer of SKLAR EXPLORATION COMPANY, L.L.C., is signed to the foregoing instrument and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such President and Chief Operating Officer and with full authority executed the same voluntarily on the _____ day of _____, 2014.

Given under my hand and seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]
My commission expires: _____

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A. BARLOW, whose name as President and Chief Operating Officer of SKLARCO. L.L.C., is signed to the foregoing instrument and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such President and Chief Operating Officer and with full authority executed the same voluntarily on the _____ day of _____, 2014.

Given under my hand and seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]
My commission expires: _____

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that ROBERT P. BOWMAN, whose name as Manager of BUNDERO INVESTMENT COMPANY, J.L.C., is signed to the foregoing instrument and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such Manager and with full authority executed the same voluntarily on the _____ day of _____, 2014.

Given under my hand and seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]
My commission expires: _____

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that STEVEN H. CRAFT, whose name as Managing Member of CRAFT EXPLORATION COMPANY, L.L.C., is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such Managing Member and with full authority executed the same voluntarily on the _____ day of _____, 2014.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]
My commission expires: _____

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that C. BICKHAM DICKSON, III, whose name as Member of DICKSON OIL & GAS LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such Member and with full authority executed the same voluntarily on the _____ day of _____, 2014.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]
My commission expires: _____

- 15c -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1 STATE OF _____ )
2 COUNTY/PARISH OF _____ )
3      I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that GEORGE S.
4 DENNIS, whose name as President of CENTRAL PETROLEUM, INC., is signed to the foregoing instrument and who is known to
4 me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such President and with full
authority executed the same voluntarily on the day the same bears date.
5      Given under my hand and official seal on this the _____ day of _____, 2014.
6
7
8 _____                                        _____
9 [affix notarial seal]                                              NOTARY PUBLIC
10 My commission expires: _____
11 on the _____ day of _____, 2014.
12
13 STATE OF Alabama _____ )
14 COUNTY/~~PARISH~~ OF Escambia _____
15      I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that COSBY MARTIN,
16 whose name as President of MARCO LAND & PETROLEUM, INC., is signed to the foregoing instrument and who is known to me,
16 acknowledged before me on this day that, being informed of the contents of said instrument, he as such President and with full authority
executed the same voluntarily on the day the same bears date.
17      Given under my hand and official seal on this the 3rd day of Oct , 2014.
18
19                                                      _Ahana Lambeth_____
20 [affix notarial seal]                                       NOTARY PUBLIC
21 My commission expires: 02-08-17
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

- 15f -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

CENTRAL PETROLEUM, INC.

GEORGE S. DENNIS, President

MARCO LAND & PETROLEUM, INC.

COSBY MARTIN, President

CARL HERRIN OIL AND GAS, LLC

CARL HERRIN, Member

HORACE, LLC

SCOTT NOBLITT, Managing Member

SPANISH FORT ROYALTY, LLC

CARL D. WILLIAMS, Manager

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A. BARLOW, whose name as President and Chief Operating Officer of SKLAR EXPLORATION COMPANY, L.L.C., is signed to the foregoing instrument, and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such President and Chief Operating Officer and with full authority executed the same voluntarily on the ____ day of _____, 2014.

Given under my hand and seal on this the ____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]
My commission expires: _____

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A. BARLOW, whose name as President and Chief Operating Officer of SKLARCO, L.L.C., is signed to the foregoing instrument and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such President and Chief Operating Officer and with full authority executed the same voluntarily on the ____ day of _____, 2014.

Given under my hand and seal on this the ____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]
My commission expires: _____

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that ROBERT P. BOWMAN, whose name as Manager of SUNDERO INVESTMENT COMPANY, L.L.C., is signed to the foregoing instrument and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such Manager and with full authority executed the same voluntarily on the ____ day of _____, 2014.

Given under my hand and seal on this the ____ day of _____, 2014.

_____
NOTARY PUBLIC

[affix notarial seal]
My commission expires: _____

- 15c -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that GEORGE S. DENNIS, whose name as President of CENTRAL PETROLEUM, INC., is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such President and with full authority executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
                                          NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

on the _____ day of _____, 2014.

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that COSHY MARTIN, whose name as President of MARCO LAND & PETROLEUM, INC., is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such President and with full authority executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
                                          NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

STATE OF Mississippi )
COUNTY/PARISH OF Hinds )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that CARL HERRIN, whose name as Manager of CARL HERRIN OIL AND GAS, L.L.C., is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Manager and with full authority executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the 12TH day of January, 2014. 2015

       Patricia L. Miller
_____
                                          NOTARY PUBLIC

[affix notarial seal]

My commission expires: 10-9-2018

on the _____ day of _____, 2014.

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that _____, whose name as Managing Member of HORACE, L.L.C., is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Managing Member and with full authority executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
                                          NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

on the _____ day of _____, 2014.

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that CARL D. WILLIAMS, whose name as Manager of SPANISH FORT ROYALTY, L.L.C., is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Manager and with full authority executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
                                          NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

on the _____ day of _____, 2014.

- 15f -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

CENTRAL PETROLEUM, INC.

GEORGE S. DENNIS, President

MARCO LAND & PETROLEUM, INC.

COSBY MARTIN, President

CARL HERRIN OIL AND GAS, LLC

CARL HERRIN, Manager

HORACE, LLC

SCOTT NOBLITT, Managing Member

SPANISH FORT ROYALTY, LLC

CARL D. WILLIAMS, Manager

STATE OF                              )
COUNTY/PARISH OF                      )
     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A. BARLOW, whose name as President and Chief Operating Officer of SOLAR EXPLORATION COMPANY, L.L.C., as signed to the foregoing instrument, and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such President and Chief Operating Officer and with full authority executed the same voluntarily on the ____ day of _____, 2014.
     Given under my hand and seal on this the ____ day of _____, 2014.

