# UNIT OPERATING AGREEMENT
## NORTHWEST BROOKLYN OIL UNIT
## BROOKLYN FIELD
## CONECUH COUNTY, ALABAMA

**THIS AGREEMENT**, entered into as of the 12ᵗʰ day of March , 2018, by the parties who have signed the original of this instrument, a counterpart thereof, or other instrument ratifying and agreeing to be bound by the provisions hereof (hereinafter referred to as the "parties hereto");

## WITNESSETH:

**WHEREAS**, the parties hereto as Working Interest Owners have executed, as of the date hereof, an agreement entitled "Unit Agreement, Northwest Brooklyn Oil Unit, Brooklyn Field, Conecuh County, Alabama," herein referred to as "Unit Agreement," which, among other things, provides for a separate agreement to be entered into by Working Interest Owners to provide for the development and operation of the Unit Area as therein defined;

**NOW, THEREFORE**, in consideration of the mutual agreements herein set forth, it is agreed as follows:

## ARTICLE 1

## CONFIRMATION OF UNIT AGREEMENT

1.1    CONFIRMATION OF UNIT AGREEMENT. The Unit Agreement is hereby confirmed and by reference made a part of this Agreement. The definitions in the Unit Agreement are adopted for all purposes of this Agreement. If there is some conflict between the Unit Agreement and this Agreement, the Unit Agreement shall govern.

## ARTICLE 2

## EXHIBITS

2.1    EXHIBITS. The following exhibits are incorporated herein by reference:

2.1.1    EXHIBITS "A," "B," "C-1," "C-2," C-3," "C-4", "C-5," "D," and "E" of the Unit Agreement.

2.1.2   EXHIBIT "F," attached hereto, which is the Accounting Procedure applicable to Unit Operations.  If there is any conflict between this Agreement and Exhibit "F," this Agreement shall govern.

2.1.3   EXHIBIT "G," attached hereto, which contains insurance provisions applicable to Unit Operations.

2.1.4   EXHIBIT "H," attached hereto, which is a Gas Balancing Agreement applicable to Unit Operations.

2.2   REVISION OF EXHIBITS.  Whenever Exhibits "A," "B," "C-1," "C-2," C-3," "C-4," "C-5," and "D" are revised, Exhibit "E" shall be revised accordingly and be effective as of the same date.

2.2.1   CORRECTION OF EXHIBITS. If it subsequently appears that any mechanical miscalculation or clerical error has been made or if subsequently discovered data renders any Exhibit incorrect, the Working Interest Owners shall correct the mistake by revising the Exhibits to conform to the facts.

## ARTICLE 3

### SUPERVISION OF OPERATIONS
### BY WORKING INTEREST OWNERS

3.1   OVERALL SUPERVISION. Working Interest Owners shall exercise overall supervision and control of all matters pertaining to Unit Operations pursuant to this Agreement and the Unit Agreement.  In the exercise of such authority, each Working Interest Owner shall act solely in its own behalf in the capacity of an individual owner and not on behalf of the owners as an entirety; provided, however, that nothing herein shall prevent one or more Working Interest Owners from appointing someone or some entity (which may be another Working Interest Owner or a third party) to act on behalf of such Working Interest Owner(s) in any or all matters relating to this Agreement.

3.2   SPECIFIC AUTHORITIES AND DUTIES.  The matters with respect to which the Working Interest Owners shall decide and take action shall include, but not be limited to, the following:

3.2.1   METHOD OF OPERATION.   The method of operation, including any type of pressure maintenance, secondary recovery, or other recovery program to be employed.

3.2.2   DRILLING OF WELLS.  The drilling of any well whether for production of Unitized Substances, for use as an injection well, or for other purposes.

2

3.2.3    WELL COMPLETIONS, RECOMPLETIONS AND CHANGE OF STATUS.
The completion of any well drilled under the terms of Article 3.2.2 above, recompletion, abandonment, plugging or change of status of any well, or the use of any well for injection or other purposes.

3.2.4    EXPENDITURES.    The making of any single expenditure in excess of Fifty Thousand Dollars ($50,000.00) except in connection with a well, the drilling, re-working, deepening completing, re-completing or plugging back of which has been previously authorized by or pursuant to this Agreement.

3.2.5    DISPOSITION OF UNIT EQUIPMENT.  The selling or otherwise disposing of any major item of surplus or obsolete Unit Equipment, if the current list price of new equipment similar thereto is Thirty Thousand Dollars ($30,000.00) or more.

3.2.6    APPEARANCE BEFORE A COURT OR REGULATORY AGENCY.    The designating of a representative to appear before any court or regulatory agency, in matters pertaining to Unit Operations; provided that such designation shall not prevent any Working Interest Owner from appearing in person or from designating another representative in its own behalf.

3.2.7    AUDITS. The auditing of the accounts of Unit Operator pertaining to Unit Operations hereunder; however, the audits shall

(a)    not be conducted more than once each year except upon the resignation or removal of Unit Operator, and

(b)    be made upon the approval of the owner or owners of a majority of Working Interest other than that of Unit Operator, at the expense of all Working Interest Owners, or

(c)    be made at the expense of those Working Interest Owners requesting such audit, if owners of less than a majority of Working Interest, other than that of Unit Operator, request such an audit, and

(d)    be made upon not less than thirty (30) days' written notice to Unit Operator and all Working Interest Owners, and

(e)    be otherwise governed by the provisions of Article 1, paragraph 5 of Exhibit "F."

