A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT
## Southeast Quarter (SE/4) of Section 30
## Township 4 North, Range 13 East
## Conecuh County, Alabama

OPERATING AGREEMENT

DATED

**February 1** , **2011** ,
*Year*

OPERATOR   **Midroc Operating Company**

CONTRACT AREA   **SE/4 of Section 30, Township 4 North, Range 13 East**

COUNTY OR PARISH OF   **Conecuh**          STATE OF   **Alabama**

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM. A.A.P.L. NO. 610 – 1982 REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___Midroc Operating Company___

_____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish- ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑  A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.
☑  B. Exhibit "B", Form of Lease.
☑  C. Exhibit "C", Accounting Procedure.
☑  D. Exhibit "D", Insurance.
☑  E. Exhibit "E", Gas Balancing Agreement.
☐  ~~F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.~~
☐  ~~G. Exhibit "G", Tax Partnership.~~

If any provision of any exhibit, except Exhibits "E"~~and "G"~~, is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE III.**
**INTERESTS OF PARTIES**

A.   **Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

B.   **Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____**all jointly owned lease burdens**_____ which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, / the royalty amount stipulated hereinabove and shall hold the **royalties and other burdens** other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

C.   **Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, **which is not a joint obligation of the parties** overriding royalty, production payment or other burden on production / in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

D.   **Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.   If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.   If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

**ARTICLE IV.**
**TITLES**

A.   **Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐ ~~Option No. 1:   Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in-gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.~~

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE IV
### continued

\*                                                    \*\*

1  ☑  Option No. 2:  Costs incurred by Operator in procuring abstracts / and fees paid outside attorneys / for title examination
2  (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) / shall be borne by the Drilling Parties
3  in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4  hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5  functions.
6
7        Operator shall be responsible
        / Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection
8  with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling
9  designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10  This shall not prevent any party from appearing on its own behalf at any such hearing. Concurrent with their execution of this Operating
11  Agreement, Operator and all of the Non-Operators shall execute the Pooling Declaration attached hereto as Exhibit "A-3" and
    Operator shall record the Pooling Declaration in the Records of the Probate Judge of Conecuh County, Alabama as soon as possible
12  and, in any event, on or before April 1, 2011.  Operator will file the Pooling Declaration even if all Non-Operators have not executed
    same.
13
14        No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
15  provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to par-
16  ticipate in the drilling of the well. Operator.
17
18  B.  Loss of Title:
19
20        1.  Failure of Title:  Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a
21  reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days
22  from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-
23  tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil
24  and gas leases and interests; and,
25        (a)  The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be
26  entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,
27  but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;
28        (b)  There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has
29  been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-
30  curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
31  Area by the amount of the interest lost;
32        (c)  If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is
33  increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-
34  terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such
35  well;
36        (d)  Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has
37  failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties
38  who bore the costs which are so refunded;
39        (e)  Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be
40  borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,
41        (f)  No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest
42  claimed by any party hereto, it being the intention of the parties that each shall defend title to its interest and bear all expenses in
43  connection therewith.
44  This space intentionally left blank.
45
46        2.  Loss by Non-Payment or Erroneous Payment of Amount Due:  If, through mistake or oversight, any rental, shut-in well
47  payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,
48  there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required
49  payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,
50  which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the
51  date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in
52  the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the
53  required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to
54  the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it
55  shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled
56  or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:
57        (a)  Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,
58  up to the amount of unrecovered costs;
59        (b)  Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of
60  oil and gas thereafter produced and marketed (excluding production from wells thereafter drilled) which, in the absence of such lease
61  termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
62  portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,
63        (c)  Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest
64  lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.
65
66        3.  Other Losses:  All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses
67  and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
68  the Contract Area.
69  \*.  Curative matters and materials
    \*\* Landmen and consultants
70  \*\*\*and for applications and hearings

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE V.
## OPERATOR

**A.    Designation and Responsibilities of Operator:**

    Midroc Operating Company _____ shall be the
Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and
required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall
have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross
negligence or willful misconduct.

**B.    Resignation or Removal of Operator and Selection of Successor:**

    1.  Resignation or Removal of Operator:  Operator may resign at any time by giving written notice thereof to Non-Operators.
If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as
Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator
may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the
affirmative vote of / two (2) or more / Non-Operators owning a / majority interest based on ownership as shown on Exhibit "A" remaining
    three (3)        parties        total of 51% or greater voting
after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the
first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action
by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier
date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a cor-
porate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not
be the basis for removal of Operator.

    2.  Selection of Successor Operator:  Upon the resignation or removal of Operator, a successor Operator shall be selected by
the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor
                                                                                                                 voting
Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority / interest
based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to
succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based
on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

**C.    Employees:**

    The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the
compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

**D.    Drilling Contracts:**

    All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so
desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing
rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and
such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of in-
dependent contractors who are doing work of a similar nature.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

**A.    Initial Well:**

                                                                                       and subject to rig availability.
    On or before the ____1ˢᵗ____ day of _____April_____ , (year) __2011__ , / Operator shall commence the drilling of a well for
oil and gas at the following location: 800' FSL and 1858' FEL of Section 30, T4N, R13E, Conecuh County, Alabama.

and shall thereafter continue the drilling of the well with due diligence to 12,000' subsurface or a depth sufficient to test the stratigraphic
equivalent of the Haynesville, Smackover, and Norphlet Sand Formation of the Upper Jurassic System, whichever is the lesser depth.

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is en-
countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

    Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and
gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which
event Operator shall be required to test only the formation or formations to which this agreement may apply.

-4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

~~If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.~~

B.   **Subsequent Operations:**

1.  Proposed Operations:   Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A., or to rework, [reenter, recomplete, sidetrack] / deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing [or capable of producing] / in paying quantities, the party desiring to drill, rework, [reenter, recomplete, sidetrack] / deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location [within the contract area] /, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays. Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of thirty (30)-days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all parties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance with the provisions hereof as if no prior proposal had been made.

2.  Operations by Less than All Parties:   If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense. If any well drilled, / reworked, [recompleted, sidetracked] deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

1  and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-

2  ties. Upon commencement of operations for the drilling, / reworking, deepening or plugging back of any such well by Consenting Parties

3  in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,

4  and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting

5  Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or

6  market value thereof if such share is not sold, (after deducting production taxes, excise taxes, / royalty, overriding royalty and other in- *severance taxes, windfall profit taxes, similar taxes,*

7  terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest

8  until it reverts) shall equal the total of the following:

9

10

11

12  (a) ~~100%~~ **200%** of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead **200%**

13  connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus / ~~100%~~ of each such

14  Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-

15  Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-

16  Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting

17  Party had it participated in the well from the beginning of the operations; and

18

19

20

21  (b) __500__ % of that portion of the costs and expenses of drilling, reworking, / deepening, plugging back, testing and completing, *

22  after deducting any cash contributions received under Article VIII.C., and __500__ % of that portion of the cost of newly acquired equip-

23  ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had

24  participated therein.

25

26

27

28  An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-

29  working / or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is

30  conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such

31  reworking / or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well **200%**

32  and there shall be added to the sums to be recouped by the Consenting Parties ~~one hundred~~ percent (~~100%~~) of that portion of the costs of *two*

33  the reworking / or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If

34  such a reworking / or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-

35  plicable as between said Consenting Parties in said well.

36

37

38

39  During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the

40  proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other

41  taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-

42  ticle III.D.

43

44

45

46  In the case of any reworking, / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free *

47  of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon

48  abandonment of a well after such reworking, / plugging back or deeper drilling, the Consenting Parties shall account for all such equip-

49  ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

50

51

52

53  Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the

54  Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an

55  itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its

56  option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-

57  ings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the

58  operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-

59  curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds

60  realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas

61  produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic

62  well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation

63  which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs

64  of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as

65  above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

66  **\*recompleting, sidetracking**

67

68

69

70

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1     If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,

2  the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-

3  Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production

4  therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, recompleting, sidetracking / reworking, deepening or plugging

5  back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of .

6  the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

7

8

9

10     Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall

11  be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such

12  well conforms to the then-existing well spacing pattern for such source of supply ; provided that an exceptional well location that is

13  approved by the State Oil and Gas Board of Alabama shall be deemed to conform to the then-existing spacing pattern.

14

15

16

17     The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.

18  except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, recompleting, sidetracking / deepening and plugging back of such initial well

19  after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-

20  duction, ceases to produce in paying quantities.

21

22

23

24     3. Stand-By Time:  When a well which has been drilled or deepened has reached its authorized depth and all tests have been

25  completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a

26  reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-

27  ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever

28  first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-

29  matical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently

30  withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion

31  each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-

32  ties.

33

34

35

36     4. Sidetracking:  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall

37  also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole

38  location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other

39  mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the

40  affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal

41  to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

42

43

44

45     (a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in

46  the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

47

48

49

50     (b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's

51  salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the

52  provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

53

54

55

56     In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period

57  shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and

58  receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time

59  incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand

60  by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-

61  ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in-

62  stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

63

64

65

66  C.  **TAKING PRODUCTION IN KIND:**

67

68     Each party shall have the right to / take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,

69  exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for

70  marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any

     party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

1 required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4 the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5 its share of all production.

6

7      In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8 the oil ᵃⁿᵈ/ᵒʳ ᵍᵃˢ / produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9 the obligation, to purchase such oil ᵃⁿᵈ/ᵒʳ ᵍᵃˢ / or sell it to others at any time and from time to time, for the account of the non-taking party at the
10 best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the
11 owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil ᵃⁿᵈ/ᵒʳ ᵍᵃˢ / not previously
12 delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil / shall be only for such reasonable periods of
13 time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14 of one (1) year.

15

16      In the event one or more parties' separate disposition of its share of the gas causes split-stream ˢᵃˡᵉˢ ᵒʳ / deliveries to separate pipelines and/or
17 deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18 be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19 agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

20

21 **D.**   **Access to Contract Area and Information:**

22

23      Each ᶜᵒⁿˢᵉⁿᵗⁱⁿᵍ / party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24 and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
25 and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with
26 governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27 each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28 gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29 quests the Information.

30

31 **E.**   **Abandonment of Wells:**

32

33     1. *Abandonment of Dry Holes:* Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34 drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35 without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
36 within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37 such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38 accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39 such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40 operations in search of oil and/or gas subject to the provisions of Article VI.B.

