



ORIGINAL

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

Southwest Quarter (SW ¼) Section 36,
Township 4 North, Range 12 East
Conecuh County, Alabama

OPERATING AGREEMENT

DATED

_____ April 1 _____ , _____ 2013 _____ ,
                                    Year

OPERATOR   Sklar Exploration Company L.L.C.

CONTRACT AREA   As shown on Exhibit "A" to this Agreement.

COUNTY OR PARISH OF   Conecuh   STATE OF   Alabama

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD, FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM. A.A.P.L. NO. 610 – 1982 REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

# TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2-3 |
| | A. TITLE EXAMINATION | 3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 4 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4-5 |
| VI. | DRILLING AND DEVELOPMENT | 5 |
| | A. INITIAL WELL | 5 |
| | B. SUBSEQUENT OPERATIONS | 5-6-7 |
| | 1. Proposed Operations | 7 |
| | 2. Operations by Less than All Parties | 7 |
| | 3. Stand-By Time | 8 |
| | 4. Sidetracking | 8 |
| | C. TAKING PRODUCTION IN KIND | 8 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8-9 |
| | E. ABANDONMENT OF WELLS | 9 |
| | 1. Abandonment of Dry Holes | 9 |
| | 2. Abandonment of Wells that have Produced | 9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9-10 |
| | C. PAYMENTS AND ACCOUNTING | 9-10 |
| | D. LIMITATION OF EXPENDITURES | 10 |
| | 1. Drill or Deepen | 10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 11 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 11 |
| | F. TAXES | 11 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11-12 |
| | B. RENEWAL OR EXTENSION OF LEASES | 12 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 13 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 13 |
| IX. | INTERNAL REVENUE CODE ELECTION | 13 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 14 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 15 |
| XVI. | MISCELLANEOUS | 15 |

Table of Contents

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

# OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between _____Sklar Exploration Company L.L.C._____ _____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

## ARTICLE II.
## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑  A. Exhibit "A", shall include the following information:
   (1) Identification of lands subject to this agreement.
   (2) Restrictions, if any, as to depths, formations, or substances.
   (3) Percentages or fractional interests of parties to this agreement.
   (4) Oil and gas leases and/or oil and gas interests subject to this agreement.
   (5) Addresses of parties for notice purposes.

☐  B. Exhibit "B", Form of Lease.

☑  C. Exhibit "C", Accounting Procedure.

☐  D. Exhibit "D", Insurance.

☑  E. Exhibit "E", Gas Balancing Agreement.

☐  ~~F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.~~

☐  ~~G. Exhibit "G", Tax Partnership.~~

If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

- 1 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE III.
## INTERESTS OF PARTIES

### A.    Oil and Gas Interests:

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

### B.    Interests of Parties in Costs and Production:

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____ all jointly owned lease burdens _____ which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

### C.    Excess Royalties, Overriding Royalties and Other Payments:

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production ~~in excess of the amount stipulated in Article III.B.~~ which is not a joint obligation of the parties, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

### D.    Subsequently Created Interests:

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.    If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and

2.    If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

## ARTICLE IV.
## TITLES

### A.    Title Examination:

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐    Option No. 1:    Costs incurred by Operator in procuring abstracts and title examination (including, preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE IV
### continued

☒ Option No. 2: Costs incurred by Operator in procuring abstracts / and fees paid outside attorneys / for title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) / shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions. **

~~Operator shall be responsible~~ / Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with leases of oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders. This shall not prevent any party from appearing on its own behalf at any such hearing. ***

No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to participate in the drilling of the well ~~Operator~~.

B. Loss of Title:

1. ~~Failure of Title: Should any oil and gas interest or lease or interest therein, be lost through failure of title, which loss results in a reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument during the entirety of the title failure, which such acquisition will not be subject to Article VIII.B. and failing to do so this agreement nevertheless, shall continue in force as to all remaining oil and gas leases and interests and:~~

~~(a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

~~(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the interest lost;~~

~~(c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well;~~

~~(d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;~~

~~(e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and~~

~~(f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in connection therewith.~~

This space intentionally left blank.

2. ~~Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment is not paid or is erroneously paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~

~~(a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis, up to the amount of unrecovered costs;~~

~~(b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and~~

~~(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

3. Other Losses: All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of the Contract Area.

* Curative matters and materials
** Landmen and consultants
*** and for applications and hearings

- 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE V.
## OPERATOR

### A. Designation and Responsibilities of Operator:

**Sklar Exploration Company L.L.C.** shall be the
Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and
required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall
have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross
negligence or willful misconduct.

### B. Resignation or Removal of Operator and Selection of Successor:

1. Resignation or Removal of Operator:   Operator may resign at any time by giving written notice thereof to Non-Operators.
If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as
Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator
may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the
affirmative vote of / two (2) or more / Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining
after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the
first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action
by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier
date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a cor-
porate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not
be the basis for removal of Operator.

*(struck text: three (3)   parties   total of 51% or greater voting)*

2. Selection of Successor Operator:   Upon the resignation or removal of Operator, a successor Operator shall be selected by
the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor
Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority *voting* interest
based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to
succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based
on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

### C. Employees:

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the
compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

### D. Drilling Contracts:

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so
desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing
rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and
such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of in-
dependent contractors who are doing work of a similar nature.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

### A. Initial Well:

On or before the    1st    day of    July    , 2013   / (year) / Operator shall commence the drilling of a well for **and subject to rig availability,**
oil and gas at the following location: 1177' FWL and 896' FNL of Section 36, Township 4 North, Range 12 East, Conecuh County,
Alabama.

and shall thereafter continue the drilling of the well with due diligence to 12,300 feet subsurface or a depth sufficient to test the
stratigraphic equivalent of the Haynesville, Smackover and Norphlet Formations of the Upper Jurassic System.

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is en-
countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and
gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which
event Operator shall be required to test only the formation or formations to which this agreement may apply.

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1  ~~If in Operator's judgment the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the~~
2  ~~well as a dry hole the provisions of Article VI.E.1. shall thereafter apply.~~
3
4
5
6  **B.    Subsequent Operations:**
7
8      **1.  Proposed Operations:**    Should any party hereto desire to drill any well on the Contract Area other than the well provided
9  for in Article VI.A., or to ~~rework,~~ **recomplete, sidetrack,** ~~deepen or plug back~~ a dry hole drilled at the joint expense of all parties or a well jointly owned by all
10  the parties and not then producing **in paying quantities,** or to ~~rework, recomplete, sidetrack,~~ **deepen or plug back** such a well shall give the
11  other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
12  tion and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice
13  within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill-
14  ing rig is on location, **notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be**
15  limited to forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays. Failure of a party receiving such notice to reply within
16  the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or
17  response given by telephone shall be promptly confirmed in writing.
18
19
20
21      If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice
22  period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on loca-
23  tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
24  ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
25  for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
26  permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
27  amination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the
28  actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
29  if any party hereto still desires to conduct such operation, written notice proposing same must be resubmitted to the other parties in accor-
30  dance with the provisions hereof as if no prior proposal had been made.
31
32
33
34      **2.  Operations by Less than All Parties:**    If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option
35  No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
36  giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of
37  the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is
38  on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all
39  work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
40  a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
41  tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Con-
42  senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
43  ditions of this agreement.
44
45
46
47      If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
48  notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as
49  to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours
50  (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-
51  ticipation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and
52  failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for
53  such a response shall not exceed a total of forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party,
54  at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.
55
56
57
58      The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
59  elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such
60  operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
61  If such an operation results in a dry hole, **the Consenting** Parties shall plug and abandon the well and restore the surface location at their
62  sole cost, risk and expense. If any well drilled, **recompleted, sidetracked,** reworked, deepened or plugged back under the provisions of this Article results in a pro-
63  ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce and equip the well to produce at their sole cost and risk.
64
65
66
67
68
69
70

- 5 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1  and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2  ties. Upon commencement of operations for the drilling, / reworking, deepening or plugging back of any such well by Consenting Parties,
3  in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4  and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5  Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6  market value thereof if such share is not sold, (after deducting production taxes, excise taxes, severance taxes, windfall profit taxes, and other in-
7  terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8  until it reverts) shall equal the total of the following:
9
10
11
12  (a) ___200%___ of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13  connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus ___400%___ of each such
14  Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15  Consenting Party's relinquished interest shall revert to it under other provisions of this Article. it being agreed that each Non-
16  Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17  Party had it participated in the well from the beginning of the operations; and
18
19
20
21  (b) ___500___ % of that portion of the costs and expenses of drilling, reworking, / deepening, plugging back, testing and completing,
22  after deducting any cash contributions received under Article VIII.C. and ___500___ % of that portion of the cost of newly acquired equip-
23  ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24  participated therein.
25
26
27  An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-
28  working / or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
29  conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
30  reworking / or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
31  and there shall be added to the sums to be recouped by the Consenting Parties one-hundred percent (100%) of that portion of the costs of
32  the reworking / or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
33  such a reworking / or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
34  plicable as between said Consenting Parties in said well.
35
36
37
38  During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
39  proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
40  taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
41  ticle III.D.
42
43
44
45
46  In the case of any reworking, / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47  of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48  abandonment of a well after such reworking, / plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49  ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.
50
51
52  Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
53  Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
54  itemized statement of the cost of drilling, deepening, plugging back, testing, completing and equipping the well for production, or, at its
55  option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
56  ings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
57  operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
58  curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
59  realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas
60  produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
61  well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
62  which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
63  of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
64  above provided and if there is a credit balance, it shall be paid to such Non-Consenting Party.
65
66  *recompleting, sidetracking
67
68
69
70

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1  If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2  the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3  Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production
4  therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging
5  back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6  the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

7
8
9
10  Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall
11  be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
12  well conforms to the then-existing well spacing pattern for such source of supply.; provided that an exceptional well location that is
13  approved by the State Oil and Gas Board of Alabama shall be deemed to conform to the then-existing spacing pattern.

14
15
16
17  The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.
18  except (a) as to Article VI.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening, recompleting, sidetracking,
19  after if it has been drilled to the depth specified in Article VI.A. If it shall thereafter prove to be a dry hole or, if initially completed for pro-
20  duction, ceases to produce in paying quantities.

21
22
23
24  3.  Stand-By Time:  When a well which has been drilled or deepened has reached its authorized depth and all tests have been
25  completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
26  reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
27  ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
28  first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
29  matical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently
30  withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
31  each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
32  ties.

33
34
35
36  4.  Sidetracking:  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
37  also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
38  location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
39  mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
40  affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
41  to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

42
43
44
45  (a)  If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
46  the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

47
48
49
50  (b)  If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
51  salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
52  provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

53
54
55
56  In the event that notice for a sidetracking operation is given while the drilling rig is on location, the response period
57  shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and
58  receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time
59  incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand
60  by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
61  ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in-
62  stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

63
64
65
66  C.  TAKING PRODUCTION IN KIND:

67
68  have the right to                 Each party shall / take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
69  exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for
70  marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any
   party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil / produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not *and/or gas* the obligation, to purchase such oil / or sell it to others at any time and from time to time, for the account of the non-taking party at the best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the *and/or gas* owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil / not previously *and/or gas* delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil / shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

In the event one or more parties' separate disposition of its share of the gas causes splitstream *sales or* / deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

### D. Access to Contract Area and Information:

Each *consenting* / party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that requests the Information.

### E. Abandonment of Wells:

1. Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further operations in search of oil and/or gas subject to the provisions of Article VI.B.

2. Abandonment of Wells that have Produced: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties *who have a present working interest in such well* / . If all parties consent to such abandonment, the well shall *Failure to respond to said notice shall constitute an election to plug and abandon said well.* be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within *or within forty-eight (48) hours if a drilling rig is on location* thirty (30) days after receipt of notice of the proposed abandonment of any well / , all parties do not agree to the abandonment of such well, those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. *Each abandoning party shall assign* the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the formation or formations then open to production. ~~If the interest of the abandoning party is or includes an oil and gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or intervals of the formation or formations then open to production for a term of one (1) year and so long thereafter as oil and/or gas is produced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit~~

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

~~required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.~~

~~Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.~~

~~In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-taking party at the best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of its share of oil and gas not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil and gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year. Notwithstanding the foregoing, Operator shall not make a sale, including one into interstate commerce, of any other party's share of gas production without first giving such other party thirty (30) days notice of such intended sale.~~

~~D. Access to Contract Area and Information:~~

~~Each party shall have access to the Contract Area at all reasonable times at its sole cost and risk to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that requests the information.~~

~~E. Abandonment of Wells:~~

~~1. Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further operations in search of oil and/or gas subject to the provisions of Article VI.B.~~

~~2. Abandonment of Wells that have been Produced: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the formation or formations then open to production if the interest of the abandoning party is or includes an oil and gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or intervals of the formation or formations then open to production for a term of one (1) year and so long thereafter as oil and/or gas is produced from the interval or intervals of the formation or formations covered thereby; such lease to be on the form attached as Exhibit~~

- 8 alternate -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1  ~~12.~~ The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2  assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3  Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4  interests in the remaining portion of the Contract Area.
5
6  Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7  the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8  quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9  templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10  well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11  repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12  visions hereof.
13
14  3  Abandonment of Non-Consent Operations:  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15  Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16  permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17  of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18  VI.E.
19
20
21  ## ARTICLE VII.
22  ## EXPENDITURES AND LIABILITY OF PARTIES
23  A.  Liability of Parties:
24
25  The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26  shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27  among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28  shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.
29
30  B.  Liens and Payment Defaults:
31
32  Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33  of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34  at the rate provided in Exhibit "C." To the extent that Operator  has a security interest under the Uniform Commercial Code of the
35  state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
36  taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37  rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
38  of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39  the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
40  purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
41  and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.
42
43  ~~If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by~~
44  ~~Operator the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that~~
45  ~~the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain~~
46  ~~reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.~~
47
48  C.  Payments and Accounting:
49
50  Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
51  and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
52  tionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder,
53  showing expenses incurred and charges and credits made and received.
54
55  Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
56  of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
57  month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
58  with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
59  on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
60  fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
61  due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
62  pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
63
64  D.  Limitation of Expenditures:
65
66  1.  Drill or Deepen:  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
67  pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:
68
69
70

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

1  ☐  *Option No. 1:  All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2  necessary tankage and/or surface facilities.
3
4  ☒  **Option No. 2:  All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5  authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6  to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have ~~forty-eight~~
7  ~~(48) hours~~ (exclusive of Saturday, Sunday and legal holidays) ~~twenty-four (24) hours~~ in which to elect to participate in the setting of casing and the completion at-
8  tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9  cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10  constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11  elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "completing or attempting to
12  back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13  than all parties.
14
15  2.  Rework or Plug Back:  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16  plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17  include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18  and/or surface facilities.
19
20  3.  Other Operations:  Without the consent of all parties, Operator shall not undertake any single project reasonably estimated
21  to require an expenditure in excess of _____ Fifty Thousand and No/100 _____ Dollars ($  50,000.00  )
22  except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23  previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24  emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25  to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26  parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27  an information copy thereof for any single project costing in excess of _____ Ten Thousand and No/100 _____
28  Dollars ($  10,000.00  ) but less than the amount first set forth above in this paragraph.
29
30  E.  Rentals, Shut-in Well Payments and Minimum Royalties:
31
32  Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33  party or parties who subjected such lease to this agreement, at its or their expense. In the event two or more parties own and have con-
34  tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35  behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments in the event of
36  failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37  ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38  visions of Article IV.B.2.3.
39
40  Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41  of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42  circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43  Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44  shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46  F.  Taxes:
47
48  Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49  subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50  become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51  be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52  Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53  riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54  owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55  tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56  anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57  value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58  the manner provided in Exhibit "C".
59
60  If Operator considers any tax assessment improper, and, in the case of a Non-Operator, if any such Non-Operator timely notifies
61  ~~Operator in writing~~ or Non-Operator, Operator may shall at its discretion protest within the time and manner
62  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
63  mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
64  interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
65  count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
66  provided in Exhibit "C".
67  on behalf of all parties
68  Operator Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
69  to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.
70

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VII**
**continued**

1
2   G.   **Insurance:**
3
4       At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
5   the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
6   pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
7   also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
8   hereof Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
9   law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

10      In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11  parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.
12
13                                    **ARTICLE VIII.**
14              **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**
15
16  A.   ~~Surrender of Leases:~~
17
18       ~~The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole~~
19  ~~or in part unless all parties consent thereto.~~
20
21       ~~However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not~~
22  ~~agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in~~
23  ~~such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production~~
24  ~~thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas in-~~
25  ~~terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering~~
26  ~~such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby; such~~
27  ~~lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all~~
28  ~~obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well~~
29  ~~attributable thereto; and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-~~
30  ~~duction other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the~~
31  ~~party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-~~
32  ~~ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of~~
33  ~~salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest~~
34  ~~shall be shared by such parties in the proportions that the interest of each bears to the total interests of all such parties.~~
35
36       ~~Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's or lessor's or surrendering~~
37  ~~party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage~~
38  ~~assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this~~
39  ~~agreement.~~
40
41  B.   ~~Renewal or Extension of Leases:~~
42
43       ~~If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and~~
44  ~~shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the~~
45  ~~renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-~~
46  ~~portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the~~
47  ~~interests held at that time by the parties in the Contract Area.~~
48
49       ~~If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties~~
50  ~~who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area~~
51  ~~to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.~~
52  ~~Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.~~
53
54       ~~Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein~~
55  ~~by the acquiring party.~~
56
57       ~~The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease~~
58  ~~or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or~~
59  ~~contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision but any lease taken or con-~~
60  ~~tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to~~
61  ~~the provisions of this agreement.~~
62
63       ~~The provisions in this Article shall also be applicable to extensions of oil and gas leases.~~
64
65  C.   ~~Acreage or Cash Contributions:~~
66
67       ~~While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other~~
68  ~~operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be~~
69  ~~applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the con-~~
70  ~~tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions~~

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VIII
### continued

1  said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2  governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3  it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4  tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

5
6  —— If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7  consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8

9  **D.  Maintenance of Uniform Interests:**
10

11  For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no
12  party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,
13  equipment and production unless such disposition covers either:
14

15  —— 1.  the entire interest of the party in all leases and equipment and production; or
16

17  —— 2.  an equal undivided interest in all leases and equipment and production in the Contract Area.
18

19  —— Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20  and shall be made without prejudice to the right of the other parties. Any extra expenditures incurred as a result or a partial disposition,
21  including any additional marketing or metering expense shall be borne for the party to which such interest in is transferred.
22

23  —— If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
24  require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
25  and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
26  party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
27  into and execute all contracts or agreements for the disposition of their respective share of the oil and gas produced from the Contract
28  Area and they shall have the right to receive, separately, payment of the sale proceeds thereof. In the event a disposition is made to a third
29  party who, at the time of disposition is in receivership or has filed for or has been petitioned into bankruptcy, the disposing party
30  shall also be liable to the other parties for all amounts accrued for operations in which the disposing party chose to participate under
     this Agreement, attributable to the disposed interest prior to the effective date of the disposition.

