

Shreveport Office
401 Edwards St., Ste. 1601
Shreveport, Louisiana 71101
Phone: 318-227-8668
Facsimile: 318-227-9012

Boulder Office
5395 Pearl Parkway, Ste. 200
Boulder, Colorado 80301
Phone: 720-961-5477
Facsimile: 303-443-1551

Steven R. Hatcher, Jr.,
Vice President – General Counsel

Telephone: 720-306-8310
E-Mail: shatcher@sklarexploration.com

December 2, 2016

VIA UPS

To:     Silver Creek Prospect Participants

Re:     Silver Creek Prospect, Smith County, Texas

Dear Participants,

Pursuant to that certain Participation and Exploration Agreement for the West Tyler 3D Seismic Prospect dated effective as of October 1, 2013, as amended (the "**Participation Agreement**"), Sklar Exploration Company L.L.C. ("**SEC**" or "**Operator**") acquired 3D seismic data across the lands located within the bold blue boundary on the plat attached hereto as **Exhibit A**, attached hereto and made a part hereof (the "**Area of Mutual Interest**" or "**AMI**"), for the purpose identifying and developing oil and gas prospects. After review of the 3D seismic data, SEC identified a Paluxy prospect, generally known as the Silver Creek Prospect (the "**Silver Creek Prospect**"), underlying the lands located within the bold black boundary on Exhibit A (the "**Contract Area**"). By letter dated October 7, 2015, SEC offered participation in the Silver Creek Prospect to all participants in the West Tyler 3D Seismic Prospect as a "Future Prospect" under Subsection 1.1(b) of the Participation Agreement. Each of you (individually a "**Participant**" and collectively the "**Participants**") has elected to participate in the Silver Creek Prospect. The purpose of this letter (the "**Agreement**") is to set forth the terms and conditions of participation in the Silver Creek Prospect, including without limitation, the acquisition of oil, gas and mineral leases covering the Contract Area, the drilling of the Initial Well (as hereinafter defined) and the reservation of the Reversionary Back-In Working Interest (as hereinafter defined) in favor of Sklarco L.L.C. and JJS Working Interests L.L.C.

**Article I.  Purchase And Sale And Development Commitments**

**Section 1.1.  Leases And Additional Leases**

SEC, on behalf of the Participants, acquired the oil, gas and mineral leases described in **Exhibit A-1**, attached hereto and made a part hereof, which cover and affect approximately 273.69 net acres within the Contract Area (the "**Leases**"). SEC incurred a total cost, including bonus and brokerage, of $89,049.90 to

Silver Creek Prospect, Smith County, Texas
December 2, 2016
Page **2** of **15**

acquire the Leases and billed those costs to all Participants through previous joint interest bills. Each of the Participants has paid its before Prospect Payout gross working interest share ("**Share**") as set forth in **Exhibit B**, attached hereto and made a part hereof, of those costs, and SEC does hereby sell and agree to assign to the Participants the Leases in those proportions.

In addition to the Leases heretofore acquired, prior to reaching total depth in the Initial Well, SEC, on behalf of the Participants, agrees to supervise the acquisition of additional oil, gas and mineral leases covering the Contract Area (collectively, the "**Additional Leases**"). Each of the Participants agrees to pay its Share of all actual third-party costs incurred by or on behalf of SEC for such Additional Leases, including, without limitation, all bonus and brokerage costs, said payment to be made within fifteen (15) days of receipt of an invoice for said amount. The term "Additional Leases" shall refer only to leases acquired pursuant to this paragraph and not to leases acquired pursuant to the AMI provisions of Section 3.1 of this Agreement. After total depth in the Initial Well is reached, the terms of the AMI set forth in Section 3.1 shall govern the acquisition of new leases covering lands within the Contract Area.

Upon completion of the Initial Well, SEC shall deliver a partial assignment to the Participants of their undivided before Prospect Payout gross working interests in, to and under the Leases and the Additional Leases. The partial assignment shall be: (i) made without warranty of title, express or implied, not even for return of the costs to acquire the leases, except SEC agrees to warrant title against all defects arising out of claims by SEC or of persons claiming by, through or under SEC, (ii) subject to the terms of the Leases and Additional Leases, including lessors' burdens, (iii) subject to the ORRI described in Subsection 1.1(a), below, (iv) subject to the RBWI described in Section 1.3, below and (v) subject to this Agreement and the JOA.

### Subsection 1.1(a). Overriding Royalty Interest

The Leases, the Additional Leases and any other lease, lease extension or other mineral interest acquired by any party to this Agreement or the JOA within the AMI shall be subject to and burdened by the sliding scale overriding royalty interest (the "**ORRI**") in favor of Tal Walker described in Subsection 1.1(c) of the Participation Agreement.

### Section 1.2. Initial Well

### Subsection 1.2(a). Drilling Of The Initial Well

At Operator's discretion, but no later than June 30, 2018, and subject to rig availability, and subject to force majeure, Operator shall commence or cause to be commenced operations for the drilling of an initial well (the "**Initial Well**") at a location to be determined in the Hezekiah George Survey, A-367, of Smith County, Texas, or as near thereto as practicable, and thereafter continue the drilling of the Initial Well with due diligence to a measured depth of 8,200' in a vertical bore hole, or a depth sufficient in Operator's discretion, to test the Paluxy Formation (the "**Objective Depth**"). The Participants agree to participate for their respective Shares of the costs to drill the Initial Well to the Objective Depth. Concurrent with their execution of this Agreement, the Participants agree to execute an Authority For Expenditure ("**AFE**") attached hereto as **Exhibit C**. Notwithstanding the estimates contained in the AFE, the Participants are responsible for and must pay SEC their respective Shares of all actual costs of the Initial Well to the Objective Depth in the following manner: (i) SEC will furnish the Participants with a cash call invoice within thirty (30) days of its anticipated spud date of the Initial Well covering their Shares of the amount estimated in the AFE to drill the Initial Well to the Objective Depth, excluding estimated completion costs, but including the amount estimated to plug and abandon the Initial Well in the event it is not completed as a producing well, and the Participants must tender to SEC as an advance, within fifteen (15) days of receipt and, in any event, prior to spudding the Initial Well, full payment of the cash call invoice, unless other arrangements have been made by Participant with SEC in

Silver Creek Prospect, Smith County, Texas
December 2, 2016
Page **3** of 15

advance; and (ii) the Participants must tender to SEC, within 15 days of receipt of (an) invoice(s) from SEC, the difference, if any, between said advance and their Shares of the actual costs to drill the Initial Well to the Objective Depth. In the event any Participant from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment as aforesaid, then Operator, at its option, shall make a second written request by certified mail, return receipt requested for such advance. The Participant shall pay for said advance as aforesaid within ten (10) days of the receipt of such second request.

If, after the receipt of a second written request as hereinabove provided, any Participant fails to pay its Share of the actual costs to drill the Initial Well to the Objective Depth, in the manner and within the time deadlines set forth above, then in that event and only in that event, that Participant hereby agrees to relinquish all of its right, title and interest in, to and under the Silver Creek Prospect, the Initial Well and all subsequent wells, the Leases, the Additional Leases and any other lease, lease extension or other mineral interest acquired by any party to this Agreement or the JOA covering lands within the Contract Area, and to execute those instruments provided by SEC necessary to convey said interest to the Participants who did not fail to pay their Shares of the actual costs to drill the Initial Well to the Objective Depth and who so elect to accept such an additional interest or portion thereof, for no consideration, not even for return of the costs to acquire the Leases and Additional Leases or drilling advance. This forfeiture of interest shall be without prejudice and in addition to the rights of the Operator and Participants who paid their Shares of the actual costs to drill the Initial Well to the Objective Depth to offset and/or recover all sums owed by a Participant that fails to pay its Share of actual costs to drill the Initial Well to the Objective Depth.

### Subsection 1.2(b). Operations After Reaching The Objective Depth

After the Initial Well has been drilled to the Objective Depth, SEC shall make a copy of any logs, core analysis, drill-stem test analysis or results of any other tests available to a representative of the Participants at the wellsite, or if none is present, by email, facsimile or overnight delivery. SEC shall also furnish the Participants in a like manner with its recommendation regarding the disposition of the wellbore, in accordance with the JOA. Failure to respond within the time specified shall be deemed an election to participate in SEC's recommended operation. An election not to participate in an election to set production casing and complete the Initial Well shall result in the forfeiture of interest not only in the Initial Well, but also in the Silver Creek Prospect, the Contract Area, the Leases, the Additional Leases and any other lease, lease extension or other mineral interest acquired by any party to this Agreement or the JOA covering lands located within the Contract Area. All subsequent operations and elections shall be governed by the JOA.

### Section 1.3. Reversionary Back-In Working Interest

Pursuant to Section 1.3 of the Participation Agreement, upon reaching Prospect Payout, an undivided twenty-five (25%) of the interest of each of the Participants in all leases covering lands located within the AMI, including, but not limited to the Leases, the Additional Leases and any other lease, lease extension or other mineral interest acquired by any party to this Agreement or the JOA, shall automatically and permanently vest in Sklarco L.L.C. and JJS Working Interests L.L.C in the proportions set forth in the Participation Agreement. The RBWI shall include a like interest in the Initial Well and any subsequent wells, the proceeds from the sale of oil, gas and all other products produced or derived from such wells, and in any easements, right-of-ways, personal property, equipment, facilities and pipelines associated with such wells. The term "Prospect Payout," as used in this Agreement, shall have the meaning set forth in Section 1.3 of the Participation Agreement.

Silver Creek Prospect, Smith County, Texas
December 2, 2016
Page **4** of **15**

**Article II.  Operations**

    **Section 2.1.  JOA**

        SEC is hereby designated Operator of all wells drilled within the Contract Area.  Except as otherwise provided in this Agreement, all operations within the Contract Area shall be governed by the joint operating agreement (the "**JOA**") covering the Contract Area attached hereto as **Exhibit D**.  The Parties agree to execute the JOA concurrent with their execution of this Agreement.  In the event of a conflict between this Agreement and the JOA, this Agreement shall govern and control.

**Article III.  Miscellaneous**

    **Section 3.1.  AMI**

        All parties to this Agreement are currently subject to an Area of Mutual Interest ("**AMI**") covering the lands located within the bold blue outline on the plat attached as Exhibit A.  The AMI was established pursuant to Section 3.1 of the Participation Agreement and governs the acquisition, extension, or renewal by any party to the Participation Agreement, or successor in title to any party to the Participation Agreement (which includes all parties to this Agreement), of any oil and gas lease or oil and gas interest covering lands located within the AMI for the term recited therein.  Silver Creek Prospect shall be deemed a "Future Prospect" within the meaning set forth in the Participation Agreement for all purposes, including without limitation, enforcement of the AMI.

    **Section 3.2.  Information**

        Upon execution of this Agreement by all of the Parties, any Participant may request and shall be entitled to a copy of all of the Leases and of any other title information such as any abstracts of title or drill-site title opinions for the drill-site tract and drilling unit for the Initial Well, along with drilling and completion and log reports for the Initial Well and any subsequent wells.

    **Section 3.3.  Confidentiality**

        The Parties agree to keep confidential and not disclose any information about the Silver Creek Prospect, not already disclosed or of public record, to third parties except as required by statutes, regulations, or court order for so long as this Agreement is in effect, but not to exceed five (5) years from the date of this Agreement.

    **Section 3.4.  Closing**

        Closing shall occur by mail or by such other means and at such time and place to which the Parties mutually agree.

    **Section 3.5.  Binding On Successors And Assigns**

        This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and assigns.

    **Section 3.6.  Force Majeure**

Silver Creek Prospect, Smith County, Texas
December 2, 2016
Page **5** of 15

     If Operator exercises reasonable efforts in good faith to timely initiate operations to fulfill any drilling operations set forth in this Agreement, but is prevented from initiating such action by reason of strikes, labor disputes, accidents, action of the elements, adverse weather conditions (or other acts of God), partial or total failure or inability to obtain material or supplies, including a drilling rig, or in the event that the performance of such drilling or seismic operations is prevented by law, directive or regulations from any authorized agency, or the inability to secure the necessary permits or use agreements from the owners of the surface or the minerals of the subject lands to fulfill either the seismic commitments or the drilling commitments, or causes of the kind enumerated herein or otherwise beyond the control of the Operator and which, by the exercise of due diligence, Operator could not have prevented or is unable to overcome, the time required for performance of such obligations shall be extended for so long and only so long as the condition causing such force majeure continues to exist. Upon cessation of the condition constituting the force majeure, Operator shall have ninety (90) days, or for so long thereafter as may be necessary to achieve optimal drilling conditions, within which to initiate the required operation; however, such period will be reduced to the extent operations must be conducted within a fixed period of time to avoid the loss, termination or forfeiture of leasehold interests or the loss of opportunity to earn additional leasehold interests. Operator shall promptly notify the Participants in writing of the existence of the force majeure condition, and shall use reasonable efforts in good faith to remove or address the force majeure situation as quickly as practicable.

### Section 3.7.  Entire Agreement

     This Agreement and its attachments constitute the entire agreement of the Parties with respect to the subject matter hereof, and any other promises, inducements, representations, warranties, or agreements with respect to the subject matter hereof have been superseded hereby and are not intended to survive this Agreement.  Except as otherwise expressly provided herein, no amendment or modification of this Agreement shall be effective unless set forth in writing and signed by a duly authorized officer of each and all of the Parties.

### Section 3.8.  Severability

     The invalidity of any one or more of the provisions of this Agreement does not affect the remaining portions of this Agreement, and in case of any such invalidity, this Agreement should be construed as if the invalid provision(s) had not been inserted.

### Section 3.9.  Notices

     All notices between the Parties authorized or required by any of the provisions of this Agreement, unless otherwise expressly provided, shall be given in writing by email or facsimile or regular or express mail, addressed to those of the Parties to whom the notice is given at the email addresses or fax telephone numbers and addresses set forth in Exhibit "A" to the JOA.  Any of the Parties may change its designated email address, fax telephone number and address at any time, and from time to time, by giving written notice thereof to the other Parties.

### Section 3.10.  Headings for Convenience

     The article, section and subsection headings used in this Agreement are inserted for convenience only and shall not be regarded in construing this Agreement.

### Section 3.11.  Time

     Time is of the essence hereunder.

Silver Creek Prospect, Smith County, Texas
December 2, 2016
Page **6** of **15**

### Section 3.12.  Governing Law

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Texas.

### Section 3.13.  Relationship Of The Parties

Liability of the Parties hereto shall be several and not joint or collective.  Each Party shall make its own elections under this Agreement and shall be responsible only for its obligations as herein set out.  It is not the intention of the Parties to create, nor shall this Agreement be construed as creating, a mining or other partnership, joint venture, or association between the Parties.

### Section 3.14.  Assignability

The Parties to this Agreement may assign all or part of their rights and obligations hereunder, provided, however, that any such assignment must be made subject to the terms and conditions of this Agreement, the JOA and the Participation Agreement.

### Section 3.15.  Term

This Agreement shall remain in full force and effect as between the Parties until expiration of the last lease jointly owned by them, or any combination of the Parties, covering any part of the Contract Area.

### Section 3.16.  Counterparts

This Participation Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

### Section 3.17.  Sophisticated Investors

By execution of this Agreement, the Participants confirm that they have a working knowledge of the oil and gas industry and that each has thoroughly investigated its participation in the Silver Creek Prospect.  Each Participant acknowledges that it is a sophisticated investor and it (or its owner) has a financial net worth in excess of one million dollars.  Each Participant represents it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of not just its share of the costs to acquire the Lease and Additional Leases and drilling advance, but also its share of all other costs incurred in operations on the Contract Area.  EACH PARTICIPANT ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES.  Each Participant further confirms and accepts that the offering of the interest herein purchased has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the State of Texas or any other state.  Each Participant has hereby agreed to participate in the Silver Creek Prospect for investment purposes only, and not with a view to or for sale in connection with any distribution of interests in the Silver Creek Prospect within the meaning of said laws.

### Section 3.18.    Effective Date

This Agreement shall be effective as of December 1, 2016.

Silver Creek Prospect, Smith County, Texas
December 5, 2016
Page 7 of 15

      If the terms set forth above for participation in the Silver Creek Prospect meet your approval, please execute this Agreement and the JOA (attached as Exhibit D) and return your signature pages by mail to the address listed above for our Boulder office (Attn: Camille Jenkins).

                             Yours Very Truly,

                             SKLAR EXPLORATION COMPANY L.L.C.

                             By:_____

                                Steven R. Hatcher, Jr.
                                Vice President – General Counsel

AGREED AND ACCEPTED THIS _____ DAY OF DECEMBER, 2016

Signature:       _____

Printed Name:   _____

Company:      _____

Title:           _____

Exhibit A:     Plat of Contract Area and AMI
Exhibit A-1:   Leases
Exhibit B:     Interests of Participants
Exhibit C:     AFE
Exhibit D:     JOA

## EXHIBIT A

Attached to and made a part of that certain Letter Agreement dated effective as of December 1, 2016, regarding the Silver Creek Prospect, Smith County, Texas, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., et al., as Participants

## PLAT OF CONTRACT AREA & AMI



## EXHIBIT A-1

Attached to and made a part of that certain Letter Agreement dated effective as of December 1, 2016, regarding the Silver Creek Prospect, Smith County, Texas, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., et al., as Participants

## LEASES

1.  Oil & Gas Lease dated 10/22/2015, by and between Robert R. Herman, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053272, of the official public records of Smith County, Texas.

2.  Oil & Gas Lease dated 10/26/2015, by and between Thelma Hogue, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053273, of the official public records of Smith County, Texas.

3.  Oil & Gas Lease dated 10/26/2015, by and between Forrest Gibbs, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053274, of the official public records of Smith County, Texas.

4.  Oil & Gas Lease dated 01/11/2016, by and between Susie Hurley, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on 01/27/2016, Entry 20160100003989, of the official public records of Smith County, Texas.

5.  Oil & Gas Lease dated 10/23/2015, by and between Lena Norwood, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053271, of the official public records of Smith County, Texas.

6.  Oil & Gas Lease dated 10/24/2015, by and between Georgeanne Picu, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053270, of the official public records of Smith County, Texas.

7.  Oil & Gas Lease dated 10/26/2015, by and between Carol Pepper, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053269, of the official public records of Smith County, Texas.

8.  Oil & Gas Lease dated 11/12/2015, by and between Thelma Hogue, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150100057971, of the official public records of Smith County, Texas.

9.  Oil & Gas Lease dated 10/26/2015, by and between Jyoti Arun Jason-Miller, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on 11/12/2015, Entry 20150100053282, of the official public records of Smith County, Texas.

