*Orig. Papers*
*5- 7267*

A.A.P.L. FORM 610

# MODEL FORM OPERATING AGREEMENT—1956
### Non-Federal Lands

OPERATING AGREEMENT

DATED

___ March 7 _____, 19 72 ,

FOR UNIT AREA IN TOWNSHIP_____, RANGE _____,

_____ Houston _____ COUNTY, STATE OF_____ Texas _____.

AMERICAN ASSOCIATION OF PETROLEUM LANDMEN
APPROVED FORM.                    A.A.P.L. NO. 610
MAY BE ORDERED DIRECTLY FROM THE PUBLISHER
ROSS - MARTIN COMPANY,    BOX 800, TULSA 74101

# TABLE OF CONTENTS

| Paragraph Number | Title | Page |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Title Examination, Loss of Leases and Oil and Gas Interests | 1 |
| 3. | Unleased Oil and Gas Interests | 2 |
| 4. | Interests of Parties | 2 |
| 5. | Operator of Unit | 3 |
| 6. | Employees | 3 |
| 7. | Test Well | 3 |
| 8. | Costs and Expenses | 3 |
| 9. | Operator's Lien | 4 |
| 10. | Term of Agreement | 4 |
| 11. | Limitation on Expenditures | 4 |
| 12. | Operations by Less Than All Parties | 5 |
| 13. | Right to Take Production in Kind | 6 |
| 14. | Access to Unit Area | 7 |
| 15. | Drilling Contracts | 7 |
| 16. | Abandonment of Wells | 7 |
| 17. | Delay Rentals and Shut-in Well Payments | 8 |
| 18. | Preferential Right to Purchase | 8 |
| 19. | Selection of New Operator | 8 |
| 20. | Maintenance of Unit Ownership | 9 |
| 21. | Resignation of Operator | 9 |
| 22. | Liability of Parties | 9 |
| 23. | Renewal or Extension of Leases | 9 |
| 24. | Surrender of Leases | 10 |
| 25. | Acreage or Cash Contributions | 10 |
| 26. | Provision Concerning Taxation | 10 |
| 27. | Insurance | 11 |
| 28. | Claims and Lawsuits | 11 |
| 29. | Force Majeure | 11 |
| 30. | Notices | 11 |
| 31. | Other Conditions | 12 |

A.A.P.L. FORM 610

## OPERATING AGREEMENT

THIS AGREEMENT, entered into this___7th___ day of__ ___March_____, 19_72_ between
_____SUN OIL COMPANY (DELAWARE)_____,
hereafter designated as "Operator", and the signatory parties other than Operator.

WITNESSETH, THAT:

WHEREAS, the parties to this agreement are owners of oil and gas leases covering and, if so indicated, unleased mineral interests in the tracts of land described in Exhibit "A", and all parties have reached an agreement to explore and develop these leases and interests for oil and gas to the extent and as hereinafter provided;

NOW, THEREFORE, it is agreed as follows:

### 1. DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them.

(1) The words "party" and "parties" shall always mean a party, or parties, to this agreement.

(2) The parties to this agreement shall always be referred to as "it" or "they", whether the parties be corporate bodies, partnerships, associations, or persons real.

(3) The term "oil and gas" shall include oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons, unless an intent to limit the inclusiveness of this term is specifically stated.

(4) The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Unit Area which are owned by parties to this agreement.

(5) The term "Unit Area" shall refer to and include all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

(6) The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Unit Area or as fixed by express agreement of the parties.

(7) All exhibits attached to this agreement are made a part of the contract as fully as though copied in full in the contract.

(8) The words "equipment" and "materials" as used here are synonymous and shall mean and include all oil field supplies and personal property acquired for use in the Unit Area.

### 2. TITLE EXAMINATION, LOSS OF LEASES AND OIL AND GAS INTERESTS

**A. Title Examination:**

There shall be no examination of title to leases, or to oil and gas interests, except that title to the lease covering the land upon which the exploratory well is to be drilled in accordance with Section 7, shall be examined on a complete abstract record by ~~Operator's~~ the Owner's attorney, and the title to both the oil and gas lease and to the fee title of the lessors must be approved by the examining attorney, and accepted by all parties. A copy of the examining attorney's opinion shall be sent to each party immediately after the opinion is written, and, also, each party shall be given, as they are written, a copy of all subsequent supplemental attorney's reports. A good faith effort to satisfy the examining attorney's requirements shall be made by the party owning the lease covering the drillsite.

If title to the proposed drillsite is not approved by the examining attorney or the lease is not acceptable for a material reason, and all the parties do not accept the title, the parties shall select a new drillsite for the first exploratory well; provided, if the parties are unable to agree upon another drillsite, this agreement shall, in that case, come to an end and all parties shall then forfeit their rights and be relieved of obligations hereunder. If a new drillsite is selected, title to the oil and gas lease covering it and to the fee title of the lessor shall be examined, and title shall be approved or accepted or rejected in like manner as provided above concerning the drillsite first selected. If title to the oil and gas lease covering the second choice drillsite is not approved or accepted, other drillsites shall be successively selected and title examined, until a drillsite is chosen

— 1 —

A.A.P.L. FORM 610

to which title is approved or accepted, or until the parties fail to select another drillsite. As in the case of the drillsite first selected, so also with successive choices if the time comes that the parties have not approved title and are unable to agree upon an alternate drillsite, the contract shall, in that case and at that time, come to an end and all parties shall forfeit their rights and be relieved of obligations under this contract.

No well other than the first test shall be drilled in the Unit Area until after (1) the title to the lease covering the lands upon which such well is to be located has been examined by the Owner's attorney, and (2) the title has been approved by the examining attorney and the title has been accepted by all of the parties who are to participate in the drilling of the well.

**B. Failure of Title:**

Should any oil and gas lease, or interest therein, be lost through failure of title, this agreement shall, nevertheless, continue in force as to all remaining leases and interests, and

    (1) The party whose lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid, but there shall be no monetary liability on its part to the other parties hereto by reason of such title failure; and

    (2) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Unit Area by the amount of the interest lost; and

    (3) If the proportionate interests of the other parties hereto in any producing well theretofore drilled on the Unit Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interests (less operating costs attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well; and

    (4) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, or equipment previously paid under this agreement, such amount shall be proportionately paid to the party or parties hereto who in the first instance paid the costs which are so refunded; and

    (5) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the party or parties whose title failed in the same proportions in which they shared in such prior production.

**C. Loss of Leases for Causes Other Than Title Failure:**

If any lease or interest subject to this agreement be lost through failure to develop or because express or implied covenants have not been performed, or if any lease be permitted to expire at the end of its primary term and not be renewed or extended, or if any lease or interest therein is lost due to the fact that the production therefrom is shut in by reason of lack of market, the loss shall not be considered a failure of title and all such losses shall be joint losses and shall be borne by all parties in proportion to their interests and there shall be no readjustment of interests in the Unit Area.

### 3. UNLEASED OIL AND GAS INTERESTS

If any party owns an unleased oil and gas interest in the Unit Area, that interest shall be treated for the purpose of this agreement as if it were a leased interest under the form of oil and gas lease attached as "Exhibit "B" and for the primary term therein stated. As to such interests, the owner shall receive royalty on production as prescribed in the form of oil and gas lease attached hereto as Exhibit "B". Such party shall, however, be subject to all of the provisions of this agreement relating to lessees, to the extent that it owns the lessee interest.

### 4. INTERESTS OF PARTIES

Exhibit "A" lists all of the parties, and their respective percentage or fractional interests under this agreement. Unless changed by other provisions, all costs and liabilities incurred in operations under this contract shall be borne and paid, and all equipment and material acquired in operations on the Unit Area shall be owned, by the parties as their interests are given in Exhibit "A". All production of oil and gas from the Unit Area, subject to the payment of lessor's royalties, shall also be owned by the parties in the same manner.

"Individual Loss"
Revised 1967

A.A.P.L. FORM 610

If any oil and gas lease covered by this agreement is subject to an overriding royalty, production payment, or other charge over and above the usual one-eighth (⅛) royalty, the party contributing that lease shall assume and alone bear all such excess obligations and shall account for them to the owners thereof out of its share of the working interest production of the Unit Area.

