**SKYLINE ENERGY, L.L.C.**
**2301 Dublin Circle**
**Pearland, Texas 77581**
Tele: (281) 481-0881 Fax: (281) 481-5645

May 14, 2002

Sklarco L.L.C.
401 Edwards, Suite 1601
Shreveport, Louisiana 71101

Attn:  Mr. David Barlow

Re:  Participation Agreement
N E Thompsonville Prospect
Webb County, Texas

Gentlemen:

This agreement (the "Agreement") is made and entered into by and between Skyline Energy, L.L.C., 2301 Dublin Circle, Pearland, Texas 77581 (hereinafter referred to as "Assignor") and Sklarco L.L.C., 401 Edwards, Suite 1601, Shreveport, Louisiana 71101 (hereinafter referred to as "Assignee"), relative to the contractual rights to acquire the leasehold interests more fully described in Exhibit "A" attached hereto and incorporated herein for all purposes.

Assignor represents that it is the present owner of all right, title and interest in and to that certain farmout agreement ("Farmout Agreement") dated February 25, 2002, as amended April 29, 2002, by and between BP America Production Company ("BP") as farmor, and Assignor, as farmee, covering certain land ("Farmout Lands"), subject to that certain oil and gas lease ("Lease") more fully described in Exhibit "A" attached hereto and incorporated herein for all purposes.  The Farmout Lands are shaded yellow on the plat attached hereto as Exhibit "B" which is incorporated herein for all purposes.

The parties recognize and acknowledge that all rights and obligations of Assignor in and to the Lease and the Farmout Lands are subject to the terms of the Farmout Agreement.  By execution in the space provided below Assignee does hereby acquire its working interest share (i.e. 80% Before Casing Point

JGW\SKYLINE\Sklar Participation Agmt Final.doc

Sklarco L.L.C.
May 14, 2002
Page 2


and 64% After Casing Point) of all contractual rights and obligations in and to the Farmout Agreement. Additionally, notwithstanding any terms contained in this Agreement to the contrary, in the event of a conflict between the terms of this Agreement and/or the Operating Agreement, as defined in Section 7. below, and the terms of the Farmout Agreement, the terms of the Farmout Agreement shall prevail and control.

Assignor hereby agrees to sell and Assignee hereby agrees to purchase an undivided eighty percent (80%) interest in and to the Farmout Agreement and related right to earn an assignment of the Lease within the Farmout Lands and to participate for an eighty percent (80%) interest in the drilling of a Test Well through Casing Point, as defined in Section 2. below, in search of oil and gas, subject to the terms, conditions, reservations and limitations provided below:

1.

### Consideration/Dry Hole Cost Advance

As full and complete payment for its undivided 80% Before Casing Point/64% After Casing Point interest, Assignee agrees to pay Assignor the sum of Sixty-Two Thousand, Two Hundred Ninety-Nine and 64/100 Dollars ($62,299.64) upon the execution of this Agreement. Assignor shall have no right to be paid, reimbursed or otherwise recover, and Assignee shall have no liability to Assignor for, any further costs, fees or other expenses associated with the prospect except as otherwise provided in the "Operating Agreement" defined in Section 7. below. All subsequent costs associated with the prospect, including the prepayment of estimated dry hole costs and the payment of actual drilling costs as set forth in this Section 1. below, shall be invoiced by the Operator under the Operating Agreement described in Section 7. below and paid by the Non-Operators in proportion to their respective interests.

Concurrent with their execution of this Agreement, Assignor and Assignee must (i) execute the Authority For Expenditure attached as Exhibit "C" estimating the costs to drill and complete the Test Well described in Section 2. below, and (ii) tender to the Operator under the Operating Agreement the following sums as advances, representing their share of the

Sklarco L.L.C.
May 14, 2002
Page 3

amount estimated in the AFE to drill the Test Well to the Total
Depth, excluding estimated completion costs, but including the
amount estimated to plug and abandon the Test Well in the event
it is not completed as a producing well, to-wit:

| Non-Operators | Share | Amount | Description |
|---|---|---|---|
| Sklarco L.L.C. | 80% | $163,200 | Dry Hole Estimate |
| Skyline Energy L.L.C. | 20% | $ 40,800 | Dry Hole Estimate |

Notwithstanding the estimates contained in the AFE,
Assignor and Assignee are responsible for and must pay the
Operator their share of all actual costs to drill the Test Well
to the Total Depth and, if a dry hole, to plug and abandon that
well ("Actual Dry Hole Costs"), by full payment of any invoice
from the Operator covering the difference between the aforesaid
advance and their share of the actual costs, within fifteen (15)
days from receipt of such an invoice.  However, if the Actual
Dry Hole Costs are less than the estimated AFE costs, Operator
shall refund to Assignor and Assignee their respective pro rata
share thereof.

If, after written notice of default and a fifteen (15) day
cure period, Assignee fails to timely pay the Actual Dry Hole
Costs, then this Agreement shall terminate and be of no further
force or effect and neither party shall have any further
recourse or remedy except Assignor shall be entitled to retain
any sums previously paid by Assignee to Assignor as liquidated
damages and not as a penalty.  If, after written notice of
default sent by certified mail, return receipt requested, and a
fifteen (15) day cure period, Assignor fails to timely pay the
Operator the Actual Dry Hole Costs, then Assignor hereby agrees
to relinquish all of its right, title and interest with respect
to its cost bearing twenty percent (20%) working interest in the
prospect (including all of its rights under the Farmout
Agreement or any working interest earned thereunder) to Assignee
and to execute such instruments as furnished by Assignee
necessary to convey said interest for no consideration, not even
return of any moneys previously advanced or invoices previously
paid.  Notwithstanding the foregoing, Assignor shall under no
circumstances lose, forfeit or have terminated its carried

Sklarco L.L.C.
May 14, 2002
Page 4


sixteen percent (16%) working interest for nonpayment of Actual
Dry Hole Costs.

2.

### Test Well

On or before July 1, 2002, the Operator under the Operating
Agreement, Sklar Exploration Company L.L.C., shall commence
operations for the drilling of a test well (herein referred to
as the "Test Well") at an approximate location 4,310' FESL and
5,700' FSSL of the Alberca De Arriba Survey, A-1996, Webb
County, Texas, and shall thereafter diligently and in a good and
workmanlike manner proceed to cause the drilling of the Test
Well to a true vertical depth of 7,000' beneath the surface of
the earth, or a depth to adequately test the Queen City
formation, whichever is lesser (hereinafter referred to as
"Total Depth"). If the Operator fails to timely commence the
Test Well as provided herein or the Test Well fails to reach
Total Depth as herein provided, then this Agreement shall
terminate and be of no further force and effect and neither
party shall have any further recourse or remedy except Assignor
shall be entitled to retain all sums paid by Assignee to
Assignor as liquidated damages and not as a penalty, and
Assignor shall remain liable to the Operator for its share of
the costs incurred in connection with drilling the Test Well, if
any, including, without limitation, costs incurred in obtaining
an abstract of title and a drill-site title opinion and costs
incurred in clearing and staking a location for the well.

3.

### Substitute Well

In the event the Test Well is lost or junked due to
encountering impenetrable substances on other conditions beyond
Assignee's control making further drilling impracticable by
generally accepted industry standards, then in lieu of drilling
to Total Depth, Assignee, for any of the reasons above noted,
shall have the option to commence actual drilling of a
substitute well provided such well is commenced within the
period permitted under the terms of the Farmout Agreement. Such
well shall be drilled at a legal location, in a like manner and

Sklarco L.L.C.
May 14, 2002
Page 5

under the same terms and conditions to the depth specified for
the Test Well, and the term "Test Well" as used herein shall be
construed to include any substitute well drilled under the terms
of this Agreement.

4.

<u>Casing Point, Completion Election and Subsequent Operations</u>

Assignee agrees to pay eighty percent (80%) of all costs of
drilling the Test Well to Casing Point as hereinafter defined.
After the Test Well has reached Total Depth, the Operator shall
test all prospective formations in accordance with prudent
operating standards. "Casing Point" shall occur and is defined
as that point in time when all tests, logs, corings and other
evaluations have been completed and the borehole is in the
condition to run production casing. In the event the Test Well
is not completed and is plugged and abandoned as a dry hole,
Assignee shall bear its eighty percent (80%) Before Casing Point
share of all actual costs in connection with the drilling,
testing, plugging and abandonment of the Test Well.
Alternatively, should a completion attempt be made upon the Test
Well, Assignee shall bear its sixty four percent (64%) After
Casing Point share of all subsequent risks, costs and expenses
in connection with such completion attempt. Furthermore, in the
event the parties hereto elect to participate in operations on a
Subsequent Well or Wells, all such costs shall be borne on an
After Casing Point basis with Assignor bearing thirty six
percent (36%) of such costs and Assignee bearing sixty four
percent (64%) of such costs. Any party who elects not to
participate in the completion attempt on the Test Well shall be
subject to the nonconsent provision set forth in Section 5.
hereinbelow.

5.

<u>Nonconsent Election for Drilling or Completion Operations</u>

In the event any party elects not to participate in the
initial completion attempt for the Test Well, if proposed, such
party shall forfeit all of its right, title and interest in the
Farmout Agreement, the related right to earn an assignment of
the Lease and the AMI defined in Section 9. below.

