```
RECEIVED
 APR 1 8 1997
BY:_____
```

# OPERATING AGREEMENT

*Dated April 17, 1997*

*between*

## STROUD & LUKE PRODUCTION COMPANY

and

## ROBERT A STROUD LLC

*covering*

Sections 19-22, 25-29 and 36-41, Township 17 North, Range 4 East

*and*

Sections 2-7, Township 16 North, Range 4 East,

Warren County, Mississippi

ARTICLE I: DEFINITIONS ........................................................................................................................1

ARTICLE II: EXHIBITS ...........................................................................................................................1

ARTICLE III: INTERESTS OF PARTIES .................................................................................................1

    A.   Oil and Gas Interests ........................................................................................................1
    B.   Interests of Parties in Costs and Production..................................................................1
    C.   Excess Royalties, Overriding Royalties and Other Payments ....................................2
    D.   Subsequently Created Interests ......................................................................................2

ARTICLE IV: TITLES ..............................................................................................................................2

    A.   Title Examination ............................................................................................................2
    B.   Loss of Title ......................................................................................................................2

ARTICLE V: OPERATOR..........................................................................................................................3

    A.   Designation and Responsibilities of Operator...............................................................3
    B.   Resignation or Removal of Operator and Selection of Successor.................................3
    C.   Employees .........................................................................................................................4
    D.   Drilling Contracts............................................................................................................4

ARTICLE VI: DRILLING AND DEVELOPMENT ...................................................................................4

    A.   Initial Well .......................................................................................................................4
    B.   Subsequent Operations ...................................................................................................4
    C.   Taking Production In Kind...............................................................................................6
    D.   Access to Contract Area and Information.......................................................................7
    E.   Abandonment of Wells ....................................................................................................7

ARTICLE VII: EXPENDITURES AND LIABILITY OF PARTIES ...........................................................7

    A.   Liability of Parties ...........................................................................................................7
    B.   Liens and Payment Defaults ...........................................................................................8
    C.   Payments and Accounting................................................................................................8
    D.   Limitation of Expenditures..............................................................................................8
    E.   Rentals, Shut-in Well Payments and Minimum Royalties .............................................8
    F.   Taxes .................................................................................................................................9
    G.   Insurance .........................................................................................................................9

ARTICLE VIII: ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST ...............................9

    A.   Surrender of Leases .........................................................................................................9
    B.   Renewal or Extension of Leases ....................................................................................10
    C.   Acreage or Cash Contributions .....................................................................................10
    D.   Maintenance of Uniform Interest..................................................................................10
    E.   Waiver of Rights to Partition .........................................................................................10

ARTICLE IX: INTERNAL REVENUE CODE ELECTION .......................................................................11

ARTICLE X: CLAIMS AND LAWSUITS ................................................................................................11

ARTICLE XI: FORCE MAJEURE ...........................................................................................................11

ARTICLE XII: NOTICES ........................................................................................................................11

ARTICLE XIII: TERM OF AGREEMENT ...............................................................................................11

ARTICLE XIV: COMPLIANCE WITH LAWS AND REGULATIONS .......................................................12

    A.   Laws, Regulations and Orders .......................................................................................12
    B.   Governing Law................................................................................................................12
    C.   Regulatory Agencies ......................................................................................................12

ARTICLE XV: MULTIPLE OPERATIONS ..............................................................................................12

ARTICLE XVI: DEFAULT ......................................................................................................................12

ARTICLE XVII: FINANCING STATEMENT ...........................................................................................13

ARTICLE XVIII: SECURITY PROVISIONS............................................................................................13

ARTICLE XIX: BILLING ADDITIONAL INTERESTS ............................................................................13

ARTICLE XX: RIGHT TO AUDIT ACCOUNTS AND RECORDS OF OPERATOR AND AFFILIATES ......13

ARTICLE XXI: CREATION OF AN AREA OF MUTUAL INTEREST. ....................................................14

ARTICLE XXII: CASING POINT ELECTION .........................................................................................14

ARTICLE XXIII: SALE OF PRODUCTION .............................................................................................14

**ARTICLE XXIV: ADMINISTRATIVE OVERHEAD** .................................................................15

**ARTICLE XXV: LIMITATION ON ASSIGNABILITY OF INTERESTS** .....................................15

**ARTICLE XXVI: PREVIOUS AGREEMENTS** .....................................................................15

**EXHIBIT A: LANDS SUBJECT TO AGREEMENT AND INTERESTS & ADDRESSES OF PARTIES** ...........1
1.   LANDS SUBJECT TO THIS AGREEMENT (CONTRACT AREA): ....................................................1
2.   OIL AND GAS LEASES AND/OR OIL AND GAS INTERESTS SUBJECT TO THIS AGREEMENT: .............1
3:   INTERESTS AND ADDRESSES OF PARTIES: ..........................................................................1

**EXHIBIT B: FORM OF LEASE** ...................................................................................1

**EXHIBIT C: ACCOUNTING PROCEDURE JOINT OPERATIONS** ...........................................1

**I.   GENERAL PROVISIONS** ....................................................................................1
A.   DEFINITIONS .................................................................................................1
B.   STATEMENT AND BILLINGS ................................................................................1
C.   ADVANCES AND PAYMENTS BY NON-OPERATORS ....................................................1
D.   ADJUSTMENTS ...............................................................................................1
E.   AUDITS .......................................................................................................1
F.   APPROVAL BY NON-OPERATORS .........................................................................1

**II. DIRECT CHARGES** ..........................................................................................2
A.   ECOLOGICAL AND ENVIRONMENTAL .....................................................................2
B.   RENTALS AND ROYALTIES ................................................................................2
C.   LABOR .......................................................................................................2
D.   EMPLOYEE BENEFITS .....................................................................................2
E.   MATERIAL ....................................................................................................2
F.   TRANSPORTATION ...........................................................................................2
G.   SERVICES ....................................................................................................2
H.   EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR .............................................2
I.   DAMAGES AND LOSSES TO JOINT PROPERTY ..........................................................3
J.   LEGAL EXPENSE .............................................................................................3
K.   TAXES ........................................................................................................3
L.   INSURANCE ...................................................................................................3
M.   ABANDONMENT AND RECLAMATION .....................................................................3
N.   COMMUNICATIONS ..........................................................................................3
O.   OTHER EXPENDITURES .....................................................................................3

**III. OVERHEAD** ..................................................................................................3
A.   OVERHEAD - DRILLING AND PRODUCING OPERATIONS .............................................3
B.   OVERHEAD - MAJOR CONSTRUCTION ....................................................................4
C.   CATASTROPHE OVERHEAD ................................................................................4
D.   AMENDMENT OF RATES ...................................................................................4

**IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS** ..........4
A.   PURCHASES ..................................................................................................4
B.   TRANSFERS AND DISPOSITIONS ..........................................................................4
C.   PREMIUM PRICES ...........................................................................................5
D.   WARRANTY OF MATERIAL FURNISHED BY OPERATOR ...............................................6

**V. INVENTORIES** ................................................................................................6
A.   PERIODIC INVENTORIES, NOTICE AND REPRESENTATION .............................................6
B.   RECONCILIATION AND ADJUSTMENT OF INVENTORIES ...............................................6
C.   SPECIAL INVENTORIES .....................................................................................6
D.   EXPENSE OF CONDUCTING INVENTORIES ...............................................................6

**EXHIBIT D: INSURANCE** ........................................................................................1

**EXHIBIT E: GAS BALANCING AGREEMENT** ...............................................................1

**EXHIBIT G: FINANCING STATEMENT AND MEMORANDUM OF OPERATING AGREEMENT** ..................... 1

# OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between **Stroud & Luke Production Company**, hereinafter designated and referred to as "Operator", and Robert A Stroud LLC and all other parties listed in Exhibit "A", Part 3 titled "Interests and addresses of parties", sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I: DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

I. The term "Casing Point" shall be defined as occurring at such time as such well has reached the depth authorized by the Consenting Parties to such drilling and/or deepening and the agreed upon logging, coring, and open hole testing has been completed.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

## ARTICLE II: EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

A. Exhibit "A", shall include the following information:
 (1) Identification of lands subject to this agreement,
 (2) Oil and gas leases and/or oil and gas interests subject to this agreement,
 (3) Interests and addresses of parties.

