

**Sklar**
Exploration Company LLC

April 22, 2013

RE: South Woodlawn Prospect
Participation Agreement/JOA
Marion Co., Texas

To Whom It May Concern:

Enclosed please is your settlement statement and a copy of the Participation Agreement for South Woodlawn Prospect, Marion County, Texas. Please execute the original AFE, signature pages and have the acknowledgment pages completed by a notary public, returning original pages to my attention.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

Ericka Levine
Lease Analyst

Encl.

# PARTICIPATION AGREEMENT

**South Woodlawn Prospect**
**Marion County, Texas**

   **THIS PARTICIPATION AGREEMENT** (the "**Agreement**"), dated effective as of the 1ˢᵗ day of March, 2013 (the "**Effective Date**"), is entered into by and between the following (sometimes herein referred to singularly as a "**Party**" or collectively as the "**Parties**"):

   **SKLAR EXPLORATION COMPANY L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President - Chief Operating Officer, David A. Barlow ("**SEC**" or "**Operator**");

   **SKLARCO L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President - Chief Operating Officer, David A. Barlow ("**Sklarco**");

   **McCOMBS ENERGY, LTD.**, a Texas limited partnership, whose address is 5599 San Felipe, Suite 1200, Houston, Texas 77056-2794, represented herein by its Vice President, Ricky Haikin ("**McCombs**");

   **TAUBER EXPLORATION & PRODUCTION CO.**, a Texas corporation, whose address is 55 Waugh Drive, Suite 601, Houston, Texas 77007-5837, represented herein by Richard Tauber, its duly authorized Manager ("**Tauber**");

   **FLEET HOWELL**, 416 Travis Street, Suite 715, Shreveport, Louisiana 71101 ("**Howell**");

   **BUNDERO INVESTMENT COMPANY, L.L.C.**, a Louisiana limited liability company, whose address is 333 Texas Street, Suite 300, Shreveport, Louisiana 71101, represented herein by its Manager, Robert P. Bowman ("**Bundero**");

   **TIEMBO, LTD.**, a Texas limited partnership, whose address is P. O. Box 270415, Houston, Texas 77277-0415, represented herein by its Registered Agent, Mark Rauch ("**Tiembo**");

   **PICKENS FINANCIAL GROUP, L.L.C.**, a Texas limited liability company, whose address is 8499 Greenville Avenue, Suite 105, Dallas, TX 75231-2417, represented herein by Michael K. Pickens, as the duly authorized Vice President of said company ("**Pickens**");

   **FANT ENERGY LIMITED**, a Texas limited partnership, whose address is 5800 Westview Drive, Houston, Texas 77055, represented herein by Richard E. Fant, LLC, the General Partner of Fant Energy Limited, represented herein by Stephen Swan, in his capacity as the duly authorized Manager of Richard E. Fant, LLC, ("**Fant**");

   **SANTO PETROLEUM LLC**, a Delaware limited liability corporation whose address is 101 South 4ᵗʰ Street, Suite B, Artesia, New Mexico, 88210, represented herein by its Executive Vice President, Tobin L. Rhodes, ("**Santo**");

   **JJS WORKING INTERESTS LLC**, a Texas limited liability company, whose address is 4295 San Felipe, Suite 207, Houston, Texas 77027, represented herein by Houston Bulldog Capital Management, LLC, its duly authorized Manager, represented herein by Justin Simons, in his capacity as the duly authorized Manager of Houston Bulldog Capital Management, LLC ("**JJS**");

**KUDZU OIL PROPERTIES, LLC,** a Mississippi limited liability company, whose address is 300 Concourse Blvd., Suite 101, Ridgeland, Mississippi 39157, represented herein by its Executive Vice President, R. Nash Neyland ("**Kudzu**");

**MARKSCO, L.L.C.,** a Louisiana limited liability company, whose address is 333 Texas Street, Suite 1050, Shreveport, Louisiana 71101, represented herein by its Member, Mark P. Sealy ("**Marksco**");

(hereinafter Sklarco, McCombs, Tauber, Howell, Bundero, Tiembo, Pickens, Fant, Santo, JJS, Kudzu, and Marksco are sometimes referred to collectively as the "**Participants**" or individually as a "**Participant**");

## WITNESSETH:

**WHEREAS,** Sklarco owns the oil, gas and other mineral Leases identified in Section 1.1 below and described on Exhibit "A-1," attached hereto and made a part hereof, covering lands located in Marion County, Texas, lying within a contract area (the "**Contract Area**") outlined in black on the plat attached hereto as Exhibit "A," which itself is lying within an area of mutual interest (the "**AMI**") outlined in red on said plat, generally known as the South Woodlawn Prospect (the "**Prospect**"); and

**WHEREAS,** subject to the Reversionary Back-In Working Interest described in Section 1.3 below, Sklarco desires to sell a portion, and retain a portion, of its right, title and interest in and to the Leases; and

**WHEREAS,** the Participants other than Sklarco desire to acquire a portion of Sklarco's right, title and interest in and to the Leases;

**WHEREAS,** all of the Participants desire to participate in the drilling of an exploratory well to test the Prospect operated by SEC (the "**Initial Well**"); and

**WHEREAS,** the Parties desire to enter into this Agreement to set forth the terms and conditions under which they sell, retain, or acquire, as the case may be, those working interests and drill the Initial Well.

**NOW, THEREFORE,** the Parties agree as follows:

## Article I. Purchase And Sale And Development Commitments

### Section 1.1. Leases

Sklarco represents and warrants that it owns the "**Sklarco Leases**" described in Exhibit "A-1" attached hereto, that the Sklarco Leases are paid up leases with no delay rentals or option bonuses due or to be paid to maintain them, that all of those Sklarco Leases are in full force and effect, that there are no overriding royalty interest burdens carved out of the leasehold interest under the Sklarco Leases, that there has been no breach of any of the obligations of the lessees under the Sklarco Leases, that none of the lessors have notified Sklarco of any alleged breach of any such obligation, that there are no restrictions upon assignment or transfer on any of the Sklarco Leases and that Sklarco has full and complete authority to enter into this Agreement and to execute the assignment attached as Exhibit "B."

Sklarco hereby represents, without warranty, that it owns an interest in the "**Albert W. Key, et al Leases**" described in Exhibit "A-1" attached hereto and further described in that certain Assignment of Oil and Gas Leases and Bill of Sale dated effective June 1, 2012, by and between Albert W. Key, et al and Sklarco L.L.C., recorded in Vol 845, Pg 304 of the county records of Marion County, Texas, a copy of which is attached hereto as Exhibit "A-2.". Furthermore, Sklarco hereby represents, without warranty, that it owns an interest in the "**Hobert Rutherford Key, et al Leases**" described in Exhibit "A-1" attached hereto and further described in that certain Assignment of Oil and Gas Leases and Bill of Sale dated effective December 1, 2012, by and between Hobert Rutherford Key, et al and Sklarco L.L.C., recorded in Vol 852, Pg 249 of the county records of Marion County, Texas, a copy of which is attached hereto as Exhibit "A-3."

Hereinafter the Sklarco Leases, Albert W. Key et al Leases, and Hobert Rutherford Key, et al Leases, are sometimes referred to singularly as a "**Lease**" or collectively as the "**Leases**."

The Participants other than Sklarco shall tender to SEC concurrent with their execution of this Agreement, unless other arrangements have been made by Participant with SEC in advance, in the following proportions, the amount of Nine Hundred Seven Thousand, Five Hundred Thirty-Seven and 42/100 Dollars ($907,537.42) (collectively, the "**Prospect Fee**"), representing the total lease bonus,

brokerage, geological, geophysical and other costs associated with the Prospect through April 17, 2013:

| Participant | Proportion | Amount |
|---|---|---|
| Sklarco | 25.0000% | (Already Paid) |
| McCombs | 25.0000% | $226,884.36 |
| Tauber | 5.0000% | $ 45,376.87 |
| Howell | 5.0000% | $ 45,376.87 |
| Bundero | 2.0000% | $ 18,150.75 |
| Tiembo | 2.0000% | $ 18,150.75 |
| Pickens | 5.0000% | $ 45,376.87 |
| Fant | 10.0000% | $ 90,753.74 |
| Santo | 15.0000% | $136,130.61 |
| JJS | 1.0000% | $  9,075.37 |
| Kudzu | 3.0000% | $ 27,226.12 |
| Marksco | 2.0000% | $ 18,150.75 |
| Total | 100.0000% | |

For and in consideration of the Prospect Fee, and the reservation of Reversionary Back-In Working Interest, the receipt and sufficiency of which are hereby acknowledged, Sklarco hereby sells and agrees to assign unto the other Participants, in the same proportions shown above, its right, title and interest in and to the Leases by means of the form of assignment attached hereto as Exhibit "B." Each assignment of interest shall be (i) made without warranty of title, express or implied, not even for return of the Prospect Fee, except Sklarco agrees to warrant title against all defects arising out of claims by Sklarco or of persons claiming by, through or under Sklarco, (ii) subject to the terms of the Leases including lessors' burdens, and (iii) subject to this Agreement and the JOA described in Section 2.1 of this Agreement.

### Section 1.2.  Initial Well

### Subsection 1.2(a).  Drilling Of The Initial Well

On or before May 15, 2013, and subject to rig availability, SEC shall commence or cause to be commenced operations for the drilling of the Initial Well at a location of approximately 3,406' FEL of C.C. Coppedge Survey and 969' North of the intersection of C.C. Coppedge and E.&S.T. Greer Surveys of Marion County, Texas, being located 1,165' Northeast of the Dollie Key Well at a 56 degree angle, or as near thereto as practicable and shall thereafter continue drilling of the well with due diligence to a depth of 6,700' in a vertical bore hole, or a depth sufficient in Operator's discretion, to test the Pettet Formation, whichever is more shallow (the "**Objective Depth**").  The Participants agree to participate in the drilling of the Initial Well to the Objective Depth in the same proportions in which they own the Leases as set forth in Section 1.1 above.  Concurrent with their execution of this Agreement, the Participants agree to execute an Authority For Expenditure ("**AFE**") attached hereto as Exhibit "C."   Notwithstanding the estimates contained in the AFE, the Participants are responsible for and must pay SEC their share of all actual costs to drill the Initial Well to the Objective Depth in the following manner: (i) SEC will furnish the Participants with a Cash Call Invoice within thirty (30) days of its anticipated spud date of the Initial Well covering their share of the amount estimated in the AFE to drill the Initial Well to the Objective Depth, excluding estimated completion costs, but including the amount estimated to plug and abandon the Initial Well in the event it is not completed as a producing well, and the Participants must tender to SEC as an advance full payment of the Cash Call Invoice, within fifteen (15) days of receipt unless other arrangements have been made with SEC in advance and, in any event, prior to spudding the Initial Well; and (ii) the Participants must tender to SEC, within 15 days of receipt of (an) invoice(s) from SEC, the difference, if any, between said advance and their share of the actual costs to drill the Initial Well to the Objective Depth.  In the event any Participant from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment as aforesaid, then Operator, at his option, shall make a second written request by certified mail, return receipt requested for such advance. Participant shall pay for said advance as aforesaid within ten (10) days of the receipt of such second request.

If, after the receipt of a second written request as hereinabove provided, any Participant fails to pay its share of the actual costs to drill the Initial Well to the Objective Depth in the manner and within the time deadlines set forth above, then, in that event, and only in that event, that Party hereby agrees to relinquish all of its right, title, and interest in the Prospect (including the AMI) and the Leases for no consideration, not even for return of the Prospect Fee or drilling advance, and to execute those instruments provided by SEC necessary to convey said interest to the Participant(s) which did not fail to pay its share of the actual costs to drill the Initial Well to the Objective Depth and who so elect to accept such an additional interest or portion thereof.  This forfeiture of interest shall be without prejudice and in addition to the rights of the Operator and Non-Operator(s) who paid their shares of the actual costs to drill the Initial Well to the Objective Depth to offset and/or recover all sums owed by a Party that fails to pay its share of actual costs to drill the Initial Well to the Objective Depth.

### Subsection 1.2(b).  Operations After Reaching The Objective Depth

After the Initial Well has been drilled to the Objective Depth, SEC shall make a copy of any logs, core analysis, drill-stem test analysis or results of any other tests or evaluations available to a representative of the Participants at the wellsite, or if none is present, by email, mail, facsimile or overnight delivery.  SEC shall also furnish the Participants in a like manner with its recommendation regarding the disposition of the wellbore, in accordance with the JOA.  Failure to respond within the time specified shall be deemed an election to participate in SEC's recommended operation.  An election not to participate in an election to set production casing and complete the Initial Well shall result in the forfeiture of interest not only in the Initial Well, but also in all the Leases and the entire Contract Area and AMI created under Section 3.1 of this Agreement and Article XV.K of the JOA.  All subsequent operations and elections shall be governed by the JOA.

The Participants acknowledge that the Prospect contemplates drilling and producing oil wells and water injection wells, creating a fieldwide unit, and commencing a water injection program to enhance the recovery of oil from the Pettet Formation.  As such, they give SEC authority, whether provided for in the JOA or not, to conduct those tests on the Initial Well which SEC believes, in its discretion, would help it evaluate and design the waterflood.  Without limitation upon the foregoing, SEC may take conventional cores, obtain PVT analyses, take pressure surveys, and log the Initial Well.  The Participants also grant SEC authority (a) to enter into a Unit Agreement and Unit Operating Agreement naming SEC as Operator in substantially the same form as those attached as Exhibits "E" and "F", respectively, and (b) to appear before the Railroad Commission of Texas for and on their behalf without the need for additional signatures or authority.  It is the Parties' intention that SEC drill the Initial Well on a lease basis and that a fieldwide unit be created by SEC only after drilling and evaluating the Initial Well.  All subsequent proposals and elections shall be governed by the JOA.

### Section 1.3.  Reversionary Back-In Working Interest

As further consideration for the sale described in Section 1.1 above, upon reaching Prospect Payout (as defined below), an undivided twenty-five percent (25%) of the interest of each of the Participants in the Leases, other than Sklarco and JJS, shall automatically and permanently vest in Sklarco and JJS, proportionately reducing each Participant's interest (the **"Reversionary Back-In Working Interest"** or **"RBWI"**).  At Sklarco's written request, those Participants will assign said interest unto Sklarco and JJS after Prospect Payout, including, without limitation, a like interest from and after the effective date of Prospect Payout in the Leases, the Initial Well and any subsequent wells, the proceeds from the sale of oil, gas, and all other products produced or derived from any and all such wells, and in any easements, rights of way, personal property, equipment, facilities and pipelines associated with such wells.

**"Prospect Payout"** is defined on a Prospect (not well-by-well) basis as the first day of the calendar month following the month in which a Participant's share of the total and cumulative revenue received from the sale of oil, gas and other hydrocarbons and minerals produced, saved and sold from the AMI, equals that Participant's share of the total and cumulative costs and expenses incurred by that Participant relating to the AMI. For purposes of Prospect Payout, (i) the total and cumulative revenue shall consist of the Participant's share of all sales proceeds received for all oil, gas and other hydrocarbons and minerals produced, saved and sold from the AMI, and (ii) the total and cumulative cost incurred shall include the Participant's share of all royalty and overriding royalty payments, severance, ad valorem, production and other taxes applicable to production and not measured by the Participant's other income, the Prospect Fee, all lease acquisition and maintenance costs, all seismic survey and data costs, geological and geophysical evaluation costs, all costs for site preparation, drilling, reworking, deepening, sidetracking, logging, stimulation, testing, equipping, operating, plugging and abandoning the Initial Well and all other wells within the AMI, and the cost of all surface damages, pipelines, gathering and other production handling facilities related thereto.

## Article II.  Operations

### Section 2.1.  JOA

SEC is hereby designated Operator.  Except for unit operations, which, once commenced, will be governed by the Unit Agreement and Unit Operating Agreement, and except as otherwise provided in this Agreement, all operations within the Contract Area shall be governed by the Joint Operating Agreement (the **"JOA"**), covering the Contract Area attached hereto as Exhibit "D."  The Parties agree to execute the JOA concurrent with their execution of this Agreement.  In the event of a conflict between this Agreement and the JOA, this Agreement shall govern and control.

## Article III.  Miscellaneous

### Section 3.1.  AMI

The Parties have formed an AMI under the terms contained in Article XV.K of the JOA covering the lands within the red outline on the plat attached hereto as Exhibit "A" which shall govern the acquisition by any of the Parties of any oil and gas lease or oil and gas interest (as defined in the JOA) covering lands located within the Contract Area and AMI created under this Agreement.  The RBWI described in Section 1.3 of this Agreement shall burden new leases acquired under the AMI.

### Section 3.2.  Information

Upon execution of this Agreement by all of the Parties, any Participant may request and shall be entitled to a copy of all of the Leases and of any other title information such as any abstracts of title or drill-site title opinions for the drill-site tract of, and drilling unit for, the Initial Well, along with drilling and completion and log reports for the Initial Well and any subsequent wells.

### Section 3.3.  Confidentiality

The Parties agree to keep confidential and not disclose any information about this Prospect, not already disclosed or of public record, to third parties except as required by statutes, regulations, or court order for so long as this Agreement is in effect, but not to exceed three (3) years from the Effective Date of this Agreement.

### Section 3.4.  Closing

Closing shall occur by mail or by such other means and at such time and place to which the Parties mutually agree.

### Section 3.5.  Binding On Successors And Assigns

This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and assigns, subject; however, to the provisions of Section 3.13 below.

### Section 3.6.  Entire Agreement

This Agreement and its attachments constitute the entire agreement of the Parties with respect to the subject matter hereof, and any other promises, inducements, representations, warranties, or agreements with respect to the subject matter hereof have been superseded hereby and are not intended to survive this Agreement.  Except as otherwise expressly provided herein, no amendment or modification of this Agreement shall be effective unless set forth in writing and signed by a duly authorized officer of each and all of the Parties.

### Section 3.7.  Severability

The invalidity of any one or more of the provisions of this Agreement does not affect the remaining portions of this Agreement, and in case of any such invalidity, this Agreement should be construed as if the invalid provision(s) had not been inserted.

### Section 3.8.  Notices

All notices between the Parties authorized or required by any of the provisions of this Agreement, unless otherwise expressly provided, shall be given in writing by email or facsimile or regular or express mail, addressed to those of the Parties to whom the notice is given at the email addresses or fax telephone numbers and addresses set forth in Exhibit "A" to the JOA.  Any of the Parties may change its designated email address, fax telephone number and address at any time, and from time to time, by giving written notice thereof to the other Parties.

### Section 3.9.  Headings for Convenience

The article, section, and subsection headings used in this Agreement are inserted for convenience only and shall not be regarded in construing this Agreement.

### Section 3.10.  Time

Time is of the essence hereunder.

### Section 3.11.  Governing Law

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Texas.

### Section 3.12.  Relationship Of The Parties

Liability of the Parties hereto shall be several and not joint or collective.  Each Party shall make its own elections under this Agreement and shall be responsible only for its obligations as herein set out.  It is not the intention of the Parties to create, nor shall this Agreement be construed as creating, a mining or other partnership, joint venture, or association between the Parties.

### Section 3.13.  Assignability

The Parties to this Agreement may assign all or part of their rights and obligations hereunder, provided; however, that any such assignment must be made subject to the terms and conditions of this Agreement and the JOA, and provided further that no such assignment shall be effective as to the Operator until 30 days after the Operator shall have been provided with a certified copy of a recorded instrument evidencing the assignment and with such other documents and information as the Operator may reasonably request.

### Section 3.14.  Term

This Agreement shall remain in full force and effect as between the Parties until expiration of the last Lease jointly owned by them, or any combination of the Parties, covering any part of the AMI.

### Section 3.15.  Counterparts

This Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

### Section 3.16.  Sophisticated Investors

By execution of this Agreement, the Participants confirm that they have a working knowledge of the oil and gas industry and that each has thoroughly investigated its participation in the Prospect.  Each Participant acknowledges that it is a sophisticated investor and it (or its owner) has a financial net worth in excess of one million dollars.  Each Participant represents it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of not just its share of the Prospect Fee and drilling advance, but also its share of all other costs incurred in operations on the Prospect.  EACH PARTICIPANT ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES.  Each Participant further confirms and accepts that the offering of the interest herein purchased has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the States of Louisiana or Texas, or any other state.  Each Participant has hereby agreed to participate in the Prospect for investment purposes only, and not with a view to or for sale in connection with any distribution of interests in the Prospect within the meaning of said laws.

THUS DONE AND SIGNED This 18th day of April, 2013, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By _____
David A. Barlow
President - Chief Operating Officer

SKLARCO L.L.C.

By _____
David A. Barlow
President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

By_____
                Ricky Hankin
                Vice President


TAUBER EXPLORATION & PRODUCTION CO


By_____
                Richard Tauber
                Manager



_____
                FLEET HOWELL

BUNDERO INVESTMENT COMPANY, L.L.C.


By_____
                Robert P. Bowman
                Manager


TIEMBO, LTD.


By_____
                Mark Rauch
                Registered Agent

PICKENS FINANCIAL GROUP, L.L.C.


BY;_____
                Michael K Pickens, Vice President


FANT ENERGY LIMITED
By:  Richard E. Fant, LLC, the General Partner of
        Fant Energy Limited


By_____
                Stephen Swan, Manager

SANTO PETROLEUM LLC


By:_____
                Tobin L. Rhodes, Executive Vice President


JJS WORKING INTERESTS LLC
By:     Houston Bulldog Capital Management, LLC


By_____
                Justin Simons
                Manager

MCCOMBS ENERGY, LTD.

By_____
       Ricky Haikin
       Vice President

Signature / Acknowledgement Pages to that certain Participation Agreement, dated March 1, 2013, by and between Sklar Exploration Company, LLC, et al; South Woodlawn Prospect, Marion County, Texas.

TAUBER EXPLORATION & PRODUCTION CO

By_____
    Richard Tauber   *RICHARD E. TAUBER*
    Manager       *PRESIDENT*


_____
      FLEET HOWELL

BUNDERO INVESTMENT COMPANY, L.L.C.


By_____
      Robert P. Bowman
      Manager


TIEMBO, LTD.


By_____
      Mark Rauch
      Registered Agent

PICKENS FINANCIAL GROUP, L.L.C.


BY;_____
      Michael K Pickens, Vice President


FANT ENERGY LIMITED
By: Richard E. Fant, LLC, the General Partner of
    Fant Energy Limited


By_____
      Stephen Swan, Manager

SANTO PETROLEUM LLC


By:_____
      Tobin L. Rhodes, Executive Vice President


JJS WORKING INTERESTS LLC
By:    Houston Bulldog Capital Management, LLC


By_____
      Justin Simons
      Manager

MCCOMBS ENERGY, LTD.


By_____
      Ricky Haikin
      Vice President


TAUBER EXPLORATION & PRODUCTION CO


By_____
      Richard Tauber
      Manager

      FLEET HOWELL

BUNDERO INVESTMENT COMPANY, L.L.C.


By_____
      Robert P. Bowman
      Manager


TIEMBO, LTD.


By_____
      Mark Rauch
      Registered Agent

PICKENS FINANCIAL GROUP, L.L.C.


BY;_____
      Michael K Pickens, Vice President


FANT ENERGY LIMITED
By:  Richard E. Fant, LLC, the General Partner of
      Fant Energy Limited


By_____
      Stephen Swan, Manager

SANTO PETROLEUM LLC


By:_____
      Tobin L. Rhodes, Executive Vice President


JJS WORKING INTERESTS LLC
By:   Houston Bulldog Capital Management, LLC


By_____
      Justin Simons
      Manager


S. Woodlawn PA/JOA

MCCOMBS ENERGY, LTD.

By_____
        Ricky Haikin
        Vice President


TAUBER EXPLORATION & PRODUCTION CO

By_____
        Richard Tauber
        Manager


_____
        FLEET HOWELL

BUNDERO INVESTMENT COMPANY, L.L.C.

By_____
        Robert P. Bowman
        Manager


TIEMBO, LTD.

By_____
        Mark Rauch
        Registered Agent

PICKENS FINANCIAL GROUP, L.L.C.


BY;_____
        Michael K Pickens, Vice President


FANT ENERGY LIMITED
By:  Richard E. Fant, LLC, the General Partner of
      Fant Energy Limited

By_____
        Stephen Swan, Manager

SANTO PETROLEUM LLC


By:_____
        Tobin L. Rhodes, Executive Vice President


JJS WORKING INTERESTS LLC
By:     Houston Bulldog Capital Management, LLC


By_____
        Justin Simons
        Manager

MCCOMBS ENERGY, LTD.

By_____
      Ricky Haikin
      Vice President


TAUBER EXPLORATION & PRODUCTION CO

By_____
      Richard Tauber
      Manager


_____
      FLEET HOWELL

BUNDERO INVESTMENT COMPANY, L.L.C.

By_____
      Robert P. Bowman
      Manager

TIEMBO, LTD.

By_____
      Mark Rauch
      Registered Agent

PICKENS FINANCIAL GROUP, L.L.C.


BY;_____
      Michael K Pickens, Vice President


FANT ENERGY LIMITED
By: Richard E. Fant, LLC, the General Partner of
    Fant Energy Limited


By_____
      Stephen Swan, Manager

SANTO PETROLEUM LLC


By:_____
      Tobin L. Rhodes, Executive Vice President


JJS WORKING INTERESTS LLC
By:   Houston Bulldog Capital Management, LLC


By_____
      Justin Simons
      Manager

MCCOMBS ENERGY, LTD.


By_____
        Ricky Haikin
        Vice President



TAUBER EXPLORATION & PRODUCTION CO


By_____
        Richard Tauber
        Manager




_____
        FLEET HOWELL

BUNDERO INVESTMENT COMPANY, L.L.C.


By_____
        Robert P. Bowman
        Manager


TIEMBO, LTD.


By_____
        Mark Rauch
        Registered Agent

PICKENS FINANCIAL GROUP, L.L.C.


BY:_____
        Michael K Pickens, ~~Vice~~ President


FANT ENERGY LIMITED
By:  Richard E. Fant, LLC, the General Partner of
     Fant Energy Limited


By_____
        Stephen Swan, Manager

SANTO PETROLEUM LLC


By:_____
        Tobin L. Rhodes, Executive Vice President


JJS WORKING INTERESTS LLC
By:    Houston Bulldog Capital Management, LLC


By_____
        Justin Simons
        Manager

MCCOMBS ENERGY, LTD.


By_____
   Ricky Haikin
   Vice President



TAUBER EXPLORATION & PRODUCTION CO


By_____
   Richard Tauber
   Manager




_____
   FLEET HOWELL

BUNDERO INVESTMENT COMPANY, L.L.C.


By_____
   Robert P. Bowman
   Manager


TIEMBO, LTD.


By_____
   Mark Rauch
   Registered Agent

PICKENS FINANCIAL GROUP, L.L.C.



BY;_____
   Michael K Pickens, Vice President


FANT ENERGY LIMITED
By:  Richard E. Fant, LLC, the General Partner of
  Fant Energy Limited


By_____
   Stephen Swan, Manager

SANTO PETROLEUM LLC


By:_____
   Tobin L. Rhodes, Executive Vice President


JJS WORKING INTERESTS LLC
By: Houston Bulldog Capital Management, LLC


By_____
   Justin Simons
   Manager

MCCOMBS ENERGY, LTD.

By_____
       Ricky Haikin
       Vice President


TAUBER EXPLORATION & PRODUCTION CO

By_____
       Richard Tauber
       Manager


_____
       FLEET HOWELL

BUNDERO INVESTMENT COMPANY, L.L.C.

By_____
       Robert P. Bowman
       Manager


TIEMBO, LTD.

By_____
       Mark Rauch
       Registered Agent

PICKENS FINANCIAL GROUP, L.L.C.


BY;_____
       Michael K Pickens, Vice President


FANT ENERGY LIMITED
By:  Richard E. Fant, LLC, the General Partner of
     Fant Energy Limited


By_____
       Stephen Swan, Manager

SANTO PETROLEUM LLC

By:_____
       Tobin L. Rhodes, Executive Vice President


JJS WORKING INTERESTS LLC
By:   Houston Bulldog Capital Management, LLC


By_____
       Justin Simons
       Manager

MCCOMBS ENERGY, LTD.

By_____
          Ricky Haikin
          Vice President


TAUBER EXPLORATION & PRODUCTION CO

By_____
          Richard Tauber
          Manager


_____
          FLEET HOWELL

BUNDERO INVESTMENT COMPANY, L.L.C.

By_____
          Robert P. Bowman
          Manager

TIEMBO, LTD.

By_____
          Mark Rauch
          Registered Agent

PICKENS FINANCIAL GROUP, L.L.C.


BY;_____
          Michael K Pickens, Vice President


FANT ENERGY LIMITED
By: Richard E. Fant, LLC, the General Partner of
     Fant Energy Limited


By_____
          Stephen Swan, Manager

SANTO PETROLEUM LLC


By:_____
          Tobin L. Rhodes, Executive Vice President


JJS WORKING INTERESTS LLC
By:    Houston Bulldog Capital Management, LLC

By_____
          Justin Simons
          Manager

KUDZU OIL PROPERTIES, L.L.C.

By _____

~~R. Nash Noyland~~          Wilet A. Yerger III

~~Executive Vice President~~     manager

MARKSCO, L.L.C.

By _____

     Mark P. Sealy
     Member

Attachments

| | |
|---|---|
| Exhibit "A": | Plat |
| Exhibit "A-1": | Description of Leases |
| Exhibit "A-2": | Albert W. Key et al Assignment and Bill of Sale |
| Exhibit "A-3": | Hobert Rutherford Key, et al Assignment and Bill of Sale |
| Exhibit "B": | Form of Assignment |
| Exhibit "C": | AFE |
| Exhibit "D": | JOA |
| Exhibit "E": | Unit Agreement |
| Exhibit "F": | Unit Operating Agreement |

S. Woodlawn PA/JOA

KUDZU OIL PROPERTIES, L.L.C.


By_____
      R. Nash Neyland
      Executive Vice President

MARKSCO, L.L.C.


By_____
      Mark P. Sealy
      Member

Attachments

| | |
|---|---|
| Exhibit "A": | Plat |
| Exhibit "A-1": | Description of Leases |
| Exhibit "A-2": | Albert W. Key et al Assignment and Bill of Sale |
| Exhibit "A-3": | Hobert Rutherford Key, et al Assignment and Bill of Sale |
| Exhibit "B": | Form of Assignment |
| Exhibit "C": | AFE |
| Exhibit "D": | JOA |
| Exhibit "E": | Unit Agreement |
| Exhibit "F": | Unit Operating Agreement |

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

I, _Kim S. Elias_____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _18th_ day of _April_____, 2013.

_Kim S. Elias_____
NOTARY PUBLIC

Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commssion is for Life

[AFFIX NOTARIAL SEAL]

My Commission Expires: _at death___

STATE OF LOUISIANA

PARISH OF CADDO

I, _Kim S. Elias_____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _18th_ day of _April_____, 2013.

_Kim S. Elias_____
NOTARY PUBLIC

Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commssion is for Life

[AFFIX NOTARIAL SEAL]

My Commission Expires: _at death___

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

**ACKNOWLEDGMENTS**

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                             _____
                             NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                             _____
                             NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF *Harris*

      I, *Sharon M. McDonald*, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the *25* day of *April*, 2013.

                             *Sharon M. McDonald*
                             NOTARY PUBLIC

SHARON METCALF McDONALD
Notary Public, State of Texas
Commission Expires 12-29-2013

My Commission Expires: *12/59/3013*

Signature / Acknowledgement Pages to that certain Participation Agreement, dated March 1, 2013, by and between Sklar Exploration Company, LLC, et al; South Woodlawn Prospect, Marion County, Texas.

STATE OF TEXAS

COUNTY OF HARRIS

I, MYLA WUNDERLICH, a notary public in and for said County and State, hereby certify that Richard Tauber, whose name as President of TAUBER EXPLORATION AND PRODUCTION COMPANY, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 8th day of MAY, 2013.

_____
NOTARY PUBLIC

MYLA WUNDERLICH
Notary Public, State of Texas
Commission Expires 02-11-2016

STATE OF TEXAS

COUNTY OF _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Richard Tauber, whose name as President of TAUBER EXPLORATION AND PRODUCTION COMPANY, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2013.

                                        _____
                                        NOTARY PUBLIC

STATE OF TEXAS

COUNTY OF _____

STATE OF LOUISIANA

PARISH OF CADDO

    I, _Melissa R. Eburb_____, a notary public in and for said Parish and State, hereby certify that FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

    Given under my hand and notarial seal this the _23rd_ day of _April_, 2013.

                                          *[signature]*
                                        NOTARY PUBLIC
                                        #68325

(AFFIX NOTARIAL SEAL)

My commission ~~expires:~~ is for Life

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2013.

                                          _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Richard Tauber, whose name as President of TAUBER EXPLORATION AND PRODUCTION COMPANY, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                        _____

STATE OF TEXAS                                    NOTARY PUBLIC

COUNTY OF _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                        _____
                                        NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, Deborah W. Cox, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the 24th day of April, 2013.

                                  Deborah W. Cox
                                      NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: for life

DEBORAH W. COX  26623
Notary Public
Parish of Caddo
State of Louisiana

STATE OF TEXAS

COUNTY OF _HARRIS_

I, _PATTI L. HANSON_, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _29_ day of _April_, 2013.

PATTI L. HANSON
MY COMMISSION EXPIRES
January 18, 2015
[AFFIX NOTARIAL SEAL]

_Patti L. Hanson_
NOTARY PUBLIC

My Commission Expires: _1/18/15_

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as Vice President for PICKENS FINANCIAL GROUP, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Stephen Swan, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

 

                                   _____
                                   NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _Texas_

COUNTY OF _Dallas_

      I, _Marilyn L. Fulton_, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as ~~Vice~~ President for PICKENS FINANCIAL GROUP, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _24th_ day of _April_, 2013.

             Marilyn L. Fulton
             My Commission Expires
             06/23/2016                _Marilyn L. Fulton_
[AFFIX NOTARIAL SEAL]                 NOTARY PUBLIC

My Commission Expires: _6-23-16_

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Stephen Swan, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

 

                                   _____
                                   NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as Vice President for PICKENS FINANCIAL GROUP, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _Harris_

I, _Brenda Witt White_, a notary public in and for said County and State, hereby certify that Stephen Swan, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

Given under my hand and notarial seal this the _13th_ day of _May_, 2013.

_Brenda Witt White_
NOTARY PUBLIC

BRENDA WITT WHITE
Notary Public, State of Texas
My Commission Expires
March 23, 2015

[AFFIX NOTARIAL SEAL]

My commission expires: _3.23.15_

STATE OF ___TEXAS___

COUNTY OF ___HARRIS___

I, ___AMY S. ROZZELL___, a notary public in and for said County and State, hereby
certify that Tobin L. Rhodes, whose name as Executive Vice President for SANTO PETROLEUM, LLC, a
Delaware limited liability corporation, is signed to the foregoing instrument and who is known to me,
acknowledged before me on this day that, being informed of the contents of the instrument, he, as such
officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the ___28th___ day of ___MAY___, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires

AMY S. ROZZELL
Notary Public, State of Texas
My Commission Expires
April 05, 2017

STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin
Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS
WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance
and who is known to me, acknowledged before me on this day that, being informed of the contents of the
conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act
of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby
certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC,
a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me,
acknowledged before me on this day that, being informed of the contents of the instrument, he, as such
officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Tobin L. Rhodes, whose name as Executive Vice President for SANTO PETROLEUM, LLC, a Delaware limited liability corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the 26th day of april, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: 8-11-15

MARCIA A. DE LUNA
Notary Public, State of Texas
My Commission Expires
August 11, 2015


STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Tobin L. Rhodes, whose name as Executive Vice President for SANTO PETROLEUM, LLC, a Delaware limited liability corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF MISSISSIPPI

COUNTY OF _Madison_          _Wiet A. Yerger III_
                              _manager_

I, _Pamela F. Sebren_, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _24_ day of _April_, 2013.

_Pamela F Sebren_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

    I, _Aungel Pattison_, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _13_ day of _May_, 2013.

<div align="center">
NOTARY PUBLIC
</div>

(AFFIX NOTARIAL SEAL)

My commission expires: _____

AUNGEL PATTISON
Embossed Hereon Is My
DeSoto, Caddo, Bossier Parishes
Louisiana Notary Public Seal
Notary ID No. 063733
My Commission Expires Upon My Death

## EXHIBIT "A"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

## PLAT



SOUTH WOODLAWN PROSPECT
MARION COUNTY, TEXAS
1 in = 10,000 ft

AMI
Contract Area

S_Woodlawn_041913

Date: 04/19/13

## EXHIBIT "A-1"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

## DESCRIPTION OF LEASES

### SKLARCO LEASES

1. Oil Gas and Mineral Lease dated 05/25/2012, by and between Albert W. Key and Key Family Marital Deduction Trust Key, as Lessor, and Sklarco L.L.C., as Lessee, recorded in Vol 842, Page 620, of the records of Marion County, Texas (1WOO01-L001).

2. Oil Gas and Mineral Lease dated 09/28/2012, by and between William Gleason, Trustee of the Taylor Grey Sain trust, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 847, page 553, of the records of Marion County, Texas (1WOO01-L006).

3. Oil Gas and Mineral Lease dated 11/05/2012, by and between Children's Hospital of Los Angeles, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 847, Page 714, of the records of Marion County, Texas (1WOO01-L007).

4. Oil Gas and Mineral Lease dated 10/30/2012, by and between Rebecca A Eidson Wright, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in 12/26/2012 Vol 850, Page 220, of the records of Marion County, Texas (1WOO01-L008).

5. Oil Gas and Mineral Lease dated 11/16/2012, by and between Davis Lynn Plunkett, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 850, Page 850 in Marion Co., TX, of the records of Marion County, Texas (1WOO01-L009).

6. Oil Gas and Mineral Lease dated 11/16/2012, by and between Bob Herwood Reed, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 850, Page 850 of the records of Marion County, Texas (1WOO01-L010).

7. Oil Gas and Mineral Lease dated 12/10/2012, by and between James D & Armitta Blackburn, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 850, Page 224 of the records of Marion County, Texas (1WOO01-L011).

8. Oil Gas and Mineral Lease dated 12/04/2012, by and between Diane Tompson Broadus, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 558 of the records of Marion County, Texas (1WOO01-L012).

9. Oil Gas and Mineral Lease dated 11/30/2102, by and between Jean Warwick Thompson, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 578 of the records of Marion County, Texas (1WOO01-L013).

10. Oil Gas and Mineral Lease dated 12/19/2012, by and between Joseph Cleveland Sullivan, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 566, of the records of Marion County, Texas (1WOO01-L014).

11. Oil Gas and Mineral Lease dated 12/18/2012, by and between Thomas B Sullivan, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 570, of the records of Marion County, Texas (1WOO01-L015).

12. Oil Gas and Mineral Lease dated 12/04/2012, by and between Robert C Thompson, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 582, of the records of Marion County, Texas (1WOO01-L016).

13. Oil Gas and Mineral Lease dated 12/07/2102, by and between Sue Cartledge Cumbus, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 562, of the records of Marion County, Texas (1WOO01-L017).

14. Oil Gas and Mineral Lease dated 12/04/2012, by and between Danna Thompson, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 574 of the records of Marion County, Texas (1WOO01-L018).

15. Oil Gas and Mineral Lease dated 12/11/2012, by and between Anne C. Morgan, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 852, Page 139, of the records of Marion County, Texas (1WOO01-L019).

16. Oil Gas and Mineral Lease dated 01/04/2013, by and between Michael D. Gollob Oil Company, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 852, Page 143, of the records of Marion County, Texas (1WOO01-L020).

17. Oil Gas and Mineral Lease dated 01/08/2013, by and between Leslie A. Bitner, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 852, Page 146, of the records of Marion County, Texas (1WOO01-L021).

18. Oil Gas and Mineral Lease dated 01/15/2013, by and between Eckankar, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 853, Page 632, of the records of Marion County, Texas (1WOO01-L022).

19. Oil Gas and Mineral Lease dated 01/15/2013, by and between Bruce Russel Cooner, et al and Russel Lynn Cooner, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 853, Page 629, of the records of Marion County, Texas (1WOO01-L023).

20. Oil Gas and Mineral Lease dated 01/10/2013, by and between Virginia B Blackman, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 853, Page 640, of the records of Marion County, Texas (1WOO01-L024).

21. Oil Gas and Mineral Lease dated 12/31/2012, by and between Sylvia Calhoun, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 853, Page 643, of the records of Marion County, Texas (1WOO01-L025).

22. Oil Gas and Mineral Lease dated 01/22/2013, by and between R. L. Ray, Ltd, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 853, Page 637, of the records of Marion County, Texas (1WOO01-L026).

23. Oil Gas and Mineral Lease dated 01/4/2013, by and between Diane McDonlad, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 854, Page 542, of the records of Marion County, Texas (1WOO01-L027).

24. Oil Gas and Mineral Lease dated 01/25/2013, by and between Faye bunch Copeland, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 854, Page 548, of the records of Marion County, Texas (1WOO01-L028).

25. Oil Gas and Mineral Lease dated 01/28/2013, by and between Bright Minerals, Inc., as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 854, Page 559, of the records of Marion County, Texas (1WOO01-L029).

26. Oil Gas and Mineral Lease dated 12/19/2012, by and between Agnes Gibson Hattaway, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 854, Page 550, of the records of Marion County, Texas (1WOO01-L030).

27. Oil Gas and Mineral Lease dated 03/1/2013, by and between Mary Bitner Spranger, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 854, Page 555, of the records of Marion County, Texas (1WOO01-L31).

28. Oil Gas and Mineral Lease dated 01/25/2013, by and between Gloria Jean Clark Mason, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 855, Page 116A, of the records of Marion County, Texas (1WOO01-L032).

29. Oil Gas and Mineral Lease dated 02/01/2013, by and between Vickie Metcalf, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 855, Page 315, of the records of Marion County, Texas (1WOO01-L033).

30. Oil Gas and Mineral Lease dated 02/05/2013, by and between Walter Thomas Edison, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 855, Page 319, of the records of Marion County, Texas (1WOO01-L034).

31. Oil Gas and Mineral Lease dated 12/28/2012, by and between Phyllis H Rostker, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 855, page 322, of the records of Marion County, Texas (1WOO01-L035).

32. Oil Gas and Mineral Lease dated 12/28/2012, by and between Susan D Mahoney-Clark, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 855, Page 325, of the records of Marion County, Texas (1WOO01-L036).

33. Oil Gas and Mineral Lease dated 12/28/2012, by and between Audrey Taylor, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L037).

34. Oil Gas and Mineral Lease dated 01/07/2013, by and between Edythe G Tucker, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L038).

35. Oil Gas and Mineral Lease dated 02/20/2013, by and between Richard Kent McGaughy, Independent Executor and Trustee of the Residury Trusts in the Estate of Roy Lamar Rather, Jr., Deceased, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L039).

36. Oil Gas and Mineral Lease dated 02/05/2013, by and between Edward Parker Eidson, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L040).

37. Oil Gas and Mineral Lease dated 02/05/2013, by and between Peggy Sue Askew, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L041).

38. Oil Gas and Mineral Lease dated 03/05/2013, by and between Richard M Schultz, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L042).

39. Oil Gas and Mineral Lease dated 02/08/2013, by and between Cynthia Thornton & Cheryl Barnett Co-Trustees, The Walford Family Trust, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L043).

40. Oil Gas and Mineral Lease dated 04/04/2013, by and between Doris Corn, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L044).

41. Oil Gas and Mineral Lease dated 02/06/2013, by and between Norma L Conkle Archung, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L045).

42. Oil Gas and Mineral Lease dated 02/05/2013, by and between Timothy Allin Eidson, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L046).

43. Oil Gas and Mineral Lease dated 02/05/2013, by and between Elizabeth Eidson Stevens, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L047).

44. Oil Gas and Mineral Lease dated 12/28/2012, by and between Norman Alfieri, Jr., as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L048).

45. Oil Gas and Mineral Lease dated 04/01/2013, by and between Alice Key Myrick, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in  / /, of the records of Marion County, Texas (1WOO01-L049).

## ALBERT W. KEY, ET AL LEASES

46. Oil Gas and Mineral Lease dated 07/03/2008, by and between Martha L Hartford, as Lessor, and Key & Key Brothers, as Lessee, recorded in Vol 771, Page 34, of the records of Marion County, Texas (1WOO01-L002).

47. Oil Gas and Mineral Lease dated 07/10/2008, by and between John Armistead, as Lessor, and Key & Key Brothers, as Lessee, recorded in Vol 771, Page 25, of the records of Marion County, Texas (1WOO01-L003).

48. Oil Gas and Mineral Lease dated 07/10/2008, by and between Charles Wise Bypass Trust, Mark Lawley & Belinda Baker Co-Trustee, as Lessor, and Key & Key Brothers, as Lessee, recorded in Vol 771, Page 27, of the records of Marion County, Texas (1WOO01-L004).

49. Oil Gas and Mineral Lease dated 07/03/2008, by and between Dawson Rev Living Trust, as Lessor, and Key & Key Brothers, as Lessee, recorded in Vol 771, Page 33, of the records of Marion County, Texas (1WOO01-L005).

## HOBART RUTHERFORD KEY, ET AL LEASES

50. Oil, Gas and Other Mineral Lease dated February 16, 1950 from M. A. Connor & William A. Connor to E. Fred Herschbach and recorded in Volume 158, Page 476-478 of the  Deed Records of Marion County, Texas.

51. Oil, Gas and Other Mineral Lease dated February 16, 1950 from O. W. Connor E. Fred Herschbach, Lessee, recorded in Volume 158, Page 472 of the  Deed Records of Marion County, Texas.

52. Oil, Gas and Other Mineral Lease dated February 16, 1950 from Mrs. Lula J. Conner, f/s to E. Fred Herschbach and recorded in Volume 158, Pages 474-476 of the Deed Records of Marion County, Texas.

53. Oil, Gas and Other Mineral Lease dated February 16, 1950 from Mrs. Maggie Turner, f/s; L. S. Turner; Jerrold Turner; Maggie Lou Turner to E. Fred Herschbach and recorded in Volume 159, Pages 218-220 of the Deed Records of Marion County, Texas.

54. Oil, Gas and Other Mineral Lease dated July 7, 1951 from Abbie Cramer & J. L. Miller w/h to Billy Mikule recorded in Volume 170, Pages 25-26 of the Deed Records of Marion County, Texas.

55. Oil, Gas and Other Mineral Lease dated June 29, 1951 from Mrs. Josephine Cramer Sims, divorced to Billy Mikule and recorded in Volume 169, Pages 557-559 of the Deed Records of Marion County, Texas.

56. Oil, Gas and Other Mineral Lease dated June 29, 1951 from R. R. Cramer to Billy Mikule and recorded in Volume 169, Pages 553-555 of the Deed Records of Marion County, Texas.

57. Oil, Gas and Other Mineral Lease dated June 25, 1951 from Ettie P. & W. D. Latimer w/h to Billy Mikule and recorded in Volume 169, Pages 248-250 of the Deed Records of Marion County, Texas.

58. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Thomas Vivian & Ruth Cherry Cramer h/w to Billy Mikule and recorded in Volume 169, Pages 272-274 of the Deed Records of Marion County, Texas.

59. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Oleta Cramer & Nigal A. Timmins w/h to Billy Mikule and recorded in Volume 170, Pages 315-317 of the Deed Records of Marion County, Texas.

60. Oil, Gas and Other Mineral Lease dated July 7, 1951 from C. D. Cramer to Billy Mikule and recorded in Volume 170, Pages 17-18 of the Deed Records of Marion County, Texas.

61. Oil, Gas and Other Mineral Lease dated July 17, 1951 from W. O. Cramer to Billy Mikule and recorded in Volume 170, Pages 286-288 of the Deed Records of Marion County, Texas.

62. Oil, Gas and Other Mineral Lease dated June 29, 1951 from Ella Mae Cramer & R. G. Brian w/h to Billy Mikule and recorded in Volume 170, Pages 284-286 of the Deed Records of Marion County, Texas.

63. Oil, Gas and Other Mineral Lease dated July 7, 1951 from Thomas C. Connor to Billy Mikule and recorded in Volume 170, Pages 21-22 of the Deed Records of Marion County, Texas.

64. Oil, Gas and Other Mineral Lease dated June 26, 1951 from Mrs. Sam E. Cramer, widow to Billy E. Mikule recorded in Volume 170, Pages 198-199 of the Deed Records of Marion County, Texas.

65. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Martha Elizabeth & S. A. Armstrong w/h to Billy Mikule and recorded in Volume 170, Pages 288-290 of the Deed Records of Marion County, Texas.

66. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Mrs. Erma C. Johnston, et als., Lessors, to Billy Mikule, Lessee, recorded in Volume 169, page 551 of the Deed Records of Marion County, Texas.

67. Oil, Gas and Other Mineral Lease dated July 7, 1951 from Annie Cramer to Billy Mikule and recorded in Volume 170, Pages 23-24 of the Deed Records of Marion County, Texas.

68. Oil, Gas and Other Mineral Lease dated June 26, 1951 from Albert Raymond Conly to Billy Mikule and recorded in Volume 169, Pages 277-279 of the Deed Records of Marion County, Texas.

69. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Mrs. Dollie & F. L. Huey w/h to Billy Mikule and recorded in Volume 169, Pages 274-276 of the Deed Records of Marion County, Texas.

70. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Ettie C. & J. W. Neville w/h to Billy Mikule and recorded in Volume 169, Pages 555-557 of the Deed Records of Marion County, Texas.

71. Oil, Gas and Other Mineral Lease dated July 7, 1951 from George Alma Terrell, a single woman to Billy Mikule and recorded in Volume 170, Pages 19-20 of the Deed Records of Marion County, Texas.

72. Oil, Gas and Other Mineral Lease dated June 26, 1951 from R. C. & Mrs. R. C. Conly h/w to Billy Mikule and recorded in Volume 169, Pages 246-248 of the Deed Records of Marion County, Texas.

73. Oil, Gas and Other Mineral Lease dated June 26, 1951 from George Conly, Jr. to Billy Mikule and recorded in Volume 169, Pages 279-281 of the Deed Records of Marion County, Texas.

74. Oil, Gas and Other Mineral Lease dated December 3, 1951 from Jane Cramer & L. D. Harrison to E. Fred Herschbach and recorded in Volume 173, Pages 437-438 of the Deed Records of Marion County, Texas.

75. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Erma C. Johnston, widow to E. Fred Herschbach and recorded in Volume 176, Pages 442-444 of the Deed Records of Marion County, Texas.

76. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Zue C. Gibbons, widow to E. Fred Herschbach and recorded in Volume 176, Pages 444-446 of the Deed Records of Marion County, Texas.

77. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Akin B. Connor to E. Fred Herschbach and recorded in Volume 176, Pages 446-448 of the Deed Records of Marion County, Texas.

78. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Pearle C. Baldwin, widow to E. Fred Herschbach and recorded in Volume 176, Pages 448-450 of the Deed Records of Marion County, Texas.

79. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Jane C. & W. R. Wood w/h to E. Fred Herschbach and recorded in Volume 176, Pages 450-452 of the Deed Records of Marion County, Texas.

80. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Flora C. & Lyle Wilson w/h to E. Fred Herschbach and recorded in Volume 176, Pages 452-454 of the Deed Records of Marion County, Texas.

81. Oil, Gas and Other Mineral Lease dated September 21, 1951 from C. W. LaCofske; Harry & Leah LaCofske Goldsmith h/w; Miss Lillian LaCofske, f/s; Mrs. Katie LaCofske, f/s to Bracken Oil Co. and recorded in Volume 172, Pages 208-213 of the Deed Records of Marion County, Texas.

82. Oil, Gas and Other Mineral Lease dated February 17, 1950 from Albert Marx and wife, Georgia E. Marx, Lessors, to E. Fred Herschbach, Lessee, recorded in Volume 159, page 181, said Deed Records, covering 91.73 acres, more or less, in the William Mason Survey, Abst. #270.

83. Oil, Gas and Other Mineral Lease dated August 28, 1951 from Louisiana & Arkansas Railway Company to James E. Kemp and recorded in Volume 171, Pages 394-397 of the Deed Records of Marion County, Texas and Amended in Volume 180, Pages 431-432 of the Deed Records of Marion County, Texas.

84. Oil, Gas and Other Mineral Lease dated October 11, 1951, from Bascom Giles, Commissioner of the General Land Office of the State of Texas, and the School Land Board of the State of Texas, Lessor, to Midstates Oil Corporation, Lessee, recorded in Volume 172, Page 218, said Deed Records, and containing 135 acres of land, more or less.

85. Oil, Gas and Other Mineral Lease dated November 7, 1952, from A. S. Harvey, Receiver in Cause No. 14,087 B.F.Ayers et al vs. Willie Hervey, et al,and recorded in Volume 177, Page 381 of the Deed Records of Marion County, Texas.

86. Oil, Gas and Other Mineral Lease dated May 12, 1953 from Mrs. Dolly Bell Key, Hobart Key, Jr.; David R. Key; E. M. Key composing Key & Key Brothers, partnership to Earl Hollandsworth and recorded in Volume 181, Pages 75-85 of the Deed Records of Marion County, Texas.

87. Oil, Gas and Other Mineral Lease dated March 12, 1951 to S. G. Read; Mrs. D. B. Read, widow; C. A. Bitner; L. H. Read; F. H. Harrell, John R. Alford; Jess B. Alford; John T. Green; and R. O. Alford to E. Fred Herschbach and recorded in Volume 167, Pages 73-76 of the Deed Records of Marion County, Texas.

88. Oil, Gas and Other Mineral Lease dated February 7, 1950 from Jefferson Wholesale Grocer Company, a corporation, acting by and through T. J. Taylor, Jr. President, Lessor, to Skelly Oil Company, Lessee, recorded in Volume 159, Page 376 of the Deed Records of Marion County, Texas.

89. Oil, Gas and Other Mineral Lease dated February 11, 1950, from Mrs. Reba Goodroe, W. B. Goodroe, Edward E. Eidson, Thomas E. Eidson and Robert D. Eidson, Lessors, to Skelly Oil Company, Lessee, recorded in Volume 159, Page 301 of the Deed Records of Marion County, Texas.

90. Oil, Gas and Other Mineral Lease dated February 9, 1950 from J. H. Benefield, Sr., Lessor, to Skelly Oil Company, Lessee, recorded in Volume 159, Page 379 of the Deed Records of Marion County, Texas.

91. Oil, Gas and Other Mineral Lease dated February 26, 1979 from Betty Gracr Wise, Mary J. Armistead, Jane Poyer, Mary M. Chapman, and Grace Dawson to David R. Key and recorded in Volume 297, Page 629 of the Deed Records of Marion County, Texas.

92. Oil, Gas and Other Mineral Lease dated February 29, 1980 from Hobart Key, Jr., Edmund M. Key, David R. Key and the Estate of Dolly Bell Key to Bill R. Tipton and recorded in Volume 407, Page 397 of the Deed Records of Marion County, Texas.

93. Oil, Gas and Other Mineral Lease dated September 9, 1988 from Louise Sayle Skelton to David R. Key and recorded in Volume 516, Page 258 of the Deed Records of Marion County, Texas.

94. Oil, Gas and Other Mineral Lease dated August 25, 1988 from Reba Jeanette Lawrence to David R. Key and recorded in Volume 516, Page 264 of the Deed Records of Marion County, Texas.

95. Oil, Gas and Other Mineral Lease dated August 25, 1988 from Franklin Jones, Sr. to David R. Key and recorded in Volume 516, Page 261 of the Deed Records of Marion County, Texas.

96. Oil, Gas and Other Mineral Lease dated August 18, 1989 from J. D. Blackburn to David R. Key and recorded in Volume 519, Page 130 of the Deed Records of Marion County, Texas.

97. Oil, Gas and Other Mineral Lease dated March 2, 1989 from fred J. Herschbach, Executor, et al., to David R. Key and recorded in Volume 520, Page 51 of the Deed Records of Marion County, Texas.

98. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Lawrence Melcher to David R. Key and recorded in Volume 520, Page 48 of the Deed Records of Marion County, Texas.

99. Oil, Gas and Other Mineral Lease dated February 28, 1989 from Verla Jane Benefield to David R. Key and recorded in Volume 520, Page 45 of the Deed Records of Marion County, Texas.

100. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Claudia W. Wood to David R. Key and recorded in Volume 520, Page 42 of the Deed Records of Marion County, Texas.

101. Oil, Gas and Other Mineral Lease dated February 28, 1989 from Francis Roberts to David R. Key and recorded in Volume 520, Page 39 of the Deed Records of Marion County, Texas.

102. Oil, Gas and Other Mineral Lease dated April 14, 1989 from Gerald Loetterle, et al., to David R. Key and recorded in Volume 520, Page 36 of the Deed Records of Marion County, Texas.

103. Oil, Gas and Other Mineral Lease dated April 26, 1989 from R. B. Fawcett to David R. Key and recorded in Volume 520, Page 33 of the Deed Records of Marion County, Texas.

104. Oil, Gas and Other Mineral Lease dated April 14, 1989 from John Dragna to David R. Key and recorded in Volume 520, Page 30 of the Deed Records of Marion County, Texas.

105. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Fannie Curry, et al., to David R. Key and recorded in Volume 521, Page 258 of the Deed Records of Marion County, Texas.

106. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Jewel Hervey to David R. Key and recorded in Volume 521, Page 267 of the Deed Records of Marion County, Texas.

107. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Precious L. Hervey, et al., to David R. Key and recorded in Volume 521, Page 264 of the Deed Records of Marion County, Texas.

108. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Mabel L. Webster to David R. Key and recorded in Volume 521, Page 255 of the Deed Records of Marion County, Texas.

109. Oil, Gas and Other Mineral Lease dated April 14, 1989 from Helen Sternberg Arnold, et al., to David R. Key and recorded in Volume 520, Page 27 of the Deed Records of Marion County, Texas.

110. Oil, Gas and Other Mineral Lease dated July 5, 1989 from John H. Carter, Jr., to David R. Key and recorded in Volume 521, Page 651 of the Deed Records of Marion County, Texas.

111. Oil, Gas and Other Mineral Lease dated May 5, 1989 from Dorothy Robinson to David R. Key and recorded in Volume 521, Page 261 of the Deed Records of Marion County, Texas.

112. Oil, Gas and Other Mineral Lease dated June 1, 1989 from David R. Key to Tipco Operating Company, et al., and recorded in Volume 522, Page 633 of the Deed Records of Marion County, Texas.

113. Oil, Gas and Other Mineral Lease dated July 13, 1993 from Billie J. Mason to Tipco Operating Company and recorded in Volume 556, Page 279 of the Deed Records of Marion County, Texas.

114. Oil, Gas and Other Mineral Lease dated May 10, 1993 from J. C. Copeland, et ux., Ina Faye Copeland to Tipco Operating Company and recorded in Volume 556, Page 283 of the Deed Records of Marion County, Texas.

115. Oil, Gas and Other Mineral Lease dated August 19, 1993 from Russell Cooner, et ux., Joyce Cooner to Tipco Operating Company and recorded in Volume 556, Page 662 of the Deed Records of Marion County, Texas.

116. Oil, Gas and Other Mineral Lease dated September 20, 1993 from Bright Minerals, Inc. to Tipco Operating Company and recorded in Volume 559, Page 133 of the Deed Records of Marion County, Texas.

117. Oil, Gas and Other Mineral Lease dated August 24, 1993 from Robert Pugh, Sr., Executor of Estate, to Dr. Albert I. Clark to Tipco Operating Company and recorded in Volume 559, Page 136 of the Deed Records of Marion County, Texas.

118. Oil, Gas and Other Mineral Lease dated October 14, 1993 from Albert G. Mason to Tipco Operating Company and recorded in Volume 559, Page 138 of the Deed Records of Marion County, Texas.

119. Oil, Gas and Other Mineral Lease dated September 20, 1993 from Richard L. Ray to Tipco Operating Company and recorded in Volume 559, Page 140 of the Deed Records of Marion County, Texas.

120. Oil, Gas and Other Mineral Lease dated October 8, 1993 from Mary Lenore Sharpton to Tipco Operating Company and recorded in Volume 559, Page 143 of the Deed Records of Marion County, Texas.

121. Oil, Gas and Other Mineral Lease dated September 10, 1993 from Michael B. Gallob to Tipco Operating Company and recorded in Volume 557, Page 329 of the Deed Records of Marion County, Texas.

122. Oil, Gas and Other Mineral Lease dated September 23, 1993 from Key Family Marital Deduction Trust to Tipco Operating Company and recorded in Volume 557, Page 334 of the Deed Records of Marion County, Texas.

123. Oil, Gas and Other Mineral Lease dated September 9, 1993 from Frances A. Key to Tipco
Operating Company and recorded in Volume 557, Page 332 of the Deed Records of Marion
County, Texas.

124. Oil, Gas and Other Mineral Lease dated December 1, 2000 from Verla Jane Stutz Benefield to
Tipco Operating Company and recorded in Volume 627, Page 424 of the Deed Records of
Marion County, Texas.

125. Oil, Gas and Other Mineral Lease dated May 23, 2001 from Frances Benefield Roberts to Tipco
Operating Company and recorded in Volume 633, Page 470 of the Deed Records of Marion
County, Texas.

126. Oil, Gas and Other Mineral Lease dated November 30, 2000 from T. Jerry Blackburn to Hobart
R. Key and recorded in Volume 627, Page 219 of the Deed Records of Marion County, Texas.

127. Oil, Gas and Other Mineral Lease dated April 6, 1951 from W. H. Mason, Jr. and Mary S.
Mason to Dr. E. T. Doehring and recorded in Volume 167, Pag 317 of the Deed Records of
Marion County, Texas.

128. Oil, Gas and Other Mineral Lease dated December 9, 1950 from D. B. Meisenheimer to S. H.
Sanderson and recorded in Volume 164, Page 517 of the Deed Records of Marion County,
Texas.

129. Oil, Gas and Other Mineral Lease dated December 9, 1950 from H. B. Meisenheimer and J. B.
Moseley to S. H. Sanderson and recorded in Volume 164, Page 515 of the Deed Records of
Marion County, Texas.

## EXHIBIT "A-2"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

2607 VOL: 845 PG: 304

### ASSIGNMENT OF OIL AND GAS LEASES AND BILL OF SALE

STATE OF TEXAS

COUNTY OF MARION

KNOW ALL MEN BY THESE PRESENTS THAT:

**Albert W. Key**, an individual, whose address is P.O. Box 768, Point Clear, AL 36564, and:

**Hobart Rutherford Key**, an individual, whose address is 649 FM 2208, Jefferson, Texas, 75657, and:

**Swann Key Wicker**, an individual, whose address is 3701 Coffeeville Road, Jefferson, TX 75657, and:

**Amy Key Keith**, an individual, whose address is 134 Riverwood, Boerne, TX 78006, and:

**Frances A. Rounds**, an individual, whose address is 759 F. M. Road 2208, Jefferson, Texas 75657, and:

**Thomas Fisher Key**, an individual, whose address is P.O. Box 475667, San Francisco, CA 97147-5667, and:

**Richard Garrett Key**, an individual, whose address is P.O. Box 2310, New York, NY 10021, and:

**Susanna Key Weiser**, an individual, whose address is P.O. Box 1205, Marshall, TX 75671, and:

**Elizabeth Key Smith**, an individual, whose address is 401 Eastmoor Drive, Marshall, TX 75672, and:

**Albert W. Key, Jr.**, an individual, whose address is 216-C Saint Michael Street, Mobile, AL 36602, and:

**Elizabeth Key Anderton**, an individual, whose address is P.O. Box 379, Point Clear, AL 36564, and:

**Alice Key Myrick**, f/k/a Alice Avent Key, an individual, whose address is 15308 River Road, Fairhope, AL 36532, and:

**Hobart Reid Key**, an individual, whose address is P.O. Box 1545, Point Clear, AL 36564, and:

**Richard Murray Key**, an individual, whose address is P.O. Box 768, Point Clear, AL 36564, and:

**Thomas Rutherford Key**, an individual, whose address is 23-1 Cabaniss Crescent, Pensacola, FL 32508, and:

**David Blacksher Key**, an individual, whose address is P.O. Box 768, Point Clear, AL 36564, and:

(hereinafter collectively referred to as "**Assignors**"):

1

2607 VOL: 845 PG: 305

for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVER and DELIVER unto:

> SKLARCO L.L.C., a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President - Chief Operating Officer, David A. Barlow ("Sklarco") (hereinafter sometimes referred to as the "**Assignee**");

all of Assignors' right, title and interest in and to the following (hereinafter collectively referred to as the "Assinged Interests"): The Oil and Gas Leases (collectively, the "**Leases**") described in Exhibit "A" attached hereto and by reference made a part hereof, said Leases covering lands located in Marion County, Texas; all wells located on the Leases or on lands pooled, unitized or communitized therewith (the "**Wells**"), including, without limitation, the Wells described in Exhibit "B" attached hereto and by reference made a part hereof; all presently existing and valid oil and gas sales, purchase, transportation, gathering, balancing, exchange and processing contracts, casinghead gas contracts, participation agreements, operating agreements, compression agreements, joint venture agreements and other agreements and instruments (the "**Contracts**"), including, without limitation, those Contracts described on Exhibit "C" attached hereto and by reference made a part hereof, insofar and only insofar as they relate to the Assigned Interests and to the extent the transfer thereof is not prohibited or restricted by law or contract; all personal property, improvements, lease and well equipment located on the site of, or used in association, with any of the Wells (the "**Equipment**"), including, without limitation, the Equipment described on Exhibit "D" attached hereto and by reference made a part hereof; all easements, servitudes, surface use agreements and rights-of-way (collectively, the "**Easements**") described in Exhibit "E" attached hereto and by reference made a part hereof.

> **TO HAVE AND TO HOLD** the Assigned Interests unto Assignee, its successors and assigns, forever, together with all rights, privileges, easements, tenements, hereditaments, improvements, equipment, appurtenances, and the like belonging or appertaining thereto, in accordance with and subject to, and in accordance with, the terms, provisions and conditions of this Assignment.

> This Assignment is made effective as of June 1, 2012 (the "**Effective Date**").

> The Assigned Interests are assigned herein without limitation as to depth or formation, except as may be provided in any of the Leases and all other instruments of record affecting the Leases (the "**Recorded Instruments**") or unrecorded instruments expressly described in this Assignment.

> This Assignment is made without warranty of title, express or implied, not even for return of the purchase price, except Assignor agrees to warrant title against all defects arising out of claims by Assignor or of persons claiming by, through or under Assignor. To the extent transferable, Assignor does hereby transfer and convey to Assignees the benefits of and the right to enforce all covenants and warranties that Assignor is entitled to enforce with respect to the Assigned Interests, including, without limitation, full substitution and subrogation of all prior rights and warranty, and the benefit of and the right to enforce all rights accruing under applicable statutes of limitation or prescription.

> The Assigned Interests are assigned subject to the terms and provisions of the Leases and the Contracts, including, without limitation, the lessor's royalty under each of the Leases. The Assigned Interests are assigned further subject to all of the terms and conditions of all instruments of record affecting the same, including, without limitation, those instruments described in Exhibit "F" (the "**Recorded Instruments**"). Without limitation upon the foregoing, the Assigned Interests are assigned subject to the overriding royalty interests stipulated in those Recorded Instruments.

> The Contracts and Recorded Instruments are referenced herein only for purposes of identification. Nothing herein shall be deemed to be an acknowledgment or ratification by the

2

2607 VOL: 845 PG: 306

parties hereto of any such instrument, and no reference made herein to an instrument or agreement which is not presently binding on the parties hereto shall operate to give effect to such instrument, except to the extent that Assignee herein assumes the liabilities and obligations associated with the Assigned Interests which are currently binding on Assignor, and which arise after the Effective Date hereof, as provided hereinbelow.

The Assigned Interests are assigned subject to the terms and provisions of all presently existing and valid oil, gas or mineral unitization, pooling, communitization agreements, declarations, orders, rules, regulations or other official acts of any federal, state or other governmental authority having jurisdiction and the units created thereby, insofar and only insofar as they relate to the Assigned Interests, including, without limitation, that certain Order _____

Assignee hereby assumes its share of all costs, obligations and liabilities attributable to the Assigned Interests that arise from and after the Effective Date.

This Assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.  The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

### ASSIGNORS

_____
Albert W. Key

_____
Hobart Rutherford Key

_____
Swann Key Wicker

_____
Amy Key Keith

_____
Frances A. Rounds

_____
Thomas Fisher Key

_____
Richard Garrett Key

3

hereof, as provided hereinbelow.

The Assigned Interests are assigned subject to the terms and provisions of all presently existing and valid oil, gas or mineral unitization, pooling, communitization agreements, declarations, orders, rules, regulations or other official acts of any federal, state or other governmental authority having jurisdiction and the units created thereby, insofar and only insofar as they relate to the Assigned Interests, including, without limitation, that certain Order ________

Assignee hereby assumes its share of all costs, obligations and liabilities attributable to the Assigned Interests that arise from and after the Effective Date.

This Assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

**ASSIGNORS**

RECORDER'S MEMORANDUM:
All or parts of the text on this page was not clearly legible for satisfactory recordation.

________________________
Albert W. Key

*Hobart Rutherford Key*
________________________
Hobart Rutherford Key

________________________
Swann Key Wicker

________________________
Amy Key Keith

________________________
Frances A. Rounds

________________________
Thomas Fisher Key

________________________
Richard Garrett Key

2607 VOL: 845 PG: 308

parties hereto of any such instrument, and no reference made herein to an instrument or agreement which is not presently binding on the parties hereto shall operate to give effect to such instrument, except to the extent that Assignee herein assumes the liabilities and obligations associated with the Assigned Interests which are currently binding on Assignor, and which arise after the Effective Date hereof, as provided hereinbelow.

The Assigned Interests are assigned subject to the terms and provisions of all presently existing and valid oil, gas or mineral unitization, pooling, communitization agreements, declarations, orders, rules, regulations or other official acts of any federal, state or other governmental authority having jurisdiction and the units created thereby, insofar and only insofar as they relate to the Assigned Interests, including, without limitation, that certain Order _____

Assignee hereby assumes its share of all costs, obligations and liabilities attributable to the Assigned Interests that arise from and after the Effective Date.

This Assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

<u>**ASSIGNORS**</u>

_____
Albert W. Key

_____
Hobart Rutherford Key

_Swann Key Wicker_
Swann Key Wicker

_____
Amy Key Keith

_____
Frances A. Rounds

_____
Thomas Fisher Key

_____
Richard Garrett Key

3

2607 VOL: 845 PG: 309

parties hereto of any such instrument, and no reference made herein to an instrument or agreement which is not presently binding on the parties hereto shall operate to give effect to such instrument, except to the extent that Assignee herein assumes the liabilities and obligations associated with the Assigned Interests which are currently binding on Assignor, and which arise after the Effective Date hereof, as provided hereinbelow.

The Assigned Interests are assigned subject to the terms and provisions of all presently existing and valid oil, gas or mineral unitization, pooling, communitization agreements, declarations, orders, rules, regulations or other official acts of any federal, state or other governmental authority having jurisdiction and the units created thereby, insofar and only insofar as they relate to the Assigned Interests, including, without limitation, that certain Order _____

Assignee hereby assumes its share of all costs, obligations and liabilities attributable to the Assigned Interests that arise from and after the Effective Date.

This Assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

## ASSIGNORS

_____
Albert W. Key

_____
Hobart Rutherford Key

_____
Swann Key Wicker

_____
Amy Key Keith

_____
Frances A. Rounds

_____
Thomas Fisher Key

_____
Richard Garrett Key

3

2607 VOL: 845 PG: 310

parties hereto of any such instrument, and no reference made herein to an instrument or agreement which is not presently binding on the parties hereto shall operate to give effect to such instrument, except to the extent that Assignee herein assumes the liabilities and obligations associated with the Assigned Interests which are currently binding on Assignor, and which arise after the Effective Date hereof, as provided hereinbelow.

The Assigned Interests are assigned subject to the terms and provisions of all presently existing and valid oil, gas or mineral unitization, pooling, communitization agreements, declarations, orders, rules, regulations or other official acts of any federal, state or other governmental authority having jurisdiction and the units created thereby, insofar and only insofar as they relate to the Assigned Interests, including, without limitation, that certain Order _____

Assignee hereby assumes its share of all costs, obligations and liabilities attributable to the Assigned Interests that arise from and after the Effective Date.

This Assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

### ASSIGNORS

_____
Albert W. Key

_____
Hobart Rutherford Key

_____
Swann Key Wicker

_____
Amy Key Keith

_____
Frances A. Rounds

_____
Susanna Key Weiser

_____
Elizabeth Key Smith

_____
Albert W. Key, Jr.

_____
Elizabeth Key Anderton

2607 VOL: 845 PG: 311

parties hereto of any such instrument, and no reference made herein to an instrument or agreement which is not presently binding on the parties hereto shall operate to give effect to such instrument, except to the extent that Assignee herein assumes the liabilities and obligations associated with the Assigned Interests which are currently binding on Assignor, and which arise after the Effective Date hereof, as provided hereinbelow.

The Assigned Interests are assigned subject to the terms and provisions of all presently existing and valid oil, gas or mineral unitization, pooling, communitization agreements, declarations, orders, rules, regulations or other official acts of any federal, state or other governmental authority having jurisdiction and the units created thereby, insofar and only insofar as they relate to the Assigned Interests, including, without limitation, that certain Order _____

Assignee hereby assumes its share of all costs, obligations and liabilities attributable to the Assigned Interests that arise from and after the Effective Date.

This Assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

### ASSIGNORS

_____
Albert W. Key

_____
Hobart Rutherford Key

_____
Swann Key Wicker

_____
Amy Key Keith

_____
Frances A. Rounds

_____
Thomas Fisher Key

_____
Richard Garrett Key

3

2607 VOL: 845 PG: 314

_____
Susanna Key Weiser


_____
Elizabeth Key Smith


_____
Albert W. Key, Jr.


_____
Elizabeth Key Anderton


_____
Alice Key Myrick, f/k/a Alice Avent Key


_____
Hobart Reid Key


_____
Richard Murray Key


_____
Thomas Rutherford Key


_____
David Blacksher Key



**ASSIGNEES**

SKLARCO L.L.C.

By _____
       David A. Barlow
       President-Chief Operating Officer

4

2607 VOL: 845 PG: 312

parties hereto of any such instrument, and no reference made herein to an instrument or agreement which is not presently binding on the parties hereto shall operate to give effect to such instrument, except to the extent that Assignee herein assumes the liabilities and obligations associated with the Assigned Interests which are currently binding on Assignor, and which arise after the Effective Date hereof, as provided hereinbelow.

The Assigned Interests are assigned subject to the terms and provisions of all presently existing and valid oil, gas or mineral unitization, pooling, communitization agreements, declarations, orders, rules, regulations or other official acts of any federal, state or other governmental authority having jurisdiction and the units created thereby, insofar and only insofar as they relate to the Assigned Interests, including, without limitation, that certain Order _____

Assignee hereby assumes its share of all costs, obligations and liabilities attributable to the Assigned Interests that arise from and after the Effective Date.

This Assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

### ASSIGNORS

_____
Albert W. Key

_____
Hobart Rutherford Key

_____
Swann Key Wicker

_____
Amy Key Keith

_____
Frances A. Rounds

_____
Thomas Fisher Key

_____
Richard Garrett Key

3

2607 VOL: 1845 PG: 313

_Susanna Key Weiser_
Susanna Key Weiser

_Elizabeth Key Smith_
Elizabeth Key Smith

_____
Albert W. Key, Jr.

_____
Elizabeth Key Anderton

_____
Alice Key Myrick, f/k/a Alice Avent Key

_____
Hobart Reid Key

_____
Richard Murray Key

_____
Thomas Rutherford Key

_____
David Blacksher Key

**ASSIGNEES**

SKLARCO L.L.C.

By _____
        David A. Barlow
        President-Chief Operating Officer

4

2607 VOL: 845 PG: 315

_____
Susanna Key Weiser


_____
Elizabeth Key Smith


_____
Albert W. Key, Jr.


_____
Elizabeth Key Anderton


_____
Alice Key Myrick, f/k/a Alice Avent Key


_____
Hobart Reid Key


_____
Richard Murray Key


_____
Thomas Rutherford Key


_____
David Blacksher Key




**ASSIGNEES**

SKLARCO L.L.C.

By _____

    David A. Barlow
    President-Chief Operating Officer




4

2607 VOL: 845 PG: 316

## ACKNOWLEDGEMENTS

STATE OF ALABAMA

COUNTY OF BALDWIN

This instrument was acknowledged before me on the __12__ day of _September_ 2012, by Albert W. Key, for the purposes and consideration therein expressed, and in the capacity therein stated.

_Linda D Tomlin_
Notary Public, State of Alabama
_Linda D. Tomlin_
Notary's Printed Name
My commission expires: NOTARY PUBLIC STATE OF ALABAMA AT LARGE
COMMISSION EXPIRES: May 28, 2013
BONDED THRU NOTARY PUBLIC UNDERWRITERS

STATE OF TEXAS

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____, 2012, by HOBART RUTHERFORD KEY for the purposes and consideration therein expressed.

Notary Public, State of Texas

Notary's Printed Name
My commission expires:_____

STATE OF TEXAS

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____, 2012, by SWANN KEY WICKER for the purposes and consideration therein expressed.

Notary Public, State of Texas

Notary's Printed Name
My commission expires:_____

STATE OF TEXAS

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____, 2012, by AMY KEY KEITH for the purposes and consideration therein expressed.

Notary Public, State of Texas

Notary's Printed Name
My commission expires:_____

5

COUNTY OF BALDWIN

2607 VOL: 845 PG: 317

This instrument was acknowledged before me on the _____ day of _____, 2012, by Albert W. Key, for the purposes and consideration therein expressed, and in the capacity therein stated.

_____
Notary Public, State of Alabama

_____
Notary's Printed Name
My commission expires:_____

STATE OF TEXAS

COUNTY OF Marion

This instrument was acknowledged before me on this 12 day of Sept, 2012, by HOBART RUTHERFORD KEY for the purposes and consideration therein expressed.

JOSIE A BALL
Notary Public
State of Texas
Comm. Expires 5-7-2016

Josie A. Ball
Notary Public, State of Texas
Josie A. Ball
Notary's Printed Name
My commission expires: 5-7-16

STATE OF TEXAS

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____, 2012, by SWANN KEY WICKER for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____

STATE OF TEXAS

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____, 2012, by AMY KEY KEITH for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____

2607 VOL: 845 PG: 318

## ACKNOWLEDGEMENTS

STATE OF ALABAMA

COUNTY OF BALDWIN

This instrument was acknowledged before me on the _____ day of _____, 2012, by Albert W. Key, for the purposes and consideration therein expressed, and in the capacity therein stated.

_____

Notary Public, State of Alabama

_____
Notary's Printed Name
My commission expires:_____

STATE OF TEXAS

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____, 2012, by HOBART RUTHERFORD KEY for the purposes and consideration therein expressed.

_____

Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____

STATE OF TEXAS

COUNTY OF _Marion_

This instrument was acknowledged before me on this _21st_ day of _September_ 2012, by SWANN KEY WICKER for the purposes and consideration therein expressed.

CAROL L WALKER
NOTARY PUBLIC
STATE OF TEXAS
My Comm... .....ir. Expires 12-22-2013

_Carol L. Walker_

Notary Public, State of Texas

_Carol L. Walker_
Notary's Printed Name
My commission expires:_12-22-2013_

STATE OF TEXAS

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____, 2012, by AMY KEY KEITH for the purposes and consideration therein expressed.

_____

Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____

5

2607 VOL: 845 PG: 319

## ACKNOWLEDGEMENTS

STATE OF ALABAMA

COUNTY OF BALDWIN

This instrument was acknowledged before me on the _____ day of _____, 2012, by Albert W. Key, for the purposes and consideration therein expressed, and in the capacity therein stated.

_____
Notary Public, State of Alabama

_____
Notary's Printed Name
My commission expires:_____

STATE OF TEXAS

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____, 2012, BY HOBART RUTHERFORD KEY for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____

STATE OF TEXAS

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____, 2012, by SWANN KEY WICKER for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____

STATE OF TEXAS

COUNTY OF Kendall

This instrument was acknowledged before me on this 13th day of Sept. 2012, by AMY KEY KEITH for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

Randall E. Young
Notary's Printed Name
My commission expires: 09-19-2014

RANDALL E. YOUNG
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
09-19-2014

5

2607 VOL= 845 PG= 320

## ACKNOWLEDGEMENTS

STATE OF ALABAMA

COUNTY OF BALDWIN

This instrument was acknowledged before me on the _____ day of _____, 2012, by Albert W. Key, for the purposes and consideration therein expressed, and in the capacity therein stated.

_____
Notary Public, State of Alabama

_____
Notary's Printed Name
My commission expires:_____

STATE OF TEXAS

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____, 2012, by HOBART RUTHERFORD KEY for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____

STATE OF TEXAS

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____, 2012, by SWANN KEY WICKER for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____

STATE OF TEXAS

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____, 2012, by AMY KEY KEITH for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

STATE OF TEXAS

COUNTY OF Marion

This instrument was acknowledged before me on this 20 day of Sept, 2012, by FRANCES A. ROUNDS for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

Josie A. Ball
_____
Notary's Printed Name
My commission expires: 5-7-16

JOSIE A BALL
Notary Public
State of Texas
Comm. Expires 5-7-2016

2607 VOL: 845 PG: 321

STATE OF TEXAS

COUNTY OF _____

    This instrument was acknowledged before me on this _____ day of _____, 2012, by FRANCES A. ROUNDS for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:__ _____


STATE OF CALIFORNIA

COUNTY OF _Marin_

    This instrument was acknowledged before me on the _8_ day of _Sept_, 2012, by THOMAS FISHER KEY for the purposes and consideration therein expressed.

_____
Notary Public, State of California
_Elizabeth D. Murray_
Notary's Printed Name
My commission expires: _Jan 7, 2016_

ELIZABETH D. MURRAY
Commission # 1965918
Notary Public - California
Marin County
My Comm. Expires Jan 7, 2016


STATE OF NEW YORK

COUNTY OF _____

    This instrument was acknowledged before me on this _____ day of _____, 2012, by RICHARD GARRETT KEY for the purposes and consideration therein expressed.

_____
Notary Public, State of New York

_____
Notary's Printed Name
My commission expires:_____


STATE OF TEXAS

COUNTY OF HARRISON

    This instrument was acknowledged before me on this _____ day of _____, 2012, by SUSANNA KEY WEISER for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____

6

2607 VOL: 845 PG: 325

STATE OF TEXAS

COUNTY OF HARRISON

This instrument was acknowledged before me on this _____ day of _____, 2012, by ELIZABETH KEY SMITH for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____


STATE OF ALABAMA

COUNTY OF BALDWIN

This instrument was acknowledged before me on this _12_ day of _September_ 2012, by ALBERT W. KEY, JR for the purposes and consideration therein expressed.

_____
Notary Public, State of Alabama
_Linda D. Tomlin_
Notary's Printed Name    NOTARY PUBLIC STATE OF ALABAMA AT LARGE
                         MY COMMISSION EXPIRES: May 26, 2013
My commission expires:BONDED THRU NOTARY PUBLIC UNDERWRITERS

STATE OF ALABAMA

COUNTY OF BALDWIN

This instrument was acknowledged before me on this _12_ day of _September_ 2012, by ELIZABETH KEY ANDERTON for the purposes and consideration therein expressed.

_____
Notary Public, State of Alabama
_Linda D. Tomlin_
Notary's Printed Name    NOTARY PUBLIC STATE OF ALABAMA AT LARGE
                         MY COMMISSION EXPIRES: May 26, 2013
My commission expires:BONDED THRU NOTARY PUBLIC UNDERWRITERS

STATE OF ALABAMA

COUNTY OF BALDWIN

This instrument was acknowledged before me on this _12_ day of _September_ 2012, by ALICE KEY MYRICK, f/k/a ALICE AVENT KEY for the purposes and consideration therein expressed.

_____
Notary Public, State of Alabama
_Linda D. Tomlin_
Notary's Printed Name    NOTARY PUBLIC STATE OF ALABAMA AT LARGE
                         MY COMMISSION EXPIRES: May 26, 2013
My commission expires:BONDED THRU NOTARY PUBLIC UNDERWRITERS

7

2607 VOL: 845 PG: 322

STATE OF TEXAS

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____, 2012, by FRANCES A. ROUNDS for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____


STATE OF CALIFORNIA

COUNTY OF _____

This instrument was acknowledged before me on the _____ day of _____, 2012, by THOMAS FISHER KEY for the purposes and consideration therein expressed.

_____
Notary Public, State of California

_____
Notary's Printed Name
My commission expires:_____


STATE OF NEW YORK

COUNTY OF New York

This instrument was acknowledged before me on this 12th day of September 2012, by RICHARD GARRETT KEY for the purposes and consideration therein expressed.

MICHAEL J GREENE
Notary Public - State of New York
No. 01GR5219006
Qualified in Nassau County
My Commission Expires June 21, 2014

_____
Notary Public, State of New York
Michael Greene
_____
Notary's Printed Name
My commission expires: 06/21/2014


STATE OF TEXAS

COUNTY OF HARRISON

This instrument was acknowledged before me on this _____ day of _____, 2012, by SUSANNA KEY WEISER for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____

6

2607 VOL: 845 PG: 323

STATE OF TEXAS

COUNTY OF _____

    This instrument was acknowledged before me on this _____ day of _____, 2012, by FRANCES A. ROUNDS for the purposes and consideration therein expressed.

                          _____
                          Notary Public, State of Texas
                          _____
                          Notary's Printed Name
                          My commission expires:_____

STATE OF CALIFORNIA

COUNTY OF _____

    This instrument was acknowledged before me on the _____ day of _____, 2012, by THOMAS FISHER KEY for the purposes and consideration therein expressed.

                          _____
                          Notary Public, State of California
                          _____
                          Notary's Printed Name
                          My commission expires:_____

STATE OF NEW YORK

COUNTY OF _____

    This instrument was acknowledged before me on this _____ day of _____, 2012, by RICHARD GARRETT KEY for the purposes and consideration therein expressed.

                          _____
                          Notary Public, State of New York
                          _____
                          Notary's Printed Name
                          My commission expires:_____

STATE OF TEXAS

COUNTY OF HARRISON

    This instrument was acknowledged before me on this _17th_ day of _September_, 2012, by SUSANNA KEY WEISER for the purposes and consideration therein expressed.

                          _Dorothy Lowrimore_
                          Notary Public, State of Texas
                          _Dorothy Lowrimore_
                          Notary's Printed Name
                          My commission expires:_12·13·15_

DOROTHY LOWRIMORE
Notary Public
STATE OF TEXAS
My Comm. Exp. 12-13-15

6

2607 VOL: 845 PG: 324

STATE OF TEXAS

COUNTY OF HARRISON

This instrument was acknowledged before me on this 17ᵗʰ day of September 2012, by ELIZABETH KEY SMITH for the purposes and consideration therein expressed.

*[Notary seal: DOROTHY LOWRIMORE, Notary Public, STATE OF TEXAS, My Comm. Exp. 12-13-15]*

Notary Public, State of Texas
Dorothy Lowrimore
Notary's Printed Name
My commission expires: 12·13·15

STATE OF ALABAMA

COUNTY OF BALDWIN

This instrument was acknowledged before me on this _____ day of _____, 2012, by ALBERT W. KEY, JR for the purposes and consideration therein expressed.

_____
Notary Public, State of Alabama
_____
Notary's Printed Name
My commission expires:_____

STATE OF ALABAMA

COUNTY OF BALDWIN

This instrument was acknowledged before me on this _____ day of _____, 2012, by ELIZABETH KEY ANDERTON for the purposes and consideration therein expressed.

_____
Notary Public, State of Alabama
_____
Notary's Printed Name
My commission expires:_____

STATE OF ALABAMA

COUNTY OF BALDWIN

This instrument was acknowledged before me on this _____ day of _____, 2012, by ALICE KEY MYRICK, f/k/a ALICE AVENT KEY for the purposes and consideration therein expressed.

_____
Notary Public, State of Alabama
_____
Notary's Printed Name
My commission expires:_____

7

2607 VOL: 845 PG: 326

STATE OF ALABAMA

COUNTY OF BALDWIN

This instrument was acknowledged before me on this _12_ day of _September_ 2012, by HOBART REID KEY for the purposes and consideration therein expressed.



Notary Public, State of Alabama

Linda D. Tomlin
Notary's Printed Name

My commission expires: NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: May 26, 2013
BONDED THRU NOTARY PUBLIC UNDERWRITERS

STATE OF ALABAMA

COUNTY OF BALDWIN

This instrument was acknowledged before me on this _12_ day of _September_ 2012, by RICHARD MURRAY KEY for the purposes and consideration therein expressed.



Notary Public, State of Alabama

Linda D. Tomlin
Notary's Printed Name

My commission expires: NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: May 26, 2013
BONDED THRU NOTARY PUBLIC UNDERWRITERS

STATE OF _ALABAMA_

COUNTY OF _BALDWIN_

This instrument was acknowledged before me on this _12_ day of _September_ 2012, by THOMAS RUTHERFORD KEY for the purposes and consideration therein expressed.



Notary Public, State of _Alabama_

Linda D. Tomlin
Notary's Printed Name

My commission expires: NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: May 26, 2013
BONDED THRU NOTARY PUBLIC UNDERWRITERS

STATE OF ALABAMA

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____, 2012, by DAVID BLACKSHER KEY for the purposes and consideration therein expressed.

_____

Notary Public, State of Alabama

_____

Notary's Printed Name

My commission expires:_____

8

2607 VOL: 845 PG: 327

STATE OF ALABAMA

COUNTY OF BALDWIN

This instrument was acknowledged before me on this _____ day of_____, 2012, by HOBART REID KEY for the purposes and consideration therein expressed.

_____
Notary Public, State of Alabama
_____
Notary's Printed Name
My commission expires:_____

STATE OF ALABAMA

COUNTY OF BALDWIN

This instrument was acknowledged before me on this _____ day of_____, 2012, by RICHARD MURRAY KEY for the purposes and consideration therein expressed.

_____
Notary Public, State of Alabama
_____
Notary's Printed Name
My commission expires:_____

STATE OF _____

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of_____, 2012, by THOMAS RUTHERFORD KEY for the purposes and consideration therein expressed.

_____
Notary Public, State of
_____
Notary's Printed Name
My commission expires:_____

STATE OF ~~ALABAMA~~ Oregon

COUNTY OF Klamath

This instrument was acknowledged before me on this 11th day of September 2012, by DAVID BLACKSHER KEY for the purposes and consideration therein expressed.

_____
Notary Public, State of ~~Alabama~~ Oregon
_____
Notary's Printed Name
My commission expires:_____

OFFICIAL SEAL
HEATHER ANNE SCIURBA
NOTARY PUBLIC-OREGON
COMMISSION NO. 445212
MY COMMISSION EXPIRES FEBRUARY 09, 2014

8

2607 VOL: 845 PG: 328

STATE OF LOUISIANA

PARISH OF CADDO

I, _Kim S. Elias_, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President/chief operating officer for SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _3rd_ day of _October_, 201~~x~~ 2012

_Kim S. Elias_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _at death_

Kim S. Elias, Notary Public # 62698
Caddo Parish, Louisiana
My Commission is for Life

9

2607 VOL: 845 PG: 329

## EXHIBIT A

Attached to and made a part of that certain Assignment Of Oil and Gas Leases And Bill Of Sale dated effective as of June 1, 2012, by and between Albert W. Key, et al, as Assignors, and Sklarco L.L.C., as Assignee.

1. Oil, Gas and Mineral Lease dated July 3, 2008, by and between Martha L. Hartford, as Lessor, and Key & Key Brothers, as Lessee, filed in Book 771, Page 34 of the county records of Marion County, Texas;

2. Oil, Gas and Mineral Lease dated July 10, 2008, by and between Charles J. Wise Bypass Trust, as Lessor, and Key & Key Brothers, as Lessee, filed in Book 771, Page 27 of the county records of Marion County, Texas;

3. Oil, Gas and Mineral Lease dated July 10, 2008, by and between John M. Armistead, as Lessor, and Key & Key Brothers, as Lessee, filed in Book 771, Page 25 of the county records of Marion County, Texas;

4. Oil, Gas and Mineral Lease dated July 3, 2008, by and between Dawson Revocable Living Trust, as Lessor, and Key & Key Brothers, as Lessee, filed in Book 771, Page 32 of the county records of Marion County, Texas

2607  VOL:  845  PG:  330

## EXHIBIT B

Attached to and made a part of that certain Assignment Of Oil and Gas Leases And Bill Of Sale
dated effective as of June 1, 2012, by and between Albert W. Key, et al. as Assignors, and
Sklarco L.L.C., as Assignee.

## DESCRIPTION OF WELLS

Eagle Dolly Bell Key #1 Well, Woodlawn Field, William Mason Survey, A-270 Marion County,
Texas; (API #42-315-80292)

2607 VOL: 845 PG: 331

## EXHIBIT C

Attached to and made a part of that certain Assignment Of Oil and Gas Leases And Bill Of Sale dated effective as of June 1, 2012, by and between Albert W. Key, et al. as Assignors. and Sklarco L.L.C., as Assignee.

## DESCRIPTION OF CONTRACTS

1. That certain contract dated _____ by and between Plains Marketing and _____ pertaining to the Eagle Dolly Bell Key #1 Well, Woodlawn Field, William Mason Survey, A-270 Marion County, Texas; (API #42-315-80292);

2. That certain contract dated _____ by and between Upshur Rural Electric Cooperative and ____;

3. Any and all contracts, recorded or unrecorded pertaining the Eagle Dolly Bell Key #1 Well, Woodlawn Field, William Mason Survey, A-270 Marion County, Texas; (API #42-315-80292) and or the 842.69 acres of land, more or less, being part of a 846.69 acre tract of land located in Marion County, Texas, being described as 561 acres of the William Mason Survey, A-270; 16.0 acres of the John G. Shoemaker Survey, A-347; all of the C.C. Coppedge Survey, A-94, containing 189.98 acres, and all of the E. & S.T. Greer Survey, A-181, containing 75.71 acres of land, and 4 acres out of the E.E. Hamilton Survey, A-182, and being the same land described in a Deed from Betty Grace Wise, et al, to Mrs. Dolly Bell Key, dated December 28, 1940 and recorded in Volume 119, Page 76, in the Deed Records of Marion County, Texas, LESS AND EXCEPT 4.0 acres, more or less, located in the E.E. Hamilton Survey, A-182, Marion County, Texas, and being the same land described in Warranty Deed dated September 8, 1941, from Dolly Bell Key to John Messenger, et ux, Mary Estella Messenger, recorded in Volume 120, Page 66, in the Deed Records of Marion County, Texas.

2607 VOL: 845 PG: 332

### EXHIBIT D

Attached to and made a part of that certain Assignment Of Oil and Gas Leases And Bill Of Sale
dated effective as of June 1, 2012, by and between Albert W. Key, et al, as Assignors, and
Sklarco L.L.C., as Assignee.

### EQUIPMENT

All surface equipment and all casing, tubing, rods and other down hole equipment pertaining to
the Eagle Dolly Bell Key #1 Well, Woodlawn Field, William Mason Survey, A-270 Marion
County, Texas; (API #42-315-80292).

2607 VOL: 845 PG: 333

## EXHIBIT E

Attached to and made a part of that certain Assignment Of Oil and Gas Leases And Bill Of Sale dated effective as of June 1, 2012, by and between Albert W. Key, et al, as Assignors, and Sklarco L.L.C., as Assignee.

### DESCRIPTION OF EASEMENTS

1. That certain Right of Way by and between _____ and _____ dated _____ and recorded in Vol ___, Page ___, in Marion County, Texas;

14

2607 VOL: 845 PG: 334

## EXHIBIT F

Attached to and made a part of that certain Assignment Of Oil and Gas Leases And Bill Of Sale dated effective as of June 1, 2012, by and between Albert W. Key, et al, as Assignors, and Sklarco L.L.C., as Assignee.

## RECORDED INSTRUMENTS

1. That certain Assignment of Oil and Gas Leases dated effective September 5, 2008, by and between Key & Key Brothers and Albert W. Key, et al, recorded in Volume 780, Page 70, of the county records of Marion County, Texas, and recorded in Volume 4083, Page 244 of the county records of Harrison County, Texas;

2. That certain Assignment of Oil and Gas Leases dated effective September 6, 2008, by and between Key Family Marital Deduction Trust, established under the will of David R. Key, deceased, and Frances A. Rounds, recorded in Volume 780, Page 68, of the county records of Marion County, Texas, and recorded in Volume 4083, Page 253 of the county records of Harrison County, Texas;

3. That certain Assignment of Oil and Gas Leases dated effective September 6, 2008, by and between Mary Hobart Key and Thomas Fisher Key, et al, recorded in Volume 780, Page 174, of the county records of Marion County, Texas, and recorded in Volume 4083, Page 251 of the county records of Harrison County, Texas;

4. That certain Assignment of Oil and Gas Leases dated effective September 6, 2008, by and between Albert W. Key, et ux, and Albert W. Key, Jr., et al, recorded in Volume 780, Page 176, of the county records of Marion County, Texas, and recorded in Volume 4083, Page 255 of the county records of Harrison County, Texas;

5. That certain Assignment of Oil and Gas Leases dated January 12, 2009, by and between Mary Hobart Key and Thomas Fisher Key, et al, recorded in Volume 780, Page 179, of the county records of Marion County, Texas;

STATE OF TEXAS                    COUNTY OF MARION    FILED FOR RECORD
I hereby certify that this instrument was filed on
the date and time stamped hereon  by me  and   Oct 05,2012 09:37A
was duly recorded  in the volume and page of the
named records of  Marion County, Texas as stamped VICKIE SMITH,
hereon by me.            OFFICIAL PUBLIC RECORDS    COUNTY CLERK
                                                   MARION COUNTY, TEXAS
                  15
             Oct 05,2012 09:37A                    By:

VICKIE SMITH, COUNTY CLERK                         Katie Sutton
MARION COUNTY, TEXAS                               DEPUTY

## EXHIBIT "A-3"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

307 VOL: 852 PG: 249

## ASSIGNMENT OF OIL AND GAS LEASES AND BILL OF SALE

**STATE OF TEXAS**

**COUNTY OF MARION**

### KNOW ALL MEN BY THESE PRESENTS THAT:

**Hobart Rutherford Key**, an individual, whose address is 649 FM 2208, Jefferson, Texas, 75657, and;

**Hobart Rutherford Key**, as Trustee of the Key Family Marital Deduction Trust, whose address is P.O. Box 855, Jefferson, Texas, 75657, and;

**Swann Key Wicker**, an individual, whose address is 3701 Coffeeville Road, Jefferson, TX 75657, and;

**Amy Key Keith**, an individual, whose address is 134 Riverwood, Boerne, TX 78006, and;

**Frances A. Rounds**, an individual, whose address is 759 F. M. Road 2208, Jefferson, Texas 75657, and;

**Susanna Key Weiser**, an individual, whose address is P.O. Box 1205, Marshall, TX 75671, and;

**Elizabeth Key Smith**, an individual, whose address is 401 Eastmoor Drive, Marshall, TX 75672;

(hereinafter collectively referred to as "**Assignors**");

for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVER and DELIVER unto:

**SKLARCO L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President - Chief Operating Officer, David A. Barlow ("Sklarco") (hereinafter sometimes referred to as the "**Assignee**");

all of Assignors' right, title and interest in and to the following (hereinafter collectively referred to as the "Assigned Interests"): The Oil and Gas Leases (collectively, the "**Leases**") described in Exhibit "A" attached hereto and by reference made a part hereof, said Leases covering lands located in Marion County, Texas; all wells located on lands covered by the Leases or on lands pooled, unitized or communitized therewith (the "**Wells**"), including, without limitation, the Wells described in Exhibit "B" attached hereto and by reference made a part hereof; all presently existing and valid oil and gas sales, purchase, transportation, gathering, balancing, exchange and processing contracts, casinghead gas contracts, participation agreements, operating agreements, compression agreements, joint venture agreements and other agreements and instruments (the "**Contracts**"), including, without limitation, those Contracts described on Exhibit "C" attached hereto and by reference made a part hereof, insofar and only insofar as they relate to the Assigned Interests and to the extent the transfer thereof is not prohibited or restricted by law or contract; all personal property, improvements, lease and well equipment located on the site of, or used in association, with any of the Wells (the "**Equipment**"), including, without limitation, the Equipment

1

described on Exhibit "D" attached hereto and by reference made a part hereof; all easements, servitudes, surface use agreements and rights-of-way (collectively, the "**Easements**") described in Exhibit "E" attached hereto and by reference made a part hereof.

**TO HAVE AND TO HOLD** the Assigned Interests unto Assignee, its successors and assigns, forever, together with all rights, privileges, easements, tenements, hereditaments, improvements, equipment, appurtenances, and the like belonging or appertaining thereto, in accordance with and subject to, and in accordance with, the terms, provisions and conditions of this Assignment.

This Assignment is made effective as of December 1, 2012 (the "**Effective Date**").

Assignors hereby exclude from this Assignment, and reserve unto themselves, any minerals in and under, any royalty which may be produced from or any overriding royalty interest carved out of the leasehold interest under, any of the Leases or the lands covered by the Leases or lands pooled or unitized therewith.

The Assigned Interests are assigned subject to the terms and provisions of the Leases and the Contracts, including without limitation, the lessor's royalty under each of the Leases. The Assigned Interests are assigned further subject to all of the terms and conditions of all instruments of record affecting the same, including, without limitation, those instruments described in Exhibit "F" (the "**Recorded Instruments**"). Without limitation upon the foregoing, the Assigned Interests are assigned subject to any overriding royalty interests stipulated in those Recorded Instruments. The Assigned Interests are assigned herein without limitation as to depth or formation, except as may be provided in any of the Leases or the Recorded Instruments or any unrecorded instruments expressly described in this Assignment.

This Assignment is made without warranty of title, express or implied, not even for return of the purchase price, except Assignors warrant and agree to defend title against all defects or encumbrances arising out of claims by Assignors or either of them or of persons claiming by, through or under either of the Assignors; and in that connection, Assignors specifically represent and warrant that they have full and complete authority to assign the above described interests in the Leases to Assignees, that they have not alienated or encumbered (in any manner whatsoever) the rights and interests conveyed or transferred to them (or either of them) in or under the Leases and that such rights and interests are free and clear of, and Assignor will defend title thereto and possession thereof against, any claims, interests, or liens by anyone claiming by, through or under them or either of them. To the extent transferable, Assignors do hereby transfer and convey to Assignee the benefits of and the right to enforce all covenants and warranties that Assignors are or either of the Assignors is entitled to enforce with respect to the Assigned Interests, including, without limitation, full substitution and subrogation of all prior rights and warranty, and the benefit of and the right to enforce all rights accruing under applicable statutes of limitation or prescription.

The Contracts and Recorded Instruments are referenced herein only for purposes of identification. Nothing herein shall be deemed to be an acknowledgment or ratification by the parties hereto of any such instrument, and no reference made herein to an instrument or agreement which is not presently binding on the parties hereto shall operate to give effect to such instrument, except to the extent that Assignee herein assumes the liabilities and obligations associated with the Assigned Interests which are currently binding on Assignor as provided hereinbelow.

Assignee hereby assumes its share of all costs, obligations and liabilities attributable to the Assigned Interests that arise from and after the Effective Date. In addition, Assignee hereby assumes the costs, obligations and liabilities attributable to the Assigned Interests, whether arising before or after the Effective Date, arising out of the plugging and abandonment of the following described wells or any other wells located on lands covered by the Leases or lands pooled or unitized with such lands, to-wit: Mason et al. #7 (Layline Petroleum I, L.L.C. AFE No. 2118), Reed & Bitner G #1 (Layline Petroleum I, L.L.C. AFE No. 2133), Reba Goodroe #1 (Layline Petroleum I, L.L.C. AFE No. 2126).

2

307 VOL: 852 PG: 251

Assignee is entitled to any salvage value or other credits associated with any of the Wells for which it pays the costs to plug and abandon whether the same was received or credited before or after the Effective Date.

The Assigned Interests are assigned subject to the terms and provisions of all presently existing and valid oil, gas or mineral unitization, pooling, communitization agreements, declarations, orders, rules, regulations or other official acts of any federal, state or other governmental authority having jurisdiction and the units created thereby, insofar and only insofar as they relate to the Assigned Interests, including, without limitation, that unit declaration recorded in Volume 182, Page 542 of the Deed Records of Marion County, Texas.

This Assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

**ASSIGNORS**

_Hobart Rutherford Key_

Hobart Rutherford Key, Individually


_Hobart Rutherford Key, Trustee_

Hobart Rutherford Key, as Trustee of the Key
Family Marital Deduction Trust


Swann Key Wicker


Amy Key Keith


Frances A. Rounds


3

307 VOL: 852 PG: 252

Assignee is entitled to any salvage value or other credits associated with any of the Wells for which it pays the costs to plug and abandon whether the same was received or credited before or after the Effective Date.

The Assigned Interests are assigned subject to the terms and provisions of all presently existing and valid oil, gas or mineral unitization, pooling, communitization agreements, declarations, orders, rules, regulations or other official acts of any federal, state or other governmental authority having jurisdiction and the units created thereby, insofar and only insofar as they relate to the Assigned Interests, including, without limitation, that unit declaration recorded in Volume 182, Page 542 of the Deed Records of Marion County, Texas.

This Assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

### ASSIGNORS

_____

Hobart Rutherford Key, Individually

_____

Hobart Rutherford Key, as Trustee of the Key
Family Marital Deduction Trust

_____

Swann Key Wicker

_____

Amy Key Keith

_____

Frances A. Rounds

3

307 VOL: 852 PG: 253

Assignee is entitled to any salvage value or other credits associated with any of the Wells for which it pays the costs to plug and abandon whether the same was received or credited before or after the Effective Date.

The Assigned Interests are assigned subject to the terms and provisions of all presently existing and valid oil, gas or mineral unitization, pooling, communitization agreements, declarations, orders, rules, regulations or other official acts of any federal, state or other governmental authority having jurisdiction and the units created thereby, insofar and only insofar as they relate to the Assigned Interests, including, without limitation, that unit declaration recorded in Volume 182, Page 542 of the Deed Records of Marion County, Texas.

This Assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

**ASSIGNORS**

_____
Hobart Rutherford Key, Individually


_____
Hobart Rutherford Key, as Trustee of the Key
Family Marital Deduction Trust


_____
Swann Key Wicker


_____
Amy Key Keith


_____
Frances A. Rounds


3

307 VOL: 852 PG: 254

Assignee is entitled to any salvage value or other credits associated with any of the Wells for which it pays the costs to plug and abandon whether the same was received or credited before or after the Effective Date.

The Assigned Interests are assigned subject to the terms and provisions of all presently existing and valid oil, gas or mineral unitization, pooling, communitization agreements, declarations, orders, rules, regulations or other official acts of any federal, state or other governmental authority having jurisdiction and the units created thereby, insofar and only insofar as they relate to the Assigned Interests, including, without limitation, that unit declaration recorded in Volume 182, Page 542 of the Deed Records of Marion County, Texas.

This Assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

## ASSIGNORS

_____
Hobart Rutherford Key, Individually


_____
Hobart Rutherford Key, as Trustee of the Key Family Marital Deduction Trust


_____
Swann Key Wicker


_____
Amy Key Keith


_____*Frances A. Rounds*_____
Frances A. Rounds

3

307 VOL: 852 PG: 255

Susanna Key Weiser

Elizabeth Key Smith

**ASSIGNEE**

SKLARCO L.L.C.

By _____

David A. Barlow
President-Chief Operating Officer

4

307 VOL: 852 PG: 256

_____

Susanna Key Weiser

_____

Elizabeth Key Smith

**ASSIGNEE**

SKLARCO L.L.C.

By _____

    David A. Barlow
    President-Chief Operating Officer

4

307 VOL= 852 PG= 257

## ACKNOWLEDGEMENTS

STATE OF TEXAS

COUNTY OF Marion

2013 This instrument was acknowledged before me on this __10th__ day of __January__, 2012, by H OBART RUTHERFORD KEY, individually and as Trustee of the Key Family Marital Deduction Trust, for the purposes and consideration therein expressed.

_Lynnette Fisher_
Notary Public, State of Texas

_Lynnette Fisher_
Notary's Printed Name
My commission expires: __4-25-2015__

LYNNETTE FISHER
Notary Public
STATE OF TEXAS
My Comm. Exp. April 25, 2015

STATE OF TEXAS

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____, 2012, by SWANN KEY WICKER for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____, 2012, by AMY KEY KEITH for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____, 2012, by FRANCES A. ROUNDS for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires: _____

5

307 VOL: 852 PG: 258

# ACKNOWLEDGEMENTS

STATE OF TEXAS

COUNTY OF _____

    This instrument was acknowledged before me on this _____ day of _____, 2012, by H OBART RUTHERFORD KEY, individually and as Trustee of the Key Family Marital Deduction Trust, for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas
_____
Notary's Printed Name
My commission expires:_____


STATE OF TEXAS

COUNTY OF Marton

    This instrument was acknowledged before me on this 8TH day of Jan, 2012, by SWANN KEY WICKER for the purposes and consideration therein expressed.

_Josie A. Ball_
Notary Public, State of Texas
_Josie A Ball_
Notary's Printed Name
My commission expires: 5-7-16

STATE OF TEXAS

COUNTY OF _____

    JOSIE A BALL
    Notary Public
    State of Texas
    Comm. Expires 5-7-2016

    This instrument was acknowledged before me on this _____ day of _____, 2012, by AMY KEY KEITH for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas
_____
Notary's Printed Name
My commission expires:_____


STATE OF TEXAS

COUNTY OF _____

    This instrument was acknowledged before me on this _____ day of _____, 2012, by FRANCES A. ROUNDS for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas
_____
Notary's Printed Name
My commission expires:_____

5

307 VOL: 852 PG: 259

## ACKNOWLEDGEMENTS

STATE OF TEXAS

COUNTY OF _____

    This instrument was acknowledged before me on this _____ day of _____, 2012, by H OBART RUTHERFORD KEY, individually and as Trustee of the Key Family Marital Deduction Trust, for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____

STATE OF TEXAS

COUNTY OF _____

    This instrument was acknowledged before me on this _____ day of _____, 2012, by SWANN KEY WICKER for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____

STATE OF TEXAS

COUNTY OF Kendall

    This instrument was acknowledged before me on this 10th day of January, 2013 ~~2012~~, by AMY KEY KEITH for the purposes and consideration therein expressed.

RANDALL E. YOUNG
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
09-19-2014

_____
Notary Public, State of Texas

Randall E. Young
Notary's Printed Name
My commission expires: 09-19-2014

STATE OF TEXAS

COUNTY OF _____

    This instrument was acknowledged before me on this _____ day of _____, 2012, by FRANCES A. ROUNDS for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____

5

307  VOL:  852  PG:  260

## ACKNOWLEDGEMENTS

STATE OF TEXAS

COUNTY OF _____

    This instrument was acknowledged before me on this _____ day of _____, 2012, by H OBART RUTHERFORD KEY, individually and as Trustee of the Key Family Marital Deduction Trust, for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____


STATE OF TEXAS

COUNTY OF _____

    This instrument was acknowledged before me on this _____ day of _____, 2012, by SWANN KEY WICKER for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____


STATE OF TEXAS

COUNTY OF _____

    This instrument was acknowledged before me on this _____ day of _____, 2012, by AMY KEY KEITH for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____


STATE OF TEXAS

COUNTY OF _Marion_

    This instrument was acknowledged before me on this _8th_ day of _January_, 2012, by FRANCES A. ROUNDS for the purposes and consideration therein expressed.

_Carol L. Walker_
Notary Public, State of Texas

_____
Notary's Printed Name _Carol L. Walker_
My commission expires:_ 12-22-2013_

CAROL L WALKER
NOTARY PUBLIC
STATE OF TEXAS
My Commission Expires 12-22-2013

5

307 VOL: 852 PG: 261

STATE OF TEXAS

COUNTY OF ~~HARRISON~~ Dallas

2013
~~2012,~~ This instrument was acknowledged before me on this _4th_ day of _January_, by SUSANNA KEY WEISER for the purposes and consideration therein expressed.

ERIKA MERAZ
Notary Public, State of Texas
My Commission Expires
November 20, 2013

Notary Public, State of Texas
_Erika Meraz_
Notary's Printed Name
My commission expires: _November 20, 2013_

STATE OF TEXAS

COUNTY OF ~~HARRISON~~ Dallas

2013
~~2012,~~ This instrument was acknowledged before me on this _4th_ day of _January_, by ELIZABETH KEY SMITH for the purposes and consideration therein expressed.

ERIKA MERAZ
Notary Public, State of Texas
My Commission Expires
November 20, 2013

Notary Public, State of Texas
_Erika Meraz_
Notary's Printed Name
My commission expires: _November 20, 2013_

STATE OF LOUISIANA

PARISH OF CADDO

     I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President/chief operating officer for SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____ _____, 2012.

[AFFIX NOTARIAL SEAL]

NOTARY PUBLIC

My Commission Expires: _____

_____

6

307 VOL: 852 PG: 262

STATE OF TEXAS

COUNTY OF HARRISON

This instrument was acknowledged before me on this _____ day of _____, 2012, by SUSANNA KEY WEISER for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____

STATE OF TEXAS

COUNTY OF HARRISON

This instrument was acknowledged before me on this _____ day of _____, 2012, by ELIZABETH KEY SMITH for the purposes and consideration therein expressed.

_____
Notary Public, State of Texas

_____
Notary's Printed Name
My commission expires:_____

STATE OF LOUISIANA

PARISH OF CADDO

I, Kim S. Elias_____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President/chief operating officer for SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 16th day of January _____, 2012.3

[TX NOTARIAL SEAL]

_____
NOTARY PUBLIC

My Commission Expires: at death

Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commission is for Life

6

307 VOL: 852 PG: 263

# EXHIBIT A

Attached to and made a part of that certain Assignment Of Oil and Gas Leases And Bill Of Sale dated effective as of December 1, 2012, by and between Hobart Rutherford Key et al., as Assignors, and Sklarco L.L.C., as Assignee

1. Oil, Gas and Other Mineral Lease dated February 16, 1950 from M. A. Connor & William A. Connor to E. Fred Herschbach and recorded in Volume 158, Page 476-478 of the Deed Records of Marion County, Texas.

2. Oil, Gas and Other Mineral Lease dated February 16, 1950 from O. W. Connor E. Fred Herschbach, Lessee, recorded in Volume 158, Page 472 of the Deed Records of Marion County, Texas.

3. Oil, Gas and Other Mineral Lease dated February 16, 1950 from Mrs. Lula J. Conner, f/s to E. Fred Herschbach and recorded in Volume 158, Pages 474-476 of the Deed Records of Marion County, Texas.

4. Oil, Gas and Other Mineral Lease dated February 16, 1950 from Mrs. Maggie Turner, f/s; L. S. Turner; Jerrold Turner; Maggie Lou Turner to E. Fred Herschbach and recorded in Volume 159, Pages 218-220 of the Deed Records of Marion County, Texas.

5. Oil, Gas and Other Mineral Lease dated July 7, 1951 from Abbie Cramer & J. L. Miller w/h to Billy Mikule recorded in Volume 170, Pages 25-26 of the Deed Records of Marion County, Texas.

6. Oil, Gas and Other Mineral Lease dated June 29, 1951 from Mrs. Josephine Cramer Sims, divorced to Billy Mikule and recorded in Volume 169, Pages 557-559 of the Deed Records of Marion County, Texas.

7. Oil, Gas and Other Mineral Lease dated June 29, 1951 from R. R. Cramer to Billy Mikule and recorded in Volume 169, Pages 553-555 of the Deed Records of Marion County, Texas.

8. Oil, Gas and Other Mineral Lease dated June 25, 1951 from Ettie P. & W. D. Latimer w/h to Billy Mikule and recorded in Volume 169, Pages 248-250 of the Deed Records of Marion County, Texas.

9. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Thomas Vivian & Ruth Cherry Cramer h/w to Billy Mikule and recorded in Volume 169, Pages 272-274 of the Deed Records of Marion County, Texas.

10. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Oleta Cramer & Nigal A. Timmins w/h to Billy Mikule and recorded in Volume 170, Pages 315-317 of the Deed Records of Marion County, Texas.

11. Oil, Gas and Other Mineral Lease dated July 7, 1951 from C. D. Cramer to Billy Mikule and recorded in Volume 170, Pages 17-18 of the Deed Records of Marion County, Texas.

12. Oil, Gas and Other Mineral Lease dated July 17, 1951 from W. O. Cramer to Billy Mikule and recorded in Volume 170, Pages 286-288 of the Deed Records of Marion County, Texas.

13. Oil, Gas and Other Mineral Lease dated June 29, 1951 from Ella Mae Cramer & R. G. Brian w/h to Billy Mikule and recorded in Volume 170, Pages 284-286 of the Deed Records of Marion County, Texas.

14. Oil, Gas and Other Mineral Lease dated July 7, 1951 from Thomas C. Connor to Billy Mikule and recorded in Volume 170, Pages 21-22 of the Deed Records of Marion County, Texas.

307 VOL: 852 PG: 264

15. Oil, Gas and Other Mineral Lease dated June 26, 1951 from Mrs. Sam E. Cramer, widow to Billy E. Mikule recorded in Volume 170, Pages 198-199 of the Deed Records of Marion County, Texas.

16. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Martha Elizabeth & S. A. Armstrong w/h to Billy Mikule and recorded in Volume 170, Pages 288-290 of the Deed Records of Marion County, Texas.

17. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Mrs. Erma C. Johnston, et als., Lessors, to Billy Mikule, Lessee, recorded in Volume 169, page 551 of the Deed Records of Marion County, Texas.

18. Oil, Gas and Other Mineral Lease dated July 7, 1951 from Annie Cramer to Billy Mikule and recorded in Volume 170, Pages 23-24 of the Deed Records of Marion County, Texas.

19. Oil, Gas and Other Mineral Lease dated June 26, 1951 from Albert Raymond Conly to Billy Mikule and recorded in Volume 169, Pages 277-279 of the Deed Records of Marion County, Texas.

20. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Mrs. Dollie & F. L. Huey w/h to Billy Mikule and recorded in Volume 169, Pages 274-276 of the Deed Records of Marion County, Texas.

21. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Ettie C. & J. W. Neville w/h to Billy Mikule and recorded in Volume 169, Pages 555-557 of the Deed Records of Marion County, Texas.

22. Oil, Gas and Other Mineral Lease dated July 7, 1951 from George Alma Terrell, a single woman to Billy Mikule and recorded in Volume 170, Pages 19-20 of the Deed Records of Marion County, Texas.

23. Oil, Gas and Other Mineral Lease dated June 26, 1951 from R. C. & Mrs. R. C. Conly h/w to Billy Mikule and recorded in Volume 169, Pages 246-248 of the Deed Records of Marion County, Texas.

24. Oil, Gas and Other Mineral Lease dated June 26, 1951 from George Conly, Jr. to Billy Mikule and recorded in Volume 169, Pages 279-281 of the Deed Records of Marion County, Texas.

25. Oil, Gas and Other Mineral Lease dated December 3, 1951 from Jane Cramer & L. D. Harrison to E. Fred Herschbach and recorded in Volume 173, Pages 437-438 of the Deed Records of Marion County, Texas.

26. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Erma C. Johnston, widow to E. Fred Herschbach and recorded in Volume 176, Pages 442-444 of the Deed Records of Marion County, Texas.

27. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Zue C. Gibbons, widow to E. Fred Herschbach and recorded in Volume 176, Pages 444-446 of the Deed Records of Marion County, Texas.

28. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Akin B. Connor to E. Fred Herschbach and recorded in Volume 176, Pages 446-448 of the Deed Records of Marion County, Texas.

29. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Pearle C. Baldwin, widow to E. Fred Herschbach and recorded in Volume 176, Pages 448-450 of the Deed Records of Marion County, Texas.

307 VOL: 852 PG: 265

30. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Jane C. & W. R. Wood w/h to E. Fred Herschbach and recorded in Volume 176, Pages 450-452 of the Deed Records of Marion County, Texas.

31. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Flora C. & Lyle Wilson w/h to E. Fred Herschbach and recorded in Volume 176, Pages 452-454 of the Deed Records of Marion County, Texas.

32. Oil, Gas and Other Mineral Lease dated September 21, 1951 from C. W. LaCofske; Harry & Leah LaCofske Goldsmith h/w; Miss Lillian LaCofske, f/s; Mrs. Katie LaCofske, f/s to Bracken Oil Co. and recorded in Volume 172, Pages 208-213 of the Deed Records of Marion County, Texas.

33. Oil, Gas and Other Mineral Lease dated February 17, 1950 from Albert Marx and wife, Georgia E. Marx, Lessors, to E. Fred Herschbach, Lessee, recorded in Volume 159, page 181, said Deed Records, covering 91.73 acres, more or less, in the William Mason Survey, Abst. #270.

34. Oil, Gas and Other Mineral Lease dated August 28, 1951 from Louisiana & Arkansas Railway Company to James E. Kemp and recorded in Volume 171, Pages 394-397 of the Deed Records of Marion County, Texas and Amended in Volume 180, Pages 431-432 of the Deed Records of Marion County, Texas.

35. Oil, Gas and Other Mineral Lease dated October 11, 1951, from Bascom Giles, Commissioner of the General Land Office of the State of Texas, and the School Land Board of the State of Texas, Lessor, to Midstates Oil Corporation, Lessee, recorded in Volume 172, Page 218, said Deed Records, and containing 135 acres of land, more or less.

36. Oil, Gas and Other Mineral Lease dated November 7, 1952, from A. S. Harvey, Receiver in Cause No. 14,087 B.F.Ayers et al vs. Willie Hervey, et al,and recorded in Volume 177, Page 381 of the Deed Records of Marion County, Texas.

37. Oil, Gas and Other Mineral Lease dated May 12, 1953 from Mrs. Dolly Bell Key, Hobart Key, Jr.; David R. Key; E. M. Key composing Key & Key Brothers, partnership to Earl Hollandsworth and recorded in Volume 181, Pages 75-85 of the Deed Records of Marion County, Texas.

38. Oil, Gas and Other Mineral Lease dated March 12, 1951 to S. G. Read; Mrs. D. B. Read, widow; C. A. Bitner; L. H. Read; F. H. Harrell, John R. Alford; Jess B. Alford; John T. Green; and R. O. Alford to E. Fred Herschbach and recorded in Volume 167, Pages 73-76 of the Deed Records of Marion County, Texas.

39. Oil, Gas and Other Mineral Lease dated February 7, 1950 from Jefferson Wholesale Grocer Company, a corporation, acting by and through T. J. Taylor, Jr. President, Lessor, to Skelly Oil Company, Lessee, recorded in Volume 159, Page 376 of the Deed Records of Marion County, Texas.

40. Oil, Gas and Other Mineral Lease dated February 11, 1950, from Mrs. Reba Goodroe, W. B. Goodroe, Edward E. Eidson, Thomas E. Eidson and Robert D. Eidson, Lessors, to Skelly Oil Company, Lessee, recorded in Volume 159, Page 301 of the Deed Records of Marion County, Texas.

41. Oil, Gas and Other Mineral Lease dated February 9, 1950 from J. H. Benefield, Sr., Lessor, to Skelly Oil Company, Lessee, recorded in Volume 159, Page 379 of the Deed Records of Marion County, Texas.

42. Oil, Gas and Other Mineral Lease dated February 26, 1979 from Betty Gracr Wise, Mary J. Armistead, Jane Poyer, Mary M. Chapman, and Grace Dawson to David R. Key and recorded in Volume 297, Page 629 of the Deed Records of Marion County, Texas.

307 VOL: 852 PG: 266

43. Oil, Gas and Other Mineral Lease dated February 29, 1980 from Hobart Key, Jr., Edmund M. Key, David R. Key and the Estate of Dolly Bell Key to Bill R. Tipton and recorded in Volume 407, Page 397 of the Deed Records of Marion County, Texas.

44. Oil, Gas and Other Mineral Lease dated September 9, 1988 from Louise Sayle Skelton to David R. Key and recorded in Volume 516, Page 258 of the Deed Records of Marion County, Texas.

45. Oil, Gas and Other Mineral Lease dated August 25, 1988 from Reba Jeanette Lawrence to David R. Key and recorded in Volume 516, Page 264 of the Deed Records of Marion County, Texas.

46. Oil, Gas and Other Mineral Lease dated August 25, 1988 from Franklin Jones, Sr. to David R. Key and recorded in Volume 516, Page 261 of the Deed Records of Marion County, Texas.

47. Oil, Gas and Other Mineral Lease dated August 18, 1989 from J. D. Blackburn to David R. Key and recorded in Volume 519, Page 130 of the Deed Records of Marion County, Texas.

48. Oil, Gas and Other Mineral Lease dated March 2, 1989 from fred J. Herschbach, Executor, et al., to David R. Key and recorded in Volume 520, Page 51 of the Deed Records of Marion County, Texas.

49. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Lawrence Melcher to David R. Key and recorded in Volume 520, Page 48 of the Deed Records of Marion County, Texas.

50. Oil, Gas and Other Mineral Lease dated February 28, 1989 from Verla Jane Benefield to David R. Key and recorded in Volume 520, Page 45 of the Deed Records of Marion County, Texas.

51. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Claudia W. Wood to David R. Key and recorded in Volume 520, Page 42 of the Deed Records of Marion County, Texas.

52. Oil, Gas and Other Mineral Lease dated February 28, 1989 from Francis Roberts to David R. Key and recorded in Volume 520, Page 39 of the Deed Records of Marion County, Texas.

53. Oil, Gas and Other Mineral Lease dated April 14, 1989 from Gerald Loetterle, et al., to David R. Key and recorded in Volume 520, Page 36 of the Deed Records of Marion County, Texas.

54. Oil, Gas and Other Mineral Lease dated April 26, 1989 from R. B. Fawcett to David R. Key and recorded in Volume 520, Page 33 of the Deed Records of Marion County, Texas.

55. Oil, Gas and Other Mineral Lease dated April 14, 1989 from John Dragna to David R. Key and recorded in Volume 520, Page 30 of the Deed Records of Marion County, Texas.

56. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Fannie Curry, et al., to David R. Key and recorded in Volume 521, Page 258 of the Deed Records of Marion County, Texas.

57. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Jewel Hervey to David R. Key and recorded in Volume 521, Page 267 of the Deed Records of Marion County, Texas.

307 VOL: 852 PG: 267

58. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Precious L. Hervey, et al., to David R. Key and recorded in Volume 521, Page 264 of the Deed Records of Marion County, Texas.

59. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Mabel L. Webster to David R. Key and recorded in Volume 521, Page 255 of the Deed Records of Marion County, Texas.

60. Oil, Gas and Other Mineral Lease dated April 14, 1989 from Helen Sternberg Arnold, et al., to David R. Key and recorded in Volume 520, Page 27 of the Deed Records of Marion County, Texas.

61. Oil, Gas and Other Mineral Lease dated July 5, 1989 from John H. Carter, Jr., to David R. Key and recorded in Volume 521, Page 651 of the Deed Records of Marion County, Texas.

62. Oil, Gas and Other Mineral Lease dated May 5, 1989 from Dorothy Robinson to David R. Key and recorded in Volume 521, Page 261 of the Deed Records of Marion County, Texas.

63. Oil, Gas and Other Mineral Lease dated June 1, 1989 from David R. Key to Tipco Operating Company, et al., and recorded in Volume 522, Page 633 of the Deed Records of Marion County, Texas.

64. Oil, Gas and Other Mineral Lease dated July 13, 1993 from Billie J. Mason to Tipco Operating Company and recorded in Volume 556, Page 279 of the Deed Records of Marion County, Texas.

65. Oil, Gas and Other Mineral Lease dated May 10, 1993 from J. C. Copeland, et ux., Ina Faye Copeland to Tipco Operating Company and recorded in Volume 556, Page 283 of the Deed Records of Marion County, Texas.

66. Oil, Gas and Other Mineral Lease dated August 19, 1993 from Russell Cooner, et ux., Joyce Cooner to Tipco Operating Company and recorded in Volume 556, Page 662 of the Deed Records of Marion County, Texas.

67. Oil, Gas and Other Mineral Lease dated September 20, 1993 from Bright Minerals, Inc. to Tipco Operating Company and recorded in Volume 559, Page 133 of the Deed Records of Marion County, Texas.

68. Oil, Gas and Other Mineral Lease dated August 24, 1993 from Robert Pugh, Sr., Executor of Estate, to Dr. Albert I. Clark to Tipco Operating Company and recorded in Volume 559, Page 136 of the Deed Records of Marion County, Texas.

69. Oil, Gas and Other Mineral Lease dated October 14, 1993 from Albert G. Mason to Tipco Operating Company and recorded in Volume 559, Page 138 of the Deed Records of Marion County, Texas.

70. Oil, Gas and Other Mineral Lease dated September 20, 1993 from Richard L. Ray to Tipco Operating Company and recorded in Volume 559, Page 140 of the Deed Records of Marion County, Texas.

71. Oil, Gas and Other Mineral Lease dated October 8, 1993 from Mary Lenore Sharpton to Tipco Operating Company and recorded in Volume 559, Page 143 of the Deed Records of Marion County, Texas.

72. Oil, Gas and Other Mineral Lease dated September 10, 1993 from Michael B. Gallob to Tipco Operating Company and recorded in Volume 557, Page 329 of the Deed Records of Marion County, Texas.

307  VOL:  852  PG:  268

73. Oil, Gas and Other Mineral Lease dated September 23, 1993 from Key Family Marital Deduction Trust to Tipco Operating Company and recorded in Volume 557, Page 334 of the Deed Records of Marion County, Texas.

74. Oil, Gas and Other Mineral Lease dated September 9, 1993 from Frances A. Key to Tipco Operating Company and recorded in Volume 557, Page 332 of the Deed Records of Marion County, Texas.

75. Oil, Gas and Other Mineral Lease dated December 1, 2000 from Verla Jane Stutz Benefield to Tipco Operating Company and recorded in Volume 627, Page 424 of the Deed Records of Marion County, Texas.

76. Oil, Gas and Other Mineral Lease dated May 23, 2001 from Frances Benefield Roberts to Tipco Operating Company and recorded in Volume 633, Page 470 of the Deed Records of Marion County, Texas.

77. Oil, Gas and Other Mineral Lease dated November 30, 2000 from T. Jerry Blackburn to Hobart R. Key and recorded in Volume 627, Page 219 of the Deed Records of Marion County, Texas.

78. Oil, Gas and Other Mineral Lease dated April 6, 1951 from W. H. Mason, Jr. and Mary S. Mason to Dr. E. T. Doehring and recorded in Volume 167, Pag 317 of the Deed Records of Marion County, Texas.

79. Oil, Gas and Other Mineral Lease dated December 9, 1950 from D. B. Meisenheimer to S. H. Sanderson and recorded in Volume 164, Page 517 of the Deed Records of Marion County, Texas.

80. Oil, Gas and Other Mineral Lease dated December 9, 1950 from H. B. Meisenheimer and J. B. Moseley to S. H. Sanderson and recorded in Volume 164, Page 515 of the Deed Records of Marion County, Texas.

307 VOL: 852 PG: 269

## EXHIBIT B

Attached to and made a part of that certain Assignment Of Oil and Gas Leases And Bill Of Sale dated effective as of December 1, 2012, by and between Hobart Rutherford Key et al., as Assignors, and Sklarco L.L.C., as Assignee

## DESCRIPTION OF WELLS

Isaac Hervey et al. #1, API #315-00999, William Mason Survey, Woodlawn Field, Marion County, Texas.

Connor-Key A #2, API #315-00998, William Mason Survey, Woodlawn Field, Marion County, Texas.

307 VOL: 852 PG: 270

## EXHIBIT C

Attached to and made a part of that certain Assignment Of Oil and Gas Leases And Bill Of Sale dated effective as of December 1, 2012, by and between Hobart Rutherford Key et al., as Assignors, and Sklarco L.L.C., as Assignee

## DESCRIPTION OF CONTRACTS

14

307 VOL: 852 PG: 271

## EXHIBIT D

Attached to and made a part of that certain Assignment Of Oil and Gas Leases And Bill Of Sale dated effective as of December 1, 2012, by and between Hobart Rutherford Key et al., as Assignors, and Sklarco L.L.C., as Assignee

## EQUIPMENT

All surface equipment and all casing, tubing, rods and other down hole equipment pertaining to the Wells.

307 VOL: 852 PG: 272

## EXHIBIT E

Attached to and made a part of that certain Assignment Of Oil and Gas Leases And Bill Of Sale
dated effective as of December 1, 2012, by and between Hobart Rutherford Key et al., as
Assignors, and Sklarco L.L.C., as Assignee

## DESCRIPTION OF EASEMENTS

1. That certain Deed of Right of Way dated January 23, 1900, from Joshua Allen Hervey, etal to Sherman Shreveport, et al, recorded in Volume B-1, Page 200 of the Deed Records of Marion County, Texas.

2. That certain Right of Way Agreement dated September 13, 1948, from Dora Kemp, etal to Texas Eastern Transmission, recorded in Volume 150, Page 388 of the Deed Records of Marion County, Texas.

3. That certain Supplement dated October 5, 1948 from Dessiemore Hervey to Texas Eastern Transmission Corporation, recorded in Volume 150, Page 576 of the Deed Records of Marion County, Texas.

4. That certain Right of Way Agreement dated January 24, 1953 from David R. Key to Natural Gas and Oil Corporation, recorded in Volume , Page  of the Deed Records of Marion County, Texas.

5. That certain Pipe Line Right of Way Grant dated June 4, 1953 from J. H. Benefield, Sr. to Sohio Petroleum Co., recorded in Volume 184, Page 284 of the Deed Records of Marion County, Texas.

6. That certain Pipe Line Right of Way Grant dated June 6, 1953 from J. R. Cornelius, et al to Sohio Petroleum Co., recorded in Volume 184, Page 285 of the Deed Records of Marion County, Texas.

7. That certain Pipe Line Right of Way Grant dated June 6, 1953 from Franklin Jones, et al to Sohio Petroleum Co., recorded in Volume 184, Page 287 of the Deed Records of Marion County, Texas.

8. That certain Right of Way Agreement dated September 13, 1948, from David R. Key ,et al, to Texas Eastern Transmission Corporation, recorded in Volume 150, Page 367 of the Deed Records of Marion County, Texas.

9. That certain Pipe Line Right Grant of Way dated April 30, 1953, from David R. Key ,et al, to Sohio Petroleum Co., recorded in Volume 181, Page 139 of the Deed Records of Marion County, Texas.

10. That certain Pipe Line Right of Way Grant dated April 30, 1953, from David R. Key ,et al, to Sohio Petroleum Com., recorded in Volume 181, Page 140 of the Deed Records of Marion County, Texas.

11. That certain Right of Way Agreement dated September 29, 1953, from David R. Key , to Mississippi River Fuel Corporation, recorded in Volume 183, Page 123 of the Deed Records of Marion County, Texas.

12. That certain Right of Way Agreement dated September 29, 1953, from David R. Key ,et al, to Mississippi River Fuel Corporation, recorded in Volume 184, Page 99 of the Deed Records of Marion County, Texas.

307 VOL: 852 PG: 273

13. That certain Right of Way Easement dated May 2, 1955, from David R. Key to Carthage Products Corporation, recorded in Volume 197, Page 292 of the Deed Records of Marion County, Texas.

14. That certain Right of Way Easement dated May 2, 1955, from David R. Key, et al, to Sohio Petroleum Co., recorded in Volume 197, Page 293 of the Deed Records of Marion County, Texas.

15. That certain Right of Way Easement dated July 2, 1956, from David R. Key to Carthage Products Corporation, recorded in Volume 207, Page 412 of the Deed Records of Marion County, Texas.

16. That certain Right of Way Deed from Tom Morris, et al, to State of Texas, recorded in Volume 256, Page 133 of the Deed Records of Marion County, Texas.

17. That certain Right of Way dated November 8, 1965, from David R. Key, et al, to San Jacinto Gas Processing Corp., recorded in Volume 305, Page 175 of the Deed Records of Marion County, Texas.

18. That certain Easement dated August 23, 1977, from David R. Key to County of Marion, Texas, recorded in Volume 381, Page 527 of the Deed Records of Marion County, Texas.

19. That certain Right of Way Agreement dated July 18, 2012, from Key Family Marital Trust to Southwestern Gas Pipeline, Inc., recorded in Volume 841, Page 72 of the Deed Records of Marion County, Texas.

307 VOL: 852 PG: 274

### EXHIBIT F

Attached to and made a part of that certain Assignment Of Oil and Gas Leases And Bill Of Sale dated effective as of December 1, 2012, by and between Hobart Rutherford Key et al., as Assignors, and Sklarco L.L.C., as Assignee

### RECORDED INSTRUMENTS

1. That certain Assignment dated June 10, 1966 from Mississippi River Corporation and Natural Gas and Oil Corporation, recorded in Volume 298, Page 139 of the Deed Records of Marion County, Texas

2. That certain Assignment dated effective July 1, 1966 by and between Mississippi River Fuel Corporation and, recorded in Volume , Page of the Deed Records of Marion County, Texas

3. That certain Assignment dated May 11, 1970 by and between Natural Gas and oil Company and H. E. Sutton, recorded in Volume 330, Page 75 of the Deed Records of Marion County, Texas

4. That certain Assignment dated March 29, 1983 by and between H. E. Sutton and Sun Exploration and Production Company, recorded in Volume 447, Page 526 of the Deed Records of Marion County, Texas

5. That certain Wellbore Assignment dated May 8, 1989, from Sun Operating Limited Partnership to Tipco Operating Company, recorded in Volume 518, Page 899 of the Deed Records of Marion County, Texas.

6. That certain Assignment, Bill of Sale and Conveyance dated Setpember 1, 2004 fromTipco Operating Company, et al, to Chalker Energy Partners, L.P., recorded in Volume 685, Page 340 of the Deed Records of Marion County, Texas

7. That certain Assignment dated January 1, 2005 from Chalker Energy Partners, L.P., to EnergyQuest Resources, L.P. recorded in Volume 692, Page 66 of the Deed Records of Marion County, Texas

8. That certain Assignment dated January 6, 2005 from Chalker Energy Partners, L.P., to EnergyQuest Resources, L.P. recorded in Volume 692, Page 156 of the Deed Records of Marion County, Texas

9. That certain Assignment dated April 1, 2007 from EnergyQuest Resources, L.P. to Layline Petroleum I, LLC recorded in Volume 746, Page 105 of the Deed Records of Marion County, Texas

10. That certain Assignment dated July 1, 2010 from Layline Petroleum I, LLC, to Layline Petroleum II, LLC recorded in Volume 802, Page 263 of the Deed Records of Marion County, Texas

STATE OF TEXAS                    COUNTY OF MARION    FILED FOR RECORD
I hereby certify that this instrument was filed on
the date and time stamped hereon by me and      Jan 28,2013 10:21A
was duly recorded in the volume and page of the
named records of Marion County, Texas as stamped VICKIE SMITH,
hereon by me.          OFFICIAL PUBLIC RECORDS      COUNTY CLERK
                                                    MARION COUNTY, TEXAS

Jan 28,2013 10:21A                                  By:

VICKIE SMITH, COUNTY CLERK                          Kim Wise
                                                    DEPUTY
MARION COUNTY, TEXAS

18

EXHIBIT "B"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

## FORM OF ASSIGNMENT OF OIL, GAS AND OTHER MINERAL LEASES

STATE OF TEXAS,

COUNTIES OF MARION.

KNOW ALL MEN BY THESE PRESENTS That:

**SKLARCO L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President & Chief Operating Officer, David A. Barlow ("**Sklarco**" or "**Assignor**");

for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the reversionary back-in working interest described hereinbelow, does hereby grant, bargain, sell, convey, assign, set over and transfer unto the following (hereinafter sometimes referred to collectively as the "**Assignees**" or individually as an "**Assignee**"):

**McCOMBS ENERGY, LTD.**, a Texas limited partnership, whose address is 5599 San Felipe, Suite 1200, Houston, Texas 77056-2794, represented herein by its Vice President, Ricky Haikin ("**McCombs**");

**TAUBER EXPLORATION & PRODUCTION CO.**, a Texas corporation, whose address is 55 Waugh Drive, Suite 601, Houston, Texas 77007-5837, represented herein by Richard Tauber, its duly authorized Manager ("**Tauber**");

**FLEET HOWELL**, 416 Travis Street, Suite 715, Shreveport, Louisiana 71101 ("**Howell**");

**BUNDERO INVESTMENT COMPANY, L.L.C.**, a Louisiana limited liability company, whose address is 333 Texas Street, Suite 300, Shreveport, Louisiana 71101, represented herein by its Manager, Robert P. Bowman ("**Bundero**");

**TIEMBO, LTD.**, a Texas limited partnership, whose address is P. O. Box 270415, Houston, Texas 77277-0415, represented herein by its Registered Agent, Mark Rauch ("**Tiembo**");

**PICKENS FINANCIAL GROUP, L.L.C.**, a Texas limited liability company, whose address is 8499 Greenville Avenue, Suite 105, Dallas, TX 75231-2417, represented herein by Michael K. Pickens, as the duly authorized Vice President of said company ("**Pickens**");

**FANT ENERGY LIMITED**, a Texas limited partnership, whose address is 5800 Westview Drive, Houston, Texas 77055, represented herein by Richard E. Fant, LLC, the General Partner of Fant Energy Limited, represented herein by Stephen Swan, in his capacity as the duly authorized Manager of Richard E. Fant, LLC, ("**Fant**");

**SANTO PETROLEUM LLC**, a Delaware limited liability corporation whose address is 101 South 4th Street, Suite B, Artesia, New Mexico, 88210, represented herein by its Executive Vice President, Tobin L. Rhodes, ("**Santo**");

**JJS WORKING INTERESTS LLC**, a Texas limited liability company, whose address is 4295 San Felipe, Suite 207, Houston, Texas 77027, represented herein by Houston Bulldog Capital Management, LLC, its duly authorized Manager, represented herein by Justin Simons, in his capacity as the duly authorized Manager of Houston Bulldog Capital Management, LLC ("**JJS**");

**KUDZU OIL PROPERTIES, LLC,** a Mississippi limited liability company, whose address is 300 Concourse Blvd., Suite 101, Ridgeland, Mississippi 39157, represented herein by its Executive Vice President, R. Nash Neyland ("**Kudzu**"); and

**MARKSCO, L.L.C.,** a Louisiana limited liability company, whose address is 333 Texas Street, Suite 1050, Shreveport, Louisiana 71101, represented herein by its Member, Mark P. Sealy ("**Marksco**");

an undivided Seventy Five percent Before Payout Interest (75% BPO), and an undivided Fifty Nine point Five Zero Four percent After Payout Interest (59.504% APO) in and to the oil, gas and other mineral leases (the "**Leases**") described in Exhibit "A" attached hereto and by reference made a part hereof and the rights, estates and interests of the lessee thereunder, in the proportions set forth below as to each such Assignee's name:

| Assignees | BPO | APO |
|---|---|---|
| McCombs | 25% | 18.75% |
| Tauber | 5% | 3.75% |
| Fleet | 5% | 3.75% |
| Bundero | 2% | 1.5% |
| Tiembo | 2% | 1.5% |
| Pickens | 5% | 3.75% |
| Fant | 10% | 7.5% |
| Santo | 15% | 11.25% |
| JJS | 1% | 4.004% |
| Kudzu | 3% | 2.25% |
| Marksco | 2% | 1.5% |
| Total | 75% | 59.504% |

Assignor does hereby except from this Assignment and reserve unto itself the following before payout (BPO) and after payout (APO) interests in and to the Leases and the rights, estates and interests of the lessee thereunder, to-wit:

| | BPO | APO |
|---|---|---|
| Sklarco | 25% | 40.496% |

TO HAVE AND TO HOLD unto the Assignees and Sklarco, their successors and assigns, forever, together with all rights, privileges, easements, tenements, hereditaments, improvements, equipment, appurtenances, and the like belonging or appertaining thereto, in accordance with and subject to the following terms, provisions and conditions:

1.     This Assignment is made effective as of March 1, 2013 (the "Effective Date").

2.     The Assignment of interests in the Leases (and in the rights, estates and interests of the lessees thereunder) made herein are made without warranty of title, express or implied, not

even return for the purchase price, except that Assignor warrants and agrees to defend title against all defects or encumbrances arising out of claims by Assignor or of persons claiming by, through or under Assignor; and in that connection, Assignor specifically represents and warrants that it has full and complete authority to assign the above described interests in the Leases to Assignees, that it has not alienated or encumbered (in any manner whatsoever) the rights and interests conveyed or transferred to Assignor in or under the Leases and that such rights and interests are free and clear of, and Assignor will defend title thereto and possession thereof against, any claims, interests, or liens by anyone claiming by, through or under Assignor. Additionally, this Assignment is made with transfer and subrogation to Assignees of all rights that Assignor may have under warranties in the Leases and/or under warranties by any prior owners of the lands covered by the Leases.

3.      This Assignment, and the interest assigned hereunder, is made subject to the terms and conditions of the Leases.

4.      This Assignment and the interest assigned hereunder, include rights in the "Assigned Interest" defined in, and further subject to all of the terms and conditions of, that certain Assignment of Oil and Gas Leases and Bill of Sale dated effective June 1, 2012, by and between Albert W. Key, et al and Sklarco L.L.C., recorded in Vol 845, Pg 304 of the county records of Marion County, Texas, and that certain Assignment of Oil and Gas Leases and Bill of Sale dated effective December 1, 2012, by and between Hobert Rutherford Key, et al and Sklarco L.L.C., recorded in Vol 852, Pg 249 of the county records of Marion County, Texas.

5.      This Assignment is also made in accordance with and subject to that certain South Woodlawn Prospect Participation Agreement (the "PA") dated effective as of March 1, 2013, by and between between Sklar Exploration Company L.L.C., Sklarco L.L.C, McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C., and all attachments thereto, including that certain Joint Operating Agreement dated March 1, 2013, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C. et al., as Non-Operators, and all of the terms and provisions of that PA and its attachments. Without limitation upon the foregoing, this Assignment is made subject to the reversionary working interest described in Section 1.3 of the PA. The terms "Before Payout Interest" and "After Payout Interest" shall have the meanings ascribed to them in the PA.

6.      This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. Also, all signature pages to copies of this Assignment may be attached to one copy thereof, and only that copy need be recorded.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.


**ASSIGNOR:**

SKLARCO L.L.C.


By_____
          David A. Barlow
          President - Chief Operating Officer


**ASSIGNEES:**

MCCOMBS ENERGY, LTD.


By_____
          Ricky Haikin
          Vice President

TAUBER EXPLORATION & PRODUCTION CO

By_____
      Richard Tauber
      Manager


_____
      FLEET HOWELL
BUNDERO INVESTMENT COMPANY, L.L.C.

By_____
      Robert P. Bowman
      Manager


TIEMBO, LTD.

By_____
      Mark Rauch
      Registered Agent


PICKENS FINANCIAL GROUP, L.L.C.

BY;_____
      Michael K Pickens, Vice President


FANT ENERGY LIMITED
By:  Richard E. Fant, LLC, the General Partner of
     Fant Energy Limited

By_____
      Stephen Swan, Manager


SANTO PETROLEUM LLC

By:_____
      Tobin L. Rhodes, Executive Vice President


JJS WORKING INTERESTS LLC
By:     Houston Bulldog Capital Management, LLC

By_____
      Justin Simons
      Manager

## EXHIBIT "A"

Attached to and made a part of that certain Assignment of Oil, Gas and Other Mineral Leases dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

## DESCRIPTION OF LEASES

### SKLARCO LEASES

1.  Oil Gas and Mineral Lease dated 05/25/2012, by and between Albert W. Key and Key Family Marital Deduction Trust Key, as Lessor, and Sklarco L.L.C., as Lessee, recorded in Vol 842, Page 620, of the records of Marion County, Texas (1WOO01-L001).

2.  Oil Gas and Mineral Lease dated 09/28/2012, by and between William Gleason, Trustee of the Taylor Grey Sain trust, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 847, page 553, of the records of Marion County, Texas (1WOO01-L006).

3.  Oil Gas and Mineral Lease dated 11/05/2012, by and between Children's Hospital of Los Angeles, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 847, Page 714, of the records of Marion County, Texas (1WOO01-L007).

4.  Oil Gas and Mineral Lease dated 10/30/2012, by and between Rebecca A Eidson Wright, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in 12/26/2012 Vol 850, Page 220, of the records of Marion County, Texas (1WOO01-L008).

5.  Oil Gas and Mineral Lease dated 11/16/2012, by and between Davis Lynn Plunkett, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 850, Page 850 in Marion Co., TX, of the records of Marion County, Texas (1WOO01-L009).

6.  Oil Gas and Mineral Lease dated 11/16/2012, by and between Bob Herwood Reed, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 850, Page 850 of the records of Marion County, Texas (1WOO01-L010).

7.  Oil Gas and Mineral Lease dated 12/10/2012, by and between James D & Armitta Blackburn, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 850, Page 224 of the records of Marion County, Texas (1WOO01-L011).

8.  Oil Gas and Mineral Lease dated 12/04/2012, by and between Diane Tompson Broadus, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 558 of the records of Marion County, Texas (1WOO01-L012).

9.  Oil Gas and Mineral Lease dated 11/30/2102, by and between Jean Warwick Thompson, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 578 of the records of Marion County, Texas (1WOO01-L013).

10. Oil Gas and Mineral Lease dated 12/19/2012, by and between Joseph Cleveland Sullivan, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 566, of the records of Marion County, Texas (1WOO01-L014).

11. Oil Gas and Mineral Lease dated 12/18/2012, by and between Thomas B Sullivan, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 570, of the records of Marion County, Texas (1WOO01-L015).

12. Oil Gas and Mineral Lease dated 12/04/2012, by and between Robert C Thompson, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 582, of the records of Marion County, Texas (1WOO01-L016).

13. Oil Gas and Mineral Lease dated 12/07/2102, by and between Sue Cartledge Cumbus, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 562, of the records of Marion County, Texas (1WOO01-L017).

14. Oil Gas and Mineral Lease dated 12/04/2012, by and between Danna Thompson, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 574 of the records of Marion County, Texas (1WOO01-L018).

15. Oil Gas and Mineral Lease dated 12/11/2012, by and between Anne C. Morgan, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 852, Page 139, of the records of Marion County, Texas (1WOO01-L019).

16. Oil Gas and Mineral Lease dated 01/04/2013, by and between Michael D. Gollob Oil Company, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 852, Page 143, of the records of Marion County, Texas (1WOO01-L020).

17. Oil Gas and Mineral Lease dated 01/08/2013, by and between Leslie A. Bitner, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 852, Page 146, of the records of Marion County, Texas (1WOO01-L021).

18. Oil Gas and Mineral Lease dated 01/15/2013, by and between Eckankar, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 853, Page 632, of the records of Marion County, Texas (1WOO01-L022).

19. Oil Gas and Mineral Lease dated 01/15/2013, by and between Bruce Russel Cooner, et al and Russel Lynn Cooner, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 853, Page 629, of the records of Marion County, Texas (1WOO01-L023).

20. Oil Gas and Mineral Lease dated 01/10/2013, by and between Virginia B Blackman, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 853, Page 640, of the records of Marion County, Texas (1WOO01-L024).

21. Oil Gas and Mineral Lease dated 12/31/2012, by and between Sylvia Calhoun, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 853, Page 643, of the records of Marion County, Texas (1WOO01-L025).

22. Oil Gas and Mineral Lease dated 01/22/2013, by and between R. L. Ray, Ltd, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 853, Page 637, of the records of Marion County, Texas (1WOO01-L026).

23. Oil Gas and Mineral Lease dated 01/4/2013, by and between Diane McDonlad, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 854, Page 542, of the records of Marion County, Texas (1WOO01-L027).

24. Oil Gas and Mineral Lease dated 01/25/2013, by and between Faye bunch Copeland, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 854, Page 548, of the records of Marion County, Texas (1WOO01-L028).

25. Oil Gas and Mineral Lease dated 01/28/2013, by and between Bright Minerals, Inc., as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 854, Page 559, of the records of Marion County, Texas (1WOO01-L029).

26. Oil Gas and Mineral Lease dated 12/19/2012, by and between Agnes Gibson Hattaway, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 854, Page 550, of the records of Marion County, Texas (1WOO01-L030).

27. Oil Gas and Mineral Lease dated 03/1/2013, by and between Mary Bitner Spranger, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 854, Page 555, of the records of Marion County, Texas (1WOO01-L31).

28. Oil Gas and Mineral Lease dated 01/25/2013, by and between Gloria Jean Clark Mason, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 855, Page 116A, of the records of Marion County, Texas (1WOO01-L032).

29. Oil Gas and Mineral Lease dated 02/01/2013, by and between Vickie Metcalf, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 855, Page 315, of the records of Marion County, Texas (1WOO01-L033).

30. Oil Gas and Mineral Lease dated 02/05/2013, by and between Walter Thomas Edison, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 855, Page 319, of the records of Marion County, Texas (1WOO01-L034).

31. Oil Gas and Mineral Lease dated 12/28/2012, by and between Phyllis H Rostker, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 855, page 322, of the records of Marion County, Texas (1WOO01-L035).

32. Oil Gas and Mineral Lease dated 12/28/2012, by and between Susan D Mahoney-Clark, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 855, Page 325, of the records of Marion County, Texas (1WOO01-L036).

33. Oil Gas and Mineral Lease dated 12/28/2012, by and between Audrey Taylor, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L037).

34. Oil Gas and Mineral Lease dated 01/07/2013, by and between Edythe G Tucker, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L038).

35. Oil Gas and Mineral Lease dated 02/20/2013, by and between Richard Kent McGaughy, Independent Executor and Trustee of the Residury Trusts in the Estate of Roy Lamar Rather, Jr., Deceased, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L039).

36. Oil Gas and Mineral Lease dated 02/05/2013, by and between Edward Parker Eidson, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L040).

37. Oil Gas and Mineral Lease dated 02/05/2013, by and between Peggy Sue Askew, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L041).

38. Oil Gas and Mineral Lease dated 03/05/2013, by and between Richard M Schultz, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L042).

39. Oil Gas and Mineral Lease dated 02/08/2013, by and between Cynthia Thornton & Cheryl Barnett Co-Trustees, The Walford Family Trust, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L043).

40. Oil Gas and Mineral Lease dated 04/04/2013, by and between Doris Corn, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L044).

41. Oil Gas and Mineral Lease dated 02/06/2013, by and between Norma L Conkle Archung, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L045).

42. Oil Gas and Mineral Lease dated 02/05/2013, by and between Timothy Allin Eidson, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L046).

43. Oil Gas and Mineral Lease dated 02/05/2013, by and between Elizabeth Eidson Stevens, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L047).

44. Oil Gas and Mineral Lease dated 12/28/2012, by and between Norman Alfieri, Jr., as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L048).

45. Oil Gas and Mineral Lease dated 04/01/2013, by and between Alice Key Myrick, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (WOO01-L049).

### ALBERT W. KEY, ET AL LEASES

46. Oil Gas and Mineral Lease dated 07/03/2008, by and between Martha L Hartford, as Lessor, and Key & Key Brothers, as Lessee, recorded in Vol 771, Page 34, of the records of Marion County, Texas (1WOO01-L002).

47. Oil Gas and Mineral Lease dated 07/10/2008, by and between John Armistead, as Lessor, and Key & Key Brothers, as Lessee, recorded in Vol 771, Page 25, of the records of Marion County, Texas (1WOO01-L003).

48. Oil Gas and Mineral Lease dated 07/10/2008, by and between Charles Wise Bypass Trust, Mark Lawley & Belinda Baker Co-Trustee, as Lessor, and Key & Key Brothers, as Lessee, recorded in Vol 771, Page 27, of the records of Marion County, Texas (1WOO01-L004).

49. Oil Gas and Mineral Lease dated 07/03/2008, by and between Dawson Rev Living Trust, as Lessor, and Key & Key Brothers, as Lessee, recorded in Vol 771, Page 33, of the records of Marion County, Texas (1WOO01-L005).

### HOBART RUTHERFORD KEY, ET AL LEASES

50. Oil, Gas and Other Mineral Lease dated February 16, 1950 from M. A. Connor & William A. Connor to E. Fred Herschbach and recorded in Volume 158, Page 476-478 of the  Deed Records of Marion County, Texas.

51. Oil, Gas and Other Mineral Lease dated February 16, 1950 from O. W. Connor E. Fred Herschbach, Lessee, recorded in Volume 158, Page 472 of the  Deed Records of Marion County, Texas.

52. Oil, Gas and Other Mineral Lease dated February 16, 1950 from Mrs. Lula J. Conner, f/s to E. Fred Herschbach and recorded in Volume 158, Pages 474-476 of the Deed Records of Marion County, Texas.

53. Oil, Gas and Other Mineral Lease dated February 16, 1950 from Mrs. Maggie Turner, f/s; L. S. Turner; Jerrold Turner; Maggie Lou Turner to E. Fred Herschbach and recorded in Volume 159, Pages 218-220 of the Deed Records of Marion County, Texas.

54. Oil, Gas and Other Mineral Lease dated July 7, 1951 from Abbie Cramer & J. L. Miller w/h to Billy Mikule recorded in Volume 170, Pages 25-26 of the Deed Records of Marion County, Texas.

55. Oil, Gas and Other Mineral Lease dated June 29, 1951 from Mrs. Josephine Cramer Sims, divorced to Billy Mikule and recorded in Volume 169, Pages 557-559 of the Deed Records of Marion County, Texas.

56. Oil, Gas and Other Mineral Lease dated June 29, 1951 from R. R. Cramer to Billy Mikule and recorded in Volume 169, Pages 553-555 of the Deed Records of Marion County, Texas.

57. Oil, Gas and Other Mineral Lease dated June 25, 1951 from Ettie P. & W. D. Latimer w/h to Billy Mikule and recorded in Volume 169, Pages 248-250 of the Deed Records of Marion County, Texas.

58. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Thomas Vivian & Ruth Cherry Cramer h/w to Billy Mikule and recorded in Volume 169, Pages 272-274 of the Deed Records of Marion County, Texas.

59. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Oleta Cramer & Nigal A. Timmins w/h to Billy Mikule and recorded in Volume 170, Pages 315-317 of the Deed Records of Marion County, Texas.

60. Oil, Gas and Other Mineral Lease dated July 7, 1951 from C. D. Cramer to Billy Mikule and recorded in Volume 170, Pages 17-18 of the Deed Records of Marion County, Texas.

61. Oil, Gas and Other Mineral Lease dated July 17, 1951 from W. O. Cramer to Billy Mikule and recorded in Volume 170, Pages 286-288 of the Deed Records of Marion County, Texas.

62. Oil, Gas and Other Mineral Lease dated June 29, 1951 from Ella Mae Cramer & R. G. Brian w/h to Billy Mikule and recorded in Volume 170, Pages 284-286 of the Deed Records of Marion County, Texas.

63. Oil, Gas and Other Mineral Lease dated July 7, 1951 from Thomas C. Connor to Billy Mikule and recorded in Volume 170, Pages 21-22 of the Deed Records of Marion County, Texas.

64. Oil, Gas and Other Mineral Lease dated June 26, 1951 from Mrs. Sam E. Cramer, widow to Billy E. Mikule recorded in Volume 170, Pages 198-199 of the Deed Records of Marion County, Texas.

65. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Martha Elizabeth & S. A. Armstrong w/h to Billy Mikule and recorded in Volume 170, Pages 288-290 of the Deed Records of Marion County, Texas.

66. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Mrs. Erma C. Johnston, et als., Lessors, to Billy Mikule, Lessee, recorded in Volume 169, page 551 of the Deed Records of Marion County, Texas.

67. Oil, Gas and Other Mineral Lease dated July 7, 1951 from Annie Cramer to Billy Mikule and recorded in Volume 170, Pages 23-24 of the Deed Records of Marion County, Texas.

68. Oil, Gas and Other Mineral Lease dated June 26, 1951 from Albert Raymond Conly to Billy Mikule and recorded in Volume 169, Pages 277-279 of the Deed Records of Marion County, Texas.

69. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Mrs. Dollie & F. L. Huey w/h to Billy Mikule and recorded in Volume 169, Pages 274-276 of the Deed Records of Marion County, Texas.

70. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Ettie C. & J. W. Neville w/h to Billy Mikule and recorded in Volume 169, Pages 555-557 of the Deed Records of Marion County, Texas.

71. Oil, Gas and Other Mineral Lease dated July 7, 1951 from George Alma Terrell, a single woman to Billy Mikule and recorded in Volume 170, Pages 19-20 of the Deed Records of Marion County, Texas.

72. Oil, Gas and Other Mineral Lease dated June 26, 1951 from R. C. & Mrs. R. C. Conly h/w to Billy Mikule and recorded in Volume 169, Pages 246-248 of the Deed Records of Marion County, Texas.

73. Oil, Gas and Other Mineral Lease dated June 26, 1951 from George Conly, Jr. to Billy Mikule and recorded in Volume 169, Pages 279-281 of the Deed Records of Marion County, Texas.

74. Oil, Gas and Other Mineral Lease dated December 3, 1951 from Jane Cramer & L. D. Harrison to E. Fred Herschbach and recorded in Volume 173, Pages 437-438 of the Deed Records of Marion County, Texas.

75. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Erma C. Johnston, widow to E. Fred Herschbach and recorded in Volume 176, Pages 442-444 of the Deed Records of Marion County, Texas.

76. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Zue C. Gibbons, widow to E. Fred Herschbach and recorded in Volume 176, Pages 444-446 of the Deed Records of Marion County, Texas.

77. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Akin B. Connor to E. Fred Herschbach and recorded in Volume 176, Pages 446-448 of the Deed Records of Marion County, Texas.

78. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Pearle C. Baldwin, widow to E. Fred Herschbach and recorded in Volume 176, Pages 448-450 of the Deed Records of Marion County, Texas.

79. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Jane C. & W. R. Wood w/h to E. Fred Herschbach and recorded in Volume 176, Pages 450-452 of the Deed Records of Marion County, Texas.

80. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Flora C. & Lyle Wilson w/h to E. Fred Herschbach and recorded in Volume 176, Pages 452-454 of the Deed Records of Marion County, Texas.

81. Oil, Gas and Other Mineral Lease dated September 21, 1951 from C. W. LaCofske; Harry & Leah LaCofske Goldsmith h/w; Miss Lillian LaCofske, f/s; Mrs. Katie LaCofske, f/s to Bracken Oil Co. and recorded in Volume 172, Pages 208-213 of the Deed Records of Marion County, Texas.

82. Oil, Gas and Other Mineral Lease dated February 17, 1950 from Albert Marx and wife, Georgia E. Marx, Lessors, to E. Fred Herschbach, Lessee, recorded in Volume 159, page 181, said Deed Records, covering 91.73 acres, more or less, in the William Mason Survey, Abst. #270.

83. Oil, Gas and Other Mineral Lease dated August 28, 1951 from Louisiana & Arkansas Railway Company to James E. Kemp and recorded in Volume 171, Pages 394-397 of the Deed Records of Marion County, Texas and Amended in Volume 180, Pages 431-432 of the Deed Records of Marion County, Texas.

84. Oil, Gas and Other Mineral Lease dated October 11, 1951, from Bascom Giles, Commissioner of the General Land Office of the State of Texas, and the School Land Board of the State of Texas, Lessor, to Midstates Oil Corporation, Lessee, recorded in Volume 172, Page 218, said Deed Records, and containing 135 acres of land, more or less.

85. Oil, Gas and Other Mineral Lease dated November 7, 1952, from A. S. Harvey, Receiver in Cause No. 14,087 B.F.Ayers et al vs. Willie Hervey, et al,and recorded in Volume 177, Page 381 of the Deed Records of Marion County, Texas.

86. Oil, Gas and Other Mineral Lease dated May 12, 1953 from Mrs. Dolly Bell Key, Hobart Key, Jr.; David R. Key; E. M. Key composing Key & Key Brothers, partnership to Earl Hollandsworth and recorded in Volume 181, Pages 75-85 of the Deed Records of Marion County, Texas.

87. Oil, Gas and Other Mineral Lease dated March 12, 1951 to S. G. Read; Mrs. D. B. Read, widow; C. A. Bitner; L. H. Read; F. H. Harrell, John R. Alford; Jess B. Alford; John T. Green; and R. O. Alford to E. Fred Herschbach and recorded in Volume 167, Pages 73-76 of the Deed Records of Marion County, Texas.

88. Oil, Gas and Other Mineral Lease dated February 7, 1950 from Jefferson Wholesale Grocer Company, a corporation, acting by and through T. J. Taylor, Jr. President, Lessor, to Skelly Oil Company, Lessee, recorded in Volume 159, Page 376 of the Deed Records of Marion County, Texas.

89. Oil, Gas and Other Mineral Lease dated February 11, 1950, from Mrs. Reba Goodroe, W. B. Goodroe, Edward E. Eidson, Thomas E. Eidson and Robert D. Eidson, Lessors, to Skelly Oil Company, Lessee, recorded in Volume 159, Page 301 of the Deed Records of Marion County, Texas.

90. Oil, Gas and Other Mineral Lease dated February 9, 1950 from J. H. Benefield, Sr., Lessor, to Skelly Oil Company, Lessee, recorded in Volume 159, Page 379 of the Deed Records of Marion County, Texas.

91. Oil, Gas and Other Mineral Lease dated February 26, 1979 from Betty Gracr Wise, Mary J. Armistead, Jane Poyer, Mary M. Chapman, and Grace Dawson to David R. Key and recorded in Volume 297, Page 629 of the Deed Records of Marion County, Texas.

92. Oil, Gas and Other Mineral Lease dated February 29, 1980 from Hobart Key, Jr., Edmund M. Key, David R. Key and the Estate of Dolly Bell Key to Bill R. Tipton and recorded in Volume 407, Page 397 of the Deed Records of Marion County, Texas.

93. Oil, Gas and Other Mineral Lease dated September 9, 1988 from Louise Sayle Skelton to David R. Key and recorded in Volume 516, Page 258 of the Deed Records of Marion County, Texas.

94. Oil, Gas and Other Mineral Lease dated August 25, 1988 from Reba Jeanette Lawrence to David R. Key and recorded in Volume 516, Page 264 of the Deed Records of Marion County, Texas.

95. Oil, Gas and Other Mineral Lease dated August 25, 1988 from Franklin Jones, Sr. to David R. Key and recorded in Volume 516, Page 261 of the Deed Records of Marion County, Texas.

96. Oil, Gas and Other Mineral Lease dated August 18, 1989 from J. D. Blackburn to David R. Key and recorded in Volume 519, Page 130 of the Deed Records of Marion County, Texas.

97. Oil, Gas and Other Mineral Lease dated March 2, 1989 from fred J. Herschbach, Executor, et al., to David R. Key and recorded in Volume 520, Page 51 of the Deed Records of Marion County, Texas.

98. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Lawrence Melcher to David R. Key and recorded in Volume 520, Page 48 of the Deed Records of Marion County, Texas.

99. Oil, Gas and Other Mineral Lease dated February 28, 1989 from Verla Jane Benefield to David R. Key and recorded in Volume 520, Page 45 of the Deed Records of Marion County, Texas.

100. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Claudia W. Wood to David R. Key and recorded in Volume 520, Page 42 of the Deed Records of Marion County, Texas.

101. Oil, Gas and Other Mineral Lease dated February 28, 1989 from Francis Roberts to David R. Key and recorded in Volume 520, Page 39 of the Deed Records of Marion County, Texas.

102. Oil, Gas and Other Mineral Lease dated April 14, 1989 from Gerald Loetterle, et al., to David R. Key and recorded in Volume 520, Page 36 of the Deed Records of Marion County, Texas.

103. Oil, Gas and Other Mineral Lease dated April 26, 1989 from R. B. Fawcett to David R. Key and recorded in Volume 520, Page 33 of the Deed Records of Marion County, Texas.

104. Oil, Gas and Other Mineral Lease dated April 14, 1989 from John Dragna to David R. Key and recorded in Volume 520, Page 30 of the Deed Records of Marion County, Texas.

105. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Fannie Curry, et al., to David R. Key and recorded in Volume 521, Page 258 of the Deed Records of Marion County, Texas.

106. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Jewel Hervey to David R. Key and recorded in Volume 521, Page 267 of the Deed Records of Marion County, Texas.

107. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Precious L. Hervey, et al., to David R. Key and recorded in Volume 521, Page 264 of the Deed Records of Marion County, Texas.

108. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Mabel L. Webster to David R. Key and recorded in Volume 521, Page 255 of the Deed Records of Marion County, Texas.

109. Oil, Gas and Other Mineral Lease dated April 14, 1989 from Helen Sternberg Arnold, et al., to David R. Key and recorded in Volume 520, Page 27 of the Deed Records of Marion County, Texas.

110. Oil, Gas and Other Mineral Lease dated July 5, 1989 from John H. Carter, Jr., to David R. Key and recorded in Volume 521, Page 651 of the Deed Records of Marion County, Texas.

111. Oil, Gas and Other Mineral Lease dated May 5, 1989 from Dorothy Robinson to David R. Key and recorded in Volume 521, Page 261 of the Deed Records of Marion County, Texas.

112. Oil, Gas and Other Mineral Lease dated June 1, 1989 from David R. Key to Tipco Operating Company, et al., and recorded in Volume 522, Page 633 of the Deed Records of Marion County, Texas.

113. Oil, Gas and Other Mineral Lease dated July 13, 1993 from Billie J. Mason to Tipco Operating Company and recorded in Volume 556, Page 279 of the Deed Records of Marion County, Texas.

114. Oil, Gas and Other Mineral Lease dated May 10, 1993 from J. C. Copeland, et ux., Ina Faye Copeland to Tipco Operating Company and recorded in Volume 556, Page 283 of the Deed Records of Marion County, Texas.

115. Oil, Gas and Other Mineral Lease dated August 19, 1993 from Russell Cooner, et ux., Joyce Cooner to Tipco Operating Company and recorded in Volume 556, Page 662 of the Deed Records of Marion County, Texas.

116. Oil, Gas and Other Mineral Lease dated September 20, 1993 from Bright Minerals, Inc. to Tipco Operating Company and recorded in Volume 559, Page 133 of the Deed Records of Marion County, Texas.

117. Oil, Gas and Other Mineral Lease dated August 24, 1993 from Robert Pugh, Sr., Executor of Estate, to Dr. Albert I. Clark to Tipco Operating Company and recorded in Volume 559, Page 136 of the Deed Records of Marion County, Texas.

118. Oil, Gas and Other Mineral Lease dated October 14, 1993 from Albert G. Mason to Tipco Operating Company and recorded in Volume 559, Page 138 of the Deed Records of Marion County, Texas.

119. Oil, Gas and Other Mineral Lease dated September 20, 1993 from Richard L. Ray to Tipco Operating Company and recorded in Volume 559, Page 140 of the Deed Records of Marion County, Texas.

120. Oil, Gas and Other Mineral Lease dated October 8, 1993 from Mary Lenore Sharpton to Tipco Operating Company and recorded in Volume 559, Page 143 of the Deed Records of Marion County, Texas.

121. Oil, Gas and Other Mineral Lease dated September 10, 1993 from Michael B. Gallob to Tipco Operating Company and recorded in Volume 557, Page 329 of the Deed Records of Marion County, Texas.

122. Oil, Gas and Other Mineral Lease dated September 23, 1993 from Key Family Marital Deduction Trust to Tipco Operating Company and recorded in Volume 557, Page 334 of the Deed Records of Marion County, Texas.

123. Oil, Gas and Other Mineral Lease dated September 9, 1993 from Frances A. Key to Tipco
Operating Company and recorded in Volume 557, Page 332 of the Deed Records of Marion
County, Texas.

124. Oil, Gas and Other Mineral Lease dated December 1, 2000 from Verla Jane Stutz Benefield to
Tipco Operating Company and recorded in Volume 627, Page 424 of the Deed Records of
Marion County, Texas.

125. Oil, Gas and Other Mineral Lease dated May 23, 2001 from Frances Benefield Roberts to Tipco
Operating Company and recorded in Volume 633, Page 470 of the Deed Records of Marion
County, Texas.

126. Oil, Gas and Other Mineral Lease dated November 30, 2000 from T. Jerry Blackburn to Hobart
R. Key and recorded in Volume 627, Page 219 of the Deed Records of Marion County, Texas.

127. Oil, Gas and Other Mineral Lease dated April 6, 1951 from W. H. Mason, Jr. and Mary S.
Mason to Dr. E. T. Doehring and recorded in Volume 167, Pag 317 of the Deed Records of
Marion County, Texas.

128. Oil, Gas and Other Mineral Lease dated December 9, 1950 from D. B. Meisenheimer to S. H.
Sanderson and recorded in Volume 164, Page 517 of the Deed Records of Marion County,
Texas.

129. Oil, Gas and Other Mineral Lease dated December 9, 1950 from H. B. Meisenheimer and J. B.
Moseley to S. H. Sanderson and recorded in Volume 164, Page 515 of the Deed Records of
Marion County, Texas.

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                    _____
                                      NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                      _____
                                      NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                      _____
                                      NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Richard Tauber, whose name as President of TAUBER EXPLORATION AND PRODUCTION COMPANY, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2013.

                                      _____

                                        NOTARY PUBLIC

STATE OF TEXAS

COUNTY OF _____

STATE OF LOUISIANA

PARISH OF CADDO

     I, _____, a notary public in and for said Parish and State, hereby certify that FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

     Given under my hand and notarial seal this the _____ day of _____, 2013.

                                        _____

                                        NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2013.

                                        _____

                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF _____

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as Vice President for PICKENS FINANCIAL GROUP, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Stephen Swan, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

     Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF _____

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Tobin L. Rhodes, whose name as Executive Vice President for SANTO PETROLEUM, LLC, a Delaware limited liability corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said corporation.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                _____
                                NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRIS

      I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                _____
                                NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                _____
                                NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.


                                        _____
                                        NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

## EXHIBIT "C"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

### AFE
**SKLAR Exploration Company L.L.C.**
401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

**AUTHORITY FOR EXPENDITURE**

| DATE: | March 25, 2013 | FIELD: | West Woodlawn |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | TX |
| WELL: | Albert Key et al #1 | HORIZON: | Pettet |
| LOCATION: | Marion County | PROJ. I.D.: | 6700 |

PROPOSAL: Drill straight hole to TD of 6,700'
Set 9-5/8" at 1500'
Set 5-1/2" at TD

Date Last Revised:

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $0 | $0 | $0 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 5,000 | 2,000 | 7,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 75,000 | 5,000 | 80,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 15,000 | | 15,000 |
| 04 | SURFACE DAMAGES & ROW | 6,000 | | 6,000 |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE | 60,000 | | 60,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | | | |
| 11 | DAYWORK WITHOUT DRILL PIPE | 169,000 | 16,000 | 185,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 16,000 | 10,000 | 26,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 3,000 | | 3,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 10,000 | | 10,000 |
| 17 | MUD & CHEMICALS | 30,000 | | 30,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 7,200 | | 7,200 |
| 24 | CEMENTING & EQUIPMENT | 18,000 | 25,000 | 43,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 14,000 | 14,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | 8,000 | 4,000 | 12,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 4,000 | | 4,000 |
| 30 | WATER | | 1,000 | 1,000 |
| 31 | FUEL | 45,000 | 6,000 | 51,000 |
| 32 | BITS | 14,000 | 1,000 | 15,000 |
| 33 | TRANSPORTATION & TRUCKING | | 6,000 | 6,000 |
| 34 | CONTRACT LABOR | | 8,000 | 8,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 22,000 | 7,000 | 29,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 50,000 | | 50,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 25,000 | 25,000 |
| 47 | PERFORATION SERVICES | | 12,000 | 12,000 |
| 48 | COMPLETION FLUIDS | | 3,000 | 3,000 |
| 49 | STIMULATION SERVICES | | 15,000 | 15,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | 10,000 | 10,000 |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,000 | 2,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 25,000 | -25,000 | |
| 78 | INSURANCE | 8,000 | 4,000 | 12,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 6,000 | 4,000 | 10,000 |
| 87 | MISCELLANEOUS | 30,000 | 9,000 | 39,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $626,000 | $178,000 | $804,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING (9-5/8") | 41,000 | | 41,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 3,500 | | 3,500 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $45,000 | $0 | $45,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS (5-1/2") | | 101,000 | 101,000 |
| 22 | TUBING (2-7/8") | | 35,000 | 35,000 |
| 23 | PACKERS | | 3,000 | 3,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 4,000 | 4,000 |
| 25 | WELLHEAD EQUIPMENT | | 16,000 | 16,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 22,000 | 22,000 |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $181,000 | $181,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 40,000 | 40,000 |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 25,000 | 25,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 3,000 | 3,000 |
| 46 | SALES METERING EQUIPMENT | | 4,000 | 4,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $102,000 | $102,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $45,000 | $283,000 | $328,000 |
| | | | | |
| | **TOTAL WELL COST** | $671,000 | $461,000 | $1,132,000 |

APPROVED _APRIL 18_ 2013

BY _[signature]_

OEE Insurance Election: Please check your election below
☐ Coverage under own policy with limits not less than
☒ Coverage under Operator's policy

NOTE If no election is checked or owner has not supplied proof of coverage _____ owner will be included in and charged for SEC's OEE coverage.

David A. Barlow
President & Chief Operating Officer

Sklarco L.L.C.

## EXHIBIT "C"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

**AFE**
**SKLAR Exploration Company L.L.C.**
401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

**AUTHORITY FOR EXPENDITURE**

| DATE: | March 25, 2013 | | FIELD: | West Woodlawn |
|---|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | | STATE: | TX |
| WELL: | Albert Key et al #1 | | HORIZON: | Pettit |
| LOCATION: | Marion County | | PROJ. T.D.: | 6700' |
| PROPOSAL: | Drill straight hole to TD of 6,700' | | | |
| | Set 9-5/8" at 1500' | | | |
| | Set 5-1/2" at TD | | Date Last Revised: | |

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $0 | $0 | $0 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 5,000 | 2,000 | 7,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 75,000 | 5,000 | 80,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 15,000 | | 15,000 |
| 04 | SURFACE DAMAGES & ROW | 6,000 | | 6,000 |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE | 60,000 | | 60,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | | | |
| 11 | DAYWORK WITHOUT DRILL PIPE | 169,000 | 16,000 | 185,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 16,000 | 10,000 | 26,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 3,000 | | 3,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 10,000 | | 10,000 |
| 17 | MUD & CHEMICALS | 30,000 | | 30,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 7,000 | | 7,000 |
| 24 | CEMENTING & EQUIPMENT | 18,000 | 25,000 | 43,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 14,000 | 14,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | 8,000 | 4,000 | 12,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 4,000 | | 4,000 |
| 30 | WATER | | 1,000 | 1,000 |
| 31 | FUEL | 45,000 | 6,000 | 51,000 |
| 32 | BITS | 14,000 | 1,000 | 15,000 |
| 33 | TRANSPORTATION & TRUCKING | | 6,000 | 6,000 |
| 34 | CONTRACT LABOR | | 8,000 | 8,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 22,000 | 7,000 | 29,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 50,000 | | 50,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 25,000 | 25,000 |
| 47 | PERFORATION SERVICES | | 12,000 | 12,000 |
| 48 | COMPLETION FLUIDS | | 3,000 | 3,000 |
| 49 | STIMULATION SERVICES | | 15,000 | 15,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | 10,000 | 10,000 |
| 57 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,000 | 2,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 25,000 | -25,000 | |
| 78 | INSURANCE | 8,000 | 4,000 | 12,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 6,000 | 4,000 | 10,000 |
| 82 | MISCELLANEOUS  ±5% contingency | 30,000 | 9,000 | 39,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $626,000 | $178,000 | $804,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING (9-5/8") | 41,000 | | 41,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 3,500 | | 3,500 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $45,000 | $0 | $45,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS (5-1/2") | | 101,000 | 101,000 |
| 22 | TUBING (2-7/8") | | 35,000 | 35,000 |
| 23 | PACKERS | | 3,000 | 3,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 4,000 | 4,000 |
| 25 | WELLHEAD EQUIPMENT | | 16,000 | 16,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 22,000 | 22,000 |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $181,000 | $181,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 40,000 | 40,000 |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 25,000 | 25,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 3,000 | 3,000 |
| 46 | SALES METERING EQUIPMENT | | 4,000 | 4,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $102,000 | $102,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $45,000 | $283,000 | $328,000 |
| | | | | |
| | **TOTAL WELL COST** | $671,000 | $461,000 | $1,132,000 |

APPROVED: _____ , 2013.

BY: _____

☐ OEE Insurance Election (Proof of coverage required by elected parties)
☐ Coverage under own policy, with limits not less than:
☐ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

## EXHIBIT "C"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

### AFE
### SKLAR Exploration Company L.L.C.
401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

**AUTHORITY FOR EXPENDITURE**

| DATE: | March 29, 2013 | FIELD: | West Woodlawn |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | TX |
| WELL: | Albert Kev et al #1 | HORIZON: | Pettit |
| LOCATION: | Marion County | PROJ. T.D.: | 6700 |

PROPOSAL: Drill straight hole to TD of 6,700'
Set 9-5/8" at 1500'
Set 5-1/2" at TD

Date Last Revised:

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 87 | DELAY RENTALS | | | |
| 88 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $0 | $0 | $0 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 5,000 | 2,000 | 7,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 75,000 | 5,000 | 80,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 15,000 | | 15,000 |
| 04 | SURFACE DAMAGES & ROW | 6,000 | | 6,000 |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE | 60,000 | | 60,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | | | |
| 11 | DAYWORK WITHOUT DRILL PIPE | 169,000 | 16,000 | 185,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 16,000 | 10,000 | 26,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 3,000 | | 3,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 10,000 | | 10,000 |
| 17 | MUD & CHEMICALS | 30,000 | | 30,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 7,200 | | 7,200 |
| 24 | CEMENTING & EQUIPMENT | 18,000 | 25,000 | 43,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 14,000 | 14,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | 8,000 | 4,000 | 12,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 4,000 | | 4,000 |
| 30 | WATER | | 1,000 | 1,000 |
| 31 | FUEL | 45,000 | 6,000 | 51,000 |
| 32 | BITS | 14,000 | 1,000 | 15,000 |
| 33 | TRANSPORTATION & TRUCKING | | 6,000 | 6,000 |
| 34 | CONTRACT LABOR | | 8,000 | 8,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 22,000 | 7,000 | 29,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 50,000 | | 50,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 25,000 | 25,000 |
| 47 | PERFORATION SERVICES | | 12,000 | 12,000 |
| 48 | COMPLETION FLUIDS | | 3,000 | 3,000 |
| 49 | STIMULATION SERVICES | | 15,000 | 15,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | 10,000 | 10,000 |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,000 | 2,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 25,000 | -25,000 | |
| 78 | INSURANCE | 8,000 | 4,000 | 12,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 6,000 | 4,000 | 10,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 30,000 | 9,000 | 39,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $626,000 | $178,000 | $804,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 01 | SURFACE CASING (9-5/8") | 41,000 | | 41,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 3,500 | | 3,500 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $45,000 | $0 | $45,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS (5-1/2") | | 101,000 | 101,000 |
| 22 | TUBING (2-7/8") | | 35,000 | 35,000 |
| 23 | PACKERS | | 3,000 | 3,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 4,000 | 4,000 |
| 25 | WELLHEAD EQUIPMENT | | 16,000 | 16,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 22,000 | 22,000 |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $181,000 | $181,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 40000 | 40,000 |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 25,000 | 25,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 3,000 | 3,000 |
| 46 | SALES METERING EQUIPMENT | | 4,000 | 4,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $102,000 | $102,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $45,000 | $283,000 | $328,000 |
| | | | | |
| | **TOTAL WELL COST** | $671,000 | $461,000 | $1,132,000 |

APPROVED __MAY 8__, 2013.

BY _____

OEE Insurance Election (Please check your election below)
☐ Coverage under own policy with limits no less than __SEE CERT.__
☐ Coverage under Operator's policy

NOTE: If no election is checked or owner is not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

TAUBER EXPLORATION & PRODUCTION CO.
(RICHARD E. TAUBER, PRESIDENT)

*No Frac Costs. Expect another AFE*

## EXHIBIT "C"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

**AFE**
**SKLAR Exploration Company L.L.C.**
401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

**AUTHORITY FOR EXPENDITURE**

| DATE: March 25, 2013 | | FIELD: West Woodlawn |
|---|---|---|
| OPERATOR: Sklar Exploration Company LLC | | STATE: TX |
| WELL: Albert Key et al #1 | | HORIZON: Pettit |
| LOCATION: Marion County | | PROJ. T.D.: 6700 |

PROPOSAL: Drill straight hole to TD of 6,700'
Set 9-5/8" at 1500'
Set 5-1/2" at TD

Date Last Revised:

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | TOTAL LEASEHOLD COSTS | $0 | $0 | $0 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 5,000 | 2,000 | 7,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 75,000 | 5,000 | 80,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 15,000 | | 15,000 |
| 04 | SURFACE DAMAGES & ROW | 6,000 | | 6,000 |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE | 60,000 | | 60,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | | | |
| 11 | DAYWORK WITHOUT DRILL PIPE | 169,000 | 16,000 | 185,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 16,000 | 10,000 | 26,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 3,000 | | 3,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 10,000 | | 10,000 |
| 17 | MUD & CHEMICALS | 30,000 | | 30,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 7,200 | | 7,200 |
| 24 | CEMENTING & EQUIPMENT | 18,000 | 25,000 | 43,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 14,000 | 14,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | 8,000 | 4,000 | 12,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 4,000 | | 4,000 |
| 30 | WATER | | 1,000 | 1,000 |
| 31 | FUEL | 45,000 | 6,000 | 51,000 |
| 32 | BITS | 14,000 | 1,000 | 15,000 |
| 33 | TRANSPORTATION & TRUCKING | | 6,000 | 6,000 |
| 34 | CONTRACT LABOR | | 8,000 | 8,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 22,000 | 7,000 | 29,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 50,000 | | 50,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 25,000 | 25,000 |
| 47 | PERFORATION SERVICES | | 12,000 | 12,000 |
| 48 | COMPLETION FLUIDS | | 3,000 | 3,000 |
| 49 | STIMULATION SERVICES | | 15,000 | 15,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | 10,000 | 10,000 |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,000 | 2,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 25,000 | -25,000 | |
| 78 | INSURANCE | 8,000 | 4,000 | 12,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 6,000 | 4,000 | 10,000 |
| 82 | MISCELLANEOUS - ±5% contingency | 30,000 | 9,000 | 39,000 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $628,000 | $178,000 | $804,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING (9-5/8") | 41,000 | | 41,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 3,500 | | 3,500 |
| 06 | CONDUCTOR CASING | | | |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $45,000 | $0 | $45,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS (5-1/2") | | 101,000 | 101,000 |
| 22 | TUBING (2-7/8") | | 35,000 | 35,000 |
| 23 | PACKERS | | 3,000 | 3,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 4,000 | 4,000 |
| 25 | WELLHEAD EQUIPMENT | | 16,000 | 16,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 22,000 | 22,000 |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $181,000 | $181,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 40000 | 40,000 |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 25,000 | 25,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 3,000 | 3,000 |
| 46 | SALES METERING EQUIPMENT | | 4,000 | 4,000 |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $102,000 | $102,000 |
| | | | | |
| | TOTAL EQUIPMENT | $45,000 | $283,000 | $328,000 |
| | **TOTAL WELL COST** | $671,000 | $461,000 | $1,132,000 |

APPROVED _____ 2013.

BY: _____

OEE Insurance Election (check one of your election below):
☐ Coverage under own policy with limits not less than _____
☐ Coverage under Operator's policy

NOTE: If no election is checked and owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

## EXHIBIT "C"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

**AFE**

**SKLAR Exploration Company L.L.C.**

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

**AUTHORITY FOR EXPENDITURE**

| DATE: | March 25, 2013 | FIELD: | West Woodlawn |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | TX |
| WELL: | Albert Key et al #1 | HORIZON: | Pettit |
| LOCATION: | Marion County | PROJ. T.D.: | 6700' |

| PROPOSAL: | Drill straight hole to TD of 6,700'.<br>Set 9-5/8" at 1500'<br>Set 5-1/2" at TD | Date Last Revised: | |

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | LEASEHOLD COSTS | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 64 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 9* | RECORDING FEES | | | |
| | TOTAL LEASEHOLD COSTS | $0 | $0 | $0 |
| | | | | |
| 9200/9300 | INTANGIBLE DRILLING & COMPLETION | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 5,000 | 2,000 | 7,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 75,000 | 5,000 | 80,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 15,000 | | 15,000 |
| 04 | SURFACE DAMAGES & ROW | 6,000 | | 6,000 |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE | 60,000 | | 60,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | | | |
| 11 | DAYWORK WITHOUT DRILL PIPE | 169,000 | 16,000 | 185,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 16,000 | 10,000 | 26,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 3,000 | | 3,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 10,000 | | 10,000 |
| 17 | MUD & CHEMICALS | 30,000 | | 30,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 7,200 | | 7,200 |
| 24 | CEMENTING & EQUIPMENT | 18,000 | 25,000 | 43,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 14,000 | 14,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | 8,000 | 4,000 | 12,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 4,000 | | 4,000 |
| 30 | WATER | | 1,000 | 1,000 |
| 31 | FUEL | 45,000 | 6,000 | 51,000 |
| 32 | BITS | 14,000 | 1,000 | 15,000 |
| 33 | TRANSPORTATION & TRUCKING | | 6,000 | 6,000 |
| 34 | CONTRACT LABOR | | 8,000 | 8,000 |
| 35 | SAFETY & HDS TRAINING | | | |
| 36 | LOGGING & WIRELINE | 22,000 | 7,000 | 29,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 50,000 | | 50,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 25,000 | 25,000 |
| 47 | PERFORATION SERVICES | | 12,000 | 12,000 |
| 48 | COMPLETION FLUIDS | | 3,000 | 3,000 |
| 49 | STIMULATION SERVICES | | 15,000 | 15,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | 10,000 | 10,000 |
| 58 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,000 | 2,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 25,000 | -25,000 | |
| 78 | INSURANCE | 8,000 | 4,000 | 12,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 8,000 | 4,000 | 10,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 30,000 | 9,000 | 39,000 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $626,000 | $178,000 | $804,000 |
| | | | | |
| 9500 | TANGIBLE EQUIPMENT - DRILLING | | | |
| 02 | SURFACE CASING (9-5/8") | 41,000 | | 41,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 3,500 | | 3,500 |
| 06 | CONDUCTOR CASING | | | |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $45,000 | $0 | $45,000 |
| | | | | |
| 9520 | TANGIBLE EQUIPMENT - COMPLETION | | | |
| 21 | PRODUCTION CASING & LINERS (5-1/2") | | 101,000 | 101,000 |
| 22 | TUBING (2-7/8") | | 35,000 | 35,000 |
| 23 | PACKERS | | 3,000 | 3,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 4,000 | 4,000 |
| 25 | WELLHEAD EQUIPMENT | | 16,000 | 16,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 22,000 | 22,000 |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $181,000 | $181,000 |
| | | | | |
| 9535 | SURFACE PRODUCTION EQUIPMENT | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 40000 | 40,000 |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 25,000 | 25,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 3,000 | 3,000 |
| 46 | SALES METERING EQUIPMENT | | 4,000 | 4,000 |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $102,000 | $102,000 |
| | | | | |
| | TOTAL EQUIPMENT | $45,000 | $283,000 | $328,000 |
| | | | | |
| | TOTAL WELL COST | $671,000 | $461,000 | $1,132,000 |

APPROVED: _April 24_ , 2013.

BY: _____

OEE Insurance Election (Please check your election below):

☐ Coverage under own policy with limits not less than _____

☑ Coverage under Operator's policy

NOTE: If no election is checked or owner
has not supplied proof of coverage
prior to spud, owner will be included
under and charged for SEC's OEE
coverage.

## EXHIBIT "C"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

### AFE
### SKLAR Exploration Company L.L.C.
401 Edwards St.  Suite 1601
Shreveport, LA  71101
(318) 227-9888

**AUTHORITY FOR EXPENDITURE**

| DATE: | March 25, 2013 | FIELD: | West Woodlawn |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | TX |
| WELL: | Albert Key et al #1 | HORIZON: | Pettit |
| LOCATION: | Marion County | PROJ. T.D.: | 6700 |

| PROPOSAL: | Drill straight hole to TD of 6,700'<br>Set 9-5/8" at 1500'<br>Set 5-1/2" at TD | Date Last Revised: | |
|---|---|---|---|

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | LEASEHOLD COSTS | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | TOTAL LEASEHOLD COSTS | $0 | $0 | $0 |

| 9200/6300 | INTANGIBLE DRILLING & COMPLETION | | | |
|---|---|---|---|---|
| 01 | SURVEY, DOC HEARINGS, PERMITS | 5,000 | 2,000 | 7,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 75,000 | 5,000 | 80,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 15,000 | | 15,000 |
| 04 | SURFACE DAMAGES & ROW | 6,000 | | 6,000 |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE | 60,000 | | 60,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | | | |
| 11 | DAYWORK WITHOUT DRILL PIPE | 169,000 | 16,000 | 185,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 16,000 | 10,000 | 26,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 3,000 | | 3,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 10,000 | | 10,000 |
| 17 | MUD & CHEMICALS | 30,000 | | 30,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 7,200 | | 7,200 |
| 24 | CEMENTING & EQUIPMENT | 18,000 | 25,000 | 43,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 14,000 | 14,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | 8,000 | 4,000 | 12,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 4,000 | | 4,000 |
| 30 | WATER | | 1,000 | 1,000 |
| 31 | FUEL | 45,000 | 6,000 | 51,000 |
| 32 | BITS | 14,000 | 1,000 | 15,000 |
| 33 | TRANSPORTATION & TRUCKING | | 6,000 | 6,000 |
| 34 | CONTRACT LABOR | | 8,000 | 8,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 22,000 | 7,000 | 29,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 50,000 | | 50,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 25,000 | 25,000 |
| 47 | PERFORATION SERVICES | | 12,000 | 12,000 |
| 48 | COMPLETION FLUIDS | | 3,000 | 3,000 |
| 49 | STIMULATION SERVICES | | 15,000 | 15,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | 10,000 | 10,000 |
| 57 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,000 | 2,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 25,000 | -25,000 | |
| 78 | INSURANCE | 8,000 | 4,000 | 12,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 6,000 | 4,000 | 10,000 |
| 82 | MISCELLANEOUS: x% contingency | 30,000 | 9,000 | 39,000 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $626,000 | $178,000 | $804,000 |

| 9500 | TANGIBLE EQUIPMENT - DRILLING | | | |
|---|---|---|---|---|
| 02 | SURFACE CASING (9-5/8") | 41,000 | | 41,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 3,500 | | 3,500 |
| 06 | CONDUCTOR CASING | | | |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $45,000 | $0 | $45,000 |

| 9520 | TANGIBLE EQUIPMENT - COMPLETION | | | |
|---|---|---|---|---|
| 21 | PRODUCTION CASING & LINERS (5-1/2") | | 101,000 | 101,000 |
| 22 | TUBING (2-7/8") | | 35,000 | 35,000 |
| 23 | PACKERS | | 3,000 | 3,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 4,000 | 4,000 |
| 25 | WELLHEAD EQUIPMENT | | 16,000 | 16,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 22,000 | 22,000 |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $181,000 | $181,000 |

| 9535 | SURFACE PRODUCTION EQUIPMENT | | | |
|---|---|---|---|---|
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 40,000 | 40,000 |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 29,000 | 29,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 3,000 | 3,000 |
| 46 | SALES METERING EQUIPMENT | | 4,000 | 4,000 |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $102,000 | $102,000 |

| | TOTAL EQUIPMENT | $45,000 | $283,000 | $328,000 |
|---|---|---|---|---|

| | TOTAL WELL COST | $671,000 | $461,000 | $1,132,000 |
|---|---|---|---|---|

APPROVED: _____ 2013.
BY: _____

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than _____

☐ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SECs OEE coverage.

## EXHIBIT "C"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, L.L.C., and Marksco, L.L.C.

**AFE**
**SKLAR Exploration Company L.L.C.**
401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668
**AUTHORITY FOR EXPENDITURE**

| DATE: | March 25, 2013 | FIELD: | West Woodlawn |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | TX |
| WELL: | Albert Key et al E1 | HORIZON: | Pettit |
| LOCATION: | Marion County | PROJ. T.D.: | 6700 |

PROPOSAL:  Drill straight hole to TD of 6,700'
Set 9-5/8" at 1500'
Set 5-1/2" at TD                    Date Last Revised:

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $0 | $0 | $0 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 5,000 | 2,000 | 7,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 75,000 | 5,000 | 80,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 15,000 | | 15,000 |
| 04 | SURFACE DAMAGES & ROW | 6,000 | | 6,000 |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE | 60,000 | | 60,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | | | |
| 11 | DAYWORK WITHOUT DRILL PIPE | 166,000 | 19,000 | 185,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 16,000 | 10,000 | 26,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 3,000 | | 3,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 10,000 | | 10,000 |
| 17 | MUD & CHEMICALS | 30,000 | | 30,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 7,200 | | 7,200 |
| 24 | CEMENTING & EQUIPMENT | 18,000 | 25,000 | 43,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 14,000 | 14,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | 8,000 | 4,000 | 12,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 4,000 | | 4,000 |
| 30 | WATER | | 1,000 | 1,000 |
| 31 | FUEL | 45,000 | 6,000 | 51,000 |
| 32 | BITS | 14,000 | 1,000 | 15,000 |
| 33 | TRANSPORTATION & TRUCKING | | 6,000 | 6,000 |
| 34 | CONTRACT LABOR | | 8,000 | 8,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 22,000 | 7,000 | 29,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 50,000 | | 50,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 25,000 | 25,000 |
| 47 | PERFORATION SERVICES | | 12,000 | 12,000 |
| 48 | COMPLETION FLUIDS | | 3,000 | 3,000 |
| 49 | STIMULATION SERVICES | | 15,000 | 15,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | 10,000 | 10,000 |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,000 | 2,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 25,000 | -25,000 | |
| 78 | INSURANCE | 8,000 | 4,000 | 12,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 6,000 | 4,000 | 10,000 |
| 82 | MISCELLANEOUS  10% contingency | 30,000 | 9,000 | 39,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $626,000 | $178,000 | $804,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING (9-5/8") | 41,000 | | 41,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 3,500 | | 3,500 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE CASING - DRILLING** | $45,000 | $0 | $45,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS (5-1/2") | | 101,000 | 101,000 |
| 22 | TUBING (2-7/8") | | 35,000 | 35,000 |
| 23 | PACKERS | | 3,000 | 3,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 4,000 | 4,000 |
| 25 | WELLHEAD EQUIPMENT | | 16,000 | 16,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 22,000 | 22,000 |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $181,000 | $181,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 40000 | 40,000 |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 25,000 | 25,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 3,000 | 3,000 |
| 46 | SALES METERING EQUIPMENT | | 4,000 | 4,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $102,000 | $102,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $45,000 | $283,000 | $328,000 |
| | | | | |
| | **TOTAL WELL COST** | $671,000 | $461,000 | $1,132,000 |

APPROVED: _#123_ , 2013.

BY: _____

OEE Insurance Election (Please check your election below):

☒ Coverage under own policy with limits not less than_____

☐ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

## EXHIBIT "C"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

### AFE
### SKLAR Exploration Company L.L.C.
401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

**AUTHORITY FOR EXPENDITURE**

| DATE: | March 25, 2013 | FIELD: | West Woodlawn |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | TX |
| WELL: | Albert Key et al #1 | HORIZON: | Pettit |
| LOCATION: | Marion County | PROJ. T.D.: | 6700 |

| PROPOSAL: | Drill straight hole to TD of 6,700'<br>Set 9-5/8" at 1500'<br>Set 5-1/2" at TD | Date Last Revised: | |

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $0 | $0 | $0 |

| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
|---|---|---|---|---|
| 01 | SURVEY, DOC HEARINGS, PERMITS | 5,000 | 2,000 | 7,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 75,000 | 5,000 | 80,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 15,000 | | 15,000 |
| 04 | SURFACE DAMAGES & ROW | 6,000 | | 6,000 |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE | 60,000 | | 60,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | | | |
| 11 | DAYWORK WITHOUT DRILL PIPE | 169,000 | 16,000 | 185,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 16,000 | 10,000 | 26,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 3,000 | | 3,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 10,000 | | 10,000 |
| 17 | MUD & CHEMICALS | 30,000 | | 30,000 |
| 18 | MUD LOGGING | | | |
| 23 | MUD LOGGING | 7,200 | | 7,200 |
| 24 | CEMENTING & EQUIPMENT | 18,000 | 25,000 | 43,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 14,000 | 14,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | 8,000 | 4,000 | 12,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 4,000 | | 4,000 |
| 30 | WATER | | 1,000 | 1,000 |
| 31 | FUEL | 45,000 | 6,000 | 51,000 |
| 32 | BITS | 14,000 | 1,000 | 15,000 |
| 33 | TRANSPORTATION & TRUCKING | | 6,000 | 6,000 |
| 34 | CONTRACT LABOR | | 8,000 | 8,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 22,000 | 7,000 | 29,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 50,000 | | 50,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 25,000 | 25,000 |
| 47 | PERFORATION SERVICES | | 12,000 | 12,000 |
| 48 | COMPLETION FLUIDS | | 3,000 | 3,000 |
| 49 | STIMULATION SERVICES | | 15,000 | 15,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | 10,000 | 10,000 |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | ISALT WATER DISPOSAL | | 2,000 | 2,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 25,000 | -25,000 | |
| 78 | INSURANCE | 8,000 | 4,000 | 12,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 6,000 | 4,000 | 10,000 |
| 87 | MISCELLANEOUS  ±5% contingency | 30,000 | 9,000 | 39,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $626,000 | $176,000 | $804,000 |

| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
|---|---|---|---|---|
| 02 | SURFACE CASING (9-5/8") | 41,000 | | 41,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 3,500 | | 3,500 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $45,000 | $0 | $45,000 |

| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
|---|---|---|---|---|
| 21 | PRODUCTION CASING & LINERS (5-1/2") | | 101,000 | 101,000 |
| 22 | TUBING (2-7/8") | | 35,000 | 35,000 |
| 23 | PACKERS | | 3,000 | 3,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 4,000 | 4,000 |
| 25 | WELLHEAD EQUIPMENT | | 16,000 | 16,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 22,000 | 22,000 |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $181,000 | $181,000 |

| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
|---|---|---|---|---|
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 40000 | 40,000 |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 25,000 | 25,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 3,000 | 3,000 |
| 46 | SALES METERING EQUIPMENT | | 4,000 | 4,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $102,000 | $102,000 |
| | **TOTAL EQUIPMENT** | $45,000 | $283,000 | $328,000 |
| | **TOTAL WELL COST** | $671,000 | $461,000 | $1,132,000 |

APPROVED: _May 9_____, 2013.

BY: _____

OEE Insurance Election (please check your election below):

☐ Coverage under own policy with limits not less than_____

☑ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

## EXHIBIT "C"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

### AFE
### SKLAR Exploration Company L.L.C.
401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

**AUTHORITY FOR EXPENDITURE**

| DATE: | March 25, 2013 | FIELD: | West Woodlawn |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | TX |
| WELL: | Albert Key et al #1 | HORIZON: | Pettit |
| LOCATION: | Marion County | PROJ. T.D.: | 6700' |

PROPOSAL: Drill straight hole to TD of 6,700'
Set 9-5/8" at 1500'
Set 5-1/2" at TD

Date Last Revised:

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| **9100** | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 85 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $0 | $0 | $0 |
| | | | | |
| **9200/9300** | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 5,000 | 2,000 | 7,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 75,000 | 5,000 | 80,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 15,000 | | 15,000 |
| 04 | SURFACE DAMAGES & ROW | 6,000 | | 6,000 |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE | 60,000 | | 60,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | | | |
| 11 | DAYWORK WITHOUT DRILL PIPE | 169,000 | 16,000 | 185,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 16,000 | 10,000 | 26,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 3,000 | | 3,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 10,000 | | 10,000 |
| 17 | MUD & CHEMICALS | 30,000 | | 30,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 7,200 | | 7,200 |
| 24 | CEMENTING & EQUIPMENT | 18,000 | 25,000 | 43,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 14,000 | 14,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | 8,000 | 4,000 | 12,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 4,000 | | 4,000 |
| 30 | WATER | | 1,000 | 1,000 |
| 31 | FUEL | 45,000 | 6,000 | 51,000 |
| 32 | BITS | 14,000 | 1,000 | 15,000 |
| 33 | TRANSPORTATION & TRUCKING | | 6,000 | 6,000 |
| 34 | CONTRACT LABOR | | 8,000 | 8,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 22,000 | 7,000 | 29,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 50,000 | | 50,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 25,000 | 25,000 |
| 47 | PERFORATION SERVICES | | 12,000 | 12,000 |
| 48 | COMPLETION FLUIDS | | 3,000 | 3,000 |
| 49 | STIMULATION SERVICES | | 15,000 | 15,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | 10,000 | 10,000 |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,000 | 2,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 25,000 | -25,000 | |
| 78 | INSURANCE | 8,000 | 4,000 | 12,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 6,000 | 4,000 | 10,000 |
| 82 | MISCELLANEOUS - 10% contingency | 30,000 | 9,000 | 39,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $626,000 | $178,000 | $804,000 |
| | | | | |
| **9500** | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING (9-5/8") | 41,000 | | 41,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 3,500 | | 3,500 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $45,000 | $0 | $45,000 |
| | | | | |
| **9520** | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS (5-1/2") | | 101,000 | 101,000 |
| 22 | TUBING (2-7/8") | | 35,000 | 35,000 |
| 23 | PACKERS | | 3,000 | 3,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 4,000 | 4,000 |
| 25 | WELLHEAD EQUIPMENT | | 16,000 | 16,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 22,000 | 22,000 |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $181,000 | $181,000 |
| | | | | |
| **9535** | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 40000 | 40,000 |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 25,000 | 25,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 3,000 | 3,000 |
| 46 | SALES METERING EQUIPMENT | | 4,000 | 4,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $102,000 | $102,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $45,000 | $283,000 | $328,000 |
| | | | | |
| | **TOTAL WELL COST** | $671,000 | $461,000 | $1,132,000 |

APPROVED: _(signature)_ 2013.

BY: TOBIN RHODES

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than _____
☑ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

## EXHIBIT "C"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

**AFE**

**SKLAR Exploration Company L.L.C.**

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8658

**AUTHORITY FOR EXPENDITURE**

| DATE: | March 25, 2013 | FIELD: | West Woodlawn |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | TX |
| WELL: | Albert Key et al #1 | HORIZON: | Pettit |
| LOCATION: | Marion County | PROJ. T.D.: | 6700' |
| PROPOSAL: | Drill straight hole to TD of 6.700' | | |
| | Set 9-5/8" at 1500' | | |
| | Set 5-1/2" at TD | Date Last Revised: | |

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 85 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $0 | $0 | $0 |

| | **INTANGIBLE DRILLING & COMPLETION** | | | |
|---|---|---|---|---|
| 9200/9300 | | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 5,000 | 2,000 | 7,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 75,000 | 5,000 | 80,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 15,000 | | 15,000 |
| 04 | SURFACE DAMAGES & ROW | 6,000 | | 6,000 |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE | 60,000 | | 60,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | | | |
| 11 | DAYWORK WITHOUT DRILL PIPE | 169,000 | 16,000 | 185,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 16,000 | 10,000 | 26,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 3,000 | | 3,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 10,000 | | 10,000 |
| 17 | MUD & CHEMICALS | 30,000 | | 30,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 7,200 | | 7,200 |
| 24 | CEMENTING & EQUIPMENT | 18,000 | 25,000 | 43,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 14,000 | 14,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | 8,000 | 4,000 | 12,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 4,000 | | 4,000 |
| 30 | WATER | | 1,000 | 1,000 |
| 31 | FUEL | 45,000 | 6,000 | 51,000 |
| 32 | BITS | 14,000 | 1,000 | 15,000 |
| 33 | TRANSPORTATION & TRUCKING | | 6,000 | 6,000 |
| 34 | CONTRACT LABOR | | 8,000 | 8,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 22,000 | 7,000 | 29,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 50,000 | | 50,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 25,000 | 25,000 |
| 47 | PERFORATION SERVICES | | 12,000 | 17,000 |
| 48 | COMPLETION FLUIDS | | 3,000 | 3,000 |
| 49 | STIMULATION SERVICES | | 15,000 | 15,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | 10,000 | 10,000 |
| 57 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,000 | 2,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 25,000 | -25,000 | |
| 78 | INSURANCE | 8,000 | 4,000 | 12,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 6,000 | 4,000 | 10,000 |
| 87 | MISCELLANEOUS: 10% contingency | 30,000 | 9,000 | 39,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $626,000 | $178,000 | $804,000 |

| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
|---|---|---|---|---|
| 02 | SURFACE CASING (9-5/8") | 41,000 | | 41,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 3,500 | | 3,500 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $45,000 | $0 | $45,000 |

| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
|---|---|---|---|---|
| 21 | PRODUCTION CASING & LINERS (5-1/2") | | 101,000 | 101,000 |
| 22 | TUBING (2-7/8") | | 35,000 | 35,000 |
| 23 | PACKERS | | 3,000 | 3,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 4,000 | 4,000 |
| 25 | WELLHEAD EQUIPMENT | | 16,000 | 16,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 22,000 | 22,000 |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $181,000 | $181,000 |

| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
|---|---|---|---|---|
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 40000 | 40,000 |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 25,000 | 25,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 3,000 | 3,000 |
| 46 | SALES METERING EQUIPMENT | | 4,000 | 4,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $102,000 | $102,000 |

| | **TOTAL EQUIPMENT** | $45,000 | $283,000 | $328,000 |
| | **TOTAL WELL COST** | $671,000 | $461,000 | $1,132,000 |

APPROVED: _04/26_ , 2013.

BY: _____

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than: _____
☑ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

## EXHIBIT "C"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

### AFE
### SKLAR Exploration Company L.L.C.
401 Edwards St.  Suite 1601
Shreveport, LA  71101
(318) 227-8668

**AUTHORITY FOR EXPENDITURE**

| DATE: | March 25, 2013 | FIELD: | West Woodlawn |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | TX |
| WELL: | Albert Key et al #1 | HORIZON: | Pettet |
| LOCATION: | Marion County | PROJ. T.D.: | 6700' |
| PROPOSAL: | Drill straight hole to TD of 6,700'<br>Set 9-5/8" at 1500'<br>Set 5-1/2" at TD | Date Last Revised: | |

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $0 | $0 | $0 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 5,000 | 2,000 | 7,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 75,000 | 5,000 | 80,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 15,000 | | 15,000 |
| 04 | SURFACE DAMAGES & ROW | 6,000 | | 6,000 |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE | 60,000 | | 60,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | | | |
| 11 | DAYWORK WITHOUT DRILL PIPE | 169,000 | 16,000 | 185,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 16,000 | 10,000 | 26,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 3,000 | | 3,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 10,000 | | 10,000 |
| 17 | MUD & CHEMICALS | 30,000 | | 30,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 7,200 | | 7,200 |
| 24 | CEMENTING & EQUIPMENT | 18,000 | 25,000 | 43,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 14,000 | 14,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | 8,000 | 4,000 | 12,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 4,000 | | 4,000 |
| 30 | WATER | | 1,000 | 1,000 |
| 31 | FUEL | 45,000 | 6,000 | 51,000 |
| 32 | BITS | 14,000 | 1,000 | 15,000 |
| 33 | TRANSPORTATION & TRUCKING | | 6,000 | 6,000 |
| 34 | CONTRACT LABOR | | 8,000 | 8,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 22,000 | 7,000 | 29,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 50,000 | | 50,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 25,000 | 25,000 |
| 47 | PERFORATION SERVICES | | 12,000 | 12,000 |
| 48 | COMPLETION FLUIDS | | 3,000 | 3,000 |
| 49 | STIMULATION SERVICES | | 15,000 | 15,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | 10,000 | 10,000 |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,000 | 2,000 |
| 62 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 25,000 | -25,000 | |
| 78 | INSURANCE | 8,000 | 4,000 | 12,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 6,000 | 4,000 | 10,000 |
| 82 | MISCELLANEOUS  ±5% contingency | 30,000 | 9,000 | 39,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $626,000 | $178,000 | $804,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING (9-5/8") | 41,000 | | 41,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 3,500 | | 3,500 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $45,000 | $0 | $45,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS (5-1/2") | | 101,000 | 101,000 |
| 22 | TUBING (2-7/8") | | 35,000 | 35,000 |
| 23 | PACKERS | | 3,000 | 3,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 4,000 | 4,000 |
| 25 | WELLHEAD EQUIPMENT | | 16,000 | 16,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 22,000 | 22,000 |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $181,000 | $181,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 40000 | 40,000 |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 25,000 | 25,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 3,000 | 3,000 |
| 46 | SALES METERING EQUIPMENT | | 4,000 | 4,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $102,000 | $102,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $45,000 | $283,000 | $328,000 |
| | | | | |
| | **TOTAL WELL COST** | $671,000 | $461,000 | $1,132,000 |

APPROVED:  4-24 , 2013.

BY: _____

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than: _____
☑ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

## EXHIBIT "C"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

### AFE
### SKLAR Exploration Company L.L.C.
401 Edwards St., Suite 1601
Shreveport, LA 71101
(318) 227-8668

**AUTHORITY FOR EXPENDITURE**

| DATE: | March 25, 2013 | | FIELD: | West Woodlawn | |
|---|---|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | | STATE: | TX | |
| WELL: | Albert Key et al #1 | | HORIZON: | Pettit | |
| LOCATION: | Marion County | | PROJ. T.D.: | 6700 | |

| PROPOSAL: | Drill straight hole to TD of 6.700'  Set 9-5/8" at 1500'  Set 5-1/2" at TD | | | Date Last Revised: | |
|---|---|---|---|---|---|

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $0 | $0 | $0 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 5,000 | 2,000 | 7,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 75,000 | 5,000 | 80,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 15,000 | | 15,000 |
| 04 | SURFACE DAMAGES & ROW | 6,000 | | 6,000 |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE | 60,000 | | 60,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | | | |
| 11 | DAYWORK WITHOUT DRILL PIPE | 169,000 | 16,000 | 185,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 16,000 | 10,000 | 26,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 3,000 | | 3,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 10,000 | | 10,000 |
| 17 | MUD & CHEMICALS | 30,000 | | 30,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 7,200 | | 7,200 |
| 24 | CEMENTING & EQUIPMENT | 18,000 | 25,000 | 43,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 14,000 | 14,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | 8,000 | 4,000 | 12,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 4,000 | | 4,000 |
| 30 | WATER | | 1,000 | 1,000 |
| 31 | FUEL | 45,000 | 6,000 | 51,000 |
| 32 | BITS | 14,000 | 1,000 | 15,000 |
| 33 | TRANSPORTATION & TRUCKING | | 6,000 | 6,000 |
| 34 | CONTRACT LABOR | | 8,000 | 8,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 22,000 | 7,000 | 29,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 50,000 | | 50,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 25,000 | 25,000 |
| 47 | PERFORATION SERVICES | | 12,000 | 12,000 |
| 48 | COMPLETION FLUIDS | | 3,000 | 3,000 |
| 49 | STIMULATION SERVICES | | 15,000 | 15,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | 10,000 | 10,000 |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,000 | 2,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 25,000 | -25,000 | |
| 78 | INSURANCE | 8,000 | 4,000 | 12,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 6,000 | 4,000 | 10,000 |
| 82 | MISCELLANEOUS 10% contingency | 30,000 | 9,000 | 39,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $626,000 | $178,000 | $804,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING (9-5/8") | 41,000 | | 41,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 3,500 | | 3,500 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $45,000 | $0 | $45,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS (5-1/2") | | 101,000 | 101,000 |
| 22 | TUBING (2-7/8") | | 35,000 | 35,000 |
| 23 | PACKERS | | 3,000 | 3,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 4,000 | 4,000 |
| 25 | WELLHEAD EQUIPMENT | | 16,000 | 16,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 22,000 | 22,000 |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $181,000 | $181,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 40000 | 40,000 |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 25,000 | 25,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 3,000 | 3,000 |
| 46 | SALES METERING EQUIPMENT | | 4,000 | 4,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $102,000 | $102,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $45,000 | $283,000 | $328,000 |
| | | | | |
| | **TOTAL WELL COST** | $671,000 | $461,000 | $1,132,000 |

APPROVED: _5/13_ , 2013.

BY: _[signature]_

☐ OEE Insurance Election (Please check your election below)
☐ Coverage under own policy with limits not less than _____

☐ Coverage under Operator's policy

**NOTE:** If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

**EXHIBIT "D"**

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

## A.A.P.L. FORM 610-1982

### MODEL FORM OPERATING AGREEMENT

## SOUTH WOODLAWN PROSPECT
## Marion County, Texas

OPERATING AGREEMENT

DATED

_____ **March 1** _____ , __ **2013** __ ,
                              *Year*

OPERATOR   **SKLAR EXPLORATION COMPANY L.L.C.** _____

CONTRACT AREA   **As shown on Exhibit "A" to this Agreement.** _____

_____

_____

COUNTY OR PARISH OF   **Marion** _____   STATE OF   **Texas** _____

COPYRIGHT 1982 – ALL RIGHTS RESERVED AMERICAN
ASSOCIATION OF PETROLEUM LANDMEN, 4100 FOSSIL CREEK
BLVD., FORT WORTH, TEXAS, 76137-2791, APPROVED FORM.
A.A.P.L.      NO.      610      –      1982      REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7-8 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between __SKLAR EXPLORATION COMPANY L.L.C.__

__401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101__                                , hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement, **including royalty and overriding royalty interests.**

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement.  Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority.  If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located **for 100% of**

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay / its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate **for 100% of its share of** in / a proposed operation.

I. The term "Deepen" shall mean a single operation whereby a well drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the deepest Zone proposed in the associated AFE, whichever is the lesser.

J. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

K. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned or temporarily isolated in order to attempt a Completion in or commingling with a different Zone within the existing wellbore.

L. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore or improve production in a Zone which is currently open to production in the wellbore.  Such operations include, without limitation, well stimulation operations, but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting or Plugging Back of a well.

M. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

N. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.  **Words defined herein shall have the same meaning whether or not they are capitalized.**

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑ A. Exhibit "A", shall include the following information:

    (1) Identification of lands subject to this agreement,

    (2) Restrictions, if any, as to depths, formations, or substances,

    (3) Percentages or fractional interests of parties to this agreement,

    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,

    (5) Addresses of parties for notice purposes.

☑ B. Exhibit "B", Form of Lease.

☑ C. Exhibit "C", Accounting Procedure.

☑ D. Exhibit "D", Insurance.

☑ E. Exhibit "E", Gas Balancing Agreement.

☐ ~~F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.~~

☐ ~~G. Exhibit "G", Tax Partnership.~~

If any provision of any exhibit, except Exhibits **"A" and** "E"~~and "G"~~, is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.  **If any provisions of Exhibits "A" or "E" is inconsistent with any provision contained in the body of this Agreement, the provision of the exhibit shall prevail.**

- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE III.
### INTERESTS OF PARTIES

A.  **Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

B.  **Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred  in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A".  In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____ __all jointly owned lease burdens__ _____ which shall be borne as hereinafter set forth.

Each of the Parties hereto shall pay or deliver or cause to be paid or delivered its proportionate part of the royalties and overriding ~~Regardless of which party has contributed the lease(s) and/or and gas interest(s) hereto on which royalty is due and~~ royalties and other leasehold burdens as described in the attached Exhibit "A" and shall hold the other Parties free from any liability ~~payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or~~ therefor.  If the interest of any Party in any oil and gas lease covered by this agreement is subject to any additional royalty, ~~overriding royalty, production payment or other charges over and above those as shown on Exhibit "A", such Party shall assume and alone bear all such obligations and they shall account for or cause to be accounted for such interests to the owners thereof,~~ ~~cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the~~ ~~other parties free from any liability therefor.~~  No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

C.  **Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, __which is not a joint obligation of the parties__ overriding royalty, production payment or other burden on production ~~in excess of the amount stipulated in Article III.B.~~, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

D.  **Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", ~~or~~ ~~was not disclosed in writing to all other parties prior to the execution of this agreement by all parties,~~ or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.  If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.  If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

### ARTICLE IV.
### TITLES

A.  **Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations ^and / ~~or, if~~ ~~the Drilling Parties so request,~~ title examination shall be made on the leases and/or oil and gas interests included, or planned to be includ-ed, in the drilling unit around such well.  The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases.  At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge.  All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator.  Operator shall cause title to be examined by attorneys on its staff or by outside attorneys.  Copies of all title opinions shall be furnished to each party __provided such party has paid 100% of its share of all costs of all operations conducted under the provisions of this Agreement.__ ~~hereto~~ hereto / .  The cost incurred by Operator in this title program shall be borne as follows:

~~☐   Option No. 1:   Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental,~~ ~~shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C",~~ ~~and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.~~

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE IV**
**continued**

1 ☑ Option No. 2:   Costs incurred by Operator in procuring abstracts / and fees paid outside attorneys /* for title examination
2 (including preliminary, supplemental, shut-in gas royalty opinions) / shall be borne by the Drilling Parties
3 in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4 hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5 functions.
6 *curative matters, and material
  **landmen, and consultants
7 ***and for applications and hearings

8      Operator shall use its best efforts to secure
9 ~~Each party shall be responsible for securing~~ / curative matter and pooling amendments or agreements required in connection
            subject to this agreement, and charge these fees to the joint account
10 with leases or oil and gas interests ~~contributed by such party~~.  Operator shall be responsible for the preparation and recording of pooling
11 designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
12 This shall not prevent any party from appearing on its own behalf at any such hearing.

13
14      No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
                                                                                    Operator.
15 provided, and (2) the title has been approved by the examining attorney or title has been accepted by / ~~all of the parties who are to par-~~
16 ~~ticipate in the drilling of the well.~~

17
18 B.   Loss of Title:

19
20      1. Failure of Title:  Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a
21 reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days
22 from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-
23 tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil
24 and gas leases and interests: and,
25      (a)  The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be
26 entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,
27 but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;
28      (b)  There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has
29 been lost, but the interests of the parties shall be revised on an acreage basis, as of the time  it is determined finally that title failure has oc-
30 curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
31 Area by the amount of the interest lost;
32      (c)  If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is
33 increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-
34 terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such
35 well;
36      (d)  Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has
37 failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties
38 who bore the costs which are so refunded;
39      (e)  Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be
40 borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,
41      (f)  No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest
42 claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in
43 connection therewith.

44
45      2. Loss by Non-Payment or Erroneous Payment of Amount Due:  If, through mistake or oversight, any rental, shut-in well
46 payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,
47 there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required
48 payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,
49 which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the
50 date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in
51 the Contract Area on account of ownership of the lease or interest which has terminated.  In the event the party who failed to make the
52 required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to
53 the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it
54 shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled
55 or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:
56      (a)  Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,
57 up to the amount of unrecovered costs;
58      (b)  Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of
59 oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease
60 termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
61 portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,
62      (c)  Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest
63 lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

64
65      3. Other Losses:  All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses
66 and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
67 the Contract Area.

68
69
70

- 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE V.
## OPERATOR

**A.   Designation and Responsibilities of Operator:**

                    __SKLAR EXPLORATION COMPANY, L.L.C. of Shreveport, Louisiana_____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

**B.   Resignation or Removal of Operator and Selection of Successor:**

    1.   Resignation or Removal of Operator:   Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, ~~no longer owns an interest hereunder in the Contract Area,~~ or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. **Such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within 30 days from its receipt.** Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

    2.   Selection of Successor Operator:   Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator ~~which has been removed~~ ~~fails to vote or votes only to succeed itself,~~ the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.
**3.   Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a committee without regard for their interest in the Contract Area based on Exhibit "A."**

**C.   Employees:**

    The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

**D.   Drilling Contracts:**

    All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area / \*. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area ~~and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced,~~ and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature, **\*except that in Operator's sole discretion all factors, such as rig availability, equipment condition, contractor employee reliability and knowledge, and drilling contractor reputation shall be taken into consideration in determining the real competitive price such that the lowest price bid may not provide the overall best value in the Drilling Parties to accomplish the drilling operations.**

**E.   Custody of Funds:**

    **Operator shall hold for the account of Non-Operators any funds of Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to Non-Operators or applied toward the payment of debts as provided in Section 3 of Article VII. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators. Nothing in this paragraph shall require the maintenance by Operator of separate accounts from the funds of Non-Operators. Operator shall, upon request, refund any advance to Non-Operator that is not used for its intended purpose within six (6) months from the receipt of the advance.**

**F.   Statutory Employer:**

    **Operator shall be considered the statutory employer of all employees of all Contractors, their sub-contractors or agents, whose goods furnished or services rendered for Operator are an integral part of or essential to Operator's ability to perform its operations as an oil and gas operator.**

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

**A.   Initial Well:**

    On or before the   __31st__   day of   __May__ , (year) __2013__ , / **Subject to rig availability** Operator shall commence the drilling of a well for oil and gas at the following location: **3.406' from FEL of C.C. Coppedge Survey and 969' North of the intersection of C.C. Coppedge and E.&S.T. Greer Surveys of Marion County, Texas, being located 2,165' Northeast of the Dollie Key #1 at a 56 degree angle, or as near thereto as practicable and shall thereafter continue the drilling of the well with due diligence to a depth of 6,700' in a vertical bore hole, or a depth sufficient in Operator's discretion, to the test Pettet Formation, whichever is more shallow.**
    **The initial well is the initial well described in section 1.2 of the Participation Agreement to which this Operating Agreement is attached as Exhibit "D".**

~~and shall thereafter continue the drilling of the well with due diligence to~~

~~unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.~~

-4-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI.**
**continued**

1
2

3    Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and
4  gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which
5  event Operator shall be required to test only the formation or formations to which this agreement may apply.

6
7
8    If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the
9  well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

10
11
12  **B.    Subsequent Operations:**

13                                                                    **any well includes water source or injection wells**
14    1.   Proposed Operations:   Should any party hereto desire to drill any well / on the Contract Area other than the well provided
                                              **reenter, recomplete, sidetrack**
15  for in Article VI.A., or to rework, / deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all
16  the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the
                                **that have not forfeited their interest in the well**
17  other parties / written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
                                                    **to whom                    is delivered            fifteen (15)        delivery**
18  tion and the estimated cost of the operation.  The parties / receiving such a notice / shall have thirty (30) / days after receipt / of the notice
19  within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation.  If a drill-
20  ing rig is on location, notice of a proposal to rework, plug back or drill deeper shall be given by telephone and the response period shall be
                          **twenty-four (24)                                                                    to whom            is delivered**
21  limited to forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays.  Failure of a party /receiving such notice /to reply within
22  the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.  Any notice or
23  response given by telephone shall be promptly confirmed in writing. **Not withstanding this Article VI/B.1, and subject to the right of any**
    **party to non-consent the proposed operation, a proposal to re-work, recomplete, sidetrack, deepen or plugback a well producing in**
24  **paying quantities, which is consented to by two (2) or more of the Parties owning two-thirds (2/3rds) or more of the working interest**
    **under the well may proceed and be executed on behalf of the Consenting Parties without the unanimous consent of all parties.**
25

26    If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice
      **fifteen (15)**                                          **twenty-four (24)**
27  period of thirty (30) / days (or as promptly as possible after the expiration of the forty-eight (48) / hour period when a drilling rig is on loca-
28  tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
29  ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
30  for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
31  permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
32  amination or curative matter required for title approval or acceptance.  Notwithstanding the force majeure provisions of Article XI, if the
33  actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
34  if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
35  dance with the provisions hereof as if no prior proposal had been made. **Operator may, at its discretion, perform preparatory work in**
    **connection with, or even actually commence, an operation for which notice has been provided under this Article VI.B prior to or**
36  **during the notice period, and if such operation ultimately is one conducted by less than all parties, the Consenting Parties shall,**
37  **nevertheless, be entitled to recover the risk compensation provided for hereunder.**

38                                                              **to whom                is delivered**
39    2.   Operations by Less than All Parties:   If any party / receive such notice / as provided in Article VI.B.1. or VII.D.1. (Option
40  No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
                                                                                **subject to availability of equipment and personnel**
41  giving the notice and such other parties as shall elect to participate in the operation shall, / within ninety (90) days after the expiration of
      **fifteen (15)**                                              **twenty-four (24)**
42  the notice period of thirty (30) / days (or as promptly as possible after the expiration of the forty-eight (48) / hour period when a drilling rig is
43  on location, as the case may be) actually commence the proposed operation and complete it with due diligence.  Operator shall perform all
44  work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
45  a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
46  tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work.  Con-
47  senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
48  ditions of this agreement.

49    If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
50  notice period, shall advise the Consenting Parties of the total interest of the parties  approving such operation and its recommendation as
                                                                              **twenty-four (24)**
51  to whether the Consenting Parties should proceed with the operation as proposed.  Each Consenting Party, within forty-eight (48) / hours
52  (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-
                                                                              **all of**
53  ticipation to such party's interest as shown on Exhibit "A" or (b) carry / its proportionate part of Non-Consenting Parties' interests, and
54  failure to advise the proposing party shall be deemed an election under (a).  In the event a drilling rig is on location, the time permitted for
                                                **twenty-four (24)**
55  such a response shall not exceed a total of forty-eight (48) / hours (inclusive of Saturday, Sunday and legal holidays).  The proposing party,
56  at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.
57

58    The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
59  elected to bear same under the terms of the preceding paragraph.  Consenting Parties shall keep the leasehold estates involved in such
60  operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
                                                                              **either**
61  If such an operation results in a dry hole, the Consenting Parties shall / plug and abandon the well and restore the surface location at their
                                          **recompleted, sidetracked,**
62  sole cost, risk and expense /.  If any well drilled, reworked, / deepened or plugged back under the provisions of this Article results in a pro-
63  ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,
    **\* or one of them shall make a proposal to the other Consenting Parties to conduct further operations under Article VI.B**
64
65
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT — 1982

ARTICLE VI.
continued

and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
ties. Upon commencement of operations for the drilling, reworking, recompleting, sidetracking, deepening or plugging back of any such well by Consenting Parties
in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
Party's interest in the **entire** well / and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or **and not just a particular Zone therein**
market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
terests not excepted by Article III.D. payable out of or measured by the production from / such well accruing with respect to such interest **any and all Zones within**
until it reverts) shall equal the total of the following:

(a) **500%** / 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
Party had it participated in the well from the beginning of the operations; and

(b) ____**500**____ % of that portion of the costs and expenses of drilling, reworking, **recompleting, sidetracking,** deepening, plugging back, testing and completing,
after deducting any cash contributions received under Article VIII.C., and ____**500**____ % of that portion of the cost of newly acquired equip-
ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
participated therein.

An election not to participate in the drilling or the deepening of a well, / **or the completing, recompleting, sidetracking or reworking of a well,** shall be deemed an election not to participate in any re-
working / or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is **recompleting, sidetracking,**
conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
reworking / or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well **recompleting, sidetracking,**
and there shall be added to the sums to be recouped by the Consenting Parties  one-hundred percent (100%) of that portion of the costs of **five**  **500%**
the reworking / or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If **recompleting, sidetracking,**
such a reworking / or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap- **recompleting, sidetracking,**
plicable as between said Consenting Parties in said well.

During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
ticle III.D.

In the case of any reworking, / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free **recompleting, sidetracking,**
of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
abandonment of a well after such reworking, / plugging back or deeper drilling, the Consenting Parties shall account for all such equip- **recompleting, sidetracking,**
ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
ings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas
produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT — 1982

ARTICLE VI.
continued

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, recompleting, sidetracking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

Notwithstanding the provisions of this Article VI.B.2., * it is agreed that without the mutual consent of /all parties, no wells shall ** be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.; provided that an exceptional well location that is approved by the Railroad Commission of Texas Oil and Gas Commission shall be deemed to conform to the then-existing spacing pattern.
* and subject to the right of any party to non-consent the proposed operation
** two (2) or more Parties owning two-thirds (2/3rds) or more of the working interest

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, recompleting, sidetracking, deepening and plugging back of such initial well after if has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro- duction, ceases to produce in paying quantities.

3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen- ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram- matical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par- ties.

4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

(a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

(b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
twenty-four (24)
shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and
twenty-four (24)
receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par- ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in- stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

C.   TAKING PRODUCTION IN KIND:

have the right to
Each party shall / take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5  its share of all production.

6

7      In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8  the oil / produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
   *or gas*
9  the obligation, to purchase such oil / or sell it to others / at any time and from time to time, for the account of the non-taking party at the
   *or gas*
10 best price obtainable in the area for such production.  Any such purchase or sale by Operator shall be subject always to the right of the
11 owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil **or gas** not previously
12 delivered to a purchaser.  Any purchase or sale by Operator of any other party's share of oil / shall be only for such reasonable periods of
   *or gas*
13 time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14 of one (1) year.
   *on the same terms and basis as Operator is marketing Operator's and other Non-Operators' share of production*
15

16     In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or
17 deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18 be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19 agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

20

21 **D.   Access to Contract Area and Information:**

22
                                   *consenting*
23     Except as otherwise provided herein Each / party who has paid 100% of its share of all costs of all operations conducted under
24 this Agreement shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
25 and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
                                          *consenting*
26 and records relating thereto.  Operator, upon request, shall furnish each of the other / parties with copies of all forms or reports filed with
27 governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
28 each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area.  The cost of
29 gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
30 quests the Information.

31

32 **E.   Abandonment of Wells:**

33

34     1.   Abandonment of Dry Holes:  Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
35 drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
                            *twenty-four (24) hours*
36 without the consent of / all parties. / Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
37 within / forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
38 such well, such party shall be deemed to have consented to the proposed abandonment.  All such wells shall be plugged and abandoned in
39 accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
      ****                        *or parties owning greater than ten percent (10%) interest in the well*
40 such well. / Any party / who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
41 operations in search of oil and/or gas subject to the provisions of Article VI.B.
      **      *Ninety percent (90%) or more of the parties thereof*
42    ***    If the well has been drilled pursuant to Article VI.B.2, only the consent of the consenting parties therein shall be required.
      ****   Any cement plugs used for plugging and abandoning such well shall be in excess of that required by the regulatory body
      recommended.
43

44     2.   Abandonment of Wells that have Produced:  Except for any well in which a Non-Consent operation has been conducted
45 hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
                                                             ***** *such parties*
46 producer which shall not be plugged and abandoned without the consent of all parties. / If all parties / consent to such abandonment, the well shall
                 *fifteen (15)*
47 be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto.  If, within
48 thirty (30) / days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
49 those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
50 parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
         *Should any party fail to reply to such notice, such party shall be deemed to have consented to the proposed abandonment.*
51 Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. / Each abandoning party shall assign
52 the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
53 material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
54 terval or intervals of the formation or formations then open to production.  If the interest of the abandoning party is or includes an oil and
55 gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
56 tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
57 duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit **"B"**.

58    ***** two-thirds percent (2/3rds%) or more of the owners thereof.  If the well has been drilled or reworked pursuant to Article
59 VI.B.2 and the consenting parties therein have not been fully reimbursed as therein provided, only the approval of such consenting
60 parties shall be required.

61

62

63

64

65

66

67

68

69

70

-8-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1   required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3   Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from

4   the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for

5   its share of all production.

6

7   In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of

8   the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it,

9   but not the obligation, to purchase such oil and gas or sell it to others / at any time and from time to time, for the account of the non-

10  taking party at the best price obtainable in the area for such production.  Any such purchase or sale by Operator shall be subject always to

11  the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas

12  not previously delivered to a purchaser.  Any purchase or sale by Operator of any other party's share of oil and gas shall be only for such

13  reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event

14  for a period in excess of one (1) year.  Notwithstanding the foregoing, Operator shall not make a sale, including one into interstate com-

15  merce, of any other party's share of gas production without first giving such other party thirty (30) days notice of such intended sale.

   \* on the same terms and basis as Operator is marketing Operator's and other Non-Operators' share of production

16

17  D.   Access to Contract Area and Information:

18       consenting

19       Each / party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,

20  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books    consenting

21  and records relating thereto.  Operator, upon request, shall furnish each of the other / parties with copies of all forms or reports filed with

22  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of

23  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area.  The cost of

24  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-

25  quests the information.

26

27  E.   Abandonment of Wells:

28

29       1.   Abandonment of Dry Holes:   Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been

30  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned

31  without the consent of all parties.  Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply    twenty-four (24)

32  within / forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon

33  such well, such party shall be deemed to have consented to the proposed abandonment.  All such wells shall be plugged and abandoned in

34  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening

35  such well.  Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further

36  operations in search of oil and/or gas subject to the provisions of Article VI.B.

37

38       2.   Abandonment of Wells that have Produced:   Except for any well in which a Non-Consent operation has been conducted

39  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a

40  producer shall not be plugged and abandoned without the consent of all parties.  If all parties consent to such abandonment, the well shall

41  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto.  If, within

42  thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,

43  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other

44  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of

45  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.  Each abandoning party shall assign

46  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and

47  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-

48  terval or intervals of the formation or formations then open to production.  If the interest of the abandoning party is or includes an oil and

49  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-

50  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-

51  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

52

53

54

55

56

57

58

59

60

61

62

63

64

65

66

67

68

69

70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

"B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portion of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.

### ARTICLE VII.
### EXPENDITURES AND LIABILITY OF PARTIES

A.   Liability of Parties:

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners. In their relations with each other under this Agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own self-interest.

B.   Liens and Payment Defaults:

Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain be entitled to recover from the amount if paid plus five hundred percent (500%) of the amount out of the proceeds from the sale of the defaulting party's share of oil and for gas, and , to secure payment thereof, be subrogated to the security rights described in the foregoing reimbursement thereof, be subrogated to the foregoing paragraph paragraph. Notwithstanding anything contained in this paragraph, all parties agree that this provision shall not apply to any operation requiring an AFE unless Operator has advance billed all parties and such parties have paid their proportionate share of said costs in accordance with other provisions of this agreement.

C.   Payments and Accounting:

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

D.   Limitation of Expenditures:

1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:

-9-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
### continued

1 ☑ *Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2 necessary tankage and/or surface facilities. **This Option No. 1 shall apply only to water source and/or water injection wells.**
3
4 ☑ **Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5 authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6 to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight
7 (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8 tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9 cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
   recompleting, sidetracking
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, / deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties. **This Option No. 2 shall cover all wells except those expressly covered by Option No. 1 above.**
14
15    2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.
19
                         one or more Parties owning a majority interest
20    3. Other Operations: Without the consent of / all parties, Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of _____FiftyThousand and No/100_____ Dollars ($_____50,000.00_____ )
22 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of _____FiftyThousand and No/100_____
28 Dollars ($_____50,000.00_____ ) bu t less than the amount first set forth above in this paragraph.
29
30 E.    **Rentals, Shut-in Well Payments and Minimum Royalties:**
31
32    Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
                                                Operator is
34 tributed interests in the same lease to this agreement, / such parties may designated / such parties to make said payments for and on
35 behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B.2.
39
40    Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46 F.    **Taxes:**
47
48    Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".
59
60    If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".
66
67    Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
68 to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VII**
**continued**

1 G.   **Insurance:**

2

3      At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4  the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5  pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
6  also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7  hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8  law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

9

10     In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11 parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

12

13                                   **ARTICLE VIII.**
14                     **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

15

16 A.   **Surrender of Leases:**

17

18     The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19 or in part unless all parties consent thereto.

20

21     However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22 agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23 such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24 thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas in-
25 terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26 such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27 lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all
28 obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29 attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30 duction other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the
31 party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32 ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33 salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest
34 shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

35

36     Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37 party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38 assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39 agreement.

40

41 B.   **Renewal or Extension of Leases:**

42

43     If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44 shall have the right for a period of thirty (15) days following receipt of such notice in which to elect to participate in the ownership of the
45 renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46 portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47 interests held at that time by the parties in the Contract Area.

48

49     If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50 who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51 to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52 Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

53

54     Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55 by the acquiring party.

56

57     The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58 or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or
59 contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
60 tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61 the provisions of this agreement.

62

63     The provisions in this Article shall also be applicable to extensions of oil and gas leases.

64

65 C.   **Acreage or Cash Contributions:**

66

67     While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68 operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69 applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the con-
70 tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VIII
#### continued

1 said Drilling Parties shared the cost of drilling the well.  Such acreage shall become a separate Contract Area and, to the extent possible, be
2 governed by provisions identical to this agreement.  Each party shall promptly notify all other parties of any acreage or cash contributions
3 it may obtain in support of any well or any other operation on the Contract Area.  The above provisions shall also be applicable to op-
4 tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.
5
6     If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7 consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8
9 D.   Maintenance of Uniform Interests:
10
11 ~~For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no~~
12 ~~party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,~~
13 ~~equipment and production unless such disposition covers either:~~
14
15 ~~1.   the entire interest of the party in all leases and equipment and production; or~~
16
17 ~~2.   an equal undivided interest in all leases and equipment and production in the Contract Area.~~
18
19     Every ~~such~~ sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20 and shall be made without prejudice to the right of the other parties.  **Any added expenditures required as a result of a partial**
21 **disposition, including marketing or metering of production, shall be borne solely by the party transferee.**
22     If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23 require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24 and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25 party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26 into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27 Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.
28
29 E.   Waiver of Rights to Partition:
30
31     If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32 undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33 interest therein.
34
35 ~~F.   Preferential Right to Purchase:~~
36
37 ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38 ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39 ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40 ~~of the offer.  The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41 ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42 ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43 ~~ties.  However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44 ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45 ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~
46
47                                    **ARTICLE IX.**
48                          **INTERNAL REVENUE CODE ELECTION**
49
50     This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51 for profit between or among the parties hereto.  Notwithstanding any provision herein that the rights and liabilities hereunder are several
52 and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53 purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54 from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1986, as per-
55 mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder.  Operator is authorized and directed to ex-
56 ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57 United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58 and the data required by Federal Regulations 1.761.  Should there be any requirement that each party hereby affected give further
59 evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60 Federal Internal Revenue Service or as may be necessary to evidence this election.  No such party shall give any notices or take any other
61 action inconsistent with the election made hereby.  If any present or future income tax laws of the state or states in which the Contract
62 Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63 Subtitle "A", of the Internal Revenue Code of 1986, under which an election similar to that provided by Section 761 of the Code is per-
64 mitted, each party hereby affected shall make such election as may be permitted or required by such laws.  In making the foregoing elec-
65 tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66 computation of partnership taxable income.
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE X.**
**CLAIMS AND LAWSUITS**

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____**Fifty Thousand and No/100**_____ Dollars ($_____50,000.00_____ ) and if the payment is in complete settlement of such claim or suit.  If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator.  All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises.  If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.  **All claims or suits involving title to any interest  subject to this Agreement shall be treated as a claim or suit against all parties hereto.**

**ARTICLE XI.**
**FORCE MAJEURE**

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it;  thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be ~~suspending~~ suspended during, but no longer than, the continuance of the force majeure.  The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

**ARTICLE XII.**
**NOTICES**

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail / or telegram, postage or charges prepaid, or by / email, telex or telecopier / and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A".  The originating notice given under any provision hereof shall be deemed given only when / ~~received by~~ sent to the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating party / ~~received~~ sent.  The second or any responsive notice shall be deemed given when deposited in the mail / or with the telegraph company, with postage or charges prepaid, or sent by / email, telex or telecopier /.  Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.
*as a primary source of notification
** as a secondary source of notification

**ARTICLE XIII.**
**TERM OF AGREEMENT**

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☑   Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☐   ~~Option No. 2:  In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein.  In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.~~

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XIV.
COMPLIANCE WITH LAWS AND REGULATIONS

A.   Laws, Regulations and Orders:

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

B.   Governing Law:

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____**Texas**_____ shall govern.

C.   Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of ~~the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and~~ any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to <sup>any</sup> said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

ARTICLE XV.
OTHER PROVISIONS

**(See attached pages 14-1 through 14-6)**

- 14 -

## ARTICLE XV.

## OTHER PROVISIONS

### A.  PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Operating Agreement, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1) An election to perform additional logging, coring or testing.
(2) An election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party.
(3) An election to plug back and attempt to complete the well in a shallower depth or formation.
(4) An election to deepen the well.
(5) An election to sidetrack the well.
(6) An election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production.
(7) An election to temporarily abandon the well.
(8) An election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of a majority of the consenting parties in possessory, cost-bearing interest (and not in number), a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth.   In such event, the operation, which, in the opinion of a majority of the consenting parties in possessory, cost bearing interest (and not in number) is less likely to jeopardize the well, will be given priority.   Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail.   It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests.   For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

### B.  HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

### C.  DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties.   If the parties are equally divided, the opinion of the Operator will prevail.

### D.  ADVANCEMENT OF COSTS

Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s) in advance of its respective share of (i) the dry hole cost for any subsequent well to be drilled hereunder to which such Non-Operator has consented, and (ii) the cost of any completion, reworking, recompletion, sidetracking, deepening, or plugging back operation to which such Non-Operator has consented (any such operation under clause (i) or (ii) being herein called a "Drilling Operation").   Such request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Drilling Operation. The amount of each Non-Operator's advance payment shall be based upon the latest AFE for such operation.   Such advanced payments shall be held by Operator for the account of the Non-Operators and applied against the actual costs incurred in the applicable operation.

A Non-Operator receiving a request for advance payment shall, within two (2) days of the receipt of such request if and when a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to operator in cash the full amount of such request.   Operator shall credit the amount to the Non-Operator's account for the payment of such Non-Operator's share of costs of such Drilling Operation, and following the end of each month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement.   Advance payment by a Non-Operator of his share of completed well costs shall in no event prevent such completion of a well pursuant to Option No. 2 of Article VII.D.1. and, in the event such a Non-Operator elects not to participate in completion, the sums that such Non-Operator has advanced shall not be charged with any share of the costs of any completion attempted.

In the event a Non-Operator from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by depositing cash as aforesaid, then Operator, at his option, shall make a second written request by certified mail, return receipt requested for such advance.   Non-Operator shall pay for said advance as aforesaid within five (5) business days from receipt of such second request.

If a Non-Operator fails to pay within five (5) business days of the receipt of such second request, then Non-Operator may, at the sole discretion and timing election of the Operator, be deemed non-consent in said operation retroactive to the beginning of such operation and thereafter subject to the penalty provisions of Article VI.B.2 hereof.

If the Non-Operator fails to make such payment or furnish such security within five (5) business days of the receipt of such second request, Operator shall promptly notify all other parties still participating in such Drilling Operation of the default in payment and if and when applicable, of the relinquishment of an interest under this provision.   The parties who wish to participate in the Drilling Operation shall have five (5) days from receipt of the applicable notice to elect to assume the costs chargeable to such relinquished interest and shall share such relinquished interest in proportion to their assumption of such relinquished interest.   If the parties who wish to participate in the Drilling Operation are unwilling to assume the costs chargeable to such relinquished interest, the Drilling Operation shall be cancelled, and if the cancelled Drilling Operation involves the drilling of a test well under Article VI. A. no assignment shall be due as a consequence of the failure to pay.

Notwithstanding anything to the contrary herein, if the applicable drilled well or operation is unsuccessful or results in a dry hole, Operator shall have the right to sue a Non-Operator who failed to pay for its proportionate share of expenses in lieu of Operator's right to an assignment of all Non-Operator's leasehold and contractual rights within the Contract Area, or in lieu of deeming the Non-Operator Non-Consent.

## E.   NECESSARY EXPENDITURES EXCLUDE SIDETRACKING

The phrase "necessary expenditures" in Article VII.D.1. (Option No. 2) on page 10 shall not be deemed to include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

## F.   ADDITIONAL CHARGES

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Unit Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same:

Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and expenses in connection with preparation and presentation of evidence and exhibits of Railroad Commission of Texas hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

## G.   INDEMNITY

Except for liabilities resulting from the gross negligence or willful misconduct of the Operator, each Non-Operator shall defend, indemnify and hold Operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operator's officers, employees and/or agents, resulting from or in any way relating to such officers, employees, and/or agents presence on a drilling rig on the Contract Area or from such person traveling by air or water between any point and such

drilling rig. Such indemnity to Operator shall also apply to any other person whose presence on the rig or transportation to or from such rig is at the request of the indemnifying Non-Operator (except for liabilities resulting from the gross negligence or willful misconduct of the Operator).

### H.   GAS BALANCING FOR FORFEITED INTERST

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

### I.   SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

### J.   NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

### K.   AREA OF MUTUAL INTEREST

The parties hereby create an Area of Mutual Interest ("AMI") consisting of the lands outlined by a bold red line on the plat attached hereto as Exhibit "A-2". This AMI shall remain in force and effect for a term of five (5) years from the date of this Agreement and, insofar and only insofar as the AMI includes lands covered by oil and gas leases and/or oil and gas interests subject to this Agreement, as long thereafter as said oil and gas leases and/or oil and gas interests remain in force and effect. This AMI shall terminate after five (5) years as to all such lands not covered by oil and gas leases and/or oil and gas interests subject to this Agreement.

During the term of this AMI, if any party hereto, including related persons or entities, ("Acquiring Party") directly or indirectly acquires any oil and gas lease or any oil and gas interest covering lands lying within the AMI, the Acquiring Party shall promptly advise the other parties ("Offerees") of such acquisition. In such event, each Offeree shall have the right to acquire its proportionate interest in such oil and gas lease and/or oil and gas interest in accordance with the other provisions of this AMI.

Promptly upon acquiring such oil and gas lease and/or oil and gas interest, the Acquiring Party shall, in writing, advise the Offerees of such acquisition. The notice shall include a copy of all instruments of acquisition including, by way of example but not of limitation, copies of the leases, assignments, subleases, farmouts or other contracts affecting the oil and gas lease and/or oil and gas interest.

The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by the Acquiring Party in acquiring such oil and gas lease and/or oil and gas interest ("Acquisition Costs"). The Offeree shall have a period of fifteen (15) days after receipt of the notice within which to furnish the Acquiring Party written notice of its election to acquire its proportionate interest in the offered oil and gas lease and/or oil and gas interest. If, however, a well in search of oil or gas is being drilled within the AMI, each Offeree shall have a period of twenty-four (24) hours (excluding Saturdays, Sundays and legal holidays) after delivery of the notice within which to elect to acquire its proportionate interest in the oil and gas lease and/or oil and gas interest so offered. It is provided, however, that the twenty-four (24) hour election period shall not apply unless the Acquiring Party shall give the notice to the Offerees within two (2) days after the date on which the Acquiring Party acquired the oil and gas lease and/or oil and gas interest so offered. In addition thereto, the Acquiring Party shall also:

(a)    furnish the Offerees with the approximate location of the well then being drilled and the name of the operator or drilling contractor drilling the well, and

(b)    specifically advise the Offerees that the Offerees shall have a period of twenty-four (24) hours within which to elect to acquire an interest in the offered Oil and Gas Interest.

The above information shall be in addition to the information and copies of instruments provided for above in connection with the usual notices of acquisition of an oil and gas lease and/or oil and gas interest.   If the Acquiring Party does not receive actual written notice of election of an Offeree to acquire its proportionate interest within the fifteen (15) day or twenty-four (24) hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire its interest therein.   An Offeree accepting the offered interest shall be entitled to participate in such oil and gas lease and/or oil and gas interest in the proportion to which its interest bears to the total interest of all parties (including the acquiring party) electing to participate.   Promptly after the time for election expires, the Acquiring Party shall invoice the Offeree electing to acquire an interest for its proportionate part of the Acquisition Cost, as reflected by the invoice.   Upon receipt of such reimbursement, the Acquiring Party shall execute and deliver an appropriate assignment to such Offeree.   If the Acquiring Party does not receive the amount due from the Offeree within thirty (30) days after receipt by the Offeree of the invoice for its cost, the Acquiring Party may, at its election, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within five (5) days after receipt of such written notice by the delinquent Offeree shall constitute a withdrawal by the delinquent Offeree of its former election to acquire the interest, and such Offeree shall no longer have the right to acquire an interest in the offered oil and gas lease and/or oil and gas interest.

Any assignment made by the Acquiring Party shall be made free and clear of any liens, encumbrances, overriding royalty interests and other burdens created by or arising under the Acquiring Party but otherwise without warranty of title, either express or implied.   The assignment shall be made and accepted subject to, and each assignee shall expressly assume its portion of all of the obligations of the Acquiring Party.   The assignment shall also be made and accepted subject to this Agreement and to the Participation Agreement to which this Agreement is attached as Exhibit "D" in all of its previsions, including, without limitation, Section 1.3 thereof and the Reversionary Back-in Working Interest described therein.

If two (2) or more separate oil and gas leases and/or oil and gas interests are included in the same notice, the Offeree shall have the separate right of election as to each separate oil and gas lease and/or oil and gas interest.

The provisions of this AMI shall not apply to acquisitions as a result of merger, consolidation, reorganization or an acquisition from a parent, subsidiary, or affiliated corporation, or as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries.   Neither shall it apply to sales and acquisitions between partners in a partnership or venturers in a joint venture, or to any acquisition by any party of an interest which interest prior to and at the time of such acquisition was subject to this Agreement, unless such acquisition was the renewal or extension of a lease which at the date of expiration was subject to this Agreement.

Renewals and extensions of oil and gas lease(s) and/or oil and gas interest(s) shall be subject to Article VIII.B of this Agreement.

## L.   DISBURSEMENT OF ROYALTIES

**Operator shall pay or cause to be paid all royalties, overriding royalties, and other excess burdens upon or payable out of production from the Contract Area that are joint burdens of the parties, provided that any party taking its share of production in kind as allowed hereunder shall pay or cause to be paid all royalties, overriding royalties, and other excess burdens upon or payable out of such production unless Operator agrees otherwise in writing.**   If Operator prepares and administers a division order for and receives and distributes the proceeds of production attributable to the interest of a Non-Operator, then Operator shall be entitled to charge that party for an appropriate monthly overhead charge for disbursing such royalty payments, in addition to the combined fixed rates specified in Exhibit "C" hereto.   If through error or inadvertence Operator shall fail to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, he shall not be liable in damages to the other parties hereto for such failure, unless arising out of the gross negligence or willful misconduct of the Operator.

## M.   INFORMATION

Anything to the contrary hereinabove notwithstanding, it is stipulated that any non-consenting party to an operation conducted hereunder shall have no right to observe such operation or have access to information pertaining to such operation, until such time as the non-consenting party's share of the cost of such operation and the penalty therefor has been recovered by the consenting parties as provided herein.

## N.  OPERATOR'S LIEN – SECURITY INTEREST

Subject to the provision of Article VII. B. of this Agreement, each Non-Operator grants to Operator a lien upon all of the rights, titles, and interests of each Non-Operator, whether now existing or hereafter acquired, in and to the (1) oil, gas, or other minerals in, on, and under the Contract Area and (2) any oil, gas, and mineral leases covering the Contract Area or any portion thereof.   In addition, each Non-Operator grants to Operator a security interest in and to all of such Non-Operator's rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (1) all oil, gas and other minerals produced from the Contract Area when produced; (2) all accounts receivable accruing or arising as a result of the sale of such oil, gas and other minerals; (3) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (4) all oil and gas wells and other surface and sub-surface equipment and facilities of any kind or character located on the Contract Area and the cash or other proceeds received from the sale thereof (collectively, the "Personal Property Collateral").   Some of the Personal Property Collateral is or will become fixtures on the Contract Area, and the interest of Non-Operator in and to the oil, gas and other minerals when extracted from the Contract Area and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area.   This Agreement (including a carbon, photographic, or other reproduction hereof) shall constitute a non-standard form financing statement under the terms of the Uniform Commercial Code of the State in which the Contract Area is located, and as such, may be filed for record in the real property records, or other applicable records, of the county, or counties, in which the Contract Area is located.   Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense, if any.

## O.  SEPARATE AGREEMENT FOR NON-UNIFORM INTEREST

Any oil and gas lease and/or oil and gas interest that is either (i) described in Exhibit "A-1" to this Agreement or (ii) that is both acquired after the effective date of this Agreement and covered by Article VIII.B, VIII.C or XV.K of this Agreement, that thereafter becomes owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such lease and/or interest becomes so owned. Any oil and gas lease and/or oil and gas interest acquired after the Effective Date of this Agreement and covered by Article VII.B, VIII.C or XV.K of this Agreement, that becomes owned by more than one but less than all of the parties hereto shall remain subject to this Agreement as to the parties who own an interest therein, but Operator is authorized to modify Exhibit "A" to this Agreement to reflect the parties' interests in each such oil and gas lease and/or oil and gas interest.   Operator is further authorized to modify said Exhibit "A" to this Agreement to reflect the parties' interests in each well subject to this Agreement.

## P.  METERING OF PRODUCTION

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

## Q.  PLUGGING AND LEASEHOLD RESTORATION FUND

At any time any well subject to this Agreement is, in Operator's sole opinion, approaching the end of its economic life and/or its useful purpose, Operator may pre-bill the Joint Account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location.   Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and abandonment and restoration of the leasehold premises.   In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any accrued interest on such difference, based upon the then working interest percentage of such owner.   In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

## R.  PREVAILING AGREEMENT

If there is a conflict between provisions of that Participation Agreement dated effective as of March 1, 2013 to which this form of Operating Agreement is attached as Exhibit "D" and this Operating Agreement, the provisions of the Participation Agreement shall prevail, and shall be binding upon all parties to this Operating Agreement.

## S.  DEFAULT PENALTY/AUTOMATIC NON-CONSENT

If written notice has been given that the lien rights conferred in Article VII. B. have been implemented or enforced against any party hereto, for so long as the affected party remains in default, it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and

shall not be entitled to vote its interest in any matter hereunder. As to any proposed operation in which it otherwise would have the right to participate, such party shall not have the right to elect to participate or be a Consenting Party unless and until it pays in full the amount it is in default plus all other outstanding amounts due hereunder. If an operation proposed during such default period commences before such payment in full, the party in default shall automatically be deemed a Non-Consenting Party to the operation.

### T. PRIOR OPERATING AGREEMENT(S)

This Joint Operating Agreement, as to the parties executing same and as to the Contract Area, shall supersede and replace any prior operating agreement(s) covering all or any portion of the Contract Area of this Joint Operating Agreement.

### U. NON-PARTICIPATING INTERESTS

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto as same may be revised from time to time to reflect record title and/or reformation of the Contract Area.

### V. MISCELLANEOUS

Anything to the contrary herein notwithstanding, this Joint Operating Agreement is expressly made subject to the terms and provisions of the leases and farmout agreements described in Exhibit "A" hereof. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and/or their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereto shall be deemed to run with the oil and gas leases and/or oil and gas interests subject to this Agreement. The headings used in this Agreement are for convenience only and shall not be considered in the interpretation or construction of the Agreement.

### W. NON-CONSENT

Any party that forfeits its interest in a well pursuant to Article VI.B.2 of this Agreement forfeits their interest in the entire well and revenue therefrom, not just a particular zone therein, for the duration of the recoupment period or, if the risk compensation is never recovered, forever. The parties recognize, however, that applicable rules of the Railroad Commission of Texas may allow for the drilling and completion of additional wells within the unit for an existing well, and, subject to the other provisions of this Agreement, the forfeiture by one party of its interest in the existing well does not affect that party's right to elect to participate or not to participate in a proposal to drill, or any other operation with respect to, another well, even if the other well is located in the same unit, and even if the new well is completed in the same Zone from which the existing well is producing.

Anything to the contrary hereinabove notwithstanding, any Non-Consenting Party to an operation conducted hereunder shall have no right to observe such operation or subsequent operations within the same well or have access to information pertaining to such operation or subsequent operations, until such time as the Non-Consenting Party's share of the cost of such operation, and any applicable subsequent operations, and the risk compensation therefor has been recovered by the Consenting Parties as provided herein.

### X. SOPHISTICATED INVESTORS

By execution of this Agreement, each Non-Operator represents to each other and to Operator: (i) that it has a working knowledge of the oil and gas industry; (ii) that it is a sophisticated investor and has a financial net worth in excess of one million dollars; (iii) that it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of leasehold costs, drilling costs, completion costs, and all other costs incurred in operations under this Agreement; (iv) that it ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES; (v) that its interest hereunder has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the State of Texas, or any other state ("Securities Law"), and that it owns said interest for investment purposes only, and not with a view to or for sale in connection with any distribution thereof within the meaning of Securities Law.

Y.  <u>OPERATOR'S OBLIGATION TO MARKET OIL AND GAS NOT TAKEN IN KIND</u>

    i.  Notwithstanding anything to the contrary contained herein, upon written request from any party that elects at any time to not take in kind or separately dispose of its proportionate share of the oil or gas produced from the Contract Area, Operator agrees to purchase any and all such oil or gas or sell it to others in accordance with the provisions set forth in Article VI.C.  Any such written request shall, however, not be deemed a waiver by the requesting party of the rights granted to it in Article VI.C. pertaining to taking production in kind in future instances.

    ii.  Operator is authorized to enter into oil and gas sales agreements with any unaffiliated third party on behalf of any party hereto whose proportionate share of the oil or gas from the Contract Area is being purchased or sold by Operator as provided for herein. Any oil or gas sales contracts entered into by Operator shall be binding upon each such party.

    iii.  Any purchase or sale by Operator of any other party's share of oil or gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, provided, however, Operator shall not enter a gas contract with a term longer than <u>one (1) year</u> to sell a party's share of gas without such party's prior written ratification of such contract.

    iv.  Operator shall make its best faith effort to obtain the best price obtainable for oil and gas of comparable grades and qualities in the immediate geographic area within which the Contract Area is situated; provided, however, Operator provides no guarantee or representation, either express or implied, that it shall obtain the best price obtainable, and all parties hereby acknowledge and recognize factors other than unit price may rightfully influence Operator's marketing decisions.

    v.  Operator shall give notice of the first sale(s) of oil and gas from any well under this agreement to any party hereto whose proportionate share of such oil or gas is being purchased or sold by Operator.  Operator shall maintain records of all marketing arrangements and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

Z.  <u>OPERATOR'S PAYMENT OF PRODUCTION TAXES.</u>

Operator shall pay or cause to be paid all severance or production taxes, whether state or Federal, owing or which may be payable from the Contract Area, provided that any party taking its share of production in kind as allowed hereunder shall pay or cause to be paid all taxes associated with such production unless Operator agrees otherwise in writing.

AA.  <u>Limitations on Well Proposals.</u>

Notwithstanding the rights to propose operations hereunder as granted to each party in Article VI., without written consent of <u>two (2) or more parties</u> having an aggregate working interest of <u>at least sixty-five percent (65%)</u> in any proposed operation, no party shall be allowed to propose (i) the drilling of more than <u>one (1) well</u> at a time, (ii) the drilling of a well during the time another well is being drilled, completed or tested in the Contract Area or (iii) the drilling of a well while a prior proposal hereunder is still in force and effect and the period of time during which the well regarding same may be commenced has not expired.  Notwithstanding the foregoing, the provisions of this paragraph shall not apply to any proposal to drill any well that is either (i) a water source and/or water injection well or (ii) necessary to maintain any oil and gas lease or oil and gas interest covered by this agreement or an agreement to earn any lease or term assignment, in each case, that would otherwise expire within <u>six (6) months</u> of the date on which the operations are proposed.

BB.  <u>CONFIDENTIALITY</u>

    i.  <u>Definition.</u> "Confidential Information" shall mean any and all information that is either nonpublic, confidential or proprietary in nature pertaining to activities under the agreement, including, without limitation, geological and geophysical information, data, and interpretations; reservoir information; tests, logs, surveys, maps, and models; commercial, contractual, and financial information; and any information pertaining to the progress, tests or results of any well or status of any activity under this agreement.

ii. <u>Limitations on Disclosure</u>. Except for necessary disclosures to governmental agencies or other persons as may be required or appropriate to comply with any applicable law, order, regulation or ruling, no party shall disclose Confidential Information other than to the following persons ("Permitted Recipients"): (a) a party's employees, officers, and directors who need to evaluate the Confidential Information to support the party's participation herein;  (b) any professional third party consultant or retained by a party for the purpose of evaluating the Confidential Information; (c) any third party bank financing or with a bona fide interest in financing a party's interests subject to this agreement, including any professional consultants retained by such bank for the purpose of evaluating the Confidential Information; (d) any third party with a bona fide interest in acquiring all or a portion of a party's interests subject to this agreement; or (e) any other third party approved in writing by all the parties hereto.

## CC. <u>DOWNSTREAM FACILITIES</u>

If any party to this agreement proposes the construction or acquisition and operation of a pipeline and/or gathering line to transport Oil and/or Gas produced from wells located in the Contract Area, or to construct a plant or other facility to treat, process, dehydrate, compress, extract ngl's or otherwise enhance the value of Oil and/or Gas produced from wells located in the Contract Area, or cause such Oil and/or Gas to meet requisite quality specifications, (hereinafter all such pipelines, gathering lines, plants and facilities are collectively referred to as the "Facilities"), then such party shall offer each of the other non-proposing parties to this agreement the right to participate in the construction, operation, ownership and use of the Facilities.  Should one or more non-proposing parties elect to participate, then between such participating, parties, the participating parties shall enter into a mutually acceptable agreement for the construction, acquisition, operation and use thereof.  Any party electing not to participate shall have no ownership in or right to use the applicable Facilities, and the participating parties shall have no obligation to allow the non-participating parties such use and/or access thereto.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____March_____, (year) _2013_.

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____, have been made to the form.~~

OPERATOR

Witness

Witness

SKLAR EXPLORATION COMPANY L.L.C.

By: David A. Barlow, President - Chief Operating Officer

NON-OPERATORS

Witness

Witness

SKLARCO L.L.C.

By: David A. Barlow, President - Chief Operating Officer

Witness

Witness

MCCOMBS ENERGY, LTD.

By: Ricky Haikin, Vice President

Witness

Witness

TAUBER EXPLORATION & PRODUCTION CO.

By: Richard Tauber, Manager

Witness

Witness

Fleet Howell

Witness

BUNDERO INVESTMENT COMPANY, L.L.C.

By: Robert P Bowman, Manager

Witness

TIEMBO Ltd.

By: Mark Rauch, Registered Agent

Witness

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ **1st** _____ day of _____ **March** _____ , (year) __2013__ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ have been made to the form.~~

O P E R A T O R

_Lindsay Abernathy_
Witness

_Mary LeSieur_
Witness

SKLAR EXPLORATION COMPANY L.L.C.

By: David A. Barlow, President - Chief Operating Officer

N O N - O P E R A T O R S

_Lindsay Abernathy_
Witness

_Mary LeSieur_
Witness

SKLARCO L.L.C.

By: David A. Barlow, President - Chief Operating Officer

_____
Witness

_____
Witness

MCCOMBS ENERGY, LTD.

By: Ricky Haikin, Vice President

_____
Witness

_____
Witness

TAUBER EXPLORATION & PRODUCTION CO.

By: Richard Tauber, Manager

_____
Witness

_____
Witness

Fleet Howell

_____
Witness

_____
Witness

BUNDERO INVESTMENT COMPANY, L.L.C.

By: Robert P Bowman, Manager

_____
Witness

_____
Witness

TIEMBO Ltd.

By: Mark Rauch, Registered Agent

_____
Witness

- 15 -

S. Woodlawn PA/JOA

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____March_____ , (year) __2013__ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles_____ _____, have been made to the form.~~

OPERATOR

_____          SKLAR EXPLORATION COMPANY L.L.C.
Witness

_____          By: David A. Barlow, President - Chief Operating Officer
Witness

NON-OPERATORS

_____          SKLARCO L.L.C.
Witness

_____          By: David A. Barlow, President - Chief Operating Officer
Witness

_____          MCCOMBS ENERGY, LTD.
Witness

                                          By: Ricky Haikin, Vice President

Signature / Acknowledgement Pages to that certain
Operating Agreement, dated March 1, 2013, Sklar
Exploration Company, LLC, as Operator; South
Woodlawn Prospect, Marion County, Texas.

_____          TAUBER EXPLORATION & PRODUCTION CO.
Witness ANDREW HAMLETT

_____          By: Richard Tauber, Manager
Witness JOHN ROBINSON                     RICHARD E. TAUBER, PRESIDENT

_____          _____
Witness                                  Fleet Howell

_____          BUNDERO INVESTMENT COMPANY, L.L.C.
Witness

_____          By: Robert P Bowman, Manager
Witness

_____          TIEMBO Ltd.
Witness

_____          By: Mark Rauch, Registered Agent
Witness

- 15 -

S. Woodlawn PA/JOA

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____March_____ , (year) __2013__ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____, have been made to the form.~~

O P E R A T O R

SKLAR EXPLORATION COMPANY L.L.C.

_Lindsay Abernathy_
Witness

By: David A. Barlow, President - Chief Operating Officer

_Mary LE den_
Witness

N O N - O P E R A T O R S

SKLARCO L.L.C.

_Lindsay Abernathy_
Witness

By: David A. Barlow, President - Chief Operating Officer

_Mary L den_
Witness

MCCOMBS ENERGY, LTD.

_____
Witness

By: Ricky Haikin, Vice President

_____
Witness

TAUBER EXPLORATION & PRODUCTION CO.

_____
Witness

By: Richard Tauber, Manager

_Candice Crabtree_
Witness
Candice Crabtree

By: Peter Howell

_David Morgan_
Witness

BUNDERO INVESTMENT COMPANY, L.L.C.

_____
Witness

By: Robert P Bowman, Manager

_____
Witness

TIEMBO Ltd.

_____
Witness

By: Mark Rauch, Registered Agent

_____
Witness

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ **1st** _____ day of _____ **March** _____ , (year) __2013__ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____ have been made to the form.~~

OPERATOR

_Lindsay Abernathy_
Witness

_Mary St Eden_
Witness

SKLAR EXPLORATION COMPANY L.L.C.

By: David A. Barlow, President - Chief Operating Officer

NON-OPERATORS

_Lindsay Abernathy_
Witness

_Mary St Eden_
Witness

SKLARCO L.L.C.

By: David A. Barlow, President - Chief Operating Officer

_____
Witness

_____
Witness

MCCOMBS ENERGY, LTD.

By: Ricky Haikin, Vice President

_____
Witness

_____
Witness

TAUBER EXPLORATION & PRODUCTION CO.

By: Richard Tauber, Manager

_____
Witness

_____
Witness

Fleet Howell

_Lisa E. Allen_
Witness

_____
Witness

BUNDERO INVESTMENT COMPANY, L.L.C.

By: Robert P Bowman, Manager

_____
Witness

_____
Witness

TIEMBO Ltd.

By: Mark Rauch, Registered Agent

- 15 -

S. Woodlawn PA/JOA

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____March_____ , (year) __2013__ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____, have been made to the form.~~

OPERATOR

_____
Witness

_____
Witness

SKLAR EXPLORATION COMPANY L.L.C.

By: David A. Barlow, President - Chief Operating Officer

NON-OPERATORS

_____
Witness

_____
Witness

SKLARCO L.L.C.

By: David A. Barlow, President - Chief Operating Officer

_____
Witness

_____
Witness

MCCOMBS ENERGY, LTD.

By: Ricky Haikin, Vice President

_____
Witness

_____
Witness

TAUBER EXPLORATION & PRODUCTION CO.

By: Richard Tauber, Manager

_____
Witness

_____
Witness

Fleet Howell

_____
Witness

_____
Witness

BUNDERO INVESTMENT COMPANY, L.L.C.

By: Robert P Bowman, Manager

_____
Witness

_____
Witness

TIEMBO Ltd.

By: Mark Rauch, Registered Agent

- 15 -

S. Woodlawn PA/JOA

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

PICKENS FINANCIAL GROUP, L.L.C.

By: Michael K Pickens, Vice President

1
2
3  Witness
4
5  Witness
6
7
8
9
10
11  Witness
12
13  Witness
14
15
16
17
18  Witness
19
20  Witness
21
22
23
24
25
26  Witness
27
28  Witness
29
30
31
32
33  Witness
34
35  Witness
36
37
38
39
40  Witness
41
42
43  Witness
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

FANT ENERGY LIMITED
By: Richard E. Fant, LLC, the General Partner of
Fant Energy Limited

By: Stephen Swan, Manager

SANTO PETROLEUM LLC

By: Tobin L Rhodes, Executive Vice President

JJS WORKING INTERESTS LLC
By: Houston Bulldog Capital Management, LLC

By: Justin Simmons, Manager

KUDZU OIL PROPERTIES, LLC

By: R. Nash Neyland, Vice President

MARKSCO, L.L.C.

By: Mark P. Sealy, Member

- 15 -

S. Woodlawn PA/JOA

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

PICKENS FINANCIAL GROUP, L.L.C.

1
2
3  Witness
4                                                        By: Michael K Pickens, Vice President
5  Witness
6
7                                                        FANT ENERGY LIMITED
8                                                        By:  Richard E. Fant, LLC, the General Partner of
9                                                             Fant Energy Limited
10
11  Witness                                              By: Stephen Swan, Manager
12
13  Witness
14
15                                                       SANTO PETROLEUM LLC
16
17
18  Witness                                              By: Tobin L Rhodes, Executive Vice President
19
20  Witness
21
22                                                       JJS WORKING INTERESTS LLC
23                                                       By:  Houston Bulldog Capital Management, LLC
24
25
26  Witness                                              By: Justin Simmons, Manager
27
28  Witness
29
30                                                       KUDZU OIL PROPERTIES, LLC
31
32
33  Witness                                              By: R. Nash Neyland, Vice President
34
35  Witness
36
37                                                       MARKSCO, L.L.C.
38
39
40  Witness                                              By: Mark P. Sealy, Member
41
42
43  Witness
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

- 15 -

S. Woodlawn PA/JOA

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

PICKENS FINANCIAL GROUP, L.L.C.

By: Michael K Pickens, Vice President

_____  Witness

_____  Witness

FANT ENERGY LIMITED
By:  Richard E. Fant, LLC, the General Partner of
     Fant Energy Limited

By: Stephen Swan, Manager

_____  Witness

_____  Witness

SANTO PETROLEUM LLC

By: Tobin L Rhodes, Executive Vice President

_____  Witness

_____  Witness

JJS WORKING INTERESTS LLC
By:  Houston Bulldog Capital Management, LLC

By: Justin Simmons, Manager

_____  Witness

_____  Witness

KUDZU OIL PROPERTIES, LLC

By: R. Nash Neyland, Vice President

_____  Witness

_____  Witness

MARKSCO, L.L.C.

By: Mark P. Sealy, Member

_____  Witness

_____  Witness

- 15 -

S. Woodlawn PA/JOA

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

PICKENS FINANCIAL GROUP, L.L.C.

1
2 _____
3 Witness
4 _____    By: Michael K Pickens, Vice President
5 Witness
6
7                                 FANT ENERGY LIMITED
8                                 By:  Richard E. Fant, LLC, the General Partner of
9                                      Fant Energy Limited
10 _____
11 Witness                        By: Stephen Swan, Manager
12
13 _____
14 Witness
15                                SANTO PETROLEUM LLC
16
17 _____
18 Witness                        By: Tobin L Rhodes, Executive Vice President
19
20 _____
21 Witness
22                                JJS WORKING INTERESTS LLC
23                                By:  Houston Bulldog Capital Management, LLC
24
25
26 Witness                        By: Justin Simmons, Manager
27
28 _____
29 Witness                        KUDZU OIL PROPERTIES, LLC
30
31
32 _____
33 Witness                        By: R. Nash Neyland, Vice President
34
35 _____
36 Witness
37                                MARKSCO, L.L.C.
38
39
40 _____
41 Witness                        By: Mark P. Sealy, Member
42
43 Witness
44
45
46
47
48
49
50
51 _____    _____
52
53
54
55
56 _____    _____
57
58
59
60
61
62
63
64
65
66
67
68
69
70

- 15 -

S. Woodlawn PA/JOA

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

PICKENS FINANCIAL GROUP, L.L.C.

Witness

By: Michael K Pickens, Vice President

Witness


FANT ENERGY LIMITED
By: Richard E. Fant, LLC, the General Partner of
      Fant Energy Limited

Witness

By: Stephen Swan, Manager

Witness


SANTO PETROLEUM LLC

Witness

By: Tobin L Rhodes, Executive Vice President

Witness


JJS WORKING INTERESTS LLC
By: Houston Bulldog Capital Management, LLC

Witness

By: Justin Simmons, Manager

Witness


KUDZU OIL PROPERTIES, LLC

By: K. Nash Neyland, Vice President
Wirt A. Yerger III
managed

Witness


MARKSCO, L.L.C.

Witness

By: Mark P. Sealy, Member

Witness

- 15 -

S. Woodlawn PA/JOA

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

PICKENS FINANCIAL GROUP, L.L.C.

_____     _____
Witness                          By: Michael K Pickens, Vice President

_____
Witness

FANT ENERGY LIMITED
By:  Richard E. Fant, LLC, the General Partner of
       Fant Energy Limited

_____     _____
Witness                          By: Stephen Swan, Manager

_____
Witness

SANTO PETROLEUM LLC

_____     _____
Witness                          By: Tobin L Rhodes, Executive Vice President

_____
Witness

JJS WORKING INTERESTS LLC
By:  Houston Bulldog Capital Management, LLC

_____     _____
Witness                          By: Justin Simmons, Manager

_____
Witness

KUDZU OIL PROPERTIES, LLC

_____     _____
Witness                          By: R. Nash Neyland, Vice President

_____
Witness

MARKSCO, L.L.C.

_Dianne Salisury_____       _Mark P. Sealy_____
Witness                          By: Mark P. Sealy, Member

_Meghan Hughes_____
Witness

_____     _____

_____     _____

- 15 -

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

I, _Kim S. Elias_____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the __18th__ day of __April_____, 2013.

_Kim S. Elias_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commission is for Life

My Commission Expires: _at death_

STATE OF LOUISIANA

PARISH OF CADDO

I, _Kim S. Elias_____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the __18th__ day of __April_____, 2013.

_Kim S. Elias_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commission is for Life

My Commission Expires: _at death_

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF *Harris*

I, *Sharon M. McDonald*, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the *25th* day of *April*, 2013.

SHARON METCALF McDONALD
Notary Public, State of Texas
Commission Expires  12-29-2013

*Sharon M. McDonald*
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: *12/29/2013*

STATE OF TEXAS

COUNTY OF _HARRIS_

==Signature / Acknowledgement Pages to that certain Operating Agreement, dated March 1, 2013, Sklar Exploration Company, LLC, as Operator; South Woodlawn Prospect, Marion County, Texas.==

I, _MYLA WUNDERLICH_, a notary public in and for said County and State, hereby certify that Richard Tauber, whose name as President of ==TAUBER EXPLORATION AND PRODUCTION COMPANY==, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___8th___ day of ___MAY___, 2013.

_____
NOTARY PUBLIC

STATE OF TEXAS

COUNTY OF _____

> MYLA WUNDERLICH
> Notary Public, State of Texas
> Commission Expires  02-11-2016

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Richard Tauber, whose name as President of TAUBER EXPLORATION AND PRODUCTION COMPANY, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

STATE OF TEXAS

COUNTY OF _____

STATE OF LOUISIANA

PARISH OF CADDO

    I, _Melissa R. Ebarb_, a notary public in and for said Parish and State, hereby certify that FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

    Given under my hand and notarial seal this the _23rd_ day of _April_, 2013.

_____
NOTARY PUBLIC
# 68325

(AFFIX NOTARIAL SEAL)

My commission ~~expires:~~ is for Life

STATE OF LOUISIANA

PARISH OF CADDO

    I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Richard Tauber, whose name as President of TAUBER EXPLORATION AND PRODUCTION COMPANY, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

STATE OF TEXAS

COUNTY OF _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, Deborah W. Cox_____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _24th_ day of ___April___, 2013.

_Deborah W. Cox_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _for life_

DEBORAH W. COX  26623
Notary Public
Parish of Caddo
State of Louisiana

STATE OF TEXAS

COUNTY OF *HARRIS*

    I, *PATTI L HANSON*, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the *29* day of *April*, 2013.

> PATTI L HANSON
> MY COMMISSION EXPIRES
> January 18, 2015

                                NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: *1/18/15*


STATE OF _____

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as Vice President for PICKENS FINANCIAL GROUP, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2013.

                                _____
                                NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Stephen Swan, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

    Given under my hand and notarial seal this the _____ day of _____, 2013.

                                  _____
                                  NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                          _____
                                          NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _Texas_

COUNTY OF _Dallas_

      I, _Marilyn L. Fulton_, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as ~~Vice~~ President for PICKENS FINANCIAL GROUP, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _24th_ day of _April_, 2013.

Marilyn L Fulton
My Commission Expires
06/23/2016

_Marilyn L. Fulton_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _6|23|16_

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Stephen Swan, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                            _____
                                          NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as Vice President for PICKENS FINANCIAL GROUP, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _Harris'_

I, _Brenda Witt White_, a notary public in and for said County and State, hereby certify that Stephen Swan, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

Given under my hand and notarial seal this the _13th_ day of _May_, 2013.

BRENDA WITT WHITE
Notary Public, State of Texas
My Commission Expires
March 23, 2015

_Brenda Witt White_
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _3 23 15_

STATE OF _TEXAS_

COUNTY OF _HARRIS_

I, _AMY S. ROZZELL_, a notary public in and for said County and State, hereby certify that Tobin L. Rhodes, whose name as Executive Vice President for SANTO PETROLEUM, LLC, a Delaware limited liability corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the _28th_ day of _MAY_, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

AMY S. ROZZELL
Notary Public, State of Texas
My Commission Expires
April 05, 2017


STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Tobin L. Rhodes, whose name as Executive Vice President for SANTO PETROLEUM, LLC, a Delaware limited liability corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the 26th day of april, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: 8-11-15

MARCIA A. DE LUNA
Notary Public, State of Texas
My Commission Expires
August 11, 2015


STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Tobin L. Rhodes, whose name as Executive Vice President for SANTO PETROLEUM, LLC, a Delaware limited liability corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said corporation.

    Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF HARRIS

    I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF MISSISSIPPI

COUNTY OF Madison

    I, Pamela F. Sebren, a notary public in and for said County and State, hereby certify that ~~R. Nash Neyland, Executive V.P.~~ Wirt A. Yerger III, manager whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the 24 day of April, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires:

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 63506
PAMELA F. SEBREN
Commission Expires
July 18, 2013
RANKIN COUNTY

STATE OF LOUISIANA

PARISH OF CADDO

I, _Aungel Pattison_, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _13_ day of _May_, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

AUNGEL PATTISON
Embossed Hereon Is My
DeSoto, Caddo, Bossier Parishes
Louisiana Notary Public Seal
Notary ID No. 063733
My Commission Expires Upon My Death

## EXHIBIT "A"

Attached to and made a part of that certain Joint Operating Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

(1)   **Identification of lands subject to this agreement:**

**Contract Area**

As shown in A-2 in Black

**Area of Mutual Interest**

As shown in A-2 in Red

(2)   **Restrictions, if any, as to depths, formations, or substances:**

There are no restrictions except as may be provided for in any lease or contract subject to this Operating Agreement.

(3)   **Decimal interest and names of Parties to this Agreement:**

| Owner | BPO Interest* | APO Interest* |
|---|---|---|
| **Sklarco, LLC | .25 | .40496 |
| McCombs | .25 | .1875 |
| Tauber | .05 | .0375 |
| Fleet | .05 | .0375 |
| Bundero | .02 | .015 |
| Tiembo | .02 | .015 |
| Pickens | .05 | .0375 |
| Fant | .10 | .075 |
| Santo | .15 | .1125 |
| **JJS | .01 | .04004 |
| Kudzu | .03 | .0225 |
| Marksco | .02 | .015 |
| Total: | 1.00000000 | 1.00000000 |

*Before Payout ("BPO") and After Payout ("APO") as defined in that Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C, McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo. Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

**Subject to Agreement For Termination Of Agency Services Agreements dated effective as of January 1, 2010, by and between Sklarco L.L.C. et al.   Interest is subject to change in accordance with the terms of said Termination Agreement.

**Oil and gas leases and/or oil and gas interests subject to this agreement:**

See Exhibit "A-1" Description of Leases.   This Agreement covers not only the oil and gas leases and/or oil and gas interests described in Exhibit "A-1," but also any oil and gas leases and/or oil and gas interests acquired after the Effective Date of this Agreement and covered by the Participation Agreement to which this Agreement is attached as Exhibit "D" or covered by Article VIII.B., VIII.C., or XV.K. of this Agreement.   The only jointly owned lease burdens are the lessor's royalty under each of the oil and gas leases described in Exhibit "A-1" and the burden described in Sections 1.1 and 1.3 of the Participation Agreement to which this Agreement is attached as Exhibit "D". There are no other joint burdens whatsoever.

1

**Addresses of parties for notice purposes:**

Sklar Exploration Company L.L.C.
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101

Sklarco L.L.C.
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101

McCombs Energy, Ltd.
5599 San Felipe Street, Suite 1200
Houston, Texas   77056-2721

Tauber Exploration & Production Co.
55 Waugh Drive, Suite 601
Houston, TX 7707-5837

Fleet Howell
416 Travis Street, Suite 715
Shreveport, Louisiana   71101

Bundero Investment Company, L.L.C.
333 Texas Street, Suite 300
Shreveport, Louisiana   71101

Tiembo Ltd.
P. O. Box 270415
Houston, Texas   77277-0415

Pickens Financial Group, L.L.C.
8499 Greenville Avenue, Suite 105
Dallas, Texas 75231-2417

Fant Energy Limited
5800 Westview Drive
Houston, Texas   77055

Santo Petroleum LLC
101 South 4th Street, Suite B
Artesia, New Mexico 88210

JJS Working Interests LLC
4295 San Felipe, Suite 207
Houston, Texas   77027

Kudzu Oil Properties, LLC
300 Concourse Blvd., Suite 101
Ridgeland, Mississippi   39157

Marksco, L.L.C.
333 Texas Street, Suite 1050
Shreveport, Louisiana   71101

## EXHIBIT "A-1"

Attached to and made a part of that certain Joint Operating Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

## DESCRIPTION OF LEASES

### SKLARCO LEASES

1. Oil Gas and Mineral Lease dated 05/25/2012, by and between Albert W. Key and Key Family Marital Deduction Trust Key, as Lessor, and Sklarco L.L.C., as Lessee, recorded in Vol 842, Page 620, of the records of Marion County, Texas (1WOO01-L001).

2. Oil Gas and Mineral Lease dated 09/28/2012, by and between William Gleason, Trustee of the Taylor Grey Sain trust, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 847, page 553, of the records of Marion County, Texas (1WOO01-L006).

3. Oil Gas and  Mineral Lease dated 11/05/2012, by and between Children's Hospital of Los Angeles, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 847, Page 714, of the records of Marion County, Texas (1WOO01-L007).

4. Oil Gas and Mineral Lease dated 10/30/2012, by and between Rebecca A Eidson Wright, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in 12/26/2012 Vol 850, Page 220, of the records of Marion County, Texas (1WOO01-L008).

5. Oil Gas and Mineral Lease dated 11/16/2012, by and between Davis Lynn Plunkett, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 850, Page 850 in Marion Co., TX, of the records of Marion County, Texas (1WOO01-L009).

6. Oil Gas and Mineral Lease dated 11/16/2012, by and between Bob Herwood Reed, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 850, Page 850 of the records of Marion County, Texas (1WOO01-L010).

7. Oil Gas and Mineral Lease dated 12/10/2012, by and between James D & Armitta Blackburn, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 850, Page 224 of the records of Marion County, Texas (1WOO01-L011).

8. Oil Gas and Mineral Lease dated 12/04/2012, by and between Diane Tompson Broadus, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 558 of the records of Marion County, Texas (1WOO01-L012).

9. Oil Gas and Mineral Lease dated 11/30/2102, by and between Jean Warwick Thompson, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 578 of the records of Marion County, Texas (1WOO01-L013).

10. Oil Gas and Mineral Lease dated 12/19/2012, by and between Joseph Cleveland Sullivan, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 566, of the records of Marion County, Texas (1WOO01-L014).

11. Oil Gas and Mineral Lease dated 12/18/2012, by and between Thomas B Sullivan, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 570, of the records of Marion County, Texas (1WOO01-L015).

12. Oil Gas and Mineral Lease dated 12/04/2012, by and between Robert C Thompson, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 582, of the records of Marion County, Texas (1WOO01-L016).

13. Oil Gas and Mineral Lease dated 12/07/2102, by and between Sue Cartledge Cumbus, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 562, of the records of Marion County, Texas (1WOO01-L017).

14. Oil Gas and Mineral Lease dated 12/04/2012, by and between Danna Thompson, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 851, Page 574 of the records of Marion County, Texas (1WOO01-L018).

15. Oil Gas and Mineral Lease dated 12/11/2012, by and between Anne C. Morgan, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 852, Page 139, of the records of Marion County, Texas (1WOO01-L019).

16. Oil Gas and Mineral Lease dated 01/04/2013, by and between Michael D. Gollob Oil Company, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 852, Page 143, of the records of Marion County, Texas (1WOO01-L020).

17. Oil Gas and Mineral Lease dated 01/08/2013, by and between Leslie A. Bitner, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 852, Page 146, of the records of Marion County, Texas (1WOO01-L021).

18. Oil Gas and Mineral Lease dated 01/15/2013, by and between Eckankar, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 853, Page 632, of the records of Marion County, Texas (1WOO01-L022).

19. Oil Gas and Mineral Lease dated 01/15/2013, by and between Bruce Russel Cooner, et al and Russel Lynn Cooner, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 853, Page 629, of the records of Marion County, Texas (1WOO01-L023).

20. Oil Gas and Mineral Lease dated 01/10/2013, by and between Virginia B Blackman, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 853, Page 640, of the records of Marion County, Texas (1WOO01-L024).

21. Oil Gas and Mineral Lease dated 12/31/2012, by and between Sylvia Calhoun, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 853, Page 643, of the records of Marion County, Texas (1WOO01-L025).

22. Oil Gas and Mineral Lease dated 01/22/2013, by and between R. L. Ray, Ltd, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 853, Page 637, of the records of Marion County, Texas (1WOO01-L026).

23. Oil Gas and Mineral Lease dated 01/4/2013, by and between Diane McDonlad, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 854, Page 542, of the records of Marion County, Texas (1WOO01-L027).

24. Oil Gas and Mineral Lease dated 01/25/2013, by and between Faye bunch Copeland, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 854, Page 548, of the records of Marion County, Texas (1WOO01-L028).

25. Oil Gas and Mineral Lease dated 01/28/2013, by and between Bright Minerals, Inc., as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 854, Page 559, of the records of Marion County, Texas (1WOO01-L029).

26. Oil Gas and Mineral Lease dated 12/19/2012, by and between Agnes Gibson Hattaway, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 854, Page 550, of the records of Marion County, Texas (1WOO01-L030).

27. Oil Gas and Mineral Lease dated 03/1/2013, by and between Mary Bitner Spranger, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 854, Page 555, of the records of Marion County, Texas (1WOO01-L31).

28. Oil Gas and Mineral Lease dated 01/25/2013, by and between Gloria Jean Clark Mason, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 855, Page 116A, of the records of Marion County, Texas (1WOO01-L032).

29. Oil Gas and Mineral Lease dated 02/01/2013, by and between Vickie Metcalf, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 855, Page 315, of the records of Marion County, Texas (1WOO01-L033).

30. Oil Gas and Mineral Lease dated 02/05/2013, by and between Walter Thomas Edison, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 855, Page 319, of the records of Marion County, Texas (1WOO01-L034).

31. Oil Gas and Mineral Lease dated 12/28/2012, by and between Phyllis H Rostker, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 855, page 322, of the records of Marion County, Texas (1WOO01-L035).

32. Oil Gas and Mineral Lease dated 12/28/2012, by and between Susan D Mahoney-Clark, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in Vol 855, Page 325, of the records of Marion County, Texas (1WOO01-L036).

33. Oil Gas and Mineral Lease dated 12/28/2012, by and between Audrey Taylor, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L037).

34. Oil Gas and Mineral Lease dated 01/07/2013, by and between Edythe G Tucker, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L038).

35. Oil Gas and Mineral Lease dated 02/20/2013, by and between Richard Kent McGaughy, Independent Executor and Trustee of the Residury Trusts in the Estate of Roy Lamar Rather, Jr., Deceased, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L039).

36. Oil Gas and Mineral Lease dated 02/05/2013, by and between Edward Parker Eidson, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L040).

37. Oil Gas and Mineral Lease dated 02/05/2013, by and between Peggy Sue Askew, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L041).

38. Oil Gas and Mineral Lease dated 03/05/2013, by and between Richard M Schultz, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L042).

39. Oil Gas and Mineral Lease dated 02/08/2013, by and between Cynthia Thornton & Cheryl Barnett Co-Trustees, The Walford Family Trust, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L043).

40. Oil Gas and Mineral Lease dated 04/04/2013, by and between Doris Corn, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L044).

41. Oil Gas and Mineral Lease dated 02/06/2013, by and between Norma L Conkle Archung, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L045).

42. Oil Gas and Mineral Lease dated 02/05/2013, by and between Timothy Allin Eidson, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L046).

43. Oil Gas and Mineral Lease dated 02/05/2013, by and between Elizabeth Eidson Stevens, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L047).

44. Oil Gas and Mineral Lease dated 12/28/2012, by and between Norman Alfieri, Jr., as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L048).

45. Oil Gas and Mineral Lease dated 04/01/2013, by and between Alice Key Myrick, as Lessor, and Sklarco, L.L.C., as Lessee, recorded in / /, of the records of Marion County, Texas (1WOO01-L049).

**ALBERT W. KEY, ET AL LEASES**

46. Oil Gas and Mineral Lease dated 07/03/2008, by and between Martha L Hartford, as Lessor, and Key & Key Brothers, as Lessee, recorded in Vol 771, Page 34, of the records of Marion County, Texas (1WOO01-L002).

47. Oil Gas and Mineral Lease dated 07/10/2008, by and between John Armistead, as Lessor, and Key & Key Brothers, as Lessee, recorded in Vol 771, Page 25, of the records of Marion County, Texas (1WOO01-L003).

48. Oil Gas and Mineral Lease dated 07/10/2008, by and between Charles Wise Bypass Trust, Mark Lawley & Belinda Baker Co-Trustee, as Lessor, and Key & Key Brothers, as Lessee, recorded in Vol 771, Page 27, of the records of Marion County, Texas (1WOO01-L004).

49. Oil Gas and Mineral Lease dated 07/03/2008, by and between Dawson Rev Living Trust, as Lessor, and Key & Key Brothers, as Lessee, recorded in Vol 771, Page 33, of the records of Marion County, Texas (1WOO01-L005).

**HOBART RUTHERFORD KEY, ET AL LEASES**

50. Oil, Gas and Other Mineral Lease dated February 16, 1950 from M. A. Connor & William A. Connor to E. Fred Herschbach and recorded in Volume 158, Page 476-478 of the Deed Records of Marion County, Texas.

51. Oil, Gas and Other Mineral Lease dated February 16, 1950 from O. W. Connor E. Fred Herschbach, Lessee, recorded in Volume 158, Page 472 of the Deed Records of Marion County, Texas.

52. Oil, Gas and Other Mineral Lease dated February 16, 1950 from Mrs. Lula J. Conner, f/s to E. Fred Herschbach and recorded in Volume 158, Pages 474-476 of the Deed Records of Marion County, Texas.

53. Oil, Gas and Other Mineral Lease dated February 16, 1950 from Mrs. Maggie Turner, f/s; L. S. Turner; Jerrold Turner; Maggie Lou Turner to E. Fred Herschbach and recorded in Volume 159, Pages 218-220 of the Deed Records of Marion County, Texas.

54. Oil, Gas and Other Mineral Lease dated July 7, 1951 from Abbie Cramer & J. L. Miller w/h to Billy Mikule recorded in Volume 170, Pages 25-26 of the Deed Records of Marion County, Texas.

55. Oil, Gas and Other Mineral Lease dated June 29, 1951 from Mrs. Josephine Cramer Sims, divorced to Billy Mikule and recorded in Volume 169, Pages 557-559 of the Deed Records of Marion County, Texas.

56. Oil, Gas and Other Mineral Lease dated June 29, 1951 from R. R. Cramer to Billy Mikule and recorded in Volume 169, Pages 553-555 of the Deed Records of Marion County, Texas.

57. Oil, Gas and Other Mineral Lease dated June 25, 1951 from Ettie P. & W. D. Latimer w/h to Billy Mikule and recorded in Volume 169, Pages 248-250 of the Deed Records of Marion County, Texas.

58. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Thomas Vivian & Ruth Cherry Cramer h/w to Billy Mikule and recorded in Volume 169, Pages 272-274 of the Deed Records of Marion County, Texas.

59. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Oleta Cramer & Nigal A. Timmins w/h to Billy Mikule and recorded in Volume 170, Pages 315-317 of the Deed Records of Marion County, Texas.

60. Oil, Gas and Other Mineral Lease dated July 7, 1951 from C. D. Cramer to Billy Mikule and recorded in Volume 170, Pages 17-18 of the Deed Records of Marion County, Texas.

61. Oil, Gas and Other Mineral Lease dated July 17, 1951 from W. O. Cramer to Billy Mikule and recorded in Volume 170, Pages 286-288 of the Deed Records of Marion County, Texas.

62. Oil, Gas and Other Mineral Lease dated June 29, 1951 from Ella Mae Cramer & R. G. Brian w/h to Billy Mikule and recorded in Volume 170, Pages 284-286 of the Deed Records of Marion County, Texas.

63. Oil, Gas and Other Mineral Lease dated July 7, 1951 from Thomas C. Connor to Billy Mikule and recorded in Volume 170, Pages 21-22 of the Deed Records of Marion County, Texas.

64. Oil, Gas and Other Mineral Lease dated June 26, 1951 from Mrs. Sam E. Cramer, widow to Billy E. Mikule recorded in Volume 170, Pages 198-199 of the Deed Records of Marion County, Texas.

65. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Martha Elizabeth & S. A. Armstrong w/h to Billy Mikule and recorded in Volume 170, Pages 288-290 of the Deed Records of Marion County, Texas.

66. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Mrs. Erma C. Johnston, et als., Lessors, to Billy Mikule, Lessee, recorded in Volume 169, page 551 of the Deed Records of Marion County, Texas.

67. Oil, Gas and Other Mineral Lease dated July 7, 1951 from Annie Cramer to Billy Mikule and recorded in Volume 170, Pages 23-24 of the Deed Records of Marion County, Texas.

68. Oil, Gas and Other Mineral Lease dated June 26, 1951 from Albert Raymond Conly to Billy Mikule and recorded in Volume 169, Pages 277-279 of the Deed Records of Marion County, Texas.

69. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Mrs. Dollie & F. L. Huey w/h to Billy Mikule and recorded in Volume 169, Pages 274-276 of the Deed Records of Marion County, Texas.

70. Oil, Gas and Other Mineral Lease dated June 27, 1951 from Ettie C. & J. W. Neville w/h to Billy Mikule and recorded in Volume 169, Pages 555-557 of the Deed Records of Marion County, Texas.

71. Oil, Gas and Other Mineral Lease dated July 7, 1951 from George Alma Terrell, a single woman to Billy Mikule and recorded in Volume 170, Pages 19-20 of the Deed Records of Marion County, Texas.

72. Oil, Gas and Other Mineral Lease dated June 26, 1951 from R. C. & Mrs. R. C. Conly h/w to Billy Mikule and recorded in Volume 169, Pages 246-248 of the Deed Records of Marion County, Texas.

73. Oil, Gas and Other Mineral Lease dated June 26, 1951 from George Conly, Jr. to Billy Mikule and recorded in Volume 169, Pages 279-281 of the Deed Records of Marion County, Texas.

74. Oil, Gas and Other Mineral Lease dated December 3, 1951 from Jane Cramer & L. D. Harrison to E. Fred Herschbach and recorded in Volume 173, Pages 437-438 of the Deed Records of Marion County, Texas.

75. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Erma C. Johnston, widow to E. Fred Herschbach and recorded in Volume 176, Pages 442-444 of the Deed Records of Marion County, Texas.

76. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Zue C. Gibbons, widow to E. Fred Herschbach and recorded in Volume 176, Pages 444-446 of the Deed Records of Marion County, Texas.

77. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Akin B. Connor to E. Fred Herschbach and recorded in Volume 176, Pages 446-448 of the Deed Records of Marion County, Texas.

78. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Pearle C. Baldwin, widow to E. Fred Herschbach and recorded in Volume 176, Pages 448-450 of the Deed Records of Marion County, Texas.

79. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Jane C. & W. R. Wood w/h to E. Fred Herschbach and recorded in Volume 176, Pages 450-452 of the Deed Records of Marion County, Texas.

80. Oil, Gas and Other Mineral Lease dated June 28, 1951 from Flora C. & Lyle Wilson w/h to E. Fred Herschbach and recorded in Volume 176, Pages 452-454 of the Deed Records of Marion County, Texas.

81. Oil, Gas and Other Mineral Lease dated September 21, 1951 from C. W. LaCofske; Harry & Leah LaCofske Goldsmith h/w; Miss Lillian LaCofske, f/s; Mrs. Katie LaCofske, f/s to Bracken Oil Co. and recorded in Volume 172, Pages 208-213 of the Deed Records of Marion County, Texas.

82. Oil, Gas and Other Mineral Lease dated February 17, 1950 from Albert Marx and wife, Georgia E. Marx, Lessors, to E. Fred Herschbach, Lessee, recorded in Volume 159, page 181, said Deed Records, covering 91.73 acres, more or less, in the William Mason Survey, Abst. #270.

83. Oil, Gas and Other Mineral Lease dated August 28, 1951 from Louisiana & Arkansas Railway Company to James E. Kemp and recorded in Volume 171, Pages 394-397 of the Deed Records of Marion County, Texas and Amended in Volume 180, Pages 431-432 of the Deed Records of Marion County, Texas.

84. Oil, Gas and Other Mineral Lease dated October 11, 1951, from Bascom Giles, Commissioner of the General Land Office of the State of Texas, and the School Land Board of the State of Texas, Lessor, to Midstates Oil Corporation, Lessee, recorded in Volume 172, Page 218, said Deed Records, and containing 135 acres of land, more or less.

85. Oil, Gas and Other Mineral Lease dated November 7, 1952, from A. S. Harvey, Receiver in Cause No. 14,087 B.F.Ayers et al vs. Willie Hervey, et al, and recorded in Volume 177, Page 381 of the Deed Records of Marion County, Texas.

86. Oil, Gas and Other Mineral Lease dated May 12, 1953 from Mrs. Dolly Bell Key, Hobart Key, Jr.; David R. Key; E. M. Key composing Key & Key Brothers, partnership to Earl Hollandsworth and recorded in Volume 181, Pages 75-85 of the Deed Records of Marion County, Texas.

87. Oil, Gas and Other Mineral Lease dated March 12, 1951 to S. G. Read; Mrs. D. B. Read, widow; C. A. Bitner; L. H. Read; F. H. Harrell, John R. Alford; Jess B. Alford; John T. Green; and R. O. Alford to E. Fred Herschbach and recorded in Volume 167, Pages 73-76 of the Deed Records of Marion County, Texas.

88. Oil, Gas and Other Mineral Lease dated February 7, 1950 from Jefferson Wholesale Grocer Company, a corporation, acting by and through T. J. Taylor, Jr. President, Lessor, to Skelly Oil Company, Lessee, recorded in Volume 159, Page 376 of the Deed Records of Marion County, Texas.

89. Oil, Gas and Other Mineral Lease dated February 11, 1950, from Mrs. Reba Goodroe, W. B. Goodroe, Edward E. Eidson, Thomas E. Eidson and Robert D. Eidson, Lessors, to Skelly Oil Company, Lessee, recorded in Volume 159, Page 301 of the Deed Records of Marion County, Texas.

90. Oil, Gas and Other Mineral Lease dated February 9, 1950 from J. H. Benefield, Sr., Lessor, to Skelly Oil Company, Lessee, recorded in Volume 159, Page 379 of the Deed Records of Marion County, Texas.

91. Oil, Gas and Other Mineral Lease dated February 26, 1979 from Betty Gracr Wise, Mary J. Armistead, Jane Poyer, Mary M. Chapman, and Grace Dawson to David R. Key and recorded in Volume 297, Page 629 of the Deed Records of Marion County, Texas.

92. Oil, Gas and Other Mineral Lease dated February 29, 1980 from Hobart Key, Jr., Edmund M. Key, David R. Key and the Estate of Dolly Bell Key to Bill R. Tipton and recorded in Volume 407, Page 397 of the Deed Records of Marion County, Texas.

93. Oil, Gas and Other Mineral Lease dated September 9, 1988 from Louise Sayle Skelton to David R. Key and recorded in Volume 516, Page 258 of the Deed Records of Marion County, Texas.

94. Oil, Gas and Other Mineral Lease dated August 25, 1988 from Reba Jeanette Lawrence to David R. Key and recorded in Volume 516, Page 264 of the Deed Records of Marion County, Texas.

95. Oil, Gas and Other Mineral Lease dated August 25, 1988 from Franklin Jones, Sr. to David R. Key and recorded in Volume 516, Page 261 of the Deed Records of Marion County, Texas.

96. Oil, Gas and Other Mineral Lease dated August 18, 1989 from J. D. Blackburn to David R. Key and recorded in Volume 519, Page 130 of the Deed Records of Marion County, Texas.

97. Oil, Gas and Other Mineral Lease dated March 2, 1989 from fred J. Herschbach, Executor, et al., to David R. Key and recorded in Volume 520, Page 51 of the Deed Records of Marion County, Texas.

98. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Lawrence Melcher to David R. Key and recorded in Volume 520, Page 48 of the Deed Records of Marion County, Texas.

99. Oil, Gas and Other Mineral Lease dated February 28, 1989 from Verla Jane Benefield to David R. Key and recorded in Volume 520, Page 45 of the Deed Records of Marion County, Texas.

100. Oil, Gas and Other Mineral Lease dated April 17, 1989 from Claudia W. Wood to David R. Key and recorded in Volume 520, Page 42 of the Deed Records of Marion County, Texas.

101. Oil, Gas and Other Mineral Lease dated February 28, 1989 from Francis Roberts to David R. Key and recorded in Volume 520, Page 39 of the Deed Records of Marion County, Texas.

102. Oil, Gas and Other Mineral Lease dated April 14, 1989 from Gerald Loetterle, et al., to David R. Key and recorded in Volume 520, Page 36 of the Deed Records of Marion County, Texas.

103. Oil, Gas and Other Mineral Lease dated April 26, 1989 from R. B. Fawcett to David R. Key and recorded in Volume 520, Page 33 of the Deed Records of Marion County, Texas.

104. Oil, Gas and Other Mineral Lease dated April 14, 1989 from John Dragna to David R. Key and recorded in Volume 520, Page 30 of the Deed Records of Marion County, Texas.

105.  Oil, Gas and Other Mineral Lease dated April 17, 1989 from Fannie Curry, et al., to David R. Key and recorded in Volume 521, Page 258 of the Deed Records of Marion County, Texas.

106.  Oil, Gas and Other Mineral Lease dated April 17, 1989 from Jewel Hervey to David R. Key and recorded in Volume 521, Page 267 of the Deed Records of Marion County, Texas.

107.  Oil, Gas and Other Mineral Lease dated April 17, 1989 from Precious L. Hervey, et al., to David R. Key and recorded in Volume 521, Page 264 of the Deed Records of Marion County, Texas.

108.  Oil, Gas and Other Mineral Lease dated April 17, 1989 from Mabel L. Webster to David R. Key and recorded in Volume 521, Page 255 of the Deed Records of Marion County, Texas.

109.  Oil, Gas and Other Mineral Lease dated April 14, 1989 from Helen Sternberg Arnold, et al., to David R. Key and recorded in Volume 520, Page 27 of the Deed Records of Marion County, Texas.

110.  Oil, Gas and Other Mineral Lease dated July 5, 1989 from John H. Carter, Jr., to David R. Key and recorded in Volume 521, Page 651 of the Deed Records of Marion County, Texas.

111.  Oil, Gas and Other Mineral Lease dated May 5, 1989 from Dorothy Robinson to David R. Key and recorded in Volume 521, Page 261 of the Deed Records of Marion County, Texas.

112.  Oil, Gas and Other Mineral Lease dated June 1, 1989 from David R. Key to Tipco Operating Company, et al., and recorded in Volume 522, Page 633 of the Deed Records of Marion County, Texas.

113.  Oil, Gas and Other Mineral Lease dated July 13, 1993 from Billie J. Mason to Tipco Operating Company and recorded in Volume 556, Page 279 of the Deed Records of Marion County, Texas.

114.  Oil, Gas and Other Mineral Lease dated May 10, 1993 from J. C. Copeland, et ux., Ina Faye Copeland to Tipco Operating Company and recorded in Volume 556, Page 283 of the Deed Records of Marion County, Texas.

115.  Oil, Gas and Other Mineral Lease dated August 19, 1993 from Russell Cooner, et ux., Joyce Cooner to Tipco Operating Company and recorded in Volume 556, Page 662 of the Deed Records of Marion County, Texas.

116.  Oil, Gas and Other Mineral Lease dated September 20, 1993 from Bright Minerals, Inc. to Tipco Operating Company and recorded in Volume 559, Page 133 of the Deed Records of Marion County, Texas.

117.  Oil, Gas and Other Mineral Lease dated August 24, 1993 from Robert Pugh, Sr., Executor of Estate, to Dr. Albert I. Clark to Tipco Operating Company and recorded in Volume 559, Page 136 of the Deed Records of Marion County, Texas.

118.  Oil, Gas and Other Mineral Lease dated October 14, 1993 from Albert G. Mason to Tipco Operating Company and recorded in Volume 559, Page 138 of the Deed Records of Marion County, Texas.

119.  Oil, Gas and Other Mineral Lease dated September 20, 1993 from Richard L. Ray to Tipco Operating Company and recorded in Volume 559, Page 140 of the Deed Records of Marion County, Texas.

120.  Oil, Gas and Other Mineral Lease dated October 8, 1993 from Mary Lenore Sharpton to Tipco Operating Company and recorded in Volume 559, Page 143 of the Deed Records of Marion County, Texas.

121.  Oil, Gas and Other Mineral Lease dated September 10, 1993 from Michael B. Gallob to Tipco Operating Company and recorded in Volume 557, Page 329 of the Deed Records of Marion County, Texas.

122. Oil, Gas and Other Mineral Lease dated September 23, 1993 from Key Family Marital Deduction Trust to Tipco Operating Company and recorded in Volume 557, Page 334 of the Deed Records of Marion County, Texas.

123. Oil, Gas and Other Mineral Lease dated September 9, 1993 from Frances A. Key to Tipco Operating Company and recorded in Volume 557, Page 332 of the Deed Records of Marion County, Texas.

124. Oil, Gas and Other Mineral Lease dated December 1, 2000 from Verla Jane Stutz Benefield to Tipco Operating Company and recorded in Volume 627, Page 424 of the Deed Records of Marion County, Texas.

125. Oil, Gas and Other Mineral Lease dated May 23, 2001 from Frances Benefield Roberts to Tipco Operating Company and recorded in Volume 633, Page 470 of the Deed Records of Marion County, Texas.

126. Oil, Gas and Other Mineral Lease dated November 30, 2000 from T. Jerry Blackburn to Hobart R. Key and recorded in Volume 627, Page 219 of the Deed Records of Marion County, Texas.

127. Oil, Gas and Other Mineral Lease dated April 6, 1951 from W. H. Mason, Jr. and Mary S. Mason to Dr. E. T. Doehring and recorded in Volume 167, Pag 317 of the Deed Records of Marion County, Texas.

128. Oil, Gas and Other Mineral Lease dated December 9, 1950 from D. B. Meisenheimer to S. H. Sanderson and recorded in Volume 164, Page 517 of the Deed Records of Marion County, Texas.

129. Oil, Gas and Other Mineral Lease dated December 9, 1950 from H. B. Meisenheimer and J. B. Moseley to S. H. Sanderson and recorded in Volume 164, Page 515 of the Deed Records of Marion County, Texas.

**EXHIBIT "A-2"**

Attached to and made a part of that certain Joint Operating Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

**PLAT**

Sklar Exploration Company LLC
SOUTH WOODLAWN PROSPECT
MARION COUNTY,TEXAS
1 in = 10,000 ft
AMI
Contract Area
S_Woodlawn_041913
Date: 04/19/13
N
JOSEPH WATKINS
A-385
WILLIAM PEACOCK
A-312
MATHIAS WARD
CLARK SIMMONS
A-344
JOHN HUMPHRIES
THOMAS GILLESPIE
A-169
RICHARD HAZELWOOD
A-192
JOSEPH MEACHUM
J H SUTTON
A-360
WILLIAM MASON
A-270
JODIE G FENDER
HH HAWLEY
A-334
WILLIAM W HOLMAN
A-294
HAMILTON MCNUTT
A-442
JOSEPH BOWMAN
A-72
PATRICK M THOMAS
A-714
FW PUGH
A-559
STEPHEN F SPARKS
A-635
CARLINGTON C DIAL
A-206
JOEL B CRAINE
A-144
RICHARD O WATKINS
A-752
SETH SHELDON
A-627
THOMAS GRAY
WD CHEW
DAVID LANE
A-241
A-750
ROBERT W SMITH
A-626
JOSEPH E WHITE
A-755
GEORGE JOHNSON
A-359
WALTER H PAYNE
A-550
JOHN HUSBAND
A-303
JOSEPH E FIELD
A-266
HENRY MARTIN
A-431
GEORGE W REYNOLDS
A-613
THOMAS GRAY
A-274
ROBERT W SMITH
JOSIAH PREWITT
A-546
JR TOWNSEND
A-708
JAMES H KENLEY
A-384
WS COOK
A-875
WILLIAM T WEATHERSBY
A-776
ELIHU D SPAIN
A-22
JOHN M CLIFTON
A-184
DANIEL MCGRAW
STATE

EXHIBIT "B"

REV - Paid Up
Prospect

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVERS LICENSE NUMBER.**

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of _____ , _____ , between _____ , Lessor (whether one or more), whose address is _____ and SKLARCO, L.L.C., whose address is **401 Edwards Street, Suite 1601, Shreveport, LA 71101**, Lessee. WITNESSETH:

1.  Lessor, in consideration of __Ten__ dollars and other valuable consideration, receipt of which is hereby acknowledged, and of the covenants and agreements of Lessee hereinafter contained, does hereby grant, lease and let exclusively to Lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas, sulphur and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, telephone lines, employee houses and other structures on said land, necessary or useful in Lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any other land adjacent thereto. The land covered hereby, herein called "said land", is located in the County of _____ , State of __Texas__ , and is described as follows:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR LEGAL DESCRIPTIONS AND ADDITIONAL PROVISIONS.

This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain _____ acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights and options hereunder.

2.  This lease, which is a "paid-up" lease requiring no rentals and unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of _____ from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3.  As royalty, Lessee covenants and agrees: (a) To deliver to the credit of Lessor, in the pipe line to which Lessee may connect its wells, the equal **one-sixth (1/6th)** part of all oil produced and saved by Lessee from said land, or from time to time, at the option of Lessee, to pay Lessor the average posted market price of such **one-sixth (1/6th)** part of such oil at the wells as of the day it is run to the pipe line or storage tanks, Lessor's interest, in either case, to bear **one-sixth (1/6th)** of the cost of treating oil to render it marketable pipe line oil; (b) To pay Lessor on gas and casinghead gas produced from said land (1) when sold or used, one-sixth (1/6th) of the amount realized by Lessee, computed at the mouth of the well, or (2) when used by Lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of **one-sixth (1/6th)** of such gas and casinghead gas; (c) To pay Lessor on all other minerals mined and marketed or utilized by Lessee from said land, one-tenth either in kind or value at the well or mine at Lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing oil or gas, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, Lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to Lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then on or before the expiration of said ninety day period, Lessee shall pay or tender, by check or draft of Lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, and may be deposited in __PAY DIRECTLY TO LESSOR AT ADDRESS SHOWN ABOVE__ Bank, or their successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that Lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, Lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownerships thereof, as Lessee may elect. Any payment hereunder may be made by check or draft of Lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above or to the Lessor at the last address known to Lessee on or before the last date for payment. Lessee's failure to properly pay shut-in royalty shall render Lessee liable for the amount due, but shall not operate to terminate this lease. Nothing herein shall impair Lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4.  Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease with any other land covered by this lease, and/or with any other land, lease, or leases, as to any or all minerals or horizons, so as to establish units containing not more than 80 surface acres, plus 10% acreage tolerance; provided, however, units may be established as to any one or more horizons, or existing units may be enlarged as to any one or more horizons, so as to contain not more than 640 surface acres plus 10% acreage tolerance, if limited to one or more of the following: (1) gas, other than casinghead gas, (2) liquid hydrocarbons (condensate) which are not liquids in the subsurface reservoir, (3) minerals produced from wells classified as gas wells by the conservation agency having jurisdiction. If larger units than any of those herein permitted, either at the time established, or after enlargement, are required under any governmental rule or order, for the drilling or operation of a well at a regular location, or for obtaining maximum allowable from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged to conform to the size required by such governmental order or rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Such unit shall become effective as of the date provided for in said instrument or instruments, but if said instrument or instruments make no such provision, then such unit shall become effective on the date such instrument or instruments are so filed of record. Each of said options may be exercised by Lessee at any time and from time to time while this lease is in force, and whether before or after production has been established either on said land, or on the portion of said land included in the unit, or on other land unitized therewith. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be mineral, royalty, or leasehold interests in lands within the unit which are not effectively pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted upon said land under this lease. There shall be allocated to the land covered by this lease within each such unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) that proportion of the total production of unitized minerals from the unit, after deducting any used in lease or unit operations, which the number of surface acres in such land (or in each such separate tract) covered by this lease within the unit bears to the total number of surface acres in the unit, and the production so allocated shall be considered for all purposes, including payment or delivery of royalty, overriding royalty and any other payments out of production, to be the entire production of unitized minerals from the land to which allocated in the same manner as though produced therefrom under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of any unit hereunder which includes land not covered by this lease shall not have the effect of exchanging or transferring any interest under this lease (including, without limitation, any shut-in royalty which may become payable under this lease) between parties owning interests in land covered by this lease and parties owning interests in land not covered by this lease. Neither shall it impair the right of Lessee to release as provided in paragraph 5 hereof, except that Lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are released as to lands within the unit. At any time while this lease is in force Lessee may dissolve any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Any unit formed may be amended, re-formed, reduced or enlarged by Lessee at its election at anytime and from time to time after the original forming thereof by filing an appropriate instrument of record in the public office in which the pooled acreage is located. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. If this lease now or hereafter covers

**EXHIBIT "A"**

ATTACHED TO AND MADE A PART OF THAT CERTAIN OIL, GAS AND
MINERAL LEASE BY AND BETWEEN_____, AS LESSOR, AND
SKLARCO L.L.C., AS LESSEE, DATED _____.


**Legal Description**


**Additional Provisions:**

13.   Notwithstanding anything to the contrary herein, Lessee shall have the right and
power to pool all or any part of the land or interest covered by this lease with any other
land, lease or leases as to any or all mineral(s) or formations, so as to establish units
containing not more than 640 surface acres, plus 10% acreage tolerance; provided
however that larger units may be formed for any such vertical oil or gas well or
horizontal drainhole well, as such are defined or recognized by the Railroad Commission
of Texas ("Commission"), in order to conform to any well spacing or density pattern that
may be permitted by the Commission for drilling or production of any such well.

14.   Notwithstanding the limitation that a production unit for oil cannot exceed 160
acres, or a production unit for gas cannot exceed 640 acres, Lessee, as the agent for
Lessor, is granted the right to unitize any part of the land or interest covered by this lease
with any other land, leases or leases as to any or all mineral(s) or formations, as may be
necessary to obtain the approval of the Railroad Commission of Texas for the creation of
a field-wide or partial field wide secondary recovery unit pursuant to the provisions of
Chapter 101 of the Texas Natural Resources Code, without regard to the size of such
field-wide or partial field wide unit, operations on such unit, allocation of production
from wells located on such unit or payment of royalties on production from unit wells, as
long as such Lessee's actions are consistent with the terms of the applicable unit
agreement, unit operating agreement and any Commission Final Order.  Lessee is further
given the right to execute all necessary ratifications of any unit agreement and/or unit
operating agreements on behalf of Lessee.


**SIGNED FOR IDENTIFICATION**

_____

**END OF EXHIBIT "A"**

1

COPAS 2005 Accounting Procedure
Recommended by COPAS

c o p a s

*Exhibit " C "*

## ACCOUNTING PROCEDURE

## JOINT OPERATIONS

Attached to and made part of **that certain Joint Operating Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C._____**

_____
_____
_____

### I. GENERAL PROVISIONS

IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.

IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.

1.   **DEFINITIONS**

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

**"Affiliate"** means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

**"Agreement"** means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

**"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

**"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

**"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS.

**"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

**"First Level Supervision"** means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices
- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

**"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

**"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



"Joint Property" means the real and personal property subject to the Agreement.

"Laws" means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

"Material" means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

"Non-Operators" means the Parties to the Agreement other than the Operator.

"Offshore Facilities" means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

"Off-site" means any location that is not considered On-site as defined in this Accounting Procedure.

"On-site" means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

"Operator" means the Party designated pursuant to the Agreement to conduct the Joint Operations.

"Parties" means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

"Participating Interest" means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

"Participating Party" means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

"Personal Expenses" means reimbursed costs for travel and temporary living expenses.

"Railway Receiving Point" means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

"Shore Base Facilities" means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.

"Supply Store" means a recognized source or common stock point for a given Material item.

"Technical Services" means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

2. **STATEMENTS AND BILLINGS**

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section 1.2 and/or Section 1.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

3.  **ADVANCES AND PAYMENTS BY THE PARTIES**

A.  Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B.  Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

    (1)  being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

    (2)  being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

    (3)  being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

    (4)  charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

4.  **ADJUSTMENTS**

A.  Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B.  All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

    (1)  a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

    (2)  an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

    (3)  a government/regulatory audit, or

    (4)  a working interest ownership or Participating Interest adjustment.

5.  **EXPENDITURE AUDITS**

A.  A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

    Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B.   The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C.   The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D.   If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E.   ☐ (*Optional Provision – Forfeiture Penalties*)
*If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*

6.   **APPROVAL BY PARTIES**

A.   GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section 1.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section 1.6.B.

B.   AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____**two**_____ ( __2__ ) or more Parties, one of which is the Operator, having a combined working interest of at least __**two-thirds**__ percent ( 66.67 %), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C.   AFFILIATES

For the purpose of administering the voting procedures of Sections 1.6.A and 1.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section 1.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section 1.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

1.   **RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

2.   **LABOR**

A.   Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

   (1)   Operator's field employees directly employed On-site in the conduct of Joint Operations.

   (2)   Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*).

   (3)   Operator's employees providing First Level Supervision.

   (4)   Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

   (5)   Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section 1.6.A (*General Matters*).

B.   Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

D.   Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E.   Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F.   Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G.   Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H.   Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3.   **MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4.   **TRANSPORTATION**

A.   Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B.   Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below, provided the total transportation cost shall not exceed $10,000.00. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1)   If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property. The Operator shall consistently apply the selected alternative.

(2)   If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5.   **SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6.   **EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A.   The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____**Fifteen**_____ percent (——**15**___%) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

7.   **AFFILIATES**

A.   Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $ __50,000.00__   If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B.   For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $ __50,000.00__   in a given calendar year.

C.   The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

8.   **DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

9.   **LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or  necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

10.   **TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section 1.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

**11. INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12. COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

**14. ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15. OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section 1.6.A (*General Matters*).

**III. OVERHEAD**

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

1.   **OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

☑   **(Alternative 1)** Fixed Rate Basis, Section III.1.B.
☐   **(Alternative 2)** Percentage Basis, Section III.1.C.

A.   TECHNICAL SERVICES

(i)   Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

☑   **(Alternative 1 – Direct)** shall be charged **direct** to the Joint Account.

☐   **(Alternative 2 – Overhead)** shall be covered by the **overhead** rates.

(ii)   Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

☐   **(Alternative 1 – All Overhead)** shall be covered by the **overhead** rates.

☑   **(Alternative 2 – All Direct)** shall be charged **direct** to the Joint Account.

☐   **(Alternative 3 – Drilling Direct)** shall be charged **direct** to the Joint Account, **only** to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

B.   OVERHEAD—FIXED RATE BASIS

(1)   The Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate per month $ 9,700.00 _____ (prorated for less than a full month)

Producing Well Rate per month $ 970.00 _____

(2)   Application of Overhead—Drilling Well Rate shall be as follows:

(a)   Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

(b)   Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3)   Application of Overhead—Producing Well Rate shall be as follows:

(a)   An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b)   Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c)   A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d)   An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e)   Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4)   The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

C.   OVERHEAD—PERCENTAGE BASIS

(1)   Operator shall charge the Joint Account at the following rates:

(a)   Development Rate _____ percent (_____) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (*Legal Expense*) and all Material salvage credits.

(b)   Operating Rate _____ percent (_____%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.

(2)   Application of Overhead—Percentage Basis shall be as follows:

(a)   The Development Rate shall be applied to all costs in connection with:

[i]     drilling, redrilling, sidetracking, or deepening of a well
[ii]    a well undergoing plugback or workover operations for a period of five (5) or more consecutive work–days
[iii]   preliminary expenditures necessary in preparation for drilling
[iv]    expenditures incurred in abandoning when the well is not completed as a producer
[v]     construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead-Major Construction and Catastrophe*).

(b)   The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead-Major Construction and Catastrophe*).

2.   **OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE**

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.  If the Operator absorbs the engineering, design and drafting costs related to the project:

    (1)  ____5____% of total costs if such costs are less than $100,000; plus

    (2)  ____2____% of total costs in excess of $100,000 but less than $1,000,000; plus

    (3)  ____1____% of total costs in excess of $1,000,000.

B.  If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

    (1)  ____5____% of total costs if such costs are less than $100,000; plus

    (2)  ____2____% of total costs in excess of $100,000 but less than $1,000,000; plus

    (3)  ____1____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

3.  **AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

**IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS**

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

1.  **DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

\* To be negotiated if the need arises.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



2.    **TRANSFERS**

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

A.    PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1)    Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

    (a)    For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

    (b)    For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2)    Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3)    Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4)    As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

B.    FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1)    Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2)    Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3)    Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point

(4)    Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

C.    TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

c o p a s

D.   CONDITION

(1)   Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service will be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section 1.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2)   Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)   Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)   Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section 1.6.A (*General Matters*).

(5)   Condition "E" – Junk shall be priced at prevailing scrap value prices.

E.   OTHER PRICING PROVISIONS

(1)   Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2)   Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

13

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

3.  **DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

4.  **SPECIAL PRICING PROVISIONS**

    A.  PREMIUM PRICING

    Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

    B.  SHOP-MADE ITEMS

    Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

    C.  MILL REJECTS

    Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

**V. INVENTORIES OF CONTROLLABLE MATERIAL**

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

14



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

1.   **DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A.   A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B.   Actual transportation costs and Personal Expenses for the inventory team.

C.   Reasonable charges for report preparation and distribution to the Non-Operators.

2.   **NON-DIRECTED INVENTORIES**

A.   OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B.   NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C.   SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

## EXHIBIT "D"

Attached to and made a part of that certain Joint Operating Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

### INSURANCE

Operator shall carry the following insurance with the limits stipulated below for the Joint Account. Operator shall have the right to charge the Joint Account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the Joint Account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of insurance will be provided upon request.

I.    WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

Workers' Compensation Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

Employers Liability Insurance coverage at limits of $1,000,000 each accident for bodily injury by accident/$1,000,000 policy limit for bodily injury by disease/$1,000,000 each employee for bodily injury by disease.

II    COMPREHENSIVE GENERAL LIABILITY

Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $1,000,000 for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III    AUTOMOBILE LIABILITY

Coverage shall include owned, non-owned and hired vehicles. Limit $1,000,000 combined single limit each occurrence for bodily injury and property damage.

IV    EXCESS LIABILITY

Operator shall carry excess liability insurance in an amount of $10,000,000.

V.    EXTRA EXPENSE LIABILITY

Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $200,000 per occurrence.

Liability Limit: $5,000,000

VI.    OIL LEASE PROPERTY

Oil Lease Property Insurance (Inland Marine) covering tanks, pumps, machinery, pipe and similar equipment of a mobile nature usual to the operation of a producing oil or gas well and crude oil while contained in tanks with limit of not less than $10,000,000 and subject to a deductible of $5,000.

VII.    ADDITIONAL INSURANCE

Operator shall be entitled to carry or provide any additional insurance for the benefit of the Joint Account, which is of direct benefit to the joint property and is incurred by the Operator in the necessary and proper conduct of the joint operations. The premium for all such insurance so carried shall be paid by Operator and charged to the Joint Account. Operator shall, at any time requested, furnish Non-Operator with information concerning the kind, character and amounts of insurance carried.

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder. Further, any party, at its own expense, may carry its own coverage for Extra Expense Liability Insurance with limits as set forth in Section V, above. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

## EXHIBIT "E"

Attached to and made a part of that certain Joint Operating Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

### GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement, the parties hereto own and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area described in the Operating Agreement (the "**JOA**").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the gas produced from said JOA. Operator shall have the right, but not the obligation, to make arrangements to sell or utilize the share of the gas produced from the JOA attributable to any Non-Operator that does not make such arrangements on its own behalf. Notwithstanding any other provisions in this Gas Balancing Agreement or the JOA, this Gas Balancing Agreement shall only apply and a Non-Operator may only avail itself of the rights and benefits under this Gas Balancing Agreement, if, and only if, and only to the extent, Operator elects not to sell or utilize such Non-Operator's share of gas produced.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit "E" is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser. Any party whose share of gas is not marketed shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ration of its participation percentage under this Operating Agreement to the participating percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, if any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Operator will, in turn, make settlement for all royalties and overriding royalties which are payable on gas produced from the Contract Area. In the event that the total royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Contract Area, then any such deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Contract Area shall furnish the Operator with division order title opinions on which Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas.  Also, any party producing and taking or delivering gas to its purchaser shall pay, or cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the volume of gas actually taken for its account.

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties.  In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties.  In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold, less applicable production taxes and royalties theretofore paid, less any reasonable dehydration, compression, treating, processing, gathering or transportation costs actually incurred, including amortized capital costs associated with the design, construction or operation of any plants to dehydrate, compress, treat or process gas, in connection with the sale of the overproduction, at the price and based on the proceeds actually received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party.  For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party).  Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party.  Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

–2–

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.

<div align="center">

**Exhibit "E"**

</div>

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

<div align="center">

**Woodlawn Field Unit Agreement**

**Pettet Formation, Woodlawn Field**

**Marion County, Texas**

</div>

THIS AGREEMENT, entered into by the parties who have signed the original of this instrument, a counterpart thereof, or other instrument agreeing to be bound by the provisions hereof;

<div align="center">

**WITNESSETH:**

</div>

WHEREAS, In the interest of the public welfare and to promote conservation and increase the ultimate recovery of unitized substances from the Pettet Formation, Woodlawn Field, in Marion County, State of Texas, and to protect the rights of the owners of interests therein, it is deemed necessary and desirable to enter into this unit agreement to unitize the Oil and Gas Rights in and to the Unitized Formation in order to conduct Unit Operations as herein provided, being a program in accordance with _____.

NOW THEREFORE, In consideration of the premises and of the mutual agreements herein contained, it is agreed as follows:

<div align="center">

**ARTICLE 1**
**DEFINITIONS**

</div>

As used in this Agreement, the terms herein contained shall have the following meaning:

1.1   "Unit Area" means the lands described by Tracts in Exhibit A and shown on Exhibit B as to which this agreement becomes effective or to which it may be enlarged as herein provided.

1.2   "Unitized Formation" means the Pettet formation underlying the Unit Area which is defined as that oil and gas bearing zone or interval encountered at a measured depth of _____ feet to ____ feet in the electric log measurement in the electric log dated ____ of _____ Well, located _____ deemed to be interconnected therewith in and under the Unit Area.

1.3   "Unitized Substances" means all oil, gas, gaseous substances, sulphur contained in gas, condensate, distillate, and all associated and constituent liquid or liquefiable hydrocarbons other than Outside Substances within or produced from the Unitized Formation. Unitized Substances does not include the commercial production of brine.

1.4   "Working Interest" means an interest in Unitized Substances by virtue of a lease, operating agreement, fee title, or otherwise, including a carried interest, the owner of which interest has the right to drill into and produce from the Unitized Formation and to appropriate production either for itself or for itself and others and Is obligated to pay or bear, either in cash or out of production or otherwise, all or a portion of the cost of drilling, completing, equipping, developing, producing, and operating the Unitized

Formation. When Working Interest is expressed in percent, the total of the Working Interests of all Working Interest Owners in each Tract shall always equal one hundred percent (100%). Oil and Gas Rights that are free of lease or other instrument creating a Working Interest shall be regarded as a Working Interest to the extent of seven-eighths (7/8) thereof and a Royalty Interest to the extent of the remaining one-eighth (1/8) thereof. A Royalty Interest created out of a Working Interest subsequent to the execution of this agreement by the owner of such Working Interest shall continue to be subject to the Working Interest burdens and obligations that are stated in this agreement and the Unit Operating Agreement, and such Royalty Interest shall, for all purposes of this agreement and the Unit Operating Agreement, be considered as a part of the Working Interest from which it was created.

1.5     "Royalty Interest" means a right to or interest in any portion of the Unitized Substances or proceeds thereof other than a Working Interest. The term Royalty Interest specifically includes an overriding royalty interest.

1.6     "Royalty Owner" means a party hereto who owns a Royalty interest.

1.7     "Working Interest Owner" means a party hereto who owns a Working Interest.

1.8     "Tract" means each parcel of land described as such and given a Tract number in Exhibit A.

1.9     "Unit Operating Agreement" is the agreement entered into by the Working Interest Owners having the same Effective Date as this agreement entitled Woodlawn Field Unit Operating Agreement, Woodlawn Field, Marion County, Texas.

1.10    "Unit Operator" means the Working Interest Owner designated by Working Interest Owners under the Unit Operating Agreement to develop and operate the Unitized Formation, acting as operator and not as a Working Interest Owner.

1.11    "Tract Participation" is that percentage of Unitized Substances produced from the Unitized Formation which is allocated to a Tract under this agreement as calculated in accordance with the provisions of Article 5. I and shown on Exhibit A. The following definitions and parameters shall be applicable:

1.11.1  Hydrocarbon Reservoir Volume Parameter for each Tract is defined and determined to be a quantity equal to a fraction, the numerator of which is the hydrocarbon saturated rock volume underlying each respective Tract and the denominator of which is the sum of the hydrocarbon saturated rock volume underlying all Tracts within the geographic boundaries of the Unit **Area.** Hydrocarbon saturated rock volume of Unitized Substances for each Tract is determined from the isopach map approved by the Working Interest Owners.

1.11.2  Current Production Parameter for each tract is defined and determined to be a quantity equal to a fraction, the numerator of which is the average current daily rate of oil production of each respective tract and the denominator of which is the sum of the average current daily rate of oil production of all tracts within the geographic boundaries of the Unit Area. The average current daily rate was determined by tests of the currently active wells on each tract that were conducted and approved by the Working Interest Owners.

1.12    "Unit Participation" of each Working Interest Owner means the sum of the percentages obtained by multiplying the Working Interest of such Working Interest Owner in each Tract by the Tract Participation of such Tract.

1.13    "Outside Substances" means all substances obtained from any source other than the Unitized Formation and which are injected into the Unitized Formation.

1.14    "Oil and Gas Rights" means the right to explore, develop, and operate lands within the Unit Area for the production of Unitized Substances, or to share in the production so obtained or the proceeds thereof.

1.15    "Unit Operations" means all operations conducted by Working Interest Owners or Unit Operator pursuant to this agreement and the Unit Operating Agreement.

1.16  "Unit Equipment" means all personal property, lease and well equipment, plants, and other facilities and equipment taken over or otherwise acquired for the joint account for use in Unit Operations.

1.17  "Unit Expense" means all cost, expense, or indebtedness incurred by Working Interest Owners or Unit Operator pursuant to this agreement and the Unit Operating Agreement for or on account of Unit Operations.

1.18  "A Person" means any individual, corporation, company, association, firm, partnership, society,
joint stock company, receiver, trustee, curator, executor, administrator, guardian, tutor, fiduciary or other representative of any kind, any department, agency, or other entity capable of holding title to Oil and Gas Rights or any other interest in the Unit Area.

1.19  "Effective Date" is the time and date this agreement becomes effective as provided in Article 17.

1.20  "Context" Unless the context otherwise clearly indicates, words used in the singular include the plural and the plural includes the singular. The neuter, masculine and feminine genders are interchangeable.

1.21  "Headings" The headings used in this agreement are inserted for convenience and shall not affect the meaning or construction thereof.

## ARTICLE 2
## EXHIBITS

2.1  Exhibits. The following exhibits, which are attached hereto, are incorporated herein by reference:

   2.1.1  Exhibit A is a schedule that describes each Tract in the Unit Area and shows its Tract Participation.

   2.1.2  Exhibit B is a map that shows the boundary lines of the Unit Area, and the Tracts therein.

2.2  Reference to Exhibits. When reference is made to an exhibit, it is to the exhibit as originally attached or, if revised, to the last revision.

2.3  Exhibits Considered Correct. An Exhibit shall be considered to be correct until revised as herein provided.

2.4  Correcting Errors. The shapes and descriptions of the respective Tracts have been established by using the best information available. If it subsequently appears that any Tract, because of diverse Royal Interest or Working Interest ownership on the Effective Date, should be divided into more than one Tract, or that any mechanical miscalculation has been made, Unit Operator, with the approval of Working Interest Owners, may correct the mistake by revising the exhibits to conform to the facts. The revision shall not include any reevaluation of engineering or geological interpretations used in determining Tract Participation. Any such revision of an exhibit made prior to thirty (30) days after the Effective Date shall be effective as of the Effective Date. Each such revision of an exhibit made thereafter shall be effective at 7:00 a.m. on the first day of the calendar month next following the filing for record of the revised exhibit or on such other date as may be determined by Working Interest Owners and set forth in the revised exhibit.

2.5  Filing Revised Exhibits. If an exhibit is revised pursuant to this agreement, Unit Operator shall certify and file the revised exhibit for record in the County in which this agreement is filed and with the Railroad Commission of Texas ("**Commission**").