# ARTICLE 3
## CREATION AND EFFECT OF UNIT

3.1    Oil and Gas Rights Unitized. Subject to the provisions of this agreement, all Oil and Gas Rights of Royalty Owners in and to the lands described in Exhibit A, and all Oil and Gas Rights of Working Interest Owners in and to said lands, are hereby unitized insofar as the respective Oil and Gas Rights pertain to the Unitized Formation, so that operations may be conducted as if the Unitized Formation had been included in a single lease executed by all Royalty Owners, as lessors, in favor of all Working Interest Owners, as lessees, and as if the lease had been subject to all of the provisions of this agreement.

3.2    Personal Property Excepted. All lease and well equipment, materials, and other facilities heretofore or hereafter placed by any of the Working Interest Owners on the Unit Area shall be deemed to be and shall remain personal property belonging to and may be removed by the Working Interest Owners. The rights and interests therein as among Working Interest Owners are covered by the Unit Operating Agreement.

3.3    Amendment of Leases and Other Agreements. The provisions of the various leases, agreements, division and transfer orders, or other instruments covering the respective Tracts or the production therefrom are amended to the extent necessary to make them conform to the provisions of this agreement authorizing the field-wide unitization of the Unitized Formation with the Unit Area but otherwise shall remain in effect as originally written.

3.4    Continuation of Leases and Term Interests. Unit Operations on or production from any part of the Unitized Formation shall be considered as operations on or production from each Tract, and such operations or production shall continue in effect to each Oil and Gas Lease, mineral interest or royalty interest as to all lands and formations covered thereby just as if such operations were conducted on and as if a well were producing from each Tract.

3.5    Titles Unaffected by Unitization. Nothing herein shall be construed to result in the transfer of title to or any cross-assignment of the Oil and Gas Rights by any party hereto to any other party or to Unit Operator. The intention is to provide for the cooperative development and operations of the Tracts and for the sharing of Unitized Substances as herein provided.

3.6    Injection Rights. Royalty Owners hereby grant unto Working Interest Owners the right to inject into the Unitized Formation any substances in whatever amounts Working Interest Owners deem expedient for Unit Operations, including the right to drill and maintain injection wells on the Unit Area and to use, convert or equip any producing or abandoned oil or gas wells for such purposes.

3.7    Development Obligation. Nothing herein shall relieve Working Interest Owners from the obligation to develop reasonably as a whole the lands and leases committed hereto.

# ARTICLE 4
## PLAN OF OPERATIONS

4.1    Unit Operator. Working Interest Owners are, as of the Effective Date of this agreement, entering into the Unit Operating Agreement, designating _____ as the initial Unit Operator. Unit Operator shall have the exclusive right to conduct Unit Operations. In the event that there is a conflict between the provisions of this Unit Agreement and the provisions of the Unit Operating Agreement, then in such event and to the extent of such conflict, the provisions of this Unit Agreement shall prevail.

4.2    Operating Methods. To the end that the quantity of Unitized Substances ultimately recoverable may be increased and waste prevented, Working Interest Owners shall, with diligence and in accordance with good engineering and production practices, engage in an approved recovery operation as determined by the best judgment of the Working Interest Owners by means of the injection of water, gas, air or other substances or any combination of two or more thereof into the Unitized Formation. Working Interest

Owners shall install and operate injection facilities as are in the best judgment of the Working Interest, Owners adapted to the most efficient, practical and economic operations having due regard both to the interest of the Working Interest Owners and Royalty Owners. Such other methods of operation as may from time to time be determined by Working Interest Owners to be feasible, necessary or desirable to efficiently and economically increase the ultimate recovery of Unitized Substances may be conducted by Working Interest Owners.

4.3   Change of Operating Methods. Nothing herein shall prevent Working Interest Owners from discontinuing or changing in whole or in part any method of operation which, in their opinion, is no longer in accord with good engineering or production practices. Other methods of operation may be conducted or changes may be made by Working Interest Owners from time to time if determined by them to be feasible, necessary, or desirable to increase the ultimate recovery of Unitized Substances.

# ARTICLE 5
## TRACT PARTICIPATION

5.1   Tract Participation. The Tract Participation of each Tract is shown in Exhibit A and is equal to three-fourths (3/4) of each tract's Hydrocarbon Reservoir Volume Parameter[1] as that term is herein above defined plus one-fourth (1/4) of each tract's Current Production Parameter[2] as that term is hereinabove defined.
*1 See GI.II. I for the definition of Hydrocarbon Reservoir Volume Parameter*
*2 See I.11.2 for the definition of Current Production Parameter*

# ARTICLE 6
## ALLOCATION OF UNITIZED SUBSTANCES

6.1   Allocation to Tracts. All Unitized Substances produced and saved shall be allocated to the several Tracts in accordance with the respective Tract Participations effective during the period that the Unitized Substances were produced. The amount of Unitized Substances allocated to each Tract, regardless of whether it is more or less than the actual production of Unitized Substances from the well or wells, if any, on such Tract, shall be deemed for all purposes to have been produced from such Tract.

6.2   Distribution Within Tracts. The Unitized Substances allocated to each Tract shall be distributed among, or accounted for, to the parties entitled to share in the production from such Tract in the same manner, in the same proportions, and upon the same conditions as they would have participated and shared in the production from such Tract, or in the proceeds thereof, had this agreement not been entered into, and with the same legal effect. If any Oil and Gas Rights in a Tract hereafter become divided and owned in severalty as to different parts of the Tract, the owners of the divided interests, in the absence of any agreement providing for a different division, shall share in the Unitized Substances allocated to the Tract, or in the proceeds thereof, in proportion to the surface acreage of their respective parts of the Tract. Any royalty or other payment which is in anyway predicated upon per well production volumes or pipeline runs from a well or wells on a Tract shall, after the Effective Date, be determined by dividing the Unitized Substances allocated to the Tract by the number of wells on the Tract capable of producing Unitized Substances on the Effective Date; however, if any Tract has no well thereon capable of producing Unitized Substances on the Effective Date, the Tract shall, for the purpose of this determination, be deemed to have one such well thereon.

6.3   Royalty Owners Taking Unitized Substances in Kind. The Unitized Substances (insofar only as it applies to the production of crude oil and/or condensate) allocated to each Tract may, with the consent of the Unit Operator, and if authorized by the underlying oil and gas lease, be delivered in kind to the Royalty Owners, or their assigns, entitled thereto by virtue of the ownership of Oil and Gas Rights therein or by purchase from such Royalty Owners. Any extra expenditures incurred by Unit Operator by reason of the delivery in kind of any portion of the oil and/or condensate shall be home by the receiving party.

6.4   Royalty Owner's Failure to Take in Kind. If at any time and from time to time any

Royalty Owner fails to take in kind or separately dispose of such Person's share of Unitized Substances, Unit Operator shall have the right, but not the obligation, for such time, subject to revocation at will by the Royalty Owner owning the share, to purchase or sell to others such share. The proceeds of the Unitized Substances so disposed of by Unit Operator shall either be paid to the Working Interest Owners of each affected Tract or to a person designated in writing by such Royalty Owners to receipt for such proceeds, who shall thereafter distribute such proceeds to the Persons entitled thereto. It is expressly provided that payment by Unit Operator to such party designated by a Royalty Owner to receipt for proceeds from Unit Operator's sale of Unitized Substances shall constitute payment by Unit Operator to such Royalty Owner for all purposes under this agreement.

6.5    Responsibility or Royalty Settlements. Any Person receiving in kind or separately disposing of all or part of the Unitized Substances allocated to any Tract or receiving the proceeds therefrom if same is disposed of by Unit Operator shall be responsible for the payment of all royalties, overriding royalties, production payments, severance taxes (subject to the provisions of 6.7 below) and all other payments chargeable against or payable out of such Unitized Substances or the proceeds there from and shall indemnify all Persons, including Unit Operator, against any liability for such payment. In the event a party fails to take and dispose of its part of Unitized Substances in kind, and subject to the provisions of Article 6.4, the Unit Operator or the purchaser of the Unitized Substances will make settlement for the proceeds of such production under its Division Order.

6.6    Royalty on Outside Substances. There shall be no royalty payable on Outside Substances. If any Outside Substances injected into the Unitized Formation be liquid or gas petroleum hydrocarbons or other non-petroleum gases and the Unitized Substances subsequently produced contain such gases or hydrocarbons as determined by fractional analysis or other appropriate tests, the Working Interest Owners shall have the right to recover such contained gases or hydrocarbons, or their equivalent value from such Unitized Substances, without payment of royalty thereon. If any Outside Substances of value are injected into the Unitized Formation, and such Outside Substances cannot be distinguished from Unitized Substances, then fifty percent (50%) of any like substances contained in Unitized Substances subsequently produced and sold, or used for other than Unit Operations, shall be deemed to be Outside Substances until the aggregate of said fifty percent (50%) equals the accumulated volume of such Outside Substances injected into the Unitized Formation, and no payments shall be due or payable to Royalty Owners on such Outside Substances.

## ARTICLE 7
## PRODUCTION AS OF THE EFFECTIVE DATE

7.1    Oil in Lease Tanks. Unit Operator shall gauge all lease and other tanks within the Unit Area to ascertain the amount of merchantable oil produced from the Unitized Formation in such tanks, above the pipe line connections, as of 7:00 a.m. on the Effective Date. The oil that is a part of the prior allowable of the wells from which it was produced shall remain the property of the parties entitled thereto the same as if the unit had not been formed. Any such oil not promptly removed may be sold by the Unit Operator for the account of the parties entitled thereto, subject to the payment of all royalties, overriding royalties, production payments, and all other payments under the provisions of the applicable lease or other contracts. The oil that is in excess of the prior allowable of the wells from which it was produced shall be regarded as Unitized Substances produced after Effective Date hereof. The ownership of any oil in tanks as of the Effective Date shall be deemed owned by the working interests immediately prior to the Effective Date.

7.2    Overproduction. If, as of the Effective Date hereof, any Tract is overproduced with respect to the allowable of the wells on that Tract and the amount of overproduction has been sold or otherwise disposed of, such overproduction shall be regarded as a part of the Unitized Substances produced after the Effective Date hereof and shall be charged to such Tract as having been delivered to the parties entitled to Unitized Substances allocated to such Tract

**ARTICLE 8**
**USE OR LOSS OF UNITIZED SUBSTANCES**

8.1     Use of Unitized Substances. Working Interest Owners may use or consume Unitized
Substances for Unit Operations including, but not limited to, the injection thereof into
the Unitized Formation. No royalty, overriding royalty, production or other payments
shall be payable on account of Unitized Substances used, lost or consumed in Unit
Operations, including any Unitized Substances reinjected into the Unitized Formation.

8.2     Royalty Payments. Royalty, overriding royalty, production and other payments shall be
payable only on Unitized Substances actually sold by the Unit Operator or other
Working Interest Owner. The Unit Operator is authorized to deliver in kind to Royalty
Owners the amount of Unitized Substances to which they are entitled under the
provisions of their lease or other contract and/or the Unit Agreement and to deduct such
amounts from the share of each Working Interest Owner responsible therefor.
Settlement for Royalty Interest Owners in each Tract responsible therefore under
existing contracts, laws and regulations, shall be in accordance with the provisions of
Article 6.6 hereof.

**ARTICLE 9**
**TRACTS TO BE INCLUDED IN UNIT**

9.1     Tracts Included in Unit Area. On and after the Effective Date hereof, the Unit Area shall
be composed of the Tracts which are described in Exhibit A and delineated in Exhibit B
and which are included within the Unit Area by order of the Railroad Commission of
Texas.

**ARTICLE 10**
**TITLES**

10.1    Warranty and Indemnity. Each Person who, by acceptance of produced Unitized
Substances or the proceeds thereof, may claim to own a Working Interest or Royalty
Interest in and to any Tract or in the Unitized Substances allocated thereto, shall be
deemed to have warranted its title to such interest and, upon receipt of the Unitized
Substances or the proceeds thereof to the credit of such interest, shall indemnify and hold
harmless all other Persons in interest from any loss due to failure, in whole or in part, of
its title to any such interest, except that if title to a Working Interest fails, the rights and
obligations of Working Interest Owners among themselves by reason of failure of title
shall be governed by the Unit Operating Agreement.

10.2    Production Where Title is in Dispute. If the title or right of any Person claiming the right
to receive in kind all or any portion of the Unitized Substances allocated to a Tract is in
dispute, Unit Operator at the direction of Working Interest Owners shall either:

(a) require that the Person to whom such Unitized Substances are delivered or to
whom the proceeds thereof are paid furnish security for the proper accounting
theretherefor to the rightful owner if the title or right of such Person fails in whole or
in part; or

(b) withhold and market the portion of the Unitized Substances with respect to which
title or right is in dispute and impound the proceeds thereof until such time as the
title or right thereto is established by a final judgment of a court of competent
jurisdiction or otherwise to the satisfaction of Working Interest Owners
whereupon the proceeds so impounded shall be paid without interest to the
Person rightfully entitled thereto.

10.3    Payment of Taxes to Protect Title. If any ad valorem taxes, present or future, or other
taxes or assessments affecting title, either now or hereafter legally becoming due and
payable, are not paid by or for any owner of surface rights to lands within the Unit Area,
or severed mineral interests, Royalty Interests or Working Interests in such lands, or
lands outside the Unit Area on which Unit Equipment is located, Unit Operator may,
with approval of a majority of the Working Interest Owners, at any time prior to tax sale,

or expiration of period of redemption after tax sale, pay the tax, redeem such rights, interests, or property, and discharge the tax lien. Any such payment shall be an item of Unit Expense. Unit Operator shall, if possible, withhold from any proceeds derived from the sale of Unitized Substances otherwise due any delinquent taxpayer an amount sufficient co defray or recoup the costs of such payment or redemption, such withholding to be credited to Working Interest Owners. Such withholding shall be without prejudice to any other remedy available to Unit Operator or the Working Interest Owners.

10.4   Underlying Agreements. Nothing contained herein shall be construed as altering or impairing the provisions of any leases or ocher agreements with reference to the proportionate reduction of royalties, overriding royalties, payments out of production, and other obligations, and irrespective of the provisions of any such leases and other agreements, it is understood and agreed that in the event any Royalty Owner or Working Interest Owner owns less than the entirety of the interest or interests claimed by or certified to him in a division order, transfer order, or other- agreement, with reference to any Tract, all payments to such party shall be reduced to the proportionate interest actually owned by him in such Tract.

## ARTICLE 11
## EASEMENTS OR USE OF SURFACE

11.1   Grant of Easements. Each Person bound by this agreement, to the extent of its rights and interests, hereby grants to Working Interest Owners the right to use as much of the surface of the land within the Unit Area as may be reasonably necessary for Unit Operations and the removal of Unitized Substances from the Unit Area; however, nothing herein shall be construed as leasing or otherwise conveying to Working Interest Owners a camp site or a plant site if not already provided for in the lease granted by such Person.

11.2   Use of Water. Except as expressly provided in any underlying oil and gas lease, nothing herein contained shall be deemed to grant to Working Interest Owners the right to use the surface water of any surface owner which is suitable for drinking by humans or animals or for agricultural purposes; however, Royalty Owners hereby grant to Working Interest Owners the use at no charge of all other non-potable water from the Unit Area for Unit Operations. Subject to any restrictions in any underlying Oil and Gas lease, the Working Interest Owners shall have the right to drill, equip, maintain and produce water supply wells from sources of supply which do not interfere with or restrict the water available to any surface owner and/or Royalty Owner for human and/or animal consumption or agricultural purposes. The Working Interest Owners shall not have the right under this agreement to use water for the commercial production of brine.

11.3   Surface Damages. Working Interest Owners shall pay the surface owner for damages to growing crops, timber, fences, improvements and structures on the Unit Area that result from Unit Operations as provided in the underlying oil and gas leases.

## ARTICLE 12
## ENLARGEMENTS OF UNIT AREA

12.1   Enlargements of Unit Area. The Unit Area may be enlarged from time to time, in accordance with the rules and regulations of the Railroad Commission of Texas, to include lands added to the Unit Area reasonably proved to be productive upon such terms as may be determined by Working Interest Owners. Such terms shall include but need not be limited to the following:

12.1.1   The Unit Area may be enlarged from time to time with the consent of Royalty Owners and Working Interest Owners owning not less than a 75% interest in the existing unit lands and not less than 75% in the additional lands. Upon such approval being obtained the Unit Area may be enlarged to include additional lands reasonably proved to be productive from the Unitized Formation upon (1) the written agreement to the enlargement and ratification of this agreement and the Unit Operating Agreement by the Working Interest Owners owning not less than seventy-five percent (75%) in interest, as costs are shared, In the area to be

added, (2) together with the written consent and approval of Working Interest Owners owning not less than seventy-five percent (75%) in interest, as costs are shared, of the existing Unit Area before enlargement, and (3) the written agreement to the enlargement and ratification of this agreement by the Royalty Owners owning not less than seventy-five percent (75%) in interest in the area to be added.

12.1.2   The participation to be allocated to the lands added to the Unit Area shall be fair and reasonable, considering all available information, and in conformity with the laws of the State of Texas.

12.1.3   There shall be no retroactive allocation or adjustment of Unit Expenditures or of interests in the Unitized Substances produced, or the proceeds thereof, by reason of an enlargement of the Unit Area; provided, however, this limitation shall not prevent an adjustment of investment among the Working Interest Owners pursuant to the Unit Operating Agreement.

12.1.4   If the Unit Area is enlarged, the revised Tract Participation of the Tracts which were within the Unit Area prior to the enlargement shall remain in the same ratio one to another as they existed prior to the enlargement.

