# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| SKLAR EXPLORATION COMPANY, LLC, *et al.*,[1] | § § § § | Case No. 20-12377-EEB |
| Debtors. | § § | (Jointly Administered) |

## COMMITTEE REPORT SUMMARIZING INVESTIGATIONS RELATING TO DEBTORS' TRANSFERS TO HOWARD SKLAR AND RELATED FAMILY TRUSTS

Pursuant to this Court's direction and request at the February 21, 2021 hearing, the Official Committee of Unsecured Creditors (the "Committee") submits the following Report summarizing its current analysis of certain transactions from the Debtors to or for the benefit of Howard Sklar and/or family trusts for which Mr. Sklar is trustee.

## I.      INTRODUCTION

**$19.5 million in the four years before the Petition Date.** That's the short answer to the Court's question at the hearing – how much money went to Howard Sklar and the trusts.

The analysis is principally based on deposition testimony of Mr. Sklar and the Debtors' representative, and limited documents received in connection with Bankruptcy Rule 2004 discovery requests propounded on the Debtors (but not Howard Sklar or the trusts) (collectively, the "Discovery"). For the avoidance of doubt the scope of the Discovery conducted by the Committee (to the extent relevant to this report) was limited to chapter 11 plan formulation/confirmation issues, including investigation of the extent to which the Debtors operated as a single business enterprise, and general claims preservation. The Discovery was expressly not intended to be comprehensive discovery of all issues or claims against Mr. Sklar or

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are as follows: Sklar Exploration Company, LLC (7930) and Sklarco, LLC (5432).

1

other insiders, which claims and any additional discovery shall be reserved to a post-confirmation trust for the benefit of creditors. Accordingly, this Report is intended to be instructive of investigations to-date, is limited to Discovery made and responses received, and is not comprehensive of all relevant transactions, claims, or other issues.

## II. RELEVANT BACKGROUND

### (1) *General Description of the Debtors' Pre-Petition Operations*

1. Sklar Exploration Company, LLC ("SEC") is an independent oil and gas exploration and production company, with its exploration and production activities primarily located in East Texas, North Louisiana, South Mississippi, South Alabama, and the Florida Panhandle. Sklarco, LLC ("Sklarco", collectively with SEC, the "Debtors") is also engaged in the oil and gas business as the owner of certain oil and gas leases and property interests in East Texas, North Louisiana, South Mississippi, South Alabama, the Florida Panhandle, and the western United States.

2. The Debtors' corporate structure allows Sklarco, as the assets-holding company, to own almost all of the Debtors' assets with very little debt carried (other than the Debtors' secured lending facility), while SEC, as the operating company, holds no significant assets and carries substantially all of the Debtors' liabilities.

3. According to the Declaration of Howard Sklar [Dkt. No. 39], on a consolidated basis the Debtors generated gross revenue in 2018 and 2019 of approximately $19 million and $15 million, respectively, with a staff and operating team of 45 individuals. Howard Sklar, until the appointment of the Debtors' CRO (defined below), controlled both SEC and Sklarco.

### (2) *Bankruptcy Filings and Subsequent Events*

4. On April 1, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The Debtors' bankruptcy cases are being jointly

administered, and the Debtors remain in control of their business and affairs as debtors-in-possession.

5. On April 28, 2020, shortly after its selection of counsel, the Committee served informal discovery requests upon the Debtors and East West Bank ("EWB"), the Debtors' primary lender, regarding all prepetition transactions and seeking documents and information regarding Sklarco, SEC, Howard Sklar, and the Sklar Family Trusts.[2]

6. On May 21, 2020, the Debtors filed their *Motion for Entry of Order Authorizing Debtors' Employment of CR3 Partners as Chief Restructuring Officer Effective as of May 21, 2020* [Dkt. No. 341], which this Court granted on June 15, 2020, appointing James Katchadurian and CR3 Partners as chief restructuring officer (the "CRO"), and replacing Howard Sklar as CEO.

