## AMENDED AND RESTATED
## PARTICIPATION AGREEMENT

**Mt. Carmel Prospect**
**Escambia County, Alabama and Santa Rosa County, Florida**

**THIS AMENDED AND RESTATED PARTICIPATION AGREEMENT** (the "**Agreement**"), dated effective as of the 8th day of April, 2015 (the "**Effective Date**"), is entered into by and between the following (sometimes herein referred to singularly as a "**Party**" or collectively as the "**Parties**"):

> **SKLAR EXPLORATION COMPANY L.L.C.**, a Louisiana limited liability company, whose address is 5395 Pearl Parkway, Suite 200, Boulder, Colorado 80301, represented herein by its President & Chief Operating Officer, David A. Barlow ("**SEC**" or "**Operator**");

> **SKLARCO L.L.C.**, a Louisiana limited liability company, whose address is 5395 Pearl Parkway, Suite 200, Boulder, Colorado 80301, represented herein by its President & Chief Operating Officer, David A. Barlow ("**Sklarco**");

> and

> **JJS WORKING INTERESTS L.L.C.**, a Texas limited liability company, whose address is 4295 San Felipe, Suite 207, Houston, Texas 77027, represented herein by its duly authorized Manager, Houston Bulldog Capital Management, LLC, a Texas limited liability company, which itself is represented herein by its duly authorized Manager, Justin Simons ("**JJS**");

> and

The following Parties who are sometimes referred to as the "**Before Payout Parties:**"

> **MCCOMBS ENERGY, LTD.**, a Texas limited partnership, whose address is 5599 San Felipe, Suite 1200, Houston, Texas 77056-2794, represented herein by its Vice President, Billy Forney, III ("**McCombs**");

> **TCP COTTONWOOD, L.P.**, a Texas limited partnership, whose address is 333 Texas Street, Suite 2020, Shreveport, Louisiana 71101, represented herein by its duly authorized General Partner Trinity-Anderson, LLC, a Louisiana limited liability company, which itself is represented herein by its duly authorized Manager, Anderson Feazel Management, Inc., a Louisiana corporation, which itself is represented herein by its duly authorized Vice-President, T. Cole Anderson ("**TCP**");

> **FANT ENERGY LIMITED**, a Texas limited partnership, whose address is 5800 Westview Drive, Houston, Texas 77055, represented herein by its duly authorized General Partner, Richard E. Fant L.L.C., a Texas limited liability company, which itself is represented herein by its duly authorized Manager, Stephen Swan ("**Fant**");

> **TAUBER EXPLORATION & PRODUCTION CO.**, a Texas corporation, whose address is 55 Waugh Drive, Suite 600, Houston TX 77007, represented herein by Richard E. Tauber, as the duly authorized President of said company ("**Tauber**");

> **KUDZU OIL PROPERTIES, L.L.C.**, a Mississippi limited liability company, whose address is 300 Concourse Blvd., Suite 101, Ridgeland, Mississippi 39157, represented herein by its Manager, Wirt A. Yerger, III ("**Kudzu**");

**JF HOWELL INTERESTS, L.P.,** a Texas Limited Partnership, whose address is 416 Travis Street, Suite 715, Shreveport, Louisiana 71101, represented herein by its duly authorized General Partner, Howell Investments, L.L.C., a Louisiana limited liability company, which itself is represented herein by its duly authorized Manager, David Morgan ("**Howell**");

**LECHWE, L.L.C.,** a Texas limited liability company, whose address is P.O. Box 270415, Houston, Texas 77277-0415, represented herein by its duly authorized Agent and Attorney-in-Fact, Mark Rauch ("**Lechwe**");

**MARKSCO, L.L.C.,** a Louisiana limited liability company, whose address is 333 Texas Street, Suite 1050, Shreveport, Louisiana 71101, represented herein by its duly authorized Member, Mark P. Sealy ("**Marksco**"); and

**BUNDERO INVESTMENT COMPANY, L.L.C.,** a Louisiana limited liability company, whose address is 333 Texas Street, Suite 300, Shreveport, Louisiana 71101, represented herein by its Manager, Robert P. Bowman ("**Bundero**");

(the Before Payout Parties together with JJS and Sklarco (to the extent that Sklarco owns a Before Payout Interest as hereinafter defined) are sometimes referred to herein as the "**BPO Non-Operating WI Owners**")

and

**LONGLEAF ENERGY GROUP, INC.,** an Alabama corporation, whose address is 212 Belleville Avenue, Brewton, Alabama 36426, represented herein by its duly authorized President, Thomas E. McMillan, Jr. ("**Longleaf**" or "**LLEG**");

(Longleaf together with Sklarco (to the extent that it owns an After Payout Interest as hereinafter defined) are sometimes referred to herein as the "**After Payout Parties**");

(The BPO Non-Operating WI Owners and the After Payout Parties are hereinafter sometimes referred to as the "**Participants**").

## W I T N E S S E T H:

WHEREAS, Sklarco owns the Geophysical and Lease Option Agreements (and all rights and interests granted thereunder) (hereinafter sometimes referred singularly as an "**Option**" or collectively as the "**Options**") which are attached hereto as Exhibits "A-1 – A-4," covering, among other property, approximately 30,413.30 net mineral acres (and also the surface and surface only interests as described in the Options) located in Escambia County, Alabama, and Santa Rosa County, Florida, lying within the contract area (the "**Contract Area**") and the area of mutual interest (the "**AMI**") outlined in black on the plat attached hereto as Exhibit "A" (subject to, however, the exclusion of certain lands set forth in Exhibit "A" to the JOA, as defined below), the Contract Area and AMI being hereinafter sometimes referred to as the "**Prospect;**" and

WHEREAS, short forms of the Options have been recorded for notice purposes in the real property records of the Probate Court of Escambia County, Alabama, in Book 598, beginning at pages 525 and 534, respectively, and in the real property records of the Clerk of Court of Santa Rosa County, Florida, in OR Book 3433, beginning at pages 1077 and 1085, respectively; and

WHEREAS, Sklarco heretofore entered into a Purchase and Sale Agreement with LLEG dated effective as of March 1, 2015 (the "**LLEG Agreement**"); and

WHEREAS, pursuant to the LLEG Agreement, LLEG executed the those certain assignments dated effective as of March 1, 2015 in favor of Sklarco (the "**LLEG Assignments**") conveying to Sklarco all of the rights and interests granted to LLEG pursuant to certain oil, gas and mineral leases (the "**LLEG Leases**"), options to acquire geophysical permits and/or oil, gas and mineral leases (the "**LLEG Options**") and certain other agreements described on Exhibit B-3 hereto (the LLEG Assignments, LLEG

Leases, LLEG Options and such other agreements are hereinafter sometimes referred to collectively as the "**LLEG Documents**"); and

**WHEREAS**, Sklarco desires to sell to JJS, and JJS wishes to purchase, (in the proportion set forth herein) an undivided seven percent (7%) of all of Sklarco's rights and interests in and under the Options, the LLEG Documents and the LLEG Agreement, including geophysical rights and the rights to acquire, and interests in, oil, gas and mineral leases; and

**WHEREAS**, Sklarco desires to sell to the Before Payout Parties, and they wish to purchase, (in the proportions set forth herein) an undivided sixty-eight percent (68%) of all its rights and interests in and under the Options, the LLEG Documents, and the LLEG Agreement including geophysical rights and the rights to acquire, and interests in, oil, gas and mineral leases, said sale to be subject to a reserved back-in after prospect payout interest (the "**After Payout Interest**") equal to twenty-five percent (25%) of the interest conveyed to Before Payout Parties pursuant to this Agreement; and

**WHEREAS**, the After Payout Interest shall also burden and apply to any interest in any oil, gas and mineral lease, any geophysical rights, any interest in any well and related facilities, and any other rights and interests in the Prospect acquired by a Before Payout Party pursuant to this Agreement or the JOA (as defined below); and

**WHEREAS**, Sklarco intends to acquire oil, gas and mineral leases and additional Geophysical Permits and Lease Options covering portions of the Prospect and to acquire, process and interpret seismic data over the Prospect and other property; and

**WHEREAS**, the Parties desire to enter this Agreement to set forth the terms and conditions under which they sell, retain or acquire, as the case may be, rights and interests in and to the Prospect, and their rights, interests and obligations with respect to the Prospect thereafter.

**NOW, THEREFORE**, the Parties agree as follows:

## Article I. Purchase And Sale And Development Commitments

### Section 1.1. Assignment and Prospect Fee

For and in consideration of the LLEG Agreement, the Prospect Fee, the After Payout Interest and the other terms and conditions of this Agreement, Sklarco hereby agrees that upon completion of the Prospect 3D seismic shoot (as described in Section 1.2(a) below), it will execute and deliver to JJS and the Before Payout Parties an assignment of a portion its rights and interests in the Prospect (including its rights and interests in, to and under the Options, the LLEG Documents, and any oil, gas and mineral leases or options to lease acquired pursuant to this Agreement prior to the date of the assignment, but not including any share of the After Payout Interest, as defined below), in substantially the same form as Exhibits "B-1" and "B-2" attached hereto, such that the BPO Non-Operating WI Owners shall own the following before Prospect Payout (defined below) interest percentages in and to the same (hereinafter referred to as the "**Before Payout Interests**"), to-wit:

| BPO Non-Operating WI Owners | Percentages |
|---|---|
| Sklarco | 25.00% |
| JJS | 7.00% |
| McCombs | 25.00% |
| TCP | 23.50% |
| Fant | 2.50% |
| Tauber | 5.00% |
| Kudzu | 3.00% |
| Howell | 4.00% |
| Lechwe | 2.00% |
| Marksco | 2.00% |
| Bundero | 1.00% |
| *Total* | 100% |

The above interests are subject to adjustment pursuant to other provisions of this Agreement (e.g., as a result of a BPO Non-Operating WI Owner electing not to participate in a lease acquired pursuant to the AMI provisions described in Section 3.1 or failing to pay an invoice in accordance with Section 1.2, 1.3 or 1.5). Prior to the execution of the partial assignment described in this Section 1.1, all permits, options to acquire oil, gas and mineral leases, and oil, gas and mineral leases acquired under or pursuant to this Agreement shall be acquired in the name of Sklarco and the acquisition thereof will be handled by SEC.

Contemporaneously with the execution of this Agreement, JJS and the Before Payout Parties will pay SEC a total of One Million Four Hundred Ten Thousand Six Hundred Sixty-Five and 97/100 Dollars ($1,410,665.97), representing the total lease bonus, brokerage, geological, geophysical and other costs associated with the Prospect through March 31, 2015 (the "**Prospect Fee**"), which includes the bonus costs of the Options, with each such Party to pay the amount set forth below:

| Name | Amount to be Paid |
|------|-------------------|
| Sklarco | Already Paid |
| JJS | $98,746.62 |
| McCombs | $352,666.49 |
| TCP | $331,506.50 |
| Fant | $35,266.65 |
| Tauber | $70,533.30 |
| Kudzu | $42,319.98 |
| Howell | $56,426.64 |
| Lechwe | $28,213.32 |
| Marksco | $28,213.32 |
| Bundero | $14,106.66 |

The Prospect Fee includes Fifty Thousand and 00/100 Dollars ($50,000.00) for internal costs incurred by Sklarco related, primarily, but not exclusively, to the licensing of software needed for the development of the Prospect. The Before Payout Parties and JJS owe their share of the costs incurred in connection with the Prospect between March 31, 2015 and the Effective Date, which costs are reflected in the joint interest bills to be furnished to the Before Payout Parties and JJS by Operator.

Each lease, lease extension, or other mineral interest acquired by any Participant covering the interest of Mary Books Pittman, Sally Elizabeth Pittman, The Sally Elizabeth Pittman Trust, Thomas Brooks Henry, Edmund T. Henry, III, Frances A. Vonk, and John Riley Pittman (the "**Pittman Group**") in the following lands shall be subject to an overriding royalty interest ("**ORRI**") in favor of Longleaf, or its designee(s), equal to 2.5% of the value (computed at the mouth of the well and net of any severance or similar taxes) of the oil and gas produced under and allocable to said lands:

SANTA ROSA COUNTY, FLORIDA

Township 5 North, Range 29 West

Section 15:    Entire Section, containing 545.00 acres, more or less.
Section 16:    East Half of the Southeast Quarter (E/2 SE/4), containing 79.65 acres, more or less.
Section 25:    Southwest Quarter of the Southwest Quarter (SW/4 SW/4) and East Half of the East Half (E/2 E/2), containing 192.128 acres, more or less.
Section 26:    Entire Section, containing 652 acres, more or less.
Section 27:    Entire Section, less and except the Southwest Quarter of the Southwest Quarter (SW/4 SW/4) and East Half of the Northwest Quarter (E/2 NW/4), containing 524.14 acres, more or less.
Section 38:    Entire Section, less and except the Northwest Quarter of the Northwest Quarter (NW/4 NW/4), containing 630.559 acres, more or less.

Township 5 North, Range 28 West

Section 30:    Southwest Quarter (SW/4), less and except the Northeast Quarter of the Southwest Quarter (NE/4 SW/4), containing 120 acres, more or less.

The ORRI shall be subject to proportionate reduction if the interest of the Pittman Group covers less than full fee simple title to the above described lands. The ORRI shall be calculated and shall be delivered and paid to Longleaf, or its designee(s), in the same manner or with the same exclusions, deductions and allocations as are provided for the calculation, delivery and payment of royalties to the lessor in each such lease. Similarly, Longleaf shall pay or bear such taxes and charges and other deductions attributable to the ORRI as are to be paid and borne by the lessor in each such lease.

**Section 1.2.   Three-Dimensional Seismic Data Acquisition**

**Subsection 1.2(a).   Acquisition and Costs**

SEC plans to shoot (or cause to be shot) 3D seismic across the Prospect and other lands in the general area, with the 3D shoot across Prospect to be completed at least 30 days prior to the expiration of

the Option Period stated in the Options or of any extension of the Option Period agreed to by the Grantors in the Options, whichever is later, subject, however, to force majeure. Each BPO Non-Operating WI Owner assumes and agrees to pay its Before Payout Interest share as set forth in Section 1.1 (hereinafter referred to as its "**Share**") of the actual cost incurred in connection with such seismic operations conducted on or with respect to the Prospect, including, but not limited to, the costs of acquiring seismic permits and/or options to lease, the costs of any damages paid to landowners, and the costs of shooting and processing the seismic. At this time it is estimated that the costs for the 3D seismic, including permitting, acquisition and processing, will be approximately $90,000.00 per square mile and that the area included in the seismic shoot will comprise about 103 square miles. Accordingly, the total amount owed by all of the BPO Non-Operating WI Owners under this Agreement is estimated to be approximately $9,270,000.00. Each BPO Non-Operating WI Owner agrees to pay its Share of the actual costs for obtaining the 3D seismic, which amount may be more or less than the amount set forth above, said payment to be made within fifteen (15) days of receipt of an invoice from SEC for said amount. It is anticipated that SEC will be billed by the company performing the 3D seismic in increments, and the Parties agree that in such eventuality, SEC will likewise invoice the BPO Non-Operating WI Owners in similar increments for their respective Share of such costs and that each BPO Non-Operating WI Owner will pay its invoice within fifteen (15) days of receipt. Additionally, SEC may (but is not required to) invoice the BPO Non-Operating WI Owners for their Share of the costs related to any permit and/or option to lease acquired by SEC immediately after acquisition of same.

If the contract with the company performing the 3D seismic includes lands in addition to the Prospect, the fees and expenses for shooting and processing the seismic will be apportioned between the Prospect and the other lands on an acreage basis, but the costs of acquiring seismic permits and options to lease shall be allocated between the Prospect and the other lands on an actual cost basis (i.e., the BPO Non-Operating WI Owners will only be charged for permits and options to lease covering property located within the Prospect), provided, however, if a seismic permit and/or lease option covers property both within and outside the Prospect, the cost for that permit/option shall be allocated between the Prospect and the lands outside the Prospect on an acreage basis and the rights and interests of the Participants in the permit or option shall be limited to the acreage in the Prospect. Notwithstanding the foregoing, SEC may enlarge the area to be covered by the Prospect 3D shoot by up to 5% without any additional consents or approvals from the Parties to this Agreement if, in its discretion, that area is needed to enhance the shoot of the Prospect, and each BPO Non-Operating WI Owner agrees to pay its Share of the costs of acquiring 3D seismic across such added land just as if that land were included in the Prospect, and the failure of a BPO Non-Operating WI Owner to timely pay its Share of such costs shall have the same ramifications as set forth in this Section with respect to lands included within the Prospect. Also, each of the Participants shall have the same rights with respect to any 3D seismic covering such added acreage as such Party would have with respect to the 3D covering lands within the Prospect. Except as set forth in the preceding two sentences, none of the provisions of this Agreement shall apply to any acreage so added to the 3D shoot by SEC unless the provision clearly states that it is to apply to such acreage.

If a BPO Non-Operating WI Owner fails to pay its Share of an invoice for seismic costs within said fifteen (15) day time period, SEC may send that BPO Non-Operating WI Owner a notice of default. If the BPO Non-Operating WI Owner fails to pay its Share of said invoice within five (5) days from receipt of the notice of default, then, at SEC's discretion, SEC may either seek collection of the amount due from said BPO Non-Operating WI Owner, together with interest at the rate of 7% per annum and any attorney's fees incurred in collecting the same (all of which said BPO Non-Operating WI Owner agrees to pay), or may send said BPO Non-Operating WI Owner a notice of non-participation, in which case that BPO Non-Operating WI Owner shall forever relinquish, release and abandon all of its right, title and interest (but not any After Payout Interest under Section 1.4 of this Agreement) in, to and under the Options, the LLEG Documents, any leases granted pursuant to the Options or the LLEG Documents, any leases in the AMI, and the Prospect and agrees to execute a recordable assignment of its interest to the remaining BPO Non-Operating WI Owners who agree to assume their proportionate share of said interest.

### Subsection 1.2(b). Before Payout and After Payout Parties' Access To Data And Right To License

Both during the term of this Agreement, and after its termination, SEC shall have the exclusive rights to sell or license the 3D seismic data. Any BPO Non-Operating WI Owner who has paid its Share of the actual costs of the 3D seismic operation shall, upon reasonable request, be entitled to have access to the Prospect data on SEC's workstation at its office during normal business hours. Upon written request, SEC shall also furnish any such BPO Non-Operating WI Owner a copy of the final processed Prospect 3D seismic data subject, however, to the terms of the seismic license attached hereto as Exhibit "C," which any such BPO Non-Operating WI Owner must execute prior to obtaining a copy of the data. After Prospect Payout the After Payout Parties shall have the same rights with respect to the Prospect 3D seismic as those provided for in this paragraph for the BPO Non-Operating WI Owners.

**Subsection 1.2(c).  Restrictions Upon Transfer Of Seismic Data And License**

Any Participant which sells or transfers all of its right, title and interest in and to the Prospect to a single third party, including all of its interests in oil and gas leases and options covering lands located within the AMI and all of its interests in any wells located within the AMI, may also transfer its rights and any license to the 3D seismic data under Subsection 1.2(b) to such third party without the consent of the other Participants, provided such third party agrees to be bound by the terms of the license agreement, this Agreement and the JOA.  If a Participant sells or transfers some, but not all, of its right, title and interest in and to Prospect to a third party, or if a Participant sells or transfers all of its right, title and interest in and to the Prospect to several third parties, or if a Participant sells or transfers some, but not all, of its right, title and interest in and to Prospect to several third parties (hereinafter referred to as a "**Partial Transfer**"), then, in either event, the Participant may transfer its seismic rights and license to a single third party (hereinafter the "**Designated Third Party**") without the consent of the other Participants, provided such third party agrees to be bound by the terms of the license agreement, this Agreement and the JOA; provided further that such rights and license may not be transferred to multiple third parties, but only a single third party; and provided further that if the Participant is retaining an interest in the Prospect, it will no longer own its own seismic rights and license since the same has been transferred to a third party.  Except as provided herein, a Participant's seismic rights and license under Subsection 1.2(b) shall be non-transferrable, and SEC shall not sell or license the 3D seismic data to any third parties during the term of this Agreement, without (in either case) the express written consent of at least 66.67% in interest of the BPO Non-Operating WI Owners or, if the transfer, sale or license occurs after Prospect Payout, at least 66.67% in interest of the Participants.  Nothing herein shall restrict the right of SEC, as Operator, to sell or transfer rights to the 3D seismic data to third parties for the purpose of obtaining a seismic permit or other rights needed to acquire the data in the first place.  Without limitation upon the foregoing, the Participants acknowledge that the Grantors under the Options are entitled to certain rights with respect to the 3D seismic data under the terms of Options.  After termination of this Agreement, SEC alone may freely sell or license the 3D seismic data to third parties, without the requirement of obtaining the consent from any of the Participants, subject to the terms of Subsection 1.2(d) below.  Anything herein to the contrary notwithstanding, the Parties understand that Sklarco may sell portions of its interest to one or more third parties and agree that it shall be entitled to up to five (5) additional licenses, one of which may be transferred to each such purchaser, but with the understanding that if Sklarco sells to more than five parties, it will only be entitled to a total five (5) additional seismic licenses.

**Subsection 1.2(d).  Proceeds from Sale or License**

SEC shall distribute any proceeds from a permitted sale or license of the 3D seismic data, net of applicable costs, among all of the Participants in proportion to their interests in the Prospect at the time of the sale or license.  If a Participant sells or transfers all of its right, title and interest in and to the Prospect to a single third party, including all of its interests in oil and gas leases and options covering lands located within the AMI and all of its interests in any wells located within the AMI, and if that Participant also transfers its rights and license to the 3D seismic data under Subsection 1.2(b) to such third party, as provided for under the terms of said license and in Subsection 1.2(c) above, and provided such third party agrees to be bound by the terms of the license agreement, this Agreement and the JOA, then, in that event, the Participant's share of proceeds (if any) from a permitted sale or license of the 3D seismic data shall be owned by, and SEC shall distribute those proceeds to, that third party.  If there is a Partial Transfer, and if the Participant involved in that Partial Transfer also transfers its rights and license to the 3D seismic data under Subsection 1.2(b) to a Designated Third Party, as provided for in Subsection 1.2(c) above, and provided the Designated Third Party agrees to be bound by the terms of the license agreement, this Agreement and the JOA, then, in that event, the Participant's share of proceeds (if any) from a permitted sale or license of the 3D seismic data thereafter shall be owned by, and SEC shall distribute those proceeds to, that Designated Third Party.

**Section 1.3.      Acquisition of Leases Under Options**

At any time (and from time to time) before expiration of the Options or the Pittman Option (defined in Exhibit "B-3"), as said options may be amended form time to time, Operator may send a notice to the BPO Non-Operating WI Owners describing lands as to which the Options or Pittman Option (or any of them) will be exercised together with an invoice for each BPO Non-Operating WI Owner's Share of the amount due to the grantors/lessors.  Each BPO Non-Operating WI Owner agrees to pay its Share of the bonus money for each such lease (an "**Option Lease**"), said payment to be made within fifteen (15) days of receipt of an invoice from SEC for said amount.  The After Payout Interest shall also burden the Option Leases.

If a BPO Non-Operating WI Owner fails to pay its invoice amount within said fifteen (15) day time period, SEC shall send that BPO Non-Operating WI Owner a notice of default.  If the BPO Non-Operating WI Owner fails to pay its Share of said invoice within five (5) days from receipt of the notice of default, then, SEC shall send said BPO Non-Operating WI Owner (a "**Non-Consenting Option Party**") a

notice of non-participation. If (and only if) the Option Lease is thereafter acquired as hereinafter provided, the Non-Consenting Option Party shall forever relinquish, release and abandon all of its right, title and interest (but not any After Payout Interest under Section 1.4 of this Agreement) in and to the Option Lease, the Option or Pittman Option (as applicable), and any future leases taken under the Option or Pittman Option (as applicable) and agrees to execute a recordable assignment of its interest in same to the remaining BPO Non-Operating WI Owners who agree to assume their proportionate share of said interest. The fact that a BPO Non-Operating WI Owner becomes a Non-Consenting Option Party as to an Option Lease shall not, however, affect that BPO Non-Operating WI Owner's interest in any Option Leases previously acquired if that BPO Non-Operating WI Owner paid its Share of the bonus consideration for the lease.

If there are one or more Non-Consenting Option Parties with respect to an Option Lease, then Operator immediately after expiration of the notice period shall advise the BPO Non-Operating WI Owners who paid their Share of the bonus for the Option Lease (the "**Consenting Option Parties**") of the total interest of the Consenting Option Parties who paid their Share of the bonus and its recommendation as to whether those Consenting Option Parties should proceed with the acquisition of the Option Lease. Each of the Consenting Option Parties within twenty-four (24) hours after delivery of such notice shall advise Operator of its desire to (a) limit participation to such party's Before Payout Interest in the Option Lease or (b) bear (and assume) all of its proportionate part of the Non-Consenting Option Parties' interest. Failure to advise Operator shall be deemed an election under (a). Operator, at its election, may withdraw the proposal to acquire the Option Lease if, in Operator's opinion, there is insufficient participation and shall promptly notify all parties of its decision, in which case Operator shall refund to the Consenting Option Parties their Share of the bonus money previously paid by them to the Operator, and the Option Lease shall not be acquired. Those Consenting Option Parties who make an election under (b) agree to bear not only their Share of the bonus for the Option Lease, but they also agree to bear, in the proportion that their interest bears to the interest of all parties electing under (b), the share of the bonus attributable to the interests of each Non-Consenting Option Party.

### Section 1.4.    After Payout Interest

As further consideration for the partial assignment described in Section 1.1 above, upon reaching Prospect Payout (as defined below), an undivided twenty-five percent (25%) of the interest acquired by each of the Before Payout Parties pursuant to this Agreement and/or the JOA (including, but not limited to, interests in seismic rights, any oil, gas and mineral lease, any wells and related equipment, and any rights-of-way, easements, personal property, equipment, facilities, pipelines, and production) shall automatically and permanently transfer to and vest in the After Payout Parties (in the relative percentages indicated below) such that the Participants' undivided interests before payout ("**BPO**") and after payout ("**APO**") are as follows:

| Participants | BPO | APO |
|---|---|---|
| Sklarco | 25.00% | 35.20% |
| JJS | 7.00% | 7.00% |
| McCombs | 25.00% | 18.75% |
| TCP | 23.50% | 17.625% |
| Fant | 2.50% | 1.875% |
| Tauber | 5.00% | 3.75% |
| Kudzu | 3.00% | 2.25% |
| JF Howell | 4.00% | 3.00% |
| Lechwe | 2.00% | 1.50% |
| Marksco | 2.00% | 1.50% |
| Bundero | 1.00% | 0.75% |
| Longleaf | 0.00% | 6.80% |
| *Total* | *100%* | *100%* |

Because the interests of individual Before Payout Parties are subject to adjustment to account for changes that result from other provisions of this Agreement and/or provisions contained in the JOA (e.g., as the result of elections to participate or not to participate in the acquisition of a lease or the drilling of a well) and because the "total and cumulative cost and expenses" (as defined below) paid by different Before Payout Parties may likewise vary, Prospect Payout may occur at different times with respect to different Before Payout Parties. After Prospect Payout, as defined below, occurs with respect to the interest of a Before Payout Party, that Before Payout Party will, at the request of either After Payout Party, immediately convey and assign the After Payout Interest to the After Payout Parties, effective as of the date of Prospect Payout occurs as to that Before Payout Party's interest, said conveyance to include, without limitation, 25% of said Before Payout Party's interest in: (i) any lease (and the lessee's interest under such lease) that is or becomes subject to this Agreement or the JOA, (ii) the Initial Well and any subsequent wells drilled pursuant to this Agreement or the JOA, (iii) the oil, gas, and all other minerals produced from any and all such wells and all products produced or derived therefrom and the proceeds from any the sale of such oil, gas and products, and (iv) any

easements, rights of way, personal property, equipment, facilities and pipelines associated with such wells. Such conveyance and assignment shall contain a warranty of title and possession against the claims of anyone claiming by, through or under the assignor, including a warranty that all costs and expenses allocable or chargeable to the interest assigned to the After Payout Parties have been paid. If, prior to Payout or prior to the recordation of such conveyance and assignment, any Before Payout Party's interest or any portion thereof is transferred to another person or entity (as a result of a transfer or assignment or as the result of an election not to participate by such Party pursuant to the terms of this Agreement or the JOA), such interest shall continue to be subject to and burdened by the above described After Payout Interest. Any assignment and/or transfer of all or any portion of a Before Payout Party's interest shall describe the After Payout Parties' right to receive an assignment of the After Payout Interest.

"**Prospect Payout**" or "**Payout**" is defined on a Prospect (not well-by-well) basis as the first day of the calendar month following the month in which a Before Payout Party's Share of the total and cumulative revenue (as defined below), equals that Before Payout Party's Share of the total and cumulative costs and expenses (as defined below). For purposes of Prospect Payout, (i) the "total and cumulative revenue" shall consist of the Before Payout Party's Share of all sales proceeds received for all oil, gas and other hydrocarbons and minerals produced, saved and sold from the Contract Area and of any other revenue, including, but not limited to, insurance proceeds, allocable to or received pursuant to the interest acquired by the Before Payout Party in the Prospect (or in any portion of the Prospect) pursuant to this Agreement and/or the JOA, and (ii) the "total and cumulative cost and expenses" shall consist of the Before Payout Party's Share of all royalty and overriding royalty payments, severance, ad valorem, production and other taxes applicable to production and not measured by such party's other income, the Prospect Fee, all lease acquisition and maintenance costs (including the costs of acquiring leases in the AMI if such party elects to participate in the acquisition of such lease), all seismic survey and data costs, geological and geophysical evaluation costs, all costs for site preparation, drilling, reworking, deepening, sidetracking, logging, stimulation, testing, equipping, operating, and (if abandoned before Prospect Payout) plugging and abandoning of any well within the Contract Area, (if the BPPO Participant participates in the well), the cost of all surface damages, pipelines, gathering and other production handling facilities related thereto, the costs of administrative or court proceedings incurred in connection with the development of the Contract Area, all costs incurred in connection with the sale of production, and all other costs billed to such party by the Operator for activities related to the development of the Contract Area, including all costs and charges which are allocable to the Joint Account received or incurred in the conduct of Joint Operations under the Operating Agreement attached hereto as Exhibit "D." Notwithstanding the foregoing, if, prior to reaching Prospect Payout as to any Before Payout Party's interest, an After Payout Party and that Before Payout Party should jointly (with or without the other Participants) sell their interests in the Prospect to one or more persons or entities, then the amount received by such Before Payout Party for its interest shall be deemed to be part of the total and cumulative revenue received by that Before Payout Party for the purpose of computing Prospect Payout, and if that amount plus the total and cumulative revenue received by or allocable to such Before Payout Party as of the effective date of the conveyance to the purchaser shall exceed the amount of the total and cumulative costs incurred by that Before Payout Party, then the After Payout Party(s) and such Before Payout Party shall share in such excess amount based on their After Payout Interests. Operator shall submit to each of the Before Payout Parties and JJS a quarterly report that reflects the status of Prospect Payout for that Before Payout Party or JJS; provided, however, that Operator shall only submit such reports for quarters in which material activity (in the form of costs and/or revenue) occurs within the Prospect.

### Section 1.5    Initial Well

#### Subsection 1.5(a). Proposal Of The Initial Well/In Or Out Election

Operator may, at any time after acquisition of the 3D seismic data, propose the drilling of an initial well (the "**Initial Well**") to be drilled on a unit that includes acreage covered by an Option Lease or any other oil, gas and mineral lease that is or becomes subject to this Agreement (the "**Operator's Proposal**"), said well to be drilled at the location described in the proposal and to a depth sufficient to test the Smackover and Upper Norphlet Formations (the "**Objective Depth**"). Subject to force majeure, if Operator does not propose an Initial Well within one hundred and twenty (120) days from receipt of the final processed data from the 3D seismic shoot described in Section 1.2, then any BPO Non-Operating WI Owner may propose to drill the Initial Well.

If Operator proposes to drill the Initial Well, then the Operator's Proposal shall contain an AFE, and each of the BPO Non-Operating WI Owners shall have thirty (30) days from delivery of the Operator's Proposal within which to respond whether that BPO Non-Operating WI Owner elects to participate or not to participate in the drilling of the Initial Well. Failure to respond within said time period shall be deemed an election to participate in Operator's Proposal. So long as the Initial Well identified in the Operator's Proposal is in fact drilled, then, in that event and only in that event, any BPO Non-Operating WI Owner that elects not to participate in Operator's Proposal (a "**Non-Consenting Drilling Party**") shall forever relinquish, release and abandon all of its right, title and working interest (but not After Payout Interest

under Section 1.4 of this Agreement) in and to the Initial Well and in, to and under the Options, the LLEG Documents, any Option Leases, any other leases acquired in the AMI, and the Prospect and agrees to execute a recordable assignment of its interest to each Consenting Drilling Party who elects to bear (and assume) its proportionate share of the Non-Consenting Drilling Parties' (or Party's) interest in the proportions which the share of the Non-Consenting Drilling Parties' (or Party's) interest each such Consenting Drilling Party agrees to bear (and assume) bears to the total of the Non-Consenting Drilling Parties' (or Party's) interest borne (and assumed) by all Consenting Drilling Parties.

If one or more of the BPO Non-Operating WI Owners elects not to participate in Operator's Proposal, then Operator immediately after expiration of the notice period shall advise the BPO Non-Operating WI Owners who elected to participate in Operator's Proposal (the "**Consenting Drilling Parties**") of the total interest of the BPO Non-Operating WI Owners approving such operation and its recommendation as to whether those Consenting Drilling Parties should proceed with the operation as proposed. Each of the Consenting Drilling Parties within twenty-four (24) hours after delivery of such notice shall advise Operator of its desire to (a) limit participation to such party's Before Payout Interest or (b) bear (and assume) all of its proportionate part of the Non-Consenting Drilling Parties' interests. Failure to advise Operator shall be deemed an election under (a). Operator, at its election, may withdraw such proposal if, in Operator's opinion, there is insufficient participation and shall promptly notify all parties of such decision. Those Consenting Drilling Parties who make an election under (b) agree to bear not only their share of the costs to drill the Initial Well to the Objective Depth, but they also agree to bear, in the proportion that their interest bears to the interest of all parties electing under (b), the costs to drill the Initial Well to the Objective Depth attributable to the interest of each Non-Consenting Drilling Party.

If a BPO Non-Operating WI Owner proposes the drilling of an Initial Well (the "**Alternate Proposal**"), then the Alternate Proposal shall describe the location (which must be on a unit that includes acreage covered by an Option Lease or any other oil, gas and mineral lease that is or becomes subject to this Agreement) and depth (which must be to the Objective Depth) of the Initial Well and shall include an AFE. Each of the BPO Non-Operating WI Owners shall have thirty (30) days from delivery of the Alternate Proposal within which to respond whether that BPO Non-Operating WI Owner elects to participate or not to participate. So long as the Initial Well identified in the Alternate Proposal is in fact drilled, then, in that event, and only in that event, any BPO Non-Operating WI Owner that elects not to participate in the Alternate Proposal (also a "**Non-Consenting Drilling Party**") shall forever relinquish, release and abandon all of its right, title and working interest (but not After Payout Interest under Section 1.4 of this Agreement) in and to the Initial Well and in, to and under the Options, the LLEG Documents, any leases granted pursuant to the Options or the LLEG Documents, any leases in the AMI, and the Prospect and agrees to execute a recordable assignment of its interest to each Consenting Drilling Party who elects to bear (and assume) its proportionate share of the Non-Consenting Drilling Parties' (or Party's) interest in the proportions which the share of the Non-Consenting Drilling Parties' (or Party's) interest each such Consenting Drilling Party agrees to bear (and assume) bears to the total of the Non-Consenting Drilling Parties' (or Party's) interest born (and assumed) by all Consenting Drilling Parties.

If one or more of the BPO Non-Operating WI Owners elects not to participate in the Alternate Proposal, then the Operator immediately after expiration of the notice period shall advise the BPO Non-Operating WI Owners who elected to participate in the Alternate Proposal (also the "**Consenting Drilling Parties**") of the total interest of the BPO Non-Operating WI Owners approving such operation and its recommendation as to whether those Consenting Drilling Parties should proceed with the operation as proposed. Each of the Consenting Drilling Parties within twenty-four (24) hours after delivery of such notice shall advise the successor Operator of its desire to (a) limit participation to such party's Well Unit Interest or (b) bear (and assume) all of its proportionate part of the Non-Consenting Drilling Parties' interests. Failure to advise the Operator shall be deemed an election under (a). The BPO Non-Operating WI Owner proposing the Alternate Proposal, at its election, may withdraw such proposal if there is, in its opinion, insufficient participation and shall promptly notify all parties of such decision. Likewise, the Operator is not required to drill the Initial Well under the Alternate Proposal unless and until all of the cost to drill said well is assumed by the Consenting Drilling Parties. Those Consenting Drilling Parties who make an election under (b) agree to bear not only their Share of the costs to drill the Initial Well to the Objective Depth, but they also agree to bear, in the proportion that their Well Unit Interest bears to the Well Unit Interest of all parties electing under (b), the costs to drill the Initial well to the Objective Depth attributable to the interests of each Non-Consenting Drilling Party.

The Operator may pre-bill each BPO Non-Operating WI Owner that has elected to participate in the applicable proposal their Share of the estimated dry hole costs as per the AFE for the Initial Well. Each such BPO Non-Operating WI Owner must pay the pre-bill in full within fifteen (15) days; provided, however, such pre-bill shall not be sent earlier than thirty (30) days from the anticipated mobilization of the drilling rig to the location of the Initial Well. Failure timely to pay shall be deemed an election not to participate and shall result in the BPO Non-Operating WI Owner being a Non-Consenting Drilling Party and forever relinquishing, releasing and abandoning all of its right, title and working interest (but not After Payout Interest under Section 1.4 of this Agreement) in and to the Initial Well and in, to and

under the Options,  the LLEG Documents, any leases granted pursuant to the Options or the LLEG Documents, any leases in the AMI, and the Prospect, such BPO Non-Operating WI Owner agreeing to execute a recordable assignment of its interest in the same manner as any other Non-Consenting Drilling Party.

At the time the Operator's Proposal or the Alternate Proposal is sent out, the Party sending out the Proposal shall, based on information then available, make a good faith effort to determine the Well Unit Interest owned by each BPO Non-Operating WI Owner and shall, in a document accompanying the proposal, list the Well Unit Interest of each BPO Non-Operating WI Owner in the unit for the Initial Well. The Well Unit Interests of the BPO Non-Operating WI Owners shall, however, be subject to adjustment if a title opinion by an Alabama licensed attorney should thereafter reveal that the initial determination is incorrect, and if such adjustment is required, the share of costs due from each Consenting Drilling Party for the Initial Well shall be retroactively adjusted.

### Subsection 1.5(b).  Operations After Reaching The Objective Depth in the Initial Well

After the Initial Well has been drilled to the Objective Depth, the Operator shall make a copy of any logs, core analysis, drill-stem test analysis or results of any other tests available to a representative of the Consenting Drilling Parties at the wellsite, or if none is present, by email, facsimile or overnight delivery.  Operator shall also furnish such Consenting Drilling Parties in a like manner with its recommendation regarding the disposition of the wellbore, in accordance with the JOA.  The casing point election and all subsequent operations and elections shall be governed by the JOA, provided, however, that failure to respond to the casing point election notice for the Initial Well within the time specified shall be deemed an election to participate in Operator's recommended operation.

## Article II.  Operations

### Section 2.1.  JOA

SEC is hereby designated Operator.  Except as otherwise provided in this Agreement, all operations within the Contract Area shall be governed by the Operating Agreement (the "**JOA**"), covering the Contract Area attached hereto as Exhibit "D."  The Parties agree to execute the JOA concurrent with their execution of this Agreement.  In the event of a conflict between this Agreement and the JOA, this Agreement shall govern and control.

## Article III.  Miscellaneous

### Section 3.1.  AMI

The Parties have formed an AMI under the terms contained in Article XV.K of the JOA covering the lands described in Exhibit "A" to the JOA and further identified as the lands outlined by the bold black outline on the plat attached hereto as Exhibit "A" (subject to, however, the exclusion of certain lands set forth in Exhibit "A" to the JOA) which shall govern the acquisition by any of the Participants of any oil and gas lease or oil and gas interest covering lands located within the Contract Area and AMI created under this Agreement, and the terms and provisions of Article XV.K are incorporated herein and shall be effective as of the date of this Agreement. Prior to Prospect Payout, the After Payout Interest described in Section 1.4 shall burden new leases acquired under the AMI, and only the BPO Non-Operating WI Owners may participate in acquiring any such lease.  Any renewals or extensions acquired under Article VIII.B of the JOA shall also be burdened by the After Payout Interest described in Section 1.4 of this Agreement.  Seismic permits and/or options to lease acquired in accordance with Section 1.2(a) shall not be subject to this AMI provision.

### Section 3.2.  Information

After execution of this Agreement by all of the Parties, any Participant may request and shall be entitled to a copy of all of the LLEG Documents, any leases and any other title information such as any abstracts of title or drill-site title opinions for the drill-site tract and drilling unit for the Initial Well, along with drilling and completion and log reports for the Initial Well and any subsequent wells.

### Section 3.3.  Confidentiality

The Parties agree to keep confidential and not disclose any information about this Prospect, not already disclosed or of public record, to third parties except as required by statutes, regulations or court order for so long as this Agreement is in effect, except that any Participant may disclose information about this Agreement to bona fide third party prospective purchasers of that Participant's working interest under this Agreement and the JOA.  The Parties may also disclose information about this Prospect to attorneys,

accountants and other consultants provided that the Party disclosing such information bears the responsibility that their attorney, accountant or other consultant himself keep the information confidential.

### Section 3.4. Closing

Closing shall occur by mail or by such other means and at such time and place to which the Parties mutually agree.

### Section 3.5. Binding On Successors And Assigns

This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and assigns, subject, however, to the provisions of Section 3.13, below.

### Section 3.6. Entire Agreement

This Agreement and its attachments constitute the entire agreement of the Parties with respect to the subject matter hereof, and any other promises, inducements, representations, warranties or agreements with respect to the subject matter hereof have been superseded hereby and are not intended to survive this Agreement, provided, however, that, as between the parties to the LLEG Agreement, that agreement shall remain in effect, but the Parties to this Agreement understand and agree that no provisions of the LLEG Agreement shall be binding on the Parties other than Longleaf and Sklarco. Except as otherwise expressly provided herein, no amendment or modification of this Agreement shall be effective unless set forth in writing and signed by a duly authorized officer of each and all of the Parties.

### Section 3.7 Recitals Are Part of Agreement

The recitals contained in the "Whereas" clauses near the beginning of this Agreement, and in particular, the definitions of terms contained therein, constitute a part of this Agreement and are not mere introductory language.

### Section 3.8. Notices

All notices between the Parties authorized or required by any of the provisions of this Agreement, unless otherwise expressly provided, shall be given in writing by email or facsimile or by regular or express mail, addressed to those of the Parties to whom the notice is given at the email addresses or fax telephone numbers and addresses set forth in Exhibit "A" to the JOA. Any of the Parties may change its designated email address, fax telephone number and address at any time, and from time to time, by giving written notice thereof to the other Parties.

### Section 3.9. Headings for Convenience

The article, section and subsection headings used in this Agreement are inserted for convenience only and shall not be regarded in construing this Agreement.

### Section 3.10. Time

Time is of the essence hereunder.

### Section 3.11. Governing Law

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Alabama without regard to conflict of laws principles or rules.

### Section 3.12. Relationship Of The Parties

Liability of the Parties hereto shall be several and not joint or collective. Each Party shall make its own elections under this Agreement and shall be responsible only for its obligations as herein set out. It is not the intention of the Parties to create, nor shall this Agreement be construed as creating, a mining or other partnership, joint venture or association between the Parties.

### Section 3.13. Assignability

Except as otherwise provided herein, the Parties to this Agreement may assign all or part of their rights and obligations hereunder, provided, however, that: (1) any such assignment must be made subject to the terms and conditions of this Agreement and the JOA; (2) no such assignment shall be effective as to the Operator until 30 days after the Operator shall have been provided with a certified copy of a recorded instrument evidencing the assignment and with such other documents and information as the Operator may reasonably request; (3) any Party making such an assignment must obtain any approval that

may be required under the terms of any option, lease or other agreement; and (4) any such assignment shall be subject to the restrictions in Section 1.2(c) and to the other provisions of Section 1.2.

### Section 3.14. Term

This Agreement shall remain in full force and effect as between the Parties until expiration of the last lease jointly owned by them, or any combination of the Parties, covering any part of the AMI and shall not be merged into or terminated by any assignment or conveyance made pursuant to this Agreement.

### Section 3.15. Counterparts

This Participation Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

### Section 3.16. Pronouns.

Where used to refer to the Participants, the pronoun "it" shall be deemed to include the pronouns he and she, and the same shall apply to the possessive case of those pronouns.

### Section 3.17    Waiver of Right to Trial by Jury

Each of the Parties hereby waives the right to trial by jury in any litigation between any of the Parties relating to this Agreement.

### Section 3.18    Pooling

The form of lease attached to the Options as an Exhibit thereto grants to the lessee the right to pool or unitize the Lease and the lands covered thereby (or portions thereof) with other lands or leases (or portions thereof) to establish units for wells, and it is expected that leases hereafter obtained that are, or become, subject to the this Agreement and/or the JOA will contain similar provisions regarding pooling and unitization. The Parties for themselves and for their successors and assigns hereby grant to Operator and its successors the right to exercise any such pooling or unitization rights so granted to them, or any of them, with full authority to execute (for them and on their behalf) any documents deemed necessary or appropriate to effectuate said pooling or unitization and hereby agree and stipulate that any instrument or declaration executed by the Operator (or its successor) with respect to any such pooling or unitization shall have the same force and effect as one executed by all of the Parties (and their successors and assigns). Nothing in this paragraph shall limit or alter a Party's right to consent or not consent to any operation in accordance with and subject to the terms of this Agreement and/or the JOA, and the power and authority granted to the Operator in this Section shall remain in effect so long as either this Agreement or the JOA remains in effect and shall not be affected by the death or incompetency of any Participant who is a natural person.

### Section 3.19    Entity Status

Each of the Parties that is not a natural person hereby represents and warrants that it is validly formed and currently existing in good standing under the laws of the state where it is formed and that it has the power and authority to enter into this Agreement and to perform its obligations hereunder, and each person executing this Agreement on behalf of an entity represents and warrants that he/she has authority to do so and to thereby bind said entity.

### Section 3.20    Indemnity

Except for liabilities resulting from the gross negligence or willful misconduct of the Operator, the Participants (in accordance with their interests at the time) agree to indemnify and hold Operator harmless from and against any loss, cost, expense (including attorneys' fees), or damages arising out of operations conducted by or on behalf of Operator pursuant to this Agreement; provided, however, if Operator enters into one contract with a seismic company for the conduct of seismic operations both on the Prospect and on other property not in the Prospect, the Parties to this Agreement shall have no obligation arising under this Agreement for any liability, cost or expense incurred for or as a result of seismic operations conducted on the property outside the Prospect unless those operations are conducted on property included within an expansion of the Prospect 3D shoot pursuant to Section 1.2(a).

### Section 3.21   Force Majeure

If Operator exercises reasonable efforts in good faith to timely initiate operations to fulfill any drilling or seismic operations set forth in this Agreement, but is prevented from initiating such action by reason of strikes, labor disputes, accidents, action of the elements, adverse weather conditions (or other acts of God), partial or total failure or inability to obtain material or supplies, including a drilling rig, or in the event that the performance of such drilling or seismic operations is prevented by law, directive or regulations from any authorized agency, or the inability to secure the necessary permits or use agreements from the owners of the surface or the minerals of the subject lands to fulfill either the seismic commitments or the drilling commitments, or causes of the kind enumerated herein or otherwise beyond the control of the Operator and which, by the exercise of due diligence, Operator could not have prevented or is unable to overcome, the time required for performance of such obligations shall be extended for so long and only so long as the condition causing such force majeure continues to exist. Upon cessation of the condition constituting the force majeure, Operator shall have ninety (90) days, or for so long thereafter as may be necessary to achieve optimal seismic acquisition or drilling conditions, within which to initiate the required operation; however, such period will be reduced to the extent operations must be conducted within a fixed period of time to avoid the loss, termination or forfeiture of leasehold interests or the loss of opportunity to earn additional leasehold interests. Operator shall promptly notify the Purchasers in writing of the existence of the force majeure condition, and shall use reasonable efforts in good faith to remove or address the force majeure situation as quickly as practicable.

### Section 3.22   Severability

The invalidity of any one or more of the provisions of this Agreement does not affect the remaining portions of this Agreement, and in case of any such invalidity, this Agreement should be construed as if the invalid provision(s) had not been inserted.

### Section 3.23   Sophisticated Investors

By execution of this Agreement, the Parties confirm that they have a working knowledge of the oil and gas industry and that they have each thoroughly investigated his/her/its participation in the Prospect and have been furnished with sufficient information which he/she/it has deemed appropriate in his/her/its independent judgment to evaluate the merits and risks of participation in the Prospect. Each Party represents and acknowledges that he/she/it is a sophisticated investor and has (or, in the case of a business entity, it or its owner has) a financial net worth in excess of one million dollars. Each Party represents he/she/it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of not just its share of the payments called for under this Agreement, but also his/her/its share of all other costs incurred in operations on the Prospect. EACH PARTY ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES. Each Party further confirms and accepts that the offering of the interest herein purchased has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the States of Louisiana or Alabama, or any other state. Each Party has hereby agreed to participate in the Prospect for investment purposes only, and not with a view to or for sale in connection with any distribution of interests in the Prospect within the meaning of said laws.

THUS DONE AND SIGNED This 12th day of _August_, 2015, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By: _____
David A. Barlow
President - Chief Operating Officer

SKLARCO L.L.C.

By: _____
David A. Barlow
President - Chief Operating Officer

JJS WORKING INTERESTS, L.L.C.

By:    HOUSTON         BULLDOG        CAPITAL
MANAGEMENT, L.L.C.
      Manager

By: _____
      Justin Simons
      Manager


MCCOMBS ENERGY, LTD.


By: _____
      Billy Forney, III
      Vice President


TCP COTTONWOOD, L.P.

By: TRINITY-ANDERSON, LLC
      General Partner

By: ANDERSON FEAZEL MANAGEMENT, INC.
      Manager

By: _____
      T. Cole Anderson
      Vice-President


FANT ENERGY LIMITED

By: RICHARD E. FANT, L.L.C.
      General Partner


By: _____
      Stephen Swan
      Manager


TAUBER EXPLORATION & PRODUCTION CO.


By: _____
      Richard E. Tauber
      President


KUDZU OIL PROPERTIES, LLC


By: _____
      Wirt A. Yerger, III
      Manager

JJS WORKING INTERESTS, L.L.C.

By:    HOUSTON        BULLDOG        CAPITAL
MANAGEMENT, L.L.C.
   Manager


By: _____
   Justin Simons
   Manager


MCCOMBS ENERGY, LTD.

By: _____
   Billy Forney, III
   Vice President


TCP COTTONWOOD, L.P.

By: TRINITY-ANDERSON, LLC
   General Partner

By: ANDERSON FEAZEL MANAGEMENT, INC.
   Manager

By: _____
   T. Cole Anderson
   Vice-President


FANT ENERGY LIMITED

By: RICHARD E. FANT, L.L.C.
   General Partner


By: _____
   Stephen Swan
   Manager


TAUBER EXPLORATION & PRODUCTION CO.


By: _____
   Richard E. Tauber
   President


KUDZU OIL PROPERTIES, LLC


By: _____
   Wirt A. Yerger, III
   Manager

JJS WORKING INTERESTS, L.L.C.

By:   HOUSTON          BULLDOG          CAPITAL
MANAGEMENT, L.L.C.
     Manager


By: _____
     Justin Simons
     Manager


MCCOMBS ENERGY, LTD.


By: _____
     Billy Forney, III
     Vice President


TCP COTTONWOOD, L.P.

By: TRINITY-ANDERSON, LLC
     General Partner

By: ANDERSON FEAZEL MANAGEMENT, INC.
     Manager
By: _____
     T. Cole Anderson
     Vice-President


FANT ENERGY LIMITED

By: RICHARD E. FANT, L.L.C.
     General Partner


By: _____
     Stephen Swan
     Manager


TAUBER EXPLORATION & PRODUCTION CO.


By: _____
     Richard E. Tauber
     President


KUDZU OIL PROPERTIES, LLC


By: _____
     Wirt A. Yerger, III
     Manager

JJS WORKING INTERESTS, L.L.C.

By:   HOUSTON        BULLDOG       CAPITAL
MANAGEMENT, L.L.C.
      Manager

By: _____
      Justin Simons
      Manager


MCCOMBS ENERGY, LTD.


By: _____
      Billy Forney, III
      Vice President


TCP COTTONWOOD, L.P.

By: TRINITY-ANDERSON, LLC
      General Partner

By: ANDERSON FEAZEL MANAGEMENT, INC.
      Manager

By: _____
      T. Cole Anderson
      Vice-President


FANT ENERGY LIMITED

By: RICHARD E. FANT, L.L.C.
      General Partner

By: _____
      Stephen Swan
      Manager


TAUBER EXPLORATION & PRODUCTION CO.


By: _____
      Richard E. Tauber
      President


KUDZU OIL PROPERTIES, LLC


By: _____
      Wirt A. Yerger, III
      Manager

JJS WORKING INTERESTS, L.L.C.

By:    HOUSTON    BULLDOG    CAPITAL
MANAGEMENT, L.L.C.
        Manager

By: _____
        Justin Simons
        Manager

MCCOMBS ENERGY, LTD.

By: _____
        Billy Forney, III
        Vice President

TCP COTTONWOOD, L.P.

By: TRINITY-ANDERSON, LLC
        General Partner

By: ANDERSON FEAZEL MANAGEMENT, INC.
        Manager

By: _____
        T. Cole Anderson
        Vice-President

FANT ENERGY LIMITED

By: RICHARD E. FANT, L.L.C.
        General Partner

By: _____
        Stephen Swan
        Manager

TAUBER EXPLORATION & PRODUCTION CO.

By: _____
        Richard E. Tauber
        President

KUDZU OIL PROPERTIES, LLC

By: _____
        Wirt A. Yerger, III
        Manager

*PARTICIPATION AGREEMENT*
*MT. CARMEL PROSPECT*
*ESCAMBIA COUNTY, ALABAMA*
*SANTA ROSA COUNTY, FLORIDA*
*DATED EFFECTIVE 4-8-2015*

Page **14** of **15**

JJS WORKING INTERESTS, L.L.C.

By:   HOUSTON      BULLDOG      CAPITAL
MANAGEMENT, L.L.C.
      Manager


By: _____
     Justin Simons
     Manager


MCCOMBS ENERGY, LTD.


By: _____
     Billy Forney, III
     Vice President


TCP COTTONWOOD, L.P.

By: TRINITY-ANDERSON, LLC
     General Partner

By: ANDERSON FEAZEL MANAGEMENT, INC.
     Manager

By: _____
     T. Cole Anderson
     Vice-President


FANT ENERGY LIMITED

By: RICHARD E. FANT, L.L.C.
     General Partner


By: _____
     Stephen Swan
     Manager


TAUBER EXPLORATION & PRODUCTION CO.


By: _____
     Richard E. Tauber
     President


KUDZU OIL PROPERTIES, LLC

By: _____
     Wirt A. Yerger, III
     Manager

JF HOWELL INTERESTS, L.P.

By: HOWELL INVESTMENTS, L.L.C.
      General Partner

By: _____
      David Morgan
      Manager


LECHWE, L.L.C.

By: _____
      Mark Rauch
      Agent and Attorney-in-Fact


MARKSCO, L.L.C.


By: _____
      Mark P. Sealy
      Member


BUNDERO INVESTMENT COMPANY, L.L.C.


By: _____
      Robert P. Bowman
      Manager


LONGLEAF ENERGY GROUP, INC.

By: _____
      Thomas E. McMillan, Jr.
      President


Attachments:

| | |
|---|---|
| Exhibit "A": | Plat |
| Exhibit "A-1": | Option (TRM Woodlands, Inc. – Alabama) |
| Exhibit "A-2": | Option (TRM Woodlands, Inc. – Florida) |
| Exhibit "A-3": | Option (State Line Oil Trust – Alabama) |
| Exhibit "A-4": | Option (State Line Oil Trust – Florida) |
| Exhibit "B-1": | Alabama Form of Assignment to Before Payout Parties and Sklar Parties |
| Exhibit "B-2": | Florida Form of Assignment to Before Payout Parties and Sklar Parties |
| Exhibit "B-3": | LLEG Documents |
| Exhibit "C": | Seismic Data License |
| Exhibit "D": | JOA |

JF HOWELL INTERESTS, L.P.

By: HOWELL INVESTMENTS, L.L.C.
      General Partner

By: _____
      David Morgan
      Manager


LECHWE, L.L.C.

By: _____
      Mark Rauch
      Agent and Attorney-in-Fact


MARKSCO, L.L.C.


By: _____
      Mark P. Sealy
      Member


BUNDERO INVESTMENT COMPANY, L.L.C.


By: _____
      Robert P. Bowman
      Manager


LONGLEAF ENERGY GROUP, INC.

By: _____
      Thomas E. McMillan, Jr.
      President

Attachments:

| | |
|---|---|
| Exhibit "A": | Plat |
| Exhibit "A-1": | Option (TRM Woodlands, Inc. – Alabama) |
| Exhibit "A-2": | Option (TRM Woodlands, Inc. – Florida) |
| Exhibit "A-3": | Option (State Line Oil Trust – Alabama) |
| Exhibit "A-4": | Option (State Line Oil Trust – Florida) |
| Exhibit "B-1": | Alabama Form of Assignment to Before Payout Parties and Sklar Parties |
| Exhibit "B-2": | Florida Form of Assignment to Before Payout Parties and Sklar Parties |
| Exhibit "B-3": | LLEG Documents |
| Exhibit "C": | Seismic Data License |
| Exhibit "D": | JOA |

JF HOWELL INTERESTS, L.P.

By: HOWELL INVESTMENTS, L.L.C.
        General Partner

By: _____
        David Morgan
        Manager

LECHWE, L.L.C.

By: _____
        Mark Rauch
        Agent and Attorney-in-Fact

MARKSCO, L.L.C.

By: _____
        Mark P. Sealy
        Member

BUNDERO INVESTMENT COMPANY, L.L.C.

By: _____
        Robert P. Bowman
        Manager

LONGLEAF ENERGY GROUP, INC.

By: _____
        Thomas E. McMillan, Jr.
        President

Attachments:

| | | |
|---|---|---|
| Exhibit "A": | Plat |
| Exhibit "A-1": | Option (TRM Woodlands, Inc. – Alabama) |
| Exhibit "A-2": | Option (TRM Woodlands, Inc. – Florida) |
| Exhibit "A-3": | Option (State Line Oil Trust – Alabama) |
| Exhibit "A-4": | Option (State Line Oil Trust – Florida) |
| Exhibit "B-1": | Alabama Form of Assignment to Before Payout Parties and Sklar Parties |
| Exhibit "B-2": | Florida Form of Assignment to Before Payout Parties and Sklar Parties |
| Exhibit "B-3": | LLEG Documents |
| Exhibit "C": | Seismic Data License |
| Exhibit "D": | JOA |

JF HOWELL INTERESTS, L.P.

By: HOWELL INVESTMENTS, L.L.C.
     General Partner


By: _____
     David Morgan
     Manager


LECHWE, L.L.C.

By: _____
     Mark Rauch
     Agent and Attorney-in-Fact


MARKSCO, L.L.C.


By: _____
     Mark P. Sealy
     Member


BUNDERO INVESTMENT COMPANY, L.L.C.

By: _____
     Robert P. Bowman
     Manager


LONGLEAF ENERGY GROUP, INC.

By: _____
     Thomas E. McMillan, Jr.
     President


Attachments:

| | |
|---|---|
| Exhibit "A": | Plat |
| Exhibit "A-1": | Option (TRM Woodlands, Inc. – Alabama) |
| Exhibit "A-2": | Option (TRM Woodlands, Inc. – Florida) |
| Exhibit "A-3": | Option (State Line Oil Trust – Alabama) |
| Exhibit "A-4": | Option (State Line Oil Trust – Florida) |
| Exhibit "B-1": | Alabama Form of Assignment to Before Payout Parties and Sklar Parties |
| Exhibit "B-2": | Florida Form of Assignment to Before Payout Parties and Sklar Parties |
| Exhibit "B-3": | LLEG Documents |
| Exhibit "C": | Seismic Data License |
| Exhibit "D": | JOA |

JF HOWELL INTERESTS, L.P.

By: HOWELL INVESTMENTS, L.L.C.
      General Partner


By: _____
      David Morgan
      Manager


LECHWE, L.L.C.

By: _____
      Mark Rauch
      Agent and Attorney-in-Fact


MARKSCO, L.L.C.


By: _____
      Mark P. Sealy
      Member


BUNDERO INVESTMENT COMPANY, L.L.C.


By: _____
      Robert P. Bowman
      Manager


LONGLEAF ENERGY GROUP, INC.

By: _____
      Thomas E. McMillan, Jr.
      President

Attachments:

| | | |
|---|---|---|
| Exhibit "A": | Plat |
| Exhibit "A-1": | Option (TRM Woodlands, Inc. – Alabama) |
| Exhibit "A-2": | Option (TRM Woodlands, Inc. – Florida) |
| Exhibit "A-3": | Option (State Line Oil Trust – Alabama) |
| Exhibit "A-4": | Option (State Line Oil Trust – Florida) |
| Exhibit "B-1": | Alabama Form of Assignment to Before Payout Parties and Sklar Parties |
| Exhibit "B-2": | Florida Form of Assignment to Before Payout Parties and Sklar Parties |
| Exhibit "B-3": | LLEG Documents |
| Exhibit "C": | Seismic Data License |
| Exhibit "D": | JOA |

EXHIBIT "A"

Attached to and made a part of that certain Amended and Restated Participation Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc.

PLAT

ESCAMBIA COUNTY, ALABAMA &
SANTA ROSA COUNTY, FLORIDA

**EXHIBIT "A-1"**

Attached to and made a part of that certain Amended and Restated Participation Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc.

**OPTION**
**(TRM Woodlands, Inc. – Alabama)**

STATE OF ALABAMA

COUNTY OF ESCAMBIA

### GEOPHYSICAL PERMIT & LEASE OPTION AGREEMENT

THIS AGREEMENT made and entered into as of the 7th day of April, 2015, by and between TRM WOODLANDS, INC., an Alabama corporation, represented herein by its duly authorized President, Paul D. Owens, Jr., whose mailing address is P.O. Box 1769, Brewton, Alabama 36427, hereinafter referred to as "Grantor" and SKLARCO L.L.C., a Louisiana limited liability company, represented herein by its duly authorized President – Chief Operating Officer, David A. Barlow, whose mailing is 5395 Pearl Parkway, Suite 200, Boulder, CO 80301, hereinafter referred to as "Grantee."

### A. CONSIDERATION AND OPTION

For and in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the agreements herein contained and subject to the terms and conditions hereinafter set forth, Grantor hereby grants unto Grantee the exclusive option for a period beginning on the date of this agreement and ending on April 7, 2017, hereinafter called "Option Period," to acquire an Oil, Gas and Mineral Lease or leases with a three year primary term covering all of Grantor's interest in all or any portion of that certain property situated in Escambia County, Alabama described in Exhibit "A-1," attached hereto and made a part hereof, together with the exclusive right, during the Option Period, to conduct or cause to be conducted geophysical and other exploration surveys on said property for the purpose of exploring same for the possible existence of oil, gas and other hydrocarbons (all such permitted methods of exploration being collectively referred to as "Seismic Operations"). It is the intention of the Grantor to grant to the Grantee a Geophysical Permit and Option to Lease all mineral interest owned by Grantor within the area outlined in black (the Mount Carmel Seismic Prospect) on Exhibit "A," attached hereto and made a part hereof, whether properly and correctly described herein or not. Grantee shall pay to Grantor upon execution of the agreement twenty-five dollars ($25.00) per net mineral acre covered by this option.

### B. EXISTING MINERAL LEASES

Grantor hereby declares that some portion of the lands set forth in Exhibit "A" may be currently subject to the terms and conditions of various Oil, Gas and Mineral Leases (the "Existing Mineral Leases") in favor of various third party mineral Lessees (hereinafter the "Existing Mineral Lessees"). Grantor makes no representation, express or implied, whether Grantee may exercise the right granted herein without the prior express written consent of one or more of the Existing Mineral Lessees. This agreement is made expressly subject to all of the terms and conditions of the said Existing Mineral Leases, and the rights, if any, of the Existing Mineral Lessees there under. Grantee shall be solely responsible for identifying all Existing Mineral Leases bearing upon the Land and obtaining all, if any, necessary consents or permits from the Existing Mineral Lessees prior to commencing operations on or under lands subject to the Existing Mineral Leases. Further, Grantee expressly agrees herein to indemnity and hold Grantor harmless from any and all causes of action by any Existing Mineral Lessee arising out of or relating to the exercise by Grantee of the rights contained herein, including, but not limited to, any and all claims or causes of action for seismic or geophysical trespass. In the event that any Existing Mineral Leases should expire during the term of this Agreement, then the lands covered by same shall be covered by this Agreement.

### C. OPERATIONS & VENUE

Grantee shall compensate Grantor for all damages suffered by Grantor, including damage to timber, buildings or improvements or injuries to persons arising out of or in connection with Grantee's operations on the land covered by this agreement.

Grantee shall conduct said seismic operations and surveys or cause same to be conducted in a workmanlike manner, according to accepted industry practice, and all applicable federal, state, county, and local rules, regulations, and statutes. Grantee further agrees to indemnify and hold Grantor harmless from and against all claims and damages of every nature that might arise as a result of Grantee's operations, and further agrees to cooperate fully with Grantor with respect to all current and proposed seismic operations conducted on permitted property. Specifically, prior to entering onto the land, Grantee shall furnish to Grantor a plat identifying the approximate location of the seismic lines or grid pattern, together with the location of each shot point or group of shot points, and the total number of holes or shot points which arc to be placed, bored or shot on said lands.

In the event of litigation between the parties, the parties agree that Alabama Law shall control and apply to this agreement and the proper venue to any suit or claim shall be Escambia County, Alabama.

### D. EXERCISE OF OPTION AND LEASE EXECUTION

In the event Grantee desires, at any time and from time to time, to exercise the option granted in Paragraph A, Grantee shall, prior to the expiration or termination of the Option Period, notify Grantor in writing. Thereafter, Grantor shall prepare two copies of Oil, Gas and Mineral Lease(s) covering land to be leased, together with two (2) copies of a Memorandum of Oil, Gas and Mineral Lease. Checks payable to Grantor, in an amount equal to 100% of the total aggregate initial bonus payment due under such lease (s) shall be paid to Grantor within 3 business days of the delivery of lease. The total aggregate initial bonus payment shall be computed on the basis of two hundred dollars ($200.00) per net mineral acre for each and every acre to be covered by the lease(s).

The parties hereto agree that any such leases shall cover an undivided 100% of the interest owned by Grantor in the lease premises. It is further agreed and understood that any single lease shall not cover less than all mineral interest owned by Grantor in a governmental quarter section subdivision.

Except with respect to the description of acreage to be covered, all leases acquired by Grantee hereunder shall be in the identical form and contain the same terms, conditions and provisions as the Oil, Gas and Mineral Lease attached hereto as Exhibit "C".

Promptly after receipt of the aforesaid memorandum, leases and payment of lease bonus, Grantee shall execute and return to Grantor one (1) copy of each Oil, Gas and Mineral Lease and Memorandum of Oil, Gas and Mineral Lease. Grantee shall promptly record Memorandum of Oil, Gas and Mineral Lease and provide Grantor with recording information.

### E. GEOPHYSICAL DATA TO BE FURNISHED

Within ninety days after the completion of final processing, Grantee agrees to furnish Grantor the geophysical data pursuant to terms and requirements as provided on Exhibit "B" hereto, and within the data area as outlined in black on Exhibit "A".

Grantee considers all the geophysical data to be acquired hereunder as proprietary and with marketable value. Therefore, any and all data furnished hereunder shall be held strictly confidential by Grantor. Without the prior written consent of Grantee, Grantor agrees not to allow such data to be reviewed by any third party while Grantee holds leases from Grantor in the area outlined in black on Exhibit "A". However, after the expiration of all leases, it is agreed that Grantor may have such data reviewed by third parties for the sole benefit of Grantor, insofar and only insofar as such data applies to lands which are no longer covered by an Oil, Gas and Mineral Lease acquired from Grantor, or concurrent with this seismic survey.

### F. NOTICE

Any notice, communication or payment to a party hereunder may be given, sent, paid

or tendered by postage prepaid mail addressed to said party at the address shown below or such other address as is hereafter designated in writing:

For: TRM WOODLANDS, INC.
(214 Deer Street - zip 36426)
P.O. Box 1769
Brewton, AL 36427

With copy to:
PAUL D. OWENS, JR.
(315 Belleville Ave.)
P.O. Box 1229
Brewton, AL 36427

For: SKLARCO L.L.C.
5395 Pearl Parkway, Suite 200
Boulder, CO 80301
Attn: J. Marshall Jones, III

With copy to:
C.P. Armbrecht
P.O. Box 290
Mobile, AL 36601

## G. SEVERABILITY

Any provision of this Agreement which is prohibited or unenforceable, in whole or in part, shall be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. If the scope of any provision set forth in this Agreement is too broad to permit enforcement of such provision to its full extent, then such provision shall be enforced to the maximum extent permitted by applicable law and, if necessary, the scope of any such provision may be judicially modified to the minimum extent necessary in any proceeding brought to enforce such provision and thereafter such provision, as so modified, may be fully enforced. This Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this instrument in duplicate original counterparts, as of the date hereinabove written.

**TRM WOODLANDS, INC.**

By: _____
      Paul D. Owens, Jr.
      President

**SKLARCO L.L.C.**

By: _____
      David A. Barlow
      President – Chief Operating Officer

Page 3 of 9

STATE OF ALABAMA

COUNTY OF ESCAMBIA

    I, _Deborah Arrington_, a notary public, in and for said County in said State, hereby certify that Paul D. Owens, Jr., whose name as President of TRM Woodlands, Inc. is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

    Given under my hand and notarial seal this the _5th_ day of _May_, 2015.

                               _Deborah Arrington_
                               NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _23-11-2018_


STATE OF COLORADO

COUNTY OF BOULDER

    I, _Camille Jenkins_, a notary public, in and for said county in said state, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

    Given under my hand and notarial seal this the _13_ day of _May_, 2015.

CAMILLE CULPEPPER JENKINS
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154003785
MY COMMISSION EXPIRES JANUARY 27, 2019

                               _Camille Jenkins_
                               NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _1/27/2019_

EXHIBIT "A"

Attached to and made a part of that certain Geophysical Permit and Lease Option Agreement
dated April 7, 2015 by and between TRM WOODLANDS, INC. and SKLARCO L.L.C.

## MT. CARMEL SEISMIC PROSPECT
## ESCAMBIA COUNTY, ALABAMA &
## SANTA ROSA COUNTY, FLORIDA

EXHIBIT "A-1"

Attached to and made a part of that certain Geophysical Permit and Lease Option Agreement dated April 7, 2015 by and between TRM WOODLANDS, INC. and SKLARCO L.L.C.

| ESCAMBIA COUNTY, ALABAMA | Gross Mineral Acres | Net Mineral Acres |
|---|---|---|
| **Township 1 North, Range 9 East** | | |
| Section 13:  The N/2 of NE/4 except that part south and east of the center line of Conecuh River; The N/2 of SW/4 of NE/4 and the NW/4. | 335.000 | 335.000 |
| Section 15: All that part of the SE1/4 of NE1/4 (2.3 acres) lying south and east of L.&N. Railroad; all that part of NE1/4 of SE1/4 (4.3 acres) lying south and east of L.&N. Railroad; all that part of SE1/4 or SW1/4 (10.9 acres) lying south and east of L. & N. Railroad; all that part of SW1/4 of SE1/4 (37.4 acres) lying south and east of L. & N. Railroad; and all that part of NE1/4 of SE1/4 (33.6 acres) lying south and east of L. & N. Railroad; and all of SE1/4 of SE1/4. | 128.500 | 64.250 |
| Section 22:  The E/2 of SE/4. | 80.000 | 80.000 |
| Section 22: S1/2 of NW1/4 and E ½ of SW1/4 (except S1/2 of NE1/4 of SW1/4) and W1/2 of SE1/4. | 220.180 | 110.090 |
| Section 23: All of SE1/4 of SE1/4 (9 acres) lying east of Conecuh River, and all of SW1/4 of SE1/4 (17 acres) lying west of Conecuh River. | 26.000 | 13.000 |
| Section 24: SE1/4 of NE1/4 and E1/2 of SE1/4 and NW1/4 of SE1/4 and SW1/4 of SW1/4 and that part of NW ¼ of SW1/4 (15 acres) lying south and east of Conecuh River. | 222.850 | 111.425 |
| Section 24: S/2 of SE/4 and SE/4 of SW/4. | 120.000 | 120.000 |
| Section 25: E1/2 of E1/2 and NE1/4 of NE1/4 and N1/2 of SW1/4 and SW1/4 of SW1/4 (except 1 acres as follows:  Begin at southeast cor. of SW1/4 of SW1/4 and run north 8.5 ch., west 3.3 ch. for starting point; north 3.17 ch., west 3.17 ch., south 3.17 ch., east 3.17 ch. to starting point); and NW1/4. | 505.850 | 252.925 |
| Section 26:   E1/2 (except Fraction of 10 acres of NW1/4 of NE1/2 north and west of Conecuh River) and NE1/4 of NW1/4. | 350.560 | 175.280 |
| Section 27:   NW1/4 of NW1/4 and SW1/4 of SW1/4 and E1/2 (except E1/2 of SE1/4) and NE1/4 of NW1/4 and SE1/4 of SW1/4. | 400.600 | 200.300 |
| Section 33:  N/2 of NE/2 and NE/4 of NW/4. | 120.000 | 120.000 |
| Section 34: All (except NW1/4 of NW1/4 and SE1/4 of NW1/4 and SW1/4 of NE1/4). | 540.150 | 270.075 |
| Section 35:  N1/2 (except SE1/4 of NE1/4) and S1/2 of SE1/4 and NW1/4 of SE1/4 and W1/2 of SW1/4. | 477.840 | 238.920 |
| Section 36: W1/2 of NE1/4 (except 1 acre in NW corner) and SE1/4 of SE1/4 and E1/2 of W1/2 of SE1/4 and N1/2 of NW1/4 and NW1/4 of SE1/4 (except 3 acres in northwest corner of NW1/4 of SW1/4. | 274.710 | 137.355 |
| | | |
| **Township 1 North, Range 10 East** | | |
| Section 1:   All that part of the SW/4 of SW/4 lying South and West of Conucuh River and all that part of SE/4 of SE/4 lying South of River and all that part lying South of River in NE/4 of SW/4 and SE/4 of SW/4. | 55.000 | 55.000 |
| Section 2:  All of the NE4 of SW4 lying south of Conecuh River and all of the SW4 OF SE4 LYING South Of Conecuh River. | 12.000 | 12.000 |
| Section 7: S1/2 of SE1/4. | 79.250 | 39.625 |
| Section 9:  SW1/4 of SW1/4 (being 38.9 acres); and all NW1/4 of SW1/4 lying south and west of Conecuh River (28.9 acres) and all NE1/4 of SW1/4 lying south of Conecuh River (12 acres); and SW1/4 of NW1/4 lying south of Conecuh River (7 acres). | 86.800 | 44.900 |
| Section 10:  SE1/4 of NE1/4 and NE1/4 of SE1/4 and SW1/4 of NW1/4 lying south of Conecuh River. | 114.360 | 57.180 |

Page 6 of 9

| | | |
|---|---|---|
| Section 11:  S1/2 of NE1/4 and SE1/4 and E1/2 of SW1/2 and SW1/4 of SW1/4. | 342.810 | 171.405 |
| Section 12:  NW1/4 of SE1/4 and W1/2 of NW1/4 lying south of Conecuh River and SE1/4 of NW1/4 and NW1/4 of SW1/4 and SE1/4 of SW/4. | 234.240 | 117.120 |
| Section 13: E1/2 and E1/2 of W1/2 and NW1/4 of SW1/4. | 522.140 | 260.070 |
| Section 13:  The W/2 of the NW/4. | 80.000 | 80.000 |
| Section 14:  N1/2 (except 5 acres in southeast corner of NE1/4 of NW1/4) and N1/2 of SE1/4 and SW1/4 of SE1/4 and N1/2 of SW1/4 (except 1 acre in southwest corner of NW1/4 and SW1/4) and E1/2 of SW1/4 of SW1/4. | 535.480 | 267.740 |
| Section 15:  E1/2 (except NE1/4 of SE1/4) and SW1/4 of NW1/4 and SW1/4.  ALSO Less and Except all that part of the W/2 of SW/4 which lies West of Alabama Highway 93. | 385.000 | 192.500 |
| Section 16: All (except NE1/4 and NE1/4)   ALSO LESS & EXCEPT the S/2; and the W/2 of NE/4; and all that part of the SE/4 of NE/4 lying West of Alabama Highway 93 and the E/2 of NE/4 of NW/4 and the SE/4 of SW/4 of NW/4, as described in Deed Book 84 at page 24; ALSO LESS & EXCEPT the SW/4 of NE/4 of NW/4 and the S/2 of SE/4 of NW/4 of NE/4; and   the SW/4 of NW/4--except the SE/4 of SW/4 of NW/4 described in Deed Book 84, page 215. | 55.000 | 27.500 |
| Section 17: E1/2 (except 10 acres described as follows:  Begin at northeast corner of NW1/4 of NE1/4 and run south 140 yards, west 350 yards, north 140 yards, east 350 yards to point of beginning); and W1/2 of W1/2 (except NW1/4 of SW1/4) and S1/2 of SE1/4 of NW1/4 and SE1/4 of SW1/4; ALSO LESS & EXCEPT the SE/4 of NE/4 and the N/2 of N/2 of NE/4 of SE/4, as described in Deed Book 84 at page 215. | 438.630 | 219.315 |
| Section 18:  E1/2 of E1/2 lying south and east of Conecuh River and W1/2 of NE1/4 and NW1/4 of SE1/4 and E1/2 of W1/2 and SW1/4 of NW1/4. | 478.680 | 239.340 |
| Section 18: All of the W/2 lying south and east of the river. | 260.331 | 260.331 |
| Section 19: NE1/4 of NE1/4 and NW1/4 of SE1/4 and S1/2 of SE1/4 and W1/2. | 478.680 | 239.340 |
| Section 20:  E1/2 of E1/2 (except 1 acre square in the northwest corner of NE1/4 of SE1/4) and NW1/4 of NE1/4 and NW1/4 and NE1/4 of SW1/4. | 399.100 | 199.550 |
| Section 21: Entire, less the NE/4 of NE/4 lying North of county road, as described in Deed Book 84 at page 24. | 600.000 | 300.000 |
| Section 22:  All (except NE1/4 of NE1/4) Also Less all that part of the NW/4 of NW/4 lying West of Alabama Highway 93 and North and West of a county road leading in to Alabama Highway 93, as described in Deed Book 84 at page 24. | 588.760 | 294.380 |
| Section 23: SE1/4 of NE1/4 and NW1/4 of NE1/4 (except 1 acre, commencing at northwest corner of NW1/4 of NE1/4 and run south 6.80 ch. to starting point; thence south 6.34 ch., thence east 1.58 ch., thence north 6.34 ch., thence west 1.58 ch. to starting point) and E1/4 of NE1/4 of SE1/4 and E1/2 of W1/2 of NE1/4 of SE1/4 and SE1/4 of SE1/4 and S1/2 of NW1/4 and SW1/4. | 389.190 | 194.595 |
| Section 24: NE1/4 (except SE ¼ of SE1/4 of NE1/4) and E1/2 of NW1/4 and N1/2 of SW1/4. | 315.820 | 157.910 |
| Section 25: S1/2 of SE1/4 and W1/2. | 409.500 | 204.75 |
| Section 26: E1/2 of NE1/4 and SE1/4 and W1/2. | 561.120 | 280.560 |
| Section 27:  Entire. | 639.280 | 319.640 |
| Section 28:  E1/2 and E1/2 of SW1/4 and W/2 of SW/4. | 480.000 | 240.000 |
| Section 29:  All (except NW1/4 of NE1/4 and N1/2 of N1/2 of N1/2 of NE1/4 of NW1/4). | 596.050 | 298.025 |
| Section 30:  E1/2 (except N1/2 of NE1/4 of NE1/4) and E1/2 of W1/2 and NW1/4 of NW1/4 and W1/2 of SW1/4. | 580.290 | 290.145 |
| Section 31: N1/2 (except 4 acres in SE cor. of SW1/4 of NW1/4) and E1/2 of SE1/4 and N1/2 of NW1/4 of SE1/4 and S1/2 of SE1/4 of SW1/4 and SW1/4 of SW1/4. | 458.120 | 229.060 |
| Section 32:  NE1/4 (except S1/2 of SW1/4 of NE1/4) and N1/2 of SE1/4 and SE1/4 of SE1/2 and W1/2. | 532.880 | 266.440 |

| | | |
|---|---|---|
| Section 33: All (except SE1/4 of SE1/4). | 551.250 | 276.125 |
| Section 34: E1/2 of NE1/4. | 73.740 | 36.870 |
| Section 35: N1/2 and SE1/4 of SE1/4 and NE1/4 of SW1/4. | 367.700 | 183.850 |
| | | |
| **Township 6 North, Range 28 West** | | |
| Section 29: All Fractional Section. | 36.870 | 18.435 |
| Section 30: Fraction of Fractional Section 30, Township 6 N., Range 28 W., described as follows: Beginning at southwest corner of Fractional Sec. 30, run east about 280 yards, thence north about 80 yards, thence west about 280 yards, thence south about 70 yards to starting point, containing about 4 acres, more or less. Beginning at southeast corner of Fractional Sec. 30, said township and range, being on Alabama and Florida line, and run west about 1220 yards, thence north about 80 yards, thence east about 1220 yards, thence south about 90 yards to a starting point, containing in all 34 acres, more or less, begin all of said Fractional Section except 4 acres reserved by Lewis L. Thompson, beginning about 280 yards from southwest corner and lying thence east about 260 yards. | 24.000 | 12.000 |
| | | |
| **Township 6 North, Range 29 West** | | |
| Section 25: All Fractional Section. | 20.330 | 10.165 |
| Section 27: All Fractional Section. | 14.620 | 7.310 |
| Section 29: All Fractional Section. | 15.540 | 7.770 |
| | | |
| **Total for Escambia County, Alabama** | **15614.801** | **8339.566** |

## EXHIBIT "B"

Attached to and made a part of that certain Geophysical Permit and Lease Option Agreement dated April 7, 2015 by and between TRM WOODLANDS, INC. and SKLARCO L.L.C.

### Seismic Data Requirements and Format

_____        **2-D Data Requirements:**

1. Shotpoint map or plat on 1" = 2000' or larger
2. Seismic data loading SEG P1 file to include X-Y coordinates or shotpoints
3. Copy of acquisition and processing parameters
4. Field tapes and support documents, either DLT tape format or DVD
5. Copy of decon gathers-digital media format, either DLT tape or DVD
6. DVD of processed stacks and final migrated data in X-Y bin form, SEG-Y format
7. Copies of observer notes, survey notes and any other information and support data necessary for the complete reprocessing of the data

As used herein, the term "final" shall be defined as migrated stack.

_____        **3-D Data Requirements:**

1. Bin fold plat
2. Seismic data loading information to include X-Y coordinates of subsurface bin locations, bin spacing, and byte location of inlines and traces (xlines)
3. Copy of acquisition and processing parameters and all field, survey or observer notes necessary for complete reprocessing of all data
4. Field tapes and support documents, either on DLT tape format, DVD, or external hard drive
5. Copy of decon gathers-digital media format:  DLT tape, DVD, or external hard drive
6. DVD of processed stacks and final migrated data in X-Y bin form, SEG-Y format

As used herein, the term "final" shall be defined as the migrated stack.

### Scope

The data subject to this agreement shall include all data acquired pertaining to the lands covered by this agreement as well as all data acquired by or obtained by or on behalf of Sklarco L.L.C. covering any and all lands located within the black outline depicted on the plat attached hereto as Exhibit "A."

## OIL, GAS AND MINERAL LEASE

STATE OF ALABAMA

COUNTY OF ESCAMBIA

THIS AGREEMENT, to be effective on the _____ day of _____, 2015, between **TRM WOODLANDS, INC.** (hereinafter referred to as "LESSOR") of Post Office Box 1769, Brewton, Alabama 36427, and **SKLARCO L.L.C.** (hereinafter referred to as "LESSEE") of 5395 Pearl Parkway, Suite 200, Boulder CO 80301.

### W I T N E S S E T H:

1. LEASE CONSIDERATION

LESSOR, in consideration of Ten and No/100 Dollars ($10.00), in hand paid, of the royalties and other benefits herein provided, and of the agreements of LESSEE herein contained, but subject to the further terms hereof, hereby GRANTS, LEASES AND LETS exclusively unto LESSEE for the purpose of investigating, exploring, prospecting and drilling for and producing oil and gas, the lands (hereinafter referred to as the "Leased Premises"), described in and on Exhibit "A", attached hereto and identified as such, which said Exhibit as so attached and identified, is incorporated herein by reference and made a part hereof for a more particular description of said land, for the purpose of calculating and determining the amount of any money  payment hereunder, and for all other pertinent purposes of this Lease.  The land therein described is hereby estimated, and shall be regarded and treated as actually comprising and containing _____ net acres, whether it be more or less, and in the event of a partial assignment or surrender hereof or hereunder, the assigned or surrendered portion or portions shall be deemed to contain the number of acres estimated realistically in such instrument or assignment or assignment or surrender.  The term "oil and gas" as used in this Lease shall mean oil, gas, casinghead gas, distillate, gas condensate and the by-products thereof, and such other hydrocarbon substances and sulphur as are necessarily produced with and incidental to the production of oil and gas. LESSOR hereby reserves and excepts from this Lease and the rights granted hereunder any and all coal, lignite, uranium and other fissionable materials, geothermal energy, base and precious metals, rock, stone, limestone, sand, gravel and other similar aggregates, and clay, and retains unto itself and other subsequent or concurrent lessees of interests therein the right to explore for and produce such reserved minerals.

2. TERM

Subject to the preservation provisions of subsection 3.4.1 and Section 5 hereof, this lease shall be for a term of **THREE (3)** years from this date (called "primary term") and for so long thereafter as oil or gas is produced in paying quantities from the Leased Premises or this Lease is otherwise maintained in force and effect under the terms hereof.

3. RESERVATION OF ROYALTIES

3.1      LESSOR hereby reserves, and LESSEE hereby agrees to pay or deliver to LESSOR, the following royalties on account of the oil and gas produced  from the Leased Premises in accordance with, but subject to, all subsequent subsections hereof:

3.1.1      AS TO OIL:

**25%** of all oil, condensate and/or other liquid hydrocarbons, produced and saved from the Leased Premises, or from a unit embracing all or a portion thereof, the same to be delivered, free of cost, at the mouth of the well, or, at LESSOR's option, to the credit of Lessor into the pipe line or lines to which LESSEE may connect its wells; provided, however, that LESSEE may purchase LESSOR's oil, condensate and/or other liquid hydrocarbons by paying to LESSOR the average posted market price of such royalty share then in effect for such oil, condensate and/or other liquid hydrocarbons at the wells as of the day  such substances are run to the pipe line or storage tank.

3.1.2      AS TO GAS:

**25%** of the market value, hereinafter defined, of all gas and casinghead gas produced and saved from the Leased Premises, or from a unit embracing all or a portion thereof.

3.2      LESSOR specifically reserves hereby the right to take in kind or separately dispose of its proportionate royalty share of all oil and/or gas produced from the Leased Premises, or from a unit embracing all or a portion thereof, and, in the event such an election is made, shall be required to pay only for the proportionate share of such part of LESSEE's surface facilities which it uses.

3.3      PAYMENT AND DELIVERY OF LESSOR'S ROYALTIES:

3.3.1      Any and all royalties due and owing to LESSOR in accordance herewith shall be payable or deliverable to LESSOR no later than 60 days after the end of the calendar month within which oil and/or gas production is sold; provided however, that the acceptance of any such royalty by LESSOR shall never be taken or construed as a waiver of any of LESSOR's rights or remedies for breach by LESSEE, its successors or assigns, of any express or implied covenant of this Lease.

3.3.2      Any payment of any royalty after the date specified in subparagraph 3.3.1 above shall bear interest from and after its respective due date until payment in full is received by LESSOR, said interest factor to be equivalent to the prime rate, as the same shall be set from time to time by the BankTrust of Mobile, Alabama (or any successor to said bank).  Furthermore, if LESSEE should fail to pay any royalty or royalties payable hereunder when the same shall become due, LESSOR shall have the specific right and option to terminate this Lease forthwith for such non-payment if such royalties due and payable to LESSOR are not delivered to the said LESSOR on or

1

before the expiration of sixty (60) days after LESSEE receives written notice from LESSOR of LESSEE's failure to pay all royalties when due.

3.3.3    All royalties payable to LESSOR under the terms and provisions of subparagraph 3.1 hereof are payable and shall be paid in cash or by check delivered or mailed to LESSOR at its principal place of business in Brewton, Alabama, or at such other address as LESSOR may designate.

3.3.4    In the event LESSOR should elect to take in kind its royalty on any one or more substances covered by this Lease, LESSOR may exercise such option at any time and from time to time upon 60 days written notice to LESSEE, in which event LESSEE shall deliver same, free of cost other than as provided in 3.2 to LESSOR, to and into LESSOR's pipe lines, tanks or other storage or transportation facilities until 60 days after receipt of written notice that LESSOR has revoked such option and has elected to receive any such royalty interest or share in cash or by check payable at its designated address as hereinabove provided.  Except to the extent to which LESSOR may have exercised its option to take one or more of its royalty interest or share in kind, as herein provided, LESSEE may, subject to all pertinent provisions of this Section 3 of this Lease, barter, contribute, dispose of, exchange, sell swap or use any one or more of said substances covered by this Lease, but shall account to LESSOR therefore to the extent and in the manner hereinabove provided.

3.4    MONETARY SUBSTITUTES FOR ACTUAL PRODUCTION

3.4.1.    Shut-In Royalty on Suspended Production

(a)    While there is a well on the Leased Premises capable of producing gas in paying quantities, as said phrase is hereinafter defined, but the production there from is shut-in, shut down, or suspended for any reason, then and in any such event, LESSEE shall pay royalty on or before ninety (90) days after the date on which (1) production from any such well is shut-in, shut down or suspended, or (2) this Lease is no longer maintained by compliance with one of the other preservation provisions, hereof, (whichever is the later date, and thereafter at annual intervals during the primary term, a sum and amount equal to One Dollar ($1.00) multiplied by the number of acres then covered by this Lease), and after the expiration of the primary term, a sum and amount equal to Twenty Five Dollars ($25.00) multiplied by the number of acres then covered by this Lease, and, if such payments are made, this Lease shall not terminate, but, on the contrary, will continue in full force and it will be considered that a substance covered by this Lease is being produced from the Leased Premises in paying quantities within the meaning of each pertinent provision of this Lease, it being understood and agreed that such payments shall only apply to the geologic strata capable of producing gas in paying quantities.

(b)    The provisions of subparagraph 3.4.1(a) shall not apply to oil wells, as the same may be classified by the State Oil and Gas Board of Alabama, by the Florida Department of Natural Resources or by its Bureau of Geology, and this Lease shall not be kept in force solely by the payment of any shut-in royalty payment on any such well.

(c)    After the primary term hereof, this Lease may not be kept in force solely by the payment of shut-in royalties hereunder for more than a period of two (2) consecutive years after the date of the first payment of any shut-in royalty hereunder.

3.4.2    Take or Pay Product Purchase Contracts

(a)    No "take or pay" products purchase contract shall be finally consummated or valid as to any substance covered hereby and produced from the Leased Premises without LESSOR's written consent.

(b)    All royalties hereunder applicable to gas, casinghead gas, or any other gaseous hydrocarbon covered by this Lease shall be due and payable to LESSOR for any such gas paid for but not taken pursuant to any "take or pay" provision of any pertinent gas purchase contract covering the Leased Premises, any part thereof, and/or any well or wells thereon, but LESSOR agrees to be responsible and liable for its proportionate share of any payments that may be recoverable by the gas purchaser by later takes of gas or refunds of money.  In the event gas is taken in kind as recoupment of take or pay payments, that gas shall be exempt from any royalties.

3.5    LESSEE shall not conduct underground storage operations without the written consent of LESSOR.

3.6    LESSEE shall not use nuclear or other blasts to create artificial conduits, chimneys or reservoirs without the written consent of LESSOR, and if such consent is given, LESSEE shall not use such artificial conduits, chimneys or reservoirs without the additional written consent of LESSOR.

3.7    All pertinent subparagraphs of this Paragraph 3 of this Lease shall apply to and govern the delivery in kind as royalty, or the payment of royalties on all such elements, natural products, by-products, residues or residuals produced from, or allocable to the Leased Premises, under the terms of, or as a result of, revised, permanent or temporary pooling, spacing or unitizing orders or rules issued by the State Oil and Gas Board of Alabama.

2

3.8   FREE FUEL AND WATER

3.8.1   Free Water

LESSEE shall have free use of any and all subsurface water during any primary operations conducted hereunder.

3.8.2   Free Fuel

LESSEE shall have free use, during any primary operations conducted hereunder, of any and all fuel or other substances covered by this Lease and produced from the Leased Premises, and the royalties thereon due and payable to LESSOR shall be computed after deducting any amount of any such substance so used.

3.8.3   For the purposes of this subparagraph 3.8, primary operations shall include the production of oil and gas and all operations associated therewith during such time as oil and gas, or either of them, are produced from a unit embracing all or a portion of the Leased Premises with the sole use of natural reservoir energy.  Primary operations shall not include secondary recovery, pressure maintenance, or other operations related thereto.

3.9   Any and all royalties due and payable to LESSOR pursuant to this Paragraph 3 shall be so paid to LESSOR, or to the credit of LESSOR, free of any and all exploration, development, production, treatment, gathering, marketing, or other related costs, excepting any taxes which may be applicable to such royalties.

4.   DELAY RENTALS   THIS IS A PAID-UP LEASE. NO DELAY RENTAL IS DUE.

4.1   The cash down payment or bonus given for the execution of this Lease constitutes a part of the consideration hereof according to its terms and shall not be allocated as mere rental for a period.

5.   CONTINUOUS OPERATIONS

5.1   If, prior to the discovery and production of any substance covered by this Lease on or from the Leased Premises or from a unit embracing any portion thereof, LESSEE should drill a dry hole or holes thereon, or, if after discovery and production of any such substances covered by this Lease, the production thereof should cease for any reason, this Lease shall not terminate if LESSEE commences operations for drilling or reworking within ninety (90) days thereafter or pays shut-in royalty as provided by 3.4.1.

5.2   If upon or after the expiration of the primary term of this Lease, no substance covered hereby is being produced from the Leased Premises or lands pooled therewith in paying  quantities, as said phrase is hereafter defined, but LESSEE is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within ninety (90) days prior to the end of the primary term, this Lease may be continued in force if, within ninety (90) days from and after the completion of the preceding well, or the cessation of operations thereon if it is dry and unproductive, LESSEE commences or causes to be commenced 1) drilling operations on an additional well on some part or portion of  the Leased Premises lying outside of any previously established  drilling or production allowable unit or 2) reworking operations on any  well previously drilled and completed on the Leased  Premises or on a unit containing all or any portion thereof.  After having so commenced the drilling or reworking  operations described above, LESSEE  may perpetuate the term of this Lease through drilling or reworking operations or the completion or abandonment of additional wells, with no more than ninety (90) consecutive days elapsing between the completion or abandonment of one such additional well and the commencement of drilling or reworking operations for another well on another unit or tract until the entire Leased Premises has been developed to the density, degree and extent permitted by any applicable statewide or field rules, or until at least one oil or gas well has been drilled and completed or abandoned under each such unit or units that may be established within the Leased Premises; provided additionally, that if any of the foregoing drilling or reworking operations result in paying production of any substance covered by this Lease, then this Lease shall remain in force as to the productive unit or units, subject to the further provisions hereof, for so long thereafter as any such substance is produced from the Leased Premises or from land pooled therewith in paying quantities, as that phrase is defined hereinafter.

6.   FORCE MAJEURE

6.1   Should LESSEE be prevented from complying with any express or implied covenant of this Lease, from conducting drilling, reworking or marketing operations, or from producing or marketing the substances covered by this Lease, by operation of force majeure, war, rebellion, devastating fires or floods, orders, rules or regulations of State or Federal governmental authority, or by other such other acts or events beyond the control or LESSEE, then while so prevented,  LESSEE's obligation to comply with such covenant shall be suspended, LESSEE  shall not be liable in damages for failure to comply therewith, and this Lease shall be extended while and so long as LESSEE is prevented by any such cause from conducting drilling, reworking, or marketing operations on or from producing oil and/or gas from the Leased Premises; provided, however, that neither force majeure nor any other cause similar or dissimilar to those described hereinabove shall confer upon LESSEE the right to extend this Lease for more than a period of twelve (12) months.

6.2   Notwithstanding anything to the contrary contained in subparagraph 6.1 above, LESSEE shall not be excused, through the operation of the foregoing force majeure provisions, from making of all proper and timely payments of royalties, shut-in royalties or all other payments required pursuant to the terms of this Lease.

7.   USE, DAMAGES TO, AND RESTORATION OF THE LEASED PREMISES

7.1   USE OF THE SURFACE OF THE LEASED PREMISES

Subject to the further terms and provisions hereof, LESSEE shall have and is hereby given access to and use of so much of  the surface of  the Leased Premises as is reasonably necessary to conduct all activities and operations

3

authorized, permitted and required by the terms of this Lease which do not unduly or unreasonably hamper, interfere with or restrict LESSOR's communicating, cultivating, farming, fishing, grazing, harvesting, hunting, logging, lumbering, milling, planting, seeding, transporting, trapping or other related or non-related activities and operations therein and thereon, it being the intention of the parties hereto to create and recognize between them reciprocal rights and complimentary estates. To this end, it is expressly AGREED, UNDERSTOOD, and hereby STIPULATED that:

### 7.1.1   LESSEE COVENANTS AND AGREES:

(a)     Not to use any more of the surface of the Leased Premises as is reasonably necessary to conduct all operations authorized, permitted and required by this Lease and specifically not to locate any well, treatment plant, flow line, gathering line, pipe line or other such facility closer than 330 feet from any house, cabin, shed, barn, silo, storage bin, feeding trough, or other structure located on the Leased Premises;

(b)     Not to grant to any third party or parties any easement for any pipeline unassociated with the transportation of oil and gas produced from the Leased Premises or from a unit embracing all or a portion thereof, any water line, transmission line, or other burden on the Leased Premises;

(c)     Not to fish, hunt or carry or use fishing gear or firearms onto the Leased Premises and to make every reasonable effort, by specific instructions, warnings, warning signs, or otherwise, to prevent its agents, executives, employees and personnel, or those furnishing material, supplies, physical equipment or third party services from fishing, hunting or carrying or using fishing gear or firearms on the Leased Premises; and

(d)     Not to cultivate, farm, graze livestock, harvest, log, lumber, mill, plant, seed, or conduct or engage in such other activities and operations similar or dissimilar in nature to those mentioned herein and not contemplated by the terms of this Lease.

### 7.1.2   LESSOR COVENANTS AND AGREES:

(a)     To maintain all fences and gates in good state of repair, and when and where it becomes absolutely necessary to cut or otherwise remove LESSOR's fences, to install adequate gates and cattleguards; and

(b)     To exercise all of its rights, privileges, powers and immunities, and to conduct its usual and customary activities and operations on the Leased Premises in a manner such that it will not unduly or unreasonably hamper, interfere with or restrict any operation or activity authorized, permitted or required by this Lease; and

(c)     To insure that any of its licensees, guests, invitees or subsequent lessees conduct their activities and operations so as not to hamper, interfere with or restrict unduly or unreasonably any operation or activity authorized, permitted or required by this Lease.

7.2     DAMAGES TO THE SURFACE OF THE LEASED PREMISES:

LESSEE COVENANTS AND AGREES:

(a)     To consult with and obtain the written release and consent of LESSOR before selecting or clearing sites for wells, pits, drainage ditches, receptacles, shafts, or locating, constructing or installing tank batteries, field-type separation devices, treating or processing mills or plants, laying pipe lines, gathering lines or flow lines, surveying and drilling shot holes for seismic surveys, or building roads, bridges or culverts on the Leased Premises; and, when requested by LESSOR, to bury all pipe lines, gathering lines and flow lines below plow depth or the depth to and at which LESSOR's timber or other seedlings are normally planted, whichever is deeper;

(b)     To conduct all seismic and other surveys in a manner so as not to damage LESSOR's water wells, tanks or reservoirs, and to conduct all operations so as not to permit any deleterious substance to collect, escape, pollute, run, seep, spread, stand or come in contact with or damage LESSOR'S blinds, boat docks, cattle, crops, fish, or other aquatic life, hunting or fishing camps or lodges, lakes, land, livestock, logs, lumber, logging and lumbering camps, mills, roads or tramways, ponds, reservoirs, seedlings, springs, streams, tanks, timber, trees, vegetation, water wells, wildlife or any other things of value on, in, over or under the Leased Premises; and

(c)     To respond to and pay damages, based on replacement cost, cost of repairs, or such other assessment to which LESSOR may agree, for the damage to, loss of, or diminution or depreciation of the beneficial use or value of any house, cabin, shed, barn, silo, storage bin, fence, crop, timber, lumber, vehicles, feeding trough or other thing of value lost, damaged or destroyed as a result of or through the conduct of any activity or operation authorized, permitted or required by this Lease or by any activity of LESSEE, its agents, employees or representatives, which amounts to a breach of any covenant hereof. This paragraph shall not apply where Lessor is negligent or involved in willful misconduct notwithstanding anything to the contrary, it is not intended that **SKLARCO L.L.C.** indemnify LESSOR for the negligent acts of LESSOR's servants or employees or for willful misconduct.

7.3     RESTORATION OF THE SURFACE OF THE LEASED PREMISES

LESSEE hereby covenants and agrees to maintain and/or restore the surface of the Leased Premises, immediately after the particular surface area of the said Leased Premises has served its purpose, in and to as near as practicable its natural state before operations and activities began hereunder. To this end, it is expressly AGREED, UNDERSTOOD, and hereby STIPULATED that LESSEE covenants and agrees:

4

     (a)      To dispose of all drilling mud, chemicals, tailings, waste, debris, and all other deleterious substances and/or materials in a lawful manner as approved by the State of Alabama or any other governing body;

     (b)      To properly and promptly fill, roll, tamp and cover all pits and sumps after each pit and sump has served its particular purpose;

     (c)      To close, securely seal and properly plug any and all wells drilled and abandoned hereunder;

     (d)      To clean up and generally repair the site used for any well, pit, receptacle, shaft, tank, plant, or other physical facility;

     (e)      To dispose of all saline solutions, saltwater, waste oil, and all other obnoxious and/or deleterious substances by removing them from the Leased Premises or through the use of authorized injection wells for disposal purposes; and

     (f)      To take all other reasonable steps to maintain and preserve the Leased Premises in a clean and orderly manner.

8.     REMOVAL OF FIXTURES FROM AND TITLE TO ABANDONED WELLS

     8.1     REMOVAL OF AND TITLE TO FIXTURES:

     Subject to the further terms and provisions hereof, LESSEE shall have and is hereby given and granted the right to remove all property, physical equipment, facilities and fixtures placed on, in and under the Leased Premises by LESSEE within one hundred eighty (180) days after the expiration of this Lease, or, if the termination of this Lease or any portion thereof is in controversy, within one hundred eighty (180) days after final determination of such controversy, but not thereafter, it being understood and agreed that all wells, receptacles, shafts, tanks, well holes or bores, and any and all such property, physical equipment, facilities and fixtures remaining in, on or under the Leased Premises, including casing and other downhole equipment left in any such wells, upon and after the expiration of said 180 day period, shall then and thereupon become the property of LESSOR.

     8.2     WATER WELLS:

     LESSOR shall have and is hereby given and granted the option, at its election, of taking over and thereafter owning and operating any well initially drilled as or later converted to a water well and equipped as such by LESSEE, including all physical facilities and equipment placed by LESSEE therein, thereon, or used by LESSEE in connection therewith, which said well or wells LESSEE may at any time or from time to time elect to abandon by paying to LESSEE the reasonable salvage value of all such salvable physical facilities and equipment as of the date of abandonment by LESSEE; provided however, that as is provided in subparagraph 8.1 above, LESSOR shall nevertheless become the owner of all such water wells located on the Leased Premises and of the equipment therein, thereon or used in connection therewith upon the expiration of the said 180 day period.

     8.3     TITLE MATTERS:

     Insofar as it may be necessary to fully effectuate all provisions of this Paragraph 8, all apt words of grant, bargain, sale, conveyance, transfer and delivery are incorporated herein by reference and made a part of this said Paragraph 8 for all pertinent purposes.

9.     ADDITIONAL EXPRESS COVENANTS

     By the acceptance of this Lease, and as a substantial part of the consideration therefore, LESSEE hereby expressly COVENANTS and AGREES:

     9.1     After the discovery of oil or gas in paying quantities on said premises, LESSEE shall develop the acreage hereunder as a reasonably prudent operator. In the event a well or wells producing oil or gas in paying quantities should be brought in on other land in the vicinity of and draining the Leased Premises or acreage pooled therewith, LESSEE agrees to drill such offset well as a reasonably prudent operator would drill under the same or similar circumstances. Such offset well or wells shall be commenced within ninety (90) days after commencement of production in paying quantities from the well being offset;

     9.2     To produce, gather, process, preserve, save, store, take care of, treat, transport and market said production, products, by-products, residues, residuals and tailing, and to conduct all such producing, gathering, processing, preserving, saving, storing, caring of, treating, transporting and marketing activities and operations at the time, with the rapidity, at the rate, and in the manner and to the extent that a reasonably prudent operator, acting under the same or similar circumstances, and with the best interests of both the LESSOR and LESSEE in mind and at heart, should or would so conduct such activities and operations;

     9.3     To conduct pressure maintenance, or secondary recovery operations, or both, if the characteristics of the particular reservoir are such that, from sound engineering and economical standpoints, and with the best interests of both LESSOR and LESSEE in mind and at heart a reasonably prudent operator would or should conduct one or both such operations;

     9.4     To market with due diligence and in good faith all oil and gas produced from a well or wells completed on the Leased Premises, or on a unit or units embracing any part thereof, which is not utilized by LESSEE pursuant to subparagraph 3.8 hereof;

     9.5     To build, construct or install and to maintain and operate a mill or mills, or plant or plants, or with LESSOR's written consent, to enter contracts, in good faith and at arm's length, with independent processors, for the purpose of absorbing, assimilating, blending, compounding, concentrating, cycling, deriving, extracting, milling,

processing, recovering, refining, saving, treating or upgrading all oil and gas initially produced from the Leased Premises, or from lands pooled therewith if such oil and gas, or either of them, are of such quality and in such quantity as to justify the building, constructing, installing, maintaining and operating of such a mill or plant by a reasonably prudent operator or processor, or to justify such a reasonably prudent operator entering into such contracts with independent processors;

      9.6    To install, maintain and operate one or more field-type device or devices such as but not limited to Bradenheads and separators, for the purpose of extracting, recovering or saving one or more elements of the oil and gas produced from the Leased Premises, or from lands pooled therewith, such as and including casinghead gas, distillate, gas condensate and natural gasoline if such oil and gas, or either of them initially produced from the said Leased Premises, or from land pooled therewith, are not of such quality or are not in such quantity as to justify plant processing;

      9.7    To enter into contracts, in good faith and at arm's length, for the sale, at or near the wells, or elsewhere, of such products and substances, covered hereby and produced from the Leased Premises, or from lands pooled therewith, which are not of such quality or are not in such quantity as to justify the installation and operation of field-type devices described in subparagraph 9.6 above;

      9.8    To furnish promptly to LESSOR, upon written request at its principal office and place of business in Brewton, Alabama or at such other address as LESSOR may designate in writing:

      (a)    Copies, duplicates or reproductions of all location plats, applications for and permits to drill, daily drilling reports on and in connection with all wells drilled on the Leased Premises or lands pooled therewith; copies of all pipe perforation and well completion records; and copies of all reports and forms required by or filed with the State Oil and Gas Board of Alabama, and all other such regulatory bodies, state and federal, having jurisdiction;

      (b)    Copies and duplicates or reproductions of all logs or surveys, drillers, electrical or otherwise, of all wells drilled on the Leased Premises or lands pooled therewith; all surveys and similar data, all coring data and core analysis reports, core analyses, core records, reports or results of drill stem or other tests, and all other data and information obtained in connection with or as a result of the exploration, development, operation and protection of the Leased Premises;

Each and all of the foregoing covenants to be construed as those running with and touching and concerning this Lease and with the acreage constituting the Leased Premises.

10.    RIGHTS OF LESSOR

LESSOR, acting by and through its corporate officers, executives, agents or duly authorized representatives, shall have and is hereby given and granted immediate access to and the absolute right, at its own risk, cost and expense, at any time and from time to time, to:

      10.1    Observe, from the well site, derrick floor, drilling platform, or from any other vantage point, all drilling, completing, logging, surveying, producing, reworking, plugging and all other such or similar activities or operations conducted on the Leased Premises by LESSEE, its agents, employees, independent contractors, or by those furnishing third party services. Access to drilling rig and location may be denied in the event a life-threatening situation exists;

      10.2    Make annual audits on LESSEE's accounts, contracts, books and records, at its own expense and at any reasonable time, for the purpose of ascertaining the amount of the production, sales and cost of manufacturing and extracting of any and all substances covered by this agreement. Each such audit shall cover the period intervening since the last audit, and LESSOR shall have one (1) year next following the close of the calendar year in which said audit is made within which to present to and assert against LESSEE any and all claims or demands against LESSEE that may be disclosed by or result from said audit.

11.    ASSIGNMENT OF RIGHTS HEREUNDER

      11.1    RIGHTS OF LESSOR:

      The rights of Lessor hereunder may be assigned, either in whole or in part, and the provisions hereof shall extend to and be binding upon the parties hereto and their respective successors, assigns and legal representatives; provided however, that no change or division in the ownership of the lands covered hereby, royalties or other payments to accrue or become payable to LESSOR hereunder, however accomplished, shall operate to enlarge the obligations or diminish the rights of LESSEE, and no change or division of such ownership shall be binding on LESSEE until thirty (30) days after LESSEE shall have been furnished with a duly certified copy of the recorded instrument or instruments evidencing same.

      11.2    RIGHTS OF LESSEE:

      Notwithstanding anything to the contrary indicated herein, the rights of LESSEE hereunder may not be assigned in whole or in part, except by transfer or exchange of stock, merger, consolidation or reorganization without LESSEE's written consent, it being understood that for purposes of this subparagraph, LESSOR's written consent may be given by any officer of said corporation and that such consent will not be unreasonably withheld. In the event such consent is requested and given, it shall not be construed as a waiver of LESSOR's right to approve any and all subsequent assignments thereafter.

12.    NOTICE OF NONCOMPLIANCE

      In the event LESSOR considers that operations are not at any time being conducted in compliance with this Lease, LESSOR shall notify LESSEE in writing of the facts relied upon as constituting a breach of any obligation

6

arising hereunder, and LESSEE, if in default, shall have sixty (60) days after receipt of such notice within which to comply with and satisfy any such obligation.

13.     CONSENT TO POOL

LESSEE shall have the right as to all or any part of the Leased Premises, without LESSOR's joinder, to combine the leasehold estate and LESSOR's royalty estate created by this Lease with any other lease or leases or lands, whether owned by LESSEE or some other person, partnership, firm, corporation or joint venture group, so as to create, by the combination of such leases, one or more operating or production units, provided that no single operating unit may embrace more than one hundred sixty (160) acres per oil well (plus 10% tolerance to allow for irregular sections) or six hundred forty (640) acres per gas well (plus 10% tolerance to allow for irregular sections), or such other amount authorized and required by the appropriate state agency having jurisdiction thereof, whichever said amount is the lesser. In the event any such unit is created hereunder by LESSEE, LESSOR agrees to accept and shall receive out of the production from any such unit the royalties described in Paragraph 3 hereof, said royalties to be proportionately reduced and to be paid only on the percentage of production that the number of acres pooled from the Leased Premises bears to the total number of acres included within the respective unit. The commencement or reworking of a well or the completion of a well to production (and production from such well) on any portion of a unit on which all or any part of the land described herein is embraced shall have the same effect under the terms of this Lease as if a well were commenced, reworked, completed or producing on the herein Leased Premises.

14.     SEVERANCE OF LEASEHOLD ACREAGE

14.1     Notwithstanding anything to the contrary herein contained (except for the provisions of Section 5, above), drilling or reworking operations on a pooled unit or units established as provided herein or by governmental authority shall maintain this Lease in force only as to the portion of the Leased Premises included in such unit or units, subject to further limitations set forth below. The Lease may be maintained as to the remainder of the Leased Premises in any manner specified herein, including Section 5, above, and this paragraph shall not limit the ability of the Lessee to maintain this lease as to all property covered hereby by conducting continuous operations in accordance with Section 5, above.

14.2     It is hereby understood by and agreed between the LESSOR and LESSEE that in the event this Lease should lapse and terminate either through the operation of 1) this Paragraph 14, 2) Paragraph 3 hereof dealing with the payment and delivery of royalties and shut-in royalties on production of oil and gas established hereunder, 3) Paragraph 5 hereof dealing with the perpetuation of this Lease through continuous operations, or 4) any other applicable provisions herein, LESSEE shall nevertheless be entitled to retain, subject to all of the express and implied covenants of this Lease, sufficient acreage around each well producing oil or gas in paying quantities, as defined herein, from the Leased Premises, or from any part thereof included in a pooled unit, so as to constitute a maximum producing unit pursuant to the applicable field rule or rules of statewide coverage, such acreage to be designated by Lessee as nearly as practicable in the form of a square, or in such shape as then existing spacing rules require.

14.2.1     Once this Lease has expired except as to any retained producing units, the Lease shall remain in force and effect as to each such retained producing unit only as to all depths equal to or above one hundred (100) feet below the deepest depth of any well completed on the Leased Premises or lands pooled therewith and productive of oil and/or gas, and only for so long as there is production therefrom in paying quantities, or for so long as drilling or reworking operations are conducted on each such unit.

14.2.2     LESSEE shall be obligated to survey any and all retained producing units established pursuant to this subparagraph 14.2, and to file for record in the county and state wherein the Leased Premises are located a release or releases of all nonproductive acreage or depths not retained hereunder or thereafter terminating due to cessation of production. Upon written request from LESSOR, LESSEE shall furnish to LESSOR copies of all surveys and releases made and executed hereunder.

14.2.3     Should LESSOR own or otherwise control or hereafter acquire the ownership or control of the surface of the Leased Premises, LESSEE shall be entitled to receive from LESSOR such easements on, over and across said lands as shall be necessary to conduct operations on the acreage retained hereby.

15.     WARRANTY OF TITLE

15.1     This lease is given without warranty of any kind, either expressed or implied, but with full substitution and subrogation in and to all of the rights and actions that LESSOR now has or may hereafter acquire.

15.2     PROPORTIONATE REDUCTION:

If LESSOR owns less than the full fee simple title to the substances which this Lease purports to cover, then the royalties and payments provided for in Paragraph 3 hereof, and any and all other payments and benefits to accrue, become payable or inure to the benefit of LESSOR under the terms and provisions of this Lease shall be reduced in proportion that LESSOR's interest bears to the whole and undivided fee simple estate therein.

16.     GENERAL PROVISIONS

16.1     LESSOR hereby expressly covenants and agrees not to withhold, fail, or refuse unreasonably to give or grant its written consent whenever such consent shall be called for or required pursuant to any term or provision of this Lease. Financial responsibility and operational staffing are deemed reasonable inquires as to proposed assignees.

16.2     LESSEE further agrees that it will indemnify and hold LESSOR harmless against any and all loss, damage, liability, cost or expense, including any claims, fines, penalties and reasonable attorneys' fees, on account of injuries to or death of persons or damage to property of any kind, arising out of or resulting from any operation hereunder; and in the event of any suit or other proceeding against LESSOR on account thereof, LESSEE shall, at LESSOR's request, appear and defend same and LESSEE shall pay any assessment, judgment or settlement which may be rendered or given against LESSOR therein. Notwithstanding anything to the contrary, it is not intended that

SKLARCO L.L.C. indemnify LESSOR's for gross negligence of LESSOR's servants or employees or for willful misconduct.

17.    ADDRESSES

    Any and all notices and/or requests required pursuant to the terms of this Lease, whether such notices and/or requests be of a general or specific nature, shall be mailed or otherwise delivered to the parties hereto at their respective business addresses listed below:

|  | With copy to: |  |
|---|---|---|
| CEDAR CREEK LAND & TIMBER, INC. | PAUL D. OWENS, JR. | SKLARCO L.L.C. |
| (214 Deer Street – zip 36426) | (315 Belleville Ave.) | Attn: J. Marshall Jones, III |
| P.O. Box 1769 | P.O. Box 1229 | 5395 Pearl Parkway, Suite 200 |
| Brewton, AL  36427 | Brewton, AL  36427 | Boulder, CO 80301 |

18.    GENERAL DEFINITIONS

    A.    PAYING QUANTITIES:  The phrase "paying quantities"  as, when and wherever it appears in this Lease, is hereby defined as that quantum of production which will return a profit, regardless of how small, above, over or beyond producing, transporting, treating and marketing costs and expenses such as and including all direct and reasonable administrative, supervisory and overhead charges, all at the field, but not the district level, actually and fairly attributable, allocable or apportionable to such production; all labor, and all minor  repairs to and maintenance of, physical facilities and equipment actually  used and actually and fairly attributable, allocable or apportionable to such production, including actual, but not book, depreciation on all salvable equipment;   all costs and expenses incurred and actually paid in connection with or resulting from all reworking and other operations designed to increase or restore production; all milling, treating, transporting and marketing costs and expenses incurred and actually paid; all ad valorem and other taxes assessed and actually paid; and all other such costs and expenses directly ,fairly and actually attributable,  allocable or apportionable to such production but not to the drilling and completion of wells as such.

    B.    DEVELOPMENT and/or PROTECTION WELLS:  Insofar as the express and implied covenants of this Lease are concerned, "development" and "protection" wells are hereby defined as wells which a reasonably prudent operator, acting under the same or similar circumstances as LESSEE may face hereunder, 1) would drill with reasonable expectations or prospects of completing as producers which would be likely to return a reasonable profit above, over and beyond drilling, completing,  producing, marketing, treating and transporting costs, or 2) should drill pursuant to the express covenants set forth in Paragraph 9 hereof.

    C.    EXPLORATORY WELLS:  Insofar as the express and implied covenants of this Lease are concerned,  "exploratory" wells are hereby defined as wells which a reasonably prudent operator, acting under the same or similar circumstances as LESSEE may face hereunder, would drill for the purpose of fully exploring the Leased Premises, and every prospectively productive formation therein and thereunder, but not necessarily with expectations or prospects of completing as producers which would be likely to return a reasonable profit above,  over and beyond drilling, completing, producing, marketing, treating and transporting costs.

    D.    BARTER, CONTRIBUTE, DISPOSE,EXCHANGE, SELL, SEVER, SWAP, OR USE:    The words or terms "barter", "contribute", "dispose", "exchange", "sell", "sever", "swap" or "use", as, when and wherever they appear in this Lease, are hereby defined as a barter, contribution, disposition, exchange, sale, severance, swap or use, with LESSOR's written consent as the same shall be required herein, made in good faith, at arm's length, and with the best interests of both  the LESSOR and LESSEE in mind and at heart .

    E.    JUSTIFY:    The word or term "justify" as, when and wherever it appears in any Paragraph or subparagraph of this Lease, is hereby defined as that which is just, right, reasonable and warranted from an economic point of view.

    F.    DRILLING OR REWORKING OPERATIONS:  Insofar as Paragraphs 5 and 14 of this Lease are concerned, the phrase "drilling or reworking operations" is hereby defined as the spudding in and actual drilling of an oil or gas well reasonably and with due diligence, and all work as operations designed to secure, restore or improve production through some use of a hole previously drilled, including, but not limited to, mechanical or chemical treatment of any horizon, deepening to test deeper strata, and plugging back to test shallower strata.

    G.    COMMENCEMENT:  The word "commencement", as it is used and referred to specifically in Paragraph 5 hereof and generally in any other provision of this Lease, shall be defined as the actual spudding in of a well.

    H.    COMPLETION:  The word "completion" as it is used and referred to specifically in Paragraph 5 hereof and  generally in any other provision of this Lease, shall be defined as the actual operation of installing on the well in question valves, meters, gauges and other controls collectively referred to as the "christmas tree".

    I.    MARKET VALUE:    Insofar as Paragraph 3 of this Lease is concerned, the term "market value" shall be defined as the applicable price determined under one of the following standards applicable to the sale of any gas produced hereunder:

       (1)    Where such gas is sold on the Lease or in the field where produced by LESSEE in an arms-length transaction, the price received by LESSEE under the terms of any gas purchase contract for gas produced and sold from the Leased Premises by LESSEE.

       (2)    Where such gas is not sold on the lease or from the field where produced by LESSEE in an arms-length transaction the average of the three highest prices paid under contracts entered into not more than one year previous to the date of first production of gas of the same or similar quality and content produced and sold from wells within the county and state wherein the Leased Premises are situated when gas is sold from a well or wells on the Leased Premises.  Said average to be determined on a semi-annual basis by LESSOR

8

who shall submit the contractual information relied upon to LESSEE.   Failure to determine said average and submit said contractual information to LESSEE semi-annually shall be an acceptance of the price received by LESSEE as a market value price for the succeeding six-month period.

IN WITNESS WHEREOF, the parties hereto have executed and accepted this instrument on the day and date hereinabove first written, in the presence of the undersigned, competent witnesses.

**LESSOR**

**TRM WOODLANDS, INC.**

_____

By: _____

**LESSEE**

**SKLARCO L.L.C.**

_____

By: _____

CORPORATE ACKNOWLEDGEMENT

STATE OF ALABAMA

COUNTY OF ESCAMBIA

I, _____, a Notary Public in and for the State and County aforesaid, hereby certify that _____ and _____, whose names as _____ and _____, respectively of TRM WOODLANDS, INC., an Alabama Corporation, are signed to the foregoing instrument and who are known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument, they, as such officers and with full authority, executed the same voluntarily for and as the act of the said Corporation.

Given under my hand and official seal on this the _____day of _____, 2015.

_____
NOTARY PUBLIC

My commission expires:

_____

ACKNOWLEDGEMENT

STATE OF COLORADO

COUNTY OF BOULDER

I, _____, a Notary Public in and for the State and County aforesaid, hereby certify that _____, whose name as _____ of SKLARCO L.L.C., a Louisiana Limited Liability Company, is signed to the foregoing  instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument and with full authority, executed the same voluntarily for and as the act of the said Company.

Given under my hand and official seal on this the _____day of _____, 2015.

_____
NOTARY PUBLIC

My commission expires:

_____

9

<u>**EXHIBIT "A"**</u>

Attached to and made a part of that certain <u>OIL, GAS AND MINERAL LEASE</u> between **TRM WOODLANDS, INC.** and **SKLARCO L.L.C.** with an effective date of _____, 2015.

All mineral interest owned by Lessor in Escambia County, Alabama, described as follows:

**ESCAMBIA COUNTY, AL:**

[INSERT PROPERTY DESCRIPTION]

Containing a total of _____ net acres, more or less.

**It is the intent to include all net mineral acreage as described within the respective quarter sections herein.**

SIGNED FOR IDENTIFICATION BY LESSOR:

**TRM WOODLANDS, INC.**

By: _____

SIGNED FOR IDENTIFICATION BY LESSEE:

**SKLARCO L.L.C.**

By: _____

10

**EXHIBIT "A-2"**

Attached to and made a part of that certain Amended and Restated Participation Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc.

**OPTION**
**(TRM Woodlands, Inc. – Florida)**

STATE OF FLORIDA

COUNTY OF SANTA ROSA

## GEOPHYSICAL PERMIT & LEASE OPTION AGREEMENT

THIS AGREEMENT made and entered into as of the 7th day of April, 2015, by and between TRM WOODLANDS, INC., an Alabama corporation, represented herein by its duly authorized President, Paul D. Owens, Jr., whose mailing address is P.O. Box 1769, Brewton, Alabama 36427, hereinafter referred to as "Grantor" and SKLARCO L.L.C., a Louisiana limited liability company, represented herein by its duly authorized President – Chief Operating Officer, David A. Barlow, whose mailing is 5395 Pearl Parkway, Suite 200, Boulder, CO 80301, hereinafter referred to as "Grantee."

### A. CONSIDERATION AND OPTION

For and in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the agreements herein contained and subject to the terms and conditions hereinafter set forth, Grantor hereby grants unto Grantee the exclusive option for a period beginning on the date of this agreement and ending on April 7, 2017, hereinafter called "Option Period," to acquire an Oil, Gas and Mineral Lease or leases with a three year primary term covering all of Grantor's interest in all or any portion of that certain property situated in Santa Rosa County, Florida described in Exhibit "A-1," attached hereto and made a part hereof, together with the exclusive right, during the Option Period, to conduct or cause to be conducted geophysical and other exploration surveys on said property for the purpose of exploring same for the possible existence of oil, gas and other hydrocarbons (all such permitted methods of exploration being collectively referred to as "Seismic Operations"). It is the intention of the Grantor to grant to the Grantee a Geophysical Permit and Option to Lease all mineral interest owned by Grantor within the area outlined in black (the Mount Carmel Seismic Prospect) on Exhibit "A," attached hereto and made a part hereof whether properly and correctly described herein or not. Grantee shall pay to Grantor upon execution of the agreement twenty-five dollars ($25.00) per net mineral acre covered by this option.

### B. EXISTING MINERAL LEASES

Grantor hereby declares that some portion of the lands set forth in Exhibit "A" may be currently subject to the terms and conditions of various Oil, Gas and Mineral Leases (the "Existing Mineral Leases") in favor of various third party mineral Lessees (hereinafter the "Existing Mineral Lessees"). Grantor makes no representation, express or implied, whether Grantee may exercise the right granted herein without the prior express written consent of one or more of the Existing Mineral Lessees. This agreement is made expressly subject to all of the terms and conditions of the said Existing Mineral Leases, and the rights, if any, of the Existing Mineral Lessees there under. Grantee shall be solely responsible for identifying all Existing Mineral Leases bearing upon the Land and obtaining all, if any, necessary consents or permits from the Existing Mineral Lessees prior to commencing operations on or under lands subject to the Existing Mineral Leases. Further, Grantee expressly agrees herein to indemnity and hold Grantor harmless from any and all causes of action by any Existing Mineral Lessee arising out of or relating to the exercise by Grantee of the rights contained herein, including, but not limited to, any and all claims or causes of action for seismic or geophysical trespass. In the event that any Existing Mineral Leases should expire during the term of this Agreement, then the lands covered by same shall be covered by this Agreement.

### C. OPERATIONS & VENUE

Grantee shall compensate Grantor for all damages suffered by Grantor, including damage to timber, buildings or improvements or injuries to persons arising out of or in connection with Grantee's operations on the land covered by this agreement.

Grantee shall conduct said seismic operations and surveys or cause same to be conducted in a workmanlike manner, according to accepted industry practice, and all applicable federal, state, county, and local rules, regulations, and statutes.  Grantee further agrees to indemnify and hold Grantor harmless from and against all claims and damages of every nature that might arise as a result of Grantee's operations, and further agrees to cooperate fully with Grantor with respect to all current and proposed seismic operations conducted on permitted property.  Specifically, prior to entering onto the land, Grantee shall furnish to Grantor a plat identifying the approximate location of the seismic lines or grid pattern, together with the location of each shot point or group of shot points, and the total number of holes or shot points which arc to be placed, bored or shot on said lands.

In the event of litigation between the parties, the parties agree that Alabama Law shall control and apply to this agreement and the proper venue to any suit or claim shall be Escambia County, Alabama.

## D. EXERCISE OF OPTION AND LEASE EXECUTION

In the event Grantee desires, at any time and from time to time, to exercise the option granted in Paragraph A, Grantee shall, prior to the expiration or termination of the Option Period, notify Grantor in writing. Thereafter, Grantor shall prepare two copies of Oil, Gas and Mineral Lease(s) covering land to be leased, together with two (2) copies of a Memorandum of Oil, Gas and Mineral Lease.  Checks payable to Grantor, in an amount equal to 100% of the total aggregate initial bonus payment due under such lease (s) shall be paid to Grantor within 3 business days of the delivery of lease. The total aggregate initial bonus payment shall be computed on the basis of two hundred dollars ($200.00) per net mineral acre for each and every acre to be covered by the lease(s).

The parties hereto agree that any such leases shall cover an undivided 100% of the interest owned by Grantor in the lease premises.  It is further agreed and understood that any single lease shall not cover less than all mineral interest owned by Grantor in a governmental quarter section subdivision.

Except with respect to the description of acreage to be covered, all leases acquired by Grantee hereunder shall be in the identical form and contain the same terms, conditions and provisions as the Oil, Gas and Mineral Lease attached hereto as Exhibit "C".

Promptly after receipt of the aforesaid memorandum, leases and payment of lease bonus, Grantee shall execute and return to Grantor one (1) copy of each Oil, Gas and Mineral Lease and Memorandum of Oil, Gas and Mineral Lease.  Grantee shall promptly record Memorandum of Oil, Gas and Mineral Lease and provide Grantor with recording information.

## E. GEOPHYSICAL DATA TO BE FURNISHED

Within ninety days after the completion of final processing, Grantee agrees to furnish Grantor the geophysical data pursuant to terms and requirements as provided on Exhibit "B" hereto, and within the data area as outlined in black on Exhibit "A".

Grantee considers all the geophysical data to be acquired hereunder as proprietary and with marketable value.  Therefore, any and all data furnished hereunder shall be held strictly confidential by Grantee.  Without the prior written consent of Grantee, Grantor agrees not to allow such data to be reviewed by any third party while Grantee holds leases from Grantor in the area outlined in black on Exhibit "A".  However, after the expiration of all leases, it is agreed that Grantor may have such data reviewed by third parties for the sole benefit of Grantor, insofar and only insofar as such data applies to lands which are no longer covered by an Oil, Gas and Mineral Lease acquired from Grantor, or concurrent with this seismic survey.

## F. NOTICE

Any notice, communication or payment to a party hereunder may be given, sent, paid

or tendered by postage prepaid mail addressed to said party at the address shown below or such other address as is hereafter designated in writing:

| For: TRM WOODLANDS, INC. | With copy to: |
|---|---|
| (214 Deer Street - zip 36426) | PAUL D. OWENS, JR. |
| P.O. Box 1769 | (315 Belleville Ave.) |
| Brewton, AL 36427 | P.O. Box 1229 |
| | Brewton, AL 36427 |

| For: SKLARCO L.L.C. | With copy to: |
|---|---|
| 5395 Pearl Parkway, Suite 200 | C.P. Armbrecht |
| Boulder, CO  80301 | P.O. Box 290 |
| Attn:  J. Marshall Jones, III | Mobile, AL  36601 |

### G. SEVERABILITY

Any provision of this Agreement which is prohibited or unenforceable, in whole or in part, shall be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.  If the scope of any provision set forth in this Agreement is too broad to permit enforcement of such provision to its full extent, then such provision shall be enforced to the maximum extent permitted by applicable law and, if necessary, the scope of any such provision may be judicially modified to the minimum extent necessary in any proceeding brought to enforce such provision and thereafter such provision, as so modified, may be fully enforced.  This Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this instrument in duplicate original counterparts, as of the date hereinabove written.

**WITNESSES**

Print Name: _Jean Kelley_

Print Name: _E. Renee Simpson_

Print Name: _Laura Medlin_

Print Name: _Cassandra Hicks_

**TRM WOODLANDS, INC.**

By: _____
      Paul D. Owens, Jr.
      President

**SKLARCO L.L.C.**

By: _____
      David A. Barlow
      President – Chief Operating Officer

STATE OF ALABAMA

COUNTY OF ESCAMBIA

    I, _Deborah Arrington_, a notary public, in and for said County in said State, hereby certify that Paul D. Owens, Jr., whose name as President of TRM Woodlands, Inc. is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

    Given under my hand and notarial seal this the 15th day of __May__, 2015.

                              NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _03-11-2018_

STATE OF COLORADO

COUNTY OF BOULDER

    I, Camille Jenkins, a notary public, in and for said county in said state, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

    Given under my hand and notarial seal this the 13 day of __May__, 2015.

CAMILLE CULPEPPER JENKINS
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154003785
MY COMMISSION EXPIRES JANUARY 27, 2019

                              NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _1/27/2019_

EXHIBIT "A"

Attached to and made a part of that certain Geophysical Permit and Lease Option Agreement dated April 7, 2015 by and between TRM WOODLANDS, INC. and SKLARCO L.L.C.

## MT. CARMEL SEISMIC PROSPECT
## ESCAMBIA COUNTY, ALABAMA &
## SANTA ROSA COUNTY, FLORIDA

EXHIBIT "A-1"

Attached to and made a part of that certain Geophysical Permit and Lease Option Agreement dated April 7, 2015 by and between TRM WOODLANDS, INC. and SKLARCO L.L.C.

| SANTA ROSA COUNTY, FLORIDA | Gross Mineral Acres | Net Mineral Acres |
|---|---|---|
| **Township 5 North, Range 28 West** | | |
| Section 2:  Entire section. | 641.000 | 320.500 |
| Section 3:  N1/2 of NE1/4 and NE1/4 of NW1/4. | 120.000 | 60.000 |
| Section 4:  SW1/4 --or Lots 3 and 4 (less 4 acres in Lot 4 conveyed to Santa Rosa County for road); - - - - - - and SW1/4 of SE1/4 --or S1/2 of Lot 5 (except E1/2 of E1/2 of SW1/4 of SE1/4). | 187.200 | 93.600 |
| Section 5:  NW1/4 --or Lots 1 and 2; and SE1/4--or Lots 5 & 6. | 321.320 | 160.660 |
| Section 6:  All. | 641.600 | 320.800 |
| Section 7:  N1/2 and SE1/4. | 480.100 | 240.050 |
| Section 8:  All. | 639.120 | 319.560 |
| Section 9:  W1/2 of W1/2 and NE1/4 (except 2 acres conveyed to Santa Rosa County for road). | 319.000 | 159.500 |
| Section 10:  E1/2 of E1/2 of SW1/4 of NE1/4 and SE1/4 of NW1/4 and W1/2 of W1/2, and E1/2 of SW1/4 and NW1/4 of SE1/4. | 520.000 | 260.000 |
| Section 15:  NW1/4 and SW1/4 of SW1/4 (less 5 acres conveyed to Santa Rosa County for road). | 195.620 | 97.810 |
| Section 15:  The NE/4 of NE/4, Less the SE/4 of NE/4 of NE/4. | 30.000 | 30.000 |
| Section 16:  All  (except 1 acre in SE corner of SW1/4 of SE1/4 35 yards north and south by 139 yards east and west; and except 5 acres conveyed to Santa Rosa County for road). | 636.160 | 318.080 |
| Section 17:  N1/2 of SW1/4 and SW ¼ of SW1/4 and SE1/4 (less 5 acres conveyed to Santa Rosa County for road). | 275.700 | 137.850 |
| Section 18:  NE1/4 and West ½ and SE1/4 of SE1/4 (less 10 acres conveyed to Santa Road County for road). | 508.700 | 254.350 |
| Section 19:  NE1/4 and SE1/4 of NW1/4 and SW1/4 and N1/2 of SE1/4 and W1/2 of SW1/4 of SE1/4. | 458.850 | 229.425 |
| Section 20:  NE1/4 (less 6 acres to Santa Rosa County for road); S1/2 of SE1/4 and W1/2 of NW1/4 and N1/2 of SW1/4 (except: Commence at southeast corner of NE1/4 of SW1/4, thence run west along southern boundary line of said forty 15.40 ch., thence run in a northeasterly direction following the meanderings of the public road, 12 ch. to north boundary line of said forty; thence in an easterly direction along the north boundary line of said forty 7 ch. 24 1., thence in a southerly direction along the eastern boundary line of said forty, 20 ch. to place of beginning, containing 20 ½ acres; also, less one acre, beginning 3.29 ch. east from northeast corner of SW1/4 of SW1/4 of said Sec. 20, thence run north 70 yards, thence east 72 yards to center of Milton-Brewton road, thence southwesterly to south boundary line of NE1/4 of SW1/4, thence west to point of beginning. | 374.250 | 185.125 |
| Section 21:  E1/2 of NW1/4 and SW1/4 of SE1/4 of NE1/4 and S1/2 of SW1/4 of NE1/4 and N1/2 of SW1/4 and SE1/4 (less 4 acres conveyed to Santa Rosa County for road). | 346.000 | 173.000 |
| Section 21:  The E/2 of E/2 of NE/4. | 40.000 | 40.00 |
| Section 28: All (except 11 acres conveyed to Santa Road County for road). | 629.680 | 314.840 |
| Section 29:  E1/2 of NE1/4 and E1/2 of SE1/4 of SE1/4 and  SW ¼ of SE1/4 of SE1/4. | 110.000 | 55.000 |
| Section 29:  The W/2 of NE/4 and the SE/4 of NE/4 Les a strip containing 2 acres running North & South 85 feet and East & West 689 feet. | 118.000 | 118.000 |
| Section 30:  NE1/4 and S1/2 of NW/4 and NE1/4 of SW1/4 and W1/2 of SE1/4. | 359.450 | 179.725 |
| Section 31:  SE1/4 of NE1/4 and SW1/4 of SE1/4 and E1/2 of SE1/4. | 159.900 | 79.950 |

| | | |
|---|---|---|
| Section 31: The S/2 of SW/4 of NE/4 and the NW/4 of SE/4. | 60.000 | 60.000 |
| Section 32: All (except SE1/4 of SE1/4; and except 10 acres in NE1/4 of NW1/4, as follows: Commencing at northwest corner of NE1/4 of NW1/4, run north 85 deg. 45' east 15.61 ½ ch., thence south 3 deg. 15' east 5.33 ch., thence south 85 deg. 45' west 15.81 1/2 ch., thence north 3 deg. 15' west 6.33 ch.). | 589.440 | 294.720 |
| Section 33: NW1/4 of SW1/4 and N1/2 of SE1/4 (less two acres conveyed to Santa Rosa County for road). | 118.000 | 59.000 |
| Section 37: S1/2 Noah Calhoun Donation (less E1/2 of NE1/4 of SE1/4, and less 2 acres conveyed to Santa Rosa County for road). | 299.000 | 149.500 |
| | | |
| **Township 6 North, Range 28 West** | | |
| Section 26: Lots 3 and 4, and N1/2 of lot 5. | 71.470 | 35.735 |
| Section 27: Lots 1 and 8. | 64.600 | 32.300 |
| Section 27: Lots 1, 2, 8 and East 10 acres of lot 6. | 99.000 | 99.00 |
| Section 28: A fraction of Lots 5 and 6, described as follows: Beginning at the southwest corner of Fractional Section 28 and run east 33 ch. to Brewton and Milton road, thence north 131/2 deg. west along said road 20.43 ch. to a point 10 ch. south from the Florida line, thence west 271/2 ch. to section line, thence south 19.70 ch. to starting point. | 61.500 | 30.750 |
| Section 29: All. | 235.000 | 117.500 |
| Section 30: All. | 225.740 | 112.870 |
| Section 31: E1/2 and E1/2 of W1/2 (except W1/2 of W1/2 of SE1/4 of SW1/4) and E1/2 of E1/2 of NW ¼ of NW1/4. | 482.700 | 241.350 |
| Section 31: The SW/4 of SW/4 of SE/4 and the SE/4 of SE/4 of SW/4. | 20.000 | 20.000 |
| Section 32: E1/2 of NE1/4 and SW1/4 of NE1/4 and S1/2 of NW1/4 and SW1/4. | 362.050 | 181.025 |
| Section 33: N1/2 of NW1/4, and SW1/4 of NW1/4. | 120.000 | 60.000 |
| Section 34: NE1/4 and S1/2 of SE1/4 and NE1/4 of NW1/4. | 280.000 | 140.000 |
| Section 35: W1/2. | 320.100 | 160.050 |
| Section 37: N1/2 of Noah Calhoun Donation. | 320.000 | 160.000 |
| | | |
| **Township 5 North, Range 29 West** | | |
| Section 1: All Fractional Section. | 480.000 | 240.000 |
| Section 13: E1/2 of NE1/4 and S1/2 of NW1/4 and SW1/4 and NE1/4 of SE1/4 (less 3 acres conveyed to Santa Road County for road). | 356.550 | 178.275 |
| Section 14: All (less NW1/4 of NW1/4 of SW1/4 and less 12 acres conveyed to Santa Rosa County for road). | 617.280 | 308.640 |
| | | |
| **Township 6 North, Range 29 West** | | |
| Section 25: Lots 1, 2, 3 and 4. | 214.000 | 107.000 |
| Section 26: All Fractional Section. | 65.860 | 32.930 |
| Section 30: Lots 1 and 2, Fractional Section. | 65.450 | 32.725 |
| Section 36: NE1/4 of NW1/4 (except 5 acres, beginning at northeast corner and running west 87 1/2 yds., thence south 280 yds., thence east 87 1/2 yds., thence north 280 yds.); also, five acres in NW1/4 of NW1/4, beginning at the southeast corner, and run north 87 1/2 yds., thence west 280 yds., thence south 87 1/2 yds., thence east 280 yds. to starting point). | 40.000 | 20.000 |
| Section 37: E/2 of NE1/4 and Lots 1 and 2 (less north 23 chains); and NE1/4 of SE1/4. | 101.340 | 50.670 |
| Section 38: All. | 639.130 | 319.565 |
| | | |
| **Township 4 North, Range 29 West** | | |
| Section 2: The NW/ of NW/4. | 40.000 | 20.000 |
| | | |
| **Total for Santa Rosa County, Florida** | | |
| | **14459.860** | **7411.430** |

**EXHIBIT "B"**

Attached to and made a part of that certain Geophysical Permit and Lease Option Agreement dated April 7, 2015 by and between TRM WOODLANDS, INC. and SKLARCO L.L.C.

**Seismic Data Requirements and Format**

_____    **2-D Data Requirements:**

1.  Shotpoint map or plat on 1" = 2000' or larger
2.  Seismic data loading SEG P1 file to include X-Y coordinates or shotpoints
3.  Copy of acquisition and processing parameters
4.  Field tapes and support documents, either DLT tape format or DVD
5.  Copy of decon gathers-digital media format, either DLT tape or DVD
6.  DVD of processed stacks and final migrated data in X-Y bin form, SEG-Y format
7.  Copies of observer notes, survey notes and any other information and support data necessary for the complete reprocessing of the data

As used herein, the term "final" shall be defined as migrated stack.

_____    **3-D Data Requirements:**

1.  Bin fold plat
2.  Seismic data loading information to include X-Y coordinates of subsurface bin locations, bin spacing, and byte location of inlines and traces (xlines)
3.  Copy of acquisition and processing parameters and all field, survey or observer notes necessary for complete reprocessing of all data
4.  Field tapes and support documents, either on DLT tape format, DVD, or external hard drive
5.  Copy of decon gathers-digital media format:  DLT tape, DVD, or external hard drive
6.  DVD of processed stacks and final migrated data in X-Y bin form, SEG-Y format

As used herein, the term "final" shall be defined as the migrated stack.

**Scope**

The data subject to this agreement shall include all data acquired pertaining to the lands covered by this agreement as well as all data acquired by or obtained by or on behalf of Sklarco L.L.C. covering any and all lands located within the black outline depicted on the plat attached hereto as Exhibit "A."

## OIL, GAS AND MINERAL LEASE

STATE OF FLORIDA

COUNTY OF SANTA ROSA

THIS AGREEMENT, to be effective on the _____ day of _____, 2015, between **TRM WOODLANDS, INC.** (hereinafter referred to as "LESSOR") of Post Office Box 1769, Brewton, Alabama 36427, and **SKLARCO L.L.C.** (hereinafter referred to as "LESSEE") of 5395 Pearl Parkway, Suite 200, Boulder CO 80301.

### W I T N E S S E T H:

1.   LEASE CONSIDERATION

LESSOR, in consideration of Ten and No/100 Dollars ($10.00), in hand paid, of the royalties and other benefits herein provided, and of the agreements of LESSEE herein contained, but subject to the further terms hereof, hereby GRANTS, LEASES AND LETS exclusively unto LESSEE for the purpose of investigating, exploring, prospecting and drilling for and producing oil and gas, the lands (hereinafter referred to as the "Leased Premises"), described in and on Exhibit "A", attached hereto and identified as such, which said Exhibit as so attached and identified, is incorporated herein by reference and made a part hereof for a more particular description of said land, for the purpose of calculating and determining the amount of any money payment hereunder, and for all other pertinent purposes of this Lease. The land therein described is hereby estimated, and shall be regarded and treated as actually comprising and containing _____ net acres, whether it be more or less, and in the event of a partial assignment or surrender hereof or hereunder, the assigned or surrendered portion or portions shall be deemed to contain the number of acres estimated realistically in such instrument or assignment or surrender. The term "oil and gas" as used in this Lease shall mean oil, gas, casinghead gas, distillate, gas condensate and the by-products thereof, and such other hydrocarbon substances and sulphur as are necessarily produced with and incidental to the production of oil and gas. LESSOR hereby reserves and excepts from this Lease and the rights granted hereunder any and all coal, lignite, uranium and other fissionable materials, geothermal energy, base and precious metals, rock, stone, limestone, sand, gravel and other similar aggregates, and clay, and retains unto itself and other subsequent or concurrent lessees of interests therein the right to explore for and produce such reserved minerals.

2.   TERM

Subject to the preservation provisions of subsection 3.4.1 and Section 5 hereof, this lease shall be for a term of **THREE (3)** years from this date (called "primary term") and for so long thereafter as oil or gas is produced in paying quantities from the Leased Premises or this Lease is otherwise maintained in force and effect under the terms hereof.

3.   RESERVATION OF ROYALTIES

3.1   LESSOR hereby reserves, and LESSEE hereby agrees to pay or deliver to LESSOR, the following royalties on account of the oil and gas produced from the Leased Premises in accordance with, but subject to, all subsequent subsections hereof:

3.1.1   AS TO OIL:

**25%** of all oil, condensate and/or other liquid hydrocarbons, produced and saved from the Leased Premises, or from a unit embracing all or a portion thereof, the same to be delivered, free of cost, at the mouth of the well, or, at LESSOR's option, to the credit of Lessor into the pipe line or lines to which LESSEE may connect its wells; provided, however, that LESSEE may purchase LESSOR's oil, condensate and/or other liquid hydrocarbons by paying to LESSOR the average posted market price of such royalty share then in effect for such oil, condensate and/or other liquid hydrocarbons at the wells as of the day such substances are run to the pipe line or storage tank.

3.1.2   AS TO GAS:

**25%** of the market value, hereinafter defined, of all gas and casinghead gas produced and saved from the Leased Premises, or from a unit embracing all or a portion thereof.

3.2   LESSOR specifically reserves hereby the right to take in kind or separately dispose of its proportionate royalty share of all oil and/or gas produced from the Leased Premises, or from a unit embracing all or a portion thereof, and, in the event such an election is made, shall be required to pay only for the proportionate share of such part of LESSEE's surface facilities which it uses.

3.3   PAYMENT AND DELIVERY OF LESSOR'S ROYALTIES:

3.3.1   Any and all royalties due and owing to LESSOR in accordance herewith shall be payable or deliverable to LESSOR no later than 60 days after the end of the calendar month within which oil and/or gas production is sold; provided however, that the acceptance of any such royalty by LESSOR shall never be taken or construed as a waiver of any of LESSOR's rights or remedies for breach by LESSEE, its successors or assigns, of any express or implied covenant of this Lease.

3.3.2   Any payment of any royalty after the date specified in subparagraph 3.3.1 above shall bear interest from and after its respective due date until payment in full is received by LESSOR, said interest factor to be equivalent to the prime rate, as the same shall be set from time to time by the BankTrust of Mobile, Alabama (or any successor to said bank). Furthermore, if LESSEE should fail to pay any royalty or royalties payable hereunder when the same shall become due, LESSOR shall have the specific right and option to terminate this Lease forthwith for such non-payment if such royalties due and payable to LESSOR are not delivered to the said LESSOR on or

1

before the expiration of sixty (60) days after LESSEE receives written notice from LESSOR of LESSEE's failure to pay all royalties when due.

3.3.3    All royalties payable to LESSOR under the terms and provisions of subparagraph 3.1 hereof are payable and shall be paid in cash or by check delivered or mailed to LESSOR at its principal place of business in Brewton, Alabama, or at such other address as LESSOR may designate.

3.3.4    In the event LESSOR should elect to take in kind its royalty on any one or more substances covered by this Lease, LESSOR may exercise such option at any time and from time to time upon 60 days written notice to LESSEE, in which event LESSEE shall deliver same, free of cost other than as provided in 3.2 to LESSOR, to and into LESSOR's pipe lines, tanks or other storage or transportation facilities until 60 days after receipt of written notice that LESSOR has revoked such option and has elected to receive any such royalty interest or share in cash or by check payable at its designated address as hereinabove provided.  Except to the extent to which LESSOR may have exercised its option to take one or more of its royalty interest or share in kind, as herein provided, LESSEE may, subject to all pertinent provisions of this Section 3 of this Lease, barter, contribute, dispose of, exchange, sell swap or use any one or more of said substances covered by this Lease, but shall account to LESSOR therefore to the extent and in the manner hereinabove provided.

3.4    MONETARY SUBSTITUTES FOR ACTUAL PRODUCTION

3.4.1.    Shut-In Royalty on Suspended Production

(a)    While there is a well on the Leased Premises capable of producing gas in paying quantities, as said phrase is hereinafter defined, but the production there from is shut-in, shut down, or suspended for any reason, then and in any such event, LESSEE shall pay royalty on or before ninety (90) days after the date on which (1) production from any such well is shut-in, shut down or suspended, or (2) this Lease is no longer maintained by compliance with one of the other preservation provisions, hereof, (whichever is the later date, and thereafter at annual intervals during the primary term, a sum and amount equal to One Dollar ($1.00) multiplied by the number of acres then covered by this Lease), and after the expiration of the primary term, a sum and amount equal to Twenty Five Dollars ($25.00) multiplied by the number of acres then covered by this Lease, and, if such payments are made, this Lease shall not terminate, but, on the contrary, will continue in full force and it will be considered that a substance covered by this Lease is being produced from the Leased Premises in paying quantities within the meaning of each pertinent provision of this Lease, it being understood and agreed that such payments shall only apply to the geologic strata capable of producing gas in paying quantities.

(b)    The provisions of subparagraph 3.4.1(a) shall not apply to oil wells, as the same may be classified by the State Oil and Gas Board of Alabama, or by the Florida Department of Environmental Protection, and this Lease shall not be kept in force solely by the payment of any shut-in royalty payment on any such well.

(c)    After the primary term hereof, this Lease may not be kept in force solely by the payment of shut-in royalties hereunder for more than a period of two (2) consecutive years after the date of the first payment of any shut-in royalty hereunder.

3.4.2    Take or Pay Product Purchase Contracts

(a)    No "take or pay" products purchase contract shall be finally consummated or valid as to any substance covered hereby and produced from the Leased Premises without LESSOR's written consent.

(b)    All royalties hereunder applicable to gas, casinghead gas, or any other gaseous hydrocarbon covered by this Lease shall be due and payable to LESSOR for any such gas paid for but not taken pursuant to any "take or pay" provision of any pertinent gas purchase contract covering the Leased Premises, any part thereof, and/or any well or wells thereon, but LESSOR agrees to be responsible and liable for its proportionate share of any payments that may be recoverable by the gas purchaser by later takes of gas or refunds of money.  In the event gas is taken in kind as recoupment of take or pay payments, that gas shall be exempt from any royalties.

3.5    LESSEE shall not conduct underground storage operations without the written consent of LESSOR.

3.6    LESSEE shall not use nuclear or other blasts to create artificial conduits, chimneys or reservoirs without the written consent of LESSOR, and if such consent is given, LESSEE shall not use such artificial conduits, chimneys or reservoirs without the additional written consent of LESSOR.

3.7    All pertinent subparagraphs of this Paragraph 3 of this Lease shall apply to and govern the delivery in kind as royalty, or the payment of royalties on all such elements, natural products, by-products, residues or residuals produced from, or allocable to the Leased Premises, under the terms of, or as a result of, revised, permanent or temporary pooling, spacing or unitizing orders or rules issued by the State Oil and Gas Board of Alabama or the Florida Department of Environmental Protection.

2

3.8    FREE FUEL AND WATER

3.8.1    Free Water

LESSEE shall have free use of any and all subsurface water during any primary operations conducted hereunder.

3.8.2    Free Fuel

LESSEE shall have free use, during any primary operations conducted hereunder, of any and all fuel or other substances covered by this Lease and produced from the Leased Premises, and the royalties thereon due and payable to LESSOR shall be computed after deducting any amount of any such substance so used.

3.8.3    For the purposes of this subparagraph 3.8, primary operations shall include the production of oil and gas and all operations associated therewith during such time as oil and gas, or either of them, are produced from a unit embracing all or a portion of the Leased Premises with the sole use of natural reservoir energy.  Primary operations shall not include secondary recovery, pressure maintenance, or other operations related thereto.

3.9    Any and all royalties due and payable to LESSOR pursuant to this Paragraph 3 shall be so paid to LESSOR, or to the credit of LESSOR, free of any and all exploration, development, production, treatment, gathering, marketing, or other related costs, excepting any taxes which may be applicable to such royalties.

4.    DELAY RENTALS          THIS IS A PAID-UP LEASE. NO DELAY RENTAL IS DUE.

4.1    The cash down payment or bonus given for the execution of this Lease constitutes a part of the consideration hereof according to its terms and shall not be allocated as mere rental for a period.

5.    CONTINUOUS OPERATIONS

5.1    If, prior to the discovery and production of any substance covered by this Lease on or from the Leased Premises or from a unit embracing any portion thereof, LESSEE should drill a dry hole or holes thereon, or, if after discovery and production of any such substances covered by this Lease, the production thereof should cease for any reason, this Lease shall not terminate if LESSEE commences operations for drilling or reworking within ninety (90) days thereafter or pays shut-in royalty as provided by 3.4.1.

5.2    If upon or after the expiration of the primary term of this Lease, no substance covered hereby is being produced from the Leased Premises or lands pooled therewith in paying  quantities, as said phrase is hereafter defined, but LESSEE is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within ninety (90) days prior to the end of the primary term, this Lease may be continued in force if, within ninety (90) days from and after the completion of the preceding well, or the cessation of operations thereon if it is dry and unproductive, LESSEE commences or causes to be commenced 1) drilling operations on an additional well on some part or portion of  the Leased Premises lying outside of any previously established  drilling or production allowable unit or 2) reworking operations on any  well previously drilled and completed on the Leased  Premises or on a unit containing all or any portion thereof.  After having so commenced the drilling or reworking  operations described above, LESSEE  may perpetuate the term of this Lease through drilling or reworking operations or the completion or abandonment of additional wells, with no more than ninety (90) consecutive days elapsing between the completion or abandonment of one such additional well and the commencement of drilling or reworking operations for another well on another unit or tract until the entire Leased Premises has been developed to the density, degree and extent permitted by any applicable statewide or field rules, or until at least one oil or gas well has been drilled and completed or abandoned under each such unit or units that may be established within the Leased Premises; provided additionally, that if any of the foregoing drilling or reworking operations result in paying production of any substance covered by this Lease, then this Lease shall remain in force as to the productive unit or units, subject to the further provisions hereof, for so long thereafter as any such substance is produced from the Leased Premises or from land pooled therewith in paying quantities, as that phrase is defined hereinafter.

6.    FORCE MAJEURE

6.1    Should LESSEE be prevented from complying with any express or implied covenant of this Lease, from conducting drilling, reworking or marketing operations, or from producing or marketing the substances covered by this Lease, by operation of force majeure, war, rebellion, devastating fires or floods, orders, rules or regulations of State or Federal governmental authority, or by other such other acts or events beyond the control or LESSEE, then while so prevented,  LESSEE's obligation to comply with such covenant shall be suspended, LESSEE  shall not be liable in damages for failure to comply therewith, and this Lease shall be extended while and so long as LESSEE is prevented by any such cause from conducting drilling, reworking, or marketing operations on or from producing oil and/or gas from the Leased Premises; provided, however, that neither force majeure nor any other cause similar or dissimilar to those described hereinabove shall confer upon LESSEE the right to extend this Lease for more than a period of twelve (12) months.

6.2    Notwithstanding anything to the contrary contained in subparagraph 6.1 above, LESSEE shall not be excused, through the operation of the foregoing force majeure provisions, from making of all proper and timely payments of royalties, shut-in royalties or all other payments required pursuant to the terms of this Lease.

7.    USE, DAMAGES TO, AND RESTORATION OF THE LEASED PREMISES

7.1    USE OF THE SURFACE OF THE LEASED PREMISES

Subject to the further terms and provisions hereof, LESSEE shall have and is hereby given access to and use of so much of  the surface of  the Leased Premises as is reasonably necessary to conduct all activities and operations

3

authorized, permitted and required by the terms of this Lease which do not unduly or unreasonably hamper, interfere with or restrict LESSOR's communicating, cultivating, farming, fishing, grazing, harvesting, hunting, logging, lumbering, milling, planting, seeding, transporting, trapping or other related or non-related activities and operations therein and thereon, it being the intention of the parties hereto to create and recognize between them reciprocal rights and complimentary estates. To this end, it is expressly AGREED, UNDERSTOOD, and hereby STIPULATED that:

### 7.1.1   LESSEE COVENANTS AND AGREES:

(a)      Not to use any more of the surface of the Leased Premises as is reasonably necessary to conduct all operations authorized, permitted and required by this Lease and specifically not to locate any well, treatment plant, flow line, gathering line, pipe line or other such facility closer than 330 feet from any house, cabin, shed, barn, silo, storage bin, feeding trough, or other structure located on the Leased Premises;

(b)      Not to grant to any third party or parties any easement for any pipeline unassociated with the transportation of oil and gas produced from the Leased Premises or from a unit embracing all or a portion thereof, any water line, transmission line, or other burden on the Leased Premises;

(c)      Not to fish, hunt or carry or use fishing gear or firearms onto the Leased Premises and to make every reasonable effort, by specific instructions, warnings, warning signs, or otherwise, to prevent its agents, executives, employees and personnel, or those furnishing material, supplies, physical equipment or third party services from fishing, hunting or carrying or using fishing gear or firearms on the Leased Premises; and

(d)      Not to cultivate, farm, graze livestock, harvest, log, lumber, mill, plant, seed, or conduct or engage in such other activities and operations similar or dissimilar in nature to those mentioned herein and not contemplated by the terms of this Lease.

### 7.1.2   LESSOR COVENANTS AND AGREES:

(a)      To maintain all fences and gates in good state of repair, and when and where it becomes absolutely necessary to cut or otherwise remove LESSOR's fences, to install adequate gates and cattleguards; and

(b)      To exercise all of its rights, privileges, powers and immunities, and to conduct its usual and customary activities and operations on the Leased Premises in a manner such that it will not unduly or unreasonably hamper, interfere with or restrict any operation or activity authorized, permitted or required by this Lease; and

(c)      To insure that any of its licensees, guests, invitees or subsequent lessees conduct their activities and operations so as not to hamper, interfere with or restrict unduly or unreasonably any operation or activity authorized, permitted or required by this Lease.

7.2      DAMAGES TO THE SURFACE OF THE LEASED PREMISES:

LESSEE COVENANTS AND AGREES:

(a)      To consult with and obtain the written release and consent of LESSOR before selecting or clearing sites for wells, pits, drainage ditches, receptacles, shafts, or locating, constructing or installing tank batteries, field-type separation devices, treating or processing mills or plants, laying pipe lines, gathering lines or flow lines, surveying and drilling shot holes for seismic surveys, or building roads, bridges or culverts on the Leased Premises; and, when requested by LESSOR, to bury all pipe lines, gathering lines and flow lines below plow depth or the depth to and at which LESSOR's timber or other seedlings are normally planted, whichever is deeper;

(b)      To conduct all seismic and other surveys in a manner so as not to damage LESSOR's water wells, tanks or reservoirs, and to conduct all operations so as not to permit any deleterious substance to collect, escape, pollute, run, seep, spread, stand or come in contact with or damage LESSOR'S blinds, boat docks, cattle, crops, fish, or other aquatic life, hunting or fishing camps or lodges, lakes, land, livestock, logs, lumber, logging and lumbering camps, mills, roads or tramways, ponds, reservoirs, seedlings, springs, streams, tanks, timber, trees, vegetation, water wells, wildlife or any other things of value on, in, over or under the Leased Premises; and

(c)      To respond to and pay damages, based on replacement cost, cost of repairs, or such other assessment to which LESSOR may agree, for the damage to, loss of, or diminution or depreciation of the beneficial use or value of any house, cabin, shed, barn, silo, storage bin, fence, crop, timber, lumber, vehicles, feeding trough or other thing of value lost, damaged or destroyed as a result of or through the conduct of any activity or operation authorized, permitted or required by this Lease or by any activity of LESSEE, its agents, employees or representatives, which amounts to a breach of any covenant hereof. This paragraph shall not apply where Lessor is negligent or involved in willful misconduct notwithstanding anything to the contrary, it is not intended that **SKLARCO L.L.C.** indemnify LESSOR for the negligent acts of LESSOR's servants or employees or for willful misconduct.

7.3      RESTORATION OF THE SURFACE OF THE LEASED PREMISES

LESSEE hereby covenants and agrees to maintain and/or restore the surface of the Leased Premises, immediately after the particular surface area of the said Leased Premises has served its purpose, in and to as near as practicable its natural state before operations and activities began hereunder. To this end, it is expressly AGREED, UNDERSTOOD, and hereby STIPULATED that LESSEE covenants and agrees:

4

(a)     To dispose of all drilling mud, chemicals, tailings, waste, debris, and all other deleterious substances and/or materials in a lawful manner as approved by the State of Alabama or any other governing body;

(b)     To properly and promptly fill, roll, tamp and cover all pits and sumps after each pit and sump has served its particular purpose;

(c)     To close, securely seal and properly plug any and all wells drilled and abandoned hereunder;

(d)     To clean up and generally repair the site used for any well, pit, receptacle, shaft, tank, plant, or other physical facility;

(e)     To dispose of all saline solutions, saltwater, waste oil, and all other obnoxious and/or deleterious substances by removing them from the Leased Premises or through the use of authorized injection wells for disposal purposes; and

(f)     To take all other reasonable steps to maintain and preserve the Leased Premises in a clean and orderly manner.

8.     REMOVAL OF FIXTURES FROM AND TITLE TO ABANDONED WELLS

8.1     REMOVAL OF AND TITLE TO FIXTURES:

Subject to the further terms and provisions hereof, LESSEE shall have and is hereby given and granted the right to remove all property, physical equipment, facilities and fixtures placed on, in and under the Leased Premises by LESSEE within one hundred eighty (180) days after the expiration of this Lease, or, if the termination of this Lease or any portion thereof is in controversy, within one hundred eighty (180) days after final determination of such controversy, but not thereafter, it being understood and agreed that all wells, receptacles, shafts, tanks, well holes or bores, and any and all such property, physical equipment, facilities and fixtures remaining in, on or under the Leased Premises, including casing and other downhole equipment left in any such wells, upon and after the expiration of said 180 day period, shall then and thereupon become the property of LESSOR.

8.2     WATER WELLS:

LESSOR shall have and is hereby given and granted the option, at its election, of taking over and thereafter owning and operating any well initially drilled as or later converted to a water well and equipped as such by LESSEE, including all physical facilities and equipment placed by LESSEE therein, thereon, or used by LESSEE in connection therewith, which said well or wells LESSEE may at any time or from time to time elect to abandon by paying to LESSEE the reasonable salvage value of all such salvable physical facilities and equipment as of the date of abandonment by LESSEE; provided however, that as is provided in subparagraph 8.1 above, LESSOR shall nevertheless become the owner of all such water wells located on the Leased Premises and of the equipment therein, thereon or used in connection therewith upon the expiration of the said 180 day period.

8.3     TITLE MATTERS:

Insofar as it may be necessary to fully effectuate all provisions of this Paragraph 8, all apt words of grant, bargain, sale, conveyance, transfer and delivery are incorporated herein by reference and made a part of this said Paragraph 8 for all pertinent purposes.

9.     ADDITIONAL EXPRESS COVENANTS

By the acceptance of this Lease, and as a substantial part of the consideration therefore, LESSEE hereby expressly COVENANTS and AGREES:

9.1     After the discovery of oil or gas in paying quantities on said premises, LESSEE shall develop the acreage hereunder as a reasonably prudent operator. In the event a well or wells producing oil or gas in paying quantities should be brought in on other land in the vicinity of and draining the Leased Premises or acreage pooled therewith, LESSEE agrees to drill such offset well as a reasonably prudent operator would drill under the same or similar circumstances. Such offset well or wells shall be commenced within ninety (90) days after commencement of production in paying quantities from the well being offset:

9.2     To produce, gather, process, preserve, save, store, take care of, treat, transport and market said production, products, by-products, residues, residuals and tailing, and to conduct all such producing, gathering, processing, preserving, saving, storing, caring of, treating, transporting and marketing activities and operations at the time, with the rapidity, at the rate, and in the manner and to the extent that a reasonably prudent operator, acting under the same or similar circumstances, and with the best interests of both the LESSOR and LESSEE in mind and at heart, should or would so conduct such activities and operations;

9.3     To conduct pressure maintenance, or secondary recovery operations, or both, if the characteristics of the particular reservoir are such that, from sound engineering and economical standpoints, and with the best interests of both LESSOR and LESSEE in mind and at heart a reasonably prudent operator would or should conduct one or both such operations;

9.4     To market with due diligence and in good faith all oil and gas produced from a well or wells completed on the Leased Premises, or on a unit or units embracing any part thereof, which is not utilized by LESSEE pursuant to subparagraph 3.8 hereof;

9.5     To build, construct or install and to maintain and operate a mill or mills, or plant or plants, or with LESSOR's written consent, to enter contracts, in good faith and at arm's length, with independent processors, for the purpose of absorbing, assimilating, blending, compounding, concentrating, cycling, deriving, extracting, milling,

5

processing, recovering, refining, saving, treating or upgrading all oil and gas initially produced from the Leased Premises, or from lands pooled therewith if such oil and gas, or either of them, are of such quality and in such quantity as to justify the building, constructing, installing, maintaining and operating of such a mill or plant by a reasonably prudent operator or processor, or to justify such a reasonably prudent operator entering into such contracts with independent processors;

   9.6     To install, maintain and operate one or more field-type device or devices such as but not limited to Bradenheads and separators, for the purpose of extracting, recovering or saving one or more elements of the oil and gas produced from the Leased Premises, or from lands pooled therewith, such as and including casinghead gas, distillate, gas condensate and natural gasoline if such oil and gas, or either of them initially produced from the said Leased Premises, or from land pooled therewith, are not of such quality or are not in such quantity as to justify plant processing;

   9.7     To enter into contracts, in good faith and at arm's length, for the sale, at or near the wells, or elsewhere, of such products and substances, covered hereby and produced from the Leased Premises, or from lands pooled therewith, which are not of such quality or are not in such quantity as to justify the installation and operation of field-type devices described in subparagraph 9.6 above;

   9.8     To furnish promptly to LESSOR, upon written request at its principal office and place of business in Brewton, Alabama or at such other address as LESSOR may designate in writing:

      (a)     Copies, duplicates or reproductions of all location plats, applications for and permits to drill, daily drilling reports on and in connection with all wells drilled on the Leased Premises or lands pooled therewith; copies of all pipe perforation and well completion records; and copies of all reports and forms required by or filed with the State Oil and Gas Board of Alabama, and all other such regulatory bodies, state and federal, having jurisdiction;

      (b)     Copies and duplicates or reproductions of all logs or surveys, drillers, electrical or otherwise, of all wells drilled on the Leased Premises or lands pooled therewith; all surveys and similar data, all coring data and core analysis reports, core analyses, core records, reports or results of drill stem or other tests, and all other data and information obtained in connection with or as a result of the exploration, development, operation and protection of the Leased Premises;

Each and all of the foregoing covenants to be construed as those running with and touching and concerning this Lease and with the acreage constituting the Leased Premises.

10.     RIGHTS OF LESSOR

LESSOR, acting by and through its corporate officers, executives, agents or duly authorized representatives, shall have and is hereby given and granted immediate access to and the absolute right, at its own risk, cost and expense, at any time and from time to time, to:

   10.1     Observe, from the well site, derrick floor, drilling platform, or from any other vantage point, all drilling, completing, logging, surveying, producing, reworking, plugging and all other such or similar activities or operations conducted on the Leased Premises by LESSEE, its agents, employees, independent contractors, or by those furnishing third party services. Access to drilling rig and location may be denied in the event a life-threatening situation exists:

   10.2     Make annual audits on LESSEE's accounts, contracts, books and records, at its own expense and at any reasonable time, for the purpose of ascertaining the amount of the production, sales and cost of manufacturing and extracting of any and all substances covered by this agreement. Each such audit shall cover the period intervening since the last audit, and LESSOR shall have one (1) year next following the close of the calendar year in which said audit is made within which to present to and assert against LESSEE any and all claims or demands against LESSEE that may be disclosed by or result from said audit.

11.     ASSIGNMENT OF RIGHTS HEREUNDER

   11.1     RIGHTS OF LESSOR:

      The rights of Lessor hereunder may be assigned, either in whole or in part, and the provisions hereof shall extend to and be binding upon the parties hereto and their respective successors, assigns and legal representatives; provided however, that no change or division in the ownership of the lands covered hereby, royalties or other payments to accrue or become payable to LESSOR hereunder, however accomplished, shall operate to enlarge the obligations or diminish the rights of LESSEE, and no change or division of such ownership shall be binding on LESSEE until thirty (30) days after LESSEE shall have been furnished with a duly certified copy of the recorded instrument or instruments evidencing same.

   11.2     RIGHTS OF LESSEE:

      Notwithstanding anything to the contrary indicated herein, the rights of LESSEE hereunder may not be assigned in whole or in part, except by transfer or exchange of stock, merger, consolidation or reorganization without LESSOR's written consent, it being understood that for purposes of this subparagraph, LESSOR's written consent may be given by any officer of said corporation and that such consent will not be unreasonably withheld. In the event such consent is requested and given, it shall not be construed as a waiver of LESSOR's right to approve any and all subsequent assignments thereafter.

12.     NOTICE OF NONCOMPLIANCE

      In the event LESSOR considers that operations are not at any time being conducted in compliance with this Lease, LESSOR shall notify LESSEE in writing of the facts relied upon as constituting a breach of any obligation

6

arising hereunder, and LESSEE, if in default, shall have sixty (60) days after receipt of such notice within which to comply with and satisfy any such obligation.

13.    CONSENT TO POOL

LESSEE shall have the right as to all or any part of the Leased Premises, without LESSOR's joinder, to combine the leasehold estate and LESSOR's royalty estate created by this Lease with any other lease or leases or lands, whether owned by LESSEE or some other person, partnership, firm, corporation or joint venture group, so as to create, by the combination of such leases, one or more operating or production units, provided that no single operating unit may embrace more than one hundred sixty (160) acres per oil well (plus 10% tolerance to allow for irregular sections) or six hundred forty (640) acres per gas well (plus 10% tolerance to allow for irregular sections), or such other amount authorized and required by the appropriate state agency having jurisdiction thereof, whichever said amount is the lesser. In the event any such unit is created hereunder by LESSEE, LESSOR agrees to accept and shall receive out of the production from any such unit the royalties described in Paragraph 3 hereof, said royalties to be proportionately reduced and to be paid only on the percentage of production that the number of acres pooled from the Leased Premises bears to the total number of acres included within the respective unit. The commencement or reworking of a well or the completion of a well to production (and production from such well) on any portion of a unit on which all or any part of the land described herein is embraced shall have the same effect under the terms of this Lease as if a well were commenced, reworked, completed or producing on the herein Leased Premises.

14.    SEVERANCE OF LEASEHOLD ACREAGE

14.1    Notwithstanding anything to the contrary herein contained (except for the provisions of Section 5, above), drilling or reworking operations on a pooled unit or units established as provided herein or by governmental authority shall maintain this Lease in force only as to the portion of the Leased Premises included in such unit or units, subject to further limitations set forth below. The Lease may be maintained as to the remainder of the Leased Premises in any manner specified herein, including Section 5, above, and this paragraph shall not limit the ability of the Lessee to maintain this lease as to all property covered hereby by conducting continuous operations in accordance with Section 5, above.

14.2    It is hereby understood by and agreed between the LESSOR and LESSEE that in the event this Lease should lapse and terminate either through the operation of 1) this Paragraph 14, 2) Paragraph 3 hereof dealing with the payment and delivery of royalties and shut-in royalties on production of oil and gas established hereunder, 3) Paragraph 5 hereof dealing with the perpetuation of this Lease through continuous operations, or 4) any other applicable provisions herein, LESSEE shall nevertheless be entitled to retain, subject to all of the express and implied covenants of this Lease, sufficient acreage around each well producing oil or gas in paying quantities, as defined herein, from the Leased Premises, or from any part thereof included in a pooled unit, so as to constitute a maximum producing unit pursuant to the applicable field rule or rules of statewide coverage, such acreage to be designated by Lessee as nearly as practicable in the form of a square, or in such shape as then existing spacing rules require.

14.2.1    Once this Lease has expired except as to any retained producing units, the Lease shall remain in force and effect as to each such retained producing unit only as to all depths equal to or above one hundred (100) feet below the deepest depth of any well completed on the Leased Premises or lands pooled therewith and productive of oil and/or gas, and only for so long as there is production therefrom in paying quantities, or for so long as drilling or reworking operations are conducted on each such unit.

14.2.2    LESSEE shall be obligated to survey any and all retained producing units established pursuant to this subparagraph 14.2, and to file for record in the county and state wherein the Leased Premises are located a release or releases of all nonproductive acreage or depths not retained hereunder or thereafter terminating due to cessation of production. Upon written request from LESSOR, LESSEE shall furnish to LESSOR copies of all surveys and releases made and executed hereunder.

14.2.3    Should LESSOR own or otherwise control or hereafter acquire the ownership or control of the surface of the Leased Premises, LESSEE shall be entitled to receive from LESSOR such easements on, over and across said lands as shall be necessary to conduct operations on the acreage retained hereby.

15.    WARRANTY OF TITLE

15.1    This lease is given without warranty of any kind, either expressed or implied, but with full substitution and subrogation in and to all of the rights and actions that LESSOR now has or may hereafter acquire.

15.2    PROPORTIONATE REDUCTION:

If LESSOR owns less than the full fee simple title to the substances which this Lease purports to cover, then the royalties and payments provided for in Paragraph 3 hereof, and any and all other payments and benefits to accrue, become payable or inure to the benefit of LESSOR under the terms and provisions of this Lease shall be reduced in proportion that LESSOR's interest bears to the whole and undivided fee simple estate therein.

16.    GENERAL PROVISIONS

16.1    LESSOR hereby expressly covenants and agrees not to withhold, fail, or refuse unreasonably to give or grant its written consent whenever such consent shall be called for or required pursuant to any term or provision of this Lease. Financial responsibility and operational staffing are deemed reasonable inquires as to proposed assignees.

16.2    LESSEE further agrees that it will indemnify and hold LESSOR harmless against any and all loss, damage, liability, cost or expense, including any claims, fines, penalties and reasonable attorneys' fees, on account of injuries to or death of persons or damage to property of any kind, arising out of or resulting from any operation hereunder; and in the event of any suit or other proceeding against LESSOR on account thereof, LESSEE shall, at LESSOR's request, appear and defend same and LESSEE shall pay any assessment, judgment or settlement which may be rendered or given against LESSOR therein. Notwithstanding anything to the contrary, it is not intended that

7

**SKLARCO L.L.C.** indemnify LESSOR's for gross negligence of LESSOR's servants or employees or for willful misconduct.

17.   ADDRESSES

Any and all notices and/or requests required pursuant to the terms of this Lease, whether such notices and/or requests be of a general or specific nature, shall be mailed or otherwise delivered to the parties hereto at their respective business addresses listed below:

|  | With copy to: |  |
|---|---|---|
| CEDAR CREEK LAND & TIMBER, INC. | PAUL D. OWENS, JR. | SKLARCO L.L.C. |
| (214 Deer Street – zip 36426) | (315 Belleville Ave.) | Attn: J. Marshall Jones, III |
| P.O. Box 1769 | P.O. Box 1229 | 5395 Pearl Parkway, Suite 200 |
| Brewton, AL 36427 | Brewton, AL 36427 | Boulder, CO 80301 |

18.   GENERAL DEFINITIONS

A.   PAYING QUANTITIES: The phrase "paying quantities" as, when and wherever it appears in this Lease, is hereby defined as that quantum of production which will return a profit, regardless of how small, above, over or beyond producing, transporting, treating and marketing costs and expenses such as and including all direct and reasonable administrative, supervisory and overhead charges, all at the field, but not the district level, actually and fairly attributable, allocable or apportionable to such production; all labor, and all minor repairs to and maintenance of, physical facilities and equipment actually used and actually and fairly attributable, allocable or apportionable to such production, including actual, but not book, depreciation on all salvable equipment; all costs and expenses incurred and actually paid in connection with or resulting from all reworking and other operations designed to increase or restore production; all milling, treating, transporting and marketing costs and expenses incurred and actually paid; all ad valorem and other taxes assessed and actually paid; and all other such costs and expenses directly ,fairly and actually attributable, allocable or apportionable to such production but not to the drilling and completion of wells as such.

B.   DEVELOPMENT and/or PROTECTION WELLS: Insofar as the express and implied covenants of this Lease are concerned, "development" and "protection" wells are hereby defined as wells which a reasonably prudent operator, acting under the same or similar circumstances as LESSEE may face hereunder, 1) would drill with reasonable expectations or prospects of completing as producers which would be likely to return a reasonable profit above, over and beyond drilling, completing, producing, marketing, treating and transporting costs, or 2) should drill pursuant to the express covenants set forth in Paragraph 9 hereof.

C.   EXPLORATORY WELLS: Insofar as the express and implied covenants of this Lease are concerned, "exploratory" wells are hereby defined as wells which a reasonably prudent operator, acting under the same or similar circumstances as LESSEE may face hereunder, would drill for the purpose of fully exploring the Leased Premises, and every prospectively productive formation therein and thereunder, but not necessarily with expectations or prospects of completing as producers which would be likely to return a reasonable profit above, over and beyond drilling, completing, producing, marketing, treating and transporting costs.

D.   BARTER, CONTRIBUTE, DISPOSE,EXCHANGE, SELL, SEVER, SWAP, OR USE: The words or terms "barter", "contribute", "dispose", "exchange", "sell", "sever", "swap" or "use", as, when and wherever they appear in this Lease, are hereby defined as a barter, contribution, disposition, exchange, sale, severance, swap or use, with LESSOR's written consent as the same shall be required herein, made in good faith, at arm's length, and with the best interests of both the LESSOR and LESSEE in mind and at heart .

E.   JUSTIFY: The word or term "justify" as, when and wherever it appears in any Paragraph or subparagraph of this Lease, is hereby defined as that which is just, right, reasonable and warranted from an economic point of view.

F.   DRILLING OR REWORKING OPERATIONS: Insofar as Paragraphs 5 and 14 of this Lease are concerned, the phrase "drilling or reworking operations" is hereby defined as the spudding in and actual drilling of an oil or gas well reasonably and with due diligence, and all work as operations designed to secure, restore or improve production through some use of a hole previously drilled, including, but not limited to, mechanical or chemical treatment of any horizon, deepening to test deeper strata, and plugging back to test shallower strata.

G.   COMMENCEMENT: The word "commencement", as it is used and referred to specifically in Paragraph 5 hereof and generally in any other provision of this Lease, shall be defined as the actual spudding in of a well.

H.   COMPLETION: The word "completion" as it is used and referred to specifically in Paragraph 5 hereof and generally in any other provision of this Lease, shall be defined as the actual operation of installing on the well in question valves, meters, gauges and other controls collectively referred to as the "christmas tree".

I.   MARKET VALUE: Insofar as Paragraph 3 of this Lease is concerned, the term "market value" shall be defined as the applicable price determined under one of the following standards applicable to the sale of any gas produced hereunder:

(1)   Where such gas is sold on the Lease or in the field where produced by LESSEE in an arms-length transaction, the price received by LESSEE under the terms of any gas purchase contract for gas produced and sold from the Leased Premises by LESSEE.

(2)   Where such gas is not sold on the lease or from the field where produced by LESSEE in an arms-length transaction the average of the three highest prices paid under contracts entered into not more than one year previous to the date of first production of gas of the same or similar quality and content produced and sold from wells within the county and state wherein the Leased Premises are situated when gas is sold from a well or wells on the Leased Premises. Said average to be determined on a semi-annual basis by LESSOR

8

who shall submit the contractual information relied upon to LESSEE.  Failure to determine said average and submit said contractual information to LESSEE semi-annually shall be an acceptance of the price received by LESSEE as a market value price for the succeeding six-month period.

IN WITNESS WHEREOF, the parties hereto have executed and accepted this instrument on the day and date hereinabove first written, in the presence of the undersigned, competent witnesses.

**LESSOR**

WITNESSES:                    **TRM WOODLANDS, INC.**

_____      By: _____
Print Name: _____      Paul D. Owens, Jr., President

_____
Print Name: _____


**LESSEE**

WITNESSES:                    **SKLARCO L.L.C.**

_____      By: _____
Print Name: _____      David A. Barlow, President & COO

_____
Print Name: _____

CORPORATE ACKNOWLEDGEMENT

STATE OF ALABAMA

COUNTY OF ESCAMBIA

I, _____, a Notary Public in and for the State and County aforesaid, hereby certify that _____ and _____, whose names as _____ and _____, respectively of TRM WOODLANDS, INC., an Alabama Corporation, are signed to the foregoing instrument and who are known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument, they, as such officers and with full authority, executed the same voluntarily for and as the act of the said Corporation.

Given under my hand and official seal on this the _____day of _____, 2015.

_____
NOTARY PUBLIC

My commission expires:

_____


ACKNOWLEDGEMENT

STATE OF COLORADO

COUNTY OF BOULDER

I, _____, a Notary Public in and for the State and County aforesaid, hereby certify that _____, whose name as _____ of SKLARCO L.L.C., a Louisiana Limited Liability Company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument and with full authority, executed the same voluntarily for and as the act of the said Company.

Given under my hand and official seal on this the _____day of _____, 2015.

_____
NOTARY PUBLIC

My commission expires:

_____

9

<u>EXHIBIT "A"</u>

       Attached to and made a part of that certain <u>OIL, GAS AND MINERAL LEASE</u> between **TRM WOODLANDS, INC.** and **SKLARCO L.L.C.** with an effective date of _____, 2015.

All mineral interest owned by Lessor in Santa Rosa County, Florida, described as follows:

**SANTA ROSA COUNTY, FL:**

[INSERT PROPERTY DESCRIPTION]

Containing a total of _____ **net acres**, more or less.

**It is the intent to include all net mineral acreage as described within the respective quarter sections herein.**

SIGNED FOR IDENTIFICATION BY LESSOR:

**TRM WOODLANDS, INC.**

By: _____

SIGNED FOR IDENTIFICATION BY LESSEE:

**SKLARCO L.L.C.**

By: _____

10

## EXHIBIT "A-3"

Attached to and made a part of that certain Amended and Restated Participation Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc.

**OPTION**
**(State Line Oil Trust – Alabama)**

STATE OF ALABAMA

COUNTY OF ESCAMBIA

### GEOPHYSICAL PERMIT & LEASE OPTION AGREEMENT

THIS AGREEMENT made and entered into as of the 7th day of April, 2015, by and between John F. Watson and David B. Foshee, as Co-Trustees of the STATE LINE OIL TRUST (a copy of said trust being recorded in real property records of the Probate Court of Escambia County, Alabama, in Book 75 beginning at page 573, and in the real property records of the office of Clerk of Court of Santa Rosa County, Florida in Deed Book A-48, beginning at page 76), whose mailing address is 1 Vickers Place, Mobile, Alabama 36608, hereinafter referred to as "Grantor" and SKLARCO L.L.C., a Louisiana limited liability company, represented herein by its duly authorized President – Chief Operating Officer, David A. Barlow, whose mailing is 5395 Pearl Parkway, Suite 200, Boulder, CO  80301, hereinafter referred to as "Grantee."

### A. CONSIDERATION AND OPTION

For and in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the agreements herein contained and subject to the terms and conditions hereinafter set forth, Grantor hereby grants unto Grantee the exclusive option for a period beginning on the date of this agreement and ending on April 7, 2017, hereinafter called "Option Period," to acquire an Oil, Gas and Mineral Lease or leases with a three year primary term covering all of Grantor's interest in all or any portion of that certain property situated in Escambia County, Alabama described in Exhibit "A-1," attached hereto and made a part hereof, together with the exclusive right, during the Option Period, to conduct or cause to be conducted geophysical and other exploration surveys on said property for the purpose of exploring same for the possible existence of oil, gas and other hydrocarbons (all such permitted methods of exploration being collectively referred to as "Seismic Operations").  It is the intention of the Grantor to grant to the Grantee a Geophysical Permit and Option to Lease all mineral interest owned by Grantor within the area outlined in black (the Mount Carmel Seismic Prospect) on Exhibit "A," attached hereto and made a part hereof whether properly and correctly described herein or not.  Grantee shall pay to Grantor upon execution of the agreement twenty-five dollars ($25.00) per net mineral acre covered by this option.

### B. EXISTING MINERAL LEASES

Grantor hereby declares that some portion of the lands set forth in Exhibit "A-1" may be currently subject to the terms and conditions of various Oil, Gas and Mineral Leases (the "Existing Mineral Leases") in favor of various third party mineral Lessees (hereinafter the "Existing Mineral Lessees").  Grantor makes no representation, express or implied, whether Grantee may exercise the right granted herein without the prior express written consent of one or more of the Existing Mineral Lessees.  This agreement is made expressly subject to all of the terms and conditions of the said Existing Mineral Leases, and the rights, if any, of the Existing Mineral Lessees there under.  Grantee shall be solely responsible for identifying all Existing Mineral Leases bearing upon the Land and obtaining all, if any, necessary consents or permits from the Existing Mineral Lessees prior to commencing operations on or under lands subject to the Existing Mineral Leases.  Further, Grantee expressly agrees herein to indemnity and hold Grantor harmless from any and all causes of action by any Existing Mineral Lessee arising out of or relating to the exercise by Grantee of the rights contained herein, including, but not limited to, any and all claims or causes of action for seismic or geophysical trespass. In the event that any Existing Mineral Leases should expire during the term of this Agreement, then the lands covered by same shall be covered by this Agreement.

### C. OPERATIONS & VENUE

Grantee shall compensate Grantor for all damages suffered by Grantor, including

damage to timber, buildings or improvements or injuries to persons arising out of or in connection with Grantee's operations on the land covered by this agreement.

Grantee shall conduct said seismic operations and surveys or cause same to be conducted in a workmanlike manner, according to accepted industry practice, and all applicable federal, state, county, and local rules, regulations, and statutes. Grantee further agrees to indemnify and hold Grantor harmless from and against all claims and damages of every nature that might arise as a result of Grantee's operations, and further agrees to cooperate fully with Grantor with respect to all current and proposed seismic operations conducted on permitted property. Specifically, prior to entering onto the land, Grantee shall furnish to Grantor a plat identifying the approximate location of the seismic lines or grid pattern, together with the location of each shot point or group of shot points, and the total number of holes or shot points which arc to be placed, bored or shot on said lands.

In the event of litigation between the parties, the parties agree that Alabama Law shall control and apply to this agreement and the proper venue to any suit or claim shall be Escambia County, Alabama.

## D. EXERCISE OF OPTION AND LEASE EXECUTION

In the event Grantee desires, at any time and from time to time, to exercise the option granted in Paragraph A, Grantee shall, prior to the expiration or termination of the Option Period, notify Grantor in writing. Thereafter, Grantor shall prepare two copies of Oil, Gas and Mineral Lease(s) covering land to be leased, together with two (2) copies of a Memorandum of Oil, Gas and Mineral Lease. Checks payable to Grantor, in an amount equal to 100% of the total aggregate initial bonus payment due under such lease (s) shall be paid to Grantor within 3 business days of the delivery of lease. The total aggregate initial bonus payment shall be computed on the basis of two hundred dollars ($200.00) per net mineral acre for each and every acre to be covered by the lease(s).

The parties hereto agree that any such leases shall cover an undivided 100% of the interest owned by Grantor in the lease premises. It is further agreed and understood that any single lease shall not cover less than all mineral interest owned by Grantor in a governmental quarter section subdivision.

Except with respect to the description of acreage to be covered, all leases acquired by Grantee hereunder shall be in the identical form and contain the same terms, conditions and provisions as the Oil, Gas and Mineral Lease attached hereto as Exhibit "B".

Promptly after receipt of the aforesaid memorandum, leases and payment of lease bonus, Grantee shall execute and return to Grantor one (1) copy of each Oil, Gas and Mineral Lease and Memorandum of Oil, Gas and Mineral Lease. Grantee shall promptly record Memorandum of Oil, Gas and Mineral Lease and provide Grantor with recording information.

## E. GEOPHYSICAL DATA TO BE FURNISHED

Concurrent with this agreement, Grantee has entered into a similar Geophysical Permit with TRM Woodlands, Inc. to provide complete geophysical data on the proposed seismic block encompassing all of option property defined as Exhibit "A" as included within this agreement. It is specifically understood by Grantors that TRM Woodlands, Inc. will serve as custodian of said data for the Grantors and in consideration that all terms as to disclosure of said data as set out in TRM Woodlands, Inc. agreement shall be binding on Grantors, they shall be afforded access to the data in the possession of TRM Woodlands, Inc. on the same terms and conditions, and subject to the same restrictions, as TRM Woodlands, Inc.

## F. NOTICE

Any notice, communication or payment to a party hereunder may be given, sent, paid or tendered by postage prepaid mail addressed to said party at the address shown below or such other address as is hereafter designated in writing:

Page 2 of 8

For: STATE LINE OIL TRUST TRUSTEES
1 Vickers Place
Mobile, AL 36608
Attn: John F. Watson

For: SKLARCO L.L.C.                     With copy to:
5395 Pearl Parkway, Suite 200           C.P. Armbrecht
Boulder, CO 80301                       P.O. Box 290
Attn: J. Marshall Jones, III            Mobile, AL 36601

G. SEVERABILITY

Any provision of this Agreement which is prohibited or unenforceable, in whole or in part, shall be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. If the scope of any provision set forth in this Agreement is too broad to permit enforcement of such provision to its full extent, then such provision shall be enforced to the maximum extent permitted by applicable law and, if necessary, the scope of any such provision may be judicially modified to the minimum extent necessary in any proceeding brought to enforce such provision and thereafter such provision, as so modified, may be fully enforced. This Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this instrument in duplicate original counterparts, as of the date hereinabove written.

**STATE LINE OIL TRUST TRUSTEES**

John F. Watson
Co-Trustee of Said Trust

David B. Foshee
Co-Trustee of Said Trust

**SKLARCO L.L.C.**

By: _____
David A. Barlow
President – Chief Operating Officer

Page 3 of 8

For: STATE LINE OIL TRUST TRUSTEES
1 Vickers Place
Mobile, AL 36608
Attn: John F. Watson

For: SKLARCO L.L.C.                     With copy to:
5395 Pearl Parkway, Suite 200           C.P. Armbrecht
Boulder, CO 80301                       P.O. Box 290
Attn: J. Marshall Jones, III            Mobile, AL 36601

### G. SEVERABILITY

Any provision of this Agreement which is prohibited or unenforceable, in whole or in part, shall be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.  If the scope of any provision set forth in this Agreement is too broad to permit enforcement of such provision to its full extent, then such provision shall be enforced to the maximum extent permitted by applicable law and, if necessary, the scope of any such provision may be judicially modified to the minimum extent necessary in any proceeding brought to enforce such provision and thereafter such provision, as so modified, may be fully enforced.  This Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this instrument in duplicate original counterparts, as of the date hereinabove written.

**STATE LINE OIL TRUST TRUSTEES**

_____
John F. Watson
Co-Trustee of Said Trust

_____
David B. Foshee
Co-Trustee of Said Trust

**SKLARCO L.L.C.**

By: _____
David A. Barlow
President – Chief Operating Officer

For: STATE LINE OIL TRUST TRUSTEES
1 Vickers Place
Mobile, AL 36608
Attn: John F. Watson

For: SKLARCO L.L.C.                    With copy to:
5395 Pearl Parkway, Suite 200          C.P. Armbrecht
Boulder, CO 80301                      P.O. Box 290
Attn: J. Marshall Jones, III           Mobile, AL 36601

## G. SEVERABILITY

Any provision of this Agreement which is prohibited or unenforceable, in whole or in part, shall be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. If the scope of any provision set forth in this Agreement is too broad to permit enforcement of such provision to its full extent, then such provision shall be enforced to the maximum extent permitted by applicable law and, if necessary, the scope of any such provision may be judicially modified to the minimum extent necessary in any proceeding brought to enforce such provision and thereafter such provision, as so modified, may be fully enforced. This Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this instrument in duplicate original counterparts, as of the date hereinabove written.

**STATE LINE OIL TRUST TRUSTEES**

_____
John F. Watson
Co-Trustee of Said Trust

_____
David B. Foshee
Co-Trustee of Said Trust

**SKLARCO L.L.C.**

By: _____
David A. Barlow
President – Chief Operating Officer

Page 3 of 8

STATE OF ___Alabama___

COUNTY OF ___Mobile___

I, ___Cynthia M. Long___ a notary public, in and for said County in said State, hereby certify that John F. Watson, whose name as Co-Trustee of the State Line Oil Trust is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in his capacity as such Co-Trustee, executed the same voluntarily on the day the same bears date.

Given under my hand and notarial seal this the 28ᵗʰ day of ___April___, 2015.

___Cynthia M. Long___
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: ___7/14/18___

STATE OF _____

COUNTY OF _____

I, _____, a notary public, in and for said County in said State, hereby certify that David B. Foshee, whose name as Co-Trustee of the State Line Oil Trust is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in his capacity as such Co-Trustee, executed the same voluntarily on the day the same bears date.

Given under my hand and notarial seal this the ____ day of_____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF COLORADO

COUNTY OF BOULDER

I, _____, a notary public, in and for said county in said state, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and notarial seal this the ____ day of_____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

    I, _____, a notary public, in and for said County in said State, hereby certify that John F. Watson, whose name as Co-Trustee of the State Line Oil Trust is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in his capacity as such Co-Trustee, executed the same voluntarily on the day the same bears date.

    Given under my hand and notarial seal this the ____ day of _____, 2015.

                          _____
                          NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _Texas_____

COUNTY OF _Fort Bend_

    I, _N. Felix_____, a notary public, in and for said County in said State, hereby certify that David B. Foshee, whose name as Co-Trustee of the State Line Oil Trust is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in his capacity as such Co-Trustee, executed the same voluntarily on the day the same bears date.

    Given under my hand and notarial seal this the _20_ day of _April____, 2015.

[AFFIX NOTARIAL SEAL]

> N. FELIX
> Notary Public, State of Texas
> My Commission Expires
> April 16, 2017

                          _____
                          NOTARY PUBLIC

My Commission Expires: _04/16/2017_

STATE OF COLORADO

COUNTY OF BOULDER

    I, _____, a notary public, in and for said county in said state, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

    Given under my hand and notarial seal this the ____ day of _____, 2015.

                          _____
                          NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Page 4 of 8

STATE OF _____

COUNTY OF _____

      I, _____, a notary public, in and for said County in said State, hereby certify that John F. Watson, whose name as Co-Trustee of the State Line Oil Trust is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in his capacity as such Co-Trustee, executed the same voluntarily on the day the same bears date.

      Given under my hand and notarial seal this the ____ day of _____, 2015.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

      I, _____, a notary public, in and for said County in said State, hereby certify that David B. Foshee, whose name as Co-Trustee of the State Line Oil Trust is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in his capacity as such Co-Trustee, executed the same voluntarily on the day the same bears date.

      Given under my hand and notarial seal this the ____ day of _____, 2015.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF COLORADO

COUNTY OF BOULDER

      I, *GEOFFREY DAVID NENNINGER*, a notary public, in and for said county in said state, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

      Given under my hand and notarial seal this the *3ᵒ* day of *APRIL*, 2015.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: *AUGUST 15, 2017*

> GEOFFREY DAVID NENNINGER
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY ID 20134051884
> MY COMMISSION EXPIRES AUGUST 15, 2017

**EXHIBIT "A"**

Attached to and made a part of that certain Geophysical Permit and Lease Option Agreement dated April 7, 2015 by and between STATE LINE OIL TRUST and SKLARCO L.L.C.

### MT. CARMEL SEISMIC PROSPECT
### ESCAMBIA COUNTY, ALABAMA &
### SANTA ROSA COUNTY, FLORIDA

EXHIBIT "A-1"

Attached to and made a part of that certain Geophysical Permit and Lease Option Agreement dated April 7, 2015 by and between STATE LINE OIL TRUST and SKLARCO L.L.C.

| ESCAMBIA COUNTY, ALABAMA | Gross Mineral Acres | Net Mineral Acres |
|---|---|---|
| **Township 1 North, Range 9 East** | | |
| Section 15:  All that part of the SE1/4 of NE1/4 (2.3 acres) lying south and east of L.&N. Railroad; all that part of NE1/4 of SE1/4 (4.3 acres) lying south and east of L.&N. Railroad; all that part of SE1/4 or SW1/4 (10.9 acres) lying south and east of L. & N. Railroad; all that part of SW1/4 of SE1/4 (37.4 acres) lying south and east of L. & N. Railroad; and all that part of NE1/4 of SE1/4 (33.6 acres) lying south and east of L. & N. Railroad; and all of SE1/4 of SE1/4. | 128.5 | 64.250 |
| Section 22:  S1/2 of NW1/4 and E ½ of SW1/4 (except S1/2 of NE1/4 of SW1/4) and W1/2 of SE1/4. | 220.18 | 110.090 |
| Section 23: All of SE1/4 of SE1/4 (9 acres) lying east of Conecuh River, and all of SW1/4 of SE1/4 (17 acres) lying west of Conecuh River. | 26.00 | 13.000 |
| Section 24: SE1/4 of NE1/4 and E1/2 of SE1/4 and NW1/4 of SE1/4 and SW1/4 of SW1/4 and that part of NW ¼ of SW1/4 (15 acres) lying south and east of Conecuh River. | 222.85 | 111.425 |
| Section 25:  E1/2 of E1/2 and NE1/4 of NE1/4 and N1/2 of SW1/4 and SW1/4 of SW1/4 (except 1 acres as follows:  Begin at southeast cor. of SW1/4 of SW1/4 and run north 8.5 ch., west 3.3 ch. for starting point; north 3.17 ch., west 3.17 ch., south 3.17 ch., east 3.17 ch. to starting point); and NW1/4. | 505.85 | 252.925 |
| Section 26:   E1/2 (except Fraction of 10 acres of NW1/4 of NE1/2 north and west of Conecuh River) and NE1/4 of NW1/4. | 350.56 | 175.280 |
| Section 27:   NW1/4 of NW1/4 and SW1/4 of SW1/4 and E1/2 (except E1/2 of SE1/4) and NE1/4 of NW1/4 and SE1/4 of SW1/4. | 400.60 | 200.300 |
| Section 33: NE1/4. | 160.00 | 80.00 |
| Section 34: All (except NW1/4 of NW1/4 and SE1/4 of NW1/4 and SW1/4 of NE1/4). | 540.15 | 270.075 |
| Section 35:  N1/2 (except SE1/4 of NE1/4) and S1/2 of SE1/4 and NW1/4 of SE1/4 and W1/2 of SW1/4. | 477.84 | 238.920 |
| Section 36: W1/2 of NE1/4 (except 1 acre in NW corner) and SE1/4 of NE1/4 and E1/2 of W1/2 of SE1/4 and N1/2 of NW1/4 and NW1/4 of SE1/4 (except 3 acres in northwest corner of NW1/4 of SW1/4. | 274.71 | 137.355 |
| | | |
| **Township 1 North, Range 10 East** | | |
| Section 7: S1/2 of SE1/4. | 79.25 | 39.625 |
| Section 9:  SW1/4 of SW1/4 (being 38.9 acres); and all NW1/4 of SW1/4 lying south and west of Conecuh River (28.9 acres) and all NE1/4 of SW1/4 lying south of Conecuh River (12 acres); and SW1/4 of NW1/4 lying south of Conecuh River (7 acres). | 86.80 | 44.900 |
| Section 10:  SE1/4 of NE1/4 and NE1/4 of SE1/4 and SW1/4 of NW1/4. | 114.36 | 57.180 |
| Section 11:   S1/2 of NE1/4 and SE1/4 and E1/2 of SW1/2 and SW1/4 of SW1/4. | 342.81 | 171.405 |
| Section 12:   NW1/4 of SE1/4 and W1/2 of NW1/4 lying south of river and SE1/4 of NW1/4 and NW1/4 of SW1/4 and SE1/4 of SW/4. | 234.24 | 117.120 |
| Section 13: E1/2 and E1/2 of W1/2 and NW1/4 of SW1/4. | 522.14 | 260.070 |

| | | |
|---|---|---|
| Section 14: N1/2 (except 5 acres in southeast corner of NE1/4 of NW1/4) and N1/2 of SE1/4 and SW1/4 of SE1/4 and N1/2 of SW1/4 (except 1 acre in southwest corner of NW1/4 and SW1/4) and E1/2 of SW1/4 of SW1/4. | 535.48 | 267.740 |
| Section 15: E1/2 (except NE1/4 of SE1/4) and SW1/4 of NW1/4 and SW1/4. | 400.00 | 200.000 |
| Section 16: All (except NE1/4 and NE1/4). | 600.79 | 300.395 |
| Section 17: E1/2 (except 10 acres described as follows: Begin at northeast corner of NW1/4 of NE1/4 and run south 140 yards, west 350 yards, north 140 yards, east 350 yards to point of beginning); and W1/2 of W1/2 (except NW1/4 of SW1/4) and S1/2 of SE1/4 of NW1/4 and SE1/4 of SW1/4. | 488.63 | 244.315 |
| Section 18: E1/2 of E1/2 and W1/2 of NE1/4 and NW1/4 of SE1/4 and E1/2 of W1/2 and SW1/4 of NW1/4. | 478.68 | 239.340 |
| Section 19: NE1/4 of NE1/4 and NW1/4 of SE1/4 and S1/2 of SE1/4 and W1/2. | 478.68 | 239.340 |
| Section 20: E1/2 of E1/2 (except 1 acre square in the northwest corner of NE1/4 of SE1/4) and NW1/4 of NE1/4 and NW1/4 and NE1/4 of SW1/4. | 399.10 | 199.550 |
| Section 21: Entire. | 639.60 | 318.800 |
| Section 22: All (except NE1/4 of NE1/4). | 598.76 | 299.380 |
| Section 23: SE1/4 of NE1/4 and NW1/4 of NE1/4 (except 1 acre, commencing at northwest corner of NW1/4 of NE1/4 and run south 6.80 ch. to starting point; thence south 6.34 ch., thence east 1.58 ch., thence north 6.34 ch., thence west 1.58 ch. to starting point) and E1/4 of NE1/4 of SE1/4 and E1/2 of W1/2 of NE1/4 of SE1/4 and SE1/4 of SE1/4 and S1/2 of NW1/4 and SW1/4. | 389.19 | 194.595 |
| Section 24: NE1/4 (except SE ¼ of SE1/4 of NE1/4) and E1/2 of NW1/4 and N1/2 of SW1/4. | 315.82 | 157.910 |
| Section 25: S1/2 of SE1/4 and W1/2. | 409.50 | 204.750 |
| Section 26: E1/2 of NE1/4 and SE1/4 and W1/2. | 561.12 | 280.560 |
| Section 27: Entire. | 639.28 | 319.640 |
| Section 28: E1/2 and E1/2 of SW1/4 and NW1/4 of SW1/4. | 438.35 | 219.175 |
| Section 29: All (except NW1/4 of NE1/4 and N1/2 of N1/2 of N1/2 of NE1/4 of NW1/4). | 596.05 | 298.025 |
| Section 30: E1/2 (except N1/2 of NE1/4 of NE1/4) and E1/2 of W1/2 and NW1/4 of NW1/4 and W1/2 of SW1/4. | 580.29 | 290.145 |
| Section 31: N1/2 (except 4 acres in SE cor. of SW1/4 of NW1/4) and E1/2 of SE1/4 and N1/2 of NW1/4 of SE1/4 and S1/2 of SE1/4 of SW1/4 and SW1/4 of SW1/4. | 458.12 | 229.060 |
| Section 32: NE1/4 (except S1/2 of SW1/4 of NE1/4) and N1/2 of SE1/4 and SE1/4 of SE1/2 and W1/2. | 532.88 | 266.440 |
| Section 33: All (except SE1/4 of SE1/4). | 551.25 | 276.125 |
| Section 34: E1/2 of NE1/4. | 73.74 | 36.870 |
| Section 35: N1/2 and SE1/4 of SE1/4 and NE1/4 of SW1/4. | 367.70 | 183.850 |
| | | |
| **Township 6 North, Range 28 West** | | |
| Section 29: All Fractional Section. | 36.87 | 18.435 |
| Section 30: Fraction of Fractional Section 30, Township 6 N., Range 28 W., described as follows: Beginning at southwest corner of Fractional Sec. 30, run east about 280 yards, thence north about 80 yards, thence west about 280 yards, thence south about 70 yards to starting point, containing about 4 acres, more or less. Beginning at southeast corner of Fractional Sec. 30, said township and range, being on Alabama and Florida line, and run west about 1220 yards, thence north about 80 yards, thence east about 1220 yards, thence south about 90 yards to a starting point, containing in all 34 acres, more or less, begin all of said Fractional Section except 4 acres | 24.00 | 12.000 |

| | | |
|---|---|---|
| reserved by Lewis L. Thompson, beginning about 280 yards from southwest corner and lying thence east about 260 yards. | | |
| | | |
| **Township 6 North, Range 29 West** | | |
| Section 25:  All Fractional Section. | 20.33 | 10.165 |
| Section 27:  All Fractional Section. | 14.62 | 7.310 |
| Section 29:  All Fractional Section. | 15.54 | 7.770 |
| | | |
| **Total for Escambia County, Alabama** | **15,341.21** | **7,670.605** |

**EXHIBIT "B"**

Attached to and made a part of that certain Geophysical Permit and Lease Option Agreement dated April 7, 2015 by and between STATE LINE OIL TRUST and SKLARCO L.L.C.

**OIL, GAS AND MINERAL LEASE**

STATE OF ALABAMA

COUNTY OF ESCAMBIA

THIS AGREEMENT, to be effective on the _____ day of _____, 201___, between John F. Watson and David B. Foshee, as Co-Trustees of the STATE LINE OIL TRUST (a copy of said trust being recorded in real property records of the Probate Court of Escambia County, Alabama, in Book 75 beginning at page 573, and in the real property records of the office of Clerk of Court of Santa Rosa County, Florida in Deed Book A-48, beginning at page 76) (hereinafter referred to as "LESSOR") of 1 Vickers Place, Mobile, Alabama 36608, and **SKLARCO L.L.C.** (hereinafter referred to as "LESSEE") of 5395 Pearl Parkway, Suite 200, Boulder CO 80301.

**W I T N E S S E T H:**

1.   LEASE CONSIDERATION

LESSOR, in consideration of Ten and No/100 Dollars ($10.00), in hand paid, of the royalties and other benefits herein provided, and of the agreements of LESSEE herein contained, but subject to the further terms hereof, hereby GRANTS, LEASES AND LETS exclusively unto LESSEE for the purpose of investigating, exploring, prospecting and drilling for and producing oil and gas, the lands (hereinafter referred to as the "Leased Premises"), described in and on Exhibit "A", attached hereto and identified as such, which said Exhibit as so attached and identified, is incorporated herein by reference and made a part hereof for a more particular description of said land, for the purpose of calculating and determining the amount of any money  payment hereunder, and for all other pertinent purposes of this Lease.  The land therein described is hereby estimated, and shall be regarded and treated as actually comprising and containing _____ net acres, whether it be more or less, and in the event of a partial assignment or surrender hereof or hereunder, the assigned or surrendered portion or portions shall be deemed to contain the number of acres estimated realistically in such instrument or assignment or surrender.  The term "oil and gas" as used in this Lease shall mean oil, gas, casinghead gas, distillate, gas condensate and the by-products thereof, and such other hydrocarbon substances and sulphur as are necessarily produced with and incidental to the production of oil and gas. LESSOR hereby reserves and excepts from this Lease and the rights granted hereunder any and all coal, lignite, uranium and other fissionable materials, geothermal energy, base and precious metals, rock, stone, limestone, sand, gravel and other similar aggregates, and clay, and retains unto itself and other subsequent or concurrent lessees of interests therein the right to explore for and produce such reserved minerals.

2.   TERM

Subject to the preservation provisions of subsection 3.4.1 and Section 5 hereof, this lease shall be for a term of **THREE (3)** years from this date (called "primary term") and for so long thereafter as oil or gas is produced in paying quantities from the Leased Premises or this Lease is otherwise maintained in force and effect under the terms hereof.

3.   RESERVATION OF ROYALTIES

3.1   LESSOR hereby reserves, and LESSEE hereby agrees to pay or deliver to LESSOR, the following royalties on account of the oil and gas produced  from the Leased Premises in accordance with, but subject to, all subsequent subsections hereof:

3.1.1   AS TO OIL:

**25%** of all oil, condensate and/or other liquid hydrocarbons, produced and saved from the Leased Premises, or from a unit embracing all or a portion thereof, the same to be delivered, free of cost, at the mouth of the well, or, at LESSOR's option, to the credit of Lessor into the pipe line or lines to which LESSEE may connect its wells; provided, however, that LESSEE may purchase LESSOR's oil, condensate and/or other liquid hydrocarbons by paying to LESSOR the average posted market price of such royalty share then in effect for such oil, condensate and/or other liquid hydrocarbons at the wells as of the day  such substances are run to the pipe line or storage tank.

3.1.2   AS TO GAS:

**25%** of the market value, hereinafter defined, of all gas and casinghead gas produced and saved from the Leased Premises, or from a unit embracing all or a portion thereof.

3.2   LESSOR specifically reserves hereby the right to take in kind or separately dispose of its proportionate royalty share of all oil and/or gas produced from the Leased Premises, or from a unit embracing all or a portion thereof, and, in the event such an election is made, shall be required to pay only for the proportionate share of such part of LESSEE's surface facilities which it uses.

3.3   PAYMENT AND DELIVERY OF LESSOR'S ROYALTIES:

3.3.1   Any and all royalties due and owing to LESSOR in accordance herewith shall be payable or deliverable to LESSOR no later than 60 days after the end of the calendar month within which oil and/or gas production is sold; provided however, that the acceptance of any such royalty by LESSOR shall never be taken or construed as a waiver of any of LESSOR's rights or remedies for breach by LESSEE, its successors or assigns, of any express or implied covenant of this Lease.

1

3.3.2    Any payment of any royalty after the date specified in subparagraph 3.3.1 above shall bear interest from and after its respective due date until payment in full is received by LESSOR, said interest factor to be equivalent to the prime rate, as the same shall be set from time to time by the BankTrust of Mobile, Alabama (or any successor to said bank). Furthermore, if LESSEE should fail to pay any royalty or royalties payable hereunder when the same shall become due, LESSOR shall have the specific right and option to terminate this Lease forthwith for such non-payment if such royalties due and payable to LESSOR are not delivered to the said LESSOR on or before the expiration of sixty (60) days after LESSEE receives written notice from LESSOR of LESSEE's failure to pay all royalties when due.

3.3.3    All royalties payable to LESSOR under the terms and provisions of subparagraph 3.1 hereof are payable and shall be paid in cash or by check delivered or mailed to LESSOR at its principal place of business in Brewton, Alabama, or at such other address as LESSOR may designate.

3.3.4    In the event LESSOR should elect to take in kind its royalty on any one or more substances covered by this Lease, LESSOR may exercise such option at any time and from time to time upon 60 days written notice to LESSEE, in which event LESSEE shall deliver same, free of cost other than as provided in 3.2 to LESSOR, to and into LESSOR's pipe lines, tanks or other storage or transportation facilities until 60 days after receipt of written notice that LESSOR has revoked such option and has elected to receive any such royalty interest or share in cash or by check payable at its designated address as hereinabove provided. Except to the extent to which LESSOR may have exercised its option to take one or more of its royalty interest or share in kind, as herein provided, LESSEE may, subject to all pertinent provisions of this Section 3 of this Lease, barter, contribute, dispose of, exchange, sell swap or use any one or more of said substances covered by this Lease, but shall account to LESSOR therefore to the extent and in the manner hereinabove provided.

3.4    MONETARY SUBSTITUTES FOR ACTUAL PRODUCTION

3.4.1.    Shut-In Royalty on Suspended Production

(a)    While there is a well on the Leased Premises capable of producing gas in paying quantities, as said phrase is hereinafter defined, but the production there from is shut-in, shut down, or suspended for any reason, then and in any such event, LESSEE shall pay royalty on or before ninety (90) days after the date on which (1) production from any such well is shut-in, shut down or suspended, or (2) this Lease is no longer maintained by compliance with one of the other preservation provisions, hereof, (whichever is the later date, and thereafter at annual intervals during the primary term, a sum and amount equal to One Dollar ($1.00) multiplied by the number of acres then covered by this Lease), and after the expiration of the primary term, a sum and amount equal to Twenty Five Dollars ($25.00) multiplied by the number of acres then covered by this Lease, and, if such payments are made, this Lease shall not terminate, but, on the contrary, will continue in full force and it will be considered that a substance covered by this Lease is being produced from the Leased Premises in paying quantities within the meaning of each pertinent provision of this Lease, it being understood and agreed that such payments shall only apply to the geologic strata capable of producing gas in paying quantities.

(b)    The provisions of subparagraph 3.4.1(a) shall not apply to oil wells, as the same may be classified by the State Oil and Gas Board of Alabama, by the Florida Department of Natural Resources or by its Bureau of Geology, and this Lease shall not be kept in force solely by the payment of any shut-in royalty payment on any such well.

(c)    After the primary term hereof, this Lease may not be kept in force solely by the payment of shut-in royalties hereunder for more than a period of two (2) consecutive years after the date of the first payment of any shut-in royalty hereunder.

3.4.2    Take or Pay Product Purchase Contracts

(a)    No "take or pay" products purchase contract shall be finally consummated or valid as to any substance covered hereby and produced from the Leased Premises without LESSOR's written consent.

(b)    All royalties hereunder applicable to gas, casinghead gas, or any other gaseous hydrocarbon covered by this Lease shall be due and payable to LESSOR for any such gas paid for but not taken pursuant to any "take or pay" provision of any pertinent gas purchase contract covering the Leased Premises, any part thereof, and/or any well or wells thereon, but LESSOR agrees to be responsible and liable for its proportionate share of any payments that may be recoverable by the gas purchaser by later takes of gas or refunds of money. In the event gas is taken in kind as recoupment of take or pay payments, that gas shall be exempt from any royalties.

3.5    LESSEE shall not conduct underground storage operations without the written consent of LESSOR.

3.6    LESSEE shall not use nuclear or other blasts to create artificial conduits, chimneys or reservoirs without the written consent of LESSOR, and if such consent is given, LESSEE shall not use such artificial conduits, chimneys or reservoirs without the additional written consent of LESSOR.

3.7    All pertinent subparagraphs of this Paragraph 3 of this Lease shall apply to and govern the delivery in kind as royalty, or the payment of royalties on all such elements, natural products, by-products, residues or residuals produced from, or allocable to the Leased Premises, under the terms of, or as a result of, revised,

2

permanent or temporary pooling, spacing or unitizing orders or rules issued by the State Oil and Gas Board of Alabama.

### 3.8   FREE FUEL AND WATER

#### 3.8.1   Free Water

LESSEE shall have free use of any and all subsurface water during any primary operations conducted hereunder.

#### 3.8.2   Free Fuel

LESSEE shall have free use, during any primary operations conducted hereunder, of any and all fuel or other substances covered by this Lease and produced from the Leased Premises, and the royalties thereon due and payable to LESSOR shall be computed after deducting any amount of any such substance so used.

#### 3.8.3   For the purposes of this subparagraph 3.8, primary operations shall include the production of oil and gas and all operations associated therewith during such time as oil and gas, or either of them, are produced from a unit embracing all or a portion of the Leased Premises with the sole use of natural reservoir energy.   Primary operations shall not include secondary recovery, pressure maintenance, or other operations related thereto.

3.9   Any and all royalties due and payable to LESSOR pursuant to this Paragraph 3 shall be so paid to LESSOR, or to the credit of LESSOR, free of any and all exploration, development, production, treatment, gathering, marketing, or other related costs, excepting any taxes which may be applicable to such royalties.

### 4.   DELAY RENTALS          THIS IS A PAID-UP LEASE. NO DELAY RENTAL IS DUE.

4.1   The cash down payment or bonus given for the execution of this Lease constitutes a part of the consideration hereof according to its terms and shall not be allocated as mere rental for a period.

### 5.   CONTINUOUS OPERATIONS

5.1   If, prior to the discovery and production of any substance covered by this Lease on or from the Leased Premises or from a unit embracing any portion thereof, LESSEE should drill a dry hole or holes thereon, or, if after discovery and production of any such substances covered by this Lease, the production thereof should cease for any reason, this Lease shall not terminate if LESSEE commences operations for drilling or reworking within ninety (90) days thereafter or pays shut-in royalty as provided by 3.4.1.

5.2   If upon or after the expiration of the primary term of this Lease, no substance covered hereby is being produced from the Leased Premises or lands pooled therewith in paying quantities, as said phrase is hereafter defined, but LESSEE is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within ninety (90) days prior to the end of the primary term, this Lease may be continued in force if, within ninety (90) days from and after the completion of the preceding well, or the cessation of operations thereon if it is dry and unproductive, LESSEE commences or causes to be commenced 1) drilling operations on an additional well on some part or portion of  the Leased Premises lying outside of any previously established  drilling or production allowable unit or 2) reworking operations on any  well previously drilled and completed on the Leased  Premises or on a unit containing all or any portion thereof.  After having so commenced the drilling or reworking  operations described above, LESSEE  may perpetuate the term of this Lease through drilling or reworking operations or the completion or abandonment of additional wells, with no more than ninety (90) consecutive days elapsing between the completion or abandonment of one such additional well and the commencement of drilling or reworking operations for another well on another unit or tract until the entire Leased Premises has been developed to the density, degree and extent permitted by any applicable statewide or field rules, or until at least one oil or gas well has been drilled and completed or abandoned under each such unit or units that may be established within the Leased Premises; provided additionally, that if any of the foregoing drilling or reworking operations result in paying production of any substance covered by this Lease, then this Lease shall remain in force as to the productive unit or units, subject to the further provisions hereof, for so long thereafter as any such substance is produced from the Leased Premises or from land pooled therewith in paying quantities, as that phrase is defined hereinafter.

### 6.   FORCE MAJEURE

6.1   Should LESSEE be prevented from complying with any express or implied covenant of this Lease, from conducting drilling, reworking or marketing operations, or from producing or marketing the substances covered by this Lease, by operation of force majeure, war, rebellion, devastating fires or floods, orders, rules or regulations of State or Federal governmental authority, or by other such other acts or events beyond the control or LESSEE, then while so prevented,  LESSEE's obligation to comply with such covenant shall be suspended, LESSEE  shall not be liable in damages for failure to comply therewith, and this Lease shall be extended while and so long as LESSEE is prevented by any such cause from conducting drilling, reworking, or marketing operations on or from producing oil and/or gas from the Leased Premises; provided, however, that neither force majeure nor any other cause similar or dissimilar to those described hereinabove shall confer upon LESSEE the right to extend this Lease for more than a period of twelve (12) months.

6.2   Notwithstanding anything to the contrary contained in subparagraph 6.1 above, LESSEE shall not be excused, through the operation of the foregoing force majeure provisions, from making of all proper and timely payments of royalties, shut-in royalties or all other payments required pursuant to the terms of this Lease.

### 7.   USE, DAMAGES TO, AND RESTORATION OF THE LEASED PREMISES

#### 7.1   USE OF THE SURFACE OF THE LEASED PREMISES

3

Subject to the further terms and provisions hereof, LESSEE shall have and is hereby given access to and use of so much of the surface of the Leased Premises as is reasonably necessary to conduct all activities and operations authorized, permitted and required by the terms of this Lease which do not unduly or unreasonably hamper, interfere with or restrict LESSOR's communicating, cultivating, farming, fishing, grazing, harvesting, hunting, logging, lumbering, milling, planting, seeding, transporting, trapping or other related or non-related activities and operations therein and thereon, it being the intention of the parties hereto to create and recognize between them reciprocal rights and complimentary estates. To this end, it is expressly AGREED, UNDERSTOOD, and hereby STIPULATED that:

### 7.1.1   LESSEE COVENANTS AND AGREES:

(a)     Not to use any more of the surface of the Leased Premises as is reasonably necessary to conduct all operations authorized, permitted and required by this Lease and specifically not to locate any well, treatment plant, flow line, gathering line, pipe line or other such facility closer than 330 feet from any house, cabin, shed, barn, silo, storage bin, feeding trough, or other structure located on the Leased Premises;

(b)     Not to grant to any third party or parties any easement for any pipeline unassociated with the transportation of oil and gas produced from the Leased Premises or from a unit embracing all or a portion thereof, any water line, transmission line, or other burden on the Leased Premises;

(c)     Not to fish, hunt or carry or use fishing gear or firearms onto the Leased Premises and to make every reasonable effort, by specific instructions, warnings, warning signs, or otherwise, to prevent its agents, executives, employees and personnel, or those furnishing material, supplies, physical equipment or third party services from fishing, hunting or carrying or using fishing gear or firearms on the Leased Premises; and

(d)     Not to cultivate, farm, graze livestock, harvest, log, lumber, mill, plant, seed, or conduct or engage in such other activities and operations similar or dissimilar in nature to those mentioned herein and not contemplated by the terms of this Lease.

### 7.1.2   LESSOR COVENANTS AND AGREES:

(a)     To maintain all fences and gates in good state of repair, and when and where it becomes absolutely necessary to cut or otherwise remove LESSOR's fences, to install adequate gates and cattleguards; and

(b)     To exercise all of its rights, privileges, powers and immunities, and to conduct its usual and customary activities and operations on the Leased Premises in a manner such that it will not unduly or unreasonably hamper, interfere with or restrict any operation or activity authorized, permitted or required by this Lease; and

(c)     To insure that any of its licensees, guests, invitees or subsequent lessees conduct their activities and operations so as not to hamper, interfere with or restrict unduly or unreasonably any operation or activity authorized, permitted or required by this Lease.

### 7.2   DAMAGES TO THE SURFACE OF THE LEASED PREMISES:

LESSEE COVENANTS AND AGREES:

(a)     To consult with and obtain the written release and consent of LESSOR before selecting or clearing sites for wells, pits, drainage ditches, receptacles, shafts, or locating, constructing or installing tank batteries, field-type separation devices, treating or processing mills or plants, laying pipe lines, gathering lines or flow lines, surveying and drilling shot holes for seismic surveys, or building roads, bridges or culverts on the Leased Premises; and, when requested by LESSOR, to bury all pipe lines, gathering lines and flow lines below  plow depth or the depth  to and at which LESSOR's timber or other seedlings are normally planted, whichever is deeper;

(b)     To conduct all seismic and other surveys in a manner so as not to damage LESSOR's water wells, tanks or reservoirs, and to conduct all operations so as not to permit any deleterious substance to collect, escape, pollute, run, seep, spread, stand or come in contact with or damage LESSOR'S blinds, boat docks, cattle, crops, fish, or other aquatic life, hunting or fishing camps or lodges, lakes, land, livestock, logs, lumber, logging and lumbering camps, mills, roads or tramways, ponds, reservoirs, seedlings, springs, streams, tanks,  timber, trees, vegetation, water wells, wildlife or any other things of value on, in, over or under the Leased Premises; and

(c)     To respond to and pay damages, based on replacement cost, cost of repairs,  or such other assessment to which LESSOR may agree, for the damage to, loss of, or diminution or depreciation of the beneficial use or value of any house, cabin, shed, barn, silo, storage bin, fence, crop, timber, lumber, vehicles, feeding trough or other thing of value lost, damaged or destroyed as a result of or through the conduct of any activity or operation authorized, permitted or required by this Lease or by any activity of LESSEE,  its agents, employees or representatives, which amounts to a breach of any covenant hereof.  This paragraph shall not apply where Lessor is negligent or involved in willful misconduct notwithstanding anything to the contrary, it is not intended that **SKLARCO L.L.C.** indemnify LESSOR for the negligent acts of LESSOR's servants or employees or for willful misconduct.

### 7.3   RESTORATION OF THE SURFACE OF THE LEASED PREMISES

LESSEE hereby covenants and agrees to maintain and/or restore the surface of the Leased Premises, immediately after the particular surface area of the said Leased Premises has served its purpose, in and to as

4

near as practicable its natural state before operations and activities began hereunder. To this end, it is expressly AGREED, UNDERSTOOD, and hereby STIPULATED that LESSEE covenants and agrees:

(a)     To dispose of all drilling mud, chemicals, tailings, waste, debris, and all other deleterious substances and/or materials in a lawful manner as approved by the State of Alabama or any other governing body;

(b)     To properly and promptly fill, roll, tamp and cover all pits and sumps after each pit and sump has served its particular purpose;

(c)     To close, securely seal and properly plug any and all wells drilled and abandoned hereunder;

(d)     To clean up and generally repair the site used for any well, pit, receptacle, shaft, tank, plant, or other physical facility;

(e)     To dispose of all saline solutions, saltwater, waste oil, and all other obnoxious and/or deleterious substances by removing them from the Leased Premises or through the use of authorized injection wells for disposal purposes; and

(f)     To take all other reasonable steps to maintain and preserve the Leased Premises in a clean and orderly manner.

8.     REMOVAL OF FIXTURES FROM AND TITLE TO ABANDONED WELLS

8.1     REMOVAL OF AND TITLE TO FIXTURES:

Subject to the further terms and provisions hereof, LESSEE shall have and is hereby given and granted the right to remove all property, physical equipment, facilities and fixtures placed on, in and under the Leased Premises by LESSEE within one hundred eighty (180) days after the expiration of this Lease, or, if the termination of this Lease or any portion thereof is in controversy, within one hundred eighty (180) days after final determination of such controversy, but not thereafter, it being understood and agreed that all wells, receptacles, shafts, tanks, well holes or bores, and any and all such property, physical equipment, facilities and fixtures remaining in, on or under the Leased Premises, including casing and other downhole equipment left in any such wells, upon and after the expiration of said 180 day period, shall then and thereupon become the property of LESSOR.

8.2     WATER WELLS:

LESSOR shall have and is hereby given and granted the option, at its election, of taking over and thereafter owning and operating any well initially drilled as or later converted to a water well and equipped as such by LESSEE, including all physical facilities and equipment placed by LESSEE therein, thereon, or used by LESSEE in connection therewith, which said well or wells LESSEE may at any time or from time to time elect to abandon by paying to LESSEE the reasonable salvage value of all such salvable physical facilities and equipment as of the date of abandonment by LESSEE; provided however, that as is provided in subparagraph 8.1 above, LESSOR shall nevertheless become the owner of all such water wells located on the Leased Premises and of the equipment therein, thereon or used in connection therewith upon the expiration of the said 180 day period.

8.3     TITLE MATTERS:

Insofar as it may be necessary to fully effectuate all provisions of this Paragraph 8, all apt words of grant, bargain, sale, conveyance, transfer and delivery are incorporated herein by reference and made a part of this said Paragraph 8 for all pertinent purposes.

9.     ADDITIONAL EXPRESS COVENANTS

By the acceptance of this Lease, and as a substantial part of the consideration therefore, LESSEE hereby expressly COVENANTS and AGREES:

9.1     After the discovery of oil or gas in paying quantities on said premises, LESSEE shall develop the acreage hereunder as a reasonably prudent operator. In the event a well or wells producing oil or gas in paying quantities should be brought in on other land in the vicinity of and draining the Leased Premises or acreage pooled therewith, LESSEE agrees to drill such offset well as a reasonably prudent operator would drill under the same or similar circumstances. Such offset well or wells shall be commenced within ninety (90) days after commencement of production in paying quantities from the well being offset;

9.2     To produce, gather, process, preserve, save, store, take care of, treat, transport and market said production, products, by-products, residues, residuals and tailing, and to conduct all such producing, gathering, processing, preserving, saving, storing, caring of, treating, transporting and marketing activities and operations at the time, with the rapidity, at the rate, and in the manner and to the extent that a reasonably prudent operator, acting under the same or similar circumstances, and with the best interests of both the LESSOR and LESSEE in mind and at heart, should or would so conduct such activities and operations;

9.3     To conduct pressure maintenance, or secondary recovery operations, or both, if the characteristics of the particular reservoir are such that, from sound engineering and economical standpoints, and with the best interests of both LESSOR and LESSEE in mind and at heart a reasonably prudent operator would or should conduct one or both such operations;

9.4     To market with due diligence and in good faith all oil and gas produced from a well or wells completed on the Leased Premises, or on a unit or units embracing any part thereof, which is not utilized by LESSEE pursuant to subparagraph 3.8 hereof;

5

9.5     To build, construct or install and to maintain and operate a mill or mills, or plant or plants, or with LESSOR's written consent, to enter contracts, in good faith and at arm's length, with independent processors, for the purpose of absorbing, assimilating, blending, compounding, concentrating, cycling, deriving, extracting, milling, processing, recovering, refining, saving, treating or upgrading all oil and gas initially produced from the Leased Premises, or from lands pooled therewith if such oil and gas, or either of them, are of such quality and in such quantity as to justify the building, constructing, installing, maintaining and operating of such a mill or plant by a reasonably prudent operator or processor, or to justify such a reasonably prudent operator entering  into such contracts with independent processors;

9.6     To install, maintain and operate one or more field-type device or devices such as but not limited to Bradenheads and separators, for the purpose of extracting, recovering or saving one or more elements of the oil and gas produced from the Leased Premises, or from lands pooled therewith, such as and including casinghead gas, distillate, gas condensate and natural gasoline if such oil and gas, or either of them initially produced from the said Leased Premises, or from land pooled therewith, are not of such quality or are not in such quantity as to justify plant processing;

9.7     To enter into contracts, in good faith and at arm's length, for the sale, at or near the wells, or elsewhere, of such products and substances, covered hereby and produced from the Leased Premises, or from lands pooled therewith, which are not of such quality or are not in such quantity as to justify the installation and operation of field-type devices described in subparagraph 9.6 above;

9.8     To furnish promptly to LESSOR, upon written request at its principal office and place of business in Brewton, Alabama or at such other address as LESSOR may designate in writing:

(a)     Copies, duplicates or reproductions of all location plats, applications for and permits to drill, daily drilling reports on and in connection with all wells drilled on the Leased Premises or lands pooled therewith; copies of all pipe perforation and well completion records; and copies of all reports and forms required by or filed with the State Oil and Gas Board of Alabama, and all other such regulatory bodies, state and federal, having jurisdiction;

(b)     Copies and duplicates or reproductions of all logs or surveys, drillers, electrical or otherwise,  of all wells drilled on the Leased Premises or lands pooled therewith; all surveys and similar data, all coring data and core analysis reports, core analyses, core records, reports or results of drill stem or other tests, and all other data and information obtained in connection with or as a result of the exploration, development, operation and protection of the Leased Premises;

Each and all of the foregoing covenants to be construed as those running with and touching and concerning this Lease and with the acreage constituting the Leased Premises.

10.     RIGHTS OF LESSOR

LESSOR, acting by and through its corporate officers, executives, agents or duly authorized representatives,  shall have and is hereby given and granted immediate access to and the absolute right, at its own risk, cost and expense, at any time and from time to time, to:

10.1     Observe, from the well site, derrick floor, drilling platform, or from any other vantage point, all drilling, completing, logging, surveying, producing, reworking, plugging and all other such or similar activities or operations conducted on the Leased Premises by LESSEE,  its agents, employees, independent contractors, or by those furnishing third party services.  Access to drilling rig and location may be denied in the event a life-threatening situation exists;

10.2     Make annual audits on LESSEE's accounts, contracts, books and records, at its own expense and at any reasonable time, for the purpose of ascertaining the amount of the production, sales and cost of manufacturing and extracting of any and all substances covered by this agreement.  Each such audit shall cover the period intervening since the last audit, and LESSOR shall have one (1) year next following the close of the calendar year in which said audit is made within which to present to and assert against LESSEE any and all claims or demands against LESSEE that may be disclosed by or result from said audit.

11.     ASSIGNMENT OF RIGHTS HEREUNDER

11.1     RIGHTS OF LESSOR:

The rights of Lessor hereunder may be assigned, either in whole or in part, and the provisions hereof shall extend to and be binding upon the parties hereto and their respective successors, assigns and legal representatives; provided however, that no change or division in the ownership of the lands covered hereby, royalties or other payments to accrue or become payable to LESSOR hereunder, however accomplished, shall operate to enlarge the obligations or diminish the rights of LESSEE,  and no change or division of such ownership shall be binding on LESSEE  until thirty (30) days after LESSEE shall have been furnished with a duly certified copy of the recorded instrument or instruments evidencing same.

11.2     RIGHTS OF LESSEE:

Notwithstanding anything to the contrary indicated herein, the rights of LESSEE hereunder may not be assigned in whole or in part, except by transfer or exchange of stock, merger, consolidation or reorganization without LESSOR's written consent, it being understood that for purposes of this subparagraph, LESSOR's written consent may be given by any officer of said corporation and that such consent will not be unreasonably withheld.   In the event such consent is requested and given, it shall not be construed as a waiver of LESSOR's right to approve any and all subsequent assignments thereafter.

12.     NOTICE OF NONCOMPLIANCE

6

In the event LESSOR considers that operations are not at any time being conducted in compliance with this Lease, LESSOR shall notify LESSEE in writing of the facts relied upon as constituting a breach of any obligation arising hereunder, and LESSEE, if in default, shall have sixty (60) days after receipt of such notice within which to comply with and satisfy any such obligation.

13.   CONSENT TO POOL

LESSEE shall have the right as to all or any part of the Leased Premises, without LESSOR's joinder, to combine the leasehold estate and LESSOR's royalty estate created by this Lease with any other lease or leases or lands, whether owned by LESSEE or some other person, partnership, firm, corporation or joint venture group, so as to create, by the combination of such leases, one or more operating or production units, provided that no single operating unit may embrace more than one hundred sixty (160) acres per oil well (plus 10% tolerance to allow for irregular sections) or six hundred forty (640) acres per gas well (plus 10% tolerance to allow for irregular sections), or such other amount authorized and required by the appropriate state agency having jurisdiction thereof, whichever said amount is the lesser.  In the event any such unit is created hereunder by LESSEE, LESSOR agrees to accept and shall receive out of the production from any such unit the royalties described in Paragraph 3 hereof, said royalties to be proportionately reduced and to be paid only on the percentage of production that the number of acres pooled from the Leased Premises bears to the total number of acres included within the respective unit.  The commencement or reworking of a well or the completion of a well to production (and production from such well) on any portion of a unit on which all or any part of the land described herein is embraced shall have the same effect under the terms of this Lease as if a well were commenced, reworked, completed or producing on the herein Leased Premises.

14.   SEVERANCE OF LEASEHOLD ACREAGE

14.1      Notwithstanding anything to the contrary herein contained (except for the provisions of Section 5, above), drilling or reworking operations on a pooled unit or units established as provided herein or by governmental authority shall maintain this Lease in force only as to the portion of the Leased Premises included in such unit or units, subject to further limitations set forth below.  The Lease may be maintained as to the remainder of the Leased Premises in any manner specified herein, including Section 5, above, and this paragraph shall not limit the ability of the Lessee to maintain this lease as to all property covered hereby by conducting continuous operations in accordance with Section 5, above.

14.2      It is hereby understood by and agreed between the LESSOR and LESSEE that in the event this Lease should lapse and terminate either through the operation of 1) this Paragraph 14,  2) Paragraph 3 hereof dealing with the payment and delivery of royalties and shut-in royalties on production of oil and gas established hereunder, 3) Paragraph 5 hereof dealing with the perpetuation of this Lease through continuous operations, or 4) any other applicable provisions herein, LESSEE shall nevertheless be entitled to retain, subject to all of the express and implied covenants of this Lease, sufficient acreage around each well producing oil or gas in paying quantities, as defined herein, from the Leased Premises, or from any part thereof included in a pooled unit, so as to constitute a maximum producing unit pursuant to the applicable field rule or rules of statewide coverage, such acreage to be designated by Lessee as nearly as practicable in the form of a square, or in such shape as then existing spacing rules require.

14.2.1      Once this Lease has expired except as to any retained producing units, the Lease shall remain in force and effect as to each such retained producing unit only as to all depths equal to or above one hundred (100) feet below the deepest depth of any well completed on the Leased Premises or lands pooled therewith and productive of oil and/or gas, and only for so long as there is production therefrom in paying quantities, or for so long as drilling or reworking operations are conducted on each such unit.

14.2.2      LESSEE shall be obligated to survey any and all retained producing units established pursuant to this subparagraph 14.2, and to file for record in the county and state wherein the Leased Premises are located a release or releases of all nonproductive acreage or depths not retained hereunder or  thereafter terminating due to cessation of production.  Upon written request from LESSOR, LESSEE shall furnish to LESSOR copies of all surveys and releases made and executed hereunder.

14.2.3      Should LESSOR own or otherwise control or hereafter acquire the ownership or control of the surface of the Leased Premises, LESSEE shall be entitled to receive from LESSOR such easements on, over and across said lands as shall be necessary to conduct operations on the acreage retained hereby.

15.   WARRANTY OF TITLE

15.1      This lease is given without warranty of any kind, either expressed or implied, but with full substitution and subrogation in and to all of the rights and actions that LESSOR now has or may hereafter acquire.

15.2      PROPORTIONATE REDUCTION:

If LESSOR owns less than the full fee simple title to the substances which this Lease purports to cover, then the royalties and payments provided for in Paragraph 3 hereof, and any and all other payments and benefits to accrue, become payable or inure to the benefit of LESSOR under the terms and provisions of this Lease shall be reduced in proportion that LESSOR's interest bears to the whole and undivided fee simple estate therein.

16.   GENERAL PROVISIONS

16.1      LESSOR hereby expressly covenants and agrees not to withhold, fail, or refuse unreasonably to give or grant its written consent whenever such consent shall be called for or required pursuant to any term or provision of this Lease.  Financial responsibility and operational staffing are deemed reasonable inquires as to proposed assignees.

16.2      LESSEE further agrees that it will indemnify and hold LESSOR harmless against any and all loss, damage, liability, cost or expense, including any claims, fines, penalties and reasonable attorneys' fees, on account of injuries to or death of persons or damage to property of any kind, arising out of or resulting from any operation hereunder; and in the event of any suit or other proceeding against LESSOR on account thereof, LESSEE shall, at

7

LESSOR's request, appear and defend same and LESSEE shall pay any assessment, judgment or settlement which may be rendered or given against LESSOR therein. Notwithstanding anything to the contrary, it is not intended that **SKLARCO L.L.C.** indemnify LESSOR's for gross negligence of LESSOR's servants or employees or for willful misconduct.

17.     <u>ADDRESSES</u>

    Any and all notices and/or requests required pursuant to the terms of this Lease, whether such notices and/or requests be of a general or specific nature, shall be mailed or otherwise delivered to the parties hereto at their respective business addresses listed below:

| | |
|---|---|
| STATE LINE OIL TRUST TRUSTEES | SKLARCO L.L.C. |
| 1 Vickers Place | Attn: J. Marshall Jones, III |
| Mobile, AL 36608 | 5395 Pearl Parkway, Suite 200 |
| Attn: John F. Watson | Boulder, CO 80301 |

18.     <u>GENERAL DEFINITIONS</u>

    A.     <u>PAYING QUANTITIES:</u> The phrase "paying quantities" as, when and wherever it appears in this Lease, is hereby defined as that quantum of production which will return a profit, regardless of how small, above, over or beyond producing, transporting, treating and marketing costs and expenses such as and including all direct and reasonable administrative, supervisory and overhead charges, all at the field, but not the district level, actually and fairly attributable, allocable or apportionable to such production; all labor, and all minor repairs to and maintenance of, physical facilities and equipment actually used and actually and fairly attributable, allocable or apportionable to such production, including actual, but not book, depreciation on all salvable equipment; all costs and expenses incurred and actually paid in connection with or resulting from all reworking and other operations designed to increase or restore production; all milling, treating, transporting and marketing costs and expenses incurred and actually paid; all ad valorem and other taxes assessed and actually paid; and all other such costs and expenses directly ,fairly and actually attributable, allocable or apportionable to such production but not to the drilling and completion of wells as such.

    B.     <u>DEVELOPMENT and/or PROTECTION WELLS:</u> Insofar as the express and implied covenants of this Lease are concerned, "development" and "protection" wells are hereby defined as wells which a reasonably prudent operator, acting under the same or similar circumstances as LESSEE may face hereunder, 1) would drill with reasonable expectations or prospects of completing as producers which would be likely to return a reasonable profit above, over and beyond drilling, completing, producing, marketing, treating and transporting costs, or 2) should drill pursuant to the express covenants set forth in Paragraph 9 hereof.

    C.     <u>EXPLORATORY WELLS:</u> Insofar as the express and implied covenants of this Lease are concerned, "exploratory" wells are hereby defined as wells which a reasonably prudent operator, acting under the same or similar circumstances as LESSEE may face hereunder, would drill for the purpose of fully exploring the Leased Premises, and every prospectively productive formation therein and thereunder, but not necessarily with expectations or prospects of completing as producers which would be likely to return a reasonable profit above, over and beyond drilling, completing, producing, marketing, treating and transporting costs.

    D.     <u>BARTER, CONTRIBUTE, DISPOSE,EXCHANGE, SELL, SEVER, SWAP, OR USE:</u> The words or terms "barter", "contribute", "dispose", "exchange", "sell", "sever", "swap" or "use", as, when and wherever they appear in this Lease, are hereby defined as a barter, contribution, disposition, exchange, sale, severance, swap or use, with LESSOR's written consent as the same shall be required herein, made in good faith, at arm's length, and with the best interests of both the LESSOR and LESSEE in mind and at heart .

    E.     <u>JUSTIFY:</u> The word or term "justify" as, when and wherever it appears in any Paragraph or subparagraph of this Lease, is hereby defined as that which is just, right, reasonable and warranted from an economic point of view.

    F.     <u>DRILLING OR REWORKING OPERATIONS:</u> Insofar as Paragraphs 5 and 14 of this Lease are concerned, the phrase "drilling or reworking operations" is hereby defined as the spudding in and actual drilling of an oil or gas well reasonably and with due diligence, and all work as operations designed to secure, restore or improve production through some use of a hole previously drilled, including, but not limited to, mechanical or chemical treatment of any horizon, deepening to test deeper strata, and plugging back to test shallower strata.

    G.     <u>COMMENCEMENT:</u> The word "commencement", as it is used and referred to specifically in Paragraph 5 hereof and generally in any other provision of this Lease, shall be defined as the actual spudding in of a well.

    H.     <u>COMPLETION:</u> The word "completion" as it is used and referred to specifically in Paragraph 5 hereof and generally in any other provision of this Lease, shall be defined as the actual operation of installing on the well in question valves, meters, gauges and other controls collectively referred to as the "christmas tree".

    I.     <u>MARKET VALUE:</u> Insofar as Paragraph 3 of this Lease is concerned, the term "market value" shall be defined as the applicable price determined under one of the following standards applicable to the sale of any gas produced hereunder:

    (1)     Where such gas is sold on the Lease or in the field where produced by LESSEE in an arms-length transaction, the price received by LESSEE under the terms of any gas purchase contract for gas produced and sold from the Leased Premises by LESSEE.

    (2)     Where such gas is not sold on the lease or from the field where produced by LESSEE in an arms-length transaction the average of the three highest prices paid under contracts entered into not more than one year previous to the date of first production of gas of the same or similar quality and content produced and sold from wells within the county and state wherein the Leased Premises are situated when gas is sold from a

8

well or wells on the Leased Premises. Said average to be determined on a semi-annual basis by LESSOR who shall submit the contractual information relied upon to LESSEE. Failure to determine said average and submit said contractual information to LESSEE semi-annually shall be an acceptance of the price received by LESSEE as a market value price for the succeeding six-month period.

IN WITNESS WHEREOF, the parties hereto have executed and accepted this instrument on the day and date hereinabove first written, in the presence of the undersigned, competent witnesses.

**LESSOR**

ATTEST:                                          **STATE LINE OIL TRUST TRUSTEES**

_____                          _____
                                                 John F. Watson, as Co-Trustee of Said Trust

_____                          _____
                                                 David B. Foshee, as Co-Trustee of Said Trust

**LESSEE**

**SKLARCO L.L.C.**

                                                 _____
                                                 By: David A. Barlow

STATE OF _____

COUNTY OF _____

I, _____, a notary public, in and for said County in said State, hereby certify that John F. Watson, whose name as Co-Trustee of the State Line Oil Trust is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in his capacity as such Co-Trustee, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the _____day of _____, 201___.

                                                 _____
                                                 NOTARY PUBLIC
My commission expires:

_____

STATE OF _____

COUNTY OF _____

I, _____, a notary public, in and for said County in said State, hereby certify that David B. Foshee, whose name as Co-Trustee of the State Line Oil Trust is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in his capacity as such Co-Trustee, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal on this the _____day of _____, 201___.

                                                 _____
                                                 NOTARY PUBLIC
My commission expires:

_____

STATE OF COLORADO

COUNTY OF BOULDER

I, _____, a Notary Public in and for the State and County aforesaid, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana Limited Liability Company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument and with full authority, executed the same voluntarily for and as the act of the said Company.

Given under my hand and official seal on this the _____day of _____, 201___.

                                                 _____
                                                 NOTARY PUBLIC
My commission expires:

_____

9

## EXHIBIT "A"

Attached to and made a part of that certain <u>OIL, GAS AND MINERAL LEASE</u> between **STATE LINE OIL TRUST** and **SKLARCO L.L.C.** with an effective date of _____, 201___.

All mineral interest owned by Lessor in Escambia County, Alabama, described as follows:

**ESCAMBIA COUNTY, AL:**

[INSERT PROPERTY DESCRIPTION]

Containing a total of _____ **net acres**, more or less.

**It is the intent to include all net mineral acreage as described within the respective quarter sections herein.**

SIGNED FOR IDENTIFICATION BY LESSOR:

**STATE LINE OIL TRUST**

By: _____

By: _____

SIGNED FOR IDENTIFICATION BY LESSEE:

**SKLARCO L.L.C.**

By: _____

## EXHIBIT "A-4"

Attached to and made a part of that certain Amended and Restated Participation Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc.

## OPTION
### (State Line Oil Trust – Florida)

STATE OF FLORIDA

COUNTY OF SANTA ROSA

### GEOPHYSICAL PERMIT & LEASE OPTION AGREEMENT

THIS AGREEMENT made and entered into as of the 7th day of April, 2015, by and between John F. Watson and David B. Foshee, as Co-Trustees of the STATE LINE OIL TRUST (a copy of said trust being recorded in real property records of the Probate Court of Escambia County, Alabama, in Book 75 beginning at page 573, and in the real property records of the office of Clerk of Court of Santa Rosa County, Florida in Deed Book A-48, beginning at page 76), whose mailing address is 1 Vickers Place, Mobile, Alabama 36608, hereinafter referred to as "Grantor" and SKLARCO L.L.C., a Louisiana limited liability company, represented herein by its duly authorized President – Chief Operating Officer, David A. Barlow, whose mailing is 5395 Pearl Parkway, Suite 200, Boulder, CO  80301, hereinafter referred to as "Grantee."

### A. CONSIDERATION AND OPTION

For and in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the agreements herein contained and subject to the terms and conditions hereinafter set forth, Grantor hereby grants unto Grantee the exclusive option for a period beginning on the date of this agreement and ending on April 7, 2017, hereinafter called "Option Period," to acquire an Oil, Gas and Mineral Lease or leases with a three year primary term covering all of Grantor's interest in all or any portion of that certain property situated in Santa Rosa County, Florida described in Exhibit "A-1," attached hereto and made a part hereof, together with the exclusive right, during the Option Period, to conduct or cause to be conducted geophysical and other exploration surveys on said property for the purpose of exploring same for the possible existence of oil, gas and other hydrocarbons (all such permitted methods of exploration being collectively referred to as "Seismic Operations"). It is the intention of the Grantor to grant to the Grantee a Geophysical Permit and Option to Lease all mineral interest owned by Grantor within the area outlined in black (the Mount Carmel Seismic Prospect) on Exhibit "A," attached hereto and made a part hereof, whether properly and correctly described herein or not. Grantee shall pay to Grantor upon execution of the agreement twenty-five dollars ($25.00) per net mineral acre covered by this option.

### B. EXISTING MINERAL LEASES

Grantor hereby declares that some portion of the lands set forth in Exhibit "A-1" may be currently subject to the terms and conditions of various Oil, Gas and Mineral Leases (the "Existing Mineral Leases") in favor of various third party mineral Lessees (hereinafter the "Existing Mineral Lessees"). Grantor makes no representation, express or implied, whether Grantee may exercise the right granted herein without the prior express written consent of one or more of the Existing Mineral Lessees. This agreement is made expressly subject to all of the terms and conditions of the said Existing Mineral Leases, and the rights, if any, of the Existing Mineral Lessees there under. Grantee shall be solely responsible for identifying all Existing Mineral Leases bearing upon the Land and obtaining all, if any, necessary consents or permits from the Existing Mineral Lessees prior to commencing operations on or under lands subject to the Existing Mineral Leases. Further, Grantee expressly agrees herein to indemnity and hold Grantor harmless from any and all causes of action by any Existing Mineral Lessee arising out of or relating to the exercise by Grantee of the rights contained herein, including, but not limited to, any and all claims or causes of action for seismic or geophysical trespass. In the event that any Existing Mineral Leases should expire during the term of this Agreement, then the lands covered by same shall be covered by this Agreement.

### C. OPERATIONS & VENUE

Grantee shall compensate Grantor for all damages suffered by Grantor, including

damage to timber, buildings or improvements or injuries to persons arising out of or in connection with Grantee's operations on the land covered by this agreement.

Grantee shall conduct said seismic operations and surveys or cause same to be conducted in a workmanlike manner, according to accepted industry practice, and all applicable federal, state, county, and local rules, regulations, and statutes. Grantee further agrees to indemnify and hold Grantor harmless from and against all claims and damages of every nature that might arise as a result of Grantee's operations, and further agrees to cooperate fully with Grantor with respect to all current and proposed seismic operations conducted on permitted property. Specifically, prior to entering onto the land, Grantee shall furnish to Grantor a plat identifying the approximate location of the seismic lines or grid pattern, together with the location of each shot point or group of shot points, and the total number of holes or shot points which arc to be placed, bored or shot on said lands.

In the event of litigation between the parties, the parties agree that Alabama Law shall control and apply to this agreement and the proper venue to any suit or claim shall be Escambia County, Alabama.

## D. EXERCISE OF OPTION AND LEASE EXECUTION

In the event Grantee desires, at any time and from time to time, to exercise the option granted in Paragraph A, Grantee shall, prior to the expiration or termination of the Option Period, notify Grantor in writing. Thereafter, Grantor shall prepare two copies of Oil, Gas and Mineral Lease(s) covering land to be leased, together with two (2) copies of a Memorandum of Oil, Gas and Mineral Lease. Checks payable to Grantor, in an amount equal to 100% of the total aggregate initial bonus payment due under such lease (s) shall be paid to Grantor within 3 business days of the delivery of lease. The total aggregate initial bonus payment shall be computed on the basis of two hundred dollars ($200.00) per net mineral acre for each and every acre to be covered by the lease(s).

The parties hereto agree that any such leases shall cover an undivided 100% of the interest owned by Grantor in the lease premises. It is further agreed and understood that any single lease shall not cover less than all mineral interest owned by Grantor in a governmental quarter section subdivision.

Except with respect to the description of acreage to be covered, all leases acquired by Grantee hereunder shall be in the identical form and contain the same terms, conditions and provisions as the Oil, Gas and Mineral Lease attached hereto as Exhibit "B".

Promptly after receipt of the aforesaid memorandum, leases and payment of lease bonus, Grantee shall execute and return to Grantor one (1) copy of each Oil, Gas and Mineral Lease and Memorandum of Oil, Gas and Mineral Lease. Grantee shall promptly record Memorandum of Oil, Gas and Mineral Lease and provide Grantor with recording information.

## E. GEOPHYSICAL DATA TO BE FURNISHED

Concurrent with this agreement, Grantee has entered into a similar Geophysical Permit with TRM Woodlands, Inc. to provide complete geophysical data on the proposed seismic block encompassing all of option property defined as Exhibit "A" as included within this agreement. It is specifically understood by Grantors that TRM Woodlands, Inc. will serve as custodian of said data for the Grantors and in consideration that all terms as to disclosure of said data as set out in TRM Woodlands, Inc. agreement shall be binding on Grantors, they shall be afforded access to the data in the possession of TRM Woodlands, Inc. on the same terms and conditions, and subject to the same restrictions, as TRM Woodlands, Inc.

## F. NOTICE

Any notice, communication or payment to a party hereunder may be given, sent, paid or tendered by postage prepaid mail addressed to said party at the address shown below or such other address as is hereafter designated in writing:

Page 2 of 7

For: STATE LINE OIL TRUST TRUSTEES
1 Vickers Place
Mobile, AL 36608
Attn: John F. Watson

For: SKLARCO L.L.C.                          With copy to:
5395 Pearl Parkway, Suite 200                C.P. Armbrecht
Boulder, CO 80301                            P.O. Box 290
Attn: J. Marshall Jones, III                 Mobile, AL 36601

G. SEVERABILITY

Any provision of this Agreement which is prohibited or unenforceable, in whole or in part, shall be ineffective only to the extent of such prohibition or unenforceability without invaliding the remaining provisions hereof. If the scope of any provision set forth in this Agreement is too broad to permit enforcement of such provision to its full extent, then such provision shall be enforced to the maximum extent permitted by applicable law and, if necessary, the scope of any such provision may be judicially modified to the minimum extent necessary in any proceeding brought to enforce such provision and thereafter such provision, as so modified, may be fully enforced. This Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this instrument in duplicate original counterparts, as of the date hereinabove written.

WITNESSES                                    STATE LINE OIL TRUST TRUSEES

Briley E. Shirah
Print Name: Briley E Shirah                  John F. Watson
Angela L. Patton                             Co-Trustee of Said Trust
Print Name: Angela L. Patton


Print Name: _____             David B. Foshee
                                             Co-Trustee of Said Trust

Print Name: _____


WITNESSES                                    SKLARCO L.L.C.


Print Name: _____             By: _____
                                                 David A. Barlow
                                                 President – Chief Operating Officer

Print Name: _____

Page 3 of 7

For: STATE LINE OIL TRUST TRUSTEES
1 Vickers Place
Mobile, AL 36608
Attn: John F. Watson

For: SKLARCO L.L.C.                    With copy to:
5395 Pearl Parkway, Suite 200          C.P. Armbrecht
Boulder, CO  80301                     P.O. Box 290
Attn:  J. Marshall Jones, III          Mobile, AL  36601

G. SEVERABILITY

Any provision of this Agreement which is prohibited or unenforceable, in whole or in part, shall be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.  If the scope of any provision set forth in this Agreement is too broad to permit enforcement of such provision to its full extent, then such provision shall be enforced to the maximum extent permitted by applicable law and, if necessary, the scope of any such provision may be judicially modified to the minimum extent necessary in any proceeding brought to enforce such provision and thereafter such provision, as so modified, may be fully enforced.  This Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this instrument in duplicate original counterparts, as of the date hereinabove written.

**WITNESSES**                          **STATE LINE OIL TRUST TRUSEES**

_____        _____
Print Name: _____            John F. Watson
                                       Co-Trustee of Said Trust

_____
Print Name: _____

_____        _____
Print Name: __Johnny R. Bowsecres__     David B. Foshee
                                       Co-Trustee of Said Trust
_____
Print Name: __Brenda Sandefur__


**WITNESSES**                          **SKLARCO L.L.C.**

_____        By: _____
Print Name: _____                David A. Barlow
                                           President – Chief Operating Officer

_____
Print Name: _____

Page 3 of 7

For: STATE LINE OIL TRUST TRUSTEES
1 Vickers Place
Mobile, AL 36608
Attn: John F. Watson

For: SKLARCO L.L.C.                    With copy to:
5395 Pearl Parkway, Suite 200          C.P. Armbrecht
Boulder, CO 80301                      P.O. Box 290
Attn:  J. Marshall Jones, III          Mobile, AL  36601

### G. SEVERABILITY

Any provision of this Agreement which is prohibited or unenforceable, in whole or in part, shall be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.  If the scope of any provision set forth in this Agreement is too broad to permit enforcement of such provision to its full extent, then such provision shall be enforced to the maximum extent permitted by applicable law and, if necessary, the scope of any such provision may be judicially modified to the minimum extent necessary in any proceeding brought to enforce such provision and thereafter such provision, as so modified, may be fully enforced.  This Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this instrument in duplicate original counterparts, as of the date hereinabove written.

**WITNESSES**                          **STATE LINE OIL TRUST TRUSEES**

_____        _____
Print Name: _____           John F. Watson
                                          Co-Trustee of Said Trust
_____
Print Name: _____


_____        _____
Print Name: _____           David B. Foshee
                                          Co-Trustee of Said Trust
_____
Print Name: _____


**WITNESSES**                          **SKLARCO L.L.C.**

_____
Print Name: Katy R. Smith              By: _____
_____           David A. Barlow
Print Name: _____ Nathan Snyder          President – Chief Operating Officer

STATE OF _Alabama_

COUNTY OF _Mobile_

I, _Cynthia M. Long_, a notary public, in and for said County in said State, hereby certify that John F. Watson, whose name as Co-Trustee of the State Line Oil Trust is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in his capacity as such Co-Trustee, executed the same voluntarily on the day the same bears date.

Given under my hand and notarial seal this the 28th day of _April_, 2015.

_Cynthia M. Long_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _7|14|8_

STATE OF _____

COUNTY OF _____

I, _____, a notary public, in and for said County in said State, hereby certify that David B. Foshee, whose name as Co-Trustee of the State Line Oil Trust is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in his capacity as such Co-Trustee, executed the same voluntarily on the day the same bears date.

Given under my hand and notarial seal this the ____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF COLORADO

COUNTY OF BOULDER

I, _____, a notary public, in and for said county in said state, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and notarial seal this the ____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Page 4 of 7

STATE OF _____

COUNTY OF _____

      I, _____, a notary public, in and for said County in said State, hereby certify that John F. Watson, whose name as Co-Trustee of the State Line Oil Trust is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in his capacity as such Co-Trustee, executed the same voluntarily on the day the same bears date.

      Given under my hand and notarial seal this the ____ day of _____, 2015.


                               _____
                               NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF _Texas_____

COUNTY OF _Fort Bend_

      I, _N. Felix_____, a notary public, in and for said County in said State, hereby certify that David B. Foshee, whose name as Co-Trustee of the State Line Oil Trust is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in his capacity as such Co-Trustee, executed the same voluntarily on the day the same bears date.

      Given under my hand and notarial seal this the _28_ day of _April_, 2015.

```
┌─────────────────────────────────┐
│  ✦  N. FELIX                     │
│     Notary Public, State of Texas│
│     My Commission Expires        │
│     April 16, 2017               │
└─────────────────────────────────┘
```
                               _N. Felix_____
[AFFIX NOTARIAL SEAL]                NOTARY PUBLIC

My Commission Expires: _04/16/2017_


STATE OF COLORADO

COUNTY OF BOULDER

      I, _____, a notary public, in and for said county in said state, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

      Given under my hand and notarial seal this the ____ day of _____, 2015.


                               _____
                               NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

I, _____, a notary public, in and for said County in said State, hereby certify that John F. Watson, whose name as Co-Trustee of the State Line Oil Trust is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in his capacity as such Co-Trustee, executed the same voluntarily on the day the same bears date.

Given under my hand and notarial seal this the ____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

I, _____, a notary public, in and for said County in said State, hereby certify that David B. Foshee, whose name as Co-Trustee of the State Line Oil Trust is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in his capacity as such Co-Trustee, executed the same voluntarily on the day the same bears date.

Given under my hand and notarial seal this the ____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF COLORADO

COUNTY OF BOULDER

I, *Geoffrey David Nenninger*, a notary public, in and for said county in said state, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and notarial seal this the *30* day of *APRIL*, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: *August 15, 2017*

GEOFFREY DAVID NENNINGER
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20134051884
MY COMMISSION EXPIRES AUGUST 15, 2017

EXHIBIT "A"

Attached to and made a part of that certain Geophysical Permit and Lease Option Agreement dated April 7, 2015 by and between STATE LINE OIL TRUST and SKLARCO L.L.C.

## MT. CARMEL SEISMIC PROSPECT
## ESCAMBIA COUNTY, ALABAMA &
## SANTA ROSA COUNTY, FLORIDA

EXHIBIT "A-1"

Attached to and made a part of that certain Geophysical Permit and Lease Option Agreement
dated April 7, 2015 by and between STATE LINE OIL TRUST and SKLARCO L.L.C.

| SANTA ROSA COUNTY, FLORIDA | Gross Mineral Acres | Net Mineral Acres |
|---|---|---|
| **Township 5 North, Range 28 West** | | |
| Section 2:  Entire section. | 641.00 | 320.500 |
| Section 3:  N1/2 of NE1/4 and NE1/4 of NW1/4. | 120.00 | 60.000 |
| Section 4:   SW1/4 --or Lots 3 and 4 (less 4 acres in Lot 4 conveyed to Santa Rosa County for road); - - - - - - and SW1/4 of SE1/4 --or S1/2 of Lot 5 (except E1/2 of E1/2 of SW1/4 of SE1/4). | 187.20 | 93.600 |
| Section 5:  NW1/4 --or Lots 1 and 2; and SE1/4--or Lots 5 & 6. | 321.32 | 160.660 |
| Section 6:  All. | 641.60 | 320.800 |
| Section 7:  N1/2 and SE1/4. | 480.10 | 240.050 |
| Section 8:  All. | 639.12 | 319.560 |
| Section 9:  W1/2 of W1/2 and NE1/4 (except 2 acres conveyed to Santa Rosa County for road). | 319.00 | 159.500 |
| Section 10:   E1/2 of E1/2 and SW1/4 of NE1/4 and SE1/4 of NW1/4 and W1/2 of W1/2, and E1/2 of SW1/4 and NW1/4 of SE1/4. | 520.00 | 260.000 |
| Section 15:   NW1/4 and SW1/4 of SW1/4 (less 5 acres conveyed to Santa Rosa County for road). | 195.62 | 97.810 |
| Section 16:  All  (except 1 acre in SE corner of SW1/4 of SE1/4 35 yards north and south by 139 yards east and west; and except 5 acres conveyed to Santa Rosa County for road). | 636.16 | 318.080 |
| Section 17:   N1/2 of SW1/4 and SW ¼ of SW1/4 and SE1/4 (less 5 acres conveyed to Santa Rosa County for road). | 275.70 | 137.850 |
| Section 18:  NE1/4 and West ½ and SE1/4 of SE1/4 (less 10 acres conveyed to Santa Road County for road). | 508.70 | 254.350 |
| Section 19:  NE1/4 and SE1/4 of NW1/4 and SW1/4 and N1/2 of SE1/4 and W1/2 of SW1/4 of SE1/4. | 458.85 | 229.425 |
| Section 20: NE1/4 (less 6 acres to Santa Rosa County for road); S1/2 of SE1/4 and W1/2 of NW1/4 and N1/2 of SW1/4 (except: Commence at southeast corner of NE1/4 of SW1/4, thence run west along southern boundary line of said forty 15.40 ch., thence run in a northeasterly direction following the meanderings of the public road, 12 ch. to north boundary line of said forty; thence in an easterly direction along the north boundary line of said forty 7 ch. 24 1., thence in a southerly direction along the eastern boundary line of said forty, 20 ch. to place of beginning, containing 20 ½ acres; also, less one acre, beginning 3.29 ch. east from northeast corner of SW1/4 of SW1/4 of said Sec. 20, thence run north 70 yards, thence east 72 yards to center of Milton-Brewton road, thence southwesterly to south boundary line of NE1/4 of SW1/4, thence west to point of beginning. | 374.25 | 185.125 |
| Section 21:  E1/2 of NW1/4 and SW1/4 of SE1/4 of NE1/4 and S1/2 of SW1/4 of NE1/4 and N1/2 of SW1/4 and SE1/4 (less 4 acres conveyed to Santa Rosa County for road). | 346.00 | 173.000 |
| Section 28:    All (except 11 acres conveyed to Santa Road County for road). | 629.68 | 314.840 |
| Section 29:  E1/2 of NE1/4 and E1/2 of SE1/4 of SE1/4 and  SW ¼ of SE1/4 of SE1/4. | 110.00 | 55.000 |
| Section 30:  NE1/4 and S1/4 of NW1/4 and NE1/4 of SW1/4 and W1/2 of SE1/4. | 359.45 | 179.725 |

| | | |
|---|---|---|
| Section 31:  SE1/4 of NE1/4 and SW1/4 of SE1/4 and E1/2 of SE1/4. | 159.90 | 79.950 |
| Section 32:  All (except SE1/4 of SE1/4; and except 10 acres in NE1/4 of NW1/4, as follows:  Commencing at northwest corner of NE1/4 of NW1/4, run north 85 deg. 45' east 15.61 ½ ch., thence south 3 deg. 15' east 5.33 ch., thence south 85 deg. 45' west 15.81 1/2 ch., thence north 3 deg. 15' west 6.33 ch.). | 589.44 | 294.720 |
| Section 33:  NW1/4 of SW1/4 and N1/2 of SE1/4 (less two acres conveyed to Santa Rosa County for road). | 118.00 | 59.000 |
| Section 37:  S1/2 Noah Calhoun Donation (less E1/2 of NE1/4 of SE1/4, and less 2 acres conveyed to Santa Rosa County for road). | 299.00 | 149.500 |
| | | |
| **Township 6 North, Range 28 West** | | |
| Section 26: Lots 3 and 4, and N1/2 of lot 5. | 71.47 | 35.735 |
| Section 27:  Lots 1 and 8. | 64.60 | 32.300 |
| Section 28:   A fraction of Lots 5 and 6, described as follows: Beginning at the southwest corner of Fractional Section 28 and run east 33 ch. to Brewton and Milton road, thence north 131/2 deg. west along said road 20.43 ch. to a point 10 ch. south from the Florida line, thence west 271/2 ch. to section line, thence south 19.70 ch. to starting point. | 61.50 | 30.750 |
| Section 29: All. | 235.00 | 117.500 |
| Section 30:  All. | 225.74 | 112.870 |
| Section 31:  E1/2 and E1/2 of W1/2 (except W1/2 of W1/2 of SE1/4 of SW1/4) and E1/2 of E1/2 of NW ¼ of NW1/4. | 482.70 | 241.350 |
| Section 32:  E1/2 of NE1/4 and SW1/4 of NW1/4 and S1/2 of NW1/4 and SW1/4. | 362.05 | 181.025 |
| Section 33:  N1/2 of NW1/4, and SW1/4 of NW1/4. | 120.00 | 60.000 |
| Section 34:  NE1/4 and S1/2 of SE1/4 and NE1/4 of NW1/4. | 280.00 | 140.000 |
| Section 35:  W1/2. | 320.10 | 160.050 |
| Section 37:  N1/2 of Noah Calhoun Donation. | 320.00 | 160.000 |
| | | |
| **Township 5 North, Range 29 West** | | |
| Section 1:  All Fractional Section. | 480.00 | 240.000 |
| Section 13:  E1/2 of NE1/4 and S1/2 of NW1/4 and SW1/4 and NE1/4 of SE1/4 (less 3 acres conveyed to Santa Road County for road). | 356.55 | 178.275 |
| Section 14:  All (less NW1/4 of NW1/4 of SW1/4 and less 12 acres conveyed to Santa Rosa County for road). | 617.28 | 308.640 |
| | | |
| **Township 6 North, Range 29 West** | | |
| Section 25:  Lots 1, 2, 3 and 4. | 214.00 | 107.000 |
| Section 26:  All Fractional Section. | 65.86 | 32.930 |
| Section 36:   NE1/4 of NW1/4 (except 5 acres, beginning at northeast corner and running west 87 1/2 yds., thence south 280 yds., thence east 87 1/2 yds., thence north 280 yds.); also, five acres in NW1/4 of NW1/4, beginning at the southeast corner, and run north 87 1/2 yds., thence west 280 yds., thence south 87 1/2 yds., thence east 280 yds. to starting point). | 40.00 | 20.000 |
| Section 37:   E/2 of NE1/4 and Lots 1 and 2 (less north 23 chains); and NE1/4 of SE1/4. | 101.34 | 50.670 |
| Section 38: All. | 639.13 | 319.565 |
| | | |
| **Total for Santa Rosa County, Florida** | **13,987.41** | **6,991.71** |

**EXHIBIT "B"**

Attached to and made a part of that certain Geophysical Permit and Lease Option Agreement dated April 7, 2015 by and between STATE LINE OIL TRUST and SKLARCO L.L.C.

**OIL, GAS AND MINERAL LEASE**

STATE OF FLORIDA

COUNTY OF SANTA ROSA

THIS AGREEMENT, to be effective on the _____ day of _____, 201___, between John F. Watson and David B. Foshee, as Co-Trustees of the STATE LINE OIL TRUST (a copy of said trust being recorded in real property records of the Probate Court of Escambia County, Alabama, in Book 75 beginning at page 573, and  in the real property records of the office of Clerk of Court of Santa Rosa County, Florida in Deed Book A-48, beginning at page 76) (hereinafter referred to as "LESSOR") of 1 Vickers Place, Mobile, Alabama 36608, and **SKLARCO L.L.C.** (hereinafter referred to as "LESSEE") of 5395 Pearl Parkway, Suite 200, Boulder CO 80301.

**W I T N E S S E T H:**

1.   LEASE CONSIDERATION

LESSOR, in consideration of Ten and No/100 Dollars ($10.00), in hand paid, of the royalties and other benefits herein provided, and of the agreements of LESSEE herein contained, but subject to the further terms hereof, hereby GRANTS, LEASES AND LETS exclusively unto LESSEE for the purpose of investigating, exploring, prospecting and drilling for and producing oil and gas, the lands (hereinafter referred to as the "Leased Premises"), described on and on Exhibit "A", attached hereto and identified as such, which said Exhibit as so attached and identified, is incorporated herein by reference and made a part hereof for a more particular description of said land, for the purpose of calculating and determining the amount of any money  payment hereunder, and for all other pertinent purposes of this Lease.  The land therein described is hereby estimated, and shall be regarded and treated as actually comprising and containing _____ **net acres**, whether it be more or less, and in the event of a partial assignment or surrender hereof or hereunder, the assigned or surrendered portion or portions shall be deemed to contain the number of acres estimated realistically in such instrument or assignment or surrender.  The term "oil and gas" as used in this Lease shall mean oil, gas, casinghead gas, distillate, gas condensate and the by-products thereof, and such other hydrocarbon substances and sulphur as are necessarily produced with and incidental to the production of oil and gas. LESSOR hereby reserves and excepts from this Lease and the rights granted hereunder any and all coal, lignite, uranium and other fissionable materials, geothermal energy, base and precious metals, rock, stone, limestone, sand, gravel and other similar aggregates, and clay, and retains unto itself and other subsequent or concurrent lessees of interests therein the right to explore for and produce such reserved minerals.

2.   TERM

Subject to the preservation provisions of subsection 3.4.1 and Section 5 hereof, this lease shall be for a term of **THREE (3)** years from this date (called "primary term") and for so long thereafter as oil or gas is produced in paying quantities from the Leased Premises or this Lease is otherwise maintained in force and effect under the terms hereof.

3.   RESERVATION OF ROYALTIES

3.1     LESSOR hereby reserves, and LESSEE hereby agrees to pay or deliver to LESSOR, the following royalties on account of the oil and gas produced  from the Leased Premises in accordance with, but subject to, all subsequent subsections hereof:

3.1.1     AS TO OIL:

**25%** of all oil, condensate and/or other liquid hydrocarbons, produced and saved from the Leased Premises, or from a unit embracing all or a portion thereof, the same to be delivered, free of cost, at the mouth of the well, or, at LESSOR's option, to the credit of Lessor into the pipe line or lines to which LESSEE may connect its wells; provided, however, that LESSEE may purchase LESSOR's oil, condensate and/or other liquid hydrocarbons by paying to LESSOR the average posted market price of such royalty share then in effect for such oil, condensate and/or other liquid hydrocarbons at the wells as of the day  such substances are run to the pipe line or storage tank.

3.1.2     AS TO GAS:

**25%** of the market value, hereinafter defined, of all gas and casinghead gas produced and saved from the Leased Premises, or from a unit embracing all or a portion thereof.

3.2     LESSOR specifically reserves hereby the right to take in kind or separately dispose of its proportionate royalty share of all oil and/or gas produced from the Leased Premises, or from a unit embracing all or a portion thereof, and, in the event such an election is made, shall be required to pay only for the proportionate share of such part of LESSEE's surface facilities which it uses.

3.3     PAYMENT AND DELIVERY OF LESSOR'S ROYALTIES:

3.3.1     Any and all royalties due and owing to LESSOR in accordance herewith shall be payable or deliverable to LESSOR no later than 60 days after the end of the calendar month within which oil and/or gas production is sold; provided however, that the acceptance of any such royalty by LESSOR shall never be taken or construed as a waiver of any of LESSOR's rights or remedies for breach by LESSEE, its successors or assigns, of any express or implied covenant of this Lease.

1

3.3.2    Any payment of any royalty after the date specified in subparagraph 3.3.1 above shall bear interest from and after its respective due date until payment in full is received by LESSOR, said interest factor to be equivalent to the prime rate, as the same shall be set from time to time by the BankTrust of Mobile, Alabama (or any successor to said bank).  Furthermore, if LESSEE should fail to pay any royalty or royalties payable hereunder when the same shall become due, LESSOR shall have the specific right and option to terminate this Lease forthwith for such non-payment if such royalties due and payable to LESSOR are not delivered to the said LESSOR on or before the expiration of sixty (60) days after LESSEE receives written notice from LESSOR of LESSEE's failure to pay all royalties when due.

3.3.3    All royalties payable to LESSOR under the terms and provisions of subparagraph 3.1 hereof are payable and shall be paid in cash or by check delivered or mailed to LESSOR at its principal place of business in Brewton, Alabama, or at such other address as LESSOR may designate.

3.3.4    In the event LESSOR should elect to take in kind its royalty on any one or more substances covered by this Lease, LESSOR may exercise such option at any time and from time to time upon 60 days written notice to LESSEE, in which event LESSEE shall deliver same, free of cost other than as provided in 3.2 to LESSOR, to and into LESSOR's pipe lines, tanks or other storage or transportation facilities until 60 days after receipt of written notice that LESSOR has revoked such option and has elected to receive any such royalty interest or share in cash or by check payable at its designated address as hereinabove provided.  Except to the extent to which LESSOR may have exercised its option to take one or more of its royalty interest or share in kind, as herein provided, LESSEE may, subject to all pertinent provisions of this Section 3 of this Lease, barter, contribute, dispose of, exchange, sell swap or use any one or more of said substances covered by this Lease, but shall account to LESSOR therefore to the extent and in the manner hereinabove provided.

3.4    <u>MONETARY SUBSTITUTES FOR ACTUAL PRODUCTION</u>

3.4.1.    <u>Shut-In Royalty on Suspended Production</u>

(a)    While there is a well on the Leased Premises capable of producing gas in paying quantities, as said phrase is hereinafter defined, but the production there from is shut-in, shut down, or suspended for any reason, then and in any such event, LESSEE shall pay royalty on or before ninety (90) days after the date on which (1) production from any such well is shut-in, shut down or suspended, or (2) this Lease is no longer maintained by compliance with one of the other preservation provisions, hereof, (whichever is the later date, and thereafter at annual intervals during the primary term, a sum and amount equal to One Dollar ($1.00) multiplied by the number of acres then covered by this Lease), and after the expiration of the primary term, a sum and amount equal to Twenty Five Dollars ($25.00) multiplied by the number of acres then covered by this Lease, and, if such payments are made, this Lease shall not terminate, but, on the contrary, will continue in full force and it will be considered that a substance covered by this Lease is being produced from the Leased Premises in paying quantities within the meaning of each pertinent provision of this Lease, it being understood and agreed that such payments shall only apply to the geologic strata capable of producing gas in paying quantities.

(b)    The provisions of subparagraph 3.4.1(a) shall not apply to oil wells, as the same may be classified by the State Oil and Gas Board of Alabama, by the Florida Department of Environmental Protection, and this Lease shall not be kept in force solely by the payment of any shut-in royalty payment on any such well.

(c)    After the primary term hereof, this Lease may not be kept in force solely by the payment of shut-in royalties hereunder for more than a period of two (2) consecutive years after the date of the first payment of any shut-in royalty hereunder.

3.4.2    <u>Take or Pay Product Purchase Contracts</u>

(a)    No "take or pay" products purchase contract shall be finally consummated or valid as to any substance covered hereby and produced from the Leased Premises without LESSOR's written consent.

(b)    All royalties hereunder applicable to gas, casinghead gas, or any other gaseous hydrocarbon covered by this Lease shall be due and payable to LESSOR for any such gas paid for but not taken pursuant to any "take or pay" provision of any pertinent gas purchase contract covering the Leased Premises, any part thereof, and/or any well or wells thereon, but LESSOR agrees to be responsible and liable for its proportionate share of any payments that may be recoverable by the gas purchaser by later takes of gas or refunds of money.  In the event gas is taken in kind as recoupment of take or pay payments, that gas shall be exempt from any royalties.

3.5    LESSEE shall not conduct underground storage operations without the written consent of LESSOR.

3.6    LESSEE shall not use nuclear or other blasts to create artificial conduits, chimneys or reservoirs without the written consent of LESSOR, and if such consent is given, LESSEE shall not use such artificial conduits, chimneys or reservoirs without the additional written consent of LESSOR.

3.7    All pertinent subparagraphs of this Paragraph 3 of this Lease shall apply to and govern the delivery in kind as royalty, or the payment of royalties on all such elements, natural products, by-products, residues or residuals produced from, or allocable to the Leased Premises, under the terms of, or as a result of, revised,

2

permanent or temporary pooling, spacing or unitizing orders or rules issued by the State Oil and Gas Board of Alabama or the Florida Department of Environmental Protection.

3.8    FREE FUEL AND WATER

    3.8.1    Free Water

LESSEE shall have free use of any and all subsurface water during any primary operations conducted hereunder.

    3.8.2    Free Fuel

LESSEE shall have free use, during any primary operations conducted hereunder, of any and all fuel or other substances covered by this Lease and produced from the Leased Premises, and the royalties thereon due and payable to LESSOR shall be computed after deducting any amount of any such substance so used.

    3.8.3    For the purposes of this subparagraph 3.8, primary operations shall include the production of oil and gas and all operations associated therewith during such time as oil and gas, or either of them, are produced from a unit embracing all or a portion of the Leased Premises with the sole use of natural reservoir energy. Primary operations shall not include secondary recovery, pressure maintenance, or other operations related thereto.

3.9    Any and all royalties due and payable to LESSOR pursuant to this Paragraph 3 shall be so paid to LESSOR, or to the credit of LESSOR, free of any and all exploration, development, production, treatment, gathering, marketing, or other related costs, excepting any taxes which may be applicable to such royalties.

4.    DELAY RENTALS    THIS IS A PAID-UP LEASE. NO DELAY RENTAL IS DUE.

4.1    The cash down payment or bonus given for the execution of this Lease constitutes a part of the consideration hereof according to its terms and shall not be allocated as mere rental for a period.

5.    CONTINUOUS OPERATIONS

5.1    If, prior to the discovery and production of any substance covered by this Lease on or from the Leased Premises or from a unit embracing any portion thereof, LESSEE should drill a dry hole or holes thereon, or, if after discovery and production of any such substances covered by this Lease, the production thereof should cease for any reason, this Lease shall not terminate if LESSEE commences operations for drilling or reworking within ninety (90) days thereafter or pays shut-in royalty as provided by 3.4.1.

5.2    If upon or after the expiration of the primary term of this Lease, no substance covered hereby is being produced from the Leased Premises or lands pooled therewith in paying quantities, as said phrase is hereafter defined, but LESSEE is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within ninety (90) days prior to the end of the primary term, this Lease may be continued in force if, within ninety (90) days from and after the completion of the preceding well, or the cessation of operations thereon if it is dry and unproductive, LESSEE commences or causes to be commenced 1) drilling operations on an additional well on some part or portion of the Leased Premises lying outside of any previously established drilling or production allowable unit or 2) reworking operations on any well previously drilled and completed on the Leased Premises or on a unit containing all or any portion thereof. After having so commenced the drilling or reworking operations described above, LESSEE may perpetuate the term of this Lease through drilling or reworking operations or the completion or abandonment of additional wells, with no more than ninety (90) consecutive days elapsing between the completion or abandonment of one such additional well and the commencement of drilling or reworking operations for another well on another unit or tract until the entire Leased Premises has been developed to the density, degree and extent permitted by any applicable statewide or field rules, or until at least one oil or gas well has been drilled and completed or abandoned under each such unit or units that may be established within the Leased Premises; provided additionally, that if any of the foregoing drilling or reworking operations result in paying production of any substance covered by this Lease, then this Lease shall remain in force as to the productive unit or units, subject to the further provisions hereof, for so long thereafter as any such substance is produced from the Leased Premises or from land pooled therewith in paying quantities, as that phrase is defined hereinafter.

6.    FORCE MAJEURE

6.1    Should LESSEE be prevented from complying with any express or implied covenant of this Lease, from conducting drilling, reworking or marketing operations, or from producing or marketing the substances covered by this Lease, by operation of force majeure, war, rebellion, devastating fires or floods, orders, rules or regulations of State or Federal governmental authority, or by other such other acts or events beyond the control or LESSEE, then while so prevented, LESSEE's obligation to comply with such covenant shall be suspended, LESSEE shall not be liable in damages for failure to comply therewith, and this Lease shall be extended while and so long as LESSEE is prevented by any such cause from conducting drilling, reworking, or marketing operations on or from producing oil and/or gas from the Leased Premises; provided, however, that neither force majeure nor any other cause similar or dissimilar to those described hereinabove shall confer upon LESSEE the right to extend this Lease for more than a period of twelve (12) months.

6.2    Notwithstanding anything to the contrary contained in subparagraph 6.1 above, LESSEE shall not be excused, through the operation of the foregoing force majeure provisions, from making of all proper and timely payments of royalties, shut-in royalties or all other payments required pursuant to the terms of this Lease.

7.    USE, DAMAGES TO, AND RESTORATION OF THE LEASED PREMISES

    7.1    USE OF THE SURFACE OF THE LEASED PREMISES

3

Subject to the further terms and provisions hereof, LESSEE shall have and is hereby given access to and use of so much of the surface of the Leased Premises as is reasonably necessary to conduct all activities and operations authorized, permitted and required by the terms of this Lease which do not unduly or unreasonably hamper, interfere with or restrict LESSOR's communicating, cultivating, farming, fishing, grazing, harvesting, hunting, logging, lumbering, milling, planting, seeding, transporting, trapping or other related or non-related activities and operations therein and thereon, it being the intention of the parties hereto to create and recognize between them reciprocal rights and complimentary estates. To this end, it is expressly AGREED, UNDERSTOOD, and hereby STIPULATED that:

### 7.1.1   LESSEE COVENANTS AND AGREES:

(a)      Not to use any more of the surface of the Leased Premises as is reasonably necessary to conduct all operations authorized, permitted and required by this Lease and specifically not to locate any well, treatment plant, flow line, gathering line, pipe line or other such facility closer than 330 feet from any house, cabin, shed, barn, silo, storage bin, feeding trough, or other structure located on the Leased Premises;

(b)      Not to grant to any third party or parties any easement for any pipeline unassociated with the transportation of oil and gas produced from the Leased Premises or from a unit embracing all or a portion thereof, any water line, transmission line, or other burden on the Leased Premises;

(c)      Not to fish, hunt or carry or use fishing gear or firearms onto the Leased Premises and to make every reasonable effort, by specific instructions, warnings, warning signs, or otherwise, to prevent its agents, executives, employees and personnel, or those furnishing material, supplies, physical equipment or third party services from fishing, hunting or carrying or using fishing gear or firearms on the Leased Premises; and

(d)      Not to cultivate, farm, graze livestock, harvest, log, lumber, mill, plant, seed, or conduct or engage in such other activities and operations similar or dissimilar in nature to those mentioned herein and not contemplated by the terms of this Lease.

### 7.1.2   LESSOR COVENANTS AND AGREES:

(a)      To maintain all fences and gates in good state of repair, and when and where it becomes absolutely necessary to cut or otherwise remove LESSOR's fences, to install adequate gates and cattleguards; and

(b)      To exercise all of its rights, privileges, powers and immunities, and to conduct its usual and customary activities and operations on the Leased Premises in a manner such that it will not unduly or unreasonably hamper, interfere with or restrict any operation or activity authorized, permitted or required by this Lease; and

(c)      To insure that any of its licensees, guests, invitees or subsequent lessees conduct their activities and operations so as not to hamper, interfere with or restrict unduly or unreasonably any operation or activity authorized, permitted or required by this Lease.

### 7.2   DAMAGES TO THE SURFACE OF THE LEASED PREMISES:

LESSEE COVENANTS AND AGREES:

(a)      To consult with and obtain the written release and consent of LESSOR before selecting or clearing sites for wells, pits, drainage ditches, receptacles, shafts, or locating, constructing or installing tank batteries, field-type separation devices, treating or processing mills or plants, laying pipe lines, gathering lines or flow lines, surveying and drilling shot holes for seismic surveys, or building roads, bridges or culverts on the Leased Premises; and, when requested by LESSOR, to bury all pipe lines, gathering lines and flow lines below plow depth or the depth to and at which LESSOR's timber or other seedlings are normally planted, whichever is deeper;

(b)      To conduct all seismic and other surveys in a manner so as not to damage LESSOR's water wells, tanks or reservoirs, and to conduct all operations so as not to permit any deleterious substance to collect, escape, pollute, run, seep, spread, stand or come in contact with or damage LESSOR'S blinds, boat docks, cattle, crops, fish, or other aquatic life, hunting or fishing camps or lodges, lakes, land, livestock, logs, lumber, logging and lumbering camps, mills, roads or tramways, ponds, reservoirs, seedlings, springs, streams, tanks, timber, trees, vegetation, water wells, wildlife or any other things of value on, in, over or under the Leased Premises; and

(c)      To respond to and pay damages, based on replacement cost, cost of repairs, or such other assessment to which LESSOR may agree, for the damage to, loss of, or diminution or depreciation of the beneficial use or value of any house, cabin, shed, barn, silo, storage bin, fence, crop, timber, lumber, vehicles, feeding trough or other thing of value lost, damaged or destroyed as a result of or through the conduct of any activity or operation authorized, permitted or required by this Lease or by any activity of LESSEE, its agents, employees or representatives, which amounts to a breach of any covenant hereof. This paragraph shall not apply where Lessor is negligent or involved in willful misconduct notwithstanding anything to the contrary, it is not intended that **SKLARCO L.L.C.** indemnify LESSOR for the negligent acts of LESSOR's servants or employees or for willful misconduct.

### 7.3   RESTORATION OF THE SURFACE OF THE LEASED PREMISES

LESSEE hereby covenants and agrees to maintain and/or restore the surface of the Leased Premises, immediately after the particular surface area of the said Leased Premises has served its purpose, in and to as

4

near as practicable its natural state before operations and activities began hereunder. To this end, it is expressly AGREED, UNDERSTOOD, and hereby STIPULATED that LESSEE covenants and agrees:

(a)     To dispose of all drilling mud, chemicals, tailings, waste, debris, and all other deleterious substances and/or materials in a lawful manner as approved by the State of Alabama or any other governing body;

(b)     To properly and promptly fill, roll, tamp and cover all pits and sumps after each pit and sump has served its particular purpose;

(c)     To close, securely seal and properly plug any and all wells drilled and abandoned hereunder;

(d)     To clean up and generally repair the site used for any well, pit, receptacle, shaft, tank, plant, or other physical facility;

(e)     To dispose of all saline solutions, saltwater, waste oil, and all other obnoxious and/or deleterious substances by removing them from the Leased Premises or through the use of authorized injection wells for disposal purposes; and

(f)     To take all other reasonable steps to maintain and preserve the Leased Premises in a clean and orderly manner.

8.      REMOVAL OF FIXTURES FROM AND TITLE TO ABANDONED WELLS

8.1     REMOVAL OF AND TITLE TO FIXTURES:

Subject to the further terms and provisions hereof, LESSEE shall have and is hereby given and granted the right to remove all property, physical equipment, facilities and fixtures placed on, in and under the Leased Premises by LESSEE within one hundred eighty (180) days after the expiration of this Lease, or, if the termination of this Lease or any portion thereof is in controversy, within one hundred eighty (180) days after final determination of such controversy, but not thereafter, it being understood and agreed that all wells, receptacles, shafts, tanks, well holes or bores, and any and all such property, physical equipment, facilities and fixtures remaining in, on or under the Leased Premises, including casing and other downhole equipment left in any such wells, upon and after the expiration of said 180 day period, shall then and thereupon become the property of LESSOR.

8.2     WATER WELLS:

LESSOR shall have and is hereby given and granted the option, at its election, of taking over and thereafter owning and operating any well initially drilled as or later converted to a water well and equipped as such by LESSEE, including all physical facilities and equipment placed by LESSEE therein, thereon, or used by LESSEE in connection therewith, which said well or wells LESSEE may at any time or from time to time elect to abandon by paying to LESSEE the reasonable salvage value of all such salvable physical facilities and equipment as of the date of abandonment by LESSEE; provided however, that as is provided in subparagraph 8.1 above, LESSOR shall nevertheless become the owner of all such water wells located on the Leased Premises and of the equipment therein, thereon or used in connection therewith upon the expiration of the said 180 day period.

8.3     TITLE MATTERS:

Insofar as it may be necessary to fully effectuate all provisions of this Paragraph 8, all apt words of grant, bargain, sale, conveyance, transfer and delivery are incorporated herein by reference and made a part of this said Paragraph 8 for all pertinent purposes.

9.      ADDITIONAL EXPRESS COVENANTS

By the acceptance of this Lease, and as a substantial part of the consideration therefore, LESSEE hereby expressly COVENANTS and AGREES:

9.1     After the discovery of oil or gas in paying quantities on said premises, LESSEE shall develop the acreage hereunder as a reasonably prudent operator. In the event a well or wells producing oil or gas in paying quantities should be brought in on other land in the vicinity of and draining the Leased Premises or acreage pooled therewith, LESSEE agrees to drill such offset well as a reasonably prudent operator would drill under the same or similar circumstances. Such offset well or wells shall be commenced within ninety (90) days after commencement of production in paying quantities from the well being offset:

9.2     To produce, gather, process, preserve, save, store, take care of, treat, transport and market said production, products, by-products, residues, residuals and tailing, and to conduct all such producing, gathering, processing, preserving, saving, storing, caring of, treating, transporting and marketing activities and operations at the time, with the rapidity, at the rate, and in the manner and to the extent that a reasonably prudent operator, acting under the same or similar circumstances, and with the best interests of both the LESSOR and LESSEE in mind and at heart, should or would so conduct such activities and operations;

9.3     To conduct pressure maintenance, or secondary recovery operations, or both, if the characteristics of the particular reservoir are such that, from sound engineering and economical standpoints, and with the best interests of both LESSOR and LESSEE in mind and at heart a reasonably prudent operator would or should conduct one or both such operations;

9.4     To market with due diligence and in good faith all oil and gas produced from a well or wells completed on the Leased Premises, or on a unit or units embracing any part thereof, which is not utilized by LESSEE pursuant to subparagraph 3.8 hereof;

5

9.5     To build, construct or install and to maintain and operate a mill or mills, or plant or plants, or with LESSOR's written consent, to enter contracts, in good faith and at arm's length, with independent processors, for the purpose of absorbing, assimilating, blending, compounding, concentrating, cycling, deriving, extracting, milling, processing, recovering, refining, saving, treating or upgrading all oil and gas initially produced from the Leased Premises, or from lands pooled therewith if such oil and gas, or either of them, are of such quality and in such quantity as to justify the building, constructing, installing, maintaining and operating of such a mill or plant by a reasonably prudent operator or processor, or to justify such a reasonably prudent operator entering  into such contracts with independent processors;

9.6     To install, maintain and operate one or more field-type device or devices such as but not limited to Bradenheads and separators, for the purpose of extracting, recovering or saving one or more elements of the oil and gas produced from the Leased Premises, or from lands pooled therewith, such as and including casinghead gas, distillate, gas condensate and natural gasoline if such oil and gas, or either of them initially produced from the said Leased Premises, or from land pooled therewith, are not of such quality or are not in such quantity as to justify plant processing;

9.7     To enter into contracts, in good faith and at arm's length, for the sale, at or near the wells, or elsewhere, of such products and substances, covered hereby and produced from the Leased Premises, or from lands pooled therewith, which are not of such quality or are not in such quantity as to justify the installation and operation of field-type devices described in subparagraph 9.6 above;

9.8     To furnish promptly to LESSOR, upon written request at its principal office and place of business in Brewton, Alabama or at such other address as LESSOR may designate in writing:

(a)     Copies, duplicates or reproductions of all location plats, applications for and permits to drill, daily drilling reports on and in connection with all wells drilled on the Leased Premises or lands pooled therewith; copies of all pipe perforation and well completion records; and copies of all reports and forms required by or filed with the State Oil and Gas Board of Alabama, and all other such regulatory bodies, state and federal, having jurisdiction;

(b)     Copies and duplicates or reproductions of all logs or surveys, drillers, electrical or otherwise,  of all wells drilled on the Leased Premises or lands pooled therewith; all surveys and similar data, all coring data and core analysis reports, core analyses, core records, reports or results of drill stem or other tests, and all other data and information obtained in connection with or as a result of the exploration, development, operation and protection of the Leased Premises;

Each and all of the foregoing covenants to be construed as those running with and touching and concerning this Lease and with the acreage constituting the Leased Premises.

10.     RIGHTS OF LESSOR

LESSOR, acting by and through its corporate officers, executives, agents or duly authorized representatives, shall have and is hereby given and granted immediate access to and the absolute right, at its own risk, cost and expense, at any time and from time to time, to:

10.1     Observe, from the well site, derrick floor, drilling platform, or from any other vantage point, all drilling, completing, logging, surveying, producing, reworking, plugging and all other such or similar activities or operations conducted on the Leased Premises by LESSEE, its agents, employees, independent contractors, or by those furnishing third party services.  Access to drilling rig and location may be denied in the event a life-threatening situation exists;

10.2     Make annual audits on LESSEE's accounts, contracts, books and records, at its own expense and at any reasonable time, for the purpose of ascertaining the amount of the production, sales and cost of manufacturing and extracting of any and all substances covered by this agreement.  Each such audit shall cover the period intervening since the last audit, and LESSOR shall have one (1) year next following the close of the calendar year in which said audit is made within which to present to and assert against LESSEE any and all claims or demands against LESSEE that may be disclosed by or result from said audit.

11.     ASSIGNMENT OF RIGHTS HEREUNDER

11.1     RIGHTS OF LESSOR:

The rights of Lessor hereunder may be assigned, either in whole or in part, and the provisions hereof shall extend to and be binding upon the parties hereto and their respective successors, assigns and legal representatives; provided however, that no change or division in the ownership of the lands covered hereby, royalties or other payments to accrue or become payable to LESSOR hereunder, however accomplished, shall operate to enlarge the obligations or diminish the rights of LESSEE,  and no change or division of such ownership shall be binding on LESSEE  until thirty (30) days after LESSEE shall have been furnished with a duly certified copy of the recorded instrument or instruments evidencing same.

11.2     RIGHTS OF LESSEE:

Notwithstanding anything to the contrary indicated herein, the rights of LESSEE hereunder may not be assigned in whole or in part, except by transfer or exchange of stock, merger, consolidation or reorganization without LESSOR's written consent, it being understood that for purposes of this subparagraph, LESSOR's written consent may be given by any officer of said corporation and that such consent will not be unreasonably withheld.  In the event such consent is requested and given, it shall not be construed as a waiver of LESSOR's right to approve any and all subsequent assignments thereafter.

12.     NOTICE OF NONCOMPLIANCE

6

In the event LESSOR considers that operations are not at any time being conducted in compliance with this Lease, LESSOR shall notify LESSEE in writing of the facts relied upon as constituting a breach of any obligation arising hereunder, and LESSEE, if in default, shall have sixty (60) days after receipt of such notice within which to comply with and satisfy any such obligation.

13.   CONSENT TO POOL

LESSEE shall have the right as to all or any part of the Leased Premises, without LESSOR's joinder, to combine the leasehold estate and LESSOR's royalty estate created by this Lease with any other lease or leases or lands, whether owned by LESSEE or some other person, partnership, firm, corporation or joint venture group, so as to create, by the combination of such leases, one or more operating or production units, provided that no single operating unit may embrace more than one hundred sixty (160) acres per oil well (plus 10% tolerance to allow for irregular sections) or six hundred forty (640) acres per gas well (plus 10% tolerance to allow for irregular sections), or such other amount authorized and required by the appropriate state agency having jurisdiction thereof, whichever said amount is the lesser. In the event any such unit is created hereunder by LESSEE, LESSOR agrees to accept and shall receive out of the production from any such unit the royalties described in Paragraph 3 hereof, said royalties to be proportionately reduced and to be paid only on the percentage of production that the number of acres pooled from the Leased Premises bears to the total number of acres included within the respective unit. The commencement or reworking of a well or the completion of a well to production (and production from such well) on any portion of a unit on which all or any part of the land described herein is embraced shall have the same effect under the terms of this Lease as if a well were commenced, reworked, completed or producing on the herein Leased Premises.

14.   SEVERANCE OF LEASEHOLD ACREAGE

14.1   Notwithstanding anything to the contrary herein contained (except for the provisions of Section 5, above), drilling or reworking operations on a pooled unit or units established as provided herein or by governmental authority shall maintain this Lease in force only as to the portion of the Leased Premises included in such unit or units, subject to further limitations set forth below. The Lease may be maintained as to the remainder of the Leased Premises in any manner specified herein, including Section 5, above, and this paragraph shall not limit the ability of the Lessee to maintain this lease as to all property covered hereby by conducting continuous operations in accordance with Section 5, above.

14.2   It is hereby understood by and agreed between the LESSOR and LESSEE that in the event this Lease should lapse and terminate either through the operation of 1) this Paragraph 14, 2) Paragraph 3 hereof dealing with the payment and delivery of royalties and shut-in royalties on production of oil and gas established hereunder, 3) Paragraph 5 hereof dealing with the perpetuation of this Lease through continuous operations, or 4) any other applicable provisions herein, LESSEE shall nevertheless be entitled to retain, subject to all of the express and implied covenants of this Lease, sufficient acreage around each well producing oil or gas in paying quantities, as defined herein, from the Leased Premises, or from any part thereof included in a pooled unit, so as to constitute a maximum producing unit pursuant to the applicable field rule or rules of statewide coverage, such acreage to be designated by Lessee as nearly as practicable in the form of a square, or in such shape as then existing spacing rules require.

14.2.1   Once this Lease has expired except as to any retained producing units, the Lease shall remain in force and effect as to each such retained producing unit only as to all depths equal to or above one hundred (100) feet below the deepest depth of any well completed on the Leased Premises or lands pooled therewith and productive of oil and/or gas, and only for so long as there is production therefrom in paying quantities, or for so long as drilling or reworking operations are conducted on each such unit.

14.2.2   LESSEE shall be obligated to survey any and all retained producing units established pursuant to this subparagraph 14.2, and to file for record in the county and state wherein the Leased Premises are located a release or releases of all nonproductive acreage or depths not retained hereunder or thereafter terminating due to cessation of production. Upon written request from LESSOR, LESSEE shall furnish to LESSOR copies of all surveys and releases made and executed hereunder.

14.2.3   Should LESSOR own or otherwise control or hereafter acquire the ownership or control of the surface of the Leased Premises, LESSEE shall be entitled to receive from LESSOR such easements on, over and across said lands as shall be necessary to conduct operations on the acreage retained hereby.

15.   WARRANTY OF TITLE

15.1   This lease is given without warranty of any kind, either expressed or implied, but with full substitution and subrogation in and to all of the rights and actions that LESSOR now has or may hereafter acquire.

15.2   PROPORTIONATE REDUCTION:

If LESSOR owns less than the full fee simple title to the substances which this Lease purports to cover, then the royalties and payments provided for in Paragraph 3 hereof, and any and all other payments and benefits to accrue, become payable or inure to the benefit of LESSOR under the terms and provisions of this Lease shall be reduced in proportion that LESSOR's interest bears to the whole and undivided fee simple estate therein.

16.   GENERAL PROVISIONS

16.1   LESSOR hereby expressly covenants and agrees not to withhold, fail, or refuse unreasonably to give or grant its written consent whenever such consent shall be called for or required pursuant to any term or provision of this Lease. Financial responsibility and operational staffing are deemed reasonable inquires as to proposed assignees.

16.2   LESSEE further agrees that it will indemnify and hold LESSOR harmless against any and all loss, damage, liability, cost or expense, including any claims, fines, penalties and reasonable attorneys' fees, on account of injuries to or death of persons or damage to property of any kind, arising out of or resulting from any operation hereunder; and in the event of any suit or other proceeding against LESSOR on account thereof, LESSEE shall, at

7

LESSOR's request, appear and defend same and LESSEE shall  pay  any assessment, judgment or settlement which may be rendered or given against LESSOR therein.  Notwithstanding anything to the contrary, it is not intended that **SKLARCO L.L.C.** indemnify LESSOR's for gross negligence of LESSOR's servants or employees or for willful misconduct.

17.    ADDRESSES

        Any and all notices and/or requests required pursuant to the terms of this Lease, whether such notices and/or requests be of a general or specific nature, shall be mailed or otherwise delivered to the parties hereto at their respective business addresses listed below:

STATE LINE OIL TRUST TRUSTEES          SKLARCO L.L.C.
1 Vickers Place                                        Attn: J. Marshall Jones, III
Mobile, AL 36608                                   5395 Pearl Parkway, Suite 200
Attn: John F. Watson                              Boulder, CO 80301

18.    GENERAL DEFINITIONS

        A.        PAYING QUANTITIES:  The phrase "paying quantities"  as, when and wherever it appears in this Lease, is hereby defined as that quantum of production which will return a profit, regardless of how small, above, over or beyond producing, transporting, treating and marketing costs and expenses such as and including all direct and reasonable administrative, supervisory and overhead charges, all at the field, but not the district level, actually and fairly attributable, allocable or apportionable to such production;  all labor, and all minor  repairs to and maintenance of, physical facilities and equipment actually  used and actually and fairly attributable, allocable or apportionable to such production, including actual, but not book, depreciation on all salvable equipment;  all costs and expenses incurred and actually paid in connection with or resulting from all reworking and other operations designed to increase or restore production; all milling, treating, transporting and marketing costs and expenses incurred and actually paid; all ad valorem and other taxes assessed and actually paid; and all other such costs and expenses directly ,fairly and actually attributable,  allocable or apportionable to such production but not to the drilling and completion of wells as such.

        B.        DEVELOPMENT and/or PROTECTION WELLS:  Insofar as the express and implied covenants of this Lease are concerned, "development" and "protection" wells are hereby defined as wells which a reasonably prudent operator, acting under the same or similar circumstances as LESSEE may face hereunder, 1) would drill with reasonable expectations or prospects of completing as producers which would be likely to return a reasonable profit above, over and beyond drilling, completing,  producing, marketing, treating and transporting costs, or 2) should drill pursuant to the express covenants set forth in Paragraph 9 hereof.

        C.        EXPLORATORY WELLS:  Insofar as the express and implied covenants of this Lease are concerned,  "exploratory" wells are hereby defined as wells which a reasonably prudent operator, acting under the same or similar circumstances as LESSEE may face hereunder, would drill for the purpose of fully exploring the Leased Premises, and every prospectively productive formation therein and thereunder, but not necessarily with expectations or prospects of completing as producers which would be likely to return a reasonable profit above,  over and beyond drilling, completing, producing, marketing, treating and transporting costs.

        D.        BARTER, CONTRIBUTE, DISPOSE,EXCHANGE, SELL, SEVER, SWAP, OR USE:    The words or terms "barter", "contribute", "dispose", "exchange", "sell", "sever", "swap" or "use", as, when and wherever they appear in this Lease, are hereby defined as a barter, contribution, disposition, exchange, sale, severance, swap or use, with LESSOR's written consent as the same shall be required herein, made in good faith, at arm's length, and with the best interests of both  the LESSOR and LESSEE in mind and at heart .

        E.        JUSTIFY:    The word or term "justify" as, when and wherever it appears in any Paragraph or subparagraph of this Lease, is hereby defined as that which is just, right, reasonable and warranted from an economic point of view.

        F.        DRILLING OR REWORKING OPERATIONS:   Insofar as Paragraphs 5 and 14 of this Lease are concerned, the phrase "drilling or reworking operations" is hereby defined as the spudding in and actual drilling of an oil or gas well reasonably and with due diligence, and all work as operations designed to secure, restore or improve production through some use of a hole previously drilled, including, but not limited to, mechanical or chemical treatment of any horizon, deepening to test deeper strata, and plugging back to test shallower strata.

        G.        COMMENCEMENT:  The word "commencement", as it is used and referred to specifically in Paragraph 5 hereof and generally in any other provision of this Lease, shall be defined as the actual spudding in of a well.

        H.        COMPLETION:   The word "completion" as it is used and referred to specifically in Paragraph 5 hereof and  generally in any other provision of this Lease, shall be defined as the actual operation of installing on the well in question valves, meters, gauges and other controls collectively referred to as the "christmas tree".

        I.        MARKET VALUE:   Insofar as Paragraph 3 of this Lease is concerned, the term "market value" shall be defined as the applicable price determined under one of the following standards applicable to the sale of any gas produced hereunder:

                (1)        Where such gas is sold on the Lease or in the field where produced by LESSEE in an arms-length transaction, the price received by LESSEE under the terms of any gas purchase contract for gas produced and sold from the Leased Premises by LESSEE.

                (2)        Where such gas is not sold on the lease or from the field where produced by LESSEE in an arms-length transaction the average of the three highest prices paid under contracts entered into not more than one year previous to the date of first production of gas of the same or similar quality and content produced and sold from wells within the county and state wherein the Leased Premises are situated when gas is sold from a

8

well or wells on the Leased Premises.  Said average to be determined on a semi-annual basis by LESSOR who shall submit the contractual information relied upon to LESSEE.  Failure to determine said average and submit said contractual information to LESSEE semi-annually shall be an acceptance of the price received by LESSEE as a market value price for the succeeding six-month period.

IN WITNESS WHEREOF, the parties hereto have executed and accepted this instrument on the day and date hereinabove first written, in the presence of the undersigned, competent witnesses.

**LESSOR**

**WITNESSES**                                   **STATE LINE OIL TRUST TRUSTEES**

_____               _____
Print Name: _____                John F. Watson, as Co-Trustee of Said Trust

_____
Print Name: _____

_____               _____
Print Name: _____                David B. Foshee, as Co-Trustee of Said Trust

_____
Print Name: _____


**WITNESSES**                                   **LESSEE**

                                                **SKLARCO L.L.C.**

_____               _____
Print Name: _____                By: David A. Barlow, President & Chief Operating Officer

_____
Print Name: _____

9

ACKNOWLEDGMENTS

STATE OF _____

COUNTY OF _____

      I, _____, a notary public, in and for said County in said State, hereby certify that John F. Watson, whose name as Co-Trustee of the State Line Oil Trust is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in his capacity as such Co-Trustee, executed the same voluntarily on the day the same bears date.

      Given under my hand and official seal on this the _____day of _____, 201___.

                                  _____
                                  NOTARY PUBLIC

My commission expires:
_____

STATE OF _____

COUNTY OF _____

      I, _____, a notary public, in and for said County in said State, hereby certify that David B. Foshee, whose name as Co-Trustee of the State Line Oil Trust is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in his capacity as such Co-Trustee, executed the same voluntarily on the day the same bears date.

      Given under my hand and official seal on this the _____day of _____, 201___.

                                  _____
                                  NOTARY PUBLIC

My commission expires:
_____

STATE OF COLORADO

COUNTY OF BOULDER

      I, _____, a Notary Public in and for the State and County aforesaid, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana Limited Liability Company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the aforesaid instrument and with full authority, executed the same voluntarily for and as the act of the said Company.

      Given under my hand and official seal on this the _____day of _____, 201___.

                                  _____
                                  NOTARY PUBLIC

My commission expires:
_____

10

**EXHIBIT "A"**

Attached to and made a part of that certain **OIL, GAS AND MINERAL LEASE** between **STATE LINE OIL TRUST** and **SKLARCO L.L.C.** with an effective date of _____, 201___.

All mineral interest owned by Lessor in Santa Rosa County, Florida, described as follows:

**SANTA ROSA COUNTY, FL:**

[INSERT PROPERTY DESCRIPTION]

Containing a total of _____ **net acres**, more or less.

**It is the intent to include all net mineral acreage as described within the respective quarter sections herein.**

SIGNED FOR IDENTIFICATION BY LESSOR:

**STATE LINE OIL TRUST**

By: _____

By: _____

SIGNED FOR IDENTIFICATION BY LESSEE:

**SKLARCO L.L.C.**

By: _____

11

EXHIBIT "B-1"

Attached to and made a part of that certain Amended and Restated Participation Agreement (Mt. Carmel
Prospect) dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., Sklarco
L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy
Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P.,
Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc.

## PARTIAL ASSIGNMENT OF INTEREST IN GEOPHYSICAL PERMIT
## & LEASE OPTION AGREEMENTS AND IN OIL GAS AND MINERAL LEASES

STATE OF ALABAMA

COUNTY OF ESCAMBIA

KNOW ALL MEN BY THESE PRESENTS, that

> **SKLARCO L.L.C.,** a Louisiana limited liability company, whose
> address is 5395 Pearl Parkway, Suite 200, Boulder, Colorado
> 80301, represented herein by its duly authorized President –
> Chief Operating Officer, David A. Barlow (hereinafter referred
> to as "**Sklarco**" or "**Assignor**");

for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable

consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the matters stated

below, does hereby grant, bargain, sell, convey, assign, set over and transfer unto the following (hereinafter

sometimes referred to as the "**Assignees**"):

> **JJS WORKING INTERESTS L.L.C.,** a Texas limited liability company,
> whose address is 4295 San Felipe, Suite 207, Houston, Texas
> 77027, represented herein by its duly authorized Manager, Houston
> Bulldog Capital Management, LLC, a Texas limited liability
> company, which itself is represented herein by its duly authorized
> Manager, Justin Simons ("**JJS**");

> **MCCOMBS ENERGY, LTD.,** a Texas limited partnership, whose
> address is 5599 San Felipe, Suite 1200, Houston, Texas 77056-
> 2794, represented herein by its Vice President, Billy Forney, III
> ("**McCombs**");

> **TCP COTTONWOOD, L.P.,** a Texas limited partnership, whose address
> is 333 Texas Street, Suite 2020, Shreveport, Louisiana 71101,
> represented herein by its duly authorized General Partner Trinity-
> Anderson, LLC, a Louisiana limited liability company, which itself
> is represented herein by its duly authorized Manager, Anderson
> Feazel Management, Inc., a Louisiana corporation, which itself is
> represented herein by its duly authorized Vice-President, T. Cole
> Anderson ("**TCP**");

> **FANT ENERGY LIMITED,** a Texas limited partnership, whose address
> is 5800 Westview Drive, Houston, Texas 77055, represented
> herein by its duly authorized General Partner, Richard E. Fant
> L.L.C., a Texas limited liability company, which itself is
> represented herein by its duly authorized Manager, Stephen Swan
> ("**Fant**");

> **TAUBER EXPLORATION & PRODUCTION CO.,** a Texas
> corporation, whose address is 55 Waugh Drive, Suite 600, Houston
> TX 77007, represented herein by Richard E. Tauber, as the duly
> authorized President of said company ("**Tauber**");

> **KUDZU OIL PROPERTIES, L.L.C.,** a Mississippi limited liability
> company, whose address is 300 Concourse Blvd., Suite 101,

Ridgeland, Mississippi 39157, represented herein by its Manager, Wirt A. Yerger, III ("**Kudzu**");

**JF HOWELL INTERESTS, L.P.,** a Texas Limited Partnership, whose address is 416 Travis Street, Suite 715, Shreveport, Louisiana 71101, represented herein by its duly authorized General Partner, Howell Investments, L.L.C., a Louisiana limited liability company, which itself is represented herein by its duly authorized Manager, David Morgan ("**Howell**");

**LECHWE, L.L.C.,** a Texas limited liability company, whose address is P.O. Box 270415, Houston, Texas 77277-0415, represented herein by its duly authorized Agent and Attorney-in-Fact, Mark Rauch ("**Lechwe**");

**MARKSCO, L.L.C.,** a Louisiana limited liability company, whose address is 333 Texas Street, Suite 1050, Shreveport, Louisiana 71101, represented herein by its duly authorized Member, Mark P. Sealy ("**Marksco**"); and

**BUNDERO INVESTMENT COMPANY, L.L.C.,** a Louisiana limited liability company, whose address is 333 Texas Street, Suite 300, Shreveport, Louisiana 71101, represented herein by its Manager, Robert P. Bowman ("**Bundero**");

an undivided seventy-five percent (75%) in and to the Geophysical Permit & Lease Option Agreements (the "**Options**") and oil, gas and mineral leases (the "**Leases**") described in Exhibit "A" attached hereto and made a part hereof, and a like interest in and to the rights, estates and interests of the Grantee under each of the Options/Leases, in the following proportions, to-wit:

| Assignees | BPO | APO |
|-----------|-----|-----|
| JJS | 7.00% | 7.00% |
| McCombs | 25.00% | 18.75% |
| TCP | 23.50% | 17.625% |
| Fant | 2.50% | 1.875% |
| Tauber | 5.00% | 3.75% |
| Kudzu | 3.00% | 2.25% |
| JF Howell | 4.00% | 3.00% |
| Lechwe | 2.00% | 1.50% |
| Marksco | 2.00% | 1.50% |
| Bundero | 1.00% | 0.75% |
| *Total* | 75.00% | 58.00% |

TO HAVE AND TO HOLD unto the Assignee and, its successors and assigns, forever, subject to, and in accordance with, the following terms and provisions:

1.  This Partial Assignment is made effective as of April 8, 2015 (the "**Effective Date**").

2.  Assignor has retained unto itself and undivided Twenty-Five percent (25%) interest in and to the Options and Leases and a like interest in and to the rights, estates and interests of the Grantee under each of the Options and Leases.

3.  The Partial Assignment of interests in the Options and Leases (and in the rights, estates and interests of the Grantee/Lessee thereunder) made herein is made without warranty of title, express or implied, except that Assignor warrants and agrees to defend title against all defects or encumbrances arising out of claims by persons claiming by, through or under Assignor.

4.  This Partial Assignment, and the interest assigned hereunder, is made subject to the terms and conditions of the Options and Leases.

5.  This Partial Assignment is made in accordance with and subject to that certain Amended & Restated Participation Agreement (the "**PA**") dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc, including all attachments thereto.  Without limitation upon the foregoing, this Partial Assignment and the rights and interests assigned hereby are made subject to the After Payout Interest described in Section 1.4 of the PA.  The terms "before payout" and "after payout" (or "**APO**" and "**BPO**") shall have the meanings ascribed to them in the PA.

6.  This Partial Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.  Also, all signature pages to copies of this Partial Assignment may be attached to one copy thereof, and only that copy need be recorded.

This Partial Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

**ASSIGNOR:**

SKLARCO L.L.C.

By: _____
   David A. Barlow
   President - Chief Operating Officer

**ASSIGNEES:**

JJS WORKING INTERESTS, L.L.C.

By:  HOUSTON  BULLDOG  CAPITAL
MANAGEMENT, L.L.C.
   Manager

By: _____
   Justin Simons
   Manager

MCCOMBS ENERGY, LTD.

By: _____
   Billy Forney, III
   Vice President

TCP COTTONWOOD, L.P.

By: TRINITY-ANDERSON, LLC
   General Partner

By: ANDERSON FEAZEL MANAGEMENT, INC.
   Manager

By: _____
   T. Cole Anderson
   Vice-President

FANT ENERGY LIMITED

By: RICHARD E. FANT, L.L.C.
        General Partner


By: _____
        Stephen Swan
        Manager


TAUBER EXPLORATION & PRODUCTION CO.


By: _____
        Richard E. Tauber
        President


KUDZU OIL PROPERTIES, LLC


By: _____
        Wirt A. Yerger, III
        Manager


JF HOWELL INTERESTS, L.P.

By: HOWELL INVESTMENTS, L.L.C.
        General Partner


By: _____
        David Morgan
        Manager


LECHWE, L.L.C.

By: _____
        Mark Rauch
        Agent and Attorney-in-Fact


MARKSCO, L.L.C.


By: _____
        Mark P. Sealy
        Member


BUNDERO INVESTMENT COMPANY, L.L.C.


By: _____
        Robert P. Bowman
        Manager

## EXHIBIT "A"

Attached to and made a part of that certain Amended and Restated Participation Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015 therein, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc.

### DESCRIPTION OF LEASES & OPTIONS

1.      Geophysical Permit & Lease Option Agreement dated April 7, 2015, by and between TRM Woodlands, Inc., as Grantor, and Sklarco L.L.C., as Grantee, a short form of which is recorded in Book 598, Page 534 of the real property records the office of the Probate Judge of Escambia County, Alabama, and in OR Book 3433, Page 1085 of the Official Records of the office of the Clerk of Court of Santa Rosa County, Florida.

2.      Geophysical Permit & Lease Option Agreement dated April 7, 2015, by and between the State Line Oil Trust, represented by John F. Watson and David B. Foshee, Co-Trustees, as Grantor, and Sklarco L.L.C., as Grantee, a short form of which is recorded in Book 598, Page 525 of the real property records the office of the Probate Judge of Escambia County, Alabama, and in OR Book 3433, Page 1077 of the Official Records of the office of the Clerk of Court of Santa Rosa County, Florida.

3.      That certain unrecorded Letter of Intent dated December 29, 2014, by and between the City of Brewton, represented by its mayor, Yank Lovelace, as grantor, and Longleaf Energy Group, Inc., granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and minerals covering certain property located in Township 1 North, Range 10 East, Escambia County, Alabama.

4.      Unrecorded Option Agreement dated July 8, 2014, by and between the State Line Oil Trust, represented by John F. Watson and David B. Foshee, Co-Trustees, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Phase I & II with Coldwater Creek Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

5.      Unrecorded Option Agreement dated December 10, 2014, by and between William Yancey Lovelace, Jr., as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

6.      Unrecorded Option Agreement dated December 10, 2014, by and between Kelley Alford, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

7.      Unrecorded Option Agreement dated December 10, 2014, by and between Caroline O'Neal, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

8.      Unrecorded Option Agreement dated December 10, 2014, by and between Gordon O'Neal, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

9.      Unrecorded Option Agreement dated December 10, 2014, by and between Robert O'Neal, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

10.     Unrecorded Option Agreement dated December 10, 2014, by and between The Mary Hardegree Strain Family Trust, represented by Jane Strain Blount, Trustee, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas

and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

11.    Unrecorded Option Agreement dated December 10, 2014, by and between John Cleveland Lovelace, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

12.    Unrecorded Option Agreement dated December 10, 2014, by and between Trust ULWT of Ben Kelly Strain FBO Erin Joann Strain, represented by Erin Joann Strain and William Dudley Strain, Co-Trustees, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

13.    Unrecorded Option Agreement dated December 10, 2014, by and between Edwin Sanford, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

14.    Unrecorded Option Agreement dated December 10, 2014, by and between Stephen O'Neal, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

15.    Unrecorded Option Agreement dated December 10, 2014, by and between Hester Lovelace Gordon, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

16.    Unrecorded Option Agreement dated December 10, 2014, by and between Lovelace Properties, LLC, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

## ACKNOWLEDGMENTS TO PARTIAL ASSIGNMENT OF INTEREST IN GEOPHYSICAL PERMIT & LEASE OPTION AGREEMENTS AND OIL, GAS AND MINERAL LEASES

STATE OF COLORADO

COUNTY OF BOULDER

I, _____, a notary public in and for said County and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF TRAVIS

I, _____, a notary public in and for said County and State, hereby certify that Justin Simons, whose name as Manager of Houston Bulldog Capital Management, L.L.C., a Texas limited liability company, duly authorized Manager of JJS WORKING INTERESTS, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF TRAVIS

I, _____, a notary public in and for said County and State, hereby certify that Billy Forney, III, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that T. Cole Anderson, whose name as Vice-President of Anderson Feazel Management, Inc., a Louisiana corporation, duly authorized Manager of Trinity-Anderson, LLC, a Louisiana limited liability company, duly authorized General Partner of TCP COTTONWOOD, L.P., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same voluntarily on the day the same bears date.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF TRAVIS

I, _____, a notary public in and for said County and State, hereby certify that Stephen Swan, whose name as Manager of RICHARD E. FANT, L.L.C., a Texas limited liability company, duly authorized General Partner of Fant Energy Limited, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF TRAVIS

I, _____, a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as President of TAUBER EXPLORATION AND PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF MADISON

I, _____, a notary public in and for said County and State, hereby certify that Wirt A. Yerger, III, whose name as Manager of KUDZU OIL PROPERTIES, L.L.C., a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that David Morgan, whose name as Manager of Howell Investments, L.L.C., a Louisiana limited liability company, duly authorized General Partner of JF HOWELL INTERESTS, L.P., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF TRAVIS

I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Agent and Attorney-in-Fact of LECHWE, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in his capacity as such Agent and Attorney-in-Fact, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

    I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of MARKSCO, L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2015.

                                       _____
                                       NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

    I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Manager of BUNDERO INVESTMENT COMPANY, L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2015.

                                         _____
                                       NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

EXHIBIT "B-2"

Attached to and made a part of that certain Amended and Restated Participation Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc.

## PARTIAL ASSIGNMENT OF INTEREST IN GEOPHYSICAL PERMIT & LEASE OPTION AGREEMENTS AND IN OIL GAS AND MINERAL LEASES

STATE OF FLORIDA

COUNTY OF SANTA ROSA

KNOW ALL MEN BY THESE PRESENTS, that

> **SKLARCO L.L.C.,** a Louisianna limited liability company, whose address is 5395 Pearl Parkway, Suite 200, Boulder, Colorado 80301, represented herein by its duly authorized President – Chief Operating Officer, David A. Barlow (hereinafter referred to as "**Sklarco**" or "**Assignor**");

for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the matters stated below, does hereby grant, bargain, sell, convey, assign, set over and transfer unto the following (hereinafter sometimes referred to as the "**Assignees**"):

> **JJS WORKING INTERESTS L.L.C.,** a Texas limited liability company, whose address is 4295 San Felipe, Suite 207, Houston, Texas 77027, represented herein by its duly authorized Manager, Houston Bulldog Capital Management, LLC, a Texas limited liability company, which itself is represented herein by its duly authorized Manager, Justin Simons ("**JJS**");

> **MCCOMBS ENERGY, LTD.,** a Texas limited partnership, whose address is 5599 San Felipe, Suite 1200, Houston, Texas 77056-2794, represented herein by its Vice President, Billy Forney, III ("**McCombs**");

> **TCP COTTONWOOD, L.P.,** a Texas limited partnership, whose address is 333 Texas Street, Suite 2020, Shreveport, Louisiana 71101, represented herein by its duly authorized General Partner Trinity-Anderson, LLC, a Louisiana limited liability company, which itself is represented herein by its duly authorized Manager, Anderson Feazel Management, Inc., a Louisiana corporation, which itself is represented herein by its duly authorized Vice-President, T. Cole Anderson ("**TCP**");

> **FANT ENERGY LIMITED,** a Texas limited partnership, whose address is 5800 Westview Drive, Houston, Texas 77055, represented herein by its duly authorized General Partner, Richard E. Fant L.L.C., a Texas limited liability company, which itself is represented herein by its duly authorized Manager, Stephen Swan ("**Fant**");

> **TAUBER EXPLORATION & PRODUCTION CO.,** a Texas corporation, whose address is 55 Waugh Drive, Suite 600, Houston TX 77007, represented herein by Richard E. Tauber, as the duly authorized President of said company ("**Tauber**");

> **KUDZU OIL PROPERTIES, L.L.C.,** a Mississippi limited liability company, whose address is 300 Concourse Blvd., Suite 101,

PA – Ex. B-2
Page 1 of 11

Ridgeland, Mississippi 39157, represented herein by its Manager, Wirt A. Yerger, III ("**Kudzu**");

**JF HOWELL INTERESTS, L.P.,** a Texas Limited Partnership, whose address is 416 Travis Street, Suite 715, Shreveport, Louisiana 71101, represented herein by its duly authorized General Partner, Howell Investments, L.L.C., a Louisiana limited liability company, which itself is represented herein by its duly authorized Manager, David Morgan ("**Howell**");

**LECHWE, L.L.C.,** a Texas limited liability company, whose address is P.O. Box 270415, Houston, Texas 77277-0415, represented herein by its duly authorized Agent and Attorney-in-Fact, Mark Rauch ("**Lechwe**");

**MARKSCO, L.L.C.,** a Louisiana limited liability company, whose address is 333 Texas Street, Suite 1050, Shreveport, Louisiana 71101, represented herein by its duly authorized Member, Mark P. Sealy ("**Marksco**"); and

**BUNDERO INVESTMENT COMPANY, L.L.C.,** a Louisiana limited liability company, whose address is 333 Texas Street, Suite 300, Shreveport, Louisiana 71101, represented herein by its Manager, Robert P. Bowman ("**Bundero**");

an undivided seventy-five percent (75%) in and to the Geophysical Permit & Lease Option Agreements (the "**Options**") and oil, gas and mineral leases (the "**Leases**") described in Exhibit "A" attached hereto and made a part hereof, and a like interest in and to the rights, estates and interests of the Grantee under each of the Options/Leases, in the following proportions, to-wit:

| Assignees | BPO | APO |
|-----------|-----:|-----:|
| JJS | 7.00% | 7.00% |
| McCombs | 25.00% | 18.75% |
| TCP | 23.50% | 17.625% |
| Fant | 2.50% | 1.875% |
| Tauber | 5.00% | 3.75% |
| Kudzu | 3.00% | 2.25% |
| JF Howell | 4.00% | 3.00% |
| Lechwe | 2.00% | 1.50% |
| Marksco | 2.00% | 1.50% |
| Bundero | 1.00% | 0.75% |
| *Total* | 75.00% | 58.00% |

TO HAVE AND TO HOLD unto the Assignee and, its successors and assigns, forever, subject to, and in accordance with, the following terms and provisions:

1.   This Partial Assignment is made effective as of April 8, 2015 (the "**Effective Date**").

2.   Assignor has retained unto itself and undivided Twenty-Five percent (25%) interest in and to the Options and Leases and a like interest in and to the rights, estates and interests of the Grantee under each of the Options and Leases.

3.   The Partial Assignment of interests in the Options and Leases (and in the rights, estates and interests of the Grantee/Lessee thereunder) made herein is made without warranty of title, express or implied, except that Assignor warrants and agrees to defend title against all defects or encumbrances arising out of claims by persons claiming by, through or under Assignor.

4.   This partial assignment of interests in the Options/Leases (and in the rights, estates and interests of the Grantee/Lessee thereunder) is specifically made subject to the overriding royalty interest previously reserved by Longleaf Energy Group, Inc.: (1) overriding royalty interest equal to 2.5% of the value (computed at the mouth of the well and net of any

severance or similar taxes) of the oil and gas produced under and allocable to the oil, gas and mineral leases granted by Mary Books Pittman, Sally Elizabeth Pittman, The Sally Elizabeth Pittman Trust, Thomas Brooks Henry, Edmund T. Henry, III, Frances A. Vonk, and John Riley Pittman (the "**Pittman Group**") in favor of Longleaf Energy Group, Inc. and covering 652.00 acres in Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, which leases are more particularly described in Exhibit "A" (the "**Pittman Leases**"); and (2) overriding royalty interest equal to 2.5% of the value (computed at  the mouth of the well and net of any severance or similar taxes) of the oil and gas produced under and allocable to any oil, gas and mineral lease acquired pursuant to that certain Option to Lease Oil, Gas and Other Minerals (as amended) dated December 14, 2012 granted by the Pittman Group in favor of Longleaf Energy Group, Inc. and covering approximately 2091.48 acres located in Santa Rosa County, Florida, which option and the amendment thereto are more particularly described in Exhibit "A" (the "**Pittman Option**").  The foregoing reservations of overriding royalty interests are subject to proportionate reduction if the Pittman Leases or Pittman Option cover less than full fee simple title to the covered property.

5.      This Partial Assignment, and the interest assigned hereunder, is made subject to the terms and conditions of the Options and Leases.

6.      This Partial Assignment is made in accordance with and subject to that certain Amended and Restated Participation Agreement (the "**PA**") dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc, including all attachments thereto.  Without limitation upon the foregoing, this Partial Assignment and the rights and interests assigned hereby are made subject to the After Payout Interest described in Section 1.4 of the PA.  The terms "before payout" and "after payout" (or "**APO**" and "**BPO**") shall have the meanings ascribed to them in the PA.

7.      This Partial Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.  Also, all signature pages to copies of this Partial Assignment may be attached to one copy thereof, and only that copy need be recorded.

This Partial Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

**WITNESSES:**                                   **ASSIGNOR:**

                                                 SKLARCO L.L.C.
_____

Print Name: _____

_____    By: _____

Print Name: _____         David A. Barlow
                                        President - Chief Operating Officer

**WITNESSES:**                                   **ASSIGNEES:**

                                                 JJS WORKING INTERESTS, L.L.C.
_____

Print Name: _____

_____    By:     HOUSTON BULLDOG CAPITAL
                                            MANAGEMENT, L.L.C.
Print Name: _____             Manager


                                    By: _____

                                            Justin Simons
                                            Manager

MCCOMBS ENERGY, LTD.

Print Name: _____

By: _____
    Billy Forney, III
    Vice President

Print Name: _____

TCP COTTONWOOD, L.P.

Print Name: _____

By: TRINITY-ANDERSON, LLC
    General Partner

Print Name: _____

By: ANDERSON FEAZEL MANAGEMENT, INC.
    Manager

By: _____
    T. Cole Anderson
    Vice-President

FANT ENERGY LIMITED

Print Name: _____

By: RICHARD E. FANT, L.L.C.
    General Partner

Print Name: _____

By: _____
    Stephen Swan
    Manager

TAUBER EXPLORATION & PRODUCTION CO.

Print Name: _____

By: _____
    Richard E. Tauber
    President

Print Name: _____

KUDZU OIL PROPERTIES, LLC

Print Name: _____

By: _____
    Wirt A. Yerger, III
    Manager

Print Name: _____

JF HOWELL INTERESTS, L.P.

Print Name: _____

By: HOWELL INVESTMENTS, L.L.C.
    General Partner

Print Name: _____

By: _____
    David Morgan
    Manager

LECHWE, L.L.C.

Print Name: _____

By: _____
    Mark Rauch
    Agent and Attorney-in-Fact

Print Name: _____

_____
Print Name: _____

_____
Print Name: _____

MARKSCO, L.L.C.

By: _____

    Mark P. Sealy
    Member

_____
Print Name: _____

_____
Print Name: _____

BUNDERO INVESTMENT COMPANY, L.L.C.

By: _____

    Robert P. Bowman
    Manager

## EXHIBIT "A"

Attached to and made a part of that certain Amended and Restated Participation Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015 therein, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc.

### DESCRIPTION OF OPTIONS

1.      Geophysical Permit & Lease Option Agreement dated April 7, 2015, by and between TRM Woodlands, Inc., as Grantor, and Sklarco L.L.C., as Grantee, a short form of which is recorded in Book 598, Page 534of the real property records the office of the Probate Judge of Escambia County, Alabama, and in OR Book 3433, Page 1085 of the Official Records of the office of the Clerk of Court of Santa Rosa County, Florida.

2.      Geophysical Permit & Lease Option Agreement dated April 7, 2015, by and between the State Line Oil Trust, represented by John F. Watson and David B. Foshee, Co-Trustees, as Grantor, and Sklarco L.L.C., as Grantee, a short form of which is recorded in Book 598, Page 525 of the real property records the office of the Probate Judge of Escambia County, Alabama, and in OR Book 3433, Page 1077 of the Official Records of the office of the Clerk of Court of Santa Rosa County, Florida.

3.      Unrecorded Option to Lease Oil, Gas and Other Minerals dated December 14, 2012, by and between Mary Brooks Pittman, Sally Elizabeth Pittman, The Sally Elizabeth Pittman Trust, Thomas Brooks Henry, Edmund T. Henry, III, Frances A. Vonk and John Riley Pittman, as grantors, and Longleaf Energy Group, Inc. covering the following property in Santa Rosa County, Florida, to-wit: all of Section 15, containing 545 acres, more or less, the East Half of the Southeast Quarter (E/2 SE/4) of Section 16, containing 79.65 acres, more or less, the Southwest Quarter of the Southwest Quarter (SW/4 SW/4) and the East Half of the East Half (E/2 E/2) of Section 25, containing 192.128 acres, more or less, all of Section 27, less and except the Southwest Quarter of the Southwest Quarter (SW/4 SW/4), containing 524.14 acres, more or less, and all of Section 38, less and except the Northwest Quarter of the Northwest Quarter (NW/4 NW/4), containing 630.559 acres, more or less, all in Township 5 North, Range 29 West; and the Southwest Quarter (SW/4) of Section 30, Township 5 North, Range 28 West, less and except the Northeast Quarter of the Southwest Quarter (NE/4 SW/4), containing 120 acres, more or less; containing in total 2,091.477 acres, more or less.

4.      Unrecorded Option Agreement dated July 8, 2014, by and between the State Line Oil Trust, represented by John F. Watson and David B. Foshee, Co-Trustees, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Phase I & II with Coldwater Creek Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

### DESCRIPTION OF LEASES

1.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between Thomas B. Henry, a married man, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1365-66, File No. 201301468 of the Deed Records of Santa Rosa County, Florida.

2.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between Mary Brooks Pittman, a widow, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1371-72, File No. 201301471 of the Deed Records of the Santa Rosa County, Florida.

3.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between Sally Elizabeth Pittman, represented by Mary Brooks Pittman, her agent and attorney-in-fact, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1373-74, File No. 201301472 of the Deed Records of the Santa Rosa County, Florida.

4.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between Edmund T. Henry, a married man, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1367-68, File No. 201301469 of the Deed Records of the Santa Rosa County, Florida.

5.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between Frances A. Vonk, a married woman, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1369-70, File No. 201301470 of the Deed Records of the Santa Rosa County, Florida.

6.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between John Riley Pittman, a married man, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1363-64, File No. 201301467 of the Deed Records of the Santa Rosa County, Florida.

7.      Oil, Gas and Mineral Lease dated October 22, 2012, by and between James Milton Bates, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the Southeast Quarter of the Southeast Quarter (SE/4 SE/4) of Section 13, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 40 acres, more or less, recorded on January 16, 2014 in Book 3318, pages 849-51, File No. 201401643 of the Deed Records of Santa Rosa County, Florida.

8.      Oil, Gas and Mineral Lease dated October 22, 2012, by and between the Lillian Louise Hendricks Revocable Trust, represented by James Milton Bates, trustee, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the Southeast Quarter of the Southeast Quarter (SE/4 SE/4) of Section 13, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 40 acres, more or less, recorded on January 16, 2014 in Book 3318, pages 846-48, File No. 201401642 of the Deed Records of Santa Rosa County, Florida.

**ACKNOWLEDGMENTS TO PARTIAL ASSIGNMENT OF INTEREST
IN GEOPHYSICAL PERMIT & LEASE OPTION AGREEMENTS AND
OIL, GAS AND MINERAL LEASES**

STATE OF COLORADO

COUNTY OF BOULDER

      I, _____, a notary public in and for said County and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2015.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF TRAVIS

      I, _____, a notary public in and for said County and State, hereby certify that Justin Simons, whose name as Manager of Houston Bulldog Capital Management, L.L.C., a Texas limited liability company, duly authorized Manager of JJS WORKING INTERESTS, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2015.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF TRAVIS

      I, _____, a notary public in and for said County and State, hereby certify that Billy Forney, III, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2015.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

   I, _____, a notary public in and for said Parish and State, hereby certify that T. Cole Anderson, whose name as Vice-President of Anderson Feazel Management, Inc., a Louisiana corporation, duly authorized Manager of Trinity-Anderson, LLC, a Louisiana limited liability company, duly authorized General Partner of TCP COTTONWOOD, L.P., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same voluntarily on the day the same bears date.

   Given under my hand and notarial seal this the _____ day of _____, 2015.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF TRAVIS

   I, _____, a notary public in and for said County and State, hereby certify that Stephen Swan, whose name as Manager of RICHARD E. FANT, L.L.C., a Texas limited liability company, duly authorized General Partner of Fant Energy Limited, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

   Given under my hand and notarial seal this the _____ day of _____, 2015.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF TRAVIS

   I, _____, a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as President of TAUBER EXPLORATION AND PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

   Given under my hand and notarial seal this the _____ day of _____, 2015.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF MADISON

       I, _____, a notary public in and for said County and State, hereby certify that Wirt A. Yerger, III, whose name as Manager of KUDZU OIL PROPERTIES, L.L.C., a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

       Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

       I, _____, a notary public in and for said Parish and State, hereby certify that David Morgan, whose name as Manager of Howell Investments, L.L.C., a Louisiana limited liability company, duly authorized General Partner of JF HOWELL INTERESTS, L.P., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

       Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF TRAVIS

       I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Agent and Attorney-in-Fact of LECHWE, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in his capacity as such Agent and Attorney-in-Fact, executed the same voluntarily for and as the act of said company.

       Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of MARKSCO, L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2015.


                                          _____
                                          NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Manager of BUNDERO INVESTMENT COMPANY, L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2015.


                                            _____
                                          NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

## EXHIBIT "B-3"

Attached to and made a part of that certain Amended and Restated Participation Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc.

## LLEG DOCUMENTS

1.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between Thomas B. Henry, a married man, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1365-66, File No. 201301468 of the Deed Records of Santa Rosa County, Florida.

2.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between Mary Brooks Pittman, a widow, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1371-72, File No. 201301471 of the Deed Records of the Santa Rosa County, Florida.

3.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between Sally Elizabeth Pittman, represented by Mary Brooks Pittman, her agent and attorney-in-fact, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1373-74, File No. 201301472 of the Deed Records of the Santa Rosa County, Florida.

4.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between Edmund T. Henry, a married man, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1367-68, File No. 201301469 of the Deed Records of the Santa Rosa County, Florida.

5.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between Frances A. Vonk, a married woman, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1369-70, File No. 201301470 of the Deed Records of the Santa Rosa County, Florida.

6.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between John Riley Pittman, a married man, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1363-64, File No. 201301467 of the Deed Records of the Santa Rosa County, Florida.

7.      Option to Lease Oil, Gas and Other Minerals dated December 14, 2012, by and between Mary Brooks Pittman, Sally Elizabeth Pittman, The Sally Elizabeth Pittman Trust, Thomas Brooks Henry, Edmund T. Henry, III, Frances A. Vonk and John Riley Pittman, as grantors, and Longleaf Energy Group, Inc. covering the following property in Santa Rosa County, Florida, to-wit: all of Section 15, containing 545 acres, more or less, the East Half of the Southeast Quarter (E/2 SE/4) of Section 16, containing 79.65 acres, more or less, the Southwest Quarter of the Southwest Quarter (SW/4 SW/4) and the East Half of the East Half (E/2 E/2) of Section 25, containing 192.128 acres, more or less, all of Section 27, less and except the Southwest Quarter of the Southwest Quarter (SW/4 SW/4), containing 524.14 acres, more or less, and all of Section 38, less and except the Northwest Quarter of the Northwest Quarter (NW/4 NW/4), containing 630.559 acres, more or less, all in Township 5 North, Range 29 West; and the Southwest Quarter (SW/4) of Section 30, Township 5 North, Range 28 West, less and except the Northeast Quarter of the Southwest Quarter (NE/4 SW/4), containing 120 acres, more or less; containing in total 2,091.477 acres, more or less.

8.      Oil, Gas and Mineral Lease dated October 22, 2012, by and between James Milton Bates, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the Southeast Quarter of the Southeast Quarter (SE/4 SE/4) of Section 13, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 40 acres, more or less, recorded on January 16, 2014 in Book 3318, pages 849-51, File No. 201401643 of the Deed Records of Santa Rosa County, Florida.

9.      Oil, Gas and Mineral Lease dated October 22, 2012, by and between the Lillian Louise Hendricks Revocable Trust, represented by James Milton Bates, trustee, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the Southeast Quarter of the Southeast Quarter (SE/4 SE/4) of Section 13, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 40 acres, more or less, recorded on January 16, 2014 in Book 3318, pages 846-48, File No. 201401642 of the Deed Records of Santa Rosa County, Florida.

10.     That certain Letter of Intent dated December 29, 2014, by and between the City of Brewton, represented by its mayor, Yank Lovelace, as grantor, and Longleaf Energy Group, Inc., granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and minerals covering all of the city's property located in Township 1 North, Range 10 East, Escambia County, Alabama.

11.     Option Agreement dated July 8, 2014, by and between the State Line Oil Trust, represented by John F. Watson and David B. Foshee, Co-Trustees, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Phase I & II with Coldwater Creek Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

12.     Option Agreement dated December 10, 2014, by and between William Yancey Lovelace, Jr., as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

13.     Option Agreement dated December 10, 2014, by and between Kelley Alford, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

14.     Option Agreement dated December 10, 2014, by and between Caroline O'Neal, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

15.     Option Agreement dated December 10, 2014, by and between Gordon O'Neal, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

16.     Option Agreement dated December 10, 2014, by and between Robert O'Neal, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

17.     Option Agreement dated December 10, 2014, by and between The Mary Hardegree Strain Family Trust, represented by Jane Strain Blount, Trustee, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

18.     Option Agreement dated December 10, 2014, by and between John Cleveland Lovelace, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

19.     Option Agreement dated December 10, 2014, by and between Trust ULWT of Ben Kelly Strain FBO Erin Joann Strain, represented by Erin Joann Strain and William Dudley Strain, Co-Trustees, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

20.     Option Agreement dated December 10, 2014, by and between Edwin Sanford, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits

and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

21.      Option Agreement dated December 10, 2014, by and between Stephen O'Neal, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

22.      Option Agreement dated December 10, 2014, by and between Hester Lovelace Gordon, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

23.      Option Agreement dated December 10, 2014, by and between Lovelace Properties, LLC, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

## EXHIBIT "C"

Attached to and made a part of that certain Amended and Restated Participation Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc.

### SEISMIC DATA LICENSE AGREEMENT

Date: _____ ___, _____

|  | LICENSOR: Sklar Exploration Company L.L.C. |
|---|---|
|  | Attention: Don Eustes |
|  | 401 Edwards Street, Suite 1601 |
|  | Shreveport, Louisiana 71101 |

LICENSOR represents that it has the right and authority to make available such seismic data to LICENSEE and that such seismic data are transferred subject to the following conditions:

LICENSOR represents that it has the right to license to LICENSEE certain confidential seismic data ("Data") described in the Participation Agreement to which this Seismic Data License Agreement is attached as Exhibit "C". LICENSOR hereby grants to LICENSEE a non-exclusive right to use the Data, and LICENSEE agrees to receive the Data and use it in accordance with the terms and conditions hereof. LICENSEE acknowledges that this license is non-exclusive and that the Data is the property of the LICENSOR.

LICENSOR retains title and full ownership rights to Data including, but not limited to, the exclusive right to license, trade, loan, transfer and reproduce the same. LICENSEE agrees that the Data, and any copies thereof, shall be for its own internal use only and that the same shall not be given, sold, traded, disposed of or otherwise divulged to any other party, except as follows:

a. Data may be provided to a consultant to prepare an analysis and interpretation for LICENSEE.

b. If LICENSEE is entering into this Agreement as the operator or other representative of one or more parties disclosed to LICENSOR, then such other parties may be shown the Data by LICENSEE or its bona fide consultant, but only if each such party agrees in writing not to divulge the data to any other party.

c. LICENSEE can make a prospect presentation of the Data and the results of any analysis and interpretations to a third party with a bona fide interest in joining LICENSEE to explore, develop, produce, or finance any appropriate property for the purpose of identifying subsurface oil and gas deposits, provided that such third party agrees to treat all such data as confidential. Should such third party wish to make his own evaluation of the data, he/she/it may do so in LICENSEE's office only, provided that such third party agrees in writing not to remove any such licensed data from LICENSEE's office, and to treat all such data as confidential.

d. If LICENSEE is a legal entity other than an individual, it may disclose, by providing copies thereof, the Data to a company owing 50% or more of the LICENSEE or to a company which is owned 50% or more by LICENSEE or to a surviving company in the event of a complete merger by LICENSEE, provided each such company is disclosed in advance to LICENSOR and that company agrees in writing to assume the terms and obligations of this agreement.

e. LICENSEE may show, and provide copies of, the Data to agencies of federal and state governments having jurisdiction to the extent required or allowed by applicable law or regulation if necessary in the ordinary course of the LICENSEE's business.

f. LICENSEE shall have the right to make copies of adaptations from the Data (including reprocessed seismic traces) for his/her/its own internal use. LICENSEE may also transfer the Data to a third party for the sole purpose of further processing and data analysis provided the third party agrees to hold the Data confidential and to return all manifestations of the Data to the LICENSEE when the reprocessing of analysis has been completed.

LICENSEE may transfer, for no additional fee or other consideration, all of its right, title and interest under this license to a buyer of all of its undivided working interest in the Prospect, Eseambia County, Alabama, and Santa Rosa County Florida provided such buyer agrees to be bound by this License Agreement and the applicable Participation Agreement and Operating Agreement governing said prospect.

LICENSEE agrees that he/she/it accepts the Data tendered to it "As Is, Where Is". LICENSOR does not make any warranty or representation regarding the quality or reliability of any or all of the Data delivered hereunder. Any action taken by LICENSEE or any opinions formed or conclusions drawn on the basis of any or all Data shall be at the sole risk and expense of the party taking such action, forming such opinion or drawing such conclusion. LICENSOR warrants that any Data it furnished hereunder is free of liens, encumbrances, and limitations on use or disposition other than those expressly set out above. THESE WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE REGARDING ANY DATA GIVEN THE LICENSEE HEREUNDER.

LICENSEE shall not have nor ever assert any claim or cause of action against LICENSOR arising out of any defect or inaccuracy in the Data, whether such defect or inaccuracy arose by negligence or any other cause.

In the event that any governmental unit should levy a sales or use tax of similar nature related to the licensing or transfer of the data covered under this agreement, then LICENSEE shall reimburse LICENSOR the amount of such levies or taxes.

The use license granted in this agreement shall continue for a term of forty-nine (49) years and shall be automatically renewed for an additional forty-nine (49) years, for no additional consideration, unless otherwise terminated by the mutual consent of both parties.

All section time and prints including all reprocessed or reformatted sections shall show the data owner as being LICENSOR and shall contain a notice reading substantially as follows:

| NOTICE |
|---|
| "This document is licensed for use only to: _____, Licensee, by SKLAR EXPLORATION COMPANY L.L.C., LICENSOR. |
| Its use is governed by the terms specified in the license agreement signed by LICENSEE." |

       By their execution of this document, LICENSOR and LICENSEE do each hereby approve and agree to be bound by the terms and conditions stated above.

LICENSOR:                                                    LICENSEE:
**Sklar Exploration Company L.L.C.**                                              .

By: _____                    By: _____
     David A. Barlow

Title: President - Chief Operating Officer          Title: _____

Date: _____                  Date: _____

**EXHIBIT "D"**

Attached to and made a part of that certain Amended and Restated Participation Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc.

**JOA**

**EXHIBIT "D"**

**Attached to and made a part of that certain Amended and Restated Participation Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc.**

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT
## (AMENDED AND RESTATED)

## MT. CARMEL PROSPECT
## ESCAMBIA COUNTY, ALABAMA &
## SANTA ROSA COUNTY, FLORIDA

OPERATING AGREEMENT

DATED

_____**April 8**_____ , __**2015**__ ,
<span>year</span>

OPERATOR   **SKLAR EXPLORATION COMPANY L.L.C.**_____

CONTRACT AREA   **As shown on Exhibit "A" to this Agreement.**_____

_____

_____

COUNTY ~~OR PARISH~~ OF   **ESCAMBIA & SANTA ROSA**   STATE OF   **AL & FL**

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM. A.A.P.L. NO. 610 – 1982 REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2-3 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1.  Failure of Title | 3 |
| | 2.  Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3.  Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4-5 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

Table of Contents

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___**SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability Company, with a mailing address of 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101**___, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided.

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement, **including royalty and overriding royalty interests.**

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay / **100% of** its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate **for 100% of its share of** ~~in~~ a proposed operation.

*

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine. **Words defined herein shall have the same meaning whether or not they are capitalized.**

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑ A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.
☑ B. Exhibit "B", Form of Lease.
☑ C. Exhibit "C", Accounting Procedure.
☑ D. Exhibit "D", Insurance.
☑ E. Exhibit "E", Gas Balancing Agreement.
☐ ~~F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.~~
☐ ~~G. Exhibit "G", Tax Partnership.~~

If any provision of any exhibit, except Exhibits / "E" ~~and~~ "G", **"A" and** is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail. **If any provision in Exhibits "A" and "E" is inconsistent with any provision contained in the body of this agreement, the provisions of Exhibits "A" and "E" shall prevail.**

*

I. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the deepest Zone proposed in the associated AFE, whichever is the lesser.

J. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a completion in a shallower Zone.

K. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned or temporarily abandoned in order to attempt a Completion in or commingling with a different Zone within the existing wellbore.

L. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, without limitation, well stimulation operations, but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Re-completing or Plugging Back of a well.

M. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location, unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

N. The term "Zone" shall mean a stratum of earth containing, or thought to contain, a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE III.
INTERESTS OF PARTIES

A.    Oil and Gas Interests:

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder; provided, however, that the provisions of this Article III.A shall be subject to the provisions of Section 3.1 of the Participation Agreement to which this agreement is attached as Exhibit "D".

B.    Interests of Parties in Costs and Production:

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____ all jointly owned lease burdens _____ which shall be borne as hereinafter set forth.

Each of the parties hereto shall pay or deliver, or cause to be paid or delivered, its proportionate part of the royalties and overriding royalties and other leasehold burdens, as described in the attached Exhibit "A", and shall hold the other party(ies) free from any liability therefor. If the interest of any party(ies) in any oil and gas lease covered by this agreement is subject to any additional royalty, overriding royalty, production payment or other charge over and above those shown on Exhibit "A", such party(ies) shall assume and alone bear all such obligations and shall account, or cause to be accounted, for such interest(s) to the owners thereof. Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

C.    Excess Royalties, Overriding Royalties and Other Payments:

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production which is not a joint obligation of the parties / in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

D.    Subsequently Created Interests:

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.    If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.    If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

ARTICLE IV.
TITLES

A.    Title Examination:

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if at Operator's election the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Upon request, Copies of all title opinions shall be furnished to each party provided such party has paid 100% of its share of all costs of all operations conducted under the provisions of this agreement hereto / . The cost incurred by Operator in this title program shall be borne as follows:

☐    Option No. 1:  Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE IV
### continued

1  ☑   Option No. 2:   Costs incurred by Operator in procuring abstracts / and fees paid outside* attorneys / for title examination **

2  (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) *** / shall be borne by the Drilling Parties

3  in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-

4  hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above

5  functions.

6  * curative matters and materials    ** landmen and consultants    *** and for applications and hearings

   Operator shall use its best efforts to secure curative matters

7  / Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection

   subject to this agreement and charge all costs incurred in connection with the foregoing to the joint account

8  with leases or oil and gas interests ~~contributed by such party~~. Operator shall be responsible for the preparation and recording of pooling

9  designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.

10  This shall not prevent any party from appearing on its own behalf at any such hearing.

11

12     No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above

13  provided, and (2) the title has been approved by the examining attorney or title has been accepted by / ~~all of the parties who are to par-~~

                                                                                                               Operator

14  ~~ticipate in the drilling of the well.~~

15

16  **B.**   **Loss of Title:**

17

18  ~~1. Failure of Title:   Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a~~

19  ~~reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days~~

20  ~~from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-~~

21  ~~tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil~~

22  ~~and gas leases and interests; and,~~

23  ~~(a)   The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be~~

24  ~~entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,~~

25  ~~but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

26  ~~(b)   There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has~~

27  ~~been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-~~

28  ~~curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract~~

29  ~~Area by the amount of the interest lost;~~

30  ~~(c)   If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is~~

31  ~~increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-~~

32  ~~terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such~~

33  ~~well;~~

34  ~~(d)   Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has~~

35  ~~failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties~~

36  ~~who bore the costs which are so refunded;~~

37  ~~(e)   Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be~~

38  ~~borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,~~

39  ~~(f)   No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest~~

40  ~~claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in~~

41  ~~connection therewith.~~

42

43  ~~2. Loss by Non-Payment or Erroneous Payment of Amount Due:   If, through mistake or oversight, any rental, shut-in well~~

44  ~~payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,~~

45  ~~there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required~~

46  ~~payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,~~

47  ~~which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the~~

48  ~~date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in~~

49  ~~the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the~~

50  ~~required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to~~

51  ~~the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it~~

52  ~~shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled~~

53  ~~or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~

54  ~~(a)   Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,~~

55  ~~up to the amount of unrecovered costs;~~

56  ~~(b)   Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of~~

57  ~~oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease~~

58  ~~termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said~~

59  ~~portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,~~

60  ~~(c)   Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest~~

61  ~~lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

62

63     3. ~~Other~~  Losses:   All losses incurred~~, other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses

64  and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of

65  the Contract Area.

66

67

68

69

70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE V.

OPERATOR

**A.   Designation and Responsibilities of Operator:**

_____SKLAR EXPLORATION COMPANY L.L.C. of Shreveport, Louisiana_____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct ~~all such operations~~ its activities under this agreement in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

**B.   Resignation or Removal of Operator and Selection of Successor:**

    1.   Resignation or Removal of Operator:   Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, ~~no longer owns an interest hereunder in the Contract Area,~~ or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such vote shall not be deemed effective until a written notice has been delivered to Operator by Non-Operator(s) detailing the alleged default and Operator has failed to cure the alleged default within thirty (30) days of its receipt of said notice. / Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

    2.   Selection of Successor Operator:   Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator ~~which~~ has been removed ~~fails to vote or votes only to succeed itself,~~ the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

**C.   Employees:**

    The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

**D.   Drilling Contracts:**

except that in Operator's sole discretion, all factors, such as rig availability, equipment condition, contractor employee reliability and knowledge and drilling contractor reputation shall be taken into consideration in determining the real competitive price. All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area, / . If so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area ~~and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced,~~ and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

E. Custody of Funds: Operator shall hold for the account of Non-Operators any funds of Non-Operators advanced or paid to Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to Non-Operators or applied toward the payment of debts, regardless of whether the debts arise out of the same well or operation for which the funds were advanced or from which the sales proceeds were derived. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators.

F. Statutory Employer: Operator shall be considered the statutory employer of all employees of all contractors, their sub-contractors or agents, whose goods furnished or services rendered for Operator are an integral part of or essential to Operator's ability to perform its operations as an oil and gas operator.

ARTICLE VI.

DRILLING AND DEVELOPMENT

**A.   Initial Well:**
The "Initial Well" is the well referred to in Section 1.5 of the Participation Agreement to which this instrument is attached as Exhibit "D".

    On or before the _____ day of _____ , (year) _____ , Operator shall commence the drilling of a well for oil and gas at the following location:

and shall thereafter continue the drilling of the well with due diligence to

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

    Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
continued

1      If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the
2  well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

6  **B.  Subsequent Operations:**

8      1. Proposed Operations:  Should any party hereto desire to drill any well on the Contract Area other than the well provided
9  for in Article VI.A., or to rework, / deepen or plug back a dry hole ~~drilled at the joint expense of all parties~~ or a well ~~jointly owned by all~~
   _(reenter, recomplete, sidetrack,)_
10 ~~the parties and~~ not then producing in paying quantities, the party desiring to drill, rework, / deepen or plug back such a well shall give the
   _(reenter, recomplete, sidetrack,)_
11 other parties / written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
   _(that have not forfeited their interest in the well)_
12 tion and the estimated cost of the operation. The parties / ~~receiving~~ such a notice / shall have / ~~thirty (30)~~ days after / ~~receipt~~ of the notice
   _(to whom)_ _(is delivered)_ _(fifteen (15))_ _(delivery)_
13 within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill-
   _(reenter, recomplete, sidetrack)_
14 ing rig is on location, notice of a proposal to rework, / plug back or drill deeper may be given by telephone and the response period shall be
   _(twenty-four (24))_ _(to whom such notice is delivered)_
15 limited to / ~~forty-eight (48)~~ hours, ~~exclusive of Saturday, Sunday, and legal holidays.~~ Failure of a party / ~~receiving such notice~~ to reply within
16 the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or
17 response given by telephone shall be promptly confirmed in writing. Notwithstanding this Article VI.B.1, and subject to the right of any
   _(party to non-consent a proposed operation, a proposal to rework, recomplete, sidetrack, deepen or plugback a well producing in pay-)_
18 ~~ing quantities, which is consented by two (2) or more parties owning two-thirds (2/3) of the working interest under the well~~
   _(may proceed and be executed on behalf of the Consenting Parties without the unanimous consent of all parties.)_

21     If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice
   _(twenty-four (24),)_
22 period of / ~~thirty (30)~~ days (or as promptly as possible after the expiration of the / ~~forty-eight (48)~~ hour period when a drilling rig is on loca-
23 tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
24 ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
25 for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
26 permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
27 amination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the
28 actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
29 if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
30 dance with the provisions hereof as if no prior proposal had been made. Operator may, at its discretion, perform preparatory work in
   _(connection with, or even actually commence, an operation for which notice has been provided under the Article VI.B prior to or)_
31 ~~during the notice period, and if such operation in one conducted by less than all parties, the Consenting Parties shall, nevertheless, be~~
   _(entitled to recover the risk compensation provided for hereunder.)_

34     2. Operations by Less than All Parties:  If any party / ~~receiving~~ such notice / as provided in Article VI.B.1. or VII.D.1. (Option
   _(to whom)_ _(is delivered)_
35 No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
   _(subject to the availability of equipment and personnel)_
36 giving the notice and such other parties as shall elect to participate in the operation shall, / within ninety (90) days after the expiration of
   _(fifteen (15))_ _(twenty-four (24))_
37 the notice period of / ~~thirty (30)~~ days (or as promptly as possible after the expiration of the / ~~forty-eight (48)~~ hour period when a drilling rig is
38 on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all
39 work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
40 a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
41 tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Con-
42 senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
43 ditions of this agreement.

47     If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
48 notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as
   _(twenty-four (24))_
49 to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within / ~~forty-eight (48)~~ hours
50 ~~(exclusive of Saturday, Sunday and legal holidays)~~ after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-
   _(all of)_
51 ticipation to such party's interest as shown on Exhibit "A" or (b) carry / its proportionate part of Non-Consenting Parties' interests, and
52 failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for
   _(twenty-four (24))_
53 such a response shall not exceed a total of / ~~forty-eight (48)~~ hours (inclusive of Saturday, Sunday and legal holidays). The proposing party,
54 at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

58     The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
59 elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such
60 operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
   _(either)_
61 If such an operation results in a dry hole, the Consenting Parties shall / plug and abandon the well and restore the surface location at their
   _(reentered, recompleted, sidetracked,)_
62 sole cost, risk and expense / . If any well drilled, reworked, / deepened or plugged back under the provisions of this Article results in a pro-
63 ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,
64 *or one of them shall make a proposal to the other Consenting Parties to conduct further operations under Article VI.B

- 5 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
#### continued

1 and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-

2 ties. Upon commencement of operations for the drilling, reworking, / deepening or plugging back of any such well by Consenting Parties

3 in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,

4 and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
    entire well and not just a particular Zone therein

5 Party's interest in the / well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
    severance taxes, windfall profit taxes, similar taxes

6 market value thereof if such share is not sold, (after deducting production taxes, excise taxes, / royalty, overriding royalty and other in-
    and all Zones within

7 terests not excepted by Article III.D. payable out of or measured by the production from / such well accruing with respect to such interest

8 until it reverts) shall equal the total of the following:

9

10

11
    500%

12     (a) / 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
    500%

13 connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus / 100% of each such

14 Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-

15 Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-

16 Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting

17 Party had it participated in the well from the beginning of the operations; and

18

19

20
                    *

21     (b) __500__ % of that portion of the costs and expenses of drilling, reworking, / deepening, plugging back, testing and completing,

22 after deducting any cash contributions received under Article VIII.C., and __500__ % of that portion of the cost of newly acquired equip-

23 ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had

24 participated therein.

25

26

27

28     An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-

29 working / or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is

30 conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such

31 reworking / or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
    except that                five             500

32 / and there shall be added to the sums to be recouped by the Consenting Parties / one hundred percent ( / 100%) of that portion of the costs of

33 the reworking / or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If

34 such a reworking / or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-

35 plicable as between said Consenting Parties in said well.

36

37

38

39     During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the

40 proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other

41 taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-

42 ticle III.D.

43

44

45
         *

46     In the case of any reworking, / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free

47 of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon

48 abandonment of a well after such reworking, / plugging back or deeper drilling, the Consenting Parties shall account for all such equip-

49 ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

50

51

52

53     Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the

54 Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an

55 itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its

56 option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
    quarter

57 ings. Each / month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the

58 operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-

59 curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
    quarter

60 realized from the sale of the well's working interest production during the preceding / month. In determining the quantity of oil and gas

61 produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic

62 well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation

63 which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs

64 of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as

65 above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

66 **\* reentering, recompleting, sidetracking**

67

68

69

70

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1     If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2 the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3 Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production
4 therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, / deepening or plugging
    <span>reentering, recompleting, sidetracking,</span>
5 back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6 the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

7

8

9

10     Notwithstanding the provisions of this Article VI.B.2., / it is agreed that without the mutual consent of / all parties, no wells shall
    <span>*</span>    <span>**</span>
11 be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
12 well conforms to the then-existing well spacing pattern for such source of supply-; **provided that an exceptional well location that is**
    **approved by the Alabama Oil and Gas Board shall be deemed to conform to the then existing well spacing pattern.**
13 * and subject to the right of any party to non-consent the proposed operation,
14 ** two (2) or more parties owning 75% or more of the working interest

15

16     The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.
    <span>reentering, recompleting, sidetracking,</span>
17 except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, / deepening and plugging back of such initial well
18 after if has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-
19 duction, ceases to produce in paying quantities.

20

21

22

23     3. Stand-By Time:  When a well which has been drilled or deepened has reached its authorized depth and all tests have been
24 completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
25 reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
26 ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
27 first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
28 matical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently
29 withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
30 each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
31 ties.

32

33

34

35     4. Sidetracking:  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
36 also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
37 location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
38 mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
39 affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
40 to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

41

42

43

44     (a)  If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
45 the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

46

47

48

49     (b)  If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
50 salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
51 provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

52

53

54

55     In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
    <span>twenty-four (24)</span>
56 shall be limited to / forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and
    <span>twenty-four (24)</span>
57 receive up to eight (8) additional days after expiration of the / forty-eight (48) hours within which to respond by paying for all stand-by time
58 incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand
59 by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
60 ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in-
    <span>fifteen (15)</span>
61 stances the response period to a proposal for sidetracking shall be limited to / thirty (30) days.

62

63

64

65 **C.   TAKING PRODUCTION IN KIND:**

66

    <span>have the right to</span>
67     Each party shall / take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
68 exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for
69 marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any
70 party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
continued

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5  its share of all production.

6

7      In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8  the oil* produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9  the obligation, to purchase such oil or sell it to others at any time and from time to time, for the account of the non-taking party / ~~at the~~
   *on the same terms as Operator is marketing Operator's and/or other Non-Operators' share of production*
10  ~~best price obtainable in the area for such production.~~ Any such purchase or sale by Operator shall be subject always to the right of the
11  owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil* not previously
12  delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil* shall be only for such reasonable periods of
13  time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14  of one (1) year. *and/or gas

15
                                                              *sales or*
16      In the event one or more parties' separate disposition of its share of the gas causes split-stream / deliveries to separate pipelines and/or
17  deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18  be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19  agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

20

21  **D.   Access to Contract Area and Information:**

22
        *Except as otherwise provided herein, each Consenting Party who has paid 100% of its share of all costs of all operations conducted under this*
23  *Agreement /* ~~Each party~~ shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
                                                                *Consenting Parties*
25  and records relating thereto. Operator, upon request, shall furnish each of the other / ~~parties~~ with copies of all forms or reports filed with
26  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29  quests the Information.

30

31  **E.   Abandonment of Wells:**

32

33      1. Abandonment of Dry Holes:  Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
                                                              **
35  without the consent of / ~~all parties.~~ / Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
    *twenty-four (24) hours (inclusive*
36  within / ~~forty-eight (48) hours (exclusive~~ of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37  such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
        *or parties owning greater than ten percent (10%) interest in the well*
39  such well.  Any party / who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40  operations in search of oil and/or gas subject to the provisions of Article VI.B.

41

42      2. Abandonment of Wells that have Produced:  Except for any well in which a Non-Consent operation has been conducted
43  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
                                                                          ***         *such*
44  producer shall not be plugged and abandoned without the consent of / ~~all parties.~~ If / ~~all~~ parties consent to such abandonment, the well shall
45  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
    *fifteen (15)*
46  / ~~thirty (30)~~ days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
47  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. / Each abandoning party shall assign
50  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52  terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
53  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

56
    * ninety percent (90%) or more of the parties thereof
57
    ** If the well has been drilled pursuant to Article VI.B.2, only the consent of the Consenting Parties therein shall be required.
58
    *** two-thirds (66.67%) or more of the owners thereof.  If the well has been drilled or reworked pursuant to Article VI.B.2 and the
59  Consenting Parties therein have not been fully reimbursed as therein provided, only the approval of two-thirds (66.67%) of such
    Consenting Parties shall be required
60
    **** Should any party fail to reply to such notice, such party shall be deemed to have consented to the proposed abandonment.
61

62

63

64

65

66

67

68

69

70

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1 required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.
2
3   Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4 the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5 its share of all production.
6
7   In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share
8 of the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it,
9 but not the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-
10 taking party at the best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to
11 the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas
12 not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil and gas shall be only for such
13 reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event
14 for a period in excess of one (1) year. Notwithstanding the foregoing, Operator shall not make a sale, including one into interstate com-
15 merce, of any other party's share of gas production without first giving such other party thirty (30) days notice of such intended sale.
16
17 D. **Access to Contract Area and Information:**
18
19   Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
20 and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
21 and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with
22 governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
23 each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
24 gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
25 quests the Information.
26
27 E. **Abandonment of Wells:**
28
29   1. Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
30 drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
31 without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
32 within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
33 such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
34 accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
35 such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
36 operations in search of oil and/or gas subject to the provisions of Article VI.B.
37
38   2. Abandonment of Wells that have Produced: Except for any well in which a Non-Consent operation has been conducted
39 hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
40 producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
41 be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
42 thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
43 those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
44 parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
45 Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign
46 the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
47 material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
48 terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
49 gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
50 tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
51 duced from the interval or intervals of the formation or formations covered thereby; such lease to be on the form attached as Exhibit
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

- 8 alternate -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

"B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portion of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.

## ARTICLE VII.
### EXPENDITURES AND LIABILITY OF PARTIES

A. **Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners. **In their relationship with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship, but rather shall be free to act on an arm's length basis in accordance with their own self-interest.**

B. **Liens and Payment Defaults:**

Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph. be entitled to recover the amount it paid plus five hundred percent (500%) of that amount out of the proceeds from the sale of the defaulting party's share of oil and for gas and, to secure the payment thereof, be subrogated to the security rights described in the foregoing paragraphs. Notwithstanding anything to the contrary in this Paragraph, all parties agree that this provision shall not apply to any operation requiring an AFE unless Operator has advance billed all parties for their proportionate share of said costs in accordance with other provisions of this agreement. Further, notwithstanding anything to the contrary in this Paragraph, all parties agree that this provision shall not apply to any oil and gas interests contributed or made subject to this agreement.

C. **Payments and Accounting:**

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

D. **Limitation of Expenditures:**

1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VII**
**continued**

1 ☑   Option No. 1 / :  All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2 necessary tankage and/or surface facilities. * This Option No. 1 shall apply only to water source and/or water injection wells.
3
4 ☑   Option No. 2 / :  All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5 authorized depth, and all tests have been completed, and the results thereof / furnished to the parties, Operator shall give immediate notice **(including all logs)**
6 to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have / ~~forty-eight~~ **twenty-four (24)**
7 ~~(48)~~ hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8 tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9 cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, / deepening or plugging **reentering, recompleting, sidetracking**
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties. ** This Option No. 2 shall cover all wells except those expressly covered by Option No. 1, above.
14
15    2. Rework or Plug Back:  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.
19
20    3. Other Operations:  Without the consent of / ~~all parties,~~ Operator shall not undertake any single project reasonably estimated **two or more parties owning a majority interest**
21 to require an expenditure in excess of _____**Fifty Thousand and No/100**_____ Dollars ($ **50,000.00**_____)
22 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of _____**Fifty Thousand and No/100**_____
28 Dollars ($ **50,000.00**_____ ) but less than the amount first set forth above in this paragraph.
29
30 E.   Rentals, Shut-in Well Payments and Minimum Royalties:
31
32    Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease / shall be paid by the **and burdening the interest of all parties**
33 ~~party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-~~ **Operator and charged to the joint account.**
34 ~~tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on~~
35 ~~behalf of all such parties.~~ Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B./2.
39
40    Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, ~~at least five (5) days (excluding Saturday, Sunday and legal holidays),~~ or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46 F.   Taxes:
47
48    Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".
59
60    If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".
66
67    Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
68 to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.
69
70

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VII**
**continued**

1 G.  **Insurance:**

3    At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4 the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5 pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
6 also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7 hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8 law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

10    In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11 parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

13                                   **ARTICLE VIII.**
14              **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

16 A.  **Surrender of Leases:**

18    The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19 or in part unless all parties consent thereto.

21    However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22 agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23 such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24 thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas in-
25 terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26 such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27 lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all
28 obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29 attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30 duction other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the
31 party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32 ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33 salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest
34 shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

36    Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37 party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38 assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39 agreement.

41 B.  **Renewal or Extension of Leases:**

43    If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44 shall have the right for a period of / ~~thirty (30)~~ fifteen (15) days following receipt of such notice in which to elect to participate in the ownership of the
45 renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46 portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47 interests held at that time by the parties in the Contract Area.

49    If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50 who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51 to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52 Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

54    Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55 by the acquiring party.

57    The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58 or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or
59 contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
60 tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61 the provisions of this agreement.

63    The provisions in this Article shall also be applicable to extensions of oil and gas leases.

65 C.  **Acreage or Cash Contributions:**

67    While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68 operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69 applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the con-
70 tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VIII**
**continued**

1  said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2  governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3  it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4  tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.
5
6      If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7  consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8
9  **D.    Maintenance of Uniform Interests:**
10
11  ~~For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no~~
12  ~~party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,~~
13  ~~equipment and production unless such disposition covers either:~~
14
15  ~~1.   the entire interest of the party in all leases and equipment and production; or~~
16
17  ~~2.   an equal undivided interest in all leases and equipment and production in the Contract Area.~~
18
19      Every ~~such~~ sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20  and shall be made without prejudice to the right of the other parties. **Any added expenditure required as a result of disposition, including**
21  **but not limited to, additional marketing or metering expense, shall be borne solely by the party transferee.**
22      If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23  require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24  and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25  party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26  into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27  Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.
28
29  **E.    Waiver of Rights to Partition:**
30
31      If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32  undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33  interest therein.
34
35  **F.    ~~Preferential Right to Purchase:~~**
36
37  ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38  ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39  ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40  ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41  ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42  ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43  ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44  ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45  ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~
46
47                                              **ARTICLE IX.**
48                                  **INTERNAL REVENUE CODE ELECTION**
49
50      This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51  for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52  and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53  purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54  from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as per-
55  mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56  ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57  United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58  and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59  evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60  Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61  action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62  Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63  Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is per-
64  mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65  tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66  computation of partnership taxable income.
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE X.**
**CLAIMS AND LAWSUITS**

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____**Ten Thousand and No/100**_____ Dollars ($ _10,000.00_____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder. **All claims or suits involving title to any oil and gas lease subject to this agreement shall be treated as a claim or suit against all parties hereto.**

**ARTICLE XI.**
**FORCE MAJEURE**

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

**ARTICLE XII.**
**NOTICES**

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier / and addressed to **fax/email** the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given **fax/email** when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier / . Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

**ARTICLE XIII.**
**TERM OF AGREEMENT**

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☑  Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☐  ~~Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.~~

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE XIV.**
**COMPLIANCE WITH LAWS AND REGULATIONS**

**A.    Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B.    Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____**Alabama**_____ shall govern.

**C.    Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of ~~the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and~~ any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to ~~said~~ **any** Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with ~~said~~ **such** Act.

**ARTICLE XV.**
**OTHER PROVISIONS**

- 14 -

# ARTICLE XV

# OTHER PROVISIONS

## A.  PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1)  an election to perform additional logging, coring or testing;
(2)  an election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;
(3)  an election to plug back and attempt to complete the well in a shallower depth or formation;
(4)  an election to deepen the well;
(5)  an election to sidetrack the well;
(6)  an election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;
(7)  an election to temporarily abandon the well;
(8)  an election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of Operator, a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth.   In such event, the operation, which, in the opinion of Operator, is less likely to jeopardize the well, will be given priority.   It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests.   For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

## B.  HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

## C.  DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties.   If the parties are equally divided, the opinion of the Operator will prevail.

## D.  ADVANCEMENT OF COSTS

The provisions of section 1.5(a) of the Participation Agreement to which this agreement is attached as Exhibit "D" shall govern advancement of costs relative to the initial well. Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s) in advance of its respective share of (i) the dry hole cost for any other well to be drilled hereunder to which such Non-Operator has consented, and (ii) the cost of any completion, reworking, recompletion, sidetracking, deepening or plugging back operation to which such Non-Operator has consented (any such operation under clause (i) or (ii), being herein called a "Drilling Operation").   Such request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Drilling Operation. The amount of each Non-Operator's advance payment shall be based upon the latest AFE for such operation.   Such advanced payments shall be held by Operator for the account of the Non-Operators and applied, with interest, against the actual costs incurred in the applicable operation.

A Non-Operator receiving a request for advance payment shall, within seven (7) days of the receipt of such request if and when a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to operator in cash the full amount of such request. Operator shall credit the amount to the Non-Operator's account for the payment of such Non-Operator's share of costs of such Drilling operation, and following the end of each month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation previously approved, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement. Advance payment by a Non-Operator of his share of completed well costs shall in no event prevent such completion of a well pursuant to Option No. 2 of Article VII.D.1. and, in the event such a Non-Operator elects not to participate in completion, the sums that such Non-Operator has advanced shall not be charged with any share of the costs of any completion attempted.

In the event a Non-Operator from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by depositing cash as aforesaid, then Operator, at his option, shall make a second written request by certified mail, return receipt requested for such advance. Non-Operator shall pay for said advance as aforesaid within five (5) business days from receipt of such second request.

If a Non-Operator fails to pay within five (5) business days of the receipt of such second request, then Non-Operator may, at the sole discretion and timing election of the Operator, be deemed non-consent in said operation retroactive to the beginning of such operation and thereafter subject to the penalty provisions of Article VI.B.2 hereof.

If the Non-Operator fails to make such payment or furnish such security within five (5) business days of the receipt of such second request, Operator shall promptly notify all other parties still participating in such Drilling Operation of the default in payment and if and when applicable, of the relinquishment of an interest under this provision. The parties who wish to participate in the Drilling Operation shall have five (5) days from receipt of the applicable notice to elect to assume the costs chargeable to such relinquished interest and shall share such relinquished interest in proportion to their assumption of such relinquished interest. If the parties who wish to participate in the Drilling Operation are unwilling to assume the costs chargeable to such relinquished interest, the Drilling Operation shall be cancelled.

Notwithstanding anything to the contrary herein, if the applicable drilled well or operation is unsuccessful or results in a dry hole, Operator shall have the right to sue a Non-Operator who failed to pay for its proportionate share of expenses in lieu of Operator's right to deem the Non-Operator Non-Consent.

**E.   NECESSARY EXPENDITURES EXCLUDE SIDETRACKING**

The phrase "necessary expenditures" in Article VII.D.1., (Option No. 2) on page 10 shall not be deemed to Include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

**F.   ADDITIONAL CHARGES**

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Unit Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same:

Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and expenses in connection with preparation and presentation of evidence and exhibits of State Oil and Gas Board of Alabama hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

**G.   INDEMNITY**

Except for liabilities resulting from the gross negligence or willful misconduct of the Operator, each Non-Operator shall defend, indemnify and hold Operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operator's officers, employees and/or agents, resulting from or in any way relating to such officers, employees, and/or agents presence on a drilling rig on the Contract Area or from such person traveling by air or water between any point and such drilling rig. Such indemnity to Operator shall also apply to any other person whose presence on the rig or

JOA – ARTICLE XV
14b

transportation to or from such rig is at the request of the indemnifying Non-Operator (except for liabilities resulting from the gross negligence or willful misconduct of the Operator).

**H.   GAS BALANCING**

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

**I.   SEVERABILITY**

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.   Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

**J.   NO WAIVERS**

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege.   The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

**K.   AREA OF MUTUAL INTEREST**

The parties hereby create an Area of Mutual Interest ("AMI") consisting of the lands described in Exhibit "A" attached hereto and further identified as the lands outlined by the bold black line on the plat attached hereto as Exhibit "A-2".   This AMI shall remain in force and effect for a term of five (5) years from the date of this Agreement and, insofar and only insofar as the AMI includes lands covered by oil and gas leases and/or oil and gas interests subject to this Agreement, as long thereafter as said oil and gas leases and/or oil and gas interests remain in force and effect.   This AMI shall terminate after five (5) years as to all such lands not covered by oil and gas leases and/or oil and gas interests subject to this Agreement.

During the term of this AMI, if any party hereto, including related persons or entities, ("Acquiring Party") directly or indirectly acquires any oil and gas lease or any oil and gas interest covering lands lying within the AMI, the Acquiring Party shall promptly advise the other parties ("Offerees") of such acquisition.   In such event, each Offeree shall have the right to acquire its proportionate interest in such oil and gas lease and/or oil and gas interest in accordance with the other provisions of this AMI.   If the oil and gas lease or oil and gas interest covers lands within and outside the AMI, the Acquiring Party shall only offer, and the Offerees shall only have the right to acquire its proportionate interest, in the oil and gas lease or oil and gas interest insofar and only insofar as the same covers lands lying within the AMI.   In such a case, the oil and gas lease or oil and gas interest insofar as they cover lands lying outside the AMI shall not be subject to this AMI, this Operating Agreement or the Participation Agreement to which this Operating Agreement is attached as Exhibit "D".

Promptly upon acquiring such oil and gas lease and/or oil and gas interest, the Acquiring Party shall, in writing, advise the Offerees of such acquisition.   The notice shall include a copy of all instruments of acquisition including, by way of example but not of limitation, copies of the leases, assignments, subleases, farmouts or other contracts affecting the oil and gas lease and/or oil and gas interest.

The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by the Acquiring Party in acquiring such oil and gas lease and/or oil and gas interest ("Acquisition costs"). The Offeree shall have a period of fifteen (15) days after receipt of the notice within which to furnish the Acquiring Party written notice of its election to acquire its proportionate interest in the offered oil and gas lease and/or oil and gas interest.   If, however, a well in search of oil or gas is being drilled within the AMI, each Offeree shall have a period of twenty-four (24) hours (excluding Saturdays, Sundays and legal holidays) after delivery of the notice within which to elect to acquire its proportionate interest in the oil and gas lease and/or oil and gas interest so offered.   It is provided, however, that the twenty-four (24) hour election period shall not apply unless the Acquiring Party shall give the notice to the Offerees within two (2) days after the date on which the Acquiring Party acquired the oil and gas lease and/or oil and gas interest so offered.   In addition thereto, the Acquiring Party shall also:

(a)   furnish the Offerees with the approximate location of the well then being drilled and the name of the operator or drilling contractor drilling the well, and

JOA – ARTICLE XV
14c

(b)    specifically advise the Offerees that the Offerees shall have a period of twenty-four (24) hours within which to elect to acquire an interest in the offered Oil and Gas Interest.

The above information shall be in addition to the information and copies of instruments provided for above in connection with the usual notices of acquisition of an oil and gas lease and/or oil and gas interest.   If the Acquiring Party does not receive actual written notice of election of an Offeree to acquire its proportionate interest within the fifteen (15) day or twenty-four (24) hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire its interest therein.   An Offeree accepting the offered interest shall be entitled to participate in such oil and gas lease and/or oil and gas interest in the proportion to which its interest bears to the total interest of all parties (including the acquiring party) electing to participate.   Promptly after the time for election expires, the Acquiring Party, or the Operator on its behalf, shall invoice the Offeree electing to acquire an interest for its proportionate part of the Acquisition Cost, as reflected by the invoice.   Upon receipt of such reimbursement, the Acquiring Party shall execute and deliver an appropriate assignment to such Offeree.   If the Acquiring Party does not receive the amount due from the Offeree within thirty (30) days after receipt by the Offeree of the invoice for its cost, the Acquiring Party may, at its election, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within five (5) days after receipt of such written notice by the delinquent Offeree shall constitute a withdrawal by the delinquent Offeree of its former election to acquire the interest, and such Offeree shall no longer have the right to acquire an interest in the offered oil and gas lease and/or oil and gas interest.

Any assignment made by the Acquiring Party shall be made free and clear of any liens, encumbrances, overriding royalty interests and other burdens created by or arising under the Acquiring Party but otherwise without warranty of title, either express or implied not even for the return of the purchase price.   The assignment shall be made and accepted subject to, and each assignee shall expressly assume its portion of all of the obligations of the Acquiring Party.   The assignment shall also be made and accepted subject to this Agreement and the Participation Agreement to which this Agreement is attached as Exhibit "D".   Without limitation upon the foregoing, oil and gas lease or oil and gas interest covered by the assignment shall bear its share of the reversionary working interest described in section 1.5 of said Participation Agreement.

If two (2) or more separate oil and gas leases and/or oil and gas interests are included in the same notice, the Offeree shall have the separate right of election as to each separate oil and gas lease and/or oil and gas interest.

The provisions of this AMI shall not apply to acquisitions as a result of merger, consolidation, reorganization or an acquisition from a parent, subsidiary, or affiliated corporation, or as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries.   Neither shall it apply to sales and acquisitions between partners in a partnership or venturers in a joint venture, or to any acquisition by any party of an interest which interest prior to and at the time of such acquisition was subject to this Agreement, unless such acquisition was the renewal or extension of a lease which at the date of expiration was subject to this Agreement.

Renewals and extensions of oil and gas lease(s) and/or oil and gas interest(s) shall be subject to Article VIII.B of this Agreement.

## L.   DISBURSEMENT OF ROYALTIES

Operator shall use its best efforts to deliver or cause to be delivered all royalties, overriding royalties, production payments and similar charges to the persons entitled thereto and such charges shall be borne proportionately by the Parties hereto on the basis of their respective ownership of the leases or well.   It is provided, however, if the interest of any Party is subject to and burdened with royalties, overriding royalties, production payments, or similar burdens ("additional burdens") which are not borne proportionately by all other Parties hereto, such Party shall account to the owners of the additional burdens for the amount due them or arrange for Operator to handle such payments.   Operator shall have no liability for the failure to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, except such as may result from gross negligence or willful misconduct.

## M.   INFORMATION

Anything to the contrary hereinabove notwithstanding, it is stipulated that any non-consenting party to an operation conducted hereunder shall have no right to observe such operation or have access to information pertaining to such operation, until such time as the non-consenting party's share of the cost of such operation and the penalty therefor has been recovered by the consenting parties as provided herein.

**N.  OPERATOR'S LIEN – SECURITY INTEREST**

Subject to the provision of Article VII. B. of this Agreement, each non-Operator grants to Operator a lien upon all of the rights, titles, and interests of each Non-Operator, whether now existing or hereafter acquired, in and to the (1) the oil, gas, or other minerals in, on, and under the Contract Area and (2) any oil, gas, and mineral leases covering the Contract Area or any portion thereof.  In addition, each Non-Operator grants to Operator a security interest in and to all of such Non-Operator's rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (1) all oil, gas and other minerals produced from the Contract Area when produced; (2) all accounts receivable accruing or arising as a result of the sale of such oil, gas and other minerals; (3) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (4) all oil and gas wells and other surface and sub-surface equipment and facilities of any kind or character located on the Contract Area and the cash or other proceeds received from the sale thereof (collectively, the "Personal Property Collateral"). Some of the Personal Property Collateral is or will become fixtures on the Contract Area, and the interest of Non-Operator in and to the oil, gas and other minerals when extracted from the Contract Area and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area.  This Agreement (including a carbon, photographic, or other reproduction hereof) shall constitute a non-standard form financing statement under the terms of the Uniform Commercial Code of the State in which the Contract Area is located, and as such, may be filed for record in the real estate records of the county in which the Contract Area is located.   Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense, if any.

**O.  SEPARATE AGREEMENT FOR NON-UNIFORM INTEREST**

Any oil and gas lease and/or oil and gas interest that is both acquired after the effective date of this Agreement and covered by Article VIII.B, VIII.C or XV.K of this Agreement, that thereafter becomes owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such lease and/or interest becomes so owned.   Any oil and gas lease and/or oil and gas interest acquired after the effective date of this Agreement and covered by Article VIII.B, VIII.C or XV.K of this Agreement, that becomes owned by more than one but less than all of the parties hereto shall remain subject to this Agreement as to the parties who own an interest therein, but Operator is authorized to modify Exhibit "A" to this Agreement to reflect the parties' interests in each such oil and gas lease and/or oil and gas interest. Operator is further authorized to modify said Exhibit "A" to this Agreement to reflect the parties' interests in each well subject to this Agreement.

**P.  METERING OF PRODUCTION**

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

**Q.  PLUGGING AND LEASEHOLD RESTORATION FUND**

At any time any well subject to this agreement is, in Operator's sole opinion, approaching the end of its economic life and/or its useful purpose, Operator may pre-bill the joint account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location.  Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and abandonment and restoration of the leasehold premises.  In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any accrued interest on such difference, based upon the then working interest percentage of such owner.  In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

**R.  PREVAILING AGREEMENT**

If there is a conflict between provisions of that certain Amended and Restated Participation Agreement dated effective as of April 8, 2015 (the "Participation Agreement"), by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc., to which this form of Operating Agreement is attached as Exhibit "D" and this Operating Agreement, the provisions of the Participation Agreement shall prevail, and shall be binding upon all parties to this Operating Agreement.  In the event and to the extent of a conflict between the provisions of this Article XV and any other provisions of this Operating Agreement, the provisions of this Article XV shall prevail.

**S.  DEFAULT PENALTY/AUTOMATIC NON-CONSENT**

If written notice has been given that the lien rights conferred in Article VII. B. have been implemented or enforced against any party hereto, for so long as the affected party remains in default, it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and shall not be entitled to vote its interest in any matter hereunder.  As to any proposed operation in which it otherwise would have the right to participate, such party shall not have the right to elect to participate or be a Consenting Party unless and until it pays in full the amount it is in default plus all other outstanding amounts due hereunder.  If an operation proposed during such default period commences before such payment in full, the party in default shall automatically be deemed a Non-Consenting Party to the operation.

**T.  NON-PARTICIPATING INTERESTS**

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto as same may be revised from time to time to reflect record title and/or reformation of the Contract Area.

**U.  MISCELLANEOUS**

Anything to the contrary herein notwithstanding, this Operating Agreement is expressly made subject to the terms and provisions of the leases and any farmout agreements described in Exhibit "A" hereof.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereto shall be deemed to run with the oil and gas leases and/or oil and gas interests subject to this Agreement.  The headings used in this Agreement are for convenience only and shall not be considered in the interpretation or construction of the Agreement.

**V. NON-CONSENT**

Any party that forfeits its interest in a well pursuant to Article VI.B.2 of this Agreement forfeits their interest in the entire well and revenue therefrom, not just a particular Zone therein, for the duration of the recoupment period or, if the risk compensation is never recovered, forever.  The parties recognize, however, that applicable rules of the State  Oil and Gas Board of Alabama may allow for the drilling and completion of additional wells within the unit for an existing well, and, subject to the other provisions of this Agreement, the forfeiture by one party of its interest in the existing well does not affect that party's right to elect to participate or not to participate in a proposal to drill, or any other operation with respect to, another well, even if the other well is located in the same unit, and even if the new well is completed in the same Zone from which the existing well is producing.

Anything to the contrary hereinabove notwithstanding, any Non-Consenting Party to an operation conducted hereunder shall have no right to observe such operation or subsequent operations within the same well or have access to information pertaining to such operation or subsequent operations, until such time as the Non-Consenting Party's share of the cost of such operation, and any applicable subsequent operations, and the risk compensation therefor has been recovered by the Consenting Parties as provided herein.

**W. SOPHISTICATED INVESTORS**

By execution of this Agreement, each Non-Operator represents to each other and to Operator: (i) that it has a working knowledge of the oil and gas industry; (ii) that it is a sophisticated investor and has a financial net worth in excess of one million dollars; (iii) that it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of leasehold costs, drilling costs, completion costs, and all other costs incurred in operations under this Agreement; (iv) that it ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES; (v) that its interest hereunder has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the State of Alabama, or any other state ("Securities Law"), and that it owns said interest for investment purposes only, and not with a view to or for sale in connection with any distribution thereof within the meaning of Securities Law.

**X. DOWNSTREAM FACILITIES**

If any party to this agreement proposes the construction or acquisition and operation of a pipeline and/or gathering line to transport Oil and/or Gas produced from wells located in the Contract Area, or to construct a plant or other facility to treat, process, dehydrate, compress, extract NGL's or otherwise enhance the value of Oil and/or Gas produced from wells located in the Contract Area, or cause such Oil and/or Gas to meet

requisite quality specifications, (hereinafter all such pipelines, gathering lines, plants and facilities are collectively referred to as the "Facilities"), then such party shall offer each of the other non-proposing parties to this agreement the right to participate in the construction, operation, ownership and use of the Facilities.   Should one or more non-proposing parties elect to participate, then between such participating, parties, the participating parties shall enter into a mutually acceptable agreement for the construction, acquisition, operation and use thereof.   Any party electing not to participate shall have no ownership in or right to use the applicable Facilities, and the participating parties shall have no obligation to allow the non-participating parties such use and/or access thereto.

## Y. **OBLIGATORY WELL**

Notwithstanding the provisions of this agreement and particularly Article VI, if any proposed operations are necessary to maintain an oil and gas lease or oil and gas interest covered by this agreement in force or an agreement to earn a lease(s) or term assignment which would otherwise expire unless such operations are conducted, then in lieu of being penalized under Article VI.B.2., each Non-Consenting Party shall assign to Consenting Parties all of such Non-Consenting Party's right, title and interest in and to the oil and gas leases(s) and/or oil and gas interest(s) or portion thereof or such agreement which would be lost or not earned if such operations were not conducted.   In order for the non-consent provisions of this Paragraph Y to apply, the notice of the proposal regarding an obligatory well or obligatory operation must clearly state that the proposed well or proposed operation is an obligatory well or obligatory operation.

Such assignment shall be promptly due upon commencement of said proposed operations by Consenting Parties and shall be free and clear of all overriding royalties, production payments, mortgages, liens and other burdens and encumbrances placed thereon by the assigning party or resulting from its ownership or operation of such oil and gas leases(s) and/or oil and gas interest(s) which is not a joint obligation of the parties, but otherwise without warranty of title either expressed or implied.

If the assignment is in favor of more than one party, the assigned interest shall be shared by the Consenting Parties in the proportions that the interest of each bears to the interest of all Consenting Parties unless otherwise agreed to in writing.   Thereafter, such acreage covered by said assignment shall not be subject to the terms of this agreement, but shall be deemed to be subject to an agreement identical to this changed only in Exhibit "A" to indicate the Consenting Parties and their percentages of interest.   Operations that are necessary to either maintain an oil and gas leases(s) and/or oil and gas interest(s) covered by this agreement in force or to earn an interest under an agreement which would otherwise expire unless operations are conducted, shall be defined as operations that are proposed within six (6) months of the date the oil and gas lease, oil and gas interest or agreement would otherwise expire.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____**8th**_____ day of _____**April**_____ , (year) ___**2015**___.

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form-610-1982 Model Form Operating Agreement, as published in computerized form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____, have been made to the form.~~

O P E R A T O R

WITNESS ES

Print Name: Chris Farrell

Print Name: Laura Medlin

SKLAR EXPLORATION COMPANY L.L.C.

David A. Barlow
President & Chief Operating Officer

N O N - O P E R A T O R S

WITNESS ES

Print Name: Chris Farrell

Print Name: Laura Medlin

SKLARCO L.L.C.

David A. Barlow
President & Chief Operating Officer

MCCOMBS ENERGY, LTD.

Print Name:

Billy Forney, III
Vice-President

Print Name:

TCP COTTONWOOD, L.P.
By: Trinity-Anderson, LLC, its General Partner
By: Anderson Feazel Management, Inc., its Manager

Print Name:

T. Cole Anderson
Vice-President

Print Name:

FANT ENERGY LIMITED
By: Richard E. Fant, L.L.C., its General Partner

Print Name:

Stephen Swan, Manager

Print Name:

- 15a -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

# ARTICLE XVI.
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____**8th**_____ day of _____**April**_____ , (year) __**2015**__ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in computerized form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____, have been made to the form.~~

## O P E R A T O R

WITNESSES                                          SKLAR EXPLORATION COMPANY L.L.C.

Print Name: _____               David A. Barlow
                                                  President & Chief Operating Officer

Print Name: _____

## N O N - O P E R A T O R S

WITNESSES                                          SKLARCO L.L.C.

Print Name: _____               David A. Barlow
                                                  President & Chief Operating Officer

Print Name: _____

*Larry Wyont*
Print Name: LARRY WYONT                           MCCOMBS ENERGY, LTD.

*Dawn Kempthorne*                                 *Billy Forney*
Print Name: Dawn Kempthorne                       Billy Forney, III
                                                  Vice-President

Print Name: _____                TCP COTTONWOOD, L.P.
                                                  By: Trinity-Anderson, LLC, its General Partner
                                                  By: Anderson Feazel Management, Inc., its Manager

Print Name: _____                T. Cole Anderson
                                                  Vice-President

Print Name: _____                FANT ENERGY LIMITED
                                                  By: Richard E. Fant, L.L.C., its General Partner

Print Name: _____                Stephen Swan, Manager

Print Name: _____

- 15a -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____8th_____ day of _____April_____, (year) _2015_.

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in computerized form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____, have been made to the form.~~

### O P E R A T O R

WITNESSES                                  SKLAR EXPLORATION COMPANY L.L.C.

Print Name:_____         David A. Barlow
                                           President & Chief Operating Officer

Print Name:_____

### N O N - O P E R A T O R S

WITNESSES                                  SKLARCO L.L.C.

Print Name:_____         David A. Barlow
                                           President & Chief Operating Officer

Print Name:_____

                                           MCCOMBS ENERGY, LTD.

Print Name:_____         Billy Forney, III
                                           Vice-President

Print Name:_____

                                           TCP COTTONWOOD, L.P.
                                           By: Trinity-Anderson, LLC, its General Partner
                                           By: Anderson Feazel Management, Inc., its Manager

_Perry B Shepherd_____         _____
Print Name: Perry B Shepherd               T. Cole Anderson
                                           Vice-President
_Lisa D. Walker_____
Print Name: LISA D. Walker

                                           FANT ENERGY LIMITED
                                           By: Richard E. Fant, L.L.C., its General Partner

Print Name:_____         Stephen Swan, Manager

Print Name:_____

- 15a -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____**8th**_____ day of _____**April**_____ , (year) ___**2015**___ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in computerized form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____; have been made to the form.~~

OPERATOR

WITNESSES                                    SKLAR EXPLORATION COMPANY L.L.C.

_____
Print Name: _____                  _____
                                             David A. Barlow
                                             President & Chief Operating Officer

_____
Print Name: _____

NON-OPERATORS

WITNESSES                                    SKLARCO L.L.C.

_____
Print Name: _____                  _____
                                             David A. Barlow
                                             President & Chief Operating Officer

_____
Print Name: _____

                                             MCCOMBS ENERGY, LTD.

_____
Print Name: _____                  _____
                                             Billy Forney, III
                                             Vice-President

_____
Print Name: _____

                                             TCP COTTONWOOD, L.P.
                                             By: Trinity-Anderson, LLC, its General Partner
                                             By: Anderson Feazel Management, Inc., its Manager

_____
Print Name: _____                  _____
                                             T. Cole Anderson
                                             Vice-President

                                             FANT ENERGY LIMITED
                                             By: Richard E. Fant, L.L.C., its General Partner

_____
Print Name: _JANET LEGENDRE_                 _____
                                             Stephen Swan, Manager
_Joshua Goodwin_
Print Name: _____

- 15a -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

*Ashley Kinnard*
Print Name: Ashley Kinnard

*Kyle Fraser*
Print Name: Kyle Fraser

Print Name:

Print Name:

Print Name:

Print Name:

Print Name:

Print Name:

Print Name:

Print Name:

Print Name:

Print Name:

Print Name:

Print Name:

Print Name:

Print Name:

JJS WORKING INTERESTS, L.L.C.
By: Houston Bulldog Capital Management, L.L.C.,
its Manager

Justin Simons, Manager

TAUBER EXPLORATION AND PRODUCTION, CO.

Richard E. Tauber, President

KUDZU OIL PROPERTIES, L.L.C.

Wirt A. Yerger, III
Manager

J.F. HOWELL INTERESTS, L.P.
By: Howell Investments, L.L.C., its General Partner

David Morgan, Manager

LECHWE, L.L.C.

Mark Rauch, Agent and Attorney-in-Fact

MARKSCO, L.L.C.

Mark P. Sealy, Member

BUNDERO INVESTMENT COMPANY, L.L.C.

Robert P. Bowman, Manager

LONGLEAF ENERGY GROUP, INC.

Thomas E. McMillan, Jr., President

- 15b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JJS WORKING INTERESTS, L.L.C.
By: Houston Bulldog Capital Management, L.L.C.,
its Manager

_____
Justin Simons, Manager

*OPERATING AGREEMENT*
*MT. CARMEL PROSPECT*

TAUBER EXPLORATION AND PRODUCTION, CO.

_____
Richard E. Tauber, President

Print Name: _____

*Rachel Clary*
Print Name: RACHEL CLARY

*John Robinson*
Print Name: JOHN ROBINSON

KUDZU OIL PROPERTIES, L.L.C.

_____
Wirt A. Yerger, III
Manager

Print Name: _____

Print Name: _____

J.F. HOWELL INTERESTS, L.P.
By: Howell Investments, L.L.C., its General Partner

_____
David Morgan, Manager

Print Name: _____

Print Name: _____

LECHWE, L.L.C.

_____
Mark Rauch, Agent and Attorney-in-Fact

Print Name: _____

Print Name: _____

MARKSCO, L.L.C.

_____
Mark P. Sealy, Member

Print Name: _____

Print Name: _____

BUNDERO INVESTMENT COMPANY, L.L.C.

_____
Robert P. Bowman, Manager

Print Name: _____

Print Name: _____

LONGLEAF ENERGY GROUP, INC.

_____
Thomas E. McMillan, Jr., President

Print Name: _____

Print Name: _____

- 15b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JJS WORKING INTERESTS, L.L.C.
By: Houston Bulldog Capital Management, L.L.C.,
    its Manager

Print Name: _____     Justin Simons, Manager

Print Name: _____


TAUBER EXPLORATION AND PRODUCTION, CO.

Print Name: _____     Richard E. Tauber, President

Print Name: _____


KUDZU OIL PROPERTIES, L.L.C.

Print Name: *Pamela F. Sebren*     Wirt A. Yerger, III
             Pamela F. Sebren      Manager

Print Name: _____


J.F. HOWELL INTERESTS, L.P.
By: Howell Investments, L.L.C., its General Partner

Print Name: _____     David Morgan, Manager

Print Name: _____


LECHWE, L.L.C.

Print Name: _____     Mark Rauch, Agent and Attorney-in-Fact

Print Name: _____


MARKSCO, L.L.C.

Print Name: _____     Mark P. Sealy, Member

Print Name: _____


BUNDERO INVESTMENT COMPANY, L.L.C.

Print Name: _____     Robert P. Bowman, Manager

Print Name: _____


LONGLEAF ENERGY GROUP, INC.

Print Name: _____     Thomas E. McMillan, Jr., President

Print Name: _____

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JJS WORKING INTERESTS, L.L.C.
By: Houston Bulldog Capital Management, L.L.C.,
its Manager

_____
Print Name:

Justin Simons, Manager

_____
Print Name:

TAUBER EXPLORATION AND PRODUCTION, CO.

_____
Print Name:

Richard E. Tauber, President

_____
Print Name:

KUDZU OIL PROPERTIES, L.L.C.

_____
Print Name:

Wirt A. Yerger, III
Manager

_____
Print Name:

J.F. HOWELL INTERESTS, L.P.
By: Howell Investments, L.L.C., its General Partner

_____
Print Name: Courtney Craig

David Morgan, Manager

_____
Print Name: Christopher G. Campbell

LECHWE, L.L.C.

_____
Print Name:

Mark Rauch, Agent and Attorney-in-Fact

_____
Print Name:

MARKSCO, L.L.C.

_____
Print Name:

Mark P. Sealy, Member

_____
Print Name:

BUNDERO INVESTMENT COMPANY, L.L.C.

_____
Print Name:

Robert P. Bowman, Manager

_____
Print Name:

LONGLEAF ENERGY GROUP, INC.

_____
Print Name:

Thomas E. McMillan, Jr., President

_____
Print Name:

- 15b -

Print Name: _____

JJS WORKING INTERESTS, L.L.C.
By: Houston Bulldog Capital Management, L.L.C.,
    its Manager

Justin Simons, Manager

Print Name: _____

Print Name: _____

TAUBER EXPLORATION AND PRODUCTION, CO.

Richard E. Tauber, President

Print Name: _____

Print Name: _____

KUDZU OIL PROPERTIES, L.L.C.

Wirt A. Yerger, III
Manager

Print Name: _____

J.F. HOWELL INTERESTS, L.P.
By: Howell Investments, L.L.C., its General Partner

David Morgan, Manager

Print Name: _____

Print Name: _____

LECHWE, L.L.C.

*Patti L. Hanson*

Print Name: PATTI L HANSON

Mark Rauch, Agent and Attorney-in-Fact

*Sharon Hudek*

Print Name: Sharon Hudek

MARKSCO, L.L.C.

Mark P. Sealy, Member

Print Name: _____

Print Name: _____

BUNDERO INVESTMENT COMPANY, L.L.C.

Robert P. Bowman, Manager

Print Name: _____

Print Name: _____

LONGLEAF ENERGY GROUP, INC.

Thomas E. McMillan, Jr., President

Print Name: _____

Print Name: _____

- 15b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JJS WORKING INTERESTS, L.L.C.
By: Houston Bulldog Capital Management, L.L.C.,
    its Manager

Print Name: _____           Justin Simons, Manager

Print Name: _____

                                        TAUBER EXPLORATION AND PRODUCTION, CO.

Print Name: _____           Richard E. Tauber, President

Print Name: _____

                                        KUDZU OIL PROPERTIES, L.L.C.

Print Name: _____           Wirt A. Yerger, III
                                        Manager

Print Name: _____

                                        J.F. HOWELL INTERESTS, L.P.
                                        By: Howell Investments, L.L.C., its General Partner

Print Name: _____           David Morgan, Manager

Print Name: _____

                                        LECHWE, L.L.C.

Print Name: _____           Mark Rauch, Agent and Attorney-in-Fact

Print Name: _____

                                        MARKSCO, L.L.C.

_Christine M Fortson_
Print Name: Christine M Fortson        Mark P. Sealy, Member

_Stephen Morehart_
Print Name: Stephen Morehart

                                        BUNDERO INVESTMENT COMPANY, L.L.C.

Print Name: _____           Robert P. Bowman, Manager

Print Name: _____

                                        LONGLEAF ENERGY GROUP, INC.

Print Name: _____           Thomas E. McMillan, Jr., President

Print Name: _____

- 15b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JJS WORKING INTERESTS, L.L.C.
By: Houston Bulldog Capital Management, L.L.C.,
   its Manager

Print Name: _____

_____
Justin Simons, Manager

Print Name: _____

TAUBER EXPLORATION AND PRODUCTION, CO.

Print Name: _____

_____
Richard E. Tauber, President

Print Name: _____

KUDZU OIL PROPERTIES, L.L.C.

Print Name: _____

_____
Wirt A. Yerger, III
Manager

Print Name: _____

J.F. HOWELL INTERESTS, L.P.
By: Howell Investments, L.L.C., its General Partner

Print Name: _____

_____
David Morgan, Manager

Print Name: _____

LECHWE, L.L.C.

Print Name: _____

_____
Mark Rauch, Agent and Attorney-in-Fact

Print Name: _____

MARKSCO, L.L.C.

Print Name: _____

_____
Mark P. Sealy, Member

Print Name: _____

BUNDERO INVESTMENT COMPANY, L.L.C.

Print Name: *Lisa E. Allen*
LISA E. MILLER

_____
Robert P. Bowman, Manager

Print Name: *Randy S. Bartlett*
RANDY S. BARTLETT

LONGLEAF ENERGY GROUP, INC.

_____
Thomas E. McMillan, Jr., President

Print Name: _____

Print Name: _____

- 15b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

JJS WORKING INTERESTS, L.L.C.
By: Houston Bulldog Capital Management, L.L.C.,
    its Manager

Print Name: _____    Justin Simons, Manager

Print Name: _____

TAUBER EXPLORATION AND PRODUCTION, CO.

Print Name: _____    Richard E. Tauber, President

Print Name: _____

KUDZU OIL PROPERTIES, L.L.C.

Print Name: _____    Wirt A. Yerger, III
                                        Manager

Print Name: _____

J.F. HOWELL INTERESTS, L.P.
By: Howell Investments, L.L.C., its General Partner

Print Name: _____    David Morgan, Manager

Print Name: _____

LECHWE, L.L.C.

Print Name: _____    Mark Rauch, Agent and Attorney-in-Fact

Print Name: _____

MARKSCO, L.L.C.

Print Name: _____    Mark P. Sealy, Member

Print Name: _____

BUNDERO INVESTMENT COMPANY, L.L.C.

Print Name: _____    Robert P. Bowman, Manager

Print Name: _____

LONGLEAF ENERGY GROUP, INC.

Print Name: _Amanda S. Holland_        Thomas E. McMillan, Jr., President
            Amanda S. Holland

Print Name: _Lisa Warren_
            Lisa Warren

- 15b -

**ACKNOWLEDGMENTS**

STATE OF COLORADO

COUNTY OF BOULDER

I, _GEOFFREY DAVID NENNINGER_ a notary public in and for said County and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the __12__ day of __AUGUST__, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _August 15, 2017_

```
GEOFFREY DAVID NENNINGER
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20134051884
MY COMMISSION EXPIRES AUGUST 15, 2017
```

STATE OF COLORADO

COUNTY OF BOULDER

I, _Geoffrey DAVID NENNINGER_, a notary public in and for said County and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the __12__ day of __AUGUST__, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _August 15, 2017_

```
GEOFFREY DAVID NENNINGER
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20134051884
MY COMMISSION EXPIRES AUGUST 15, 2017
```

STATE OF TEXAS

COUNTY OF TRAVIS

I, _____, a notary public in and for said County and State, hereby certify that Billy Forney, III, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

- 16a -

## ACKNOWLEDGMENTS

STATE OF COLORADO

COUNTY OF BOULDER

I, _____, a notary public in and for said County and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF COLORADO

COUNTY OF BOULDER

I, _____, a notary public in and for said County and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF TRAVIS   *HARRIS*

I, *Sharon M. McDonald*, a notary public in and for said County and State, hereby certify that Billy Forney, III, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the *4* day of *August*, 2015.

SHARON M. McDONALD
Notary Public, State of Texas
Commission Expires 12-29-2017

*Sharon M. McDonald*
_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: *12/29/2017*

- 16a -

STATE OF LOUISIANA

PARISH OF CADDO

    I, _Janet H. Gould_____, a notary public in and for said Parish and State, hereby certify that T. Cole Anderson, whose name as Vice-President of Anderson Feazel Management, Inc., a Louisiana corporation, duly authorized Manager of Trinity-Anderson, LLC, a Louisiana limited liability company, duly authorized General Partner of TCP COTTONWOOD, L.P., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _27th_ day of _August_____, 2015.

                          _Janet H. Gould_____
                          NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _With Life_

                              Janet H. Gould
                         Notary Public, ID # 41828
                         State of Louisiana
                         Parish of Bossier

STATE OF TEXAS

COUNTY OF TRAVIS

    I, _____, a notary public in and for said County and State, hereby certify that Stephen Swan, whose name as Manager of RICHARD E. FANT, L.L.C., a Texas limited liability company, duly authorized General Partner of Fant Energy Limited, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2015.

                     _____
                     NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF TRAVIS

    I, _____, a notary public in and for said County and State, hereby certify that Justin Simons, whose name as Manager of Houston Bulldog Capital Management, L.L.C., a Texas limited liability company, duly authorized Manager of JJS WORKING INTERESTS, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2015.

                     _____
                     NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

- 16b -

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that T. Cole Anderson, whose name as Vice-President of Anderson Feazel Management, Inc., a Louisiana corporation, duly authorized Manager of Trinity-Anderson, LLC, a Louisiana limited liability company, duly authorized General Partner of TCP COTTONWOOD, L.P., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF TRAVIS

I, _*JANET LEGENDRE*_, a notary public in and for said County and State, hereby certify that Stephen Swan, whose name as Manager of RICHARD E. FANT, L.L.C., a Texas limited liability company, duly authorized General Partner of Fant Energy Limited, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _17TH_ day of _AUGUST_, 2015.

```
┌─────────────────────────────────┐
│        JANET LEGENDRE           │
│   MY COMMISSION EXPIRES         │
│      February 25, 2017          │
└─────────────────────────────────┘
```

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _2/25/2017_

STATE OF TEXAS

COUNTY OF TRAVIS

I, _____, a notary public in and for said County and State, hereby certify that Justin Simons, whose name as Manager of Houston Bulldog Capital Management, L.L.C., a Texas limited liability company, duly authorized Manager of JJS WORKING INTERESTS, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

- 16b -

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that T. Cole Anderson, whose name as Vice-President of Anderson Feazel Management, Inc., a Louisiana corporation, duly authorized Manager of Trinity-Anderson, LLC, a Louisiana limited liability company, duly authorized General Partner of TCP COTTONWOOD, L.P., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2015.

                                  _____
                                    NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF TRAVIS

      I, _____, a notary public in and for said County and State, hereby certify that Stephen Swan, whose name as Manager of RICHARD E. FANT, L.L.C., a Texas limited liability company, duly authorized General Partner of Fant Energy Limited, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2015.

                                    _____
                                    NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF ~~TRAVIS~~ HARRIS

      I, DAPHENE R NORWOOD, a notary public in and for said County and State, hereby certify that Justin Simons, whose name as Manager of Houston Bulldog Capital Management, L.L.C., a Texas limited liability company, duly authorized Manager of JJS WORKING INTERESTS, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the 17th day of AUGUST, 2015.

DAPHENE R. NORWOOD
Notary Public, State of Texas
My Commission Expires
May 13, 2018

                              *Daphene R. Norwood*
                              NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: MAY 13, 2018

- 16b -

STATE OF TEXAS

COUNTY OF ~~TRAVIS~~ *HARRIS*

*Operating Agreement*
*Mt. Carmel Prospect*

I, *Myla Wunderlich*, a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as President of TAUBER EXPLORATION AND PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the *27th* day of *August*, 2015.

*Myla Wunderlich*

NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: *2-11-16*

MYLA WUNDERLICH
Notary Public, State of Texas
Commission Expires 02-11-2016

STATE OF MISSISSIPPI

COUNTY OF MADISON

I, _____, a notary public in and for said County and State, hereby certify that Wirt A. Yerger, III, whose name as Manager of KUDZU OIL PROPERTIES, L.L.C., a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that David Morgan, whose name as Manager of Howell Investments, L.L.C., a Louisiana limited liability company, duly authorized General Partner of JF HOWELL INTERESTS, L.P., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

- 16c -

STATE OF TEXAS

COUNTY OF TRAVIS

    I, _____, a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as President of TAUBER EXPLORATION AND PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2015.

                                           _____
                                         NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF MISSISSIPPI

COUNTY OF MADISON

    I, _Pamela F. Sebren___, a notary public in and for said County and State, hereby certify that Wirt A. Yerger, III, whose name as Manager of KUDZU OIL PROPERTIES, L.L.C., a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _15_ day of _August_, 2015.

                                           Pamela F Sebren
                                       NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: Commission Expires July 18, 2017

*(Notary seal: STATE OF MISSISSIPPI, NOTARY PUBLIC, ID # 63506, PAMELA F. SEBREN, Commission Expires July 18, 2017, RANKIN COUNTY)*


STATE OF LOUISIANA

PARISH OF CADDO

    I, _____, a notary public in and for said Parish and State, hereby certify that David Morgan, whose name as Manager of Howell Investments, L.L.C., a Louisiana limited liability company, duly authorized General Partner of JF HOWELL INTERESTS, L.P., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2015.

                                           _____
                                         NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF TRAVIS

I, _____, a notary public in and for said County and State, hereby certify that Richard E. Tauber, whose name as President of TAUBER EXPLORATION AND PRODUCTION CO., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF MADISON

I, _____, a notary public in and for said County and State, hereby certify that Wirt A. Yerger, III, whose name as Manager of KUDZU OIL PROPERTIES, L.L.C., a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, _Melissa R. Ebarb_, a notary public in and for said Parish and State, hereby certify that David Morgan, whose name as Manager of Howell Investments, L.L.C., a Louisiana limited liability company, duly authorized General Partner of JF HOWELL INTERESTS, L.P., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _13th_ day of _August_, 2015.

_Melissa R. Ebarb_
NOTARY PUBLIC
Melissa R. Ebarb
68325

[AFFIX NOTARIAL SEAL]

My Commission Expires: _is for life_

- 16c -

STATE OF TEXAS

COUNTY OF ~~TRAVIS~~ *HARRIS*

I, _Patti L Hanson_, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Agent and Attorney in Fact of LECHWE, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _31_ day of _August_, 2015.

_Patti L Hanson_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _1/18/19_


STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of MARKSCO, L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Manager of BUNDERO INVESTMENT COMPANY, L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2015.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


- 16d -

STATE OF TEXAS

COUNTY OF TRAVIS

    I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Agent and Attorney in Fact of LECHWE, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2015.


                              _____
                                NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

    I, *Peggy Day Gill*, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of MARKSCO, L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the *12th* day of *August*, 2015.


                              _____
NOTARY PUBLIC
                     PEGGY DAY GILL, NOTARY PUBLIC
                       CADDO PARISH, LOUISIANA
                     MY COMMISSION IS FOR LIFE
                     NOTARY NO. 2425

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

    I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Manager of BUNDERO INVESTMENT COMPANY, L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2015.


                              _____
                                  NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

- 16d -

STATE OF TEXAS

COUNTY OF TRAVIS

     I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as Agent and Attorney in Fact of LECHWE, L.L.C., a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2015.


                                        _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

     I, _____, a notary public in and for said Parish and State, hereby certify that Mark P. Sealy, whose name as Member of MARKSCO, L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2015.


                                          _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

     I, _Deborah W. Cox_, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Manager of BUNDERO INVESTMENT COMPANY, L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

     Given under my hand and notarial seal this the _11th_ day of _August_, 2015.


                            _Deborah W. Cox_
NOTARY PUBLIC

DEBORAH W. COX 26623
Notary Public
Parish of Caddo
State of Louisiana

[AFFIX NOTARIAL SEAL]

My Commission Expires: _for life_


- 16d -

STATE OF ALABAMA

COUNTY OF ESCAMBIA

I, _Paula Gerety Pettis_ , a notary public in and for said County and State, hereby certify that Thomas E. McMillan, Jr., whose name as President of LONGLEAF ENERGY GROUP, INC., an Alabama corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _24th_ day of _August_ , 2015.

NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _3/4/2019_

- 16e -

## EXHIBIT "A"

Attached to and made a part of that certain Amended and Restated Joint Operating Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc., as Non-Operators

### MT. CARMEL PROSPECT
### ESCAMBIA COUNTY, ALABAMA & SANTA ROSA COUNTY, FLORIDA

(1) **Identification of lands subject to this agreement:**

#### Contract Area

All lands, oil and gas leasehold interests, options to acquire oil and gas leasehold interests and oil and gas interests located in Escambia County, Alabama and Santa Rosa County, Florida and lying within the bold black boundary on the plat attached hereto as Exhibit "A-2," specifically described as follows:

#### ESCAMBIA COUNTY, ALABAMA

Sections 13-16, 21-28 and 33-36, Township 1 North, Range 9 East.
All that part of Township 1 North, Range 10 East lying South of the center line of Conecuh River.

#### SANTA ROSA COUNTY, FLORIDA

All of Township 6 North, Range 29 West.
All of Township 5 North, Range 29 West, less and except Sections 19-22 and 30-35.
Sections 1-3 and 10-12, Township 4 North, Range 29 West.
All of Township 6 North, Range 28 West, less and except Sections 25 and 36.
Sections 2-11, 16-21, 28-33 and 37, Township 5 North, Range 28 West.
Sections 4-9, Township 4 North, Range 28 West.

In the event of a conflict between the specific descriptions set forth in this Exhibit "A" and the plat attached as Exhibit "A-2," the specific descriptions in this Exhibit "A" shall prevail.

Anything herein to the contrary notwithstanding, the following described tracts are not included within the Contract Area and/or AMI, even though they fall within the above described lands and the bold black boundary on Exhibit "A-2:"

1. The NE/4 of the NE/4 and the north 264 feet of the SE/4 of the NE/4 of Section 14, Township 1 North, Range 9 East, Escambia County, Alabama, containing 48.00 acres, more or less; and

2. All that part of the SE/4 of the SW/4, less the Conecuh River, of Section 2, Township 1 North, Range 10 East, Escambia County, Alabama, containing 30.10 acres, more or less.

#### Area of Mutual Interest

Same as Contract Area.

(2) **Restrictions, if any, as to depths, formations, or substances:**

There are no restrictions except as may be provided for in any lease or contract subject to this Operating Agreement.

(3) **Decimal Interest and names of Parties to this Agreement**

| Participants | BPO Interest | APO Interest |
|---|---|---|
| Sklarco | 25.00% | 35.20% |
| JJS | 7.00% | 7.00% |
| McCombs | 25.00% | 18.75% |
| TCP | 23.50% | 17.625% |
| Fant | 2.50% | 1.875% |

| | | |
|---|---|---|
| Tauber | 5.00% | 3.75% |
| Kudzu | 3.00% | 2.25% |
| JF Howell | 4.00% | 3.00% |
| Lechwe | 2.00% | 1.50% |
| Marksco | 2.00% | 1.50% |
| Bundero | 1.00% | 0.75% |
| Longleaf | 0.00% | 6.80% |
| *Total* | *100%* | *100%* |

The interests owned by the Non-Operators in the Contract Area and in the oil and gas leases and interests that become subject to this Agreement will be dependent upon elections made by the Non-Operators with respect to oil and gas leases, pursuant to the AMI and the other provisions of this Agreement. Operator shall revise this Exhibit "A" from time to time to reflect the interests of the Parties resulting from those elections.

(4) **Oil and gas lease and/or oil and gas interests subject to this agreement:**

The oil and gas leases, options to acquire seismic permits and/or oil and gas leases and other agreements currently subject to this Agreement are listed in Exhibit "A-1" attached hereto. Operator shall amend Exhibit "A-1" from time to time as appropriate to reflect the leases or other interests that become subject to this Agreement. The only jointly owned lease burdens will be: (i) the lessor's royalty under each of the oil and gas leases that become subject to this Agreement, (ii) the reversionary working interest described in Section 1.4 of that certain Amended and Restated Participation Agreement dated effective as of April 8, 2015 by and between by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc., (the "Participation Agreement"), to which this Agreement is attached as Exhibit "D" and (iii) the overriding royalty interest in favor of Longleaf Energy Group, Inc. described in Section 1.1 of the Participation Agreement. There are no other joint burdens whatsoever.

(5) **Addresses of parties for notice purposes:**

Sklar Exploration Company L.L.C.
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Phone: (318) 227-8668
Fax: (318) 227-9012
grembert@sklarexploration.com

Sklarco L.L.C.
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Phone: (318) 227-8668
Fax: (318) 227-9012
grembert@sklarexploration.com

McCombs Energy, Ltd.
Attn: Billy Forney, III, Vice President
5599 San Felipe St., Suite 1200
Houston, TX 77056-2721
Phone: (713) 621-0033
Fax: (713) 621-1670
BForney3@mccombsenergy.com

TCP Cottonwood, L.P.
Attn: T. Cole Anderson (All Correspondence)
Attn: Jerry D. Crooks, Jr. (All Correspondence, Drilling Reports)
Attn: Jerry D. Crooks, Jr. (AFEs and Elections)
Attn: Janet Gould (Drilling Reports, AFEs and Elections)
Attn: J. David Garrett (Land and Legal)
333 Texas Street, Suite 2020
Shreveport, LA 71101
Phone: (318) 227-2000

Fax: (318) 425-5935
cole@andersonoilandgas.com
jcrooks@andersonoilandgas.com
janetg@andersonoilandgas.com
david@andersonoilandgas.com

Fant Energy Limited
Attn: Stephen Swan
5800 Westview Drive
Houston, TX 77055
Phone: (713) 316-1216
Fax: (713) 316-1473
pkelley@nps.cc

JJS Working Interests LLC
Attn: Justin Simons
4295 San Felipe, Suite 207
Houston, Texas 77027
Phone: (713) 888-0875
Fax:  (866) 406-9550
justin@hbcapllc.com

Tauber Exploration & Production Company
Attn:  John F. Robinson
55 Waugh Drive, Suite 600
Houston, Texas 77007
Phone:  (713) 869-5656
Fax:     (713) 869-1997
john.robinson@tauberoil.com

Kudzu Oil Properties, LLC
Attn: Mr. Wirt A. Yerger, III
300 Concourse Blvd, Suite 101
Ridgeland, Mississippi 39157
Phone: (601) 987-6576
Fax: (601) 366-1922
kudzu@caviliergrp.com

JF Howell Interests, L.P.
Attn: David Morgan
416 Travis Street, Suite 715
Shreveport, LA  71101
Phone: (318) 221-6382
Fax: (318) 425-0839
jdavidmorgan@me.com

Lechwe, L.L.C.
Attn: Mark Rauch
P.O. Box 270415
Houston, TX 77277-0415
Phone: (713) 627-1700 ext. 109
Fax:  (713) 621-9292
mrauch@standardsouthern.com

Marksco, L.L.C.
Attn: Mark Sealy
333 Texas Street, Suite 1050
Shreveport, LA 71101
Phone: (318) 222-8700 ext. 7325
Fax:  (318) 222-4124
marks@sealynet.com

Bundero Investment Company, L.L.C.
Attn: Robert P. Bowman, Manager
333 Texas Street, Ste. 300
Shreveport, LA 71101
Phone: (318) 213-8780
Fax: (318) 213-8784

rbowman@bowmansystems.com

Longleaf Energy Group, Inc.
Attn: Roger Chapman, Exploration Manager
212 Belleville Avenue
Brewton, Alabama 36426
Phone: (251) 867-5413
Fax: (251) 867-5427
rchapman@leighplace.com

EXHIBIT "A-1"

Attached to and made a part of that certain Amended and Restated Joint Operating Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc., as Non-Operators

## OIL AND GAS LEASES, OPTIONS & OTHER AGREEMENTS

1.      Geophysical Permit & Lease Option Agreement dated April 7, 2015, by and between TRM Woodlands, Inc., as Grantor, and Sklarco L.L.C., as Grantee, a short form of which is recorded in Book 598, Page 534 of the real property records the office of the Probate Judge of Escambia County, Alabama, and in OR Book 3433, Page 1085 of the Official Records of the office of the Clerk of Court of Santa Rosa County, Florida.

2.      Geophysical Permit & Lease Option Agreement dated April 7, 2015, by and between the State Line Oil Trust, represented by John F. Watson and David B. Foshee, Co-Trustees, as Grantor, and Sklarco L.L.C., as Grantee, a short form of which is recorded in Book 598, Page 525 of the real property records the office of the Probate Judge of Escambia County, Alabama, and in OR Book 3433, Page 1077 of the Official Records of the office of the Clerk of Court of Santa Rosa County, Florida.

3.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between Thomas B. Henry, a married man, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1365-66, File No. 201301468 of the Deed Records of Santa Rosa County, Florida.

4.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between Mary Brooks Pittman, a widow, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1371-72, File No. 201301471 of the Deed Records of the Santa Rosa County, Florida.

5.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between Sally Elizabeth Pittman, represented by Mary Brooks Pittman, her agent and attorney-in-fact, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1373-74, File No. 201301472 of the Deed Records of the Santa Rosa County, Florida.

6.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between Edmund T. Henry, a married man, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1367-68, File No. 201301469 of the Deed Records of the Santa Rosa County, Florida.

7.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between Frances A. Vonk, a married woman, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1369-70, File No. 201301470 of the Deed Records of the Santa Rosa County, Florida.

8.      Oil, Gas and Mineral Lease dated December 14, 2012, by and between John Riley Pittman, a married man, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the entirety of Section 26, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 652 acres, more or less, recorded on January 11, 2013 in Book 3207, pages 1363-64, File No. 201301467 of the Deed Records of the Santa Rosa County, Florida.

9.      Option to Lease Oil, Gas and Other Minerals dated December 14, 2012, by and between Mary Brooks Pittman, Sally Elizabeth Pittman, The Sally Elizabeth Pittman Trust, Thomas Brooks Henry, Edmund T. Henry, III, Frances A. Vonk and John Riley Pittman, as grantors, and Longleaf Energy Group, Inc. covering the following property in Santa Rosa County, Florida, to-wit: all of Section 15, containing 545 acres, more or less, the East Half of the Southeast Quarter (E/2 SE/4) of Section 16, containing 79.65 acres, more or less, the Southwest Quarter of the Southwest Quarter (SW/4 SW/4) and the East Half of the East Half (E/2 E/2) of Section 25, containing 192.128 acres, more or less, all of Section 27, less and except the Southwest Quarter of the Southwest Quarter (SW/4 SW/4), containing 524.14 acres, more or less, and all of

Section 38, less and except the Northwest Quarter of the Northwest Quarter (NW/4 NW/4), containing 630.559 acres, more or less, all in Township 5 North, Range 29 West; and the Southwest Quarter (SW/4) of Section 30, Township 5 North, Range 28 West, less and except the Northeast Quarter of the Southwest Quarter (NE/4 SW/4), containing 120 acres, more or less; containing in total 2,091.477 acres, more or less.

10.    Oil, Gas and Mineral Lease dated October 22, 2012, by and between James Milton Bates, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the Southeast Quarter of the Southeast Quarter (SE/4 SE/4) of Section 13, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 40 acres, more or less, recorded on January 16, 2014 in Book 3318, pages 849-51, File No. 201401643 of the Deed Records of Santa Rosa County, Florida.

11.    Oil, Gas and Mineral Lease dated October 22, 2012, by and between the Lillian Louise Hendricks Revocable Trust, represented by James Milton Bates, trustee, as lessor, and Longleaf Energy Group, Inc., as lessee, covering the Southeast Quarter of the Southeast Quarter (SE/4 SE/4) of Section 13, Township 5 North, Range 29 West, Santa Rosa County, Florida, containing 40 acres, more or less, recorded on January 16, 2014 in Book 3318, pages 846-48, File No. 201401642 of the Deed Records of Santa Rosa County, Florida.

12.    That certain Letter of Intent dated December 29, 2014, by and between the City of Brewton, represented by its mayor, Yank Lovelace, as grantor, and Longleaf Energy Group, Inc., granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and minerals covering all of the city's property located in Township 1 North, Range 10 East, Escambia County, Alabama.

13.    Option Agreement dated July 8, 2014, by and between the State Line Oil Trust, represented by John F. Watson and David B. Foshee, Co-Trustees, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Phase I & II with Coldwater Creek Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

14.    Option Agreement dated December 10, 2014, by and between William Yancey Lovelace, Jr., as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

15.    Option Agreement dated December 10, 2014, by and between Kelley Alford, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

16.    Option Agreement dated December 10, 2014, by and between Caroline O'Neal, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

17.    Option Agreement dated December 10, 2014, by and between Gordon O'Neal, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

18.    Option Agreement dated December 10, 2014, by and between Robert O'Neal, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

19.    Option Agreement dated December 10, 2014, by and between The Mary Hardegree Strain Family Trust, represented by Jane Strain Blount, Trustee, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

20.    Option Agreement dated December 10, 2014, by and between John Cleveland Lovelace, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

21.     Option Agreement dated December 10, 2014, by and between Trust ULWT of Ben Kelly Strain FBO Erin Joann Strain, represented by Erin Joann Strain and William Dudley Strain, Co-Trustees, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

22.     Option Agreement dated December 10, 2014, by and between Edwin Sanford, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

23.     Option Agreement dated December 10, 2014, by and between Stephen O'Neal, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

24.     Option Agreement dated December 10, 2014, by and between Hester Lovelace Gordon, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

25.     Option Agreement dated December 10, 2014, by and between Lovelace Properties, LLC, as grantor, and Longleaf Energy Group, Inc., as grantee, granting Longleaf the right and option to acquire seismic permits and/or options to lease oil, gas and other minerals covering all of grantors property within the prospect area known as the Mt. Carmel Seismic Prospect, Escambia County, Alabama and Santa Rosa County, Florida.

EXHIBIT "A-2"

Attached to and made a part of that certain Amended and Restated Joint Operating Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc., as Non-Operators

## MT. CARMEL PROSPECT
## ESCAMBIA COUNTY, ALABAMA & SANTA ROSA COUNTY, FLORIDA

EXHIBIT "B"

Producers 88 (9/70)—Paid Up (SP 4-75)
With Pooling Provision
Mississippi-Alabama-Florida

HEDERMAN BROS., RIDGELAND, MS

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of_____ 20 _____ between

_____

_____

_____

lessor (whether one or more), whose address is: _____

and _____ lessee, WITNESSETH:

1. Lessor, in consideration of _____ Dollars, receipt of which is hereby acknowledged, and of the covenants and agreements of lessee hereinafter contained, does hereby grant, lease and let unto lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas (including carbon dioxide), sulphur and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, power lines, telephone lines, employee houses and other structures on said land, necessary or useful in lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any other land adjacent thereto. The land covered hereby, herein called "said

land," (is located in the County of_____, State of_____ and is described as follows:

This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain_____acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights, and options hereunder.

2. Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of ten (10) years from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3. As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipe line to which lessee may connect its wells, the equal one-eighth part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such one-eighth part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear one-eighth of the cost of treating oil to render it marketable pipe line oil; (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, one-eighth of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of one-eighth of such gas and casinghead gas; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one-tenth either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing gas or any other mineral covered hereby, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this sub-paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be en-

titled to receive the royalties which would be paid under this lease if the wells were producing, or may be deposited to such parties credit in the_____Bank

at_____, or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownerships thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above on or before the last date for payment. Nothing herein contained shall imply an obligation or duty to release to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4. Lessee is hereby granted the right, at its option, to pool or unitize all or any part of said land and of this lease as to any or all minerals or horizons thereunder, with other lands, lease or leases, or portion or portions thereof, or mineral or horizon thereunder, so as to establish units containing not more than 80 surface acres plus 10% acreage tolerance; provided, however, a unit may be established or an existing unit may be enlarged to contain not more than 640 acres plus 10% acreage tolerance, if unitized only as to gas or only as to gas and liquid hydrocarbons (condensate) which are not a liquid in the subsurface reservoir. If larger units are required, under any governmental rule or order, for the drilling or operation of a well at a regular location, or for obtaining maximum allowable, any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged, to conform to the size required by such governmental order or rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of said options may be exercised by lessee from time to time, and whether before or after production has been established either on said land or on the portion of said land included in the unit or on other land utilized therewith and any such unit may include any well to be drilled, being drilled or already completed. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be land or mineral, royalty or leasehold interests in land within the unit which are not pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted under this lease. There shall be allocated to the land covered by this lease included in any such unit that proportion of the total production of unitized minerals from wells in the unit, after deducting any used in lease or unit operations, which the number of surface acres in the land covered by this lease included in the unit bears to the total number of surface acres in the unit. The production so allocated shall be considered for all purposes, including the payment or delivery of royalty, over-riding royalty, and any other payments out of production, to be the entire production of unitized minerals from the portion of said land covered hereby and included in such unit in the same manner as though produced from said land under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of such unit shall not have the effect of changing the ownership of any shut-in production royalty which may become payable under this lease. Neither shall it impair the right of lessee to release from this lease all or any portion of said land, except that lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are released as to lands within the unit. Lessee may discharge any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. A unit may be so established, modified or dissolved during the life of this lease.

5. Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations as to the released acreage or interest.

6. This is a PAID-UP LEASE. In consideration of the down cash payment, Lessor agrees that this lease may be maintained except as otherwise provided herein, in commence or continue any operations during the primary term. Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

7. Lessee shall have the use, free from royalty, of water, other than from lessor's water wells, and of oil and gas produced from said land in all operations hereunder. Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing. No well shall be drilled nearer than 200 feet to the house or barn now on said land without the consent of the lessor. Lessee shall pay for damages caused by its operations to growing crops and timber on said land.

EXHIBIT "B", continued

8. The rights and estate of any party hereto may be assigned from time to time in whole or in part and as to any mineral or horizon. All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns. No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of lessee, including, but not limited to, the location and drilling of wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof of or to lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by lessor or lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of the death of the owner, lessee may, nevertheless, pay or tender such royalties, or other moneys, or part thereof, to the credit of the decedent in a depository bank provided for above.

9. In the event lessor considers that lessee has not complied with all its obligations hereunder, both express and implied, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor. The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee. Neither the service of said notice nor the doing of any acts by lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that lessee has failed to perform all its obligations hereunder. Should it be asserted in any notice given to the lessee under the provisions of this paragraph that lessee has failed to comply with any implied obligation or covenant hereof, this lease shall not be subject to cancellation for any such cause except after final judicial ascertainment that such failure exists and lessee has then been afforded a reasonable time to prevent cancellation by complying with and discharging its obligations as to which lessee has been judicially determined to be in default. If this lease is cancelled for any cause, it shall nevertheless remain in force and effect as to (1) sufficient acreage around each well as to which there are operations to constitute a drilling or maximum allowable unit under applicable governmental regulations, (but in no event less than forty acres), such acreage to be designated by lessee as nearly as practicable in the form of a square centered at the well, or in such shape as then existing spacing rules require; and (2) any part of said land included in a pooled unit on which there are operations. Lessee shall also have such easements on said land as are necessary to operations on the acreage so retained.

10. Lessor hereby warrants and agrees to defend title to said land against the claims of all persons whomsoever. Lessor's rights and interests hereunder shall be charged primarily with any mortgage, taxes or other liens, or interest and other charges on said land, but lessor agrees that lessee shall have the right at any time to pay or reduce same for lessor, either before or after maturity, and be subrogated to the rights of the holder thereof and to deduct amounts so paid from royalties or other payments payable or which may become payable to lessor and/or assigns under this lease. Lessee is hereby given the right to acquire for its own benefit, deeds, leases, or assignments covering any interest or claim in said land which lessee or any other party contends is outstanding and not covered hereby and even though such outstanding interest or claim be invalid or adverse to lessor. If this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether lessor's interest is herein specified or not), or no interest therein, then the royalties, and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by lessor) shall be paid out of the royalty herein provided. This lease shall be binding upon each party who executes it without regard to whether it is executed by all those named herein as lessor.

11. If, while this lease is in force, at or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and lessee is not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delay had not occurred.

12. Within thirty (30) days prior to the expiration of the primary term of this lease, or if operations are being conducted on said lease or land pooled therewith at the expiration of the primary term in such manner as to maintain this lease in force, within thirty (30) days after the completion of a dry hole resulting from such operations, lessee may extend the primary term of this lease as to all or any part of acreage then covered hereby, for an additional five (5) years beyond the initial primary term, by written notification of action taken and by making payment to lessor or to lessor's successor in interest as reflected by notice to lessee pursuant to Paragraph 8 hereof, or to the credit of lessor or such successor in interest in any depository bank named herein or in any amendatory instrument in the sum of $_____ for each net acre as to which the lease is so extended. If this option is exercised by lessee, the lease as extended will thereafter be treated as if the original primary term had been five (5) years longer.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

_____ (SEAL)

_____ (SEAL)

_____ (SEAL)

JOINT OR SINGLE ACKNOWLEDGMENT
(MISSISSIPPI-ALABAMA-FLORIDA)

STATE OF _____

COUNTY OF _____

I hereby certify, that on this day, before me, a _____

duly authorized in the state and county aforesaid to take acknowledgments, personally appeared _____

to me known to be the person _____ described in and who executed the foregoing instrument and _____ he _____

acknowledged before me that, being informed of the contents of the same, _____ he _____ voluntarily signed and delivered the within and foregoing instrument on the day and year therein mentioned.

Given under my hand and official seal, this _____ day of _____ A.D., 20 _____

(Affix Seal)

_____
(Title of Official)

My commission expires _____ in and for _____ County, _____

WITNESS ACKNOWLEDGMENT
(MISSISSIPPI-ALABAMA-FLORIDA)

STATE OF _____

COUNTY OF _____

I, a _____ in and for the aforesaid jurisdiction, hereby certify that _____

a subscribing witness to the foregoing instrument, known to me, appeared before me on this day, and being sworn, stated that _____

the grantor(s), having been informed of the contents thereof, voluntarily executed and delivered the same in his presence, and in the presence of the other subscribing witness, on the day the same bears date; that he attested the same in the presence of the grantor(s), and of the other witness, and that such other witness subscribed his name as a witness in his presence.

_____
(Subscribing Witness)

Given under my hand and official seal, this _____ day of _____ 20 _____

(Affix Seal)

_____
(Title of Official)

My commission expires _____ in and for _____ County, _____

COPAS 2005 Accounting Procedure
Recommended by COPAS

**c o p a s**

## Exhibit " C "
## ACCOUNTING PROCEDURE
## JOINT OPERATIONS

Attached to and made part of  that certain Joint Operating Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, JJS Working Interests, L.L.C., Tauber Exploration and Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Markseo, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc. as Non-Operators

### I. GENERAL PROVISIONS

IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.

IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.

1.  **DEFINITIONS**

   All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

   "**Affiliate**" means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

   "**Agreement**" means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

   "**Controllable Material**" means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

   "**Equalized Freight**" means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

   "**Excluded Amount**" means a specified excluded trucking amount most recently recommended by COPAS.

   "**Field Office**" means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

   "**First Level Supervision**" means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

   - Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
   - Responsibility for day-to-day direct oversight of rig operations
   - Responsibility for day-to-day direct oversight of construction operations
   - Coordination of job priorities and approval of work procedures
   - Responsibility for optimal resource utilization (equipment, Materials, personnel)
   - Responsibility for meeting production and field operating expense targets
   - Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
   - Responsibility for all emergency responses with field staff
   - Responsibility for implementing safety and environmental practices
   - Responsibility for field adherence to company policy
   - Responsibility for employment decisions and performance appraisals for field personnel
   - Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

   "**Joint Account**" means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

   "**Joint Operations**" means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



**"Joint Property"** means the real and personal property subject to the Agreement.

**"Laws"** means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

**"Material"** means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

**"Non-Operators"** means the Parties to the Agreement other than the Operator.

**"Offshore Facilities"** means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

**"Off-site"** means any location that is not considered On-site as defined in this Accounting Procedure.

**"On-site"** means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

**"Operator"** means the Party designated pursuant to the Agreement to conduct the Joint Operations.

**"Parties"** means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

**"Participating Interest"** means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

**"Participating Party"** means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

**"Personal Expenses"** means reimbursed costs for travel and temporary living expenses.

**"Railway Receiving Point"** means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

**"Shore Base Facilities"** means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.

**"Supply Store"** means a recognized source or common stock point for a given Material item.

**"Technical Services"** means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

2. **STATEMENTS AND BILLINGS**

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

**c o p a s**

## 3. ADVANCES AND PAYMENTS BY THE PARTIES

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1) being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

(2) being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

(3) being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

(4) charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

## 4. ADJUSTMENTS

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B. All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1) a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

(2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

(3) a government/regulatory audit, or

(4) a working interest ownership or Participating Interest adjustment.

## 5. EXPENDITURE AUDITS

A. A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B.   The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C.   The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D.   If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E.   ☐ *(Optional Provision – Forfeiture Penalties)*
*If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*

6.   **APPROVAL BY PARTIES**

A.   GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B.   AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____ two _____ ( 2 ) or more Parties, one of which is the Operator, having a combined working interest of at least ___ two-thirds ___ percent ( 66.67 %), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C.   AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

1.   **RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

2.   **LABOR**

A.   Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1)   Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2)   Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3)   Operator's employees providing First Level Supervision,

(4)   Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5)   Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B.   Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

D.  Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E.  Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or  that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F.  Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G.  Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H.  Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3.  **MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4.  **TRANSPORTATION**

A.  Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B.  Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below, **provided the total transportation cost shall not exceed $10,000.00.** Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1)  If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property . The Operator shall consistently  apply the selected alternative.

(2)  If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5.  **SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6.  **EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A.  The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____**Fifteen**_____ percent (_____**15**_____%) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B.  In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

**7.  AFFILIATES**

A.  Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $ __50,000.00__ If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B.  For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $ __50,000.00__ in a given calendar year.

C.  The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

**8.  DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

**9.  LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

**10.  TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

### 11. INSURANCE

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

### 12. COMMUNICATIONS

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

### 13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

### 14. ABANDONMENT AND RECLAMATION

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

### 15. OTHER EXPENDITURES

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

### III. OVERHEAD

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

1.  **OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

    As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

    ☑ **(Alternative 1)** Fixed Rate Basis, Section III.1.B.
    ☐ **(Alternative 2)** Percentage Basis, Section III.1.C.

    A.  TECHNICAL SERVICES

        (i)  Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

            ☑ **(Alternative 1 – Direct)** shall be charged **direct** to the Joint Account.

            ☐ **(Alternative 2 – Overhead)** shall be covered by the **overhead** rates.

        (ii)  Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

            ☐ **(Alternative 1 – All Overhead)** shall be covered by the **overhead** rates.

            ☑ **(Alternative 2 – All Direct)** shall be charged **direct** to the Joint Account.

            ☐ **(Alternative 3 – Drilling Direct)** shall be charged **direct** to the Joint Account, **only** to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

    Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

    B.  OVERHEAD—FIXED RATE BASIS

        (1)  The Operator shall charge the Joint Account at the following rates per well per month:

            Drilling Well Rate per month $ 12,000.00        (prorated for less than a full month)

            Producing Well Rate per month $ 1,200.00

        (2)  Application of Overhead—Drilling Well Rate shall be as follows:

            (a)  Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead—Producing Well Rate shall be as follows:

(a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e) Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4) The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

C. OVERHEAD—PERCENTAGE BASIS

(1) Operator shall charge the Joint Account at the following rates:

(a) Development Rate _____ percent (_____) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (*Legal Expense*) and all Material salvage credits.

(b) Operating Rate _____ percent (_____%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead—Percentage Basis shall be as follows:

(a) The Development Rate shall be applied to all costs in connection with:

[i]    drilling, redrilling, sidetracking, or deepening of a well
[ii]   a well undergoing plugback or workover operations for a period of five (5) or more consecutive work–days
[iii]  preliminary expenditures necessary in preparation for drilling
[iv]   expenditures incurred in abandoning when the well is not completed as a producer
[v]    construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead-Major Construction and Catastrophe*).

(b) The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead-Major Construction and Catastrophe*).

2. **OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE**

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.  If the Operator absorbs the engineering, design and drafting costs related to the project:

(1)  ____5____% of total costs if such costs are less than $100,000; plus

(2)  ____2____% of total costs in excess of $100,000 but less than $1,000,000; plus

(3)  ____1____% of total costs in excess of $1,000,000.

B.  If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1)  ____5____% of total costs if such costs are less than $100,000; plus

(2)  ____2____% of total costs in excess of $100,000 but less than $1,000,000; plus

(3)  ____1____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

3.  **AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

## IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

1.  **DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

**2.   TRANSFERS**

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

A.   PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1)   Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

   (a)   For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

   (b)   For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2)   Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3)   Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4)   As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

B.   FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1)   Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2)   Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3)   Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4)   Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

C.   TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

D. **CONDITION**

(1) Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than that price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2) Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3) Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4) Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section I.6.A (*General Matters*).

(5) Condition "E" – Junk shall be priced at prevailing scrap value prices.

E. **OTHER PRICING PROVISIONS**

(1) Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2) Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

13

c o p a s

3.  **DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

4.  **SPECIAL PRICING PROVISIONS**

A.  PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

B.  SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C.  MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

### V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

c o p a s

1. **DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A.   A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section 1.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B.   Actual transportation costs and Personal Expenses for the inventory team.

C.   Reasonable charges for report preparation and distribution to the Non-Operators.

2. **NON-DIRECTED INVENTORIES**

A.   OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B.   NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C.   SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

## EXHIBIT "D"

Attached to and made a part of that certain Amended and Restated Joint Operating Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc., as Non-Operators

## INSURANCE

Operator shall carry the following insurance with the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of insurance will be provided upon request. PREMIUMS FOR CERTAIN INSURANCE COVERAGE MAY CONTINUE TO BE CHARGED TO THE JOINT ACCOUNT BEYOND THE PLUGGING AND ABANDONING OF A WELL IN ORDER TO PROTECT AGAINST POTENTIAL ONGOING LIABILTY.

I.   WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

Workers' Compensation Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

Employers Liability Insurance coverage at limits of $1,000,000 each accident for bodily injury by accident/$1,000,000 policy limit for bodily injury by disease/$1,000,000 each employee for bodily injury by disease.

II.   COMPREHENSIVE GENERAL LIABILITY

Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $1,000,000 for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III.   AUTOMOBILE LIABILITY

Coverage shall include owned, non-owned and hired vehicles. Limit $1,000,000 combined single limit each occurrence for bodily injury and property damage.

IV.   EXCESS LIABILITY

Operator shall carry excess liability insurance in an amount of $10,000,000.

V.   EXTRA EXPENSE LIABILITY

Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $200,000 per occurrence.

Liability Limit: $5,000,000

VI.   OIL LEASE PROPERTY

Oil Lease Property Insurance (Inland Marine) covering tanks, pumps, machinery, pipe and similar equipment of a mobile nature usual to the operation of a producing oil or gas well and crude oil while contained in tanks with limit of not less than $10,000,000 and subject to a deductible of $5,000.

VII.   ADDITIONAL INSURANCE

Operator shall be entitled to carry or provide any additional insurance for the benefit of the Joint Account, which is of direct benefit to the joint property and is incurred by the Operator in the necessary and proper conduct of the joint operations. The premium for all such insurance so carried shall be paid by Operator and charged to the Joint Account. Operator shall, at any time requested, furnish Non-Operator with information concerning the kind, character and amounts of insurance carried.

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder.   Further, any party, at its own expense, may carry its own coverage for Extra Expense Liability Insurance with limits as set forth in Section V, above.   Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability.   Upon timely notification such party will not be charged by Operator for the coverage.

**EXHIBIT "E"**

Attached to and made a part of that certain Amended and Restated Joint Operating Agreement (Mt. Carmel Prospect) dated effective as of April 8, 2015, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., JJS Working Interests L.L.C., McCombs Energy, LTD., TCP Cottonwood, L.P., Fant Energy Limited, Tauber Exploration & Production Co., Kudzu Oil Properties, L.L.C., JF Howell Interests, L.P., Lechwe, L.L.C., Marksco, L.L.C., Bundero Investment Company, L.L.C. and Longleaf Energy Group, Inc., as Non-Operators

**GAS BALANCING AGREEMENT**

Subject to and under the terms of the above described Operating Agreement, the parties hereto own and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area described in the Operating Agreement (the "**JOA**").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the gas produced from said JOA. However, one or more of the parties may be unable to take or market its interest in the gas production from time to time; therefore, to permit any party to produce and dispose of its interest in the gas production from the JOA with as much flexibility as possible, the parties hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser. Any party whose share of gas is not marketed shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ration of its participation percentage under this Operating Agreement to the participating percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, it any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Operator will, in turn, make settlement for all royalties and overriding royalties which are payable on gas produced from the Contract Area. In the event that the total royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Contract Area, then any such deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Contract Area shall furnish the Operator with division order title opinions on which Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser

JOA – Ex. E
Page 1 of 2

shall pay, or cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the volume of gas actually taken for its account.

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties.  In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties.   In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold, less applicable production taxes and royalties theretofore paid, less any reasonable dehydration, compression, treating, processing, gathering or transportation costs actually incurred, including amortized capital costs associated with the design, construction or operation of any plants to dehydrate, compress, treat or process gas, in connection with the sale of the overproduction, at the price and based on the proceeds actually received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party.  For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party).  Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party.  Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.  The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.