

January 7, 2016

**(Via Email)**
Working Interest Owners

Re:   East Castor JOA & AFE
      Bodcaw 3D Project
      Bienville Parish, Louisiana

Dear Owner:

Enclosed is the JOA for East Castor Prospect, along with the AFE for the initial well, the Echo Papa 10-10 #1. Please execute the signature page before two witnesses, have notarized, and return with the executed AFE to my attention to our Boulder, Colorado, office. Once we have received all signatures, we will send a complete set to all.

Should you have any questions, please contact my office.

Yours very truly,

Sutton Lloyd
Landman

Enclosures

*tel:* 318.227.8668 • *fax:* 318.227.9012 • 401 Edwards Street, Ste 1601 • Shreveport, Louisiana 71101
*tel:* 303.541.1559 • *fax:* 303.443.1551 • 5395 Pearl Parkway, Ste 200 • Boulder, Colorado 80301



TOWNSHIP 14 NORTH, RANGE 7 WEST,
BIENVILLE PARISH, LOUISIANA

HOSS RA SU23

SKLAR EXPLORATION CO, LLC
HOSS RA SU23;
Echo Papa 10-10 No. 1

PLAT SHOWING:
**WELL LOCATION**
**SKLAR EXPLORATION CO, LLC**
**HOSS RA SU23; Echo Papa 10-10 No. 1**
Located 1474 feet from the South line and 1471 feet
from the East line of SECTION 10, T14N-R7W,
BIENVILLE PARISH, LOUISIANA

August 21, 2014

Ground Elev.: 306.9' NAVD88
Latitude: 32°12'38.398"
Longitude: 93°04'14.700"
X = 1,823,473.75
Y = 562,093.90
NAD 27 - LA North Zone
X = 3,104,260.84
Y = 622,801.74
NAD 83 - LA North Zone

BENJAMIN C. WINN
REG. No. 4778
REGISTERED
PROFESSIONAL
LAND SURVEYOR
STATE OF LOUISIANA

I hereby certify that this plat accurately reflects this location as staked
on the ground

Benjamin C. Winn, P.E., P.L.S. (LA Reg. No. 4778)       Date: 11/24/2015
Winn Surveying & Engineering, L.L.C.
Homer, LA 71040    (318) 927-4089

File Name: S:\PROJ14\14739\14739.dwg

BASIS OF WELL POSITION AND GROUND
ELEVATION: GNSS OBSERVATIONS
PERFORMED COINCIDENT WITH GROUND
SURVEY UTILIZING LSU C4G RTN AND RTK
NETWORK SERVICE.
PROJECTION: SPCS83-LA-N-1701 LATEST
VERSION NAD 83(2011) EPOCH 2010.00 (THEN
CONVERTED TO NAD27).
DATUM: NAVD 1988 (GEOID 12A). BENCHMARK
- LSRC CORS - 1NSU - NATCHITOCHES, LA.

0'       1000'       2000'

**SCALE: 1"=1000'**

NOTE: This plat does not represent a Property Boundary Survey, Route Survey
or Unitization Survey and therefore does not comply with the applicable
standards of practice stipulated in Section §2911 of LAC 46:LXI. Chapter 29,
Standards of Practice for Boundary Surveys as currently adopted by the
Louisiana Professional Engineering and Land Surveying Board. It is, however,
in compliance with Statewide Order 29-8 and 29-E (Title 43 of the LAC).

NOTE: No commercial or residential structures not
owned by the applicant, his lessor, or their predecessor
in interest are located within a 500 foot radius of the well
site as staked on the ground on 8/27/2014.

Rev. 3 - November 24, 2015   Rev. 1 - September 09, 2014   Rev. A - August 21, 2014
Rev. 2 - September 18, 2014   Rev. 0 - August 22, 2014

**Sklar Exploration Company L.L.C.**

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| DATE: | January 10, 2016 | FIELD: | East Castor |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | LA |
| WELL: | Echo Papa 10-10 #1 | HORIZON: | Hosston |
| LOCATION: | Section 10, T14N - R7W, Bienville Parish | PROJ. T.D.: | 9,200' MD = TVD |

| PROPOSAL: | D&C straight hole 9,200' |
| | | Latest Revision: | 12/3/2015 - GLR |

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 03 | SURFACE DAMAGES AND RIGHT OF WAY | | | |
| 79 | DRILL SITE ABSTRACT | | | |
| 81 | LEGAL FEES | | | |
| 82 | MISCELLANEOUS - Spud Fee | 17,500 | | 17,500 |
| 83 | DRILL SITE TITLE OPINION & CURATIVE | | | |
| 89 | BROKERAGE COSTS | | | |
| 90 | LANDMAN COSTS | | | |
| | **TOTAL LEASEHOLD COSTS** | $17,500 | $0 | $17,500 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 2,000 | 2,000 | 4,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 220,000 | 5,000 | 225,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 40,000 | | 40,000 |
| 04 | SURFACE DAMAGES & ROW | | | |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE($75000 up $75000 down) | | | |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | 325,000 | | 325,000 |
| 10 | DAYWORK WITH DRILL PIPE(4 comp days @ $11500/day) | | 46,000 | 46,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION: | 30,000 | 4,000 | 34,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | | | |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS(from quote) | | | |
| 17 | MUD & CHEMICALS(from quote) | | | |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 30,000 | | 30,000 |
| 24 | CEMENTING & EQUIPMENT | | 34,000 | 34,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 18,000 | 18,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | | 14,000 | 14,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 10,000 | 2,500 | 12,500 |
| 31 | FUEL | | | |
| 32 | BITS (5@$8000) | | | |
| 33 | TRANSPORTATION & TRUCKING | 20,000 | 16,000 | 36,000 |
| 34 | CONTRACT LABOR | 25,000 | 10,000 | 35,000 |
| 35 | SAFETY & H2S TRAINING (10 days @ $1000/day) | 10,000 | | 10,000 |
| 36 | LOGGING & WIRELINE | 25,000 | 10,000 | 35,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | 5,000 | 5,000 |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 4,000 | | 4,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 30,000 | 30,000 |
| 47 | PERFORATION SERVICES (2 zones @ $20000/zone) | | 40,000 | 40,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES(1 frac zones @ $100000/zone, from quote) | | 100,000 | 100,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 3,000 | 3,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 40,000 | -40,000 | |
| 78 | INSURANCE | 10,000 | | 10,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 14,000 | 2,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 40,500 | 16,075 | 56,575 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $850,500 | $337,575 | $1,188,075 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING (9-5/8") | | | |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 7,500 | | 7,500 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $8,000 | $0 | $8,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS (4-1/2")(9200ft @$5.10/ft) | | 74,520 | 74,520 |
| 22 | TUBING (2-3/8")(9000 ft @$5/ft) | | 45,000 | 45,000 |
| 23 | PACKERS | | 20,000 | 20,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 24,000 | 24,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 0 | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $189,000 | $189,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 0 | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 100,000 | 100,000 |
| 42 | COMPRESSION (VRU) | | 0 | |
| 43 | TANK BATTERY COSTS(gas well) | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 30,000 | 30,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 0 | |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $174,000 | $174,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $8,000 | $343,000 | $351,000 |
| | | | | |
| | **TOTAL WELL COST** | $876,000 | $680,575 | $1,556,575 |

APPROVED:_____, 2014.

BY:_____

OEE Insurance Election (Please check your election below):

☐ Coverage under own policy with limits not less than_____.

☐ Coverage under Operator's policy

NOTE: If no election is checked or owner
has not supplied proof of coverage
prior to spud, owner will be included
under and charged for SEC's OEE
coverage.

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

## EAST CASTOR PROSPECT

## SECTION 2, SECTION 3, SECTION 10, SECTION 11, SECTION 14, SECTION 15, TOWNSHIP 14 NORTH, RANGE 7 WEST BIENVILLE PARISH, LOUISIANA

OPERATING AGREEMENT

DATED

<u>January 1</u> , <u>2016</u> ,
<sub>Year</sub>

OPERATOR   **SKLAR EXPLORATION COMPANY L.L.C.**

CONTRACT AREA   **As shown on Exhibit "A" to this Agreement.**

COUNTY OR PARISH OF   **BIENVILLE**   STATE OF   **LOUISIANA**

COPYRIGHT 1982 – ALL RIGHTS RESERVED AMERICAN ASSOCIATION OF PETROLEUM LANDMEN, 4100 FOSSIL CREEK BLVD., FORT WORTH, TEXAS, 76137-2791, APPROVED FORM. A.A.P.L. NO. 610 – 1982 REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. ~~Failure of Title~~ | 3 |
| | 2. ~~Loss by Non-Payment or Erroneous Payment of Amount Due~~ | 3 |
| | 3. ~~All Other~~ Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. ~~PREFERENTIAL RIGHT TO PURCHASE~~ | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

1 OPERATING AGREEMENT
2
3    THIS AGREEMENT, entered into by and between ___**SKLAR EXPLORATION COMPANY L.L.C.**___
4 **401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101**_____, hereinafter designated and
5 referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein
6 as "Non-Operator", and collectively as "Non-Operators".
7
8 **WITNESSETH:**
9
10    WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in
11 Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the
12 production of oil and gas to the extent and as hereinafter provided,
13
14    NOW, THEREFORE, it is agreed as follows:
15
16                                     **ARTICLE I.**
17                                     **DEFINITIONS**
18
19    As used in this agreement, the following words and terms shall have the meanings here ascribed to them:
20    A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons
21 and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.
22    B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land
23 lying within the Contract Area which are owned by the parties to this agreement.
24    C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the
25 Contract Area which are owned by parties to this agreement.
26    D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be
27 developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests
28 are described in Exhibit "A".
29    E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or
30 federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-
31 ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.
32    F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.
33    G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay **for 100% of** its share of the cost of
34 any operation conducted under the provisions of this agreement.
35    H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate
36 in **for 100% of its share of** a proposed operation.
37
38    Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the
39 singular, and the neuter gender includes the masculine and the feminine.
40
41                                     **ARTICLE II.**
42                                     **EXHIBITS**
43
44    The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:
45 ☑    A. Exhibit "A", shall include the following information:
46           (1) Identification of lands subject to this agreement,
47           (2) Restrictions, if any, as to depths, formations, or substances,
48           (3) Percentages or fractional interests of parties to this agreement,
49           (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
50           (5) Addresses of parties for notice purposes.
51 ☑    B. Exhibit "B", Form of Lease.
52 ☑    C. Exhibit "C", Accounting Procedure.
53 ☑    D. Exhibit "D", Insurance.
54 ☑    E. Exhibit "E", Gas Balancing Agreement.
55 ⊟    ~~F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.~~
56 ⊟    ~~G. Exhibit "G", Tax Partnership.~~
57    If any provision of any exhibit, except Exhibits "E"~~ and "G"~~, is inconsistent with any provision contained in the body
58 of this agreement, the provisions in the body of this agreement shall prevail.
59
60
61
62
63
64
65
66
67
68
69
70



## ARTICLE III.
## INTERESTS OF PARTIES

A.    **Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

B.    **Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred  in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A".  In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____ all jointly owned lease burdens _____ which shall be borne as hereinafter set forth.

Each of the Parties hereto shall pay or deliver or cause to be paid or delivered its proportionate part of the royalties and overriding royalties and other leasehold burdens as described in the attached Exhibit "A" and shall hold the other Parties free from any liability ~~Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount hereinabove and shall hold the~~ therefor.  If the interest of any Party in any oil and gas lease covered by this agreement is subject to any additional royalty, overriding royalty, production payment or other charges over and above those as shown on Exhibit "A", such Party shall assume and alone bear all such obligations and they shall account for or cause to be accounted for such interests to the owners thereof, ~~all such obligations and they shall account for or cause to be accounted for such interests to the owners thereof.~~ ~~other parties free from any liability therefor.~~ No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

C.    **Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production, which is not a joint obligation of the parties ~~in excess of the amount stipulated in Article III.B.~~, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

D.    **Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.    If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.    If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

## ARTICLE IV.
## TITLES

A.    **Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well.  The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases.  At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge.  All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator.  Operator shall cause title to be examined by attorneys on its staff or by outside attorneys.  Copies of all title opinions shall be furnished to each party hereto.  The cost incurred by Operator in this title program shall be borne as follows:

☐  ~~Option No. 1:  Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.~~

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE IV
continued

1 ☑    Option No. 2:    Costs incurred by Operator in procuring abstracts / and fees paid outside attorneys / * for title examination
2 (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) / shall be borne by the Drilling Parties
3 in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4 hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5 functions.
6
                                        Operator shall use its best efforts to secure
7    Each party shall be responsible for securing / curative matter and pooling amendments or agreements required in connection
8 with leases or oil and gas interests /contributed by such party. Operator shall be responsible for the preparation and recording of pooling
      subject to this agreement, and charge these fees to the joint account
9 designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10 This shall not prevent any party from appearing on its own behalf at any such hearing.
11
12    No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
                                                                                                                    Operator,
13 provided, and (2) the title has been approved by the examining attorney or title has been accepted by / all of the parties who are to par-
14 ticipate in the drilling of the well.
15
16 B.    Loss of Title:
17
18    1.  Failure of Title:  Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a
19 reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days
20 from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-
21 tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil
22 and gas leases and interests; and,
23    (a)  The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be
24 entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,
25 but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;
26    (b)  There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has
27 been lost, but the interests of the parties shall be revised on an acreage basis, as of the time—it is determined finally that title failure has oc-
28 curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
29 Area by the amount of the interest lost;
30    (c)  If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is
31 increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-
32 terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such
33 well;
34    (d)  Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has
35 failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties
36 who bore the costs which are so refunded;
37    (e)  Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be
38 borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,
39    (f)  No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest
40 claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in
41 connection therewith.
42
43    2.  Loss by Non-Payment or Erroneous Payment of Amount Due:  If, through mistake or oversight, any rental, shut-in well
44 payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,
45 there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required
46 payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,
47 which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the
48 date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in
49 the Contract Area on account of ownership of the lease or interest which has terminated.  In the event the party who failed to make the
50 required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to
51 the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it
52 shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled
53 or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:
54    (a)  Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,
55 up to the amount of unrecovered costs;
56    (b)  Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of
57 oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease
58 termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
59 portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,
60    (c)  Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest
61 lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.
62
63    3.  Other Losses:  All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses
64 and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
65 the Contract Area.
66 *curative matters and material
   **landmen and consultants        ***and for applications and hearings
67
68
69
70

- 3 -

**ARTICLE V.**
**OPERATOR**

A.  **Designation and Responsibilities of Operator:**

_____SKLAR EXPLORATION COMPANY L.L.C. of Shreveport, Louisiana_____ shall be the
Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and
required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall
have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross
negligence or willful misconduct.

B.  **Resignation or Removal of Operator and Selection of Successor:**

1.  _Resignation or Removal of Operator:_  Operator may resign at any time by giving written notice thereof to Non-Operators.
If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, / or is no longer capable of serving as
Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor.  Operator
**at any time with or without cause by the affirmative vote of a majority interest of the owners as set forth in Exhibit "A"**
may be removed / if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the
affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining
after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the
first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action
by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier
date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a cor-
porate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not
be the basis for removal of Operator. * **this condition shall not apply to Sklar Exploration Company, L.L.C. or any other designated**
**operator who owns no interest in the Contract Area by virtue of the fact that it is solely an operating company.**

2.  _Selection of Successor Operator:_  Upon the resignation or removal of Operator, a successor Operator shall be selected by
the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor
Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest
based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to
succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based
on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

C.  **Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the
compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D.  **Drilling Contracts:**

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. / ** If it so
desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing
rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and
such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of in-
dependent contractors who are doing work of a similar nature. **except that in Operator's sole discretion all factors, such as rig availability,
equipment condition, contractor employee reliability and knowledge, and drilling contractor reputation shall be taken into consideration in determining
the real competitive price such that the lowest price bid may not provide the overall best value in the Drilling Partes to accomplish the drilling
operation.

**ARTICLE VI.**
**DRILLING AND DEVELOPMENT**

A.  **Initial Well:**

On or before the ____31st____ day of ____December____ , (year) __2016__ , Operator shall commence the drilling of a well for
oil and gas at the following location: **1474' from the south line and 1471' from the east line of Section 10, Township 14 North, Range 7
West, Bienville Parish, Louisiana or as near thereto as practical,**

and shall thereafter continue the drilling of the well with due diligence to a depth of **9,200' or a depth sufficient to test the Hosston and/or
Pettit Formations, whichever is the lesser,**

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is en-
countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and
gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which
event Operator shall be required to test only the formation or formations to which this agreement may apply.

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1    If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the
2    well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.
3
4
5
6    B.    **Subsequent Operations:**
7
8        1.    Underline{Proposed Operations:}    Should any party hereto desire to drill any well /any well includes water source or injection wells on the Contract Area other than the well provided
9    for in Article VI.A., or to rework, /reenter, recomplete, sidetrack deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all
10    the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the
11    other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
12    tion and the estimated cost of the operation.    The parties receiving such a notice shall have /fifteen (15) ~~thirty (30)~~ days after receipt of the notice within
13    within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation.    If a drill-
14    ing rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be
15    limited to /twenty-four (24) hours ~~forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays~~.    Failure of a party receiving such notice to reply within
16    the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.    Any notice or
17    response given by telephone shall be promptly confirmed in writing.
18
19
20
21        If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice
22    period of /fifteen (15) ~~thirty (30)~~ days (or as promptly as possible after the expiration of the /twenty-four (24) ~~forty-eight (48)~~ hour period when a drilling rig is on loca-
23    tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
24    ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
25    for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
26    permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
27    amination or curative matter required for title approval or acceptance.    Notwithstanding the force majeure provisions of Article XI, if the
28    actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
29    if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
30    dance with the provisions hereof as if no prior proposal had been made.
31
32
33
34        2.    Underline{Operations by Less than All Parties:}    If any party receiving such notice as provided in Article VI.B.1. or VI.D.1. (Option
35    No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
36    giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of
37    the notice period of /fifteen (15) ~~thirty (30)~~ days (or as promptly as possible after the expiration of the /twenty-four (24) ~~forty-eight (48)~~ hour period when a drilling rig is
38    on location, as the case may be) actually commence the proposed operation and complete it with due diligence.    Operator shall perform all
39    work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
40    a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
41    tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work.    Con-
42    senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
43    ditions of this agreement.
44
45
46
47        If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
48    notice period, shall advise the Consenting Parties of the total interest of the parties  approving such operation and its recommendation as
49    to whether the Consenting Parties should proceed with the operation as proposed.    Each Consenting Party, within /twenty-four (24) ~~forty-eight (48)~~ hours
50    ~~(exclusive of Saturday, Sunday and legal holidays)~~ after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-
51    ticipation to such party's interest as shown on Exhibit "A" or (b) carry /all of its proportionate part of Non-Consenting Parties' interests, and
52    failure to advise the proposing party shall be deemed an election under (a).    In the event a drilling rig is on location, the time permitted for
53    such a response shall not exceed a total of /twenty-four (24) ~~forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays)~~.    The proposing party,
54    at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.
55
56
57
58        The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
59    elected to bear same under the terms of the preceding paragraph.    Consenting Parties shall keep the leasehold estates involved in such
60    operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
61    If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their
62    sole cost, risk and expense.    If any well drilled, reworked, /recompleted, sidetracked, deepened or plugged back under the provisions of this Article results in a pro-
63    ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,
64
65
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1  and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2  ties. Upon commencement of operations for the drilling, reworking, ~~recompleting, sidetracking,~~ deepening or plugging back of any such well by Consenting Parties
3  in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4  and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5  Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6  market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7  terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8  until it reverts) shall equal the total of the following:

9

10

11

12      (a) **500%** / ~~100%~~ of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13  connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
14  Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15  Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16  Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17  Party had it participated in the well from the beginning of the operations; and

18

19

20 r

21      (b) ____**500**____ % of that portion of the costs and expenses of drilling, reworking, ~~recompleting, sidetracking,~~ deepening, plugging back, testing and completing,
22  after deducting any cash contributions received under Article VIII.C., and ____**500**____ % of that portion of the cost of newly acquired equip-
23  ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24  participated therein.

25

26

27

28      An election not to participate in the drilling or the deepening of a well, **or the completing, recompleting or reworking of a well,** shall be deemed an election not to participate in any re-
29  working / or plugging back ~~recompleting, sidetracking,~~ operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30  conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31  reworking / or plugging back ~~recompleting, sidetracking,~~ operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
32  and there shall be added to the sums to be recouped by the Consenting Parties **five** one-hundred percent (~~100%~~ **500%**) of that portion of the costs of
33  the reworking / or plugging back ~~recompleting, sidetracking,~~ operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
34  such a reworking / or plugging back ~~recompleting, sidetracking,~~ operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35  plicable as between said Consenting Parties in said well.

