A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

<u>February 15</u> , 19<u>99</u> ,

OPERATOR  <u>BRAMMER ENGINEERING, INC.</u>

CONTRACT  AREA  <u>South one-half (S/2) of Section 16 and the North</u>

<u>one-half (N/2) of Section 21, Township 18 North, Range 7 West.</u>

XXXXXXXXXX PARISH OF  <u>BIENVILLE</u>  STATE OF  <u>LOUISIANA</u>

KIDD #1 WELL

GIBSLAND PROSPECT

COPYRIGHT 1982  —  ALL RIGHTS RESERVED
AMERICAN  ASSOCIATION  OF  PETROLEUM
LANDMEN, 2408 CONTINENTAL LIFE BUILDING,
FORT WORTH, TEXAS, 76102, APPROVED FORM.
A.A.P.L.  NO.  610  -  1982  REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between _____ BRAMMER ENGINEERING, INC. _____

_____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

## ARTICLE II.
## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☒ A. Exhibit "A", shall include the following information:
(1) Identification of lands subject to this agreement,
(2) Restrictions, if any, as to depths, formations, or substances,
(3) Percentages or fractional interests of parties to this agreement,
(4) Oil and gas leases and/or oil and gas interests subject to this agreement,
(5) Addresses of parties for notice purposes.

☒ B. Exhibit "B", Form of Lease.
☒ C. Exhibit "C", Accounting Procedure.
☒ D. Exhibit "D", Insurance.
☒ E. Exhibit "E", Gas Balancing Agreement.
☒ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit "G", Tax Partnership.

If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

A.A.P.L. FORM 610 - ____AL FORM OPERATING AGREEME___ - 1982

## ARTICLE III.
## INTERESTS OF PARTIES

A.  Oil and Gas Interests:

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

B.  Interests of Parties in Costs and Production:

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of ————————————————————————————which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

C.  Excess Royalties, Overriding Royalties and Other Payments:

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

D.  Subsequently Created Interests:

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

   1. If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

   2. If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

## ARTICLE IV.
## TITLES

A.  Title Examination:

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐  Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

*Wheless IDL Exploration Company, L.L.C.

-2-

A.A.P.L. FORM 610 ·   EL FORM OPERATING AGREEM⌐ ⌐  .982

ARTICLE IV
continued

1  ☒ Option No. 2: Costs incurred by Operator/or Wheless TDL Exploration Company, L.L.C. examination
2  (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties
3  in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4  hibit "A". Operator/shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5  functions.          *Wheless TDL Exploration Company, L.L.C.
6
7  Operator and/or Wheless TDL Exploration Company, L.L.C.
   ~Each~party~shall be responsible for securing curative matter or pooling amendments or agreements required in connection
8  with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling
9  designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10 This shall not prevent any party from appearing on its own behalf at any such hearing.
11
12     No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
13 provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to par-
14 ticipate in the drilling of the well.
15
16 B. Loss of Title:
17
18     1. Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a
19 reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days
20 from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-
21 tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil
22 and gas leases and interests: and,
23     (a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be
24 entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,
25 but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;
26     (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has
27 been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-
28 curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
29 Area by the amount of the interest lost;
30     (c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is
31 increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-
32 terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such
33 well;
34     (d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has
35 failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties
36 who bore the costs which are so refunded;
37     (e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be
38 borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,
39     (f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest
40 claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in
41 connection therewith.
42
43     2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well
44 payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,
45 there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required
46 payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,
47 which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the
48 date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in
49 the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the
50 required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to
51 the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it
52 shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled
53 or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:
54     (a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,
55 up to the amount of unrecovered costs;
56     (b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of
57 oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease
58 termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
59 portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and,
60     (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest
61 lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.
62
63     3. Other Losses: All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses
64 and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
65 the Contract Area.
66
67
68
69
70

-3-

A.A.P.L. FORM 610   MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE V.
OPERATOR

A.  Designation and Responsibilities of Operator:

Brammer Engineering, Inc. _____shall be the
Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and
required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall
have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross
negligence or willful misconduct.

B.  Resignation or Removal of Operator and Selection of Successor:

    1.  Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators.
If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as
Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator   *
may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the
affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining
after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the
first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action
by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier
date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a cor-
porate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not
be the basis for removal of Operator. However, in the event any party owning  an interest in the Contract Area
becomes Operator, the deleted portions in this paragraph shall be reinstated and in full force and
effect.
    2.  Selection of Successor Operator: Upon the resignation or removal of Operator, a successor Operator shall be selected by
the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor
Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest
based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to
succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based
on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.
*or at the desire  of a majority in interest of the owners as set forth on Exhibit "A,"
C.  Employees:

    The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the
compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D.  Drilling Contracts:

    All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so
desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing
rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and
such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of in-
dependent contractors who are doing work of a similar nature.

ARTICLE VI.
DRILLING AND DEVELOPMENT

A.  Initial Well:

    On or before the 15th day of March , 19 99 , Operator shall commence the drilling of a well for
oil and gas at the following location: a surface location 1180 feet from the North Line and 1300
feet from the West Line of Section 21, Township 18 North, Range 7 West, Bienville
Parish, Louisiana

and shall thereafter continue the drilling of the well with due diligence directionally (12,700' MD) to a bottom-
hole location (12,200' TVD) 1614 feet from the South Line and 1300 feet from the
West Line of Section 16, Township 18 North, Range 7 West, Bienville Parish,
Louisiana or a depth sufficient to test the Lower Cotton Valley Formation, whichever
is the lesser depth
unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is en-
countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

    Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and
gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations in which
event Operator shall be required to test only the formation or formations to which this agreement may apply.

-4-

A.A.P.L. FORM 610 - .L FORM OPERATING AGREEMEN1 - 1982

## ARTICLE VI
### continued

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

### B. Subsequent Operations:

1. Proposed Operations: Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to rework/plug back or drill deeper may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all parties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance with the provisions hereof as if no prior proposal had been made.

2. Operations by Less than All Parties: If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is not a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement. However, in the event any party owning an interest in the Contract Area becomes Operator, the deleted portions in this paragraph shall be reinstated and in full force and effect.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision, and pay all costs incurred as a result of such proposal and the withdrawal thereof.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense. If any well drilled, reworked, deepened and/or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1  and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2  ties. Upon commencement of operations for the drilling/reworking, deepening or plugging back of any such well by Consenting Parties
   *sidetracking        completing*
3  in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4  and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5  Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6  market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7  terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8  until it reverts) shall equal the total of the following:

9
10
11      **200%**
12      (a) ~~100%~~ of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13  connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
14  Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15  Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16  Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17  Party had it participated in the well from the beginning of the operations; and
18
19
20                                                              *sidetracking*
21      (b) _500_ % of that portion of the costs and expenses of drilling/reworking, deepening, plugging back, testing and completing,
22  after deducting any cash contributions received under Article VIII.C., and _500_ % of that portion of the cost of newly acquired equip-
23  ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24  participated therein.
25
26
27
28                                      *sidetracking*
    An election not to participate in the drilling/or the deepening of a well shall be deemed an election not to participate in any re-
29  working or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30  conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31  reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
    *three        300%*
32  and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100%) of that portion of the costs of
33  the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
34  such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35  plicable as between said Consenting Parties in said well.
36
37
38
39      During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40  proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41  taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42  ticle III.D.
43
44
45                                      *completing*
46      In the case of any reworking, plugging back/or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47  of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
    *completing*
48  abandonment of a well after such reworking, plugging back/or deeper drilling, the Consenting Parties shall account for all such equip-
49  ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.
50
51
52
53      Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54  Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55  itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56  option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57  ings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
58  operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59  curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
60  realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas
61  produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62  well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63  which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64  of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65  above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.
66
67
68
69
70

-6-

A.A.P.L. FORM 610 -    └ FORM OPERATING AGREEMEN   ✓ 82

ARTICLE VI
continued

from and after 7:00 a.m.
the first day of the month
following recoupment,

1   If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2   the relinquished interest of such Non-Consenting Party shall automatically revert to it/and, from and after such reversion, such Non-
3   Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production
    Completing
4   therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging
5   back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6   the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.
7
8
9
10   Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall
11   be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
12   well conforms to the then-existing well spacing pattern for such source of supply.
13
14
15
16   The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.
17   except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well
                                                                        Completing
18   after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-
19   duction, ceases to produce in paying quantities.
20
21
22
23   3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and all tests have been
24   completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
25   reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
26   ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
27   first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
28   matical paragraph of Article VI.B.2, shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently
29   withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
30   each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
31   ties.
32
33
34
35   4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
36   also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
37   location (herein called "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
38   mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
39   affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
40   to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:
41
42
43
44   (a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
45   the initial drilling of the well down to the depth at which the sidetracking operation is initiated.
46
47
48
49   (b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
50   salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
51   provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.
52
53
54
55   In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
56   shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and
57   receive up to five (5) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time
58   incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand-
59   by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
60   ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in-
61   stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.
62
63
64
65   C.   TAKING PRODUCTION IN KIND:
66   have the right to
67   Each party shall/take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
68   exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for
69   marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any
70   party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be-

Use of this identimax mark is prohibited
except when authorized in writing by the
American Association of Petroleum Landmen

A.A.P.L. FORM 610 ·     L FORM OPERATING AGREEME     - 982

## ARTICLE VI
### continued

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3  Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5  its share of all production.

6

7  In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8  the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9  the obligation, to purchase such oil or sell it to others at any time and from time to time, for the account of the non-taking party at the
10  best price obtainable in the area for such production. Any su~~~                          ~hall be subject always to the right of the
11  owner of the production to exercise at any time its right to                                      ot previously
12  delivered to a purchaser. Any purchase or sale by Operator o      *48 hr Notice*              ble periods of
13  time as are consistent with the minimum needs of the industr                                 riod in excess
14  of one (1) year.                                                  *Art. 6 E 1*

15

16  In the event one or more parties' separate disposition of                                  ipelines and/or
17  deliveries which on a day-to-day basis for any reason are not                                tal gas sales to
18  be allocated to it, the balancing or accounting between the r                               y gas balancing
19  agreement between the parties hereto, whether such an ag                                    nent.

20

21  D.  Access to Contract Area and Information:

22

23  Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
25  and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with
26  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29  quests the information.

30

31  E.  Abandonment of Wells:

32

33  1.  Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35  without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
36  within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37  such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39  such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40  operations in search of oil and/or gas subject to the provisions of Article VI.B.

