# RED RIVER PROSPECT
## CADDO AND BOSSIER PARISHES, LOUISIANA

Operator:           Sklar Exploration Company L.L.C.

Non-Operators:    Sklarco L.L.C.
                    Tensas Delta Exploration Company, L.L.C.
                    McCombs Energy, Ltd.
                    Wemo, Inc.
                    Yelbom Oil, Inc.
                    William Rudd Limited Partnership

**Documents**:

Participation Agreement dated effective as of 1st day of April, 2006, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., Tensas Delta Exploration Company, L.L.C., McCombs Energy, Ltd., Wemo, Inc., Yelbom Oil, Inc. and William Rudd Limited Partnership, with attached exhibits:

Exhibit "A":  Plat of Contract Area and Area of Mutual Interest

Exhibit "A1": Description of Leases

Exhibit "B":  Form of Lease

Exhibit "C":  B & K Letter Agreement

Exhibit "D":  AFE

Exhibit "E":  Joint Operating Agreement with attached exhibits:

    Exhibit "A":  Description of Lands and Interests

    Exhibit "A1": Description of Oil, Gas And Mineral Leases

    Exhibit "A2": Plat of Contract Area and Area of Mutual Interest

    Exhibit "B":  Oil, Gas And Mineral Lease

    Exhibit "C":  Accounting Procedure Joint Operations (COPAS)

    Exhibit "D":  Insurance Provisions

    Exhibit "E":  Gas Balancing Agreement

## PARTICIPATION AGREEMENT

**Red River Prospect**
**Caddo and Bossier Parishes, Louisiana**

THIS PARTICIPATION AGREEMENT (the "Agreement"), dated effective as of the 1st day of April, 2006 (the "Effective Date"), is entered into by and between the following (sometimes herein referred to singularly as a "Party" or collectively as the "Parties"):

> **SKLAR EXPLORATION COMPANY L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its Chief Operating Officer, David A. Barlow ("SEC" or "Operator");

> **SKLARCO L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its Chief Operating Officer, David A. Barlow ("Sklarco");

> **TENSAS DELTA EXPLORATION COMPANY, LLC**, a Louisiana limited liability company, whose address is 333 Texas Street, Suite 525, Shreveport, Louisiana 71101, represented herein by its duly authorized Executive Vice President, Michael E. Riddick ("TDEC");

> **McCOMBS ENERGY, LTD.**, a Texas limited partnership, whose address is 5599 San Felipe, Suite 1200, Houston, Texas 77056-2794, represented herein by its Vice President, Ricky Haikin ("McCombs");

> **WEMO, INC.**, a Louisiana corporation, whose address is Post Office Box 5326, Shreveport, Louisiana 71135-5326, represented herein by its Vice-President, B. Craig Webb ("Wemo");

> **YELBOM OIL INC.**, a Louisiana corporation, whose address is Post Office Box 1091, Shreveport, Louisiana 71163-1091, represented herein by its President, Gregory B. Mobley ("Yelbom");

> **WILLIAM RUDD LIMITED PARTNERSHIP**, a Texas limited partnership, whose address is Post Office Box 1797, Waskom, Texas 75692, represented herein by William L. Rudd III ("Rudd");

> (hereinafter Sklarco, TDEC, McCombs, Wemo, Yelbom and Rudd are sometimes referred to collectively as the "Participants" or individually as a "Participant");

### WITNESSETH:

WHEREAS, Sklarco holds record title for and on behalf of SEC to the oil, gas and other mineral leases (hereinafter sometimes referred singularly as a "Lease" or collectively as the "Leases") described on Exhibit "A-1," attached hereto and made a part hereof, covering lands located in Caddo and Bossier Parishes, Louisiana, lying within a contract area (the "Contract Area") outlined in black on the plat attached hereto as Exhibit "A," which itself is lying within an area of mutual interest (the "AMI") outlined in red on said plat, generally known as the Red River Prospect (the "Prospect"); and

WHEREAS, SEC desires to sell, and the Participants desire to acquire, all of SEC's right, title and interest in and to the Leases, and the Participants desire to participate in the drilling of an exploratory well to test the Prospect operated by SEC (the "Initial Well"); and

WHEREAS, the Parties desire to enter this Agreement to set forth the terms and conditions under which they sell or acquire, as the case may be, those working interests and drill the Initial Well.

NOW, THEREFORE, the Parties agree as follows:

## Article I.  Purchase And Sale And Development Commitments

### Section 1.1.  Leases

SEC represents and warrants that it owns the Leases and that all of those Leases are in full force and effect.  The Participants have either tendered to SEC, or shall tender to SEC concurrent with their execution of this Agreement, in the following proportions, the amount of $413,351.00 (collectively, the "Prospect Fee"), representing the total lease bonus, brokerage, geological, geophysical and other costs associated with the prospect through March 31, 2006, as itemized on the Joint Interest Bill dated March 31, 2006, a copy of which have been furnished to or is available for inspection by the Participants:

| Participant | Proportion | Amount |
|---|---|---|
| Sklarco | 0.37000000 | $152,939.87 |
| TDEC | 0.33000000 | $136,405.83 |
| McCombs | 0.25000000 | $103,337.75 |
| Yelbom | 0.02000000 | $  8,267.02 |
| Wemo | 0.02000000 | $  8,267.02 |
| Rudd | 0.01000000 | $  4,133.51 |
| Total | 1.00000000 | $413,351.00 |

For and in consideration of the Prospect Fee and the reversionary back-in working interest described below, the receipt and sufficiency of which are hereby acknowledged, SEC hereby sells and agrees to cause Sklarco formally to assign to the Participants in the same proportions, upon completion of the Initial Well as a well capable of producing in paying quantities, by means of the form of assignment attached hereto as Exhibit "B," all of its right, title and interest in and to the Leases.  This assignment of this interest shall be (i) proportionately reduced to the interest owned by SEC, (ii) made without warranty of title, express or implied, not even for return of the Prospect Fee, except SEC agrees to warrant title against all defects arising out of claims by SEC, Sklarco or of persons claiming by, through or under SEC or Sklarco, (iii) subject to all burdens of record, (iv) subject to the terms of the Leases and (v) subject to this Agreement and the JOA described in Section 2.1 of this Agreement.

Further, the assignment of interest shall be burdened by and subject to that certain letter agreement dated December 12, 2005, executed by B & K Exploration Investments LLC and Sklarco L.L.C., a copy of which is attached hereto as Exhibit "C" and by reference made a part hereof.

The Parties recognize that they may incur additional costs in the form of lease bonuses and brokerage associated with acquisitions currently underway of additional leases covering the following described lands located in the Contract Area, estimated to cost approximately $235,719.39: (i) 536.646 acres, more or less, owned by the Estate of Sam Grayson; (ii) 239.6666 acres, more or less, owned by Sunflower Plantation Company; (iii) 518.9 acres, more or less, owned by members of the Leslie Cowley family; and (iv) 276.25 acres, more or less, owned by Blount Construction, L.L.C.  The Participants assume their share of said additional costs and agree to pay the same if, as and when it is incurred in addition to the Prospect Fee.  All other leases acquired after the spudding of the Initial Well shall be governed by the AMI described in Section 3.1 below.

### Section 1.2.  Initial Well

#### Subsection 1.2(a).  Drilling Of The Initial Well

On or before September 1, 2006, and subject to rig availability, SEC shall commence or cause to be commenced operations for the drilling of the Initial Well at a location of approximately 1200' FSL and 2300' FEL of Section 26, T17N, R13W, or as near thereto as practicable, and thereafter continue the drilling of the Initial Well with due diligence to a measured depth of 10,200' in a vertical bore hole, or a depth sufficient in SEC's discretion, to test the Taylor Sand of the Cotton Valley Formation, whichever is more shallow (the "Objective Depth").  The Participants agree to participate in the drilling of the Initial Well to the Objective Depth in the following proportions:

| Participant | Proportion |
|---|---|
| Sklarco | 0.37000000 |
| TDEC | 0.33000000 |
| McCombs | 0.25000000 |
| Yelbom | 0.02000000 |
| Wemo | 0.02000000 |
| Rudd | 0.01000000 |
| Total | 1.00000000 |

Concurrent with their execution of this Agreement, the Participants agree to execute an Authority For Expenditure ("AFE") attached hereto as Exhibit "D." Notwithstanding the estimates contained in the AFE, the Participants are responsible for and must pay SEC their share of all actual costs to drill the Initial Well to the Objective Depth in the following manner: (i) SEC will furnish the Participants with a Cash Call Invoice within thirty (30) days of its anticipated spud date of the Initial Well covering their share of the amount estimated in the AFE to drill the Initial Well to the Objective Depth, excluding estimated completion costs, but including the amount estimated to plug and abandon the Initial Well in the event it is not completed as a producing well, and the Participants must tender to SEC as an advance, within fifteen (15) days of receipt and, in any event, prior to spudding the Initial Well, full payment of the Cash Call Invoice; and (ii) the Participants must tender to SEC, within 15 days of receipt of (an) invoice(s) from SEC, the difference, if any, between said advance and their share of the actual costs to drill the Initial Well to the Objective Depth.

If any Participant fails to pay its share of the actual costs to drill the Initial Well to the Objective Depth in the manner and within the time deadlines set forth above, then, in that event, and only in that event, that Party hereby agrees to relinquish all of its right, title and interest in the Prospect and the Leases and to execute those instruments provided by SEC necessary to convey said interest to the Participants which did not fail to pay its share of the actual costs to drill the Initial Well to the Objective Depth and who so elect to accept such an additional interest or portion thereof, for no consideration, not even for return of the Prospect Fee or drilling advance. This forfeiture of interest shall be without prejudice and in addition to the rights of the Operator and Non-Operators who paid their shares of the actual costs to drill the Initial Well to the Objective Depth to offset and recover all sums owed by a Party that fails to pay its share of actual costs to drill the Initial Well to the Objective Depth.

### Subsection 1.2(b). Operations After Reaching The Objective Depth

After the Initial Well has been drilled to the Objective Depth, SEC shall make a copy of any logs, core analysis, drill-stem test analysis or results of any other tests available to a representative of the Participants at the wellsite, or if none is present, by regular mail, email, facsimile or overnight delivery. SEC shall also furnish the Participants in a like manner with its recommendation regarding the disposition of the wellbore, in accordance with the JOA. Failure to respond within the time specified shall be deemed an election to participate in SEC's recommended operation. An election not to participate in an election to set production casing and complete the Initial Well shall result in the forfeiture of interest not only in the Initial Well, but also in the entire Contract Area and AMI pursuant to Article XV.C of the JOA. All subsequent operations and elections shall be governed by the following provisions of this Agreement and the JOA:

(i) Article XV.E of the JOA: This provision governs advancement of costs. Failure to tender an advanced payment in accordance with the terms of this article may, in certain circumstances, result in relinquishment of interest or being deemed non-consent, depending on the circumstances, as set forth more fully therein.

(ii) Article XV.R of the JOA: This provision governs elections to participate in any proposed operation necessary to maintain an oil and gas lease and/or oil and gas interest covered by the Agreement or earn an interest therein. An election not to participate in the same results in forfeiture of all right, title and interest in and to the oil and gas lease(s) and/or oil and gas interest(s) which would be lost or not earned if such operation were not conducted as set forth in more detail in said Article XV.R.

(iii) Article VI.B.2 and Article XV.W of the JOA govern subsequent operations by less than all of the parties that are not governed by any of the above described provisions. An election not to participate in a subsequent operation under Article VI.B results in relinquishment of interest in the entire well, and not just a particular Zone therein, together with the share of proceeds from the sale of production from such well. The relinquished interest reverts back to the Non-Consenting Parties only if and when the risk compensation provided for thereunder is recouped by the Consenting Parties as set forth in more detail in said Article VI.B.2.

### Section 1.3. Reversionary Back-In Working Interest

As further consideration for the sale described in Section 1.1 above, upon reaching Prospect Payout (as defined below), an undivided twenty-five percent (25%) of the other Participants' interests in the Leases shall automatically and permanently revert to and vest in Sklarco. At Sklarco's request, those other Participants will formally assign said interest unto Sklarco after Project Payout, including, without limitation, a like interest in the Leases, the proceeds from the sale of oil, gas, and all other products produced or derived from any and all wells drilled within the Prospect, and in any surface use agreements, easements, rights of way, personal property, equipment, facilities and pipelines associated with such wells.

Page 3 of 18

Prospect Payout is defined on a Prospect (not well-by-well) basis as the first day of the calendar month following the month in which a Participant's share of the total and cumulative revenue resulting from or relating to the Prospect, equals that Participant's share of the total and cumulative cost incurred within that Prospect. For purposes of Prospect Payout, (i) the total and cumulative revenue shall consist of the Participant's share of all sales proceeds for all oil, gas and other hydrocarbons and minerals saved and sold from the applicable Prospect and any other income, bonus payment or other revenue attributable to the Participant's interest therein, and (ii) the total and cumulative cost incurred shall include · the Participant's share of all royalty and overriding royalty payments, severance, ad valorem, production and other taxes applicable to production and not measured by the Participant's other income, all lease acquisition and maintenance costs, all seismic survey and data costs, geological and geophysical evaluation costs, all costs for site preparation, drilling, reworking, deepening, sidetracking, logging, stimulation, testing, equipping, operating, plugging and abandoning the Initial Well and all other wells within the Prospect, and the cost of all surface damages, pipelines, gathering and other production handling facilities related thereto.

## Article II.  Operations

### Section 2.1.  JOA

SEC is hereby designated Operator.  Except as otherwise provided in this Agreement, all operations within the Contract Area shall be governed by the joint operating agreement (the "JOA"), covering the Contract Area attached hereto as Exhibit "E."  The Parties agree to execute the JOA concurrent with their execution of this Agreement.  In the event of a conflict between this Agreement and the JOA, this Agreement shall govern and control.

## Article III.  Miscellaneous

### Section 3.1.  AMI

The Parties have formed an AMI under the terms contained in Article XV.M of the JOA covering the lands within the red outline on the plat attached hereto as Exhibit "A" which shall govern all other acquisitions within the Contract Area.  The reversionary back-in after payout working interest described above shall burden new leases acquired under this AMI.

### Section 3.2.  Information

Without limitation upon the right of Non-Operators to obtain information under the JOA, upon execution of this Agreement by all of the Parties, any Participate may request and shall be entitled to a copy of all of the Leases and of the drill-site title opinion for the drill-site tract of the Initial Well.

### Section 3.3.  Confidentiality

The Parties agree to keep confidential and not disclose any information about this Prospect, not already disclosed or of public record, to third parties for so long as this Agreement is in effect.

### Section 3.4.  Closing

Closing shall occur by mail or by such other means and at such time and place to which the Parties mutually agree.

### Section 3.5.  Binding On Successors And Assigns

This Agreement shall enure to the benefit of and be binding upon the Parties hereto and their respective successors and assigns.

### Section 3.6.  Entire Agreement

This Agreement and its attachments constitute the entire agreement of the Parties with respect to the subject matter hereof, and any other promises, inducements, representations, warranties or agreements with respect to the subject matter hereof have been superseded hereby and are not intended to survive this Agreement. Except as otherwise expressly provided herein, no amendment or modification of this Agreement shall be effective unless set forth in writing and signed by a duly authorized officer of each of the Parties.

**Section 3.7.  Severability**

The invalidity of any one or more of the provisions of this Agreement does not affect the remaining portions of this Agreement, and in case of any such invalidity, this Agreement should be construed as if the invalid provision(s) had not been inserted.

**Section 3.8.  Notices**

All notices between the Parties authorized or required by any of the provisions of this Agreement, unless otherwise expressly provided, shall be given in writing by email or facsimile or by regular mail, addressed to those of the Parties to whom the notice is given at the email addresses or fax telephone numbers or addresses set forth in Exhibit "A" to the JOA.  Any of the Parties may change its designated email address, fax telephone number or address at any time, and from time to time, by giving written notice thereof to the Operator and the other Parties.

**Section 3.9.  Headings for Convenience**

The article, section and subsection headings used in this Agreement are inserted for convenience only and shall not be regarded in construing this Agreement.

**Section 3.10.  Time**

Time is of the essence hereunder.

**Section 3.11.  Governing Law**

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Louisiana.

**Section 3.12.  Relationship Of The Parties**

Liability of the Parties hereto shall be several and not joint or collective.  Each Party shall make its own elections under this Agreement and shall be responsible only for its obligations as herein set out. It is not the intention of the Parties to create, nor shall this Agreement be construed as creating, a mining or other partnership, joint venture or association between the Parties.

**Section 3.13.  Assignability**

The Parties to this Agreement may assign all or part of their rights and obligations hereunder, provided, however, that any such assignment must be made subject to the terms and conditions of this Agreement and the JOA.

**Section 3.14.  Term**

This Agreement shall remain in full force and effect as between the Parties until expiration of the last lease jointly owned by them, or any combination of the Parties, covering any part of the AMI.

**Section 3.15.  Counterparts**

This Participation Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

THUS DONE AND SIGNED This ____ day of _____, 2006, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By _____
    David A. Barlow
    Chief Operating Officer

SKLARCO L.L.C.

By _____
    David A. Barlow
    Chief Operating Officer

TENSAS DELTA EXPLORATION COMPANY, LLC

By_____
    Michael E. Riddick
    Executive Vice President

McCOMBS ENERGY, LTD.

By_____
    Ricky Haikin
    Vice President

WEMO, INC.

By_____
    B. Craig Webb
    President

YELBOM OIL INC.

By_____
    Gregory B. Mobley
    President

WILLIAM RUDD LIMITED PARTNERSHIP

By_____
    William L. Rudd III

Attachments
    Exhibit "A":    Plat
    Exhibit "A-1":  Description of Leases
    Exhibit "B":    Form of Assignment
    Exhibit "C":    B&K Letter Agreement
    Exhibit "D":    AFE
    Exhibit "E":    JOA

## Exhibit "A"

Attached to and made a part of that certain Participation Agreement dated effective as of April 1, 2006, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., Tensas Delta Exploration Company, L.L.C., McCombs Energy, Ltd., Wemo, Inc., Yelbom Oil, Inc. and William Rudd Limited Partnership, covering the Red River Prospect, T17N, R13W and T17N, R12W, Caddo and Bossier Parishes, Louisiana

## Plat of Contract Area and AMI



EXHIBIT "A-1"

Attached to and made a part of that certain
Participation Agreement dated effective as of April 1, 2006,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C.,
Tensas Delta Exploration Company, L.L.C., McCombs Energy, Ltd.,
Wemo, Inc., Yelbom Oil Inc. and William Rudd Limited Partnership

## DESCRIPTION OF LEASES

Oil, Gas And Mineral Lease dated September 1, 2005, executed by Sunflower Plantation, L.L.C., C. Bickham Dickson, Jr., C. Bickham Dickson, III, Michael Augustus Dickson and James Scott Dickson, as Lessors, in favor of Sklarco L.L.C., as Lessee, covering 798.438 acres, more or less, recorded in Book 3817, Page 770 under Registry No. 2011891 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1356, Page 359 under Registry No. 852706 of the Conveyance Records of Bossier Parish, Louisiana.

Oil, Gas And Mineral Lease dated September 1, 2005, executed by C. Bickham Dickson, III, as Lessor, in favor of Sklarco L.L.C., as Lessee, covering 447.2914 acres, more or less, recorded in Book 3817, Page 792 under Registry No. 2011893 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1356, Page 371 under Registry No. 852708 of the Conveyance Records of Bossier Parish, Louisiana.

Oil, Gas And Mineral Lease dated November 9, 2005, executed by Dutton Family, L.L.C. and Sorensen-Naylor, Ltd., as Lessors, in favor of Sklarco L.L.C., as Lessee, covering 346.5 acres, more or less, recorded in Book 3817, Page 785 under Registry No. 2011892 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1356, Page 364 under Registry No. 852707 of the Conveyance Records of Bossier Parish, Louisiana.

Oil, Gas And Mineral Lease dated December 12, 2005, executed by B & K Exploration Investments, L.L.C., as Lessor, in favor of Sklarco L.L.C., as Lessee, covering 232.03 acres, more or less, recorded in Book 3818, Page 1 under Registry No. 2011894 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1356, Page 380 under Registry No. 852709 of the Conveyance Records of Bossier Parish, Louisiana, as amended by that certain Amendment To Oil, Gas And Mineral Lease dated effective as of December 12, 2005, recorded in Book _____, Page _____ under Registry No. _____ of the Conveyance Records of Caddo Parish, Louisiana, and in Book _____, Page _____ under Registry No. _____ of the Conveyance Records of Bossier Parish.

Lease For Oil, Gas And Other Liquid Or Gaseous Minerals, dated December 14, 2005, executed by the State Mineral Board on behalf of the State of Louisiana, as Lessor, in favor of Sklarco L.L.C., as Lessee, covering 454 acres, more or less, recorded in Book 3825, Page 646 under Registry No. 2016353 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1359, Page 434 under Registry No. 855469 of the Conveyance Records of Bossier Parish, Louisiana.

Oil, Gas And Mineral Lease dated December 19, 2005, executed by Locke Properties, Inc., as Lessor, in favor of Sklarco L.L.C., as Lessee, covering 190.448 acres, more or less, recorded in Book 3828, Page 447 under Registry No. 2018179 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1360, Page 497 under Registry No. 856523 of the Conveyance Records of Bossier Parish, Louisiana.

EXHIBIT "B"

Attached to and made a part of that certain
Participation Agreement dated effective as of April 1, 2006,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C.,
Tensas Delta Exploration Company, L.L.C., McCombs Energy, Ltd.,
Wemo, Inc., Yelbom Oil Inc. and William Rudd Limited Partnership

FORM OF ASSIGNMENT

STATE OF LOUISIANA,

PARISHES OF CADDO AND BOSSIER.

KNOW ALL MEN BY THESE PRESENTS That:

**SKLARCO L.L.C.,** a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its Chief Operating Officer, David A. Barlow ("Assignor");

for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the back-in after project payout reversionary working interest described hereinbelow, does hereby reserve unto itself and grant, bargain, sell, convey, assign, set over and transfer unto the following:

**SKLARCO L.L.C.,** a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its Chief Operating Officer, David A. Barlow ("Sklarco");

**TENSAS DELTA EXPLORATION COMPANY, LLC,** a Louisiana limited liability company, whose address is 333 Texas Street, Suite 525, Shreveport, Louisiana 71101, represented herein by its duly authorized Executive Vice President, Michael E. Riddick ("TDEC");

**McCOMBS ENERGY, LTD.,** a Texas limited partnership, whose address is 5599 San Felipe, Suite 1200, Houston, Texas 77056-2794, represented herein by its Vice President, Ricky Haikin ("McCombs");

**WEMO, INC.,** a Louisiana corporation, whose address is Post Office Box 5326, Shreveport, Louisiana 71135-5326, represented herein by its Vice-President, B. Craig Webb ("Wemo");

**YELBOM OIL INC.,** a Louisiana corporation, whose address is Post Office Box 1091, Shreveport, Louisiana 71163-1091, represented herein by its President, Gregory B. Mobley ("Yelbom");

**WILLIAM RUDD LIMITED PARTNERSHIP,** a Texas limited partnership, whose address is Post Office Box 1797, Waskom, Texas 75692, represented herein by William L. Rudd III ("Rudd");

(hereinafter Sklarco, TDEC, McCombs, Wemo, Yelbom and Rudd are sometimes referred to collectively as "Assignees," or singularly as "Assignee");

all of Assignor's right, title and interest in and to the oil, gas and mineral leases (the "Leases") described on Exhibit "A," attached hereto and by reference made a part hereof, to be shared by the Assignees in the proportions set forth below as to each such Assignee's name:

| ASSIGNEES | INTEREST |
|---|---|
| Sklarco | 0.37000000 of 8/8ths |
| TDEC | 0.33000000 of 8/8ths |
| McCombs | 0.25000000 of 8/8ths |
| Yelbom | 0.02000000 of 8/8ths |
| Wemo | 0.02000000 of 8/8ths |
| Rudd | 0.01000000 of 8/8ths |
| *Total* | 1.00000000 |

TO HAVE AND TO HOLD unto the Assignees, their successors and assigns, forever, subject to, and in accordance with, the following terms and provisions:

1. This Assignment is made effective as of April 1, 2006 (the "Effective Date").

2. This Assignment is made without warranty of title, express or implied, not even return for the purchase price, except that Assignors agree to warrant title against all defects arising out of claims by Sklar Exploration Company L.L.C. or Assignor or of persons claiming by, through or under Sklar Exploration Company L.L.C. or Assignor.

3. This Assignment, and the interest assigned hereunder, is made subject to the terms and conditions of the Leases and all other instruments of record affecting those Leases as of the Effective Date, including, without limitation, (i) [DESCRIBE ANY INSTRUMENTS HERE].

4. This Assignment is also made in accordance with and subject to that certain Participation Agreement dated effective as of April 1, 2006, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., Tensas Delta Exploration Company, L.L.C., McCombs Energy, Ltd., Wemo, Inc., Yelbom Oil Inc. and William Rudd Limited Partnership, and all attachments thereto, including that certain Joint Operating Agreement dated April 1, 2006, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C. et al., as Non-Operators, and all of the terms and provisions of that Participation Agreement and its attachments, including, without limitation, the back-in after prospect payout reversionary working interest described therein.

5. This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

WITNESSES:

_____

_____

SKLARCO L.L.C.

By_____
    David A. Barlow
    Chief Operating Officer

- - - ASSIGNOR

SKLARCO L.L.C.

By_____
    David A. Barlow
    Chief Operating Officer

TENSAS DELTA EXPLORATION COMPANY, LLC

By_____
    Michael E. Riddick
    Executive Vice President

McCOMBS ENERGY, LTD.

By_____
    Ricky Haikin
    Vice President

WEMO, INC.

By_____
    B. Craig Webb
    President

YELBOM OIL INC.

By_____
    Gregory B. Mobley
    President

WILLIAM RUDD LIMITED PARTNERSHIP

By_____
    William L. Rudd III

- - - ASSIGNEES

## EXHIBIT "A"

Attached to and made a part of that certain Assignment Of Oil, Gas
And Mineral Leases dated effective as of April 1, 2006,
by and between Sklarco L.L.C., as Assignor, and Sklarco L.L.C ,
Tensas Delta Exploration Company, L.L.C., McCombs Energy, Ltd.,
Wemo, Inc., Yelbom Oil Inc. and William Rudd Limited Partnership, as Assignees

### DESCRIPTION OF LEASES

Oil, Gas And Mineral Lease dated September 1, 2005, executed by Sunflower Plantation, L.L.C., C. Bickham Dickson, Jr., C. Bickham Dickson, III, Michael Augustus Dickson and James Scott Dickson, as Lessors, in favor of Sklarco L.L.C., as Lessee, covering 798.438 acres, more or less, recorded in Book 3817, Page 770 under Registry No. 2011891 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1356, Page 359 under Registry No. 852706 of the Conveyance Records of Bossier Parish, Louisiana.

Oil, Gas And Mineral Lease dated September 1, 2005, executed by C. Bickham Dickson, III, as Lessor, in favor of Sklarco L.L.C., as Lessee, covering 447.2914 acres, more or less, recorded in Book 3817, Page 792 under Registry No. 2011893 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1356, Page 371 under Registry No. 852708 of the Conveyance Records of Bossier Parish, Louisiana.

Oil, Gas And Mineral Lease dated November 9, 2005, executed by Dutton Family, L.L.C. and Sorensen-Naylor, Ltd., as Lessors, in favor of Sklarco L.L.C., as Lessee, covering 346.5 acres, more or less, recorded in Book 3817, Page 785 under Registry No. 2011892 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1356, Page 364 under Registry No. 852707 of the Conveyance Records of Bossier Parish, Louisiana.

Oil, Gas And Mineral Lease dated December 12, 2005, executed by B & K Exploration Investments, L.L.C., as Lessor, in favor of Sklarco L.L.C., as Lessee, covering 232.03 acres, more or less, recorded in Book 3818, Page 1 under Registry No. 2011894 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1356, Page 380 under Registry No. 852709 of the Conveyance Records of Bossier Parish, Louisiana, as amended by that certain Amendment To Oil, Gas And Mineral Lease dated effective as of December 12, 2005, recorded in Book ____, Page _____ under Registry No. _____ of the Conveyance Records of Caddo Parish, Louisiana, and in Book ____, Page _____ under Registry No. _____ of the Conveyance Records of Bossier Parish.

Lease For Oil, Gas And Other Liquid Or Gaseous Minerals, dated December 14, 2005, executed by the State Mineral Board on behalf of the State of Louisiana, as Lessor, in favor of Sklarco L.L.C., as Lessee, covering 454 acres, more or less, recorded in Book 3825, Page 646 under Registry No. 2016353 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1359, Page 434 under Registry No. 855469 of the Conveyance Records of Bossier Parish, Louisiana.

Oil, Gas And Mineral Lease dated December 19, 2005, executed by Locke Properties, Inc., as Lessor, in favor of Sklarco L.L.C., as Lessee, covering 190.448 acres, more or less, recorded in Book 3828, Page 447 under Registry No. 2018179 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1360, Page 497 under Registry No. 856523 of the Conveyance Records of Bossier Parish, Louisiana.

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

Before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, appeared David A. Barlow, to me personally known, who, being by me duly sworn, did say:

That he is the Vice President and Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and that said appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, said appearer has signed these presents before me and in the presence of two competent witnesses, whose printed or typed names are _____ and _____, and I have hereunto set my official hand and seal with said appearer and said witnesses, all on this _____ day of _____, 2006.

_____
Notary Public in and for the Parish of Caddo, State of Louisiana
Notary's Printed Name:
Notary Public's Number:
My Commission Expires:

STATE OF LOUISIANA

PARISH OF CADDO

Before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, appeared Michael E. Riddick, to me personally known, who, being by me duly sworn, did say:

That he is the Executive Vice President of TENSAS DELTA EXPLORATION COMPANY LLC, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and that said appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, said appearer has signed these presents before me and in the presence of two competent witnesses, whose printed or typed names are _____ and _____, and I have hereunto set my official hand and seal with said appearer and said witnesses, all on this _____ day of _____, 2006.

_____
Notary Public in and for the Parish of Caddo, State of Louisiana
Notary's Printed Name:
Notary Public's Number:
My Commission Expires:

STATE OF TEXAS

COUNTY OF HARRIS

Before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, appeared Ricky Haikin, to me personally known, who, being by me duly sworn, did say:

That he is the Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, and that the foregoing instrument was signed by him on behalf of said limited partnership, and that said appearer acknowledged said instrument to be the free act and deed of said limited partnership.

IN WITNESS WHEREOF, said appearer has signed these presents before me and in the presence of two competent witnesses, whose printed or typed names are _____ and _____, and I have hereunto set my official hand and seal with said appearer and said witnesses, all on this _____ day of _____, 2006.

_____
Notary Public in and for the Parish of Caddo, State of Louisiana
Notary's Printed Name:
Notary Public's Number:
My Commission Expires:

STATE OF LOUISIANA

PARISH OF CADDO

Before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, appeared B. Craig Webb, to me personally known, who, being by me duly sworn, did say:

That he is the President of WEMO, INC., a Louisiana corporation, and that the foregoing instrument was signed by him on behalf of said company, and that said appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, said appearer has signed these presents before me and in the presence of two competent witnesses, whose printed or typed names are _____ and _____, and I have hereunto set my official hand and seal with said appearer and said witnesses, all on this _____ day of _____, 2006.

_____
Notary Public in and for the Parish of Caddo, State of Louisiana
Notary's Printed Name:
Notary Public's Number:
My Commission Expires:

STATE OF LOUISIANA

PARISH OF CADDO

 Before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, appeared Gregory B. Mobley, to me personally known, who, being by me duly sworn, did say:

 That he is the President of YELBOM OIL, INC., a Louisiana corporation, and that the foregoing instrument was signed by him on behalf of said company, and that said appearer acknowledged said instrument to be the free act and deed of said company.

 IN WITNESS WHEREOF, said appearer has signed these presents before me and in the presence of two competent witnesses, whose printed or typed names are _____ and _____, and I have hereunto set my official hand and seal with said appearer and said witnesses, all on this _____ day of _____, 2006.


          _____
          Notary Public in and for the Parish of Caddo, State of
          Louisiana
          Notary's Printed Name:
          Notary Public's Number:
          My Commission Expires:


STATE OF TEXAS

COUNTY OF _____

 Before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, appeared William L. Rudd III, to me personally known, who, being by me duly sworn, did say:

 That he is the _____ of WILLIAM RUDD LIMITED PARTNERSHIP, a Texas limited partnership, and that the foregoing instrument was signed by him on behalf of said limited partnership, and that said appearer acknowledged said instrument to be the free act and deed of said limited partnership.

 IN WITNESS WHEREOF, said appearer has signed these presents before me and in the presence of two competent witnesses, whose printed or typed names are _____ and _____, and I have hereunto set my official hand and seal with said appearer and said witnesses, all on this _____ day of _____, 2006.


          _____
          Notary Public in and for the Parish of Caddo, State of
          Louisiana
          Notary's Printed Name:
          Notary Public's Number:
          My Commission Expires:

**EXHIBIT "C"**

Attached to and made a part of that certain
Participation Agreement dated effective as of April 1, 2006,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C ,
Tensas Delta Exploration Company, L.L.C., McCombs Energy, Ltd.,
Wemo, Inc., Yelbom Oil Inc. and William Rudd Limited Partnership

**B&K LETTER AGREEMENT**



December 12, 2005

Mr. Kenneth J. Canatella
B & K Exploration Investments LLC
10323 Ellerbe Road
Shreveport, Louisiana 71106

Re:    Sections 26, 35 and Irregular Section 37,
Township 17 North, Range 13 West, Caddo
and Bossier Parishes, Louisiana

Dear Mr. Canatella:

This will confirm our agreement that, concurrent with the execution of that certain Oil, Gas And Other Mineral Lease (the "Lease") dated October 15, 2005, executed by B & K Exploration Investments LLC, as Lessor, in favor of Sklarco L.L.C., covering lands located in the referenced area, we offer B & K Exploration Investments LLC ("Participant") the right, without any obligation, to participate in any well drilled on the lands covered by the Lease, or lands pooled therewith, for an undivided 1% gross working interest. The said interest shall be a "ground floor" working interest, meaning that it is not subject to any promotion, in the form of cash, overriding royalty interest, reversionary interest or otherwise; however, the said working interest shall be carved out of our leasehold interest and shall be subject to the same terms and conditions to which our interest is subject, including, without limitation, the terms and conditions of the Lease and any other leases covering lands located within the unit for the well, including the royalty obligations thereunder.

Participant's election to participate, or not to participate, in a well shall be determined on a well by well basis as follows. At least thirty (30) days prior to spudding a well, we will furnish Participant in writing an election ballot specifying the location of the well, estimating the costs to drill the well to the objective depth and identifying the objective depth and objective formation or formations expected to be encountered. The election ballot will be accompanied by an Authority For Expenditure ("AFE") itemizing the estimated costs of the operation. Participant must respond in writing within thirty (30) days of delivery of the election ballot. If Participant elects to participate, then Participant must execute the election ballot and the AFE and return the same to us within the thirty (30) day deadline. Failure to respond in this manner and within this time period shall be deemed an election not to participate. If Participant elects not to participate in a well, either by its affirmative election or by presumption, then Participant shall forever forfeit, relinquish and abandon any working interest in that well. Such an election, however, shall not affect his right to participate, or not to participate, in other wells. If Participant elects to participate in a well, then his interest in

Mr. Kenneth J. Canatella
B & K Exploration Investments LLC
December 12, 2005
Page 2

that well shall thereafter be governed by the terms and conditions of a Model Form Operating Agreement (the "JOA"), by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C. and B & K Exploration Investments LLC, as Non-Operators, covering a Contract Area limited to the wellbore for that well, and in the same form as the AAPL Model Form Operating Agreement Form 610-1982. Subject to the terms of the JOA, Participant's 1% gross working interest shall bear its share of all actual expenses associated with the well, including, without limitation, the costs of drilling, completing, producing, re-completing, reworking and operating the well, and treating, transporting and marketing natural gas produced from the well.

Liability between us shall be several and not joint or collective. Each of us shall be responsible only for our own obligations as set out herein and in the JOA. We do not intend to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture or association between us, or any relationship whatsoever that may give rise to a fiduciary duty between us. Neither Sklar Exploration Company L.L.C., nor Sklarco L.L.C., shall bear any obligation to perform its duties hereunder or under the JOA to a multiplicity of parties succeeding to the interest of Participant. If Participant assigns or otherwise transfers all or part of its interest, we may require that all assignees and transferees designate a single individual or party to receive all notices and make all elections for the full interest originally held by Participant. This agreement, together with the JOA attached hereto, constitute the entire agreement of the parties with respect to the subject matter hereof, and any other promises, inducements, representations, warranties or agreements with respect to the subject matter hereof have been superseded hereby and shall not survive this agreement. The validity of any one or more of the provisions of this agreement does not affect the remaining portions of this agreement, and in case of any such invalidity, this agreement should be construed as if the invalid provision(s) had not been inserted. This agreement shall be governed by and interpreted in accordance with the laws of the state of Louisiana. By execution of this agreement, Participant confirms that it has a working knowledge of the oil and gas industry and that it has the ability independently and thoroughly to investigate whether or not to participate in a well. Participant acknowledges that its members are sophisticated investors and have an aggregate financial net worth in excess of one million dollars. Participant represents it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of its share of the actual costs to drill the a well to the objective depth, which may exceed the estimated costs of that operation. PARTICIPANT ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES.

Mr. Kenneth J. Canatella
B & K Exploration Investments LLC
December 12, 2005
Page 3

    If the foregoing accurately sets forth our understanding, then please execute this letter in duplicate originals, keep one fully executed original for your records and return the other to us for our records.

         Yours very truly,

         David A. Barlow
         Chief Operating Officer


DABlme


AGREED TO AND ACCEPTED
THIS 12th DAY OF DECEMBER, 2005

B & K EXPLORATION INVESTMENTS LLC


By: _____
   Mr. Kenneth J. Canatella
   Manager

## EXHIBIT "D"

Attached to and made a part of that certain
Participation Agreement dated effective as of April 1, 2006,
by and between Sklar Exploration Company L.L.C., Sklarco L.L.C ,
Tensas Delta Exploration Company, L.L.C., McCombs Energy, Ltd.,
Wemo, Inc., Yelbom Oil Inc. and William Rudd Limited Partnership

**AFE**

(See Attached)

AFE,3/14/2006,3:10 PM

**SKLAR Exploration Company LLC**
401 Edwards St., Ste. 601
Shreveport, LA 71101
(318) 227-6668

## AUTHORITY FOR EXPENDITURE

| DATE: | December 22, 2005 | | FIELD: | Red River Prospect | |
|---|---|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | | STATE: | Louisiana | |
| WELL: | Canatela #1 | | HORIZON: | CV & Hosston | |
| LOCATION: | Bossier Parish | | PROJ. T.D.: | 10,200' | |

PROPOSAL: Drill & complete Cotton Valley & Hosston well
Higher than usual location cost - river bottom & near town, may need to soil cement
Used $15,000/d for dayrate, $100,000 for mob.
No DST or whole cores

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 15,000 | | 15,000 |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $15,000 | $0 | $15,000 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 5,000 | | 5,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 181,000 | 5,000 | 186,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 15,000 | | 15,000 |
| 04 | SURFACE DAMAGES & ROW | 5,000 | | 5,000 |
| 05 | SETTING CONDUCTOR CASING | 5,000 | | 5,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 100,000 | | 100,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 240,000 | 45,000 | 285,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 12,000 | | 12,000 |
| 13 | ENGINEERING & SUPERVISION | 16,000 | 20,000 | 36,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 5,000 | | 5,000 |
| 15 | COIL TUBING UNIT | | 25,000 | 25,000 |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | | | |
| 17 | MUD & CHEMICALS | 20,000 | 2,000 | 22,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 11,250 | 2,250 | 13,500 |
| 24 | CEMENTING & EQUIPMENT | 20,000 | 25,000 | 45,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 7,500 | 7,500 | 15,000 |
| 26 | PIPE TESTING | | 2,000 | 2,000 |
| 27 | EQUIPMENT RENTALS | 24,450 | 17,900 | 42,350 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 1,000 | 1,000 | 2,000 |
| 30 | WATER | 5,000 | 20,000 | 25,000 |
| 31 | FUEL | 24,000 | 4,500 | 28,500 |
| 32 | BITS | 2,000 | 41,800 | 43,800 |
| 33 | TRANSPORTATION & TRUCKING | 20,000 | 20,000 | 40,000 |
| 34 | CONTRACT LABOR | 5,000 | 30,000 | 35,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 60,000 | 50,000 | 110,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | 5,000 | | 5,000 |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 15,000 | 15,000 |
| 48 | COMPLETION FLUIDS | | | |
| 49 | STIMULATION SERVICES | | 400,000 | 400,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | 1,000 | 1,000 | 2,000 |
| 61 | SALT WATER DISPOSAL | | 5,000 | 5,000 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 2,000 | 2,000 |
| 65 | PLUG & ABANDON COSTS | 15,000 | -15,000 | |
| 78 | INSURANCE | 34,656 | | 34,656 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 7,000 | 3,500 | 10,500 |
| 82 | MISCELLANEOUS: ±5% contingency | 40,000 | 38,000 | 78,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $887,056 | $808,450 | $1,695,506 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING (1,800' of 8-5/8") | 38,448 | | 38,448 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 1,500 | | 1,500 |
| 05 | WELLHEAD EQUIPMENT | 1,500 | | 1,500 |
| 06 | CONDUCTOR CASING | 5,000 | | 5,000 |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $46,448 | $0 | $46,448 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS (5-1/2") | | 136,374 | 136,374 |
| 22 | TUBING (2-7/8") | | 63,648 | 63,648 |
| 23 | PACKERS | | 7,500 | 7,500 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 4,500 | 4,500 |
| 25 | WELLHEAD EQUIPMENT | | 15,000 | 15,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $227,022 | $227,022 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 40,000 | 40,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 20,000 | 20,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 20,000 | 20,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 200,000 | 200,000 |
| 46 | SALES METERING EQUIPMENT | | 5,000 | 5,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $285,000 | $285,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $46,448 | $512,022 | $558,470 |
| | | | | |
| | **TOTAL WELL COST** | $948,504 | $1,320,472 | $2,268,976 |

APPROVED: _____, 2006

BY: _____

MWW

**EXHIBIT "E"**

This Exhibit "E" is attached to and made a part of that Participation Agreement dated effective as of April 1, 2006 by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., Tensas Delta Exploration Company, L.L.C., WEMO, Inc., YELBOM OIL Inc., William Rudd Limited Partnership, and McCombs Energy, Ltd. as Non-Operators covering lands located in Caddo and Bossier Parishes, Louisiana.

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

## RED RIVER PROSPECT

OPERATING AGREEMENT

DATED

_____April 1_____ , __2006__ ,
year

OPERATOR   Sklar Exploration Company L.L.C.

CONTRACT AREA   As shown on Exhibit "A" to this Agreement.

~~COUNTY OR~~ PARISH OF   Caddo and Bossier          STATE OF   Louisiana

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM. A.A.P.L. NO. 610 – 1982 REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. All Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4-5 |
| | A. INITIAL WELL | 5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5-6-7 |
| | 2. Operations by Less than All Parties | 7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9-10 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 11 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11-12 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 13 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 14 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982



OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___Sklar Exploration Company L.L.C., a Louisiana limited liability Company, 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101_____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

ARTICLE I.
DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement, including royalty and overriding royalty interests.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay 100% of its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine. Words defined herein shall have the same meaning whether or not they are capitalized.

ARTICLE II.
EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☒ A. Exhibit "A", shall include the following information:
(1) Identification of lands subject to this agreement,
(2) Restrictions, if any, as to depths, formations, or substances,
(3) Percentages or fractional interests of parties to this agreement,
(4) Oil and gas leases and/or oil and gas interests subject to this agreement,
(5) Addresses of parties for notice purposes.

☒ / B. Exhibit "B", Form of Lease.
☒ C. Exhibit "C", Accounting Procedure.
☒ D. Exhibit "D", Insurance.
☒ E. Exhibit "E", Gas Balancing Agreement.
☐ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit "G", Tax Partnership.

If any provision of any exhibit, except Exhibits "A" and "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail. If any provisions of Exhibits "A" or "E" is inconsistent with any provision contained in the body of this Agreement, the provision of the exhibit shall prevail.

I. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the deepest Zone proposed in the associated AFE, whichever is the lesser.

J. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

K. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in or commingling with a different Zone within the existing wellbore.

L. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore or improve production in a Zone which is currently open to production in the wellbore. Such operations include, without limitation, well stimulation operations, but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting or Plugging Back of a well.

M. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole or to overcome other mechanical difficulties.

N. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE III.
### INTERESTS OF PARTIES

**A. Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

**B. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____ all jointly owned lease burdens _____ which shall be borne as hereinafter set forth.

Each of the Parties hereto shall pay or deliver or cause to be paid or delivered its proportionate part of the royalties and over-riding royalties of which each has contributed the leases and all gas interests hereto on which royalty is due and regardless of whether such party is entitled to receive a share of production of oil and gas from the Contract Area shall bear and pay or deliver, or cause to be paid or delivered to the extent of its interest in such production the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. If the interest of any Party/ies in any oil and gas lease covered by this Agreement is subject to any additional royalty, overriding royalty, production payment or other charge over and above those shown on Exhibit "A," such Party/ies shall assume and alone bear all such obligations and shall account or cause to be accounted for such interests to the owners thereof. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C. Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production *which is not a joint obligation of the parties* / in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D. Subsequently Created Interests:**

If any party shall hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1. If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2. If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

## ARTICLE IV.
### TITLES

**A. Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto provided such party has paid 100% of its share of all costs of all operations conducted under the provisions of this Agreement. The cost incurred by Operator in this title program shall be borne as follows:

☐ Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE IV
continued

☑ Option No. 2: Costs incurred by Operator in procuring abstracts / and fees paid outside attorneys / for title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) / shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

~~Operator shall use its best efforts to secure~~ / ~~Each party shall be responsible for securing~~ curative matter and pooling amendments or agreements required in connection ~~subject to this agreement and charge these fees to the joint account.~~ with leases or oil and gas interests / contributed by such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders. This shall not prevent any party from appearing on its own behalf at any such hearing.

No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by / ~~all of the parties who are to participate in the drilling of the well.~~ Operator.

B. Loss of Title:

~~1. Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interests; and,~~

~~(a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

~~(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interest of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the interest lost;~~

~~(c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well;~~

~~(d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;~~

~~(e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,~~

~~(f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in connection therewith.~~

This space intentionally left blank.

~~2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~

~~(a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis, up to the amount of unrecovered costs;~~

~~(b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,~~

~~(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

3. Other Losses: All losses incurred, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of the Contract Area.

\* Curative matters and materials
\*\* Landmen and consultants
\*\*\* and for applications and hearings

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE V.
## OPERATOR

A.  Designation and Responsibilities of Operator:

_____ Sklar Exploration Company L.L.C., of Shreveport, Louisiana _____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

B.  Resignation or Removal of Operator and Selection of Successor:

1. Resignation or Removal of Operator:  Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, / or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within 30 days from its receipt. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator. *This condition shall not apply to a designated operator, such as Sklar Exploration Company L.L.C., who owns no interest in the Contract Area by virtue of the fact that it is solely an operating company.

2. Selection of Successor Operator:  Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

C.  Employees:

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D.  Drilling Contracts:  ~~except that in Operator's sole discretion all factors such as rig availability, equipment condition, contractor employee reliability and knowledge and drilling contractor reputation shall be taken into consideration in determining the real competitive price.~~ All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area, / If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. E. Custody of Funds: Operator shall hold for the account of Non-Operators any funds of Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advance or paid until used for their intended purpose or otherwise delivered to Non-Operators or applied toward the payment of debts, regardless of whether the debts arose out of the same well or operation for which the funds were advanced or from which the sale proceeds were derived. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators. F. Statutory Employer: Operator shall be considered the statutory employer of all employees of all Contractors, their sub-contractors or agents, whose goods furnished or services rendered for Operator are an integral part of or essential to Operator's ability to perform its operations as an oil and gas operator.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

A.  Initial Well:

The initial well is the Initial Well referred to in Subsection 1.2 (a) of the Participation Agreement to which this instrument is attached as Exhibit "E".                                       And subject to rig availability
On or before the _____ day of _____, (year) _____, Operator shall commence the drilling of a well for oil and gas at the following location:

and shall thereafter continue the drilling of the well with due diligence to a measured depth of 10,200 feet in a vertical bore hole, or a depth sufficient in operator's discretion to test the Taylor Sand of the Cotton Valley Formation, whichever is more shallow

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is en-
countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and
gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which
event Operator shall be required to test only the formation or formations to which this agreement may apply.

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the
well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

B.  Subsequent Operations:

1. Proposed Operations: Should any party hereto desire to drill any *any well includes water source or injection wells* well on the Contract Area other than the well provided
for in Article VI.A., or to rework, / deepen or plug back any dry hole *drilled at the joint expense of all parties* or a well *jointly owned by all*
*reenter, recomplete, sidetrack* / *reenter, recomplete, sidetrack*
*the parties and not* then producing in / paying quantities, the party desiring to drill, rework, / deepen or plug back such a well shall give the
*that have not forfeited their interest in the well*
other parties / written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
*to whom*       *Fifteen (15)*   *is delivered*
tion and the estimated cost of the operation. The parties / receiving such a notice / shall have / thirty (30) days after receipt / of the notice
within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill-
ing rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be
*to whom*         *is delivered*
limited to / forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays. Failure of a party / receiving such notice / to reply
*within twenty-four (24) hours*
the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or
response given by telephone shall be promptly confirmed in writing.
*Not withstanding this Article VI.B.1. and subject to the right of any party to non-consent the proposed operation a proposal to re-*
*work, recomplete, sidetrack, deepen or plugback a well in producing in paying quantities, which is consented to by two (2) or more of*
*the Parties owning two-thirds (2/3rds) or more of the working interest under the well may proceed and be executed on behalf of the*
*Consenting Parties without the unanimous consent of all parties.*

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice
*Fifteen (15)*        *twenty-four (24)*
period of / thirty (30) days (or as promptly as possible after the expiration of the / forty-eight (48)-hour period when a drilling rig is on loca-
tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
amination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the
actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
dance with the provisions hereof as if no prior proposal had been made. *Operator may, at its discretion, perform preparatory work for which*
*Operator may, at its discretion, perform preparatory work in connection with, or even actually commence, an operation for which*
*notice has been provided under this Article 1 prior to our during the notice period, and if such operation ultimately is one con-*
*ducted by less than all parties, the Consenting Parties shall, nevertheless, be entitled to recover the risk compensation provided for*
*hereunder.*

*to whom*       *is delivered*
2. Operations by Less than All Parties: If any party / receiving such notice / as provided in Article VI.B.1. or VII.D.1. (Option
No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
*subject to availability of equipment and personnel*
giving the notice and such other parties as shall elect to participate in / within ninety (90) days after the expiration of
*twenty-four (24)*
the notice period of / thirty (30) days (or as promptly as possible after the expiration of the / forty-eight (48) hour period when a drilling rig is
on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all
work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Con-
senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
ditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and *its recommendation as*
*twenty-four (24)*
to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within / forty-eight (48) hours
*either*
(exclusive of Saturday, Sunday and legal holidays) after receipt /delivery of such notice, shall advise the proposing party of its desire to (a) limit par-
*all of*
ticipation to such party's interest as shown on Exhibit "A" or (b) carry / its proportionate part of Non-Consenting Parties' interests, and
failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for
*twenty-four (24) hours*
such a response shall not exceed a total of / forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party,
at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such
operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
*recompleted, sidetracked*
If such an operation results in a dry hole, the Consenting Parties shall / plug and abandon the well and restore the surface location at *their*
*all of*
sole costs, risk and expense / . If any well drilled, reworked, / deepened or plugged back under the provisions of this Article results in a pro-
*their*
ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,
*or one of them shall make a proposal to the other Consenting Parties to conduct further operations under Article VI.B*

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1  and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2  ties. Upon commencement of operations for the drilling, / reworking, deepening or plugging back of any such well by Consenting Parties
3  in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4  and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
   *and not just a particular zone therein*
5  Party's interest in the entire well -/ and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6  market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
   *any and all zones within*
7  terests not excepted by Article III.D. payable out of or measured by the production from / such well accruing with respect to such interest
8  until it reverts) shall equal the total of the following:

12  (a) ~~100%~~ **500%** of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13  connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
14  Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15  Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16  Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17  Party had it participated in the well from the beginning of the operations; and

21  (b) ____500____ % of that portion of the costs and expenses of drilling, reworking, / deepening, plugging back, testing and completing,
22  after deducting any cash contributions received under Article VIII.C., and ____500____ % of that portion of the cost of newly acquired equip-
23  ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24  participated therein.

28  An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-
29  working / or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30  conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
   *have*
31  reworking / or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
   *100%*
32  and there shall be added to the sums to be recouped by the Consenting Parties one-hundred percent (100%) of that portion of the costs of
33  the reworking / or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
34  such a reworking / or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35  plicable as between said Consenting Parties in said well.

39  During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40  proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41  taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42  ticle III.D.

46  In the case of any reworking, / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47  of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48  abandonment of a well after such reworking, / plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49  ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

53  Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54  Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55  itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56  option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
   *quarter*
57  ings. Each / month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
58  operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59  curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
   *quarter*
60  realized from the sale of the well's working interest production during the preceding / month. In determining the quantity of oil and gas
61  produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62  well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63  which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64  of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65  above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

66  *recompleting, sidetracking

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
continued

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, recompleting, sidetracking, reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

Notwithstanding the provisions of this Article VI.B.2., * it is agreed that without the mutual consent of / all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply ; provided that an exceptional well location that is approved by the Louisiana Office of Conservation shall be deemed to conform to the then-existing spacing pattern.

*and subject to the right of any party to non-consent the proposed operation
**two (2) or more Parties owning two-thirds (2/3rds) or more of the working interest

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the recompleting, sidetracking, reworking, deepening and plugging back of such initial well after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for production, ceases to produce in paying quantities.

3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

(a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

(b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period shall be limited to twenty-four (24) hours / forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and twenty-four (24) hours receive up to eight (8) additional days after expiration of the / forty-eight (48) hours within which to respond by paying for all stand-by time incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand by costs shall be allocated between the parties electing to take additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other instances the response period to a proposal for sidetracking shall be limited to fifteen (15) / thirty (30) days.

### C. TAKING PRODUCTION IN KIND:

have the right to
Each party shall / take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1 required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3     Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4 the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5 its share of all production.

6

7     In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share
8 of the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
on the same terms and/or Operator is marketing Operator's and/or other Non-Operators' share of production
9 the obligation, to purchase such oil or sell it to others at any time and from time to time, for the account of the non-taking party / ~~at the~~
10 ~~best price obtainable in the area for such production~~. Any such purchase or sale by Operator shall be subject always to the right of the
11 owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously
12 delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of
13 time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14 of one (1) year.

15

16     In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or
17 deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18 be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19 agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

20

21 D.   Access to Contract Area and Information:

22
    consenting
23     Except as otherwise provided herein Each / party who has paid 100% of its share of all costs of all operations conducted under
this Agreement shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24 and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
25 and records relating thereto. Operator, upon request, shall furnish each of the other / parties with copies of all forms or reports filed with
    consenting
26 governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27 each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28 gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29 quests the Information.

30

31 E.   Abandonment of Wells:

32

33     1. Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34 drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35 without the consent of / ~~all parties~~ / Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
    twenty-four (24) hours (inclusive
36 within / ~~forty-eight (48) hours (exclusive~~ of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37 such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38 accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
    or parties owning greater than ten percent (10%) interest in the well
39 such well. / Any party / who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40 operations in search of oil and/or gas subject to the provisions of Article VI.B.
    *ninety percent (90%) or more of the parties thereto
41 **If the well has been drilled pursuant to Article VI.B.2, only the consent of the consenting parties therein shall be required.
42 ***Any cement plugs used for plugging and abandoning such well shall be in excess of that required by the regulatory body
43 recommended to be a volume of one and one-half times of that required.

44     2. Abandonment of Wells that have Produced: Except for any well in which a Non-Consent operation has been conducted
45 hereunder for which the Consenting Parties have not been fully reimbursed, as herein provided, any well which has been completed as a
46 producer shall not be plugged and abandoned without the consent of ~~all parties~~ / . If / ~~all parties~~ consent to such abandonment, the well shall
    such parties
47 be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
    ten (10)
48 thirty (30) / days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
49 those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
    determined in accordance with the provisions of
50 parties its proportionate share of the value of the well's salvable material and equipment, / Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. / Should any party fail to reply to such notice, such party shall be deemed to have consented to the proposed abandonment. / Each abandoning party shall assign
51     the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
52 material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
53 terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
54 gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
55 tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
56 duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit
57 ****two-thirds percent (2/3rds%) or more of the owners thereof. If the well has been drilled or reworked pursuant to Article VI.B.2
58 and the consenting parties therein have not been fully reimbursed as therein provided, only the approval of such consenting parties
59 shall be required
60

61

62

63

64

65

66

67

68

69

70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
continued

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3  Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5  its share of all production.

6

7  In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8  the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it,
9  but not the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-
10  taking party at the best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to
11  the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas
12  not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil and gas shall be only for such
13  reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event
14  for a period in excess of one (1) year. Notwithstanding the foregoing, Operator shall not make a sale, including one into interstate com-
15  merce, of any other party's share of gas production without first giving such other party thirty (30) days notice of such intended sale.

16

17  D.    Access to Contract Area and Information:

18

19  Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
20  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
21  and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with
22  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
23  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
24  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
25  quests the information.

26

27  E.    Abandonment of Wells:

28

29  1. Abandonment of Dry Holes:  Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
30  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
31  without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
32  within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
33  such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
34  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
35  such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
36  operations in search of oil and/or gas subject to the provisions of Article VI.B.

37

38  2. Abandonment of Wells that have Produced:  Except for any well in which a Non-Consent operation has been conducted
39  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
40  producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
41  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
42  thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
43  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
44  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
45  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign
46  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
47  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
48  terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
49  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
50  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
51  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

- 8 alternate -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1   "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2   assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3   Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4   interests in the remaining portion of the Contract Area.
5
6      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7   the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8   quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9   templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10   well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11   repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12   visions hereof.
13
14      3. Abandonment of Non-Consent Operations:  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15   Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16   permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17   of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18   VI.E.
19
20                                **ARTICLE VII.**
21              **EXPENDITURES AND LIABILITY OF PARTIES**
22
23   A.   Liability of Parties:
24
25      The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26   shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27   among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28   shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners. In their
29   relations with each other under this Agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own self-interest.
30
31   B.   Liens and Payment Defaults:
32
33      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
34   of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
35   at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the
36   state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
37   taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
38   rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
39   of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
40   the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
41   purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
42   and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.
43
44      If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
45   Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
46   the interest of each party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain
47   reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph, be entitled to recover the amount it paid
48   plus five hundred percent (500%) of that amount out of the proceeds from the sale of the defaulting party's share of oil and/or gas, and, to secure payment thereof, be subrogated to the security rights described in the foregoing paragraph. Notwithstanding anything contained to the contrary in this paragraph, all parties agree that this provision shall not apply to any operation requiring an AFE
49   unless Operator has advance billed all parties for their proportionate share of said costs in accordance with other provisions of this agreement.
50
51   C.   Payments and Accounting:
52
53      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
54   and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
55   tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
56   showing expenses incurred and charges and credits made and received.
57
58      Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
59   of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
60   month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
61   with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
62   on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
63   fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
64   due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
65   pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
66
67   D.   Limitation of Expenditures:
68
69      1. Drill or Deepen:  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
70   pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
continued

1  ☒  *Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2  necessary tankage and/or surface facilities. *This Option No. 1 shall apply only to water source and/or water injection wells.
3
4  ☒  **Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5  authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6  to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have ~~forty-eight~~ twenty-four (24) hours
7  ~~(48) hours (exclusive of Saturday, Sunday and legal holidays)~~ in which to elect to participate in the setting of casing and the completion at-
8  tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9  cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10  constitute an election by that party not to participate in the cost of the completion attempt. If less than all of the parties, but less than all of the parties,
11  elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase recompleting, sidetracking / "reworking, / deepening or plugging
12  back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13  than all parties.**This Option No. 2 shall cover all wells except those expressly covered by Option No. 1 above.
14
15  2. Rework or Plug Back:  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16  plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17  include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18  and/or surface facilities.
19
20  3. Other Operations:  Without the consent of / ~~all parties,~~ Two or more Parties owning a majority interest Operator shall not undertake any single project reasonably estimated
21  to require an expenditure in excess of _____Fifty Thousand and No/100———— Dollars ($_____50,000.00_____)
    sidetracking
22  except in connection with a well, the drilling, reworking, / deepening, completing, recompleting, or plugging back of which has been
23  previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24  emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25  to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26  parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27  an information copy thereof for any single project costing in excess of _____Fifty Thousand and No/100————
28  Dollars ($_____50,000.00_____) but less than the amount first set forth above in this paragraph.
29
30  E.  Rentals, Shut-in Well Payments and Minimum Royalties:
31
32  Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33  party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34  tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35  behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36  failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37  ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38  visions of Article IV.B.2 3.
39
40  Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41  of a producing gas well, ~~at least five (5) days (exclusive of Saturday, Sunday and legal holidays),~~ or at the earliest opportunity permitted by
42  circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43  Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44  shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46  F.  Taxes:
47
48  Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49  subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50  become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51  be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52  Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53  riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54  owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55  tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56  anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57  value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58  the manner provided in Exhibit "C".
59
60  If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62  mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63  interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64  count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65  provided in Exhibit "C".
66
67  Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
68  to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
continued

G.   Insurance:

At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

### ARTICLE VIII.
ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A.   Surrender of Leases:

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leased acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

B.   Renewal or Extension of Leases:

If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of oil and gas leases.

C.   Acreage or Cash Contributions:

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VIII
### continued

1  said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2  governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3  it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4  tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

6  If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7  consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

9  **D.  Maintenance of Uniform Interests:**

11  For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no
12  party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,
13  equipment and production unless such disposition covers either:

15  1.  the entire interest of the party in all leases and equipment and production; or

17  2.  an equal undivided interest in all leases and equipment and production in the Contract Area.

19  Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20  and shall be made without prejudice to the right of the other parties. Any added expenditure required as a result of partial disposition,
21  including but not limited to additional marketing or metering expense, shall be borne solely by the party transferee.

22  If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23  require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24  and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25  party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26  into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27  Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

29  **E.  Waiver of Rights to Partition:**

31  If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32  undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33  interest therein.

35  **F.  Preferential Right to Purchase:**

37  Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract
38  Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the
39  name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms
40  of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase
42  on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-
43  ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-
44  ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to
45  dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-
46  pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.

## ARTICLE IX.
### INTERNAL REVENUE CODE ELECTION

50  This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51  for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52  and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53  purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54  from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as per-
55  mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56  ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57  United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58  and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59  evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60  Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61  action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62  Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63  Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is per-
64  mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65  tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66  computation of partnership taxable income.

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE X.
CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed **Ten Thousand and No/100** ─────────────────────────────────────── Dollars ($ **10,000.00** ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder. All claims or suits involving title to any interest subject to this Agreement shall be treated as a claim or suit against all parties hereto.

ARTICLE XI.
FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

ARTICLE XII.
NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

ARTICLE XIII.
TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☒ Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☐ ~~Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.~~

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XIV.

COMPLIANCE WITH LAWS AND REGULATIONS

A.   Laws, Regulations and Orders:

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

B.   Governing Law:

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ **Louisiana** _____ shall govern.

C.   Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the ~~"Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"),~~ and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said [897] Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

ARTICLE XV.

OTHER PROVISIONS

**(See attached page 14-1 through 14-7)**

ARTICLE XV.

OTHER PROVISIONS

A. PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1) an election to perform additional logging, coring or testing;
(2) an election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;
(3) an election to plug back and attempt to complete the well in a shallower depth or formation;
(4) an election to deepen the well;
(5) an election to sidetrack the well;
(6) an election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;
(7) an election to temporarily abandon the well;
(8) an election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of two or more Parties with a majority of the consenting parties in possessory, cost-bearing interest (and not in number), a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth. In such event, the operation, which, in the opinion of two or more Parties with a majority of the consenting parties in possessory, cost bearing interest (and not in number) is less likely to jeopardize the well, will be given priority. Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail. It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests. For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation. Notwithstanding anything to the contrary contained in this Article XV.A, an election supported by two or more consenting parties owning at least two-thirds (2/3rds) of the cost bearing interest in the well shall control regardless of where that election falls in the preference of operations set forth above.

B. HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

C. INITIAL WELL

The parties hereto understand and agree that the Initial Well described in Article VI A herein refers to the same well described in Section 1.2 of that certain Participation Agreement dated April 1, 2006, to which this agreement is attached as Exhibit "E". If a party elects or is deemed to have elected not to participate in the completion of the Initial Well, or fails to pay all of its share of the actual costs to complete that well, then such party shall be deemed a "Non-Participating Party" or "Non-Participant" in said Initial Well and shall automatically be deemed to have relinquished and forfeited all of its interest, including but not limited to its leasehold, oil and gas interests and contractual rights in and to the Initial Well, the Contract Area and the AMI. In the event an assignment of oil and gas interests, leasehold or contractual rights have been made to such Party electing not to participate in the Initial Well, the Non-Participating Party agrees hereby to promptly assign to Operator as agent on behalf of the Consenting Parties, all of its right, title and interest in all oil and gas leases and oil and gas interests covering lands located within the Contract Area and AMI, and such Non-Participating Party agrees and shall perform all necessary acts to evidence such relinquishment and forfeiture. Any such Non-Participating Party's Assignment shall be without warranty, except by, through and under Assignor, and shall be delivered to the Operator within thirty (30) days of the request for such Assignment. Operator shall assign such Non-Participating Party's interests in oil and gas leases and/or oil and gas interests to the Consenting Party or Parties, or their

designee, their proportionate share of such forfeited Non-Participating Party's interest in the entire Contract Area and AMI. This forfeiture shall be without prejudice and in addition to the rights of the Parties under Articles VII and XV.E of this agreement.

### D. DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of two or more Parties with a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties. If the parties are equally divided, the opinion of the Operator will prevail.

### E. ADVANCEMENT OF COSTS

Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s) in advance of its respective share of (i) the dry hole cost for the initial well to be drilled under Article VI A, (ii) the dry hole cost for any other well to be drilled hereunder to which such Non-Operator has consented, and (iii) the cost of any completion, reworking, recompletion, sidetracking, deepening or plugging back operation to which such Non-Operator has consented (any such operation under clause (i), (ii), or (iii) being herein called a "Drilling Operation"). Such request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Drilling Operation. The amount of each Non-Operator's advance payment shall be based upon the latest AFE for such operation. Such advanced payments shall be held by Operator for the account of the Non-Operators and applied, with interest, against the actual costs incurred in the applicable operation.

A Non-Operator receiving a request for advance payment shall, within two (2) days of the receipt of such request if and when a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to Operator by wire transfer, check or other ready funds the full amount of such request. Operator shall credit the amount to the Non-Operator's account for the payment of such Non-Operator's share of costs of such Drilling operation, and following the end of each month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement.

In the event a Non-Operator to which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by tendering ready funds as aforesaid, then Operator, at its option, shall make a second written or telephonic request for such advance. Non-Operator shall pay for said advance as aforesaid within two (2) days from delivery of such second request.

If a Non-Operator fails to pay within two (2) days of the delivery of such second request, then:

(1) If the advance payment was requested for the drilling of the Initial Well under Article VI.A, Non-Operator may, at the sole discretion and timing election of the Operator, be deemed to have relinquished all of its interests in the oil and gas leases and/or oil and gas interests covering lands located in the Contract Area and AMI retroactive to the date of default in payment, and if assignment has been made to such Non-Operator, Non-Operator shall assign all of such rights, within thirty (30) days of a request for such assignment, to those parties who have participated in such Drilling Operation, in the proportion that such parties share the relinquished interest.

(2) If the advance payment was requested for any other Drilling Operation (including completion of the initial well), Non-Operator may, at the sole discretion and timing election of the Operator, be deemed non-consent in said operation retroactive to the beginning of such operation and thereafter subject to the risk compensation provisions of Article VI.B.2 hereof.

If the Non-Operator fails to make such payment within two (2) business days of the receipt of such second request, Operator shall promptly notify all other Consenting Parties to such Drilling Operation of the default in payment and if and when applicable, of the relinquishment of an interest under this

provision. The Consenting Parties who wish to participate in the Drilling Operation shall have five (5) days from receipt of the applicable notice to elect to assume the costs chargeable to such relinquished interest and shall share such relinquished interest in proportion to their assumption of such relinquished interest. If the Consenting Parties who wish to participate in the Drilling Operation are unwilling to assume the costs chargeable to such relinquished interest, the Drilling Operation shall be cancelled and the forfeiture described above shall not take effect.

Notwithstanding anything to the contrary herein, if the applicable drill well or operation is unsuccessful or results in a dry hole, Operator and Non-Operator(s) shall have the right to sue a Party who failed to pay for its proportionate share of expenses in lieu of a Party's right to an assignment of all Non-Operator's leasehold and contractual rights within the Contract Area, or in lieu of deeming the Party Non-Consent.

## F. NECESSARY EXPENDITURES EXCLUDE SIDETRACKING

The phrase "necessary expenditures" in Article VII.D.1. (Option No. 2) on page 10 shall not be deemed to include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

## G. ADDITIONAL CHARGES

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Contract Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same: Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and expenses in connection with preparation and presentation of evidence and exhibits of Louisiana Office of Conservation hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

## H. INDEMNITY

Except for liabilities resulting from the gross negligence or willful misconduct of the Operator, each Non-Operator shall defend, indemnify and hold Operator harmless against any and all claims, causes of action, debts, liabilities and other responsibilities whatsoever arising out of Operator's performance of its obligations hereunder for and on behalf of the Non-Operators. Non-Operators also agree to defend, indemnify and hold any Contract Operators, with whom Operator contracts to perform certain services hereunder for an on its behalf, harmless against any and all such claims, causes of action, debts, liabilitys and other responsibilities whatsoever arising out of the Contract Operator's performance of its obligations under the Contract Operating Agreement between it and Operator, except for liabilities resulting from gross negligence or willful misconduct.

## I. RECOUPMENT

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

## J. SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

## K. NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

## L.  GAS MARKETING

If Operator reaches agreement to market any Non-Operator's share of natural gas produced from any well subject to this Agreement, then, in that event, and only in that event, Operator shall furnish the other Non-Operators notice, including all pertinent terms and conditions, and offer to market such other Non-Operators' share of natural gas. Each party to whom such notice is delivered shall have fifteen (15) days to exercise their right in writing to accept the offer on the terms offered which shall be the same basis upon which Operator is marketing the other Non-Operator's share of natural gas and which shall include all applicable costs that all Non-Operators who accept the offer must bear thereunder (to include, without limitation, assumption of costs to construct, operate and own any pipeline to transport or gather natural gas and/or facilities to treat, dehydrate, extract liquids or otherwise process natural gas and natural gas liquids). If the Non-Operator(s) receiving such notice elect not to accept the offer, then they shall either (i) market their own share of natural gas at their own costs and risks; or (ii) reach some other agreement with Operator to market their share of natural gas for a fee. If said Non-Operator(s) fail(s) to elect either of these options, then their share of natural gas shall be subject to the terms of the Gas Balancing Agreement attached hereto as Exhibit "E." Nothing herein shall be construed as establishing a fiduciary relationship between Operator and Non-Operators.

## M.  AREA OF MUTUAL INTEREST

The parties hereby create an Area of Mutual Interest ("AMI") consisting of the lands outlined by a bold red line on the plat attached hereto as Exhibit "A-2". This AMI shall remain in force and effect for a term of five (5) years from the date of this Agreement and, insofar and only insofar as the AMI includes lands covered by oil and gas leases and/or oil and gas interests subject to this Agreement, as long thereafter as said oil and gas leases and/or oil and gas interests remain in force and effect. This AMI shall terminate after five (5) years as to all such lands not covered by oil and gas leases and/or oil and gas interests subject to this Agreement.

During the term of this AMI, if any party hereto, including related persons or entities, ("Acquiring Party") directly or indirectly acquires any oil and gas lease or any oil and gas interest covering lands lying within the AMI, the Acquiring Party shall promptly advise the other parties ("Offerees") of such acquisition. In such event, each Offeree shall have the right to acquire its proportionate interest in such oil and gas lease and/or oil and gas interest in accordance with the other provisions of this AMI.

Promptly upon acquiring such oil and gas lease and/or oil and gas interest, the Acquiring Party shall, in writing, advise the Offerees of such acquisition. The notice shall include a copy of all instruments of acquisition including, by way of example but not of limitation, copies of the leases, assignments, subleases, farmouts or other contracts affecting the oil and gas lease and/or oil and gas interest.

The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by the Acquiring Party in acquiring such oil and gas lease and/or oil and gas interest ("Acquisition costs"). The Offeree shall have a period of fifteen (15) days after receipt of the notice within which to furnish the Acquiring Party written notice of its election to acquire its proportionate interest in the offered oil and gas lease and/or oil and gas interest. If, however, a well in search of oil or gas is being drilled within the AMI, each Offeree shall have a period of twenty-four (24) hours (excluding Saturdays, Sundays and legal holidays) after delivery of the notice within which to elect to acquire its proportionate interest in the oil and gas lease and/or oil and gas interest so offered. It is provided, however, that the twenty-four (24) hour election period shall not apply unless the Acquiring Party shall give the notice to the Offerees within two (2) days after the date on which the Acquiring Party acquired the oil and gas lease and/or oil and gas interest so offered. In addition thereto, the Acquiring Party shall also:

    (a)    furnish the Offerees with the approximate location of the well then being drilled and the name of the operator or drilling contractor drilling the well, and

    (b)    specifically advise the Offerees that the Offerees shall have a period of twenty-four (24) hours within which to elect to acquire an interest in the offered Oil and Gas Interest.

The above information shall be in addition to the information and copies of instruments provided for above in connection with the usual notices of acquisition of an oil and gas lease and/or oil and gas interest. If the Acquiring Party does not receive actual written notice of election of an Offeree to acquire its proportionate interest within the fifteen (15) day or twenty-four (24) hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire its interest therein. An Offeree accepting the offered interest shall be entitled to participate in such oil and gas lease and/or oil and gas interest in the proportion to which its interest bears to the total interest of all parties (including the

acquiring party) electing to participate. Promptly after the time for election expires, the Acquiring Party shall invoice the Offeree electing to acquire an interest for its proportionate part of the Acquisition Cost, as reflected by the invoice. Upon receipt of such reimbursement, the Acquiring Party shall execute and deliver an appropriate assignment to such Offeree. If the Acquiring Party does not receive the amount due from the Offeree within thirty (30) days after receipt by the Offeree of the invoice for its cost, the Acquiring Party may, at its election, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within five (5) days after receipt of such written notice by the delinquent Offeree shall constitute a withdrawal by the delinquent Offeree of its former election to acquire the interest, and such Offeree shall no longer have the right to acquire an interest in the offered oil and gas lease and/or oil and gas interest.

Any assignment made by the Acquiring Party shall be made free and clear of any liens, encumbrances, overriding royalty interests and other burdens created by or arising under the Acquiring Party but otherwise without warranty of title, either express or implied. The assignment shall be made and accepted subject to, and each assignee shall expressly assume its portion of all of the obligations of the Acquiring Party. The assignment shall also be made and accepted subject to this Agreement.

If two (2) or more separate oil and gas leases and/or oil and gas interests are included in the same notice, the Offeree shall have the separate right of election as to each separate oil and gas lease and/or oil and gas interest.

The provisions of this AMI shall not apply to acquisitions as a result of merger, consolidation, reorganization or an acquisition from a parent, subsidiary, or affiliated corporation, or as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries. Neither shall it apply to sales and acquisitions between partners in a partnership or venturers in a joint venture, or to any acquisition by any party of an interest which interest prior to and at the time of such acquisition was subject to this Agreement, unless such acquisition was the renewal or extension of a lease which at the date of expiration was subject to this Agreement.

Renewals and extensions of oil and gas lease(s) and/or oil and gas interest(s) shall be subject to Article VIII.B of this Agreement.

N. OPERATOR'S and NON OPERATORS' LIEN – SECURITY INTEREST

At the request of Operator, each Non-Operator agrees to execute and furnish Operator for filing in the records of Caddo and Bossier Parishes, Louisiana a Memorandum of Operating Agreement in a form suitable to Operator for the purpose of perfecting and giving effect to the lien described in Article VII.B of this Agreement.

If written notice has been given that the lien rights conferred in Article VII.B have been implemented or enforced against any party hereto, for so long as the affected party remains in default, it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and shall not be entitled to vote its interest in any matter hereunder. As to any proposed operation in which it otherwise would have the right to participate, such party shall not have the right to elect to participate or be a Consenting Party unless and until it pays in full the amount it is in default plus all other outstanding amounts due hereunder. If an operation proposed during such default period commences before such payment in full, the party in default shall automatically be deemed a Non-Consenting Party to the operation.

O. METERING OF PRODUCTION

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

P. PLUGGING AND LEASEHOLD RESTORATION FUND

At any time any well subject to this agreement is approaching the end of its economic life and/or its useful purpose, upon the approval of two or more Parties with a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A", Operator may pre-bill the joint account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location. Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and abandonment and restoration of the leasehold premises. In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any

accrued interest on such difference, based upon the then working interest percentage of such owner. In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

Q. SEPARATE AGREEMENT FOR NON-UNIFORM INTEREST

Any oil and gas lease and/or oil and gas interest that is either (i) described in Exhibit "A-1" to this Agreement or (ii) that is both acquired after the effective date of this Agreement and covered by Article VIII.B, VIII.C or XV.M of this Agreement, that thereafter becomes owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such lease and/or interest becomes so owned. Any oil and gas lease and/or oil and gas interest acquired after the effective date of this Agreement and covered by Article VII.B, VIII.C or XV.M of this Agreement, that becomes owned by more than one but less than all of the parties hereto shall remain subject to this Agreement as to the parties who own an interest therein, but Operator is authorized to modify Exhibit "A" to this Agreement to reflect the parties' interests in each such oil and gas lease and/or oil and gas interest. Operator is further authorized to modify said Exhibit "A" to this Agreement to reflect the parties' interests in each well subject to this Agreement.

R. OBLIGATORY WELL

Notwithstanding the provisions of this agreement and particularly Article VI.B, if any proposed operations are necessary to maintain a an oil and gas lease and/or oil and gas interest covered by this Agreement in force or an agreement to earn an oil and gas lease and/or oil and gas interest which would otherwise expire unless such operations are conducted, then in lieu of being penalized under Article VI.B.2., each Non-Consenting Party shall assign to Consenting Parties all of such Non-Consenting Party's right, title and interest in and to the oil and gas lease(s) and/or oil and gas interest(s) or portion thereof or such agreement which would be lost or not earned if such operations were not conducted. Such assignment shall be promptly due upon commencement of said proposed operations by Consenting Parties and shall be free and clear of all overriding royalties, production payments, mortgages, liens and other burdens and encumbrances placed thereon by the assigning party or resulting from its ownership or operation thereof which is not a joint obligation of the parties, but otherwise without warranty of title either expressed or implied.

If the assignment is in favor of more than one party, the assigned interest shall be shared by the Consenting Parties in the proportions that the interest of each bears to the interest of all Consenting Parties unless otherwise agreed to in writing. Thereafter, Operator may modify Exhibit "A" to reflect the distinct ownership of such acreage covered by said assignment. Operations that are necessary to either maintain an oil and gas lease and/or oil and gas interest covered by this Agreement in force or to earn an interest in the same or part thereof under an agreement which would otherwise expire unless operations are conducted, shall be defined as operations that are proposed within six (6) months of the date the oil and gas lease and/or oil and gas interest or agreement would otherwise expire.

S. PREVAILING AGREEMENT

If there is a conflict between provisions of the Participation Agreement dated April 1, 2006, to which this Operating Agreement is attached as Exhibit "E", and this Operating Agreement, the provisions of the Participation Agreement shall prevail, and shall be binding upon all parties to this Operating Agreement. In the event of a conflict between any of the additional provisions in Article XV of this Agreement, or any added text in this Agreement, on one hand, and any form text contained in this Agreement, the additional provisions or added text, as the case may be, shall govern and control.

T. NON-PARTICIPATING INTERESTS

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto as same may be revised from time to time to reflect record title and/or reformation of the Contract Area.

U. EXECUTION

This agreement shall be binding upon each Non-Operator that executes this agreement without regard to whether this same instrument, or any copy or counterpart hereof shall be executed by any other Non-Operator. This Agreement shall be effective as between the Operator and each Non-Operator who executes this Agreement, regardless of whether all of the Non-Operators execute the same.

V. MISCELLANEOUS

Anything to the contrary herein notwithstanding, this Operating Agreement is expressly made subject to the terms and provisions of the leases and farmout agreements described in Exhibit "A" hereof. This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereto shall be deemed to run with the oil and gas leases and/or oil and gas interests subject to this Agreement. The headings used in this Agreement are for convenience only and shall not be considered in the interpretation or construction of the Agreement.

W. NON-CONSENT

Any party that forfeits its interest in a well pursuant to Article VI.B.2 of this Agreement forfeits their interest in the entire well and revenue therefrom, not just a particular Zone therein, for the duration of the recoupment period or, if the risk compensation is never recovered, forever. The parties recognize, however, that applicable rules of the Louisiana Office of Conservation may allow for the drilling and completion of additional wells within the unit for an existing well, and, subject to the other provisions of this Agreement, the forfeiture by one party of its interest in the existing well does not affect that party's right to elect to participate or not to participate in a proposal to drill, or any other operation with respect to, another well, even if the other well is located in the same unit, and even if the new well is completed in the same Zone from which the existing well is producing.

Anything to the contrary hereinabove notwithstanding, any Non-Consenting Party to an operation conducted hereunder shall have no right to observe such operation or subsequent operations within the same well or have access to information pertaining to such operation or subsequent operations, until such time as the Non-Consenting Party's share of the cost of such operation, and any applicable subsequent operations, and the risk compensation therefor has been recovered by the Consenting Parties as provided herein.

X. SOPHISTICATED INVESTORS

By execution of this Agreement, each Non-Operator represents to each other and to Operator: (i) that it has a working knowledge of the oil and gas industry; (ii) that it is a sophisticated investor and has a financial net worth in excess of one million dollars; (iii) that it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of leasehold costs, drilling costs, completion costs, and all other costs incurred in operations under this Agreement; (iv) that it ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES; (v) that its interest hereunder has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the State of Louisiana, or any other state ("Securities Law"), and that it owns said interest for investment purposes only, and not with a view to or for sale in connection with any distribution thereof within the meaning of Securities Law.

Y. PAYMENT OF ROYALTIES

Notwithstanding anything to the contrary in this agreement, Operator shall use its best efforts to deliver or cause to be delivered all royalties, overriding royalties, production payments and similar charges to the persons entitled thereto and such charges shall be borne proportionately by the Parties hereto on the basis of their respective ownership of the leases or well. It is provided, however, that if the interest of any Party is subject to and burdened with royalties, overriding royalties, production payments, or similar burdens ("additional burdens") which are not borne proportionately by all other Parties hereto, such Party shall account to the owners of the additional burdens for the amount due them or arrange for Operator to handle such payments. Operator shall have no liability for the failure to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, except such as may result from gross negligence or willful misconduct.

Z. NOTICE FOR RENEWALS OR EXTENSION OF LEASES

With regard to Articles VIII.B. and/or VIII.C., hereof, in the event that a drilling rig is on location, notice may be given by telephone, and the time permitted for participation election shall not exceed forty-eight (48) hours, exclusive of weekends and holidays."

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE XVI.**
**MISCELLANEOUS**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 1st _____ day of _____ April _____, (year) _2006_.

_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____, have been made to the form.

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

_____    David A. Barlow, Chief Operating Officer

NON-OPERATORS

Sklarco L.L.C.

_____    David A. Barlow, Chief Operating Officer

McCombs Energy, Ltd.

_____    Ricky Halkin, Vice President

Tensas Delta Exploration Company, L.L.C.

_____    Michael E. Riddick, Executive Vice President

WEMO, Inc.

_____    B. Craig Webb, President

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

YELBOM OIL Inc.

1
2
3
4  _____          _____
5                                       Gregg B. Mobley, President
6  _____
7
8
9
10                                      William Rudd Limited Partnership
11
12
13  _____          _____
14                                       William L. Rudd, III
15  _____
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

Before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, appeared David A. Barlow, to me personally known, who, being by me duly sworn, did say:

That he is the Vice President and Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, and SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said companies, and that said appearer acknowledged said instrument to be the free act and deed of said companies.

IN WITNESS WHEREOF, said appearer has signed these presents before me and in the presence of two competent witnesses, whose printed or typed names are _Marie Gordon_ and _Tiffany Harris_, and I have hereunto set my official hand and seal with said appearer and said witnesses, all on this _14th_ day of _March_, 2006.

                                        _____
                                        Notary Public in and for the Parish of Caddo, State of
                                        Louisiana
                                        Notary's Printed Name:
                                        Notary Public's Number:
                                        My Commission Expires: Tyler E. Adams, Jr., Notary Public # 60418
                                                             Caddo Parish, Louisiana
                                                             My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

Before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, appeared Michael E. Riddick, to me personally known, who, being by me duly sworn, did say:

That he is the Executive Vice President of TENSAS DELTA EXPLORATION COMPANY LLC, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and that said appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, said appearer has signed these presents before me and in the presence of two competent witnesses, whose printed or typed names are _____ and _____, and I have hereunto set my official hand and seal with said appearer and said witnesses, all on this _____ day of _____, 2006.

                                        _____
                                        Notary Public in and for the Parish of Caddo, State of
                                        Louisiana
                                        Notary's Printed Name:
                                        Notary Public's Number:
                                        My Commission Expires:

STATE OF TEXAS

COUNTY OF HARRIS

    Before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, appeared Ricky Haikin, to me personally known, who, being by me duly sworn, did say:

    That he is the Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, and that the foregoing instrument was signed by him on behalf of said limited partnership, and that said appearer acknowledged said instrument to be the free act and deed of said limited partnership.

    IN WITNESS WHEREOF, said appearer has signed these presents before me and in the presence of two competent witnesses, whose printed or typed names are _____ and _____, and I have hereunto set my official hand and seal with said appearer and said witnesses, all on this _____ day of _____, 2006.

<div style="margin-left:50%">

_____
Notary Public in and for the Parish of Caddo, State of Louisiana
Notary's Printed Name:
Notary Public's Number:
My Commission Expires:

</div>

STATE OF LOUISIANA

PARISH OF CADDO

    Before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, appeared B. Craig Webb, to me personally known, who, being by me duly sworn, did say:

    That he is the President of WEMO, INC., a Louisiana corporation, and that the foregoing instrument was signed by him on behalf of said company, and that said appearer acknowledged said instrument to be the free act and deed of said company.

    IN WITNESS WHEREOF, said appearer has signed these presents before me and in the presence of two competent witnesses, whose printed or typed names are _____ and _____, and I have hereunto set my official hand and seal with said appearer and said witnesses, all on this _____ day of _____, 2006.

<div style="margin-left:50%">

_____
Notary Public in and for the Parish of Caddo, State of Louisiana
Notary's Printed Name:
Notary Public's Number:
My Commission Expires:

</div>

STATE OF LOUISIANA

PARISH OF CADDO

  Before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, appeared Gregory B. Mobley, to me personally known, who, being by me duly sworn, did say:

  That he is the President of YELBOM OIL, INC., a Louisiana corporation, and that the foregoing instrument was signed by him on behalf of said company, and that said appearer acknowledged said instrument to be the free act and deed of said company.

  IN WITNESS WHEREOF, said appearer has signed these presents before me and in the presence of two competent witnesses, whose printed or typed names are _____ and _____, and I have hereunto set my official hand and seal with said appearer and said witnesses, all on this _____ day of _____, 2006.

           _____
           Notary Public in and for the Parish of Caddo, State of Louisiana
           Notary's Printed Name:
           Notary Public's Number:
           My Commission Expires:

STATE OF TEXAS

COUNTY OF _____

  Before me, the undersigned authority, duly qualified and acting as such in and for the above parish, state aforesaid, appeared William L. Rudd III, to me personally known, who, being by me duly sworn, did say:

  That he is the _____ of WILLIAM RUDD LIMITED PARTNERSHIP, a Texas limited partnership, and that the foregoing instrument was signed by him on behalf of said limited partnership, and that said appearer acknowledged said instrument to be the free act and deed of said limited partnership.

  IN WITNESS WHEREOF, said appearer has signed these presents before me and in the presence of two competent witnesses, whose printed or typed names are _____ and _____, and I have hereunto set my official hand and seal with said appearer and said witnesses, all on this _____ day of _____, 2006.

           _____
           Notary Public in and for the Parish of Caddo, State of Louisiana
           Notary's Printed Name:
           Notary Public's Number:
           My Commission Expires:

**EXHIBIT "A"**
**RED RIVER PROSPECT**
**CADDO AND BOSSIER PARISHES, LOUISIANA**

Attached to and made a part of that certain Operating Agreement dated April 1, 2006, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., McCombs Energy, LTD., Tensas Delta Exploration Company LLC, Wemo, Inc., Yelbom Oil Inc., and William Rudd Limited Partnership, as Non-Operators.

(1)    Identification of lands subject to this agreement:

### Contract Area

All lands, oil and gas leasehold interest and
oil and gas interest lying within the following sections as depicted on the black
boundary as shown on the plat designated at Exhibit "A-2":

Sections 13-16, 21-27, 34-37, Township 17 North, Range 13 West,
And Section 18-19, 30-31, Township 17 North, Range 12 West
Caddo and Bossier Parishes, Louisiana

### Area of Mutual Interest

All lands, oil and gas leasehold interest and
oil and gas interest lying within the following sections as depicted on the red
boundary as shown on the plat designated at Exhibit "A-2":

Sections 13-16, 21-27, 34-37, Township 17 North, Range 13 West,
And Section 18-19, 30-31, Township 17 North, Range 12 West
Caddo and Bossier Parishes, Louisiana

(2)    Restrictions, if any, as to depths, formations, or substances:

There are no restrictions except as may be provided for in any lease or contract subject to this Operating Agreement.

(3)    Decimal interest and names and addresses of Parties to this Agreement:

| Owners | BPPO | APPO |
|---|---|---|
| Sklarco L.L.C. | 0.37000000 | 0.52750000 |
| Tensas Delta Exploration Company, LLC | 0.33000000 | 0.24750000 |
| McCombs Energy, Ltd. | 0.25000000 | 0.18750000 |
| Wemo, Inc. | 0.02000000 | 0.01500000 |
| Yelbom Oil Inc. | 0.02000000 | 0.01500000 |
| William Rudd Limited Partnership | 0.01000000 | 0.00750000 |
| Total | 1.00000000 | 1.00000000 |

(4)    Oil and gas leases and/or oil and gas interests subject to this agreement:

See Exhibit "A-1" Description of Leases. This Agreement covers not only the oil and gas leases and/or oil and gas interests described in Exhibit "A-1," but also any oil and gas leases and/or oil and gas interests acquired after the effective date of this Agreement and covered by the Participation Agreement to which this Agreement is attached as Exhibit "E" or Article VIII.B, VIII.C or XV.M of this Agreement. The only jointly owned lease burdens are the lessor's royalty under each of the oil and gas leases described in Exhibit "A-1" and the burden described in Exhibit "C" to the Participation Agreement. There are no other joint burdens whatsoever.

(5)    **Addresses of parties for notice purposes:**

Sklar Exploration Company, LLC
Attn: David A. Barlow
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Telephone: (318) 227-8668
Telecopier: (318) 227-9012
Email: dbarlow@sklarexploration.com

Sklarco, LLC
Attn: David A. Barlow
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Telephone: (318) 227-8668
Telecopier: (318) 227-9012
Email: dbarlow@sklarexploration.com

Tensas Delta Exploration Company, L.L.C.
Attention: Glen E. Kelly
333 Texas Street, Suite 2121
Shreveport, LA 71101
Telephone: (318) 222-0026
Telecopier: (318) 429-1991
Email: gkelly@tensasdelta.com

McCombs Energy, Ltd.
Attn: Larry Wyont, VP, Operations
5599 San Felipe Street, Suite 1200
Houston, Texas 77056-2721
Telephone: (713) 621-0033
Telecopier: (713) 621-1670
Email: lwyont@mccombsenergy.com

Wemo, Inc.
Attention:  B. Craig Webb, Vice-President
P. O. Box  5326
Shreveport, Louisana 71135-5326
Telephone: (318) 868-3902
Telecopier: (318) 865-8793

Yelbom Oil Inc.
Attention:  Gregory B. Mobley, President
P. O. Box 1091
Shreveport, Louisiana 71163-1091
Telephone: (318) 868-6161
Telecopier: (318) 865-8793
Ob3@bellsouth.net

William Rudd Limited Partnership
Attention:  William L. Rudd, III
P. O. Box 1797
Waskom, Texas 75692
Telephone: (214) 450-7272
Telecopier: (214) 219-1713
Email: billrudd@charter.net

**EXHIBIT "A-1"**
**RED RIVER PROSPECT**
**CADDO AND BOSSIER PARISHES, LOUISIANA**

Attached to and made a part of that certain Operating Agreement dated effective as of April 1, 2006 by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., Tensas Delta Exploration Company, L.L.C., WEMO, Inc., YELBOM OIL Inc., William Rudd Limited Partnership, and McCombs Energy, Ltd. as Non-Operators covering lands located in Caddo and Bossier Parishes, Louisiana.

## DESCRIPTION OF OIL, GAS AND MINERAL LEASES

1.      Oil, Gas And Mineral Lease dated September 1, 2005, executed by Sunflower Plantation, L.L.C., C. Bickham Dickson, Jr., C. Bickham Dickson, III, Michael Augustus Dickson and James Scott Dickson, as Lessors, in favor of Sklarco L.L.C., as Lessee, covering 798.438 acres, more or less, recorded in Book 3817, Page 770 under Registry No. 2011891 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1356, Page 359 under Registry No. 852706 of the Conveyance Records of Bossier Parish, Louisiana.

2.      Oil, Gas And Mineral Lease dated September 1, 2005, executed by C. Bickham Dickson, III, as Lessor, in favor of Sklarco L.L.C., as Lessee, covering 447.2914 acres, more or less, recorded in Book 3817, Page 792 under Registry No. 2011893 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1356, Page 371 under Registry No. 852708 of the Conveyance Records of Bossier Parish, Louisiana.

3.      Oil, Gas And Mineral Lease dated November 9, 2005, executed by Dutton Family, L.L.C. and Sorensen-Naylor, Ltd., as Lessors, in favor of Sklarco L.L.C., as Lessee, covering 346.5 acres, more or less, recorded in Book 3817, Page 785 under Registry No. 2011892 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1356, Page 364 under Registry No. 852707 of the Conveyance Records of Bossier Parish, Louisiana.

4.      Oil, Gas And Mineral Lease dated December 12, 2005, executed by B & K Exploration Investments, L.L.C., as Lessor, in favor of Sklarco L.L.C., as Lessee, covering 232.03 acres, more or less, recorded in Book 3818, Page 1 under Registry No. 2011894 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1356, Page 380 under Registry No. 852709 of the Conveyance Records of Bossier Parish, Louisiana, as amended by that certain Amendment To Oil, Gas And Mineral Lease dated effective as of December 12, 2005, recorded in Book ____, Page _____ under Registry No. _____ of the Conveyance Records of Caddo Parish, Louisiana, and in Book ____, Page _____ under Registry No. _____ of the Conveyance Records of Bossier Parish.

5.      Lease For Oil, Gas And Other Liquid Or Gaseous Minerals, dated December 14, 2005, executed by the State Mineral Board on behalf of the State of Louisiana, as Lessor, in favor of Sklarco L.L.C., as Lessee, covering 454 acres, more or less, recorded in Book 3825, Page 646 under Registry No. 2016353 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1359, Page 434 under Registry No. 855469 of the Conveyance Records of Bossier Parish, Louisiana.

6.      Oil, Gas And Mineral Lease dated December 19, 2005, executed by Locke Properties, Inc., as Lessor, in favor of Sklarco L.L.C., as Lessee, covering 190.448 acres, more or less, recorded in Book 3828, Page 447 under Registry No. 2018179 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1360, Page  497 under Registry No. 856523 of the Conveyance Records of Bossier Parish, Louisiana.

## Exhibit "A-2"

Attached to and made a part of that certain Operating Agreement dated effective as of April 1, 2006, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., Tensas Delta Exploration Company, L.L.C., McCombs Energy, Ltd., Wemo, Inc., Yelbom Oil, Inc. and William Rudd Limited Partnership, as Non-Operators, covering the Red River Prospect, T17N, R13W and T17N, R12W, Caddo and Bossier Parishes, Louisiana

## Plat of Contract Area and AMI



Bath Form Louisiana Spec. 14-BR1-2A-NL  Paid up R2/99

EXHIBIT "B"

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of _____, _____ between

Lessor (whether one or more) whose address is: _____

and _____ Lessee,

whose address is _____

WITNESSETH:

1. Lessor in consideration of One Hundred Dollars and Other Valuable Considerations ($100.00 & OVC), in hand paid, of the royalties herein provided, and of the agreement of the Lessee herein contained, hereby grants, leases and lets unto Lessee, the exclusive right to enter upon and use the land hereinafter described for the exploration for and production of oil, gas, sulphur and all other minerals, together with the use of the surface of the land for all purposes incident to the exploration for and production, ownership, possession and transportation of said minerals (either from said land or acreage pooled therewith), and the right to dispose of salt water, with the right of ingress and egress to and from said lands at all times for such purposes, including for operations hereunder or in connection with similar operations on adjoining land, the land to which this lease applies and which is affected hereby

being situated in _____ Parish, Louisiana, and described as follows, to-wit:

This lease shall also extend and apply to any interest therein which Lessor may hereafter acquire, including, but not limited to, outstanding mineral rights acquired by reversion, prescription or otherwise, and includes battures, accretions, roads, highways, easements, right-of-ways and all land, if any, contiguous or adjacent to, or adjoining the land particularly described above. Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purposes of determining the amount of bonus and the shut-in royalty payment hereunder, said land shall be deemed to contain _____ acres , whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof.

2. Subject to the other provisions herein contained, this lease shall be for a period of _____ years from the date hereof (called "primary term") and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner herein provided.

3 For the consideration hereinabove recited, this lease shall remain in full force and effect during the primary term, without any additional payment and without Lessee being required to conduct any operations on the land (either before or after the discovery of minerals), except to drill such wells as might be necessary to protect the land from drainage, as hereinafter provided.

4. The royalties to be paid by Lessee are: (a) on oil, and other hydrocarbons which are produced at the well in liquid form by ordinary production methods, one-eighth of that produced and saved from said land, same to be delivered at the wells or to the credit of Lessor in the pipe line to which the wells may be connected; Lessee's interest in either case to bear its proportion of any expenses for treating the oil to make it marketable as crude; Lessee may from time to time purchase any royalty oil or other liquid hydrocarbons in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas, or other gaseous substance produced from said land and sold or used off the premises or for the extraction of gasoline or other products therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; such gas, casinghead gas, residue gas, or gas of any other nature or description measured as may be disposed of for no consideration to Lessee, either through unavoidable waste or leakage, or in order to recover oil or other liquid hydrocarbons, or returned to the ground, shall not be deemed to have been sold or used either on or off the premises within the meaning of this paragraph 4 hereof; (c) on all other minerals mined and marketed, one-eighth, either in kind or value at the well or mine, at Lessee's election, except that on sulphur the royalty shall be one dollar ($1.00) per long ton.

5. If Lessee during or after the primary term should drill a well capable of producing gas or gaseous substances in paying quantities, (or which although previously produced Lessee is unable to continue to produce) and should Lessee be unable to operate said well because of lack of market or marketing facilities or governmental restrictions, then Lessee's rights may be maintained beyond or after the primary term without production of mineral or further drilling operations by paying Lessor as royalty a sum equal to one dollar (1.00) per acre of land covered hereby per year, the first payment being due, if said well should be completed or shut-in after the primary term, within ninety (90) days after the completion of such well or the cessation of production and such payment will extend Lessee's rights for one year from the date of such completion or cessation. If such a well should be completed during the primary term, the first payment, if made by Lessee, shall be due within 90 days after such well is shut-in, or before the expiration date of the primary term herein fixed, whichever is the later date. Thereafter Lessee's rights may be continued from year to year by making annual payments in the amount stated on or before the anniversary date beginning with the date of completion of said well (if completed after the primary term) or the end of the primary term (if completed prior thereto) as the case may be; each of such payments to extend Lessee's rights for one year. The annual payments herein provided for may be deposited to Lessor's credit in the _____

Bank of _____ which bank shall be and remain Lessor's agent for such purpose regardless of any change or changes in the ownership of the land or mineral rights therein. The owners of the royalty as of the date of such payments shall be entitled thereto in proportion to their ownership of said royalty. The provisions of this paragraph shall be recurring at all times during the life of this lease should any well producing gas or gaseous substances be completed on a drilling unit which includes any part of the land herein leased, the provisions of this paragraph shall be subject to all other agreements herein contained allowing the pooling of the above described lands with other lands.

6. If within ninety (90) days prior to the end of the primary term, Lessee should complete or abandon a well on the lands described above or on land pooled therewith, or if production previously secured should cease from any cause, this lease shall continue in force and effect for ninety (90) days from such completion or abandonment or cessation of production. If at the expiration of the primary term or at the expiration at the ninety (90) day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith, but Lessee is then engaged in operations for drilling, completion or reworking thereon, or operations to achieve or restore production, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations for drilling, completion or reworking, or operations to achieve or restore production, with no cessation between operations or between such cessation of production and additional operations of more than ninety (90) consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith. If sulphur be encountered on said premises or on land pooled therewith, this lease shall continue in force and effect so long as Lessee is engaged with due diligence in explorations for and/or erecting a plant for the production of sulphur and thereafter subject to the foregoing provisions hereof so long as oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith.

7. Lessee is hereby granted the right as to all or any part of the land described herein, without Lessor's joinder, to combine, pool or unitize the acreage royalty or mineral interest covered by this lease, or any portion thereof, at any time during the life of this lease, with any other land, lease or leases, royalty or mineral interests in or under any other tract or tracts of land in the vicinity thereof, whether owned by Lessee or some other person, or corporation so as to create, by the combination of such lands and leases, one or more operating units, as to any and all mineral horizons, provided that no one operating unit shall, in the case of gas, including condensate, embrace more than six hundred forty (640) acres, and in the case of oil, including casinghead gas, embrace more than eighty (80) acres, and provided further, however, that if any spacing or drilling rules and regulations of the State or Federal Commission, Agency, or regulatory body having or claiming jurisdiction fixes heretofore or shall at any time hereafter permit or prescribe a drilling or operating unit or spacing rule in the case of gas, including condensate, greater than six hundred forty (640) acres, or in the case of oil or casinghead gas greater than eighty (80) acres, then the unit or units herein contemplated may have, or may be redesigned so as to have, as the case may be, the same surface content as, but not more than, the unit or the acreage in the spacing rule so prescribed or permitted. However, it is further specifically understood and agreed, anything herein to the contrary notwithstanding, that the Lessee shall have the right to, and the benefit of an acreage tolerance of ten per cent in excess of any drilling or operating unit authorized herein. The commencement of operations for the drilling of a well, or the completion of a well to production of either oil, gas, casinghead gas, condensate or other minerals on any portion of an operating unit in which all or any part of the land described herein is embraced, or production of oil, gas, casinghead gas, condensate, or other minerals therefrom shall have the same effect under the terms of this lease as if a well were commenced, completed or producing oil, gas, casinghead gas, condensate, or other minerals in paying quantities on the land embraced by this lease. Lessee shall execute in writing and file for record in the records of the Parish in which the lands herein leased are located, an instrument identifying or describing the pooled acreage, or an instrument supplemental thereto redesignating same, as the case may be. Either prior to the securing of production from any unit created under the authority hereinabove granted, or after cessation of production therefrom Lessee shall have the right to dissolve the unit so created, without Lessor's joinder or further consent, by executing in writing and placing of record in the Parish or Parishes in which the lands making up such unit may be located, an instrument identifying and dissolving such unit. The provisions hereof shall be construed as a covenant running with the land and shall inure to the benefit of and be binding upon the parties hereto, their heirs, representatives, successors and assigns. In the event such operating unit or units is/are so created by Lessee, Lessor shall receive out of production or the proceeds from production from such operating unit or units out of the shut-in royalty specified herein as the number of acres (mineral acres) out of this lease placed in any such operating unit or units bears to the total number of acres included in such operating unit or units.

8. If Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the payments herein provided shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

9. Lessee shall have the exclusive right to explore the land herein described by geological, geophysical or other methods, whether similar to those herein specified or not and whether now known or not, including the drilling of holes, use of torsion balance, seismograph explosions, magnetometer, or other geophysical or geological instruments, test of procedures, for

the purpose of acquiring geological and geophysical information. All information obtained by Lessee as a result of such activity shall be the exclusive property of Lessee, and Lessee may disseminate or sell such information without Lessor's consent. In exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or on any adjacent or adjoining lands, as may be reasonably necessary for such purpose, including but not limited to the drilling of wells, construction and use of the leased premises, or on any adjacent or adjoining lands, as may be reasonably necessary for such purpose, including but not limited to the drilling of wells, construction and use of roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Lessee to discover, produce, store, treat and/or transport oil, gas and other substances. Lessee shall have free use of oil, gas, casinghead gas, condensate, and water from said land, except water from Lessor's wells, for all operations hereunder, including reprocessing, pressure maintenance and recycling, and the royalty shall be computed after deducting any so used. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred feet of any residence or barn now on said land without Lessor consent. In the event a well or wells, producing oil, gas, casinghead gas or condensate in paying quantities should be brought in on adjacent lands not owned by the Lessor and within one hundred fifty feet of and draining the leased premises, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances.

10. The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns, but no change or division in ownership of the land, or royalties, however accomplished shall operate to enlarge the obligations or diminish the rights of Lessee. No such change or division in the ownership of the land, or royalties shall be binding upon Lessee for any purpose until such person acquiring any interest has furnished Lessee, at its principal place of business, with a certified copy of the instrument or instruments, constituting the chain of title from the original Lessor. An assignment of this lease, in whole or in part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder to Lessor and, if Lessee or assignee of part or parts hereof shall fail to comply with any other provisions of the lease, leese, such default shall not affect this lease insofar as it covers a part of said lands upon which Lessee or any assignee shall comply with the provisions of the lease. In addition, Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations as to the released acreage or interest.

11. In case of suit, adverse claim, dispute or question as to the ownership of the royalties (or some part thereof) payable under this lease, Lessee shall not be held in default in payment of such royalties (or the part thereof in dispute), until such suit, claim, dispute or question has been finally disposed of, and Lessee shall have thirty (30) days after being furnished with a certified copy of the instrument or instruments disposing of such suit, claim or dispute, or after being furnished with proof sufficient, in Lessee's opinion, to settle such question, within which to make payment. Should the right or interest of Lessee hereunder be disputed by Lessor, or any other person, the time covered by the pendency of such dispute shall not be counted against Lessee either as affecting the term of the lease or for any other purpose, and Lessee may suspend all payment without interest until there is a final adjudication or other determination of such dispute.

12. In case of cancellation or termination of this lease from any cause, Lessee shall have the right to retain, under the terms hereof, around each well producing, being worked on, or drilled hereunder, the number of acres in the form allocated to each such well under spacing and proration rules issued by the Commissioner of Conservation of the State of Louisiana, or any other State or Federal authority having control of such matters; or any unit or units formed pursuant to paragraph 7 or, in the absence of such rulings, unit or units, forty (40) acres around each such well in as near a square form as practicable, and in the event Lessor considers that operations are not being conducted in compliance with this contract, Lessee shall be notified in writing of the facts relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument.

13. When drilling, reworking, production or other operations are delayed or interrupted by force majeure, that is, by storm, flood or other acts of God, fire, war, rebellion, insurrection, riot, strikes, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some law, order, rule, regulation, requisition or necessity of government, Federal or State, or as a result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding, but this lease shall be extended for a period of time equal to that during which Lessee is so prevented from conducting such drilling or reworking operations on, or producing oil, gas, casinghead gas, condensate or other minerals from, the premises; provided that during any period that this lease is continued in force after its primary term solely by force majeure as herein provided, Lessee shall pay to the owners of the royalty hereunder the shut-in royalty provided in paragraph 5 hereof, and in the manner therein provided, without regard to whether or not there is a producing well shut in, located on said land or on land with which the lease premises or any part thereof has been pooled.

14. Lessee shall pay for actual damages caused by its operations to growing crops and timber on said land leased herein.

15. Notwithstanding the death of any party Lessor, or his successor in interest, the payment or tender of all sums accruing hereunder in the manner provided above shall be binding on the heirs, executors and administrators of such person.

16. Lessor hereby warrants and agrees to defend the title to the lands herein described, and agrees that the Lessee at its option shall have the right to redeem for Lessor, by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof. In case of payment of any such mortgage, taxes or other liens by Lessee, in addition to the right to subrogation herein granted, Lessee shall also have the right to retain any royalties which become due Lessor hereunder and to repay itself therefrom, and the retention of such royalties by Lessee shall have the same effect as if paid to the Lessor in whose behalf payment of any mortgage, taxes or other liens was made.

17. This lease shall be binding upon all who execute it, whether or not named in the body hereof as Lessor, and without regard to whether this same instrument, or any copy thereof, shall be executed by any other Lessor named above.

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

WITNESSES:                                    LESSOR (WHETHER ONE OR MORE)

_____   _____   SS No. OR TAX ID _____

_____   _____   SS No. OR TAX ID _____

_____   _____   SS NO. OR TAX ID _____

_____   _____   SS NO. OR TAX ID _____

STATE OF _____
PARISH/COUNTY OF _____

On this _____ day of _____, before me, the undersigned authority, personally appeared _____ to me known to be the person(s) described in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as their free act and deed.

My Commission expires _____        _____
                                                             NOTARY PUBLIC in and for

STATE OF _____
PARISH/COUNTY OF _____

Before me, the undersigned authority, personally came and appeared _____ who being first duly sworn deposes and says that he/she was one of the subscribing witnesses to the execution of the foregoing instrument by _____ who signed the same in he/she presence and that of the other subscribing witness(es) to such signature(s) whose name(s) (signatures) are affixed as such, and that he/she now recognizes all said signatures to be true and genuine.

                                                             _____
                                                             Subscribing Witness

Sworn to and subscribed before me, notary, on this _____ day of _____

My Commission expires _____        _____
                                                             NOTARY PUBLIC in and for

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

# EXHIBIT "C"

Attached to and made a part of ___ the Operating Agreement dated April 1, 2006, between Sklar Exploration Company L.L.C.
as Operator, and Sklarco L.L.C., Tensas Delta Exploration Company, L.L.C., WEMO, Inc., YELBOM OIL INC., William Rudd
Limited Partnership, and McCombs Energy, Ltd., as Non-Operators, covering Red River Prospect, located in Caddo and Bossier
Parishes, Louisiana.

# ACCOUNTING PROCEDURE

# JOINT OPERATIONS

## I. GENERAL PROVISIONS

1. **Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

2. **Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3. **Advances and Payments by Non-Operators**

   A. Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

   B. Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at Hibernia National Bank, Shreveport, Louisiana on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4. **Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.**

- 1 -

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

5. **Audits**

A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B. The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6. **Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2. **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

3. **Labor**

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2) Salaries of First level Supervisors in the field.

(3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation or the Joint Property if such charges are excluded from the overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4. **Employee Benefits**

Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

5. **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV.    Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6. **Transportation**

~~Transportation of employees and Material necessary for the Joint Operations~~ shall be charged at actual cost incurred by Operator, ~~but subject to the following limitations:~~

~~A.  If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.~~

~~B.  If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.~~

~~C.  In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.~~

7. **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III.    The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8. **Equipment and Facilities Furnished By Operator**

A.  Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _____ fifteen _____ percent ( _____ 15 _____%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.  In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%.    For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9. **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10. **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, ~~except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to be the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3,~~ and the costs and expenses incurred in connection with hearings and other matters before governmental bodies and agencies and costs and expenses incurred in examining and curing title.

11. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

**12. Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**13. Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

**14. Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

**15. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

**1. Overhead - Drilling and Producing Operations**

i.   As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph 1A, or
(   ) Percentage Basis, Paragraph 1B

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii.  The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

(   ) shall be covered by the overhead rates, or
( X ) shall not be covered by the overhead rates.

iii. The ~~salaries, wages and Personal Expenses of Technical Employees and/or~~ costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

(   ) shall be covered by the overhead rates, or
( X ) shall not be covered by the overhead rates.

A.   Overhead - Fixed Rate Basis_____ See ADDITIONAL REVISIONS page 9.

(1)  Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $____7,000.00____
(Prorated for less than a full month)

Producing Well Rate $____700.00____

(2)  Application of Overhead - Fixed Rate Basis shall be as follows:

(a)  Drilling Well Rate

(1) Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

COPAS 1984 - ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

    (b) Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B. ~~Overhead - Percentage Basis~~

~~(1) Operator shall charge the Joint Account at the following rates:~~

~~(a) Development~~

~~_____ Percent (_____%) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.~~

~~(b) Operating~~

~~_____ Percent (_____%) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.~~

~~(2) Application of Overhead - Percentage Basis shall be as follows:~~

~~For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.~~

2.    Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

Account for overhead based on the following rates for any Major Construction project in excess of $ _25,000.00_

A.  _____5_____ % of first $100,000 or total cost if less, plus

B.  _____4_____ % of costs in excess of $100,000 but less than $1,000,000, plus

C.  _____3_____ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3.  **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A.  _____5_____ % of total costs through $100,000; plus

B.  _____4_____ % of total costs in excess of $100,000 but less than $1,000,000; plus

C.  _____3_____ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4.  **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV.    PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1.  **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2.  **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.  New Material (Condition A)

(1)  Tubular Goods Other than Line Pipe

(a)  Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at ___cost___ Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

(b)  For grades which are special to one mill only, prices shall be computed at ___cost___ the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

~~pound Oil Field Haulers Association interstate truck rate shall be used.~~

(c) ~~Special end finish tubular goods shall be priced at~~ **cost** ~~the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.~~

(d) ~~Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at~~ **cost** ~~the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.~~

(2) Line Pipe

(a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced ~~at~~ **at cost** ~~under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.~~

(b) ~~Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at~~ **cost** ~~Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.~~

(c) ~~Line pipe 24 inch OD and over and ½ inch wall and larger shall be priced~~ **at cost** ~~f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.~~

(d) ~~Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at~~ **cost** ~~quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.~~

(3) ~~Other Material shall be priced at~~ **cost** ~~the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.~~

(4) ~~Unused new Material, except tubular goods, moved from the Joint Property shall be priced at~~ **cost** ~~the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).~~

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

At ~~seventy-five percent (75%) of current~~ **market value,** ~~new price, as determined by Paragraph A.~~

(2) Material used on and moved from the Joint Property

(a) At ~~seventy-five percent (75%) of current~~ **market value,** ~~new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or~~

(b) At ~~sixty-five percent (65%) of current~~ **market value,** ~~new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material~~

(3) Material not used on and moved from the Joint Property

At ~~seventy-five percent (75%) of current~~ **market value,** ~~new price as determined by Paragraph A.~~

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at ~~fifty percent (50%) of~~ **current market value** ~~current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.~~

- 7 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS 

(2)  Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)  Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight.   Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)  Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)  Condition E

Junk shall be priced at prevailing prices.  Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.  Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties.  Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.  Pricing Conditions

(1)  Loading or unloading costs may be charged to the Joint Account at / ~~the rate of twenty-five cents (25¢)~~   ^actual costs incurred by operator ~~per hundred weight~~ on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point.  The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3).  Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year.  Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)  Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.  **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material.   Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator, provided, however, if a Non-Operator elects to furnish material in kind, such material must (a) meet the quality specifications set by Operator, and (b) be inspected by Operator with inspection costs to be billed to the Joint Account.

4.  **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished.   In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.  **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken.  Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.  **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of   a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

Recommended by the Council
of Petroleum Accountants
Societies


COPAS

overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.  **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.  In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.  **Expense of Conducting Inventories**

A.  The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.  The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

ADDITIONAL REVISIONS

(1)    In the event the subject well is expected to be above the State threshold for H2S sour gas operations, the Drilling Well rate set forth in Art. III.1.A(1) will be increased by $2000.00 per month and the associated Producing Well Overhead Rate will be increased an additional $100.00 per month.

## EXHIBIT "D"

Attached to and made a part of that Operating Agreement dated effective as of April 1, 2006 by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., Tensas Delta Exploration Company, L.L.C., WEMO, Inc., YELBOM OIL Inc., William Rudd Limited Partnership, and McCombs Energy, Ltd. as Non-Operators covering lands located in Caddo and Bossier Parishes, Louisiana.

Operator shall carry the following insurance wit h the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of insurance will be provided upon request.

I.   WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

   A. Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

   B. Extension of Coverage B of policy to provide for not less than $500,000 for death or injury to one person in any one accident.

II.   COMPREHENSIVE GENERAL LIABILITY

   Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $2,000,000 for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III.   AUTOMOBILE LIABILITY

   Coverage shall include owned, non-owned and hired vehicles. Limit $500,000 combined single limit each occurrence for bodily injury and property damage.

IV.   EXCESS LIABILITY

   Operator shall carry excess liability insurance in an amount necessary to provide a total of $5,000,000 coverage for both Automobile Liability and Comprehensive General Liability.

   Any party, at its own expense, may carry its own coverage for Excess Liability Insurance with limits as set forth in this Section IV. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

V.   EXTRA EXPENSE LIABILITY

   Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $25,000 per occurrence.

Liability Limit: $5,000,000

   Any party, at its own expense, may carry its own coverage for Extra Expense Liability Insurance with limits as set forth in this Section V. Any party so electing must notify

Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability.  Upon timely notification such party will not be charged by Operator for the coverage.

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder.

## EXHIBIT "E"

Attached to and made a part of that Operating Agreement dated effective as of April 1, 2006 by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., Tensas Delta Exploration Company, L.L.C., WEMO, Inc., YELBOM OIL Inc., William Rudd Limited Partnership, and McCombs Energy, Ltd. as Non-Operators covering lands located in Caddo and Bossier Parishes, Louisiana.

## GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement, the parties hereto own and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area described in the Operating Agreement (the "JOA").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the gas produced from said JOA. However, one or more of the parties may be unable to take or market its interest in the gas production from time to time; therefore, to permit any party to produce and dispose of its interest in the gas production from the JOA with as much flexibility as possible, the parties hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser. Any party whose share of gas is not marketed shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto monthly statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ration of its participation percentage under this Operating Agreement to the participating percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, it any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Operator will, in turn, make settlement for all royalties and overriding royalties which are payable on gas produced from the Contract Area. In the event that the total royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Contract Area, then any such deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Contract Area shall furnish the Operator with division order title opinions on which Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser

shall pay, or cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the volume of gas actually taken for its account.

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold or took but did not sell, less applicable production taxes and royalties theretofore paid, less any reasonable compression, treating, gathering, or transportation costs actually incurred and paid to third party, unaffected entitles and otherwise directly in connection with the sale of the overproduction, at the price received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party. Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.

## PARTIAL SUBLEASE OF OIL, GAS AND MINERAL LEASES

**THIS PARTIAL SUBLEASE OF OIL, GAS AND MINERAL LEASES** (this "Agreement") is made effective this 1st day of February, 2008 (the "Effective Date"), by and between (hereinafter sometimes individually referred to as a "Party" or collectively as the "Parties"):

> **SKLARCO L.L.C.,** a Louisiana limited liability company, whose address is 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101, represented herein by its duly authorized Vice President - Chief Operating Officer, David A. Barlow ("Sublessor"); and

> **PETROHAWK PROPERTIES, L.P.,** a Texas limited partnership, whose address is 1000 Louisiana, Suite 5600, Houston, Texas 77002, represented herein by Stephen W. Herod, Executive Vice President- Corporate Development of P-H Energy, LLC, its General Partner ("Sublessee");

### WITNESSETH:

**WHEREAS,** Sublessor is the record owner of those certain Oil, Gas and Mineral Leases (hereinafter sometimes individually referred to as a "Lease" or collectively as the "Leases") described in Exhibit "A," attached hereto and made a part hereof, covering lands located in Caddo and Bossier Parishes, Louisiana, as further described in Exhibit "A" attached hereto and made a part hereof (the "Subleased Premises"); and

**WHEREAS,** Sublessor has developed certain of those Leases by drilling and establishing production from the Rodessa Zone, Reservoir A, Cedar Grove Field (as defined by the Louisiana Office of Conservation Order No. 967-B dated November 7, 1988, and hereinafter referred to as the "Rodessa Formation") in the VUA; B&K Exploration Inv. LLC #1 Well (said unit created by that certain Voluntary Unit Agreement dated effective as of June 1, 2007, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., the City of Shreveport and the State Mineral Board on behalf of the State of Louisiana, recorded in Conveyance Book 3977, Page 544 under Registry No. 2118525 of the Records of Caddo Parish, Louisiana, and in Conveyance Book 1417, Page 114 under Registry No. 909042 of the Records of Bossier Parish, Louisiana) ; and

**WHEREAS,** Sublessor desires to develop some or all of the lands covered by the Leases as to those depths from the surface of the Earth to the top of the stratigraphic equivalent of the Hosston Zone, Reservoir A, Cedar Grove Field (as defined by the Louisiana Office of Conservation Order No. 967 dated January 28, 1976 and hereinafter referred to as the "Hosston Formation"), including the Rodessa Formation; and

**WHEREAS,** Sublessee desires to develop some or all of the lands covered by the Leases as to those depths from the top of the Hosston Formation and below.

**NOW, THEREFORE,** Sublessor desires to sublease to Sublessee, and Sublessee desires to sublease from Sublessor, all of the right, title and interest of Sublessor in and to the Leases INSOFAR AND ONLY INSOFAR as they cover depths from and below the top of the Hosston Formation, pursuant to the following terms and conditions.

## ARTICLE I. GRANTING AND CONSIDERATION
### Section 1.1. Granting

Sublessor, in consideration of the cash bonus set forth in Section 1.2 of this Agreement, and Other Good and Valuable Considerations, in hand paid, and of the overriding royalties herein provided, the receipt of sufficiency of which are hereby acknowledged, and of the agreement of Sublessee herein contained, hereby subleases, transfers, assigns and delivers unto Sublessee, subject to the provisions, exceptions, and reservations hereafter set out, Sublessor's right, title and interest in and to Leases, INSOFAR AND ONLY INSOFAR as they cover and affect depths from and below the top of the Hosston Formation, for the purposes of prospecting, drilling for, and producing Oil and Gas. "Oil" is defined to include all oil and associated liquid hydrocarbons and sulphur produced in association therewith, and "Gas" is defined to include all gas, casinghead gas, gas condensate, distillate and other gaseous and liquid hydrocarbons and sulphur produced in association therewith. Sublessor grants unto Sublessee, as to those depths from and below the top of the Hosston Formation, all the rights of Sublessor under the granting clause of the Leases, including all rights of ingress and egress, and the right to conduct seismic or other geological and/or geophysical exploration from and below the top of the Hosston Formation. Further, this Agreement shall cover any accretion or alluvion formed along the bank of the Red River or otherwise covered by any "Mother Hubbard," "Cover All" or similar clauses under the Leases. Sublessor expressly reserves unto itself and excepts from this Agreement all rights in and to the Leases as to those depths from the surface of the Earth to the top of the Hosston Formation, including, without limitation, all rights to the Rodessa Formation. Without limitation upon the foregoing, Sublessor, its successors, assigns, transferees or sublessees expressly reserve from this Agreement the right to use, occupy and enjoy the Leases and all of the Subleased Premises, for the purposes of (i) conducting seismic or other geological and/or geophysical exploration from the surface of the Earth to the top of the Hosston Formation, including, without limitation, the Rodessa Formation; (ii) to explore for and produce oil, gas or other minerals from the surface of the Earth to the top of the Hosston Formation, including, without limitation, all rights to the Rodessa Formation, or any zone or horizon as to which this Sublease may hereinafter terminate; (iii) to construct canals, roads, ditches, ponds, levees, dams, fences, buildings, camps, pipelines, telephone lines, and other facilities, structures and improvements; and (iv) to use any road or canal constructed or maintained by Sublessee to the extent that Sublessee has such rights of use and the right to assign such rights to Sublessor without additional cost to Sublessee; provided, however, that such use, occupation and enjoyment by Sublessor shall not unreasonably and unduly interfere with the rights granted herein. Sublessor shall pay a fair share of the costs of maintaining any such roads and canals during such use.

- 2 -

## Section 1.2.  Bonus Consideration

Concurrent with the Parties' execution of this Agreement, Sublessee has paid unto Sublessor, as a bonus, the cash sum of $1,460,782.09, being the product of $375 per net mineral acre multiplied by 3895.4189 net mineral acres covered by the Leases.  Some of the Leases may expire as to some or all of the lands and depths covered by the Leases. Likewise, some of the Leases may cover less net mineral acres than described on Exhibit "A."  On the other hand, some of the Leases may, as a result of accretion, alluvion or other reasons, cover more net acres than described on Exhibit "A."  Regardless, the Subleased Premises are deemed to comprise, and the Leases are deemed to cover, for purposes of the cash bonus consideration described in this Section 1.2., 3895.4189 net mineral acres, whether they actually comprise more or less.  This cash bonus consideration shall not be subject to proportionate reduction or increase for any reason whatsoever.

## ARTICLE II.  TERM OF SUBLEASE

### Section 2.1.  Term

This Sublease shall remain in force as to each of the Leases for the duration of that Lease, including the primary and secondary term of the Lease and any extensions or renewals of, or replacements to, each such Lease.

## ARTICLE III.  OVERRIDING ROYALTIES

### Section 3.1.  Reservation of Overriding Royalty Interests

Sublessor reserves and retains unto itself, and the interest subleased under this Agreement shall be subject to, an overriding royalty interest (the "ORRI") carved out of the leasehold interest in each of the Leases equal to the positive difference between the lessor's royalty under each of the Leases and twenty-five percent (25%) of the Oil and Gas produced and saved from the Subleased Premises from those depths from and below the top of the Hosston Formation.  It is the intent of Sublessor and Sublessee that Sublessee acquire a seventy-five percent (75%) net revenue interest in each Lease. Sublessor warrants that no Lease is burdened by a lessor's royalty in excess of twenty-five percent (25%).  Sublessor further warrants that no Lease, except Lease #5 described in Exhibit "A", is burdened by an overriding royalty interest carved out of the lessee's leasehold interest.  The ORRI described in this Section 3.1 does not burden Lease #5 described in Exhibit "A", said Lease being previously burdened by an overriding royalty interest in favor of Alternate Fuel Systems, Inc. pursuant to that certain assignment and reservation more particularly described in Exhibit "A."  The only consequence of the breach of the warranties set forth in this Section 3.1 is the reduction of the ORRI so as to allow the Sublessee a seventy-five percent (75%) net revenue interest in the production from any well drilled by Sublessee under this Agreement.  The ORRI shall not burden Oil and Gas produced and saved from those depths from the surface of the Earth to the top of the Hosston Formation, including, without limitation, the Rodessa Formation.

### Section 3.2.  Payment of ORRI And Lessor's Royalty

Oil and/or Gas used in the conduct of normal operations on the Subleased Premises shall be deducted before calculating the Sublessor's ORRI.  All payments or deliveries by Sublessee of Sublessor's ORRI, as hereinabove stated, shall be inclusive of

all royalty obligations under the Leases. Sublessor expressly retains and reserves the right and obligation to pay any and all royalties owed to the lessor under the terms of each of the Leases. Sublessor shall make accurate and timely payments to the said lessors for all royalties attributable to the Subleased Premises. Such payments shall be made by Sublessor no later than thirty (30) days after the receipt by Sublessor from Sublessee of the payment of this inclusive ORRI. Furthermore, Sublessor shall be liable to Sublessee for any and all sums paid by the Sublessee to the lessors arising out of Sublessor's failure to make accurate and timely payments under this Section 3.2., including interest, penalties and attorney fees, and Sublessee shall be liable to Sublessor for any and all sums paid by Sublessor to the lessors arising out of Sublessee's failure to make accurate and timely payments under this Section 3.2, including interest, penalties and attorney fees. Notwithstanding the foregoing, Sublessee may pay any proceeds from the sale of Oil and/or Gas attributable to the royalty interest of State Mineral Board on behalf of the State of Louisiana directly to the State of Louisiana, Office of Mineral Resources.

Payments by Sublessee hereunder shall commence within ninety (90) days after the date of first sales and will continue thereafter no later than thirty (30) days after the end of the calendar month within which subsequent production of Oil is sold and no later than forty-five (45) days after the end of the calendar month within which subsequent production of Gas is sold. All such payments or deliveries not timely made, as set out above, shall include interest at the greater of ten percent (10%) per annum or such greater interest as may be authorized by applicable statute, from the date due until such payments or deliveries are made.

Sublessor will not be obligated to execute a division order or other similar instrument ("Division Order") as a prerequisite to receiving its ORRI. Sublessee cannot use Sublessor's failure or refusal to execute a Division Order as a reason or excuse not to pay or deliver timely Sublessor's ORRI. This Sublease may not be modified or amended, in any respect, by Sublessor's execution of a Division Order, and any provisions in a Division Order executed by Sublessor which conflict with, amend or modify, in any respect, any term or provision of this Sublease will be deemed null and void.

Except as otherwise provided herein, Sublessor's ORRI shall never bear, either directly or indirectly, any part of the costs and expenses of production, compression, gathering, dehydration, treating, transportation and marketing of Oil and/or Gas from the Subleased Premises or any other costs and expenses attributable to the Subleased Premises or Oil and/or Gas produced from the Subleased Premises, except Sublessor's ORRI shall bear its proportionate part of severance, production and other similar taxes.

## ARTICLE IV. CONDUCT OF OPERATIONS AFFECTING THE SURFACE
### Section 4.1. Restrictions On Use Of Surface

Sublessee is cognizant that a portion or all of the surface of the Subleased Premises may be owned by natural or juridical persons that do not own the minerals in and under the Subleased Premises. Further, some of the Leases may contain restrictions on the right to use a portion or all of the surface of the Subleased Premises. Sublessee's

- 4 -

rights are expressly subject to all surface restrictions and obligations imposed upon Sublessor in the Leases and any other instrument of record in the Parish(es) where the Subleased Premises are located, and Sublessee expressly assumes all such obligations. Sublessee shall protect, defend and fully indemnify Sublessor, its members, managers, employees, officers, attorneys, agents, successors and assigns, from and against all claims, liabilities or causes of action arising from Sublessee's activities hereunder (i) that violate any of such surface restrictions and obligations, or (ii) that result in damages to or alleged damages to the surface of the Subleased Premises, including, without limitation, all attorneys' fees and costs associated with any defense thereof.

### Section 4.2. Servitudes And Rights-Of-Way

This Sublease is made subject to existing servitudes and rights-of-way covering the lands affected hereby, including, without limitation, those described in Exhibit "B" attached hereto and by reference made a part hereof.

### Section 4.3. Compliance With Laws

Sublessee, its successors and assigns, agree to comply with all orders, rules and regulations of any Federal, State or Local agency having jurisdiction over the Subleased Premises, including, but not limited to, the Department of the Army, Corps of Engineers, the Red River Waterway District, the Louisiana Office of Conservation, the Environmental Protection Agency, the Louisiana Department of Natural Resources, Office of Mineral Resources and the State Mineral Board, and the Louisiana Department of Environmental Quality, and further agree to protect, indemnify, save and hold harmless Sublessor, its members, managers, employees, officers, attorneys, agents, successors and assigns, from and against any and all claims, liabilities or causes of action, including, without limitation, all attorneys' fees and costs associated with any defense thereof, arising directly or indirectly as a result of Sublessee's failure to fully comply with any such orders, rules and regulations.

### Section 4.4. Removal Of Fixtures & Restoration Of Surface

Sublessee shall have the right at any time until six (6) months after the expiration of this Sublease (or such shorter period of time that may be applicable as set forth in any of the Leases or any other instrument of record in the Parish(es) where the Subleased Premises are located) to remove all fixtures and other property placed by Sublessee on the Subleased Premises, including the right to draw and remove all casing. Sublessee shall bury all pipelines to a depth so as not to interfere with the surface owner's normal operations or use of the surface but in no event less than thirty-six (36) inches from the surface of the earth to the top of the pipe. Sublessee shall be responsible for and shall promptly pay the surface owner or other applicable owner for all damages to timber, crops, improvements, lands and all damage whatsoever caused by or resulting from any operation of Sublessee on the Subleased Premises. Immediately following any operation or cessation of any operation hereunder, Sublessee shall return the lands covered by this Sublease (i) to the condition (or as near the same condition as is reasonably practicable) at the inception of this Sublease, or (ii) to such superior condition as may be required by the applicable provisions of the Leases or any other instrument of record in the Parish(es) where the Subleased Premises are located. Sublessee shall have the right at any and all

times to use existing roads, canals and bridges located on the land to the extent that
Sublessor has such rights of use and the right to assign such rights to Sublessee without
additional cost to Sublessor.  Sublessee shall pay a fair share of the costs of maintaining
any such roads, canals and bridges during such use.  Prior to laying pipelines, installing
telephone or telegraph lines, building or dredging canals, building bridges, establishing
power lines, or erecting any other structure that could impede the surface owner's use of
the surface of the Subleased Premises, Sublessee shall notify the applicable surface
owner(s).

### Section 4.5.  Reciprocal Indemnities

With respect to Sublessor's wells presently located or located in the future on the
lands covered by the Leases, Sublessor does hereby agree to protect, indemnify, save and
hold harmless the Sublessee from any and all claims, causes of action, obligations or
requirements, if any, to plug and abandon such well or wells, to clean up the location
surrounding said wells, to remove any equipment located in, on or around said wells, and
to pay each owner its share of the proceeds of production from Sublessor's wells and to
pay monetary compensation for damages to the surface or sub-surface owner of the lands
covered by the Leases in accordance with any oil, gas and mineral lease, or rules,
regulations or directives of the Louisiana Office of Conservation or any other
governmental agency having jurisdiction or any right of lessor under the Louisiana
Mineral Code or other law; it being the intent of the Sublessor and Sublessee that
Sublessor shall be responsible for Sublessor's operations on the lands covered by the
Leases.  This indemnity of Sublessor is in favor of Sublessee and its partners, managers,
employees, officers, attorneys, agents, successors and assigns, and shall include all
attorneys' fees and costs associated with any defense thereof arising directly or indirectly
as a result of Sublessor's failure to fully comply with the obligations of this Section 4.5.

With respect to Sublessee's wells located in the future on the lands covered by the
Leases, Sublessee does hereby agree to protect, indemnify, save and hold harmless the
Sublessor from any and all claims, causes of action, obligations or requirements, if any,
to plug and abandon such well or wells, to clean up the location surrounding said wells,
to remove any equipment located in, on or around said wells, and to pay each owner its
share of the proceeds of production from Sublessee's wells and to pay monetary
compensation for damages to the surface or sub-surface owner of the lands covered by
the Leases in accordance with any oil, gas and mineral lease, or rules, regulations or
directives of the Louisiana Office of Conservation or any other governmental agency
having jurisdiction or any right of lessor under the Louisiana Mineral Code or other law;
it being the intent of the Sublessor and Sublessee that Sublessee shall be responsible for
Sublessee's operations on the lands covered by the Leases.  This indemnity of Sublessee
is in favor of Sublessor and its members, managers, employees, officers, attorneys,
agents, successors and assigns, and shall include all attorneys' fees and costs associated
with any defense thereof arising directly or indirectly as a result of Sublessee's failure to
fully comply with the obligations of this Section 4.5.

## ARTICLE V.  POOLING PROVISION

Subject to the terms and conditions of the Leases, Sublessee is hereby granted the right at any time and from time to time to pool the Subleased Premises or any portion or portions thereof, with any other lands, as to all strata or any stratum or strata covered by this Sublease for the production of Oil and/or Gas.  Sublessee shall file written unit designations in the applicable Parish Records in which the lands are located and a copy thereof shall be furnished to Sublessor.  Operations upon or production from the unit shall be treated as if operations were upon or such production were from the Subleased Premises whether or not the well or wells are located thereon.

## ARTICLE VI.  RESTRICTIONS ON TRANSFER

The rights of Sublessee hereunder shall not be assigned or subleased or otherwise transferred or encumbered in any manner in whole or in part without Sublessor's prior written consent, which consent shall not be unreasonably withheld; provided, further, that this restriction shall not be applicable to a transfer of rights hereunder by Sublessee through merger, reorganization, consolidation, or by sale of all or substantially all of its oil and gas assets in the State of Louisiana (other than at a forced sale), or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which Sublessee owns a majority of the stock.  Sublessee shall not delegate its operating rights hereunder to an operator of record with the Louisiana Office of Conservation or assign its rights and obligations hereunder to a third party without said operator or assignee expressly agreeing in writing to assume all obligations of the Sublessee under this Agreement.

Sublessee shall furnish Sublessor a copy of any instrument conveying, assigning, transferring or encumbering any interest in the Subleased Premises within thirty (30) days after the recording thereof.  However, no change or division in ownership of the lands, rentals or royalties however accomplished shall enlarge the obligations or diminish the rights of Sublessor or of Sublessee.  No change or division in such ownership by Sublessor shall be binding on Sublessee until thirty (30) days after the Sublessee shall have been furnished by mail with a certified copy of the recorded instrument or instruments evidencing same necessary to establish a complete chain of record title from Sublessor.

## ARTICLE VII.  LEASE MAINTENANCE
### Section 7.1.  Rentals

One of the Leases, namely, Lease #2 on Exhibit "A," may be extended during its primary term by the payment of annual delay rentals.  Either Party may pay the rental to extend that Lease.  If one Party desires to pay the rental to extend that Lease, then that Party shall notify the other Party thirty (30) days prior to the date such rental is due, and the other Party shall have fifteen (15) days from receipt of such notice within which to elect to participate in the rental payment.  If the other Party participates in the rental payment, then the Parties shall bear the rental payment in equal proportions and Sublessor shall own all rights in and to that Lease covering depths from the surface of the Earth to the top of the Hosston Formation, while Sublessee shall own all rights in and to that Lease covering depths from and below the top of the Hosston Formation.  If

- 7 -

Sublessor does not participate in the rental payment, then, in that event, and only in that event, Sublessor, subject to Section 7.4, waives its rights to the leasehold interest in that Lease covering depths from the surface of the Earth to the top of the Hosston Formation. If Sublessee does not participate in the rental payment, then, in that event, and only in that event, Sublessee waives its rights to the leasehold interest in that Lease covering depths from and below the top of the Hosston Formation.

### Section 7.2. Extensions, Renewals & Replacements

Either Party may acquire an extension or renewal of an existing Lease in order to extend the same beyond its primary term. Furthermore, either Party may acquire a new Lease within one (1) year after the complete or partial expiration of an existing Lease covering all or part of the same lands or depths as the existing Lease (the "replacement Lease"). If one Party desires to pay to extend or renew a Lease, then that Party shall notify the other Party thirty (30) days prior to the effective date of such extension or renewal, and the other Party shall have fifteen (15) days from receipt of such notice within which to elect to participate in the lease extension or renewal. If one Party acquires a replacement Lease, then that Party shall notify the other Party thirty (30) days after the effective date of such replacement Lease, and the other Party shall have fifteen (15) days from receipt of such notice within which to elect to participate in the replacement Lease. If the other Party participates in the lease extension, renewal or replacement, then the Parties shall bear the bonus payment in equal proportions and Sublessor shall own all rights in and to that extended, renewed or replaced lease covering depths from the surface of the Earth to the top of the Hosston Formation, while Sublessee shall own all rights in and to that extended, renewed or replaced lease covering depths from and below the top of the Hosston Formation. If Sublessor does not participate in the bonus payment, then, in that event, and only in that event, Sublessor, subject to Section 7.4, waives its rights to the leasehold interest in that extended, renewed or replaced lease covering depths from the surface of the Earth to the top of the Hosston Formation. If Sublessee does not participate in the bonus payment, then, in that event, and only in that event, Sublessee waives its rights to the leasehold interest in that extended, renewed or replaced lease covering depths from and below the top of the Hosston Formation. For purposes of this Section 7.2, a lease extension or renewal shall be defined as any new lease acquired prior to the expiration of the primary term of an existing Lease or amendment to the primary term of an existing Lease covering the same lands as an existing Lease that extends the term of an existing Lease beyond the original primary term of such existing Lease or contains a new primary term. Each Party agrees to promptly execute and record an assignment in favor of the other Party to reflect any election made under this Section 7.2.

### Section 7.3. Shut-In Royalty

Should either Party by the drilling of a well discover Gas capable of production in paying quantities but which such Party is unable to produce (or which, although previously produced that Party is unable to continue to produce) because of lack of market or marketing facilities, that Party may maintain the Leases covering lands on which the well is located and lands pooled therewith by the payment of shut-in royalties pursuant to the terms of those Leases. Any Leases maintained beyond their primary term

- 8 -

by the payment of shut-in royalties shall be treated like an extended or renewed lease pursuant to Section 7.4, and the Parties rights and obligations with regard to any such Leases shall be governed by said Section 7.4.

### Section 7.4. Anti-Washout

Any Leases or interests therein extended, renewed, amended, replaced or otherwise acquired by Sublessee pursuant to this Article VII shall be burdened by the ORRI described in Article III of this Agreement regardless of whether Sublessor paid any part of the bonus consideration.

## ARTICLE VIII. TITLE NOT WARRANTED

Sublessor does not warrant title to the Leases or the Subleased Premises, express or implied, not even for return of the bonus paid to Sublessor pursuant to Section 1.2 of this Agreement. If Sublessor owns less interest than the entire fee or mineral estate or if the Leases cover less than the entire fee or mineral estate, the ORRI and royalties to be paid Sublessor may be reduced proportionately; provided, however, the cash bonus paid pursuant to Section 1.2 of this Agreement is not subject to proportionate reduction.

Each Party shall keep the Leases and its respective wells and equipment free from all liens and encumbrances occasioned by its operations. If either Party desires to mortgage its interest under the Leases, any such mortgage shall be limited in scope to the rights of the Party in and to the Leases.

## ARTICLE IX. OFFSET DRILLING OBLIGATIONS; REASONABLE DEVELOPMENT

Sublessee assumes any obligations set forth or implied in any of the Leases to drill offset wells or protect the Subleased Premises against drainage. Neither Party shall have any obligation to the other Party to maintain by operations any of the Leases subject to this Agreement. "Operations" shall mean production of oil and/or gas, or drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil and/or gas. However, both Parties agree to act as a reasonably prudent operator and to use their best efforts to maintain the said Leases by such operations. In the event it should come to the attention of a Party that a Lease covered by this Agreement may expire or is about to expire from lack of production of oil and/or gas in paying quantities or from lack of other operations, such Party shall use its best efforts to give written notice to the other Party at least sixty (60) days prior to the time operations or other action is necessary to maintain the said Lease; provided, however, neither Party shall be liable to the other Party for the failure to give such notice.

## ARTICLE X. INFORMATION

In connection with any well drilled and other operations conducted on the Subleased Premises or on land pooled therewith, Sublessee agrees to provide Sublessor, and Sublessor agrees to provide Sublessee, full and complete information obtained in

connection with any such well and operations, including, but not limited to, all information as required on Exhibit "C."

Sublessee shall notify Sublessor prior to conducting seismic work on the Subleased Premises. Sublessee shall furnish Sublessor with a copy of the data acquired by its seismic exploration. Sublessor agrees to keep all such data confidential ("Confidential Information") and shall limit access to the Confidential Information to only those of its employees, agents, representatives or consultants who reasonably require such for business purposes of Sublessor and who are obligated to treat such as confidential in the same manner and to the same extent as herein provided, whether or not said employees (or consultants) remain in the employment of Sublessor.

Except for data related to Sublessee's seismic work, all information, items and other materials furnished to Sublessor hereunder shall become the property of Sublessor and shall be furnished at no expense to Sublessor, and, likewise, all information, items and other materials furnished to Sublessee hereunder shall become the property of Sublessee and shall be furnished at no expense to Sublessee. Further, all such information shall be furnished by the one to the other, as near as practicable, contemporaneously with the acquisition of the same.

Each Party shall have the right, at its own expense, at any reasonable time, to make an annual audit of the other Party's accounts, contracts, books and records for the purpose of confirming the other Party's compliance with the provisions of this Agreement. Each such audit shall cover the years intervening since the last audit, and the Party making the audit shall have one (1) year next following the close of the calendar year in which the audit is made within which to present to and assert against the other Party any and all claims or demands that might be disclosed by or result from said audit.

## ARTICLE XI. PLUGGING AND ABANDONMENT

Sublessee shall not at any time plug and abandon any well on the Subleased Premises without first giving Sublessor written notice of such desire and intention, and Sublessor shall not at any time plug and abandon any well on the Subleased Premises without first giving Sublessee written notice of such desire and intention. Sublessor or Sublessee (hereinafter referred to as the "Party Giving Notice"), as the case may be, shall give such notice to the other Party (hereinafter referred to as the "Party Receiving Notice") immediately if a drilling rig is then on location, otherwise at least thirty (30) days before a well is to be plugged. The Party Receiving Notice shall have fifteen (15) days (forty-eight [48] hours if a drilling rig is then on location) after receipt of such notice within which to notify the Party Giving Notice whether or not the Party Receiving Notice elects to take over said well for additional testing by any method, with the Party Receiving Notice being responsible for all costs and expenses in connection with such testing, including standby rig time. Furthermore, the indemnity of the Party Receiving Notice provided for in Section 4.5 above shall include these testing operations. These testing operations must be commenced immediately after the said notice is given, and these testing operations must be prosecuted in a diligent and workmanlike manner. After completing its testing of such well, the Party Receiving Notice may elect either to return

- 10 -

the well to the Party Giving Notice or to keep the well.  If the Party Receiving Notice elects to keep any well which it has taken over for purposes of testing, the Party Receiving Notice shall pay the Party Giving Notice the salvage value of all the equipment in and pertaining to such well so taken over and kept by the Party Receiving Notice less the cost of salvage.  If the Party Receiving Notice shall fail to notify the Party Giving Notice of such election within said fifteen (15) day (or forty-eight [48] hour) period, it shall be deemed that the Party Receiving Notice does not elect to take over said well. "Salvage value" is herein defined as being the average of no less than three (3) bona fide written offers by responsible parties on a salvage basis for the equipment in and pertaining to such well.

If the Party Receiving Notice elects not to take over any particular well or wells or, after taking over a well or wells for testing, elects to return such well or wells to the Party Giving Notice, then the Party Giving Notice shall plug and abandon any and all wells which the Party Receiving Notice does not elect to take over or keep, and shall, within a reasonable time thereafter, remove all leasehold material and debris placed on said premises by the Party Giving Notice and restore the property to as near its original condition as is possible and practicable, all at the risk and expense of the Party Giving Notice.  If the Party Receiving Notice elects to take over and keep a well and is successful in establishing production in commercial quantities from such well, the Party Giving Notice, or its designated Operator, shall deliver unto the Party Receiving Notice, or its designated Operator, a complete and fully executed change of operator form for filing with the Louisiana Office of Conservation and assignment and bill of sale covering the wellbore and any tangible equipment associated therewith.  If the Party Receiving Notice elects to take over and keep a well and is unsuccessful in establishing commercial production, then the Party Receiving Notice shall plug and abandon the well and restore the surface, at its sole risk and expense.  Any well and related equipment which the Party Receiving Notice elects to take over shall be delivered to the Party Receiving Notice by the Party Giving Notice free and clear of all liens, claims, clouds and encumbrances caused, suffered or created by, through or under the Party Giving Notice.

This Article XI is not intended and shall not be construed to alter the rights and obligations of the Parties in and to the Leases, it being the intent of this Agreement that Sublessor retain all rights in and to the Leases as to those depths from the surface of the Earth to the top of the Hosston Formation, and Sublessor subleasing to Sublessee rights in and to the Leases as to those depths from and below the top of the Hosston Formation. Any well taken over by Sublessor pursuant to this Article XI may only be completed in those depths retained by Sublessor, and any wells take over by Sublessee pursuant to this Article XI may only be completed in those depths subleased by Sublessee.

## ARTICLE XII.  GAS MARKETING
Sublessor owns or leases certain assets (hereinafter, "Sublessor's Facilities") used to separate, gather, dehydrate, treat, process, compress and sell natural gas produced from the VUA; B&K Exploration Inv. LLC #1 Well, including, without limitation, an tap and related facilities whereby Sublessor interconnects with Texas Gas Transmission LLC's Sharon Carthage 20 Inch pipeline.  If Sublessee establishes production of natural gas

- 11 -

from wells located on the Subleased Premises, then Sublessee, at its discretion, may notify Sublessor that it desires to use some or all of Sublessor's available capacity with regard to Sublessor's Facilities, in which event Sublessor and Sublessee shall negotiate in good faith to reach agreement concerning the sharing of Sublessor's Facilities for and in consideration of a reasonable fee to be paid by Sublessee to Sublessor.

Similarly, if, in the future, Sublessee owns or leases similar assets (hereinafter, "Sublessee's Facilities") to separate, gather, dehydrate, treat, process, compress and sell natural gas produced from wells located on the Subleased Premises or lands pooled therewith, then Sublessor may, at its discretion, notify Sublessee that it desires to use some or all of Sublessee's available capacity with regard to Sublessee's Facilities, in which event Sublessee and Sublessor shall negotiate in good faith to reach agreement concerning the sharing of Sublessee's Facilities for and in consideration of a reasonable fee to be paid by Sublessor to Sublessee.

Any rights of Sublessee to use Sublessor's Facilities, or of Sublessor to use Sublessee's Facilities, under this Article XII shall be subject to the Leases. Neither Party shall be obliged to grant unto the other Party any rights it does not have under the Leases, or under any rights of way, servitudes, surface use agreements or other instruments affecting use of the surface of the Subleased Premises.

## ARTICLE XIII. MISCELLANEOUS
### Section 13.1. Priority of Sublease
In the event of any contradictions or conflict between the terms and conditions of this Sublease and any of the Leases, the terms and conditions of this Sublease shall take precedence and shall govern and control the operations and relations between Sublessor and Sublessee hereunder.

### Section 13.2. Notice
All notices and other communications permitted or required under this Agreement shall (unless otherwise specifically provided herein) be in writing and be delivered personally, by recognized commercial courier or delivery service which provides a receipt, by facsimile (with receipt acknowledged), or by registered or certified mail (postage prepaid), at the following addresses:

If to Buyer:        Petrohawk Properties, LP
                    1000 Louisiana, Suite 5600
                    Houston, Texas 77002
                    Fax: (832) 204-2801
                    Attention: Stephen W. Herod

- 12 -

| With a copy to: | Hinkle Elkouri Law Firm L.L.C. |
|---|---|
| | 301 N. Main, Suite 2000 |
| | Wichita, Kansas 67202 |
| | Fax: (316) 660-6011 |
| | Attention: Connie D. Tatum |

| If to Seller: | Sklarco, LLC |
|---|---|
| | 401 Edwards Street, Suite 1601 |
| | Shreveport, Louisiana 71101 |
| | Tel: (318) 227-8668 |
| | Fax: (318) 227-9012 |
| | Attn: David A. Barlow |

| With a copy to: | Lemle & Kelleher, L.L.P. |
|---|---|
| | 401 Edwards Street, 10th Floor |
| | Shreveport, Louisiana 71101 |
| | Tel: (318) 227-1131 |
| | Fax: (318) 227-1141 |
| | Attn: Malcolm S. Murchison |

and shall be considered delivered on the date of receipt. Either Party may specify as its proper address any other post office address within the continental limits of the United States by giving notice to the other party, in the manner provided in this Section, at least ten (10) days prior to the effective date of such change of address.

**Section 13.3. Governing Law**
Without regard to principles of conflicts of law, this Agreement shall be construed and enforced in accordance with and governed by the laws of the State of Louisiana.

**Section 13.4. Expenses.** Each Party shall bear and pay all expenses (including, without limitation, legal fees) incurred by it in connection with the transaction contemplated by this Agreement.

**Section 13.5. No Sales Taxes.** No sales, transfer or similar tax will be collected from Sublessee in connection with the payment of the cash bonus set forth in Section 1.2 of this Agreement. If, however, this transaction is later deemed to be subject to sales, transfer or similar tax, for any reason, Sublessee agrees to be solely responsible, and shall indemnify and hold Sublessor (and its affiliates, and its and their members, managers, officers, employees, attorneys, contractors and agents) harmless, for any and all sales, transfer or other similar taxes (including related penalty, interest or legal costs) due by virtue of this transaction on the Subleased Premises subleased pursuant hereto and the Sublessee shall remit such taxes at that time. The Parties agree to cooperate with each other in demonstrating that the requirements for exemptions from such taxes have been met.

- 13 -

**Section 13.6.    Entire Agreement.**   This Agreement contains the entire understanding of the Parties with respect to subject matter hereof and supersedes all prior agreements, understandings, negotiations, and discussions among the Parties with respect to such subject matter.

**Section 13.7.    Amendments, Waivers.**   This Agreement may be amended, modified, supplemented, restated or discharged (and provisions hereof may be waived) only by an instrument in writing signed by the party against whom enforcement of the amendment, modification, supplement, restatement or discharge (or waiver) is sought.

**Section 13.8.    Headings, Time of Essence, etc.**   The descriptive headings contained in this Agreement are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.   Within this Agreement words of any gender shall be held and construed to cover any other gender, and words in the singular shall be held and construed to cover the plural, unless the context otherwise requires.   Time is of the essence in this Agreement.

**Section 13.9.   Successors and Assigns.**   Subject to the limitation on assignment contained in Article VI above, this Agreement shall be binding on and inure to the benefit of the parties hereto and their respective successors and assigns.

**Section 13.10.   Counterpart Execution.**   This Agreement may be executed in counterparts, all of which are identical and all of which constitute one and the same instrument.   It shall not be necessary for Sublessor and Sublessee to sign the same counterpart.

**Section 13.11.   Confidentiality.**   The Parties agree to keep the terms of this Agreement confidential, except Sublessee consents to Sublessor disclosing the terms and conditions of this Agreement to any Non-Operators who have a right to share in the Leases pursuant to unrecorded Participation and Joint Operating Agreements. Notwithstanding any rights of such third parties, Sublessor warrants that it has full authority to enter into this Agreement on behalf of itself and such Non-Operators, and that there are no other unrecorded agreements affecting the Leases other than that certain letter agreement dated December 12, 2005, by and between Sklarco L.L.C. and B & K Exploration Investments, LLC, which letter agreement covers and affects the Lease identified in the first numbered paragraph of Exhibit "A," a copy of which letter agreement has been furnished to Sublessee.   Concurrent with their execution of this Agreement, the Parties shall execute a Memorandum of Partial Sublease Of Oil, Gas And Mineral Leases in the form attached as Exhibit "D" and record said instrument in the Conveyance Records of Caddo and Bossier Parishes, Louisiana for the purpose of putting third parties on notice of this Agreement.

**Section 13.12.   Consents To Assign.**   If Sublessor's right to sublease a portion of the Leases is restricted in any of the Leases, then Sublessor shall use its best efforts to obtain consent to sublease in writing from the lessor under that Leases or the lessors under those Leases.

**Section 13.13.  Release.**  If any Lease has expired in whole or in part, each Party agrees to promptly execute and record any written release required by the Lease itself or by Louisiana law.  As to any mineral lease which has not expired, Sublessee may at any time, and from time to time, execute and deliver to Sublessor or place of record a release or releases of this Sublease covering all or any portion or portions of the Subleased Premises, and thereupon shall be relieved of all obligations to Sublessor as to the portion surrendered; provided, however, that Sublessee shall continue to be responsible for all costs, expenses and liability which has accrued or may accrue concerning the released portion or portions of the Sublease which it has incurred as a result of its operations hereunder.

IN  WITNESS  WHEREOF, this instrument is executed in duplicate original counterparts this 4th day of March, 2008 and effective as of February 1, 2008.

SKLARCO L.L.C.

WITNESSES:

By:_____
David A. Barlow
V.P. – Chief Operating Officer

PETROHAWK PROPERTIES, L.P.
By:   P-H Energy, LLC,
      Its General Partner

By:_____
Stephen W. Herod
Executive Vice President- Corporate
Development

- 15 -

## ACKNOWLEDGMENTS

STATE OF LOUISIANA )
                             ) ss.

PARISH OF CADDO )

      This instrument was acknowledged before me on this the 4th day of March, 2008, by David A. Barlow, as Vice President – Chief Operating Officer of Sklarco, LLC, a Louisiana limited liability company, on behalf of said limited liability company.

          Witness my hand and official seal.
          My commission expires: _with life_

                                        Notary Public

                          BRENDA G. SUMRALL, NOTARY PUBLIC
                             CADDO PARISH, LOUISIANA
                           MY COMMISSION IS FOR LIFE
                             NOTARY ID # 28854

STATE OF TEXAS )
                             ) ss.

COUNTY OF HARRIS )

      This instrument was acknowledged before me on this the 4th day of March, 2008, by Stephen W. Herod, Executive Vice President- Corporate Development of P-H Energy, LLC, general partner of Petrohawk Properties, LP, a Texas limited partnership, on behalf of said limited partnership.

          Witness my hand and official seal.
          My commission expires: _3-29-2010_

                                          Notary Public

GLORIA KAY DAILY
Notary Public, State of Texas
Commission Expires 03-29-2010

- 16 -

## EXHIBIT "A"

Attached to and made a part of that certain Partial Sublease Of Oil, Gas And Mineral
Leases dated effective as of February 1, 2008, by and between Sklarco L.L.C., as
Sublessor, and Petrohawk Properties, LP, as Sublessee

## DESCRIPTION OF LANDS AND LEASES

1.    **Oil, gas and mineral lease, dated December 12, 2005, recorded in
Conveyance Book 1356, page 380, Reg.  No.  852709, Bossier Parish, and in
Conveyance Book 3818, page 1, Registry No.  2011894, Caddo Parish, from B & K
Exploration Investments, L.L.C., lessor, to Sklarco, L.L.C., lessee, primary term 3
years, 1/5 royalty, covering the following described property, to-wit:**

A 259.05-acre tract, more or less, tract of land in Section 37, Township 17 North, Range
13 West, Caddo Parish, Louisiana, a portion of which may be located in Bossier Parish,
Louisiana.  Also being known as Eagle Bend Point and being more particularly described
as follows:

Commence at a Concrete Monument found for corner at the Southwest Corner of Section
31, Township 17 North, Range 13 West, Caddo Parish, Louisiana; thence run N 90 deg
00' 00" E a distance of 22,047.92 feet, to a point; thence run N 0 deg 00' 00" a distance of
3006.18 feet, to a 1/2" iron pipe set for corner in a fence line and also being the Point of
Beginning of the tract herein described; thence run N 32 deg 30' 59" W along the fence
line and an extension thereof, a distance of 465.40 feet, to a 1/2" iron pipe set for corner;
thence run along the centerline of the Old River these next seven (7) calls:

| | |
|---|---|
| (1) | N 2 deg 16' 21" W a distance of 343.98 feet; |
| (2) | N 13 deg 42' 39" E a distance of 255.00 feet; |
| (3) | N 25 deg 17' 21" W a distance of 408.00 feet; |
| (4) | N 3 deg 37' 39" E a distance of 192.00 feet; |
| (5) | N 21 deg 47' 39" E a distance of 910.00 feet; |
| (6) | N 24 deg 42' 39" E a distance of 350.00 feet; |
| (7) | N 4 deg 44' 39" E a distance of 670.00 feet; to a 1/2" iron pipe set for |

corner; thence run N 14 deg 13' 21" W to the Mean Low Water Line of the Red River, a
distance of 185.48 feet;

thence run Easterly, Southeasterly, Southerly and Southwesterly along the Mean Low
Water Line of the Westerly side of the Red River approximately 7,150 feet to the
Extension of a fence line; thence run N 55 deg 11' 24" W along a Fence Line a distance
of 1937.94 feet to the Point of Beginning.

Said lease being subject to the terms and conditions of that certain letter agreement dated
December 12, 2005, by and between Sklarco L.L.C. and B & K Exploration Investments,
LLC, a copy of which has been furnished to Sublessee.

- 17 -

2.      Lease for Oil, Gas and Other Liquid or Gaseous Minerals (State Lease No.
19349), dated May 9, 2007, recorded in Conveyance Book 1409, page 497, Reg.  No.
901451, Bossier Parish, and in Conveyance Book 3953, page 99, Registry No.
2102902, Caddo Parish, from the State Mineral Board of the State of Louisiana,
acting on behalf of the State of Louisiana, as Lessor, to Sklarco, L.L.C., as Lessee,
primary term 3 years, 22.0% royalty, covering State Mineral Board Tract 39008,
more particularly described as follows:

All of the lands now or formerly constituting the beds and bottoms of all water bodies of
every nature and description the title of which vests in the State of Louisiana, together
with all islands arising therein and other lands formed by accretion or by reliction, where
allowed by law, excepting tax adjudicated lands, and not presently under mineral lease on
May 9, 2007, situated in Bossier and Caddo Parishes, Louisiana, and more particularly
described as follows: Beginning at the Northwest corner of State Lease No. 11155, as
amended, having Coordinates of  X = 1,630,100.00 and Y = 638,800.00; thence North
13,564.67 feet to a point having Coordinates of X =1,630,100.00 and Y = 652,364.67;
thence East 15,628.17 feet to a point having Coordinates of X = 1,645,728.17 and Y =
652,364.67; thence South 13,564.67 feet to a point having Coordinates of X =
1,645,728.17 and Y = 638,800.00; thence West 2,428.17 feet to the Northeast corner of
said State Lease No. 11155 having Coordinates of X = 1,643,300.00 and Y = 638,800.00;
thence along the boundary of said State Lease No. 11155 the following courses: West
approximately 970 feet to the East shoreline of Pruitts Lake; Southeasterly; Southerly;
Southwesterly; and Northerly along the meanders of said Lake to a point on its West
shoreline having a Coordinate of Y = 638,800.00 and West approximately 10,752 feet to
the point of beginning, **LESS AND EXCEPT** any portion of State Lease No. 11155, as
amended, which may lie within the above described tract; (This nomination includes only
waterbottoms claimed and owned by the state and specifically excludes any land which
the state may claim or own and to which the mineral rights are vested in the state),
containing approximately **326 acres**, all as more particularly outlined on a plat on file in
the Office of Mineral Resources, Department of Natural Resources.   All bearings,
distances and coordinates are based on Louisiana Coordinate System of 1927, (North or
South Zone), where applicable.

3.      Oil, gas and mineral lease, dated November 7, 2006, recorded in Conveyance
Book 1389, page 508, Reg.  No. 882899, Bossier Parish, and in Conveyance Book
3905, page 607, Registry No.  2070746, Caddo Parish, from  Sheri Lynn Cowley
Soulie, divorced from Mike Soulie, dealing with her separate property, The Kathryn
C.  Turner Testamentary Trust,  created under the Will of Kathryn Gaye Cowley
Turner, deceased, represented by Argent Trust and E.  H.  Turner III, Co-Trustees,
Dorothy Colleen Cowley Le Blanc, wife of Clifford H.  Le Blanc, III, dealing with
her separate property and Susan A.  Cowley Bantle, wife of Carl M.  Bantle, dealing
with her separate property, as Lessors, to Tensas Delta Exploration Company, LLC,
as Lessee, primary term 3 years, 1/5 royalty, covering the following property:

Tract 1:        464 acres, more or less, located in Section 25, T17N, R13W, Bossier and Caddo Parishes, Louisiana, more particularly identified as Tract 1-A1 in page 339 of Assessor's Block Book for Bossier Parish.

Tract 2:        17.19 acres, more or less, located in Section 25, T17N, R13W, Bossier and Caddo Parishes, Louisiana, more particularly identified as Tract 1-A2 in page 339 of Assessor's Block Book for Bossier Parish

Tract 3:        54.9 acres, more or less, located in Sections 25 and 26, T17N, R13 W, more particularly identified as "Leslie A. Cowley Heirs" tract in that certain plat of survey dated September 20, 1996, by Roger C. Wilkinson & Associates, Inc., attached to that certain Agreement Relative to Properties in Caddo and Bossier Parishes, Louisiana, executed by C. Bickham Dickson Jr. et al. recorded under Registry No. 1548103 of the Conveyance Records of Caddo Parish, and in that certain Agreement Relative to Certain Boundaries of Properties in Caddo and Bossier Parishes, Louisiana, executed by Jacquelyn Stewart Fuller, et al., recorded under Registry No. 1554565, Conveyance Records of Caddo Parish, being more particularly described as follows:

From the NE corner of the SW 1/4 of Section 24, Township 17 North, Range 13 West, Bossier Parish, Louisiana, run thence N 89 deg 50' W a distance of 2640 feet, run thence South for 528.0 feet, run thence S 34 deg 19' E for 102.0 feet, run thence S 29 deg 25' E for 183.7 feet, run thence S 28 deg 47' E for 220.2 feet,  run thence S 30 deg 25' E for 126.4 feet, run thence S 42 deg 10' E for 387.3 feet, run thence S 18 deg 32' E for 201.4 feet, run thence S 0 deg 28' W for 489.0 feet, run thence S 16 deg 51' E for 217.3 feet, run thence S 2 deg 20' E for 392.5 feet, run thence S 2 deg 55' W for 309.4 feet, run thence S 3 deg 49' W for 314.7 feet, run thence S 36deg 53' 38" E for 297.6 feet, run thence S 17 deg 51' 30" E for 332.0 feet, run thence S 19 deg 49' 30" E for 249 feet, run thence S 35 deg 52' 30" E for 103.3 feet to the point of beginning of the tract described herein.  Run thence N 89 deg 12' W 1455.6 feet, thence run S 13 deg 50' W to the bed of the Red River being the average present low water marker of Red River on the left descending side of the river, said distance being approximately 1124.5 feet, run thence S 68 deg 11' 55" E along the average present low water mark of the Red River on the left descending side of the river a distance of 621.8 feet, run thence S 69 deg 41' 44" E along the average present low water mark of the Red River on the left descending side of the river, a distance of 1066.2 feet, run thence S 82 deg 28' 34" E along the average present low water mark of the Red River on the left descending side of the river, a distance of 534.60 feet, run thence N 14 deg 10' W 332 feet, run thence N 29 deg 26' 30" W 170 feet, run thence N 5 deg 32' 30" W 362 feet, run thence N 2 deg 51' 30" W 196 feet, run thence N 9 deg 53' 30" W for 177 feet, run thence N 21 deg 0' 30" W 411.5 feet, run thence N 35 deg 52' 30" W 28.7 feet to the point of beginning, containing 54.9 acres more or less

Said lease being assigned unto Sklarco L.L.C. by Assignment of Oil, Gas and Mineral Lease, dated effective November 7, 2006, from Tensas Delta Exploration Company, LLC, assigning all of assignor' right, title and interest in that lease, said assignment being recorded in Book 1416, page 799, Reg. No. 908676 of Bossier Parish, and Book 3976, page 780, Reg. No. 2117881 of Caddo Parish.

4.      Oil, gas and mineral lease, dated November 9, 2005, recorded in Conveyance
Book 1356, page 364, Reg.  No.  852707, Bossier Parish, and in Conveyance Book
3817, page 785, Registry No.  2011892, Caddo Parish, from Dutton Family, L.L.C.,
and Sorensen-Naylor, Ltd., lessors, to Sklarco, L.L.C., lessee, primary term 3 years,
1/5 royalty, covering 346.5 acres, more or less, known as Lattier's Island, described
as the West fractional half of Section 26; Fractional Sections 27 and 34 and all that part
of the North fractional half of Section 35 lying west of the present channel of Red River,
all in Township 17 North, Range 13 West, Bossier Parish, Louisiana, together with half
of the bed of Old River surrounding the same, and all alluvion, accretion, batture and
other riparian rights thereunto belonging, whether included in the above description or
not.

5.      Oil, gas and mineral lease, dated August 13, 2004, a Memorandum of which
was recorded in Book 3803, page 718, Registry No. 2003065, Caddo Parish, from
the City of Shreveport to Alternate Fuel Systems of Louisiana, Inc., primary term 3
years, 1/6 royalty, covering Lots 6, 7 and 8 of Sandy Bend Acres, a subdivision of
Caddo Parish, Louisiana, a plat of which is recorded in Plat Book 150, page 334,
Records of Caddo Parish, Louisiana, along with other property, totaling 56.446
acres, more or less, as amended by Extension of Oil and Gas Lease, dated July 30,
2007, recorded in Book 3967, page 761, Reg.  No. 2112187, Caddo Parish, extending
the primary term until February 13, 2008.

Said lease being assigned unto Sklarco L.L.C. by Assignment of Oil and Gas Lease With
Reservation of Overriding Royalty Interest, dated November 30, 2006, from Alternate
Fuel Systems of Louisiana, Inc., to Sklarco L.L.C., assigning all of its interest in the
aforesaid Oil and Gas Lease, dated August 13, 2004, from the City of Shreveport to
Alternate Fuel Systems of Louisiana, Inc., reserving an overriding royalty interest equal
to the difference between 25% and existing leases burdens (25% - 16.667%), said
assignment being recorded in Book 1391, page 925, Reg.  No.  885190 of the Records of
Bossier Parish, and Book 3906, page 52, Reg. No.  2071010 of the Records of Caddo
Parish.

6.      Oil, Gas And Mineral Lease dated September 1, 2005, executed by Sunflower
Plantation, L.L.C., C. Bickham Dickson, Jr., C. Bickham Dickson, III, Michael
Augustus Dickson and James Scott Dickson, as Lessors, in favor of Sklarco L.L.C.,
as Lessee, covering 798.438 acres, more or less, recorded in Book 3817, Page 770
under Registry No. 2011891 of the Conveyance Records of Caddo Parish, Louisiana,
and in Book 1356, Page 359 under Registry No. 852706 of the Conveyance Records
of Bossier Parish, Louisiana, said lands more particularly described as follows:

First Tract:  A certain parcel or piece of ground situated in Section 23, Township 17
North, Range 13 West, Parish of Bossier, State of Louisiana, and more fully described as
follows, to-wit:

- 20 -

Commencing at the Northeast Corner of Lot 14 of Sunflower Plantation Subdivision, go South 9 degrees 55 minutes 0 seconds East, a distance of 2,041.81 to the point of beginning. From the said point of beginning, go South 80 degrees 55 minutes 40 seconds East, a distance of 241.0 feet; thence North 86 degrees 30 minutes 02 seconds East, a distance of 105.27 feet; thence go South 73 degrees 32 minutes, 21 seconds East, a distance of 162.53 feet; thence go south 74 degrees 08 minutes, 46 seconds East, a distance of 188.84 feet; thence go North 72 degrees 03 minutes, 25 seconds East a distance of 33.81 feet; thence go South 33 degrees 15 minutes 18 seconds East, a distance of 41.87 feet; thence go South 63 degrees 56 minutes 48 seconds East, a distance of 111.10 feet; thence go South 66 degrees 16 minutes 46 seconds East, a distance of 191.12 feet; thence go South 05 degrees 31 minutes 59 seconds West, a distance of 91.73 feet; thence go South 46 degrees 40 minutes 43 seconds East, a distance of 151.49 feet; thence go South 64 degrees 31 minutes 04 seconds East, a distance of 59.06 feet; thence go South 29 degrees 49 minutes 57 seconds East, a distance of 47.64 feet; thence go South 60 degrees 35 minutes 15 seconds East, a distance of 72.09 feet; thence go South 39 degrees 19 minutes 58 seconds East, a distance of 23.15 feet; thence go South 48 degrees 46 minutes 31 East, a distance of 143.99 feet; thence go South 61 degrees 50 minutes 06 seconds East, a distance of 288.55 feet; thence go South 29 degrees 25 minutes 0 seconds east, a distance of 183.20 feet; thence go South 28 degrees 47 minutes 00 seconds East, a distance of 220.20 feet; thence go South 30 degrees 25 minutes 00 seconds East, a distance of 126.40 feet; thence go South 42 degrees 10 minutes 00 seconds East, a distance of 387.30 feet; thence go South 18 degrees 32 minutes 00 seconds East, a distance of 201.40 feet; thence go South 00 degrees 28 minutes 00 seconds West, a distance of 489.0 feet; thence go South 16 degrees 51 minutes 00 seconds East, a distance of 217.30 feet; thence go South 02 degrees 20 minutes 00 seconds East, a distance of 392.50 feet; thence go South 02 degrees 55 minutes 00 seconds West, a distance of 309.40 feet; thence go South 03 degrees 49 minutes 00 seconds West, a distance of 314.70 feet; thence go South 88 degrees 35 minutes 21 seconds West, a distance of 1,833.78; thence go South 10 degrees 38 minutes 33 seconds West, a distance of 1,695.76 feet; thence go North 75 degrees 30 minutes 39 seconds West, a distance of 1,577.27 feet; thence go North 84 degrees 48 minutes 14 seconds West, a distance of 1,008.40 feet; thence go North 69 degrees 11 minutes 07 seconds West, a distance of 434.60 feet; thence go North 27 degrees 18 minutes 54 seconds West, a distance of 1,884.19 feet; thence go North 52 degrees 56 minutes 21 seconds East, a distance of 477.04 feet; thence go North 52 degrees 56 minutes 21 seconds east, a distance of 1,395.86 feet; thence go North 45 degrees 06 minutes 21 seconds East, a distance of 1,752.30 feet; thence go North 84 degrees 04 minutes 39 seconds West, a distance of 235.40 feet; thence go North 47 degrees 12 minutes 39 seconds West, a distance of 85 feet; thence go North 32 degrees 09 minutes 21 seconds east, a distance of 123.30 feet; thence go North 80 degrees 33 minutes 21 seconds East, a distance of 190.50 feet; thence go North 71 degrees 28 minutes 21 seconds East, a distance of 341.80 feet, thence go North 78 degrees 57 minutes 21 seconds East, a distance of 390.60 feet; thence go North 61 degrees 27 minutes 21 seconds East, a distance of 227.60 feet; thence go South 89 degrees 41 minutes 39 seconds east, a distance of 96.97 feet to the point of beginning, containing 436.575 acres of land, more or less.

- 21 -

**Second Tract**: A certain parcel of land or piece of ground situated in Section 23, Township 17 North, Range 13 West, Parish of Bossier, State of Louisiana, and more fully described as follows, to-wit:

Commencing at the Northeast Corner of Lot 14 of Sunflower Plantation Subdivision, run South 80 degrees 44 minutes 15 seconds West a distance of 30.41 feet; thence run North 09 degrees 15 minutes 45 seconds West a distance of 16.0 feet; thence run South 09 degrees 55 minutes 00 seconds East a distance of 2279.10 feet to the point of beginning of the tract herein described.  From the said point of beginning, run thence North 77 degrees 22 minutes 30 seconds East a distance of 33.86 feet, thence run South 47 degrees 12 minutes 39 seconds East a distance of 85.00 feet, thence run South 84 degrees 04 minutes 39 seconds East a distance of 235.40 feet, thence run South 45 degrees 06 minutes 21 seconds West a distance of 1752.30 feet, thence run South 52 degrees 56 minutes 21 seconds West a distance of 1395.86 feet to the East Bank of the Red River, thence run along the East Bank of the Red River the following two calls:

North 00 degrees 48 minutes 23 seconds West a distance of 1282.34 feet;  North 01 degrees 23 minutes 38 seconds West a distance of 345.54 feet, Thence run North 67 degrees 14 minutes 54 seconds East a distance of 362.62 feet, thence run North 77 degrees 22 minutes 30 seconds East a distance of 1760.28 feet to the point of beginning containing 53.358 acres of land, more or less.

**Third Tract**: A certain parcel or piece of ground, being 9.839 acres of land, more or less, a part of fractional section 23, Township 17 North, Range 13 West, Bossier Parish, Louisiana, and more particularly described as Tract 3 in that unrecorded plat drawn by Smith and Raley, Inc., Consulting Engineers, dated November 11, 2001, styled "Proposed Master Plan of Tracts Located in Section 23, Township 17 North, Range 13 West, Bossier Parish, Louisiana".

**Fourth Tract**: 2.919 acres of land, more or less, in fractional Section 23, Township 17 North, Range 13 West, Bossier Parish, Louisiana, more particularly described as follows:

Commence at the northeast corner of said Section 23; thence proceed North 89 degrees 23 minutes 03 seconds West along the North line of said Section 23 for a distance of 3080.39 feet; then proceed South 00 degrees 36 minutes 57 seconds West for a distance of 601.46 feet to center line of closed and abandoned Sunflower Road and a 3/4 inch iron rod; thence proceed South 09 degrees 17 minutes 47 seconds East for a distance of 2279.19 feet to a 3/4 inch iron rod; thence proceed South 77 degrees 59 minutes 43 seconds West for a distance of 1760.28 feet to a 3/4 inch iron rod; thence proceed South 67 degrees 52 minutes 07 seconds West for a distance of 364.74 feet to the East high bank of Red River and the Point of Beginning of the tract herein described which is monumented with a 3/4 inch iron rod; thence proceed South 67 degrees 52 minutes 07 seconds West for a distance of 85.74 feet to the mean low water line of Red River; thence proceed northeasterly along said mean low water line for a distance of 1548.47 feet; thence proceed North 83 degrees 32 minutes 03 seconds East for a distance of 103.96 feet to the East high bank of Red River and a 3/4 inch iron rod; thence proceed South 14

- 22 -

degrees 13 minutes 31 seconds West along said high bank for a distance of 83.40 to a 3/4 inch iron rod; thence proceed South 14 degrees 41 minutes 44 seconds West along said high bank for a distance of 252.73 feet; thence proceed South 02 degrees 07 minutes 48 seconds East along said high bank for a distance of 206.45 feet; thence proceed South 12 degrees 27 minutes 58 seconds West along said high bank for a distance of 168.01 feet; thence proceed South 01 degrees 57 minutes 23 seconds East along said high bank for a distance of 376.53 feet; thence proceed South 07 degrees 12 minutes 33 seconds West along said high bank for a distance of 192.88 feet' thence proceed South 12 degrees 32 minutes 58 seconds West along said high bank for a distance of 206.91 feet' thence proceed South 00 degrees 46 minutes 25 seconds East along said high bank for a distance of 40.00 feet to the Point of Beginning of the tract herein described, containing 2.919 acres, more or less.

**Fifth Tract:**  BEING DESCRIBED AS A 32.546 ACRE, MORE OR LESS, TRACT OF LAND IN FRACTIONAL SECTION 23, TOWNSHIP 17 NORTH, RANGE 13 WEST, BOSSIER PARISH LOUISIANA AND MORE PARTICULARLY DESCRIBED AS FOLLOWS;

Commence at the north east corner of said section 23; then proceed north 89 degrees 23 minutes 03 seconds west along north line of section 23 for a distance of 3080.39 feet; then proceed south 00 degrees 36 minute 57 seconds west for a distance of 601.46 feet to the center line of closed and abandoned Sunflower Road and Point of Beginning of the tract here in described which is monumented with a 3/4 inch iron rod; then proceed north 81 degrees 20 minutes 55 seconds east along said center line for a distance of 658.15 feet to a 3/4 inch iron rod; then proceed south 08 degrees 52 minutes 39 seconds east for a distance of 2129.22 feet to a lake traverse and a 3/4 inch rod.; then proceed south 72 degrees 05 minutes 34 seconds west along said lake traverse for a distance of 341.80 feet to a 3/4 inch iron rod; then proceed south 81 degrees 10 minutes 34 seconds west along said lake traverse for a distance of 190.50 feet to a 3/4 inch iron rod; then proceed south 32 degrees 46 minutes 34 seconds west along lake traverse for a distance of 123.30 feet to a 3/4 inch iron rod; then proceed south 77 degrees 59 minutes 43 seconds west along said lake traverse for a distance of 31.52 feet to a 3/4 inch iron rod; then proceed north 09 degrees 17 minutes 47 seconds west for a distance of 2279.19 feet to the Point of Beginning of the tract here in described, containing 32.546 acres, more or less.

**Sixth Tract:** A tract of land located in Section 23, Township 17 north, Range 13 west Bossier Parish, Louisiana and containing a portion of lots 9 and 11, Sunflower Plantation as recorded in book 60, page 221.  Said tract being more fully described as follow: from the northeast corner of lot 14, Sunflower Plantation run thence south 09 degrees 55 minutes 00 seconds east along the common line of lots 14 and 9 a distance of 1719.63 feet to a found 2" diameter iron pipe being on the centerline of the Red River levee and being the Point of Beginning of the tract herein described:

From Said Point of beginning run thence south 77 degrees 21 minutes 33 seconds east along the centerline of the Red River levee a distance of 858.47 feet to a found 2" diameter iron pipe, Thence run south 65 degrees 25 minutes 11 seconds east along the

- 23 -

centerline of the Red River levee a distance of 627.97 feet to a found 2" diameter iron pipe, Thence run south 02 degrees 11 minutes 58 seconds east with a fence a distance of 558.37 feet to a set 2" diameter iron pipe being on the high bank of the old Red River, Thence run the following 15 calls along the high bank of the old Red River, North 48 degrees 46 minutes 31 seconds west with a distance of 143.99 feet to a set 2" diameter iron pipe, North 39 degrees 19 minutes 58 seconds west a distance of 23.15 feet to a set 2" diameter iron pipe, North 60 degrees 35 minutes 15 seconds west a distance of 72.09 feet to set 2" diameter iron pipe, North 29 Degrees 49 minutes 57 seconds west a distance of 47.64 feet to a set 2" diameter iron pipe, North 64 Degrees 31 minutes 04 seconds west a distance of 59.06 feet to a set 2" diameter iron pipe, North 46 Degrees 40 minutes 43 seconds west a distance of 151.49 feet to a set 2" diameter iron pipe, North 05 degrees 31 minutes 59 seconds east to a distance of 91.73 feet to a set 2" diameter iron pipe, North 66 degrees 16 minutes 46 seconds west a distance of 191.12 feet to a set 2" diameter iron pipe, North 63 degrees 56 minutes 48 seconds west a distance of 111.10 feet to a set 2" diameter iron pipe, North 33 degrees 15 minutes 18 seconds west a distance of 41.87 feet to a set 2" diameter iron pipe, South 72 degrees 03 minutes 25 seconds west a distance of 33.81 feet to a set 2" diameter iron pipe, North 74 degrees 08 minutes 46 seconds west a distance of 188.84 feet to a set 2" diameter iron pipe, North 73 degrees 32 minutes 21 seconds west a distance of 162.53 feet to a set 2" diameter iron pipe, South 86 degrees 30 minutes 2 seconds west a distance of 105.27 feet to a set 2" diameter iron pipe, North 80 degrees 55 minutes 40 seconds west a distance of 241.04 feet to a set 2" diameter iron pipe, Thence run north 09 degrees 55 minutes 00 seconds west a distance of 322.19 feet to the Point of Beginning, Said tract containing 10.7164 acres, more or less.

**Seventh Tract**: BEING DESCRIBED AS A 33.618 ACRE MORE OR LESS TRACT OF LAND IN FRACTIONAL SECTION 23, TOWNSHIP 17 NORTH, RANGE 13 WEST, BOSSIER PARISH LOUISIANA AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

Commence at the north east corner of said section 23; then proceed north 89 degrees 23 minutes 03 seconds west along north line of section 23 for a distance of 3080.39 feet; then proceed south 00 degrees 36 minute 57 seconds west for a distance of 601.46 feet to the center line of closed and abandoned Sunflower Road and Point of Beginning of the tract here in described which is monumented with a 3/4 inch iron rod; then proceed north 81 degrees 20 minutes 55 seconds east along said center line for a distance of 658.15 feet to a 3/4 inch iron rod; then proceed south 08 degrees 52 minutes 39 seconds east for a distance of 2129.22 feet to a lake traverse and a 3/4 inch rod.; then proceed south 72 degrees 05 minutes 34 seconds west along said lake traverse for a distance of 341.80 feet to a 3/4 inch iron rod to Point of Beginning, then proceed south 78 degrees 57 minutes 21 seconds east along said lake traverse for a distance of 390.60 feet to a 3/4 inch iron rod; then proceed south 61 degrees 27 minutes 21 seconds east along lake traverse for a distance of 227.60 feet to a 3/4 inch iron rod; then proceed north 89 degrees 41 minutes

- 24 -

39 seconds east along said lake traverse for a distance of 96.97 feet to a 3/4 inch iron rod; then proceed north 09 degrees 55 minutes 00 seconds east for a distance of 2041.81 feet to a 3/4 inch iron rod; then proceed north 80 degrees 40 minutes 15 seconds for a distance of 30.41 feet to a 3/4 inch iron rod; then proceed north 09 degrees 15 minutes 45 seconds west for a distance of 16.00 feet to 3/4 inch iron rod; then proceed in same direction for 662.72 feet to the Half way point of the call North 80 degrees 44 minutes 15 seconds used to describe all of tract five on the Smith and Raley survey. Thence proceed South 09 degrees 55 minutes 00 seconds for a distance of 2191.00 feet to the Point of Beginning of the tract here in described, containing 33.618 acres, more or less.

**Eighth Tract:** A tract of land known as Sunflower Point containing 585 acres, more or less, and located in Township 17 North, Range 13 West, Caddo and Bossier Parishes, Louisiana, together with and including all the batture, alluvion, and accretion appertaining thereto and all other lands between the said property and the mean low water line of the Red River, and all riparian rights in and to said property; and all right, title and interest in, on and under all roads, levees and rights-of-way on said property more particularly described as follows:

Begin at a point on the high bank of Old Red River, which is 26.3 feet South 86 degrees 34 minutes West of the Southwest corner of Lot 134, Dixie Gardens Subdivision, recorded in Conveyance Book 150, Page 410 of the Records of Caddo Parish, Louisiana; run thence North 86 degrees 34 minutes East, a distance of 455 feet; run thence North 64 degrees 37 minutes East, a distance of 515 feet' run thence North 71 degrees 40 minutes East, a distance of 495 feet; run thence North 77 degrees 13 minutes East, a distance of 465 feet; run thence South 67 degrees 14 minutes East, a distance of 400 feet; run thence South 70 degrees 20 minutes East, a distance of 600 feet; run thence South 87 degrees 38 minutes East, a distance of 585 feet; run thence North 87 degrees 25 minutes East, a distance of 535 feet; run thence North 70 degrees 58 minutes East a distance of 560 feet, to intersect the traverse of existing high bank of Red River; run thence South 21 degrees 15 minutes West, a distance of 190 feet; run thence South 14 degrees 59 minutes West, a distance of 508.6 feet; run thence South 81 degrees 02 minutes East, a distance of 415 feet; run thence South 4 degrees 42 minutes West, a distance of 1200 feet; run thence South 13 degrees 22 minutes East, a distance of 566 feet; run thence South 27 degrees 03 minutes East, a distance of 800 feet; run thence 55 degrees 56 minutes East, a distance of 580 feet; to intersect the traverse of high bank of Old Red River; run thence South 65 degrees 03 minutes West, a distance of 289 feet; run thence South 51 degrees 08 minutes West, a distance of 807 feet; run thence South 48 degrees 57 minutes West, a distance of 540 feet; run thence South 41 degrees 16 minutes West, a distance of 376.7 feet; run thence South 57 degrees 15 minutes West, a distance of 514 feet; run thence South 67 degrees 23 minutes West, a distance of 320 feet; run thence South 79 degrees 40 minutes West, a distance of 882 feet; run thence North 80 degrees 16 minutes West, a distance of 980 feet; run thence North 77 degrees 30 minutes West , a distance of 142 feet; run thence North 50 degrees 04 minutes West, a distance of 500 feet; run thence North 36 degrees 42 minutes West, a distance of 500 feet; run thence North 33 degrees 50 minutes West, a distance of 500 feet; run thence North 32 degrees 51 minutes West, a distance of 570 feet; run thence North 22 degrees 10 minutes West, a distance of 300 feet; run thence

North 18 degrees 04 minutes West, a distance of 400 feet; run thence North 22 degrees 22 minutes West, a distance of 200 feet; run thence North 16 degrees 35 minutes West, a distance of 385.6 feet; run thence North 10 degrees 46 minutes East, a distance of 557.6 feet; run thence North 16 degrees 29 minutes East, a distance of 549.5 feet; run thence North 6 degrees 31 minutes East, a distance of 1033.1 feet to the point of beginning, except that portion of Lot 137 and the adjacent abandoned portion of Dixie Drive, lying between the Easterly right of way line of the Industrial Loop Parkway and the mean low water line of the lake, said Lot 137 being in Dixie Gardens Subdivision of Caddo Parish, Louisiana.

**Ninth Tract:** 81.158 acres of land, more or less, a part of fractional Section 23, Township 17 North, Range 13 West, Bossier Parish, Louisiana, more particularly described as follows: Commence at the northeast corner of said Section 23, thence proceed North 89 degrees 23 minutes 03 seconds West along the north line of said Section 23 for a distance of 3,080.39 feet; thence proceed South 00 degrees 36 minutes 57 seconds West for a distance of 601.46 feet the centerline of closed and abandoned Sunflower Road and the point of beginning of the tract herein described which is monumented with a : inch iron rod; thence proceed South 09 degrees 17 minutes 47 seconds East for a distance of 2,279.19 feet to a : inch iron rod; thence proceed South 77 degrees 59 minutes 43 seconds West for a distance of 1760.28 feet to a : inch iron rod; thence proceed South 67 degrees 52 minutes 07 seconds West for a distance of 364.74 feet to the east high bank of Red River and a : inch iron rod; thence proceed North 00 degrees 46 minutes 25 seconds West along said high bank for a distance of 40.00 feet; thence proceed North 12 degrees 32 minutes 58 seconds East along said high bank for a distance of 206.91 feet; thence proceed North 07 degrees 12 minutes 33 seconds East along said bank for a distance of 192.88 feet; thence proceed North 01 degrees 67 minutes 23 seconds West along said high bank for a distance of 376.53 feet; thence proceed North 12 degrees 27 minutes 58 seconds east along said high bank for a distance of 168.01 feet; thence proceed North 02 degrees 07 minutes 48 seconds West along said high bank for a distance of 206.45 feet; thence proceed North 14 degrees 41 minutes 44 seconds east along said high bank for a distance of 252.73 feet; thence proceed North 14 degrees 13 minutes 31 seconds east along said high bank for a distance of 83.40 feet to a : inch iron rod; thence proceed North 83 degrees 32 minutes 03 seconds East for a distance of 264.19 feet to : inch iron rod; thence proceed North 32 degrees 17 minutes 53 seconds East for a distance of 1,308.59 feet to a : inch iron rod; thence proceed North 81 degrees 20 minutes 55 seconds East for a distance of 470.59 feet to a iron rod; thence proceed North 08 degrees 39 minutes 05 seconds West for a distance of 26.00 feet to the centerline of said Sunflower Road and a : inch iron rod; thence proceed North 81 degrees 20 minutes 55 seconds East for a distance of 100.60 feet to the point of beginning, containing 81.158 acres, more or less.

7.    Oil, Gas And Mineral Lease dated September 1, 2005, executed by C. Bickham Dickson, III, as Lessor, in favor of Sklarco L.L.C., as Lessee, covering 447.2914 acres, more or less, recorded in Book 3817, Page 792 under Registry No. 2011893 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1356,

Page 371 under Registry No. 852708 of the Conveyance Records of Bossier Parish, Louisiana, said lands more particular described as follows:

**Tract 1:** A certain parcel or piece of ground situated in Section 23, Township 17 North, Range 13 West, Parish of Bossier, State of Louisiana, and more fully described as follows, to-wit:

Commencing at the Northeast Corner of Lot 14 of Sunflower Plantation Subdivision, go South 9 degrees 55 minutes 0 seconds East, a distance of 2,041.81 to the point of beginning. From the said point of beginning, go South 80 degrees 55 minutes 40 seconds East, a distance of 241.0 feet; thence North 86 degrees 30 minutes 02 seconds East, a distance of 105.27 feet; thence go South 73 degrees 32 minutes, 21 seconds East, a distance of 162.53 feet; thence go south 74 degrees 08 minutes, 46 seconds East, a distance of 188.84 feet; thence go North 72 degrees 03 minutes, 25 seconds East a distance of 33.81 feet; thence go South 33 degrees 15 minutes 18 seconds East, a distance of 41.87 feet; thence go South 63 degrees 56 minutes 48 seconds East, a distance of 111.10 feet; thence go South 66 degrees 16 minutes 46 seconds East, a distance of 191.12 feet; thence go South 05 degrees 31 minutes 59 seconds West, a distance of 91.73 feet; thence go South 46 degrees 40 minutes 43 seconds East, a distance of 151.49 feet; thence go South 64 degrees 31 minutes 04 seconds East, a distance of 59.06 feet; thence go South 29 degrees 49 minutes 57 seconds East, a distance of 47.64 feet; thence go South 60 degrees 35 minutes 15 seconds East, a distance of 72.09 feet; thence go South 39 degrees 19 minutes 58 seconds East, a distance of 23.15 feet; thence go South 48 degrees 46 minutes 31 East, a distance of 143.99 feet; thence go South 61 degrees 50 minutes 06 seconds East, a distance of 288.55 feet; thence go South 29 degrees 25 minutes 0 seconds east, a distance of 183.20 feet; thence go South 28 degrees 47 minutes 00 seconds East, a distance of 220.20 feet; thence go South 30 degrees 25 minutes 00 seconds East, a distance of 126.40 feet; thence go South 42 degrees 10 minutes 00 seconds East, a distance of 387.30 feet; thence go South 18 degrees 32 minutes 00 seconds East, a distance of 201.40 feet; thence go South 00 degrees 28 minutes 00 seconds West, a distance of 489.0 feet; thence go South 16 degrees 51 minutes 00 seconds East, a distance of 217.30 feet; thence go South 02 degrees 20 minutes 00 seconds East, a distance of 392.50 feet; thence go South 02 degrees 55 minutes 00 seconds West, a distance of 309.40 feet; thence go South 03 degrees 49 minutes 00 seconds West, a distance of 314.70 feet; thence go South 88 degrees 35 minutes 21 seconds West, a distance of 1,833.78; thence go South 10 degrees 38 minutes 33 seconds West, a distance of 1,695.76 feet; thence go North 75 degrees 30 minutes 39 seconds West, a distance of 1,577.27 feet; thence go North 84 degrees 48 minutes 14 seconds West, a distance of 1,008.40 feet; thence go North 69 degrees 11 minutes 07 seconds West, a distance of 434.60 feet; thence go North 27 degrees 18 minutes 54 seconds West, a distance of 1,884.19 feet; thence go North 52 degrees 56 minutes 21 seconds East, a distance of 477.04 feet; thence go North 52 degrees 56 minutes 21 seconds east, a distance of 1,395.86 feet; thence go North 45 degrees 06 minutes 21 seconds East, a distance of 1,752.30 feet; thence go North 84 degrees 04 minutes 39 seconds West, a distance of 235.40 feet; thence go North 47 degrees 12 minutes 39 seconds West, a distance of 85 feet; thence go North 32 degrees 09 minutes 21 seconds east, a distance of 123.30 feet; thence go North 80

degrees 33 minutes 21 seconds East, a distance of 190.50 feet; thence go North 71 degrees 28 minutes 21 seconds East, a distance of 341.80 feet, thence go North 78 degrees 57 minutes 21 seconds East, a distance of 390.60 feet; thence go North 61 degrees 27 minutes 21 seconds East, a distance of 227.60 feet; thence go South 89 degrees 41 minutes 39 seconds east, a distance of 96.97 feet to the point of beginning, containing 436.575 acres of land, more or less.

**Tract 6**: A tract of land located in Section 23, Township 17 north, Range 13 West Bossier Parish, Louisiana and containing a portion of lots 9 and 11, Sunflower Plantation as recorded in book 60, page 221. Said tract being more fully described as follow: from the northeast corner of lot 14, Sunflower Plantation run thence south 09 degrees 55 minutes 00 seconds east along the common line of lots 14 and 9 a distance of 1719.63 feet to a found 2" diameter iron pipe being on the centerline of the Red River levee and being the Point of Beginning of the tract herein described:

From Said Point of beginning run thence south 77 degrees 21 minutes 33 seconds east along the centerline of the Red River levee a distance of 858.47 feet to a found 2" diameter iron pipe, Thence run south 65 degrees 25 minutes 11 seconds east along the centerline of the Red River levee a distance of 627.97 feet to a found 2" diameter iron pipe, Thence run south 02 degrees 11 minutes 58 seconds east with a fence a distance of 558.37 feet to a set 2" diameter iron pipe being on the high bank of the old Red River, Thence run the following 15 calls along the high bank of the old Red River, North 48 degrees 46 minutes 31 seconds west with a distance of 143.99 feet to a set 2" diameter iron pipe, North 39 degrees 19 minutes 58 seconds west a distance of 23.15 feet to a set 2" diameter iron pipe, North 60 degrees 35 minutes 15 seconds west a distance of 72.09 feet to set 2" diameter iron pipe, North 29 Degrees 49 minutes 57 seconds west a distance of 47.64 feet to a set 2" diameter iron pipe, North 64 Degrees 31 minutes 04 seconds west a distance of 59.06 feet to a set 2" diameter iron pipe, North 46 Degrees 40 minutes 43 seconds west a distance of 151.49 feet to a set 2" diameter iron pipe, North 05 degrees 31 minutes 59 seconds east to a distance of 91.73 feet to a set 2" diameter iron pipe, North 66 degrees 16 minutes 46 seconds west a distance of 191.12 feet to a set 2" diameter iron pipe, North 63 degrees 56 minutes 48 seconds west a distance of 111.10 feet to a set 2" diameter iron pipe, North 33 degrees 15 minutes 18 seconds west a distance of 41.87 feet to a set 2" diameter iron pipe, South 72 degrees 03 minutes 25 seconds west a distance of 33.81 feet to a set 2" diameter iron pipe, North 74 degrees 08 minutes 46 seconds west a distance of 188.84 feet to a set 2" diameter iron pipe, North 73 degrees 32 minutes 21 seconds west a distance of 162.53 feet to a set 2" diameter iron pipe, South 86 degrees 30 minutes 2 seconds west a distance of 105.27 feet to a set 2" diameter iron pipe, North 80 degrees 55 minutes 40 seconds west a distance of 241.04 feet to a set 2" diameter iron pipe, Thence run north 09 degrees 55 minutes 00 seconds west a distance of 322.19 feet to the Point of Beginning, Said tract containing 10.7164 acres, more or less.

- 28 -

8.    **Oil, Gas And Mineral Lease dated December 19, 2005, executed by Locke Properties, Inc., as Lessor, in favor of Sklarco L.L.C., as Lessee, covering 190.448 acres, more or less, recorded in Book 3828, Page 447 under Registry No. 2018179 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1360, Page 497 under Registry No. 856523 of the Conveyance Records of Bossier Parish, Louisiana, said lands being more particularly described as follows:**

Tract 1:

Said tract of land more fully described as follows: Beginning at the southeast corner of Lot 3, William Murray Land, a subdivision recorded in Conveyance Book 17, Page 475, records of Caddo Parish, LA, said point being a 2" iron pipe 2 feet tall; Run N43° 27' 15"W, a distance of 460.78 feet to set one half inch iron pipe at Northeast Corner of said Lot 3;

Thence run S89° 06' 09"W along North line of said Lot 3 over old two inch iron pipe to center line of abandoned railroad right-of-way, a distance of 812.95 feet;
Thence run N07°45' 06"W a distance of 972.63 feet to new one half inch iron rod on South Line of Lot 2, Eagle Bend Plantation, Conveyance Book 4, Page 287;
Thence run S40° 56' 52" E a distance of 128.87 feet along South line of said Lot 2 found one half inch iron pipe;
Thence on said South Line run N47° 30' 28"E a distance of 101.09 feet to found one half inch iron pipe, six inches deep;
Thence run on said south Line N85° 03' 01"E to a found one half inch iron pipe in standing water a distance of 252.41 feet, being the South Common Corner of Lots 1 and 2 of said Eagle Bend Plantation, as per Conveyance Book 4, Page 287;
Thence from said Common Corner run the following 7 courses along the southerly line of said Eagle Bend Plantation;
Run N85° 03' 01"E a distance of 858.03 feet to found old one half inch iron pipe six inches deep;
Thence run N61° 12' 11" E a distance of 594.00 feet to found old one half inch iron pipe;
Thence run N47° 42' 11"E a distance of 330.00 feet to found old one half inch iron pipe newly uprooted and set back in hole;
Thence run N34° 12' 11"E a distance of 594.00 feet to found old iron pipe newly uprooted and set back;
Thence run N45° 57' 11"E a distance of 264.00 feet to found old one half inch iron pipe in thick vegetation;
Thence run N33° 12' 11"E a distance of 595.49 feet to set one half inch iron pipe;
Thence run N89° 26' 37"E a distance of 1177.70 feet to found one half inch iron pipe at top bank of Red River, being last line on Eagle Bend Plantation;
Thence run S51° 10' 02"E a distance of 109.45 feet along said top bank;
Thence continuing along said top bank run S65° 56' 07"E a distance of 107.58 feet;
Thence run S2° 40' 41"W over old two inch iron pipe a distance of 2182.56 feet to found two inch iron pipe two feet tall;

Thence run S43° 51' 59"W a distance of 219.12 feet to found two inch iron pipe two feet tall;

Thence run S33° 51' 59"W a distance of 146.52 feet to found two inch iron pipe two feet tall;

Thence run S34° 21' 59"W a distance of 476.52 feet to two inch iron pipe two feet tall;

Thence run S42° 01' 59"W a distance of 264.00 feet to two inch iron pipe two feet tall on North Line of Bagley Place, as recorded in conveyance Book 6, Page 669 of the Records of Caddo Parish, LA;

Thence run S88° 36' 56"W a distance of 1494.81 feet along said North Line of Bagley Place to two inch iron pipe two feet tall, being the Point of Beginning;

Said tract containing about 154.4 acres, more or less;

**Tract 2**

A parcel of land in Fractional Section 37, Township 17 North, Range 13 West, Caddo Parish, Louisiana, being a portion of Lots 1 and 2 of Eagle Bend Plantation, Conveyance Book No. 4, page 287 of the Records of Caddo Parish, Louisiana, and a parcel of adjacent land described in Instrument No. 1773323, said 2.018 acre parcel described more fully:

Beginning at the South common corner of Lots 1 and 2 of said Eagle Bend Plantation, run South 74 degrees 33 minutes 24 seconds West a distance of 399.33 feet along an Agreement Line described in said Instrument No. 1773323 to a point 10.00 feet off the center line of abandoned 100 foot railroad right-of-way,

Thence run North 07 degrees 45 minutes 06 seconds West parallel to and ten feet from said center line a distance of 159.03 feet to the beginning of a curve to the right,

Thence run Northeasterly along said curve having a radius of 50.00 feet a distance of 68.19 feet to end of curve,

Thence from end of curve run North 70 degrees 23 minutes 29 seconds East parallel to and five feet from North line of parcel owned by Scott Pernici a distance of 283.13 feet to the beginning of a curve to the right,

Thence run Southeasterly along a curve to the right a distance of 68.34 feet, said curve having a radius of 52.44 feet,

Thence run South 34 degrees 56 minutes 30 seconds East a distance of 211.09 feet to an Agreement Line as per Instrument No. 1773321,

Thence run South 84 degrees 06 minutes 40 seconds West along said Agreement Line a distance of 75.00 feet to the Point of Beginning,

Said parcel of land containing 2.018 acres, more or less.

LESS AND EXCEPT 1.115 acres, more or less, being the three (3) parcels conveyed in that certain Cash Sale Deed dated October 18, 2001, executed by Locke Properties, Inc., as Vendor, in favor of Thomas Scott Pernici et ux., recorded in Book 3493, Page 121 under Registry No. 1773323 of the Conveyance Records of Caddo Parish, Louisiana, as amended by that certain instrument dated February 21, 2002, recorded in Book 3515,

Page 474 under Registry No. 1789114 of the Conveyance Records of Caddo Parish, Louisiana.

LESS AND EXCEPT 2.225 acres, more or less, being the two (2) parcels conveyed by Locke Properties, Inc. in that certain Act Of Exchange dated January 16, 2002, recorded in Book 3509, Page 599 under Registry No. 1784815 of the Conveyance Records of Caddo Parish, Louisiana.

**Tract 3**

A tract of land in Fractional 27 and 37, T17N-R13W, Caddo Parish, Louisiana, more particularly described as follows:

That portion of Lot 3 of William Murray Land lying east of East Kings Highway, said subdivision recorded in Conveyance Book 17, Page 475 of the records of Caddo Parish, Louisiana.  Tract 1 being more fully described as follows:

Beginning at the southwest corner of subject tract at the intersection of the south line of said Lot 3 and the easterly right-of-way line of East Kings Highway, run N7_45= 06@W along said easterly right-of-way line a distance of 308.69 feet to the southwest corner of parcel taken for right-of-way as per Instrument No. 01197579,

Thence run N82_ 14= 16@E (recorded N82_33=06@E) along south line of new right-of way line a distance of 14.5 feet, Thence run northerly along easterly line of new right of way on an arc to left a length of 31.82 feet to the north line of said Lot 3, William Murray Land, said arc having a radius of 790 feet and a chord bearing of N8_ 36= 09@ as per said Instrument No. 01197579, Thence run N89_ 06= 09@E along north line of said Lot 3 a distance of 849.39 feet to angle point being set iron pipe, Thence run S43_ 27= 15@E along easterly line of said Lot 3 a distance of 460.78 feet to the southeast corner of Lot 3, point being found two-inch iron pipe, Thence run S89_ 06= 09@W along south line of said Lot 3, being the north line of Lot 24 of Sandy-Bend Acres as recorded in Conveyance Book 150, Page 334 of Caddo Parish, a distance of 1134.15 feet to the Point of Beginning.  Said tract containing 7.77 acres +/-.

**Tract 4**

A long, narrow tract of land in Fractional Sections 22, 26, 27 and 37, T17N-R13W, Caddo Parish, Louisiana, said tract lying south of tract purchased by EKCOL, L.L.C., Conveyance Instrument No. 1765812 and north of the middle of Old River.  Said tract described more fully as follows:

Beginning at the northeast corner of Lot 24, Sandy-Bend Acres as per Book 150, Page 334 of the Conveyance Records of said Caddo Parish, run N88_ 38= 58@E a distance of 1488.21 feet along north line of Bagley Place (Book 5, Page 669) to a two-foot tall, two-

inch iron pipe, said line and next five lines along south line of tract owned by EKCOL, L.L.C. as per Instrument No. 1765812,

Thence run N42_ 01= 59@E, 264.00 feet to a two foot tall, two-inch pipe,
Thence run N34_ 21= 59@E, 476.52 feet to a two-inch iron pipe,
Thence run N33_ 51= 59@E, 146.52 feet to a two-inch iron pipe two feet tall,
Thence run N43_ 51= 59@E, 219.12 feet to a two foot tall, two-inch pipe,
Thence run N21_ 40= 41@E, 2182.56 feet to iron pipe at top bank of Red River, thus ending abutting tract owned by EKCOL, L.L.C. (Instrument No. 1765812),

Thence run southerly along west bank (right side of descending) of Red River the following four calls:

S63_ 05= 12@E, 17.20 feet,
S73_ 56= 07@E, 80.39 feet,
S49_ 44= 35@E, 56.30 feet,
S51_ 11= 03@E, 145.82 feet to approximate middle of old channel for AOld River@.

Thence run southwesterly along centerline of Old River the following 13 calls:

1.     S32_ 00= 00@W, 192.66 feet
2.     S60_ 18= 00@W, 201.60 feet
3.     S15_ 56= 00@W, 364.00 feet
4.     S20_ 15= 00@W, 794.13 feet
5.     S12_ 56= 00@W, 379.60 feet
6.     S06_ 07= 00@W, 270.20 feet
7.     S20_ 41= 00@W, 240.50 feet
8.     S31_ 36= 00@W, 305.30 feet
9.     S52_ 22= 00@W, 303.00 feet
10.    S70_ 18= 00@W, 355.80 feet
11.    S61_ 14= 00@W, 313.20 feet
12.    S72_ 42= 00@W, 638.90 feet
13.    S73_ 59= 00@W, 481.69 feet to the southeast corner of said Lot 24, Sandy-Bend Acres (Conveyance Book 150, Page 334).

Thence leaving Old River, run N09_ 40= 00@W along easterly line of said Lot 24 a distance of 200.60 feet to angle point,
Thence run N43_ 27= 15@W 399.0 feet to the Point of Beginning.  Said tract containing 29.6 acres +/-.
Area in water of Old River 11.1 acres +/- on 9/28/01.

9.     Oil, Gas and Mineral Lease dated June 7, 2006, recorded in Conveyance Book 3864, Page 214, Registry No. 2042136, Caddo Parish, Louisiana from Sealy Orleans Square, a Limited Partnership, lessor, to Sklarco, L.L.C., lessee, primary term 3 years, 1/5th royalty, covering the following described property, to-wit:

**TOWNSHIP 17 NORTH, RANGE 13 WEST**
**CADDO PARISH, LOUISIANA**

**Section 34:** Lot One (1), Two (2) and Three (3), ORLEANS SQUARE SUBDIVISION, a subdivision of Shreveport, Caddo Parish, Louisiana, as per plat recorded under Registry No. 649135 recorded in Book 1500, at page 47 and 49, of the Records of Caddo Parish, Louisiana. Further described in that Deed dated August 2, 1993, from Donald S. Coleman to Sealy Orleans Square, a Limited Partnership, filed under Registry No. 1397637 recorded in Book 2909, Page 60, of the Conveyance Records of Caddo Parish, Louisiana, containing **19.4874** acres, more or less.

10.     **Oil, Gas and Mineral Lease dated June 20, 2006, recorded in Conveyance Book 3891, Page 705, Registry No. 2061235, Caddo Parish, Louisiana from James H. Stroud and wife, Margaret E. Stroud, lessors, to Sklarco, L.L.C., lessee, primary term 3 years, 1/4th royalty, covering the following described property, to-wit:**

**TOWNSHIP 17 NORTH, RANGE 13 WEST**
**CADDO PARISH, LOUISIANA**

**Tract #1:**
A **0.089** acre, more or less, strip of land in Lot 22 and abandoned T & P Railroad R/W of Sandy Bend Acres Subdivision as per map recorded in Book 150 on page 334 of the records of Caddo Parish, Louisiana and located in fractional Section 37, Township 17 North, Range 13 West and being more particularly described as follows: From the point of intersection of the center line of East Kings Highway with the North line of Sandy Bend Acres Subdivision run thence S 8□21'E along said centerline 826.75', run thence N 83□13'E 25.01' to the East R/W line of East Kings Highway and point of beginning; run thence N 83□13'E 388.21', run thence S 7□10E 10', thence run S 83□13'W 388' to the East R/W of East Kings Highway, run thence N 8□21'W along said highway 10' to the point of beginning, as shown on the survey by John R. Bowman & Associates, Ltd., attached to the Deed dated May 20, 1997 by and between Stroud Family Limited Partnership and James H. Stroud, et ux filed under registry number 1568621, conveyance book 3194, page 205 of Caddo Parish, Louisiana.

**Tract #2:**
A tract of land in Lots 20, 21 and 22 and abandoned T & P Railroad right-of-way of the Sandy Bend Acres Subdivision of Caddo Parish, LA., as shown on map of records in Conveyance Book 150 at Page 334 of Records of Caddo Parish, Louisiana, Said subdivision situated in Theoretical Section 37, Township 17 North, Range 13 West, being more fully described as follows: Beginning at the point of intersection of the center line of Harts Island Road with the North line of Sandy Ben Acres run thence S. 8□21'E along the center line of Harts Island Road a distance of 836.75 feet, run thence N. 85□13'E a distance of 25.01 feet to a point on the Easterly line of Harts Island Road, the point of beginning of tract herein described.  Run thence N. 85□13'E a distance of 850.0 feet to appoint on the boundary line between Caddo and Bossier Parishes, run thence Southerly

along said boundary line to a point that is located S. 6□13'W 242.0 feet from the preceding point, run thence S. 85□13'W a distance of 789.0 feet to a point on the Easterly right-of-way line of Harts Island Road, run thence N. 8□21'W. along the Harts Island Road a distance of 238.0 feet to the point of beginning, containing **4.46** acres, more or less.

**Tract #3:**
A tract of land in Lots 20, 21 and the abandoned T & P Railroad R/W of the Sandy Bend Acres Subdivision, Caddo Parish, Louisiana shown on map of records in book 150, page 334 of the records in Caddo Parish, Louisiana, said subdivision situated in Theoretical Section 37, Township 17 North, Range 13 West, being more fully described as follows: Beginning at the point of intersection of the centerline of Harts Island Road with the North line of said Sandy Bend Acres Subdivision; run thence S. 8□21'E along the centerline of Harts Island Road a distance of 1074.75', thence run N. 85□13'E a distance of 25.01' to a point on the Easterly line of Harts Island Road, the point of beginning of tract herein described. Thence N. 85□13'E along the South line of J. Stroud Property 789' to a point on the Boundary line between Caddo Parish and Bossier, run thence S. 19□30'W 111.5', thence run S 41□13'E 60.5', the preceding 2 courses being along the centerline of the Old River, thence run S83W, 150' South of and parallel to the South line of J. Stroud Property, 773' to the Harts Island Road., Thence Run N 8□21'W along same 150.04' to the point of beginning, containing **2.62** acres, more or less.

11.    **Oil, Gas and Mineral Lease dated April 17, 2006, recorded in Conveyance Book 1372, Page 924, Registry No. 868570, Bossier Parish, Louisiana from Sunflower Plantaion Company, lessor, to Sklarco, L.L.C., lessee, primary term 3 years, 1/5ᵗʰ royalty, covering the following described property, to-wit:**

Parcel 1: Lots 2, 3, 4, 9, 11, 13, and 15 of the Subdivision of the Sunflower Plantation in Sections 13, 14, 23, and 24, Township 17 North, Range 13 West, as per map of said subdivision recorded in Conveyance Book 60, page 221, Records of Bossier Parish, Louisiana, LESS AND EXCEPT:  Tract 1) 3.052 acres of land, more or less, being more particularly described in that Deed dated March 30, 1964, from Antoinette Burt, as Vendor, to State of Louisiana Department of Highways, as Vendee filed under Registry No. 1722115, recorded in Volume 383, Page 358 of the Conveyance Records of Bossier Parish, Louisiana;  Tract 2) 7.5 acres of land , more or less, being more particularly described in that Deed dated November 23, 1974 from Antoinette W. Burt Sloan Sentell Et Al, as Vendor, to Barksdale Baptist Church, as Vendee, filed under Registry No. 270146, recorded in Volume 531, Page 161 of the Conveyance Records of Bossier Parish, Louisiana;   Tract 3) 40.591 acres of land, more or less, being described more particularly in that Credit Sale dated October 9, 1985 from Sunflower Plantation Company, as Vendor, to Bossier Golden Meadows, Inc., as Vendee, filed under Registry No. 427744, recorded in Volume 834, Page 585 of the Conveyance Records of Bossier Parish, Louisiana;   Tract 4) 5.72 acres of land, more or less, being more particularly described in that Cash Sale Deed dated October 19, 1988 from Sunflower Plantation Company, as Vendor, to Bossier Golden Meadows, Inc., as Vendee, filed under Registry No. 479415, recorded in Volume 913, Page 762 of the Conveyance Records of Bossier

- 35 -

Parish, Louisiana;  Tract 5) 4.9964 acres of land, more or less, being more particularly described in that Cash Sale Deed dated March 26, 1992 from Sunflower Plantation Company, as Vendor, to Food Lion, Inc., as Vendee, filed under Registry No. 534096, recorded in Volume 1000, Page 274 of the Conveyance Records of Bossier Parish, Louisiana;  Tract 6) 17.679 acres of land, more or less, being more particularly described in that Cash Sale Deed dated June 1, 1992 from Sunflower Plantation Company, as Vendor, to Bossier Golden Meadows, Inc., as Vendee, filed under Registry No. 537402, recorded in Volume 1004, Page 857 of the Conveyance Records of Bossier Parish, Louisiana;  Tract 7) 12.97 acres of land, more or less, being described more particularly in that Cash Sale Deed dated June 30, 1993 from Sunflower Plantation Company, as Vendor, to James Brown Builders, Inc., as Vendee, filed under Registry No. 558029, recorded in Volume 1031, Page 876 of Conveyance Records of Bossier Parish, Louisiana;  Tract 8) 7.617 acres of land, more or less, being described more particularly in that Cash Sale Deed dated March 17, 1994 from Sunflower Plantation Company, as Vendor, to James Brown Builder, Inc., as Vendee, filed under Registry No. 572510, recorded in Volume 1050, Page 542 of the Conveyance Records of Bossier Parish, Louisiana;  Tract 9) 9.908 acres of land, more or less, being described in that Cash Sale Deed dated September 15, 1995 from Sunflower Plantation Company, as Vendor, to James Brown Builders, Inc., as Vendee, filed under Registry No. 601247, recorded in Volume 1089, Page 932 of the Conveyance Records of Bossier Parish, Louisiana;  Tract 10) 10.00 acres of land, more or less, being more particularly described in that Cash Sale Deed dated November 25, 1996 from Sunflower Plantation Company, as Vendor, to James Brown Builders, Inc., as Vendee, filed under Registry No. 626024, recorded in Volume 1119, Page 735 of the Conveyance Records of Bossier Parish, Louisiana;  Tract 11) 53.169 acres of land , more or less, being described in that Credit Sale Deed dated July 10, 1998 from Sunflower Plantation Company, as Vendor, to R.R.J. Company, L.L.C., as Vendee, filed under Registry No. 659281, recorded in Volume 1160, Page 929 of the Conveyance Records of Bossier Parish, Louisiana;  Tract 12) 10.00 acres of land, more or less, being more particularly described as Cash Sale Deed dated July 22, 1999 from Sunflower Plantation Company, as Vendor, to Bossier Golden Meadows, Inc., as Vendee, file under Registry No. 686704, recorded in Volume 1188, Page 861 of the Conveyance Records of Bossier Parish, Louisiana;  Tract 13) 10.00 acres of land, more or less, being more particularly described in that Cash Sale Deed dated July 12, 2001 from Sunflower Plantation Company, as Vendor, to Bossier Golden Meadows, Inc., as Vendee, filed under Registry No. 727579, recorded in Volume 1238, Page 140 of the Conveyance Records of Bossier Parish, Louisiana; Tract14) 10.00 acres of land, more or less, being more particularly described in that Cash Sale Deed dated May 22, 2003 from Sunflower Plantation Company, as Vendor, to Brown Property Development, Inc., as Vendee, filed under Registry No. 775323, recorded in Volume 1282, Page 899 of the Conveyance Records of Bossier Parish, Louisiana;  Tract 15) 11.802 acres of land, more or less, being more particularly described in that Cash Sale Deed dated October 10, 2004 from Sunflower Plantation Company, as Vendor to Brown Property development, Inc., as Vendee, filed under Registry No. 812442, recorded in Volume 1315, Page 793 of the Conveyance records of Bossier Parish, Louisiana.  Containing 134.6956 acres, more or less.

Parcel 2: A portion of Lots 2, 3 and 4 of the Sunflower Plantation Subdivision in Sections 13, 14, 23, and 24, Township 17 North, Range 13 West, as per map of said subdivision recorded in Conveyance Book 60, page 221, Records of Bossier Parish, Louisiana; being more particularly described in that Credit Sale Deed dated July 10, 1998 from Sunflower Plantation Company, as Vendor, to R.R.J. Company, L.L.C., as Vendee, filed under Registry No. 659281, recorded in Volume 1160, Page 929 of the Conveyance Records of Bossier Parish, Louisiana; containing 53.169 acres, more or less.

Parcel 3: A portion of Lot 9 of the Sunflower Plantation Subdivision in Sections 13, 14, 23, and 24, Township 17 North, Range 13 West, as per map of said subdivision recorded in Conveyance Book 60, page 221, Records of Bossier Parish, Louisiana, being more particularly described as Cash Sale Deed dated July 22, 1999 from Sunflower Plantation Company, as Vendor, to Bossier Golden Meadows, Inc., as Vendee, file under Registry No. 686704, recorded in Volume 1188, Page 861 of the Conveyance Records of Bossier Parish, Louisiana, containing 10.00 acres more or less.

Parcel 4: A portion of Lot 9 of the Sunflower Plantation Subdivision in Sections 13, 14, 23, and 24, Township 17 North, Range 13 West, as per map of said subdivision recorded in Conveyance Book 60, page 221, Records of Bossier Parish, Louisiana, being more particularly described in that Cash Sale Deed dated July 12, 2001 from Sunflower Plantation Company, as Vendor, to Bossier Golden Meadows, Inc., as Vendee, filed under Registry No. 727579, recorded in Volume 1238, Page 140 of the Conveyance Records of Bossier Parish, Louisiana;  containing 10.00 acres, more or less.

Parcel 5: A portion of Lot 9 of the Sunflower Plantation Subdivision in Sections 13, 14, 23, and 24, Township 17 North, Range 13 West, as per map of said subdivision recorded in Conveyance Book 60, page 221, Records of Bossier Parish, Louisiana, being more particularly described in that Cash Sale Deed dated May 22, 2003 from Sunflower Plantation Company, as Vendor, to Brown Property Development, Inc., as Vendee, filed under Registry No. 775323, recorded in Volume 1282, Page 899 of the Conveyance Records of Bossier Parish, Louisiana; containing 10.00 acres, more or less.

Parcel 6: A portion of Lot 9 of the Sunflower Plantation Subdivision in Sections 13, 14, 23, and 24, Township 17 North, Range 13 West, as per map of said subdivision recorded in Conveyance Book 60, page 221, Records of Bossier Parish, Louisiana, being more particularly described in that Cash Sale Deed dated October 10, 2004 from Sunflower Plantation Company, as Vendor to Brown Property development, Inc., as Vendee, filed under Registry No. 812442, recorded in Volume 1315, Page 793 of the Conveyance records of Bossier Parish, Louisiana. Containing 11.802 acres, more or less.

Parcel 7: 10.00 acres, more or less, described in that certain Cash Sale Deed dated November 25, 1996, from Sunflower Plantation Company, as Vendor, to James Brown Builders, Inc., Vendee, recorded in Volume 1119, Page 735 of the Conveyance Records of Bossier Parish, Louisiana.

12.    **Oil, Gas and Mineral Lease dated June 29, 2006, recorded in Conveyance Book 1374, Page 234, Registry No. 869813, Bossier Parish, Louisiana from Succession of Sam Boatner Grayson, lessor, to Sklarco, L.L.C., lessee, primary term 3 years, 1/5th royalty, covering the following described property, to-wit:**

Tract 1: A Tract of land located in the Northeast Quarter (NE/4) of Section 24, Township 17 North, Range 13 West, Bossier Parish, Louisiana, being more particularly described as follows: From the Southwest corner of the Northeast Quarter ( SW/ c of NE/4) of said Section 24, run thence North 00 degrees 42 minutes 31 seconds East a distance of 617.64 feet to the point of beginning of tract herein described: Continue thence North 00 degrees 42 minutes 31 seconds East a distance of 903.90 feet to a found iron pipe; Run thence North 57 degrees 16 minutes 45 seconds east a distance of 324.59 feet to a found iron pipe located on the westerly right of way line of U.S. Highway 71; Run thence along said westerly right of way line the following courses and distances: South 32 degrees 35 minutes 49 seconds East a distance of 194.87 feet to a found iron pipe; South 30 degrees 16 minutes 21 seconds East a distance of 1,000 feet to a found iron pipe; Thence leaving said westerly right of way line run North 89 degrees 16 minutes 52 seconds West a distance of 981.23 feet to the point of beginning of tract, containing 14.958 acres, more or less.

Tract 2:A Tract of land located in the East Half (E/2) of Section 24, Township 17 North, Range 13 West, Bossier Parish, Louisiana, being more particularly described as follows: From the Southwest corner of the Northeast Quarter (SW/c of NE/4) of said Section 24 run thence South 89 degrees 19 minutes 46 seconds east a distance of 591.93 feet; Run thence North 65 degrees 03 minutes 51 seconds East a distance of 168.03 feet to a found iron pipe, said iron pipe being the beginning of tract herein described, said point being located on the easterly line of lot 96, River bend Subdivision, Unit No. 1as recorded in book 583, Pages 134,135 and 136 of the records of Bossier Parish, Louisiana;   Run thence North 75 degrees 22 minutes 32 seconds East a distance of 536.38 feet to a found iron pipe on the westerly right of way line of U.S. Highway 71; run thence along said westerly right of way line the following courses and distances: South 32 degrees 17 minutes 27 seconds East a distance of 409.92 feet to a found iron pipe; South 28 degrees 33 minutes 17 seconds East a distance of 216.68 feet to a found iron pipe; South 33 degrees 23 minutes 45 seconds East a distance of 134.47 feet to the point of curvature of a curve to the right, ( said curve having a radius of 20.00 feet and a chord bearing South 12 degrees 23 minutes 13 seconds West a distance of 28.28 feet), Run thence along said curve a distance of 31.42 feet to a point on the northerly right of way line of River Bend Drive as recorded in book 583, page 180 of the records of Bossier Parish, Louisiana; Run thence along said northerly right of way line South 57 degrees 23 minutes 13 seconds West a distance of 249.55 feet to the southeast corner of said lot 96, River Bend Subdivision, Unit No. 1; Thence leaving said northerly right of way line run thence along the easterly line of said lot 96 the following courses and distances: North 32 degrees 45 minutes 13 seconds West a distance of 513.86 feet; North 57 degrees 45 minutes 09 seconds West a distance of 305.27 feet and North 63 degrees 39 minutes 24 seconds West a distance of 182.02 feet to the point of beginning of tract, containing 6.17 acres, more or less.

- 38 -

Tract 3: A Tract of land located in the in the Southeast Quarter (SE/4) of Section 24, Township 17 North, Range 13 West, Bossier Parish, Louisiana, being more particularly described as follows: From the Southwest corner of the Northeast Quarter (SW/c of NE/4) of said section 24 run thence South 89 degrees 19 minutes 46 seconds East a distance of 591.93 feet; Run thence North 65 degrees 03 minutes 51 seconds East a distance of 168.03 feet; Run thence South 63 degrees 39 minutes 24 seconds East a distance of 182.02 feet; Run thence South 57 degrees 45 minutes 09 seconds East a distance of 305.27 feet; Run thence South 32 degrees 45 minutes 13 seconds East a distance of 513.86 feet; Run thence South 42 degrees 30 minutes 12 seconds east a distance of 81.20 feet to a found iron pipe on the southerly right of way line of River Bend Drive and being the northeast corner of lot 56, of River Bend Subdivision, Unit No. 1 as recorded in Book 583, Pages 134, 135 and 136 of the records of Bossier Parish, Louisiana, said point also being the point of beginning of tract herein described; Run thence along said southerly right of way line North 57 degrees 23 minutes 13 seconds East a distance of 236.08 feet to the point of curvature of a curve to the right, (said curve having a radius of 20.00 feet and a chord bearing South 77 degrees 37 minutes 06 seconds East a distance of 28.28 feet); Run thence along said curve a distance of 31.42 feet to a point on the westerly right of way line of U. S. Highway 71; Run thence along said westerly right of way line the following courses and distances: South 28 degrees 29 minutes 35 seconds East a distance of 500.00 feet; South 36 degrees 37 minutes 44 seconds East a distance of 100.55 feet to a found iron pipe and South 33 degrees 00 minutes 55 seconds East a distance of 162.19 feet; Thence leaving said westerly right of way line run South 57 degrees 18 minutes 40 seconds West a distance of 622.53 feet to a found iron pipe being the southeast corner of Lot 7 of South Fork Estates Unit No. 1 as recorded in Book 808, Page 249 of the records of Bossier Parish, Louisiana; Run thence along the rear line of Lots 7, 6, 5, 4, 3, 2 and 1of said subdivision North 06 degrees 27 minutes 32 seconds West a distance of 407.70 feet to a found iron pipe being the common rear corner of said Lot 1 and Lot 98 of River Bend Subdivision the following courses and distances: North 12 degrees 32 minutes 05 seconds West a distance of 215.69 feet; North 06 degrees 46 minutes 56 seconds West a distance of 175.40 feet to the point of beginning of tract, containing 8.571 acres, more or less.

Tract 4: A tract of land located in the South Half (S/2) of Section 24 and the North Half (N/2) of Section 25, Township 17 North, Range 13 West, Bossier Parish, Bossier Parish, Louisiana, being more particularly described as follows: From the Southwest corner of the Northeast Quarter (SW/c of NE?4) of said Section 24 run thence South 00 degrees 06 minutes 48 seconds East a distance of 2,503.45 feet; Run thence East a distance of 862.50 feet to a found iron pipe being the point of beginning of tract herein described; Run thence North 73 degrees 42 minutes 28 seconds East a distance of 588.17 feet to the point of curvature of a curve to the left, (said curve having a radius of 1,462.20 feet and a chord bearing North 63 degrees 30 minutes 34 seconds East a distance of 417.03 feet); Run thence along said curve a distance of 418.45 feet; Run thence North 57 degrees 18 minutes 39 seconds East a distance of 721.41 feet to a point on the westerly right of way line of U. S. Highway 71; Run thence along said westerly right of way line the following courses and distances: South 33 degrees 00 minutes 55 seconds East a distance of 241.15

- 39 -

feet to a found concrete monument and South 27 degrees 05 minutes 00 seconds East a distance of 12.87 feet; Thence leaving said westerly right of way line run South 60 degrees 36 minutes 30 seconds West a distance of 797.90 feet to a found iron pin; Run thence South 29 degrees 09 minutes 01 seconds East a distance of 914.00 feet; Run thence South 61 degree 51 minutes 16 seconds West a distance of 3,329.10 feet to the centerline of the levee; Run thence along the centerline of the levee North 27 degrees 36 minutes 44 seconds West a distance of 1,389.60 feet; Run thence North 72 degrees 36 minutes 31 seconds East a distance of 2,340.76 feet to the point of beginning of tract, containing 93.407 acres, more or less.

Tract 5: A strip of land located in Section 24, Township 17 North, Range 13 West, Bossier Parish, Louisiana, is more particularly described as follows: From an iron rod being the southeast corner of a 150 acre tract deeded to Grayson Company from McCall Land Company as per plat of G. Q. Carmichael Surveyors & Engineers, Inc., dated October 18, 1983, fun North 16 degrees 25 minutes 14 seconds West a distance of 520.44 feet to the point of beginning on the eastern boundary of said 150 acre tract; Thence North 73 degrees 34 minutes 46 seconds East a distance of 620.01 feet to a point of curvature concave to the left, having a central angle of 16 degrees 22 minutes 24 seconds and a radius of 1265.20 feet; Thence along said curve an arc distance of 361.55 feet; Thence North 57 degrees 12 minutes 22 seconds East a distance of 694.40 feet to the west line of U. S. Highway 71; Thence South 32 degrees 47 minutes 38 seconds East along said right-of-way a distance of 197.00 feet; Thence South 57 degrees 12 minutes 22 seconds West a distance of 694.40 feet to a point of curvature concave to the right, having a central angle of 16 degrees 22 minutes 24 seconds and a radius of 1462.20 feet; Thence along said curve an arc distance of 417.85 feet; Thence South 73 degrees 34 minutes 46 Seconds West a distance of 620.01 feet to the eastern boundary of said 150 acre tract; Thence North 16 degrees 25 minutes 14 seconds West a distance of 197.00 feet to the point of beginning. Said strip containing 7.7 acres, more or less.

Tract 6: A tract of land located in Sections 24 and 25, Township 17 North, Range 13 West, Bossier Parish, Louisiana, is more particularly described as follows: Beginning at a one inch iron pipe being the Southwest corner of the Northeast quarter of Section 24, run South 89 degrees 17 minutes 29 seconds East, a distance of 591.75 feet to an iron rod on the west line of River Bend Subdivision; thence, along said western line South 65 degrees 08 minutes 26 seconds West, a distance of 45.51 feet to an iron rod; thence, South 64 degrees 23 minutes 18 seconds West, a distance of 194.60 feet to an iron rod; thence South 28 degrees 31 minutes 48 seconds West, a distance of 194.61 feet to an iron rod; thence, South 8 degrees 02 minutes 26 seconds East, a distance of 308.70 feet to an iron rod; thence, South 19 degrees 58 minutes 48 seconds East, a distance of 289.68 feet to an iron rod; thence, South 19 degrees 58 minutes 48 seconds East, a distance of 289.68 feet to an iron rod; thence, South 17 degrees 36 minutes 52 seconds East, a distance of 300.55 feet to an iron rod; thence, South 18 degrees 50 minutes 05 seconds East, a distance of 33.23 feet to an iron rod; thence, South 4 degrees 18 minutes 43 seconds East, a distance of 283.95 feet to an iron rod, said point being the Southwest corner of River Bend Subdivision; thence, South 16 degrees 25 minutes 14 seconds East, a distance of 790.87 feet to an iron rod; thence north 2 degrees 15 minutes 48 seconds West, a distance of

2,024.40 feet; thence North 41 degrees 56 minutes 10 seconds West, a distance of 477.19 feet; thence, North 9 degrees 32 minutes 32 seconds West, a distance of 169.64 feet; thence, North 36 degrees 15 minutes 54 seconds West, a distance of 147.47 feet; thence, North 63 24 minutes 46 seconds West, a distance of 408.30 feet to an iron rod driven on the eastern tow of said levee; thence, South 89 degrees 17 minutes 29 seconds East, a distance of 2,425.25 feet to the point of beginning, said tract containing 150 acres, more or less.

Tract 7: A tract of land located in Sections 24 and 25, Township 17 North, Range 13 West, Bossier Parish, Louisiana, is more particularly described as follows: From the center of Section 24 run North 89degrees 17 minutes 29 seconds west a distance of 2425.25 feet to an iron rod on the eastern toe of a levee for the point of beginning; thence, along the eastern toe of levees South 63 degrees 24 minutes 46 seconds East a distance of 408.30 feet; thence, South 36 degrees 15 minutes 54 seconds East a distance of 147.47 feet; thence, South 41 degrees 56 minutes 10 seconds East a distance of 477.19 feet; thence, South 2 degrees 15 minutes 48 seconds East a distance of 2024.40 feet; thence, South 27 degrees 39 minutes 26 seconds East a distance of 1813.16 feet; thence, along a fence, South 61 degrees 47 minutes 35 seconds West a distance of 555.26 feet; thence, along said fence, North 88 degrees 12 minutes 48 seconds West a distance of 253.95 feet to a high bank, said bank once being the bank of Red River; thence along said bank the following courses and distances; North 9 degrees 20 minutes 36 seconds West a distance of 237.36 feet; thence North 22 degrees 33 minutes 32 seconds West a distance of 368.02 feet; thence, North 22 degrees 50 minutes 12 seconds West a distance of 454.79 feet; thence, North 8 degrees 21 minutes 18 seconds West a distance of 329.35 feet; thence, North 1 degree 43 minutes 06 seconds East a distance of 305.75 feet; thence, North 0 degrees 30 minutes 43 seconds East a distance of 744.38 feet; thence, North 4 degrees 40 minutes 39 seconds West a distance of 801.16 feet; thence, North 37 degrees 58 minutes 25 seconds West a distance of 475.34 feet; thence, North 34 degrees 40 minutes 52 seconds West a distance of 844.72 feet to the west line of Section 24, thence, along the section line North 0 degrees 47 minutes 38 seconds East a distance of 473.42 feet; thence, South 89 degrees 17 minutes 29 seconds East a distance of 242.36 feet to the point of beginning, said tract containing 56.5 acres, more or less, together with all other lands, batture, alluvion and accretions owned by vendor lying along and adjacent to the high bank of said property.

Tract 8: The following described tract in Bossier and Caddo Parishes, Louisiana: from the Northeast corner of the Southwest quarter of section 24 township 17 North, range 13 West, Bossier Parish, Louisiana, run thence North 89 degrees 50 minutes West a distance of2640.0 feet, run thence South a distance of 528.0 feet, run thence South 34 degrees 19 minutes East a distance of 102.0 feet, run thence South 29 degrees 25 minutes East a distance of 183.7 feet, run thence South 28 degrees 47 minutes East a distance of 220.2 feet, run thence South 30 degrees 25 minutes East, a distance of 126.4 feet, run thence South 42 degrees 10 minutes East, a distance of 387.3 feet, run thence South 18 degrees 32 minutes East a distance 201.4 feet, run thence South 0 degrees 28 minutes West a distance of 489.0 feet run thence South 16 degrees 51 minutes East a distance of 271.3 feet, run thence South 2 degrees 20 minutes East a distance of 392.5 feet, run thence

- 41 -

South 2 degrees 55 minutes West a distance of 309.4 feet, run thence South 3 degrees 49 minutes West a distance of 314.7 feet to the point of beginning of the tract herein described. Run thence South 36 degrees 53 minutes 38 seconds East a distance of 297.6 feet, run thence South 17 degrees 51 minutes 30 seconds East a distance of 332 feet, run thence South 19 degrees 49 minutes 30 seconds East a distance of 249 feet, run thence South 35 degrees 52 minutes 30 seconds East a distance of 103.3 feet, run thence North 89 degrees 12 minutes West a distance of 1455.6 feet, run thence South 13 degrees 50 minutes West a distance of 1124.5 feet more or less to the average present low water mark of Red River on the left descending side of the river, run thence North 68 degrees 11 minutes 55 seconds West along the average present low water mark of Red River on the left descending side of the river a distance of 455.24 feet, run thence North 73 degrees 18 minutes west along the average present low water mark of Red River on the left descending side of the river a distance of 510.83 feet, run thence North 12 degrees 51 minutes 12 seconds East a distance of 1695.76 feet, run thence South 89 degrees 12 minutes East a distance of 1833.78 feet to the point of beginning, containing 64.3 acres, more or less.

Tract 9: Starting at a concrete monument at the quarter section corner between Sections 23 and 24, Township 17North, range 13 West, Bossier Parish, Louisiana, for a point of beginning, run thence North 9 degrees 44 minutes West 2360 feet to a public road; thence up said road North 84 degrees 35 minutes East 558 feet, thence south 13 degrees 48 minutes East 331.5 feet; thence North 84 degrees 35 minutes E 132 feet; thence South 13 degrees 48 minutes East 2139.8 feet; thence West 876 feet to the point of beginning, containing 41.84 acres, more or less, the said property being in Sections 23 and 24, Township 17 North, Range 13 West, Bossier Parish, Louisiana, as per map recorded in Volume 80, page 629 of the Conveyance Records of Bossier Parish, Louisiana.

Tract 10: A certain tract of land containing 93.20 acres, more or less, in Sections 13 and 24, Township 17 North, Range 13 West, Bossier Parish, Louisiana, more particularly described as follows: Beginning at a point of the east and west centerline of Section 24, this point being 528 feet west of the center of Section 24, thence North 567 feet to the edge of the east high bank of bayou, thence along the edge of this bayou high bank, North 41 degrees 08 minutes West 53.7 feet; thence North 19 degrees 50 minutes West 182.3 feet; thence North 14 degrees 07 minutes West 195 feet; thence North 23 degrees 05 minutes West 101.2 feet; thence North 8 degrees 35 minutes West 105.6 feet; thence North 13 degrees 10 minutes East 328.6 feet; thence North 9 degrees 05 minutes East 165.5 feet; thence North 5 degrees 35 minutes West 104.7 feet; thence North 23 degrees 25 minutes East 36.6 feet; thence North 61 degrees 08 minutes East 116.4 feet; thence North 25 degrees 15 minutes East 167.4 feet; thence North 40 degrees 53 minutes East 118; thence North 49 degrees 05 minutes East 68.4 feet; thence North 47 degrees 45 minutes West 34.5 feet to the center of this bayou; thence along the center of this bayou North 20 degrees 40 minutes East 84.6 feet; thence North 14 degrees 40 minutes West 195.8 feet; thence North 10 degrees 10 minutes East 84.5 feet; thence North 33 degrees 15 minutes East 171.5 feet to the intersection with the west right of way line of the Shreveport-Coushatta paved highway; thence North 33 degrees 03 minutes West 165.5 feet along this west line of Shreveport-Coushatta Highway to the intersection with the

- 42 -

south right of way line of gravel road; thence south 79 degrees 30 minutes West 2054 feet along the south line of said gravel road; thence south 84 degrees 35 minutes West 132 feet along the south line of said gravel road; thence South 13 degrees 48 minutes East 331.5 feet; thence North 84 degrees 35 minutes East 132 feet; thence South 13 degrees 48 minutes East 2139.8 feet to the East and West centerline of Section 24; thence east long this line 1261 feet to the point of beginning, as per map prepared by H. L. Mitchell, Civil Engineer, recorded in the Conveyance Records of Bossier Parish, Louisiana, January 25, 1932, Registry No. 11678.   Less and except Sunflower Place, Unit 1, being a resubdivision of Lot 7, Sunflower Plantation, as recorded in Book 60, Page 221, of the records of Bossier Parish, Louisiana and being located in Section 13 and 24, Township 17 North, Range 13 west, Bossier Parish, Louisiana, containing 16.91 acres more or less. The above property is also referred to as Lots 7 and 8 of the Sunflower Plantation Subdivision of Parts of Sections 13, 14, 23 and 24, Township 17 North, Range 13 West, Bossier Parish, Louisiana.

13.   **Oil, Gas and Mineral Lease dated August 14, 2006, recorded in Conveyance Book 3878, Page 617, Registry No. 2052193, Caddo Parish, Louisiana, and recorded in Conveyance Book 1378, Page 480, Registry No. 873729, Bossier Parish, Louisiana from Don Coleman Construction Company, Inc., lessor, to Sklarco, L.L.C., lessee, primary term 3 years, 1/5[th] royalty, covering the following described property, to-wit:**

**TOWNSHIP 17 NORTH, RANGE 13 WEST**
**CADDO PARISH, LOUISIANA**

**SECTION 34**

**Tract #1:**
A tract containing **1.80** acres, more or less, located at the Northwest intersection of Harts Island Road (E. Kings Hwy) and India Drive., per assessor's city plat 171334-1-60, of the records of Caddo Parish, Louisiana, being more particularly described as follows:  From the Southeast corner of Lot 45, Jackson Square Subdivision Unit No. 3, as per plat recorded under Registry No. 654608, in conveyance Book 1500, Page 105, 107 & 109, Records of Caddo Parish, Louisiana, said corner being the point of beginning of the tract herein described; run thence North 150 feet, or a distance sufficient to reach the southwest corner of that tract of land described in Deed dated September 9, 1958 from Lucille Cubberly Pugh to Robert G. Pugh recorded under Registry No. 189,736 in conveyance book 847, Page 521, Caddo Parish, Louisiana; run thence North 81°46' East a distance of 522.72 feet to a point on the West right of way line of Harts Island Road (E. Kings Hwy); run thence South 8°14' East, along said West right of line, a distance of 150 feet, run thence South 81°46' West, a distance of 523.61 to the point of beginning.

**Tract #2:**
Lot 4, containing **3.496** acres, more or less, of Orleans Square Subdivision, as more particularly described in that plat filed under Registry No. 649135, recorded in plat Book 1500, Pages 47 & 49 of the Conveyance Records of Caddo Parish, Louisiana.  Further

- 43 -

described in that Deed dated March 6, 1998 from Don Coleman Construction Co., Inc. to Senior Retirement Communities, Inc., Filed under Registry No. 1600365, recorded in Book 3242, Page 804 of the Conveyance Records of Caddo Parish, Louisiana. Reference is herein made to the above described deed for the purposes of description only.

## SECTION 37

**Tract #3:**
Being described as a 20.628 acres (more or less) tract of land in Section 37, Township 17 North, Range 13 East, Caddo Parish, Louisiana, and being all that part of lots 22, 23, and 24, Sandy Bend Acres Subdivision, as recorded in plat book 150, page 334 of the conveyance records of Caddo Parish, Louisiana, and that part of the old abandoned T&P Railroad Right-of-Way lying in front of and adjacent to the above lots, and being more particularly described as follows: Begin at the northwest corner of said lot 24 and the east line of the old abandoned T&P Railroad right-of-way; Thence proceed North 88°25'36" East, a distance of 1042.50 feet to a concrete monument; Thence proceed South 42°44'24" East, a distance of 399.00 feet to a concrete monument; Thence proceed South 12°41'57" East, a distance of 200.00 feet to the centerline of Old River; Thence proceed South 65°23'26" West, a distance of 370.00 feet; Thence proceed South 26°27'47" West, a distance of 90.00 feet; Thence proceed South 16°45'15" West, a distance of 27.67 feet; Thence proceed South 84°23'37" West, a distance of 504.61 feet to a ¼" iron pipe; Thence proceed South 84°23'37" West, a distance of 74.19 feet to a ¾" iron pipe; Thence proceed North 06°33'45" West, a distance of 168.48 feet to a 1" iron pipe; Thence proceed South 83°50'31" West, a distance of 391.50 feet to the east right-of-way line of Kings Highway; Thence proceed North 07°27'26" West, along said east right-of-way line, a distance o f655.07 feet; Thence proceed North 88°25'36" East, a distance of 100.59 feet to the Point of Beginning of the tract herein described, containing 20.628 acres, more or less, however, for the purposes of this Oil, Gas and Mineral Lease, said tract contains **20.98** acres, more or less.

14.    **Oil, Gas and Mineral Lease dated August 1, 2006, recorded in Conveyance Book 3891, Page 692, Registry No. 2061233, Caddo Parish, Louisiana, from Mark A. Roberts, lessor, to Sklarco, L.L.C., lessee, primary term 3 years, 22.5% royalty, covering the following described property, to-wit:**

**Township 17 North, Range 13 West**
**Caddo Parish, Louisiana**

**Parcel # 1**
Part of Eagle Bend Plantation in Section 37, Township 17 North, Range 13 West, Caddo Parish, Louisiana, more particularly described as follows:

Begin at a ½" crimp top pipe being the Southeast corner of lot 2 of said Eagle Bend Plantation as recorded in Book 4, Page 287 of the conveyance records of Caddo Parish, Louisiana;

- 44 -

Thence North 29 degrees, 31 minutes, 00 seconds East a distance of 723.03 feet to the high bank of Old River Lake;
Thence North 72 degrees, 39 minutes, 16 seconds East a distance of 491.75 feet;
Thence North 57 degrees, 20 minutes, 41 seconds East a distance of 800.00 feet;
Thence North 38 degrees, 41 minutes, 01 seconds East a distance of 270.00 feet to a found ½" iron pipe;
Thence North 39 degrees, 54 minutes, 16 seconds East a distance of 241.26 feet to a found ½ " iron pipe;
Thence North 53 degrees, 36 minutes, 49 seconds East a distance of 310.90 feet;
Thence north 50 degrees, 50 minutes, 29 seconds East a distance of 384.00 feet;
Thence North 48 degrees, 54 minutes, 43 seconds East a distance of 383.00 feet to a found ½ " iron pipe;
Thence North 69 degrees, 54 minutes, 41 seconds East a distance of 251.61 Feet to the high bank of Red River;
Thence along the high bank of Red River the following six courses:
      South 50 degrees, 44 minutes, 31 seconds East – 113.74 Feet,
      South 46 degrees, 43 minutes, 22 seconds East – 283.00 Feet,
      South 55 degrees, 56 minutes, 03 seconds East – 206.84 Feet,
      South 46 degrees 24 minutes, 38 seconds East – 143.09 Feet,
South 72 degrees, 54 minutes, 17 seconds East – 91.81 Feet,
South 55 degrees, 33 minutes, 28 seconds East – 124.86 Feet,
Thence South 89 degrees, 42 minutes, 48 seconds West a distance of 1,181.93 Feet;
Thence South 33 degrees, 54 minutes, 56 seconds West a distance of 536.56 Feet;
Thence South 40 degrees, 42 minutes, 51 seconds West a distance of 282.26 Feet;
Thence South 33 degrees, 39 minutes, 19 seconds West a distance of 594.00 Feet;
Thence South 45 degrees, 46 minutes, 07 seconds West a distance of 330.00 Feet;
Thence South 61 degrees, 46 minutes, 26 seconds West a distance of 637.56 Feet;
Thence South 83 degrees, 27 minutes, 23 seconds West a distance of 868.36 Feet to the point of beginning.
Said tract herein described contains **43.413 acres.**


**Parcel # 2**
A tract of land consisting of a portion of Lot 2, Eagle Bend Plantation as recorded in Book 4, Page 287, Conveyance Records of Caddo Parish, Louisiana, and being located in Township 17 North, Range 13 west, Caddo Parish, Louisiana, and being more particularly described as follows:

From a 1" crimp top iron pipe being the Southwest corner of said Lot 2, Eagle Bend Plantation, and being also the Point of Beginning of the tract herein described.
Thence North 00 degrees, 10 minutes, 33 seconds West a distance of 128.46 feet along the West line of said Lot 2 to a ½" iron pipe;
Thence North 70 degrees 23 minutes, 29 seconds East a distance of 397.48 feet to a ½ " iron pipe on the high bank of an existing slough;
Thence North 26 degree, 45 minutes, 13 seconds West a distance of 312.36 feet along said high bank to a ½" iron pipe;

- 45 -

Thence North 82 degrees, 04 minutes, 08 seconds East a distance of 78.99 feet to a ½" iron pipe;

Thence North 35 degrees, 31 seconds, 08 minutes West a distance of 54.84 feet to a ½" iron pipe on the high bank of the old river lake;

Thence North 10 degrees, 17 seconds, 27 minutes West a distance of 79.81 feet to a point on the boundary agreement line established in Suit No. 168182;

Thence North 79 degrees, 42 minutes, 04 seconds East a distance of 608.68 feet along said boundary agreement line to the East line of said Lot 2, Eagle Bend Plantation.

Thence South 29 degrees, 31 minutes, 00 seconds West a distance of 837.86 feet along said East line of Lot 2 to a ¾" iron pipe being the Southeast corner of said Lot 2;

Thence along the South boundary of said Lot 2 the following four courses.

South 84 degree, 04 minutes, 52 seconds West a distance of 260.00 feet to a ½" iron pipe;

South 45 degrees 22 minutes, 27 seconds West a distance of 100.98 feet to a ½" iron pipe;

North 42 degrees, 27 minutes, 50 seconds West a distance of 133.12 feet to a 1" crimp top iron pipe;

South 29 degrees, 36 minutes, 49 seconds West a distance of 63.26 feet to the Point of Beginning.

Said tract herein described contains 6.526 acres.

**Less & Except the following portion thereof:** A parcel of land in Fractional Section 37, Township 17 North, Range 13 West, Caddo Parish, Louisiana, being a portion of Lots 1 and 2 of Eagle Bend Plantation, conveyance Book No. 4, page 287 of the Records of said Caddo Parish, Louisiana, and a parcel of adjacent land described in Instrument No. 1773323, said 2.018 acre parcel described more fully:

Beginning at the South common corner of Lots 1 and 2 of said Eagle Bend Plantation, run South 74 degrees 33 minutes 24 seconds West a distance of 399.33 feet along an Agreement Line described in said Instrument No. 1773323 to a point 10.00 feet off the center line of abandoned 100 foot railroad right of way,

Thence run North 07 degrees 45 minutes 06 seconds West parallel to and ten feet from said center line a distance of 159.03 feet to the beginning of a curve to the right,

Thence run Northeasterly along said curve having a radius of 50.00 feet a distance of 68.19 feet to end of curve,

Thence from end of curve run North 70 degrees 23 minutes 29 seconds East parallel to and five feet from north line of parcel owned by Scott Pernici a distance of 283.13 feet to the beginning of a curve to the right,

Thence run Southeasterly along a curve tot he right a distance of 68.34 feet, said curve having a radius of 52.44 feet,

Thence run South 34 degrees 56 minutes 30 seconds East a distance of 211.09 feet to an Agreement Line as per Instrument No. 1773321,

Thence run South 84 degrees 06 minutes 40 seconds West along said Agreement Line a distance of 75.00 feet to the Point of Beginning,

Said Parcel #2 herein described contains **4.508 acres**, more or less.

- 46 -

**Parcel # 3**

A tract of land in Kentucky Plantation, Township 17 North, range 13 West, Shreveport, Caddo Parish, Louisiana per map in Book 10, Page 664 of the records of Caddo Parish, Louisiana. Said tract being that portion of said Kentucky Plantation lying East of East Kings Highway (formerly Harts Island Road) and West of the abandoned T & P Railroad right-of-way. Said portion being more fully described as follows:

Beginning at the intersection of the East right-of-way line of East Kings Highway (formerly Harts island Road) and the North line of William Murray lands partition per Book 17, Page 475 of the records of Caddo Parish, Louisiana, run Northwesterly along said East right-of-way line the following calls:

Northwesterly along a curve to the left an arc distance of 144.61 feet (said curve having a radius of 805.00 feet and a chord bearing North 14 degrees, 35 minutes, 55 seconds West – 144.42 feet).

North 25 degrees, 44 minutes 32 seconds West a distance of 53.67 feet.

Northwesterly along a curve to the left an arc distance of 181.12 feet (said curve having a radius of 383.10 feet and a chord bearing North 31 degrees, 01 minutes, 01 seconds West – 179.44 feet).

North 44 degrees, 33 minutes, 37 seconds west a distance of 970.56 feet to south line of the property owned by Carroll W. Feist.

Thence run South 79 degrees, 43 minutes, 50 s3econds East along the south line of said Feist property a distance of 693.46 feet to a found one inch iron pipe at the Southwest corner of Lot 2, Eagle Bend Plantation per book 7, page 287 of the records of Caddo parish, Louisiana.

Thence run North 32 degrees, 01 minute, 52 seconds East along the Southerly line of said Lot 2 a distance of 63.36 feet.

Thence run South 40 degrees, 56 minutes, 52 seconds East along the southerly line of said Lot 2 a distance of 3.13 feet to a point on the centerline of the abandoned T & P Railroad right-of-way.

Thence run South 07 degrees, 45 minutes, 06 seconds East along said centerline a distance of 969.51 feet to the north line of William Murray lands partition (said line also being the south line of the Kentucky Plantation).

Thence run South 88 Degrees, 13 minutes, 30 seconds West along said north line of the William Murray lands partition a distance of 15.61 feet back to the point of beginning.

Said tract containing **5.935 acres**, more or less, in being subject to any and all servitudes, easements and/or right-of-ways.


**Parcel # 4**

A Triangular Parcel of Land in Fractional Sections 27 and 37, Township 17 North, Range 13 West, Caddo Parish, Louisiana. Parcel being more fully described as follows:

From the South common corner of Lots 1 and 2 of Eagle Bend Plantation as per Conveyance Book 4, page 287 of the Records of said Caddo Parish, run North 1759.14 feet, thence fun East 2861.40 feet to the point of beginning. Said point being on South line of said Lot 1.

Thence from said Point of Beginning run North 89 degrees 26 minutes 37 seconds East a distance of 323.34 feet;

Thence fun South 65 degrees 34 minutes 18 seconds East a distance of 375.38 feet.

Thence fun South 37 degrees 00 minutes 00 seconds West a distance of 200.00 feet;

Thence run North 60 degrees 12 minutes 41 seconds West a distance of 627.67 feet to the Point of Beginning.

Said Tract containing 87.903 square feet or **2.018 acres**, more or less.

### Parcel # 5

A 10-foot wide strip of land in Fractional Section 37, Township 17 North, Range 13 West, Caddo Parish, Louisiana.  Said parcel of land more fully described as follows:

From the South common corner of Lots 1 and 2 of Eagle Bend Plantation as per Conveyance Book 4, page 287 of the Records of said Caddo Parish, run South 74 degrees 33 minutes 24 seconds West a distance of 399.33 feet to the Point of Beginning;

Thence from said Point of Beginning, run South 07 degrees 45 minutes 06 seconds East parallel and ten feet from the center line of abandoned railroad right of way a distance of 867.88 feet,

Thence run South 89 degrees 06 minutes 09 seconds West a distance of 45.83 feet to the Easterly right of way line of East Kings highway,

Thence run North 89 degrees 06 minutes 09 seconds East a distance of 35.76 feet to center line of said abandoned right of way,

Thence run North 07 degrees 45 minutes 06 seconds West along said center line a distance of 855.26 feet,

Thence run North 74 degrees 33 minutes 24 seconds East a distance of 10.09 feet to the Point of Beginning.

Said parcel containing **0.207 acres**, more or less.

### Parcel # 6

A triangular parcel of land in fractional Sections 27 and 37, T17N-R13W, Caddo Parish, Louisiana, parcel being more fully described as follows;

From the South common corner of Lots 1 and 2 of Eagle Bend Plantation as per conveyance Book 4, Page 287 of the records of said Caddo Parish, run North 1762.28 feet, thence run East 3184.72 feet to the point of beginning, said point being on a South line of said Lot 1;

Thence run South 37 degrees 00 minutes 00 seconds West a distance of 200.00 feet;

Thence run North 65 degrees 34 minutes 18 seconds West a distance of 375.38 feet to the point of beginning.

Said tract containing 36,638 square feet or **0.841 acres**, more or less.

### Parcel #7

A tract of land located in the Fractional Section 37, Township 17 North, Range 13 West, Caddo Parish, Louisiana, and being a portion of Lot 22, The Haven, Phase 1, Unit 1, as recorded in Book 3500, Pages 244 and 245 of the Conveyance Records of Caddo Parish, Louisiana.  Said tract more fully described as follows:

From the northwest corner of Lot 1001 of The Haven, Phase 1, Unit 1, as per Book 3500, Pages 244 and 245 of the Conveyance records of Caddo Parish, Louisiana, the point also being on the east right of way of East Kings Highway, thence South 82 degrees 14 minutes 54 seconds West a distance of 0.50 feet, thence along said right of way of East Kings Highway North 07 degrees 45 minutes 06 seconds West a distance of 21.39 feet; thence North 89 degrees 06 minutes 09 seconds East a distance of 45.83 feet to a corner of said Lot 22 and the Point of Beginning;

Thence North 07 degrees 45 minutes 06 seconds West a distance of 246.27 feet to the centerline of the levee as recorded in Instrument # 66087/54,

Thence along the centerline of said levee South 44 degrees 03 minutes 03 seconds East a distance of 272.74;

Thence South 49 degrees 44 minutes 41 seconds West a distance of 71.81 feet.

Thence South 89 degrees 06 minutes 09 seconds West parallel to the south property line of Lot 22, The Haven, Phase 1, Unit 1, a distance of 101.63 feet to the Point of Beginning.  Said tract containing **0.51 acres**, more or less.

**Parcel #8**
A tract of land consisting of a portion of Lot 2, Eagle Bend Plantation as recorded in Book 4, Page 287, Conveyance Records of Caddo Parish, Louisiana, and being located in Township 17 North, Range 13 West, Caddo Parish, Louisiana, and being more particularly described as follows:

From a 1"crimp top iron pipe being the southwest corner of said Lot 2, Eagle Bend Plantation, Thence North 00 degrees 10 minutes 33 seconds West a distance of 128.46 feet along the West line of said Lot 2 to a ½" iron pipe; and being the Point of beginning of the tract herein described;

Thence continue North 00 degrees 10 minutes 33 seconds West a distance of 571.54 feet along the West line of said Lot 2 to a point on the boundary agreement line established in Suite No. 168182;

Thence South 80 degrees 50 minutes 42 seconds East a distance of 218.00 feet along said boundary agreement line;

Thence North 79 degrees 42 minutes 04 seconds East a distance of 53.30 feet along said boundary agreement line;

Thence South 10 degrees 17 minutes 27 seconds East a distance of 79.81 feet to a ½" iron pipe on the high bank of the old river lake;

Thence South 35 degrees 31 minutes 08 seconds East a distance of 54.84 feet to a ½" iron pipe;

Thence South 82 degrees 04 minutes 08 seconds West a distance of 78.99 feet to a ½" iron pipe on the high bank an existing slough;

Thence South 26 degrees 45 minutes 13 seconds East a distance of 312.36 feet along said high bank to a ½" iron pipe;

Thence South 70 degrees 23 minutes 29 seconds West a distance of 397.48 feet to the Point of Beginning.

Said tract herein described contains **3.428 acres**.

15.   **Oil, Gas and Mineral Lease dated October 3, 2006, recorded in Conveyance Book 3898, Page 70, Registry No. 2065572, Caddo Parish, Louisiana, from Sorensen-Naylor, Ltd., lessor, to Sklarco, L.L.C., lessee, primary term 3 years, 1/5ᵗʰ royalty, covering the following described property, to-wit:**

**Section 37: Township 17 North, Range 13 West**
**Caddo Parish, Louisiana**

All that part of Lots 10, 14, 15, 16, 17, 18, 19 and 20, lying east of the center line of the levee, of Sandy-Bend Acres, as filed in Map Book 150, Page 334, Caddo Parish, Louisiana, described as follows:

Begin at the Southwest Corner of Lot 15, thence N 88°15' E 1632.67 feet to the center line of levee, for the true Point of Beginning;

Thence N 54°29'46" W 816.41 feet to a brass cap;
Thence N 51°58'01" W 118.28 feet to a brass cap;
Thence N 41°33'06" W 771.03 feet to a brass cap;
Thence N 28°33'58" W 579.48 feet;
Thence N 83°18'36" E 439.62 feet, to the center line of Old River and the Parish Line;
Thence S 29°03'23" E 54.61 feet;
Thence S 44°36'05" E 1061.68 feet;
Thence S 49°07'33" E 302.18 feet;
Thence S 55°23'35" E 159.46 feet;
Thence S 35°30'14" W 444.91 feet;
Thence S 54°39'46" W 292.09 feet;
Thence N 88°15' E 600 feet;
Thence North 171.18 feet to the center line of Old River and Parish Line;
Thence S 63°09'51" E 142.24 feet;
Thence S 71°10'14" E 331.41 feet;
Thence S 77°51' E 193.787 feet;
Thence S 88°15' W 1232.20 feet to the point of beginning, containing **22.52** acres, more or less, of land all in Caddo Parish, Louisiana.  Assessor's Geographical No. 171337-022-0036

16.    Oil, Gas and Mineral Lease dated August 25, 2006, recorded in Conveyance Book 3891, Page 702, Registry No. 2061234, Caddo Parish, Louisiana, from David R. Johns, Jr., and Paula C. Johns, husband and wife, lessors, to Sklarco, L.L.C., lessee, primary term 3 years, 1/4th royalty, covering the following described property, to-wit:

**TOWNSHIP 17 NORTH, RANGE 13 WEST**
**CADDO PARISH, LOUISIANA**

A tract of land in Lots 22 and 23 and abandoned T & P Railroad Right of Way of the Sandy Bend Acres Subdivision of Caddo Parish, Louisiana, as shown on map of record in Conveyance book 150, Page 334 of the Records of Caddo Parish, Louisiana, said subdivision situated in theoretical Section 37, Township, 17 North, Range 13 West, being more fully described as follows:

Beginning at the point of intersection of the center line of Harts Island Road with the North line of Sandy Bend Acres Subdivision, thence South 8° 21' East along the centerline of Harts Island Road a distance 667.95 feet, thence North 83° 13' East a distance of 25.01 feet to a point of the Easterly line of Harts Island Road, thence North 83° 13' East a distance of 391.5 feet, thence South 7° 10' East a distance of 168.7 feet, thence South 83° 13' West a distance of 388.0 feet to a point on the Easterly Right of Way line of Harts Island Road, thence North 8° 21' West along the Harts Island Road, a distance of 168.8 feet to the point of beginning, containing 1.50 acres, more or less.

LESS AND EXCEPT the following described property conveyed by Stroud Family Limited Partnership to James H. Stroud et ux., by Cash Sale Deed dated May 20, 1997, recorded in Conveyance Book 3194, page 205, Registry No. 1568621, Records of Caddo Parish, Louisiana, more particularly described as follows:

A 0.089 acre, more or less, strip of land in Lot 22 and abandoned T & P railroad R/W of Sandy Bend Acres Subdivision as per map recorded in Book 150 on page 334 of the records of Caddo parish, Louisiana and located in fractional Section 37, Township 17 North, Range 13 West and being more particularly described as follows:

From the point of intersection of the center line of east Kings Highway (a/k/a/ Harts Island Road) with the North line of Sandy Bend Acres Subdivision run thence S 8 deg. 21' East along said centerline 826.75', run thence N 83 deg 13' E 25.01' to the East R/W line of East Kings Highway and point of beginning: run thence N 83 deg 13' E 388.21', run thence S 7 deg 10' E 10', thence run S 83 deg 13' W 388' to the East R/W of East Kings Highway, run thence N 8 deg 21' W along said highway 10' to the point of beginning.

Leaving said tract herein described to contain **1.42** acres, more or less.

17.    **Oil, Gas and Mineral Lease** dated December 5, 2006, recorded in Conveyance Book 3906, Page 50, Registry No. 2071008, Caddo Parish, Louisiana, from Kathy Lynn Waters Cox, lessor, to Sklarco, L.L.C., lessee, primary term 3 years, 1/6th royalty, covering the following described property, to-wit:

<u>Section 37, Township 17 North, Range 13 West</u>

A certain piece, parcel or tract of land lying and situated in Caddo Parish, Louisiana, and being part of Lot "D" of the subdivision of the West half of Plot 5, Sandy Bend Acres subdivision of Caddo Parish, in Section 37, T17N – R13W on the right descending bank of Red River and being more particularly described as follows:  From the Southwest corner of Plot 1, Sandy Bend Acres subdivision, then run Easterly along the South line of said subdivision, 2,501 feet, more or less, to a point on the Southwest corner of Lot "D", this being the point of beginning, thence continue East along said South line 165 feet, more or less, to a point on the Southeast corner of said Lot "D", thence run Northerly along the East line of said Lot "D", 170 feet, more or less, to a point on the 148 foot contour line, thence run Southwesterly along said contour line, 210 feet, more or less, to a point on the West line of Lot "D", thence run Southerly along said West line 50 feet, more or less, back to the point of beginning, containing **0.4 acres**, more or less;

18.    **Oil, Gas and Mineral Lease** dated November 27, 2006, recorded in Conveyance Book 3908, Page 712, Registry No. 2072672, Caddo Parish, Louisiana, from Dutton Family, L.L.C., lessor, to Sklarco, L.L.C., lessee, primary term 3 years, 1/5th royalty, covering the following described property, to-wit:

<u>Section 37, Township 17 North, Range 13 West</u>
<u>Caddo Parish, Louisiana</u>

**Tract #1:**
All of part of Lots 15 through 20, and that part of the Old Abandon T&P RR R/W, lying in front of same, of Sandy-Bend Acres as filed in Map Book 150, Page 334; described as follows:

Begin at the Northwest Corner of Lot 20, thence S 8°21' E 125.59 feet, thence S 83°18'36" W 101.84 feet across RR R/W, for a true Point of Beginning on the East R/W line of the Harts Island Road; Thence with same S 8°16' E 755.90 feet; Thence N 78°12'02" E 729.41 feet to the toe of the levee; Thence with same S 41°ee'06" E 425.61 feet; Thence S 81°39' W 960.56 feet to the East R/W of the Harts Island Road; Thence with same a chord distance of S 11°22'23" E 405.34 feet, a curve of a central angle of 5°07' and a degree of curve of 1°; Thence S 13°23' E 182.13 feet; Thence N 88°15' E 1734.77 feet to the center line of levee;  Thence N 54°29'46" W 816.41 feet to a brass cap; Thence N 51°58'01" W 118.28 feet to a brass cap; Thence N 41°33'06" W 771.03 feet to a brass cap;  Thence N 28°33'58" W 579.48 feet; Thence S 83°18'36" W 467.55 feet to the point of beginning, containing **30.56 acres** of land, all in Caddo Parish, Louisiana.
Assessor's Geographical No. 171337-022-0035

- 52 -

**Tract #2:**
All that part of Lots 15 and 14, lying East of the levee, of Sandy-Bend Acres as filed in Map Book 150, Page 334, Caddo Parish, Louisiana, described as follows:

Begin at the Southwest Corner of Lot 15, thence N 88°15' E 1632.67 feet along South Line of Lot 15 to the centerline of levee, thence N 54°29'46" W 99.12 feet, thence N 88°15' E 82.60 feet to the toe of levee, and the true Point of Beginning:  Thence N 54°29'46" W 292.09 feet; Thence N .2°30'14" E 444.91 feet to the center line of Old River and the Parish Line; Thence with same S 55°23'35" E 325.50 feet; Thence S 63°09'51" E 348.77 feet; Thence South 171.18 feet; Thence S 88°15' W 600.00 feet to the Point of Beginning.  Containing **6.11** acres, more or less, of land all in Caddo Parish, Louisiana.
Assessor's Geographical No. 171337-022-0037

**19.    Oil, Gas and Mineral Lease dated November 27, 2006, recorded in Conveyance Book 3908, Page 706, Registry No. 2072670, Caddo Parish, Louisiana, from Betty Jo Fuller Dutton, et al, lessors, to Sklarco, L.L.C., lessee, primary term 3 years, 1/5ᵗʰ royalty, covering the following described property, to-wit:**

**Section 37, Township 17 North, Range 13 West**
**Caddo Parish, Louisiana**

All that part of Lots 10, 14, 15, 16, 17, 18, 19 and 20, lying east of the center line of the levee, of Sandy-Bend Acres, as filed in Map Book 150, Page 334, Caddo Parish, Louisiana, described as follows:

Begin at the Southwest Corner of Lot 15, thence N 88°15' E 1632.67 feet to the center line of levee, for the true Point of Beginning;

Thence N 54°29'46" W 816.41 feet to a brass cap;
Thence N 51°58'01" W 118.28 feet to a brass cap;
Thence N 41°33'06" W 771.03 feet to a brass cap;
Thence N 28°33'58" W 579.48 feet;
Thence N 83°18'36" E 439.62 feet, to the center line of Old River and the Parish Line;
Thence S 29°03'23" E 54.61 feet;
Thence S 44°36'05" E 1061.68 feet;
Thence S 49°07'33" E 302.18 feet;
Thence S 55°23'35" E 159.46 feet;
Thence S 35°30'14" W 444.91 feet;
Thence S 54°39'46" W 292.09 feet;
Thence N 88°15' E 600 feet;
Thence North 171.18 feet to the center line of Old River and Parish Line;
Thence S 63°09'51" E 142.24 feet;
Thence S 71°10'14" E 331.41 feet;

- 53 -

Thence S 77°51' E 193.787 feet;
Thence S 88°15' W 1232.20 feet to the point of beginning, containing **22.52** acres, more or less, of land all in Caddo Parish, Louisiana.

Assessor's Geographical No. 171337-022-0036

20.    **Oil, Gas and Mineral Lease dated November 28, 2006, recorded in Conveyance Book 3937, Page 562, Registry No. 2092337, Caddo Parish, Louisiana, from John Taylor, lessor, to Sklarco, L.L.C., lessee, primary term 3 years, 1/6th royalty, covering the following described property, to-wit:**

The West **3** acres of Plot 4, Sandy Bend Acres, a subdivision of Caddo Parish, Louisiana, as per plat thereof recorded in Conveyance Book 150, Page 334, Records of Caddo Parish, Louisiana. Further described in that Judgment of Possession dated November 10, 1993, from the Succession of Willianna Barton Kellum to Hazel Edwina Taylor Smith and John Taylor, filed under Registry Number 1409454, recorded in Book 2929, Page 382, of the Conveyance Records of Caddo Parish, Louisiana.

21.    **Oil, Gas and Mineral Lease dated December 1, 2006, recorded in Conveyance Book 3937, Page 574, Registry No. 2092338, Caddo Parish, Louisiana, from Leander Roque, Sr., et ux, lessors, to Sklarco, L.L.C., lessee, primary term 3 years, 1/6th royalty, covering the following described property, to-wit:**

**SECTION 37, TOWNSHIP 17 NORTH, RANGE 13 WEST**
**CADDO PARISH, LOUISIANA**

A tract of land commencing at the southwest corner of Lot 10, run thence N.88°15'E. along the south line of Lot 10, a distance of 386.46 feet to the point of beginning of the 5.06 acres tract; run thence N.8°58'E. a distance of 576.62 feet to the toe of an existing levee, run thence No. 83°27'21"E. along the toe of said levee, a distance of 257.08 feet; run thence S.84°18'08"E. along the toe of said levee a distance of 98.33 feet, run thence S.3°12'46"W. a distance of 577.47 feet to a point on the south line of said Lot 9, run thence S.88°15'W along the south line of Lots 9 and 10, a distance of 410.94 feet to the point of beginning, containing 5.06 acres, more or less.

**LESS AND EXCEPT** the westerly 1.0 acres of the 5.06 acre tract of land, more or less, being a part of Lots 9 and 10, Sandy Bend Acres, Caddo Parish, Louisiana, as per plat recorded in Book 150 at Page 334 of the Records of Caddo Parish, Louisiana. Said 1.0 acre tract of land being more fully described in Irrevocable Donation dated March 19, 2003, by and between Albert Wells and Francis Wells, as Donors, and Lee Ellis Wells, Laverne Gilbert Wells, and Angela Renee Wells, as Donees, recorded in Conveyance Book 3601, Page222, Registry No.1855659, Records of Caddo Parish, Louisiana.

Leaving said tract herein described to contain **4.06** acres, more or less.

22.     **Oil, Gas and Mineral Lease dated December 1, 2006, recorded in Conveyance Book 3908, Page 335, Registry No. 2072480, Caddo Parish, Louisiana, from John D. Cummins and Denyse B. Cummins, husband and wife, lessors, to Sklarco, L.L.C., lessee, primary term 3 years, 1/4th royalty, covering the following described property, to-wit:**

**SECTION 37, TOWNSHIP 17 NORTH, RANGE 13 WEST**
**CADDO PARISH, LOUISIANA**

West one-half (W/2) of Lot 5, Sandy Bend Acres, a subdivision of Caddo Parish, Louisiana, as per plat recorded in Book 150, Page 334 of the Conveyance Records of Caddo Parish, Louisiana, LESS AND EXCEPT the following two described tracts of land:

LESS AND EXCEPT TRACT A:
A certain piece, parcel or tract of land lying and situated in Caddo Parish, Louisiana, and being part of Lot "D" of the subdivision of the West half of Plot 5, Sandy Bend Acres subdivision of Caddo Parish, in Section 37, T17N – R13W on the right descending bank of Red River and being more particularly described as follows:  From the Southwest corner of Plot 1, Sandy Bend Acres subdivision, then run Easterly along the South line of said subdivision, 2,501 feet, more or less, to a point on the Southwest corner of Lot "D", this being the point of beginning, thence continue East along said South line 165 feet, more or less, to a point on the Southeast corner of said Lot "D", thence run Northerly along the East line of said Lot "D", 170 feet, more or less, to a point on the 148 foot contour line, thence run Southwesterly along said contour line, 210 feet, more or less, to a point on the West line of Lot "D", thence run Southerly along said West line 50 feet, more or less, back to the point of beginning, containing 0.4 acres, more or less;

LESS AND EXCEPT TRACT B:
A certain piece, parcel or tract of land lying and situated in Caddo Parish, Louisiana, and being part of Lot "C" of a Partition of the West half of Lot 5, of Sandy Bend Acres in Section 37, T17N – R13W on the Right descending Bank of Red River and Being more particularly described as follows:  From the Southwest corner of Lot 1, of Sandy Bend Acres subdivision, thence run Easterly, along the South line of said subdivision, 2,451 feet, more or less, to a point on the 148 foot contour and the South line of Lot "C", this being the point of beginning, thence run Northeasterly along the 148 foot contour for a distance of 70 feet, more or less, to a point on the East line of Lot "C", thence run Southerly, along the East line of said Lot "C", 50 feet, more or less, to a point at the Southeast corner of Lot "C", thence run Westerly along the South line of Lot "C", 50 feet, more or less, back to the point of beginning, containing 0.1 acres, more or less.

Leaving said tract herein described to contain **4.5** acres, more or less.

23.   Oil, Gas and Mineral Lease dated December 1, 2006, recorded in Conveyance Book 3937, Page 567, Registry No. 2092341, Caddo Parish, Louisiana, from Lee Ellis Wells, lessor, to Sklarco, L.L.C., lessee, primary term 3 years, 1/5th royalty, covering the following described property, to-wit:

SECTION 37, TOWNSHIP 17 NORTH, RANGE 13 WEST
CADDO PARISH, LOUISIANA

The westerly **1.0 acres** of the 5.06 acre tract of land, more or less, being a part of Lots 9 and 10, Sandy Bend Acres, Caddo Parish, Louisiana, as per plat recorded in Book 150 at Page 334 of the Records of Caddo Parish, Louisiana, said 5.06 acre tract of land being more fully described as follows:

Commence at the southwest corner of Lot 10, run thence N.88°15'E. along the south line of Lot 10, a distance of 386.46 feet to the point of beginning of the 5.06 acres tract; run thence N.8°58'E. a distance of 576.62 feet to the toe of an existing levee, run thence No. 83°27'21"E. along the toe of said levee, a distance of 257.08 feet; run thence S.84°18'08"E. along the toe of said levee a distance of 98.33 feet, run thence S.3°12'46"W. a distance of 577.47 feet to a point on the south line of said Lot 9, run thence S.88°15'W along the south line of Lots 9 and 10, a distance of 410.94 feet to the point of beginning, containing 5.06 acres, more or less.

Being the same 1.0 acre tract of land described in Irrevocable Donation dated March 19, 2003, by and between Albert Wells and Francis Wells, as Donors, and Lee Ellis Wells, Laverne Gilbert Wells, and Angela Renee Wells, as Donees, recorded in Conveyance Book 3601, Page222, Registry No.1855659, Records of Caddo Parish, Louisiana.

24.   Oil, Gas and Mineral Lease dated December 1, 2006, recorded in Conveyance Book 3914, Page 283, Registry No. 2076473, Caddo Parish, Louisiana, from Angela Renee Wells, lessor, to Sklarco, L.L.C., lessee, primary term 3 years, 1/5th royalty, covering the following described property, to-wit:

SECTION 37, TOWNSHIP 17 NORTH, RANGE 13 WEST
CADDO PARISH, LOUISIANA

The westerly **1.0 acres** of the 5.06 acre tract of land, more or less, being a part of Lots 9 and 10, Sandy Bend Acres, Caddo Parish, Louisiana, as per plat recorded in Book 150 at Page 334 of the Records of Caddo Parish, Louisiana, said 5.06 acre tract of land being more fully described as follows:

Commence at the southwest corner of Lot 10, run thence N.88°15'E. along the south line of Lot 10, a distance of 386.46 feet to the point of beginning of the 5.06 acres tract; run thence N.8°58'E. a distance of 576.62 feet to the toe of an existing levee, run thence No. 83°27'21"E. along the toe of said levee, a distance of 257.08 feet; run thence S.84°18'08"E. along the toe of said levee a distance of 98.33 feet, run thence

S.3°12'46"W. a distance of 577.47 feet to a point on the south line of said Lot 9, run thence S.88°15'W along the south line of Lots 9 and 10, a distance of 410.94 feet to the point of beginning, containing 5.06 acres, more or less.

Being the same 1.0 acre tract of land described in Irrevocable Donation dated March 19, 2003, by and between Albert Wells and Francis Wells, as Donors, and Lee Ellis Wells, Laverne Gilbert Wells, and Angela Renee Wells, as Donees, recorded in Conveyance Book 3601, Page222, Registry No.1855659, Records of Caddo Parish, Louisiana.

## EXHIBIT "B"

Attached to and made a part of that certain Partial Sublease Of Oil, Gas And Mineral
Leases dated effective as of February 1, 2008, by and between Sklarco L.L.C., as
Sublessor, and Petrohawk Properties, LP, as Sublessee

## DESCRIPTION OF SERVITUDES AND RIGHTS-OF-WAY

1.      Pipeline Right of Way, dated June 23, 1938, from The Hicks Co. Ltd., by J. H.
Brown, President, to R. E. Boothe, granting a right of way for one or more oil and gas
pipelines across a 400 acre tract known as Lattier's Island (part of the Bagley Plantation)
in Sections 34 and 35, Township 17 North, Range 13 West, recorded in Book 139, page
135, Reg. No. 29868 of the Records of Bossier Parish, Louisiana.

2.      Pipeline Right of Way, dated July 28, 1949, from Crawford Willis to Texas Gas
Transmission Corporation, granting a right of way for one or more oil and gas pipelines
across portions of Fractional Section 34 and Fractional Section 35, Township 17 North,
Range 13 West, lying in Bossier Parish, and portions of Lot 10, 11 and 14 of Sandy Bend
Acres as per plat recorded in Map Book 150, page 334, recorded in Book 200, page 522,
Reg. No. 69618 of the Records of Bossier Parish, Louisiana.

3.      Perpetual Easement Deed, dated January 5, 1954, from D.  P.  Comegys to the
Board of Commissioners of the Caddo Levee District, granting a perpetual easement
across a strip of land on grantor's property on the right descending bank of the Red River
at Eagle Bend and extending back a distance of 200 feet from the top of the river bank at
the time of construction, being part of former Bagley and Eagle Bend Plantations,
Township 17 North, Range 13 West, Caddo Parish, to be used in connection with the
construction of bank protections structures and for any other purposes in connection with
flood control, grantors reserving all such rights to use and enjoy the land without
abridging the rights hereby granted to the Caddo Levee District, recorded in Book 718,
page 42, Reg. No. 66087 of the Records of Caddo Parish, Louisiana.

4.      Right of Way, dated April 25, 1967, from Malcolm D.  Dutton (3/8), Elsie Lloyd
Allison (1/4) and Francis Alvin Fuller (3/8) to Southwestern Electric Power Company,
for a pole line and appurtenances located on Lots 14 and 15 of Sandy Bend Acres, as
recorded in Book 150, page 334, Caddo Parish, and on a tract located east of and adjacent
to said Lots 14 and 15, said tract being a part of Lattier's Island in Bossier Parish, the
right of way to be 15 feet in width, beginning at the Harts Island Road at a point near the
south line of Lot 15 and running easterly and northeasterly for approximately 2400 feet,
thence southerly approximately 350 feet, recorded in Book 422, page 74, Reg. No.
199998 of the Records of Bossier Parish, and in Book 1146, page 547, Reg. No. 430487
of the Records of Caddo Parish.

5.     Right of Way, dated December 3, 1970, from D. P. Comegys, marital status not given, to Southwestern Electric Power Company, for a pole line and appurtenances located on Lots 8 and 7 of Sandy Bend Acres, Caddo Parish, north of Bagley Road and running in a northeasterly direction parallel and north of existing levee, recorded in Book 1289, page 767, Reg. No. 528168 of the Records of Caddo Parish, Louisiana.

6.     Servitude of Passage, dated May 26, 1987, amended August 21, 1987, from Malcolm D. Dutton, his wife, Betty Jo Fuller Dutton, R. S. Allison and his wife, Elsie Lloyd Allison, to Barton Land Company, granting a right of way 40 feet wide across grantors' property in Section 35, Township 17 North, Range 13 West, recorded in Book 881, page 859, Reg. No. 457935 and in Book 890, page 381, Reg. No. 462832 of the Records of Bossier Parish, Louisiana.

7.     Right of Way Agreement, dated June 12, 1990, from Malcolm D. Dutton, Betty Jo Fuller Dutton and Elsie Lloyd Allison to Texas Gas Transmission Corporation, granting a right of way 50 feet wide for the construction and maintenance of one pipeline for the transportation of oil, gas and other liquids or gases which can be transported through a pipeline, recorded in Book 968, page 409, Reg. No. 512383 of the Records of Bossier Parish, Louisiana.

8.     Act of Servitude, dated August 18, 1992, from Malcolm D. Dutton, husband of Betty Jo Fuller Dutton, having a 3/4 interest, and Elsie Lloyd Allison, wife of R. S. Allison, having a 1/4 interest, to the Red River Waterway District, granting a servitude of access, including the right to construct drainage ditches and spoil retaining dikes, affecting 13.9 acres located in Sections 26 and 37, Township 17 North, Range 13 West, referenced as Eagle Bend Revetment, Tract No. 7, located in Caddo and Bossier Parishes, on the right descending bank of Red River, recorded in Book 1259, page 530, Reg. No. 749151 and in Book 1010, page 846, Reg. No. 542561, and in Book 1264, page 874, Reg. No. 753649 of the Records of Bossier Parish, and in Book 2838, page 417, Reg. No. 356694 and in Book 2838, page 421, Reg. No. 1356695 of the Records of Caddo Parish.

9.     Act of Servitude, dated August 7, 2002, from Dutton Family, LLC, having at least a 3/4 interest, and from Noel Naylor Sorensen, wife of Robert Sorensen, having at least a 1/4 interest, to Red River Waterway District, granting a perpetual servitude of the right to inundate the servitude property for the construction, maintenance and operation of the Red River Waterway Project, recorded in Book 1264, page 875, Reg. No. 753650 of the Records of Bossier Parish, and in Book 3550, page 341, Reg. No. 1814545 of the Records of Caddo Parish.

10.    Valve Site Easement, dated June 16, 2003, from Dutton Family, LLC, and Noel Naylor Sorensen, wife of Robert Sorensen, dealing with her separate property, to Texas Gas Transmission, LLC, a Delaware LLC, conveying a valve site easement and servitude measuring 30' x 40' for the purpose of installing and maintaining valves and equipment on the Sharon-Carthage 24-Inch Pipeline, recorded in Book 1287, page 341, Reg. No. 781369 of the Records of Bossier Parish, Louisiana.

11.     Right of Way Agreement, dated January 9, 2007, from Sorensen-Naylor, Ltd. to Sklar Exploration Company, LLC, granting a right of way 30 feet wide, for one 6 5/8ths inch pipeline for oil, gas and any other liquids, gases or substances, together with all necessary appurtenances, together with a 20 foot wide temporary construction servitude adjacent to the easement, recorded in Book 1416, page 808, Reg. No. 908675 of the Records of Bossier Parish, and in Book 3965, page 619, Reg. No. 2110795 of the Records of Caddo Parish.

12.     Right of Way Agreement, dated January 8, 2007, from Dutton Family, L.L.C. to Sklar Exploration Company, LLC, granting the same right of way as that described in Item (11) above, as co-owner of an undivided 3/4 interest in the property affected by the right of way, recorded in Book 1416, page 803, Reg. No. 908677 of the Records of Bossier Parish, and in Book 3965, page 624, Reg. No. 2110796 of the Records of Caddo Parish.

13.     Surface Use Agreement dated October 6, 2006, from Ken Canatella Investments, LLC et al. to Sklar Exploration Company L.L.C., granting the right to use the surface of certain property more particularly described therein located in Sections 26, 35 and irregular Section 37, T17N, R13W, recorded in Book 3891, page 686, Reg. No. 2061230 of the Records of Caddo Parish, Louisiana.

## EXHIBIT "C"

Attached to and made a part of that certain Partial Sublease Of Oil, Gas And Mineral Leases dated effective as of February 1, 2008, by and between Sklarco L.L.C., as Sublessor, and Petrohawk Properties, LP, as Sublessee

### WELL REQUIREMENTS

**SKLAR EXPLORATION COMPANY L.L.C.**
**SKLARCO L.L.C.**
401 Edwards St. Suite 1601
Shreveport, Louisiana 71101
318/227-8668
318/227-9012 (fax)

## WELL DATA REQUIREMENTS
### NON-OPERATED WELLS

OPERATOR:
WELL NAME:
LOCATION:
FIELD/PROSPECT:
COUNTY/STATE:

### DAILY REPORTS

**Fax or e-mail daily drilling reports to:**
Nicole Burgess  and Kim Timon  (318) 227-9012 (Fax)
E -mail: nburgess@sklarexploration.com and ktimon@sklarexploration.com
**Fax or e-mail Mudlogs to:**
Kim Timon  (318) 227-9012 (fax)
**E-mail:** ktimon@sklarexploration.com

### NOTICES:

Notify the following of intention to Spud, Log, Core, Test, Complete or Abandon:

Cory Ezelle   (Geology)    office: (318) 227-8668   home: (318) 865-0826   mobile: (318) 458-2257

Miles McDowell   (Geology)   office: (318) 227-8668                         mobile: (318) 218-6788

Stan Golis  (Engineering)   office: (318) 227-8668                         mobile: (318) 560-3960

David Barlow  (Chief Operating Officer)   office: (318)227-8668            mobile: (318) 560-3983

1. We require a minimum of 24 hours notice prior to spudding, logging, testing, coring or abandoning operations.

2. We reserve the option to have a representative on location for logging, coring or testing.

| REGULATORY, DRILLING, COMPLETION, PRODUCTION DATA | NO. OF COPIES |
|---|---|
| Permit to Drill (State & Federal)............................................. | 1 |
| Location Plat................................................................. | 1 |
| Completion Report (incl. directional survey)............................... | 1 |
| Well Test Data.............................................................. | 3 |
| Monthly Production Reports filed with state agencies....................... | 1 |
| Drilling Prognosis.......................................................... | 1 |
| Completion Prognosis....................................................... | 1 |

### GEOLOGICAL/GEOPHYSICAL DATA

| | |
|---|---|
| Wireline Logs (Open  & Cased Hole) | |
| Field Prints............................................................ | 2 |
| Fax Prints (if applicable)............................................... | 1 |
| Final Composites........................................................ | 3 |
| Sepias/floppy discs...................................................... | 1 |
| Core Reports/Core Analysis............................................... | 3 |
| Mud Logs | |
| Final Prints............................................................ | 3 |
| Fax Prints (daily or daily e-mail)........................................ | 1 |
| Sepias/floppy discs...................................................... | 1 |
| DST, FT Reports, Chemical Analysis, Dipmeter, etc......................... | 3 |

**PETROHAWK ENERGY CORPORATION**
**WELL INFORMATION AND DATA REQUIRED**

1. The Operator shall furnish Petrohawk Energy Corporation ("Phawk") with a surveyor's plat showing the location and ground elevation of the test well, together with a brief summary of Operator logging, coring, and testing program and/or a copy of Operator drilling and geologic prognosis proposed for such well, and notify PHawk the date of commencement of actual drilling within 24 hours after the well has been spudded.

2. During operations of each test well, Operator shall do the following:

   a. Permit Phawk's authorized representatives to have full and complete access to the derrick floor at any time and to observe all operations at PHawk's own risk and expense.

   b. Furnish daily to Phawk at the office indicated below a drilling report covering the preceding 24 hours showing work done, depth drilled, formations penetrated, footage last 24 hours, days from spud, mud properties, bit data, surveys, cumulative mud cost, cumulative total cost, present operations, and any shows of oil or gas encountered.

   c. Core and/or test all formations as a reasonable prudent operator would do for all formations having shows of oil or gas as revealed in drilling, coring, or by electrical or mud logging surveys.

   d. Run or make or cause to be run or made one type of an Induction Electrical Survey plus one porosity log such as a Formation Density log and/or a Sonic survey.

   e. Operator must notify PHawk prior to any open-hole electric logs, runs, coring, drillstem testing, or production tests. Operator must notify PHawk in ample time (at lease 24 hours) before beginning any of the above operations so that Phawk can have a representative present.

3. Daily Drilling Reports:

   Petrohawk Energy Corporation
   6100 South Yale Avenue, Suite 500
   Tulsa, OK  74136
   Attention:      Erin Fromm
   Phone:          918-499-1347
   Fax:            918-488-8752
   Email:          efromm@petrohawk.com

4. Notification prior to testing, logging, completing, P&A, etc.:

   Petrohawk Energy Corporation
   6100 S. Yale Avenue, Ste. 500
   Tulsa, OK  74136
   Attention: Dale Nabors
   Phone (Office):  972/767-1288
        (Home):
        (Cell):     214/906-6364
   Email Logs to: .
        gasmith@petrohawk.com

   Fax (Logs, etc.):  918-488-8752

5. All correspondence and formal written proposals should be mailed or directed to our Land Department:

   KCS Resources, Inc.                    Phone (Office):  918-491-4110
   6100 S. Yale Avenue, Ste. 500             (FAX):  918-491-4107
   Tulsa, OK 74136
   Attention: D. Deffenbaugh
   E-mail: rdeffenbaugh@petrohawk.com

6. The following items (if run) should be mailed to this office to the same address as listed above. Number of copies are underlined:

   a. Electric Logs:  Field Prints 2  Final Prints 2   Image and LAS Files 1
   b. Core Analysis:  Field Prints 2  Final Prints 2
   c. DST/RFT Results and Analysis:  2
   d. All forms filed with State and Federal Regulatory Bodies:  1.
   e. Location Plat and elevations:  1.
   f. Directional, Temperature, Caliper, and Collar Log Surveys:  Field Prints 1  Final Prints 2.
   g. Mud Log:  Field Prints 2  Final Prints 2
   h. Drilling Contract 1.

## EXHIBIT "D"

Attached to and made a part of that certain Partial Sublease Of Oil, Gas And Mineral Leases dated effective as of February 1, 2008, by and between Sklarco L.L.C., as Sublessor, and Petrohawk Properties, LP, as Sublessee

## MEMORANDUM OF PARTIAL SUBLEASE
## OF OIL, GAS AND MINERAL LEASES

STATE:                              Louisiana

PARISHES:                           Caddo and Bossier

SUBLESSOR:                          Sklarco L.L.C.
                                    401 Edwards Street, Suite 1601
                                    Shreveport, Louisiana 71101

SUBLESSEE:                          Petrohawk Properties, L.P.
                                    1000 Louisiana, Suite 5600
                                    Houston, Texas 77002

EFFECTIVE DATE OF SUBLEASE:         February 1, 2008

For adequate consideration, Sublessor, named above, has subleased, transferred, assigned and delivered unto Sublessee, named above, for the purpose of prospecting, drilling for and producing oil and gas and otherwise exercising the rights of the lessee under the Oil, Gas And Other Mineral Leases described in Exhibit "1" attached hereto and by reference made a part hereof, INSOFAR AND ONLY INSOFAR as said leases cover and affect those depths from and below the top of the Hosston Zone, Reservoir A, Cedar Grove Field, as defined by the Louisiana Office of Conservation Order No. 967 dated January 28, 1976. Sublessor excepts from the Sublease and reserves unto itself the rights of the lessee under the leases insofar as they cover and affect those depths from the surface of the Earth to the top of the said Hosston Zone, Reservoir A. The Sublease is for the same terms as the Leases according to the terms and provisions of said Sublease which, with all of its terms, covenants and other provisions, is by reference incorporated into this Memorandum for all purposes. This Memorandum is placed of record for the purpose of notifying third parties of the Sublease.

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

WITNESSES:

SKLARCO L.L.C.

By:_____
    David A. Barlow
    V.P. -- Chief Operating Officer

_____

_____

PETROHAWK PROPTERIES, L.P.
By:    P-H Energy, LLC,
    Its General Partner

_____

By:_____
    Stephen W. Herod
    Executive Vice President- Corporate
    Development

_____

## ACKNOWLEDGEMENTS

STATE OF LOUISIANA    )
    ) ss.
PARISH OF CADDO    )

This instrument was acknowledged before me on this the ___ day of March, 2008, by David A. Barlow, as Vice President -- Chief Operating Officer of Sklarco, LLC, a Louisiana limited liability company, on behalf of said limited liability company.

    Witness my hand and official seal.
    My commission expires: _____

_____
                 Notary Public

STATE OF TEXAS                    )
                                  ) ss.
COUNTY OF HARRIS                  )

     This instrument was acknowledged before me on this the ___ day of March, 2008, by Stephen W. Herod, Executive Vice President- Corporate Development of P-H Energy, LLC, general partner of Petrohawk Properties, LP, a Texas limited partnership, on behalf of said limited partnership.

     Witness my hand and official seal.
     My commission expires: _____

                   _____
                            Notary Public

## EXHIBIT "1"

Attached to and made a part of that certain Memorandum of Partial Sublease Of Oil, Gas And Mineral Leases dated effective as of February 1, 2008, by and between Sklarco L.L.C., as Sublessor, and Petrohawk Properties, LP, as Sublessee

## DESCRIPTION OF OIL, GAS AND MINERAL LEASES

1.      Oil, gas and mineral lease, dated December 12, 2005, recorded in Conveyance Book 1356, page 380, Reg. No. 852709, Bossier Parish, and in Conveyance Book 3818, page 1, Registry No. 2011894, Caddo Parish, from B & K Exploration Investments, L.L.C., lessor, to Sklarco, L.L.C., lessee.

2.      Lease for Oil, Gas and Other Liquid or Gaseous Minerals (State Lease No. 19349), dated May 9, 2007, recorded in Conveyance Book 1409, page 497, Reg. No. 901451, Bossier Parish, and in Conveyance Book 3953, page 99, Registry No. 2102902, Caddo Parish, from the State Mineral Board of the State of Louisiana, acting on behalf of the State of Louisiana, as Lessor, to Sklarco, L.L.C., as Lessee.

3.      Oil, gas and mineral lease, dated November 7, 2006, recorded in Conveyance Book 1389, page 508, Reg. No. 882899, Bossier Parish, and in Conveyance Book 3905, page 607, Registry No. 2070746, Caddo Parish, from Sheri Lynn Cowley Soulie, divorced from Mike Soulie, dealing with her separate property, The Kathryn C. Turner Testamentary Trust, created under the Will of Kathryn Gaye Cowley Turner, deceased, represented by Argent Trust and E. H. Turner III, Co-Trustees, Dorothy Colleen Cowley Le Blanc, wife of Clifford H. Le Blanc, III, dealing with her separate property and Susan A. Cowley Bantle, wife of Carl M. Bantle, dealing with her separate property, as Lessors, to Tensas Delta Exploration Company, LLC, as Lessee.

4.      Oil, gas and mineral lease, dated November 9, 2005, recorded in Conveyance Book 1356, page 364, Reg. No. 852707, Bossier Parish, and in Conveyance Book 3817, page 785, Registry No. 2011892, Caddo Parish, from Dutton Family, L.L.C., and Sorensen-Naylor, Ltd., lessors, to Sklarco, L.L.C.

5.      Oil, gas and mineral lease, dated August 13, 2004, a Memorandum of which was recorded in Book 3803, page 718, Registry No. 2003065, Caddo Parish, from the City of Shreveport to Alternate Fuel Systems of Louisiana, Inc., primary term 3 years, 1/6 royalty, covering Lots 6, 7 and 8 of Sandy Bend Acres, a subdivision of Caddo Parish, Louisiana, a plat of which is recorded in Plat Book 150, page 334, Records of Caddo Parish, Louisiana, along with other property, totaling 56.446 acres, more or less, as amended by Extension of Oil and Gas Lease, dated July 30, 2007, recorded in Book 3967, page 761, Reg. No. 2112187, Caddo Parish.

6.      Oil, Gas And Mineral Lease dated September 1, 2005, executed by Sunflower Plantation, L.L.C., C. Bickham Dickson, Jr., C. Bickham Dickson, III, Michael Augustus Dickson and James Scott Dickson, as Lessors, in favor of Sklarco L.L.C., as Lessee, covering 798.438 acres, more or less, recorded in Book 3817, Page 770 under Registry No. 2011891 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1356, Page 359 under Registry No. 852706 of the Conveyance Records of Bossier Parish, Louisiana.

7.      Oil, Gas And Mineral Lease dated September 1, 2005, executed by C. Bickham Dickson, III, as Lessor, in favor of Sklarco L.L.C., as Lessee, covering 447.2914 acres, more or less, recorded in Book 3817, Page 792 under Registry No. 2011893 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1356, Page 371 under Registry No. 852708 of the Conveyance Records of Bossier Parish, Louisiana.

8.      Oil, Gas And Mineral Lease dated December 19, 2005, executed by Locke Properties, Inc., as Lessor, in favor of Sklarco L.L.C., as Lessee, covering 190.448 acres, more or less, recorded in Book 3828, Page 447 under Registry No. 2018179 of the Conveyance Records of Caddo Parish, Louisiana, and in Book 1360, Page 497 under Registry No. 856523 of the Conveyance Records of Bossier Parish, Louisiana.

9.      Oil, Gas and Mineral Lease dated June 7, 2006, recorded in Conveyance Book 3864, Page 214, Registry No. 2042136, Caddo Parish, Louisiana from Sealy Orleans Square, a Limited Partnership, lessor, to Sklarco, L.L.C., lessee..

10.     Oil, Gas and Mineral Lease dated June 20, 2006, recorded in Conveyance Book 3891, Page 705, Registry No. 2061235, Caddo Parish, Louisiana from James H. Stroud and wife, Margaret E. Stroud, lessors, to Sklarco, L.L.C., lessee..

11.     Oil, Gas and Mineral Lease dated April 17, 2006, recorded in Conveyance Book 1372, Page 924, Registry No. 868570, Bossier Parish, Louisiana from Sunflower Plantaion Company, lessor, to Sklarco, L.L.C., lessee.

12.     Oil, Gas and Mineral Lease dated June 29, 2006, recorded in Conveyance Book 1374, Page 234, Registry No. 869813, Bossier Parish, Louisiana from Succession of Sam Boatner Grayson, lessor, to Sklarco, L.L.C., lessee.

13.     Oil, Gas and Mineral Lease dated August 14, 2006, recorded in Conveyance Book 3878, Page 617, Registry No. 2052193, Caddo Parish, Louisiana, and recorded in Conveyance Book 1378, Page 480, Registry No. 873729, Bossier Parish, Louisiana from Don Coleman Construction Company, Inc., lessor, to Sklarco, L.L.C., lessee.

14.     Oil, Gas and Mineral Lease dated August 1, 2006, recorded in Conveyance Book 3891, Page 692, Registry No. 2061233, Caddo Parish, Louisiana, from Mark A. Roberts, lessor, to Sklarco, L.L.C., lessee.

15.     Oil, Gas and Mineral Lease dated October 3, 2006, recorded in Conveyance Book 3898, Page 70, Registry No. 2065572, Caddo Parish, Louisiana, from Sorensen-Naylor, Ltd., lessor, to Sklarco, L.L.C., lessee.

16.     Oil, Gas and Mineral Lease dated August 25, 2006, recorded in Conveyance Book 3891, Page 702, Registry No. 2061234, Caddo Parish, Louisiana, from David R. Johns, Jr., and Paula C. Johns, husband and wife, lessors, to Sklarco, L.L.C., lessee.

17.     Oil, Gas and Mineral Lease dated December 5, 2006, recorded in Conveyance Book 3906, Page 50, Registry No. 2071008, Caddo Parish, Louisiana, from Kathy Lynn Waters Cox, lessor, to Sklarco, L.L.C., lessee.

18.     Oil, Gas and Mineral Lease dated November 27, 2006, recorded in Conveyance Book 3908, Page 712, Registry No. 2072672, Caddo Parish, Louisiana, from Dutton Family, L.L.C., lessor, to Sklarco, L.L.C., lessee.

19.     Oil, Gas and Mineral Lease dated November 27, 2006, recorded in Conveyance Book 3908, Page 706, Registry No. 2072670, Caddo Parish, Louisiana, from Betty Jo Fuller Dutton, et al, lessors, to Sklarco, L.L.C., lessee.

20.     Oil, Gas and Mineral Lease dated November 28, 2006, recorded in Conveyance Book 3937, Page 562, Registry No. 2092337, Caddo Parish, Louisiana, from John Taylor, lessor, to Sklarco, L.L.C., lessee.

21.     Oil, Gas and Mineral Lease dated December 1, 2006, recorded in Conveyance Book 3937, Page 574, Registry No. 2092338, Caddo Parish, Louisiana, from Leander Roque, Sr., et ux, lessors, to Sklarco, L.L.C., lessee.

22.     Oil, Gas and Mineral Lease dated December 1, 2006, recorded in Conveyance Book 3908, Page 335, Registry No. 2072480, Caddo Parish, Louisiana, from John D. Cummins and Denyse B. Cummins, husband and wife, lessors, to Sklarco, L.L.C., lessee.

23.     Oil, Gas and Mineral Lease dated December 1, 2006, recorded in Conveyance Book 3937, Page 567, Registry No. 2092341, Caddo Parish, Louisiana, from Lee Ellis Wells, lessor, to Sklarco, L.L.C., lessee.

24.     Oil, Gas and Mineral Lease dated December 1, 2006, recorded in Conveyance Book 3914, Page 283, Registry No. 2076473, Caddo Parish, Louisiana, from Angela Renee Wells, lessor, to Sklarco, L.L.C., lessee.

# PETROHAWK PROPERTIES, LP
## 416 Travis Street, Suite 700
### Shreveport, LA 71101

December 3, 2010

Mr. David A. Barlow
Vice President – Chief Operating Officer
SKLARCO, L. L.C.
401 Edwards Street, Suite 1601
Shreveport, Louisiana 71101

        RE:    Partial Assignment of Oil, Gas, and Mineral Leases granted by Petrohawk Properties, LP, as Assignors, covering acreage in Sections 23, 24, 26, 27, 34 and Irregular Section 37, being in TI7N-13W, Caddo and Bossier Parishes, Louisiana.

Dear Mr. Barlow:

By "Partial Sublease of Oil, Gas and Mineral Leases" (the "**Sublease**") dated effective February 1, 2008, a "Memorandum" of which is recorded under Registry No. 2142878 of the Conveyance Records of Caddo Parish, Louisiana, and under Registry No. 922481 of the Conveyance Records of Bossier Parish, Louisiana, Sklarco, L.L.C. ("Sklarco") subleased to Petrohawk Properties, L.P. ("Petrohawk") various oil, gas and mineral leases identified in Exhibit "A" attached to the Sublease (individually referred to as a "Lease" and collectively as the "Leases"), INSOFAR AND ONLY INSOFAR as said leases cover and affect those depths from and below the top of the Hosston Zone, Reservoir A, Cedar Grove Field, as defined by the Louisiana Office of Conservation Order No. 967, dated January 28, 1976 (the "**HOSSTON ZONE**"), and reserving unto Sklarco the rights of the lessee under the leases insofar as they cover and affect those depths from the surface of the Earth to the top of the Hosston Zone. Many of the Leases expired either wholly or in part, pursuant to their own terms.

Under Section 7.2 of the Sublease, Sklarco or Petrohawk may acquire an extension or renewal (as defined therein) of a Lease or a new Lease within one (1) year after the complete or partial expiration of a Lease. Petrohawk renewed, extended and acquired new Leases to maintain the leasehold interests in Leases that either did or would have completely or partially expired by their own terms, such renewed and new Leases being more particularly described in Exhibit A attached hereto (the "Replacement Leases"). Additionally, Petrohawk acquired additional leases, not subject to the Sublease, covering lands in Sections 23, 24, 26, 27, 34 and Irregular Section 37, being in TI7N-13W, Caddo and Bossier Parishes, Louisiana, and being particularly described in Exhibit B attached hereto (the "Additional Leases").

Pursuant to on-going discussions by and among Petrohawk and Sklarco regarding a Partial Assignment (as defined below) by Petrohawk to Sklarco of the New Leases and Additional Leases (hereinafter collectively referred to as the "Subject Leases"), Petrohawk proposes the following "Agreement," to wit:

1.)    In consideration of the agreement of Sklarco to comply with the obligations to be assumed by it hereunder and under the Subject Leases, Petrohawk agrees to partially assign unto Sklarco all of its right, title, and interest in and to the Subject Leases INSOFAR AND ONLY

INSOFAR as the Subject Leases cover and affect those depths from the surface of the Earth to the top of the Hosston Zone, as defined above. The Partial Assignment of said interests in the Subject Leases shall be in the form of "PARTIAL ASSIGNMENT OF OIL, GAS AND MINERAL LEASES" attached hereto as Exhibit C (the "Partial Assignment").

2.)    Sklarco agrees to accept the Partial Assignment and to assume all of the rights and obligations of Petrohawk under the Subject Leases as described in such Partial Assignment, from and after the Effective Date thereof, including, without limitation, the obligation to restore the surface of the leased premises under the Subject Leases to its approximate original condition, insofar only as said rights and obligations relate to the drilling, completion, ownership, and/or operation of the leased premises by Sklarco or Sklar Exploration Company, L.L.C. on behalf of Sklarco.

3.)    In consideration of the foregoing and the mutual benefits to accrue to the parties, Petrohawk does hereby agree with Sklarco (1) that notwithstanding the terms of the Sublease, Petrohawk shall bear all costs and expenses incurred in connection with its acquisition of the Subject Leases, including but not limited to the bonus consideration per net mineral acre covered by the Subject Leases paid to the respective Lessors, and (2) that except as specifically agreed herein, and limited to the scope of this Agreement, the Sublease shall remain in force and effect in accordance with its terms and conditions. This Agreement is not intended as and shall not be construed to be an amendment to the Sublease.

If the foregoing is acceptable to Sklarco, please so indicate by executing in the space provided below and return one copy of this letter to my attention. We look forward to your response.

Sincerely,

**Petrohawk Properties, L.P.**

By:    P-H Energy, LLC
        Its General Partner

_____
D.R. Deffenbaugh
Vice President-Land, Mid-Continent Region

Enclosures:
Exhibit A – Replacement Leases
Exhibit B – Additional Leases
Exhibit C – Partial Assignment

AGREED TO AND ACCEPTED
THIS  2ND  DAY OF ~~DECEMBER 2010~~.
                          FEBRUARY, 2011

**SKLARCO, L.L.C.**

By: _____
David Barlow, Vice President and
Chief Operating Officer

# EXHIBIT A

Attached to and made a part of that certain Letter Agreement  dated December 3, 2010, executed by Petrohawk Properties, LP, in favor of Sklarco, L.L.C.

Replacement Leases:

| No. | Lessor | Sec/Town/Range | Lessee | Instrument Number | BK/PG |
|-----|--------|----------------|--------|-------------------|-------|
| 1 | Dutton Family, LLC, et al | 27-17-13; 34-17-13; | PETROHAWK PROPERTIES, LP | 2237168 | 4241/709 |
| 3 | Dutton Family, LLC | 34-17-13 | PETROHAWK PROPERTIES, LP | 2237166 | 4241/701 |
| 4 | Sorensen-Naylor, LTD | 34-17-13 | PETROHAWK PROPERTIES, LP | 2237167 | 4241/705 |
| 7 | David R. Johns, Jr, et ux | 34-17-13 | PETROHAWK PROPERTIES, LP | 2248263 | 4264/333 |
| 8 | Robert Alan Stroud | 34-17-13 | PETROHAWK PROPERTIES, LP | 2250460 | 4269/283 |
| 9 | Don Coleman Construction Co. | 34-17-13 | PETROHAWK PROPERTIES, LP | 2248261 | 4264/326 |
| 10 | Sert, LLC | 27-17-13 | PETROHAWK PROPERTIES, LP | 2223389 | 4218/459 |

**Insofar as said Leases cover depths from the surface of the Earth to the top of the stratigraphic equivalent of the Hosston Zone, Reservoir A, Cedar Grove Field (as defined by the Louisiana Office of Conservation Order No. 967 dated January 28, 1976), including the Rodessa Formation.**

3

## EXHIBIT B

Attached to and made a part of that certain Letter Agreement  dated December 3, 2010, executed by Petrohawk Properties, LP, in favor of Sklarco, L.L.C.

Additional Leases:

| No. | Lessor | Sec/Town/Range | Lessee | Instrument Number | BK/PG |
|-----|--------|----------------|--------|-------------------|-------|
| 1 | CHARLES D. NORCROSS ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 2 | GLYNN R. MELANCON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 3 | JEFFREY W. WATSON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 4 | KERRY A. LANDRY ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 5 | JOHN T. MEEHAN ETX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 6 | JASON R. TYNES, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 7 | LARRY D. JAMES ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 8 | JOHN D. HENSON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 9 | STEPHEN C. MCCANN ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 10 | PRESTON W. BENNETT | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 11 | SCOTT W. MUSCUTT ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 12 | JEFFREY A. HUDSON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 13 | BRIAN J. HUGHES ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 14 | RUSSELL K. HARBIN ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 15 | JAMES R. HALEY ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 16 | DAVID L. MCGRATH ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 17 | PLANTATION TRACE ESTATES HOMEOWNERS ASSOCIATION | 23-17-13 | PETROHAWK PROPERTIES, LP | 957310 | 1503/108 |
| 18 | BILLY WAYNE BROWN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948830 | 1483/843 |
| 19 | MICHAEL D. BARGER ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 20 | YOUREE H. MCBRIDE, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 21 | JAMES DOUGLAS BROWN, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948831 | 1483-848 |
| 22 | DAVID G MCHALFFEY | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |

4

| 23 | R B NOLES | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 24 | CRAIG LESTER WILLIAMS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 25 | KEPNER DELL SOUTHERLAND | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 26 | RANDY GERARD BORDELON | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 27 | JASON WARREN GRUBAUGH | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 28 | JERENE J METZLER | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 29 | DEBORAH BALENTINE KNAPP | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 30 | DAVID A FRYE, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 31 | ARNOLD WILLIAM JOHNSON, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 32 | MERTON FRANCIS FILKINS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 33 | JEAN L ROGERS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 34 | RALPH DEWEY JR SHELTON, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 35 | REBECCA N SHAPIRO | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 36 | BRUCE EDWARD GONYEA, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 37 | DEBRA PATRICIA SHELTON | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 38 | RUPERT REGINALD VAUGHN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 39 | JEFFREY DENNIS SADOW, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |

5

# PETROHAWK PROPERTIES, LP
## 416 Travis Street, Suite 700
## Shreveport, LA  71101

December 3, 2010

Mr. David A. Barlow
Vice President – Chief Operating Officer
SKLARCO, L. L.C.
401 Edwards Street, Suite 1601
Shreveport, Louisiana 71101

RE:   Partial Assignment of Oil, Gas, and Mineral Leases
granted by Petrohawk Properties, LP, as Assignors,
covering acreage in Sections 23, 24, 26, 27, 34 and
Irregular Section 37, being in TI7N-13W, Caddo and
Bossier Parishes, Louisiana.

Dear Mr. Barlow:

By "Partial Sublease of Oil, Gas and Mineral Leases" (the "**Sublease**") dated effective February 1, 2008, a "Memorandum" of which is recorded under Registry No. 2142878 of the Conveyance Records of Caddo Parish, Louisiana, and under Registry No. 922481 of the Conveyance Records of Bossier Parish, Louisiana, Sklarco, L.L.C. ("Sklarco") subleased to Petrohawk Properties, L.P. ("Petrohawk") various oil, gas and mineral leases identified in Exhibit "A" attached to the Sublease (individually referred to as a "Lease" and collectively as the "Leases"), INSOFAR AND ONLY INSOFAR as said leases cover and affect those depths from and below the top of the Hosston Zone, Reservoir A, Cedar Grove Field, as defined by the Louisiana Office of Conservation Order No. 967, dated January 28, 1976 (the "**HOSSTON Zone**"), and reserving unto Sklarco the rights of the lessee under the leases insofar as they cover and affect those depths from the surface of the Earth to the top of the Hosston Zone.  Many of the Leases expired either wholly or in part, pursuant to their own terms.

Under Section 7.2 of the Sublease, Sklarco or Petrohawk may acquire an extension or renewal (as defined therein) of a Lease or a new Lease within one (1) year after the complete or partial expiration of a Lease.  Petrohawk renewed, extended and acquired new Leases to maintain the leasehold interests in Leases that either did or would have completely or partially expired by their own terms, such renewed and new Leases being more particularly described in Exhibit A attached hereto (the "Replacement Leases").  Additionally, Petrohawk acquired additional leases, not subject to the Sublease, covering lands in Sections 23, 24, 26, 27, 34 and Irregular Section 37, being in TI7N-13W, Caddo and Bossier Parishes, Louisiana, and being particularly described in Exhibit B attached hereto (the "Additional Leases").

Pursuant to on-going discussions by and among Petrohawk and  Sklarco regarding a Partial Assignment (as defined below) by Petrohawk to Sklarco of the New Leases and Additional Leases (hereinafter collectively referred to as the "Subject Leases"), Petrohawk proposes the following "Agreement," to wit:

1.)    In consideration of the agreement of Sklarco to comply with the obligations to be assumed by it hereunder and under the Subject Leases, Petrohawk agrees to partially assign unto Sklarco all of its right, title, and interest in and to the Subject Leases INSOFAR AND ONLY

INSOFAR as the Subject Leases cover and affect those depths from the surface of the Earth to the top of the Hosston Zone, as defined above. The Partial Assignment of said interests in the Subject Leases shall be in the form of "PARTIAL ASSIGNMENT OF OIL, GAS AND MINERAL LEASES" attached hereto as Exhibit C (the "Partial Assignment").

2.)    Sklarco agrees to accept the Partial Assignment and to assume all of the rights and obligations of Petrohawk under the Subject Leases as described in such Partial Assignment, from and after the Effective Date thereof, including, without limitation, the obligation to restore the surface of the leased premises under the Subject Leases to its approximate original condition, insofar only as said rights and obligations relate to the drilling, completion, ownership, and/or operation of the leased premises by Sklarco or Sklar Exploration Company, L.L.C. on behalf of Sklarco.

3.)    In consideration of the foregoing and the mutual benefits to accrue to the parties, Petrohawk does hereby agree with Sklarco (1) that notwithstanding the terms of the Sublease, Petrohawk shall bear all costs and expenses incurred in connection with its acquisition of the Subject Leases, including but not limited to the bonus consideration per net mineral acre covered by the Subject Leases paid to the respective Lessors, and (2) that except as specifically agreed herein, and limited to the scope of this Agreement, the Sublease shall remain in force and effect in accordance with its terms and conditions. This Agreement is not intended as and shall not be construed to be an amendment to the Sublease.

If the foregoing is acceptable to Sklarco, please so indicate by executing in the space provided below and return one copy of this letter to my attention. We look forward to your response.

Sincerely,

**Petrohawk Properties, L.P.**

By:    P-H Energy, LLC
Its General Partner

D.R. Deffenbaugh
Vice President-Land, Mid-Continent Region

Enclosures:
Exhibit A – Replacement Leases
Exhibit B – Additional Leases
Exhibit C – Partial Assignment

AGREED TO AND ACCEPTED
THIS 2 ND DAY OF ~~DECEMBER 2010~~.
FEBRUARY, 2011

**SKLARCO, L.L.C.**

By:

David Barlow, Vice President and
Chief Operating Officer

# EXHIBIT A

Attached to and made a part of that certain Letter Agreement  dated December 3, 2010, executed by
Petrohawk Properties, LP, in favor of Sklarco, L.L.C.

Replacement Leases:

| No. | Lessor | Sec/Town/Range | Lessee | Instrument Number | BK/PG |
|-----|--------|----------------|--------|-------------------|-------|
| 1 | Dutton Family, LLC, et al | 27-17-13; 34-17-13; | PETROHAWK PROPERTIES, LP | 2237168 | 4241/709 |
| 3 | Dutton Family, LLC | 34-17-13 | PETROHAWK PROPERTIES, LP | 2237166 | 4241/701 |
| 4 | Sorensen-Naylor, LTD | 34-17-13 | PETROHAWK PROPERTIES, LP | 2237167 | 4241/705 |
| 7 | David R. Johns, Jr, et ux | 34-17-13 | PETROHAWK PROPERTIES, LP | 2248263 | 4264/333 |
| 8 | Robert Alan Stroud | 34-17-13 | PETROHAWK PROPERTIES, LP | 2250460 | 4269/283 |
| 9 | Don Coleman Construction Co. | 34-17-13 | PETROHAWK PROPERTIES, LP | 2248261 | 4264/326 |
| 10 | Sert, LLC | 27-17-13 | PETROHAWK PROPERTIES, LP | 2223389 | 4218/459 |

**Insofar as said Leases cover depths from the surface of the Earth to the top of the stratigraphic
equivalent of the Hosston Zone, Reservoir A, Cedar Grove Field (as defined by the Louisiana
Office of Conservation Order No. 967 dated January 28, 1976), including the Rodessa
Formation.**

3

# EXHIBIT B

Attached to and made a part of that certain Letter Agreement  dated December 3, 2010, executed by Petrohawk Properties, LP, in favor of Sklarco, L.L.C.

Additional Leases:

| No. | Lessor | Sec/Town/Range | Lessee | Instrument Number | BK/PG |
|---|---|---|---|---|---|
| 1 | CHARLES D. NORCROSS ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 2 | GLYNN R. MELANCON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 3 | JEFFREY W. WATSON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 4 | KERRY A. LANDRY ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 5 | JOHN T. MEEHAN ETX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 6 | JASON R. TYNES, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 7 | LARRY D. JAMES ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 8 | JOHN D. HENSON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 9 | STEPHEN C. MCCANN ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 10 | PRESTON W. BENNETT | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 11 | SCOTT W. MUSCUTT ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 12 | JEFFREY A. HUDSON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 13 | BRIAN J. HUGHES ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 14 | RUSSELL K. HARBIN ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 15 | JAMES R. HALEY ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 16 | DAVID L. MCGRATH ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 17 | PLANTATION TRACE ESTATES HOMEOWNERS ASSOCIATION | 23-17-13 | PETROHAWK PROPERTIES, LP | 957310 | 1503/108 |
| 18 | BILLY WAYNE BROWN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948830 | 1483/843 |
| 19 | MICHAEL D. BARGER ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 20 | YOUREE H. MCBRIDE, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 21 | JAMES DOUGLAS BROWN, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948831 | 1483-848 |
| 22 | DAVID G MCHALFFEY | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |

4

| 23 | R B NOLES | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 24 | CRAIG LESTER WILLIAMS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 25 | KEPNER DELL SOUTHERLAND | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 26 | RANDY GERARD BORDELON | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 27 | JASON WARREN GRUBAUGH | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 28 | JERENE J METZLER | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 29 | DEBORAH BALENTINE KNAPP | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 30 | DAVID A FRYE, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 31 | ARNOLD WILLIAM JOHNSON, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 32 | MERTON FRANCIS FILKINS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 33 | JEAN L ROGERS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 34 | RALPH DEWEY JR SHELTON, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 35 | REBECCA N SHAPIRO | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 36 | BRUCE EDWARD GONYEA, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 37 | DEBRA PATRICIA SHELTON | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 38 | RUPERT REGINALD VAUGHN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 39 | JEFFREY DENNIS SADOW, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |

| 40 | WILBERT DALE PRYOR | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
|---|---|---|---|---|---|
| 41 | HILDA BREYZEK FITCH | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 42 | BLANCHE ANN RIVERS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 43 | TERRY LYNN BRYANT | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 44 | LOIS MARIE PROCEL SALTER, ET AL | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 45 | RICHARD DOWDALL | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 46 | BARBARA ANN NICHOLAS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 47 | JUDY LESSARD BROWN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 48 | JAMES GENE DRAPER, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 49 | ROBERT EDWARD GOING | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 50 | RICHARD KURT PUSCH | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 51 | JAMES DAVID BEACH, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 52 | MARY M SHELTON | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 53 | BILLY RAY BOWEN, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 54 | LYNDELL DUNN DAVIS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 55 | SHAWN DAVID MCCALLON, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 56 | LORRAINE MARIE LINDER | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 57 | OWEN L SWEASY, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |

6

| 58 | MARY EDRIS JORGENSEN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
|----|----------------------|----------|--------------------------|--------|----------|
| 59 | SHIVANI SAWHNEY, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 60 | JEAN C GARDNER LANIER | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 61 | WILLIAM RANDY SANDERS, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 62 | TIMOTHY CHRISTIAN SAYLES | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 63 | RUSSELL LANCE HUNT | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 64 | GARY DAVID ELLIOTT | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 65 | SOL WATSON HOOK, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 66 | DEBRA FREY KOCH | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 67 | LLOYD HARRISON MCCARTY, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 68 | ARNAULD RADERMACHER | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 69 | JOHN JOSEPH SPILLANE III, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 70 | MARK JAMES FRANKS, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 71 | JEAN MANGHAM SMITH | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 72 | DAVID LYNN LEE, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 73 | JOEY SHIH CHIA WANG | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 74 | ALICE P HIPP, ET VIR | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 75 | TYRONE BRUCE LANZ | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |

| | | | | | |
|---|---|---|---|---|---|
| 76 | PERSHING MERO, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 77 | DAVID ALLAN BARTHOLOMEW, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 987297 | 1541/309 |
| 78 | GEORGE N ESSARY | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 79 | BOBBY HILLIARD FLANAGAN, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 80 | THOMAS KNOX, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 985718 | 1538/479 |
| 81 | DONALD M. BOWERS | 23-17-13 | PETROHAWK PROPERTIES, LP | 985719 | 1538/483 |
| 82 | ULYSSES LINARES | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 83 | WAYNE & ELIZABETH PARKER | 23-17-13 | PETROHAWK PROPERTIES, LP | 985720 | 1538/488 |
| 84 | DONALD GENE GOOD, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 85 | CARLOS MEZA, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 86 | WARREN A HENRY. ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 87 | TIMOTHY L HEWITT | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 88 | DANIELLE MILLER BOZ | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 89 | BILLY LANE MCCARTNEY | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 90 | PLANTATION TRACE GARDEN HOMES ASSOCIATION | 23-17-13 | PETROHAWK PROPERTIES, LP | 957311 | 1503/114 |
| 91 | THOMAS D. VAUGHN, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 92 | JAMES E. THOMAS, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 93 | MALCOLM S. DEPHILLIPS, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |

| 94 | JEREMY D. POTTS ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 95 | CHARLES J. KAMMERDIENER, JR. | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 96 | THEODORE L. HOPKINS ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 97 | ANITA JANE MANN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 98 | CAROL D. LLOYD | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 99 | APRIL GRIMSLEY ANDREWS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 100 | DAVID RAYMOND MCCLATCHEY | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 101 | TOMMY D. LEONARD | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 102 | JOHN T. DONALDSON, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 103 | EMMIT T. BARTEE ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 104 | MARY DARLENE MASE DAVIS, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 105 | JOSEPH M. ANDING ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 106 | DAVID A. ORR ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 107 | JULIE L COLEMAN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 108 | PAUL DUANE LINDSEY | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 109 | RACHIE E. WILSON, JR. | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 110 | DON L. SANDIFER, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 111 | DENNIS RAY CLARK | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 112 | TIMOTHY P. BERTRAND ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |

9

| 113 | DEBORAH J. HOLLANDS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 114 | DO SHIK CHAE | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 115 | LONNIE D. WILLIS, III ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 116 | VICENTE LABOY | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 117 | JOHN M. KUNIK ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 118 | ALLEN C. NELSON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 119 | MICHAEL F. BROWN ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 120 | JACOB H. VRIJENHOEK, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 121 | JERRY A. FRANTOM ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 122 | ANDREA A. SATTLER | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 123 | JEFFREY S. DELAUNE ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 124 | CHAMP W. CROSSNO, JR., ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 125 | MICHAEL CORREAL ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 126 | DAVID B. HARMON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 127 | MARY KATHERINE B. SERRA | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 128 | TIMOTHY ELLIS IRWIN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 129 | WAYNE L. EARP, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 130 | MICHAEL J. HOLLAND ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 131 | KENNETH W. ODOM ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |

10

| | | | | | |
|---|---|---|---|---|---|
| 132 | MICHAEL LOUIS STEVENSON, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 133 | JASON M ALEMAN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 134 | JAMES C. LONGINO ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 135 | MURRAY W. BROWN ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 136 | ALLEN D. SCHAEFER, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 137 | HOA T. VU ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 138 | ROBERT W. SHIELD JR. ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 139 | JACKIE F. DAVIS ET VIR | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 140 | MELODY K.W. BLOCKER ET VIR | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 141 | CONSTANCE D. LONG | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 142 | JAMES W. KOONTZ ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 143 | JOSEPH C. PEASE ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 144 | JOHN GAYDOS III ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 145 | ALAN CRAIG RINGLE, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 146 | DAVID T. STOLL, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 147 | SHAWN A. EVANS ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 148 | PAUL T. CLAPP ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 149 | TERESA MARIE HAYWARD | 23-17-13 | PETROHAWK PROPERTIES, LP | 973823 | 1523/234 |

11

| 150 | ALAN LEEPS ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
|---|---|---|---|---|---|
| 151 | GEORGE CHARLES BOORAS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 152 | THOMAS N. CARLETON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 153 | JOHNETTE MOSES EVANS ET VIR | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 154 | GEORGE S.PRICE ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 155 | PAUL HIGHT ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 156 | JASON BLANCHE NICHOLS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 157 | MARVIN R MCHORSE | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 158 | MARY ANN WHITLAW CARSON, ET AL | 23-17-13 | PETROHAWK PROPERTIES, LP | 955406 | 1500/103 |
| 159 | RAVINDRA H. GOEL ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 160 | TROY K. JEFFREY ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 161 | JIM MACDONALD ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 162 | TERRELL SHAYNE SHARKEY, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 163 | BRUCE D. ANDERSON, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 164 | JANIS POSEY FLETCHER | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 165 | KAREN PLEW MELANCON | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 166 | BRUCE EWING | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 167 | MONA M. QUALLS ET VIR | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |

12

| 168 | MARY E. SURANE WAITS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 169 | JIMMIE L. PERDUE ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 170 | CESAR ANGEL MARRERO | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 171 | ROXIE L. TABOR, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 172 | SEAN G. THEODOS, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 173 | MICHAEL J. COOK ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 174 | JOSEPH PAUL BARANIK | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 175 | RICKY STEVENS BRYANT, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 176 | ROBERT AGUSTA MCARTHUR | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 177 | RONALD O'DILLION FOULK, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 178 | TODD HENRY | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 179 | ALLEN DAVID BELLANGER, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 180 | JAMES ROY GILCREASE | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 181 | PETER L. STEED | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 182 | ADAM PATRICK CORMIER | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 183 | BOBBY DON BROWN, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 184 | CLARENCE JUNIOR BYRD | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 185 | BRIAN DALE ANDERSON | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |

13

| 186 | JON JOSEPH HUTCHINS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 187 | JAMES ROBERT SLEPICKA | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 188 | STEPHEN GEORGE VEKOVIOUS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 189 | GUY RANDAL MEYERS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 190 | BARNEY B BATES, III | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 191 | RANDALL JOSEPH LANG | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 192 | JIMMIE O ANDERSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 193 | GARY GREGG GOODELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 194 | WILLIAM THOMAS BENSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 195 | ROBERT ESTA MARLOW | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 196 | LLOYD EDWARD HELMS, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 197 | ROBERT LEE WALKER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 198 | JIMMY LAWRENCE JOYNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 199 | CARL JACOB SCHULER, SR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 200 | GUY LEE WHIDDON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 201 | HELEN FRANCES SCARBOROUGH SAPP | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 202 | BYRON N HINES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 203 | MITCHELL WAYNE BOWEN, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

14

| 204 | KAREN LOUISE GRAY FOX, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
|-----|------------------------|----------|--------------------------|--------|----------|
| 205 | JOSHUA TIMOTHY BURFORD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 206 | SCOTT GARY WADSLEY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 207 | MARY PATRICIA PIAZZA FALTING | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 208 | SUSAN DIANNE BOYETT ALLEN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 209 | LEAMON S THOMPSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 210 | KARLA S LEHMANN STRICKLAND | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 211 | JOSIAH YOUNG | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 212 | JOHN DAVID WESTRICH, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 213 | RENE FRANK HERNANDEZ | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 214 | WILLIAM K WASHBURN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 215 | BRUCE LYNN ROHRER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 216 | RICHARD ANTHONY POMBER, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 217 | BRIAN LIVINGSTON COLE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 218 | GINA C STANDISH CHERRY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 219 | DENNIS FREDERIC GUILLIAMS, SR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 220 | FRANK J LAROUX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 221 | KAREN EVELYN BOQUIST NOBLE, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

15

| | | | | | |
|---|---|---|---|---|---|
| 222 | ROBERT TERRAZAS, JR.;ET AL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 223 | JASON MICHAEL LAFLAME | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 224 | DONALD EUGENE CHAPMAN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 225 | JEFFREY RYAN NALL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 226 | CAROL WILSON STAHL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 227 | JAVIS MICHAEL SMOAK | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 228 | JIMMIE V HAMRIC | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 229 | DEBRA BEASON BATES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 230 | DIANA ROBBINS PARKS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 231 | VERNON COUGHRAN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 232 | NATHAN HARUO HARAGUCHI | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 233 | DAVID ALLEN GEORGE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 234 | SHANNON EUGENE BOYETTE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 235 | KENNETH WAYNE DAVIS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 236 | HUGH WAYNE MOSELEY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 237 | GARY DALE HADWIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 238 | GILBERTO BAZO | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 239 | RICKY GLENN BUMGARDNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

16

| 240 | EBENEZER HIRST, IV | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
|---|---|---|---|---|---|
| 241 | LARRY MICHAEL SKINNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 242 | PAULINE ANN HOFFMAN TINSLEY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 243 | FRANKIE L SPARKS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 244 | LYNN CORBIN LYLE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 245 | MICHAEL WAYNE TASCHE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 246 | JEREMY WILLIAM MARKLE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 247 | HARRIETT DORIEN JOHNSON PARK, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 248 | RICKY ALAN NORWOOD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 249 | EDWARD JAMES PROCELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 250 | JIMMY SHERRILL WEAVER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 251 | MARY CAROL SMALLEY DAVIDSON THOMAS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 252 | BENJAMIN P AIKEN, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 253 | LAURIE BALENTINE SCOTT | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 254 | JERROL VERRANDO JONES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 255 | PAUL DUNCIL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 256 | JERNIGAN, JAMIE;ET AL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 257 | HOWARD THOMAS MCCLURE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

17

| 258 | DAVID MICHAEL TURNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 259 | PAUL TERRY HARGIS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 260 | STACY ANN WALLACE TAYLOR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 261 | MORRISON, MELLISSA;ET AL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 262 | JUAN JOSE CAPETILLO | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 263 | ALEXANDER GORDON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 264 | LONNIE RAY LOCKWOOD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 265 | MICHAEL DEAN EKSTROM | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 266 | ARLIN BENNIE SPRAGGINS, JR. | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 267 | DARRYL DAVID GARRETT | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 268 | JOSEPH CLAYTON REPPOND | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 269 | ROBERT WILSON EASTWOOD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 270 | CRAIG ALAN UPTON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 271 | CHARLES LOUIS STRATE, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 272 | JAMES ERIC LONG | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 273 | RODNEY J JEANSONNE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 274 | PAUL DOUGLAS BROWN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 275 | ELAINE FOSTER ELKINS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 276 | JAMES ALLEN ROGIER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

18

| | | | | | |
|---|---|---|---|---|---|
| 277 | FOREST NORELL COLLINS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 278 | VINCENT A BEALL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 279 | MICHAEL RAY JOYNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 280 | RICHARD EARL ATKINSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 281 | ANTOINE JOSEPH SEMIRA | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 282 | DOUGLAS TAYLOR SMITH | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 283 | PATRICK SEAN GRIFFING | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 284 | JACOB SNIPE, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 285 | THOMAS MARK TICICH | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 286 | BRENDA WADE BURNHAM | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 287 | ADALBERTO TORRES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 288 | JAMES ALFRED BULLOCK | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 289 | DANIEL RAY SAWYER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 290 | CARL LEROY BRUMBAUGH, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 291 | WILLIE RAY FRANTOM, ET AL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 292 | CHARLOTTE ELAINE WALKER GOLIHAR LINDY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 293 | FREDERICK BYRON HAPGOOD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 294 | DAWN TERESA GOOD GARDNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

19

| | | | | | |
|---|---|---|---|---|---|
| 295 | MAHMOUD P. RASOULIYAN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 296 | CYNTHIA BELL CATER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 297 | SHELVIE BOOTH, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 298 | GLENN DAVID WEAVER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 299 | ODELL BROOM, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 300 | RILEY EVERETT PIERCE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 301 | LAWRENCE A NALL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 302 | ALVIN MATHEWS, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 303 | GENE ARTHUR KERSTEN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 304 | CRAIG SHAWN MILLS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 305 | DENNIS HILTON BREWER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 306 | ELMER LEROY BURGER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 307 | STEPHEN LLOYD ADAMS, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 308 | ROBERT C CARNEY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 309 | ROBERT CALVIN JONES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 310 | JEFFREY BLAKE CANTERBURY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 311 | WILLIAM CHARLES SEAL, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 312 | CAROL ANN CERAVINO PETRIE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

| 313 | MARTHA ETTE DUBOSE ROGERS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 314 | DONALD WAYNE RUSHING, ET AL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 315 | WESLEY DALE KELLER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 316 | JEFFREY KYLE HARPER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 317 | TIMOTHY AMES SHOWS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 318 | MARGARET ANNE PIPPAL BONNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 319 | VALENTINE K FERNANDEZ, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 320 | HENRY SIMMONS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 321 | WILLIAM JOHN ADAMS, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 322 | JAMES HAROLD HUMPHREYS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 323 | RYAN ELLIS OSWALT | 24-17-13 | PETROHAWK PROPERTIES, LP | 954880 | 1499/634 |
| 324 | SAMUEL BRUCE LOMBARDINO | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 325 | DAVID HENRY NELSON, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 326 | JOYCE IVORY HAMPTON, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 327 | RICHARD ANTHONY JELINEK, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 328 | GAILA JEAN CLARK | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 329 | CHRISTOPHER WAYNE WOLF | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

21

| | | | | | |
|---|---|---|---|---|---|
| 330 | STEPHEN JERALD WILLIAMS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 331 | BENNIE RAYMOND ROSS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 332 | JASON MICHAEL BROUSSARD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 333 | PRESTON RAY FRIEDLEY, SR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 334 | MARVIN JESSE DONOVAN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 335 | WILLIAM OSCAR GARCIA | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 336 | CLEDITH H. TUGGLE, AS TRUSTEE OF THE CLEDITH H. TUGGLE AND JOYCE F. TUGGLE REVOCABLE LIVING TRUST | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 337 | REBECCA LOUISE PILKINTON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 338 | STEVEN NICHOLAS MARIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 339 | BOBBY GENE BOLING | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 340 | CHARLES RODGERS PILKINTON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 341 | GORDON HOWARD GRAGSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 342 | KENNETH WAYNE PARNELL, JR. | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 343 | DONNIE A JAMES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 344 | WILLIE LEE HENRY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

22

| 345 | ROBERT JOHN DAVIS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
|---|---|---|---|---|---|
| 346 | JOHN JOSEPH HARKINS,JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 347 | DAVID ROY ALLEN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 348 | RONNIE GENE MURPHY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 349 | RICHARD MICHAEL FORD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 350 | ROBERT D GRIFFIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 351 | C J WALKER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 352 | MICHAEL DEWAYNE TUGGLE, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 353 | KEVIN LYN WHITLOCK | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 354 | GARY DAN DUPREE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 355 | LORETTA JOHNSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 356 | JUDY C NASSER, AKA JUDY CLAIRE MURRAY NASSER RANDEL, AKA JUDY MURRAY LANDRY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 357 | DAVID RAKES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 358 | REX LEE KELLY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 359 | WALTER CHARLES BLAIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 360 | JOHN ERIC FISHER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 361 | DORA JUNE CONLY CAMERON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 362 | CLENTON HUGHES RAMBIN, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

23

| 363 | CHARLES FRANK BURKHARDT, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 364 | J W KELLY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 365 | MARY LYNN FLORENCE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 366 | EUGENE SMEED | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 367 | LISA MARIE MORSE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 368 | KYLE BISHOP HAMAOKA | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 369 | MARK FREDERICK WEBB | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 370 | RONNIE GENE SELLERS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 371 | JESSE NEWELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 372 | PATRICIA FARRINGTON GALLION | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 373 | MELANIE ELIZABETH HANNA | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 374 | DOUGLAS RALPH DAUGHTERY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 375 | SHERI GUNCHANA FITTIPALDI | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 376 | CAROLYN SUE CRAIG, AKA CAROLYN SUE CRAIG KING | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 377 | ANGELA YVETTE BURKS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 378 | BARRY WAYNE WILLIAMS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 379 | GREGORY WILSON UPDYKE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 380 | KAZUKO MIWA DIGNEY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

24

| 381 | SARAH F MCLEMORE KENT | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 382 | MOSES RANDOLPH GIVENS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 383 | RICHARD JOSEPH MCDOWELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 384 | JUSTIN JOSHUA MEYER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 385 | SUSAN JILL WALKER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 386 | CHRISTI LEN CANNON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 387 | BRAEDEN C. HARRIS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 388 | MAURICIO AGUIRRE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 389 | WILBUR EUGENE TUCKER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 390 | ISAAC ALEX JEFFERSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 391 | MATTHEW CAINEY SCOFIELD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 392 | MELISSA RANK | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 393 | VIRGINIA M SMITH | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 394 | KODY ALLEN MORRIS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 395 | GEORGE A. KRISE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 396 | DIANE THERESA HEASER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 397 | THERESA ANN MANGIAPANE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 398 | RANDI RENEE GARRETT | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 399 | DEWITTE MILES PIERSON, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

| 400 | RANDY CLAYTON ANDERSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
|---|---|---|---|---|---|
| 401 | JEFFREY PAIGE CASH | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 402 | NOLTON GERALD LAVERGNE, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 403 | DUANE ROGER SHUMAKER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 404 | MICHAEL JAMES STAYNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 405 | LEDONIS DARNELL BLACK | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 406 | SANDY DARYLE GILBERT | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 407 | DAVID LYNN DIXON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 408 | MICHAEL A ROGERS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 409 | TINNAKORN NAKORNSRI, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 410 | JIMMY EDWARD BRYSON, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 411 | MATTHEW STEVEN SAMEC | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 412 | PATSY RENE GAFFORD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 413 | STEVE J MICHEL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 414 | ROBERT SCOTT BAZO | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 415 | DENNIS K AUSTIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 416 | THOMAS EDWIN JONES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 417 | BARRY KEITH GREEN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 418 | DUANE EUGENE CHILTON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

26

| 419 | JAMES WESLEY HARRISON, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 420 | WALTER RUSH SCOTT | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 421 | WALTER E SNELLING | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 422 | TRACY M. TURNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 423 | LAWADE FERGUSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 948834 | 1483/861 |
| 424 | Josephine MacDonald | 24-17-13 | PETROHAWK PROPERTIES, LP | 948834 | 1483/861 |
| 425 | Francis Caldwell | 24-17-13 | PETROHAWK PROPERTIES, LP | 948834 | 1483/861 |
| 426 | Terry Willis | 24-17-13 | PETROHAWK PROPERTIES, LP | 948834 | 1483/861 |
| 427 | DAVID T. STOLL, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 428 | JOSEPH HAROLD CRAMER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 429 | DENISE SPANJA JONES | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 430 | ERVIN N WASHINGTON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 431 | CYNTHIA CARTER HADWIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 432 | GEORGE HENRY HARVISON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 433 | LORETTA MARIE NICHENKO | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 434 | KENNETH REID PRIM SR | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 435 | KENNETH F BANGSBERG | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 436 | STEVEN ANDREW KING | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 437 | DENNIS WAYNE MUMMERY | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 438 | JAMES F DEBUSK | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |

27

| 439 | HILLARY D. PICKETT Jr. | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
|-----|------------------------|----------|--------------------------|--------|----------|
| 440 | CLAYTON LAWRENCE III MURRY | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 441 | LAURA HELEN BROWN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 442 | MICHAEL ANTHONY EMMER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 443 | MARY WALSH TREVINO | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 444 | CHESTER EARL SPEARS | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 445 | QIANG ZQ ZHENG | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 446 | STEPHEN PAUL MICHELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 447 | JIMMIE LYNN HUDSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 448 | FAYE GOLSON WOODS | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 449 | RAYMOND JOSEPH BROWN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 450 | LARRY L JOHNSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 451 | ROSEMARY FORD HITCHENS | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 452 | LORI BETH SPARTZ | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 453 | THOMAS MICHAEL ESKEW III | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 454 | RANDAL MELVIN SORRELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 455 | STEPHEN RANDALL TEEKELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 456 | DANIEL LEE SIMON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |

28

| 457 | SUSAN LYNNE MARTIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 458 | BENNON LEE | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 459 | REVIS CLIFFORD GAY | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 460 | DAVID WESLEY LOWE | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 461 | WILLIAM DALE JONES | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 462 | WILLIAM DALE JONES | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 463 | WARREN CLYDE DEHN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 464 | DAVID GRADY COLE | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 465 | JAMES WILLIAM SPARTZ | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 466 | JAMES WILLIAM SPARTZ | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 467 | RICHARD JAMES JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 468 | ALICE FAY RAMBO | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 469 | OLEG V KOLOMYTKIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 470 | ANTHONY CHARLES JOYNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 471 | FRANK SCOTT STINSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 472 | EDDIE DANIEL MCWOODSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 473 | CLYDE JOHN LENGEL | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 474 | DAVID E HERNANDEZ | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 475 | BRIAN KEITH HILL | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |

29

| | | | | | |
|---|---|---|---|---|---|
| 476 | HUNTER RALPH PIPES | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 477 | PHILIP WAYNE PARDUE | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 478 | YENING MARIE HARDY EDMONDSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 479 | CAROL BENDER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 480 | CHARNIE DESHAY RENFRO WOOD | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 481 | TINA RHEA SMITH SHEFFIELD | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 482 | WALLACE A FORTIER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 483 | TOD BENSON RAWLS | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 484 | CAROLYNNE HENRY MURRAY | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 485 | LEATRICE SHAVONNE PINES WILLIAMS | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 486 | HILLARY D PICKETT JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 487 | STERLING SCOTT HALL | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 488 | MAUREEN ELIZABETH AGUIRRE | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 489 | HERSHEL I FORD | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 490 | SAMUEL TIMOTHY CULPEPPER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 491 | DAVID PRESTON KEY | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 492 | MICHAEL RICHARD PARKER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |

30

| 493 | MICHAEL CHARLES RASBURY | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
|---|---|---|---|---|---|
| 494 | VICTORIA MILLS BRADSHAW | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 495 | SETH ANDREW GHOLSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 496 | JEANETTE TOWNS | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 497 | ANDREW VARTAMIN CARDIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 498 | OLLIAN JERRY ROBERTSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 499 | WARREN JOSEPH BARNETT | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 500 | ROCKY WAYNE THRASH | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 501 | DOUGLAS WAYNE CONNELLY | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 502 | JUSTIN PAUL WUTZKE JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 503 | LEWIS RAY COKER JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 504 | JASON DALE WEIR | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 505 | EDGAR EARL SMITH III | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 506 | AARON JOSEPH JONES | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 507 | GERALD GREGORY SMITH | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 508 | ROBERT CRAIG HOUSE | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 509 | RICHARD CHARLES CLUTE JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 510 | CASSANDRA GORDON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 511 | PAUL PORRAS GUERRERO | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |

| 512 | PERRY LOPEZ | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 513 | KENNETH JOSEPH WYCOFF | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 514 | AUDRY BRUCE COOK, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 515 | LENA GARRETT | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 516 | JAMES MARSHALL ELLSTROM | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 517 | RUSSELL MINOR | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 518 | BRUCE G GOOTEE | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 519 | MATTHEW TODD MCGUIRT | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 520 | RICHARD WAYNE KENNADY | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 521 | JAMES BRANDON ROBERTSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 522 | JAMES GLEN ANDREWS | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 523 | DERRICK SCOTT MCMICHAEL | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 524 | AGNES DUNN SUDDS | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 525 | BETTY JEAN LOTT HENDERSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 526 | RICARDO DESHANE TILMON | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 527 | WILLIAM CHARLES NEWSTEAD | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 528 | THYDCOMPHIA RAY BROWN | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 529 | JERRY SAYERS | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |

32

| | | | | | |
|---|---|---|---|---|---|
| 530 | LOUIS EUGENE JOHNSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 531 | JAYNE S. PAYNE | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 532 | JOHN CHESTER LYNCH | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 533 | KRISTEN DAWSEY HAMMOCK | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 534 | DAVID LEE QUINN SR | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 535 | DALE EUGENE KEELER | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 536 | STEVE MICHAEL NUSBAUM | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 537 | MARILYN LEE COOK | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 538 | RANDY BRUCE GRAY JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 539 | ROBERT D GRIFFIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 540 | JEFFERY D THIGPEN | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 541 | JIMMY ALTON HENDRICKS | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 542 | DARRELL KEITH COLLINS | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 543 | EWELL AVIE III | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 544 | ALICE JANE JARRELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 545 | CHRISTOPHER LEE EINSPAHR | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 546 | MAYNARD HOWARD DEAN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 547 | David L. Bennet, et ux | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 548 | HERBERT PETER MEADOWS | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |

33

| | | | | | |
|---|---|---|---|---|---|
| 549 | JEFFREY SCOTT FERRELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 550 | JEFFREY STEPHEN LAFITTE | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 551 | CARPENTER, ERNEST W III | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 552 | THOMAS EVERETT BRYD | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 553 | RAYMOND M HUNT | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 554 | WILLIAM LUTHER JR BRYANT | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 555 | DERRICK BARTLEY | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 556 | CRANDAL LAMAR TODD | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 557 | GARY FRANCIS TODD | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 558 | JAMES RODNEY KNIGHT | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 559 | CHARLES THOMAS SIMMONS | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 560 | WILLIAM WALTER BOHRINGER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 561 | GREGORY D MCCALLIE | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 562 | TUAN H NGUYEN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 563 | GREGORY WAYNE STANFIELD | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 564 | PEDRO MUDAFORT | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 565 | MAYNARD HOWARD DEAN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 566 | SEAN HOLLEY MCINNIS, et ux | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |

34

| 567 | ROGER D FLATT | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
|-----|---------------|----------|--------------------------|--------|----------|
| 568 | THONG S NGUYEN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 569 | DWIGHT P PREVOST | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 570 | VERNON BUTLER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 571 | EDDIE GLEN III JOHNSON III | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 572 | JERRY PAUL HARBOUR | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 573 | RICHARD RAY HARPER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 574 | MICHAEL KEITH EVANS, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 575 | IVORY JEFF WIGGENS, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 576 | BOBBY EUGENE BARNETTE, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 577 | MELVALINE JORDEN, ET AL | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 578 | HUTCHESON, MARK ALLEN and VIRGINIA P. HUTCHESON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 579 | JLO CORPORATION | 24-17-13 | PETROHAWK PROPERTIES, LP | 948828 | 1483/833 |
| 580 | RICH GANEY, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 945788 | 1476/604 |
| 581 | NATCHITOCHES TIRE SERVICE, INC. | 24-17-13 | PETROHAWK PROPERTIES, LP | 970750 | 1519/881 |
| 582 | JOHNATHEN ANDREW THOMAS | 24-17-13 | PETROHAWK PROPERTIES, LP | 987959 | 1542/516 |
| 583 | SHREVEPORT DISTRICT BOARD OF MISSIONS AND CHURCH EXTENSION OF THE UNITED METHODIST CHURCH | 24-17-13 | PETROHAWK PROPERTIES, LP | 975749 | 1525/549 |

35

| 584 | Terrace Assisted Living, Inc. | 34-17-13 | PETROHAWK PROPERTIES, LP | 2251941 | 4273/127 |
|---|---|---|---|---|---|
| 585 | Dora Garland-Thompson | 34-17-13 | PETROHAWK PROPERTIES, LP | 2248900 | 4266/179 |
| 586 | University Baptist Church of S'Port | 34-17-13 | PETROHAWK PROPERTIES, LP | 2250462 | 4269/293 |
| 587 | James Mac Kay Owen | 34-17-13 | PETROHAWK PROPERTIES, LP | 2250461 | 4269/289 |
| 588 | Barton Land Company | 34-17-13 | PETROHAWK PROPERTIES, LP | 2252427 | 4274/234 |
| 589 | Haven HOA | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237180 | 4241/747 |
| 590 | Penn Investments, LLC | 27-17-13 | PETROHAWK PROPERTIES, LP | 2223388 | 4218/452 |
| 591 | Joshua Caleb Knicely | 27-17-13 | PETROHAWK PROPERTIES, LP | 2254259 | 4278/504 |
| 592 | Charles A. Knicely Builders, LLC | 27-17-13 | PETROHAWK PROPERTIES, LP | 2254261 | 4278/509 |
| 593 | Troy Wayne Davis, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237181 | 4241/754 |
| 594 | Erskin McAllister, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237187 | 4241/778 |
| 595 | Dexter Daniels, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237188 | 4241/782 |
| 596 | Charle Ray Bath, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237189 | 4241/786 |
| 597 | Arnaz Jerome Battle | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237190 | 4241/790 |
| 598 | Nicholas C. Jameson, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237184 | 4241/766 |
| 599 | Ivory Juan Angello, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237186 | 4241/774 |
| 600 | Lynnwood J. Ruiz, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237186 | 4241/770 |
| 601 | Thomas Henry Tompkins, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237182 | 4241/758 |
| 602 | Jeffrey Todd Greer, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2255095 | 4280/516 |
| 603 | Robert Donald Long, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237183 | 4241/762 |

36

| 604 | Sunflower Plantation, LLC, et al | 23, 26 & 37-17-13 | PETROHAWK PROPERTIES, LP | 2176805 | 4095/123 |
|-----|----------------------------------|-------------------|--------------------------|---------|----------|
| 605 | Succession of Sam B. Grayson | 24-17-13 | PETROHAWK PROPERTIES, LP | 963558 | 1511/848 |
| 606 | APRIL E. COLLINS | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 607 | TOMMY A. DIGILORMO | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 608 | MARK ALLEN HUTCHINSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 609 | CHARLES ANTHONY BEVERLY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 610 | RICHARD KENT FALLLING, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 611 | JOHN WAYNE CARLISLE, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 612 | JOSEPH A. SONNEY, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 613 | GEORGE WILLIAM PORTOCERRO | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 614 | SHARON LEA BRAZIL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 615 | KATHERINE MORENO NELSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 616 | ANGELA KECHELLE FRENCH | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 617 | MARK L. MONTGOMERY, LLC | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 618 | EDWARD FRANCIS PROKOPF, II, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 619 | MELANIE ELIZABETH HANNA | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 620 | ROBERT LEE GRIGGS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

37

| 621 | CARRIE JEANNE ROBINSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
|-----|------------------------|----------|--------------------------|--------|----------|
| 622 | KIWANII KI SHAY RAWLS, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 623 | ANGEL GARCIA | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 624 | RONALD FRANK ITLA, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 625 | MARILYN WILLIAMS CAUSEY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 626 | JORDAN PULLIAM, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 627 | CADURE PROPERTIES, LLC | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 628 | AUDREY DENISE GARZA | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 629 | SHIRLEY ANN PARKERSON CURTIS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 630 | ALTON JACKSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 631 | CAROLYN SUE STILES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 632 | GABRIEL LAMEN HORTON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 633 | JAMES MILTON MIXON, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 634 | JEFFERY LYNN WILLIAMS, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 635 | PETER G. WEILBACHER, JR. | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 636 | LEROY TATUM, JR., ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 637 | CHRIS KEVIN WINNER, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

| | | | | | |
|---|---|---|---|---|---|
| 638 | MARK ROBERT DARNELL, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 639 | KEVIN DAVID BREEM | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 640 | HEATHER ELIZABETH HEIDGEN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 641 | ROBERT CLOTS REYNOLDS, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 642 | CONNIE MARIE ROSSALES SIMS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 643 | FRED ELLIS FAIR, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 644 | KENNY JOE WORD, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 645 | TREY DANIEL REPBURN | 24-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |

# EXHIBIT C

Attached to and made a part of that certain Letter Agreement  dated December 3, 2010, executed by Petrohawk Properties, L.P., in favor of Sklarco, L.L.C.

## PARTIAL ASSIGNMENT OF OIL, GAS AND MINERAL LEASES

**STATE OF LOUISIANA,**

**PARISHES OF CADDO AND BOSSIER.**

KNOW ALL MEN BY THESE PRESENTS THAT:

**PETROHAWK PROPERTIES, LP**, a Texas limited partnership, whose address is 1000 Louisiana, Suite 5600, Houston, Texas 77002, represented herein by Stephen W. Herod, Executive Vice President- Corporate Development of P-H Energy  L.L.C., its General Partner (hereinafter referred to as "Assignor");

for and in consideration of the sum of Ten and No/100 Dollars cash, and other good and valuable considerations ($10.00 and O.V.C.), the receipt and sufficiency of which are hereby acknowledged, has bargained, sold, conveyed, transferred, assigned, set over and delivered, and does by these presents bargain, sell, transfer, assign, set over and deliver unto:

**SKLARCO, L.L.C.,** a Louisiana limited liability company, whose permanent mailing address is 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101 (hereinafter referred to as "Assignee");

all of Assignor's right, title and interest in and to the Oil, Gas and Mineral Leases (the "Leases") described on Exhibit "A", insofar and only insofar as said Leases cover depths from the surface of the Earth to the top of the stratigraphic equivalent of the Hosston Zone, Reservoir A, Cedar Grove Field (as defined by the Louisiana Office of Conservation Order No. 967 dated January 28, 1976), including the Rodessa Formation.

TO HAVE AND TO HOLD unto Assignee, its successors and assigns, forever, subject to and in accordance with the following terms and provisions:

1.) This assignment is made effective as of December 3, 2010 (the "Effective Date").

2.) This assignment is expressly made subject to all provisions, terms and conditions of the Leases described on Exhibit "A" attached hereto and made a part hereof, including the lessor's royalties provided for in each of the Leases.

40

3.)   Even though some of the Leases may be listed in Exhibit "A" more than once, it is Assignor's intent to assign the interests described above only once with respect to each of the Leases.

4.)   This assignment is made without warranty of title, express or implied, not even for return of the purchase price, except that Assignor warrants title against all defects arising out of claims by Assignor or persons claiming by, through or under Assignor.  Assignor further warrants that the Assigned Interests are free of any privileges, liens, mortgages or other encumbrances.

This assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

This assignment may be executed in any number of counterparts, and each counterpart shall be deemed to be an original instrument and binding on the signatory parties, but all such counterparts shall constitute but one instrument.  The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

**[INTENTIONALLY LEFT BLANK SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF ASSIGNOR has executed this instrument on this _____ day of _____, 2010, but effective as of the Effective Date.

WITNESSES:

_____
KELLY WILCOX

_____
D. MATTHEW HUFFTY

Petrohawk Properties, LP
By:    P-H Energy, LLC,
        It's General Partner

By:_____
        D.R. Deffenbaugh
        Its Vice President – Land, Mid-
        Continent Region

                                    - - Assignor


## ACKNOWLEDGMENT OF ASSIGNOR SIGNATURE

STATE OF LOUISIANA

PARISH OF CADDO

**BEFORE ME**, the undersigned authority, on this _____ day of _____, 2010, personally appeared D.R. Deffenbaugh, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was signed on behalf of the P-H Energy, LLC, General Partner of **PETROHAWK PROPERTIES, LP**, a Texas limited partnership, by the authority of its Partners and that he executed the same as the act of such company for the purposes and consideration therein expressed, and in the capacity therein stated.

DONT THINK THIS NEEDED TO BE SIGNED AS IT WAS ONLY THE EXHIBIT SHOWING THE ASSIGNMENT FORMAT TO BE USED.

IN WITNESS WHEREOF ASSIGNEE has executed this instrument on this _____ day of _____, 2010, but effective as of the effective date.

SKLARCO, L.L.C.

_____

By:_____
    David A. Barlow
    Vice President – Chief Operating Officer

- - Assignee

_____


## ACKNOWLEDGMENT OF ASSIGNEE SIGNATURE

STATE OF LOUISIANA

PARISH OF CADDO

**BEFORE ME**, the undersigned authority, on this _____ day of _____, 2010, personally appeared David A. Barlow, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was signed on behalf of the **SKLARCO, L.L.C.**, a Louisiana limited liability company, by the authority of its Members and that he executed the same as the act of such company for the purposes and consideration therein expressed, and in the capacity therein stated.


_____
NOTARY PUBLIC in and for
Caddo Parish, Louisiana

43

# EXHIBIT "A"

Attached to and made a part of that certain Partial Assignment of Oil, Gas and Mineral Leases dated effective as of December 3, 2010, executed by Petrohawk Properties, L.P., as Assignor, in favor of Sklarco, L.L.C., as Assignee

| No. | Lessor | Sec/Town/Rnge | Lessee | Instrument Number | BK/PG |
|---|---|---|---|---|---|
| 1 | CHARLES D. NORCROSS ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 2 | GLYNN R. MELANCON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 3 | JEFFREY W. WATSON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 4 | KERRY A. LANDRY ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 5 | JOHN T. MEEHAN ETX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 6 | JASON R. TYNES, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 7 | LARRY D. JAMES ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 8 | JOHN D. HENSON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 9 | STEPHEN C. MCCANN ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 10 | PRESTON W. BENNETT | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 11 | SCOTT W. MUSCUTT ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 12 | JEFFREY A. HUDSON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 13 | BRIAN J. HUGHES ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 14 | RUSSELL K. HARBIN ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 15 | JAMES R. HALEY ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 16 | DAVID L. MCGRATH ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 17 | PLANTATION TRACE ESTATES HOMEOWNERS ASSOCIATION | 23-17-13 | PETROHAWK PROPERTIES, LP | 957310 | 1503/108 |
| 18 | BILLY WAYNE BROWN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948830 | 1483/843 |
| 19 | MICHAEL D. BARGER ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 20 | YOUREE H. MCBRIDE, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |
| 21 | JAMES DOUGLAS BROWN, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948831 | 1483-848 |
| 22 | DAVID G MCHALFFEY | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 23 | R B NOLES | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 24 | CRAIG LESTER WILLIAMS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 25 | KEPNER DELL SOUTHERLAND | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 26 | RANDY GERARD BORDELON | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 27 | JASON WARREN GRUBAUGH | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 28 | JERENE J METZLER | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 29 | DEBORAH BALENTINE KNAPP | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 30 | DAVID A FRYE, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 31 | ARNOLD WILLIAM JOHNSON, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 32 | MERTON FRANCIS FILKINS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 33 | JEAN L ROGERS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 34 | RALPH DEWEY JR SHELTON, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |

| 35 | REBECCA N SHAPIRO | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
|----|-------------------|----------|--------------------------|--------|----------|
| 36 | BRUCE EDWARD GONYEA, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 37 | DEBRA PATRICIA SHELTON | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 38 | RUPERT REGINALD VAUGHN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 39 | JEFFREY DENNIS SADOW, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 40 | WILBERT DALE PRYOR | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 41 | HILDA BREYZEK FITCH | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 42 | BLANCHE ANN RIVERS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 43 | TERRY LYNN BRYANT | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 44 | LOIS MARIE PROCEL SALTER, ET AL | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 45 | RICHARD DOWDALL | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 46 | BARBARA ANN NICHOLAS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 47 | JUDY LESSARD BROWN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 48 | JAMES GENE DRAPER, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 49 | ROBERT EDWARD GOING | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 50 | RICHARD KURT PUSCH | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 51 | JAMES DAVID BEACH, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 52 | MARY M SHELTON | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 53 | BILLY RAY BOWEN, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 54 | LYNDELL DUNN DAVIS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 55 | SHAWN DAVID MCCALLON, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 56 | LORRAINE MARIE LINDER | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 57 | OWEN L SWEASY, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 58 | MARY EDRIS JORGENSEN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 59 | SHIVANI SAWHNEY, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 60 | JEAN C GARDNER LANIER | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 61 | WILLIAM RANDY SANDERS, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 62 | TIMOTHY CHRISTIAN SAYLES | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 63 | RUSSELL LANCE HUNT | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 64 | GARY DAVID ELLIOTT | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 65 | SOL WATSON HOOK, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 66 | DEBRA FREY KOCH | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 67 | LLOYD HARRISON MCCARTY, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 68 | ARNAULD RADERMACHER | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 69 | JOHN JOSEPH SPILLANE III, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 70 | MARK JAMES FRANKS, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 71 | JEAN MANGHAM SMITH | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 72 | DAVID LYNN LEE, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 73 | JOEY SHIH CHIA WANG | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 74 | ALICE P HIPP, ET VIR | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 75 | TYRONE BRUCE LANZ | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 76 | PERSHING MERO, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |

| 77 | DAVID ALLAN BARTHOLOMEW, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 987297 | 1541/309 |
|---|---|---|---|---|---|
| 78 | GEORGE N ESSARY | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 79 | BOBBY HILLIARD FLANAGAN, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 80 | THOMAS KNOX, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 985718 | 1538/479 |
| 81 | DONALD M. BOWERS | 23-17-13 | PETROHAWK PROPERTIES, LP | 985719 | 1538/483 |
| 82 | ULYSSES LINARES | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 83 | WAYNE & ELIZABETH PARKER | 23-17-13 | PETROHAWK PROPERTIES, LP | 985720 | 1538/488 |
| 84 | DONALD GENE GOOD, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 85 | CARLOS MEZA, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 86 | WARREN A HENRY. ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 87 | TIMOTHY L HEWITT | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 88 | DANIELLE MILLER BOZ | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 89 | BILLY LANE MCCARTNEY | 23-17-13 | PETROHAWK PROPERTIES, LP | 948838 | 1484/103 |
| 90 | PLANTATION TRACE GARDEN HOMES ASSOCIATION | 23-17-13 | PETROHAWK PROPERTIES, LP | 957311 | 1503/114 |
| 91 | THOMAS D. VAUGHN, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 92 | JAMES E. THOMAS, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 93 | MALCOLM S. DEPHILLIPS, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 94 | JEREMY D. POTTS ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 95 | CHARLES J. KAMMERDIENER, JR. | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 96 | THEODORE L. HOPKINS ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 97 | ANITA JANE MANN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 98 | CAROL D. LLOYD | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 99 | APRIL GRIMSLEY ANDREWS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 100 | DAVID RAYMOND MCCLATCHEY | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 101 | TOMMY D. LEONARD | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 102 | JOHN T. DONALDSON, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 103 | EMMIT T. BARTEE ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 104 | MARY DARLENE MASE DAVIS, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 105 | JOSEPH M. ANDING ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 106 | DAVID A. ORR ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 107 | JULIE L COLEMAN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 108 | PAUL DUANE LINDSEY | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 109 | RACHIE E. WILSON, JR. | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 110 | DON L. SANDIFER, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 111 | DENNIS RAY CLARK | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 112 | TIMOTHY P. BERTRAND ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 113 | DEBORAH J. HOLLANDS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 114 | DO SHIK CHAE | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 115 | LONNIE D. WILLIS, III ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 116 | VICENTE LABOY | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 117 | JOHN M. KUNIK ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |

| 118 | ALLEN C. NELSON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
|---|---|---|---|---|---|
| 119 | MICHAEL F. BROWN ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 120 | JACOB H. VRIJENHOEK, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 121 | JERRY A. FRANTOM ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 122 | ANDREA A. SATTLER | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 123 | JEFFREY S. DELAUNE ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 124 | CHAMP W. CROSSNO, JR., ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 125 | MICHAEL CORREAL ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 126 | DAVID B. HARMON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 127 | MARY KATHERINE B. SERRA | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 128 | TIMOTHY ELLIS IRWIN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 129 | WAYNE L. EARP, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 130 | MICHAEL J. HOLLAND ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 131 | KENNETH W. ODOM ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 132 | MICHAEL LOUIS STEVENSON, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 133 | JASON M ALEMAN | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 134 | JAMES C. LONGINO ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 135 | MURRAY W. BROWN ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 136 | ALLEN D. SCHAEFER, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 137 | HOA T. VU ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 138 | ROBERT W. SHIELD JR. ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 139 | JACKIE F. DAVIS ET VIR | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 140 | MELODY K.W. BLOCKER ET VIR | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 141 | CONSTANCE D. LONG | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 142 | JAMES W. KOONTZ ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 143 | JOSEPH C. PEASE ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 144 | JOHN GAYDOS III ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 145 | ALAN CRAIG RINGLE, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 146 | DAVID T. STOLL, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 147 | SHAWN A. EVANS ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 148 | PAUL T. CLAPP ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 149 | TERESA MARIE HAYWARD | 23-17-13 | PETROHAWK PROPERTIES, LP | 973823 | 1523/234 |
| 150 | ALAN LEEPS ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 151 | GEORGE CHARLES BOORAS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 152 | THOMAS N. CARLETON ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 153 | JOHNETTE MOSES EVANS ET VIR | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 154 | GEORGE S.PRICE ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 155 | PAUL HIGHT ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 156 | JASON BLANCHE NICHOLS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 157 | MARVIN R MCHORSE | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 158 | MARY ANN WHITLAW CARSON, ET AL | 23-17-13 | PETROHAWK PROPERTIES, LP | 955406 | 1500/103 |
| 159 | RAVINDRA H. GOEL ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |

| 160 | TROY K. JEFFREY ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 161 | JIM MACDONALD ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 162 | TERRELL SHAYNE SHARKEY, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 163 | BRUCE D. ANDERSON, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 164 | JANIS POSEY FLETCHER | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 165 | KAREN PLEW MELANCON | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 166 | BRUCE EWING | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 167 | MONA M. QUALLS ET VIR | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 168 | MARY E. SURANE WAITS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 169 | JIMMIE L. PERDUE ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 170 | CESAR ANGEL MARRERO | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 171 | ROXIE L. TABOR, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 172 | SEAN G. THEODOS, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 173 | MICHAEL J. COOK ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 174 | JOSEPH PAUL BARANIK | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 175 | RICKY STEVENS BRYANT, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 176 | ROBERT AGUSTA MCARTHUR | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 177 | RONALD O'DILLION FOULK, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 178 | TODD HENRY | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 179 | ALLEN DAVID BELLANGER, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 180 | JAMES ROY GILCREASE | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 181 | PETER L. STEED | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 182 | ADAM PATRICK CORMIER | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 183 | BOBBY DON BROWN, ET UX | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 184 | CLARENCE JUNIOR BYRD | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 185 | BRIAN DALE ANDERSON | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 186 | JON JOSEPH HUTCHINS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 187 | JAMES ROBERT SLEPICKA | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 188 | STEPHEN GEORGE VEKOVIOUS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 189 | GUY RANDAL MEYERS | 23-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 190 | BARNEY B BATES, III | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 191 | RANDALL JOSEPH LANG | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 192 | JIMMIE O ANDERSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 193 | GARY GREGG GOODELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 194 | WILLIAM THOMAS BENSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 195 | ROBERT ESTA MARLOW | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 196 | LLOYD EDWARD HELMS, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 197 | ROBERT LEE WALKER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 198 | JIMMY LAWRENCE JOYNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 199 | CARL JACOB SCHULER, SR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 200 | GUY LEE WHIDDON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 201 | HELEN FRANCES SCARBOROUGH SAPP | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

| 202 | BYRON N HINES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 203 | MITCHELL WAYNE BOWEN, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 204 | KAREN LOUISE GRAY FOX, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 205 | JOSHUA TIMOTHY BURFORD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 206 | SCOTT GARY WADSLEY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 207 | MARY PATRICIA PIAZZA FALTING | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 208 | SUSAN DIANNE BOYETT ALLEN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 209 | LEAMON S THOMPSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 210 | KARLA S LEHMANN STRICKLAND | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 211 | JOSIAH YOUNG | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 212 | JOHN DAVID WESTRICH, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 213 | RENE FRANK HERNANDEZ | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 214 | WILLIAM K WASHBURN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 215 | BRUCE LYNN ROHRER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 216 | RICHARD ANTHONY POMBER, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 217 | BRIAN LIVINGSTON COLE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 218 | GINA C STANDISH CHERRY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 219 | DENNIS FREDERIC GUILLIAMS, SR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 220 | FRANK J LAROUX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 221 | KAREN EVELYN BOQUIST NOBLE, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 222 | ROBERT TERRAZAS, JR.;ET AL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 223 | JASON MICHAEL LAFLAME | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 224 | DONALD EUGENE CHAPMAN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 225 | JEFFREY RYAN NALL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 226 | CAROL WILSON STAHL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 227 | JAVIS MICHAEL SMOAK | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 228 | JIMMIE V HAMRIC | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 229 | DEBRA BEASON BATES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 230 | DIANA ROBBINS PARKS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 231 | VERNON COUGHRAN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 232 | NATHAN HARUO HARAGUCHI | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 233 | DAVID ALLEN GEORGE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 234 | SHANNON EUGENE BOYETTE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 235 | KENNETH WAYNE DAVIS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 236 | HUGH WAYNE MOSELEY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 237 | GARY DALE HADWIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 238 | GILBERTO BAZO | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 239 | RICKY GLENN BUMGARDNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 240 | EBENEZER HIRST, IV | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 241 | LARRY MICHAEL SKINNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 242 | PAULINE ANN HOFFMAN TINSLEY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 243 | FRANKIE L SPARKS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

| 244 | LYNN CORBIN LYLE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
|-----|------------------|----------|--------------------------|--------|----------|
| 245 | MICHAEL WAYNE TASCHE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 246 | JEREMY WILLIAM MARKLE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 247 | HARRIETT DORIEN JOHNSON PARK, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 248 | RICKY ALAN NORWOOD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 249 | EDWARD JAMES PROCELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 250 | JIMMY SHERRILL WEAVER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 251 | MARY CAROL SMALLEY DAVIDSON THOMAS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 252 | BENJAMIN P AIKEN, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 253 | LAURIE BALENTINE SCOTT | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 254 | JERROL VERRANDO JONES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 255 | PAUL DUNCIL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 256 | JERNIGAN, JAMIE;ET AL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 257 | HOWARD THOMAS MCCLURE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 258 | DAVID MICHAEL TURNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 259 | PAUL TERRY HARGIS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 260 | STACY ANN WALLACE TAYLOR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 261 | MORRISON, MELLISSA;ET AL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 262 | JUAN JOSE CAPETILLO | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 263 | ALEXANDER GORDON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 264 | LONNIE RAY LOCKWOOD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 265 | MICHAEL DEAN EKSTROM | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 266 | ARLIN BENNIE SPRAGGINS, JR. | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 267 | DARRYL DAVID GARRETT | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 268 | JOSEPH CLAYTON REPPOND | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 269 | ROBERT WILSON EASTWOOD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 270 | CRAIG ALAN UPTON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 271 | CHARLES LOUIS STRATE, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 272 | JAMES ERIC LONG | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 273 | RODNEY J JEANSONNE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 274 | PAUL DOUGLAS BROWN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 275 | ELAINE FOSTER ELKINS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 276 | JAMES ALLEN ROGIER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 277 | FOREST NORELL COLLINS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 278 | VINCENT A BEALL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 279 | MICHAEL RAY JOYNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 280 | RICHARD EARL ATKINSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 281 | ANTOINE JOSEPH SEMIRA | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 282 | DOUGLAS TAYLOR SMITH | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 283 | PATRICK SEAN GRIFFING | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 284 | JACOB SNIPE, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 285 | THOMAS MARK TICICH | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

| 286 | BRENDA WADE BURNHAM | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
|-----|---------------------|----------|--------------------------|--------|----------|
| 287 | ADALBERTO TORRES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 288 | JAMES ALFRED BULLOCK | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 289 | DANIEL RAY SAWYER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 290 | CARL LEROY BRUMBAUGH, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 291 | WILLIE RAY FRANTOM, ET AL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 292 | CHARLOTTE ELAINE WALKER GOLIHAR LINDY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 293 | FREDERICK BYRON HAPGOOD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 294 | DAWN TERESA GOOD GARDNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 295 | MAHMOUD P. RASOULIYAN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 296 | CYNTHIA BELL CATER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 297 | SHELVIE BOOTH, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 298 | GLENN DAVID WEAVER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 299 | ODELL BROOM, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 300 | RILEY EVERETT PIERCE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 301 | LAWRENCE A NALL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 302 | ALVIN MATHEWS, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 303 | GENE ARTHUR KERSTEN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 304 | CRAIG SHAWN MILLS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 305 | DENNIS HILTON BREWER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 306 | ELMER LEROY BURGER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 307 | STEPHEN LLOYD ADAMS, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 308 | ROBERT C CARNEY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 309 | ROBERT CALVIN JONES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 310 | JEFFREY BLAKE CANTERBURY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 311 | WILLIAM CHARLES SEAL, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 312 | CAROL ANN CERAVINO PETRIE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 313 | MARTHA ETTE DUBOSE ROGERS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 314 | DONALD WAYNE RUSHING, ET AL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 315 | WESLEY DALE KELLER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 316 | JEFFREY KYLE HARPER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 317 | TIMOTHY AMES SHOWS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 318 | MARGARET ANNE PIPPAL BONNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 319 | VALENTINE K FERNANDEZ, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 320 | HENRY SIMMONS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 321 | WILLIAM JOHN ADAMS, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 322 | JAMES HAROLD HUMPHREYS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 323 | RYAN ELLIS OSWALT | 24-17-13 | PETROHAWK PROPERTIES, LP | 954880 | 1499/634 |
| 324 | SAMUEL BRUCE LOMBARDINO | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 325 | DAVID HENRY NELSON, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 326 | JOYCE IVORY HAMPTON, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 327 | RICHARD ANTHONY JELINEK, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

| 328 | GAILA JEAN CLARK | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
|---|---|---|---|---|---|
| 329 | CHRISTOPHER WAYNE WOLF | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 330 | STEPHEN JERALD WILLIAMS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 331 | BENNIE RAYMOND ROSS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 332 | JASON MICHAEL BROUSSARD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 333 | PRESTON RAY FRIEDLEY, SR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 334 | MARVIN JESSE DONOVAN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 335 | WILLIAM OSCAR GARCIA | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 336 | CLEDITH H. TUGGLE, AS TRUSTEE OF THE CLEDITH H. TUGGLE AND JOYCE F. TUGGLE REVOCABLE LIVING TRUST | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 337 | REBECCA LOUISE PILKINTON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 338 | STEVEN NICHOLAS MARIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 339 | BOBBY GENE BOLING | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 340 | CHARLES RODGERS PILKINTON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 341 | GORDON HOWARD GRAGSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 342 | KENNETH WAYNE PARNELL, JR. | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 343 | DONNIE A JAMES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 344 | WILLIE LEE HENRY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 345 | ROBERT JOHN DAVIS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 346 | JOHN JOSEPH HARKINS,JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 347 | DAVID ROY ALLEN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 348 | RONNIE GENE MURPHY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 349 | RICHARD MICHAEL FORD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 350 | ROBERT D GRIFFIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 351 | C J WALKER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 352 | MICHAEL DEWAYNE TUGGLE, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 353 | KEVIN LYN WHITLOCK | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 354 | GARY DAN DUPREE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 355 | LORETTA JOHNSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 356 | JUDY C NASSER, AKA JUDY CLAIRE MURRAY NASSER RANDEL, AKA JUDY MURRAY LANDRY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 357 | DAVID RAKES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 358 | REX LEE KELLY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 359 | WALTER CHARLES BLAIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 360 | JOHN ERIC FISHER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 361 | DORA JUNE CONLY CAMERON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 362 | CLENTON HUGHES RAMBIN, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 363 | CHARLES FRANK BURKHARDT, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 364 | J W KELLY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 365 | MARY LYNN FLORENCE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 366 | EUGENE SMEED | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

| 367 | LISA MARIE MORSE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
|-----|------------------|----------|--------------------------|--------|----------|
| 368 | KYLE BISHOP HAMAOKA | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 369 | MARK FREDERICK WEBB | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 370 | RONNIE GENE SELLERS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 371 | JESSE NEWELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 372 | PATRICIA FARRINGTON GALLION | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 373 | MELANIE ELIZABETH HANNA | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 374 | DOUGLAS RALPH DAUGHTERY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 375 | SHERI GUNCHANA FITTIPALDI | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 376 | CAROLYN SUE CRAIG, AKA CAROLYN SUE CRAIG KING | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 377 | ANGELA YVETTE BURKS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 378 | BARRY WAYNE WILLIAMS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 379 | GREGORY WILSON UPDYKE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 380 | KAZUKO MIWA DIGNEY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 381 | SARAH F MCLEMORE KENT | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 382 | MOSES RANDOLPH GIVENS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 383 | RICHARD JOSEPH MCDOWELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 384 | JUSTIN JOSHUA MEYER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 385 | SUSAN JILL WALKER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 386 | CHRISTI LEN CANNON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 387 | BRAEDEN C. HARRIS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 388 | MAURICIO AGUIRRE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 389 | WILBUR EUGENE TUCKER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 390 | ISAAC ALEX JEFFERSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 391 | MATTHEW CAINEY SCOFIELD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 392 | MELISSA RANK | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 393 | VIRGINIA M SMITH | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 394 | KODY ALLEN MORRIS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 395 | GEORGE A. KRISE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 396 | DIANE THERESA HEASER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 397 | THERESA ANN MANGIAPANE | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 398 | RANDI RENEE GARRETT | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 399 | DEWITTE MILES PIERSON, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 400 | RANDY CLAYTON ANDERSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 401 | JEFFREY PAIGE CASH | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 402 | NOLTON GERALD LAVERGNE, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 403 | DUANE ROGER SHUMAKER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 404 | MICHAEL JAMES STAYNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 405 | LEDONIS DARNELL BLACK | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 406 | SANDY DARYLE GILBERT | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 407 | DAVID LYNN DIXON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 408 | MICHAEL A ROGERS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |

| 409 | TINNAKORN NAKORNSRI, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
|---|---|---|---|---|---|
| 410 | JIMMY EDWARD BRYSON, | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 411 | MATTHEW STEVEN SAMEC | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 412 | PATSY RENE GAFFORD | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 413 | STEVE J MICHEL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 414 | ROBERT SCOTT BAZO | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 415 | DENNIS K AUSTIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 416 | THOMAS EDWIN JONES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 417 | BARRY KEITH GREEN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 418 | DUANE EUGENE CHILTON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 419 | JAMES WESLEY HARRISON, JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 420 | WALTER RUSH SCOTT | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 421 | WALTER E SNELLING | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 422 | TRACY M. TURNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 423 | LAWADE FERGUSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 948834 | 1483/861 |
| 424 | Josephine MacDonald | 24-17-13 | PETROHAWK PROPERTIES, LP | 948834 | 1483/861 |
| 425 | Francis Caldwell | 24-17-13 | PETROHAWK PROPERTIES, LP | 948834 | 1483/861 |
| 426 | Terry Willis | 24-17-13 | PETROHAWK PROPERTIES, LP | 948834 | 1483/861 |
| 427 | DAVID T. STOLL, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 948837 | 1484/1 |
| 428 | JOSEPH HAROLD CRAMER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 429 | DENISE SPANJA JONES | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 430 | ERVIN N WASHINGTON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 431 | CYNTHIA CARTER HADWIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 432 | GEORGE HENRY HARVISON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 433 | LORETTA MARIE NICHENKO | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 434 | KENNETH REID PRIM SR | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 435 | KENNETH F BANGSBERG | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 436 | STEVEN ANDREW KING | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 437 | DENNIS WAYNE MUMMERY | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 438 | JAMES F DEBUSK | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 439 | HILLARY D. PICKETT Jr. | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 440 | CLAYTON LAWRENCE III MURRY | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 441 | LAURA HELEN BROWN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 442 | MICHAEL ANTHONY EMMER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 443 | MARY WALSH TREVINO | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 444 | CHESTER EARL SPEARS | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 445 | QIANG ZQ ZHENG | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 446 | STEPHEN PAUL MICHELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 447 | JIMMIE LYNN HUDSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 448 | FAYE GOLSON WOODS | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 449 | RAYMOND JOSEPH BROWN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 450 | LARRY L JOHNSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |

| 451 | ROSEMARY FORD HITCHENS | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
|---|---|---|---|---|---|
| 452 | LORI BETH SPARTZ | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 453 | THOMAS MICHAEL ESKEW III | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 454 | RANDAL MELVIN SORRELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 455 | STEPHEN RANDALL TEEKELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 456 | DANIEL LEE SIMON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 457 | SUSAN LYNNE MARTIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 458 | BENNON LEE | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 459 | REVIS CLIFFORD GAY | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 460 | DAVID WESLEY LOWE | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 461 | WILLIAM DALE JONES | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 462 | WILLIAM DALE JONES | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 463 | WARREN CLYDE DEHN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 464 | DAVID GRADY COLE | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 465 | JAMES WILLIAM SPARTZ | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 466 | JAMES WILLIAM SPARTZ | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 467 | RICHARD JAMES JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 468 | ALICE FAY RAMBO | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 469 | OLEG V KOLOMYTKIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 470 | ANTHONY CHARLES JOYNER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 471 | FRANK SCOTT STINSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 472 | EDDIE DANIEL MCWOODSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 473 | CLYDE JOHN LENGEL | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 474 | DAVID E HERNANDEZ | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 475 | BRIAN KEITH HILL | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 476 | HUNTER RALPH PIPES | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 477 | PHILIP WAYNE PARDUE | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 478 | YENING MARIE HARDY EDMONDSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 479 | CAROL BENDER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 480 | CHARNIE DESHAY RENFRO WOOD | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 481 | TINA RHEA SMITH SHEFFIELD | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 482 | WALLACE A FORTIER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 483 | TOD BENSON RAWLS | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 484 | CAROLYNNE HENRY MURRAY | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 485 | LEATRICE SHAVONNE PINES WILLIAMS | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 486 | HILLARY D PICKETT JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 487 | STERLING SCOTT HALL | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 488 | MAUREEN ELIZABETH AGUIRRE | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 489 | HERSHEL I FORD | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 490 | SAMUEL TIMOTHY CULPEPPER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 491 | DAVID PRESTON KEY | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |

| 492 | MICHAEL RICHARD PARKER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
|-----|------------------------|----------|--------------------------|--------|----------|
| 493 | MICHAEL CHARLES RASBURY | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 494 | VICTORIA MILLS BRADSHAW | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 495 | SETH ANDREW GHOLSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 496 | JEANETTE TOWNS | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 497 | ANDREW VARTAMIN CARDIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 498 | OLLIAN JERRY ROBERTSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 499 | WARREN JOSEPH BARNETT | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 500 | ROCKY WAYNE THRASH | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 501 | DOUGLAS WAYNE CONNELLY | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 502 | JUSTIN PAUL WUTZKE JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 503 | LEWIS RAY COKER JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 504 | JASON DALE WEIR | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 505 | EDGAR EARL SMITH III | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 506 | AARON JOSEPH JONES | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 507 | GERALD GREGORY SMITH | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 508 | ROBERT CRAIG HOUSE | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 509 | RICHARD CHARLES CLUTE JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 510 | CASSANDRA GORDON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 511 | PAUL PORRAS GUERRERO | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 512 | PERRY LOPEZ | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 513 | KENNETH JOSEPH WYCOFF | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 514 | AUDRY BRUCE COOK, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 515 | LENA GARRETT | 24-17-13 | PETROHAWK PROPERTIES, LP | 949361 | 1485/420 |
| 516 | JAMES MARSHALL ELLSTROM | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 517 | RUSSELL MINOR | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 518 | BRUCE G GOOTEE | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 519 | MATTHEW TODD MCGUIRT | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 520 | RICHARD WAYNE KENNADY | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 521 | JAMES BRANDON ROBERTSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 522 | JAMES GLEN ANDREWS | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 523 | DERRICK SCOTT MCMICHAEL | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 524 | AGNES DUNN SUDDS | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 525 | BETTY JEAN LOTT HENDERSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 526 | RICARDO DESHANE TILMON | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 527 | WILLIAM CHARLES NEWSTEAD | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 528 | THYDCOMPHIA RAY BROWN | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 529 | JERRY SAYERS | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 530 | LOUIS EUGENE JOHNSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 531 | JAYNE S. PAYNE | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 532 | JOHN CHESTER LYNCH | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 533 | KRISTEN DAWSEY HAMMOCK | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |

| 534 | DAVID LEE QUINN SR | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 535 | DALE EUGENE KEELER | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 536 | STEVE MICHAEL NUSBAUM | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 537 | MARILYN LEE COOK | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 538 | RANDY BRUCE GRAY JR | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 539 | ROBERT D GRIFFIN | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 540 | JEFFERY D THIGPEN | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 541 | JIMMY ALTON HENDRICKS | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 542 | DARRELL KEITH COLLINS | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 543 | EWELL AVIE III | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 544 | ALICE JANE JARRELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 545 | CHRISTOPHER LEE EINSPAHR | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 546 | MAYNARD HOWARD DEAN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 547 | David L. Bennet, et ux | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 548 | HERBERT PETER MEADOWS | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 549 | JEFFREY SCOTT FERRELL | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 550 | JEFFREY STEPHEN LAFITTE | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 551 | CARPENTER, ERNEST W III | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 552 | THOMAS EVERETT BRYD | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 553 | RAYMOND M HUNT | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 554 | WILLIAM LUTHER JR BRYANT | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 555 | DERRICK BARTLEY | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 556 | CRANDAL LAMAR TODD | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 557 | GARY FRANCIS TODD | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 558 | JAMES RODNEY KNIGHT | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 559 | CHARLES THOMAS SIMMONS | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 560 | WILLIAM WALTER BOHRINGER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 561 | GREGORY D MCCALLIE | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 562 | TUAN H NGUYEN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 563 | GREGORY WAYNE STANFIELD | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 564 | PEDRO MUDAFORT | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 565 | MAYNARD HOWARD DEAN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 566 | SEAN HOLLEY MCINNIS, et ux | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 567 | ROGER D FLATT | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 568 | THONG S NGUYEN | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 569 | DWIGHT P PREVOST | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 570 | VERNON BUTLER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 571 | EDDIE GLEN III JOHNSON III | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 572 | JERRY PAUL HARBOUR | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 573 | RICHARD RAY HARPER | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 574 | MICHAEL KEITH EVANS, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 575 | IVORY JEFF WIGGENS, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |

| 576 | BOBBY EUGENE BARNETTE, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
|---|---|---|---|---|---|
| 577 | MELVALINE JORDEN, ET AL | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 578 | HUTCHESON, MARK ALLEN and VIRGINIA P. HUTCHESON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 579 | JLO CORPORATION | 24-17-13 | PETROHAWK PROPERTIES, LP | 948828 | 1483/833 |
| 580 | RICH GANEY, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 945788 | 1476/604 |
| 581 | NATCHITOCHES TIRE SERVICE, INC. | 24-17-13 | PETROHAWK PROPERTIES, LP | 970750 | 1519/881 |
| 582 | JOHNATHEN ANDREW THOMAS | 24-17-13 | PETROHAWK PROPERTIES, LP | 987959 | 1542/516 |
| 583 | SHREVEPORT DISTRICT BOARD OF MISSIONS AND CHURCH EXTENSION OF THE UNITED METHODIST CHURCH | 24-17-13 | PETROHAWK PROPERTIES, LP | 975749 | 1525/549 |
| 584 | Dutton Family, LLC | 34-17-13 | PETROHAWK PROPERTIES, LP | 2237168 | 4241/709 |
| 585 | Sorensen-Naylor, LTD | 34-17-13 | PETROHAWK PROPERTIES, LP | 2237168 | 4241/709 |
| 586 | Dutton Family, LLC | 34-17-13 | PETROHAWK PROPERTIES, LP | 2237166 | 4241/701 |
| 587 | Sorensen-Naylor, LTD | 34-17-13 | PETROHAWK PROPERTIES, LP | 2237167 | 4241/705 |
| 588 | Dutton Family, LLC | 34-17-13 | PETROHAWK PROPERTIES, LP | 2237166 | 4241/701 |
| 589 | Dutton Family, LLC | 34-17-13 | PETROHAWK PROPERTIES, LP | 2237166 | 4241/701 |
| 590 | David R. Johns, Jr, et ux | 34-17-13 | PETROHAWK PROPERTIES, LP | 2248263 | 4264/333 |
| 591 | Robert Alan Stroud | 34-17-13 | PETROHAWK PROPERTIES, LP | 2250460 | 4269/283 |
| 592 | Terrace Assisted Living, Inc. | 34-17-13 | PETROHAWK PROPERTIES, LP | 2251941 | 4273/127 |
| 593 | Dora Garland-Thompson | 34-17-13 | PETROHAWK PROPERTIES, LP | 2248900 | 4266/179 |
| 594 | University Baptist Church of S'Port | 34-17-13 | PETROHAWK PROPERTIES, LP | 2250462 | 4269/293 |
| 595 | James Mac Kay Owen | 34-17-13 | PETROHAWK PROPERTIES, LP | 2250461 | 4269/289 |
| 596 | Barton Land Company | 34-17-13 | PETROHAWK PROPERTIES, LP | 2252427 | 4274/234 |
| 597 | Sert, LLC | 27-17-13 | PETROHAWK PROPERTIES, LP | 2223389 | 4218/459 |
| 598 | Haven HOA | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237180 | 4241/747 |
| 599 | Penn Investments, LLC | 27-17-13 | PETROHAWK PROPERTIES, LP | 2223388 | 4218/452 |
| 600 | Don Coleman Construction Co. | 27-17-13 | PETROHAWK PROPERTIES, LP | 2248261 | 4264/326 |
| 601 | Dutton Family, LLC | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237168 | 4241/709 |
| 602 | Sorensen-Naylor, LTD | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237168 | 4241/709 |
| 603 | Joshua Caleb Knicely | 27-17-13 | PETROHAWK PROPERTIES, LP | 2254259 | 4278/504 |
| 604 | Charles A. Knicely Builders, LLC | 27-17-13 | PETROHAWK PROPERTIES, LP | 2254261 | 4278/509 |
| 605 | Troy Wayne Davis, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237181 | 4241/754 |
| 606 | Erskin McAllister, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237187 | 4241/778 |
| 607 | Dexter Daniels, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237188 | 4241/782 |
| 608 | Charle Ray Bath, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237189 | 4241/786 |
| 609 | Arnaz Jerome Battle | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237190 | 4241/790 |
| 610 | Nicholas C. Jameson, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237184 | 4241/766 |
| 611 | Ivory Juan Angello, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237186 | 4241/774 |
| 612 | Lynnwood J. Ruiz, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237186 | 4241/770 |
| 613 | Thomas Henry Tompkins, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237182 | 4241/758 |
| 614 | Jeffrey Todd Greer, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2255095 | 4280/516 |
| 615 | Robert Donald Long, et ux | 27-17-13 | PETROHAWK PROPERTIES, LP | 2237183 | 4241/762 |

| 616 | Sunflower Plantation, LLC, et al | 23, 26 & 37-17-13 | PETROHAWK PROPERTIES, LP | 2176805 | 4095/123 |
| 617 | Succession of Sam B. Grayson | 24-17-13 | PETROHAWK PROPERTIES, LP | 963558 | 1511/848 |
| 618 | APRIL E. COLLINS | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 619 | TOMMY A. DIGILORMO | 24-17-13 | PETROHAWK PROPERTIES, LP | 950960 | 1489/657 |
| 620 | MARK ALLEN HUTCHINSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 949362 | 1485/509 |
| 621 | CHARLES ANTHONY BEVERLY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 622 | RICHARD KENT FALLLING, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 623 | JOHN WAYNE CARLISLE, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 624 | JOSEPH A. SONNEY, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 625 | GEORGE WILLIAM PORTOCERRO | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 626 | SHARON LEA BRAZIL | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 627 | KATHERINE MORENO NELSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 628 | ANGELA KECHELLE FRENCH | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 629 | MARK L. MONTGOMERY, LLC | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 630 | EDWARD FRANCIS PROKOPF, II, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 631 | MELANIE ELIZABETH HANNA | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 632 | ROBERT LEE GRIGGS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 633 | CARRIE JEANNE ROBINSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 634 | KIWANII KI SHAY RAWLS, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 635 | ANGEL GARCIA | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 636 | RONALD FRANK ITLA, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 637 | MARILYN WILLIAMS CAUSEY | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 638 | JORDAN PULLIAM, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 639 | CADURE PROPERTIES, LLC | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 640 | AUDREY DENISE GARZA | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 641 | SHIRLEY ANN PARKERSON CURTIS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 642 | ALTON JACKSON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 643 | CAROLYN SUE STILES | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 644 | GABRIEL LAMEN HORTON | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 645 | JAMES MILTON MIXON, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 646 | JEFFERY LYNN WILLIAMS, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 647 | PETER G. WEILBACHER, JR. | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 648 | LEROY TATUM, JR., ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 649 | CHRIS KEVIN WINNER, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 650 | MARK ROBERT DARNELL, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 651 | KEVIN DAVID BREEM | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 652 | HEATHER ELIZABETH HEIDGEN | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 653 | ROBERT CLOTS REYNOLDS, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 654 | CONNIE MARIE ROSSALES SIMS | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 655 | FRED ELLIS FAIR, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 656 | KENNY JOE WORD, ET UX | 24-17-13 | PETROHAWK PROPERTIES, LP | 951695 | 1491/376 |
| 657 | TREY DANIEL REPBURN | 24-17-13 | PETROHAWK PROPERTIES, LP | 948836 | 1483/881 |