## EXPLORATION AGREEMENT

### West Arcadia Field
### Bienville and Claiborne Parishes, Louisiana

THIS EXPLORATION AGREEMENT (the "Agreement"), dated effective as of the 1st day of February, 2007 (the "Effective Date"), is entered into by and between the following (sometimes herein referred to singularly as a "Party" or collectively as the "Parties"):

> **SKLAR EXPLORATION COMPANY L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its Chief Operating Officer, David A. Barlow ("SEC");

> **SKLARCO L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its Chief Operating Officer, David A. Barlow ("Sklarco");

> **McCOMBS ENERGY, LTD.**, a Texas limited partnership, whose address is 5599 San Felipe, Suite 1200, Houston, Texas 77056-2794, represented herein by its Vice President, Ricky Haikin ("McCombs");

> **TENSAS DELTA EXPLORATION COMPANY LLC**, a Louisiana limited liability company, whose address is 333 Texas Street, Suite 2121, represented herein by its Executive Vice President, Michael E. Riddick ("TDEC");

(Sklarco, McCombs and TDEC are referred to collectively as the "Participants" or individually as a "Participant");

### WITNESSETH:

WHEREAS, the Participants own undivided working interest in oil, gas and other mineral leases covering lands located in or near the West Arcadia Field, Bienville and Claiborne Parishes, Louisiana, and related rights and assets, including certain wells operated by SEC or TDEC; and

WHEREAS, the Participants desire to share in the costs of acquiring oil, gas and other mineral leases or interests therein, and related rights and assets, covering lands located in Township 18 North, Range 6 West, Bienville Parish, Louisiana, less and except Sections 21, 22, 27 and 30 of said township, and in Sections 15, 16, 21, 22, 27, 28, 32, 33, 34 and 35, Township 19 North, Range 6 West, Claiborne Parish, Louisiana (hereinafter the "Area of Mutual Interest" or the "AMI") within the red outline on the plat attached hereto as Exhibit "A"; and

WHEREAS, the Parties desire to enter this Agreement to set forth the terms and conditions under which they acquire and jointly develop oil, gas and other mineral leases or interests therein, and related rights and assets, in the AMI.

NOW, THEREFORE, the Parties agree as follows:

## Article I. Existing Jointly Owned Acreage

Section 1.1. The Participants own undivided working interest in oil, gas and other mineral leases described in Exhibit "B" (the "Section 28 Leases") covering lands located in Section 28, T18N, R6W, Bienville Parish, Louisiana, and earned an undivided interest in other oil, gas and other mineral leases covering lands located within the same section, limited to the well bore of the UHOSS SUK; Cindy Lou Cloyd #1 Well, pursuant to that certain well bore farmout also described in Exhibit "B" (collectively, the "Section 28 Leases"). SEC operates the UHOSS SUK; Cindy Lou Cloyd #1 Well and the UHOSS SUK; Haynesville Mercantile #1 Alt.

Well located in Section 28 pursuant to an existing Operating Agreement dated May 26, 2004 by and between SEC, as Operator, and Sklarco, McCombs and TDEC, as Non-Operators ("Section 28 JOA"). KCS Resources, Inc. is now a party to the Section 28 JOA as a Non-Operator as a result of a back-in after payout reversionary working interest pursuant to its farmout agreement. This Agreement is not intended to amend, novate, supersede or otherwise modify the Section 28 JOA whatsoever, which shall remain in full force and effect and shall continue to govern all operations within Section 28. In the event of a conflict between this Agreement and the Section 28 JOA, insofar as the Contract Area is concerned, the Section 28 JOA shall govern and control. The Participants' gross working interests in the Contract Area under the Section 28 JOA are as follows:

| Participant | Cloyd #1 GWI | Haynesville #1 GWI | Leasehold GWI |
|---|---|---|---|
| TDEC | 0.48124267 | 0.40621336 | 0.50000000 |
| Sklarco | 0.30077668 | 0.25388336 | 0.31250000 |
| McCombs | 0.18046600 | 0.15233001 | 0.18750000 |

Subject to the back-in reversionary interests that previously vested upon prospect payout and/or wellbore payout, and subject to the interest of KCS Resources, Inc., there are no overriding royalty interests, reversionary interests or other burdens upon any of the Section 28 Leases other than the lessors' royalty thereunder due by any one of the Participants to any of the other Participants or any other parties.

Section 1.2. Sklarco has acquired oil, gas and other mineral leases described in Exhibit "C" (the "Section 33 Leases") covering approximately 639.72 net acres located in Section 33, T18N, R6W, Bienville Parish, Louisiana, with an approximate net revenue interest ("NRI") of 80% and agrees to share undivided working interest in these leases with McCombs and TDEC in the proportions of 1/3 each. The Participants agree to execute a separate Operating Agreement (the "Section 33 JOA") covering Section 33 in the same form as the Section 28 JOA pursuant to which SEC, as Operator, shall, on or before September 1, 2007, drill on behalf of the Participants, as Non-Operators, a well at a location of 1000' FWL and 1225' FNL of Section 33, or as near thereto as practicable, and drill such initial well with due diligence, to a total depth of 8,400'. An AFE estimating the costs to drill the well is attached hereto as Exhibit "D." Each Participant agrees to pay its 1/3 share of the actual costs to drill said well, regardless of whether those costs exceed the estimated costs in the AFE. All operations with regard to that well, including elections after reaching total depth, shall be governed by the Section 33 JOA. In the event of a conflict between this Agreement and the Section 33 JOA, insofar as the Contract Area is concerned, the Section 33 JOA shall govern and control. The Participants' gross working interests in the Contract Area under the Section 33 JOA are as follows:

| Participant | Gross Working Interest |
|---|---|
| TDEC | 1/3 |
| Sklarco | 1/3 |
| McCombs | 1/3 |

There are no overriding royalty interests, reversionary interests or other burdens upon any of the Section 33 Leases other than the lessors' royalty thereunder due by any one of the Participants to any of the other Participants or any other parties. In the event there has been an assignment of or charges made for the acquisition of the Section 33 leases in proportions other than 1/3 each, an appropriate reassignment and/or an accounting for costs shall be made.

Section 1.3. The Participants own undivided working interest in the oil, gas and mineral lease described in Exhibit "E" covering approximately 23.5 acres located within Section 16, T18N, R6W, Bienville Parish, Louisiana and earned an undivided working interest in other oil, gas and other mineral leases covering lands located within the same section, limited to the well bore of the L HOSS RA SUF; Jowers #1 – Alt. Well, pursuant to certain well bore farmouts also described in Exhibit "E" (collectively, the "Section 16 Leases"). TDEC operates that well pursuant to a Letter Agreement dated August 31, 2005, and an Operating Agreement (the "Section 16 JOA") attached thereto as Exhibit "B" by and between TDEC, as Operator, and Pentad Energy, L.L.C. et al., as Non-Operators, covering a Contract Area limited to the wellbore of the L HOSS RA SUF; Jowers #1-Alt. Well. This Agreement is not intended to amend, novate, supersede or otherwise modify the Section 16 JOA whatsoever, which shall remain in full force and effect and shall continue to govern all operations within Section 16. In the event

2

of a conflict between this Agreement and the Section 16 JOA, insofar as the Contract Area is concerned, the Section 16 JOA shall govern and control. The Participants' gross working interests in the Contract Area under the Section 16 JOA are as follows:

| Participant | Gross Working Interest |
|---|---|
| TDEC | 0.41148029 |
| Sklarco | 0.13274962 |
| McCombs | 0.13274962 |

Subject to the back-in reversionary interests and/or royalty escalations that previously vested upon prospect payout and/or wellbore payout, there are no overriding royalty interests, reversionary interests or other burdens upon any of the Section 16 Leases other than the lessors' royalty thereunder due by any one of the Participants to any of the other Participants or any other parties.

Section 1.4.  The Participants own undivided working interest in certain oil, gas and other mineral leases described in Exhibit "F" covering lands located within Section 4, T18N, R6W, Bienville Parish, Louisiana, and earned an undivided working interest in other oil, gas and other mineral leases covering lands located within the same section, pursuant to farmouts also described in Exhibit "F" (collectively, the "Section 4 Leases")  The Participants participated in the HOSS RA SUA; Virginia Upshaw 4 #1 Well located in Section 4 operated by TDEC pursuant to an Operating Agreement (the "Section 4 JOA") dated May 1, 2006, by and between TDEC, as Operator, and Sklarco, McCombs et al., as Non-Operators.  This Agreement is not intended to amend, novate, supersede or otherwise modify the Section 4 JOA whatsoever, which shall remain in full force and effect and shall continue to govern all operations within Section 4. In the event of a conflict between this Agreement and the Section 4 JOA, insofar as the Contract Area is concerned, the Section 4 JOA shall govern and control. The Participants' gross working interests in the Contract Area under the Section 4 JOA are as follows:

| Participant | BPO GWI |
|---|---|
| TDEC | 0.39321667 |
| Sklarco | 0.19660834 |
| McCombs | 0.19660834 |

Sklarco previously owned an undivided working interest in certain oil, gas and other mineral leases covering Section 4 and is, thus, both a farmor of its interest in those leases to TDEC and a farmee as a Participant through TDEC.  Approximately 40 acres within Section 4 is unleased. Save for the rights of farmors under their respective farmout agreements (including Sklarco's rights as a farmor), and the rights of unleased owners after payout, there are no overriding royalty interests, reversionary interests or other burdens upon any of the Section 4 Leases other than the lessors' royalty thereunder due by any one of the Participants to any of the other Participants or any other parties. Participants' downward gross working interest adjustments due to any farmors exercising rights at payout to convert reserved overriding royalty interests to working interests shall be borne 50% by TDEC, 25% by Sklarco and 25% by McCombs.

Article II.  Open Acreage

Section 2.1.  Current Buy Area.  Sklarco is in the process of acquiring oil, gas and other mineral leases covering lands located in Sections 2, 5 and 8, T18N, R6W, Bienville Parish, Louisiana, and in Section 27, T19N, R6W, Claiborne Parish, Louisiana. Sklarco hereby offers, and by their signature below, McCombs and TDEC accept the said offer, to share in the costs of any leases acquired covering these sections, including bonus, landman, brokerage and recording fees, in the proportions of 1/3 to each of the Participants.  The drilling of a Test Well shall be governed by Section 4.2 of this Agreement, and operations within each of these sections shall be governed by a JOA under which SEC is Operator in accordance with Section 4.3 of this Agreement.  The parties to that certain Operating Agreement dated May 26, 2004, by and between SEC, as Operator, and Sklarco and TDEC, as Non-Operators covering a Contract Area consisting of Section 8, T18N, R6W, Bienville Parish, Louisiana, hereby terminate that agreement.

Section 2.2.  Other Open Acreage.  The parties are also evaluating the possibility of acquiring leases covering other lands located in the AMI, including the following sections:

3

Sections 33, 34 and 35, T19N, R6W, Claiborne Parish, Louisiana. Any such acquisitions shall be subject to Section 4.1 of this Agreement, the drilling of any Test Wells shall be governed by Section 4.2 of this Agreement and operations shall be governed by the JOA described in Section 4.3 of this Agreement.

## Article III. HBP Acreage

**Section 3.1.** The Parties are interested in jointly acquiring oil, gas and other mineral leases described in Exhibit "G" covering lands located in Section 3, T18N, R6W, Bienville Parish, Louisiana , that are held by production of natural gas from the U HOSS SUS; Joe D. Burns #1 Well which is operated by Cypress Operating, Inc. ("Cypress") pursuant to that certain Operating Agreement dated March 5, 2003, by and between Cypress, as Operator, and Sklarco et.al., as Non-Operators ("Section 3 JOA"). TDEC is negotiating with Cypress to acquire an undivided 32.5% gross working interest in the Section 3 Leases and that well as well as leasehold in Section 2, T18N, R6W and Section 34, T19N, R6W. Any interests acquired by TDEC will be shared with the other Participants such that each of the Participants own an undivided 1/3 of the total interest of all of the Participants in the Leases, including the existing interest of Sklarco. Each of the Participants agrees to bear the actual acquisition costs attributable to the interest that it acquires as a result of the Cypress acquisition. Sklarco's existing interest constitutes an undivided 0.08964844 gross working interest and 0.06723317 net revenue interest in the Section 3 Leases subject to the terms of the Section 3 JOA and that certain letter agreement dated March 12, 2003, by and between Cypress and Sklarco, and that certain letter agreement dated November 17, 2003, by and between Cypress and Sklarco. Any obligations assumed by Sklarco hereunder are made subject to the terms of said existing agreements. The Participants agree to vote to make TDEC the successor Operator under the Section 3 JOA. Save for the reversionary interest that previously vested after payout of the well and/or prospect, there are no overriding royalty interests, reversionary interests or other burdens upon any of the Section 3 Leases other than the lessors' royalty thereunder and a proportionately reduced overriding royalty interest being reserved by Cypress equal to the difference between royalty and 22.6%. A like overriding royalty interest also burdens other Section 3 interests that TDEC is attempting to acquire.

**Section 3.2.** TDEC is negotiating with St. Mary Land & Exploration Company to farmout its rights in certain oil, gas and other mineral leases covering Section 9, T18N, R6W, Bienville Parish, Louisiana. The terms of said farmout will include the obligation to drill an earning well, among others. If it acquires a farmout, TDEC agrees to share the same with the other Participants in the proportions of 1/3 each, and each of the Participants agree to participate in the drilling of an earning well to be operated by TDEC pursuant to the terms of a JOA governing that section as set forth in Section 4.3 of this Agreement.

**Section 3.3.** Upon completing its lease acquisitions in Section 8, Sklarco desires to farmout from El Paso E & P Company, L.P. (or its successors and assigns), its rights in certain oil, gas and other mineral leases covering Section 17, T18N, R6W, Bienville Parish, Louisiana. The terms of said farmout will include the obligation to drill an earning well, among others. If it acquires a farmout, Sklarco agrees to share the same with the other Participants in the proportions of 1/3 each, and each of the Participants agree to participate in the drilling of an earning well to be operated by SEC pursuant to the terms of a JOA governing that section as set forth in Section 4.3 of this Agreement. The parties to that certain Operating Agreement dated May 26, 2004, by and between SEC, as Operator, and Sklarco and TDEC, as Non-Operators covering a Contract Area consisting of Section 17, T18N, R6W, Bienville Parish, Louisiana, hereby terminate that agreement.

**Section 3.4.** Before drilling the well described in Section 1.2 of this Agreement, Sklarco desires to farmout from Par Minerals Corporation (or its successors and assigns), its rights in certain oil, gas and other mineral leases covering Section 32, Township 18 North, Range 6 West, Bienville Parish, Louisiana. The terms of said farmout will include the obligation to drill an earning well, among others. If it acquires a farmout, Sklarco agrees to share the same with the other Participants in the proportions of 1/3 each, and each of the Participants agree to participate in the drilling of an earning well to be operated by SEC pursuant to the terms of a JOA governing that section as set forth in Section 4.3 of this Agreement.

4

**Article IV.  Acquisition And Development Of New Interests**

**Section 4.1.  New Leases And AMI.**

The Parties have formed an area of mutual interest comprised of the AMI for the same term as this Agreement.  The AMI covers not only working interest that is leased, optioned, farmed in or otherwise acquired, but also royalty, overriding royalty, net profits and any other type of mineral right acquired directly or indirectly by any of the Parties, their successors and assigns.  The Parties agree to share newly acquired interests within the AMI in the manner set forth in this Agreement or, if not expressly provided for herein, in the proportions of 1/3 each in the manner described in the following paragraph of this Section 4.1.

If and when any of the Parties acquires a lease covering any lands located within the AMI, then, in that event, that Party shall notify the other Participants and offer them the opportunity to participate in the costs of the lease(s) acquired, including bonus, landman, brokerage and recording fees, in the proportion of 1/3 each.  For ease of administration, an election to acquire any single lease covering lands within a governmental section shall constitute an election to acquire any other leases covering lands within that section, and, likewise, an election not to acquire any single lease covering lands within a section shall constitute an election not to acquire any other leases covering lands within that section.  Any of the Participants that elect not to share in the costs of acquiring lease(s) covering lands within a given section shall forever forfeit and waive all of its rights to participate in those or any new leases covering lands located within that section and shall not be entitled to participate in the Test Well described in Section 4.2 located on such lands in that section or the JOA described in Section 4.3 of this Agreement whose Contract Area covers lands within that section.

**Section 4.2.  Test Wells**

If and when any of the Parties, or combination thereof, acquires at least an undivided 95% gross working interest and 71.25% net revenue interest in the oil, gas and other mineral leases covering an entire governmental section located within the AMI that is not already governed by an operating agreement between the Parties, or the right to earn an interest in such leases pursuant to a farmout agreement, then, in that event, the Operator, being either TDEC or SEC as per the operational designations set forth in Section 4.3 of this Agreement, may, in its discretion, propose to drill a test well (a "Test Well") at a location within that section agreed upon in writing by the other Participants (or, if they cannot agree, at the location described in the notice proposing the well described below), or as near thereto as practicable, and thereafter continue the drilling of the Test Well with due diligence to a depth sufficient, in the Operator's discretion, to test either the upper, middle or lower Hosston Formation, whichever is specified in the notice, or any deeper depth required to earn a farmout of leasehold interest in leases covering the section (the "Objective Depth").  Any of the Participants that have not previously forfeited their right to participate in that well under Section 4.2 shall have thirty (30) days from receipt of notice proposing a Test Well, which notice shall include an Authority For Expenditure itemizing the estimated costs to drill the Test Well to the Objective Depth, within which to elect to participate or not to participate, in said Test Well.  Any Participants electing to participate (the "Consenting Party" or the "Consenting Parties") shall execute the AFE and agree to pay its/their share of the actual costs, even if they exceed the estimated costs in the AFE, to drill the Test Well to the Objective Depth.  If any Participant elects <u>not</u> to participate (the "Non-Consenting Party"), and one or more of the remaining Participants elects to drill the Test Well without the other's participation, then the Non-Consenting Party shall immediately assign to the Consenting Party or the Consenting Parties, in equal proportions, all of its right, title and interest in and to the leases and/or farmout covering the section in which the Test Well is located for and in consideration of the costs the Non-Consenting Party paid for the same to be refunded by the Consenting Party or the Consenting Parties, in equal proportions.  If the Test Well is not actually drilled, then the Participants agree to continue to own the leases and/or farmouts covering lands within that section in the proportion of 1/3 each.  If, on the other hand, a Party acquires, or combination of the Parties acquire, at least an undivided 95% gross working interest and 71.25% net revenue interest in the leases covering a governmental section located within the AMI that is not already governed by an operating agreement between the Parties, but that Party does not, or those Parties do not, propose to drill a Test Well in that section, then, in that event, and only in that event, the other Participant may propose a well in the same manner described above, in which case, the remaining Participants receiving such proposal shall have the same time within

which to elect to participate and the same penalty shall apply as a result of an election not to participate.

## Section 4.3. Operations

All new leases acquired covering lands within a governmental section within the AMI that is not already governed by a JOA shall be made subject to, and all operations within a given governmental section, including the drilling of a Test Well, shall be governed by, a Model Form Operating Agreement whose Contract Area is limited to that governmental section to be executed by the Operator and the Consenting Parties and which shall be in substantially the same form as the Section 28 JOA. Any such JOA shall be prepared and executed prior to the drilling of the Test Well for that governmental section. If there is any conflict between this agreement and any such JOA, this Agreement shall govern. Except as otherwise provided herein, the Operator under a JOA shall be either SEC or TDEC, depending upon the following: If TDEC is the party that acquires the majority (in interest, not number) of leases within a given section, then TDEC shall be the Operator under the JOA governing operations within that section. If, on the other hand, Sklarco or McCombs acquires the majority (in interest, not number), then SEC shall be the Operator.

## Section 4.4. Reversionary After Payout Back-In Working Interest

At Prospect Payout, an undivided one-eighth (1/8th) of any working interest in all oil, gas and other mineral leases acquired by McCombs hereunder (hereinafter, the "Burdened Leases"), excluding the interests in oil, gas and other mineral leases described in Sections 1.1, 1.2, 1.3 and 1.4 of this Agreement, shall automatically and permanently revert to and vest in Sklarco. At Sklarco's request, McCombs will assign said interest unto Sklarco after Project Payout, including, without limitation, a like interest in the Burdened Leases, the wells and the proceeds from the sale of oil, gas, and all other products produced or derived from any and all wells drilled on the Burdened Leases, and in any easements, rights of way, personal property, equipment, facilities and pipelines associated with such wells. Prospect Payout is defined on a Prospect (not well-by-well) basis as the first day of the calendar month following the month in which McCombs' share of the total and cumulative revenue resulting from or relating to the Burdened Leases, equals McCombs' share of the total and cumulative cost incurred within the Burdened Leases. For purposes of Prospect Payout, (i) the total and cumulative revenue shall consist of McCombs' share of all sales proceeds for all oil, gas and other hydrocarbons and minerals saved and sold from the Burdened Leases and any other income, bonus payment or other revenue attributable to McCombs' interest therein, and (ii) the total and cumulative cost incurred shall include McCombs' share of all royalty and overriding royalty payments, severance, ad valorem, production and other taxes applicable to production and not measured by McCombs' other income, all lease acquisition and maintenance costs, all seismic survey and data costs, geological and geophysical evaluation costs, all costs for site preparation, drilling, reworking, deepening, sidetracking, logging, stimulation, testing, equipping, operating, plugging and abandoning all wells located on the Burdened Leases, and the cost of all surface damages, pipelines, gathering and other production handling facilities related thereto.

## Article V.  Miscellaneous

## Section 5.1.  Information

Upon execution of this Agreement by all of the Parties, any Participate may request and shall be entitled to a copy of all of the leases and of other title information in the possession of any of the other Parties.

## Section 5.2.  Binding On Successors And Assigns

This Agreement shall enure to the benefit of and be binding upon the Parties hereto and their respective successors and assigns.

## Section 5.3.  Entire Agreement

This Agreement and the other agreements referenced herein constitute the entire agreement of the Parties with respect to the subject matter hereof, and any other promises,

inducements, representations, warranties or agreements with respect to the subject matter hereof, except as otherwise set forth herein, have been superseded hereby and are not intended to survive this Agreement. Except as otherwise expressly provided herein, no amendment or modification of this Agreement shall be effective unless set forth in writing and signed by a duly authorized officer of each of the Parties.

### Section 5.4. Severability

The invalidity of any one or more of the provisions of this Agreement does not affect the remaining portions of this Agreement, and in case of any such invalidity, this Agreement should be construed as if the invalid provision(s) had not been inserted.

### Section 5.5. Notices

All notices between the Parties authorized or required by any of the provisions of this Agreement, unless otherwise expressly provided, shall be given in writing by email or facsimile or regular mail, addressed to those of the Parties to whom the notice is given at the email addresses or fax telephone numbers and addresses set forth in Exhibit "A" to the Section 28 JOA. Any of the Parties may change its designated email address, fax telephone number and address at any time, and from time to time, by giving written notice thereof to the other Parties.

### Section 5.6. Headings for Convenience

The article, section and subsection headings used in this Agreement are inserted for convenience only and shall not be regarded in construing this Agreement.

### Section 5.7. Governing Law

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Louisiana.

### Section 5.8. Relationship Of The Parties

Liability of the Parties hereto shall be several and not joint or collective. Each Party shall make its own elections under this Agreement and shall be responsible only for its obligations as herein set out. It is not the intention of the Parties to create, nor shall this Agreement be construed as creating, a mining or other partnership, joint venture or association between the Parties. In their relations with each other under this Agreement, the Parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own self-interest.

### Section 5.9. Assignability

The Parties to this Agreement may assign all or part of their rights and obligations hereunder, provided, however, that any such assignment must be made subject to the terms and conditions of this Agreement and the applicable JOA or JOA's.

### Section 5.10. Term

This Agreement shall remain in full force and effect as between the Parties until for the duration of two (2) years. Any JOA's discussed herein that are in effect at the time of this Agreement's termination shall survive the termination of this Agreement for the duration set forth therein.

### Section 5.11. Sophisticated Investors

By execution of this Agreement, the Participants confirm that they have a working knowledge of the oil and gas industry and that each has thoroughly investigated its participation in the Prospect. Each Participant acknowledges that it is a sophisticated investor with a financial net worth in excess of one million dollars. Each Participant represents it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of its share of the lease costs, drilling costs, completion costs,

re-completion costs and the costs to plug and abandon wells. EACH PARTICIPANT ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES. Each Participant further confirms and accepts that the offering of the interest herein purchased has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the States of Louisiana, or any other state. Each Participant has hereby agreed to participate in the Prospect for investment purposes only, and not with a view to or for sale in connection with any distribution of interests in the Prospect within the meaning of said laws.

### Section 5.12. Counterparts

This Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

THUS DONE AND SIGNED This ____ day of _____, 2007, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By _____
    David A. Barlow
    Chief Operating Officer

SKLARCO L.L.C.

By _____
    David A. Barlow
    Chief Operating Officer

McCOMBS ENERGY, LTD.

By _____
    Ricky Haikin
    Vice President

TENSAS DELTA EXPLORATION COMPANY, LLC

By _____
    Michael E. Riddick
    Executive Vice President

EXHIBIT "A"

Attached to and made a part of that certain Exploration Agreement dated as of the 1st day of February, 2007, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd. and Tensas Delta Exploration Company LLC

## Area of Mutual Interest Plat

## EXHIBIT "B"

Attached to and made a part of that certain Exploration Agreement dated as of the 1st day of February, 2007, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd. and Tensas Delta Exploration Company LLC

### Description of Oil, Gas And Mineral Leases

### Section 28:  Township 18 North, Range 6 West

1. Oil, Gas and Mineral Lease dated February 20, 2004, by and between Philemon J. Whatley and Willie Mae Simpson Whatley, as Lessors, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20041377, recorded in Book 964, Page 848 of the Conveyance Records of Bienville Parish, Louisiana.

2. Oil, Gas and Mineral Lease dated March 3, 2004, by and between Cindy Lou Cloyd, as Lessors, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20041378, recorded in Book 964, Page 851 of the Conveyance Records of Bienville Parish, Louisiana.

3. Oil, Gas and Mineral Lease dated March 3, 2004, by and between Daniel Read, Trustee of the Daniel Read Living Trust, dated July 23, 2001, as Lessors, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20041379, recorded in Book 964, Page 854 of the Conveyance Records of Bienville Parish, Louisiana.

4. Oil, Gas and Mineral Lease dated March 15, 2004, by and between Charles Ray Hassell and Louise S. Hassell, Co-Trustees of the Hassell 1989 Trust, as Lessors, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20041374, recorded in Book 964, Page 839 of the Conveyance Records of Bienville Parish, Louisiana.

5. Oil, Gas and Mineral Lease dated March 15, 2004, by and between Elizabeth Ann Hassell Turner, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20041375, recorded in Book 964, Page 842 of the Conveyance Records of Bienville Parish, Louisiana.

6. Oil, Gas and Mineral Lease dated March 15, 2004, by and between Joan Marie Hassell Simpson, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20041376, recorded in Book 964, Page 845 of the Conveyance Records of Bienville Parish, Louisiana.

7. Oil, Gas and Mineral Lease dated April 15, 2004, by and between John Clinton Merritt, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20041589, recorded in Book 965, Page 320 of the Conveyance Records of Bienville Parish, Louisiana.

8. Oil, Gas and Mineral Lease dated April 19, 2004, by and between Judy K. Merritt Carter, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20041588, recorded in Book 965, Page 316 of the Conveyance Records of Bienville Parish, Louisiana.

9. Oil, Gas and Mineral Lease dated April 19, 2004, by and between Janet Ann Merritt Robinson, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20041587, recorded in Book 965, Page 313 of the Conveyance Records of Bienville Parish, Louisiana.

10. Oil, Gas and Mineral Lease dated April 23, 2004, by and between Mary Lane Day, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20041719 recorded in Book 965, Page 500 of the Conveyance Records of Bienville Parish, Louisiana.

11. Oil, Gas and Mineral Lease dated April 19, 2004, by and between William Jefferson Day, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20041720

recorded in Book 965, Page 503 of the Conveyance Records of Bienville Parish, Louisiana.

12. Oil, Gas and Mineral Lease dated March 2, 2004, by and between Haynesville Mercantile Company, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20041721 recorded in Book 965, Page 506 of the Conveyance Records of Bienville Parish, Louisiana.

13. Oil, Gas and Mineral Lease dated June 14, 2004, by and between William Oates, Trustee of the Gloria Oates Living Trust dated October 10, 1983, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20042309 recorded in Book 966, Page 722 of the Conveyance Records of Bienville Parish, Louisiana.

14. Oil, Gas and Mineral Lease dated July 8, 2004, by and between Meredith Lynn Noel Day, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20042254, recorded in Book 966, Page 566 of the Conveyance Records of Bienville Parish, Louisiana.

15. Oil, Gas and Mineral Lease dated July 27, 2004, by and between Willie Mae Hassell Daniel and L. H. Daniel, as Lessors, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20042880, recorded in Book 967, Page 932 of the Conveyance Records of Bienville Parish, Louisiana.

16. Oil, Gas and Mineral Lease dated August 3, 2004, by and between Harry L. Plaster, et al, as Lessors, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20042879, recorded in Book 967, Page 929 of the Conveyance Records of Bienville Parish, Louisiana.

17. Oil, Gas and Mineral Lease dated August 5, 2004, by and between Beverly Lynn Gantt Mazza, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20042881, recorded in Book 967, Page 936 of the Conveyance Records of Bienville Parish, Louisiana.

18. Oil, Gas and Mineral Lease dated August 18, 2004, by and between James Keith Baker, II, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20043260, recorded in Book 968, Page 641 of the Conveyance Records of Bienville Parish, Louisiana.

19. Oil, Gas and Mineral Lease dated August 5, 2004, by and between Carol Elaine Koschak, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20043261, recorded in Book 968, Page 644 of the Conveyance Records of Bienville Parish, Louisiana.

20. Oil, Gas and Mineral Lease dated August 18, 2004, by and between John Forest Baker, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20043731, recorded in Book 969, Page 565 of the Conveyance Records of Bienville Parish, Louisiana.

21. Oil, Gas and Mineral Lease dated September 29, 2004, by and between Red Barn Land Company, L.P., as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20043730, recorded in Book 969, Page 562 of the Conveyance Records of Bienville Parish, Louisiana.

22. Oil, Gas and Mineral Lease dated January 5, 2005, by and between Haynesville Mercantile Company, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20051030, of the Conveyance Records of Bienville Parish, Louisiana.

23. Oil, Gas and Mineral Lease dated October 8, 2004, by and between Timothy H. Atkins and Melissa T. Atkins, as Lessors, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20044325, recorded in Book 970, Page 829 of the Conveyance Records of Bienville Parish, Louisiana.

24. Oil, Gas and Mineral Lease dated November 1, 2004, by and between Elizabeth Lynn Noel Mathews, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20044323 recorded in Book 970, Page 823 of the Conveyance Records of Bienville Parish, Louisiana.

25. Oil, Gas and Mineral Lease dated November 10, 2004, by and between Veronica L. Harris, herein represented by Gerald W. Harris, her True and Lawful Agent and Attorney-in-Fact, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20044324, recorded in Book 970, Page 826 of the Conveyance Records of Bienville Parish, Louisiana.

26. Oil, Gas and Mineral Lease dated March 15, 2005, by and between Mary Elizabeth Holley, as Lessor,      and Sklarco L.L.C., as Lessee, filed under Registry No. 20052855 , recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

27. Oil, Gas and Mineral Lease dated July 15, 2005, by and between The Kansas City Southern Railway Company, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20053460, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

28. Oil, Gas and Mineral Lease dated August 9, 2005, by and between H. Preston Holley, Jr., as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20054260, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

29. Oil, Gas and Mineral Lease dated March 16, 2005, by and between Terry Lynn Holley, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20054259, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

30. Oil, Gas and Mineral Lease dated April 19, 1960, by and between Annie Lou Jones  et vir, as Lessor, and John L. Copeland, as Lessee, filed under Registry No. P-1857, recorded in Book 237, Page 203 of the Conveyance Records of Bienville Parish, Louisiana,  insofar and only insofar as same covers that interest earned under that farmout agreement dated September 6, 2005, agreed and accepted September 19, 2005, by and between Exxon Mobil Corporation, as Farmor,  and Sklar Exploration Company L.L.C., as Farmee.

INSOFAR AND ONLY INSOFAR AS THE ABOVE DESCRIBED OIL, GAS AND MINERAL LEASES COVER LANDS WITHIN SECTION 28 OF TOWNSHIP 18 NORTH, RANGE 6 WEST, BIENVILLE PARISH, LOUISIANA.

## EXHIBIT "C"

Attached to and made a part of that certain Exploration Agreement dated as of the 1st day of February, 2007, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd. and Tensas Delta Exploration Company LLC

### Description of Oil, Gas And Mineral Leases

### Section 33:  Township 18 North, Range 6 West

1. Oil, Gas and Mineral Lease dated February 20, 2004, by and between Philemon J. Whatley and Willie Mae Simpson Whatley, as Lessors, and Sklarco, L.L.C., as Lessee, filed under Registry Number 20041377, recorded in Book 964, Page 848 of the Conveyance Records of Bienville Parish, Louisiana.

2. Oil, Gas and Mineral Lease dated November 10, 2005, by and between The Gloria Oates Living Trust, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061544, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

3. Oil, Gas and Mineral Lease dated November 10, 2005, by and between Janet Ann Merritt Robinson, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061547, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

4. Oil, Gas and Mineral Lease dated November 10, 2005, by and between Meredith Lynn Noel Day, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061539, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

5. Oil, Gas and Mineral Lease dated November 10, 2005, by and between Jerry T. Carter, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061540, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

6. Oil, Gas and Mineral Lease dated November 10, 2005, by and between John Clinton Merritt, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061541, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

7. Oil, Gas and Mineral Lease dated November 10, 2005, by and between Judy K. Merritt Carter, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061546, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

8. Oil, Gas and Mineral Lease dated November 10, 2005, by and between Beverly Lynn Gantt Mazza, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061542, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

9. Oil, Gas and Mineral Lease dated November 10, 2005, by and between Mary Lane Day, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061550, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

10. Oil, Gas and Mineral Lease dated November 10, 2005, by and between Carol Elaine Koschak, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061548, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

11. Oil, Gas and Mineral Lease dated February 6, 2006, by and between Veronica Landry, a/k/a Veronica Landry-Harris, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061543, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

12. Oil, Gas and Mineral Lease dated January 31, 2006, by and between Andre Toliver, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061551, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

13. Oil, Gas and Mineral Lease dated January 31, 2006, by and between Clinton Holland, Sr., as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061549, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

14. Oil, Gas and Mineral Lease dated January 24, 2006, by and between William Jefferson Day, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061545, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

15. Oil, Gas and Mineral Lease dated November 10, 2005, by and between Terry Lynn Holley, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061675, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

16. Oil, Gas and Mineral Lease dated March 21, 2006, by and between John Douglas Bryant, Jr., as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061676, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

17. Oil, Gas and Mineral Lease dated January 31, 2006, by and between Terri Holland, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061677, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

18. Oil, Gas and Mineral Lease dated April 17, 2006, by and between Elizabeth Lynn Noel Mathews, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20062505, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

19. Oil, Gas and Mineral Lease dated January 31, 2006, by and between Lawrence E. Holland, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20062504, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

20. Oil and Gas Lease dated March 28, 2006, by and between Weyerhaeuser Company, as Lessor, and Sklarco L.L.C., as Lessee, the existence of which is evidenced by that Memorandum of Oil and Gas Lease filed under Registry No. 20062136, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

21. Oil, Gas and Mineral Lease dated January 31, 2006, by and between Willie R. Holland, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20062507, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

22. Oil, Gas and Mineral Lease dated May 3, 2006, by and between Mary Elizabeth Holley, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20062506, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

23. Oil, Gas and Mineral Lease dated March 31, 2006, by and between George P. Bryant, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20064217, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

24. Oil, Gas and Mineral Lease dated July 11, 2006, by and between Wand Ann Holland, et al, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20064220, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

25. Oil, Gas and Mineral Lease dated April 17, 2006, by and between Charlie Bryant, Jr., as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20064219, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

26. Oil, Gas and Mineral Lease dated February 3, 2006, by and between Monica L. Elder, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20064218, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

27. Oil, Gas and Mineral Lease dated August 14, 2006, by and between Floyd Bryant, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20064221, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

28. Oil, Gas and Mineral Lease dated August 14, 2006, by and between Monique Bryant, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20065640, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

29. Oil, Gas and Mineral Lease dated August 14, 2006, by and between John Douglas Bryant, III, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20065641, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

30. Oil, Gas and Mineral Lease dated November 20, 2006, by and between Leo Lawrence Bryant, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20070875, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

INSOFAR AND ONLY INSOFAR AS THE ABOVE DESCRIBED OIL, GAS AND MINERAL LEASES COVER LANDS WITHIN SECTION 33 OF TOWNSHIP 18 NORTH, RANGE 6 WEST, BIENVILLE PARISH, LOUISIANA.

## EXHIBIT "D"

Attached to and made a part of that certain Exploration Agreement dated as of the 1st day of February, 2007, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd. and Tensas Delta Exploration Company LLC

### Authority For Expenditure

**SKLAR Exploration Company L.L.C.**
401 Edwards St.  Suite 1601
Shreveport, LA 71101
(318) 227-8668

**AUTHORITY FOR EXPENDITURE**

| DATE: | March 19, 2007 | FIELD: | West Arcadia |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | LA |
| WELL: | Section 33 Proposed Drillwell | HORIZON: | Hosston |
| LOCATION: | Bienville Parish | PROJ. T.D.: | 8,400' |

PROPOSAL:   Drill & complete a well in the Hosston. Includes costs for single stage fracture stimulation

Date last revised: March 19, 2007

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | LEASEHOLD COSTS | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | TOTAL LEASEHOLD COSTS | $0 | $0 | $0 |
| | | | | |
| 9200/9300 | INTANGIBLE DRILLING & COMPLETION | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 8,000 | | 8,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 90,000 | | 90,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 15,000 | | 15,000 |
| 04 | SURFACE DAMAGES & ROW | 10,000 | | 10,000 |
| 05 | SETTING CONDUCTOR CASING | 10,000 | | 10,000 |
| 07 | RIG MOBILIZE/DEMOBILIZE | 80,000 | | 80,000 |
| 08 | DRILLING - FOOTAGE | | | |
| 09 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | | | |
| 11 | DAYWORK WITHOUT DRILL PIPE | 321,000 | 54,000 | 375,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 20,000 | 8,000 | 28,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 5,000 | | 5,000 |
| 15 | COIL TUBING UNIT | | 15,000 | 15,000 |
| 16 | DIRECTIONAL\DRILLING TOOLS & SVCS | | | |
| 17 | MUD & CHEMICALS | 40,000 | | 40,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 9,500 | | 9,500 |
| 24 | CEMENTING & EQUIPMENT | 20,000 | 40,000 | 60,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 10,000 | 15,000 | 25,000 |
| 26 | PIPE TESTING | | 5,000 | 5,000 |
| 27 | EQUIPMENT RENTALS | 17,000 | 15,000 | 32,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 2,000 | | 2,000 |
| 30 | WATER | 2,800 | | 2,800 |
| 31 | FUEL | 25,000 | | 25,000 |
| 32 | BITS | 35,000 | 1,000 | 36,000 |
| 33 | TRANSPORTATION & TRUCKING | 3,500 | 10,000 | 13,500 |
| 34 | CONTRACT LABOR | 2,000 | 15,000 | 17,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 40,000 | 12,000 | 52,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | | |
| 47 | PERFORATION SERVICES | | 40,800 | 40,800 |
| 48 | COMPLETION FLUIDS | | 15,000 | 15,000 |
| 49 | STIMULATION SERVICES | | 20,000 | 20,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | 115,000 | 115,000 |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | 15,000 | 15,000 |
| 61 | SALT WATER DISPOSAL | 1,000 | | 1,000 |
| 62 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | | |
| 65 | PLUG & ABANDON COSTS | 25,000 | -25,000 | |
| 78 | INSURANCE | 29,000 | | 29,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 3,000 | 3,000 | 6,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 39,000 | 19,000 | 58,000 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $863,000 | $393,000 | $1,256,000 |
| | | | | |
| 9500 | TANGIBLE EQUIPMENT - DRILLING | | | |
| 02 | SURFACE CASING | 30,000 | | 30,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,000 | | 3,000 |
| 05 | WELLHEAD EQUIPMENT | 2,500 | | 2,500 |
| 06 | CONDUCTOR CASING | 8,000 | | 8,000 |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $43,500 | $0 | $43,500 |
| | | | | |
| 9520 | TANGIBLE EQUIPMENT - COMPLETION | | | |
| 21 | PRODUCTION CASING & LINERS | | 120,000 | 120,000 |
| 22 | TUBING | | 55,000 | 55,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 16,000 | 16,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $211,000 | $211,000 |
| | | | | |
| 9535 | SURFACE PRODUCTION EQUIPMENT | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 10,000 | 10,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 35,000 | 35,000 |
| 44 | FLOWLINES FITTINGS, CONNECTIONS | | 20,000 | 20,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 7,500 | 7,500 |
| 46 | SALES METERING EQUIPMENT | | 10,000 | 10,000 |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $82,500 | $82,500 |
| | | | | |
| | TOTAL EQUIPMENT | $43,500 | $293,500 | $337,000 |
| | | | | |
| | TOTAL WELL COST | $907,000 | $687,000 | $1,593,000 |

APPROVED:_____, 2007

BY:_____

SWG

## EXHIBIT "E"

Attached to and made a part of that certain Exploration Agreement dated as of the 1st day of February, 2007, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd. and Tensas Delta Exploration Company LLC

### Description of Oil, Gas And Mineral Leases

### Section 16: Township 18 North, Range 6 West

1. Oil, Gas and Mineral Lease dated October 30, 2000, by and between Washington & Lee University, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010078, recorded in Book 895, Page 195 of the Conveyance Records of Bienville Parish, Louisiana.

2. Oil, Gas and Mineral Lease dated October 17, 2000, by and between Kathryn Cole Eeds, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010096, recorded in Book 895, Page 250 of the Conveyance Records of Bienville Parish, Louisiana.

3. Oil, Gas and Mineral Lease dated November 1, 2000, by and between Gene Anne Martin Reynolds, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010102, recorded in Book 895, Page 268 of the Conveyance Records of Bienville Parish, Louisiana.

4. Oil, Gas and Mineral Lease dated January 24, 2001, by and between Timothy H. Atkins, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010747, recorded in Book 901, Page 272 of the Conveyance Records of Bienville Parish, Louisiana.

5. Oil, Gas and Mineral Lease dated October 4, 2000, by and between Carl Justin Greer, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010077, recorded in Book 895, Page 192 of the Conveyance Records of Bienville Parish, Louisiana.

6. Oil, Gas and Mineral Lease dated October 27, 2000, by and between Darlene Lee Gilmer, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010082, recorded in Book 895, Page 208 of the Conveyance Records of Bienville Parish, Louisiana.

7. Oil, Gas and Mineral Lease dated October 4, 2000, by and between Henry Wilson Greer, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010089, recorded in Book 895, Page 229 of the Conveyance Records of Bienville Parish, Louisiana.

8. Oil, Gas and Mineral Lease dated October 12, 2000, by and between Don D Webber, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010076, recorded in Book 895, Page 189 of the Conveyance Records of Bienville Parish, Louisiana.

9. Oil, Gas and Mineral Lease dated October 4, 2000, by and between Thomas L. Gilmer, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010074, recorded in Book 895, Page 183 of the Conveyance Records of Bienville Parish, Louisiana.

10. Oil, Gas and Mineral Lease dated October 12, 2000, by and between Gordie T Green, III, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010099, recorded in Book 895, Page 259 of the Conveyance Records of Bienville Parish, Louisiana.

11. Oil, Gas and Mineral Lease dated October 23, 2000, by and between Bennie Green Manshack, as Lessor and KCS Resources, Inc., as Lessee filed under Registry No. 20010101, recorded in Book 895, Page 265 of the Conveyance Records of Bienville Parish, Louisiana.

12. Oil, Gas and Mineral Lease dated October 03, 2000, by and between Everett Lee Edwards, Jr., as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010103, recorded in Book 895, Page 271 of the Conveyance Records of Bienville Parish, Louisiana.

13. Oil, Gas and Mineral Lease dated October 4, 2000, by and between Myrtis Lillian J. Nolan, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010106, recorded in Book 895, Page 280 of the Conveyance Records of Bienville Parish, Louisiana.

14. Oil, Gas and Mineral Lease dated October 18, 2000, by and between Lyneet Mitchell, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010107, recorded in Book 895, Page 283 of the Conveyance Records of Bienville Parish, Louisiana.

15. Oil, Gas and Mineral Lease dated October 18, 2000, by and between Earl Newton Greer, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010109, recorded in Book 895, Page 289 of the Conveyance Records of Bienville Parish, Louisiana.

16. Oil, Gas and Mineral Lease dated October 3, 2000, by and between Gloria Ann Maddry, et al, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010110, recorded in Book 895, Page 292 of the Conveyance Records of Bienville Parish, Louisiana.

17. Oil, Gas and Mineral Lease dated October 18, 2000, by and between Pam Anthony, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010129, recorded in Book 895, Page 322 of the Conveyance Records of Bienville Parish, Louisiana.

18. Oil, Gas and Mineral Lease dated October 3, 2000, by and between John Thomas Greer, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010087, recorded in Book 895, Page 223 of the Conveyance Records of Bienville Parish, Louisiana.

19. Oil, Gas and Mineral Lease dated October 6, 2000, by and between Bonnie Faye Fay, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010131, recorded in Book 895, Page 328 of the Conveyance Records of Bienville Parish, Louisiana.

20. Oil, Gas and Mineral Lease dated October 3, 2000, by and between Loyd T. Hammontree, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010092, recorded in Book 895, Page 238 of the Conveyance Records of Bienville Parish, Louisiana.

21. Oil, Gas and Mineral Lease dated October 3, 2000, by and between Mary Lee Green Latino, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010093, recorded in Book 895, Page 241 of the Conveyance Records of Bienville Parish, Louisiana.

22. Oil, Gas and Mineral Lease dated October 4, 2000, by and between Mary Lucille Chapman, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010085, recorded in Book 895, Page 217 of the Conveyance Records of Bienville Parish, Louisiana.

23. Oil, Gas and Mineral Lease dated October 4, 2000, by and between Bobby Gene Gilmer, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010086, recorded in Book 895, Page 220 of the Conveyance Records of Bienville Parish, Louisiana.

24. Oil, Gas and Mineral Lease dated October 6, 2000, by and between Ronald Wayne Gilmer, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20013398, recorded in Book 899, Page 41 of the Conveyance Records of Bienville Parish, Louisiana.

25. Oil, Gas and Mineral Lease dated October 9, 2000, by and between Beth Green Mericle, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010138, recorded in Book 896, Page 11 of the Conveyance Records of Bienville Parish, Louisiana.

26. Oil, Gas and Mineral Lease dated October 4, 2000, by and between Marie Greer Butler, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010748, recorded in Book 901, Page 275 of the Conveyance Records of Bienville Parish, Louisiana.

27. Oil, Gas and Mineral Lease dated October 3, 2000, by and between Bertie Lee O'Quin, et al, as Lessors, and KCS Resources, Inc., as Lessee filed under Registry No. 20010969, recorded in Book 903, Page 311 of the Conveyance Records of Bienville Parish, Louisiana.

28. Oil, Gas and Mineral Lease dated December 19, 2000, by and between CTC Minerals Inc., as Lessor and KCS Resources, Inc., as Lessee filed under Registry No. 20010447, recorded in Book 899, Page 138 of the Conveyance Records of Bienville Parish, Louisiana.

29. Oil, Gas and Mineral Lease dated October 16, 2000, by and between Lee Paterson Futch, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010130, recorded in Book 895, Page 325 of the Conveyance Records of Bienville Parish, Louisiana.

30. Oil, Gas and Mineral Lease dated October 6, 2000, by and between Beryl Louise White Saucer, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010098, recorded in Book 895, Page 256 of the Conveyance Records of Bienville Parish, Louisiana.

31. Oil, Gas and Mineral Lease dated October 16, 2000, by and between Beverly Stewart Ostroska, as Lessor, and KCS Resources, Inc., as Lessee filed under Registry No. 20010108, recorded in Book 895, Page 286 of the Conveyance Records of Bienville Parish, Louisiana.

32. Oil, Gas and Mineral Lease dated October 16, 2000, by and between Thomas B. White, Jr., as Lessor and KCS Resources, Inc., as Lessee filed under Registry No. 20010105, recorded in Book 895, Page 277 of the Conveyance Records of Bienville Parish, Louisiana.

33. Oil, Gas and Mineral Lease dated October 2, 2000, by and between Belen M. Singleton, et al, as Lessor, and KCS Resources, Inc., as Lessee, filed under Registry No. 20010081, recorded in Book 895, Page 205 of the Conveyance Records of Bienville Parish, Louisiana.

34. Oil, Gas and Mineral Lease dated December 1, 2000, by and between Albert L. Faulk, as Lessor, and KCS Resources, Inc., as Lessee, filed under Registry No. 20010079, recorded in Book 895, Page 199 of the Conveyance Records of Bienville Parish, Louisiana.

35. Oil, Gas and Mineral Lease dated October 18, 2000, by and between Margaret Melton Malone, as Lessor, and KCS Resources, Inc., as Lessee, filed under Registry No. 20010084, recorded in Book 895, Page 214 of the Conveyance Records of Bienville Parish, Louisiana.

36. Oil, Gas and Mineral Lease dated October 23, 2000, by and between Eleanor Melton Riordan, as Lessor, and KCS Resources, Inc., as Lessee, filed under Registry No. 20010097, recorded in Book 895, Page 253 of the Conveyance Records of Bienville Parish, Louisiana.

37. Oil, Gas and Mineral Lease dated October 30, 2000, by and between Marcelle Marie Materson, as Lessor and KCS Resources, Inc., as Lessee, filed under Registry No.

20010095, recorded in Book 895, Page 247 of the Conveyance Records of Bienville Parish, Louisiana.

38. Oil, Gas and Mineral Lease dated October 18, 2000, by and between James L Loe, et ux, as Lessors, and KCS Resources, Inc., as Lessee, filed under Registry No. 20010094, recorded in Book 895, Page 244 of the Conveyance Records of Bienville Parish, Louisiana.

39. Oil, Gas and Mineral Lease dated October 23, 2000, by and between Sidney P. Huff, III, as Lessor, and KCS Resources, Inc., as Lessee, filed under Registry No. 20010083, recorded in Book 895, Page 211 of the Conveyance Records of Bienville Parish, Louisiana.

40. Oil, Gas and Mineral Lease dated October 27, 2000, by and between H. D. Melton, III, as Lessor, and KCS Resources, Inc., as Lessee, filed under Registry No. 20010399, recorded in Book 899, Page 44 of the Conveyance Records of Bienville Parish, Louisiana.

41. Oil, Gas and Mineral Lease dated October 30, 2000, by and between Carolyn Melton Marsh, as Lessor, and KCS Resources, Inc., as Lessee, filed under Registry No. 20010100, recorded in Book 895, Page 262 of the Conveyance Records of Bienville Parish, Louisiana.

42. Oil, Gas and Mineral Lease dated October 19, 2000, by and between Henry Dayton Thrash, Individually and as Executor for Succession of Janice Smith Thrash, as Lessor, and KCS Resources, Inc., as Lessee, filed under Registry No. 20010091, recorded in Book 895, Page 235 of the Conveyance Records of Bienville Parish, Louisiana.

43. Oil, Gas and Mineral Lease dated October 30, 2000, by and between Mary T. Holstead, et al, as Lessors, and KCS Resources, Inc., as Lessee, filed under Registry No. 20010080, recorded in Book 895, Page 201 of the Conveyance Records of Bienville Parish, Louisiana.

44. Oil, Gas and Mineral Lease dated October 30, 2000, by and between Jack Turner Taylor, Jr., as Lessor, and KCS Resources, Inc., as Lessee, filed under Registry No. 20010139, recorded in Book 896, Page 14 of the Conveyance Records of Bienville Parish, Louisiana.

45. Oil, Gas and Mineral Lease dated February 13, 2001, by and between Mosely Custodial Trust, as Lessor and KCS Resources, Inc., as Lessee, filed under Registry No. 20010827, recorded in Book 902, Page 222 of the Conveyance Records of Bienville Parish, Louisiana.

46. Oil, Gas and Mineral Lease dated October 27, 2000, by and between Mary Mosely Newsom Trust, as Lessor, and KCS Resources, Inc., as Lessee, filed under Registry No. 20011189, recorded in Book 905, Page 323 of the Conveyance Records of Bienville Parish, Louisiana.

47. Oil, Gas and Mineral Lease dated February 7 2000, by and between Charles H. Jowers, et ux, as Lessors, and KCS Resources, Inc., as Lessee, filed under Registry No. 2001-0450, recorded in Book 899, Page 155 of the Conveyance Records of Bienville Parish, Louisiana.

48. Oil, Gas and Mineral Lease dated December 7, 2000, by and between Troy S. Brown, et al, as Lessors, and KCS Resources, Inc., as Lessee, filed under Registry No. 20010449, recorded in Book 899, Page 150 of the Conveyance Records of Bienville Parish, Louisiana.

49. Oil, Gas and Mineral Lease dated January 13, 2001, by and between Robert Pitts Thomas, as Lessor, and KCS Resources, Inc., as Lessee, filed under Registry No. 20010448, recorded in Book 899, Page 146 of the Conveyance Records of Bienville Parish, Louisiana.

50. Oil, Gas and Mineral Lease dated April 30, 2001, by and between Lorraine R. Gray, as Lessor, and KCS Resources, Inc., as Lessee, filed under Registry No. 20012248, recorded in Book 912, Page 259 of the Conveyance Records of Bienville Parish, Louisiana.

51. Oil, Gas and Mineral Lease dated April 30, 2001, by and between Ruby Delitha Gray, as Lessor, and KCS Resources, Inc., as Lessee, filed under Registry No. 20012247, recorded in Book 912, Page 262 of the Conveyance Records of Bienville Parish, Louisiana.

52. Oil, Gas and Mineral Lease dated January 23, 1978, by and between Shirley Joiner Harper, as Lessor, and WHB Exploration, Inc., as Lessee, filed under Registry No.____, recorded in Book 390, Page 15 of the Conveyance Records of Bienville Parish, Louisiana.

53. Oil, Gas and Mineral Lease dated January 23, 1978, by and between Joe Oren Harper, Jr., as Lessor, and WHB Exploration, Inc., as Lessee, filed under Registry No. ____, recorded in Book 390, Page 70 of the Conveyance Records of Bienville Parish, Louisiana.

54. Oil, Gas and Mineral Lease dated December 16, 2005, by and between Robert Pitts Thomas, as Lessor, and Tensas Delta Exploration Company LLC, as Lessee, recorded under Registry No. 20060177 of the Conveyance Records of Bienville Parish, Louisiana.

INSOFAR AND ONLY INSOFAR AS THE ABOVE DESCRIBED OIL, GAS AND MINERAL LEASES COVER LANDS WITHIN SECTION 16 OF TOWNSHIP 18 NORTH, RANGE 6 WEST, BIENVILLE PARISH, LOUISIANA.

### Description of Farmout Agreements

1. That certain Farmout Agreement dated March 28, 2005, by and between KCS Resources, Inc., as Farmor, and Tensas Delta Exploration Company, LLC, as Farmee, covering lands located in Section 16, T18N, R6W, Bienville Parish, Louisiana.

2. That certain Farmout Agreement dated July 27, 2005, by and between Unit Petroleum Company, as Farmor, and Tensas Delta Exploration Company, LLC, as Farmee, covering lands located in Section 16, T18N, R6W, Bienville Parish, Louisiana.

3. That certain Farmout Agreement dated July 27, 2005, by and between Atlanta Guardian Company, LLC, as Farmor, and Tensas Delta Exploration Company, LLC, as Farmee, covering lands located in Section 16, T18N, R6W, Bienville Parish, Louisiana.

EXHIBIT "F"

Attached to and made a part of that certain Exploration Agreement dated as of the 1st day of February, 2007, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd. and Tensas Delta Exploration Company LLC

## Description of Oil, Gas And Mineral Leases

### Section 4: Township 18 North, Range 6 West

1. Oil, Gas and Mineral Lease dated February 17, 2003, by and between Drew Bridges, et ux, as Lessors, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20032121, recorded in Book 957, Page 431 of the Conveyance Records of Bienville Parish, Louisiana.

2. Oil, Gas and Mineral Lease dated February 27, 2004, by and between Drew Bridges, et ux, as Lessors, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20041904, recorded in Book 965, Page 863 of the Conveyance Records of Bienville Parish, Louisiana.

3. Oil, Gas and Mineral Lease dated March 1, 2003, by and between Virginia K. Upshaw, as Lessor, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20032122, recorded in Book 957, Page 433 of the Conveyance Records of Bienville Parish, Louisiana.

4. Oil, Gas and Mineral Lease dated March 17, 2004, by and between Henry Warren Patterson, et ux, as Lessors, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20041901, recorded in Book 965, Page 854 of the Conveyance Records of Bienville Parish, Louisiana.

5. Oil, Gas and Mineral Lease dated February 27, 2004, by and between Georgia Bridges Harmon, as Lessor, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20041902, recorded in Book 965, Page 857 of the Conveyance Records of Bienville Parish, Louisiana.

6. Oil, Gas and Mineral Lease dated February 27, 2004, by and between Teddie John Harmon, as Lessor, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20041903, recorded in Book 965, Page 860 of the Conveyance Records of Bienville Parish, Louisiana.

7. Oil, Gas and Mineral Lease dated February 27, 2004, by and between Jo Ann Harmon Geary, as Lessor, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20041911, recorded in Book 965, Page 876 of the Conveyance Records of Bienville Parish, Louisiana.

8. Oil, Gas and Mineral Lease dated February 27, 2004, by and between Minnie Estelle Methvin Skinner, et al, as Lessors, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20041905, recorded in Book 965, Page 866 of the Conveyance Records of Bienville Parish, Louisiana.

9. Oil, Gas and Mineral Lease dated February 27, 2004, by and between Joyce Skinner Brazzel, as Lessor, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20041906, recorded in Book 965, Page 868 of the Conveyance Records of Bienville Parish, Louisiana.

10. Oil, Gas and Mineral Lease dated February 27, 2004, by and between Gloria Jean Skinner Thomas, as Lessor, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20041907, recorded in Book 965, Page 870 of the Conveyance Records of Bienville Parish, Louisiana.

11. Oil, Gas and Mineral Lease dated February 25, 2004, by and between Martha Ann Goff Green, as Lessor, and Cypress Operating, Inc, as Lessee, filed under Registry No.

20041908, recorded in Book 965, Page 872 of the Conveyance Records of Bienville Parish, Louisiana.

12. Oil, Gas and Mineral Lease dated February 25, 2004, by and between William M. Johnson Goff, as Lessor, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20041909, recorded in Book 965, Page 874 of the Conveyance Records of Bienville Parish, Louisiana.

13. Oil, Gas and Mineral Lease dated December 5, 2005, by and between G&Y Sstill LP, et al, as Lessors, and Tensas Delta Exploration Company LLC, as Lessee, filed under Registry No. 20061085 of the Conveyance Records of Bienville Parish, Louisiana.

14. Oil, Gas and Mineral Lease dated December 17, 2005, by and between James Robert McClung, as Lessor, and Tensas Delta Exploration Company LLC, as Lessee, filed under Registry No. 20061084 of the Conveyance Records of Bienville Parish, Louisiana.

15. Oil, Gas and Mineral Lease dated December 17, 2005, by and between James G. McKenzie, as Lessor, and Tensas Delta Exploration Company LLC, as Lessee, filed under Registry No. 20061083 of the Conveyance Records of Bienville Parish, Louisiana.

16. Oil, Gas and Mineral Lease dated December 17, 2005, by and between Sarah Frances Little, as Lessor, and Tensas Delta Exploration Company LLC, as Lessee, filed under Registry No. 20061082 of the Conveyance Records of Bienville Parish, Louisiana.

17. Oil, Gas and Mineral Lease dated December 17, 2005, by and between Charles D. McKenzie, as Lessor, and Tensas Delta Exploration Company LLC, as Lessee, filed under Registry No. 20061081 of the Conveyance Records of Bienville Parish, Louisiana.

18. Oil, Gas and Mineral Lease dated December 17, 2005, by and between Nell Pearlman Love, as Lessor, and Tensas Delta Exploration Company LLC, as Lessee, filed under Registry No. 20061080 of the Conveyance Records of Bienville Parish, Louisiana.

19. Oil, Gas and Mineral Lease dated December 17, 2005, by and between Phillip T. McKenzie, as Lessor, and Tensas Delta Exploration Company LLC, as Lessee, filed under Registry No. 20061079 of the Conveyance Records of Bienville Parish, Louisiana.

20. Oil, Gas and Mineral Lease dated December 17, 2005, by and between Ellis Ann McKenzie Lay, as Lessor, and Tensas Delta Exploration Company LLC, as Lessee, filed under Registry No. 20061078 of the Conveyance Records of Bienville Parish, Louisiana.

21. Oil, Gas and Mineral Lease dated March 1, 2003, by and between Virginia K. Upshaw, as Lessor, and Cypress Operating, Inc., as Lessee, filed under Registry No. 20061247 of the Conveyance Records of Bienville Parish, Louisiana.

22. Oil, Gas and Mineral Lease dated February 17, 2003, by and between Drew Bridge, ex ux, as Lessor, and Cypress Operating, Inc., as Lessee, filed under Registry No. 20061086 of the Conveyance Records of Bienville Parish, Louisiana.

23. Oil, Gas and Mineral Lease dated March 27, 2006, by and between Weyerhaeuser Company, as Lessor, and Tensas Delta Exploration Company LLC, as Lessee, filed under Registry No. 20061743 of the Conveyance Records of Bienville Parish, Louisiana.

24. Oil, Gas and Mineral Lease dated May 30, 2006, by and between Nancy J. Bond, as Lessor, and Tensas Delta Exploration Company LLC, as Lessee, filed under Registry No. 20063476 of the Conveyance Records of Bienville Parish, Louisiana.

INSOFAR AND ONLY INSOFAR AS THE ABOVE DESCRIBED OIL, GAS AND MINERAL LEASES COVER LANDS WITHIN SECTION 4 OF TOWNSHIP 18 NORTH, RANGE 6 WEST, BIENVILLE PARISH, LOUISIANA.

## EXHIBIT "G"

Attached to and made a part of that certain Exploration Agreement dated as of the 1st day of February, 2007, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd. and Tensas Delta Exploration Company LLC

### Description of Oil, Gas And Mineral Leases

### Section 3: Township 18 North, Range 6 West

1. Oil, Gas and Mineral Lease dated January 9, 2003, by and between Louisiana Minerals, Ltd., as Lessor, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20030583, recorded in Book 954, Page 972 of the Conveyance Records of Bienville Parish, Louisiana.

2. Oil, Gas and Mineral Lease dated January 28, 2003, by and between Mt. Mariah United Methodist Church, as Lessor, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20030589, recorded in Book 954, Page 1001 of the Conveyance Records of Bienville Parish, Louisiana.

3. Oil, Gas and Mineral Lease dated January 15, 2003, by and between Joe D. Burns, et al, as Lessors, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20030588, recorded in Book 954, Page 996 of the Conveyance Records of Bienville Parish, Louisiana.

4. Oil, Gas and Mineral Lease dated March 4, 2003, by and between Timothy H. Atkins, as Lessor, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20030889, recorded in Book 955, Page 346 of the Conveyance Records of Bienville Parish, Louisiana.

5. Oil, Gas and Mineral Lease dated February 18, 2003, by and between Harvey Crowder,e t ux, as Lessors, and Cypress Operating, Inc, as Lessee, filed under Registry No. 2003809, recorded in Book 955, Page 196 of the Conveyance Records of Bienville Parish, Louisiana.

6. Oil, Gas and Mineral Lease dated February 4, 2003, by and between Nancy J. Bond, et vir, as Lessors, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20030590, recorded in Book 954, Page 1007 of the Conveyance Records of Bienville Parish, Louisiana.

7. Oil, Gas and Mineral Lease dated January 28, 2003, by and between Frances Duran Crain, as Lessor, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20030587, recorded in Book 954, Page 991 of the Conveyance Records of Bienville Parish, Louisiana.

8. Oil, Gas and Mineral Lease dated January 28, 2003, by and between Mt. Mariah Cemetery Association, as Lessor, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20030586, recorded in Book 954, Page 985 of the Conveyance Records of Bienville Parish, Louisiana.

9. Oil, Gas and Mineral Lease dated January 16, 2003, by and between Drew Bridges, et ux, as Lessors, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20030585, recorded in Book 954, Page 981 of the Conveyance Records of Bienville Parish, Louisiana.

10. Oil, Gas and Mineral Lease dated January 23, 2003, by and between George A. Pestell, Jr., et ux, as Lessor, and Cypress Operating, Inc, as Lessee, filed under Registry No. 20030584, recorded in Book 954, Page 976 of the Conveyance Records of Bienville Parish, Louisiana.

INSOFAR AND ONLY INSOFAR AS THE ABOVE DESCRIBED OIL, GAS AND MINERAL LEASES COVER LANDS WITHIN SECTION 3 OF TOWNSHIP 18 NORTH, RANGE 6 WEST, BIENVILLE PARISH, LOUISIANA.

*Cindy Lou Cloud #1*
*Haynesville Mercantile #*

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

### WEST ARCADIA PROSPECT
### SECTION 28, TOWNSHIP 18 NORTH, RANGE 6 WEST
### BIENVILLE PARISH, LOUISIANA

OPERATING AGREEMENT

DATED

__**May 26**__ , __**2004**__ ,
*Year*

OPERATOR   __**SKLAR EXPLORATION COMPANY L.L.C.**__

CONTRACT AREA   __**As shown on Exhibit "A" to this Agreement.**__

COUNTY OR PARISH OF   __**BIENVILLE**__          STATE OF   __**LOUISIANA**__

COPYRIGHT 1982 – ALL RIGHTS RESERVED AMERICAN
ASSOCIATION OF PETROLEUM LANDMEN, 4100 FOSSIL CREEK
BLVD., FORT WORTH, TEXAS, 76137-2791, APPROVED FORM.
A.A.P.L. NO. 610 – 1982 REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. All Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between _____SKLAR EXPLORATION COMPANY L.L.C._____

**401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101**_____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided.

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish- ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay **for 100% of** its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate **for 100% of its share of** in / a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑ A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.
☑ B. Exhibit "B", Form of Lease.
☑ C. Exhibit "C", Accounting Procedure.
☑ D. Exhibit "D", Insurance.
☑ E. Exhibit "E", Gas Balancing Agreement.
☐ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit "G", Tax Partnership.

If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE III.
### INTERESTS OF PARTIES

**A.  Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

**B.  Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred  in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A".  In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____ all jointly owned lease burdens _____ which shall be borne as hereinafter set forth.

~~Each of the Parties hereto shall pay or deliver or cause to be paid or delivered its proportionate part of the royalties and overriding royalties and other leasehold burdens as described in the attached Exhibit "A" and shall hold the other Parties free from any liability therefor.  If the interest of any Party in any oil and gas lease covered by this agreement is subject to any additional royalty, overriding royalty, production payment or other charges over and above those as shown on Exhibit "A", such Party shall assume and alone bear all such obligations and they shall account for or cause to be accounted for such interests to the owners thereof, and shall hold the~~ ~~Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor.~~  No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C.  Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production ~~in excess of the amount stipulated in Article III.B.,~~ which is not a joint obligation of the parties such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D.  Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.  If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.  If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

## ARTICLE IV.
### TITLES

**A.  Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well.  The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases.  At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge.  All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator.  Operator shall cause title to be examined by attorneys on its staff or by outside attorneys.  Copies of all title opinions shall be furnished to each party hereto.  The cost incurred by Operator in this title program shall be borne as follows:

~~☐  Option No. 1:  Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.~~

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE IV
### continued

1 ☑   <u>Option No. 2:</u>   Costs incurred by Operator in procuring abstracts / and fees paid outside attorneys /  ** for title examination
2 (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) / shall be borne by the Drilling Parties ***
3 in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4 hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5 functions.
6
7                              <u>Operator shall use its best efforts to secure</u>
  ~~Each party shall be responsible for securing~~ / curative matter and pooling amendments or agreements required in connection
8                  <u>subject to this agreement, and charge these fees to the joint account</u>
  with leases or oil and gas interests /~~contributed by such party.~~ Operator shall be responsible for the preparation and recording of pooling
9 designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10 This shall not prevent any party from appearing on its own behalf at any such hearing.
11
12        No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
13 provided, and (2) the title has been approved by the examining attorney or title has been accepted by / ~~all of the parties who are to par-~~ <u>Operator.</u>
14 ~~ticipate in the drilling of the well.~~
15
16 <u>B.  Loss of Title:</u>
17
18     ~~1.  Failure of Title:  Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a~~
19 ~~reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days~~
20 ~~from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-~~
21 ~~tion will not be subject to Article VIII.B.; and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil~~
22 ~~and gas leases and interests; and,~~
23     ~~(a)  The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be~~
24 ~~entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,~~
25 ~~but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~
26     ~~(b)  There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has~~
27 ~~been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that the failure has oc-~~
28 ~~curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract~~
29 ~~Area by the amount of the interest lost;~~
30     ~~(c)  If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is~~
31 ~~increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-~~
32 ~~terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such~~
33 ~~well;~~
34     ~~(d)  Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has~~
35 ~~failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties~~
36 ~~who bore the costs which are so refunded;~~
37     ~~(e)  Any liability to a third party for prior production of oil and gas which arises by reason of title failure shall be~~
38 ~~borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,~~
39     ~~(f)  No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest~~
40 ~~claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in~~
41 ~~connection therewith.~~
42
43     ~~2.  Loss by Non-Payment or Erroneous Payment of Amount Due:  If, through mistake or oversight, any rental, shut-in well~~
44 ~~payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,~~
45 ~~there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required~~
46 ~~payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,~~
47 ~~which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the~~
48 ~~date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in~~
49 ~~the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the~~
50 ~~required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to~~
51 ~~the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it~~
52 ~~shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled~~
53 ~~or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~
54     ~~(a)  Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,~~
55 ~~up to the amount of unrecovered costs;~~
56     ~~(b)  Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of~~
57 ~~oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease~~
58 ~~termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said~~
59 ~~portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,~~
60     ~~(c)  Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest~~
61 ~~lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~
62
63     3.  <u>Other Losses:</u>  All losses incurred~~, other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses
64 and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
65 the Contract Area.
66 *curative matters and material
  **landmen and consultants         ***and for applications and hearings
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1
2
3                                          ARTICLE V.
                                           OPERATOR

4   A.   Designation and Responsibilities of Operator:
5
6   _____SKLAR EXPLORATION COMPANY, L.L.C. of Shreveport, Louisiana_____ shall be the
7   Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and
8   required by, and within the limits of this agreement.  It shall conduct all such operations in a good and workmanlike manner, but it shall
9   have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross
10  negligence or willful misconduct.
11
12  B.   Resignation or Removal of Operator and Selection of Successor:
13
14       1.   Resignation or Removal of Operator:   Operator may resign at any time by giving written notice thereof to Non-Operators.
15  If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, / or is no longer capable of serving as
16  Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor.  Operator
17  may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the
18  affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining
19  after excluding the voting interest of Operator.  Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the
20  first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action
21  by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier
22  date.  Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator.  A change of a cor-
23  porate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not
24  be the basis for removal of Operator. * this condition shall not apply to Sklar Exploration Company, L.L.C. or any other designated
25  operator who owns no interest in the Contract Area by virtue of the fact that it is solely an operating company.
26       2.   Selection of Successor Operator:   Upon the resignation or removal of Operator, a successor Operator shall be selected by
27  the parties.  The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor
28  Operator is selected.  The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest
29  based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to
30  succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based
31  on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.
32
33  C.   Employees:
34
35       The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the
36  compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.
37
38  D.   Drilling Contracts:
39
40       All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area.  / **  If so
41  desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing
42  rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and
43  such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of in-
44  dependent contractors who are doing work of a similar nature.  **except that in Operator's sole discretion all factors,  such as rig
45  availability, equipment condition, contractor employee reliability and knowledge, and drilling contractor reputation shall be taken
46  into consideration in determining the real competitive price such that the lowest price bid may not provide the overall best value in
47  the Drilling Parties to accomplish the drilling operations.
48
49                                          ARTICLE VI.
50                                     DRILLING AND DEVELOPMENT
51
52  A.   Initial Well:
53       The initial well is the Test Well referred to in section 2 of the Letter Agreement to which this instrument is attached.
54       On or before the ____day of _____ , (year) _____ , Operator shall commence the drilling of a well for
55  oil and gas at the following location: 330 feet from the North line and 1000 feet from the West line of Section 28, T18N, R6W, Bienville
56  Parish, Louisiana
57
58
59
60
61
62  and shall thereafter continue the drilling of the well with due diligence to
63
64
65
66
67  unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is en-
68  countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.
69
70       Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and
    gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which

                                           - 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

event Operator shall be required to test only the formation or formations to which this agreement may apply.

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

**B.   Subsequent Operations:**

1.   Proposed Operations:   Should any party hereto desire to drill any well / on the Contract Area other than the well provided for in Article VI.A., or to rework, / deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation.   The parties receiving such a notice shall have / thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation.   If a drilling rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to / forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays.   Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.   Any notice or response given by telephone shall be promptly confirmed in writing.

*[marginal insertions: "any well includes water source or injection wells", "reenter, recomplete, sidetrack", "fifteen (15)", "twenty-four (24) hours"]*

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of / thirty (30) days (or as promptly as possible after the expiration of the / forty-eight (48)-hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all parties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance.   Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance with the provisions hereof as if no prior proposal had been made.

*[marginal insertions: "fifteen (15)", "twenty-four (24)"]*

2.   Operations by Less than All Parties:   If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of the notice period of / thirty (30) days (or as promptly as possible after the expiration of the / forty-eight (48)-hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence.   Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work.   Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

*[marginal insertions: "fifteen (15)", "twenty-four (24)"]*

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties  approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed.   Each Consenting Party, within / forty-eight (48)-hours (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry / its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a).   In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of / forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays).   The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

*[marginal insertions: "twenty-four (24)", "all of", "twenty-four (24)"]*

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph.   Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.   If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense.   If any well drilled, reworked, / deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

*[marginal insertions: "recompleted, sidetracked"]*

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1 and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2 ties. Upon commencement of operations for the drilling, reworking, recompleting, / deepening or plugging back of any such well by Consenting Parties
3 in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4 and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5 Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6 market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7 terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8 until it reverts) shall equal the total of the following:

9
10
11
12        **500%**
         (a) / 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13 connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
14 Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15 Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting
16 Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17 Party had it participated in the well from the beginning of the operations; and

18
19
20 r
21                                                          **recompleting, sidetracking,**
         (b) ___**500**___ % of that portion of the costs and expenses of drilling, reworking, / deepening, plugging back, testing and completing,
22 after deducting any cash contributions received under Article VIII.C., and ___**500**___ % of that portion of the cost of newly acquired equip-
23 ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24 participated therein.

25
26
27                                           **or the completing, recompleting or reworking of a well,**
28        An election not to participate in the drilling or the deepening of a well, / shall be deemed an election not to participate in any re-
29                **recompleting, sidetracking,**
   working / or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30 conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31        **recompleting, sidetracking,**
   reworking / or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
32 and there shall be added to the sums to be recouped by the Consenting Parties  ~~one~~-hundred percent (~~100%~~) of that portion of the costs of
                                              five                                        **500%**
33        **recompleting, sidetracking,**
   the reworking / or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
34        **recompleting, sidetracking,**
   such a reworking / or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35 plicable as between said Consenting Parties in said well.

36
37
38
39        During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40 proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41 taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42 ticle III.D.

43
44
45                                  **recompleting, sidetracking,**
46        In the case of any reworking, / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47 of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48                                                    **recompleting, sidetracking,**
   abandonment of a well after such reworking, / plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49 ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

50
51
52
53        Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54 Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55 itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56 option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57 ings. Each / ~~month~~ thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
                quarter
58 operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59 curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
                                                                                       quarter
60 realized from the sale of the well's working interest production during the preceding / ~~month~~.  In determining the quantity of oil and gas
61 produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62 well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63 which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64 of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65 above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

66
67
68
69
70

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, *recompleting, sidetracking,* / deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

Notwithstanding the provisions of this Article VI.B.2., / *it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.;* **provided that an exceptional well location that is approved by the Louisiana Office of Conservation shall be deemed to conform to the then-existing spacing pattern. ** *and subject to the right of any party to non-consent the proposed operation*

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, *recompleting, sidetracking,* / deepening and plugging back of such initial well after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for production, ceases to produce in paying quantities.

3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

(a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

(b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period shall be limited to / *forty-eight (48)* **twenty-four (24)** hours, *exclusive of Saturday, Sunday and legal holidays*; provided, however, any party may request and receive up to eight (8) additional days after expiration of the / *forty-eight (48)* **twenty-four (24)** hours within which to respond by paying for all stand-by time incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other instances the response period to a proposal for sidetracking shall be limited to / *thirty (30)* **fifteen (15)** days.

C.   TAKING PRODUCTION IN KIND:

Each party shall / **have the right to** take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1   required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.
2
3      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4   the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5   its share of all production.
6
7      In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8   the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9   the obligation, to purchase such oil or sell it to others /  at any time and from time to time, for the account of the non-taking party ~~at the~~
10  ~~best price obtainable in the area for such production~~. Any such purchase or sale by Operator shall be subject always to the right of the
11   owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously
12   delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of
13   time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14   of one (1) year.
       **on the same terms and basis as Operator is marketing Operator's and other Non-Operators' share of production**
15
16      In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or
17   deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18   be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19   agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.
20
21 **D.**   **Access to Contract Area and Information:**
22
       **consenting**
23      Each / party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24   and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
                          **consenting**
25   and records relating thereto. Operator, upon request, shall furnish each of the other / parties with copies of all forms or reports filed with
26   governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27   each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28   gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29   quests the Information.
30
31 **E.**   **Abandonment of Wells:**
32
33      1.  Abandonment of Dry Holes:  Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34   drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35   without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
       **twenty-four (24) hours**
36   within / ~~forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays)~~ after receipt of notice of the proposal to plug and abandon
37   such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38   accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39   such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40   operations in search of oil and/or gas subject to the provisions of Article VI.B.
41
42      2.  Abandonment of Wells that have Produced:  Except for any well in which a Non-Consent operation has been conducted
43   hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44   producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
45   be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
46   thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
47   those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48   parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49   Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign
50   the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51   material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52   terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
53   gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54   tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55   duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1 "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2 assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3 Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4 interests in the remaining portion of the Contract Area.
5
6 Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7 the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8 quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9 templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10 well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11 repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12 visions hereof.
13
14 3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15 Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16 permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17 of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18 VI.E.
19
20 **ARTICLE VII.**
21 **EXPENDITURES AND LIABILITY OF PARTIES**
22
23 **A. Liability of Parties:**
24
25 The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26 shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27 among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28 shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.
29
30 **B. Liens and Payment Defaults:**
31
32 Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33 of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34 at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the
35 state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
36 taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37 rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
38 of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39 the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
40 purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
41 and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.
42
43 If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
44 Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that ~~be entitled to~~
45 the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall ~~, to obtain~~
46 ~~recover the amount it paid plus five hundred percent (500%) of the amount out of the proceeds from the sale of the defaulting~~ party's share of oil and for gas, and , to secure payment thereof, be subrogated to the security rights described in the foregoing
47 ~~reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph~~ paragraph. Notwithstanding anything contained to the contrary in this paragraph, all parties agree that this provision shall not apply to any operation requiring an AFE
48 unless Operator has advance billed all parties and such parties have paid their proportionate share of said costs in accordance with other provisions of this agreement.
49 **C. Payments and Accounting:**
50
51 Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
52 and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
53 tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
54 showing expenses incurred and charges and credits made and received.
55
56 Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
57 of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
58 month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
59 with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
60 on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
61 fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
62 due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
63 pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
64
65 **D. Limitation of Expenditures:**
66
67 1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
68 pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:
69
70

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VII**
**continued**

1 ☑ *Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2 necessary tankage and/or surface facilities. **This Option No. 1 shall apply only to water source and/or water injection wells.**
3
4 ☑ **Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5 authorized depth, and all tests thereof furnished to the parties, Operator shall give immediate notice
6 to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have~~/ forty-eight~~ twenty-four (24)
7 ~~(48)~~ hours ~~(exclusive of Saturday, Sunday and legal holidays)~~ in which to elect to participate in the setting of casing and the completion at-
8 tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9 cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "~~reworking,~~ recompleting, sidetracking deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties. **This Option No. 2 shall cover all wells except those expressly covered by Option No. 1 above.**
14
15 2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.
19
20 3. Other Operations: Without the consent of ~~/ all parties,~~ *one or more Parties owning a majority interest Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of _____Twenty-five Thousand and No/100_____ Dollars ($_____25,000.00_____ )
22 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of _____Twenty-five Thousand and No/100_____
28 Dollars ($_____25,000.00_____ ) but less than the amount first set forth above in this paragraph.
29
30 E. Rentals, Shut-in Well Payments and Minimum Royalties:
31
32 Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35 behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B./ 2.
39
40 Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, ~~at least five (5) days (excluding Saturday, Sunday and legal holidays),~~ or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46 F. Taxes:
47
48 Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".
59
60 If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".
66
67 Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
68 to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.
69
70

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
#### continued

1  G.  **Insurance:**
2
3  At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4  the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5  pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
6  also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7  hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8  law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.
9
10  In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11  parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.
12
13  ### ARTICLE VIII.
14  #### ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST
15
16  A.  **Surrender of Leases:**
17
18  The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19  or in part unless all parties consent thereto.
20
21  However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22  agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23  such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24  thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas in-
25  terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26  such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27  lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all
28  obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29  attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30  duction other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the
31  party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32  ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33  salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest
34  shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.
35
36  Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39  agreement.
40
41  B.  **Renewal or Extension of Leases:**
42
43  If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44  shall have the right for a period of ~~thirty / (~~fifteen~~15)~~ days following receipt of such notice in which to elect to participate in the ownership of the
45  renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46  portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47  interests held at that time by the parties in the Contract Area.
48
49  If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50  who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51  to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52  Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.
53
54  Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55  by the acquiring party.
56
57  The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58  or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or
59  contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
60  tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61  the provisions of this agreement.
62
63  The provisions in this Article shall also be applicable to extensions of oil and gas leases.
64
65  C.  **Acreage or Cash Contributions:**
66
67  While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69  applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the con-
70  tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VIII**
**continued**

1 said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2 governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3 it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4 tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.
5
6      If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7 consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8
9 **D.    Maintenance of Uniform Interests:**
10
11      ~~For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no~~
12 ~~party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,~~
13 ~~equipment and production unless such disposition covers either:~~
14
15 ~~1.    the entire interest of the party in all leases and equipment and production; or~~
16
17 ~~2.    an equal undivided interest in all leases and equipment and production in the Contract Area.~~
18
19      Every ~~such~~ sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20 and shall be made without prejudice to the right of the other parties. **Any added expenditures required as a result of a partial**
   **disposition, including marketing or metering of production, shall be borne solely by the party transferee.**
21
22      If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23 require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24 and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25 party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26 into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27 Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.
28
29 **E.    Waiver of Rights to Partition:**
30
31      If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32 undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33 interest therein.
34
35 ~~F.    Preferential Right to Purchase:~~
36
37 ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38 ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39 ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40 ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41 ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42 ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43 ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44 ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45 ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~
46
47 **ARTICLE IX.**
48 **INTERNAL REVENUE CODE ELECTION**
49
50      This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51 for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52 and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53 purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54 from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1986, as per-
55 mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56 ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57 United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58 and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59 evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60 Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61 action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62 Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63 Subtitle "A", of the Internal Revenue Code of 1986, under which an election similar to that provided by Section 761 of the Code is per-
64 mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65 tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66 computation of partnership taxable income.
67
68
69
70

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE X.
### CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____ Ten Thousand and No/100 _____ Dollars ($_____10,000.00_____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder. **All claims or suits involving title to any interest subject to this Agreement shall be treated as a claim or suit against all parties hereto.**

### ARTICLE XI.
### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

### ARTICLE XII.
### NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

### ARTICLE XIII.
### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☑   Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☐   Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XIV.
## COMPLIANCE WITH LAWS AND REGULATIONS

**A.  Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B.  Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ **Louisiana** _____ shall govern.

**C.  Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of ~~the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and~~ any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to <sup>any</sup> said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

## ARTICLE XV.
## OTHER PROVISIONS

**(See attached pages 14-1 through 14-5)**

## ARTICLE XV.

## OTHER PROVISIONS

### A. PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1)  an election to perform additional logging, coring or testing;

(2)  an election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;

(3)  an election to plug back and attempt to complete the well in a shallower depth or formation;

(4)  an election to deepen the well;

(5)  an election to sidetrack the well;

(6)  an election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;

(7)  an election to temporarily abandon the well;

(8)  an election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of a majority of the consenting parties in possessory, cost-bearing interest (and not in number), a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth. In such event, the operation, which, in the opinion of a majority of the consenting parties in possessory, cost bearing interest (and not in number) is less likely to jeopardize the well, will be given priority. Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail. It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests. For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

### B. HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

### C. DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties. If the parties are equally divided, the opinion of the Operator will prevail.

### D. ADVANCEMENT OF COSTS

Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s) in advance of its respective share of (i) the dry hole cost for the initial well to be drilled under Article VI A, (ii) the dry hole cost for any other well to be drilled hereunder to which such Non-Operator has consented, and (iii) the cost of any completion, reworking, recompletion, sidetracking, deepening or plugging back operation to which such Non-Operator has consented (any such operation under clause (i), (ii), or (iii) being herein called a "Drilling Operation"). Such request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Drilling Operation. The amount of each Non-Operator's advance payment shall be based upon the latest AFE for such operation. Such advanced payments shall be held by Operator for the account of the Non-Operators and applied, with interest, against the actual costs incurred in the applicable operation.

A Non-Operator receiving a request for advance payment shall, within two (2) days of the receipt of such request if and when a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to

operator in cash the full amount of such request. Operator shall credit the amount to the Non-Operator's account for the payment of such Non-Operator's share of costs of such Drilling operation, and following the end of each month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement. Advance payment by a Non-Operator of his share of completed well costs shall in no event prevent such completion of a well pursuant to Option No. 2 of Article VII.D.1. and, in the event such a Non-Operator elects not to participate in completion, the sums that such Non-Operator has advanced shall not be charged with any share of the costs of any completion attempted.

In the event a Non-Operator from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by depositing cash as aforesaid, then Operator, at his option, shall make a second written request by certified mail, return receipt requested for such advance. Non-Operator shall pay for said advance as aforesaid within two (2) business days from receipt of such second request.

If a Non-Operator fails to pay within two (2) business days of the receipt of such second request, then:

(1) If the advance payment was requested for the drilling of the initial well under Article VI A Non-Operator may, at the sole discretion and timing election of the Operator, be deemed to have relinquished all of its leasehold and contractual rights in the Contract Area retroactive to the date of default in payment, and if assignment has been made to such Non-Operator, Non-Operator shall assign all of its rights in and to the Contract area, within thirty (30) days of a request for such assignment, to those parties who have participated in such Drilling Operation, in the proportion that such parties elected to share the relinquished interest.

(2) If the advance payment was requested for any other Drilling Operation (including completion of the initial well), Non-Operator may, at the sole discretion and timing election of the Operator, be deemed non-consent in said operation retroactive to the beginning of such operation and thereafter subject to the penalty provisions of Article VI.B.2 hereof.

If the Non-Operator fails to make such payment or furnish such security within two (2) business days of the receipt of such second request, Operator shall promptly notify all other parties still participating in such Drilling Operation of the default in payment and if and when applicable, of the relinquishment of an interest under this provision. The parties who wish to participate in the Drilling Operation shall have five (5) days from receipt of the applicable notice to elect to assume the costs chargeable to such relinquished interest and shall share such relinquished interest in proportion to their assumption of such relinquished interest. If the parties who wish to participate in the Drilling Operation are unwilling to assume the costs chargeable to such relinquished interest, the Drilling Operation shall be cancelled, and if the cancelled Drilling Operation involves the drilling of a test well under Article VI A no assignment shall be due as a consequence of the failure to pay.

Notwithstanding anything to the contrary herein, if the applicable drill well or operation is unsuccessful or results in a dry hole, Operator shall have the right to sue a Non-Operator who failed to pay for its proportionate share of expenses in lieu of Operator's right to an assignment of all Non-Operator's leasehold and contractual rights within the Contract Area, or in lieu of deeming the Non-Operator Non-Consent.

## E. NECESSARY EXPENDITURES EXCLUDE SIDETRACKING

The phrase "necessary expenditures" in Article VII.D.1. (Option No. 2) on page 10 shall not be deemed to include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

## F. ADDITIONAL CHARGES

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Unit Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same:

Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and expenses in connection with preparation and presentation of evidence and exhibits of Louisiana Office of Conservation hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

## G. INDEMNITY

Except for liabilities resulting from the gross negligence or willful misconduct of the Operator, each Non-Operator shall defend, indemnify and hold Operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operator's officers, employees and/or agents, resulting from or in any way relating to such officers, employees, and/or agents presence on a drilling rig on the Contract Area or from such person traveling by air or water between any point and such drilling rig. Such indemnity to Operator shall also apply to any other person whose presence on the rig or transportation to or from such rig is at the request of the indemnifying Non-Operator (except for liabilities resulting from the gross negligence or willful misconduct of the Operator).

## H. RECOUPMENT

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

## I. SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

## J. NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

## K. PIPELINE AND/OR GATHERING LINE CONSTRUCTION

If any party to this Agreement elects either to construct, operate or purchase or to join in the construction, operation or purchase of a pipeline, and/or gathering line to transport production from the Contract Area, then such party shall notify the other parties hereto furnishing all pertinent cost and information. Each party receiving such notice shall have thirty (30) days to exercise their right in writing to participate in the construction, operation and ownership of such pipeline and/or gathering line, including the right of transporting production from the Contract Area, by agreeing to bear their proportionate share of the cost of such operation and thereafter entering into a mutually acceptable operating agreement for the operation thereof. Otherwise, the parties consenting to participate in such operation shall be entitled to establish the terms and conditions (including any costs and fees for use or reservation of the applicable facilities) under which the non-consenting parties may use or have access to the applicable facilities. Absent a mutually agreeable agreement for the use of said facilities by and between the consenting and non-consenting parties, the non-consenting parties shall be obligated to separately dispose of their share of all production.

## L. DISBURSEMENT OF ROYALTIES

If Operator prepares and administers a division order for and receives and distributes the proceeds of production attributable to the interest of a Non-Operator, then Operator shall be entitled to charge that party for an appropriate monthly overhead charge for disbursing such royalty payments, in addition to the combined fixed rates specified in Exhibit "C" hereto. If through error or inadvertence Operator shall fail to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, he shall not be liable in damages to the other Parties hereto for such failure, unless arising out of the gross negligence or willful misconduct of the Operator.

## M. INFORMATION

Anything to the contrary hereinabove notwithstanding, it is stipulated that any non-consenting party to an operation conducted hereunder shall have no right to observe such operation or have access to information pertaining to such operation, until such time as the non-consenting party's share of the cost of such operation and the penalty therefor has been recovered by the consenting parties as provided herein. It is understood that this Section M of Art. XV does not apply when the in the situation where the non-consenting party is a Farmor under this Agreement.

## N. OPERATOR'S LIEN – SECURITY INTEREST

Subject to the provision of Article VII. B. of this Agreement, each non-Operator grants to Operator a lien upon all of the rights, titles, and interests of each Non-Operator, whether now existing or hereafter acquired, in and to the (1) the oil, gas, or other minerals in, on, and under the Contract Area and (2) any oil, gas, and mineral leases covering the Contract Area or any portion thereof. In addition, each Non-Operator grants to Operator a security interest in and to all of such Non-Operator's rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (1) all oil, gas and other minerals produced from the Contract Area when produced; (2) all accounts receivable accruing or arising as a result of the sale of such oil, gas and other minerals; (3) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (4) all oil and gas wells and other surface and sub-surface equipment and facilities of any kind or character located on the Contract Area and the cash or other proceeds received from the sale thereof (collectively, the "Personal Property Collateral"). Some of the Personal Property Collateral is or will become fixtures on the Contract Area, and the interest of Non-Operator in and to the oil, gas and other minerals when extracted from the Contract Area and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract

Area. This Agreement (including a carbon, photographic, or other reproduction hereof) shall constitute a non-standard form financing statement under the terms of the Uniform Commercial Code of the State in which the Contract Area is located, and as such, may be filed for record in the real estate records of the county in which the Contract Area is located.  Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense, if any.

## O. MARKETING OF PRODUCTION

Operator agrees to market all Non-Operator's share of any production from the Contract Area under the same terms that Operator is marketing its share of said production; provided, however, that contracts entered into by Operator in marketing Non-Operator's share of production shall be subject to the limitations set forth in Article VI. C. hereof. Further, Non-Operator shall be given the continuing right to participate as a signatory to any contract entered into by Operator to market production hereunder.  Notwithstanding the above, any Non-Operator may choose to separately market its proportionate share of said production by giving written notice to Operator by the 15th day of the month prior to the month in which said Non-Operator intends to separately market its production.  Conversely, if said Non-Operator again requests that Operator market its production, Non-Operator must provide written request of same by the 15th day of the month prior to the month in which Operator is again to market said Non-Operator's production.

## P. METERING OF PRODUCTION

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

## Q. PLUGGING AND LEASEHOLD RESTORATION FUND

At any time any well subject to this agreement is, in Operator's sole opinion, approaching the end of its economic life and/or its useful purpose, Operator may pre-bill the joint account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location.  Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and abandonment and restoration of the leasehold premises.  In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any accrued interest on such difference, based upon the then working interest percentage of such owner.  In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

## R. SEPARATE AGREEMENT FOR NON-UNIFORM INTEREST

Any leases or interests therein (and the land covered thereby) that, pursuant to the terms of this Agreement or otherwise, become owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such leases become so owned.  Any leases or interests therein (and the lands covered thereby) that, pursuant to the terms of this Agreement or otherwise, become owned by more than one but less than all of the parties hereto or in which a party assigns, transfers or otherwise disposes of all or part of its interests shall remain subject to this Agreement as to the surviving parties; however, for all purposes, the terms of this Agreement shall apply separately to each such lease (or group of such leases in which the parties' ownership is uniform) as if it were a separate agreement covering such lease(s), with an Exhibit "A" modified to reflect the parties' interests therein, based upon the parties' ownership in such lease(s).

## S. OBLIGATORY WELL

Notwithstanding the provisions of this agreement and particularly Article VI, if any proposed operations are necessary to maintain a Lease covered by this agreement in force or an agreement to earn a lease(s) which would otherwise expire unless such operations are conducted, then in lieu of being penalized under Article VI.B.2., each Non-Consenting Party shall assign to Consenting Parties all of such Non-Consenting Party's right, title and interest in and to the Lease(s) or portion thereof or such agreement which would be lost or not earned if such operations were not conducted.

Such assignment shall be promptly due upon commencement of said proposed operations by Consenting Parties and shall be free and clear of all overriding royalties, production payments, mortgages, liens and other burdens and encumbrances placed thereon by the assigning party or resulting from its ownership or operation of such Lease or interest which is not a joint obligation of the parties, but otherwise without warranty of title either expressed or implied.

If the assignment is in favor of more than one party, the assigned interest shall be shared by the Consenting Parties in the proportions that the interest of each bears to the interest of all Consenting Parties unless otherwise agreed to in writing.  Thereafter, such acreage covered by said assignment shall not be subject to the terms of this agreement, but shall be deemed to be subject to an agreement identical to this changed only in Exhibit "A" to indicate the Consenting Parties and their percentages of interest.  Operations that are necessary to either maintain a Lease covered by this agreement in force or to earn a lease or part thereof under an agreement which would otherwise expire unless operations are conducted, shall be defined as operations that are proposed within six (6) months of the date the Lease or agreement would otherwise expire.

## T.  PREVAILING AGREEMENT

If there is a conflict between provisions of the Participation Agreement dated May 26, 2004 to which this Operating Agreement is attached as Exhibit "B", and this Operating Agreement, the provisions of the Participation Agreement shall prevail, and shall be binding upon all parties to this Operating Agreement.

## U.  DEFAULT PENALTY/AUTOMATIC NON-CONSENT

If written notice has been given that the lien rights conferred in Article VII. B. have been implemented or enforced against any party hereto, for so long as the affected party remains in default, it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and shall not be entitled to vote its interest in any matter hereunder.  As to any proposed operation in which it otherwise would have the right to participate, such party shall not have the right to elect to participate or be a Consenting Party unless and until it pays in full the amount it is in default plus all other outstanding amounts due hereunder.  If an operation proposed during such default period commences before such payment in full, the party in default shall automatically be deemed a Non-Consenting Party to the operation.

## V.  PRIOR OPERATING AGREEMENT(S)

This operating agreement, as to the parties executing same and as to the Contract Area and Depth Restrictions, shall supersede and replace any prior operating agreement(s) covering all or any portion of the Contract Area of this operating agreement.

## W.  NON-PARTICIPATING INTERESTS

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto as same may be revised from time to time to reflect record title and/or reformation of the Contract Area.

## X. EXECUTION

This agreement shall be binding upon each Non-Operator that executes this agreement without regard to whether this same instrument, or any copy or counterpart hereof shall be executed by any other Non-Operator.

## Y. MISCELLANEOUS

Anything to the contrary herein notwithstanding, this Operating Agreement is expressly made subject to the terms and provisions of the leases and farmout agreements described in Exhibit "A" hereof.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.

MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____26th_____ day of _____May_____ , (year) __2004__ .

_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles_____ _____ have been made to the form.

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

_____
Witness

By: David A. Barlow, Chief Operating Officer

_____
Witness

NON-OPERATORS

SKLARCO L.L.C.

_____
Witness

By: David A. Barlow, Chief Operating Officer

_____
Witness

TENSAS DELTA EXPLORATION COMPANY, LLC

_____
Witness

By:  Michael Riddick, Executive Vice President

_____
Witness

MCCOMBS ENERGY L.L.C.

_____
Witness

Ricky Haikin, Vice President

_____
Witness

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XVI.
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____26th_____ day of _____May_____ , (year) __2004__ .

_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____, have been made to the form.

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

By: David A. Barlow, Chief Operating Officer

_____
Witness

_____
Witness

NON-OPERATORS

SKLARCO L.L.C.

By: David A. Barlow, Chief Operating Officer

_____
Witness

_____
Witness

_____
Witness    John Gardner

_____
Witness    Annie Wilson

TENSAS DELTA EXPLORATION COMPANY, LLC

By: Michael Riddick, Executive Vice President

MCCOMBS ENERGY L.L.C.

Ricky Raikin, Vice President

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 26th _____ day of _____ May _____ , (year) __2004__ .

~~, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ , have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

By: David A. Barlow, Chief Operating Officer

Witness

Witness

NON-OPERATORS

SKLARCO L.L.C.

By: David A. Barlow, Chief Operating Officer

Witness

Witness

TENSAS DELTA EXPLORATION COMPANY, LLC

By: Michael Riddick, Executive Vice President

Witness

Witness

MCCOMBS ENERGY L.L.C.

Ricky Haikin, Vice President

Witness

Witness

- 15 -

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

On this *15th* day of *August*          , 2005, before me appeared **DAVID A. BARLOW,** to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for **SKLAR EXPLORATION COMPANY L.L.C.,** a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

Linda Edwards, Notary Public # 5074
Bossier Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

On this *15th* day of *August*          , 2005, before me appeared **DAVID A. BARLOW,** to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for **SKLARCO L.L.C.,** a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

Linda Edwards, Notary Public # 5074
Bossier Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2005, before me appeared **MICHAEL RIDDICK,** to me known, who being by me duly sworn, did say that he is the Executive Vice President for **TENSAS DELTA EXPLORATION COMPANY, LLC,** a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

On this 15th day of August, 2005, before me appeared **DAVID A. BARLOW**, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for **SKLAR EXPLORATION COMPANY L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public in and for the Parish of Caddo
State of Louisiana

Linda Edwards, Notary Public # 5074
Bossier Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

On this 15th day of August, 2005, before me appeared **DAVID A. BARLOW**, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for **SKLARCO L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public in and for the Parish of Caddo
State of Louisiana

Linda Edwards, Notary Public # 5074
Bossier Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

On this 16th day of AUGUST, 2005, before me appeared **MICHAEL RIDDICK**, to me known, who being by me duly sworn, did say that he is the Executive Vice President for **TENSAS DELTA EXPLORATION COMPANY, LLC**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public in and for the Parish of Caddo
State of Louisiana

KAREN L. CODDINGTON, Notary Public
ID # 2088
Caddo Parish, Louisiana
My Commission is for Life

STATE OF TEXAS

COUNTY OF HARRIS

On this 18 day of  August , 2005, before me appeared **RICKY HAIKIN** , to me known, who being by me duly sworn, did say that he is the Vice President of **MCCOMBS ENERGY L.L.C.**, a Texas limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public in and for the State of Texas

SHARON METCALF McDONALD
Notary Public, State of Texas
Commission Expires 12-29-2005

## EXHIBIT "A"

**Attached to and made a part of that certain Operating Agreement dated May 26, 2004, by and between SKLAR EXPLORATION COMPANY L.L.C., as Operator, SKLARCO L.L.C., TENSAS DELTA EXPLORATION COMPANY, LLC, and MCCOMBS ENERGY, L.L.C., as Non-Operators.**

(1) **Identification of lands subject to this agreement:**

### Contract Area

**Township 18 North, Range 6 West
Bienville Parish, Louisiana
Section 28
and lying within the black boundary as shown on the plat designated as Exhibit "A-2".**

### Area of Mutual Interest

**Township 18 North, Range 6 West
Bienville Parish, Louisiana
Section 28**

**and lying within the red boundary as shown on the plat designated as Exhibit "A-2".**

(2) **Restrictions, if any, as to depths, formations, or substances:**

There are no restrictions except as may be provided for in any lease or contract subject to this Operating Agreement.

(3) **Decimal interest and names and addresses of Parties to this Agreement:**

| Owners | Interest |
|---|---|
| Sklarco L.L.C. | 25% |
| Tensas Delta Exploration Company, LLC | 50% |
| McCombs Energy L.L.C. | 25% |
| Total: | 100% |

(4) **Oil and gas leases and/or oil and gas interests subject to this agreement:**

See Exhibit "A-1" Description of Leases.

(5) **Addresses of parties for notice purposes:**

Sklar Exploration Company, LLC
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Telephone: (318) 227-8668
Telecopier: (318) 227-9012

Sklarco, LLC
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Telephone: (318) 227-8668
Telecopier: (318) 227-9012

1

Tensas Delta Exploration Company, LLC
333 Texas Street, Suite 525
Shreveport, LA 71101
Telephone: (318) 222-0026
Telecopier: (318) 222-1898

McCombs Energy, L.L.C.
Attn: Larry Wynont, VP, Operations
5599 San Felipe Street, Suite 1200
Houston, Texas 77056-2721
Telephone: (713) 621-0033
Telecopier: (713) 621-1670

EXHIBIT "A-1"

**Attached to and made a part of that certain Operating Agreement dated May 26, 2004, by and between SKLAR EXPLORATION COMPANY L.L.C., as Operator, SKLARCO L.L.C., TENSAS DELTA EXPLORATION COMPANY, LLC, and MCCOMBS ENERGY, L.L.C. as Non-Operators.**

## DESCRIPTION OF LEASES

1. Oil, Gas and Mineral Lease dated February 20, 2004, by and between Philemon J. Whatley and Willie Mae Simpson Whatley, as Lessors, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-1377, recorded in Book 964, Page 848 of the Conveyance Records of Bienville Parish, Louisiana.

2. Oil, Gas and Mineral Lease dated March 3, 2004, by and between Cindy Lou Cloyd, as Lessors, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-1378, recorded in Book 964, Page 851 of the Conveyance Records of Bienville Parish, Louisiana.

3. Oil, Gas and Mineral Lease dated March 3, 2004, by and between Daniel Read, Trustee of the Daniel Read Living Trust, dated July 23, 2001, as Lessors, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-1379, recorded in Book 964, Page 854 of the Conveyance Records of Bienville Parish, Louisiana.

4. Oil, Gas and Mineral Lease dated March 15, 2004, by and between Charles Ray Hassell and Louise S. Hassell, Co-Trustees of the Hassell 1989 Trust, as Lessors, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-1374, recorded in Book 964, Page 839 of the Conveyance Records of Bienville Parish, Louisiana.

5. Oil, Gas and Mineral Lease dated March 15, 2004, by and between Elizabeth Ann Hassell Turner, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-1375, recorded in Book 964, Page 842 of the Conveyance Records of Bienville Parish, Louisiana.

6. Oil, Gas and Mineral Lease dated March 15, 2004, by and between Joan Marie Hassell Simpson, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-1376, recorded in Book 964, Page 845 of the Conveyance Records of Bienville Parish, Louisiana.

7. Oil, Gas and Mineral Lease dated April 15, 2004, by and between John Clinton Merritt, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-1589, recorded in Book 965, Page 320 of the Conveyance Records of Bienville Parish, Louisiana.

8. Oil, Gas and Mineral Lease dated April 19, 2004, by and between Judy K. Merritt Carter, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-1588, recorded in Book 965, Page 316 of the Conveyance Records of Bienville Parish, Louisiana.

9. Oil, Gas and Mineral Lease dated April 19, 2004, by and between Janet Ann Merritt Robinson, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-1587, recorded in Book 965, Page 313 of the Conveyance Records of Bienville Parish, Louisiana.

10. Oil, Gas and Mineral Lease dated April 23, 2004, by and between Mary Lane Day, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-1719 recorded in Book 965, Page 500 of the Conveyance Records of Bienville Parish, Louisiana.

11. Oil, Gas and Mineral Lease dated April 19, 2004, by and between William Jefferson Day, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-1720 recorded in Book 965, Page 503 of the Conveyance Records of Bienville Parish, Louisiana.

12. Oil, Gas and Mineral Lease dated March 2, 2004, by and between Haynesville Mercantile Company, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-1721 recorded in Book 965, Page 506 of the Conveyance Records of Bienville Parish, Louisiana.

13. Oil, Gas and Mineral Lease dated June 14, 2004, by and between William Oates, Trustee of the Gloria Oates Living Trust dated October 10, 1983, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-2309 recorded in Book 966, Page 722 of the Conveyance Records of Bienville Parish, Louisiana.

14. Oil, Gas and Mineral Lease dated July 8, 2004, by and between Meredith Lynn Noel Day, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-2254, recorded in Book 966, Page 566 of the Conveyance Records of Bienville Parish, Louisiana.

15. Oil, Gas and Mineral Lease dated July 27, 2004, by and between Willie Mae Hassell Daniel and L. H. Daniel, as Lessors, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-2880, recorded in Book 967, Page 932 of the Conveyance Records of Bienville Parish, Louisiana.

16. Oil, Gas and Mineral Lease dated August 3, 2004, by and between Harry L. Plaster, et al, as Lessors, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-2879, recorded in Book 967, Page 929 of the Conveyance Records of Bienville Parish, Louisiana.

17. Oil, Gas and Mineral Lease dated August 5, 2004, by and between Beverly Lynn Gantt Mazza, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-2881, recorded in Book 967, Page 936 of the Conveyance Records of Bienville Parish, Louisiana.

18. Oil, Gas and Mineral Lease dated August 18, 2004, by and between James Keith Baker, II, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-3260, recorded in Book 968, Page 641 of the Conveyance Records of Bienville Parish, Louisiana.

19. Oil, Gas and Mineral Lease dated August 5, 2004, by and between Carol Elaine Koschak, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-3261, recorded in Book 968, Page 644 of the Conveyance Records of Bienville Parish, Louisiana.

20. Oil, Gas and Mineral Lease dated August 18, 2004, by and between John Forest Baker, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-3731, recorded in Book 969, Page 565 of the Conveyance Records of Bienville Parish, Louisiana.

21. Oil, Gas and Mineral Lease dated September 29, 2004, by and between Red Barn Land Company, L.P., as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-3730, recorded in Book 969, Page 562 of the Conveyance Records of Bienville Parish, Louisiana.

22. Oil, Gas and Mineral Lease dated January 5, 2005, by and between Haynesville Mercantile Company, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2005-1030, of the Conveyance Records of Bienville Parish, Louisiana.

23. Oil, Gas and Mineral Lease dated October 8, 2004, by and between Timothy H. Atkins and Melissa T. Atkins, as Lessors, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-4325, recorded in Book 970, Page 829 of the Conveyance Records of Bienville Parish, Louisiana.

24. Oil, Gas and Mineral Lease dated November 1, 2004, by and between Elizabeth Lynn Noel Mathews, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-4323 recorded in Book 970, Page 823 of the Conveyance Records of Bienville Parish, Louisiana.

25. Oil, Gas and Mineral Lease dated November, her 10, 2004, by and between Veronica L. Harris, herein represented by Gerald W. Harris, her True and Lawful Agent and Attorney-in-Fact, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 2004-4324, recorded in Book 970, Page 826 of the Conveyance Records of Bienville Parish, Louisiana.

26. Oil, Gas and Mineral Lease dated March 15, 2005, by and between Mary Elizabeth Holley, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 2005-2855 , recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

2

27. Oil, Gas and Mineral Lease dated July 15, 2005, by and between The Kansas City Southern
Railway Company, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No.
2005-3460, recorded in Book _____, Page _____ of the Conveyance Records of Bienville
Parish, Louisiana.

EXHIBIT "A-2"

Attached to and made a part of that certain Operating Agreement dated May 26, 2004, by and between SKLAR EXPLORATION COMPANY L.L.C., as Operator, and SKLARCO L.L.C., TENSAS DELTA EXPLORATION COMPANY, LLC, and MCCOMBS ENERGY, L.L.C., as Non-Operators



Bath Form Louisiana Spec. 14-BR1-2A-NL  Paid up  R2/99

EXHIBIT "B"

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of _____ , _____ , between

Lessor (whether one or more) whose address is: _____ .

and _____ , Lessee,

whose address is _____
WITNESSETH.

1.  Lessor in consideration of  One Hundred Dollars and Other Valuable Considerations ($100.00 & OVC), in hand paid, of the royalties herein provided, and of the agreement of Lessee herein contained, hereby  grants, leases and lets unto Lessee, the exclusive right to enter upon and use the land hereinafter described for the exploration for and production of oil, gas, sulphur and all other minerals, together with the use of the surface of the land for all purposes incident to the exploration for and production, ownership, possession and transportation of said minerals (either from said land or acreage pooled therewith), and the  right to dispose of salt water, with the right of ingress and egress to and from said lands at all times for such purposes, including for operations hereunder or in connection with similar operations on adjoining  land; the land to which this lease applies  and  which is affected hereby

being situated in _____ Parish, Louisiana, and described as follows, to-wit:

This lease shall  also extend and apply to any interest therein which Lessor may hereafter acquire, including, but not limited to, outstanding mineral rights acquired by reversion, prescription or otherwise, and includes batture, accretions, roads, highways, easements, right-of-ways and all land, if any, contiguous or adjacent to, or adjoining the land particularly described above.  Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land.  For  the purposes of determining

the amount of  bonus and the shut-in royalty payment  hereunder, said land shall be deemed to contain _____ acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof.

2.  Subject to the other provisions herein contained, this lease shall be for a period of _____ years from the date hereof (called "primary term") and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner herein provided.

3.  For the consideration hereinabove recited, this lease shall remain in full force and effect during the primary term, without any additional payment and without Lessee being required to conduct any operations on the land (either before or after the discovery of minerals), except to drill such wells as might be necessary to protect the land from drainage, as hereinafter provided.

4.  The royalties to be paid by Lessee are:  (a) on oil, and other hydrocarbons which are produced at the well in liquid form by ordinary production methods, one-eighth of that produced and saved from said land, same to be delivered at the wells or to the credit of Lessor in the pipe line to which the wells may be connected; Lessor's interest in either case to bear its proportion of any expenses for treating the oil to make it marketable as crude; Lessee may from time to time purchase any royalty oil or other liquid hydrocarbons in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas, or other gaseous substance produced from said land and sold or used off the premises or for the extraction of gasoline or other products therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; such gas, casinghead gas, residue gas, or gas of any other nature or description whatsoever, as may be disposed of for no consideration to Lessee, either through unavoidable waste or leakage, or in order to recover oil or other liquid hydrocarbons, or returned to the ground, shall not be deemed to have been sold or used either on or off the premises within the meaning of this paragraph 4 hereof; (c ) on all other  minerals mined and marketed, one-eighth, either in kind or value at the well or mine, at Lessee's election, except that on sulphur the royalty shall be one dollar ($1.00) per long ton.

5.  If Lessee during or after the primary term should drill a well capable of producing gas or gaseous substances in paying quantities, (on which although previously produced Lessee is unable to continue to produce) and should Lessee be unable to operate said well because of lack of market or marketing facilities or governmental restrictions, then Lessee's rights may be maintained beyond or after the primary term without production of minerals or further drilling operations by paying Lessor as royalty a sum equal to one dollar (1.00) per acre of land covered hereby per year, the first payment being due, if said well should be completed or shut-in after the primary term, within ninety (90) days after the completion of such well or the cessation of production and such payment will extend Lessee's rights for one year from the date of such completion or cessation.  If such a well should be completed during the primary term, the first payment, if made by Lessee, shall be due within 90 days after such well is shut-in, or before the expiration date of the primary term herein fixed, whichever is the later date. Thereafter Lessee's rights may be continued from year to year by making annual payments in the amount stated on or before the anniversary date beginning with the date of completion of said well (if completed after the primary term) or the end of the primary term (if completed prior thereto) as  the  case  may  be;  each  of  such payments to extend Lessee's rights for one year.  The annual payments herein provided for may be deposited to Lessor's credit in the _____

_____ Bank of _____ , which bank shall be and remain Lessor's agent for such purpose regardless of any change or changes in the ownership of the land or mineral rights therein.  The owners of the royalty as of the date of such payments shall be entitled thereto in proportion to their ownership of said royalty.  The provisions of this paragraph shall be recurring at all times during the life of this lease. Should any well producing gas or gaseous substances be completed on a drilling unit which includes any part of the land herein leased, the provisions of this paragraph shall be subject to all other agreements herein contained allowing the pooling of the above described lands with other lands.

6.  If within ninety (90) days prior to the end of the primary term, Lessee should complete or abandon a well on the lands described above or on land pooled therewith, or if production previously secured should cease from any cause, this lease shall continue in force and effect for ninety (90) days from such completion or abandonment or cessation of production.  If at the expiration of the primary term or at the expiration of the ninety (90) day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith, but Lessee is then engaged in operations for drilling, completion or reworking thereon, or operations to achieve or restore production, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations for drilling, completion or reworking, or operations to achieve or restore production, with no cessation between operations or between such cessation of production and additional operations of more than ninety (90) consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith.  If sulphur be encountered on said premises or on land pooled therewith, this lease shall continue in force and effect so long as Lessee is engaged with due diligence in explorations for and/or erecting a plant for the production of sulphur and thereafter subject to the foregoing provisions hereof so long as oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith.

7.  Lessee is hereby granted the right as to all or any part of the land described herein, without Lessor's joinder, to combine, pool or unitize the acreage royalty or mineral interest covered by this lease, or any portion thereof,  at any time during the life of this lease, with any other land, lease or leases, royalty or mineral interests in or under any other tract or tracts of land in the vicinity thereof, whether owned by Lessee or some other person, or corporation so as to create, by the combination of such lands and leases, one or more operating Units, as to any and all mineral horizons, provided that no one operating unit shall, in the case of gas, including condensate, embrace more than six hundred forty (640) acres, and in the case of oil, including casinghead gas, embrace more than eighty (80) acres; and provided further, however, that if any spacing or other rules and regulations of the state or Federal Commission, Agency, or regulatory body having or claiming jurisdiction has heretofore or shall at any time hereafter permit or prescribe a drilling or operating unit or spacing rule in the case of gas, including condensate, greater than six hundred forty (640) acres, or in the case of oil or casinghead gas greater than eighty (80) acres, then the unit or units herein contemplated may have, or may be redesigned so as to have, as the case may be, the same surface content as, but not more than, the unit or the acreage in the spacing rule so prescribed or permitted. However, it is further specifically understood and agreed, anything herein to the contrary notwithstanding, that the Lessee shall have the right to, and the benefit of an acreage tolerance of ten per cent in excess of any provision thereof, at any time during the life of this lease, with any other land, lease or leases, royalty or other mineral from said land hereunder or from land pooled therewith.   If sulphur be oil, gas, casinghead gas, condensate or other minerals on any portion of an operating unit in which all or any part of the land described herein is embraced, or production of oil, gas, casinghead gas, condensate, or other minerals therefrom shall have the same effect under the terms of this lease as if a well were commenced, completed or producing oil, gas, casinghead gas, condensate, or other minerals in paying quantities on the land embraced by this lease.  Lessee shall execute in writing and file for record in the records of the Parish in which the lands herein leased are located, an instrument identifying or describing the pooled acreage, or an instrument supplemental thereto redesignating same, as the case may be. Either prior to the securing of production from any unit created under the authority hereinabove granted, or after cessation of production therefrom Lessee shall have the right to dissolve the unit so created, without Lessor's joinder or further consent, by executing in writing and placing of record in the Parish or Parishes in which the lands making up such unit may be located, an instrument identifying and dissolving such unit.  The provisions hereof shall be construed as a covenant running with the land and shall inure to the benefit of and be binding upon the parties hereto, their heirs, representatives, successors and assigns.  In the event such operating unit or units is/are so created by Lessee, Lessor shall receive out of production or the proceeds from production from such operating unit or units or out of the shut-in royalty provided for above, such portion of the royalty or of the shut-in royalty specified herein as the number of acres (mineral acres) out of this lease placed in any such operating unit or units bears to the total number of acres included in such operating unit or units.

8.  If Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the payments herein provided shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

9.  Lessee shall have the exclusive right to explore the land herein described by geological, geophysical or other methods, whether similar to those herein specified or not and whether now known or not, including the drilling of holes, use of torsion balance, seismograph explosions, magnetometer, or other geophysical or geological instruments, test or procedures, for

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

EXHIBIT   "–C–"

Attached to and made a part of __the Operating Agreement dated May 26, 2004 between Sklar Exploration Company__
__L.L.C. as Operator, and  Sklarco L.L.C., Tensas Delta Exploration Company, LLC, and McCombs Energy, L.L.C. as__
__Non-Operators, covering the West Arcadia Prospect  located in Bienville Parish, Louisiana.__

# ACCOUNTING PROCEDURE

# JOINT OPERATIONS

## I.  GENERAL PROVISIONS

**1.** **Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

**2.** **Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3.** **Advances and Payments by Non-Operators**

A.   Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B.   Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at __Bank One, Shreveport, Louisiana__ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4.** **Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

# COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.

COPAS · 1984 · ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

5.   **Audits**

   A.   A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

   B.   The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6.   **Approval By Non-Operators**

   Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II.   DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.   **Ecological and Environmental**

   Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2.   **Rentals and Royalties**

   Lease rentals and royalties paid by Operator for the Joint Operations.

3.   **Labor**

   A.   (1)   Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

        (2)   Salaries of First level Supervisors in the field.

        (3)   Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

        (4)   Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation on the Joint Property if such charges are excluded from the overhead rates.

   B.   Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

   C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

   D.   Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4.   **Employee Benefits**

   Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

**COPAS**

5.  **Material**

    Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV.   Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6.  **Transportation**

    Transportation of employees and Material necessary for the Joint Operations / **shall be charged at actual cost incurred by Operator.** ~~but subject to the following limitations:~~

    A.  ~~If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.~~

    B.  ~~If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.~~

    C.  ~~In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.~~

7.  **Services**

    The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III.   The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.  **Equipment and Facilities Furnished By Operator**

    A.  Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed __fifteen__ percent (____15____%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

    B.  In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%.   For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9.  **Damages and Losses to Joint Property**

    All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10. **Legal Expense**

    Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, ~~except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.~~   **and the costs and expenses incurred in connection with hearings and other matters before governmental bodies and agencies and costs and expenses incurred in examining and curing title.**

11. **Taxes**

    All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

12.    **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13.    **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14.    **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property.    In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15.    **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

1.    **Overhead - Drilling and Producing Operations**

    i.    As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

        ( **x** ) Fixed Rate Basis, Paragraph IA, or

        (    ) Percentage Basis, Paragraph IB

    Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II.    The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

    ii.    The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

        (    ) shall be covered by the overhead rates, or

        ( **x** ) shall not be covered by the overhead rates.

    iii.    The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

        (    ) shall be covered by the overhead rates, or

        ( **x** ) shall not be covered by the overhead rates.

    A.    Overhead - Fixed Rate Basis  **See ADDITIONAL REVISIONS page 9.**

        (1)    Operator shall charge the Joint Account at the following rates per well per month:

            Drilling Well Rate $____7,000.00_____
            (Prorated for less than a full month)

            Producing Well Rate $___700.00_____

        (2)    Application of Overhead - Fixed Rate Basis shall be as follows:

            (a)    Drilling Well Rate

                (1)    Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b) Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B. Overhead - Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

(a) Development

_____ Percent (_____%) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b) Operating

_____ Percent (_____%) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2. **Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

Account for overhead based on the following rates for any Major Construction project in excess of $ __25,000.00__ :

A. ___5___ % of first $100,000 or total cost if less, plus

B. ___4___ % of costs in excess of $100,000 but less than $1,000,000, plus

C. ___3___ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

**3.   Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. ___5___ % of total costs through $100,000; plus

B. ___4___ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. ___3___ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

**4.   Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

### IV.   PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

**1.   Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

**2.   Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A. New Material (Condition A)

(1)   Tubular Goods Other than Line Pipe

(a)   Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at **cost.** / ~~Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.~~

(b)   For grades which are special to one mill only, prices shall be computed at **cost.** / ~~the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000~~

Recommended by the Council of Petroleum Accountants Societies

COPAS

pound Oil Field Haulers Association interstate truck rate shall be used.

    (c)  Special end finish tubular goods shall be priced at / **cost.** the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

    (d)  Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at / **cost.** the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

  (2)  Line Pipe

    (a)  Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced at / **at cost.** under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

    (b)  Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at / **cost.** Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

    (c)  Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced / **at cost.** f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

    (d)  Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at / **cost.** quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

  (3)  Other Material shall be priced at / **cost.** the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

  (4)  Unused new Material, except tubular goods, moved from the Joint Property shall be priced at / **cost.** the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(l) and (2).

B.  Good Used Material (Condition B)

  Material in sound and serviceable condition and suitable for reuse without reconditioning:

  (1)  Material moved to the Joint Property

    At seventy-five percent (75%) of current / **market value.** new price, as determined by Paragraph A.

  (2)  Material used on and moved from the Joint Property

    (a)  At seventy-five percent (75%) of current / **market value.** new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

    (b)  At sixty-five percent (65%) of current / **market value.** new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material

  (3)  Material not used on and moved from the Joint Property

    At seventy-five percent (75%) of current / **market value.** new price as determined by Paragraph A.

  The cost of reconditioning, if any, shall be absorbed by the transferring property.

C.  Other Used Material

  (1)  Condition C

    Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at / **current market value.** fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

(2)   Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)   Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight.  Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)   Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)   Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.   Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.   Pricing Conditions

(1)   Loading or unloading costs may be charged to the Joint Account at / ~~the rate of twenty-five cents (25¢)~~  **actual costs incurred by Operator** ~~per hundred weight~~ on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)   Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.   **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material.  Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator, **provided however, if a Non-Operator elects to furnish material in kind, such material must (a) meet the quality specifications set by Operator, and (b) be inspected by Operator with inspection costs to be billed to the Joint Account.**

4.   **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished.  In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.   **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.   **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of  a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

Recommended by the Council
of Petroleum Accountants
Societies



overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

**3.  Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.  In cases involving a change of Operator, all Parties shall be governed by such inventory.

**4.  Expense of Conducting Inventories**

A.  The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.  The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

**ADDITIIONAL REVISIONS**
(1)  In the event the subject well is expected to be above the State threshold for H2S sour gas operations, the Drilling Well rate set forth in Art. III.1.A(1) will be increased by $2000.00 per month and the associated Producing Well Overhead Rate will be increased an additional $100.00 per month.

## EXHIBIT "D"

This Exhibit "D" is attached to and made a part of that Operating Agreement dated May 26, 2004, by and between Sklar Exploration Company L.L.C, as Operator, and Sklarco L.L.C., Tensas Delta Exploration Company, LLC, and McCombs Energy, L.L.C., as Non-Operators.

## INSURANCE

Operator shall carry the following insurance with the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of insurance will be provided upon request.

I.  **WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY**

   A.   Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

   B.   Extension of Coverage B of policy to provide for not less than $500,000 for death or injury to one person in any one accident.

II  **COMPREHENSIVE GENERAL LIABILITY**

   Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $2,000,000 for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III  **AUTOMOBILE LIABILITY**

   Coverage shall include owned, non-owned and hired vehicles. Limit $500,000 combined single limit each occurrence for bodily injury and property damage.

IV  **EXCESS LIABILITY**

   Operator shall carry excess liability insurance in an amount necessary to provide a total of $10,000,000 coverage for both Automobile Liability and Comprehensive General Liability.

   Any party, at its own expense, may carry its own coverage for Excess Liability Insurance with limits as set forth in this Section IV. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

V.  **EXTRA EXPENSE LIABILITY**

   Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $25,000 per occurrence.

   Liability Limit: $5,000,000

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder. Further, any party, at its own expense, may carry its own coverage for Extra Expense Liability Insurance with limits as set forth in this Section V. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

## EXHIBIT "E"

This Exhibit "E" is attached to and made a part of that Operating Agreement dated May 26, 2004, by and between Sklar Exploration Company L.L.C, as Operator, and Sklarco L.L.C., Tensas Delta Exploration Company, LLC and McCombs Energy, L.L.C., as Non-Operators.

### GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement, the parties hereto own and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area described in the Operating Agreement (the "JOA").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the gas produced from said JOA. However, one or more of the parties may be unable to take or market its interest in the gas production from time to time; therefore, to permit any party to produce and dispose of its interest in the gas production from the JOA with as much flexibility as possible, the parties hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser. Any party whose share of gas is not marketed shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ration of its participation percentage under this Operating Agreement to the participating percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, it any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Operator will, in turn, make settlement for all royalties and overriding royalties which are payable on gas produced from the Contract Area. In the event that the total royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Contract Area, then any such deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Contract Area shall furnish the Operator with division order title opinions on which Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser shall pay, or cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on

-1-

the volume of gas actually taken for its account.

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold, less applicable production taxes and royalties theretofore paid, less any reasonable dehydration, compression, treating, processing, gathering or transportation costs actually incurred, including amortized capital costs associated with the design, construction or operation of any plants to dehydrate, compress, treat or process gas, in connection with the sale of the overproduction, at the price and based on the proceeds actually received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party). Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.

-2-

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

## WEST ARCADIA PROSPECT
## SECTION 34, TOWNSHIP 19 NORTH, RANGE 6 WEST
## BIENVILLE & CLAIBORNE PARISH, LOUISIANA

OPERATING AGREEMENT

DATED

__February 1__ , __2008__ ,
<br>*Year*

OPERATOR   __SKLAR EXPLORATION COMPANY L.L.C.__

CONTRACT AREA   __As shown on Exhibit "A" to this Agreement.__

~~COUNTY OR~~ PARISH OF __BIENVILLE & CLAIBORNE__ STATE OF __LOUISIANA__

COPYRIGHT 1982 – ALL RIGHTS RESERVED AMERICAN
ASSOCIATION OF PETROLEUM LANDMEN, 4100 FOSSIL CREEK
BLVD., FORT WORTH, TEXAS, 76137-2791, APPROVED FORM.
A.A.P.L.   NO.   610   –   1982   REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 1 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2 |
| | B. LOSS OF TITLE | 2-3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. All Other Losses | 3 |
| V. | OPERATOR | 3 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4 |
| | B. SUBSEQUENT OPERATIONS | 4-5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5 |
| | 3. Stand-By Time | 5-6-7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 7 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8 |
| | 3. Abandonment of Non-Consent Operations | 8-9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 9-10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 10 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 11-12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 12 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 13 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 14 |
| | | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ____Sklar Exploration Company L.L.C.____

____401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay **for 100% of** / its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in **for 100% of its share of** / a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑ A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.

☑ B. Exhibit "B", Form of Lease.
☑ C. Exhibit "C", Accounting Procedure.
☑ D. Exhibit "D", Insurance.
☑ E. Exhibit "E", Gas Balancing Agreement.
☐ ~~F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.~~
☐ ~~G. Exhibit "G", Tax Partnership.~~

If any provision of any exhibit, except Exhibits "E" ~~and "G"~~, is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE III.**
**INTERESTS OF PARTIES**

A. **Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

B. **Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____ all jointly owned lease burdens _____ which shall be borne as hereinafter set forth.

Each of the Parties hereto shall pay or deliver or cause to be paid or delivered its proportionate part of the royalties and overriding royalties and other leasehold burdens as described in the attached Exhibit "A" and shall hold the other Parties free from any liability ~~Regardless of which party has contributed the leasehold interest and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor.~~ therefor. If the interest of any Party in any oil and gas lease covered by this agreement is subject to any additional royalty, overriding royalty, production payment or other charges over and above those as shown on Exhibit "A", such Party shall assume and alone bear all such obligations and they shall account for or cause to be accounted for such interests to the owners thereof. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

C. **Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, which is not a joint obligation of the parties overriding royalty, production payment or other burden on production / ~~in excess of the amount stipulated in Article III.B.~~, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

D. **Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1. If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2. If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

**ARTICLE IV.**
**TITLES**

A. **Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

~~☐ Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in-gas royalty opinions and division-order-title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.~~

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE IV
### continued

1 ☑ Option No. 2: Costs incurred by Operator in procuring abstracts / and fees paid outside attorneys / for title examination
2 (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) / shall be borne by the Drilling Parties
3 in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4 hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5 functions.
6
7 ~~Each party shall be responsible for securing~~ / curative matter and pooling amendments or agreements required in connection
8 with leases or oil and gas interests ~~contributed by such party.~~ Operator shall be responsible for the preparation and recording of pooling
9 designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10 This shall not prevent any party from appearing on its own behalf at any such hearing.
11
12 No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
13 provided, and (2) the title has been approved by the examining attorney or title has been accepted by ~~all of the parties who are to par-~~
14 ~~ticipate in the drilling of the well.~~
15
16 ~~B.   Loss of Title:~~
17
18 ~~1.   Failure of Title:   Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a~~
19 ~~reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days~~
20 ~~from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-~~
21 ~~tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil~~
22 ~~and gas leases and interests; and,~~
23 ~~(a)   The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be~~
24 ~~entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,~~
25 ~~but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~
26 ~~(b)   There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has~~
27 ~~been lost, but the interests of the parties shall be revised on an acreage basis, as of the time — it is determined finally that title failure has oc-~~
28 ~~curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract~~
29 ~~Area by the amount of the interest lost;~~
30 ~~(c)   If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is~~
31 ~~increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-~~
32 ~~terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such~~
33 ~~well;~~
34 ~~(d)   Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has~~
35 ~~failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties~~
36 ~~who bore the costs which are so refunded;~~
37 ~~(e)   Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be~~
38 ~~borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,~~
39 ~~(f)   No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest~~
40 ~~claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in~~
41 ~~connection therewith.~~
42
43 ~~2.   Loss by Non-Payment or Erroneous Payment of Amount Due:   If, through mistake or oversight, any rental, shut-in well~~
44 ~~payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,~~
45 ~~there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required~~
46 ~~payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,~~
47 ~~which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the~~
48 ~~date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in~~
49 ~~the Contract Area on account of ownership of the lease or interest which has terminated.   In the event the party who failed to make the~~
50 ~~required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to~~
51 ~~the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it~~
52 ~~shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled~~
53 ~~or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~
54 ~~(a)   Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,~~
55 ~~up to the amount of unrecovered costs;~~
56 ~~(b)   Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of~~
57 ~~oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease~~
58 ~~termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said~~
59 ~~portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and,~~
60 ~~(c)   Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest~~
61 ~~lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~
62
63 3.   ~~Other~~ Losses:   All losses incurred, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses
64 and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
65 the Contract Area.

*curative matters and material
**landmen and consultants          ***and for applications and hearings

66
67
68
69
70

- 3 -

*Operator shall use its best efforts to secure* (interlineation above line 7)
*subject to this agreement, and charge these fees to the joint account* (interlineation line 8)
*Operator.* (interlineation line 13-14)

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE V.

OPERATOR

A.   Designation and Responsibilities of Operator:

SKLAR EXPLORATION COMPANY, L.L.C. of Shreveport, Louisiana shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

B.   Resignation or Removal of Operator and Selection of Successor:

1.   Resignation or Removal of Operator:   Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, / or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator. * this condition shall not apply to Sklar Exploration Company, L.L.C. or any other designated operator who owns no interest in the contract area by virtue of the fact that it is solely an operating company.

2.   Selection of Successor Operator:   Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

C.   Employees:

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D.   Drilling Contracts:

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. / ** If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. **except that in Operator's sole discretion all factors, such as rig availability, equipment condition, contractor employee reliability and knowledge, and drilling contractor reputation shall be taken into consideration in determining the real competitive price such that the lowest price bid may not provide the overall best value in the Drilling Parties to accomplish the drilling operations.

ARTICLE VI.

DRILLING AND DEVELOPMENT

A.   Initial Well:                                        Subject to rig availability
                                                            /
On or before the 1st  day of  May          , (year) 2008          , Operator shall commence the drilling of a well for oil and gas at the following location:
340 feet from the South Line and 1442 feet from the East Line of Section 34, Township 19 North, Range 6 West, Bienville and Claiborne Parish, Louisiana, and shall thereafter continue the drilling of the well with due diligence to a total depth of 8400 feet.

and shall thereafter continue the drilling of the well with due diligence to

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

- 4 -

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

B.   Subsequent Operations:

1.   Proposed Operations:   Should any party hereto desire to drill any well / on the Contract Area other than the well provided for in Article VI.A., or to rework, ~~reenter, recomplete, sidetrack~~ deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation.  The parties receiving such a notice shall have / ~~thirty (30)~~ **fifteen (15)** days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation.  If a drilling rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to / ~~forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays.~~ **twenty-four (24) hours** Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.  Any notice or response given by telephone shall be promptly confirmed in writing.

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of / ~~thirty (30)~~ **fifteen (15)** days (or as promptly as possible after the expiration of the / ~~forty-eight (48)~~ **twenty-four (24)** hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all parties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance.  Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance with the provisions hereof as if no prior proposal had been made.

2.   Operations by Less than All Parties:   If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of the notice period of / ~~thirty (30)~~ **fifteen (15)** days (or as promptly as possible after the expiration of the / ~~forty-eight (48)~~ **twenty-four (24)** hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence.  Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work.  Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed.  Each Consenting Party, within / ~~forty-eight (48) hours~~ **twenty-four (24)** ~~(exclusive of Saturday, Sunday and legal holidays)~~ after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry / **all of** its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a).  In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of / ~~forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays).~~ **twenty-four (24)** The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph.  Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.  If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense.  If any well drilled, reworked, **recompleted, sidetracked,** deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

-5-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1 and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2 ties. Upon commencement of operations for the drilling, reworking, *recompleting,* deepening or plugging back of any such well by Consenting Parties
3 in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4 and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5 Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6 market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7 terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8 until it reverts) shall equal the total of the following:

9
10
11
12      *500%*
        (a) / 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13 connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
14 Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15 Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16 Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17 Party had it participated in the well from the beginning of the operations; and

18
19
20
21      (b) ____500____ % of that portion of the costs and expenses of drilling, reworking, *recompleting, sidetracking,* deepening, plugging back, testing and completing,
22 after deducting any cash contributions received under Article VIII.C., and ____500____ % of that portion of the cost of newly acquired equip-
23 ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24 participated therein.

25
26
27
28      *or the completing, recompleting or reworking of a well,*
        An election not to participate in the drilling or the deepening of a well, / shall be deemed an election not to participate in any re-
29 working / or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is *recompleting, sidetracking,*
30 conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31 reworking / or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well *recompleting, sidetracking,*
32 and there shall be added to the sums to be recouped by the Consenting Parties *five* one-hundred percent *500%* (100%) of that portion of the costs of *recompleting, sidetracking,*
33 the reworking / or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If *recompleting, sidetracking,*
34 such a reworking / or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35 plicable as between said Consenting Parties in said well.

36
37
38
39      During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40 proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41 taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42 ticle III.D.

43
44
45
46      *recompleting, sidetracking,*
        In the case of any reworking, / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47 of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon *recompleting, sidetracking,*
48 abandonment of a well after such reworking, / plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49 ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

50
51
52
53      Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54 Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55 itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56 option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill- *quarter*
57 ings. Each / month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
58 operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59 curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
60 realized from the sale of the well's working interest production during the preceding / month. *quarter* In determining the quantity of oil and gas
61 produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62 well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63 which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64 of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65 above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, recompleting, sidetracking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

Notwithstanding the provisions of this Article VI.B.2., /* it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply; provided that an exceptional well location that is approved by the Louisiana Office of Conservation shall be deemed to conform to the then-existing spacing pattern. and subject to the right of any party to non-consent the proposed operation

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the recompleting, reworking, deepening and plugging back of such initial well after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for production, ceases to produce in paying quantities.

3. <u>Stand-By Time</u>:  When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepening operation just completed.  Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

4. <u>Sidetracking</u>:  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties.  Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

(a)  If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

(b)  If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period shall be limited to / forty-eight (48) hours, twenty-four (24) exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and receive up to eight (8) additional days after expiration of the / forty-eight (48) twenty-four (24) hours within which to respond by paying for all stand-by time incurred during such extended response period.  If more than one party elects to take such additional time to respond to the notice, stand by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.  In all other instances the response period to a proposal for sidetracking shall be limited to / thirty (30) fifteen (15) days.

## C.  TAKING PRODUCTION IN KIND:

Each party shall / have the right to take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost.  Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party.  Any party taking its share of production in kind shall be

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

3  Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5  its share of all production.

7  In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8  the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9  the obligation, to purchase such oil or sell it to others / at any time and from time to time, for the account of the non-taking party at the
10  best obtainable in the area for such production.  Any such purchase or sale by Operator shall be subject always to the right of the
11  owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously
12  delivered to a purchaser.  Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of
13  time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14  of one (1) year.
15  *on the same terms and basis as Operator is marketing Operator's and other Non-Operators' share of production

16  In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or
17  deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18  be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19  agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

21  D.    Access to Contract Area and Information:

23  Each / party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
   consenting
24  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
   consenting
25  and records relating thereto.  Operator, upon request, shall furnish each of the other / parties with copies of all forms or reports filed with
26  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area.  The cost of
28  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29  quests the Information.

31  E.    Abandonment of Wells:

33  1.  Abandonment of Dry Holes:  Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35  without the consent of all parties.  Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
   twenty-four (24) hours
36  within / forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37  such well, such party shall be deemed to have consented to the proposed abandonment.  All such wells shall be plugged and abandoned in
38  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39  such well.  Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40  operations in search of oil and/or gas subject to the provisions of Article VI.B.

42  2.  Abandonment of Wells that have Produced:  Except for any well in which a Non-Consent operation has been conducted
43  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44  producer shall not be plugged and abandoned without the consent of all parties.  If all parties consent to such abandonment, the well shall
45  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto.  If, within
46  thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
47  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.  Each abandoning party shall assign
50  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52  terval or intervals of the formation or formations then open to production.  If the interest of the abandoning party is or includes an oil and
53  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

- 8 -

ARTICLE VI
continued

1  "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2  assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3  Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4  interests in the remaining portion of the Contract Area.
5
6      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7  the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8  quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9  templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10  well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11  repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12  visions hereof.
13
14      3.  Abandonment of Non-Consent Operations:  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15  Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16  permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17  of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18  VI.E.
19
20                                    ARTICLE VII.
21                        EXPENDITURES AND LIABILITY OF PARTIES
22
23  A.  Liability of Parties:
24
25      The liability of the parties shall be several, not joint or collective.  Each party shall be responsible only for its obligations, and
26  shall be liable only for its proportionate share of the costs of developing and operating the Contract Area.  Accordingly, the liens granted
27  among the parties in Article VII.B. are given to secure only the debts of each severally.  It is not the intention of the parties to create, nor
28  shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.
29
30  B.  Liens and Payment Defaults:
31
32      Each Non-Operator grants to Operator a lien on its oil and gas rights in the Contract Area, and a security interest in its share
33  of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34  at the rate provided in Exhibit "C".  To the extent that Operator has a security interest under the Uniform Commercial Code of the
35  state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code.  The bringing of a suit and the ob-
36  taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37  rights or security interest as security for the payment thereof.  In addition, upon default by any Non-Operator in the payment of its share
38  of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39  the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid.  Each
40  purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default.  Operator grants a like lien
41  and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.
42
43      If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
44  Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
45  the interest of each such party bears to the interest of all such parties.  Each party so paying its share of the unpaid amount shall, to obtain
46  recover the amount it paid plus five hundred percent (500%) of the amount out of the proceeds from the sale of the defaulting
47  party's share of oil and for gas, and , to secure payment thereof, be subrogated to the security rights described in the foregoing
    reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph. Notwithstanding anything
48  contained to the contrary in this paragraph, all parties agree that this provision shall not apply to any operation requiring an APE
    unless Operator has advance billed all parties and such parties have paid their proportionate share of said costs in accordance with
    other provisions of this agreement.
49  C.  Payments and Accounting:
50
51      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
52  and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
53  tionate shares upon the expense basis provided in Exhibit "C".  Operator shall keep an accurate record of the joint account hereunder,
54  showing expenses incurred and charges and credits made and received.
55
56      Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
57  of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
58  month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
59  with an invoice for its share thereof.  Each such statement and invoice for the payment in advance of estimated expense shall be submitted
60  on or before the 20th day of the next preceding month.  Each party shall pay to Operator its proportionate share of such estimate within
61  fifteen (15) days after such estimate and invoice is received.  If any party fails to pay its share of said estimate within said time, the amount
62  due shall bear interest as provided in Exhibit "C" until paid.  Proper adjustment shall be made monthly between advances and actual ex-
63  pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
64
65  D.  Limitation of Expenditures:
66
67      1.  Drill or Deepen:  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
68  pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the drilling or deepening shall include:
69
70

-9-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
### continued

1  ☑  *Option No. 1:  All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2  necessary tankage and/or surface facilities.  *This Option No. 1 shall apply only to water source and/or water injection wells.
3
4  ☑  **Option No. 2:  All necessary expenditures for the drilling or deepening and testing of the well.  When such well has reached its
5  authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6  to the Non-Operators who have the right to participate in the completion costs.  The parties receiving such notice shall have / forty-eight (24) twenty-four (24)
7  (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8  tempt.  Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9  cluding necessary tankage and/or surface facilities.  Failure of any party receiving such notice to reply within the period above fixed shall
10  constitute an election by that party not to participate in the cost of the completion attempt.  If one or more, but less than all of the parties,
11  elect to get pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase recompleting, sidetracking deepening or plugging
12  back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13  than all parties.  **This Option No. 2 shall cover all wells except those expressly covered by Option No. 1 above.
14
15      2. Rework or Plug Back:  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16  plugged back pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the reworking or plugging back of a well shall
17  include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18  and/or surface facilities.
19
20      3. Other Operations:  Without the consent of / all parties, Operator shall not undertake any single project reasonably estimated     *one or more Parties owning a majority interest
21  to require an expenditure in excess of _____ Twenty-five Thousand and No/100 _____ Dollars ($_____25,000.00_____)
22  except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23  previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24  emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25  to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26  parties.  If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27  an information copy thereof for any single project costing in excess of _____ Twenty-five Thousand and No/100 _____
28  Dollars ($_____25,000.00_____) but less than the amount first set forth above in this paragraph.
29
30  E.    Rentals, Shut-in Well Payments and Minimum Royalties:
31
32      Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33  party or parties who subjected such lease to this agreement at its or their expense.  In the event two or more parties own and have con-
34  tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35  behalf of all such parties.  Any party may request, and shall be entitled to receive, proper evidence of all such payments.  In the event of
36  failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37  ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38  visions of Article IV.B.J.2.
39
40      Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41  of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42  circumstances, prior to taking such action, but assumes no liability for failure to do so.  In the event of failure by Operator to so notify
43  Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44  shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46  F.    Taxes:
47
48      Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49  subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50  become delinquent.  Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51  be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52  Operator.  If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53  riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54  owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55  tion.  If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56  anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57  value generated by each party's working interest.  Operator shall bill the other parties for their proportionate shares of all tax payments in
58  the manner provided in Exhibit "C".
59
60      If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62  mination.  During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63  interest and penalty.  When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64  count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65  provided in Exhibit "C".
66
67      Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
68  to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.
69
70

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VII
continued

1  G.  Insurance:
2
3        At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4  the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5  pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
6  also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7  hereof.  Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8  law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.
9
10       In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11  parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.
12
13                                                    ARTICLE VIII.
14                            ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST
15
16  A.  Surrender of Leases:
17
18       The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19  or in part unless all parties consent thereto.
20
21       However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22  agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23  such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24  thereafter secured, to the parties not consenting to such surrender.  If the interest of the assigning party is or includes an oil and gas in-
25  terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26  such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27  lease to be on the form attached hereto as Exhibit "B".  Upon such assignment or lease, the assigning party shall be relieved from all
28  obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29  attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30  duction other than the royalties retained in any lease made under the terms of this Article.  The party assignee or lessee shall pay to the
31  party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32  ed acreage.  The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33  salvaging and the estimated cost of plugging and abandoning.  If the assignment or lease is in favor of more than one party, the interest
34  shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.
35
36       Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39  agreement.
40
41  B.  Renewal or Extension of Leases:
42
43       If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
                                    fifteen
44  shall have the right for a period of thirty (3015) days following receipt of such notice in which to elect to participate in the ownership of the
45  renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46  portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47  interests held at that time by the parties in the Contract Area.
48
49       If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50  who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51  to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52  Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.
53
54       Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55  by the acquiring party.
56
57       The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58  or cover only a portion of its area or an interest therein.  Any renewal lease taken before the expiration of its predecessor lease, or taken or
59  contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
60  tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61  the provisions of this agreement.
62
63       The provisions in this Article shall also be applicable to extensions of oil and gas leases.
64
65  C.  Acreage or Cash Contributions:
66
67       While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69  applied by it against the cost of such drilling or other operation.  If the contribution be in the form of acreage, the party to whom the con-
70  tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VIII
### continued

1 said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2 governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3 it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4 tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.
5
6     If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7 consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8
9 D.   Maintenance of Uniform Interests:
10
11    For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no
12 party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,
13 equipment and production unless such disposition covers either:
14
15    1.  the entire interest of the party in all leases and equipment and production; or
16
17    2.  an equal undivided interest in all leases and equipment and production in the Contract Area.
18
19    Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20 and shall be made without prejudice to the right of the other parties. Any added expenditures required as a result of a partial
21 disposition, including marketing or metering of production, shall be borne solely by the party transferee.
22    If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23 require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24 and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25 party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26 into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27 Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.
28
29 E.   Waiver of Rights to Partition:
30
31    If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32 undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33 interest therein.
34
35 F.   Preferential Right to Purchase:
36
37    Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract
38 Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the
39 name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms
40 of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase
41 on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-
42 ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-
43 ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to
44 dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-
45 pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.
46
47                                ARTICLE IX.
48                     INTERNAL REVENUE CODE ELECTION
49
50    This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51 for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52 and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53 purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54 from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1986, as per-
55 mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56 ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57 United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58 and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59 evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60 Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61 action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62 Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63 Subtitle "A", of the Internal Revenue Code of 1986, under which an election similar to that provided by Section 761 of the Code is per-
64 mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65 tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66 computation of partnership taxable income.
67
68
69
70

# ARTICLE X.
## CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____ **Ten Thousand and No/100** _____ Dollars ($ _____ 10,000.00 _____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder. **All claims or suits involving title to any interest subject to this Agreement shall be treated as a claim or suit against all parties hereto.**

# ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

# ARTICLE XII.
## NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

# ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☑ Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☐ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production, provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XIV.
COMPLIANCE WITH LAWS AND REGULATIONS

A.   **Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

B.   **Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____Louisiana_____ shall govern.

C.   **Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of ~~the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and~~ any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to ~~said~~ any Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

ARTICLE XV.
OTHER PROVISIONS

(See attached pages 14-1 through 14-5)

- 14 -

# ARTICLE XV.

## OTHER PROVISIONS

### A. PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1) an election to perform additional logging, coring or testing;

(2) an election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;

(3) an election to plug back and attempt to complete the well in a shallower depth or formation;

(4) an election to deepen the well;

(5) an election to sidetrack the well;

(6) an election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;

(7) an election to temporarily abandon the well;

(8) an election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of a majority of the consenting parties in possessory, cost-bearing interest (and not in number), a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth. In such event, the operation, which, in the opinion of a majority of the consenting parties in possessory, cost bearing interest (and not in number) is less likely to jeopardize the well, will be given priority. Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail. It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests. For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

### B. HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

### C. DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties. If the parties are equally divided, the opinion of the Operator will prevail.

### D. ADVANCEMENT OF COSTS

Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s) in advance of its respective share of (i) the dry hole cost for the initial well to be drilled under Article VI A, (ii) the dry hole cost for any other well to be drilled hereunder to which such Non-Operator has consented, **and (iii) the cost of any completion, reworking, recompletion, sidetracking, deepening or plugging back operation to** which such Non-Operator has consented (any such operation under clause (i), (ii), or (iii) being herein called a "Drilling Operation"). Such request for advance payment may be made upon all Non-Operators or upon any one or more of them **to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated** commencement date for such Drilling Operation. The amount of each Non-Operator's advance payment shall be based **upon the latest AFE for such operation. Such advanced payments shall be held by Operator for the account of the Non-** Operators and applied, with interest, against the actual costs incurred in the applicable operation.

A Non-Operator receiving a request for advance payment shall, within two (2) days of the receipt of such request if and when a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to

operator in cash the full amount of such request. Operator shall credit the amount to the Non-Operator's account for the payment of such Non-Operator's share of costs of such Drilling operation, and following the end of each month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement. Advance payment by a Non-Operator of his share of completed well costs shall in no event prevent such completion of a well pursuant to Option No. 2 of Article VII.D.1. and, in the event such a Non-Operator elects not to participate in completion, the sums that such Non-Operator has advanced shall not be charged with any share of the costs of any completion attempted.

In the event a Non-Operator from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by depositing cash as aforesaid, then Operator, at his option, shall make a second written request by certified mail, return receipt requested for such advance. Non-Operator shall pay for said advance as aforesaid within two (2) business days from receipt of such second request.

If a Non-Operator fails to pay within two (2) business days of the receipt of such second request, then:

(1) If the advance payment was requested for the drilling of the initial well under Article VI A Non-Operator may, at the sole discretion and timing election of the Operator, be deemed to have relinquished all of its leasehold and contractual rights in the Contract Area retroactive to the date of default in payment, and if assignment has been made to such Non-Operator, Non-Operator shall assign all of its rights in and to the Contract area, within thirty (30) days of a request for such assignment, to those parties who have participated in such Drilling Operation, in the proportion that such parties elected to share the relinquished interest.

(2) If the advance payment was requested for any other Drilling Operation (including completion of the initial well), Non-Operator may, at the sole discretion and timing election of the Operator, be deemed non-consent in said operation retroactive to the beginning of such operation and thereafter subject to the penalty provisions of Article VI.B.2 hereof.

   If the Non-Operator fails to make such payment or furnish such security within two (2) business days of the receipt of such second request, Operator shall promptly notify all other parties still participating in such Drilling Operation of the default in payment and if and when applicable, of the relinquishment of an interest under this provision. The parties who wish to participate in the Drilling Operation shall have five (5) days from receipt of the applicable notice to elect to assume the costs chargeable to such relinquished interest and shall share such relinquished interest in proportion to their assumption of such relinquished interest. If the parties who wish to participate in the Drilling Operation are unwilling to assume the costs chargeable to such relinquished interest, the Drilling Operation shall be cancelled, and if the cancelled Drilling Operation involves the drilling of a test well under Article VI A no assignment shall be due as a consequence of the failure to pay.

   Notwithstanding anything to the contrary herein, if the applicable drill well or operation is unsuccessful or results in a dry hole, Operator shall have the right to sue a Non-Operator who failed to pay for its proportionate share of expenses in lieu of Operator's right to an assignment of all Non-Operator's leasehold and contractual rights within the Contract Area, or in lieu of deeming the Non-Operator Non-Consent.

## E.  NECESSARY EXPENDITURES EXCLUDE SIDETRACKING

The phrase "necessary expenditures" in Article VII.D.1. (Option No. 2) on page 10 shall not be deemed to include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

## F.  ADDITIONAL CHARGES

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Unit Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same:

Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and expenses in connection with preparation and presentation of evidence and exhibits of Louisiana Office of Conservation hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

## G.  INDEMNITY

Except for liabilities resulting from the gross negligence or willful misconduct of the Operator, each Non-Operator shall defend, indemnify and hold Operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operator's officers, employees and/or agents, resulting from or in any way relating to such officers, employees, and/or agents presence on a drilling rig on the Contract Area or from such person traveling by air or water between any point and such drilling rig. Such indemnity to Operator shall also apply to any other person whose presence on the rig or transportation to or from such rig is at the request of the indemnifying Non-Operator (except for liabilities resulting from the gross negligence or willful misconduct of the Operator).

**H.  RECOUPMENT**

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

**I.  SEVERABILITY**

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

**J.  NO WAIVERS**

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

**K.  PIPELINE AND/OR GATHERING LINE CONSTRUCTION**

If any party to this Agreement elects either to construct, operate or purchase or to join in the construction, operation or purchase of a pipeline, and/or gathering line to transport production from the Contract Area, then such party shall notify the other parties hereto furnishing all pertinent cost and information.  Each party receiving such notice shall have thirty (30) days to exercise their right in writing to participate in the construction, operation and ownership of such pipeline and/or gathering line, including the right of transporting production from the Contract Area, by agreeing to bear their proportionate share of the cost of such operation and thereafter entering into a mutually acceptable operating agreement for the operation thereof.   Otherwise, the parties consenting to participate in such operation shall be entitled to establish the terms and conditions (including any costs and fees for use or reservation of the applicable facilities) under which the non-consenting parties may use or have access to the applicable facilities.  Absent a mutually agreeable agreement for the use of said facilities by and between the consenting and non-consenting parties, the non-consenting parties shall be obligated to separately dispose of their share of all production.

**L.  DISBURSEMENT OF ROYALTIES**

If Operator prepares and administers a division order for and receives and distributes the proceeds of production attributable to the interest of a Non-Operator, then Operator shall be entitled to charge that party for an appropriate monthly overhead charge for disbursing such royalty payments, in addition to the combined fixed rates specified in Exhibit "C" hereto.  If through error or inadvertence Operator shall fail to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, he shall not be liable in damages to the other Parties hereto for such failure, unless arising out of the gross negligence or willful misconduct of the Operator.

**M.  INFORMATION**

Anything to the contrary hereinabove notwithstanding, it is stipulated that any non-consenting party to an operation conducted hereunder shall have no right to observe such operation or have access to information pertaining to such operation, until such time as the non-consenting party's share of the cost of such operation and the penalty therefor has been recovered by the consenting parties as provided herein.  It is understood that this Section M of Art. XV does not apply when the in the situation where the non-consenting party is a Farmor under this Agreement.

**N.  OPERATOR'S LIEN – SECURITY INTEREST**

Subject to the provision of Article VII. B. of this Agreement, each non-Operator grants to Operator a lien upon all of the rights, titles, and interests of each Non-Operator, whether now existing or hereafter acquired, in and to the (1) the oil, gas, or other minerals in, on, and under the Contract Area and (2) any oil, gas, and mineral leases covering the Contract Area or any portion thereof.  In addition, each Non-Operator grants to Operator a security interest in and to all of such Non-Operator's rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (1) all oil, gas and other minerals produced from the Contract Area when produced; (2) all accounts receivable accruing or arising as a result of the sale of such oil, gas and other minerals; (3) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (4) all oil and gas wells and other surface and sub-surface equipment and facilities of any kind or character located on the Contract Area and the cash or other proceeds received from the sale thereof (collectively, the "Personal Property Collateral").  Some of the Personal Property Collateral is or will become fixtures on the Contract Area, and the interest of Non-Operator in and to the oil, gas and other minerals when extracted from the Contract Area and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract

Area. This Agreement (including a carbon, photographic, or other reproduction hereof) shall constitute a non-standard form financing statement under the terms of the Uniform Commercial Code of the State in which the Contract Area is located, and as such, may be filed for record in the real estate records of the county in which the Contract Area is located. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense, if any.

## O. MARKETING OF PRODUCTION

Operator agrees to market all Non-Operator's share of any production from the Contract Area under the same terms that Operator is marketing its share of said production; provided, however, that contracts entered into by Operator in marketing Non-Operator's share of production shall be subject to the limitations set forth in Article VI. C. hereof. Further, Non-Operator shall be given the continuing right to participate as a signatory to any contract entered into by Operator to market production hereunder. Notwithstanding the above, any Non-Operator may choose to separately market its proportionate share of said production by giving written notice to Operator by the 15th day of the month prior to the month in which said Non-Operator intends to separately market its production. Conversely, if said Non-Operator again requests that Operator market its production, Non-Operator must provide written request of same by the 15th day of the month prior to the month in which Operator is again to market said Non-Operator's production.

## P. METERING OF PRODUCTION

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

## Q. PLUGGING AND LEASEHOLD RESTORATION FUND

At any time any well subject to this agreement is, in Operator's sole opinion, approaching the end of its economic life and/or its useful purpose, Operator may pre-bill the joint account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location. Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and abandonment and restoration of the leasehold premises. In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any accrued interest on such difference, based upon the then working interest percentage of such owner. In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

## R. SEPARATE AGREEMENT FOR NON-UNIFORM INTEREST

Any leases or interests therein (and the land covered thereby) that, pursuant to the terms of this Agreement or otherwise, become owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such leases become so owned. Any leases or interests therein (and the lands covered thereby) that, pursuant to the terms of this Agreement or otherwise, become owned by more than one but less than all of the parties hereto or in which a party assigns, transfers or otherwise disposes of all or part of its interests shall remain subject to this Agreement as to the surviving parties; however, **for all purposes, the terms of this Agreement shall apply separately to each such lease (or group of such leases in which the parties' ownership is uniform) as if it were a separate agreement covering such lease(s), with an Exhibit "A" modified to reflect the parties' interests therein, based upon the parties' ownership in such lease(s).**

## S. OBLIGATORY WELL

Notwithstanding the provisions of this agreement and particularly Article VI, if any proposed operations are necessary to maintain a Lease covered by this agreement in force or an agreement to earn a lease(s) which would otherwise expire unless such operations are conducted, then in lieu of being penalized under Article VI.B.2., each Non-Consenting Party shall assign to Consenting Parties all of such Non-Consenting Party's right, title and interest in and to the Lease(s) or portion thereof or such agreement which would be lost or not earned if such operations were not conducted.

Such assignment shall be promptly due upon commencement of said proposed operations by Consenting Parties and shall be free and clear of all overriding royalties, production payments, mortgages, liens and other burdens and encumbrances placed thereon by the assigning party or resulting from its ownership or operation of such Lease or interest which is not a joint obligation of the parties, but otherwise without warranty of title either expressed or implied.

If the assignment is in favor of more than one party, the assigned interest shall be shared by the Consenting Parties in the proportions that the interest of each bears to the interest of all Consenting Parties unless otherwise agreed to in writing. Thereafter, such acreage covered by said assignment shall not be subject to the terms of this agreement, but shall be deemed to be subject to an agreement identical to this changed only in Exhibit "A" to indicate the Consenting Parties and their percentages of interest. Operations that are necessary to either maintain a Lease covered by this agreement in force or to earn a lease or part thereof under an agreement which would otherwise expire unless operations are conducted, shall be defined as operations that are proposed within six (6) months of the date the Lease or agreement would otherwise expire.

**T. DEFAULT PENALTY/AUTOMATIC NON-CONSENT**

If written notice has been given that the lien rights conferred in Article VII. B. have been implemented or enforced against any party hereto, for so long as the affected party remains in default, it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and shall not be entitled to vote its interest in any matter hereunder. As to any proposed operation in which it otherwise would have the right to participate, such party shall not have the right to elect to participate or be a Consenting Party unless and until it pays in full the amount it is in default plus all other outstanding amounts due hereunder. If an operation proposed during such default period commences before such payment in full, the party in default shall automatically be deemed a Non-Consenting Party to the operation.

**U. PRIOR OPERATING AGREEMENT(S)**

This operating agreement, as to the parties executing same and as to the Contract Area and Depth Restrictions, shall supersede and replace any prior operating agreement(s) covering all or any portion of the Contract Area of this operating agreement.

**V. NON-PARTICIPATING INTERESTS**

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto as same may be revised from time to time to reflect record title and/or reformation of the Contract Area.

**X. EXECUTION**

This agreement shall be binding upon each Non-Operator that executes this agreement without regard to whether this same instrument, or any copy or counterpart hereof shall be executed by any other Non-Operator.

**Y. MISCELLANEOUS**

Anything to the contrary herein notwithstanding, this Operating Agreement is expressly made subject to the terms and provisions of the leases and farmout agreements described in Exhibit "A" hereof.

**EXHIBIT "A"**

**Attached to and made a part of that certain Operating Agreement dated February 1, 2008, by and between SKLAR EXPLORATION COMPANY L.L.C., as Operator, and SKLARCO L.L.C., WAC EXPLORATION COMPANY L.L.C., and MCCOMBS ENERGY, L.L.C., as Non-Operators.**

I.   **Identification of lands subject to this agreement:**

**Contract Area**

**Township 19 North, Range 6 West**
**Bienville and Claiborne Parish, Louisiana**
**Section 34 and lying within the black boundary as shown on the plat designated as Exhibit "A-2".**

**Area of Mutual Interest**

**Township 19 North, Range 6 West**
**Bienville and Claiborne Parish, Louisiana**
**Section 34 and lying within the red boundary as shown on the plat designated as Exhibit "A-2".**

II.   **Restrictions, if any, as to depths, formations, or substances:**

There are no restrictions except as may be provided for in any lease or contract subject to this Operating Agreement.

III.   **Decimal interest and names and addresses of Parties to this Agreement:**

A.  **As to those Oil, Gas and Mineral Leases described in the attached Exhibit A-1:**

| Working Interest Owners | Interest |
|---|---|
| Sklarco L.L.C. | 0.33333333 |
| WAC Exploration Company L.L.C. | 0.33333333 |
| McCombs Energy L.L.C. | 0.33333334 |
| Total: | 1.00000000 |

IV.   **Oil and gas leases and/or oil and gas interests subject to this agreement:**

See Exhibit "A-1" for Description of Leases and oil and gas interests.

V.   **Addresses of parties for notice purposes:**

Sklar Exploration Company, LLC
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Telephone: (318) 227-8668
Telecopier: (318) 227-9012

Sklarco, LLC
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Telephone: (318) 227-8668
Telecopier: (318) 227-9012

1

WAC Exploration Company L.L.C.
Attn: Michael E. Riddick, Executive Vice President
333 Texas Street, Suite 2121
Shreveport, LA 71101
Telephone: (318) 222-0026
Telecopier: (318) 429-1600

McCombs Energy, L.L.C.
Attn: Larry Wynont, VP, Operations
5599 San Felipe Street, Suite 1200
Houston, Texas 77056-2721
Telephone: (713) 621-0033
Telecopier: (713) 621-1670

## EXHIBIT "A-1"

**Attached to and made a part of that certain Operating Agreement dated February 1, 2008, by and between SKLAR EXPLORATION COMPANY L.L.C., as Operator, and SKLARCO L.L.C., WAC EXPLORATION COMPANY L.L.C., and MCCOMBS ENERGY, L.L.C., as Non-Operators.**

### DESCRIPTION OF LEASES

1.  Oil, Gas and Mineral Lease dated December 4, 2007, by and between Royce Henley Trust, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 428281, Book 1457, Page 118, in the Conveyance Records of Claiborne Parish, Louisiana.

2.  Oil, Gas and Mineral Lease dated October 2, 2007, by and between Era Onita Sanders Methvin, et al, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 427541, Book 1451, Page 113, in the Conveyance Records of Claiborne Parish, Louisiana.

    Ratification of Oil, Gas and Mineral Lease dated October 2, 2007, by and between Era Onita Sanders Methvin, et al, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 428076, Book 1455, Page 55 in the Conveyance Records of Claiborne Parish, Louisiana.

3.  Oil, Gas and Mineral Lease dated September 4, 2007, by and between DSK Ltd., as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 427540, Book 1451, Page 108, in the Conveyance Records of Claiborne Parish, Louisiana.

4.  Oil, Gas and Mineral Lease dated May 15, 2007, by and between Troy W. Moore, et ux, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 427532, Book 1451, Page 80, in the Conveyance Records of Claiborne Parish, Louisiana.

5.  Oil, Gas and Mineral Lease dated May 15, 2007, by and between Dorothy Jean Moore, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426652, Book 1442, Page 195, in the Conveyance Records of Claiborne Parish, Louisiana.

6.  Oil, Gas and Mineral Lease dated May 15, 2007, by and between Patricia Joann Sanders Pascarella, et ux, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426651, Book 1442, Page 193, in the Conveyance Records of Claiborne Parish, Louisiana.

7.  Oil, Gas and Mineral Lease dated May 15, 2007, by and between Shirley Ann Matteson, et ux, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426650, Book 1442, Page 191, in the Conveyance Records of Claiborne Parish, Louisiana.

8.  Oil, Gas and Mineral Lease dated May 1, 2007, by and between Nora Elizabeth Mason Sanders, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426609, Book 1442, Page 105, in the Conveyance Records of Claiborne Parish, Louisiana.

9.  Oil, Gas and Mineral Lease dated May 1, 2007, by and between Jeannet Sanders Dewil, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426610, Book 1442, Page 107, in the Conveyance Records of Claiborne Parish, Louisiana.

10. Oil, Gas and Mineral Lease dated April 23, 2007, by and between John W. Sanders, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426634, Book 1442, Page 155, in the Conveyance Records of Claiborne e Parish, Louisiana.

11. Oil, Gas and Mineral Lease dated April 23, 2007, by and between Frances Elouise Sanders, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426633, Book 1442, Page 152, in the Conveyance Records of Claiborne Parish, Louisiana.

12. Oil, Gas and Mineral Lease dated April 23, 2007, by and between Joseph C. Sanders, et ux, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426641, Book 1442, Page 160, in the Conveyance Records of Claiborne Parish, Louisiana.

13. Oil, Gas and Mineral Lease dated April 26, 2007, by and between Claudie Sanders Shaffer, et al, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426631, Book 1442, Page 146, in the Conveyance Records of Claiborne Parish, Louisiana.

14. Oil, Gas and Mineral Lease dated April 26, 2007, by and between Claudie Sanders Shaffer, et al, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426632, Book 1442, Page 149, in the Conveyance Records of Claiborne Parish, Louisiana.

15. Oil, Gas and Mineral Lease dated May 10, 2007, by and between Alvin Curtis Jordan, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426612, Book 1442, Page 109, in the Conveyance Records of Claiborne Parish, Louisiana.

16. Oil, Gas and Mineral Lease dated May 11, 2007, by and between Nancy Gail Jordan Bond, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426613, Book 1442, Page 111, in the Conveyance Records of Claiborne Parish, Louisiana.

17. Oil, Gas and Mineral Lease dated January 4, 2008, by and between Drew Bridges, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 428282, Book 1457, Page 126, in the Conveyance Records of Claiborne Parish, Louisiana.

18. Oil, Gas and Mineral Lease dated August 6, 2007, by and between Kimberly Tomlinson Lay, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 427539, Book 1451, Page 103, in the Conveyance Records of Claiborne Parish, Louisiana.

19. Oil, Gas and Mineral Lease dated May 10, 2007, by and between Rick S. Ewing, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 427644, Book 1452, Page 01, in the Conveyance Records of Claiborne Parish, Louisiana.

20. Oil, Gas and Mineral Lease dated May 10, 2007, by and between Jesse W. Shaffer, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426629, Book 1442, Page 142, in the Conveyance Records of Claiborne Parish, Louisiana.

21. Oil, Gas and Mineral Lease dated May 10, 2007, by and between Betty Shaffer Minor, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426630, Book 1442, Page 144, in the Conveyance Records of Claiborne Parish, Louisiana.

22. Oil, Gas and Mineral Lease dated May 11, 2007, by and between Jo Ann Harmon Geary, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426642, Book 1442, Page 163, in the Conveyance Records of Claiborne Parish, Louisiana.

23. Oil, Gas and Mineral Lease dated May 10, 2007, by and between Analisa Ewing Murray, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426649, Book 1442, Page 186, in the Conveyance Records of Claiborne Parish, Louisiana.

24. Oil, Gas and Mineral Lease dated May 1, 2007, by and between Willie James, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426644, Book 1442, Page 167, in the Conveyance Records of Claiborne Parish, Louisiana.

25. Oil, Gas and Mineral Lease dated May 1, 2007, by and between Celeste Holder Mazarakes, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426643, Book 1442, Page 165, in the Conveyance Records of Claiborne Parish, Louisiana.

26. Oil, Gas and Mineral Lease dated May 11, 2007, by and between Nancy Gail Jordan Bond, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426622, Book 1442, Page 130, in the Conveyance Records of Claiborne Parish, Louisiana.

27. Oil, Gas and Mineral Lease dated May 4, 2007, by and between Emmett W. Averett, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426614, Book 1442, Page 114, in the Conveyance Records of Claiborne Parish, Louisiana.

28. Oil, Gas and Mineral Lease dated May 1, 2007, by and between Hubie James, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426615, Book 1442, Page 116, in the Conveyance Records of Claiborne Parish, Louisiana.

2

29. Oil, Gas and Mineral Lease dated May 1, 2007, by and between Amy Blunschi, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426616, Book 1442, Page 118, in the Conveyance Records of Claiborne Parish, Louisiana.

30. Oil, Gas and Mineral Lease dated May 1, 2007, by and between Edna James Gantt, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426617, Book 1442, Page 120, in the Conveyance Records of Claiborne Parish, Louisiana.

31. Oil, Gas and Mineral Lease dated May 1, 2007, by and between Norvis James Burton, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426618, Book 1442, Page 122, in the Conveyance Records of Claiborne Parish, Louisiana.

32. Oil, Gas and Mineral Lease dated May 1, 2007, by and between Betty Virginia Purdy, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426619, Book 1442, Page 124, in the Conveyance Records of Claiborne Parish, Louisiana.

33. Oil, Gas and Mineral Lease dated May 1, 2007, by and between Diane James Futch, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426620, Book 1442, Page 126, in the Conveyance Records of Claiborne Parish, Louisiana.

34. Oil, Gas and Mineral Lease dated May 1, 2007, by and between Larry A. James, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 4266219, Book 1442, Page 128, in the Conveyance Records of Claiborne Parish, Louisiana.

35. Oil, Gas and Mineral Lease dated May 10, 2007, by and between Mary Virginia Shaffer Hudson, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426628, Book 1442, Page 140, in the Conveyance Records of Claiborne Parish, Louisiana.

36. Oil, Gas and Mineral Lease dated May 11, 2007, by and between Ronald L. Roach, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426624, Book 1442, Page 133, in the Conveyance Records of Claiborne Parish, Louisiana.

37. Oil, Gas and Mineral Lease dated May 11, 2007, by and between Thelma Hope Roach, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426626, Book 1442, Page 136, in the Conveyance Records of Claiborne Parish, Louisiana.

38. Oil, Gas and Mineral Lease dated May 11, 2007, by and between Claud Timothy Roach, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 426627, Book 1442, Page 138, in the Conveyance Records of Claiborne Parish, Louisiana.

39. Oil, Gas and Mineral Lease dated May 18, 2007, by and between Mary Will Griffin, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 2007-3655 in the Conveyance Records of Bienville Parish, Louisiana.

40. Oil, Gas and Mineral Lease dated May 18, 2007, by and between Marion Jeanette Jordan Keen, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 2007-3654 in the Conveyance Records of Bienville Parish, Louisiana.

41. Oil, Gas and Mineral Lease dated November 7, 2007, by and between Therman Royce Bridges, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 428082, Book 1455, Page 85, in the Conveyance Records of Claiborne Parish, Louisiana.

42. Oil, Gas and Mineral Lease dated November 7, 2007, by and between Joyce Annette Bridges Baxley, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 428081, Book 1455, Page 80, in the Conveyance Records of Claiborne Parish, Louisiana.

43. Oil, Gas and Mineral Lease dated November 7, 2007, by and between John A. Bridges, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 428080, Book 1455, Page 75, in the Conveyance Records of Claiborne Parish, Louisiana.

44. Oil, Gas and Mineral Lease dated August 27, 2007, by and between Marion Janell Shanta,
as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry Number 427533, Book 1451,
Page 82, in the Conveyance Records of Claiborne Parish, Louisiana.

**INSOFAR AND ONLY INSOFAR AS THE ABOVE DESCRIBED LEASES COVER
ACREAGE LYING WITHIN SECTION 34, TOWNSHIP 19 NORTH, RANGE 6 WEST,
BIENVILLE AND CLAIBORNE PARISH, LOUISIANA.**

EXHIBIT "A-2"

Attached to and made a part of that Operating Agreement dated February 1, 2008, by and
between SKLAR EXPLORATION COMPANY L.L.C., as Operator, and SKLARCO
L.L.C., WAC EXPLORATION COMPANY L.L.C., and MCCOMBS ENERGY, L.L.C.,
as Non-Operators.

### SECTION 34, TOWNSHIP 19 NORTH, RANGE 6 WEST
### BIENVILLE PARISH, LOUISIANA



EXHIBIT "B"

Bath Form Louisiana Spec. 14-BR1-2A-NL  Paid up R2/99

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of _____, _____, between

Lessor (whether one or more) whose address is: _____

and _____ Lessee,

whose address is _____

WITNESSETH:

1. Lessor in consideration of  One Hundred Dollars and Other Valuable Considerations ($100.00 & OVC), in hand paid, of the royalties herein provided, and of the agreement of Lessee herein contained, hereby  grants, leases and lets unto Lessee, the exclusive right to enter upon and use the land hereinafter described for the exploration for and production of oil, gas, sulphur and all other minerals, together with the use of the surface of the land for all purposes incident to the exploration for and production, ownership, possession and transportation of said minerals (either from said land or acreage pooled therewith), and the  right to dispose of salt water, with the right of ingress and egress to and from said lands at all times for such purposes, including for operations hereunder or in connection with similar operations on adjoining  land;  the land to which this lease applies and which is  affected  hereby

being situated in _____ Parish, Louisiana, and described as follows, to-wit:

This lease shall  also extend and apply to any interest therein which Lessor may hereafter acquire, including, but not limited to, outstanding mineral rights acquired by reversion, prescription or otherwise, and includes betures, accretions, roads, highways, easements, right-of-ways and all land, if any, contiguous or adjacent to, or adjoining the land particularly described above.  Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land.  For the purposes of determining

the amount of  bonus and the shut-in royalty payment  hereunder, said land shall be deemed to contain _____ acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof.

2. Subject to the other provisions herein contained, this lease shall be for a period of _____ years from the date hereof (called "primary term") and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner herein provided.

3. For the consideration hereinabove recited, this lease shall remain in full force and effect during the primary term, without any additional payment and without Lessee being required to conduct any operations on the land (either than for the discovery of minerals), except to drill such wells as might be necessary to protect the land from drainage, as hereinafter provided.

4. The royalties to be paid by Lessee are:  (a) on oil, and other hydrocarbons which are produced at the well in liquid form by ordinary production methods, one-eighth of that produced and saved from said land, same to be delivered at the wells or to the credit of Lessor in the pipe line to which the wells may be connected; Lessor's interest in either case to bear its proportion of any expenses for treating the oil to make it marketable as crude; Lessee may from time to time purchase any royalty oil or other liquid hydrocarbons in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas, or other gaseous substance produced from said land and sold or used off the premises or for the extraction of gasoline or other products therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; such gas, casinghead gas, residue gas, or gas of any other nature or description whatsoever, as may be disposed of for no consideration to Lessee, either through unavoidable waste or leakage, or in order to recover oil or other liquid hydrocarbons, or returned to the ground, shall not be deemed to have been sold or used either on or off the premises within the meaning of this paragraph 4 hereof; (c ) on all other  minerals mined and marketed, one-eighth, either in kind or value at the well or mine, at Lessee's election, except that on sulphur the royalty shall be one dollar ($1.00) per long ton.

5. If Lessee during or after the primary term should drill a well capable of producing gas or gaseous substances in paying quantities, (or which although previously produced Lessee is unable to continue to produce) and should Lessee be unable to operate said well because of lack of market or marketing facilities or governmental restrictions, then Lessee's rights may be maintained beyond or after the primary term without production of minerals or further drilling operations by paying Lessor as royalty a sum equal to one dollar (1.00) per acre of land covered hereby per year, the first payment being due, if said well should be completed or shut-in after the primary term, within ninety (90) days after the completion of such well or the cessation of production and such payment will extend Lessee's rights for one year from the date of such completion or cessation.  If such a well should be completed during the primary term, the first payment, if made by Lessee, shall be due within 90 days after such well is shut-in, or before the expiration date of the primary term herein fixed, whichever is the later date.  Thereafter Lessee's rights may be continued from year to year by making annual payments in the amount stated on or before the anniversary date beginning with the date of completion of said well (if completed after the primary term) or the end of the primary term (if completed prior thereto) as  the  case  may  be;  each  of such payments to extend Lessee's rights for one year.  The annual payments herein provided for may be deposited to Lessor's credit in the _____

Bank of _____, which bank shall be and remain Lessor's agent for such purpose regardless of any change or changes in the ownership of the land or mineral rights therein.  The owners of the royalty as of the date of such payments shall be entitled thereto in proportion to their ownership of said royalty.  The provisions of this paragraph shall be recurring at all times during the life of this lease.  Should any well producing gas or gaseous substances be completed on a drilling unit which includes any part of the land herein leased, the provisions of this paragraph shall be subject to all other agreements herein contained allowing the pooling of the above described lands with other lands.

6. If within ninety (90) days prior to the end of the primary term, Lessee should complete or abandon a well on the lands described above or on land pooled therewith, or if production previously secured should cease from any cause, this lease shall continue in force and effect for ninety (90) days from such completion or abandonment or cessation of production.  If at the expiration of the primary term or at the expiration of the ninety (90) day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith, but Lessee is then engaged in operations for drilling, completion or reworking thereon, or operations to achieve or restore production, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long as Lessee is engaged in operations for drilling, completion or reworking, or operations to achieve or restore production, with no cessation between operations or between such cessation of production and additional operations of more than ninety (90) consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith.  If sulphur be encountered on said premises or on land pooled therewith, this lease shall continue in force and effect so long as Lessee is engaged with due diligence in explorations for and/or erecting a plant for the production of sulphur and thereafter subject to the foregoing provisions hereof so long as oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith.

7. Lessee is hereby granted the right as to all or any part of the land described herein, without Lessor's joinder, to combine, pool or unitize the acreage royalty or mineral interest covered by this lease, or any portion thereof,  at any time during the life of this lease, with any other land, lease or leases, royalty or mineral interests in or under any other tract or tracts of land in the vicinity thereof, whether owned by Lessee or some other person, or corporation so as to create, by the combination of such lands and leases, one or more operating units, as to any and all mineral horizons, provided that no one operating unit shall, in the case of gas, including condensate, embrace more than six hundred forty (640) acres, and in the case of oil, including casinghead gas, embrace more than eighty (80) acres; and provided further, however, that if any spacing or other rules and regulations of the State or Federal Commission, Agency, or regulatory body having or claiming jurisdiction has heretofore or shall at any time hereafter permit or prescribe a drilling or operating unit or spacing rule in the case of gas, including condensate, greater than six hundred forty (640) acres, or in the case of oil or casinghead gas greater than eighty (80) acres, than the unit or units herein contemplated may have, or may be redesigned so as to have, as the case may be, the same surface content as, but not more than, the unit or the acreage in the spacing rule so prescribed or permitted.  However, it is further specifically understood and agreed, anything herein to the contrary notwithstanding, that the Lessee shall have the right to, and the benefit of an acreage tolerance of ten per cent in excess of any drilling or operating unit authorized herein.  The commencement of operations for the drilling  of a well, or the completion of a well to production of either oil, gas, casinghead gas, condensate or other minerals on any portion of an operating unit in which all or any part of the land described herein is embraced, or production of oil, gas, casinghead gas, condensate, or other minerals therefrom shall have the same effect under the terms of this lease as if a well were commenced, completed or producing oil, gas, casinghead gas, condensate, or other minerals in paying quantities on the land embraced by this lease.  Lessee shall execute in writing and file for record in the records of the Parish in which the lands herein leased are located, an instrument identifying or describing the pooled acreage, or an instrument supplemental thereto redesignating same, as the case may be.  Either prior to the securing of production from any unit created under the authority hereinabove granted, or after cessation of production therefrom Lessee shall have the right to dissolve the unit so created, without Lessor's joinder or further consent, by executing in writing and placing of record in the Parish or Parishes in which the lands making up such unit may be located, an instrument identifying and dissolving such unit.  The provisions hereof shall be construed as a covenant running with the land and shall inure to the benefit and be binding upon the parties hereto, their heirs, representatives, successors and assigns.  In the event such operating unit or units is/are so created by Lessee, Lessor shall receive out of production or the proceeds from production of oil, gas, casinghead gas or other minerals out or out of the shut-in royalty provided for above, such portion of the royalty or of the shut-in royalty specified herein as the number of acres (mineral acres) out of this lease placed in any such operating unit or units bears to the total number of acres included in such operating unit or units.

8. If Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the payments herein provided shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

9. Lessee shall have the exclusive right to explore the land herein described by geological, geophysical or other methods, whether similar to those herein specified or,not and whether now known or not, including the drilling of holes, use of torsion balance, seismograph explosions, magnetometer, or  other geophysical or geological instruments, test or procedures,  for

EXHIBIT "B", continued

the purpose of securing geological and geophysical information. All information obtained by Lessee as a result of such activity shall be the exclusive property of Lessee, and Lessee may disseminate or sell such information without Lessor's consent. In exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized therewith, in primary and/or enhanced recovery, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises, or on any adjacent or adjoining lands, as may be reasonably necessary for such purpose, including but not limited to the drilling of wells, construction and use of roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Lessee to discover, produce, store, treat and/or transport oil, gas and other substances. Lessee shall have free use of oil, gas, casinghead gas, condensate, and water from said land, except water from Lessor's wells, for all operations hereunder, including repressuring, pressure maintenance and recycling, and the royalty shall be computed after deducting any so used. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred feet of any residence or barn now on said land without Lessor consent. In the event a well or wells, producing oil, gas, casinghead gas or condensate in paying quantities should be brought in on adjacent lands not owned by the Lessor and within one hundred fifty feet of and draining the leased premises, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances.

10. The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns, but no change or division in ownership of the land, or royalties, however accomplished shall operate to enlarge the obligations or diminish the rights of Lessee. No such change or division in the ownership of the land, or royalties shall be binding upon Lessee for any purpose until such person acquiring any interest has furnished Lessee, at its principal place of business, with a certified copy of the instrument or instruments, constituting his chain of title from the original Lessor. An assignment of this lease, in whole or in part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder to Lessor and, if Lessee or assignee of part or parts hereof shall fail to comply with any other provisions of the lease, such default shall not affect this lease insofar as it covers a part of said lands upon which Lessee or any assignee shall comply with the provisions of the lease. In addition, Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations as to the released acreage or interest.

11. In case of suit, adverse claim, dispute or question as to the ownership of the royalties (or some part thereof) payable under this lease, Lessee shall not be held in default in payment of such royalties (or the part thereof in dispute), until such suit, claim, dispute or question has been finally disposed of, and Lessee shall have thirty (30) days after being furnished with a certified copy of the instrument or instruments disposing of such suit, claim or dispute, or after being furnished with proof sufficient, in Lessee's opinion, to settle such question, within which to make payment. Should the right or interest of Lessee hereunder be disputed by Lessor, or any other person, the time covered by the pendency of such dispute shall not be counted against Lessee either as affecting the term of the lease or for any other purpose, and Lessee may suspend all payments without interest until there is a final adjudication or other determination of such dispute.

12. In case of cancellation or termination of this lease from any cause, Lessee shall have the right to retain, under the terms hereof, around each well producing, being worked on, or drilling hereunder, the number of acres in the form allocated to each such well under spacing and proration rules issued by the Commissioner of Conservation of the State of Louisiana, or any other State or Federal authority having control of such matters; or any unit or units formed pursuant to paragraph 7 or, in the absence of such rulings, unit or units, forty (40) acres around each such well in as near a square form as practicable, and in the event Lessor considers that operations are not being conducted in compliance with this contract, Lessee shall be notified in writing of the facts relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument.

13. When drilling, reworking, production or other operations are delayed or interrupted by force majeure, that is, by storm, flood or other acts of God, fire, war, rebellion, insurrection, riot, strikes, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some law, order, rule, regulation, requisition or necessity of government, Federal or State, or as a result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding, but this lease shall be extended for a period of time equal to that during which Lessee is so prevented from conducting such drilling or reworking operations on, or producing oil, gas, casinghead gas, condensate or other minerals from, the premises; provided that during any period that this lease is continued in force after its primary term solely by force majeure as herein provided, Lessee shall pay to the owners of the royalty hereunder the shut-in royalty provided in paragraph 5 hereof, and in the manner therein provided, whether or not there is a producing well shut in, located on said land or on land with which the lease premises or any part thereof has been pooled.

14. Lessee shall pay for actual damages caused by its operations to growing crops and timber on said land leased herein.

15. Notwithstanding the death of any party Lessor, or his successor in interest, the payment or tender of all sums accruing hereunder in the manner provided above shall be binding on the heirs, executors and administrators of such person.

16. Lessor hereby warrants and agrees to defend the title to the lands herein described, and agrees that the Lessee at its option shall have the right to redeem for Lessor, by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof. In case of payment of any such mortgage, taxes or other liens by Lessee, in addition to the right to subrogation herein granted, Lessee shall also have the right to retain any royalties which become due Lessor hereunder and to repay itself therefrom, and the retention of such royalties by Lessee shall have the same effect as if paid to the Lessor in whose behalf payment of any mortgage, taxes or other liens was made.

17. This lease shall be binding upon all who execute it, whether or not named in the body hereof as Lessor, and without regard to whether this same instrument, or any copy thereof, shall be executed by any other Lessor named above.

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

WITNESSES:                                      LESSOR (WHETHER ONE OR MORE)

_____    _____    _____

SS No. OR TAX ID

_____    _____    _____

SS No. OR TAX ID

_____    _____    _____

SS NO. OR TAX ID

_____    _____    _____

SS NO. OR TAX ID

STATE OF _____

PARISH/ COUNTY OF _____

On this _____ day of _____, _____, before me, the undersigned authority, personally appeared _____
_____ to
me known to be the person(s) described in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as their free act and deed.

My Commission expires _____.     _____

NOTARY PUBLIC in and for

STATE OF _____

PARISH/ COUNTY OF _____

Before me, the undersigned authority, personally came and appeared _____ who being first duly sworn deposes and says that he/she was one of the subscribing witnesses to the execution of the foregoing instrument by _____

who signed the name in his/her presence and that of the other subscribing witness(es) to such signature(s) whose name(s) (signatures) are affixed as such, and that he/she now recognizes all said signatures to be true and genuine.

_____

Subscribing Witness

Sworn to and subscribed before me, notary, on this _____ day of _____, _____.

My Commission expires_____.     _____

NOTARY PUBLIC in and for

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

EXHIBIT "C"

**Attached to and made a part of that certain Operating Agreement dated February 1, 2008, by and between SKLAR EXPLORATION COMPANY L.L.C., as Operator, and SKLARCO L.L.C., et al, as Non-Operators.**

## ACCOUNTING PROCEDURE

## JOINT OPERATIONS

I. GENERAL PROVISIONS

1.  **Definitions**

    "Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

    "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

    "Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

    "Operator" shall mean the party designated to conduct the Joint Operations.

    "Non-Operators" shall mean the Parties to this agreement other than the Operator.

    "Parties" shall mean Operator and Non-Operators.

    "First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

    "Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

    "Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

    "Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

    "Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

2.  **Statement and Billings**

    Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3.  **Advances and Payments by Non-Operators**

    A.  Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

    B.  Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at <u>Bank One, Shreveport, Louisiana</u> on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4.  **Adjustments**

    Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.**

COPAS

5. **Audits**

A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B. The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6. **Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2. **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

3. **Labor**

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2) Salaries of First level Supervisors in the field.

(3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation or the Joint Property if such charges are excluded from the overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4. **Employee Benefits**

Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

5.   **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6.   **Transportation**

Transportation of employees and Material necessary for the Joint Operations / **shall be charged at actual cost incurred by Operator.** ~~but subject to the following limitations:~~

~~A.   If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.~~

~~B.   If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.~~

~~C.   In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.~~

7.   **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.   **Equipment and Facilities Furnished By Operator**

A.   Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _fifteen_ percent (_15_%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9.   **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.  **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, ~~except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.~~ and the costs and expenses incurred in connection with hearings and other matters before governmental bodies and agencies and costs and expenses incurred in examining and curing title.

11.  **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

COPAS
Recommended by the Council
of Petroleum Accountants
Societies

**12.  Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**13.  Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

**14.  Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

**15.  Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III.  OVERHEAD

**1.  Overhead - Drilling and Producing Operations**

   i.  As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

     ( **x** )  Fixed Rate Basis, Paragraph lA, or
     (    )  Percentage Basis, Paragraph lB

   Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii.  The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

     (    )  shall be covered by the overhead rates, or
     ( **x** )  shall not be covered by the overhead rates.

   iii.  The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

     (    )  shall be covered by the overhead rates, or
     ( **x** )  shall not be covered by the overhead rates.

  A.  Overhead - Fixed Rate Basis  See ADDITIONAL REVISIONS page 9.

    (1)  Operator shall charge the Joint Account at the following rates per well per month:

      Drilling Well Rate $_____7,000.00_____
      (Prorated for less than a full month)

      Producing Well Rate $____700.00____

    (2)  Application of Overhead - Fixed Rate Basis shall be as follows:

      (a)  Drilling Well Rate

        (1)  Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

COPAS SHORT
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b) Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

~~B. Overhead - Percentage Basis~~

~~(1) Operator shall charge the Joint Account at the following rates:~~

~~(a) Development~~

~~_____ Percent (_____%) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.~~

~~(b) Operating~~

~~_____ Percent (_____%) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II; all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.~~

~~(2) Application of Overhead - Percentage Basis shall be as follows:~~

~~For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.~~

2. **Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

Recommended by the Council of Petroleum Accountants Societies

COPAS

Account for overhead based on the following rates for any Major Construction project in excess of $ **25,000.00**                                      :

A.      **5**      % of first $100,000 or total cost if less, plus

B.      **4**      % of costs in excess of $100,000 but less than $1,000,000, plus

C.      **3**      % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any ˉone project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

**3.    Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A.      **5**      % of total costs through $100,000; plus

B.      **4**      % of total costs in excess of $100,000 but less than $1,000,000; plus

C.      **3**      % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

**4.    Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV.    PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

**1.    Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

**2.    Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.   New Material (Condition A)

   (!)   Tubular Goods Other than Line Pipe

      (a)   Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at cost. ~~Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.~~

      (b)   For grades which are special to one mill only, prices shall be computed at cost. ~~the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000~~

COPAS 1984 ONSHORE
... of the Council
of Petroleum Accountants
Societies

COPAS

pound Oil Field Haulers Association interstate truck rate shall be used.

(c)   Special end finish tubular goods shall be priced at **cost.** / the lowest published out of stock price, f.o.b. Houston, Texas; plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

(d)   Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at **cost.** / the lowest published out of stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2)   Line Pipe

(a)   Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced **at cost.** / under provisions of tubular goods pricing in Paragraph A (1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(b)   Line Pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at **cost.** / Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A (1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(c)   Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced **at cost.** / f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

(d)   Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at **cost.** / quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3)   Other Material shall be priced at **cost.** / the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4)   Unused new Material, except tubular goods, moved from the Joint Property shall be priced at **cost.** / the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).

B.   Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1)   Material moved to the Joint Property

At seventy-five percent (75%) of current / **market value.** new price, as determined by Paragraph A.

(2)   Material used on and moved from the Joint Property

(a)   At seventy-five percent (75%) of current / **market value.** new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b)   At sixty-five percent (65%) of current / **market value.** new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material

(3)   Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current / **market value.** new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C.   Other Used Material

(1)   Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at **current market value.** / fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

- 7 -

COPAS

(2)   Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)   Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight.   Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)   Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)   Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.   Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.   Pricing Conditions

(1)   Loading or unloading costs may be charged to the Joint Account at / **actual costs incurred by Operator** ~~the rate of twenty-five cents (25¢) per hundred weight~~ on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)   Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.   **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator. **provided however, if a Non-Operator elects to furnish material in kind, such material must (a) meet the quality specifications set by Operator, and (b) be inspected by Operator with inspection costs to be billed to the Joint Account.**

4.   **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished.   In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.   **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.   **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of  a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

- 8 -

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.   **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.   In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.   **Expense of Conducting Inventories**

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

**ADDITIONAL REVISIONS**
(I)   In the event the subject well is expected to be above the State threshold for H2S sour gas operations, the Drilling Well rate set forth in Art. III.1.A(I) will be increased by $2000.00 per month and the associated Producing Well Overhead Rate will be increased an additional $100.00 per month.

## EXHIBIT "D"

This Exhibit "D" is attached to and made a part of that Operating Agreement dated February 1, 2008, by and between SKLAR EXPLORATION COMPANY L.L.C., as Operator, and SKLARCO L.L.C., WAC EXPLORATION COMPANY L.L.C., and MCCOMBS ENERGY, L.L.C.,, as Non-Operators.

## INSURANCE

Operator shall carry the following insurance with the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of insurance will be provided upon request.

I.     WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

     A.     Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

     B.     Extension of Coverage B of policy to provide for not less than $500,000 for death or injury to one person in any one accident.

II     COMPREHENSIVE GENERAL LIABILITY

     Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $2,000,000 for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III    AUTOMOBILE LIABILITY

     Coverage shall include owned, non-owned and hired vehicles. Limit $500,000 combined single limit each occurrence for bodily injury and property damage.

IV     EXCESS LIABILITY

     Operator shall carry excess liability insurance in an amount necessary to provide a total of $10,000,000 coverage for both Automobile Liability and Comprehensive General Liability.

     Any party, at its own expense, may carry its own coverage for Excess Liability Insurance with limits as set forth in this Section IV. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

V.     EXTRA EXPENSE LIABILITY

     Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $25,000 per occurrence.

               Liability Limit: $5,000,000

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder. Further, any party, at its own expense, may carry its own coverage for Extra Expense Liability Insurance with limits as set forth in this Section V. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

**EXHIBIT "E"**

This Exhibit "E" is attached to and made a part of that Operating Agreement dated February 1, 2008, by and between SKLAR EXPLORATION COMPANY L.L.C, as Operator, and SKLARCO L.L.C., WAC EXPLORATION COMPANY L.L.C., and MCCOMBS ENERGY, L.L.C., as Non-Operators.

GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement, the parties hereto own and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area described in the Operating Agreement (the "JOA").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the gas produced from said JOA. However, one or more of the parties may be unable to take or market its interest in the gas production from time to time; therefore, to permit any party to produce and dispose of its interest in the gas production from the JOA with as much flexibility as possible, the parties hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser. Any party whose share of gas is not marketed shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ration of its participation percentage under this Operating Agreement to the participating percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, it any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Operator will, in turn, make settlement for all royalties and overriding royalties which are payable on gas produced from the Contract Area. In the event that the total royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Contract Area, then any such deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Contract Area shall furnish the Operator with division order title opinions on which Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser shall pay, or cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the volume of gas actually taken for its account.

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold, less applicable production taxes and royalties theretofore paid, less any reasonable dehydration, compression, treating, processing, gathering or transportation costs actually incurred, including amortized capital costs associated with the design, construction or operation of any plants to dehydrate, compress, treat or process gas, in connection with the sale of the overproduction, at the price and based on the proceeds actually received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party). Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____February_____ , (year) __2008__ .

_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____, have been made to the form.

OPERATOR

Witness _____

Witness _____

SKLAR EXPLORATION COMPANY L.L.C.

By: David A. Barlow, Chief Operating Officer

NON-OPERATORS

Witness _____

Witness _____

SKLARCO L.L.C.

By: David A. Barlow, Chief Operating Officer

WAC EXPLORATION COMPANY L.L.C.

Witness _____

Witness _____

By: Michael E. Riddick, Executive Vice President

MCCOMBS ENERGY L.L.C.

Witness _____

Witness _____

Ricky Haikin, Vice President

- 15 -

## ACKNOWLEDGMENT

STATE OF LOUISIANA

PARISH OF CADDO

      On this ____ day of _____, 2008, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for **Sklar Exploration Company L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

TIFFANY N. HARRIS, NOTARY PUBLIC
CADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE
NOTARY No. 69179

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

STATE OF LOUISIANA

PARISH OF CADDO

      On this ____ day of _____, 2008, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for **Sklarco L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

TIFFANY N. HARRIS, NOTARY PUBLIC
CADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE
NOTARY No. 69179

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

STATE OF LOUISIANA

PARISH OF CADDO

      On this _____ day of _____, 2008, before me appeared Michael E. Riddick, to me known, who being by me duly sworn, did say that he is the Executive Vice President for **WAC Exploration Company L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ____1st____ day of ____February____ , (year) __2008__ .

~~who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ have been made to the form.~~

OPERATOR

_Witness_

_Witness_

SKLAR EXPLORATION COMPANY L.L.C.

By: David A. Barlow, Chief Operating Officer

NON-OPERATORS

_Witness_

_Witness_

SKLARCO L.L.C.

By: David A. Barlow, Chief Operating Officer

WAC INVESTMENT COMPANY, LLC

_Witness_

_Witness_

By: Michael Riddick, Executive Vice President

_Witness_

_Witness_

MCCOMBS ENERGY L.L.C.

Ricky Harkin, Vice President

- 15 -

**ACKNOWLEDGMENT**

STATE OF LOUISIANA

PARISH OF CADDO

On this _4th_ day of _March_ _____, 2008, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for **Sklar Exploration Company L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

Marie Gardner, Notary Public # 56265
Bossier Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

On this _4th_ day of _March_ _____, 2008, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for **Sklarco L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

Marie Gardner, Notary Public # 56265
Bossier Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2008, before me appeared Michael Riddick, to me known, who being by me duly sworn, did say that he is the Executive Vice President for **WAC Investment Company, LLC**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

STATE OF TEXAS

COUNTY OF HARRIS

On this _1_ day of _March_ _____, 2008, before me appeared Ricky Haikin , to me known, who being by me duly sworn, did say that he is the Vice President of **McCombs Energy L.L.C.**, a Texas limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

*Sharon Metcalf McDonald*

Notary Public in and for the State of Texas

SHARON METCALF McDONALD
Notary Public, State of Texas
Commission Expires 12-29-2009

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____February_____ , (year) _2008_ .

~~_____ , who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____ , have been made to the form.~~

OPERATOR

_____
Witness

_____
Witness

SKLAR EXPLORATION COMPANY L.L.C.

By: David A. Barlow, Chief Operating Officer

NON-OPERATORS

_____
Witness

_____
Witness

SKLARCO L.L.C.

By: David A. Barlow, Chief Operating Officer

_____
Witness
John R. Gardner

_____
Witness
Gregory L. Rembert

WAC Exploration Company, L.L.C.
~~XXXXXXXXXXXXXXXXXXXXXXXX~~

By: ~~XXXXXXXXXXXXXXXXXXXXXXXX~~
Michael E. Riddick
Executive Vice President

_____
Witness

_____
Witness

MCCOMBS ENERGY L.L.C.

Ricky Haikia, Vice President

**EXECUTE & RETURN**

- 15 -

## ACKNOWLEDGMENT

STATE OF LOUISIANA

PARISH OF CADDO

On this ꓕꓩꓕꓐ day of _____ꓟꓳꓢꓳꓦ_____, 2008, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for **Sklar Exploration Company L.L.C.,** a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

<div style="margin-left:2em;">
TIFFANY N. HARRIS, NOTARY PUBL..<br>
CADDO PARISH, LOUISIANA<br>
MY COMMISSION IS FOR LIFE<br>
NOTARY No. 59179
</div>

Notary Public in and for the Parish of Caddo
State of Louisiana

STATE OF LOUISIANA

PARISH OF CADDO

On this ꓕꓩꓕꓐ day of _____ꓟꓳꓢꓳꓦ_____, 2008, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for **Sklarco L.L.C.,** a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

<div style="margin-left:2em;">
TIFFANY N. HARRIS, NOTARY PUBLIC<br>
CADDO PARISH, LOUISIANA<br>
MY COMMISSION IS FOR LIFE<br>
NOTARY No. 59179
</div>

Notary Public in and for the Parish of Caddo
State of Louisiana

STATE OF LOUISIANA

PARISH OF CADDO

On this _7th_ day of _March_, 2008, before me appeared Michael E. Riddick, to me known, who being by me duly sworn, did say that he is the Executive Vice President for **WAC Exploration Company L.L.C.,** a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public in and for the Parish of Caddo
State of Louisiana

**Donna K. Hardin**
**Parish of Caddo**
**My commission is for life.**



A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

## WEST ARCADIA PROSPECT
## SECTION 33, TOWNSHIP 18 NORTH, RANGE 6 WEST
## BIENVILLE PARISH, LOUISIANA

OPERATING AGREEMENT

DATED

August  15,        ,  2007        ,
<br>Year

OPERATOR   **SKLAR EXPLORATION COMPANY L.L.C.**

CONTRACT AREA   **As shown on Exhibit "A" to this Agreement.**

~~COUNTY OR~~ PARISH OF   **BIENVILLE**               STATE OF   **LOUISIANA**

COPYRIGHT 1982 – ALL RIGHTS RESERVED AMERICAN
ASSOCIATION OF PETROLEUM LANDMEN, 4100 FOSSIL CREEK
BLVD., FORT WORTH, TEXAS, 76137-2791, APPROVED FORM.
A.A.P.L.   NO.   610   –   1982   REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

# TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. All Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 10 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 12 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

Table of Contents

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1
2                                            OPERATING AGREEMENT

3       THIS AGREEMENT, entered into by and between ___**SKLAR EXPLORATION COMPANY L.L.C.**___

4 ___**401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101**___ , hereinafter designated and

5 referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein

6 as "Non-Operator", and collectively as "Non-Operators".

7
8                                                 **WITNESSETH:**

9
10       WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in

11 Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the

12 production of oil and gas to the extent and as hereinafter provided,

13
14       NOW, THEREFORE, it is agreed as follows:

15
16                                                 **ARTICLE I.**

17                                              **DEFINITIONS**

18
19       As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

20       A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons

21 and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

22       B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land

23 lying within the Contract Area which are owned by the parties to this agreement.

24       C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the

25 Contract Area which are owned by parties to this agreement.

26       D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be

27 developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests

28 are described in Exhibit "A".

29       E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or

30 federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-

31 ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

32       F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

33       G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay **for 100% of** / its share of the cost of

34 any operation conducted under the provisions of this agreement.

35       H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate **for 100% of its share of**

36 in- / a proposed operation.

37
38       Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the

39 singular, and the neuter gender includes the masculine and the feminine.

40
41                                               **ARTICLE II.**

42                                               **EXHIBITS**

43
44       The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

45 ☑   A. Exhibit "A", shall include the following information:

46        (1) Identification of lands subject to this agreement,

47        (2) Restrictions, if any, as to depths, formations, or substances,

48        (3) Percentages or fractional interests of parties to this agreement,

49        (4) Oil and gas leases and/or oil and gas interests subject to this agreement,

50        (5) Addresses of parties for notice purposes.

51 ☑   B. Exhibit "B", Form of Lease.

52 ☑   C. Exhibit "C", Accounting Procedure.

53 ☑   D. Exhibit "D", Insurance.

54 ☑   E. Exhibit "E", Gas Balancing Agreement.

55 ☐   ~~F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.~~

56 ☐   ~~G. Exhibit "G", Tax Partnership.~~

57       If any provision of any exhibit, except Exhibits "E" ~~and "G"~~, is inconsistent with any provision contained in the body

58 of this agreement, the provisions in the body of this agreement shall prevail.

59
60
61
62
63
64
65
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE III.
### INTERESTS OF PARTIES

**A.   Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

**B.   Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred   in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A".  In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____**all jointly owned lease burdens**_____ which shall be borne as hereinafter set forth.

Each of the Parties hereto shall pay or deliver or cause to be paid or delivered its proportionate part of the royalties and overriding royalties and other leasehold burdens as described in the attached Exhibit "A" ~~Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area~~ and shall hold the other Parties free from any liability therefor.  If the interest of any Party in any oil and gas lease covered by this agreement is subject to any additional royalty, overriding royalty, production payment or other charges over and above those as shown on Exhibit "A", such Party shall assume and alone bear all such additional royalty and they shall account for or cause to be accounted for such interests to the owners thereof. ~~cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor.~~  No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C.   Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, which is not a joint obligation of the parties overriding royalty, production payment or other burden on production ~~in excess of the amount stipulated in Article III.B.~~, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D.   Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.   If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.   If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

### ARTICLE IV.
### TITLES

**A.   Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well.  The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases.  At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge.  All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator.  Operator shall cause title to be examined by attorneys on its staff or by outside attorneys.  Copies of all title opinions shall be furnished to each party hereto.  The cost incurred by Operator in this title program shall be borne as follows:

~~☐  Option No. 1:  Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.~~

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE IV**
**continued**

1  ☑  Option No. 2:  Costs incurred by Operator in procuring abstracts / and fees paid outside attorneys / for title examination
2  (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) / shall be borne by the Drilling Parties
3  in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4  hibit "A".  Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5  functions.
6
7  ~~Each party shall be responsible for securing /~~ Operator shall use its best efforts to secure curative matter and pooling amendments or agreements required in connection
8  with leases or oil and gas interests ~~contributed by such party.~~ subject to this agreement, and charge these fees to the joint account Operator shall be responsible for the preparation and recording of pooling
9  designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10 This shall not prevent any party from appearing on its own behalf at any such hearing.
11
12     No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
13 provided, and (2) the title has been approved by the examining attorney or title has been accepted by Operator. ~~all of the parties who are to par-~~
14 ~~ticipate in the drilling of the well.~~
15
16 ~~B.   Loss of Title:~~
17
18     ~~1.  Failure of Title:  Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a~~
19 ~~reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days~~
20 ~~from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-~~
21 ~~tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil~~
22 ~~and gas leases and interests; and,~~
23     ~~(a)  The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be~~
24 ~~entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,~~
25 ~~but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~
26     ~~(b)  There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has~~
27 ~~been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that the title failure has oc-~~
28 ~~curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract~~
29 ~~Area by the amount of the interest lost;~~
30     ~~(c)  If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is~~
31 ~~increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-~~
32 ~~terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such~~
33 ~~well;~~
34     ~~(d)  Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has~~
35 ~~failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties~~
36 ~~who bore the costs which are so refunded;~~
37     ~~(e)  Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be~~
38 ~~borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,~~
39     ~~(f)  No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest~~
40 ~~claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in~~
41 ~~connection therewith.~~
42
43     ~~2.  Loss by Non-Payment or Erroneous Payment of Amount Due:  If, through mistake or oversight, any rental, shut-in well~~
44 ~~payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,~~
45 ~~there shall be no monetary liability against the party who failed to make such payment.  Unless the party who failed to make the required~~
46 ~~payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,~~
47 ~~which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the~~
48 ~~date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in~~
49 ~~the Contract Area or account of ownership of the lease or interest which has terminated.  In the event the party who failed to make the~~
50 ~~required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to~~
51 ~~the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it~~
52 ~~shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled~~
53 ~~or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~
54     ~~(a)  Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,~~
55 ~~up to the amount of unrecovered costs;~~
56     ~~(b)  Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of~~
57 ~~oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease~~
58 ~~termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said~~
59 ~~portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and,~~
60     ~~(c)  Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest~~
61 ~~lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~
62
63     3.  ~~Other~~ Losses:  All losses incurred, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses
64 and shall be borne by all parties in proportion to their interests.  There shall be no readjustment of interests in the remaining portion of
65 the Contract Area.
66 *curative matters and material         **landmen and consultants          ***and for applications and hearings
67
68
69
70

- 3 -

ARTICLE V.

OPERATOR

A.   **Designation and Responsibilities of Operator:**

            **SKLAR EXPLORATION COMPANY, L.L.C. of Shreveport, Louisiana**              shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement.  It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

B.   **Resignation or Removal of Operator and Selection of Successor:**

    1.   Resignation or Removal of Operator:   Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, / or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor.  Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator.  Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date.  Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator.  A change of a cor-porate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator. **\* this condition shall not apply to Sklar Exploration Company, L.L.C. or any other designated operator who owns no interest in the Contract Area by virtue of the fact that it is solely an operating company.**

    2.   Selection of Successor Operator:   Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties.  The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected.  The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

C.   **Employees:**

    The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D.   **Drilling Contracts:**

    All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. **\*\*** / If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of in-dependent contractors who are doing work of a similar nature. **\*\*except that in Operator's sole discretion all factors, such as rig availability, equipment condition, contractor employee reliability and knowledge, and drilling contractor reputation shall be taken into consideration in determining the real competitive price such that the lowest price bid may not provide the overall best value in the Drilling Parties to accomplish the drilling operations.**

ARTICLE VI.

DRILLING AND DEVELOPMENT

A.

    On or before the \_\_1st\_\_ day of \_\_\_\_September\_\_\_\_, (year) \_\_2007\_\_ , Operator shall commence the drilling of a well for oil and gas at the following location : .

**1000 feet from the West Line and 1,225 feet from the North Line of Section 33, Township 18 North, Range 6 West, Bienville Parish, Louisiana, and shall thereafter continue the drilling of the well with due diligence to a total depth of 8,400 feet.**

and shall thereafter continue the drilling of the well with due diligence to

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is en-countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

    Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

event Operator shall be required to test only the formation or formations to which this agreement may apply.

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

**B.   Subsequent Operations:**

1.  Proposed Operations:  Should any party hereto desire to drill any well / on the Contract Area other than the well provided for in Article VI.A., or to rework, / deepen or plug back any dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation.  The parties receiving such a notice shall have / thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation.  If a drilling rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to / forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays.  Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.  Any notice or response given by telephone shall be promptly confirmed in writing.

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of / thirty (30) days (or as promptly as possible after the expiration of the / forty-eight (48)-hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all parties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance.  Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance with the provisions hereof as if no prior proposal had been made.

2.  Operations by Less than All Parties:  If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of the notice period of / thirty (30) days (or as promptly as possible after the expiration of the / forty-eight (48)-hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence.  Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work.  Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed.  Each Consenting Party, within / forty-eight (48)-hours (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry / its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a).  In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of / forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays).  The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph.  Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense.  If any well drilled, reworked, / deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

1  and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2  ties. Upon commencement of operations for the drilling, reworking, / deepening or plugging back of any such well by Consenting Parties
                       recompleting,
3  in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4  and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5  Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6  market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7  terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8  until it reverts) shall equal the total of the following:
9
10
11      500%
12     (a)  / 100%-of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13  connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
14  Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15  Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16  Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17  Party had it participated in the well from the beginning of the operations; and
18
19
20  r
                                  recompleting, sidetracking,
21     (b)  ___500___ % of that portion of the costs and expenses of drilling, reworking, / deepening, plugging back, testing and completing,
22  after deducting any cash contributions received under Article VIII.C., and ___500___ % of that portion of the cost of newly acquired equip-
23  ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24  participated therein.
25
26
27                         or the completing, recompleting or reworking of a well,
28     An election not to participate in the drilling or the deepening of a well, / shall be deemed an election not to participate in any re-
             recompleting, sidetracking,
29  working / or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30  conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
            recompleting, sidetracking,
31  reworking / or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
            recompleting, sidetracking,                      five             500%
32  and there shall be added to the sums to be recouped by the Consenting Parties- one-hundred percent (100%) of that portion of the costs of
            recompleting, sidetracking,
33  the reworking / or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
            recompleting, sidetracking,
34  such a reworking / or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35  plicable as between said Consenting Parties in said well.
36
37
38
39     During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40  proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41  taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42  ticle III.D.
43
44
45                     recompleting, sidetracking,
46     In the case of any reworking, / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
                                recompleting, sidetracking,
47  of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48  abandonment of a well after such reworking, / plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49  ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.
50
51
52
53     Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54  Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55  itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56  option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
             quarter
57  ings. Each / month-thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
58  operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59  curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
                                        quarter
60  realized from the sale of the well's working interest production during the preceding-/ month. In determining the quantity of oil and gas
61  produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62  well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63  which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64  of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65  above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, recompleting, sidetracking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

Notwithstanding the provisions of this Article VI.B.2., * it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.; provided that an exceptional well location that is approved by the Louisiana Office of Conservation shall be deemed to conform to the then-existing spacing pattern. and subject to the right of any party to non-consent the proposed operation

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, recompleting, sidetracking, deepening and plugging back of such initial well after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for production, ceases to produce in paying quantities.

3. Stand-By Time:  When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepening operation just completed.  Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

4. Sidetracking:  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties.  Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

(a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

(b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period shall be limited to / twenty-four (24) forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and receive up to eight (8) additional days after expiration of the / twenty-four (24) forty-eight (48) hours within which to respond by paying for all stand-by time incurred during such extended response period.  If more than one party elects to take such additional time to respond to the notice, stand by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.  In all other instances the response period to a proposal for sidetracking shall be limited to / fifteen (15) thirty (30) days.

## C.   TAKING PRODUCTION IN KIND:

Each party shall / have the right to take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost.  Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party.  Any party taking its share of production in kind shall be

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
continued

1 required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.
2
3         Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4 the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5 its share of all production.
6
7         In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8 the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9 the obligation, to purchase such oil or sell it to others / at any time and from time to time, for the account of the non-taking party at the
10 best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the
11 owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously
12 delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of
13 time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14 of one (1) year.
   *on the same terms and basis as Operator is marketing Operator's and other Non-Operators' share of production
15
16         In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or
17 deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18 be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19 agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.
20
21 D.   Access to Contract Area and Information:
22
                                consenting
23         Each / party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24 and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
                                                        consenting
25 and records relating thereto. Operator, upon request, shall furnish each of the other / parties with copies of all forms or reports filed with
26 governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27 each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28 gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29 quests the information.
30
31 E.   Abandonment of Wells:
32
33         1.   Abandonment of Dry Holes:   Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34 drilled or deepened pursuant to the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35 without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
                         twenty-four (24) hours
36 within / forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37 such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38 accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39 such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40 operations in search of oil and/or gas subject to the provisions of Article VI.B.
41
42         2.   Abandonment of Wells that have Produced:   Except for any well in which a Non-Consent operation has been conducted
43 hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44 producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
45 be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
46 thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
47 those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48 parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49 Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign
50 the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51 material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52 terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
53 gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54 tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55 duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

**ARTICLE VI**
**continued**

1    "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2    assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3    Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4    interests in the remaining portion of the Contract Area.
5

6      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7    the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8    quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9    templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10    well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11    repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12    visions hereof.
13

14      3.  Abandonment of Non-Consent Operations:  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15    Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16    permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17    of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18    VI.E.
19

20                                  **ARTICLE VII.**
21                  **EXPENDITURES AND LIABILITY OF PARTIES**
22

23    **A.**    **Liability of Parties:**
24

25      The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26    shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27    among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28    shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.
29

30    **B.**    **Liens and Payment Defaults:**
31

32      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33    of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34    at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the
35    state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
36    taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37    rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
38    of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39    the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
40    purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
41    and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.
42

43      If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
44    Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that ~~be entitled to~~
45    the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall,~/ to obtain
46    ~~recover the amount it paid plus five hundred percent (500%) of the amount out of the proceeds from the sale of the defaulting~~
47    ~~party's share of oil and for gas, and , to secure payment thereof, be subrogated to the security rights described in the foregoing~~
     ~~reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.~~ paragraph. Notwithstanding anything
48    contained to the contrary in this paragraph, all parties agree that this provision shall not apply to any operation requiring an AFE
     unless Operator has advance billed all parties and such parties have paid their proportionate share of said costs in accordance with
     other provisions of this agreement.
49    **C.**    **Payments and Accounting:**
50

51      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
52    and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
53    tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
54    showing expenses incurred and charges and credits made and received.
55

56      Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
57    of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
58    month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
59    with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
60    on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
61    fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
62    due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
63    pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
64

65    **D.**    **Limitation of Expenditures:**
66

67      1.  Drill or Deepen:  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
68    pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
### continued

1 ☑ *Option No. 1:  All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2 necessary tankage and/or surface facilities.  *This Option No. 1 shall apply only to water source and/or water injection wells.
3
4 ☑ **Option No. 2:  All necessary expenditures for the drilling or deepening and testing of the well.  When such well has reached its
5 authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6 to the Non-Operators who have the right to participate in the completion costs.  The parties receiving such notice shall have / ~~forty-eight~~ twenty-four (24)
7 ~~(48)~~ hours ~~(exclusive of Saturday, Sunday and legal holidays)~~ in which to elect to participate in the setting of casing and the completion at-
8 tempt.  Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9 cluding necessary tankage and/or surface facilities.  Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt.  If one or more, but less than all of the parties,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, / deepening or plugging recompleting, sidetracking
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties.  **This Option No. 2 shall cover all wells except those expressly covered by Option No. 1 above.
14
15        2. Rework or Plug Back:  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.
19                                          *one or more Parties owning a majority interest
20        3. Other Operations:  Without the consent of / ~~all parties,~~ Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of _____Twenty-five Thousand and No/100_____ Dollars ($_____25,000.00_____ )
22 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties.  If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of _____Twenty-five Thousand and No/100_____
28 Dollars ($_____25,000.00_____ ) but less than the amount first set forth above in this paragraph.
29
30 E.   Rentals, Shut-in Well Payments and Minimum Royalties:
31
32        Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense.  In the event two or more parties own and have con-
34 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35 behalf of all such parties.  Any party may request, and shall be entitled to receive, proper evidence of all such payments.  In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B./ 2.
39                                                   3
40        Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, ~~at least five (5) days (excluding Saturday, Sunday and legal holidays),~~ or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so.  In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46 F.   Taxes:
47
48        Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent.  Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator.  If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion.  If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest.  Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".
59
60        If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination.  During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty.  When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".
66
67        Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
68 to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.
69
70

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
### continued

1  **G.   Insurance:**
2
3        At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4  the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5  pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
6  also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7  hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8  law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.
9
10       In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11  parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.
12
13                                         **ARTICLE VIII.**
14                **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**
15
16  **A.   Surrender of Leases:**
17
18       The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19  or in part unless all parties consent thereto.
20
21       However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22  agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23  such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24  thereafter accrued, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas in-
25  terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26  such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27  lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all
28  obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29  attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30  duction other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the
31  party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32  ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33  salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest
34  shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.
35
36       Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39  agreement.
40
41  **B.   Renewal or Extension of Leases:**
42
43       If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44  shall have the right for a period of thirty / (3015) days following receipt of such notice in which to elect to participate in the ownership of the
                                        fifteen
45  renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46  portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47  interests held at that time by the parties in the Contract Area.
48
49       If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50  who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51  to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52  Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.
53
54       Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55  by the acquiring party.
56
57       The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58  or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or
59  contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
60  tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61  the provisions of this agreement.
62
63       The provisions in this Article shall also be applicable to extensions of oil and gas leases.
64
65  **C.   Acreage or Cash Contributions:**
66
67       While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69  applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the con-
70  tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

- 11 -

## ARTICLE VIII
### continued

1 said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2 governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3 it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4 tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.
5
6 If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7 consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8
9 **D. Maintenance of Uniform Interests:**
10
11 ~~For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no~~
12 ~~party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,~~
13 ~~equipment and production unless such disposition covers either:~~
14
15 ~~1. the entire interest of the party in all leases and equipment and production; or~~
16
17 ~~2. an equal undivided interest in all leases and equipment and production in the Contract Area.~~
18
19 Every ~~such sale,~~ encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20 and shall be made without prejudice to the right of the other parties. **Any added expenditures required as a result of a partial**
21 **disposition, including marketing or metering of production, shall be borne solely by the party transferee.**
22 If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23 require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24 and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25 party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26 into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27 Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.
28
29 **E. Waiver of Rights to Partition:**
30
31 If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32 undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33 interest therein.
34
35 ~~F. Preferential Right to Purchase:~~
36
37 ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38 ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39 ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40 ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41 ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42 ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43 ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44 ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45 ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~
46
47 ## ARTICLE IX.
48 ### INTERNAL REVENUE CODE ELECTION
49
50 This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51 for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52 and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53 purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54 from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1986, as per-
55 mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56 ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57 United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58 and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59 evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60 Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61 action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62 Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63 Subtitle "A", of the Internal Revenue Code of 1986, under which an election similar to that provided by Section 761 of the Code is per-
64 mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65 tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66 computation of partnership taxable income.
67
68
69
70

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE X.
### CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____ Ten Thousand and No/100 _____ Dollars ($_____ 10,000.00 _____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder. **All claims or suits involving title to any interest subject to this Agreement shall be treated as a claim or suit against all parties hereto.**

### ARTICLE XI.
### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

### ARTICLE XII.
### NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

### ARTICLE XIII.
### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☑  Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☐  Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production, provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

# ARTICLE XIV.
## COMPLIANCE WITH LAWS AND REGULATIONS

**A.   Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B.   Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located.  If the Contract Area is in two or more states, the law of the state of _____ Louisiana _____ shall govern.

**C.   Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith.  Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the ~~"Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and~~ any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to any said Act.  Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

# ARTICLE XV.
## OTHER PROVISIONS

### (See attached pages 14-1 through 14-5)

- 14 -

## ARTICLE XV.

### OTHER PROVISIONS

**A.  PRECEDENCE OF OPERATIONS**

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1)  an election to perform additional logging, coring or testing;

(2)  an election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;

(3)  an election to plug back and attempt to complete the well in a shallower depth or formation;

(4)  an election to deepen the well;

(5)  an election to sidetrack the well;

(6)  an election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;

(7)  an election to temporarily abandon the well;

(8)  an election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of a majority of the consenting parties in possessory, cost-bearing interest (and not in number), a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth.  In such event, the operation, which, in the opinion of a majority of the consenting parties in possessory, cost bearing interest (and not in number) is less likely to jeopardize the well, will be given priority.  Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail.  It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests.  For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

**B.  HOLIDAYS**

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

**C.  DISPUTES AS TO PROPOSED DEPTHS**

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties.  If the parties are equally divided, the opinion of the Operator will prevail.

**D.  ADVANCEMENT OF COSTS**

Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s)  in advance of its respective share of (i) the dry hole cost for the initial well to be drilled under Article VI A, (ii) the dry hole cost for any other well to be drilled hereunder to which such Non-Operator has consented, and (iii) the cost of any completion, reworking, recompletion, sidetracking, deepening or plugging back operation to which such Non-Operator has consented (any such operation under clause (i), (ii), or (iii) being herein called a "Drilling Operation").  Such request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Drilling Operation. The amount of each Non-Operator's advance payment shall be based upon the latest AFE for such operation.  Such advanced payments shall be held by Operator for the account of the Non-Operators and applied, with interest, against the actual costs incurred in the applicable operation.

A Non-Operator receiving a request for advance payment shall, within two (2) days of the receipt of such request if and when a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to operator in cash the full amount of such request. Operator shall credit the amount to the Non-Operator's account for the

payment of such Non-Operator's share of costs of such Drilling operation, and following the end of each month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement. Advance payment by a Non-Operator of his share of completed well costs shall in no event prevent such completion of a well pursuant to Option No. 2 of Article VII.D.1. and, in the event such a Non-Operator elects not to participate in completion, the sums that such Non-Operator has advanced shall not be charged with any share of the costs of any completion attempted.

In the event a Non-Operator from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by depositing cash as aforesaid, then Operator, at his option, shall make a second written request by certified mail, return receipt requested for such advance. Non-Operator shall pay for said advance as aforesaid within two (2) business days from receipt of such second request.

If a Non-Operator fails to pay within two (2) business days of the receipt of such second request, then:

(1)  If the advance payment was requested for the drilling of the initial well under Article VI A Non-Operator may, at the sole discretion and timing election of the Operator, be deemed to have relinquished all of its leasehold and contractual rights in the Contract Area retroactive to the date of default in payment, and if assignment has been made to such Non-Operator, Non-Operator shall assign all of its rights in and to the Contract area, within thirty (30) days of a request for such assignment, to those parties who have participated in such Drilling Operation, in the proportion that such parties elected to share the relinquished interest.

(2)  If the advance payment was requested for any other Drilling Operation (including completion of the initial well), Non-Operator may, at the sole discretion and timing election of the Operator, be deemed non-consent in said operation retroactive to the beginning of such operation and thereafter subject to the penalty provisions of Article VI.B.2 hereof.

     If the Non-Operator fails to make such payment or furnish such security within two (2) business days of the receipt of such second request, Operator shall promptly notify all other parties still participating in such Drilling Operation of the default in payment and if and when applicable, of the relinquishment of an interest under this provision. The parties who wish to participate in the Drilling Operation shall have five (5) days from receipt of the applicable notice to elect to assume the costs chargeable to such relinquished interest and shall share such relinquished interest in proportion to their assumption of such relinquished interest. If the parties who wish to participate in the Drilling Operation are unwilling to assume the costs chargeable to such relinquished interest, the Drilling Operation shall be cancelled, and if the cancelled Drilling Operation involves the drilling of a test well under Article VI A no assignment shall be due as a consequence of the failure to pay.

     Notwithstanding anything to the contrary herein, if the applicable drill well or operation is unsuccessful or results in a dry hole, Operator shall have the right to sue a Non-Operator who failed to pay for its proportionate share of expenses in lieu of Operator's right to an assignment of all Non-Operator's leasehold and contractual rights within the Contract Area, or in lieu of deeming the Non-Operator Non-Consent.

## E.  NECESSARY EXPENDITURES EXCLUDE SIDETRACKING

The phrase "necessary expenditures" in Article VII.D.1. (Option No. 2) on page 10 shall not be deemed to include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

## F.  ADDITIONAL CHARGES

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Unit Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same:

Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and expenses in connection with preparation and presentation of evidence and exhibits of Louisiana Office of Conservation hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

## G.  INDEMNITY

Except for liabilities resulting from the gross negligence or willful misconduct of the Operator, each Non-Operator shall defend, indemnify and hold Operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operator's officers, employees and/or agents, resulting from or in any way relating to such officers, employees, and/or agents presence on a drilling rig on the Contract Area or from such person traveling by air or water between any point and such drilling rig. Such indemnity to Operator shall also apply to any other person whose presence on the rig or transportation to or from such rig is at the request of the indemnifying Non-Operator (except for liabilities resulting from the gross negligence or willful misconduct of the Operator).

### H.  RECOUPMENT

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

### I.  SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

### J.  NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

### K.  PIPELINE AND/OR GATHERING LINE CONSTRUCTION

If any party to this Agreement elects either to construct, operate or purchase or to join in the construction, operation or purchase of a pipeline, and/or gathering line to transport production from the Contract Area, then such party shall notify the other parties hereto furnishing all pertinent cost and information.  Each party receiving such notice shall have thirty (30) days to exercise their right in writing to participate in the construction, operation and ownership of such pipeline and/or gathering line, including the right of transporting production from the Contract Area, by agreeing to bear their proportionate share of the cost of such operation and thereafter entering into a mutually acceptable operating agreement for the operation thereof.  Otherwise, the parties consenting to participate in such operation shall be entitled to establish the terms and conditions (including any costs and fees for use or reservation of the applicable facilities) under which the non-consenting parties may use or have access to the applicable facilities.  Absent a mutually agreeable agreement for the use of said facilities by and between the consenting and non-consenting parties, the non-consenting parties shall be obligated to separately dispose of their share of all production.

### L.  DISBURSEMENT OF ROYALTIES

If Operator prepares and administers a division order for and receives and distributes the proceeds of production attributable to the interest of a Non-Operator, then Operator shall be entitled to charge that party for an appropriate monthly overhead charge for disbursing such royalty payments, in addition to the combined fixed rates specified in Exhibit "C" hereto.  If through error or inadvertence Operator shall fail to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, he shall not be liable in damages to the other Parties hereto for such failure, unless arising out of the gross negligence or willful misconduct of the Operator.

### M.  INFORMATION

Anything to the contrary hereinabove notwithstanding, it is stipulated that any non-consenting party to an operation conducted hereunder shall have no right to observe such operation or have access to information pertaining to such operation, until such time as the non-consenting party's share of the cost of such operation and the penalty therefor has been recovered by the consenting parties as provided herein.  It is understood that this Section M of Art. XV does not apply when the in the situation where the non-consenting party is a Farmor under this Agreement.

### N.  OPERATOR'S LIEN – SECURITY INTEREST

Subject to the provision of Article VII. B. of this Agreement, each non-Operator grants to Operator a lien upon all of the rights, titles, and interests of each Non-Operator, whether now existing or hereafter acquired, in and to the (1) the oil, gas, or other minerals in, on, and under the Contract Area and (2) any oil, gas, and mineral leases covering the Contract Area or any portion thereof.  In addition, each Non-Operator grants to Operator a security interest in and to all of such Non-Operator's rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (1) all oil, gas and other minerals produced from the Contract Area when produced; (2) all accounts receivable accruing or arising as a result of the sale of such oil, gas and other minerals; (3) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (4) all oil and gas wells and other surface and sub-surface equipment and facilities of any kind or character located on the Contract Area and the cash or other proceeds received from the sale thereof (collectively, the "Personal Property Collateral").  Some of the Personal Property Collateral is or will become fixtures on the Contract Area, and the interest of Non-Operator in and to the oil, gas and other minerals when extracted from the Contract Area and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area.  This Agreement (including a carbon, photographic, or other reproduction hereof) shall constitute a non-standard

form financing statement under the terms of the Uniform Commercial Code of the State in which the Contract Area is located, and as such, may be filed for record in the real estate records of the county in which the Contract Area is located.   Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense, if any.

## O.  MARKETING OF PRODUCTION

Operator agrees to market all Non-Operator's share of any production from the Contract Area under the same terms that Operator is marketing its share of said production; provided, however, that contracts entered into by Operator in marketing Non-Operator's share of production shall be subject to the limitations set forth in Article VI. C. hereof. Further, Non-Operator shall be given the continuing right to participate as a signatory to any contract entered into by Operator to market production hereunder.  Notwithstanding the above, any Non-Operator may choose to separately market its proportionate share of said production by giving written notice to Operator by the 15th day of the month prior to the month in which said Non-Operator intends to separately market its production.  Conversely, if said Non-Operator again requests that Operator market its production, Non-Operator must provide written request of same by the 15th day of the month prior to the month in which Operator is again to market said Non-Operator's production.

## P.  METERING OF PRODUCTION

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

## Q.  PLUGGING AND LEASEHOLD RESTORATION FUND

At any time any well subject to this agreement is, in Operator's sole opinion, approaching the end of its economic life and/or its useful purpose, Operator may pre-bill the joint account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location.  Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and abandonment and restoration of the leasehold premises.  In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any accrued interest on such difference, based upon the then working interest percentage of such owner.  In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

## R.  SEPARATE AGREEMENT FOR NON-UNIFORM INTEREST

Any leases or interests therein (and the land covered thereby) that, pursuant to the terms of this Agreement or otherwise, become owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such leases become so owned.  Any leases or interests therein (and the lands covered thereby) that, pursuant to the terms of this Agreement or otherwise, become owned by more than one but less than all of the parties hereto or in which a party assigns, transfers or otherwise disposes of all or part of its interests shall remain subject to this Agreement as to the surviving parties; however, for all purposes, the terms of this Agreement shall apply separately to each such lease (or group of such leases in which the parties' ownership is uniform) as if it were a separate agreement covering such lease(s), with an Exhibit "A" modified to reflect the parties' interests therein, based upon the parties' ownership in such lease(s).

## S.  OBLIGATORY WELL

Notwithstanding the provisions of this agreement and particularly Article VI, if any proposed operations are necessary to maintain a Lease covered by this agreement in force or an agreement to earn a lease(s) which would otherwise expire unless such operations are conducted, then in lieu of being penalized under Article VI.B.2., each Non-Consenting Party shall assign to Consenting Parties all of such Non-Consenting Party's right, title and interest in and to the Lease(s) or portion thereof or such agreement which would be lost or not earned if such operations were not conducted.

Such assignment shall be promptly due upon commencement of said proposed operations by Consenting Parties and shall be free and clear of all overriding royalties, production payments, mortgages, liens and other burdens and encumbrances placed thereon by the assigning party or resulting from its ownership or operation of such Lease or interest which is not a joint obligation of the parties, but otherwise without warranty of title either expressed or implied.

If the assignment is in favor of more than one party, the assigned interest shall be shared by the Consenting Parties in the proportions that the interest of each bears to the interest of all Consenting Parties unless otherwise agreed to in writing.  Thereafter, such acreage covered by said assignment shall not be subject to the terms of this agreement, but shall be deemed to be subject to an agreement identical to this changed only in Exhibit "A" to indicate the Consenting Parties and their percentages of interest.  Operations that are necessary to either maintain a Lease covered by this agreement in force or to earn a lease or part thereof under an agreement which would otherwise expire unless operations are conducted, shall be defined as operations that are proposed within six (6) months of the date the Lease or agreement would otherwise expire.

**T. DEFAULT PENALTY/AUTOMATIC NON-CONSENT**

If written notice has been given that the lien rights conferred in Article VII. B. have been implemented or enforced against any party hereto, for so long as the affected party remains in default, it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and shall not be entitled to vote its interest in any matter hereunder.  As to any proposed operation in which it otherwise would have the right to participate, such party shall not have the right to elect to participate or be a Consenting Party unless and until it pays in full the amount it is in default plus all other outstanding amounts due hereunder.  If an operation proposed during such default period commences before such payment in full, the party in default shall automatically be deemed a Non-Consenting Party to the operation.

**U. PRIOR OPERATING AGREEMENT(S)**

This operating agreement, as to the parties executing same and as to the Contract Area and Depth Restrictions, shall supersede and replace any prior operating agreement(s) covering all or any portion of the Contract Area of this operating agreement.

**V. NON-PARTICIPATING INTERESTS**

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto as same may be revised from time to time to reflect record title and/or reformation of the Contract Area.

**W. EXECUTION**

This agreement shall be binding upon each Non-Operator that executes this agreement without regard to whether this same instrument, or any copy or counterpart hereof shall be executed by any other Non-Operator.

**X. MISCELLANEOUS**

Anything to the contrary herein notwithstanding, this Operating Agreement is expressly made subject to the terms and provisions of the leases and farmout agreements described in Exhibit "A" hereof.

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ___28TH___ day of ___August___ , (year) 2007

_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than these in Articles _____ _____, have been made to the form.

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

_____
Witness

_____
Witness

By: David A. Barlow, Chief Operating Officer

NON-OPERATORS

SKLARCO L.L.C.

_____
Witness

_____
Witness

By: David A. Barlow, Chief Operating Officer

TENSAS DELTA EXPLORATION COMPANY, LLC

_____
Witness

By: Michael Riddick, Executive Vice President

_____
Witness

MCCOMBS ENERGY L.L.C.

_____
Witness

Ricky Halkin, Vice President

_____
Witness

- 15 -

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _28TH_ day of _August_, (year) 2007

~~who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ have been made to the form.~~

OPERATOR

Witness

Witness

SKLAR EXPLORATION COMPANY L.L.C.

By: David A. Barlow, Chief Operating Officer

NON-OPERATORS

Witness

Witness

SKLARCO L.L.C.

By: David A. Barlow, Chief Operating Officer

Witness
John R. Gardner

Witness
Gregory L. Rembert

TENSAS DELTA EXPLORATION COMPANY, LLC

By: Michael E. Riddick
Executive Vice President

Witness

Witness

MCCOMBS ENERGY L.L.C.

Ricky Halkin, Vice President

- 15 -

## ARTICLE XVI.
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ___28TH___ day of ___August___ , (year)___2007___

~~_____ , who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610 1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____ have been made to the form.~~

### OPERATOR

Witness

Witness

SKLAR EXPLORATION COMPANY L.L.C.

By: David A. Barlow, Chief Operating Officer

### NON-OPERATORS

Witness

Witness

SKLARCO L.L.C.

By: David A. Barlow, Chief Operating Officer

TENSAS DELTA EXPLORATION COMPANY, LLC

Witness

Witness

By: Michael Riddick, Executive Vice President

MCCOMBS ENERGY L.L.C.

Witness

Ricky Haikin, Vice President

Witness

- 15 -

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

On this 29th day of August_____, 2007, before me appeared **DAVID A. BARLOW**, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for **SKLAR EXPLORATION COMPANY L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

TIFFANY N. HARRIS, NOTARY PUBL.
CADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE
NOTARY No. 69179

STATE OF LOUISIANA

PARISH OF CADDO

On this 29th day of August_____, 2007, before me appeared **DAVID A. BARLOW**, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for **SKLARCO L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

 . . . .Y N. HARRIS, NOTARY PUBLIC
. . ADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE
NOTARY No. 69179

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2007, before me appeared **MICHAEL RIDDICK**, to me known, who being by me duly sworn, did say that he is the Executive Vice President for **TENSAS DELTA EXPLORATION COMPANY, LLC**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

## ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

On this 29th day of August, 2007, before me appeared **DAVID A. BARLOW**, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for **SKLAR EXPLORATION COMPANY L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public in and for the Parish of Caddo
State of Louisiana

TIFFANY N. HARRIS, NOTARY PUBLIC
CADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE
NOTARY No. 69179

STATE OF LOUISIANA

PARISH OF CADDO

On this 29th day of August, 2007, before me appeared **DAVID A. BARLOW**, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for **SKLARCO L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public in and for the Parish of Caddo
State of Louisiana

TIFFANY N. HARRIS, NOTARY PUBLIC
CADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE
NOTARY No. 69179

STATE OF LOUISIANA

PARISH OF CADDO

On this 20th day of August, 2007, before me appeared **MICHAEL RIDDICK**, to me known, who being by me duly sworn, did say that he is the Executive Vice President for **TENSAS DELTA EXPLORATION COMPANY, LLC**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public in and for the Parish of Caddo
State of Louisiana

DONNA K. HARDIN
Notary Public # 35675
Caddo Parish, Louisiana
My Commission is for Life

STATE OF TEXAS

COUNTY OF HARRIS

On this 30 day of August, 2007, before me appeared **RICKY HAIKIN**, to me known, who being by me duly sworn, did say that he is the Vice President of **MCCOMBS ENERGY L.L.C.**, a Texas limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

SHARON METCALF McDONALD
Notary Public, State of Texas
Commission Expires 12-29-2009

Notary Public in and for the State of Texas

## EXHIBIT "A"

Attached to and made a part of that certain Operating Agreement dated 15th day of August, 2007, by and between SKLAR EXPLORATION COMPANY L.L.C., as Operator, SKLARCO L.L.C., TENSAS DELTA EXPLORATION COMPANY, LLC, and MCCOMBS ENERGY, L.L.C., as Non-Operators.

(1)    **Identification of lands subject to this agreement:**

### Contract Area

Township 18 North, Range 6 West
Bienville Parish, Louisiana
Section 33
and lying within the black boundary as shown on the plat designated as Exhibit "A-2".

### Area of Mutual Interest

Township 18 North, Range 6 West
Bienville Parish, Louisiana
Section 33

and lying within the red boundary as shown on the plat designated as Exhibit "A-2".

(2)    **Restrictions, if any, as to depths, formations, or substances:**

There are no restrictions except as may be provided for in any lease or contract subject to this Operating Agreement.

(3)    **Decimal interest and names and addresses of Parties to this Agreement:**

| Owners | Interest |
|---|---|
| Sklarco L.L.C. | 33.34% |
| Tensas Delta Exploration Company, LLC | 33.33% |
| McCombs Energy L.L.C. | 33.33% |
| Total: | 100.00% |

(4)    **Oil and gas leases and/or oil and gas interests subject to this agreement:**

See Exhibit "A-1" Description of Leases.

(5)    **Addresses of parties for notice purposes:**

Sklar Exploration Company, LLC
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Telephone: (318) 227-8668
Telecopier: (318) 227-9012

Sklarco, LLC
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Telephone: (318) 227-8668
Telecopier: (318) 227-9012

Tensas Delta Exploration Company, LLC
333 Texas Street, Suite 525
Shreveport, LA 71101
Telephone: (318) 222-0026
Telecopier: (318) 222-1898

McCombs Energy, L.L.C.
Attn: Larry Wynont, VP, Operations
5599 San Felipe Street, Suite 1200
Houston, Texas 77056-2721
Telephone: (713) 621-0033
Telecopier: (713) 621-1670

## EXHIBIT "A-1"

Attached to and made a part of that certain Operating Agreement dated August 15, 2007, by and
between SKLAR EXPLORATION COMPANY L.L.C., as Operator, and SKLARCO L.L.C.,
TENSAS DELTA EXPLORATION COMPANY, LLC, and MCCOMBS ENERGY, L.L.C., as
Non-Operators.

## DESCRIPTION OF OIL AND GAS LEASES

### Section 33:  Township 18 North, Range 6 West

1.  Oil, Gas and Mineral Lease dated February 20, 2004, by and between Philemon J.
    Whatley and Willie Mae Simpson Whatley, as Lessors, and Sklarco, L.L.C., as Lessee,
    filed under Registry Number 20041377, recorded in Book 964, Page 848 of the
    Conveyance Records of Bienville Parish, Louisiana.

2.  Oil, Gas and Mineral Lease dated November 10, 2005, by and between The Gloria Oates
    Living Trust, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No.
    20061544, recorded in Book _____, Page _____ of the Conveyance Records of Bienville
    Parish, Louisiana.

3.  Oil, Gas and Mineral Lease dated November 10, 2005, by and between Janet Ann Merritt
    Robinson, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061547,
    recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish,
    Louisiana.

4.  Oil, Gas and Mineral Lease dated November 10, 2005, by and between Meredith Lynn
    Noel Day, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061539,
    recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish,
    Louisiana.

5.  Oil, Gas and Mineral Lease dated November 10, 2005, by and between Jerry T. Carter,
    as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061540, recorded in
    Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

6.  Oil, Gas and Mineral Lease dated November 10, 2005, by and between John Clinton
    Merritt, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061541,
    recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish,
    Louisiana.

7.  Oil, Gas and Mineral Lease dated November 10, 2005, by and between Judy K. Merritt
    Carter, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061546,
    recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish,
    Louisiana.

8.  Oil, Gas and Mineral Lease dated November 10, 2005, by and between Beverly Lynn
    Gantt Mazza, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No.
    20061542, recorded in Book _____, Page _____ of the Conveyance Records of Bienville
    Parish, Louisiana.

9.  Oil, Gas and Mineral Lease dated November 10, 2005, by and between Mary Lane Day,
    as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061550, recorded in
    Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

10. Oil, Gas and Mineral Lease dated November 10, 2005, by and between Carol Elaine
    Koschak, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061548,
    recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish,
    Louisiana.

11. Oil, Gas and Mineral Lease dated February 6, 2006, by and between Veronica Landry, a/k/a Veronica Landry-Harris, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061543, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

12. Oil, Gas and Mineral Lease dated January 31, 2006, by and between Andre Toliver, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061551, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

13. Oil, Gas and Mineral Lease dated January 31, 2006, by and between Clinton Holland, Sr., as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061549, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

14. Oil, Gas and Mineral Lease dated January 24, 2006, by and between William Jefferson Day, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061545, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

15. Oil, Gas and Mineral Lease dated November 10, 2005, by and between Terry Lynn Holley, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061675, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

16. Oil, Gas and Mineral Lease dated March 21, 2006, by and between John Douglas Bryant, Jr., as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061676, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

17. Oil, Gas and Mineral Lease dated January 31, 2006, by and between Terri Holland, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20061677, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

18. Oil, Gas and Mineral Lease dated April 17, 2006, by and between Elizabeth Lynn Noel Mathews, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20062505, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

19. Oil, Gas and Mineral Lease dated January 31, 2006, by and between Lawrence E. Holland, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20062504, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

20. Oil and Gas Lease dated March 28, 2006, by and between Weyerhaeuser Company, as Lessor, and Sklarco L.L.C., as Lessee, the existence of which is evidenced by that Memorandum of Oil and Gas Lease filed under Registry No. 20062136, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

21. Oil, Gas and Mineral Lease dated January 31, 2006, by and between Willie R. Holland, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20062507, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

22. Oil, Gas and Mineral Lease dated May 3, 2006, by and between Mary Elizabeth Holley, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20062506, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

23. Oil, Gas and Mineral Lease dated March 31, 2006, by and between George P. Bryant, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20064217, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

24. Oil, Gas and Mineral Lease dated July 11, 2006, by and between Wand Ann Holland, et al, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20064220, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

25. Oil, Gas and Mineral Lease dated April 17, 2006, by and between Charlie Bryant, Jr., as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20064219, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

26. Oil, Gas and Mineral Lease dated February 3, 2006, by and between Monica L. Elder, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20064218, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

27. Oil, Gas and Mineral Lease dated August 14, 2006, by and between Floyd Bryant, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20064221, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

28. Oil, Gas and Mineral Lease dated August 14, 2006, by and between Monique Bryant, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20065640, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

29. Oil, Gas and Mineral Lease dated August 14, 2006, by and between John Douglas Bryant, III, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20065641, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

30. Oil, Gas and Mineral Lease dated November 20, 2006, by and between Leo Lawrence Bryant, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20070875, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

31. Oil, Gas and Mineral Lease dated April 16, 2007, by and between The Kansas City Southern Railway Company, as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20071946, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

32. Oil, Gas and Mineral Lease dated March 29, 2007, by and between H. Preston Holley, Jr., as Lessor, and Sklarco L.L.C., as Lessee, filed under Registry No. 20073043, recorded in Book _____, Page _____ of the Conveyance Records of Bienville Parish, Louisiana.

INSOFAR AND ONLY INSOFAR AS THE ABOVE DESCRIBED OIL, GAS AND MINERAL LEASES COVER LANDS WITHIN SECTION 33 OF TOWNSHIP 18 NORTH, RANGE 6 WEST, BIENVILLE PARISH, LOUISIANA.



# BIENVILLE PARISH, LOUISIANA
## LAND DISTRICT NORTH OF RED RIVER
### TOWNSHIP 18 NORTH, RANGE 6 WEST
### SECTION 33

EXHIBIT "A-2"

LEGEND:

○ INDICATES PROPOSED WELL LOCATION

XXXXX INDICATES UNIT BOUNDARY

NOTES:

1. THERE ARE NO COMMERCIAL OR RESIDENTIAL STRUCTURES WITHIN 500 FEET OF PROPOSED LOCATION.

2. BASED FROM G.P.S. OBSERVATIONS WE HAVE DETERMINED THE FOLLOWING PRE-CONSTRUCTION DATA:
GROUND ELEVATION AT LOCATION = 303' NAVD 88
LATITUDE = 32°30'32.5" (N) NAD 83    32°30'31.8" (N) NAD 27
LONGITUDE = 92°59'46.4" (W) NAD 83    92°59'45.9" (W) NAD 27
731155 (N) NAD 83    Y = 670446 NAD 27
3127855 (E) NAD 83    X = 1847068 NAD 27

3. MINERAL OWNERSHIP AND EXISTING WELL INFORMATION HAS BEEN FURNISHED BY PRODUCER AND SURVEYOR MAKES NO CLAIMS OR ACCEPTS ANY RESPONSIBILITY FOR CORRECTNESS THERETO.

4. EXCEPT AS NOTED, THIS SURVEY DOES NOT SHOW ANY ENVIRONMENTAL SITES, HAZARDOUS WASTE SITES, OR STRUCTURES BEING EITHER SURFACE OR SUBSURFACE THAT WOULD ENCUMBER PROPOSED WELL LOCATION AND NO LIABILITY SHALL BE PLACED UPON SURVEYOR FOR SUCH OMISSIONS.

CERTIFICATION

I, WAYNE ACREE, REGISTERED UNDER THE LAWS OF THE STATE OF LOUISIANA AS A PROFESSIONAL LAND SURVEYOR, DO HEREBY CERTIFY THAT TO THE BEST OF MY KNOWLEDGE THE LOCATION HAS BEEN STAKED BY ME AS HEREON SHOWN

WAYNE ACREE    P.L.S. NO 4465



WAYNE ACREE P.L.S., INC.
A Professional Surveying Corporation
P.O. BOX 96
WEST MONROE, LOUISIANA
(318)388-3237

PROJECT NO.  05979

LOCATION DESCRIPTION:

1225' FEET FROM THE NORTH LINE AND 1000' FEET FROM THE WEST LINE OF SECTION 33, T 18 N, R 6 W
LAND DISTRICT NORTH OF RED RIVER
BIENVILLE PARISH, LOUISIANA

## WELL LOCATION PLAT

FOR

SKLAR EXPLORATION COMPANY, L.L.C.
L HOSS RA SU C; J.C. MERRITT, ETAL #1
SITUATED IN
NW 1/4 OF THE NW 1/4
SECTION 33, T 18 N, R 6 W
LAND DISTRICT NORTH OF RED RIVER
BIENVILLE PARISH, LOUISIANA

SCALE: 1"=1000'    JULY 9, 2007

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of _____, _____, between

Lessor (whether one or more) whose address is:_____

and _____ Lessee,

whose address is _____

WITNESSETH

1.  Lessor in consideration of  One Hundred Dollars and Other Valuable Considerations ($100.00 & OVC), in hand paid, of the royalties herein provided, and of the agreement of Lessee herein contained, hereby  grants, leases and lets unto Lessee, the exclusive right to enter upon and use the land hereinafter described for the exploration for and production of oil, gas, sulphur and all other minerals, together with the use of the surface of the land for all purposes incident to the exploration for and production, ownership, possession and transportation of said minerals (either from said land or acreage pooled therewith), and the  right to dispose of salt water, with the right of ingress and egress to and from said lands at all times for such purposes, including for operations hereunder or in connection with similar operations on adjoining  land;  the land to which this lease applies  and  which is affected  hereby

being situated in _____ Parish, Louisiana, and described as follows, to-wit:

This lease shall  also extend and apply to any interest therein which Lessor may hereafter acquire, including, but not limited to, outstanding mineral rights acquired by reversion, prescription or otherwise, and includes battures, accretions, roads, highways, easements, right-of-ways and all land, if any, contiguous or adjacent to, or adjoining the land particularly described above.  Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land.  For the purposes of determining

the amount of  bonus and the shut-in royalty payment  hereunder, said land shall be deemed to contain _____ acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof.

2.  Subject to the other provisions herein contained, this lease shall be for a period of _____ years from the date hereof (called "primary term") and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner herein provided.

3.  For the consideration hereinabove recited, this lease shall remain in full force and effect during the primary term, without any additional payment and without Lessee being required to conduct any operations on the land (either before or after the discovery of minerals), except to drill such wells as might be necessary to protect the land from drainage, as hereinafter provided.

4.  The royalties to be paid by Lessee are:  (a) on oil, and other hydrocarbons which are produced at the well in liquid form by ordinary production methods, one-eighth of that produced and saved from said land, same to be delivered at the wells or to the credit of Lessor in the pipe line to which the wells may be connected; Lessor's interest in either case to bear its proportion of any expenses for treating the oil to make it marketable as crude; Lessee may from time to time purchase any royalty oil or other liquid hydrocarbons in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas, or other gaseous substance produced from said land and sold or used off the premises or for the extraction of gasoline or other products therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; such gas, casinghead gas, residue gas, or gas of any other nature or description whatsoever, as may be disposed of for no consideration to Lessee, either through unavoidable waste or leakage, or in order to recover oil or other liquid hydrocarbons, or returned to the ground, shall not be deemed to have been sold or used either on or off the premises within the meaning of this paragraph 4 hereof; (c ) on all other  minerals mined and marketed, one-eighth, either in kind or value at the well or mine, at Lessee's election, except that on sulphur the royalty shall be one dollar ($1.00) per long ton.

5.  If Lessee during or after the primary term should drill a well capable of producing gas or gaseous substances in paying quantities, (or which although previously produced Lessee is unable to continue to produce) and should Lessee be unable to operate said well because of lack of market or marketing facilities or governmental restrictions, then Lessee's rights may be maintained beyond or after the primary term without production of minerals or further drilling operations by paying Lessor as royalty a sum equal to one dollar (1.00) per acre of land covered hereby per year, the first payment being due, if said well should be completed or shut-in after the primary term, within ninety (90) days after the completion of such well or the cessation of production and such payment will extend Lessee's rights for one year from the date of such completion or cessation.  If such a well should be completed during the primary term, the first payment, if made by Lessee, shall be due within 90 days after such well is shut-in, or before the expiration date of the primary term herein fixed, whichever is the later date. Thereafter Lessee's rights may be continued from year to year by making annual payments in the amount stated on or before the anniversary date beginning with the date of completion of said well (if completed after the primary term) or the end of the primary term (if completed prior thereto) as  the  case  may  be;  each  of such payments to extend Lessee's rights for one year.  The annual payments herein provided for may be deposited to Lessor's credit in the _____

_____ Bank of _____, which bank shall be and remain Lessor's agent for such purpose regardless of any change or changes in the ownership of the land or mineral rights therein.  The owners of the royalty as of the date of such payments shall be entitled thereto in proportion to their ownership of said royalty.  The provisions of this paragraph shall be recurring at all times during the life of this lease.  Should any well producing gas or gaseous substances be completed on a drilling unit which includes any part of the land herein leased, the provisions of this paragraph shall be subject to all other agreements herein contained allowing the pooling of the above described lands with other lands.

6.  If within ninety (90) days prior to the end of the primary term, Lessee should complete or abandon a well on the lands described above or on land pooled therewith, or if production previously secured should cease from any cause, this lease shall continue in force and effect for ninety (90) days from such completion or abandonment or cessation of production.  If at the expiration of the primary term or at the expiration of the ninety (90) day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith, but Lessee is then engaged in operations for drilling, completion or reworking thereon, or operations to achieve or restore production, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations for drilling, completion or reworking, or operations to achieve or restore production, with no cessation between operations or between such cessation of production and additional operations of more than ninety (90) consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith.  If sulphur be encountered on said premises or on land pooled therewith, this lease shall continue in force and effect so long as Lessee is engaged with due diligence in explorations for and/or erecting a plant for the production of sulphur and thereafter subject to the foregoing provisions hereof so long as oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith.

7.  Lessee is hereby granted the right as to all or any part of the land described herein, without Lessor's joinder, to combine, pool or unitize the acreage royalty or mineral interest covered by this lease, or any portion thereof,  at any time during the life of this lease, with any other land, lease or leases, royalty or mineral interests in or under any other tract or tracts of land in the vicinity thereof, whether owned by Lessee or some other person, or corporation so as to create, by the combination of such lands and leases, one or more operating units, as to any and all mineral horizons, provided that no one operating unit shall, in the case of gas, including condensate, embrace more than six hundred forty (640) acres, and in the case of oil, including casinghead gas, embrace more than eighty (80) acres; and provided further, however, that if any spacing or other rules and regulations of the State or Federal Commission, Agency, or regulatory body having or claiming jurisdiction has heretofore or shall at any time hereafter permit or prescribe a drilling or operating unit or spacing rule in the case of gas, including condensate, greater than six hundred forty (640) acres, or in the case of oil or casinghead gas greater than eighty (80) acres, then the unit or units herein contemplated may have, or may be redesigned so as to have, as the case may be, the same surface content as, but not more than, the unit or the acreage in the spacing rule so prescribed or permitted.  However, it is further specifically understood and agreed, anything herein to the contrary notwithstanding, that the Lessee shall have the right to, and the benefit of an acreage tolerance of ten per cent in excess of any drilling or operating unit authorized herein.  The commencement of operations for the drilling  of a well, or the completion of a well to production of either oil, gas, casinghead gas, condensate or other minerals on any portion of an operating unit in which all or any part of the land described herein is embraced, or production of oil, gas, casinghead gas, condensate, or other minerals therefrom shall have the same effect under the terms of this lease as if a well were commenced, completed or producing oil, gas, casinghead gas, condensate, or other minerals in paying quantities on the land embraced by this lease.  Lessee shall execute in writing and file for record in the records of the Parish in which the lands herein leased are located, an instrument identifying or describing the pooled acreage, or an instrument supplemental hereto redesignating same, as the case may be.  Either prior to the securing of production from any unit created under the authority hereinabove granted, or after cessation of production therefrom Lessee shall have the right to dissolve the unit so created, without Lessor's joinder or further consent, by executing in writing and placing of record in the Parish or Parishes in which the lands making up such unit may be located, an instrument identifying and dissolving such unit.  The provisions hereof shall be construed as a covenant running with the land and shall inure to the benefit of and be binding upon the parties hereto, their heirs, representatives, successors and assigns.  In the event such operating unit or units is/are so created by Lessee, Lessor shall receive out of production or the proceeds from production from such operating unit or units or out of the shut-in royalty provided for above, such portion of the royalty or of the shut-in royalty specified herein as the number of acres (mineral acres) out of this lease placed in any such operating unit or units bears to the total number of acres included in such operating unit or units.

8.  If Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the payments herein provided for above shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

9.  Lessee shall have the exclusive right to explore the land herein described by geological, geophysical or other methods, whether similar to those herein specified or not and whether now known or not, including the drilling of holes, use of torsion balance, seismograph explosions, magnetometer, or other geophysical or geological instruments, test or procedures, for

EXHIBIT "B"
Continued

the purpose of securing geological and geophysical information. All information obtained by Lessee as a result of such activity shall be the exclusive property of Lessee, and Lessee may disseminate or sell such information without Lessor's consent. In exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized therewith, in primary and/or enhanced recovery, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises, or on any adjacent or adjoining lands, as may be reasonably necessary for such purpose, including but not limited to the drilling of wells, construction and use of roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Lessee to discover, produce, store, treat and/or transport oil, gas and other substances. Lessee shall have free use of oil, gas, casinghead gas, condensate, and water from said land, except water from Lessor's wells, for all operations hereunder, including repressuring, pressure maintenance and recycling, and the royalty shall be computed after deducting any so used. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred feet of any residence or barn now on said land without Lessor consent. In the event a well or wells, producing oil, gas, casinghead gas or condensate in paying quantities should be brought in on adjacent lands not owned by the Lessor and within one hundred fifty feet of and draining the leased premises, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances.

10.  The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns, but no change or division in ownership of the land, or royalties, however accomplished shall operate to enlarge the obligations or diminish the rights of Lessee. No such change or division in the ownership of the land, or royalties shall be binding upon Lessee for any purpose until such person acquiring any interest has furnished Lessee, at its principal place of business, with a certified copy of the instrument or instruments, constituting his chain of title from the original Lessor. An assignment of this lease, in whole or in part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder to Lessor and, if Lessee or assignee of part or parts hereof shall fail to comply with any other provisions of the lease, such default shall not affect this lease insofar as it covers a part of said lands upon which Lessee or any assignee shall comply with the provisions of the lease. In addition, Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations as to the released acreage or interest.

11.  In case of suit, adverse claim, dispute or question as to the ownership of the royalties (or some part thereof) payable under this lease, Lessee shall not be held in default in payment of such royalties (or the part thereof in dispute), until such suit, claim, dispute or question has been finally disposed of, and Lessee shall have thirty (30) days after being furnished with a certified copy of the instrument or instruments disposing of such suit, claim or dispute, or after being furnished with proof sufficient, in Lessee's opinion, to settle such question, within which to make payment. Should the right or interest of Lessee hereunder be disputed by Lessor, or any other person, the time covered by the pendency of such dispute shall not be counted against Lessee either as affecting the term of the lease or for any other purpose, and Lessee may suspend all payments without interest until there is a final adjudication or other determination of such dispute.

12.  In case of cancellation or termination of this lease from any cause, Lessee shall have the right in each case, under the terms hereof, around each well producing, being worked on, or drilling hereunder, the number of acres in the form allocated to each such well under spacing and proration rules issued by the Commissioner of Conservation of the State of Louisiana, or any other State or Federal authority having control of such matters; or any unit or units formed pursuant to paragraph 7 or, in the absence of such rulings, unit or units, forty (40) acres around each such well in as near a square form as practicable, and in the event Lessor considers that operations are not being conducted in compliance with this contract, Lessee shall be notified in writing of the facts relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument.

13.  When drilling, reworking, production or other operations are delayed or interrupted by force majeure, that is, by storm, flood or other acts of God, fire, war, rebellion, insurrection, riot, strikes, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some law, order, rule, regulation, requisition or necessity of government, Federal or State, or as a result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding, but this lease shall be extended for a period of time equal to that during which Lessee is so prevented from conducting such drilling or reworking operations on, or producing oil, gas, casinghead gas, condensate or other minerals from, the premises; provided that during any period that this lease is continued in force after its primary term solely by force majeure as herein provided, Lessee shall pay to the owners of the royalty hereunder the shut-in royalty provided in paragraph 5 hereof, and in the manner therein provided, without regard to whether or not there is a producing well shut in, located on said land or on land with which the lease premises or any part thereof has been pooled.

14.  Lessee shall pay for actual damages caused by its operations to growing crops and timber on said land leased herein.

15.  Notwithstanding the death of any party Lessor, or his successor in interest, the payment or tender of all sums accruing hereunder in the manner provided above shall be binding on the heirs, executors and administrators of such person.

16.  Lessor hereby warrants and agrees to defend the title to the lands herein described, and agrees that the Lessee at its option shall have the right to redeem for Lessor, by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof. In case of payment of any such mortgage, taxes or other liens by Lessee, in addition to the right to subrogation herein granted, Lessee shall also have the right to retain any royalties which become due Lessor hereunder and to repay itself therefrom, and the retention of such royalties by Lessee shall have the same effect as if paid to the Lessor in whose behalf payment of any mortgage, taxes or other liens was made.

17.  This lease shall be binding upon all who execute it, whether or not named in the body hereof as Lessor, and without regard to whether this same instrument, or any copy thereof, shall be executed by any other Lessor named above.

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

WITNESSES:

_____

_____

LESSOR (WHETHER ONE OR MORE)

_____     _____

_____     SS No. OR TAX ID

_____

_____

_____     _____

_____     SS No. OR TAX ID

_____

_____

_____     _____

_____     SS No. OR TAX ID

_____

_____

_____     _____

_____     SS No. OR TAX ID

STATE OF _____

PARISH/ COUNTY OF _____

On this _____ day of _____, _____, before me, the undersigned authority, personally appeared _____

_____to

me known to be the person(s) described in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as their free act and deed.

My Commission expires _____.

_____

NOTARY PUBLIC in and for

STATE OF _____

PARISH/ COUNTY OF _____

Before me, the undersigned authority, personally came and appeared _____ who being first duly sworn deposes and says that he/she

was one of the subscribing witnesses to the execution of the foregoing instrument by _____

, who signed the same in his/her presence and that of  the other subscribing witness(es) to such signature(s) whose name(s) (signatures) are affixed as such, and that he/she now recognizes all said signatures to be true and genuine.

_____

Subscribing Witness

Sworn to and subscribed before me, notary, on this _____ day of _____, _____.

My Commission expires_____.

_____

NOTARY PUBLIC in and for


COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

# EXHIBIT "C"

Attached to and made a part of the Operating Agreement dated August 15, 2007, between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., Tensas Delta Exploration Company, LLC, and McCombs Energy, L.L.C., as Non-Operators, covering Section 33, Township 18 North, Range 6 West, Bienville Parish, Louisiana.

# ACCOUNTING PROCEDURE

# JOINT OPERATIONS

## I. GENERAL PROVISIONS

**1.    Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

**2.    Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3.    Advances and Payments by Non-Operators**

A.    Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B.    Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at __CHASE BANK NA, or successors__ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4.    Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

**5.   Audits**

A.   A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B.   The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

**6.   Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II.  DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

**1.   Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

**2.   Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

**3.   Labor**

A.   (1)   Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2)   Salaries of First level Supervisors in the field.

(3)   Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4)   Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation or the Joint Property if such charges are excluded from the overhead rates.

B.   Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D.   Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

**4.   Employee Benefits**

Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

1  5.    **Material**
2
3        Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV.   Only such
4        Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is
5        reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be
6        avoided.
7
8  6.    **Transportation**
9
10       Transportation of employees and Material necessary for the Joint Operations / ~~but subject to the following limitations:~~ **shall be charged at actual cost incurred by Operator.**
11
12       ~~A.    If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be~~
13       ~~made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like~~
14       ~~material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.~~
15
16       ~~B.    If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint~~
17       ~~Account for a distance greater than the distance to the nearest reliable supply store where like material is normally~~
18       ~~available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be~~
19       ~~made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the~~
20       ~~Parties.~~
21
22       ~~C.    In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is~~
23       ~~available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the~~
24       ~~amount most recently recommended by the Council of Petroleum Accountants Societies.~~
25
26  7.   **Services**
27
28       The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph
29       10 of Section II and Paragraph i, ii, and iii, of Section III.   The cost of professional consultant services and contract
30       services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead
31       rates.  The cost of professional consultant services or contract services of technical personnel not directly engaged on the
32       Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.
33
34  8.   **Equipment and Facilities Furnished By Operator**
35
36       A.    Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate
37             with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating
38             expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to
39             exceed __fifteen_____ percent (____15____%) per annum. Such rates shall not exceed average commercial
40             rates currently prevailing in the immediate area of the Joint Property.
41
42       B.    In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the
43             immediate area of the Joint Property less 20%.   For automotive equipment, Operator may elect to use rates
44             published by the Petroleum Motor Transport Association.
45
46  9.   **Damages and Losses to Joint Property**
47
48       All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or
49       losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross
50       negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as
51       soon as practicable after a report thereof has been received by Operator.
52
53  10.  **Legal Expense**
54
55       Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and
56       amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to
57       protect or recover the Joint Property, ~~except that no charge for services of Operator's legal staff or fees or expense of~~
58       ~~outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be~~
59       ~~covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section~~
60       ~~I, Paragraph 3.~~ **and the costs and expenses incurred in connection with hearings and other matters before governmental bodies and agencies and costs and expenses incurred in examining and curing title.**
61
62  11.  **Taxes**
63
64       All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof,
65       or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad
66       valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then
67       notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties
68       hereto in accordance with the tax value generated by each party's working interest.
69
70

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

12. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13. **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14. **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property.   In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

1. **Overhead - Drilling and Producing Operations**

    i.   As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

        ( x ) Fixed Rate Basis, Paragraph 1A, or
        (    ) Percentage Basis, Paragraph 1B

        Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II.   The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

    ii.  The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

        (    ) shall be covered by the overhead rates, or
        ( x ) shall not be covered by the overhead rates.

    iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

        (    ) shall be covered by the overhead rates, or
        ( x ) shall not be covered by the overhead rates.

    A.   Overhead - Fixed Rate Basis   **See ADDITIONAL REVISIONS page 9.**

        (1)   Operator shall charge the Joint Account at the following rates per well per month:

            Drilling Well Rate $_____7,000.00_____
                (Prorated for less than a full month)

            Producing Well Rate $____700.00_____

        (2)   Application of Overhead - Fixed Rate Basis shall be as follows:

            (a)   Drilling Well Rate

                (1)   Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2)    Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b)    Producing Well Rates

(1)    An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2)    Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3)    An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4)    A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5)    All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3)    The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached.    The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B.    Overhead - Percentage Basis

(1)    Operator shall charge the Joint Account at the following rates:

(a)    Development

_____ Percent (_____ %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b)    Operating

_____ Percent (_____ %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2)    Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph IB of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2.    **Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

Account for overhead based on the following rates for any Major Construction project in excess of $  25,000.00                    :

A.     5     % of first $100,000 or total cost if less, plus

B.     4     % of costs in excess of $100,000 but less than $1,000,000, plus

C.     3     % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3.   **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A.     5     % of total costs through $100,000; plus

B.     4     % of total costs in excess of $100,000 but less than $1,000,000; plus

C.     3     % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4.   **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

IV.   **PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS**

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1.   **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2.   **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.   New Material (Condition A)

(1)   Tubular Goods Other than Line Pipe

(a)   Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at / Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio. ^cost.

(b)   For grades which are special to one mill only, prices shall be computed at / the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 ^cost.

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

~~pound Oil Field Haulers Association interstate truck rate shall be used.~~

(c) Special end finish tubular goods shall be priced at / **cost.** ~~the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.~~

(d) Macaroni tubing (size less than 2 3/8 inch OD) shall be priced / **cost.** ~~at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.~~

(2) Line Pipe

(a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced / **at cost.** ~~under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.~~

(b) Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at / **cost.** ~~Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.~~

(c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced / **at cost.** ~~f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.~~

(d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at / **cost.** ~~quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.~~

(3) Other Material shall be priced at / **cost.** ~~the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.~~

(4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at / **cost.** ~~the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.~~ Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

At ~~seventy-five percent (75%) of~~ current / **market value.** ~~new price, as determined by Paragraph A.~~

(2) Material used on and moved from the Joint Property

(a) At ~~seventy-five percent (75%) of~~ current / **market value.** ~~new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or~~

(b) At ~~sixty-five percent (65%) of~~ current / **market value.** ~~new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material~~

(3) Material not used on and moved from the Joint Property

At ~~seventy-five percent (75%) of~~ current / **market value.** ~~new price as determined by Paragraph A.~~

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at / **current market value.** ~~fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.~~

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

(2)   Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)   Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight.  Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)   Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)   Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.   Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.   Pricing Conditions

(1)   Loading or unloading costs may be charged to the Joint Account at / ~~the rate of twenty-five cents (25¢)~~ **actual costs incurred by Operator** ~~per hundred weight~~ on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)   Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.   **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use **and acceptable to Operator. provided however, if a Non-Operator elects to furnish material in kind, such material must (a) meet the quality specifications set by Operator, and (b) be inspected by Operator with inspection costs to be billed to the Joint Account.**

4.   **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished.  In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

**V. INVENTORIES**

The Operator shall maintain detailed records of Controllable Material.

1.   **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.   **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of  a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

- 8 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.   **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.   In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.   **Expense of Conducting Inventories**

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

**ADDITIIONAL REVISIONS**
(1)   In the event the subject well is expected to be above the State threshold for H2S sour gas operations, the Drilling Well rate set forth in Art. III.1.A(I) will be increased by $2000.00 per month and the associated Producing Well Overhead Rate will be increased an additional $100.00 per month.

## EXHIBIT "D"

This Exhibit "D" is attached to and made a part of that Operating Agreement dated August 15, 2007, by and between Sklar Exploration Company L.L.C, as Operator, and Sklarco L.L.C., Tensas Delta Exploration Company, LLC, and McCombs Energy, L.L.C., as Non-Operators.

## INSURANCE

Operator shall carry the following insurance with the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of insurance will be provided upon request.

I.   WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

    A.   Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

    B.   Extension of Coverage B of policy to provide for not less than $500,000 for death or injury to one person in any one accident.

II   COMPREHENSIVE GENERAL LIABILITY

Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $2,000,000 for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III   AUTOMOBILE LIABILITY

Coverage shall include owned, non-owned and hired vehicles. Limit $500,000 combined single limit each occurrence for bodily injury and property damage.

IV   EXCESS LIABILITY

Operator shall carry excess liability insurance in an amount necessary to provide a total of $10,000,000 coverage for both Automobile Liability and Comprehensive General Liability.

Any party, at its own expense, may carry its own coverage for Excess Liability Insurance with limits as set forth in this Section IV. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

V.   EXTRA EXPENSE LIABILITY

Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $25,000 per occurrence.

Liability Limit: $5,000,000

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to necessary arising out of operations hereunder. Further, any party, at its own expense, may carry its own coverage for Extra Expense Liability Insurance with limits as set forth in this Section V. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

**EXHIBIT "E"**

This Exhibit "E" is attached to and made a part of that Operating Agreement dated August 15, 2007, by and between Sklar Exploration Company L.L.C, as Operator, and Sklarco L.L.C., Tensas Delta Exploration Company, LLC and McCombs Energy, L.L.C., as Non-Operators.

GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement, the parties hereto own and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area described in the Operating Agreement (the "JOA").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the gas produced from said JOA. However, one or more of the parties may be unable to take or market its interest in the gas production from time to time; therefore, to permit any party to produce and dispose of its interest in the gas production from the JOA with as much flexibility as possible, the parties hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser. Any party whose share of gas is not marketed shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ration of its participation percentage under this Operating Agreement to the participating percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, it any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Operator will, in turn, make settlement for all royalties and overriding royalties which are payable on gas produced from the Contract Area. In the event that the total royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Contract Area, then any such deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Contract Area shall furnish the Operator with division order title opinions on which Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser shall pay, or cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the volume of gas actually taken for its account.

ˇ1ˇ

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold, less applicable production taxes and royalties theretofore paid, less any reasonable dehydration, compression, treating, processing, gathering or transportation costs actually incurred, including amortized capital costs associated with the design, construction or operation of any plants to dehydrate, compress, treat or process gas, in connection with the sale of the overproduction, at the price and based on the proceeds actually received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party). Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

## WEST ARCADIA PROSPECT
## SECTION 33, TOWNSHIP 19 NORTH, RANGE 6 WEST
## CLAIBORNE PARISH, LOUISIANA

OPERATING AGREEMENT

DATED

_____ **May 1** _____ , __ **2009** __ ,
*Year*

OPERATOR   **SKLAR EXPLORATION COMPANY L.L.C.** _____

CONTRACT AREA   **As shown on Exhibit "A" to this Agreement.** _____

_____

_____

~~COUNTY OR~~ PARISH OF   **CLAIBORNE** _____   STATE OF   **LOUISIANA** _____

COPYRIGHT 1982 – ALL RIGHTS RESERVED AMERICAN
ASSOCIATION OF PETROLEUM LANDMEN, 4100 FOSSIL CREEK
BLVD., FORT WORTH, TEXAS, 76137-2791, APPROVED FORM.
A.A.P.L.    NO.    610    –    1982    REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**TABLE OF CONTENTS**

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. All Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___SKLAR EXPLORATION COMPANY L.L.C._____

__401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101_____, hereinafter designated and
referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein
as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in
Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the
production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons
and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land
lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the
Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be
developed and operated for oil and gas purposes under this agreement.  Such lands, oil and gas leasehold interests and oil and gas interests
are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or
federal body having authority.  If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-
ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.
                                                                                                              for 100% of
G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay / its share of the cost of
any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate
      for 100% of its share of
in- / a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the
singular, and the neuter gender includes the masculine and the feminine.

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑ A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.
☑ B. Exhibit "B", Form of Lease.
☑ C. Exhibit "C", Accounting Procedure.
☑ D. Exhibit "D", Insurance.
☑ E. Exhibit "E", Gas Balancing Agreement.
☐ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit "G", Tax Partnership.

If any provision of any exhibit, except Exhibits "E" and "G",  is inconsistent with any provision contained in the body
of this agreement, the provisions in the body of this agreement shall prevail.

**ARTICLE III.**
**INTERESTS OF PARTIES**

**A.   Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

**B.   Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred  in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A".  In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____**all jointly owned lease burdens**_____ which shall be borne as hereinafter set forth.

~~Each of the Parties hereto shall pay or deliver or cause to be paid or delivered its proportionate part of the royalties and overriding~~ ~~Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and~~ ~~royalties and other leasehold burdens as described in the attached Exhibit "A" and shall hold the other Parties free from any liability~~ ~~payable, each party entitled to receive a share or production of oil and gas from the Contract Area shall bear and shall pay or deliver, or~~ ~~therefor.  If the interest of any Party in any oil and gas lease covered by this agreement is subject to any additional royalty,~~ ~~overriding royalty, production payment or other charges over and above those as shown on Exhibit "A", such Party shall assume~~ ~~and alone bear all such obligations and they shall account for or cause to be accounted for such interests to the owners thereof,~~ ~~cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the~~ ~~other parties free from any liability therefor.~~  No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C.   Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, which is not a joint obligation of the parties overriding royalty, production payment or other burden on production / ~~in excess of the amount stipulated in Article III.B.~~, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D.   Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.   If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.   If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

**ARTICLE IV.**
**TITLES**

**A.   Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be includ-ed, in the drilling unit around such well.  The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases.  At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge.  All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator.  Operator shall cause title to be examined by attorneys on its staff or by outside attorneys.  Copies of all title opinions shall be furnished to each party hereto.  The cost incurred by Operator in this title program shall be borne as follows:

~~☐   Option No. 1:   Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental,~~ ~~shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C",~~ ~~and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.~~

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE IV
### continued

☑ Option No. 2:  Costs incurred by Operator in procuring abstracts / and fees paid outside attorneys /  for title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) / shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A".  Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

~~Each party shall be responsible for securing~~ / curative matter and pooling amendments or agreements required in connection ~~with leases or oil and gas interests /contributed by such party.~~  Operator shall use its best efforts to secure, subject to this agreement, and charge these fees to the joint account  Operator shall be responsible for the preparation and recording of pooling designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.  This shall not prevent any party from appearing on its own behalf at any such hearing.

No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by / ~~all of the parties who are to par-~~ Operator. ~~ticipate in the drilling of the well.~~

~~B.   Loss of Title:~~

~~1.  Failure of Title:  Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interests: and,~~

~~(a)  The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

~~(b)  There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the interest lost;~~

~~(c)  If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well;~~

~~(d)  Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;~~

~~(e)  Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,~~

~~(f)  No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in connection therewith.~~

~~2.  Loss by Non-Payment or Erroneous Payment of Amount Due:  If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against the party who failed to make such payment.  Unless the party who failed to make the required payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the lease or interest which has terminated.  In the event the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~

~~(a)  Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis, up to the amount of unrecovered costs;~~

~~(b)  Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,~~

~~(c)  Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

3.  Other Losses:  All losses incurred, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses and shall be borne by all parties in proportion to their interests.  There shall be no readjustment of interests in the remaining portion of the Contract Area.

*curative matters and material  
**landmen and consultants        ***and for applications and hearings

**ARTICLE V.**

**OPERATOR**

**A. Designation and Responsibilities of Operator:**

                **SKLAR EXPLORATION COMPANY, L.L.C. of Shreveport, Louisiana**                         shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

**B. Resignation or Removal of Operator and Selection of Successor:**

    1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, / or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator. * this condition shall not apply to Sklar Exploration Company, L.L.C. or any other designated operator who owns no interest in the Contract Area by virtue of the fact that it is solely an operating company.

    2. Selection of Successor Operator: Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed ~~fails to vote or votes only to succeed itself~~, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

**C. Employees:**

    The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

**D. Drilling Contracts:**

    All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. / If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area ~~and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced~~, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. **except that in Operator's sole discretion all factors, such as rig availability, equipment condition, contractor employee reliability and knowledge, and drilling contractor reputation shall be taken into consideration in determining the real competitive price such that the lowest price bid may not provide the overall best value in the Drilling Parties to accomplish the drilling operations.**

**ARTICLE VI.**

**DRILLING AND DEVELOPMENT**

**A. Initial Well:**

    On or before the 15ᵗʰ day of __July__ , (year) 2009 , Operator shall commence the drilling of a well for oil and gas at the following location: 564 feet from the East line and 1,372 feet from the South line of Section 33, T19N, R6W, Claiborne Parish, Louisiana

and shall thereafter continue the drilling of the well with due diligence to a depth of 8,500 feet.

~~unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.~~

    Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which

- 4 -

event Operator shall be required to test only the formation or formations to which this agreement may apply.

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

**B.  Subsequent Operations:**

1.  Proposed Operations:  Should any party hereto desire to drill any well / on the Contract Area other than the well provided for in Article VI.A., or to rework, / deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation.  The parties receiving such a notice shall have/ ~~thirty (30)~~ days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation.  If a drilling rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to / ~~forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays.~~  Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.  Any notice or response given by telephone shall be promptly confirmed in writing.

*any well includes water source or injection wells* (above line 10, after "well")
*reenter, recomplete, sidetrack* (line 11)
*fifteen (15)* (line 14)
*twenty-four (24) hours* (line 16)

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of / ~~thirty (30)~~ days (or as promptly as possible after the expiration of the / ~~forty-eight (48)~~ hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all parties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance.  Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance with the provisions hereof as if no prior proposal had been made.

*fifteen (15)* (line 24)
*twenty-four (24)* (line 24)

2.  Operations by Less than All Parties:  If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of the notice period of / ~~thirty (30)~~ days (or as promptly as possible after the expiration of the / ~~forty-eight (48)~~ hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence.  Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work.  Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

*fifteen (15)* (line 39)
*twenty-four (24)* (line 39)

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties  approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed.  Each Consenting Party, within / ~~forty-eight (48) hours~~ ~~(exclusive of Saturday, Sunday and legal holidays)~~ after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry / its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a).  In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of / ~~forty-eight (48) hours~~ ~~(inclusive of Saturday, Sunday and legal holidays)~~.  The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

*twenty-four (24)* (line 51)
*all of* (line 52)
*twenty-four (24)* (line 54)

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph.  Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.  If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense.  If any well drilled, reworked, / deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

*recompleted, sidetracked,* (line 64)

-5-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1 and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2 ties. Upon commencement of operations for the drilling, reworking, ~~recompleting,~~ deepening or plugging back of any such well by Consenting Parties
3 in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4 and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5 Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6 market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7 terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8 until it reverts) shall equal the total of the following:
9
10
11       500%
12      (a) / ~~100%~~ of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13 connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
14 Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15 Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16 Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17 Party had it participated in the well from the beginning of the operations; and
18
19
20 r                                                             recompleting, sidetracking,
21      (b) _____ 500 ___ % of that portion of the costs and expenses of drilling, reworking, / deepening, plugging back, testing and completing,
22 after deducting any cash contributions received under Article VIII.C., and ____ 500 ___ % of that portion of the cost of newly acquired equip-
23 ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24 participated therein.
25
26
27                                               or the completing, recompleting or reworking of a well,
28      An election not to participate in the drilling of the deepening of a well, / shall be deemed an election not to participate in any re-
29 working / or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30 conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31 reworking / or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
32 and there shall be added to the sums to be recouped by the Consenting Parties- ~~one~~ hundred percent (~~100%~~ 400%) of that portion of the costs of
33 the reworking / or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
34 such a reworking / or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35 plicable as between said Consenting Parties in said well.
36
37
38
39      During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40 proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41 taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42 ticle III.D.
43
44
45               recompleting, sidetracking,
46      In the case of any reworking, / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47 of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48 abandonment of a well after such reworking, / plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49 ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.
50
51
52
53      Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54 Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55 itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56 option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57 ings. Each / ~~month~~ thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
58 operations for the Consenting Parties shall furnish the Non-Consenting Party with an itemized statement of all costs and liabilities in-
59 curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
60 realized from the sale of the well's working interest production during the preceding / ~~month~~. In determining the quantity of oil and gas
61 produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62 well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63 which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64 of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65 above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.
66
67
68
69
70

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1   If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2   the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3   Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production
4   therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, $^{recompleting, sidetracking,}$ deepening or plugging
5   back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6   the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

7

8

9

10   Notwithstanding the provisions of this Article VI.B.2., / it is agreed that without the mutual consent of all parties, no wells shall
11   be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
12   well conforms to the then-existing well spacing pattern for such source of supply.; provided that an exceptional well location that is
13   approved by the Louisiana Office of Conservation shall be deemed to conform to the then-existing spacing pattern.
     * and subject to the right of any party to non-consent the proposed operation

14

15

16   The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.
17   except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, $^{recompleting, sidetracking,}$ deepening and plugging back of such initial well
18   after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-
19   duction, ceases to produce in paying quantities.

20

21

22

23   3. <u>Stand-By Time:</u>  When a well which has been drilled or deepened has reached its authorized depth and all tests have been
24   completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
25   reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
26   ing operation just completed.  Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
27   first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
28   matical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently
29   withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
30   each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
31   ties.

32

33

34

35   4. <u>Sidetracking:</u>  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
36   also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
37   location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
38   mechanical difficulties.  Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
39   affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
40   to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

41

42

43

44   (a)  If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
45   the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

46

47

48

49   (b)  If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
50   salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
51   provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

52

53

54

55   In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
56   shall be limited to / $^{twenty-four (24)}$ forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and
57   receive up to eight (8) additional days after expiration of the / $^{twenty-four (24)}$ forty-eight (48) hours within which to respond by paying for all stand-by time
58   incurred during such extended response period.  If more than one party elects to take such additional time to respond to the notice, stand
59   by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
60   ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.  In all other in-
61   stances the response period to a proposal for sidetracking shall be limited to / $^{fifteen (15)}$ thirty (30) days.

62

63

64

65   **C. TAKING PRODUCTION IN KIND:**

66

67   Each party shall / $^{have the right to}$ take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
68   exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for
69   marketing purposes and production unavoidably lost.  Any extra expenditure incurred in the taking in kind or separate disposition by any
70   party of its proportionate share of the production shall be borne by such party.  Any party taking its share of production in kind shall be

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1   required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3       Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4   the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5   its share of all production.

6

7       In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8   the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9   the obligation, to purchase such oil or sell it to others / at any time and from time to time, for the account of the non-taking party~~at the~~
10  ~~best price obtainable in the area for such production~~. Any such purchase or sale by Operator shall be subject always to the right of the
11  owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously
12  delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of
13  time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14  of one (1) year.
15  <sup>*</sup>on the same terms and basis as Operator is marketing Operator's and other Non-Operators' share of production

16      In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or
17  deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18  be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19  agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

20

21  D.   **Access to Contract Area and Information:**

22

23      Each / party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
    *(consenting)*
24  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
    *(consenting)*
25  and records relating thereto. Operator, upon request, shall furnish each of the other / parties with copies of all forms or reports filed with
26  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29  quests the Information.

30

31  E.   **Abandonment of Wells:**

32

33      1.   Abandonment of Dry Holes:   Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35  without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
    *(twenty-four (24) hours)*
36  within / ~~forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays)~~ after receipt of notice of the proposal to plug and abandon
37  such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39  such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40  operations in search of oil and/or gas subject to the provisions of Article VI.B.

41

42      2.   Abandonment of Wells that have Produced:   Except for any well in which a Non-Consent operation has been conducted
43  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44  producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
45  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
46  thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
47  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign
50  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52  terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
53  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
continued

1 "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2 assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3 Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4 interests in the remaining portion of the Contract Area.

5

6    Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7 the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8 quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9 templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10 well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11 repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12 visions hereof.

13

14    3.  Abandonment of Non-Consent Operations:  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15 Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16 permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17 of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18 VI.E.

19

20                                     ARTICLE VII.
21                       EXPENDITURES AND LIABILITY OF PARTIES

22

23  A.  Liability of Parties:

24

25    The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26 shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27 among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28 shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

29

30  B.  Liens and Payment Defaults:

31

32    Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33 of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34 at the rate provided in Exhibit "C".  To the extent that Operator has a security interest under the Uniform Commercial Code of the
35 state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code.  The bringing of a suit and the ob-
36 taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37 rights or security interest as security for the payment thereof.  In addition, upon default by any Non-Operator in the payment of its share
38 of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39 the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid.  Each
40 purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default.  Operator grants a like lien
41 and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

42

43    If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
44 Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
                                                                                                          be entitled to
45 the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall~/ to obtain
46 recover the amount it paid plus five hundred percent (500%) of the amount out of the proceeds from the sale of the defaulting
   party's share of oil and for gas, and , to secure payment thereof, be subrogated to the security rights described in the foregoing
   reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph. Notwithstanding anything
47 contained to the contrary in this paragraph, all parties agree that this provision shall not apply to any operation requiring an APE
48 unless Operator has advance billed all parties and such parties have paid their proportionate share of said costs in accordance with
   other provisions of this agreement.

49  C.  Payments and Accounting:

50

51    Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
52 and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
53 tionate shares upon the expense basis provided in Exhibit "C".  Operator shall keep an accurate record of the joint account hereunder,
54 showing expenses incurred and charges and credits made and received.

55

56    Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
57 of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
58 month, which right may be exercised only by submission to each such party of an itemized statement of such expense, together
59 with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
60 on or before the 20th day of the next preceding month.  Each party shall pay to Operator its proportionate share of such estimate within
61 fifteen (15) days after such estimate and invoice is received.  If any party fails to pay its share of said estimate within said time, the amount
62 due shall bear interest as provided in Exhibit "C" until paid.  Proper adjustment shall be made monthly between advances and actual ex-
63 pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

64

65  D.  Limitation of Expenditures:

66

67    1. Drill or Deepen:  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
68 pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the drilling or deepening shall include:

69

70

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

1  ☑  *Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2  necessary tankage and/or surface facilities.  *This Option No. 1 shall apply only to water source and/or water injection wells.

3

4  ☑  **Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well.  When such well has reached its
5  authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
   twenty-four (24)
6  to the Non-Operators who have the right to participate in the completion costs.  The parties receiving such notice shall have / forty-eight
7  (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8  tempt.  Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9  cluding necessary tankage and/or surface facilities.  Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt.  If one or more, but less than all of the parties,
   recompleting, sidetracking,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, / deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties.  **This Option No. 2 shall cover all wells except those expressly covered by Option No. 1 above.

14

15     2. Rework or Plug Back:  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.

19
                                 *one or more Parties owning a majority interest
20     3. Other Operations:  Without the consent of / all parties, Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of _____Twenty-five Thousand and No/100_____ Dollars ($_____25,000.00_____ )
22 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties.  If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of _____Twenty-five Thousand and No/100_____
28 Dollars ($_____25,000.00_____ ) but less than the amount first set forth above in this paragraph.

29

30 E.  Rentals, Shut-in Well Payments and Minimum Royalties:

31

32     Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense.  In the event two or more parties own and have con-
34 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35 behalf of all such parties.  Any party may request, and shall be entitled to receive, proper evidence of all such payments.  In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B./2.

39

40     Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so.  In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

45

46 F.  Taxes:

47

48     Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent.  Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator.  If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion.  If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest.  Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".

59

60     If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination.  During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty.  When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".

66

67     Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
68 to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

69
70

- 10 -

ARTICLE VII
continued

1  G.  Insurance:
2
3      At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4  the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5  pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C".  Operator shall
6  also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7  hereof.  Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8  law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.
9
10      In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11  parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.
12
13                                    ARTICLE VIII.
14              ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST
15
16  A.  Surrender of Leases:
17
18      The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19  or in part unless all parties consent thereto.
20
21      However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22  agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23  such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24  thereafter secured, to the parties not consenting to such surrender.  If the interest of the assigning party is or includes an oil and gas in-
25  terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26  such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27  lease to be on the form attached hereto as Exhibit "B".  Upon such assignment or lease, the assigning party shall be relieved from all
28  obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29  attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30  duction other than the royalties retained in any lease made under the terms of this Article.  The party assignee or lessee shall pay to the
31  party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32  ed acreage.  The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33  salvaging and the estimated cost of plugging and abandoning.  If the assignment or lease is in favor of more than one party, the interest
34  shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.
35
36      Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39  agreement.
40
41  B.  Renewal or Extension of Leases:
42
43      If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44  shall have the right for a period of thirty-/ (3015) days following receipt of such notice in which to elect to participate in the ownership of the
45  renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46  portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47  interests held at that time by the parties in the Contract Area.
48
49      If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50  who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51  to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52  Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.
53
54      Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55  by the acquiring party.
56
57      The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58  or cover only a portion of its area or an interest therein.  Any renewal lease taken before the expiration of its predecessor lease, or taken or
59  contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
60  tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61  the provisions of this agreement.
62
63      The provisions in this Article shall also be applicable to extensions of oil and gas leases.
64
65  C.  Acreage or Cash Contributions:
66
67      While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69  applied by it against the cost of such drilling or other operation.  If the contribution be in the form of acreage, the party to whom the con-
70  tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

- 11 -

## ARTICLE VIII
### continued

1  said Drilling Parties shared the cost of drilling the well.  Such acreage shall become a separate Contract Area and, to the extent possible, be
2  governed by provisions identical to this agreement.  Each party shall promptly notify all other parties of any acreage or cash contributions
3  it may obtain in support of any well or any other operation on the Contract Area.  The above provisions shall also be applicable to op-
4  tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.
5
6      If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7  consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8
9  **D.   Maintenance of Uniform Interests:**
10
11      ~~For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no~~
12  ~~party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,~~
13  ~~equipment and production unless such disposition covers either:~~
14
15  ~~1.   the entire interest of the party in all leases and equipment and production; or~~
16
17  ~~2.   an equal undivided interest in all leases and equipment and production in the Contract Area.~~
18
19      Every ~~such sale,~~ encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20  and shall be made without prejudice to the right of the other parties.  Any added expenditures required as a result of a partial
21  disposition, including marketing or metering of production, shall be borne solely by the party transferee.
22      If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23  require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24  and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25  party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26  into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27  Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.
28
29  **E.   Waiver of Rights to Partition:**
30
31      If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32  undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33  interest therein.
34
35  ~~F.   Preferential Right to Purchase:~~
36
37  ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38  ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39  ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40  ~~of the offer.  The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41  ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42  ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43  ~~ties.  However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44  ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45  ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~
46
47                              **ARTICLE IX.**
48                      **INTERNAL REVENUE CODE ELECTION**
49
50      This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51  for profit between or among the parties hereto.  Notwithstanding any provision herein that the rights and liabilities hereunder are several
52  and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53  purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54  from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1986, as per-
55  mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder.  Operator is authorized and directed to ex-
56  ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57  United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58  and the data required by Federal Regulations 1.761.  Should there be any requirement that each party hereby affected give further
59  evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60  Federal Internal Revenue Service or as may be necessary to evidence this election.  No such party shall give any notices or take any other
61  action inconsistent with the election made hereby.  If any present or future income tax laws of the state or states in which the Contract
62  Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63  Subtitle "A", of the Internal Revenue Code of 1986, under which an election similar to that provided by Section 761 of the Code is per-
64  mitted, each party hereby affected shall make such election as may be permitted or required by such laws.  In making the foregoing elec-
65  tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66  computation of partnership taxable income.
67
68
69
70

- 12 -

**ARTICLE X.**

**CLAIMS AND LAWSUITS**

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____ Ten Thousand and No/100 _____ Dollars ($_____ 10,000.00 _____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder. All claims or suits involving title to any interest subject to this Agreement shall be treated as a claim or suit against all parties hereto.

**ARTICLE XI.**

**FORCE MAJEURE**

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

**ARTICLE XII.**

**NOTICES**

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

**ARTICLE XIII.**

**TERM OF AGREEMENT**

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☑   Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☐   Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

## ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

**A.   Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B.   Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____Louisiana_____ shall govern.

**C.   Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of ~~the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and~~ any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to any said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

## ARTICLE XV.
### OTHER PROVISIONS

**(See attached pages 14-1 through 14-4)**

- 14 -

## ARTICLE XV.

## OTHER PROVISIONS

### A.  PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

1)  an election to perform additional logging, coring or testing;
2)  an election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;

3)  an election to plug back and attempt to complete the well in a shallower depth or formation;
4)  an election to deepen the well;
5)  an election to sidetrack the well;
6)  an election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;

7)  an election to temporarily abandon the well;
8)  an election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of a majority of the consenting parties in possessory, cost-bearing interest (and not in number), a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth.  In such event, the operation, which, in the opinion of a majority of the consenting parties in possessory, cost bearing interest (and not in number) is less likely to jeopardize the well, will be given priority.  Should the consenting parties be equally divided in their opinion, then the opinion of the Operator shall prevail.  It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests.  For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

### B.  HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

### C.  DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties.  If the parties are equally divided, the opinion of the Operator will prevail.

### D.  ADVANCEMENT OF COSTS

Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s)  in advance of its respective share of (i) the dry hole cost for the initial well to be drilled under Article VI A, (ii) the dry hole cost for any other well to be drilled hereunder to which such Non-Operator has consented, and (iii) the cost of any completion, reworking, recompletion, sidetracking, deepening or plugging back operation to which such Non-Operator has consented (any such operation under clause (i), (ii), or (iii) being herein called a "Drilling Operation").  Such request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Drilling Operation. The amount of each Non-Operator's advance payment shall be based upon the latest AFE for such operation.  Such advanced payments shall be held by Operator for the account of the Non-Operators and applied, with interest, against the actual costs incurred in the applicable operation.

A Non-Operator receiving a request for advance payment shall, within two (2) days of the receipt of such request if and when a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to operator in cash the full amount of such request.  Operator shall credit the amount to the Non-Operator's account for the payment of such Non-Operator's share of costs of such Drilling operation, and following the end of each

month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement.   Advance payment by a Non-Operator of his share of completed well costs shall in no event prevent such completion of a well pursuant to Option No. 2 of Article VII.D.1. and, in the event such a Non-Operator elects not to participate in completion, the sums that such Non-Operator has advanced shall not be charged with any share of the costs of any completion attempted.

In the event a Non-Operator from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by depositing cash as aforesaid, then Operator, at his option, shall make a second written request by certified mail, return receipt requested for such advance. Non-Operator shall pay for said advance as aforesaid within two (2) business days from receipt of such second request.

If a Non-Operator fails to pay within two (2) business days of the receipt of such second request, then:

1)  If the advance payment was requested for the drilling of the initial well under Article VI A Non-Operator may, at the sole discretion and timing election of the Operator, be deemed to have relinquished all of its leasehold and contractual rights in the Contract Area retroactive to the date of default in payment, and if assignment has been made to such Non-Operator, Non-Operator shall assign all of its rights in and to the Contract area, within thirty (30) days of a request for such assignment, to those parties who have participated in such Drilling Operation, in the proportion that such parties elected to share the relinquished interest.

2)  If the advance payment was requested for any other Drilling Operation (including completion of the initial well), Non-Operator may, at the sole discretion and timing election of the Operator, be deemed non-consent in said operation retroactive to the beginning of such operation and thereafter subject to the penalty provisions of Article VI.B.2 hereof.

    If the Non-Operator fails to make such payment or furnish such security within two (2) business days of the receipt of such second request, Operator shall promptly notify all other parties still participating in such Drilling Operation of the default in payment and if and when applicable, of the relinquishment of an interest under this provision.   The parties who wish to participate in the Drilling Operation shall have five (5) days from receipt of the applicable notice to elect to assume the costs chargeable to such relinquished interest and shall share such relinquished interest in proportion to their assumption of such relinquished interest.   If the parties who wish to participate in the Drilling Operation are unwilling to assume the costs chargeable to such relinquished interest, the Drilling Operation shall be cancelled, and if the cancelled Drilling Operation involves the drilling of a test well under Article VI A no assignment shall be due as a consequence of the failure to pay.

    Notwithstanding anything to the contrary herein, if the applicable drill well or operation is unsuccessful or results in a dry hole, Operator shall have the right to sue a Non-Operator who failed to pay for its proportionate share of expenses in lieu of Operator's right to an assignment of all Non-Operator's leasehold and contractual rights within the Contract Area, or in lieu of deeming the Non-Operator Non-Consent.

## E.  NECESSARY EXPENDITURES EXCLUDE SIDETRACKING

The phrase "necessary expenditures" in Article VII.D.1. (Option No. 2) on page 10 shall not be deemed to include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

## F.  ADDITIONAL CHARGES

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Unit Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same:

Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and Expenses in connection with preparation and presentation of evidence and exhibits of Louisiana Office of Conservation hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

## G.  INDEMNITY

Except for liabilities resulting from the gross negligence or willful misconduct of the Operator, each Non-Operator Shall defend, indemnify and hold Operator harmless against any and all liability in excess of insurance coverage carried for the joint account for injury to each such Non-Operator's officers, employees and/or agents, resulting from or in any way relating to such officers, employees, and/or agents presence on a drilling rig on the Contract Area or from such person traveling by air or water between any point and such drilling rig.   Such indemnity to Operator shall also apply to any other person whose presence on the rig or transportation to or from such rig is at the request

of the indemnifying Non-Operator (except for liabilities resulting from the gross negligence or willful misconduct of the Operator).

## H.  RECOUPMENT

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

## I.  SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

## J.  NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

## K.  PIPELINE AND/OR GATHERING LINE CONSTRUCTION

If any party to this Agreement elects either to construct, operate or purchase or to join in the construction, operation or purchase of a pipeline, and/or gathering line to transport production from the Contract Area, then such party shall notify the other parties hereto furnishing all pertinent cost and information.  Each party receiving such notice shall have thirty (30) days to exercise their right in writing to participate in the construction, operation and ownership of such pipeline and/or gathering line, including the right of transporting production from the Contract Area, by agreeing to bear their proportionate share of the cost of such operation and thereafter entering into a mutually acceptable operating agreement for the operation thereof.    Otherwise, the parties consenting to participate in such operation shall be entitled to establish the terms and conditions (including any costs and fees for use or reservation of the applicable facilities) under which the non-consenting parties may use or have access to the applicable facilities.  Absent a mutually agreeable agreement for the use of said facilities by and between the consenting and non-consenting parties, the non-consenting parties shall be obligated to separately dispose of their share of all production.

## L.  DISBURSEMENT OF ROYALTIES

If Operator prepares and administers a division order for and receives and distributes the proceeds of production attributable to the interest of a Non-Operator, then Operator shall be entitled to charge that party for an appropriate monthly overhead charge for disbursing such royalty payments, in addition to the combined fixed rates specified in Exhibit "C" hereto.  If through error or inadvertence Operator shall fail to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, he shall not be liable in damages to the other Parties hereto for such failure, unless arising out of the gross negligence or willful misconduct of the Operator.

## M.  INFORMATION

Anything to the contrary hereinabove notwithstanding, it is stipulated that any non-consenting party to an operation conducted hereunder shall have no right to observe such operation or have access to information pertaining to such operation, until such time as the non-consenting party's share of the cost of such operation and the penalty therefor has been recovered by the consenting parties as provided herein.  It is understood that this Section M of Art. XV does not apply when the in the situation where the non-consenting party is a Farmor under this Agreement.

## N.  OPERATOR'S LIEN – SECURITY INTEREST

Subject to the provision of Article VII. B. of this Agreement, each non-Operator grants to Operator a lien upon all of the rights, titles, and interests of each Non-Operator, whether now existing or hereafter acquired, in and to the (1) the oil, gas, or other minerals in, on, and under the Contract Area and (2) any oil, gas, and mineral leases covering the Contract Area or any portion thereof.  In addition, each Non-Operator grants to Operator a security interest in and to all of such Non-Operator's rights, titles, interests, claims, general intangibles, proceeds, and products thereof, hether now existing or hereafter acquired, in and to (1) all oil, gas and other minerals produced from the Contract Area when produced; (2) all accounts receivable accruing or arising as a result of the sale of such oil, gas and other minerals; (3) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (4) all oil and gas wells and other surface and sub-surface equipment and facilities of any kind or character located on the

Contract Area and the cash or other proceeds received from the sale thereof (collectively, the "Personal Property Collateral"). Some of the Personal Property Collateral is or will become fixtures on the Contract Area, and the interest of Non-Operator in and to the oil, gas and other minerals when extracted from the Contract Area and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area. This Agreement (including a carbon, photographic, or other reproduction hereof) shall constitute a non-standard form financing statement under the terms of the Uniform Commercial Code of the State in which the Contract Area is located, and as such, may be filed for record in the real estate records of the county in which the Contract Area is located.   Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense, if any.

## O.  MARKETING OF PRODUCTION

Operator agrees to market all Non-Operator's share of any production from the Contract Area under the same terms that Operator is marketing its share of said production; provided, however, that contracts entered into by Operator in marketing Non-Operator's share of production shall be subject to the limitations set forth in Article VI. C. hereof. Further, Non-Operator shall be given the continuing right to participate as a signatory to any contract entered into by Operator to market production hereunder.  Notwithstanding the above, any Non-Operator may choose to separately market its proportionate share of said production by giving written notice to Operator by the 15th day of the month prior to the month in which said Non-Operator intends to separately market its production.  Conversely, if said Non-Operator again requests that Operator market its production, Non-Operator must provide written request of same by the 15th day of the month prior to the month in which Operator is again to market said Non-Operator's production.

## P.  METERING OF PRODUCTION

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

## Q.  PLUGGING AND LEASEHOLD RESTORATION FUND

At any time any well subject to this agreement is, in Operator's sole opinion, approaching the end of its economic life and/or its useful purpose, Operator may pre-bill the joint account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location.  Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and abandonment and restoration of the leasehold premises.  In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any accrued interest on such difference, based upon the then working interest percentage of such owner.  In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

## R.  SEPARATE AGREEMENT FOR NON-UNIFORM INTEREST

Any leases or interests therein (and the land covered thereby) that, pursuant to the terms of this Agreement or otherwise, become owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such leases become so owned.   Any leases or interests therein (and the lands covered thereby) that, pursuant to the terms of this Agreement or otherwise, become owned by more than one but less than all of the parties hereto or in which a party assigns, transfers or otherwise disposes of all or part of its interests shall remain subject to this Agreement as to the surviving parties; however, for all purposes, the terms of this Agreement shall apply separately to each such lease (or group of such leases in which the parties' ownership is uniform) as if it were a separate agreement covering such lease(s), with an Exhibit "A" modified to reflect the parties' interests therein, based upon the parties' ownership in such lease(s).

## S.  OBLIGATORY WELL

Notwithstanding the provisions of this agreement and particularly Article VI, if any proposed operations are necessary to maintain a Lease covered by this agreement in force or an agreement to earn a lease(s) which would otherwise expire unless such operations are conducted, then in lieu of being penalized under Article VI.B.2., each Non-Consenting Party shall assign to Consenting Parties all of such Non-Consenting Party's right, title and interest in and to the Lease(s) or portion thereof or such agreement which would be lost or not earned if such operations were not conducted.

Such assignment shall be promptly due upon commencement of said proposed operations by Consenting Parties and shall be free and clear of all overriding royalties, production payments, mortgages, liens and other burdens and encumbrances placed thereon by the assigning party or resulting from its ownership or operation of such Lease or interest which is not a joint obligation of the parties, but otherwise without warranty of title either expressed or implied.

If the assignment is in favor of more than one party, the assigned interest shall be shared by the Consenting Parties in the proportions that the interest of each bears to the interest of all Consenting Parties unless otherwise agreed to in writing.  Thereafter, such acreage covered by said assignment shall not be subject to the terms of this agreement, but shall be deemed to be subject to an agreement identical to this changed only in Exhibit "A" to indicate the Consenting Parties and their percentages of interest.  Operations that are necessary to either maintain a Lease covered by this agreement in force or to earn a lease or part thereof under an agreement which would otherwise expire unless operations are conducted, shall be defined as operations that are proposed within six (6) months of the date the Lease or agreement would otherwise expire.

## T.  PREVAILING AGREEMENT

If there is a conflict between provisions of that Exploration Agreement dated effective as of February 1, 2007, as amended, to which this form of Operating Agreement is referred in Article IV, Section 4.3 and this Operating Agreement, the provisions of the Exploration Agreement shall prevail, and shall be binding upon all parties to this Operating Agreement.

## U.  DEFAULT PENALTY/AUTOMATIC NON-CONSENT

If written notice has been given that the lien rights conferred in Article VII. B. have been implemented or enforced against any party hereto, for so long as the affected party remains in default, it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and shall not be entitled to vote its interest in any matter hereunder.  As to any proposed operation in which it otherwise would have the right to participate, such party shall not have the right to elect to participate or be a Consenting Party unless and until it pays in full the amount it is in default plus all other outstanding amounts due hereunder.  If an operation proposed during such default period commences before such payment in full, the party in default shall automatically be deemed a Non-Consenting Party to the operation.

## V.  PRIOR OPERATING AGREEMENT(S)

This operating agreement, as to the parties executing same and as to the Contract Area and Depth Restrictions, shall supersede and replace any prior operating agreement(s) covering all or any portion of the Contract Area of this operating agreement.

## W.  NON-PARTICIPATING INTERESTS

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto as same may be revised from time to time to reflect record title and/or reformation of the Contract Area.

## X. EXECUTION

This agreement shall be binding upon each Non-Operator that executes this agreement without regard to whether this same instrument, or any copy or counterpart hereof shall be executed by any other Non-Operator.

## Y. MISCELLANEOUS

Anything to the contrary herein notwithstanding, this Operating Agreement is expressly made subject to the terms and provisions of the leases and farmout agreements described in Exhibit "A" hereof.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 1st _____ day of _____ May _____ , (year) __2009__

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____, have been made to the form.~~

OPERATOR

SKLAR EXPLORATION COMPANY L.L.C.

Witness

By: David A. Barlow, Chief Operating Officer

Melissa Lambeth
Witness

NON-OPERATORS

SKLARCO L.L.C.

Witness

By: David A. Barlow, Chief Operating Officer

Melissa Lambeth
Witness

WAC EXPLORATION COMPANY, LLC

Witness

By: Scott C. Sinclair, Manager

Witness

MCCOMBS ENERGY, LTD.

Witness

By: Ricky Haikin, Vice President

Witness

- 15 -

## ACKNOWLEDGMENT

STATE OF LOUISIANA

PARISH OF CADDO

On this 7th day of May_____, 2009, before me appeared **DAVID A. BARLOW**, to me known, who being by me duly sworn, did say that he is the Vice President - Chief Operating Officer for **SKLAR EXPLORATION COMPANY L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commssion Is for Life

STATE OF LOUISIANA

PARISH OF CADDO

On this 7th day of May_____, 2009, before me appeared **DAVID A. BARLOW**, to me known, who being by me duly sworn, did say that he is the Vice President - Chief Operating Officer for **SKLARCO L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commssion Is for Life

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2008, before me appeared **SCOTT C. SINCLAIR**, to me known, who being by me duly sworn, did say that he is the Manager for **WAC EXPLORATION COMPANY, LLC**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

STATE OF TEXAS

COUNTY OF HARRIS

     On this _____ day of _____, 2008, before me appeared **RICKY HAIKIN** , to me known, who being by me duly sworn, did say that he is the Vice President of **MCCOMBS ENERGY LTD.,** a Texas limited partnership company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

     IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____

Notary Public in and for the State of Texas

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE XVI.**
**MISCELLANEOUS**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ **1ˢᵗ** _____ day of _____ **May** _____ , (year) **2009** .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____, have been made to the form.~~

O P E R A T O R

SKLAR EXPLORATION COMPANY L.L.C.

By: David A. Barlow, Chief Operating Officer

Witness

Melissa Lambeth
Witness

N O N - O P E R A T O R S

SKLARCO L.L.C.

By: David A. Barlow, Chief Operating Officer

Witness

Melissa Lambeth
Witness

WAC EXPLORATION COMPANY, LLC

By: Scott C. Sinclair, Manager President

Witness
John R. Gardner

Cynthia L. Burkette
Witness

MCCOMBS ENERGY, LTD.

Witness                          By: Ricky Haikin, Vice President

Witness

- 15 -

**ACKNOWLEDGMENT**

STATE OF LOUISIANA

PARISH OF CADDO

On this 7th day of May, 2009, before me appeared **DAVID A. BARLOW**, to me known, who being by me duly sworn, did say that he is the Vice President - Chief Operating Officer for **SKLAR EXPLORATION COMPANY L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana
Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commission Is for Life

STATE OF LOUISIANA

PARISH OF CADDO

On this 7th day of May, 2009, before me appeared **DAVID A. BARLOW**, to me known, who being by me duly sworn, did say that he is the Vice President - Chief Operating Officer for **SKLARCO L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana
Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commission Is for Life

STATE OF LOUISIANA

PARISH OF CADDO

On this 14th day of May, 2009, before me appeared **SCOTT C. SINCLAIR**, to me known, who being by me duly sworn, did say that he is the President for **WAC EXPLORATION COMPANY, LLC**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

DONNA K. HARDIN
Notary Public # 35675
Caddo Parish, Louisiana
My Commission is for Life

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

STATE OF TEXAS

COUNTY OF HARRIS

     On this _____ day of _____, 2009, before me appeared **RICKY HAIKIN** , to me known, who being by me duly sworn, did say that he is the Vice President of **MCCOMBS ENERGY LTD.,** a Texas limited partnership company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

     IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                                _____

                                              Notary Public in and for the State of Texas

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 1st _____ day of _____ May _____ , (year) __2009__ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____, have been made to the form.~~

OPERATOR

Witness _____   SKLAR EXPLORATION COMPANY L.L.C.

_____   By: David A. Barlow, Chief Operating Officer

Melissa Lamberth
Witness

NON-OPERATORS

Witness _____   SKLARCO L.L.C.

_____   By: David A. Barlow, Chief Operating Officer

Melissa Lamberth
Witness


Witness _____   WAC EXPLORATION COMPANY, LLC

_____   By: Scott C. Sinclair, Manager
Witness


Witness _____   McCOMBS ENERGY, LTD.

_____   By: Ricky Hakin, Vice President
Witness

- 15 -

## ACKNOWLEDGMENT

STATE OF LOUISIANA

PARISH OF CADDO

On this 7th day of May _____, 2009, before me appeared **DAVID A. BARLOW**, to me known, who being by me duly sworn, did say that he is the Vice President - Chief Operating Officer for **SKLAR EXPLORATION COMPANY L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public in and for the Parish of Caddo
State of Louisiana

Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commission Is for Life

STATE OF LOUISIANA

PARISH OF CADDO

On this 7th day of May _____, 2009, before me appeared **DAVID A. BARLOW**, to me known, who being by me duly sworn, did say that he is the Vice President - Chief Operating Officer for **SKLARCO L.L.C.**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public in and for the Parish of Caddo
State of Louisiana

Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commission Is for Life

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2008, before me appeared **SCOTT C. SINCLAIR**, to me known, who being by me duly sworn, did say that he is the Manager for **WAC EXPLORATION COMPANY, LLC**, a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public in and for the Parish of Caddo
State of Louisiana

STATE OF TEXAS

COUNTY OF HARRIS

On this *11* day of *May* , 2009, before me appeared **RICKY HAIKIN**, to me known, who being by me duly sworn, did say that he is the Vice President of **MCCOMBS ENERGY LTD.,** a Texas limited partnership company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

*Sharon M. McDonald*

Notary Public in and for the State of Texas

SHARON METCALF McDONALD
Notary Public, State of Texas
Commission Expires 12-29-2009

## EXHIBIT "A"

**Attached to and made a part of that certain Operating Agreement dated May 1, 2009 between SKLAR EXPLORATION COMPANY L.L.C., as Operator, and SKLARCO L.L.C., ET AL, as Non-Operators.**

(1) <u>**Identification of lands subject to this agreement:**</u>

<u>**Contract Area**</u>

**Township 19 North, Range 6 West**
**Claiborne Parish, Louisiana**
**Section 33**
**and lying within the black boundary as shown on the plat designated as Exhibit "A-2".**

(2) <u>**Restrictions, if any, as to depths, formations, or substances:**</u>

There are no restrictions except as may be provided for in any lease or contract subject to this Operating Agreement.

(3) <u>**Decimal interest and names and addresses of Parties to this Agreement:**</u>

a. The following parties own Oil, Gas and Mineral Lease Nos. 1-34 in Exhibit "A-1" in the following fractional interests:

| <u>Owners</u> | <u>Interest</u> |
|---|---|
| Sklarco L.L.C. | .33333334 |
| WAC Exploration Company, L.L.C. | .33333333 |
| McCombs Energy Ltd. | .33333333 |
| Total: | 1.00000000 |

(4) <u>**Oil and gas leases and/or oil and gas interests subject to this agreement:**</u>

See Exhibit "A-1" Description of Leases.

(5) <u>**Addresses of parties for notice purposes:**</u>

Sklar Exploration Company, L.L.C.
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Telephone: (318) 227-8668
Telecopier: (318) 227-9012

Sklarco, LLC
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Telephone: (318) 227-8668
Telecopier: (318) 227-9012

WAC Exploration Company, LLC
Attn: John R. Gardner, Land Manager
333 Texas Street, Suite 2121
Shreveport, LA 71101
Telephone: (318) 222-0026
Telecopier: (318) 429-1600

1
.

McCombs Energy, Ltd.
Attn: Larry Wynont, VP, Operations
5599 San Felipe Street, Suite 1200
Houston, Texas 77056-2721
Telephone: (713) 621-0033
Telecopier: (713) 621-1670

EXHIBIT "A-1"

**Attached to and made a part of that certain Operating Agreement dated May 1, 2009, by and between SKLAR EXPLORATION COMPANY L.L.C., as Operator, and SKLARCO L.L.C., ET AL as Non-Operators.**

## DESCRIPTION OF LEASES

1. Oil, Gas and Mineral Lease dated 4/16/2007, by and between Teddy Arthur Fincher, et ux, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426585, recorded in Book 1442, Page 59 of the Conveyance Records of Claiborne Parish, Louisiana.

2. Oil, Gas and Mineral Lease dated 4/16/2007, by and between Cleo Hornsby Bagwell, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426584, recorded in Book 1442, Page 56 of the Conveyance Records of Claiborne Parish, Louisiana.

3. Oil, Gas and Mineral Lease dated 10/2/2007, by and between Donald Wayne Corbin, et ux, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 427531, recorded in Book 1451, Page 48 of the Conveyance Records of Claiborne Parish, Louisiana.

4. Oil, Gas and Mineral Lease dated 10/10/2007, by and between Sallie P. Penix, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 427647, recorded in Book 1452, Page 10 of the Conveyance Records of Claiborne Parish, Louisiana.

5. Oil, Gas and Mineral Lease dated 4/5/2007, by and between Mary Lou Powell McCants, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426603, recorded in Book 1442, Page 90 of the Conveyance Records of Claiborne Parish, Louisiana.

6. Oil, Gas and Mineral Lease dated 4/5/2007, by and between Ina Powell Collins, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426599, recorded in Book 1442, Page 84 of the Conveyance Records of Claiborne Parish, Louisiana.

7. Oil, Gas and Mineral Lease dated 4/5/2007, by and between Mertie Lucille Powell, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426602, recorded in Book 1442, Page 88 of the Conveyance Records of Claiborne Parish, Louisiana.

8. Oil, Gas and Mineral Lease dated 4/5/2007, by and between Claudine Guthrie Powell, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426600, recorded in Book 1442, Page 86 of the Conveyance Records of Claiborne Parish, Louisiana.

9. Oil, Gas and Mineral Lease dated 4/2/2007, by and between Tony Martin Powell, et ux, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426581, recorded in Book 1442, Page 49 of the Conveyance Records of Claiborne Parish, Louisiana.

10. Oil, Gas and Mineral Lease dated 5/29/2007, by and between Robert Clayton Bond, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426608, recorded in Book 1442, Page 102 of the Conveyance Records of Claiborne Parish, Louisiana.

11. Oil, Gas and Mineral Lease dated 5/7/2007, by and between Nancy Gail Jordan Bond, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426583, recorded in Book 1442, Page 52 of the Conveyance Records of Claiborne Parish, Louisiana.

12. Oil, Gas and Mineral Lease dated 8/6/2007, by and between Kimberly Tomlinson Lay, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 427538, recorded in Book 1451, Page 97 of the Conveyance Records of Claiborne Parish, Louisiana.

13. Oil, Gas and Mineral Lease dated 1/4/2008, by and between Drew Bridges, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 428282, recorded in Book 1457, Page 126 of the Conveyance Records of Claiborne Parish, Louisiana.

14. Oil, Gas and Mineral Lease dated 6/1/2007, by and between Rodney E. Trammell, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426606, recorded in Book 1442, Page 96 of the Conveyance Records of Claiborne Parish, Louisiana.

15. Oil, Gas and Mineral Lease dated 4/16/2007, by and between Mary Frances Nelson Joyner, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426605, recorded in Book 1442, Page 94 of the Conveyance Records of Claiborne Parish, Louisiana.

16. Oil, Gas and Mineral Lease dated 4/3/2007, by and between Dorothy Ann Shaffer Cathey, et ux, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426598, recorded in Book 1442, Page 81 of the Conveyance Records of Claiborne Parish, Louisiana.

17. Oil, Gas and Mineral Lease dated 4/3/2007, by and between Lonnie Yvonne Shaffer Teutsch, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426597, recorded in Book 1442, Page 78 of the Conveyance Records of Claiborne Parish, Louisiana.

18. Oil, Gas and Mineral Lease dated 4/3/2007, by and between Donia Beth Shaffer Groff, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426586, recorded in Book 1442, Page 63 of the Conveyance Records of Claiborne Parish, Louisiana.

19. Oil, Gas and Mineral Lease dated 4/3/2007, by and between Cynthia Leigh Shaffer Barry, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426594, recorded in Book 1442, Page 69 of the Conveyance Records of Claiborne Parish, Louisiana.

20. Oil, Gas and Mineral Lease dated 4/3/2007, by and between Cheryl Lynn Shaffer Sessions, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426596, recorded in Book 1442, Page 75 of the Conveyance Records of Claiborne Parish, Louisiana.

21. Oil, Gas and Mineral Lease dated 4/3/2007, by and between James Ruffin Shaffer, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426595, recorded in Book 1442, Page 72 of the Conveyance Records of Claiborne Parish, Louisiana.

22. Oil, Gas and Mineral Lease dated 11/7/2007, by and between Therman Royce Bridges, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 428078, recorded in Book 1455, Page 63 of the Conveyance Records of Claiborne Parish, Louisiana.

23. Oil, Gas and Mineral Lease dated 11/7/2007, by and between Joyce Annette Bridges Baxley, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 428079, recorded in Book 1455, Page 69 of the Conveyance Records of Claiborne Parish, Louisiana.

24. Oil, Gas and Mineral Lease dated 11/7/2007, by and between The Bridges Family Trust, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 428077, recorded in Book 1455, Page 57 of the Conveyance Records of Claiborne Parish, Louisiana.

25. Oil, Gas and Mineral Lease dated 3/27/2007, by and between Rogers Family Trust, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 426604, recorded in Book 1442, Page 92 of the Conveyance Records of Claiborne Parish, Louisiana.

26. Oil, Gas and Mineral Lease dated 5/1/2008, by and between Jerry D. Roberson, et ux, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 430114, recorded in Book 1473, Page 26 of the Conveyance Records of Claiborne Parish, Louisiana.

27. Oil, Gas and Mineral Lease dated 6/15/2008, by and between Mary Claire Edwards and Siri Gail Richter, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 431063, recorded in Book 1480, Page 295 of the Conveyance Records of Claiborne Parish, Louisiana.

28. Oil, Gas and Mineral Lease dated 6/15/2008, by and between Siri Gail Richter, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 431063, recorded in Book 1480, Page 295 of the Conveyance Records of Claiborne Parish, Louisiana.

29. Oil, Gas and Mineral Lease dated 1/15/2009, by and between William Daryl Edwards, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 433469, recorded in Book 1503, Page 14 of the Conveyance Records of Claiborne Parish, Louisiana.

30. Oil, Gas and Mineral Lease dated 6/1/2008, by and between Ardis A. Powell, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 430698, recorded in Book 1477, Page 244 of the Conveyance Records of Claiborne Parish, Louisiana.

31. Oil, Gas and Mineral Lease dated 4/15/2008, by and between Rebecca Scruggs Wilcox, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 429999, recorded in Book 1471, Page 242 of the Conveyance Records of Claiborne Parish, Louisiana.

32. Oil, Gas and Mineral Lease dated 7/15/2008, by and between Jerry D. Burnham, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 431619, recorded in Book 1486, Page 65 of the Conveyance Records of Claiborne Parish, Louisiana.

33. Oil, Gas and Mineral Lease dated 11/11/2008, by and between Jan Wallace Briscoe, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 432753, recorded in Book 1497, Page 238 of the Conveyance Records of Claiborne Parish, Louisiana.

34. Oil, Gas and Mineral Lease dated 11/11/2008, by and between DVJ Partnership, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 432754, recorded in Book 1497, Page 242 of the Conveyance Records of Claiborne Parish, Louisiana.

35. Oil, Gas and Mineral Lease dated 3/12/2009, by and between Dorothy Ann Shaffer Cathey, et ux., as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number 433092, recorded in Book 1500, Page 164 of the Conveyance Records of Claiborne Parish, Louisiana.

36. Oil, Gas and Mineral Lease dated 3/11/2009, by and between Tony Martin Powell, as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number_____, recorded in Book ____, Page ___ of the Conveyance Records of Claiborne Parish, Louisiana.

37. Oil, Gas and Mineral Lease dated 3/11/2009, by and between Tony Martin Powell, et ux., as Lessor, and Sklarco, L.L.C., as Lessee, filed under Registry Number _____, recorded in Book ____, Page ___ of the Conveyance Records of Claiborne Parish, Louisiana.


**INSOFAR AND ONLY INSOFAR AS THE ABOVE DESCRIBED LEASES AND OIL AND GAS INTERESTS COVER ACREAGE LYING WITHIN SECTION 33, TOWNHSIP 19 NORTH, RANGE 6 WEST, CLAIBORNE PARISH, LOUISIANA.**

EXHIBIT "A-2"

Attached to and made a part of that certain Operating Agreement dated May 1, 2009, by and between SKLAR EXPLORATION COMPANY L.L.C., as Operator, and SKLARCO L.L.C., et al, as Non-Operators.



Bath Form Louisiana Spec. 14-BRI-2A-NL  Paid up R2/99

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of _____, _____, between

Lessor (whether one or more) whose address is:_____

and _____, Lessee,

whose address is _____

WITNESSETH:

1. Lessor in consideration of  One Hundred Dollars and Other Valuable Considerations ($100.00 & OVC), in hand paid, of the royalties herein provided, and of the agreement of Lessee herein contained, hereby grants, leases and lets unto Lessee, the exclusive right to enter upon and use the land hereinafter described for the exploration for and production of oil, gas, sulphur and all other minerals, together with the use of the surface of the land for all purposes incident to the exploration for and production, ownership, possession and transportation of said minerals (either from said land or acreage pooled therewith), and the right to dispose of said water, with the right of ingress and egress to and from said lands at all times for such purposes, including for operations hereunder or in connection with similar operations on adjoining land; the land to which this lease applies and which is affected hereby

being situated in _____ Parish, Louisiana, and described as follows, to-wit:

This lease shall  also extend and apply to any interest therein which Lessor may hereafter acquire, including, but not limited to, outstanding mineral rights acquired by reversion, prescription or otherwise, and includes batteries, accretions, roads, highways, easements, right-of-ways and all land, if any, contiguous or adjacent to, or adjoining the land particularly described above.  Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land.  For the purposes of determining

the amount of  bonus and the shut-in royalty payment  hereunder, said land shall be deemed to contain _____ acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof.

2. Subject to the other provisions herein contained, this lease shall be for a period of _____ years from the date hereof (called "primary term") and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner herein provided.

3. For the consideration hereinabove recited, this lease shall remain in full force and effect during the primary term, without any additional payment and without Lessee being required to conduct any operations on the land (either before or after the discovery of minerals), except to drill such wells as might be necessary to protect the land from drainage, as hereinafter provided.

4. The royalties to be paid by Lessee are:  (a) on oil, and other hydrocarbons which are produced at the well in liquid form by ordinary production methods, one-eighth of that produced and saved from said land, same to be delivered at the wells or to the credit of Lessor in the pipe line to which the wells may be connected; Lessor's interest in either case to bear its proportion of any expenses for treating the oil to make it marketable as crude; Lessee may from time to time purchase any royalty oil or other liquid hydrocarbons in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas, or other gaseous substance produced from said land and sold or used off the premises or for the extraction of gasoline or other products therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; such gas, casinghead gas, residue gas, or gas of any other nature or description whatsoever, as may be disposed of for no consideration to Lessee, either through unavoidable waste or leakage, or in order to recover oil or other liquid hydrocarbons, or returned to the ground, shall not be deemed to have been sold or used either on or off the premises within the meaning of this paragraph 4 hereof; (c) on all other  minerals mined and marketed, one-eighth, either in kind or value at the well or mine, at Lessee's election, except that on sulphur the royalty shall be one dollar ($1.00) per long ton.

5. If Lessee during or after the primary term should drill a well capable of producing gas or gaseous substances in paying quantities, (or which although previously produced Lessee is unable to continue to produce) and should Lessee be unable to produce said well because of lack of market or marketing facilities or governmental restrictions, then Lessee's rights may be maintained beyond or after the primary term without production of minerals or further drilling operations by paying Lessor as royalty a sum equal to one dollar (1.00) per acre of land covered hereby per year, the first payment being due, if said well should be completed or shut-in after the primary term, within ninety (90) days after the completion of such well or the cessation of production and such payment will extend Lessee's rights for one year from the date of such completion or cessation.  If such a well should be completed during the primary term, the first payment, if made by Lessee, shall be due within 90 days after such well is shut-in, or before the expiration date of the primary term herein fixed, whichever is the later date. Thereafter Lessee's rights may be continued from year to year by making annual payments in the amount stated on or before the anniversary date beginning with the date of completion of said well (if completed after the primary term) or the end of the primary term (if completed prior thereto) as  the case  may be;  each  of  such payments to extend Lessee's rights for one year.  The annual payments herein provided for may be deposited to Lessor's credit in the _____

_____ Bank of _____ which bank shall be and remain Lessor's agent for such purpose regardless of any change or changes in the ownership of the land or mineral rights therein.  The owners of the royalty as of the date of such payments shall be entitled thereto in proportion to their ownership of said royalty.  The provisions of this paragraph shall be recurring at all times during the life of this lease. Should any well producing gas or gaseous substances be completed on a drilling unit which includes any part of the land herein leased, the provisions of this paragraph shall be subject to all other agreements herein contained allowing the pooling of the above described lands with other lands.

6. If within ninety (90) days prior to the end of the primary term, Lessee should complete or abandon a well on the lands described above or on land pooled therewith, or if production previously secured should cease from any cause, this lease shall continue in force and effect for ninety (90) days from such completion or abandonment or cessation of production.  If at the expiration of the primary term or at the expiration of the ninety (90) day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith, but Lessee is then engaged in operations for drilling, completion or reworking thereof, or operations to achieve or restore production, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations for drilling, completion or reworking, or operations to achieve or restore production, with no cessation between operations of more than ninety (90) consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith.  If sulphur be encountered on said premises or on land pooled therewith, this lease shall continue in force and effect so long as Lessee is engaged with due diligence in explorations for and/or erecting a plant for the production of sulphur and thereafter subject to the foregoing provisions hereof so long as oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith.

7. Lessee is hereby granted the right as to all or any part of the land described herein, without Lessor's joinder, to combine, pool or unitize the acreage royalty or mineral interest covered by this lease, or any portion thereof, at any time during the life of this lease, with any other land, lease or leases, royalty or mineral interests in or under any other tract or tracts of land in the vicinity thereof, whether owned by Lessee or some other person, or corporation so as to create, by the combination of such lands and leases, one or more operating units, as to any and all mineral horizons, provided that no one operating unit shall, in the case of gas, including condensate, embrace more than six hundred forty (640) acres, and in the case of oil, including casinghead gas, embrace more than eighty (80) acres; and provided further, however, that if any spacing or other rules and regulations of the State or Federal Commission, Agency, or regulatory body having or claiming jurisdiction has heretofore or shall at any time hereafter permit or prescribe a drilling or operating unit or spacing rule in the case of gas, including condensate, greater than six hundred forty (640) acres, or in the case of oil or casinghead gas greater than eighty (80) acres, then the unit or units herein contemplated may have, or may be redesigned so as to have, as the case may be, the same surface content as, but not more than, the unit or the acreage in the spacing rule so prescribed or permitted. However, it is further specifically understood and agreed, anything herein to the contrary notwithstanding, that the Lessee shall have the right to, and the benefit of an acreage tolerance of ten per cent in excess of any drilling or operating unit authorized herein.  The commencement of operations for the drilling  of a well, or the completion of a well to production of either oil, gas, casinghead gas, condensate or other minerals on any portion of an operating unit in which all or any part of the land described herein is embraced, or production of oil, gas, casinghead gas, condensate, or other minerals therefrom shall have the same effect under the terms of this lease as if a well were commenced, completed or producing oil, gas, casinghead gas, condensate, or other minerals in paying quantities on the land embraced by this lease.  Lessee shall execute in writing and file for record in the records of the Parish in which the lands herein leased are located, an instrument identifying or describing the pooled acreage, or an instrument supplemental thereto redesignating same, as the case may be. Either prior to the securing of production from any unit created under the authority hereinabove granted, or after cessation of production therefrom Lessee shall have the right to dissolve the unit so created, without Lessor's joinder or further consent, by executing in writing and record in the Parish or Parishes in which the lands making up such unit may be located, an instrument identifying and dissolving such unit.  The provisions hereof shall be construed as a covenant running with the land and shall inure to the benefit of and be binding upon the parties hereto, their heirs, representatives, successors and assigns.  In the event such operating unit or units is/are so created by Lessee, Lessor shall receive out of production or the proceeds from production from such operating unit or out of the shut-in royalty provided for above, such portion of the royalty or of the shut-in royalty specified herein as the number of acres (mineral acres) out of this lease placed in any such operating unit or units bears to the total number of acres included in such operating unit or units.

8. If Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the payments herein provided shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

9. Lessee shall have the exclusive right to explore the land herein described by geological, geophysical or other methods, whether similar to those herein specified or not and whether now known or not, including the drilling of holes, use of torsion balance, seismograph explosions, magnetometer, or other geophysical or geological instruments, test or procedures, for

EXHIBIT "B", continued

the purpose of securing geological and geophysical information. All information obtained by Lessee as a result of such activity shall be the exclusive property of Lessee, and Lessee may disseminate or sell such information without Lessor's consent. In exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized therewith, in primary and/or enhanced recovery, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises, or on any adjacent or adjoining lands, as may be reasonably necessary for such purpose, including but not limited to the drilling of wells, construction and use of roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Lessee to discover, produce, store, treat and/or transport oil, gas and other substances. Lessee shall have free use of oil, gas, casinghead gas, condensate, and water from said land, except water from Lessor's wells, for all operations hereunder, including repressuring, pressure maintenance and recycling, and the royalty shall be computed after deducting any so used. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred feet of any residence or barn now on said land without Lessor consent. In the event a well or wells, producing oil, gas, casinghead gas or condensate in paying quantities should be brought in on adjacent lands not owned by the Lessor and within one hundred fifty feet of and draining the leased premises, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances.

10.   The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns, but no change or division in ownership of the land, or royalties, however accomplished shall operate to enlarge the obligations or diminish the rights of Lessee. No such change or division in the ownership of the land, or royalties shall be binding upon Lessee for any purpose until such person acquiring any interest has furnished Lessee, at its principal place of business, with a certified copy of the instrument or instruments, constituting his chain of title from the original Lessor. An assignment of this lease, in whole or in part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder to Lessor and, if Lessee or assignee of part or parts hereof shall fail to comply with any other provisions of the lease, such default shall not affect this lease insofar as it covers a part of said lands upon which Lessee or any assignee shall comply with the provisions of the lease. In addition, Lessee may at any time and from time to time execute and deliver to Lessor for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations as to the released acreage or interest.

11.   In case of suit, adverse claim, dispute or question as to the ownership of the royalties (or some part thereof) payable under this lease, Lessee shall not be held in default in payment of such royalties (or the part thereof in dispute), until such suit, claim, dispute or question has been finally disposed of, and Lessee shall have thirty (30) days after being furnished with a certified copy of the instrument or instruments disposing of such suit, claim or dispute, or after being furnished with proof sufficient, in Lessee's opinion, to settle such question, within which to make payment. Should the right or interest of Lessee hereunder be disputed by Lessor, or any other person, the time covered by the pendency of such dispute shall not be counted against Lessee either as affecting the term of the lease or for any other purpose, and Lessee may suspend all payments without interest until there is a final adjudication or other determination of such dispute.

12.   In case of cancellation or termination of this lease from any cause, Lessee shall have the right to retain, under the terms hereof, around each well producing, being worked on, or drilling hereunder, the number of acres in the form allocated to each such well under spacing and proration rules issued by the Commissioner of Conservation of the State of Louisiana, or any other State or Federal authority having control of such matters; or any unit or units formed pursuant to paragraph 7 or, in the absence of such rulings, unit or units, forty (40) acres around each such well in as near a square form as practicable, and in the event Lessor considers that operations are not being conducted in compliance with this contract, Lessee shall be notified in writing of the facts relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument.

13.   When drilling, reworking, production or other operations are delayed or interrupted by force majeure, that is, by storm, flood or other acts of God, fire, war, rebellion, insurrection, riot, strikes, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some law, order, rule, regulation, requisition or necessity of government, Federal or State, or as a result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding, but this lease shall be extended for a period of time equal to that during which Lessee is so prevented from conducting such drilling or reworking operations on, or producing oil, gas, casinghead gas, condensate or other minerals from, the premises; provided that during any period that this lease is continued in force after its primary term solely by force majeure as herein provided, Lessee shall pay to the owners of the royalty hereunder the shut-in royalty provided in paragraph 5 hereof, and in the manner therein provided, without regard to whether or not there is a producing well shut in, located on or land with which the lease premises or any part thereof has been pooled.

14.   Lessee shall pay for actual damages caused by its operations to growing crops and timber on said land leased herein.

15.   Notwithstanding the death of any party Lessor, or his successor in interest, the payment or tender of all sums accruing hereunder in the manner provided above shall be binding on the heirs, executors and administrators of such person.

16.   Lessee hereby warrants and agrees to defend the title to the lands herein described, and agrees that the Lessee at its option shall have the right to redeem for Lessor, by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof. In case of payment of any such mortgage, taxes or other liens by Lessee, in addition to the right to subrogation herein granted, Lessee shall also have the right to retain any royalties which become due Lessor hereunder and to repay itself therefrom, and the retention of such royalties by Lessee shall have the same effect as if paid to the Lessor in whose behalf payment of any mortgage, taxes or other liens was made.

17.   This lease shall be binding upon all who execute it, whether or not named in the body hereof as Lessor, and without regard to whether this same instrument, or any copy thereof, shall be executed by any other Lessor named above.
IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

WITNESSES:                                          LESSOR (WHETHER ONE OR MORE)

_____            _____        _____
                                                                                                                       SS No. OR TAX ID

_____            _____        _____
                                                                                                                       SS No. OR TAX ID

_____            _____        _____
                                                                                                                       SS NO. OR TAX ID

_____            _____        _____
                                                                                                                       SS NO. OR TAX ID

STATE OF _____
PARISH/ COUNTY OF _____

On this _____ day of _____, _____ before me, the undersigned authority, personally appeared _____
_____to
me known to be the person(s) described in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as their free act and deed.

My Commission expires _____.
                                                                            _____
                                                                            NOTARY PUBLIC in and for

STATE OF _____
PARISH/ COUNTY OF _____

Before me, the undersigned authority, personally came and appeared _____ who being first duly sworn deposes and says that he/she was one of the subscribing witnesses to the execution of the foregoing instrument by _____
_who signed the same in his/her presence and that of the other subscribing witness(es) to such signature(s) whose name(s) (signatures) are affixed as such, and that he/she now recognizes all said signatures to be true and genuine.

                                                                            _____
                                                                            Subscribing Witness

Sworn to and subscribed before me, notary, on this _____ day of _____

My Commission expires_____.
                                                                            _____
                                                                            NOTARY PUBLIC in and for

of Petroleum Accountants
Societies

COPAS

## EXHIBIT "C"

**Attached to and made a part of that certain Operating Agreement dated May 1, 2009, by and between SKLAR EXPLORATION COMPANY L.L.C., as Operator, and SKLARCO L.L.C., et al, as Non-Operators.**

## ACCOUNTING PROCEDURE

## JOINT OPERATIONS

### I. GENERAL PROVISIONS

1.  **Definitions**

    "Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

    "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

    "Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

    "Operator" shall mean the party designated to conduct the Joint Operations.

    "Non-Operators" shall mean the Parties to this agreement other than the Operator.

    "Parties" shall mean Operator and Non-Operators.

    "First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

    "Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

    "Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

    "Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

    "Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

2.  **Statement and Billings**

    Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3.  **Advances and Payments by Non-Operators**

    A.  Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

    B.  Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within said time, the unpaid balance shall bear interest at the prime rate in effect at <u>Bank One, Shreveport, Louisiana</u> on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4.  **Adjustments**

    Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.**

- 1 -

5.  **Audits**

    A.  A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

    B.  The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6.  **Approval By Non-Operators**

    Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.  **Ecological and Environmental**

    Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2.  **Rentals and Royalties**

    Lease rentals and royalties paid by Operator for the Joint Operations.

3.  **Labor**

    A.  (1)  Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

        (2)  Salaries of First level Supervisors in the field.

        (3)  Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

        (4)  Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation or the Joint Property if such charges are excluded from the overhead rates.

    B.  Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3B of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

    C.  Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

    D.  Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4.  **Employee Benefits**

    Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

- 2 -

Case:20-12377-MER   Doc#:901-1   Filed:02/26/21   Entered:02/26/21 Recommended by the Council 208 of
217   of Petroleum Accountants
Societies

COPAS

5.   **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV.   Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6.   **Transportation**

Transportation of employees and Material necessary for the Joint Operations / ~~but subject to the following limitations:~~ shall be charged at actual cost incurred by Operator.

A.   ~~If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.~~

B.   ~~If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.~~

C.   ~~In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.~~

7.   **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III.   The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.   **Equipment and Facilities Furnished By Operator**

A.   Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed ___fifteen___ percent (___15___%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%.   For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9.   **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.   **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, ~~except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.~~   and the costs and expenses incurred in connection with hearings and other matters before governmental bodies and agencies and costs and expenses incurred in examining and curing title.

11.   **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

COPAS

**12.    Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers' Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**13.    Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

**14.    Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property.   In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

**15.    Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

**1.    Overhead - Drilling and Producing Operations**

i.    As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( x )  Fixed Rate Basis, Paragraph 1A, or
(    )  Percentage Basis, Paragraph 1B

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II.   The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii.    The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

(    )  shall be covered by the overhead rates, or
( x )  shall not be covered by the overhead rates.

iii.    The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

(    )  shall be covered by the overhead rates, or
( x )  shall not be covered by the overhead rates.

A.    Overhead - Fixed Rate Basis  See ADDITIONAL REVISIONS page 9.

(1)    Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $_____7,000.00_____
        (Prorated for less than a full month)

Producing Well Rate $____700.00_____

(2)    Application of Overhead - Fixed Rate Basis shall be as follows:

(a)    Drilling Well Rate

(1)    Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

- 4 -

Case:20-12377-MER Doc#:901-1 Filed:02/26/21 Entered:02/26/21 Recommended by the Council Page 210 of
of Petroleum Accountants
217 Societies

COPAS

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b) Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B.   Overhead - Percentage Basis

(1)   Operator shall charge the Joint Account at the following rates:

(a)   Development

_____ Percent (_____%) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b)   Operating

_____ Percent (_____%) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2)   Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2.   **Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

Recommended by the Council of Petroleum Accountants Societies

COPAS

Account for overhead based on the following rates for any Major Construction project in excess of $ __25,000.00__ :

A. __5__ % of first $100,000 or total cost if less, plus

B. __4__ % of costs in excess of $100,000 but less than $1,000,000, plus

C. __3__ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3. **Catastrophic Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. __5__ % of total costs through $100,000; plus

B. __4__ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. __3__ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4. **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

### IV.  PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A. New Material (Condition A)

(1) Tubular Goods Other than Line Pipe

(a) Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at cost. ~~/ Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.~~

(b) For grades which are special to one mill only, prices shall be computed at cost. ~~/ the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000~~

pound Oil Field Haulers Association interstate truck rate shall be used.

(c) Special end finish tubular goods shall be priced at / cost. the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

(d) Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at / cost. the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2) Line Pipe

(a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced / at cost. under provisions of tubular goods pricing in Paragraph A.(l)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(b) Line Pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at / cost. Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced / at cost. f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

(d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at / cost. quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3) Other Material shall be priced at / cost. the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at / cost. the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(l) and (2).

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

At seventy-five percent (75%) of / market value. current new price, as determined by Paragraph A.

(2) Material used on and moved from the Joint Property

(a) At seventy-five percent (75%) of / market value. current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b) At sixty-five percent (65%) of / market value. current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material

(3) Material not used on and moved from the Joint Property

At seventy-five percent (75%) of / market value. current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at / current market value. fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2)   Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)   Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)   Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)   Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.   Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.   Pricing Conditions

(1)   Loading or unloading costs may be charged to the Joint Account at / the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies. *[actual costs incurred by Operator]*

(2)   Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.   Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator. *provided however, if a Non-Operator elects to furnish material in kind, such material must (a) meet the quality specifications set by Operator, and (b) be inspected by Operator with inspection costs to be billed to the Joint Account.*

4.   Warranty of Material Furnished By Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.   Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.   Reconciliation and Adjustment of Inventories

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

- 8 -

overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.   In cases involving a change of Operator, all Parties shall be governed by such inventory.

4. **Expense of Conducting Inventories**

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

**ADDITIIONAL REVISIONS**
(1)   In the event the subject well is expected to be above the State threshold for H2S sour gas operations, the Drilling Well rate set forth in Art. III.1.A(1) will be increased by $2000.00 per month and the associated Producing Well Overhead Rate will be increased an additional $100.00 per month.

## EXHIBIT "D"

This Exhibit "D" is attached to and made a part of that certain Operating Agreement dated May 1, 2009, by and between SKLAR EXPLORATION COMPANY L.L.C, as Operator, and SKLARCO L.L.C., ET AL, as Non-Operators.

## INSURANCE

Operator shall carry the following insurance with the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of insurance will be provided upon request.

I.   WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

Extension of Coverage B of policy to provide for not less than $500,000 for death or injury to one person in any one accident.

II   COMPREHENSIVE GENERAL LIABILITY

Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $2,000,000 for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III   AUTOMOBILE LIABILITY

Coverage shall include owned, non-owned and hired vehicles. Limit $500,000 combined single limit each occurrence for bodily injury and property damage.

IV   EXCESS LIABILITY

Operator shall carry excess liability insurance in an amount necessary to provide a total of $10,000,000 coverage for both Automobile Liability and Comprehensive General Liability.

Any party, at its own expense, may carry its own coverage for Excess Liability Insurance with limits as set forth in this Section IV. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

EXTRA EXPENSE LIABILITY

Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $200,000 per occurrence.

Liability Limit: $5,000,000

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder. Further, any party, at its own expense, may carry its own coverage for Extra Expense Liability Insurance with limits as set forth in this Section V. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

EXHIBIT "E"

**This Exhibit "E" is attached to and made a part of that Operating Agreement dated May 1, 2009, by and between Sklar Exploration Company L.L.C, as Operator, and Sklarco L.L.C., ET AL as Non-Operators.**

GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement, the parties hereto own and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area described in the Operating Agreement (the "JOA").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the gas produced from said JOA. However, one or more of the parties may be unable to take or market its interest in the gas production from time to time; therefore, to permit any party to produce and dispose of its interest in the gas production from the JOA with as much flexibility as possible, the parties hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser. Any party whose share of gas is not marketed shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ration of its participation percentage under this Operating Agreement to the participating percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, it any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Operator will, in turn, make settlement for all royalties and overriding royalties which are payable on gas produced from the Contract Area. In the event that the total royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Contract Area, then any such deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Contract Area shall furnish the Operator with division order title opinions on which Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser shall pay, or cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the volume of gas actually taken for its account.

–1–

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold, less applicable production taxes and royalties theretofore paid, less any reasonable dehydration, compression, treating, processing, gathering or transportation costs actually incurred, including amortized capital costs associated with the design, construction or operation of any plants to dehydrate, compress, treat or process gas, in connection with the sale of the overproduction, at the price and based on the proceeds actually received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party). Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.