**Participation Sales Agreement**
**NORTH BEACH PROSPECT**
**Conecuh County, Alabama**

State of Alabama

County of Conecuh

} KNOW ALL MEN BY THESE PRESENTS:

## PREAMBLE

This **PARTICIPATION SALES AGREEMENT** (this "Agreement"), dated effective November 15,2004, when fully executed, shall constitute a "Participation Sales Agreement" by and between the following parties (hereinafter sometimes singularly referred to as a "Party" and sometimes collectively referred to as the "Parties"):

> **Craft Exploration Company L.L.C.,** a Mississippi Limited Liability Company, whose address is 4215 Athens Drive, Jackson, MS, 39211, represented herein by its duly authorized Member, Steven H. Craft (hereinafter referred to as **"CEC"** and/or as **"SELLER");**

> **Sklar Exploration Company L.L.C.,** a Louisiana limited liability company, whose address is 401 Edwards Street, Suite 1601, Shreveport, Louisiana, 71101, represented herein by its duly authorized Chief Operating Officer, David A. Barlow (hereinafter referred to as **"SEC"** and/or as **"Operator");** and

> **Sklarco L.L.C.,** a Louisiana limited liability company, whose address is 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101, represented herein by its duly authorized Chief Operating Officer, David A. Barlow (hereinafter referred to as **"Participant"** and/or as **"BUYER"** and/or as **"Sklarco").**

## RECITALS

**WHEREAS,** Participant is desirous of purchasing an undivided working interest in and to the "NORTH BEACH PROSPECT" from **Seller,** including an undivided working interest in the Oil, Gas And Other Mineral Leases (the "Leases") described in Exhibit "A-1" to the JOA attached hereto as Exhibit "I" (attached hereto and by reference made a part hereof) covering approximately 8,700 net acres located within the NORTH BEACH PROSPECT AMI (as defined hereinbelow); and

**WHEREAS,** Participant is further desirous of developing the Leases by participating in the drilling of an exploratory well to be operated by SEC; and

**WHEREAS,** subject to the reservation of an overriding royalty interest and reversionary working interest, and in further consideration of cash consideration, all of which are described in further detail hereinbelow, **Seller** is willing to sell to **Buyer** such undivided interest in and to the "NORTH BEACH PROSPECT" including the Leases; and

**WHEREAS,** the Parties desire to enter into this Agreement to set forth the terms and conditions under which they sell, acquire or own, as the case may be, the aforesaid undivided working interest, overriding royalty interest, and reversionary working interest and drill the Initial Well (as defined hereinbelow).

**NOW, THEREFORE,** the Parties hereby agree as follows:

Initialed by BUYER: _____     Initialed by SELLER: _____

# I. PROSPECT ACREAGE

SELLER has prepared the Joint Operating Agreement attached hereto as Exhibit "I" hereinafter sometimes referred to as the "Operating Agreement" or "JOA", together with applicable Exhibits with SELLER's intent of setting out the acreage covered, the lease provisions and/or terms with as much detail as practical. It is understood and agreed, however, that the parties hereto recognize that lease data and notations listed on such Exhibits "A", "A-1" and "A-2" to the JOA are not intended to be all inclusive or totally complete. This Agreement shall cover all leases and rights to which SELLER is entitled covering lands located within the AMI whether described in said exhibits or not. SELLER has furnished BUYER complete copies of all Leases and agreements in SELLER's possession associated with the North Beach Prospect. BUYER hereby acknowledges that its review of the Leases and agreements, and the rights covered thereby have not been limited to such Exhibits "A", "A-1" and/or "A-2" to the JOA.

SELLER makes no warranty of title as to the interests and lands covered by the leases and agreements except SELLER warrants title against all defects arising out of claims by SELLER or persons claiming by, through or under SELLER. SELLER further warrants that it has full authority to sell and convey interests in the Leases without liens or other encumbrances attached thereto except as specifically provided herein and that SELLER is not aware of any other liens presently affecting the Leases. All of the rights, benefits and obligations owned by the SELLER in the Leases and agreements and the lands covered thereby are sometimes hereinafter collectively referred to as the "Prospect Acreage".

# II. PURPOSE OF THIS PARTICIPATION SALES AGREEMENT

SELLER desires to sell, and BUYER desires to purchase SELLER's rights, title and interests in and to the Prospect Acreage in return for the cash consideration set forth in Article V. hereof, subject to the reservation of the Overriding Royalty Interest and the Reversionary Working Interest provided for in the succeeding articles hereof. It is agreed that the interests being sold hereby, subject to the reservations to be subsequently set forth, shall be owned in proportion to BUYER's respective interest as set forth in Article VI. hereof.

# III. OPERATOR/OPERATING AGREEMENT

Contemporaneously with the execution of this agreement the parties have entered into the Operating Agreement attached hereto as Exhibit "I" and said Operating Agreement shall become effective as of November 15, 2004, as to all operations and other activities conducted on the Contract Area described therein. In the event of a conflict or inconsistency between the terms and provisions of this Participation Sales Agreement and those of the Operating Agreement, it is stipulated that the terms and provisions of this Participation Sales Agreement shall prevail as between the Parties hereto.

The Parties hereto hereby appoint and designate SEC to be the Operator of the Project Acreage under the terms and provisions of the Operating Agreement. SEC, as a result of this Article III, is sometimes hereinafter referred to as Operator for the purposes of identification and reference.

# IV. INITIAL TEST WELL

Subject to the terms and provisions of this Participation Sales Agreement, SELLER and BUYER agree to commence or cause the commencement of the drilling operations no later than March 15, 2005, subject to force majeure, drill site title opinion approval by the Operator, rig availability, and, extension by a majority of the voting interest as set forth in the JOA, and under the directions of Operator and pursuant to the provisions of the JOA, of an exploratory test well, sometimes hereinafter referred to as the "Initial Test Well" as set forth in the JOA.

# V. CASH CONSIDERATION

At such time as this Participation Sales Agreement and the JOA have been fully executed and funding for the entirety of the acquisition costs as provided below has taken place, SELLER shall timely deliver to BUYER a recordable assignment in the form attached hereto as Exhibit "II" conveying its Before Payout working interest in the Leases and subsequently a timely copy of any written consent, if required, approving such assignment. The assignment shall convey Participant its pro-rata undivided Forty percent of eight-eighths (40.0 % of 8/8ths) Before Payout working interest in the Leases, and shall be subject only to landowner's royalty burdens, and the SELLER'S overriding royalty and reversionary working interest. SELLER warrants that there are no other burdens on the Leases as of the effective date of this Agreement

Initialed by BUYER: _____      Initialed by SELLER: _____

If the assignment does not cover all of the Leases owned by Seller covering lands located within the AMI as of the effective date of this Agreement, then Seller shall make a subsequent assignment of said additional Leases. All other leases shall be governed by the AMI.

BUYER shall pay SELLER its Before Payout pro-rata share of $ 3,045,000.00 being $1,218,000.00, with 25% or $304,500.00 being due upon execution of this Agreement, and the remaining 75% or $913,500, being due and payable in 3 additional and equal payments of $304,500.00 on the first day of each of the following months, being on 12-15-2004, 1-15-2005, and 2-15-2005, for all prospect costs through the effective date of this Agreement, including, without limitation, leasehold, geology and geophysical costs.

In the event BUYER executes this agreement and does not tender its proportionate total consideration as provided hereinabove, then SELLER shall notify BUYER of such default and BUYER shall have five (5) days upon receipt of written notice in which to perfect such default, otherwise SELLER at its sole option may either enforce the performance required by Buyer or terminate this Agreement and BUYER's interest shall ipso facto terminate and be returned to Seller and any monies tendered to SELLER shall be retained by SELLER and forfeited by BUYER.

BUYER shall tender a Legal Promissory Note for said amount due

## VI. INTEREST ASSIGNED TO BUYER
### OVERRIDING ROYALTY AND REVERSIONARY WORKING INTEREST RESERVED UNTO SELLER

The assignment of working interest, provided for in Article V. above, from SELLER unto BUYER, shall transfer the Before Payout and After Payout working interest in the Leases subject to the terms of this Agreement and in the following proportion, to wit:

| BUYER | BEFORE PAYOUT WORKING INTEREST | AFTER PAYOUT WORKING INTEREST |
|---|---|---|
|  | 40.00% | 30.00% |
| TOTAL | 40.00% | 30.00% |

Such assignment in and to the Leases shall be subject to the following terms, conditions, burdens, reservations and limitations, and no others:

A.   The above mentioned assignment shall be made without warranty of any kind, express or implied, except SELLER warrants title against all defects arising out of claims by SELLER or persons claiming by, through or under SELLER, and, in addition, those representations and warranties contained in Article I.; provided, however, said assignment shall be made subject to the matters set forth in the succeeding paragraphs, hereinbelow.

B.   Said assignment shall be made subject to the terms, covenants and conditions of the following:

1.   The terms and provisions in the Leases subject to said assignment;

2.   The terms and provisions of this Agreement;

3.   SELLER, its successors, assigns or designees reserving an Overriding Royalty Interest plus a Reversionary Working Interest as set out in Article IX. below and in the Area of Mutual Interest (AMI) provision of the JOA;

4.   The Operating Agreement provided for in Article III. above.

C.   The interests assigned hereby to BUYER and the interest reserved herein to SELLER shall be subject to their proportionate shares of all royalties, overriding royalties and other burdens and encumbrances created, reserved, excepted, assigned or described in any of the instruments referred to in Article VI.B. (sometimes herein referred to as "jointly borne burdens") and no others.

D. SELLER, its successors, assigns, or designees hereby expressly reserves and excepts and will reserve and except in the assignment a twenty-five percent of eight-eighths (25.00% of 8/8ths) Reversionary Working Interest proportionately reduced to BUYER's Before Payout working interest in the Leases, being twenty-five percent of eight-eighths (25% of 8/8ths) of forty percent of eight-eights (40% of 8/8ths), or ten percent of eight-eights (10% of 8/8ths). Payout is on a well-by-well basis. Upon the occurrence of Payout as contemplated herein and as defined hereinbelow, there shall revert unto SELLER the aforesaid interest in each well that has reached Payout and the Leases, together with a like share of production produced and saved from and attributable to the lands covered by the Leases or lands pooled therewith and a like interest in all personal property, fixtures, pipelines and equipment located thereon or used or useful in connection therewith, on each well which has reached Payout, INSOFAR AND ONLY INSOFAR as said Leases cover and affect lands located within the unit for said well that has reached Payout. Said reversion shall be effective for all purposes as of 7:00 AM on the first day following the date on which such Payout occurred, and shall be free and clear of all leasehold encumbrances (other than jointly borne burdens).

Within thirty (30) days after BUYER's receipt of SELLER's written request after the occurrence of Payout, BUYER shall execute and deliver unto SELLER a recordable assignment of SELLER's Reversionary Working Interest in the Leases for the purpose of evidencing such reversion, or, if BUYER disagrees with SELLER that Payout has occurred, BUYER shall deliver to SELLER within such thirty (30) day period a written notice of dispute and BUYER may thereafter withhold such assignment to SELLER pending resolution of such dispute. The parties shall then have a period of forty-five (45) days from the date of delivery of such notice of dispute or, if no notice of dispute is given, forty-five (45) days from the date SELLER requests an assignment, to attempt in good faith to resolve such dispute. In the event that the parties are unable to resolve such dispute within such forty-five (45) day period, then the Dispute Resolution Procedure provided in Article X., Paragraph D below shall be followed.

From and after the effective date and time of the reversion and assignment discussed above, SELLER shall, as to its reversionary working interest, bear and pay its proportionate share of all costs, risks, and liabilities of owning the well which has reached payout.

The term **"Payout"** as used in this agreement, unless otherwise noted, shall mean that point in time at which the cumulative "Net Well Proceeds" (as hereinafter defined) are equal to the cumulative "Net Well Costs" (as hereinafter defined)

1. The term "Net Well Proceeds" shall mean the proceeds, payments, income or value received by BUYER, or its assignee or designee, with respect to any individual well (said well) located within the Contract Area described in the Operating Agreement or lands pooled therewith from the following sources:

   a. in the case of sales (including advance sales of oil, gas or other hydrocarbons where funds are actually received) of oil, gas, sulphur and/or other hydrocarbons or hydrocarbon products produced and sold from or attributable to any said well within the Contract Area or lands pooled therewith, the actual amounts received therefor (and in the case of the utilization of oil, gas, sulphur and/or other hydrocarbons or hydrocarbon products off the premises, the market value thereof), after deducting therefrom all royalties, overriding royalties and other leasehold burdens payable out of production which are jointly borne burdens by the parties, if any, and all production, excise, severance, ad valorem and other taxes applicable to such production together with any applicable dehydration, treating, processing, compression, gathering, transportation or other charges incurred to render the oil or gas merchantable or deliverable or otherwise enhance its value;

   b. the actual price received from the salvage or sale of any interest in any personal property, fixtures or equipment located on any said well located

on the Contract Area or lands pooled therewith or used or obtained in connection therewith or purchased for the joint account and including any rental proceeds received from the rental thereof;

c. contributions, goods, services or payments of cash received from third parties toward the drilling of any said well or any other operation for said well on the Contract Area or lands pooled therewith;

d. any insurance proceeds received pursuant to any insurance contract relating to any loss including, without limitation, loss of control, blow out or loss of income with respect to any said well or operation on any said well located on the Contract Area or lands pooled therewith or the oil and gas leases or a "no claims" refund; and

2. The term "Net Well Costs" shall mean the following costs:

a. the cost incurred by BUYER in drilling, redrilling, testing, logging, coring, evaluating, completing, equipping and operating, sidetracking, recompleting, reworking any said well drilled on the Contract Area or land pooled therewith, (and including overhead as determined in accordance with the accounting procedure) all in accordance with the terms of the Operating Agreement and the attached accounting procedure; and

b. the costs incurred by BUYER in acquiring leasehold, geology and geophysics, determined on a well-by-well basis by calculating the product of $3,045,000.00 multiplied by BUYER's 40% Before Payout Working Interest, spread equally in quarter increments of $304,500 for the first four wells drilled and completed in the Contract Area in which BUYER participates; provided, however, that said leasehold, geological and geophysical costs shall never exceed $304,500.00 for any given well, and provide further that the amount of $304,500.00 is recoupable per well for the first four wells only, whether or not they result in producers or dry holes and whether or not said amounts are actually recouped.

The SELLER'S Reversionary Working Interest shall become effective for and on each and any said well which reaches Payout as described above.

The BUYER shall pay for all costs attributable to the interest across the entirety of the prospect, but the SELLER shall assume its own costs and burdens on each well which has reached payout.

Under any fieldwide unitization, said 25% Reversionary Working Interest will become effective for calculation of tract factors and interests across the fieldwide unit with regard to production proceeds across the fieldwide unit, but if any well is producing that has not yet reached Payout, then Seller shall pay Buyer from production, the amount required for all wells to reach Payout. The Buyer shall remain responsible for 100% of all costs associated with drilling, completion, and development within the fieldwide unit, but may recoup the 25% Net Well Cost(s) attributable to the Seller's interest on any successfully completed well from the Seller's interest in the form of production payments from the Seller.

E. SELLER's Reversionary Working Interest and all other rights and privileges reserved herein to SELLER shall apply to the Leases, as well as any extension(s), renewal(s), top lease(s) or new lease(s) covering any such lease(s) within the "AMI" as defined in Article XV of the attached Operating Agreement as well as any options to acquire any of the foregoing, which may be acquired directly or indirectly by any party hereto during the term of any such lease within such AMI or within one (1) year following the expiration of any such lease, interest or option.

F. The parties hereto specifically recognize that said assignment from SELLER shall reserve unto SELLER, its successors, assigns, or designees an Overriding Royalty Interest in the Prospect Acreage equal to the difference between Lessors' Royalty Burdens in the Probate

Initialed by BUYER: _____          Initialed by SELLER: _____

Records of Conecuh County, Alabama and/or other burdens existing as of the effective date of this agreement, and twenty-five percent (25.0%) for the approximate 8,700 acres being delivered. In the event there is a Lessors Royalty Burden greater than or equal to twenty four percent (≥24.0%) but less than or equal to twenty five percent ( ≤25.0% ) on such delivered leasehold, then the Overriding Royalty Interest reserved unto SELLER shall be two percent of eight-eighths (2.0% of 8/8ths). In the event there is a Lessors Royalty Burden greater than twenty five percent (>25.0%) on such delivered leasehold then the Overriding Royalty reserved unto SELLER shall be one percent of eight eighths (1.0% of 8/8ths). The Overriding Royalty reserved herein shall be calculated and shall be delivered and paid to SELLER in the same manner and with the same exclusions, deductions and allocations as are provided for the calculation, delivery and payment of royalties to the Lessors in the Leases.

G. In the event any of the Leases covers less than the full undivided mineral interest in the oil, gas and associated hydrocarbons in the lands covered thereby, then as to such lease, the Overriding Royalty Interest and the Reversionary Working Interest herein reserved by SELLER shall be reduced in the proportion that the mineral interest actually covered by said lease bears to the entire mineral interest. Such Overriding Royalty Interest and Reversionary Working Interest shall also be proportionately reduced in the event any such lease covers less than the full leasehold estate in the lands covered thereby or in the event of failure of leasehold or mineral title, or in the event any such lease is pooled or unitized with lands or leases in which SELLER does not own an Overriding Royalty Interest and Reversionary Working Interest. Such Overriding Royalty Interest and Reversionary Working Interest shall be further subject to proportionate reduction to the BUYER's acquisition of the leasehold interest affected.

H. Any assignment of working interest earned from a third party farmout (if applicable) by the parties participating in such farmout shall be subject to the Overriding Royalty Interest and the Reversionary Working Interest reserved by SELLER herein as to each respective party's interest as provided for in Exhibit "A" of the Operating Agreement. However, such earned working interest shall first bear the burdens of the farmout, then, the Overriding Royalty Interest and the Reversionary Working Interest reserved by SELLER shall burden the working interest net of the farmout burdens.

## VII. DRILLING COSTS

BUYER does hereby acknowledge that the certain Drilling AFE attached hereto as Exhibit "III" is an estimate. Operator shall within approximately thirty (30) days of "Spud" provide BUYER and SELLER with a more precise Drilling AFE.

BUYER agrees to pay its Before Payout Working Interest share of drilling costs, as is set forth in said AFE approved by BUYER, and throughout the course of drilling the Initial Test Well, as hereinbefore defined, until the point in time when Operator has performed the drilling, coring, logging and testing of the Initial Test Well to Contract Depth and any additional customary costs incurred in drilling the Initial Test Well to Contract Depth as defined in Article IV above, such as costs of permitting, surveying, staking and building of location, the settlement of damages, examination and curing of title to the subject property, and the cost of plugging and abandoning the Initial Test Well, if a completion thereof is not attempted. In the event BUYER executes this agreement and fails to perform and/or pay for its proportionate share of this Initial Test Well as provided hereinabove, then SELLER shall notify BUYER of such default and BUYER shall have five (15) days upon receipt of notice in which to perfect such default, otherwise SELLER at its sole option may either enforce the performance required by Buyer or terminate this agreement and BUYER's interest shall ipso facto terminate and be returned to Seller and any monies tendered to SELLER shall be retained by SELLER and forfeited by BUYER. Such AFE drilling and/or completion costs are set forth below and are apportioned to Buyer's respective interest.

Initialed by BUYER: _____        Initialed by SELLER: _____

**PARTY**

COSTS

|  | DRILLING (1) ESTIMATED | COMPLETION (2) ESTIMATED* |
|---|---|---|
| Sklarco L.L.C. | $300,000.00 | $ 184,000.00 |

(1)   $750,000.00 Estimated AFE Drilling Costs (8/8ths)

(2)   $460,000.00 Estimated AFE Completion Costs (8/8ths)
   * Assumes participation by all parties "Before Payout".

## VIII. RE-ASSIGNMENT PROVISIONS

SELLER shall maintain the first right to elect, participate, or acquire any interest released, forfeited, or farmed out by BUYER through the terms and conditions of the JOA. If the SELLER chooses not to elect, participate, or acquire any portion of the interest released, forfeited, or farmed out, then said interest may then be acquired by the consenting or participating parties on a pro-rata basis election procedure. SELLER assumes sole responsibility for making the aforesaid preferential right binding upon the parties to the JOA that are not Parties to this Agreement. The interests acquired by BUYER under this Agreement are freely assignable, and this Article VIII does not apply to sales, transfers or other assignments to third parties that are made independent of elections under the JOA.

In the event BUYER refuses to drill the Initial Test Well or substitute therefor and said BUYER also declines to participate in proposals made by any other party to the Operating Agreement to drill the Initial Test Well or substitute therefor, then BUYER's interest shall be considered to have been forfeited and BUYER agrees to timely execute such document(s) as necessary in order to "clear title" to SELLER. The terms and provisions of the attached JOA regarding non-consent provisions or forfeiture of interest shall apply for all wells drilled under this Agreement except for the Initial Well or substitute therefor. In the event that any interest is forfeited under the provisions herein, then the SELLER shall be entitled to the reassignment of such party's right, title and interest in and to the Prospect Acreage at no additional cost and shall be free and clear of any liens or encumbrances or additional burdens and SELLER shall own such interest with no obligation or liability to said BUYER.

## IX. AREA OF MUTUAL INTEREST

The terms and provisions relative to the operation of the Area of Mutual Interest ("AMI") is specifically set forth in Article XV. of the JOA and is shown within the red outline on the plat map attached as Exhibit "A-2" to the JOA. The parties take cognizance of the AMI provision as described in Article XV. of the JOA and also in Exhibit "A-2" and agree to be bound thereby. In addition to this AMI provision, the parties hereto recognize and agree that as among themselves, each lease or contractual interest acquired under the Operating Agreement shall be subject to the lessors royalty, overriding royalty, Reversionary Working Interest or other contractual burdens in favor of the granting party of a lease or contractual right to earn a lease necessary for and incident to the acquisition of such lease or contractual right to earn a lease, and to the following burdens which parties hereto agree to jointly bear on subsequent AMI acquisitions:

1.   An overriding royalty interest reserved unto CEC, its successors, assigns or designees equal to the difference between lease burdens and twenty-five percent (25.0%); or two percent of eight eighths (2.0% of 8/8ths) on lease burdens which are greater than or equal to twenty four percent but less than or equal to twenty five percent ( $\geq 24.0\%$ and $\leq 25.0\%$); or one percent of eight eighths on lease burdens which are greater than twenty five percent (> 25.0%). Such overriding royalty shall apply to all oil, gas and associated hydrocarbons produced and/or sold from or attributable to the lands covered by each such acquired lease or contractual right to earn a lease.

Such overriding royalty and Reversionary Working Interest shall apply to any extension, renewal, top lease, option to acquire a lease, contractual right to earn a

Initialed by BUYER: _____      Initialed by SELLER: _____

lease covering any right title and/or interest acquired within the AMI as defined herein within one (1) year from expiration of the existing leasehold interest.

2. The twenty-five percent (25.00%) Reversionary Working Interest reserved to CEC, its successors, assigns, or designees in Article VI. of this Participation Sales Agreement shall also apply to each lease, royalty interest, mineral interest or right(s) title(s) and/or interest(s) acquired under the terms of this AMI which may be acquired directly or indirectly by any of the parties hereto during the term of any interest and within one (1) year following the expiration of any such interest.

In the event any lease, royalty interest, mineral interest or contractual right to earn an interest covers less than the entire mineral estate or less than one hundred percent (100.0%) of the leasehold, then the Overriding Royalty and Reversionary Working Interest as provided for herein shall be proportionately reduced.

With respect to the AMI acquisitions procedures please see Article XV.A. of the Operating Agreement.

## X. MISCELLANEOUS

### A.    NOTICES/ INFORMATION

All notices or information authorized or required between the parties and required by the provisions of this Participation Sales Agreement or the Operating Agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex, fax, or email and addressed to the parties to whom the notice is given at the addresses listed in Exhibit "A" of the JOA attached to this Agreement. The originating notice given under any provision hereof or in the Operating Agreement shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date and time the originating notice is received.

All geological well, land, geophysical and seismic data, and ownership, licensing, and copyrights therein acquired by BUYER or SELLER shall be owned and held by the BUYER and SELLER on a 75% / 25% pro-rata undivided joint interest basis with each party being free to deal with such data as it sees fit without accounting to the other parties hereto, except by and through the limitations set forth in the JOA, which shall apply to both BUYER and SELLER hereto. As to third party data which a party hereto acquires by license, such data shall be shared with the other parties that contributed to the cost of acquiring such data hereto to the extent allowed by the underlying seismic agreement, however, at the very least, BUYER shall grant SELLER, or SELLER shall grant BUYER, as the case may be, the right to review said data on an in-house basis at any time during normal business hours. If more than one Party to this Agreement wishes to obtain a copy of such speculative data, all Parties agree to cooperate in obtaining licenses for additional copies at the discounted group rates which are normally available for such licenses, but the costs of acquiring such copies shall be borne by the Party desiring to obtain such copies that participated in such acquisition.

### B.    CONFORMANCE WITH LAWS AND REGULATIONS

This Participation Sales Agreement is subject to all applicable Federal, State and Local laws and all applicable rules, orders, and regulations of any authorized and duly constituted, regulatory body or authority having jurisdiction thereof, and all operations conducted hereunder shall be in conformity therewith. The provisions hereof are binding upon their respective legal representatives, heirs, successors, assigns and designees.

### C.    GOVERNING LAW, JURISDICTION AND VENUE

This Participation Sales Agreement and all other documents or instruments executed in connection with this Participation Sales Agreement shall be construed, governed and enforced in accordance with the laws of the State of Alabama.

Without limiting Article X., Paragraph D. below, any legal action or proceeding, including but not limited to any legal action or proceeding arising from or related to any mediation or arbitration or the enforcement of any mediation or arbitration award, shall be brought exclusively in the district courts of

the State of Alabama in Conecuh County, Alabama, or in the event of exclusive federal district court jurisdiction and/or federal preemption of state law, jurisdiction and venue shall lie in the United States District Court for the Southern District of Alabama, and, by execution and delivery of this agreement, the SELLER and BUYER hereby accept the provisions of this paragraph and expressly agree to subject themselves to the jurisdictions and venues, if and when necessary, as expressed herein and submits to the in personam jurisdiction of the state and federal courts located in Conecuh County, Alabama. The SELLER and BUYER hereby irrevocably waive any objections to the jurisdictions and/or venues as stated herein, including grounds of forum non conveniens, which they may now or hereafter have to the bringing of any such action or proceeding in such respective jurisdictions and/or venues.

### D.    MEDIATION/ARBITRATION

1.    Dispute Resolution.  The Parties and their successors and assigns hereby agree that any and all claims, disputes and controversies arising out of or relating to the interpretation or enforcement of this Participation Sales Agreement (including attachments hereto such as the JOA), the operation of its terms, or the relationship of the Parties hereunder (a "Dispute"), shall be subjected to mediation, as described herein.  If the mediation proceeding is unsuccessful, the Parties hereby agree that the Dispute shall be decided by mandatory, final and binding arbitration in accordance with the rules of arbitration of the American Arbitration Association (AAA), excluding its conflicts of law principles and as supplemented hereby.

2.    Venue.  The Parties bind themselves to mediate, and if necessary to arbitrate, any Dispute in Conecuh County, Alabama, United States of America.

3.    Governing Law.  The substantive law of the State of Alabama and the United States of America shall govern and be applied in any mediation or arbitration in accordance with Article X., Paragraph C of this Participation Sales Agreement.

4.    Language.  Any mediation or arbitration pursuant to this Section shall be conducted in English.

5.    Independent Nature of Mediator/Arbitrator.  The mediator and/or arbitrator shall be independent of the Parties and under no circumstance shall any mediator or arbitrator have any connection to or relationship with any of the Parties, or their respective principals or employees.

6.    Mediation Proceeding.

a.    If any Party desires to mediate any Dispute, such Party shall notify the other Parties of the Dispute desired to be mediated, including a brief statement of the matter in controversy.  If the Parties are not able to resolve the Dispute within five (5) days after the Party notifies the other Parties of its desire to mediate ("Mediation Notice), then, within five (5) days immediately after the expiration of the aforesaid five (5) day period, the Parties shall attempt to agree upon an independent mediator.  If the Parties are unable to reach an agreement upon an independent mediator within such second five (5) day period, then any Party shall be entitled to request that the AAA (or similar mediation service of a similar national scope if AAA no longer then exists) appoint an independent mediator who shall serve as mediator for all purposes hereof.  The SELLER and BUYER shall each pay one-half (1/2) of the cost of the mediator's services, in advance upon written request by the mediator.

b.    Within ten (10) days after selection of the mediator, the mediator shall call for and set a meeting among the Parties and the mediator for the purpose of mediating the Dispute.  If the Parties are unable to resolve the Dispute within thirty (30) days after the Mediation Notice (the "Mediation Period"), the Dispute shall be decided by arbitration.

7. Arbitration Proceeding.

a. Unless all Parties can agree in writing on a single arbitrator within five (5) days after the expiration of the Mediation Period, then, within five (5) days after thereafter, SELLER, on the one hand, and BUYER, on the other hand, shall notify the other in writing of the name of the independent arbitrator chosen by them to participate as a member of a three-member panel of arbitrators. If either SELLLER or BUYER fails to timely give the other notice of such appointment, then the Party who timely gave such notice shall be entitled to require that its arbitrator act as the sole arbitrator hereunder. If an arbitrator is timely appointed by each of the Parties, the two named arbitrators shall select the third member of the arbitration panel within five (5) days after they have both been appointed, and they shall promptly notify the Parties thereof. Each Party shall promptly notify the other Party and the Party-selected arbitrators in writing if the third arbitrator has any relationship to or affiliation with such Party (a "Notice of Relationship"), in which event another arbitrator shall be selected within five (5) days after receipt of such Notice of Relationship by the Party-selected arbitrators. If the two initially appointed arbitrators cannot agree on a third arbitrator, then any Party may request that the AAA select the third arbitrator.

b. Arbitration demanded hereunder by any Party shall be final and binding on the Parties and may not be appealed. The decision, arbitration order and relief agreed upon in writing by any two or more of the arbitrators (in the case of a three-member panel) shall be deemed the decision of the panel for all purposes hereof. If two or more members of the arbitration panel cannot agree, then the decision of the arbitrator not appointed by any Party shall control. The references herein to the arbitration panel shall also be deemed to refer to a single arbitrator where a panel is not being used hereunder, and all references to decisions, orders, awards and relief granted by the panel of arbitrators shall mean the decision, order, award or relief agreed upon in writing by the required number of members of the panel, as indicated. Any monetary award made in arbitration shall be made payable in the currency of the United States of America. "Notwithstanding anything contained in this agreement to the contrary, the arbitrator(s) may not award anything in excess of compensatory or actual damages. Such disallowed damage awards would include, without limitation, consequential, indirect, special, exemplary and punitive damages."

c. The Parties agree that the arbitration panel may render and the Parties shall abide by any interim ruling that the arbitration panel deems necessary or prudent regarding injunctive relief, discovery, summary proceedings, or other pre-arbitration matters. Notwithstanding the requirement to mediate prior to seeking arbitration, any of the Parties may invoke arbitration without seeking mediation if arbitration is necessary to obtain immediate injunctive relief or relief similar to injunctive relief.

d. The Parties hereby submit to the in personam jurisdiction of the state and federal courts located in Conecuh County, Alabama, and agree that any such court may enter all such orders as may be necessary or appropriate to enforce the provisions hereof and/or to confirm any pre-arbitration ruling or decision or any award rendered by the arbitration panel. Any court of law of Alabama or the United States of America shall enforce the decision of the panel of arbitrators (or single arbitrator, as applicable) in its entirety and only in its entirety; *provided, however*, that if a court for any reason refuses to enforce any equitable remedies ordered by the arbitration panel, such refusal shall not affect any damage or attorney fee award made by the arbitration panel.

e. Any costs or other expenses, including reasonable attorneys fees and costs incurred by the successful Party, arising out of or occurring because of the arbitration proceedings may be assessed against the unsuccessful Party, borne equally, or assessed in any manner within the sound discretion of the arbitration panel and shall be included as part of any order or decision rendered by the

arbitration panel. The arbitration panel may also order any Party who is ordered to pay any other Party's attorneys' fees and costs to pay interest on such award at a rate not to exceed eight percent (8%) per annum from the date of the award until paid. As an initial matter (and until ordered differently by the arbitration panel in connection with an award), the Parties shall each pay the fees, costs and expenses charged by the arbitrator chosen by it, and, in advance, one-half (1/2) of the fees, costs and expenses charged by the third arbitrator.

