## PARTICIPATION AND EXPLORATION AGREEMENT

**West Tyler 3D Seismic Prospect**
**Smith County, Texas**

THIS PARTICIPATION AND EXPLORATION AGREEMENT (the "**Agreement**"), dated effective as of the 1ˢᵗ day of October, 2013 (the "**Effective Date**"), is entered into by and between the following (sometimes herein referred to singularly as a "**Party**" or collectively as the "**Parties**"):

SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President - Chief Operating Officer, David A. Barlow ("**SEC**" or "**Operator**");

SKLARCO L.L.C., a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President - Chief Operating Officer, David A. Barlow ("**Sklarco**");

MCCOMBS ENERGY, LTD., a Texas limited partnership, whose address is 5599 San Felipe, Suite 1200, Houston, Texas 77056-2794, represented herein by its Vice President, Ricky Haikin ("**McCombs**");

JJS WORKING INTERESTS LLC, a Texas limited liability company, whose address is 4295 San Felipe, Suite 207, Houston, Texas 77027, represented herein by Houston Bulldog Capital Management, LLC, its duly authorized Manager, represented herein by Justin Simons, in his capacity as the duly authorized Manager of Houston Bulldog Capital Management, LLC ("**JJS**");

JAMES FLEET HOWELL, whose address is 416 Travis Street, Suite 715, Shreveport, Louisiana 71101 ("**Howell**");

KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, whose address is 300 Concourse Blvd., Suite 101, Ridgeland, Mississippi 39157, represented herein by its Executive Vice President, R. Nash Neyland ("**Kudzu**");

TIEMBO, LTD., a Texas limited partnership, whose address is P. O. Box 270415, Houston, Texas 77277-0415, represented herein by its Registered Agent, Mark Rauch ("**Tiembo**");

BUNDERO INVESTMENT COMPANY, L.L.C., a Louisiana limited liability company, whose address is 333 Texas Street, Suite 300, Shreveport, Louisiana 71101, represented herein by its Manager, Robert P. Bowman ("**Bundero**");

BENNETT GREENSPAN, whose address is 5207 Braeburn Drive, Bellaire, Texas 77401 ("**Greenspan**");

FAIR OIL LTD, a Texas limited partnership, whose address is 225 South College, Tyler, Texas 75702, represented herein Fair Oil Company of Texas, Inc., its sole General Partner, represented herein by its President, John R. Garrett ("**Fair**");

R. L. RAY, LTD, a Texas limited partnership, whose address is 223 South College, Tyler, Texas 75702, represented herein by its General Partner, John D. Hills ("**Ray**");

FANT ENERGY LIMITED, a Texas limited partnership, represented herein by its General Partner, Richard E. Fant L.L.C., which itself is represented herein by its Manager, Richard E. Fant ("**Fant**");

1

**LUCAS PETROLEUM GROUP, INC.** a Texas corporation, whose address is 327 Congress Avenue, Suite 500, Austin, Texas 78701, represented herein by its President, Fain Brock ("**Lucas**"); and

**CULVER & CAIN, PRODUCTION LLC,** a Texas limited liability company, whose address is 121 S. Broadway, Suite 760, Tyler, Texas 75702, represented herein by Matthew R. Culver, its Manager ("**Culver**")

(hereinafter Sklarco, McCombs, JJS, Howell, Kudzu, Tiembo, Bundero, Greenspan, Fair, Ray, Fant, Lucas, and Culver are sometimes referred to collectively as the "**Participants**" or individually as a "**Participant**");

## W I T N E S S E T H:

**WHEREAS,** Sklarco owns agreements to conduct seismic surveys and geophysical explorations (hereinafter sometimes referred to singularly as a "**Permit**" or collectively as the "**Permits**") covering lands located in Smith County, Texas, lying within an area of mutual interest (the "**AMI**") outlined in blue on the plat attached hereto as **Exhibit "A,"** generally known as the West Tyler 3D Seismic Prospect (the "**Seismic Prospect**");

**WHEREAS,** all of the Participants desire to participate in the 3D seismic shoot described in Section 1.1(a) of this Agreement below, to be conducted across the Seismic Prospect, which includes, but is not expressly limited to lands covered under the AMI;

**WHEREAS,** Sklarco owns the oil, gas and other mineral leases (hereinafter sometimes referred to singularly as a "**Lease**" or collectively as the "**Leases**") described on **Exhibit "A-1,"** attached hereto and made a part hereof, covering lands located in Smith County, Texas, lying within a contract area (the "**Contract Area**") outlined in black on the plat attached hereto as Exhibit "A," which itself is lying within the AMI , generally known as the "**Prospect**;"

**WHEREAS,** subject to a Reversionary Back-In Working Interest described in Section 1.3 of this Agreement below and ORRI described in Subsection 1.1(c), Sklarco desires to sell a portion, and retain a portion, of its right, title and interest in and to the Leases;

**WHEREAS,** the Participants, other than Sklarco, desire to acquire a portion of Sklarco's right, title and interest in and to the Leases;

**WHEREAS,** all of the Participants desire to participate in the acquisition of additional leases lying within the boundary of the Contract Area, and additional permits lying with the Seismic Prospect;

**WHEREAS,** all of the Participants desire to participate in the drilling of a well to develop the Prospect operated by SEC (the "**Initial Well**");

**WHEREAS,** all of the Participants desire an opportunity to participate in the acquisition of leases and the drilling of wells to develop Future Prospects, as described in Subsection 1.1(b) of this Agreement below, located with the AMI, if any, and agree that the initial well(s) of any such Future Prospect(s) shall be operated by SEC; and

**WHEREAS,** the Parties desire to enter into this Agreement to set forth the terms and conditions under which they sell, retain, or acquire, as the case may be, those working interests and drill the Initial Well for the Prospect, and Future Prospects;

**NOW, THEREFORE,** the Parties agree as follows:

### Article I.  Purchase And Sale And Development Commitments

#### Section 1.1.  Leases and Permits

The Participants other than Sklarco shall tender to SEC concurrent with their execution of this Agreement, unless other arrangements have been made by Participant with SEC in advance, in the following proportions, the amount of One Million, One Hundred Seventy-Seven Thousand, Two Hundred Sixty-Eight and 86/100 Dollars ($1,177,268.86), representing the total lease bonus, brokerage, geological, geophysical, Permits, and other costs associated with the Seismic Prospect and the Prospect through October 31, 2013 (collectively, the "**Prospect Fee**"):

2

| Participant | Proportion | Amount |
|---|---|---|
| Sklarco | 25.0000% | (Already Paid) |
| McCombs | | 94,317.21 |
| JJS | | 68,863.44 |
| Howell | | 68,863.44 |
| Kudzu | | 8,863.44 |
| Tiembo | | 3,545.38 |
| Bundero | | 3,545.38 |
| Greenspan | | ,772.69 |
| Fair | | ,385.92 |
| Ray | | ,749.79 |
| Fant | | ,726.89 |
| Lucas | | 545.38 |
| Culver | | ,772.69 |



Sklarco has incurred additional ... ...ensing of software needed for the develop... ...within the Prospect Fee is a Fifty Thousand ... ...ely by all Participants, which represents a s... ...or and in consideration of the Prospect Fee... ...nd ORRI described below, the receipt and ... ...sells and agrees to assign unto the other Par... ...est in all of its right, title and interest in an... ...ment attached hereto as Exhibit "B." Each assignment of i... ...y made without warranty of title, express or implied, not even for return of the Prospect Fee, except Sklarco agrees to warrant title against all defects arising out of claims by Sklarco or of persons claiming by, through or under Sklarco, (ii) subject to the terms of the Leases including Lessors' Burdens, (iii) subject to the ORRI described below, and (iv) subject to this Agreement and the JOA described in Section 2.1 of this Agreement.

Included in the Prospect Fee are costs associated with leases taken primarily for the purpose of conducting seismic operations in those instances where the surface owner was unwilling to grant a seismic permit; and it is anticipated that additional such leases will be taken in order to secure rights necessary to conduct effective seismic operations over the Seismic Prospect area (such leases are referred to collectively herein as "**Seismic Lease(s)**"). Participant agrees to pay its share of the costs associated with such Seismic Leases as part of the seismic operations to be conducted over the Seismic Prospect area. Should leases covered by any such Seismic Lease fall within a Future Prospect, described below, Sklarco or SEC, as applicable, will calculate a credit for each Participant equal to the difference between: 1) the cost associated with the acquisition of such Seismic Lease, and 2) the average cost (within the Seismic Prospect area) associated with the acquisition of a seismic permit for the gross acreage covered by such Seismic Lease, which amount shall then be proportionately reduced by the number of acres covered by the Seismic Lease that are not located within said Future Prospect. Sklarco or SEC, as applicable, will then apply said credit as follows: 1) if the Participant participates in said Future Prospect, the credit will be applied to Participant's share of that Future Prospect fee, and 2) if the Participant does not participate in said Future Prospect, the credit will be applied to Participant's share of costs associated with the Prospect.

**Subsection I.1(a).  Three-Dimensional Seismic Data Acquisition**

(i)    **Costs.**  Within one year of the date of this Agreement, SEC plans to shoot (or cause to be shot) 3D seismic across the Seismic Prospect and other lands in the general area.  Each Participant assumes and agrees to pay its share of the costs incurred in connection with such seismic operations.  At this time it is estimated that the costs for the 3D seismic, including permitting, acquisition and processing, will be approximately $53,450.00 per square mile and that the area included in the seismic shoot will comprise about 35 square miles.  Accordingly, the total amount owed by all of the Participants under this Agreement in association with the 3D seismic shoot is estimated to be approximately $1,870,800.00.  Each Participant agrees to pay its share of $1,870,800.00 in accordance with the before prospect payout percentages set forth in Subsection 1.1 above.  This total amount is subject to adjustment if the cost of the 3D seismic is more or less than the amount set forth above, and does not include other costs associated with the 3D seismic shoot, including, but not limited to, the cost of the Permits and Seismic Leases.

If a Participant fails to pay its share of any invoice for costs of the 3D seismic within fifteen (15) days after receipt of an invoice for same, SEC may send that Participant a notice of default.  If the Participant fails to pay said invoice within fifteen (15) days from receipt of the notice of default, then, at SEC's discretion, SEC may either seek collection of the amount due from said Participant, together with any interest and attorney's fees incurred in collecting the same, or may send said Participant a notice of non-participation, in which case that Participant shall forever relinquish, release and abandon all of its

right, title and working interest (but not Reversionary Back-In Working Interest under Section 1.3 of this Agreement) in and to the AMI and Seismic Prospect (including the Swan Prospect and any Future Prospects) and all leases covering lands located within same, including the Leases, and any wells, and agrees to execute a recordable assignment of its interest to the remaining Participants who agree to assume their proportionate share of said interest.

(ii)    **Participants' Access To Data And Right To License.**  Both during the term of this Agreement, and after termination, SEC shall have the exclusive rights to sell or license the 3D seismic data.  Any Participant who has paid its share of the Prospect Fee, future costs associated with the Prospect, future costs associated with the Seismic Prospect, and costs associated with the 3D seismic operation shall, upon reasonable request, be entitled to have access to the data on SEC's workstation at its office during normal business hours.  Upon written request, SEC shall furnish any such Participant a copy of the final processed 3D seismic data subject, however, to the terms of the seismic license attached hereto as **Exhibit "E"** and by reference made a part hereof, which any such Participant must also execute prior to obtaining a copy of the data.

(iii)    **Restrictions Upon Transfer Of Seismic Data And License.**  Any Participant that sells or transfers all of its right, title and interest in and to the Prospect  to a single third party, including all of its interests in oil and gas leases covering lands located within the AMI and all of its interest in any wells located within the AMI, may also transfer all of its rights to the 3D seismic data under Subsection 1.1(a)(ii) and under any license granted pursuant thereto to such third party without the consent of the other Owners, provided such third party agrees to be bound by the terms of any applicable license agreement, this Agreement and the JOA.  If a Participant sells or transfers, some, but not all, of its right, title and interest in and to the Prospect to one or more third parties, or if an owner sells or transfers all of its right, title and interest in and to the Prospect to several third parties, then, in either event, the Participant may transfer all of its seismic rights hereunder and under any license granted pursuant hereto to a single third party without the consent of the other Participants, provided that single third party agrees to be bound by the terms of any applicable license agreement, this Agreement and the JOA; provided further that such rights may not be transferred to multiple third parties, but only a single third party and such transfer must include all of such Participant's rights and interest in the seismic data under this Agreement and under any license granted pursuant to this Agreement, and accordingly, such Participant will no longer own any seismic rights under this Agreement or under any license granted pursuant to the Agreement even if that Participant retains some Agreement or under any license granted pursuant to this Agreement even if that Participant retains some interest in the Prospect.  Except as provided for herein, a Participant's seismic rights under Subsection 1.1(a)(ii) and under any license granted pursuant thereto shall be non-transferable.  In no event shall any transfer of seismic rights as aforesaid be binding on SEC until 30 days after it has been provided with written documentation satisfactory to it evidencing such transfer.  Nothing herein shall restrict the right of SEC, as Operator, to sell or transfer rights to the 3D seismic data to third parties for the purpose of obtaining a seismic permit or other rights needed to acquire the data in the first place.  Without limitation upon the foregoing, the Participants acknowledge that after termination of this Agreement, SEC alone may freely sell or license the 3D seismic data to third parties, without the requirement of obtaining the Participants' consent, subject, however, to the requirements of Subsection 1.1(a)(iv) below.

(iv)    **Proceeds From Sale Or License.**  SEC shall distribute any proceeds from a permitted sale of the 3D seismic data, net of applicable costs, among all of the Participants in accordance with the before prospect payout percentages set forth in Section 1.1 above.  If a Participant transfers all of its rights and interest in and to the 3D seismic data under Subsection 1.1(a)(ii) and under any license granted pursuant thereto to a single party, as provided for under the terms of Subsection 1.1(a)(iii) above, and provided such third party agrees to be bound by the terms of the license agreement, this Agreement and the JOA, then in that event and only in that event, such Participant's protion of the proceeds from a permitted sale or license of the 3D seismic data thereafter shall be owned by, and SEC shall distrubte those proceeds to, that third party; provided, however, that no such transfer by a Participant shall be binding on SEC until 30 days after SEC has been provided with written documentation satisfactory to it evidencing such transfer.

**Subsection 1.1(b).  Future Prospects**

As further consideration of the Prospect Fee, which includes Permits and Seismic Leases costs, and the reservation of Reversionary Back-In Working Interest described below, Sklarco agrees to provide the other Participants an opportunity to elect to participate in additional prospects located within the AMI (the **"Future Prospect(s)"**), if any, in at least the same before prospect payout percentages set forth in Subsection 1.1 above and subject to a reversionary back-in working interest in favor of Sklarco.  Upon the completion of 3D seismic operations set forth in Subsection 1.1(a) above, Sklarco will identify additional prospects located within the AMI, which in Sklarco's sole opinion are potentially economically viable and warrant f urther exploration, if any.  Sklarco will then o ffer to Participants an opportunity to elect to participate in any or all of such Future Prospect(s).  Participant will have thirty (30) days from receipt of the

4

election notice from Sklarco within which to notify Sklarco of Participant's election to participate in the Future Prospect(s). Failure of a Participant to respond within said thirty (30) day notice period shall automatically be deemed an election not to participate in said Future Prospect(s).

After the expiration of the thirty (30) election period set forth above, Sklarco, at its election, may withdraw a proposal of any or all Future Prospects if, in Sklarco's opinion, there is insufficient participation, or Sklarco may assume or market for sale the portion of any Future Prospect(s) for which an election not to participate has been given or deemed given, and shall promptly notify all parties of such decision.    Once all of a Future Prospect's ownership has been purchased by Participants or third parties, Sklarco will circulate for execution by the participants to each such Future Prospect, participation agreements for each Future Prospect in substantially the same form as this Agreement identifying the ownership percentage of each participant, the contract area, the leases, and fees to be paid by the participants in each such prospect. Additionally, Sklarco will agree to sell and assign unto the participants in each such prospect, in the same proportions identified in each such participation agreement, an undivided interest in all of its right, title and interest in and to the leases contained in each such Future Prospect by means of the form of assignment substantially the same as is attached hereto as Exhibit "B." Each assignment of interest, if any, shall be: (i) made without warranty of title, express or implied, not even for return of the prospect fee, except Sklarco agrees to warrant title against all defects arising out of claims by Sklarco or of persons claiming by, through or under Sklarco, (ii) subject to the terms of the leases including Lessors' Burdens, (iii) subject to the ORRI described below, and (iv) subject to this Agreement, the participation agreement for each Future Prospect, and the operating agreement to be executed by the participants in association with each such Future Prospect, which shall be in substantially the same form as the JOA described in Section 2.1 of this Agreement.

### Subsection 1.1(c).  Overriding Royalty Interests

Each lease, including the Leases, lease extensions, or other mineral interests acquired by Sklarco in the AMI, including, but not limited to, the Prospect and Future Prospects, shall be subject to a sliding scale overriding royalty interest (the "ORRI") in favor of Tal Walker ("Walker") or his designee(s), as more fully set forth in that certain letter agreement between Tal Walker, Sklarco, and SEC dated November 15, 2012, as amended by that certain letter agreement amendment dated November 12, 2013 (collectively the "Walker Letter Agreement"), copies of which are attached hereto as Exhibits "F-1" and "F-2", respectively, and which are incorporated herein by reference.  In the event of a conflict between this Agreement and the Walker Letter Agreement, the Walker Letter Agreement shall control.

The Walker ORRI to be borne by all Participants shall be a percentage of the oil, gas and other minerals produced and saved under the terms and provisions of such lease, from or attributable to, any lands covered thereby, proportionately reduced to the net mineral acres covered by such lease, and shall be calculated on a lease by lease basis according to the net revenue interest ("NRI") of each such lease, as follows: 1) if the NRI of a lease is greater than seventy-five percent (75%), but less than or equal to seventy-eight percent (78%), then the ORRI on any such lease shall be one percent (1%), and 2) if the NRI of a lease is greater than seventy-eight percent (78%), then the ORRI on any such lease shall be two percent (2%).  Walker is not entitled to an ORRI on leases for which the NRI is less than or equal to seventy-five percent (75%).  The ORRI shall be calculated and shall be delivered and paid to Walker or his designee(s) in the same manner or with the same exclusions, deductions, and allocations as are provided for the calculation, delivery, and payment of royalties to the lessor in the lease.  Similarly, Walker shall pay or bear such taxes and charges and other deductions attributable to the ORRI as are to be paid and borne by the lessor in the lease.

Additionally, Sklarco and JJS have granted Walker a sliding scale after prospect payout back-in working interest ("APOWI") in each lease, including the Leases, and lease extensions acquired by Sklarco in the AMI.  As set forth in the Walker Letter Agreement, Walker's APOWI shall be calculated on a lease by lease basis according to the NRI of each such lease, as follows: 1) if the NRI of a lease is greater than seventy-five percent (75%), but less than or equal to seventy-eight percent (78%), then the APOWI on any such lease shall be two percent (2%), and 2) if the NRI of a lease is less than or equal to seventy-five percent (75%), then the APOWI on any such lease shall be four percent (4%).  Walker is not entitled to an APOWI on leases for which the NRI is greater than seventy-eight percent (78%).  The APOWI shall be borne by Sklaro and JJS proportionately as reflected on Exhibit A to the JOA identified in Subsection 2.1 below, which is allocated in accordance with the terms of that certain "Agreement For Termination Of Agency Services Agreements" dated effective as of January 1, 2010, to which Sklarco and JSS, et al are parties.

### Section 1.2. Initial Well

#### Subsection 1.2(a). Drilling Of The Initial Well

At Operator's discretion, but no later than the December 31, 2014, and subject to rig availability, Operator shall commence or cause to be commenced operations for the drilling of the Initial Well at a location of 5,300' FSL and 2,850' FEL of the Hezekiah George Survey A-367, of Smith County, Texas, or as near thereto as practicable, or at a mutually acceptable location picked after shooting 3D Seismic, and thereafter continue the drilling of the Initial Well with due diligence to a measured depth of 8,000' in a vertical bore hole, or a depth sufficient in Operator's discretion, to test the Paluxy Formation (the "**Objective Depth**"). The Participants agree to participate in the drilling of the Initial Well to the Objective Depth in the same before prospect payout proportions in which they own the Leases as set forth in Section 1.1 above. Concurrent with their execution of this Agreement, the Participants agree to execute an Authority For Expenditure ("AFE") attached hereto as **Exhibit "C."** Notwithstanding the estimates contained in the AFE, the Participants are responsible for and must pay SEC their share of all actual costs to drill the Initial Well to the Objective Depth in the following manner: (i) SEC will furnish the Participants with a cash call invoice within thirty (30) days of its anticipated spud date of the Initial Well covering their share of the amount estimated in the AFE to drill the Initial Well to the Objective Depth, excluding estimated completion costs, but including the amount estimated to plug and abandon the Initial Well in the event it is not completed as a producing well, and the Participants must tender to SEC as an advance, within fifteen (15) days of receipt and, in any event, prior to spudding the Initial Well, full payment of the cash call invoice, unless other arrangements have been made by Participant with SEC in advance; and (ii) the Participants must tender to SEC, within 15 days of receipt of (an) invoice(s) from SEC, the difference, if any, between said advance and their share of the actual costs to drill the Initial Well to the Objective Depth. In the event any Participant from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment as aforesaid, then Operator, at its option, shall make a second written request by certified mail, return receipt requested for such advance. Participant shall pay for said advance as aforesaid within ten (10) days of the receipt of such second request.

If, after the receipt of a second written request as hereinabove provided, any Participant fails to pay its share of the actual costs to drill the Initial Well to the Objective Depth, in the manner and within the time deadlines set forth above, then in that event and only in that event, that Party hereby agrees to relinquish all of its right, title and interest in the AMI (including the Prospect and any Future Prospects) and all leases covering lands located within same, including the Leases, and to execute those instruments provided by SEC necessary to convey said interest to the Participant(s) which did not fail to pay its share of the actual costs to drill the Initial Well to the Objective Depth and who so elect to accept such an additional interest or portion thereof, for no consideration, not even for return of the Prospect Fee or drilling advance. This forfeiture of interest shall be without prejudice and in addition to the rights of the Operator and Non-Operator(s) who paid their shares of the actual costs to drill the Initial Well to the Objective Depth to offset and/or recover all sums owed by a Party that fails to pay its share of actual costs to drill the Initial Well to the Objective Depth.

#### Subsection 1.2(b). Operations After Reaching The Objective Depth

After the Initial Well has been drilled to the Objective Depth, SEC shall make a copy of any logs, core analysis, drill-stem test analysis or results of any other tests available to a representative of the Participants at the wellsite, or if none is present, by email, facsimile or overnight delivery. SEC shall also furnish the Participants in a like manner with its recommendation regarding the disposition of the wellbore, in accordance with the JOA. Failure to respond within the time specified shall be deemed an election to participate in SEC's recommended operation. An election not to participate in an election to set production casing and complete the Initial Well shall result in the forfeiture of interest not only in the Initial Well, but also in the Leases and the entire Contract Area, including all leases covering lands located within same. All subsequent operations and elections shall be governed by the JOA.

### Section 1.3. Reversionary Back-In Working Interest

As further consideration for the sale described in Section 1.1 above, upon reaching Prospect Payout (as defined below), an undivided twenty-five percent (25%) of the interest of each of the Participants in all leases covering lands located within the AMI, including, but not limited to, the Leases, other than Sklarco and JJS, shall automatically and permanently vest in Sklarco and JJS, proportionately as reflected on Exhibit A to the JOA identified in Subsection 2.1 below, thereby proportionately reducing each Participant's interest (the "**Revisionary Back-In Working Interest**"). Sklarco and JSS, et al are parties to that certain "Agreement For Termination Of Agency Services Agreements" dated effective as of January 1, 2010, and the RBWI shall be allocated between Sklarco and JSS pursuant to the terms of said agreement. At Sklarco's written request, those Participants will assign said interest unto Sklarco and JJS after Prospect Payout, including, without limitation, a like interest from and after the effective date of Prospect Payout in all leases covering lands located within the AMI, including, but not limited to, the Leases, the Initial Well and any subsequent wells, the proceeds from the sale of oil, gas, and all other products produced or derived from any

and all such wells, and in any easements, rights of way, personal property, equipment, facilities, and pipelines associated with such wells.

"**Prospect Payout**" is defined on an AMI (not a prospect-by-prospect or well-by-well ) basis as the first day of the calendar month following the month in which a Participant's share of the total and cumulative revenue received from the sale of oil, gas and other hydrocarbons and minerals produced, saved and sold from all prospects located with the AMI, which shall consist of the Prospect and all Future Prospect(s), if any, within which a Participant has elected to participate within the AMI, equals that Participant's share of the total and cumulative costs and expenses incurred by that Participant relating to all such prospects. For purposes of Prospect Payout, (i) the total and cumulative revenue shall consist of the Participant's share of all sales proceeds received for all oil, gas and other hydrocarbons and minerals produced, saved and sold from the AMI, and (ii) the total and cumulative cost incurred shall include the Participant's share of all royalty and overriding royalty payments, severance, ad valorem, production, and other taxes applicable to production and not measured by the Participant's other income, the Prospect Fee, Future Prospect Fee(s), all lease acquisition and maintenance costs, all seismic permit, survey and data costs, geological and geophysical evaluation costs, all costs for site preparation, drilling, reworking, deepening, sidetracking, logging, stimulation, testing, equipping, operating, and plugging and abandoning the Initial Well, Future Prospect initial wells, and all other wells within the AMI, and the cost of all surface damages, pipelines, gathering and other production handling facilities related thereto. Before Prospect Payout has occurred, the status of the Prospect (and Future Prospects, as applicable) is sometimes hereinafter referred to as **Before Prospect Payout** ("**BPPO**"). Once Prospect Payout has occurred, the status of the Prospect (and Future Prospects, as applicable) is sometimes hereinafter referred to as **After Prospect Payout** ("**APPO**").

## Article II. Operations

### Section 2.1. JOA

SEC is hereby designated Operator of all wells drilled within the Prospect and Future Prospects or land outlined therewith. Except as otherwise provided in this Agreement, all operations within the Contract Area shall be governed by the joint operating agreement (the "**JOA**") covering the Contract Area attached hereto as **Exhibit "D."** The Parties agree to execute the JOA concurrent with their execution of this Agreement. In the event of a conflict between this Agreement and the JOA, this Agreement shall govern and control.