[affix notarial seal]                              _____
My commission expires: _____             NOTARY PUBLIC

STATE OF                              )
COUNTY/PARISH OF                      )
     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A. BARLOW, whose name as President and Chief Operating Officer of SOURCES, LLC, as signed to the foregoing instrument, and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such President and Chief Operating Officer and with full authority executed the same voluntarily on the ____ day of _____, 2014.
     Given under my hand and seal on this the ____ day of _____, 2014.

[affix notarial seal]                              _____
My commission expires: _____             NOTARY PUBLIC

STATE OF                              )
COUNTY/PARISH OF                      )
     I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that ROBERT P. BOWMAN, whose name as Manager of HENDERSON INVESTMENT COMPANY, LLC and signed to the foregoing instrument, and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such Manager and with full authority executed the same voluntarily on the ____ day of _____, 2014.
     Given under my hand and seal on this the ____ day of _____, 2014.

[affix notarial seal]                              _____
My commission expires: _____             NOTARY PUBLIC

- 15c -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that GEORGE S. DENNIS, whose name as President of COLGROVE OIL & GAS FUND, INC., is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such President and with full authority executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
                                                NOTARY PUBLIC
[affix notarial seal]
My commission expires:
on the _____ day of _____, 2014.

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that COSBY MARTIN, whose name as President of ROYALCO OIL & GAS PRODUCTION, INC., is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such President and with full authority executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
                                                NOTARY PUBLIC
[affix notarial seal]
My commission expires:
on the _____ day of _____, 2014.

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that CARL HERBIN, whose name as Manager of CARL HERBIN OIL, PARTNERS, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Manager and with full authority executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
                                                NOTARY PUBLIC
[affix notarial seal]
My commission expires:
on the _____ day of _____, 2014.

STATE OF Mississippi )
COUNTY/PARISH OF Madison )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that SCOTT KINNEY, whose name as Managing Member of HORACE, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Manager and with full authority executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the 10th day of October 2014.

_____
                                                NOTARY PUBLIC
[affix notarial seal]
My commission expires: 4-10-2018
on the _____ day of _____, 2014.

STATE OF _____ )
COUNTY/PARISH OF _____ )

I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that CARL D. WILLIAMS, whose name as Manager of ANDMORE FORT RENTABLE, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Manager and with full authority executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the _____ day of _____, 2014.

_____
                                                NOTARY PUBLIC
[affix notarial seal]
My commission expires:
on the _____ day of _____, 2014.

STATE OF MISSISSIPPI
LINDA ANN CARVER
NOTARY PUBLIC
ID No. 27473
MY COMMISSION EXPIRES
APRIL 10, 2018
RANKIN COUNTY

- 15f -

_____

                                    GEORGE S. DENNIS, President

_____

                                    MARCO LAND & PETROLEUM, INC.

_____

                                    COSBY MARTIN, President

_____

                                    CARL HERRIN OIL AND GAS, LLC

_____

                                    CARL HERRIN, Manager

_____

                                    HORACE, LLC

_____

                                    SCOTT NOBLITT, Managing Member

_____

                                    SPANISH FORT ROYATY, LLC

_____

                                    CARL D. WILLIAMS, Manager

_____

STATE OF _____)
COUNTY/PARISH OF _____)

        I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A. BARLOW, whose name as President and Chief Operating Officer of SKLAR EXPLORATION COMPANY, L.L.C., is signed to the foregoing instrument and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such President and Chief Operating Officer and with full authority executed the same voluntarily on the _____ day of _____, 2014.

        Given under my hand and seal on this the _____ day of _____, 2014.


_____
                                    NOTARY PUBLIC
[affix notarial seal]
My commission expires: _____


STATE OF _____)
COUNTY/PARISH OF _____)

        I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that DAVID A. BARLOW, whose name as President and Chief Operating Officer of SKLARCO, L.L.C., is signed to the foregoing instrument and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such President and Chief Operating Officer and with full authority executed the same voluntarily on the _____ day of _____, 2014.

        Given under my hand and seal on this the _____ day of _____, 2014.


_____
                                    NOTARY PUBLIC
[affix notarial seal]
My commission expires: _____


STATE OF _____)
COUNTY/PARISH OF _____)

        I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that ROBERT P. BOWMAN, whose name as Manager of BUNDERO INVESTMENT COMPANY, L.L.C., is signed to the foregoing instrument and who is known to me, acknowledged before me that, being informed of the contents of said instrument, he, as such Manager and with full authority executed the same voluntarily on the _____ day of _____, 2014.

        Given under my hand and seal on this the _____ day of _____, 2014.


_____
                                    NOTARY PUBLIC
[affix notarial seal]
My commission expires: _____

before me on this day that, being informed of the contents of said instrument, he as such President and with full authority executed the same voluntarily on the day the same bears date.

    Given under my hand and official seal on this the _____ day of _____, 2014.

_____

_____
                                NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

on the _____ day of _____, 2014.

STATE OF _____ )
COUNTY/PARISH OF _____ )

    I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that COSBY MARTIN, whose name as President of MARCO LAND & PETROLEUM, INC., is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such President and with full authority executed the same voluntarily on the day the same bears date.

    Given under my hand and official seal on this the _____ day of _____, 2014.

_____
                                NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

STATE OF _____ )
COUNTY/PARISH OF _____ )

    I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that CARL HERRIN, whose name as Manager of CARL HERRIN OIL AND GAS, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Manager and with full authority executed the same voluntarily on the day the same bears date.

    Given under my hand and official seal on this the _____ day of _____, 2014.

_____
                                NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

on the _____ day of _____, 2014.

STATE OF _____ )
COUNTY/PARISH OF _____ )

    I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that SCOTT NOBLITT, whose name as Managing Member of HORACE, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Managing Member and with full authority executed the same voluntarily on the day the same bears date.

    Given under my hand and official seal on this the _____ day of _____, 2014.

_____
                                NOTARY PUBLIC

[affix notarial seal]

My commission expires: _____

on the _____ day of _____, 2014.