3.2.8    INVENTORIES.  The taking of periodic inventories under the terms of Exhibit "F."

3

3.2.9   TECHNICAL SERVICES.   The authorizing of charges to the joint account for services by consultants or Unit Operator's technical personnel not otherwise provided by this Agreement or covered by the overhead charges provided by Exhibit "F" when such charges are reasonably expected to exceed Thirty thousand dollars ($30,000) for a single project.

3.2.10  ASSIGNMENT TO COMMITTEES.   The appointment of committees to study any problems in connection with Unit Operations.

3.2.11  REMOVAL OF UNIT OPERATOR. The removal of Unit Operator and the selection of a successor as provided in Section 6.2.

3.2.12  ENLARGEMENT OF UNIT AREA.  The enlargement of the Unit Area.

3.2.13  INVESTMENT ADJUSTMENT. The adjustment and re-adjustment of investments.

3.2.14  INJECTION OF ANY SUBSTANCE.   The injection of any substance into the Unitized Interval, including, but not limited to, water and/or gas either produced from the Unitized Interval or purchased from a party hereto or any third party.

3.2.15  The termination of the Unit Agreement.

## ARTICLE 4

### MANNER OF EXERCISING SUPERVISION

4.1     DESIGNATION OF REPRESENTATIVES.  Each Working Interest Owner shall, in writing, inform Unit Operator of the name and address of its representative who is authorized to represent and bind such Working Interest Owner with respect to Unit Operations.  Each Working Interest Owner may also designate, in writing, alternate(s) who is/are authorized to bind each Working Interest Owner with respect to Unit Operations.  The representative or alternate(s) may be changed from time to time by written notice to Unit Operator.

4.2     MEETINGS.  All meetings of Working Interest Owners shall be called by Unit Operator upon its own motion or at the request of one or more Working Interest Owners having a combined Unit Participation totaling not less than Twenty-Five Percent (25%).  If Unit Operator fails to call a meeting of the Working Interest Owners for a period of ten (10) days after having been requested to do so by one or more of the Working Interest Owners, any one of such Working Interest Owners who requested a meeting may call the same.   Unless otherwise agreed upon by the Working Interest Owners, no meeting shall be called on less than ten (10) days' advance written notice, with agenda attached.  Working Interest Owners attending the meeting and having a combined voting

4

interest sufficient to determine a matter may amend items included in the agenda and may act upon an amended item or other items presented at the meeting. The representative of Unit Operator shall be chairman of each meeting, except any meeting called by a Working Interest Owner following Unit Operator's failure to call a requested meeting as hereinabove provided, and at such meeting the representative of the Working Interest Owner calling the meeting shall be chairman. Meetings shall be held at the time and place stipulated in the notice calling the meeting.

4.3     VOTING PROCEDURES. Working Interest Owners shall decide all matters coming before them as follows:

4.3.1     VOTING INTEREST. Each Working Interest Owner shall have a voting interest equal to its Unit Participation (cost bearing) at the time of the vote.

4.3.2     VOTE REQUIRED - GENERALLY. Unless otherwise provided herein or in the Unit Agreement, Working Interest Owners shall determine all matters by the affirmative vote of three (3) or more Working Interest Owners having a combined voting interest, based on Unit Participation, of at least Sixty-Six and Two-Thirds Percent (66 2/3%).

4.3.3     VOTE AT MEETING BY NON-ATTENDING WORKING INTERESTOWNER.

Any Working Interest Owner who is not represented at a meeting may vote by letter, facsimile, or email addressed to the representative of the Unit Operator if its vote is received prior to the vote on the item.

4.3.4     POLL VOTES. Working Interest Owners may vote on and decide, by letter, facsimile, or email, any matter submitted in writing to Working Interest Owners, if no meeting is requested, as provided in Article 4.2, within fifteen (15) days after the proposal is received by Working Interest Owners. Any notice given by facsimile shall be deemed received once same is properly transmitted. If a drilling rig is on location, notice of any proposal concerning the further use of said rig on location may be given by facsimile, email or by telephone and the response period shall be limited to twenty-four (24) hours, inclusive of Saturday, Sunday and legal holidays. Any notice given by telephone shall be promptly confirmed in writing by letter, email or by facsimile. The failure of any Working Interest Owner to timely reply within said period to any such submittal shall be conclusively construed as a negative vote by such Working Interest Owner. Unit Operator will give prompt notice of the results of the voting to all Working Interest Owners.

5

4.3.5    BINDING EFFECT OF VOTE.  All Working Interest Owners shall be bound for their proportionate share of all costs and expenses of Unit Operations which have been approved by the vote of Working Interest Owners required by Article 4.3.2 herein.

# ARTICLE 5

## INDIVIDUAL RIGHTS OF WORKING INTEREST OWNERS

5.1    RESERVATION OF RIGHTS.   Working Interest Owners severally reserve to themselves all their rights, except as otherwise provided in this Agreement and the Unit Agreement.

5.2    SPECIFIC RIGHTS.  Each Working Interest Owner shall have, among others, the following specific rights.

5.2.1    ACCESS TO UNIT AREA.  Access to the Unit Area at all reasonable times at its sole risk, to inspect Unit Operations, all wells, equipment and facilities and the records and data pertaining thereto.

5.2.2    REPORTS.  The right to receive from Unit Operator, upon written request, copies of all reports to any governmental agency, monthly reports of crude oil runs and stocks, inventory reports, and all other information pertaining to the Unit Operations.  The cost of gathering and furnishing information not ordinarily furnished by Unit Operator to all Working Interest Owners shall be charged to the Working Interest Owner who requests the information.