41

42     2. *Abandonment of Wells that have Produced:* Except for any well in which a Non-Consent operation has been conducted
43 hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44 producer shall not be plugged and abandoned without the consent of all parties ʷʰᵒ ʰᵃᵛᵉ ᵃ ᵖʳᵉˢᵉⁿᵗ ʷᵒʳᵏⁱⁿᵍ ⁱⁿᵗᵉʳᵉˢᵗ ⁱⁿ ˢᵘᶜʰ ʷᵉˡˡ /. If all parties consent to such abandonment, the well shall
45 be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
46 thirty (30) days after receipt of notice of the proposed abandonment of any well ᵒʳ ʷⁱᵗʰⁱⁿ ᶠᵒʳᵗʸ⁻ᵉⁱᵍʰᵗ ⁽⁴⁸⁾ ʰᵒᵘʳˢ ⁱᶠ ᵃ ᵈʳⁱˡˡⁱⁿᵍ ʳⁱᵍ ⁱˢ ᵒⁿ ˡᵒᶜᵃᵗⁱᵒⁿ /, all parties do not agree to the abandonment of such well,
47 those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48 parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49 Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. ᶠᵃⁱˡᵘʳᵉ ᵗᵒ ʳᵉˢᵖᵒⁿᵈ ᵗᵒ ˢᵃⁱᵈ ⁿᵒᵗⁱᶜᵉ ˢʰᵃˡˡ ᶜᵒⁿˢᵗⁱᵗᵘᵗᵉ ᵃⁿ ᵉˡᵉᶜᵗⁱᵒⁿ ᵗᵒ ᵖˡᵘᵍ ᵃⁿᵈ ᵃᵇᵃⁿᵈᵒⁿ ˢᵃⁱᵈ ʷᵉˡˡ. / Each abandoning party shall assign
50 the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51 material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52 terval or intervals of the formation or formations then open to production. ~~If the interest of the abandoning party is or includes an oil and~~
53 ~~gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-~~
54 ~~tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-~~
55 ~~duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit~~

56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1   "B".  The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2   assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3   Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4   interests in the remaining portion of the Contract Area.

5

6       Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7   the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8   quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9   templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10  well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11  repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12  visions hereof.

13

14      3. Abandonment of Non-Consent Operations:  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15  Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16  permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17  of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18  VI.E.

19

20                                          ARTICLE VII.
21                          EXPENDITURES AND LIABILITY OF PARTIES

22

23  A.   Liability of Parties:

24

25      The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26  shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27  among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28  shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

29

30  B.   Liens and Payment Defaults:

31

32      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33  of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34  at the rate provided in Exhibit "C". To the extent that Operator  has a security interest under the Uniform Commercial Code of the
35  state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
36  taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37  rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
38  of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39  the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
40  purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
41  and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

42

43      ~~If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by~~
44  ~~Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that~~
45  ~~the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain~~
46  ~~reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.~~

47

48  C.   Payments and Accounting:

49

50      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
51  and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
52  tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
53  showing expenses incurred and charges and credits made and received.

54

55      Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
56  of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
57  month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
58  with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
59  on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
60  fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
61  due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
62  pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

63

64  D.   Limitation of Expenditures:

65

66      1. Drill or Deepen:  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
67  pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:

68

69

70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

1 ☐ *Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2 necessary tankage and/or surface facilities.

3

4 ☑ **Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
(including all logs)
5 authorized depth, and all tests have been completed, and the results thereof / furnished to the parties, Operator shall give immediate notice
twenty-four (24) hours
6 to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have / forty-eight
7 (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8 tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9 cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
recompleting, sidetracking
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, / deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties.

14

15     2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.

19

20     3. Other Operations: Without the consent of all parties, Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of _____Fifty Thousand and No/100———_____ Dollars ($_____50,000.00_____)
sidetracking
22 except in connection with a well, the drilling, reworking, / deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of _____Ten Thousand and No/100———_____
28 Dollars ($_____10,000.00_____) but less than the amount first set forth above in this paragraph.

29

30 E.   Rentals, Shut-in Well Payments and Minimum Royalties:

31

32     Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35 behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B.2 3.

39

40     Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

45

46 F.   Taxes:

47

48     Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".

59

60     or Non-Operator
If Operator / considers any tax assessment improper, and, in the case of a Non-Operator, if any such Non-Operator timely notifies
61 Operator   in   writing,   Operator may—   shall   at   its   discretion,   protest   within   the   time   and   manner
62 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
63 mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
64 interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
65 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
66 provided in Exhibit "C".

67     Operator           on behalf of all parties
/ Each party shall pay or cause to be paid / all production, severance, excise, gathering and other taxes imposed upon or with respect
68 to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

69

70

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

G.  **Insurance:**

At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

### ARTICLE VIII.
### ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A.  ~~Surrender of Leases:~~

~~The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.~~

~~However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leased acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.~~

~~Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.~~

B.  ~~Renewal or Extension of Leases:~~

~~If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.~~

~~If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.~~

~~Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.~~

~~The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.~~

~~The provisions in this Article shall also be applicable to extensions of oil and gas leases.~~

C.  ~~Acreage or Cash Contributions:~~

~~While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions~~

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VIII
### continued

1  ~~said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be~~
2  ~~governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions~~
3  ~~it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-~~
4  ~~tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.~~
5
6  ~~If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such~~
7  ~~consideration shall not be deemed a contribution as contemplated in this Article VIII.C.~~
8
9  **D.  Maintenance of Uniform Interests:**
10
11  For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no
12  party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,
13  equipment and production unless such disposition ~~covers either:~~
14
15  ~~1.   the entire interest of the party in all leases and equipment and production; or~~
16
17  ~~2.   an equal undivided interest in all leases and equipment and production in the Contract Area.~~
18
19  ~~Every such sale, encumbrance, transfer or other disposition made by any party~~ shall be made expressly subject to this agreement
20  and shall be made without prejudice to the right of the other parties. **Any extra expenditures incurred as a result or a partial disposition,**
21  **including any additional marketing or metering expense shall be borne to the party to which such interest is transferred.**
22
23  ~~If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may~~
24  ~~require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for~~
25  ~~and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such~~
26  ~~party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter~~
27  ~~into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract~~
28  ~~Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.~~ **In the event a disposition is made to a third**
     **party who, at the time of disposition is in receivership or has filed for or has been petitioned into bankruptcy, the disposing party**
29  **shall also be liable to the other parties for all amounts accrued for operations in which the disposing party chose to participate under**
     **this Agreement, attributable to the disposed interest prior to the effective date of the disposition.**
30
31  **E.  Waiver of Rights to Partition:**
32
33  If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
34  undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
35  interest therein.
36
37  ~~F.   Preferential Right to Purchase:~~
38
39  ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
40  ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
41  ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
42  ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
43  ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
44  ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
45  ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
46  ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
47  ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~
48
49  ## ARTICLE IX.
50  ### INTERNAL REVENUE CODE ELECTION
51
52  This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
53  for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
54  and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
55  purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
56  from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as per-
57  mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
58  ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
59  United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
60  and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
61  evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
62  Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
63  action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
64  Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
65  Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is per-
66  mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
67  tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
68  computation of partnership taxable income.
69
70

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE X.**
**CLAIMS AND LAWSUITS**

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed __Ten Thousand and No/100__ ——————————————————————————————————————————— Dollars ($_____10,000.00_____) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

**ARTICLE XI.**
**FORCE MAJEURE**

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

**ARTICLE XII.**
**NOTICES**

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex / or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex / or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

**ARTICLE XIII.**
**TERM OF AGREEMENT**

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: ~~So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.~~

☑ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____180_____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____180_____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B. Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ Alabama _____ shall govern.

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

### ARTICLE XV.
### OTHER PROVISIONS

**(See attached page 14-1 through 14-3)**

- 14 -

## ARTICLE XV

## OTHER PROVISIONS

### A.   PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1)   an election to perform additional logging, coring or testing;

(2)   an election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;

(3)   an election to plug back and attempt to complete the well in a shallower depth or formation;

(4)   an election to deepen the well to a new objective formation;

(5)   an election to sidetrack the well;

(6)   an election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;

(7)   an election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of a majority in interest (not in number) of the consenting parties, a reasonably prudent operator would not conduct the operations contemplated by the particular election involved  for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth.   In such event, the operation, which, in the opinion of said majority in interest is less likely to jeopardize the well, will be given priority.   Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail.   It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores, or the results of the tests.   For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

### B.   HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

### C.   DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties.   If the parties are equally divided, the opinion of the Operator will prevail.

### D.   INDEMNITY

Each Non-Operator shall defend, indemnify and hold Operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operators, officers, employees and/or agents, resulting from or in any way relating to such officers, employees, and/or agents presence on a drilling rig on the Contract Area or from such person traveling by air or water between any point and such drilling rig, including, without limitation, claims arising out of THE FAULT, LIABILITY, NEGLIGENCE OR GROSS NEGLIGENCE OF OPERATOR.   Such indemnity to Operator shall also apply to any other person whose presence on the rig or transportation to or from such rig is at the request of the indemnifying Non-Operator.

## E.    SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon any binding determination that any term of other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

## F.    NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

## G.    INTERESTS OF THE PARTIES & TITLES

Subject to the provisions of Article XV.H below, the provisions of Article III.B, C and D and Article IV shall apply as between each of the Midroc Parties, or as between each of the Sklar Parties, but as between the Midroc Parties, on one hand, and the Sklar Parties, on the other hand, the provisions set forth in the Article XV.G shall apply.  The Midroc Parties own, Oil, Gas and Mineral Lease No. 1 (hereinafter the "Midroc Lease") described in Exhibit "A-1" to this Operating Agreement.  The Midroc Parties alone shall bear, in proportion to their interest in the Midroc Lease set forth in Exhibit "A" to this Operating Agreement, all burdens, losses and costs attributable to the lease, including, without limitation, the following:  (i) all royalties, overriding royalties, production payments or other burdens on production to which the Midroc Lease is subject; (ii) all losses associated with the Midroc Lease, through failure of title or otherwise; and (iii) such costs attributable to the working interest in the Midroc Lease as that lease's share of the costs to drill the Initial Well.  The Sklar Parties own Oil, Gas and Mineral Leases No. 2-4 (hereinafter the "Sklar Leases") described in Exhibit "A-1" to this Operating Agreement.  The Sklar Parties alone shall bear, in proportion to their interest in the Sklar Leases set forth in Exhibit "A" to this Operating Agreement, all burdens, losses and costs attributable to those leases, including, without limitation, the following:  (i) all royalties, overriding royalties, production payments or other burdens on production to which the Sklar Leases are subject; (ii) all losses associated with the Sklar Leases, through failure of title or otherwise; and (iii) such costs attributable to the working interest in the Sklar Leases as those leases' share of the costs to drill the Initial Well.

The Midroc Parties and the Sklar Parties agree to share costs within the Contract Area in the proportion that the interest of each group bears to the total interest of both groups as determined by title examination to the drilling unit for the Initial Well more particularly described as the Southeast Quarter of Section 30, Township 4 North, Range 13 East, Conecuh County, Alabama.  Operator may rely upon said title examination for the purpose of invoicing costs between the Midroc Parties, on one hand, and the Sklar Parties, on the other hand.  Costs attributable to any non-participating oil and gas interest or oil and gas lease shall be carried by the Midroc Parties, on one hand, and the Sklar Parties, on the other hand, in the same proportion.  The voting interest or interest to make other decisions required or permitted by the Non-Operators hereunder shall be allocated between the Midroc Parties, on one hand, and the Sklar Parties, on the other hand, in the same manner.  Notwithstanding any provisions of this paragraph or any other provisions of this Operating Agreement to the contrary, if Operator invoices the Midroc Parties and the Sklar Parties costs associated with the Initial Well based upon title examination of the drilling unit for that well as of a date prior to the commencement of operations for the drilling of that well, and if any of the oil and gas leases described in Exhibit "A-1" terminate prior to the commencement of operations for the drilling of the Initial Well, then, in that event, Operator shall cause its title examination to the drilling unit to be updated and shall invoice the Midroc Parties and the Sklar Parties all costs associated with the Initial Well based upon the updated title examination and shall credit any amounts previously invoiced and refund any amounts previously paid based upon the prior title examination.  Nothing herein shall prevent any Non-Operator from contesting the accuracy or validity of any title opinion if it believes in good faith that the title opinion in inaccurate or invalid.