31  **E.  Waiver of Rights to Partition:**
32

33  If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
34  undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
35  interest therein.
36

37  **F.  —— Preferential Right to Purchase:**
38

39  —— Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract
40  Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the
41  name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price and all other terms
42  of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase
43  on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchase
44  ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-
45  ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to
46  dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-
47  pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.
48

49

50  ## ARTICLE IX.
## INTERNAL REVENUE CODE ELECTION

51

52  This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
53  for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
54  and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
55  purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
56  from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as per-
57  mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
58  ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
59  United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
60  and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
61  evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
62  Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
63  action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
64  Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
65  Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is per-
66  mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
67  tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
68  computation of partnership taxable income.
69
70

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE X.
## CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed __Ten Thousand and No/100__ Dollars ($ __10,000.00__ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, ~~or by telex or telecopier~~ and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, ~~or sent by telex or telecopier.~~ Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☐  Option No. 1:  So long as any of the oil and gas subject to this agreement remain or are continued in force as to any part of the Contract Area whether by production, extension, renewal, or otherwise.

☒  Option No. 2:  In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of __180__ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within __180__ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XIV.
## COMPLIANCE WITH LAWS AND REGULATIONS

### A. Laws, Regulations and Orders:

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, or-dinances, rules, regulations, and orders.

### B. Governing Law:

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ Alabama _____ shall govern.

### C. Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offset-ting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or ap-plication was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as aresult of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", its same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

## ARTICLE XV.
## OTHER PROVISIONS
## (14-1 through 14-3)

- 14 -

# ARTICLE XV
## ADDITIONAL PROVISIONS

### A. PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1) An election to perform additional logging, coring or testing;

(2) An election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;

(3) An election to plug back and attempt to complete the well in a shallower depth or formation;

(4) An election to deepen the well to a new objective formation;

(5) An election to sidetrack the well;

(6) An election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;

(7) An election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of a majority in interest (not in number) of the consenting parties, a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth. In such event, the operation, which, in the opinion of said majority in interest is less likely to jeopardize the well, will be given priority. Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail. It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests. For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

### B. HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

### C. DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties. If the parties are equally divided, the opinion of the Operator will prevail.

### D. INDEMNITY

Each Non-Operator shall defend, indemnify and hold Operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operator's officers, employees and/or agents, resulting from or in any way relating to such officers, employees, and/or agents presence on a drilling rig on the Contract Area or from such person traveling by air or water between any point and such drilling rig, including, without limitation, claims arising out of THE FAULT, LIABILITY, NEGLIGENCE OR GROSS NEGLIGENCE OF OPERATOR. Such indemnity to Operator shall also apply to any other person whose presence on the rig or transportation to or from such rig is at the request of the indemnifying Non-Operator.

### E. SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

### F. NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

14-1

## G.  PRIOR AGREEMENTS

The Sklar Parties are also parties to another operating agreement (the "Sklar JOA") by and between Sklar Exploration Company L.L.C., as Operator, and the Sklar Parties, as Non-Operators, covering lands that include, among other lands, the Contract Area of this Agreement.  Likewise, the Pruet Parties are also parties to another operating agreement (the "Pruet JOA") by and between Pruet Operating Company, as Operator, and the Pruet Parties, as Non-Operators covering lands that include, among other lands, the Contract Area of this Agreement.  The Sklar JOA and the Pruet JOA are referred to herein as the Prior Agreements.  None of the parties to this Agreement shall have any rights or obligations under a Prior Agreement unless he/she/it is now, or later becomes by separate instrument, a Party to such Prior Agreement.  If there is a conflict between this Agreement and a Prior Agreement, then, as between the parties to the Prior Agreement, the Prior Agreement shall govern and prevail.  Except as provided in the preceding sentence, this Agreement shall control as among the parties hereto with respect to the matters covered hereby.

## H.  INTERESTS OF THE PARTIES

Subject to the provisions of Article XV.G above, the provisions set forth in this Article XV.H shall apply and govern in lieu of the other provisions of this Agreement to the extent the provisions of this Article XV.H are inconsistent with those provisions.  If Operator invoices the Parties for costs associated with the Initial Well based upon title examination of the drilling unit for that well as of a date prior to the commencement of operations for the drilling of that well, and if any of the oil and gas leases described in Exhibit "A-1" terminate prior to the commencement of operations for the drilling of the Initial Well, then, in that event, Operator shall cause its title examination to the drilling unit to be updated and shall invoice the Parties all costs associated with the Initial Well based upon the updated title examination and shall credit any amounts previously invoiced and refund any amounts previously over paid by any Non-Operators based upon the prior title examination.  Nothing herein shall prevent any Non-Operator from contesting the accuracy or validity of any title opinion if it believes in good faith that the title opinion is inaccurate or invalid.

Pruet Production Co. subscribes to and is a party to this Agreement as agent and nominee for and on behalf of the Pruet Parties.  Operator may invoice Pruet Production Co., as agent and nominee for the Pruet Parties, all costs attributable to the Pruet Leases and owed by the Pruet Parties.  Operator may also disburse to Pruet Production Co., as agent and nominee for the Pruet Parties, all proceeds from the sale of oil and gas produced from wells located within the Contract Area attributable to the Pruet Leases, including proceeds attributable to royalties, overriding royalties and working interest under such leases.  Any notice delivered to Pruet Production Co. under this Agreement shall be deemed to be delivered to the Pruet Parties as well.  Pruet Production Co. also agrees to act as agent and nominee with respect to non-consent interest as set forth in Article XV.I of this Agreement.

## I.  NON-CONSENT BY PRUET AND/OR SKLAR PARTIES

All of the Sklar Parties and all of the Pruet Parties have consented to participate in the drilling of the Initial Well pursuant to Article VI.A of this Agreement.  Elections to participate in any subsequent operations under Article VI.B of this Agreement shall be made by Pruet Production Co. on behalf of all of the interest of the Pruet Parties and by Operator on behalf of all of the interest of the Sklar Parties.  If one or more of the Sklar Parties elects not to participate in a subsequent operation, the non-consent interest shall be assumed by the remaining Sklar Parties pursuant to the terms of the Sklar JOA, whereas if one or more of the Pruet Parties elects not to participate in a subsequent operation, the non-consent interest shall be assumed by the remaining Pruet Parties pursuant to the terms of the Pruet JOA.  Accordingly, insofar as the Sklar Parties and the Pruet Parties are concerned, the provisions of Article VI.B.2 of this Agreement shall only apply to elections to which either Pruet Production Co. non-consents on behalf of all of the Pruet Parties or Operator non-consents on behalf of all of the Sklar Parties.

## J.  EXECUTION

This Agreement shall be binding upon each party that executes this Agreement without regard to whether this same instrument, or any copy or counterpart hereof shall be executed by any other parties.

## K.  HEADINGS FOR CONVENIENCE

The headings used in this Agreement are inserted for convenience only and shall not be regarded in construing or interpreting this Agreement.

## L.  RELATIONSHIP OF THE PARTIES

In their relations with each other under this Agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's length basis in accordance with their own self interest.

## M.  PAYMENT OF LEASE ROYALTIES AND OTHER BURDENS

If requested, Operator may, but is not obligated to, pay any royalty, overriding royalty, production payment, or other burden on production (regardless of whether or not it exceeds the amount stipulated in Article III.B.) on behalf of the party obligated to make such payment.  And if operator makes such payment, it shall not be liable for any mistake made in making the payment, and the party who is obligated to make such payment agrees to reimburse Operator for any additional cost or expense that may be incurred in connection with making such payment and to save Operator harmless from, and indemnify Operator against, any loss, cost, damage or expense of any nature whatsoever (including reasonable attorneys' fees and regardless of whether or not caused by negligence of Operator) arising out of any claim or suit relating to payments made or not made by Operator on behalf of such party.  If Operator commences making such payments on behalf of any party hereto, it may thereafter cease making such payments provided that, thirty (30) days prior to such cessation, it notifies the party in question that it intends to cease making such payments.

14-2

N. POOLING

Many of the Leases described on Exhibit A-1 grant to the lessee thereunder the right to pool or unitize the Lease and the lands covered thereby (or portions thereof) with other lands or leases (or portions thereof) to establish units for wells. The parties for themselves and for their successors and assigns hereby grant to Operator and its successors the right to exercise any such pooling or unitization rights so granted to them, or any of them, with full authority to execute (for them and on their behalf) any documents deemed necessary or appropriate to effectuate said pooling or unitization and hereby agree and stipulate that any instrument or declaration executed by the Operator (or its successor) with respect to any such pooling or unitization shall have the same force and effect as one executed by all of the parties to this Agreement (and their successors and assigns). Nothing in this paragraph shall limit or alter a party's right to consent or not consent to any operation in accordance with and subject to the terms of this Agreement, and the power and authority granted to the Operator in this Section shall remain in effect so long as this Agreement remains in effect and shall not be affected by the death or incompetency of any party who is a natural person.

O. WAIVER OF RIGHT TO TRIAL BY JURY

Each of the parties to this Agreement hereby waives the right to trial by jury in any litigation between any of the parties relating to this Agreement.

P. CONFLICTS WITH OTHER PROVISIONS

Should any provision of this Article XV conflict or be inconsistent with any other provision of this Agreement, then the provision of this Article XV shall govern and control.

14-3

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 1st _____ day of _____ April _____, (year) _____ 2013

~~who has prepared and circulated this form for execution, represents and warrants that the form~~
~~was printed from and with the exception listed below, is identical to the A.A.P.L. Form 610-1982 Model Form Operating Agreement as~~
~~published in diskette form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Article~~
_____ ~~have been made to the form.~~

OPERATORS

SKLAR EXPLORATION COMPANY L.L.C.

_____
DAVID A. BARLOW
Vice President-Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

_____
DAVID A. BARLOW
Vice President-Chief Operating Officer

McCOMBS ENERGY, LTD.

_____
RICKY HARKIN, Vice President

TAUBER EXPLORATION & PRODUCTIN COMPANY

_____
RICHARD TAUBER, President

PICKENS FINANCIAL GROUP, LLC

_____
MICHAEL K. PICKENS, Vice President

JJS WORKING INTERESTS LLC
Houston Bulldog Capital Management, LLC, its Manager

_____
JUSTIN SIMONS, Manager of Houston Bulldog Capital
Management, LLC

JSS INTERESTS LLC

_____
JONATHAN SIMONS, Manager

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1
2        ARTICLE XVI.
3        MISCELLANEOUS
4
5   This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees,
6   legal representatives, successors and assigns.
7
8   This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.
9
10  IN WITNESS WHEREOF, this agreement shall be effective as of _____ 1st _____ day of _____ April _____ , (year) 2013
11  _____ who has prepared and circulated this form for execution, represents and warrants that the form
12  was printed from and with the exception listed below, is identical to the the AAPL Form 610 1982 Model Form Operating Agreement, as
13  published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications other than those in Articles _____
14  _____ have been made to the form
15
16      O P E R A T O R
17
18      SKLAR EXPLORATION COMPANY L.L.C.
19
20
21
22      DAVID A. BARLOW
23      Vice President-Chief Operating Officer
24
25      N O N - O P E R A T O R S
26
27
28
29
30      SKLARCO L.L.C.
31
32
33      DAVID A. BARLOW
34      Vice President-Chief Operating Officer
35
36      McCOMBS ENERGY, LTD.
37
38
39
40      RICKY HAIRIN, Vice President
41
42
43      TAUBER EXPLORATION & PRODUCTIN COMPANY
44
45
46      RICHARD TAUBER, President
47
48
49
50      PICKENS FINANCIAL GROUP, LLC
51
52
53      MICHAEL R. PICKENS, Vice President
54
55
56      JSS WORKING INTERESTS LLC
57      Houston Bulldog Capital Management, LLC, its Manager
58
59
60
61
62      JUSTIN SIMONS, Manager of Houston Bulldog Capital
63      Management, LLC
64
65      JSS INTERESTS LLC
66
67
68
69      JONATHAN SIMONS, Manager
70

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XVI.
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 1st _____ day of _____ April _____, (year) __2013__

who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below is identical to the A.A.P.L. Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations or modifications other than those in Articles _____ have been made to the form.

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

DAVID A. BARLOW
Vice President-Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

DAVID A. BARLOW
Vice President-Chief Operating Officer

McCOMBS ENERGY, LTD.

RICKY HAIKIN, Vice President

TAUBER EXPLORATION & PRODUCTION CO.

RICHARD TAUBER, President

PICKENS FINANCIAL GROUP, LLC

MICHAEL K. PICKENS, Vice President

JJS WORKING INTERESTS LLC
Houston Bulldog Capital Management, LLC, its Manager

JUSTIN SIMONS, Manager of Houston Bulldog Capital Management, LLC

JJS INTERESTS LLC

JONATHAN SIMONS, Manager

Signature / Acknowledgement Pages to that certain Operating Agreement, dated April 1, 2013, Sklar Exploration Company, LLC, as Operator; Contract Area – Kennedy 36-12 # 1 Well, SW/4, Section 36, T4N, R12E, Conecuh County, Alabama.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ the _____ day of _____ April _____ , (year) 2011.

~~who has prepared and circulated this form for execution, represents and warrants that the form~~
~~was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as~~
~~published in whole to form by Form-A-Chek, Inc. No changes, alterations, or modifications other than those in Article _____~~
~~have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.
_____

HOWARD A. SKLAR
Vice President-Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.
_____

HOWARD A. SKLAR
Vice President-Chief Operating Officer

McCOMBS ENERGY, LTD.
_____

RICKY RAIKIN, Vice President
_____

TAUBER EXPLORATION & PRODUCTION COMPANY
_____

RICHARD TAUBER, President
_____

PICKENS FINANCIAL GROUP, LLC
_____

MICHAEL L. PICKENS, President

J2S WORKING INTERESTS LLC
Houston Building Capital Management, LLC, its Manager
_____

JUSTIN SIMONS, Manager of Houston Building Capital
Management, LLC

J5S INTERESTS LLC
_____

JONATHAN SIMONS, Manager

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 1st _____ day of _____ April _____ , (year) _____ 2013 _____

~~who has prepared and circulated this form for execution represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in dickets form by Forms-On-A-Disk, Inc. No changes, alteration, or modifications other than those in Articles _____ have been made to the form~~

O P E R A T O R

SKLAR EXPLORATION COMPANY L.L.C.

_____
DAVID A. BARLOW
Vice President-Chief Operating Officer

N O N - O P E R A T O R S

SKLARCO L.L.C.

_____
DAVID A. BARLOW
Vice President-Chief Operating Officer

McCOMBS ENERGY, LTD.

_____
RICKY HARKIN, Vice President

TAUBER EXPLORATION & PRODUCTION COMPANY

_____
RICHARD TAUBER, President

PICKENS FINANCIAL GROUP, LLC

_____
MICHAEL K. PICKENS, Vice President

JJS WORKING INTERESTS LLC
Houston Bulldog Capital Management, LLC, its Manager

_____
JJS INVESTORS, Manager of Houston Bulldog Capital Management, LLC

JSS INTERESTS LLC

_____
JONATHAN SIMONS, Manager

- 15 -

K 3412

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

TISDALE NATURAL RESOURCES, LLC

PRUET PRODUCTION, CO

WILLIAM K. JAMES, President

DBC RESOURCES, LP

DONALD J. CLARK,
President of DBC Management LLC, Its General Manager

DCOD, L.L.C.

DALE CLARK, Partner

BOBBY COLEMAN

FOUR D LLC

K. L. DOUGLAS, Manager

FIDDLER INVESTMENTS

HAROLD K. DUNN, General Manager

FRANKS EXPLORATION COMPANY, LLC

BOBBY E. JELKS, Manager

JCE GALBRAITH OIL & GAS, L.L.C.

JOAN McDONOUGH, General Manager

GASTON OIL COMPANY

ROBERT S. GASTON, President

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

TISDALE NATURAL RESOURCES, LLC

*George W Tisdale*

*Manager Tisdale Natural Resources*

PRUET PRODUCTION CO

WILLIAM K. JAMES, President

DBC RESOURCES, LP

DONALD J. CLARK,
President of DBC Management LLC, Its General Manager

DCOD, L.L.C.

DALE CLARK, Partner

BOBBY COLEMAN

FOUR D LLC

R. E. DOUGLAS, Manager

FIDDLER INVESTMENTS

HAROLD K. DUNN, General Manager

FRANKS EXPLORATION COMPANY, LLC

BOBBY E. ELLIS, Manager

JCE GALBRAITH OIL & GAS, L.L.C.

JOAN MCDONOUGH, General Manager

GASTON OIL COMPANY

ROBERT S. GASTON, President

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

THE RUDMAN PARTNERSHIP

_____
W.K. (TREY) SIBLEY, as its Attorney-in-Fact

TISDALE NATURAL RESOURCES, LLC

_____
JOHN W. TISDALE, Sr., as Manager

PRUET PRODUCTION CO

_____
WILLIAM K. JAMES, President

DBC RESOURCES, LP

_____
DONALD L. CLARK,
President of DBC Management LLC, Its General Manager

DCOD, L.L.C.

_____
DALE CLARK, Partner

BOBBY COLEMAN

FOUR D LLC

_____
K. L. DOUGLAS, Manager

FIDDLER INVESTMENTS

_____
HAROLD R. DUNN, General Manager

FRANKS EXPLORATION COMPANY, LLC

_____
BOBBY E. JELKS, Manager

JCE GALBRAITH OIL & GAS, L.L.C.

_____
JOAN MCDONOUGH, General Manager

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

THE RUDMAN PARTNERSHIP

_WEX (TRUST) SHELL, as its Authorized Person

TISDALE NATURAL RESOURCES, LLC

JOHN W. TISDALE, SR., as Manager

PRUET PRODUCTION CO.

WILLIAM R. JAMES, President



DBK RESOURCES, LLC
DONALD DEAN,
President of DBK Management LLC, Its General Manager

DCOOL, L.L.C.

DALE CLARK, Partner

BOBBY COLEMAN

FOUR D LLC

N. L. DOUGLAS, Manager

FIDDLER INVESTMENTS

HAROLD R. DUNN, General Manager

FRANKS EXPLORATION COMPANY, LLC

BOBBY E. ELLIS, Manager

JCE GALBRAITH OIL & GAS, L.L.C.

JOHN MCDONOUGH, General Manager

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

THE RUDMAN PARTNERSHIP

WACHTREJTSHLETY,SIS AIRsofwysurasat

TISDALE NATURAL RESOURCES, LLC

JOHN W. TISDALE, Sr., as Manager

FRUET PRODUCTION CO.

WILLIAM K. FAULK, President

D&C RESOURCES, LP

DONALD J. OGANS,
President of D&C Management LLC, Its General Manager

DCOR, L.C.

DALE CLOSE, President

BOBBY COLEMAN

FOUR D LLC

R. E. DOUGLAS, Manager

FIDDLER INVESTMENTS

HAROLD E. DUNN, General Manager

FRANKS EXPLORATION COMPANY, LLC

BOBBY E. JELKS, Manager

JCE GALBRAITH OIL & GAS, L.L.C.

JOAN MCDONOUGH, General Manager

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

THE RUDMAN PARTNERSHIP

W.K. (PAT) SHELLY, as its Attorney-in-Fact

TISDALE NATURAL RESOURCES, LLC

JOHN W. TISDALE, SR., as Manager

PRUET PRODUCTION CO.

WILLIAM K. ANDERSON II

DBC RESOURCES, LP

DON LITTLE JOHN
President of DBC Management LLC, Its General Manager

DCOO, L.L.C.