10. Oil & Gas Lease dated 10/26/2015, by and between Rexanne Meaux, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on 11/12/2015, Entry 20150100053280, of the official public records of Smith County, Texas.

11. Oil & Gas Lease dated 10/24/2015, by and between John W. Konrad, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on 11/12/2015, Entry 20150100053278, of the official public records of Smith County, Texas.

12.     Oil & Gas Lease dated 10/29/2015, by and between Delma R. House, as Lessor, and Sklarco, LLC, as Lessee, recorded on 11/12/2015, Entry 20150100053281, of the official public records of Smith County, Texas.

13.     Oil & Gas Lease dated 11/02/2015, by and between Marion Smalley Evans, as Lessor, and Sklarco, LLC, as Lessee, recorded on 11/12/2015, Entry 20150100053279, of the official public records of Smith County, Texas.

14.     Oil & Gas Lease dated 11/02/2015, by and between Charlotte Draeger, as Lessor, and Sklarco, LLC, as Lessee, recorded on 11/12/2015, Entry 20150100053277, of the official public records of Smith County, Texas.

15.     Oil & Gas Lease dated 10/29/2015, by and between Melinda Chilton, as Lessor, and Sklarco, LLC, as Lessee, recorded on 11/12/2015, Entry 20150100053275, of the official public records of Smith County, Texas.

16.     Oil & Gas Lease dated 10/24/2015, by and between Joanne Carr, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, Entry 20150100057970, of the official public records of Smith County, Texas.

17.     Oil & Gas Lease dated 11/12/2015, by and between Forrest Gibbs, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, Entry 20150100057968, of the official public records of Smith County, Texas.

18.     Oil & Gas Lease dated 10/24/2015, by and between Mercedes Zentgraf, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, Entry 20150100057969, of the official public records of Smith County, Texas.

19.     Oil & Gas Lease dated 12/28/2015, by and between Lohrey Henderson, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/06/2016, Entry 20160100000834, of the official public records of Smith County, Texas.

20.     Oil & Gas Lease dated 12/21/2015, by and between Kittrell Family Minerals, LLC Scott R. Kittrell, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/06/2016, Entry 20160100000831, of the official public records of Smith County, Texas.

21.     Oil & Gas Lease dated 12/28/2015, by and between Holly Materka, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003986, of the official public records of Smith County, Texas.

22.     Oil & Gas Lease dated 12/20/2015, by and between Joyce House Riggins c/o Rachel Schuler, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/06/2015, Entry 20160100000833, of the official public records of Smith County, Texas.

23.     Oil & Gas Lease dated 12/22/2015, by and between Wayne McMurty, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003992, of the official public records of Smith County, Texas.

24.     Oil & Gas Lease dated 12/22/2015, by and between Wanda Lee Lemons, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003991, of the official public records of Smith County, Texas.

25.     Oil & Gas Lease dated 01/06/2016, by and between Norma Beddingfield and Chad Beddingfield, individually and as Co-Trustees of the Elbert and Norma Beddingfield Marital Trust and the Beddingfield Family Trust, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003993, of the official public records of Smith County, Texas.

26.     Oil & Gas Lease dated 01/11/2016, by and between Melinda Chilton, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003988, of the official public records of Smith County, Texas.

27.     Oil & Gas Lease dated 01/07/2016, by and between Terri L. Beddingfield, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003990, of the official public records of Smith County, Texas.

28.     Oil & Gas Lease dated 12/07/2015, by and between Jean House Hughes, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150100057976, of the official public records of Smith County, Texas.

29.     Oil & Gas Lease dated 12/21/2015, by and between ENK3 Minerals, LP, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/06/2016, Entry 20160100000832, of the official public records of Smith County, Texas.

30.     Oil & Gas Lease dated 11/21/2015, by and between Charles Clay House, Jr. and Kathy Ann House, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150100057972, of the official public records of Smith County, Texas.

31.     Oil & Gas Lease dated 11/12/2015, by and between Rexanne Meaux, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150100057967, of the official public records of Smith County, Texas.

32.     Oil & Gas Lease dated 01/11/2016, by and between Delma R. House, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003987, of the official public records of Smith County, Texas.

33.     Oil & Gas Lease dated 12/28/2015, by and between Roy David Hilberg, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003985, of the official public records of Smith County, Texas.

34.     Oil & Gas Lease dated 11/21/2015, by and between Charles Clay House, Jr., as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 2016100003994, of the official public records of Smith County, Texas.

35.     Oil & Gas Lease dated 01/19/2016, by and between Charles Clay House, Jr., as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003984, of the official public records of Smith County, Texas.

36.     Oil & Gas Lease dated 10/22/2015, by and between John J. Hermann, as Lessor, and Sklarco,
        LLC, as Lessee, recorded on 12/16/2015, Entry 20150400057966, of the official public records
        of Smith County, Texas.

37.     Oil & Gas Lease dated 11/12/2015, by and between Delma R. House, as Lessor, and Sklarco,
        LLC, as Lessee, recorded on 12/16/2015, Entry 20150100057973, of the official public records
        of Escambia County, Alabama.

38.     Oil & Gas Lease dated 12/02/2015, by and between The Joe and Marnell House Trust dated
        June 4, 1998 c/o Merr, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry
        20150100057974, of the official public records of Escambia County, Alabama.

39.     Oil & Gas Lease dated 11/12/2015, by and between Carol Pepper, as Lessor, and Sklarco, LLC,
        as Lessee, recorded on 12/16/2015, Entry 20150400057975, of the official public records of
        Smith County, Texas.

## EXHIBIT B

Attached to and made a part of that certain Letter Agreement dated effective as of December 1, 2016, regarding the Silver Creek Prospect, Smith County, Texas, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., et al., as Participants

## INTERESTS OF PARTICIPANTS IN SILVER CREEK PROSPECT

| Participant | BPPO* | APPO* | AFPO*** |
|---|---|---|---|
| **Sklarco L.L.C. | 0.17500000 | 0.34055000 | 0.32180000 |
| **JJS Working Interests LLC | 0.05000000 | 0.07820000 | 0.07820000 |
| Bennett Greenspan | 0.01000000 | 0.00750000 | 0.00750000 |
| Bundero Investment Company, L.L.C. | 0.07000000 | 0.05250000 | 0.04000000 |
| Fair Oil Ltd. | 0.11500000 | 0.08625000 | 0.08625000 |
| Fant Energy, Ltd. | 0.10000000 | 0.07500000 | 0.07500000 |
| FPCC USA, Inc. | 0.06500000 | 0.04875000 | 0.04875000 |
| Genesis Resources, LLC | 0.00500000 | 0.00375000 | 0.00375000 |
| JF Howell Interests, LP | 0.05000000 | 0.03750000 | 0.03750000 |
| Kingston, LLC | 0.01000000 | 0.00750000 | 0.00750000 |
| Kudzu Oil Properties, LLC | 0.05000000 | 0.03750000 | 0.03750000 |
| Lucas Petroleum Group, Inc. | 0.02000000 | 0.01500000 | 0.01500000 |
| McCombs Energy, Ltd. | 0.12500000 | 0.09375000 | 0.12500000 |
| R. L. Ray, Ltd. | 0.05500000 | 0.04125000 | 0.04125000 |
| Santo Petroleum, L.L.C. | 0.03000000 | 0.02250000 | 0.02250000 |
| Sugar Oil Properties, L.P. | 0.05000000 | 0.03750000 | 0.03750000 |
| Tiembo Ltd. | 0.02000000 | 0.01500000 | 0.01500000 |
| | 1.00000000 | 1.00000000 | 1.00000000 |

*Before Prospect Payout ("BPPO") and After Prospect Payout ("APPO") have the meanings set forth in Section 1.3 of that certain Participation And Exploration Agreement, West Tyler 3D Seismic Prospect, dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain Production, LLC, as Participants, as amended.

**Subject to Agreement For Termination Of Agency Services Agreements dated effective as of January 1, 2010, by and between Sklarco L.L.C., et al.

*** After Farmout Payout ("AFPO") has the meaning set forth in Section 3.2 of that certain Farmout Agreement, West Tyler 3D Seismic Prospect, dated effective as of June 1, 2016, by and between McCombs Energy, Ltd., as Farmor, and Sklarco L.L.C., as Farmee.

## EXHIBIT C

Attached to and made a part of that certain Letter Agreement dated effective as of December 1, 2016, regarding the Silver Creek Prospect, Smith County, Texas, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., et al., as Participants

## AFE

[Insert AFE]

# SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| DATE: | TBD | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Texas |
| WELL: | Silver Creek | HORIZON: | Paluxy |
| LOCATION: | TBD | PROJ. T.D.: | 8,200 ft |

| PROPOSAL: | Straight hole (Turnkey) | | |
|---|---|---|---|
| | Set 9-5/8" at 2,500 ft | | |
| | Set 5-1/2" at 8,200 ft | Latest Revision: | 8-Sep-16 |

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | LEASEHOLD COSTS | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | TOTAL LEASEHOLD COSTS | $0 | $0 | $0 |

| 9200/9300 | INTANGIBLE DRILLING & COMPLETION | | | |
|---|---|---|---|---|
| 01 | SURVEY, DOC HEARINGS, PERMITS | 10,000 | 0 | 10,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 55,000 | 5,000 | 60,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 40,000 | | 40,000 |
| 04 | SURFACE DAMAGES & ROW | | | |
| 05 | SETTING CONDUCTOR CASING | 15,000 | | 15,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 0 | | |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | 365,000 | | 365,000 |
| 10 | DAYWORK WITH DRILL PIPE @ $12.5K/day | 0 | 37,500 | 37,500 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION: 16 days @ $1250/Day | 20,000 | 6,000 | 26,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 7,000 | | 7,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 0 | | |
| 17 | MUD & CHEMICALS | 0 | | |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 12,000 | | 12,000 |
| 24 | CEMENTING & EQUIPMENT | 0 | 30,000 | 30,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 0 | 22,000 | 22,000 |
| 26 | PIPE TESTING | 5,000 | 4,000 | 9,000 |
| 27 | EQUIPMENT RENTALS | 28,000 | 10,000 | 38,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 2,000 | | 2,000 |
| 30 | WATER | 9,000 | | 9,000 |
| 31 | FUEL | 0 | 2,500 | 2,500 |
| 32 | BITS | 0 | | |
| 33 | TRANSPORTATION & TRUCKING | 15,000 | 16,000 | 31,000 |
| 34 | CONTRACT LABOR | 20,000 | 13,000 | 33,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 20,000 | 10,000 | 30,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | 3,000 | 3,000 |
| 38 | CORING & ANALYSIS | 5,000 | | 5,000 |
| 39 | GEOLOGICAL | 4,000 | | 4,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 30,000 | 30,000 |
| 47 | PERFORATION SERVICES | | 22,000 | 22,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | 25,000 | 25,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 3,000 | 3,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 30,000 | -30,000 | |
| 78 | INSURANCE | 10,000 | | 10,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 14,000 | 2,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 34,300 | 11,350 | 45,650 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $720,300 | $238,350 | $958,650 |

| 9500 | TANGIBLE EQUIPMENT - DRILLING | | | |
|---|---|---|---|---|
| 02 | SURFACE CASING (9-5/8") | 0 | | |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 0 | | |
| 05 | WELLHEAD EQUIPMENT | 0 | | 0 |
| 06 | CONDUCTOR CASING | 0 | | |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $0 | $0 | $0 |

| 9520 | TANGIBLE EQUIPMENT - COMPLETION | | | |
|---|---|---|---|---|
| 21 | PRODUCTION CASING & LINERS  (5-1/2") | | 68,000 | 68,000 |
| 22 | TUBING (2-7/8") | | 30,000 | 30,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 24,000 | 24,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 30,000 | 30,000 |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | 75,000 | 75,000 |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $247,000 | $247,000 |

| 9535 | SURFACE PRODUCTION EQUIPMENT | | | |
|---|---|---|---|---|
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 0 | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 28,000 | 28,000 |
| 42 | COMPRESSION  (VRU) | | 18,000 | 18,000 |
| 43 | TANK BATTERY COSTS | | 35,000 | 35,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 30,000 | 30,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | | |
| 46 | SALES METERING EQUIPMENT | | | |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $111,000 | $111,000 |

| | TOTAL EQUIPMENT | $0 | $358,000 | $358,000 |
|---|---|---|---|---|

| | TOTAL WELL COST | $720,300 | $596,350 | $1,316,650 |
|---|---|---|---|---|

APPROVED:_____, 2016.

BY:_____

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than_____.

☐ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

**EXHIBIT D**

Attached to and made a part of that certain Letter Agreement dated effective as of December 1, 2016, regarding the Silver Creek Prospect, Smith County, Texas, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., et al., as Participants

**JOA**

[Insert JOA]

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

## SILVER CREEK PROSPECT
## SMITH COUNTY, TEXAS

OPERATING AGREEMENT

DATED

__December 1__ , __2016__ ,
<span style="font-style:italic">year</span>

OPERATOR   **Sklar Exploration Company L.L.C.**

CONTRACT AREA   **As shown on Exhibit "A" to this Agreement**

COUNTY ~~OR PARISH~~ OF   **Smith**                STATE OF   **Texas**

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM. A.A.P.L. NO. 610 – 1982 REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between _____Sklar Exploration Company L.L.C._____
_____, hereinafter designated and
referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein
as "Non-Operator", and collectively as "Non-Operators".

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in
Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the
production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons
and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land
lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the
Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be
developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests
are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or
federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-
ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located. for 100% of

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay / its share of the cost of
any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate for 100% of its share of
in / a proposed operation.
*

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the
singular, and the neuter gender includes the masculine and the feminine.

## ARTICLE II.
## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑ A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.
☑ B. Exhibit "B", Form of Lease.
☑ C. Exhibit "C", Accounting Procedure.
☑ D. Exhibit "D", Insurance.
☑ E. Exhibit "E", Gas Balancing Agreement.
☑ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities. Recording Memorandum and Supplement
☐ G. Exhibit "G", Tax Partnership.

If any provision of any exhibit, except Exhibits "A" and "E" and "G", is inconsistent with any provision contained in the body
of this agreement, the provisions in the body of this agreement shall prevail. If any provision of Exhibits "A" or "E" is inconsistent with
any provision contained in the body of this Agreement, the provisions of the Exhibit shall prevail. Terms and provisions in Exhibit
"F" that supplement or are in addition to those in this Agreement shall not be considered to be in conflict with the terms and
provisions of this Agreement.

* I. The term "Deepen" shall mean a single operation whereby a well drilled to an objective Zone below the deepest Zone in
which the well was previously drilled, or below the deepest Zone proposed in the associated AFE, whichever is the lesser.

J. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a
completion in a shallower Zone.

K. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned
or temporarily isolated in order to attempt a Completion in or commingling with a different Zone within the existing
wellbore.

L. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore
or improve production in a Zone which is currently open to production in the wellbore. Such operations include,
without limitation, well stimulation operations, but exclude any routine repair or maintenance work or drilling,
Sidetracking, Deepening, Completing, Recompleting or Plugging Back of a well.

M. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to
change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other
mechanical difficulties.

N. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and
gas separately producible from any other common accumulation of Oil and Gas.

- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE III.
### INTERESTS OF PARTIES

**A.   Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

**B.   Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____ **all jointly owned lease burdens** _____ which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, **royalties and other burdens,** the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C.   Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, **which is not a joint obligation of the parties** overriding royalty, production payment or other burden on production ~~in excess of the amount stipulated in Article III.B.~~, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D.   Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

    1.   If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

    2.   If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

## ARTICLE IV.
### TITLES

**A.   Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party **upon request, provided such requesting party has paid 100% of its share of all costs incurred under the provisions of this Agreement** hereto /. The cost incurred by Operator in this title program shall be borne as follows:

~~☐   Option No. 1:   Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.~~

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE IV**
**continued**

1   ☑   Option No. 2:   Costs incurred by Operator in procuring abstracts / and fees paid outside* attorneys / for title examination**
2   (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) / shall be borne by the Drilling Parties***
3   in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4   hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5   functions.
        *   Curative matters and materials
6      **   Landman and consultants
7     ***   and for applications and hearings
                    Operator shall use its best efforts to secure
8      ~~Each party shall be responsible for /~~ securing curative matter and pooling amendments or agreements required in connection
                    subject to this Agreement and charge these fees to the joint account
9   with leases or oil and gas interests ~~contributed by such party~~ /. Operator shall be responsible for the preparation and recording of pooling
10   designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
11   This shall not prevent any party from appearing on its own behalf at any such hearing.

12

13       No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
14   provided, and (2) the title has been approved by the examining attorney or title has been accepted by /~~all of the parties who are to par-~~  Operator,
15   ~~ticipate in the drilling of the well.~~

16

17   **B.   Loss of Title:**

18

19       ~~1. Failure of Title:   Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a~~
20   ~~reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days~~
21   ~~from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-~~
22   ~~tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil~~
23   ~~and gas leases and interests; and,~~
24      ~~(a)   The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be~~
25   ~~entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,~~
26   ~~but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~
27      ~~(b)   There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has~~
28   ~~been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-~~
29   ~~curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract~~
30   ~~Area by the amount of the interest lost;~~
31      ~~(c)   If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is~~
32   ~~increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-~~
33   ~~terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such~~
34   ~~well;~~
35      ~~(d)   Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has~~
36   ~~failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties~~
37   ~~who bore the costs which are so refunded;~~
38      ~~(e)   Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be~~
39   ~~borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,~~
40      ~~(f)   No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest~~
41   ~~claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in~~
42   ~~connection therewith.~~

43

44       ~~2. Loss by Non-Payment or Erroneous Payment of Amount Due:   If, through mistake or oversight, any rental, shut-in well~~
45   ~~payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,~~
46   ~~there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required~~
47   ~~payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,~~
48   ~~which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the~~
49   ~~date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in~~
50   ~~the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the~~
51   ~~required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to~~
52   ~~the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it~~
53   ~~shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled~~
54   ~~or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~
55      ~~(a)   Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,~~
56   ~~up to the amount of unrecovered costs;~~
57      ~~(b)   Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of~~
58   ~~oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease~~
59   ~~termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said~~
60   ~~portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,~~
61      ~~(c)   Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest~~
62   ~~lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

63

64       3. ~~Other~~ Losses:   All losses incurred, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses
65   and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
66   the Contract Area.