## 5. OPERATOR OF UNIT

**SUN OIL COMPANY (DELAWARE)**_____shall be the Operator of the Unit Area, and shall conduct and direct and have full control of all operations on the Unit Area as permitted and required by, and within the limits of, this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained, or liabilities incurred, except such as may result from gross negligence or from breach of the provisions of this agreement.

## 6. EMPLOYEES

The number of employees and their selection, and the hours of labor and the compensation for services performed, shall be determined by Operator. All employees shall be the employees of Operator.

## 7. TEST WELL

On or before the____1st____ day of_____June_____, 19 72, Operator shall commence the drilling of a well for oil and gas in the following location:

A mutually acceptable location on 687.80 acres, more or less, in the Chas. C. Marsh Survey, A-757; William Watson Survey, A-1072; and W. H. L. Burton Survey, A-175, Houston County, Texas, as shown on the attached plat as Exhibit "A-1".

and shall thereafter continue the drilling of the well with due diligence to a depth of 10,100 feet, or to a depth sufficient to test the Rodessa Formation, whichever is the lesser,

unless granite or other practically impenetrable substance is encountered at a lesser depth or unless all parties agree to complete the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If in Operator's judgment the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the test as a dry hole, it shall first secure the consent of all parties to the plugging, and the well shall then be plugged and abandoned as promptly as possible.

## 8. COSTS AND EXPENSES

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge all costs and expenses incurred in the development and operation of the Unit Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the cost and expense basis provided in the Accounting Procedure attached hereto and marked Exhibit "C". If any provision of Exhibit "C" should be inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the costs to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated costs, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated costs shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its provided in the share of said estimate within said time, the amount due shall bear interest at the rate ~~of six percent (6%) per~~ accounting procedure attached hereto as Exhibit "C". ~~annum from the date~~ Proper adjustment shall be made monthly between advances and actual cost, to the end that each party shall bear and pay its proportionate share of actual costs incurred, and no more.

—3—

A.A.P.L. FORM 610

## 9. OPERATOR'S LIEN

Operator is given a first and preferred lien on the interest of each party covered by this contract, and in each party's interest in oil and gas produced and the proceeds thereof, and upon each party's interest in material and equipment, to secure the payment of all sums due from each such party to Operator.

In the event any party fails to pay any amount owing by it to Operator as its share of such costs and expense or such advance estimate within the time limited for payment thereof, Operator, without prejudice to other existing remedies, is authorized, at its election, to collect from the purchaser or purchasers of oil or gas, the proceeds accruing to the working interest or interests in the Unit Area of the delinquent party up to the amount owing by such party, and each purchaser of oil or gas is authorized to rely upon Operator's statement as to the amount owing by such party.

In the event of the neglect or failure of any non-operating party to promptly pay its proportionate part of the cost and expense of development and operation when due, the other non-operating parties and Operator, within thirty (30) days after the rendition of statements therefor by Operator, shall proportionately contribute to the payment of such delinquent indebtedness and the non-operating parties so contributing shall be entitled to the same lien rights as are granted to Operator in this section. Upon the payment by such delinquent or defaulting party to Operator of any amount or amounts on such delinquent indebtedness, or upon any recovery on behalf of the non-operating parties under the lien conferred above, the amount or amounts so paid or recovered shall be distributed and paid by Operator to the other non-operating parties and Operator proportionately in accordance with the contributions theretofore made by them.

## 10. TERM OF AGREEMENT

This agreement shall be effective as of the date first shown above when signed by the parties listed below and shall remain in force for ninety (90) days and as long thereafter as (1) there is a well on the Unit Area capable of producing oil or gas or (2) producing, drilling, or reworking operations are conducted thereon with no cessation of more than sixty (60) consecutive days. It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

## 11. LIMITATION ON EXPENDITURES

Without the consent of all parties: (a) No well shall be drilled on the Unit Area except any well expressly provided for in this agreement and except any well drilled pursuant to the provisions of Section 12 of this agreement, it being understood that the consent to the drilling of a well shall include consent to all necessary expenditures in the drilling, testing, completing, and equipping of the well, including necessary tankage; (b) No well shall be reworked, plugged back or deepened except a well reworked, plugged back or deepened pursuant to the provisions of Section 12 of this agreement, it being understood that the consent to the reworking, plugging back or deepening of a well shall include consent to all necessary expenditures in conducting such operations and completing and equipping of said well to produce, including necessary tankage; (c) Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of_____ - - - Ten Thousand - - -_____Dollars ($ 10,000.00 ) except in connection with a well the drilling, reworking, deepening, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that in case of explosion, fire, flood, or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency and to safeguard life and property, but Operator shall, as promptly as possible, report the emergency to the other parties. Operator shall, upon request, furnish copies of its "Authority for Expenditures" for any single project costing in excess of $ 5,000.00 .

— 4 —

Revised

## 12. OPERATIONS BY LESS THAN ALL PARTIES

If all the parties cannot mutually agree upon the drilling of any well on the Unit Area other than the test well provided for in Section 7, or upon the reworking, deepening or plugging back of a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities on the Unit Area, any party or parties wishing to drill, rework, deepen or plug back such a well may give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days (except as to reworking, plugging back or drilling deeper, where a drilling rig is on location, the period shall be limited to forty-eight (48) hours exclusive of Saturday or Sunday) after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation. Failure of a party receiving such a notice to so reply to it within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.

If any party receiving such a notice elects not to participate in the proposed operation (such party or parties being hereafter referred to as "Non-Consenting Party"), then in order to be entitled to the benefits of this section, the party or parties giving the notice and such other parties as shall elect to participate in the operation (all such parties being hereafter referred to as the "Consenting Parties") shall, within thirty (30) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the 48-hour period where the drilling rig is on location, as the case may be) actually commence work on the proposed operation and complete it with due diligence.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions that their respective interests as shown in Exhibit "A" bear to the total interests of all Consenting Parties. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well at their sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this section results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this section, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well, its leasehold operating rights, and share of production therefrom until the proceeds or market value thereof (after deducting production taxes, royalty, overriding royalty and other interests payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(A) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this section, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non-Consenting Party had it participated in the well from the beginning of the operation; and

(B) ~~200%~~ 300% of that portion of the costs and expenses of drilling, reworking, deepening or plugging back, testing and completing, after deducting any cash contributions received under Section 24, and ~~200%~~ 300% of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

A.A.P.L. FORM 610

In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value.

Within sixty (60) days after the completion of any operation under this section, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased, in determining when the interest of such Non-Consenting Party shall revert to it as above provided; if there is a credit balance it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it and from and after such reversion such Non-Consenting Party shall own the same interest in such well, the operating rights and working interest therein, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have owned had it participated in the drilling, reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the accounting procedure schedule, Exhibit "C", attached hereto.

Notwithstanding the provisions of this Section 12, it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Unit Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.

The provisions of this section shall have no application whatsoever to the drilling of the initial test well on the Unit Area, but shall apply to the reworking, deepening, or plugging back of the initial test well after it has been drilled to the depth specified in Section 7, if it is, or thereafter shall prove to be, a dry hole or non-commercial well, and to all other wells drilled, reworked, deepened, or plugged back, or proposed to be drilled, reworked, deepened, or plugged back, upon the Unit Area subsequent to the drilling of the initial test well.

## 13. RIGHT TO TAKE PRODUCTION IN KIND

Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Unit Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil for marketing purposes and production unavoidably lost. Each party shall pay or deliver, or cause to be paid or delivered, all royalties, overriding royalties, or other payments due on its share of such production, and shall hold the other parties free from any liability therefor. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party.

Each party shall execute all division orders and contracts of sale pertaining to its interest in production from the Unit Area, and shall be entitled to receive payment direct from the purchaser or purchasers thereof for its share of all production.

— 6 —

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the Unit Area, Operator shall have the right, subject to revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others for the time being, at not less than the market price prevailing in the area, which shall in no event be less than the price which Operator receives for its portion of the oil and gas produced from the Unit Area.  Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a purchaser.  Notwithstanding the foregoing, Operator shall not make a sale into interstate commerce of any other party's share of gas production without first giving such other party sixty (60) days notice of such intended sale.  and without first securing the prior written authorization of such sale by such other party   Any such purchase or sale by Operator shall be for such reasonable periods of time only as is consistent with the minimum needs of the industry, and shall in no event exceed one year.