Sklarco L.L.C.
May 14, 2002
Page 6

In the event any party elects not to participate in the drilling, sidetracking or completion of a subsequent well drilled after the Test Well, such nonconsenting party shall forfeit all of its right, title and interest in the well in which it elects not to participate and the Farmout Agreement, the related right to earn an assignment of the Lease and the AMI defined in Section 9. below, but INSOFAR AND ONLY INSOFAR as the Farmout Agreement, Lease and/or AMI covers the well and the proration unit or pooled unit, whichever is larger, attributable to the well in which such nonconsenting party elected not to participate.  Such nonconsenting party shall immediately assign its interest in the well and proration or pooled unit proportionately to the parties who do elect to participate in such operation ("Consenting Parties"), or in such other proportions as such Consenting Parties shall mutually agree, and the nonconsenting party shall reassign such interest to the Consenting Parties with a special warranty of title and free and clear of all liens, claims, encumbrances and burdens not existing as of the date of this Agreement.

For purposes hereof, a party's failure timely to pay its share of costs, or to advance its share of the estimated costs, associated with any drilling, sidetracking or completion operation, after written notice of default sent pursuant to the Operating Agreement and by certified mail, return receipt requested, and a fifteen (15) day cure period, shall be deemed an election not to participate in that operation subject to the forfeiture for the Test Well as described in this Section 5. above.  Any such forfeiture shall be without prejudice and in addition to the rights of the Operator under Articles VII. and XV.D of the Operating Agreement.

Any nonconsent elections for reworking, recompletion or other operations other than the drilling, sidetracking, or completion of a well shall be subject to the nonconsent provisions contained in the Operating Agreement.

Sklarco L.L.C.
May 14, 2002
Page 7

6.

### Assignment of Lease Covering Farmout Lands

Subject to the Test Well forfeiture provisions in Section
5. above, Assignor hereby assigns unto Assignee an undivided
eighty percent (80%) Before Casing Point and sixty-four percent
(64%) After Casing Point interest in, to and under the Farmout
Agreement.   To maximum extent permissible under any applicable
license agreements, Assignor further assigns, and agrees to
deliver and/or make available to Assignee, at Assignee's
request, all geologic and seismic data relating to or acquired
in connection with the prospect, and interpretations of such
data, including, without limitation, Northwind Exploration Co.
Line No. 42-247-AR2.   Provided Assignee has made timely payment
of all sums due hereunder, and Operator has timely commenced the
drilling and subsequently drilled the Test Well to Total Depth,
and has completed such well as a well capable of producing oil
and gas in paying quantities, BP shall execute and deliver to
Assignee an Assignment, in recordable form, of an undivided
sixty-four percent (64%) interest in the Lease covering the
Farmout Lands, or a portion thereof, in accordance with the
terms of the Farmout Agreement.

7.

### Operating Agreement

All operations on the Farmout Lands and the AMI shall be
conducted in accordance with the terms of this Agreement, the
Farmout Agreement, and the Operating Agreement ("Operating
Agreement") attached hereto as Exhibit "D" and incorporated
herein for all purposes.   Sklar Exploration Company L.L.C.
("Operator") is hereby designated the Operator under that
Operating Agreement subject to the change of operator provisions
of the Operating Agreement.   In the event of a conflict between
the terms of this Agreement and the Operating Agreement, the
terms of this Agreement shall prevail and control.   The Operator
joins in the execution of this Agreement relative to the
covenants of Operator made in this Agreement.

Sklarco L.L.C.
May 14, 2002
Page 8

8.

## Well Information

Both Assignor and Assignee and their respective representatives shall have access at its own risk and at all times to the location and derrick floor during the drilling of any well hereunder. Both Assignor and Assignee shall further be entitled to all information concerning any well drilled hereunder, the Farmout Agreement, and the Lease unless any such party is delinquent in the payment of its joint interest billings to Operator for a period greater than sixty (60) days in which event Operator at its sole option may withhold any information to such delinquent party. Notwithstanding the foregoing, any party that elects not to participate in an operation shall have no right in perpetuity to any information relating to the well on which the operation is performed in the event that party is a Non-Consenting Party on the Test Well under Section 5. above, or, in all other events, for so long as the party is subject to the non-consent provisions of the Operating Agreement.

9.

## Area of Mutual Interest

The parties hereto hereby establish an Area of Mutual Interest ("AMI") which covers and includes all lands included within (i) one-half (1/2) mile outside the perimeter of the lands covered by the Lease and set forth by the heavy black outline on the plat attached hereto as Exhibit "B" and (ii) all lands which lie within one-half (1/2) mile from the location of the Northwind Exploration Co. Seismic Line No. 42-247-AR2. In the event that any party hereto hereafter acquires an oil and gas leasehold interest, or contractual right to earn an oil and gas leasehold interest, covering lands lying in whole or in part within the AMI, the acquiring party shall, in writing, offer to assign, without warranty of title, to the non-acquiring parties, within fifteen (15) days of purchase or acquisition, the entire proportionate interest which the non-acquiring parties are ratably entitled to acquire in the AMI under this Agreement.

Sklarco L.L.C.
May 14, 2002
Page 9

Such notice shall include a copy of the lease or contract, paid draft and other pertinent and available data. Each non-acquiring party shall, within fifteen (15) days after receipt of such offer, elect whether to purchase such interest by paying the acquiring parties such non-acquiring party's proportionate part of the actual cost and expenses, if any, incurred by the acquiring party in acquiring such lease or contract. Failure by any non-acquiring party to timely notify the acquiring party shall be deemed an election by such non-acquiring party not to acquire its ratable interest in the leasehold interest offered. When any non-acquiring party elects not to acquire its ratable interest from the acquiring party, such non-acquiring party's interest in such lease or contract which is the subject of such offer shall be wholly owned by the acquiring party and shall not be subject to this Agreement. Any interest jointly owned by the parties in whole or in part within one-half (1/2) mile outside the perimeter of the lands covered by the Lease shall be subject to the terms of the Operating Agreement, including, without limitation, the nonconsent penalties set forth in Section 5. hereof. However, any interest jointly owned by the parties in whole or in part within one-half (1/2) mile from the location of the Northwind Exploration Co. Seismic Line No. 42-247-AR2 shall be subject to a separate operating agreement in the same form as the Operating Agreement attached hereto as Exhibit "D" but the nonconsent penalties shall be the same as set forth in Section 5. hereof. Unless otherwise mutually agreed, this AMI shall terminate the later of (i) six (6) months from the date of this Agreement or (ii) if the parties earn or purchase any leasehold interest in the AMI, six (6) months after the expiration of the last leasehold interest earned or purchased within the AMI, regardless of whether the lease out of which such leasehold interest is carved is held by production or is otherwise maintained as to third parties. After Assignee has drilled the Test Well to Total Depth, all interests under this paragraph shall be offered on an After Casing Point basis. The parties shall have no obligations to each other with regard to any leads or prospects lying outside of the AMI.

For greater certainty, if the interest covers lands lying partially inside and partially outside the boundaries of the AMI, or outside the Contract Area but inside the AMI, the acquiring party shall offer the entirety of such interest to the nonacquiring parties.

Sklarco L.L.C.
May 14, 2002
Page 10

If two (2) or more separate interests are included in the same notice, the nonacquiring parties shall have the separate right of election as to each separate interest.

The provisions of this AMI shall not apply to acquisitions as a result of merger, consolidation, reorganization or an acquisition from a parent, subsidiary, of affiliated corporation, or as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries. Neither shall it apply to sales and acquisitions between partners in a partnership or venturers in a joint venture, or to any acquisition by any party of an interest which interest prior to and at the time of such acquisition was subject to this Agreement, unless such acquisition was the renewal or extension of a lease which at the date of expiration was subject to this Agreement. As used herein a renewal or extension of any lease means any renewal lease, extension, top lease or new lease covering all or any portion of or any interest in the area covered by an expiring lease taken before, or taken or contracted for within one (1) year after the expiration of the predecessor lease.

10.

## Miscellaneous

A.   Paragraph Headings.

The paragraph headings inserted in this Agreement are utilized solely for reference purposes and do not constitute substantive matter to be considered in construing the terms of this Agreement.

B.   Time is of the Essence.

It is specifically understood and agreed that time is of the essence hereunder.

Sklarco L.L.C.
May 14, 2002
Page 11


C.   Liability.

It is not the purpose of this Agreement to create a
partnership, mining partnership, partnership for a specific
purpose, joint venture, or any other relationship which would
render the parties liable as partners, associates, or joint
venturers, or otherwise give rise to any duties or obligations
not expressly provided for herein.

D.   Entire Agreement.

This Agreement, including exhibits attached hereto, shall
constitute the entire Agreement between the parties hereto and
supersedes any prior agreements, promises, negotiations or
representations, whether written or oral, not expressly set
forth in this Agreement.   No variations, modifications, or
changes herein or hereof shall be effective unless evidenced by
written document executed by the parties hereto.

E.   Counterparts.

This Agreement may be executed in any number of
counterparts and each counterpart so executed shall be deemed an
original for all purposes and shall be binding upon each party
executing same whether or not executed by all parties.

F.   Governing Law.

This Agreement shall be governed by the laws of the State
of Texas.