B. Exhibit B    Form of Lease.

C. Exhibit C    Accounting Procedure.

D. Exhibit D    Insurance.

E. Exhibit E    Gas Balancing Agreement.

G. Exhibit G    Financing Statement and Memorandum of Operating Agreement.

If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

## ARTICLE III: INTERESTS OF PARTIES

### A. Oil and Gas Interests

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

### B. Interests of Parties in Costs and Production

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties which shall be borne as set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interests) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

## C. Excess Royalties, Overriding Royalties and Other Payments

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

## D. Subsequently Created Interests

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1. If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2. If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

# ARTICLE IV: TITLES

## A. Title Examination

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

> Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders. This shall not prevent any party from appearing on its own behalf at any such hearing.

No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to participate in the drilling of the well.

## B. Loss of Title

1. <u>Failure of Title</u>: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interests: and,

   (a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the interest lost;

(c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well;

(d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the party or parties whose title failed in the same proportions in which they shared in Such prior productions and,

(f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in connection therewith.

2. <u>Loss by Non-Payment or Erroneous Payment of Amount Due</u>: If, through mistake or oversight, delay rental, shut-in well payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled which, in the absence of such lease termination, would be attributable to the lost interest on an acreage basis, tip to the amount of unrecovered costs, the proceeds of said portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and,

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

3. <u>Other Losses</u>: All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of the Contract Area.

## ARTICLE V: OPERATOR

### A. Designation and Responsibilities of Operator

Stroud & Luke Production Company shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

### B. Resignation or Removal of Operator and Selection of Successor

1. <u>Resignation or Removal of Operator</u>: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2.   Selection of Successor Operator: Upon the resignation or removal of Operator, the parties shall select a successor Operator. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" and not on the number of parties remaining after excluding the voting interest of the Operator that was removed.

### C.  Employees

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

### D.  Drilling Contracts

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

## ARTICLE VI: DRILLING AND DEVELOPMENT

### A.  Initial Well

The Pride 26-12 which was spudded with PAR Minerals Corporation as operator on September 6, 1996 and drilling rig released on November 15, 1996. Production casing was successfully run. Stroud & Luke Production Company was named operator as of January 20, 1997. Operations for completing well were subsequently commenced.

### B.  Subsequent Operations

1.   Proposed Operations: Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all parties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance with the provisions hereof as if no prior proposal had been made.

2.   Operations by Less than All Parties: If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties, If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other interests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(a) 200% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(b) 400% of that portion of the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C., and 400% of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non Consenting Party if it had participated therein.

An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any reworking or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100%) of that portion of the costs of the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.D.

In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at it's option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

Notwithstanding the provisions of this Article VI.B.2. it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. except (a) as to Article VII.D.1. or (b) as to the reworking, deepening and plugging back of such initial well after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for production, ceases to produce in paying quantities.

3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2, shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein called "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

   (a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

   (b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

      In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paving for all stand-by time incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other instances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

## C. Taking Production In Kind

Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such oil or sell it to others at any time and from time to time, for the account of the non taking party at the best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

**D. Access to Contract Area and Information**

Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that requests the information.

**E. Abandonment of Wells**

1.  <u>Abandonment of Dry Holes</u>: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further operations in search of oil and/or gas subject to the provisions of Article VI.B.

2.  <u>Abandonment of Wells that have Produced</u>: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or intervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is produced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portion of the Contract Area.

    Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3.  <u>Abandonment of Non-Consent Operations</u>: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.

## ARTICLE VII: EXPENDITURES AND LIABILITY OF PARTIES

**A. Liability of Parties**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

## B. Liens and Payment Defaults

Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas until the amount owed by Such Non-Operator, plus interest, has been paid. Each purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien and Security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

## C. Payments and Accounting

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

## D. Limitation of Expenditures

1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include all necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, including necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties, elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less than all parties.

2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage and/or surface facilities.

3. Other Operations: Without the consent of all parties, Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of Fifty thousand Dollars ($50,000.00) except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been previously authorized by or pursuant to this agreement provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of Twenty-five thousand Dollars ($25,000.00) but less than the amount first set forth above in this paragraph.

## E. Rentals, Shut-in Well Payments and Minimum Royalties

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operator of the anticipated completion of a shut in gas well, or the shutting in or return to production of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by circumstances, prior to taking such action, but assumes no liability for filature to do so. In the event of failure by Operator to so notify Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.2.

## F. Taxes

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C".

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and shall paid by them, as provided in Exhibit "C".

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

## G. Insurance

At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of the state where the operations are being conducted provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

## ARTICLE VIII: ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

## A. Surrender of Leases

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced front the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leased acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

Any assignment, lease or Surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

## B. Renewal or Extension of Leases

If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of oil and gas leases.

## C. Acreage or Cash Contributions

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

## D. Maintenance of Uniform Interest

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells, equipment and production unless such disposition covers either:

1.  the entire interest of the party in all leases and equipment and productions or
2.  an equal undivided interest in all leases and equipment and production in the Contract Area.

Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties.

If, at any time the interest of any party is transferred to two or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof. The transferring party shall remain principally liable for all obligations under this agreement, attributable to the transferred interest.

## E. Waiver of Rights to Partition

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

## ARTICLE IX: INTERNAL REVENUE CODE ELECTION

This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax purposes, this agreement and the operations hereunder arc regarded as a partnership, each party hereby affected elects to be excluded from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may he required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but riot by way of limitation, all of the returns, statements, and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

## ARTICLE X: CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed Fifteen thousand Dollars ($15,000.00) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI: FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## ARTICLE XII: NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, electronic mail or similar communication, or by telex, telecopier or facsimile and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by electronic mail or similar communication, telex, telecopier or facsimile. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

## ARTICLE XIII: TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

## ARTICLE XIV: COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B. Governing Law**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located.

**C. Regulatory Agencies**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owning by Operator as a result of such incorrect interpretation or application.

## ARTICLE XV: MULTIPLE OPERATIONS

Notwithstanding any to the contrary contained in this Agreement the parties agree that none of them shall be required to consider or make an election to participate in any proposed operation to drill rework, deepen, complete, recomplete, sidetrack, or plug back any well while:

(a) Any drilling, reworking, deepening, recompleting, side-tracking or plugging back operation is in progress on any well covered by this Agreement; or

(b) Any proposal to drill, rework, deepen, complete, recomplete, sidetrack, or plug back on any well covered by this Agreement is being considered by the parties.

If, however, any operation is proposed to comply with any express or implied covenant provided for in any lease or interest subject to this Agreement or if any lease will expire at the end of its primary term in the absence of such operation, the proposing party shall clearly include this information in its notice of the proposed operation. Should any party fail to elect within thirty (30) days of receipt of such notice either to participate or become a non-consenting party, such failure shall constitute an election by it not to participate in the proposed operation. Failure by any party to assert or invoke the rights provided for herein shall not prejudice that party's right to assert or invoke such rights on any future occasion.