12.1.5   If the Unit Area is enlarged, the Tract Participation of the Tracts which are within the area to be enlarged, shall be determined using the allocation formula as defined in Article 5.1 of this agreement together with all other currently available engineering and geological data.

12.2   Determination Tract Participation. Unit Operator, subject to Article 5.1 and to the terms of the enlargement agreement determined under Article 12.1 above, shall compute, based upon the allocation formula denned in Article 5.2, the Tract Participation of each Tract within the Unit Area as enlarged, and shall revise Exhibits A and B accordingly.

12.3   Effective Date. The Effective Date of any enlargement of the Unit Area shall be 7:00 a.m. on the first day of the calendar month following compliance with conditions for enlargement as specified by Working Interest Owners and the filing for record of revised Exhibits A and B in the county in which this agreement is recorded, and as ordered by the Railroad Commission of Texas.

## ARTICLE 13
## TRANSFER OF TITLE – PARTITION

13.1   Transfer of Title. Any conveyance of all or any part of any interest owned by any party hereto with respect to any Tract shall be made expressly subject to this agreement. No change of title shall be binding upon Unit Operator, or upon any party hereto other than the party so transferring, until 7:00 a.m. on the first day of the calendar month next succeeding the date of receipt by Unit Operator of a certified copy of the recorded instrument evidencing such change in ownership, or such other documentary evidence as the Unit Operator, ot its legal counsel shall approve from time to time.

13.2   Waiver of Rights to Partition. Each party hereto agrees that during the existence of this agreement, it will not resort to any action to partition the Unitized Formation or the Unit Equipment, and to that extent waives the benefits of all laws authorizing such partition.

## ARTICLE 14
## RELATIONSHIP OF PARTIES

14.1   No Partnership. The duties, obligations, and liabilities of the parties hereto are intended to be several and not joint or collective. This agreement Is not intended to create, and shall not be construed to create, an association or trust, or to impose a partnership duty, obligation, or liability with regard to any one or more of the parties hereto. Each party hereto shall be individually responsible for its own obligations as herein provided.

14.2   No Joint Refining or Marketing. This agreement is not intended to provide, and shall not be construed to provide, directly or indirectly, for any joint refining or marketing of Unitized Substances.

14.3   Royalty Owners Free of Costs. This agreement is not intended to impose, and shall not be construed to impose, upon any Royalty Owner any obligation to pay Unit Expense unless such Royalty Owner is otherwise so obligated.

14.4   Information to Royalty Owners. Each Royalty Owner shall be entitled to all information in possession of Unit Operator to which such Royalty Owner is entitled by an existing agreement with any Working Interest Owner.

## ARTICLE 15
## LAWS AND REGULATIONS

15.1   Laws and Regulations. This agreement shall be subject to all applicable federal, state, and municipal laws, rules, regulations, and orders.

15.2    Governing Law. This agreement shall be subject to and governed by the laws of the State of Texas. Any and all obligations of the respective parties shall be deemed to be due and performable in Marion County, Texas.

15.3   Severability. If any provision of this agreement shall, for any reason, be held violative of any applicable law, and so much of said agreement is held to be unenforceable, then the invalidity of such a specific provision herein shall not be held to invalidate any provisions herein, which other provisions shall remain in full force and effect unless removal of said invalid provisions destroys the legitimate purposes of this agreement, in which event this agreement shall be canceled.

## ARTICLE 16
## FORCE MAJEURE

16.1   Force Majeure. All obligations imposed by this agreement on each party, except for the payment of money, shall be suspended while compliance is prevented, in whole or in part, by a labor dispute, fire, war, civil disturbance, act of God; by federal, state, or municipal laws; by any rule, regulation, or order of a governmental agency; by inability to secure materials; or by any other cause or causes, whether similar or dissimilar, beyond reasonable control of the party. No party shall be required against its will to adjust or settle any labor dispute. Neither this agreement nor any lease or other instrument subject hereto shall be terminated by reason of suspension of Unit Operations due to any one or more of the causes set forth in this Article.

## ARTICLE 17
## EFFECTIVE DATE

17.1   Effective Date. This agreement shall become binding upon all parties who execute or ratify it as of the date of execution or ratification by such party and shall become effective notwithstanding the fact that one or more of the Working Interest Owners or one or more of the Royalty Owners shall fail or refuse to execute or ratify this agreement when the conditions for effectiveness have been met as follows:

(a) when the same has been executed or ratified by parties who own of record legal title to not less than an undivided seventy-five percent (75%) interest of the Working Interest in the total Unit Area and by parties who own of record legal title to not less than seventy-five (75%) in interest of the Royalty Interest in the total Unit Area (for the purpose of this provision, with respect to an interest which is encumbered of record with a mortgage or deed of trust, both the granter and grantee therein shall be considered as the record owner of legal title thereto, except that when the instrument gives the granter in such mortgage or deed of trust the right to execute a Unit Agreement, the granter shall be deemed the record owner); and

(b) when an order has been issued by the Railroad Commission of Texas approving Unit Operation of the Unit Area in accordance with the terms of this agreement and the Unit Operating Agreement.

The Effective Date of the unit shall be as specified in the order of the Commission. If, however, this agreement does not become effective on or before_____, then this agreement shall ipso facto terminate unless extended as hereinafter provided in Article 17.2. If said termination date is extended and this agreement does not become effective on or before said extended termination date, this agreement shall ipso facto terminate on said extended termination date, and thereafter be of no further force or effect. For the purpose of this article, and except as hereinabove specifically provided in Section 17.1, ownership shall be computed on the basis of the Tract Participation set forth in Exhibit "B". This agreement shall become binding upon each party as of the date such party signs the instrument by which it becomes a party hereto and binding on all other parties as of the date of entry of the Commission's order described below, and, unless sooner terminated as provided in Article 17.2, shall become effective as of the time set by an order of the Commission pursuant to _____ for the commencement of Unit Operations.

17.2   Ipso Facto Termination. If this agreement has not become effective on or before _____, 20__, it shall ipso facto terminate on that date (hereinabove called "termination date") and thereafter be of no further effect, unless prior thereto this Unit Agreement and the Unit Operating Agreement have been executed by Working Interest Owners who own of record legal title to not less than an undivided seventy-five percent (75%) interest in the right to drill into and produce oil and gas from the proposed Unitized Area and by Persons who, at that time, owned of record legal title to not less than seventy-five percent (75%) of royalty and overriding royalty payable with respect to oil or gas produced from the entire Unit Area. If Working Interest Owners who own not less than seventy-five percent (75%) or more of the right to drill and produce from the Unitized Area and the Royalty Interest Owners who own not less than seventy-five percent (75%) of the royalty payable with respect to Unitized Substances produced from the entire Unit Area that percent elect to extend the termination date for an additional period not to exceed one year, then in that event the time to acquire the necessary signatures for ratification of this agreement and the Unit Operating Agreement shall be so extended. If the termination date is so extended and this agreement does not become effective on or before the extended termination date, this agreement shall ipso facto terminate on the extended termination date and thereafter be of no further effect.

17.3   Certificate of Effectiveness. Unit Operator shall file for record in Marion County, Texas, a certificate stating the Effective Date, containing a description or plat of the land included within the Unit Area and containing the docket number and date of the Railroad Commission of Texas Order or Orders making effective this agreement with an appropriate reference to such Order or Orders and the files of the Commission for further information concerning this agreement. A like declaration shall also be filed with the Commission.

## ARTICLE 18
## TERM

18.1   Term. The term of this agreement shall be for the time that Unitized Substances are produced in paying quantities or other Unit Operations are conducted without a cessation of more than ninety (90) consecutive days.

18.2   Termination by Working Interest Owners. This agreement may be terminated by Working Interest Owners owning a combined Unit Participation of seventy-five percent (75%) or more whenever such Working Interest Owners determine that Unit Operations are no longer profitable or feasible.

18.3   Effect of Termination. Upon termination of this agreement, the further development and operation of the Unitized Formation as a unit shall be abandoned, and Unit Operations shall cease. Each oil and gas lease and other agreement covering lands within the Unit Area shall remain in force for sixty (60) days after the date on which this agreement

terminates and for such further period as is provided by the lease or other agreement.

18.4 <u>Salvaging Equipment Upon Termination.</u> If not otherwise granted by the leases or other instruments affecting each Tract, Royalty Owners hereby grant Working Interest Owners a period of six (6) months after the date of termination of this agreement within which to salvage and remove Unit Equipment.

18.5 <u>Certificate of Termination.</u> Upon termination of this agreement, Unit Operator shall file for record in Marion County, Texas, a certificate that this agreement has terminated, stating its termination date, and a like certificate shall be filed with the Commission.

**ARTICLE 19**
**EXECUTION**

19.1 <u>Original Counterpart</u> or <u>Other Instrument.</u> A Person may become a party to this agreement by signing the original of this instrument, a counterpart thereof, a separate ratification, or any other instrument agreeing to be bound by the provisions hereof. The signing of any such instrument shall have the same effect as if all the parties had signed the same instrument.

19.2 <u>Joinder in Dual Capacity</u> Execution as herein provided by any party as either a Working Interest Owner or a Royalty Owner shall commit all interests that may be owned or controlled by such party.

**ARTICLE 20**
**GENERAL**

20.1 <u>Amendments Affecting Working Interest Owners.</u> Amendments hereto relating wholly to Working Interest Owners may be made if signed by all Working Interest Owners. Execution of this agreement shall constitute approval of the Unit Operating Agreement.

20.2 <u>Action by Working Interest Owners.</u> Any action or approval required by Working Interest Owners hereunder shall be in accordance with the provisions of the Unit Operating Agreement.

20.3 <u>Conversion of Royalty to Working Interest.</u> Any Royalty Interest which is convertible to a Working Interest upon the happening of a certain event will be treated as a Royalty Interest until such time as the event triggering conversion occurs and notice of the conversion has been given to the Unit Operator. The conversion of a Royalty Interest to a Working Interest shall be treated as a change in ownership and be made subject to the provisions set forth in Section 12.2 of this agreement.

20.4 <u>Division Orders and Transfer Orders.</u> Any division order or transfer order in effect on the Effective Date hereof which pertains to Unitized Substances made subject hereto, shall remain in force and effect unless otherwise terminated and, such division order or transfer order shall be deemed to be modified to the extent necessary to conform to this agreement and, in particular, to the allocation provisions hereof.

**ARTICLE 21**
**SUCCESSORS AND ASSIGNS**

21.1 <u>Successors and Assigns.</u> This agreement shall extend to, be binding upon and inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and, upon approval by the Commission, shall extend to, be binding upon and inure to the benefit of all parties owning an interest in the Unit Area, their respective heirs, devisees, legal representatives, successors and assigns, and shall constitute a covenant running with the lands, leases and interests covered hereby.

THUS DONE AND SIGNED This _____ day of _____, 2013, but effective as of the _____ day of _____, 2013.

SKLAR EXPLORATION COMPANY L.L.C.


By_____
  David A. Barlow
  President - Chief Operating Officer

SKLARCO L.L.C.


By_____
  David A. Barlow
  President - Chief Operating Officer

MCCOMBS ENERGY, LTD.


By_____
  Ricky Haikin
  Vice President

TAUBER EXPLORATION & PRODUCTION CO.


By_____
  Richard Tauber
  Manager


_____
  FLEET HOWELL

BUNDERO INVESTMENT COMPANY, L.L.C.


By_____
  Robert P. Bowman
  Manager


TIEMBO, LTD.


By_____
  Mark Rauch
  Registered Agent


PICKENS FINANCIAL GROUP, L.L.C.


By_____
  Michael K. Pickens,
  Vice President

FANT ENERGY LIMITED
By:  Richard E. Fant, LLC, the General Partner of
      Fant Energy Limited


By_____
        Stephen Swan, Manager



SANTO PETROLEUM LLC


By_____
        Tobin L. Rhodes
        Executive Vice President



JJS WORKING INTERESTS LLC
By:    Houston Bulldog Capital Management, LLC


By_____
        Justin Simons
        Manager



KUDZU OIL PROPERTIES, L.L.C.


By_____
        R. Nash Neyland
        Executive Vice President

MARKSCO, L.L.C.


By_____
        Mark P. Sealy
        Member

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

       I, _____, a notary public in and for said County and State, hereby certify that Richard Tauber, whose name as President of TAUBER EXPLORATION AND PRODUCTION COMPANY, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

       Given under my hand and notarial seal this the _____ day of _____, 2013.

                                          _____
                                          NOTARY PUBLIC

STATE OF TEXAS

COUNTY OF _____

STATE OF LOUISIANA

PARISH OF CADDO

       I, _____, a notary public in and for said Parish and State, hereby certify that FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

       Given under my hand and notarial seal this the _____ day of _____, 2013.

                                          _____
                                          NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

       Given under my hand and notarial seal this the _____ day of _____, 2013.

                                          _____
                                          NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                _____
                                NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as Vice President for PICKENS FINANCIAL GROUP, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                  _____
                                NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Stephen Swan, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                  _____
                                  NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF _____

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Tobin L. Rhodes, whose name as Executive Vice President for SANTO PETROLEUM, LLC, a Delaware limited liability corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said corporation.

      Given under my hand and notarial seal this the _____ day of _____, 2013.


                                         _____
                                         NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF HARRIS

      I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.


                                         _____
                                         NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____


STATE OF MISSISSIPPI

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.


                                         _____
                                         NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.


                                        _____
                                        NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

Exhibit "A"

**Legal Descriptions and Tract Participation Factors**

Exhibit "B"

Woodlawn Field Unit Plat

Exhibit "C"

| Working Interest Owner | Unit Acres | Unit Percentage |
|---|---|---|

Exhibit "D"

COPAS

Exhibit "E"

**INSURANCE**

Operator shall carry the following insurance with the limits stipulated below for the Joint Account. Operator shall have the right to charge the Joint Account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the Joint Account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of insurance will be provided upon request.

I.   WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

Workers' Compensation Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

Employers Liability Insurance coverage at limits of $1,000,000 each accident for bodily injury by accident/$1,000,000 policy limit for bodily injury by disease/$1,000,000 each employee for bodily injury by disease.

II   COMPREHENSIVE GENERAL LIABILITY

Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $1,000,000 for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III   AUTOMOBILE LIABILITY

Coverage shall include owned, non-owned and hired vehicles. Limit $1,000,000 combined single limit each occurrence for bodily injury and property damage.

IV   EXCESS LIABILITY

Operator shall carry excess liability insurance in an amount of $10,000,000.

V.   EXTRA EXPENSE LIABILITY

Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $200,000 per occurrence.

Liability Limit: $5,000,000

VI.   OIL LEASE PROPERTY

Oil Lease Property Insurance (Inland Marine) covering tanks, pumps, machinery, pipe and similar equipment of a mobile nature usual to the operation of a producing oil or gas well and crude oil while contained in tanks with limit of not less than $10,000,000 and subject to a deductible of $5,000.

VII.   ADDITIONAL INSURANCE

Operator shall be entitled to carry or provide any additional insurance for the benefit of the Joint Account, which is of direct benefit to the joint property and is incurred by the Operator in the necessary and proper conduct of the joint operations. The premium for all such insurance so carried shall be paid by Operator and charged to the Joint Account. Operator shall, at any time requested, furnish Non-Operator with information concerning the kind, character and amounts of insurance carried.

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder. Further, any party, at its own expense, may carry its own coverage for Extra Expense Liability Insurance with limits as set forth in Section V, above. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

Exhibit "F"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

# Woodlawn Field Unit Operating Agreement
# Pettet Formation, Woodlawn Field
# Marion County, Texas

THIS AGREEMENT, entered into by the parties who have signed the original of this instrument, a counterpart thereof, or other instrument agreeing to be bound by the provisions hereof;

WITNESSETH:

WHEREAS, the parties hereto as *Working Interest Owners* have executed, as of the date hereof, an agreement entitled *Woodlawn Field Unit Agreement, Woodlawn Field, Marion County, Texas,* herein referred to as the *Woodlawn Field Unit Agreement,* which, among other things, provides for a separate agreement to be entered into by *Working Interest Owners* to provide for *Unit Operations* as therein defined,

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, it is agreed as follows:

## ARTICLE 1

### CONFIRMATION OF UNIT AGREEMENT

1.1 Confirmation of *Woodlawn Field Unit Agreement.* The *Woodlawn Field Unit Agreement* is hereby confirmed and by reference made a part of this Agreement. The definitions in the *Woodlawn Field Unit Agreement* are adopted for all purposes of this Agreement. If there is any conflict between the *Woodlawn Field Unit Agreement* and this Agreement, then in such event and to the extent of any such conflict, the provisions of the *Woodlawn Field Unit Agreement* shall govern.

## ARTICLE 2

### EXHIBITS

2.1 Exhibits. The following exhibits are incorporated herein by reference:

2.1.1 Exhibits A and B of the *Woodlawn Field Unit Agreement* (named here for the sake of completeness but already incorporated by reference in Article I above).

2.1.2 Exhibit C, attached hereto and made a part hereof, is a schedule showing the *Working Interest* of each *Working Interest Owner* in each Tract, the percentage of total *Unit Participation* attributable to each such interest, and the *Unit Participation* of each *Working Interest Owner.* Exhibit C, or a revision thereof, shall not be conclusive as to the information therein, except it may be used as showing the *Unit Participations* of *Working Interest Owners* for purposes of this

Agreement until shown to be in error and revised as herein authorized.

2.1.3    Exhibit D, attached hereto and made a part hereof, is the Accounting Procedure applicable to *Unit Operations.* If there is any conflict between the provisions of this Agreement and the provisions of Exhibit D, then in such event and to the extent of any such conflict, the provisions of this Agreement shall govern.