7. On August 14, 2020, the CRO filed his *Status Report of Chief Restructuring Officer* (the "CRO Status Report") [Dkt. No. 529]. As directed by the Court, the scope of the CRO Status Report was limited to an analyzing cash call and revenue payment transactions with certain working interest owners during the six-month period immediately preceding the Petition Date. Accordingly, the CRO Report left significant questions regarding the Debtors' finances—particularly relating to Howard Sklar-related transfers—unanswered.

**(3)** *2004 Examinations of Howard Sklar and James Katchadurian*

8. Based in part on the limited scope of the CRO Status Report, on October 2, 2020, the Committee filed its *Ex Parte Motion for Examination of Debtors Pursuant to Fed. R. Bankr. P. 2004 and Local Bankr. R. 2004-1* [Dkt. No. 577], seeking the examination of Howard Sklar, individually; and also filed its *Ex Parte Motion for Examination of Howard Sklar Pursuant to Fed. R. Bankr. P. 2004 and Local Bankr. R. 2004-1* [Dkt. No. 578], seeking the examination of the

---

[2] "Sklar Family Trusts" shall mean the Howard Sklar Trust, Howard/Jacob Sklar Trust, Maren Trust, Alan Trust, and the Succession of Miriam Mandel Sklar Trust.

3

4836-0911-6894v.1

Debtors' corporate representative and requesting production of certain documentation. Copies of the Rule 2004 examination transcripts of Mr. Sklar and Mr. Katchadurian, as the Debtors' corporate representative, are attached hereto as **Exhibits "A" and "B"**, respectively.

9. The Committee's formal document requests made demand for production from the Debtors (beginning four years from the Petition Date) of all documents relating to the Debtors transfers to or from Howard Sklar and/or the Sklar Family Trusts; specifically, the requests included the Sklar Family Trusts documents (including ownership and formation documents), email exchanges and all attachments thereto, and any contract, loan, or other documentation pertaining to transactions with Howard Sklar or the Sklar Family Trusts.

10. Immediately upon receiving rolling document production from the Debtors, the Committee began reviewing and analyzing the materials provided. This examination included detailed review of Debtors' banking records, accounting and financial documents, and email communications regarding the aforementioned items as they relate to Howard Sklar.

11. On November 24, 2020, the Committee, along with Fant Energy Limited, JF Howell Interests, LP, and various other parties authorized by the Court, conducted their Rule 2004 examination of the Debtors' corporate representative and Howard F. Sklar, in his individual capacity. The subjects of the examination are fully described in the Committee's 2004 Motion; *Howell Interests' Ex Parte Motion for Examination of Howard Sklar Pursuant to Fed. R. Bankr. P. 2004 and Local Bankr. R. 2004-1* [Dkt. No. 587]; and *Fant Energy's Ex Parte Motion for Examination of Debtors Pursuant to Fed. R. Bankr. P. 2004 and Local Bankr. R. 2004-1* [Dkt. No. 603]; and included inquiry into the prepetition operations of the Debtors and their transactions with Howard Sklar and various related corporate entities, trusts, individuals, and other insiders.

12. Pursuant to the Rule 2004 examinations, the Committee and other parties conducting the examination adduced evidence regarding the Debtors' and Mr. Sklar's above-listed activities. The Committee concluded that, despite his acting as the Debtors' CEO,[3] Howard Sklar was insufficiently educated on the Debtors' financial affairs, internal business procedures, or inter-company transfers.

13. The Committee, having completed its Rule 2004 examinations of the Debtors and Mr. Sklar, as well as its review and analysis of document discovery consisting of over twenty-one (21) gigabytes of data between the Debtors' and CR3's file share sites, along with several hundred produced emails and attachments, still lacks information necessary to paint the entire picture of what happened to the prepetition funds and all of the transfers to and from the Sklar Family Trusts. Critically, the Debtors only produced bank records for SEC and Sklarco going back a little over a year from the Petition Date, rather than four years as requested. In addition to the missing bank records, necessary documents include, but are not limited to: materials regarding certain bank accounts that were shown to receive transfers from the Sklar Family Trusts; documents (and/or testimony) revealing how the Debtors quantified the amounts of funds to be transferred from the Debtors to the various Sklar Family Trusts and the timing of same; and documentation evidencing that all expenses paid by the Debtors on behalf of the Sklar Family Trusts and/or for Mr. Sklar's personal expenses were accounted for and repaid, if at all.