36

37

38

39      During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40  proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41  taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42  ticle III.D.

43

44

45

46      In the case of any reworking, **recompleting, sidetracking,** / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47  of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48  abandonment of a well after such reworking, **recompleting, sidetracking,** / plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49  ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

50

51

52

53      Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54  Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55  itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56  option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57  ings. Each / ~~month~~ **quarter** thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
58  operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59  curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
60  realized from the sale of the well's working interest production during the preceding / ~~month~~ **quarter**. In determining the quantity of oil and gas
61  produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62  well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63  which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64  of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65  above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

66

67

68

69

70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1   If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2   the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3   Consenting Party shall own the same interest in such well, the material and equipment in or ~~pertaining thereto~~ pertaining thereto, and the
    production
4   therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, **recompleting, sidetracking,** deepening or plugging
5   back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6   the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.
7
8
9
10   Notwithstanding the provisions of this Article VI.B.2., / it is agreed that without the mutual consent of all parties, no wells shall
11   be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
12   well conforms to the then-existing well spacing pattern for such source of supply; provided that an **exceptional well location that is**
13   **approved by the Louisiana Office of Conservation shall be deemed to conform to the** then-existing spacing pattern.
     **and subject to the right of any party to non-consent the proposed operation**
14
15
16
17   The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.
18   except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, **recompleting, sidetracking,** deepening and plugging back of such initial well
19   after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-
20   duction, ceases to produce in paying quantities.
21
22
23
24   3. Stand-By Time:   When a well which has been drilled or deepened has reached its authorized depth and all tests have been
25   completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
26   reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
27   ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
28   first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
29   matical paragraph of Article VI.B.2., shall be charged and borne as part of the proposed operation, but if the proposal is subsequently
30   withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
31   each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
32   ties.
33
34
35
36   4. Sidetracking:   Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
37   also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
38   location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
39   mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
40   affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
41   to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:
42
43
44
45   (a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
46   the initial drilling of the well down to the depth at which the sidetracking operation is initiated.
47
48
49
50   (b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
51   salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
52   provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.
53
54
55
56   In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
        **twenty-four (24)**
57   shall be limited to / ~~forty-eight (48)~~ hours, ~~exclusive of Saturday, Sunday and legal holidays~~; provided, however, any party may request and
        **twenty-four (24)**
58   receive up to eight (8) additional days after expiration of the / ~~forty-eight (48)~~ hours within which to respond by paying for all stand-by time
59   incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand
60   by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
61   ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in-
        **fifteen (15)**
62   stances the response period to a proposal for sidetracking shall be limited to / ~~thirty (30)~~ days.
63
64
65
66   **C.   TAKING PRODUCTION IN KIND:**
67
        **have the right to**
68   Each party shall / take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
69   exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for
70   marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any
     party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.
2
3      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5  its share of all production.
6
7      In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8  the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9  the obligation, to purchase such oil or sell it to others / at any time and from time to time, for the account of the non-taking party ~~at the~~
10  ~~best price obtainable in the area for such production~~. Any such purchase or sale by Operator shall be subject always to the right of the
11  owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously
12  delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of
13  time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14  of one (1) year.
   *on the same terms and basis as Operator is marketing Operator's and other Non-Operators' share of production
15
16      In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or
17  deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18  be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19  agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.
20
21  **D.   Access to Contract Area and Information:**
22
                                    consenting
23      Each / party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
                                                               consenting
25  and records relating thereto. Operator, upon request, shall furnish each of the other / parties with copies of all forms or reports filed with
26  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area.  The cost of
28  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29  quests the information.
30
31  **E.   Abandonment of Wells:**
32
33      1.  Abandonment of Dry Holes:  Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35  without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
         twenty-four (24) hours
36  within / ~~forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays)~~ after receipt of notice of the proposal to plug and abandon
37  such well, such party shall be deemed to have consented to the proposed abandonment.  All such wells shall be plugged and abandoned in
38  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39  such well.  Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40  operations in search of oil and/or gas subject to the provisions of Article VI.B.
41
42      2.  Abandonment of Wells that have Produced:  Except for any well in which a Non-Consent operation has been conducted
43  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44  producer shall not be plugged and abandoned without the consent of all parties.  If all parties consent to such abandonment, the well shall
45  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto.  If, within
46  thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
47  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.  Each abandoning party shall assign
50  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52  terval or intervals of the formation or formations then open to production.  If the interest of the abandoning party is or includes an oil and
53  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
continued

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3  ——— Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from

4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for

5  its share of all production.

6

7  ——— In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of

8  the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it,

9  but not the obligation, to purchase such oil and gas or sell it to others / at any time and from time to time, for the account of the non-

10  taking party at the best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to

11  the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas

12  not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil and gas shall be only for such

13  reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event

14  for a period in excess of one (1) year. Notwithstanding the foregoing, Operator shall not make a sale, including one into interstate com-

15  merce, of any other party's share of gas production without first giving such other party thirty (30) days notice of such intended sale.
    * on the same terms and basis as Operator is marketing Operator's and other Non-Operators' share of production

16

17  **D.    Access to Contract Area and Information:**

18
                     consenting
19  ——— Each / party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,

20  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
                                                                                                      consenting
21  and records relating thereto. Operator, upon request, shall furnish each of the other / parties with copies of all forms or reports filed with

22  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of

23  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of

24  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-

25  quests the information.

26

27  **E.    Abandonment of Wells:**

28

29  ——— 1.    Abandonment of Dry Holes:   Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been

30  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned

31  without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
                       twenty-four (24)
32  within / forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon

33  such well, such party shall be deemed to have consented to the proposed abandonment.   All such wells shall be plugged and abandoned in

34  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening

35  such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further

36  operations in search of oil and/or gas subject to the provisions of Article VI.B.

37

38  ——— 2.    Abandonment of Wells that have Produced:   Except for any well in which a Non-Consent operation has been conducted

39  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a

40  producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall

41  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within

42  thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,

43  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other

44  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of

45  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign

46  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and

47  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-

48  terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and

49  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-

50  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-

51  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

52

53

54

55

56

57

58

59

60

61

62

63

64

65

66

67

68

69

70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
continued

1  "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2  assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3  Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4  interests in the remaining portion of the Contract Area.
5
6      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7  the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8  quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9  templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10 well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11 repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12 visions hereof.
13
14     3. Abandonment of Non-Consent Operations:  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15 Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16 permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17 of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18 VI.E.
19
20                        ARTICLE VII.
21              EXPENDITURES AND LIABILITY OF PARTIES
22
23 A.   Liability of Parties:
24
25     The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26 shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27 among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28 shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.
29
30 B.   Liens and Payment Defaults:
31
32     Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33 of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34 at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the
35 state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
36 taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37 rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
38 of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39 the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
40 purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
41 and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.
42
43     If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
44 Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
                                                                                                              be entitled to.
45 the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall-/ to obtain
   recover the amount it paid plus five hundred percent (500%) of the amount out of the proceeds from the sale of the defaulting
46 party's share of oil and for gas, and , to secure payment thereof, be subrogated to the security rights described in the foregoing
   reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph. paragraph. Notwithstanding anything
47 contained to the contrary in this paragraph, all parties agree that this provision shall not apply to any operation requiring an AFE
48 unless Operator has advance billed all parties and such parties have paid their proportionate share of said costs in accordance with
   other provisions of this agreement.
49 C.   Payments and Accounting:
50
51     Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
52 and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
53 tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
54 showing expenses incurred and charges and credits made and received.
55
56     Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
57 of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
58 month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
59 with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
60 on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
61 fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
62 due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
63 pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
64
65 D.   Limitation of Expenditures:
66
67     1. Drill or Deepen:  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
68 pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:
69
70

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
#### continued

1   ☑   *Option No. 1:  All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
necessary tankage and/or surface facilities.  **This Option No. 1 shall apply only to water source and/or water injection wells.**

2

3   ☑   **Option No. 2:  All necessary expenditures for the drilling or deepening and testing of the well.  When such well has reached its
4   authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
5   to the Non-Operators who have the right to participate in the completion costs.  The parties receiving such notice shall have twenty-four (24) / ~~forty-eight~~
6   ~~(48)~~ hours ~~(exclusive of Saturday, Sunday and legal holidays)~~ in which to elect to participate in the setting of casing and the completion at-
7   tempt.  Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
8   cluding necessary tankage and/or surface facilities.  Failure of any party receiving such notice to reply within the period above fixed shall
9   constitute an election by that party not to participate in the cost of the completion attempt.  If one or more, but less than all of the parties,
10  elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, / recompleting, sidetracking / deepening or plugging
11  back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
12  than all parties.  **This Option No. 2 shall cover all wells except those expressly covered by Option No. 1 above.**

13

14      2. Rework or Plug Back:  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
15  plugged back pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the reworking or plugging back of a well shall
16  include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
17  and/or surface facilities.

18                                              *one or more Parties owning a majority interest
19      3. Other Operations:  Without the consent of / ~~all parties,~~ Operator shall not undertake any single project reasonably estimated
20  to require an expenditure in excess of _____**Twenty-five Thousand and No/100**_____ Dollars ($_____**25,000.00**_____ )
21  except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
22  previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
23  emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
24  to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
25  parties.  If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
26  an information copy thereof for any single project costing in excess of _____**Twenty-five Thousand and No/100**_____
27  Dollars ($_____**25,000.00**_____ ) but less than the amount first set forth above in this paragraph.

28

29  **E.   Rentals, Shut-in Well Payments and Minimum Royalties:**

30

31      Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
32  party or parties who subjected such lease to this agreement at its or their expense.  In the event two or more parties own and have con-
33  tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
34  behalf of all such parties.  Any party may request, and shall be entitled to receive, proper evidence of all such payments.  In the event of
35  failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
36  ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
37  visions of Article IV.B./ 2.

38

39      Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
40  of a producing gas well, ~~at least five (5) days (excluding Saturday, Sunday and legal holidays),~~ or at the earliest opportunity permitted by
41  circumstances, prior to taking such action, but assumes no liability for failure to do so.  In the event of failure by Operator to so notify
42  Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
43  shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

44

45  **F.   Taxes:**

46

47      Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
48  subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
49  become delinquent.  Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
50  be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
51  Operator.  If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
52  riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
53  owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
54  tion.  If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
55  anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
56  value generated by each party's working interest.  Operator shall bill the other parties for their proportionate shares of all tax payments in
57  the manner provided in Exhibit "C".

58

59      If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
60  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
61  mination.  During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
62  interest and penalty.  When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
63  count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
64  provided in Exhibit "C".

65

66      Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
67  to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VII
continued

1 **G.   Insurance:**

2

3        At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4 the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5 pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
6 also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7 hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8 law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

9

10       In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11 parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

12

13                                                ARTICLE VIII.
14                      ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

15

16 **A.   Surrender of Leases:**

17

18       The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19 or in part unless all parties consent thereto.

20

21       However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22 agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23 such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24 thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas in-
25 terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26 such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27 lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all
28 obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29 attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30 duction other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the
31 party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32 ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33 salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest
34 shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

35

36       Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37 party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38 assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39 agreement.

40

41 **B.   Renewal or Extension of Leases:**

42

43       If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44 shall have the right for a period of thirty (3015) days following receipt of such notice in which to elect to participate in the ownership of the
45 renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46 portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47 interests held at that time by the parties in the Contract Area.

48

49       If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50 who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51 to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52 Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

53

54       Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55 by the acquiring party.

56

57       The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58 or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or
59 contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
60 tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61 the provisions of this agreement.

62

63       The provisions in this Article shall also be applicable to extensions of oil and gas leases.

64

65 **C.   Acreage or Cash Contributions:**

66

67       While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68 operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69 applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the con-
70 tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VIII
continued

1 said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2 governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3 it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4 tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.
5
6     If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7 consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8
9 **D. Maintenance of Uniform Interests:**
10
11     ~~For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no~~
12 ~~party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,~~
13 ~~equipment and production unless such disposition covers either:~~
14
15     ~~1. the entire interest of the party in all leases and equipment and production; or~~
16
17     ~~2. an equal undivided interest in all leases and equipment and production in the Contract Area.~~
18
19     Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20 and shall be made without prejudice to the right of the other parties. **Any added expenditures required as a result of a partial**
21 **disposition, including marketing or metering of production, shall be borne solely by the party transferee.**
22     If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23 require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24 and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25 party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26 into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27 Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.
28
29 **E. Waiver of Rights to Partition:**
30
31     If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32 undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33 interest therein.
34
35 ~~**F. Preferential Right to Purchase:**~~
36
37     ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38 ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39 ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40 ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41 ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42 ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43 ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44 ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45 ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~
46
47 ### ARTICLE IX.
48 ### INTERNAL REVENUE CODE ELECTION
49
50     This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51 for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52 and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53 purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54 from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1986, as per-
55 mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56 ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57 United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58 and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59 evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60 Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61 action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62 Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63 Subtitle "A", of the Internal Revenue Code of 1986, under which an election similar to that provided by Section 761 of the Code is per-
64 mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65 tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66 computation of partnership taxable income.
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE X.
CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____ **Ten Thousand and No/100** _____ Dollars ($ **10,000.00** ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder. **All claims or suits involving title to any interest subject to this Agreement shall be treated as a claim or suit against all parties hereto.**

ARTICLE XI.
FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

ARTICLE XII.
NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

ARTICLE XIII.
TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☑  Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☐  ~~Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.~~

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

### ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

**A.    Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B.    Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located.  If the Contract Area is in two or more states, the law of the state of _____**Louisiana**_____ shall govern.

**C.    Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith.  Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of ~~the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and~~ any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to /ᵃⁿʸ said Act.  Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

### ARTICLE XV.
### OTHER PROVISIONS

**(See attached pages 14-1 through 14-7)**

## ARTICLE XV.

## OTHER PROVISIONS

### A. PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in such well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

1) an       election       to       perform       additional       logging,       coring       or testing;
2) an election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;
3) an election to plug back and attempt to complete the well in a shallower depth or formation;
4) an       election       to       deepen       the well;
5) an       election       to       sidetrack       the well;
6) an election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;
7) an       election       to       temporarily       abandon       the       well;

8) an election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of a majority of the consenting parties in possessory, cost-bearing interest (and not in number), a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth.   In such event, the operation, which, in the opinion of a majority of the consenting parties in possessory, cost bearing interest (and not in number) is less likely to jeopardize the well, will be given priority.   Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail.   It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests.   For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

### B. HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

### C. DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties.   If the parties are equally divided, the opinion of the Operator will prevail.

### D. ADVANCEMENT OF COSTS

Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s) in advance of its respective share of (i) the dry hole cost for the initial well to be drilled under Article VI A, (ii) the dry hole cost for any other well to be drilled hereunder to which such Non-Operator has consented, and (iii) the cost of any completion, reworking, recompletion, sidetracking, deepening or plugging back operation to which such Non-Operator has consented (any such operation under clause (i), (ii), or (iii) being herein called a "Drilling Operation").   Such request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Drilling Operation. The amount of each Non-Operator's advance payment shall be based upon the latest AFE for such operation.   Such advanced payments shall be held by Operator for the account of the Non-Operators and applied, with interest, against the actual costs incurred in the applicable operation.

A Non-Operator receiving a request for advance payment shall, within two (2) days of the receipt of such request if and when a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to operator in cash the full amount of such request.   Operator shall credit the amount to the Non-Operator's account

for the payment of such Non-Operator's share of costs of such Drilling operation, and following the end of each month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement. Advance payment by a Non-Operator of his share of completed well costs shall in no event prevent such completion of a well pursuant to Option No. 2 of Article VII.D.1. and, in the event such a Non-Operator elects not to participate in completion, the sums that such Non-Operator has advanced shall not be charged with any share of the costs of any completion attempted.

In the event a Non-Operator from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by depositing cash as aforesaid, then Operator, at his option, shall make a second written request by certified mail, return receipt requested for such advance. Non-Operator shall pay for said advance as aforesaid within two (2) business days from receipt of such second request.

If a Non-Operator fails to pay within two (2) business days of the receipt of such second request, then:

1) If the advance payment was requested for the drilling of the initial well under Article VI A Non-Operator may, at the sole discretion and timing election of the Operator, be deemed to have relinquished all of its leasehold and contractual rights in the Contract Area retroactive to the date of default in payment, and if assignment has been made to such Non-Operator, Non-Operator shall assign all of its rights in and to the Contract area, within thirty (30) days of a request for such assignment, to those parties who have participated in such Drilling Operation, in the proportion that such parties elected to share the relinquished interest.

2) If the advance payment was requested for any other Drilling Operation (including completion of the initial well), Non-Operator may, at the sole discretion and timing election of the Operator, be deemed non-consent in said operation retroactive to the beginning of such operation and thereafter subject to the penalty provisions of Article VI.B.2 hereof.

If the Non-Operator fails to make such payment or furnish such security within two (2) business days of the receipt of such second request, Operator shall promptly notify all other parties still participating in such Drilling Operation of the default in payment and if and when applicable, of the relinquishment of an interest under this provision. The parties who wish to participate in the Drilling Operation shall have five (5) days from receipt of the applicable notice to elect to assume the costs chargeable to such relinquished interest and shall share such relinquished interest in proportion to their assumption of such relinquished interest. If the parties who wish to participate in the Drilling Operation are unwilling to assume the costs chargeable to such relinquished interest, the Drilling Operation shall be cancelled, and if the cancelled Drilling Operation involves the drilling of a test well under Article VI A no assignment shall be due as a consequence of the failure to pay.

Notwithstanding anything to the contrary herein, if the applicable drill well or operation is unsuccessful or results in a dry hole, Operator shall have the right to sue a Non-Operator who failed to pay for its proportionate share of expenses in lieu of Operator's right to an assignment of all Non-Operator's leasehold and contractual rights within the Contract Area, or in lieu of deeming the Non-Operator Non-Consent.

## E.   NECESSARY EXPENDITURES EXCLUDE SIDETRACKING

The phrase "necessary expenditures" in Article VII.D.1. (Option No. 2) on page 10 shall not be deemed to include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

## F.   ADDITIONAL CHARGES

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Unit Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same:

Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and Expenses in connection with preparation and presentation of evidence and exhibits of Louisiana Office of Conservation hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

## G.   INDEMNITY

Except for liabilities resulting from the gross negligence or willful misconduct of the Operator, each Non-Operator Shall defend, indemnify and hold Operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operator's officers, employees and/or agents, resulting from or in any way relating to such officers, employees, and/or agents presence on a drilling rig on the Contract Area or from such person traveling by air or water between any point and such drilling rig. Such indemnity to Operator shall also apply to any other person whose presence on the rig or transportation to or from such rig is at the request of the indemnifying Non-Operator (except for liabilities resulting from the gross negligence or willful misconduct of the Operator).

**H. RECOUPMENT**

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

**I. SEVERABILITY**

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

**J. NO WAIVERS**

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

**K. PIPELINE AND/OR GATHERING LINE CONSTRUCTION**

If any party to this Agreement elects either to construct, operate or purchase or to join in the construction, operation or purchase of a pipeline, and/or gathering line to transport production from the Contract Area, then such party shall notify the other parties hereto furnishing all pertinent cost and information. Each party receiving such notice shall have thirty (30) days to exercise their right in writing to participate in the construction, operation and ownership of such pipeline and/or gathering line, including the right of transporting production from the Contract Area, by agreeing to bear their proportionate share of the cost of such operation and thereafter entering into a mutually acceptable operating agreement for the operation thereof. Otherwise, the parties consenting to participate in such operation shall be entitled to establish the terms and conditions (including any costs and fees for use or reservation of the applicable facilities) under which the non-consenting parties may use or have access to the applicable facilities. Absent a mutually agreeable agreement for the use of said facilities by and between the consenting and non-consenting parties, the non-consenting parties shall be obligated to separately dispose of their share of all production.

**L. DISBURSEMENT OF ROYALTIES**

Operator shall use its best efforts to deliver or cause to be delivered all royalties, overriding royalties, production payments and similar charges to the persons entitled thereto and such charges shall be borne proportionately by the Parties hereto on the basis of their respective ownership of the leases or well. It is provided, however, if the interest of any Party is subject to and burdened with royalties, overriding royalties, production payments, or similar burdens ("additional burdens") which are not borne proportionately by all other Parties hereto, such Party shall account to the owners of the additional burdens for the amount due them or arrange for Operator to handle such payments. Operator shall have no liability for the failure to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, except such as may result from gross negligence or willful misconduct.

**M. INFORMATION**

Anything to the contrary hereinabove notwithstanding, it is stipulated that any non-consenting party to an operation conducted hereunder shall have no right to observe such operation or have access to information pertaining to such operation, until such time as the non-consenting party's share of the cost of such operation and the penalty therefor has been recovered by the consenting parties as provided herein. It is understood that this Section M of Art. XV does not apply when the in the situation where the non-consenting party is a Farmor under this Agreement.