41

42  2.  Abandonment of Wells that have Produced: Except for any well in which a Non-Consent operation has been conducted
43  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44  producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
45  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
46  thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
47  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign
50  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52  terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
53  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

56
57
58
59
60
61
62
63
64
65
66
67
68
69
70



A.A.P.L. FORM 610 · ᴇL FORM OPERATING AGREEMI )82

## ARTICLE VI
### continued

1  "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2  assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3  Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4  interests in the remaining portion of the Contract Area.
5
6  Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7  the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8  quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9  templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10 well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11 repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12 visions hereof.
13
14  3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between
15 Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16 permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17 of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18 VI.E.
19
20
21                              ARTICLE VII.
22                    EXPENDITURES AND LIABILITY OF PARTIES
23
24 A.  Liability of Parties:
25
26      The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
27 shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
28 among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
29 shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.
30
31 B.  Liens and Payment Defaults:
32
33      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
34 of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
35 at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the
36 state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
37 taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
38 rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
39 of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
40 the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
41 purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. ~~Operator grants a like lien~~
42 ~~and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.~~ *
43
44      If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
45 Operator, the non-defaulting parties, including Operator,* shall, upon request by Operator, pay the unpaid amount in the proportion that
46 the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain
47 reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.
48
49 C.  Payments and Accounting:
50
51      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
52 and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
53 tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
54 showing expenses incurred and charges and credits made and received.
55
56      Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
57 of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
58 month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
59 with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
60 on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
61 fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
62 due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
63 pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
64
65 D.  Limitation of Expenditures:
66
67      1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
68 pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include
69      *However, in the event any party owning an interest in the Contract Area becomes Operator,
70       the deleted portions in this paragraph shall be reinstated and in full force and effect.

-9-

A.A.P.L. FORM 610          EL FORM OPERATING AGREEME     .982

### ARTICLE VII
#### continued

1    ☐  Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2    necessary tankage and/or surface facilities.

3

4    ☒  Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5    authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6    to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight
7    (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8    tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9    cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10    constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11    elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging
12    back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13    than all parties.

14

15    2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16    plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17    include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18    and/or surface facilities.

19

20    3. Other Operations: Without the consent of all parties, Operator shall not undertake any single project reasonably estimated
21    to require an expenditure in excess of     Twenty Thousand and No/100     Dollars ($   20,000.00   )
22    except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23    previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24    emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25    to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26    parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27    an information copy thereof for any single project costing in excess of     Twenty Thousand and No/100
28    Dollars ($   20,000.00   ) but less than the amount first set forth above in this paragraph.

29

30    E. Rentals, Shut-in Well Payments and Minimum Royalties:

31

32    Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33    party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34    tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35    behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36    failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37    ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38    visions of Article IV.B.2.

39

40    Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41    of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42    circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43    Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44    shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

45

46    F. Taxes:

47

48    Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49    subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50    become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51    be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52    Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53    riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54    owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55    tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56    anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57    value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58    the manner provided in Exhibit "C".

59

60    If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61    prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62    mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63    interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64    count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65    provided in Exhibit "C".

66

67    Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to
68    the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

69

70    * and billed to the other parties for their proportionate share
      as provided in Exhibit "C."

Use of this identifying mark is prohibited except when authorized in writing by the American Association of Petroleum Landmen

A.A.P.L. FORM 610 - ⸻ ⸻L FORM OPERATING AGREEMEN⸻ - ⸻82

ARTICLE VII
continued

G. Insurance:

At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

ARTICLE VIII.
ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. Surrender of Leases:

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leased acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

B. Renewal or Extension of Leases:

If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of oil and gas leases.

C. Acreage or Cash Contributions:

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

Use of this identifying mark is prohibited except when authorized in writing by the American Association of Petroleum Landmen.

-11-

A.A.P.L. FORM 610 - ... ..LL FORM OPERATING AGREEMEN... - ...82

## ARTICLE VIII
### continued

1    said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2    governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3    it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4    tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.
5

6      If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7    consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8

9    D.   Maintenance of Uniform Interest:
10

11      For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no
12    party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,
13    equipment and production unless such disposition covers either:
14

15      1. the entire interest of the party in all leases and equipment and production; or
16

17      2. an equal undivided interest in all leases and equipment and production in the Contract Area.
18

19      Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20    and shall be made without prejudice to the right of the other parties.
21

22      If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23    require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24    and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25    party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26    into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27    Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.
28

29    E.   Waiver of Rights to Partition:
30

31      If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32    undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33    interest therein.
34

35    ~~F.   Preferential Right to Purchase:~~
36

37      ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38    Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, ~~which shall include the~~
39    name and address of the prospective purchaser (who must be ready, willing and able to purchase), ~~the purchase price, and all other terms~~
40    of the offer. The other parties shall then have an optional prior right, for a period of ~~ten (10)~~ days after receipt of the notice, to purchase
41    on the same terms and conditions the interest which the other ~~party proposes~~ to sell; and, if this optional right is exercised, the purchas-
42    ing parties shall share the purchased interest in ~~the proportions~~ that the interest of each bears to the total interest of all purchasing par-
43    ties. However, there shall be ~~no preferential~~ right to purchase in those cases where any party wishes to mortgage its interests, or to
44    dispose of its ~~interests by merger,~~ reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-
45    ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~
46

47                         **ARTICLE IX.**
48              **INTERNAL REVENUE CODE ELECTION**
49

50      This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51    for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52    and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53    purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54    from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of ~~1954,~~ 1986 as per-
55    mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56    ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57    United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58    and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59    evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60    Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61    action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62    Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter I,
63    Subtitle "A", of the Internal Revenue Code of ~~1954,~~ 1986 under which an election similar to that provided by Section 761 of the Code is per-
64    mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65    tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66    computation of partnership taxable income.
67

68

69

70

Use of this identifying mark is prohibited
except where authorized in writing by the
American Association of Petroleum Landmen

-12-

A.A.P.L. FORM 610       EL FORM OPERATING AGREEME      _982

## ARTICLE X.
## CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed ___Ten Thousand and No/100___—————————————————————————Dollars ($ 10,000.00 ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☒  Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☐  Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

-13-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XIV.
COMPLIANCE WITH LAWS AND REGULATIONS

A.  Laws, Regulations and Orders:

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

B.  Governing Law:

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ shall govern.

C.  Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

ARTICLE XV.
OTHER PROVISIONS

(A)  Where a well, which has been authorized under the terms of this Agreement by all parties, or by one or more but less than all parties under Article VI.B. shall have been drilled to Contract Depth, and the parties participating in the well cannot mutually agree upon the sequence and timing of further operations regarding said well, the following elections shall control in the order enumerated hereinafter: (1) An election to do additional logging, coring or testing; (2) An election to attempt to complete the well at either the objective depth or objective formation; (3) An election to plug back and attempt to complete said well; (4) An election to deepen said well; and (5) An election to sidetrack the well. It is provided, however, that if at any time said participating parties are considering any of the above elections, the hole is in such a condition that a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the well in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority hereinabove set forth.

(B)  Operator is authorized to take all reasonable action in any emergency situation at the joint expense of the parties without prior consent of the parties where such action is prudent in the circumstances in the interest of parties or the jointly owned properties subject to this agreement; provided, however, Operator shall promptly notify the parties as soon as reasonably possible of the development of such emergency situation and the action taken by it in the circumstances.

(C)  The lien and security interests granted by each Non-Operator to Operator and by Operator to each Non-Operator under Article VII.B. shall extend not only to such party's oil and gas rights in the Contract Area (which for greater certainty shall include all of each party's leasehold, mineral, royalty or overriding royalty interests, or other interests in production), the oil and/or gas when extracted and equipment (as mentioned in said Article) but also to all accounts, contract rights, inventory and general intangibles constituting a part of, relating to or arising

- 14 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

out of said oil and gas rights, extracted oil and gas and said equipment or which are otherwise owned or held by any such party in the Contract Area. Further, the lien and security interest of each of said parties shall extend to all proceeds and products of all of the property and collateral described in this paragraph and in Article VII.B. as being subject to said lien and security interest. Any party, to the extent it deems necessary to perfect the lien and security interest provided herein, may file this Operating Agreement or a memorandum as a lien or mortgage in the applicable real estate records and as a financing statement with the property officer under the Uniform Commercial Code. Further, and not in limitation of the foregoing, each party hereby grants to Operator full right, power and authority to execute in each such party's name and on its behalf any memorandum or financing statement which Operator deems necessary in order to perfect the lien or security interest hereby granted.

(D) If, following the granting of relief under the Bankruptcy Code to any party hereto as debtor thereunder, this Agreement should be held to be an executory contract within the meaning of 11 U.S.C. S365, then the Operator, or (if the Operator is the debtor in bankruptcy) any other party, shall be entitled to a determination by debtor or any trustee for debtor within thirty (30) days from the date an order for relief is entered under the Bankruptcy Code as to the rejection or assumption of this Operating Agreement. In the event of an assumption, Operator or said other party shall be entitled to adequate assurances as to future performance of debtor's obligation hereunder and the protection of the interest of all other parties.

(E) Each Party hereto covenants and agrees for itself, its successors and assigns, that any sale, assignment sublease, mortgage, pledge or other instrument affecting the leases and lands subject to this instrument (whether of an operating or non-operating interest or a mortgage, pledge or other security interest) will be made and accepted subject to this instrument. The Party acquiring the interest or security shall be furnished a copy of this agreement and any amendments thereto, and shall expressly agree to be bound by all of its terms and provisions. It is provided, however, that a mortgagee, pledgee or person holding a security interest shall not incur any obligations under this agreement although its rights may be affected or limited hereby. It is further agreed in the event of the foreclosure of the mortgage or security interest, any sale will be expressly made and accepted subject to all of the terms and provisions of this agreement. Any Party hereto (and any successor of a Party hereto) who executed any instrument in favor of any party without complying with the provisions of this paragraph shall indemnify, defend and hold the other Parties hereto harmless for and against any and all claims or causes of action by any person whomsoever or for any losses sustained as a result of the failure of such Party to comply with these provisions. This indemnity shall also include reimbursement for reasonable attorneys' fees incurred in connection with the assertion of the rights herein granted such parties

(F) This instrument may be executed in any number of counterparts and each of same shall be considered an original for all purposes, notwithstanding that all parties are not signatories to the same counterpart. Failure of any one or more of the parties hereto to execute this instrument or a counterpart hereof shall not affect the validity and binding effect of this instrument as to those parties who execute same.

(G) Brammer Engineering, Inc. is herein designated as Operator. It owns no interest in the oil and gas properties subject to this Agreement. Brammer Engineering, Inc. provides contract management and operating services for Wheless TDL Exploration Company, L.L.C. It is understood that under the provisions of Article V.B.1., a new operator may be selected, among other instances, if the Operator no longer owns an interest in the Contract Area. If while Brammer Engineering, Inc. is the Operator hereunder, Wheless TDL Exploration Company, L.L.C. should sell all of its interest in the Contract Area, then such sale, for the purposes of Article V.B.1., shall have the effect of a sale by the Operator of all its interests.