Third parties dealing with any Party shall be entitled to fully rely on any written arbitration order or decision with regard to the matters addressed therein, whether or not such arbitration order or decision has been confirmed or adopted by a court, or incorporated in any order of any court.

## E.   NO PARTNERSHIP PROVISION

Nothing within this Participation Sales Agreement is intended to create, and nothing herein shall ever be construed as creating a partnership, joint venture, mining partnership, corporation, association, or other relationship whereby any party hereto shall ever be held liable for the acts or debts of another. The duties, obligations, and liabilities of BUYER set forth in this Participation Sales Agreement shall be several and not joint so that the BUYER shall be liable only for its proportionate shares of the duties, obligations, and liabilities of BUYER under the terms of this Participation Sales Agreement.

## F.   ENTIRE AGREEMENT

This Participation Sales Agreement, the Joint Operating Agreement and any other contracts between the parties referred to herein or entered into contemporaneously herewith contains the entire agreement between the parties hereto relative to the Contract Area described herein and in the JOA and/or Exhibits attached hereto. Any prior agreements, promises, negotiations or representations not expressly set forth in this Agreement, the Operating Agreement and/or any other such contracts are of no force and effect unless evidenced by written document executed by the party(s) hereto. The Parties specifically intend that this Agreement supercede that certain Confidentiality And Non-Compete Agreement dated effective as of October 8, 2004, by and between Craft and SEC. No variations, modifications, or changes herein or hereof shall be effective unless evidenced by written document executed by the parties hereto. Notwithstanding the provisions of this Article X., Paragraph F., no party shall be bound by, subject to, or deemed a party to any agreement between the parties hereto which such party does not execute.

## G.   EXECUTION AND CONCLUSION

This Participation Sales Agreement shall be binding upon all parties hereto and may be executed in one or more counterparts or multiple originals. This Participation Sales Agreement and the attached Exhibits set forth the agreement of the parties with respect to the subject matter hereof, and may be amended only in writing, executed by the parties hereto.

## H.   BINDING AGREEMENT

Subject to Article VIII. of the Operating Agreement, the terms, covenants and conditions of this agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, legal representatives, successors, designees and/or assigns, and such terms, covenants and conditions shall be deemed as covenants running with the oil and gas leases covered hereby and with each transfer or assignment of leases; however, it is stipulated that no assignment or transfer by any party subject to this agreement, however accomplished, of any right, title or interest acquired hereunder shall relieve such party of any liability or obligation previously incurred, and any such assignment shall be null and void unless it specifically provides that it is made subject to the terms and provisions hereof for all purposes.

## I.   NEWS RELEASES

Any party hereto or any related party hereto desiring to issue a news release concerning operations or information conducted on the Contract Area shall provide the other parties hereto with advance copies of the proposed release and no such news release shall be issued without first obtaining the written consent of the majority interest participants as provided in Exhibit "A" of the JOA.

**Participation Sales Agreement**
**North Beach Prospect**

Page 11 of 14

Initialed by BUYER: _DHd_          Initialed by SELLER: _____

J.      **INFORMATION DISTRIBUTION LIST/GEOLOGICAL WELL REQUIREMENTS**

Non-Operators shall furnish or cause to be furnished separately to Operator at 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101, and to Craft Exploration Company, LLC at P.O. Box 16084 Jackson, Mississippi 39236, similar information as set out in the Information Distribution List attached hereto as Exhibit "H" to the Operating Agreement, and Operator shall provide such information and/or perform such requirements as set out therein.

K.      **PARAGRAPH HEADINGS**

The paragraph headings inserted in this agreement are utilized solely for reference purposes and do not constitute substantive matter to be considered in construing of this agreement.

L.      **TERM**

The term of this agreement shall expire contemporaneously with the term of the Operating Agreement.

M.      **LIABILITY**

All liability hereunder shall be separate and several and not joint or collective and shall be in proportion to BUYER's interest Before or After Payout as set forth in Article **VI** above. It is not the purpose of this agreement to create a partnership, mining partnership, partnership for a specific purpose, joint venture, or any other relationship which would render the parties liable as partners, associates, or joint venturers. Further, with regard to BUYER's Before Payout interest only, BUYER, as to its respective individual interest, shall during the period prior to Payout assume all costs and liabilities attributable to such interest, whereas SELLER assumes all costs and liabilities attributable to its Reversionary Working Interest from and after such time as SELLER's after Payout Reversionary Working Interest takes effect.

N.      **TIME IS OF ESSENCE**

It is specifically understood and agreed that time is of the essence hereof.

**Participation Sales Agreement**
**North Beach Prospect**

Page 12 of 14

Initialed by BUYER: _____          Initialed by SELLER: _____

**IN WITNESS WHEREOF,** this instrument is executed in multiple originals by each of the Parties hereto as of the effective date hereinabove first written.

The person executing this instrument on behalf of each Party represents that they have full authority to bind and commit the Party to the obligations herein set forth and that the Party that they are representing has been named correctly.

This instrument is deemed effective the 15th day of November, 2004, upon the execution of both parties hereto, regardless of the date of executions.

**OPERATOR:**

**SKLAR EXPLORATION COMPANY L.L.C.:**

By: David A. Barlow
Title: V.P. Chief Operating Officer
Date:  11-22-04

**BUYER:**

**SKLARCO L.L.C.:**

By: David A. Barlow
Title: V.P. Chief Operating Officer
Date:  11-22-04

**SELLER:**

**CRAFT EXPLORATION COMPANY, L.L.C.**

By: Steven H. Craft
Title: Member
Date:  11-22-04

State of _Louisiana_
Parish
County of _Caddo_

I, _Linda Edwards_ a Notary Public in and for said County and State, hereby certify that David A. Barlow, whose name as _COO_ of SKLAR EXPLORATION, LLC a ~~Louisiana LLC corporation,~~ is signed to the foregoing instrument and who is known to me on this day that being informed of the contents of the instrument _he_ is the _COO_ and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and seal this 22 nd day of _November_ 2004.

My Commission Expires: _for life_

_Linda Edwards_
Notary Public

Linda Edwards, Notary Public # 5074
Bossier Parish, Louisiana
My Commission is for Life

---

State of _Louisiana_
Caddo
County of _Caddo_
Parish

I, _Linda Edwards_ a Notary Public in and for said County and State, hereby certify that David A. Barlow, whose name as _COO_ of SKLARCO, L.L.C. a _Louisiana LLC_ ~~corporation,~~ is signed to the foregoing instrument and who is known to me on this day that being informed of the contents of the instrument _he_ is the _COO_ and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and seal this 22 nd day of _November_ 2004.

My Commission Expires: _for life_

_Linda Edwards_
Notary Public

Linda Edwards, Notary Public # 5074
Bossier Parish, Louisiana
My Commission is for Life

---

State of _Louisiana_
Parish
County of _Caddo_

I, _Linda Edwards_, a Notary Public in and for said County and State, hereby certify that Steven H. Craft, whose name as Member of CRAFT EXPLORATION COMPANY, LLC a MISSISSIPPI LLC corporation, is signed to the foregoing instrument and who is known to me on this day that being informed of the contents of the instrument he is the duly authorized member and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and seal this 22 nd day of _November_ 2004.

My Commission Expires: _for life_

_Linda Edwards_
Notary Public

Linda Edwards, Notary Public # 5074
Bossier Parish, Louisiana
My Commission is for Life

**Participation Sales Agreement**
**North Beach Prospect**

**Page 14 of 14**

Initialed by BUYER: _DAB_          Initialed by SELLER: _SH_

# EXHIBIT "I"

**Attached to and made part of that certain**
**Participation Sales Agreement dated effective NOVEMBER 15, 2004**
**By and Between SKLAR EXPLORATION COMPANY L.L.C., as Operator, SKLARCO**
**L.L.C., as Buyer and CRAFT EXPLORATION COMPANY, LLC, as Seller**

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED
Effective
__November 15__ , __2004__ ,

OPERATOR   **SKLAR EXPLORATION COMPANY L.L.C.**

CONTRACT AREA   **NORTH BEACH PROSPECT**

**As described in Exhibit "A-1" and  as depicted on Exhibit  "A-2"**

**Attached hereto and made part hereof**

COUNTIES OF            **Conecuh**                  STATE OF      **Alabama**

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM.   A.A.P.L. NO. 610 – 1982 REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS "A", "A-1" and "A-2" | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 -21 |
| XVI. | MISCELLANEOUS | 22 |

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1982

1                                       OPERATING AGREEMENT
2
3    THIS AGREEMENT, entered into by and between _____ **SKLAR EXPLORATION COMPANY L.L.C.**, hereinafter designated
4    and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein
5    as "Non-Operator", and collectively as "Non-Operators".
6
7                                          **WITNESSETH:**
8
9        WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in
10   Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the
11   production of oil and gas to the extent and as hereinafter provided,
12
13       NOW, THEREFORE, it is agreed as follows:
14
15                                             **ARTICLE I.**
16                                             **DEFINITIONS**
17
18       As used in this agreement, the following words and terms shall have the meanings here ascribed to them:
19       A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons
20   and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.
21       B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land
22   lying within the Contract Area which are owned by the parties to this agreement.
23       C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the
24   Contract Area which are owned by parties to this agreement.
25       D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be
26   developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests
27   are described in Exhibit "A".
28       E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or
29   federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-
30   ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.
31       F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.
32       G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of
33   any operation conducted under the provisions of this agreement.
34       H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate
35   in a proposed operation.
36       I. The term "legal holidays" shall mean those holidays observed by all national banking associations.
37       Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the
38   singular, and the neuter gender includes the masculine and the feminine.
39
40                                             **ARTICLE II.**
41                                              **EXHIBITS**
42
43       The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:
44   ☒   A. Exhibit "A", shall include the following information: plus – see Exhibit "A-1" and "A-2"
45           (1) Identification of lands subject to this agreement,
46           (2) Restrictions, if any, as to depths, formations, or substances,
47           (3) Percentages or fractional interests of parties to this agreement,
48           (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
49           (5) Addresses of parties for notice purposes.
50   ☐   . There is no Exhibit "B"
51   ☒   C. Exhibit "C", Accounting Procedure.
52   ☒   D. Exhibit "D", Insurance.
53   ☒   E. Exhibit "E", Gas Balancing Agreement
54   ☒   F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
55   ☐   . There is no Exhibit "G"
56       If any provision of any exhibit, except Exhibits "F",   is inconsistent with any provision contained in the body
57   of this agreement, the provisions in the body of this agreement shall prevail.
58   X   H. Exhibit "H", Geological Well Requirements/Information Distribution List.
59
60
61
62
63
64
65
66
67
68
69
70

### ARTICLE III.
### INTERESTS OF PARTIES

**A.   Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

**B.   Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A".  In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties, overriding royalties, and other burdens  which are the joint obligation of the parties.

Each party shall be entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest, in such production, / royalties and other burdens / and shall hold the other parties free from any liability therefor.  No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.  Should all parties share in the same market for the production of oil and gas from the Contract Area, Operator shall pay or deliver all such burdens as listed on Exhibit "A".

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C.   Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden / which is not a joint obligation of the parties / on production, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D.   Subsequently Created Interests:**

  See Article XV.D.

~~1.   If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and.~~

~~2.   If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently-created interest in the same manner as they are enforceable against the working interest of the burdened party.~~

### ARTICLE IV.
### TITLES

**A.   Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well.  The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases.  At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge.  All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator.  Operator shall cause title to be examined by attorneys on its staff or by outside attorneys.  Copies of all title opinions shall be furnished to each party hereto.  The cost incurred by Operator in this title program shall be borne as follows:

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE IV
**continued**

1 ☒  Option No. 2:   Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination
2 (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties
3 in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4 hibit "A".  Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5 functions.
6
7   Operator shall  be  responsible  for  securing  curative  matter  and  pooling  amendments  or  agreements  required  in  connection
8 with leases or oil and gas interests contributed by such party.  Operator shall be responsible for the preparation and recording of pooling
9 designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10 This shall not prevent any party from appearing on its own behalf at any such hearing.  Costs, if any, incurred by Operator for these matters
11 shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties
12 as such interest appears in Exhibit "A".
13
14   No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
15 provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to par-
16 ticipate in the drilling of the well.
17
18
19
20   3.  Other Losses:   All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses
21 and shall be borne by all parties in proportion to their interests.  There shall be no readjustment of interests in the remaining portion of
22 the Contract Area.
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

**ARTICLE V.**

**OPERATOR**

**A.   Designation and Responsibilities of Operator:**

**SKLAR EXPLORATION COMPANY L.L.C.** _____ shall be the
Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and
required by, and within the limits of this agreement.  It shall conduct all such operations in a good and workmanlike manner, but it shall
have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross
negligence or willful misconduct.

**B.   Resignation or Removal of Operator and Selection of Successor:**

   1.   Resignation or Removal of Operator:   Operator may resign at any time by giving written notice thereof to Non-Operators.
If   Operator   terminates   its   legal   existence,   or   is   no   longer   capable   of   serving   as
Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor.  Operator
may be removed ~~if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership,~~ by the
affirmative vote of ~~three (3) parties~~ total or fifty one percent (51.0%) or greater voting ~~2 or more / owning a / interest based on voting interest as shown on Exhibit "A".~~ Such resignation or removal shall not
become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of
notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and
assumes the duties of Operator at an earlier date, however a successor Operator may become Operator and begin duties thereof in the drilling
and Operation of proposed wells and assume Operations of existing wells at a later time.  Operator, after effective date of resignation or
removal, shall be bound by the terms hereof as a Non-Operator.  A change of a corporate name or structure of Operator or transfer of
Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

   2.   Selection of Successor Operator:   Upon the resignation or removal of Operator, a successor Operator shall be selected by
the parties.  The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor
Operator is selected.  The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority voting / interest
based on voting interest as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to
succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based
on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

**C.   Employees:**

   The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the
compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

**D.   Drilling Contracts:**

   All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area.  If it so
desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing
rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and
such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of in-
dependent contractors who are doing work of a similar nature.

**ARTICLE VI.**

**DRILLING AND DEVELOPMENT**

**A.   Initial Well:**

                                                                                                                                and location
   On or before the _____ **15th** _____ day of _____ **March** _____ **2003** _____, with said date / extended or moved, respectively,
by a majority voting interest, Operator shall commence the drilling of a well for oil and gas at the following location:
      **1510' from the North Line and 2055' from the East Line of**
      **Section 8, Township 4 North Range 13 East, Conecuh County, Alabama, or as near thereto as practicable.**
and shall thereafter continue the drilling of the well with due diligence to
**11,600 feet or a to a depth sufficient to reach 100' into the basement or impenetrables in order to test the entirety of stratigraphic**
**equivalent of the Haynesville, Smackover, and Norphlet Sand Formations of the Upper Jurassic System.**

**Said Initial Text well drilling date and / or location may be extended or moved, respectively, by a majority vote.**

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is en-
countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth

   Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and
gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which
event Operator shall be required to test only the formation or formations to which this agreement may apply.

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

**B.   Subsequent Operations:**

1.   Proposed Operations:   Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing *l* in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma- tion and the estimated cost of the operation.   The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation.   If a drill- ing rig is on location *l*, notice of a proposal *l* to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays.   Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.   Any notice or response given by telephone shall be promptly confirmed in writing.

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the ~~forty-eight~~ twenty-four (24) hour period when a drilling rig is on loca- tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par- ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex- amination or curative matter required for title approval or acceptance.   Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor- dance with the provisions hereof as if no prior proposal had been made.

2.   Operations by Less than All Parties:   If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the ~~forty-eight~~ twenty-four (24) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence.   Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera- tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work.   Con- senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con- ditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposal.   Each Consenting Party, within twenty-four (24) hours ~~forty-eight~~ hours (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par- ticipation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a).   In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of ~~forty-eight~~ twenty-four (24) hours (inclusive of Saturday, Sunday and legal holidays).   The proposing party at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph.   Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense.   If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a pro- ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk.

- 5 -

and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other interests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

    200

(a) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(b)     __500__     % of that portion of the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing,

after deducting any cash contributions received under Article VIII.C., and   __500__   % of that portion of the cost of newly acquired equip-

ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any reworking or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100 %) of that portion of the costs of the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.D.

In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production, or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply; provided, however, that an exception well location that is approved by the Alabama Oil & Gas Board shall be deemed to conform to the then-existing spacing pattern.

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for production, ceases to produce in paying quantities.

3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

(a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

(b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period shall be limited to forty-eight twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and receive up to eight (8) additional days after expiration of the forty-eight twenty-four (24) hours within which to respond by paying for all stand-by time incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other instances the response period to a proposal for sidetracking shall be limited to thirty (30) days.
*See Article XV- Item EE ___

## C.   TAKING PRODUCTION IN KIND:

Each party shall have the right to take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

1 required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3     Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from

4 the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for

5 its share of all production.

6

7     In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of

8 the oil / produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not

9 the obligation, to purchase such oil / or sell it to others at any time and from time to time, for the account of the non-taking party at the

10 best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the

11 owner of the / production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil / not previously

12 delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil / shall be only for such reasonable periods of

13 time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess

14 of one (1) year.

15

16     In the event one or more parties' separate disposition of its share of the gas causes split-stream / deliveries to separate pipelines and/or

17 deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to

18 be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing

19 agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

20

21 **D.  Access to Contract Area and Information:**

22

23     Each consenting party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe

24 operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's

25 books and records relating thereto. Operator, upon request, shall furnish each of the other consenting parties with copies of all forms or

26 reports filed with governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on

27 hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area.

28 The cost of gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that

requests the information.

29

30 **E.  Abandonment of Wells:**

31

32     1.  Abandonment of Dry Holes:  Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been

33 drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned

34 without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply

35 within forty-eight hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon

36 such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in

37 accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening

38 such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further

39 operations in search of oil and/or gas subject to the provisions of Article VI.B. by immediately assuming all costs, risks and liabilities of such

40 further operations including plugging and abandonment costs.

41

42     2.  Abandonment of Wells that have Produced:  Except for any well in which a Non-Consent operation has been conducted

43 hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a

44 producer shall not be plugged and abandoned without the consent of all parties /. If all parties consent to such abandonment, the well shall

45 be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within

46 thirty (30) days after receipt of notice of the proposed abandonment of any well /, all parties do not agree to such abandonment of such well,

47 those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other

48 parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of

49 Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.* Each abandoning party shall assign

50 the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and

51 material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the interval

52 intervals     of     the     formation     or     formations     then     open     to     production.

53

54

55

56 * Failure to respond to said notice shall constitute an election to plug and abandon said well.

57

58

59

60 The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the

61 assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the

62 Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of

63 interests in the remaining portion of the Contract Area.

64

65     Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from

66 the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-

67 quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-

68 templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned

69 well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to

70 repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-

visions hereof.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT – 1982

## ARTICLE VI
### continued

3.   Abandonment of Non-Consent Operations:   The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
VI.E.

## ARTICLE VII.
## EXPENDITURES AND LIABILITY OF PARTIES

**A.   Liability of Parties:**

The liability of the parties shall be several, not joint or collective.   Each party shall be responsible only for its obligations, and
shall be liable only for its proportionate share of the costs of developing and operating the Contract Area.   Accordingly, the liens granted
among the parties in Article VII.B. are given to secure only the debts of each severally.   It is not the intention of the parties to create, nor
shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

**B.   Liens and Payment Defaults:**

Each Non-Operator grants to Operator / a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
at the rate provided in Exhibit "C".   To the extent that Operator / a security interest under the Uniform Commercial Code of the
state, Operator / shall be entitled to exercise the rights and remedies of a secured party under the Code.   The bringing of a suit and the ob-
taining of judgment by Operator / for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
rights or security interest as security for the payment thereof.   In addition, upon default by any Non-Operator in the payment of its share
of expense, Operator / shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid.   Each
purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default.   Operator grants a like lien
and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefore by
Operator, the non-defaulting parties, including Operator, shall   upon   written request by Operator pay   the unpaid amount in   the proportion
that
the interest of each such party bears to the interest of all such parties.   Each party so paying its share of the unpaid amount shall, to obtain
reimbursement thereof, be subrogated to the security rights described in the forgoing paragraph.

**C.   Payments and Accounting:**

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
tionate shares upon the expense basis provided in Exhibit "C".   Operator shall keep an accurate record of the joint account hereunder,
showing expenses incurred and charges and credits made and received.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
with an invoice for its share thereof.   Each such statement and invoice for the payment in advance of estimated expense shall be submitted
on or before the 20th day of the next preceding month.   Each party shall pay to Operator its proportionate share of such estimate within
fifteen (15) days after such estimate and invoice is received.   If any party fails to pay its share of said estimate within said time, the amount
due shall bear interest as provided in Exhibit "C" until paid.   Proper adjustment shall be made monthly between advances and actual ex-
pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D.   Limitation of Expenditures:**

1.   Drill or Deepen:   Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
pursuant to the provisions of Article VI.B.2. of this agreement.   Consent to the drilling or deepening shall include:

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
continued

1 ☐ Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2 necessary tankage and/or surface facilities.
3
4 ☒ Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5 authorized depth, and all tests have been completed, and the results thereof (including all logs) furnished to the parties. Operator shall give immediate notice
6 to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight twenty-four(24)
7 hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8 tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9 cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties.
14
15 2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.
19
20 3. Other Operations: Without the consent of all parties, Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of _____**Fifty Thousand and No/100**_____ Dollars ($_____**50,000.00**_____ )
22 except in connection with a well, the drilling, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of _____**Ten Thousand and No/100**_____
28 Dollars ($_____**10,000.00**_____ ) but less than the amount first set forth above in this paragraph.
29
30 E. Rentals, Shut-in Well Payments and Minimum Royalties:
31
32 Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35 behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B.3.
39
40 Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46 F. Taxes:
47
48 Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".
59
60                                           or Non-Operator
   If Operator / considers any tax assessment improper, and, in the case of a Non-Operator, if any such Non-Operator timely notifies
61 Operator in writing. Operator, shall may at its discretion protest within the time and manner
   prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".
66
67     Operator                               on behalf of all parties
   Each party shall pay or cause to be paid / all production, severance, excise, gathering and other taxes imposed upon or with respect
68 to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.
69
70

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**G.    Insurance:**

At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of the state where the operations are being conducted; however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided as in Exhibit "C". Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation law of the state where the operations are being conducted and to maintain such other insurance as stated in Exhibit "D".

In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

## ARTICLE VIII.

### ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

**A.    Surrender of Leases:**

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto, except by and through any of the non-consenting provisions hereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leased acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

**B    Renewal or Extension of Leases**

Intentionally Omitted. See Article XV

**C.    Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for / a contribution of cash towards the drilling of a well or any other
(*or receives* written above "for /")
operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VIII
continued

**D.   Maintenance of Uniform Interests:**

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells, equipment and production unless such disposition shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties. Any extra expenditure incurred as a result or a partial disposition, including any additional marketing or metering expense, shall be borne by the party to which such interest is transferred.

~~If at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.~~ In the event a disposition is made to a third party who, at the time of disposition is in receivership or has filed for or has been petitioned into bankruptcy, the disposing party shall also be liable to the other parties for all amounts accrued for operations in which the disposing party chose to participate under this Agreement, attributable to the disposed interest prior to the effective date of the disposition.

**E.   Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

**F.   ~~Preferential Right to Purchase:~~**

**Intentionally deleted**

### ARTICLE IX.

### INTERNAL REVENUE CODE ELECTION

This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1986, as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1986, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

# ARTICLE X.

## CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____ **Ten Thousand and No/100** Dollars ($ **10,000** ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder. All claims or suits involving title to any interest subject to this Agreement, except subsequently created interests, shall be treated as a claim or suit against all parties hereto.

# ARTICLE XI.

## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

# ARTICLE XII.

## NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

# ARTICLE XIII.

## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☒ Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise. * See Article XV: Item A.1.

☐ Option No. 2: In the event the well described in Article VI.A. or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

# ARTICLE XIV.

## COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B. Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ Alabama shall govern. The venue shall be in Conecuh County, Alabama. In the event that a matter is decided before the court, then the prevailing party shall have the right to recover and the non-prevailing party hereby agrees to pay the recovery of reasonable attorney's fees.

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations, or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

# ARTICLE XV
## OTHER PROVISIONS

**In the event of conflict between any provisions in this Operating Agreement and the provisions of**

**Article XV hereinbelow, the provisions of Article XV herein shall control**

**A.    Area of Mutual Interest.**

1.    Definition, Bounds, and Term: The parties hereto hereby create an Area of Mutual Interest ("AMI") consisting of the Contract Area described in EXHIBIT "A-1" and depicted within the red outline in Exhibit "A-2" attached hereto. This AMI shall remain in force and effect as long as this Operating Agreement remains in effect.

2.    Acquisition: During the term of this AMI, if any party hereto ("Acquiring Party") acquires, renews or extends any oil and gas leases or any interest therein, any mineral interest, royalty interest or any farmouts or other contracts with respect thereto which affect lands and minerals lying within the AMI ("Mineral Interest"), the Acquiring Party shall promptly advise each of the other parties hereto ("Offeree") of such acquisition. In such event, each Offeree shall have the right to acquire its proportionate interest in such Mineral Interest in accordance with the other provisions of this AMI.

3.    Offering of acquired properties to other parties: Promptly upon acquiring such Mineral Interest, the Acquiring Party shall, in writing, advise the Offerees of such acquisition. The notice shall include a copy of all instruments of acquisition including, by way of example but not of limitation, copies of the leases, assignments, subleases, farmouts or other contracts affecting the Mineral Interest. The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by the Acquiring Party in acquiring such Mineral Interest, excluding, however, costs and expenses of its own personnel ("Acquisition Costs"). Each Offeree shall have a period of thirty (30) days after receipt of the notice within which to furnish the Acquiring Party written notice of its election to acquire its proportionate interest in the offered Mineral Interest. If, however, a well in search of oil or gas is being drilled within the AMI, each Offeree shall have a period of forty-eight (48) hours after receipt of the notice within which to elect to acquire its proportionate interest in the Mineral Interest so offered. It is provided, however, that the forty-eight (48) hour election period shall not apply unless the Acquiring Party shall give the notice to the Offerees within two (2) days after the date on which

- 14 -

the **Acquiring Party** acquired the Mineral Interest so offered. In addition thereto, the Acquiring Party shall also:

> (a) furnish the Offeree with the approximate location of the well then being drilled and the name of the Operator or drilling contractor drilling the well, and

> (b) specifically advise the Offeree that the Offeree shall have a period of forty-eight (48) hours within which to elect to acquire an interest in the offered Mineral Interest.

The above information shall be in addition to the information and copies of instruments provided for above in connection with the usual notice of acquisition of a Mineral Interest. If the Acquiring Party shall not have received actual written notice of election of Offeree to acquire its proportionate interest within the thirty (30) day or forty-eight (48) hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire its interest in the Mineral Interest. Each Offeree accepting the offered Mineral Interest shall be entitled to participate in such Mineral Interest in the proportion to which its Before Payout interest under this Operating Agreement as set forth in Exhibit "A" hereto bears to the aggregate interest under this Operating Agreement as set forth in Exhibit "A" hereto of the Acquiring Party and all other Offerees who have elected to acquire an interest in the Mineral Interest so offered. Promptly after the time for the election shall have expired, the Acquiring Party shall invoice each Offeree electing to acquire an interest for its proportionate part of the Acquisition Costs. Each Offeree shall immediately reimburse the Acquiring Party for its share of the Acquisition Costs, as reflected by the invoice. Upon receipt of such reimbursement, the Acquiring Party shall execute and deliver an appropriate assignment to such Offeree. If the Acquiring Party does not receive the amount due from the Offeree within thirty (30) days after the receipt by the offeree of the invoice for its costs, the Acquiring Party may, at its election, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within thirty (30) days after receipt of such invoice by the delinquent Offeree shall constitute a withdrawal by the delinquent Offeree of its former election to acquire the interest, and such Offeree shall no longer have the right to acquire an interest in the offered Mineral Interest.

4. Assignment of interest(s): Any assignment made by the Acquiring Party shall be made free and clear of any burdens placed thereon by the Acquiring Party but otherwise without warranty of title, either express or implied, even to the return of the purchase price. The assignment shall be made and accepted subject to, and each assignee shall expressly assume its portion of, all of the contractual obligations of the Acquiring Party as to the acquisition.

5. Mineral interest(s) lying both within and outside the AMI: If the Mineral Interest covers lands within and outside the AMI, the Acquiring Party shall offer the entire Mineral Interest within and outside the AMI. If each party hereto acquires its proportionate interest, the lands lying outside the AMI shall still be subject to this Agreement and the AMI shall thereby be enlarged. If less than all of the parties acquire their proportionate interest in the Mineral Interest, the Mineral Interest so acquired shall not be subject to this Operating Agreement, but shall be subject to an operating agreement on a form identical to this Operating Agreement (without this Area of Mutual Interest provision) between the parties hereto who acquire an interest in such Mineral Interest.

6. Offering multiple mineral interest(s): If two (2) or more separate Mineral Interests are included in the same notice, each Offeree shall have the separate right of election as to each separate Mineral Interest which is not contiguous, joined, adjacent, or a portion of the same tract, but Offeree shall have the right to separately acquire or not acquire any lands lying outside of the AMI.

7. Mergers and sales: The provisions of this AMI shall not apply to acquisitions as a result of merger, consolidation, reorganization or an acquisition from a parent, subsidiary or affiliated corporation, or, as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries. Neither shall it apply to sales and acquisitions between partners in a partnership or venturers in a joint venture, or to any acquisition by any party of an interest which interest prior to and at the time of such acquisition was subject to this Agreement, unless such acquisition was the renewal or extension of a lease which at the date of expiration was subject to this Agreement. As used herein a renewal or extension of any lease means any renewal lease, extension or new lease covering all or any portion of or any interest in the area covered by an expiring lease taken before, or taken or contracted for within one year after, the expiration of the predecessor lease.

8. Proposal to acquire lease through lease acquisition program:

Any party may propose to acquire Mineral Interest through an acquisition program for the benefit of participating parties through notice and written proposal to all parties hereto. Said written proposal shall include the details of the proposed acquisition area, including a hard and fixed outline, which shall create a sub-AMI for the acquisition program, the estimated cost of the proposed acquisition(s) on a net acre basis, which must be prudent and reasonable for the area as established by recent and comparable trades, and geological or geophysical support deemed applicable by proposing party.

Upon receipt of written proposal, said parties shall have 15 days (or 48 hours if a drilling rig is on location and the Mineral Interest are lying within the drilling unit) to elect to participate in said Mineral Interest acquisition program. Parties electing not to participate in the proposed acquisition program shall relinquish their right to earn any right, title, and/or interests in and to the proposed acquisition area and its established sub-AMI through the term of the acquisition program and will relinquish their right to earn any right, title, and/or interest in any Mineral Interests acquired through the acquisition program through the term established on each individual acquisition.

Operator may manage and pursue said acquisitions on behalf of the participating parties unless, by a majority vote, those participating parties elect one of the participating parties to manage and pursue said acquisitions instead of Operator. If Operator or an elected party does not wish to pursue said acquisitions, then the proposing party shall pursue said acquisitions.

Said participating parties shall be required to pay 50% of their pro-rata share of said estimated costs within 30 days of receipt of request by notice for advanced payment with the remaining 50% due 30 days thereafter if so requested. If said funds are not received, then a majority vote of the paying parties may elect to remove the non-paying party from any or all of the entire acquisition program at the majority vote of the paying parties exclusive election, and said removed party shall not retain any right, title, and/or interest in and to the portion of the program that they are removed, and shall have no future rights in the remainder of the acquisition program. Said removed party will be reimbursed his costs on any monies paid in to the acquisition program on said acquisitions from which he is removed.