## Article III. Miscellaneous

### Section 3.1. AMI

The Parties have formed an AMI under the terms contained in Article XV.W of the JOA covering the lands within the blue outline on the plat attached hereto as Exhibit "A" which shall govern the acquisition, extension, or renewal by any of the Parties of any oil and gas lease, including the Leases, or oil and gas interest (as defined in the JOA) covering lands located within the AMI created under this Agreement, including, but not limited to, the Prospect and Future Prospects. Culver shall not be subject to the AMI with respect to those lands located within the green outline on the plat attached hereto as Exhibit "A", which areas are further identified as the "**Culver Excluded Areas.**" If a lease is acquired from a lessee, the term "**Lessor's Burden**" as used in paragraph 1.1, above, shall include any overriding royalty interest, production payment, or other burden created by any lessee of the lease prior to its acquisition or reserved in the assignment of the lease to the Party which acquires the lease. The Reversionary Back-In Working Interest described in Section 1.3 of this Agreement and ORRI and APOWI described in Subsection 1.1(c) shall also burden new leases acquired under the AMI in which Sklarco also acquires an interest.

As, more fully set forth in the Article XV.W of the JOA, and as will be set forth in the JOAs for Future Prospects, an Acquiring Party (as defined in the JOA) shall make an offer of an oil and gas lease or interest to an Offeree(s) (as defined in the JOA) in accordance with the following:

1. If the oil and gas lease or interest covers a portion of lands located within the contract area of the Prospect or any single Future Prospect, then the Acquiring Party shall offer the entirety of such lease or interest to the participants within such prospect;

2. If the oil and gas lease or interest does not cover any portion of lands located within the contract areas of the Prospect or any Future Prospect(s), then the Acquiring Party shall offer such lease or interest to the Participants of the Prospect; or

3. If the oil and gas lease or interest covers a portion of lands located within the contract areas of multiple prospects, including the Prospect and/or any Future Prospect(s), then the Acquiring Party shall offer such lease or interest to the participants within all such prospects; and such offer shall be allocated between the multiple prospects b ased on the ratio of net mineral acres

7

contained within each prospect as compared with the total net mineral acres contained in all such prospects.

### Section 3.2. Information

Upon execution of this Agreement by all of the Parties, any Participant may request and shall be entitled to a copy of all of the Leases and of any other title information such as any abstracts of title or drill-site title opinions for the drill-site tract of and drilling unit for the Initial Well, along with drilling and completion and log reports for the Initial Well and any subsequent wells.

### Section 3.3. Confidentiality

The Parties agree to keep confidential and not disclose any information about the Seismic Prospect, the Prospect, and any Future Prospect(s), not already disclosed or of public record, to third parties except as required by statutes, regulations, or court order for so long as this Agreement is in effect, but not to exceed five (5) years from the date of this Agreement.

### Section 3.4. Closing

Closing shall occur by mail or by such other means and at such time and place to which the Parties mutually agree.

### Section 3.5. Binding On Successors And Assigns

This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and assigns.

### Section 3.6. Entire Agreement

This Agreement and its attachments constitute the entire agreement of the Parties with respect to the subject matter hereof, and any other promises, inducements, representations, warranties, or agreements with respect to the subject matter hereof have been superseded hereby and are not intended to survive this Agreement. Except as otherwise expressly provided herein, no amendment or modification of this Agreement shall be effective unless set forth in writing and signed by a duly authorized officer of each and all of the Parties.

### Section 3.7. Severability

The invalidity of any one or more of the provisions of this Agreement does not affect the remaining portions of this Agreement, and in case of any such invalidity, this Agreement should be construed as if the invalid provision(s) had not been inserted.

### Section 3.8. Notices

All notices between the Parties authorized or required by any of the provisions of this Agreement, unless otherwise expressly provided, shall be given in writing by email or facsimile or regular or express mail, addressed to those of the Parties to whom the notice is given at the email addresses or fax telephone numbers and addresses set forth in Exhibit "A" to the JOA. Any of the Parties may change its designated email address, fax telephone number and address at any time, and from time to time, by giving written notice thereof to the other Parties.

### Section 3.9. Headings for Convenience

The article, section and subsection headings used in this Agreement are inserted for convenience only and shall not be regarded in construing this Agreement.

### Section 3.10. Time

Time is of the essence hereunder.

### Section 3.11. Governing Law

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Texas.

### Section 3.12.  Relationship Of The Parties

Liability of the Parties hereto shall be several and not joint or collective.  Each Party shall make its own elections under this Agreement and shall be responsible only for its obligations as herein set out.  It is not the intention of the Parties to create, nor shall this Agreement be construed as creating, a mining or other partnership, joint venture, or association between the Parties.

### Section 3.13.  Assignability

The Parties to this Agreement may assign all or part of their rights and obligations hereunder, provided, however, that any such assignment must be made subject to the terms and conditions of this Agreement and the JOA.

### Section 3.14.  Term

This Agreement shall remain in full force and effect as between the Parties until expiration of the last lease jointly owned by them, or any combination of the Parties, covering any part of the AMI.

### Section 3.15.  Counterparts

This Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

### Section 3.16.  Sophisticated Investors

By execution of this Agreement, the Participants confirm that they have a working knowledge of the oil and gas industry and that each has thoroughly investigated its participation in the Seismic Prospect and the Prospect.  Each Participant acknowledges that it is a sophisticated investor and it (or its owner) has a financial net worth in excess of one million dollars.  Each Participant represents it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of not just its share of the Prospect Fee and drilling advance, but also its share of all other costs incurred in operations on the Prospect.  EACH PARTICIPANT ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES.  Each Participant further confirms and accepts that the offering of the interest herein purchased has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the States of Louisiana or Texas, or any other state.  Each Participant has hereby agreed to participate in the Seismic Prospect and the Prospect, for investment purposes only, and not with a view to or for sale in connection with any distribution of interests in the Seismic Prospect and the Prospect within the meaning of said laws.

THUS DONE AND SIGNED This _15th_ day of _November_, 2013, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By _____
David A. Barlow
President - Chief Operating Officer

SKLARCO L.L.C.

By _____
David A. Barlow
President - Chief Operating Officer

MCCOMBS ENERGY, LTD.

By_____
       Ricky Haikin
       Vice President


JJS WORKING INTERESTS LLC
By     Houston Bulldog Capital Management, LLC

By_____
       Justin Simons Manager of Houston Bulldog Capital
       Management, LLC


_____
       James Fleet Howell


KUDZU OIL PROPERTIES, LLC

By_____
       R. Nash Neyland
       Executive Vice President


TIEMBO LTD.
By  Simba Investors L.L.C., General Partner of Tiembo Ltd.

By_____
       Mark Rauch, Member of Simba Investors L.L.C.


BUNDERO INVESTMENT COMPANY, L.L.C.

By_____
       Robert P. Bowman, Manager


_____
       Bennett Greenspan


FAIR OIL LTD.
By Fair Oil Company of Texas, Inc.

By_____
       John R. Garrett, President of Fair Oil Company of
       Texas, Inc.

R. L. RAY, LTD.

By_____
       John D. Hills, General Partner


FANT ENERGY LIMITED
By Richard E. Fant L.L.C.

By_____
       Richard E. Fant
       Manager of Richard E. Fant L.L.C.


LUCAS PETROLEUM GROUP, INC.

By_____
       Fain Brock, President


CULVER & CAIN, PRODUCTION LLC

By_____
       Matthew R. Culver, Manager


Attachments

| Exhibit "A": | Plat |
|---|---|
| Exhibit "A-1": | Description of Leases |
| Exhibit "B": | Form of Assignment |
| Exhibit "C": | AFE |
| Exhibit "D": | JOA |
| Exhibit "E": | Seismic Data License Agreement |
| Exhibit "F-1": | Letter Agreement |
| Exhibit "F-2": | Letter Agreement Amendment |

11

### ACKNOWLEDGMENTS

STATE OF ~~LOUISIANNA~~ *COLORADO*
~~PARISH~~ OF ~~CADDO~~ *COUNTY BOULDER*

I, *GEOFFREY DAVID NENNINGER* a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___15TH___ day of ___NOVEMBER___, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: *AUGUST 15, 2017*

> GEOFFREY DAVID NENNINGER
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY ID 20134051884
> MY COMMISSION EXPIRES AUGUST 15, 2017

STATE OF ~~LOUISIANNA~~ *COLORADO*
~~PARISH~~ OF ~~CADDO~~ *COUNTY BOULDER*

I, *GEOFFREY DAVID NENNINGER*, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___15TH___ day of ___NOVEMBER___, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: *AUGUST 15, 2017*

> GEOFFREY DAVID NENNINGER
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY ID 20134051884
> MY COMMISSION EXPIRES AUGUST 15, 2017

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRIS

      I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                  _____
                                    NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                    _____
                                    Notary Public

[AFFIX NOTARIAL SEAL]

My commission expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                    _____
                                    NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as member of Simba Investors, L.L.C., The General Partner of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2013.


                                     _____
                                     NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2013.


                                     _____
                                     NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that BENNETT GREENSPAN, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

     Given under my hand and notarial seal this the _____ day of _____, 2013.


                                     _____
                                     Notary Public

[AFFIX NOTARIAL SEAL]

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

    I, the undersigned notary public in and for said County in said State, hereby certify John R. Garrett, whose name as President of Fair Oil Company of Texas, Inc., the General Partner of FAIR OIL LTD., a Texas limited partnership, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

        Given under my hand and notarial seal this the _____ day of _____, 2013.

                                        _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that John D. Hills, whose name as General Manager for R. L. RAY, LTD a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

        Given under my hand and notarial seal this the _____ day of _____, 2013.

                                          _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Stephen Swan, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

        Given under my hand and notarial seal this the _____ day of _____, 2013.

                                          _____
                                        NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Fain Brock, whose name as President of LUCAS PETROLEUM GROUP, INC., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2013.

                                 _____
                                 NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Matthew R. Culver, whose name as Manager of CULVER & CAIN PRODUCTION LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2013.

                                 _____
                                 NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

## EXHIBIT "A"

Attached to and made a part of that certain Participation and Exploration Agreement (West Tyler 3D Seismic Prospect) dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group Inc., and Culver & Cain.

PLAT



EXHIBIT "A-1"

Attached to and made a part of that certain Participation and Exploration Agreement (West Tyler 3D Seismic Prospect) dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group Inc., and Culver & Cain.

## DESCRIPTION OF LEASES

1. Oil, Gas and Mineral Lease dated 12/18/2012, by and between Mary Catherine Campbell, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00007409, of the Official Records of Smith County, Texas

2. Oil, Gas and Mineral Lease dated 01/03/2013, by and between Lometa Hudnall Cox Trust No. Two Trustees, Lometa Hudnal! Cox & Sam Roosth, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00007103, of the Official Records of Smith County, Texas

3. Oil, Gas and Mineral Lease dated 01/03/2013, by and between Ogden Sharon Hudnall Trust No. 2, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00008200, of the Official Records of Smith County, Texas

4. Oil, Gas and Mineral Lease dated 01/09/2013, by and between Evergreen Memorial Park C/O Tom Tatum, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00008201, of the Official Records of Smith County, Texas

5. Oil, Gas and Mineral Lease dated 01/09/2013, by and between Eugene Motley Oliver, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00008202, of the Official Records of Smith County, Texas

6. Oil, Gas and Mineral Lease dated 01/15/2013, by and between Katherine Louise Ginn, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00007102, of the Official Records of Smith County, Texas

7. Oil, Gas and Mineral Lease dated 01/14/2013, by and between Marsha Ann High, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00007101, of the Official Records of Smith County, Texas

8. Oil, Gas and Mineral Lease dated 01/15/2013, by and between Martha Ann Mullins, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00009556, of the Official Records of Smith County, Texas

9. Oil, Gas and Mineral Lease dated 01/24/2013, by and between Thomas T. Tatum, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00009557, of the Official Records of Smith County, Texas

10. Oil, Gas and Mineral Lease dated 02/01/2013, by and between Mary S. Jarvis and Ben E. Jarvis, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00009555, of the Official Records of Smith County, Texas

11. Oil, Gas and Mineral Lease dated 01/29/2013, by and between Carol Cook Baremore, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012737, of the Official Records of Smith County, Texas

12. Oil, Gas and Mineral Lease dated 01/29/2013, by and between William H. Cook, Jr., as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012736, of the Official Records of Smith County, Texas

13. Oil, Gas and Mineral Lease dated 01/15/2013, by and between Susan Louis, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012735, of the Official Records of Smith County, Texas

14. Oil, Gas and Mineral Lease dated 01/14/2013, by and between Robert James Honzell, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012734, of the Official Records of Smith County, Texas

15. Oil, Gas and Mineral Lease dated 02/18/2013, by and between James J. Clark, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012733, of the Official Records of Smith County, Texas

16. Oil, Gas and Mineral Lease dated 02/18/2013, by and between Mary Catherine Campbell, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012738, of the Official Records of Smith County, Texas

17. Oil, Gas and Mineral Lease dated 02/17/2013, by and between Dan V. Matise, Co-Independent Executor of the Estate of Mary Hoyt Matise, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018058, of the Official Records of Smith County, Texas

18. Oil, Gas and Mineral Lease dated 03/18/2013, by and between Mary Catherine Campbell, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027941, of the Official Records of Smith County, Texas

19. Oil, Gas and Mineral Lease dated 03/11/2013, by and between Ben Terry, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027942, of the Official Records of Smith County, Texas

20. Oil, Gas and Mineral Lease dated 03/22/2013, by and between Nathaniel Howard, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018057, of the Official Records of Smith County, Texas

21. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Mozelle Carroll, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018054, of the Official Records of Smith County, Texas

22. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Phillip Allen, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018055, of the Official Records of Smith County, Texas

23. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Loneta Nelson, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018054, of the Official Records of Smith County, Texas

24. Oil, Gas and Mineral Lease dated 03/14/2013, by and between John M Allen, Jr., as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018053, of the Official Records of Smith County, Texas

25. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Jackie Calicutt, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018052, of the Official Records of Smith County, Texas

26. Oil, Gas and Mineral Lease dated 03/26/2013, by and between Mary Catherine Campbell, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027943, of the Official Records of Smith County, Texas

27. Oil, Gas and Mineral Lease dated 03/25/2013 by and between Robert M Clay, as Lessor, and Sklarco, LLC as Lessee recorded as Instrument 2013-00020014, of the Official Records of Smith County, Texas

28. Oil, Gas and Mineral Lease dated 03/25/2013, by and between Corrine A. Tubb, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00020012, of the Official Records of Smith County, Texas

29. Oil, Gas and Mineral Lease dated 03/11/2013, by and between Nanette Sissney, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00020011, of the Official Records of Smith County, Texas

30. Oil, Gas and Mineral Lease dated 03/18/2013, by and between Tanya Cooper, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00020010, of the Official Records of Smith County, Texas

31. Oil, Gas and Mineral Lease dated 03/27/2013, by and between Bennie W. Pettigrew, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00020013, of the Official Records of Smith County, Texas

32. Oil, Gas and Mineral Lease dated 03/22/2013, by and between Carole Ann Pool, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00020008, of the Official Records of Smith County, Texas

33. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Mildred Allen, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-000200009, of the Official Records of Smith County, Texas

34. Oil, Gas and Mineral Lease dated 08/07/2013, by and between Bette Huff King, as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas and Mineral Lease dated 08/07/2013, recorded as Instrument 2013-00043437, of the Official Records of Smith County, Texas

35. Oil, Gas and Mineral Lease dated 03/01/2013, by and between Gladys Houston Mosley, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027944, of the Official Records of Smith County, Texas

36. Oil, Gas and Mineral Lease dated 04/03/2013, by and between Tyler Iron & Metal, Inc. c/o Tom Salome, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027945, of the Official Records of Smith County, Texas

37. Oil, Gas and Mineral Lease dated 03/27/2013, by and between Charles E. Sanders, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027946, of the Official Records of Smith County, Texas

38. Oil, Gas and Mineral Lease dated 03/30/2013, by and between Kinsey Holdings, Ltd. by Rickey Kinsey, President, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027948, of the Official Records of Smith County, Texas

39. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Debra Carliss Shannon as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027947, of the Official Records of Smith County, Texas

40. Oil, Gas and Mineral Lease dated 05/07/2013, by and between JNP Investments I, LTD by JNP Investments LLC, as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas, and Mineral Lease dated 05/07/2013, recorded as Instrument 2013-00041719, of the Official Records of Smith County, Texas

41. Oil, Gas and Mineral Lease dated 04/23/2013, by and between Fair Investments, Ltd., as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas, and Mineral Lease dated 04/23/2012, recorded as Instrument 2013-00030432, of the Official Records of Smith County, Texas

42. Oil, Gas and Mineral Lease dated 04/23/2013, by and between Fairway Ranches, Ltd., as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas and Mineral Lease dated 04/23/2012, recorded as Instrument 2013-00030430, of the Official Records of Smith County, Texas

43. Oil, Gas and Mineral Lease dated 04/23/2013, by and between Estate of James Waiter Fair, as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas, and Mineral Lease dated 04/23/2012, recorded as Instrument 2013-00030431, of the Official Records of Smith County, Texas

44. Oil, Gas and Mineral Lease dated 06/28/2013, by and between Keenan Browning Dowdy, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00035184, of the Official Records of Smith County, Texas

45. Oil, Gas and Mineral Lease dated 06/28/2013, by and between Gaylan Sasgier William C. Brooks, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00035185, of the Official Records of Smith County, Texas

46. Oil, Gas and Mineral Lease dated 06/28/2013, by and between Kathryn Harris, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00035186, of the Official Records of Smith County, Texas

47. Oil, Gas and Mineral Lease dated 06/26/2013, by and between Marvin Keith Patterson, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00035187, of the Official Records of Smith County, Texas

48. Oil, Gas and Mineral Lease dated 05/07/2013, by and between Marilyn L. Richey, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00035188, of the Official Records of Smith County, Texas

49. Oil, Gas and Mineral Lease dated 07/16/2013, by and between Billie H. Hoskins, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00041720, of the Official Records of Smith County, Texas

50. Oil, Gas and Mineral Lease dated 08/05/2013, by and between Georgia Smith, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00043438, of the Official Records of Smith County, Texas

51. Oil, Gas and Mineral Lease dated 05/07/2013, by and between Diana Dunnam Hill, as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas and Mineral Lease dated 05/07/2013, recorded as Instrument 2013-00041721, of the Official Records of Smith County, Texas

52. Oil, Gas and Mineral Lease dated 05/07/2013, by and between James M. Hill, as Lessor, and Sklarco, LLC as Lessee, as evidenced by that certain Memorandum of Oil, Gas and Mineral Lease dated 05/07/2013, recorded as Instrument 2013-00041722, of the Official Records of Smith County, Texas.

## EXHIBIT "B"

Attached to and made a part of that certain Participation and Exploration Agreement (West Tyler 3D Seismic Prospect) dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group Inc., and Culver & Cain.

### FORM OF ASSIGNMENT

STATE OF TEXAS,

COUNTY OF SMITH

KNOW ALL MEN BY THESE PRESENTS That:

SKLARCO L.L.C., a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President - Chief Operating Officer, David A. Barlow ("Sklarco" OR "Assignor");

for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the reversionary back-in working interest described hereinbelow, does hereby grant, bargain, sell, convey, assign, set over and transfer unto (hereinafter sometimes referred to collectively as the "Assignees" or individually as an "Assignee"):

MCCOMBS ENERGY, LTD., a Texas limited partnership, whose address is 5599 San Felipe, Suite 1200, Houston, Texas 77056-2794, represented herein by its Vice President, Ricky Haikin ("McCombs");

JJS WORKING INTERESTS LLC, a Texas limited liability company, whose address is 4295 San Felipe, Suite 207, Houston, Texas 77027, represented herein by Houston Bulldog Capital Management, LLC, its duly authorized Manager, represented herein by Justin Simons, in his capacity as the duly authorized Manager of Houston Bulldog Capital Management, LLC ("JJS");

JAMES FLEET HOWELL, whose address is 416 Travis Street, Suite 715, Shreveport, Louisiana 71101 ("Howell");

KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, whose address is 300 Concourse Blvd., Suite 101, Ridgeland, Mississippi 39157, represented herein by its Executive Vice President, R. Nash Neyland ("Kudzu");

TIEMBO, LTD., a Texas limited partnership, whose address is P. O. Box 270415, Houston, Texas 77277-0415, represented herein by its Registered Agent, Mark Rauch ("Tiembo");

BUNDERO INVESTMENT COMPANY, L.L.C., a Louisiana limited liability company, whose address is 333 Texas Street, Suite 300, Shreveport, Louisiana 71101, represented herein by its Manager, Robert P. Bowman ("Bundero");

BENNETT GREENSPAN, whose address is 5207 Braeburn Drive, Bellaire, Texas 77401 ("Greenspan");

**FAIR OIL LTD**, a Texas limited partnership, whose address is 225 South College, Tyler, Texas 75702, represented herein Fair Oil Company of Texas, Inc., its sole General Partner, represented herein by its President, John R. Garrett ("**Fair**");

**R. L. RAY, LTD**, a Texas limited partnership, whose address is 223 South College, Tyler, Texas 75702, represented herein by its General Partner, John D. Hills ("**Ray**");

**FANT ENERGY LIMITED**, a Texas limited partnership, represented herein by its General Partner, Richard E. Fant L.L.C., which itself is represented herein by its Manager, Richard E. Fant ("**Fant**");

**LUCAS PETROLEUM GROUP, INC.** a Texas corporation, whose address is 327 Congress Avenue., Suite 500, Austin, Texas 78701, represented herein by its President, Fain Brock ("**Lucas**"); and

**CULVER & CAIN, PRODUCTION LLC**, a Texas limited liability company, whose address is 121 S. Broadway, Suite 760, Tyler, Texas 75702, represented herein by Matthew R. Culver, its Manager ("**Culver**")

an undivided Seventy Five percent Before Payout Interest (75% BPO), and an undivided Fifty Nine point Five Zero Four percent After Payout Interest (59.504% APO) in all of its right, title and interest in and to the oil, gas and other mineral leases (the "**Leases**") described in Exhibit "A" attached hereto and by reference made a part hereof and the rights, estates and interests of the lessee thereunder, in the proportions set forth below as to each such Assignee's name:

| ASSIGNEES | BPO INTEREST | APO INTEREST |
|---|---|---|
| Participant | Proportion | Proportion |
| McCombs | 25.0000% | 18.7500% |
| JJS | 5.0000% | 7.8200% |
| Howell | 5.0000% | 3.7500% |
| Kudzu | 5.0000% | 3.7500% |
| Tiembo | 2.0000% | 1.5000% |
| Bundero | 2.0000% | 1.5000% |
| Greenspan | 1.0000% | 0.7500% |
| Fair | 11.5000% | 8.6250% |
| Ray | 5.5000% | 4.1250% |
| Fant | 10.0000% | 7.5000% |
| Lucas | 2.0000% | 1.5000% |
| Culver | 1.0000% | 0.7500% |
| | | |
| Total | 75.0000% | 60.3200% |

Assignor does hereby except from this Assignment and reserve unto itself the following before payout (BPO) and after payout (APO) interests in and to the Leases and the rights, estates and interests of the lessee thereunder, to-wit:

| | BPO | APO |
|---|---|---|
| Sklarco | 25% | 39.68% |

TO HAVE AND TO HOLD unto the Assignees, their successors and assigns, forever, subject to, and in accordance with, the following terms and provisions:

1.   This Assignment is made effective as of October 1, 2013 (the "**Effective Date**").

2.   The Assignment of leasehold interest made herein is made without warranty of title, express or implied, not even return for the purchase price, except that Assignor warrants title against all defects arising out of claims by Assignor or of persons claiming by, through or under Assignor. Additionally, this Assignment is made with transfer and subrogation of all rights and warranties of Assignor and of all prior owners of the Leases and/or the Lands unto Assignees.

3.   This Assignment, and the interest assigned hereunder, is made subject to the terms and conditions of the Leases and the JOA covering the Contract Area.

4.   This Assignment is also made in accordance with and subject to that certain Participation Agreement dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C, McCombs Energy, Ltd., JJS Working Interests LLC, Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd.., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group Inc. and Culver & Cain,  and all attachments thereto, including that certain Joint Operating Agreement dated October 1, 2013, by and between Sklar Exploration Company L.L.C., as Operator, and Sklarco L.L.C. et al., as Non-Operators, and all of the terms and provisions of that Participation Agreement and its attachments.  Without limitation upon the foregoing, this Assignment is made subject to the terms of Section 1.1(c) of the Participation Agreement providing for an overriding royalty interest in favor of Walker Interest LLC and Section 1.3 of the Participation Agreement providing for a reversionary back-in working interest after payout to Sklarco and JJS, 25% of the interest assigned herein to certain Assignees.

5.   This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

SKLARCO L.L.C.

Printed Name:_____    _____

                                        DAVID A. BARLOW
                                        President – Chief Operating Officer

Printed Name:_____

                                        McCOMBS ENERGY, LTD.

Printed Name:_____    _____

                                        RICKY HAIKIN, Vice President

Printed Name:_____

JJS WORKING INTERESTS LLC
By Houston Bulldog Capital Management, LLC,
its Manager

Printed Name:_____

JUSTIN SIMONS, Manager of Houston
Bulldog Capital Management, LLC

Printed Name:_____


Printed Name:_____

FLEET HOWELL

Printed Name:_____



KUDZU OIL PROPERTIES, LLC

Printed Name:_____

R. NASH NEYLAND, Executive Vice-
President

Printed Name:_____



TIEMBO LTD.
By Simba Investors L.L.C., General Partner of
Tiembo Ltd.

Printed Name:_____

MARK RAUCH, Member of Simba Investors
L.L.C.  The General Partner of Tiembo, Ltd.

Printed Name:_____



BUNDERO INVESTMENT COMPANY,
L.L.C.

Printed Name:_____

ROBERT P. BOWMAN, Manager

Printed Name:_____

Printed Name:_____

Printed Name:_____

BENNETT GREENSPAN
_____


FAIR OIL LIMITED
By Fair Oil Company of Texas, Inc., its sole
General Partner

Printed Name:_____

JOHN R. GARRETT, President of Fair Oil
Company of Texas, Inc.
_____

Printed Name:_____


R. L. RAY, LTD.

Printed Name:_____

JOHNS D. HILLS, President
_____

Printed Name:_____


FANT ENERGY LIMITED
By Richard E. Fant L.L.C.

Printed Name:_____

RICHARD E. FANT
Manager of Richard E. Fant L.L.C.
_____

Printed Name:_____


LUCAS PETROLEUM GROUP INC.