STATE OF _A l A b A m A_ )
COUNTY/PARISH OF _B A l d w i n_ )

    I, the undersigned authority, a Notary Public, in and for said State and County/Parish, hereby certify that CARL D. WILLIAMS, whose name as Manager of SPANISH FORT ROYALTY, LLC, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he as such Manager and with full authority executed the same voluntarily on the day the same bears date.

    Given under my hand and official seal on this the _10th_ day of _Oct_, 2014.

[seal: NOTARY PUBLIC — Dawn Marie Hudson — My Commission Expires June 24, 2018]

_Dawn Marie Hudson_
_____
                                NOTARY PUBLIC
_DAWN MARIE HUDSON_

[affix notarial seal]

My commission expires: _____

on the _24th_ day of _June_, ~~2014~~ 2018.

EXHIBIT "A"

Attached to and made a part of that certain Operating Agreement dated August 1, 2014 by and between SKLAR EXPLORATION COMPANY L.L.C., as Operator, and SKLARCO L.L.C. et al., as Non-Operators

1)    <u>Identification of lands subject to this agreement:</u>

Contract Area

TOWNSHIP 3 NORTH, RANGE 12 EAST
ESCAMBIA COUNTY, ALABAMA

Section 2: Southeast Quarter (SE/4).

**And being further described as all lands, oil and gas leasehold interest and oil and gas interests lying within the red boundary as shown on the plat designated as Exhibit "A-2".**

2)    <u>Restrictions, if any, as to depths, formations, or substances:</u>

There are no restrictions except as may be provided for in any lease or contract subject to this Operating Agreement.

3)    <u>Decimal Interest and names of Parties to this Agreement:</u>

a.    The following parties (who are sometimes referred to in this Exhibit "A", in the Operating Agreement to which this exhibit is attached and other exhibits thereto as the "Sklar Parties") own Oil, Gas and Mineral Leases 1 through 28 described under the heading "Sklar Leases" in Exhibit "A-1" in the following fractional interests:

| Owner | Interest |
|---|---|
| Bundero Investment Company, L.L.C. | 0.01000000 |
| Craft Exploration Company L.L.C. | 0.00750000 |
| Dickson Oil & Gas, LLC | 0.00875000 |
| Fant Energy Limited | 0.08750000 |
| Fleet Howell | 0.04000000 |
| JJS Interests Escambia, LLC | 0.18193750 |
| Kudzu Oil Properties, LLC | 0.01500000 |
| Landmark Exploration, LLC | 0.01500000 |
| Marksco, L.L.C. | 0.01750000 |
| McCombs Energy, Ltd. | 0.20250000 |
| Pickens Financial Group, LLC | 0.03750000 |
| Resource Ventures LLC | 0.00093750 |
| The Rudman Partnership | 0.09375000 |
| Sklarco, LLC | 0.24837500 |
| Tauber Exploration & Production Company | 0.01875000 |
| Tiembo Ltd. | 0.01500000 |

b.    Central Petroleum, Inc. owns Oil, Gas and Mineral Lease 29 described under the heading "Central Petroleum Lease" in Exhibit "A-1."

c.    Marco Land & Petroleum, Inc. owns Oil, Gas and Mineral Leases 30 through 32 described under the heading "Marco Leases" in Exhibit "A-1."

1

     d.    Initial billing and revenue interests will be based on the ownership information in a-c, above, and the title and survey information presently available to Operator.  Some of the interests shown above extend beyond seven decimal places but are rounded to the eighth decimal place in this exhibit; so, the lease ownership decimal interests shown above may not total to 1.0000000 due to rounding.

4)    Oil and gas lease and/or oil gas interests subject to this agreement:
    See Exhibit "A-1" Description of Leases.

5)    Addresses of parties for notice purposes:

Sklar Exploration Company L.L.C., Agent and Nominee for the Sklar Parties
401 Edwards Street, Suite 1601
Shreveport, Louisiana  71101

Sklarco, L.L.C.
401 Edwards Street, Suite 1601
Shreveport, Louisiana  71101

Bundero Investment Company, L.L.C.
333 Texas Street, Suite 300
Shreveport, Louisiana  71101

Craft Exploration Company L.L.C.
325 Lakeshire Parkway
Canton, Mississippi  39046

Dickson Oil & Gas, LLC
P.O. Box 52479
Shreveport, LA 71135

Fant Energy Limited
P.O. Box 55205
Houston, Texas  77255

Fleet Howell
416 Travis Street, Suite 715
Shreveport, Louisiana 71101

JJS Interests Escambia, LLC
4295 San Felipe, Suite 207
Houston, Texas  77027

Kudzu Oil Properties, LLC
300 Concourse Blvd., Suite 101
Ridgeland, Mississippi 39157

Landmark Exploration, LLC
P. O. Box 12004
Jackson, Mississippi  39236

Marksco, L.L.C.
333 Texas Street, Suite 1050
Shreveport, Louisiana 71101

McCombs Energy, Ltd.
5599 San Felipe Street, Suite 1200
Houston, Texas  77056-2721

2

Pickens Financial Group, LLC
10100 N. Central Expressway, Suite 200
Dallas, TX 75231-4159
Resource Ventures, LLC
8369 Southpark Lane, Suite B
Littleton, Colorado 80120

The Rudman Partnership
1700 Pacific Ave., Suite 4200
Dallas, Texas 75201-4620

Tauber Exploration & Production Company
55 Waugh Drive, Suite 600
Houston, Texas 77007

Tiembo Ltd.
P. O. Box 270415
Houston, Texas  77277-0415

Central Petroleum, Inc.
P.O. Box 2547
Madison, MS 39130

Marco Land & Petroleum, Inc.
2811 Keego Road
Brewton, AL 36426

3

EXHIBIT "A-1"

**Cedar Creek Land & Timber 2-9 #1 Well**

· Attached to and made a part of that certain Operating Agreement effective August 1, 2014 by and between SKLAR EXPLORATION COMPANY L.L.C. as Operator, and SKLARCO L.L.C. et al., as Non-Operators

**DESCRIPTION OF LEASES**

<u>SKLAR LEASES</u>

1. Oil, Gas and Mineral Lease with an effective date of December 1, 2013, by and between Cedar Creek Land & Timber, Inc., as Lessor, and Sklarco, L.L.C., as Lessee, a memorandum of which was recorded in Book 568, Page 806, of the Probate Records of Escambia County, Alabama.