# ARTICLE 6

## UNIT OPERATOR

6.1    INITIAL UNIT OPERATOR.  Pruet Production Co. is hereby designated as initial Unit Operator.

6.2    RESIGNATION OR REMOVAL.  Unit Operator may resign at any time.  Working Interest Owners may remove Unit Operator at any time by the affirmative vote of at least Sixty-Six and Two-Thirds Percent (66 2/3%) of the voting interest, based on Unit Participation, in the manner specified in Paragraph 4.3.2 hereof.  A Unit Operator who resigns or is removed shall not be released from its obligations hereunder for a period of three (3) months after the resignation or discharge, unless a successor Unit Operator has taken over Unit Operations prior to the expiration of such period.

6.3    SELECTION OF SUCCESSOR.  Upon the resignation or removal of a Unit Operator, a successor Unit Operator shall be selected by Working Interest Owners.  The successor Unit Operator

shall be selected by the affirmative vote of at least Sixty-Six and Two-Thirds Percent (66 2/3%) of the voting interest, based on Unit Participation.

6.4     DELIVERY OF PROPERTY.  On the effective date of resignation or removal, Unit Operator shall deliver to the successor Unit Operator the possession of everything jointly owned by the Working Interest owners pursuant to this Agreement.

## ARTICLE 7

## AUTHORITIES AND DUTIES OF UNIT OPERATOR

7.1     EXCLUSIVE RIGHT TO OPERATE UNIT.   Subject to the provisions of this Agreement, the Unit Agreement and to instructions from Working Interest Owners, Unit Operator shall have the exclusive right and be obligated to conduct Unit Operations.

7.2     WORKMANLIKE CONDUCT.  Unit Operator shall conduct Unit Operations in a good and workmanlike manner and, in the absence of specific instructions from Working Interest Owners, shall have the right and duty to conduct such operations in the same manner as would a prudent operator under the same or similar circumstances.  Unit Operator shall freely consult with Working Interest Owners and keep them informed of all matters which Unit Operator, in the exercise of its best judgment, considers important.  Unit Operator shall not be liable to Working Interest Owners for damages, unless such damages result from its gross negligence or willful conduct.

7.3     LIENS AND ENCUMBRANCES.  Unit Operator shall endeavor to keep the lands and leases and Unit Equipment in the Unit Area free from all liens and encumbrances occasioned by Unit Operations, except the lien of Unit Operator granted hereunder.

7.4     EMPLOYEES.  The number of employees used by Unit Operator in conducting Unit Operations, their selection, hours of labor, and compensation shall be determined by Unit Operator, with the employees to be the employees of Unit Operator and not of the other Working Interest Owners.

7.5     RECORDS.  Unit Operator shall keep full, true and correct books, accounts, and records of the Unit Operations, which shall be made available for inspection by any Working Interest Owner at Unit Operator's principal place of business during normal business hours.

7.6     REPORTS TO WORKING INTEREST OWNERS. Unit Operator shall furnish to Working Interest Owners monthly reports and shall keep the Working Interest Owners fully informed of Unit Operations.

7.7     REPORTS TO GOVERNMENTAL AUTHORITIES.  Except as otherwise provided in Section 8.2, below, Unit Operator shall make all reports to governmental authorities that are required for Unit Operations.

7.8     ENGINEERING AND GEOLOGICAL INFORMATION. Unit Operator shall furnish to a Working Interest Owner, upon written request, a copy of all logs and other engineering and geological data pertaining to wells drilled for Unit Operations.

7.9     EXPENDITURES.  Unit Operator shall neither make any single expenditure nor undertake any project costing in excess of Fifty Thousand Dollars ($50,000.00) without prior approval of Working Interest Owners.  In cases of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Unit Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property, but Unit Operator shall report to Working Interest Owners, as promptly as possible, the nature of the emergency and the action taken.

7.10     WELLS DRILLED BY UNIT OPERATOR.  All wells drilled by Unit Operator shall be at the usual rates prevailing in the area. Unit Operator may employ its own tools and equipment, or that of an affiliate, but the rates for the services shall not exceed the then current rates charged by Unit Operator or the affiliate to third parties for like kind services.

7.11     DISPOSITION OF UNIT EQUIPMENT.  Unit Operator may dispose of any major item or surplus or obsolete Unit Equipment, subject to the terms and conditions of Article IV of Exhibit "F" of this Agreement, if the current price of new equipment similar thereto is less than Thirty Thousand Dollars ($30,000.00).

7.12     RETURN LINES. Working Interest Owners reserve the right to use unutilized capacity in any return lines constructed by Working Interest Owners at Unit Expense after the Effective Date for the transportation of natural gas to wells outside the Unit Area, subject to and conditioned upon (1) the overall and superseding right of the return lines to be used for Unit Operations, (ii) the quality and specifications of the natural gas being no less than that for the natural gas which is transported for Unit Operations, and (iii) the approval of Unit Operator, which approval will not be unreasonably withheld.

## ARTICLE 8

## TAXES

8

8.1     AD VALOREM TAXES.  Unit Operator shall make and file all necessary ad valorem tax renditions and returns with the proper taxing authorities covering Unit Equipment.  Unit Operator shall settle assessments arising therefrom.  Any such ad valorem taxes due and payable shall be paid by the Unit Operator and charged to the joint account in the same manner as other operating expenses.

8.2     OTHER TAXES.   Unit Operator shall pay or cause to be paid all production, severance, gathering, and other taxes imposed upon or in respect to the production of Unitized Substances sold by the Unit Operator, with payment of such taxes charged to those of the joint account for those whom Unit Operator sells Unitized Substances. Any party hereto that takes Unitized Substances in kind shall be responsible for payment of all production, severance, gathering, and other taxes imposed upon or with respect to the production of such Unitized Substances taking in kind and for all reports to governmental agencies relating thereto.