Nothwithstanding anything herein to the contrary, the Midroc Parties or Operator on their behalf may perform curative work or otherwise protect the Midroc Leases against title loss, and bear no obligation to offer extensions, amendments, renewals, ratifications or other curative instruments relating to the Midroc Leases or lands covered by the leases to the Sklar Parties.  Similarly, the Sklar Parties or Sklar Exploration Company, L.L.C. on their behalf may perform curative work or otherwise protecting the Sklar Leases against title loss, and bear no obligation to offer extensions, amendments, renewals, ratifications or other curative instruments relating to the Sklar Leases or lands covered by those leases to the Midroc Parties.

The Midroc Parties shall be entitled, in proportion to their interest in the Midroc Lease set forth in Exhibit "A" and subject to all burdens, the share of the proceeds from the sale of oil and gas produced from the Initial Well or Subsequent Wells drilled and completed hereunder attributable to the Midroc Lease, whereas the Sklar Parties shall be entitled, in proportion to their interest in the Sklar Leases set forth in Exhibit "A"

**Page 14-2**

and subject to all burdens, the share of the proceeds from the sale of oil and gas produced from the Initial Well or Subsequent Wells drilled and completed hereunder attributable to the Sklar Leases. The Midroc Parties and the Sklar Parties agree to share the proceeds from the sale of oil and gas produced from the Initial Well or Subsequent Wells drilled and completed hereunder in the proportion that the interest of each group bears to the total interest of both groups as determined by title examination to the producing unit for such well. Operator may rely upon said title examination for the purpose of disbursing proceeds between the Midroc Parties, on one hand, and the Sklar Parties, on the other hand.

Sklar Exploration Company, L.L.C. subscribes to and is a party of this Operating Agreement as agent and nominee for and on behalf of the Sklar Parties. Operator may invoice Sklar Exploration Company, L.L.C., as agent and nominee for the Sklar Parties, all costs attributable to the Sklar Leases and owed by the Sklar Parties. Operator may also disburse to Sklar Exploration Company, L.L.C., as agent and nominee for the Sklar Parties, all proceeds from the sale of oil and gas produced from wells located within the Contract Area attributable to the Sklar Leases, including proceeds attributable to royalties, overriding royalties and working interest under such leases. Any notice delivered to Sklar Exploration Company, L.L.C. under this Operating Agreement shall be deemed to be delivered to the Sklar Parties as well. Sklar Exploration Company, L.L.C. also agrees to act as agent and nominee with respect to non-consent interest as set forth in Article XV.I of this Operating Agreement.

## H.   PRIOR AGREEMENTS

The Midroc Parties are also parties to another operating agreement (the "Midroc JOA") by and between Midroc Operating Company, as Operator, and the Midroc Parties, as Non-Operators, covering lands that include, among other lands, the Contract Area of this Operating Agreement. Likewise, the Sklar Parties are also parties to another operating agreement (the "Sklar JOA") by and between Sklar Exploration Company, L.L.C., as Operator, and the Sklar Parties, as Non-Operators covering lands that include, among other lands, the Contract Area of this Operating Agreement. The Midroc Parties bear no obligations under the Sklar JOA, and the Sklar Parties bear no obligation under the Midroc JOA. If there is a conflict between this Operating Agreement and a prior operating agreement, then, as between the parties to the prior operating agreement, the prior operating agreement shall govern and prevail. However, if there is such a conflict, then, in that event, and insofar and only insofar as the Contract Area under this Operating Agreement is concerned, this Operating Agreement, as between the Midroc Parties, on one hand, and the Sklar Parties, on the other hand, shall govern and prevail.

## I.   NON-CONSENT

All of the Midroc Parties and all of the Sklar Parties have consented to participate in the drilling of the Initial Well pursuant to Article VI.A of this Operating Agreement. Elections to participate in any subsequent operations under Article VI.B of this Operating Agreement shall be made by Operator on behalf of all of the interest of the Midroc Parties, and by Sklar Exploration Company, L.L.C. on behalf of all of the interest of the Sklar Parties. If one or more of the Midroc Parties elects not to participate in a subsequent operation, the non-consent interest shall be assumed by the remaining Midroc Parties pursuant to the terms of the Midroc JOA, whereas if one or more of the Sklar Parties elects not to participate in a subsequent operation, the non-consent interest shall be assumed by the remaining Sklar Parties pursuant to the terms of the Sklar JOA. The provisions of Article VI.B.2 of this Operating Agreement shall only apply to elections to which either Operator non-consents on behalf of all of the Midroc Parties, or Sklar non-consents on behalf of all of the Sklar Parties.

## J.   EXECUTION

This agreement shall be binding upon each party that executes this agreement without regard to whether this same instrument, or any copy or counterpart hereof shall be executed by any other parties.

## K.   HEADINGS FOR CONVENIENCE

The headings used in this agreement are inserted for convenience only and shall not be regarded in construing or interpreting this Agreement.

## G.   RELATIONSHIP OF THE PARTIES

In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's length basis in accordance with their own self interest.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____February_____ , (year) __2011__ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____, have been made to the form.~~

O P E R A T O R

ATTEST

_Beverly J. Clark_                                    MIDROC OPERATING COMPANY

BEVERLY J. CLARK, ASSISTANT SECRETARY        _Donald L. Clark_

                                             DONALD L. CLARK, PRESIDENT

N O N - O P E R A T O R S

RAB OIL & GAS HOLDINGS, LLC

_____        ROBERT A. BOURNE
                                       _____

_____        DBC RESOURCES, LP

_____        Printed Name: Donald L. Clark, President of DBC
                                       Title: President of DBC Management LLC,
                                       Its General Manager
_____

_____        DCOD, LLC

_____        Printed Name: Dale Clark
                                       Title: Partner
_____

_____        BOBBY L. COLEMAN
                                       _____

_____        FOUR D LLC

_____        Printed Name: R. E. Douglass
                                       Title: Manager
_____

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

HARKNESS A. DUNCAN FAMILY TRUST

Printed Name:  H. A. Duncan
Title:  Trustee

FIDDLER INVESTMENTS

Printed Name:  Harold R. Dunk
Title:  General Manager

FRANKS EXPLORATION COMPANY, LLC

Printed Name:  Bobby E. Jelks
Title:  Manager

GJR INVESTMENTS, INC.

Printed Name:  Grady Cooksey
Title:  President

JCE GALBRAITH OIL & GAS, L.L.C.

Printed Name:  Joan McDonough
Title:  General Manager

GASTON OIL COMPANY

Printed Name:  Terry M. Gaston
Title:  Secretary/Treasury

DONALD HALL, M.D.

HANSON OPERATING CO., INC.

Printed Name:  Ray Willis
Title:  President

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1
2
3                                          **J & A HARRIS, LP**
4  _____
5                                          Printed Name: James B. Harris
6                                          Title:  Manager
7  _____
8
9
10                                         **HARRIS OIL AND LAND CORPORATION**
11
12
13  _____
14                                         Printed Name: James B. Harris
15                                         Title:  President
16  _____
17
18                                         **HUGHES 2000 LLC**
19
20
21  _____
22                                         Printed Name:  Dudley J. Hughes
23                                         Title:  President
24  _____
25
26
27                                         **HUGHESOIL, INC.**
28
29  _____
30                                         Printed Name:  Dudley J. Hughes
31                                         Title:  President
32  _____
33
34
35
36  _____                **MELVIN J. JOHNSON, M.D.**
37
38  _____
39
40
41
42  _____                **MARSHA JOHNSON**
43
44
45  _____
46
47                                         **KMR INVESTMENTS, LLC**
48
49
50  _____
51                                         Printed Name:  Mike Hays
52                                         Title:  President
53  _____
54
55
56
57  _____                **W. D. MOUNGER**
58
59
60  _____
61
62                                         **PAM-LIN CORPORATION**
63
64
65  _____
66                                         Printed Name:  Donald L. Clark
67                                         Title:  President
68  _____
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

PETROLEUM INVESTMENTS, INC.

Printed Name:  Camille C. Despot
Title:  President

DON B. SAUNDERS

SAWYER DRILLING & SERVICE, INC.

Printed Name:  Ronald L. Sawyer
Title:  President

JMS OIL & GAS HOLDINGS, LLC

JAMES M. SENEFF, JR.

RYCO EXPLORATION, LLC

Printed Name:  M. Robin Smith
Title:  President

SUGAR OIL PROPERTIES, LP

Printed Name:   Alan Sugar
Title:  President

LEONARD E. WILLIAMS

EDWARD L. YARBROUGH, JR.

TOM YOUNGBLOOD

DARLENE K. HALL

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

SKLARCO L.L.C

_David A. Barlow, Chief Operating Officer_

Nicole Haggard

Vickie M. Deaton

McCOMBS ENERGY, LTD.

_Ricky Haikin, Vice President_

TAUBER EXPLORATION & PRODUCTION COMPANY

_Richard Tauber, President_

PICKENS FINANCIAL GROUP, LLC

_Michael K. Pickens, Vice President_

THE RUDMAN PARTNERSHIP

_W.R. (Trey) Sibley, III, Attorney-in-Fact_

JJS WORKING INTERESTS LLC
By:  Houston Bulldog Capital Management, LLC, its partner

_Justin Simons, Manager of Houston Bulldog Capital
Management, LLC_

JSS INTERESTS LLC

_Jonathan Simons, Manager_

BUNDERO INVESTMENT COMPANY, LLC

_Robert P. Bowman, Manager_

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

SKLARCO L.L.C

_____
David A. Barlow, Chief Operating Officer


McCOMBS ENERGY, LTD.

_____
Ricky Haikin, Vice President


TAUBER EXPLORATION & PRODUCTION COMPANY

_____
Richard Tauber, President


PICKENS FINANCIAL GROUP, LLC

_____
Michael K. Pickens, Vice President


THE RUDMAN PARTNERSHIP

_____
W.R. (Trey) Sibley, III, Attorney-in-Fact


By:   JJS WORKING INTERESTS LLC
      Houston Bulldog Capital Management, LLC, its partner

_____
Justin Simons, Manager of Houston Bulldog Capital
Management, LLC


JSS INTERESTS LLC

_____
Jonathan Simons, Manager


BUNDERO INVESTMENT COMPANY, LLC

_____
Robert P. Bowman, Manager

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

CRAFT EXPLORATION COMPANY LLC

_____
Steven H. Craft, Managing Member



DICKSON OIL & GAS, LLC

_____
C. Bickham Dickson, III, Member



FANT ENERGY LIMITED
By:   Richard E. Fant, LLC, the General Partner of Fant Energy Limited

_____
Richard E. Fant, Manager of Richard E. Fant, LLC, the General Partner of Fant Energy Limited



JAMES FLEET HOWELL



KUDZU OIL PROPERTIES, LLC

_____
Wirt A. Yerger, III, Manager



LANDMARK EXPLORATION, LLC

_____
Larry Johnson, Managing Member



MARKSCO, LLC

_____
Mark P. Sealy, Member



TIEMBO, LTD.
By:   Simba Investors, LLC, General Partner of Tiembo, Ltd.