DALE CLARK, Partner

BOBBY COLEMAN

FOUR D LLC

R. L. DOUGLAS, Manager

FIDDLER INVESTMENTS

HAROLD K. DUNN, General Manager

FRANKS EXPLORATION COMPANY, LLC

BOBBY C. FLENS, Manager

JCE GALBRAITH OIL & GAS, LLC

JOHN MCDONOUGH, General Manager

- 15 -

p.3

970-259-2032

FOUR D LLC

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

THE RUDMAN PARTNERSHIP

W.K. (IKE) TISDALE, an individual

TISDALE NATURAL RESOURCES, LLC

JOHN W. TISDALE, as its Manager

PRIEST PRODUCTIONS CO

WILLIAM H. PRIEST, President

DRC RESOURCES, LP

DOUGLAS RANCH
President of DRC Management, LLC, its General Manager

DCOR, LLC

DALE CLARK, Partner

BOBBY COLEMAN

FOUR D LLC

J.C. DOUGLAS, Manager

FIDDLER INVESTMENTS

HAROLD E. DUNN, General Manager

FRANKS EXPLORATION COMPANY, LLC

BOBBY E. FRANKS, Manager

JCK GALBRAITH OIL & GAS, L.L.C.

JONATHON DUNCAN, General Manager

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

THE RUDMAN PARTNERSHIP

_____
W.R. (TREY) SIBLEY, as its Attorney-in-Fact

TISDALE NATURAL RESOURCES, LLC

_____
JOHN W. TISDALE, Sr., as Manager

PRUET PRODUCTION CO.

_____
WILLIAM K. JAMES, President

DBC RESOURCES, LP

_____
DONALD J. CLARK,
President of DBC Management LLC, Its General Manager

DCOD, L.L.C.

_____
DALE CLARK, Partner

_____
BOBBY COLEMAN

FOUR D LLC

_____
K.L. DOUGLAS, Manager

FIDDYER INVESTMENTS

_____
HAROLD K. DUNN, General Manager

FRANKS EXPLORATION COMPANY, LLC

_____
BOBBY E. JELKS, Manager

JCE GALBRAITH OIL & GAS, L.L.C.

_____
JOAN MCDONOUGH, General Manager

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

THE RUDMAN PARTNERSHIP

_____
W.K. (IKE) SIBLEY, as its Attorney-in-Fact

TISDALE NATURAL RESOURCES, LLC

_____
JOHN W. TISDALE, Sr., as Manager

PRUET PRODUCTION CO.

_____
WILLIAM K. JAMES, President

DBC RESOURCES, LP

_____
DONALD J. CLARK,
President of DBC Management LLC, Its General Manager

DCOB, L.L.C.

_____
DALE CLARK, Partner

_____
BOBBY COLEMAN

FOUR D LLC

_____
K. E. DOUGLAS, Manager

FIDDLER INVESTMENTS

_____
HAROLD K. DUNN, General Manager

FRANKS EXPLORATION COMPANY, LLC

_____
BOBBY E. JELKS, Manager

JCE GALBRAITH OIL & GAS, L.L.C.

_____
JOAN MCDONOUGH, General Manager

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

36-18

THE RUDMAN PARTNERSHIP

W.K. (IKE) TISBELT, as its Attorney-in-Fact

TISDALE NATURAL RESOURCES, LLC

JOHN W. TISDALE, Sr., as Manager

PRLET PRODUCTION CO.

WILLIAM K. JANSSY, President

DBC RESOURCES, LP

DONALD J. DUNN,
President of DBC Management LLC, Its General Manager

DCOB, L.L.C.

DALE CLARK, Partner

BOBBY COLEMAN

FOUR D LLC

R. E. DOUGLAS, Manager

FIDDLER INVESTMENTS

HAROLD R. DUNN, General Manager

FRANKS EXPLORATION COMPANY, LLC

BOBBY E. JEAN, Manager

ICE GALBRAITH OIL & GAS, LLC

RON CONROY, Its General Manager

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

BUNFERO INVESTMENT COMPANY, L.L.C.

_[signature]_
ROBERT F. BOWMAN, Manager

CRAFT EXPLORATION COMPANY L.L.C.

STEVEN H. CRAFT, Managing Member

DICKSON OIL & GAS, LLC

C. BICKHAM DICKSON, III, Member

FANT ENERGY LIMITED
Richard E. Fant, LLC, the General Partner of Fant Energy Limited

RICHARD FANT, Manager of Richard E. Fant, LLC, the General Partner of Fant Energy Limited

FLEET HOWELL

KUDZU OIL PROPERTIES, LLC

WIRT A. YERGER, III, Manager

LANDMARK EXPLORATION, LLC

LARRY JOHNSON, Managing Member

MARKSCO, L.L.C.

MARK T. SEALY, Member

TIEMBO LTD.
Simba Investors L.L.C., General Partner of Tiembo Ltd.

MARK KAUCH, Member of Simba Investors L.L.C., The General Partner of Tiembo, Ltd.

RESOURCE VENTURES, LLC

MARK ARNOLD, General Manager

_[signatures in left margin]_
Philip S.
Steen E. Allen

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

BUNDERO INVESTMENT COMPANY, L.L.C.

ROBERT P. BOWMAN, Manager

CRAFT EXPLORATION COMPANY L.L.C.

STEVEN H. CRAFT, Managing Member

DICKSON OIL & GAS, LLC

C. BURNAM DICKSON, III, Member

FANT ENERGY LIMITED
Richard E. Fant, LLC, the General Partner of Fant Energy
Limited

RICHARD FANT, Manager of Richard E. Fant, LLC, the
General Partner of Fant Energy Limited

FLEET HOWELL

KUDZU OIL PROPERTIES, LLC

WIRT A. YERGER, III, Manager

LANDMARK EXPLORATION, LLC

LARRY JOHNSON, Managing Member

MARKSCO, L.L.C.

MARK P. SEALY, Member

TIEMBO LTD.
Simba Investors L.L.C., General Partner of Tiembo Ltd.

MARK RAVICH, Member of Simba Investors L.L.C.,
The General Partner of Tiembo, Ltd.

RESOURCE VENTURES, LLC

MARK ARNOLD, General Manager

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

BUNDERO INVESTMENT COMPANY, L.L.C.

ROBERT F. BOWMAN, Manager

CRAFT EXPLORATION COMPANY L.L.C.

STEVEN H. CRAFT, Managing Member

DICKSON OIL & GAS, LLC

C. B. CRAFT DICKSON, III, Member

FANT ENERGY LIMITED
Richard E. Fant, LLC, the General Partner of Fant Energy Limited

RICHARD FANT, Manager of Richard E. Fant, LLC, the General Partner of Fant Energy Limited

FLEET HOWELL

KUDZU OIL PROPERTIES, LLC

WIRT A. YERGER, III, Manager

LANDMARK EXPLORATION, LLC

LARRY JOHNSON, Managing Member

MARKSCO, L.L.C.

MARK F. SEALY, Member

TIEMBO LTD.
Simba Investors L.L.C., General Partner of Tiembo Ltd.

MARX KATZ, H. Member of Simba Investors L.L.C., The General Partner of Tiembo, Ltd.

THE RUDMAN PARTNERSHIP

W.R. (TREY) SIBLEY, as its Attorney-in-Fact

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

BUNDERO INVESTMENT COMPANY, L.L.C.

_____
ROBERT F. BOWMAN, Manager

CRAFT EXPLORATION COMPANY L.L.C.

_____
STEVEN H. CRAFT, Managing Member

DICKSON OIL & GAS, LLC

_____
C. BICKHAM DICKSON, III, Member

FANT ENERGY LIMITED
Richard _____ L.L.C. the General Partner of Fant Energy
Limited

_____
RICHARD FANT, Manager of Richard E. Fant, LLC, the
General Partner of Fant Energy Limited

_____
FLEET HOWELL

KUDZU OIL PROPERTIES, LLC

_____
WIRT A. YERGER, III, Manager

LANDMARK EXPLORATION, LLC

_____
LARRY JOHNSON, Managing Member

MARSSCO, L.L.C.

_____
MARK F. SEALY, Member

TIEMBO LTD.
Simba Investors L.L.C., General Partner of Tiembo Ltd.

_____
MARK KATCH, Manager of Simba Investors L.L.C.,
The General Partner of Tiembo, Ltd.

THE RUDMAN PARTNERSHIP

_____
W.K. (TREY) SIBLEY, as its Attorney-in-Fact

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1
2
3    BUNDERO INVESTMENT COMPANY, L.L.C.
4
5    _____
6    ROBERT F. BOWMAN, Manager
7
8    CRAFT EXPLORATION COMPANY L.L.C.
9
10   _____
11   STEVEN H. CRAFT, Managing Member
12
13   DICKSON OIL & GAS, LLC
14
15   _____
16   C. BUCKHAM DICKSON, III, Member
17
18   FANT ENERGY LIMITED
19   Richard E. Fant, LLC, the General Partner of Fant Energy
20   Limited
21
22
23
24   _____
25   RICHARD FANT, Manager of Richard E. Fant, LLC, the
26   General Partner of Fant Energy Limited
27
28
29
30
31
32
33
34
35
36
37   KUDZU OIL PROPERTIES, LLC
38
39   _____
40   WIRT A. YERGER, III, Manager
41
42
43   LANDMARK EXPLORATION, LLC
44
45
46   _____
47   LARRY JOHNSON, Managing Member
48
49
50   MARKSCO, L.L.C.
51
52   _____
53   MARK P. SEALY, Member
54
55
56   TIEMBO LTD.
57   Simba Investors L.L.C., General Partner of Tiembo Ltd.
58
59
60   _____
61   MARK SEALY, Member of Simba Investors L.L.C.,
62   The General Partner of Tiembo, Ltd.
63
64
65
66   THE RUDMAN PARTNERSHIP
67
68   _____
69   W.K. (TREY) SHELY, as its Attorney-in-Fact
70

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

BUNDERO INVESTMENT COMPANY, L.L.C.

ROBERT F. BOWMAN, Manager

CRAFT EXPLORATION COMPANY L.L.C.

STEVEN H. CRAFT, Managing Member

DICKSON OIL & GAS, LLC

C. BUCHANAN DICKSON, JR., Member

FANT ENERGY LIMITED
Richard E. Fant, LLC, the General Partner of Fant Energy
Limited

Richard Fant, Manager of Richard E. Fant, LLC, the
General Partner of Fant Energy Limited

FLEET HOWELL

KUDZU OIL PROPERTIES, LLC

WIRT A. YERGER, III, Manager

LANDMARK EXPLORATION, LLC

LARRY JOHNSON, Managing Member

MARISCO, L.L.C.

MARK P. SEALY, Member

TIEMBO LTD.
Simba Investors L.L.C., General Partner of Tiembo Ltd.

Mason Kelly II, Member of Simba Investors L.L.C.,
The General Partner of Tiembo, Ltd.

THE RUDMAN PARTNERSHIP

WM. (TREY) SIBLEY, as its Attorney-in-Fact

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

BUNDERO INVESTMENT COMPANY, L.L.C.

_____
ROBERT F. BOWMAN, Manager

CRAFT EXPLORATION COMPANY L.L.C.

_____
STEVEN H. CRAFT, Managing Member

DICKSON OIL & GAS, LLC

_____
C. BICKHAM DICKSON, III, Member

FANT ENERGY LIMITED
Richard E. Fant, LLC, the General Partner of Fant Energy Limited

By: _____
RICHARD FANT, Manager of Richard E. Fant, LLC, the General Partner of Fant Energy Limited

_____
FLEET HOWELL

KUDZU OIL PROPERTIES, LLC

_____
WIRT A. YERGER, III, Manager

LANDMARKS EXPLORATION, LLC

_____
LARRY OLINSON, Managing Member

MARKSCO, L.L.C.

_____
MARK F. SEALY, Member

TIEMBO LTD.
Simba Investors L.L.C., General Partner of Tiembo Ltd.

By: _____
MARK KAUCH, Member of Simba Investors L.L.C., The General Partner of Tiembo, Ltd.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

BUNDERO INVESTMENT COMPANY, L.L.C.

ROBERT F. BOWMAN, Manager

CRAFT EXPLORATION COMPANY L.L.C.

STEVEN H. CRAFT, Managing Member

DICKSON OIL & GAS, LLC

C. BICKHAM DICKSON, III, Member

FANT ENERGY LIMITED
Richard E. Fant, LLC, the General Partner of Fant Energy
Limited

RICHARD FANT, Manager of Richard E. Fant, LLC, the
General Partner of Fant Energy Limited

FLEET HOWELL

KUDZU OIL PROPERTIES, LLC

WIRT A. YERGER, III, Manager

LANDMARK EXPLORATION, LLC

LARRY JOHNSON, Managing Member

MARKSCO, L.L.C.

MARK F. SEALY, Member

TIEMBO LTD.
Simba Investors L.L.C., General Partner of Tiembo Ltd.

MARK KAUCH, Member of Simba Investors L.L.C.
The General Partner of Tiembo, Ltd.

THE RUDMAN PARTNERSHIP

W.R. (TREY) SIBLEY, as its Attorney-in-Fact

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

BUNDERO INVESTMENT COMPANY, L.L.C.

_____
ROBERT F. BOWDON, Manager

CRAFT EXPLORATION COMPANY L.L.C.

_____
STEVEN H. CRAFT, Managing Member

DICKSON OIL & GAS, LLC

_____
C. BUCKNAM DICKSON, III, Member

FANT ENERGY LIMITED
Richard E. Fant, LLC, the General Partner of Fant Energy
Limited

_____
RICHARD FANT, Manager of Verdura E. Fant, LLC, the
General Partner of Fant Energy Limited

FLEET HOWELL

_____

KUDZU OIL PROPERTIES, LLC

_____
WIRT A. YERGER, III, Manager

LANDMARK EXPLORATION, LLC

_____
LARRY JOHNSON, Managing Member

MARKSCO, L.L.C.

_____
MARK T. SEALY, Member

TIEMBO LTD.
Simba Invstors L.L.C. General Partner of Tiembo Ltd.

_____
MARK KAYNE, Member Simba Investors L.L.C.,
The General Partner of Tiembo, Ltd.

THE RUDMAN PARTNERSHIP

_____
W.K. (TREY) SIBLEY, as it Attorney-in-Fact

- 15 -

Signature Page - Kennedy 36-12 #1 Well
JOA- Conecuh County, Alabmaa
Dated April 1, 2013

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

BUNDERO INVESTMENT COMPANY, L.L.C.

_____
ROBERT P. BOWMAN, Manager

CRAFT EXPLORATION COMPANY L.L.C.

_____
STEVEN H. CRAFT, Managing Member

DICKSON OIL & GAS, LLC

_____
C. BICKHAM DICKSON, III, Member

FANT ENERGY LIMITED
Richard E. Fant, LLC, the General Partner of Fant Energy
Limited

_____
RICHARD FANT, Manager of Richard E. Fant, LLC, the
General Partner of Fant Energy Limited

_____
FLEET HOWELL

KUDZU OIL PROPERTIES, LLC

_____
WIRT A. YERGER, III, Manager

LANDMARK EXPLORATION, LLC

_____
LARRY JOHNSON, Managing Member

MARKSCO, L.L.C.

_____
MARK F. SEALY, Member

TIEMBO LTD.
Simba Investors L.L.C. General Partner of Tiembo Ltd.

_____
MARK KOELER, Member of Simba Investors L.L.C.,
the General Partner of Tiembo, Ltd.

THE RUDMAN PARTNERSHIP

_____
W.R. (RICK) RUDMAN, as its Attorney-in-Fact

* Execution is subject to that certain Conditional Letter of Acceptance dated
June 4, 2013

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

GASTON OIL COMPANY

*Robert S. Gaston*

ROBERT S. GASTON, President

HALL MANAGEMENT, LLC

DONALD L. HALL, President

HANSON OPERATING CO., INC.

RAY WILLIS, President

J&A HARRIS, LP

HUGHES 2000 LLC

ROBBIE HUGHES, Vice President

HUGHESOIL, INC.

ROBBIE HUGHES, Vice President

KMR INVESTMENTS, LLC

MIKE HAYS, President

PAM-LIN CORPORATION

DONALD L. CLARK, President

PETROLEUM INVESTMENTS, INC.

CAMILLE C. DESPOT, President

SAWYER DRILLING & SERVICE INC.

RONALD L. SAWYER, President

RYCO EXPLORATION, LLC

W. ROBIN SMITH, President

- 15 -

Jul 10 2013 10:22AM   THE UPS STORE   2087266897   P.2

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

CASTON OIL COMPANY

1
2
3   ROBERT S. CASTON, PRESIDENT
4
5
6   HALL MANAGEMENT, LLC
7
8
9   _DONALD N. HALL, PRESIDENT_
10
11
12
13
14
15   HANSON OPERATING CO., INC.
16
17   KIT WELLS, PRESIDENT
18
19
20   JILA PARTS, LP
21
22
23   BY:
24
25
26   HUGHES 2000 LLC
27
28
29   RUSSEL HUGHES, VICE PRESIDENT
30
31
32
33   HUGHESPOL, INC.
34
35
36
37   RUSSEL HUGHES, VICE PRESIDENT
38
39
40   KMR INVESTMENTS, LLC
41
42
43   DALE DAYS, MEMBER
44
45
46   FAM-LIN CORPORATION
47
48
49   DONALD F. CLARK, PRESIDENT
50
51
52   PETROLEUM INVESTMENTS, INC.
53
54
55   CAMILLE C. DESPOT, PRESIDENT
56
57   SAWYER DRILLING & SERVICE INC.
58
59
60
61   HAROLD L. SAWYER, PRESIDENT
62
63
64   RYCO EXPLORATION, LLC
65
66
67   W. ROBIN SMITH, PRESIDENT
68
69
70

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

GASTON OIL COMPANY

ROBERT S. GASTON, President

HALL MANAGEMENT, LLC

DONALD L. HALL, President

HANSON OPERATING CO., INC.

KAY WILLIS, President

J&A HARRIS, LP

HUGHES 2000 LLC

ROBBIE HUGHES, Vice President

HUGHESOIL, INC.

ROBBIE HUGHES, Vice President

KMR INVESTMENTS, LLC

MIKE HAYS, President

PAM-LIN CORPORATION

DONALD L. CLARK, President

PETROLEUM INVESTMENTS, INC.

CAMILLE C. DESPOT, President

SAWYER DRILLING & SERVICE INC.

RONALD L. SAWYER, President

RYCO EXPLORATION, LLC

M. ROBIN SMITH, President

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1
2 GASTON OIL COMPANY
3
4 ROBERT S. GASTON, President
5
6 HALL MANAGEMENT, LLC
7
8
9 DONALD L. HALL, President
10
11
12 HANSON OPERATING CO., INC.
13
14
15
16 KAY WILLIS, President
17
18
19
20 J&A HARRIS, LP
21 *Angela Harris*
22 *Angela Harris, as Manager*
23 *Alice Baltoteki*
24
25 *Evelyn Collier*
26
27 HUGHES 2000 LLC
28
29
30 ROBBIE HUGHES, Vice President
31
32
33 HUGHESOIL, INC.
34
35
36 ROBBIE HUGHES, Vice President
37
38
39
40 KMR INVESTMENTS, LLC
41
42
43 MIKE HAYS, President
44
45
46 PAM-LIN CORPORATION
47
48
49
50 DONALD L. CLARK, President
51
52
53 PETROLEUM INVESTMENTS, INC.
54
55 CAMILLE C. DESPOT, President
56
57
58
59 SAWYER DRILLING & SERVICE INC.
60
61
62
63 RONALD L. SAWYER, President
64
65 RYCO EXPLORATION, LLC
66
67
68
69 M. ROBYN SMITH, President
70

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

GASTON OIL COMPANY

ROBERT S. GASTON, President

HALL MANAGEMENT, LLC

DONALD L. HALL, President

HANSON OPERATING CO., INC.

KAY WILLIS, President

J&A HARRIS, LP

HUGHES 2000 LLC

Robbie W. Hughes (DBA?)
ROBBIE HUGHES, Vice President

HUGHESOIL, INC.