67

68

69

70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE V.
OPERATOR

A.   **Designation and Responsibilities of Operator:**

_____ Sklar Exploration Company L.L.C. _____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct ~~all such operations~~ / in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

B.   **Resignation or Removal of Operator and Selection of Successor:**

1. Resignation or Removal of Operator:   Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, ~~no longer owns an interest hereunder in the Contract Area,~~ or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators / owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. / Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator. * Such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within 30 days from its receipt.

2. Selection of Successor Operator:   Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority / interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

3. Effect of Bankruptcy:  See Additional Provisions Article XV.Z.

C.   **Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D.   **Drilling Contracts:**

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

ARTICLE VI.
DRILLING AND DEVELOPMENT

A.   **Initial Well:**

On or before the ____30th____ day of ____June____ , (year) _____2018__ , Operator shall commence the drilling of a well for oil and gas at the following location: **at a location to be determined in the Hezekiah George, A-367, of Smith County, Texas, or as near thereto as practicable,**

and shall thereafter continue the drilling of the well with due diligence to a **depth of 8,200' or a depth sufficient to test the Paluxy Formation**

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

**B.   Subsequent Operations:**

1. Proposed Operations:   Should any party hereto desire to drill any well *"any well" includes water source or injection wells* / on the Contract Area other than the well provided for in Article VI.A., or to rework, *reenter, recomplete, sidetrack,* / deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing *or capable of producing* / in paying quantities, *reenter, recomplete, sidetrack,* the party desiring to drill, rework, / deepen or plug back such a well shall give the *that have not forfeited their interest in the well* other parties / written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma- tion and the estimated cost of the operation. The parties receiving such a notice shall have ~~thirty (30)~~ *fifteen (15)* / days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill- *within the contract area* ing rig is on location / , notice of a proposal to rework, plug back or drill deeper may be given by telephone / and the response period shall be *or facsimile or email* limited to / ~~forty-eight (48)~~ *twenty four (24)* hours, ~~exclusive of Saturday, Sunday, and legal holidays.~~ Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing. **Not withstanding this Article VI/B.1, and subject to the right of any party to non-consent the proposed operation, a proposal to re-work, recomplete, sidetrack, deepen or plugback a well producing in paying quantities, which is consented to by two (2) or more of the Parties owning two-thirds (2/3rds) or more of the working interest under the well may proceed and be executed on behalf of the Consenting Parties without the unanimous consent of all parties.**

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice *fifteen (15)* period of / ~~thirty (30)~~ days (or as promptly as possible after the expiration of the/ ~~forty-eight (48)~~ *twenty four (24)* hour period when a drilling rig is on loca- tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par- ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex- amination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor- dance with the provisions hereof as if no prior proposal had been made. **Operator may, at its discretion, perform prepatory work in connection with, or even actually commence an operation for which notice has been provided under this Article VI.B prior to or during the notice period, and if such operation ultimately is con- ducted by less than all parties, the Consenting Parties shall, nevertheless, be entitled to recover the risk compensation provided for hereunder.**

2. Operations by Less than All Parties:   If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties *subject to availability of equipment and personnel* giving the notice and such other parties as shall elect to participate in the operation shall / , within ninety (90) days after the expiration of *fifteen (15)* *twenty four (24)* the notice period of / ~~thirty (30)~~ days (or as promptly as possible after the expiration of the / ~~forty-eight (48)~~ hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera- tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Con- senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con- ditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as *twenty four (24)* to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within / ~~forty-eight (48)~~ hours (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par- *all of* ticipation to such party's interest as shown on Exhibit "A" or (b) carry / its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for *twenty four (24)* such a response shall not exceed a total of / ~~forty-eight (48)~~ hours (inclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. *either* If such an operation results in a dry hole, the Consenting Parties shall / plug and abandon the well and restore the surface location at their *re-entered, recompleted, sidetracked* sole cost, risk and expense / . If any well drilled, / reworked, deepened or plugged back under the provisions of this Article results in a pro- ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, ***or one of them shall make a proposal to the other Consenting Parties to conduct further operations under Article VI.B**

- 5 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1   and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-

2   ties. Upon commencement of operations for the drilling, reworking, / deepening or plugging back of any such well by Consenting Parties *(recompleting, sidetracking,)*

3   in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,

4   and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting

5   Party's interest in the entire well / and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or *(and not just a particular zone therein)* *(severance taxes, windfall profit taxes, similar taxes,)*

6   market value thereof if such share is not sold, (after deducting production taxes, excise taxes, / royalty, overriding royalty and other in- *(any and all zones within)*

7   terests not excepted by Article III.D. payable out of or measured by the production from / such well accruing with respect to such interest

8   until it reverts) shall equal the total of the following:

12     (a) ~~100%~~ **500%** of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead

13   connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus ~~100%~~ **200%** of each such

14   Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-

15   Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-

16   Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting

17   Party had it participated in the well from the beginning of the operations; and

21     (b) _____**500**_____ % of that portion of the costs and expenses of drilling, / reworking, deepening, plugging back, testing and completing, *(re-entering, recompleting, sidetracking,)*

22   after deducting any cash contributions received under Article VIII.C., and _____**500**_____ % of that portion of the cost of newly acquired equip-

23   ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had

24   participated therein.

28     An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-

29   working / or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is *(re-entering, recompleting, sidetracking,)*

30   conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such

31   reworking / or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well *(re-entering, recompleting, sidetracking,)*

32   and there shall be added to the sums to be recouped by the Consenting Parties ~~one~~ / hundred percent (~~100%~~) of that portion of the costs of *(five)* *(500%)*

33   the reworking / or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If *(re-entering, recompleting, sidetracking,)*

34   such a reworking / or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap- *(re-entering, recompleting, sidetracking,)*

35   plicable as between said Consenting Parties in said well.

39     During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the

40   proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other

41   taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-

42   ticle III.D.

46     In the case of any reworking, / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free *(re-entering, recompleting, sidetracking,)*

47   of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon

48   abandonment of a well after such reworking, / plugging back or deeper drilling, the Consenting Parties shall account for all such equip- *(re-entering, recompleting, sidetracking,)*

49   ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

53     Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the

54   Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an

55   itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its

56   option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-

57   ings. Each / ~~month~~ thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the *(quarter)*

58   operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-

59   curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds

60   realized from the sale of the well's working interest production during the preceding / ~~month~~. In determining the quantity of oil and gas *(quarter)*

61   produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic

62   well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation

63   which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs

64   of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as

65   above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production re-entering, recompleting, sidetracking, therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, / reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

two (2) or more parties owning two-thirds
and subject to the right of any party to non-consent the proposed operation                    (2/3rds) or more of the working interest
Notwithstanding the provisions of this Article VI.B.2., / it is agreed that without the mutual consent of / all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.; provided that an exceptional well location that is approved by the Railroad Commission of Texas shall be deemed to conform to the then-existing spacing pattern.

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. re-entering, recompleting, sidetracking, except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, / deepening and plugging back of such initial well after if has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for production, ceases to produce in paying quantities.

3. Stand-By Time:  When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

4. Sidetracking:  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

(a)  If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

(b)  If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

twenty four (24)
In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period shall be limited to / forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and twenty four (24) receive up to eight (8) additional days after expiration of the / forty-eight (48) hours within which to respond by paying for all stand-by time incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other instances the response period to a proposal for sidetracking shall be limited to / thirty (30) days.

C.   TAKING PRODUCTION IN KIND:

have the right to
Each party shall / take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5  its share of all production.

6

7      In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8  the oil / produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9  the obligation, to purchase such oil / or sell it to others at any time and from time to time, for the account of the non-taking party at the
10  best price obtainable in the area for such production / . Any such purchase or sale by Operator shall be subject always to the right of the
11  owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil / not previously
12  delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil / shall be only for such reasonable periods of
13  time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14  of one (1) year.

15

16      In the event one or more parties' separate disposition of its share of the gas causes split-stream / deliveries to separate pipelines and/or
17  deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18  be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19  agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

20

21  **D.    Access to Contract Area and Information:**

22      Except as otherwise provided herein, each consenting party who has paid 100% of its share of all costs of all operations
23  conducted under this Agreement shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
25  and records relating thereto. Operator, upon request, shall furnish each of the other / parties with copies of all forms or reports filed with
26  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29  quests the Information.

30

31  **E.    Abandonment of Wells:**

32

33      1. Abandonment of Dry Holes:  Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35  without the consent of / all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
36  within / forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37  such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39  such well. Any party / who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40  operations in search of oil and/or gas subject to the provisions of Article VI.B. Any cement plugs used for plugging and abandoning such
41  well shall be in excess of that required by the regulatory body, recommended to be a volume of one and one-half times of that required.

42      2. Abandonment of Wells that have Produced:  Except for any well in which a Non-Consent operation has been conducted
43  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44  producer shall not be plugged and abandoned without the consent of / all parties. If all / parties consent to such abandonment, the well shall
45  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
46  thirty (30) days after receipt of notice of the proposed abandonment of any well / , all parties do not agree to the abandonment of such well,
47  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning / Each abandoning party shall assign
50  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52  terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
53  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit
56  * parties owning greater than a 90% combined interest in the well.  If the well has been drilled pursuant to Article VI.B.2, only the consent of the consenting parties shall be required.
57
58  ** If the well has been drilled or reworked pursuant to Article VI.B.2 and the consenting parties therein have **not** been fully reimbursed as provided, only the approval of such consenting parties shall be required.
59
60
61
62
63
64
65
66
67
68
69
70

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
continued

1  ~~required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.~~

2

3  ~~Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from~~
4  ~~the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for~~
5  ~~its share of all production.~~

6

7  ~~In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of~~
8  ~~the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it,~~
9  ~~but not the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-~~
10  ~~taking party at the best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to~~
11  ~~the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas~~
12  ~~not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil and gas shall be only for such~~
13  ~~reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event~~
14  ~~for a period in excess of one (1) year. Notwithstanding the foregoing, Operator shall not make a sale, including one into interstate com-~~
15  ~~merce, of any other party's share of gas production without first giving such other party thirty (30) days notice of such intended sale.~~

16

17  ~~**D.    Access to Contract Area and Information:**~~

18

19  ~~Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,~~
20  ~~and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books~~
21  ~~and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with~~
22  ~~governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of~~
23  ~~each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of~~
24  ~~gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-~~
25  ~~quests the Information.~~

26

27  ~~**E.    Abandonment of Wells:**~~

28

29  ~~1. Abandonment of Dry Holes:   Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been~~
30  ~~drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned~~
31  ~~without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply~~
32  ~~within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of the proposal to plug and abandon~~
33  ~~such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in~~
34  ~~accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening~~
35  ~~such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further~~
36  ~~operations in search of oil and/or gas subject to the provisions of Article VI.B.~~

37

38  ~~2. Abandonment of Wells that have Produced:   Except for any well in which a Non-Consent operation has been conducted~~
39  ~~hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a~~
40  ~~producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall~~
41  ~~be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within~~
42  ~~thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,~~
43  ~~those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other~~
44  ~~parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of~~
45  ~~Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign~~
46  ~~the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and~~
47  ~~material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-~~
48  ~~terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and~~
49  ~~gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-~~
50  ~~tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-~~
51  ~~duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit~~

52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

- 8 alternate -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1 "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2 assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3 Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4 interests in the remaining portion of the Contract Area.
5
6    Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7 the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8 quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9 templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10 well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11 repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12 visions hereof.
13
14    3. Abandonment of Non-Consent Operations:  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15 Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16 permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17 of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18 VI.E.
19
20                              **ARTICLE VII.**
21                    **EXPENDITURES AND LIABILITY OF PARTIES**
22
23 A.    **Liability of Parties:**
24
25    The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26 shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27 among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28 shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners. **In their**
29 **relations with each other under this Agreement, the parties shall not be considered fiduciaries or to have established a confidential**
   **relationship but rather shall be free to act on an arm's-length basis in accordance with their own self-interest.**
30
31 B.    **Liens and Payment Defaults:**
32
33    Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
34 of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
35 at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the
36 state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
37 taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
38 rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
39 of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
40 the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
41 purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
42 and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.
43
44    If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
45 Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
   **be entitled to recover the amount it paid plus five hundred percent (500%) of the amount out of the proceeds from the sale of**
46 the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall / , to obtain
   **the defaulting party's share of oil and for gas, and to secure payment thereof,**
47 reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph .  **Notwithstanding anything contained to**
48 **the contrary in this paragraph, all parties agree that this provision shall not apply to any operation requiring an AFE unless**
49 **Operator has advance billed all parties and such parties have paid their proportionate share of said costs in accordance with**
   **other provision of this agreement.**
50 C.    **Payments and Accounting:**
51
52    Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
53 and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
54 tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
55 showing expenses incurred and charges and credits made and received.
56
57    Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
58 of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
59 month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
60 with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
61 on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
62 fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
63 due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
64 pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
65
66 D.    **Limitation of Expenditures:**
67
68    1. Drill or Deepen:  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
69 pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:
70

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

1  ☒   * / Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2  necessary tankage and/or surface facilities. * This Option No. 1 shall apply only to water source and/or water injections wells.

3

4  ☒   ** / Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5  authorized depth, and all tests have been completed, and the results thereof (including all logs) furnished to the parties, Operator shall give immediate notice
6  to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have ~~forty-eight~~ twenty-four
7  (48 / 24) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8  tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9  cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10  constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11  elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, re-entering, recompleting, sidetracking, deepening or plugging
12  back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13  than all parties. **This Option No. 2 shall cover all wells except those expressly covered by Option No. 1 above.

14

15       2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16  plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17  include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18  and/or surface facilities.

19

20       3. Other Operations: Without the consent of ~~all parties,~~ two or more parties owning a majority interest Operator shall not undertake any single project reasonably estimated
21  to require an expenditure in excess of _____ Fifty Thousand and No/100 _____ Dollars ($ 50,000.00 _____ )
22  except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23  previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24  emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25  to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26  parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27  an information copy thereof for any single project costing in excess of _____ Fifty -Thousand and No/100 _____
28  Dollars ($ 50,000.00 _____ ) but less than the amount first set forth above in this paragraph.

29

30  E.    Rentals, Shut-in Well Payments and Minimum Royalties:

31

32       Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33  party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34  tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35  behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36  failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37  ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38  visions of Article IV.B.~~2.~~3.

39

40       Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41  of a producing gas well, ~~at least five (5) days (excluding Saturday, Sunday and legal holidays), or~~ at the earliest opportunity permitted by
42  circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43  Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44  shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

45

46  F.    Taxes:

47

48       Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49  subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50  become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51  be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52  Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53  riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54  owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55  tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56  anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57  value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58  the manner provided in Exhibit "C".

59       and in the case of a Non-Operator, if any such Non-Operator timely notifies Operator in writing,
60  or Non-Operator    If Operator / considers any tax assessment improper, / Operator may, at its discretion, protest within the time and manner
61  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62  mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63  interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64  count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65  provided in Exhibit "C".

66

67       Operator      on behalf of all parties. Each party / shall pay or cause to be paid / all production, severance, excise, gathering and other taxes imposed upon or with respect
68  to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement. In the event Operator
69  applies for and receives a reduced severance tax rate, the same rate shall be applied to royalty and working interest owners
70  prospectively, as applicable.

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VII**
**continued**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VII**
**continued**

1  G.  **Insurance:**
2
3      At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4  the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5  pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
6  also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7  hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8  law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.
9
10      In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11  parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.
12
13                                         **ARTICLE VIII.**
14                    **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**
15
16  A.  **Surrender of Leases:**
17
18      The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19  or in part unless all parties consent thereto.
20
21      However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22  agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23  such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24  thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas in-
25  terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26  such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27  lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all
28  obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29  attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30  duction other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the
31  party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32  ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33  salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest
34  shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.
35
36      Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39  agreement.
40
41  B.  **Renewal or Extension of Leases:**
42
43      If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44  shall have the right for a period of thirty (30) fifteen (15) days following receipt of such notice in which to elect to participate in the ownership of the
45  renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46  portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47  interests held at that time by the parties in the Contract Area.
48
49      If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50  who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51  to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52  Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.
53
54      Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55  by the acquiring party.
56
57      The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58  or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or
59  contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
60  tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61  the provisions of this agreement.
62
63      The provisions in this Article shall also be applicable to extensions of oil and gas leases.
64
65  C.  **Acreage or Cash Contributions:**
66
67      While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69  applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the con-
70  tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VIII**
**continued**

1   said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2   governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3   it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4   tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.
5
6       If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7   consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8
9   **D.**   **Maintenance of Uniform Interests:**
10
11   ~~For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no~~
12   ~~party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,~~
13   ~~equipment and production unless such disposition covers either:~~
14
15   ~~1.   the entire interest of the party in all leases and equipment and production; or~~
16
17   ~~2.   an equal undivided interest in all leases and equipment and production in the Contract Area.~~
18
19       Every ~~such~~ sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20   and shall be made without prejudice to the right of the other parties. **Any added expenditures required as a result of a partial disposition,**
21   **including marketing or metering of production, shall be borne solely by the party transferee.**
22       If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23   require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24   and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25   party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26   into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27   Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.
28
29   **E.**   **Waiver of Rights to Partition:**
30
31       If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32   undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33   interest therein.
34
35   ~~**F.**   **Preferential Right to Purchase:**~~
36
37   ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38   ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39   ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40   ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41   ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42   ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43   ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44   ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45   ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~
46
47                               **ARTICLE IX.**
48               **INTERNAL REVENUE CODE ELECTION**
49
50       This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51   for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52   and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53   purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54   from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as per-
55   mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56   ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57   United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58   and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59   evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60   Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61   action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62   Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63   Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is per-
64   mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65   tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66   computation of partnership taxable income.
67
68
69
70

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE X.
## CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____ Fifty Thousand and No/100 _____ Dollars ($ 50,000.00 _____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder. **All claims or suits involving title to any interest subject to this Agreement shall be treated as a claim or suit against all parties hereto.**

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending / during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex, fax, e-mail or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex, fax, e-mail or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☑   Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☐   Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____180_____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____180_____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XIV.
## COMPLIANCE WITH LAWS AND REGULATIONS

**A.    Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B.    Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____Texas_____ shall govern.

**C.    Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of ~~the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and~~ any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said <sup>any</sup> Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

## ARTICLE XV.
## OTHER PROVISIONS

**A. PRECEDENCE OF OPERATIONS**

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

1)        an election to perform additional logging, coring or testing;

2)        an election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;

3)        an election to plug back and attempt to complete the well in a shallower depth or formation;

4)        an election to deepen the well;

5)        an election to sidetrack the well;

6)        an election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in  commercial quantities or is capable of commercial production;

7)        an election to temporarily abandon the well;

8)        an election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of Operator, a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth.  In such event, the operation, which, in the opinion of Operator is less likely to jeopardize the well, will be given priority.  It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required

- 14a -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests. For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

## B. DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties. If the parties are equally divided, the opinion of the Operator will prevail.