## 14.  ACCESS TO UNIT AREA

Each party shall have access to the Unit Area at all reasonable times, at its sole risk, to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto.  Operator shall, upon request, furnish each of the other parties with copies of all drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Unit Area.

## 15. DRILLING CONTRACTS

All wells drilled on the Unit Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area.  Operator, if it so desires, may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the field, and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as shall be customary and usual in the field in contracts of independent contractors who are doing work of a similar nature.

## 16. ABANDONMENT OF WELLS

No well, other than any well which has been drilled or reworked pursuant to Section 12 hereof for which the Consenting Parties have not been fully reimbursed as therein provided, which has been completed as a producer shall be plugged and abandoned without the consent of all parties; provided, however, if all parties do not agree to the abandonment of any well, those wishing to continue its operation shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.  Each abandoning party shall then assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, quality, or fitness for use of the equipment and material, all of its interest in the well and its equipment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the formation or formations then open to production.  The assignments so limited shall encompass the "drilling unit" upon which the well is located.  The payments by, and the assignments to, the assignees shall be in a ratio based upon the relationship of their respective percentages of participation in the Unit Area to the aggregate of the percentages of participation in the Unit Area of all assignees.  There shall be no readjustment of interest in the remaining portion of the Unit Area.

After the assignment, the assignors shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open.  Upon request of the assignees, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well.

## 17. DELAY RENTALS AND SHUT-IN WELL PAYMENTS

Delay rentals and shut-in well payments which may be required under the terms of any lease shall be paid by the party who has subjected such lease to this agreement, at its own expense. Proof of each payment shall be given to Operator at least ten (10) days prior to the rental or shut-in well payment date. Operator shall furnish similar proof to all other parties concerning payments it makes in connection with its leases. Any party may request, and shall be entitled to receive, proper evidence of all such payments. If, through mistake or oversight, any delay rental or shut-in well payment is not paid or is erroneously paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to pay a rental or shut-in well payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, the interests of the parties shall be revised on an acreage basis effective as of the date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in the Unit Area on account of the ownership of the lease which has terminated. In the event the party who failed to pay the rental or the shut-in well payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(1) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis, up to the amount of unrecovered costs;

(2) proceeds, less operating expenses thereafter incurred attributable to the lost interest on an acreage basis, of that portion of oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which would, in the absence of such lease termination, be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and

(3) any moneys, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest lost, for the privilege of participating in the Unit Area or becoming a party to this contract.

Operator shall attempt to notify all parties when a gas well is shut-in or returned to production, but assumes no liability whatsoever for failure to do so.

## ~~18. PREFERENTIAL RIGHT TO PURCHASE~~

~~Should any party desire to sell all or any part of its interests under this contract, or its rights and in-~~ terests in the Unit Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all of its assets, or a sale or transfer of its interests to a subsidiary or parent company, or subsidiary of a parent company, or to any company in which any one party owns a ma- ~~jority of the stock.~~

## 19. SELECTION OF NEW OPERATOR

Should a sale be made by Operator of its rights and interests, the other parties shall have the right within sixty (60) days after the date of such sale, by majority vote in interest, to select a new Operator. If a new Operator is not so selected, the transferee of the present Operator shall assume the duties of and act as Operator. In either case, the retiring Operator shall continue to serve as Operator, and discharge its duties in that capacity under this agreement, until its successor Operator is selected and begins to function, but the present Operator shall not be obligated to continue the performance of its duties for more than 120 days after the sale of its rights and interests has been completed.

— 8 —

"Individual Loss"

A.A.P.L. FORM 610

## 20. MAINTENANCE OF UNIT OWNERSHIP

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this contract, and notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Unit Area and in wells, equipment and production unless such disposition covers either:

(1) the entire interest of the party in all leases and equipment and production; or

(2) an equal undivided interest in all leases and equipment and production in the Unit Area.

Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement, and shall be made without prejudice to the rights of the other parties.

If at any time the interest of any party is divided among and owned by four or more co-owners, Operator may, at its discretion, require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interests within the scope of the operations embraced in this contract; however, all such co-owners shall enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Unit Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

## 21. RESIGNATION OF OPERATOR

Operator may resign from its duties and obligations as Operator at any time upon written notice of not less than ninety (90) days given to all other parties, or Operator may be removed at any time if it fails or refuses to carry out the terms of this agreement, becomes insolvent, or ceases to own an interest in the Unit Area. In such case, all parties to this contract shall select by majority vote in interest, not in numbers, a new Operator who shall assume the responsibilities and duties, and have the rights, prescribed for Operator by this agreement. The retiring Operator shall deliver to its successor all records and information necessary to the discharge by the new Operator of its duties and obligations.

## 22. LIABILITY OF PARTIES

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Unit Area. Accordingly, the lien granted by each party to Operator in Section 9 is given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render them liable as partners.

## 23. RENEWAL OR EXTENSION OF LEASES

If any party secures a renewal of any oil and gas lease subject to this contract, each and all of the other parties shall be notified promptly, and shall have the right to participate in the ownership of the renewal lease by paying to the party who acquired it their several proper proportionate shares of the acquisition cost, which shall be in proportion to the interests held at that time by the parties in the Unit Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the unit area to the aggregate of the percentages of participation in the unit area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all the parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this section shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this section.

The provisions in this section shall apply also and in like manner to extensions of oil and gas leases.

— 9 —
Revised

## 24. SURRENDER OF LEASES

The leases covered by this agreement, in so far as they embrace acreage in the Unit Area, shall not be surrendered in whole or in part unless all parties consent.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and other parties not agree or consent, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not desiring to surrender it. Upon such assignment, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the acreage assigned and the operation of any well thereon, and the assigning party shall have no further interest in the lease assigned and its equipment and production. The parties assignee shall pay to the party assignor the reasonable salvage value of the latter's interest in any wells and equipment on the assigned acreage, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment is in favor of more than one party, the assigned interest shall be shared by the parties assignee in the proportions that the interest of each bears to the interest of all parties assignee.

Any assignment or surrender made under this provision shall not reduce or change the assignors' or surrendering parties' interest, as it was immediately before the assignment, in the balance of the Unit Area; and the acreage assigned or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

## 25. ACREAGE OR CASH CONTRIBUTIONS

If any party receives while this agreement is in force a contribution of cash toward the drilling of a well or any other operation on the Unit Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly execute an assignment of the acreage, without warranty of title, to all parties to this agreement in proportion to their interests in the Unit Area at that time, and such acreage shall become a part of the Unit Area and be governed by all the provisions of this contract. Each party shall promptly notify all other parties of all acreage or money contributions it may obtain in support of any well or any other operation on the Unit Area.

## 26. PROVISION CONCERNING TAXATION

Each of the parties hereto elects, under the authority of Section 761(a) of the Internal Revenue Code of 1954, to be excluded from the application of all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1954. If the income tax laws of the state or states in which the property covered hereby is located contain, or may hereafter contain, provisions similar to those contained in the Subchapter of the Interhal Revenue Code of 1954 above referred to under which a similar election is permitted, each of the parties agrees that such election shall be exercised. Each party authorizes and directs the Operator to execute such an election or elections on its behalf and to file the election with the proper governmental office or agency. If requested by the Operator so to do, each party agrees to execute and join in such an election.

Operator shall render for ad valorem taxation all property subject to this agreement which by law should be returned for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Operator shall bill all other parties for their proportionate share of all tax payments in the manner provided in Exhibit "C".

If any tax assessment is considered unreasonable by Operator, it may at its discretion protest such valuation within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. When any such protested valuation shall have been finally determined, Operator shall pay the assessment for the joint account, together with interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C".

## 27. INSURANCE

At all times while operations are conducted hereunder, Operator shall comply with the Workmen's Compensation Law of the State where the operations are being conducted. Operator shall also carry or provide insurance for the benefit of the joint account of the parties as may be outlined in Exhibit "D" attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Unit Area to comply with the Workmen's Compensation Law of the State where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event Automobile Public Liability Insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for operator's fully owned automotive equipment.