G.   Binding Agreement.

The terms, covenants and conditions of this Agreement shall
be binding upon, and shall inure to the benefit of, the parties
hereto and to their respective heirs, executors, administrators,
successors and assigns, and such terms, covenants and conditions
shall be deemed as covenants running with the lands and Lease
covered hereby.   It is stipulated, however, that no assignment
or transfer by or, however accomplished, of any right, title or
interest acquired hereunder shall relieve such party of any
liability or obligation herein assumed, except with written
consent of the other party.

Sklarco L.L.C.
May 14, 2002
Page 12

H.    Acceptance.

If the foregoing fully sets forth your understanding of our agreement, please so indicate by execution in the space provided below and return one (1) fully executed original hereof.

Very truly yours,

SKYLINE ENERGY, L.L.C.

By: _____
Donnie Jones, President

AGREED TO AND ACCEPTED THIS
23rd DAY OF MAY, 2002

SKLARCO, L.L.C.

By: _____
David A. Barlow
Chief Operating Officer

AGREED TO AND ACCEPTED THIS
23rd DAY OF MAY, 2002

SKLAR EXPLORATION COMPANY L.L.C.

By: _____
David A. Barlow
Chief Operating Officer

EXHIBIT "A"
ATTACHED TO AND MADE A PART OF THAT CERTAIN
PARTICIPATION AGREEMENT DATED MAY 14, 2002
BY AND BETWEEN SKYLINE ENERGY, L.L.C. AND
SKLARCO L.L.C.

## THE LEASE

Oil, Gas and Mineral Lease dated February 24, 1956, by and between J. C. Martin, et al, as Trustees under that certain Trust Deed dated July 22, 1939, as Lessor, and W. L. Scheig, as Lessee, covering 7,648.13 acres, more or less, and recorded in Volume 245, Page 489, Deed Records, Webb County, Texas, INSOFAR AND ONLY INSOFAR as the Lease covers all of Lot 59 and the North 1/4 of Lot 62 of the George M. Brown Subdivision of Alberca De Arriba Grant, A-1996, as to lands included in the Bruni Gas Unit No. 1 per that certain Declaration of Unit effective 3-1-66, and being the same lands described in that certain Farmout Agreement dated February 25, 2002, as amended April 29, 2002, by and between BP America Production Company, as Farmor, and Skyline Energy, L.L.C., as Farmee.

EXHIBIT "B"
ATTACHED TO AND MADE A PART OF THAT CERTAIN
PARTICIPATION AGREEMENT DATED MAY 14, 2002
BY AND BETWEEN SKYLINE ENERGY, L.L.C. AND
SKLARCO L.L.C.



EXHIBIT "C"
ATTACHED TO AND MADE A PART OF THAT CERTAIN
PARTICIPATION AGREEMENT DATED MAY 14, 2002
BY AND BETWEEN SKYLINE ENERGY, L.L.C. AND
SKLARCO L.L.C.

## SKLAR Exploration Company L.L.C.

401 Edwards St.  Suite 1601

Shreveport, LA  71101

(318) 227-8668

**AUTHORITY FOR EXPENDITURE**

| DATE: | April 17, 2002 | FIELD: | |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Texas |
| WELL: | N. E. Thompsonville Prospect | HORIZON: | Queen City Sand |
| LOCATION: | Webb County | PROJ. T.D.: | 7,000' |

| PROPOSAL: | This is a preliminary AFE for the drilling of the N. E. Thompsonville Prospect (Queen City Sand). | | |
|---|---|---|---|
| | This AFE is thru setting production casing only and assumes it's an oil well. | | |
| | | Date last revised: | 6-May-02 |

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | TOTAL LEASEHOLD COSTS | $0 | $0 | $0 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 7,000 | | 7,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 5,000 | | 5,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 15,000 | | 15,000 |
| 04 | SURFACE DAMAGES & ROW | 5,000 | | 5,000 |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE | | | |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | 107,000 | | 107,000 |
| 10 | DAYWORK WITH DRILL PIPE (2 days @ $6,600/D) | 13,200 | | 13,200 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION: | 6,000 | 1,200 | 7,200 |
| 14 | RIG INSTRUMENTATION  & MONITORING | | | |

| | | | | |
|---|---|---|---|---|
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | | | |
| 17 | MUD & CHEMICALS | | | |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | | | |
| 24 | CEMENTING & EQUIPMENT | | 15,000 | 15,000 |
| 25 | CASING CREW & LAYDOWN MACHINE: | | 7,000 | 7,000 |
| 26 | PIPE TESTING | | 1,500 | 1,500 |
| 27 | EQUIPMENT RENTALS | 2,500 | 2,500 | 5,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS: | 2,000 | 500 | 2,500 |
| 30 | WATER | 2,000 | 500 | 2,500 |
| 31 | FUEL | | | |
| 32 | BITS | | | |
| 33 | TRANSPORTATION & TRUCKING | 2,500 | 2,500 | 5,000 |
| 34 | CONTRACT LABOR | | | |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 10,000 | 15,000 | 25,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | | |
| 47 | PERFORATION SERVICES | | | |
| 48 | COMPLETION FLUIDS | | | |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | 1,000 | 500 | 1,500 |
| 61 | SALT WATER DISPOSAL | | | |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | | |
| 65 | PLUG & ABANDON COSTS | 15,000 | -15,000 | |
| 78 | INSURANCE | | | |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 6,000 | | 6,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 5,000 | 2,000 | 6,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $204,000 | $33,000 | $236,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 01 | CONDUCTOR CASING | | | |
| 02 | SURFACE CASING | | | |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $0 | $0 | $0 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS | | 38,500 | 38,500 |
| 22 | TUBING | | | |
| 23 | PACKERS | | | |

| | | | | |
|---|---|---|---|---|
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 25 | WELLHEAD EQUIPMENT | | 5,000 | 5,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $43,500 | $43,500 |
| | | | | |
| 9540 | SURFACE PRODUCTION EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | | |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | | |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | | |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | | |
| 46 | SALES METERING EQUIPMENT | | | |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $0 | $0 |
| | | | | |
| | TOTAL EQUIPMENT | $0 | $43,500 | $43,500 |
| | | | | |
| | TOTAL WELL COST | $204,000 | $77,000 | $280,000 |

APPROVED: _____, 2002

BY _____

MWW

| | | | | |
|---|---|---|---|---|
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 25 | WELLHEAD EQUIPMENT | | 5,000 | 5,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $43,500 | $43,500 |
| | | | | |
| 9540 | SURFACE PRODUCTION EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | | |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | | |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | | |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | | |
| 46 | SALES METERING EQUIPMENT | | | |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $0 | $0 |
| | | | | |
| | TOTAL EQUIPMENT | $0 | $43,500 | $43,500 |
| | | | | |
| | TOTAL WELL COST | $204,000 | $77,000 | $280,000 |

APPROVED: _May   23_____, 2002

BY: _David H. Gailen, as COO of SKLARCO L.L.C._

MWW

**EXHIBIT "D"**

**This Exhibit "D" is attached to and made a part of that Participation Agreement dated May 14, 2002, by and between Sklarco L.L.C. and Skyline Energy, L.L.C., covering lands located in Webb County, Texas.**

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

## N E THOMPSONVILLE PROSPECT

OPERATING AGREEMENT

DATED

_____May 14_____ , __2002___ ,
                              Year

OPERATOR   **SKLAR EXPLORATION COMPANY, L.LC.**

    **401 Edwards Street, Suite 1601**

    **Shreveport, LA 71101**

CONTRACT AREA   **As shown on Exhibit "A" to this Agreement.**

COUNTY ~~OR PARISH~~ OF  **Webb**                    STATE OF   **Texas**

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS. 76137-2791, APPROVED
FORM. A.A.P.L. NO. 610 – 1982 REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 19__

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| |    1. Failure of Title | 3 |
| |    2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| |    3. All Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| |    1. Resignation or Removal of Operator | 4 |
| |    2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| |    1. Proposed Operations | 5 |
| |    2. Operations by Less than All Parties | 5-6-7 |
| |    3. Stand-By Time | 7 |
| |    4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| |    1. Abandonment of Dry Holes | 8 |
| |    2. Abandonment of Wells that have Produced | 8-9 |
| |    3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| |    1. Drill or Deepen | 9-10 |
| |    2. Rework or Plug Back | 10 |
| |    3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

# OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ____SKLAR EXPLORATION COMPANY L.L.C.____
____401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101_____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay **for 100% of** / its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate **for 100% of its share of** in-/a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

## ARTICLE II.
## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑ A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.
☑ B. Exhibit "B", Form of Lease.
☑ C. Exhibit "C", Accounting Procedure.
☑ D. Exhibit "D", Insurance.
☑ E. Exhibit "E", Gas Balancing Agreement.
☐ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit "G", Tax Partnership.

If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE III.**
**INTERESTS OF PARTIES**

**A.   Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

**B.   Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred  in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A".  In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____all jointly owned lease burdens_____ which shall be borne as hereinafter set forth.