## ARTICLE XVI: DEFAULT

1. If any party (including the Operator) fails to pay, as provided in the Accounting Procedure (attached hereto as Exhibit "C"), its share of any cost which it is obligated to pay under any provision of this Agreement and if such default continues for a period of fifteen (15) days following delivery by Operator (or by any Non-Operator in case of a default by Operator) of notice of such default to such party; then at any time after the expiration of such notice period the Operator (or any Non-Operator if the Operator is the Party in default) shall be entitled to the remedies in (a) and (b) or (a) and (c) below:

   (a) Operator (or any Non-Operator if Operator is the party in default) may suspend by written notice any or all of the rights of the defaulting party granted by this Agreement, without prejudice to the right of the non-defaulting party to continue to enforce the obligations of the defaulting party under this Agreement. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to elect to participate in any subsequent operation regarding the well to which the default relates, or any subsequent operation proposed under this Agreement; and

   (b) Operator (or any Non-Operator if Operator is the party in default) may take any action to which it may be entitled or pursue any remedy to collect the amounts in default, together with all damages suffered by the non-defaulting parties as a result of the default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in the Accounting Procedure (attached hereto as Exhibit "C") together with reasonable attorney's fees and court costs related thereto; or

   (c) Operator (or any Non-Operator if the Operator is the party in default) may deliver a written Notice of Nonparticipation Election to the defaulting party at any time after the default occurs with the following effect:

      (i) If the billing is for the drilling of a new well or the plugging back, reworking, or deepening (including side-tracking) of a dry hole or a well not then producing in paying quantities, or the completion or recompletion of any well, the nonpaying party will be deemed conclusively to have elected not to participate in the subject operation from the time of the billing which led to the default and to be a Nonparticipating party with respect thereto, notwithstanding any election to participate theretofore made.

      (ii) Until the delivery of such Notice of Nonparticipation Election to the non-paying party, such party shall have the right to cure its default by paying the unpaid billing plus interest at the rate set forth in the Accounting Procedure (attached hereto as Exhibit "C"). Any interest relinquished pursuant to this Article shall be owned by the non-defaulting parties in proportion to their interests, and the non-defaulting parties shall be liable to contribute their shares of the defaulted amount.

2. Notwithstanding the other provisions of this paragraph, if a party fails to pay part or all of its share of costs hereunder because of a legitimate disagreement as to the appropriateness of part or all of the billing in question, and if such party makes such disagreement and the grounds therefor known to the Operator in writing prior to the due date of such billing and timely tenders payment of all undisputed amounts, then such party shall not be subject to paragraph I.(a) or I.(c) of this Article.

## ARTICLE XVII: FINANCING STATEMENT

The parties hereto agree to execute simultaneously herewith a Financing Statement and Memorandum of Operating Agreement that will be provided by Operator. The parties shall have a continuing obligation to execute additional Memoranda of Operating Agreement accurately to reflect the current properties covered by the Operating Agreement and the current working interests of the parties.

## ARTICLE XVIII: SECURITY PROVISIONS

Notwithstanding anything to the contrary contained in this Operating Agreement, it is understood and agreed that:

1. Each Non-Operator, to secure payment of its share of expenses incurred under this Operating Agreement, together with interest thereon at the rate provided in the Accounting Procedure (attached hereto as Exhibit "C"), grants to Operator a lien on all of its right, title, and interest now owned or hereafter acquired in the Contract Area, including, but not limited to, the oil, gas, and mineral leases, mineral estates, and other mineral interests described in Exhibit "A," as hereafter amended, modified, ratified, renewed, or extended; any properties now or hereafter pooled or unitized with any of the properties affected by such mineral interests; and all unsevered and unextracted oil, gas, and other hydrocarbons that may be produced, obtained, or secured from the lands covered and affected by such mineral interests.

2. To further secure its share of expenses incurred under this Operating Agreement, together with interest thereon at the rate provided in the Accounting Procedure, each Non-Operator grants to Operator a security interest in all of its interest now owned or hereafter acquired in and to all other properties associated with or attributable to the Contract Area, including: (i) all equipment; (ii) all hydrocarbons severed and extracted from or attributable to the properties described in the Contract Area; (iii) all accounts (including, but not limited to, accounts resulting from the sale of such hydrocarbons), contract rights, and general intangibles arising in connection with the sale or other disposition of such hydrocarbons; (iv) fixtures; and (v) all proceeds and products of all such properties.

3. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expenses. Each party paying its share of unpaid expenses pursuant to Article VII.B. hereof shall, to obtain reimbursement thereof, be subrogated to the security rights described in this Agreement.

## ARTICLE XIX: BILLING ADDITIONAL INTERESTS

Notwithstanding anything to the contrary contained in this Operating Agreement, Operator shall not be required to make more than one billing per billing period for the entire interest credited to each party on Exhibit "A." If any party hereto (the "Selling Party") disposes of part of the interest credited to it on Exhibit "A," it shall remain primarily liable to the other parties for the interest or interests assigned and shall make prompt payment to Operator for the entire amount of statements and billings rendered to it. Such Selling Party shall be solely responsible for billing its assignee or assignees. If a Selling Party disposes of all of its interest, as set out on Exhibit "A," Operator shall continue to issue statements and billings to the Selling Party for the interest conveyed until such time as Selling Party has qualified a single assignee (whether the assignment is to one or several assignees) to receive the billing for the entire interest. To qualify an assignee to receive and assume primary liability for the billing for the entire interest credited to Selling Party on Exhibit "A," Selling Party shall furnish to Operator the following:

(i) Written notice of the conveyance and copies of the assignments by which the transfer was made;

(ii) The name and address of the assignee to be billed; and

(iii) A written statement signed by such assignee in which it consents to be bound by the Operating Agreement and agrees to receive and assume primary liability for statements and billings for the entire interest credited to Selling Party together with such party's agreement to handle any sub-billings made necessary by any division of the interest credited to Selling Party on Exhibit "A."

## ARTICLE XX: RIGHT TO AUDIT ACCOUNTS AND RECORDS OF OPERATOR AND AFFILIATES

Notwithstanding anything to the contrary contained in this Operating Agreement and the Accounting Procedure attached hereto as Exhibit "C," it is agreed that any Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the accounts and records of the Operator and the following entities providing goods and services to the Operator: the parent corporation of the Operator, any directly affiliated corporations of the Operator, and, if Operator is a partnership or limited partnership, the managing general partner of Operator (hereinafter referred to collectively as "Affiliates"). Such audit shall be limited in purpose and scope to a determination of whether charges for such goods and services are reasonable. Notice of such audit must be given within the twenty-four (24) month period following the end of the calendar year in which such goods or services are charged to the Joint Account. The making of such an audit, however, shall not extend the time during which a Non-Operator may take written exception to, and make a claim of adjustment on, bills and statements rendered to Non-Operators by the Operator, as provided for in Paragraph D of Section 1. of the Accounting Procedure. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the operator and Affiliate. Operator shall not be obligated to bear any portion of the Non-Operators' audit cost incurred under this paragraph. Such audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit. The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

## ARTICLE XXI: CREATION OF AN AREA OF MUTUAL INTEREST.

1. The Contract Area described in Exhibit "A" shall hereinafter be referred to as the Area of Mutual Interest.

2. If, after the effective date of this Agreement, any party hereto (Acquiring Party) acquires either an Oil and Gas Lease (or any interest therein) or any other mineral interest covering lands lying within the Area of Mutual Interest, or if the Acquiring Party enters into any type of agreement by which such an interest may be earned or otherwise acquired by conducting drilling, seismic, or other operations on the lands lying within the Area of Mutual Interest, then the Acquiring Party shall promptly notify the other parties of such acquisition or such agreement. Any interest acquired by a party hereto in lands outside of the Area of Mutual Interest, however, shall not be subject to the terms of this Article.