2.1.4    Exhibit E, attached hereto and made a part hereof, contains insurance provisions applicable to *Unit Operations.*

2.2    Revision of Exhibits. If at any time Exhibits A and B are revised, Exhibit C shall be concurrently revised to reflect the effect of any such revision(s) to Exhibit A and B hereof. *Unit Operator* shall also revise Exhibit C from time to time as required to conform to changes in ownership of which *Unit Operator* has been notified as provided in the *Woodlawn Field Unit Agreement.* Upon request by any non-operator, the *Unit Operator* shall provide such amended exhibits to the non-operator requesting such exhibits.

2.3    Reference to Exhibits. When reference is made herein to an exhibit, it is to the exhibit as originally attached or incorporated by reference, or if revised, to the last revision.

# ARTICLE 3

## SUPERVISION OF OPERATIONS
## BY WORKING INTEREST OWNERS

3.1    Overall Supervision. *Working Interest Owners* shall exercise overall supervision and control of all matters pertaining to *Unit Operations* pursuant to this Agreement and the Woodlawn Field Unit Agreement. In the exercise of such authority, each *Working Interest Owner* shall act solely in its own behalf in the capacity of an individual owner and not on behalf of the owners as an entirety.

3.2    Specific Authority and Duties. The matters with respect to which *Working Interest Owners* shall decide and take action shall include, but not be limited to, the following:

3.2.1    Method of Operation. The method of operation, including the type or types of pressure maintenance, secondary recovery or other recovery program to be employed.

3.2.2    Drilling of Wells. The drilling of any well whether for production of *Unitized Substances,* for use as an injection well, or for other purposes.

3.2.3    Well Recompletions and Change of Status. The recompletion, abandonment or change of status of any well, or the use of any well where contractually permitted for injection or other purposes.

3.2.4    Expenditures. The making of any single expenditure in excess of Fifty Thousand Dollars ($50,000.00); however, approval by *Working Interest Owners* to the drilling, reworking, deepening or plugging back of any well shall also include approval of all necessary expenditures required therefor, and for completing, testing and equipping the well, including, but not limited to, necessary flow lines, separators and tankage.

3.2.5    Disposition of *Unit Equipment.* The selling or otherwise disposing of any major

item of surplus *Unit Equipment* if the current price of new equipment similar thereto is Five Thousand Dollars ($5,000.00) or more.

3.2.6   Appearance Before a Court or Regulatory Agency. The designation of a representative to appear before any court or regulatory agency in matters pertaining to *Unit Operations;* however, such designation shall not prevent any *Working Interest Owner* from appearing in person or from designating another representative in its own behalf.

3.2.7   Audits. The auditing of the accounts of *Unit Operator* pertaining to *Unit Operations* hereunder; however, the audits shall:

   a)   not be conducted more than once each year except upon the resignation or removal of *Unit Operator,* and

   b)   be made upon the approval of the *Working Interest Owner* or owners of a majority of the *Unit Participation* other than that of *Unit Operator,* at the expense of all *Working Interest Owners* other than *Unit Operator;*

   c)   be made at the expense of those *Working Interest Owners* requesting such audit, if owners of less than a majority of the *Unit Participation,* other than that of *Unit Operator,* request such an audit; and

   d)   be made upon not less than thirty (30) days written notice to *Unit Operator.*

3.2.8   Inventories.  The taking of periodic inventories under the terms of Exhibit D.

3.2.9   Technical Services.  The authorizing of charges to the joint account for services by consultants or *Unit Operator's* technical personnel not covered by the overhead charges provided for in Exhibit D.

3.2.10  Assignments to Committees.  The appointment of committees to study any problems in connection with *Unit Operations.*

3.2.11  Removal of *Unit Operator.* The removal of *Unit Operator* and the selection of a successor.

3.2.12  Enlargement of the *Unit Area.* The enlargement of the *Unit Area.*

3.2.13  Acquisition of the Right to Use Injection Wells. The acquisition of the right to use injection wells lying inside and outside the Unit Area.

3.2.14  Adjustment of Investments. The adjustment and readjustment of investments.

3.2.15  Termination. The termination of the Woodlawn Field Unit Agreement.

3.2.16  Working Fund. The determination of an amount necessary to provide a reasonable working fund for *Unit Operator.*

3.2.17  Gas Processing and Balancing Agreements. The approval of any agreements with any gas processing plants in connection with the handling, monitoring and balancing of gas and plant liquids.

## ARTICLE 4

### MANNER OF EXERCISING SUPERVISION

4.1    <u>Designation Representatives</u>. Each *Working Interest Owner* shall inform *Unit Operator* in writing of the names and addresses of the representative and alternate who are authorized to represent and bind such *Working Interest Owner* with respect to *Unit Operations.* The representative or alternate may be changed from time to time by written notice to *Unit Operator.*

4.2    <u>Meetings.</u>  All meetings of *Working Interest Owners* shall be called by *Unit Operator* upon its own motion or at the request of one or more *Working Interest Owners* having a total *Unit Participation* of not less than ten percent (10%). No meeting shall be called on less than fourteen (14) days advance written notice, with agenda for the meeting attached. *Working Interest Owners* who attend the meeting may amend items included in the agenda and may act upon an amended item or other items presented at the meeting. The representative of *Unit Operator* shall be chairman of each meeting. Notice of each meeting shall specify the time and place of meeting. Meetings will be held at the offices of the Unit Operator unless the Unit Operator specifies otherwise.

4.3    <u>Voting Procedure</u>. *Working Interest Owners* shall decide all matters coming before them as follows:

4.3.1    <u>Voting Interest</u>. Each *Working Interest Owner* shall have a *Voting Interest* equal to its *Unit Participation.*

4.3.2    <u>Vote Required</u>. Unless otherwise provided herein or in the Woodlawn Field Unit Agreement, *Working Interest Owners* shall prescribe and control the method of all operations, grant all specific authorities and duties, determine the drilling and completion of new wells, and/or the plugging and abandonment of all old wells, and without limitation determine all other matters appurtenant to the conduct of operations and management of the properties subject to this Agreement by the affirmative vote of *Working Interest Owners* having a combined *Voting Interest* of at least sixty-five percent (65%).

4.3.3    <u>Vote at Meeting by Nonattending *Working Interest Owner.*</u> Any *Working Interest Owner* who is not represented at a meeting may vote on any agenda item by letter or telegram addressed to the representative of *Unit Operator* if its vote is received prior to the vote at the meeting or by written proxy in favor of another *Working Interest Owner* or *Owners* represented at the meeting.

4.3.4    <u>Poll Votes</u>. *Working Interest Owners* may vote on and decide, by letter, facsimile transmission (FAX), or telegram, any matter submitted in writing by *Unit Operator* on its own motion or at the request of one or more *Working Interest Owners* having a total *Unit Participation* of not less than ten percent (10%). If a meeting is not requested, as provided in Article 4.2, within fourteen (14) days after a written proposal is sent to *Working Interest Owners,* the vote taken by letter, facsimile transmission (FAX), or telegram shall become final. *Unit Operator* will give prompt notice of the results of such voting to all *Working Interest Owners.* Failure to reply within sixty (60) days from the date the written proposal is sent shall be counted as a vote against the proposal.

## ARTICLE 5

### INDIVIDUAL RIGHTS OF WORKING INTEREST OWNERS

5.1    *Unit Participation of Working Interest Owners.*  Whenever in this Agreement a reference Is made to the *Unit Participation* of a *Working Interest Owner* or the *Unit Participations*

of the *Working Interest Owners,* whether for the purpose of sharing an expense, for participation in benefits hereunder or for the voting upon or approval of any matter, such reference shall mean the *Unit Participation* or Participations in effect at the time the expense was incurred, the benefit was received, the vote taken or the approval made, unless otherwise specifically provided herein.

5.2   Reservation of Rights. *Working Interest Owners* severally reserve to themselves all their rights, except as otherwise provided or specifically waived within this Agreement and the Woodlawn Field Unit Agreement.

5.3   Specific Rights. Each *Working Interest Owner* shall have, in addition to all other rights or actions not specifically waived, the following specific rights:

5.3.1   Access to Unit Area and Unit Records. Access at all reasonable times to the *Unit Area* to inspect *Unit Operations,* all wells and the records and data pertaining thereto during regular office hours, but such access shall be at such *Working Interest Owner's* sole cost, risk and expense.

5.3.2   Reports. The right to receive from *Unit Operator,* upon written request, copies of all reports to any governmental agency, reports of crude oil runs and stocks, inventory reports and all other information pertaining to *Unit Operations.* The cost of gathering and furnishing information not ordinarily furnished by *Unit Operator* to all *Working Interest Owners* shall be charged to the *Working Interest Owner* that requests the information.

## ARTICLE 6

## UNIT OPERATOR

6.1   *Unit Operator.* Sklar Exploration Company, L.L.C. is hereby designated as the initial *Unit Operator.*

6.2   Resignation or Removal. *Unit Operator* may resign at any time. *Unit Operator* may be removed at any time for a material breach of the Unit Operating Agreement by the affirmative vote of two or more *Working Interest Owners* having a eighty-five percent (85%) of the *Voting Interest* remaining after excluding the *Voting Interest* of the Unit *Operator.* Such resignation or removal shall not become effective for a period of three (3) months after the resignation or removal, unless a successor *Unit Operator* has taken over *Unit Operations* prior to the expiration of such period; provided, however, that, in the event of removal, the *Unit Operator* which has been removed shall continue to serve until the successor *Unit Operator* is ready to assume office. The foregoing provisions to the contrary notwithstanding, it is expressly provided that the Unit Operator may not be removed more frequently than once per any twelve (12) month period, except for reason of gross negligence or willful misconduct.

6.3   Selection of Successor. Upon the resignation or removal of a *Unit Operator,* a successor *Unit Operator* shall be selected by the affirmative vote of *Working Interest Owners* having majority of the *Voting Interest.* If the *Unit Operator* that was removed fails to vote or votes in a manner that prevents selection of a successor, the successor operator shall be selected by the affirmative vote of *Working Interest Owners* having a majority of the *Voting Interest* remaining after excluding the *Voting Interest* of the *Unit Operator* who was removed.

## ARTICLE 7

## AUTHORITY AND DUTIES OF UNIT OPERATOR

7.1  Exclusive Right to Operate Unit. Subject to the provisions of this Agreement and pursuant to the specific method of conduct and procedure of operation prescribed by the *Working Interest Owners* voting in accordance herewith, the *Unit Operator* shall have the exclusive rights, duties and obligations for the conduct of all *Unit Operations.*

7.2  Workmanlike Conduct. *Unit Operator* shall conduct *Unit Operations* in a good and workmanlike manner as would a prudent operator under the same or similar circumstances. *Unit Operator* shall freely consult with *Working Interest Owners* and keep them informed of all matters which *Unit Operator,* in the `exercise of its best judgment, considers important. *Unit Operator* shall not be liable to *Working Interest Owners* for damages, unless such damages result from its gross negligence or willful misconduct.

7.3  Liens and Encumbrances. *Unit Operator* shall endeavor to keep the lands and leases in the *Unit Area* and *Unit Equipment* free from all liens and encumbrances occasioned by *Unit Operations,* except the lien and security interest of Unit *Operator* granted hereunder.

7.4  Employees. The number of employees used by *Unit Operator* in conducting Unit *Operations,* their selection, hours of labor and compensation shall be determined by *Unit Operator.* Such employees shall be the employees of *Unit Operator.* The term *employee* shall be deemed to include *leased employees, contract employees* and persons employed as independent contractors whether full time, part-time, or temporary.

7.5  Records. *Unit Operator* shall keep correct books, accounts and records of *Unit Operations.*

7.6  Reports to *Working Interest Owners. Unit Operator* will upon request furnish to each requesting *Working Interest Owner* not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, or Federal agencies or authorities having jurisdiction over *Unit Operations.* Each *Working Interest Owner* shall provide to *Unit Operator* on a timely basis all information necessary to *Unit Operator* to make such filings.

7.7  Reports to Governmental Authorities. *Unit Operator* shall make all reports to governmental authorities that it has the duty to make as *Unit Operator.*

7.8  *This paragraph has been intentionally omitted.*

7.9  Expenditures. *Unit Operator* is authorized to make any single expenditure not in excess of Fifty Thousand Dollars ($50,000.00) without prior approval of the *Working Interest Owners* (see Article 3.2.4). If an emergency occurs endangering property or human life, Unit *Operator* shall immediately take appropriate actions, and shall be authorized to make or incur such expenditures as in its sole opinion are required to deal with the emergency. *Unit Operator* shall report to *Working Interest Owners,* as promptly as possible, the nature of the emergency and the action taken. *Unit Operator* shall prepare an *Authority For Expenditure (AFE)* for its own use and *Unit Operator* shall furnish any *Working Interest Owner* so requesting an information copy thereof for any single project costing in excess of Fifty Thousand Dollars ($50,000.00) but less than the amount first set forth above in this Article 7.9.

7.10  Wells Drilled by Unit *Operator.* All wells drilled on the *Unit Area* shall be drilled and equipped on a competitive contract basis at the usual rates prevailing in the area. If it so desires, *Unit Operator* may employ its own tools and equipment in the drilling of wells,

but its charges therefore shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the Parties in writing before drilling operations are commenced, and such work shall be performed by Unit *Operator* under the same terms and conditions as are customary and usual in the area under contracts of independent contractors doing work of a similar nature. Notwithstanding anything contained in Exhibit "D", The Accounting Joint Operations, which is attached hereto and made a part hereof, all prices for New Materials (Condition A), including but not limited to tubular goods, line pipe and other material, shall be based at either competitively quoted prices, market prices or actual cost, whichever is the least, with all transportation costs therefore being calculated on an actual cost basis. Prices for Good Used Material (Condition B) and other Used Material (Condition C) shall be based upon current market prices or actual costs, whichever is the lesser.

7.11   <u>Taking Unitized Substances in Kind</u>. The *Unitized Substances* allocated to each *Tract* may, with the consent of the *Unit Operator* (which consent shall not be unreasonably withheld), be delivered in kind to the *Working Interest Owners,* or their assigns, entitled thereto by virtue of the ownership of *Oil and Gas Rights* therein or by purchase from such owners; provided that the volumetric reduction of oil, gas and/or condensate marketed by the *Unit Operator* incidental to or resulting fr om such in kind delivery does not adversely affect the price which *Unit Operator* would have otherwise received under *Unit Operator's* sale contracts in absence of such in kind delivery. Such parties shall have the right to construct, maintain, and operate within the *Unit Area,* all necessary facilities for the purpose of taking such in kind delivery, provided that such facilities are so constructed, maintained, and operated so as not to interfere with *Unit Operations;* and further provided that such operations are approved by *Working Interest Owners* owning or controlling at least sixty-five percent (65%) of the *Working Interest* within the Unit Area. It is further expressly provided that any such in kind delivery of crude oil and/or condensate to any specific receipt point shall not serve to reduce or in any way relieve the *Working Interest Owner(s)* taking in kind delivery of their proportionate liability for payment of severance, or other production related taxes which would have otherwise applied to such parties interest the *Unit Operator's* sale of *Unitized Substances* from all wells within the *Unit Area.* The *Unit Operator* shall maintain current and accurate production accounts for all parties; and shall take all actions necessary to preserve and maintain balanced production accounts for all parties. In the event production of *Unitized Substances* from the *Unit Area* shall permanently cease with a condition of production account imbalance, a cash balancing shall be effected between the interest owners in order of accrual. Any extra expenditures incurred by *Unit Operator* by reason of the delivery in kind of any portion of the oil and/or condensate shall be home by the receiving party. If a *Working Interest Owner* has the right to take in kind a share of the oil, gas, and/or condensate and fails to do so, the *Unit Operator* shall be entitled to take in kind such share of the oil, gas or condensate as hereinafter provided.

7.12   <u>Failure to Take in Kind</u>. If at any time and from time to time any *Person* fails to take in kind or separately dispose of such Person's share of *Unitized Substances, Unit Operator* shall have the right, but not the obligation, for such time, subject to revocation at will by the *Person* owning the share, to purchase or sell to others such share; however, all contracts of sale by *Unit Operator* of any other *Person's* share of *Unitized Substances* shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but in no event shall any such c ontract be for a period in excess of one (1) year without the consent of the affected *Working Interest Owners.* The proceeds of the *Unitized Substances* so disposed of by *Unit Operator* shall either be paid to the *Working Interest Owners* of each affected *Tract* or to a person designated in writing by such *Working Interest Owners* to receipt for such proceeds, who shall thereafter distribute such proceeds to the Persons entitled thereto. It is expressly provided that payment by *Unit Operator* to such party designated by a *Working Interest Owner* to receipt for proceeds from *Unit Operator's* sale of *Unitized Substances* shall constitute payment by *Unit Operator* to such *Working Interest Owner* for all purposes under this Agreement. A Working *Interest Owner* may from time to

time designate a new party or agent to receipt for such proceeds by giving *Unit Operator* not less than thirty (30) days written notice of such change or requested change in method of payment.

## ARTICLE 8

## TAXES

8.1   Property Taxes. Beginning with the first calendar year after the Eff*ective Date* hereof, *Unit Operator* shall make and file all necessary property tax renditions and returns with the proper taxing authorities with respect to all property (real and personal) of each *Working Interest Owner* used or held by *Unit Operator* for *Unit Operations*. Prior to the rendition date, each *Working Interest Owner* shall furnish *Unit Operator* information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on leases and *Oil and Gas Rights* contributed by such *Working Interest Owner*. *Unit Operator* shall settle assessments arising therefrom. All such property taxes shall be paid by *Unit Operator* and charged to the joint account; however, if the interest of a *Working Interest Owner* is subject to a separately assessed overriding royalty interest, production payment, or other interest in excess of a _____ royalty, such *Working Interest Owner* shall be given credit for the reduction in taxes paid resulting therefrom.