### III. INITIAL FINDINGS

**(1)** *The Debtors transferred approximately $19.5 Million to the Sklar Family Trusts in the four years immediately preceding the Petition Date*

14. Howard Sklar and/or the Sklar Family Trusts received **$19,500,285.79** from the Debtors between April 1, 2016, and April 1, 2020. Amounts received varied from month-to-

---

[3] Sklar Exam, Page 15, Lines 16–18.

month. In some months the Sklar Family Trusts received more than $1,000,000; in other months, the trusts received nothing. The below chart sets forth the amounts the Committee has thus far identified as being transferred to the Sklar Family Trusts during the four-year period prior to the Petition Date:

| Year | Howard Sklar Trust | Alan Sklar Trust | Jacob Sklar Trust | SMMS Trust |
|---|---|---|---|---|
| 2016 | $6,728,606.22[4] | $318,146.00[5] | $70,000 | $1,575,466.75 |
| 2017 | $2,691,081.81 | $172,817.04 | $199,831.37 | $540,913.76 |
| 2018 | $1,494,337.53[6] | $328,478.22 | $235,158.48 | $30,434.09 |
| 2019 | $2,838,725.96 | $245,130.91 | $271,223.79 | $120,035.61 |
| 2020 | $1,511,040.93[7] | $53,146.84[8] | $56,732.48[9] | $18,978.00 |
| **Total** | **$15,263,792.45** | **$1,117,719.01** | **$832,946.12** | **$2,285,828.21**[10] |

15. Even when SEC was unable to satisfy its obligations to creditors, significant transfers to the Sklar Family Trusts continued. Various emails dated May 22, 2019, evidence that the Debtors knew they were suffering a financial crisis. In these emails, the Debtors state:

> "RAPAD is not included in the check run. [I]t's going to be a tight month this month . . . how far out can we push RAPAD? They have a $558k invoice out there dated 04/01, so I know it needs to be paid sooner rather than later."[11]

---

[4] This amount does not include payments for January through March 2016. This amount also includes $1,830,231.86 in deposits from an unknown source.
[5] This amount only includes $10,000 from the 8199 Account, and the remaining balance is from three deposits from an unknown source.
[6] This amount is missing payments for the month of May, 2018.
[7] This amount does not include any payments received during May, August, September, October, November, and December 2020.
[8] This amount includes some deposits labeled "Deposit Bridge." The Committee does not currently have any accounting showing where this deposit is coming from. Moreover, this amount includes payments only through the Petition Date.
[9] This amount includes some deposits labeled "Deposit Bridge." The Committee does not currently have any accounting showing where this deposit is coming from. Moreover, this amount includes payments only through the Petition Date.
[10] These amounts are primarily derived from "deposits" directly into the account with no information regarding where they came from.
[11] Sklar Exam, Exhibit 11.

4836-0911-6894v.1

16. This evidences that, at least as of May 2019, the Debtors could not pay their debts as they became due. But, the Debtors' own filings with this Court reflect that at this same time, when the Debtors could not pay creditors, the Debtors transferred $425,513.20 to the Sklar Family Trusts.[12]

| **Slarco Transfers to Howard Sklar and the Sklar Family Trusts** **May 2019** ||
|---|---|
| Transfers to Alan Trust | ($37,546.69) |
| Transfers to Howard Sklar/Howard Trust | ($355,000.00) |
| Transfers to Jacob Trust | ($32,966.51) |
| **Total Transfers** | **($425,513.20)** |