**N. OPERATOR'S LIEN – SECURITY INTEREST**

Subject to the provision of Article VII. B. of this Agreement, each non-Operator grants to Operator a lien upon all of the rights, titles, and interests of each Non-Operator, whether now existing or hereafter acquired, in and to the (1) the oil, gas, or other minerals in, on, and under the Contract Area and (2) any oil, gas, and mineral leases covering the Contract Area or any portion thereof. In addition, each Non-Operator grants to Operator a security interest in and to all of such Non-Operator's rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (1) all oil, gas and other minerals produced from the Contract Area when produced; (2) all accounts receivable accruing or arising as a result of the sale of such oil, gas and other minerals; (3) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (4) all oil and gas wells and other surface and sub-surface equipment and facilities of any kind or character located on the Contract Area and the cash or other proceeds received from the sale thereof (collectively, the "Personal Property Collateral"). Some of the Personal Property Collateral is or will become fixtures on the Contract Area, and the interest of Non-Operator in and to the oil, gas and other minerals when extracted from the Contract Area and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well

Page 14-3

or wells located on the Contract Area. This Agreement (including a carbon, photographic, or other reproduction hereof) shall constitute a non-standard form financing statement under the terms of the Uniform Commercial Code of the State in which the Contract Area is located, and as such, may be filed for record in the real estate records of the county in which the Contract Area is located. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense, if any.

## O. MARKETING OF PRODUCTION

Operator agrees to market all Non-Operator's share of any production from the Contract Area under the same terms that Operator is marketing its share of said production; provided, however, that contracts entered into by Operator in marketing Non-Operator's share of production shall be subject to the limitations set forth in Article VI. C. hereof. Further, Non-Operator shall be given the continuing right to participate as a signatory to any contract entered into by Operator to market production hereunder. Notwithstanding the above, any Non-Operator may choose to separately market its proportionate share of said production by giving written notice to Operator by the 15th day of the month prior to the month in which said Non-Operator intends to separately market its production. Conversely, if said Non-Operator again requests that Operator market its production, Non-Operator must provide written request of same by the 15th day of the month prior to the month in which Operator is again to market said Non-Operator's production.

## P. METERING OF PRODUCTION

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

## Q. PLUGGING AND LEASEHOLD RESTORATION FUND

At any time any well subject to this agreement is, in Operator's sole opinion, approaching the end of its economic life and/or its useful purpose, Operator may pre-bill the joint account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location. Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and abandonment and restoration of the leasehold premises. In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any accrued interest on such difference, based upon the then working interest percentage of such owner. In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

## R. SEPARATE AGREEMENT FOR NON-UNIFORM INTEREST

Any leases or interests therein (and the land covered thereby) that, pursuant to the terms of this Agreement or otherwise, become owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such leases become so owned. Any leases or interests therein (and the lands covered thereby) that, pursuant to the terms of this Agreement or otherwise, become owned by more than one but less than all of the parties hereto or in which a party assigns, transfers or otherwise disposes of all or part of its interests shall remain subject to this Agreement as to the surviving parties; however, for all purposes, the terms of this Agreement shall apply separately to each such lease (or group of such leases in which the parties' ownership is uniform) as if it were a separate agreement covering such lease(s), with an Exhibit "A" modified to reflect the parties' interests therein, based upon the parties' ownership in such lease(s).

## S. OBLIGATORY WELL

Notwithstanding the provisions of this agreement and particularly Article VI, if any proposed operations are necessary to maintain a Lease covered by this agreement in force or an agreement to earn a lease(s) which would otherwise expire unless such operations are conducted, then in lieu of being penalized under Article VI.B.2., each Non-Consenting Party shall assign to Consenting Parties all of such Non-Consenting Party's right, title and interest in and to the Lease(s) or portion thereof or such agreement which would be lost or not earned if such operations were not conducted.

Such assignment shall be promptly due upon commencement of said proposed operations by Consenting Parties and shall be free and clear of all overriding royalties, production payments, mortgages, liens and other burdens and encumbrances placed thereon by the assigning party or resulting from its ownership or operation of such Lease or interest which is not a joint obligation of the parties, but otherwise without warranty of title either expressed or implied.

If the assignment is in favor of more than one party, the assigned interest shall be shared by the Consenting Parties in the proportions that the interest of each bears to the interest of all Consenting Parties unless otherwise agreed to in writing. Thereafter, such acreage covered by said assignment shall not be subject to the terms of this agreement, but shall be deemed to be subject to an agreement identical to this changed only in Exhibit "A" to indicate the Consenting Parties and their percentages of interest. Operations that are necessary to either maintain a Lease covered by this agreement in force or to earn a lease or part thereof under an agreement which would otherwise

expire unless operations are conducted, shall be defined as operations that are proposed within six (6) months of the date the Lease or agreement would otherwise expire.

## T. PREVAILING AGREEMENT

If there is a conflict between provisions of that Participation Agreement dated effective as of May 1, 2014, and this Operating Agreement, the provisions of the Participation Agreement shall prevail, and shall be binding upon all parties to this Operating Agreement. If there is a conflict between the provisions of this Article XV and the Operating Agreement, the provisions of this Article XV shall prevail.

## U. DEFAULT PENALTY/AUTOMATIC NON-CONSENT

If written notice has been given that the lien rights conferred in Article VII. B. have been implemented or enforced against any party hereto, for so long as the affected party remains in default, it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and shall not be entitled to vote its interest in any matter hereunder. As to any proposed operation in which it otherwise would have the right to participate, such party shall not have the right to elect to participate or be a Consenting Party unless and until it pays in full the amount it is in default plus all other outstanding amounts due hereunder. If an operation proposed during such default period commences before such payment in full, the party in default shall automatically be deemed a Non-Consenting Party to the operation.

## V. PRIOR OPERATING AGREEMENT(S)

This Operating Agreement, as to the parties executing same and as to the Contract Area and Depth Restrictions, shall supersede and replace any prior operating agreement(s) covering all or any portion of the Contract Area of this operating agreement.

## W. NON-PARTICIPATING INTERESTS

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto as same may be revised from time to time to reflect record title and/or reformation of the Contract Area.

## X. EXECUTION

This agreement shall be binding upon each Non-Operator that executes this agreement without regard to whether this same instrument, or any copy or counterpart hereof shall be executed by any other Non-Operator.

## Y. MISCELLANEOUS

Anything to the contrary herein notwithstanding, this Operating Agreement is expressly made subject to the terms and provisions of the leases and farmout agreements described in Exhibit "A" hereof.

## Z. AREA OF MUTUAL INTEREST

1.      The Parties hereto hereby create an Area of Mutual Interest ("AMI") covering the lands within the red outline as shown on the plat attached hereto as Exhibit "A-2".

2.      During the period this AMI is in force, if any Party hereto acquires an "Oil and Gas Property" within the Area of Mutual Interest (the "Acquiring Party"), it shall promptly give the other Party or Parties (the "Other Party") written notice of such acquisition. As used herein the term "Oil and Gas Property" means any right, title and interest, in and to or any option to acquire any (i) oil or gas lease, and/or top lease (ii) royalty, overriding royalty, production payment, net profits interest or other cost free, non-working interest in oil or gas production, (iii) farmin agreements and all other contractual rights, options, permits, licenses or concessions relating to the acquisition, development, exploration or production of oil or gas (the "Acquired Interest"). The notice shall include a copy of all instruments of acquisition including, without limitation, copies of the leases, assignments, subleases, farmins or other contracts evidencing and/or affecting the Acquired Interest. The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by such Party in acquiring the Acquired Interest, excluding, however, costs and expenses of its own personnel. In the case of a farmin, the itemized statement shall describe, in addition to other information required herein, (i) the location of the proposed earning well, (ii) the projected depth and the hydrocarbon bearing formation anticipated to be tested by such well, and (iii) the estimated costs of the well.

3.      The Other Party shall have a period of thirty (30) days after receipt of such notice to furnish the Acquiring Party written notice of its election, whether or not to participate for its proportionate interest in the Acquired Interest; provided, however, if a well in search of oil or gas is being drilled within one (1) mile of such Acquired Interest at the time the notice is given, such Other Party shall have a period of forty-eight (48) hours after receipt of the notice (exclusive of Saturdays, Sundays and legal holidays) within which

to elect to acquire its proportionate interest in the Acquired Interest, provided further, however, that the forty-eight (48) hour election period shall not apply unless the Acquiring Party shall (i) give the notice to the Other Party within two (2) days after the date on which the Acquiring Party acquired the Acquired Interest, exclusive of Saturdays, Sundays or legal holidays, (ii) furnish the Other Party with the approximate location of the well then being drilled and the name of the operator or drilling contractor drilling the well, and (iii) specifically advise the Other Party that they shall have a period of forty-eight (48) hours (exclusive of Saturdays, Sundays and legal holidays) within which to elect to acquire their proportionate interest in the Acquired Interest. The Parties shall be entitled to participate in the Acquired Interest, and all costs and expenses incurred therewith shall be borne and paid by the Parties according to the appropriate ownership interest of each. If the Acquiring Party shall have not received actual written notice of the election by the Other Party to acquire its proportionate interest within the thirty (30) day or forty-eight (48) hour period, as the case may be, it shall be conclusively deemed that such Other Party has elected not to acquire its proportionate interest in the Acquired Interest and thereafter, to the extent of such Party's interest, the acquisition shall not be subject to the terms and provisions of this agreement and shall be subject to a separate Operating Agreement, identical in form to the Operating Agreement, revised only to properly reflect the ownership of the Acquired Interest and the interest subject to such Operating Agreement.

4. If the Other Party elects to acquire its proportionate interest in the Acquired Interest, the Acquiring Party shall invoice such Other Party for its share of the acquisition costs as reflected by the notice, and such Other Party shall make payment of such invoice within thirty (30) days after receipt thereof, and upon timely receipt of such payment, the Acquiring Party shall promptly thereafter execute and deliver an appropriate assignment to the Other Party. Any assignment made by the Acquiring Party to the Other Party shall be made free and clear of any burdens, liens or encumbrances placed thereon by the Acquiring Party, but without warranty of title, either express or implied, even as to the return of the purchase price. The assignment shall be made and accepted subject to, and the Other Party shall expressly assume its portion of all of the obligations of the Acquiring Party with respect to the Acquired Interest. If two or more Acquired Interests are included in the same notice, the Other Party shall have the separate right of election as to each Acquired Interest; provided, however, that Oil and Gas Properties or Acquired Interest acquired by the Acquiring Party as part of a single transaction shall be considered a single Acquired Interest. Any Acquired Interest shall be considered for all purposes as part of this agreement and the Parties shall amend the Operating Agreement to include the Acquired Interest.

5. If any Acquired Interest or other Oil and Gas Property acquired by any Party to this Agreement is included within the AMI, but with contiguous lands situated outside the AMI, then all such contiguous lands included in the Acquired Interest or other Oil and Gas Property acquired shall be deemed to be included as being subject to the AMI provisions contained herein.

6. The provisions of the AMI shall not apply to acquisitions as a result of merger, consolidation, reorganization or acquisition from a parent, subsidiary or affiliated corporation, or as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries.

8. Three (3) years after January 1, 2016, the effective date of this Operating Agreement, the AMI clause shall be reduced to cover only that portion of the lands lying within producing units or leases otherwise held by production.

## AA. COST OVERAGES AND SUPPLEMENTAL AUTHOTIZATIONS

Notwithstanding any provisions to the contrary contained in this agreement, if in drilling any well under the terms of this agreement it is evident, in any party's reasonable judgment, that the Operator's actual cost of operations, prior to reaching the proposed depth, have already exceeded 100% and are likely to exceed 130% of the Authority for Expenditure (AFE) for such well prior to the completion of the approved operations, exclusive of the estimated cost of completion, and for reasons which could not be avoided by abandoning the well (i.e. well control cost, fishing costs, etc.), then such party shall notify the Operator and other Non-Operators and the Operator shall, within twenty-four (24) hours of receipt of notification, furnish to Non-Operators a revised AFE for approval by the parties. All parties who wish to consent to the revised AFE shall notify Operator of such fact within twenty-four (24) hours of receipt of such revised AFE, inclusive of Saturday, Sunday and legal holidays. If less than all parties approve the revised AFE, Operator, immediately after expiration of the twenty-four (24) hour notice period, shall advise the Consenting Parties of the total interest of the parties approving such revised AFE and its recommendation as to whether the Consenting Parties should proceed with the operations as proposed. Each Consenting Party, within twenty-four (24) hours after receipt of such notice, inclusive of Saturday, Sunday and legal holidays, shall advise Operator of its desire to (1) limit participation to such party's interest as shown on Exhibit "A", or (2) carry its proportionate share of Non-Consenting Parties interest. Failure to timely notify Operator shall be deemed an election under (1). Operator, at its election, may withdraw the proposal to proceed with the operations if there is insufficient participation and shall promptly notify all parties of such decision. Should less than all parties consent to the revised AFE, and at least one Consenting Party commences operations under the revised AFE within forty-eight (48) hours after expiration of the original twenty-four (24) hour notice period, the Non-Consenting parties shall be subject to the non-consent penalties provided herein. Provided, however, that Operator shall have the responsibility and authority to take any actions deemed necessary to conduct continuous operations of a well until such time as Operator receives the required approvals referenced hereinabove. In the event that no party elects to proceed under any such revised AFE, Operator shall immediately proceed to abandon the applicable operation in accordance with the terms set forth herein.

## BB. PROPOSED OPERATIONS REGARDING PAYING WELLS

Notwithstanding any provisions to the contrary in Article VI.B, or elsewhere in this Operating Agreement, should any party hereto desire to rework, deepen, plug back, add additional perforations, recomplete or

sidetrack a well jointly owned by all the parties hereto, which is then producing, or capable of producing in commercial quantities, such party shall give notice of the proposed operation pursuant to the terms of this Operating Agreement.   Should two or more parties owning in the aggregate 70% interest in the well, and in the proposed operation, consent thereto, such participating parties may proceed with such operation, subject to the provisions of this Article XV.BB., to wit:

> After the prescribed notice period, but prior to proceeding with the proposed operation, the proposing party shall notify any Non-Consenting Party that it has received the required participation percentage to commence with the proposed operation, and shall, again, offer any Non-Consenting Party the opportunity to join in the proposed operation.   Any such Non-Consenting Party will then have an additional twenty-four (24) hours from receipt of this second notice in which it may still choose to participate, or remain subject to the applicable non-consent provisions of this Operating Agreement.   Consenting Parties shall have no liability to any Non-Consenting Party for any losses related to leaving the commercially producing, or productive, interval.   Subsequently, no Non-Consenting Party shall bear any expenses related to returning to the commercially producing, or productive, interval in which it was a participant, nor in re-establishing commercial production therefrom.

## CC. NON-CONSENT PENALTIES FOR UNHELD ACREAGE

Notwithstanding anything to the contrary in this Agreement, if at any time after the Initial Well provided for in the Participation Agreement to which this Operating Agreement is attached is drilled to the required contract depth casing point and a party subject to this Operating Agreement either (1) elects not to participate in the completion of the Initial Well or (2) elects not to participate in the drilling or completion of a subsequent well proposed under this Operating Agreement in either a pooled unit or unpooled leasehold that does not have a producing well located on it, and, thereafter, that well is completed as a producer of oil and/or gas, then the non-participating party shall assign to the participating parties all rights, title and interests in the production unit  established for the subsequent well in question and leases comprising same, or, in the absence of such a production unit, all leasehold and other rights, title and interests in a regular shaped area of 160 acres around an oil well or 640 acres around a gas/condensate well.   Said assignment shall be delivered by the non-consenting parties within thirty days of the completion of the well in question.   If the subsequent well is not completed as a producer of oil and/or gas, no such forfeiture or assignment is required.

**ARTICLE XVI.**
**MISCELLANEOUS**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ____1ˢᵗ____ day of __January__ , (year) __2016__

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____, have been made to the form.~~

OPERATOR

Witness  SHERRI HARMON

Witness  Amber Greer

SKLAR EXPLORATION COMPANY L.L.C.

By: Gregory L. Kembert
V. P. – Land Manager

NON-OPERATORS

Witness  SHERRI HARMON

Witness  Amber Greer

SKLARCO L.L.C.

By: Gregory L. Kembert
V.P. – Land Manager

AEEC II, L.L.C.

Witness

Witness

By: L. Cole Anderson
Agent and Attorney-in Fact

LEFRAK ENERGY INVESTORS, L.P.
BY: LEFRAK NY ENERGY INVESTORS, LLC GP
BY: RSL WOODMERE MGT. CORP., MANAGER

Witness

Witness

By: Richard Papert
Vice President

BODCAW 3-D, LLC

Witness

Witness

By: Stephen O. Smith
Manager

MCCOMBS ENERGY, LTD.

Witness

Witness

By: Bill Forney, Jr.
President

- 15b -

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _1st_ day of _January_ . (year) _2016_

~~who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles:~~ ~~have been made to the form.~~

### OPERATOR

Witness *SHERRI HARMON*

Witness *Amber Greer*

SKLAR EXPLORATION COMPANY L.L.C.

By: Gregory L. Kembert
V. P. – Land Manager

### NON-OPERATORS

Witness *SHERRI HARMON*

Witness *Amber Greer*

SKLARCO L.L.C.

By: Gregory L. Kembert
V.P. – Land Manager

Witness *Jenny B Shepra*

Witness *Lisa Walker*

AEEC II, L.L.C.

By: J. Cole Anderson
Agent and Attorney-In Fact

Witness _____

Witness _____

LEFRAK ENERGY INVESTORS L.P.
BY: LEFRAK NY ENERGY INVESTORS LLC GP
BY: RSL WOODMERE MGT. CORP. MANAGER

By: Richard Papert
Vice President

Witness _____

Witness _____

BODCAW 3-D, LLC

By: Stephen O. Smith
Manager

Witness _____

Witness _____

MCCOMBS ENERGY, LTD.

By: Bill Forney, Jr.
President

- 15b -

### ARTICLE XVI.
#### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _January_, (year) _2016_

~~who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form-610-1982-Model-Form-Operating-Agreement, as published in diskette form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles~~ ~~have been made to the form.~~

#### OPERATOR

Witness _Sherri Harmon_
SHERRI HARMON

Witness _Amber Greer_
Amber Greer

SKLAR EXPLORATION COMPANY L.L.C.

By: Gregory L. Kimbrell
V.P. – Land Manager

#### NON-OPERATORS

Witness _Sherri Harmon_
SHERRI HARMON

Witness _Amber Greer_
Amber Greer

SKLARCO L.L.C.

By: Gregory L. Kimbrell
V.P. – Land Manager

Witness _[signature]_

Witness _Tyler Howard_
Tyler Howard

Witness _Stacey Guidozzi_
Stacey Guidozzi

AESC II, LLC.

By: J. Lee Abraben
Agent and Attorney-in-Fact

Witness _____

Witness _____

LERAK ENERGY INVESTORS, L.P.
BY: LERAK ENERGY INVESTORS, LLC GP
BY: LRL WOODBINE MGT. CORP., MANAGER

By: Richard Zapert
Vice President

Witness _____

Witness _____

BODCAW 3-D, LLC

By: Stephen O. Smith
Manager

Witness _____

Witness _____

MCCOMBS ENERGY, LTD.

By: Bill Forney, Jr.
President

- 15b -

## ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _1ST_ day of _January_ (year) _2016_

~~who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles have been made to the form.~~

### OPERATOR

Witness _Sherri Harmon_
SHERRI HARMON

Witness _Amber Greer_
Amber Greer

SKLAR EXPLORATION COMPANY L.L.C.

By: Gregory L. Kembert
V.P. - Land Manager

### NON-OPERATORS

Witness _Sherri Harmon_
SHERRI HARMON

Witness _Amber Greer_
Amber Greer

SKLARCO L.L.C.

By: Gregory L. Kembert
V.P. - Land Manager

AEEC II, L.L.C.

Witness _____

Witness _____

By: J. Cole Agee
Agent and Attorney-in Fact

LEPRAK ENERGY INVESTORS, L.P.
BY: RSL WOODMODE MGT. CORP., MANAGER

Witness _____

Witness _____

By: Richard Kaperi
Vice President

Witness _Karen Richardson_
Karen Richardson

Witness _Patricia A. Plata_
PATRICIA A. PLATA

BODCAW 5.0, LLC

By: Meghan D. Smith
Manager

MCCOMBS ENERGY, LTD.

Witness _____

Witness _____

By: Bill Foracy, Jr.
President

- 15b -

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ____1ST____ day of __January__ , (year) __2016__

~~_____ who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ have been made to the form.~~

OPERATOR

Witness _SHERRI HARMON_

Witness _Amber Greer_

SKLAR EXPLORATION COMPANY L.L.C.