(H) The interests of all of the parties to this agreement other than the interest contributed by R. P. Thomas and Janie M. Thomas are also subject to that certain Operating Agreement dated March 31, 1997 and made effective as of December 8, 1995 which Agreement governs the respective rights and obligations of said parties in and to the Contract area as well as other lands. R. P. Thomas and Janie M. Thomas are not parties to and are not bound by the terms and provisions thereof, however, among all other parties hereto, and only in respect to their rights and obligations one to the other, in the event of a conflict between the terms and provisions of this Operating Agreement and of the March 31, 1997 Operating Agreement said March 31, 1997 Operating Agreement shall control.

(I) The interests of Robert P. Thomas and Janie M. Thomas are subject to those certain Letter Agreements dated June 25, 1998 and October 20, 1998 respectively by and between them and Wheless TDL Exploration Company, L.L.C. ("Wheless") said Letter Agreements having been executed by Wheless on its behalf and on behalf of the other interest owners identified in Exhibit "A" hereto and made a part hereof. Said other interest owners hereby ratify and adopt the terms and provisions of the said Letter Agreements and to the extent that the terms and provisions of said Letter Agreements conflict with those of this Operating Agreement, those of the above mentioned Letter Agreements shall control. Further, Operator until further written notice from Wheless shall direct joint interest billings to Wheless, Attention: James E. Devan, Controller

-14a-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of 25th day of June 1999.

OPERATOR

WITNESSES:                              BRAMMER ENGINEERING, INC.

_Sue Celley_

_Chris Agent_                           By _W. Taylor May_

NON-OPERATORS

WITNESSES:                              ANDERSON EXPLORATION ENERGY COMPANY, L.C.

                                        By _R. E. Bounds, Jr._
                                           R. E. Bounds, Jr.
                                           Agent and Attorney-in-Fact

                                        GARNER & TAKACH, L.L.C.

                                        By_____
                                           J. Michael Garner, Managing Member

                                        By_____
                                           John Takach, Managing Member

                                        WHELESS TDL EXPLORATION COMPANY, L.L.C.

_Patricia J. Horn_                      By _Willis L. Meadows_
                                           Willis L. Meadows, Agent

                                        SKLAR & PHILLIPS, INC.

                                        By_____
                                           August Erickson, Vice-President

                                        HUGHES-RAWLS, L.L.C.

                                        By_____
                                           James H. Rawls, President


                                        _____
                                           J. Michael Garner


                                        _____
                                           John Takach


                                        _____
                                           R. P. Thomas


                                        _____
                                           Janie M. Thomas

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of 25th day of June, 1999.

OPERATOR

WITNESSES:

_Sue Cella_

_Chris Agnel_

BRAMMER ENGINEERING, INC.

By _W. Taylor May_

NON-OPERATORS

WITNESSES:

ANDERSON EXPLORATION ENERGY COMPANY, L.C.

By _____
       R. E. Bounds, Jr.
       Agent and Attorney-in-Fact

GARNER & TAKACH, L.L.C.

By _Michael Garner_
       J. Michael Garner, Managing Member

By _John Takach_
       John Takach, Managing Member

WHELESS TDL EXPLORATION COMPANY, L.L.C.

By _Willis L. Meadows_
       Willis L. Meadows, Agent

SKLAR & PHILLIPS, INC.

By _____
       August Erickson, Vice-President

HUGHES-RAWLS, L.L.C.

By _____
       James H. Rawls, President

_J. Michael Garner_
J. Michael Garner

_John Takach_
John Takach

_____
       R. P. Thomas

_____
       Janie M. Thomas

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of __25th__ day of __June__, 19_99_.

OPERATOR

WITNESSES:                         BRAMMER ENGINEERING, INC.

_Sue Celloy_

_Chris Aquil_          By _W. Taylor Moy_

NON-OPERATORS

WITNESSES:                         ANDERSON EXPLORATION ENERGY COMPANY, L.C.

_____            By_____
                                       R. E. Bounds, Jr.
_____                Agent and Attorney-in-Fact

_____            GARNER & TAKACH, L.L.C.

                                   By_____
_____                J. Michael Garner, Managing Member

                                   By_____
_____                John Takach, Managing Member

                                   WHELESS TDL EXPLORATION COMPANY, L.L.C.

_Patricia J. Hine_                 By _Willis R. Meadows_
_____                  Willis L. Meadows, Agent

                                   SKLAR & PHILLIPS, INC.

_Carolyn B. Ingle_                 By _August Erickson_
_Phyllis Longmire_                     August Erickson, Vice-President

                                   HUGHES-RAWLS, L.L.C.

_____            By_____
                                       James H. Rawls, President

_____

_____

_____            _____
_____                J. Michael Garner

_____
                                   _____
_____                John Takach

_____
                                   _____
_____                R. P. Thomas

_____
                                   _____
                                       Janie M. Thomas

-15-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ___25th___ day of ___June___, 19_99_.

OPERATOR

WITNESSES:

BRAMMER ENGINEERING, INC.

By _W. Taylor May_

NON-OPERATORS

WITNESSES:

ANDERSON EXPLORATION ENERGY COMPANY, L.C.

By _____
      R. E. Bounds, Jr.
      Agent and Attorney-in-Fact

GARNER & TAKACH, L.L.C.

By _____
      J. Michael Garner, Managing Member

By _____
      John Takach, Managing Member

WHELESS TDL EXPLORATION COMPANY, L.L.C.

By _Willie L. Meadows_
      Willis L. Meadows, Agent

SKLAR & PHILLIPS, INC.

By _____
      August Erickson, Vice-President

HUGHES-RAWLS, L.L.C.

By _James H. Rawls_
      James H. Rawls, President

_____
      J. Michael Garner

_____
      John Takach

_____
      R. P. Thomas

_____
      Janie M. Thomas

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ____25th____ day of ____June____, 1999____.

OPERATOR

WITNESSES:

BRAMMER ENGINEERING, INC.

By _____

NON-OPERATORS

WITNESSES:

ANDERSON EXPLORATION ENERGY COMPANY, L.C.

By _____
          R. E. Bounds, Jr.
          Agent and Attorney-in-Fact

GARNER & TAKACH, L.L.C.

By _____
          J. Michael Garner, Managing Member

By _____
          John Takach, Managing Member

WHELESS TDL EXPLORATION COMPANY, L.L.C.

By _____
          Willis L. Meadows, Agent

SKLAR & PHILLIPS, INC.

By _____
          August Erickson, Vice-President

HUGHES-RAWLS, L.L.C.

By _____
          James H. Rawls, President



_____
          J. Michael Garner


_____
          John Takach


_____
          R. P. Thomas


_____
          Janie M. Thomas

STATE OF LOUISIANA

PARISH OF CADDO

      PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named _____W. TAYLOR MAY_____, known to me, acknowledged that as attorney-in-fact of **BRAMMER ENGINEERING, INC.**, a Louisiana corporation, and that for and on behalf of said corporation, and as its act and deed, and being informed of the contents of same, he voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said corporation to do so.

      GIVEN under my hand and official seal, this _18th_ day of _February_, 1999.

                                      _Margaret A. Hakun_
                                    Notary Public

My Commission Expires                      MARGARET A. HAKUN
  With Life                             Notary Public
                                Caddo Parish, Louisiana
                             My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

      PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named **R. E. Bounds, Jr.**, of **ANDERSON EXPLORATION ENERGY COMPANY, L.C.**, a Texas limited liability company, and that for and on behalf of said company, and as its act and deed, and being informed of the contents of same, he voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said company to do so.

      GIVEN under my hand and official seal, this ____ day of _____, 1999.

                           _____

                            Notary Public
My Commission Expires
  With Life

STATE OF LOUISIANA

PARISH OF CADDO

      PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named **J. MICHAEL GARNER** and **JOHN TAKACH**, known to me, acknowledged that as individuals and as Managing Members of **GARNER & TAKACH, L.L.C.**, and that for and on behalf of said joint venture, and as its act and deed, and being informed of the contents of same, they voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said joint venture to do so.

      GIVEN under my hand and official seal, this ____ day of _____, 1999.

                              _____

                            Notary Public
My Commission Expires
  With Life

STATE OF LOUISIANA

PARISH OF CADDO

PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named _W. TAYLOR MAY_, known to me, acknowledged that as attorney-in-fact of **BRAMMER ENGINEERING, INC.**, a Louisiana corporation, and that for and on behalf of said corporation, and as its act and deed, and being informed of the contents of same, he voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said corporation to do so.

GIVEN under my hand and official seal, this _18th_ day of _February_, 1999.

_Margaret A. Hakun_
Notary Public
MARGARET A. HAKUN
Notary Public
Caddo Parish, Louisiana
My Commission is for Life

My Commission Expires
With Life

STATE OF LOUISIANA

PARISH OF CADDO

PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named **R. E. Bounds, Jr.**, of **ANDERSON EXPLORATION ENERGY COMPANY, L.C.**, a Texas limited liability company, and that for and on behalf of said company, and as its act and deed, and being informed of the contents of same, he voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said company to do so.

GIVEN under my hand and official seal, this _22nd_ day of _February_, 1999.

_Janet C. Higginbotham_
Notary Public

My Commission Expires
With Life

STATE OF LOUISIANA

PARISH OF CADDO

PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named **J. MICHAEL GARNER** and **JOHN TAKACH**, known to me, acknowledged that as individuals and as Managing Members of **GARNER & TAKACH, L.L.C.**, and that for and on behalf of said joint venture, and as its act and deed, and being informed of the contents of same, they voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said joint venture to do so.

GIVEN under my hand and official seal, this _____ day of _____, 1999.

_____
Notary Public

My Commission Expires
With Life

STATE OF LOUISIANA

PARISH OF CADDO

PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named _____W. TAYLOR MAY_____, known to me, acknowledged that as attorney-in-fact of **BRAMMER ENGINEERING, INC.**, a Louisiana corporation, and that for and on behalf of said corporation, and as its act and deed, and being informed of the contents of same, he voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said corporation to do so.

GIVEN under my hand and official seal, this _18th_ day of _February_ 1999.

_Margaret A. Hakun_
Notary Public

My Commission Expires
   With Life

MARGARET A. HAKUN
Notary Public
Caddo Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named **R. E. Bounds, Jr.**, of **ANDERSON EXPLORATION ENERGY COMPANY, L.C.**, a Texas limited liability company, and that for and on behalf of said company, and as its act and deed, and being informed of the contents of same, he voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said company to do so.

GIVEN under my hand and official seal, this _____ day of _____, 1999.

_____
Notary Public

My Commission Expires
   With Life

STATE OF LOUISIANA

PARISH OF CADDO

PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named **J. MICHAEL GARNER** and **JOHN TAKACH**, known to me, acknowledged that as individuals and as Managing Members of **GARNER & TAKACH, L.L.C.**, and that for and on behalf of said joint venture, and as its act and deed, and being informed of the contents of same, they voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said joint venture to do so.