Said acquiring party shall have a period of 90 days from the date of its receipt of funds or from the date of it being elected as the acquiring party, whichever is later, to pursue said acquisition program, whereby at the end of 90 days said participating parties may each elect whether they wish to continue or not continue in the acquisition program. Parties electing not to continue will maintain their position that has been acquired to date and relinquish their right to earn any right, title, and/or interests in any subsequent acquisitions within the acquisition program which shall continue for an additional 60 days for the continuing parties, whereby the acquisition portion of the acquisition program will expire. Any acquisition past this 60 days will be deemed an acquisition under the remainder of the AMI provisions and not a part of the proposed acquisition program.

No individual acquisition shall be made which would exceed 150% of the estimated net acre cost basis without the majority vote of the participating parties. Said acquiring party shall provide notice for this vote and said voting parties shall have 7 days (or 48 hours if a drilling rig is on location and the Mineral Interests are lying within the drilling unit) to return their vote. Any acquisition which exceeds this 150% and is not approved by a majority vote shall be deemed a defaulting acquisition, which shall be treated, paid for and owned by the exclusive decision of the majority vote of the participating parties, however excluding the vote of the acquiring party.

Upon completion of the acquisition program, said properties and interests shall no longer be subject to this Agreement, but shall be subject to an operating agreement identical to this agreement changed only to reflect the names and interests of the new owning parties and the terms and conditions of the Initial Test Well which shall be deemed to have been already drilled and any proposed well shall be under the terms and conditions of the remainder of the JOA.

9. Recognition of AMI and burdens: The parties take cognizance of the AMI provision as described herein and also in Exhibit "A-2" attached to this Operating Agreement and agree to be bound thereby. In addition to this AMI provision, the parties hereto recognize and agree that as among themselves, each lease or contractual interest acquired under the Operating Agreement shall be subject to the lessors Royalty, Overriding Royalty, Reversionary Interest or other contractual burdens in favor of the granting party of a lease or contractual right to earn a lease necessary for and incident to the acquisition of such lease or contractual right to earn a lease, and to the burdens as set forth in each parties respective Participation Sales Agreement, which parties hereto agree to jointly bear on subsequent AMI acquisitions.

10. Trading acreage with competing Operators in the area: Prior to the establishment of production and in the event that a trade is worked out with other operators in the area to trade acreage, and the trade is supported by a majority vote of the voting parties, then all parties shall be bound by the terms and conditions of the trade.

B. (There is no paragraph B.)

C. Pre-order of Tubulars. If in the opinion of Operator it is necessary to pre-order tubular goods or other equipment in order to insure the orderly conduct of operations hereunder, Operator shall have the right to do so, only after obtaining a 65% or greater vote, and each Non-Operator shall reimburse Operator for its proportionate part of the cost of the goods or equipment so ordered within twenty (20) days after receipt of an invoice from Operator.

D. Subsequently Created Interests. Notwithstanding any provision of this agreement to the contrary, if any party hereto shall create an overriding royalty, production payment, net proceeds interest, or other

- 16 -

similar interest, which pursuant to the terms of the Participation Sales Agreement is not a joint obligation of the parties thereto, (any such interest shall hereafter be referred to as a "Subsequently Created Interest") such Subsequently Created Interest shall be specifically subject to all of the terms and provisions of this Agreement, as follows:

1.  If non-consent operations are conducted pursuant to any provision of this agreement, and the party conducting such operations becomes entitled to receive the production attributable to the interest out of which the Subsequently Created Interest is derived, such party shall receive same free and clear of such Subsequently Created Interest. The party creating same shall bear and pay all such Subsequently Created Interests and shall indemnify and hold the other parties hereto free and harmless from any and all liability resulting therefrom.

2.  If the owner of the interest from which a Subsequently Created Interest is derived fails to pay, when due, its share of expenses chargeable hereunder, the lien granted the other parties hereto under the provision of Article VII.B, or under the appropriate state statutes shall cover and affect the Subsequently Created Interest and the rights of the parties shall be the same as if the Subsequently Created Interest had not been created.

3.  If the owner of the interest from which a Subsequently Created Interest is derived (i) elects to abandon a well under the provisions of Article VI.E hereof, (ii) elects to surrender a lease (or portion thereof) under the provisions of Article VIII.A hereof, (iii) elects not to pay rentals attributable to its interest in any lease and thereby is required to assign the lease or that portion or interest therein for which it elects not to pay rentals to those parties paying such rental, or (iv) elects not to participate in an Obligatory Operation as defined in Article XV.G, any assignment resulting from such election shall be free and clear of the Subsequently Created Interest.

4.  The owner creating such interest shall indemnify and hold the other parties hereto harmless from any claim or cause of action by the owner of the Subsequently Created Interest.

E.  (There is no Paragraph E.)

F.  Multiple Proposals. Except by the expressed written consent of a majority vote of the voting parties, it is specifically provided that no notice shall be given under Article VI hereof by any single party which proposes the drilling of more than one additional well during the time in which another well is being drilled and / or completed. If a rig is on location within the contract area, and the decision to run completion pipe and make a completion attempt is made by a majority vote, then a well proposal for an offsetting well (any well proposed within 3300' of a producing well or the well in which the completion attempt is being made) may be made and parties shall be bound by a 48 hour election period, exclusive of Saturday, Sunday, and legal holidays. However, in the event that an arrangement has been made with another Operator in the area to share drilling and development obligations, and it is the other Operator's obligation to drill a subsequent well, then well proposals shall conform with time frames to respect the Agreement with other Operator, for as long as other Operator meets with their obligations.   This paragraph shall not apply under those circumstances where the well to which such notice is directed is a well which is required to be drilled under the terms of a lease or contract or one required to maintain in force a lease or portion thereof.

G.  Obligatory Operations.  Notwithstanding anything to the contrary contained in the Agreement, the parties hereto agree that the non-consent provision of Article XV, shall be applicable to any well or operation within the Contract Area which is deemed to be a "required well" or "required operation".  A "required well" is defined for the purposes of this Agreement as any well or operation required or necessary to maintain the Contract Area lease(s) in effect if such lease (or a portion thereof) would otherwise expire within six (6) months or less following the date of the proposal of said well or operation.  A "required operation" is necessary to acquire or earn an interest in a lease(s) under a farmin or acreage contribution contract.

If an acreage contribution contract is entered into, including but not limited to other Operators such as Midroc, then the non-consenting penalties of this Article shall apply, unless the penalties for not drilling under the acreage contribution contract are greater, then they may supercede and apply, at the exclusive choice of the consenting parties. The contemplated acreage contribution contract with Midroc may require alternate drilling between themselves and the parties hereto.

If other parties have a drilling rig on location within the contract area of this JOA, and the well proposal of any well proposed by the parties hereto is within 3960' of the location of the active rig, then the well proposed may be deemed by the proposing party or a majority vote, to be a proposal with a rig on location within the contract area , and the election response period shall be limited to 48 hours, exclusive of Saturday, Sunday, and legal holidays, as set forth in Article VI B.

H.  Priority of Elections. When a well has reached its authorized depth, and all logging, coring and testing that would be performed by a prudent operator has been completed, and the results thereof (including all logs) furnished to the parties set forth in Exhibit "A" attached hereto, and should such participating parties be unable to reach mutual agreement as to the sequence and timing of further operations regarding said well, it is agreed that the following elections shall control in the order enumerated hereafter. The order of such elections enumerated hereafter shall also control at any other time in the life of a well when the participating parties have submitted conflicting proposals.

- 17 -

1. If a well has reached its objective depth prior to reaching the objective formation, an election to deepen to a new objective depth or the objective formation whichever is reached first;
2. An election to conduct additional well logging surveys, coring operations, or testing operations on the well;
3. An election to attempt to complete the well in the deepest interval in which a completion attempt has not previously been made;
4. An election to plug back and attempt to complete the well in the deepest interval in which a completion attempt has not previously been made;
5. An election to deepen the well to a new objective formation;
6. An election to sidetrack the well;
7. An election to plug and abandon the well.

It is provided, however, that if at the time said parties are considering any of the above elections the Operator deems that the hole is in such a condition that a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well, such election shall not be given the priority hereinabove set forth.

Notwithstanding anything to the contrary in this Article, any party which desires to perform logging, coring, or testing (in addition to the logging, coring, and testing that would be performed by a prudent operator) before attempting a completion which has been proposed by any party may do so at its sole cost, risk and expense, and said party shall be responsible to all other non-participating partners in said operation for any consequential or incidental damages whatsoever which may occur as a result of said additional logging, coring or testing. The parties not participating in such additional testing shall not be entitled to receive the logs and other data resulting from such tests, except that the parties conducting such additional operations shall share any new information with the Operator if it does not participate and such information is deemed to be critical to the safety or integrity of future operations. After the additional logging, coring or testing is performed each party that participated in the well shall then be allowed to participate in the next proposed operation. If the decision is made to plug and abandon the well before a completion attempt has been made the parties who participated in the drilling of the well shall be responsible for their proportionate share of the plugging and abandoning costs.

Anything to the contrary notwithstanding, an election by a party not to participate in an operation other than drilling, sidetracking or deepening, or those which are included in XV.G, XV.H.2. or XV.EE in which such party has a right to participate, will serve to preclude participation by such party in all subsequent operations (including those to test and complete the well) conducted in the formation to which the operation is proposed. That is, such party shall be deemed non-consent as to all subsequent operations proposed in, and as to all production from, the objective formation of the respective proposal. However, this shall not preclude such party from having the right to participate in any subsequent operation proposed in any other formation in the well in which the party either participated in the drilling or elected not to participate in the drilling but for which the respective penalty has been recouped. The term "formation" as used in this Article shall be defined as a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas. Without limitation upon the foregoing, the so-called "A-1", "A-2" and "B" zones of the Smackover Formation within the North Beach Prospect shall be deemed to constitute one single formation.

Advance Payment. If a proposal is made pursuant hereto for the drilling, sidetracking, deepening, completing or recompleting of any well where the estimated costs exceed $25,000, any party electing to participate in the proposed operation shall within thirty (30) days after receipt of written request by Operator either (1) advance its portion of the estimated costs of such operation, or (2) furnish Operator a letter of credit from a bank acceptable to all parties containing terms reasonably acceptable to Operator obligating the bank to pay such party's portion of the estimated costs of such operation, or (3) make other credit arrangements satisfactory to all parties for the payment of its portion of the estimated costs of such operation. Notwithstanding anything to the contrary contained in this agreement, the failure of a party either to advance its share of such costs, furnish such letter of credit, or to make other satisfactory credit arrangements within the time provided shall, at the option of Operator, constitute a withdrawal by the party of its prior election to participate in the proposed operation and an election by such party to become a Non-Consenting Party with respect to such operation. Such withdrawal by Operator shall be subject to Operator granting the party who failed to timely make necessary financial arrangements with Operator a second notice period for twenty-four hours in which to do so. If Operator makes an election under this Article XV.I., the other Non-Operators shall immediately be afforded the elections provided in the second paragraph of Article VI.B. The provisions of this Article XV.I. shall be in addition to and not in lieu of other provisions of the Operating Agreement, and particularly Article VII.B and C. It is further understood that Operator will be under no liability to the Non-Operators for Operator's failure to carry out any proposed operation if such operation is not fully subscribed, although Operator does agree to timely refund advance payments made by Non-Operators for operations not carried out.

The rights and obligations as between Operator and other parties, Non-Operators, hereto who participate in the proposed operation shall not be affected for reason of Operator's failure to require any other party to make advance payment, furnish a letter of credit, or make other credit arrangements. If Operator or any Non-Operator so requests, all parties to this agreement shall enter into a mutually acceptable Escrow Agreement for the escrow of all funds prior to the drilling of any well hereunder, or any operation which requires the issuance of an AFE.

J.   **Election Not to Pay Delay Rental, Shut-in or Minimum Royalty Payments.** Each party hereto shall be obligated to bear its proportionate part of any and all rentals, shut-in well payments and minimum royalties necessary to continue in force and effect the leases covered by this agreement unless and until such party timely gives the notice provided for in the next sentence hereof. At least thirty (30) days prior to the date on which the payment of any rental, shut-in well payment or minimum royalty necessary to continue in force a lease is due, Operator shall make a written recommendation to Non-Operators as to whether or not such payment should be paid. If any party does not wish to bear its proportionate part of any such payment necessary to continue in force any lease covered by this agreement (the "Non-Paying Party"), such Non-Paying Party shall give the Operator and other Non-Operators written notice of such elections at least fifteen (15) days prior to the date upon which such payment is due, and the non-Paying Party shall be released from its obligation to bear its proportionate part of any such payments that accrue under the terms of the lease or leases specified in such written election notice at any time after the expiration of fifteen (15) days following the date on which the Operator received the foregoing written election notice from such Non-Paying Party. Unless mutually agreed otherwise, the proportionate part of such payment attributable to any such lease that would have been borne by the Non-Paying Party shall be borne by the parties hereto that do not exercise the foregoing election (the "Paying Parties"), in the proportion that the interest of each Paying Party bears to the total interests of all Paying Parties, and the Non-Paying Party shall assign to the Paying Parties, without express or implied warranty of title (but free of any Subsequently Created Interest or lien created or placed on such lease or leases by such party), all of its interest in the lease or leases specified in such written election notice in the respective proportions that the Paying Parties bear such payment on any such lease or leases. In the event that a Party fails to provide the election notice provided herein, said party shall be deemed to concur with operator's recommendation. It is further hereby agreed and understood that Operator shall maintain the rental responsibility of the leases subject to this Agreement unless otherwise provided for.

K.   **Necessary Expenditures.** The phrase "necessary expenditures" in Article VII.D.1 (option No.2) on page 10 shall not be deemed to include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

L.   **Past Due Balance.** If a Non-Operator has a past-due balance for sixty (60) days or greater, and, the lien conferred in Article VII.B, has been enforced by notice from the Operator to the defaulting Non-Operator, for so long as the affected party remains in default, it shall have no further access to the Contract Area or information obtained in connection with operations hereunder and shall not be entitled to vote on any matter hereunder. Unless Operator has been notified in writing by Non-Operator of a grievance over an alleged "past due balance" or "default" which is then being negotiated as to any proposed operation in which it otherwise would have the right to participate, such party shall have the right to be a Consenting Party therein only if it pays the amount which is in default before the operation is commenced; otherwise, it may, at Operator's discretion, be deemed a Non-Consenting Party to that operation; alternatively, rather than deeming the defaulting Non-Operator a Non-Consenting Party, Operator may pursue any and all other remedies available against said Non-Operator.

M.   **Pipeline and/or Gathering Line or Acquisition.** If any party to this agreement proposes the construction or acquisition and operation of a pipeline and/or gathering line to transport production from the Contract Area, then such party shall offer each of the other non-proposing parties to this agreement the right to participate in the construction, operation and ownership in the pipeline/gathering line, including the right of transporting production from the Contract Area. Should one or more non-proposing parties elect to participate, then between such participating parties, the participating parties shall enter into a mutually acceptable Operating Agreement for the construction, acquisition, and operation thereof. Any party electing not to participate shall have no ownership in or right to use such pipeline and/or gathering line, and the participating parties shall have no obligation to allow the non-participating parties such use and / or access thereto.

N.   **Assignment of Interest.** All the terms, conditions, and provisions of this agreement shall extend to and be binding upon each of the parties hereto and their respective successors and assigns. The parties agree that in the event any part hereto in any way conveys, sells, transfers, assigns, mortgages or pledges all or any part of its interest within the Contract Area hereunder, such assignment shall be made expressly subject to the terms and provisions of this agreement.

O.   **Direct Payment of Revenue.** In the event any well drilled in accordance with this Operating Agreement is a producer of oil and/or gas, the Operator agrees that:

1.   The Non-Operator shall have the right to receive its net share of revenue directly from the purchaser of the oil and/or gas.

2.   the Operator will use its best efforts to facilitate the Non-Operator's right to receive its net share of revenue directly from said purchaser.

    If the Operator disburses revenue from the Contract Area, Operator shall use its best efforts to make such disbursement within thirty (30) days from receipt of revenue from the purchaser.

    In no way shall this Article XV.D. supercede the provisions of Article VII.B. above.

P.   **Insurance.** With the exception of minimum limits specified herein and set by State and Federal regulations Non-Operator(s) may elect not to be covered by any of Operator's insurance coverage provided for the joint account by providing Operator with written notice and Certificate of Insurance.

Q.  Metering of Production. In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

R.  Standard of Conduct of Operations. The Operator of the Contract Area shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this Agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator vis-a-vis any third party. Operator shall conduct its activities under this Agreement as a reasonably prudent Operator, i.e., in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, in compliance with applicable law and regulation. It shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct. Non-Operators agree to indemnify, defend and hold Operator harmless from and against all losses sustained or liabilities incurred in the operation of the Contract Area, except such as may result from Operator's gross negligence or willful misconduct.

S.  Well Access and Information. Operator shall inform consenting Non-Operators of its recommendation for drilling, completing, testing, equipping, including building of facilities, in enough time to allow consenting Non-Operators to provide their input regarding these operations. Operators shall, throughout the course of all operations conducted hereunder, keep consenting Non-Operators fully informed with respect thereto, furnishing to consenting Non-Operators in a timely manner, among other things, copies of all location plats, well prognosis, forms required by any governmental office or body, daily drilling reports, notice of shows, notice prior to logging, coring and testing, and copies of all logs, core analyses and testing results as set forth in Exhibit "H" attached to this Operating Agreement. Consenting Non-Operators shall be notified in sufficient time prior to logging, coring or testing in order to have the opportunity of having their representatives present. Consenting Non-Operators and their duly authorized agents, employees, and representatives shall have access to said well at all times at their sole risk and expense.

Notwithstanding any Article herein to the contrary, any party that has elected or been deemed not to participate in a well or operation shall not have the right to receive or gain access to any data or information derived from or regarding such well or operation.

T.  Intentionally Ommitted

U.  Separate Agreement for Non-Uniform Interest. Any leases or interest therein (and the land covered thereby) that, pursuant to the terms of this Agreement or otherwise, become owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such leases become so owned. Any leases or interests therein (and the lands covered thereby) that, pursuant to the terms of this Agreement or otherwise, become owned by more than one but less than all of the parties hereto or in which a party assigns, transfers or otherwise disposes of all or part of its interests shall remain subject to this Agreement as to the surviving parties; however, for all purposes, the terms of this Agreement shall apply separately to each such lease (or group of such leases in which the parties' ownership is uniform) as if it were a separate agreement covering such lease(s), with an Exhibit "A" modified to reflect the parties' interests therein, based upon the parties' ownership in such lease(s).

V.  Reports. Upon request, within one hundred twenty (120) days after completion of each producing well hereunder, Operator shall furnish Non-Operators with a detailed statement indicating the costs incurred in the drilling, completion and equipping of such well. Thereafter, upon request, Operator shall provide Non-Operators with quarterly statements indicating the well costs and production proceeds attributable to each well for the previous three (3) months, along with the cumulative well costs and production proceeds attributable to the well.

W.  Marketing of Production. If all parties prefer to collectively market their production, Operator agrees to market all Non-Operator's share of any production from the Contract Area under the same terms that Operator is marketing its share of said production. Any Non-Operator may subsequently market its share of production by giving written notice to Operator by the 15th day of the month prior to the month in which said Non-Operator intends to separately market its production. Conversely, if said Non-Operator again requests that Operator market its product, Non-Operator must provide written request of same by the 15th day of the month prior to the month in which Operator is again to market said Non-Operator's production.

X.  Notice of Limited Liability. Operator shall not represent to any third party performing services or supplying materials for operations hereunder that the parties hereto are jointly liable for any obligation hereunder or that they are a partnership, joint venture, association, or in any principal/agent relationship.

Y.  Cost Overruns. If and each time that Operator learns that there have been or there will be cost overruns

- 20 -

equal to more than twenty-five percent (25.0%) of the total amount approved in an AFE, Operator shall send a supplemental AFE to each of the Consenting Parties in the operation to which the AFE applies. The AFE shall state the total amount of the anticipated overrun. Each Consenting Party receiving the supplemental AFE shall have the time period applicable pursuant to the provisions governing proposed operations within which to approve the supplemental AFE. The failure of the party receiving the supplemental AFE to reply within the applicable period shall constitute an election by that party not to participate in the cost of the proposed operation, and the provisions governing operations by less than all the parties shall apply.

Z. Substitute or Replacement Wells. Should any well hereunder, including the initial well provided for in Article VI.A., be plugged and abandoned prior to reaching the objective depth because of mechanical or drilling difficulties, then no later than 30 days thereafter any party which participated in such well may propose the drilling of a substitute or replacement well. Only said participating parties shall have the right to participate in a substitute or replacement well, and elections thereto shall be subject to the provisions of Article VI.B.2 or this Article XV.

AA. Termination of Operations. Upon the commencement of an operation for the drilling, reworking, sidetracking, plugging back, deepening, testing, completion or plugging of a well, including but not limited to the Initial Well, such operation may be terminated with the consent of no fewer than three participating parties bearing no less than eighty percent (80.0%) for the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.A., and the provisions of Article VI.B. shall thereafter apply to such operation, as appropriate.

BB. Geoscience Operations.

Definition: Geoscience Operations shall be defined as seismic and other geophysical work and interpretation, purchase of seismic, geophysical, geochemical or geological information, interpretations or data from third parties, surface geological or geochemical studies, gravity and magnetic surveys, and other exploratory work, investigations, and interpretations other than the actual drilling of an oil and gas well.

Proposal: Any party may propose that Geoscience Operations be conducted on the Contract Area lands. The party (hereinafter referred to as "Proposing Party") wishing to conduct Geoscience Operations shall furnish the other party(s) (hereinafter referred to as "Non-Proposing Party(s)") with an informational notice which generally describes the Geoscience Operation and its geological/geophysical justification, specifying the Contract Area of the operation, recording parameters or a description of the operation and a list of the contractors which will be solicited to perform the operation. The Proposing Party shall not propose or solicit bids from contractors which would provide for the contractors to earn an interest in the Contract Area lands as payment in lieu of cash for performing the proposed Geoscience Operation.

Formal Election Procedure: Following receipt of bids and the preparation of a formal AFE, then said proposing party shall propose to all parties its formal Geoscience proposal with a full disclosure of the acquisition contents and properties thereof as well as the formal cost estimates for the entire proposal.

If the geoscience provision meets with 100% consent of all parties, then all parties shall join in the proposal in the amounts of their respective interest(s)

Participation by less than all parties: If the geoscience provision is to acquire seismic data and if the proposal is not met with approval by all parties and:

A) Majority Consent: If the proposal is accompanied by or reaches a 50% or greater vote, then the proposing party may move forward under the following binding terms and conditions:

1) If the proposal is less than $500,000, then all remaining non-consenting parties shall be bound to the terms of the proposal and shall be obligated to pay its proportionate share of the costs and obligations, as if it had consented to the proposal, and shall be automatically deemed a consenting party, however at their new level of interest established through voting procedures.

2) If the proposal is more than $500,000, then the non-consenting parties shall be required to enter into the forced farmout provision more fully described in Item FF of this Article XV on an area to be determined in the following manner: Said participating parties shall chose said acreage to be included in the farmout following their receipt of the processed data and shall choose an amount equal to 1 acre for each $375 spent by the participating parties on the proposed seismic acquisition (ie. Participating parties spend $750,000, then the forced farmout shall include 2,000 net acres ; if $1,000,000 is spent, then 2,666.66 net acres). The acreage chosen must be chosen in 160 acre units (as much as practical), cannot be within a producing unit or a unit in which a well is located the drilling and (if applicable) completion of which the non-consenting party has participated in and must be within the area covered by the proposed seismic acquisition. Said non-consenting parties shall not share in any ownership of the data, however shall have the right to review the data on an in-house basis and if so requested, prior to the forced farmout beginning. This arrangement may be modified by the written consent of the participating parties and the majority vote and written consent of a majority of the non-consenting parties.

B) Less than Majority Consent: If the proposal fails to reach a 50% or greater vote, then the proposing party may move forward under the following terms and conditions:

1)  If the proposal is less than $500,000, then the proposing party may move forward at their sole cost, risk, and expense.

2)  If the proposal is more than $500,000, then the non-consenting parties shall be required to enter into the forced farmout provision more fully described in Item FF of this Article XV on an area to be determined in the following manner: Said participating parties shall chose said acreage to be included in the farmout following their receipt of the processed data and shall choose an amount equal to 1 acre for each $750 spent by the participating parties on the proposed seismic acquisiton (ie. Participating parties spend $750,000, then the forced farmout shall include 1,000 net acres ; if $1,000,000 is spent, then 1,333.33 net acres). The acreage chosen must be chosen in 160 acre units (as much as practical), cannot be within a producing unit or a unit in which a well is located the drilling and (if applicable) completion of which the non-consenting party has participated in and must be within the area covered by the proposed seismic acquisition.. The participating parties may choose up to four contiguous 160 acre units in a square fashion, however the remaining acreage to be chosen shall be selected in a checkerboard layout, that is that the remaining acreage for forced farmout must include 160 acre units with an equal amount of 160 acre units not chosen for forced farmout intermixed in a checkerboard layout with participating parties electing which ½ of the checkerboard will be subject to the forced farmout.  However, if the acreage is already checkerboarded with another Operator in the area, who is joining with the participating parties in the seismic acquisition and is incurring their 50% or greater of their respective pro-rata share of the costs, then said participating parties shall chose any acreage pattern that they desire. Said cost to acre basis considered for establishment of the forced farmout area shall only include the cost borne by the participating parties subject to this Agreement and shall not include those costs born by other participating Operators. Said non-consenting parties shall not share in any ownership of the data, however shall have the right to review the data on an in-house basis and if so requested, prior to the forced farmout beginning. This arrangement may be modified by the written consent of the participating parties and the majority vote and written consent of a majority of the non-consenting parties.

If a seismic proposal includes the participation of another operator in or adjacent to the contract area, then that shall be included in the original proposal, If participation by another Operator in excess of 10% of the total project becomes a part of the trade and proposal after the original proposal, then the original proposal and voting procedure shall be void and the proposal shall be reissued as a new proposal and all parties shall begin the election process anew.

Supervision: If Sklarco L.L.C. elects to participate in the proposed Geoscience Operation, then the Operator, as designated in the Operating Agreement, shall supervise the Geoscience Operation: otherwise, a majority of the Non-Operators electing to participate in the Geoscience Operation may choose and designate the party that supervises the operation.

Ownership and Access: All proprietary information, data and materials generated as a result of the Geoscience Operation shall be owned by the party or parties who have participated in the Geoscience Operation in the proportion that they have paid for the Geoscience Operation. Copies of all information, data and materials shall be timely disseminated by the party supervising the Geoscience Operation to those parties (including Craft Exploration Company, LLC as the generator of the North Beach Prospect) who have elected to participate in the Geoscience Operation. A party who does not participate in the Geoscience Operation shall not receive or have access to information, data or materials generated by such operation, except by Item BB. A)2) and B)2), herein above.

Confidential Period: All jointly owned geophysical, geological and other Geoscience data acquired, compiled or generated pursuant to and after the effective date of this Agreement shall be treated as confidential for a period of three (3) years, and shall not be sold, traded or otherwise disposed of or divulged without the prior written consent of the parties participating in the acquisition of such data; provided that access to such data may be made available to a party's parent company and/or its subsidiaries, agents, employees, contractors engaged in the performance of any work hereunder, third parties (only to the extent such third parties are contacted pursuant to a farmout to such third party), or to any other person or entity where disclosure is required by law.

Data Sales: Such jointly owned data shall not be available for brokerage until termination of the confidentiality obligations hereinabove specified, unless otherwise mutually agreed to by all parties owning the data. Sale of data following the end of the confidentiality period shall require the consenting vote of 50% or greater of the participating parties.

Income derived from sales: If any income or information is derived from the sale, trade, or subsequent acquisition of any jointly owned information, data or materials acquired pursuant to a Geoscience Operation, that information or income shall be shared based on the proportionate interest of the participating parties.

CC   Intentionally omitted

DD.   Pro-Rata Basis Election Procedure: Once each party has elected his pro-rata share of non-consent interests, then each of said electing parties will have the further right to elect his pro-rata share of any non-elected portions. This procedure repeats until there are no remaining non-elected portions. Each

election within this process must be received within 3 business days of notice, unless a shorter time frame for the specific type of election or conditions of the election is specified elsewhere in this agreement.

EE. Non-Consent Penalty Provisions for the Drilling of Proposed Wells:

1) If a party elects not to participate in the drilling of a proposed well that meets with all of the terms and conditions of this JOA, and is supported by a majority vote, then the following non-consenting penalties shall apply in lieu of Article VI.B:

    a) If the well proposed classifies as a 'wildcat' well, being defined as a well proposed at a distance of more than 2640' from an established producing unit, then the non-consenting party shall be deemed to have entered into a 'forced farmout' as defined in Item FF herein with the 'forced farmout' applying to the unit for said proposed test well and all adjacent and contiguous units.

    b) If the well proposed classifies as an 'offset' well, being defined as a well proposed on a unit which is adjacent to a producing unit, then the non-consenting parties shall be deemed to have entered a 'forced farmout' as defined in Item FF herein with the 'forced farmout' applying in and to the unit for said proposed test well and two (2) adjacent and contiguous units which will be determined by the election of the majority vote of the drilling parties.

2) If a party elects not to participate in the drilling of a proposed sidetrack well that meets with all of the terms and conditions of this JOA and is supported by a majority vote, then the following non-consenting penalties shall apply in lieu of Article VI.B:

    a) If the sidetrack well proposed classifies as a 'wildcat' well, being defined as a sidetrack well proposed at a distance of more than 2640' from an established producing unit, then the non-consenting party shall be deemed to have entered into a 'forced farmout' as defined in Item FF herein with the 'forced farmout' applying to the unit for said proposed test well and all adjacent and contiguous units.

    b) If the sidetrack well proposed classifies as an 'offset' well, being defined as a well proposed on a unit which is adjacent to a producing unit, then the non-consenting parties shall be deemed to have entered a 'forced farmout' as defined in Item FF herein with the 'forced farmout' applying in and to the unit for said proposed test well and two (2) adjacent and contiguous units which will be determined by the election of the majority vote of the drilling parties.

FF. Forced Farmout: The Non-Consenting party who is subject to this forced farmout provision shall automatically assign to the earning parties the entirety of their interest across the area to which the forced farmout is applied, with the Non-Consenting party reserving the difference between the existing lease burdens and 25%. In the event that the Non-Consenting party cannot deliver a 75% net revenue interest, then said Non-Consenting party shall deliver the entirety of his position of right, title, and interest across the specified area of penalty. Upon the assignment of these interests, such interests shall no longer be subject to this Agreement, but shall be subject to an operating agreement identical to this agreement changed only to reflect the names and interests of the new owning parties. Farmee shall protect, indemnify, and hold Farmor(s) harmless from and against any claims, liens, encumbrances, demands, damages and losses caused by farmee(s)'s operations hereunder. Notwithstanding any provision hereof to the contrary, no party shall be forced to farmout a leasehold interest covering lands located within a producing unit or a unit in which a well is located the drilling and (if applicable) completion of which the Non-consenting party has participated in. Further, notwithstanding any provision herein to the contrary, operations by less than all parties to drill or sidetrack a proposed well shall be governed by the risk penalties set forth in Article VI.B of the JOA, rather than the above forced farmout provision, if such proposal is not supported by a majority vote.