Printed Name:_____

FAIN BROCK, President
_____

Printed Name:_____

CULVER & CAIN, PRODUCTION LLC

_____          _____
Printed Name:_____          Matthew R. Culver, Manager


_____
Printed Name:_____

## ACKNOWLEDGMENTS

STATE OF LOUISIANNA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANNA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRIS

     I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

     I, _____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

     Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
Notary Public

[AFFIX NOTARIAL SEAL]

My commission expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as member of Simba Investors, L.L.C., The General Partner of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

 

                                      _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

 

STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                        _____
                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

 

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that BENNETT GREENSPAN, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

      Given under my hand and notarial seal this the _____ day of _____, 2013.

                                        _____
                                        Notary Public

[AFFIX NOTARIAL SEAL]

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

I, the undersigned notary public in and for said County in said State, hereby certify John R. Garrett, whose name as President of Fair Oil Company of Texas, Inc., the General Partner of FAIR OIL LTD., a Texas limited partnership, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that John D. Hills, whose name as General Manager for R. L. RAY, LTD a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Stephen Swan, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

  I, _____, a notary public in and for said County and State, hereby certify that Fain Brock, whose name as President of LUCAS PETROLEUM GROUP, INC., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2013.

              _____
              NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

  I, _____, a notary public in and for said County and State, hereby certify that Matthew R. Culver, whose name as Manager of CULVER & CAIN PRODUCTION LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2013.

              _____
              NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

### EXHIBIT "A"

Attached to and made a part of that certain Assignment dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group Inc., and Culver & Cain.

### DESCRIPTION OF LEASES

1. Oil, Gas and Mineral Lease dated 12/18/2012, by and between Mary Catherine Campbell, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00007409, of the Official Records of Smith County, Texas

2. Oil, Gas and Mineral Lease dated 01/03/2013, by and between Lometa Hudnall Cox Trust No. Two Trustees, Lometa Hudnal! Cox & Sam Roosth, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00007103, of the Official Records of Smith County, Texas

3. Oil, Gas and Mineral Lease dated 01/03/2013, by and between Ogden Sharon Hudnall Trust No. 2, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00008200, of the Official Records of Smith County, Texas

4. Oil, Gas and Mineral Lease dated 01/09/2013, by and between Evergreen Memorial Park C/O Tom Tatum, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00008201, of the Official Records of Smith County, Texas

5. Oil, Gas and Mineral Lease dated 01/09/2013, by and between Eugene Motley Oliver, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00008202, of the Official Records of Smith County, Texas

6. Oil, Gas and Mineral Lease dated 01/15/2013, by and between Katherine Louise Ginn, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00007102, of the Official Records of Smith County, Texas

7. Oil, Gas and Mineral Lease dated 01/14/2013, by and between Marsha Ann High, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00007101, of the Official Records of Smith County, Texas

8. Oil, Gas and Mineral Lease dated 01/15/2013, by and between Martha Ann Mullins, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00009556, of the Official Records of Smith County, Texas

9. Oil, Gas and Mineral Lease dated 01/24/2013, by and between Thomas T, Tatum, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00009557, of the Official Records of Smith County, Texas

10. Oil, Gas and Mineral Lease dated 02/01/2013, by and between Mary S. Jarvis and Ben E. Jarvis, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00009555, of the Official Records of Smith County, Texas

11. Oil, Gas and Mineral Lease dated 01/29/2013, by and between Carol Cook Baremore, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012737, of the Official Records of Smith County, Texas

12. Oil, Gas and Mineral Lease dated 01/29/2013, by and between William H. Cook, Jr., as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012736, of the Official Records of Smith County, Texas

13. Oil, Gas and Mineral Lease dated 01/15/2013, by and between Susan Louis, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012735, of the Official Records of Smith County, Texas

14. Oil, Gas and Mineral Lease dated 01/14/2013, by and between Robert James Honzell, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012734, of the Official Records of Smith County, Texas

15. Oil, Gas and Mineral Lease dated 02/18/2013, by and between James J. Clark, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012733, of the Official Records of Smith County, Texas

16. Oil, Gas and Mineral Lease dated 02/18/2013, by and between Mary Catherine Campbell, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012738, of the Official Records of Smith County, Texas

17. Oil, Gas and Mineral Lease dated 02/17/2013, by and between Dan V. Matise, Co-Independent Executor of the Estate of Mary Hoyt Matise, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018058, of the Official Records of Smith County, Texas

18. Oil, Gas and Mineral Lease dated 03/18/2013, by and between Mary Catherine Campbell, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027941, of the Official Records of Smith County, Texas

19. Oil, Gas and Mineral Lease dated 03/11/2013, by and between Ben Terry, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027942, of the Official Records of Smith County, Texas

20. Oil, Gas and Mineral Lease dated 03/22/2013, by and between Nathaniel Howard, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018057, of the Official Records of Smith County, Texas

21. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Mozelle Carroll, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018054, of the Official Records of Smith County, Texas

22. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Phillip Allen, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018055, of the Official Records of Smith County, Texas

23. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Loneta Nelson, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018054, of the Official Records of Smith County, Texas

24. Oil, Gas and Mineral Lease dated 03/14/2013, by and between John M Allen, Jr., as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018053, of the Official Records of Smith County, Texas

25. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Jackie Calicutt, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018052, of the Official Records of Smith County, Texas

26. Oil, Gas and Mineral Lease dated 03/26/2013, by and between Mary Catherine Campbell, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027943, of the Official Records of Smith County, Texas

27. Oil, Gas and Mineral Lease dated 03/25/2013 by and between Robert M Clay, as Lessor, and Sklarco, LLC as Lessee recorded as Instrument 2013-00020014, of the Official Records of Smith County, Texas

28. Oil, Gas and Mineral Lease dated 03/25/2013, by and between Corrine A. Tubb, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00020012, of the Official Records of Smith County, Texas

29. Oil, Gas and Mineral Lease dated 03/11/2013, by and between Nanette Sissney, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00020011, of the Official Records of Smith County, Texas

30. Oil, Gas and Mineral Lease dated 03/18/2013, by and between Tanya Cooper, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00020010, of the Official Records of Smith County, Texas

31. Oil, Gas and Mineral Lease dated 03/27/2013, by and between Bennie W. Pettigrew, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00020013, of the Official Records of Smith County, Texas

32. Oil, Gas and Mineral Lease dated 03/22/2013, by and between Carole Ann Pool, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00020008, of the Official Records of Smith County, Texas

33. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Mildred Allen, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-000200009, of the Official Records of Smith County, Texas

34. Oil, Gas and Mineral Lease dated 08/07/2013, by and between Bette Huff King, as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas and Mineral Lease dated 08/07/2013, recorded as Instrument 2013-00043437, of the Official Records of Smith County, Texas

35. Oil, Gas and Mineral Lease dated 03/01/2013, by and between Gladys Houston Mosley, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027944, of the Official Records of Smith County, Texas

36. Oil, Gas and Mineral Lease dated 04/03/2013, by and between Tyler Iron & Metal, Inc. c/o Tom Salome, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027945, of the Official Records of Smith County, Texas

37. Oil, Gas and Mineral Lease dated 03/27/2013, by and between Charles E. Sanders, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027946, of the Official Records of Smith County, Texas

38. Oil, Gas and Mineral Lease dated 03/30/2013, by and between Kinsey Holdings, Ltd. by Rickey Kinsey, President, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027948, of the Official Records of Smith County, Texas

39. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Debra Carliss Shannon as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027947, of the Official Records of Smith County, Texas

40. Oil, Gas and Mineral Lease dated 05/07/2013, by and between JNP Investments I, LTD by JNP Investments LLC, as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas, and Mineral Lease dated 05/07/2013, recorded as Instrument 2013-00041719, of the Official Records of Smith County, Texas

41. Oil, Gas and Mineral Lease dated 04/23/2013, by and between Fair Investments, Ltd., as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas, and Mineral Lease dated 04/23/2012, recorded as Instrument 2013-00030432, of the Official Records of Smith County, Texas

42. Oil, Gas and Mineral Lease dated 04/23/2013, by and between Fairway Ranches, Ltd., as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas and Mineral Lease dated 04/23/2012, recorded as Instrument 2013-00030430, of the Official Records of Smith County, Texas

43. Oil, Gas and Mineral Lease dated 04/23/2013, by and between Estate of James Waiter Fair, as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas, and Mineral Lease dated 04/23/2012, recorded as Instrument 2013-00030431, of the Official Records of Smith County, Texas

44. Oil, Gas and Mineral Lease dated 06/28/2013, by and between Keenan Browning Dowdy, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00035184, of the Official Records of Smith County, Texas

45. Oil, Gas and Mineral Lease dated 06/28/2013, by and between Gaylan Sasgier William C. Brooks, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00035185, of the Official Records of Smith County, Texas

46. Oil, Gas and Mineral Lease dated 06/28/2013, by and between Kathryn Harris, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00035186, of the Official Records of Smith County, Texas

47. Oil, Gas and Mineral Lease dated 06/26/2013, by and between Marvin Keith Patterson, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00035187, of the Official Records of Smith County, Texas

48. Oil, Gas and Mineral Lease dated 05/07/2013, by and between Marilyn L. Richey, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00035188, of the Official Records of Smith County, Texas

49. Oil, Gas and Mineral Lease dated 07/16/2013, by and between Billie H. Hoskins, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00041720, of the Official Records of Smith County, Texas

50. Oil, Gas and Mineral Lease dated 08/05/2013, by and between Georgia Smith, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00043438, of the Official Records of Smith County, Texas

51. Oil, Gas and Mineral Lease dated 05/07/2013, by and between Diana Dunnam Hill, as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas and Mineral Lease dated 05/07/2013, recorded as Instrument 2013-00041721, of the Official Records of Smith County, Texas

52. Oil, Gas and Mineral Lease dated 05/07/2013, by and between James M. Hill, as Lessor, and Sklarco, LLC as Lessee, as evidenced by that certain Memorandum of Oil, Gas and Mineral Lease dated 05/07/2013, recorded as Instrument 2013-00041722, of the Official Records of Smith County, Texas.

**EXHIBIT "D"**

Attached to and made a part of that certain Participation and Exploration Agreement (West Tyler 3D Seismic Prospect) dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, LTD., Fant Energy Limited, Lucas Petroleum Group Inc., and Culver & Cain.

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

## SWAN PROSPECT
## SMITH COUNTY, TEXAS

OPERATING AGREEMENT

DATED

October 1st , __2013__ ,

OPERATOR   Sklar Exploration Company L.L.C.

CONTRACT AREA   As shown on Exhibit "A" to this Agreement

COUNTY ~~OR PARISH~~ OF   Smith                    STATE OF   Texas

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM. A.A.P.L. NO. 610 – 1982 REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___Sklar Exploration Company L.L.C.___
_____, hereinafter designated and
referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein
as "Non-Operator", and collectively as "Non-Operators".

WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in
Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the
production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

ARTICLE I.
DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons
and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land
lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the
Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be
developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests
are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or
federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-
ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.
                                                                                                              for 100% of
G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay / its share of the cost of
any operation conducted under the provisions of this agreement.
                                                                                                    for 100% of its share of
H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate
in / a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the
singular, and the neuter gender includes the masculine and the feminine.

ARTICLE II.
EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑  A. Exhibit "A", shall include the following information:
   (1) Identification of lands subject to this agreement,
   (2) Restrictions, if any, as to depths, formations, or substances,
   (3) Percentages or fractional interests of parties to this agreement,
   (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
   (5) Addresses of parties for notice purposes.
☑  B. Exhibit "B", Form of Lease.
☑  C. Exhibit "C", Accounting Procedure.
☑  D. Exhibit "D", Insurance.
☑  E. Exhibit "E", Gas Balancing Agreement.
☐  F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
☐  G. Exhibit "G", Tax Partnership.

If any provision of any exhibit, except Exhibits "A" and "E" and "G", is inconsistent with any provision contained in the body
of this agreement, the provisions in the body of this agreement shall prevail. If any provision of Exhibits "A" or "E" is inconsistent with
any provision contained in the body of this Agreement, the provisions of the Exhibit shall prevail.

   *   I. The term "Deepen" shall mean a single operation whereby a well drilled to an objective Zone below the deepest Zone in
         which the well was previously drilled, or below the deepest Zone proposed in the associated AFE, whichever is the
         lesser.
       J. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a
         Completion in a shallower Zone.
       K. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned
         or temporarily isolated in order to attempt a Completion in or commingling with a different Zone within the existing
         wellbore.
       L. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore
         or improve production in a Zone which is currently open to production in the wellbore. Such operations include,
         without limitation, well stimulation operations, but exclude any routine repair or maintenance work or drilling,
         Sidetracking, Deepening, Completing, Recompleting or Plugging Back of a well.
       M. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to
         change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other
         mechanical difficulties.
       N. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas
         separately producible from any other common accumulation of Oil and Gas.

- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982



1
2
3
4  A.  Oil and Gas Interests:
5
6        If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement
7  and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof
8  shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.
9
10  B.  Interests of Parties in Costs and Production:
11
12        Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and
13  paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set
14  forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the
15  payment of royalties to the extent of_____all jointly owned lease burdens_____ which shall be borne as hereinafter set forth.
16
17        Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and
18  payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or
19  cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the
20  other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received
21  by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and
22  receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to
23  such higher price.
24
25        Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.
26
27  C.  Excess Royalties, Overriding Royalties and Other Payments:
28
29        Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty,
30  overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B., such party so
31  burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any
32  and all claims and demands for payment asserted by owners of such excess burden.
33
34  D.  Subsequently Created Interests:
35
36        If any party should hereafter create an overriding royalty, production payment or other burden payable out of production
37  attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or
38  was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and
39  accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the
40  timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred
41  to as "burdened party"), and:
42
43        1.  If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion
44            of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or
45            production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party,
46            or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest;
47            and,
48
49        2.  If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be
50            enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of
51            the burdened party.
52
53                              ARTICLE IV.
54                                TITLES
55
56  A.  Title Examination:
57
58        Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if
59  the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be includ-
60  ed, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding
61  royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and
62  gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status
63  reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or
64  made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall
65  cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party
66  upon request, provided such requesting party has paid 100% of its share of all costs incurred under the provisions of this Agreement
    hereto /. The cost incurred by Operator in this title program shall be borne as follows:
67
68  ☐  Option No. 1:  Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental,
69  shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C",
70  and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE IV**
**continued**

☑ Option No. 2:  Costs incurred by Operator in procuring abstracts / fees paid outside attorneys / for title examination
(including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) / shall be borne by the Drilling Parties
in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
functions.

* Curative matters and materials
** Landman and consultants
*** and for applications and hearings

Operator shall use its best efforts to secure

~~Each party shall be responsible for / securing~~ curative matter and pooling amendments or agreements required in connection
~~subject to this Agreement and charge these fees to the joint account~~
with leases on oil and gas interests ~~contributed by such party~~ /. Operator shall be responsible for the preparation and recording of pooling
designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
This shall not prevent any party from appearing on its own behalf at any such hearing.

No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
provided, and (2) the title has been approved by the examining attorney or title has been accepted by ~~all of the parties who are to par-~~   Operator
~~ticipate in the drilling of the well.~~

B.  Loss of Title:

~~1. Failure of Title:  Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a~~
~~reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days~~
~~from final determination of the title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-~~
~~tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil~~
~~and gas leases and interests and:~~

~~(a)  The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be~~
~~entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,~~
~~but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

~~(b)  There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has~~
~~been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-~~
~~curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract~~
~~Area by the amount of the interest lost;~~

~~(c)  If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is~~
~~increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-~~
~~terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such~~
~~well;~~

~~(d)  Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has~~
~~failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties~~
~~who bore the costs which are so refunded;~~

~~(e)  Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be~~
~~borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and~~

~~(f)  No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest~~
~~claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in~~
~~connection therewith.~~

~~2. Loss by Non-Payment or Erroneous Payment of Amount Due:  If, through mistake or oversight, any rental, shut-in well~~
~~payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,~~
~~there shall be no monetary liability against the party who failed to make the required payment. Unless the party who failed to make the required~~
~~payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,~~
~~which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the~~
~~date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in~~
~~the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the~~
~~required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to~~
~~the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it~~
~~shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled~~
~~or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~

~~(a)  Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,~~
~~up to the amount of unrecovered costs;~~

~~(b)  Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of~~
~~oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease~~
~~termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said~~
~~portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and~~

~~(c)  Any monies, up to the amount of unrecovered costs that may be paid by any party who is, or becomes, the owner of the interest~~
~~lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

3. Other Losses:  All losses incurred, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses
and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
the Contract Area.

- 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE V.**

**OPERATOR**

A.   **Designation and Responsibilities of Operator:**

Sklar Exploration Company L.L.C. shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct ~~all such operations~~ in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

B.   **Resignation or Removal of Operator and Selection of Successor:**

1. **Resignation or Removal of Operator:**  Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, ~~no longer owns an interest hereunder in the Contract Area,~~ or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators / owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. / Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator. * Such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within 30 days from its receipt.

2. **Selection of Successor Operator:**  Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority [voting] interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

3. **Effect of Bankruptcy: See Additional Provisions Article XV.Z.**

C.   **Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D.   **Drilling Contracts:**

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

**ARTICLE VI.**

**DRILLING AND DEVELOPMENT**

A.   **Initial Well:**

On or before the _____31st_____ day of _____December_____ , (year) _____2014_____ , Operator shall commence the drilling of a well for oil and gas at the following location: 5,300' FSL and 2,850' FEL of the Hezekiah George Survey A-367, of Smith County, Texas, or as near thereto as practicable, or at a mutually acceptable location picked after shooting 3D Seismic

and shall thereafter continue the drilling of the well with due diligence to a depth of 8,000' or a depth sufficient to test the Paluxy Formation

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

1    If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the
2    well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

3

4

5

6    B.   Subsequent Operations:

7

                          "any well" includes water source or injection wells

8    1. Proposed Operations:  Should any party hereto desire to drill any well / on the Contract Area other than the well provided
9    for in Article VI.A., or to rework, / deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all
                            reenter, recomplete, sidetrack,
10   the parties and not then producing / in paying quantities, the party desiring to drill, rework, / deepen or plug back such a well shall give the
                          or capable of produced      reenter, recomplete, sidetrack,
                        that have not forfeited their interest in the well
11   other parties / written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
12   tion and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) / days after receipt of the notice
                          fifteen (15)
13   within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill-
                      within the contract area        or facsimile or email
14   ing rig is on location /, notice of a proposal to rework, plug back or drill deeper may be given by telephone / and the response period shall be
                      twenty four (24)
15   limited to / forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays. Failure of a party receiving such notice to reply within
16   the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or
17   response given by telephone shall be promptly confirmed in writing. Not withstanding this Article VI/B.1, and subject to the right of any
18   party to non-consent the proposed operation, a proposal to re-work, recomplete, sidetrack, deepen or plugback a well producing in
        paying quantities, which is consented to by two (2) or more of the Parties own007 two-thirds (2/3rds) or more of the working interest
19   under the well may proceed and be executed on behalf of the Consenting Parties without the unanimous consent of all parties.

20

21

22

23   If all parties elect to participate in such a operation, Operator shall, within ninety (90) days after expiration of the notice
                    fifteen (15)
24   period of / thirty (30) days (or as promptly as possible after the expiration of the / forty-eight (48) hour period when a drilling rig is on loca-
25   tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
26   ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
27   for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
28   permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
29   amination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the
30   actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
31   if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
32   dance with the provisions hereof as if no prior proposal had been made.

33   Operator may, at its discretion, perform preparatory work in connection with, or even actually commence an operation for which
34   notice has been provided under this Article VI.B prior to or during the notice period, and if such operation ultimately is con-
35   ducted by less than all parties, the Consenting Parties shall, nevertheless, be entitled to recover the risk compensation provided for
        hereunder.

36   2. Operations by Less than All Parties:  If any party receiving such notice as provided in Article VI.B.1. or VI.D.1. (Option
37   No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
                        subject to availability of equipment and personnel
38   giving the notice and such other parties as shall elect to participate in the operation shall /, within ninety (90) days after the expiration of
                    twenty four (24)
39   the notice period of / thirty (30) days (or as promptly as possible after the expiration of the / forty-eight (48) hour period when a drilling rig is
40   on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all
41   work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
42   a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
43   tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Con-
44   senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
45   ditions of this agreement.

46

47

48

49   If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
50   notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as
                      twenty four (24)
51   to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within / forty-eight (48) hours
                      either
52   (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-
53   ticipation to such party's interest as shown on Exhibit "A" or (b) carry / its proportionate part of Non-Consenting Parties' interests, and
                      all of
54   failure to so advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for
                    twenty four (24)
55   such a response shall not exceed a total of / forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party,
56   at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

57

58

59

60   The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
61   elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such
62   operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
63   If such an operation results in a dry hole, the Consenting Parties should / plug and abandon the well and restore the surface location at their
                      reentered, recompleted, sidetracked
64   sole cost, risk and expense /. If any well drilled, / reworked, deepened or plugged back under the provisions of this Article results in a pro-
65   ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,
66   *or one of them shall make a proposal to the other Consenting Parties to conduct further operations under Article VI.B

67

68

69

70

- 5 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, recompleting, sidetracking, / deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the entire well / and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or and not just a particular zone therein market value thereof if such share is not sold, (after deducting production taxes, excise taxes, / royalty, overriding royalty and other in-any and all zones within terests not excepted by Article III.D. payable out of or measured by the production from / such well accruing with respect to such interest until it reverts) shall equal the total of the following:

500%
(a) 100% / of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% 200% / of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

re-entering, recompleting, sidetracking,
(b)    500    % of that portion of the costs and expenses of drilling, / reworking, deepening, plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C., and    500    % of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

re-entering, recompleting, sidetracking,
An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any reworking / or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such re-entering, recompleting, sidetracking, reworking / or plugging back operation conducted during the recoupment period shall be deemed part of / the cost of operation of said well five and there shall be added to the sums to be recouped by the Consenting Parties one/ hundred percent (100%) of that portion of the costs of re-entering, recompleting, sidetracking, the reworking / or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If re-entering, recompleting, sidetracking, such a reworking / or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.D.

re-entering, recompleting, sidetracking,
In the case of any reworking, / plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon re-entering, recompleting, sidetracking, abandonment of a well after such reworking, / plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. quarter Each / month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds quarter realized from the sale of the well's working interest production during the preceding /month. In determining the quantity of oil and gas produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

- 6 -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1982

### ARTICLE VI
continued

1     If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2  the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3  Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production
4  therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, re-entering, recompleting, sidetracking, / reworking, deepening or plugging
5  back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6  the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

9     Notwithstanding the provisions of this Article VI.B.2., / and subject to the right of any party to non-consent the proposed operation two (2) or more parties owning two-thirds (2/3rds) or more of the working interest it is agreed that without the mutual consent of / all parties, no wells shall
11 be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
12 well conforms to the then-existing well spacing pattern for such source of supply; provided that an exceptional well location that is
13 approved by the  Railroad Commission of Texas shall be deemed to conform to the then-existing spacing pattern.

16     The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.
17 except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, re-entering, recompleting, sidetracking, / deepening and plugging back of such initial well
18 after if has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-
19 duction, ceases to produce in paying quantities.

23     3.  Stand-By Time:  When a well which has been drilled or deepened has reached its authorized depth and all tests have been
24 completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
25 reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
26 ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
27 first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
28 matical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently
29 withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
30 each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
31 ties.

35     4.  Sidetracking:  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
36 also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
37 location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
38 mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
39 affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
40 to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

44     (a)  If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
45 the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

49     (b)  If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
50 salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
51 provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

55     In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
56 shall be limited to / twenty four (24) forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and
57 receive up to eight (8) additional days after expiration of the / twenty four (24) forty-eight (48) hours within which to respond by paying for all stand-by time
58 incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand
59 by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
60 ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in-
61 stances the response period to a proposal for sidetracking shall be limited to / fifteen (15) thirty (30) days.

65 C.   TAKING PRODUCTION IN KIND:

67     Each party shall / have the right to take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
68 exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for
69 marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any
70 party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5  its share of all production.

6

7      In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share
8  of the oil / produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9  the obligation, to purchase such oil / or sell it to others at any time and from time to time, for the account of the non-taking party ~~at the~~
10  ~~best price obtainable in the area for such production~~ /. Any such purchase or sale by Operator shall be subject always to the right of the
11  owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil / not previously
12  delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil / shall be only for such reasonable periods of
13  time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14  of one (1) year.

*(margin annotations line 7-8: "and/or gas")*
*(line 9-10: "on the same terms as Operator is marketing Operator's and/or other Non-Operator's share of production")*
*(line 10: "and/or gas")*
*(line 11: "and/or gas")*
*(line 12: "and/or gas")*

15

16      In the event one or more parties' separate disposition of its share of the gas causes split-stream / deliveries to separate pipelines and/or
17  deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18  be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19  agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

*(line 16 annotation: "sales or")*

20

21  D.    Access to Contract Area and Information:

22      ~~Except as otherwise provided herein, each consenting party who has paid 100% of its share of all costs of all operations~~
~~conducted under this Agreement~~
23      ~~Each party /~~ shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
25  and records relating thereto. Operator, upon request, shall furnish each of the other / parties with copies of all forms or reports filed with
26  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29  quests the Information.

*(line 25 annotation: "consenting")*

30

31  E.    Abandonment of Wells:

32

33      1. Abandonment of Dry Holes:  Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35  without the consent of ~~/all~~ parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
36  within / ~~forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays)~~ after receipt of notice of the proposal to plug and abandon
37  such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39  such well. Any party / who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40  operations in search of oil and/or gas subject to the provisions of Article VI.B. Any cement plugs used for plugging and abandoning such
41  well shall be in excess of that required by the regulatory body, recommended to be a volume of one and one-half times of that
required.

*(line 36 annotation: "twenty four (24)")*
*(line 38 annotation: "or parties owning greater than 10% interest in the well")*

42      2. Abandonment of Wells that have Produced:  Except for any well in which a Non-Consent operation has been conducted
43  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44  producer shall not be plugged and abandoned without the consent of / ~~all~~ parties~~/~~. If ~~all /~~ parties consent to such abandonment, the well shall
45  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
46  thirty (30) days after receipt of notice of the proposed abandonment of any well /, all parties do not agree to the abandonment of such well,
47  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. / Each abandoning party shall assign
50  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52  terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
53  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit
56  * parties owning greater than a 90% combined interest in the well.  If the well has been drilled pursuant to Article VI.B.2, only the
consent of the consenting parties shall be required.
57
58  ** If the well has been drilled or reworked pursuant to Article VI.B.2 and the consenting parties therein have not been fully
reimbursed as provided, only the approval of such consenting parties shall be required.