2. Oil, Gas and Mineral Lease with an effective date of March 13, 2013, by and between Ben Kelly Strain, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 551, Page 960, of the Probate Records of Escambia County, Alabama.

3. Oil, Gas and Mineral Lease with an effective date of February 15, 2013, by and between Steve Frances O'Neal, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 557, Page 36, of the Probate Records of Escambia County, Alabama.

4. Oil, Gas and Mineral Lease with an effective date of February 15, 2013, by and between Caroline Frances O'Neal, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 551, Page 954, of the Probate Records of Escambia County, Alabama.

5. Oil, Gas and Mineral Lease with an effective date of February 15, 2013, by and between Robert H. O'Neal, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 551, Page 952, of the Probate Records of Escambia County, Alabama.

6. Oil, Gas and Mineral Lease with an effective date of February 15, 2013, by and between Gordon Kelley O'Neal, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 551, Page 957, of the Probate Records of Escambia County, Alabama.

7. Oil, Gas and Mineral Lease with an effective date of February 15, 2013, by and between Edwin Sanford, III, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 551, Page 946, of the Probate Records of Escambia County, Alabama.

8. Oil, Gas and Mineral Lease with an effective date of February 15, 2013, by and between Kelley Alford, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 551, Page 949, of the Probate Records of Escambia County, Alabama.

9. Oil, Gas and Mineral Lease with an effective date of February 15, 2013, by and between Mary H. Strain Family Trust, herein represented by Jane S. Blount, Trustee, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 552, Page 506, of the Probate Records of Escambia County, Alabama.

10. Oil, Gas and Mineral Lease with an effective date of June 24, 2014, by and between The Theodore B. Roby Trust, Established February 10, 1998, by Thomas C. Tolbert, Trustee, as Lessor, and Sklarco, L.L.C., as Lessee.

11. Oil, Gas and Mineral Lease with an effective date of March 29, 2013, by and between Karen A. Fulford, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 552, Page 506, of the Probate Records of Escambia County, Alabama.

12. Oil, Gas and Mineral Lease with an effective date of April 24, 2013, by and between Katherine Roby DuFrain, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 552, Page 506, of the Probate Records of Escambia County, Alabama.

1

13. Oil, Gas and Mineral Lease with an effective date of March 19, 2013, by and between John Robert Roby, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 552, Page 500, of the Probate Records of Escambia County, Alabama.

14. Oil, Gas and Mineral Lease with an effective date of March 19, 2013, by and between Richard Lombard, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 557, Page 915, of the Probate Records of Escambia County, Alabama.

15. Oil, Gas and Mineral Lease with an effective date of March 19, 2013, by and between Susan Lombard Wilkinson, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 554, Page 83, of the Probate Records of Escambia County, Alabama.

16. Oil, Gas and Mineral Lease with an effective date of March 19, 2013, by and between Sandra Ellis, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 552, Page 496, of the Probate Records of Escambia County, Alabama.

17. Oil, Gas and Mineral Lease with an effective date of March 19, 2013, by and between Carol Roberts, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 552, Page 498, of the Probate Records of Escambia County, Alabama.

18. Oil, Gas and Mineral Lease with an effective date of June 16, 2014, by and between Carse Casey Jackson, Jr., as Lessor, and Sklarco, L.L.C., as Lessee.

19. Oil, Gas and Mineral Lease with an effective date of March 19, 2013, by and between Janice Smith, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 552, Page 494, of the Probate Records of Escambia County, Alabama.

20. Oil, Gas and Mineral Lease with an effective date of June 24, 2014, by and between Samuel Alto Jackson, Jr., as Lessor, and Sklarco, L.L.C., as Lessee.

21. Oil, Gas and Mineral Lease with an effective date of March 19, 2013, by and between Foster F. Fountain, III, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 552, Page 492, of the Probate Records of Escambia County, Alabama.

22. Oil, Gas and Mineral Lease with an effective date of March 19, 2013, by and between Sarah Russell Tate, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 554, Page 81, of the Probate Records of Escambia County, Alabama.

23. Oil, Gas and Mineral Lease with an effective date of May 8, 2013, by and between James C. Roby, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 555, Page 139, of the Probate Records of Escambia County, Alabama.

24. Oil, Gas and Mineral Lease with an effective date of March 19, 2013, by and between Syble LaJune White, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 554, Page 77, of the Probate Records of Escambia County, Alabama.

25. Oil, Gas and Mineral Lease with an effective date of June 27, 2014, by and between Lovelace Properties, L.L.C., as Lessor, and Sklarco, L.L.C., as Lessee.

26. Oil, Gas and Mineral Lease executed on or about July 15, 24, and 25, 2014, by and between The Estate of Thomas E. McMillan, as Lessor, and Sklarco, L.L.C., as Lessee.

27. Oil, Gas and Mineral Lease executed on or about July 21, 2014, by and between Cindy Calvert Hayes, as Lessor, and Sklarco, L.L.C., as Lessee.

28. Oil, Gas and Mineral Lease with an effective date of June 23, 2014, by and between James Timothy Calvert, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Book 578, Page 741, of the Probate Records of Escambia County, Alabama.

2

**CENTRAL PETROLEUM LEASE**

29. Oil, Gas and Mineral Lease with an effective date of May 23, 2013, by and between Lenis Holley and A.F. Holley, Jr., individually and as Co-Trustees of the A.F. Holley, Sr. Trust, as Lessor, and Central Petroleum, Inc., as Lessee, recorded in Book 556, Page 183, of the Probate Records of Escambia County, Alabama.