## ARTICLE 9

### INSURANCE

9.1     INSURANCE.   Unit Operator, with respect to Unit Operations, shall provide insurance for the benefit of the Joint Account as specified in Exhibit "G."

## ARTICLE 10

### PERSONAL PROPERTY

10.1    PERSONAL PROPERTY TAKEN OVER.  Upon the effective date hereof, Working Interest Owners shall deliver to Unit Operator the following items of Unit Equipment:

10.1.1  WELLS AND CASING.  All wells completed in the Unit Area, together with the casing therein.

10.1.2  WELL AND LEASE EQUIPMENT.  The tubing in each such well, the wellhead connections thereon, and all other lease and operating equipment that is used in the operations of such wells which Working Interest Owners determine is necessary or desirable for conducting Unit Operations provided, however, that the meters located near the wells which are utilized to measure Unit Rich Gas produced from each well, together with all of the gathering lines located downstream of those meters which are used to transport Unit Rich Gas for processing and treatment, shall not become Unit Equipment but the Working Interest Owners hereby grant to Unit Operator the nonexclusive rights to use the above-described meters for measurement of Unit Rich Gas, to perform tests on and calibrate the meters, and to repair or replace the meters when necessary with the

9

reasonable expense therefor to be chargeable to the Working Interest Owners (as a Unit Expense) and/or to the then owners of the meters as the Unit Operator shall deem appropriate.

10.1.3   RECORDS.  A copy of all production and well records that pertain to each such well.

10.2   INVENTORY AND EVALUATION OF PERSONAL PROPERTY AND WELLBORES.

Unit Operator shall, on behalf of the Working Interest Owners, at Unit expense within a reasonable time after the effective date hereof, inventory and evaluate the personal property taken over by the Unit Operator under this Article.  Such inventory shall include and be limited to those items of equipment considered controllable under Exhibit "F" except: (1) non-controllable items (including, but not limited to, intangible costs and production casing) with respect to the Sklar Exploration Company L.L.C. – Cedar Creek Land & Timber 33-4 #1 Well will be included in the inventory to the extent that those costs have not been recovered by the Working Interest Owners in that well as of the Effective Date, and (2) upon determination of Unit Operator, other items considered non-controllable may be included in the inventory in order to insure a more equitable adjustment of investment.  Casing shall be included in the inventory for record purposes, but shall be excluded from evaluation and investment adjustment.

10.3   INVESTMENT ADJUSTMENT.  Upon approval by the Working Interest Owners of the inventory and evaluation, each Working Interest Owner shall be credited with the value, as determined in accordance with Article 10.2, of its interest (prior to unitization) in all personal property taken over under this Article 10, and shall be charged with an amount equal to that obtained by multiplying the total value of all personal property taken over under Article 10.1 by such Working Interest Owner's Unit Participation.  If the charge against the Working Interest Owner is greater than the amount credited to such Working Interest Owner, the resulting net charge shall be an item of Unit Expenditure chargeable against such Working Interest Owner.  If the credit to the Working Interest Owner is greater than the amount charged against the Working Interest Owner, the resulting net credit shall be paid to the Working Interest Owner out of funds received by it in settlement of the net charges described above.

10.4   OWNERSHIP OF PROPERTY AND FACILITIES.  Each Working Interest Owner, individually, shall by virtue hereof, own an undivided interest, equal to its Unit Participation, in all wells, equipment and facilities taken over or otherwise acquired by Unit Operator pursuant to this Agreement.

# ARTICLE 11

## UNIT EXPENDITURES

11.1 BASIS OF CHARGE TO WORKING INTEREST OWNERS. Unit Operator initially shall pay all Unit Expenditures. Each Working Interest Owner shall reimburse Unit Operator for its share of Unit Expenditure. Each Working Interest Owner's share shall be the same as its Unit Participation in effect at the time the expense was incurred and paid. All charges, credits and accounting for Unit Expenditures shall be in accordance with Exhibit "F." Charges for outside attorneys, landmen and/or technical experts used in conjunction with Unit Operations, title examination, and/or hearings before Governmental Agencies will be direct charges to the Unit Joint Account. Unit Operator shall charge a reasonable fee for services rendered by its in-house personnel in the foregoing functions.

11.2 ADVANCE BILLINGS. Unit Operator shall have the right to require Working Interest Owners to advance their respective shares of estimated Unit Expenditures by submitting to Working Interest Owners an itemized estimate thereof for the succeeding month, with a request for payment in advance. Within fifteen (15) days after receipt thereof, each Working Interest Owner shall pay to Unit Operator its share of such estimate. Adjustments between estimated and actual Unit Expenditures shall be made by Unit Operator at the close of each calendar month, and the accounts of Working Interest Owners shall be adjusted accordingly.

11.3 COMMINGLING OF FUNDS. Unit Operator shall hold for the account of the Working Interest Owners any funds of the Working Interest Owners advanced or paid to the Unit Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Unit Area, and such funds shall remain the funds of the Working Interest Owners on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Working Interest Owners or applied toward the payment of debts as provided in Section 11.5. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Unit Operator and Working Interest Owners for any purpose other than to account for Working Interest Owners' funds as herein specifically provided, and no funds received by Unit Operator under this agreement need be segregated or maintained by it as a separate fund, but may be commingled with its own funds.