_____
Mark Rauch, Member of Simba Investors, LLC The General Partner of Tiembo, Ltd.

- 15 -

## ACKNOWLEDGMENTS

STATE OF TEXAS

COUNTY OF DALLAS

On this _____ day of _____, 2011, before me appeared **Donald L. Clark**, to me known, who being by me duly sworn, did say that he is the President of **Midroc Operating Company**, a corporation, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Texas
My Commission Expires: _____

STATE OF FLORIDA

COUNTY OF ORANGE

On this _____ day of _____, 2011, before me appeared **Robert A. Bourne**, to me known, who being by me duly sworn, did say that he is the _____ of **RAB Oil & Gas Holdings, LLC**, a limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Florida
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF DALLAS

On this _____ day of _____, 2011, before me appeared **Donald L. Clark**, to me known, who being by me duly sworn, did say that he is the President of **DBC, Resources, LP**, a limited partnership, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Texas
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF DALLAS

On this _____ day of _____, 2011, before me appeared **Dale Clark**, to me known, who being by me duly sworn, did say that he is the Partner of **DCOD, LLC**, a limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Texas
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF DALLAS

       Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2011, within my jurisdiction, the within **Bobby L. Coleman**, who acknowledged that he executed the above and foregoing instrument.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                             _____
                             Notary Public in and for the
                             State of Texas
                             My Commission Expires: _____

STATE OF COLORADO

COUNTYOF LA PLATA

       On this _____ day of _____, 2011, before me appeared **R. E. Douglass**, to me known, who being by me duly sworn, did say that he is the Manager of **Four D LLC**, a limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                               _____
                             Notary Public in and for the
                             State of Colorado
                             My Commission Expires: _____

STATE OF FLORIDA

COUNTY OF SEMINOLE

       Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2011, within my jurisdiction, the within **H. A. Duncan**, who acknowledged that he is the Trustee of the **Harkness A. Duncan Family Trust** and that he executed the above and foregoing instrument on behalf of the Harkness A. Duncan Family Trust.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                               _____
                             Notary Public in and for the
                             State of Florida
                               My Commission Expires: _____

STATE OF TEXAS

COUNTY OF DALLAS

       On this _____ day of _____, 2011, before me appeared **Harold R. Dunk**, to me known, who being by me duly sworn, did say that he is the General Manager of **Fiddler Investments**, a Partnership, and that the foregoing instrument was signed by him on behalf of said Fiddler Investments, and said Appeared acknowledged said instrument to be the free act and deed of said _____.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                               _____
                             Notary Public in and for the
                             State of Texas
                             My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF BOSSIER

       Personally Appeared before me, the undersigned authority in and for said parish and state, on this _____ day of _____, 2011, within my jurisdiction, the within named **Bobby E. Jelks**, who acknowledged that he is the _____ of **Franks Exploration Company., LLC.** and that for and on behalf of the said corporation, and as its act and deed he executed the above and foregoing instrument, after first having been duly authorized by said corporation so to do.

                                                   _____
                                                 Notary Public in and for the
                                                 State of Louisiana
                                                 My Commission Expires: _____

STATE OF FLORIDA

COUNTY OF ORANGE

       On this _____ day of _____, 2011, before me appeared **Grady Cooksey, Jr.**, to me known, who being by me duly sworn, did say that he is the President of **GJR Investments Inc.**, a Corporation, and that the foregoing instrument was signed by him on behalf of said Corporation, and said Appeared acknowledged said instrument to be the free act and deed of said Corporation.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                                   _____
                                                 Notary Public in and for the
                                                 State of Florida
                                                 My Commission Expires: _____

STATE OF FLORIDA

COUNTY OF ORANGE

       On this _____ day of _____, 2011, before me appeared **Joan McDonough**, to me known, who being by me duly sworn, did say that she is the _____ of **JCE Galbraith Oil & Gas, L.L.C.**, a limited liability company, and that the foregoing instrument was signed by her on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                                   _____
                                                 Notary Public in and for the
                                                 State of Florida
                                                 My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

       On this _____ day of _____, 2011, before me appeared **Terry M. Gaston**, to me known, who being by me duly sworn, did say that he is the Secretary/Treasurer of **Gaston Oil Company**, a Corporation, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                                   _____
                                                 Notary Public in and for the
                                                 State of Louisiana
                                                 My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

Personally appeared before me, the undersigned authority in and for said parish and state, on this _____ day of _____, 2011, within my jurisdiction, the within **Donald Hall**, **MD**, who acknowledged that he executed the above and foregoing instrument.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

> _____
> Notary Public in and for the
> State of Louisiana
> My Commission Expires: _____

STATE OF NEW MEXICO

COUNTY OF CHAVES

Personally Appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2011, within my jurisdiction, the within named **Ray Willis**, who acknowledged that he is the President of **Hanson Operating Co.**, Inc. and that for and on behalf of the said corporation, and as its act and deed he executed the above and foregoing instrument, after first having been duly authorized by said corporation so to do.

> _____
> Notary Public in and for the
> State of New Mexico
> My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2011, before me appeared **James B. Harris**, to me known, who being by me duly sworn, did say that he is the Manager of **J & A Harris, LP**, a limited partnership, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

> _____
> Notary Public in and for the
> State of Louisiana
> My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

Personally Appeared before me, the undersigned authority in and for said parish and state, on this _____ day of _____, 2011, within my jurisdiction, the within named **James B. Harris**, who acknowledged that he is the President of **Harris Oil and Land Corporation** and that for and on behalf of the said corporation, and as its act and deed he executed the above and foregoing instrument, after first having been duly authorized by said corporation so to do.

> _____
> Notary Public in and for the
> State of Louisiana
> My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF RANKIN

I _____, a Notary Public in and for the state and county aforesaid, hereby certify that **Dudley J. Hughes**, whose name as President, of **Hughes 2000 LLC**, and attested by _____, are signed to the foregoing instrument and are known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument, they, as such officers and with full authority, executed the same voluntarily for and as the act of the said Company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Mississippi
My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF RANKIN

I _____, a Notary Public in and for the state and county aforesaid, hereby certify that **Dudley J. Hughes**, whose name as President, of **HughesOil Corporation**, and attested by _____, are signed to the foregoing instrument and are known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument, they, as such officers and with full authority, executed the same voluntarily for and as the act of the said Company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Mississippi
My Commission Expires: _____

STATE OF FLORIDA

COUNTY OF ORANGE

Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2011, within my jurisdiction, the within **Melvin J. Johnson, MD**, who acknowledged that he executed the above and foregoing instrument.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Florida
My Commission Expires: _____

STATE OF FLORIDA

COUNTYOF ORANGE

Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2011, within my jurisdiction, the within **Marsha Johnson**, who acknowledged that she executed the above and foregoing instrument.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Florida
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2011, before me appeared **Timothy G. Brown**, to me known, who being by me duly sworn, did say that he is the Controller of **KMR Investments, LLC**, a limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public in and for the
State of Louisiana
My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTYOF HINDS

Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2011, within my jurisdiction, the within **W. D. Mounger**, who acknowledged that he executed the above and foregoing instrument.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public in and for the
State of Mississippi
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF DALLAS

Personally Appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2011, within my jurisdiction, the within named **Donald L. Clark**, who acknowledged that he is the President of **PAM-LIN Corporation**, and that for and on behalf of the said corporation, and as its act and deed he executed the above and foregoing instrument, after first having been duly authorized by said corporation so to do.

Notary Public in and for the
State of Texas
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

Personally Appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2011, within my jurisdiction, the within named **Camille C. Despot**, who acknowledged that he is the President of **Petroleum Investments, Inc.**, and that for and on behalf of the said corporation, and as its act and deed he executed the above and foregoing instrument, after first having been duly authorized by said corporation so to do.

Notary Public in and for the
State of Louisiana
My Commission Expires: _____

STATE OF FLORIDA

COUNTY OF ORANGE

       Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2011, within my jurisdiction, the within **Don B. Saunders**, who acknowledged that he executed the above and foregoing instrument.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                            _____

                                            Notary Public in and for the
                                            State of Florida
                                            My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF BOSSIER

       Personally Appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2011, within my jurisdiction, the within named **Ronald L. Sawyer**, who acknowledged that he is the President of **Sawyer Drilling & Service, Inc.**, and that for and on behalf of the said corporation, and as its act and deed he executed the above and foregoing instrument, after first having been duly authorized by said corporation so to do.

                                            _____
                                            Notary Public in and for the
                                            State of Louisiana
                                            My Commission Expires: _____

STATE OF FLORIDA

COUNTY OF ORANGE

       On this _____ day of _____, 2011, before me appeared **James M. Seneff, Jr.**, to me known, who being by me duly sworn, did say that he is the _____ of **JMS Oil & Gas Holdings, LLC**, a limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                            _____
                                            Notary Public in and for the
                                            State of Florida
                                            My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

       On this _____ day of _____, 2011, before me appeared **M. Robin Smith**, to me known, who being by me duly sworn, did say that he is the President of **RYCO Exploration, LLC**, a limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                            _____
                                            Notary Public in and for the
                                            State of Louisiana
                                              My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2011, before me appeared **Alan Sugar**, to me known, who being by me duly sworn, did say that he is the Partner of **Sugar Oil Properties**, a limited partnership, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Louisiana
My Commission Expires: _____

STATE OF FLORIDA

COUNTY OF ORANGE

Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2011, within my jurisdiction, the within **Leonard E. Williams**, who acknowledged that he executed the above and foregoing instrument.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Florida
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2011, within my jurisdiction, the within **Edward L. Yarbrough, Jr.**, who acknowledged that he executed the above and foregoing instrument.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Louisiana
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2011, within my jurisdiction, the within **Tom Youngblood**, who acknowledged that he executed the above and foregoing instrument.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Louisiana
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      Personally appeared before me, the undersigned authority in and for said parish and state, on this _____ day of _____, 2011, within my jurisdiction, the within **Darlene K. Hall**, who acknowledged that she executed the above and foregoing instrument.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                 _____
                                 Notary Public in and for the
                                 State of Louisiana
                                 My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      On this 25th day of February_____, 2011, before me appeared **David A. Barlow**, to me known, who being by me duly sworn, did say that he is the Vice President/Chief Operating Officer for **Sklar Exploration Company L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                           *Kim S. Elias*
                               Notary Public in and for the Parish of Caddo
                               State of Louisiana
                               My Commission Expires: S. Elias, Notary Public # 52698
                                             Caddo Parish, Louisiana
                                             My Commission is for Life

STATE OF TEXAS

COUNTY OF _____

      On this _____ day of _____, 2011, before me appeared **Ricky Haikin**, to me known, who being by me duly sworn, did say that he is the Vice President of **McCombs Energy, LTD.**, a limited partnership, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                   _____
                                   Notary Public in and for the
                                   State of Texas
                                     My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

      Personally Appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2011, within my jurisdiction, the within named **Richard Tauber**, who acknowledged that he is the President of **Tauber Exploration and Production Company**, and that for and on behalf of the said corporation, and as its act and deed he executed the above and foregoing instrument, after first having been duly authorized by said corporation so to do.