Robbie W. Hughes (DBA?)
ROBBIE HUGHES, Vice President

KMR INVESTMENTS LLC

MIKE HAYS, President

PAM-LIN CORPORATION

DONALD L. CLARK, President

PETROLEUM INVESTMENTS, INC.

CAMILLE C. DESPOT, President

SAWYER DRILLING & SERVICE INC.

RONALD L. SAWYER, President

RYCO EXPLORATION, LLC

W. ROBIN SMITH, President

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

GASTON OIL COMPANY

ROBERT S. GASTON, President

HALL MANAGEMENT, LLC

DONALD L. HALL, President

HANSON OPERATING CO., INC.

KAY WILLIS, President

J&A HARRIS, LP

HUGHES 2000 LLC

ROBBIE HUGHES, Vice President

HUGHESOIL, INC.

ROBBIE HUGHES, Vice President

KMR INVESTMENTS, LLC

Timothy S. Brown - Controller

PAM-LIN CORPORATION

DONALD L. CLARK, President

PETROLEUM INVESTMENTS, INC.

CAMILLE C. DESPOT, President

SAWYER DRILLING & SERVICE INC.

RONALD C. SAWYER, President

RYCO EXPLORATION, LLC

M. ROBIN SMITH, President

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

GASTON OIL COMPANY

ROBERT S. GASTON, President

HALL MANAGEMENT, LLC

DONALD L. HALL, President

HANSON OPERATING CO., INC.

KAY WILLIS, President

J&A HARRIS, LP

HUGHES 2000 LLC

ROBBIE HUGHES, Vice President

HUGHESOIL, INC.

ROBBIE HUGHES, Vice President

KMR INVESTMENTS, LLC

MIKE HAYS, President

PAULIN CORPORATION

DONALD J. PAULIN, President

PETROLEUM INVESTMENTS, INC.

CARROLL C. DISPOTI, President

SAWYER DRILLING & SERVICE INC.

RONALD L. SAWYER, President

RYCO EXPLORATION, LLC

M. ROBIN SMITH, President

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

GASTON OIL COMPANY

ROBERT S. GASTON, President

HALL MANAGEMENT, LLC

DONALD L. HALL, President

HANSON OPERATING CO., INC.

KAY WILLIS, President

J&A HARRIS, LP

, as

HUGHES 2000 LLC

ROBBIE HUGHES, Vice President

HUGHESOIL, INC.

ROBBIE HUGHES, Vice President

KMR INVESTMENTS, LLC

MIKE HAYS, President

PAM-LIN CORPORATION

DONALD L. CLARK, President

PETROLEUM INVESTMENTS, INC.

CAMILLE C. DESPOT, President

SAWYER DRILLING & SERVICE INC.

RONALD L. SAWYER, President

RYCO EXPLORATION, LLC

M. ROBIN SMITH, President

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

GASTON OIL COMPANY

ROBERT S. GASTON, President

HALL MANAGEMENT, LLC

DONALD L. HALL, President

HANSON OPERATING CO., INC.

KAY WILLIS, President

J&A HARRIS, LP

HUGHES 2000 LLC

ROBBIE HUGHES, Vice President

HUGHESOIL, INC.

ROBBIE HUGHES, Vice President

KMR INVESTMENTS, LLC

MIKE HAYS, President

PAM-LIN CORPORATION

DONALD L. CLARK, President

PETROLEUM INVESTMENTS, INC

CAMILLE C. DISIVOLI, President

SAWYER DRILLING & SERVICE INC.

RONALD L. SAWYER, President

RYCO EXPLORATION, LLC

M. ROBIN SMITH, President

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

GASTON OIL COMPANY

ROBERT S. GASTON, President

HALL MANAGEMENT, LLC

DONALD L. HALL, President

HANSON OPERATING CO., INC.

RAY WILLIS, President

J&A HARRIS, LP

HUGHES 2000 LLC

ROBBIE HUGHES, Vice President

HUGHESOIL, INC.

ROBBIE HUGHES, Vice President

KMR INVESTMENTS, LLC

MIKE HAYS, President

PAM-LIN CORPORATION

DONALD L. CLARK, President

PETROLEUM INVESTMENTS, INC.

CAMILLE C. BISHOP, President

SAWYER DRILLING & SERVICE INC.

RONALD L. SAWYER, President

RYCO EXPLORATION LLC

By ROBBY SMITH, President

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

SUGAR OIL PROPERTIES, LP

_Mel Z_ (signature)
J. Melvin ___, President
Mickey Quinlan

R&B OIL & GAS HOLDINGS, LLC

ROBERT BOURNE

HARKNESS A. DUNCAN FAMILY TRUST

H. A. DUNCAN, Trustee

GJR INVESTMENTS, INC.

GRADY COOLSEY, JR., President

M JOHNSON INVESTMENT PARTNERSHIP I, LLP

MELVIN J. JOHNSON, President

DARLENE K. HALL

EDWARD L. YARBOROUGH, JR.

TOM YOUNGBLOOD

W. D. WOUNGER

LEONARD L. WILLIAMS

DON B. SAUNDERS TRUST

DON B. SAUNDERS, as

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1
2
3
4 _____
5                              SUGAR OIL PROPERTIES, LP
6 _____
7                              ALAN SUGAR, President
8 _____
9                              RAB OIL & GAS HOLDINGS, LLC
10 _____
11                             ROBERT BOURNE
12 _____
13                             HARKNESS A. DUNCAN FAMILY TRUST
14 _____
15                             H.A. DUNCAN, Trustee
16 _____
17
18 _____
19                             GJR INVESTMENTS, INC.
20 _____
21
22 _____
23                             GRADY COONSEY, Jr., President
24 _____
25
26 _____
27                             M JOHNSON INVESTMENT PARTNERSHIP I, LLP
28 _____
29
30 _____
31                             MELVIN J. JOHNSON, President
32 _____
33
34 _____
35                             DARLENE A. HALL
36 _____
37
38 _____
39
40 _____
41                             EDWARD L. YARBOROUGH, JR.
42 _____
43
44 _____
45
46 _____
47                             TOM YOUNGBLOOD
48 _____
49
50 _____
51
52 _____
53                             W. D. MOUNGER
54 _____
55
56 _____
57                             LEONARD E. WILLIAMS
58 _____
59
60 _____
61                             DON B. SAUNDERS TRUST
62 _____
63
64 _____
65                             DON R. SAUNDERS, as
66 _____
67
68
69
70

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

SUGAR OIL PROPERTIES, LP

ALAN SUGAR, President

RAB OIL & GAS HOLDINGS, LLC

ROBERT BOURNE

HARKNESS A. DUNCAN FAMILY TRUST

H. A. DUNCAN, Trustee

GJR INVESTMENTS, INC.

GRADY COOKSEY, Jr., President

M JOHNSON INVESTMENT PARTNERSHIP I, LLP

MELVIN J. JOHNSON, President

DARLENE K. HALL

EDWARD L. YARBOROUGH, JR.

TOM YOUNGBLOOD

W. D. WOUNGER

LEONARD E. WILLIAMS

DON B. SAUNDERS TRUST

DON B. SAUNDERS, as

- 15 -

Kennedy 36-12

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

SUGAR OIL PROPERTIES, LP

_____
ALAN SUGAR, President

RAB OIL & GAS HOLDINGS, LLC

_____
ROBERT BOURNE

HARKNESS A. DUNCAN FAMILY TRUST

_____
H. A. DUNCAN, Trustee

GJR INVESTMENTS, INC.

_____
GRADY O'DANIEL, JR., President

M JOHNSON INVESTMENT PARTNERSHIP I, LLP

_____
MELVIN J. JOHNSON, President

_____
DARLENE A. HALL

_____
EDWARD L. YARBOROUGH, JR.

_____
TOM YOUNGBLOOD

_____
W. D. YOUNGER

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

SUGAR OIL PROPERTIES, LP

_____
ALAN SUGAR, President

RAB OIL & GAS HOLDINGS, LLC

ROBERT BOURNE

HARKNESS A. DUNCAN FAMILY TRUST

H. A. DUNCAN, Trustee

GJR INVESTMENTS, INC.

GRADY COOKSEY, JR., President

M JOHNSON INVESTMENT PARTNERSHIP I, LLP

MELVIN J. JOHNSON, President

DARLENE K. HALL

EDWARD L. YARBOROUGH, JR.

TOM YOUNGBLOOD

W. D. WOUNGER

LEONARD E. WILLIAMS

DON B. SAUNDERS TRUST

DON B. SAUNDERS, II

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

SUGAR OIL PROPERTIES, LP

_____
ALAN SUGAR, President

RAB OIL & GAS HOLDINGS, LLC

_____
ROBERT BOURNE

HARKNESS A. DUNCAN FAMILY TRUST

_____
H.A. DUNCAN, Trustee

GJR INVESTMENTS, INC.

_____
GRADY COOKSEY, JR., President

M JOHNSON INVESTMENT PARTNERSHIP I, LLP

_____
MELVYN J. JOHNSON, President

_____

EDWARD L. YARBOROUGH, JR.

_____

TOM YOUNGBLOOD

_____

W.D. WOJNICK

_____

LEONARD L. WILLIAMS

_____

DON E. SAUNDERS TRUST

_____
DON E. SAUNDERS, as

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

SUGAR OIL PROPERTIES, LP

ALAN SUGAR, President

RAB OIL & GAS HOLDINGS, LLC

ROBERT BOURNE

HARKNESS A. DUNCAN FAMILY TRUST

H.A. DUNCAN, Trustee

GJR INVESTMENTS, INC.

GRADY COOKSEY, JR., President

M JOHNSON INVESTMENT PARTNERSHIP I, LLP

MELVIN J. JOHNSON, President

DARLENE K. HALL

EDWARD L YARBROUGH, JR.

TOM YOUNGBLOOD

W. D. MOUNGER

LEONARD E. WILLIAMS

DON B. SAUNDERS TRUST

DON E. SAUNDERS, as

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

SUGAR OIL PROPERTIES, LP

ALAN SUGAR, President

RAB OIL & GAS HOLDINGS, LLC

ROBERT BOURNE

HARKNESS A. DUNCAN FAMILY TRUST

H.A. DUNCAN, Trustee

GJR INVESTMENTS, INC.

GRADY COOKSEY, Jr., President

M. JOHNSON INVESTMENT PARTNERSHIP I, LLP

MELVIN C. JOHNSON, President

DARLENE A. HALL

EDWARD L. YARBOROUGH CO., INC.

TONY YARBOROUGH

W.D. MOUNGER

LEONARD E. WILLIAMS

DON B. SAUNDERS TRUST

DON B. SAUNDERS, as

- 15 -

SUGAR OIL PROPERTIES, LP

ALAN SUGAR, President

RAB OIL & GAS HOLDINGS, LLC

ROBERT BOURNE

HARKNESS A. DUNCAN FAMILY TRUST

H. A. DUNCAN, Trustee

GJR INVESTMENTS, INC.

GRADY COOKSEY, Jr., President

M JOHNSON INVESTMENT PARTNERSHIP I, LLP

MELVIN J. JOHNSON, President

DARLENE K. HALL

EDWARD L. YARBOROUGH, JR.

TOM YOUNGBLOOD

WFD. MUNGER

LEONARD E. WILLIAMS

DON B. SAUNDERS TRUST

DON B. SAUNDERS, as

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

SUGAR OIL PROPERTIES, LP

ALAN SUGAR, Manager

RAB OIL & GAS HOLDINGS, LLC

ROBERT BOURNE

HARKNESS A. DUNCAN FAMILY TRUST

H. A. DUNCAN, Trustee

CJR INVESTMENTS, INC.

GROUT COOKSEY, Jr., Manager

M JOHNSON INVESTMENT PARTNERSHIP #, LLP

MELVIN J. JOHNSON, Manager

DARLENE A. HALL

EDWARD L. YARBOROUGH, III

TOM YOUNGBLOOD

W. H. MOLINGER

GEORGE E. WILLIAMS

DON B. SAUNDERS TRUST

DON B. SAUNDERS, Jr.

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

SUGAR OIL PROPERTIES, LP

ALAN SUGAR, President

RAB OIL & GAS HOLDINGS, LLC

ROBERT BOURNE

HARKNESS A. DUNCAN FAMILY TRUST

H.A. DUNCAN, Trustee

GJR INVESTMENTS, INC.

GRADY COOKSEY, Jr., President

M JOHNSON INVESTMENT PARTNERSHIP 1, LLP

MELVIN J. JOHNSON, President

DARLENE K. HALL

EDWARD L. YARBOROUGH, JR.

TOM YOUNGBLOOD

W. D. WOZNICEK

LEONARD E. WILLIAMS

DON R. SAUNDERS TRUST

DON R. SAUNDERS, as

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JMS OIL & GAS HOLDINGS, LLC

JAMES M. SINGER, JR.

AEECH, L.L.C.

T. COLE ANDERSON, Agent and Attorney-in-Fact

FLETCHER PETROLEUM CORP.

DAN SLOAN, PARKER

HALL & HALL, LLC

LEANNE D. FORD, LLC

LEANNE D. FORD

SUMMIT, LLC

NOCTUA OIL, LLC

Tim Hurst, et al

BARBARA M. SUGAR

SUGAR PROPERTIES TRUST

_____ as Co-Trustee

AEH PROPERTIES, INC.

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JMS OIL & GAS HOLDINGS, LLC

_____
JAMES W. SENEFF, JR.

AEEC II, L.L.C.

_____
T. COLE ANDERSON, Agent and Attorney-in-Fact

FLETCHER PETROLEUM CORP.

_____
DAN SLOAN, President

HALL & HALL, LLC

_____, as

LEANNE D. FORD, LLC

_____
LEANNE D. FORD

SUMMIT, LLC

_____, as

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JMS OIL & GAS HOLDINGS, LLC

1
2 JAMES N. SENFF, JR.
3
4
5 AREC II, L.L.C.
6
7
8 T. COLE ANDERSON, Agent and Attorney-in-Fact
9
10
11
12
13 FLETCHER PETROLEUM CORP.
14
15
16 DAN SLOAN, Trustee
17
18
19
20 BALL & BALL, LLC
21
22
23 RK HALL, as Mevaser
24
25
26 LEANNE D. FORR, LLC
27
28
29 LEANNE D. FORD
30
31
32 SUMMIT, LLC
33
34
35
36 , as
37
38
39
40 NOCTUA OIL, LLC
41
42
43 Tim Harris, as
44
45
46
47
48 BARBARA N. SUGAR
49
50
51 SUGAR PROPERTIES TRUST
52
53
54
55 , as Co-Trustee
56
57 AEH PROPERTIES, INC.
58
59
60
61
62
63
64
65
66
67
68
69
70

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JMS OIL & GAS HOLDINGS, LLC

JAMES M. SENEFF, JR.

AEEC II, L.L.C.

T. COLE ANDERSON, Agent and Attorney-in-Fact

FLETCHER PETROLEUM CORP.

DAN SLOAN, Trustee

HALL & HALL, LLC

LEANNE D. FORD, LLC

LEANNE D. FORD

SUMMIT, LLC

NOCTUA OIL, LLC

THE HIGH, LLC

BARBARA N. SOGAN

SUGAR PROPERTIES TRUST

_____, as Co-Trustee

AEH PROPERTIES, INC.

- 15 -

Joint Operating Agreement
Shior EXPLOR LLC
APril 11 2013

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JMS OIL & GAS HOLDINGS, LLC

JAMES M. SENERY, JR.

AECH, LLC.

T. COLE ANDERSON, Agent and Attorney-in-Fact

FLETCHER PETROLEUM CORP.

DAN SLOAN, PARTNER

HALL & HALL, LLC

LEANNE D. FORD, LLC

LEANNE D. FORD

SUMMIT, LLC

NOCTUA OIL, LLC

BARBARA M. SUGAR

SUGAR PROPERTIES TRUST

as Co-Trustee

AEH PROPERTIES, INC.

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JMS OIL & GAS HOLDINGS, LLC

_____
1

JAMES M. SENEFF, JR.

_____
2
3
4

AEEC II, L.L.C.

_____
5
6
7

T. COLE ANDERSON, Agent and Attorney-in-Fact

_____
8
9
10

FLETCHER PETROLEUM CORP.

_____
11
12
13
14

DAN SLOAN, President

_____
15
16
17

HALL & HALL, LLC

_____
18
19
20

_____, as _____
21
22
23

LEANNE D. FORD, LLC

_____
24
25
26

LEANNE D. FORD

_____
27
28
29

SUMMIT, LLC

_____
30
31
32

_____, as _____
33
34
35

NOCTUA OIL, LLC

_____
Tim Hurst, as
36
37
38

BARBARA M. SUGAR

_____
39
40
41

SUGAR PROPERTIES TRUST

_____
42
43

_____, as Co Trustee
44
45
46

_____
47
48
49

_____
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

- 15 -

A.A.P.I. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JMS OIL & GAS HOLDINGS, LLC

1
2 JAMES M. SENEY, JR.
3
4
5 AEEC II, LLC.
6
7
8
9 T. COLE ANDERSON, Agent and Attorney-in-Fact
10
11
12
13 FLETCHER PETROLEUM CORP.
14
15
16
17
18 DAN SLOAN, Trustee
19
20
21 HALL & HALL, LLC
22
23
24 , as
25
26
27 LEANNE D. FORD, LLC
28
29
30 LEONNE D. FORD
31
32
33 SUMMIT, LLC
34
35
36 , as
37
38
39
40 NOCTUA OIL, LLC
41
42
43
44
45
46
47
48 BARBARA M. SUGAR
49
50
51
52 SUGAR PROPERTIES TRUST
53
54
55
56 , as Co-Trustee
57
58
59
60 AEH PROPERTIES, INC.
61
62
63
64
65
66
67
68
69
70

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JMS OIL & GAS HOLDINGS, LLC

JAMES M. SKIVERT, JR.

AERICH, L.L.C.

T. COLE ANDERSON, Agent and Attorney-in-Fact

SLETCHER PETROLEUM CORP,

DAN SLOAN, 7/6/2020

HALL & HALL, LLC

LEANNE D. FORD, LLC

LEANNE D. FORD

SUMMIT, LLC

NOCTUA OIL, LLC

Tim Fuerst, Jr.

BARBARA M. SUGAR

SUGAR PROPERTIES, INC., its Co-Trustee

AEH PROPERTIES, INC.

- 15 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JMS OIL & GAS HOLDINGS, LLC

JAMES M. SENEFF, JR.

AEEC II, LLC

T. COLE ANDERSON, Agent and Attorney-in-fact

FLETCHER PETROLEUM CORP.

DAN SLOAN, President

HALL & HALL, LLC

LEANNE D. FORD, LLC

LEANNE D. FORD

SUMMIT, LLC

NOCTUA OIL, LLC

THE HENN, et al

BORENSTEIN SUGAR

SUGAR PROPERTIES TRUST

_Alice B. Mitchell_ , as Co-Trustee

_Evelyn Collier_

AEH PROPERTIES, INC.

_____ INVESTMENTS, LLC

_Angela Harris_
Angela Harris, Manager

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JMS OIL & GAS HOLDINGS, LLC

_____
JAMES M. SEINEL, JR.

AFEC II, L.L.C.

_____
T. COLE ANDERSON, Agent and Attorney-in-Fact

FLETCHER PETROLEUM CORP.