## C. HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

## D. ADVANCEMENT OF COSTS

Billing of estimated dry hole costs in advance and actual costs to drill the Initial Well shall be governed by that certain Letter Agreement dated effective as of December 1, 2016 regarding the Silver Creek Prospect, Smith County, Texas, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, JF Howell Interests, LP, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., FPCC USA, Inc., Genesis Resources, LLC, Kingston, LLC, Santo Petroleum, L.L.C. and Sugar Oil Properties, L.P., as Participants, to which this Operating Agreement is attached as Exhibit "C."

Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s) in advance of its respective share of (i) the dry hole cost for any other well to be drilled hereunder to which such Non-Operator has consented, and (ii) the cost of any completion, reworking, recompletion, sidetracking, deepening or plugging back operation to which such Non-Operator has consented (any such operation under clause (i) or (ii) being herein called a "Drilling Operation"). Such request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Drilling Operation. The amount of each Non-Operator's advance payment shall be based upon the latest AFE for such operation and may, at the written request of a Non-Operator, be limited as to such requesting Non-Operator to the amount that Operator estimates that it will spend during the next thirty (30) day period for any Drilling Operations with Operator having the right to make additional requests for advance payment until the AFE amount is totally funded.

A Non-Operator receiving a request for advance payment shall, within two (2) days of the receipt of such request if and when a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to operator by wire transfer, check or other ready funds the full amount of such request. Operator shall credit the amount to the Non-Operator's account for the payment of such Non-Operator's share of costs of such Drilling operation, and following the end of each month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement.

In the event a Non-Operator from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by depositing cash as aforesaid, then Operator, at its option, may make a second written request by certified mail, return receipt requested for such advance. Non-Operator shall pay for said advance as aforesaid within two (2) business days from receipt of such second request.

If a Non-Operator fails to pay within two (2) business days of the receipt of such second request, then Non-Operator may, at the sole discretion and timing election of the Operator, be deemed non-consent in the drilling operation retroactive to the beginning of such operation and thereafter subject to the penalty provisions of Article VI.B.2 hereof.

- 14b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

Notwithstanding anything to the contrary herein, if the applicable drill well or operation is unsuccessful or results in a dry hole or even if it results in a producer, Operator shall have the right to sue a Non-Operator who failed to pay for its proportionate share of expenses in lieu of deeming the Non-Operator Non-Consent.  Further, nothing herein shall prejudice other rights of Operator under this Operating Agreement, including, without limitation, rights under Article VII.B and Article VII.C of this Operating Agreement.

E. NECESSARY EXPENDITURES EXCLUDE SIDETRACKING

The phrase "necessary expenditures" in Article VII.D.1. (Option No. 2) on page 10 shall not be deemed to include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

F. ADDITIONAL CHARGES

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Contract Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same:

Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and expenses in connection with preparation and presentation of evidence and exhibits for  Railroad Commission of Texas hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

G. INDEMNITY

Non-Operators release and hold harmless, and agree to fully defend, protect, and indemnify, and render whole Operator, its subsidiaries and affiliates, and the respective directors, officers, agents and employees of Operator and its subsidiaries and affiliates, from and against all claims, actions, fines, penalties, losses, damages, and/or judgments of every kind, including costs and attorney's fees, incident to or in any manner resulting in (i) any injury or death of any person or persons (including employees, agents, representatives, invitees, and licensees of Non-Operators, or others engaged by Non-Operators), (ii) any damage to or loss of any property, (iii) any violation of or failure to comply with any applicable law (including Environmental Laws), regulation, decree, understanding, ordinance, rule or order; and (iv) any other legal consequences or obligation sustained and/or liabilities incurred, resulting from, related to, or arising out of activities in or related to the Contract Area, except such as may result from Operator's gross negligence or willful misconduct.

H. GAS BALANCING FOR FORFEITED INTERST

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

I. SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect. Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to affect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

J. NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

K. DOWNSTREAM FACILITIES

If any party to this agreement proposes the construction or acquisition and operation of a pipeline and/or gathering line to transport Oil and/or Gas produced from wells located in the Contract Area, or to construct a plant or other facility to treat, process, dehydrate, compress, extract NGL's or otherwise enhance the value of Oil and/or Gas produced from wells located in the Contract Area, or cause such Oil and/or Gas to meet requisite quality specifications, (hereinafter all such pipelines, gathering lines, plants and facilities are collectively referred to as the "Facilities"), then such party shall offer each of the other non-proposing parties to this agreement the right to participate in the construction, operation, ownership and use of

- 14c -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

the Facilities.  Should one or more non-proposing parties elect to participate, then between such participating, parties, the participating parties shall enter into a mutually acceptable agreement for the construction, acquisition, operation and use thereof.  Any party electing not to participate shall have no ownership in or right to use the applicable Facilities, and the participating parties shall have no obligation to allow the non-participating parties such use and/or access thereto.

L.  **DISBURSEMENT OF ROYALTIES**

If Operator prepares and administers a division order for and receives and distributes the proceeds of production attributable to the interest of a Non-Operator, then Operator shall be entitled to charge that party for an appropriate monthly overhead charge for disbursing such royalty payments, in addition to the combined fixed rates specified in Exhibit "C" hereto.  If through error or inadvertence Operator shall fail to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, it shall not be liable in damages to the other Parties hereto for such failure, unless arising out of the gross negligence or willful misconduct of the Operator.

M.  **INFORMATION**

Anything to the contrary hereinabove notwithstanding, it is stipulated that any non-consenting party to an operation conducted hereunder shall have no right to observe such operation or have access to information pertaining to such operation, until such time as the non-consenting party's share of the cost of such operation and the penalty therefor has been recovered by the consenting parties as provided herein.

N.  **OPERATOR'S LIEN – SECURITY INTEREST**

In accordance with Article VII. B. of this Agreement, as supplemented by the Recording Memorandum and Supplement to Operating Agreement attached as Exhibit "F" to this Agreement, each non-Operator grants to Operator a lien upon all of the rights, titles, and interests of each Non-Operator, whether now existing or hereafter acquired, in and to the (1) the oil, gas, or other minerals in, on, and under the Contract Area and (2) any oil, gas, and mineral leases covering the Contract Area or any portion thereof.  In addition, each Non-Operator grants to Operator a security interest in and to all of such Non-Operator's rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (I) all oil, gas and other minerals produced from the Contract Area when produced; (2) all accounts receivable accruing or arising as a result of the sale of such oil, gas and other minerals; (3) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (4) all oil and gas wells and other surface and sub-surface equipment and facilities of any kind or character located on the Contract Area and the cash or other proceeds received from the sale thereof (collectively, the "Personal Property Collateral").  Some of the Personal Property Collateral is or will become fixtures on the Contract Area, and the interest of Non-Operator in and to the oil, gas and other minerals when extracted from the Contract Area and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area.  This Agreement (including a carbon, photographic, or other reproduction hereof) shall constitute a non-standard form financing statement under the terms of the Uniform Commercial Code of the State in which the Contract Area is located, and as such, may be filed for record in the real property records, or other applicable records, of the county, or counties, in which the Contract Area is located.   Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense, if any.

O.  **SEPARATE AGREEMENT FOR NON-UNIFORM INTEREST**

Any oil and gas lease and/or oil and gas interest that is either (i) described in Exhibit "A-1" to this Agreement or (ii) that is both acquired after the effective date of this Agreement and covered by Article VIII.B, VIII.C or XV.W of this Agreement, that thereafter becomes owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such lease and/or interest becomes so owned.  Any oil and gas lease and/or oil and gas interest acquired after the effective date of this Agreement and covered by Article VII.B, VIII.C or XV.W of this Agreement, that becomes owned by more than one but less than all of the parties hereto shall remain subject to this Agreement as to the parties who own an interest therein, but Operator is authorized to modify Exhibit "A" to this Agreement to reflect the parties' interests in each such oil and gas lease and/or oil and gas interest.  Operator is further authorized to modify said Exhibit "A" to this Agreement to reflect the parties' interests in each well subject to this Agreement.

P.  **METERING OF PRODUCTION**

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

- 14d -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

Q. **PLUGGING AND LEASEHOLD RESTORATION FUND**

At any time any well subject to this agreement is, in Operator's sole opinion, approaching the end of its economic life and/or its useful purpose, Operator may pre-bill the joint account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location. Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and abandonment and restoration of the leasehold premises. In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any accrued interest on such difference, based upon the then working interest percentage of such owner. In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

R. **OBLIGATORY WELL**

Notwithstanding the provisions of this agreement and particularly Article VI, if any proposed operations are necessary to maintain an oil and gas lease or oil and gas interest covered by this agreement in force or an agreement to earn a lease(s) or term assignment which would otherwise expire unless such operations are conducted, then in lieu of being penalized under Article VI.B.2., each Non-Consenting Party shall assign to Consenting Parties all of such Non-Consenting Party's right, title and interest in and to the oil and gas leases(s) and/or oil and gas interest(s) or portion thereof or such agreement which would be lost or not earned if such operations were not conducted.

Such assignment shall be promptly due upon commencement of said proposed operations by Consenting Parties and shall be free and clear of all overriding royalties, production payments, mortgages, liens and other burdens and encumbrances placed thereon by the assigning party or resulting from its ownership or operation of such oil and gas leases(s) and/or oil and gas interest(s) which is not a joint obligation of the parties, but otherwise without warranty of title either expressed or implied.

If the assignment is in favor of more than one party, the assigned interest shall be shared by the Consenting Parties in the proportions that the interest of each bears to the interest of all Consenting Parties unless otherwise agreed to in writing. Thereafter, such acreage covered by said assignment shall not be subject to the terms of this agreement, but shall be deemed to be subject to an agreement identical to this changed only in Exhibit "A" to indicate the Consenting Parties and their percentages of interest. Operations that are necessary to either maintain an oil and gas leases(s) and/or oil and gas interest(s) covered by this agreement in force or to earn an interest under an agreement which would otherwise expire unless operations are conducted, shall be defined as operations that are proposed within six (6) months of the date the oil and gas lease, oil and gas interest or agreement would otherwise expire.

S. **PREVAILING AGREEMENT**

If there is a conflict between the provisions of that certain Letter Agreement dated effective December 1, 2016 regarding the Silver Creek Prospect, Smith County, Texas, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, JF Howell Interests, LP, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., FPCC USA, Inc., Genesis Resources, LLC, Kingston, LLC, Santo Petroleum, L.L.C. and Sugar Oil Properties, L.P., as Participants, and this Operating Agreement, the provisions of said Letter Agreement shall prevail, and shall be binding upon all parties to this Operating Agreement.

T. **PRIOR OPERATING AGREEMENT(S)**

This operating agreement, as to the parties executing same and as to the Contract Area and Depth Restrictions, shall supersede and replace any prior operating agreement(s) covering all or any portion of the Contract Area of this Operating Agreement.

U. **NON-PARTICIPATING INTERESTS**

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto as same may be revised from time to time to reflect record title and/or reformation of the Contract Area.

V. **NON-CONSENT**

Any party that forfeits its interest in a well pursuant to Article VI.B.2 of this Agreement forfeits their interest in the entire well and revenue therefrom, not just a particular Zone therein, for the duration of the recoupment period or, if the risk compensation is never recovered, forever. The parties recognize, however, that applicable rules of the Railroad Commission of Texas may allow for the drilling and completion of additional wells within the unit for an existing well, and,

- 14e -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

except as otherwise provided herein, the forfeiture by one party of its interest in the existing well does not affect that party's right to elect to participate or not to participate in a proposal to drill, or any other operation with respect to, another well, even if the other well is located in the same unit, and even if the new well is completed in the same Zone from which the existing well is producing.

Anything to the contrary hereinabove notwithstanding, any Non-Consenting Party to an operation conducted hereunder shall have no right to observe such operation or subsequent operations within the same well or have access to information pertaining to such operation or subsequent operations, until such time as the Non-Consenting Party's share of the cost of such operation, and any applicable subsequent operations, and the risk compensation therefrom, has been recovered by the Consenting Parties as provided herein.

**W. AREA OF MUTUAL INTEREST**

All parties to this Operating Agreement are currently subject to an Area of Mutual Interest ("AMI") covering the lands located within the blue outline on the plat attached hereto as Exhibit "A-2." The AMI was established pursuant to Section 3.1 of that certain Participation And Exploration Agreement, West Tyler 3D Seismic Prospect (the "Participation Agreement"), dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain Production, LLC, as Participants, as amended, and Article XV.W of that certain Operating Agreement, Swan Prospect (the "Swan JOA"), dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain Production, LLC, as Non-Operators, as amended, a copy of which is attached as Exhibit "D" to the Participation Agreement. The AMI governs the acquisition, extension, or renewal by any party to the Participation Agreement, or successor in title to any party to the Participation Agreement (which includes all parties to this Operating Agreement), of any oil and gas lease or oil and gas interest covering lands located within the AMI for the term recited therein. The Contract Area established by this Operating Agreement, generally known as the Silver Creek Prospect, shall be deemed a "Future Prospect" within the meaning set forth in the Participation Agreement for all purposes, including without limitation, enforcement of the AMI.

Renewals and extensions of oil and gas lease(s) and/or oil and gas interest(s) shall be subject to Article VIII.B of this Agreement.

**X. EXECUTION**

This agreement shall be binding upon each Non-Operator that executes this agreement without regard to whether this same instrument, or any copy or counterpart hereof, shall be executed by any other Non-Operator.

**Y. SOPHISTICATED INVESTORS**

By execution of this Agreement, each Non-Operator represents to each other and to Operator: (i) that it has a working knowledge of the oil and gas industry; (ii) that it is a sophisticated investor and has a financial net worth in excess of one million dollars; (iii) that it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of leasehold costs, drilling costs, completion costs, and all other costs incurred in operations under this Agreement; (iv) that it ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES; (v) that its interest hereunder has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the State of Texas, or any other state ("Securities Law"), and that it owns said interest for investment purposes only, and not with a view to or for sale in connection with any distribution thereof within the meaning of Securities Law.

**Z. EFFECT OF BANKRUPTCY**

If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non- Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a committee without regard for their interest in the Contract Area based on Exhibit "A."

AA. **CUSTODY OF FUNDS**

Operator shall hold for the account of Non-Operators any funds of Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to Non-Operators or applied toward the payment of debts, regardless or whether the debts arise out of the same well or operation for which the funds were advanced or from which the sales proceeds were derived. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators. Nothing in this paragraph shall require the maintenance by Operator of separate accounts from the funds of Non-Operators. Operator shall, upon request, refund any advance to Non-Operator that is not used for its intended purpose within six (6) months from the receipt of the advance.

BB. **STATUTORY EMPLOYER**

Operator shall be considered the statutory employer of all employees of all Contractors, their sub-contractors or agents, whose goods furnished or services rendered for Operator are an integral part of or essential to Operator's ability to perform its operations as an oil and gas operator.

CC. **MISCELLANEOUS**

Anything to the contrary herein notwithstanding, this Operating Agreement is expressly made subject to the terms and provisions of the leases, contracts and/or agreements described in Exhibit "A" hereof.

- 14g -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE XVI.**
**MISCELLANEOUS**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____**1st**_____ day of _____**December**_____ , (year) __**2016**__ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____, have been made to the form.~~

O P E R A T O R

SKLAR EXPLORATION COMPANY L.L.C.

_____          By: DAVID A. BARLOW
_____          President – Chief Operating Officer

N O N - O P E R A T O R S

SKLARCO L.L.C.

_____          By: DAVID A. BARLOW
_____          President – Chief Operating Officer

McCOMBS ENERGY, LTD.

_____          BILL FORNEY, JR., President

JJS WORKING INTERESTS L.L.C.
By: Houston Bulldog Capital Management, LLC, Manager

_____          By: JUSTIN SIMONS, Manager

JF HOWELL INTERSTS, LP
By: Howell Investments, L.L.C., General Partner

_____          By: DAVID MORGAN, Manager

KUDZU OIL PROPERTIES, LLC

- 15a -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

SUGAR OIL PROPERTIES, L.P.
By: Sugar Management, LLC, General Partner

By: MICKEY QUINLAN, President

FPCC USA, INC.

By:
Title:

GENESIS RESOURCES, LLC

By: WILLIAM M. MOUNGER, II, Manager

KINGSTON, LLC

By: DARRIN PITTS, Manager

SANTO PETROLEUM, L.L.C.

By: PEYTON YATES, President

- 15c -

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Fain Brock, whose name as President of LUCAS PETROLEUM GROUP, INC., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2016.


                                       _____
                                       NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that Mickey Quinlan, whose name as President of Sugar Management, LLC, the General Partner of SUGAR OIL PROPERTIES, L.P., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

      Given under my hand and notarial seal this the _____ day of _____, 2016.


                                       _____
                                       NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that _____, whose name as _____ of FPCC USA, INC., a Delaware corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

      Given under my hand and notarial seal this the _____ day of _____, 2016.


                                       _____
                                       NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

SILVER CREEK JOA

EXHIBIT "A"

Attached to and made a part of that certain Joint Operating Agreement (Silver Creek Prospect) dated effective as of December 1, 2016, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests L.L.C., JF Howell Interests, LP, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., Sugar Oil Properties, L.P., FPCC USA, Inc., Genesis Resources, LLC, Kingston, LLC and Santo Petroleum, L.L.C., as Non-Operators.

(1)   **Identification of lands subject to this agreement:**

**Contract Area**

All lands, oil and gas leasehold interests and oil and gas interests lying within the BLACK boundary on the plat attached hereto and made a part hereof as Exhibit "A-2."

**Area of Mutual Interest**

All lands, oil and gas leasehold interests and oil and gas interests lying within the BLUE boundary on the plat attached hereto and made a part hereof as Exhibit "A-2," subject to the terms, conditions and exclusions set forth in that Section 3.1 of that certain Participation And Exploration Agreement, West Tyler 3D Seismic Prospect (the "**Participation Agreement**"), dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain Production, LLC, as Participants, as amended, and Article XV.W of that certain Operating Agreement, Swan Prospect, dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain Production, LLC, as Non-Operators, as amended, a copy of which is attached as Exhibit "D" to the Participation Agreement

(2)   **Restrictions, if any, as to depths, formations, or substances:**

There are no restrictions except as may be provided for in any oil and gas lease, oil and gas interest, assignment or contract subject to this Operating Agreement or to which this Operating Agreement is subject.