## 28. CLAIMS AND LAWSUITS

If any party to this contract is sued on an alleged cause of action arising out of operations on the Unit Area, or on an alleged cause of action involving title to any lease or oil and gas interest subjected to this contract, it shall give prompt written notice of the suit to the Operator and all other parties.

The defense of lawsuits shall be under the general direction of a committee of lawyers representing the parties, with Operator's attorney as Chairman. Suits may be settled during litigation only with the joint consent of all parties. No charge shall be made for services performed by the staff attorneys for any of the parties, but otherwise all expenses incurred in the defense of suits, together with the amount paid to discharge any final judgment, shall be considered costs of operation and shall be charged to and paid by all parties in proportion to their then interests in the Unit Area. Attorneys, other than staff attorneys for the parties, shall be employed in lawsuits involving Unit Area operations only with the consent of all parties; if outside counsel is employed, their fees and expenses shall be considered Unit Area expense and shall be paid by Operator and charged to all of the parties in proportion to their then interests in the Unit Area. The provisions of this paragraph shall not be applied in any instance where the loss which may result from the suit is treated as an individual loss rather than a joint loss under prior provisions of this agreement, and all such suits shall be handled by and be the sole responsibility of the party or parties concerned.

Damage claims caused by and arising out of operations on the Unit Area, conducted for the joint account of all parties, shall be handled by Operator and its attorneys, the settlement of claims of this kind shall be within the discretion of Operator so long as the amount paid in settlement of any one claim does not exceed one thousand ($1000.00) dollars and, if settled, the sums paid in settlement shall be charged as expense to and be paid by all parties in proportion to their then interests in the Unit Area.

## 29. FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all possible diligence to remove the force majeure as quickly as possible.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure" as here employed shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental restraint, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## 30. NOTICES

All notices authorized or required between the parties, and required by any of the provisions of this agreement, shall, unless otherwise specifically provided, be given in writing by United States mail or Western Union Telegram, postage or charges prepaid, and addressed to the party to whom the notice is given at the

— 11 —

A.A.P.L. FORM 610

addresses listed on Exhibit "A". The originating notice to be given under any provision hereof shall be given only when received by the party to whom such notice is directed and the time for such party to give notice in response thereto shall run from the date the originating notice is received. The second or responsive notice shall be deemed given when deposited in the United States mail or with the Western Telegraph Company, with postage or charges prepaid. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

## 31. OTHER CONDITIONS, IF ANY, ARE:

If any party hereto shall, after executing this agreement, create an overriding royalty, production payment, net profits, carried interest, or other like interest out of its working interest, which is then subject to this agreement, such new interest shall be created and shall in all respects be subject to the terms and provisions of this agreement as follows:

(1.) In the event the party owning the working interest from which the new interest was created withdraws from this agreement under the terms of Section 24 hereof, then such new interest shall terminate and be of no further force and effect;

(2.) If any party or parties should conduct non-consent operations pursuant to any provision of this agreement and as a result become entitled to receive the working interest production otherwise belonging to the non-participating party, the party or parties entitled to receive the working interest production of the non-participating party shall receive such production free and clear of any such burdens against such production which may have been created subsequent to this agreement; and

(3.) If any party fails to pay any expense or costs chargeable to such party under this agreement and the production to the credit of such party is insufficient for that purpose, the owner of the new interest created out of the working interest of said party will be liable for the prorata portion of all costs and expenses which the original party that created such new interest would have been liable for by virtue of his original working interest just as though the new interest had not been created, in which event the lien provided in Section 9 hereof may be enforced against such new interest in the same manner as the lien was enforceable against the original working interest of such party.

In any such event the party creating such new interests shall save the other party hereto harmless with respect to the receipt of all production otherwise attributed to the new interests.

Consent to the drilling of a well shall not be deemed as consent to the setting of casing and a completion attempt. After any well drilled pursuant to this agreement has reached its authorized depth, Operator shall give immediate notice to Non-Operator. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday and Sunday) in which to elect whether or not they desire to set casing and participate in a completion attempt. Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of a completion attempt. If all of the parties elect to plug and abandon the well, Operator shall plug and abandon same at the expense of all parties. If one or more, but less than all, of the parties elect to set pipe and attempt a completion, the provisions of Section 12 shall apply to the operation after conducted by less than all parties.

— 12 —

Immediately upon the completion of the first well on the Unit Area as a well
capable of producing oil or gas in paying quantities, the parties hereto shall
cause the Unit Area to be surveyed and the participating interests of the parties
shall be adjusted so that the participating interest of each party shall be deter-
mined by the formula, the numerator of which is the net surface acres contributed
by each party to the Unit Area and the denominator of which is the total net sur-
face acres in the Unit Area.  The effective date of this adjustment shall be as
of the effective date of this Operating Agreement.

A.A.P.L. FORM 610

This agreement may be signed in counterpart, and shall be binding upon the parties and upon their heirs, successors, representatives and assigns.

SUN OIL COMPANY (DELAWARE)

XXXXXXXX

BY: _____
Agent and Attorney-in-Fact

O P E R A T O R

/ATTEST: WITNESSES

ATTEST:

John G. Carruth, Secretary

ATTEST:

J. T. Mewborne, Secretary

ATTEST:

J. T. Mewborne, Secretary

NEMOURS CORPORATION

BY: _____
Clinton W. Fuller, Corporate Agent

SKLAR & PHILLIPS OIL COMPANY

BY: _____
August Erickson, Vice President

JONES-O'BRIEN, INCORPORATED

BY: _____
G. F. Land, Vice President

OAKLAND CORPORATION

BY: _____
George P. Moran, President

O'BRIEN DRILLING COMPANY

BY: _____
W. J. O'Brien, Jr.

ATTEST WITNESSES

_____
W. J. O'Brien, Jr., Testamentary
Executor of the Succession of
Raymond J. O'Brien, Jr.

STATE OF LOUISIANA)
)
PARISH OF CADDO   )

BEFORE ME, the undersigned authority, on this day personally appeared AUGUST ERICKSON, duly authorized VICE PRESIDENT for SKLAR & PHILLIPS OIL CO., a Delaware corporation, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacity therein stated, and as the act and deed of said corporation.

Given under my hand and seal of office this 27th day of March, ,1972.

Gwen L. Hutchins, Notary Public
in and for Caddo Parish, Louisiana


STATE OF LOUISIANA)
)
PARISH OF CADDO   )

BEFORE ME, the undersigned authority, on this day personally appeared G. F. Land, duly authorized Vice President for JONES-O'BRIEN, INCORPORATED, a Virginia corporation, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacity therein stated, and as the act and deed of said corporation.

GIVEN Under my hand and seal of office this ____ day of March, 1972.

Notary Public in and for
Caddo Parish, Louisiana


STATE OF LOUISIANA)
)
PARISH OF CADDO   )

BEFORE ME, the undersigned authority, on this day personally appeared GEORGE P. MORAN, duly authorized PRESIDENT for OAKLAND CORPORATION, a Delaware corporation, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacity therein stated, and as the act and deed of said corporation.

Given under my hand and seal of office this ____ day of March, 1972.

Notary Public in and for
Caddo Parish, Louisiana


STATE OF LOUISIANA)
)
PARISH OF CADDO   )

BEFORE ME, the undersigned authority, on this day personally appeared Clinton W. Fuller, duly authorized Corporate Agent for NEMOURS CORPORATION, a Delaware corporation, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacity therein stated, and as the act and deed of said corporation.

Given under my hand and seal of office this 29th day of MARCH, 1972.

STATE OF LOUISIANA)
                  )
PARISH OF CADDO   )

BEFORE ME, the undersigned authority, on this day personally appeared W. J. O'BRIEN, JR., individually and as Testamentary Executor of the Succession of Raymond J. O'Brien, Jr., known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, and in the capacity therein stated.

Given under my hand and seal of office this ___ day of ___MARCH___, 1972.