Each of the Parties hereto shall pay or deliver or cause to be paid or delivered its proportionate part of the royalties and overriding royalties and other leasehold burdens as described in the attached Exhibit "A" and shall hold the other Parties free from any liability therefor.  If the interest of any Party in any oil and gas lease covered by this agreement is subject to any additional royalty, overriding royalty, production payment or other charges over and above those as shown on Exhibit "A", such Party shall assume and alone bear all such obligations and they shall account for or cause to be accounted for such interests to the owners thereof.  ~~Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor.~~  No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C.   Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production which is not a joint obligation of the parties ~~in excess of the amount stipulated in Article III.B.~~, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D.   Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.   If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.   If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

**ARTICLE IV.**
**TITLES**

**A.   Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be includ- ed, in the drilling unit around such well.  The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases.  At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drilling, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge.  All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator.  Operator shall cause title to be examined by attorneys on its staff or by outside attorneys.  Copies of all title opinions shall be furnished to each party hereto.  The cost incurred by Operator in this title program shall be borne as follows:

☐   ~~Option No. 1:  Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.~~

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE IV
### continued

           *            **

1 ☑   Option No. 2:  Costs incurred by Operator in procuring abstracts / and fees paid outside attorneys / for title examination
2 (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) / shall be borne by the Drilling Parties
3 in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4 hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5 functions.
6
               **Operator shall use its best efforts to secure**
7 ~~Each party shall be responsible for securing~~ / curative matter and pooling amendments or agreements required in connection
        **subject to this agreement, and charge these fees to the joint account**
8 with leases or oil and gas interests ~~contributed by such party~~/ Operator shall be responsible for the preparation and recording of pooling
9 designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10 This shall not prevent any party from appearing on its own behalf at any such hearing.
11
12     No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
                                                **Operator.**
13 provided, and (2) the title has been approved by the examining attorney or title has been accepted by / ~~all of the parties who are to par-~~
14 ~~ticipate in the drilling of the well.~~
15
16 **B.  Loss of Title:**
17
18 ~~1.  Failure of Title:  Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a~~
19 ~~reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days~~
20 ~~from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-~~
21 ~~tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil~~
22 ~~and gas leases and interests; and,~~
23 ~~(a)  The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be~~
24 ~~entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,~~
25 ~~but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~
26 ~~(b)  There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has~~
27 ~~been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-~~
28 ~~curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract~~
29 ~~Area by the amount of the interest lost;~~
30 ~~(c)  If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is~~
31 ~~increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-~~
32 ~~terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such~~
33 ~~well;~~
34 ~~(d)  Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has~~
35 ~~failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties~~
36 ~~who bore the costs which are so refunded;~~
37 ~~(e)  Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be~~
38 ~~borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,~~
39 ~~(f)  No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest~~
40 ~~claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in~~
41 ~~connection therewith.~~
42
43 ~~2.  Loss by Non-Payment or Erroneous Payment of Amount Due:  If, through mistake or oversight, any rental, shut-in well~~
44 ~~payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,~~
45 ~~there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required~~
46 ~~payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,~~
47 ~~which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the~~
48 ~~date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in~~
49 ~~the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the~~
50 ~~required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to~~
51 ~~the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it~~
52 ~~shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled~~
53 ~~or wells previously abandoned) from so much of the following is as necessary to effect reimbursement:~~
54 ~~(a)  Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,~~
55 ~~up to the amount of unrecovered costs;~~
56 ~~(b)  Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of~~
57 ~~oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease~~
58 ~~termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said~~
59 ~~portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,~~
60 ~~(c)  Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest~~
61 ~~lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~
62
63     3.  ~~Other~~ Losses:  All losses incurred, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses
64 and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
65 the Contract Area.
    **curative matters and material
66 **landmen and consultants       ***and for applications and hearings
67
68
69
70

              - 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE V.**

**OPERATOR**

**A.   Designation and Responsibilities of Operator:**

_____SKLAR EXPLORATION COMPANY, L.L.C. of Shreveport, Louisiana_____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

**B.   Resignation or Removal of Operator and Selection of Successor:**

1.   Resignation or Removal of Operator:   Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, / or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator. * this condition shall not apply to Sklar Exploration Company, L.L.C. or any other designated operator who owns no interest in the Contract Area by virtue of the fact that it is solely an operating company.

2.   Selection of Successor Operator:   Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

**C.   Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

**D.   Drilling Contracts:**

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. /  **  If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. **except that in Operator's sole discretion all factors, such as rig availability, equipment condition, contractor employee reliability and knowledge, and drilling contractor reputation shall be taken into consideration in determining the real competitive price such that the lowest price bid may not provide the overall best value in the Drilling Parties to accomplish the drilling operations.

**ARTICLE VI.**

**DRILLING AND DEVELOPMENT**

**A.   Initial Well:**

The Initial Well is the Test Well referred to in Section 2 of the Participation Agreement to which this instrument is attached as Exhibit "D".

On or before the ___1st___ day of _____July_____ , (year) ___2002___ , Operator shall commence the drilling of a well for oil and gas at the following location: described in Section 2 of the Participation Agreement.

and shall thereafter continue the drilling of the well with due diligence to a **true vertical depth of 7000' beneath the surface of the earth or a depth to adequately test the Queen City formation, whichever is the lesser depth.**

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

**B.   Subsequent Operations:**

1.   Proposed Operations:  Should any party hereto desire to drill any well / any well includes water source or injection wells on the Contract Area other than the well provided for in Article VI.A., or to rework, / reenter, recomplete, sidetrack deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation.  The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation.  If a drilling rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to / twenty-four (24) hours forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays.  Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.  Any notice or response given by telephone shall be promptly confirmed in writing.

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of / fifteen (15) thirty (30) days (or as promptly as possible after the expiration of the / twenty-four (24) forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all parties hereto; provided, however, that commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance.  Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance with the provisions hereof as if no prior proposal had been made.

2.  Operations by Less than All Parties:  If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of the notice period of / fifteen (15) thirty (30) days (or as promptly as possible after the expiration of the / twenty-four (24) forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence.  Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work.  Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed.  Each Consenting Party, within / twenty-four (24) forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry / all of its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a).  In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of / twenty-four (24) forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays).  The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph.  Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.  If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense.  If any well drilled, reworked, / recompleted, sidetracked, deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, / deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other interests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(a) / 100%-of **500%** each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(b) ____**500**____ % of that portion of the costs and expenses of drilling, reworking, / **recompleting, sidetracking,** deepening, plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C., and ____**500**____ % of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-working / or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is **recompleting, sidetracking,** conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such reworking / or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well **recompleting, sidetracking,** and there shall be added to the sums to be recouped by the Consenting Parties- one-hundred percent (100%) of that portion of the costs of **five  500%** the reworking / or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If **recompleting, sidetracking,** such a reworking / or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.D.

**recompleting, sidetracking,** In the case of any reworking, / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon **recompleting, sidetracking,** abandonment of a well after such reworking, / plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each / **quarter** month-thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds **quarter** realized from the sale of the well's working interest production during the preceding-/ month. In determining the quantity of oil and gas produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining  thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, <ins>recompleting, sidetracking,</ins> deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

Notwithstanding the provisions of this Article VI.B.2., * it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply; <ins>provided that an exceptional well location that is approved by the Texas Railroad Commission shall be deemed to conform to the then-existing spacing pattern.</ins>
* <ins>and subject to the right of any party to non-consent the proposed operation</ins>

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, <ins>recompleting,</ins> deepening and plugging back of such initial well after if has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for production, ceases to produce in paying quantities.

3. Stand-By Time:  When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

4. Sidetracking:  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

(a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

(b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period shall be limited to / <ins>twenty-four (24)</ins> forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and receive up to eight (8) additional days after expiration of the <ins>twenty-four (24)</ins> forty-eight (48) hours within which to respond by paying for all stand-by time incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other instances the response period to a proposal for sidetracking shall be limited to / <ins>fifteen (15)</ins> thirty (30) days.

## C.  TAKING PRODUCTION IN KIND:

Each party shall / <ins>have the right to</ins> take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1   required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3     Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4   the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5   its share of all production.

6

7     In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8   the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it,
9   but not the obligation, to purchase such oil and gas or sell it to others / at any time and from time to time, for the account of the non-
10   taking party ~~at the best price obtainable in the area for such production~~. Any such purchase or sale by Operator shall be subject always to
11   the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas
12   not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil and gas shall be only for such
13   reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event
14   for a period in excess of one (1) year. Notwithstanding the foregoing, Operator shall not make a sale, including one into interstate com-
15   merce, of any other party's share of gas production without first giving such other party thirty (30) days notice of such intended sale.
    * on the same terms and basis as Operator is marketing Operator's and other Non-Operators' share of production
16

17   **D.**   **Access to Contract Area and Information:**

18
    **consenting**
19     Each / party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
20   and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
                **consenting**
21   and records relating thereto. Operator, upon request, shall furnish each of the other / parties with copies of all forms or reports filed with
22   governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
23   each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
24   gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
25   quests the Information.

26

27   **E.**   **Abandonment of Wells:**

28

29     1.   <u>Abandonment of Dry Holes:</u>   Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
30   drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
31   without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
            **twenty-four (24) hours**
32   within / ~~forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays)~~ after receipt of notice of the proposal to plug and abandon
33   such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
34   accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
35   such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
36   operations in search of oil and/or gas subject to the provisions of Article VI.B.