3. The notification provided for in paragraph 2. shall contain all available title information, and copies of leases, agreements by which the interests may be acquired, and all other pertinent instruments. It shall also describe in detail the cost and expense of such acquisition and any other obligation which may be incurred pursuant thereto.

4. If drilling, seismic, or other operations are not required to acquire the interest, each party hereto shall have fifteen (15) days from receipt of notice thereof in which to elect to participate in such acquisition to the extent of its interest as set forth in Exhibit "A," attached hereto. Failure to notify the acquiring party of its election within fifteen (15) days shall be deemed an election not to participate.

5. (a) If the acquisition requires drilling, seismic, or other operations on the lands long within the Area of Mutual Interest, the election of a party to participate in such operations shall be deemed an election to participate in the agreement governing such operations, to the extent necessary to acquire the interest. No party shall be required to make such election more than sixty (60) days nor less than fifteen (15) days prior to the commencement of initial operations. Operations necessary to acquire the interest shall be governed by this Agreement.

   (b) To receive an assignment of its proportionate share of the interest acquired as a result of conducting drilling, seismic, or other operations on the Area of Mutual Interest, a party (Participating Party) must have: (i) participated in all operations necessary for the acquisition of the interest, including, but not limited to, completion operations and also must have paid all costs and expenses incurred in connection therewith; (ii) participated in any previous drilling, seismic, or other operations that were necessary or were a condition precedent to the operations resulting in the acquisition of the interest; and (iii) participated in accordance with the terms, provisions, covenants, and conditions of the agreements governing the acquisition of interest.

6. The Acquiring Party and the Participating Party shall share in the acquisition in the proportion that each such party's respective working interest after "completion point" in the Initial Well, as set forth in Exhibit "A" hereto, bears to the sum of the working interests of the Acquiring Party and the Participating Parties. On receipt of an invoice from the Acquiring Party setting forth in detail the cost and expense of the acquisition, each Participating Party shall promptly reimburse the Acquiring Party for its proportionate share thereof. The Acquiring Party shall then promptly assign to the Participating Party its proportionate interest in the acquisition.

7. If all parties to this Operating Agreement elect to participate in any acquisition, then any such acquired interest shall thereafter be subject to this Agreement as part of the Contract Area. If fewer than all parties elect to participate in such acquisition, such acquired interest will not be subject to this Agreement, but shall be subject to an operating agreement containing the same terms and provisions of this Agreement, except the Initial Well provision shall be deleted.

8. The Area of Mutual Interest shall be in effect for a period of three (3) years from the effective date hereof unless extended for an additional term or earlier terminated by written agreement of the parties to this Agreement.

9. The provisions of this Article XXI. shall prevail over any conflicting provisions in this Operating Agreement.

## ARTICLE XXII: CASING POINT ELECTION

Notwithstanding anything to the contrary contained in Article VI.B. and VII.D. hereof, the Consenting Parties' consent to the drilling and/or deepening of a well shall not be deemed consent to subsequent operations on such well after it has reached casing point. After any well drilled and/or deepened pursuant to this agreement has reached the casing point, Operator shall give immediate notice thereof to the Consenting Parties; shall provide them with the results of the agreed upon logging, coring, and open hole testing; and shall provide them with an outline of the operations proposed thereafter. Each Consenting Party receiving such notice shall have twenty-four (24) hours in which to elect to participate in the cost of operations in the following order:

1. an election to conduct additional logging, coring, or testing;
2. an election to attempt to complete the well in the deepest objective formation;
3. an election to plug back and attempt to complete the well at a shallower formation, with priorities given in ascending order;
4. an election to deepen the well with priorities given in descending order;
5. an election to sidetrack the well.
6. an election to plug and abandon.

Failure of a party receiving such notice to notify Operator of its election within the period fixed above shall constitute an election by that party to plug and abandon the well. If all of the parties elect to plug and abandon the well, Operator shall plug and abandon same at the expense of all the parties. If one or more, but less than all, of the Consenting Parties elect to participate in any of the operations set forth as items 1. through 4. hereinabove, the provisions of Article VI.B.2 shall apply to such operations thereafter conducted by less than all parties, subject to the modifications hereinafter set out.

## ARTICLE XXIII: SALE OF PRODUCTION

In the event a well capable of producing oil and/or gas in paying quantities is completed within the Contract Area, Operator, if requested by any Non-Operator hereto, shall make its best effort to include within any agreement to sell or transport production from the Contract Area such requesting Non-Operator's interest in production.

## ARTICLE XXIV: ADMINISTRATIVE OVERHEAD

In addition to the combined fixed rates for overhead specified in Exhibit "C" thereof, Operator shall be entitled to an appropriate overhead charge for the payment of delay rentals and shut-in well payments or the disbursement of proceeds from production.

## ARTICLE XXV: LIMITATION ON ASSIGNABILITY OF INTERESTS

No assignment of any interest by any party to this Agreement shall subject any of the leases or subleases held hereunder or any portion thereof, to any overriding royalty, payments out of production, net profit obligation, or any other obligation or addition to those created under the terms of this Agreement that would create thereby an uneconomical remainder as a working interest.

## ARTICLE XXVI: PREVIOUS AGREEMENTS

Notwithstanding anything herein to the contrary, this Operating agreement is subject to the terms of that certain Letter Agreement dated  between PAR Minerals Corporation and Robert A Stroud LLC.

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of 1ST day of April 1997.

**OPERATOR**

STROUD & LUKE PRODUCTION COMPANY

ROBERT A STROUD

**NON-OPERATORS**

Robert A Stroud LLC

Robert A Stroud, Manager

And all other parties listed in Exhibit "A", Part 3 titled "Interests and addresses of parties"

STATE OF LOUISIANA.
PARISH OF CADDO.

On the 17th day of April, 1997, before me, ROBERT A. STROUD to me know to be one of the persons who executed the forgoing instrument, and who, being by me duly sworn, did say that he executed said instrument for the purposes therein set forth as his own free act and deed.

IN WITNESS WHEREOF, I hereunto se my hand and official seal.

NOTARY PUBLIC in and for _____, _____.

My Commission expires _____.

JAN H. TAYLOR, NOTARY PUBLIC
Caddo Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANA
COUNTY/PARISH OF CADDO .

On the 17th day of April , 1997, before me, Robert A Stroud to me know to be one of the persons who executed the forgoing instrument, and who, being by me duly sworn, did say that he executed said instrument for the purposes therein set forth as his own free act and deed.

IN WITNESS WHEREOF, I hereunto se my hand and official seal.

NOTARY PUBLIC in and for _____, _____.

My Commission expires _____.

JAN H. TAYLOR, NOTARY PUBLIC
Caddo Parish, Louisiana
My Commission is for Life

## EXHIBIT A: LANDS SUBJECT TO AGREEMENT AND INTERESTS & ADDRESSES OF PARTIES

*Attached to and made a part of Operating Agreement dated 17 April 1997 by and between STROUD & LUKE PRODUCTION COMPANY as Operator, and Robert A Stroud LLC as Non-Operator.*

**1.  Lands Subject to this Agreement (Contract Area):**

This agreement shall cover all of Sections 19, 20, 21, 22, 25, 26, 27, 28, 29, 36, 37, 38, 39, 40 and 41 of Township 17 North, Range 4 East and Sections 2, 3, 4, 5, 6 and 7 of Township 16 North, Range 4 East, all being in Warren County Mississippi.

**2.  Oil and Gas Leases and/or Oil and Gas Interests Subject to this Agreement:**

This agreement shall cover all oil & gas leases and/or oil & gas interests  held in the name of Ron D. Jurenka, PAR Minerals Corporation, Kings Dome LLC, or any associated entities in the Contract Area as of the date of this agreement.