8.2   Other Taxes. Each *Working Interest Owner* shall pay or cause to be paid all production, severance, gathering and other taxes imposed upon or with respect to the production or handling of its share of *Unitized Substances*.

8.3   Protest of Taxes. Notwithstanding the provisions of the foregoing Sections 8.1 and 8.2, each *Working Interest Owner* shall have the right, at its own expense, to protest and resist the payment of any direct tax levied in respect of its share of *Unitized Substances*, and to protest and resist any proposed rendition of or assessment for ad valorem taxes on its interest in the *Unit* or its personal property. When any such protested assessment shall have been finally determined, *Unit Operator* shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "D".

## ARTICLE 9

## INSURANCE

9.1   Insurance. *Unit Operator,* with respect to *Unit Operations,* shall:

    a)   Comply with the Workers' Compensation Laws of the State of Texas;

    b)   Carry Employer's Liability and other insurance required by the laws of the State of Texas, and

    c)   Provide other insurance as set forth in Exhibit"E.

9.2   Contracts and Subcontracts. *Unit Operator* shall require its contractors and subcontractors conducting operations on the *Unit Area* to comply with the Workers' Compensation Laws of the State of Texas and to carry such other insurance in such amounts as Unit *Operator* shall deem necessary.

9.3   Uninsured Losses. *Unit Operator* shall promptly notify *Working Interest Owners* of any loss, damage or claim not covered by insurance carried by *Unit Operator* for the joint

# ARTICLE 10

## ADJUSTMENT OF INVESTMENTS

10.1 <u>Personal Property Taken Over.</u> Upon the Effe*ctive Date* hereof, *Working Interest Owners* shall deliver to *Unit Operator* the following:

   10.1.1 <u>Wells and Casing.</u> All wells completed in the *Unitized Formation,* together with the casing therein.

   10.1.2 <u>Well and Lease Equipment.</u> The tubing and all other casing and equipment located within each such well, the wellhead connections thereon, Bowlines, tank batteries, and without limitation all other lease and operating equipment that is used in the operation of such wells which *Working Interest Owners* determine is necessary or desirable for conducting *Unit Operations.*

   10.1.3 <u>Records.</u> A copy of all production, accounting and well records that pertain to such wells, which shall include full records relative to the drilling, equipping and completion of such well, together with a certified copy of complete cost statements and billing/payment records for each such well and applicable equipment.

10.2 <u>Inventory and Evaluation of Personal Property.</u> *Working Interest Owners* shall at *Unit Expense* inventory and evaluate the personal property taken over in accordance with the provisions of Exhibit D.

10.3 <u>Investment Adjustment.</u> All personal property, including Unit Area wells as heretofore provided, as well as all other lease or well equipment hereafter installed upon the Unit Area, shall become Unit property and shall be owned and operated by the Working Interest Owners in accordance with this agreement. Operator shall charge to the account of the Working Interest Owners its share of the value of such property and shall credit the account of each party with the value of the property contributed by it. Within fifteen (15) days after such adjustment of accounts, each party charged with an amount greater than that with which it has been credited shall pay Operator in cash the amount of such difference. Operator, within thirty (30) days after the end of said fifteen (15) day period, and every thirty (30) days thereafter, shall disburse all such payments actually received to the other parties in the amounts to which such other parties may be entitled because of the excess of credits over charges to their respective accounts. Any equipment and property not selected by Working Interest Owners shall be released to the party or parties owning the same, who shall thereupon have the right, or in cases of interference with Unit operations may be required, to remove any such property and equipment from the Unit Area.

10.4 <u>Investment Adjustment Due to Enlargement of Unit Area.</u> In the event additional lands other than Tracts I through 8 as described in the Woodlawn Field Unit Agreement should subsequently be added to the Unit Area, upon approval by *Working Interest Owners* of the inventory and evaluation, of personal property pursuant to Article 10.2 each *Working Interest Owner* who owns a working interest in a *Tract* which did not contribute a well to the unit shall be charged with an amount to be subsequently determined (the Well Value) equal to product obtained by multiplying Well Value per well (the total value for each completed and fully equipped well as set forth in Article 10.2 hereof) times the number of completed and fully equipped wells delivered to the unit under Articles 10.1.1 and 10.1.2 hereof, times such *Working Interest Owners' Tract Participation* in each *Tract* which did not contribute a well to the *Unit.* This charge shall be an item of *Unit Expense* chargeable against such Working Interest Owner effective as of the Effec*tive Date* of this Agreement. The amount collected from such *Working Interest Owners* shall be paid to the *Working Interest Owners* who did contribute wells to the Unit and shall be distributed to them in proportion to their ownership in the wells contributed.

10.5 <u>General Facilities.</u> The acquisition of warehouses, warehouse stocks, lease houses, camps, facility systems, and office buildings necessary for Unit *Operations* shall be by negotiation by the owners thereof and *Unit Operator,* subject to the approval of *Working Interest Owners.*

10.6    Ownership of Personal Property and Facilities. Each *Working Interest Owner,* individually, shall by virtue hereof own an undivided interest, equal to its *Unit Participation,* in all personal property and facilities taken over or otherwise acquired by Unit *Operator* pursuant to this Agreement.

10.7    For the purpose of Article 11.5 hereof, any sums owing under this Article 10 by any *Working Interest Owner* to *Unit Operator* for the account of any other *Working Interest Owners* shall be considered an item of *Unit Expense,* and the Unit *Operator* shall be entitled to all of the rights and remedies provided in said Article 11.5 in order to collect the payment thereof for and on behalf of the *Working Interest Owners* entitled thereto.

## ARTICLE 11

## UNIT EXPENSE

11.1    Basis of Charge *Working Interest Owners* Unit *Operator* initially shall pay all *Unit Expense.* Each *Working Interest Owner* shall reimburse *Unit Operator* for its share of *Unit Expense.* Each *Working Interest Owner's* share shall be the same as its Unit *Participation* in effect when the expense was incurred. All charges, credits and accounting for *Unit Expense* shall be in accordance with Exhibit D.

11.2    Budgets. Before or as soon as practical after the Eff*ective Date. Unit Operator* shall prepare a budget of estimated *Unit Expense* for the remainder of the calendar year, and, on or before the first day of each October thereafter, shall prepare a budget for the ensuing calendar year. A budget shall set forth the estimated *Unit Expense* by quarterly periods. Budgets shall be estimates for informational purposes only, shall not bind any *Working Interest Owner* to any expenditure or course of action and shall be adjusted or corrected by *Working Interest Owners* and *Unit Operator* whenever an adjustment or correction is proper. A copy of each budget and adjusted budget shall be furnished promptly to each *Working Interest Owner.*

11.3    Advance Billings. *Unit Operator* shall have the right, without prejudice to other rights or remedies, to require all *Working Interest Owners* to advance their respective share of estimated *Unit Expense* by submitting to each *Working Interest Owner,* on or before the l5th day of any month, an itemized estimate thereof for the succeeding month, with a request for payment in advance. Within fifteen (15) days after receipt of the estimate, each such *Working Interest Owner* shall pay to *Unit Operator* its share of such estimate. However, should two or more *Working Interest Owners* notify Unit *Operator* within such fifteen (15) day period of a bona fide dispute involving a cost or expense covered by such invoice ("Disputed Costs"), then for so long as the dispute remains unresolved and such *Working Interest Owners* work expeditiously with *Unit Operator* toward resolving it, they shall not be required to pay *Unit Operator* the amount of such Disputed Costs, provided such *Working Interest Owners* pay Unit *Operator* for all other amounts on such invoice. Proper adjustments between advance payments and actual *Unit Expense* shall be made by *Unit Operator* at the close of each calendar month and appropriate billings, reimbursements, or credits shall thereupon be made to the end that each *Working Interest Owner* shall bear and pay its proportionate share of actual *Unit Expenses* incurred, and no more. Any sums due under this Article 11.3 (subject to the Disputed Costs exception provided hereinabove) shall be considered an item of *Unit Expense* from the date they are due for all purposes of Article 11.5 hereof, and such sums shall bear interest at the rate of 12% per annum from the date they are due. Notwithstanding anything contained herein to the contrary, in no event will the interest rate charged under this Agreement exceed the maximum rate of interest permitted under the laws of the State of Texas.

11.3.1    AFE Advance Billings Penalty. S hould any single expenditure in excess of F ifty Thousand Dollars ($50,000.00) be approved, Operator may require all *Working Interest Owners* to advance their respective share of estimated

expenditures. Within fifteen (15) days after receipt of the AFE, each *Working Interest Owner* shall pay to *Unit Operator* its share of such estimated costs. Failure to timely pay the advance billing associated with an AFE will subject such *Working Interest Owner* (Non-Paying Working Interest Owner) to a 200% penalty. Those *Working Interest Owners* (Paying Working Interest Owner) who timely pay the advance billing associated with an AFE will bear, in the proportion their *Unit Participation* bears to the *Unit Participation* of all Paying Working Interest Owner, the costs associated with the Unit *Participation* of the Non-Paying Working Interest Owner(s). Beginning with the first day of the month following approval of the AFE, the Non-Paying Working Interest Owner shall be deemed to have relinquished all such Non-Paying Working Interest Owner's *Unit Participation.* Such deemed relinquishment shall begin the first day of the month following approval of the AFE and shall end the first day of the month after the Paying Working Interest Owners receive from the sale of oil & gas (after deducting ad-valorem, production, severance, and excise taxes, royalty, overriding royalty and other interest payable out of the Unit Interest of the Non-Paying Working Interest Owner, and *Unit Expenses* associated with the relinquished interest) 200% of each Non-Paying Working Interest Owners share of the actual costs associated with the AFE.

11.4    Commingling of Funds. Funds received by *Unit Operator* under this Agreement need not be segregated or maintained by it as a separate fund but may be commingled with its own funds.

11.5    Lien and Security Interest Of *Unit Operator.* Each *Working Interest Owner* grants to *Unit Operator* a lien upon its *Oil and Gas Rights,* including but not limited to the following security interests and collateral:

a.  a security interest and mortgage upon the Working Interest Owner 's interest in any royalty, overriding royalty, and/or working interest, in and to the oil, gas, and minerals located within the Unitized Formation under the lands described in Exhibit A and Exhibit B to the Woodlawn Field Unit Agreement;

b.  a security interest in its share of Unitized Substances when extracted;

c.  a security interest in each Working Interest Owner's interest in all Unit Equipment; and

d.  a security interest in all accounts and contract rights (including but not limited to rights under division order agreements, casinghead gas contracts, gas contracts, operating agreements, and the like) relating to the oil and gas leases within the Unit Area, together with a lien upon all general intangibles and any other rights, data, information in the possession or control of such Working Interest Owner or in the possession of Unit Operator relating to the Unit Area; and

e.  a lien and security interest in all proceeds of the collateral and all products of the collateral.

Each *Working Interest Owner* executing this Agreement (or ratifying this Agreement by separate instrument) for and in consideration of the undertakings by *Unit Operator* has granted, bargained, sold, assigned, transferred, and conveyed, and mortgaged and by these presents does hereby grant, bargain, sell, assign, transfer , convey and mortgage unto *Unit Operator* the security and collateral hereinabove described to secure the payment of such *Working Interest Owner 's* share of *Unit Expense,* together with interest thereon at the rate of 12% per annum, from the date they are due. In no event, however, is the maximum rate of interest to exceed the legal amount of interest that could be charged under the laws of the State of Texas.

The *Unit Operator* shall be deemed to have a security interest under the Uniform Commercial Code as adopted in the State of Texas together with a lien under the applicable laws of the State of Texas relating to liens upon real property, and *Unit Operator* shall be entitled to exercise the rights and remedies of a secured party, mechanic, materialman and/or of a mortgagee under a mortgage or deed of trust. The bringing of a suit and the obtaining of judgment by *Unit*

*Operator* for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any *Working Interest Owner* in the payment of its share of *Unit Expense, Unit Operator* shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such *Working Interest Owner's* share of *Unitized Substances* until the amount owed by such *Working Interest Owner,* plus interest, has been paid. Each purchaser shall be entitled to rely upon Unit *Operator's* written statement concerning the amount of any default. *Unit Operator* grants a like lien and security interest to the non-operating *Working Interest Owners* to secure payment of *Unit Operator's* proportionate share of expense. The lien and security interests granted to *Unit Operator* herein shall be paramount and superior to any security interest or lien which may be granted by any *Working Interest Owner* or which may arise by operation of law subsequent to the *Effective Date* of this Agreement.

11.6 Unpaid *Unit Expense.* If any *Working Interest Owner* fails to pay its share of Unit *Expense* within sixty (60) days after rendition of a statement therefore by *Unit Operator,* each *Working Interest Owner* agrees, upon request by Unit *Operator,* to pay its proportionate part of the unpaid share of *Unit Expense* (excluding interest then accrued thereon) of the defaulting *Working Interest Owner. Working Interest Owners* that pay the share of *Unit Expense* of a defaulting *Working Interest Owner* shall be reimbursed by *Unit Operator* for the amount so paid, plus any interest collected thereon, upon receipt by *Unit Operator* of any past due amount collected from the defaulting *Working Interest Owner.* Any *Working Interest Owner* so paying a defaulting *Working Interest Owner's* share of *Unit Expense* shall, to obtain reimbursement thereof, be subrogated to the lien and other rights herein granted *Unit Operator.*

11.7 Subsequently Created Interest. If any *Working Interest Owner* shall, after executing this Agreement, create an overriding royalty, production payment, net proceeds interest, carried interest or any other interest (including any lien, security interest or other encumbrance) out of its interest (other than a *Royalty Interest*) in the Unit, such a carved-out interest shall be subject to the terms and provisions of this Agreement, specifically including, but without limitation, Article 11.5 hereof entitled *"Lien and Security Interest of Unit Operator."* If the *Working Interest Owner* creating such subsequently created interest (a) fails to pay any *Unit Expense* chargeable to such *Working Interest Owner* under this Agreement and the production of *Unitized Substances* accruing to the credit of such *Working Interest Owner* is insufficient for that purpose, or (b) withdraws from this Agreement under the terms and provisions of Article 17 hereof, the subsequently created interest shall be chargeable with a pro rata portion of all *Unit Expense* incurred hereunder, the same as though such subsequently created interest were a part of the *Working Interest* from which such subsequently created interest was created, and *Unit Operator* shall have the right to enforce against such subsequently created interest the lien and all other rights granted in Article I 1.5 for the purpose of collecting the *Unit Expense* chargeable to the subsequently created interest.

11.8 Third Party Services. The provisions of this Unit Operating Agreement or of the Accounting Procedure attached hereto as Exhibit D to the contrary notwithstanding, fees and expenses of third party engineers, geologists, consultants, landmen, title curative personnel, attorneys and other third party services incurred by the *Unit Operator* in connection with operations of the *Unitized Formation* and within the *Unit Area* for the benefit of the *Working Interest Owners* shall be a direct charge to the *Unit Expense.*

## ARTICLE 12

### NONUNITIZED FORMATIONS

12.1   Right to Operate. Any *Working Interest Owner* that now has or hereafter acquires the right to drill for and produce oil, gas or other minerals from a formation underlying the Unit Area other than the *Unitized Formation* shall have the right to do so notwithstanding this Agreement or the Woodlawn Field Unit Agreement. In exercising such right, however, such *Working Interest Owner* shall exercise care to prevent unreasonable interference with *Unit Operations,* No *Working Interest Owner* other than *Unit Operator* shall produce *Unitized Substances* through any well drilled or operated by such *Working Interest Owner.* If any *Working Interest Owner* intends to drill any well into or through the *Unitized Formation,* such party shall give *Unit Operator* not less than fifteen (15) days written notice of such intended operations. Any such notice shall include full details of well location, the proposed drilling, casing, and mud programs for such intended operations. Any such operation so conducted shall be prosecuted and engineered in such a manner as to best insure that the *Unitized Formation* shall be protected in a manner satisfactory to *Working Interest Owners* so that the production of *Unitized Substances* will not be affected adversely.

## ARTICLE 13

### TITLES

13.1   Warranty and Indemnity. Each *Working Interest Owner* .represents and warrants that it is the owner of the respective *Working Interests* set forth opposite its name in Exhibit C and agrees to indemnify and hold harmless the other *Working Interest Owners* from any loss due to failure, in whole or in part, of its title to any such interest; however, such indemnity and any liability for breach of warranty shall be limited to an amount equal to the net value that has been received from the sales or receipt of *Unitized Substances* attributed to the interest as to which title failed. Each failure of title will be deemed to be effective, insofar as this Agreement is concerned, as of 7:00 a.m. on the first day of the calendar month in which such failure is finally determined, and there shall be no retroactive adjustment of *Unit Expense,* or retroactive allocation of *Unitized Substances,* or the proceeds therefrom, as a result of a title failure.

13.2   Failure Because of Unitized *Operations.* The failure of title to any *Working Interest* in any Tract because of *Unit Operations,* including non-production from such Tract, shall not change the *Unit Participation* of the *Working Interest Owner* whose title failed in relation to the *Unit Participations* of the other *Working Interest Owners* at the time of the title failures.