17. Based on documents reviewed and testimony provided, these Sklar Family Trusts transfers were made without any internal distribution protocols, meaningful executive control or oversight, or documentary support. As stated in the 2004 Examination of Howard Sklar, throughout Howard Sklar's tenure as CEO, he would make payment requests to the then CFO, John Strausser, who would tell Mr. Sklar what he could "afford to take out."[13] Notably, the CFO never turned down Mr. Sklar's request to transfer funds from the Debtors to Mr. Sklar or the Sklar Family Trusts either as salary or a distribution.[14] The funds were wired to either Mr. Sklar's or the Sklar Family Trusts' bank accounts. Funds were also subsequently wired into Howard Sklar's personal account, including Mr. Sklar's Charles Schwab account, and an account ending in 8199.[15]

---

[12] Sklar Exam, Exhibit 7, Page. 30.
[13] 2004 Deposition of Howard Sklar ("Sklar Exam"), Pages 14 and 15, Lines 22–4; Sklar Exam Page 67, Lines 1–6; Pages 115 and 116, Lines 23–5; Pages 117 and 118, Lines 18–9.
[14] Sklar Exam, Pages 117, Lines 18–25.
[15] The Committee has not been provided with any documentation regarding the 8199 account. It thus has no understanding of how, when, or why it was funded or how, when, or why funds were transferred out of it. It has no knowledge of how much remains in this account, how the account's balance varies from month-to-month, or the sources of the funds in the account.

**(2)** *Howard Sklar used the Debtors to pay for his extravagant lifestyle*

18.     The $19.5 million paid to Howard Sklar and the Sklar Family Trusts is not inclusive of the amounts transferred from the Debtors to Howard Sklar, individually, for his role as CEO or the various other benefits Howard Sklar received including the use of a private jet, apparent funding of his race-car team, and numerous personal expenses seemingly borne by the Debtors (including costs for maintaining his prized show dogs).[16] When examined on these issues, Mr. Sklar testified that all these personal expenses were accounted for and a process was followed whereby he paid the Debtors back for all funds expended on his personal endeavors.[17] But this alleged process and the corresponding tracing of the repayment of these funds is not evidenced in the materials produced by the Debtors in response to the Committee's requests for production, and the Committee's review and analysis of the documents in its possession from any source do not support Mr. Sklar's claim.

19.     The lack of internal controls and protocols for payments regarding the Sklar Family Trusts and Mr. Sklar, personally, are further evidenced by Mr. Sklar's use of the Debtors' airplane to which the Debtors had access via a contract between SEC and Flexjet, for the benefit of Sklar Transport, LLC ("Sklar Transport"). Based on a review of the Flexjet invoices, the Committee determined that Mr. Sklar frequently used the jet for his personal travels. He traveled to Napa Valley, Las Vegas, Denver, Portland, and San Diego in May 2019, apparently all at Debtor's expense.[18] Similarly, he took the jet to Chico, San Diego, and Monterey, California in August of

---

[16] Pursuant to a Debtors' report entitled "Howard F. Sklar Personal", which detailed some of Howard Sklar's personal expenses that were paid through the Debtors, document production, Howard Sklar's show dogs costs $49,899. *See* Sklar Exam, Pages 75 to Page 78, Line 22; Exhibit 13.1.

[17] Sklar Exam, Pages 36 and 37, Lines 24–22;

[18] Sklar Examination, Exhibit 18, SEC000588 - SEC000591. As stated earlier, despite Mr. Sklar's explanation that all his personal expenses were accounted for and repaid to the Debtors, the Committee has not yet been provided documentary evidence to support this testimony.

4836-0911-6894v.1

2019,[19] and returned to Napa in September 2019.[20] During his 2004 Examination, Mr. Sklar testified that he believed that each time he used the jet for a personal trip, SEC would bill Sklarco for the trip and be reimbursed.[21] The Debtors' accounting staff (they were the same for both SEC and Sklarco) would then allegedly seek to allocate the trips' cost between business travel and personal travel.[22] Mr. Sklar, however, as the CEO, had no definitive knowledge of how this allocation occurred or how the funds were paid back to the Debtors.[23]

20. The Debtors did quantify and disclose Howard Sklar's personal use of the jet between 2019 and 2020 in the Debtors' Statements of Financial Affairs. By the Debtors' own admission, Mr. Sklar used the jet for personal expenses totaling no less than $503,173.35.[24] The Debtors did not quantify the other Sklar family members' personal use of the jet; although Mr. Sklar's testimony suggests that at least one other member of the Sklar family did, in fact, use the jet.[25]