By: Gregory L. Kembert
    V.P. - Land Manager

NON-OPERATORS

Witness _SHERRI HARMON_

Witness _Amber Greer_

SKLARCO L.L.C.

By: Gregory L. Kembert
    V.P. - Land Manager

AEEC II, L.L.C.

Witness

Witness

By: J. Cole Anderson
    Agent and Attorney-In-Fact

LEBRAK ENERGY INVESTORS, L.P.
BY: LEBRAK NY ENERGY INVESTORS, LLC GP
BY: RSL WOODMERE MGT. CORP., MANAGER

Witness

Witness

By: Richard Papert
    Vice President

BODCAW 3-D, LLC

Witness

Witness

By: Stephen O. Smith
    Manager

MCCOMBS ENERGY, LTD.

Witness _DAWN KEMPTHORNE_

Witness _Diane E. Cook_

By: Bill Forney, Jr.
    President

_Larry Wyant
Vice President_

- 15b -

JJS WORKING INTERESTS, LLC

Witness Ashley Kinnard

By: Justin Simoes
Manager of Houston Bulldog Capital Management, LLC,
Manager of JJS Working Interests, LLC

Witness Jeffrey Fiero

MARSHALL-WUELLNER, INC.

Witness

By: Tim Marshall
President

Witness

LUCAS PETROLEUM GROUP, INC.

Witness

By: Fain Brock
President

Witness

JJS WORKING INTERESTS, LLC

Witness _____

Witness _____

By: Justin Simons
    Manager of Houston Bulldog Capital Management, LLC,
    Manager of JJS Working Interests, LLC


MARSHALL-WUELLNER, INC.

By: Tom Marshall
    President

Witness _____


LUCAS PETROLEUM GROUP, INC.

Witness _____

By: Tam Brock
    President

Witness _____

JJS WORKING INTERESTS, LLC

Witness _____

By: Justin Simons
Manager of Houston Bulldog Capital Management, LLC,
Manager of JJS Working Interests, LLC

Witness _____


MARSHALL-WUELLNER, INC.

Witness _____

By: Tim Marshall
President

Witness _____


LUCAS PETROLEUM GROUP, INC.

Witness _____

By: Fain Brock
President

Witness _____

SCANNED

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

I, _Julia P. Smith_____, a notary public in and for said Parish and State, hereby certify that Gregory L. Rembert, whose name as V.P – Land Manager of SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _1st_ day of _January_____, 2016.

_____
NOTARY PUBLIC

Julia P. Smith
Notary Public
State of Louisiana
Caddo Parish
Notary ID # 58135
My Commission is for Life

[AFFIX NOTARIAL SEAL]

My Commission Expires: _at death_

STATE OF LOUISIANA

PARISH OF CADDO

I, _Julia P. Smith_____, a notary public in and for said Parish and State, hereby certify that Gregory L. Rembert, whose name as V.P – Land Manager of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _1st_ day of _January_____, 2016.

_____
NOTARY PUBLIC

Julia P. Smith
Notary Public
State of Louisiana
Caddo Parish
Notary ID # 58135
My Commission is for Life

[AFFIX NOTARIAL SEAL]

My Commission Expires: _at death_

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that T. Cole Anderson, whose name as Agent and Attorney-in-Fact of AEEC II, L.L.C. a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2016.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

I, Julia P. Smith _____, a notary public in and for said Parish and State, hereby certify that Gregory L. Rembert, whose name as V.P – Land Manager of SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 1st day of January _____, 2016.

NOTARY PUBLIC

Julia P. Smith
Notary Public
State of Louisiana
Caddo Parish
Notary ID # 58135
My Commission is for Life

[AFFIX NOTARIAL SEAL]

My Commission Expires: at death


STATE OF LOUISIANA

PARISH OF CADDO

I, Julia P. Smith _____, a notary public in and for said Parish and State, hereby certify that Gregory L. Rembert, whose name as V.P – Land Manager of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 1st day of January _____, 2016.

NOTARY PUBLIC

Julia P. Smith
Notary Public
State of Louisiana
Caddo Parish
Notary ID # 58135
My Commission is for Life

[AFFIX NOTARIAL SEAL]

My Commission Expires: at death


STATE OF LOUISIANA

PARISH OF CADDO

I, Janet H. Gould _____, a notary public in and for said Parish and State, hereby certify that T. Cole Anderson, whose name as Agent and Attorney-in-Fact of AEEC II, L.L.C. a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 12th day of January _____, 2016.

NOTARY PUBLIC

Janet H. Gould
Notary Public, ID # 41828
State of Louisiana
Parish of Bossier

[AFFIX NOTARIAL SEAL]

My Commission Expires: With Life

STATE OF _Texas_

COUNTY OF _Harris_

I, _Christine Touchstone_ a notary public in and for said County and State, hereby certify that Richard Papert, whose name as Vice President of RSL WOODMERE MGT. CORP., MANAGER OF LEFRAK NY ENERGY INVESTORS, LLC, GENERAL PARTNER OF LEFRAK ENERGY INVESTORS, L.P., a Delaware Limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _12th_ day of _January_, 2016.

CHRISTINE J TOUCHSTONE
My Commission Expires
November 14, 2018

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF LINCOLN

I, _____, a notary public in and for said County and State, hereby certify that Stephen O. Smith, whose name as Manager of BODCAW 3-D, LLC., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2016.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRIS

I, _____, a notary public in and for said County and State, hereby certify that Bill Forney, Jr., whose name as President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2016.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Richard Papert, whose name as Vice President of RSL WOODMERE MGT. CORP., MANAGER OF LEFRAK NY ENERGY INVESTORS, LLC, GENERAL PARTNER OF LEFRAK ENERGY INVESTORS, L.P., a Delaware Limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2016.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF LINCOLN

I, John Tom James Jr, a notary public in and for said County and State, hereby certify that Stephen O. Smith, whose name as Manager of BODCAW 3-D, LLC., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 19ᵗʰ day of JANUARY, 2016.

_____
NOTARY PUBLIC

JOHN TOM JAMES, JR.
NOTARY PUBLIC
ID# 69464
PARISH OF LINCOLN
LOUISIANA

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRIS

I, _____, a notary public in and for said County and State, hereby certify that Bill Forney, Jr., whose name as President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2016.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF _____

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Richard Papert, whose name as Vice President of RSL WOODMERE MGT. CORP., MANAGER OF LEFRAK NY ENERGY INVESTORS, LLC, GENERAL PARTNER OF LEFRAK ENERGY INVESTORS, L.P., a Delaware Limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2016.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF LINCOLN

I, _____, a notary public in and for said County and State, hereby certify that Stephen O. Smith, whose name as Manager of BODCAW 3-D, LLC., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2016.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRIS

I, _Sharon M. McDonald_, a notary public in and for said County and State, hereby certify that Bill Forney, Jr., whose name as President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _15_ day of _January_, 2016.

SHARON M. McDONALD
Notary Public, State of Texas
Commission Expires 12-29-2017

_Sharon M. McDonald_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _12/29/2017_

STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons, whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the ___29th___ day of ___JANUARY___, 2018̸.



NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My commission expires: __MAY 13, 2018__

```
            DAPHENE R. NORWOOD
        Notary Public, State of Texas
        Comm. Expires 05-13-2018
          Notary ID 129817322
```

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said County and State, hereby certify that Tim Marshall, whose name as President of MARSHALL-WUELLNER, INC., a Louisiana corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF TRAVIS

I, _____, a notary public in and for said County and State, hereby certify that Fain Brock, whose name as President of LUCAS PETROLEUM GROUP, INC., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2016.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRIS

    I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons, whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2014.

                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My commission expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

    I, _____, a notary public in and for said County and State, hereby certify that Tim Marshall, whose name as President of MARSHALL-WUELLNER, INC., a Louisiana corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2014.

                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF TRAVIS

    I, _Elaine Fitzgerald_ a notary public in and for said County and State, hereby certify that Fain Brock, whose name as President of LUCAS PETROLEUM GROUP, INC., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _25th_ day of _January_, 2016.

                                    _Elaine Fitzgerald_
                                    NOTARY PUBLIC

ELAINE FITZGERALD
Notary Public, State of Texas
My Commission Expires
September 16, 2017

[AFFIX NOTARIAL SEAL]

My Commission Expires: _9-16-17_

SCANNED

STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons, whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2014.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My commission expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

I, _Janet H. Gould_____, a notary public in and for said County and State, hereby certify that Tim Marshall, whose name as President of MARSHALL-WUELLNER, INC., a Louisiana corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _11th_ day of _January_, ~~2014.~~ 2016

_Janet H. Gould_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _def____

Janet H. Gould
Notary Public, ID # 41828
State of Louisiana
Parish of Bossier


STATE OF TEXAS

COUNTY OF TRAVIS

I, _____, a notary public in and for said County and State, hereby certify that Fain Brock, whose name as President of LUCAS PETROLEUM GROUP, INC., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2016.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

**EXHIBIT "A"**

Attached to and made a part of that certain Joint Operating Agreement (East Castor) dated effective as of January 1, 2016, by and between Sklar Exploration Company L.L.C., Operator, and Sklarco L.L.C, et al, Non-Operators.

(1)   **Identification of lands subject to this agreement:**

**Contract Area**

All lands, oil and gas leasehold interest and
oil and gas interest lying within the following sections as depicted on the black
boundary as shown on the plat designated as Exhibit "A-2"

Township 14 North, Range 7 West,
Section 2, Section 3,
Section 10, Section 11,
Section 14, Section 15,
Bienville Parish, Louisiana

**Area of Mutual Interst**

All lands, oil and gas leasehold interest and
oil and gas interest lying within the following sections as depicted on the red
boundary as shown on the plat designated as Exhibit "A-2"

Township 14 North, Range 7 West,
Section 2, Section 3,
Section 10, Section 11,
Section 14, Section 15,
Bienville Parish, Louisiana

(2)   **Restrictions, if any, as to depths, formations, or substances:**

There are no restrictions except as may be provided for in any oil and gas lease, oil and gas interest, assignment or contract subject to this Operating Agreement or to which this Operating Agreement is subject.

(3)   **Decimal interest and names and addresses of Parties to this Agreement:**

| Owners | BCP WI | ACP WI |
|---|---|---|
| AEEC II, L.L.C. | 33.50% | 30.15% |
| LeFrak Energy Investors, L.P. | 25.00% | 22.50% |
| Bodcaw 3-D, LLC | 3.00% | 2.70% |
| McCombs Energy, Ltd. | 10.00% | 9.00% |
| Lucas Petroleum Group, Inc. | 5.555556% | 5.00% |
| JJS Working Interest, LLC | 2.00% | 1.80% |
| Sklarco L.L.C. | 20.944444% | 18.85% |
| Marshall-Wuellner, Inc. | 0% | 10% |
| Total | 100% | 100% |

BCP – Before Casing Point in the Initial Test Well
ACP – After Casing Point in the Initial Test Well and all Subsequent Wells.

(4)   **Oil and gas leases and/or oil and gas interests subject to this agreement:**

Attached as Exhibit "A-1"

(5)   **Addresses of parties for notice purposes:**

Sklar Exploration Company L.L.C.
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Phone: (318) 227-8668
Fax: (318) 227-9012
Email:  grembert@sklarexploration.com

Sklarco L.L.C.
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Phone: (318) 227-8668
Fax: (318) 227-9012
Email:  grembert@sklarexploration.com

McCombs Energy, Ltd.
Attn:  Ricky Haikin, Vice President
5599 San Felipe St., Suite 1200
Houston, TX  77056-2721
Phone: (713) 621-0033
Fax:  (713) 621-1670
Email:  rhaikin@mccombsenergy.com

JJS Working Interests, LLC
Attn:  Justin Simons
4295 San Felipe, Suite 207
Houston, TX 77027
Phone: (713) 888-0875
Fax:  (866) 406-9550
Email: Justin@hbcapllc.com
Email: Suzanne@hbcapllc.com

AEEC II, L.L.C.
Attn:   T. Cole Anderson (All Correspondence)
Attn:   Jerry D. Crooks, Jr. (All Correspondence, Drilling Reports, Elections)
Attn:   Janet H. Gould (Drilling Reports)
Attn:   J. David Garrett (Land and Legal)
333 Texas Street, Suite 2020
Shreveport, LA  71101
Phone: (318) 227-2000
Fax:    (318) 425-5935
Email: cole@andersonoilandgas.com
Email: jcrooks@andersonoilandgas.com
Email: janetg@andersonoilandgas.com
Email: david@andersonoilandgas.com

For mudlogs, core analysis, and electric logs:
Jerry D. Crooks, Jr: jcrooks@andersonoilandgas.com (Email and Hard Copy)
Daniel Sevier: dsevier@andersonoilandgas.com (Email Only)

Marshall-Wuellner, Inc.
Attn:   Tim Marshall
333 Texas Street, Suite 608
Shreveport, LA 71101
Phone: (318) 429-2250
Fax:    (318) 429-2251
Email: staff@mwgeologists.com

LeFrak Energy Investors, L.P.
1301 McKinney, Suite 3150
Houston, TX  77010
Attn:   Richard Papert
Attn:   Jon Pruet
Phone: (713) 600-6350
Fax:    (713) 600-6354
Email: rpapert@lefrak.com
Email: jpruet@lefrakenergy.com

Lucas Petroleum Group, Inc.
Fain Brock, President
327 Congress Ave, Ste 500
Austin, TX 78701-3656
Phone: (512) 236-8211
Fax:  (512) 457-1068
Email: fbrock@lucaspetroleum.com
Logs and Reports: Joni Jones (jjones@lucaspetroleum.com)

Bodcaw 3-D, LLC
P. O. Box 1689
Ruston, LA  71273
Attn:   Stephen O. Smith
Phone  (318) 255-2400
Fax:    (381) 251-1211
Email: steve@hunterenergycorp.com


(6)   **Burdens on Production**

There are no burdens on the oil and gas leases and/or oil and gas interests except for the lessor's royalty thereunder and the Carried Working Interest in favor of Marshall-Wuellner, Inc., as described in Section 2.03 of that certain Participation Agreement dated May 1, 2014, covering the Bodcaw 3D Project, to which this JOA is attached as Exhibit "C", and any other burdens described in such oil and gas leases, assignments and/or oil and gas interests.

## EXHIBIT "A-1"

Attached to and made a part of that certain Joint Operating Agreement (East Castor) dated effective as of January 1, 2016, by and between Sklar Exploration Company L.L.C., Operator, and Sklarco L.L.C., et al, Non-Operators.

1.  Oil & Gas Lease dated 05/27/2014, by and between Weyerhaeuser Company, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142204, of the Oil & Gas Records of Bienville Parish, Louisiana.

2.  Oil & Gas Lease dated 06/19/2014, by and between Burns Forest Products, LLC, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014 Document# 20142224, of the Oil & Gas Records of Bienville Parish, Louisiana.

3.  Oil & Gas Lease dated 06/02/2014, by and between Sara Atkinson Blocker and Allison Anne Blocker Zabbia, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142213, of the Oil & Gas Records of Bienville Parish, Louisiana.

4.  Oil & Gas Lease dated 07/23/2014, by and between Sandra Bogan Bell, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142185, of the Oil & Gas Records of Bienville Parish, Louisiana.

5.  Oil & Gas Lease dated 05/16/2014, by and between Iris Jean Thrasher Cotton, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142189, of the Oil & Gas Records of Bienville Parish, Louisiana.

6.  Oil & Gas Lease dated 07/23/2014, by and between Darrie Dianne Bogan Coleman, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142188, of the Oil & Gas Records of Bienville Parish, Louisiana.

7.  Oil & Gas Lease dated 05/27/2014, by and between Christopher R. Claypool, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142208, of the Oil & Gas Records of Bienville Parish, Louisiana.

8.  Oil & Gas Lease dated 05/20/2014, by and between Robbins Marshall Claypool, Jr, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142200, of the Oil & Gas Records of Bienville Parish, Louisiana.

9.  Oil & Gas Lease dated 06/23/2014, by and between Patricia Thrasher Busher, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142229, of the Oil & Gas Records of Bienville Parish, Louisiana.

10. Oil & Gas Lease dated 06/20/2014, by and between Roy David Deroche, et ux, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142228, of the Oil & Gas Records of Bienville Parish, Louisiana.

11. Oil & Gas Lease dated 07/23/2014, by and between Echo Papa LLC AND 4KRB, LLC, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142190, of the Oil & Gas Records of Bienville Parish, Louisiana.

12. Oil & Gas Lease dated 06/02/2014, by and between Charles R. Blocker, Trust Derek Zabbia, Trustee, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142211, of the Oil & Gas Records of Bienville Parish, Louisiana.

13. Oil & Gas Lease dated 06/03/2014, by and between Evans Land Management, LLC, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142219, of the Oil & Gas Records of Bienville Parish, Louisiana.

14. Oil & Gas Lease dated 05/07/2014, by and between Teresa Haddox, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142165, of the Oil & Gas Records of Bienville Parish, Louisiana.

15. Oil & Gas Lease dated 06/03/2014, by and between Max Evans and Daisy Broussard Evans, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142216, of the Oil & Gas Records of Bienville Parish, Louisiana.

16. Oil & Gas Lease dated 05/14/2014, by and between Bruce Roy Humphrey, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142169, of the Oil & Gas Records of Bienville Parish, Louisiana.

17. Oil & Gas Lease dated 06/03/2014, by and between Zachariah Hagin, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142220, of the Oil & Gas Records of Bienville Parish, Louisiana.

18. Oil & Gas Lease dated 07/14/2014, by and between Teresa Eileen Walker Hicks, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142180, of the Oil & Gas Records of Bienville Parish, Louisiana.

19. Oil & Gas Lease dated 06/03/2014, by and between Joe Bruce Evans, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142215, of the Oil & Gas Records of Bienville Parish, Louisiana.

20. Oil & Gas Lease dated 06/11/2014, by and between Janis Evans Leach, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142222, of the Oil & Gas Records of Bienville Parish, Louisiana.

21. Oil & Gas Lease dated 05/27/2014, by and between Honey Claypool Kutach, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142206, of the Oil & Gas Records of Bienville Parish, Louisiana.

22. Oil & Gas Lease dated 06/03/2014, by and between Francis Guy Kelley & Joan Evans Kelley Living Trust Francis Guy Kelley & Joan Evans Kelley, Co-Trustees, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Book 20142217, of the Oil & Gas Records of Bienville Parish, Louisiana.

23. Oil & Gas Lease dated 05/07/2014, by and between Kevin Lane Johnson, et ux, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142166, of the Oil & Gas Records of Bienville Parish, Louisiana.

24. Oil & Gas Lease dated 07/23/2014, by and between Roy Jack McCarroll, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142186, of the Oil & Gas Records of Bienville Parish, Louisiana.

25. Oil & Gas Lease dated 05/14/2014, by and between Frederick and Janice Moser Trust Frederick & Janice Moser, Trustees, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142168, of the Oil & Gas Records of Bienville Parish, Louisiana.

26. Oil & Gas Lease dated 05/14/2014, by and between Maurice Charles Lucky Management Trust Maurice Charles Lucky, Trustee, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142176, of the Oil & Gas Records of Bienville Parish, Louisiana.

27. Oil & Gas Lease dated 06/26/2014, by and between Loe Family Limited Partnership Babo Loe, Manager, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142173, of the Oil & Gas Records of Bienville Parish, Louisiana.

28. Oil & Gas Lease dated 04/07/2014, by and between Louisiana Minerals, LTD, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142164, of the Oil & Gas Records of Bienville Parish, Louisiana.

29. Oil & Gas Lease dated 05/04/2014, by and between Laura Watts Robertson, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142179, of the Oil & Gas Records of Bienville Parish, Louisiana.

30. Oil & Gas Lease dated 05/20/2014, by and between Pullig Holdings, LLC, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142196, of the Oil & Gas Records of Bienville Parish, Louisiana.

31. Oil & Gas Lease dated 05/27/2014, by and between Sue Ann Blocker Peck, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142209, of the Oil & Gas Records of Bienville Parish, Louisiana.

32. Oil & Gas Lease dated 06/01/2014, by and between Pavillion Land Development, LLC, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142210, of the Oil & Gas Records of Bienville Parish, Louisiana.

33. Oil & Gas Lease dated 07/14/2014, by and between Gloria Sue Wells Smith and Arden D. Smith, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142181, of the Oil & Gas Records of Bienville Parish, Louisiana.

34. Oil & Gas Lease dated 05/14/2014, by and between Barbara Lucky Shannon Decedent's Trust James Lerow Shannon Trustee, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142174, of the Oil & Gas Records of Bienville Parish, Louisiana.