GIVEN under my hand and official seal, this _24th_ day of _Feb_, 1999.

_Lina L. Goldston_
Notary Public

My Commission Expires
   With Life

STATE OF LOUISIANA

PARISH OF CADDO

PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named **August Erickson**, of **SKLAR & PHILLIPS, INC.**, a Texas corporation, and that for and on behalf of said company, and as its act and deed, and being informed of the contents of same, he voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said company to do so.

GIVEN under my hand and official seal, this 22nd day of February, 1999.

_Frances M Bailey_
Notary Public

My Commission Expires
    With Life

FRANCES M. BAILEY
NOTARY PUBLIC, Caddo Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named Willis L. Meadows, of **WHELESS TDL EXPLORATION COMPANY, L.L.C.**, a Louisiana limited liability company, and that for and on behalf of said company, and as its act and deed, and being informed of the contents of same, he voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said company to do so.

GIVEN under my hand and official seal, this 18th day of February 1999.

_Virginia K. Mock_
Notary Public

My Commission Expires
    With Life

STATE OF MISSISSIPPI

COUNTY OF HINDS

PERSONALLY appeared before me, the undersigned authority in and for the said county and state, within my jurisdiction, the within named **James H. Rawls**, of **HUGHES-RAWLS, L.L.C.**, a Mississippi Limited Liability company, and that for and on behalf of said company, and as its act and deed, and being informed of the contents of same, he voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said company to do so.

GIVEN under my hand and official seal, this _____ day of _____, 1999.

_____
Notary Public

My Commission Expires:

_____

STATE OF LOUISIANA

PARISH OF CADDO

      PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named **August Erickson**, of **SKLAR & PHILLIPS, INC.**, a Texas corporation, and that for and on behalf of said company, and as its act and deed, and being informed of the contents of same, he voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said company to do so.

      GIVEN under my hand and official seal, this ____ day of _____, 1999.

_____
Notary Public

My Commission Expires
   With Life


STATE OF LOUISIANA

PARISH OF CADDO

      PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named **Willis L. Meadows**, of **WHELESS TDL EXPLORATION COMPANY, L.L.C.**, a Louisiana limited liability company, and that for and on behalf of said company, and as its act and deed, and being informed of the contents of same, he voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said company to do so.

      GIVEN under my hand and official seal, this *18th* day of *February* 1999.

_____
Notary Public

My Commission Expires
   With Life


STATE OF MISSISSIPPI

COUNTY OF HINDS

      PERSONALLY appeared before me, the undersigned authority in and for the said county and state, within my jurisdiction, the within named **James H. Rawls**, of **HUGHES-RAWLS, L.L.C.**, a Mississippi Limited Liability company, and that for and on behalf of said company, and as its act and deed, and being informed of the contents of same, he voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said company to do so.

      GIVEN under my hand and official seal, this *22nd* day of *February* 1999.

_____
Notary Public

My Commission Expires:
   *9-6-02*

STATE OF LOUISIANA

PARISH OF CADDO

     I hereby certify, that on this day, before me, a Notary Public duly authorized in the state and parish aforesaid to take acknowledgments, personally appeared **J. MICHAEL GARNER** to me known to be the person who is described in and who executed the foregoing instrument and he acknowledged before me that, being informed of the contents of the same, he voluntarily signed and delivered the within and foregoing instrument on the day and year therein mentioned.

     GIVEN under my hand and official seal, this the 24th day of _Feb_ , 1999.

                        _Tina L Golston_

                        Notary Public

My Commission Expires
   With Life


STATE OF LOUISIANA

PARISH OF CADDO

     I hereby certify, that on this day, before me, a Notary Public duly authorized in the state and parish aforesaid to take acknowledgments, personally appeared **JOHN TAKACH** to me known to be the person who is described in and who executed the foregoing instrument and he acknowledged before me that, being informed of the contents of the same, he voluntarily signed and delivered the within and foregoing instrument on the day and year therein mentioned.

     GIVEN under my hand and official seal, this the 24th day of _Feb_ , 1999.

                        _Tina L Golston_

                        Notary Public

My Commission Expires
   With Life


STATE OF LOUISIANA

PARISH OF CADDO

     I hereby certify, that on this day, before me, a Notary Public duly authorized in the state and parish aforesaid to take acknowledgments, personally appeared **R. P. THOMAS** to me known to be the person who is described in and who executed the foregoing instrument and he acknowledged before me that, being informed of the contents of the same, he voluntarily signed and delivered the within and foregoing instrument on the day and year therein mentioned.

     GIVEN under my hand and official seal, this the ___ day of _____, 1999.

                        _____

                        Notary Public

My Commission Expires
   With Life

STATE OF LOUISIANA

PARISH OF CADDO

    I hereby certify, that on this day, before me, a Notary Public duly authorized in the state and parish aforesaid to take acknowledgments, personally appeared **J. MICHAEL GARNER** to me known to be the person who is described in and who executed the foregoing instrument and he acknowledged before me that, being informed of the contents of the same, he voluntarily signed and delivered the within and foregoing instrument on the day and year therein mentioned.

    GIVEN under my hand and official seal, this the ____ day of _____, 1999.

_____
Notary Public

My Commission Expires
  With Life

STATE OF LOUISIANA

PARISH OF CADDO

    I hereby certify, that on this day, before me, a Notary Public duly authorized in the state and parish aforesaid to take acknowledgments, personally appeared **JOHN TAKACH** to me known to be the person who is described in and who executed the foregoing instrument and he acknowledged before me that, being informed of the contents of the same, he voluntarily signed and delivered the within and foregoing instrument on the day and year therein mentioned.

    GIVEN under my hand and official seal, this the ____ day of _____, 1999.

_____
Notary Public

My Commission Expires
  With Life

STATE OF LOUISIANA

PARISH OF ~~CADDO~~ *Bienville*

    I hereby certify, that on this day, before me, a Notary Public duly authorized in the state and parish aforesaid to take acknowledgments, personally appeared **R. P. THOMAS** to me known to be the person who is described in and who executed the foregoing instrument and he acknowledged before me that, being informed of the contents of the same, he voluntarily signed and delivered the within and foregoing instrument on the day and year therein mentioned.

    GIVEN under my hand and official seal, this the 19th day of *Feb*, 1999.

*Thomas F Martin*
_____
Notary Public

My Commission Expires
  With Life

STATE OF LOUISIANA

PARISH OF ~~CADDO~~ *BIENVILLE*

     I hereby certify, that on this day, before me, a Notary Public duly authorized in the state and parish aforesaid to take acknowledgments, personally appeared **JANIE M. THOMAS** to me known to be the person who is described in and who executed the foregoing instrument and he acknowledged before me that, being informed of the contents of the same, he voluntarily signed and delivered the within and foregoing instrument on the day and year therein mentioned.

     GIVEN under my hand and official seal, this the *19th* day of *Feb*, 1999.

                              *Thomas L Martin*
                              Notary Public

My Commission Expires
   With Life

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XVI.
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ___25th___ day of ___June___, 1999.

OPERATOR

WITNESSES:

BRAMMER ENGINEERING, INC.

By _W. Taylor May_

NON-OPERATORS

WITNESSES:

ANDERSON EXPLORATION ENERGY COMPANY, L.C.

By_____
          R. E. Bounds, Jr.
          Agent and Attorney-in-Fact

GARNER & TAKACH, L.L.C.

By_____
          J. Michael Garner, Managing Member

By_____
          John Takach, Managing Member

WHELESS TDL EXPLORATION COMPANY, L.L.C.

By _Willis L. Meadows_
          Willis L. Meadows, Agent

SKLAR & PHILLIPS, INC.

By_____
          August Erickson, Vice-President

HUGHES-RAWLS, L.L.C.

By_____
          James H. Rawls, President


_____
          J. Michael Garner


_____
          John Takach


_____
          R. P. Thomas


_____
          Janie M. Thomas

STATE OF LOUISIANA

PARISH OF CADDO

PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named _____W. TAYLOR MAY_____, known to me, acknowledged that as attorney-in-fact of **BRAMMER ENGINEERING, INC.**, a Louisiana corporation, and that for and on behalf of said corporation, and as its act and deed, and being informed of the contents of same, he voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said corporation to do so.

GIVEN under my hand and official seal, this _18th_ day of _February_ 1999.

_Margaret A. Hakun_
Notary Public
MARGARET A. HAKUN
Notary Public
Caddo Parish, Louisiana
My Commission is for Life

My Commission Expires
With Life

STATE OF LOUISIANA

PARISH OF CADDO

PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named **R. E. Bounds, Jr.**, of **ANDERSON EXPLORATION ENERGY COMPANY, L.C.**, a Texas limited liability company, and that for and on behalf of said company, and as its act and deed, and being informed of the contents of same, he voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said company to do so.

GIVEN under my hand and official seal, this _____ day of _____, 1999.

_____
Notary Public

My Commission Expires
With Life

STATE OF LOUISIANA

PARISH OF CADDO

PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named **J. MICHAEL GARNER** and **JOHN TAKACH**, known to me, acknowledged that as individuals and as Managing Members of **GARNER & TAKACH, L.L.C.**, and that for and on behalf of said joint venture, and as its act and deed, and being informed of the contents of same, they voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said joint venture to do so.

GIVEN under my hand and official seal, this _____ day of _____, 1999.

_____
Notary Public

My Commission Expires
With Life

STATE OF LOUISIANA

PARISH OF CADDO

PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named **August Erickson**, of **SKLAR & PHILLIPS, INC.**, a Texas corporation, and that for and on behalf of said company, and as its act and deed, and being informed of the contents of same, he voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said company to do so.

GIVEN under my hand and official seal, this _____ day of _____, 1999.

_____
Notary Public

My Commission Expires
    With Life

STATE OF LOUISIANA

PARISH OF CADDO

PERSONALLY appeared before me, the undersigned authority in and for the said parish and state, within my jurisdiction, the within named **Willis L. Meadows**, of **WHELESS TDL EXPLORATION COMPANY, L.L.C.**, a Louisiana limited liability company, and that for and on behalf of said company, and as its act and deed, and being informed of the contents of same, he voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said company to do so.

GIVEN under my hand and official seal, this _18th_ day of _February_ 1999.

_Virginia R. Mack_
Notary Public

My Commission Expires
    With Life

STATE OF MISSISSIPPI

COUNTY OF HINDS

PERSONALLY appeared before me, the undersigned authority in and for the said county and state, within my jurisdiction, the within named **James H. Rawls**, of **HUGHES-RAWLS, L.L.C.**, a Mississippi Limited Liability company, and that for and on behalf of said company, and as its act and deed, and being informed of the contents of same, he voluntarily executed the above and foregoing instrument for the purposes mentioned on the day and year therein mentioned, after having been duly authorized by said company to do so.