GG. Re-Assignment of Interests: In the event that a party to this agreement is required by this agreement to make an assignment, said assigning party shall assign said interest to the earning parties without contest and within 30 days. If said assignment is not received within 30 days of notice, then said party subject to the assignment shall incur an additional monetary penalty equal to the number of acres to be assigned multiplied by a penalty of $75 per net acre per month. Said penalty shall continue to acrue at this rate until the assignee(s) are in receipt of both the assignment and the penalty. Assignee shall immediately notify assignor of any breach hereto

HH. Rights Retained by Craft Exploration Company, LLC. ("CEC") as prospect generator: CEC reserves a 25% vote, which will be created by a proportionate reduction of the 100% of the Parties vote (i.e. a Participant with a 30% interest will have a vote of 30% reduced by 25% = 22.5%). In the event that a party who is subject to a reversionary interest by CEC elects to go Non-Consent on any proposals subject to this Agreement, then CEC shall first have the right to participate with any or all of that parties entire interest and shall have a reasonable period of time from notice of same (not to exceed 15 days) to make its election. On the portion of interest that CEC does not elect to participate in, then that portion shall be bound by the terms and conditions of this Agreement, and the acquiring parties shall acquire the interest subject to the reversionary interest reserved by CEC. Said reversionary interest shall not be subject to any penalties. All parties to this Agreement agree to protect and defend the reversionary rights of CEC. CEC reserves the first right to acquire interests created by non-consenting elections of parties or may offer all or any portion of said interests to the consenting parties on a pro-rata basis election procedure. Said interest shall remain subject to all of the terms and conditions of this Agreement. The rights reserved in this Item HH. shall supercede all other terms and conditions of this Agreement.

II. Overriding Royalty Limitation: Parties may **not** burden their interests with burdens resulting in their ownership of less than a 70% net revenue interest, except on producing units.

JJ Liens: All parties to this Agreement who elect to go non-consent on any elections shall notify all other participants of any liens or encumbrances which would affect any interests which would be subject to the non-consenting penalties and provisions. Parties to this Agreement do not have the right and shall not create any liens or encumbrances on any of the acreage within the Contract Area which is not included in a producing unit.

KK. Sale and Transfer of Interest Limitations: The following terms and conditions shall apply on any acreage within the contract area which is not included in a producing unit, except for and by Article XV. Item 10 herein.

    1) Parties may sell overriding royalty interest(s) from their interests across the contract area, but they shall not sell any amount that will result in the creation of a net revenue to working interest of less than 70%. Any sale which places a burden of greater than this shall be deemed null and void and shall be of no effect.

    2) Parties may sell or transfer any portion of their leasehold interest(s), but any such party must make said sale or transfer in contiguous (or as contiguous as possible) parcels covering a minimum of 160 acres.

LL. Naming Wells to be Drilled: Subject to the rules of the Alabama Oil & Gas Board, all wells drilled on the contract area during the term of this Agreement shall be named in the following manner.

Operator Name / Well Number / Craft / Fee name

ie. XYZ Operating Company #1 Craft-Smith 20-6

When filling out an OGB-1 Application to Drill, the Operator shall submit in the Well Name and Number blank: #1(or other appropriate number) Craft-'Fee name'

MM. Severability: Should any clause, condition, term, or any part thereof contained in this Agreement be unenforceable or prohibited by any present or future legal requirement, then such clause, condition, term, or part thereof shall be amended to the minimum extent to comply with the legal requirement, and this Agreement is hereby amended by operation of this paragraph so as to be in compliance with the legal requirement, but if such clause, condition, term, or part thereof cannot be amended so as to be in compliance with any such legal requirement, then such clause, condition, term, or part thereof is severable from this Agreement and the rest of the clauses, terms, conditions, and parts thereof contained in this Agreement shall remain unimpaired and in full force and effect.

## ARTICLE XVI.

## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

**This instrument may be executed in any number of counterparts, and shall be construed together and constitute one instrument each of which shall be considered an original for all purposes.**

IN WITNESS WHEREOF, this agreement shall be effective as of ____15th____ day of __NOVEMBER . 2004__

**OPERATOR**

**SKLAR EXPLORATION COMPANY L.L.C.**

**By: David A. Barlow**
**Title:  Chief Operating Officer**

**NON-OPERATORS**

**CRAFT EXPLORATION COMPANY, LLC**          **SKLARCO L.L.C.**

**By: Steven H. Craft**                     **By: David A. Barlow**
**Title: Member**                           **Title: Chief Operating Officer**

**PETR-PRO, LLC**                           **LANDMARK EXPLORATION, LLC**

**By: Steven H. Craft**                     **By: Larry Johnson**
**Title: Member**                           **Title: Member**

**COASTAL EXPLORATION, INC.**               **HENRY B. TYLER, M.D.**

**By: Julius Ridgway**                      **By: Henry B. Tyler, M.D.**
**Title: President**                        **Title: Individually**

**SIGNATURE PAGE FOR THAT CERTAIN OPERATING AGREEMENT DATED EFFECTIVE
____NOVEMBER 15, 2004 BY AND BETWEEN  SKLAR EXPLORATION COMPANY, LLC,  AS
OPERATOR AND CRAFT EXPLORATION COMPANY, LLC,  ET AL
AS NON-OPERATORS**

- 25 -

State of Mississippi

County of RANKIN

I Clay Gatlin , a Notary Public in and for said County and State, hereby certify that Donnie Lambert, whose name as managing member of PETRO-PRO, LLC a Mississippi LLC corporation, is signed to the foregoing instrument and who is known to me on this day that being informed of the contents of the instrument he is the managing member and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and seal this 18 day of November 2004.

My Commission Expires: _____

_____
Notary Public

---

State of Mississippi

County of Hinds

I Martha Jo Willett , a Notary Public in and for said County and State, hereby certify that Larry Johnson, whose name as _____ of Landmark Exploration, LLC a _____ corporation, is signed to the foregoing instrument and who is known to me on this day that being informed of the contents of the instrument he is the _____ and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and seal this 18 day of November 2004.

My Commission Expires: 10/8/07 .

Martha Jo Willett
Notary Public

---

State of Mississippi                    Attest: Anita R. Hemphill
                                                Secretary
County of Hinds

I Anita R. Hemphill , a Notary Public in and for said County and State, hereby certify that Julius M. Ridgway whose name as President of Coastal Exploration, Inc. a Delaware corporation, is signed to the foregoing instrument and who is known to me on this day that being informed of the contents of the instrument he is the President and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and seal this 18th day of November 2004.

MISSISSIPPI STATEWIDE NOTARY PUBLIC
My Commission Expires: MY COMMISSION EXPIRES APRIL 8, 2007

Anita R. Hemphill
Notary Public

---

State of Mississippi

County of Hinds

I Anita R. Hemphill , a Notary Public in and for said County and State, hereby certify that Henry B. Tyler, M.D., individually, is signed to the foregoing instrument and who is known to me on this day that being informed of the contents of the instrument he executed the same voluntarily for and as the act of himself, individually.

Given under my hand and seal this 18th day of November 2004.

MISSISSIPPI STATEWIDE NOTARY PUBLIC
My Commission Expires: MY COMMISSION EXPIRES APRIL 8, 2007

Anita R. Hemphill
Notary Public

State of _Louisiana_

Parish

County of _Caddo_

I _Linda Edwards_, a Notary Public in and for said County and State, hereby certify that David A. Barlow, whose name as _COO_ of SKLAR EXPLORATION, LLC a _LA LLC_ corporation, is signed to the foregoing instrument and who is known to me on this day that being informed of the contents of the instrument _he_ is the _COO_ and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and seal this 22nd day of _November_ 2004.

My Commission Expires: _for life_

Linda Edwards, Notary Public # 5074
Bossier Parish, Louisiana
My Commission is for Life

_Linda Edwards_
Notary Public

---

State of _Louisiana_

Parish

County of _Caddo_

I _Linda Edwards_, a Notary Public in and for said County and State, hereby certify that David A. Barlow, whose name as _COO_ of SKLARCO, L.L.C. a _LA LLC_ corporation, is signed to the foregoing instrument and who is known to me on this day that being informed of the contents of the instrument _he_ is the _COO_ and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and seal this 22nd day of _November_ 2004.

My Commission Expires: _for life_

Linda Edwards, Notary Public # 5074
Bossier Parish, Louisiana
My Commission is for Life

_Linda Edwards_
Notary Public

---

State of _Mississippi_

County of _Hinds_

I _Anita R. Hemphill_, a Notary Public in and for said County and State, hereby certify that Steven H. Craft, whose name as Member of CRAFT EXPLORATION COMPANY, LLC a MISSISSIPPI LLC corporation, is signed to the foregoing instrument and who is known to me on this day that being informed of the contents of the instrument he is the duly authorized member and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and seal this 18th day of _November_ 2004.

My Commission Expires: _____ MISSISSIPPI STATEWIDE NOTARY PUBLIC
MY COMMISSION EXPIRES APRIL 8, 2007

_Anita R. Hemphill_
Notary Public

**EXHIBIT "A"**
**NORTH BEACH PROSPECT**

Attached to and made a part of that certain Operating Agreement dated effective
November 15, 2004 by and between Sklar Exploration Company, L.L.C., as Operator, and Craft
Exploration Company, LLC, et al, as Non-Operators

(1) **Description of lands subject to this agreement**
All lands described below lie in Conecuh County, Alabama
Township 5 North Range 12 East: Sections 24-26; and 33-36
Township 5 North Range 13 East: Sections 19-36;
Township 4 North Range 12 East: Sections 1-4; and 9-13
Township 4 North Range 13 East: Sections 2-11; 14-18; and 20-23

See Exhibit "A-1" for lease details and Exhibit "A-2" for Area of Mutual Interest ("AMI")
outline.

(2) **Restriction, if any, as to depths, formation or substances**
NONE

(3) and (4)
**Parties to agreement with addresses and telephone numbers, for notice**
**purposes and percentage or fractional interest of parties to this agreement**
See next page

(5) Oil and gas leases subject to this agreement

See Lease Schedule attached hereto as Exhibit "A-1".

(6) Burdens on production
As described in the applicable unrecorded Participation Agreements by and between each
respective Participant and Craft Exploration Company, L.L.C.

\* Payout as defined in each participant's respective Participation Sales Agreement to
which the Operating Agreement is attached as Exhibit "I"

| PARTICIPANTS | BEFORE PAYOUT* | AFTER PAYOUT* |
|---|---|---|
| **SKLARCO, L.L.C.**<br>401 Edwards Street, Suite 1601<br>Shreveport, LA 71101<br>Tel. # (318) 227-8668<br>Fax # (318) 227-9012<br>Email: Dbarlow@sklarexploration.com<br>Attn: David A. Barlow | 40.00% | 30.00% |
| **Craft Exploration Company, L.L.C.**<br>P.O. Box 16084<br>Jackson, Mississippi 39236<br>Tel. # (601) 982-5961<br>Fax # (601) 982-7213<br>Email: scraft@jam rr com<br>Attn.: Steven H. Craft | 0.00% | 10.00% |
| **Petro-Pro, LLC**<br>5417 Lakeland Drive, Suite F<br>Brandon, MS 39047<br>Tel.# (601) 919-3600<br>Fax# (601) 919-3999<br>Email: dlambert@petroprollc.com<br>Attention: Donnie Lambert | 22.5% | 22.5% |
| **Landmark Exploration, LLC**<br>P.O. Box 12004<br>Jackson, MS 39236<br>Tel.# (601) 932-1972<br>Fax# (601)939-1949<br>Email: llj@lmhomes.com<br>Attention: Larry Johnson | 25.00% | 25.00% |
| **Coastal Exploration, Inc.**<br>1437 Old Square Road<br>Crescent Court, Suite 104<br>Jackson, MS 39236<br>Tel.# (601) 362-0502<br>Fax# (601) 362-5397<br>Email: awhenp@aol.com<br>Email: juliusridg@aol.com<br>Attention: Julius Ridgway | 10.00% | 10.00% |
| **Henry B. Tyler, M.D.**<br>137 Bridgewater Crossing<br>Ridgeland, MS 39157<br>Tel.# (601) 278-5161<br>Fax# n.a.<br>Email: none<br>Attention: Henry Tyler | 2.50% | 2.50% |
| **TOTALS** | 100.00% | 100.00% |

EXHIBIT **A** – NORTH BEACH PROSPECT

# EXHIBIT "A-1"

Attached to and made a part of that certain Operating Agreement dated effective November 15, 2004, by and between
Sklar Exploration Company, LLC, as Operator, and Craft Exploration Company, LLC, et al, as Non-Operators.

## LEASE LOG: By LEASE #
### NORTH BEACH PROSPECT
CONECUH COUNTY, ALABAMA

1-188

4-Nov-04

| LEASE NO. | LESSOR | LESSEE | DATE | TERM | EXPIRES | ROYALTY | GROSS ACRES | NET ACRES | COMMENTS | RECORDING BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | RALLS, SR., GILLIS E. | CRAFT EXPLORATION | 02/23/04 | 2 yrs | 2/23/2006 - 09 | 0.1875 | 87.00 | 49.50 | 3 YR. EXT. @ $30.00 / NMA | 2004 | 2284 |
| 2 | RALLS, GRADY LYNN, ETUX | CRAFT EXPLORATION | 02/23/04 | 2 yrs | 2/23/2006 - 09 | 0.1875 | 752.75 | 715.25 | 3 YR. EXT. @ $30.00 / NMA | 2004 | 2275 |
| 3 | RALLS, JUANITA J., IND/TTEE | CRAFT EXPLORATION | 02/23/04 | 2 yrs | 2/23/2006 - 09 | 0.1875 | 754.25 | 624.25 | 3 YR. EXT. @ $30.00 / NMA | 2004 | 2280 |
| 4 | PRICE, JR., L. W. | CRAFT EXPLORATION | 04/12/04 | 4 yrs | 04/12/08 | 0.2000 | 305.90 | 76.48 | | 2004 | 2323 |
| 5 | ROBERTS, GERALD R. | CRAFT EXPLORATION | 04/12/08 | 4 yrs | 04/12/08 | 0.2000 | 305.90 | 153.00 | | 2004 | 2325 |
| 6 | EVERS, JEAN B., IND/EXECTRX | CRAFT EXPLORATION | 04/07/04 | 4 yrs | 04/07/08 | 0.2000 | 197.90 | 197.90 | | 2004 | 2165 |
| 7 | IVEY, WILLIAM W. | CRAFT EXPLORATION | 04/23/04 | 5 yrs | 04/23/09 | 0.2000 | 120.48 | 120.48 | | 2004 | 2196 |
| 8 | MACK, MARY HORTON | CRAFT EXPLORATION | 04/28/04 | 2 yrs | 4/28/2006 - 09 | 0.2000 | 827.00 | 817.00 | 3 YR. EXT. @ $100.00 / NMA | 2004 | 2217 |
| 9 | MACK, MARY HORTON | CRAFT EXPLORATION | 04/28/04 | 3 yrs | 04/28/07 | 0.2000 | 647.00 | 403.50 | | 2004 | 2220 |
| 10 | HOLLEY, ROSA HORTON | CRAFT EXPLORATION | 04/28/04 | 2 yrs | 4/28/2006 - 09 | 0.2000 | 912.00 | 912.00 | 3 YR. EXT. @ $100.00 / NMA | 2004 | 2180 |
| 11 | JONES, FLOYD F., ETAL | CRAFT EXPLORATION | 05/04/04 | 5 yrs | 05/04/09 | 0.1667 | 186.98 | 105.04 | | 2004 | 2207 |
| 12 | HYDE, JR., CLINTON O | CRAFT EXPLORATION | 05/24/04 | 5 yrs | 05/24/09 | 0.1875 | 40.00 | 6.67 | | 2004 | 2194 |
| 13 | COX, WILLA HYDE | CRAFT EXPLORATION | 05/24/04 | 5 yrs | 05/24/09 | 0.1875 | 40.00 | 6.67 | | 2004 | 2155 |
| 14 | TAYLOR, RUBY NELL | CRAFT EXPLORATION | 05/24/04 | 5 yrs | 05/24/09 | 0.1875 | 37.00 | 18.50 | | 2004 | 2294 |
| 15 | McCREARY, EDGAR C., ETUX | CRAFT EXPLORATION | 05/20/04 | 5 yrs | 05/20/09 | 0.1875 | 188.00 | 149.50 | | 2004 | 2231 |
| 16 | THOMPSON, MARY JO HYDE | CRAFT EXPLORATION | 05/24/04 | 5 yrs | 05/24/09 | 0.1875 | 40.00 | 6.67 | | 2004 | 2296 |
| 17 | RYLAND, LARRY | CRAFT EXPLORATION | 06/03/04 | 5 yrs | 06/03/09 | 0.1875 | 6.75 | 3.38 | | 2004 | 2286 |
| 18 | PADGETT, WESLEY | CRAFT EXPLORATION | 06/07/04 | 3 yrs | 6/7/2007 - 09 | 0.2000 | 334.00 | 33.40 | 2 YR. EXT. @ $45.00 / NMA. | 2004 | 2267 |
| 19 | BEVEN-JACKSON LUMBER & VENEER | CRAFT EXPLORATION | 06/10/04 | 5 yrs | 06/10/09 | 0.1875 | 40.00 | 40.00 | | 2004 | 2125 |
| 20 | SHEFFIELD, RICHARD R. ETUX | CRAFT EXPLORATION | 06/08/04 | 5 yrs | 06/08/09 | 0.1875 | 20.00 | 10.00 | | 2004 | 2290 |

1-188

4-Nov-04

| LEASE NO. | LESSOR | LESSEE | DATE | TERM | EXPIRES | ROYALTY | GROSS ACRES | NET ACRES | COMMENTS | RECORDING BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | PADGETT, EDWARD G. | CRAFT EXPLORATION | 06/07/04 | 3 yrs | 6/7/2007 - 09 | 0.2000 | 334.00 | 200.40 | 2 YR. EXT @ $45.00 / NMA | 2004 | 2249 |
| 22 | PADGETT, TERRY | CRAFT EXPLORATION | 06/07/04 | 3 yrs | 6/7/2007 - 09 | 0.2000 | 334.00 | 100.20 | 2 YR. EXT @ $45.00 / NMA | 2004 | 2265 |
| 23 | JEFFERSON SMURFIT CORPORATION | CRAFT EXPLORATION | 06/04/04 | 1 yr opt. | 6/4/2005 - 09 | 0.2000 | 343.20 | 330.10 | 3 YR. EXT @ $100.00 / NMA | 2004 | 2199 |
| 24 | MOEHLE, M. STEVEN | CRAFT EXPLORATION | 06/11/04 | 5 yrs | 06/11/09 | 0.2500 | 21.00 | 21.00 | | 2004 | 2244 |
| 25 | FRY, MAUDIS M. ETVIR | CRAFT EXPLORATION | 06/12/04 | 5 yrs | 06/12/09 | 0.1875 | 21.50 | 21.50 | | 2004 | 2170 |
| 26 | PATE, JASON L. ETUX | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 2.51 | 2.51 | | 2004 | 2269 |
| 27 | COBB, SUE BELL | CRAFT EXPLORATION | 06/17/04 | 5 yrs | 06/17/09 | 0.1875 | 42.00 | 18.38 | | 2004 | 2153 |
| 28 | BELL, JIMMY L. | CRAFT EXPLORATION | 06/17/04 | 5 yrs | 06/17/09 | 0.1875 | 42.00 | 18.38 | | 2004 | 2123 |
| 29 | PATE, WILLIAM T. | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 62.00 | 62.00 | | 2004 | 2271 |
| 30 | BROWN, CLEVELAND C., ETUX | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 26.00 | 26.00 | | 2004 | 2133 |
| 31 | TRAVIS, JENNIFER LYNN, ETVIR | CRAFT EXPLORATION | 06/08/04 | 5 yrs | 06/08/09 | 0.1875 | 1.00 | 1.00 | | 2004 | 2300 |
| 32 | McCLAIN, WILLIE F., ETUX | CRAFT EXPLORATION | 06/08/04 | 5 yrs | 06/08/09 | 0.1875 | 1.00 | 1.00 | | 2004 | 2229 |
| 33 | MEEKS, SR., LEWIS E. | CRAFT EXPLORATION | 06/17/04 | 5 yrs | 06/17/09 | 0.1875 | 11.43 | 11.43 | | 2004 | 2236 |
| 34 | MEEKS, SR., WILLARD L. | CRAFT EXPLORATION | 06/17/04 | 5 yrs | 06/17/09 | 0.1875 | 5.68 | 5.68 | | 2004 | 2242 |
| 35 | MEEKS, LILLIE R. | CRAFT EXPLORATION | 06/17/04 | 5 yrs | 06/17/09 | 0.1875 | 5.68 | 5.68 | | 2004 | 2234 |
| 36 | BROWN, ARTENSE M. | CRAFT EXPLORATION | 06/17/04 | 5 yrs | 06/17/09 | 0.1875 | 6.00 | 6.00 | | 2004 | 2131 |
| 37 | TODD, EARNESTINE M. | CRAFT EXPLORATION | 06/17/04 | 5 yrs | 06/17/09 | 0.1875 | 6.00 | 6.00 | | 2004 | 2298 |
| 38 | MEEKS, SR., ROBERT EARL | CRAFT EXPLORATION | 06/17/04 | 5 yrs | 06/17/09 | 0.1875 | 7.71 | 7.71 | | 2004 | 2239 |
| 39 | MATTHEWS, SCOTT ELLIS, ETUX | CRAFT EXPLORATION | 05/21/04 | 5 yrs | 05/21/09 | 0.1875 | 94.51 | 91.01 | | 2004 | 2225 |
| 40 | JONES, F. GAINES | CRAFT EXPLORATION | 05/04/04 | 5 yrs | 05/04/09 | 0.1667 | 2.40 | 1.80 | | 2004 | 2205 |
| 41 | MACK, MARY HORTON | CRAFT EXPLORATION | 05/20/04 | 2 yrs | 5/20/2006 - 09 | 0.2000 | 20.00 | 20.00 | 3 YR. EXT @ $100.00 / NMA | 2004 | 2223 |
| 42 | CEDAR CREEK LAND & TIMBER, INC. | CRAFT EXPLORATION | 05/10/04 | 3 yrs | 5/10/2007 - 09 | 0.2500 | 823.64 | 763.64 | 2 YR. EXT @ $150.00 / NMA | 2004 | 2147 |
| 43 | CEDAR CREEK LAND & TIMBER, INC. | CRAFT EXPLORATION | 05/10/04 | 3 yrs | 05/10/07 | 0.2500 | 279.00 | 279.00 | | 2004 | 2150 |
| 44 | HARVEY, LILLIE | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 1.07 | | 2004 | 2178 |
| 45 | BRYE, K. C. | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 1.07 | | 2004 | 2139 |
| 46 | CRAWFORD, ARNETTA | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 1.07 | | 2004 | 2157 |
| 47 | BRYE, EULIS | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 1.43 | 1.43 | | 2004 | 2137 |

| LEASE NO. | LESSOR | LESSEE | DATE | TERM | EXPIRES | ROYALTY | GROSS ACRES | NET ACRES | COMMENTS | RECORDING BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 48 | WILSON, CHARLIE MAE | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 1.50 | | 2004 | 2302 |
| 49 | BRYE, MARY | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 1.07 | | 2004 | 2145 |
| 50 | BRYE, EUGENE | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 1.50 | | 2004 | 2135 |
| 51 | BOYKIN, ELOIS | CRAFT EXPLORATION | 07/09/04 | 5 yrs | 07/09/09 | 0.1875 | 48.30 | 12.07 | | 2004 | 2127 |
| 52 | HAMPTON, HELEN | CRAFT EXPLORATION | 07/09/04 | 5 yrs | 07/09/09 | 0.1875 | 48.30 | 12.07 | | 2004 | 2176 |
| 53 | DRAKEFORD, ROBERT L. | CRAFT EXPLORATION | 07/09/04 | 5 yrs | 07/09/09 | 0.1875 | 48.30 | 12.07 | | 2004 | 2163 |
| 54 | DRAKEFORD, FRED L. ETUX | CRAFT EXPLORATION | 07/09/04 | 5 yrs | 07/09/09 | 0.1875 | 48.30 | 12.07 | | 2004 | 2159 |
| 55 | DRAKEFORD, FRED LEE, ETUX | CRAFT EXPLORATION | 06/19/04 | 5 yrs | 06/19/09 | 0.1875 | 34.00 | 34.00 | | 2004 | 2161 |
| 56 | GRIFFIN, LORETTA | CRAFT EXPLORATION | 05/28/04 | 5 yrs | 05/28/09 | 0.1875 | 15.00 | 15.00 | | 2004 | 2172 |
| 57 | BRYE, LAWRENCE, ETAL | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 8.35 | | 2004 | 2141 |
| 58 | BRANTLEY, JOE NATHAN | CRAFT EXPLORATION | 06/04/04 | 5 yrs | 06/04/09 | 0.1875 | 6.00 | 6.00 | | 2004 | 2129 |
| 59 | LEE, BERNICE | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 121.00 | 3.03 | | 2004 | 2215 |
| 60 | HOLMES, CLAUDINE | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 121.00 | 3.03 | | 2004 | 2187 |
| 61 | PERRYMAN, GARY ANN | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 121.00 | 3.03 | | 2004 | 2273 |
| 62 | SAMUEL, JR., MONROE, ETUX | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 122.00 | 3.28 | | 2004 | 2288 |
| 63 | STRAUGHN, KATHERINE HOLMES | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 40.00 | 3.33 | | 2004 | 2292 |
| 64 | HOLMES, RICHARD D. | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 45.10 | 8.43 | | 2004 | 2189 |
| 65 | PACKAGING CORPORATION | CRAFT EXPLORATION | 06/01/04 | 5 yrs | 06/01/09 | 0.1875 | 120.00 | 90.00 | | 2004 | 2247 |
| 66 | HOWARD, CLARENCE LEE, ETUX | CRAFT EXPLORATION | 06/03/04 | 5 yrs | 06/03/09 | 0.1875 | 15.00 | 7.50 | | 2004 | 2191 |
| 67 | PADGETT, OLEN PAUL, ETUX | CRAFT EXPLORATION | 06/30/04 | 3 yrs | 6/30/2007 - 09 | 0.2000 | 510.99 | 510.99 | 2 YR. EXT. @ $100.00 / NMA | 2004 | 2259 |
| 68 | JOHNSTON, WILNER W., ETAL | CRAFT EXPLORATION | 06/23/04 | 5 yrs | 06/23/09 | 0.1875 | 60.00 | 15.00 | | 2004 | 2201 |
| 69 | ZEIBACH & WEBB TIMBER COMPANY | CRAFT EXPLORATION | 07/01/04 | 5 yrs | 07/01/09 | 0.1875 | 222.00 | 222.00 | | 2004 | 2304 |
| 70 | JOHNSTON, WILNER W., ETAL | CRAFT EXPLORATION | 06/23/04 | 5 yrs | 06/23/09 | 0.1875 | 60.00 | 30.00 | | 2004 | 2203 |
| 71 | KIRKSEY LIVING TRUST | CRAFT EXPLORATION | 06/14/04 | 5 yrs | 06/14/09 | 0.1875 | 40.00 | 20.00 | | 2004 | 2213 |
| 72 | PADGETT, GERALD IRA, ETAL | CRAFT EXPLORATION | 06/24/04 | 3 yrs | 6/24/2007 - 09 | 0.2000 | 115.00 | 115.00 | 2 YR. EXT. @ $37.50 / NMA | 2004 | 2251 |
| 73 | PADGETT, GERALD IRA, ETAL | CRAFT EXPLORATION | 06/24/04 | 3 yrs | 6/24/2007 - 09 | 0.2000 | 111.00 | 111.00 | 2 YR. EXT. @ $37.50 / NMA | 2004 | 2255 |
| 74 | HOLLEY, ROSA HORTON | CRAFT EXPLORATION | 04/28/04 | 3 yrs | 04/28/07 | 0.2000 | 490.00 | 325.00 | | 2004 | 2184 |

1-168                                                                                                                          4-Nov-04

| LEASE NO. | LESSOR | LESSEE | DATE | TERM | EXPIRES | ROYALTY | GROSS ACRES | NET ACRES | COMMENTS | RECORDING BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 75 | LITTRELL, YVONNE | CRAFT EXPLORATION | 07/16/04 | 5 yrs | 07/16/09 | 0.1666 | 40.00 | 10.00 | | 2004 | 2327 |
| 76 | COLEMAN, VERNA W | CRAFT EXPLORATION | 06/25/04 | 5 yrs | 06/25/09 | 0.1875 | 29.00 | 29.00 | | 2004 | 2329 |
| 77 | MEEKS, SR., ALFONZA C. | CRAFT EXPLORATION | 06/17/04 | 5 yrs | 06/17/09 | 0.1875 | 5.68 | 5.68 | | 2004 | 2331 |
| 78 | JACKSON, PATRICIA ANN | CRAFT EXPLORATION | 06/17/04 | 5 yrs | 06/17/09 | 0.1875 | 5.84 | 5.84 | | 2004 | 2333 |
| 79 | MEEKS, LEE NARD | CRAFT EXPLORATION | 06/17/04 | 5 yrs | 06/17/09 | 0.1875 | 5.68 | 5.68 | | 2004 | 2335 |
| 80 | MEEKS, JR., EARNTON | CRAFT EXPLORATION | 06/17/04 | 5 yrs | 06/17/09 | 0.1875 | 6.00 | 6.00 | | 2004 | 2337 |
| 81 | DRAKEFORD, MARTHA | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/04 | 0.1875 | 60.00 | 0.83 | | 2004 | 2339 |
| 82 | SAITER, JR., JOSEPH T., ETUX | CRAFT EXPLORATION | 07/10/04 | 3 yrs | 07/10/07 | 0.2300 | 21.30 | 15.97 | | 2004 | 2341 |
| 83 | SAITER, JR., JOSEPH T., ETUX | CRAFT EXPLORATION | 07/10/04 | 5 yrs | 07/10/09 | 0.2300 | 80.00 | 20.00 | | 2004 | 2344 |
| 84 | JOHNSTON, WILNER W., ETAL | CRAFT EXPLORATION | 06/23/04 | 5 yrs | 06/23/09 | 0.1875 | 60.00 | 15.00 | | 2004 | 2347 |
| 85 | RICHARDSON, TIFFNEY | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 40.00 | 3.33 | | 2004 | 2349 |
| 86 | EDSON, MURIEL | CRAFT EXPLORATION | 07/20/04 | 5 yrs | 07/20/09 | 0.1875 | 4.75 | 2.38 | | | |
| 87 | EDSON, ROGER | CRAFT EXPLORATION | 07/20/04 | 5 yrs | 07/20/09 | 0.1875 | 4.75 | 0.79 | | | |
| 88 | PIERCE, BARBARA | CRAFT EXPLORATION | 07/20/04 | 5 yrs | 07/20/09 | 0.1875 | 4.75 | 0.79 | | | |
| 89 | COVINGTON, J. T | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.83 | | 2004 | 2468 |
| 90 | BRYE, WILLIE | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 1.50 | | 2004 | 2470 |
| 91 | BRYE, NARVIE | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 1.25 | | 2004 | 2472 |
| 92 | COVINGTON, MARY | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.83 | | 2004 | 2474 |
| 93 | COVINGTON, CHRISTINE | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.83 | | 2004 | 2476 |
| 94 | WALLACE, JUNE | CRAFT EXPLORATION | 07/16/04 | 5 yrs | 07/16/09 | 0.1666 | 40.00 | 5.00 | | 2004 | 2478 |
| 95 | FINNEGAN, PEGGY | CRAFT EXPLORATION | 07/20/04 | 5 yrs | 07/20/09 | 0.1875 | 4.75 | 0.79 | | | |
| 96 | WOODS, ALICE MARGARET HOLMES | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 40.00 | 3.33 | | 2004 | 2454 |
| 97 | GANT, ELLA RUTH HOLMES | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 40.00 | 3.33 | | 2004 | 2456 |
| 98 | RICHBURG, LIZZIE MAE HOLMES | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 40.00 | 3.33 | | 2004 | 2458 |
| 99 | HOLMES, DAISY L. | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 40.00 | 0.48 | | 2004 | 2460 |
| 100 | HALE, CONSTANCE M. HOLMES | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 40.00 | 0.48 | | 2004 | 2462 |
| 101 | HOLMES, VERONICA R. | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 40.00 | 0.48 | | 2004 | 2464 |