*(line 43-44 annotation: "25% or more of the owners thereof")*
*(line 45-46 annotation: "or within forty-eight (48) hours if a drilling rig is on location")*
*(line 49 annotation: "Failure to respond to said notice shall constitute an election to plug and abandon said well.")*

59

60

61

62

63

64

65

66

67

68

69

70

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
#### continued

"B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portion of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations:  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.

### ARTICLE VII.
#### EXPENDITURES AND LIABILITY OF PARTIES

A.    Liability of Parties:

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners. **In their relations with each other under this Agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own self-interest.**

B.    Liens and Payment Defaults:

Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that ~~each shall be entitled to recover the amount if paid~~ plus five hundred percent (500%) of the amount out of the proceeds from the sale of ~~the interest of each such party bears to the interest~~ the defaulting party's share of oil and/or gas, and to secure payment thereof, ~~of all such parties. Each party so paying its share of the unpaid amount shall~~ , to obtain ~~reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.~~  Notwithstanding anything contained to ~~the contrary in this paragraph, all parties agree that this provision shall not apply to any operation requiring an AFE unless~~ Operator has advance billed all parties and such parties have paid their proportionate share of said costs in accordance with other provision of this agreement.

C.    Payments and Accounting:

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

D.    Limitation of Expenditures:

1. Drill or Deepen:  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

1 ☑  / Option No. 1:  All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2 necessary tankage and/or surface facilities. * This Option No. 1 shall apply only to water source and/or water injections wells.

3

4 ☑  / Option No. 2:  All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
(including all loss)
5 authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
twenty-four
6 to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have / forty-eight
7 (48 ) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8 tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9 cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
re-entering, recompleting, sidetracking,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking," deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties. **This Option No. 2 shall cover all wells except those expressly covered by Option No. 1 above.

14

15   2.  Rework or Plug Back:  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.

19

two or more parties owning a majority interest
20   3.  Other Operations:  Without the consent of ~~all~~ parties, Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of_____Fifty Thousand and No/100_____Dollars ($_50,000.00_____)
22 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of_____Fifty -Thousand and No/100_____
28 Dollars ($_50,000.00_____) bu t less than the amount first set forth above in this paragraph.

29

30 E.   Rentals, Shut-in Well Payments and Minimum Royalties:

31

32   Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35 behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B.23.

39

40   Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, ~~at least five (5) days (excluding Saturday, Sunday and legal holidays),~~ or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

45

46 F.   Taxes:

47

48   Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".
and in the case of a Non-Operator, if any such Non-Operator timely
59 notifies Operator in writing,
or Non-Operator
60   If Operator / considers any tax assessment improper, / Operator may, at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".

66

Operator       on behalf of all parties
67   Each party / shall pay or cause to be paid / all production, severance, excise, gathering and other taxes imposed upon or with respect
68 to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

69

70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VII**
continued

G. **Insurance:**

At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

**ARTICLE VIII.**
**ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

A. **Surrender of Leases:**

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leased acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

B. **Renewal or Extension of Leases:**

If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and shall have the right for a period of ~~thirty (30)~~ fifteen (15) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of oil and gas leases.

C. **Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VIII
### continued

1   said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2   governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3   it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4   tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.
5
6      If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7   consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8
9   D.   Maintenance of Uniform Interests:
10
11   ~~For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no~~
12   ~~party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,~~
13   ~~equipment and production unless such disposition covers either:~~
14
15   ~~1.  the entire interest of the party in all leases and equipment and production; or~~
16
17   ~~2.  an equal undivided interest in all leases and equipment and production in the Contract Area.~~
18
19      Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20   and shall be made without prejudice to the right of the other parties. **Any added expenditures required as a result of a partial disposition,**
21   **including marketing or metering of production, shall be borne solely by the party transferee.**
22      If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23   require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24   and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25   party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26   into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27   Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.
28
29   E.   Waiver of Rights to Partition:
30
31      If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32   undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33   interest therein.
34
35   ~~F.   Preferential Right to Purchase:~~
36
37   ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38   ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39   ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40   ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41   ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42   ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43   ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44   ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45   ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~
46
47                ARTICLE IX.
48         INTERNAL REVENUE CODE ELECTION
49
50      This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51   for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52   and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53   purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54   from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as per-
55   mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56   ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57   United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58   and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59   evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60   Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61   action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62   Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63   Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is per-
64   mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65   tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66   computation of partnership taxable income.
67
68
69
70

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE X.
## CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____ **Fifty Thousand and No/100** _____ Dollars (S _50,000.00_ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder. **All claims or suits involving title to any interest subject to this Agreement shall be treated as a claim or suit against all parties hereto.**

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending / during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex, / or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex, / or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☑  Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☐ ~~Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____180_____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____180_____ days from the date of abandonment of said well.~~

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

- 13 -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1982



### ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

A.  **Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

B.  **Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ Texas _____ shall govern.

C.  **Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as aresult of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the ~~"Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and~~ any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said[^any] Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

### ARTICLE XV.
### OTHER PROVISIONS

A.  PRECEDENCE OF OPERATIONS

Where a well that has been authorized under the terms of this Agreement by all parties, has been drilled to the proposed depth or the objective formation, or a depth at which further drilling is impractical, whichever is the lesser, and the consenting parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

1)  an election to perform additional logging, coring or testing;
2)  an election to attempt to complete the well at the deepest drilled depth proposed for completion by any Party;
3)  an election to plug back and attempt to complete the well in a shallower depth or formation;
4)  an election to deepen the well;
5)  an election to sidetrack the well;
6)  an election to rework the well by generally accepted stimulation techniques whether or not the well had previously produced in commercial quantities or is capable of commercial production;
7)  an election to temporarily abandon the well;
8)  an election to plug and abandon the well.

It is provided, however, that if at any time said consenting parties are considering the above election, the wellbore is in such a condition that, in the opinion of Operator, a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority herein above set forth.  In such event, the operation, which, in the opinion of Operator is less likely to jeopardize the well, will be given priority.  It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so at their expense and risk, but should the party or parties not participate in such additional logging, coring, or testing, later elect to participate in a proposed operation based on the information obtained from the additional logging, coring, or testing, then the party or parties so electing shall be required

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1982

to pay their proportionate share of the cost of said logging, coring, or testing, and shall be entitled to the logs, cores or the results of the tests. For the purpose of this paragraph the proposed depth shall be the depth as set forth in the AFE or in the proposal for the proposed operation, and the objective formation shall be the formation as set forth in the AFE or in the proposal for the proposed operation.

B. DISPUTES AS TO PROPOSED DEPTHS

If during the drilling of any well drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest (and not in number) of the owners as shown by Exhibit "A" shall control and be binding upon all parties. If the parties are equally divided, the opinion of the Operator will prevail.

C. HOLIDAYS

The word "holidays" when used herein is defined as a legal holiday observed by the United States government and its agencies.

D. ADVANCEMENT OF COSTS

Billing of estimated dry hole costs in advance and actual costs to drill the Initial Well shall be governed by Subsection 2.1(a) of the Participation Agreement to which this Operating Agreement is attached as Exhibit "D"

Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s) in advance of its respective share of (i) the dry hole cost for any other well to be drilled hereunder to which such Non-Operator has consented, and (ii) the cost of any completion, reworking, recompletion, sidetracking, deepening or plugging back operation to which such Non-Operator has consented (any such operation under clause (i) or (ii) being herein called a "Drilling Operation"). Such request for advance payment may be made upon all Non-Operators or upon any one or more of them to the exclusion of others, and shall be made in writing no earlier than thirty (30) days prior to the anticipated commencement date for such Drilling Operation. The amount of each Non-Operator's advance payment shall be based upon the latest AFE for such operation and may, at the written request of a Non-Operator, be limited as to such requesting Non-Operator to the amount that Operator estimates that it will spend during the next thirty (30) day period for any Drilling Operations with Operator having the right to make additional requests for advance payment until the AFE amount is totally funded.

A Non-Operator receiving a request for advance payment shall, within two (2) days of the receipt of such request if and when a drilling rig is on location and within fifteen (15) days of the receipt of such request in all other cases, pay to operator by wire transfer, check or other ready funds the full amount of such request. Operator shall credit the amount to the Non-Operator's account for the payment of such Non-Operator's share of costs of such Drilling operation, and following the end of each month Operator shall charge such account with such Non-Operator's share of actual costs incurred during such month.

Payment in advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual cost of a Drilling Operation, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure as set forth in Exhibit "C" to this Agreement.

In the event a Non-Operator from which a request for advance payment was made does not, within the time and manner above provided, fully satisfy the request for advance payment by depositing cash as aforesaid, then Operator, at its option, may make a second written request by certified mail, return receipt requested for such advance. Non-Operator shall pay for said advance as aforesaid within two (2) business days from receipt of such second request.

If a Non-Operator fails to pay within two (2) business days of the receipt of such second request, then Non-Operator may, at the sole discretion and timing election of the Operator, be deemed non-consent in the drilling operation retroactive to the beginning of such operation and thereafter subject to the penalty provisions of Article VI.B.2 hereof.

Notwithstanding anything to the contrary herein, if the applicable drill well or operation is unsuccessful or results in a dry hole or even if it results in a producer, Operator shall have the right to sue a Non-Operator who failed to pay for its proportionate share of expenses in lieu of deeming the Non-Operator Non-Consent. Further, nothing herein shall prejudice other rights of Operator under this Operating Agreement, including, without limitation, rights under Article VII.B and Article VII.C of this Operating Agreement.

- 14b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

E.  NECESSARY EXPENDITURES EXCLUDE SIDETRACKING

The phrase "necessary expenditures" in Article VII.D.1. (Option No. 2) on page 10 shall not be deemed to include sidetracking operations, unless specifically included in an Authority for Expenditure approved by the participating parties.

F.  ADDITIONAL CHARGES

Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Contract Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same:

Long distance telephone call, fees for legal services, overnight mail, title costs (including curative), costs and expenses in connection with preparation and presentation of evidence and exhibits for  Railroad Commission of Texas hearings, preparation and handling of application to and hearings before other governmental agencies or regulatory bodies.

G.  INDEMNITY

Non-Operators release and hold harmless, and agree to fully defend, protect, and indemnify, and render whole Operator, its subsidiaries and affiliates, and the respective directors, officers, agents and employees of Operator and its subsidiaries and affiliates, from and against all claims, actions, fines, penalties, losses, damages, and/or judgments of every kind, including costs and attorney's fees, incident to or in any manner resulting in (i) any injury or death of any person or persons (including employees, agents, representatives, invitees and licensees of Non-Operators, or others engaged by Non-Operators), (ii) any damage to or loss of any property, (iii) any violation of or failure to comply with any applicable law (including Environmental Laws), regulation, decree, understanding, ordinance, rule or order; and (iv) any other legal consequences or obligation sustained and/or liabilities incurred, resulting from, related to, or arising out of activities in or related to the Contract Area, except such as may result from Operator's gross negligence or willful misconduct.

H.  GAS BALANCING FOR FORFEITED INTERST

In the event that (i) any party hereto refuses to participate in any operation proposed under this Agreement and who is, as consequence thereof, subject to forfeiture of his interest, and (ii) such party is, at that time, in an imbalance situation with either overproduction or underproduction, then the mechanism established in Exhibit "E" to correct such imbalances shall prevail.

I.  SEVERABILITY

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect. Upon any binding determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to affect the original intent of the parties as closely as possible in an acceptable and legally enforceable manner.

J.  NO WAIVERS

No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

K.  DOWNSTREAM FACILITIES

If any party to this agreement proposes the construction or acquisition and operation of a pipeline and/or gathering line to transport Oil and/or Gas produced from wells located in the Contract Area, or to construct a plant or other facility to treat, process, dehydrate, compress, extract NGL's or otherwise enhance the value of Oil and/or Gas produced from wells located in the Contract Area, or cause such Oil and/or Gas to meet requisite quality specifications, (hereinafter all such pipelines, gathering lines, plants and facilities are collectively referred to as the "Facilities"), then such party shall offer each of the other non-proposing parties to this agreement the right to participate in the construction, operation, ownership and use of the Facilities. Should one or more non-proposing parties elect to participate, then between such participating parties, the participating parties shall enter into a mutually acceptable agreement for the construction, acquisition, operation and use thereof.  Any party electing not to participate shall have no ownership in or right to use the applicable Facilities, and the participating parties shall have no obligation to allow the non-participating parties such use and/or access thereto.

- 14c -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

L. DISBURSEMENT OF ROYALTIES

If Operator prepares and administers a division order for and receives and distributes the proceeds of production attributable to the interest of a Non-Operator, then Operator shall be entitled to charge that party for an appropriate monthly overhead charge for disbursing such royalty payments, in addition to the combined fixed rates specified in Exhibit "C" hereto. If through error or inadvertence Operator shall fail to pay or timely pay any royalties, overriding royalties or other payments to the parties entitled thereto, it shall not be liable in damages to the other Parties hereto for such failure, unless arising out of the gross negligence or willful misconduct of the Operator.

M. INFORMATION

Anything to the contrary hereinabove notwithstanding, it is stipulated that any non-consenting party to an operation conducted hereunder shall have no right to observe such operation or have access to information pertaining to such operation, until such time as the non-consenting party's share of the cost of such operation and the penalty therefor has been recovered by the consenting parties as provided herein.

N. OPERATOR'S LIEN – SECURITY INTEREST

Subject to the provision of Article VII. B. of this Agreement, each non-Operator grants to Operator a lien upon all of the rights, titles, and interests of each Non-Operator, whether now existing or hereafter acquired, in and to the (1) the oil, gas, or other minerals in, on, and under the Contract Area and (2) any oil, gas, and mineral leases covering the Contract Area or any portion thereof. In addition, each Non-Operator grants to Operator a security interest in and to all of such Non-Operator's rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (1) all oil, gas and other minerals produced from the Contract Area when produced; (2) all accounts receivable accruing or arising as a result of the sale of such oil, gas and other minerals; (3) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced; and (4) all oil and gas wells and other surface and sub-surface equipment and facilities of any kind or character located on the Contract Area and the cash or other proceeds received from the sale thereof (collectively, the "Personal Property Collateral"). Some of the Personal Property Collateral is or will become fixtures on the Contract Area, and the interest of Non-Operator in and to the oil, gas and other minerals when extracted from the Contract Area and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area. This Agreement (including a carbon, photographic, or other reproduction hereof) shall constitute a non-standard form financing statement under the terms of the Uniform Commercial Code of the State in which the Contract Area is located, and as such, may be filed for record in the real property records, or other applicable records, of the county, or counties, in which the Contract Area is located.    Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense, if any.

O. SEPARATE AGREEMENT FOR NON-UNIFORM INTEREST

Any oil and gas lease and/or oil and gas interest that is either (i) described in Exhibit "A-1" to this Agreement or (ii) that is both acquired after the effective date of this Agreement and covered by Article VII.B, VIII.C or XV.W of this Agreement, that thereafter becomes owned by only one of the parties hereto shall not be subject to this Agreement from and after the date such lease and/or interest becomes so owned. Any oil and gas lease and/or oil and gas interest acquired after the effective date of this Agreement and covered by Article VII.B, VIII.C or XV.W of this Agreement, that becomes owned by more than one but less than all of the parties hereto shall remain subject to this Agreement as to the parties who own an interest therein, but Operator is authorized to modify Exhibit "A" to this Agreement to reflect the parties' interests in each such oil and gas lease and/or oil and gas interest. Operator is further authorized to modify said Exhibit "A" to this Agreement to reflect the parties' interests in each well subject to this Agreement.

P. METERING OF PRODUCTION

In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area, which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

Q. PLUGGING AND LEASEHOLD RESTORATION FUND

At any time any well subject to this agreement is, in Operator's sole opinion, approaching the end of its economic life and/or its useful purpose, Operator may pre-bill the joint account an amount which is reasonably estimated to plug and abandon such well and restore the leasehold premises at the well-site location. Such amount shall be invested in an interest bearing certificate of deposit, and the principal and interest therefrom utilized to offset the actual costs of plugging and

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1982

abandonment and restoration of the leasehold premises. In the event actual costs are less than the estimate, each working interest owner will be issued a refund of the difference, together with any accrued interest on such difference, based upon the then working interest percentage of such owner. In the event the actual costs exceed the estimate, each owner agrees to pay its proportionate share of the expenses over and above the estimated and pre-billed amount.

R. OBLIGATORY WELL.

Notwithstanding the provisions of this agreement and particularly Article VI, if any proposed operations are necessary to maintain an oil and gas lease or oil and gas interest covered by this agreement in force or an agreement to earn a lease(s) or term assignment which would otherwise expire unless such operations are conducted, then in lieu of being penalized under Article VI.B.2., each Non-Consenting Party shall assign to Consenting Parties all of such Non-Consenting Party's right, title and interest in and to the oil and gas leases(s) and/or oil and gas interest(s) or portion thereof or such agreement which would be lost or not earned if such operations were not conducted.

Such assignment shall be promptly due upon commencement of said proposed operations by Consenting Parties and shall be free and clear of all overriding royalties, production payments, mortgages, liens and other burdens and encumbrances placed thereon by the assigning party or resulting from its ownership or operation of such oil and gas leases(s) and/or oil and gas interest(s) which is not a joint obligation of the parties, but otherwise without warranty of title either expressed or implied.

If the assignment is in favor of more than one party, the assigned interest shall be shared by the Consenting Parties in the proportions that the interest of each bears to the interest of all Consenting Parties unless otherwise agreed to in writing. Thereafter, such acreage covered by said assignment shall not be subject to the terms of this agreement, but shall be deemed to be subject to an agreement identical to this changed only in Exhibit "A" to indicate the Consenting Parties and their percentages of interest. Operations that are necessary to either maintain an oil and gas leases(s) and/or oil and gas interest(s) covered by this agreement in force or to earn an interest under an agreement which would otherwise expire unless operations are conducted, shall be defined as operations that are proposed within six (6) months of the date the oil and gas lease, oil and gas interest or agreement would otherwise expire.

S. PREVAILING AGREEMENT

If there is a conflict between provisions of that certain Participation Agreement dated effective October 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain, and this Operating Agreement, the provisions of said Participation Agreement shall prevail, and shall be binding upon all parties to this Operating Agreement.

T. PRIOR OPERATING AGREEMENT(S)

This operating agreement, as to the parties executing same and as to the Contract Area and Depth Restrictions, shall supersede and replace any prior operating agreement(s) covering all or any portion of the Contract Area of this operating agreement.

U. NON-PARTICIPATING INTERESTS

Anything to the contrary herein notwithstanding, the parties hereto agree to carry any non-participating oil and gas interest and/or any non-participating leasehold interest in proportion to their respective interests as set out in Exhibit "A" hereto as same may be revised from time to time to reflect record title and/or reformation of the Contract Area.

V. NON-CONSENT

Any party that forfeits its interest in a well pursuant to Article VI.B.2 of this Agreement forfeits their interest in the entire well and revenue therefrom, not just a particular Zone therein, for the duration of the recoupment period or, if the risk compensation is never recovered, forever. The parties recognize, however, that applicable rules of the Railroad Commission of Texas may allow for the drilling and completion of additional wells within the unit for an existing well and, except as otherwise provided herein, the forfeiture by one party of its interest in the existing well does not affect that party's right to elect to participate or not to participate in a proposal to drill, or any other operation with respect to, another well, even if

the other well is located in the same unit, and even if the new well is completed in the same Zone from which the existing well is producing.

Anything to the contrary hereinabove notwithstanding, any Non-Consenting Party to an operation conducted hereunder shall have no right to observe such operation or subsequent operations within the same well or have access to information pertaining to such operation or subsequent operations, until such time as the Non-Consenting Party's share of the cost of such operation, and any applicable subsequent operations, and the risk compensation therefrom, has been recovered by the Consenting Parties as provided herein.

**W.  AREA OF MUTUAL INTEREST**

The parties hereby create an Area of Mutual Interest ("AMI") consisting of the lands outlined by a bold blue line on the plat attached hereto as Exhibit "A-2". Culver shall not be subject to the AMI with respect to those lands located within the green outline on the plat attached hereto as Exhibit "A", which areas are further identified as the "Culver Excluded Areas." This AMI shall remain in force and effect for a term of five (5) years from the date of this Agreement and, insofar and only insofar as the AMI includes lands covered by oil and gas leases and/or oil and gas interests subject to this Agreement, as long thereafter as said oil and gas leases and/or oil and gas interests remain in force and effect. This AMI shall terminate after five (5) years as to all such lands not covered by oil and gas leases and/or oil and gas interests subject to this Agreement.

During the term of this AMI, if any party hereto, including related persons or entities, ("Acquiring Party") directly or indirectly acquires any oil and gas lease or any oil and gas interest covering lands lying within the AMI, the Acquiring Party shall promptly advise the other parties ("Offerees") of such acquisition in writing in accordance with the following:

1.    If the oil and gas lease or interest covers a portion of lands located within the contract area of the Prospect or any single Future Prospect, then the Acquiring Party shall offer the entirety of such lease or interest to the participants within such prospect;

2.    If the oil and gas lease or interest does not cover any portion of lands located within the contract areas of the Prospect or any Future Prospect(s), then the Acquiring Party shall offer such lease or interest to the Participants of the Prospect; or

3.    If the oil and gas lease or interest covers a portion of lands located within the contract areas of multiple prospects, including the Prospect and/or any Future Prospect(s), then the Acquiring Party shall offer such lease or interest to the participants within all such prospects; and such offer shall be allocated between the multiple prospects based on the ratio of net mineral acres contained within each prospect as compared with the total net mineral acres contained in all such prospects.

The notice shall include a copy of all instruments of acquisition including, by way of example but not of limitation, copies of the leases, assignments, subleases, farmouts or other contracts affecting the oil and gas lease and/or oil and gas interest. In such event, each Offeree shall have the right to acquire its proportionate interest in such oil and gas lease and/or oil and gas interest in accordance with the other provisions of this AMI.

The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by the Acquiring Party in acquiring such oil and gas lease and/or oil and gas interest ("Acquisition costs"). The Offeree shall have a period of fifteen (15) days after receipt of the notice within which to furnish the Acquiring Party written notice of its election to acquire its proportionate interest in the offered oil and gas lease and/or oil and gas interest. If, however, a well in search of oil or gas is being drilled within the AMI, each Offeree shall have a period of twenty-four (24) hours (excluding Saturdays, Sundays and legal holidays) after delivery of the notice within which to elect to acquire its proportionate interest in the oil and gas lease and/or oil and gas interest so offered. It is provided, however, that the twenty-four (24) hour election period shall not apply unless the Acquiring Party shall give the notice to the Offerees within two (2) days after the date on which the Acquiring Party acquired the oil and gas lease and/or oil and gas interest so offered. In addition thereto, the Acquiring Party shall also:

(a)    furnish the Offerees with the approximate location of the well then being drilled and the name of the operator or drilling contractor drilling the well, and

(b)    specifically advise the Offerees that the Offerees shall have a period of twenty-four (24) hours within which to elect to acquire an interest in the offered oil and gas lease and/or oil and gas interest.

The above information shall be in addition to the information and copies of instruments provided for above in connection with the usual notices of acquisition of an oil and gas lease and/or oil and gas interest. If the Acquiring Party does not receive actual written notice of election of an Offeree to acquire its proportionate interest within the fifteen (15) day or twenty-four (24) hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire its interest therein. An Offeree accepting the offered interest shall be entitled to participate in such oil and gas lease and/or oil and gas interest in the proportion to which its interest bears to the total interest of all parties (including the acquiring party) electing to participate. Promptly after the time for election expires, the Acquiring Party shall invoice the Offeree electing to acquire an interest for its proportionate part of the Acquisition Cost, as reflected by the invoice. If the Acquiring Party does not receive the amount due from the Offeree within thirty (30) days after receipt by the Offeree of the invoice for its cost, the Acquiring Party may, at its election, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within five (5) days after receipt of such written notice by the delinquent

- 14f -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

Offeree shall constitute a withdrawal by the delinquent Offeree of its former election to acquire the interest, and such Offeree shall no longer have the right to acquire an interest in the offered oil and gas lease and/or oil and gas interest.

Any assignment made by the Acquiring Party shall be made free and clear of any liens, encumbrances, overriding royalty interests and other burdens created by or arising under the Acquiring Party but otherwise without warranty of title, either express or implied. The assignment shall be made and accepted subject to, and each assignee shall expressly assume its portion of all of the obligations of the Acquiring Party. The assignment shall also be made and accepted subject to this Agreement.

If two (2) or more separate oil and gas leases and/or oil and gas interests are included in the same notice, the Offeree shall have the separate right of election as to each separate oil and gas lease and/or oil and gas interest.

The provisions of this AMI shall not apply to acquisitions as a result of merger, consolidation, reorganization or an acquisition from a parent, subsidiary, or affiliated corporation, or as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries. Neither shall it apply to sales and acquisitions between partners in a partnership or venturers in a joint venture, or to any acquisition by any party of an interest which interest prior to and at the time of such acquisition was subject to this Agreement, unless such acquisition was the renewal or extension of a lease which at the date of expiration was subject to this Agreement.

Renewals and extensions of oil and gas lease(s) and/or oil and gas interest(s) shall be subject to Article VIII.B of this Agreement.

## X. EXECUTION

This agreement shall be binding upon each Non-Operator that executes this agreement without regard to whether this same instrument, or any copy or counterpart hereof shall be executed by any other Non-Operator.

## Y. SOPHISTICATED INVESTORS

By execution of this Agreement, each Non-Operator represents to each other and to Operator: (i) that it has a working knowledge of the oil and gas industry; (ii) that it is a sophisticated investor and has a financial net worth in excess of one million dollars; (iii) that it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of leasehold costs, drilling costs, completion costs, and all other costs incurred in operations under this Agreement; (iv) that it ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES; (v) that its interest hereunder has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the State of Texas, or any other state ("Securities Law"), and that it owns said interest for investment purposes only, and not with a view to or for sale in connection with any distribution thereof within the meaning of Securities Law.

## Z. EFFECT OF BANKRUPTCY

If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a committee without regard for their interest in the Contract Area based on Exhibit "A."

## AA. CUSTODY OF FUNDS

Operator shall hold for the account of Non-Operators any funds of Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to Non-Operators or applied toward the payment of debts, regardless or whether the debts arise out of the same well or operation for which the funds were advanced or from which the sales proceeds were derived. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators. Nothing in this paragraph shall require the maintenance by Operator of separate accounts from the funds of

- 14g -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

Non-Operators. Operator shall, upon request, refund any advance to Non-Operator that is not used for its intended purpose within six (6) months from the receipt of the advance.