**MARCO LEASES**

30. Oil, Gas and Mineral Lease with an effective date of February 15, 2013, by and between John Cleveland Lovelace, as Lessor, and Marco Land & Petroleum, Inc., as Lessee, recorded in Book 557, Page 109, of the Probate Records of Escambia County, Alabama.

31. Oil, Gas and Mineral Lease with an effective date of February 25, 2013, by and between William Yancy Lovelace, as Lessor, and Marco Land & Petroleum, Inc., as Lessee, recorded in Book 557, Page 111, of the Probate Records of Escambia County, Alabama.

32. Oil, Gas and Mineral Lease with an effective date of February 18, 2013, by and between Hester Lovelace Gordon, as Lessor, and Marco Land & Petroleum, Inc., as Lessee, recorded in Book 557, Page 107, of the Probate Records of Escambia County, Alabama.

**INSOFAR AND ONLY INSOFAR AS SAID OIL, GAS AND MINERAL LEASES COVER ACREAGE LYING WITHIN THE SOUTHEAST QUARTER (SE/4) OF SECTION 2, TOWNSHIP 3 NORTH, RANGE 12 EAST, ESCAMBIA COUNTY, ALABAMA.**

3

EXHIBIT "A-2"

Attached to and made part of that certain Operating Agreement effective August 1, 2014, by and between SKLAR EXPLORATION COMPANY L.L.C., as Operator, and SKLARCO, L.L.C., *et al.*, as Non-Operators



EXHIBIT "B"

Producers 88 (9/70)—Paid Up (SF 4-75)
With Pooling Provision
Mississippi-Alabama-Florida

HEDERMAN BROS., RIDGELAND, MS

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this ______ day of ______ 20 ____, between

______

______

______

______

lessor (whether one or more), whose address is: ______

and ______, lessee, WITNESSETH:

1. Lessor, in consideration of ______ Dollars, receipt of which is hereby acknowledged, and of the covenants and agreements of lessee hereinafter contained, does hereby grant, lease and let unto lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas (including carbon dioxide), sulphur and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, power lines, telephone lines, employee houses and other structures on said land, necessary or useful in lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any other land adjacent thereto. The land covered hereby, herein called "said land", is located in the County of ______, State of ______, and is described as follows:

This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain ______ acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights, and options hereunder.

2. Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of ten (10) years from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3. As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipe line to which lessee may connect its wells, the equal one-eighth part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such one-eighth part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear one-eighth of the cost of treating oil to render it marketable pipe line oil; (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, one-eighth of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of one-eighth of such gas and casinghead gas; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one-tenth either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing gas or any other mineral covered hereby, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this sub-paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, or may be deposited to such parties credit in the ______ Bank ______

at ______, or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownerships thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4. Lessee is hereby granted the right, at its option, to pool or unitize all or any part of said land and of this lease as to any or all minerals or horizons thereunder, with other lands, lease or leases, or portion or portions thereof, or mineral or horizon thereunder, so as to establish units containing not more than 80 surface acres plus 10% acreage tolerance; provided, however, a unit may be established or an existing unit may be enlarged to contain not more than 640 acres plus 10% acreage tolerance, if unitized only as to gas or only as to gas and liquid hydrocarbons (condensate) which are not a liquid in the subsurface reservoir. If larger units are required, under any governmental rule or order, for the drilling or operation of a well at a regular location, or for obtaining maximum allowable, from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged, to conform to the size required by such governmental order or rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of said options may be exercised by lessee from time to time, and whether before or after production has been established either on said land or on the portion of said land included in the unit or on other land unitized therewith and any such unit may include any well to be drilled, being drilled or already completed. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be land or mineral, royalty or leasehold interests in land within the unit which are not pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted under this lease. There shall be allocated to the land covered by this lease included in any such unit that proportion of the total production of unitized minerals from wells in the unit, after deducting any used in lease or unit operations, which the number of surface acres in the land covered by this lease included in the unit bears to the total number of surface acres in the unit. The production so allocated shall be considered for all purposes, including the payment or delivery of royalty, overriding royalty, and any other payments out of production, to be the entire production of unitized minerals from the portion of said land covered hereby and included in such unit in the same manner as though produced from said land under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of such unit shall not have the effect of changing the ownership of any shut-in production royalty which may become payable under this lease. Neither shall it impair the right of lessee to release from this lease all or any portion of said land, except that lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are released as to lands within the unit. Lessee may dissolve any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. A unit may be so established, modified or dissolved during the life of this lease.

5. Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations as to the released acreage or interest.

6. This is a PAID-UP LEASE. In consideration of the down cash payment, Lessor agrees that Lessee shall not be obligated except as otherwise provided herein, to commence or continue any operations during the primary term. Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

7. Lessee shall have the use, free from royalty, of water, other than from lessor's water wells, and of oil and gas produced from said land in all operations hereunder. Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing. No well shall be drilled nearer than 200 feet to the house or barn now on said land without the consent of the lessor. Lessee shall pay for damages caused by its operations to growing crops and timber on said land.

## EXHIBIT "B", continued

8. The rights and estate of any party hereto may be assigned from time to time in whole or in part and as to any mineral or horizon. All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns. No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of lessee, including, but not limited to, the location and manner of drilling of wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof of or to lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by lessor or lessor's heirs, successors, or assigns, notice of such change or division, supported by either original or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of the death of the owner, lessee may, nevertheless, pay or tender such royalties, or other moneys, or part thereof, to the credit of the deceased or his estate in a depository bank provided for above.