11.4     LIEN OF UNIT OPERATOR.  Each Working Interest Owner grants to Unit Operator a first and preferred lien upon its Oil and Gas Rights in each Tract, its share of Unitized Substances when produced, and its interest in all Unit Equipment, as security for payment of its share of Unit Expenditures, together with interest thereon at the rate designated by Paragraph 1.3.B of Exhibit F; provided, however, if this interest rate exceeds the maximum allowed by Alabama law, then the interest rate will be limited to the maximum permitted under Alabama law. Each Working Interest Owner also grants to Unit Operator a security interest in its share of oil and/or gas when extracted and a security interest in all equipment as security for payment for its share of Unit Expenditures together with interest thereon.  To the extent that Unit Operator has a security interest under the Uniform Commercial Code of Alabama, Unit Operator shall be entitled to exercise the rights and remedies of a Secured Party under the Code.  The bringing of a suit and the obtaining of judgment by Unit Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof.  In the event any other Working Interest Owner takes over as Unit Operator in the manner described under Article 6.3 herein, Unit Operator shall thereupon grant a like lien to other Working Interest Owners.  Unit Operator shall have the right to bring suit to enforce collection of such indebtedness with or without seeking foreclosure of the lien.  In addition, upon default by any Working Interest Owner in the payment of its share of Unit Expenditures, Unit Operator shall have the right without prejudice to other existing remedies, to collect from the purchaser the proceeds from the sale of such Working Interest Owner's share of Unitized Substances not to exceed seven-eighths (7/8ths) of the proceeds allocated to the Tract or Tracts in which said Working Interest Owner owns a Working Interest, until the amount owed by such Working Interest Owner, plus interest as aforesaid, has been paid.  However, Unit Operator shall continue to collect such proceeds and distribute same to the Owner or Owners of overriding royalty, production payment interest, royalty in excess of one-eighth (1/8th) of production or other interests not primarily responsible for the payment of Unit Expenditures in the event that any of the proceeds so appropriated by Unit Operator were attributable to the interest of said Owner or Owners.  Each purchaser shall be entitled to rely upon Unit Operator's written statement concerning the amount of any default.

In such event, each Working Interest Owner hereby authorizes and directs the purchaser to pay Unit Operator pursuant to the terms hereof upon receipt of written notice given by Unit Operator

12

to the purchaser and to such Working Interest Owner. If any Working Interest Owner shall create any overriding royalty, production payment or other burden against its share of Unitized Substances, and if Unit Operator shall become entitled to receive the proceeds from the sale of such Working Interest Owner's share of Unitized Substances as provided herein, Unit Operator shall receive such production free and clear of such burdens against such production which may have been created subsequent to this Agreement, and the Working Interest Owner creating such subsequent burden shall save harmless Unit Operator with respect to said burden or burdens and shall bear same at its own expense.

11.5    SUBSEQUENTLY CREATED INTEREST. If any Working Interest Owner shall, after executing this Agreement, create an overriding royalty, production payment, net proceeds interest, carried interest, or any other interest out of its Working Interest, such subsequently created interest shall be subject to the terms and provisions of this Agreement, specifically including, but without limitation, Section 11.4 hereof entitled "Lien of Unit Operator." If the Working Interest Owner creating such subsequently created interest (a) fails to pay any Unit Expenditure chargeable to such Working Interest Owner under this Agreement, and the production of Unitized Substances accruing to the credit of such Working Interest Owner is insufficient for that purpose, or (b) withdraws from this Agreement under the terms and provisions of Article 17 hereof, the subsequently created interest shall be chargeable with a pro-rata portion of all Unit Expenditure incurred hereunder, the same as though such subsequently created interest were a Working Interest, and Unit Operator shall have the right to enforce against such subsequently created interest the lien for the purpose of collecting the Unit Expenditure chargeable to the subsequently created interest.

# ARTICLE 12

## NON-UNITIZED FORMATIONS

12.1    RIGHT TO OPERATE. Any Working Interest Owner that now has or hereafter acquires the right to drill for and produce oil, gas or other minerals from other than the Unitized Interval shall have the right to do so notwithstanding this Agreement or the Unit Agreement. In exercising this right, however, the Working Interest Owner shall exercise reasonable precaution to prevent unreasonable interference with Unit Operations. No Working Interest Owner shall produce Unitized Substances through any well drilled or operated by it. If any Working Interest Owner drills any well into or through the Unitized Interval, the Unitized Interval shall be protected in a manner

13

satisfactory to Working Interest Owners so that the production of Unitized Substances will not adversely be affected.

## ARTICLE 13

## TITLES

13.1    REPRESENTATIONS AND INDEMNITY.    Each Working Interest Owner represents to the best of its knowledge and belief that it is the owner of the respective working interests set forth opposite its name in Exhibit "E," and hereby agrees to indemnify and hold harmless the other Working Interest Owners from any loss due to failure, in whole or in part, of its title to any such interest, except failure of title arising out of Unit Operations; provided that such indemnity shall be limited to an amount equal to the net value that has been received from the sale or receipt of Unitized Substances attributed to the interest as to which title failed and there will be no retroactive adjustments of Unit Expenditures or allocation of proceeds.

13.2    FAILURE OF TITLE.  Should any interest or lease, or interest therein, be lost through failure of title, this Agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interest.  The party whose lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Unit Operator or the other Working Interest Owners any Unit Expenditure which it may have theretofore paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure.  There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interests of the parties shall be revised, as of the time it is determined finally that title failure has occurred so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Unit Area by the amount of the interest lost.  If the proportionate interest of the other parties hereto in the Unit Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it.  Should any person not a party to this Agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the Working Interest Owners who bore the costs which are so refunded.  Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the party or parties whose title failed in

the same proportions in which they shared in such prior production. No charge shall be borne by the Working Interest Owners or Unit Operator for legal expenses, fees or salaries, in connection with the defense of the interest claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in, unless such title failure be due to Unit Operations, then the loss shall be borne jointly by Working Interest Owners in proportion to their Unit Participation.