                                   _____
                                   Notary Public in and for the
                                   State of Texas
                                   My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

On this _____ day of _____, 2011, before me appeared **Michael K. Pickens**, to me known, who being by me duly sworn, did say that he is the Vice President of **Pickens Financial Group, LLC**, a limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Texas
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF DALLAS

On this _____ day of _____, 2011, before me appeared **W.R. (Trey) Sibley, III**, to me known, who being by me duly sworn, did say that he is the Attorney in Fact of **The Rudman Partnership**, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Texas
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRIS

On this _____ day of _____, 2011, before me appeared **Justin Simons**, to me known, who being by me duly sworn, did say that he is the Manager of **Houston Bulldog Capital Management, LLC**, a limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Texas
My Commission Expires: _____

STATE OF _____

COUNTY OF _____

On this _____ day of _____, 2011, before me appeared **Jonathan Simons**, to me known, who being by me duly sworn, did say that he is the Manager of **JSS Interests LLC**, a limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of _____
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

On this 22nd day of February_____, 2011, before me appeared **Robert P. Bowman**, to me known, who being by me duly sworn, did say that he is the Manager of **Bundero Investment Company, LLC**, a limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_Deborah W. Cox_____
Notary Public in and for the
State of Louisiana
My Commission Expires: _for life_

DEBORAH W. COX 24653
Notary Public
Parish of Caddo
State of Louisiana

STATE OF MISSISSIPPI

COUNTY OF _____

On this _____ day of _____, 2011, before me appeared **Steven H. Craft**, to me known, who being by me duly sworn, did say that he is the Managing Member of **Craft Exploration Company, LLC**, a limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Mississippi
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2011, before me appeared **C. Bickham Dickson, III**, to me known, who being by me duly sworn, did say that he is the Member of **Dickson Oil & Gas, LLC**, a limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Louisiana
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF DALLAS

On this _____ day of _____, 2011, before me appeared **Richard E. Fant**, to me known, who being by me duly sworn, did say that he is the Manager of **Richard E. Fant, LLC**, the General Partner of **Fant Energy Limited,** a limited liability partnership, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Texas
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2011, before me appeared **JAMES FLEET HOWELL**, to me known, who being by me duly sworn, and that the foregoing instrument was signed by him and said Appeared acknowledged said instrument.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Louisiana
My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

On this _____ day of _____, 2011, before me appeared **Wirt A. Yerger, III**, to me known, who being by me duly sworn, did say that he is the Manager of **Kudzu Oil Properties, LLC**, a limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Mississippi
My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

On this _____ day of _____, 2011, before me appeared **Larry Johnson**, to me known, who being by me duly sworn, did say that he is the Managing Member of **Landmark Exploration, LLC**, a limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Mississippi
My Commission Expires: _____

STATE OF LOUISIANA

COUNTY OF CADDO

On this _____ day of _____, 2011, before me appeared **Mark P. Sealy**, to me known, who being by me duly sworn, did say that he is the Member of **MARKSCO, LLC**, a limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the
State of Louisiana
My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

       On this _____ day of _____, 2011, before me appeared **Mark Rauch**, to me known, who being by me duly sworn, did say that he is the Member of **Simba Investors, LLC**, the General Partner of **Tiembo, Ltd.,** a limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appeared acknowledged said instrument to be the free act and deed of said company.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                        _____

                        Notary Public in and for the
                        State of Mississippi
                        My Commission Expires: _____

EXHIBIT "A"


Attached to and made a part of that certain Operating Agreement dated February 1, 2011
by and between MIDROC OPERATING COMPANY, as Operator,
and SKLARCO L.L.C. et al., as Non-Operators.


1)   **Identification of lands subject ot this agreement:**

Contract Area

TOWNSHIP 4 NORTH, RANGE 13 EAST
CONECUH COUNTY, ALABAMA

Section 30: Southeast Quarter (SE/4).

**And being further described as all lands, oil and gas leasehold interest and
oil and gas interests lying within the red boundary as shown
on the plat designated as Exhibit "A-2".**

2)   **Restrictions, if any, as to depths, formations, or substances:**

There are no restrictions except as may be provided for in any lease or contract subject to this
Operating Agreement.

3)   **Decimal Interest and names of Parties to this Agreement:**

a.   The following parties (who are sometimes referred to in this Exhibit "A", in the
Operating Agreement to which this exhibit is attached and other exhibits thereto as the
"Sklar Parties") own Oil, Gas and Mineral Lease Nos. 1 through 3 described in Exhibit
"A-1" in the following fractional interests:

| Owners | Interest |
|---|---|
| Bundero Investment Company, L.L.C. | 0.01000000 |
| Craft Exploration Company L.L.C. | 0.01000000 |
| Dickson Oil & Gas, LLC | 0.01000000 |
| Fant Energy Limited | 0.10000000 |
| Fleet Howell | 0.05000000 |
| JJS Working Interests LLC | 0.11925000 |
| JSS Interests LLC | 0.00125000 |
| Kudzu Oil Properties, LLC | 0.02000000 |
| Landmark Exploration, LLC | 0.02000000 |
| Marksco, L.L.C. | 0.02000000 |
| McCombs Energy, Ltd. | 0.26500000 |
| Pickens Financial Group, LLC | 0.05000000 |
| The Rudman Partnership | 0.12500000 |
| Sklarco, LLC | 0.15450000 |
| Tauber Exploration & Production Company | 0.02500000 |
| Tiembo Ltd. | 0.02000000 |
| **TOTAL FOR LEASE NOS. 1 THROUGH 3** | **1.00000000** |

b.   The following parties (who are sometimes referred to in this Exhibit "A", in the
Operating Agreement to which this exhibit is attached and other exhibits thereto as the
"Midroc Parties") own Oil, Gas and Mineral Lease No. 4 described in Exhibit "A-1" in
the following fractional interests:

| Owners | Interest |
|---|---|
| RAB Oil & Gas Holdings, LLC | 0.00400000 |
| DBC Resources, LP | 0.07797000 |
| DCOD, LLC | 0.06375000 |
| Bobby L. Coleman | 0.01000000 |

1

| | |
|---|---|
| Four D. LLC | 0.00800000 |
| Harkness A. Duncan Family Trust | 0.00800000 |
| Fiddler Investments | 0.02125000 |
| Franks Exploration Company LLC | 0.09800000 |
| GJR Investments, Inc. | 0.00800000 |
| JCE Galbraith Oil & Gas, LLC | 0.01000000 |
| Gaston Oil Company | 0.02250000 |
| Dr. Donald Hall | 0.01000000 |
| Darlene K. Hall | 0.01000000 |
| Hanson Operating Co., Inc. | 0.08000000 |
| J&A Harris, LP | 0.08597000 |
| Harris Oil and Land Corporation | 0.01250000 |
| Hughes 2000 LLC | 0.14700000 |
| HughesOil, Inc. | 0.14700000 |
| Dr. Melvin J. and Marsha Johnson | 0.00800000 |
| KMR Investments, LLC | 0.02940000 |
| W. D. Mounger | 0.01000000 |
| Pam-Lin Corporation | 0.01500000 |
| Petroleum Investments, Inc. | 0.01000000 |
| Dan B. Saunders | 0.00800000 |
| Sawyer Drilling & Service Inc. | 0.02000000 |
| JMS Oil & Gas Holdings, LLC | 0.00400000 |
| RYCO Exploration, LLC | 0.01166000 |
| Sugar Oil Properties, LP | 0.03000000 |
| Leonard E. Williams | 0.00800000 |
| Edward L. Yarborough, Jr. | 0.00200000 |
| Tom Youngblood | 0.02000000 |
| TOTAL FOR LEASE NO. 4 | 1.00000000 |

4) **Oil and gas lease and/or oil and gas interests subject to this agreement:**

See Exhibit "A-1" Description of Leases.

5) **Addresses of parties for notice purposes:**

Sklar Exploration Company L.L.C., Agent and Nominee for the Sklar Parties
401 Edwards Street, Suite 1601
Shreveport, Louisiana  71101

Sklarco, L.L.C.
401 Edwards Street, Suite 1601
Shreveport, LA  71101

Bundero Investment Company, L.L.C.
333 Texas Street, Suite 300
Shreveport, Louisiana  71101

Craft Exploration Company L.L.C.
325 Lakeshire Parkway
Canton, MS  39046

Dickson Oil & Gas, LLC
P. O. Box 52479
Shreveport, Louisiana  71135

Fant Energy Limited
5800 Westview Drive
Houston, Texas  77055

Fleet Howell
416 Travis Street, Suite 715
Shreveport, Louisiana  71101

2

JJS Working Interests LLC
4295 San Felipe, Suite 207
Houston, Texas  77027

JSS Interests LLC
925 De Maisonneuve O #201
Montreal, Quebec H3A 0A5

Kudzu Oil Properties, LLC
300 Concourse Blvd., Suite 101
Ridgeland, Mississippi  39157

Landmark Exploration, LLC
P. O. Box 12004
Jackson, MS  39236

Marksco, L.L.C.
333 Texas Street, Suite 1050
Shreveport, Louisiana  71101

McCombs Energy, Ltd.
5599 San Felipe Street, Suite 1200
Houston, Texas  77056-2721

Pickens Financial Group, LLC
8499 Greenville Avenue, Suite 105
Dallas, Texas 75231-2417

The Rudman Partnership
1700 Pacific Ave., Suite 4200
Dallas, Texas 75201-4620

Tauber Exploration & Production Company
55 Waugh Drive, Suite 601
Houston, TX 77007

Tiembo Ltd.
P. O. Box 270415
Houston, Texas  77277-0415

Midroc Operating Company
3141 Hood Street
Dallas, Texas  75219

RAB Oil & Gas Holdings, LLC
P. O. Box 4920
Orlando, Florida  32802-4920

DBC Resources, LP
P. O. Box 191407
Dallas, Texas  75219-1407

DCOD, LLC
16250 Dallas North Parkway
Dallas, Texas  75248

Bobby Coleman
4600 Greenville Avenue, Suite 128
Dallas, Texas  75206

Four D LLC
P. O. Box 2444
Darango, CO  81302

Harkness A. Duncan Family Trust
806 Turnbull Ave., Suite 104
Altamonte Springs, FL  32701