_____
DAN SLOAN, Trustee

HALL & HALL, LLC

_____ as

LEANNE D. FORD, LLC

_____
LEANNE D. FORD

SUMMIT, LLC

_____ as

NOCTUA OIL, LLC

_____
THETHOMAS

_____
BARBARA N. SUGAR

SUGAR PROPERTIES TRUST

_____ as Co-Trustee

AEII PROPERTIES, INC.

*WALLACE + WALLACE, LLC*
*Butt. H. Wallace*
*Ruth H. Wallace*

- 15 -

# ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

I, _Julia P Smith_, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President/Chief Operating Officer for SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _28th_ day of _May_ _____, 2013.

_Julia P Smith_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: _____

JULIA P. SMITH, Notary Public # 58135
Caddo Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

I, _Julia P Smith_, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President/Chief Operating Officer for SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _28th_ day of _May_ _____, 2013.

_Julia P Smith_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: _____

JULIA P. SMITH, Notary Public # 58135
Caddo Parish, Louisiana
My Commission is for Life

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: _____

# ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

I, Julia P. Smith , a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President/Chief Operating Officer for SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 28ᵗʰ day of May , 2013.

Julie P. Smith
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: _____

JULIA P. SMITH, Notary Public # 58135
Caddo Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

I, Julia P. Smith , a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President/Chief Operating Officer for SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 28ᵗʰ day of May , 2013.

Julie P. Smith
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: _____

JULIA P. SMITH, Notary Public # 58135
Caddo Parish, Louisiana
My Commission is for Life

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: _____

Kennedy 36-12#1

1

# ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President/Chief Operating Officer for SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President/Chief Operating Officer for SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _Harris_

I, _Sharon M. Metcalf_, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _28_ day of _May_, 2013.

_Sharon M. Metcalf_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: _12/29/2013_

SHARON METCALF McDONALD
Notary Public, State of Texas
Commission Expires 12-29-2013

Kennedy 36-12#1

1

**Signature / Acknowledgement Pages to that certain Operating Agreement, dated April 1, 2013, Sklar Exploration Company, LLC, as Operator; Contract Area – Kennedy 36-12 #1 Well, SW/4, Section 36, T4N, R12E, Conecuh County, Alabama.**

STATE OF TEXAS

COUNTY OF __MYRA WUNDERLICH__

I, __MYRA WUNDERLICH__, a notary public in and for said County and State, hereby certify that Richard Tauber, whose name as President of TAUBER EXPLORATION AND PRODUCTION COMPANY, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the __6th__ day of __June__, 2013.

_[signature]_

NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

_[notary seal: Given under my hand and notarial seal — Notary Public, State of Texas — Commission Expires 02-11-2016]_

---

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as Vice President for PICKENS FINANCIAL GROUP, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____

NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____

NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

Kennedy 36-12#1

2

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Richard Tauber, whose name as President of TAUBER EXPLORATION AND PRODUCTION COMPANY, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF Dallas

I, Marilyn L. Fulton, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as the President for PICKENS FINANCIAL GROUP, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 30th day of May, 2013.

_____
NOTARY PUBLIC

Marilyn L Fulton
NOTARY PUBLIC STATE OF TEXAS
My Commission Expires
06/23/2016

STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

Kennedy 36-12#1

2

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Richard Tauber, whose name as President of TAUBER EXPLORATION AND PRODUCTION COMPANY, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as Vice President for PICKENS FINANCIAL GROUP, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the 3rd day of April, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: 8-11-15

MARCIA A. DE LUNA
Notary Public, State of Texas
My Commission Expires
August 11, 2015

2

Kennedy 36-12#1

STATE OF LOUISIANA

PARISH OF CADDO

I, Deborah W. Cox, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 17th day of June, 2013.

_Richard W. Cox_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL
My Commission Expires: _____

```
DEBORAH W. COX  24693
Notary Public
Parish of Caddo
State of Louisiana
```

STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Steven H. Craft, whose name as Managing Member of CRAFT EXPLORATION COMPANY L.L.C., a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that C. Bickham Dickson, III, whose name as Member of the DICKSON OIL & GAS, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument and as such Member and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

Kennedy 36-12#1

3

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: _____


STATE OF MISSISSIPPI

COUNTY OF MADISON

I, Stewart H Craft, a notary public in and for said County and State, hereby certify that Steven H. Craft, whose name as Managing Member of CRAFT EXPLORATION COMPANY L.L.C., a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 23rd day of August, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: 10.15.16


STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that C. Bickham Dickson, III, whose name as Member of the DICKSON OIL & GAS, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

Kennedy 56-12#1

3

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, L.L.C, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: _____


STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Steven H. Craft, whose name as Managing Member of CRAFT EXPLORATION COMPANY L.L.C, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

I, GEORGE PORTOCARRERO, a notary public in and for said Parish and State, hereby certify that C. Bickham Dickson, III, whose name as Member of the DICKSON OIL & GAS, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the 29th day of May, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: For Life

GEORGE PORTOCARRERO
NOTARY PUBLIC - LOUISIANA
CADDO - BOSSIER PARISH
NOTARY ID NUMBER 056287
My Commission Is For Life

Kennedy 36-12#1

3

STATE OF TEXAS

COUNTY OF *Harris*

I, *Brenda Witt White*, a notary public in and for said County and State, hereby certify that Richard E. Fant, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

Given under my hand and notarial seal this the 3rd day of *June*, 2013.

*Brenda Witt White*

NOTARY PUBLIC

BRENDA WITT WHITE
Notary Public, State of Texas
My Commission Expires
MARCH 23, 2015

My commission expires: *3-23-15*

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF MISSISSIPPI

COUNTY OF MADISON

I, _____, a notary public in and for said County and State, hereby certify that Wirt A. Yeager, III, whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 56-12#1

4

STATE OF TEXAS

COUNTY OF _____

I, _____ a notary public in and for said County and State, hereby certify that Richard E. Fant, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, Melissa R. Edwards, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

Given under my hand and notarial seal this the 28th day of May, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: is for LIFE

STATE OF MISSISSIPPI

COUNTY OF MADISON

I, _____ a notary public in and for said County and State, hereby certify that Wirt A. Yeager, III, whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

4

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Richard E. Fant, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF MISSISSIPPI

COUNTY OF MADISON

I, Pamela F. Sebren, a notary public in and for said County and State, hereby certify that Wirt A. Yeager, III, whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 29 day of May, 2013.

Pamela F. Sebren
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]  ID # 63506

My Commission Expires: PAMELA F. SEBREN
Commission Expires:
July 18, 2013

STATE OF MISSISSIPPI
NOTARY PUBLIC
RANKIN COUNTY

Kennedy 56-12#1

STATE OF MISSISSIPPI

COUNTY OF RANKIN

I, _____, a notary public in and for said County and State, hereby certify that Larry Johnson, whose name as Managing Member of LANDMARK EXPLORATION LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

---

STATE OF LOUISIANA

PARISH OF CADDO

I, _Aungel Pattison_, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _29_ day of _May_, 2013.

_Aungel Pattison_
NOTARY PUBLIC

AUNGEL PATTISON
Embossed Hereon Is My
DeSoto, Caddo, Bossier Parishes
Louisiana Notary Public Seal
Notary ID No. 063733
My Commission Expires Upon My Death

(AFFIX NOTARIAL SEAL)

My commission expires: _____

---

STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Member of Simba Investors, L.L.C., The General Partner of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

5

STATE OF MISSISSIPPI

COUNTY OF RANKIN

I, _____, a notary public in and for said County and State, hereby certify that Larry Johnson, whose name as Managing Member of LANDMARK EXPLORATION LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____ 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____ 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF ~~MISSISSIPPI~~ TEXAS

COUNTY OF HARRIS

I, Patti L. Hanson, a notary public in and for said County and State, hereby certify that Mark Ranch, whose name as Member of Simba Investors, L.L.C., The General Partner of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 22 day of August 2013.

_____
NOTARY PUBLIC

PATTI L. HANSON
MY COMMISSION EXPIRES
January 18, 2015

[AFFIX NOTARIAL SEAL]

My Commission Expires: 1/18/15

Kennedy 36-12#1

5

STATE OF Colorado

COUNTY OF Douglas

I, the undersigned notary public in and for said County in said State, hereby certify that Mark Arnold whose name as General Manager of RESOURCE VENTURES, LLC, an Indiana limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he/she, as such Manager and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the 28th day of MAy, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

JOANNE SCHERFEL
Notary Public
State of Colorado
Notary ID 20014001784
My Commission Expires Mar 5, 2017

STATE OF TEXAS

COUNTY OF DALLAS

I, _____, a notary public in and for said County and State, hereby certify that W. R. (Trey) Sibley, III, whose name as ATTORNEY-IN-FACT, of THE RUDMAN PARTNERSHIP, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF HINDS

I, _____, a notary public in and for said County and State, hereby certify that William R. James, whose name as President of PRUET PRODUCTION CO., a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

6

STATE OF _____

COUNTY OF _____

    I, the undersigned notary public in and for said County in said State, hereby certify that Mark Arnold whose name as General Manager of RESOURCE VENTURES, LLC, an Indiana limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he/she, as such Manager and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF TEXAS

COUNTY OF DALLAS

    I, _Robert Hiram Lucius_, a notary public in and for said County and State, hereby certify that W. R. (Trey) Sibley, III, whose name as ATTORNEY-IN-FACT, of THE RUDMAN PARTNERSHIP, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _5th_ day of _June_, 2013.

_Robert Hiram Lucius_
NOTARY PUBLIC

ROBERT HIRAM LUCIUS
Notary Public, State of Texas
My Commission Expires
04/15/2016

[AFFIX NOTARIAL SEAL]

My Commission Expires: _April 15, 2016_


STATE OF MISSISSIPPI

COUNTY OF HINDS

    I, _____, a notary public in and for said County and State, hereby certify that William R. James, whose name as President of PRUET PRODUCTION CO, a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

6

STATE OF _____

COUNTY OF _____

I, the undersigned notary public in and for said County in said State, hereby certify that Mark Arnold whose name as General Manager of RESOURCE VENTURES, LLC, an Indiana limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day, being informed of the contents of the conveyance, he/she, as such Manager and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF DALLAS

I, _____, a notary public in and for said County and State, hereby certify that W. R. (Trey) Sibley, III, whose name as ATTORNEY-IN-FACT, of THE RUDMAN PARTNERSHIP, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF HINDS

I, Lynda H Grice, a notary public in and for said County and State, hereby certify that William R. James, whose name as President of PRUET PRODUCTION CO., a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 3rd day of July, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: 12-11-13

Kennedy 36-12#1

6

STATE OF ~~TEXAS~~ New Mexico

COUNTY OF ~~DALLAS~~ SANTA FC

I, JEANNETTE L MARTINEZ , a notary public in and for said County and State, hereby
certify that Donald L. Clark, whose name as President of DBC Management L.L.C., the General Manager
of DBC RESOURCES, L.P. a limited partnership, is signed to the foregoing instrument and who is
known to me, acknowledged before me on this day that, being informed of the contents of the instrument,
he, in such capacity and with full authority, executed the same voluntarily for and as the act of said
limited partnership.

Given under my hand and notarial seal this the 6th day of July , 2013.

_____
NOTARY PUBLIC

OFFICIAL SEAL
JEANNETTE L. MARTINEZ
NOTARY PUBLIC-STATE OF NEW MEXICO
My commission expires: 9/20/15
My Commission Expires:

---

STATE OF TEXAS

COUNTY OF DALLAS

I, _____ , a notary public in and for said County and State, hereby
certify that James A. Russell, whose name as Manager of DCOD, L.L.C. a limited liability company, is
signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being
informed of the contents of the instrument, he, as such officer and with full authority, executed the same for
and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF TEXAS

COUNTY OF DALLAS

Personally appeared before me, the undersigned authority in and for said county and state, on this
_____ day of _____, 2013, within my jurisdiction, the within BOBBY COLEMAN,
who acknowledged that he executed the above and foregoing instrument.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

7

STATE OF _Texas_

COUNTY OF _Dallas_

Personally appeared before me, the undersigned authority in and for said county and state, on this ___11___ day of ___February___, 2013, within my jurisdiction, the within named ___Paul Pilata___ who acknowledged that he/she is ___President___ of DCOD LLC, a Texas Limited Liability Company, and that for and on behalf of the said Limited Liability Company and as its act and deed he/she executed, signed, and delivered the above and foregoing instrument, after first having been duly authorized by said _____ so to do.

___Ann Lageose___
Notary Public

ANN LAGEOSE
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 04-30-2016

MY COMMISSION EXPIRES: _____

STATE OF TEXAS

COUNTY OF DALLAS

I, _____, a notary public in and for said County and State, hereby certify that Donald L. Clark, whose name as President of DBC Management L.L.C. the General Manager of DBC RESOURCES, L.P., a limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF DALLAS

I, _____, a notary public in and for said County and State, hereby certify that James A. Russell, whose name as Manager of DCOD, L.L.C., a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF DALLAS

Personally appeared before me, the undersigned authority in and for said county and state, on this 8th day of July, 2013, within my jurisdiction, the within BOBBY COLEMAN, who acknowledged that he executed the above and foregoing instrument.

Given under my hand and notarial seal this the 8th day of July, 2013.

*Ann Sweeney*
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: 8/19/2015

ANN SWEENEY
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 08/19/2015

Kennedy 36-12#1

7

FOUR D LLC

970-259-2032

p.4

STATE OF COLORADO

COUNTY OF _____

hereby certify that R. E. Douglas, whose name as Manager of FOUR D L.L.C., a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: 1-7-2017

```
ROSIE THOMPSON
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 19964013736
MY COMMISSION EXPIRES 01/07/2017
```

STATE OF TEXAS

COUNTY OF DALLAS

I, _____, a notary public in and for said County and State, hereby certify that Harold R. Dunk, whose name as General Manager of FIDDLER INVESTMENTS, a partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said partnership.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF BOSSIER

I, _____, a notary public in and for said Parish and State, hereby certify that Bobby E. Jeiks, whose name as Manager of FRANKS EXPLORATION COMPANY, L.L.C., a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

8

STATE OF COLORADO

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that R. E. Douglas, whose name as Manager of FOUR D L.L.C., a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF DALLAS

I, Marjorie G. Turner, a notary public in and for said County and State, hereby certify that Harold R. Dunk, whose name as General Manager of FIDDLER INVESTMENTS, a partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said partnership.

Given under my hand and notarial seal this the 11th day of July, 2013.

Marjorie G. Turner
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires:

MARJORIE G. TURNER
Notary Public, State of Texas
My Comm. Expires April 30, 2017

STATE OF LOUISIANA

PARISH OF BOSSIER

I, _____, a notary public in and for said Parish and State, hereby certify that Bobby E. Jelks, whose name as Manager of FRANKS EXPLORATION COMPANY, L.L.C., a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

8

STATE OF COLORADO

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that R. E. Douglas, whose name as Manager of FOUR D L.L.C, a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF DALLAS

I, _____, a notary public in and for said County and State, hereby certify that Harold R. Dunk, whose name as General Manager of FIDDLER INVESTMENTS, a partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said partnership.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF BOSSIER

I, Diane Marie Fong , a notary public in and for said Parish and State, hereby certify that Bobby E. Jelks, whose name as Manager of FRANKS EXPLORATION COMPANY, L.L.C., a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 8th day of July , 2013.

_____
NOTARY PUBLIC

Diane Marie Fong, Notary Public ID # 2731
P.O. Box 7665  Shreveport, LA 71137-7665
Commissioned in Caddo Parish, Louisiana
Commission is for life.

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

8

STATE OF FLORIDA

COUNTY OF ORANGE

I, _Sampson Martin_, a notary public in and for said County and State, hereby certify that Joan McDonough, whose name as General Manager of JOE GALBRAITH OIL & GAS, L.L.C., a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _8th_ day of _July_, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _1/27/2014_

STATE OF FLORIDA

COUNTY OF SANTA ROSA

I, _____, a notary public in and for said County and State, hereby certify that Terry M. Gaston, whose name as Secretary/Treasurer of GASTON OIL COMPANY, a _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Ray Willis, whose name as President of HANSON OPERATING CO., INC., a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

9

STATE OF FLORIDA

COUNTY OF ORANGE

I, _____, a notary public in and for said County and State, hereby certify that Joan McDonough, whose name as General Manager of JOE GALBRAITH OIL & GAS, L.L.C., a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF FLORIDA MISSISSIPPI

COUNTY OF SANTA ROSA

I, Diane Egger, a notary public in and for said County and State, hereby certify that Perry R. Gaston, whose name as Secretary/Treasurer of GASTON OIL COMPANY, a La Corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 9 day of July, 2013.

Diane Egger
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

DIANA EGGER
ID # 6516
NOTARY PUBLIC
STATE OF MISSISSIPPI
Commission For Life
HINDS COUNTY
My Commission Expires: Aug 24 2016

---

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Ray Willis, whose name as President of HANSON OPERATING CO., INC., a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

9

STATE OF FLORIDA

COUNTY OF ORANGE

I, _____, a notary public in and for said County and State, hereby certify that Joan McDonough, whose name as General Manager of JCE GALBRAITH OIL & GAS, L.L.C., a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF FLORIDA

COUNTY OF SANTA ROSA

I, _____, a notary public in and for said County and State, hereby certify that Terry M. Gaston, whose name as Secretary/Treasurer of GASTON OIL COMPANY, a _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _Montana_

COUNTY OF _Chouteau_

I, _Sharon R. Hamilton_, a notary public in and for said County and State, hereby certify that Ray Willis, whose name as President of HANSON OPERATING CO., INC., a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the _3_ day of _July_, 2013.

_Sharon R. Hamilton_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _Feb 17, 2016_

Kennedy 56-12#1

9

STATE OF LOUISIANA
PARISH
COUNTY OF CADDO

I, Vickie K. Kelly, a notary public in and for said County and State, hereby certify that _____, whose name as _____ of J&A HARRIS, L.P., a limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrumentide, as such officer and with full authority, executed the same for and as the act of said limited partnership.

Given under my hand and notarial seal this the 18th day of _____, 2013.

Vickie K. Kelly #066496
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: With life

STATE OF MISSISSIPPI

COUNTY OF HINDS

I, _____, a notary public in and for said County and State, hereby certify that Robbie Hughes, whose name as Vice President of HUGHES 2000 L.L.C., a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF HINDS

I, _____, a notary public in and for said County and State, hereby certify that Robbie Hughes, whose name as Vice President of HUGHESOIL, INC., a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said corporation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 3/6-12#1

10

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that _____, whose name as _____ of J&A HARRIS, L.P., a limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said limited partnership.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF MISSISSIPPI

COUNTY OF HINDS

I, PAULA W. DENLEY, a notary public in and for said County and State, hereby certify that Robbie Hughes, whose name/as ~~the~~ President of HUGHES 2000 L.L.C., a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 8th day of July, 2013.

Paula W. Denley
NOTARY PUBLIC (128417)

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF MISSISSIPPI

COUNTY OF HINDS

I, PAULA W. DENLEY, a notary public in and for said County and State, hereby certify that Robbie Hughes, whose name as ~~the~~ President of HUGHESOIL, INC., a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she, as such officer and with full authority, executed the same for and as the act of said corporation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Paula W. Denley (128417)
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

10

STATE OF LOUISIANA

PARISH OF CLAIBORNE

I, _Dawn Morgan_, a notary public in and for said Parish and State, hereby certify that _Lisa H. Deas_ whose name as _Co-Mem/Mgr_ of KMR INVESTMENTS, LLC, a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_Dawn Morgan_   #51040
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _at death_

STATE OF TEXAS

COUNTY OF DALLAS

I, _____, a notary public in and for said County and State, hereby certify that Donald L. Clark, whose name as President of PAM-LIN CORPORATION, a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Camille C. Despot, whose name as President of PETROLEUM INVESTMENTS, INC., a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

11

STATE OF LOUISIANA

PARISH OF CLAIBORNE

I, _____, a notary public in and for said Parish and State, hereby certify that _____ whose name as _____ of KMR INVESTMENTS, LLC, a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF ~~Texas~~ New Mexico

COUNTY OF ~~Dallas~~ Santa Fe

I, JEANNETTE L MARTINEZ, a notary public in and for said County and State, hereby certify that Donald L. Clark, whose name as President of PAM-LIN CORPORATION, a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the _____ day of _____ 2013.