(3)   **Decimal interests of Parties to this Agreement:**

| Owners | BPPO* | APPO* | AFPO*** |
|---|---|---|---|
| **Sklarco L.L.C. | 0.17500000 | 0.34055000 | 0.32180000 |
| **JJS Working Interests LLC | 0.05000000 | 0.07820000 | 0.07820000 |
| Bennett Greenspan | 0.01000000 | 0.00750000 | 0.00750000 |
| Bundero Investment Company, L.L.C. | 0.07000000 | 0.05250000 | 0.04000000 |
| Fair Oil Ltd. | 0.11500000 | 0.08625000 | 0.08625000 |
| Fant Energy, Ltd. | 0.10000000 | 0.07500000 | 0.07500000 |
| FPCC USA, Inc. | 0.06500000 | 0.04875000 | 0.04875000 |
| Genesis Resources, LLC | 0.00500000 | 0.00375000 | 0.00375000 |
| JF Howell Interests, LP | 0.05000000 | 0.03750000 | 0.03750000 |
| Kingston, LLC | 0.01000000 | 0.00750000 | 0.00750000 |
| Kudzu Oil Properties, LLC | 0.05000000 | 0.03750000 | 0.03750000 |
| Lucas Petroleum Group, Inc. | 0.02000000 | 0.01500000 | 0.01500000 |
| McCombs Energy, Ltd. | 0.12500000 | 0.09375000 | 0.12500000 |
| R. L. Ray, Ltd. | 0.05500000 | 0.04125000 | 0.04125000 |
| Santo Petroleum, L.L.C. | 0.03000000 | 0.02250000 | 0.02250000 |
| Sugar Oil Properties, L.P. | 0.05000000 | 0.03750000 | 0.03750000 |
| Tiembo Ltd. | 0.02000000 | 0.01500000 | 0.01500000 |
| | 1.00000000 | 1.00000000 | 1.00000000 |

*Before Prospect Payout ("**BPPO**") and After Prospect Payout ("**APPO**") have the meanings set forth in Section 1.3 the Participation Agreement.

**Subject to Agreement For Termination Of Agency Services Agreements dated effective as of January 1, 2010, by and between Sklarco L.L.C., et al.

\*\*\* After Farmout Payout ("**AFOPO**") has the meaning set forth in Section 3.2 of that certain Farmout Agreement, West Tyler 3D Seismic Prospect, dated effective as of June 1, 2016, by and between McCombs Energy, Ltd., as Farmor, and Sklarco L.L.C., as Farmee.

(4)     **Oil and gas leases and/or oil and gas interests subject to this agreement:**

Attached as Exhibit "A-1."

(5)     **Addresses of parties for notice purposes:**

Sklar Exploration Company L.L.C.
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Phone: (318) 227-8668
Fax: (318) 227-9012
jmjones@sklarexploration.com

Sklarco L.L.C.
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Phone: (318) 227-8668
Fax: (318) 227-9012
jmjones@sklarexploration.com

McCombs Energy, Ltd.
Attn:  Larry Wyont, Vice President, Operations
5599 San Felipe St., Suite 1200
Houston, TX  77056-2721
Phone: (713) 621-0033
Fax:  (713) 621-1670
lwyont@mccombsenergy.com

JJS Working Interests LLC
Attn: Justin Simons
4295 San Felipe, Suite 207
Houston, Texas 77027
Phone: (713) 888-0875
Fax:  (866) 406-9550
justin@hbcapllc.com

JF Howell Interests, LP
Attn: David Morgan, Manager
416 Travis Street, Suite 715
Shreveport, LA  71101
Phone: (318) 221-6382
Weekend Phone:  (318) 868-1185
Fax: (318) 425-0839
david@jfhowell.com
melissa@jfhowell.com
howellreports@jfhowell.com (reports/logs/etc. only)

Kudzu Oil Properties, LLC
Attn: Mr. Wirt A. Yerger, III
300 Concourse Blvd, Suite 101
Ridgeland, Mississippi 39157
Phone: (601) 987-6576
Fax: (601) 366-1922
kudzu@caviliergrp.com

Tiembo, Ltd.
Attn: Mark Rauch
P.O. Box 270415
Houston, TX 77277-0415
Phone: (713) 627-1700 ext. 109
Fax:  (713) 621-9292
mrauch@standardsouthern.com

Bundero Investment Company, L.L.C.
Attn: Robert P. Bowman, Manager
401 Edwards Street, Suite 820
Shreveport, LA 71101
Phone: (318) 606-2122
Fax: (318) 754-4042
rbowman@bundero.com

Bennett Greenspan
5207 Braeburn Drive
Bellaire, Texas 77401
Phone:   (713) 957-0636
bcg@ftdna.com

Fair Oil Ltd
Attn:  John R. Garrett
225 South College
Tyler, Texas 75702
Phone:  (903) 510-6517
Fax:  (903) 510-6549
Fax:  (903) 597-3587
bob.garrett@fairoil.com
production@fairoil.com

R. L. Ray, Ltd.
Attn:  John D. Hills
223 South College
Tyler, Texas 75702
Phone:  (903) 510-6556
Fax:  (903) 510-6554
john.hills@rayltd.com

Fant Energy Limited
Attn: Stephen Swan
5800 Westview Drive
Houston, Texas 77055
Phone: (713) 316-1216
Fax: (713) 316-1473
swan@blackswanrep.com

Lucas Petroleum Group, Inc.
Attn:  Fain Brock
327 Congress Avenue, Suite 500
Austin, Texas 78701
Phone:  (512) 236-8211
Fax: (512) 457-1068
fbrock@lucaspetroleum.com

Culver & Cain Production LLC
Attn:  Matthew R. Culver, Manager
121 S. Broadway, Suite 760
Tyler, Texas 75702
Phone: 903-533-0091
Fax: 903-597-6850
mculver@culverandcain.com

Sugar Oil Properties, L.P.
Attn: Mr. Mickey Quinlan, President
625 Market Street, Ste 100
Shreveport, LA 71101
Phone: 318-222-4316
Fax: 318-226-0570
mickey@sugaroilproperties.com

FPCC USA, Inc.
Attn: William Hu
245 Commerce Green Blvd, Ste 250
Sugar Land, Texas 77478

Phone: 281-302-6850
Fax:
liweihu@fpcc.com.tw

Genesis Resources, LLC
Attn: William M. Mounger, II, Manager
4450 Old Canton Rd., Ste 207
Jackson, MS 39211
Phone: (601) 321-1950
Fax:
WMounger@tstarlg.com

Kingston, LLC
Attn: Darrin Pitts, Manager
2790 South Thompson Street, Suite 102
Springdale, Arkansas 72764
Direct Dial: (479) 872-3821
Fax:
darrin.pitts@ubh.com

Santo Petroleum, L.L.C.
Attn: Hanson Yates
P.O. Box 1020
Artesia, NM 88211
Tel: (575) 736-3260
Fax: (575) 736-3269
hyates@santopetroleum.com

(6)    **Burdens on Production**

There are no burdens on the oil and gas leases and/or oil and gas interests except for the lessor's royalty thereunder, the overriding royalty in favor of Walker Interests, Inc. as described in Subsection 1.1(a) of the Participation Agreement and any other burdens described in such oil and gas leases, assignments and/or oil and gas interests.

## EXHIBIT "A-1"

Attached to and made a part of that certain Joint Operating Agreement (Silver Creek Prospect) dated effective as of December 1, 2016, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests L.L.C., JF Howell Interests, LP, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., Sugar Oil Properties, L.P., FPCC USA, Inc., Genesis Resources, LLC, Kingston, LLC and Santo Petroleum, L.L.C., as Non-Operators.

## <u>OIL, GAS AND MINERAL LEASES</u>

1.    Oil & Gas Lease dated 10/22/2015, by and between Robert R. Herman, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053272, of the official public records of Smith County, Texas.

2.    Oil & Gas Lease dated 10/26/2015, by and between Thelma Hogue, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053273, of the official public records of Smith County, Texas.

3.    Oil & Gas Lease dated 10/26/2015, by and between Forrest Gibbs, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053274, of the official public records of Smith County, Texas.

4.    Oil & Gas Lease dated 01/11/2016, by and between Susie Hurley, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on 01/27/2016, Entry 20160100003989, of the official public records of Smith County, Texas.

5.    Oil & Gas Lease dated 10/23/2015, by and between Lena Norwood, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053271, of the official public records of Smith County, Texas.

6.    Oil & Gas Lease dated 10/24/2015, by and between Georgeanne Picu, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053270, of the official public records of Smith County, Texas.

7.    Oil & Gas Lease dated 10/26/2015, by and between Carol Pepper, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053269, of the official public records of Smith County, Texas.

8.    Oil & Gas Lease dated 11/12/2015, by and between Thelma Hogue, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150100057971, of the official public records of Smith County, Texas.

9.    Oil & Gas Lease dated 10/26/2015, by and between Jyoti Arun Jason-Miller, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on 11/12/2015, Entry 20150100053282, of the official public records of Smith County, Texas.

10.   Oil & Gas Lease dated 10/26/2015, by and between Rexanne Meaux, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on 11/12/2015, Entry 20150100053280, of the official public records of Smith County, Texas.

11.   Oil & Gas Lease dated 10/24/2015, by and between John W. Konrad, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on 11/12/2015, Entry 20150100053278, of the official public records of Smith County, Texas.

12.   Oil & Gas Lease dated 10/29/2015, by and between Delma R. House, as Lessor, and Sklarco, LLC, as Lessee, recorded on 11/12/2015, Entry 20150100053281, of the official public records of Smith County, Texas.

13.   Oil & Gas Lease dated 11/02/2015, by and between Marion Smalley Evans, as Lessor, and Sklarco, LLC, as Lessee, recorded on 11/12/2015, Entry 20150100053279, of the official public records of Smith County, Texas.

14.   Oil & Gas Lease dated 11/02/2015, by and between Charlotte Draeger, as Lessor, and Sklarco, LLC, as Lessee, recorded on 11/12/2015, Entry 20150100053277, of the official public records of Smith County, Texas.

15. Oil & Gas Lease dated 10/29/2015, by and between Melinda Chilton, as Lessor, and Sklarco, LLC, as Lessee, recorded on 11/12/2015, Entry 20150100053275, of the official public records of Smith County, Texas.

16. Oil & Gas Lease dated 10/24/2015, by and between Joanne Carr, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, Entry 20150100057970, of the official public records of Smith County, Texas.

17. Oil & Gas Lease dated 11/12/2015, by and between Forrest Gibbs, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, Entry 20150100057968, of the official public records of Smith County, Texas.

18. Oil & Gas Lease dated 10/24/2015, by and between Mercedes Zentgraf, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, Entry 20150100057969, of the official public records of Smith County, Texas.

19. Oil & Gas Lease dated 12/28/2015, by and between Lohrey Henderson, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/06/2016, Entry 20160100000834, of the official public records of Smith County, Texas.

20. Oil & Gas Lease dated 12/21/2015, by and between Kittrell Family Minerals, LLC Scott R. Kittrell, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/06/2016, Entry 20160100000831, of the official public records of Smith County, Texas.

21. Oil & Gas Lease dated 12/28/2015, by and between Holly Materka, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003986, of the official public records of Smith County, Texas.

22. Oil & Gas Lease dated 12/20/2015, by and between Joyce House Riggins c/o Rachel Schuler, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/06/2015, Entry 20160100000833, of the official public records of Smith County, Texas.

23. Oil & Gas Lease dated 12/22/2015, by and between Wayne McMurty, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003992, of the official public records of Smith County, Texas.

24. Oil & Gas Lease dated 12/22/2015, by and between Wanda Lee Lemons, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003991, of the official public records of Smith County, Texas.

25. Oil & Gas Lease dated 01/06/2016, by and between Norma Beddingfield and Chad Beddingfield, individually and as Co-Trustees of the Elbert and Norma Beddingfield Marital Trust and the Beddingfield Family Trust, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003993, of the official public records of Smith County, Texas.

26. Oil & Gas Lease dated 01/11/2016, by and between Melinda Chilton, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003988, of the official public records of Smith County, Texas.

27. Oil & Gas Lease dated 01/07/2016, by and between Terri L. Beddingfield, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003990, of the official public records of Smith County, Texas.

28. Oil & Gas Lease dated 12/07/2015, by and between Jean House Hughes, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150100057976, of the official public records of Smith County, Texas.

29. Oil & Gas Lease dated 12/21/2015, by and between ENK3 Minerals, LP, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/06/2016, Entry 20160100000832, of the official public records of Smith County, Texas.

30. Oil & Gas Lease dated 11/21/2015, by and between Charles Clay House, Jr. and Kathy Ann House, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150100057972, of the official public records of Smith County, Texas.

31. Oil & Gas Lease dated 11/12/2015, by and between Rexanne Meaux, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150100057967, of the official public records of Smith County, Texas.

32.  Oil & Gas Lease dated 01/11/2016, by and between Delma R. House, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003987, of the official public records of Smith County, Texas.

33.  Oil & Gas Lease dated 12/28/2015, by and between Roy David Hilberg, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003985, of the official public records of Smith County, Texas.

34.  Oil & Gas Lease dated 11/21/2015, by and between Charles Clay House, Jr., as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 2016100003994, of the official public records of Smith County, Texas.

35.  Oil & Gas Lease dated 01/19/2016, by and between Charles Clay House, Jr., as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003984, of the official public records of Smith County, Texas.

36.  Oil & Gas Lease dated 10/22/2015, by and between John J. Hermann, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150400057966, of the official public records of Smith County, Texas.

37.  Oil & Gas Lease dated 11/12/2015, by and between Delma R. House, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150100057973, of the official public records of Escambia County, Alabama.

38.  Oil & Gas Lease dated 12/02/2015, by and between The Joe and Marnell House Trust dated June 4, 1998 c/o Merr, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150100057974, of the official public records of Escambia County, Alabama.

39.  Oil & Gas Lease dated 11/12/2015, by and between Carol Pepper, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150400057975, of the official public records of Smith County, Texas.

EXHIBIT "A-2"

Attached to and made a part of that certain Joint Operating Agreement (Silver Creek Prospect) dated effective as of December 1, 2016, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests L.L.C., JF Howell Interests, LP, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., Sugar Oil Properties, L.P., FPCC USA, Inc., Genesis Resources, LLC, Kingston, LLC and Santo Petroleum, L.L.C., as Non-Operators.

## PLAT OF CONTRACT AREA & AMI



## EXHIBIT "B"

Attached to and made a part of that certain Joint Operating Agreement (Silver Creek Prospect) dated effective as of December 1, 2016, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests L.L.C., JF Howell Interests, LP, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., Sugar Oil Properties, L.P., FPCC USA, Inc., Genesis Resources, LLC, Kingston, LLC and Santo Petroleum, L.L.C., as Non-Operators.

REV - Paid Up
Swan Prospect

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVERS LICENSE NUMBER.**

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of _____, 2013 between _____, Lessor (whether one or more), whose address is _____ , and SKLARCO, L.L.C., whose address is 401 Edwards Street, Suite 1601, Shreveport, LA 71101, Lessee. WITNESSETH:

1.  Lessor, in consideration of ___Ten___ dollars and other valuable consideration, receipt of which is hereby acknowledged, and of the covenants and agreements of Lessee hereinafter contained, does hereby grant, lease and let exclusively to Lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas, sulphur and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, telephone lines, employee houses and other structures on said land, necessary or useful in Lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any other land adjacent thereto. The land covered hereby, herein called "said land", is located in the County of __Smith__, State of __Texas__, and is described as follows:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR LEGAL DESCRIPTIONS AND ADDITIONAL PROVISIONS.

This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain ____acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights and options hereunder.

2.  This lease, which is a "paid-up" lease requiring no rentals and unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of _____from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3.  As royalty, Lessee covenants and agrees: (a) To deliver to the credit of Lessor, in the pipe line to which Lessee may connect its wells, the equal _____ part of all produced and saved by Lessee from said land, or from time to time, at the option of Lessee, to pay Lessor the average posted market price of such _____ part of such oil at the wells as of the day it is run to the pipe line or storage tanks, Lessor's interest, in either case, to bear _____ of the cost of treating oil to render it marketable pipe line oil; (b) To pay Lessor on gas and casinghead gas produced from said land (1) when sold by Lessee_____ of the amount realized by Lessee, computed at the mouth of the well, or (2) when used by Lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of_____ of such gas and casinghead gas; (c) To pay Lessor on all other minerals mined and marketed or utilized by Lessee from said land, one-tenth either in kind or value at the well or mine; but if at Lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing oil or gas, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, Lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to Lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, Lessee shall pay or tender, by check or draft of Lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, and may be deposited in __PAY DIRECTLY TO LESSOR AT ADDRESS SHOWN ABOVE__ Bank, or their successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that Lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, Lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownerships thereof, as Lessee may elect. Any payment hereunder may be made by check or draft of Lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above or to the Lessor at the last address known to Lessee on or before the last date for payment. Lessee's failure to properly pay shut-in royalty shall render Lessee liable for the amount due, but shall not operate to terminate this lease. Nothing herein shall impair Lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4.  Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease with any other land covered by this lease, and/or with any other land, lease, or leases, as to any or all minerals or horizons, so as to establish units containing not more than 80 surface acres, plus 10% acreage tolerance; provided, however, units may be established as to any one or more horizons, or existing units may be enlarged as to any one or more horizons, so as to contain not more than 640 surface acres plus 10% acreage tolerance, if limited to one or more of the following: (1) gas, other than casinghead gas, (2) liquid hydrocarbons (condensate) which are not liquids in the subsurface reservoir, (3) minerals produced from wells classified as gas wells by the conservation agency having jurisdiction. If larger units than any of those herein permitted, either at the time established, or after enlargement, are required under any governmental rule or order, for the drilling or operation of a vertical or horizontal well at a regular location, or for obtaining maximum allowable from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged to conform to the size required by such governmental order or rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Such unit shall become effective as of the date provided for in said instrument or instruments, but if said instrument or instruments make no such provision, then such unit shall become effective on the date such instrument or instruments are so filed of record. Each of said options may be exercised by Lessee at any time and from time to time while this lease is in force, and whether before or after production has been established either on said land, or on the portion of said land included in the unit, or on other land unitized therewith. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be mineral, royalty, or leasehold interests in lands within the unit which are not effectively pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted upon said land under this lease. There shall be allocated to the land covered by this lease within each such unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) that proportion of the total production of unitized minerals from the unit, after deducting any used in lease or unit operations, which the number of surface acres in such land (or in each such separate tract) covered by this lease within the unit bears to the total number of surface acres in the unit, and the production so allocated shall be considered for all purposes, including payment or delivery of royalty, overriding royalty and any other payments out of production, to be the entire production of unitized minerals from the land to which allocated in the same manner as though actually produced therefrom under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of any unit hereunder which includes land not covered by this lease shall not have the effect of exchanging or transferring any interest under this lease (including, without limitation, any shut-in royalty which may become payable under this lease) between parties owning interests in land covered by this lease and parties owning interests in land not covered by this lease. Neither shall it impair the right of Lessee to release as provided in paragraph 5 hereof, except that Lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are released as to lands within the unit. At any time while this lease is in force Lessee may dissolve any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Any unit formed may be amended, re-formed, Swan Prospect

reduced or enlarged by Lessee at its election at anytime and from time to time after the original forming thereof by filing an appropriate instrument of record in the public office in which the pooled acreage is located. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. If this lease now or hereafter covers separate tracts, no pooling or unitization of royalty interests as between any such separate tracts is intended or shall be implied or result merely from the inclusion of such separate tracts within this lease but Lessee shall nevertheless have the right to pool or unitize as provided in this paragraph 4 with consequent allocation of production as herein provided. As used in this paragraph 4, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the leased premises.