Notary Public in and for
Caddo Parish, Louisiana

STATE   OF   TEXAS §
                   §
COUNTY OF DALLAS §

    BEFORE ME, the undersigned authority, on this day per-
sonally appeared ____JOHN W. STOREY_____,
Agent and Attorney-in-Fact for SUN OIL COMPANY (DELAWARE), a
Delaware corporation, known to me to be the person whose name
is subscribed to the foregoing instrument, and acknowledged
to me that he executed the same for the purposes and con-
sideration therein expressed, in the capacity therein stated,
and as the act and deed of said corporation.

    Given under my hand and seal of office this _7th_ day
of _____, 19 7?.

                           Notary Public in and for
                           Dallas County, Texas

ATTEST

_____

ATTEST

_____

AMOCO PRODUCTION COMPANY

BY: _____

RUDMAN RESOURCES, INC.

BY: _____

ALVRONE SATER

BY: *Alvrone Sater*

CARY M. MAGUIRE

_____

J. A. HUMPHREY

_____

CARY M. MAGUIRE, TRUSTEE

BY: _____

MAGUIRE OIL COMPANY

ATTEST

_____

BY: _____

STATE OF INDIANA          )
                          )
COUNTY OF VANDERBURGH     )

     Before me, the undersigned authority, on this day personally appeared ALVRONE SATER, known to me to be the identical person whose name is subscribed to the foregoing instrument, and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

     Given under my hand and seal of office this the ___30th___ day of ___May___, A.D. 1972.

_____
*Patty J. Williams*
Notary Public in and for Vanderburgh County, Indiana

ATTEST

_____

ATTEST

_____

AMOCO PRODUCTION COMPANY

BY:_____

RUDMAN RESOURCES, INC.

BY:_____

ALVRONE SATER

BY:_____

CARY M. MAGUIRE

_____  5/2/72

J. A. HUMPHREY

_____

CARY M. MAGUIRE, TRUSTEE for Russell
    Ambler Maguire u/t/d 1/2/52

BY:_____

MAGUIRE OIL COMPANY

BY:_____
            Pres

ATTEST

_____
            Secretary

-14-

THE STATE OF TEXAS }

COUNTY OF DALLAS }

BEFORE ME, the undersigned authority, a Notary Public in and for said County and State on this day personally appeared CARY M. MAGUIRE known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 8th day of May, 1972.

Helen Mitchakes, Notary Public in and for Dallas County, Texas

My commission expires:
June 1, 1973

THE STATE OF TEXAS }

COUNTY OF DALLAS }

BEFORE ME, the undersigned authority, a Notary Public in and for said County and State, on this day personally appeared CARY M. MAGUIRE, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said MAGUIRE OIL COMPANY, a corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 8th day of May, 1972.

Helen Mitchakes, Notary Public in and for Dallas County, Texas

My Commission expires:
June 1, 1973

ATTEST

_____

AMOCO PRODUCTION COMPANY

BY:_____

RUDMAN RESOURCES, INC.

ATTEST

_Ruth M. Stephens_
RUTH M. STEPHENS, Secretary

BY:_____
M. B. RUDMAN, President

ALVRONE SATER

BY:_____

CARY M. MAGUIRE

_____

J. A. HUMPHREY

_____

CARY M. MAGUIRE, TRUSTEE

BY:_____

ATTEST

MAGUIRE OIL COMPANY

_____

BY:_____

THE STATE OF TEXAS }
County of ____ DALLAS ____ }

Before me, the undersigned authority, on this day personally appeared_____ M. B. RUDMAN _____
_____, known to me to be the person whose name is
subscribed to the foregoing instrument as _____ President _____ of RUDMAN RESOURCES, INC., a corporation, _____ and
acknowledged to me that he executed the same for the purposes and consideration therein expressed, and as the act and deed of said corporation.

Given under my hand and seal of office this the ____ 23rd ____ day of ____ May ____ A. D. 19 72

_Annie White Van Hoose_

ANNE WHITE VAN HOOSE
Notary Public, Dallas County, Texas

Notary Public in and for _____ Dallas _____ County, Texas

ATTEST

_____


ATTEST

_____

AMOCO PRODUCTION COMPANY

BY:_____


RUDMAN RESOURCES, INC.

BY:_____


ALVRONE SATER

BY:_____

CARY M. MAGUIRE

_____


J. A. HUMPHREY

CARY M. MAGUIRE, TRUSTEE

BY:_____

MAGUIRE OIL COMPANY

BY:_____


ATTEST

_____

-14-

STATE   OF   TEXAS   §
                     §
COUNTY OF DALLAS   §

BEFORE ME, the undersigned authority, on this day per-
sonally appeared ___JOHN W. STOREY_____,
Agent and Attorney-in-Fact for SUN OIL COMPANY (DELAWARE), a
Delaware corporation, known to me to be the person whose name
is subscribed to the foregoing instrument, and acknowledged
to me that he executed the same for the purposes and con-
sideration therein expressed, in the capacity therein stated,
and as the act and deed of said corporation.

Given under my hand and seal of office this _7th_ day
of _March_____, 19_73_.

                          _Bettie Lawrey. (L.)_
                          Notary Public in and for
                          Dallas County, Texas


SINGLE ACKNOWLEDGMENT

THE STATE OF TEXAS          }
COUNTY OF _Dallas_          }

BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared

_J. A. Humphrey_

known to me to be the person whose name _is_ subscribed to the foregoing instrument, and acknowledged to
me that _he_ executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the _21st_ day of _April_ A. D. 19_72_

(L. S.)
                          _Helen Scott Hodges_
842—The Odee Company. Publishers—Dallas        Notary Public in and for _Dallas_        County, Texas.

ATTEST

_____

ATTEST

_____

AMOCO PRODUCTION COMPANY

BY: _____
         Attorney-in-Fact

APPROVED

RUDMAN RESOURCES, INC.

BY: _____

ALVRONE SATER

BY: _____

CARY M. MAGUIRE

_____

J. A. HUMPHREY

_____

CARY M. MAGUIRE, TRUSTEE

BY: _____

ATTEST

_____

MAGUIRE OIL COMPANY

BY: _____

-14-

THE STATE OF TEXAS    ⚬

COUNTY OF HARRIS      ⚬

     BEFORE ME, the undersigned authority, on this day personally appeared ___C. N. Menninger,___ known to me to be the person who executed the foregoing instrument as Attorney-in-Fact for AMOCO PRODUCTION COMPANY, and acknowledged to me that he executed the same for the purposes and consideration therein expressed; as the act and deed of said corporation, and in the capacity therein stated.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE this __26__ day of _____May_____, 19_72_.

                         _Irene Haldas_
                       Notary Public in and for
                        Harris County, Texas

                        IRENE HALDAS
           Notary Public in and for Harris County, Texas
           My Commission Expires___6-1-73__

NO. N-244 (2/71)

EXHIBIT "A"

SCHEDULE OF LEASES

CONTRIBUTED BY SUN OIL COMPANY

| LEASE NO. | DATE | LESSOR | LESSEE | RECORDED BOOK | PAGE |
|---|---|---|---|---|---|
| 113255 | 11-04-67 | George H. Scarborough | Sun Oil Company | 433 | 227 |
| 113255-A | 6-18-71 | Charlotte Lee Henderson | Sun Oil Company | 478 | 466 |
| 113255-B | 6-18-71 | Mary E. L. Payne | Sun Oil Company | 479 | 63 |
| 113255-C | 7-08-71 | Carolyn Bailey | Sun Oil Company | 480 | 24 |
| 113255-D | 7-08-71 | L. M. Boring | Sun Oil Company | 480 | 30 |
| 113255-E | 7-16-71 | John C. Voorhees, Trustee | Sun Oil Company | | |
| 113255-F | 7-08-71 | Evelyn Miller | Sun Oil Company | 480 | 27 |
| 113255-G | 8-24-71 | Hattie B. Kilburn | Sun Oil Company | 481 | 356 |
| 113255-H | 10-5-71 | Patsy Harrison et al | Sun Oil Company | | |
| 113255-I | 7-16-71 | James L. Dolman, Ind. & as Agent | Sun Oil Company | | |
| 113277 | 11-04-67 | Charles W. Warner | Sun Oil Company | 432 | 672 |
| 113277-A | 11-08-71 | Helen Ball Schniewind et al | Sun Oil Company | | |
| 113277-B | 11-08-71 | St. Germain Co. et al | Sun Oil Company | | |
| 113313 | 11-04-67 | Luther E. Warner et al | Sun Oil Company | 433 | 233 |
| 502067 | 10-22-71 | James L. Dolman, Ind. & as Agent | Sun Oil Company | | |
| 502067-A | 10-14-71 | John C. Voorhees, Trustee | Sun Oil Company | | |
| 502067-B | 10-14-71 | Evelyn Miller | Sun Oil Company | | |
| 502067-C | 10-14-71 | Charlotte Lee Lynch Henderson et al | Sun Oil Company | | |
| 502067-D | 10-14-71 | Hattie B. Kilburn | Sun Oil Company | | |
| 502067-E | 10-19-71 | Carolyn Bailey | Sun Oil Company | | |
| 502067-F | 10-19-71 | L. M. Boring | Sun Oil Company | | |