37

38     2.   <u>Abandonment of Wells that have Produced:</u>   Except for any well in which a Non-Consent operation has been conducted
39   hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
40   producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
41   be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
42   thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
43   those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
44   parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
45   Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign
46   the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
47   material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
48   terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
49   gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
50   tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
51   duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1   "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2 assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3 Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4 interests in the remaining portion of the Contract Area.
5
6     Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7 the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8 quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9 templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10 well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11 repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12 visions hereof.
13
14     3. <u>Abandonment of Non-Consent Operations:</u> The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15 Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16 permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17 of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18 VI.E.
19
20               **ARTICLE VII.**
21         **EXPENDITURES AND LIABILITY OF PARTIES**
22
23 **A.**   **Liability of Parties:**
24
25     The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26 shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27 among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28 shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.
29
30 **B.**   **Liens and Payment Defaults:**
31
32     Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33 of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34 at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the
35 state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
36 taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37 rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
38 of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39 the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
40 purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
41 and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.
42
43     If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
44 Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
45 the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, <s>to obtain</s> ~~be entitled to~~
46 ~~recover the amount it paid plus five hundred percent (500%) of the amount out of the proceeds from the sale of the defaulting~~
47 ~~party's share of oil and for gas, and , to secure payment thereof, be subrogated to the security rights described in the foregoing~~
48 ~~reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph. paragraph. Notwithstanding anything~~
contained to the contrary in this paragraph, all parties agree that this provision shall not apply to any operation requiring an AFE
unless Operator has advance billed all parties and such parties have paid their proportionate share of said costs in accordance with
other provisions of this agreement.
49 **C.**   **Payments and Accounting:**
50
51     Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
52 and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
53 tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
54 showing expenses incurred and charges and credits made and received.
55
56     Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
57 of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
58 month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
59 with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
60 on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
61 fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
62 due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
63 pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
64
65 **D.**   **Limitation of Expenditures:**
66
67     1. <u>Drill or Deepen:</u> Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
68 pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
### continued

1 ☑ *Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2 necessary tankage and/or surface facilities. *This Option No. 1 shall apply only to water source and/or water injection wells.
3
4 ☑ **Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5 authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6 to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have  ̶f̶o̶r̶t̶y̶-̶e̶i̶g̶h̶t̶ twenty-four (24)
7 (48) hours ̶(̶e̶x̶c̶l̶u̶s̶i̶v̶e̶ ̶o̶f̶ ̶S̶a̶t̶u̶r̶d̶a̶y̶,̶ ̶S̶u̶n̶d̶a̶y̶ ̶a̶n̶d̶ ̶l̶e̶g̶a̶l̶ ̶h̶o̶l̶i̶d̶a̶y̶s̶)̶ in which to elect to participate in the setting of casing and the completion at-
8 tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9 cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking," recompleting, sidetracking deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties. **This Option No. 2 shall cover all wells except those expressly covered by Option No. 1 above.
14
15    2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.
19
20    3. Other Operations:  *one or more Parties owning a majority interest  Without the consent of / all parties, Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of _____Twenty-five Thousand and No/100_____ Dollars ($____25,000.00____ )
22 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of _____Twenty-five Thousand and No/100_____
28 Dollars ($____25,000.00____ ) but less than the amount first set forth above in this paragraph.
29
30 E.   Rentals, Shut-in Well Payments and Minimum Royalties:
31
32    Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35 behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B./ 2.
39
40    Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well,  ̶a̶t̶ ̶l̶e̶a̶s̶t̶ ̶f̶i̶v̶e̶ ̶(̶5̶)̶ ̶d̶a̶y̶s̶ ̶(̶e̶x̶c̶l̶u̶d̶i̶n̶g̶ ̶S̶a̶t̶u̶r̶d̶a̶y̶,̶ ̶S̶u̶n̶d̶a̶y̶ ̶a̶n̶d̶ ̶l̶e̶g̶a̶l̶ ̶h̶o̶l̶i̶d̶a̶y̶s̶)̶,̶ or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46 F.   Taxes:
47
48    Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".
59
60    If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".
66
67    Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
68 to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.
69
70

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

G.   **Insurance:**

At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

## ARTICLE VIII.
## ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A.   **Surrender of Leases:**

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leased acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

B.   **Renewal or Extension of Leases:**

If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of oil and gas leases.

C.   **Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VIII
### continued

1   said Drilling Parties shared the cost of drilling the well.  Such acreage shall become a separate Contract Area and, to the extent possible, be
2   governed by provisions identical to this agreement.  Each party shall promptly notify all other parties of any acreage or cash contributions
3   it may obtain in support of any well or any other operation on the Contract Area.  The above provisions shall also be applicable to op-
4   tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

6       If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7   consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

9   **D.   Maintenance of Uniform Interests:**

11   ~~For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no~~
12  ~~party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,~~
13  ~~equipment and production unless such disposition covers either:~~

15  ~~1.  the entire interest of the party in all leases and equipment and production; or~~

17  ~~2.  an equal undivided interest in all leases and equipment and production in the Contract Area.~~

19       Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20  and shall be made without prejudice to the right of the other parties.  **Any added expenditures required as a result of a partial disposition, including marketing or metering of production, shall be borne solely by the party transferee.**

22       If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23  require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24  and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25  party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26  into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27  Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

29   **E.   Waiver of Rights to Partition:**

31       If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32  undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33  interest therein.

35   ~~F.   Preferential Right to Purchase:~~

37  ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38  ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39  ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40  ~~of the offer.  The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41  ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42  ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43  ~~ties.  However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44  ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45  ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~

47                                    **ARTICLE IX.**
48             **INTERNAL REVENUE CODE ELECTION**

50       This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51  for profit between or among the parties hereto.  Notwithstanding any provision herein that the rights and liabilities hereunder are several
52  and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53  purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54  from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1986, as per-
55  mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder.  Operator is authorized and directed to ex-
56  ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57  United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58  and the data required by Federal Regulations 1.761.  Should there be any requirement that each party hereby affected give further
59  evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60  Federal Internal Revenue Service or as may be necessary to evidence this election.  No such party shall give any notices or take any other
61  action inconsistent with the election made hereby.  If any present or future income tax laws of the state or states in which the Contract
62  Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63  Subtitle "A", of the Internal Revenue Code of 1986, under which an election similar to that provided by Section 761 of the Code is per-
64  mitted, each party hereby affected shall make such election as may be permitted or required by such laws.  In making the foregoing elec-
65  tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66  computation of partnership taxable income.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE X.
## CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____ Ten Thousand and No/100 _____ Dollars ($_____ 10,000.00 _____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder. **All claims or suits involving title to any interest subject to this Agreement shall be treated as a claim or suit against all parties hereto.**

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☑  Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☐  Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XIV.
COMPLIANCE WITH LAWS AND REGULATIONS

**A.   Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B.   Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____**Texas**_____ shall govern.

**C.   Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to ⁺any⁺ said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

ARTICLE XV.
OTHER PROVISIONS

**(See attached pages 14-1 through 14-5)**

## ARTICLE XV.

## OTHER PROVISIONS

### A. PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1)  an election to perform additional logging, coring or testing;

(2)  an election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;

(3)  an election to plug back and attempt to complete the well in a shallower depth or formation;

(4)  an election to deepen the well;

(5)  an election to sidetrack the well;

(6)  an election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;

(7)  an election to temporarily abandon the well;

(8)  an election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of a majority of the consenting parties in possessory, cost-bearing interest (and not in number), a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth. In such event, the operation, which, in the opinion of a majority of the consenting parties in possessory, cost bearing interest (and not in number) is less likely to jeopardize the well, will be given priority. Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail. It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests. For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

### B. HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

### C. DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties. If the parties are equally divided, the opinion of the Operator will prevail.

### D. ADVANCEMENT OF COSTS

Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s) in advance of its respective share of (i) the dry hole cost for the initial well to be drilled under Article VI A, (ii) the dry hole cost for any other well to be drilled hereunder to which such Non-Operator has consented, and (iii) the cost of any completion, reworking, recompletion, sidetracking, deepening or plugging back operation to which such Non-Operator has consented (any such operation under clause (i), (ii), or (iii) being herein called a "Drilling Operation"). Such request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Drilling Operation. The amount of each Non-Operator's advance payment shall be based upon the latest AFE for such operation. Such advanced payments shall be held by Operator for the account of the Non-Operators and applied, with interest, against the actual costs incurred in the applicable operation.

A Non-Operator receiving a request for advance payment shall, within two (2) days of the receipt of such request if and when a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to operator in cash the full amount of such request.  Operator shall credit the amount to the Non-Operator's account for the payment of such Non-Operator's share of costs of such Drilling operation, and following the end of each month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement.  Advance payment by a Non-Operator of his share of completed well costs shall in no event prevent such completion of a well pursuant to Option No. 2 of Article VII.D.1. and, in the event such a Non-Operator elects not to participate in completion, the sums that such Non-Operator has advanced shall not be charged with any share of the costs of any completion attempted.

In the event a Non-Operator from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by depositing cash as aforesaid, then Operator, at his option, shall make a second written request by certified mail, return receipt requested for such advance.  Non-Operator shall pay for said advance as aforesaid within two (2) business days from receipt of such second request.

If a Non-Operator fails to pay within two (2) business days of the receipt of such second request, then:

(1)  If the advance payment was requested for the drilling of the initial well under Article VI A Non-Operator may, at the sole discretion and timing election of the Operator, be deemed to have relinquished all of its leasehold and contractual rights in the Contract Area retroactive to the date of default in payment, and if assignment has been made to such Non-Operator, Non-Operator shall assign all of its rights in and to the Contract area, within thirty (30) days of a request for such assignment, to those parties who have participated in such Drilling Operation, in the proportion that such parties elected to share the relinquished interest.