**3:  Interests and addresses of parties:**

| Party | Interest |
|---|---|
| Jim Byrd<br>PO Box 3247<br>Longview, TX 75606 | 1.00% |
| Jamie Love Crim Trust<br>P O Box 1250<br>Kilgore, TX 75663 | 1.00% |
| Bryon Fields<br>PO Box 1578<br>Alice, TX 78333-0491 | 0.18% |
| Brian Flournoy<br>6003 Arden Road<br>Shreveport, LA 71106 | 1.00% |
| Lucien Flournoy<br>PO Box 1578<br>Alice, TX 78333-0491 | 8.92% |
| B. W. Formby<br>36 Rambling Road<br>Longview, TX 75604 | 1.00% |
| Suzanne Formby Marshall<br>6418 Warrham Lane<br>Austin, TX 78739 | 1.00% |
| Stacey Ann Formby<br>5816 Grassmere #22<br>Dallas, TX 75205 | 1.00% |
| Stephen W. Formby<br>1809 Teton Dr #8<br>Ausitn, TX 78752 | 1.00% |
| Theo Formby<br>1102 County Rd<br>Hope, AR 71801 | 1.00% |
| Sanny Sue Holland<br>PO Box 2017<br>Kilgore, TX 75663 | 2.00% |
| Don Hood<br>6381-A New Copeland Rd<br>Tyler, TX 75703 | 1.00% |
| Howard Trust<br>PO Box 3735<br>Shreveport, LA 71133-3735 | 4.00% |
| R. D. Jurenka<br>10 Oak Forest Drive<br>Longview, TX 75605 | 12.00% |
| Alice P. League<br>109 Archer<br>White Oak, TX 75693 | 1.00% |
| Damian Luke<br>107 Community Blvd, #2<br>Longview, TX 75601 | 3.00% |
| James T Parker, Jr.<br>13803 Johns Gin Road<br>Keithville, LA 71047 | 0.50% |
| Melinda Piper<br>729 Jeffery<br>Tyler, TX 75703 | 0.50% |
| Mississippi Unlimited LLC<br>PO Box 1607<br>Shreveport, LA 71165 | 1.00% |
| PAR Minerals Corporation<br>220 Travis Street, Ste 500<br>Shreveport, LA 71101 | 25.75% |
| Powers Mineral Group, Inc.<br>1012 Troup Highway<br>Tyler, TX 75701-4407 | 2.00% |
| Ranger Investments<br>107 Community Blvd, Ste 2<br>Longview, TX 75601 | 0.50% |
| Smith Partners Limited<br>PO Box 1865<br>Kilgore, TX 75663 | 1.00% |
| Denny Smith<br>PO Box 1865<br>Kilgore, TX 75663 | 5.00% |
| Stroud Family LP<br>220 Travis St Ste 500<br>Shreveport, LA 71101-3255 | 2.50% |
| Robert A Stroud LLC<br>333 Texas Street, Ste 860<br>Shreveport, LA 71101 | 10.25% |
| Bert S Turner<br>PO Box 2750<br>Baton Rouge, LA 70821-2750 | 3.00% |
| Jim Weaver<br>13811 W Pinetree Dr<br>Sun City West, AZ 85375 | 1.00% |
| F C West<br>PO Box 1578<br>Alice, TX 78333-0491 | 0.90% |
| Mary Woods Keisler<br>PO Box 65200<br>Shreveport, LA 71136-5299 | 1.50% |
| Dalton J Woods<br>PO Box 65300<br>Shreveport, LA 71136-5300 | 3.00% |
| Michael H Woods<br>PO Box 65300<br>Shreveport, LA 71136-5301 | 1.50% |
| **TOTAL** | **100.00%** |

**EXHIBIT B: FORM OF LEASE**

*Attached to and made a part of Operating Agreement dated 17 April 1997 by and between STROUD & LUKE PRODUCTION COMPANY as Operator, and Robert A Stroud LLC as Non-Operator.*

Producers 88 (9/70)—Paid Up ( SP 4-75)
With Pooling Provision
Mississippi-Alabama-Florida

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of _____, 19___, between _____
_____, lessor (whether one or more), whose address is: _____
_____
_____, and _____
_____, lessee, WITNESSETH:

1. Lessor, in consideration of _____ Dollars, receipt of which is hereby acknowledge, and of the covenants and agreements of lessee hereinafter contained, does hereby grant, lease and let unto lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas (including carbon dioxide), sulphur and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, power lines, telephone lines, employee houses and other structures on said land, necessary or useful in lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any other land adjacent thereto. The land covered hereby, herein called "said land", is located in the County of_____, State of ____
_____, and is described as follows:

This lease, also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain _____ acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights, and options hereunder.

2. Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of _____ (____) years from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3. As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipe line to which lessee may connect wells, the equal ~~one-eighth~~ one-quarter part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such ~~one-eighth~~ one-quarter part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear ~~one-eighth~~ one-quarter of the cost of treating oil to render it marketable pipe line oil; (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, ~~one-eighth~~ one-quarter of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of ~~one-eighth~~ one-quarter of such gas and casinghead gas; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one-tenth either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing gas or any other mineral covered hereby, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this sub-paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, or may be deposited to such parties credit in the _____ Bank at _____
_____, or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownerships thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4. Lessee is hereby granted the right, at its option, to pool or unitize all or any part of said land and of this lease as to any or all minerals or horizons thereunder, with other lands, lease or leases, or portion or portions thereof, or mineral or horizon thereunder, so as to establish units containing not more than 80 surface acres plus 10% acreage tolerance; provided, however, a unit may be established or an existing unit may be enlarged to contain not more than 640 acres plus 10% acreage tolerance, if unitized only as to gas or only as to gas and liquid hydrocarbons (condensate) which are not a liquid in the subsurface reservoir. If larger units are required, under any governmental rule or order, for the drilling or operation of a well at a regular location, or for obtaining maximum allowable, from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged, to conform to the size required by such governmental order or rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of said options may be exercised by lessee from time to time and whether before or after production has been established either on said land or on the portion of said land included in the unit or on other land unitized therewith and any such unit may include any well to be drilled, being drilled or already completed. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be land or mineral, royalty or leasehold interests in land within the unit which are not pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted under this lease. There shall be allocated to the land covered by this lease included in any such unit that proportion of the total production of unitized minerals from wells in the unit, after deducting any used in lease or unit operations, which the number of surface acres in the land covered by this lease included in the unit bears to the total number of surface acres in the unit. The production so allocated shall be considered for all purposes, including the payment or delivery of royalty, overriding royalty, and any other payments out of production, to be the entire production of unitized minerals from the portion of said land covered hereby and included in such unit in the same manner as though produced from said land under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of such unit shall not have the effect of changing the ownership of any shut-in production royalty which may become payable under this lease. Neither shall it impair the right of lessee to release from this lease all or any portion of said land, except that lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are released as to lands within the unit. Lessee may dissolve any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. A unit may be so established, modified or dissolved during the life of this lease.

5. Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations as to the released acreage or interest.

6. This is a PAID-UP LEASE. In consideration of the down cash payment, Lessor agrees that Lessee shall not be obligated except as otherwise provided herein, to commence or continue any operations during the primary term. Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

7. Lessee shall have the use, free from royalty, of water, other than from lessor's water wells, and of oil and gas produced from said land in all operations hereunder. Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing. No well shall be drilled nearer than 200 feet to the house or barn now on said land without the consent of the lessor. Lessee shall pay for damages caused by its operations to growing crops and timber on said land.

8. The rights and estate of any party hereto may be assigned from time to time in whole or in part and as to any mineral or horizon. All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns. No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of lessee, including, but not limited to, the location and drilling of said wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof of or to lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by lessor or lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings,

transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of the death of the owner, lessee may, nevertheless, pay or tender such royalties, or other moneys, or part thereof, to the credit of the decedent in a depository bank provided for above.