## ARTICLE 14

### LIABILITY, CLAIMS AND SUITS

14.1   Individual Liability. The duties, obligations and liabilities of *Working Interest Owners* shall be several and not joint or collective, and nothing herein shall ever be construed as creating a partnership of any kind, joint venture, association or trust among *Working Interest Owners.*

14.2   Settlements. *Unit Operator* may settle any single damage claim or suit involving *Unit Operations* if the expenditure does not exceed Fifteen Thousand Dollars ($15,000.00) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, *Working Interest Owners* shall assume and take over the further handling of the claim or suit, unless such authority is delegated to *Unit Operator.* All costs and expense of handling, settling or otherwise discharging such claim or suit shall be an item of *Unit Expense.* If a claim is made against any *Working Interest Owner* or if any *Working Interest Owner* is sued on account of any matter

arising from *Unit Operations* over which such *Working Interest Owner* individually has no control because of the rights given *Working Interest Owners* and *Unit Operator* by this Agreement and the Woodlawn Field Unit Agreement, the *Working Interest Owner* shall immediately notify *Unit Operator,* and the claim or suit shall be treated as any other claim or suit involving *Unit Operations.*

14.3   <u>Binding Arbitration.</u> Any dispute with respect to this Agreement, or the making or validity thereof, or its interpretation, or any breach thereof, by and between the *Unit Operator* and any *Working Interest Owner,* or between two or more *Working Interest O'wners,* shall be determined and settled by binding arbitration pursuant to the rules and guidelines of the American Arbitration Association. Any award or decision rendered shall be final and conclusive upon the parties and a judgment to enforce such award or decision may be entered in` any court having jurisdiction,

### ARTICLE 15

### LAWS AND REGULATIONS

15.1   <u>Internal Revenue Provision.</u> Notwithstanding any provisions herein that the rights and liabilities of the parties hereunder are several and not joint or collective, or that this Agreement and operations hereunder shall not constitute a partnership, if, for Federal income tax purposes, this Agreement and the operations hereunder are regarded as a partnership, then each of the parties bound hereby elects to be excluded from the application of all of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. *Unit Operator* is hereby authorized and directed to execute on behalf of each of the parties such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements and the data required by Treasury regulations Sec. 1.761. Should there be any requirement that each party hereto further evidence this election, each party hereto agrees to execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. Each party hereto further agrees not to give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the State of Texas, or any future income tax law of the United States, contain provisions similar to those in Subchapter K. Chapter i, Subtitle A, of the Internal Revenue Code of 1986, as amended, under which an election similar to that provided by Section 761- of the Code is permitted, each of the parties agrees to make such election as may be permitted or required by such laws. In making this election, each of the parties states that the income derived by such party from the operations under this Agreement can be adequately determined without the computation of partnership taxable income.

### ARTICLE 16

### NOTICES

16.1   <u>Notices.</u> All notices required hereunder shall be in writing and shall be deemed to have been properly served when sent by mail, telegram or facsimile transmission (FAX) to the address of the representative of each *Working Interest Owner* as furnished to *Unit Operator* in accordance with Article 4.

## ARTICLE 17

### WITHDRAWAL OF WORKING INTEREST OWNER

17.1    Withdrawal.   A *Working Interest Owner* may withdraw from this Agreement by transferring, without warranty of title, either express or implied, to the other *Working Interest Owners,* all its Oil and Gas Rights, exclusive of Royalty Interests, together with its interest in all *Unit Equipment* and in all wells used in *Unit Operations.* The instrument of transfer may be delivered to *Unit Operator* for the proportionate benefit of all *Working Interest Owners* electing to continue operations, and such transfer shall be effective as of 7:00 a.m. on the first day of the month following such delivery of a transfer instrument to *Unit Operator* unless *Working Interest Owners* refuse to permit such withdrawal as hereinafter provided. Such transfer shall not relieve the *Working Interest Owner* so wishing to withdraw from any obligation or liability incurred prior to the date of the delivery of the instrument of transfer, or from any liability or obligation which will accrue for expenditures previously approved by the *Working Interest Owners,* or which will arise out of operations previously conducted or operations which will be conducted which have previously been approved by *Working Interest Owners.* The interest transferred shall be owned by the *Working Interest Owners* electing to continue operations in proportion to their respective *Unit Participations.* The transferee, in proportion to the respective interests so acquired, shall pay the *Working Interest Owners* electing to withdraw, for its interest in *Unit Equipment,* the net salvage value thereof as determined by *Working Interest Owners,* and such transferor shall be entitled to no payment for its Oil and Gas Rights so transferred. After the date of delivery of the instrument of transfer, the withdrawing *Working Interest Owner* shall be relieved from any obligations and liability thereafter incurred hereunder and under the Woodlawn Field Unit Agreement, except as otherwise above provided in this Article 17.1, and the rights of such *Working Interest Owner* hereunder and under the Woodlawn Field Unit Agreement shall cease insofar as they existed by virtue of the interest transferred. Notwithstanding anything hereinabove set forth in this Article, *Working Interest Owners* may refuse to permit the withdrawal of a *Working Interest Owner* if, and only if (a) upon the receipt by *Unit Operator* of the instrument of transfer, *Working Interest Owners* theretofore have determined to abandon Unit *Operations* and terminate the Woodlawn Field Unit Agreement in accordance with the provisions of Article 3.2.15 and Article 20 hereof, or if such determination shall be made at the meeting of *Working Interest Owners* which next ensues after the receipt of such instrument of transfer, but not later than sixty (60) days thereafter, or (b) the *Working Interest* of the *Working Interest Owner* seeking to withdraw is burdened by any royalties, overriding royalties or other burdens in excess of a one-fourth (1/4) Lessor's royalty, unless the other *Working Interest Owners* willing to accept the assignment agree to accept said interest subject to the royalties, overriding royalties or other burdens in excess of a one-fourth (1/4) lessor's royalty then existing and burdening said interest.

## ARTICLE 18

### ABANDONMENT OF WELLS

18.1    Plugging of Wells. If *Working Interest Owners* decide to permanently abandon any well within the *Unit Area* prior to termination of the Woodlawn Field Unit Agreement, *Unit Operator* shall plug and abandon the well in compliance with applicable laws and regulations. The cost of such plugging and abandonment operations shall be treated as a *Unit Expense;* and disposition of recoverable materials and equipment, and appropriate accounting for same shall be handled by the *Unit Operator* in accordance with the provisions of Exhibit D (Accounting Procedure) attached hereto and made a part hereof,

## ARTICLE 19

### EFFECTIVE DATE AND TERM

19.1 *Effective Date.* This Agreement shall become effective when the Woodlawn Field Unit Agreement becomes effective.

19.2 Term. This Agreement shall continue in effect so long as the Woodlawn Field Unit Agreement remains in effect and thereafter until (a) all Unit wells have been plugged and abandoned by the *Working Interest Owners* in accordance with Article 20; (b) all *Unit Equipment* and real property acquired for the joint account have been disposed of by Unit *Operator* in accordance with instructions of *Working Interest Owners;* and (c) there has been a final accounting.

## ARTICLE 20

### ABANDONMENT OF OPERATIONS

20.1 Termination. Upon termination of the Woodlawn Field Unit Agreement, the following will occur:

20.1.1 Salvaging Wells. *Unit Operator* shall salvage as much of the casing and equipment in or on wells not taken over by *Working Interest Owners* of separate Tracts as can economically and reasonably be salvaged and shall cause the wells to be plugged and abandoned in compliance with applicable laws and regulations.

20.1.2 Cost of Abandonment. The cost of abandonment of *Unit Operations* shall be *Unit Expense.*

20.1.3 Distribution of Assets. *Working Interest Owners* shall share in the distribution of *Unit Equipment,* or the proceeds thereof, in proportion to their *Unit Participations.*

20.1.4 Oil *and Gas Rights. Oil and Gas Rights* in and to each separate Tract shall no longer be affected by this Agreement, and thereafter the parties shall be governed by the terms and provisions of the leases, contracts and other instruments affecting the separate Tracts.

## ARTICLE 21

### AMENDMENTS

21.1 Amendments. Amendments hereto relating wholly and solely to Exhibit D, Accounting Procedure, Joint Operations; and Exhibit E, Insurance; may be made accomplished by an affirmative vote of *Working Interest Owners* controlling sixty-five percent (65%) or more of the *Voting Interests.*

## ARTICLE 22

### EXECUTION

22.1 Original Counterpart or Other Instrument. An owner of a *Working Interest* may become a party to this Agreement by signing a counterpart of this Agreement or other instrument agreeing to become a party hereto. The signing of any such instrument shall have the same effect as if all parties had signed the same instrument.

## ARTICLE 23
## SUCCESSORS AND ASSIGNS

23.1   <u>Successors and Assigns.</u> This Agreement shall extend to, be binding upon and inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and shall extend to, be binding upon and inure to the benefit of all persons having an interest in the Unit Area, their respective heirs, devisees, legal representatives, successors and assigns, and shall constitute a covenant running with the lands, leases and interests covered hereby.

THUS DONE AND SIGNED This _____ day of _____, 2013, but effective as of the _____ day of _____, 2013.

SKLAR EXPLORATION COMPANY L.L.C.


By_____
        David A. Barlow
        President - Chief Operating Officer

SKLARCO L.L.C.


By_____
        David A. Barlow
        President - Chief Operating Officer

MCCOMBS ENERGY, LTD.


By_____
        Ricky Haikin
        Vice President

TAUBER EXPLORATION & PRODUCTION CO.


By_____
        Richard Tauber
        Manager


_____
        JAMES FLEET HOWELL


BUNDERO INVESTMENT COMPANY, L.L.C.


By_____
        Robert P. Bowman
        Manager

TIEMBO, LTD.


By_____
        Mark Rauch
        Registered Agent

PICKENS FINANCIAL GROUP, L.L.C.


By_____
        Michael K. Pickens,
        Vice President


FANT ENERGY LIMITED
By:  Richard E. Fant, LLC, the General Partner of
     Fant Energy Limited

By_____
        Stephen Swan, Manager




SANTO PETROLEUM LLC


By_____
        Tobin L. Rhodes
        Executive Vice President




JJS WORKING INTERESTS LLC
By:    Houston Bulldog Capital Management, LLC


By_____
        Justin Simons
        Manager


KUDZU OIL PROPERTIES, L.L.C.


By_____
        R. Nash Neyland
        Executive Vice President

MARKSCO, L.L.C.


By_____
        Mark P. Sealy
        Member

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

     I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2013.

                                        _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

     I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2013.

                                        _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2013.

                                        _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

       I, _____, a notary public in and for said County and State, hereby certify that Richard Tauber, whose name as President of TAUBER EXPLORATION AND PRODUCTION COMPANY, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

       Given under my hand and notarial seal this the _____ day of _____, 2013.

                                     _____

                                     NOTARY PUBLIC

STATE OF TEXAS

COUNTY OF _____

STATE OF LOUISIANA

PARISH OF CADDO

       I, _____, a notary public in and for said Parish and State, hereby certify that FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

       Given under my hand and notarial seal this the _____ day of _____, 2013.

                                     _____

                                     NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

       Given under my hand and notarial seal this the _____ day of _____, 2013.

                                     _____

                                     NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Registered Agent of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as Vice President for PICKENS FINANCIAL GROUP, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Stephen Swan, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Tobin L. Rhodes, whose name as Executive Vice President for SANTO PETROLEUM, LLC, a Delaware limited liability corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said corporation.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of the MARKSCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such Member and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____



May 23, 2013

To All Working Interest Owners

RE:    South Woodlawn Prospect- Amendments
        Marion County, Texas

Dear Owner:

In regards to South Woodlawn Prospect, it has come to our attention that the following revisions need to be made to the Participation Agreement, the Exhibit "B" Form of Assignment, and the Additional Provisions to Joint Operating Agreement.

1. Second paragraph of Section 1.3 of the Participation Agreement for South Woodlawn Prospect, Marion County, Texas, regarding "Prospect Payout" has been revised and the words "Contract Area" were changed to "AMI". Therefore, please find enclosed a revised page 3 to the Participation Agreement for you to slip sheet.

2. The Form of Assignment is not subject to an assignment of overriding royalty interest and/or carried working interest. Therefore, I have removed this language from the first paragraph on the first page and enclosed a revised page one for you to slip sheet.

3. Added the following to the Additional Provisions of the Joint Operating Agreement:
   a. <u>First sentence</u> to Article XV.L. **Disbursement of Royalty**
   b. Article XV.Y.  **Operator's Obligation to Market Oil and Gas Not Taken In Kind**;
   c. Article XV.Z. **Operator's Payment of Production Taxes**;
   d. Article XV.AA. **Limitations on Well Proposals**;
   e. Article XV.BB. **Confidentiality**;
   f. Article XV.CC. **Downstream Facilities**;

*tel:* 318.227.8668 · *fax:* 318.227.9012 · 401 Edwards Street, Ste 1601 · Shreveport, Louisiana 71101

To Working Interest Owners
South Woodlawn Prospect - Amendments
May 23, 2013
Page 2

Please acknowledge your receipt and acceptance of the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating by signing the enclosed copy of this letter in the space provided and returning it to me at your first opportunity.   Should you have any questions regarding any of the aforementioned, please do not hesitate to give me a call.

Sincerely,

Kim E. Ramsey, CPL
Landman

Enclosures

I hereby acknowledge receipt of and accept the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating.

Company Name: _____

Name: _____

Title: _____

Date: _____

To Working Interest Owners
South Woodlawn Prospect - Amendments
May 23, 2013
Page 2

      Please acknowledge your receipt and acceptance of the amended Section 1.3 of
the Participation Agreement, the amended Form of Assignment, and the amended
Additional Provisions to the Joint Operating by signing the enclosed copy of this letter in the
space provided and returning it to me at your first opportunity.    Should you have any
questions regarding any of the aforementioned, please do not hesitate to give me a call.

           Sincerely,

           Kim E. Ramsey, CPL
           Landman

Enclosures

I hereby acknowledge receipt of and accept the amended Section 1.3 of the Participation
Agreement, the amended Form of Assignment, and the amended Additional Provisions to
the Joint Operating.

Company Name: _Bundero Investment Company, L.L.C._

Name: _____, Robert P. Bowman_

Title: _Manager_

Date: _6/13/13_

To Working Interest Owners
South Woodlawn Prospect - Amendments
May 23, 2013
Page 2

Please acknowledge your receipt and acceptance of the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating by signing the enclosed copy of this letter in the space provided and returning it to me at your first opportunity.   Should you have any questions regarding any of the aforementioned, please do not hesitate to give me a call.

Sincerely,

Kim E. Ramsey, CPL
Landman

Enclosures

I hereby acknowledge receipt of and accept the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating.

Company Name: _TAUBER EXPLORATION & PRODUCTION Co._

Name: _____

Title: _RICHARD E. TAUBER, PRESIDENT_

Date: _JUNE 6, 2013_

To Working Interest Owners
South Woodlawn Prospect - Amendments
May 23, 2013
Page 2

Please acknowledge your receipt and acceptance of the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating by signing the enclosed copy of this letter in the space provided and returning it to me at your first opportunity. Should you have any questions regarding any of the aforementioned, please do not hesitate to give me a call.

Sincerely,

Kim E. Ramsey, CPL
Landman

Enclosures

I hereby acknowledge receipt of and accept the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating.

Company Name: _JJS Working Interests LLC_

Name: _Justin Simon_

Title: _Manager_

Date: _06/00/2013_

To Working Interest Owners
South Woodlawn Prospect - Amendments
May 23, 2013
Page 2

     Please acknowledge your receipt and acceptance of the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating by signing the enclosed copy of this letter in the space provided and returning it to me at your first opportunity. Should you have any questions regarding any of the aforementioned, please do not hesitate to give me a call.

Sincerely,

Kim E. Ramsey, CPL
Landman

Enclosures

I hereby acknowledge receipt of and accept the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating.

Company Name: SANTO PETROLEUM LLC

Name: HANSON YATES

Title: VICE PRESIDENT

Date: 6/7/2013

To Working Interest Owners
South Woodlawn Prospect - Amendments
May 23, 2013
Page 2

     Please acknowledge your receipt and acceptance of the amended Section 1.3 of
the Participation Agreement, the amended Form of Assignment, and the amended
Additional Provisions to the Joint Operating by signing the enclosed copy of this letter in the
space provided and returning it to me at your first opportunity.    Should you have any
questions regarding any of the aforementioned, please do not hesitate to give me a call.

                    Sincerely,

                    Kim E. Ramsey, CPL
                    Landman

Enclosures

I hereby acknowledge receipt of and accept the amended Section 1.3 of the Participation
Agreement, the amended Form of Assignment, and the amended Additional Provisions to
the Joint Operating.

Company Name: _FAUT ENERGY_

Name: _STEPHEN SWAN_

Title: _MANAGER_

Date: _6/3/17_

To Working Interest Owners
South Woodlawn Prospect - Amendments
May 23, 2013
Page 2

Please acknowledge your receipt and acceptance of the amended Section 1.3 of
the Participation Agreement, the amended Form of Assignment, and the amended
Additional Provisions to the Joint Operating by signing the enclosed copy of this letter in the
space provided and returning it to me at your first opportunity.    Should you have any
questions regarding any of the aforementioned, please do not hesitate to give me a call.

Sincerely,

Kim E. Ramsey, CPL
Landman

Enclosures

I hereby acknowledge receipt of and accept the amended Section 1.3 of the Participation
Agreement, the amended Form of Assignment, and the amended Additional Provisions to
the Joint Operating.

Company Name: Kudzu Oil Properties, LLC

Name: _____

Title: Manager

Date: 6-3-2013

To Working Interest Owners
South Woodlawn Prospect - Amendments
May 23, 2013
Page 2

      Please acknowledge your receipt and acceptance of the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating by signing the enclosed copy of this letter in the space provided and returning it to me at your first opportunity.    Should you have any questions regarding any of the aforementioned, please do not hesitate to give me a call.