21. Based on the information currently available to the Committee, no records have been located evidencing the process for the reimbursement of Mr. Sklar's personal travel (and other personal expenses). To better understand these accounting issues, the Committee requires clear documentation of all personal travel, the methodology for repayment, and a distillation of all

---

[19] Sklar Examination, Exhibit 18, SEC000611 - SEC000613.
[20] Sklar Examination, Exhibit 18, SEC000617 - SEC000619.
[21] Sklar Examination, Pages 36 through 39; Lines 16 – 24.
[22] Sklar Examination, Pages 36 through 39; Lines 16 – 24.
[23] Sklar Examination, Pages 36 through 39; Lines 16 – 24. Moreover, transfers from Sklar Transportation into the Howard Sklar Trust occurred at least once in the amount of $7,245.01. Without the Sklar Transportation bank statements and records, determining the frequency of these events/occurrences is not possible
[24] Debtors' Form 207 Statement of Financial Affairs [Dkt. 324], Page 11 (reporting the $503,173.35 Debtors paid to Flexjet as a credit to insider with the reason for listing this amount as "Amounts paid attributed to personal travel expenses of Howard Sklar."); Moreover, Judge Brown stated at the May 18, 2020 hearing on the Debtors' use of cash collateral, that Howard Sklar's Flexjet travel "even if it was business travel, this is just - - it's appalling that this company is in the position it's in due to one person's actions." See Cash Collateral transcript, Page. 227, Lines 14-16.
[25] See Sklar Examination, Pages 36 and 37, lines 24 – 5 (wherein Sklar mentions his mother's personal use of the corporate jet).

bank account statements and receipts supporting Mr. Sklar's testimony that he was accounting for these personal expenses.

22. The skepticism surrounding the Debtors' payment of Howard Sklar personal expenses is further highlighted by the costs associated with Mr. Sklar's car-racing team. Mr. Sklar admits his racing hobby was purely personal and had no business purpose.[26] Mr. Sklar claims the Debtors did not fund this hobby.[27] As shown in multiple emails, several wire transfers were made from SEC to Laurent Sénéchal, a racing management company, in amounts totaling at least $50,951.63.[28] Mr. Sklar claims funds would be transferred to SEC from his personal account to cover these expenses.[29] But, as explained above, the Debtors did not produce to the Committee the documentation to substantiate this claim.[30]

### (3) *The Debtors commingled funds and assets in order to support insufficiently funded affiliates*

23. It appears neither Debtor could function without the other. Throughout the Debtors' prepetition operations, SEC and Sklarco shared the same management team,[31] accounting department,[32] accounting staff for payroll,[33] employees,[34] and decision makers (primarily Howard Sklar).[35] Moreover, no management agreement existed between SEC and Sklarco;[36] the books

---

[26] Sklar Exam, Pages 90 and 91, Lines 18–19.
[27] Sklar Exam, Page 91, Lines 20–22.
[28] Sklar Exam, Page 90, Line 23 through Page 92, Line 5; Sklar Exam Exhibit 18.
[29] *Id.*
[30] These concerns surrounding Mr. Sklar's use of the Debtors as his personal account continued with such things as SEC's operating account paying for the Sklar Masters Cycling Team in the amount of $10,000. *See* Sklar Examination, Exhibit 17. This check was approved by Geoffrey Nenninger and paid to Lefthand Velo Corp. *Id.*
[31] Katchadurian Exam, Pages 41; Lines 21 – 23.
[32] Katchadurian Exam, Page 44; Lines 7 – 9; Sklar Exam, Page 22; lines 9 – 19.
[33] Katchadurian Exam, Page 81; Lines 13 – 15.
[34] Katchadurian Exam, Page 44; Lines 10 – 21.
[35] Katchadurian Exam, Page 45; Lines 12 –20.
[36] Katchadurian Exam, Pages 45 and 46; Lines 21 – 8.