35. Oil & Gas Lease dated 05/20/2014, by and between Mudd Holdings, LLC, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142198, of the Oil & Gas Records of Bienville Parish, Louisiana.

36. Oil & Gas Lease dated 06/03/2014, by and between Christine Colbert Ozley and Lamar E. Ozley, Jr., as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142214, of the Oil & Gas Records of Bienville Parish, Louisiana.

37. Oil & Gas Lease dated 07/14/2014, by and between Kathy Dianne Walker Tolar, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142183, of the Oil & Gas Records of Bienville Parish, Louisiana.

38. Oil & Gas Lease dated 07/25/2014, by and between Jay Owen Toms, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142197, of the Oil & Gas Records of Bienville Parish, Louisiana.

39. Oil & Gas Lease dated 06/23/2014, by and between Zachary T. Thrasher, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142171, of the Oil & Gas Records of Bienville Parish, Louisiana.

40. Oil & Gas Lease dated 07/07/2014, by and between Regina Watts Thrasher, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142177, of the Oil & Gas Records of Bienville Parish, Louisiana.

41. Oil & Gas Lease dated 05/16/2014, by and between Maurice S. Thrasher, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142187, of the Oil & Gas Records of Bienville Parish, Louisiana.

42. Oil & Gas Lease dated 06/16/2014, by and between Connie Thrasher Wilson, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142223, of the Oil & Gas Records of Bienville Parish, Louisiana.

43. Oil & Gas Lease dated 07/01/2014, by and between XH, LLC, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142175, of the Oil & Gas Records of Bienville Parish, Louisiana.

44. Oil & Gas Lease dated 07/14/2014, by and between David M. Wells and Joy J. Wells, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142178, of the Oil & Gas Records of Bienville Parish, Louisiana.

45. Oil & Gas Lease dated 05/14/2014, by and between Richard H. Watts, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142184, of the Oil & Gas Records of Bienville Parish, Louisiana.

46. Oil & Gas Lease dated 07/25/2014, by and between Scott David Toms, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142199, of the Oil & Gas Records of Bienville Parish, Louisiana.

47. Oil & Gas Lease dated 07/25/2014, by and between Jeffery Wayne Toms, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142195, of the Oil & Gas Records of Bienville Parish, Louisiana.

48. Oil & Gas Lease dated 06/23/2014, by and between Britney Shae Thrasher, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142170, of the Oil & Gas Records of Bienville Parish, Louisiana.

49. Oil & Gas Lease dated 05/16/2014, by and between Danita Thrasher, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142191, of the Oil & Gas Records of Bienville Parish, Louisiana.

50. Oil & Gas Lease dated 05/16/2014, by and between Derrell Glen Thrasher, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142193, of the Oil & Gas Records of Bienville Parish, Louisiana.

51. Oil & Gas Lease dated 05/22/2014, by and between Ronnie Gene Thomas and Brenda Mae Thomas, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142202, of the Oil & Gas Records of Bienville Parish, Louisiana.

52. Oil & Gas Lease dated 06/20/2014, by and between Florian J. Thomala, et al, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142225, of the Oil & Gas Records of Bienville Parish, Louisiana.

53. Oil & Gas Lease dated 06/20/2014, by and between Michael Jerome Thomala, et al, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142227, of the Oil & Gas Records of Bienville Parish, Louisiana.

54. Oil & Gas Lease dated 05/08/2014, by and between Ray L Southern, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142167, of the Oil & Gas Records of Bienville Parish, Louisiana.

55. Oil & Gas Lease dated 05/14/2014, by and between Sherry M. Hall Taylor, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142172, of the Oil & Gas Records of Bienville Parish, Louisiana.

56. Oil & Gas Lease dated 06/03/2014, by and between JFKELLEY Clan, LLC, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142218, of the Oil & Gas Records of Bienville Parish, Louisiana.

57. Oil & Gas Lease dated 05/14/2014, by and between Mary Watts Iverstine, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142182, of the Oil & Gas Records of Bienville Parish, Louisiana.

58. Oil & Gas Lease dated 06/04/2014, by and between Barbara Evans Rogers, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142221, of the Oil & Gas Records of Bienville Parish, Louisiana.

59. Oil & Gas Lease dated 07/23/2014, by and between Frederick R Bogan, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142194, of the Oil & Gas Records of Bienville Parish, Louisiana.

60. Oil & Gas Lease dated 09/24/2014, by and between Jerry Lane Sullivan, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/25/2014, Entry 20142327, of the Oil & Gas Records of Bienville Parish, Louisiana.

61. Oil & Gas Lease dated 09/02/2014, by and between LTD Hunters, LLC, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/25/2014, Entry 20142326, of the Oil & Gas Records of Bienville Parish, Louisiana.

62. Oil & Gas Lease dated 09/11/2014, by and between Petro-Hunt, LLC, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142226, of the Oil & Gas Records of Bienville Parish, Louisiana.

63. Oil & Gas Lease dated 08/04/2014, by and between Kingfisher Resources, Inc., as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142203, of the Oil & Gas Records of Bienville Parish, Louisiana.

64. Oil & Gas Lease dated 05/27/2014, by and between Susan Claire Claypool Mercer, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 10/14/2014, Entry 20142509, of the Oil & Gas Records of Bienville Parish, Louisiana.

65. Oil & Gas Lease dated 08/04/2014, by and between Kingfisher Resources, Inc., as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142201, of the Oil & Gas Records of Bienville Parish, Louisiana.

66. Oil & Gas Lease dated 08/06/2014, by and between Petro-Hunt, LLC, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142205, of the Oil & Gas Records of Bienville Parish, Louisiana.

67. Oil & Gas Lease dated 08/21/2014, by and between Larry William Carr and Carolyn Vail Smith Carr, as Lessor, and Hunter Energy Corp, as Lessee, recorded on 09/11/2014, Entry 20142207, of the Oil & Gas Records of Bienville Parish, Louisiana.

*EXHIBIT "A-2"*

**Attached to and made a part of that certain Operating Agreement (East Castor)
dated January 1, 2016, by and between SKLAR  EXPLORATION COMPANY L.L.C.,
as Operator, and SKLARCO L.L.C., ET AL as Non-Operators.**



| 28 | 27 | 26 | 25 |
|----|----|----|----|
|    | **15N - 7W** | | |
| 33 | 34 | 35 | 36 |
| 4  | 3  | 2  | 1  |
| 9  | 10 | 11 | 12 |
| 16 | **14N - 7W** 15 | 14 | 13 |
| 21 | 22 | 23 | 24 |
| 28 | **BIENVILLE** 27 | 26 | 25 |

EXHIBIT "B"

Attached to and made a part of that certain Joint Operating Agreement (East Castor) dated effective as of January 1, 2016, by and between Sklar Exploration Company L.L.C., Operator, and Sklarco L.L.C, et al, Non-Operators.

Bath Form Louisiana Spec. 14-BRI-2A-NL Paid up R2/99

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of _____ , _____ , between

Lessor (whether one or more) whose address is: _____

and _____ Lessee,
whose address is _____
WITNESSETH :

1.    Lessor in consideration of One Hundred Dollars and Other Valuable Considerations ($ 100.00 & OVC), in hand paid, of the royalties herein provided, and of the agreement of Lessee herein contained, hereby grants, leases and lets unto Lessee the exclusive right to enter upon and use the land hereinafter described for the exploration for and production of oil, gas, sulphur and all other minerals together with the use of the surface of the land for all purposes incident to the exploration for and production, ownership, possession and transportation of said minerals (either from said land or acreage pooled therewith), and the right to dispose of salt water, with the right of ingress and egress to and from said lands at all times for such purposes, including for operations hereunder or in connection with similar operations on adjoining land; the land to which this lease applies and which is affected hereby being situated in_____ and described as follows, to-wit:

This lease shall also extend and apply to any interest therein which Lessor may hereafter acquire, including, but not limited to, outstanding mineral rights acquired by reversion, prescription or otherwise, and includes battures, accretions, roads, highways, easements, right-of-ways and all land, if any, contiguous or adjacent to, or adjoining the land particularly described above. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land. For the purposes of determining the amount of bonus and the shut-in royalty payment hereunder, said land shall be deemed to comprise _____ acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof

2. Subject to the other provisions herein contained, this lease shall be for a period of    Three (3)    years from the date hereof ("called primary term") and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner herein provided.

3.    For the consideration hereinabove recited, this lease shall remain in full force and effect during the primary term, without any additional payment and without Lessee being required to conduct any operations on the land (either before or after the discovery of minerals), except to drill such wells as might be necessary to protect the land from drainage, as hereinafter provided.

4. The royalties to be paid by Lessee are: (a) on oil, and other hydrocarbons which are produced at the well in liquid form by ordinary production methods, one-eighth of that produced and saved from said land, same to be delivered at the wells or to the credit of Lessor in the pipe line to which the wells may be connected; Lessor's interest in either case to bear its proportion of any expenses for treating the oil to make it marketable as crude; Lessee may from time to time purchase any royalty oil or other liquid hydrocarbons in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas, or other gaseous substance produced from said land and sold or used off the premises or for the extraction of gasoline or other products therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; such gas, casinghead gas, residue gas, or gas of any other nature or description whatsoever, as may be disposed of for no consideration to Lessee, either through unavoidable waste or leakage, or in order to recover oil or other liquid hydrocarbons, or returned to the ground, shall not be deemed to have been sold or used either on or off the premises within the meaning of this paragraph 4 hereof, (c ) on all other minerals mined and marketed, one-eighth, either in kind or value at the well or mine, at Lessee's election except that on sulphur the royalty shall be one dollar ($ 1.00) per long ton.

5. If Lessee during or after the primary term should drill a well capable of producing gas or gaseous substances in paying quantities, (or which although previously produced Lessee is unable to continue to produce) and should Lessee be unable to operate said well because of lack of market or marketing facilities or governmental restrictions, then Lessee's rights may be maintained beyond or after the primary term without production of minerals or further drilling operations by paying Lessor as royalty a sum equal to one dollar ($1.00) per acre of land covered hereby per year, the first payment being due, if said well should be completed or shut-in after the primary term, within ninety (90) days after the completion of such well or the cessation of production and such payment will extend Lessee's rights for one year from the date of such completion or cessation. If such a well should be completed during the primary term, the first payment, if made by Lessee, shall be due within 90 days after such well is shut-in, or before the expiration date of the primary term herein fixed, whichever is the later date. Thereafter Lessee's rights may be continued from year to year by making annual payments in the amount stated on or before the anniversary date beginning with the date of completion of said well (if completed after the primary term) or the end of the primary term (if completed prior thereto) as the case may be; each of such payments to extend Lessees rights for one year. The annual payments herein provided for may be deposited to Lessor's credit in the _____ Bank of _____ or paid direct to Lessor at the above address, which bank/address shall be and remain Lessor's agent/address for such purpose regardless of any change or changes in the ownership of the land or mineral rights therein. The owners of the royalty as of the date of such payments shall be entitled thereto in proportion to their ownership of said royalty. The provisions of this paragraph shall be recurring at all times during the life of this lease. Should any well producing gas or gaseous substances be completed on a drilling unit which includes any part of the land herein leased, the provisions of this paragraph shall be subject to all other agreements herein contained allowing the pooling of the above described lands with other lands.

6. If within ninety (90) days prior to the end of the primary term, Lessee should complete or abandon a well on the lands described above or on land pooled therewith, or if production previously secured should cease from any cause, this lease shall continue in force and effect for ninety (90) days from such completion or abandonment or cessation of production. If at the expiration of the primary term or at the expiration of the ninety (90) day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith, but Lessee is then engaged in operations for drilling, completion or reworking thereon, or operations to achieve or restore production, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations for drilling, completion or reworking, or operations to achieve or restore production, with no cessation between operations or between such cessation of production and additional operations of more than ninety (90) consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith. If sulphur be encountered on said premises or on land pooled therewith, this lease shall continue in force and effect so long as Lessee is engaged with due diligence in explorations for and/or erecting a plant for the production of sulphur and thereafter subject to the foregoing provisions hereof so long as oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith.

7. Lessee is hereby granted the right as to all or any part of the land described herein, without Lessors joinder, to combine, pool or unitize the acreage royalty or mineral interest covered by this lease, or any portion thereof, at any time during the life of this lease, with any other land, lease or leases, royalty or mineral interests in or under any other tract or tracts of land in the vicinity thereof, whether owned by Lessee or some other person, or corporation so as to create, by the combination of such lands and leases, one of more operating units, as to any and all mineral horizons, provided that no one operating unit shall, in the case of gas, including condensate, embrace more than six hundred forty (640) acres, and in the case of oil, including casinghead gas, embrace more than eighty (80) acres; and provided further, however, that if any spacing or other rules and regulations of the State or Federal Commission, Agency, or regulatory body having or claiming jurisdiction has heretofore or shall at any time hereafter permit or prescribe a drilling or operating unit or spacing rule in the case of gas, including condensate, greater than six hundred forty (640) acres, or in the case of oil or casinghead gas greater than eighty (80) acres, then the unit or units herein contemplated may have, or may be redesigned so as to have, as the case may be, the same surface content as, but not more than, the unit or the acreage in the spacing rule so prescribed or permitted. However, it is further specifically understood and agreed, anything herein to the contrary notwithstanding, that the Lessee shall have the right to, and the benefit of an acreage tolerance of ten per cent in excess of any drilling or operating unit authorized herein. The commencement of operations for the drilling of a well, or the completion of a well to production of either oil, gas, casinghead gas, condensate or other minerals on any portion of an operating unit in which all or any part of the land described herein is embraced, or production of oil, gas, casinghead gas, condensate, or other minerals therefrom shall have the same effect under the terms of this lease as if a well were commenced, completed or producing oil, gas, casinghead gas, condensate, or other minerals in paying quantities on the land embraced by this lease. Lessee shall execute in writing and file for record in the records of the Parish in which the lands herein leased are located, an instrument identifying and describing the pooled acreage, or an instrument supplemental thereto redesignating same, as the case may be. Either prior to the securing of production from any unit created under the authority hereinabove granted, or after cessation of production therefrom Lessee shall have the right to dissolve the unit so created, without Lessor's joinder or further consent, by executing in writing and placing of record in the Parish or Parishes in which the lands making up such unit may be located, an instrument identifying and dissolving such unit. The provisions hereof shall be construed as a covenant running with the land and shall inure to the benefit of and be binding upon the parties hereto, their heirs, representatives, successors and assigns. In the event such operating unit or units is/are so created by Lessee, Lessor shall receive out of production or the proceeds from production from said operating unit or units or out of the shut-in royalty provided for above, such portion of the royalty or of the shut-in roya l ty specified herein as the number of acres (mineral acres) out of this lease placed in any such operating unit or units bears to the total number of acres included in such operating unit or units.

8. If Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the payments herein provided shall be paid to Lessor only in the proportion which Lessors interest bears to the whole and undivided fee.

9. Lessee shall have the exclusive right to explore the land herein described by geological, geophysical, or other methods, including the right to conduct geophysical or geological exploratory tests, whether or not and whether or not (including the drilling of core test or test or version, seismic, seismograph explosive, magnetometer, or other geophysical or geological

Instruments, test or procedures, for the purpose of securing geological and geophysical information. All information obtained by Lessee as a result of such activity shall be the exclusive property of Lessee, and Lessee may disseminate or sell such information without Lessor's consent, in exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized therewith, in primary and/or enhanced recovery, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises, or on any adjacent or adjoining lands, as may be reasonably necessary for such purpose, including but not limited to the drilling of wells, construction and use of roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Lessee to discover, produce, store, treat and/or transport oil, gas and other substances. Lessee shall have free use of oil, gas, casinghead gas, condensate, and water from said land, except water from Lessors wells, for all operations hereunder, including repressuring, pressure maintenance and recycling, and the royalty shall be computed after deducting any so used, Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred feet of any residence or barn now on said land without Lessor's consent. In the event a well or wells, producing oil, gas, casinghead gas or condensate in paying quantities should be brought in on adjacent lands not owned by the Lessor and within one hundred fifty feet of and draining the leased premises, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances.

10. The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns, but no change or division in ownership of the land, or royalties, however accomplished shall operate to enlarge the obligations or diminish the rights of Lessee. No such change or division in the ownership of the land, or royalties shall be binding upon Lessee for any purpose until such person acquiring any interest has furnished Lessee, at its principal place of business, with a certified copy of the instrument or instruments, constituting his chain of title from the original Lessor. An assignment of this lease, in whole or in part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder to Lessor and, if Lessee or assignee of part or parts hereof shall fail to comply with any other provisions of the lease, such default shall not affect this lease insofar as it covers a part of said lands upon which Lessee or any assignee shall comply with the provisions of the lease. In addition, Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations as to the released acreage or interest.

11. In case of suit, adverse claim, dispute or question as to the ownership of the royalties (or some part thereof payable under this lease, Lessee shall not be held in default in payment of such royalties (or the part thereof in dispute), until such suit, claim, dispute or question has been finally disposed of, and Lessee shall have thirty (30) days after being furnished with a certified copy of the instrument or instruments disposing of such suit, claim or dispute, or after being furnished with proof sufficient, In Lessee's opinion, to settle such question, within which to make payment. Should the right or interest of Lessee hereunder be disputed by Lessor, or any other person, the time covered by the pendency of such dispute shall not be counted against Lessee either as affecting the term of the lease or for any other purpose, and Lessee may suspend all payments without interest until there is a final adjudication or other determination of such dispute.

12. In case of cancellation or termination of this lease from any cause, Lessee shall have the right to retain, under the terms hereof, around each well producing, being worked on, or drilling hereunder, the number of acres in the form allocated to each such well under spacing and proration rules issued by the Commissioner of Conservation of the State of Louisiana, or any other State or Federal authority having control of such matters; or any unit or units formed pursuant to paragraph 7 or, in the absence of such rulings, unit or units, forty (40) acres around each such well in as near a square form as practicable, and in the event lessor considers that operations are not being conducted in compliance with this contract, Lessee shall be notified in writing of the facts relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument.

13. When drilling, reworking, production or other operations are delayed or interrupted by force majeure, that is, by storm, flood or other acts of God, fire, war, rebellion, insurrection, riot, strikes, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some law, order, rule, regulation, requisition or necessity of government, Federal or State, or as a result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding, but this lease shall be extended for a period of time equal to that during which Lessee is so prevented from conducting such drilling or reworking operations on, or producing oil, gas, casinghead gas, condensate or other minerals from, the premises; provided that during any period that this lease is continued in force after its primary term solely by force majeure as herein provided, Lessee shall pay to the owners of the royalty hereunder the shut-in royalty provided in paragraph 5 hereof, and in the manner therein provided, without regard to whether or not there is a producing well shut in, located on said land or on land with which the lease premises or any part thereof has been pooled.

14. Lessee shall pay for actual damages caused by its operations to growing crops and timber on said land leased herein.

15. Notwithstanding the death of any party Lessor, or his successor in interest, the payment or tender of all sums accruing hereunder in the manner provided above shall be binding on the heirs, executors and administrators of such person.

16. Lessor hereby warrants and agrees to defend the title to the lands herein described, and agrees that the Lessee at its option shall have the right to redeem for Lessor, by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof. In case of payment of any such mortgage, taxes or other liens by Lessee, in addition to the right to subrogation herein granted, Lessee shall also have the right to retain any royalties which become due Lessor hereunder and to repay itself therefrom, and the retention of such royalties by Lessee shall have the same effect as if paid to the Lessor in whose behalf payment of any mortgage, taxes or other liens was made.

17. This lease shall be binding upon all who execute it, whether or not named in the body hereof as Lessor, and without regard to whether this same instrument, or any copy thereof, shall be executed by any other Lessor named above.

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

WITNESSES:                                              LESSOR (WHETHER ONE OR MORE)

_____                    _____

_____                    _____                    SS NO. OR TAX ID

_____                    _____

_____                    _____                    SS NO. OR TAX ID

_____                    _____

_____                    _____                    SS NO. OR TAX ID

_____                    _____

_____                    _____                    SS NO. OR TAX ID

STATE OF          _____

PARISH/ COUNTY OF   _____

On this _____ day of _____ _____, before me, the undersigned authority, personally appeared _____

to me known to be the person(s) described in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as their free act and deed.

My Commission expires _____

                                                        NOTARY PUBLIC in and for

STATE OF          _____

PARISH/ COUNTY OF   _____

Before me, the undersigned authority, personally came and appeared _____ who being first duly sworn deposes and says that he/she was one of the subscribing witnesses to the execution of the foregoing instrument by _____

who signed the same in his/her presence and that of the other subscribing witness(es) to such signature(s) whose name(s) (signatures) are affixed as such, and that he/she now recognizes all said signatures to be true and genuine.