GIVEN under my hand and official seal, this _____ day of _____, 1999.

_____
Notary Public

My Commission Expires:

_____

STATE OF LOUISIANA

PARISH OF CADDO

I hereby certify, that on this day, before me, a Notary Public duly authorized in the state and parish aforesaid to take acknowledgments, personally appeared **J. MICHAEL GARNER** to me known to be the person who is described in and who executed the foregoing instrument and he acknowledged before me that, being informed of the contents of the same, he voluntarily signed and delivered the within and foregoing instrument on the day and year therein mentioned.

GIVEN under my hand and official seal, this the ____ day of _____, 1999.

_____
Notary Public

My Commission Expires
    With Life

STATE OF LOUISIANA

PARISH OF CADDO

I hereby certify, that on this day, before me, a Notary Public duly authorized in the state and parish aforesaid to take acknowledgments, personally appeared **JOHN TAKACH** to me known to be the person who is described in and who executed the foregoing instrument and he acknowledged before me that, being informed of the contents of the same, he voluntarily signed and delivered the within and foregoing instrument on the day and year therein mentioned.

GIVEN under my hand and official seal, this the ____ day of _____, 1999.

_____
Notary Public

My Commission Expires
    With Life

STATE OF LOUISIANA

PARISH OF CADDO

I hereby certify, that on this day, before me, a Notary Public duly authorized in the state and parish aforesaid to take acknowledgments, personally appeared **R. P. THOMAS** to me known to be the person who is described in and who executed the foregoing instrument and he acknowledged before me that, being informed of the contents of the same, he voluntarily signed and delivered the within and foregoing instrument on the day and year therein mentioned.

GIVEN under my hand and official seal, this the ____ day of _____, 1999.

_____
Notary Public

My Commission Expires
    With Life

STATE OF LOUISIANA

PARISH OF CADDO

      I hereby certify, that on this day, before me, a Notary Public duly authorized in the state and parish aforesaid to take acknowledgments, personally appeared **JANIE M. THOMAS** to me known to be the person who is described in and who executed the foregoing instrument and he acknowledged before me that, being informed of the contents of the same, he voluntarily signed and delivered the within and foregoing instrument on the day and year therein mentioned.

      GIVEN under my hand and official seal, this the ____ day of _____, 1999.


_____
Notary Public

My Commission Expires
   With Life

## EXHIBIT "A-1"
## CONTRACT AREA


Attached to and made a part of Operating Agreement dated February 15, 1999, by and between Brammer Engineering, Inc., OPERATOR, and Wheless TDL Exploration Company, L.L.C., et al., NON-OPERATOR, covering lands in Gibsland Prospect, Bienville Parish, Louisiana


### TOWNSHIP 18 NORTH, RANGE 7 WEST

South one-half (S/2) of Section 16 and the

North one-half (N/2) of Section 21.

EXHIBIT "A-2"

Attached to and made a part of Operating Agreement dated February 15, 1999, by and between Brammer Engineering, Inc., OPERATOR, and Wheless TDL Exploration Company, L.L.C., et al., NON-OPERATOR, covering lands in Gibsland Prospect, Bienville Parish, Louisiana.

NONE

EXHIBIT "A-3 and A-5"

Attached to and made a part of Operating Agreement dated February 15, 1999, by and between Brammer Engineering, Inc., OPERATOR, and Wheless TDL Exploration Company, L.L.C., et al., NON-OPERATOR, covering lands in Gibsland Prospect, Bienville Parish, Louisiana.

| NAME AND ADDRESS | PRE-PRODUCTION INTEREST* | POST-PRODUCTION INTEREST* |
|---|---|---|
| **Anderson Exploration Energy Company, L.C.**<br>333 Texas Street, Suite 2121<br>Shreveport, Louisiana 71101-5302<br><br>Attention:    R. E. Bounds<br>Telephone:    (318) 227-2000<br>Fax:              (318) 425-5935 | .245 x .995= .2437750 | .2352 x .995= .2340240 |
| **Garner & Takach, L.L.C.**<br>400 Travis Street, Suite 407<br>Shreveport, Louisiana 71101<br><br>Attention:    John Takach<br>Telephone:    (318) 221-5052<br>Fax:              (318) 459-1368 | .02 x .995= .0199000 | .0192 x .995= .0191040 |
| **J. Michael Garner**<br>400 Travis Street, Suite 407<br>Shreveport, Louisiana 71101<br>Telephone:    (318) 221-5052<br>Fax:              (318) 459-1368 | .00000000 | .02 x .995= .0199000 |
| **John Takach**<br>400 Travis Street, Suite 407<br>Shreveport, Louisiana 71101<br>Telephone:    (318) 221-5052<br>Fax:              (318) 459-1368 | .00000000 | .02 x .995= .0199000 |
| **Sklar & Phillips, Inc.**<br>330 Marshall Street, Suite 300<br>Shreveport, Louisiana 71103<br><br>Attention:    August Erickson<br>Telephone:    (318) 222-1800<br>Fax:              (318) 424-1257 | .245 x .995= .2437750 | .2352 x .995= .2340240 |
| **Wheless TDL Exploration Company, L.L.C.**<br>333 Texas Street, Suite 2020<br>Shreveport, Louisiana 71101-5301<br><br>Attention:    John R. Gardner<br>Telephone:    (318) 222-3137<br>Fax:              (318) 429-1600 | .245 x .995= .2437750 | .2352 x .995= .2340240 |
| **Hughes-Rawls, L.L.C.**<br>Security Centre South, Suite 800<br>200 South Lamar Street<br>Jackson, Mississippi 39201<br><br>Attention:    James H. Rawls<br>Telephone:    (601) 969-7474<br>Fax:              (601) 353-4331 | .245 x .995= .2437750 | .2352 x .995= .2340240 |

| NAME AND ADDRESS | PRE-PRODUCTION INTEREST* | POST-PRODUCTION INTEREST* |
|---|---|---|
| **R. P. Thomas and Janie M. Thomas**<br>Route 2, Box 4<br>Gibsland, Louisiana 71208 | .0050000 | .0050000 |
| Telephone:     (318) 843-6640 | | |
| | 1.00000000 | 1.00000000 |

*Costs shall be shared on a Pre-Production basis on each well  within the Contract Area until the well is completed and, in the case of an oil well, on site equipment is installed and the well is connection to on site tanks or, in the case of a gas well,  through the installation of on site equipment and pipeline connection, after which costs shall be shared on the Post-Production basis.

EXHIBIT "A-4"

Attached to and made a part of Operating Agreement dated February 15, 1999, by and between Brammer Engineering, Inc., OPERATOR, and Wheless TDL Exploration Company, L.L.C., et al, NON-OPERATORS, covering lands in Gibsland Prospect, Bienville Parish, Louisiana

## A. LEASES:

I. Interests contributed and shared by Wheless TDL Exploration Company, L.L.C. Anderson Exploration Energy Company, L.C., Sklar & Phillips, Inc., Hughes-Rawls, L.L.C., Garner & Takach, L.L.C., J. Michael Garner and Deborah Clara Fiegel Garner and John Takach and Nancy Teresa Lammons Takach :

| Ls. # | Lessor | Lessee | Date | Recording Book | Page |
|-------|--------|--------|------|------|------|
| LA022001-00 | VIOLET W MARTIN | WHELESS TDL EXPLORATION CO LLC | 11/12/96 | 778 | 284 |
| LA022002-00 | FLOYD L & SALLY FIELD MARTIN | WHELESS TDL EXPLORATION CO LLC | 11/12/96 | 778 | 288 |
| LA022012-00 | ROBERT P THOMAS & JANIE M | WHELESS TDL EXPLORATION CO LLC | 01/30/96 | 760 | 242 |
| LA022018-01 | WILLIAM GORDON STILL SR & NELLIE MCCOY STILL | WHELESS TDL EXPLORATION CO LLC | 02/07/96 | 760 | 313 |
| LA022019-01 | G & Y STILL LTD PARTNERSHIP | WHELESS TDL EXPLORATION CO LLC | 02/07/96 | 760 | 318 |
| LA022034-01 | WILLAMETTE INDUSTRIES INC | WHELESS TDL EXPLORATION CO LLC | 04/03/96 | 761 | 131 |
| LA022039-00 | ZACK A KIDD & NORMA JEAN E | WHELESS TDL EXPLORATION CO LLC | 04/03/96 | 761 | 173 |
| LA022041-01 | JAMES LAMAR KIDD | WHELESS TDL EXPLORATION CO LLC | 04/03/96 | 761 | 181 |
| LA022041-02 | A S COLLEY TRUST | WHELESS TDL EXPLORATION CO LLC | 07/11/96 | 773 | 205 |
| LA022047-01 | SHERMAN MILLS | WHELESS TDL EXPLORATION CO LLC | 02/12/96 | 761 | 99 |
| LA022047-02 | CALVIN PEARSON | WHELESS TDL EXPLORATION CO LLC | 07/06/98 | 822 | 221 |
| LA022047-03 | LONNIE PEARSON | WHELESS TDL EXPLORATION CO LLC | 07/06/98 | 822 | 223 |
| LA022047-04 | ALVIN PEARSON | WHELESS TDL EXPLORATION CO LLC | 07/06/98 | 822 | 226 |
| LA022047-05 | WILLIE MAE PEARSON CATO | WHELESS TDL EXPLORATION CO LLC | 07/06/98 | 822 | 228 |
| LA022047-06 | CLEOPHUS PEARSON | WHELESS TDL EXPLORATION CO LLC | 07/09/98 | 822 | 237 |
| LA022047-07 | ARDIS PEARSON | WHELESS TDL EXPLORATION CO LLC | 07/06/98 | 822 | 233 |
| LA022047-08 | TOMMY EDWARD CORTEZ | WHELESS TDL EXPLORATION CO LLC | 07/13/98 | 822 | 235 |
| LA022047-09 | TOMMY LOU PEARSON RHODES | WHELESS TDL EXPLORATION CO LLC | 07/10/98 | 822 | 251 |
| LA022047-10 | MAXINE CORTEZ BELL | WHELESS TDL EXPLORATION CO LLC | 07/13/98 | 822 | 253 |
| LA022047-11 | LAVADA ANN CORTEZ ABNEY | WHELESS TDL EXPLORATION CO LLC | 07/13/98 | 822 | 255 |
| LA022047-12 | MAGALINE CORTEZ | WHELESS TDL EXPLORATION CO LLC | 07/13/98 | 822 | 257 |
| LA022050-00 | THE KANSAS CITY SOUTHERN | WHELESS TDL EXPLORATION CO LLC | 07/08/96 | 768 | 279 |
| LA022059-00 | HERCULES PETROLEUM COMPANY INC | WHELESS TDL EXPLORATION CO LLC | 04/06/98 | 812 | 263 |
| LA022074-00 | ROBERT P THOMAS & JANIE M | WHELESS TDL EXPLORATION CO LLC | 06/25/98 | 820 | 167 |

## B. OTHER INTERESTS:

I. Interests contributed by Wheless TDL Exploration Company, L.L.C., Anderson Exploration Energy Company, L.C., Sklar & Phillips, Inc., Hughes-Rawls, L.L.C., Garner & Takach, L.L.C., J. Michael Garner and Deborah Clara Fiegel Garner and John Takach and Nancy Teresa Lammons Takach:

Unleased mineral interests carried by the above parties:

a. That certain one-sixty fourth (1.5625%) unleased undivided mineral interest (0.62500000 net acres) in the Southeast Quarter of the Northwest Quarter, Section 21, Township 18 North, Range 7 West, Bienville Parish, Louisiana.

b. That certain 8.0769231% unleased undivided mineral interest (1.61538462 net acres ) in the West Half of the Southwest Quarter of the Northeast Quarter, Section 21, Township 18 North, Range 7 West, Bienville Parish, Louisiana.