1-188

4-Nov-04

| LEASE NO. | LESSOR | LESSEE | DATE | TERM | EXPIRES | ROYALTY | GROSS ACRES | NET ACRES | COMMENTS | RECORDING BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 102 | MODLEY, CLAUDIE M. HOLMES | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 40.00 | 0.48 | | 2004 | 2466 |
| 103 | TALIAFERRO, LILLIE | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.83 | | 2004 | 2568 |
| 104 | COVINGTON SYLVESTER | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.83 | | 2004 | 2570 |
| 105 | HARDIE, LEOTIS | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.83 | | 2004 | 2572 |
| 106 | BYRD, DOROTHY B. | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.83 | | 2004 | 2574 |
| 107 | MERRILL, MINNIE PEARL B. | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.83 | | 2004 | 2576 |
| 108 | BRYE, NERO | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.83 | | 2004 | 2578 |
| 109 | JONES, BEULAH | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.83 | | 2004 | 2580 |
| 110 | ROGERS, OSSIE B. | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.83 | | 2004 | 3035 |
| 111 | ROLLING, STEVE A. | CRAFT EXPLORATION | 08/05/04 | 5 yrs | 08/05/09 | 0.1966 | 21.30 | 2.66 | | 2004 | 3037 |
| 112 | HORTON, WILLIE, ET UX NOVELLA B. | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 62.00 | 2.83 | | 2004 | 3040 |
| 113 | HENRY, JOHN L. ETUX, CARRIE I | CRAFT EXPLORATION | 08/24/04 | 5 yrs | 08/24/09 | 0.1875 | 2.65 | 2.65 | | 2004 | 3042 |
| 114 | SAMUEL, JESSIE B | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 121.00 | 3.03 | | 2004 | 2523 |
| 115 | BRADLEY, ROBERT L. & DOROTHY S | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 157.00 | 39.03 | | 2004 | 2525 |
| 116 | RILEY, GERALDINE | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 121.00 | 3.03 | | 2004 | 2527 |
| 117 | BRYANT, ZOLA M. | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 121.00 | 3.03 | | 2004 | 2529 |
| 118 | HOLLEY, ROSA HORTON | CRAFT EXPLORATION | 04/28/04 | 2 yrs | 4/28/2006 - 08 | 0.2000 | 80.00 | 80.00 | 2 YR. EXT. @ $100.00 / NMA | 2004 | 2531 |
| 119 | BALL, HATTIE MAE HOLMES | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 40.00 | 3.33 | | 2004 | 2534 |
| 120 | BARROW, CORRINE E. NOBLES | CRAFT EXPLORATION | 07/29/04 | 5 yrs | 07/29/09 | 0.1875 | 20.00 | 20.00 | | 2004 | 2536 |
| 121 | MITCHELL, SYBIL W | CRAFT EXPLORATION | 08/17/04 | 5 yrs | 08/17/09 | 0.1875 | 40.00 | 2.50 | | 2004 | 2538 |
| 122 | RUDOLPH, EUGENE & MARTIN | CRAFT EXPLORATION | 05/17/04 | 5 yrs | 05/17/09 | 0.1875 | 51.00 | 51.00 | | 2004 | 2540 |
| 123 | JACKSON, JOEL R. | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/04 | 0.1875 | 40.00 | 1.67 | | 2004 | 2542 |
| 124 | HOLMES, REELICE | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 40.00 | 3.33 | | 2004 | 2544 |
| 125 | HOOKS, BUICE LEE HOLMES | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 40.00 | 3.33 | | 2004 | 2546 |
| 126 | BANKS, PAMELA D. HOLMES | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 40.00 | 0.48 | | 2004 | 2548 |
| 127 | SOTERRA, LLC | CRAFT EXPLORATION | 08/09/04 | 3 yrs | 08/09/07 | 0.2000 | 160.00 | 160.00 | | 2004 | 2550 |
| 128 | WHITE, GEORGE HENRY | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.75 | | 2004 | 3044 |

1-188

4-Nov-04

| LEASE NO. | LESSOR | LESSEE | DATE | TERM | EXPIRES | ROYALTY | GROSS ACRES | NET ACRES | COMMENTS | RECORDING BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 129 | WHITE, CLARENCE | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.75 | | 2004 | 3046 |
| 130 | TOLBERT, AGNES | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.75 | | 2004 | 3048 |
| 131 | THOMPSON, BERTHA | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.75 | | 2004 | 3050 |
| 132 | SMITH, NELL | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.75 | | 2004 | 3052 |
| 133 | PRINDLE, JAMES P. | CRAFT EXPLORATION | 07/16/04 | 5 yrs | 07/16/09 | 0.1667 | 40.00 | 5.00 | | 2004 | 3054 |
| 134 | McEWEN, SARAH NELL | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.75 | | 2004 | 3056 |
| 135 | HATHORNE, LOIS BRYE | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.75 | | 2004 | 3058 |
| 136 | HARDING, JANIE B. | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 80.00 | 1.25 | | 2004 | 3060 |
| 137 | FERGUSON, MARY ANN | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.75 | | 2004 | 3062 |
| 138 | CULLIVER, INEZ | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.63 | | 2004 | 3064 |
| 139 | CRITTENDEN, MARY HELEN | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.75 | | 2004 | 3067 |
| 140 | CARTER, MINNIE | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 80.00 | 0.75 | | 2004 | 3069 |
| 141 | BRYE, HUZELL | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 1.25 | | 2004 | 3071 |
| 142 | BRYE, GRADY | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.75 | | 2004 | 3073 |
| 143 | BROOKS, VIRGIE | CRAFT EXPLORATION | 06/18/04 | 5 yrs | 06/18/09 | 0.1875 | 60.00 | 0.75 | | 2004 | 3075 |
| 144 | ROLLING, STEPHANIE | CRAFT EXPLORATION | 08/05/04 | 5 yrs | 08/05/09 | 0.1667 | 21.30 | 2.66 | | 2004 | 3077 |
| 145 | PIERCE, MATTIE | CRAFT EXPLORATION | 08/16/04 | 5 yrs | 08/16/09 | 0.1875 | 54.00 | 1.00 | | 2004 | 3080 |
| 146 | JONES, LEON | CRAFT EXPLORATION | 09/07/04 | 5 yrs | 09/07/09 | 0.1875 | 69.90 | 1.42 | | 2004 | 3082 |
| 147 | JONES, TANYA | CRAFT EXPLORATION | 09/07/04 | 5 yrs | 09/07/09 | 0.1875 | 69.90 | 1.42 | | 2004 | 3084 |
| 148 | BRADLEY, FRANK | CRAFT EXPLORATION | 09/07/04 | 5 yrs | 09/07/09 | 0.1875 | 54.00 | 0.68 | | 2004 | 3086 |
| 149 | ETHRIDGE, MARTHA | CRAFT EXPLORATION | 08/20/04 | 5 yrs | 08/20/09 | 0.1875 | 54.00 | 0.10 | | 2004 | 3088 |
| 150 | TALIAFERRO, RICHARD L. | CRAFT EXPLORATION | 08/21/04 | 5 yrs | 08/21/04 | 0.1875 | 54.00 | 0.17 | | 2004 | 3090 |
| 151 | STRAUGHN, CYNTHIA | CRAFT EXPLORATION | 08/19/04 | 5 yrs | 08/19/09 | 0.1875 | 80.00 | 0.07 | | 2004 | 3092 |
| 152 | TALIAFERRO, RAS | CRAFT EXPLORATION | 08/21/04 | 5 yrs | 08/21/09 | 0.1875 | 54.00 | 0.19 | | 2004 | 3094 |
| 153 | BRADLEY, ROBERT L | CRAFT EXPLORATION | 09/09/04 | 5 yrs | 09/09/09 | 0.1875 | 54.00 | 0.17 | | 2004 | 3096 |
| 154 | TALIAFERRO, BOOKER T. | CRAFT EXPLORATION | 08/25/04 | 5 yrs | 08/25/09 | 0.1875 | 69.90 | 1.57 | | 2004 | 3098 |
| 155 | HOWARD, SIMPSON Jr. | CRAFT EXPLORATION | 09/01/04 | 5 yrs | 09/01/09 | 0.1875 | 64.00 | 4.75 | | 2004 | 3100 |

1-188

4-Nov-04

| LEASE NO. | LESSOR | LESSEE | DATE | TERM | EXPIRES | ROYALTY | GROSS ACRES | NET ACRES | COMMENTS | RECORDING BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 156 | WILLIAMS, BEAMAN | CRAFT EXPLORATION | 09/09/04 | 5 yrs | 09/09/09 | 0.1875 | 54.00 | 0.17 | | 2004 | 3104 |
| 157 | PRYOR, BERNICE | CRAFT EXPLORATION | 08/18/04 | 5 yrs | 08/18/09 | 0.1875 | 54.00 | 0.17 | | 2004 | 3106 |
| 158 | TALIAFERRO, CALVIN | CRAFT EXPLORATION | 08/21/04 | 5 yrs | 08/21/09 | 0.1875 | 54.00 | 0.17 | | 2004 | 3110 |
| 159 | TALIAFERRO, LILLIE PEARL | CRAFT EXPLORATION | 08/18/04 | 5 yrs | 08/18/09 | 0.1875 | 54.00 | 0.17 | | 2004 | 3108 |
| 160 | TALIAFERRO, CHARLIE | CRAFT EXPLORATION | 08/18/04 | 5 yrs | 08/18/09 | 0.1875 | 54.00 | 0.17 | | 2004 | 3122 |
| 161 | TALIAFERRO, MARY H. | CRAFT EXPLORATION | 08/18/04 | 5 yrs | 08/18/09 | 0.1875 | 54.00 | 0.34 | | 2004 | 3112 |
| 162 | TALIAFERRO, OTHELLE | CRAFT EXPLORATION | 08/20/04 | 5 yrs | 08/20/09 | 0.1875 | 54.00 | 0.33 | | 2004 | 3114 |
| 163 | BRADLEY, WILLIA | CRAFT EXPLORATION | 08/19/04 | 5 yrs | 08/19/09 | 0.1875 | 54.00 | 0.17 | | 2004 | 3116 |
| 164 | SAMUELS, SARAH E. | CRAFT EXPLORATION | 08/19/04 | 5 yrs | 08/19/09 | 0.1875 | 54.00 | 0.17 | | 2004 | 3120 |
| 165 | BRADLEY, MIZELL, Jr | CRAFT EXPLORATION | 08/19/04 | 5 yrs | 08/19/09 | 0.1875 | 54.00 | 0.07 | | 2004 | 3118 |
| 166 | BRYE, ARTANSIE TALIAFERRO | CRAFT EXPLORATION | 08/18/04 | 5 yrs | 08/18/09 | 0.1875 | 54.00 | 1.42 | | 2004 | 3124 |
| 167 | MEEKS, MABLE TALIAFERRO | CRAFT EXPLORATION | 08/18/04 | 5 yrs | 08/18/09 | 0.1875 | 54.00 | 1.42 | | 2004 | 3126 |
| 168 | BRADLEY, RUTH | CRAFT EXPLORATION | 08/19/04 | 5 yrs | 08/19/09 | 0.1875 | 54.00 | 0.17 | | 2004 | 3102 |
| 169 | GRIGGS, DONNIE RICHARD, ET UX. | CRAFT EXPLORATION | 08/11/04 | 5 yrs | 08/11/09 | 0.1875 | 5.10 | 5.10 | | 2004 | 3130 |
| 170 | SHAW, GEORGE ELLIS, Jr., ET UX | CRAFT EXPLORATION | 08/18/04 | 5 yrs | 08/18/09 | 0.2500 | 125.08 | 10.74 | | 2004 | 3132 |
| 171 | CEDAR CREEK LAND & TIMBER, INC. | CRAFT EXPLORATION | 08/31/04 | 3 yrs | 08/31/07 | 0.2500 | 80.00 | 80.00 | | 2004 | 3173 |
| 172 | JONES, KENNETH HUMPHREY | CRAFT EXPLORATION | 08/26/04 | 3 yrs | 08/26/07 | 0.2500 | 120.00 | 3.75 | | 2004 | 3168 |
| 173 | JONES, KEITH ROBERT | CRAFT EXPLORATION | 08/26/04 | 3 yrs | 08/26/07 | 0.2500 | 120.00 | 3.75 | | 2004 | 3166 |
| 174 | JONES, TROY RUSSELL | CRAFT EXPLORATION | 08/26/04 | 3 yrs | 08/26/07 | 0.2500 | 120.00 | 3.75 | | 2004 | 3164 |
| 175 | JONES, BRUCE ALLEN | CRAFT EXPLORATION | 08/26/04 | 3 yrs | 08/26/07 | 0.2500 | 120.00 | 3.75 | | 2004 | 3162 |
| 176 | FRANKLIN, YVONNE J. & JAMES B. | CRAFT EXPLORATION | 08/14/04 | 3 yrs | 08/14/07 | 0.2500 | 120.00 | 15.00 | | 2004 | 3160 |
| 177 | HILL, JAMES H. | CRAFT EXPLORATION | 08/17/04 | 5 yrs | 08/17/09 | 0.1875 | 40.00 | 3.33 | | 2004 | 3158 |
| 178 | HILL, RICHARD L. | CRAFT EXPLORATION | 08/19/04 | 5 yrs | 08/19/09 | 0.1875 | 40.00 | 0.83 | | 2004 | 3156 |
| 179 | KAYLOR, TERRY HILL | CRAFT EXPLORATION | 08/19/04 | 5 yrs | 08/19/09 | 0.1875 | 40.00 | 0.83 | | 2004 | 3154 |
| 180 | HILL, CHARLOTTE R. | CRAFT EXPLORATION | 08/19/04 | 5 yrs | 08/19/09 | 0.1875 | 40.00 | 0.83 | | 2004 | 3152 |
| 181 | HILL, KATHRYN LYNN | CRAFT EXPLORATION | 08/19/04 | 5 yrs | 08/19/09 | 0.1875 | 40.00 | 0.83 | | 2004 | 3150 |
| 182 | McGEHEE, WILLIAM NEWTON TRUST | CRAFT EXPLORATION | 08/27/04 | 3 yrs | 08/27/04 | 0.2000 | 40.00 | 3.33 | | 2004 | 3145 |

1-188

4-Nov-04

| LEASE NO. | LESSOR | LESSEE | DATE | TERM | EXPIRES | ROYALTY | GROSS ACRES | NET ACRES | COMMENTS | RECORDING BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 183 | STUART, MARY McGEHEE | CRAFT EXPLORATION | 08/23/04 | 3 yrs | 08/23/07 | 0.2000 | 40.00 | 3.33 | | 2004 | 3143 |
| 184 | SAMUEL, WILLIE J. | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 121.00 | 3.03 | | 2004 | 3141 |
| 185 | STRATFORD, CHIQUITA L. JACKSON | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 40.00 | 1.67 | | 2004 | 3139 |
| 186 | ELLINGTON, JOHNNIE MAE HOLMES | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 40.00 | 3.33 | | 2004 | 3137 |
| 187 | AVERHART, FELITA FAY HOLMES | CRAFT EXPLORATION | 07/13/04 | 5 yrs | 07/13/09 | 0.1875 | 40.00 | 0.48 | | 2004 | 3135 |
| 188 | HERRING, FRED DEEN | CRAFT EXPLORATION | 08/18/04 | 5 yrs | 08/18/09 | 0.2250 | 125.08 | 7.81 | | 2004 | 3170 |

TOTAL                    8765.23

Exhibit "A-2"
**Attached to and made part of that certain Operating Agreement dated effective November 15, 2004 By and Between Sklar Exploration Company, LLC as Operator and Craft Exploration Company, LLC, et al as Non-Operators**



## EXHIBIT "B"

Attached to and made a part of that certain Operating Agreement dated effective
November 15, 2004 by and between Sklar Exploration Company, LLC, as Operator,
and Craft Exploration Company, LLC, et al, as Non-Operators

(There is no Exhibit "B" to this Agreement)

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

# EXHIBIT "C"

**Attached to and made a part of that certain Operating Agreement dated effective November 15, 2004 by and between Sklar Exploration Company, LLC, as Operator, and Craft Exploration Company, LLC, et al, as Non-Operators**

# ACCOUNTING PROCEDURE

# JOINT OPERATIONS

## I. GENERAL PROVISIONS

1. **Definitions**

   "Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

   "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

   "Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

   "Operator" shall mean the party designated to conduct the Joint Operations.

   "Non-Operators" shall mean the Parties to this agreement other than the Operator.

   "Parties" shall mean Operator and Non-Operators.

   "First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

   "Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

   "Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

   "Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

   "Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

2. **Statement and Billings**

   Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3. **Advances and Payments by Non-Operators**

   A. Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

   B. Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at ___CHASE BANK'N.A. or successors___ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4. **Adjustments**

   Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.**

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

5.  Audits

A.  A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B.  The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6.  Approval By Non-Operators

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.  Ecological and Environmental

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2.  Rentals and Royalties

Lease rentals and royalties paid by Operator for the Joint Operations.

3.  Labor

A.  (1)  Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

    (2)  Salaries of First Level Supervisors in the field.

    (3)  Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

    (4)  Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B.  Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.  Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D.  Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4.  Employer Benefits

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

5.  Material

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6.  Transportation

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A.  If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made

to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material

- 2 -

Case:20-12377-MER   Doc#:903-1   Filed:02/26/21   Entered:02/26/21 16:57:44   Page58 of 128

COPAS 1984 · ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7.   **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.   **Equipment and Facilities Furnished By Operator**

A.   Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _____ eight _____ percent ( 8.0% ) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9.   **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.   **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11.   **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

12.   **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13.   **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14.   **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15.   **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which

- 3 -

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

1. **Overhead - Drilling and Producing Operations**

   i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

      ( x ) Fixed Rate Basis, Paragraph 1A, or

      (   ) Percentage Basis, Paragraph 1B

      Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II.   The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property

      (   ) shall be covered by the overhead rates, or

      ( x ) shall not be covered by the overhead rates.

   iii. The salaries, wages and Personal Expenses of Technical Employees ~~and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently~~ assigned to and directly employed in the operation of the Joint Property:

      ( x ) shall be covered by the overhead rates, or

      (   ) shall not be covered by the overhead rates.

   A. Overhead - Fixed Rate Basis

      (1) Operator shall charge the Joint Account at the following rates per well per month:

          Drilling Well Rate $_____9,400.00_____
          (Prorated for less than a full month)

          Producing Well Rate $____965.00_____

      (2) Application of Overhead - Fixed Rate Basis shall be as follows:

          (a) Drilling Well Rate

              (1) Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever is later, except that no  charge shall be made during suspension of drilling or completion    operations    for fifteen (15) or more consecutive calendar days.

              (2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

          (b) Producing Well Rates

              (1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

              (2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

              (3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

              (4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

              (5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

      (3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached.   The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

- 4 -

COPAS — 1984 — ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

B.  (1) Overhead - Percentage Basis :

Operator shall charge the Joint Account at the following rates:

(a)  Development

_____ Percent (_____ %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b)  Operating

_____ Percent (_____ %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2)  Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2.  Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of $ _____:

A.  ____5____ % of first $100,000 or total cost if less, plus

B.  ____2____ % of costs in excess of $100,000 but less than $1,000,000, plus

C.  ____1____ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3.  Catastrophic Overhead

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A.  ____5____ % of total costs through $100,000; plus

B.  ____2____ % of total costs in excess of $100,000 but less than $1,000,000; plus

C.  ____1____ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4.  Amendment of Rates

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

IV.  PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1.  Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

- 5 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

2.   **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts.

A.   New Material (Condition A)

(1)   Tubular Goods Other than Line Pipe

(a)   Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

(b)   For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

(c)   Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

(d)   Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2)   Line Pipe

(a)   Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(b)   Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(c)   Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

(d)   Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3)   Other Material shall be priced at the current ~~new~~ market price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4)   Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current ~~new~~ market price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).

B.   Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1)   Material moved to the Joint Property

At seventy-five percent (75%) of current ~~new~~ market price, as determined by Paragraph A.

(2)   Material used on and moved from the Joint Property

(a)   At seventy-five percent (75%) of current ~~new~~ market price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b)   At sixty-five percent (65%) of current ~~new~~ market price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material

(3)   Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current ~~new~~ market price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

- 6 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

C.   Other Used Material

(1)   Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2)   Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)   Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight.   Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)   Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)   Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.   Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

1.   Pricing Conditions

(1)   Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)   Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.   Premium Price

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4.   Warranty of Material Furnished By Operator

Operator does not warrant the Material furnished.   In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.   Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.   Reconciliation and Adjustment of Inventories

Adjustments to the Joint Account resulting from the reconciliation of   a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

OFFSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

3.   **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.   In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.   **Expense of Conducting Inventories**

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

## VI. Miscellaneous

The following, notwithstanding anything herein to the contrary, shall be made a part of and included in this Accounting Procedure:

A.   In the event Non-Operator is required under any applicable provision of the Operating Agreement or under Article I(3) of the Accounting Procedure attached thereto as Exhibit "B" to advance or prepay funds for operations to which it has consented, any discounts offered by Vendors selling to the Joint Account during and applicable to such prepay situation shall be credited pro rata by Operator to Non-Operator.

B.   Any volume discounts or special rebates which are credited to the Operator by vendors selling to the Joint Account shall be credited to the Joint Account when received by Operator.

C.   In the event Operator plans to use his own equipment for any operations hereunder, or the equipment of any subsidiary, parent company or sister company, Operator agrees that the charge to the Joint Account for the use of such equipment shall be equal to the competitive market price at the time the goods or services are provided for the use of similar equipment or Operator's actual cost, whichever is the lesser.

D.   In the event Operator plans to purchase goods and/or services for the Joint Account from his own subsidiaries, parent company or sister companies, such goods and services shall be charged to the Joint Account at prices equal to competitive market prices at the time the goods or services are provided.

E.   Within ninety (90) days after close of operations on any well drilled hereunder, any unused or salvaged tubulars shall be credited to the Joint Account, offered proportionately to the Non-Operators "in-kind" or sold to a third party with a credit being reflected on the Joint Account.

F.   Operator agrees to acquire any tubular goods obtained for the Joint Account at current competitive market price. If Operator wishes to use tubular goods from its own inventory, or the inventory of any subsidiary, parent company or sister company, such tubulars shall be charged to the Joint Account at prices which are equal to or lower than current competitive market price. In no event shall Operator charge the Joint Account for material transfers from its own inventory at mill price when mill price is in excess of current competitive market price.

G.   Billings and Credits

1   Without waiving any of the rights, obligations, and privileges of Paragraph 5 of Article I, any Non-Operator shall have the right to contest any unusual charge made to the Joint Account and/or request copies of actual invoices within sixty (60) days after receipt of said billing by giving written notice to the Operator as to the amount and charge contested and the reason therefor.

Operator shall have thirty (30) days within which to respond, explain the charge in question and provide copies of invoices if required. Any adjustment in favor of Non-Operator(s) (A) will be processed within thirty (30) days of such explanation and at Operator's election, will be issued either as (1) a check payable to Non-Operator(s) or (2) a credit on the next occurring Joint Account billing. Any balance in favor of Operator shall be paid within thirty (30) days by Non-Operator(s).

2.   During the time any charge is being contested as provided for above, no disputed amounts shall accrue interest, unless charges are contested excessively, and/or unreasonably Provided,   however, nothing herein shall waive Non-Operator's obligation to pay charges when due.

H.   Settlement of Audits

Upon receipt of any audit report conducted on the Joint Account by Non-Operators, Operator shall have ninety days (90) days within which to (1) respond in writing or (2) cure the exceptions detailed.  Failure to respond shall be deemed approval of the audit report.

I.   Producing Well Rates

Notwithstanding anything to the contrary within Article III.1.A.(1), Operator shall not charge the joint account an amount in excess of one Producing Well Rate per well even in the event such well may be co-mingled or a dual completed well.

- 8 -

## EXHIBIT "D"

**Attached to and made a part of that certain Operating Agreement dated effective November 15, 2004 by and between Sklar Exploration Company, LLC, as Operator, and Craft Exploration Company, LLC, et al, as Non-Operators**

### INSURANCE PROVISIONS

### SCHEDULE OF INSURANCE TO BE CARRIED

| Type of coverage: | | Limits: |
|---|---|---|
| (a) | Workman's Compensation | Statutory |
| (b) | Employer's Liability | |
| | Bodily Injury (each accident) | $ 500,000.00 |
| | Occupational Disease (policy limit) | $ 500,000.00 |
| | Occupational Disease (each employee) | $ 500,000.00 |
| (c) | Commercial General Liability | |
| | General Aggregate | $1,000,000.00 |
| | Products-Completed Operations Aggregate | $1,000,000.00 |
| | Personal & Advertising Injury | $1,000,000.00 |
| | Each Occurrence | $1,000,000.00 |
| | Medical Expense (any one person) | $ 5,000.00 |
| (d) | Excess Liability | |
| | Each Occurrence | $5,000,000.00 |
| | Aggregate | $5,000,000.00 |
| (e) | Comprehensive Automobile Liability | $1,000,000.00 |
| (f) | Operator's Extra Expense | |
| | Aggregate | $5,000,000.00 |
| | Retention | $ 500,000.00 |

Operator, at his election, may carry, for the benefit of the Joint Account, umbrella coverage which shall be in excess of the primary amounts listed above. In no event, however, shall operator carry umbrella coverage in excess of $10,000,000. All premiums paid on the insurance listed above may, at Operator's disrection, be charged to the Joint Account.

In lieu of the Operator's insurance provided for herein, Non-Operators may elect to provide their own Umbrella Liability Coverage and Cost of Well Control Insurance. Non-Operators shall evidence such an election by providing Operator with Certificates of Insurance at Operator's request.

All losses not covered by standard form policies of insurance for hazards as set out above, shall be borne by the parties hereto as their interest may appear at the same time of loss.

Operator shall not be liable to Non-Operators for loss suffered on account of the insufficiency of insurance carried, or of the Insurer with whom carried.

## EXHIBIT "E"

Attached to and made a part of that certain Operating Agreement dated effective November 15, 2004 by and between Sklar Exploration Company, LLC, and Craft Exploration Company, LLC, et al as Non-Operators

## GAS BALANCING AGREEMENT

Each party hereto has the right to take in-kind its share of the gas produced from the Contract Area and to sell its share of the gas for itself (exclusive of production which may be used in development and production operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost), and each party herein has made or will make arrangements either to take or market its share of such gas. If, however, Non-Operators have not elected to take production 'in-kind', then the Operator shall market each Non-Operator's saleable gas on the same basis as his own or, if Operator does not own a share, then on the same basis Operator markets other Non-Operator's gas, provided, however, said gas contract shall not exceed a period of one year. Operator may enter into gas contracts for a period of longer than one year, but, in that event, Operator shall furnish Non-Operators advanced notice and Non-Operators must elect for either Operator to market their gas on the same basis and through the same or similar contract or to take their share in kind. If Non-Operators do not elect to elect for Operator to market their gas through this longer term contract, then they shall be choosing to take their production 'in-kind' and shall be responsible for the marketing of their own gas.    The parties hereto recognize, however, that the taking or marketing of gas by the respective parties may occur at different times or may result in imbalances in accordance with each party's ownership interest therein, and the following terms and provisions shall be applicable and effective at any time and at all times that any of the parties hereto is not taking or marketing one hundred percent (100%) of its share of the gas produced, or a purchaser of gas from any party is not taking such party's full share of the gas produced (hereinafter referred to as an "underproducing party"), or so long as any of the parties is in an underproduced position..

I.

During any period when there are one or more underproducing parties, the other parties shall be entitled to produce one hundred percent (100%) of the allowable gas production assigned by a governmental regulatory body having jurisdiction or produce such gas at the maximum efficient rate in the absence of regulation, and to any sales proceeds therefrom. Such other parties shall be entitled to take or market all of the gas produced during such period. Parties who take or market more than their working interest share of the gas during any month are hereinafter referred to as "overproducing parties". All underproducing and overproducing parties shall share in and own the proceeds attributable to the liquid hydrocarbons recovered by lease equipment from such gas in accordance with their respective interest and subject to the Operating Agreement to which this Agreement is attached. However, the overproducing parties shall own and have title to such residual gas and any and all liquid hydrocarbons recovered downstream of such lease equipment.

In order for the Operator to develop and maintain current the MMBTU volume and value imbalance account contemplated by this Agreement, each month in which an MMBTU imbalance is created, each and every overproducing party taking or marketing its share of the gas in-kind hereby agrees to and shall provide Operator with a statement itemizing for its account (i) the total MMBTU volume of gas taken and not marketed, and taken and marketed, (ii) an estimate of the value (if any) of all such gas taken but not marketed, and (iii) the Net Amount Realized (as hereinafter defined) for all such gas taken and marketed, for the applicable production month. Such statements shall be provided to Operator in writing no later than sixty (60) days following the end of the applicable production month.   Such statements shall not be required from overproducing parties for any month(s) in which such parties' gas is being taken or marketed by Operator.

For the purposes of maintaining the value of each underproduced party's imbalance account, Operator shall determine and proportionately apply to each MMBTU of underproduced gas each month, a weighted average net price per MMBTU for each MMBTU of gas taken or marketed by each overproducing party during the applicable month. Such weighted average net price shall be equal to the sum of the estimated value and the Net Amount Realized by such overproducing party, divided by the total MMBTU volume of gas allocated to such overproducing party's account for such month.  The Net Amount Realized by an overproducing party during any given month shall be equal to the total proceeds actually received by such party for gas (and when applicable, liquid hydrocarbons) sold for its account during such month, less any and all costs paid by such party in marketing or selling its gas (and liquid hydrocarbons when applicable) which reduces the amount actually realized by such party for such sales, including but not limited to capital amortization, operating, treating, processing, gathering, compression, dehydration, transportation and other such costs.  Operator shall be entitled to rely on all of the information provided to it by each and every overproducing party and all purchasers of gas, and shall not be held accountable or liable for maintaining the imbalance value of any underproduced MMBTU volumes for any month(s) for which it does not have or is not provided, the information necessary to determine such value.  Nevertheless, Operator shall endeavor to maintain the MMBTU volume (but not value) imbalance account for all parties for such month(s), based on information it has received or had access to, such as pipeline volume allocation statements.

II.

On a cumulative basis, each underproducing party shall be credited each calendar month with an MMBTU volume of gas in storage equal to its full share of the MMBTU of gas actually produced from the applicable unit during such month, less its share of MMBTU of gas used in lease operations, vented or lost, and less that MMBTU portion such party took and/or marketed during such month. The Operator under said Operating Agreement will establish and maintain current, an MMBTU gas volume account to show the MMBTU gas imbalance which exists between all the parties and will furnish each of these parties a monthly statement showing the total MMBTU quantity of gas produced, the amount used in lease operations, vented or lost, the total quantity of gas taken or delivered to market for the account of each party (including any in-kind make-up volumes), and the monthly and cumulative over and under account of each party, all on an MMBTU basis. Subject to the other provisions hereof, the Operator shall be responsible for determining the final MMBTU volume accounting of the underproduction and overproduction on a unit by unit basis. To the extent the Operator has been timely and properly informed of the estimated value and Net Amounts Realized by each and every overproduced party taking and/or marketing its share of the gas as described above, and of the volumes taken and amounts paid by the applicable purchasers of gas, Operator shall also be responsible for determining and maintaining current the value of each underproduced account and the amounts due to be paid to, or by, each party upon final settlement.

III.

Each party agrees to indemnify and hold each and every other party harmless from any and all claims for royalty payments asserted by royalty owners to whom each indemnifying party is accountable. The term "royalty owner" shall include owners of royalty, overriding royalties, productions payments, reversionary interests and similar interests.

IV.

If an underproduced party desires to take make-up gas in-kind, at least fifteen (15) days prior to the beginning of a calendar month, said party shall give written notice to the Operator and all other parties and such party may begin the next month taking or marketing its full share of the gas produced, less such party's share of gas used in operations, vented or lost. In addition to such share, each underproduced party, until it has recovered it's MMBTU of gas in storage and balanced the gas account as to its interest shall also be entitled to take or market all or part of the following amounts of make-up gas:

   (a) If any other party is not then taking or marketing its full share of the gas, the amount of gas not being taken or marketed by such underproducing party, plus

   (b) Up to fifty percent (50%) of the interest in the then current gas production of each and every overproduced party until the gas account of each such overproduced party is balanced.