BB.  STATUTORY EMPLOYER

Operator shall be considered the statutory employer of all employees of all Contractors, their sub-contractors or agents, whose goods furnished or services rendered for Operator are an integral part of or essential to Operator's ability to perform its operations as an oil and gas operator.

CC.  MISCELLANEOUS

Anything to the contrary herein notwithstanding, this Operating Agreement is expressly made subject to the terms and provisions of the leases, contracts and/or agreements described in Exhibit "A" hereof.

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____April_____ , (year) _2013_ .

~~, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____ have been made to the form.~~

OPERATOR

_Katy R Smith_                                    SKLAR EXPLORATION COMPANY L.L.C.
Katy R Smith
_Monica Goncalves_                               DAVID A. BARLOW
Monica Goncalves                                 President – Chief Operating Officer

NON-OPERATORS

_Katy R Smith_                                    SKLARCO L.L.C.
Katy R Smith
_Monica Goncalves_                               DAVID A. BARLOW
Monica Goncalves                                 President – Chief Operating Officer

                                                 McCOMBS ENERGY, LTD.

                                                 RICKY HAIKIN, Vice President

                                                 JJS WORKING INTERESTS LLC
                                                 By Houston Bulldog Capital Management, LLC, its
                                                 Manager

                                                 JUSTIN SIMONS, Manager of Houston Bulldog Capital
                                                 Management, LLC

                                                 JAMES FLEET HOWELL

                                                 KUDZU OIL PROPERTIES, LLC

                                                 R. NASH NEYLAND, Executive Vice President

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

TIEMBO LTD.
By Simba Investors L.L.C., General Partner of Tiembo Ltd.

MARK RAUCH, Member of Simba Investors L.L.C.

BUNDERO INVESTMENT COMPANY, L.L.C.

ROBERT P. BOWMAN, Manager

BENNETT GREENSPAN

FAIR OIL LTD
By Fair Oil Company of Texas, Inc., sole General Partner
of Fair Oil Ltd.

JOHN R. GARRETT, President of Fair Oil Company of Texas, Inc.

R. L. RAY, LTD

JOHN D. HILLS, General Partner

FANT ENERGY LIMITED

RICHARD E. FANT, Manager

LUCAS PETROLEUM GROUP, INC.

FAIN BROCK, President

CULVER & CAIN PRODUCTION LLC

MATTHEW R. CULVER, Manager

- 15 -

**ACKNOWLEDGMENTS**

STATE OF ~~LOUISIANNA~~ *COLORADO*

~~PARISH~~ *COUNTY* OF ~~CADDO~~ *BOULDER*

I, *GEOFFREY DAVID NENNINGER* a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _15TH_ day of _NOVEMBER_, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _AUGUST 15, 2017_

> GEOFFREY DAVID NENNINGER
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY ID 20134051884
> MY COMMISSION EXPIRES AUGUST 15, 2017

STATE OF ~~LOUISIANNA~~ *COLORADO*

~~PARISH~~ *COUNTY* OF ~~CADDO~~ *BOULDER*

I, *GEOFFREY DAVID NENNINGER* a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _15TH_ day of _NOVEMBER_, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _AUGUST 15, 2017_

> GEOFFREY DAVID NENNINGER
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY ID 20134051884
> MY COMMISSION EXPIRES AUGUST 15, 2017

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Ricky Haikin, whose name as Vice President of MCCOMBS ENERGY, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRIS


I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My commission expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that JAMES FLEET HOWELL, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

Given under my hand and notarial seal this the _____ day of _____, 2013.


_____
Notary Public

[AFFIX NOTARIAL SEAL]

My commission expires: _____


STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, Executive V.P. whose name as Manager of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Mark Rauch, whose name as member of Simba Investors, L.L.C., The General Partner of TIEMBO, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2013.


                                           _____
                                           NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF LOUISIANA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that Robert P. Bowman, whose name as Member of BUNDERO INVESTMENT COMPANY, LLC, a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _____ day of _____, 2013.


                                           _____
                                         NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that BENNETT GREENSPAN, signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same as his free act and deed.

    Given under my hand and notarial seal this the _____ day of _____, 2013.


                                           _____
                                         Notary Public

[AFFIX NOTARIAL SEAL]

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

I, the undersigned notary public in and for said County in said State, hereby certify John R. Garrett, whose name as President of Fair Oil Company of Texas, Inc., the General Partner of FAIR OIL LTD., a Texas limited partnership, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that John D. Hills, whose name as General Manager for R. L. RAY, LTD a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Stephen Swan, whose name as Manager of Richard E. Fant, LLC, the General Partner of FANT ENERGY LIMITED, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Fain Brock, whose name as President of LUCAS PETROLEUM GROUP, INC., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2013.

                                       _____
                                       NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Matthew R. Culver, whose name as Manager of CULVER & CAIN PRODUCTION LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____, 2013.

                                       _____
                                       NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

### EXHIBIT "A"

Attached to and made a part of that certain Joint Operating Agreement (Swan Prospect) dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain, Non-Operators.

(1)   **Identification of lands subject to this agreement:**

#### Contract Area

All lands, oil and gas leasehold interest and oil and gas interest lying within the following surveys as depicted in the BLACK boundary as shown on the plat designated as Exhibit "A-2".

#### Area of Mutual Interest

All lands, oil and gas leasehold interest and oil and gas interest lying within the following sections as depicted on the BLUE boundary as shown on the plat designated as Exhibit "A-2". Culver shall not be subject to those lands located within the green outline on the plat attached hereto as Exhibit "A-2", which areas are further identified as the **"Culver Excluded Areas."**

(2)   **Restrictions, if any, as to depths, formations, or substances:**

There are no restrictions except as may be provided for in any oil and gas lease, oil and gas interest, assignment or contract subject to this Operating Agreement or to which this Operating Agreement is subject.

(3)   **Decimal interest and names and addresses of Parties to this Agreement:**

| Owners | BPPO WI* | APPO WI* |
|---|---|---|
| **Sklarco L.L.C. | .25000000 | .39680000 |
| McCombs Energy, Ltd. | .25000000 | .18750000 |
| **JJS Working Interests LLC | .00500000 | .07820000 |
| James Fleet Howell | .05000000 | .03750000 |
| Kudzu Oil Properties, L.L.C. | .05000000 | .03750000 |
| Tiembo, Ltd. | .02000000 | .01500000 |
| Bundero Investment Company, L.L.C. | .02000000 | .01500000 |
| Bennett Greenspan | .01000000 | .00750000 |
| Fair Oil Ltd. | .11500000 | .08625000 |
| R. L. Ray, Ltd. | .05500000 | .04125000 |
| Fant Energy Limited | .10000000 | .07500000 |
| Lucas Petroleum Group, Inc. | .02000000 | .01500000 |
| Culver & Cain | .01000000 | .00750000 |
| Total: | 1.00000000 | 1.00000000 |

*Before Prospect Payout ("BPPO") and After Prospect Payout ("APPO") as defined in that Participation Agreement dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, LLC., Tiembo. Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd, R. L. Ray, Ltd, Fant Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain.

**Subject to Agreement For Termination Of Agency Services Agreements dated effective as of January 1, 2010, by and between Sklarco L.L.C. et al.

(4)   **Oil and gas leases and/or oil and gas interests subject to this agreement:**

Attached as Exhibit "A-1"

(5)   <u>Addresses of parties for notice purposes:</u>

Sklar Exploration Company L.L.C.
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Phone: (318) 227-8668
Fax: (318) 227-9012
grembert@sklarexploration.com

Sklarco L.L.C.
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Phone: (318) 227-8668
Fax: (318) 227-9012
grembert@sklarexploration.com

McCombs Energy, Ltd.
Attn: Ricky Haikin, Vice President
5599 San Felipe St., Suite 1200
Houston, TX 77056-2721
Phone: (713) 621-0033
Fax: (713) 621-1670
rhaikin@mccombsenergy.com

JJS Working Interests LLC
Attn: Justin Simons
4295 San Felipe, Suite 207
Houston, Texas 77027
Phone: (713) 888-0875
Fax: (866) 406-9550
justin@hbcapllc.com

James Fleet Howell
416 Travis Street, Suite 715
Shreveport, LA 71101
Phone: (318) 221-6382
Fax: (318) 425-0839
fleet@jfhowell.com

Kudzu Oil Properties, LLC
Attn: Mr. Wirt A. Yerger, III
300 Concourse Blvd, Suite 101
Ridgeland, Mississippi 39157
Phone: (601) 987-6576
Fax: (601) 366-1922
kudzu@caviliergrp.com

Tiembo, Ltd.
Attn: Mark Rauch
P.O. Box 270415
Houston, TX 77277-0415
Phone: (713) 627-1700 ext. 109
Fax: (713) 621-9292
mrauch@standardsouthern.com

Bundero Investment Company, L.L.C.
Attn: Robert P. Bowman, Manager
333 Texas Street, Ste. 300
Shreveport, LA 71101
Phone: (318) 213-8780
Fax: (318) 213-8784
rbowman@bowmansystems.com

Bennett Greenspan
5207 Braeburn Drive
Bellaire, Texas 77401
Phone: (713) 957-0636
bcg@ftdna.com

Fair Oil Ltd
Attn: John R. Garrett
225 South College
Tyler, Texas 75702
Phone: (903) 510-6517
Fax: (903) 510-6549
bob.garrett@fairoilc.com

R. L. Ray, Ltd.
Attn: John D. Hills
223 South College
Tyler, Texas 75702
Phone: (903) 510-6556
Fax: (903) 510-6554
john.hills@rayltd.com

Fant Energy Limited
Attn: Stephen Swan
5800 Westview Drive
Houston, Texas 77055
Phone: (713) 316-1216
Fax: (713) 316-1473
Email: swan@blackswanrep.com

Lucas Petroleum Group, Inc.
Attn: Fain Brock
327 Congress Avenue, Suite 500
Austin, Texas 78701
Phone: (512) 236-8211
Fax: (512) 457-1068
fbrock@lucaspetroleum.com

Culver & Cain Production LLC
Attn: Matthew R. Culver, Manager
121 S. Broadway, Suite 760
Tyler, Texas 75702
Phone: 903-533-0091
Fax: 903-597-6850
mculver@culverandcain.com

(6)      **Burdens on Production**

There are no burdens on the oil and gas leases and/or oil and gas interests except for the lessor's royalty thereunder, the overriding royalty in favor of Walker Interests, Inc. as described in Subsection 1.1.a. of that certain Participation Agreement dated October 1, 2013 covering the West Tyler 3D Seismic Prospect, to which this JOA is attached as Exhibit "D", and any other burdens described in such oil and gas leases, assignments and/or oil and gas interests.

EXHIBIT "A-1"

Attached to and made a part of that certain Joint Operating Agreement (Swan Prospect) dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain, Non-Operators.

## DESCRIPTION OF LEASES

1. Oil, Gas and Mineral Lease dated 12/18/2012, by and between Mary Catherine Campbell, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00007409, of the Official Records of Smith County, Texas

2. Oil, Gas and Mineral Lease dated 01/03/2013, by and between Lometa Hudnall Cox Trust No. Two Trustees, Lometa Hudnall Cox & Sam Roosth, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00007103, of the Official Records of Smith County, Texas

3. Oil, Gas and Mineral Lease dated 01/03/2013, by and between Ogden Sharon Hudnall Trust No. 2, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00008200, of the Official Records of Smith County, Texas

4. Oil, Gas and Mineral Lease dated 01/09/2013, by and between Evergreen Memorial Park C/O Tom Tatum, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00008201, of the Official Records of Smith County, Texas

5. Oil, Gas and Mineral Lease dated 01/09/2013, by and between Eugene Motley Oliver, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00008202, of the Official Records of Smith County, Texas

6. Oil, Gas and Mineral Lease dated 01/15/2013, by and between Katherine Louise Ginn, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00007102, of the Official Records of Smith County, Texas

7. Oil, Gas and Mineral Lease dated 01/14/2013, by and between Marsha Ann High, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00007101, of the Official Records of Smith County, Texas

8. Oil, Gas and Mineral Lease dated 01/15/2013, by and between Martha Ann Mullins, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00009556, of the Official Records of Smith County, Texas

9. Oil, Gas and Mineral Lease dated 01/24/2013, by and between Thomas T, Tatum, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00009557, of the Official Records of Smith County, Texas

10. Oil, Gas and Mineral Lease dated 02/01/2013, by and between Mary S. Jarvis and Ben E. Jarvis, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00009555, of the Official Records of Smith County, Texas

11. Oil, Gas and Mineral Lease dated 01/29/2013, by and between Carol Cook Baremore, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012737, of the Official Records of Smith County, Texas

12. Oil, Gas and Mineral Lease dated 01/29/2013, by and between William H. Cook, Jr., as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012736, of the Official Records of Smith County, Texas

13. Oil, Gas and Mineral Lease dated 01/15/2013, by and between Susan Louis, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012735, of the Official Records of Smith County, Texas

14. Oil, Gas and Mineral Lease dated 01/14/2013, by and between Robert James Honzell, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012734, of the Official Records of Smith County, Texas

15. Oil, Gas and Mineral Lease dated 02/18/2013, by and between James J. Clark, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012733, of the Official Records of Smith County, Texas

16. Oil, Gas and Mineral Lease dated 02/18/2013, by and between Mary Catherine Campbell, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00012738, of the Official Records of Smith County, Texas

17. Oil, Gas and Mineral Lease dated 02/17/2013, by and between Dan V. Matise, Co-Independent Executor of the Estate of Mary Hoyt Matise, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018058, of the Official Records of Smith County, Texas

18. Oil, Gas and Mineral Lease dated 03/18/2013, by and between Mary Catherine Campbell, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027941, of the Official Records of Smith County, Texas

19. Oil, Gas and Mineral Lease dated 03/11/2013, by and between Ben Terry, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027942, of the Official Records of Smith County, Texas

20. Oil, Gas and Mineral Lease dated 03/22/2013, by and between Nathaniel Howard, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018057, of the Official Records of Smith County, Texas

21. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Mozelle Carroll, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018054, of the Official Records of Smith County, Texas

22. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Phillip Allen, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018055, of the Official Records of Smith County, Texas

23. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Loneta Nelson, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018054, of the Official Records of Smith County, Texas

24. Oil, Gas and Mineral Lease dated 03/14/2013, by and between John M Allen, Jr., as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018053, of the Official Records of Smith County, Texas

25. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Jackie Calicutt, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00018052, of the Official Records of Smith County, Texas

26. Oil, Gas and Mineral Lease dated 03/26/2013, by and between Mary Catherine Campbell, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027943, of the Official Records of Smith County, Texas

27. Oil, Gas and Mineral Lease dated 03/25/2013 by and between Robert M Clay, as Lessor, and Sklarco, LLC as Lessee recorded as Instrument 2013-00020014, of the Official Records of Smith County, Texas

28. Oil, Gas and Mineral Lease dated 03/25/2013, by and between Corrine A. Tubb, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00020012, of the Official Records of Smith County, Texas

29. Oil, Gas and Mineral Lease dated 03/11/2013, by and between Nanette Sissney, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00020011, of the Official Records of Smith County, Texas

30. Oil, Gas and Mineral Lease dated 03/18/2013, by and between Tanya Cooper, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00020010, of the Official Records of Smith County, Texas

31. Oil, Gas and Mineral Lease dated 03/27/2013, by and between Bennie W. Pettigrew, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00020013, of the Official Records of Smith County, Texas

32. Oil, Gas and Mineral Lease dated 03/22/2013, by and between Carole Ann Pool, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00020008, of the Official Records of Smith County, Texas

33. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Mildred Allen, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-000200009, of the Official Records of Smith County, Texas

34. Oil, Gas and Mineral Lease dated 08/07/2013, by and between Bette Huff King, as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas and Mineral Lease dated 08/07/2013, recorded as Instrument 2013-00043437, of the Official Records of Smith County, Texas

35. Oil, Gas and Mineral Lease dated 03/01/2013, by and between Gladys Houston Mosley, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027944, of the Official Records of Smith County, Texas

36. Oil, Gas and Mineral Lease dated 04/03/2013, by and between Tyler Iron & Metal, Inc. c/o Tom Salome, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027945, of the Official Records of Smith County, Texas

37. Oil, Gas and Mineral Lease dated 03/27/2013, by and between Charles E. Sanders, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027946, of the Official Records of Smith County, Texas

38. Oil, Gas and Mineral Lease dated 03/30/2013, by and between Kinsey Holdings, Ltd. by Rickey Kinsey, President, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027948, of the Official Records of Smith County, Texas

39. Oil, Gas and Mineral Lease dated 03/14/2013, by and between Debra Carliss Shannon as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00027947, of the Official Records of Smith County, Texas

40. Oil, Gas and Mineral Lease dated 05/07/2013, by and between JNP Investments I, LTD by JNP Investments LLC, as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas, and Mineral Lease dated 05/07/2013, recorded as Instrument 2013-00041719, of the Official Records of Smith County, Texas

41. Oil, Gas and Mineral Lease dated 04/23/2013, by and between Fair Investments, Ltd., as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas, and Mineral Lease dated 04/23/2012, recorded as Instrument 2013-00030432, of the Official Records of Smith County, Texas

42. Oil, Gas and Mineral Lease dated 04/23/2013, by and between Fairway Ranches, Ltd., as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas and Mineral Lease dated 04/23/2012, recorded as Instrument 2013-00030430, of the Official Records of Smith County, Texas

43. Oil, Gas and Mineral Lease dated 04/23/2013, by and between Estate of James Waiter Fair, as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas, and Mineral Lease dated 04/23/2012, recorded as Instrument 2013-00030431, of the Official Records of Smith County, Texas

44. Oil, Gas and Mineral Lease dated 06/28/2013, by and between Keenan Browning Dowdy, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00035184, of the Official Records of Smith County, Texas

45. Oil, Gas and Mineral Lease dated 06/28/2013, by and between Gaylan Sasgier William C. Brooks, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00035185, of the Official Records of Smith County, Texas

46. Oil, Gas and Mineral Lease dated 06/28/2013, by and between Kathryn Harris, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00035186, of the Official Records of Smith County, Texas

47. Oil, Gas and Mineral Lease dated 06/26/2013, by and between Marvin Keith Patterson, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00035187, of the Official Records of Smith County, Texas

48. Oil, Gas and Mineral Lease dated 05/07/2013, by and between Marilyn L. Richey, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00035188, of the Official Records of Smith County, Texas

49. Oil, Gas and Mineral Lease dated 07/16/2013, by and between Billie H. Hoskins, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00041720, of the Official Records of Smith County, Texas

50. Oil, Gas and Mineral Lease dated 08/05/2013, by and between Georgia Smith, as Lessor, and Sklarco, LLC, as Lessee, recorded as Instrument 2013-00043438, of the Official Records of Smith County, Texas

51. Oil, Gas and Mineral Lease dated 05/07/2013, by and between Diana Dunnam Hill, as Lessor, and Sklarco, LLC, as Lessee, as evidenced by that certain Memorandum of Oil, Gas and Mineral Lease dated 05/07/2013, recorded as Instrument 2013-00041721, of the Official Records of Smith County, Texas

52. Oil, Gas and Mineral Lease dated 05/07/2013, by and between James M. Hill, as Lessor, and Sklarco, LLC as Lessee, as evidenced by that certain Memorandum of Oil, Gas and Mineral Lease dated 05/07/2013, recorded as Instrument 2013-00041722, of the Official Records of Smith County, Texas.

EXHIBIT "A-2"

Attached to and made a part of that certain Joint Operating Agreement (Swan Prospect) dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests L.L.C., James Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Font Energy Limited, Lucas Petroleum Group, Inc., and Colver & Cain, Non-Operators.



WEST TYLER 3D SEISMIC PROSPECT
& SWAN PROSPECT
SMITH COUNTY, TEXAS

EXHIBIT "B"

Attached to and made a part of that certain Joint Operating Agreement (Swan Prospect) dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain, Non-Operators.

## LEASE FORM

REV - Paid Up
Swan Prospect

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVERS LICENSE NUMBER.**

## OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of _____, 2013 between _____, Lessor (whether one or more), whose address is _____, and SKLARCO, L.L.C., whose address is 401 Edwards Street, Suite 1601, Shreveport, LA 71101, Lessee. WITNESSETH:

1. Lessor, in consideration of ____Ten____ dollars and other valuable consideration, receipt of which is hereby acknowledged, and of the covenants and agreements of Lessee hereinafter contained, does hereby grant, lease and let exclusively to Lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas, sulphur and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, telephone lines, employee houses and other structures on said land, necessary or useful in Lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any other land adjacent thereto. The land covered hereby, herein called "said land", is located in the County of Smith, State of Texas, and is described as follows:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR LEGAL DESCRIPTIONS AND ADDITIONAL PROVISIONS.

This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain _____ acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights and options hereunder.

2. This lease, which is a "paid-up" lease requiring no rentals and unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of _____ from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3. As royalty, Lessee covenants and agrees: (a) To deliver to the credit of Lessor, in the pipe line to which Lessee may connect its wells, the equal _____ part of all oil produced and saved by Lessee from said land, or from time to time, at the option of Lessee, to pay Lessor the average posted market price of such _____ part of such oil at the wells as of the day it is run to the pipe line or storage tanks, Lessor's interest, in either case, to bear _____ of the cost of treating oil to render it marketable pipe line oil; (b) To pay Lessor on gas and casinghead gas produced from said land (1) when sold by Lessee, _____ of the amount realized by Lessee, computed at the mouth of the well, or (2) when used by Lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of _____ of such gas and casinghead gas; (c) To pay Lessor on all other minerals mined and marketed or utilized by Lessee from said land, one-tenth either in kind or value at the well or mine at Lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing oil or gas, and all such wells are shut-in, this lease shall nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, Lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to Lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, Lessee shall pay or tender, by check or draft of Lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, and may be deposited in **PAY DIRECTLY TO LESSOR AT ADDRESS SHOWN ABOVE** Bank, at _____ or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that Lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, Lessee may, in lieu of any other method of payment herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownerships thereof, as Lessee may elect. Any payment hereunder may be made by check or draft of Lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above or to the Lessor at the last address known to Lessee on or before the last date for payment. Lessee's failure to properly pay shut-in royalty shall render Lessee liable for the amount due, but shall not operate to terminate this lease. Nothing herein shall impair Lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4. Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease with any other land covered by this lease, and/or with any other land, lease, or leases, as to any or all minerals or horizons, so as to establish units composed not more than 80 surface acres, plus 10% acreage tolerance; provided, however, units may be established as to any one or more horizons, or existing units may be enlarged as to any one or more horizons, so as to contain not more than 640 surface acres plus 10% acreage tolerance, if limited to one or more of the following: (1) gas, other than casinghead gas, (2) liquid hydrocarbons (condensate) which are not liquids in the subsurface reservoir, (3) minerals produced from wells classified as gas wells by the conservation agency having jurisdiction. If larger units than any of those herein permitted, either in the area established, or after enlargement, are required under any governmental rule or order, for the drilling or operation of a well at a regular location, or for obtaining maximum allowable from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged to conform to the size required by such governmental order or rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each such unit shall become effective as of the date provided for in said instrument of instruments, but if said instrument or instruments make no such provision, then such unit shall become effective on the date such instrument or instruments are so filed of record. Each of said options may be exercised by Lessee at any time and from time to time while this lease is in force, and whether before or after production has been established either on said land, or on the portion of said land included in the unit, or on other land unitized therewith. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be mineral, royalty, or leasehold interests in lands within the unit which are not effectively pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted upon said land under this lease. There shall be allocated to the land covered by this lease within each such unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) that proportion of the total production of unitized minerals from the unit, after deducting any used in lease or unit operations, which the number of surface acres in such land (or in each such separate tract) covered by this lease within the unit bears to the total number of surface acres in the unit, and the production so allocated shall be considered for all purposes, including payment or delivery of royalty, overriding royalty and other payments out of production, to be the entire production of unitized minerals from the land to which allocated in the same manner as though produced therefrom under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of any unit hereunder which includes land not covered by this lease shall not have the effect of exchanging or transferring any interest under this lease (including, without limitation, any shut-in royalty which may become payable under this lease) between parties owning interests in land covered by this lease and parties owning interests in land not covered by this lease. Neither shall it impair the right of Lessee to release as provided in paragraph 5 hereof, except that Lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are likewise released as to lands within the unit. At any time while this lease is in force Lessee may dissolve any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Any unit formed may be amended, re-formed, Swan Prospect

reduced or enlarged by Lessee at its election at anytime and from time to time after the original forming thereof by filing an appropriate instrument of record in the public office in which the pooled acreage is located. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. If this lease now or hereafter covers separate tracts, no pooling or utilization of royalty interests as between any such separate tracts is intended or shall be implied or result merely from the inclusion of such separate tracts within this lease but Lessee shall nevertheless have the right to pool or utilize as provided in this paragraph 4 with consequent allocation of production as herein provided. As used in this paragraph 4, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the leased premises.

5. Lessee may at any time and from time to time execute and deliver to Lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations, as to the released acreage or interest. If Lessee releases all or an undivided interest in less than all of the area covered hereby, Lessee's obligation to pay or tender shut-in royalties shall be proportionately reduced in accordance with the net acreage interest retained hereunder.

6. Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, marketing, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

7. Lessee shall have the use, free from royalty, of water, other than from Lessor's water wells, and of oil and gas produced from said land in all operations hereunder. Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing. No well shall be drilled nearer than 200 feet to the house or barn on said land without the consent of the Lessor. Lessee shall pay for damages caused by its operations to growing crops and timber on said land

8. The rights and estate of any party hereto may be assigned from time to time in whole or in part and as to any mineral or horizon. All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns. No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of Lessee, including, but not limited to, the location and drilling of wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof of or to Lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until thirty (60) days after there has been furnished to such record owner at his or its principal place of business by Lessor or Lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of the death of the owner, Lessee may, nevertheless pay or tender such royalties, or other moneys, or part thereof, to the credit of the decedent in a depository bank provided for above.