9. In the event lessor considers that lessee has not complied with all its obligations hereunder, both express and implied, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor. The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee. Neither the service of said notice nor the doing of any acts by lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that lessee has failed to perform all its obligations hereunder. Should it be asserted in any notice given to the lessee under the provisions of this paragraph that lessee has failed to comply with any implied obligation or covenant hereof, this lease shall not be subject to cancellation for any such cause except after final judicial ascertainment that such failure exists and lessee has then been afforded a reasonable time to prevent cancellation by complying with and discharging the obligations as to which lessee has been judicially determined to be in default. If this lease is cancelled for any cause, it shall nevertheless remain in force and effect as to (1) sufficient acreage around each well as to which there are operations to constitute a drilling or maximum allowable unit under applicable governmental regulations, (but in no event less than forty (40) acres), such acreage to be designated by lessee as nearly as practicable in the form of a square centered at the well, or in such shape as then existing spacing rules require; and (2) any part of said land included in a pooled unit on which there are operations. Lessee shall also have such easements on said land as are necessary to operations on the acreage so retained.

10. Lessor hereby warrants and agrees to defend title to said land against the claims of all persons whomsoever. Lessor's rights and interests hereunder shall be charged primarily with any mortgage, taxes or other lien, or interest and other charges on said land, but lessor agrees that lessee shall have the right at any time to pay or reduce same for lessor, either before or after maturity, and be subrogated to the rights of the holder thereof and to deduct amounts so paid from royalties or other payments payable or which may become payable to lessor and/or assigns under this lease. Lessee is hereby given the right to acquire for its own benefit, deeds, leases, or assignments covering any interest or claim in said land which lessee or any other party contends is outstanding and not covered hereby and even though such outstanding interest or claim be invalid or adverse to lessor. If this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether lessor's interest is herein specified or not), or no interest therein, then the royalties, and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee. All royalty interest covered by this lease (whether or not owned by lessor) shall be paid out of the royalty herein provided. This lease shall be binding upon each party who executes it without regard to whether it is executed by all those named herein as lessor.

11. If, while this lease is in force, at, or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and lessee is not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delay had not occurred.

12. Within thirty (30) days prior to the expiration of the primary term of this lease, or if operations are being conducted on said lease or land pooled therewith at the expiration of the primary term in such manner as to maintain this lease in force, within thirty (30) days after the completion of a dry hole resulting from such operations, lessee may extend the primary term of this lease as to all or any part of acreage then covered hereby, for an additional five (5) years beyond the initial primary term, by written notification of action taken to lessor or to lessor's successor in interest as evidenced by notice to lessee pursuant to Paragraph 8 hereof, or to the credit of lessor or such successor in interest in any depository bank named herein or

in any mandatory instrument in the sum of _____ for each net acre as to which the lease is so extended. If this option is exercised by lessee, the lease so extended will thereafter be treated as if the original primary term had been five (5) years longer.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

_____     _____ (SEAL)

_____     _____ (SEAL)

_____     _____ (SEAL)

### JOINT OR SINGLE ACKNOWLEDGMENT
### (MISSISSIPPI-ALABAMA-FLORIDA)

STATE OF _____

COUNTY OF _____

I hereby certify, that on this day, before me, a _____

duly authorized in the state and county aforesaid to take acknowledgments, personally appeared _____

to me known to be the person _____ described in and who executed the foregoing instrument and _____ he _____ acknowledged before me that, being informed of the contents of the same, _____ he _____ voluntarily signed and delivered the within and foregoing instrument on the day and year therein mentioned.

Given under my hand and official seal, this _____ day of _____ A.D., 20 ____

(Affix Seal)

_____
(Title of Official)

My commission expires _____     in and for _____ County, _____

### WITNESS ACKNOWLEDGMENT
### (MISSISSIPPI-ALABAMA-FLORIDA)

STATE OF _____

COUNTY OF _____

I, a _____ in and for the aforesaid jurisdiction, hereby certify that _____

a subscribing witness to the foregoing instrument, known to me, appeared before me on this day, and being sworn, stated that _____

the grantor(s), having been informed of the contents thereof, voluntarily executed and delivered the same in his presence, and in the presence of the other subscribing witness, on the day the same bore date; that he attested the same in the presence of the grantor(s), and of the other witness, and that such other witness subscribed his name as a witness in his presence.

_____
(Subscribing Witness)

Given under my hand and official seal, this _____ day of _____ 20 ____

(Affix Seal)

_____
(Title of Official)

My commission expires _____     in and for _____ County, _____



<div style="text-align:right">COPAS 2005 Accounting Procedure<br/>Recommended by COPAS</div>

c o p a s

### Exhibit " C "
## ACCOUNTING PROCEDURE
## JOINT OPERATIONS

1   Attached to and made part of _that certain Operating Agreement dated August 1, 2014 by and between Sklar Exploration Company_
2   _L.L.C., as Operator, and Sklarco, L.L.C., et al., as non-operators_
3
4
5
6                                        **I. GENERAL PROVISIONS**
7
8   IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE
9   COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE
10  BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.
11
12  IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE
13  PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT
14  FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT
15  OF THE PARTIES IN SUCH EVENT.
16
17  **1.   DEFINITIONS**
18
19      All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:
20
21      "**Affiliate**" means for a person, another person that controls, is controlled by, or is under common control with that person. In this
22      definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities
23      of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an
24      individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.
25
26      "**Agreement**" means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting
27      Procedure is attached.
28
29      "**Controllable Material**" means Material that, at the time of acquisition or disposition by the Joint Account, is so classified
30      in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).
31
32      "**Equalized Freight**" means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest
33      Railway Receiving Point to the property.
34
35      "**Excluded Amount**" means a specified excluded trucking amount most recently recommended by COPAS.
36
37      "**Field Office**" means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is
38      to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable
39      field personnel.
40
41      "**First Level Supervision**" means those employees whose primary function in Joint Operations is the direct oversight of the Operator's
42      field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may
43      include, but are not limited to:
44
45          •  Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance,
46             construction, well remedial work, equipment movement and drilling
47          •  Responsibility for day-to-day direct oversight of rig operations
48          •  Responsibility for day-to-day direct oversight of construction operations
49          •  Coordination of job priorities and approval of work procedures
50          •  Responsibility for optimal resource utilization (equipment, Materials, personnel)
51          •  Responsibility for meeting production and field operating expense targets
52          •  Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental
53             part of the supervisor's operating responsibilities
54          •  Responsibility for all emergency responses with field staff
55          •  Responsibility for implementing safety and environmental practices
56          •  Responsibility for field adherence to company policy
57          •  Responsibility for employment decisions and performance appraisals for field personnel
58          •  Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group
59             or team leaders.
60
61      "**Joint Account**" means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be
62      shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.
63
64      "**Joint Operations**" means all operations necessary or proper for the exploration, appraisal, development, production, protection,
65      maintenance, repair, abandonment, and restoration of the Joint Property.
66