## ARTICLE 14

## LIABILITY, CLAIMS AND SUITS

14.1    INDIVIDUAL LIABILITY.   The duties, obligations, and liabilities of Working Interest Owners shall be individual and not joint or collective; and nothing herein contained shall ever be construed as creating a partnership of any kind, joint venture, association, or trust among Working Interest Owners.

14.2    SETTLEMENTS. Unit Operator may settle any single damage claim or suit involving Unit Operations but not involving an expenditure in excess of Twenty-Five Thousand Dollars ($25,000.00) provided the payment is in complete settlement of such claim or suit.  If the amount required for settlement exceeds the above specified amount, Working Interest Owners shall assume and take over the further handling of the claim or suit unless such authority is expressly delegated to Unit Operator.  All costs and expense of handling, settling, or otherwise discharging such claim or suit shall be an item of Unit Expenditure.  If a claim is made against any Working Interest Owner or if any Working Interest Owner is sued on account of any matter arising from Unit Operations and over which such Working Interest Owner individually has no control because of the rights given Working Interest Owners and Unit Operator by this Agreement and the Unit Agreement, the claim or suit shall be treated as any other claim or suit involving Unit Operations.

14.3    INDEMNIFICATION.

14.3.1  Working Interest Owners agree to indemnify and hold Unit Operator harmless from any and all losses, damages, injuries, claims and causes of action arising out of, incident to, or resulting directly or indirectly from Unit Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy, Federal Energy Regulatory Commission, State Oil and Gas Board or State of Alabama Department of Environmental Management or predecessor or successor agencies to the extent Unit Operator's interpretation or application of such rules, rulings,

15

regulations or orders was made in good faith.  Working Interest Owners further agree to reimburse Unit Operator for their proportionate share of any amounts Unit Operator may be required to refund, rebate or pay as a result of an incorrect interpretation or application of the above-noted rules, rulings, regulations or orders together with the Working Interest Owner's proportionate part of interest and penalties owing by Unit Operator as a result of such incorrect interpretation or application of such rules, rulings, regulations, or orders.

14.3.2  Notwithstanding anything to the contrary contained in this Unit Operating Agreement, in the Accounting Procedure made a part thereof, or in any other attachment hereto or thereto or inany other instrument covering or affecting the terms, conditions, and provisions of this Unit Operating Agreement, it is specifically agreed that all costs, liabilities, obligations, and expenses, including, but not limited to, court costs, litigation expenses, expenses incurred in administrative proceedings, attorney's fees, fines, penalties, judgments, and orders incurred by or levied, granted, or issued to or against Unit Operator by any Federal or State court, administrative body, or other agency with respect to violations or alleged violations or actions or inactions contrary to any Federal or State laws, rules and regulations, or any one or more of them, pertaining directly, indirectly, or in whole or in part to pollution, environmental protection, Fair Labor Standards, safety and occupational injuries, allocation of crude oil and other petroleum products, any and all other Federal and State Laws, rules  and regulations, or any one or more of them, of a like or similar nature, shall be considered a Unit Expenditure to be paid, respectively, by the parties to this Unit Operating Agreement in the same manner as other Unit Expenditures are allocated and paid, save and except only in those cases where Unit Operator has been proven guilty of gross negligence or willful misconduct directly causing the costs and expenses involved.   In case of any conflict between the provisions of the sentence immediately preceding and any other terms, conditions, and provisions of this Unit Operating Agreement or any ambiguity as between them, or any of them, then the provisions of said sentence next preceding shall govern and prevail with respect to the matter involved.

## ARTICLE 15

### INTERNAL REVENUE PROVISION

15.1   INTERNAL REVENUE PROVISION.  Notwithstanding any provisions herein that the rights and liabilities of the parties hereunder are several and not joint or collective, or that this Agreement and the operations hereunder shall not constitute a partnership, if for Federal income tax

16

purposes this Agreement and the operations hereunder are regarded as a partnership, then each of the parties hereto hereby elects to be excluded from the applications of all of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986 as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder. Unit Operator is hereby authorized and directed to execute on behalf of each of the parties hereto such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Federal Regulations 1.761-1(a). Should there by any requirement that each party hereto further evidence this election, each party hereto agrees to execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. Each party hereto further agrees not to give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the State of Alabama, or any future income tax law of the United States contain, or shall hereafter contain, provisions similar to those contained in Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, under which an election similar to that provided by Section 761 of said Subchapter K is permitted, each of the parties hereto hereby makes such election or agrees to make such election as may be permitted by such laws. In making this election, each of the parties hereto hereby states that the income derived by it from the operations under this Agreement can be adequately determined without the computation of partnership taxable income.

## ARTICLE 16

## NOTICES

16.1    NOTICES.  GIVING AND RECEIVING NOTICES.  All notices shall be in writing and delivered in person or by mail, email, overnight delivery service or facsimile; however, if a drilling rig is on location and standby charges are accumulating, such notices shall be given by (i) facsimile or email or (ii) by telephone and immediately confirmed in writing. Notice shall be deemed given only when received by the Party to whom such notice is directed, except that any notice by overnight delivery service, properly addressed pursuant to Section 4.1, and marked for next day delivery and with all charges prepaid, shall be deemed given twenty-four (24) hours after such notice is delivered to a national overnight delivery service.