Fiddler Investments
4601 Langland Rd., Suite 107
Dallas, Texas  75244

Franks Exploration Company, LLC
P. O. Box 7665
Shreveport, Louisiana  71137-7665

GJR Investments, Inc.
1830 Gipson Green Lane
Winter Park, FL  32789

JCE Galbraith Oil & Gas, LLC
2032 Alameda Avenue
Orlando, Florida  32804

Gaston Oil Company
2509 S. Cotswald
Shreveport, Louisiana  71118-4526

Dr. Donald Hall
2611 Greenwood Road
Shreveport, Louisiana  71103

Darlene K. Hall
6121 Fern Avenue, #117
Shreveport, LA  71105

Hanson Operating Co., Inc.
P. O. Box 1515
Roswell, NM  88202-1515

J&A Harris, LP
333 Texas Street, Suite 1414
Shreveport, Louisiana  71101-3679

Harris Oil and Land Corporation
333 Texas Street, Suite 1414
Shreveport, Louisiana  71101-3679

Hughes 2000 LLC
Mirror Lake Office Plaza
2829 Lakeland Drive, #1101
Flowood, MS  39232

Hughes Oil, Inc.
Mirror Lake Office Plaza
2829 Lakeland Drive, #1101
Flowood, MS  39232

Dr. Melvin J. and Marsha Johnson
60 West Gore
Orlando, Florida  32806

KMR Investments, LLC
P. O. Box 298
Arcadia, Louisiana  71001

4

W. D. Mounger
200 E. Capitol St., Suite 1601
Jackson, MS  39201

Pam-Lin Corporation
P. O. Box 191407
Dallas, Texas  75219-1407

Petroleum Investments, Inc.
Mid-South Towers
416 Travis Street, Suite 612
Shreveport, LA  71101-5584

Dan B. Saunders
627 E. Marks Street
Orlando, FL  32803

Sawyer Drilling & Service, Inc.
509 Market St., Suite 1010
Shreveport, Louisiana  71101-3240

JMS Oil & Gas Holdings, LLC
P. O. Box 4920
Orlando, FL  32802-4920

RYCO Exploration, LLC
333 Texas St., Suite 1414
Shreveport, Louisiana  71101-3679

Sugar Oil Properties, LP
625 Market St., Suite 100
Shreveport, Louisiana  71101

Leonard E. Williams
2518 Norfolk Road
Orlando, FL  32803

Edward L. Yarborough, Jr.
P. O. Box 11
Belcher, LA  71004

Tom Youngblood
P. O. Box 5926
Shreveport, Louisiana  71135-5926

## EXHIBIT "A-1"

Attached to and made a part of that certain Operating Agreement dated February 1, 2011
by and between MIDROC OPERATING COMPANY, as Operator,
and SKLARCO L.L.C. et al. as Non-Operators.

### MACK 30-15 #1 WELL

### DESCRIPTION OF OIL AND GAS LEASES

1. Oil, Gas and Mineral Lease dated September 29, 2008, by and between John Greel Ralls, Sr., a single man, as Lessor, and Sklarco L.L.C., as Lessee, recorded in Book 2008, Page 4746, of the Probate Judge Records of Conecuh County, Alabama.

2. Oil, Gas and Mineral Lease dated May 12, 2006, by and between William E. Older, an unmarried man, as Lessor, and Sklarco L.L.C., as Lessee, recorded in Book 2006, Page 2532 of the Probate Judge Records of Conecuh County, Alabama.

3. Oil, Gas and Mineral Lease dated January 3, 2011, by and between Earline B. Older, a single woman, as Lessor, and Sklarco L.L.C., as Lessee, recorded in Book 2011, Page _____ of the Probate Judge Records of Conecuh County, Alabama.

4. 179-00 Oil, Gas and Mineral Lease dated January 1, 2007, by and between Mary Ann Mack, as Lessor and Donald L. Clark, as Lessee, recorded in Book 2007, page 98 and Re-recorded in Book 2007, Page 251

**INSOFAR AND ONLY INSOFAR AS SAID OIL, GAS AND MINERAL LEASES COVER ACREAGE LYING WITHIN THE SOUTHEAST QUARTER (SE/4) OF SECTION 30, TOWNSHIP 4 NORTH, RANGE 13 SOUTH, CONECUH COUNTY, ALABAMA.**

1

EXHIBIT "A-2"

Attached to and made a part of that certain Operating Agreement dated February 1, 2011
by and between MIDROC OPERATING COMPANY, as Operator, and
SKLARCO, LLC, et al, as Non-Operators.



Little                     Cedar Creek

30
T4N   R13E

N

Field

LOCATION:
Mary Mack 30-15
Elev. 182.9'
X=721,440
Y=465,469
LAT. 31.27791'
LON. 86.79119'

SE/4
±160 Ac.

±2075'    800'    1858'

800'

16398
MIDROC
Mary Mack 30-14

SL

Boundary

DRILLING UNIT: ——————

NOTE:
Coordinates Based On Transverse
Mercator—Alabama West Zone NAD27.

CERTIFIED
ENGINEERING SERVICE
NO. 20361
PROFESSIONAL
RUSSELL
REGISTERED

BY Edgar Russell McDill
EDGAR RUSSELL MCDILL, P.L.S.
ALABAMA LICENSE NO. 20361

WELL LOCATION
FOR

**MIDROC OPERATING COMPANY**
SECTION 30, T4N – R13E
CONECUH COUNTY, ALABAMA

BY

ENGINEERING SERVICE – MOBILE, ALABAMA

0      1000      2000      3000
SCALE IN FEET

JANUARY 27, 2011

3076/51,52;3077/8,9    11M–5037    MIDROC373    A7266

Attached to and made a part of that certain Operating Agreement dated February 1, 2011
by and between MIDROC OPERATING COMPANY, as Operator,
and SKLARCO L.L.C. et al. as Non-Operators.

## DECLARATION OF POOLING

STATE OF ALABAMA

COUNTY OF CONECUH

WHEREAS, Midroc Operating Company, is the Operator of the Mary Mack 30-15 #1 well; and

WHEREAS, joined by Operator are the undersigned owners of those certain oil, gas and mineral leases described in Exhibit "A", attached hereto and made a part hereof, covering all or a part of the property described; and

WHEREAS, the undersigned owners, having full authority in and under the oil, gas and mineral leases described in Exhibit "A" with referenced to the lands described in said leases and embraced within the following described unit, consider it necessary and advisable to pool, consolidate, and combine the lands covered by said leases situated in said unit and to establish said lands as a drilling, operating and production unit in order to properly develop said lands and leases, in order to promote the conservation of oil, gas and other hydrocarbons, and in order to comply with the rules, regulations, and orders prescribed by the State Oil and Gas Board of Alabama;

NOW THEREFORE, in accordance with the power and authority granted by the leases described in Exhibit "A" and in consideration of the premises, the undersigned do hereby pool, combine and consolidate the oil, gas and mineral leases and interests described in Exhibit "A", and the lands and acreage covered thereby, so as to constitute and establish the following described lands as a unit for the development ( including drilling ), production, and transportation of oil, gas and other hydrocarbons to-wit:

Southeast Quarter (SE/4)
Section 30, Township 4 North, Range 13 East, Conecuh County,
Alabama, containing 160.00 acres, more or less.

There is hereby pooled and combined, into the area described above, all of the leasehold, mineral, overriding royalty, and royalty interests and all other interests in the above-described unit as to which the undersigned have the right to pool and combine into the unit created hereby whether or not said leases and others interests are particularly described herein, and the above described lands are hereby designated as a unit. Said unit is subject to the laws of Alabama and to the rules, regulations, and orders of the State Oil and Gas Board of Alabama, and such pooled unit shall, unless sooner terminated or modified by said Board or by the parties hereto, remain in full force and effect until the leases described in Exhibit "A" have terminated by their own terms and provisions.

This Declaration may be executed in one document, signed by all parties, or in a number of counterparts; and when executed in counterparts, all such counterparts shall constitute one document. The failure of any one or more of the parties hereto to sign this document or a counterpart thereof shall not affect the validity and binding effect of the same as to the parties who execute this Declaration.

This Declaration shall be binding on the heirs, executors, and assigns of the parties hereto.

This Declaration shall be effective as of the 11th day of February, 2011, which is the date Permit # 16445 was approved by the Alabama Oil and Gas Board.

EXECUTED as of the 16th day of February, 2011.

OPERATOR

MIDROC OPERATING COMPANY
By:

Witness: _____

_____
Donald L. Clark

OWNERS

RAB OIL & GAS HOLDINGS, LLC
By:

Witness: _____

_____
Robert A. Bourne

DBC RESOURCES, LP
By:

Witness: _____

_____
Donald L. Clark
Title: President of DBC Management LLC,
Its General Manager

DCOD, LLC
By:

Witness: _____

_____
Dale Clark, Partner


Witness: _____

_____
Bobby L. Coleman


FOUR D LLC
By:

Witness:_____

_____
R. E. Douglass, Manager


HARKNESS A. DUNCAN FAMILY TRUST
By:

Witness: _____

_____
H. A. Duncan, Trustee


FIDDLER INVESTMENTS
By:

Witness: _____

_____
Harold R. Dunk, General Manager


FRANKS EXPLORATION COMPANY, LLC
By:

Witness: _____

_____
Bobby E. Jelks, Manager

Witness: _____

GJR INVESTMENTS, INC.
By:

_____
Grady Cooksey, President


Witness: _____

JCE GALBRAITH OIL & GAS, L.L.C.
By:

_____
Joan McDonough, General Manager


Witness: _____

GASTON OIL COMPANY
By:

_____
Terry M. Gaston, Secretary/Treasurer


Witness: _____
:

_____
Donald Hall, M.D.


Witness: _____

HANSON OPERATING CO., INC.
By:

_____
Ray Willis, President


Witness: _____

J & A HARRIS, LP
By:

_____
James B. Harris, Manager

HARRIS OIL AND LAND CORPORATION
By:

Witness: _____

_____
James B. Harris, President


HUGHES 2000 LLC
By:

Witness: _____

_____
Dudley J. Hughes, President


HUGHESOIL, INC.
By:

Witness: _____

_____
Dudley J. Hughes, President


Witness: _____

_____
Melvin J. Johnson, M.D.

Witness: _____

_____
Marsha Johnson


KMR INVESTMENTS, LLC
By:

Witness: _____

_____
Mike Hays, President

Witness: _____

_____
W. D. Mounger

PAM-LIN CORPORATION
By:

Witness: _____

_____
Donald L. Clark, President


PETROLEUM INVESTMENTS, INC.
By:

Witness: _____

_____
Camille C. Despot, President


Witness: _____


_____
Don B. Saunders


SAWYER DRILLING & SERVICE, INC.
By:

Witness: _____

_____
Ronald L. Sawyer, President


JMS OIL & GAS HOLDINGS, LLC
By:

Witness: _____

_____
James M. Seneff, Jr.


RYCO EXPLORATION, LLC
By:

Witness: _____

_____
M. Robin Smith, President


SUGAR OIL PROPERTIES, LP
By:

Witness: _____

_____
Alan Sugar, President

Witness: _____

_____
Leonard E. Williams

Witness: _____

_____
Edward L. Yarbrough, Jr.

Witness: _____

_____
Tom Youngblood

Witness: _____

_____
Linda Darlene Kelly Hall

SKLARCO L.L.C.
By:

Witness: _____

_____
David A. Barlow, V.P. / C.O.O.

MCCOMBS ENERGY, LTD.
By:

Witness: _____

_____
Ricky Haikin, Vice President

TAUBER   EXPLORATION   &   PRODUCTION
COMPANY
By:

Witness: _____

_____
Richard Tauber, President

PICKENS FINANCIAL GROUP
By:

Witness: _____

_____
Michael K. Pickens, Vice President

JJS WORKING INTERESTS, LLC
Houston Bulldog Capital Management, LLC, its Manager
By:

Witness: _____

_____
Justin Simons Manager of Houston Bulldog Capital Management, LLC

JSS INTERESTS
By:

Witness: _____

_____
Jonathon Simons, Manager

BUNDERO INVESTMENT COMPANY, LLC
By:

Witness: _____

_____
Robert P. Bowman, Manager

CRAFT EXPLORATION COMPANY
By:

Witness: _____

_____
Steven H. Craft, Managing Member

DICKSON OIL AND GAS, LLC
By:

Witness: _____

_____
C. Bickham Dickson, III, Member

FANT ENERGY LIMITED
By:

Witness: _____

_____
Richard E. Fant, LLC, Manager of Richard E. Fant,LLC, the General Partner of Fant Energy Limited



Witness: _____

_____
Fleet Howell


KUDZU OIL PROPOERTIES, LLC
By:

Witness: _____

_____
Wirt A. Yerger, III, Manager

LANDMARK EXPLORATION, LLC
By:

Witness: _____

_____
Larry Johnson, Managing Member

MARKSCO, LLC
By:

Witness: _____

_____
Mark P. Sealy, Member


TIEMBO LTD.
By:

Witness: _____

_____
Mark Rauch Member of Simba Investors LLC,
General Partner of Tiembo Ltd.


## EXHIBIT "A"


Attached to and made a part of that certain Declaration of Pooling dated February 1, 2011, by and between Midroc Operating Company, as Operator, and Sklarco L.L.C., ET AL, as Owners.


## <u>DESCRIPTION OF OIL AND GAS LEASES</u>

1.     Oil, Gas and Mineral Lease dated September 29, 2008, by and between John Greel Ralls,
       Sr., a single man, as Lessor, and Sklarco L.L.C., as Lessee, recorded in Book 2008, Page
       4746, of the Probate Judge Records of Conecuh County, Alabama.

2.     Oil, Gas and Mineral Lease dated May 12, 2006, by and between William E. Older, an
       unmarried man, as Lessor, and Sklarco L.L.C., as Lessee, recorded in Book 2006, Page
       2532 of the Probate Judge Records of Conecuh County, Alabama.

3.     Oil, Gas and Mineral Lease dated November 15, 2010, by and between William E. Older,
       a single man, as Lessor, and Donald L. Clark, as Lessee, recorded in Book 2011, Page 71
       of the Probate Judge Records of Conecuh County, Alabama.

4.     Oil, Gas and Mineral Lease dated May 12, 2006, by and between Earline B. Older, a
       single woman, as Lessor, and John C. Albury, as Lessee, recorded in Book 2006, Page
       2526 of the Probate Judge Records of Conecuh County, Alabama.

5.     Oil, Gas and Mineral Lease dated January 3, 2011, by and between Earline B. Older, a
       single woman, as Lessor, and Sklarco L.L.C., as Lessee, recorded in Book 2011, Page
       _____ of the Probate Judge Records of Conecuh County, Alabama.

6.     Oil, Gas and Mineral Lease dated January 1, 2007, by and between Mary Ann Mack, as
       Lessor, and Donald L. Clark, as Lessee, recorded in Book 2007, Page 98 and Re-recorded
       in Book 2007, Page 251 of the Probate Judge Records of Conecuh County, Alabama.

7.     All other oil, gas and mineral leases and interests in oil and/or gas owned or controlled by
       any of the parties to the Declaration of Pooling to which this exhibit is attached,
       including, but not limited to, any amendments, modifications or extensions of any of the
       above described leases.


**INSOFAR AND ONLY INSOFAR AS SAID OIL, GAS AND MINERAL LEASES
COVER ACREAGE LYING WITHIN THE SOUTHEAST QUARTER (SE/4) OF
SECTION 30, TOWNSHIP 4 NORTH, RANGE 13 SOUTH, CONECUH COUNTY,
ALABAMA.**



COPAS 2005 Accounting Procedure
Recommended by COPAS

**Exhibit " C "**
# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

1  Attached to and made part of _that certain Operating Agreement dated February 1, 2011 by and between Midroc Operating Company,_
2  _as Operator, and SKLARCO LLC, et al, as Non-Operators._
3
4
5
6                                    **I. GENERAL PROVISIONS**
7
8  **IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE**
9  **COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE**
10  **BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.**
11
12  **IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE**
13  **PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT**
14  **FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT**
15  **OF THE PARTIES IN SUCH EVENT.**
16
17  **1.    DEFINITIONS**
18
19      All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:
20
21      **"Affiliate"** means for a person, another person that controls, is controlled by, or is under common control with that person. In this
22      definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities
23      of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an
24      individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.
25
26      **"Agreement"** means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting
27      Procedure is attached.
28
29      **"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified
30      in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).
31
32      **"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest
33      Railway Receiving Point to the property.
34
35      **"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS.
36
37      **"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is
38      to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable
39      field personnel.
40
41      **"First Level Supervision"** means those employees whose primary function in Joint Operations is the direct oversight of the Operator's
42      field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may
43      include, but are not limited to:
44
45          •   Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance,
46              construction, well remedial work, equipment movement and drilling
47          •   Responsibility for day-to-day direct oversight of rig operations
48          •   Responsibility for day-to-day direct oversight of construction operations
49          •   Coordination of job priorities and approval of work procedures
50          •   Responsibility for optimal resource utilization (equipment, Materials, personnel)
51          •   Responsibility for meeting production and field operating expense targets
52          •   Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental
53              part of the supervisor's operating responsibilities
54          •   Responsibility for all emergency responses with field staff
55          •   Responsibility for implementing safety and environmental practices
56          •   Responsibility for field adherence to company policy
57          •   Responsibility for employment decisions and performance appraisals for field personnel
58          •   Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group
59              or team leaders.
60
61      **"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be
62      shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.
63
64      **"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection,
65      maintenance, repair, abandonment, and restoration of the Joint Property.
66

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



**"Joint Property"** means the real and personal property subject to the Agreement.

**"Laws"** means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

**"Material"** means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

**"Non-Operators"** means the Parties to the Agreement other than the Operator.

**"Offshore Facilities"** means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

**"Off-site"** means any location that is not considered On-site as defined in this Accounting Procedure.

**"On-site"** means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

**"Operator"** means the Party designated pursuant to the Agreement to conduct the Joint Operations.

**"Parties"** means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

**"Participating Interest"** means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

**"Participating Party"** means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

**"Personal Expenses"** means reimbursed costs for travel and temporary living expenses.

**"Railway Receiving Point"** means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

**"Shore Base Facilities"** means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.

**"Supply Store"** means a recognized source or common stock point for a given Material item.

**"Technical Services"** means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

2.    **STATEMENTS AND BILLINGS**

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

3.   **ADVANCES AND PAYMENTS BY THE PARTIES**

   A.   Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

   B.   Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

       (1)   being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

       (2)   being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

       (3)   being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

       (4)   charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

4.   **ADJUSTMENTS**

   A.   Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

   B.   All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

       (1)   a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

       (2)   an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

       (3)   a government/regulatory audit, or

       (4)   a working interest ownership or Participating Interest adjustment.

5.   **EXPENDITURE AUDITS**

   A.   A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

   Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

3





COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B.    The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C.    The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D.    If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E.    ☐ *(Optional Provision – Forfeiture Penalties)*
*If the Non-Operators fail to meet the deadline in Section I.5.C. any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*

6.    APPROVAL BY PARTIES

A.    GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B.   AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____ (_____) or more Parties, one of which is the Operator, having a combined working interest of at least _____ percent (_____%), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C.   AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

1.   **RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

2.   **LABOR**

A.   Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1)   Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2)   Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3)   Operator's employees providing First Level Supervision,

(4)   Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5)   Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B.   Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

5


COPAS

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

D. Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E. Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F. Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G. Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H. Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

**3. MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

**4. TRANSPORTATION**

A. Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B. Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

   (1) If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property.. The Operator shall consistently apply the selected alternative.

   (2) If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

**5. SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

**6. EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A. The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____ percent (_____%) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

**7.   AFFILIATES**

A.   Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $_____ If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B.   For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $_____ in a given calendar year.

C.   The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

**8.   DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

**9.   LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

**10.   TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.



Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

**11. INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12. COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

**14. ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15. OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

**III. OVERHEAD**

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

**1.   OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

☑ **(Alternative 1)** Fixed Rate Basis, Section III.1.B.

☐ **(Alternative 2)** Percentage Basis, Section III.1.C.

**A.   TECHNICAL SERVICES**

(i) Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

☑ **(Alternative 1 – Direct)** shall be charged <u>**direct**</u> to the Joint Account.

☐ **(Alternative 2 – Overhead)** shall be covered by the <u>**overhead**</u> rates.

(ii) Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

☐ **(Alternative 1 – All Overhead)** shall be covered by the <u>**overhead**</u> rates.

☑ **(Alternative 2 – All Direct)** shall be charged <u>**direct**</u> to the Joint Account.

☐ **(Alternative 3 – Drilling Direct)** shall be charged <u>**direct**</u> to the Joint Account, <u>**only**</u> to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

**B.   OVERHEAD—FIXED RATE BASIS**

(1) The Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate per month $ 9,778.07            (prorated for less than a full month)

Producing Well Rate per month $ 977.81

(2) Application of Overhead—Drilling Well Rate shall be as follows:

(a) Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

9



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead—Producing Well Rate shall be as follows:

(a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e) Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4) The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

C.   OVERHEAD—PERCENTAGE BASIS

(1) Operator shall charge the Joint Account at the following rates:

(a) Development Rate _____ percent (_____) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (*Legal Expense*) and all Material salvage credits.

(b) Operating Rate _____ percent (_____%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead—Percentage Basis shall be as follows:

(a) The Development Rate shall be applied to all costs in connection with:

[i] drilling, redrilling, sidetracking, or deepening of a well
[ii] a well undergoing plugback or workover operations for a period of five (5) or more consecutive work–days
[iii] preliminary expenditures necessary in preparation for drilling
[iv] expenditures incurred in abandoning when the well is not completed as a producer
[v] construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead-Major Construction and Catastrophe*).

(b) The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead-Major Construction and Catastrophe*).

2.   OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.    If the Operator absorbs the engineering, design and drafting costs related to the project:

    (1)    _____*_____% of total costs if such costs are less than $100,000; plus

    (2)    _____*_____% of total costs in excess of $100,000 but less than $1,000,000; plus

    (3)    _____*_____% of total costs in excess of $1,000,000.