_____
NOTARY PUBLIC

OFFICIAL SEAL
JEANNETTE L. MARTINEZ
NOTARY PUBLIC-STATE OF NEW MEXICO
My Commission Expires: 7/20/15

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Camille C. Despot, whose name as President of PETROLEUM INVESTMENTS, INC., a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day, being informed of the contents of the instrument, she, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the _____ day of _____ 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

11

STATE OF LOUISIANA

PARISH OF CLAIBORNE

I, _____, a notary public in and for said Parish and State, hereby certify that _____, whose name as _____ of KMR INVESTMENTS, LLC, a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF DALLAS

I, _____, a notary public in and for said County and State, hereby certify that Donald L. Clark, whose name as President of PAM-LIN CORPORATION, a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, Cynthia M. White, a notary public in and for said Parish and State, hereby certify that Camille C. Despot, whose name as President of PETROLEUM INVESTMENTS, INC., a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the 3rd day of July, 2013.

Cynthia M. White
NOTARY PUBLIC   Cynthia M. White
Notary Public ID #60574
Caddo Parish, LA
My Commission is
for Life.

[AFFIX NOTARIAL SEAL]

My Commission Expires: at my death

Kennedy 36-12#1

11

STATE OF LOUISIANA

PARISH OF BOSSIER

I, _Tommye H. Gray_ a notary public in and for said Parish and State, hereby certify that Ronald L. Sawyer, whose name as President of SAWYER DRILLING & SERVICE INC, a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the __5th__ day of __July__, 2013.

_Tommye H. Gray_
NOTARY PUBLIC

OFFICIAL SEAL
TOMMYE H. GRAY
NOTARY PUBLIC NO. 48944
STATE OF LOUISIANA
PARISH OF BOSSIER
My Commission is for Life

[AFFIX NOTARIAL SEAL]

My Commission Expires: _with life_

STATE OF LOUISIANA

COUNTY OF CADDO

I, _____ a notary public in and for said Parish and State, hereby certify that M. Robin Smith, whose name as President of RYCO EXPLORATION, LLC, a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF BOSSIER

I, _____ a notary public in and for said Parish and State, hereby certify that Alan Sugar, whose name as President of SUGAR OIL PROPERTIES, LP, a limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said limited partnership.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

12

STATE OF LOUISIANA

PARISH OF BOSSIER

I, _____, a notary public in and for said Parish and State, hereby certify that Ronald L. Sawyer, whose name as President of SAWYER DRILLING & SERVICE INC., a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

COUNTY OF CADDO

I, VICKIE U. KELLY, a notary public in and for said Parish and State, hereby certify that M. Robin Smith, whose name as President of RYCO EXPLORATION, LLC, a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 8th day of July, 2013.

Vickie U. Kelly #066496
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: with life


STATE OF LOUISIANA

PARISH OF BOSSIER

I, _____, a notary public in and for said Parish and State, hereby certify that Alan Sugar, whose name as President of SUGAR OIL PROPERTIES, L.P, a limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said limited partnership.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

12

STATE OF LOUISIANA

PARISH OF BOSSIER

I, _____, a notary public in and for said Parish and State, hereby certify that Ronald L. Sawyer, whose name as President of SAWYER DRILLING & SERVICE INC., a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF LOUISIANA

COUNTY OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that M. Robin Smith, whose name as President of RYCO EXPLORATION, LLC, a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF LOUISIANA

PARISH OF BOSSIER

I, Suzette Piper, a notary public in and for said Parish and State, hereby certify that Alan Sugar whose name as President of SUGAR OIL PROPERTIES, LP, a limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said limited partnership.

Given under my hand and notarial seal this the 10th day of July, 2013.

Suzette Piper
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: with life

SUZETTE PIPER
NOTARY ID # 87385
STATE OF LOUISIANA
MY COMMISSION IS FOR LIFE

Kennedy 36-12#1

12

STATE OF LOUISIANA

PARISH OF BOSSIER

Personally appeared before me, the undersigned authority in and for said Parish and State, on this 8th day of ____July____, 2013, within my jurisdiction, the within EDWARD L. YARBROUGH, JR., who acknowledged that he executed the above and foregoing instrument.

Given under my hand and notarial seal this the ___8th___ day of ___July___, 2013.

_____
NOTARY PUBLIC

Diane Marie Fong, Notary Public ID # 2731
P. O. Box 7665 · Shreveport, LA. 71137-7665
Commissioned in Caddo Parish, Louisiana
Commission is for life.

[AFFIX NOTARIAL SEAL]
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

Personally appeared before me, the undersigned authority in and for said Parish and State, on this ___ day of _____, 2013, within my jurisdiction, the within TOM YOUNGBLOOD, who acknowledged that he executed the above and foregoing instrument.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: _____

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Donald Hall, M.D., whose name as _____ of Hall Management, LLC, a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: _____

Kennedy 36-12#1

13

STATE OF LOUISIANA

PARISH OF BOSSIER

Personally appeared before me, the undersigned authority in and for said Parish and State, on this _____ day of ____________________, 2013, within my jurisdiction, the within EDWARD L. YARBOROUGH, JR., who acknowledged that he executed the above and foregoing instrument.

Given under my hand and notarial seal this the _________ day of ___________________, 2013.

______________________________
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: ___________

STATE OF LOUISIANA

PARISH OF CADDO

Personally appeared before me, the undersigned authority in and for said Parish and State, on this 3rd day of July, 2013, within my jurisdiction, the within TOM YOUNGBLOOD, who acknowledged that he executed the above and foregoing instrument.

Given under my hand and notarial seal this the 3rd day of July, 2013.

Lori C. Schildt
NOTARY PUBLIC

Lori C. Schildt
Notary No. 2271

[AFFIX NOTARIAL SEAL]
My Commission Expires: at death

STATE OF ________________

COUNTY OF ______________

I, ______________________________, a notary public in and for said County and State, hereby certify that Donald Hall, M.D., whose name as _______________ of Hall Management, LLC, a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _________ day of ___________________, 2013.

______________________________
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: ___________

Jul 10 2013 10:22AM   THE UPS STORE   2087266897   P.3

STATE OF LOUISIANA

PARISH OF BOSSIER

Personally appeared before me, the undersigned authority in and for said Parish and State, on this _____ day of _____, 2013, within my jurisdiction, the within EDWARD L. YARBOROUGH, JR., who acknowledged that he executed the above and foregoing instrument.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

Personally appeared before me, the undersigned authority in and for said Parish and State on this _____ day of _____, 2013, within my jurisdiction, the within TOM YOUNGBLOOD, who acknowledged that he executed the above and foregoing instrument.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: _____


STATE OF ___Idaho___

COUNTY OF ___Blaine___

I, Christina M. Stice, a notary public in and for said County and State, hereby certify that Donald Hall, M.D. whose name as Manager of Hall Management, LLC, a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___10___ day of ___July___, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]
My Commission Expires: ___6-20-2014___

┌─────────────────────┐
│   Christina M. Stice │
│   Notary Public      │
│   State of Idaho     │
└─────────────────────┘

Kennedy 26-12#1

13

STATE OF _Florida_

COUNTY OF _Orange_

I, _Cynara Gilreath_, a notary public in and for said County and State, hereby certify that James M. Seneff, Jr., whose name as _____ of JMS OIL & GAS HOLDINGS, L.L.C., a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _18th_ day of _July_, 2013.

_____
NOTARY PUBLIC

[Notary seal: Notary Public State of Florida / Cynara Gilreath / My Commission EE054054 / Expires 04/08/2015]

My Commission Expires: _4/8/15_

---

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Robert Bourne, whose name as _____ of the RAB OIL & GAS HOLDINGS, L.L.C., a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such _____ and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that H. A. Duncan, whose name as Trustee of HARKNESS A. DUNCAN FAMILY TRUST, a _____ is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said trust.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-129/1

14

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that James M. Seroff, Jr., whose name as _____ of JMS OIL & GAS HOLDINGS, L.L.C., a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF _Florida_

COUNTY OF _Orange_

I, _Mary Lee Stallings_, a notary public in and for said County and State, hereby certify that Robert Bourne, whose name as _CEO_ of the RAB OIL & GAS HOLDINGS, L.L.C., a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such _CEO_ and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the 10th day of July, 2013.

_____
NOTARY PUBLIC

Notary Public State of Florida
Mary Lee Stallings
My Commission EE087113
Expires 07/06/2015

[AFFIX NOTARIAL SEAL]

My Commission Expires: _July 4, 2005_

---

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that H. A. Duncan, whose name as Trustee of HARKNESS A. DUNCAN FAMILY TRUST, a _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said trust.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

14

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that James M. Seneff, Jr., whose name as _____ of JMS OIL & GAS HOLDINGS, L.L.C., a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Robert Bourne, whose name as _____ of the RAB OIL & GAS HOLDINGS, L.L.C., a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such _____ and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF Oregon

COUNTY OF Sunner

I, Susan D. Burke, a notary public in and for said County and State, hereby certify that H. A. Duncan, whose name as Trustee of HARKNESS A. DUNCAN FAMILY TRUST, a Trust, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said trust.

Given under my hand and notarial seal this the 8th day of Jany, 2013.

Susan Burke
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

SUSAN D. BURKE
MY COMMISSION # EE 157284
EXPIRES: March 20, 2016
Bonded Thru Notary Public Underwriters

14

Kennedy 36-12#1

STATE OF _FLORIDA_

COUNTY OF _ORANGE_

I, _MARIA PEREZ_ , a notary public in and for said County and State, hereby certify that _Ricky T. Loudermilk_ whose name as _President_ of M. JOHNSON INVESTMENT PARTNERSHIP I, LLLP is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the __8th__ day of _____July_____, 2013.

_Maria Perez_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _2/26/2016_

```
Notary Public State of Florida
Maria Perez
My Commission EE 184102
Expires 2/26/2016
```

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that _____ whose name as _____ of DON B. SAUNDERS TRUST, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Grady Cooksey, Jr., whose name as President of GJR INVESTMENTS, INC., a _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said _____.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

15

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that _____, whose name as _____ of M JOHNSON INVESTMENT PARTNERSHIP I, LLLP is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____ 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF _FL_

COUNTY OF _Pinellas_

I, _Brenda Clayton_, a notary public in and for said County and State, hereby certify that _Don Saunders_, whose name as _Trustee_ of DON B. SAUNDERS TRUST, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _3rd_ day of _July_ 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _8/12/16_

Notary Public State of Florida
Brenda J Clayton
My Commission EE 224159
Expires 08/12/2016

---

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Grady Cooksey, Jr., whose name as President of GIR INVESTMENTS, INC., a _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said _____

Given under my hand and notarial seal this the _____ day of _____ 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

15

STATE OF Florida

COUNTY OF Sarasota

I, Cindy Micciola, a Notary Public in and for said County and State, hereby certify that Grady Cooksey whose name as President M JOHNSON INVESTMENT PARTNERSHIP I LLP, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day, that being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 12th day of July 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that _____ whose name as _____ of DON B. SAUNDERS TRUST, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____ 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF Florida

COUNTY OF Sarasota

I, Cindy Micciola, a notary public in and for said County and State, hereby certify that Grady Cooksey, Jr., whose name as President of GJR INVESTMENTS, INC., a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the 12th day of July, 2013.

_____

[AFFIX NOTARIAL SEAL]

My Commission Expires: 11-17-14

Kennedy 36-12#1

STATE OF _____MS_____

COUNTY OF _____Hinds_____

    Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____July_____, 2013, within my jurisdiction, the within W. D. MOUNGER, who acknowledged that he executed the above and foregoing instrument.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

    Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2013, within my jurisdiction, the within DARLENE K. HALL, who acknowledged that he executed the above and foregoing instrument.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Leanne D. Ford, whose name as _____ of LEANNE D. FORD, LLC, a limited liability corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said limited liability corporation.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1           16

STATE OF _____

COUNTY OF _____

    Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2013, within my jurisdiction, the within W. D. MOUNGER, who acknowledged that he executed the above and foregoing instrument.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF Louisiana

~~COUNTY~~ OF Caddo

    Personally appeared before me, the undersigned authority in and for said county and state, on this 12+h day of JRCA, 2013, within my jurisdiction, the within DARLENE K. HALL, who acknowledged that he executed the above and foregoing instrument.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_Tammy Boytim_ 25961
NOTARY PUBLIC

TAMMY T. BOYTIM, NOTARY PUBLIC
CADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE
NOTARY ID 25961

[AFFIX NOTARIAL SEAL]

My Commission Expires: _upon death_

---

STATE OF _____

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Leanne D. Ford, whose name as _____ of LEANNE D. FORD, LLC, a limited liability corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said limited liability corporation.

    Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-1241

16

Parish

Joint Operating Agreement
Sklar Expl Co LLC
April 1, 2013

STATE OF _____

COUNTY OF _____

Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2013, within my jurisdiction, the within W. D. MOUNGER, who acknowledged that he executed the above and foregoing instrument.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2013, within my jurisdiction, the within DARLENE K. HALL, who acknowledged that he executed the above and foregoing instrument.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF Mississippi

COUNTY OF Madison

I, Linda Ann Burns, a notary public in and for said County and State, hereby certify that Leanne D. Ford, whose name as manager of LEANNE D. FORD, LLC, a limited liability corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said limited liability corporation.

Given under my hand and notarial seal this the 5th day of July, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

16

STATE OF _Mississippi_

COUNTY OF _Scott_

I, _Sheila D. McDaniel_, a notary public in and for said County and State, hereby certify that Alvin Byrd, whose name as _Mgr._ of SUMMIT, LLC, a limited liability corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said limited liability corporation.

Given under my hand and notarial seal this the _5th_ day of _July_, 2013.

_Sheila D. McDaniel_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _February 8, 2015_

---

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Ruth H. Wallace, whose name as _____ of WALLACE AND WALLACE, LLC, a limited liability corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said limited liability corporation.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF _____

COUNTY OF _____

Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2011, within my jurisdiction, the within LEONARD E. WILLIAMS, who acknowledged that he executed the above and foregoing instrument.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

17

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Alvin Byrd, whose name as _____ of SUMMIT, LLC, a limited liability corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said limited liability corporation.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF _Mississippi_

COUNTY OF _Rankin_

I, _Patricia A Griffith_, a notary public in and for said County and State, hereby certify that Ruth H. Wallace, whose name as _____ of WALLACE AND WALLACE, LLC, a limited liability corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said limited liability corporation.

Given under my hand and notarial seal this the _25_ day of _July_, 2013.

_Patricia Ann Griffith_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _04-24-2017_

STATE OF MISSISSIPPI
PATRICIA ANN GRIFFITH
NOTARY PUBLIC
My Commission Expires: 04-24-2017
RANKIN COUNTY

---

STATE OF _____

COUNTY OF _____

Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2011, within my jurisdiction, the within LEONARD E. WILLIAMS, who acknowledged that he executed the above and foregoing instrument.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

17

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Alvin Byrd, whose name as _____ of SUMMIT LLC, a limited liability corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said limited liability corporation.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Rush H. Wallace, whose name as _____ of WALLACE AND WALLACE, LLC, a limited liability corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said limited liability corporation.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF _Florida_

COUNTY OF _Orange_

Personally appeared before me, the undersigned authority in and for said county and state, on this ___ day of _July_, 2013, within my jurisdiction, the within LEONARD E. WILLIAMS, who acknowledged that he executed the above and foregoing instrument.

Given under my hand and notarial seal this the _5_ day of _July_, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires:

Kennedy 36-12#1

DEBRA L GOSNEY
MY COMMISSION # EE 152380
EXPIRES: August 27, 2015
Bonded Thru Notary Public Underwriters

STATE OF _MISSISSIPPI_

COUNTY OF _RANKIN_

I, _PATRICIA M. HARPER_, a notary public in and for said County and State, hereby certify that _R.K. HALL_ whose name as _MEMBER_ of _HALL & HALL, LLC_, a _LIMITED LIABILITY COMPANY_ is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said _MEMBER_, 2013.

Given under my hand and notarial seal this the _3rd_ day of _July_, 2013.

_Patricia M. Harper_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _April 29, 2014_

[SEAL: STATE OF MISSISSIPPI NOTARY PUBLIC ID # 95902 PATRICIA M. HARPER Commission Expires April 29, 2014 RANKIN COUNTY]

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that _____, whose name as _____ of AEH PROPERTIES, INC. a _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said _____.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Dan Sloan, whose name as _____ of FLETCHER PETROLEUM, CORP., a _____ is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said _____.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Kennedy 36-12#1

18

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that _____, whose name as _____ of HALL & HALL, LLC, a _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said _____.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

~~PARISH~~ COUNTY OF CADDO

I, Vicke U. Kelly, a notary public in and for said County and State, hereby certify that Brent Harris, whose name as Manager of AEH PROPERTIES, INC, a ~~corporation~~ of AEH Investments, LLC is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the 12th day of July, 2013.

Vicke U. Kelly  #066496
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: 1/4th life


STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Dan Sloan, whose name as _____ of FLETCHER PETROLEUM, CORP., a _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said _____.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


18

Kennedy 36-12#1

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that _____, whose name as _____ of HALL & HALL, LLC, a _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said _____.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that _____, whose name as _____ of AEH PROPERTIES, INC, a _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said _____.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF ALABAMA

COUNTY OF BALDWIN

I, Christen L. Burkett, a notary public in and for said County and State, hereby certify that Dan Sloan, whose name as PRESIDENT of FLETCHER PETROLEUM, CORP., a ALABAMA CORPORATION, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said _____.

Given under my hand and notarial seal this the 12th day of June, 2013.

Christen Burkett
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: July 6, 2016

Kennedy 36-12#1

18

STATE OF ALABAMA)

COVINGTON COUNTY)

I, _Diane B. Bean_ , a Notary Public in and for said State of Florida, hereby certify that JOHN W. TISDALE, JR., whose name as Manager of TISDALE NATURAL RESOURCES, LLC, a limited liability company, is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, as such officers and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand this the _24th_ day of _May_ , 2013.

_Diane B. Bean_
Notary Public

(AFFIX NOTARIAL SEAL)

My Commission Expires: _7-24-13_

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that John W. Tisdale, Sr., whose name as Manager of TISDALE NATURAL RESOURCES, LLC, a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that John W. Tisdale, Jr., whose name as Manager of TISDALE NATURAL RESOURCES, LLC, a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and official seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My commission expires: _____

---

STATE OF _Alabama_

COUNTY OF _Jefferson_

I, _Tracie Denise White_, a notary public in and for said County and State, hereby certify that George N. Tisdale, whose name as Manager of TISDALE NATURAL RESOURCES, LLC, a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and official seal this the _21_ day of _May_, 2013.