5.  Lessee may at any time and from time to time  execute and deliver to Lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations, as to the released acreage or interest.  If Lessee releases all or an undivided interest in less than all of the area covered hereby, Lessee's obligation to pay or tender shut-in royalties shall be proportionately reduced in accordance with the net acreage interest retained hereunder.

6.  Whenever used in this lease the word "operations" shall mean operations for any of the following: drilling, testing, completing, reworking, marketing, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

7.  Lessee shall have the use, free from royalty, of water, other than from Lessor's water wells, and of oil and gas produced from said land in all operations hereunder.  Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing.  No well shall be drilled nearer than 200 feet to the house or barn on said land without the consent of the Lessor.  Lessee shall pay for damages caused by its operations to growing crops and timber on said land

8.  The rights and estate of any party hereto may be assigned from time to time in whole or in part and as to any mineral or horizon.  All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns.  No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of Lessee, including, but not limited to, the location and drilling of wells and the measurement of production.  Notwithstanding any other actual or constructive knowledge or notice thereof of or to Lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other  moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until sixty (60) days after there has been furnished to such record owner at his or its principal place of business by Lessor or Lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division.  If any such change in ownership occurs by reason of the death of the owner, Lessee may, nevertheless pay or tender such royalties, or other moneys, or part thereof, to the credit of the decedent in a depository bank provided for above.

9.  In the event Lessor considers that Lessee has not complied with all its obligations hereunder, both express and implied, Lessor shall notify Lessee in writing, setting out specifically in what respects Lessee has breached this contract.  Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by Lessor.  The service of said notice shall be precedent to the bringing of any action by Lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on Lessee.  Neither the service of said notice nor the doing of any acts by Lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that Lessee has failed to perform all its obligations hereunder.  If this lease is canceled for any cause, it shall nevertheless remain in force and effect as to (1) sufficient acreage around each well as to which there are operations to constitute a drilling or maximum allowable unit under applicable governmental regulations, (but in no event less than forty acres), such acreage to be designated by Lessee as nearly as practicable in the form of a square centered at the well, or in such shape as then existing spacing rules require; and (2) any part of said land included in a pooled unit on which there are operations.  Lessee shall also have such easements on said land as are necessary to operations on the acreage so retained and shall not be required to move or remove any existing surface facilities necessary or convenient for current operations.

10.  Lessor hereby warrants and agrees to defend title to said land against the claims of all persons whomsoever.  Lessor's rights and interests hereunder shall be charged primarily with any mortgages, taxes or other liens, or interest and other charges on said land, but Lessor agrees that Lessee shall have the right at any time to pay or reduce same for Lessor, either before or after maturity, and be subrogated to the rights of the holder thereof and to deduct amounts so paid from royalties or other payments payable or which may become payable to Lessor and/or assigns under this lease.  If this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether Lessor's interest is herein specified or not), or no interest therein, then the royalties and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein.  All royalty interest covered by this lease (whether or not owned by Lessor) shall be paid out of the royalty herein provided.  This lease shall be binding upon each party who executes it without regard to whether it is executed by all those named herein as Lessor.

11.  If, while this lease is in force, at, or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and Lessee is not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of Lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delay had not occurred.

12.  Lessor agrees that this lease covers and includes any and all of Lessor's rights in and to any existing well(s) and/or wellbore(s) on said land, other than existing water well(s), and for all purposes of this lease the re-entry and use by Lessee of any existing well(s) and/or wellbore(s) shall be deemed the same as the drilling of a new well.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

_____                        .

### ACKNOWLEDGMENT

STATE OF TEXAS
COUNTY OF _____

           This instrument was acknowledged before me on the _____ day of _____,2013, by
_____.

                                             _____
                                             NOTARY PUBLIC FOR THE STATE OF TEXAS

                                             Notary's printed name: _____

                                             Notary's Commission Expires: _____



**c o p a s**

*Exhibit " C "*

## ACCOUNTING PROCEDURE

### JOINT OPERATIONS

Attached to and made part of that certain Joint Operating Agreement (Silver Creek Prospect) dated effective as of December 1, 2016, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC., JF Howell Interests, LP, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., Sugar Oil Properties, L.P., FPCC USA, Inc., Genesis Resources, LLC, Kingston, LLC and Santo Petroleum, L.L.C., as Non-Operators.

## I. GENERAL PROVISIONS

IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.

IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.

1. **DEFINITIONS**

   All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

   **"Affiliate"** means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

   **"Agreement"** means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

   **"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

   **"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

   **"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS.

   **"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

   **"First Level Supervision"** means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

   - Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
   - Responsibility for day-to-day direct oversight of rig operations
   - Responsibility for day-to-day direct oversight of construction operations
   - Coordination of job priorities and approval of work procedures
   - Responsibility for optimal resource utilization (equipment, Materials, personnel)
   - Responsibility for meeting production and field operating expense targets
   - Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
   - Responsibility for all emergency responses with field staff
   - Responsibility for implementing safety and environmental practices
   - Responsibility for field adherence to company policy
   - Responsibility for employment decisions and performance appraisals for field personnel
   - Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

   **"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

   **"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

1



1      **"Joint Property"** means the real and personal property subject to the Agreement.

3      **"Laws"** means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other
4      governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions
5      contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted,
6      promulgated or issued.

8      **"Material"** means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

10      **"Non-Operators"** means the Parties to the Agreement other than the Operator.

12      **"Offshore Facilities"** means platforms, surface and subsea development and production systems, and other support systems such as oil and
13      gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping,
14      heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of
15      offshore operations, all of which are located offshore.

17      **"Off-site"** means any location that is not considered On-site as defined in this Accounting Procedure.

19      **"On-site"** means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of
20      Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other
21      facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

23      **"Operator"** means the Party designated pursuant to the Agreement to conduct the Joint Operations.

25      **"Parties"** means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as
26      "Party."

28      **"Participating Interest"** means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees,
29      or is otherwise obligated, to pay and bear.

31      **"Participating Party"** means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of
32      the costs and risks of conducting an operation under the Agreement.

34      **"Personal Expenses"** means reimbursed costs for travel and temporary living expenses.

36      **"Railway Receiving Point"** means the railhead nearest the Joint Property for which freight rates are published, even though an actual
37      railhead may not exist.

39      **"Shore Base Facilities"** means onshore support facilities that during Joint Operations provide such services to the Joint Property as a
40      receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication,
41      scheduling and dispatching center; and other associated functions serving the Joint Property.

43      **"Supply Store"** means a recognized source or common stock point for a given Material item.

45      **"Technical Services"** means services providing specific engineering, geoscience, or other professional skills, such as those performed by
46      engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint
47      Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second
48      paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-
49      Operator, Non-Operator Affiliates, and/or third parties.

51 **2.**     **STATEMENTS AND BILLINGS**

53      The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the
54      preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all
55      charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified
56      and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications.
57      Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

59      The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances
60      and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper
61      copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and
62      bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of
63      weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via
64      email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings
65      electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written
66      notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

3. **ADVANCES AND PAYMENTS BY THE PARTIES**

A.  Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B.  Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

  (1)  being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

  (2)  being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

  (3)  being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

  (4)  charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

4. **ADJUSTMENTS**

A.  Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B.  All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

  (1)  a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

  (2)  an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

  (3)  a government/regulatory audit, or

  (4)  a working interest ownership or Participating Interest adjustment.

5. **EXPENDITURE AUDITS**

A.  A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

1   those Non-Operators approving such audit.

3   The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after
4   completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month
5   requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be
6   supported with sufficient documentation.

8   A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to
9   the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator
10  hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to
11  comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with
12  the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against
13  the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations,
14  provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or
15  I.5.C.

17  B.   The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator
18  receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive
19  response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion
20  thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section
21  I.3.B (*Advances and Payments by the Parties*).

23  C.   The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator
24  shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator
25  shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not
26  adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response
27  to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately
28  granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and
29  Payments by the Parties*).

31  D.   If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after
32  Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution
33  meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable.
34  The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting
35  shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with
36  authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution
37  reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the
38  Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself.
39  Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information
40  supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may
41  be discussed at subsequent meetings until each such issue is resolved.

43  If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall
44  be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute
45  shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present
46  at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to
47  ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any
48  Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60)
49  days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other
50  provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or
51  to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

53  E.   ☐ *(Optional Provision – Forfeiture Penalties)*
54  *If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-*
55  *Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been*
56  *withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that*
57  *were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response*
58  *of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made,*
59  *without interest, to the Joint Account.*

61  **6.   APPROVAL BY PARTIES**

63  A.   GENERAL MATTERS

65  Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting
66  Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B.   AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____**two**_____ ( __2__ ) or more Parties, one of which is the Operator, having a combined working interest of at least ___**two-thirds**___ percent ( 66.67 %), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C.   AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

1. **RENTALS AND ROYALTIES**

    Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

2. **LABOR**

    A.   Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

    (1)   Operator's field employees directly employed On-site in the conduct of Joint Operations,

    (2)   Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

    (3)   Operator's employees providing First Level Supervision,

    (4)   Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

    (5)   Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

    Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

    Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

    B.   Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

    C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

D.  Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E.  Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F.  Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G.  Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H.  Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3.  **MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4.  **TRANSPORTATION**

A.  Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B.  Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below, **provided the total transportation cost shall not exceed $10,000.00.** Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1)  If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property. The Operator shall consistently apply the selected alternative.

(2)  If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5.  **SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6.  **EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A.  The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____Fifteen_____ percent (_____15_____%) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

**7.   AFFILIATES**

A.   Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $__50,000.00_____ If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B.   For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $__50,000.00_____ in a given calendar year.

C.   The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

**8.   DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

**9.   LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

**10.   TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)





COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

**11.  INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12.  COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13.  ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration,  and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

**14.  ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15.  OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

**III.  OVERHEAD**

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are  jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



1.  • human resources
2.  • management
3.  • supervision not directly charged under Section II.2 (*Labor*)
4.  • legal services not directly chargeable under Section II.9 (*Legal Expense*)
5.  • taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
6.  • preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with
7.    governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing,
8.    interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

1.  **OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

    As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

    ☑ **(Alternative 1)** Fixed Rate Basis, Section III.1.B.
    ☐ **(Alternative 2)** Percentage Basis, Section III.1.C.

    A.  TECHNICAL SERVICES

        (i)  Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

            ☑ **(Alternative 1 – Direct)** shall be charged **direct** to the Joint Account.

            ☐ **(Alternative 2 – Overhead)** shall be covered by the **overhead** rates.

        (ii)  Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

            ☐ **(Alternative 1 – All Overhead)** shall be covered by the **overhead** rates.

            ☑ **(Alternative 2 – All Direct)** shall be charged **direct** to the Joint Account.

            ☐ **(Alternative 3 – Drilling Direct)** shall be charged **direct** to the Joint Account, **only** to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

    Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

    B.  OVERHEAD—FIXED RATE BASIS

        (1)  The Operator shall charge the Joint Account at the following rates per well per month:

            Drilling Well Rate per month $ **10,038.19**          (prorated for less than a full month)*

            Producing Well Rate per month $ **1,003.82**          *

        **\* Based on base Drilling Well Rate of $9,700 per month and Producing Well Rate of $970 per month as of October 1, 2013, adjusted annually using COPAS overhead adjustment factors.**

        (2)  Application of Overhead—Drilling Well Rate shall be as follows:

            (a)  Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

    (b)  Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3)  Application of Overhead—Producing Well Rate shall be as follows:

    (a)  An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

    (b)  Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

    (c)  A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

    (d)  An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

    (e)  Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4)  The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

C.  OVERHEAD—PERCENTAGE BASIS

(1)  Operator shall charge the Joint Account at the following rates:

    (a)  Development Rate _____ percent (_____) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (*Legal Expense*) and all Material salvage credits.

    (b)  Operating Rate _____ percent (_____%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.

(2)  Application of Overhead—Percentage Basis shall be as follows:

    (a)  The Development Rate shall be applied to all costs in connection with:

        [i]   drilling, redrilling, sidetracking, or deepening of a well
        [ii]  a well undergoing plugback or workover operations for a period of five (5) or more consecutive work–days
        [iii]  preliminary expenditures necessary in preparation for drilling
        [iv]  expenditures incurred in abandoning when the well is not completed as a producer
        [v]   construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead-Major Construction and Catastrophe*).

    (b)  The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead-Major Construction and Catastrophe*).

**2.  OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE**

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.   If the Operator absorbs the engineering, design and drafting costs related to the project:

(1)    ____5____% of total costs if such costs are less than $100,000; plus

(2)    ____2____% of total costs in excess of $100,000 but less than $1,000,000; plus

(3)    ____1____% of total costs in excess of $1,000,000.

B.   If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1)    ____5____% of total costs if such costs are less than $100,000; plus

(2)    ____2____% of total costs in excess of $100,000 but less than $1,000,000; plus

(3)    ____1____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

**3.   AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

**IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS**

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

**1.   DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

**\* To be negotiated if the need arises.**

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

2. **TRANSFERS**

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

A. PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1)  Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

    (a)  For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

    (b)  For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2)  Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3)  Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4)  As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

B. FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1)  Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2)  Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3)  Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4)  Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

C. TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

D.   CONDITION

(1)   Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section 1.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2)   Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)   Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)   Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section 1.6.A (*General Matters*).

(5)   Condition "E" – Junk shall be priced at prevailing scrap value prices.

E.   OTHER PRICING PROVISIONS

(1)   Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2)   Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

13



3. **DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

4. **SPECIAL PRICING PROVISIONS**

A. PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

B. SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C. MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

1. **DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A.   A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B.   Actual transportation costs and Personal Expenses for the inventory team.

C.   Reasonable charges for report preparation and distribution to the Non-Operators.

2. **NON-DIRECTED INVENTORIES**

A.   OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B.   NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C.   SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

## EXHIBIT "D"

Attached to and made a part of that certain Joint Operating Agreement (Silver Creek Prospect) dated effective as of December 1, 2016, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests L.L.C., JF Howell Interests, LP, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., Sugar Oil Properties, L.P., FPCC USA, Inc., Genesis Resources, LLC, Kingston, LLC and Santo Petroleum, L.L.C., as Non-Operators.

### INSURANCE

Operator shall carry the following insurance with the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of insurance will be provided upon request. PREMIUMS FOR CERTAIN INSURANCE COVERAGE MAY CONTINUE TO BE CHARGED TO THE JOINT ACCOUNT BEYOND THE PLUGGING AND ABANDONING OF A WELL IN ORDER TO PROTECT AGAINST POTENTIAL ONGOING LIABILTY.

I.      WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

Workers' Compensation Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

Employers Liability Insurance coverage at limits of $1,000,000 each accident for bodily injury by accident/$1,000,000 policy limit for bodily injury by disease/$1,000,000 each employee for bodily injury by disease.

II.     COMPREHENSIVE GENERAL LIABILITY

Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $1,000,000 for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III.    AUTOMOBILE LIABILITY

Coverage shall include owned, non-owned and hired vehicles. Limit $1,000,000 combined single limit each occurrence for bodily injury and property damage.

IV.     EXCESS LIABILITY

Operator shall carry excess liability insurance in an amount of $10,000,000.

V.      EXTRA EXPENSE LIABILITY

Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $200,000 per occurrence.

Liability Limit: $5,000,000

VI.     OIL LEASE PROPERTY

Oil Lease Property Insurance (Inland Marine) covering tanks, pumps, machinery, pipe and similar equipment of a mobile nature usual to the operation of a producing oil or gas well and crude oil while contained in tanks with limit of not less than $10,000,000 and subject to a deductible of $5,000.

VII.    ADDITIONAL INSURANCE

Operator shall be entitled to carry or provide any additional insurance for the benefit of the Joint Account, which is of direct benefit to the joint property and is incurred by the Operator in the necessary and proper conduct of the joint operations. The premium for all such insurance so carried shall be paid by Operator and charged to the Joint Account. Operator shall, at any time requested, furnish Non-Operator with information concerning the kind, character and amounts of insurance carried.

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder.   Further, any party, at its own expense, may carry its own coverage for Extra Expense Liability Insurance with limits as set forth in Section V, above.   Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability.   Upon timely notification such party will not be charged by Operator for the coverage.

## EXHIBIT "E"

Attached to and made a part of that certain Joint Operating Agreement (Silver Creek Prospect) dated effective as of December 1, 2016, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests L.L.C., JF Howell Interests, LP, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., Sugar Oil Properties, L.P., FPCC USA, Inc., Genesis Resources, LLC, Kingston, LLC and Santo Petroleum, L.L.C., as Non-Operators.

## GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement, the parties hereto own and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area described in the Operating Agreement (the "**JOA**").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the gas produced from said JOA. However, one or more of the parties may be unable to take or market its interest in the gas production from time to time; therefore, to permit any party to produce and dispose of its interest in the gas production from the JOA with as much flexibility as possible, the parties hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser. Any party whose share of gas is not marketed shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ration of its participation percentage under this Operating Agreement to the participating percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, it any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Operator will, in turn, make settlement for all royalties and overriding royalties which are payable on gas produced from the Contract Area. In the event that the total royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Contract Area, then any such deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Contract Area shall furnish the Operator with division order title opinions on which Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser shall pay, or

−1−

cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the volume of gas actually taken for its account.