CONTRIBUTED BY RUDMAN RESOURCES, INC., AMOCO PRODUCTION COMPANY, ALVRONE SATER, J. A. HUMPHREY, MAGUIRE OIL COMPANY, CARY M. MAGUIRE, INDIVIDUALLY & AS TRUSTEE FOR RUSSELL AMBLER MAGUIRE UNDER TRUST DATED 1-1-52

| LEASE NO. | DATE | LESSOR | LESSEE | RECORDED BOOK | PAGE |
|---|---|---|---|---|---|
| 50916A | 3-09-71 | The University of Rochester | Mason Bristol | 475 | 223 |

CONTRIBUTED BY NEMOURS CORPORATION, SKLAR AND PHILLIPS OIL CO., JONES & O'BRIEN, INC., OAKLAND CORP., O'BRIEN DRILLING CO.

| LEASE NO. | DATE | LESSOR | LESSEE | RECORDED BOOK | PAGE |
|---|---|---|---|---|---|
| | 2-09-71 | Mrs. Gertie Spence et al | Jack T. Everett | 473 | 123 |

UNIT AREA

The unit area shall cover 687.80 acres, more or less, in the Chas. C. Marsh Survey, A-757; William Watson Survey, A-1072; and W. H. L. Burton Survey, A-175, Houston County, Texas, and shall consist of all of the above described leases insofar as they cover lands situated within the area outlined in red on the plat attached hereto.

INTEREST OF THE PARTIES

Sun Oil Company          59.6933
P. O. Box 2880
Dallas, Texas 75221

Nemours Corporation          12.2274
1306 Petroleum Tower
Shreveport, Louisiana 71102

INTEREST OF THE PARTIES - continued

| | |
|---|---|
| Sklar & Phillips Oil Company<br>2925 Mansfield Road<br>Shreveport, Louisiana 71103 | 12.2274 |
| Jones & O'Brien, Inc.<br>P. O. Box 5152<br>Shreveport, Louisiana 71105 | 6.1137 |
| Oakland Corporation<br>P. O. Box 5152<br>Shreveport, Louisiana 71105 | 3.0568 |
| O'Brien Drilling Company<br>P. O. Box 5152<br>Shreveport, Louisiana 71105 | 3.0568 |
| Amoco Production Company<br>P. O. Box 3092<br>Houston, Texas 77001 | 1.8123 |
| Rudman Resources, Inc.<br>1730 Mercantile Dallas Building<br>Dallas, Texas 75201 | .8496 |
| Alvrone Sater<br>10 Northwest Third Street<br>Evansville, Indiana 47708 | .2832 |
| Cary M. Maguire<br>4200 First National Bank Bldg.<br>Dallas, Texas 75202 | .2718 |
| J. A. Humphrey<br>1100 First National Bank Building<br>Dallas, Texas 75202 | .2265 |
| Cary M. Maguire, Trustee<br>4200 First National Bank Bldg.<br>Dallas, Texas 75202 | .1359 |
| Maguire Oil Company<br>4200 First National Bank Bldg.<br>Dallas, Texas 75202 | .0453 |
| | 100.0000 |



EXHIBIT "A-1"

EXHIBIT "B"

There is no unleased interest within the Unit Area.

COPAS — 1968

Recommended by the Council of Petroleum Accountants Societies of North America

COPAS

# EXHIBIT "C"

Attached to and made a part of Operating Agreement dated March 7, 1972, between Sun Oil Company (Delaware) and Rudman Resources, Inc., et al, covering 687.80 acres in Houston County, Texas.

# ACCOUNTING PROCEDURE

# JOINT OPERATIONS

## I. GENERAL PROVISIONS

**1. Definitions**

"Joint Account" shall mean the account showing the charges and credits accruing because of the Joint Operations and which are to be shared by the Parties.

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall be defined as set forth under the subparagraph selected below:

A. [X] Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

B. [ ] Material which is ordinarily so classified and controlled by Operator in the conduct of its operations. List shall be furnished Non-Operators upon request.

**2. Statements and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of costs and expenses for the preceding month. Such bills will be accompanied by statements reflecting the total charges and credits as set forth under the subparagraph selected below:

A. [ ] Statement in detail of all charges and credits to the Joint Account.

B. [ ] Statement of all charges and credits to the Joint Account, summarized by appropriate classifications indicative of the nature thereof.

C. [X] Statement of all charges and credits to the Joint Account, summarized by appropriate classification indicative of the nature thereof, except that items of Controllable Material and unusual charges and credits shall be detailed.

**3. Advances and Payments by Non-Operators**

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of ten per cent (10%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser.

**4. Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of the Joint Property as provided for in Section VII.

**5. Audits**

A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the accounting hereunder for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

**6. Approval by Non-Operators**

Where an approval or other agreement of Non-Operators is expressly required under Paragraphs 5A, 5B, 6A and 8 of Section II, Section III, Section V, Section VI, and Paragraph 4 of Section VII, of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the Operator shall notify all Non-Operators of the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators. The provisions of this paragraph shall not apply to Paragraph 7, Section III.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

**1. Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

**2. Labor**

A. (1) Salaries and wages of Operator's employees directly employed on the Joint Property in the conduct of Joint Operations.

(2) Salaries of first-level supervisors in the field if such charges are excluded from overhead rates in Option A of Section III.

(3) Salaries and wages of technical employees temporarily assigned to and directly employed on the Joint Property if such charges are excluded from overhead rates in Option B of Section III.

(4) Salaries and wages of technical employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from overhead rates in Option C of Section III.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to the employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II and Paragraph 1A of Section III; except that in the case of those employees only a pro rata portion of whose salaries and wages are chargeable to the Joint Account under Paragraph 1A of Section III, not more than the same pro rata portion of the benefits and allowances herein provided for shall be charged to the Joint Account. Cost under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II and Paragraph 1A of Section III. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's labor cost of salaries and wages chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II and Paragraph 1A of Section III.

D. Reasonable personal expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II and for which expenses the employees are reimbursed under Operator's usual practice.

**3. Employee Benefits**

Operator's current cost of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II and Paragraph 1A of Section III shall be chargeable as indicated in the subparagraph selected below:

A. [ ] Operator's actual cost.

B. [X] Operator's actual cost not to exceed fifteen per cent (15%).

**4. Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. So far as it is reasonably practical and consistent with efficient and economical operation, only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use; and the accumulation of surplus stocks shall be avoided.

**5. Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by Operator and Non-Operators.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by Operators and Non-Operators. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by Operator and Non-Operators.

C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking costs of $100 or less.

**6. Services**

A. The cost of contract services and utilities procured from outside sources other than services covered by Paragraph 8 of this Section II and Paragraph 1B of Section III. The cost of professional consultant services shall not be charged to the Joint Account unless agreed to by Operator and Non-Operators.

B. Use and service of equipment and facilities furnished by Operator as provided in Paragraph 5 of Section IV.

**7. Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except to the extent that the damage or loss could have been avoided through the exercise of reasonable diligence on the part of Operator. Operator shall furnish Non-Operators written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

**8. Legal Expense**

All costs and expenses of handling, investigating, and settling litigation or claims arising by reason of the Joint Operations or necessary to protect or recover the Joint Property, including, but not limited to, attorney's fees court costs, cost of investigation or procuring evidence and amounts paid in settlement or satisfaction of any such litigation or claims: provided, (a) no charge shall be made for the services of Operator's legal staff or other regularly employed personnel (such services being considered to be Administrative Overhead under Section III) unless agreed to by Operator and Non-Operators, and (b) no charge shall be made for the fees and expenses o outside attorneys unless the employment of such attorneys is agreed to by Operator and Non-Operators.