(2)  If the advance payment was requested for any other Drilling Operation (including completion of the initial well), Non-Operator may, at the sole discretion and timing election of the Operator, be deemed non-consent in said operation retroactive to the beginning of such operation and thereafter subject to the penalty provisions of Article VI.B.2 hereof.

If the Non-Operator fails to make such payment or furnish such security within two (2) business days of the receipt of such second request, Operator shall promptly notify all other parties still participating in such Drilling Operation of the default in payment and if and when applicable, of the relinquishment of an interest under this provision.  The parties who wish to participate in the Drilling Operation shall have five (5) days from receipt of the applicable notice to elect to assume the costs chargeable to such relinquished interest and shall share such relinquished interest in proportion to their assumption of such relinquished interest.  If the parties who wish to participate in the Drilling Operation are unwilling to assume the costs chargeable to such relinquished interest, the Drilling Operation shall be cancelled, and if the cancelled Drilling Operation involves the drilling of a test well under Article VI A no assignment shall be due as a consequence of the failure to pay.

Notwithstanding anything to the contrary herein, if the applicable drill well or operation is unsuccessful or results in a dry hole, Operator shall have the right to sue a Non-Operator who failed to pay for its proportionate share of expenses in lieu of Operator's right to an assignment of all Non-Operator's leasehold and contractual rights within the Contract Area, or in lieu of deeming the Non-Operator Non-Consent.

### E.  NECESSARY EXPENDITURES EXCLUDE SIDETRACKING

The phrase "necessary expenditures" in Article VII.D.1. (Option No. 2) on page 10 shall not be deemed to include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

### F.  ADDITIONAL CHARGES

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Unit Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same:

Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and expenses in connection with preparation and presentation of evidence and exhibits of Texas Railroad Commission hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

### G.  INDEMNITY

Except for liabilities resulting from the gross negligence or willful misconduct of the Operator, each Non-Operator shall defend, indemnify and hold Operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operator's officers, employees and/or agents, resulting from or in any way relating to such officers, employees, and/or agents presence on a drilling rig on the Contract Area or from such person

other person whose presence on the rig or transportation to or from such rig is at the request of the indemnifying Non-Operator (except for liabilities resulting from the gross negligence or willful misconduct of the Operator).

## H. RECOUPMENT

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

## I. SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

## J. NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

## K. PIPELINE AND/OR GATHERING LINE CONSTRUCTION

If any party to this Agreement elects either to construct, operate or purchase or to join in the construction, operation or purchase of a pipeline, and/or gathering line to transport production from the Contract Area, then such party shall notify the other parties hereto furnishing all pertinent cost and information. Each party receiving such notice shall have thirty (30) days to exercise their right in writing to participate in the construction, operation and ownership of such pipeline and/or gathering line, including the right of transporting production from the Contract Area, by agreeing to bear their proportionate share of the cost of such operation and thereafter entering into a mutually acceptable operating agreement for the operation thereof. Otherwise, the parties consenting to participate in such operation shall be entitled to establish the terms and conditions (including any costs and fees for use or reservation of the applicable facilities) under which the non-consenting parties may use or have access to the applicable facilities. Absent a mutually agreeable agreement for the use of said facilities by and between the consenting and non-consenting parties, the non-consenting parties shall be obligated to separately dispose of their share of all production.

## L. DISBURSEMENT OF ROYALTIES

If Operator prepares and administers a division order for and receives and distributes the proceeds of production attributable to the interest of a Non-Operator, then Operator shall be entitled to charge that party for an appropriate monthly overhead charge for disbursing such royalty payments, in addition to the combined fixed rates specified in Exhibit "C" hereto. If through error or inadvertence Operator shall fail to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, he shall not be liable in damages to the other Parties hereto for such failure, unless arising out of the gross negligence or willful misconduct of the Operator.

## M. INFORMATION

Anything to the contrary hereinabove notwithstanding, it is stipulated that any non-consenting party to an operation conducted hereunder shall have no right to observe such operation or have access to information pertaining to such operation, until such time as the non-consenting party's share of the cost of such operation and the penalty therefor has been recovered by the consenting parties as provided herein. It is understood that this Section O of Art. XV does not apply when the in the situation where the non-consenting party is a Farmor under this Agreement.

## N. OPERATOR'S LIEN – SECURITY INTEREST

Subject to the provision of Article VII. B. of this Agreement, each non-Operator grants to Operator a lien upon all of the rights, titles, and interests of each Non-Operator, whether now existing or hereafter acquired, in and to the (1) the oil, gas, or other minerals in, on, and under the Contract Area and (2) any oil, gas, and mineral leases covering the Contract Area or any portion thereof. In addition, each Non-Operator grants to Operator a security interest in and to all of such Non-Operator's rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (1) all oil, gas and other minerals produced from the Contract Area when produced; (2) all accounts receivable accruing or arising as a result of the sale of such oil, gas and other minerals; (3) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (4) all oil and gas wells and other surface and sub-surface equipment and facilities of any kind or character located on the Contract Area and

and other surface and sub-surface equipment and facilities of any kind or character located on the Contract Area and the cash or other proceeds received from the sale thereof (collectively, the "Personal Property Collateral"). Some of the Personal Property Collateral is or will become fixtures on the Contract Area, and the interest of Non-Operator in and to the oil, gas and other minerals when extracted from the Contract Area and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area. This Agreement (including a carbon, photographic, or other reproduction hereof) shall constitute a non-standard form financing statement under the terms of the Uniform Commercial Code of the State in which the Contract Area is located, and as such, may be filed for record in the real estate records of the county in which the Contract Area is located. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense, if any.

## O. **MARKETING OF PRODUCTION**

Operator agrees to market all Non-Operator's share of any production from the Contract Area under the same terms that Operator is marketing its share of said production; provided, however, that contracts entered into by Operator in marketing Non-Operator's share of production shall be subject to the limitations set forth in Article VI. C. hereof. Further, Non-Operator shall be given the continuing right to participate as a signatory to any contract entered into by Operator to market production hereunder. Notwithstanding the above, any Non-Operator may choose to separately market its proportionate share of said production by giving written notice to Operator by the 15th day of the month prior to the month in which said Non-Operator intends to separately market its production. Conversely, if said Non-Operator again requests that Operator market its production, Non-Operator must provide written request of same by the 15th day of the month prior to the month in which Operator is again to market said Non-Operator's production.

## P. **METERING OF PRODUCTION**

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

## Q. **PLUGGING AND LEASEHOLD RESTORATION FUND**

At any time any well subject to this agreement is, in Operator's sole opinion, approaching the end of its economic life and/or its useful purpose, Operator may pre-bill the joint account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location. Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and abandonment and restoration of the leasehold premises. In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any accrued interest on such difference, based upon the then working interest percentage of such owner. In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

## R. **SEPARATE AGREEMENT FOR NON-UNIFORM INTEREST**

Any leases or interests therein (and the land covered thereby) that, pursuant to the terms of this Agreement or otherwise, become owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such leases become so owned. Any leases or interests therein (and the lands covered thereby) that, pursuant to the terms of this Agreement or otherwise, become owned by more than one but less than all of the parties hereto or in which a party assigns, transfers or otherwise disposes of all or part of its interests shall remain subject to this Agreement as to the surviving parties; however, for all purposes, the terms of this Agreement shall apply separately to each such lease (or group of such leases in which the parties' ownership is uniform) as if it were a separate agreement covering such lease(s), with an Exhibit "A" modified to reflect the parties' interests therein, based upon the parties' ownership in such lease(s).

## S. **OBLIGATORY WELL**

Notwithstanding the provisions of this agreement and particularly Article VI, if any proposed operations are necessary to maintain a Lease covered by this agreement in force or an agreement to earn a lease(s) which would otherwise expire unless such operations are conducted, then in lieu of being penalized under Article VI.B.2., each Non-Consenting Party shall assign to Consenting Parties all of such Non-Consenting Party's right, title and interest in and to the Lease(s) or portion thereof or such agreement which would be lost or not earned if such operations were not conducted.

Such assignment shall be promptly due upon commencement of said proposed operations by Consenting Parties and shall be free and clear of all overriding royalties, production payments, mortgages, liens and other burdens and encumbrances placed thereon by the assigning party or resulting from its ownership or operation of such Lease or interest which is not a joint obligation of the parties, but otherwise without warranty of title either expressed or implied.

If the assignment is in favor of more than one party, the assigned interest shall be shared by the Consenting Parties in the proportions that the interest of each bears to the interest of all Consenting Parties unless otherwise agreed to in writing. Thereafter, such acreage covered by said assignment shall not be subject to the terms of this agreement, but

shall be deemed to be subject to an agreement identical to this changed only in Exhibit "A" to indicate the Consenting Parties and their percentages of interest. Operations that are necessary to either maintain a Lease covered by this agreement in force or to earn a lease or part thereof under an agreement which would otherwise expire unless operations are conducted, shall be defined as operations that are proposed within six (6) months of the date the Lease or agreement would otherwise expire.