9.   In the event lessor considers that lessee has not complied with all its obligations hereunder, both express and implied, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor. The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee. Neither the service of said notice nor the doing of any acts by lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that lessee has failed to perform all its obligations hereunder. Should it be asserted in any notice given to the lessee under the provisions of this paragraph that lessee has failed to comply with any implied obligation or covenant hereof, this lease shall not be subject to cancellation for any such cause except after final judicial ascertainment that such failure exists and lessee has then been afforded a reasonable time to prevent cancellation by complying with and discharging its obligations as to which lessee has been judicially determined to be in default. If this lease is cancelled for any cause, it shall nevertheless remain in force and effect as to (1) sufficient acreage around each well as to which there are operations to constitute a drilling or maximum allowable unit under applicable governmental regulations, (but in no event less than forty acres), such acreage to be designated by lessee as nearly as practicable in the form of a square centered at the well, or in such shape as then existing spacing rules require; and (2) any part of said land included in a pooled unit on which there are operations. Lessee shall also have such easements on said land as are necessary to operations on the acreage so retained.

10. Lessor hereby warrants and agrees to defend title to said land against the claims of all persons whomsoever, Lessor's rights and interests hereunder shall be charged primarily with any mortgages, taxes or other liens, or interest and other charges on said land, but lessor agrees that lessee shall have the right at any time to pay or reduce same for lessor, either before or after maturity, and be subrogated to the rights of the holder thereof and to deduct amounts so paid from royalties or other payments payable or which may become payable to lessor and/or assigns under this lease. Lessee is hereby given the right to acquire for its own benefit, deeds, leases, or assignments covering any interest or claim in said land which lessee or any other party contends is outstanding and not covered hereby and even though such outstanding interest or claim be invalid or adverse to lessor. If this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether lessor's interest is herein specified or not), or no interest therein, then the royalties, and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by lessor) shall be paid out of the royalty herein provided. This lease shall be binding upon each party who executes it without regard to whether it is executed by all those named herein as lessor.

11. If, while this lease is in force, at, or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and lessee is not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delay had not occurred.

12.  Within thirty (30) days prior to the expiration of the primary term of this lease, or if operations are being conducted on said lease or land pooled therewith at the expiration of the primary term in such manner as to maintain this lease in force, within thirty (30) days after the completion of a dry hole resulting from such operations, lessee may extend the primary terms of this lease as to all or any part of acreage then covered hereby, for an additional five (5) years beyond the initial primary term, by written notification of action taken and by making payment to lessor or to lessor's successor in interest as reflected by notice to lessee pursuant to Paragraph 8 hereof, or to the credit of lessor or such successor in interest in any depository bank named herein or in any amendatory instrument in the sum of $_____ for each net acre as to which the lease is so extended. If this option is exercised by lessee, the lessee as extended will thereafter be treated as if the original primary term had been five (5) years longer.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

_____          _____(SEAL)

_____

_____          _____(SEAL)

## JOINT OR SINGLE ACKNOWLEDGMENT

(Mississippi-Alabama-Florida)

STATE OF _____

COUNTY OF _____

I, hereby certify, that on this day, before me, a _____ duly authorized in the state and county aforesaid to take acknowledgments, personally appeared _____
_____, to me known to be the person _____
described in and who executed the foregoing instrument and _____

he _____ acknowledged before me that, being informed of the contents of the same, _____
he _____ voluntarily signed and delivered the within and foregoing instrument on the day and year therein mentioned.

Given under my hand and official seal, this _____ day of _____, A.D., 19_____.
(Affix Seal)                                                        _____

_____
                                                                             (Title of Official)
My commission expires: _____          in and for _____ County, _____

## WITNESS ACKNOWLEDGMENT

(Mississippi-Alabama-Florida)

STATE OF _____

COUNTY OF _____

I, a _____ in and for the aforesaid jurisdiction, hereby certify that _____
_____, a subscribing witness to the foregoing instrument, known to me, appeared before me on this day, and being sworn, stated that _____
_____, the grantor(s), having been informed of the contents thereof, voluntarily executed and delivered the same in his presence, and in the presence of the other subscribing witness, on the day the same bears date; that he attested the same in the presence of the grantor(s), and of the other witness, and that such other witness subscribed his name as a witness in his presence.

_____
                                                                             (Subscribing Witness)
Given under my hand and official seal, this _____ day of _____, 19_____.
(Affix Seal)                                                        _____

_____
                                                                             (Title of Official)
My commission expires: _____          in and for _____ County, _____

### EXHIBIT C: ACCOUNTING PROCEDURE JOINT OPERATIONS

*Attached to and made a part of Operating Agreement dated 17 April 1997 by and between STROUD & LUKE PRODUCTION COMPANY as Operator, and Robert A Stroud LLC as Non-Operator.*

## I.  GENERAL PROVISIONS

### A.  Definitions

The term "Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

The term "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

The term "Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

The term "Operator" shall mean the party designated to conduct the Joint Operations.

The term "Non-Operators" shall mean the Parties to this agreement other than the Operator.

The term "Parties" shall mean Operator and Non-Operators.

The term "First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

The term "Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

The term "Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

The term "Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

The term "Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

### B.  Statement and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

### C.  Advances and Payments by Non-Operators

1. Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

2. Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at The Bank One, Louisiana, National Association Index Rate plus two percent (2.0%) on the third (day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

### D.  Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator, takes written exception thereto and claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material is provided for in Section V.

### E.  Audits

1. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph D of this Section 1. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no proportion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

2. The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

### F.  Approval By Non-Operators

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling oil all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

### A. Ecological and Environmental

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

### B. Rentals and Royalties

Lease rentals and royalties paid by Operator for the Joint Operations.

### C. Labor

1. (a) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

    (b) Salaries of First Level Supervisors in the field.

    (c) Salaries and wages of Technical Employees directly employed on the Joint.

    (d) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property.

2. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph C.1 of this Section II. Such costs under this Paragraph C.2 may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph C.1 of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

3. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs C.1 and C.2 of this Section II.

4. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph C.1 of this Section II.

### D. Employee Benefits

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs C.1 and C.2 of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

### E. Material

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

### F. Transportation

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

1. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

2. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

3. In the application of subparagraphs F.1 and F.2 above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

### G. Services

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph J of Section II and Paragraph 1, 2, and 3, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

### H. Equipment and Facilities Furnished By Operator

1. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed Twelve percent (12.0%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

2. In lieu of charges in Paragraph H.1 above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

### I.  Damages and Losses to Joint Property

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred is soon as practicable after a report thereof has been received by Operator.

### J.  Legal Expense

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgements and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff shall be made unless previously agreed to by the Parties

### K.  Taxes

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

### L.  Insurance

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers liability under the respective state's laws, Operator may, at its election, include the risk under its self insurance program in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

### M.  Abandonment and Reclamation

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

### N.  Communications

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charge to the Joint Account shall be made is provided in Paragraph 8 of this Section 11.

### O.  Other Expenditures

Any other expenditure not covered or dealt with in the foregoing provisions of this Section 11, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

### A.  Overhead - Drilling and Producing Operations

1.  As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either Fixed Rate Basis.

    Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph C.1, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

2.  The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall not be covered by the overhead rates.

3.  The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property shall not be covered by the overhead rates.

4.  Operator shall charge the Joint Account at the following rates per well per month:

    Drilling Well Rate $9,000.00 (prorated for less than a full month).

    Producing Well Rate $650.00.