                       Sincerely,

                       Kim E. Ramsey, CPL
                       Landman

Enclosures

I hereby acknowledge receipt of and accept the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating.

Company Name: _Pickens Fincial Group LLC_

Name: _Michel L. Pk_

Title: _President_

Date: _5/30/2013_

To Working Interest Owners
South Woodlawn Prospect - Amendments
May 23, 2013
Page 2

Please acknowledge your receipt and acceptance of the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating by signing the enclosed copy of this letter in the space provided and returning it to me at your first opportunity.   Should you have any questions regarding any of the aforementioned, please do not hesitate to give me a call.

Sincerely,

Kim E. Ramsey, CPL
Landman

Enclosures

I hereby acknowledge receipt of and accept the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating.

Company Name: _TIEMBO LTD_

Name: _M.E. Aau_

Title: _____

Date: _5/31/2013_

To Working Interest Owners
South Woodlawn Prospect - Amendments
May 23, 2013
Page 2

Please acknowledge your receipt and acceptance of the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating by signing the enclosed copy of this letter in the space provided and returning it to me at your first opportunity. Should you have any questions regarding any of the aforementioned, please do not hesitate to give me a call.

Sincerely,

Kim E. Ramsey, CPL
Landman

Enclosures

I hereby acknowledge receipt of and accept the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating.

Company Name: McCombs Energy

Name: _____    RICKY HAIKIN

Title: _____    VICE PRESIDENT

Date: _____ 5/30/13

To Working Interest Owners
South Woodlawn Prospect - Amendments
May 23, 2013
Page 2

       Please acknowledge your receipt and acceptance of the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating by signing the enclosed copy of this letter in the space provided and returning it to me at your first opportunity. Should you have any questions regarding any of the aforementioned, please do not hesitate to give me a call.

                Sincerely,

                Kim E. Ramsey, CPL
                Landman

Enclosures

I hereby acknowledge receipt of and accept the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating.

Company Name:

Name:

Title:

Date: May 29, 2013

To Working Interest Owners
South Woodlawn Prospect - Amendments
May 23, 2013
Page 2

Please acknowledge your receipt and acceptance of the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating by signing the enclosed copy of this letter in the space provided and returning it to me at your first opportunity.    Should you have any questions regarding any of the aforementioned, please do not hesitate to give me a call.

Sincerely,

Kim E. Ramsey, CPL
Landman

Enclosures


I hereby acknowledge receipt of and accept the amended Section 1.3 of the Participation Agreement, the amended Form of Assignment, and the amended Additional Provisions to the Joint Operating.

Company Name: _____ Marks co, LLC _____

Name: _____ Mark P. Sly _____

Title: _____ Member _____

Date: _____ 5-29-13 _____

.                    **Subsection 1.2(b).  Operations After Reaching The Objective Depth**

After the Initial Well has been drilled to the Objective Depth, SEC shall make a copy of
any logs, core analysis, drill-stem test analysis or results of any other tests or evaluations available to a
representative of the Participants at the wellsite, or if none is present, by email, mail, facsimile or
overnight delivery.  SEC shall also furnish the Participants in a like manner with its recommendation
regarding the disposition of the wellbore, in accordance with the JOA.  Failure to respond within the time
specified shall be deemed an election to participate in SEC's recommended operation.  An election not to
participate in an election to set production casing and complete the Initial Well shall result in the
forfeiture of interest not only in the Initial Well, but also in all the Leases and the entire Contract Area
and AMI created under Section 3.1 of this Agreement and Article XV.K of the JOA.  All subsequent
operations and elections shall be governed by the JOA.

The Participants acknowledge that the Prospect contemplates drilling and producing oil
wells and water injection wells, creating a fieldwide unit, and commencing a water injection program to
enhance the recovery of oil from the Pettet Formation.  As such, they give SEC authority, whether
provided for in the JOA or not, to conduct those tests on the Initial Well which SEC believes, in its
discretion, would help it evaluate and design the waterflood.  Without limitation upon the foregoing, SEC
may take conventional cores, obtain PVT analyses, take pressure surveys, and log the Initial Well.  The
Participants also grant SEC authority (a) to enter into a Unit Agreement and Unit Operating Agreement
naming SEC as Operator in substantially the same form as those attached as Exhibits "E" and "F",
respectively, and (b) to appear before the Railroad Commission of Texas for and on their behalf without
the need for additional signatures or authority.  It is the Parties' intention that SEC drill the Initial Well on
a lease basis and that a fieldwide unit be created by SEC only after drilling and evaluating the Initial Well.
All subsequent proposals and elections shall be governed by the JOA.

### Section 1.3.  Reversionary Back-In Working Interest

As further consideration for the sale described in Section 1.1 above, upon reaching Prospect
Payout (as defined below), an undivided twenty-five percent (25%) of the interest of each of the Participants
in the Leases, other than Sklarco and JJS, shall automatically and permanently vest in Sklarco and JJS,
proportionately reducing each Participant's interest (the "**Reversionary Back-In Working Interest**" or
"**RBWI**").  At Sklarco's written request, those Participants will assign said interest unto Sklarco and JJS after
Prospect Payout, including, without limitation, a like interest from and after the effective date of Prospect
Payout in the Leases, the Initial Well and any subsequent wells, the proceeds from the sale of oil, gas, and all
other products produced or derived from any and all such wells, and in any easements, rights of way, personal
property, equipment, facilities and pipelines associated with such wells.

"**Prospect Payout**" is defined on a Prospect (not well-by-well) basis as the first day of the
calendar month following the month in which a Participant's share of the total and cumulative revenue
received from the sale of oil, gas and other hydrocarbons and minerals produced, saved and sold from the
AMI, equals that Participant's share of the total and cumulative costs and expenses incurred by that
Participant relating to the AMI. For purposes of Prospect Payout, (i) the total and cumulative revenue shall
consist of the Participant's share of all sales proceeds received for all oil, gas and other hydrocarbons and
minerals produced, saved and sold from the AMI, and (ii) the total and cumulative cost incurred shall include
the Participant's share of all royalty and overriding royalty payments, severance, ad valorem, production and
other taxes applicable to production and not measured by the Participant's other income, the Prospect Fee, all
lease acquisition and maintenance costs, all seismic survey and data costs, geological and geophysical
evaluation costs, all costs for site preparation, drilling, reworking, deepening, sidetracking, logging,
stimulation, testing, equipping, operating, plugging and abandoning the Initial Well and all other wells within
the AMI, and the cost of all surface damages, pipelines, gathering and other production handling facilities
related thereto.

## Article II.  Operations

### Section 2.1.  JOA

SEC is hereby designated Operator.  Except for unit operations, which, once commenced,
will be governed by the Unit Agreement and Unit Operating Agreement, and except as otherwise
provided in this Agreement, all operations within the Contract Area shall be governed by the Joint
Operating Agreement (the "**JOA**"), covering the Contract Area attached hereto as Exhibit "D."  The
Parties agree to execute the JOA concurrent with their execution of this Agreement.  In the event of a
conflict between this Agreement and the JOA, this Agreement shall govern and control.

## EXHIBIT "B"

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., Tauber Exploration & Production Co., Fleet Howell, Bundero Investment Company, L.L.C., Tiembo Ltd., Pickens Financial Group, L.L.C., Fant Energy Limited, Santo Petroleum LLC., JJS Working Interests LLC., Kudzu Oil Properties, LLC., and Marksco, L.L.C.

## FORM OF ASSIGNMENT OF OIL, GAS AND OTHER MINERAL LEASES

STATE OF TEXAS,

COUNTIES OF MARION.

KNOW ALL MEN BY THESE PRESENTS That:

> **SKLARCO L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President & Chief Operating Officer, David A. Barlow ("**Sklarco**" or "**Assignor**");

for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable

consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the reversionary

back-in working interest described hereinbelow, does hereby grant, bargain, sell, convey, assign, set over and

transfer unto the following (hereinafter sometimes referred to collectively as the "**Assignees**" or individually

as an "**Assignee**"):

> **McCOMBS ENERGY, LTD.,** a Texas limited partnership, whose address is 5599 San Felipe, Suite 1200, Houston, Texas 77056-2794, represented herein by its Vice President, Ricky Haikin ("**McCombs**");

> **TAUBER EXPLORATION & PRODUCTION CO.,** a Texas corporation, whose address is 55 Waugh Drive, Suite 601, Houston, Texas 77007-5837, represented herein by Richard Tauber, its duly authorized Manager ("**Tauber**");

> **FLEET HOWELL,** 416 Travis Street, Suite 715, Shreveport, Louisiana 71101 ("**Howell**");

> **BUNDERO INVESTMENT COMPANY, L.L.C.,** a Louisiana limited liability company, whose address is 333 Texas Street, Suite 300, Shreveport, Louisiana 71101, represented herein by its Manager, Robert P. Bowman ("**Bundero**");

> **TIEMBO, LTD.,** a Texas limited partnership, whose address is P. O. Box 270415, Houston, Texas 77277-0415, represented herein by its Registered Agent, Mark Rauch ("**Tiembo**");

> **PICKENS FINANCIAL GROUP, L.L.C.,** a Texas limited liability company, whose address is 8499 Greenville Avenue, Suite 105, Dallas, TX 75231-2417, represented herein by Michael K. Pickens, as the duly authorized Vice President of said company ("**Pickens**");

> **FANT ENERGY LIMITED**, a Texas limited partnership, whose address is 5800 Westview Drive, Houston, Texas 77055, represented herein by Richard E. Fant, LLC, the General Partner of Fant Energy Limited, represented herein by Stephen Swan, in his capacity as the duly authorized Manager of Richard E. Fant, LLC, ("**Fant**");

# ARTICLE XV.

## OTHER PROVISIONS

### A. PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Operating Agreement, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1) An election to perform additional logging, coring or testing.
(2) An election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party.
(3) An election to plug back and attempt to complete the well in a shallower depth or formation.
(4) An election to deepen the well.
(5) An election to sidetrack the well.
(6) An election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production.
(7) An election to temporarily abandon the well.
(8) An election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of a majority of the consenting parties in possessory, cost-bearing interest (and not in number), a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth.   In such event, the operation, which, in the opinion of a majority of the consenting parties in possessory, cost bearing interest (and not in number) is less likely to jeopardize the well, will be given priority.   Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail.   It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests.   For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

### B. HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

### C. DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties.   If the parties are equally divided, the opinion of the Operator will prevail.

### D. ADVANCEMENT OF COSTS

Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s) in advance of its respective share of (i) the dry hole cost for any subsequent well to be drilled hereunder to which such Non-Operator has consented, and (ii) the cost of any completion, reworking, recompletion, sidetracking, deepening, or plugging back operation to which such Non-Operator has consented (any such operation under clause (i) or (ii) being herein called a "Drilling Operation").   Such request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Drilling Operation. The amount of each Non-Operator's advance payment shall be based upon the latest AFE for such operation.   Such advanced payments shall be held by Operator for the account of the Non-Operators and applied against the actual costs incurred in the applicable operation.

A Non-Operator receiving a request for advance payment shall, within two (2) days of the receipt of such request if and when a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to operator in cash the full amount of such request.   Operator shall credit the amount to the Non-Operator's account for the payment of such Non-Operator's share of costs of such Drilling Operation, and following the end of each month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement.   Advance payment by a Non-Operator of his share of completed well costs shall in no event prevent such completion of a well pursuant to Option No. 2 of Article VII.D.1. and, in the event such a Non-Operator elects not to participate in completion, the sums that such Non-Operator has advanced shall not be charged with any share of the costs of any completion attempted.

In the event a Non-Operator from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by depositing cash as aforesaid, then Operator, at his option, shall make a second written request by certified mail, return receipt requested for such advance.   Non-Operator shall pay for said advance as aforesaid within five (5) business days from receipt of such second request.

If a Non-Operator fails to pay within five (5) business days of the receipt of such second request, then Non-Operator may, at the sole discretion and timing election of the Operator, be deemed non-consent in said operation retroactive to the beginning of such operation and thereafter subject to the penalty provisions of Article VI.B.2 hereof.

If the Non-Operator fails to make such payment or furnish such security within five (5) business days of the receipt of such second request, Operator shall promptly notify all other parties still participating in such Drilling Operation of the default in payment and if and when applicable, of the relinquishment of an interest under this provision. The parties who wish to participate in the Drilling Operation shall have five (5) days from receipt of the applicable notice to elect to assume the costs chargeable to such relinquished interest and shall share such relinquished interest in proportion to their assumption of such relinquished interest.   If the parties who wish to participate in the Drilling Operation are unwilling to assume the costs chargeable to such relinquished interest, the Drilling Operation shall be cancelled, and if the cancelled Drilling Operation involves the drilling of a test well under Article VI. A. no assignment shall be due as a consequence of the failure to pay.

Notwithstanding anything to the contrary herein, if the applicable drilled well or operation is unsuccessful or results in a dry hole, Operator shall have the right to sue a Non-Operator who failed to pay for its proportionate share of expenses in lieu of Operator's right to an assignment of all Non-Operator's leasehold and contractual rights within the Contract Area, or in lieu of deeming the Non-Operator Non-Consent.

## E.   NECESSARY EXPENDITURES EXCLUDE SIDETRACKING

The phrase "necessary expenditures" in Article VII.D.1. (Option No. 2) on page 10 shall not be deemed to include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

## F.   ADDITIONAL CHARGES

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Unit Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same:

Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and expenses in connection with preparation and presentation of evidence and exhibits of Railroad Commission of Texas hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

## G.   INDEMNITY

Except for liabilities resulting from the gross negligence or willful misconduct of the Operator, each Non-Operator shall defend, indemnify and hold Operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operator's officers, employees and/or agents, resulting from or in any way relating to such officers, employees, and/or agents presence on a drilling rig on the Contract Area or from such person traveling by air or water between any point and such

drilling rig.  Such indemnity to Operator shall also apply to any other person whose presence on the rig or transportation to or from such rig is at the request of the indemnifying Non-Operator (except for liabilities resulting from the gross negligence or willful misconduct of the Operator).

## H.  GAS BALANCING FOR FORFEITED INTERST

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

## I.  SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

## J.  NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

## K.  AREA OF MUTUAL INTEREST

The parties hereby create an Area of Mutual Interest ("AMI") consisting of the lands outlined by a bold red line on the plat attached hereto as Exhibit "A-2".  This AMI shall remain in force and effect for a term of five (5) years from the date of this Agreement and, insofar and only insofar as the AMI includes lands covered by oil and gas leases and/or oil and gas interests subject to this Agreement, as long thereafter as said oil and gas leases and/or oil and gas interests remain in force and effect.  This AMI shall terminate after five (5) years as to all such lands not covered by oil and gas leases and/or oil and gas interests subject to this Agreement.

During the term of this AMI, if any party hereto, including related persons or entities, ("Acquiring Party") directly or indirectly acquires any oil and gas lease or any oil and gas interest covering lands lying within the AMI, the Acquiring Party shall promptly advise the other parties ("Offerees") of such acquisition.  In such event, each Offeree shall have the right to acquire its proportionate interest in such oil and gas lease and/or oil and gas interest in accordance with the other provisions of this AMI.

Promptly upon acquiring such oil and gas lease and/or oil and gas interest, the Acquiring Party shall, in writing, advise the Offerees of such acquisition.  The notice shall include a copy of all instruments of acquisition including, by way of example but not of limitation, copies of the leases, assignments, subleases, farmouts or other contracts affecting the oil and gas lease and/or oil and gas interest.

The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by the Acquiring Party in acquiring such oil and gas lease and/or oil and gas interest ("Acquisition Costs").  The Offeree shall have a period of fifteen (15) days after receipt of the notice within which to furnish the Acquiring Party written notice of its election to acquire its proportionate interest in the offered oil and gas lease and/or oil and gas interest.  If, however, a well in search of oil or gas is being drilled within the AMI, each Offeree shall have a period of twenty-four (24) hours (excluding Saturdays, Sundays and legal holidays) after delivery of the notice within which to elect to acquire its proportionate interest in the oil and gas lease and/or oil and gas interest so offered.  It is provided, however, that the twenty-four (24) hour election period shall not apply unless the Acquiring Party shall give the notice to the Offerees within two (2) days after the date on which the Acquiring Party acquired the oil and gas lease and/or oil and gas interest so offered.  In addition thereto, the Acquiring Party shall also:

    (a)    furnish the Offerees with the approximate location of the well then being drilled and the name of the operator or drilling contractor drilling the well, and

    (b)    specifically advise the Offerees that the Offerees shall have a period of twenty-four (24) hours within which to elect to acquire an interest in the offered Oil and Gas Interest.

The above information shall be in addition to the information and copies of instruments provided for above in connection with the usual notices of acquisition of an oil and gas lease and/or oil and gas interest.  If the Acquiring Party does not receive actual written notice of election of an Offeree to acquire its proportionate interest within the fifteen (15) day or twenty-four (24) hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire its interest therein.   An Offeree accepting the offered interest shall be entitled to participate in such oil and gas lease and/or oil and gas interest in the proportion to which its interest bears to the total interest of all parties (including the acquiring party) electing to participate.  Promptly after the time for election expires, the Acquiring Party shall invoice the Offeree electing to acquire an interest for its proportionate part of the Acquisition Cost, as reflected by the invoice. Upon receipt of such reimbursement, the Acquiring Party shall execute and deliver an appropriate assignment to such Offeree.  If the Acquiring Party does not receive the amount due from the Offeree within thirty (30) days after receipt by the Offeree of the invoice for its cost, the Acquiring Party may, at its election, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within five (5) days after receipt of such written notice by the delinquent Offeree shall constitute a withdrawal by the delinquent Offeree of its former election to acquire the interest, and such Offeree shall no longer have the right to acquire an interest in the offered oil and gas lease and/or oil and gas interest.