were maintained in the same computer system for both companies;[37] and the Sklar Family Trusts, were maintained and tended to by the Debtors and the Debtors' employees.[38]

24. In addition to sharing a number of resources, the Debtors also shared a lack of corporate governance. The Debtors did not have a formal board of directors.[39] Although Mr. Sklar testified that the directors and officers did have some meetings, these meetings were not "official board meetings" and minutes were never taken.[40]

25. When asked about certain aspects of the Debtors' finances, Mr. Sklar could not quantify (or even estimate) the return-on-investment for the interest holders in the last five years: these are investments the Debtors' managed while Mr. Sklar was the CEO.[41] He could not provide testimony as to whether or not his family's trusts had provided loans to the Debtors other than the DIP loan.[42] He could not explain the Debtors' own accounting forms[43] or otherwise identify various entities that appeared to have received funds from the Debtors.[44]

26. Mr. Sklar was, however, well aware that SEC was never profitable.[45] Funds were sent from Sklarco to SEC every month.[46] Virtually every month, funds were also sent from SEC to Sklarco.[47] At times, Sklarco's revenue would be transferred to SEC but would not be distributed to Sklarco in the normal monthly check run like it would be to other working interest owners.[48] In

---

[37] Katchadurian Exam, Page 131; Lines 5 – 13.
[38] Katchadurian Exam, Pages 124 through 126; Lines 8 – 14.
[39] Katchadurian Exam, Page 40, Lines 17 – 18; Sklar Exam, Page 21, Lines 24 – 25.
[40] Sklar Exam, Page 22, Lines 1 – 8.
[41] Sklar Exam, Pages 26 and 27, Lines 22–9.
[42] Sklar Exam, Pages 58 and 59, Lines 20–21.
[43] Sklar Exam, Page 94, Lines 14–17.
[44] Sklar Exam, Pages 95, Line 25 through Page 97, Line 8.
[45] Sklar Exam, Page 145, Lines 18–25.
[46] Katchadurian Exam, Pages 85 and 86, Lines 15–3.
[47] Katchadurian Exam, Page 86, Lines 4–6.
[48] Katchadurian Exam, Page 142, Lines 18–21.

short, Sklarco provided SEC's working capital.[49] On the face of the produced documents, SEC itself was never profitable[50] and could not sustain its own operations.

27. This corporate structure (or lack thereof) allowed Sklarco, as the holding company, to own the Debtors' assets with very little debt (beyond the primary lending facility of the single business enterprise), while SEC as the operating company maintained no significant assets and carried all of the "trade" and operating debt.[51] For example, despite the fact that SEC and Sklarco shared employees,[52] SEC paid the employees' salaries.[53]

28. Funds were commingled. When cash calls were issued to working interest owners and SEC received the requested funds as earmarked for specific projects, those funds would sometimes be spent on other projects.[54] This left vendors unpaid and projects either incomplete or without capital to maintain them. Indeed, the Debtors admit that working interest owners sent requested funds to the Debtors in response to cash calls but those funds were not always applied to the project for which the cash call was made.[55] The Debtors admit that at least $5.8 million of cash-call advances exist where working interest owners paid money for projects that were never completed.[56] The Debtors could not account for where this money went and, when asked during the CRO's Rule 2004 examination if any of the $5.8 million went to Mr. Sklar or into the Sklar Family Trusts, the Debtors claimed only that "[i]t's hard to say, because cash is fungible."[57]

---

[49] Katchadurian Exam, Page 143, Lines 20–22.
[50] Sklar Exam, Page 145, Lines 18–25.
[51] *See, e.g.*, Katchadurian Exam, Page 81 and 82, Lines 22–1.
[52] Katchadurian Exam, Page 44; Lines 10 – 21.
[53] Katchadurian Exam, Pages 81 and 82, Lines 22 – 1.
[54] Katchadurian Exam, Page 89, Lines 22–25.
[55] Katchadurian Exam, Page 89, Lines 22–25.
[56] Katchadurian Exam, Page 90, Lines 5–8.
[57] Katchadurian Exam, Page 90, Lines 5–16.