                                                        _____
                                                        Subscribing Witness

Sworn to and subscribed before me, notary, on this _____ day of _____

My Commission expires _____

                                                        NOTARY PUBLIC in and for



# Exhibit " C "
# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

**Attached to and made a part of that certain Joint Operating Agreement (East Castor) dated effective as of January 1, 2016, by and between Sklar Exploration Company L.L.C., Operator, and Sklarco L.L.C, et al, Non-Operators.**

Attached to and made part of _____

_____

_____

_____

## I. GENERAL PROVISIONS

IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.

IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.

**1.   DEFINITIONS**

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

**"Affiliate"** means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

**"Agreement"** means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

**"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

**"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

**"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS.

**"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

**"First Level Supervision"** means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices
- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

**"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

**"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

**c o p a s**

1        **"Joint Property"** means the real and personal property subject to the Agreement.

3        **"Laws"** means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other
4        governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions
5        contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted,
6        promulgated or issued.

8        **"Material"** means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

10      **"Non-Operators"** means the Parties to the Agreement other than the Operator.

12      **"Offshore Facilities"** means platforms, surface and subsea development and production systems, and other support systems such as oil and
13      gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping,
14      heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of
15      offshore operations, all of which are located offshore.

17      **"Off-site"** means any location that is not considered On-site as defined in this Accounting Procedure.

19      **"On-site"** means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of
20      Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other
21      facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

23      **"Operator"** means the Party designated pursuant to the Agreement to conduct the Joint Operations.

25      **"Parties"** means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as
26      "Party."

28      **"Participating Interest"** means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees,
29      or is otherwise obligated, to pay and bear.

31      **"Participating Party"** means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of
32      the costs and risks of conducting an operation under the Agreement.

34      **"Personal Expenses"** means reimbursed costs for travel and temporary living expenses.

36      **"Railway Receiving Point"** means the railhead nearest the Joint Property for which freight rates are published, even though an actual
37      railhead may not exist.

39      **"Shore Base Facilities"** means onshore support facilities that during Joint Operations provide such services to the Joint Property as a
40      receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication,
41      scheduling and dispatching center; and other associated functions serving the Joint Property.

43      **"Supply Store"** means a recognized source or common stock point for a given Material item.

45      **"Technical Services"** means services providing specific engineering, geoscience, or other professional skills, such as those performed by
46      engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint
47      Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second
48      paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-
49      Operator, Non-Operator Affiliates, and/or third parties.

51   **2.**    **STATEMENTS AND BILLINGS**

53      The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the
54      preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all
55      charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified
56      and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications.
57      Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

59      The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances
60      and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper
61      copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and
62      bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of
63      weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via
64      email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings
65      electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written
66      notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



### 3. ADVANCES AND PAYMENTS BY THE PARTIES

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

    (1) being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

    (2) being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

    (3) being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

    (4) charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

### 4. ADJUSTMENTS

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B. All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

    (1) a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

    (2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

    (3) a government/regulatory audit, or

    (4) a working interest ownership or Participating Interest adjustment.

### 5. EXPENDITURE AUDITS

A. A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B.   The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C.   The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3 (*Advances and Payments by the Parties*).

D.   If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E.   ☐ *(Optional Provision – Forfeiture Penalties)*
*If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*

6.   **APPROVAL BY PARTIES**

A.   GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B.  AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____ **two** _____ (__ **2** __) or more Parties, one of which is the Operator, having a combined working interest of at least __ **two-thirds** __ percent ( **66.67** %), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C.  AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

1.  **RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

2.  **LABOR**

A.  Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1)  Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2)  Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3)  Operator's employees providing First Level Supervision,

(4)  Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5)  Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B.  Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.  Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



D. Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E. Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F. Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G. Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H. Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3. **MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4. **TRANSPORTATION**

A. Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B. Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below, **provided the total transportation cost shall not exceed $10,000.00.** Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

   (1) If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property.. The Operator shall consistently apply the selected alternative.

   (2) If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5. **SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6. **EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A. The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____ **Fifteen** _____ percent ( **15** %) per annum; provided, however, depreciation shall not be charged when the



equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B.  In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

## 7.   AFFILIATES

A.  Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $ **50,000.00**          If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B.  For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $ **50,000.00**          in a given calendar year.

C.  The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

## 8.   DAMAGES AND LOSSES TO JOINT PROPERTY

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

## 9.   LEGAL EXPENSE

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

## 10.  TAXES AND PERMITS

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

**11. INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12. COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

**14. ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15. OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

**III. OVERHEAD**

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

**c o p a s**

- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

1. **OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

☑ **(Alternative 1)** Fixed Rate Basis, Section III.1.B.
☐ **(Alternative 2)** Percentage Basis, Section III.1.C.

A. TECHNICAL SERVICES

(i) Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

☑ **(Alternative 1 – Direct)** shall be charged <u>direct</u> to the Joint Account.

☐ **(Alternative 2 – Overhead)** shall be covered by the <u>overhead</u> rates.

(ii) Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

☐ **(Alternative 1 – All Overhead)** shall be covered by the <u>overhead</u> rates.

☑ **(Alternative 2 – All Direct)** shall be charged <u>direct</u> to the Joint Account.

☐ **(Alternative 3 – Drilling Direct)** shall be charged <u>direct</u> to the Joint Account, <u>only</u> to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

B. OVERHEAD—FIXED RATE BASIS

(1) The Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate per month $ **9,700.00**          (prorated for less than a full month)

Producing Well Rate per month $ **970.00**

(2) Application of Overhead—Drilling Well Rate shall be as follows:

(a) Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



(b)  Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3)  Application of Overhead—Producing Well Rate shall be as follows:

(a)  An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b)  Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c)  A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d)  An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e)  Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4)  The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

C.  OVERHEAD—PERCENTAGE BASIS

(1)  Operator shall charge the Joint Account at the following rates:

(a)  Development Rate _____ percent (_____) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (*Legal Expense*) and all Material salvage credits.

(b)  Operating Rate _____ percent (_____%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.

(2)  Application of Overhead—Percentage Basis shall be as follows:

(a)  The Development Rate shall be applied to all costs in connection with:

[i]   drilling, redrilling, sidetracking, or deepening of a well
[ii]  a well undergoing plugback or workover operations for a period of five (5) or more consecutive work–days
[iii] preliminary expenditures necessary in preparation for drilling
[iv]  expenditures incurred in abandoning when the well is not completed as a producer
[v]   construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead-Major Construction and Catastrophe*).

(b)  The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead-Major Construction and Catastrophe*).

2.  **OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE**

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.   If the Operator absorbs the engineering, design and drafting costs related to the project:

   (1)    __5__  % of total costs if such costs are less than $100,000; plus

   (2)    __2__  % of total costs in excess of $100,000 but less than $1,000,000; plus

   (3)    __1__  % of total costs in excess of $1,000,000.

B.   If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

   (1)    __5__  % of total costs if such costs are less than $100,000; plus

   (2)    __2__  % of total costs in excess of $100,000 but less than $1,000,000; plus

   (3)    __1__  % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

**3.   AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

### IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

**I.   DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



**2. TRANSFERS**

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

A. PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1) Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

    (a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

    (b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2) Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3) Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4) As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

B. FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2) Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3) Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4) Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

C. TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

D.  CONDITION

(1)  Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section 1.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2)  Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)  Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)  Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section 1.6.A (*General Matters*).

(5)  Condition "E" – Junk shall be priced at prevailing scrap value prices.

E.  OTHER PRICING PROVISIONS

(1)  Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2)  Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



3. **DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

4. **SPECIAL PRICING PROVISIONS**

A. PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

B. SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C. MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



**1. DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A. A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B. Actual transportation costs and Personal Expenses for the inventory team.

C. Reasonable charges for report preparation and distribution to the Non-Operators.

**2. NON-DIRECTED INVENTORIES**

A. OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B. NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C. SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

## EXHIBIT "D"

Attached to and made a part of that certain Joint Operating Agreement (East Castor) dated effective as of January 1,
2016, by and between Sklar Exploration Company L.L.C., Operator, and Sklarco L.L.C, et al, Non-Operators.

## INSURANCE

Operator shall carry the following insurance with the limits stipulated below for the joint account.
Operator shall have the right to charge the joint account premiums for the insurance coverage required by
this Exhibit. Such premiums shall be allocated to the joint account using a fair and reasonable method
based on the nature of the operations covered by this Agreement. Non-operating working interest owners
shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates
of insurance will be provided upon request.

### I.    WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

Workers' Compensation Insurance covering the employees of Operator engaged in operations hereunder in
compliance with the applicable State and Federal Laws.

Employers Liability Insurance coverage at limits of $1,000,000 each accident for bodily injury by
accident/$1,000,000 policy limit for bodily injury by disease/$1,000,000 each employee for bodily injury
by disease.

### II    COMPREHENSIVE GENERAL LIABILITY

Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single
limit each occurrence/aggregate of $1,000,000 for bodily injury and property damage. Said
Comprehensive General Liability Insurance shall include contractual liability coverage.

### III    AUTOMOBILE LIABILITY

Coverage shall include owned, non-owned and hired vehicles. Limit $1,000,000 combined single limit
each occurrence for bodily injury and property damage.

### IV    EXCESS LIABILITY

Operator shall carry excess liability insurance in an amount not less than $10,000,000.

### V.    EXTRA EXPENSE LIABILITY

Operator's Extra Expense coverage including control of well, seepage, pollution and contamination
coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator,
subject to limit(s) as shown below and subject to deductible not to exceed $200,000 per occurrence.

Liability Limit: $20,000,000

### VI.    OIL LEASE PROPERTY

Oil Lease Property Insurance (Inland Marine) covering tanks, pumps, machinery, pipe and similar
equipment of a mobile nature usual to the operation of a producing oil or gas well and crude oil while
contained in tanks with limit of not less than $10,000,000 and subject to a deductible of $5,000.

### VII.    ADDITIONAL INSURANCE

Operator shall be entitled to carry or provide any additional insurance for the benefit of the Joint Account,
which is of direct benefit to the joint property and is incurred by the Operator in the necessary and proper
conduct of the joint operations. The premium for all such insurance so carried shall be paid by Operator
and charged to the Joint Account. Operator shall, at any time requested, furnish Non-Operator with
information concerning the kind, character and amounts of insurance carried.

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to
protect its own interest against claims, losses, damages or destruction to property arising out of operations
hereunder. Further, any party, at its own expense, may carry its own coverage for Extra Expense Liability
Insurance with limits as set forth in Section V, above. Any party so electing must notify Operator of such
election prior to commencement of operations and provide a certificate of insurance evidencing the
appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the
coverage.

## EXHIBIT "E"

Attached to and made a part of that certain Joint Operating Agreement (East Castor) dated effective as of January 1, 2016, by and between Sklar Exploration Company L.L.C., Operator, and Sklarco L.L.C, et al, Non-Operators.

## GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement, the parties hereto own and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area described in the Operating Agreement (the "**JOA**").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the gas produced from said JOA. However, one or more of the parties may be unable to take or market its interest in the gas production from time to time; therefore, to permit any party to produce and dispose of its interest in the gas production from the JOA with as much flexibility as possible, the parties hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser. Any party whose share of gas is not marketed shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ration of its participation percentage under this Operating Agreement to the participating percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, it any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Operator will, in turn, make settlement for all royalties and overriding royalties which are payable on gas produced from the Contract Area. In the event that the total royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Contract Area, then any such deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Contract Area shall furnish the Operator with division order title opinions on which Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser shall pay, or cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the volume of gas actually taken for its account.

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold, less applicable production taxes and royalties theretofore paid, less any reasonable dehydration, compression, treating, processing, gathering or transportation costs actually incurred, including amortized capital costs associated with the design, construction or operation of any plants to dehydrate, compress, treat or process gas, in connection with the sale of the overproduction, at the price and based on the proceeds actually received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party). Notwithstanding the foregoing, should the underproduced party desire to receive which such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.

## SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

### AUTHORITY FOR EXPENDITURE

| DATE: | January 10, 2016 | FIELD: | East Castor |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | LA |
| WELL: | Echo Papa 10-10 #1 | HORIZON: | Hosston |
| LOCATION: | Section 10, T14N - R7W, Bienville Parish | PROJ. T.D.: | 9,200' MD = TVD |

PROPOSAL:  D&C straight hole 9,200'

Latest Revision:  12/3/2015 - GLR

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| **9100** | **LEASEHOLD COSTS** | | | |
| 03 | SURFACE DAMAGES AND RIGHT OF WAY | | | |
| 79 | DRILL SITE ABSTRACT | | | |
| 81 | LEGAL FEES | | | |
| 82 | MISCELLANEOUS - Spud Fee | 17,500 | | 17,500 |
| 83 | DRILL SITE TITLE OPINION & CURATIVE | | | |
| 89 | BROKERAGE COSTS | | | |
| 90 | LANDMAN COSTS | | | |
| | **TOTAL LEASEHOLD COSTS** | $17,500 | $0 | $17,500 |
| | | | | |
| **9200/9300** | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 2,000 | 2,000 | 4,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 220,000 | 5,000 | 225,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 40,000 | | 40,000 |
| 04 | SURFACE DAMAGES & ROW | | | |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE($75000 up $75000 down) | | | |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | 325,000 | | 325,000 |
| 10 | DAYWORK WITH DRILL PIPE(4 comp days @ $11500/day) | | 46,000 | 46,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION: | 30,000 | 4,000 | 34,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | | | |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS(from quote) | | | |
| 17 | MUD & CHEMICALS(from quote) | | | |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 30,000 | | 30,000 |
| 24 | CEMENTING & EQUIPMENT | | 34,000 | 34,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 18,000 | 18,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | | 14,000 | 14,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 10,000 | 2,500 | 12,500 |
| 31 | FUEL | | | |
| 32 | BITS (5@$8000) | | | |
| 33 | TRANSPORTATION & TRUCKING | 20,000 | 16,000 | 36,000 |
| 34 | CONTRACT LABOR | 25,000 | 10,000 | 35,000 |
| 35 | SAFETY & H2S TRAINING (10 days @ $1000/day) | 10,000 | | 10,000 |
| 36 | LOGGING & WIRELINE | 25,000 | 10,000 | 35,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | 5,000 | 5,000 |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 4,000 | | 4,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 30,000 | 30,000 |
| 47 | PERFORATION SERVICES (2 zones @ $20000/zone) | | 40,000 | 40,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES(1 frac zones @ $100000/zone, from quote) | | 100,000 | 100,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 3,000 | 3,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 40,000 | -40,000 | |
| 78 | INSURANCE | 10,000 | | 10,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 14,000 | 2,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 40,500 | 16,075 | 56,575 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $950,500 | $337,575 | $1,188,075 |
| | | | | |
| **9500** | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING (9-5/8") | | | |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 7,500 | | 7,500 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $8,000 | $0 | $8,000 |
| | | | | |
| **9520** | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS (4-1/2")(9200ft @$8.10/ft) | | 74,520 | 74,520 |
| 22 | TUBING (2-3/8")(9000 ft @$5/ft) | | 45,000 | 45,000 |
| 23 | PACKERS | | 20,000 | 20,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 24,000 | 24,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 0 | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $169,000 | $169,000 |
| | | | | |
| **9535** | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 0 | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 100,000 | 100,000 |
| 42 | COMPRESSION (VRU) | | 0 | |
| 43 | TANK BATTERY COSTS(gas well) | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 30,000 | 30,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 0 | |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $174,000 | $174,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $8,000 | $343,000 | $351,000 |
| | | | | |
| | **TOTAL WELL COST** | $976,000 | $880,575 | $1,556,575 |

APPROVED: January 12, 2016  20XX.
Abbe M. (signature)
BY:

OEE Insurance Election (Please check your election below):
[X] Coverage under own policy with limits not less than _____ .

[ ] Coverage under Operator's policy

BY: T. Cole Anderson, Agent and Attorney-in-Fact

NOTE: If no election is checked or owner
has not supplied proof of coverage
prior to spud, owner will be included
under and charged for SEC's OEE
coverage.

## SKLAR Exploration Company L.L.C.
401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

### AUTHORITY FOR EXPENDITURE

| | | | |
|---|---|---|---|
| DATE: | January 10, 2016 | FIELD: | East Castor |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | LA |
| WELL: | Echo Papa 10-10 #1 | HORIZON: | Hosston |
| LOCATION: | Section 10, T14N - R7W, Bienville Parish | PROJ. T.D.: | 9,200 MD = TVD |

PROPOSAL:  D&C straight hole 9,200'

Latest Revision:  12/3/2015 - GLR

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | LEASEHOLD COSTS | | | |
| 03 | SURFACE DAMAGES AND RIGHT OF WAY | | | |
| 79 | DRILL SITE ABSTRACT | | | |
| 81 | LEGAL FEES | | | |
| 82 | MISCELLANEOUS - Spud Fee | 17,500 | | 17,500 |
| 83 | DRILL SITE TITLE OPINION & CURATIVE | | | |
| 89 | BROKERAGE COSTS | | | |
| 90 | LANDMAN COSTS | | | |
| | TOTAL LEASHOLD COSTS | $17,500 | $0 | $17,500 |
| | | | | |
| 9200/9300 | INTANGIBLE DRILLING & COMPLETION | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 2,000 | 2,000 | 4,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 220,000 | 5,000 | 225,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 40,000 | | 40,000 |
| 04 | SURFACE DAMAGES & ROW | | | |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE($75000 up $75000 down) | | | |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | 325,000 | | 325,000 |
| 10 | DAYWORK WITH DRILL PIPE(4 comp days @ $11500/day) | | 46,000 | 46,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION: | 30,000 | 4,000 | 34,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | | | |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS(from quote) | | | |
| 17 | MUD & CHEMICALS(from quote) | | | |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 30,000 | | 30,000 |
| 24 | CEMENTING & EQUIPMENT | | 34,000 | 34,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 18,000 | 18,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | | 14,000 | 14,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 10,000 | 2,500 | 12,500 |
| 31 | FUEL | | | |
| 32 | BITS (5@$9000) | | | |
| 33 | TRANSPORTATION & TRUCKING | 20,000 | 15,000 | 35,000 |
| 34 | CONTRACT LABOR | 25,000 | 10,000 | 35,000 |
| 35 | SAFETY & H2S TRAINING (10 days @ $1000/day) | 10,000 | | 10,000 |
| 36 | LOGGING & WIRELINE | 25,000 | 10,500 | 35,500 |
| 37 | DRILL STEM & PRODUCTION TESTING | | 5,000 | 5,000 |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 4,000 | | 4,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 30,000 | 30,000 |
| 47 | PERFORATION SERVICES (2 zones @ $20000/zone) | | 40,000 | 40,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES(1 frac zones @ $100000/zone, from quote) | | 100,000 | 100,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 3,000 | 3,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 40,000 | -40,000 | |
| 78 | INSURANCE | 10,000 | | 10,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 14,000 | 2,000 | 16,000 |
| 82 | MISCELLANEOUS: ±6% contingency | 40,500 | 18,075 | 58,575 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $850,500 | $337,575 | $1,188,075 |
| | | | | |
| 9500 | TANGIBLE EQUIPMENT - DRILLING | | | |
| 02 | SURFACE CASING (9-5/8") | | | |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 7,500 | | 7,500 |
| 06 | CONDUCTOR CASING | | | |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $8,000 | $0 | $8,000 |
| | | | | |
| 9520 | TANGIBLE EQUIPMENT - COMPLETION | | | |
| 21 | PRODUCTION CASING & LINERS  (4-1/2")/9200ft @$8.10/ft) | | 74,520 | 74,520 |
| 22 | TUBING (2-3/8")/9600 ft @$5/ft) | | 45,000 | 45,000 |
| 23 | PACKERS | | 20,000 | 20,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 24,000 | 24,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 0 | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $169,000 | $169,000 |
| | | | | |
| 9535 | SURFACE PRODUCTION EQUIPMENT | | | |
| 38 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 0 | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 100,000 | 100,000 |
| 42 | COMPRESSION  (VRU) | | 0 | |
| 43 | TANK BATTERY COSTS(gas well) | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 30,000 | 30,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 0 | |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $174,000 | $174,000 |
| | | | | |
| | TOTAL EQUIPMENT | $8,000 | $343,000 | $351,000 |
| | | | | |
| | TOTAL WELL COST | $876,000 | $680,575 | $1,556,575 |

APPROVED: 1 - 12

BY:

OEE Insurance Election (Please check your election below):
[X] Coverage under own policy with limits not less than _____ .

☐ Coverage under Operator's policy

LEPRAK ENERGY INVESTORS, L.P.
20140: By: LePrak NY Energy Investors LLC, General Partner
By: R&L Woodpere Mgt. Corp., Manager

Richard Pape/Mike President

NOTE: If no election is checked or owner
has not supplied proof of coverage
prior to spud, owner will be included
under and charged for SEC's OEE
coverage.