II. Interests contributed by Robert P. Thomas and Janie M. Thomas:

    a. That certain sixteen percent (16%) unleased undivided mineral interest (3.20000000 net mineral acres) in the South Half of the Southeast Quarter of the Southwest Quarter, Section 16, Township 18 North, Range 7 West, Bienville Parish, Louisiana

EXHIBIT 3

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this_____day of_____, 19_____, between

_____
lessor (whether one or more), and_____
lessee, WITNESSETH:

1. Lessor in consideration of_____Dollars ($_____), in hand paid, of the royalties herein provided, and of the agreement of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purposes of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building tanks, power stations, telephone lines, and other structures thereon to produce, save, take care of, treat, transport and own said products and for dredging and maintaining canals, constructing roads and bridges, and building houses for its employees, and, in general, for all appliances, structures, equipment, servitudes and privileges which may be necessary, useful or convenient to or in connection with any such operations conducted by Lessee thereon, or on any adjacent lands, the following described land in_____ Parish, Louisiana, to-wit:

> Attached to and made a part of Operating Agreement dated
> February 15, 1999, by and between Brammer Engineering, Inc.,
> OPERATOR, and Wheless TDL Exploration Company, L.L.C., et al,
> NON-OPERATORS, Gibsland Prospect, Bienville Parish, Louisiana

Comprising_____acres, more or less.

This lease also covers and includes battures, accretions and all other land owned by Lessor adjacent to the land particularly described above.

2. Subject to the other provisions herein contained, this lease shall be for a period of_____years from this date (called "primary term") and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner herein provided.

(a) It is the intention of the parties that this lease shall also extend and apply to all outstanding mineral rights or servitudes affecting the lands herein described as the same may revert to Lessor, his heirs, or assigns, from time to time.

3. For the consideration hereinabove recited, this lease shall remain in full force and effect during the primary term, without any additional payment and without Lessee being required to conduct any operations on the land (either before or after the discovery of minerals), except to drill such wells as might be necessary to protect the land from drainage, as hereinafter provided.

4. The royalties to be paid by Lessee are: (a) on oil, and other hydrocarbons which are produced at the well in liquid form by ordinary production methods, one-eighth of that produced and saved from said land, same to be delivered at the wells or to the credit of Lessor in the pipe line to which the wells may be connected; Lessor's interest in either case to bear its proportion of any expenses for treating the oil to make it marketable as crude; Lessee may from time to time purchase any royalty oil or other liquid hydrocarbons in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas, or other gaseous substance produced from said land and sold or used off the premises or for the extraction of gasoline or other products therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; such gas, casinghead gas, residue gas, or gas of any other nature or description whatsoever, as may be disposed of for no consideration to Lessee, either through unavoidable waste or leakage, or in order to recover oil or other liquid hydrocarbons, or returned to the ground, shall not be deemed to have been sold or used either on or off the premises within the meaning of this paragraph 3 hereof; (c) on all other minerals mined and marketed, one-eighth, either in kind or value at the well or mine, at Lessee's election, except that on sulphur the royalty shall be one dollar ($1.00) per long ton.

5. If Lessee during or after the primary term should drill a well capable of producing gas or gaseous substances in paying quantities, (or which although previously produced Lessee is unable to continue to produce) and should Lessee be unable to operate said well because of lack of market or marketing facilities or governmental restrictions, then Lessee's rights may be maintained beyond or after the primary term without production of minerals or further drilling operations by paying Lessor as royalty_____Dollars ($_____) per year, the first payment being due, if said well should be completed or shut-in after the primary term, within sixty (60) days after the completion of such well or the cessation of production and such payment will extend Lessee's rights for one year from the date of such completion or cessation. If such a well should be completed during the primary term, the first payment, if made by Lessee, shall be due on or before the expiration date of the primary term herein fixed. Thereafter Lessee's rights may be continued from year to year by making annual payments in the amount stated on or before the anniversary date beginning with the date of completion of said well (if completed after the primary term) or the end of the primary term (if completed prior thereto) as the case may be; each of such payments to extend Lessee's rights for one year. It is provided, however, that in no event shall Lessee's rights be so extended by annual payments herein fixed without drilling operations or the production of oil, gas or some other mineral for more than five (5) years beyond the end of the primary term hereinabove fixed. The annual payments herein provided for may be deposited to Lessor's Credit in the

_____Bank of_____, which bank shall be and remain Lessor's agent for such purpose regardless of any change or changes in the ownership of the

land or mineral rights therein.   . _ wners of the royalty as of the date c    .u payments shall be entitled thereto in proportion to their ownership of said royalty. The provisions of this paragraph shall be recurring at all times during the life of this lease. Should any well producing gas or gaseous substances be completed on a drilling unit which includes any part of the land herein leased, the provisions of this paragraph shall be subject to all other agreements herein contained allowing the pooling of the above described lands with other lands.

6.   If within ninety (90) days prior to the end of the primary term, Lessee should complete or abandon a dry hole or holes on the land described above or on land pooled therewith, or if production previously secured should cease from any cause, this lease shall continue in force and effect for ninety (90) days from such completion or abandonment or cessation of production. If at the expiration of the primary term or at the expiration of the ninety (90) day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith, but Lessee is then engaged in operations for drilling or reworking thereon, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations for drilling or reworking with no cessation between operations or between such cessation of production and additional operations of more than ninety (90) consecutive days; or (b)· is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith. If sulphur· be encountered on said premises or on land pooled therewith, this lease shall continue in force and effect so long as Lessee is engaged with due diligence in explorations for and/or erecting a plant for the production of sulphur and thereafter subject to the foregoing provisions hereof so long as oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith.

7.   Lessee is hereby granted the right as to all or any part of the land described herein, without Lessor's joinder, to combine, pool or unitize the acreage royalty or mineral interest covered by this lease, or any portion thereof, with any other land, lease or leases, royalty or mineral interests in or under any other tract or tracts of land in the vicinity thereof, whether owned by Lessee or some other person, or corporation so as to create, by the combination of such lands and leases, one or more operating units, provided that no one operating unit shall, in the case of gas, including condensate, embrace more than six hundred forty (640) acres, and in the case of oil, including casinghead gas, embrace more than forty (40) acres; and provided further, however, that if any spacing or other rules and regulations of the State or Federal Commission, Agency, or regulatory body having or claiming jurisdiction has heretofore or shall at any time hereafter prescribe a drilling or operating unit or spacing rule in the case of gas, including condensate, greater than six hundred forty (640) acres, or in the case of oil or casinghead gas greater than forty (40) acres, then the unit or units herein contemplated may have, or may be redesigned so as to have, as the case may be, the same surface content as, but not more than, the unit or the acreage in the spacing rule so prescribed. However, it is further specifically understood and agreed, anything herein to the contrary notwithstanding, that the Lessee shall have the right to, and the benefit of an acreage tolerance of ten per cent in excess of any drilling or operating unit authorized herein. The commencement of a well, or the completion of a well to production of either oil, gas, casinghead gas, condensate, or other minerals on any portion of an operating unit in which all or any part of the land described herein is embraced, or production of oil, gas, casinghead gas, condensate, or other minerals therefrom shall have the same effect under the terms of this lease as if a well were commenced, completed or producing oil, gas, casinghead gas, condensate, or other minerals in paying quantities on the land embraced by this lease. Lessee shall execute in writing and file for record in the records of the Parish in which the lands herein leased are located, an instrument identifying or describing the pooled acreage, or an instrument supplemental thereto redesignating same, as the case may be. Either prior to the securing of production from any unit created under the authority hereinabove granted, or after cessation of production therefrom Lessee shall have the right to dissolve the unit so created, without Lessor's joinder or further consent, by executing in writing and placing of record in the Parish or Parishes in which the lands making up such unit may be located, an instrument identifying and dissolving such unit. The provisions hereof shall be construed as a covenant running with the land and shall inure to the benefit of and be binding upon the parties hereto, their heirs, representatives, successors and assigns. In the event such operating unit or units is/are so created by Lessee, Lessor shall receive out of production or the proceeds from production from such operating unit or units or out of the shut-in royalty provided for above, such portion of the one-eighth (1/8) royalty or of the shut-in royalty specified herein as the number of acres (mineral acres) out of this lease placed in any such operating unit or units bears to the total number of acres included in such operating unit or units.

8.   If Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the royalties herein provided shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

9.   Lessee shall have free use of oil, gas, casinghead gas, condensate, coal and water from said land, except water from Lessor's wells, for all operations hereunder, including repressuring, pressure maintenance and recycling, and the royalty shall be computed after deducting any so used. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred feet of any residence or barn now on said land, without Lessor's consent. In the event a well or wells, producing oil, gas, casinghead gas or condensate in paying quantities should be brought in on adjacent lands not owned by the Lessor and within one hundred fifty feet of and draining the leased premises, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances.

10.   The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns, but no change or division in ownership of the land, rentals, or royalties, however accomplished shall operate to enlarge the obligations or diminish the rights of Lessee. No such change or division in the ownership of the land, rentals or royalties shall be binding upon Lessee for any purpose until such person acquiring any interest has furnished Lessee, at its principal place of business, with a certified copy of the instrument or instruments, constituting his chain of title from the original Lessor. In the event of an assignment of this lease as to a segregated portion of said land, or as to an undivided interest therein, the rentals payable hereunder shall be apportioned as between the several leasehold owners ratably according to the surface area of each, or according to the undivided interest of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. An assignment of this lease, in whole or in part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder and, if Lessee or assignee of part or parts hereof shall fail or make default in the payment of the proportionate part of the rentals due from such Lessee, or assignee, or fail to comply with any other provisions of the lease, such default shall not affect this lease insofar as it covers a part of said lands upon which Lessee or any assignee thereof shall make payment of said rentals.