   (c) Notwithstanding anything to the contrary herein no party shall be allowed to make up any of its underproduced gas in-kind during the calendar months of November, December, January or February, regardless of which calendar month(s) the underproduction occurred.

All such make-up gas taken or marketed in-kind by an underproduced party at any time and from time to time shall first be deemed taken or marketed from any amount available under Subsection IV,(a) above; and, provided further, that if more than one underproduced party desires to take or market make-up gas in-kind, each such party shall be entitled to take or market that portion of available make-up gas represented by the total of Subsection (a) and (b) above, determined by multiplying such available make-up amount by a fraction, the numerator of which is the then current working interest of such party in the applicable unit and the denominator of which is the sum of the then current working interests of all underproduced parties desiring to so take or market such available make-up gas in-kind in the applicable unit.

V.

Each party producing and taking or marketing gas shall pay any and all production taxes and royalty due on such gas.

VI.

Nothing herein contained shall be construed as denying any party the right, from time to time, to produce and take or deliver to its purchaser its working interest share of gas production to meet the deliverability tests required by its purchaser.

VII.

In the event production of gas is permanently discontinued or ceases for 12 consecutive months before the MMBTU gas imbalance account for all parties is balanced, Operator will provide all parties with written notice thereof together with the then current MMBTU volume and value imbalance account statement. A financial settlement will then be made between the under produced and overproduced parties as to the then existing imbalance within sixty (60) days of such notice. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties based on the value and proceeds received by the overproduced party or parties from overproduction, which proceeds are not

subject to refund in whole or in part. Such sum shall be less applicable royalty, taxes, reversionary interests and similar lease burdens and other costs actually incurred and theretofore paid by the applicable overproduced party or parties and shall be based on the weighted average net price actually received by the overproduced party at the time the overproduced party took or marketed that portion of production that was attributable to the share of the underproduced party as described in Section I. and reflected in Operator's imbalance statements.

Notwithstanding the foregoing, should the underproduced party elect to receive any sums of money which are subject to refund, it shall be entitled to the payment thereof from the overproduced party or parties upon the underproduced party executing and delivering to said overproduced party or parties a letter, in which the underproduced party agrees to timely repay to the overproduced party or parties that amount so said that is ultimately required to be refunded. For the purposes of this Agreement, the in-kind make-up of gas by any underproduced party at any time and from time to time, shall be considered and reflected by Operator in its imbalance statements as make-up of the gas first chronologically stored for the account of such underproduced party.

Upon providing notice to all parties that the production of gas from a given unit has permanently discontinued or ceased for 12 consecutive months together with the then current MMBTU volume and value imbalance account provided for herein, Operator shall have completed and satisfied all of its obligations and liabilities hereunder. Operator shall not be responsible for initiating, negotiating, or concluding a financial settlement between any under and over produced parties hereto and each party shall indemnify and hold harmless Operator from any and all claims, suits and other causes of action for damages or other losses arising from or related to the accuracy or completeness of said MMBTU volume and value imbalance account, and the timing, amount, accuracy or other provisions of any financial settlements arising from or related to such imbalance account, except as may result from Operator's gross negligence or willful misconduct.

VIII

Nothing herein contained shall change or affect the obligations of each party to bear or pay its proportionate share of all costs, expenses, and liabilities as provided in the Operating Agreement.

IX.

This Agreement shall become effective in accordance with its terms and shall remain in force and effect for the longer of the effective term of the Operating Agreement to which it is attached is in effect, or so long as there remains an unbalanced or unsettled imbalance account hereunder. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their heirs, successors, legal representatives and assigns.

X.

If any party sells or assigns an interest in the working interest in the land owned by it when such party is an underproduced party, the sale or assignment shall include all interest of the selling or assigning party in the underproduced gas, all right to take make-up gas in-kind and all right to any money payment which may ultimately be due hereunder, in the absence of specific provision in the assignment instrument otherwise.

XI.

If any situation arises in which there exists an imbalance of gas in a given unit, Operator shall make a reasonable effort to determine the point in time when an overproduced party has taken one hundred percent (100%) of its working interest share of the estimated gas reserves attributable to such unit. Operator shall be entitled to rely on its own or third party estimates of gas reserves for such purposes. Upon notice by Operator to such party that it believes that such point in time has been reached, Operator shall be entitled to and shall suspend the delivery and allocation of gas to such overproduced party and each underproduced party shall be entitled to take its proportionate share of such overproduced party's production in such unit until recovery of its cumulative underproduction, and from the time of such notice until the recovery of all underproduced volumes by all underproduced parties in such unit, the overproduced party shall have no rights to the gas produced from such unit.

Initials: _____    Initials: _____    Initials: _____    Initials: _____

Initials: _____    Initials: _____    Initials: _____

## EXHIBIT "F"

**Attached to and made a part of that certain Operating Agreement dated effective November 15, 2004 by and between Sklar Exploration Company, LLC, as Operator, and Craft Exploration Company, LLC, et al, as Non-Operators**

### NON-DISCRIMINATION AND EQUAL EMPLOYMENT OPPORTUNITY

In the performance of this Agreement, Operator shall not engage in any conduct or practice which violates any applicable law, order or regulation prohibiting discrimination against any person by reason of race, religion, color, sex, national origin or age. Operator, unless exempt therefrom, further agrees to comply fully with the non-discrimination provisions of Section 202 of Executive Order No. 11246 (30 C.F.R. 12319), which are hereby included in this agreement as fully as if copied herein.

## EXHIBIT "G"

Attached to and made a part of that certain Operating Agreement dated effective November 15, 2004 by and between Sklar Exploration Company, LLC, as Operator, and Craft Exploration Company, LLC, et al, as Non-Operators

(There is no Exhibit **"G"** to this Agreement)

**Attached to and made a part of that certain Operating Agreement dated effective
November 15, 2004 by and between Sklar Exploration Company, LLC, as Operator, and Craft
Exploration Company, LLC, et al, as Non-Operators**

GEOLOGICAL WELL REQUIREMENTS/INFORMATION DISTRIBUTION LIST

(1)  Steven H. Craft
(2)  Donnie Lambert
(3)  Larry Johnson
(4)  Julius Ridgway
(5)  Henry Tyler, M.D.
(6)  Skarco, LLC
(7)

All Parties listed above shall receive one (1) of each of the following, unless otherwise noted.

AFE's

Drilling, Completion, and Workover Reports: Faxed or emailed daily or as practicable.

Drilling Permits, Wetland Permits, Location Plats, Surface and Right of Way Agreements. all Regulatory Reports Filed.
all reports filed with State Oil and Gas Board or pertinent regulatory agency.

DST's, Production Reports, Production Tests

Directional Surveys

Geological Information, Core Analysis, Paleo reports, show reports

All Logs, Electrical and Mud Logs

**24 HOUR NOTIFICATION OF**

**Mud Logging target zone, Coring, Electrical Logging, all DST and open hole testing,**

**Casing Point Election, P&A, Perforating, swabbing, production tests.**

List of Telephone Numbers     See **Exhibit "A"** to the Operating Agreement for Telephone/Facsimile/ Email/Addresses/Designated Person to notify.

**EXHIBIT "H" – NORTH BEACH PROSPECT - Page 1 of 1**

## EXHIBIT "II"

**Attached to and made a part of that certain Participation Sales Agreement dated effective November 15, 2004 by and between Sklar Exploration Company, LLC, as Operator, Sklarco L.L.C., as Buyer, and Craft Exploration Company, LLC, as Seller**

### Assignment of Oil and Gas Leases
### (NORTH BEACH PROSPECT)

| | | |
|---|---|---|
| STATE OF ALABAMA | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF CONECUH & MONROE | § | |

**WHEREAS**, Craft Exploration Company, L.L.C., P.O. Box 16084 Jackson, Mississippi 39236 hereinafter sometimes referred to as "Assignor" represents that it is the present owner of the oil and gas leases described in Exhibit "A-1", attached hereto and made a part hereof, hereinafter sometimes referred to as the "oil and gas leases"; and

WHEREAS, Assignor desires to assign unto the following party the percentage set forth next to its name hereinbelow:

| Party | Percentage |
|---|---|
| SKLARCO L.L.C. | 40% of 8/8ths |
| 401 Edwards Street, Suite 1601 | |
| Shreveport, Louisiana 71101 | |
| TOTAL | 40% of 8/8ths |

hereinafter sometimes referred to as "Assignee", forty percent of eight eighths (40% of 8/8ths) interest in and to said oil and gas leases (the "Leases") described in said Exhibit "A-1", subject to certain conditions, reservations, and limitations.

**NOW, THEREFORE**, for and in consideration of the sum of Ten Dollars ($10.00) cash and other good and valuable consideration in hand paid by Assignee, the receipt and sufficiency of which are hereby acknowledged and confessed, Assignor does hereby GRANT, SELL, TRANSFER, ASSIGN and CONVEY unto Assignee that certain undivided percentage set forth next to its name above in and to the Leases, and in and to any contractual rights set out in the Leases, subject to the following terms, conditions, reservations and limitations:

1. This Assignment shall be made without warranty of any kind, express or implied, except Assignor warrants title against all defects arising out of claims by Assignor or persons claiming by, through or under Assignor;

2. This Assignment is made subject to the terms, covenants and conditions of the following:

   a. The terms and provisions in the Leases; and

   b. The terms and provisions of Assignee's unrecorded Participation Sales Agreement dated effective November 15, 2004 between Assignor and Assignee (hereinafter referred to as the "Participation Sales Agreement"). In the event of a conflict or inconsistency between the terms and provisions of this Assignment and those of the unrecorded Participation Sales Agreement, it is stipulated that the terms and provisions of the unrecorded Participation Sales Agreement shall prevail;

3. Assignor hereby reserves and excepts from this Assignment an overriding royalty interest in and to each of the Leases equal to the difference between Lessor's

royalty and twenty-five percent of eight-eighths (25.0% of 8/8ths); two percent of eight eighths (2.0% of 8/8ths) if lessor's royalty burdens is greater than or equal to twenty-four percent and less than or equal to twenty-five percent (≥24.0% and ≤25.0%) and one percent of eight eighths (1.0% of 8/8ths) if Lessor's royalty burden is greater than twenty-five percent (>25.0%) of all oil, gas and associated hydrocarbons produced and sold from the lands covered by each such oil, gas and mineral lease. Said overriding royalty shall be calculated and shall be delivered and paid to Assignor in the same manner and with the same exclusions, deductions and allocations as are provided for the calculation, delivery and payment of royalties to the Lessors in the Leases. Said overriding royalty interest in each of the Leases may be pooled or unitized in the same manner and under the same terms and conditions as the Lessor's royalty may be pooled or unitized under the terms of each such lease. The overriding royalty interest reserved herein shall apply to any lease renewal, top lease, new lease, lease amendment, extension, farmin lease, purchase, trade or otherwise covering any right title and/or interest which may be acquired directly or indirectly during the term of any such lease and within one (1) year following the expiration of any such lease within the "Area of Mutual Interest" ("AMI") as defined in Article XV.A. of the Operating Agreement attached as Exhibit "I" to the Assignee's unrecorded Participation Sales Agreement as set forth in numerical paragraph 2. above.

4.  The interests assigned shall be subject to their proportionate share of all royalties, overriding royalties and other leasehold burdens created, reserved, excepted or assigned in any of the instruments referred to in numerical paragraph 2. hereinabove.

5.  Assignor hereby further reserves and excepts from this Assignment a twenty-five percent of eight eighths (25.0% of 8/8ths) reversionary leasehold working interest (hereinafter referred to as "Reversionary Interest") in whatever rights Assignee owns in the Leases on the date the Reversionary Interest Assignment is made effective, proportionately reduced to Assignee's interest in the Leases such that upon the occurrence of Payout as defined in said Participation Sales Agreement, there shall be an automatic reversion unto Assignor of twenty-five percent of eight eighths (25.0% of 8/8ths) working interest in and to the rights, titles and interests assigned herein in the Leases, together with such interests' part of production, if any, produced and saved from or attributable to the lands covered by said Leases, and a like interest in all personal property, fixtures and equipment located thereon or used in connection therewith, INSOFAR AND ONLY INSOFAR as said Leases cover and affect lands located within the unit for the well that has reached Payout. Said automatic reversion shall be effective for all purposes as of 7:00 A.M. on the day following the date of Payout, and shall be free and clear of all leasehold burdens, liens and encumbrances not existing as of the date hereof. Consistent with the terms contained in the above described Participation Sales Agreement, Assignee agrees to execute such instrument as may be required by Assignor for the purpose of further evidencing such automatic reversion.

6.  The reversionary interest and any other rights and privileges reserved herein to Assignor shall apply to any lease renewal, top lease, new lease, lease amendment, extension, farmin lease, purchase, trade or otherwise, covering any right, title or interest which may be acquired directly or indirectly during the term of any such lease and within one (1) year following the expiration of any such lease within the "Area of Mutual Interest", as defined in Article XV. A. of the Operating Agreement attached as Exhibit "I" to Assignee's unrecorded Participation Agreement set forth in numerical paragraph 2. above. Per the terms of Article VI.D. of the aforementioned Participation Agreement, Assignee agrees to execute such instrument or instruments as may be required by Assignor for the purpose of evidencing or creating its reversionary interest in all leases or lease interests in the AMI.

7.  In the event any of the Leases covers less than the full undivided mineral fee estate in the oil, gas and associated hydrocarbons in the lands covered thereby, or in the event that Assignor owns less than one hundred percent (100.0%) of the leasehold estate in any of the Leases, then as to such lease, the reversionary and/or overriding royalty interest herein reserved shall be reduced to the proportion that the mineral interest actually covered by said leasehold estate bears to the entire mineral fee estate.

8.  This assignment and its terms, covenants and conditions shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective heirs, devisees, legal representatives, successors and assigns, and such terms, covenants and conditions shall be deemed as covenants running with the lands and leases covered hereby and with transfer or assignment of said lands and leases.

**IN WITNESS WHEREOF**, this instrument is executed effective as of the 15th day of November, 2004.

**CRAFT EXPLORATION COMPANY, L.L.C.**

By: _____
   Steven H. Craft, Member

This instrument prepared by Steven H. Craft, P.O. Box 16084, Jackson, MS, 39236.

CORPORATE ACKNOWLEDGMENT

THE STATE OF _____

COUNTY OF _____

I, _____, a Notary Public in and for said County, in said State, hereby certify that Steven H. Craft, whose name as Member of Craft Exploration Company, LLC, a Mississippi LLC, is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such Member, and with full authority, executed the same voluntarily for and as the act of said corporation.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this ___ day of _____, 2004.

_____
Notary Public

My Commission Expires: _____

**EXHIBIT "III"**
**AUTHORITY FOR EXPENDITURE ("AFE")**

Attached to and made a part of that certain Participation Sales Agreement dated effective November 15, 2004 by and between Sklarco Exploration Company, LLC, as Operator, Sklarco, L.L.C., as Buyer, and Craft Exploration Company, LLC, as Seller.

AUTHORITY FOR EXPENDITURE ("AFE")

### Rig Managers, Inc.
177 Dunnation Drive, Suite A / Jackson, MS 39211 / (601) 362-5121
**AUTHORIZATION FOR EXPENDITURE**

| PROSPECT/FIELD | Craft Exploration Co. | | | WELL NAME | Initial Test #1 | | | 8/20/2004 |
|---|---|---|---|---|---|---|---|---|
| STATE | AL | | | LOCATION | | | | |
| COUNTY/PARISH | Conecuh | | | PROPOSED TD | 11,000' | | FORMATION | Smackover |
| EXPLORATORY | X | OIL | X | DEV/OCOMP | X | SINGLE | X | REV CI- |
| DEVELOPMENT | | GAS | | WORKOVER | | DUAL | | KB- |

| Code | TANGIBLE DESCRIPTION | | | | | | DRILLING | CUMPLETION | TOTAL COST |
|---|---|---|---|---|---|---|---|---|---|
| 100 | CONDUCTOR | 110 ' OF | 20" | @ | | /FT | 17500 | 0 | 17500 |
| 101 | SURFACE | 2400 ' OF | 9 5/8" | @ | $24.50 | /FT | 58800 | 0 | 58800 |
| 102 | INTERMEDIATE | ' OF | | @ | | /FT | 0 | 0 | 0 |
| 103 | LINER, HANGERS | ' OF | | @ | | /FT | 0 | 0 | 0 |
| 104 | PRODUCTION | 11600 ' OF | 5 1/2" | @ | $14.00 | /FT | 0 | 162400 | 162400 |
| 105 | TUBING | 11300 ' OF | 2 7/8" | @ | $5.25 | /FT | 0 | 59325 | 59325 |
| 106 | BRADENHEAD, INT. SPOOL | | | | | | 2350 | 0 | 2350 |
| 107 | CHRISTMAS TREE & TUBING HEAD | | | | | | 0 | 21000 | 21000 |
| 108 | SURFACE SAFETY SHUT IN EQUIPMENT | | | | | | 0 | 0 | 0 |
| 109 | LINE HTR, SEPARATOR, HEATER TREATER | | | | | | 0 | 12000 | 12000 |
| 110 | DEHYDRATOR | | | | | | 0 | 0 | 0 |
| 111 | FLOWLINES, VALVES, FITTINGS, CONNECTIONS | | | | | | 0 | 9500 | 9500 |
| 112 | TANKS | | | | | | 0 | 25000 | 25000 |
| 113 | ARTFL. LIFT UNITS, MOTORS & CONTROLS | | | | | | 0 | 0 | 0 |
| 114 | SUCKER RODS, POLISH RODS, BTM HOLE PUMP | | | | | | 0 | 0 | 0 |
| 115 | PACKERS | | | | | | 0 | 8500 | 8500 |
| 116 | MISC. PERMANENT LEASE EQUIPMENT | | | | | | 0 | 7850 | 7850 |
| 117 | CONTINGENCY & MISCELLANEOUS | | | | | | 0 | 0 | 0 |
| | **TOTAL TANGIBLE ESTIMATED COST:** | | | | | | **$78,650** | **$305,575** | **$384,225** |
| | **INTANGIBLE DESCRIPTION** | | | | | | | | |
| 200 | SURVEY, PERMITS, DAMAGES, TITLE & CURATIVE | | | | | | 10000 | 0 | 10000 |
| 201 | ROADS & LOCATION | | | | | | 35000 | 15000 | 50000 |
| 202 | RESTORE LOCATION | | | | | | 17500 | 0 | 17500 |
| 203 | MOVE IN, RIG UP,RIG DOWN, & MOVE OUT | | | | | | 70000 | 0 | 70000 |
| 204 | DAYWORK | 22 DAYS/ $11,000 /DAY | | | | | 242000 | 16500 | 258500 |
| 205 | FOOTAGE OR TURNKEY | | | | | | 0 | 0 | 0 |
| 206 | COMPLETION | DAYS/ | DAY | | | | 0 | 15000 | 15000 |
| 207 | SWAB UNIT | DAYS/ | DAY | | | | 0 | 3000 | 3000 |
| 208 | MUD & CHEMICALS | | | | | | 30000 | 0 | 30000 |
| 209 | COMPLETION FLUIDS | | | | | | 0 | 2500 | 2500 |
| 210 | FUEL, POWER, WATER | | | | | | 28000 | 0 | 28000 |
| 211 | BITS | | | | | | 24000 | 2000 | 26000 |
| 212 | WELL SUPPLIES | | | | | | 7500 | 1500 | 9000 |
| 213 | RENTAL SUBSURFACE | | | | | | 20000 | 0 | 20000 |
| 214 | RENTAL SURFACE | | | | | | 15000 | 5000 | 20000 |
| 215 | CEMENTING | SURFACE | | | | | 18000 | 0 | 18000 |
| 216 | | INTERMEDIATE | | | | | 0 | 0 | 0 |
| 217 | | PRODUCTION LINER | | | | | 0 | 0 | 0 |
| 218 | | PRODUCTION CASING STRING | | | | | 0 | 22000 | 22000 |
| 219 | | PLUGS & SQUEEZE | | | | | 12000 | 0 | 12000 |
| 220 | CASING CREWS, TONGS, & TOOLS | | | | | | 5500 | 12000 | 17500 |
| 221 | DIRECTIONAL EQUIPMENT & SERVICES | | | | | | 4500 | 0 | 4500 |
| 222 | TUBULAR INSPECTION & TESTING | | | | | | 2500 | 1000 | 3500 |
| 223 | TRANSPORTATION | | | | | | 3000 | 5000 | 8000 |
| 224 | CONTRACT LABOR | | | | | | 3500 | 12250 | 15750 |
| 225 | COMMUNICATIONS | | | | | | 2000 | 500 | 2500 |
| 226 | EQUIPMENT INSPECTION & TESTING SERVICE | | | | | | 3500 | 0 | 3500 |
| 227 | EVALUATION | WIRELINE LOGGING | | | | | 31000 | 0 | 31000 |
| 228 | | MUD LOGGING | | | | | 8500 | 0 | 8500 |
| 229 | | CORING & ANALYSIS (3 cores) | | | | | 21000 | 0 | 21000 |
| 230 | | DST, ETC | | | | | 0 | 0 | 0 |
| 231 | CASED HOLE LOGS & PERFORATIONS | | | | | | 0 | 20000 | 20000 |
| 232 | FORMATION STIMULATION | | | | | | 0 | 0 | 0 |
| 233 | TECHNICAL SUPERVISION & SERVICES | | | | | | 19850 | 5000 | 24850 |
| 234 | OVERHEAD | | | | | | 9500 | 0 | 9500 |
| 235 | CONTINGENCY | | | | | | 28000 | 16175 | 44175 |
| 236 | MISCELLANEOUS | | | | | | 0 | 0 | 0 |
| | **TOTAL INTANGIBLE ESTIMATED COST:** | | | | | | **$671,350** | **$154,425** | **$825,775** |
| | **TOTAL AFE ESTIMATED COST:** | | | | | | **$750,000** | **$460,000** | **$1,210,000** |

THE TOTAL COST FOR WELL CONTROL INSURANCE WILL BE: _____ .PLEASE INCLUDE MY WORKING
INTEREST SHARE FOR THIS COVERAGE AND BILL MY PROPORTIONATE SHARE OF THIS COST.  YES ____  NO ____

**APPROVAL AND ACCEPTANCE**

It is recognized that the amounts herein are estimates only and approval of this authorization shall extend to the actual cost incurred in the operation specified, whether more or less than that herein set out. Participant agrees to pay his proportionate share of the expenditures detailed herein on or before fifteen days after receipt of an invoice for same.

| RIG MANAGERS, INC. | PARTICIPANT | |
|---|---|---|
| DATE: | EQUITY: | DATE: |
| SIGNATURE: | SIGNATURE: | |

EXHIBIT III – NORTH BEACH PROSPECT
Page 1 of 1



Shreveport Office
401 Edwards St., Ste. 1601
Shreveport, Louisiana 71101
Phone: 318-227-8668
Facsimile: 318-227-9012

Boulder Office
5395 Pearl Parkway, Ste. 200
Boulder, Colorado 80301
Phone: 720-961-5477
Facsimile: 303-443-1551

J. Marshall Jones, III
Vice President – COO

Telephone: 303-647-6011
E-Mail: jmjones@sklarexploration.com

February 13, 2020

**VIA EMAIL & UPS**

TO:     Working Interest Owners

RE:     North Beach Gas Plant Transfer
         North Beach Prospect
         Conecuh County, Alabama

Dear Owners:

As you are aware, Sklar Exploration Company L.L.C. ("**SEC**") and the North Beach Prospect working interest group (the "**Customers**"), entered into a Service Agreement dated June 20, 2009 (the "**Service Agreement**") with CDM Max, LLC (now Plains Gas Solutions, LLC; "**CDM/Plains**"), whereby CDM/Plains agreed to construct, own and operate a gas processing and treatment plant (the "**North Beach Plant**" or "**Plant**") to process and treat gas produced from wells located within the North Beach Prospect, Conecuh County, Alabama. Pursuant to Section 3.6 of the Service Agreement, ownership in the Plant is scheduled to vest in SEC, on behalf of the Customers, effective as of March 1, 2020 (the "**Effective Date**"). We have been preparing to take over operations of the Plant for quite some time and the purpose of this letter to propose terms for operation of the Plant after the transition. In addition, the working interest group also co-owns a gathering system to transport gas from wells located in the contract area to the Plant (the "**Gathering System**") and this letter also proposes terms for continued operation of the Gathering System. Enclosed for your review and execution is a proposed Amendment to the North Beach Prospect Joint Operating Agreement (the "**Amendment**"), which adds as Exhibit "G" a "Gathering and Processing Addendum" which will govern operation of the Gathering System and Plant after the Effective Date.

CDM/Plains has agreed to provide transition services for a sixty (60) day period following the Effective Date to ensure a smooth transition. There are currently eight (8) full-time Plant

North Beach Gas Plant Transfer
Conecuh County, Alabama
February 13, 2020
Page 2 of 4

employees, some of which have been employed there since its inception. (These employees also work at the Abbyville Plant which is located on the same property and which services nearby Brooklyn Field). We recently offered employment to all Plant employees in order to retain their institutional knowledge of Plant operations and to provide business continuity after the transition. Consolidating operational control of the Plant with our field operations will improve communication between the Plant and our field engineers, allowing us to operate both in a more productive and efficient manner. For example, ensuring that the Plant is running at optimal capacity reduces back pressure on the Gathering System, which in turn can result in better productivity of individual wells in the field.

The arrangement under the CDM/Plains Service Agreement provided for a sharing of proceeds between CDM/Plains and SEC/Customers (known as a "percent of proceeds" or "POP" arrangement). Under that agreement, CDM/Plains retained a portion the net proceeds (gross proceeds generated from sales of residue gas, raw make (unprocessed NGLs) and condensate, less operating expenses) in consideration for the services it provided. Under the proposed Amendment, the working interest group will retain 100% of their allocated share of net proceeds from sales of residue gas and plant products, eliminating the POP arrangement. In consideration for the services provided by SEC in managing the Plant, a management fee of $0.50 per MCF (calculated at the Plant inlet) will be included in the monthly operating costs.

In addition to managing operations of the Plant and Gathering System, the Amendment also contemplates that SEC will be responsible for marketing NGL's and condensate produced at the Plant. Over the past several months, we've been evaluating ways to improve net back pricing on NGLs and condensate. We are pleased to inform you that, effective April 1, 2020, we've secured a long term, local market for our NGLs and condensate at Grizzly Energy's Big Escambia Creek plant, near Atmore, Alabama. This new marketing arrangement will substantially reduce marketing, transportation and fractionation fees and improve realized pricing over the long term.

Also enclosed for your review are pro-forma financials for the Plant, which show 2018-19 actual performance under the CDM/Plains Service Agreement versus modeled performance under the proposed Amendment for those same years. Based on 2018 volumes and pricing, the working interest group would have realized $0.16/MCF improvement over the CDM/Plains Service Agreement and, based on 2019 volume and pricing, a $0.22/MCF improvement. It is important to note that the working interest group lost money under the CDM/Plains arrangement in 2019 (-$2.13/MCF) and would still have lost money, albeit less, under the proposed Amendment (-$1.91/MCF). This is due to the fact that while operating expenses at the Plant remain relatively flat, both volume and price declined in 2019.

There are a number of factors which affect the economics of the Plant, most significantly, volume and price. First, while we cannot control commodity prices, under the structure we have proposed, elimination of the POP arrangement means that the working interest group retains 100% of the upside in price improvement  Further, as discussed above, the working interest group will benefit from better net back pricing under the new marketing arrangement. Second, our secondary recovery efforts at Little Cedar Creek Oil Units II and IV are ongoing and we have yet to realize the full benefit of those efforts. As you are aware, we are preparing to re-commence a gas injection

North Beach Gas Plant Transfer
Conecuh County, Alabama
February 13, 2020
Page 3 of 4

program at LCCOU II, and will continue our water injection program at LCCOU IV.  At LCCOU II in particular, our reservoir model shows that gas injection will result in substantially higher volumes of both oil and gas over time, which should ultimately improve Plant economics.

Another way to increase volumes and improve Plant economics is to evaluate opportunities to process additional third party gas.  Not only does the Plant run more efficiently with more gas, bringing in additional third party volumes would lower the working interest group's share of monthly operating expenses and provide additional revenue in the form of processing fees.  We are currently in discussions with an operator of wells in southeast Brooklyn Field about bringing their gas to Plant.  This arrangement would be mutually beneficial for our group and the third party operator, who currently has no market for its gas.  Any agreement made with such party would be on an interruptible basis, with the working interest group's gas being placed in priority.  Further, any processing fees charged to such third party over and above that party's allocated share of monthly operating expenses would be credited directly to the working interest group.

We are also evaluating ways to improve Plant economics by lowering monthly operating expenses.  For example, while CDM/Plains traditionally leased compression at the Plant, we are considering the long-term benefits of purchasing compression.  In addition to lowering monthly operating expenses, we are also evaluating how monthly expenses are allocated between the North Beach Plant and the Abbyville Plant.  CDM/Plains was responsible for allocating expenses between the two plants under the Service Agreements and SEC will now be able to ensure a proper and equitable allocation of those expenses.

In summary, we have been preparing for the transfer of ownership and operation of the Plant for quite some time.  Not only will the consolidation of Plant and field operations provide productivity and efficiency gains in the field and at the Plant, it will also provide direct economic benefit to the working interest group.   Further, while the economics of the Plant are currently challenged due to low prices and low volume, economics should improve over time as our secondary recovery efforts are realized.   Further, in addition to the new NGL marketing arrangement, which will improve realized pricing immediately, and we are also evaluating ways to improve Plant economics by bringing in third party volumes and by reducing operating expenses.

We are currently working with CDM/Plains in order to finalize the transfer documents and we will forward those documents to the working interest group for approval prior to execution by SEC.  Of note, we recently conducted a Phase 2 environmental assessment at the Plant, and we are pleased to report that the assessment showed no substantial change in soil conditions since the Plant was built.  In short, the Plant and site appear to be in sound environmental condition.

If you have any questions regarding the enclosed pro-forma economics or the proposed Amendment, feel free to give us a call.  After your review, please execute the Amendment in the space provided and have your signature acknowledged by a Notary Public.  Please return your executed Amendment to us using the self-addressed, postage prepaid, UPS envelope.

North Beach Gas Plant Transfer
Conecuh County, Alabama
February 13, 2020
Page 4 of 4

Sincerely,

J. Marshall Jones, III
Vice President - Chief Operating Officer

Enclosures:    Pro-forma Plant Economics
               Amendment to North Beach Operating Agreement, including new Exhibit G

| North Beach Plant Pro-Forma Economics | | Actual | | Modeled | | Modeled vs. Actual | |
|---|---|---|---|---|---|---|---|
| | | 2018 | 2019 | 2018 | 2019 | 2018 | 2019 |
| Products POP % | WI % of product value | 89% | 91% | 100% | 100% | 11% | 9% |
| | $000's | $2,671 | $620 | $2,999 | $680 | $328 | $60 |
| NGL Marketing Changes | % NGL Pricing Uplift | 0% | 0% | 100% | 100% | 100% | 100% |
| | $000's | $0 | $0 | $156 | $117 | $156 | $117 |
| Opex Sharing % | % WI pays of Midstream opex | 89% | 94% | 100% | 100% | 11% | 6% |
| | $000's | -$1,031 | -$982 | -$1,163 | -$1,049 | -$132 | -$67 |
| Midstream/Management Fee | $/mcf | -$0.08 | -$0.08 | -$0.50 | -$0.50 | -$0.42 | -$0.42 |
| | $000's | -$44 | -$19 | -$300 | -$90 | -$256 | -$71 |
| Working Interest Check | $/mcf | $2.66 | -$2.13 | $2.82 | -$1.91 | $0.16 | $0.22 |
| | $000's | $1,596 | -$381 | $1,692 | -$342 | $96 | $39 |

## AMENDMENT TO OPERATING AGREEMENT

Reference is made to that certain Operating Agreement (the "Operating Agreement") dated effective November 15, 2004, by and between Sklar Exploration Company L.L.C., as Operator, and the other parties therein pertaining to the North Beach Prospect, such Operating Agreement being an exhibit to that certain Participation Sales Agreement dated effective November 15, 2004, by and between Craft Exploration Company L.L.C., Sklar Exploration Company L.L.C. and Sklarco L.L.C.