9. In the event Lessor considers that Lessee has not complied with all its obligations hereunder, both express and implied, Lessor shall notify Lessee in writing, setting out specifically in what respects Lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by Lessor. The service of said notice shall be precedent to the bringing of any action by Lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on Lessee. Neither the service of said notice nor the doing of any acts by Lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that Lessee has failed to perform all its obligations hereunder. If this lease is canceled for any cause, it shall nevertheless remain in force and effect as to (1) sufficient acreage around each well as to which there are operations to constitute a drilling or maximum allowable unit under applicable governmental regulations, (but in no event less than forty acres), such acreage to be designated by Lessee as nearly as practicable in the form of a square centered at the well, or in such shape as then existing spacing rules require; and (2) any part of said land included in a pooled unit on which there are operations. Lessee shall also have such easements on said land as are necessary to operations on the acreage so retained and shall not be required to move or remove any existing surface facilities necessary or convenient for current operations.

10. Lessee hereby warrants and agrees to defend title to said land against the claims of all persons whomsoever. Lessor's rights and interests hereunder shall be charged primarily with any mortgages, taxes or other liens, or interest and other charges on said land, but Lessor agrees that Lessee shall have the right at any time to pay or reduce same for Lessor, either before or after maturity, and be subrogated to the rights of the holder thereof and to deduct amounts so paid from royalties or other payments payable or which may become payable to Lessee and/or assigns under this lease. If this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether Lessor's interest is herein specified or not), or no interest therein, then the royalties and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by Lessor) shall be paid out of the royalty herein provided. This lease shall be binding upon each party who executes it without regard to whether it is executed by all those named herein as Lessor.

11. If, while this lease is in force, at, or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and Lessee is not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of Lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delay had not occurred.

12. Lessor agrees that this lease covers and includes any and all of Lessor's rights in and to any existing well(s) and/or wellbore(s) on said land other than existing water well(s), and for all purposes of this lease the re-entry and use by Lessee of any existing well(s) and/or wellbore(s) shall be deemed the same as the drilling of a new well.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

_____        .

_____

ACKNOWLEDGMENT

STATE OF TEXAS
COUNTY OF _____

    This instrument was acknowledged before me on the _____ day of _____,2013, by
_____.

_____
NOTARY PUBLIC FOR THE STATE OF TEXAS

Notary's printed name: _____

Notary's Commission Expires: _____



*Exhibit " C "*

## ACCOUNTING PROCEDURE

## JOINT OPERATIONS

Attached to and made part of that certain Joint Operating Agreement (Swan Prospect) dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Buedero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Pan1 Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain, Non-Operators.

### I. GENERAL PROVISIONS

IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.

IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.

1.  **DEFINITIONS**

    All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

    "**Affiliate**" means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

    "**Agreement**" means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

    "**Controllable Material**" means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

    "**Equalized Freight**" means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Pointto the property.

    "**Excluded Amount**" means a specified excluded trucking amount most recently recommended by COPAS.

    "**Field Office**" means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

    "**First Level Supervision**" means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

    - Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
    - Responsibility for day-to-day direct oversight of rig operations
    - Responsibility for day-to-day direct oversight of construction operations
    - Coordination of job priorities and approval of work procedures
    - Responsibility for optimal resource utilization (equipment, Materials, personnel)
    - Responsibility for meeting production and field operating expense targets
    - Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
    - Responsibility for all emergency responses with field staff
    - Responsibility for implementing safety and environmental practices
    - Responsibility for field adherence to company policy
    - Responsibility for employment decisions and performance appraisals for field personnel
    - Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

    "**Joint Account**" means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

    "**Joint Operations**" means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

1



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

"Joint Property" means the real and personal property subject to the Agreement.

"Laws" means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties or their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

"Material" means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

"Non-Operators" means the Parties to the Agreement other than the Operator.

"Offshore Facilities" means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

"Off-site" means any location that is not considered On-site as defined in this Accounting Procedure.

"On-site" means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

"Operator" means the Party designated pursuant to the Agreement to conduct the Joint Operations.

"Parties" means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

"Participating Interest" means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

"Participating Party" means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

"Personal Expenses" means reimbursed costs for travel and temporary living expenses.

"Railway Receiving Point" means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

"Shore Base Facilities" means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.

"Supply Store" means a recognized source or common stock point for a given Material item.

"Technical Services" means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

2.   STATEMENTS AND BILLINGS

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**3. ADVANCES AND PAYMENTS BY THE PARTIES**

A.  Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B.  Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1)  being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

(2)  being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

(3)  being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

(4)  charges outside the adjustment period, as provided in Section 1.4 (*Adjustments*).

**4. ADJUSTMENTS**

A.  Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section 1.5 (*Expenditure Audits*).

B.  All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section 1.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1)  a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

(2)  an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

(3)  a government/regulatory audit, or

(4)  a working interest ownership or Participating Interest adjustment.

**5. EXPENDITURE AUDITS**

A.  A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section 1.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section 1.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section 1.5.B or 1.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section 1.5.B or 1.5.C.

B.   The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section 1.3.B (*Advances and Payments by the Parties*).

C.   The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section 1.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section 1.3.B (*Advances and Payments by the Parties*).

D.   If any Party fails to meet the deadlines in Sections 1.5.B or 1.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section 1.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E.   ☐ *(Optional Provision – Forfeiture Penalties)*
*If the Non-Operators fail to meet the deadline in Section 1.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section 1.5.B or 1.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*

6.   APPROVAL BY PARTIES

A.   GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

4



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section 1.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section 1.6.B.

B.   AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____ two _____ ( _2_ ) or more Parties, one of which is the Operator, having a combined working interest of at least _____ two-thirds _____ percent ( 66.67 %), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C.   AFFILIATES

For the purpose of administering the voting procedures of Sections 1.6.A and 1.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section 1.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section 1.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

1.   RENTALS AND ROYALTIES

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

2.   LABOR

A.   Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1)   Operator's field employees directly employed On-site in the conduct of Joint Operations.

(2)   Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*).

(3)   Operator's employees providing First Level Supervision.

(4)   Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

(5)   Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B.   Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



D.  Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E.  Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section 1.6.A *(General Matters)*.

F.  Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G.  Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H.  Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3.  MATERIAL

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4.  TRANSPORTATION

A.  Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B.  Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below, provided the total transportation cost shall not exceed $10,000.00. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

   (1)  If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property . The Operator shall consistently apply the selected alternative.

   (2)  If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5.  SERVICES

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6.  EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A.  The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____Fifteen_____ percent ( __15__ %) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

## 7.   AFFILIATES

A.   Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $_50,000.00_____. If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (General Matters).

B.   For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (General Matters), if the charges exceed $_50,000.00_____ in a given calendar year.

C.   The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (Communications).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

## 8.   DAMAGES AND LOSSES TO JOINT PROPERTY

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

## 9.   LEGAL EXPENSE

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (General Matters) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

## 10.   TAXES AND PERMITS

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section 1.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

**11.  INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12.  COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13.  ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

**14.  ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15.  OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section 1.6.A (*General Matters*).

**III. OVERHEAD**

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)





COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

1. **OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

☒ **(Alternative 1)** Fixed Rate Basis, Section III.1.B.
☐ **(Alternative 2)** Percentage Basis, Section III.1.C.

A. **TECHNICAL SERVICES**

(i) Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section II.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

☒ **(Alternative 1 – Direct)** shall be charged <u>direct</u> to the Joint Account.

☐ **(Alternative 2 – Overhead)** shall be covered by the <u>overhead</u> rates.

(ii) Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section II.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

☐ **(Alternative 1 – All Overhead)** shall be covered by the <u>overhead</u> rates.

☒ **(Alternative 2 – All Direct)** shall be charged <u>direct</u> to the Joint Account.

☐ **(Alternative 3 – Drilling Direct)** shall be charged <u>direct</u> to the Joint Account, <u>only</u> to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

B. **OVERHEAD—FIXED RATE BASIS**

(1) The Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate per month $ 9,700.00              (prorated for less than a full month)

Producing Well Rate per month $  970.00

(2) Application of Overhead—Drilling Well Rate shall be as follows:

(a) Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

9



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

(b)    Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work-days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3)    Application of Overhead—Producing Well Rate shall be as follows:

(a)    An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b)    Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c)    A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d)    An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e)    Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4)    The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

C.    OVERHEAD—PERCENTAGE BASIS

(1)    Operator shall charge the Joint Account at the following rates:

(a)    Development Rate _____ percent (_____) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (*Legal Expense*) and all Material salvage credits.

(b)    Operating Rate _____ percent (_____%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.

(2)    Application of Overhead—Percentage Basis shall be as follows:

(a)    The Development Rate shall be applied to all costs in connection with:

[i]    drilling, redrilling, sidetracking, or deepening of a well

[ii]    a well undergoing plugback or workover operations for a period of five (5) or more consecutive work-days

[iii]    preliminary expenditures necessary in preparation for drilling

[iv]    expenditures incurred in abandoning when the well is not completed as a producer

[v]    construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead-Major Construction and Catastrophe*).

(b)    The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead-Major Construction and Catastrophe*).

2.    OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.   If the Operator absorbs the engineering, design and drafting costs related to the project:

(1)   _____5_____% of total costs if such costs are less than $100,000; plus

(2)   _____2_____% of total costs in excess of $100,000 but less than $1,000,000; plus

(3)   _____1_____% of total costs in excess of $1,000,000.

B.   If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1)   _____5_____% of total costs if such costs are less than $100,000; plus

(2)   _____2_____% of total costs in excess of $100,000 but less than $1,000,000; plus

(3)   _____1_____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

3.   AMENDMENT OF OVERHEAD RATES

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

## IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

1.   DIRECT PURCHASES

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

* To be negotiated if the need arises.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

2.    TRANSFERS

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

A.    PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1)    Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

(a)    For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

(b)    For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2)    Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3)    Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4)    As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

B.    FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1)    Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2)    Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3)    Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point

(4)    Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

C.    TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.



c o p a s

D.  CONDITION

(1)  Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2)  Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)  Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)  Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section I.6.A (*General Matters*).

(5)  Condition "E" – Junk shall be priced at prevailing scrap value prices.

E.  OTHER PRICING PROVISIONS

(1)  Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2)  Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

13



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**3. DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

**4. SPECIAL PRICING PROVISIONS**

**A. PREMIUM PRICING**

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

**B. SHOP-MADE ITEMS**

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

**C. MILL REJECTS**

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**1.   DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A.   A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B.   Actual transportation costs and Personal Expenses for the inventory team.

C.   Reasonable charges for report preparation and distribution to the Non-Operators.

**2.   NON-DIRECTED INVENTORIES**

A.   OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B.   NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C.   SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

EXHIBIT "C"

Attached to and made a part of that certain Participation and Exploration Agreement (West Tyler 3D Seismic Prospect) dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain, Non-Operators.

AFE

Swan Prospect DC AFE 000813,10/14/2013,11:36 AM

## SKLAR Exploration Company L.L.C.
401 Edwards St, Suite 1601
Shreveport, LA 71101
(318) 227-6006

**AUTHORITY FOR EXPENDITURE**

| DATE: | August 8, 2013 | FIELD: | Wildcat |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | TX |
| WELL: | Swan Prospect | HORIZON: | Paluxy |
| LOCATION: | Henderson County Survey A-267 | PROJ. T.D.: | 8000 MD = 8000 TVD |
| PROPOSAL: | Drill straight hole to BHL of 5300' FSL & 2850' FEL of survey. Set 9-5/8" at 1800'. Set 5-1/2" at TD. | Date Last Revised: | |

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 1100 | **LEASEHOLD COSTS** | | | |
| 01 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 02 | LEASE BONUS | | | |
| 03 | LEASE EXTENSION | | | |
| 04 | DELAY RENTALS | | | |
| 05 | BROKERAGE | | | |
| 06 | LANDMAN COSTS | | | |
| 07 | RECORDING FEES | | | |
| | TOTAL LEASEHOLD COSTS | $0 | $0 | $0 |
| | | | | |
| 10000000 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 5,000 | 2,000 | 7,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 70,000 | 2,000 | 72,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 10,000 | | 10,000 |
| 04 | SURFACE DAMAGES & ROW | 6,000 | | 6,000 |
| 05 | SETTING CONDUCTOR CASING | | | |
| 06 | RIG MOVE-IN/OUT/MOBILIZN | 60,000 | | 60,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 09 | DAYWORK WITH DRILL PIPE | 182,000 | 24,000 | 206,000 |
| 10 | DAYWORK WITHOUT DRILL PIPE | | | |
| 11 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 12 | ENGINEERING & SUPERVISION | 20,000 | 10,000 | 30,000 |
| 13 | RIG INSTRUMENTATION & MONITORING | 4,000 | | 4,000 |
| 14 | COIL TUBING UNIT | | | |
| 15 | DIRECTIONAL DRILLING TOOLS & SVCS | 10,000 | | 10,000 |
| 16 | MUD & CHEMICALS | 30,000 | | 30,000 |
| 17 | MUD DISPOSAL | | | |
| 18 | MUD LOGGING | 7,000 | | 7,000 |
| 19 | CEMENTING & EQUIPMENT | 18,000 | 25,000 | 43,000 |
| 20 | CASING CREW & LAYDOWN MACHINE | 17,000 | 19,000 | 36,000 |
| 21 | PIPE TESTING | 4,000 | 4,000 | 8,000 |
| 22 | EQUIPMENT RENTALS | 8,000 | 5,000 | 13,000 |
| 23 | FISHING TOOLS & SVCS | | | |
| 24 | TELEPHONE & COMMUNICATIONS | 4,000 | | 4,000 |
| 25 | WATER | 3,000 | | 3,000 |
| 30 | FUEL | 35,000 | 6,000 | 41,000 |
| 31 | BITS | 10,000 | 1,000 | 11,000 |
| 32 | TRANSPORTATION & TRUCKING | | 5,000 | 5,000 |
| 34 | CONTRACT LABOR | | 5,000 | 5,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 38,000 | 7,000 | 45,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS (DWOS) | | | |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 45 | MUD/CORING RIG | | 25,000 | 25,000 |
| 47 | PERFORATION (SERVICES) | | 12,000 | 12,000 |
| 48 | COMPLETION FLUIDS | | 3,000 | 3,000 |
| 49 | STIMULATION SERVICES | | 12,000 | 12,000 |
| 50 | INSTALLATION OF WELL EQUIPMENT | | 10,000 | 10,000 |
| 51 | PIPELINE JOINT/WET & ROW | | | |
| 55 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,000 | 2,000 |
| 62 | HOT OIL SERVICE | | | |
| 64 | TRAINING/MIT/MIT | | 6,000 | 6,000 |
| 66 | PLUG & ABANDON COSTS | 25,000 | | 25,000 |
| 70 | INSURANCE | 8,000 | 4,000 | 12,000 |
| 71 | COPAS OVERHEAD - DRILLING/COMPLETION | 8,000 | 4,000 | 12,000 |
| 80 | MISCELLANEOUS - 5% estimated | 30,000 | 9,000 | 39,000 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $640,000 | $176,000 | $816,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING (9-5/8") | 38,000 | | 38,000 |
| 04 | INTERMEDIATE CASING & LINERS | | | |
| 05 | FLOAT EQUIPMENT, HANGERS & RELATED | | | |
| 06 | WELLHEAD EQUIPMENT | 3,500 | | 3,500 |
| 05 | CONDUCTOR CASING | | | |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $42,000 | $0 | $42,000 |
| | | | | |
| 1620 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS (5-1/2") | | 137,000 | 137,000 |
| 22 | TUBING (2-7/8") | | 40,000 | 40,000 |
| 23 | PACKERS | | 3,000 | 3,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 4,000 | 4,000 |
| 25 | WELLHEAD EQUIPMENT | | 16,000 | 16,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | 40,000 | 40,000 |
| 77 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $240,000 | $240,000 |
| | | | | |
| 9505 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 39 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | 50,000 | 50,000 |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 30,000 | 30,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 30,000 | 30,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 25,000 | 25,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | | |
| 46 | SALES, METERING EQUIPMENT | | | |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $135,000 | $135,000 |
| | | | | |
| | TOTAL EQUIPMENT | $42,000 | $375,000 | $417,000 |
| | | | | |
| | **TOTAL WELL COST** | $682,000 | $553,000 | $1,235,000 |

APPROVED ~~NOVEMBER 15~~ 2013

BY: _[signature]_

☐ OCC Insurance Election - check your choice below:
☐ Coverage under own policy with limits not less than...
☐ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage for spud, owner will be included under and charged for SEC's OCC coverage.

**David A. Barlow**
**President & Chief Operating Officer**
**Sklarco L.L.C.**

EXHIBIT "D"

Attached to and made a part of that certain Joint Operating Agreement (Swan Prospect) dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, LLC, Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain, Non-Operators.

## INSURANCE

Operator shall carry the following insurance with the limits stipulated below for the joint account. Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit. Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement. Non-operating working interest owners shall be named as additional insured on the liability policies. This insurance shall be primary. Certificates of insurance will be provided upon request.

I.    WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY

Workers' Compensation Insurance covering the employees of Operator engaged in operations hereunder in compliance with the applicable State and Federal Laws.

Employers Liability Insurance coverage at limits of $1,000,000 each accident for bodily injury by accident/$1,000,000 policy limit for bodily injury by disease/$1,000,000 each employee for bodily injury by disease.

II    COMPREHENSIVE GENERAL LIABILITY

Coverage for all operations conducted hereunder by Operator for the Joint Account with a combined single limit each occurrence/aggregate of $1,000,000 for bodily injury and property damage. Said Comprehensive General Liability Insurance shall include contractual liability coverage.

III    AUTOMOBILE LIABILITY

Coverage shall include owned, non-owned and hired vehicles. Limit $1,000,000 combined single limit each occurrence for bodily injury and property damage.

IV    EXCESS LIABILITY

Operator shall carry excess liability insurance in an amount of $10,000,000.

V.    EXTRA EXPENSE LIABILITY

Operator's Extra Expense coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, redrilling and/or restoring, shall be carried by Operator, subject to limit(s) as shown below and subject to deductible not to exceed $200,000 per occurrence.

Liability Limit: $5,000,000

VI.    OIL LEASE PROPERTY

Oil Lease Property Insurance (Inland Marine) covering tanks, pumps, machinery, pipe and similar equipment of a mobile nature usual to the operation of a producing oil or gas well and crude oil while contained in tanks with limit of not less than $10,000,000 and subject to a deductible of $5,000.

VII.    ADDITIONAL INSURANCE

Operator shall be entitled to carry or provide any additional insurance for the benefit of the Joint Account, which is of direct benefit to the joint property and is incurred by the Operator in the necessary and proper conduct of the joint operations. The premium for all such insurance so carried shall be paid by Operator and charged to the Joint Account. Operator shall, at any time requested, furnish Non-Operator with information concerning the kind, character and amounts of insurance carried.

ANY PARTY, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder. Further, any party, at its own expense, may carry its own coverage for Extra Expense Liability Insurance with limits as set forth in Section V, above. Any party so electing must notify Operator of such election prior to commencement of operations and provide a certificate of insurance evidencing the appropriate limits of liability. Upon timely notification such party will not be charged by Operator for the coverage.

## EXHIBIT "E"

Attached to and made a part of that certain Joint Operating Agreement (Swan Prospect) dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, L.L.C.,Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain, Non-Operators.

## GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Operating Agreement, the parties hereto own and are entitled to share in the oil and gas produced from the wells completed on the Joint Operating Area described in the Operating Agreement (the "**JOA**").

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the gas produced from said JOA. However, one or more of the parties may be unable to take or market its interest in the gas production from time to time; therefore, to permit any party to produce and dispose of its interest in the gas production from the JOA with as much flexibility as possible, the parties hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser. Any party whose share of gas is not marketed shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ration of its participation percentage under this Operating Agreement to the participating percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, it any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area, any party taking or marketing gas shall furnish to the Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto; and any such party shall pay to the Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Operator will, in turn, make settlement for all royalties and overriding royalties which are payable on gas produced from the Contract Area. In the event that the total royalties and overriding royalties so paid to the Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Contract Area, then any such deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Contract Area shall furnish the Operator with division order title opinions on which Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser shall pay, or cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the

—1—

volume of gas actually taken for its account.

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from any reservoir or producing formation of each wellbore be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Operator along with sufficient accounting documentation as hereinafter described and Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold, less applicable production taxes and royalties theretofore paid, less any reasonable dehydration, compression, treating, processing, gathering or transportation costs actually incurred, including amortized capital costs associated with the design, construction or operation of any plants to dehydrate, compress, treat or process gas, in connection with the sale of the overproduction, at the price and based on the proceeds actually received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighted average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party). Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the terms of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in JOA operations as its share thereof is set forth in the above described Joint Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor in interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.

–2–

## EXHIBIT "E"

Attached to and made a part of that certain Participation and Exploration Agreement (West Tyler 3D Seismic Prospect) dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain, Non-Operators.

## SEISMIC DATA LICENSE AGREEMENT

Date: _____ ___, _____

| | LICENSOR: Sklar Exploration Company L.L.C. |
|---|---|
| | Attention: Don Eustes |
| | 401 Edwards Street, Suite 1601 |
| | Shreveport, Louisiana 71101 |

LICENSOR represents that it has the right to license to LICENSEE certain confidential seismic data ("Data") as described in Paragraph 1.1(a) of the Participation and Exploration Agreement to which this Seismic Data License Agreement is attached as Exhibit "E". LICENSOR hereby grants to LICENSEE a right to use the Data, and LICENSEE agrees to receive the Data and use it in accordance with the terms and conditions hereof. LICENSOR and LICENSEE acknowledge that this license is exclusive for a period of one year from the date that LICENSEE receives the Data, and thereafter non-exclusive. LICENSOR and LICENSEE further acknowledge that the Data is the property of the LICENSOR.

Subject to the foregoing, LICENSOR retains title and full ownership rights to Data including, but not limited to, the exclusive right to license, trade, loan, transfer and reproduce the same. LICENSEE agrees that the Data, and any copies thereof, shall be for its own internal use only and that the same shall not be given, sold, traded, disposed of or otherwise divulged to any other party, except as follows:

    a.    Data may be provided to a consultant to prepare an analysis and interpretation for LICENSEE but only if such consultant first agrees in writing not to divulge the data to any other party.

    b.    If LICENSEE is entering into this Agreement as the operator or other representative of one or more parties disclosed to LICENSOR, then such other parties may be shown the Data by LICENSEE or its bona fide consultant, but only if each such party first agrees in writing not to divulge the data to any other party.

    c.    LICENSEE can make a prospect presentation of the Data and the results of any analysis and interpretations to a third party with a bona fide interest in joining LICENSEE to explore, develop, produce, or finance any appropriate property for the purpose of identifying subsurface oil and gas deposits, provided that such third party agrees to treat all such data as confidential. Should such third party wish to make his own evaluation of the data, he/she/it may do so in LICENSEE's office only, provided that such third party first agrees in writing not to remove any such licensed data from LICENSEE's office, and to treat all such data as confidential.

    d.    If LICENSEE is a legal entity other than an individual, it may disclose, by providing copies thereof, the Data to a company owning 50% or more of the LICENSEE or to a company which is owned 50% or more by LICENSEE or to a surviving company in the event of a complete merger by LICENSEE, provided each such company is disclosed in advance to LICENSOR and that company first agrees in writing to assume the terms and obligations of this agreement.

    e.    LICENSEE may show, and provide copies of, the Data to agencies of federal and state governments having jurisdiction to the extent required or allowed by applicable law or regulation if necessary in the ordinary course of the LICENSEE's business.

    f.    LICENSEE shall have the right to make copies of adaptations from the Data (including reprocessed seismic traces) for his/her/its own internal use. LICENSEE may also transfer

the Data to a third party for the sole purpose of further processing and data analysis provided the third party first agrees in writing to hold the Data confidential and to return all manifestations of the Data to the LICENSEE when the reprocessing of analysis has been completed.

LICENSEE's rights hereunder are non-transferable, except under the provisions contained in that certain Participation and Exploration Agreement to which this Seismic Data License Agreement is attached as Exhibit "E".

LICENSEE agrees that he/she/it accepts the Data tendered to it "As Is, Where Is". LICENSOR does not make any warranty or representation regarding the quality or reliability of any or all of the Data delivered hereunder. Any action taken by LICENSEE or any opinions formed or conclusions drawn on the basis of any or all Data shall be at the sole risk and expense of the party taking such action, forming such opinion or drawing such conclusion. LICENSOR warrants that any Data it furnished hereunder is free of liens, encumbrances, and limitations on use or disposition other than those expressly set out above. THESE WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE REGARDING ANY DATA GIVEN THE LICENSEE HEREUNDER.

LICENSEE shall not have nor ever assert any claim or cause of action against LICENSOR arising out of any defect or inaccuracy in the Data, whether such defect or inaccuracy arose by negligence or any other cause.

In the event that any governmental unit should levy a sales or use tax of similar nature related to the licensing or transfer of the data covered under this agreement, then LICENSEE shall reimburse LICENSOR the amount of such levies or taxes.

The use license granted in this agreement shall continue for a term of forty-nine (49) years and shall be automatically renewed for an additional forty-nine (49) years, for no additional consideration, unless otherwise terminated by the mutual consent of both parties.

All section time and prints including all reprocessed or reformatted sections shall show the data owner as being LICENSOR and shall contain a notice reading substantially as follows:

| NOTICE |
| --- |
| "This document is licensed for use only to: _____, Licensee, by SKLAR EXPLORATION COMPANY L.L.C., LICENSOR. |
| Its use is governed by the terms specified in the license agreement signed by LICENSEE." |

By their execution of this document, LICENSOR and LICENSEE do each hereby approve and agree to be bound by the terms and conditions stated above.

LICENSOR:                                      LICENSEE:
**Sklar Exploration Company L.L.C.**

By: _____                        By: _____
      David A. Barlow

Title: President – Chief Operating Officer      Title: _____

Date: _____                       Date: _____

EXHIBIT "F-1"

Attached to and made a part of that certain Participation and Exploration Agreement (West Tyler 3D Seismic Prospect) dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group Inc., and Culver & Cain.

Letter Agreement

**WALKER INTERESTS LLC** 416 Travis St., Suite912 | Shreveport, La. 71101 | 318.227.6100

November 15, 2012

Sklar Exploration Company L.L.C.
401 Edwards Street, Suite 1601
Shreveport, Louisiana 71101

RE:    Swan Prospect
       Smith County, TX

Gentlemen:

This letter shall set out the terms and conditions under which Sklar Exploration Company L.L.C. & Sklarco L.L.C. (hereinafter collectively referred to as "Buyer") agrees to acquire from Tal Walker (hereinafter referred to as "Seller") the Swan Prospect (the "Prospect") covering the lands set forth as follows and herein referred to as "Prospect Area":

Portions of the Hezekiah George Survey A-367 and the Thomas Burbridge Survey A-161, Smith County, Texas, as outlined in red on the plat attached hereto as Exhibit "A",

subject to the following terms:

1.  Prospect Fee. Upon execution of this letter agreement ("Agreement") by all parties, a cash consideration ("Prospect Fee") in the amount of $20,000 shall be paid by Buyer to Seller.