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

1

**c o p a s**

1    "**Joint Property**" means the real and personal property subject to the Agreement.
2
3    "**Laws**" means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other
4    governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions
5    contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted,
6    promulgated or issued.
7
8    "**Material**" means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.
9
10    "**Non-Operators**" means the Parties to the Agreement other than the Operator.
11
12    "**Offshore Facilities**" means platforms, surface and subsea development and production systems, and other support systems such as oil and
13    gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping,
14    heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of
15    offshore operations, all of which are located offshore.
16
17    "**Off-site**" means any location that is not considered On-site as defined in this Accounting Procedure.
18
19    "**On-site**" means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of
20    Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other
21    facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.
22
23    "**Operator**" means the Party designated pursuant to the Agreement to conduct the Joint Operations.
24
25    "**Parties**" means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as
26    "Party."
27
28    "**Participating Interest**" means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees,
29    or is otherwise obligated, to pay and bear.
30
31    "**Participating Party**" means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of
32    the costs and risks of conducting an operation under the Agreement.
33
34    "**Personal Expenses**" means reimbursed costs for travel and temporary living expenses.
35
36    "**Railway Receiving Point**" means the railhead nearest the Joint Property for which freight rates are published, even though an actual
37    railhead may not exist.
38
39    "**Shore Base Facilities**" means onshore support facilities that during Joint Operations provide such services to the Joint Property as a
40    receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication,
41    scheduling and dispatching center; and other associated functions serving the Joint Property.
42
43    "**Supply Store**" means a recognized source or common stock point for a given Material item.
44
45    "**Technical Services**" means services providing specific engineering, geoscience, or other professional skills, such as those performed by
46    engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint
47    Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second
48    paragraph of the Introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-
49    Operator, Non-Operator Affiliates, and/or third parties.
50
51   2.    STATEMENTS AND BILLINGS
52
53    The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the
54    preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all
55    charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified
56    and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications.
57    Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.
58
59    The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances*
60    *and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper
61    copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and
62    bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of
63    weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via
64    email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings
65    electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written
66    notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

2

ⓒ
c o p a s

**3.   ADVANCES AND PAYMENTS BY THE PARTIES**

A.   Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B.   Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1)   being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

(2)   being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

(3)   being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

(4)   charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

**4.   ADJUSTMENTS**

A.   Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B.   All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1)   a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

(2)   an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

(3)   a government/regulatory audit, or

(4)   a working interest ownership or Participating Interest adjustment.

**5.   EXPENDITURE AUDITS**

A.   A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

3

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B. The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C. The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D. If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operators participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have reasonable efforts at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E. ☐ *(Optional Provision — Forfeiture Penalties)*
If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.

6. APPROVAL BY PARTIES

A. GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

4

**c o p a s**

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration when a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

**B.   AMENDMENTS**

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____ (_____) or more Parties, one of which is the Operator, having a combined working interest of at least _____ percent (_____%), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

**C.   AFFILIATES**

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

**1.   RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

**2.   LABOR**

A.   Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1)   Operator's field employees directly employed On-site in the conduct of Joint Operations.

(2)   Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section I.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3)   Operator's employees providing First Level Supervision,

(4)   Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5)   Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B.   Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

5

**c o p a s**

D. Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E. Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section 1.6.A (*General Matters*).

F. Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G. Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H. Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3. **MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (*Material Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4. **TRANSPORTATION**

A. Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B. Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

   (1) If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property. The Operator shall consistently apply the selected alternative.

   (2) If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5. **SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6. **EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A. The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____ percent (_____%) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

c o p a s

equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismemberment. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

7.   **AFFILIATES**

A.   Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $_____. If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B.   For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $_____ in a given calendar year.

C.   The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

8.   **DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

9.   **LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

10.   **TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

(C)
c o p a s

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A. (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

## 11. INSURANCE

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

## 12. COMMUNICATIONS

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

## 13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration,  and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

## 14. ABANDONMENT AND RECLAMATION

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

## 15. OTHER EXPENDITURES

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

## III. OVERHEAD

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are  jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)
8



c o p a s

- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site Inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

1. **OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

   As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

   ☑ (Alternative 1)  Fixed Rate Basis, Section III.1.B.
   ☐ (Alternative 2)  Percentage Basis, Section III.1.C.

   A. **TECHNICAL SERVICES**

      (i) Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section 1.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for On-site Technical Services, including third party Technical Services:

         ☑ (Alternative 1 – Direct) shall be charged <u>direct</u> to the Joint Account.

         ☐ (Alternative 2 – Overhead) shall be covered by the <u>overhead</u> rates.

      (ii) Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section 1.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for Off-site Technical Services, including third party Technical Services:

         ☐ (Alternative 1 – All Overhead) shall be covered by the <u>overhead</u> rates.

         ☑ (Alternative 2 – All Direct) shall be charged <u>direct</u> to the Joint Account.

         ☐ (Alternative 3 – Drilling Direct) shall be charged <u>direct</u> to the Joint Account, <u>only</u> to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

   Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

   B. **OVERHEAD—FIXED RATE BASIS**

      (1) The Operator shall charge the Joint Account at the following rates per well per month:

         Drilling Well Rate per month $ 10,000.00 _____ (prorated for less than a full month)

         Producing Well Rate per month $ 1,000.00 _____

      (2) Application of Overhead—Drilling Well Rate shall be as follows:

         (a) Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

9

**c o p a s**

(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work-days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead—Producing Well Rate shall be as follows:

(a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e) Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4) The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

C. OVERHEAD—PERCENTAGE BASIS

(1) Operator shall charge the Joint Account at the following rates:

(a) Development Rate _____ percent (_____) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (*Legal Expense*) and all Material salvage credits.