16.2    CONTENT OF NOTICE.   Any notice that requires a response shall indicate the maximum time allowed for responding as specified in elsewhere in this Agreement or the Unit Agreement.  If a proposal involves a well operation, the notice shall include the proposed depth, the objective zone or zones to be tested, the surface and bottom-hole locations, the equipment to be used, and the estimated costs of the operation including all necessary expenditures through installation of the wellhead.

16.3    RESPONSE TO NOTICES.   Each Party's response to a proposal shall be in writing to the Unit Operator.  The maximum response time shall be thirty (30) days; however, if a drilling rig is on location and standby charges are accumulating, the maximum response time to a notice pertaining to such drilling rig shall be twenty-four (24) hours, including holidays and weekends.

16.4    FAILURE TO RESPOND.   Failure of any Party to respond to a notice within the required period shall be deemed to be a negative vote.

## ARTICLE 17

## WITHDRAWAL OF WORKING INTEREST OWNER

17.1    WITHDRAWAL.  A Working Interest Owner may withdraw from this Agreement by transferring, without warranty of title, either express or implied, to the other Working Interest Owners who do not desire to withdraw and are willing to accept such transfer, all of its Oil and Gas Rights, exclusive of Royalty interests, together with its interest in all Unit Equipment and in all wells used in Unit Operations.  Such transfer shall not relieve said Working Interest Owner from any obligation or liability incurred or resulting from an event which occurred prior to the first day of the month following receipt by those Working Interest Owners accepting the transfer an assignment of such interest.   The interest transferred shall be owned by the transferees in proportion that the Unit Participation of each transferee bears to the Unit Participation of all transferees who are willing to accept such transfer, or as may be agreed among the transferees.  The transferees, in proportion to the respective interests so acquired, shall pay transferor, for its interest in Unit Equipment, the fair salvage value thereof as estimated and agreed upon by Working Interest Owners less such transferor's share of the estimated cost of salvaging same, of plugging and abandoning all wells then being used or held for Unit Operations and of terminating the Unit.   In the event such withdrawing owner's interest in the aforesaid salvage value is less than such owner's share of such estimated costs, the withdrawing owner, as a condition precedent to withdrawal, shall pay the Unit Operator, for the benefit of Working

18

Interest Owners succeeding to its interest, a sum equal to the deficiency. Within sixty (60) days after receiving delivery of the transfer, Unit Operator shall render a final statement to the withdrawing owner for its share of Unit Expenditure, including any deficiency in salvage value, as determined by Working Interest Owners, incurred as of the first day of the month following the date of receipt of the transfer. Provided all Unit Expenditures, including any deficiency hereunder, due from the withdrawing owner has been paid in full within thirty (30) days after the rendering of such final statement by the Unit Operator, the transfer shall be effective the first day of the month following receipt of said transfer by those Working Interest Owners accepting the transfer and, as of such effective date, the withdrawing Working Interest Owner shall be relieved from all further obligations and liability hereunder and under the Unit Agreement, and the rights of such Working Interest Owner hereunder and under the Unit Agreement shall cease insofar as they existed by virtue of the interest transferred.

17.2    LIMITATION ON WITHDRAWAL.  Notwithstanding anything set forth in Section 17.1, and without limitation to the right of a Working Interest Owner to refuse to accept such transfer for any reason as determined by that Working Interest Owner, Working Interest Owners may refuse to permit the withdrawal of a Working Interest Owner if its Working Interest is burdened by any royalties, overriding royalties, production payments, net proceeds interest, carried interest or any other interest created out of the Working Interest in excess of twenty-five percent (25%), unless the other Working Interest Owners willing to accept the assignment agree to accept the Working Interest subject to such burdens.

17.3    ASSIGNMENT OF INTEREST.  Notwithstanding any Provision in this Article 17 to the contrary, nothing herein shall preclude one or more Working Interest Owners from transferring or assigning to another Working Interest Owner or Owners or a third party all or part of its or their interest in the Unit, provided any such assignment is made subject to the Unit Agreement and this Unit Operating Agreement.

## ARTICLE 18

### ABANDONMENT OF WELLS

18.1    RIGHTS OF FORMER OWNERS.  If Working Interest Owners decide to abandon permanently any well within the Unit Area prior to termination of the Unit Agreement, Unit Operator shall give written notice thereof to the Working Interest Owners of the Tract on which the well is

located, and they shall have the option for a period of fifteen (15) days after the sending of such notice, or twenty-four (24) hours, inclusive of Saturday, Sunday, or legal holidays if a rig is on location, to notify Unit Operator in writing of their election to take over and own the well and to deepen or plug-back the well to a formation other than the Unitized Interval.  The absence of a reply from one or more Working Interest Owners during such fifteen (15) day period (or as applicable, twenty-four hour period) shall be conclusively presumed to be an election NOT to take over such well.  Within ten (10) days after the Working Interest Owners of the Tract have notified Unit Operator of their election to take over the well, they shall pay Unit Operator, for credit to the Working Interest Owners, the amount estimated by Working Interest Owners to be the net salvage value of the casing and equipment in and on the well to be transferred.  The Working Interest Owners of the Tract, by taking over the well, agree to seal off effectively and protect the Unitized Interval, and upon abandonment to plug the well at their sole cost, risk and expense in compliance with applicable laws and regulations.

18.2     PLUGGING.  If the Working Interest Owners of a Tract do not elect to take over a well located thereon which is proposed for abandonment, Unit Operator shall plug and abandon the well at the expense of the Working Interest Owners in compliance with applicable laws and regulations.