B.    If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

    (1)    _____*_____% of total costs if such costs are less than $100,000; plus

    (2)    _____*_____% of total costs in excess of $100,000 but less than $1,000,000; plus

    (3)    _____*_____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

3.    **AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

**IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS**

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

1.    **DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

*    **To be negotiated if the need arises.**

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



## 2.   TRANSFERS

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

### A.   PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1)   Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

    (a)   For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

    (b)   For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2)   Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3)   Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4)   As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

### B.   FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1)   Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2)   Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3)   Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4)   Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

### C.   TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



D.    CONDITION

(1)    Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Account either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2)    Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)    Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)    Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section I.6.A (*General Matters*).

(5)    Condition "E" – Junk shall be priced at prevailing scrap value prices.

E.    OTHER PRICING PROVISIONS

(1)    Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2)    Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

3.  **DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

4.  **SPECIAL PRICING PROVISIONS**

    A.  **PREMIUM PRICING**

    Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

    B.  **SHOP-MADE ITEMS**

    Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

    C.  **MILL REJECTS**

    Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

### V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)





1.  **DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A.  A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B.  Actual transportation costs and Personal Expenses for the inventory team.

C.  Reasonable charges for report preparation and distribution to the Non-Operators.

2.  **NON-DIRECTED INVENTORIES**

A.  OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B.  NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C.  SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

**INSURANCE AND INDEMNITY**

### Attached to and made a part of that certain Operating Agreement dated February 1, 2011 by and between Midroc Operating Company, as Operator, and SKLARCO LLC, et al, as Non-Operators.

At all times while operations are conducted under this Agreement with regard to subject properties, *the working interest owners agree to protect, defend, indemnify, release from liability and hold the Operator, its officers, directors and employees harmless from and against all losses, liabilities, costs, claims, demands and causes of action of every kind and character, without regard to the cause or causes thereof, or the negligence of any party or parties, except for the gross negligence or willful misconduct of the Operator or the Operator's offices or employees.* If the Operator is also a working interest owner, it shall bear its proportionate working interest share of the such losses, liability, costs, claims, demands and causes of action. This indemnification is without limit; however, if it is judicially determined that monetary limits should apply in certain instances of the working interest owners' voluntary assumption of such indemnities, the limit, or limits, shall automatically be amended to conform with the maximum limit permitted under law. *It is understood by all parties that this indemnification is to clarify Operator's and working interest owners' obligations as stated in Article V of this Joint Operating agreement and does not place any additional liabilities on the working interest owners.*

It is agreed that any future reference to the word "indemnify" shall also mean "protect, defend, hold harmless and release from liability" and shall only apply in the absence of gross negligence or willful misconduct on the part of the Operator or the Operator's officers or employees.

Notwithstanding the previous indemnification, Operator shall maintain for the benefit for all parties hereto, insurance of the types and in the maximum amounts as follows. Such insurance may carry reasonable deductibles. Premiums for such insurance shall be charged to the Joint Account and such premiums shall not exceed that which is normally available.

Non-operating working interest shall be named as Additional Insureds on the liability insurance policies, but only with respect to the performance of all work hereunder and only to the limits shown on this agreement. *This insurance shall be primary to any insurance carried by non-operating working interest owners.* The preceding indemnification shall not act to relieve the insurance carrier(s) of liability under the policies.

All such insurance shall be carried by an acceptable insurer or insurers; shall be maintained in full force and effect during the terms of this agreement; and shall not be cancelled materially, altered or amended without 30 days prior written notice having first been furnished non-operating working interest owners. If so required, Operator agrees to have its insurance carrier furnish certifications of insurance evidencing such insurance coverages.

Non-operating working interest owners agree that the limits and coverage carried by operator are adequate and shall indemnify the Operator if any claim exceeds such limit or is not covered by such policy. If the Operator is also a working interest owner, it shall bear its proportionate working interest share of such amount of claim which exceeds that limit or which is not covered by such policy. Such coverages and limits may change or be unavailable from time to time and operator does not guarantee their continuance but will use its best efforts to provide such coverages and limits at reasonable costs.

Operator and non-operator working interest owners agree to mutually waive Subrogation in favor of each other on all insurance carried by each party and/or to obtain such waiver from the insurance carrier if so required by the insurance contract. If such a waiver is not obtained, the party failing to do so shall indemnify the other party for any claim by an insurance carrier arising out of Subrogation.

   a. Workers' Compensation insurance in full compliance with all applicable state and federal laws and regulations.
   b. Employer's Liability insurance in the limits of $1,000,000 per accident covering injury or death to any employee who may be outside the scope of the Workers' Compensation statute of the state in which the work is performed. (Non-operating working interest owners shall be named as additional insureds only in permitted by the insurer.)
   c. Commercial (or Comprehensive) General Liability insurance with combined single limits per occurrence (and any general aggregate if applicable) of $1,000,000 for Bodily Injury and Property Damage, including Property Damage due to Blowout and Cratering, Completed Operations, and Broad Form Contractual Liability as respects any contract into which the Operator may enter under the terms of this agreement.
   d. Automobile Liability insurance covering owned, non-owned and hire automotive with limits for Bodily Injury and Property Damage of $1,000,000.
   e. Operator shall carry Control of Well Insurance covering the costs of controlling a Blowout, the expenses involved in redrilling or restoring the well, certain other related costs and Seepage and Pollution Liability. (These are descriptive terms only and exact coverage can be found only the policy.) The limit for this insurance is *$3,000,000.00 for drilling and workover and $1,000,000.00 for producing and shut-in* per occurrence with a *$25,000.00* per occurrence deductible. Non-operating working interest owners not wishing to be covered under this policy must notify operator prior to spud date and provide evidence of satisfactory insurance on a certificate furnished by the Operator; and by such refusal of coverage each non-operating working interest owner agrees to be responsible for his proportionate share of such loss and indemnify the Operator for any such loss that would have been covered under Operator's coverage, regardless of the degree or type of negligence, either sole, joint, concurrent or gross, anything in this agreement to the contrary notwithstanding.

**EXHIBIT "E"**

**Attached to and made a part of that certain Operating Agreement dated February 1, 2011 by and between Midroc Operating Company, as Operator, and SKLARCO, LLC, et al, as Non-Operators.**

## GAS STORAGE AND BALANCING AGREEMENT

1. The parties to the Operating Agreement to which this gas storage and balancing agreement is attached own the working interest in the gas rights underlying the Unit Area covered by such agreement in accordance with the percentages of participation as set forth in Exhibit "A" to the Operating Agreement.

2. In accordance with the terms of the Operating Agreement, each party thereto has the right to take its share of gas produced from the Unit Area and market the same. In the event that any of the parties hereto are not able to market its share of gas or has contracted to sell its share of gas produced from the Unit Area to a purchaser which is unable at any time while the Operating Agreement is in effect to take the share of gas attributable to the interest of such party, the terms of this storage agreement shall automatically become effective.

3. During the period or periods when any party hereto has no market for its share of gas produced from the Unit Area, or its purchaser is unable to take its share of gas produced from the Unit Area, the other parties shall be entitled to produce each month one hundred percent (100%) of the allowable gas production (including lawful tolerances) assigned to such Unit by the State of Alabama and shall be entitled to take and deliver to its or their purchaser all of such gas production, except, however, that no party shall be entitled to take or deliver to a purchaser gas production in excess of three hundred percent (300%) of its share of such allowable unless that party has gas in storage. All parties hereto shall share in and own the liquid hydrocarbons recovered from such gas by lease equipment in accordance with their respective interests and subject to the Operating Agreement to which this agreement is attached, but the party or parties taking such gas shall own all of the gas delivered to its or their purchaser. Each party unable to market its share of the gas produced shall be credited with such gas in storage equal to its share of the gas produced under the Operating Agreement, less its share of gas used in lease operations, vented or lost. The Operator will maintain a current account of the gas balance between the parties and will furnish all parties hereto monthly statements showing the total quantity of gas produced, the amount used in lease operations, vented or lost, and the total quantity of liquid hydrocarbons recovered there from.

4. It is the intent that each party be entitled to gas produced in the proportion that its ownership interest bears to the sum of the ownership interests. It is the intent that the Unit Operator have the duty of controlling gas well production and the responsibility of administering the provisions of this agreement. Unit Operator shall cause deliveries to be made to the gas purchasers at such rates as may be required to give effect to the intent that the gas production accounts of all parties are to be brought into balance under the provisions contained herein.

5. To give effect to the intent of this agreement, the Unit Operator shall be governed by the following rights of each party.

    (a) When the well's current production is less than the well allowable due to either the capacity of the well to produce or the Unit Operator causing the well to produce below the allowable in order to properly balance well allowable over production:

    (1) Each under produced party (a party who has taken a lesser volume of gas that the quantity such party is herein entitled) shall have the right to take a greater amount of gas than its proportionate share of the well's current production, provided that the right to take such greater amount shall be in proportion that its interest bears to the total interest of all under produced parties desiring to take more than their proportionate share of the well's current production.

EXHIBIT "E"

 (2) Each over produced party (a party who has taken a greater volume of gas than the quantity such party is herein entitled) shall reduce its respective take in the proportion that such party's interest bears to the total interest of all over produced parties, but in no event shall any over produced party be required to reduce its take to less than fifty percent (50%) of such over produced party's proportionate share of the well's current production.

(b) When the well's current production is less than the well allowable due to combined pipeline takes or for reasons other than in subparagraph (a) above:

 (1) Each under produced party shall have the right as in subparagraph (a) (1) above.
 (2) Each over produced party shall reduce its respective take in the proportion that such party's interest bears to the total interest of all over produced parties, but in no event shall any over produced party be required to reduce its take to less than fifty percent (50%) of such over produced party's proportionate share of the well allowable.

(c) When the well's current production is equal to or greater than the well allowable:

 (1) Each under produced party shall have the right to take a greater amount of gas that its proportionate share of the well allowable, provided that the right to take such greater amount shall be in proportion that its interest bears to the total interests of all under produced parties desiring to take more than their proportionate share of the well allowable.
 (2) Each over produced party shall have the right as in subparagraph (a) (2) above.
 (3) The Unit Operator, at the request of any party, may produce the entire well stream, if necessary, for a deliverability test not to exceed seventy-two (72) hours duration required under such requesting party's gas sales contract and may over produce in any situation provided that such over producing would be consistent with prudent operations.

6. Each party taking gas shall furnish, or caused to be furnished, the Unit Operator a monthly statement of gas taken. After commencement of production, Unit Operator shall furnish a current account monthly of the gas balance between parties hereto including the total quantity of gas produced, the portion hereof used in Unit operations, vented or lost, and the total quantity of gas delivered to a market.

7. Each party taking or delivering gas to its purchaser shall pay any and all production taxes due on such gas.

8. The provisions of this agreement shall constitute a separate agreement and be separately applicable to each well and reservoir to the end that the production from one reservoir in a gas well may not be utilized for the purpose of the balancing under production from other reservoirs.

9. When gas sales from a reservoir in a gas well permanently cease, Unit Operator shall be responsible to determine the final accounting of under production and overproduction and each over produced party shall account to and compensate each under produced party with a sum or money equal to the amount actually received, less applicable taxes, by any over produced party from the sale of that part of the total cumulative volume of gas produced which the under produced party was entitled to take and payment for such over production shall be in the order of accrual.