_Tracie Denise White_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL] 

My commission expires: _____

Kennedy 36-12#1

19

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that John W. Tisdale, Sr., whose name as Manager of TISDALE NATURAL RESOURCES, LLC, a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Tim Hurst, whose name as _____ of NOCTUA OIL, LLC, a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

---

STATE OF LOUISIANA

PARISH OF CADDO

Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____, 2013, within my jurisdiction, the within BARBARA M. SUGAR, who acknowledged that she executed the above and foregoing instrument.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

19

Kennedy 36-12#1

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that John W. Tisdale, Sr., whose name as Manager of TISDALE NATURAL RESOURCES, LLC, a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Tim Hurst, whose name as _____ of NOCTUA OIL, LLC, a limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

29th. Personally appeared before me, the undersigned authority in and for said county and state, on this _____ day of _____ July _____, 2013, within my jurisdiction, the within BARBARA M. SUGAR, who acknowledged that she executed the above and foregoing instrument.

Given under my hand and notarial seal this the 29th day of July, 2013.

Lori C. Schildt
_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: at death

Lori C. Schildt
Notary No. 2271

Kennedy 36-12#1

19

STATE OF LOUISIANA

PARISH OF CADDO

I, _Lori C. Schildt_ a notary public in and for said Parish and State, hereby certify that _Thomas R Flournoy_ whose name as Co Trustee of Sugar Properties Trust, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he /she, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the __3rd__ day of __July__, 2013.

_Lori C. Schildt_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: __at death__

**Lori C. Schildt**
. **Notary No. 2271**

Kennedy 56-12#1

20

EXHIBIT "A"

Attached to and made a part of that certain Operating Agreement dated April 1, 2013 by and between SKLAR EXPLORATION COMPANY, as Operator, and SKLARCO L.L.C. et al., as Non-Operators

Contract Area

1)   **Identification of lands subject to this agreement:**

TOWNSHIP 4 NORTH, RANGE 12 EAST
CONECUH COUNTY, ALABAMA

Section 36: Southwest Quarter (SW/4).

**And being further described as all lands, oil and gas leasehold interest and oil and gas interests lying within the red boundary as shown on the plat designated as Exhibit "A-2".**

2)   **Restrictions, if any, as to depths, formations, or substances;**

There are no restrictions except as may be provided for in any lease or contract subject to this Operating Agreement.

3)   **Decimal Interest and names of Parties to this Agreement:**

a.    The following parties (who are sometimes referred to in this Exhibit "A", in the Operating Agreement to which this exhibit is attached and other exhibits thereto as the "Sklar Parties") own the Oil, Gas and Mineral Leases described under the heading "Sklar Parties' Leases" (Leases 1 through 13) in Exhibit "A-1" in the following fractional interests:

| Owners | Interest |
|---|---|
| Bundero Investment Company, L.L.C. | 0.01000000 |
| Craft Exploration Company L.L.C. | 0.01000000 |
| Dickson Oil & Gas, LLC | 0.01000000 |
| Fant Energy Limited | 0.10000000 |
| Fleet Howell | 0.05000000 |
| JJS Working Interests LLC | 0.11925000 |
| Resource Ventures LLC | 0.00125000 |
| Kudzu Oil Properties, LLC | 0.02000000 |
| Landmark Exploration, LLC | 0.02000000 |
| Marksco, L.L.C. | 0.02000000 |
| McCombs Energy, Ltd. | 0.26500000 |
| Pickens Financial Group, LLC | 0.05000000 |
| Sklarco, LLC | 0.15450000 |
| Tauber Exploration & Production Company | 0.02500000 |
| The Rudman Partnership | 0.12500000 |
| Tiembo Ltd. | 0.02000000 |
| **TOTAL FOR LEASE NOS. 1 - 13** | **1.00000000** |

b.    The following parties (who are sometimes referred to in this Exhibit "A", in the Operating Agreement to which this exhibit is attached and other exhibits thereto as the "Pruet Parties") own the Oil, Gas and Mineral Leases described under the heading "Pruet Parties' Leases" (Leases 14 through 15) in Exhibit "A-1" in the following fractional interests:

| Owners | Interest |
|---|---|
| RAB Oil & Gas Holdings, LLC | 0.00400000 |
| DBC Resources, LP | 0.07297000 |
| DCOD, LLC | 0.06375000 |
| Bobby L. Coleman | 0.01000000 |
| Four D. LLC | 0.00800000 |
| Harkness A. Duncan Family Trust | 0.00800000 |

| | |
|---|---|
| Fiddler Investments | 0.02125000 |
| Franks Exploration Company LLC | 0.09800000 |
| GJR Investments, Inc. | 0.00800000 |
| JCE Galbraith Oil & Gas, LLC | 0.01000000 |
| Gaston Oil Company | 0.02250000 |
| Hall Management, LLC | 0.01000000 |
| Darlene K. Hall | 0.01000000 |
| Hall and Hall, LLC | 0.00367500 |
| Hanson Operating Co., Inc. | 0.08000000 |
| J&A Harris, LP | 0.08097000 |
| AEH Properties Inc. | 0.01250000 |
| Hughes 2000 LLC | 0.13377000 |
| Hughes Oil, Inc. | 0.14700000 |
| Leanne D. Ford, LLC | 0.00220500 |
| M Johnson Investment Partnership I, LLLP | 0.00800000 |
| KMR Investments, LLC | 0.02940000 |
| W. D. Mounger | 0.01000000 |
| Pam-Lin Corporation | 0.01500000 |
| Petroleum Investments, Inc. | 0.01000000 |
| Pruet Production Co. | 0.01000000 |
| Don B. Saunders Trust | 0.00800000 |
| Sawyer Drilling & Service Inc. | 0.02000000 |
| JMS Oil & Gas Holdings, LLC | 0.00400000 |
| RYCO Exploration, LLC | 0.01166000 |
| Sugar Oil Properties, LP | 0.03000000 |
| Summit LLC | 0.00367500 |
| Wallace & Wallace LLC | 0.00367500 |
| Leonard E. Williams | 0.00800000 |
| Edward L. Yarbrough, Jr. | 0.00200000 |
| Tom Youngblood | 0.02000000 |
| TOTAL FOR LEASE NOS. 14-15 | 1.00000000 |

c.  Fletcher Petroleum, Corp. owns the Oil, Gas and Mineral Leases described under the heading "Fletcher Leases" (Leases 16 through 22) in Exhibit "A-1" in the following fractional interests:

d.  Tisdale has contributed the Oil and Gas Interest as more particularly described in Exhibit "A-1".

e.  Initial billing and revenue interests will be based on the ownership information in a-d, above, and the title and survey information presently available to Operator. Some of the interests shown above extend beyond seven decimal places but are rounded to the seventh decimal place in this exhibit; so, the lease ownership decimal interests shown above may not total to 1.0000000 due to rounding.

4)  Oil and gas lease and/or oil and gas interests subject to this agreement:
   See Exhibit "A-1" Description of Leases.

5)  Addresses of parties for notice purposes:

   Sklar Exploration Company L.L.C., Agent and Nominee for the Sklar Parties
   401 Edwards Street, Suite 1601
   Shreveport, Louisiana  71101

   Sklarco, L.L.C.
   401 Edwards Street, Suite 1601
   Shreveport, LA 71101

   Bundero Investment Company, L.L.C.
   333 Texas Street, Suite 300
   Shreveport, Louisiana  71101

Craft Exploration Company L.L.C.
325 Lakeshire Parkway
Canton, MS 39046

Dickson Oil & Gas, LLC
P. O. Box 52479
Shreveport, Louisiana 71135

Fant Energy Limited
5800 Westview Drive
Houston, Texas 77055

Fleet Howell
416 Travis Street, Suite 715
Shreveport, Louisiana 71101

JJS Working Interests LLC
4295 San Felipe, Suite 207
Houston, Texas 77027

Resource Ventures, LLC
8369 Southpark Lane, Suite B
Littleton, CO 80120

Kudzu Oil Properties, LLC
300 Concourse Blvd., Suite 101
Ridgeland, Mississippi 39157

Landmark Exploration, LLC
P. O. Box 12004
Jackson, MS 39236

Marksco, L.L.C.
333 Texas Street, Suite 1050
Shreveport, Louisiana 71101

McCombs Energy, Ltd.
5599 San Felipe Street, Suite 1200
Houston, Texas 77056-2721

Pickens Financial Group, LLC
8499 Greenville Avenue, Suite 105
Dallas, Texas 75231-2417

The Rudman Partnership
1700 Pacific Ave., Suite 4200
Dallas, Texas 75201-4620

Tauber Exploration & Production Company
55 Waugh Drive, Suite 601
Houston, TX 77007

Tiembo Ltd.
P. O. Box 270415
Houston, Texas 77277-0415

RAB Oil & Gas Holdings, LLC
P. O. Box 4920
Orlando, Florida 32802-4920

DBC Resources, LP
P. O. Box 191407
Dallas, Texas 75219-1407

DCOD, LLC
16250 Dallas North Parkway
Dallas, Texas 75248

Bobby Coleman
4600 Greenville Avenue, Suite 128
Dallas, Texas 75206

Four D LLC
P. O. Box 2444
Durango, Colorado 81302

Harkness A. Duncan Family Trust
806 Turnbull Ave., Suite 104
Altamonte Springs, Florida 32701

Fiddler Investments
4601 Langland Rd., Suite 107
Dallas, Texas 75244

Franks Exploration Company, LLC
P. O. Box 7665
Shreveport, Louisiana 71137-7665

GJR Investments, Inc.
100 S. Eola Dr., #PH115
Orlando, Florida. 32801

JCE Galbraith Oil & Gas, LLC
2032 Alameda Avenue
Orlando, Florida 32804

Gaston Oil Company
2509 S. Cotswald
Shreveport, Louisiana 71118-4526

Hall Management, LLC
4913 Oak Point Drive
Shreveport, Louisiana 71107

Darlene K. Hall
6121 Fern Avenue, #117
Shreveport, LA 71105

Hall and Hall, LLC
116 Timbercrest Lane
Brandon, Mississippi 39047

Hanson Operating Co., Inc.
P. O. Box 1515
Roswell, NM 88202-1515

J&A Harris, LP
333 Texas Street, Suite 1414
Shreveport, Louisiana 71101-3679

AEH Properties Inc.
333 Texas Street, Suite 1414
Shreveport, Louisiana 71101-3679

Hughes 2000 LLC
P.O. Box 720369
Byram, Mississippi 39272-0369

Hughes Oil, Inc.
P.O. Box 720369
Byram, Mississippi 39272-0369

Leanne D. Ford LLC
742 Oakmont Parkway
Ridgeland, Mississippi 39157

M Johnson Investment Partnership I, LLLP
1558 Waterwitch Drive
Orlando, Florida 32806

KMR Investments, LLC
P. O. Box 298
Arcadia, Louisiana  71001

W. D. Mounger
200 E. Capitol St., Suite 1601
Jackson, MS  39201

Pam-Lin Corporation
P. O. Box 191407
Dallas, Texas  75219-1407

Petroleum Investments, Inc.
416 Travis Street, Suite 612
Shreveport, LA  71101-5584

Don B. Saunders Trust
1721 Springlake Drive
Orlando, Florida  32804

Sawyer Drilling & Service, Inc.
509 Market St., Suite 1010
Shreveport, Louisiana  71101-3240

JMS Oil & Gas Holdings, LLC
P. O. Box 4920
Orlando, FL  32802-4920

RYCO Exploration, LLC
333 Texas St., Suite 1414
Shreveport, Louisiana  71101-3679

Sugar Oil Properties, LP
625 Market St., Suite 100
Shreveport, Louisiana  71101

Summit LLC
229 Dogwood Lane
Madison, Mississippi 39110

Wallace & Wallace, LLC
6163 Kay Brook Drive
Byram, Mississippi 39272

Leonard E. Williams
2518 Norfolk Road
Orlando, Florida 32803

Edward L. Yarbrough, Jr.
P. O. Box 11
Belcher, LA  71004

Tom Youngblood
P. O. Box 5926
Shreveport, Louisiana  71135-5926

Pruet Production Co.
217 W. Capitol St., Suite 201
Jackson, Mississippi 39201

Fletcher Petroleum, Corp.
101 Lottie Lane – Unit #5
Fairhope, AL 36532

Tisdale Natural Resources, LLC
P.O. Box 176
Andalusia, AL 36420

**EXHIBIT "A-1"**

Attached to and made a part of that certain Operating Agreement dated April 1, 2013 by and between SKLAR EXPLORATION COMPANY, as Operator, and SKLARCO L.L.C. et al., as Non-Operators

**DESCRIPTION OF LEASES**

<u>SKLAR PARTIES' LEASES</u>

1. Oil, Gas, and Mineral Lease dated 03/13/2009, by and between Carolyn C. Kennedy, as Lessor, and Sklarco, LLC, as Lessee, recorded in Book 2009 Page 2017, of the records of Conecuh County, Alabama.

2. Oil, Gas, and Mineral Lease dated 03/14/2009, by and between Rene Cary, as Lessor, and Sklarco, LLC, as Lessee, recorded in Book 2009 Page 2017, of the records of Conecuh County, Alabama.

3. Oil, Gas, and Mineral Lease dated 03/14/2009, by and between W.T. Cary, Jr., as Lessor, and Sklarco, LLC, as Lessee, recorded in Book 2009 Page 2881, of the records of Conecuh County, Alabama.

4. Oil, Gas, and Mineral Lease dated 03/14/2009, by and between Joyce Wingard, as Lessor, and Sklarco, LLC, as Lessee, recorded in Book 2009 Page 2883, of the records of Conecuh County, Alabama.

5. Oil, Gas, and Mineral Lease dated 03/14/2009, by and between Margaret Ann Skiles, as Lessor, and Sklarco, LLC, as Lessee, recorded in Book 2009 Page 2895, of the records of Conecuh County, Alabama.

6. Oil, Gas, and Mineral Lease dated 04/02/2009, by and between Robert E. Cary, as Lessor, and Sklarco, LLC, as Lessee, recorded in Book 2009 Page 2885, of the records of Conecuh County, Alabama.

7. Oil, Gas, and Mineral Lease dated 04/02/2009, by and between Juanita Cary Waters, as Lessor, and Sklarco, LLC, as Lessee, recorded in Book 2009 Page 2887, of the records of Conecuh County, Alabama.

8. Oil, Gas, and Mineral Lease dated 04/02/2009, by and between Jo Ann Cary Langham, as Lessor, and Sklarco, LLC, as Lessee, recorded in Book 2009 Page 2893, of the records of Conecuh County, Alabama.

9. Oil, Gas, and Mineral Lease dated 04/02/2009, by and between Alva Nan Cary Taylor, as Lessor, and Sklarco, LLC, as Lessee, recorded in Book 2009 Page 2951, of the records of Conecuh County, Alabama.

10. Oil, Gas, and Mineral Lease dated 02/24/2011, by and between Alice Smith Cary, represented by Cewilla Garmon as Agent and Attorney-In-Fact, as Lessor, and Sklarco, LLC, as Lessee, recorded in Book 2011 Page 820, of the records of Conecuh County, Alabama.

11. Oil, Gas, and Mineral Lease dated 02/24/2011, by and between Fannie H. Robins, as Lessor, and Sklarco, LLC, as Lessee, recorded in Book 2011 Page 822, of the records of Conecuh County, Alabama.

12. Oil, Gas, and Mineral Lease dated 01/21/2013, by and between Ethan Tyler Monroe, as Lessor, and Sklarco, LLC, as Lessee, recorded in Book 2013 Page 1742, of the records of Conecuh County, Alabama.

13. Oil, Gas, and Mineral Lease dated 04/30/2013, by and between Tisdale Natural Resources, LLC, as Lessor, and Sklarco, LLC, as Lessee, recorded in Book 2013 Page ____, of the records of Conecuh County, Alabama.

**PRUET LEASES**

14. Oil, Gas, and Mineral Lease dated 05/15/2010, by and between Ray Weeks, Jr. and Betty E. Weeks Spurlock, as Lessors, and Donald L. Clark, as Lessee, recorded in Book 2010 Page 3338, of the records of Conecuh County, Alabama.

15. Memorandum of Oil, Gas, and Mineral Lease dated 11/22/2010, by and between Cedar Creek Land & Timber, Inc., as Lessor, and Midroc Operating Company, as Lessee, recorded in Book 2011 Page 266, of the records of Conecuh County, Alabama.

**FLETCHER LEASES**

16. Oil, Gas, and Mineral Lease dated 03/01/2012, by and between John H. Cary, as Lessor, and Fletcher Exploration, LLC, as Lessee, recorded in Book 2012 Page 1927, of the records of Conecuh County, Alabama.

17. Oil, Gas, and Mineral Lease dated 03/01/2012, by and between David A. Cary, as Lessor, and Fletcher Exploration, LLC, as Lessee, recorded in Book 2012 Page 1936, of the records of Conecuh County, Alabama.

18. Oil, Gas, and Mineral Lease dated 03/02/2012, by and between Phyllis M. Pickens, as Lessor, and Fletcher Exploration, LLC, as Lessee, recorded in Book 2012 Page 1924, of the records of Conecuh County, Alabama.

19. Oil, Gas, and Mineral Lease dated 03/02/2012, by and between Kenneth R. Matthews, Jr., as Lessor, and Fletcher Exploration, LLC, as Lessee, recorded in Book 2012 Page 1930, of the records of Conecuh County, Alabama.

20. Oil, Gas, and Mineral Lease dated 03/02/2012, by and between Mary Knight Smith, as Lessor, and Fletcher Exploration, LLC, as Lessee, recorded in Book 2012 Page 1933, of the records of Conecuh County, Alabama.

21. Oil, Gas, and Mineral Lease dated 03/06/2012, by and between Margaret Coker, as Lessor, and Fletcher Exploration, LLC, as Lessee, recorded in Book 2012 Page 1921, of the records of Conecuh County, Alabama.

22. Oil, Gas, and Mineral Lease dated 02/23/2005, by and between Brad Dudley Cary, as Lessor, and Ronnie Fouts, as Lessee, recorded in Book 2005 Page 606, of the records of Conecuh County, Alabama.

**CONTRIBUTED OIL AND GAS INTERESTS**

Mineral Interest contributed by Tisdale Natural Resources, LLC, more particularly described as follows:

4/5 of the mineral interest in and under the following described tract of land:

**TOWNSHIP 4 NORTH, RANGE 12 EAST**
**Conecuh County, Alabama**

All that part of the NW/SW of Section 36, T4N, R12E, lying West of the Mill Road, containing 20 acres, more or less.

The undivided interest specified above is subject to adjustment so that the actual net mineral acres covered by this Agreement will equal 10% of the total net mineral acres in the SW quarter of said Section 36. Any undivided interest in the NW/SW that is not covered by the Participation Election Agreement dated April 30, 2013, by and between Tisdale Natural Resources, LLC and Sklarco, L.L.C., is, and shall be, covered by Lease No. 13 described above.

**INSOFAR AND ONLY INSOFAR AS SAID OIL, GAS AND MINERAL LEASES COVER ACREAGE LYING WITHIN THE SOUTHWEST QUARTER (SE/4) OF SECTION 36, TOWNSHIP 4 NORTH, RANGE 12 EAST, CONECUH COUNTY, ALABAMA.**



WELL LOCATION
FOR
SKLAR EXPLORATION COMPANY L.L.C.
SECTION 36, T4N – R12E
CONECUH COUNTY, ALABAMA

BY

ENGINEERING SERVICE – MOBILE, ALABAMA

FEBRUARY 20, 2012 REV. 3–5–13

SCALE IN FEET

NOTE:
Coordinates Based On Transverse
Mercator–Alabama West Zone NAD27.

DRILLING UNIT: SW/4 ±160 Ac.