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold, less applicable production taxes and royalties theretofore paid, less any reasonable dehydration, compression, treating, processing, gathering or transportation costs actually incurred, including amortized capital costs associated with the design, construction or operation of any plants to dehydrate, compress, treat or process gas, in connection with the sale of the overproduction, at the price and based on the proceeds actually received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party). Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.

**EXHIBIT "F"**

Attached to and made a part of that certain Joint Operating Agreement (Silver Creek Prospect) dated effective as of December 1, 2016, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests L.L.C., JF Howell Interests, LP, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., Sugar Oil Properties, L.P., FPCC USA, Inc., Genesis Resources, LLC, Kingston, LLC and Santo Petroleum, L.L.C., as Non-Operators.

**RECORDING MEMORANDUM AND SUPPLEMENT TO
OPERATING AGREEMENT**
**(Silver Creek Prospect)**

THIS AGREEMENT (the "Supplement") is entered into by and between SKLAR EXPLORATION COMPANY L.L.C., hereinafter referred to as "Operator," a Louisiana limited liability company with its office at 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101, and the signatory party or parties other than Operator, hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators", whose respective addresses are shown in their signature blocs.

WHEREAS, the parties to this Supplement are owners of Oil and Gas Leases (the "Oil and Gas Leases") and Oil and Gas Interests (the "Oil and Gas Interests") identified in Exhibit A-1, attached hereto and made a part hereof.

WHEREAS, all or part of those Oil and Gas Leases and Oil and Gas Interests are included in the lands described in Exhibit A-2 attached hereto and made a part hereof (said lands, Oil and Gas Leases and Oil and Gas Interests, or portions thereof, described in Exhibit A-2 being hereinafter called the "Contract Area");

WHEREAS, in any instance in which the Oil and Gas Leases or Oil and Gas Interests of a party are not of record, the record owner of the Oil and Gas Lease or Oil and Gas Interest, or rights therein, are shown on Exhibit A-3, attached hereto and made a part hereof;

WHEREAS, the parties hereto have executed a Letter Agreement and Operating Agreement dated effective as of December 1, 2016, each with exhibits (the Letter Agreement and Operating Agreement being herein individually and collectively referred to as the "Agreements") covering the Contract Area for the purpose of exploring and developing such lands, Oil and Gas Leases and Oil and Gas Interests for Oil and Gas; and

WHEREAS, the parties hereto have executed this Supplement for the purpose of imparting notice to all persons of certain rights and obligations of the parties under the Agreements and for the further purposes of perfecting those rights capable of perfection and providing additional rights relating to the enforcement of the liens and security interests securing the obligations of the parties.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the parties hereto, it is agreed as follows:

1.  This Supplement supplements the Agreements, which Agreements in their entirety are incorporated herein by reference, and all terms used herein shall have the meaning ascribed to them in the Agreements.

2.  The parties do hereby agree that:

    A.  The Oil and Gas Leases and Oil and Gas Interests of the parties comprising the Contract Area shall be subject to and burdened with the terms and provisions of this Supplement and the Agreements, and the parties do hereby commit the portions of the Oil and Gas Leases and Oil and Gas Interests included in the Contract Area to the performance thereof.

    B.  The exploration and development of the Contract Area for Oil and Gas shall be governed by the terms and provisions of the Agreements, as supplemented by this Supplement.

    C.  All costs and liabilities incurred in operations under this Supplement and the Agreements shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties hereto, as provided in the Agreements.

    D.  Regardless of the record title ownership of the Oil and Gas Leases and Oil and Gas Interests identified in Exhibit A-1, all production of Oil and Gas from the Contract Area shall be owned by the parties as provided in the Agreements; provided, further, that (i) nothing contained in this Supplement shall be deemed an assignment or cross-assignment of interests covered hereby and

      (ii) the actual interests of parties in the Contract Area or in any well drilled therein pursuant to the Agreements may from time to time differ from the interests of the parties reflected in Exhibit A-3 due to assignments, elections, forfeitures or other transfers made pursuant to the terms of the Agreements.

E.   Each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area as provided in the Operating Agreement.

F.   An overriding royalty, production payment, net profits interest or other burden payable out of production hereafter created, assignments of production given as security for the payment of money and those overriding royalties, production payments and other burdens payable out of production heretofore created and defined as Subsequently Created Interests in the Operating Agreement shall be (i) borne solely by the party whose interest is burdened therewith, (ii) subject to suspension if a party is required to assign or relinquish to another party an interest which is subject to such burden, and (iii) subject to the lien and security interest hereinafter provided if the party subject to such burden fails to pay its share of expenses chargeable hereunder and under the Operating Agreement, all upon the terms and provisions and in the times and manner provided by the Operating Agreement.

G.   The Oil and Gas Leases and Oil and Gas Interests which are subject hereto may not be assigned or transferred except in accordance with those terms, provisions and restrictions in the Operating Agreement regulating such transfers.

H.   The parties shall have the right to acquire an interest in renewal, extension and replacement leases, leases proposed to be surrendered, wells proposed to be abandoned, and interests to be relinquished as a result of non-participation in subsequent operations, all in accordance with the terms and provisions of the Agreements. Any such interest in Oil and Gas Leases or Oil and Gas Interests in the Contract Area will be subject to the Agreements, to this Supplement, and to the liens, security interests, and rights and obligations under the Agreements and this Supplement.

I.   The rights and obligations of the parties and the adjustment of interests among them in the event of a failure or loss of title, each party's right to propose operations, obligations with respect to participation in operations on the Contract Area and the consequences of a failure to participate in operations, the rights and obligations of the parties regarding the marketing of production, and the rights and remedies of the parties for failure to comply with financial obligations shall be as provided in the Operating Agreement.

J.   Each party's interest under this Supplement and under the Operating Agreement shall be subject to relinquishment for its failure to participate in subsequent operations and each party's share of production and costs shall be reallocated on the basis of such relinquishment, all upon the terms and provisions provided in the Operating Agreement.

K.   All other matters with respect to exploration and development of the Contract Area and the ownership and transfer of the Oil and Gas Leases and Oil and Gas Interest in the Contact Area shall be governed by the terms and provisions of the Agreements.

3.   The parties hereby grant reciprocal liens and security interests as follows:

A.   Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this Supplement and the Agreements including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid under this Supplement and the Agreements, the assignment or relinquishment of interest in Oil and Gas Leases as required under this Supplement and the Agreements, and the proper performance of operations under this Supplement and the Agreements. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this Supplement and the Operating Agreement, the Oil and Gas As Extracted therefrom and equipment now or hereafter situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from the sale of production at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing, in each case including all such property in which the party now owns or hereafter acquires any interest.

B.  All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this Supplement and the Operating Agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by the Operating Agreement and this instrument as to all obligations attributable to such interest under this Supplement and the Agreements whether or not such obligations arise before or after such interest is acquired.

C.  With respect to property covered by Chapter 9 of the Texas Business and Commerce Code., as hereafter amended, supplemented or replaced, in addition to all other rights of the parties under the Agreements, this Supplement or applicable law, each party shall be entitled to exercise the rights and remedies of a secured party under that Code. The bringing of a suit and the obtaining of judgment by a party for any secured obligations owed shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interest or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest at the rate provided in the Operating Agreement, has been received, and shall have the right to offset the amount owed by the defaulting party against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating that the defaulting party is in default and the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

D.  If any party fails to pay its share of expenses within sixty (60) days after rendition of a statement therefor by Operator the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security interests described in this Supplement and in the Operating Agreement, and each paying party may independently pursue any remedy available under the Agreements, this Supplement, or applicable law.

E.  If any party does not perform all of its obligations under this Supplement or the Agreements, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this Supplement or the Agreements, to the extent allowed by governing law, the defaulting party waives notice of default, notice of intent to accelerate, notice of acceleration, any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed.

F.  The lien and security interest granted in this Supplement supplements the rights granted under the Agreements.

G.  To the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due under this Supplement and the Agreements for services performed or materials supplied by Operator.

H.  The above described security will be financed at the wellhead of the well or wells located on the Contract Area and this Recording Supplement may be filed in the land records in the County or Parish in which the Contract Area is located, and as a financing statement in all recording offices required under the Uniform Commercial Code or other applicable state statutes to perfect the above-described security interest, and any party hereto may file a continuation statement as necessary under the Uniform Commercial Code, or other state laws.

4.  This Supplement shall be effective as of the date of the Operating Agreement as above recited. Upon termination of this Supplement and the Operating Agreement and Letter Agreement and the satisfaction of all obligations thereunder, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon the request of Operator, if Operator has complied with all of its financial obligations.

5.  This Supplement and the Agreements shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns. No sale, encumbrance, transfer or other disposition shall be made by any party of any interest in the Leases or Interests subject hereto except as expressly permitted under the Operating Agreement and, if permitted,

shall be made expressly subject to this Supplement and the Agreements and without prejudice to the rights of the other parties. If the transfer is permitted, the assignee of an ownership interest in any Oil and Gas Lease shall be deemed a party to this Supplement and the Agreements as to the interest assigned from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party under this Supplement or the Agreements with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted under this Supplement and the Agreements in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. of the Operating Agreement and hereby shall continue to burden the interest transferred to secure payment of any such obligations.

6.   In the event of a conflict between the terms and provisions of this Supplement and the terms and provisions of the Agreements, then, as between the parties, the terms and provisions of the Agreements shall control.  Terms and provisions in this Supplement that supplement or are in addition to those in the Agreements, but do not contradict the terms and provisions of the Agreements, shall not be considered to be in conflict with the terms and provisions of the Agreements.

7.   This Supplement shall be binding upon each Non-Operator when this Supplement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this Supplement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit A-3 as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. Non-Operators hereby authorize Operator to revise the exhibits attached hereto from time to time to reflect changes to: (i) the Oil and Gas Leases or Oil and Gas Interests subject to the Agreements, (ii) the interests of the Non-Operators in the Contract Area and (iii) the addresses of Non-Operators for notice purposes. In the event that any provision herein is illegal or unenforceable, the remaining provisions shall not be affected, and shall be enforced as if the illegal or unenforceable provision did not appear herein.

8.   Other provisions.

A.   Each party to this Supplement (each being sometimes referred to herein as a "Granting Party") grants and conveys to Steven R. Hatcher, Jr., Vice President – General Counsel, Sklar Exploration Company L.L.C., Trustee, whose address is 5395 Pearl Parkway, Suite 200, Boulder, Colorado 80301, in trust, with power of sale pursuant to the Texas Property Code as now in effect or as hereafter amended, the Granting Party's Real Property Collateral, as hereafter defined, subject to any matters of record to the extent only that any thereof are valid and subsisting and affect said Granting Party's interest in the Real Property Collateral, to secure performance of the Granting Party's obligations (the "secured obligations") under the Agreements and this Supplement. Upon satisfaction by a Granting Party of all its obligations under the Operating Agreement, Letter Agreement and this Supplement, this conveyance by such Granting Party will have no further effect and at the written request of a Granting Party the other parties will release the liens and security interests created in this Supplement at the Granting Party's expense.

B.   TO HAVE AND TO HOLD TO HAVE AND TO HOLD the Real Property Collateral, together with all related rights, privileges, contracts, and appurtenances, unto Trustee and Trustee's successors in interest (said Trustee, and the Trustee's successors in interest being referred to collectively as "Trustee"). In addition, each Granting Party grants to every other party to this Supplement a security interest in the Granting Party's Personal Property Collateral, as hereafter defined.

C.   Definitions: The following definitions shall apply to this Supplement:

i.   The "Collateral" means: the Personal Property Collateral and the Real Property Collateral now or hereafter owned by a Granting Party.

ii.   "Personal Property Collateral" means all rights, titles, interests, and claims the Granting Party now owns or hereafter acquires in the personal property and fixtures now or hereafter in, on or under, extracted from, or used or obtained for use in connection with the Contract Area, or in lands pooled or unitized therewith, or becoming subject to this Supplement, or any other items of Personal Property Collateral, including, without limitation: (1) all goods which are or are to become fixtures located on any portion of the Real Property Collateral; (2) all as-extracted collateral including the Oil and Gas at any time extracted from the Real Property Collateral; (3) any accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil or Gas; (4) all cash or other proceeds from the sale of Oil or Gas; (5) all wells, equipment (both surface and sub-surface), and facilities, of any kind or

character now or hereafter located in, on or under the Real Property Collateral (including, without limitation, all wells, tools, and tubular goods) to the extent that any thereof are not included in the Real Property Collateral; (7) all contract rights, inventory and general intangibles now or hereafter relating to or arising from any of the foregoing; (8) any other property now or hereafter located in, on or under the Contract Area; and (9) all proceeds, products, substitutions and replacements of any of the foregoing. Provided, that a party who is not in default under this Supplement may remove movable tangible personal property no longer used or useful in connection with the Contract Area and upon such removal such movable tangible personal property, except for as extracted collateral and proceeds thereof, will no longer be subject to this security interest.

    iii.  **"Real Property Collateral"** means all rights, titles, interests and claims the Granting Party now owns or hereafter acquires in and to the Contract Area, or in lands pooled or unitized therewith or otherwise becoming subject to this Supplement and includes, without limitation, such party's Oil and Gas Leases and Oil and Gas Interests, to the extent included in the Contract Area, together with and including any and all wells, fixtures, fee interests, leasehold interests, working interests, operating rights, and royalty and overriding royalty interests to the extent that any of said interests are included within the Contract Area or otherwise covered by this Supplement.

    iv.  "Oil and Gas" means oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith.

D.  <u>Effective as Security Agreement, Financing Statement, Deed of Trust, etc.</u>: This Supplement:

    i.  constitutes a security agreement, a financing statement, a deed of trust, and a mortgage;

    ii.  grants security interests and creates liens covering the Collateral, as defined above, including both real and personal property;

    iii.  is effective as a financing statement covering all of the Collateral, and will be filed as a fixture filing with respect to all fixtures, and will be filed as a filing to cover as-extracted collateral with respect to all as-extracted collateral.

E.  <u>Recordation in County Records</u>: This Supplement, or a photographic or other reproduction thereof shall be filed for record in the real property records of each county where any part of the Collateral is situated, or any other appropriate recording office. Any party to this Supplement is authorized to file or record this Supplement or a photographic or other reproduction thereof in the appropriate records in order to perfect its lien and security interest in the Collateral.

F.  <u>Trustee's Power of Sale</u>: If any party does not perform any of its obligations under this Supplement (such defaulting party being sometimes referred to herein as the "Defaulting Party"), Trustee is authorized and empowered, at the request of Requestor(s) ("Requestor" means Operator, unless Operator is the Defaulting Party, in which case "Requestor" means any non-defaulting non-operator) to sell the Collateral conveyed or otherwise pledged by the Defaulting Party, or any part thereof, including, at Requestor's option, any or all of the Defaulting Party's Personal Property Collateral in addition to the Defaulting Party's Real Property Collateral.

If directed by Requestor to sell any or all of the Defaulting Party's Collateral, Trustee will:

    i.  either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect; and

    ii.  sell and convey all or part of the Defaulting Party's Collateral AS IS in accordance with the Texas Property Code, and, if required, the Texas Business and Commerce Code, as now in effect or as hereafter amended.

G.  <u>Successive Sales</u>: Trustee may sell the Defaulting Party's Collateral as a whole or in part as requested by Requestor, whether Real Property Collateral or Personal Property Collateral. The sale of less than all of the Defaulting Party's Collateral shall not exhaust Trustee's power of sale; the trust and lien shall remain in full force and effect as to any unsold portion. Trustee is specifically empowered to make successive sales from time to time as appropriate to recover the full value of the secured obligations owed to the Requestor, a reasonable Trustee's fee and any incidental costs Trustee incurs, or until all the Defaulting Party's Collateral is sold.

H.  <u>Conveyances</u>: Trustee shall not be required to take possession, present, or exhibit any part of the Collateral at any sale thereof. After each sale, Trustee shall convey the sold portion of the

Defaulting Party's Collateral in the name of the Defaulting Party, "AS IS" with special warranty of title by the Defaulting Party, subject to all matters of record as of the date of this Supplement and without representation or warranty, express or implied, by Trustee (a "Trustee's Deed"). Any statements of fact made in a Trustee's Deed shall be prima facie evidence of the truth of such statement absent manifest error.

I. Application of Proceeds: Trustee shall receive any sale proceeds and apply the same as required by law and the terms of this Supplement, including payment of a reasonable Trustee's fee to Trustee. Payment to Trustee shall satisfy purchaser's payment obligation, and such purchaser shall not be responsible for Trustee's application thereof. To the extent allowed by applicable law, Trustee may appoint an agent or agents from time to time in order to perform any act or acts appropriate to facilitate a sale.

J. Purchase by Non-Defaulting Party: Any Requestor may purchase the Defaulting Party's Collateral at any foreclosure sale by offering the highest bid and may have the Requestor's bid credited with the amounts owed by the Defaulting Party to the Requestor under this Supplement and the Agreements.

K. Indemnity of Trustee: Trustee shall be indemnified, held harmless, and defended by Requestor against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this Supplement, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

L. Tenant at Sufferance: If a Defaulting Party's Real Property Collateral is sold under this Supplement, the Defaulting Party must immediately surrender possession to the purchaser. If the Defaulting Party does not, the Defaulting Party will be a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

M. Mailing Addresses: Each party's mailing address is shown on Exhibit A-4, attached hereto and made a part hereof. Information concerning the security interests hereunder may be obtained from Operator, whose address is also shown on Exhibit A-4.

N. Appointment of Substitute Trustee: Requestor may appoint a substitute trustee, in writing and in recordable format, for any reason or without cause; Trustee may resign for any reason and without cause. Appointment of a substitute trustee must be in writing. The substitute trustee shall then succeed to all of the estates, titles, rights, powers, and trusts herein granted to and vested in Trustee.

O. Representations and Warranties: the terms hereof shall be deemed to run with the leases or interests included within the Contract Area.

P. Binding on Successors in Interest: The terms hereof shall be deemed to run with the portions of the Oil and Gas Leases and Oil and Gas Interests included within the Contract Area and the other Collateral. All provisions of this Supplement shall be binding upon and inure to the benefit of each of the parties to this Supplement and their successors in interest to all portions of the Real Property Collateral and Personal Property Collateral.

Q. Usury Savings Clause: Interest on the amounts owed under this Supplement will not exceed the maximum amount of non-usurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the amount lawfully owed under this Supplement (other than for interest) or, if the amount so owed has been paid or received, refunded to the payor. This provision overrides any conflicting provisions in this Supplement or in any communication or document relating to it.