**9. Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operatio thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of th Parties.

**10. Insurance**

Net premiums paid for insurance required to be carried on the Joint Property for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge therefor on the following basis:

_____

_____

_____

**11. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator for the necessary and proper conduct of the Joint Operations.

## III. INDIRECT CHARGES

Operator may charge the Joint Account for indirect costs either by use of an allocation of district expense items plus the rate for administrative overhead, and plus the warehousing charges, all as provided for in Paragraph 1 of this Section III or by combining all three of said items under the rates provided for in Paragraph 2 or 3 of this Section III, as indicated next below:

**OPERATOR SHALL CHARGE INDIRECT COSTS TO THE JOINT ACCOUNT UNDER THE TERMS OF:**

[ ] Paragraph 1. (District Expense, Administrative Overhead and Warehousing)

[X] Paragraph 2. (Combined Rates - Well Basis)

[ ] Paragraph 3. (Combined Rates - Percentage Basis)

The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by Operator and Non-Operators as a direct charge to the Joint Account.

**THE OVERHEAD RATES PROVIDED FOR IN ANY OF THE PARAGRAPHS SELECTED ABOVE**

A. [ ] shall [X] shall not include salaries and ~~personal~~ related expenses of first-level supervisors in the field.

B. [ ] shall [X] shall not include salaries, wages and personal expenses of technical employees temporarily assigned to and directly employed on the Joint Property.

C. [X] shall [ ] shall not include salaries, wages and personal expenses of technical employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property.

**1. District Expense, Administrative Overhead and Warehousing**

A. District Expense

Operator shall charge the Joint Account with a pro rata portion of the salaries, wages and expenses of Operator's production superintendent and other employees serving the Joint Property and other properties of the Operator in the same operating area, whose time is not allocated directly to the properties, and a pro rata portion of the cost of maintaining and operating a production office known as Operator's ...................... ...... _____ office located at or near ............................................................ (or a comparable office if location changed); and necessary sub-offices (if any), maintained for the convenience of the above-described office, and all necessary camps, including housing facilities for employees if required, used in connection with the operations of the Joint Property and other properties in the same operating area. The expense of, less any revenue from, such facilities may, at the option of Operator, include depreciation of investment or a fair monthly rental in lieu of depreciation. Such charges shall be apportioned to all properties served on some equitable basis consistent with Operator's accounting practice.

B. Administrative Overhead

Operator shall charge administrative overhead to the Joint Account at the following rates, which charge shall be in lieu of the cost and expense of all offices of the Operator not covered by Paragraph 1A of this Section III, including salaries, wages and expenses of personnel assigned to such offices. Such charge shall be in addition to the salaries, wages and expenses of employees of Operator authorized to be charged direct as provided in Paragraphs 2 and 8 of Section II. Such charge shall be made on the basis indicated below, either (1) well basis or (2) percentage basis, at the rates shown thereunder.

(1) [ ] Well Basis

### RATE PER WELL PER MONTH

| Well Depth | DRILLING WELL RATE (Use Total Depth) Each Well | PRODUCING WELL RATE (Use Current Producing Depth) | | |
|---|---|---|---|---|
| | | First Five | Next Five | All Wells Over Ten |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

(2) [ ] Percentage Basis

### PERCENTAGE BASIS

Development:

.......................... Percent ( %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 8 of Section II and all salvage credits.

Operating:

.......................... Percent ( %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 1 and 8 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

— 3 —

C. Operator's Warehouse Operating and Maintenance Expense
[  ] Included in district expense
[  ] No charge either direct or indirect
[  ] Percentage basis (describe fully) ........................................................................................

**2. Combined Rates - Well Basis**

Operator shall charge the Joint Account for the services covered by Paragraph 1 of this Section III on the basis indicated below:

### RATE PER WELL PER MONTH

| Well Depth | DRILLING WELL RATE (Use Total Depth) Each Well | PRODUCING WELL RATE (Use Current Producing Depth) First Five | Next Five | All Wells Over Ten |
|---|---|---|---|---|
| All depths | $1,200.00 | 155.00 | 135.00 | 120.00 |

**3. Combined Rates - Percentage Basis**

Operator shall charge the Joint Account for the services covered by Paragraph 1 of this Section III on the basis indicated below:

### PERCENTAGE BASIS

A. Development:

........................ Percent (    %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 8 of Section II and all salvage credits.

B. Operating:

........................ Percent (    %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 1 and 8 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

**4. Application of Administrative Overhead or Combined Rates - Well Basis**

The following limitations, instructions and charges shall apply in the application of the rates as provided under either Paragraph 1B (1) or Paragraph 2 of this Section III.

A. Charges for drilling wells shall begin on the date each well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during the suspension of drilling operations for fifteen (15) or more consecutive days.

B. The status of wells shall be as follows:
(1) Producing gas wells, injection wells for recovery operations, water supply wells utilized for waterflooding operations and salt water disposal wells shall be considered the same as producing oil wells.
(2) Wells permanently shut down but on which plugging operations are deferred shall be dropped from the well schedule at the time the shutdown is effected. Any well being plugged or produced during any portion of the month shall be considered as a producing well for the entire month.
(3) Wells being plugged back, drilled deeper, converted to a source or input well, or which are undergoing any type of workover that requires the use of a drilling rig or workover rig capable of drilling shall be considered the same as drilling wells.
(4) Temporarily shut-down wells, which are not produced or worked upon for a period of a full calendar month, shall not be included in the well schedule, provided however, wells shut in by governmental regulatory body shall be included in the well schedule only in the event the allowable production is transferred to some other well or wells on the Joint Property. In the event of a unit allowable, shut-in wells shall be counted in determining the charge hereunder for such month if said wells contribute allowable production that is actually produced during such month from one or more unit wells as a result of allowable transfer, inclusion in the unit allowable or other circumstances, but the total shut-in well count shall be limited to the minimum number of shut-in wells necessary to provide the contributed allowable actually produced during the month.
(5) Gas wells shall be included in the well schedule if directly connected to a permanent sales outlet even though temporarily shut in due to overproduction or failure of purchaser to take the allowed production.
(6) Wells completed in multiple horizons, shall be considered as a producing well for each separately producing horizon, providing each completion is considered a separate well by governmental or other state-wide regulatory authority.

C. The well rates for producing wells shall be applied to the individual leases; provided that, whenever leases covered by this agreement are operated as a unitized project, the well rates shall be applied to the total number of producing wells, irrespective of individual leases.

D. The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the preceding calendar year as shown by "The Index of Average Weekly Earnings of Crude Petroleum and Gas Production Workers" as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian Index as published by the Dominion Bureau of Statistics, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

**5. Application of Administrative Overhead or Combined Rates - Percentage Basis**

For the purpose of determining charges on a Percentage Basis under Paragraph 1B (2) or Paragraph 3 of this Section III. Development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when well is not completed as a producer; and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 6 of this Section III. All other costs shall be considered as Operating.

**6. Major Construction Overhead**

For the construction of compressor plants, water stations, secondary recovery systems, drilling and production platforms, salt water disposal facilities, and other such projects, as distinguished from the more usual drilling

— 4 —

and producing operations, Operator in addition to the Administrative Overhead or Combined Rates provided for in Paragraph 1, 2 or 3 of this Secton III shall either negotiate a rate prior to beginning of construction or shall charge the Joint Account with an additional overhead charge as follows:

A. Total cost less than $25,000, no charge.

B. Total cost more than $25,000, but less than $100,000, ........*........% of total cost.

C. Total cost of $100,000 or more, ........*........ % of the first $100,000 plus ........*........ % of all over $100,000 of total cost.

Total cost shall mean the total gross cost of any one project. For the purpose of this paragraph the component parts of a single project shall not be treated separately and the cost of drilling wells shall be excluded.