## T. **PREVAILING AGREEMENT**

If there is a conflict between provisions of the Participation Agreement dated May 14, 2002, to which this Operating Agreement is attached as Exhibit "D", and this Operating Agreement, the provisions of the Participation Agreement shall prevail, and shall be binding upon all parties to this Operating Agreement.

## U. **DEFAULT PENALTY/AUTOMATIC NON-CONSENT**

If written notice has been given that the lien rights conferred in Article VII. B. have been implemented or enforced against any party hereto, for so long as the affected party remains in default, it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and shall not be entitled to vote its interest in any matter hereunder. As to any proposed operation in which it otherwise would have the right to participate, such party shall not have the right to elect to participate or be a Consenting Party unless and until it pays in full the amount it is in default plus all other outstanding amounts due hereunder. If an operation proposed during such default period commences before such payment in full, the party in default shall automatically be deemed a Non-Consenting Party to the operation.

## V. **PRIOR OPERATING AGREEMENT(S)**

This operating agreement, as to the parties executing same and as to the Contract Area and Depth Restrictions, shall supersede and replace any prior operating agreement(s) covering all or any portion of the Contract Area of this operating agreement.

## W. **NON-PARTICIPATING INTERESTS**

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto as same may be revised from time to time to reflect record title and/or reformation of the Contract Area.

## X. **EXECUTION**

This agreement shall be binding upon each Non-Operator that executes this agreement without regard to whether this same instrument, or any copy or counterpart hereof shall be executed by any other Non-Operator.

## Y. **MISCELLANEOUS**

Anything to the contrary herein notwithstanding, this Operating Agreement is expressly made subject to the terms and provisions of the leases and farmout agreements described in Exhibit "A" hereof.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE XVI.**

**MISCELLANEOUS**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____14th_____ day of _____May_____ , (year) __2002__ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____, have been made to the form.~~

O P E R A T O R

_____     SKLAR EXPLORATION COMPANY, L.L.C.
Witness
_____     By: David A. Barlow, Chief Operating Officer
Witness

N O N - O P E R A T O R S

_____     SKLARCO L.L.C.
Witness
_____     By: David A. Barlow, Chief Operating Officer
Witness

_____     SKYLINE ENERGY, L.L.C.
Witness
_____     By: Donnie Jones, Managing Member
Witness

_____     _____

- 15 -

**ACKNOWLEDGMENT**

STATE OF LOUISIANA

PARISH OF CADDO

On this 23ʳᵈ day of _____May_____, 2002, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for Sklar Exploration Company, L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_Kim S. Elias_
Notary Public in and for the Parish of Caddo
State of Louisiana     KIM S. ELIAS, Notary Public
Caddo Parish, Louisiana
My Commission is for Life

**ACKNOWLEDGMENT**

STATE OF LOUISIANA

PARISH OF CADDO

On this 23ʳᵈ day of _____May_____, 2002, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for Sklarco L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_Kim S. Elias_
Notary Public in and for the Parish of Caddo
State of Louisiana     KIM S. ELIAS, Notary Public
Caddo Parish, Louisiana
My Commission is for Life

**ACKNOWLEDGMENT**

STATE OF TEXAS

COUNTY OF _Harris_

On this 28ᵗʰ day of _____May_____, 2002, before me appeared Donnie Jones, to me known, who being by me duly sworn, did say that he is the Managing Member of Skyline Energy, L.L.C., a Texas limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal

_Kathleen Watts_
Notary Public in and for the State of Texas

KATHLEEN WATTS
Notary Public, State of Texas
My Commission Expires
November 14, 2004

EXHIBIT "A"

ATTACHED TO AND MADE A PART OF THAT CERTAIN OPERATING AGREEMENT DATED THE <u>14TH</u> DAY OF <u>MAY</u>, <u>2002</u>, BY AND BETWEEN SKLAR EXPLORATION COMPANY, L.L.C., AS OPERATOR AND SKLARCO., ET AL, AS NON-OPERATOR(S).

(1) <u>Identification of Lands Subject to this Agreement:</u>

### Contract Area

All of Lot 59 and the North ¼ of Lot 62 of the George M. Brown Subdivision of Alberca De Arriba Grant, A-1996, as to lands included in the Bruni Gas Unit No. 1 per that certain Declaration of Unit effective 3-1-66, herein after referred to as "Contract Acreage."

(2)   <u>Restrictions, if any, as to Depths, Formations, or Substances:</u>

There are no restrictions except as may be provided for in any lease or contract subject to this Operating Agreement.

(3)   <u>Decimal interest and names and addresses of Parties to this Agreement:</u>

| OWNERS | BEFORE CASING POINT | AFTER CASING POINT* |
|---|---|---|
| Sklarco, L.L.C. | .80 | .64 |
| Skyline Energy, L.L.C. | .20 | .36 |
| Total | 1.00 | 1.00 |

*"Casing Point" is defined in Section 4 of the Participation Agreement to which this Operating Agreement is attached as Exhibit "D."

(4)   <u>Oil and Gas Leases and/or oil and gas interests subject to this Agreement:</u>

(a) See Exhibit "A-1" Description of Leases.
(b) Subject to that unrecorded Letter Agreement dated February 25, 2002, as amended April 29, 2002, by and between BP America Production Company, and Skyline Energy, L.L.C.
(c) All leases and interests are subject to that certain Participation Agreement for the N E Thompsonville Prospect dated effective as of May 14, 2002, by and between Sklarco L.L.C. and Skyline Energy, L.L.C. to which this Operating Agreement is attached.

(5)    <u>Addresses of parties for notice purposes:</u>

Sklar Exploration Company, L.L.C.
Attention:  David A. Barlow
401 Edwards Street, Ste. 1601
Shreveport, LA  71101
Phone:  (318) 227-8668
Fax:  (318) 227-9012

Sklarco, L.L.C.
Attention:  David A. Barlow
401 Edwards Street, Ste. 1601
Shreveport, LA  71101
Phone:  (318) 227-8668
Fax:  (318) 227-9012

Skyline Energy, L.L.C.
Attn:  Donnie Jones
2301 Dublin Circle
Pearland, TX  77581
Phone:  (281) 481-0881
Fax:  (281) 481-5645

EXHIBIT "A-1"

ATTACHED TO AND MADE A PART OF THAT CERTAIN OPERATING AGREEMENT DATED THE 14TH DAY OF MAY, 2002, BY AND BETWEEN SKLAR EXPLORATION COMPANY, L.L.C., AS OPERATOR AND SKLARCO., ET AL, AS NON-OPERATOR(S).

THE LEASE

Oil, Gas and Mineral Lease dated February 24, 1956, by and between J. C. Martin, et al, as Trustees under that certain Trust Deed dated July 22, 1939, as Lessor, and W. L. Scheig, as Lessee, covering 7,648.13 acres, more or less, and recorded in Volume 245, Page 489, Deed Records, Webb County, Texas, INSOFAR AND ONLY INSOFAR as the Lease covers all of Lot 59 and the North ¼ of Lot 62 of the George M. Brown Subdivision of Alberca De Arriba Grant, A-1996, as to lands included in the Bruni Gas Unit No. 1 per that certain Declaration of Unit effective 3-1-66, and being the same lands described in that certain Farmout Agreement dated February 25, 2002, as amended April 29, 2002, by and between BP America Production Company, as Farmor, and Skyline Energy, L.L.C., as Farmee.

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

# EXHIBIT "C"

Attached to and made a part of __the Operating Agreement dated May 14, 2002 between Sklar Exploration Company__
__L.L.C. as Operator, and Sklarco, L.L.C. et al as Non-Operators, covering the N E Thompsonville Prospect located in__
__Webb County, Texas.__

# ACCOUNTING PROCEDURE

# JOINT OPERATIONS

### I. GENERAL PROVISIONS

**1.    Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

**2.    Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3.    Advances and Payments by Non-Operators**

A.    Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B.    Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at __Bank One, Shreveport, Louisiana__ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4.    Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.**

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

5.   **Audits**

A.   A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B.   The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6.   **Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II.  DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.   **Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2.   **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

3.   **Labor**

A.   (1)   Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2)   Salaries of First level Supervisors in the field.

(3)   Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4)   Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation or the Joint Property if such charges are excluded from the overhead rates.

B.   Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D.   Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4.   **Employee Benefits**

Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

5.  **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV.    Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations.  The accumulation of surplus stocks shall be avoided.

6.  **Transportation**

shall be charged at actual cost incurred by Operator.
Transportation of employees and Material necessary for the Joint Operations / but subject to the following limitations:

~~A.    If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.~~

~~B.    If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.~~

~~C.    In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.~~

7.  **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i. ii. and iii. of Section III.    The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates.  The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.  **Equipment and Facilities Furnished By Operator**

A.    Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed **fifteen** percent (_____15_____%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.    In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%.    For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9.  **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct.  Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.  **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, ~~except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.~~    and the costs and expenses incurred in connection with hearings and other matters before governmental bodies and agencies and costs and expenses incurred in examining and curing title.

11.  **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

COPAS 1984 · ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

12. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13. **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14. **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property.  In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

1. **Overhead - Drilling and Producing Operations**

   i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

   ( **x** ) Fixed Rate Basis, Paragraph IA, or
   (     ) Percentage Basis, Paragraph IB

   Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II.  The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

   (     ) shall be covered by the overhead rates, or
   ( **x** ) shall not be covered by the overhead rates.

   iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

   (     ) shall be covered by the overhead rates, or
   ( **x** ) shall not be covered by the overhead rates.