5.  Application of Overhead:

    (a) Drilling Well Rate

    (i)   Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

    (ii)  Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

    (b) Producing Well Rates

    (i)   An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

    (ii)  Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

     (iii) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

     (iv) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

     (v) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(c) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the list calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

## B. Overhead – Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall negotiate a rate prior to the beginning of construction.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

## C. Catastrophe Overhead

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall negotiate a rate prior to charging the Joint.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

## D. Amendment of Rates

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

## A. Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

## B. Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

1. New Material (Condition A)

  (a) Tubular Goods Other than Line Pipe

     (i) Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

     (ii) For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(I)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

     (iii) Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

     (iv) Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

  (b) Line Pipe

     (i) Line pipe movements (except size 24 inch OD and larger with walls 3/4 inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 1.(a).(i) as provided above. Freight charges shall be calculated from Lorain, Ohio.

    (ii) Line pipe movements (except size 24 inch OD and larger with walls 3/4 inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation cost; based on freight rates as set forth under provisions of tubular goods pricing in Paragraph 1.(a).(i) as provided above. Freight charges shall be calculated from Lorain, Ohio.

    (iii) Line pipe 24 inch OD and over and 3/4 inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

    (iv) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

  (c) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

  (d) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current now price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph B.1(a) and (b).

2. **Good Used Material (Condition B)**

Material in sound and serviceable condition and suitable for reuse without reconditioning:

  (a) Material moved to the Joint Property

    At seventy-five percent (75%) of current new price, as determined by Paragraph 1.

  (b) Material used on and moved from the Joint Property

    (i) At seventy-five percent (75%) of current new price, as determined by Paragraph 1, if Material was originally charged to the Joint Account as new Material or

    (ii) At sixty-five percent (65%) of current new price, as determined by Paragraph 1, if Material was originally charged to the Joint Account as used Material.

  (c) Material not used on and moved from the Joint Property At seventy-five percent (75%) of current new price as determined by Paragraph 1.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

3. **Other Used Material**

  (a) **Condition C**

    Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph 1. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

  (b) **Condition D**

    Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

    (i) Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

    (ii) Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

  (c) **Condition E**

    Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

4. **Obsolete Material**

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

5. **Pricing Conditions**

  (1) Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph A.5.(c) Each year, the rate calculated shall be founded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

  (2) Material involving election costs shall be charged at applicable percentage of the current knocked-down price of new Material.

## C. Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

### D. Warranty of Material Furnished By Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

### A. Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

### B. Reconciliation and Adjustment of Inventories

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

### C. Special Inventories

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

### D. Expense of Conducting Inventories

1.  The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

2.  The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

## EXHIBIT D: INSURANCE

*Attached to and made a part of Operating Agreement dated 17 April 1997 by and between STROUD & LUKE PRODUCTION COMPANY as Operator, and Robert A Stroud LLC as Non-Operator.*

1.  The Operator shall not be liable for damages arising out of injuries of any of the employees of Non-Operator or for damage to any property of Non-Operator in connection with the operations hereunder for the Joint Account on the operations covered herein, except for willful misconduct or gross negligence of Operator.

2.  The Operator shall carry the following insurance:

    A.  Worker's compensation and Employer's Liability Insurance

    Coverage A - Statutory in accordance with the laws of the State of Mississippi.

    Coverage B - Employer's Liability Insurance - $100,000.00 each accident.

    B.  Business Auto Policy - $500,000 Combined Single limit for Bodily Injury Liability and/or Property Damage Liability.

    C.  Comprehensive General Liability Policy - $500,000 each occurrence limit.

3.  Operator shall not carry Energy Exploration and Development Insurance nor physical damage insurance for the benefit of the Joint Account covering loss of or damage to the jointly owned property or production therefrom caused by fire, theft, explosion, windstorm, tornado, flood, vandalism, malicious mischief, or other extended perils, and the Joint Account shall be charged with all loss and expenditures caused or incurred as the results thereof or as the result of any other casualty for which Operator is not required to carry insurance hereunder. operator shall not be liable to non-operator for any loss suffered on account of any errors, omissions, the insufficiency of the insurance carried nor of the insurers with whom carried.

4.  The premium for all such insurance so carried shall be paid by Operator and charged to the Joint Account. Operator shall, at any time requested, furnish Non-Operator with full information concerning the kind, character, and amounts of insurance carried.

5.  Operator shall require its contractors and sub-contractors conducting operations covered herein to comply with the Workmen's Compensation Laws of the State of Mississippi and to carry such other insurance in such amounts as Operator shall deem necessary.

## EXHIBIT E: GAS BALANCING AGREEMENT

*Attached to and made a part of Operating Agreement dated 17 April 1997 by and between STROUD & LUKE PRODUCTION COMPANY as Operator, and Robert A Stroud LLC as Non-Operator.*

Subject to and under the terms of the Operating Agreement to which this Agreement is attached as Exhibit "E" (the "Operating Agreement"), the parties hereto own and are entitled to share in the oil and gas production from the Contract Area (as defined in the Operating Agreement) in accordance with their respective interests as set forth in the Operating Agreement. Each party has made or will make arrangements to sell or utilize its share of the gas production; however, it is recognized that one or more of the parties may be unable from time to time to take in kind or otherwise dispose of its interest in the gas production. In order to permit each party to produce and utilize or dispose of its interest in the gas production with as much flexibility as possible, the parties hereto have agreed as follows:

1. Definitions:
    A. The term "Percentage Interest" means the percentage ownership interest of each party as determined in the Operating Agreement.
    B. The term "Accumulated Underproduction" means the amount by which the cumulative volume for gas taken by a party is less than the cumulative volume that party was entitled to take according to its Percentage Interest.
    C. The term "Accumulated Overproduction" means the amount by which the cumulative volume of gas taken by a party exceeds the cumulative volume that party was entitled to take according to its Percentage Interest.
    D. The term "Underproduced Party" means a party credited with Accumulated Underproduction.
    E. The term "Overproduced Party" means a party charged with Accumulated Overproduction.
    F. The term "Make-up Gas" means the volume of gas taken by an Underproduced Party to make up Accumulated Underproduction pursuant to paragraph 4 below.

2. From and after the date of initial delivery of gas from the Contract a, during any period when any party is taking less than its full Percentage Interest share of the gas production, the other party or parties shall produce from the Contract Area and take or deliver to a purchaser their pro rata share of all or any part of that portion of the allowable gas production which is not then being produced as a result of a party taking less than its full share; provided, however, that no party shall be entitled to take or deliver to a purchaser gas production in excess of 200% of its share of the allowable gas production assigned thereto by the regulatory body having jurisdiction unless that party is an Underproduced Party. The parties hereto shall share in and own the liquid hydrocarbons recovered from such gas by lease equipment in accordance with their respective interest in the Contract Area as set forth in said Operating Agreement, but the party or parties taking gas shall own all of such gas delivered to its or their purchaser(s).

3. The Operator shall maintain an account of the gas balance as between the parties hereto and will furnish each party monthly statements showing the total quantity of gas produced, the portion thereof used in operations on the Contract Area, vented or lost the total quantity of gas taken by each party or delivered to its purchaser, and the Accumulated Overproduction and Underproduction of each party.

4. After ten (10) days written notice to the Operator and commencing on the first day of any month, any party may at any time begin taking or delivering to a purchaser its full share of the gas produced (less such party's share of gas used in operations in the Contract Area, vented or lost). In addition to such share, each Underproduced Party, including the Operator, until it has brought its gas account into balance, shall be entitled to take or deliver to its purchaser an additional share of the gas produced determined by multiplying the applicable Make-up Percent (hereinafter defined) of the Percentage Interest of the Overproduced Parties in the current gas production by a fraction, the numerator of which is the Accumulated Underproduction of such party and the denominator of which is the total Accumulated Underproduction of all Underproduced Parties then undertaking to make up production. "Make-up Percent" shall mean twenty-five percent (25%) for gas made up in the months of October, November, December, January, February, and March; and fifty percent (50%) for the months of April, May, June, July, August, and September. Make-up Gas shall offset Accumulated Underproduction in the order of accrual.