Any assignment made by the Acquiring Party shall be made free and clear of any liens, encumbrances, overriding royalty interests and other burdens created by or arising under the Acquiring Party but otherwise without warranty of title, either express or implied.  The assignment shall be made and accepted subject to, and each assignee shall expressly assume its portion of all of the obligations of the Acquiring Party.  The assignment shall also be made and accepted subject to this Agreement and to the Participation Agreement to which this Agreement is attached as Exhibit "D" in all of its previsions, including, without limitation, Section 1.3 thereof and the Reversionary Back-in Working Interest described therein.

If two (2) or more separate oil and gas leases and/or oil and gas interests are included in the same notice, the Offeree shall have the separate right of election as to each separate oil and gas lease and/or oil and gas interest.

The provisions of this AMI shall not apply to acquisitions as a result of merger, consolidation, reorganization or an acquisition from a parent, subsidiary, or affiliated corporation, or as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries.  Neither shall it apply to sales and acquisitions between partners in a partnership or venturers in a joint venture, or to any acquisition by any party of an interest which interest prior to and at the time of such acquisition was subject to this Agreement, unless such acquisition was the renewal or extension of a lease which at the date of expiration was subject to this Agreement.

Renewals and extensions of oil and gas lease(s) and/or oil and gas interest(s) shall be subject to Article VIII.B of this Agreement.

## L.  DISBURSEMENT OF ROYALTIES

**Operator shall pay or cause to be paid all royalties, overriding royalties, and other excess burdens upon or payable out of production from the Contract Area that are joint burdens of the parties, provided that any party taking its share of production in kind as allowed hereunder shall pay or cause to be paid all royalties, overriding royalties, and other excess burdens upon or payable out of such production unless Operator agrees otherwise in writing.**  If Operator prepares and administers a division order for and receives and distributes the proceeds of production attributable to the interest of a Non-Operator, then Operator shall be entitled to charge that party for an appropriate monthly overhead charge for disbursing such royalty payments, in addition to the combined fixed rates specified in Exhibit "C" hereto.  If through error or inadvertence Operator shall fail to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, he shall not be liable in damages to the other parties hereto for such failure, unless arising out of the gross negligence or willful misconduct of the Operator.

## M.  INFORMATION

Anything to the contrary hereinabove notwithstanding, it is stipulated that any non-consenting party to an operation conducted hereunder shall have no right to observe such operation or have access to information pertaining to such operation, until such time as the non-consenting party's share of the cost of such operation and the penalty therefor has been recovered by the consenting parties as provided herein.

**N.  OPERATOR'S LIEN – SECURITY INTEREST**

Subject to the provision of Article VII. B. of this Agreement, each Non-Operator grants to Operator a lien upon all of the rights, titles, and interests of each Non-Operator, whether now existing or hereafter acquired, in and to the (1) oil, gas, or other minerals in, on, and under the Contract Area and (2) any oil, gas, and mineral leases covering the Contract Area or any portion thereof.   In addition, each Non-Operator grants to Operator a security interest in and to all of such Non-Operator's rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (1) all oil, gas and other minerals produced from the Contract Area when produced; (2) all accounts receivable accruing or arising as a result of the sale of such oil, gas and other minerals; (3) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (4) all oil and gas wells and other surface and sub-surface equipment and facilities of any kind or character located on the Contract Area and the cash or other proceeds received from the sale thereof (collectively, the "Personal Property Collateral").   Some of the Personal Property Collateral is or will become fixtures on the Contract Area, and the interest of Non-Operator in and to the oil, gas and other minerals when extracted from the Contract Area and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area.   This Agreement (including a carbon, photographic, or other reproduction hereof) shall constitute a non-standard form financing statement under the terms of the Uniform Commercial Code of the State in which the Contract Area is located, and as such, may be filed for record in the real property records, or other applicable records, of the county, or counties, in which the Contract Area is located.   Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense, if any.

**O.  SEPARATE AGREEMENT FOR NON-UNIFORM INTEREST**

Any oil and gas lease and/or oil and gas interest that is either (i) described in Exhibit "A-1" to this Agreement or (ii) that is both acquired after the effective date of this Agreement and covered by Article VIII.B, VIII.C or XV.K of this Agreement, that thereafter becomes owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such lease and/or interest becomes so owned. Any oil and gas lease and/or oil and gas interest acquired after the Effective Date of this Agreement and covered by Article VII.B, VIII.C or XV.K of this Agreement, that becomes owned by more than one but less than all of the parties hereto shall remain subject to this Agreement as to the parties who own an interest therein, but Operator is authorized to modify Exhibit "A" to this Agreement to reflect the parties' interests in each such oil and gas lease and/or oil and gas interest.  Operator is further authorized to modify said Exhibit "A" to this Agreement to reflect the parties' interests in each well subject to this Agreement.

**P.  METERING OF PRODUCTION**

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

**Q.  PLUGGING AND LEASEHOLD RESTORATION FUND**

At any time any well subject to this Agreement is, in Operator's sole opinion, approaching the end of its economic life and/or its useful purpose, Operator may pre-bill the Joint Account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location.   Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and abandonment and restoration of the leasehold premises.   In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any accrued interest on such difference, based upon the then working interest percentage of such owner.   In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

**R.  PREVAILING AGREEMENT**

If there is a conflict between provisions of that Participation Agreement dated effective as of March 1, 2013 to which this form of Operating Agreement is attached as Exhibit "D" and this Operating Agreement, the provisions of the Participation Agreement shall prevail, and shall be binding upon all parties to this Operating Agreement.

**S.  DEFAULT PENALTY/AUTOMATIC NON-CONSENT**

If written notice has been given that the lien rights conferred in Article VII. B. have been implemented or enforced against any party hereto, for so long as the affected party remains in default, it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and

shall not be entitled to vote its interest in any matter hereunder.  As to any proposed operation in which it otherwise would have the right to participate, such party shall not have the right to elect to participate or be a Consenting Party unless and until it pays in full the amount it is in default plus all other outstanding amounts due hereunder.  If an operation proposed during such default period commences before such payment in full, the party in default shall automatically be deemed a Non-Consenting Party to the operation.

### T.   PRIOR OPERATING AGREEMENT(S)

This Joint Operating Agreement, as to the parties executing same and as to the Contract Area, shall supersede and replace any prior operating agreement(s) covering all or any portion of the Contract Area of this Joint Operating Agreement.

### U.   NON-PARTICIPATING INTERESTS

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto as same may be revised from time to time to reflect record title and/or reformation of the Contract Area.

### V.   MISCELLANEOUS

Anything to the contrary herein notwithstanding, this Joint Operating Agreement is expressly made subject to the terms and provisions of the leases and farmout agreements described in Exhibit "A" hereof. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and/or their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereto shall be deemed to run with the oil and gas leases and/or oil and gas interests subject to this Agreement.  The headings used in this Agreement are for convenience only and shall not be considered in the interpretation or construction of the Agreement.

### W.   NON-CONSENT

Any party that forfeits its interest in a well pursuant to Article VI.B.2 of this Agreement forfeits their interest in the entire well and revenue therefrom, not just a particular zone therein, for the duration of the recoupment period or, if the risk compensation is never recovered, forever.  The parties recognize, however, that applicable rules of the Railroad Commission of Texas may allow for the drilling and completion of additional wells within the unit for an existing well, and, subject to the other provisions of this Agreement, the forfeiture by one party of its interest in the existing well does not affect that party's right to elect to participate or not to participate in a proposal to drill, or any other operation with respect to, another well, even if the other well is located in the same unit, and even if the new well is completed in the same Zone from which the existing well is producing.

Anything to the contrary hereinabove notwithstanding, any Non-Consenting Party to an operation conducted hereunder shall have no right to observe such operation or subsequent operations within the same well or have access to information pertaining to such operation or subsequent operations, until such time as the Non-Consenting Party's share of the cost of such operation, and any applicable subsequent operations, and the risk compensation therefor has been recovered by the Consenting Parties as provided herein.

### X.   SOPHISTICATED INVESTORS

By execution of this Agreement, each Non-Operator represents to each other and to Operator: (i) that it has a working knowledge of the oil and gas industry; (ii) that it is a sophisticated investor and has a financial net worth in excess of one million dollars; (iii) that it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of leasehold costs, drilling costs, completion costs, and all other costs incurred in operations under this Agreement; (iv) that it ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES; (v) that its interest hereunder has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the State of Texas, or any other state ("Securities Law"), and that it owns said interest for investment purposes only, and not with a view to or for sale in connection with any distribution thereof within the meaning of Securities Law.

**Y.   OPERATOR'S OBLIGATION TO MARKET OIL AND GAS NOT TAKEN IN KIND**

i.   Notwithstanding anything to the contrary contained herein, upon written request from any party that elects at any time to not take in kind or separately dispose of its proportionate share of the oil or gas produced from the Contract Area, Operator agrees to purchase any and all such oil or gas or sell it to others in accordance with the provisions set forth in Article VI.C.  Any such written request shall, however, not be deemed a waiver by the requesting party of the rights granted to it in Article VI.C. pertaining to taking production in kind in future instances.

ii.   Operator is authorized to enter into oil and gas sales agreements with any unaffiliated third party on behalf of any party hereto whose proportionate share of the oil or gas from the Contract Area is being purchased or sold by Operator as provided for herein. Any oil or gas sales contracts entered into by Operator shall be binding upon each such party.

iii.   Any purchase or sale by Operator of any other party's share of oil or gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, provided, however, Operator shall not enter a gas contract with a term longer than <u>one (1) year</u> to sell a party's share of gas without such party's prior written ratification of such contract.

iv.   Operator shall make its best faith effort to obtain the best price obtainable for oil and gas of comparable grades and qualities in the immediate geographic area within which the Contract Area is situated; provided, however, Operator provides no guarantee or representation, either express or implied, that it shall obtain the best price obtainable, and all parties hereby acknowledge and recognize factors other than unit price may rightfully influence Operator's marketing decisions.

v.   Operator shall give notice of the first sale(s) of oil and gas from any well under this agreement to any party hereto whose proportionate share of such oil or gas is being purchased or sold by Operator.   Operator shall maintain records of all marketing arrangements and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

**Z.   OPERATOR'S PAYMENT OF PRODUCTION TAXES.**

Operator shall pay or cause to be paid all severance or production taxes, whether state or Federal, owing or which may be payable from the Contract Area, provided that any party taking its share of production in kind as allowed hereunder shall pay or cause to be paid all taxes associated with such production unless Operator agrees otherwise in writing.

**AA.   Limitations on Well Proposals.**

Notwithstanding the rights to propose operations hereunder as granted to each party in Article VI., without written consent of <u>two (2) or more parties</u> having an aggregate working interest of <u>at least sixty-five percent (65%)</u> in any proposed operation, no party shall be allowed to propose (i) the drilling of more than <u>one (1) well</u> at a time, (ii) the drilling of a well during the time another well is being drilled, completed or tested in the Contract Area or (iii) the drilling of a well while a prior proposal hereunder is still in force and effect and the period of time during which the well regarding same may be commenced has not expired.   Notwithstanding the foregoing, the provisions of this paragraph shall not apply to any proposal to drill any well that is either (i) a water source and/or water injection well or (ii) necessary to maintain any oil and gas lease or oil and gas interest covered by this agreement or an agreement to earn any lease or term assignment, in each case, that would otherwise expire within <u>six (6) months</u> of the date on which the operations are proposed.

**BB.   CONFIDENTIALITY**

i.   <u>Definition.</u> "Confidential Information" shall mean any and all information that is either nonpublic, confidential or proprietary in nature pertaining to activities under the agreement, including, without limitation, geological and geophysical information, data, and interpretations; reservoir information; tests, logs, surveys, maps, and models; commercial, contractual, and financial information; and any information pertaining to the progress, tests or results of any well or status of any activity under this agreement.

ii.  <u>Limitations on Disclosure</u>.  Except for necessary disclosures to governmental agencies or other persons as may be required or appropriate to comply with any applicable law, order, regulation or ruling, no party shall disclose Confidential Information other than to the following persons ("Permitted Recipients"): (a) a party's employees, officers, and directors who need to evaluate the Confidential Information to support the party's participation herein;   (b) any professional third party consultant or retained by a party for the purpose of evaluating the Confidential Information; (c) any third party bank financing or with a bona fide interest in financing a party's interests subject to this agreement, including any professional consultants retained by such bank for the purpose of evaluating the Confidential Information; (d) any third party with a bona fide interest in acquiring all or a portion of a party's interests subject to this agreement; or (e) any other third party approved in writing by all the parties hereto.

CC.  <u>DOWNSTREAM FACILITIES</u>

If any party to this agreement proposes the construction or acquisition and operation of a pipeline and/or gathering line to transport Oil and/or Gas produced from wells located in the Contract Area, or to construct a plant or other facility to treat, process, dehydrate, compress, extract ngl's or otherwise enhance the value of Oil and/or Gas produced from wells located in the Contract Area, or cause such Oil and/or Gas to meet requisite quality specifications, (hereinafter all such pipelines, gathering lines, plants and facilities are collectively referred to as the "Facilities"), then such party shall offer each of the other non-proposing parties to this agreement the right to participate in the construction, operation, ownership and use of the Facilities.  Should one or more non-proposing parties elect to participate, then between such participating, parties, the participating parties shall enter into a mutually acceptable agreement for the construction, acquisition, operation and use thereof.  Any party electing not to participate shall have no ownership in or right to use the applicable Facilities, and the participating parties shall have no obligation to allow the non-participating parties such use and/or access thereto.

# ARTICLE XV.

## OTHER PROVISIONS

### A. PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Operating Agreement, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1) An election to perform additional logging, coring or testing.
(2) An election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party.
(3) An election to plug back and attempt to complete the well in a shallower depth or formation.
(4) An election to deepen the well.
(5) An election to sidetrack the well.
(6) An election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production.
(7) An election to temporarily abandon the well.
(8) An election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of a majority of the consenting parties in possessory, cost-bearing interest (and not in number), a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth. In such event, the operation, which, in the opinion of a majority of the consenting parties in possessory, cost bearing interest (and not in number) is less likely to jeopardize the well, will be given priority. Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail. It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests. For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

### B. HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

### C. DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties. If the parties are equally divided, the opinion of the Operator will prevail.

### D. ADVANCEMENT OF COSTS

Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s) in advance of its respective share of (i) the dry hole cost for any subsequent well to be drilled hereunder to which such Non-Operator has consented, and (ii) the cost of any completion, reworking, recompletion, sidetracking, deepening, or plugging back operation to which such Non-Operator has consented (any such operation under clause (i) or (ii) being herein called a "Drilling Operation"). Such request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Drilling Operation. The amount of each Non-Operator's advance payment shall be based upon the latest AFE for such operation. Such advanced payments shall be held by Operator for the account of the Non-Operators and applied against the actual costs incurred in the applicable operation.

A Non-Operator receiving a request for advance payment shall, within two (2) days of the receipt of such request if and when a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to operator in cash the full amount of such request. Operator shall credit the amount to the Non-Operator's account for the payment of such Non-Operator's share of costs of such Drilling Operation, and following the end of each month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement. Advance payment by a Non-Operator of his share of completed well costs shall in no event prevent such completion of a well pursuant to Option No. 2 of Article VII.D.1. and, in the event such a Non-Operator elects not to participate in completion, the sums that such Non-Operator has advanced shall not be charged with any share of the costs of any completion attempted.

In the event a Non-Operator from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by depositing cash as aforesaid, then Operator, at his option, shall make a second written request by certified mail, return receipt requested for such advance. Non-Operator shall pay for said advance as aforesaid within five (5) business days from receipt of such second request.

If a Non-Operator fails to pay within five (5) business days of the receipt of such second request, then Non-Operator may, at the sole discretion and timing election of the Operator, be deemed non-consent in said operation retroactive to the beginning of such operation and thereafter subject to the penalty provisions of Article VI.B.2 hereof.

If the Non-Operator fails to make such payment or furnish such security within five (5) business days of the receipt of such second request, Operator shall promptly notify all other parties still participating in such Drilling Operation of the default in payment and if and when applicable, of the relinquishment of an interest under this provision. The parties who wish to participate in the Drilling Operation shall have five (5) days from receipt of the applicable notice to elect to assume the costs chargeable to such relinquished interest and shall share such relinquished interest in proportion to their assumption of such relinquished interest. If the parties who wish to participate in the Drilling Operation are unwilling to assume the costs chargeable to such relinquished interest, the Drilling Operation shall be cancelled, and if the cancelled Drilling Operation involves the drilling of a test well under Article VI. A. no assignment shall be due as a consequence of the failure to pay.

Notwithstanding anything to the contrary herein, if the applicable drilled well or operation is unsuccessful or results in a dry hole, Operator shall have the right to sue a Non-Operator who failed to pay for its proportionate share of expenses in lieu of Operator's right to an assignment of all Non-Operator's leasehold and contractual rights within the Contract Area, or in lieu of deeming the Non-Operator Non-Consent.

## E.   NECESSARY EXPENDITURES EXCLUDE SIDETRACKING

The phrase "necessary expenditures" in Article VII.D.1. (Option No. 2) on page 10 shall not be deemed to include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

## F.   ADDITIONAL CHARGES

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Unit Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same:

Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and expenses in connection with preparation and presentation of evidence and exhibits of Railroad Commission of Texas hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

## G.   INDEMNITY

Except for liabilities resulting from the gross negligence or willful misconduct of the Operator, each Non-Operator shall defend, indemnify and hold Operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operator's officers, employees and/or agents, resulting from or in any way relating to such officers, employees, and/or agents presence on a drilling rig on the Contract Area or from such person traveling by air or water between any point and such

drilling rig. Such indemnity to Operator shall also apply to any other person whose presence on the rig or transportation to or from such rig is at the request of the indemnifying Non-Operator (except for liabilities resulting from the gross negligence or willful misconduct of the Operator).