4836-0911-6894v.1

29. Mr. Sklar provided no additional clarity to where this $5.8 million dollars went.[58] When questioned about this issue during his 2004 examination, Mr. Sklar could not remember a single discussion in which he engaged with his management team regarding the apparent misapplication and expenditure of these $5.8 million advances.[59]

30. Other Sklar entities suffered from the same collapsing of corporate formalities. Sklar Transport is an entity owned by one of the Sklar Family Trusts, benefitting Howard Sklar.[60] Sklar Transport does not have a board of directors or any employees.[61] Sklar Transport previously owned an aircraft but had a dry lease with SEC such that SEC would lease the aircraft and pay expenses for the aircraft.[62] When Sklar Transport sold the aircraft, a Cessna Sovereign, for $9,000,000, the proceeds of the sale were used first to pay off the jet's note and the remainder, approximately $2,000,000, went to SEC.[63] There have been no documents produced that explain why the proceeds of this sale went to SEC rather than Sklar Transport. If corporate structures and formalities were being followed, the funds should have gone to Sklar Transport. In fact, later in Mr. Sklar's testimony, he referred to the jet as belonging to Sklarco and not Sklar Transport.[64] While this may have been a testimonial mistake, it suggests that, at least in Mr. Sklar's mind, the entities were indistinct.

---

[58] Sklar Exam, Page 50, Lines 5–21.
[59] Sklar Exam, Page 111, Lines 18-24.
[60] Sklar Exam, Page 30, Lines 3 – 14.
[61] Sklar Exam, Page 30, Lines 3 – 21.
[62] Sklar Exam, Pages 30 and 31, Lines 30 – 11.
[63] Sklar Exam, Pages 31 and 32, Lines 12 – 11.
[64] *See* Sklar Exam, Page 38, Lines 13 – 25 (when questioned about Sklar Transport's plane, Sklar responded that "when Sklarco owned the aircraft, there were the actual – the actual logbooks of the aircraft …").

4836-0911-6894v.1

**(4)** *The Committee's investigation is sufficient to describe and preserve significant Chapter 5 and other causes of action against Mr. Sklar and the Sklar Family Trusts*

31. For preservation purposes in connection with chapter 11 plan formulation, the Committee has conducted a significant—but not comprehensive—investigation into potential claims, including director and officer liability claims against Howard Sklar and other potentially culpable directors and officers of the Debtors. Given the facts discovered to date, it is possible that claims could be brought against Mr. Sklar, including, but not limited to, breaching the duty of care for his gross mismanagement and for breaching his duty of loyalty arising from his placing his own pecuniary interests above and to the detriment of the Debtors and its creditors. It would also seem that the Debtors' other directors and officers could be liable for their acts of omission or commission in allowing these breaches or for aiding and abetting those breaches. The Committee will seek to preserve all rights to pursue these claims for the benefit of unsecured creditors and to seek redress for a generalized harm to the entire creditor body. Director and Officer liability insurance does exist to potentially cover a portion of the damages sought against Mr. Sklar and other culpable directors and officers; however, the aggregate policy limits of $5,000,000 is not expected to cover the entirety of the losses.

Respectfully submitted this 26th day of February, 2021

**MUNSCH HARDT KOPF & HARR, P.C.**

By: */s/ Christopher D. Johnson*
Christopher D. Johnson
Texas Bar No. 24012913
John D. Cornwell
Texas Bar No. 24050450
Grant M. Beiner
Texas Bar No. 24116090
700 Milam Street, Suite 2700
Houston, Texas 77002
Telephone: (713) 222-1470
Facsimile: (713) 222-1475
cjohnson@munsch.com
jcornwell@munsch.com
gbeiner@munsch.com

**COUNSEL FOR
THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS**

## **CERTIFICATE OF SERVICE**

      This will certify that a true and correct copy of the foregoing document was forwarded by electronic transmission to all registered ECF users appearing in the case on February 26, 2021.

                                            */s/ Grant M. Beiner*
                                            Grant M. Beiner

4836-0911-6894v.1