**SKLAR Exploration Company L.L.C.**
401 Edwards St. #1601
Shreveport, LA 71101
(318) 227-4566

## AUTHORITY FOR EXPENDITURE

| DATE: | January 10, 2016 | FIELD: | East/Castor |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | LA |
| WELL: | Echo-Pace 10-10 #1 | HORIZON: | Houston |
| LOCATION: | Section 10, T16N –R7W / Bienville Parish | PROD. TBG.: | 6,200' BID = TVD |
| PROPOSAL: | D&C straight hole 6,200' | | |
| | | Latest Revision: | 12/16/2016 –GLR |

| CODE or SUB | CLASSIFICATION | DRY/HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 0100 | **LEASEHOLD COSTS** | | | |
| 03 | SURFACE DAMAGES and RIGHT OF WAY | | | |
| 70 | DRILL SITE ABSTRACT | | | |
| 81 | LEGAL FEES | | | |
| 82 | MISCELLANEOUS – Scout Fee | 17,500 | | 17,500 |
| 83 | DRILL SITE TITLE OPINION & CURATIVE | | | |
| 89 | BROKERAGE COSTS | | | |
| 90 | LAND/MAP COSTS | | | |
| | TOTAL LEASEHOLD COSTS | $17,500 | $0 | $17,500 |

| 0200/0300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
|---|---|---|---|---|
| 01 | SURVEY, DOC HEARINGS, PERMITS | 2,000 | 2,000 | 4,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 220,000 | 5,000 | 225,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 40,000 | | 40,000 |
| 04 | SURFACE DAMAGES & ROW | | | |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE (75000 up $75000 down) | | | |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | 325,000 | | 325,000 |
| 10 | DAYWORK WITH DRILL PIPE (x comp days @ $1150/day) | | 46,000 | 46,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 30,000 | 4,000 | 34,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | | | |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS (from quote) | | | |
| 17 | MUD & CHEMICALS (from quote) | | | |
| 19 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 30,000 | | 30,000 |
| 24 | CEMENTING & EQUIPMENT | | 34,500 | 34,500 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 18,000 | 18,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | | 14,000 | 14,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 10,000 | 2,500 | 12,500 |
| 31 | FUEL | | | |
| 32 | BITS (S@$5000) | | | |
| 33 | TRANSPORTATION & TRUCKING | 20,000 | 16,000 | 36,000 |
| 34 | CONTRACT LABOR | 25,000 | 10,000 | 35,000 |
| 35 | SAFETY & H2S TRAINING (10 days @ $1000/day) | 10,000 | | 10,000 |
| 36 | LOGGING & WIRELINE | 25,000 | 10,000 | 35,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | 5,000 | 5,000 |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 4,000 | | 4,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 30,000 | 30,000 |
| 47 | PERFORATION SERVICES (2 zones @ $20000/zone) | | 40,000 | 40,000 |
| 48 | COMPLETION FLUIDS | | 5,000 | 5,000 |
| 49 | STIMULATION SERVICES (1 frac zones @ $100000/zone, from quote) | | 100,000 | 100,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 3,000 | 3,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,900 | 10,900 |
| 65 | PLUG & ABANDON COSTS | 40,000 | -40,000 | |
| 78 | INSURANCE | 10,000 | | 10,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 14,000 | 2,900 | 15,000 |
| 82 | MISCELLANEOUS: x% contingency | 40,500 | 16,675 | 56,575 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $850,500 | $327,575 | $1,168,075 |

| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
|---|---|---|---|---|
| 02 | SURFACE CASING (9-5/8") | | | |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 7,500 | | 7,500 |
| 06 | CONDUCTOR CASING | | | |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $8,000 | $0 | $8,000 |

| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
|---|---|---|---|---|
| 21 | PRODUCTION CASING & LINERS (4-1/2")/(9200ft @$8.10/ft) | | 74,520 | 74,520 |
| 22 | TUBING (2-3/8")/(9000 ft.@$5/ft) | | 45,000 | 45,000 |
| 23 | PACKERS | | 20,000 | 20,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 24,900 | 24,900 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 0 | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | 0 | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $169,000 | $169,000 |

| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
|---|---|---|---|---|
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 0 | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 100,000 | 100,000 |
| 42 | COMPRESSION (VRU) | | 0 | |
| 43 | TANK BATTERY COST (3 gas well) | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 30,000 | 30,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 0 | |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $174,000 | $174,000 |

| | TOTAL EQUIPMENT | $8,000 | $343,000 | $351,000 |

| | TOTAL WELL COST | $876,000 | $680,575 | $1,556,575 |

APPROVED:   1/19     2014-2016

BY:

OEE Insurance Election (Please check your election below):

☐ Coverage under own policy with limits not less than _____

☑ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

**SKLAR Exploration Company L.L.C.**
401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-6868

**AUTHORITY FOR EXPENDITURE**

| DATE: | January 10, 2016 | FIELD: | East Castor |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | LA |
| WELL: | Echo Papa 10-10 #1 | HORIZON: | Hosston |
| LOCATION: | Section 10, T14N - R7W, Bienville Parish | PROJ. T.D.: | 9,200' MD = TVD |
| PROPOSAL: | D&C straight hole 9,200' | | |
| | | Latest Revision: | 12/3/2015 - GLR |

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 03 | SURFACE DAMAGES AND RIGHT OF WAY | | | |
| 79 | DRILL SITE ABSTRACT | | | |
| 81 | LEGAL FEES | | | |
| 82 | MISCELLANEOUS - Spud Fee | 17,500 | | 17,500 |
| 83 | DRILL SITE TITLE OPINION & CURATIVE | | | |
| 89 | BROKERAGE COSTS | | | |
| 90 | LANDMAN COSTS | | | |
| | **TOTAL LEASEHOLD COSTS** | $17,500 | $0 | $17,500 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 2,000 | 2,000 | 4,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 220,000 | 5,000 | 225,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 40,000 | | 40,000 |
| 04 | SURFACE DAMAGES & ROW | | | |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE($75000 up $75000 down) | | | |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | 325,000 | | 325,000 |
| 10 | DAYWORK WITH DRILL PIPE(4 comp days @ $11500/day) | | 46,000 | 46,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG STANDBY & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 30,000 | 4,000 | 34,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | | | |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS(from quote) | | | |
| 17 | MUD & CHEMICALS(from quote) | | | |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 30,000 | | 30,000 |
| 24 | CEMENTING & EQUIPMENT | | 34,000 | 34,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 18,000 | 18,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | | 14,000 | 14,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 10,000 | 2,500 | 12,500 |
| 31 | FUEL | | | |
| 32 | BITS (5@$8000) | | | |
| 33 | TRANSPORTATION & TRUCKING | 20,000 | 16,000 | 36,000 |
| 34 | CONTRACT LABOR | 25,000 | 10,000 | 35,000 |
| 35 | SAFETY & H2S TRAINING (10 days @ $1000/day) | 10,000 | | 10,000 |
| 36 | LOGGING & WIRELINE | 25,000 | 10,000 | 35,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | 5,000 | 5,000 |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 4,000 | | 4,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 30,000 | 30,000 |
| 47 | PERFORATION SERVICES (2 zones @ $20000/zone) | | 40,000 | 40,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES(1 frac zones @ $100000/zone, from quote) | | 100,000 | 100,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 3,000 | 3,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 40,000 | -40,000 | |
| 78 | INSURANCE | 10,000 | | 10,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 14,000 | 2,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 40,500 | 16,075 | 56,575 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $850,500 | $337,575 | $1,188,075 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING (9-5/8") | | | |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 7,500 | | 7,500 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $8,000 | $0 | $8,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS  (4-1/2")(9200ft @$8.10/ft) | | 74,520 | 74,520 |
| 22 | TUBING (2-3/8")(9000 ft @$5/ft) | | 45,000 | 45,000 |
| 23 | PACKERS | | 20,000 | 20,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 24,000 | 24,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 0 | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $168,000 | $168,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 0 | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 100,000 | 100,000 |
| 42 | COMPRESSION (VRU) | | 0 | |
| 43 | TANK BATTERY COSTS(gas well) | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 30,000 | 30,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 0 | |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $174,000 | $174,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $8,000 | $343,000 | $351,000 |
| | | | | |
| | **TOTAL WELL COST** | $876,000 | $680,575 | $1,556,575 |

APPROVED: _J. L. Marlar_ , 2016

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than _____
☑ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

# SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8688

## AUTHORITY FOR EXPENDITURE

| | | |
|---|---|---|
| DATE: | January 10, 2016 | FIELD: North Saline |
| OPERATOR: | Sklar Exploration Company LLC | STATE: LA |
| WELL: | Pavillion 4-7 #1 | HORIZON: Hosston |
| LOCATION: | Section 4, T14N - R6W, Bienville Parish | PROJ. T.D.: 10,100' MD = TVD |

PROPOSAL:  D&C straight hole 10,100'

Latest Revision:   1-Oct-15

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | LEASEHOLD COSTS | | | |
| 09 | SURFACE DAMAGES AND RIGHT OF WAY | | | |
| 79 | DRILL SITE ABSTRACT | | | |
| 81 | LEGAL FEES | | | |
| 82 | MISCELLANEOUS - Spud Fee | 17,500 | | 17,500 |
| 83 | DRILL SITE TITLE OPINION & CURATIVE | | | |
| 89 | BROKERAGE COSTS | | | |
| 90 | LANDMAN COSTS | | | |
| | TOTAL LEASEHOLD COSTS | $17,500 | $0 | $17,500 |
| | | | | |
| 9200/9300 | INTANGIBLE DRILLING & COMPLETION | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 2,000 | 2,000 | 4,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 376,000 | 5,000 | 381,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 40,000 | | 40,000 |
| 04 | SURFACE DAMAGES & ROW | 10,000 | | 10,000 |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE | | | |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | 355,000 | | 355,000 |
| 10 | DAYWORK WITH DRILL PIPE(4 comp days @ $11500/day) | | 46,000 | 46,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION: | 30,000 | 4,000 | 34,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | | | |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS(from quote) | | | |
| 17 | MUD & CHEMICALS(from quote) | | | |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 23,000 | | 23,000 |
| 24 | CEMENTING & EQUIPMENT | | 34,000 | 34,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 25,000 | 25,000 |
| 26 | PIPE TESTING | | 8,000 | 8,000 |
| 27 | EQUIPMENT RENTALS | | 14,000 | 14,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 10,000 | 2,500 | 12,500 |
| 31 | FUEL | | | |
| 32 | BITS (5@$8000) | | | |
| 33 | TRANSPORTATION & TRUCKING | 20,000 | 16,000 | 36,000 |
| 34 | CONTRACT LABOR | 25,000 | 10,000 | 35,000 |
| 35 | SAFETY & H2S TRAINING (10 days @ $1000/day) | 10,000 | | 10,000 |
| 36 | LOGGING & WIRELINE | 25,000 | 10,000 | 35,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | 5,000 | 5,000 |
| 38 | CORING & ANALYSIS | | 10,000 | 10,000 |
| 39 | GEOLOGICAL | 4,000 | | 4,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 30,000 | 30,000 |
| 47 | PERFORATION SERVICES (2 zones @ $20000/zone) | | 40,000 | 40,000 |
| 48 | COMPLETION FLUIDS | | 7,500 | 7,500 |
| 49 | STIMULATION SERVICES(1 frac zones @ $100000/zone, from quote) | | 100,000 | 100,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 3,000 | 3,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 40,000 | -40,000 | |
| 78 | INSURANCE | 10,000 | | 10,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 14,000 | 2,000 | 16,000 |
| 82 | MISCELLANEOUS; ±5% contingency | 49,950 | 17,200 | 67,150 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $1,049,000 | $361,000 | $1,410,000 |
| | | | | |
| 9500 | TANGIBLE EQUIPMENT - DRILLING | | | |
| 02 | SURFACE CASING (9-5/8") | | | |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 7,500 | | 7,500 |
| 06 | CONDUCTOR CASING | | | |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $8,000 | $0 | $8,000 |
| | | | | |
| 9520 | TANGIBLE EQUIPMENT - COMPLETION | | | |
| 21 | PRODUCTION CASING & LINERS  (4-1/2")(10,100ft @$8/ft) | | 80,800 | 80,800 |
| 22 | TUBING (2-3/8")(10,100 ft @$4.50/ft) | | 45,400 | 45,400 |
| 23 | PACKERS | | 20,000 | 20,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 24,000 | 24,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 0 | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $175,000 | $175,000 |
| | | | | |
| 9535 | SURFACE PRODUCTION EQUIPMENT | | | |
| 35 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 0 | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 100,000 | 100,000 |
| 42 | COMPRESSION (VRU) | | 0 | |
| 43 | TANK BATTERY COSTS(as well) | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 30,000 | 30,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 0 | |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $174,000 | $174,000 |
| | | | | |
| | TOTAL EQUIPMENT | $8,000 | $349,000 | $357,000 |
| | | | | |
| | TOTAL WELL COST | $1,074,500 | $710,000 | $1,784,500 |

APPROVED: _____ 2014.

BY: _____

1-15-16

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than _____

☐ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

SKLAR Exploration Company L.L.C.
401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8688

349 W 135

## AUTHORITY FOR EXPENDITURE

| DATE: | January 10, 2016 | FIELD: | East Castor |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | LA |
| WELL: | Echo Paps 10-10 #1 | HORIZON: | Hosston |
| LOCATION: | Section 10, T14N - R7W, Bienville Parish | PROJ. T.D.: | 9,200' MD = TVD |

PROPOSAL:   D&C straight hole 9,200'

Latest Revision:   12/3/2015 - GLR

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | LEASEHOLD COSTS | | | |
| 03 | SURFACE DAMAGES AND RIGHT OF WAY | | | |
| 79 | DRILL SITE ABSTRACT | | | |
| 81 | LEGAL FEES | | | |
| 82 | MISCELLANEOUS - Spud Fee | 17,500 | | 17,500 |
| 83 | DRILL SITE TITLE OPINION & CURATIVE | | | |
| 89 | BROKERAGE COSTS | | | |
| 90 | LANDMAN COSTS | | | |
| | TOTAL LEASEHOLD COSTS | $17,500 | $0 | $17,500 |
| | | | | |
| 9200/9300 | INTANGIBLE DRILLING & COMPLETION | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 2,000 | 2,000 | 4,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 220,000 | 5,000 | 225,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 40,000 | | 40,000 |
| 04 | SURFACE DAMAGES & ROW | | | |
| 05 | SETTING CONDUCTOR CASING | | | |
| 09 | RIG MOBILIZE/DEMOBILIZE($75000 up $75000 down) | | | |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | 325,000 | | 325,000 |
| 10 | DAYWORK WITH DRILL PIPE(4 comp days @ $11500/day) | | 46,000 | 46,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 30,000 | 4,000 | 34,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | | | |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS(from quote) | | | |
| 17 | MUD & CHEMICALS(from quote) | | | |
| 18 | MUD DISPOSAL | | | 30,000 |
| 23 | MUD LOGGING | 30,000 | | 30,000 |
| 24 | CEMENTING & EQUIPMENT | | 34,000 | 34,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 18,000 | 18,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | | 14,000 | 14,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 10,000 | 2,500 | 12,500 |
| 31 | FUEL | | | |
| 32 | BITS (5@$8000) | | | |
| 33 | TRANSPORTATION & TRUCKING | 20,000 | 16,000 | 36,000 |
| 34 | CONTRACT LABOR | 25,000 | 10,000 | 35,000 |
| 35 | SAFETY & H2S TRAINING (10 days @ $1000/day) | 10,000 | | 10,000 |
| 36 | LOGGING & WIRELINE | 25,000 | 10,000 | 35,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | 5,000 | 5,000 |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 4,000 | | 4,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 30,000 | 30,000 |
| 47 | PERFORATION SERVICES (2 zones @ $20000/zone) | | 40,000 | 40,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES(1 frac zones @ $100000/zone, from quote) | | 100,000 | 100,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | 3,000 | 3,000 |
| 61 | SALT WATER DISPOSAL | | | |
| 63 | HOT OIL SERVICE | | 10,000 | 10,000 |
| 64 | SWABBING UNIT | | | |
| 65 | PLUG & ABANDON COSTS | 40,000 | -40,000 | |
| 78 | INSURANCE | 10,000 | | 10,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 14,000 | 2,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 40,500 | 16,075 | 56,575 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $850,500 | $337,575 | $1,188,075 |
| | | | | |
| 9500 | TANGIBLE EQUIPMENT - DRILLING | | | |
| 02 | SURFACE CASING (9-5/8") | | | |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 7,500 | | 7,500 |
| 08 | CONDUCTOR CASING | | | |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $8,000 | $0 | $8,000 |
| | | | | |
| 9620 | TANGIBLE EQUIPMENT - COMPLETION | | | |
| 21 | PRODUCTION CASING & LINERS  (4-1/2")(9200ft @$8.10/ft) | | 74,520 | 74,520 |
| 22 | TUBING (2-3/8")(9000 ft @$5/ft) | | 45,000 | 45,000 |
| 23 | PACKERS | | 20,000 | 20,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 24,000 | 24,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 0 | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $169,000 | $169,000 |
| | | | | |
| 9535 | SURFACE PRODUCTION EQUIPMENT | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 0 | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 100,000 | 100,000 |
| 42 | COMPRESSION (VRU) | | 0 | |
| 43 | TANK BATTERY COSTS(gas well) | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 30,000 | 30,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 0 | |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $174,000 | $174,000 |
| | | | | |
| | TOTAL EQUIPMENT | $8,000 | $343,000 | $351,000 |
| | | | | |
| | TOTAL WELL COST | $876,000 | $680,575 | $1,556,575 |

APPROVED: _____ 2014.   1-15-16

BY: _____

OEE Insurance Election (Please check your election below):
☑ Coverage under own policy with limits not less than _____
☐ Coverage under Operator's policy   10 % BEP  9% BEP

NOTE: If no election is checked or owner
has not supplied proof of coverage
prior to spud, owner will be included
under and charged for SEC's OEE
coverage.

## SKLAR Exploration Company L.L.C.
401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8666

### AUTHORITY FOR EXPENDITURE

| DATE: | January 10, 2016 | FIELD: | East Castor |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | LA |
| WELL: | Echo Papa 10-10 #1 | HORIZON: | Hosston |
| LOCATION: | Section 10, T14N - R7W, Bienville Parish | PROJ. T.D.: | 9,200' MD = TVD |

PROPOSAL:   D&C straight hole 9,200'

Latest Revision:   12/3/2015 - GLR

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 03 | SURFACE DAMAGES AND RIGHT OF WAY | | | |
| 79 | DRILL SITE ABSTRACT | | | |
| 81 | LEGAL FEES | | | |
| 82 | MISCELLANEOUS - Spud Fee | 17,500 | | 17,500 |
| 83 | DRILL SITE TITLE OPINION & CURATIVE | | | |
| 89 | BROKERAGE COSTS | | | |
| 90 | LANDMAN COSTS | | | |
| | **TOTAL LEASEHOLD COSTS** | $17,500 | $0 | $17,500 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 2,000 | 2,000 | 4,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 220,000 | 5,000 | 225,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 40,000 | | 40,000 |
| 04 | SURFACE DAMAGES & ROW | | | |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE($75000 up $75000 down) | | | |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | 325,000 | | 325,000 |
| 10 | DAYWORK WITH DRILL PIPE(4 comp days @ $11500/day) | | 46,000 | 46,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION: | 30,000 | 4,000 | 34,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | | | |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS(from quote) | | | |
| 17 | MUD & CHEMICALS(from quote) | | | |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 30,000 | | 30,000 |
| 24 | CEMENTING & EQUIPMENT | | 34,000 | 34,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 18,000 | 18,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | | 14,000 | 14,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 10,000 | 2,500 | 12,500 |
| 31 | FUEL | | | |
| 32 | BITS (5@$8000) | | | |
| 33 | TRANSPORTATION & TRUCKING | 20,000 | 16,000 | 36,000 |
| 34 | CONTRACT LABOR | 25,000 | 10,000 | 35,000 |
| 35 | SAFETY & H2S TRAINING (10 days @ $1000/day) | 10,000 | | 10,000 |
| 36 | LOGGING & WIRELINE | 25,000 | 10,000 | 35,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | 5,000 | 5,000 |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 4,000 | | 4,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 30,000 | 30,000 |
| 47 | PERFORATION SERVICES (2 zones @ $20000/zone) | | 40,000 | 40,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES(1 frac zones @ $100000/zone, from quote) | | 100,000 | 100,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 3,000 | 3,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 40,000 | -40,000 | |
| 78 | INSURANCE | 10,000 | | 10,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 14,000 | 2,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 40,500 | 16,075 | 56,575 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $850,500 | $337,575 | $1,188,075 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING (9-5/8") | | | |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 7,500 | | 7,500 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $8,000 | $0 | $8,000 |
| | | | | |
| 9320 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS  (4-1/2")(9200ft @$8.10/ft) | | 74,520 | 74,520 |
| 22 | TUBING (2-3/8")(9000 ft @$5/ft) | | 45,000 | 45,000 |
| 23 | PACKERS | | 20,000 | 20,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 24,000 | 24,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 0 | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $169,000 | $169,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 0 | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 100,000 | 100,000 |
| 42 | COMPRESSION (VRU) | | 0 | |
| 43 | TANK BATTERY COSTS(gas well) | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 30,000 | 30,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 0 | |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $174,000 | $174,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $8,000 | $343,000 | $351,000 |
| | | | | |
| | **TOTAL WELL COST** | $876,000 | $680,575 | $1,556,575 |

APPROVED: _____ 2016

BY: _____

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than _____ .
☑ Coverage under Operator's policy

Lucas Petroleum Group, Inc.