11.   In case of suit, adverse claim, dispute or question as to the ownership of the rentals or royalties (or some part thereof) payable under this lease, Lessee shall not be held in default in payment of such rentals or royalties (or the part thereof in dispute), until such suit, claim, dispute or question has been finally disposed of, and Lessee shall have thirty (30) days after being furnished with a certified copy of the instrument or instruments disposing of such suit, claim or dispute, or after being furnished with proof sufficient, in Lessee's opinion, to settle such question, within which to make payment. Should the right or interest of Lessee hereunder be disputed by Lessor, or any other person, the time covered by the pendency of such dispute shall not be counted against Lessee either as affecting the term of the lease or for any other purpose, and Lessee may suspend all payments without interest until there is a final adjudication or other determination of such dispute.

12.   In case of cancellation or termination of this lease from any cause, Lessee shall have the right to retain, under the terms hereof, around each well producing, being worked on, or drilling hereunder, the number of acres in the form allocated to each such well under spacing and proration rules issued by the Commissioner of Conservation of the State of Louisiana, or any other State or Federal authority having control of such matters; or, in the absence of such rulings, forty (40) acres around each such well in as near a square form as practicable, and in the event Lessor considers that operations are not being conducted in compliance with this contract, Lessee shall be notified in writing of the facts

relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument.

13.   When drilling, reworking, production or other operations are delayed or interrupted by force majeure, that is, by storm, flood or other acts of God, fire, war, rebellion, insurrection, riot, strikes, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some law, order, rule, regulation, requisition or necessity of the government, Federal or State, or as a result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding, but this lease shall be extended for a period of time equal to that during which Lessee is so prevented from conducting such drilling or reworking operations on, or producing oil, gas, casinghead gas, condensate or other minerals from, the premises; provided that during any period that this lease is continued in force after its primary term solely by force majeure as herein provided, Lessee shall pay to the owners of the royalty hereunder the shut-in royalty provided in paragraph 5 hereof, and in the manner therein provided, without regard to whether or not there is a producing well shut in, located on said land or on land with which the lease premises or any part thereof has been pooled.

14.   It is expressly understood and agreed that the premises leased herein shall, for all the purposes of this lease, be considered and treated as owned in indivision by the Lessor and shall be developed and operated as one lease, and there shall be no obligation on the part of Lessee to offset wells on separate tracts into which the land covered by this lease may be now or hereafter divided by sale, or otherwise, or to furnish separate measuring or receiving tanks, and all rentals, royalties and other payments accruing hereunder shall be treated as an entirety and shall be divided among and paid to Lessor in the proportion that the acreage (mineral rights) owned by each bears to the entire leased acreage. Lessee may at any time or times pay or tender all sums accruing hereunder to the joint credit of Lessor.

15.   Notwithstanding the death of any party Lessor, or his successor in interest, the payment or tender of all sums accruing hereunder in the manner provided above shall be binding on the heirs, executors and administrators of such person.

16.   Lessor hereby warrants and agrees to defend the title to the lands herein described, and agrees that the Lessee at its option shall have the right to redeem for Lessor, by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof. In case of payment of any such mortgage, taxes or other liens by Lessee, in addition to the right of subrogation herein granted, Lessee shall also have the right to retain any royalties which become due Lessor hereunder and to repay itself therefrom, and the retention of such royalties by Lessee shall have the same effect as if paid to the Lessor in whose behalf payment of any mortgage, taxes or other liens was made.

17.   This lease shall be binding upon all who execute it, whether or not named in the body hereof as Lessor, and without regard to whether this same instrument, or any copy thereof, shall be executed by any other Lessor named above.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

WITNESSES:

STATE OF_____ }

_____of_____ }

On this_____day of_____19_____, before me personally appeared_____

_____

to me known to be the person described in and who executed the foregoing instrument, and acknowledged that_____

executed the same as_____free act and deed.

NOTARY PUBLIC in and for

_____

---

STATE OF_____ }

_____of_____ }

Before me, the undersigned authority, personally came and appeared _____

who being first duly sworn deposes and says that he was one of the subscribing witnesses to the execution of the foregoing instrument by

_____

_____

who signed the same in his presence and that of the other subscribing witness(es) to such signature(s) whose name(s) (signatures) are affixed as such, and that he now recognizes all said signatures to be true and genuine.

Sworn to and subscribed before me, notary, on this_____day of_____, 19_____.

Notary Public in and for

_____

## MINERAL LEASE

No._____

FROM

TO

Parish of _____

THE N. L. BATH COMPANY
BATH©GRAN
BATM'S FORM LOUISIANA SPEC. 16-BRTI-JA-FX PAID UP #77 R6/11

---

STATE OF_____ }

_____of_____ }

Before me, the undersigned authority, personally came and appeared _____,

who being first duly sworn deposes and says that he was one of the subscribing witnesses to the execution of the foregoing instrument for

and on behalf of_____,

a corporation; that the same was executed for and on behalf of that corporation by_____

who signed his name thereto as the duly authorized representative of the corporation in the presence of affiant and the other subscribing witness to that signature, whose name (signature) is affixed as such; and that he (affiant) now recognizes all said signatures to be true and genuine.

Sworn to and subscribed before me, notary, on this_____day of_____, 19_____.

Notary Public in and for

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

601, BOX 800
TULSA OK 74101



## EXHIBIT   " C "

Attached to and made a part of Operating Agreement dated February 15, 1999, by and between Brammer Engineering, Inc., OPERATOR, and Wheless TDL Exploration  Company, L.L.C., et al NON-OPERATORS, covering lands in Gibsland Prospect, Bienville Parish, Louisiana

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

### 1. Definitions

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

### 2. Statement and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

### 3. Advances and Payments by Non-Operators

A. Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B. Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at _____*_____ _____ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

    * Deposit Guaranty National Bank of Jackson

### 4. Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

COPYRIGHT© 1985 by the Council of Petroleum Accountants Societies.

- 1 -

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

5.   Audits

A.   A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B.   The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6.   Approval By Non-Operators

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.   Ecological and Environmental

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2.   Rentals and Royalties

Lease rentals and royalties paid by Operator for the Joint Operations.

3.   Labor

A.   (1)   Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2)   Salaries of First Level Supervisors in the field.

(3)   Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4)   Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B.   Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D.   Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II.

E.   Operator shall be entitled to charge its customary fees for consulting services for its employees when directly employed on the joint property and either (1) performing professional level engineering services or (2) supervising drilling or production operations.

4.   Employee Benefits

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

5. **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred ·to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6. **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A.   If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B.   If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C.   In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7. **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8. **Equipment and Facilities Furnished By Operator**

A.   Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _____eight_____ percent ( ___8___ %) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to. use rates published by the Petroleum Motor Transport Association.

9. **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.   **Legal Expense**

All fees and expenses of outside attorneys for legal services rendered for the Joint Account at Operator's request, including all costs and expenses of title examinations, drilling or division order opinions, title curative work, appearance and related matters in connection with administrative bodies and agencies, and handling, investigating and settling litigation or claims arising by reason of the Joint Operators or necessary to protect or recover the Joint Property, including, but not limited to attorneys' fees, court costs, cost of investigation or procuring evidence and amounts paid in settlement or satisfaction of any such litigation or claim.

11.   **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



12. **Insurance**

   Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13. **Abandonment and Reclamation**

   Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14. **Communications**

   Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15. **Other Expenditures**

   Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

1. **Overhead – Drilling and Producing Operations**

   i.   As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

   ( X ) Fixed Rate Basis, Paragraph 1A, or
   (   ) Percentage Basis, Paragraph 1B

   Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii.  The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

   (   ) shall be covered by the overhead rates, or
   ( X ) shall not be covered by the overhead rates.

   iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

   (   ) shall be covered by the overhead rates, or
   ( X ) shall not be covered by the overhead rates.

   A.  **Overhead – Fixed Rate Basis**

   (1)  Operator shall charge the Joint Account at the following rates per well per month:

   Drilling Well Rate $ 9,000.00*          *This rate applicable to the initial well only.
   (Prorated for less than a full month)    Rates on subsequent wells to be negotiated.

   Producing Well Rate $ 600.00

   (2)  Application of Overhead – Fixed Rate Basis shall be as follows:

   (a)  Drilling Well Rate

   (1)  Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

- 4 -

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

**COPAS**

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2)  Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b)  Producing Well Rates

(1)  An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2)  Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3)  An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4)  A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5)  All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3)  The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B.  Overhead – Percentage Basis

(1)  Operator shall charge the Joint Account at the following rates:

(a)  Development

_____ Percent ( _____ %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b)  Operating

_____ Percent ( _____ %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2)  Application of Overhead – Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2.  Overhead – Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



Account for overhead based on the following rates for any Major Construction project in excess of $ __25,000.00__ :

A. _____5_____ % of first $100,000 or total cost if less, plus

B. _____2_____ % of costs in excess of $100,000 but less than $1,000,000, plus

C. ___1 1/2___ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3.    Catastrophe Overhead

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. _____*_____ % of total costs through $100,000; plus

B. _____*_____ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. _____*_____ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.    * to be negotiated when and if needed

4.    Amendment of Rates

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1.    Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2.    Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

- 6 -

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

A. New Material (Condition A)

(1) Tubular goods, except line pipe, shall be priced at the current new price in effect on date of movement on a maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.

(2) Line Pipe

   (a) Movement of less than 30,000 pounds shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.

   (b) Movement of 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

   (1)  Material moved to the Joint Property

        At seventy-five percent (75%) of current new price, as determined by Paragraph A.

   (2)  Material used on and moved from the Joint Property

        (a)  At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

        (b)  At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material.

   (3)  Material not used on and moved from the Joint Property

        At seventy-five percent (75%) of current new price as determined by Paragraph A.

   The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material

   (1)  Condition C

        Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

(2)   Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)   Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)   Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)   Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.   Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.   Pricing Conditions

(1)   Loading or unloading costs may be charged to the Joint Account at the rate ~~of twenty-five cents (25¢)~~ ^actually billed Operator^ ~~per hundred weight~~ on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)   Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.   Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4.   Warranty of Material Furnished By Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

# V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.   Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.   Reconciliation and Adjustment of Inventories

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

COPAS — 1984 — ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.   **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.   **Expense of Conducting Inventories**

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

## EXHIBIT "D"

Attached to and made a part of Operating Agreement dated February 15, 1999, by and between **Brammer Engineering, Inc.,** OPERATOR and **Wheless TDL Exploration Company, L.L.C., et al,** NON-OPERATOR, covering lands in West Lucky Prospect, Bienville Parish, Louisiana.

At all times while operations are conducted under this Agreement, Operator shall maintain for the benefit of all parties hereto, insurance of the types and in the maximum amounts as follows. Premiums for such insurance shall be charged to the Joint Account.