Each of the undersigned, being a current party to the Operating Agreement, does hereby amend the Operating Agreement by adding thereto Exhibit "G" attached hereto and made a part hereof and titled "Gas Gathering and Processing Addendum." This Amendment to Operating Agreement shall be deemed effective as of 12:01 A.M. Central Standard Time on March 1, 2020 (the "Effective Date").

This Amendment to Operating Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement. A signed copy of this Amendment to Operating Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. This Amendment to Operating Agreement is effective and binding on each party who executes a counterpart hereof.

THUS DONE AND SIGNED on this 13th day of February, 2020, but effective as of the Effective Date.

OPERATOR:

SKLAR EXPLORATION COMPANY L.L.C.

By: _____
    J. Marshall Jones, III
    Vice President – Chief Operating Officer

NON-OPERATORS:

SKLARCO L.L.C.

By: _____
    J. Marshall Jones, III
    Vice President – Chief Operating Officer

ANSABEN TRUST

By: _____
    David A. Barlow
    Trustee


ASPEN ENERGY, INC.


By: _____
    Mike S. Reed
    President


BEAZLEY PETROLEUM, LLC


By: _____
    Dr. Hamilton Beazley
    President


BOBMARY, LC


By: _____
    Dr. Robert T. Lafargue
    Member


BROCK RESOURCES, LLC


By: _____
    Fain Brock
    President


BUNDERO INVESTMENT CO., LLC


By: _____
    Robert P. Bowman
    Manager


CARL HERRIN OIL AND GAS, LLC


By: _____
    Scott H. Noblitt
    Vice-President


CAYMAN RESOURCES, INC.


By: _____
    Vincent J. Manara, III
    President

Page 2 of 6

ANSABEN TRUST

By: _____
David A. Barlow
Trustee

ASPEN ENERGY, INC.

By: _____
Mike S. Reed
President

State of Texas
County of Travis

This Instrument was acknowledged
before me on Feb-19 2020. by
Hamilton Beazley

*[notary signature]*

JAHLIESE CLAIR BLOUNT
Notary ID #130299915
My Commission Expires
July 17, 2023

BEAZLEY PETROLEUM, LLC

By: *Hamilton Beazley*
Dr. Hamilton Beazley
President

BOBMARY, LC

By: _____
Dr. Robert T. Lafargue
Member

BROCK RESOURCES, LLC

By: _____
Fain Brock
President

BUNDERO INVESTMENT CO., LLC

By: _____
Robert P. Bowman
Manager

CARL HERRIN OIL AND GAS, LLC

By: _____
Scott H. Noblitt
Vice-President

CAYMAN RESOURCES, INC.

By: _____
Vincent J. Manara, III
President

Page 2 of 6

ANSABEN TRUST

By: _____
     David A. Barlow
     Trustee


ASPEN ENERGY, INC.


By: _____
     Mike S. Reed
     President


BEAZLEY PETROLEUM, LLC


By: _____
     Dr. Hamilton Beazley
     President


BOBMARY, LC


By _____
     Dr. Robert P. Lafargue
     Member


BROCK RESOURCES, LLC


By: _____
     Fain Brock
     President


BUNDERO INVESTMENT CO., LLC


By: _____
     Robert P. Bowman
     Manager


CARL HERRIN OIL AND GAS, LLC


By: _____
     Scott H. Noblitt
     Vice-President


CAYMAN RESOURCES, INC.


By: _____
     Vincent J. Manara, III
     President

ANSABEN TRUST

By: _____
      David A. Barlow
      Trustee

ASPEN ENERGY, INC.

By: _____
      Mike S. Reed
      President

BEAZLEY PETROLEUM, LLC

By: _____
      Dr. Hamilton Beazley
      President

BOBMARY, LC

By: _____
      Dr. Robert T. Lafargue
      Member

BROCK RESOURCES, LLC

By: _____
      Fain Brock
      President

BUNDERO INVESTMENT CO., LLC

By: _____
      Robert P. Bowman
      Manager

CARL HERRIN OIL AND GAS, LLC

By: _____
      Scott H. Noblitt
      Vice-President

CAYMAN RESOURCES, INC.

By: _____
      Vincent J. Manara, III
      President

Page **2** of **6**

ANSABEN TRUST

By: _____
   David A. Barlow
   Trustee


ASPEN ENERGY, INC.


By: _____
   Mike S. Reed
   President


BEAZLEY PETROLEUM, LLC


By: _____
   Dr. Hamilton Beazley
   President


BOBMARY, LC


By: _____
   Dr. Robert T. Lafargue
   Member


BROCK RESOURCES, LLC


By: _____
   Fain Brock
   President


BUNDERO INVESTMENT CO., LLC


By: _____
   Robert P. Bowman
   Manager


CARL HERRIN OIL AND GAS, LLC


By: _____
   Scott H. Noblitt
   Vice-President


CAYMAN RESOURCES, INC.


By: _____
   Vincent J. Manara, III
   President

Page 2 of 6

ANSABEN TRUST

By: _____
         David A. Barlow
         Trustee

ASPEN ENERGY, INC.

By: _____
         Mike S. Reed
         President

BEAZLEY PETROLEUM, LLC

By: _____
         Dr. Hamilton Beazley
         President

BOBMARY, LC

By: _____
         Dr. Robert T. Lafargue
         Member

BROCK RESOURCES, LLC

By: _____
         Fain Brock
         President

BUNDERO INVESTMENT CO., LLC

By: _____
         Robert P. Bowman
         Manager

CARL HERRIN OIL AND GAS, LLC

By: _____
         Scott H. Noblitt
         Vice-President

CAYMAN RESOURCES, INC.

By: _____
         Vincent J. Manara, III
         President

Page 2 of 6

Attest: *Anita W. Hemphill*
Anita W. Hemphill, Secretary

COASTAL EXPLORATION, INC.

By: *Julius M. Ridgway*
　　Julius M. Ridgway
　　President and Secretary

CRAFT EXPLORATION CO., LLC

By: _____
　　Steven H. Craft
　　Managing Member

DICKSON OIL & GAS, LLC

By: _____
　　C. Bickham Dickson, III
　　Member

EMBAYMENT PRODUCTION, LLC

By: _____
　　William B. Ridgway, Jr.
　　Manager

FANT ENERGY LIMITED

By: _____
　　Stephen Swan
　　Manager

GATEWAY EXPLORATION, LLC

By: _____
　　Jay Moffitt

JF HOWELL INTERESTS, LP

By: _____
　　David Morgan
　　Manager
JEFFREYS DRILLING, LLC

By: _____
　　J. Bradley Jeffreys
　　Manager

Page 3 of 6

COASTAL EXPLORATION, INC.

By: _____
      Julius M. Ridgway
      President and Secretary

CRAFT EXPLORATION CO., LLC

By: _____
      Steven H. Craft
      Managing Member

DICKSON OIL & GAS, LLC

By: _____
      C. Bickham Dickson, III
      Member

EMBAYMENT PRODUCTION, LLC

By: _____
      William B. Ridgway, Jr.
      Manager

FANT ENERGY LIMITED

By: _____
      Stephen Swan
      Manager

GATEWAY EXPLORATION, LLC

By: _____
      Jay Moffitt

JF HOWELL INTERESTS, LP

By: _____
      David Morgan
      Manager
JEFFREYS DRILLING, LLC

By: _____
      J. Bradley Jeffreys
      Manager

COASTAL EXPLORATION, INC.

By: _____
      Julius M. Ridgway
      President and Secretary

CRAFT EXPLORATION CO., LLC

By: _____
      Steven H. Craft
      Managing Member

DICKSON OIL & GAS, LLC

By: _____
      C. Bickham Dickson, III
      Member

EMBAYMENT PRODUCTION, LLC

By: _____
      William B. Ridgway, Jr.
      Manager

FANT ENERGY LIMITED

By: _____
      Stephen Swan
      Manager

GATEWAY EXPLORATION, LLC

By: _____
      Jay Moffitt

JF HOWELL INTERESTS, LP

By: _____
      David Morgan
      Manager

JEFFREYS DRILLING, LLC

By: _____
      J. Bradley Jeffreys
      Manager

COASTAL EXPLORATION, INC.

By: _____
    Julius M. Ridgway
    President and Secretary

CRAFT EXPLORATION CO., LLC

By: _____
    Steven H. Craft
    Managing Member

DICKSON OIL & GAS, LLC

By: _____
    C. Bickham Dickson, III
    Member

EMBAYMENT PRODUCTION, LLC

By: _____
    William B. Ridgway, Jr.
    Manager

FANT ENERGY LIMITED

By: _____
    Stephen Swan
    Manager

GATEWAY EXPLORATION, LLC

By: _____
    Jay Moffitt

JF HOWELL INTERESTS, LP

By: _____
    David Morgan
    Manager
JEFFREYS DRILLING, LLC

By: _____
    J. Bradley Jeffreys
    Manager

Page 3 of 6

COASTAL EXPLORATION, INC.

By: _____
     Julius M. Ridgway
     President and Secretary

CRAFT EXPLORATION CO., LLC

By: _____
     Steven H. Craft
     Managing Member

DICKSON OIL & GAS, LLC

By: _____
     C. Bickham Dickson, III
     Member

EMBAYMENT PRODUCTION, LLC

By: _____
     William B. Ridgway, Jr.
     Manager

FANT ENERGY LIMITED

By: _____
     Stephen Swan
     Manager

GATEWAY EXPLORATION, LLC

By: _____
     Jay Moffitt

JF HOWELL INTERESTS, LP

By: _____
     David Morgan
     Manager
JEFFREYS DRILLING, LLC

By: _____
     J. Bradley Jeffreys
     Manager

COASTAL EXPLORATION, INC.


By: _____
      Julius M. Ridgway
      President and Secretary

CRAFT EXPLORATION CO., LLC


By: _____
      Steven H. Craft
      Managing Member


DICKSON OIL & GAS, LLC


By: _____
      C. Bickham Dickson, III
      Member


EMBAYMENT PRODUCTION, LLC


By: _____
      William B. Ridgway, Jr.
      Manager


FANT ENERGY LIMITED


By: _____
      Stephen Swan
      Manager


GATEWAY EXPLORATION, LLC


By: _____
      Jay Moffitt


JF HOWELL INTERESTS, LP


By: _____
      David Morgan
      Manager
JEFFREYS DRILLING, LLC


By: _____
      J. Bradley Jeffreys
      Manager

JJS INTERESTS NORTH BEACH LLC

By: _____
    Justin Simons
    Manager

KUDZU OIL PROPERTIES, LLC

By: _____
    Wirt A. Yerger, III
    Manager

LONGLEAF ENERGY GROUP, INC.

By: _____
    Thomas E. McMillan, Jr.

LUCAS PETROLEUM GROUP, INC.

By: _____
    Fain Brock
    President

MARKSCO, LLC

By: _____
    Mark P. Sealy
    Manager

MCCOMBS ENERGY, LLC

By: _____
    Gary V. Woods
    President

J.C. OGDEN

By: _____
    J. C. Ogden
    President

PAROUS ENERGY, LLC

By: _____
    George S. Dennis
    Managing Member

JJS INTERESTS NORTH BEACH LLC

By: _____
      Justin Simons
      Manager

KUDZU OIL PROPERTIES, LLC

By: _____
      Wirt A. Yerger, III
      Manager

2/18/2020

notary:
Pamela F. Sebren

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 68506
PAMELA F. SEBREN
Commission Expires
July 18, 2021
RANKIN COUNTY

LONGLEAF ENERGY GROUP, INC.

By: _____
      Thomas E. McMillan, Jr.

LUCAS PETROLEUM GROUP, INC.

By: _____
      Fain Brock
      President

MARKSCO, LLC

By: _____
      Mark P. Sealy
      Manager

MCCOMBS ENERGY, LLC

By: _____
      Gary V. Woods
      President

J.C. OGDEN

By: _____
      J. C. Ogden
      President

PAROUS ENERGY, LLC

By: _____
      George S. Dennis
      Managing Member

JJS INTERESTS NORTH BEACH LLC

By: _____
       Justin Simons
       Manager


KUDZU OIL PROPERTIES, LLC

By: _____
       Wirt A. Yerger, III
       Manager


LONGLEAF ENERGY GROUP, INC.

By: _____
       Thomas E. McMillan, Jr.


LUCAS PETROLEUM GROUP, INC.

By: _____
       Fain Brock
       President


MARKSCO, LLC

By: _____
       Mark P. Sealy
       Manager

MCCOMBS ENERGY, LLC

By: _____
       Gary V. Woods
       President


J.C. OGDEN

By: _____
       J. C. Ogden
       President


PAROUS ENERGY, LLC

By: _____
       George S. Dennis
       Managing Member


Page 4 of 6

# ALABAMA NOTARY ACKNOWLEDGEMENT
# (CORPORATION)

State of Alabama }

County of Escambia}

I, PAULA GERETY PETTIS, a notary public in and for said County in said State, hereby certify that THOMAS E. MCMILLAN, JR.  whose name as PRESIDENT of the LONGLEAF ENERGY GROUP, INC., an Alabama corporation, is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand this 21st day of February, 2020.

(Seal)

_____
Notary Public

3/12/2025
_____
My Commission Expires

Copyright © 2018 NotaryAcknowledgement.com. All Rights Reserved.

JJS INTERESTS NORTH BEACH LLC

By: _____
          Justin Simons
          Manager

KUDZU OIL PROPERTIES, LLC

By: _____
          Wirt A. Yerger, III
          Manager

LONGLEAF ENERGY GROUP, INC.

By: _____
          Thomas E. McMillan, Jr.

LUCAS PETROLEUM GROUP, INC.

By: _____
          Fain Brock
          President

MARKSCO, LLC

By: _____
          Mark P. Sealy
          Manager

MCCOMBS ENERGY, LLC

By: _____
          Gary V. Woods
          President

J.C. OGDEN

By: _____
          J. C. Ogden
          President

PAROUS ENERGY, LLC

By: _____
          George S. Dennis
          Managing Member

JJS INTERESTS NORTH BEACH LLC

By: _____
      Justin Simons
      Manager

KUDZU OIL PROPERTIES, LLC

By: _____
      Wirt A. Yerger, III
      Manager

LONGLEAF ENERGY GROUP, INC.

By: _____
      Thomas E. McMillan, Jr.

LUCAS PETROLEUM GROUP, INC.

By: _____
      Fain Brock
      President

MARKSCO, LLC

By: _____
      Mark P. Sealy
      Manager

MCCOMBS ENERGY, LLC

By: _____
      Gary V. Woods
      President

J.C. OGDEN

By: _____
      J. C. Ogden
      President

PAROUS ENERGY, LLC

By: _____
      George S. Dennis
      Managing Member

JJS INTERESTS NORTH BEACH LLC


By: _____
       Justin Simons
       Manager


KUDZU OIL PROPERTIES, LLC


By: _____
       Wirt A. Yerger, III
       Manager


LONGLEAF ENERGY GROUP, INC.


By: _____
       Thomas E. McMillan, Jr.


LUCAS PETROLEUM GROUP, INC.


By: _____
       Fain Brock
       President


MARKSCO, LLC


By: _____
       Mark P. Sealy
       Manager


MCCOMBS ENERGY, LLC


By: _____Gary V. Woods_____
       Gary V. Woods
       President


J.C. OGDEN


By: _____
       J. C. Ogden
       President


PAROUS ENERGY, LLC


By: _____
       George S. Dennis
       Managing Member

JJS INTERESTS NORTH BEACH LLC

By: _____
     Justin Simons
     Manager

KUDZU OIL PROPERTIES, LLC

By: _____
     Wirt A. Yerger, III
     Manager

LONGLEAF ENERGY GROUP, INC.

By: _____
     Thomas E. McMillan, Jr.

LUCAS PETROLEUM GROUP, INC.

By: _____
     Fain Brock
     President

MARKSCO, LLC

By: _____
     Mark P. Sealy
     Manager

MCCOMBS ENERGY, LLC

By: _____
     Gary V. Woods
     President

J.C. OGDEN

By: _JC Ogden (by Lee P. Fischer)_ POA
     J. C. Ogden
     President

PAROUS ENERGY, LLC

By: _____
     George S. Dennis
     Managing Member

JJS INTERESTS NORTH BEACH LLC

By: _____
       Justin Simons
       Manager

KUDZU OIL PROPERTIES, LLC

By: _____
       Wirt A. Yerger, III
       Manager

LONGLEAF ENERGY GROUP, INC.

By: _____
       Thomas E. McMillan, Jr.

LUCAS PETROLEUM GROUP, INC.

By: _____
       Fain Brock
       President

MARKSCO, LLC

By: _____
       Mark P. Sealy
       Manager

MCCOMBS ENERGY, LLC

By: _____
       Gary V. Woods
       President

J.C. OGDEN

By: _____
       J. C. Ogden
       President

PAROUS ENERGY, LLC

By: _____
       George S. Dennis
       Managing Member

RECEIVED
FEB 2 4 2020
BY: ........................

PFLANZER PARTNERS, LTD.

By: _____
      Dr. Joseph Pflanzer
      General Partner


QUAIL CREEK PRODUCTION CO.


By: _____
      Don W. Dahlgren
      President


RESOURCE VENTURES, LLC


By: _____
      Mark A. Arnold
      Manager

SELLARS FAMILY, LLC


By: _____
      Jodi Smith
      Manager


SEPULGA RIVER FUELS, LLC


By: _____
      Cosby H. Martin, Jr.
      Sole Member


TENEXCO, INC.


By: _____
      Richard Incandela II
      Vice-President


TEPCO, LLC
c/o BKD, LLP


By: _____
      John C. Aubrey
      President


TIEMBO, LTD.


By: _____
      Mark S. Rauch
      Member


Page **5** of **6**

PFLANZER PARTNERS, LTD.

By: _____
        Dr. Joseph Pflanzer
        General Partner

State of Oklahoma
County of Oklahoma   ACKNOWLEDGEMENT
Before me, the undersigned authority, on this
18th day of February, 2020, personally appeared
D.W. Dahlgren, personally known to me to be
the person whose name is subscribed to the
foregoing instrument.

My Commission Expires:
08/28/20

QUAIL CREEK PRODUCTION CO.

By: _____
        Don W. Dahlgren
        President

RESOURCE VENTURES, LLC

By: _____
        Mark A. Arnold
        Manager

SELLARS FAMILY, LLC

By: _____
        Jodi Smith
        Manager

SEPULGA RIVER FUELS, LLC

By: _____
        Cosby H. Martin, Jr.
        Sole Member

TENEXCO, INC.

By: _____
        Richard Incandela II
        Vice-President

TEPCO, LLC
c/o BKD, LLP

By: _____
        John C. Aubrey
        President

TIEMBO, LTD.

By: _____
        Mark S. Rauch
        Member

PFLANZER PARTNERS, LTD.


By: _____
       Dr. Joseph Pflanzer
       General Partner


QUAIL CREEK PRODUCTION CO.


By: _____
       Don W. Dahlgren
       President


RESOURCE VENTURES, LLC


By: _____
       Mark A. Arnold
       Manager
SELLARS FAMILY, LLC


By: _____
       Jodi Smith
       Manager


SEPULGA RIVER FUELS, LLC


By: _____
       Cosby H. Martin, Jr.
       Sole Member


TENEXCO, INC.


By: _____
       Richard Incandela II
       Vice-President


TEPCO, LLC
c/o BKD, LLP


By: _____
       John C. Aubrey
       President


TIEMBO, LTD.


By: _____
       Mark S. Rauch
       Member

PFLANZER PARTNERS, LTD.


By: _____
      Dr. Joseph Pflanzer
      General Partner


QUAIL CREEK PRODUCTION CO.


By: _____
      Don W. Dahlgren
      President


RESOURCE VENTURES, LLC


By: _____
      Mark A. Arnold
      Manager

SELLARS FAMILY, LLC


By: _____
      Jodi Smith
      Manager


SEPULGA RIVER FUELS, LLC


By: _____
      Cosby H. Martin, Jr.
      Sole Member


TENEXCO, INC.


By: _____
      Richard Incandela II
      Vice-President


TEPCO, LLC
c/o BKD, LLP


By: _____
      John C. Aubrey
      President


TIEMBO, LTD.


By: _____
      Mark S. Rauch
      Member

PFLANZER PARTNERS, LTD.

By: _____
      Dr. Joseph Pflanzer
      General Partner

QUAIL CREEK PRODUCTION CO.

By: _____
      Don W. Dahlgren
      President

RESOURCE VENTURES, LLC

By: _____
      Mark A. Arnold
      Manager

SELLARS FAMILY, LLC

By: _____
      Jodi Smith
      Manager

SEPULGA RIVER FUELS, LLC

By: _____
      Cosby H. Martin, Jr.
      Sole Member

TENEXCO, INC.

By: _____
      Richard Incandela II
      Vice-President

TEPCO, LLC
c/o BKD, LLP

By: _____
      John C. Aubrey
      President

TIEMBO, LTD.

By: _____
      Mark S. Rauch
      Member

Page 5 of 6

PFLANZER PARTNERS, LTD.

By: _____
     Dr. Joseph Pflanzer
     General Partner

QUAIL CREEK PRODUCTION CO.

By: _____
     Don W. Dahlgren
     President

RESOURCE VENTURES, LLC

By: _____
     Mark A. Arnold
     Manager
SELLARS FAMILY, LLC

By: _____
     Jodi Smith
     Manager

SEPULGA RIVER FUELS, LLC

By: _____
     Cosby H. Martin, Jr.
     Sole Member

TENEXCO, INC.

By: _____
     Richard Incandela II
     Vice-President

TEPCO, LLC
c/o BKD, LLP

By: _____
     John C. Aubrey
     President

TIEMBO, LTD.

By: _____
     Mark S. Rauch
     Member

TYLER OIL & GAS, LLC

By: _____
      BT Steadman
      Manager

VICKERY EXPLORATION, LLC

By: _____
      Jimmy D. Vickery
      Manager

WALLER BROTHERS, INC.

By: _____
      Donald E. Waller, Sr.
      President

YATES RESOURCES, LP

By: _____
      J. Brook Yates, Jr.
      President of JBY Management Corporation,
      its General Partner

RECEIVED

FEB 1 9 2020

BY: E-MAILED

TYLER OIL & GAS, LLC

By: _____
    BT Steadman
    Manager

VICKERY EXPLORATION, LLC

By: _____
    Jimmy D. Vickery
    Manager

WALLER BROTHERS, INC.

By: _____
    Donald E. Waller, Sr.
    President

YATES RESOURCES, LP

By: _____
    J. Brook Yates, Jr.
    President of JBY Management Corporation,
    its General Partner

## EXHIBIT "G"

Attached to and made a part of that certain Operating Agreement (North Beach Prospect) dated effective November 15, 2004, by and between Sklar Exploration Company L.L.C., as Operator, and Craft Exploration Company L.L.C., et al, as Non-Operators

### GAS GATHERING AND PROCESSING ADDENDUM

THIS GATHERING AND GAS PROCESSING ADDENDUM (this "**Addendum**") dated effective as of March 1, 2020 (the "**Effective Date**") shall govern the operation and maintenance of the North Beach Plant and Gathering System (defined below) and co-owned by the Non-Operators (sometimes referred to as the "Parties" or "parties", which term may, depending on the context, include the Operator). All terms used in this Addendum shall have the meanings ascribed to them in the Operating Agreement ("**Operating Agreement**") to which this Addendum is attached as Exhibit "G" unless the context indicates to the contrary or the term is otherwise defined in this Addendum.

WHEREAS, pursuant to that certain Service Agreement dated June 30, 2009, as amended on September 14, 2011 (the "**Service Agreement**"), by and between CDM Max, LLC (now Plains Gas Solutions, LLC)("**CDM/Plains**"), Sklar Exploration Company, L.L.C. ("**Sklar**"), and the Customers (as defined in the Service Agreement), CDM/Plains constructed on real property located in the Northwest 1/4 of Section 17, Township 4 North, Range 13 East, Conecuh County, Alabama (the "**Property**") owned by Sklar and leased to CDM/Plains a gas processing and treatment plant known as the "**North Beach Plant**" for the purpose of treating and processing gas produced from various wells operated by Sklar and located within the Contract Area (as defined in the Operating Agreement) and for other purposes set forth in the Service Agreement;

WHEREAS, pursuant to Section 3.6 of the Service Agreement, ownership of the North Beach Plant is scheduled to vest in (and to be assigned to) Sklar, for and on behalf of the "Customers," effective as of March 1, 2020;

WHEREAS, the current Customers under the terms of the Service Agreement are Sklarco L.L.C., and the other Non-Operators identified on **Exhibit 1** attached hereto and made a part hereof (all of which Customers are hereinafter sometimes referred to as the "**Non-Operators**");

WHEREAS, Sklar installed a gas gathering system consisting of a pipeline system and related facilities and equipment co-owned by the Non-Operators to transport gas from the wells located within the Contract Area to the North Beach Plant (the "**Gathering System**", such term to include any additions or extension to the said pipeline system made heretofore or hereafter);

WHEREAS, Sklar and the Non-Operators desire that the Gathering System and the North Beach Plant will be operated from and after the Effective Date under and pursuant to the terms of the Operating Agreement, as modified or supplemented by this Addendum;

NOW, THEREFORE, the parties hereto agree as follows:

## 1. DEFINITIONS

Terms defined above shall have the meanings so stated.  Otherwise, the following terms shall have the following meanings.  Any term defined in the Operating Agreement shall have the meaning set forth therein, unless such term is defined below:

1.1     "**Committed Gas**" has the meaning set forth in Section 4.1.

1.2     "**Committed Gas Quality Specifications**" means the pressure and quality specifications for Committed Gas as set forth in Exhibit 2 attached hereto.

1.3     "**Gas**" means natural gas, including casinghead gas produced with crude oil, gas that vaporizes and is recovered in a vapor recovery unit from oil in tanks, and well gas from gas or gas-condensate reservoirs, including all Liquefiable Hydrocarbons, inerts and other components contained therein.

1.4     "**Liquefiable Hydrocarbons**" means the theoretical GPM quantity of natural gasoline (iso-pentanes plus heavier hydrocarbons), butanes, propane, and ethane, including methane allowable in commercial ethane, present in a Gas stream.

1.5     "**Management Fee**" means a $0.50 per MCF fee charged by Operator on all Gas received at the inlet of the Plant as compensation for managing the Gathering System and Plant.   Beginning in January 2022, and in January of each year thereafter, the Management Fee shall be adjusted for that year to account for changes to the Producer Price Index for Industrial Commodities as published by the United States Bureau of Labor Statistics (the "Producer Price Index – Industrial Commodities," Series ID: WPU03 through 15), or any successor index thereto.

1.6     "**Monthly Operating Costs**" means the sum of the following: (a) the total and actual costs necessarily incurred and paid by Operator (not in excess of such amounts as are reasonable) to operate and maintain the Plant and the Gathering System for any given month, including, but not limited to, amounts paid for utilities, filters, lube oil, lease product storage equipment and facilities, compression, propane refrigerant, glycol and other expendables, labor (including employee salaries and benefits for employees working at the Plant or the Gathering System), taxes, insurance, environmental and governmental permitting and (b) the Management Fee.  It is understood and agreed that there is another plant (known as the "Abbyville Plant" or "Escambia Plant") located on the Property, that there are expenses that are common to both the North Beach Plant and the Abbyville Plant (e.g., employees that work at the two plants), and that Sklar shall allocate such expenses between the two plants on a commercially reasonable basis.  It is further understood and agreed that Non-Operators are responsible for and shall pay 100% of the Monthly Operating Costs as and when due but that to the extent that Operator

Page 2 of 19

recovers a portion of the Monthly Operating Costs from the owner(s) of Third-Party Gas, each Non-Operator shall be entitled to a prorata credit (or refund, with respect to amounts already paid by it) for the amounts so recovered by Operator.

1.7   "**Gross Proceeds**" means the total amount actually collected by Operator for the Residue Gas, plus the total amount actually collected by Operator for the Raw Make and/or the Plant Products, as the case may be, after the deduction or netting of all applicable taxes, transportation, fractionation, fuel, loading, storage, delivery, marketing or other similar costs or expenses paid by Operator for transporting and selling the Residue Gas, Raw Make and/or Plant Products. "Gross Proceeds" shall not include the proceeds received by a Non-Operator from the sale of any products that it chooses to separately market in kind.

1.8   "**Net Proceeds**" means the Gross Proceeds less the Monthly Operating Costs, any royalty and overriding royalty paid by the Operator, and any severance or other production taxes paid by Operator.

1.9   "**North Beach Plant**" or "**Plant**" has the meaning set forth in the Recitals, which assets include, without limitation, the gas processing plant and related facilities and equipment constructed pursuant to the Service Agreement, as amended, and any and all additions, extensions or modifications to the gas processing plant made heretofore or hereafter. The Plant is currently located on the Property.

1.10  "**Plant Products**" means the actual quantity (expressed in U.S. gallons) of commercial products fractionated in the Plant attributable to the Raw Make produced by the Plant and which are allocated and sold by Operator or delivered in kind from the Plant by component part including, but not limited to, natural gasoline, butanes, propanes, and ethane/propane mix or purity ethane (including methane allowable in commercial ethane). The terms shall also include any condensate recovered within the Plant.

1.11  "**Plant Thermal Reduction**" or "**PTR**" means the heat content, in Btu's, removed from the Gas as a result of processing, including Shrinkage, fuel and incidental uses and losses.

1.12  "**Raw Make**" means the combined stream of Liquefiable Hydrocarbons and concomitant materials actually captured from the stream of Gas that is delivered to the Plant.

1.13  "**Receipt Point,**" when that term is used in connection with Committed Gas, means the point of connection between each well from which the Gas is produced and the meter connected to the Gathering System downstream of the well. As to Third Party Gas, the Receipt Point shall be the point at which the Gas is delivered into the Gathering System or the Plant, as the case may be.

1.14   "**Residue Gas**" means the gaseous portion of Gas remaining after the extraction and removal therefrom of the Raw Make and/or Plant Products, the satisfaction of plant fuel requirements and the taking into account of all incidental plant losses or uses.

1.15   "**Residue Gas Buyer**" has the meaning set forth in Section 9.1.

1.16   "**Residue Gas Quality Specifications**" means the pressure and quality specifications for Residue Gas as set forth in Exhibit 3 attached hereto.

1.17   "**Third Party Gas**" means any Gas which is not Committed Gas.

1.18   "**Shrinkage**" means the decrease in Gas volume and heating content that results from the conversion of liquefiable components of Gas into Raw Make, but exclusive of Gas used for fuel, flared and vented.

## 2. INTERESTS OF THE PARTIES

2.1   The Gathering System and Plant shall be owned by Non-Operators as their interests are shown on **Exhibit 1**, attached hereto and made a part hereof, as the same may be modified from time to time to reflect changes in ownership, and title shall be held in Sklar's name, all subject to the terms and provisions of this Addendum. All costs and liabilities incurred in the operation of the Gathering System and the Plant shall be borne and paid by the Non-Operators as their interests are shown on Exhibit 1, as the same may be revised from time to time. Allocation of Net Proceeds from the sale of Residue Gas, Raw Make, and/or Plant Products shall be made as provided in Section 6.1.

## 3. OPERATIONS

3.1   Operator shall conduct and direct and have full control of all operations with respect to the Gathering System and the Plant, as permitted and required by, and within the limits of this Addendum. Operator shall conduct all operations with respect to the Gathering System and Plant in a good and workmanlike manner, but it shall have no liability to the Non-Operators for losses sustained or liabilities incurred, except such as may result from its gross negligence or willful misconduct. The Operator shall be entitled to charge the Management Fee as part of the Monthly Operating Costs, and the amount of such Management Fee actually recovered shall be retained by the Operator and not subject to distribution to the Non-Operators.