2.  Acquisition of Leases. Should Buyer fail to acquire any leases and/or mineral interests in the Prospect Area within 180 (one hundred and eighty) days from the date this letter agreement is accepted by Buyer, this Agreement may be terminated at Seller's option by providing written notice to Buyer at the address above.. In the event of such termination, Buyer shall not be entitled to a refund of the Prospect Fee and Buyer agrees that for a period of three (3) years Buyer will not acquire or cause to be acquired on Buyer's behalf, any lease and/or mineral interest located within the Prospect Area.

3.  Option to Abandon. In the event that Buyer acquires leases and/or mineral interests within the Prospect Area but is unable to acquire leases, mineral interests, and/or agreements that cover at least 90% of the mineral rights within the Prospect Area, Buyer may elect to abandon the Prospect and terminate this Agreement by providing written notice to Seller at the address above. Seller shall then have the option to purchase any leases, mineral interests, and/or agreements within the Prospect Area from Buyer for an amount equal to Buyer's actual costs incurred in the acquisition of any such leases, mineral interests, and/or agreements.

4.  Sliding Scale ORRI/APOWI. Any leasehold interests covering lands located within the Prospect Area acquired or earned by Buyer shall be subject to the overriding royalty interest ("ORRI") or reversionary after prospect payout back-in working interest ("APOWI"), or combination thereof, described in this paragraph 4. Specifically, within ninety (90) days of receiving a written request from seller, Buyer agrees to assign unto Seller an ORRI or APOWI or combination thereof apportioned from any such leases acquired by Buyer covering lands located within the Prospect Area, or to which Buyer has the right to earn an interest under a farmout, in the following proportions, according to the net revenue interest ("NRI") of each such lease owned by the Buyer covering lands located with the Prospect Area:

| NRI | ORRI | APOWI |
|---|---|---|
| < or = 75% | 0% | 4% |
| >75% but < or = 78% | 1% | 2% |
| >78% | 2% | 0% |

Any ORRI or APOWI shall be proportionately reduced to the interest owned by Buyer at the time it acquires a particular lease. Buyer makes no guarantees, but agrees to use its best efforts to obtain the best terms as reasonably available in the area on any leases it acquires, including the highest NRI that it can reasonably obtain. For purposes hereof, "Prospect Payout" is defined on a prospect (not well-by-well) basis and shall occur on the first day of the calendar month following the month in which Buyer's

# WALKER INTERESTS LLC
416 Travis St., Suite912 | Shreveport, La. 71101 | 318.227.6100

share of the total and cumulative revenue resulting from or relating to the Prospect, equals Buyer's share of the total and cumulative cost incurred within the Prospect. For purposes of further defining Prospect Payout, (i) the total and cumulative revenue shall consist of Buyer's share of all sales proceeds for all oil, gas and other hydrocarbons and minerals produced, saved and sold from any wells in the Prospect and any other income, bonus payment or other revenue attributable to Buyer's interest therein, and (ii) the total and cumulative cost incurred shall include Buyer's share of all royalty and overriding royalty payments, severance, ad valorem, production and other taxes applicable to production and not measured by Buyer's other income, all lease acquisition and maintenance costs, all seismic survey and data costs, geological and geophysical evaluation costs, all costs for site preparation, drilling, reworking, deepening, sidetracking, logging, stimulation, testing, completing, equipping, operating, plugging and abandoning any wells within the Prospect, and the cost of all surface damages, pipelines, gathering and other production handling facilities related thereto. For purposes hereof, NRI for a particular lease shall mean the lessee's share of production after satisfaction of the lessor's royalty and any other burdens in favor of parties other than Buyer. The ORRI shall be proportionately reduced in the event that the mineral interest covered by a lease is less than the full mineral interest and in the event that Buyer acquires less than full interest in a lease. The ORRI and APOWI described in this paragraph 4 shall be due to Seller on extensions and renewals acquired by Buyer, its successors and assigns, within six months of the expiration of any lease within the Prospect Area. The APOWI shall be subject to a joint operating agreement under which Sklar Exploration Company L.L.C. or its designee serves as Operator and shall be an A.A.P.L. Model Form 610-1982 with a 500%/500% risk compensation provision.

5. **AML** An Area of Mutual Interest ("AMI") covering the Prospect Area exists between the parties as to the Prospect Area and shall be in full force and effect for so long as any leases subject to this Agreement are in force and in effect.

6. **Seller's Services.** During the term of this Agreement, Seller agrees to provide up to 20 (twenty) hours of consulting services related to the Prospect Area to Buyer at no additional cost. Buyer may use other consultants or employees at its discretion.

7. **Data.** Buyer agrees to timely provide Seller with all well data and reports and allow Seller and/or its designee, access to the rig floor during drilling and completion operations.

If the above terms and conditions are acceptable, please so indicate by signing in the space provided below and return one (1) duplicate original to the attention of the undersigned within ten (10) days of the date of this letter or this proposal may terminate at Buyer's option.

Sincerely,

By: _____
Tai Walker, Seller

ACCEPTED AND AGREED TO this _15th_ day of _November_ 2012.

Sklar Exploration Company L.L.C. & Sklarco L.L.C., Buyer

By: _____
David Barlow, President/A. Chief Operating Officer,
Sklar Exploration Company L.L.C. and Sklarco L.L.C.



SMITH COUNTY, TEXAS

LEASE SUMMARY MAP

EXHIBIT "F-2"

Attached to and made a part of that certain Participation and Exploration Agreement (West Tyler 3D Seismic Prospect) dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group Inc., and Culver & Cain.

Letter Agreement Amendment

November 12, 2013

WALKER INTERESTS LLC  416 Travis St., Suite 912 : Shreveport, La. 71101 | 318.227.6100

Sklar Exploration Company L.L.C.
401 Edwards Street, Suite 1601
Shreveport, Louisiana 71101

RE:   Amendment to Letter Agreement dated November 15, 2012
      Swan Prospect
      Smith County, TX

Gentlemen:

This letter will serve to amend the terms and conditions under which Sklar Exploration Company L.L.C. & Sklarco L.L.C. (hereinafter collectively referred to as "Buyer") agreed to acquire from Tal Walker (hereinafter referred to as "Seller") the Swan Prospect as same relates to the "Prospect Area", to-wit:

"Portions of the Hezekiah George Survey A-367 and the Thomas Burbridge Survey A-161. Smith County, Texas, as outlined in blue on the plat attached hereto as Exhibit "A"."

shall be deemed changed, effective November 12, 2012, to read:

"Lands in Smith County, Texas, as outlined in blue on the Amended Plat attached hereto as Exhibit "A"."

All the other terms of the original agreement shall remain as before.

Sincerely,

By: _____
    Tal Walker, Seller

ACCEPTED AND AGREED TO this ____ day of _____ 2015.

Sklar Exploration Company L.L.C. & Sklarco L.L.C. Buyer

By: _____
    Gregory L. Rembert, Vice President – Land Manager
    Sklar Exploration Company L.L.C. and Sklarco L.L.C.

Exhibit "A"

Attached to and made a part of that certain Amendment to Letter Agreement dated November 12, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C. and Tal Walker.



SWAN PROSPECT
SMITH COUNTY, TEXAS



October 30, 2014

To All Working Interest Owners

RE:   West Tyler 3D Seismic Prospect Status Update and
      Swan Prospect JOA Amendment
      Smith County, Texas

Dear Owner:

The purpose of this letter is to inform the working interest owners of the progress we are making in West Tyler 3D Seismic Prospect and to amend the initial well spud date in the Swan Prospect Joint Operating Agreement.

Please be advised that a portion of the 3D seismic processing is still in progress. We are currently evaluating the received data and will identify additional prospects upon evaluation of all of the 3D seismic data. Based on the evaluation of seismic data which we have received thus far, we plan on staking our first initial well location as stated in the Swan Prospect Joint Operating Agreement. However, we have a few title issues to cure and permits to file that may take anywhere from 4-6 months to complete.

Therefore, Sklar hereby request your approval of an extension to spud the initial well. Enclosed for your review and approval is a revised page 4 of the Joint Operating Agreement changing the initial well spud date to April 30, 2015.

Please acknowledge your receipt and acceptance of the extension to spud the initial well by signing the enclosed copy of this letter in the space provided and returning it to me at your first opportunity. Should you have any questions regarding any of the aforementioned, please do not hesitate to give me a call.

Sincerely,

Kim E. Ramsey, CPL
Landman

Enclosures

To All Working Interest Owners
West Tyler 3D Seismic Prospect Status Update and
Swan Prospect JOA Amendment
October 30, 2014
Page 2


I hereby acknowledge receipt of and accept the revised spud date of the initial well from December 31, 2014 to April 30, 2015, as amended on page 4 of the JOA.

Company Name: _____

Name: _____

Title: _____

Date: _____

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE V.

OPERATOR

**A.  Designation and Responsibilities of Operator:**

_____ **Sklar Exploration Company L.L.C.** _____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations / **its activities under this agreement** in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

**B.  Resignation or Removal of Operator and Selection of Successor:**

1. Resignation or Removal of Operator:  Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators / owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. / Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a cor- porate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator  **\* Such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within 30 days from its receipt.**

2. Selection of Successor Operator:  Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority / **voting** interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

3. **Effect of Bankruptcy:  See Additional Provisions Article XV.Z.**

**C.  Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

**D.  Drilling Contracts:**

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of in- dependent contractors who are doing work of a similar nature.

ARTICLE VI.

DRILLING AND DEVELOPMENT

**A.  Initial Well:**

On or before the _____**30th**_____ day of **April**___ , _(year)_ **2015**_____ , Operator shall commence the drilling of a well for oil and gas at the following location: **5,300' FSL and 2,850' FEL of the Hezekiah George Survey A-367, of Smith County, Texas, or as near thereto as practicable, or at a mutually acceptable location picked after shooting 3D Seismic**

and shall thereafter continue the drilling of the well with due diligence to a **depth of 8,000' or a depth sufficient to test the Paluxy Formation**

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is en- countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

- 4 -



January 7, 2014

TO ALL WORKING INTEREST OWNERS

      RE:  Revisions to West Tyler 3D Seismic Participation Agreement
           And Swan Prospect JOA
           Smith County, Texas

Dear Owner:

    Fair Oil, Ltd. has requested a few revisions to the West Tyler 3D Seismic Participation Agreement ("**PA**") and Swan Prospect JOA.   Please see the attached revisions to the PA, Exhibit "B" to PA, JOA, and Exhibit "A" to JOA.

1. PA-Section 1.1(b) page 5:  Added language to paragraphs one and two to address the issue of non-participating interest in Future Prospects;

2. PA-Section 3.1 AMI page 7:  Added language to address the issue of Fair and Ray's mineral/leasehold interest within the AMI;

3. Exhibit "B" to PA:  Corrected typo from 59.504% to 60.32% APO interest;

4. JOA-Article VI page 5 line 52; changed 24 hour period to be exclusive of Saturday, Sunday and legal holidays;

5. JOA-Article VI page 8 Line 8: deleted "but not the obligation" and line 10: addresses the issue of sales;

6. JOA Article VII(f) on page 10 lines 68-70: Language added to address the issue of severance tax;

7. JOA-Article XV(W) on page 14f:  Added language to first paragraph to address Fair and Ray's mineral/leasehold interest within AMI and revised the second paragraph to address the term of AMI (page 14g and 14h are included because of spacing); and

*tel:* 318.227.8668 · *fax:* 318.227.9012 · 401 Edwards Street,  Ste 1601 · Shreveport, Louisiana 71101

All Working Interest Owners
Revisions to West Tyler 3D Seismic Participation Agreement
And Swan Prospect JOA
January 7, 2014
Page 2

8. Exhibit "A" to JOA: (3) corrected JJS BPO Interest and (4) added additional
   contact information to Fair Oil Ltd.

Please review and if all meets your approval, please slip sheet the attached sheets, sign this
letter and return it to my office as soon as possible.  If you have any questions, please don't
hesitate to give me a call.

Sincerely,

Kim E. Ramsey, CPL
Landman

Enclosures

Agreed to and accepted this _____ day
of _____, 20_____.

Company:  _____

By:  _____

Title:  _____





January 7, 2014

TO ALL WORKING INTEREST OWNERS

    RE:  Revisions to West Tyler 3D Seismic Participation Agreement
           And Swan Prospect JOA
           Smith County, Texas

Dear Owner:

    Fair Oil, Ltd. has requested a few revisions to the West Tyler 3D Seismic Participation Agreement ("PA") and Swan Prospect JOA.  Please see the attached revisions to the PA, Exhibit "B" to PA, JOA, and Exhibit "A" to JOA.

1. PA-Section 1.1(b) page 5:  Added language to paragraphs one and two to address the issue of non-participating interest in Future Prospects;

2. PA-Section 3.1 AMI page 7:  Added language to address the issue of Fair and Ray's mineral/leasehold interest within the AMI;

3. Exhibit "B" to PA:  Corrected typo from 59.504% to 60.32% APO interest;

4. JOA-Article VI page 5 line 52; changed 24 hour period to be exclusive of Saturday, Sunday and legal holidays;

5. JOA-Article VI page 8 Line 8: deleted "but not the obligation" and line 10: addresses the issue of sales;

6. JOA Article VII(f) on page 10 lines 68-70: Language added to address the issue of severance tax;

7. JOA-Article XV(W) on page 14f:  Added language to first paragraph to address Fair and Ray's mineral/leasehold interest within AMI and revised the second paragraph to address the term of AMI (page 14g and 14h are included because of spacing); and

*tel:* 318.227.8668 · *fax:* 318.227.9012 · 401 Edwards Street,  Ste 1601 · Shreveport, Louisiana 71101

All Working Interest Owners
Revisions to West Tyler 3D Seismic Participation Agreement
And Swan Prospect JOA
January 7, 2014
Page 2



RETURN COPY

8. Exhibit "A" to JOA: (3) corrected JJS BPO Interest and (4) added additional contact information to Fair Oil Ltd.

Please review and if all meets your approval, please slip sheet the attached sheets, sign this letter and return it to my office as soon as possible.  If you have any questions, please don't hesitate to give me a call.

Sincerely,

Kim E. Ramsey, CPL
Landman

Enclosures

Agreed to and accepted this _____ day
of _____, 20_____.

Company:  _____

By:  _____

Title:  _____

election notice from Sklarco within which to notify Sklarco of Participant's election to participate in the Future Prospect(s). Failure of a Participant to respond within said thirty (30) day notice period shall automatically be deemed an election not to participate in said Future Prospect(s). Participants shall have an opportunity to participate in any and all Future Prospects for as long as this Agreement is in effect, regardless of when such Future Prospect may be identified by Sklarco, and regardless of whether Participant has elected to participate in other Future Prospect(s).

After the expiration of each thirty (30) day election period set forth above, Sklarco, at its election, may withdraw a proposal for a Future Prospect if, in Sklarco's opinion, there is insufficient participation in such Future Prospect, or Sklarco may offer to all Participants who elected to participate in said Future Prospect, each parties' proportionate part of the remaining interest available. Each such Participant, within 24 hours after receipt of notice, shall advise Sklarco of its election to acquire its proportionate part of the remaining interest available. Failure of a Participant to respond within said 24 hour period (exclusive of Saturday, Sunday and legal holidays) shall automatically be deemed an election not to acquire an additional interest in said Future Prospect, at which point Sklarco may assume or market for sale the portion of any Future Prospect(s) for which an election not to participate has been given or deemed given and shall promptly notify all parties of such decision. Sklarco shall have the absolute right to withdraw any proposal for a Future Prospect if, in Sklarco's opinion, there is insufficient participation in such Future Prospect. Once all of a Future Prospect's ownership has been purchased by Participants or third parties, Sklarco will circulate for execution by the participants to each such Future Prospect, participation agreements for each Future Prospect in substantially the same form as this Agreement identifying the ownership percentage of each participant, the contract area, the leases, and fees to be paid by the participants in each such prospect. Additionally, Sklarco will agree to sell and assign unto the participants in each such prospect, in the same proportions identified in each such participation agreement, an undivided interest in all of its right, title and interest in and to the leases contained in each such Future Prospect by means of the form of assignment substantially the same as is attached hereto as Exhibit "B." Each assignment of interest, if any, shall be: (i) made without warranty of title, express or implied, not even for return of the prospect fee, except Sklarco agrees to warrant title against all defects arising out of claims by Sklarco or of persons claiming by, through or under Sklarco, (ii) subject to the terms of the leases including Lessors' Burdens, (iii) subject to the ORRI described below, and (iv) subject to this Agreement, the participation agreement for each Future Prospect, and the operating agreement to be executed by the participants in association with each such Future Prospect, which shall be in substantially the same form as the JOA described in Section 2.1 of this Agreement.

### Subsection 1.1(c). Overriding Royalty Interests

Each lease, including the Leases, lease extensions, or other mineral interests acquired by Sklarco in the AMI, including, but not limited to, the Prospect and Future Prospects, shall be subject to a sliding scale overriding royalty interest (the "ORRI") in favor of Tal Walker ("Walker") or his designee(s), as more fully set forth in that certain letter agreement between Tal Walker, Sklarco, and SEC dated November 15, 2012, as amended by that certain letter agreement amendment dated November 12, 2013 (collectively the "**Walker Letter Agreement**"), copies of which are attached hereto as **Exhibits "F-1" and "F-2"**, respectively, and which are incorporated herein by reference. In the event of a conflict between this Agreement and the Walker Letter Agreement, the Walker Letter Agreement shall control.

The Walker ORRI to be borne by all Participants shall be a percentage of the oil, gas and other minerals produced and saved under the terms and provisions of such lease, from or attributable to, any lands covered thereby, proportionately reduced to the net mineral acres covered by such lease, and shall be calculated on a lease by lease basis according to the net revenue interest ("**NRI**") of each such lease, as follows: 1) if the NRI of a lease is greater than seventy-five percent (75%), but less than or equal to seventy-eight percent (78%), then the ORRI on any such lease shall be one percent (1%), and 2) if the NRI of a lease is greater than seventy-eight percent (78%), then the ORRI on any such lease shall be two percent (2%). Walker is not entitled to an ORRI on leases for which the NRI is less than or equal to seventy-five percent (75%). The ORRI shall be calculated and shall be delivered and paid to Walker or his designee(s) in the same manner or with the same exclusions, deductions, and allocations as are provided for the calculation, delivery, and payment of royalties to the lessor in the lease. Similarly, Walker shall pay or bear such taxes and charges and other deductions attributable to the ORRI as are to be paid and borne by the lessor in the lease.

Additionally, Sklarco and JJS have granted Walker a sliding scale after prospect payout back-in working interest ("**APOWI**") in each lease, including the Leases, and lease extensions acquired by Sklarco in the AMI. As set forth in the Walker Letter Agreement, Walker's APOWI shall be calculated on a lease by lease basis according to the NRI of each such lease, as follows: 1) if the NRI of a lease is greater than seventy-five percent (75%), but less than or equal to seventy-eight percent (78%), then the APOWI on any such lease shall be two percent (2%), and 2) if the NRI of a lease is less than or equal to seventy-five percent (75%), then the APOWI on any such lease shall be four percent (4%). Walker is not entitled to an APOWI on leases for which the NRI is greater than seventy-eight percent (78%). The APOWI shall be borne by Sklaro and JJS proportionately as reflected on Exhibit A to the JOA identified in Subsection 2.1 below, which is allocated in accordance with the terms of that certain "Agreement For Termination Of Agency Services Agreements" dated effective as of January 1, 2010, to which Sklarco and JSS, et al are parties.

and all such wells, and in any easements, rights of way, personal property, equipment, facilities, and pipelines associated with such wells.

   **"Prospect Payout"** is defined on an AMI (not a prospect-by-prospect or well-by-well ) basis as the first day of the calendar month following the month in which a Participant's share of the total and cumulative revenue received from the sale of oil, gas and other hydrocarbons and minerals produced, saved and sold from all prospects located with the AMI, which shall consist of the Prospect and all Future Prospect(s), if any, within which a Participant has elected to participate within the AMI, equals that Participant's share of the total and cumulative costs and expenses incurred by that Participant relating to all such prospects. For purposes of Prospect Payout, (i) the total and cumulative revenue shall consist of the Participant's share of all sales proceeds received for all oil, gas and other hydrocarbons and minerals produced, saved and sold from the AMI, and (ii) the total and cumulative cost incurred shall include the Participant's share of all royalty and overriding royalty payments, severance, ad valorem, production, and other taxes applicable to production and not measured by the Participant's other income, the Prospect Fee, Future Prospect Fee(s), all lease acquisition and maintenance costs, all seismic permit, survey and data costs, geological and geophysical evaluation costs, all costs for site preparation, drilling, reworking, deepening, sidetracking, logging, stimulation, testing, equipping, operating, and plugging and abandoning the Initial Well, Future Prospect initial wells, and all other wells within the AMI, and the cost of all surface damages, pipelines, gathering and other production handling facilities related thereto. Before Prospect Payout has occurred, the status of the Prospect (and Future Prospects, as applicable) is sometimes hereinafter referred to as **Before Prospect Payout ("BPPO")**. Once Prospect Payout has occurred, the status of the Prospect (and Future Prospects, as applicable) is sometimes hereinafter referred to as **After Prospect Payout ("APPO")**.

## Article II.  Operations

### Section 2.1.  JOA

   SEC is hereby designated Operator of all wells drilled within the Prospect and Future Prospects or land outlined therewith. Except as otherwise provided in this Agreement, all operations within the Contract Area shall be governed by the joint operating agreement (the **"JOA"**) covering the Contract Area attached hereto as Exhibit **"D."** The Parties agree to execute the JOA concurrent with their execution of this Agreement. In the event of a conflict between this Agreement and the JOA, this Agreement shall govern and control.

## Article III.  Miscellaneous

### Section 3.1.  AMI

   The Parties have formed an AMI under the terms contained in Article XV.W of the JOA covering the lands within the blue outline on the plat attached hereto as Exhibit "A" which shall govern the acquisition, extension, or renewal by any of the Parties of any oil and gas lease, including the Leases, or oil and gas interest (as defined in the JOA) covering lands located within the AMI created under this Agreement, including, but not limited to, the Prospect and Future Prospects. Culver shall not be subject to the AMI with respect to those lands located within the green outline on the plat attached hereto as Exhibit "A", which areas are further identified as the **"Culver Excluded Areas."** Fair and Ray, respectively, shall not be subject to the AMI as to those mineral or leasehold interests each owned within the AMI prior to the Effective Date. If a lease is acquired from a lessee, the term **"Lessor's Burden"** as used in paragraph 1.1, above, shall include any overriding royalty interest, production payment, or other burden created by any lessee of the lease prior to its acquisition or reserved in the assignment of the lease to the Party which acquires the lease. The Reversionary Back-In Working Interest described in Section 1.3 of this Agreement and ORRI and APOWI described in Subsection 1.1(c) shall also burden new leases acquired under the AMI in which Sklarco also acquires an interest.

   As, more fully set forth in the Article XV.W of the JOA, and as will be set forth in the JOAs for Future Prospects, an Acquiring Party (as defined in the JOA) shall make an offer of an oil and gas lease or interest to an Offeree(s) (as defined in the JOA) in accordance with the following:
   1. If the oil and gas lease or interest covers a portion of lands located within the contract area of the Prospect or any single Future Prospect, then the Acquiring Party shall offer the entirety of such lease or interest to the participants within such prospect;

   2. If the oil and gas lease or interest does not cover any portion of lands located within the contract areas of the Prospect or any Future Prospect(s), then the Acquiring Party shall offer such lease or interest to the Participants of the Prospect; or

   3. If the oil and gas lease or interest covers a portion of lands located within the contract areas of multiple prospects, including the Prospect and/or any Future Prospect(s), then the Acquiring Party shall offer such lease or interest to the participants within all such prospects; and such offer shall be allocated between the multiple prospects b ased on the ratio of net mineral acres

**FAIR OIL LTD**, a Texas limited partnership, whose address is 225 South College, Tyler, Texas 75702, represented herein Fair Oil Company of Texas, Inc., its sole General Partner, represented herein by its President, John R. Garrett ("**Fair**");

**R. L. RAY, LTD**, a Texas limited partnership, whose address is 223 South College, Tyler, Texas 75702, represented herein by its General Partner, John D. Hills ("**Ray**");

**FANT ENERGY LIMITED**, a Texas limited partnership, represented herein by its General Partner, Richard E. Fant L.L.C., which itself is represented herein by its Manager, Richard E. Fant ("**Fant**");

**LUCAS PETROLEUM GROUP, INC.** a Texas corporation, whose address is 327 Congress Avenue., Suite 500, Austin, Texas 78701, represented herein by its President, Fain Brock ("**Lucas**"); and

**CULVER & CAIN, PRODUCTION LLC,** a Texas limited liability company, whose address is 121 S. Broadway, Suite 760, Tyler, Texas 75702, represented herein by Matthew R. Culver, its Manager **("Culver")**

an undivided Seventy Five percent Before Payout Interest (75% BPO), and an undivided Sixty point Thirty-two percent After Payout Interest (60.32% APO) in all of its right, title and interest in and to the oil, gas and other mineral leases (the "**Leases**") described in Exhibit "A" attached hereto and by reference made a part hereof and the rights, estates and interests of the lessee thereunder, in the proportions set forth below as to each such Assignee's name:

| ASSIGNEES | BPO INTEREST | APO INTEREST |
|---|---|---|
| Participant | Proportion | Proportion |
| McCombs | 25.0000% | 18.7500% |
| JJS | 5.0000% | 7.8200% |
| Howell | 5.0000% | 3.7500% |
| Kudzu | 5.0000% | 3.7500% |
| Tiembo | 2.0000% | 1.5000% |
| Bundero | 2.0000% | 1.5000% |
| Greenspan | 1.0000% | 0.7500% |
| Fair | 11.5000% | 8.6250% |
| Ray | 5.5000% | 4.1250% |
| Fant | 10.0000% | 7.5000% |
| Lucas | 2.0000% | 1.5000% |
| Culver | 1.0000% | 0.7500% |
| | | |
| Total | 75.0000% | 60.3200% |

Assignor does hereby except from this Assignment and reserve unto itself the following before payout (BPO) and after payout (APO) interests in and to the Leases and the rights, estates and interests of the lessee thereunder, to-wit:

| | BPO | APO |
|---|---|---|
| Sklarco | 25% | 39.68% |

TO HAVE AND TO HOLD unto the Assignees, their successors and assigns, forever, subject to, and in accordance with, the following terms and provisions:

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1    If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the
2  well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

3

4

5

6  **B.   Subsequent Operations:**

7

8    1.  Proposed Operations:   Should any party hereto desire to drill any well / "any well" includes water source or injection wells on the Contract Area other than the well provided
9  for in Article VI.A., or to rework, / deepen or plug back a dry hole drilled at the joint expense of all parties reenter, recomplete, sidetrack, or a well jointly owned by all
10  the parties and not then producing / in paying quantities, the party desiring to drill, rework, / deepen or plug back such a well shall give the that have not forfeited their interest in the well   reenter, recomplete, sidetrack,
11  other parties / written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
12  tion and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) / fifteen (15) days after receipt of the notice
13  within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill- within the contract area
14  ing rig is on location / , notice of a proposal to rework, plug back or drill deeper may be given by telephone / and the response period shall be or facsimile or email
15  limited to / twenty four (24) forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays. Failure of a party receiving such notice to reply within
16  the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or
17  response given by telephone shall be promptly confirmed in writing. Not withstanding this Article VI/B.1, and subject to the right of any
18  party to non-consent the proposed operation, a proposal to re-work, recomplete, sidetrack, deepen or plugback a well producing in paying quantities, which is consented to by two (2) or more of the Parties owning two-thirds (2/3rds) or more of the working interest
19  under the well may proceed and be executed on behalf of the Consenting Parties without the unanimous consent of all parties.