(b) Operating Rate _____ percent (_____%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead—Percentage Basis shall be as follows:

(a) The Development Rate shall be applied to all costs in connection with:

[i] drilling, redrilling, sidetracking, or deepening of a well
[ii] a well undergoing plugback or workover operations for a period of five (5) or more consecutive work-days
[iii] preliminary expenditures necessary in preparation for drilling
[iv] expenditures incurred in abandoning when the well is not completed as a producer
[v] construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead-Major Construction and Catastrophe*).

(b) The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead-Major Construction and Catastrophe*).

2. OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

10



Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.   If the Operator absorbs the engineering, design and drafting costs related to the project:

   (1)   _____5_____ % of total costs if such costs are less than $100,000; plus

   (2)   _____2_____ % of total costs in excess of $100,000 but less than $1,000,000; plus

   (3)   _____1_____ % of total costs in excess of $1,000,000.

B.   If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

   (1)   _____5_____ % of total costs if such costs are less than $100,000; plus

   (2)   _____2_____ % of total costs in excess of $100,000 but less than $1,000,000; plus

   (3)   _____1_____ % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

3.   AMENDMENT OF OVERHEAD RATES

   The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

1.   DIRECT PURCHASES

   Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

© copas

2.   TRANSFERS

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

A.   PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1)   Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

(a)   For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

(b)   For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2)   Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3)   Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4)   As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

B.   FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1)   Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2)   Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3)   Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4)   Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

C.   TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

**c o p a s**

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

D.    CONDITION

(1)    Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2)    Condition "B" -- Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)    Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)    Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section I.6.A (*General Matters*).

(5)    Condition "E" – Junk shall be priced at prevailing scrap value prices.

E.    OTHER PRICING PROVISIONS

(1)    Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2)    Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

13

**c o p a s**

### 3.   DISPOSITION OF SURPLUS

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

### 4.   SPECIAL PRICING PROVISIONS

#### A.   PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

#### B.   SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

#### C.   MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

### V.  INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

14

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**c o p a s**

1. **DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A. A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B. Actual transportation costs and Personal Expenses for the inventory team.

C. Reasonable charges for report preparation and distribution to the Non-Operators.

2. **NON-DIRECTED INVENTORIES**

A. OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B. NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C. SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

15

## EXHIBIT "D"

Attached to and made a part of that certain Joint Operating Agreement effective as of August 1, 2014, by and between SKLAR EXPLORATION COMPANY L.L.C., as Operator, and SKLARCO L.L.C., *et al.*, as Non-Operators

### INSURANCE

Operator shall carry the following insurance with the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of insurance will be provided upon request.

### I.   WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

Workers' Compensation Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

Employers Liability Insurance coverage at limits of $1,000,000 each accident for bodily injury by accident/$1,000,000 policy limit for bodily injury by disease/$1,000,000 each employee for bodily injury by disease.

### II.   COMPREHENSIVE GENERAL LIABILITY

Coverage for all operations conducted hereunder by Operator for the Joint Account with limits of $1,000,000 per occurrence/$2,000,000 general aggregate for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

### III.   AUTOMOBILE LIABILITY

Coverage shall include owned, non-owned and hired vehicles. Limit $1,000,000 combined single limit each occurrence for bodily injury and property damage.

### IV.   EXCESS LIABILITY

Operator shall carry excess liability insurance in an amount not less than $20,000,000.

### V.   EXTRA EXPENSE LIABILITY

Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $200,000 per occurrence.

Liability Limit: $10,000,000

### VI.   OIL LEASE PROPERTY

Oil Lease Property Insurance (Inland Marine) covering tanks, pumps, machinery, pipe and similar equipment of a mobile nature usual to the operation of a producing oil or gas well and crude oil while contained in tanks with limit of not less than $10,000,000 and subject to a deductible of $5,000.

### VII.   ADDITIONAL INSURANCE

Operator shall be entitled to carry or provide any additional insurance for the benefit of the Joint Account, which is of direct benefit to the joint property and is incurred by the Operator in the necessary and proper conduct of the joint operations. The premium for all such insurance so carried shall be paid by Operator and charged to the Joint Account. Operator shall, at any time requested, furnish Non-Operator with information concerning the kind, character and amounts of insurance carried.

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder. Further, any party, at its own expense, may carry its own coverage for Extra Expense Liability Insurance with limits as set forth in Section V, above. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

EXHIBIT "E"

Attached to and made a part of that certain Operating Agreement effective August 1, 2014 by and between SKLAR EXPLORATION COMPANY L.L.C., as Operator, and SKLARCO L.L.C. et al., as Non-Operators

GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement, the parties hereto own and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area described in the Operating Agreement (the "JOA").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the gas produced from said JOA. However, one or more of the parties may be unable to take or market its interest in the gas production from time to time; therefore, to permit any party to produce and dispose of its interest in the gas production from the JOA with as much flexibility as possible, the parties hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser. Any party whose share of gas is not marketed shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ration of its participation percentage under this Operating Agreement to the participating percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, it any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Operator will, in turn, make settlement for all royalties and overriding royalties which are payable on gas produced from the Contract Area. In the event that the total royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Contract Area, then any such deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Contract Area shall furnish the Operator with division order title opinions on which Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser shall pay, or cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the volume of gas actually taken for its account.

--1--

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold, less applicable production taxes and royalties theretofore paid, less any reasonable dehydration, compression, treating, processing, gathering or transportation costs actually incurred, including amortized capital costs associated with the design, construction or operation of any plants to dehydrate, compress, treat or process gas, in connection with the sale of the overproduction, at the price and based on the proceeds actually received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party). Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.

--2--