# ARTICLE 19

## EFFECTIVE DATE AND TERM

19.1     EFFECTIVE DATE.  This Agreement shall become effective on the date and at the time that the Unit Agreement becomes effective and on such date, this Unit Operating Agreement shall supersede, replace and be used in lieu of any Operating Agreements currently in force and effect governing and controlling operations on the Tracts, or any one or more thereof, set out in Exhibit "B" to the Unit Agreement for Northwest Brooklyn Oil Unit, insofar and only insofar as (a) any such existing Operating Agreements cover the Unitized Interval defined in said Unit Agreement, and (b) are in conflict with or are otherwise inconsistent with this Agreement or the Unit Agreement. Except as provided in the preceding sentence, any currently effective Operating Agreements that cover all or any portion of the Tracts shall remain in effect.

19.2     TERM.  This Agreement shall continue in effect so long as the Unit Agreement remains in effect, and thereafter until (a) all unit wells have been abandoned and plugged or turned over to Working Interest Owners in accordance with Article 20, (b) all Unit Equipment and real

property acquired for Unit Operations have been disposed of by Unit Operator in accordance with instructions of Working Interest Owners, and (c) there has been a final accounting.

## ARTICLE 20

## ABANDONMENT OF OPERATIONS

20.1    TERMINATION.  Upon termination of the Unit Agreement, the following will occur:

20.1.1  OIL AND GAS RIGHTS.  Oil and Gas Rights in and to each separate Tract shall no longer be affected by this Agreement, and thereafter the parties shall be governed by the terms and provisions of the leases, contracts and other instruments affecting the separate Tracts.  Ownership and possession of all Oil and Gas in and under and all Oil and Gas Rights in and to the several separate Tracts shall revert to the Working Interest Owners thereof.

20.1.2  RIGHT TO OPERATE.  Working Interest Owners of any Tract that desire to take over and continue to operate wells located thereon may do so by paying Unit Operator, for credit to the Working Interest Owners, the net salvage value of the casing and equipment in and on the wells taken over, as estimated by Working Interest Owners, and by agreeing to plug each well in compliance with applicable laws at such time as it is abandoned.

20.1.3  SALVAGING WELLS.  Unit Operator shall salvage as much of the casing and equipment in or on wells not taken over by Working Interest Owners of separate Tracts as can economically and reasonably be salvaged, and shall cause the wells to be plugged and abandoned in compliance with applicable laws and regulations.

20.1.4  COST OF SALVAGE.  Working Interest Owners shall share the cost of salvaging, liquidation or other distribution of assets and properties used in Unit Operation in proportion to the respective Unit Participation.

20.1.5  DISTRIBUTION OF ASSETS.   Working Interest Owners shall share in the distribution of Unit Equipment, or the proceeds thereof, in proportion to their Unit Participations.

20.1.6  COST OF ABANDONMENT AND SURFACE RESTORATION.   The cost of abandonment of Unit Operations and surface restoration of the Unit Area shall be a Unit Expenditure.

## ARTICLE 21

## EXECUTION

21.1    ORIGINAL COUNTERPART OR OTHER INSTRUMENT.   A Working Interest Owner may become a party to this Agreement by signing the original of this instrument, a counterpart

21

thereof, or other instrument ratifying and agreeing to be bound by the provisions hereof. The signing of any such instrument shall have the same effect as if all the parties had signed the same instrument. All signature and acknowledgment pages to this Agreement or counterparts hereof that are executed by Working Interest Owners may be attached to one copy of this Agreement. This Agreement may be signed and delivered by any method noted by Article 16 hereof for Notices, and any such execution and delivery shall constitute the valid and binding agreement of such Party.

## ARTICLE 22

### SUCCESSORS AND ASSIGNS.

22.1    SUCCESSORS AND ASSIGNS.  The provisions hereof shall be covenants running with the lands, leases and interests covered hereby, and shall be binding upon and inure to the benefit of the respective heirs, devisees, legal representatives, successors and assigns of the parties hereto.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the dates opposite their respective signatures.

**[SIGNATURE PAGES FOLLOW]**

**UNIT OPERATING AGREEMENT**
**NORTHWEST BROOKLYN OIL UNIT**
**BROOKLYN FIELD**
**CONECUH COUNTY, ALABAMA**

## UNIT OPERATOR

PRUET PRODUCTION CO.

ATTEST:

BY: _____        BY: _____
ITS: ___Secretary_____        ITS: ___President_____

STATE OF MISSISSIPPI        ){PRIVATE }
COUNTY OF HINDS              )

    I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that ___William R. James___ and ___Rick J. Calhoon___, whose names as President and Secretary, respectively, of PRUET PRODUCTION CO., a corporation, are signed to the foregoing agreement, and who are known to me, acknowledged before me on this day that, being informed of the contents of the agreement, they, as such officers and with full authority, executed the same for and as the act of said corporation.

    GIVEN under my hand this the ___12th___ day of ___March___, 2018.

_____
NOTARY PUBLIC
My Commission Expires:

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 15501
BRENDA L. BIARD
Commission Expires
Jan. 30, 2022
RANKIN COUNTY

**UNIT OPERATING AGREEMENT**
**NORTHWEST BROOKLYN OIL UNIT**
**BROOKLYN FIELD**
**CONECUH COUNTY, ALABAMA**

NON-OPERATORS
WORKING INTEREST OWNERS

*[Individual]*

ATTEST                          SIGNATURE                          DATE

_____      _____      _____

*[Trustee]*

ATTEST                          SIGNATURE                          DATE

_____      _____      _____
                            As Trustee of the following trust:

*[Legal entity]*              ENTITY NAME:

                            _____
ATTEST                                                         DATE

_____      By_____      _____
                            Its_____