LOCATION:
Kennedy 36–12 #1
Elev. ±180'
X=713,600
Y=401,240
LAT. 31.26669°
LON. 86.81600°

SW/4
±160 Ac.

FIELD BOUNDARY



EXHIBIT "A-2"

Attached to and made a part of that certain Operating Agreement dated April 1, 2013 by and
between SKLAR EXPLORATION COMPANY, as Operator, and SKLARCO L.L.C. et al.,
as Non-Operators

EXHIBIT "B"

Producers 88 (9/76)—Paid Up (SP 475)
With Pooling Provision
Mississippi-Alabama-Florida

HEDERMAN BROS., RIDGELAND, MS

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of _____, 20 ____, between

_____ , lessor, (whether one or more), whose address is: _____

and _____ , lessee, WITNESSETH:

1. Lessor, in consideration of _____ Dollars ($ _____), in hand paid, of the royalties herein provided, and of the agreements of the lessee herein contained, hereby grants, leases and lets exclusively unto lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals...

# EXHIBIT "B", continued

8. The rights and estate of any party hereto may be assigned from time to time in whole or in part and as to any mineral or horizon. All of the covenants, conditions and terms hereof shall be binding upon the heirs, successors and assigns. No change or division in ownership of the land, rents or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee; and no change or division in such ownership shall be binding on Lessee until thirty (30) days after Lessee shall have been furnished by registered U. S. mail at Lessee's principal place of business with a certified copy of recorded instrument or instruments evidencing same. In the event of assignment hereof in whole or in part liability for breach of any obligation hereunder shall rest exclusively upon the owner of this lease or of a portion thereof who commits such breach.

9. In the event lessor considers that lessee has not complied with all its obligations hereunder, both express and implied, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor. The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee. Neither the service of said notice nor the doing of any acts by lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that lessee has failed to perform all its obligations hereunder.

10. Lessee hereby warrants and agrees to defend title to said land against the claims of all persons whomsoever. Lessee's rights and interests hereunder shall remain subordinate to any mortgage, taxes or other liens now existing against said land, and Lessee shall have the right to discharge any tax, mortgage or other lien upon said land, either in whole or in part, and in event Lessee does so, it shall be subrogated to such lien with the right to enforce same and apply royalties and rentals accruing hereunder toward satisfying same. Without impairment of Lessee's rights under the warranty in event of failure of title, it is agreed that if this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether Lessor's interest is herein specified or not), or no interest therein, then the royalties and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by Lessor) shall be paid out of the royalty herein provided.

11. Should any one or more of the parties herein above named as lessor fail to execute this lease, it shall nevertheless be binding upon all such parties who do execute it as lessor. The word "Lessor," as used in this lease, shall mean any one or more or all of the parties who execute this lease as Lessor. All the provisions of this lease shall be binding on the heirs, successors and assigns of Lessor and Lessee.

12. Within thirty (30) days prior to the expiration of the primary term in such manner as to maintain this lease in force, within thirty (30) days after the completion of a drilling operation on the leased premises, Lessee shall have the right to extend the primary term for an additional five (5) years by written notification to lessor in which such additional five (5) year period beyond the original primary term, by making payment to lessor or to the credit of lessor as provided herein.

13. Notwithstanding anything to the contrary herein contained, if at the expiration of the primary term oil or gas is not being produced on the leased premises but Lessee is then engaged in drilling or reworking operations thereon, then this lease shall continue in force so long as operations are being continuously prosecuted on the leased premises; and operations shall be considered to be continuously prosecuted if not more than ninety (90) days shall elapse between the completion or abandonment of one well and the beginning of operations for the drilling of a subsequent well. If after discovery of oil or gas on said land the production thereof should cease from any cause after the primary term, this lease shall not terminate if Lessee commences additional drilling or reworking operations within ninety (90) days from date of cessation of production or from date of completion of dry hole. If oil or gas shall be discovered and produced as a result of such operations at or after the expiration of the primary term of this lease, this lease shall continue in force so long as oil or gas is produced from the leased premises.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

_____ (SEAL)

_____ (SEAL)

_____ (SEAL)

## JOINT OR SINGLE ACKNOWLEDGMENT
### (MISSISSIPPI-ALABAMA-FLORIDA)

STATE OF _____

COUNTY OF _____

I hereby certify that on this day, before me, a _____ duly authorized in the state and county aforesaid to take acknowledgments, personally appeared _____

to me known to be the person _____ described in and who executed the foregoing instrument and acknowledged before me that _____ being informed of the contents of the within and foregoing instrument _____ executed the same _____ voluntarily signed and delivered the within and foregoing instrument on the day and year therein mentioned.

Given under my hand and official seal, this _____ day of _____ A.D. 20 ____

(Affix Seal)

My commission expires _____

_____
(Title of Official) _____, County.

## WITNESS ACKNOWLEDGMENT
### (MISSISSIPPI-ALABAMA-FLORIDA)

STATE OF _____

COUNTY OF _____

I, _____ in and for the aforesaid jurisdiction, hereby certify that _____ a subscribing witness to the foregoing instrument, known to me, appeared before me on this day, and being sworn, stated that _____ the grantor(s), having been informed of the contents thereof, voluntarily executed and delivered the same in his presence, and in the presence of the other witness, if any, whose name subscribed hereto as witness; that he attested the same in the presence of the grantor(s), and of the other witness, and that this and other witnesses subscribed his name as a witness in his presence.

Given under my hand and official seal, this _____ day of _____ 20 ____

(Affix Seal)

_____
(Subscribing Witness)

My commission expires _____

_____
(Title of Official) _____, County.



COPAS 2005 Accounting Procedure
Recommended by COPAS

# EXHIBIT "C"
## ACCOUNTING PROCEDURE
## JOINT OPERATIONS

Attached to and made part of _that certain Operating Agreement dated April 1, 2013 by and between Sklar Exploration Company L.L.C._, as Operator, and SKLARCO L.L.C., et al., as Non-Operators.

## I. GENERAL PROVISIONS

IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.

IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.

1. **DEFINITIONS**

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

"**Affiliate**" means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

"**Agreement**" means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

"**Controllable Material**" means Material that, at the time of acquisition or disposition by the Joint Account, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

"**Equalized Freight**" means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

"**Excluded Amount**" means a specified excluded trucking amount most recently recommended by COPAS.

"**First Level Supervision**" means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices
- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

"**Field Office**" means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

"**Joint Account**" means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

"**Joint Operations**" means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

**C O P A S**

1
2  "**Joint Property**" means the real and personal property subject to the Agreement.
3
4  "**Laws**" means any laws, regulations, decrees, and orders of the United States of America or any state thereof and all other
5  governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions
6  contemplated by the Agreement or the actions of the Parties and their operations, whether such laws now exist or are hereafter amended, enacted,
7  promulgated or issued.
8
9  "**Material**" means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.
10
11 "**Non-Operators**" means the Parties to the Agreement other than the Operator.
12
13 "**Offshore Facilities**" means platforms, surface and subsea development and production systems, and other support systems such as oil and
14 gas handling facilities, living quarters, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping,
15 heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of
16 offshore operations, all of which are located offshore.
17
18 "**Off-site**" means any location that is not considered On-site as defined in this Accounting Procedure.
19
20 "**On-site**" means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of
21 Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other
22 facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.
23
24 "**Operator**" means the Party designated pursuant to the Agreement to conduct the Joint Operations.
25
26 "**Parties**" means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as
27 "Party."
28
29 "**Participating Interest**" means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees,
30 or is otherwise obligated, to pay and bear.
31
32 "**Participating Party**" means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of
33 the costs and risks of conducting an operation under the Agreement.
34
35 "**Personal Expenses**" means reimbursed costs for travel and temporary living expenses.
36
37 "**Railway Receiving Point**" means the railhead nearest the Joint Property for which freight rates are published, even though an actual
38 railhead may not exist.
39
40 "**Shore Base Facilities**" means onshore support facilities that during Joint Operations provide such services to the Joint Property as a
41 receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication,
42 scheduling and dispatching center; and other associated functions serving the Joint Property.
43
44 "**Supply Store**" means a recognized source or common stock point for a given Material item.
45
46 "**Technical Services**" means services providing specific engineering, geoscience, or other professional skills, such as those performed by
47 engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint
48 Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second
49 paragraph of the introduction of Section III (Overhead). Technical Services may be provided by the Operator, Operator's Affiliate, Non-
50 Operator, Non-Operator Affiliates, and/or third parties.
51
52 **2.  STATEMENTS AND BILLINGS**
53
54 The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the
55 preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all
56 charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified
57 and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications.
58 Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.
59
60 The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (Advances
61 and Payments by the Parties) via email, electronic data interchange, internet website or other equivalent electronic media in lieu of paper
62 copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and
63 bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of
64 weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via
65 email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings
66 electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written
   notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

2

COPAS

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

3. ADVANCES AND PAYMENTS BY THE PARTIES

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1) being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

(2) being billed for a project or an AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

(3) being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

(4) charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

4. ADJUSTMENTS

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, rendered during any calendar year shall conclusively be presumed to be true and correct, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B. All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1) a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

(2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

(3) a governmental/regulatory audit, or

(4) a working interest ownership or Participating Interest adjustment.

5. EXPENDITURE AUDITS

A. A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

3

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

(C)

those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section 1.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A. A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section 1.5.B or 1.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section 1.5.B or 1.5.C.

B. The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section 1.3.B (*Advances and Payments by the Parties*).

C. The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section 1.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section 1.3.B (*Advances and Payments by the Parties*).

D. If any Party fails to meet the deadlines in Sections 1.5.B or 1.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section 1.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E. ☐ *(Optional Provision – Forfeiture Penalties)*
If the Non-Operators fail to meet the deadline in Section 1.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section 1.5.B or 1.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.

6. **APPROVAL BY PARTIES**

A. GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

4

**c o p a s**

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section 1.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section 1.6.B.

### B. AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____ ( _____ ) or more Parties, one of which is the Operator, having a combined working interest of at least _____%, which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

### C. AFFILIATES

For the purpose of administering the voting procedures of Sections 1.6.A and 1.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section 1.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section 1.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

### 1. RENTALS AND ROYALTIES

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

### 2. LABOR

A. Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1) Operator's field employees directly employed On-site in the conduct of Joint Operations.

(2) Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*).

(3) Operator's employees providing First Level Supervision.

(4) Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

(5) Operator's employees providing Offsite Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section 1.6.A (*General Matters*).

B. Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

D.  Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A, when the expenses are incurred in connection with directly chargeable activities.

E.  Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F.  Training costs as specified in COPAS MFI-35 ("*Charging of Training Costs to the Joint Account*") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G.  Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("*Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation*"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H.  Award payments to employees, in accordance with COPAS MFI-49 ("*Awards to Employees and Contractors*") for personnel whose salaries and wages are chargeable under Section II.2.A.

3.  MATERIAL.

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (*Material Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4.  TRANSPORTATION.

A.  Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B.  Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1)  If the actual trucking charge is less than or equal to the Excluded Amount, the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property. The Operator shall consistently apply the selected alternative.

(2)  If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5.  SERVICES

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("*Awards to Employees and Contractors*").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6.  EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A.  The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____ percent (_____%) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

copas (c)

equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Section II.6.A. above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

# 7. AFFILIATES

A. Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $ _____. If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B. For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $ _____ in a given calendar year.

C. The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

# 8. DAMAGES AND LOSSES TO JOINT PROPERTY

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

# 9. LEGAL EXPENSE

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

# 10. TAXES AND PERMITS

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

7

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**11. INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work, On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12. COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

**14. ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15. OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Operations and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

**III. OVERHEAD**

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of

• warehousing, other than for warehouses that are jointly owned under this Agreement
• design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
• inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
• procurement
• administration
• accounting and auditing
• gas dispatching and gas chart integration

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

c o p a s



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**c o p a s**

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

## I.   OVERHEAD—DRILLING AND PRODUCING OPERATIONS

As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

☑ (Alternative 1) Fixed Rate Basis, Section III.1.B.
☐ (Alternative 2) Percentage Basis, Section III.1.C.

### A.   TECHNICAL SERVICES

(i) Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for On-site Technical Services, including third party Technical Services:

☑ (Alternative 1 – Direct) shall be charged direct to the Joint Account.

☐ (Alternative 2 – Overhead) shall be covered by the overhead rates.

(ii) Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for Off-site Technical Services, including third party Technical Services:

☐ (Alternative 1 – All Overhead) shall be covered by the overhead rates.

☑ (Alternative 2 – All Direct) shall be charged direct to the Joint Account.

☐ (Alternative 3 – Drilling Direct) shall be charged direct to the Joint Account, only to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

### B.   OVERHEAD—FIXED RATE BASIS

(1)   The Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate per month $ 9,778.07 _____ (prorated for less than a full month)

Producing Well Rate per month $ 977.81 _____

(2)   Application of Overhead—Drilling Well Rate shall be as follows:

(a)   Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead—Producing Well Rate shall be as follows:

   (a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

   (b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

   (c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well had produced.

   (d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

   (e) Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

C.  OVERHEAD—PERCENTAGE BASIS

(1) Operator shall charge the Joint Account at the following rates:

   (a) Development Rate _____ percent (____ %) of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (*Legal Expenses*) and all Material salvage credits.

   (b) Operating Rate _____ percent (____ %) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expenses*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead—Percentage Basis shall be as follows:

   (a) The Development Rate shall be applied to all costs in connection with:

     [i]  drilling, redrilling, sidetracking, or deepening of a well
     [ii]  a well undergoing plugback or workover operations for a period of five (5) or more consecutive work–days
     [iii]  preliminary expenditures necessary in preparation for drilling
     [iv]  expenditures incurred in abandoning when the well is not completed as a producer
     [v]  construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead—Major Construction and Catastrophe*).

   (b) The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead—Major Construction and Catastrophe*).

2.  OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

copas

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A. If the Operator absorbs the engineering, design and drafting costs related to the project:

(1) __5__ % of total costs if such costs are less than $100,000, plus

(2) __2__ % of total costs in excess of $100,000 but less than $1,000,000, plus

(3) __1__ % of total costs in excess of $1,000,000.

B. If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1) __5__ % of total costs if such costs are less than $100,000, plus

(2) __2__ % of total costs in excess of $100,000 but less than $1,000,000, plus

(3) __1__ % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections III.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

3. AMENDMENT OF OVERHEAD RATES

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

1. DIRECT PURCHASES

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

* To be negotiated if the need arises.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

11

**c o p a s**

2. **TRANSFERS**

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

A. **PRICING**

The value of Material transferred to/from the Operator should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer.

   (1) Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

      (a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

      (b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

   (2) Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

   (3) Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

   (4) As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

B. **FREIGHT**

   (1) Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

      (a) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

      (b) Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

      (c) Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

      (d) Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point.

   (2) Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

C. **TAXES**

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

12

copas

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

D. CONDITION

(1) Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section 1.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2) Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3) Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4) Condition "D" – Material that (i) is no longer suitable for its original purpose but usable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe prices of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section 1.6.A (*General Matters*).

(5) Condition "E" – Junk shall be priced at prevailing scrap value prices.

E. OTHER PRICING PROVISIONS

(1) Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of service. New coating and/or wrapping shall be considered a component of the Material and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual"). Documentation must be provided to the Non-Operators upon request to support the cost of service.

(2) Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

13

**c o p a s**

3. DISPOSITION OF SURPLUS

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

• The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

• If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

• Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (Transfers).

• Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (Transfers), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

• Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

4. SPECIAL PRICING PROVISIONS

A. PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (Transfers) or Section IV.3 (Disposition of Surplus), as applicable.

B. SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (Pricing) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C. MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (Transfers). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (Transfers) and shall be based on the Condition "B" prices in effect on the date of the physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

# 1. DIRECTED INVENTORIES

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A.  A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section 1.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B.  Actual transportation costs and Personal Expenses for the inventory team.

C.  Reasonable charges for report preparation and distribution to the Non-Operators.

# 2. NON-DIRECTED INVENTORIES

A.  OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B.  NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C.  SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

# EXHIBIT "D"

Attached to and made a part of that certain Operating Agreement dated April 1, 2013 by and between SKLAR EXPLORATION COMPANY, as Operator, and SKLARCO L.L.C. et al., as Non-Operators.

## INSURANCE

Operator shall carry the following insurance with the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of Insurance will be provided upon request.

I.   WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

Extension of Coverage B of policy to provide for not less than $500,000 for death or injury to one person in any one accident.

II   COMPREHENSIVE GENERAL LIABILITY

Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $2,000,000 for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III   AUTOMOBILE LIABILITY

Coverage shall include owned, non-owned and hired vehicles. Combined single limit of at least $500,000 for each occurrence for bodily injury and property damage.

IV   EXCESS LIABILITY

Operator shall carry excess liability insurance in an amount necessary to provide a total of $10,000,000 coverage for both Automobile Liability and Comprehensive General Liability.

Any party, at its own expense, may carry its own coverage for Excess Liability Insurance with limits as set forth in this Section IV. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

EXTRA EXPENSE LIABILITY

Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $350,000 per occurrence.

Liability Limit: $5,000,000

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder. Further, any party, at its own expense, may carry its own coverage for Extra Expense Liability Insurance with limits as set forth in this Section V. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

# EXHIBIT "E"

Attached to and made a part of that certain Operating Agreement dated April 1, 2013 by and
between SKLAR EXPLORATION COMPANY, as Operator, and SKLARCO L.L.C. et al.,
as Non-Operators.

## GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement, the parties hereto own
and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area
described in the Operating Agreement (the "JOA").

1.

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share
of the gas produced from said JOA. However, one or more of the parties may be unable to take or market its
interest in the gas production from time to time; therefore, to permit any party to produce and dispose of its
interest in the gas production from the JOA with as much flexibility as possible, the parties hereto agree to the
storage and balancing agreement herein set forth.

2.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the
period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party
elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said
share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof,
said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to
the participation percentages of all taking parties. All parties hereto shall share in and own the condensate
recovered at the surface in accordance with their respective interest, but each party taking such gas shall own
all of the gas delivered to its purchaser. Any party whose share of gas is not marketed shall be credited with
gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or
lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all
parties hereto statements showing the total quantity of gas produced, used in lease operations, vented or lost,
and the total quantity of condensate recovered.

3.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In
addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be
entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of
gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas,
each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on
the ratio of its participation percentage under this Operating Agreement to the participating percentages of all
entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the
Unit Area so the lease will not be shut-in for overproducing the allowable, if any, assigned thereto by the
regulatory body having jurisdiction.

4.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall
furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding
month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of the
proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which
are payable on gas produced by any such party, and Operator will, in turn, make settlement for all royalties and
overriding royalties which are payable on gas produced from the Contract Area. In the event that the total
royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty and overriding
royalty obligations on gas produced and marketed from the Contract Area, then any such deficiency will be
borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency
was asserted. Any party or parties contributing separate leases to the Contract Area shall furnish the Operator
with division order title opinions on which Operator shall be entitled to rely in making distribution of royalties
and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production
taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser shall pay, or
cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the
volume of gas actually taken for its account.

5.  Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.  Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties.  In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties.  In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold, less applicable production taxes and royalties theretofore paid, less any reasonable dehydration, compression, treating, processing, gathering or transportation costs actually incurred, including amortized capital costs associated with the design, construction or operation of any plants to dehydrate, compress, treat or process gas, in connection with the sale of the overproduction, at the price and based on the proceeds actually received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party.  For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party). Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party or parties upon the underproduced party executing and delivering to said overproduced party an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party.  Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.  This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.  Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.  The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.  The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.

-2-