R. Fees, Expenses, and Costs: Each party agrees that, if it becomes a Defaulting Party, it will pay the reasonable attorney's fees, trustee's fees, and court and other costs of enforcing any Requestor's rights under this Supplement. This paragraph does not supersede or limit any other provision of this Supplement in which the parties have agreed to pay attorney's fees or court costs.

S. Rights and Remedies Cumulative: All rights and remedies under the Agreements, under this Supplement and under applicable law are cumulative and not exclusive.

The rest of this page is intentionally left blank.
Signatures follow on next page.

IN WITNESS WHEREOF, this agreement shall be effective as of December 1, 2016.

**OPERATOR**

ATTEST OR WITNESS                                     SKLAR EXPLORATION COMPANY L.L.C.

_____
Print Name: _____               By: _____
                                                                          David A. Barlow
                                                                          President – Chief Operating Officer
_____
Print Name: _____

**NON-OPERATORS**

ATTEST OR WITNESS                                     SKLARCO L.L.C.

_____
Print Name: _____               By: _____
                                                                          David A. Barlow
                                                                          President – Chief Operating Officer
_____
Print Name: _____


ATTEST OR WITNESS                                     MCCOMBS ENERGY, LTD.

_____
Print Name: _____               By: _____
                                                                          Bill Forney, Jr.
                                                                          President
_____
Print Name: _____


ATTEST OR WITNESS                                     JJS WORKING INTERESTS, LLC
                                                                   By: Houston Bulldog Capital
                                                                   Management, LLC, Manager

_____
Print Name: _____               By: _____
                                                                          Justin Simons
                                                                          Manager
_____
Print Name: _____


ATTEST OR WITNESS                                     JF HOWELL INTERESTS, LP
                                                                   By: Howell Investments, L.L.C.,
                                                                   General Partner

_____
Print Name: _____               By: _____
                                                                          David Morgan
                                                                          Manager
_____
Print Name: _____


ATTEST OR WITNESS                                     KUDZU OIL PROPERTIES, LLC

_____
Print Name: _____               By: _____
                                                                          Wirt A. Yerger, III
                                                                          Manager
_____
Print Name: _____

Page 7 of 22

**SILVER CREEK RS**

**ACKNOWLEDGMENTS**

STATE OF COLORADO

COUNTY OF BOULDER

I, _Camille Jenkins_, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _2nd_ day of _December_, 2016.

CAMILLE CULPEPPER JENKINS
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154003785
MY COMMISSION EXPIRES JANUARY 27, 2019

_Camille Jenkins_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _1/27/2019_


STATE OF COLORADO

COUNTY OF BOULDER

I, _Camille Jenkins_, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _2nd_ day of _December_, 2016.

CAMILLE CULPEPPER JENKINS
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154003785
MY COMMISSION EXPIRES JANUARY 27, 2019

_Camille Jenkins_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _1/27/2019_


STATE OF TEXAS

COUNTY OF HARRIS

I, _____, a notary public in and for said County and State, hereby certify that Bill Forney, Jr., whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2016.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

**SILVER CREEK RS**

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Fain Brock, whose name as President of LUCAS PETROLEUM GROUP, INC., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2016.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that Mickey Quinlan, whose name as President of Sugar Management, LLC, the General Partner of SUGAR OIL PROPERTIES, L.P., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

      Given under my hand and notarial seal this the _____ day of _____, 2016.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that _____, whose name as _____ of FPCC USA, INC., a Delaware corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

      Given under my hand and notarial seal this the _____ day of _____, 2016.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

**SILVER CREEK RS**

## EXHIBIT "A-1"

Attached to and made a part of that certain Recording Memorandum and Supplement to Operating Agreement (Silver Creek Prospect) dated effective as of December 1, 2016, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., JJS Working Interests L.L.C., JF Howell Interests, LP, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., Sugar Oil Properties, L.P., FPCC USA, Inc., Genesis Resources, LLC, Kingston, LLC and Santo Petroleum, L.L.C., as Non-Operators.

### OIL, GAS AND MINERAL LEASES

1.  Oil & Gas Lease dated 10/22/2015, by and between Robert R. Herman, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053272, of the official public records of Smith County, Texas.

2.  Oil & Gas Lease dated 10/26/2015, by and between Thelma Hogue, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053273, of the official public records of Smith County, Texas.

3.  Oil & Gas Lease dated 10/26/2015, by and between Forrest Gibbs, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053274, of the official public records of Smith County, Texas.

4.  Oil & Gas Lease dated 01/11/2016, by and between Susie Hurley, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on 01/27/2016, Entry 20160100003989, of the official public records of Smith County, Texas.

5.  Oil & Gas Lease dated 10/23/2015, by and between Lena Norwood, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053271, of the official public records of Smith County, Texas.

6.  Oil & Gas Lease dated 10/24/2015, by and between Georgeanne Picu, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053270, of the official public records of Smith County, Texas.

7.  Oil & Gas Lease dated 10/26/2015, by and between Carol Pepper, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on Instrument Number 20150100053269, of the official public records of Smith County, Texas.

8.  Oil & Gas Lease dated 11/12/2015, by and between Thelma Hogue, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150100057971, of the official public records of Smith County, Texas.

9.  Oil & Gas Lease dated 10/26/2015, by and between Jyoti Arun Jason-Miller, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on 11/12/2015, Entry 20150100053282, of the official public records of Smith County, Texas.

10. Oil & Gas Lease dated 10/26/2015, by and between Rexanne Meaux, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on 11/12/2015, Entry 20150100053280, of the official public records of Smith County, Texas.

11. Oil & Gas Lease dated 10/24/2015, by and between John W. Konrad, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, recorded on 11/12/2015, Entry 20150100053278, of the official public records of Smith County, Texas.

12. Oil & Gas Lease dated 10/29/2015, by and between Delma R. House, as Lessor, and Sklarco, LLC, as Lessee, recorded on 11/12/2015, Entry 20150100053281, of the official public records of Smith County, Texas.

13. Oil & Gas Lease dated 11/02/2015, by and between Marion Smalley Evans, as Lessor, and Sklarco, LLC, as Lessee, recorded on 11/12/2015, Entry 20150100053279, of the official public records of Smith County, Texas.

14.  Oil & Gas Lease dated 11/02/2015, by and between Charlotte Draeger, as Lessor, and Sklarco, LLC, as Lessee, recorded on 11/12/2015, Entry 20150100053277, of the official public records of Smith County, Texas.

15.  Oil & Gas Lease dated 10/29/2015, by and between Melinda Chilton, as Lessor, and Sklarco, LLC, as Lessee, recorded on 11/12/2015, Entry 20150100053275, of the official public records of Smith County, Texas.

16.  Oil & Gas Lease dated 10/24/2015, by and between Joanne Carr, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, Entry 20150100057970, of the official public records of Smith County, Texas.

17.  Oil & Gas Lease dated 11/12/2015, by and between Forrest Gibbs, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, Entry 20150100057968, of the official public records of Smith County, Texas.

18.  Oil & Gas Lease dated 10/24/2015, by and between Mercedes Zentgraf, as Lessor, and Eiche, Mapes, and Company, Inc., as Lessee, Entry 20150100057969, of the official public records of Smith County, Texas.

19.  Oil & Gas Lease dated 12/28/2015, by and between Lohrey Henderson, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/06/2016, Entry 20160100000834, of the official public records of Smith County, Texas.

20.  Oil & Gas Lease dated 12/21/2015, by and between Kittrell Family Minerals, LLC Scott R. Kittrell, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/06/2016, Entry 20160100000831, of the official public records of Smith County, Texas.

21.  Oil & Gas Lease dated 12/28/2015, by and between Holly Materka, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003986, of the official public records of Smith County, Texas.

22.  Oil & Gas Lease dated 12/20/2015, by and between Joyce House Riggins c/o Rachel Schuler, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/06/2015, Entry 20160100000833, of the official public records of Smith County, Texas.

23.  Oil & Gas Lease dated 12/22/2015, by and between Wayne McMurty, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003992, of the official public records of Smith County, Texas.

24.  Oil & Gas Lease dated 12/22/2015, by and between Wanda Lee Lemons, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003991, of the official public records of Smith County, Texas.

25.  Oil & Gas Lease dated 01/06/2016, by and between Norma Beddingfield and Chad Beddingfield, individually and as Co-Trustees of the Elbert and Norma Beddingfield Marital Trust and the Beddingfield Family Trust, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003993, of the official public records of Smith County, Texas.

26.  Oil & Gas Lease dated 01/11/2016, by and between Melinda Chilton, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003988, of the official public records of Smith County, Texas.

27.  Oil & Gas Lease dated 01/07/2016, by and between Terri L. Beddingfield, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003990, of the official public records of Smith County, Texas.

28.  Oil & Gas Lease dated 12/07/2015, by and between Jean House Hughes, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150100057976, of the official public records of Smith County, Texas.

29.    Oil & Gas Lease dated 12/21/2015, by and between ENK3 Minerals, LP, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/06/2016, Entry 20160100000832, of the official public records of Smith County, Texas.

30.    Oil & Gas Lease dated 11/21/2015, by and between Charles Clay House, Jr. and Kathy Ann House, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150100057972, of the official public records of Smith County, Texas.

31.    Oil & Gas Lease dated 11/12/2015, by and between Rexanne Meaux, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150100057967, of the official public records of Smith County, Texas.

32.    Oil & Gas Lease dated 01/11/2016, by and between Delma R. House, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003987, of the official public records of Smith County, Texas.

33.    Oil & Gas Lease dated 12/28/2015, by and between Roy David Hilberg, as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003985, of the official public records of Smith County, Texas.

34.    Oil & Gas Lease dated 11/21/2015, by and between Charles Clay House, Jr., as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 2016100003994, of the official public records of Smith County, Texas.

35.    Oil & Gas Lease dated 01/19/2016, by and between Charles Clay House, Jr., as Lessor, and Sklarco, LLC, as Lessee, recorded on 01/27/2016, Entry 20160100003984, of the official public records of Smith County, Texas.

36.    Oil & Gas Lease dated 10/22/2015, by and between John J. Hermann, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150400057966, of the official public records of Smith County, Texas.

37.    Oil & Gas Lease dated 11/12/2015, by and between Delma R. House, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150100057973, of the official public records of Escambia County, Alabama.

38.    Oil & Gas Lease dated 12/02/2015, by and between The Joe and Marnell House Trust dated June 4, 1998 c/o Merr, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150100057974, of the official public records of Escambia County, Alabama.

39.    Oil & Gas Lease dated 11/12/2015, by and between Carol Pepper, as Lessor, and Sklarco, LLC, as Lessee, recorded on 12/16/2015, Entry 20150400057975, of the official public records of Smith County, Texas.

## EXHIBIT "A-2"

Attached to and made a part of that certain Recording Memorandum and Supplement to Operating Agreement (Silver Creek Prospect) dated effective as of December 1, 2016, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests L.L.C., JF Howell Interests, LP, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., Sugar Oil Properties, L.P., FPCC USA, Inc., Genesis Resources, LLC, Kingston, LLC and Santo Petroleum, L.L.C., as Non-Operators.

### PLAT OF CONTRACT AREA



**EXHIBIT "A-3"**

Attached to and made a part of that certain Recording Memorandum and Supplement to Operating Agreement (Silver Creek Prospect) dated effective as of December 1, 2016, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests L.L.C., JF Howell Interests, LP, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., Sugar Oil Properties, L.P., FPCC USA, Inc., Genesis Resources, LLC, Kingston, LLC and Santo Petroleum, L.L.C., as Non-Operators.

## DECIMAL INTERESTS OF NON-OPERATORS IN CONTRACT AREA

| Owners | BPPO* | APPO* | AFPO*** |
|---|---|---|---|
| **Sklarco L.L.C. | 0.17500000 | 0.34055000 | 0.32180000 |
| **JJS Working Interests LLC | 0.05000000 | 0.07820000 | 0.07820000 |
| Bennett Greenspan | 0.01000000 | 0.00750000 | 0.00750000 |
| Bundero Investment Company, L.L.C. | 0.07000000 | 0.05250000 | 0.04000000 |
| Fair Oil Ltd. | 0.11500000 | 0.08625000 | 0.08625000 |
| Fant Energy, Ltd. | 0.10000000 | 0.07500000 | 0.07500000 |
| FPCC USA, Inc. | 0.06500000 | 0.04875000 | 0.04875000 |
| Genesis Resources, LLC | 0.00500000 | 0.00375000 | 0.00375000 |
| JF Howell Interests, LP | 0.05000000 | 0.03750000 | 0.03750000 |
| Kingston, LLC | 0.01000000 | 0.00750000 | 0.00750000 |
| Kudzu Oil Properties, LLC | 0.05000000 | 0.03750000 | 0.03750000 |
| Lucas Petroleum Group, Inc. | 0.02000000 | 0.01500000 | 0.01500000 |
| McCombs Energy, Ltd. | 0.12500000 | 0.09375000 | 0.12500000 |
| R. L. Ray, Ltd. | 0.05500000 | 0.04125000 | 0.04125000 |
| Santo Petroleum, L.L.C. | 0.03000000 | 0.02250000 | 0.02250000 |
| Sugar Oil Properties, L.P. | 0.05000000 | 0.03750000 | 0.03750000 |
| Tiembo Ltd. | 0.02000000 | 0.01500000 | 0.01500000 |
| | 1.00000000 | 1.00000000 | 1.00000000 |

*Before Prospect Payout ("**BPPO**") and After Prospect Payout ("**APPO**") have the meanings set forth in Section 1.3 of that certain Participation And Exploration Agreement, West Tyler 3D Seismic Prospect, dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain Production, LLC, as Participants, as amended.

**Subject to Agreement For Termination  Of Agency Services Agreements dated effective as of January 1, 2010, by and between Sklarco L.L.C., et al.

*** After Farmout Payout ("**AFOPO**") has the meaning set forth in Section 3.2 of that certain Farmout Agreement, West Tyler 3D Seismic Prospect, dated effective as of June 1, 2016, by and between McCombs Energy, Ltd., as Farmor, and Sklarco L.L.C., as Farmee.

**EXHIBIT "A-4"**

Attached to and made a part of that certain Recording Memorandum and Supplement to Operating Agreement (Silver Creek Prospect) dated effective as of December 1, 2016, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests L.L.C., JF Howell Interests, LP, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., Sugar Oil Properties, L.P., FPCC USA, Inc., Genesis Resources, LLC, Kingston, LLC and Santo Petroleum, L.L.C., as Non-Operators.

## ADDRESSES OF PARTIES FOR NOTICE PURPOSES

Sklar Exploration Company L.L.C.
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Phone: (318) 227-8668
Fax: (318) 227-9012
jmjones@sklarexploration.com

Sklarco L.L.C.
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Phone: (318) 227-8668
Fax: (318) 227-9012
jmjones@sklarexploration.com

McCombs Energy, Ltd.
Attn: Larry Wyont, Vice President, Operations
5599 San Felipe St., Suite 1200
Houston, TX 77056-2721
Phone: (713) 621-0033
Fax: (713) 621-1670
lwyont@mccombsenergy.com

JJS Working Interests LLC
Attn: Justin Simons
4295 San Felipe, Suite 207
Houston, Texas 77027
Phone: (713) 888-0875
Fax: (866) 406-9550
justin@hbcapllc.com

JF Howell Interests, LP
Attn: David Morgan, Manager
416 Travis Street, Suite 715
Shreveport, LA 71101
Phone: (318) 221-6382
Weekend Phone: (318) 868-1185
Fax: (318) 425-0839
david@jfhowell.com

Kudzu Oil Properties, LLC
Attn: Mr. Wirt A. Yerger, III
300 Concourse Blvd, Suite 101
Ridgeland, Mississippi 39157
Phone: (601) 987-6576
Fax: (601) 366-1922
kudzu@caviliergrp.com

Tiembo, Ltd.
Attn: Mark Rauch
P.O. Box 270415
Houston, TX 77277-0415
Phone: (713) 627-1700 ext. 109
Fax: (713) 621-9292
mrauch@standardsouthern.com

Bundero Investment Company, L.L.C.
Attn: Robert P. Bowman, Manager
401 Edwards Street, Suite 820
Shreveport, LA 71101
Phone: (318) 606-2122
Fax: (318) 754-4042
rbowman@bundero.com

Bennett Greenspan
5207 Braeburn Drive
Bellaire, Texas 77401
Phone: (713) 957-0636
bcg@ftdna.com

Fair Oil Ltd
Attn: John R. Garrett
225 South College
Tyler, Texas 75702
Phone: (903) 510-6517
Fax: (903) 510-6549
Fax: (903) 597-3587
bob.garrett@fairoil.com
production@fairoil.com

R. L. Ray, Ltd.
Attn: John D. Hills
223 South College
Tyler, Texas 75702
Phone: (903) 510-6556
Fax: (903) 510-6554
john.hills@rayltd.com

Fant Energy Limited
Attn: Stephen Swan
5800 Westview Drive
Houston, Texas 77055
Phone: (713) 316-1216
Fax: (713) 316-1473
swan@blackswanrep.com

Lucas Petroleum Group, Inc.
Attn: Fain Brock
327 Congress Avenue, Suite 500
Austin, Texas 78701
Phone: (512) 236-8211
Fax: (512) 457-1068
fbrock@lucaspetroleum.com

Culver & Cain Production LLC
Attn: Matthew R. Culver, Manager
121 S. Broadway, Suite 760
Tyler, Texas 75702
Phone: 903-533-0091
Fax: 903-597-6850
mculver@culverandcain.com

Sugar Oil Properties, L.P.
Attn: Mr. Mickey Quinlan, President
625 Market Street, Ste 100
Shreveport, LA 71101
Phone: 318-222-4316
Fax: 318-226-0570
mickey@sugaroilproperties.com

FPCC USA, Inc.
Attn: William Hu
245 Commerce Green Blvd, Ste 250
Sugar Land, Texas 77478
Phone: 281-302-6850
Fax:
liweihu@fpcc.com.tw

Genesis Resources, LLC
Attn: William M. Mounger, II, Manager
4450 Old Canton Rd., Ste 207
Jackson, MS 39211
Phone: (601) 321-1950
Fax:
WMounger@tstarlg.com

Kingston, LLC
Attn: Darrin Pitts, Manager
2790 South Thompson Street, Suite 102
Springdale, Arkansas 72764
Direct Dial: (479) 872-3821
Fax:
darrin.pitts@ubh.com

Santo Petroleum, L.L.C.
Attn: Hanson Yates
P.O. Box 1020
Artesia, NM 88211
Tel: (575) 736-3260
Fax: (575) 736-3269
hyates@santopetroleum.com