**7. Amendment of Rates**

The specific rates provided for in this Section III may be amended from time to time by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive. Amendment of rates shall require approval of 100% in interest of the non-operators.

(*). - To be negotiated.

## IV. BASIS OF CHARGES TO JOINT ACCOUNT

Subject to the further provisions of this Section IV, Operator will procure all Material and services for the Joint Property. At the Operator's option, Non-Operators may supply Material or services for the Joint Property.

**1. Purchases**

Material purchased and service procured shall be charged at the price paid by Operator after deduction of all discounts actually received.

**2. Material furnished from Operator's Warehouse or Other Properties**

A. New Material (Condition "A")

(1) Tubular goods, except line pipe, shall be priced on a maximum carload and/or barge load weight basis regardless of quantity transferred and equalized to the lowest prevailing price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available effective at date of transfer.

(2) Line pipe shall be priced at the current replacement cost effective at date of transfer from a reliable supply store nearest the Joint Property where such Material is normally available if the movement is less than 30,000 pounds. If the movement is 30,000 pounds or more, it shall be priced on the same basis as casing and tubing under Subparagraph (1) of this paragraph.

(3) When the Operator has equalized actual hauling costs as provided for in Paragraph 5 of Section II, Operator is permitted to include ten cents (10¢) per hundred-weight on all tubular goods furnished from his stocks in lieu of loading and unloading costs sustained.

(4) Other Material shall be priced at the current replacement cost of the same kind of Material, effective at date of movement and f.o.b. the supply store or railway receiving point nearest the Joint Property where Material of the same kind is normally available.

(5) The Joint Account shall not be credited with cash discounts applicable to prices provided for in this Paragraph 2 of Section IV.

B. Used Material (Condition "B" and "C")

(1) Material in sound and serviceable condition and suitable for reuse without reconditioning, shall be classified as Condition "B" and priced at seventy-five per cent (75%) of the current price of new Material.

(2) Material which is not suitable for its original function until after reconditioning shall be furnished to the Joint Account under one of the two methods defined below:

(a) Classified as Condition "B" and priced at seventy-five per cent (75%) of the current price of new Material. The cost of reconditioning shall be absorbed by the Operator of the transferring property.

(b) Classified as Condition "C" and priced at fifty per cent (50%) of current price of new Material. The cost of reconditioning also shall be charged to the receiving property, provided Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(3) Obsolete Material or Material which cannot be classified as Condition "B" or Condition "C" shall be priced at a value commensurate with its use. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose.

(4) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

**3. Premium Prices**

Whenever Material is not readily obtainable at prices specified in Paragraphs 1 and 2 of this Section IV because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in procuring such Material, in making it suitable for use, and in moving it to the Joint Property, provided, that notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within 10 days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

**4. Warranty of Material Furnished by Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

**5. Equipment and Facilities Furnished by Operator**

A. Operator shall charge the Joint Account for use of equipment and facilities at rates commensurate with cost of ownership and operation. Such rates shall include cost of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed six per cent (6%) per annum, provided such rates shall not exceed those currently prevailing in the immediate area within which the Joint Property is located. In lieu of rates based on costs of ownership and operation of equipment, other than automotive, Operator may elect to use commercial rates prevailing in the area of the Joint Property less 20%; for automotive equipment, rates as published by the Petroleum Motor Transport Association may be used. Rates for laboratory services shall not exceed those currently prevailing if performed by

— 5 —

outside service laboratories. Rates for trucks, tractors and well service units may include wages and penses of operator.

B. Whenever requested, Operator shall inform Non-Operators in advance of the rates it proposes to char

C. Rates shall be revised and adjusted from time to time when found to be either excessive or insuffic

## V. DISPOSAL OF MATERIAL

The Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surp Condition "A" or "B" Material. The disposition of surplus Controllable Material, not purchased by Operator, s be agreed to by Operator and Non-Operators, provided Operator shall dispose of normal accumulations of junk : scrap Material either by transfer or sale from Joint Property.

1. **Material Purchased by the Operator or Non-Operators.**
   Material purchased by either the Operator or Non-Operators shall be credited by the Operator to the Joint Accou for the month in which the Material is removed by the purchaser.

2. **Division in Kind**
   Division of Material in kind, if made between Operator and Non-Operators, shall be in proportion to the respect interests in such Material. The Parties will thereupon be charged individually with the value of the Mater received or receivable. Proper credits shall be made by the Operator to the Joint Account.

3. **Sales to Outsiders**
   Sales to outsiders of Material from the Joint Property shall be credited by Operator to the Joint Account at : net amount collected by Operator from vendee. Any claim by vendee related to such sale shall be charged b to the Joint Account if and when paid by Operator.

## VI. BASIS OF PRICING MATERIAL TRANSFERRED FROM JOINT ACCOUNT

Material purchased by either Operator or Non-Operators or divided in kind, unless agreed to by Operator and N Operators shall be priced on the following basis:

1. **New Price Defined**
   New price as used in this Section VI shall be the price specified for new Material in Section IV.

2. **New Material**
   New Material (Condition "A"), being new Material procured for the Joint Property but never used. at c hundred per cent (100%) of current new price (plus sales tax if any).

3. **Good Used Material**
   Good used Material (Condition "B"), being used Material in sound and serviceable condition, suitable for reu without reconditioning:
   A. At seventy-five per cent (75%) of current new price if Material was charged to Joint Account as new.
   B. At sixty-five per cent (65%) of current new price if Material was originally charged to the Joint Accou as secondhand at seventy-five per cent (75%) of new price.

4. **Other Used Material**
   Used Material (Condition "C"), at fifty per cent (50%) of current new price, being used Material which:
   A. Is not in sound and serviceable condition but suitable for reuse after reconditioning, or
   B. Is serviceable for original function but not suitable for reconditioning.

5. **Bad-Order Material**
   Material (Condition "D"), no longer suitable for its original purpose without excessive repair cost but usable : some other purpose at a price comparable with that of items normally used for such other purpose.

6. **Junk Material**
   Junk Material (Condition "E"), being obsolete and scrap Material, at prevailing prices.

7. **Temporarily Used Material**
   When the use of Material is temporary and its service to the Joint Property does not justify the reduction price as provided for in Paragraph 3B of this Section VI. such Material shall be priced on a basis that will lea a net charge to the Joint Account consistent with the value of the service rendered.

## VII. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories. Notice and Representation**
   At reasonable intervals. inventories shall be taken by Operator of the Joint Account Controllable Mate Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before a inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken Operator.

2. **Reconciliation and Adjustment of Inventories**
   Reconciliation of inventory with the Joint Account shall be made, and a list of overages and shortages shall furnished to the Non-Operators. Inventory adjustments shall be made by Operator with the Joint Account overages and shortages, but Operator shall be held accountable to Non-Operators only for shortages due to l of reasonable diligence.

3. **Special Inventories**
   Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It sh be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of inte takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

4. **Expense of Conducting Periodic Inventories**
   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to Operator and Non-Operators.

EXHIBIT "D"

Attached to and made a part of Operating
Agreement dated ___March 7, 1972, be-
tween _Sun Oil Company (Delaware)_
_and Rudman Resources, Inc., et al_
covering _687.80 acres in Houston_
_County, Texas._

Operator shall carry or provide for the benefit of the
Joint Account of the parties the types and amounts of Insurance as
are shown below.

(1) Workmen's Compensation Insurance to cover
full liability under the Workmen's Compen-
sation Law of the State where the opera-
tions are being conducted.

(2) Employer's Liability Insurance with a limit
of not less than $500,000 for accidental
injuries or deaths of one or more employees
as a result of one accident.

(3) Comprehensive General Liability Insurance
with limits of not less than $500,000 Com-
bined Single Limit Per Occurrence for both
Bodily Injury and Property Damage.

(4) Automobile Public Liability Insurance with
limits of not less than $500,000 Combined
Single Limit Per Occurrence for both Bodily
Injury and Property Damage.

The premiums paid for all such Insurance except Automobile
shall be charged as operation expense. No Insurance, other than that
shown above, shall be carried for the benefit of the Joint Account except
by mutual consent of the parties.