   A. Overhead - Fixed Rate Basis  **See ADDITIONAL REVISIONS page 9.**

   (1) Operator shall charge the Joint Account at the following rates per well per month:

   Drilling Well Rate $_____5,000.00_____
   {Prorated for less than a full month}

   Producing Well Rate $___600.00_____

   (2) Application of Overhead - Fixed Rate Basis shall be as follows:

   (a) Drilling Well Rate

   (1) Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

- 4 -

1  is later, except that no charge shall be made during suspension of drilling or completion operations
2  for fifteen (15) or more consecutive calendar days.

4      (2)  Charges for wells undergoing any type of workover or recompletion for a period of five (5)
5          consecutive work days or more shall be made at the drilling well rate. Such charges shall be
6          applied for the period from date workover operations, with rig or other units used in workover,
7          commence through date of rig or other unit release, except that no charge shall be made during
8          suspension of operations for fifteen (15) or more consecutive calendar days.

10     (b)  Producing Well Rates

12      (1)  An active well either produced or injected into for any portion of the month shall be considered as
13          a one-well charge for the entire month.

15      (2)  Each active completion in a multi-completed well in which production is not commingled down
16          hole shall be considered as a one-well charge providing each completion is considered a separate
17          well by the governing regulatory authority.

19      (3)  An inactive gas well shut in because of overproduction or failure of purchaser to take the
20          production shall be considered as a one-well charge providing the gas well is directly connected to
21          a permanent sales outlet.

23      (4)  A one-well charge shall be made for the month in which plugging and abandonment operations
24          are completed on any well. This one-well charge shall be made whether or not the well has
25          produced except when drilling well rate applies.

27      (5)  All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease
28          allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

30    (3)  The well rates shall be adjusted as of the first day of April each year following the effective date of the
31        agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying
32        the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude
33        Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as
34        shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published
35        by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as
36        published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or
37        minus the computed adjustment.

39  B.   ~~Overhead - Percentage Basis~~

41    ~~(1)   Operator shall charge the Joint Account at the following rates:~~

43      ~~(a)   Development~~

45        ~~_____ Percent (_____%) of the cost of development of the Joint Property exclusive of costs~~
46        ~~provided under Paragraph 10 of Section II and all salvage credits.~~

48      ~~(b)   Operating~~

50        ~~_____ Percent (_____%) of the cost of operating the Joint Property exclusive of costs provided~~
51        ~~under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased~~
52        ~~for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the~~
53        ~~mineral interest in and to the Joint Property.~~

55    ~~(2)   Application of Overhead - Percentage Basis shall be as follows:~~

57      ~~For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III,~~
58      ~~development shall include all costs in connection with drilling, redrilling, deepening, or any remedial~~
59      ~~operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing~~
60      ~~interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and~~
61      ~~expenditures incurred in abandoning when the well is not completed as a producer, and original cost of~~
62      ~~construction or installation of fixed assets, the expansion of fixed assets and any other project clearly~~
63      ~~discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other~~
64      ~~costs shall be considered as operating.~~

66  **2.   Overhead - Major Construction**

68    To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of
69    fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the
70    Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

- 5 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

Account for overhead based on the following rates for any Major Construction project in excess of $__25,000.00_____:

A. ____5____ % of first $100,000 or total cost if less, plus

B. ____4____ % of costs in excess of $100,000 but less than $1,000,000, plus

C. ____3____ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3. **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. ____5____ % of total costs through $100,000; plus

B. ____4____ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. ____3____ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4. **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV.    PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A. New Material (Condition A)

   (1) Tubular Goods Other than Line Pipe

       (a) Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at *cost.* / ~~Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.~~

       (b) For grades which are special to one mill only, prices shall be computed at *cost.* / ~~the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000~~

COPAS  1984  ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

(c) Special end finish tubular goods shall be priced at / ~~the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, plus Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.~~ **cost.**

(d) Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at / ~~the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.~~ **cost.**

(2) Line Pipe

(a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced at / ~~under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.~~ **cost.**

(b) Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at / ~~Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.~~ **cost.**

(c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced / ~~f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.~~ **at cost.**

(d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at / ~~quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.~~ **cost.**

(3) Other Material shall be priced at / ~~the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.~~ **cost.**

(4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at / ~~the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.~~ Unused new tubulars will be priced as provided above in Paragraph 2.A.(l) and (2). **cost.**

B.   Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

At ~~seventy-five percent (75%) of~~ current / ~~new price, as determined by Paragraph A.~~ **market value.**

(2) Material used on and moved from the Joint Property

(a) At ~~seventy-five percent (75%) of~~ current / ~~new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or~~ **market value.**

(b) At ~~sixty-five percent (65%) of~~ current / ~~new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material~~ **market value.**

(3) Material not used on and moved from the Joint Property

At ~~seventy-five percent (75%) of~~ current / ~~new price as determined by Paragraph A.~~ **market value.**

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C.   Other Used Material

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at / ~~fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.~~ **current market value.**

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

       (2)  Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

       (a)  Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

       (b)  Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

       (3)  Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

### D.  Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

### E.  Pricing Conditions

       (1)  Loading or unloading costs may be charged to the Joint Account at / **actual costs incurred by Operator** ~~the rate of twenty-five cents (25¢) per hundred weight~~ on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph I.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

       (2)  Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

### 3.  Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator. **provided however, if a Non-Operator elects to furnish material in kind, such material must (a) meet the quality specifications set by Operator, and (b) be inspected by Operator with inspection costs to be billed to the Joint Account.**

### 4.  Warranty of Material Furnished By Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

### 1.  Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

### 2.  Reconciliation and Adjustment of Inventories

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.   **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.   In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.   **Expense of Conducting Inventories**

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

**ADDITIIONAL REVISIONS**
(1)   **In the event the subject well is expected to be above the State threshold for H2S sour gas operations, the Drilling Well rate set forth in Art. III.1.A(1) will be increased by $2000.00 per month and the associated Producing Well Overhead Rate will be increased an additional $100.00 per month.**

# EXHIBIT "D"

This Exhibit "D" is attached to and made a part of that Operating Agreement dated the 14th day of May, 2002, by and between Sklar Exploration Company L.L.C, as Operator, and Sklarco, L.L.C., et al, as Non-Operators.

# INSURANCE

Operator shall carry the following insurance with the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of insurance will be provided upon request.

I.     WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

       A.     Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

       B.     Extension of Coverage B of policy to provide for not less than $500,000 for death or injury to one person in any one accident.

II     COMPREHENSIVE GENERAL LIABILITY

       Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $2,000,000 for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III     AUTOMOBILE LIABILITY

       Coverage shall include owned, non-owned and hired vehicles. Limit $500,000 combined single limit each occurrence for bodily injury and property damage.

IV     EXCESS LIABILITY

       Operator shall carry excess liability insurance in an amount necessary to provide a total of $10,000,000 coverage for both Automobile Liability and Comprehensive General Liability.

       Any party, at its own expense, may carry its own coverage for Excess Liability Insurance with limits as set forth in this Section IV. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

V.     EXTRA EXPENSE LIABILITY

       Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $25,000 per occurrence.

Liability Limit: $5,000,000

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder.

# EXHIBIT "E"

This Exhibit "E" is attached to and made a part of that Operating Agreement dated the 14<u>th</u> day of <u>May,</u>
<u>2002,</u> by and between Sklar Exploration Company L.L.C. as Operator, and Sklarco, L.L.C. et al, as Non-
Operators.

## GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement, the parties hereto own
and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area
described in the Operating Agreement (the "JOA").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share
of the gas produced from said JOA. However, one or more of the parties may be unable to take or market
its interest in the gas production from time to time; therefore, to permit any party to produce and dispose of
its interest in the gas production from the JOA with as much flexibility as possible, the parties hereto agree
to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the
period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party
elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said
share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof,
said pro rata share being based on the ratio of its participation percentage under this Operating Agreement
to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate
recovered at the surface in accordance with their respective interest, but each party taking such gas shall own
all of the gas delivered to its purchaser. Any party whose share of gas is not marketed shall be credited with
gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented
or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish
all parties hereto monthly statements showing the total quantity of gas produced, used in lease operations,
vented or lost, and the total quantity of condensate recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In
addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall
be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share
of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share
of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being
based on the ration of its participation percentage under this Operating Agreement to the participating
percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and
deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, it any,
assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall
furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding
month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of
the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties
which are payable on gas produced by any such party, and Operator will, in turn, make settlement for all
royalties and overriding royalties which are payable on gas produced from the Contract Area. In the event
that the total royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty
and overriding royalty obligations on gas produced and marketed from the Contract Area, then any such
deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to
which the deficiency was asserted. Any party or parties contributing separate leases to the Contract Area
shall furnish the Operator with division order title opinions on which Operator shall be entitled to rely in
making distribution of royalties and overriding royalties share of production of liquid hydrocarbons
recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production
taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser shall pay, or

1

cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the volume of gas actually taken for its account.

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold or took but did not sell, less applicable production taxes and royalties theretofore paid, less any reasonable compression treating, gathering or transportation costs actually incurred and paid to third party, unaffected entitles and otherwise directly in connection with the sale of the overproduction, at the price received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party. Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.