5. In the event any party enters into an agreement subsequent to this Agreement for the disposition of its gas, including but not limited to a gas sales agreement(s), the subsequent agreement shall be subordinated to the rights of the parties under this Agreement.

6. Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to its purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser. Each party shall, at all times, use its best efforts to regulate its takes and deliveries from the Contract Area so that the well(s) will not be shut in for overproducing the allowable, if any, assigned thereto by the regulatory body having jurisdiction.

7. During the term of this Agreement, each party shall pay or cause to be paid its own royalty owners (the term "royalty owners" shall include owners of royalty interests, overriding royalty interests, production payments, and similar interests) as they may be entitled, respectively, to be paid, and shall hold the other parties harmless from any liability therefor.

8. Each party producing and taking or delivering gas to its purchaser shall pay or cause to be paid any and all production taxes due on such gas.

9. Should production of gas from the Contract Area be permanently discontinued before the gas account is balanced, a final settlement will be made between the Underproduced and Overproduced Parties. In making such settlement, the Underproduced Party or Parties will be paid a sum of money by the Overproduced Party or Parties equal to the value of the total Accumulated Overproduction less applicable taxes and royalties theretofore paid by the Overproduced Party on such overproduction. The value of the total Accumulated Overproduction shall be based on the price the Overproduced Party actually received for the gas during the month(s) in which the Accumulated Overproduction accrued. Operator shall furnish to all parties a statement showing the final Accumulated Overproduction and Accumulated Underproduction of each party and the month and year in which it accrued. Within sixty (60) days after receipt of Operator's statement, each Overproduced Party shall furnish to all other parties a statement showing the value of its Accumulated Overproduction based on the price the Overproduced Party actually received for the gas during the month(s) in which the Accumulated Overproduction accrued, less applicable taxes and royalties theretofore paid by the Overproduced Party on such Accumulated Overproduction. Based upon the statements furnished by the Overproduced Parties, the net amount owed by or to each party shall be calculated by Operator and furnished to all parties in a final cash balancing statement. Within sixty (60) days after receipt of Operator's final cash balancing statement, each Overproduced Party shall pay each Underproduced Party in accordance with the statement and without interest. Any party may challenge any volumes or values or amounts specified in any of the statements furnished under paragraph 3 above or this paragraph 9 in the same manner and subject to the same limitations that an invoice from Operator may be challenged under the Operating Agreement or the accounting procedure attached thereto. If any portion of the proceeds collected by an Overproduced Party is subject to a contingent refund obligation under law, regulation, or court order, such amount shall be withheld until such time as a final determination is made with respect thereto, or the Underproduced Party agrees in writing to indemnify, defend, and hold harmless from any refund obligation the party paying such amount.

10. This Gas Balancing Agreement shall be and remain in full force and effect for a term concurrent with the term of the Operating Agreement.

11. This Gas Balancing Agreement shall be deemed to be a separate agreement for each well on the Contract Area and as to each separate reservoir from which gas is produced from each well.

12. Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in operations on the Contract Area, as set forth in the Operating Agreement. All costs and expenses of administering this Gas Balancing Agreement shall be borne in accordance with the provisions of the Operating Agreement.

13. Any party transferring its interest, or any part thereof, which is covered by the Operating Agreement, shall give notice of this Gas Balancing Agreement to any transferee, and such transfer shall not be binding upon the parties until such transferee has agreed in writing to be bound by the terms of the Operating Agreement, including this Gas Balancing Agreement. At the option of any Underproduced Party, cash settlement as between such Underproduced Party and the Overproduced Party transferring the interest shall occur whenever any Overproduced Party transfers any of its interest in the Contract Area to an unaffiliated third party.

14. The Operator under the Operating Agreement is authorized to carry out the provisions of this agreement but shall not be liable for its failure to do so as long as it acts without gross negligence or willful misconduct. The Operator has no duty or authority to maintain or restore balanced production, except as specifically provided herein.

## EXHIBIT G: FINANCING STATEMENT AND MEMORANDUM OF OPERATING AGREEMENT

*Attached to and made a part of Operating Agreement dated 17 April 1997 by and between STROUD & LUKE PRODUCTION COMPANY as Operator, and Robert A Stroud LLC as Non-Operator.*

THE STATE OF *LOUISIANA*   ~~PARISH~~

KNOW ALL MEN BY THESE PRESENTS: ~~COUNTY~~ OF *CADDO*

1. This Financing Statement and Memorandum of Operating Agreement ("Memorandum") shall be effective concurrently with that certain Operating Agreement (the "Operating Agreement") dated 17 April 1997 between STROUD & LUKE PRODUCTION COMPANY as Operator, and the parties named on Exhibit "A", attached hereto and incorporated herein by reference, as Non-Operators ("Non-Operators"). The Operating Agreement is incorporated herein for all purposes by this reference to the same extent as if it had been set forth in full in the Memorandum. A complete copy of the Operating Agreement is on file in the office of the Operator, at 333 Texas Street, Suite 860, Shreveport, Louisiana 71101-3666.

2. Each of the parties who executes this instrument is deemed to be a debtor and secured party for the purposes of this memorandum and the security interests perfected hereby. The addresses of the secured parties and debtors are fully set out in Exhibit "A" attached hereto and made a part hereof.

3. The Operating Agreement contains the following provision as part of Article XVIII:

   Notwithstanding anything to the contrary contained in this Operating Agreement, it is understood and agreed that:

   (a) Each Non-Operator, to secure payment of its share of expenses incurred under this Operating Agreement, together with interest thereon at the rate provided in the Accounting Procedure (attached hereto as Exhibit "C"), grants to Operator a lien on all of its right, title, and interest now owned or hereafter acquired in the Contract Area, including, but no limited to, the oil, gas, and mineral leases, mineral estates, and other mineral interests described in Exhibit "A", as hereafter amended, modified, ratified, renewed, or extended; any properties now or hereafter pooled or unitized with any of the properties affected by such mineral interest; and all unsevered and unextracted oil, gas, and other hydrocarbons that may be produced, obtained, or secured from the lands covered and affected by such mineral interests.

   (b) To further secure its share of expenses incurred under this Operating Agreement, together with interest thereon at the rate provided in the Accounting Prouder, each Non-Operator grants to Operator a security interest in all of its interest now owned or hereafter acquired in and to all including: (i) all equipment (ii) all hydrocarbons severed and extracted from or attributable to the properties described in the Contract Area; (iii) all accounts (including but not limited to, accounts resulting from the sale of such hydrocarbons), contract rights, and general intangibles arising in connection with the sale or other disposition of such hydrocarbons; (iv) fixtures; and (v) all proceeds and products of all such properties.

   (c) Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expenses. Each party paying its share of unpaid expenses pursuant to Article VII.B hereof shall, to obtain reimbursement thereof, be subrogated to the security rights described in this agreement.

4. This instrument is intended to be used as a financing statement. The minerals and the accounts which are subject to the security interest herein granted will be financed at the wellheads of the wells located in the Contract Area. This financing statement is to be filed for record in, among other places the real records of the county where such properties are located. This instrument secures future advances and constitutes, among other things, a fixture filing.

5. The Memorandum may be executed in multiple counterparts, each of which shall constitute an original and all of which, when construed together, shall constitute but one and the same instrument. The executed signature and acknowledgment pages of each counterpart joined together with a single copy of the body hereof for recording purposes.

Dated this *17th* day of April, 1997, but effective as of the effective date of the Operating Agreement.

DEBTOR:

Robert A Stroud LLC

Robert A Stroud, Manager