## H. GAS BALANCING FOR FORFEITED INTERST

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

## I. SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

## J. NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

## K. AREA OF MUTUAL INTEREST

The parties hereby create an Area of Mutual Interest ("AMI") consisting of the lands outlined by a bold red line on the plat attached hereto as Exhibit "A-2". This AMI shall remain in force and effect for a term of five (5) years from the date of this Agreement and, insofar and only insofar as the AMI includes lands covered by oil and gas leases and/or oil and gas interests subject to this Agreement, as long thereafter as said oil and gas leases and/or oil and gas interests remain in force and effect. This AMI shall terminate after five (5) years as to all such lands not covered by oil and gas leases and/or oil and gas interests subject to this Agreement.

During the term of this AMI, if any party hereto, including related persons or entities, ("Acquiring Party") directly or indirectly acquires any oil and gas lease or any oil and gas interest covering lands lying within the AMI, the Acquiring Party shall promptly advise the other parties ("Offerees") of such acquisition. In such event, each Offeree shall have the right to acquire its proportionate interest in such oil and gas lease and/or oil and gas interest in accordance with the other provisions of this AMI.

Promptly upon acquiring such oil and gas lease and/or oil and gas interest, the Acquiring Party shall, in writing, advise the Offerees of such acquisition. The notice shall include a copy of all instruments of acquisition including, by way of example but not of limitation, copies of the leases, assignments, subleases, farmouts or other contracts affecting the oil and gas lease and/or oil and gas interest.

The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by the Acquiring Party in acquiring such oil and gas lease and/or oil and gas interest ("Acquisition Costs"). The Offeree shall have a period of fifteen (15) days after receipt of the notice within which to furnish the Acquiring Party written notice of its election to acquire its proportionate interest in the offered oil and gas lease and/or oil and gas interest. If, however, a well in search of oil or gas is being drilled within the AMI, each Offeree shall have a period of twenty-four (24) hours (excluding Saturdays, Sundays and legal holidays) after delivery of the notice within which to elect to acquire its proportionate interest in the oil and gas lease and/or oil and gas interest so offered. It is provided, however, that the twenty-four (24) hour election period shall not apply unless the Acquiring Party shall give the notice to the Offerees within two (2) days after the date on which the Acquiring Party acquired the oil and gas lease and/or oil and gas interest so offered. In addition thereto, the Acquiring Party shall also:

(a)     furnish the Offerees with the approximate location of the well then being drilled and the name of the operator or drilling contractor drilling the well, and

(b)     specifically advise the Offerees that the Offerees shall have a period of twenty-four (24) hours within which to elect to acquire an interest in the offered Oil and Gas Interest.

Page 14-3

The above information shall be in addition to the information and copies of instruments provided for above in connection with the usual notices of acquisition of an oil and gas lease and/or oil and gas interest.   If the Acquiring Party does not receive actual written notice of election of an Offeree to acquire its proportionate interest within the fifteen (15) day or twenty-four (24) hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire its interest therein.   An Offeree accepting the offered interest shall be entitled to participate in such oil and gas lease and/or oil and gas interest in the proportion to which its interest bears to the total interest of all parties (including the acquiring party) electing to participate.  Promptly after the time for election expires, the Acquiring Party shall invoice the Offeree electing to acquire an interest for its proportionate part of the Acquisition Cost, as reflected by the invoice. Upon receipt of such reimbursement, the Acquiring Party shall execute and deliver an appropriate assignment to such Offeree.  If the Acquiring Party does not receive the amount due from the Offeree within thirty (30) days after receipt by the Offeree of the invoice for its cost, the Acquiring Party may, at its election, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within five (5) days after receipt of such written notice by the delinquent Offeree shall constitute a withdrawal by the delinquent Offeree of its former election to acquire the interest, and such Offeree shall no longer have the right to acquire an interest in the offered oil and gas lease and/or oil and gas interest.

Any assignment made by the Acquiring Party shall be made free and clear of any liens, encumbrances, overriding royalty interests and other burdens created by or arising under the Acquiring Party but otherwise without warranty of title, either express or implied.  The assignment shall be made and accepted subject to, and each assignee shall expressly assume its portion of all of the obligations of the Acquiring Party.  The assignment shall also be made and accepted subject to this Agreement and to the Participation Agreement to which this Agreement is attached as Exhibit "D" in all of its previsions, including, without limitation, Section 1.3 thereof and the Reversionary Back-in Working Interest described therein.

If two (2) or more separate oil and gas leases and/or oil and gas interests are included in the same notice, the Offeree shall have the separate right of election as to each separate oil and gas lease and/or oil and gas interest.

The provisions of this AMI shall not apply to acquisitions as a result of merger, consolidation, reorganization or an acquisition from a parent, subsidiary, or affiliated corporation, or as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries.  Neither shall it apply to sales and acquisitions between partners in a partnership or venturers in a joint venture, or to any acquisition by any party of an interest which interest prior to and at the time of such acquisition was subject to this Agreement, unless such acquisition was the renewal or extension of a lease which at the date of expiration was subject to this Agreement.

Renewals and extensions of oil and gas lease(s) and/or oil and gas interest(s) shall be subject to Article VIII.B of this Agreement.

## L.  DISBURSEMENT OF ROYALTIES

Operator shall pay or cause to be paid all royalties, overriding royalties, and other excess burdens upon or payable out of production from the Contract Area that are joint burdens of the parties, provided that any party taking its share of production in kind as allowed hereunder shall pay or cause to be paid all royalties, overriding royalties, and other excess burdens upon or payable out of such production unless Operator agrees otherwise in writing.  If Operator prepares and administers a division order for and receives and distributes the proceeds of production attributable to the interest of a Non-Operator, then Operator shall be entitled to charge that party for an appropriate monthly overhead charge for disbursing such royalty payments, in addition to the combined fixed rates specified in Exhibit "C" hereto.  If through error or inadvertence Operator shall fail to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, he shall not be liable in damages to the other parties hereto for such failure, unless arising out of the gross negligence or willful misconduct of the Operator.

## M.  INFORMATION

Anything to the contrary hereinabove notwithstanding, it is stipulated that any non-consenting party to an operation conducted hereunder shall have no right to observe such operation or have access to information pertaining to such operation, until such time as the non-consenting party's share of the cost of such operation and the penalty therefor has been recovered by the consenting parties as provided herein.

**N.   OPERATOR'S LIEN – SECURITY INTEREST**

Subject to the provision of Article VII. B. of this Agreement, each Non-Operator grants to Operator a lien upon all of the rights, titles, and interests of each Non-Operator, whether now existing or hereafter acquired, in and to the (1) oil, gas, or other minerals in, on, and under the Contract Area and (2) any oil, gas, and mineral leases covering the Contract Area or any portion thereof.   In addition, each Non-Operator grants to Operator a security interest in and to all of such Non-Operator's rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (1) all oil, gas and other minerals produced from the Contract Area when produced; (2) all accounts receivable accruing or arising as a result of the sale of such oil, gas and other minerals; (3) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (4) all oil and gas wells and other surface and sub-surface equipment and facilities of any kind or character located on the Contract Area and the cash or other proceeds received from the sale thereof (collectively, the "Personal Property Collateral").   Some of the Personal Property Collateral is or will become fixtures on the Contract Area, and the interest of Non-Operator in and to the oil, gas and other minerals when extracted from the Contract Area and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area.   This Agreement (including a carbon, photographic, or other reproduction hereof) shall constitute a non-standard form financing statement under the terms of the Uniform Commercial Code of the State in which the Contract Area is located, and as such, may be filed for record in the real property records, or other applicable records, of the county, or counties, in which the Contract Area is located.   Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense, if any.

**O.   SEPARATE AGREEMENT FOR NON-UNIFORM INTEREST**

Any oil and gas lease and/or oil and gas interest that is either (i) described in Exhibit "A-1" to this Agreement or (ii) that is both acquired after the effective date of this Agreement and covered by Article VIII.B, VIII.C or XV.K of this Agreement, that thereafter becomes owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such lease and/or interest becomes so owned. Any oil and gas lease and/or oil and gas interest acquired after the Effective Date of this Agreement and covered by Article VII.B, VIII.C or XV.K of this Agreement, that becomes owned by more than one but less than all of the parties hereto shall remain subject to this Agreement as to the parties who own an interest therein, but Operator is authorized to modify Exhibit "A" to this Agreement to reflect the parties' interests in each such oil and gas lease and/or oil and gas interest.   Operator is further authorized to modify said Exhibit "A" to this Agreement to reflect the parties' interests in each well subject to this Agreement.

**P.   METERING OF PRODUCTION**

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

**Q.   PLUGGING AND LEASEHOLD RESTORATION FUND**

At any time any well subject to this Agreement is, in Operator's sole opinion, approaching the end of its economic life and/or its useful purpose, Operator may pre-bill the Joint Account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location.   Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and abandonment and restoration of the leasehold premises.   In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any accrued interest on such difference, based upon the then working interest percentage of such owner.   In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

**R.   PREVAILING AGREEMENT**

If there is a conflict between provisions of that Participation Agreement dated effective as of March 1, 2013 to which this form of Operating Agreement is attached as Exhibit "D" and this Operating Agreement, the provisions of the Participation Agreement shall prevail, and shall be binding upon all parties to this Operating Agreement.

**S.   DEFAULT PENALTY/AUTOMATIC NON-CONSENT**

If written notice has been given that the lien rights conferred in Article VII. B. have been implemented or enforced against any party hereto, for so long as the affected party remains in default, it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and

shall not be entitled to vote its interest in any matter hereunder.   As to any proposed operation in which it otherwise would have the right to participate, such party shall not have the right to elect to participate or be a Consenting Party unless and until it pays in full the amount it is in default plus all other outstanding amounts due hereunder.  If an operation proposed during such default period commences before such payment in full, the party in default shall automatically be deemed a Non-Consenting Party to the operation.

## T.  PRIOR OPERATING AGREEMENT(S)

This Joint Operating Agreement, as to the parties executing same and as to the Contract Area, shall supersede and replace any prior operating agreement(s) covering all or any portion of the Contract Area of this Joint Operating Agreement.

## U.  NON-PARTICIPATING INTERESTS

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto as same may be revised from time to time to reflect record title and/or reformation of the Contract Area.

## V.  MISCELLANEOUS

Anything to the contrary herein notwithstanding, this Joint Operating Agreement is expressly made subject to the terms and provisions of the leases and farmout agreements described in Exhibit "A" hereof. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and/or their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereto shall be deemed to run with the oil and gas leases and/or oil and gas interests subject to this Agreement.  The headings used in this Agreement are for convenience only and shall not be considered in the interpretation or construction of the Agreement.

## W.  NON-CONSENT

Any party that forfeits its interest in a well pursuant to Article VI.B.2 of this Agreement forfeits their interest in the entire well and revenue therefrom, not just a particular zone therein, for the duration of the recoupment period or, if the risk compensation is never recovered, forever.  The parties recognize, however, that applicable rules of the Railroad Commission of Texas may allow for the drilling and completion of additional wells within the unit for an existing well, and, subject to the other provisions of this Agreement, the forfeiture by one party of its interest in the existing well does not affect that party's right to elect to participate or not to participate in a proposal to drill, or any other operation with respect to, another well, even if the other well is located in the same unit, and even if the new well is completed in the same Zone from which the existing well is producing.

Anything to the contrary hereinabove notwithstanding, any Non-Consenting Party to an operation conducted hereunder shall have no right to observe such operation or subsequent operations within the same well or have access to information pertaining to such operation or subsequent operations, until such time as the Non-Consenting Party's share of the cost of such operation, and any applicable subsequent operations, and the risk compensation therefor has been recovered by the Consenting Parties as provided herein.

## X. SOPHISTICATED INVESTORS

By execution of this Agreement, each Non-Operator represents to each other and to Operator: (i) that it has a working knowledge of the oil and gas industry; (ii) that it is a sophisticated investor and has a financial net worth in excess of one million dollars; (iii) that it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of leasehold costs, drilling costs, completion costs, and all other costs incurred in operations under this Agreement; (iv) that it ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES; (v) that its interest hereunder has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the State of Texas, or any other state ("Securities Law"), and that it owns said interest for investment purposes only, and not with a view to or for sale in connection with any distribution thereof within the meaning of Securities Law.

## Y.   OPERATOR'S OBLIGATION TO MARKET OIL AND GAS NOT TAKEN IN KIND

i.   Notwithstanding anything to the contrary contained herein, upon written request from any party that elects at any time to not take in kind or separately dispose of its proportionate share of the oil or gas produced from the Contract Area, Operator agrees to purchase any and all such oil or gas or sell it to others in accordance with the provisions set forth in Article VI.C.  Any such written request shall, however, not be deemed a waiver by the requesting party of the rights granted to it in Article VI.C. pertaining to taking production in kind in future instances.

ii.   Operator is authorized to enter into oil and gas sales agreements with any unaffiliated third party on behalf of any party hereto whose proportionate share of the oil or gas from the Contract Area is being purchased or sold by Operator as provided for herein. Any oil or gas sales contracts entered into by Operator shall be binding upon each such party.

iii.   Any purchase or sale by Operator of any other party's share of oil or gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, provided, however, Operator shall not enter a gas contract with a term longer than <u>one (1) year</u> to sell a party's share of gas without such party's prior written ratification of such contract.

iv.   Operator shall make its best faith effort to obtain the best price obtainable for oil and gas of comparable grades and qualities in the immediate geographic area within which the Contract Area is situated; provided, however, Operator provides no guarantee or representation, either express or implied, that it shall obtain the best price obtainable, and all parties hereby acknowledge and recognize factors other than unit price may rightfully influence Operator's marketing decisions.

v.   Operator shall give notice of the first sale(s) of oil and gas from any well under this agreement to any party hereto whose proportionate share of such oil or gas is being purchased or sold by Operator.   Operator shall maintain records of all marketing arrangements and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

## Z.   OPERATOR'S PAYMENT OF PRODUCTION TAXES.

Operator shall pay or cause to be paid all severance or production taxes, whether state or Federal, owing or which may be payable from the Contract Area, provided that any party taking its share of production in kind as allowed hereunder shall pay or cause to be paid all taxes associated with such production unless Operator agrees otherwise in writing.

## AA.   Limitations on Well Proposals.

Notwithstanding the rights to propose operations hereunder as granted to each party in Article VI., without written consent of <u>two (2) or more parties</u> having an aggregate working interest of <u>at least sixty-five percent (65%)</u> in any proposed operation, no party shall be allowed to propose (i) the drilling of more than <u>one (1) well</u> at a time, (ii) the drilling of a well during the time another well is being drilled, completed or tested in the Contract Area or (iii) the drilling of a well while a prior proposal hereunder is still in force and effect and the period of time during which the well regarding same may be commenced has not expired. Notwithstanding the foregoing, the provisions of this paragraph shall not apply to any proposal to drill any well that is either (i) a water source and/or water injection well or (ii) necessary to maintain any oil and gas lease or oil and gas interest covered by this agreement or an agreement to earn any lease or term assignment, in each case, that would otherwise expire within <u>six (6) months</u> of the date on which the operations are proposed.

## BB.   CONFIDENTIALITY

i.   **Definition. "Confidential Information"** shall mean any and all information that is either nonpublic, confidential or proprietary in nature pertaining to activities under the agreement, including, without limitation, geological and geophysical information, data, and interpretations; reservoir information; tests, logs, surveys, maps, and models; commercial, contractual, and financial information; and any information pertaining to the progress, tests or results of any well or status of any activity under this agreement.

ii. **Limitations on Disclosure.**   Except for necessary disclosures to governmental agencies or other persons as may be required or appropriate to comply with any applicable law, order, regulation or ruling, no party shall disclose Confidential Information other than to the following persons ("Permitted Recipients"): (a) a party's employees, officers, and directors who need to evaluate the Confidential Information to support the party's participation herein; (b) any professional third party consultant or retained by a party for the purpose of evaluating the Confidential Information; (c) any third party bank financing or with a bona fide interest in financing a party's interests subject to this agreement, including any professional consultants retained by such bank for the purpose of evaluating the Confidential Information; (d) any third party with a bona fide interest in acquiring all or a portion of a party's interests subject to this agreement; or (e) any other third party approved in writing by all the parties hereto.

## CC.  DOWNSTREAM FACILITIES

If any party to this agreement proposes the construction or acquisition and operation of a pipeline and/or gathering line to transport Oil and/or Gas produced from wells located in the Contract Area, or to construct a plant or other facility to treat, process, dehydrate, compress, extract ngl's or otherwise enhance the value of Oil and/or Gas produced from wells located in the Contract Area, or cause such Oil and/or Gas to meet requisite quality specifications, (hereinafter all such pipelines, gathering lines, plants and facilities are collectively referred to as the "Facilities"), then such party shall offer each of the other non-proposing parties to this agreement the right to participate in the construction, operation, ownership and use of the Facilities.   Should one or more non-proposing parties elect to participate, then between such participating, parties, the participating parties shall enter into a mutually acceptable agreement for the construction, acquisition, operation and use thereof.   Any party electing not to participate shall have no ownership in or right to use the applicable Facilities, and the participating parties shall have no obligation to allow the non-participating parties such use and/or access thereto.