**Fain Brock, President**

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

*Signed & Returned*
*Date: 1·26·16*

*Copied for Acctg.*

SCANNED

# SKLAR Exploration Company L.L.C.

401 Edwards St., Suite 1601
Shreveport, LA 71101
(318) 227-6886

## AUTHORITY FOR EXPENDITURE

| DATE: | January 10, 2016 | FIELD: | East Castor |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | LA |
| WELL: | Echo Papa 10-10 #1 | HORIZON: | Hosston |
| LOCATION: | Section 10, T14N - R7W, Bienville Parish | PROJ. T.D.: | 9,200' MD = TVD |

PROPOSAL: D&C straight hole 9,200'

Latest Revision: 12/3/2015 - GLR

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | LEASEHOLD COSTS | | | |
| 03 | SURFACE DAMAGES AND RIGHT OF WAY | | | |
| 79 | DRILL SITE ABSTRACT | | | |
| 81 | LEGAL FEES | | | |
| 82 | MISCELLANEOUS - Spud Fee | 17,500 | | 17,500 |
| 83 | DRILL SITE TITLE OPINION & CURATIVE | | | |
| 89 | BROKERAGE COSTS | | | |
| 90 | LANDMAN COSTS | | | |
| | TOTAL LEASEHOLD COSTS | $17,500 | $0 | $17,500 |
| | | | | |
| 9200/9300 | INTANGIBLE DRILLING & COMPLETION | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 2,000 | 2,000 | 4,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 220,000 | 5,000 | 225,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 40,000 | | 40,000 |
| 04 | SURFACE DAMAGES & ROW | | | |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOBILIZE/DEMOBILIZE($75000 up $75000 down) | | | |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | 325,000 | | 325,000 |
| 10 | DAYWORK WITH DRILL PIPE(4 comp days @ $11500/day) | | 46,000 | 46,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION: | 30,000 | 4,000 | 34,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | | | |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS(from quote) | | | |
| 17 | MUD & CHEMICALS(from quote) | | | |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 30,000 | | 30,000 |
| 24 | CEMENTING & EQUIPMENT | | 34,000 | 34,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | | 18,000 | 18,000 |
| 26 | PIPE TESTING | | 4,000 | 4,000 |
| 27 | EQUIPMENT RENTALS | | 14,000 | 14,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 10,000 | 2,500 | 12,500 |
| 31 | FUEL | | | |
| 32 | BITS (5@$5000) | | | |
| 33 | TRANSPORTATION & TRUCKING | 20,000 | 16,000 | 36,000 |
| 34 | CONTRACT LABOR | 25,000 | 10,000 | 35,000 |
| 35 | SAFETY & H2S TRAINING (10 days @ $1000/day) | 10,000 | | 10,000 |
| 36 | LOGGING & WIRELINE | 25,000 | 10,000 | 35,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | 5,000 | 5,000 |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 4,000 | | 4,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 30,000 | 30,000 |
| 47 | PERFORATION SERVICES (2 zones @ $20000/zone) | | 40,000 | 40,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES(1 frac zones @ $100000/zone, from quote) | | 100,000 | 100,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 3,000 | 3,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 40,000 | -40,000 | |
| 78 | INSURANCE | 10,000 | | 10,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 14,000 | 2,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 40,500 | 16,075 | 56,575 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $850,500 | $337,575 | $1,188,075 |
| | | | | |
| 9500 | TANGIBLE EQUIPMENT - DRILLING | | | |
| 02 | SURFACE CASING (9-5/8") | | | |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 05 | WELLHEAD EQUIPMENT | 7,500 | | 7,500 |
| 06 | CONDUCTOR CASING | | | |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $8,000 | $0 | $8,000 |
| | | | | |
| 9520 | TANGIBLE EQUIPMENT - COMPLETION | | | |
| 21 | PRODUCTION CASING & LINERS (4-1/2")(9200ft @$8.10/ft) | | 74,520 | 74,520 |
| 22 | TUBING (2-3/8")(9000 ft @$5/ft) | | 45,000 | 45,000 |
| 23 | PACKERS | | 20,000 | 20,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 24,000 | 24,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 0 | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $169,000 | $169,000 |
| | | | | |
| 9535 | SURFACE PRODUCTION EQUIPMENT | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 0 | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 100,000 | 100,000 |
| 42 | COMPRESSION (VRU) | | 0 | |
| 43 | TANK BATTERY COSTS(gas well) | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 30,000 | 30,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 0 | |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $174,000 | $174,000 |
| | | | | |
| | TOTAL EQUIPMENT | $8,000 | $343,000 | $351,000 |
| | | | | |
| | TOTAL WELL COST | $876,000 | $680,575 | $1,556,575 |

APPROVED: 01/29/16 , 2014.

BY:

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than _____ .
☑ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.



Shreveport Office
401 Edwards St., Ste. 1601
Shreveport, Louisiana 71101
Phone: 318-227-8668
Facsimile: 318-227-9012

Boulder Office
5395 Pearl Parkway, Ste. 200
Boulder, Colorado 80301
Phone: 720-961-5477
Facsimile: 303-443-1551

David A. Barlow, President-Chief Operating
Officer
Telephone: 720-836-1082
E-Mail: dbarlow@sklarexploration.com

April 29, 2016

To: Parties listed on Exhibit "A" to JOA        **VIA UPS AND HAND DELIVERY**

Re: Amendment to Joint Operating Agreement dated January 1, 2016
East Castor Prospect, Bienville Parish, LA

Gentlemen:

Reference is made to that certain Joint Operating Agreement dated January 1, 2016, naming Sklar Exploration Company L.L.C. ("Operator") as Operator of the East Castor Prospect located in Bienville Parish, Louisiana (the "JOA") and the parties listed on the Exhibit "A" to the JOA (sometimes collectively referred to as the "Parties").

The Parties wish to amend and expand the Contract Area and Area of Mutual Interest as defined in Article XV. A., reflected on Exhibit "A" and depicted on Exhibit "A-2" to the JOA to include the sections described below located in Red River, Natchitoches and Bienville Parishes, Louisiana. Accordingly, the Parties hereby agree as follows:

1. The Parties hereby amend Paragraph (1) of Exhibit "A" to the JOA to read as follows:

    (1) **Identification of lands subject to this agreement:**

    **Contract Area**

    All lands, oil and gas leasehold interest and
    oil and gas interest lying within the following sections as depicted on the black
    boundary as shown on the plat designated as Exhibit "A-2"

    Township 14 North, Range 7 West,
    Section 2, Section 3, Section 10, Section 11,
    Section 14, Section 15, Section 16, Section 21,

East Castor Prospect
JOA Amendment
April 29, 2016
Page 2 of 3

Section 22, Section 23, Section 28, Section 29,
Section 31, Section 32 and Section 33,
Bienville Parish, Louisiana

The Contract Area shall automatically expand to include the lands covered by oil and gas leases or oil and gas mineral within the AMI but outside of the previously existing Contract Area (in whole or in part) acquired by one of the Parties, offered to the other Parties and shared in by one or more of those Parties.

### Area of Mutual Interest

All lands, oil and gas leasehold interest and
oil and gas interest lying within the following sections
located in Natchitoches, Red River and Bienville Parishes, Louisiana
as depicted on the red boundary as shown on the plat designated as Exhibit "A-2"

Township 14 North, Range 7 West,
Sections 1, 2, 3, 4, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19,
20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33 and 34

Township 15 North, Range 7 West
Sections 33, 34, 35 and 36

Township 13 North, Range 7 West
Sections 3, 4, 5, 7 and 8

Township 14 North, Range 8 West
Sections 25, 34, 35 and 36

Township 13 North Range 8 West
Sections 3, 10, 11 and 12

2. The Parties also hereby amend and replace the Exhibit "A-2" to the JOA with the plat attached hereto and labeled Exhibit "A-2".

3. The Parties further stipulate that the Echo Papa 10-10 #1 well located in Section 10, Township 14 North, Range 7 West, Bienville Parish, Louisiana was the Initial Test Well in the East Castor Prospect under that certain Restated Participation Agreement effective May 1, 2014, among the Parties, and that accordingly, all costs and expenses, including the costs to be incurred hereafter by the Parties in acquiring and developing leasehold interests in the expanded AMI described above, shall be borne by the Parties according to the Expenses Interests stated below:

| Parties | ACP WI |
|---|---|
| AEEC II, L.L.C. | 34.983333% |
| LeFrak Energy Investors, L.P. | 22.50% |
| Bodcaw 3-D, LLC | 2.70% |

East Castor Prospect
JOA Amendment
April 29, 2016
Page 3 of 3

| | |
|---|---|
| McCombs Energy, Ltd. | 9.00% |
| Lucas Petroleum Group, Inc. | 5.166667% |
| JJS Working Interest, LLC | 1.80% |
| Sklarco L.L.C. | 18.85% |
| Wuellner Oil & Gas, Inc. | 5.0% |
| Total | 100.00% |

4.  The Parties authorize Operator to acquire Leases covering lands in Sections 16, 21, 22, 23, 28, 29, 31, 32 and 33 of Township 14 North, Range 7 West, Bienville Parish, Louisiana, and each Party agrees to pay its Expense Interest share, as set forth in Paragraph 3 above, of all costs incurred in acquiring such Leases, including bonus and brokerage costs, and including a retainer to be paid to Hunter Energy, Inc., the lease broker, in the amount of $100,000.00.

Since time is of the essence, please signify your agreement as set forth above by executing in the space provided below and return it to the undersigned within five business days.  This JOA Amendment shall not be effective as to any party unless all Parties execute the Amendment.

Sincerely,

SKLAR EXPLORATION COMPANY L.L.C.

By:_____
    David A. Barlow
    President


APPROVED AS OF THIS _____ DAY OF APRIL, 2016

Entity: _AEEC II, L.L.C._____

By: _____

Title: _Agent_____

Date: _4-29-2016_____

East Castor Prospect
JOA Amendment
April 29, 2016
Page 3 of 3

| | |
|---|---|
| McCombs Energy, Ltd. | 9.00% |
| Lucas Petroleum Group, Inc. | 5.166667% |
| JJS Working Interest, LLC | 1.80% |
| Sklarco L.L.C. | 18.85% |
| Wuellner Oil & Gas, Inc. | 5.0% |
| Total | 100.00% |

4. The Parties authorize Operator to acquire Leases covering lands in Sections 16, 21, 22, 23, 28, 29, 31, 32 and 33 of Township 14 North, Range 7 West, Bienville Parish, Louisiana, and each Party agrees to pay its Expense Interest share, as set forth in Paragraph 3 above, of all costs incurred in acquiring such Leases, including bonus and brokerage costs, and including a retainer to be paid to Hunter Energy, Inc., the lease broker, in the amount of $100,000.00.

Since time is of the essence, please signify your agreement as set forth above by executing in the space provided below and return it to the undersigned within five business days. This JOA Amendment shall not be effective as to any party unless all Parties execute the Amendment.

Sincerely,

SKLAR EXPLORATION COMPANY L.L.C.

By: _____
    David A. Barlow
    President


APPROVED AS OF THIS _____ DAY OF APRIL, 2016

Entity: LEFRAK ENERGY INVESTORS, L.P.
        BY: LEFRAK NY ENERGY INVESTOS, LLC GP
        BY: RSL WOODMERE MGT. CORP., MANAGER

By: _____
    Richard Papert

Title: VICE PRESIDENT

Date: _____

East Castor Prospect
JOA Amendment
April 29, 2016
Page 3 of 3

| McCombs Energy, Ltd. | 9.00% |
|---|---|
| Lucas Petroleum Group, Inc. | 5.166667% |
| JJS Working Interest, LLC | 1.80% |
| Sklarco L.L.C. | 18.85% |
| Wuellner Oil & Gas, Inc. | 5.0% |
| Total | 100.00% |

4. The Parties authorize Operator to acquire Leases covering lands in Sections 16, 21, 22, 23, 28, 29, 31, 32 and 33 of Township 14 North, Range 7 West, Bienville Parish, Louisiana, and each Party agrees to pay its Expense Interest share, as set forth in Paragraph 3 above, of all costs incurred in acquiring such Leases, including bonus and brokerage costs, and including a retainer to be paid to Hunter Energy, Inc., the lease broker, in the amount of $100,000.00.

Since time is of the essence, please signify your agreement as set forth above by executing in the space provided below and return it to the undersigned within five business days. This JOA Amendment shall not be effective as to any party unless all Parties execute the Amendment.

Sincerely,

SKLAR EXPLORATION COMPANY L.L.C.

By: _____

David A. Barlow
President

APPROVED AS OF THIS 29th DAY OF APRIL, 2016

Entity: Lucas Petroleum Group, Inc.

By: _____

Title: Fain Brock, President

Date: 5·2·16

East Castor Prospect
JOA Amendment
April 29, 2016
Page 3 of 3

| | |
|---|---|
| McCombs Energy, Ltd. | 9.00% |
| Lucas Petroleum Group, Inc. | 5.166667% |
| JJS Working Interest, LLC | 1.80% |
| Sklarco L.L.C. | 18.85% |
| Wuellner Oil & Gas, Inc. | 5.0% |
| Total | 100.00% |

4.  The Parties authorize Operator to acquire Leases covering lands in Sections 16, 21, 22, 23, 28, 29, 31, 32 and 33 of Township 14 North, Range 7 West, Bienville Parish, Louisiana, and each Party agrees to pay its Expense Interest share, as set forth in Paragraph 3 above, of all costs incurred in acquiring such Leases, including bonus and brokerage costs, and including a retainer to be paid to Hunter Energy, Inc., the lease broker, in the amount of $100,000.00.

Since time is of the essence, please signify your agreement as set forth above by executing in the space provided below and return it to the undersigned within five business days.  This JOA Amendment shall not be effective as to any party unless all Parties execute the Amendment.

Sincerely,

SKLAR EXPLORATION COMPANY L.L.C.

By:

David A. Barlow
President


APPROVED AS OF THIS _29th_ DAY OF APRIL, 2016

Entity: _Wuellner Oit & Gas Inc_
By: _Dirck E. Wuellner_
Title: _President_
Date: _4/29/16_

East Castor Prospect
JOA Amendment
April 29, 2016
Page 3 of 3

| | |
|---|---|
| McCombs Energy, Ltd. | 9.00% |
| Lucas Petroleum Group, Inc. | 5.166667% |
| JJS Working Interest, LLC | 1.80% |
| Sklarco L.L.C. | 18.85% |
| Wuellner Oil & Gas, Inc. | 5.0% |
| Total | 100.00% |

4.  The Parties authorize Operator to acquire Leases covering lands in Sections 16, 21, 22, 23, 28, 29, 31, 32 and 33 of Township 14 North, Range 7 West, Bienville Parish, Louisiana, and each Party agrees to pay its Expense Interest share, as set forth in Paragraph 3 above, of all costs incurred in acquiring such Leases, including bonus and brokerage costs, and including a retainer to be paid to Hunter Energy, Inc., the lease broker, in the amount of $100,000.00.

Since time is of the essence, please signify your agreement as set forth above by executing in the space provided below and return it to the undersigned within five business days. This JOA Amendment shall not be effective as to any party unless all Parties execute the Amendment.

Sincerely,

SKLAR EXPLORATION COMPANY L.L.C.

By: _____

   David A. Barlow
   President


APPROVED AS OF THIS 29ᵗʰ DAY OF APRIL, 2016

Entity: _Bodcaw 3-D, LLC_

By: _____

Title: _Manager_

Date: _4/29/16_

East Castor Prospect
JOA Amendment
April 29, 2016
Page 3 of 3

| McCombs Energy, Ltd. | 9.00% |
|---|---|
| Lucas Petroleum Group, Inc. | 5.166667% |
| JJS Working Interest, LLC | 1.80% |
| Sklarco L.L.C. | 18.85% |
| Wuellner Oil & Gas, Inc. | 5.0% |
| Total | 100.00% |

4.  The Parties authorize Operator to acquire Leases covering lands in Sections 16, 21, 22, 23, 28, 29, 31, 32 and 33 of Township 14 North, Range 7 West, Bienville Parish, Louisiana, and each Party agrees to pay its Expense Interest share, as set forth in Paragraph 3 above, of all costs incurred in acquiring such Leases, including bonus and brokerage costs, and including a retainer to be paid to Hunter Energy, Inc., the lease broker, in the amount of $100,000.00.

Since time is of the essence, please signify your agreement as set forth above by executing in the space provided below and return it to the undersigned within five business days. This JOA Amendment shall not be effective as to any party unless all Parties execute the Amendment.

Sincerely,

SKLAR EXPLORATION COMPANY L.L.C.

By: _____
       David A. Barlow
       President

APPROVED AS OF THIS 29 DAY OF APRIL, 2016

Entity: McCombs Energy, Ltd.

By: _____

Title: President

Date: April 29, 2016

East Castor Prospect
JOA Amendment
April 29, 2016
Page 3 of 3

| | |
|---|---|
| McCombs Energy, Ltd. | 9.00% |
| Lucas Petroleum Group, Inc. | 5.166667% |
| JJS Working Interest, LLC | 1.80% |
| Sklarco L.L.C. | 18.85% |
| Wuellner Oil & Gas, Inc. | 5.0% |
| Total | 100.00% |

4. The Parties authorize Operator to acquire Leases covering lands in Sections 16, 21, 22, 23, 28, 29, 31, 32 and 33 of Township 14 North, Range 7 West, Bienville Parish, Louisiana, and each Party agrees to pay its Expense Interest share, as set forth in Paragraph 3 above, of all costs incurred in acquiring such Leases, including bonus and brokerage costs, and including a retainer to be paid to Hunter Energy, Inc., the lease broker, in the amount of $100,000.00.

Since time is of the essence, please signify your agreement as set forth above by executing in the space provided below and return it to the undersigned within five business days. This JOA Amendment shall not be effective as to any party unless all Parties execute the Amendment.

Sincerely,

SKLAR EXPLORATION COMPANY L.L.C.

By: _____
        David A. Barlow
        President


APPROVED AS OF THIS _____ DAY OF APRIL, 2016

Entity: _JJS Working Interest, LLC_

By: _____

Title: _President_

Date: _05/11/16_

East Castor Prospect
JOA Amendment
April 29, 2016
Page 3 of 3

| | |
|---|---|
| McCombs Energy, Ltd. | 9.00% |
| Lucas Petroleum Group, Inc. | 5.166667% |
| JJS Working Interest, LLC | 1.80% |
| Sklarco L.L.C. | 18.85% |
| Wuellner Oil & Gas, Inc. | 5.0% |
| Total | 100.00% |

4.  The Parties authorize Operator to acquire Leases covering lands in Sections 16, 21, 22, 23, 28, 29, 31, 32 and 33 of Township 14 North, Range 7 West, Bienville Parish, Louisiana, and each Party agrees to pay its Expense Interest share, as set forth in Paragraph 3 above, of all costs incurred in acquiring such Leases, including bonus and brokerage costs, and including a retainer to be paid to Hunter Energy, Inc., the lease broker, in the amount of $100,000.00.

Since time is of the essence, please signify your agreement as set forth above by executing in the space provided below and return it to the undersigned within five business days. This JOA Amendment shall not be effective as to any party unless all Parties execute the Amendment.

Sincerely,

SKLAR EXPLORATION COMPANY L.L.C.

By: _____
    David A. Barlow
    President


APPROVED AS OF THIS _____ DAY OF APRIL, 2016

Entity: _____

By: _____

Title: _____

Date: _____

## EXHIBIT A-2

Attached to and made a part of that certain Operating Agreement (East Castor) dated effective as of January 1, 2016, by and between SKLAR EXPLORATION COMPANY, as Operator, and SKLARCO L.L.C., ET AL., as NON-OPERATORS