(A)   Comprehensive General Liability:

          Bodily Injury and Property Damage
               $1,000,000 each occurrence
               $1,000,000 aggregate

          Combined - Single Limits

(B)   Automobile Liability:

          Bodily Injury and Property Damage
               $1,000,000 each accident

          Combined - Single Limits

(C)   Workmen's Compensation:   Workmen's compensation insurance to cover full liability under the Workmen's Compensation Law of the state where operations are being conducted (Alabama, Mississippi, Louisiana and Florida):

               $ 500,000 accident
               $ 500,000 disease
               $ 500,000 aggregate

(D)   OPERATOR's Control of Well Insurance including coverage for well control, underground blowout, redrilling expenses, removal of wreck or debris, seepage, pollution, cleanup and containment and evacuation expenses as controlled by the policy wording and subject to its conditions and exclusions. The limit of such insurance of $10,000,000 for any one occurrence with a deductible of $25,000.00 for any one occurrence.  Both the limit and deductible are for 100% interest.  In the event non-operator carries insurance and does not want to be insured under OPERATOR's Control of Well Insurance arranged by the OPERATOR, then non-operator shall provide a certificate of insurance evidencing coverage feature as stated above and minimum limits of $10,000,000 for any one occurrence for non-operator's interest prior to spudding the initial well.  Certificate of insurance shall be subject to the attention of Operations Manager.  Such evidence must indicate that OPERATOR will be given thirty (30) days written advance notice of any material change in or cancellation of non-operator's coverage. Failure by non-operator to provide evidence of insurance shall be considered as acceptance of OPERATOR's Control of Well Insurance arranged by the OPERATOR.

Operator and non-operating working interest owners to agree to mutually waive subrogation, in favor of each other on all insurance carried by each party and/or to obtain such waiver from the insurance carrier if so required by the insurance contract.  If such a waiver is not obtained, the party failing to do so shall indemnify the other party for any claim by an insurance carrier arising out of Subrogation.

Any liability, loss, damage, claim or expense resulting from the accidents or occurrences not covered by insurance of the character referred to above, or in excess of the insurance actually carried under the above provisions, shall be borne by the parties hereto in the proportion in which they own in the Unit Area. In the event OPERATOR is unable to procure and maintain any of the insurance enumerated above, OPERATOR shall promptly give written notice thereof to the other parties and in such event resulting loss, damage, claim and expense shall be borne by the parties hereto in proportion to their respective interests in the Unit Area. Such notice shall also constitute a waiver of the requirement that OPERATOR procure and maintain the insurance which is the subject to this notice. OPERATOR shall give NON-OPERATOR thirty (30) days written notice prior to canceling any of said insurance.

## EXHIBIT "E"

Attached to and made a part of Operating Agreement dated February 15, 1999, by and between **Brammer Engineering, Inc.**, OPERATOR, and **Wheless TDL Exploration Company, L.L.C.**, et al, NON-OPERATOR, covering lands in Gibsland Prospect, Bienville Parish, Louisiana.

### GAS BALANCING AGREEMENT
### FOR GAS WELL PRODUCTION

The parties listed on Exhibit "A" to the Operating Agreement to which this Gas Balancing Agreement is attached, own the working interest in the gas rights underlying the Contract Area covered by such Agreement and are entitled to share in the percentages as stated in the Operating Agreement.

Operator shall give each party advance written notice when a pipeline connection is to be made to, and production is to be commenced from, any gas or gas-condensate well completed in the Contract Area. Within 30 days after receipt of such notice, each party which has not made arrangements to currently dispose of its share of gas shall notify Operator if such party elects to invoke its balancing and storage rights under this Exhibit "E." If such election is made, the said rights shall commence with first gas production. If such election is not made, Operator may, but shall not be obligated, to sell such party's share of gas as provided in Article VI Section "C" subject to the rights of such party as set out in said Article VI Section "C" to exercise its right to take in kind or separately dispose of such production at any time, and the right of such party to invoke the balancing and storage provisions of this Exhibit "E" at any time after giving 30 days written notice. As to parties taking or selling production and those invoking the provisions hereof, it is agreed as follows:

1.

Each party shall make a good faith effort to take and market its share of gas as currently produced. During any period or periods when the market of a party is not sufficient to take that party's full share of the gas produced from the Contract Area, or its purchaser is unable to take its share of gas produced from the Contract Area, the other party or parties shall be entitled but not obligated to produce from said Contract Area (and take or deliver to a purchaser), each month, all or part of that portion of the allowable gas production assigned to such Contract Area by the regulatory body having jurisdiction. That party shall be entitled to take and deliver to its or their purchaser all of such gas production; provided, however, that no party shall be entitled to take or deliver to a purchaser gas production in excess of 300% of its share of the allowable gas production assigned thereto by the regulatory body having jurisdiction, unless that party has gas in storage. Those parties which are capable of taking and marketing quantities of gas allocable to an underproduced party or parties, in the absence of any other agreement between them, shall each take a share of gas attributed to the underproduced party or parties in the direct proportion that its interest bears to the total interest of all parties taking underproduced gas and shall be considered overproduced. All parties hereto shall share in and own the liquid hydrocarbons recovered from such gas by primary separation equipment prior to processing in a gas plant in accordance with their respective interests and subject to the terms of the Operating Agreement.

2.

Each party failing to take or to market its full share of the gas produced, or taking less than its full share of the gas produced shall be considered underproduced and shall be credited with gas in storage equal to its share of the gas produced from the Contract Area, less such party's share of the gas taken, gas used in lease operations, vented or lost. Each party taking gas shall furnish the Operator a monthly statement of gas taken. The Operator will maintain a running account of the gas balance between the parties hereto and will furnish each party statements within sixty (60) days of the end of each month of production showing the total quantity of gas produced and sold, and the total quantity of liquid hydrocarbons recovered, and the monthly and cumulative over-and-under production of each party. Measurement of gas for over-and-under production shall be accomplished by use of sales meters, and gas measurement shall be in accordance with AGA requirements.

3.

After written notice to the Operator at least ten (10) days prior to the beginning of any calendar month, any party may at any time begin taking or delivering to its purchaser its full share of the gas produced from said Contract Area (less any used in lease operations, vented or lost). To allow for the recovery gas in storage and to balance the gas account of the parties in accordance with their respective interests, a party with gas in storage shall be entitled to take or deliver to a purchaser its full share of gas produced from said Contract Area (less any used in lease operations, vented or lost) plus a make-up amount determined by multiplying fifty percent (50%) of the interest of the party or parties without gas in storage by a fraction, the numerator of which is the interest in the Contract Area of such party with gas in storage and the denominator of which is the total percentage interest in the Contract Area of all parties with gas in storage. The first gas made up shall be assumed to be the first gas underproduced.

4.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to its purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

5.

During the term of this Agreement, while gas is being produced from the Joint Property, each party shall pay or deliver, or cause to be paid or delivered, all royalties, overriding royalties or other payments due on its share of production which it is obligated to pay by law or by lease or by contract, just as if each party were taking or delivering to a purchaser its share, and its share only, of such gas production exclusive of gas used in lease operations, vented or lost. Each party hereto shall indemnify and hold the other parties hereto harmless against all claims, losses or liabilities arising out of its failure to fulfill such obligations. In the event any governmental rule, regulation, statute or authority properly prescribes that royalty payments be made on any basis other than that stated in this paragraph 5, or which may otherwise affect the balancing provisions among the parties hereto as stated in this Agreement, this Agreement shall be modified to the extent necessary to comply with such rule, regulation, statute or authority.

6.

Each party producing and taking or delivering gas to its purchaser shall pay, or cause to be paid, all production and severance taxes due on such gas.

7.

When gas sales from a gas well permanently cease, Operator shall make a final determination of the volumes of the last accrued over-and-under production, if any, as of the date of such cessation of sales, by statement to the parties and the final balancing adjustment shall be achieved through a cash settlement (without interest) within sixty (60) days of Operator's statement by the overproduced party, or parties, to the underproduced party, or parties, for the overproduced volumes which have been taken and sold; the price to be paid for such adjustment shall be the actual price received for the last accrued over-production (in the reverse order of accrual, taking most recent over-production and going back until net over-production is accounted for) by the overproduced party, or parties, less appropriate deductions for taxes and/or royalties paid on such production by the overproduced party. If the overproduced party or parties did not sell their gas but otherwise utilized such gas in their own operations separate and apart from Joint Operations, such gas will be valued at the maximum price which the overproduced party or parties could have received for such gas at the time of over-production had it actually been delivered and sold under such party's sales contract, or if none, the weighted average price received by all other parties for gas sold from the Joint Property. For gas sold in intrastate commerce, and not subject to the jurisdiction of the Federal Energy Regulatory Commission (FERC), the price basis shall be the price received for sale of the gas. For gas sold subject to the jurisdiction of the FERC, the price basis shall be the rate collected from time to time, which is

E-2

not subject to possible refund, as provided by the FERC pursuant to final order or settlement applicable to the gas sold from such well, plus any additional collected amount which is not ultimately required by said Commission to be refunded. Any such additional collected amount will be accounted for at such time as final FERC determination is made with respect thereto, unless the underproduced party or parties furnish a bond or other indemnity satisfactory to the overproduced parties agreeing to hold the overproduced party or parties harmless from financial loss due to orders by the FERC.

8.

Nothing herein shall change or affect each party's obligations to pay its proportionate share of all costs and liabilities incurred in Joint Operations as its share thereof is set forth in the described Operating Agreement. In the event of any conflict between this Agreement and the Operating Agreement, other than the Operations by Less than All Parties provisions, this Agreement shall prevail.

9.

Each party hereby indemnifies the other parties hereto against all liability to, and agrees to defend the other parties hereto against, all claims which may be asserted by third parties who now or hereafter stand in a contractual relationship with such indemnifying party which arise out of the operation of this Agreement or activities authorized to be conducted by any party under its provisions; and further agrees to save the other parties hereto harmless from all judgments or damages sustained and costs incurred in connection therewith.

10.

This Agreement shall constitute a separate agreement as to each drilling unit within the Contract Area and shall become effective in accordance with its terms and shall remain in force and effect as long as the Operating Agreement to which it is attached remains in effect, and shall inure to the benefit of and be binding upon the parties hereto, their successors, legal representatives and assigns.

E-3

## EXHIBIT "F"

Attached to and made a part of Operating Agreement dated February 15, 1999, by and between **Brammer Engineering, Inc.**, OPERATOR, and **Wheless TDL Exploration Company, L.L.C.,** et al., NON-OPERATOR, covering lands in Gibsland Prospect, Bienville Parish, Louisiana.

Operator agrees, in its performance of this agreement, to comply with all the nondiscrimination provisions of Section 202 (1) to (7), inclusive, of Executive Order No. 11246 (30 F.F. 12319), and any present or future amendments, supplements, substitutes or revisions thereof, which are hereby incorporated by reference in this agreement.