## 4. DEDICATION AND DELIVERY OF GAS

4.1   The Non-Operators hereby dedicate and commit to the Gathering System and Plant all Gas owned or controlled by the parties and produced from wells located within the Contract Area (the "**Committed Gas**"). Committed Gas shall not include any Gas that is pipeline or plant use and drop out gas, any Gas that is taken in kind by a Royalty or Overriding Royalty Owner,

Page **4** of **19**

any Third Party Gas, and any Gas as may be required or needed from time to time for the following purposes:

(a) fuel for internal combustion engines employed in lifting oil to the surface from any well now or hereafter drilled within the Contract Area, fuel for operating any lease, fuel for operating any facilities installed by Operator for the purpose of delivering the Committed Gas hereunder, and fuel used to power any equipment within the Plant;

(b) Gas used by Operator for cycling, re-pressuring, pressure maintenance, secondary recovery, tertiary recovery and Gas lift operations within the Contract Area; and

(c) fuel for any other operations by Operator within the Contract Area or pertaining to the operation of the Plant or the Gathering System.

4.2     The Committed Gas shall be delivered by Non-Operators, or Operator on their behalf, at the Receipt Points in a commingled Gas stream, without the prior extraction or removal of any Liquefiable Hydrocarbons other than those recovered in lease separation facilities, in conformance with the "**Committed Gas Quality Specifications**" set forth in **Exhibit 2**, attached hereto.   In the event the Committed Gas fails to conform to the Committed Gas Quality Specifications, Operator shall immediately provide notice to Non-Operators and propose any such repairs, adjustments or modifications to the affected production facilities necessary to cause the Committed Gas to meet such specifications in accordance with the provisions of the Operating Agreement.

## 5. GATHERING AND PROCESSING

5.1     Operator shall gather, treat and process all Committed Gas delivered to the Receipt Points in the following manner: Operator shall transport all Committed Gas from the Receipt Points to the Plant, condition the Committed Gas, extract and, to the extent authorized herein, sell the Raw Make and/or Plant Products, and deliver the Residue Gas to the Residue Gas Buyer in conformance with the "**Residue Gas Quality Specifications**" set forth in **Exhibit 3**, attached hereto. In the event the Residue Gas fails to conform to the Residue Gas Quality Specifications, Operator shall immediately provide notice to Non-Operators and propose any Facilities Improvement necessary to cause the Residue Gas to meet such specifications.  Operator shall have no obligation to replace in-kind the MMBtu volume of PTR or the value thereof.

## 6. ALLOCATIONS

6.1     Operator shall separately measure or cause to be measured the volume and MMBTU content of all Gas at the Receipt Points, and the Raw Make, Plant Products, Residue Gas,  Plant Fuel, PTR, and Plant Flare shall be allocated ratably, (i) based on the GPM content and measured Mcf volume of such Gas in the case of allocating Raw Make and Plant Products, (ii) based on the gallons of Raw Make allocable to such Gas in the case of PTR, and (iii) based on the Heat

Page 5 of 19

Content of such Gas for all other allocation.  To the extent Operator markets the Residue Gas, Raw Make or Plant Products, Operator shall pay to the operator of each partial or total fieldwide unit (for Gas delivered from such a unit), the operator of each well (for Gas delivered from a well that is not included in such a unit), or to any Third-Party Gas owner, as the case may be, the portion of the Net Proceeds allocable to such unit, well, or Third-Party Gas, as the case may be, based on the volume and MMBTU allocation described above on or before the last day of the month following the month in which the Gross Proceeds are received by Operator, for further distribution by them as may be appropriate; provided, however, that in the case of Third Party Gas, the Operator shall deduct from the Net Proceeds any additional fees or charges that may be due under any agreement pertaining to such Third Party Gas.  To the extent any Non-Operator exercises its right to separately market its share of Raw Make, Plant Products or Residue Gas in kind; the Net Proceeds that would otherwise be distributable to the operator of a unit or well shall be calculated without inclusion of the products that are marketed in kind; the amount of such products allocable to the Non-Operator shall (subject to Article 9 hereof) be delivered in kind at the tailgate of the Plant to or for the benefit of such Non-Operator, and such Non-Operator who markets products in kind shall pay directly to Operator the proportionate share of Monthly Operating Costs allocable to the products so marketed in kind.  Operator may net out any Monthly Operating Costs and costs of Facilities Improvements against the Gross Proceeds received for the sale of any Residue Gas, Raw Make, and/or Plant Products, but to the extent that the amount of Monthly Operating Costs and costs of Facilities Improvements in a given month exceed the amount of Gross Proceeds received by Operator for that month plus the amount of any Monthly Operating Costs paid for that month by a Non-Operator who markets products in kind, the Non-Operators shall be obligated to reimburse Operator for the excess of such costs proportionate to the Non-Operators' interest as then reflected by Exhibit 1 attached hereto and made a part hereof.


## 7. MAINTENANCE, REPAIRS AND IMPROVEMENTS

7.1    Operator shall maintain the Gathering System and Plant in proper working order and is authorized to make any repair, modification, addition or improvement (collectively, a "**Facilities Improvement**") which, in Operator's good faith opinion, is either: (a) necessary to maintain the Gathering System or Plant in proper working order (*e.g.*, in order to maintain compliance with the Residue Gas Quality Specifications), or (b) is in the best business interests of the parties (*e.g.*, lowering Monthly Operating Costs, improving recovery of Liquefiable Hydrocarbons, enhancing the economic return on the Gathering System and the Plant, etc.), provided, however, in either case Operator shall circulate a written proposal with an AFE and obtain prior approval of a majority in interest of Non-Operators, as their interests are then reflected in Exhibit 1, for any single Facilities Improvement which is reasonably estimated to cost in excess of $75,000, except that in case of an emergency Operator is authorized to make any repairs reasonably necessary to prevent loss of property or damage to persons or property without first circulating an AFE or obtaining such approval.

7.2     Operator shall have the right to request and receive payment in advance from each Non-Operator of its respective share, as its interest is then reflected in Exhibit 1, of the cost of any such Facilities Improvement.  Any request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Facilities Improvement. The amount of each Non-Operator's advance payment shall be based upon the latest AFE for such Facilities Improvement.  A Non-Operator receiving a request for advance payment shall, within fifteen (15) days of the receipt of such request, pay to Operator in cash the full amount of such request. If any Non-Operator shall fail to timely pay in full the amount of such request, the unpaid portion thereof shall bear interest at the rate provided in Exhibit "C" to the Operating Agreement until paid. Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Facilities Improvement authorized or approved, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing.

7.3     In the event Operator makes a request for advance payment under Section 7.2 hereof and receives such advance payment from a Non-Operator, then as and to the extent that the costs of such Facilities Improvement are recovered by Operator from the owner(s) of Third-Party Gas, Operator shall reimburse such Non-Operator for its respective share of such advance actually paid.

## 8.  LIEN & SECURITY INTEREST

8.1     Each Non-Operator grants to Operator  a lien upon and a security interest in its ownership interest in the Gathering System and the Plant to secure payment of all amounts due by it, including its share of the Monthly Operating Costs plus its share of any Facilities Improvement cost and cash call requested under Section 7.2 hereof, together with interest at the at the rate provided in Exhibit "C" to the Operating Agreement.  To the extent that Operator has a security interest under the Alabama Commercial Code, Operator shall be entitled to exercise the rights and remedies of a secured party under such Code.  The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof.  In addition, upon default by any Non-Operator in the payment of its share of any amounts due hereunder, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas and/or to collect and withhold from such Non-Operator's share of the revenues generated from operation of the Plant or the Gathering System, and apply such proceeds against the expenses in default until the amount owed by such Non-Operator, plus interest at the rate provided in Exhibit "C" to the Operating Agreement, has been paid in full.  Each purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default.  To the extent Operator owns an interest in either the Plant or the Gathering System, Operator grants a like lien and security interest to Non-Operators to secure payment of Operator's proportionate share of

expense, if any.  If any party fails or is unable to pay its share of any amount due hereunder within thirty (30) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator to the extent Operator owns an interest, shall upon written request by the Operator pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties other than the defaulting party.  Each party paying its share of the unpaid amount shall, to obtain reimbursement thereof, be subrogated to the security rights described above.

## 9.  MARKETING

9.1    The Residue Gas is currently committed to a Gas Purchase Contract ("**Gas Contract**") dated August 7, 2009, as amended, with the Southeast Alabama Gas District (the "**Residue Gas Buyer,**" such term to include any person or entity that may from time to time purchase the Residue Gas) and Operator shall continue to deliver all Residue Gas to the Residue Gas Buyer in accordance with that agreement until modified or terminated.  Subject to the Gas Contract, each Non-Operator reserves the right to separately market in kind its share of any Residue Gas.  If a Non-Operator takes its share of Residue Gas in kind, it shall provide facilities at the Plant to receive its share, and it shall pay to Operator any extra expense that may be incurred by Operator as a result of said Non-Operator taking its share in kind. If any Non-Operator shall fail to separately market in kind its share of any Residue Gas, the Operator will have the right to market such Residue Gas consistent with the terms of the Operating Agreement, including Exhibit "E" thereto.

9.2    Each Non-Operator reserves the right to separately market in kind its share of any Raw Make or Plant Products.  If a Non-Operator takes its share of Raw Make or Plant Products in kind, it shall provide facilities at the Plant to receive its share, and it shall pay to Operator any extra expense that may be incurred by Operator as a result of said Non-Operator taking its share in kind.  If any Non-Operator shall fail to separately market in kind its share of any Raw Make or Plant Products, the Operator will have the right to market such Raw Make or Plant Products consistent with the terms of the Operating Agreement, including Exhibit "E" thereto.

9.3    The provisions of Article IX of the Operating Agreement shall be fully applicable with respect to the Plant and the Gathering System. If any provision of this Addendum is inconsistent with Article IX or would cause the Parties to lose their exclusion from partnership income tax treatment, this Addendum shall be treated for all purposes as if the offending provision thereof were not included in the Addendum.

## 10.  DECOMMISSIONING OF PLANT

10.1    If, at any time, Operator, in its sole discretion, determines that either the Plant or Gathering System is approaching the end of its economic life and/or useful purpose, Operator may pre-bill the Non-Operators, as their interests are then reflected in Exhibit 1, an amount that is reasonably estimated to shut down and decommission the Plant or Gathering System.  Such

amount shall be deposited in an interest bearing account, and the principal and interest therefrom utilized to offset the actual costs of shutting down and decommissioning the Plant or Gathering System.  In the event actual costs are less than the estimate, each Non-Operator will be issued a refund of the difference, together with any accrued interest on such difference, based upon the then current ownership percentage of such owner.  In the event the actual costs exceed the estimate, each Non-Operator agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

10.2    If, at any time, Operator determines that either the Plant or Gathering System has reached the end of the its economic life and/or useful purpose and should be shut down and decommissioned, or should be shut down and decommissioned for any other reason, Operator shall circulate a written proposal to Non-Operators articulating the reasons for such proposal, along with an estimate of costs to shut down and decommission the Plant or Gathering system, as the case may be.  If none such Non-Operators object within thirty (30) days after sending of such proposal, Operator shall proceed with the proposed shut down and decommissioning.  If any Non-Operator objects to such proposal within the thirty (30)-day period, the objecting owner(s) (the "assuming owner(s)") shall, within thirty (30) days thereafter, tender to the other owner(s) (the "abandoning owner(s)") each abandoning owner's proportionate share of the value of the Plant's and/or the Gathering System's salvable material and equipment, determined in accordance with the provisions of Exhibit C to the Operating Agreement, less the estimated cost of salvaging and the estimated cost of ultimately shutting down and decommissioning.  Each abandoning owner shall upon receipt thereof assign to the assuming owner(s), without warranty, express or implied, as to title or as to quantity, for fitness for use of the equipment and material, all of its interest in the plant and/or gathering system, as the case may be.  Thereafter the abandoning owners shall have no further responsibility, liability, or interest in the operation of the Plant and/or Gathering System, as the case may be, and all such assuming owners shall thereafter assume full responsibility, liability, or interest in the operation of the Plant and/or Gathering System, as the case may be.  Operator may tender its resignation as operator of the Plant and/or Gathering System in the event any assuming owners desire to continue operation of the same, but may, in its discretion, continue as Operator under the terms and provisions, including the Management Fee, then in place.  Failure of assuming owner(s) to tender all amounts due to abandoning owner(s) within thirty (30) days shall be deemed a withdrawal of the objection and consent to the proposal by the objecting owner(s).

## 11.  THIRD PARTY GAS

11.1    Operator is authorized to enter into agreements for the transporting, gathering, treating and/or processing of Third Party Gas in the Gathering System and/or Plant, provided, however, that any such agreements shall: (a) be subject to there being available capacity in the Gathering System and Plant after accounting for the Committed Gas, (b) not interfere with Operator's obligation to gather, treat and process the Committed Gas, (c) require that the Third Party Gas meet or exceed the Committed Gas Quality Specifications, and (d) require the owner of the Third Party Gas to pay a share of the Monthly Operating Costs (including the Management Fee) based

on the ratio of Third-Party Gas to the total amount of Gas received at the Plant for the month. Any such agreement may also require the owner(s) of the Third-Party Gas to pay or be liable for such other fees or charges as Operator shall determine appropriate, including a portion of the costs of any Facilities Improvement. In the event Operator enters into such an agreement, Operator shall separately measure (or cause to be measured) all Third-Party Gas and the BTU content thereof. Any revenues generated by Operator on account of transporting, gathering, treating and/or processing fees charged for Third Party Gas which are in excess of the Net Proceeds allocable to such Third-Party Gas less (a) any other costs or expenses related to transporting or gathering that Gas and (b) any costs of Facilities Improvements charged to the owner(s) of such Third-Party Gas shall be distributed to Non-Operators as their interests are then reflected in Exhibit 1.

## 12. INSURANCE

12.1    Operator shall carry and provide the following minimum insurance protection to cover the Plant, which shall name Non-Operators as an additional insured, the costs of which incurred by Operator in obtaining, maintaining, extending, renewing or replacing such insurance shall be included in the Monthly Operating Costs (it being understood that Operator may, in its discretion, carry and provide for larger amounts of insurance):

   a. Worker's Compensation Insurance to comply with all applicable laws of the State of Alabama and employer's liability insurance with a limit of not less than One Million U.S. Dollars ($1,000,000.00) each accident;

   b. Comprehensive General Liability Insurance covering Operator's operations with a combined single limit of Five Million U.S. Dollars ($5,000,000.00) per any one occurrence for bodily injury and/or property damage;

   c. "Fire and extended coverage," "broad form" and "all physical loss" insurance coverages, including coverage for property damage, fire, lightning, smoke damage, theft, windstorm, hail, explosion, damage, vandalism and malicious mischief, sinkhole collapse, and similar damage and peril;

   d. Automobile Liability Insurance covering all automotive equipment used by Operator in performing work under the contract, with a combined single limit of not less than One Million U.S. Dollars ($1,000,000.00) any one accident for bodily injury and/or property damage.

## 13. MAINTENANCE OF UNIFORM INTEREST AND TRANSFERS

13.1    For the purpose of maintaining uniformity of ownership in the leases and wells subject to the Operating Agreement, on the one hand, and the Gathering System and Plant, on the other hand, no Non-Operator's interest in the leases and wells subject to the Operating Agreement

Page **10** of **19**

shall be transferred to any person or entity unless a concomitant portion of the assignor's ownership interest in the Plant and the Gathering System is likewise transferred to the same person or entity, and vice-versa. Any purported transfer in violation of the preceding sentence shall be null and void and shall not be recognized by the Operator. All transfers of any interest in the Plant and the Gathering System shall be made expressly subject to the provisions of this Addendum and shall be without prejudice to the rights of the other parties.

13.2   No transfer by a Non-Operator shall be effective until thirty (30) days after receipt by Operator of notice of such transfer and documentation confirming such transfer. Upon receipt of notice and reasonably requested documentation, Operator shall revise Exhibit 1 hereto to reflect the then current interests of the Non-Operators in the Plant and Gathering System. Any reference to Exhibit 1 in this Addendum shall be deemed to refer to said exhibit as the same may be amended from time to time.

## 14.  CONFLICTS

14.1   The provisions of the Operating Agreement shall apply generally to the operation of the Gathering System and the Plant, including Exhibit "C" (COPAS) to the Operating Agreement; provided, however, that, as to the Plant and the Gathering System, the Management Fee shall be in lieu of any costs otherwise allowable to the Operator under and pursuant to Article III "Overhead" of Exhibit C (COPAS). To the extent that the provisions of the Operating Agreement or Exhibit "C" thereto apply by their terms to a well or wells or the marketing of oil and/or gas, such provisions shall, for purposes of this Addendum, be deemed to apply to the Plant and the Gathering System and to the marketing of Residue Gas, Raw Make, or Plant Products as the context may require. In the event of a conflict between the provisions of this Addendum and the remaining provisions of the Operating Agreement, the provisions of this Addendum shall supersede and prevail.

## 15.  ENTIRETIES AND AMENDMENTS

15.1   This Addendum, and the Operating Agreement to which it is attached, constitute the entire agreement of the parties with respect to the subject matter hereof, and any other promises, inducements, representations, warranties or agreements with respect to the subject matter hereof have been superseded hereby and are not intended to survive this Addendum. This Addendum may be amended in writing by the parties hereto at any time with the approval of at least 60% by interest of the then Non-Operators (as reflected on Exhibit 1) and the Operator. No amendment or modification of this Addendum shall be effective unless set forth in a written agreement signed by the parties approving same.

## 16.  APPLICABLE LAW AND VENUE

16.1   This Agreement shall be governed exclusively by and interpreted in accordance with the laws of the State of Alabama without regard to any conflict of laws principles or rules. This

Agreement is subject to all applicable laws and regulations pertaining to the transportation and handling of sour gas. In the event of any litigation concerning this Addendum, the parties agree that such litigation shall be conducted in the circuit court of either Escambia or Conecuh County, Alabama, or in the United States District Court for the Southern District of Alabama, **AND EACH PARTY HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH LITIGATION**.

## 17.  NOTICE

17.1   Any notice, request, demand, statement or invoice which either party desires to serve upon the other shall be in writing and shall be considered delivered when hand delivered, or if mailed by United States certified mail, postage prepaid, five days after mailing or, if sent by facsimile transmission, when receipt is confirmed by the equipment of the transmitting Party or, if sent by email transmission, when receipt is confirmed by the equipment of the transmitting Party. If receipt of a facsimile or email transmission is confirmed after normal business hours receipt shall be deemed to be the next business day. Such notice shall be given to the other party at the following address:

> Notice to Sklar:   Sklar Exploration Company, LLC
> Attention: Mr. Steven Hatcher
> 5395 Pearl Parkway, Suite 200
> Boulder, Colorado 80301
> Phone:  720-306-8310
> Fax:  303-443-1551
> Email: SHatcher@sklarexploration.com
>
> Notice to any Non-Operator:    At the address and other contact information
> provided in Exhibit "1" hereto

or to such other address as either Party shall designate by notice in the manner provided above. Operating communications by telephone or other mutually agreeable means shall be considered as duly delivered without subsequent written confirmation, unless written confirmation is requested by either party.

## 18.    MISCELLANEOUS

18.1   This Addendum shall be binding on, and inure to the benefit of, all successors in interest and assigns of the parties hereto.

18.2   Unless the context otherwise clearly indicates, words used in the singular include the plural, and the plural include the singular.

18.3   All words used in any gender in this Addendum shall, where appropriate, extend to and include all other genders, and all words used in the singular in this Addendum shall, where appropriate, extend to and include the plural, and vice-versa.

Page **12** of **19**

18.4    Wherever possible, each provision of this Addendum shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provisions of this Agreement shall be prohibited by or invalidated under applicable law, such provisions shall be ineffective to the extent of such provision and the remaining provisions of this Addendum shall remain fully effective.

## EXHIBIT 1

Attached to and made a part of that certain Gas Gathering and Processing Addendum date effective as of March 1, 2020, which itself is attached as Exhibit G to that certain Operating Agreement dated effective as of November 15, 2004, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., et al., as Non-Operators

Sklarco, LLC .34995239
Attn: J. Marshall Jones, III
5395 Pearl Parkway, Ste. 200
Boulder, CO 80301
Phone: (318) 227-8668
Email: shatcher@sklarexploration.com

Bundero Investment Co. LLC .00809077
Attn: Robert P. Bowman, Manager
401 Edwards Street, Suite 820
Shreveport, LA 71101
Phone: (318) 840-6226
Email: rbowman@bundero.com

Ansaben Trust .00202263
Attn: David A. Barlow, Trustee
321 Paseo Encinal St.
San Antonio, TX 78212
Phone: (210) 749-5253
Email: ansabentrust@gmail.com

Carl Herrin Oil and Gas, LLC .03792424
Attn: Mr. Scott H. Noblitt, VP
P. O. Box 957
Ridgeland, MS 39158-0957
Phone: (601) 354-3882
Email: noblitt.scott@gmail.com

Aspen Energy, Inc. .00114569
Attn: Mike Reed
161 St. Matthews Ave., Ste. 16
Louisville, Kentucky 40207
Phone: (502) 897-1757
Email: mike@aspenenergyinc.com

Cayman Resources, Inc. .00190950
Attn: Mr. Vincent J. Manara, III
5773 Woodway Drive, PMB #412
Houston, TX 77057
Phone: (713) 851-0664
Email: vsscmanara@sbcglobal.net

Beazley Petroleum, LLC .00017979
Attn: Dr. Hamilton Beazley
411 West St. Elmo Road #24
Austin, Tx 78745
Phone: (512) 444-4242
Email: hamiltonbeazley@gmail.com

Coastal Exploration, Inc. .01527597
Attn: Julius Ridgway
701 Avignon Drive
Ridgeland, MS 39158
Phone: (601) 427-5388
Email: Juliusridg@aol.com

Bobmary L.C. .00404525
Attn: Dr. Robert Lafargue
5928 East Ridge Drive
Shreveport, LA 71106
Phone: (318) 865-7531
Email: bobmarylc@comcast.net

Craft Exploration Co., LLC .02638582
Attn: Steven H. Craft, Managing Member
P.O. Box 2430
Madison, MS 39130
Phone: (601) 594-4400
Email: stevecraft@att.net

Brock Resources, LLC .00017980
Attn: Mr. Fain Brock
2634 Henley Drive
Round Rock, Texas 78681
Phone: (512) 236-8211
Email: fbrock@lucaspetroleum.com

Dickson Oil & Gas, LLC .00809077
Attn: Mr. C. Bickham Dickson, III
455 Southfield Road
Shreveport, LA 71106
Phone: (318) 841-1122
Email: bickham@bdicksonproperties.com

Page **14** of **19**

Embayment Production, LLC   .01213096
Attn: William B. Ridgway, Jr.
P.O. Box 187
Jackson, MS 39205-0187
Phone: (601) 353-8349
Email: wridgwayjr@aol.com,

Fant Energy Limited   .08090504
Attn: Stephen Swan
P. O. Box 55205
Houston, TX  77255
Phone: (713) 316-1273
Email: SSwan@nps.cc

Gateway Exploration, LLC   .00133665
Attn: Jay Moffitt
3040 Post Oak, Ste. 525
Houston, Tx 77056
Phone: (713) 750-9485 Ext. 104
Email: jmoffitt@gatewayexp.com

JF Howell Interests, LP   .03236202
Attn: David Morgan, Managing Member
416 Travis Street, Suite 715
Shreveport, LA  71101
Phone: (318) 221-6382
Email: david@jfhowell.com

Jeffreys Drilling, LLC   .00101840
Attn: Mr. Bradley Jeffreys
3839 McKinney Ave., Suite 155-269
Dallas, TX 75204
Phone: (214) 361-4934
Email: bradley.jeffreys@gmail.com

JJS Interests North Beach LLC  .13379793
Attn: Mr. Justin Simons
2001 Kirby Drive, Ste. 1110
Houston, Texas 77019
Phone: (713) 888-0875
Email: justin@hbcapllc.com

Kudzu Oil Properties, LLC   .01618155
Attn: Mr. Wirt A. Yerger, III
300 Concourse Blvd, Suite 101
Ridgeland, MS 39157
Phone: (601) 987-6576
Email: way3@cavaliergrp.com

Longleaf Energy Group, Inc.   .00763798
Attn: Mr. Thomas E. McMillan, Jr.
315 Belleville Ave.
Brewton, AL 36426
Phone: (251) 867-9044
Email: tmcmillan@longleafenergy.com

Lucas Petroleum   .05339893
Fain Brock, President
327 Congress Ave, Ste 500
Austin, TX 78701-3656
Phone: (512) 236-8211
Email: fbrock@lucaspetroleum.com

Marksco, LLC   .01618155
Attn: Mark Sealy
333 Texas Street, Ste. 1050
Shreveport, LA 71101
Phone: (318) 698-3101
Email: marks@sealynet.com

McCombs Energy, LTD, LLC  .03748292
Attn: Gary Woods
750 E. Mulberry Ave., Ste. 403
San Antonio, TX 78212
Phone: (210) 731-4720
Email: gwoods@mccombshq.com

J. C. Ogden   .00017980
5419 Cedar Creek
Houston, Texas 77056
Phone: (713) 858-4756
Email: jcogdengeo@sbcglobal.net

Parous Energy, LLC.   .01769798
Attn: George Dennis
1267 Gluckstadt Road
Madison, MS 39130-2547
Phone: (601) 856-7613
Email: georgedennis@parousenergy.com

Pflanzer Partners, Ltd.   .00809050
Attn: Dr. Joseph Pflanzer
1225 Sunset Ridge Circle
Cedar Hill, TX 75104
Phone: (972) 298-1710
Email:  pflanzermd@yahoo.com

Quail Creek Production Co.          .00798511
Attn: Don W. Dahlgren
13831 Quail Pointe Drive
Oklahoma City, OK 73134
Phone: (405) 755-7419
Email: dwdahlgren@quailcreekcompanies.com

Resource Ventures, LLC          .02016604
Attn: Mark A. Arnold
7112 W. Jefferson Ave, Ste. 106
Lakewood, CO 80235
Phone: (303) 217-5151
Email: Arnold@royaltyexploration.com

Sellars Family LLC          .00809050
Attn: Jodi Smith, Managing Member
11128 Windjammer Dr.
Frisco, TX 75034
Phone: (972) 529-7625
Email: stevenjodi@gmail.com

Sepulga River Fuels, LLC          .00763798
Attn: Mr. Cosby H. Martin, Jr.
15 Rodgers Lane
Brewton, AL 36426
Phone: (251) 867-3344
Email: marcoland@bellsouth.net

Tenexco, Inc.          .04000108
Attn: Richard Incandela II, President
17W 715C Butterfield Road
Oak Brook Terrace, IL 60181
Phone: (708) 771-7870
Email: tenexco@comcast.net

TEPCO, LLC          .00133665
c/o BKD, LLP
Attn: John C. Aubrey, President
2700 Post Oak Blvd, Ste #1500
Houston, TX 77056
Phone: (713) 542-5229
Email: jcaubrey@meritagenrg.com

Tiembo, Ltd.          .01618101
Attn: Mark Rauch
P.O. Box 270415
Houston, TX 77277-0415
Phone: (713) 627-1700 ext. 109
Email: mrauch@standardsouthern.com

Tyler Oil & Gas, LLC          .00500000
Attn: BT Steadman
P.O. Box 12761
Jackson, MS 39236
Phone: (917) 414-3344
Email: bts@vactruckrental.com

Vickery Exploration, LLC          .00809050
Attn: Jimmy D. Vickery, Manager
333 Summerville Drive
Madison, MS 39110
Phone: 769-300-2907
Email: vickery.resources@gmail.com

Waller Brothers, Inc.          .00999680
Attn: Mr. Don Waller
524 E. Pascagoula Street
Jackson, MS 39201
Phone: (601) 352-6556
Email: don@wallerbros.com

Yates Resources, LP          .00190950
Attn: Brook Yates
3131 Southwestern Blvd
Dallas, TX 75225
Phone: (214) 520-2929
Email: byates@sbcglobal.net

## EXHIBIT 2

Attached to and made a part of that certain Gas Gathering and Processing Addendum date effective as of March 1, 2020, which itself is attached as Exhibit G to that certain Operating Agreement dated effective as of November 15, 2004, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., et al., as Non-Operators

## ABBYVILLE PLANT DESIGN AND RECOVERY MODEL PERFORMANCE

The ABBYVILLE Plant is designed to meet the following performance parameters based upon the following pressure, quality and GPM assumptions for Inlet Gas volume of 4000 Mcf/D:

Operator to deliver Inlet Gas at the Abbyville Plant Delivery Meter at 25 psig or greater.

Operator to deliver Residue Gas at the Abbyville Plant Redelivery Meter at 800 psig or less.

Committed Gas: GPM = 10.305 or greater, and Btu/CF = 1465.6 or greater on a Wet basis at a 14.65 PSIA pressure base, N2 Mol Percent = 4.699% or greater, and the C2/C2+ GPM ratio shall be 40% or less.

Committed Gas less than 10 ppm H2S.

Residue Gas Btu/CF = 1050 or less.

Committed Gas shall not at any time have a carbon dioxide content in excess of one and three-quarters percent (1.75%) by volume.

Committed Gas shall not at any time have nitrogen content in excess of eight percent (8%) by volume.

Committed Gas shall not contain more than fifteen (15) grains of total sulfur per one hundred (100) cubic feet.

| Recovery (%) | MAXIMUM Recovery |
|---|---|
| Ethane | 52% |
| Propane | 85% |
| I-Butane | 95% |
| N-Butane | 98% |
| N-Gasoline | 98% |

Page 17 of 19

## EXHIBIT 3

Attached to and made a part of that certain Gas Gathering and Processing Addendum date effective as of March 1, 2020, which itself is attached as Exhibit G to that certain Operating Agreement dated effective as of November 15, 2004, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C., et al., as Non-Operators

## RESIDUE GAS QUALITY SPECIFICATIONS

a.  <u>Solids</u> – Residue Gas shall be free from solid matter, dust, gums, and gum-forming constituents which might interfere with tits merchantability or cause injury to or interference with proper operation of the lines, meters, regulators, or other appliances through which it flows.

b.  <u>Oxygen</u> – Residue Gas shall at all times be free from oxygen.

c.  <u>Carbon Dioxide</u> – Residue Gas shall not at any time have a carbon dioxide content in excess of two percent (2%) by volume.

d.  <u>Nitrogen</u> – Residue Gas shall not at any time have a nitrogen content in excess of ten percent (10%) by volume when the carbon dioxide content is two percent (2%) by volume. However, the nitrogen content may be increased as the carbon dioxide content is decreased such that the sum of the two gases will not exceed twelve percent (12%) by volume. Neither nitrogen or carbon dioxide will be added or introduced to the Gas stream. Only nitrogen or carbon dioxide from naturally occurring flow from the wells shall be included.

e.  <u>Liquids</u> – Residue Gas shall be free of water and hydrocarbons in liquid form.

f.  <u>Hydrogen Sulfide</u> – Residue Gas shall not contain more than ten (10) parts per million of hydrogen sulfide.

g.  <u>Total Sulfur</u> – Residue Gas shall not contain more than ten (10) grains of total sulfur per one hundred (100) cubic feet.

h.  <u>Heating Value</u> – Residue Gas shall have a total gross heating value of not more than one thousand fifty (1050) Btus per cubic foot. Moreover, Residue Gas shall have a total or gross heating value of not less than nine hundred ninety (990) Btus per cubic foot. The number of Btus of heating value per cubic foot shall be determined on the basis of gas being burned with air and saturated with water vapor at sixty (60) degrees Fahrenheit and under a pressure equivalent to thirty inches (30") of mercury at thirty two (32) degrees Fahrenheit. The total or gross heating value is obtained by cooling the products of combustion to sixty (60) degrees Fahrenheit and condensing the moisture formed, corrected to a water free (dry) basis. To the extent Residue Gas Buyer allows delivery up to one thousand one hundred (1100 Btus) per cubic foot, Operator may deliver Residue Gas up to but not more than 1100 Btu/cf heating value.

i.    <u>Temperature</u> – Residue Gas shall not be delivered at a temperature of less than forty (40) degrees nor more than one hundred twenty (120) degrees Fahrenheit.

j.    <u>Water Vapor Content</u> – Residue Gas shall not contain more than seven (7) pounds of water vapor per million cubic feet.