20

21

22

23    If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice
24  period of / thirty (30) fifteen (15) days (or as promptly as possible after the expiration of the / forty-eight (48) twenty four (24) hour period when a drilling rig is on loca-
25  tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
26  ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
27  for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
28  permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
29  amination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the
30  actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
31  if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
32  dance with the provisions hereof as if no prior proposal had been made.

33  Operator may, at its discretion, perform prepatory work in connection with, or even actually commence an operation for which
34  notice has been provided under this Article VI.B prior to or during the notice period, and if such operation ultimately is con-
ducted by less than all parties, the Consenting Parties shall, nevertheless, be entitled to recover the risk compensation provided for
35  hereunder.

36    2.  Operations by Less than All Parties:   If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option
37  No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
38  giving the notice and such other parties as shall elect to participate in the operation shall / subject to availability of equipment and personnel within ninety (90) days after the expiration of
39  the notice period of / fifteen (15) thirty (30) days (or as promptly as possible after the expiration of the / twenty four (24) forty-eight (48) hour period when a drilling rig is
40  on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all
41  work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
42  a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
43  tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Con-
44  senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
45  ditions of this agreement.

46

47

48

49    If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
50  notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as
51  to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within / twenty four (24) forty-eight (48) hours
52  (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-
53  ticipation to such party's interest as shown on Exhibit "A" or (b) carry / all of its proportionate part of Non-Consenting Parties' interests, and
54  failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for
55  such a response shall not exceed a total of / twenty four (24) forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party,
56  at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

57

58

59

60    The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
61  elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such
62  operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
63  If such an operation results in a dry hole, the Consenting Parties shall / plug and abandon the well and restore the surface location at their either
64  sole cost, risk and expense / . If any well drilled, / reworked, deepened or plugged back under the provisions of this Article results in a pro- re-entered, recompleted, sidetracked
65  ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,
66  *or one of them shall make a proposal to the other Consenting Parties to conduct further operations under Article VI.B

67

68

69

70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1   required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from

4   the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for

5   its share of all production.

6

7      In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of

8   the oil / produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, ~~but not~~ [and/or gas]

9   ~~the obligation,~~ to purchase such oil / or sell it to others at any time and from time to time, for the account of the non-taking party ~~at the~~ [and/or gas] [on the same terms as Operator is marketing Operator's and/or other Non-Operator's share of production]

10   ~~best price obtainable in the area for such production~~ / . Any such purchase or sale by Operator shall be subject always to the right of the [and/or gas]

11   owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil / not previously [and/or gas]

12   delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil / shall be only for such reasonable periods of

13   time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess

14   of one (1) year.

15

16      In the event one or more parties' separate disposition of its share of the gas causes split-stream / deliveries to separate pipelines and/or [sales or]

17   deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to

18   be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing

19   agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

20

21   **D.   Access to Contract Area and Information:**

22      Except as otherwise provided herein, each consenting party who has paid 100% of its share of all costs of all operations [conducted under this Agreement]

23   ~~Each party~~ shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,

24   and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books

25   and records relating thereto. Operator, upon request, shall furnish each of the other / parties with copies of all forms or reports filed with [consenting]

26   governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of

27   each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of

28   gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-

29   quests the Information.

30

31   **E.   Abandonment of Wells:**

32

33      1. Abandonment of Dry Holes:  Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been

34   drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned

35   without the consent of ~~all parties~~. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply

36   within / ~~forty-eight (48)~~ hours ~~(exclusive of Saturday, Sunday and legal holidays)~~ after receipt of notice of the proposal to plug and abandon [twenty four (24)]

37   such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in

38   accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening [or parties owning greater than 10% interest in the well]

39   such well. Any party / who objects to plugging and abandoning such well shall have the right to take over the well and conduct further

40   operations in search of oil and/or gas subject to the provisions of Article VI.B. [Any cement plugs used for plugging and abandoning such well shall be in excess of that required by the regulatory body, recommended to be a volume of one and one-half times of that]

41   [required.]

42      2. Abandonment of Wells that have Produced:  Except for any well in which a Non-Consent operation has been conducted

43   hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a [2/3 or more of the owners thereof]

44   producer shall not be plugged and abandoned without the consent of / ~~all parties~~ / . If ~~all~~ / parties consent to such abandonment, the well shall [such]

45   be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within [or within forty-eight (48) hours if a drilling rig is on location]

46   thirty (30) days after receipt of notice of the proposed abandonment of any well / , all parties do not agree to abandonment of such well,

47   those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other

48   parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of [Failure to respond to said notice shall constitute an election to plug and abandon said well.]

49   Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. / Each abandoning party shall assign

50   the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and

51   material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-

52   terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and

53   gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-

54   tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-

55   duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

56   * parties owning greater than a 90% combined interest in the well.  If the well has been drilled pursuant to Article VI.B.2, only the consent of the consenting parties shall be required.

57

58   ** If the well has been drilled or reworked pursuant to Article VI.B.2 and the consenting parties therein have not been fully reimbursed as provided, only the approval of such consenting parties shall be required.

59

60

61

62

63

64

65

66

67

68

69

70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VII**
**continued**

1 ☑ */ Option No. 1:* All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2 necessary tankage and/or surface facilities. * This Option No. 1 shall apply only to water source and/or water injections wells.
3
4 ☑ */ Option No. 2:* All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5 authorized depth, and all tests have been completed, and the results thereof / furnished (including all logs) to the parties, Operator shall give immediate notice
6 to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have / forty-eight
7 (48 / ) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8 tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9 cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, / deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties. **This Option No. 2 shall cover all wells except those expressly covered by Option No. 1 above.
14
15     2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.
19
20     3. Other Operations:  two or more parties owning a majority interest  Without the consent of / all parties, Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of_____Fifty Thousand and No/100_____ Dollars ($_50,000.00_____ )
22 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of_____Fifty -Thousand and No/100_____
28 Dollars ($_50,000.00_____ ) bu t less than the amount first set forth above in this paragraph.
29
30 E.   **Rentals, Shut-in Well Payments and Minimum Royalties:**
31
32     Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35 behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B.23.
39
40     Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46 F.   **Taxes:**
47
48     Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".
59                                                                     and in the case of a Non-Operator, if any such Non-Operator timely
                                                                       notifies Operator in writing,
   or Non-Operator
60     If Operator / considers any tax assessment improper, / Operator may, at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".
66
           Operator            on behalf of all parties
67     Each party / shall pay or cause to be paid / all production, severance, excise, gathering and other taxes imposed upon or with respect
68 to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement. In the event Operator
69 applies for and receives a reduced severance tax rate, the same rate shall be applied to royalty and working interest owners
70 prospectively, as applicable.

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

the other well is located in the same unit, and even if the new well is completed in the same Zone from which the existing well is producing.

Anything to the contrary hereinabove notwithstanding, any Non-Consenting Party to an operation conducted hereunder shall have no right to observe such operation or subsequent operations within the same well or have access to information pertaining to such operation or subsequent operations, until such time as the Non-Consenting Party's share of the cost of such operation, and any applicable subsequent operations, and the risk compensation therefrom, has been recovered by the Consenting Parties as provided herein.

W.  AREA OF MUTUAL INTEREST

The parties hereby create an Area of Mutual Interest ("AMI") consisting of the lands outlined by a bold blue line on the plat attached hereto as Exhibit "A-2". Culver shall not be subject to the AMI with respect to those lands located within the green outline on the plat attached hereto as Exhibit "A-2", which areas are further identified as the "Culver Excluded Areas." Fair Oil, Ltd. and R. L. Ray, Ltd., respectively, shall not be subject to the AMI as to those mineral or leasehold interests each owned within the AMI prior to October 1, 2013.
~~This AMI shall remain in force and effect for a term of five (5) years from the date of this Agreement and, insofar and only insofar as the AMI includes lands covered by oil and gas leases and/or oil and gas interests subject to this Agreement, as long thereafter as said oil and gas leases and/or oil and gas interests remain in force and effect. This AMI shall terminate after five (5) years as to all such lands not covered by oil and gas leases and/or oil and gas interests subject to this Agreement.~~
This AMI shall remain in force and effect for an initial term of five (5) years from the date of this Agreement (the "AMI Initial Term"), at which point the AMI shall terminate as to all lands that are both: 1) located outside the Prospect or Contract Area, or outside of a Future Prospect(s) or Contract Area(s) within the AMI, and 2) not covered by an oil and gas lease or oil and gas interest subject to this Agreement at that time. This AMI shall remain in force and effect beyond the AMI Initial Term as to all respective lands located within the Prospect or Contract Area, or within each Future Prospect(s) or Contract Area(s) within the AMI, for as long as any land located within each such respective area is covered by any oil and gas lease(s) or oil and gas interest(s) subject to this Agreement, and for as long thereafter as any such oil and gas lease(s) and/or oil and gas interest(s) remain in force and effect. The perpetuation of the AMI beyond the AMI Initial Term as to a particular prospect or contract area shall not act to maintain the AMI as to any other prospect or contract area. This AMI shall also remain in force and effect beyond the AMI Initial Term as to all lands located outside of the Prospect and Contract Area, or outside of a Future Prospect(s) or Contract Area(s) within the AMI, that are covered by an oil and gas lease or oil and gas interest subject to this Agreement at the expiration of the AMI Initial Term, and for as long thereafter as any such oil and gas lease(s) or oil and gas interest(s) remain in force and effect.

During the term of this AMI, if any party hereto, including related persons or entities, ("Acquiring Party") directly or indirectly acquires any oil and gas lease or any oil and gas interest covering lands lying within the AMI, the Acquiring Party shall promptly advise the other parties ("Offerees") of such acquisition in writing **in accordance with the following:**

1.  **If the oil and gas lease or interest covers a portion of lands located within the contract area of the Prospect or any single Future Prospect, then the Acquiring Party shall offer the entirety of such lease or interest to the participants within such prospect;**

2.  **If the oil and gas lease or interest does not cover any portion of lands located within the contract areas of the Prospect or any Future Prospect(s), then the Acquiring Party shall offer such lease or interest to the Participants of the Prospect; or**

3.  **If the oil and gas lease or interest covers a portion of lands located within the contract areas of multiple prospects, including the Prospect and/or any Future Prospect(s), then the Acquiring Party shall offer such lease or interest to the participants within all such prospects; and such offer shall be allocated between the multiple prospects based on the ratio of net mineral acres contained within each prospect as compared with the total net mineral acres contained in all such prospects.**

The notice shall include a copy of all instruments of acquisition including, by way of example but not of limitation, copies of the leases, assignments, subleases, farmouts or other contracts affecting the oil and gas lease and/or oil and gas interest. In such event, each Offeree shall have the right to acquire its proportionate interest in such oil and gas lease and/or oil and gas interest in accordance with the other provisions of this AMI.

The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by the Acquiring Party in acquiring such oil and gas lease and/or oil and gas interest ("Acquisition costs"). The Offeree shall have a period of fifteen (15) days after receipt of the notice within which to furnish the Acquiring Party written notice of its election to acquire its proportionate interest in the offered oil and gas lease and/or oil and gas interest. If, however, a well in search of oil or gas is being drilled within the AMI, each Offeree shall have a period of twenty-four (24) hours (excluding Saturdays, Sundays and legal holidays) after delivery of the notice within which to elect to acquire its proportionate interest in the oil and gas lease and/or oil and gas interest so offered. It is provided, however, that the twenty-four (24) hour election period shall not apply unless the Acquiring Party shall give the notice to the Offerees within two (2) days after the date on which the Acquiring Party acquired the oil and gas lease and/or oil and gas interest so offered. In addition thereto, the Acquiring Party shall also:

(a)      furnish the Offerees with the approximate location of the well then being drilled and the name of the operator or drilling contractor drilling the well, and

- 14f -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

(b)     specifically advise the Offerees that the Offerees shall have a period of twenty-four (24) hours within which to elect to acquire an interest in the offered oil and gas lease and/or oil and gas interest.

The above information shall be in addition to the information and copies of instruments provided for above in connection with the usual notices of acquisition of an oil and gas lease and/or oil and gas interest.  If the Acquiring Party does not receive actual written notice of election of an Offeree to acquire its proportionate interest within the fifteen (15) day or twenty-four (24) hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire its interest therein.  An Offeree accepting the offered interest shall be entitled to participate in such oil and gas lease and/or oil and gas interest in the proportion to which its interest bears to the total interest of all parties (including the acquiring party) electing to participate.  Promptly after the time for election expires, the Acquiring Party shall invoice the Offeree electing to acquire an interest for its proportionate part of the Acquisition Cost, as reflected by the invoice.  If the Acquiring Party does not receive the amount due from the Offeree within thirty (30) days after receipt by the Offeree of the invoice for its cost, the Acquiring Party may, at its election, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within five (5) days after receipt of such written notice by the delinquent Offeree shall constitute a withdrawal by the delinquent Offeree of its former election to acquire the interest, and such Offeree shall no longer have the right to acquire an interest in the offered oil and gas lease and/or oil and gas interest.

Any assignment made by the Acquiring Party shall be made free and clear of any liens, encumbrances, overriding royalty interests and other burdens created by or arising under the Acquiring Party but otherwise without warranty of title, either express or implied.  The assignment shall be made and accepted subject to, and each assignee shall expressly assume its portion of all of the obligations of the Acquiring Party.  The assignment shall also be made and accepted subject to this Agreement.

If two (2) or more separate oil and gas leases and/or oil and gas interests are included in the same notice, the Offeree shall have the separate right of election as to each separate oil and gas lease and/or oil and gas interest.

The provisions of this AMI shall not apply to acquisitions as a result of merger, consolidation, reorganization or an acquisition from a parent, subsidiary, or affiliated corporation, or as to individuals, from ascendants or descendants or trusts of which such parties are beneficiaries.  Neither shall it apply to sales and acquisitions between partners in a partnership or venturers in a joint venture, or to any acquisition by any party of an interest which interest prior to and at the time of such acquisition was subject to this Agreement, unless such acquisition was the renewal or extension of a lease which at the date of expiration was subject to this Agreement.

Renewals and extensions of oil and gas lease(s) and/or oil and gas interest(s) shall be subject to Article VIII.B of this Agreement.

X. EXECUTION

This agreement shall be binding upon each Non-Operator that executes this agreement without regard to whether this same instrument, or any copy or counterpart hereof shall be executed by any other Non-Operator.

Y. SOPHISTICATED INVESTORS

By execution of this Agreement, each Non-Operator represents to each other and to Operator: (i) that it has a working knowledge of the oil and gas industry; (ii) that it is a sophisticated investor and has a financial net worth in excess of one million dollars; (iii) that it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of leasehold costs, drilling costs, completion costs, and all other costs incurred in operations under this Agreement; (iv) that it ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES; (v) that its interest hereunder has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the State of Texas, or any other state ("Securities Law"), and that it owns said interest for investment purposes only, and not with a view to or for sale in connection with any distribution thereof within the meaning of Securities Law.

Z. EFFECT OF BANKRUPTCY

If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non- Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators,

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a committee without regard for their interest in the Contract Area based on Exhibit "A."

AA. CUSTODY OF FUNDS

Operator shall hold for the account of Non-Operators any funds of Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to Non-Operators or applied toward the payment of debts, regardless of whether the debts arise out of the same well or operation for which the funds were advanced or from which the sales proceeds were derived. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators. Nothing in this paragraph shall require the maintenance by Operator of separate accounts from the funds of Non-Operators. Operator shall, upon request, refund any advance to Non-Operator that is not used for its intended purpose within six (6) months from the receipt of the advance.

BB. STATUTORY EMPLOYER

Operator shall be considered the statutory employer of all employees of all Contractors, their sub-contractors or agents, whose goods furnished or services rendered for Operator are an integral part of or essential to Operator's ability to perform its operations as an oil and gas operator.

CC. MISCELLANEOUS

Anything to the contrary herein notwithstanding, this Operating Agreement is expressly made subject to the terms and provisions of the leases, contracts and/or agreements described in Exhibit "A" hereof.

- 14h -

### EXHIBIT "A"

Attached to and made a part of that certain Joint Operating Agreement (Swan Prospect) dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Operator, and Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, L.L.C., Tiembo, Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd., R. L. Ray, Ltd., Fant Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain, Non-Operators.

(1)     **Identification of lands subject to this agreement:**

#### Contract Area

All lands, oil and gas leasehold interest and oil and gas interest lying within the following surveys as depicted in the BLACK boundary as shown on the plat designated as Exhibit "A-2".

#### Area of Mutual Interest

All lands, oil and gas leasehold interest and oil and gas interest lying within the following sections as depicted on the BLUE boundary as shown on the plat designated as Exhibit "A-2". Culver shall not be subject to the AMI with respect to those lands located within the green outline on the plat attached hereto as Exhibit "A-2", which areas are further identified as the **"Culver Excluded Areas."**

(2)     **Restrictions, if any, as to depths, formations, or substances:**

There are no restrictions except as may be provided for in any oil and gas lease, oil and gas interest, assignment or contract subject to this Operating Agreement or to which this Operating Agreement is subject.

(3)     **Decimal interest and names and addresses of Parties to this Agreement:**

| Owners | BPPO WI* | APPO WI* |
|---|---|---|
| **Sklarco L.L.C. | .25000000 | .39680000 |
| McCombs Energy, Ltd. | .25000000 | .18750000 |
| **JJS Working Interests LLC | .05000000 | .07820000 |
| James Fleet Howell | .05000000 | .03750000 |
| Kudzu Oil Properties, L.L.C. | .05000000 | .03750000 |
| Tiembo, Ltd. | .02000000 | .01500000 |
| Bundero Investment Company, L.L.C. | .02000000 | .01500000 |
| Bennett Greenspan | .01000000 | .00750000 |
| Fair Oil Ltd. | .11500000 | .08625000 |
| R. L. Ray, Ltd. | .05500000 | .04125000 |
| Fant Energy Limited | .10000000 | .07500000 |
| Lucas Petroleum Group, Inc. | .02000000 | .01500000 |
| Culver & Cain | .01000000 | .00750000 |
| Total: | 1.00000000 | 1.00000000 |

*Before Prospect Payout ("**BPPO**") and After Prospect Payout ("**APPO**") as defined in that Participation Agreement dated effective as of October 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., McCombs Energy, Ltd., JJS Working Interests LLC, James Fleet Howell, Kudzu Oil Properties, LLC., Tiembo. Ltd., Bundero Investment Company, L.L.C., Bennett Greenspan, Fair Oil Ltd, R. L. Ray, Ltd, Fant Energy Limited, Lucas Petroleum Group, Inc., and Culver & Cain.

**Subject to Agreement For Termination Of Agency Services Agreements dated effective as of January 1, 2010, by and between Sklarco L.L.C. et al.

(4)     **Oil and gas leases and/or oil and gas interests subject to this agreement:**

Attached as Exhibit "A-1"

Bundero Investment Company, L.L.C.
Attn: Robert P. Bowman, Manager
333 Texas Street, Ste. 300
Shreveport, LA 71101
Phone: (318) 213-8780
Fax: (318) 213-8784
rbowman@bowmansystems.com

Bennett Greenspan
5207 Braeburn Drive
Bellaire, Texas 77401
Phone: (713) 957-0636
bcg@ftdna.com

Fair Oil Ltd
Attn: John R. Garrett
225 South College
Tyler, Texas 75702
Phone: (903) 510-6517
Fax: (903) 510-6549
Fax: (903) 597-3587
bob.garrett@fairoil.com
production@fairoil.com

R. L. Ray, Ltd.
Attn: John D. Hills
223 South College
Tyler, Texas 75702
Phone: (903) 510-6556
Fax: (903) 510-6554
john.hills@rayltd.com

Fant Energy Limited
Attn: Stephen Swan
5800 Westview Drive
Houston, Texas 77055
Phone: (713) 316-1216
Fax: (713) 316-1473
Email: swan@blackswanrep.com

Lucas Petroleum Group, Inc.
Attn: Fain Brock
327 Congress Avenue, Suite 500
Austin, Texas 78701
Phone: (512) 236-8211
Fax: (512) 457-1068
fbrock@lucaspetroleum.com

Culver & Cain Production LLC
Attn: Matthew R. Culver, Manager
121 S. Broadway, Suite 760
Tyler, Texas 75702
Phone: 903-533-0091
Fax: 903-597-6850
mculver@culverandcain.com



December 24, 2013

Fair Oil, Ltd.
Attn:  Rodney Thomson, Production Manager
P.O. Box 689
Tyler, Texas 75710

RE:  West Tyler 3D Seismic Participation Agreement and Swan Prospect JOA
Smith County, Texas

Dear Mr. Thomson:

I have reviewed your request as to the West Tyler 3D Seismic Participation Agreement ("**PA**") and Swan Prospect JOA.   Please see the attached revisions to the PA, Exhibit "B" to PA, JOA, and Exhibit "A" to JOA.

1.  PA-Section 1.1(b) page 5:  Added language to paragraphs one and two to address the issue of non-participating interest in Future Prospects;
2.  PA-Section 3.1 AMI page 7:  Added language to address the issue of Fair and Ray's mineral/leasehold interest within the AMI;
3.  Exhibit "B" to PA:  Corrected typo from 59.504% to 60.32% APO interest;
4.  JOA-Article VI pg 5 line 52; changed 24 hour period to be exclusive of Saturday, Sunday and legal holidays;
5.  JOA-Article VI pg 8 Line 8: deleted "but not the obligation" and line 10: addresses the issue of sales and we added language to Article VII(f) on page 10 lines 68-70 to address the issue of severance tax;
6.  JOA-Article XV(W) on page 14f:  Added language to first paragraph to address Fair and Ray's mineral/leasehold interest within AMI and revised the second paragraph to address the term of AMI; and
7.  Exhibit "A" to JOA: (3) corrected JJS BPO Interest and (4) added additional contact information to Fair Oil Ltd.

Please review and let me know as soon as possible if all meets your approval.   I will then propose these revisions to the other partners.   If you have any questions, please don't hesitate to give me a call.

Sincerely,

Kim E. Ramsey, CPL
Landman

KER/
Enclosures

*tel:* 318.227.8668 • *fax:* 318.227.9012 • 401 Edwards Street,  Ste 1601 • Shreveport, Louisiana 71101

(5)   **Addresses of parties for notice purposes:**

Sklar Exploration Company L.L.C.
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Phone: (318) 227-8668
Fax: (318) 227-9012
grembert@sklarexploration.com

Sklarco L.L.C.
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Phone: (318) 227-8668
Fax: (318) 227-9012
grembert@sklarexploration.com

McCombs Energy, Ltd.
Attn:  Ricky Haikin, Vice President
5599 San Felipe St., Suite 1200
Houston, TX  77056-2721
Phone: (713) 621-0033
Fax:  (713) 621-1670
rhaikin@mccombsenergy.com

JJS Working Interests LLC
Attn: Justin Simons
4295 San Felipe, Suite 207
Houston, Texas 77027
Phone: (713) 888-0875
Fax:  (866) 406-9550
justin@hbcapllc.com

James Fleet Howell
416 Travis Street, Suite 715
Shreveport, LA  71101
Phone: (318) 221-6382
Fax: (318) 425-0839
fleet@jfhowell.com

Kudzu Oil Properties, LLC
Attn: Mr. Wirt A. Yerger, III
300 Concourse Blvd, Suite 101
Ridgeland, Mississippi 39157
Phone: (601) 987-6576
Fax: (601) 366-1922
kudzu@caviliergrp.com

Tiembo, Ltd.
Attn: Mark Rauch
P.O. Box 270415
Houston, TX 77277-0415
Phone: (713) 627-1700 ext. 109
Fax:  (713) 621-9292
mrauch@standardsouthern.com

Bundero Investment Company, L.L.C.
Attn: Robert P. Bowman, Manager
333 Texas Street, Ste. 300
Shreveport, LA 71101
Phone: (318) 213-8780
Fax: (318) 213-8784
rbowman@bowmansystems.com

Bennett Greenspan
5207 Braeburn Drive
Bellaire, Texas 77401
Phone:  (713) 957-0636
bcg@ftdna.com

Fair Oil Ltd
Attn:  John R. Garrett
225 South College
Tyler, Texas 75702
Phone:  (903) 510-6517
Fax:  (903) 510-6549
Fax:  (903) 597-3587
bob.garrett@fairoil.com
production@fairoil.com

R. L. Ray, Ltd.
Attn:  John D. Hills
223 South College
Tyler, Texas 75702
Phone:  (903) 510-6556
Fax:  (903) 510-6554
john.hills@ravltd.com

Fant Energy Limited
Attn: Stephen Swan
5800 Westview Drive
Houston, Texas 77055
Phone: (713) 316-1216
Fax: (713) 316-1473
Email: swan@blackswanrep.com

Lucas Petroleum Group, Inc.
Attn:  Fain Brock
327 Congress Avenue, Suite 500
Austin, Texas 78701
Phone:  (512) 236-8211
Fax: (512) 457-1068
fbrock@lucaspetroleum.com

Culver & Cain Production LLC
Attn:  Matthew R. Culver, Manager
121 S. Broadway, Suite 760
Tyler, Texas 75702
Phone: 903-533-0091
Fax: 903-597-6850
mculver@culverandcain.com